AO 241 (Rev. 09/17)

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: |
|---|---|

| Name (under which you were convicted): | Docket or Case No.: |
|---|---|

| Place of Confinement : | Prisoner No.: |
|---|---|

| Petitioner (include the name under which you were convicted)    Respondent (authorized person having custody of petitioner)      v. |
|---|

| The Attorney General of the State of: |
|---|

## PETITION

1.    (a) Name and location of court that entered the judgment of conviction you are challenging:

_____

_____

_____

   (b) Criminal docket or case number (if you know): _____

2.    (a) Date of the judgment of conviction (if you know): _____

   (b) Date of sentencing: _____

3.    Length of sentence: _____

4.    In this case, were you convicted on more than one count or of more than one crime?   ❏ Yes   ❏ No

5.    Identify all crimes of which you were convicted and sentenced in this case: _____

_____

_____

_____

_____

_____

6.    (a) What was your plea? (Check one)

|  | (1) | Not guilty |  | (3) | Nolo contendere (no contest) |
|---|---|---|---|---|---|
| ❏ | (2) | Guilty | ❏ | (4) | Insanity plea |

AO 241 (Rev. 09/17)

     (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did

     you plead guilty to and what did you plead not guilty to? _____

_____

_____

_____

_____

_____

     (c) If you went to trial, what kind of trial did you have? (Check one)

            ❐ Jury    ❐ Judge only

7.    Did you testify at a pretrial hearing, trial, or a post-trial hearing?

            ❐ Yes    ❐ No

8.    Did you appeal from the judgment of conviction?

            ❐ Yes    ❐ No

9.    If you did appeal, answer the following:

    (a) Name of court: _____

    (b) Docket or case number (if you know): _____

    (c) Result: _____

    (d) Date of result (if you know): _____

    (e) Citation to the case (if you know): _____

    (f) Grounds raised: _____

_____

_____

_____

_____

_____

_____

    (g) Did you seek further review by a higher state court?    ❐ Yes    ❐ No

        If yes, answer the following:

        (1) Name of court: _____

        (2) Docket or case number (if you know): _____

        (3) Result: _____

_____

AO 241 (Rev. 09/17)

(4) Date of result (if you know): _____

(5) Citation to the case (if you know): _____

(6) Grounds raised: _____

_____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?     ❏  Yes     ❏  No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10.   Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions

concerning this judgment of conviction in any state court?          ❏  Yes          ❏  No

11.   If your answer to Question 10 was "Yes," give the following information:

(a)     (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

❏  Yes     ❏  No

(7) Result: _____

AO 241 (Rev. 09/17)

      (8) Date of result (if you know): _____

(b) If you filed any second petition, application, or motion, give the same information:

      (1) Name of court: _____

      (2) Docket or case number (if you know): _____

      (3) Date of filing (if you know): _____

      (4) Nature of the proceeding: _____

      (5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

      (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

      ❒  Yes    ❒  No

      (7) Result: _____

      (8) Date of result (if you know): _____

(c) If you filed any third petition, application, or motion, give the same information:

      (1) Name of court: _____

      (2) Docket or case number (if you know): _____

      (3) Date of filing (if you know): _____

      (4) Nature of the proceeding: _____

      (5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

❑ Yes     ❑ No

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application,

or motion?

(1) First petition:     ❑ Yes     ❑ No

(2) Second petition:     ❑ Yes     ❑ No

(3) Third petition:     ❑ Yes     ❑ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

12.     For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the facts supporting each ground.  Any legal arguments must be submitted in a separate memorandum.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court.  Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(c)　　**Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?　　❏　Yes　　❏　No

(2) If you did not raise this issue in your direct appeal, explain why:　_____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

❏　Yes　　❏　No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?　　❏　Yes　　❏　No

(4) Did you appeal from the denial of your motion or petition?　　❏　Yes　　❏　No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?　❏　Yes　❏　No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One: _____

_____

_____

**GROUND TWO:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

(c)     **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ❏  Yes     ❏  No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

❏  Yes     ❏  No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

AO 241 (Rev. 09/17)

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?　　　❏　Yes　　❏　No

(4) Did you appeal from the denial of your motion or petition?　　❏　Yes　　❏　No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?　❏　Yes　　❏　No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e)　　**Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two : _____

_____

_____

**GROUND THREE:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c)     **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ❏  Yes     ❏  No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        ❏  Yes     ❏  No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?                         ❏  Yes     ❏  No

(4) Did you appeal from the denial of your motion or petition?                    ❏  Yes     ❏  No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ❏  Yes     ❏  No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

AO 241 (Rev. 09/17)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

(c)    **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ❏  Yes     ❏  No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)    **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

❏  Yes     ❏  No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

AO 241 (Rev. 09/17)

Name and location of the court where the motion or petition was filed:

_____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?            ❏ Yes        ❏ No

(4) Did you appeal from the denial of your motion or petition?       ❏ Yes        ❏ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ❏ Yes   ❏ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

_____

_____

(e)      **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four: _____

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

13.    Please answer these additional questions about the petition you are filing:

    (a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?    ❑  Yes    ❑  No

        If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: _____

_____

_____

_____

    (b)    Is there any ground in this petition that has not been presented in some state or federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

_____

_____

_____

14.    Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?    ❑  Yes    ❑  No

If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy of any court opinion or order, if available. _____

_____

_____

_____

_____

_____

_____

15.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?    ❑  Yes    ❑  No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: _____

_____

(b) At arraignment and plea: _____

_____

(c) At trial: _____

_____

(d) At sentencing: _____

_____

(e) On appeal: _____

_____

(f) In any post-conviction proceeding: _____

_____

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

_____

_____

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? ❏ Yes ❏ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

_____

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? ❏ Yes ❏ No

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in

part that:

    (1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

        (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

        (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

        (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

        (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241 (Rev. 09/17)

(2)  The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: __PLEASE SEE ATTACHED HABEAS__

PETITION.

or any other relief to which petitioner may be entitled.

_/s/ Lori B. Riga_

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _____ (month, date, year).

Executed (signed) on _____ (date).

_Donna M Roberts_

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

**PROPOSITIONS OF LAW, The Ohio Supreme Court, Case No. 2003-1441**

PROPOSITION OF LAW NO. 1: A Waiver Of The Presentation Of Mitigation Evidence In The Penalty Phase Of Trial Is Not Valid Unless The Defendant Is Informed That The Waiver Will Result In The Death Penalty. Such Waiver Is Also Invalid If The Defendant Intends To Present Any Mitigation In Any Form.

PROPOSITION OF LAW NO. 2: The Scope Of A Consent Search Of The Home Of A Defendant Must Be Limited Strictly To The Terms Of The Consent Provided By The Defendant.

PROPOSITION OF LAW NO. 3: A Trial Court's Refusal To Dismiss Biased Jurors From The Panel Deprives A Capital Defendant Her Protections Under The Fifth, Sixth, Eighth And Fourteenth Amendments To The United States Constitution.

PROPOSITION OF LAW NO. 4: Evidence That Does Not Establish The Theft Element Of Au Aggravated Robbery, R.C. §2911.01 And The Corresponding Capital Specification, R.C. §2929.04(A)(7) Is Insufficient To Sustain Guilty Verdicts On These Charges.

PROPOSITION OF LAW NO. 5: A Capital Defendant's Right To Allocution Before Being Sentenced Is Mandatory. Where The Sentencing Court Neglects This Right, The Subsequent Sentence Is Void Or Voidable.

PROPOSITION OF LAW NO. 6: The Trial Court Sentencing Opinion Under R.C. §2929.03(F) Requires Independent Analysis Of The Trial Court In The Weighing The Factors To Determine The Appropriateness Of A Death Sentence. It In Not Proper For The Court To Allow The Prosecutor Of The Case To Draft The Opinion As The Sentence Loses Its Independent Nature Mandated By The Legislature.

PROPOSITION OF LAW NO. 7: Where The Pre-Trial Publicity Is So Pervasive That A Jury Cannot Be Expected To Ignore The Media Attention To The Case, A Trial Court Must Grant A Defense Request For A Change Of Venue To Protect The Integrity Of The Fact-Finding Process.

PROPOSITION OF LAW NO. 8: The Failure To Properly Advise And Ensure That A Capital Defendant Understands The Ramification Of A The Waiver Of Evidence In The Penalty Phase Constitutes Ineffective Assistance Of Counsel.

PROPOSITION OF LAW NO. 9: The Inclusion Of A R.C. §2929.04(A)(7) Specification To A Conviction Of R.C. §2903.0l(A) May Not Sustain A Conviction Of Death When The Element Of Prior Calculation And Design Is Found By The Jury In Both Statutes. The Repeat Finding Of The Same Element Fails To Provide The Narrowing Procedure That Is Required For A Sentencing Scheme To Be Found Constitutional.

PROPOSITION OF LAW NO. 10: Instructing The Jury That Its Penalty Phase Determination Was A Recommendation Is Improper Because It Unfairly Diminishes The Jury's Sense Of Responsibility.

PROPOSITION OF LAW NO. 11: Ohio's Definition Of Reasonable Doubt Is Violative Of The Constitutional As It Allows The Appellant To Be Convicted With Evidence Below The Degree Of Proof Required By The Fifth, Sixth, Eighth And Fourteenth Amendments To The United States Constitution.

PROPOSITION OF LAW NO. 12: The Death Penalty May Not Be Sustained Where The Cumulative Errors That Occurring In In The Trial Deprived The Defendant Of A Fair Consideration Of The Appropriateness Of The Death Penalty.

PROPOSITION OF LAW NO. 13: The Death Penalty Cannot Be Upheld Where The Reviewing Court Fails To Follow The Statutory Provisions Regarding The Proportionality Review Of The Defendant's Sentence.

PROPOSITION OF LAW NO. 14: The Death Penalty Is Unconstitutional As Presently Administered In Ohio.

**GROUNDS FOR RELIEF, Trumbull County Court of Common Pleas,**

**Case No. 01-CR-793**

**First Grounds for Relief:** Petitioner Roberts' s convictions and sentences are void and/or voidable because Petitioner was denied his right to a fair and impartial jury and equal protection because there was an underrepresentation of African Americans in the venire from which his jury was drawn. Racial discrimination in the selection of the members of a petit jury venire constitutes a denial of an impartial jury as guaranteed by the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment.

**Second Grounds for Relief:** Petitioner Roberts' s convictions and sentence are void or voidable because the grand jury that indicted him was drawn from a venire in which African-Americans were disportionately excluded in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Third Grounds for Relief:** Petitioner Roberts' convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel during the trial stage of his capital case. The acts and omissions of trial counsel deprived him of the Sixth Amendment right to effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Strickland v. Washington, 486 U.S. 668 (1984).

**Fourth Grounds for Relief:** The death sentence against Petitioner Roberts is void and/or voidable because the death penalty as administered by lethal injection violates his constitutional right to protection from cruel and unusual punishment as guaranteed by the Eighth Amendment and to due process of law. Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998) (five justices holding that the Due Process Clause protects the life interest at issue in capital cases).

**Fifth Grounds for Relief:** Petitioner Roberts' judgment and sentence are void or voidable because Ohio's post-conviction procedures do not provide an adequate corrective process, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States. The Petitioner understands that the Eleventh District Court of Appeals has previously found that postconviction is an improper venue for challenging the constitutionality of the procedure. However, the Petitioner alleges that even though the state court's have decided the issue, the federal aspect has not been definitively decided in the federal Sixth Circuit Court of Appeals.

**ASSIGNMENTS OF ERROR, Court of Appeals, Eleventh District Appellate Court, Trumbull County, Case No. 05-TR-34**

**First Assignment of Error:** The Trial Court Erred By Failing To Grant Appellant Roberts An Evidentiary Hearing Which Would Allow Her To Establish The Prejudice Of The Errors Which Occurred During Her Capital Trial.

**Second Assignment of Error:** The Appellant Was Denied Her Right To A Fair And Impartial Jury And Equal Protection Because There Was An Under-Representation Of African Americans In The Venire From Which His Jury Was Drawn.

**Third Assignment of Error:** The Appellant's Convictions And Sentence Are Void Or Voidable Because The Grand Jury That Indicted Her Was Drawn From A Venire In Which African-Americans Were Disportionately Excluded In Violation Of The Fifth, Sixth, Eighth And Fourteenth Amendments To The United States Constitution.

**Fourth Assignment of Error:** The Appellant's Was Denied The Effective Assistance Of Counsel During The Culpability Stage Of Her Capital Case.

**Fifth Assignment of Error:** The Death Sentence Against Appellant Roberts Is Void And/Or Voidable Because The Death Penalty As Administered By Lethal Injection Violates Her Constitutional Right To Protection From Cruel And Unusual Punishment As Guaranteed By The Eighth Amendment And Federal Due Process Of Law.

**Sixth Assignment of Error:** Ohio's Post-Conviction Procedures Do Not Provide An Adequate Corrective Process, In Violation Of The Fifth, Sixth, Eighth And Fourteenth Amendments To The United States.

## **GROUNDS FOR RELIEF, Trumbull County Court of Common Pleas,**

## **Case No. 01-CR-793**

**First Grounds for Relief:** Petitioner Roberts' convictions and sentences are void and/or voidable because Petitioner was denied her right to a fair and impartial jury and equal protection because there was an under-representation of African Americans in the venire from which her jury was drawn. Racial discrimination in the selection of the members of a petit jury venire constitutes a denial of an impartial jury as guaranteed by the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment.

**Second Grounds for Relief:** Petitioner Roberts' convictions and sentence are void or voidable because the grand jury that indicted him was drawn from a venire in which African-Americans were disproportionately excluded in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Third Grounds for Relief:** Petitioner Roberts' convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel during the trial stage of her capital case. The acts and omissions of trial counsel deprived her of the Sixth Amendment right to effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Strickland v. Washington, 486 U.S. 668 (1984).

**Fourth Grounds for Relief:** Trial counsel violated Roberts' Sixth Amendment right to effective assistance of counsel at the penalty phase when they failed to make a timely and reasonable investigation of her character, history, and background. Counsel's mitigation presentation was deficient and deprived the jurors of evidence that was worthy of weight and effect. Defense counsel's deficient performance undermines confidence in the outcome of Roberts' sentencing hearing. As a result of trial counsel's ineffectiveness, Roberts' rights guaranteed by the United States Constitution's Fifth, Sixth, Eighth, and Fourteenth Amendments were violated.

**Fifth Grounds for Relief:** Ms. Roberts is not eligible for the death penalty as her full-scale IQ is less than 70.

**Sixth Grounds for Relief:**  Ms. Roberts was not competent to make decisions at her penalty phase hearing. As the result, the decisions made by her and statements made by her were illogical, disjointed and self-defeating. She was unable to assist counsel to represent her in a meaningful fashion. She was unable to address the jury or understand the procedures which resulted in her receiving the death penalty. The conducting of the penalty phase while she was not competent was in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Seventh Grounds for Relief:** The trial court refused to grant an independent evaluation as requested by defense counsel. Defense counsel requested the independent psychologist on December 6, 2006.

**Eighth Grounds for Relief:** Petitioner Roberts' judgment and sentence are void or voidable because Ohio's post-conviction procedures do not provide an adequate corrective process, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States. The Petitioner understands that the Eleventh District Court of Appeals has previously found that postconviction is an improper venue for challenging the constitutionality of the procedure. However, the Petitioner alleges that even though the state courts have decided the issue, the federal aspect has not been definitively decided in the federal Sixth Circuit Court of Appeals.

**Name of court:** The Supreme Court of Ohio

**Docket or case number (if you know):** 2007-2288

**Date of filing:** 8/20/2008

**Nature of proceedings:** Appeal for Post-Conviction Relief denial

**Grounds raised:**

## PROPOSITIONS OF LAW, The Ohio Supreme Court, Case No. 2011-0857

PROPOSITION OF LAW NO. 1: Where A Capital Sentence Is Remanded For A New Sentencing, The Trial Court Must Consider And Give Effect To All Relevant Evidence In Mitigation Available For Consideration. A Remand To Allow Allocution Does Not Prevent The Sentencing Court From Considering Evidence Which Would Support And Provide Weight To The Allocution.

PROPOSITION OF LAW NO. 2: When Considering The Appropriate Sentence In A Capital Trial, R.C. 2929.03(F) And The Federal Constitution Require That The Sentencing Judge Must Consider And Give Effect To All Presented Evidence In Mitigation.

PROPOSITION OF LAW NO. 3: In A Capital Case, The Sentencing Court May Not Consider Non-Statutory Aggravating Factors In The Determination Of The Appropriate Sentence.

PROPOSITION OF LAW NO. 4: In A Capital Trial, Where The Death Sentence Is Reversed For Improper Conduct By The Sentencing Judge, That Judge Must Recuse Himself From The Resentencing Hearing Where An Ethical Investigation By The Reviewing Court Is Pending At The Time Of The Hearing.

PROPOSITION OF LAW NO. 5: The Failure To Fully Investigate And Present All Possible Evidence Of Mitigation In A Capital Trial Constitutes Ineffective Assistance Of Penalty Phase Counsel Where The Investigation Would Have Revealed Substantial Evidence Calling For A Sentence Of Less Than Death.

PROPOSITION OF LAW NO. 6: The Trial Court May Not Conduct A Penalty Phase Hearing For A Death-Eligible Defendant Where The Record Does Not Establish By A Preponderance Of The Evidence That The Defendant Is Legally Competent.

PROPOSITION OF LAW NO. 7: A Sentence Of Death May Not Stand Where The Review Of The Evidence Establishes That The Aggravating Factors Do Not Outweigh The Mitigation Presented Beyond A Reasonable Doubt.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** Yes

**Result:** Vacated and remanded to the trial court for resentencing on the basis of the existing record.

**Date of result (if you know):** 10/22/2013

**Name of court:** The Supreme Court of Ohio

**Docket or case number (if you know):** 2014-0989

**Date of filing:** 3/23/2015

**Nature of proceedings:** Appeal for Post-Conviction Relief denial

**Grounds raised:**

### PROPOSITIONS OF LAW, The Ohio Supreme Court, Case No. 2014-0989

PROPOSITION OF LAW NO. 1: Where A Capital Sentence Is Remanded For A New Sentencing Hearing Because Of The Trial Court Failure To Consider And Give Effect To The Defendant's Allocution, A Sentence Of Death Is Precluded If A Different Judge Conducts The Hearing Without Allowing The Defendant To Speak Because Proper Weighing Is Impossible Without Ever Having Heard The Defendant Speak.

PROPOSITION OF LAW NO. 2: When Considering The Appropriate Sentence In A Capital Trial, The Sentencing Judge Must Consider And Give Effect To All Presented Evidence In Mitigation. This Process Requires The Independent Weighing Of The Available Evidence In Mitigation Separately From The Weight Assessed To The Proven Capital Specifications. It Is Not Required That The Mitigation "Draw Attention" From The Proven Aggravating Factors Before Weight Is Assessed.

PROPOSITION OF LAW NO. 3: In A Capital Case, The Sentencing Court May Not Use Its Findings Of The Nature And Circumstances Of A The Case To Negate The Presence Of Available Factors In Mitigation.

PROPOSITION OF LAW NO. 4: On Remand For A New Sentencing Procedure Requiring A Judge Who Has Not Had The Benefit Of Hearing The Trial, Penalty Phase Or Allocution Phases Of Trial To Write A R.C. §2929.03(F) Opinion, The Trial Court Must Conduct A De Novo Penalty Phase Hearing.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** Yes

**Result:** Affirmed

**Date of result (if you know):** 05/30/2017

**Name of court:** Trumbull County, Eleventh District Court of Appeals

**Docket or case number (if you know):** 2019-TR-00089

**Date of filing:** 12/18/2019

**Nature of proceedings:** Appeal for Post-Conviction Relief denial

**Grounds raised:**

### ASSISGNMENT OF ERROR, Eleventh Judicial District Court of Appeals, Case No. 2019 TR 89

FIRST ASSIGNMENT OF ERROR: Petitioner Roberts' Convictions And Sentences Are Void And/Or Voidable Because Petitioner Was Denied The Effective Assistance Of Counsel During The Trial Do First State Of Her Capital Trial.

SECOND ASSISNGMENT OF ERROR: If The Affidavits Provided In A Petitioner's Motion To Vacate Filed Pursuant To R.C.§2953.21 Established A Meritorious Issue, May Trial Court Dismiss The Petition Without An Evidentiary Hearing.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** No

**Result:** Affirmed

**Date of result (if you know):** 08/24/2020

**Name of court:** The Supreme Court of Ohio

**Docket or case number (if you know):** 2020-1220

**Date of filing:** 10/08/202

**Nature of proceedings:** Appeal for Post-Conviction Relief denial

**Grounds raised:**

### PROPOSITION OF LAW, The Supreme Court of Ohio, Case No. 2020-1220

PROPOSITION OF LAW I: In The First Phase Of A Capital Trial, Trial Counsel Renders Ineffective Assistance Of Counsel If They Fail To Introduce The Tape Recording Of The Co-Defendant In Which That Co-Defendant Claims He Shot The Victim In Self-Defense And Precludes The Involvement Of The Petitioner Altogether.

PROPOSITION OF LAW II: In A Capital Case, If The Affidavits Provided In A Petitioner's Motion To Vacate Filed Pursuant To R.C.§2953.21 Established A Meritorious Issue, Trial Court May Not Dismiss The Petition Without An Evidentiary Hearing.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** No

**Result:** Jurisdiction Denied.

**Date of result (if you know):** 12/29/2020

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **DONNA ROBERTS,** | ) | **Case No. 4:21 CV 368** |
| | ) | |
| **Petitioner,** | ) | **Judge:  DAN AARON POLSTER** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TERI BALDUAF, WARDEN,** | ) | **CAPITAL HABEAS CASE** |
| | ) | |
| **Respondent.** | ) | |

## PETITION FOR WRIT OF HABEAS CORPUS BY DONNA ROBERTS

## <u>INTRODUCTION</u>

1.       Will the real Donna Roberts please stand up? That was a statement utilized throughout Petitioner Donna Roberts's trial. Poignantly, Ms. Roberts herself uttered those words when she made an unsworn statement to the jury in the penalty phase of her trial. One would assume, after the many rounds of sentencing and appeal, the jury, the trial judge or the Ohio Supreme Court would have had a clear picture of the real Donna Roberts. Yet despite the time the Ohio court system devoted to Ms. Roberts's case, it refused to truly consider her.

2.       During trial, the prosecution depicted Ms. Roberts as a scheming "dirty old lady" who preferred the company of her Black paramours to that of her husband. The prosecution also supplied the motive for the murder: money and greed. They painted Ms. Roberts in a dark light, leaving the jury, the media, and the appellate courts with the impression of a sinister woman plotting the murder of her husband for insurance proceeds.

3.       Even foregoing the factual inaccuracies of the motive and method of the homicide, Ms. Roberts's actual life could not have been more contrary to the femme noir story the prosecution

created during her trial. Born and raised in a rural area outside of Youngstown, Ohio, Ms. Roberts's childhood was not nearly as bucolic as her surroundings. At a young age she became the victim of sexual abuse when her own cousin raped her. She witnessed her father's daily physical violence against her mother. Despite these traumatic childhood events, Ms. Roberts grew into adulthood a generous, kind spirit going to great lengths to assist others. Perhaps as a result of childhood trauma, Ms. Roberts's mental health declined as she aged into adulthood.

4.      While the procedural history of her case is lengthy, no factfinder or sentencer ever knew the Real Donna Roberts. Neither the jury nor the Ohio courts considered how Ms. Roberts's diagnosed mental illnesses impacted her decision-making in both her involvement in the offense and the events that led up to it. No court considered or would allow a psychologist to expound upon what prison records clearly demonstrate—Ms. Roberts has suffered from Bipolar Disorder, Depression and, at times, hallucinations for her entire adult life. Ms. Roberts suffered head injuries in three automobile accidents that affected her cognitive ability. No factfinder considered her psychiatric hospitalization or a Social Security Administration's determination that her mental illnesses and cognitive impairments were severe enough to qualify for disability payments in the years prior to the homicide.

5.      Neither the jury nor the Ohio courts considered Ms. Roberts's incredible generosity. After attaining financial security by working for a plastic surgeon, Ms. Roberts provided financial assistance to her adult son and younger sister. Upon her conversion to Judaism, she performed one of the highest good deeds of that religion: the washing of the dead for burial. She assisted in reconstructive surgery for disfigured Israeli soldiers. She procured funds to save an Ethiopian Jew from persecution in his homeland, ensuring his safe passage to Israel.

6.      All of these acts comprised the person of Donna Roberts. Yet given more than typical

2

opportunity to consider the whole person, the Ohio courts eschewed it. In violation of United States

Supreme Court precedent, no factfinder would consider her. If the ultimate punishment is meant

to be imposed on only the most heinous offender, the Ohio court system malfunctioned here. It is

now incumbent upon this Court to consider for the first time the Real Donna Roberts. After doing

so, it can come to but one conclusion: federal habeas relief is warranted.

## STATEMENT OF FACTS

### A.     The Trial

7.       The state charged Petitioner Donna Roberts with conspiring with a prison inmate to kill

her roommate/ex-husband. According to the state, Ms. Roberts and the prison inmate, Nathaniel

Jackson, were pen-pals while he was serving time in a state penal institution. At some point during

their correspondence and phone conversations, the two spoke about the homicide of Ms. Roberts's

roommate/ex-husband, Robert Fingerhut. Shortly after Jackson was released from prison, the two

allegedly orchestrated the homicide at a time during which Ms. Roberts could establish an alibi for

herself shopping and eating outside of her home, where the offense transpired.

8.       The defense did not contest Jackson was the killer. Rather, the defense argued Ms. Roberts

did not act in complicity with him. While their correspondence admittedly was suggestive of a

plot, the defense argued there was insufficient evidence to establish that Ms. Roberts acted in

complicity with Jackson. During trial, the State adduced evidence of the following facts.

9.       On December 11, 2001, a notably shaken Donna Roberts made a call to 911 at 11:00 p.m.

(Trial Tr., Vol. XXIV at 5138.) Howland Township police officer Albert Ray was dispatched to

the home of Ms. Roberts to investigate a purported homicide. He arrived to find Ms. Roberts

visibly distraught outside her home.[1] (Trial Tr., Vol. XXIV at 5156.) Officer Ray found the

---

[1] During trial and on direct appeal, the courts utilized patently misogynistic descriptions of Ms.
Roberts's behavior as "hysterical," and depicted distressed reactions as "screaming hysterically."

decedent, Robert Fingerhut, laying in the entrance to the home from the garage. A gun was located by the body on a step in the garage. (Id. at 5165.)

10.     The coroner reported Fingerhut died from multiple gunshot wounds. One of the shots entered his brain, causing the death. (Trial Tr., Vol. XXVI at 5596.) The time of death was estimated from as little as two hours to as many as six hours prior to the 1:00 a.m. autopsy, performed on December 12, 2001. (Id. at 5603.)

11.     Sergeant Frank Dillon arrived on the scene to investigate the homicide. Upon checking the weapon, Sgt. Dillon discovered that all five chambers held a bullet. (Id. at 5615.) A search of the body revealed that money remained in the wallet and pants pocket of the decedent. (Id. at 5629.) Sgt. Dillon also noted that Fingerhut's car was not in the garage. (Id. at 5631.) Police later recovered the vehicle in a location not far from Jackson's residence. (Id. at 5654.)

12.     Sgt. Dillon testified he first became suspicious of Ms. Roberts when he noticed she seemed to cry only when the officers checked on her condition but was silent when the officers talked amongst themselves. He believed Ms. Roberts was attempting to overhear their conversations. (Id. at 5640.) When police questioned her, Ms. Roberts informed them she was not at home at the time of Fingerhut's death. She described her day for the officers. (Id. at 5649-5650.) She indicated that she was at the local Greyhound station, two of which she and Fingerhut operated, until 5:30 p.m. (Trial Tr., Vol. XXVII, at 5868-5871.) Ms. Roberts did not arrive home until shortly before midnight when she discovered the decedent. (Id. at 5872.)

13.     Police eventually linked the homicide to Jackson when they found letters between Jackson and Ms. Roberts in the bedroom and the trunk of her car. (Trial Tr., Vol. XXVII at 5886, 5897.)

_____

See, e.g., State v. Roberts, 850 N.E.2d 1168, 1173 (Ohio 2006). Ms. Roberts omits these misogynistic tropes in her factual recitation of this case.

4

The officers thereafter called the Lorain Correctional Institution, where Jackson had been incarcerated to obtain copies of 18 phone calls between Ms. Roberts and Jackson. (Trial Tr., Vol. XXIV at 5147.)

14.     Jeff Diamantes, an employee at the Days Inn Hotel in Boardman, Ohio also testified at trial he had rented a room to Ms. Roberts on December 11, 2001. He identified her because she had shown him photo identification. (Trial Tr., Vol. XXV at 5377, 5386.) Blood stains were found throughout the room as were Jackson's fingerprints. (Trial Tr., Vol. XXVII at 5843.)

15.     Trial counsel provided the jury with neither an opening nor a closing statement. Ms. Roberts exercised her Fifth Amendment right and did not testify. The jury convicted Ms. Roberts of all counts charged in the indictment.

### B.     The Penalty Phase

16.     After her convictions, Ms. Roberts indicated to the trial court she did not wish to present any mitigating evidence. (Trial Tr., Vol. XXVIII at 6222.) She also informed the court of her wish to make an unsworn statement. (Id.) Even though they had obtained evidence of a psychiatric hospitalization and head injuries from three motor vehicle accidents, one of Ms. Roberts's trial counsel appallingly conceded her competency to waive the presentation of mitigating evidence, exclaiming: "I'll state on the record that it is my personal and professional opinion that Donna's decision making process was rational and that she's competent to make the decision. . .. My own perspective is that this is a rational competent decision on her part." (Id. at 6225.) Ms. Roberts's other attorney echoed that sentiment.

17.     After the trial judge made an additional "personal" observation that Ms. Roberts appeared "less emotional" and more "relaxed" upon deciding to forego the presentation of mitigation evidence, it inquired of Dr. Thomas Eberle, the psychologist tasked with evaluating her

competency to waive the presentation of mitigation. (Trial Tr., Vol. XXVIII at 6228.) Despite his failure to conduct any formal testing and only "speaking with her for a few hours this morning," Dr. Eberle concluded Ms. Roberts was competent to waive the presentation of mitigating evidence. (Id. at 6231.) Upon informing Ms. Roberts that the jury would have little to consider in favor of mitigation and her chances of receiving a death sentence were high, Ms. Roberts responded, "That is what I hope for." (Id. at 6232.) Ignoring this bizarre retort, the trial court found Ms. Roberts's waiver of the presentation of mitigating evidence was knowing, voluntary and intelligent. (Id. at 6234.)

18.     Ms. Roberts thereafter requested assurance that she would be permitted to make an unsworn statement ("Just as long as I get to make a statement tomorrow. I do get to make a statement tomorrow?"). (Id. at 6235.) After assuring her she would be so permitted, the trial court adjourned the competency hearing.

19.     Ms. Roberts's unsworn statement served more to demonstrate and underscore her mental illnesses than provide the jury with anything of mitigatory value. In fact, she began by informing the jury that neither she nor her attorneys would be presenting any mitigating evidence. (Id. at 6254-6255.) Instead, Ms. Roberts revealed she had two purposes for speaking. First, she wanted to elucidate the inaccuracies and untruths told at trial. Second, she requested the jury sentence her to death because she wanted to obtain "racial equality in a Courtroom." (Id. at 6255.)

20.     Ms. Roberts called out the misogyny in the media. While the media referred to Fingerhut as "a Youngstown businessman," Ms. Roberts was referenced merely as his "live-in companion." (Trial Tr., Vol. XXVIII at 6259.) She informed the jury she had been a businesswoman for 40 years. Dispelling the prosecution's accusation that Ms. Roberts was dependent on Fingerhut for money, Ms. Roberts clarified for the jury that she had worked hard all her life to obtain financial

6

independence. (Id.)

21.     Ms. Roberts exposed the prosecution's ploy to prejudice the jury against her. After noting the many instances in which the prosecution referred to Jackson's race, she observed that the prosecution was careful to point out Ms. Roberts was Jewish, to further prejudice the Trumbull County jury against her. When referring to the religious vows she and Fingerhut took, Ms. Roberts observed of the prosecutor:

> [H]e had to go one step further. He had to say 'what religion[?],' because he knew the answer and I know none of you forgot it. "She's Jewish." Who do people hate more than black people? Jews. You went in that room, thinking, black and Jews. I know it. You know it. We all know it, because that is the way it is in this world today. Black and Jewish.

(Id. at 6263.)

22.     Ms. Roberts also took issue with the State's alleged motive for the homicide, that she was aware and desirous of the insurance money the decedent had procured with her as the beneficiary. She informed the jury she had made a good salary and was not in need of Fingerhut's money. (Id. at 6267.) She observed the disparity in the State's depiction of her in Jackson's trial ("She had everything") with how the prosecution tried to portray her in her trial: a woman desperate enough for money to conspire to have her ex-husband/roommate murdered for the insurance proceeds. (Id.). She was incredulous that the jury accepted the State's version of the facts. She lamented, "I thought the verdict was going to be not guilty." (Id. at 6269.) She expressed her dismay at the manner in which the prosecution characterized her as a "dirty old lady." (Id. at 6283.) She informed the jury of the inaccuracies in the State's witness testimony, noting that "anything they couldn't explain, they made up." (Id. at 6286.)

23.     Finally, Ms. Roberts asked the jury to return a death penalty verdict. After noting Ohio's law required this sentence upon her failure to provide the jury with mitigating evidence, she

explained why she wanted that sentence: "There's only one difference between me and Nathaniel Jackson. I'm white. He's black. That is it." (Trial Tr., Vol. XXVIII at 6296.) Because Jackson had been tried and sentenced to death, Ms. Roberts stated, she too should receive the death penalty to bring truth to the notion that "all men are created equal." (Id. at 6297.) After recapping for the jury that she was in no way admitting her guilt of the crime, she nonetheless asked them to sentence her to death.

24.  The jury complied and thereafter returned a death verdict.

### C.  First Sentencing Hearing

25.  The trial court held a sentencing hearing on June 20, 2003. After recounting the trial and evidence adduced therein, the judge declared he gave "very slight weight" in mitigation to references in Ms. Roberts's letters to Jackson that she had been abused as a child. (Id. at 6358.) The trial court reviewed the evidence supporting the aggravating factors and thereafter announced the acceptance of the jury's death recommendation.

26.  It is at this point the sentencing hearing turned an odd corner. Defense counsel had observed the trial judge and the prosecutor appeared to be reading from the same document ("As you read that [sentencing] decision, [the prosecutor] sat at the Prosecution table and reviewed a document as if he was reading along. Every time you turned the page, [the prosecutor] turned the page.") (Id. at 6365.) The trial court then revealed the prosecutor had, in fact, written the sentencing opinion at the court's direction, without informing defense counsel. The judge conceded he "gave [to the prosecution] notes saying this is what I want. This, this and this, and they sent it back. I read it over, made some corrections, went back from there." (Trial Tr., Vol. XXVIII at 6371-72.) Unsurprisingly, defense counsel objected strenuously.

27.  After accepting a statement from Ms. Roberts about why she asked the jury to impose the

death penalty, the trial judge sentenced Ms. Roberts to death. (Id. at 6379.)

28.    On appeal, the Ohio Supreme Court affirmed Ms. Roberts's conviction for aggravated

murder and other charges but reversed the death sentence because of "the trial judge's ex parte use

of the prosecutor in directly preparing the court's sentencing opinion." *State v. Roberts*, 850 N.E.2d

1168, 1171 (Ohio 2006).[2] In addressing Ms. Roberts's claim on appeal that the trial court never

afforded her the right to allocute before sentencing her, the Ohio Supreme Court observed that,

because it had vacated her sentence, the claim was now moot. It instructed, "The trial court shall

provide Roberts with her right of allocution before imposing any new sentence." *Id.* at 1190.

### D.    First Remand For Resentencing

29.    On remand, Ms. Roberts procured new counsel (hereinafter "resentencing counsel.").

Resentencing counsel moved the trial court for release of records and for funds to obtain an expert

psychologist, neuropsychologist and psychiatrist to present for mitigation in the resentencing. The

court denied the motions, finding it did not have the jurisdiction to grant them. It determined the

case had been remanded from the Ohio Supreme Court "with one narrow issue involved and that

is for me to do another independent review of the mitigating aggravating factors and to type my

findings to resubmit into this case. There is no instruction from the Supreme Court as to anything

other than that that I read." (Resentencing Proceedings Transcripts, hereinafter "Resent. Tr." at 8.)

30.    The trial court did appoint Dr. Thomas Gazley from the Forensic Diagnostic Center to

determine whether Ms. Roberts was competent to be resentenced. Prison records from the Ohio

Department of Rehabilitation and Corrections revealed that, in the time between her initial

---

[2] Both the trial judge and the prosecutor were disciplined for their conduct in Ms. Roberts's sentencing as well as that of co-defendant Jackson. After she was resentenced to death, the Ohio Supreme Court found the judge and prosecutor violated ethical rules in Ms. Roberts's case and publicly reprimanded them. *Disciplinary Counsel v. Stuard, Judge & Becker*, 901 N.E.2d 788 (Ohio 2009).

sentence and resentencing hearing, the prison had diagnosed Ms. Roberts with Bipolar Disorder. (Petition to Vacate or Set Aside Sentence Pursuant to Ohio Revised Code § 2953.21, Aug. 20, 2008, hereinafter "2008 PCR Petition," Ex. K.) She also had suffered a delusional episode while in prison, for which she required additional psychotropic medication. (Id. at Rep. dated 3/16/2006.) The trial court denied defense counsel's request for funds to procure independent psychological experts. (Resent. Tr. at 15-16.)

31.     At the competency hearing, Dr. Gazley stated Ms. Roberts was competent to be resentenced. Resentencing counsel cross-examined him. He queried whether Dr. Gazley was aware of the functions of a neuropsychologist if he suspects a patient has brain damage. (Id. at 26.) Resentencing counsel further questioned whether Dr. Gazley had reviewed prison records indicating Ms. Roberts could have a diagnosis of post-traumatic stress disorder based on childhood abuse or the period of Ms. Roberts's hallucinations. Dr. Gazley responded he did not "recall [the prison] saying she had gone through periods of hallucinations specifically," but did note the prison had observed significant depression. (Id. at 29.)

32.     Resentencing counsel questioned whether Dr. Gazley was aware of Ms. Roberts's mental health diagnoses prior to her incarceration. He noted that he had just received records from the Social Security Administration, in which Ms. Roberts applied for and received SSI benefits for a "mental handicap." (Id. at 34, Defense Ex. A.) Dr. Gazley admitted he was not aware of these records, but even if he had been, he claimed it would not have changed his opinion. After asserting that Ms. Roberts's possible brain injury from automobile accidents also would not change his findings, the cross-examination concluded.

33.     After Dr. Gazley's testimony, resentencing counsel moved for the admission of the SSI records into the court record. Counsel also filed a motion to introduce into the record evidence it

10

would have presented in mitigation had the trial court permitted it, which contained, among other things, Ms. Roberts's prison records. (Resent. Tr. at 41.) In denying defense counsel's motions to admit mitigating evidence into the record, the trial court stated emphatically: "The only thing I am concerned with or should be concerned with is the present competency." (Id. at 44.) While it noted for the record resentencing counsel's motion for appointment of an independent expert and for a continuance, the trial court denied both motions. It declared, "The Court's reason for overruling [the motion for an independent expert] is that, that is for another court and another day. . .. The question before this Court is only the competency presently of the Defendant to understand this resentencing." It determined the issue of whether to admit mitigating evidence was an "Appellate question []" which was "not before this Court, nor relevant to the issue at hand in my mind." (Id. 45.) With that statement, the trial court ended the matter.

34.     The trial court thereafter permitted Ms. Roberts to make a statement. The information Ms. Roberts imparted to the trial court was in stark contrast to what the jury knew of her and her life. Ms. Roberts first explained about her upbringing on a farm in Austintown, Ohio. She told of a rape she endured at an early age by an older cousin. (Resent. Tr. at 46.) She recalled her father would physically and emotionally abuse her mother and how frightened she felt witnessing this abuse as a child. (Id. at 47.) She recalled marrying her high school sweetheart, the father of her son, and moving to Florida with him.

35.     Ms. Roberts recounted she had been involved in three automobile accidents in 1963, 1983 and 1999, each involving head injuries. After her final accident, Ms. Roberts stated her cognitive abilities were impaired for several months. She was in pain and depressed. It was at that low moment that she first attempted to take her own life through carbon monoxide poisoning with her dog in the car of her garage. (Resent. Tr. at 51.) When her dog licked and pawed at her, she

11

suddenly realized the impact of what she was doing and called 911. (Id.) Ms. Roberts was then

hospitalized in a psychiatric ward. While there, she was prescribed Risperdal because she had been

hearing voices. (Id. at 52.) Ms. Roberts revealed that she stopped taking the Risperdal once she

arrived at Marysville because "everybody knows everybody's business and I didn't want them

making fun of me." (Id.) She relayed to the court her hallucination of seeing ant hills in her cell

when none was actually present.[3] Several months after her 1999 accident, Ms. Roberts applied for

and received Social Security disability benefits for her mental impairments.

36.     During the 1980s, Ms. Roberts revealed to the court, two significant changes occurred in

her life. First, Ms. Roberts began working for Dr. Morton Freiman, a plastic surgeon for whom

she would work for 23 years. This position altered her financial status and she attained financial

security and comfort. She married her second husband during this time. Ms. Roberts also described

another great change that occurred during this time:

> There came a time in 1980 that I felt very strongly about God, and one God, and I
> converted to Judaism. The first thing I was able to do was join the Chevre Kadisha,
> and that is the burial society. You have to be in a state of grace to work for them
> and we [would] get called in the out in the middle of the night, very strict about
> burial, you can't wait, and we would wash them, wash the bodies, and we would
> talk to them in case they were still around, and we would tell them not to be
> embarrassed and that God loved them and they were about to go and meet God, and
> we dressed them in a shroud. . . .

(Id. at 56.)

37.     Ms. Roberts recounted other acts of her generosity, once assisting a Jewish man from

Ethiopia escape persecution and flee to Israel. She went from "Temple to Temple," describing the

man's feared fate and secured sufficient funds to ensure his safe passage. She volunteered with the

plastic surgeon for whom she worked, assisting him in applying skin grafts in reconstructive

---

[3] ODRC personnel documented this incident in prison records. (2008 PCR Petition, Ex. K.)

surgery on Israeli and even enemy soldiers who had been injured and disfigured during deployment. (Resent. Tr. at 57.)

38.    Aside from her acts of loving kindness, Ms. Roberts recounted her financial generosity, taking issue with the Ohio Supreme Court's portrayal of her as a "money grubber," who killed her husband for insurance proceeds. (Id at 60.) She informed the trial court it was exactly the opposite: Fingerhut used her money to settle his second divorce. Ms. Roberts and Fingerhut divorced only to preserve her assets from his divorce settlement. In recounting her generosity, Ms. Roberts told of her wiring $10,000 to her son upon his mere expression of financial need. She described how she financially assisted her sister, putting her through school and providing employment for her at Dr. Freiman's office.

39.    Ms. Roberts finished her statement by informing the trial judge that, throughout her life, she had excelled at creative writing. She explained, "in those letters and conversations with Nate [Jackson], this is all they were, stories. I never initiated any talk of hurting anyone in the tapes or the letters. But it was my imagination, and I answered, and I wrote what he told me to write, and I'm not a bad person, Your Honor." (Id. at 64.)

40.    Despite responding, "I never thought for a moment that you are a bad person," the trial court resented Ms. Roberts to death on October 29, 2007. (Id.)

41.    After Ms. Robert's statement, resentencing counsel proffered for the record additional mitigating evidence it would have presented had the court allowed it. This evidence consisted of affidavits from family members. In lieu of the testimony the trial court should have accepted, defense counsel proffered into the record an affidavit from Ms. Roberts's sister and son. Resentencing counsel closed the hearing by expressing his frustration at the process. He stated his belief that Ms. Roberts's decisions to forego the presentation of mitigating evidence was based on

13

suspected traumatic brain injury and mental illness. He urged the court to consider that the death

penalty should be reserved for the "worst of the worst," and that Ms. Roberts was not in that

category. (Resent. Tr. at 68-69.)

42.    The trial court expressed for a final time the limitations it was placing on what it would

consider for sentencing:

> Some of what you have presented may in some way be an explanation of
> how the entire case went before, but I do not feel I have the luxury of taking
> that into account at this point because as I have told you many times and
> you are well aware, I have approached this within the directions given to
> me by the Supreme Court when this was sent back on the very narrow
> portion of the case.

(Id. at 70.) It thereafter sentenced Donna Roberts to death for a second time.

43.    On direct appeal to the Ohio Supreme Court, the case was again reversed and remanded

for resentencing. The Ohio Supreme Court found the trial court had not considered Ms. Roberts's

allocution in its sentencing decision. Because the trial court did not make any reference to Ms.

Roberts's allocution or consider its effect on the sentence in the court's sentencing opinion, the

Ohio Supreme Court concluded "that the particular circumstances of this case warrant the

inference that the trial judge did, in fact, fail to consider Roberts's allocution in sentencing her to

death." *State v. Roberts*, 998 N.E.2d 1100, 1111 (Ohio 2013).

### E.    Second Remand For Resentencing

44.    By the time of the second remand, the initial trial judge who had overseen the trial and the

first and second sentencings had passed away. Like the initial trial judge, the second trial judge

refused to hear any new evidence in mitigation and considered only what was presented to the jury

at the penalty phase of trial. *State v. Roberts*, No. 2001CR00793 ("Nunc Pro Tunc Findings of Fact

and Conclusions of Law Regarding Imposition of the Death Penalty," Opinion of the Court,

Trumbull Court of Common Pleas June 10, 2014). Following the unconstitutional refusal of the

14

Ohio Supreme Court to permit Ms. Roberts to update her mitigation evidence, the trial court expressly held it "did not permit Roberts to update her mitigation at the hearing following the recent remand." (Id. at Page 2.) For the third time the Trumbull County Court of Common Pleas sentenced Ms. Roberts to death. This time, the Ohio Supreme Court affirmed her sentence. *State v. Roberts*, 78 N.E.2d 851 (Ohio 2017).

45.     Ms. Roberts petitioned for post-conviction relief, presenting all the evidence in that proceeding that was presented, but was denied consideration, during the resentencings. No post-conviction court would consider that evidence. The Ohio Supreme Court denied Ms. Roberts jurisdiction to present her post-conviction appeal on December 29, 2020. *State v. Roberts*, 159 N.E.2d 1158 (Table) (Ohio 2020).

46.     Additional facts will be included as they pertain to the specific claims for relief raised below.

## PROCEDURAL HISTORY

### A.     The Indictment And Trial

47.     On December 20, 2001, Petitioner Donna Roberts was indicted in Trumbull County Court of Common Pleas on a four-count indictment surrounding the death of her ex-husband, Robert Fingerhut.  The indictment charged Ms. Roberts with one count of the purposeful killing of Mr. Fingerhut with prior calculation and design in violation of Ohio Revised Code §2903.0l(A) and one count of felony murder in violation of Ohio Revised Code §2903.0l (B). Both capital murder counts included two capital specifications addressing violations of Ohio Revised Code §2929.04(A)(7). The first specification alleged the murder occurred during the commission of an Aggravated Burglary, in violation of Ohio Revised Code §2911.11. The second specification alleged that the murder occurred during the commission of an Aggravated Robbery, in violation of Ohio Revised Code §2911.01.

15

48.     The third and fourth counts charged the felonies underlying the capital specifications, i.e.,

Aggravated Burglary, Ohio Rev. Code. §2911.11 and Aggravated Robbery, Ohio Rev. Code

§2911.01. Each count of the indictment included a firearm specification pursuant to Ohio Revised

Code §2929.141. The charges indicated Ms. Roberts was not the principal offender, but rather she

acted in complicity with the principal, and co-defendant, Nathaniel Jackson. Mr. Jackson was tried

separately as he also was capitally indicted. Ms. Roberts pleaded not guilty to all counts of the

indictment at her arraignment on December 31, 2001.

49.     Ms. Roberts retained her own trial counsel, Gerald Ingram and John Juhasz.

50.     On February 26, 2003, the trial court conducted a hearing on the defense motion to suppress

items taken from Ms. Roberts's home the night of the homicide. The trial court denied the motion.

(Trial Tr., Vol. I at 154-291.)

51.     Jury selection began on April 8, 2003, with the jury finally empaneled on May 12, 2003.

The trial commenced on Tuesday, May 13, 2003.  (Trial Tr., Vol. XXIII.) The jury found Ms.

Roberts guilty of all counts including the capital and firearm specifications on May 29, 2003.

52.     On June 3, 2003, Ms. Roberts indicated to the court that she wanted to waive the

presentation of mitigation at the penalty hearing, except for her right to make an unsworn

statement. The trial court conducted a hearing to determine her competency. The court found she

was competent under the Ohio competency standard expressed in *State v. Ashworth*, 706 N.E.2d

1231 (Ohio 1999). (Trial Tr., Vol. XXVII at 6234.)

53.     Prior to the start of the penalty phase, the prosecutor elected to dismiss Count Two,

Ohio Rev. Code §2903.0l(B) (felony-murder) and proceeded with Count One, Ohio Rev.

Code §2903.01(A) (prior calculation and design). The hearing began on June 4, 2003. At the

direction of Ms. Roberts, defense counsel waived opening and closing argument. Ms. Roberts provided an unsworn statement. That same day, the jury recommended a sentence of death

54.    On June 20, 2003, the trial court accepted the jury's recommendation and formally sentenced Ms. Roberts to death. The court also sentenced her to serve ten years' imprisonment for both the convictions of Aggravated Robbery and Aggravated Burglary, to run consecutive to each other and the death sentence. The trial court also applied a three-year imprisonment for the firearm specification, also to be served consecutively to the principal sentences.

### B.    First Direct Appeal – *State of Oho v. Donna Roberts*, Case No. 2003-1441

55.    After Ms. Roberts was formally sentenced, the trial court appointed the Ohio Public Defender to represent Ms. Roberts on direct appeal. However, that office was conflicted because it had represented co-defendant Jackson. The trial court then appointed Attorneys David Doughten and Patricia Smith to represent Ms. Roberts on appeal.

56.    Ms. Roberts appealed her convictions and sentence to the Ohio Supreme Court. *State v. Roberts*, 850 N.E.2d 1158 (2006). The Ohio Supreme Court affirmed the convictions but reversed the sentence of death. The court found Judge Stuard violated Ms. Roberts's rights by not independently preparing the sentencing opinion in accordance with Ohio Revised Code §2929.03(F). The court remanded the case to the trial court to prepare an independent sentencing opinion and to allow Ms. Roberts to allocute. *Id.*

### C.    First Resentencing

57.    On remand, Judge Stuard presided over the re-sentencing proceedings. On May 1, 2007, Ms. Roberts moved to expand the sentencing hearing to include all relevant mitigation evidence that had not been presented at her original trial. On September 14, 2007, the trial

court denied the motion and restricted the evidence at the hearing to Ms. Roberts's allocution. (Resent. Tr. at 70.) After finding her competent to be resentenced, the trial court once again sentenced Ms. Roberts to the death penalty. (Id.)

58.     Resentencing counsel also requested that Judge Stuard voluntarily recuse from presiding over Ms. Roberts's resentencing as he was under investigation by the Disciplinary Counsel for the *ex parte* communications he had with the prosecutor at Ms. Roberts's first trial. Judge Stuard refused to recuse himself. That same day,  the court conducted a hearing to allow Ms. Roberts to allocute as the Ohio Supreme Court required.

59.     On October 29, 2007, Judge Stuard again sentenced Ms. Roberts to death. (Id.)

60.     On January 29, 2009, the Ohio Supreme Court reprimanded publicly Judge Stuard and the prosecutor for their unethical behavior in Ms. Roberts's first trial. *Disciplinary Counsel v. Stuard, Judge, and Becker*, 901 N.E.2d 788 (Ohio 2009).

### D.      Second Direct Appeal – *State v. Donna Roberts*, Case No. 2007-2288

61.     On October 22, 2013, the Ohio Supreme Court remanded the case for a second time to the trial court with specific instructions to regarding sentencing considerations. *State v. Roberts*, 998 N.E.2d 1100 (Ohio 2013). The court held:

> On remand, the trial court is to review the entire record, including Roberts's allocution of October 22, 2007. The trial court shall consider the entire record-again, including the allocution- in determining whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. The trial court shall then write and file a sentencing opinion pursuant to R.C. 2929.03(F) reflecting that it has complied with these instructions.
>
> In accordance with our holding as to Roberts's first proposition of law, Roberts is not entitled to present any further evidence on remand. Moreover, because Roberts has been given her opportunity to make allocution pursuant to Crim.R. 32, she is not entitled to make another one.

18

> Finally, while the trial court must consider Roberts's allocution, nothing in today's opinion should be interpreted as a determination that the matters discussed in her allocution are true or that the trial court must afford them any particular weight. It is for the trial court to determine in the first instance what mitigating factors, if any, are present in the case, and what weight, if any, they should be given.

*Id.* at 1115.

### E.     Second Resentencing Hearing

62.     By the time of the second resentencing hearing, Judge Stuard had passed away. A new judge was therefore appointed who had heard none of the trial testimony and was only permitted to review the previous trial transcripts without the ability to make any credibility assessments. The trial court did not allow Ms. Roberts to speak at the re-sentencing.

63.     On April 17, 2014, Roberts filed a motion to preclude a sentence of death because the new trial judge had neither conducted the trial nor heard Ms. Roberts's unsworn statement at the penalty phase of trial or allocution at the sentencing hearing. On April 30, 2014, the trial court denied the defense motion to preclude death or, in the alternative, to grant a *de novo* sentencing phase hearing. The trial court again found death was the appropriate penalty and filed an amended sentencing opinion on June 10, 2014. *State v. Roberts*, No. 2001CR00793 ("Nunc Pro Tunc Findings of Fact and Conclusions of Law Regarding Imposition of the Death Penalty," Opinion of the Court, Trumbull Court of Common Pleas June 10, 2014). Ms. Roberts filed a notice of appeal on June 13, 2014.

### F.     Third Direct Appeal – *State v. Roberts*, Case No. 2014-0989

64.     On May 30, 2017, the Ohio Supreme Court affirmed the second resentencing/third death sentence. *State v. Roberts*, 78 N.E.3d 851 (Ohio 2017).

19

### G. Post-Conviction Proceedings

65.     An initial post-conviction petition was filed in the trial court on September 24, 2004. Judge Stuard, the trial judge, denied the petition on February 11, 2005. The notice of appeal was filed to the Eleventh District Court of Appeals but stayed by agreement of the parties pending the disposition by the Supreme Court of Ohio on direct appeal.

66.     After the Supreme Court of Ohio affirmed the convictions but vacated the death sentence, the appeal was dismissed for lack of jurisdiction.

67.     On August 20, 2008, Ms. Roberts filed again a petition for post-conviction relief with the trial court. The proceedings were held in abeyance pending the second direct appeal.

68.     While the direct appeal was pending, and a second resentencing hearing occurred, Ms. Roberts filed an amended petition for post-conviction relief on July 20, 2015. This petition was held in abeyance while the third direct appeal was pending.

69.     On November 20, 2019, the trial court granted the State's motion for summary judgment to dismiss the petition for post-conviction relief without an evidentiary hearing, but no final order was filed. Counsel for Ms. Roberts, out of an abundance of caution, filed a notice of appeal.

70.     The Eleventh District Court of Appeals affirmed the denial of post-conviction relief on August 24, 2020. *State v. Robert*, 2020 WL 4933461 (Ohio. Ct. App. 11th Dist.).

71.     Ms. Roberts timely filed with the Ohio Supreme Court a request for them to accept jurisdiction and review the post-conviction appeal. On December 29, 2020, the Ohio Supreme Court declined to accept jurisdiction. *State v. Roberts*, (Table) 159 N.E.3d 1158 (Ohio 2020).

### H. The Trial And Appeals Of Co-Defendant Nathanial Jackson

72.     Jackson was represented by court-appointed counsel from the Ohio Public Defender. His trial took place before Ms. Roberts's trial. His jury trial took place before Judge Stuard

and he was found guilty on all counts and sentenced him to death on November 18, 2002. He was formally sentenced on December 19, 2002.

73.     Jackson's convictions and death sentence were affirmed on appeal by the Ohio Supreme Court. *State v. Jackson*, 839 N.E.2d 362 (Ohio 2005). Jackson's post-conviction appeal was denied as well. *State v. Jackson*, 2006 WL 1459757 (Ohio Ct. App 11th Dist 2006).

74.     Jackson filed his petition for writ of habeas corpus in the District Court for the Northern District of Ohio on October 31, 2007. *Jackson v. Houk*, Case No. 07-CV-00880 (N.D. Ohio 2007.)

75.     After Ms. Roberts obtained sentencing relief in 2007, Jackson sought and obtained resentencing relief on the same issue. *State v. Jackson*, 941 N.E.2d 1221 (Ohio Ct. App. 2010). Judge Stuard conducted the resentencing hearing in 2012 and again sentenced him to death. Jackson was not permitted to present any new evidence at that resentencing hearing.  *State v. Jackson*, 73 N.E.3d 414 (Ohio 2016).

76.     On habeas review, another judge on this Court found Jackson's constitutional rights were violated at his resentencing and ordered that habeas relief be granted. *Jackson v. Houk*, 2021 WL 698590 (N.D. Ohio Feb 23, 2021). This case is currently on appeal by both parties in the Sixth Circuit Court of Appeals. *Jackson v. Houk*, Case No. 21-3280.

## I.     Ms. Roberts Habeas Proceedings

77.     On February 16, 2021, Ms. Roberts, through undersigned counsel, filed a Notice of Intention to File Habeas Corpus Petition, along with a motion requesting the Office of the Federal Public Defender for the Northern District of Ohio, Capital Habeas Unit, be appointed to represent her in this capital habeas proceeding. *Roberts v. Baldauf*, No. 4:21CV368, ECF 1, PageID 1-2;

ECF 2, PageID 6-10. On March 1, 2021, the Court appointed counsel and issued the Case Management Order.

78.     A timeline for purposes of determining the statute of limitations was filed on October 20, 2021. This habeas petition is timely filed.

## STANDARD OF REVIEW

79.     Fundamental to any determination of a petition for writ of habeas corpus is the application of 28 U.S.C. § 2254. On April 24, 1996, Congress and the President enacted severe changes to the statutory framework of Petitions for Writs of Habeas Corpus in the aftermath of the Oklahoma City bombings involving Timothy McVeigh and others in April 1995. *See Felker v. Turpin*, 518 U.S. 651, 654 (1996) (analyzing only Art. I, Section 9, the Suspension Clause of the Constitution, and the Exceptions Clause of Article III, Section 2).

80.     The signing ceremony took place on the South Lawn of the White House, and it was a picturesque display. "In a presidential election year," the AP reported, "it was an opportunity for a warm display of bipartisanship on a sunny, spring day." The New York Times described "the Marine band playing and American flags whipping in the breeze."

81.     "We send a loud, clear message today all over the world, in your names," the President told families in attendance whose loved ones had died in Oklahoma City. "America will never surrender to terror." Then the President signed the Antiterrorism and Effective Death Penalty Act.

82.     The change to the operation of habeas corpus centered on statutory limitations to federal court review of the decisions of state courts. Allegedly enacted in the interests of "comity," these provisions require that the federal courts give tremendous deference to the state courts' decisions; Specifically, sections §§ 2254 (d)(1) and (d)(2) provide:

22

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

83.     There was a vote in the Senate on the language that became § 2254(d)(1); the vote to *remove this language* was defeated by a vote of 53-46. The vote was close; five Senators changed their vote the day after President Clinton went on the Larry King Show broadcast by CNN and announced he was satisfied with the unamended bill. *See* James S. Liebman, *An "Effective Death Penalty"?* 67 Brook.L. Rev. 411 (2001) at pages 412-413. To soothe the nerves of those who worried about the negative effects of the new law on federal habeas review, the President in his signing statement assured:

> [T]hat the law would neither "limit the authority of the federal courts" or "deny litigants a meaningful opportunity" to win evidentiary hearings. "Our constitutional ideal of a limited government that must respect individual freedom has been a practical reality because independent federal courts have the power 'to say what the law is' and to apply the law to the cases before them," Clinton said. "I have signed this bill on the understanding that the courts can and will interpret these provisions … in accordance with this ideal."

84.     Ironically, AEDPA had little bearing on the case of Timothy McVeigh, whose relatively swift execution in 2001 had more to do with political will than stringent new review standards. Liliana Segura, *Gutting Habeas Corpus The Inside Story of How Bill Clinton Sacrificed Prisoners' Rights for Political Gain (June 23, 2020)* https://theintercept.com/2016/05/04/the-untold-story-of-bill-clintons-other-crime-bill/.

### A.      Settled Constitutional Principles

85.     The effect of §§ 2254 (d)(1) and (d)(2) is to degrade or diminish what it means to be a

citizen of the United States. Whether a citizen has the full advantage of the rights guaranteed under

the Federal Constitution depends entirely on the state judiciary if §§ 2254 (d)(1) or (d)(2) is

applied.

86.     The Supreme Court has held that the Citizenship Clause of the Fourteenth Amendment is

a limitation on the powers of the national government as well as the states. Congress may not

authorize the states to violate the Fourteenth Amendment. *Saenz v. Roe*, 526 U.S. 489, 507-508

(1999); *see also Shapiro v. Thompson*, 394 U.S. 618, 641 (1969) (Congress is without power to

enlist state cooperation in a joint federal-state program by legislation which authorizes the states

to violate the Equal Protection Clause); *see Townsend v. Swank*, 404 U.S. 282, 291 (1971).

87.     As the Court in *Saenz* emphasized:

> Article I of the Constitution grants Congress broad power to legislate in certain
> areas. Those legislative powers are, however, limited not only by the scope of the
> Framers' affirmative delegation, but also by the principle "that they may not be
> exercised in a way that violates other specific provisions of the Constitution. For
> example, Congress is granted broad power to 'lay and collect Taxes,' but the taxing
> power, broad as it is, may not be invoked in such a way as to violate the privilege
> against self-incrimination." *Williams v. Rhodes*, 393 U. S. 23, 29 (1968) (footnote
> omitted). Congress has no affirmative power to authorize the States to violate the
> Fourteenth Amendment and is *implicitly prohibited from passing legislation* that
> purports to validate any such violation.

*Id*. at 508 (emphasis added).

Finally, the *Saenz* Court explained:

> Section 5 of the Fourteenth Amendment gives Congress broad power indeed to
> enforce the command of the amendment and "to secure to all persons the enjoyment
> of perfect equality of civil rights and the equal protection of the laws against State
> denial or invasion. . .." *Ex parte Virginia*, 100 U. S. 339, 346 (1880). Congress'
> power under § 5, however, "is limited to adopting measures to enforce the
> guarantees of the Amendment; § 5 grants Congress no power to restrict, abrogate,
> or dilute these guarantees." *Katzenbach v. Morgan*, 384 U. S. 641, 651, n.10 (1966).

> Although we give deference to congressional decisions and classifications, neither Congress nor a State can validate a law that denies the rights guaranteed by the Fourteenth Amendment. *See, e.g.*, *Califano v. Goldfarb*, 430 U. S. 199, 210 (1977); *Williams v. Rhodes*, 393 U. S. 23, 29 (1968). *Mississippi Univ. For Women v. Hogan*, 458 U. S. 718, 732-733 (1982).

88.     The Constitution must be applied uniformly throughout the entire union. The Fourteenth Amendment was enacted to maintain that uniformity and guarantee that even in those states where all citizens were not treated equally before the law, there would be a federal remedy for disparate treatment. Under §§ 2254(d)(1) and (2), the various federal constitutional amendments and rights applicable in a criminal case are not only varied from one jurisdiction to another but are allowed to be incorrect either as to the law or to the facts if they are not "unreasonably" incorrect. Good faith or a "reasonable" effort by a state court in applying the facts and federal constitutional law are good enough under §§ 2254(d)(1) and (2). A citizen, depending on the jurisdiction or state they are in, is thus not guaranteed that the rights provided by the Federal Constitution will actually be applied to his or her case.

89.     Under AEDPA, a state judge or court is only required to give a "good enough" effort in getting it right. A participation prize is in order for the state judiciary that tries to get it right but does not. Meanwhile, the citizen is left knowing that his or her constitutional rights were violated, or the facts were simply incorrect as found by the state court but that is just "tough luck" for the unfortunate citizen whose state judiciary did not properly apply the Federal Constitution.

90.     The Citizenship Clause of the Fourteenth Amendment means much more and offers absolute protections to all citizens of the United States. Whether the Constitution applies to a particular citizen or not does not vary depending on which state his case is heard. There is a national standard. That is the whole point behind the Union of the United States. Quoting Justice Cardozo, the Court in *Saenz* concluded:

25

> The Fourteenth Amendment, like the Constitution itself, was, as Justice Cardozo put it, "framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U. S. 511, 523 (1935).

*Saenz*, 526 U.S. at 511.

91.     Fundamental rights based on the Federal Constitution are also not subject to a vote either by the people or their representatives. Regardless of the political winds drifting through Congress at any particular time or whether the Marine band is playing music at a bill's signing ceremony, fundamental rights do not depend on the outcome of elections. *See* O*bergefell v. Hodges*, 576 U.S. 644 (2015) (recognizing same sex marriages and there is no lawful basis for a state to refuse to recognize a lawful same sex marriage performed in another state on the ground of its same sex character).

92.     Likewise, the application of the Constitution in the habeas corpus context must not depend on the state where the criminal trial took place or the state's judiciary and its interpretation of the Federal Constitution. The habeas petitioner has a citizenship right to the protections of the Fourteenth Amendment to the Constitution being applied correctly to the correct facts of his or her case regardless of the particular state where he is seeking vindication of his federal constitutional rights.

93.     The right to access the courts of justice in the several states was specifically upheld by the majority in *The Slaughter-House Cases*, 83 U.S. 36 (1873), 16 Wall. 36. The Court recognized certain fundamental rights of national citizenship including the right to come to the seat of government to seek protection of the guarantees of the Constitution. Access to the courts is fundamental to seeking protection of the Constitution. *See also Crandell v. Nevada*, 73 U.S. 35, 44 (1868) 6 Wall 35.

94.     A United States citizen is entitled to the full protection of the Constitution when he or she

26

appears before a court of law and not simply a good faith effort of the state judiciary to properly interpret or apply the Constitution to the correct facts. No act of Congress can alter this fundamental right found in the Fourteenth Amendment. *See* Access to the Courts as a Privilege or Immunity of National Citizenship, 40 Conn. L. Rev. 1477 (2008); Citizenship and the Fourteenth Amendment, San Diego L. Rev., Vol. 34, Issue 2 (1997).

**B.     Citizenship**

95.     Section 1 of the Fourteenth Amendment defines citizenship as belonging to one who is born in the United States or naturalized. Birthright citizenship was part of an effort to purge the legacy of slavery and is a repudiation of America's long history of racism; it repudiates the tradition of equating whiteness with citizenship. For black women in America, it held a special significance; instead of giving birth to property or economic assets to white southerners, black women gave citizens. The Second Founding, How the Civil War and Reconstruction Remade the Constitution by Eric Foner, 2019 at 71-72. A new uniform definition of citizenship was announced and protected by the federal government. The Second Founding at 79-80.

96.     Citizenship may be terminated by Congress only under the exercise of the foreign affairs power held by Congress, *see Perez v. Brownell*, 356 U.S. 44 (1958) (citizenship divested by voting in political elections in Mexico), but citizenship is not subject to the general powers of the national government, *Trop v. Dulles*, 356 U.S. 86, 92 (1958), and cannot be used as punishment under the Eighth Amendment even for desertion by a military member in wartime. *Id.* at 101.

97.     In *Trop*, a statute, which originated in the Civil War, but which had been amended, provided for loss of citizenship under defined circumstances. *Trop*, 356 U.S. at 89-90. The death penalty was a possible punishment for wartime desertion. *Id.* at 99. One who has lost citizenship is an expatriate; "the expatriate has lost the right to have rights." *Id.* at 102. The Court explained:

27

> This punishment is offensive to cardinal principles for which the Constitution stands. It subjects the individual to a fate of ever-increasing fear and distress. He knows not what discriminations may be established against him, what proscriptions may be directed against him, and when and for what cause his existence in his native land may be terminated.

*Id.* at 103. The Eighth Amendment prohibited Congress from enacting the statute which deprived the wartime deserter of his citizenship. *Id.*

98.     A federal (and state) court's duty to "defend the Constitution" is explained in *Trop* and the Court's eloquent words are worth quoting at length:

> We are oath-bound to defend the Constitution. This obligation requires that congressional enactments be judged by the standards of the Constitution. The Judiciary has the duty of implementing the constitutional safeguards that protect individual rights. When the Government acts to take away the fundamental right of citizenship, the safeguards of the Constitution should be examined with special diligence.
>
> The provisions of the Constitution are not time-worn adages or hollow shibboleths. They are vital, living principles that authorize and limit governmental powers in our Nation. They are the rules of government. When the constitutionality of an Act of Congress is challenged in this Court, we must apply those rules. If we do not, the words of the Constitution become little more than good advice.
>
> When it appears that an Act of Congress conflicts with one of these provisions, we have no choice but to enforce the paramount commands of the Constitution. We are sworn to do no less. We cannot push back the limits of the Constitution merely to accommodate challenged legislation. We must apply those limits as the Constitution prescribes them, bearing in mind both the broad scope of legislative discretion and the ultimate responsibility of constitutional adjudication. We do well to approach this task cautiously, as all our predecessors have counseled. But the ordeal of judgment cannot be shirked. In some 81 instances since this Court was established it has determined that congressional action exceeded the bounds of the Constitution. It is so in this case.

*Trop* 356 U.S. at 103-104.

99.     The separate state courts which attempt to apply the federal Constitution in their respective jurisdictions must get it right if Section 1 of the Fourteenth Amendment and national citizenship means anything. The federal courts must ensure the Federal Constitution is correctly applied to the

28

citizen. This is the bedrock principle of the Fourteenth Amendment and the Federal Constitution, and it is the ultimate duty of the federal courts.

100.      The Fourteenth Amendment was enacted in response to the ending of the Civil War. It was enacted to protect individual rights by a national guarantee that could not be undermined by  the vagaries of individual states and that state's interpretation of individual rights. A bloody and long war was fought over individual rights and whether some people could be made slaves or not. The Union was preserved at a very steep cost in lives and treasure. To ensure the uniform treatment of its citizens, the Fourteenth Amendment was enacted. No act of Congress, including AEDPA, can undermine what the Fourteenth Amendment guarantees.

101.      Each citizen is entitled to the protections of the U.S. Constitution on equal terms. *Brown v. Board of Education*, 347 U.S. 483 (1954). The good faith effort by state judiciaries to correctly interpret the  Federal Constitution or get the facts right in the context of a criminal trial or appeal does  not  deprive a federal court of granting federal habeas corpus relief despite 28 U.S.C. §§ 2254(d)(1) and (2). A citizen of the United States is entitled, by the Fourteenth Amendment itself, to the full  application of the Constitution regardless of what a state judiciary may think about the facts of a case or the Constitution.

       **C.**     **History Of The Thirteenth, Fourteenth And Fifteenth Amendments Of The U.S. Constitution**

102.      The historical debate and rationale for enacting the Thirteenth, Fourteenth, and Fifteenth Amendments to  the  Federal Constitution is often overlooked and largely unknown to many members of the legal community. Enlightening historical overview of the debate in Congress and in  public opinion over the enactment of these critical post-Civil War Amendments is found in the book The Second Founding, How the Civil War and Reconstruction Remade the Constitution by Eric Foner, 2019. Mr. Foner is a preeminent historian of the Civil War era and winner of the

Pulitzer Prize.

### D.    The Fourteenth Amendment

103.    Regarding the Fourteenth Amendment, the purpose, at least regarding Section 1, was to clarify that citizenship in the United States was derived from the Federal Constitution primarily and no longer through the individual states. Before the Civil War, individual rights for people depended largely on which state one was in; the clearest example of this notion was slavery. But after the war, it had to be clarified that the protection of individual rights was uniform throughout the Union. Slaves were no longer property but citizens. In this respect, the Fourteenth Amendment, Section 1, overruled the infamous Dred Scott decision. *Scott v. Sandford*, 60 U.S. 393 (1857), 19 How. 393.

104.    Citizens have fundamental rights, including those contained in the Bill of Rights, which are now guaranteed throughout the Union by the Fourteenth Amendment. No state can infringe or diminish the fundamental rights now guaranteed to citizens by the Fourteenth Amendment.

105.    The war had been a long, bloody and costly experience. That was the price paid for the principle that individual rights were now to be uniform throughout the Union. This was guaranteed now and forever. It was not an issue up for popular vote or to be determined by the whims of politics or political parties. It was part of the Constitution, Section 1 of the Fourteenth Amendment.

106.    The primary problem with §§ 2254(d)(1) and (2) is that the rights guaranteed to citizens under the Fourteenth Amendment, *i.e.*, fundamental rights including the Bill of Rights, depend on the interpretation, even if incorrect, of the meaning of the Constitution as determined by state judges. It is actually a shocking development in the law. It demeans the Constitution and takes one back to a pre-Civil War understanding of the rights of individuals. It is reminiscent of the Civil War statute which supported the decision in *Trop v. Dulles*.

30

107.    In enacting §§ 2254(d)(1) and (2), Congress and the President, actually allow citizens to be convicted and sentenced, some to death, even though the Constitution is not properly applied by state court judges and the facts are inaccurate or true. As long as the state court judges "reasonably" believed they were properly applying the facts or law, then that is good enough. If the state court judges were "reasonable" but wrong, then the sentence, even one of death, is perfectly permissible under AEDPA.

108.    A citizen of the United States is entitled to the full protection of the Constitution. Not some good faith effort by a state court judge to properly apply the law or facts. Citizenship means something in America. The Civil War was fought and won by the Union. The state's rights activists lost the war. The state's rights activists were defeated again and forever when the Thirteenth, Fourteenth and Fifteenth Amendments were passed by Congress and ratified by the Union of States.

109.    Sections 1 and 5 of the Fourteenth Amendment provide:

Section 1.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 5.

The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

110.    Section 28 U.S.C. 2254(d)(1) and (2) violate Section 1 of the Fourteenth Amendment by granting state courts the undue deference to interpret and apply a citizen's constitutional rights, largely insulated from review by the federal courts. Section 5 of the Fourteenth Amendment allows

31

Congress to act to **enforce** Section 1; it does not allow legislation that demeans or diminishes Section 1 and the rights of citizens to have the full force of the Constitution guaranteed on a citizen's behalf regardless of which state he or she is in at the time.

      **E.**    **The Second Founding**

111.    The Fourteenth Amendment cannot be understood properly without understanding history. It cannot be understood properly without understanding it exists because the Union won the Civil War. It must be understood, given the congressmen who wrote it and passed it and the states that ratified it. The United States changed and was re-founded with the post-Civil War Amendments to the Constitution. Provisions of AEDPA undermine and violate the rights of citizens guaranteed by Section 1 of the Fourteenth Amendment. Congress had no authority to demean and diminish the Fourteenth Amendment.

112.    The Framers of our Constitution include the congressmen who enacted the Thirteenth, Fourteenth, and Fifteenth Amendments. The viewpoint of these great men must not be ignored. Nor can the context of our history which caused the need for these amendments. These amendments did not come out of thin air; they resulted from the Civil War and all that war involved. Citizenship rights needed to be uniform throughout the Union. No longer could individual states determine the rights of a citizen; the Constitution now guaranteed and defined citizenship in a manner to be applied consistently throughout the Union. No longer did a state or a state judge have the ability to violate, demean or diminish fundamental rights.

113.    In *Scott v. Sanford*, 60 U.S. 393 (1857), the *Dred Scott* decision, made slavery legal in all territories, adding fuel to the great controversies that eventually led to civil war. Chief Justice Roger B. Taney declared that no matter what rights might be provided by an individual State, a Negro was not entitled to rights as a U.S. citizen. The Negro was not even a person that whites

need respect. Justice Taney reasoned, "we must not confound the rights of citizenship which a State may confer within its own limits, and the rights of citizenship as a member of the Union. It does not by any means follow, because he has all the rights and privileges of a citizen of a State, that he must be a citizen of the United States." *Dred Scott v. Sandford*, 60 U.S. 393, 405 (1857).

114.     The Fourteenth Amendment was a direct response and meant to overrule the infamous *Dred Scott* decision. Citizenship in the United States now meant something for every person born or naturalized that the individual states could not diminish or ignore.

115.     The Fourteenth Amendment was ratified in 1868 after being rejected two years earlier. However, seven southern states that had  first rejected the amendment changed their votes and approved it, specifically because elections had resulted in biracial governments in these seven states. The votes of black men in southern elections and legislatures changed the outcome. Without the votes of black men, the Fourteenth Amendment never would have become a part of the Constitution. The Second Founding at page 91, Eric Foner. Black men in the south had the right to vote granted by law under the 1867 Reconstruction Act. Black men did not have a constitutional right to vote until the Fifteenth Amendment was passed in 1869 and then ratified in 1870.

116.     A citizen of this country owes a duty of allegiance to it and in return gets the protection of the government and the protection of his or her rights guaranteed by law.

117.     Congress cannot diminish or demean the rights of citizens to the full protection of the federal Constitution; this Court must declare 28 U.S.C. §§ 2254(d)(1) and (2) to be in violation of Section 1 of the Fourteenth Amendment and determine the merits of this Petition without applying these provisions. *Saenz*, *Trop*, *supra*. Congress cannot delegate the federal judiciary's duty to properly enforce the Federal Constitution and fundamental rights to state court judges or justices.

### F.    Thirteenth Amendment

118.    The Thirteenth Amendment prohibits slavery and involuntary servitude except as punishment for crimes. Section 2 of the amendment allows for Congress to enact laws to enforce the amendment. Congress has passed laws under the authority of Section 2 over the years to ensure the "badge and incidents" of slavery are eliminated from both private conduct of individuals and businesses and from states.

119.    The concurring opinion of Justice Douglas in *Jones v. Mayer*, 392 U.S. 409 (1968) is worth quoting at length:

> Some badges of slavery remain today. While the institution has been outlawed, it has remained in the minds and hearts of many white men. Cases which have come to this Court depict a spectacle of slavery unwilling to die. We have seen contrivances by States designed to thwart Negro voting, e. g., *Lane v. Wilson*, 307 U. S. 268. Negroes have been excluded over and again from juries solely on account of their race, e. g., *Strauder v. West Virginia*, 100 U. S. 303, or have been forced to sit in segregated seats in courtrooms, *Johnson v. Virginia*, 373 U. S. 61. They have been made to attend segregated and inferior schools, e. g., *Brown v. Board of Education*, 347 U. S. 483, or been denied entrance to colleges or graduate schools because of their color, e. g., *Pennsylvania v. Board of Trusts*, 353 U. S. 230; *Sweatt v. Painter*, 339 U.S. 629. Negroes have been prosecuted for marrying whites, e. g., *Loving v. Virginia*, 388 U.S. 1. They have been forced to live in segregated residential districts, *Buchanan v. Warley*, 245 U.S. 60, and residents of white neighborhoods have denied them entrance, e. g., *Shelley v. Kraemer*, 334 U.S. 1. Negroes have been forced to use segregated facilities in going about their daily lives, having been excluded from railway coaches, *Plessy v. Ferguson*, 163 U.S. 537; public parks, *New Orleans Park Improvement Association v. Detiege*, 358 U.S. 54; restaurants, *Lombard v. Louisiana*, 373 U.S. 267; public beaches, *Mayor of Baltimore v. Dawson*, 350 U.S. 877; municipal golf courses, *Holmes v. City of Atlanta*, 350 U. S. 879; amusement parks, *Griffin v. Maryland*, 378 U.S. 130; buses, *Gayle v. Browderr*, 352 U.S. 903; public libraries, *Brown v. Louisiana*, 383 U.S. 131. A state court judge in Alabama convicted a Negro woman of contempt of court because she refused to answer him when he addressed her as "Mary," although she had made the simple request to be called "Miss Hamilton." *Hamilton v. Alabama*, 376 U.S. 650.

*Id.* at 445-446.

120.    The institution of slavery and white supremacy remains today in the minds and hearts of

34

many white men as Justice Douglass noted. Unfortunately, § 2254(d) reflects a regression of individual rights and an unwillingness of Congress to recognize that federal judges and justices must enforce the Federal Constitution regardless of what state court judges or justices think of the facts or how the Federal Constitution applies.

121.    The death penalty remains largely, although not exclusively, a remnant of the Confederate south. The death penalty's connection to slavery "is not the stuff of hyperbole or analogy. The histories of both institutions are tightly bound." The Death Penalty's Darkside: A Response to Phyllis Goldfarb's *Matters of Strata: Race, Gender, and Class Structures in Capital*, 74 Wash. & Lee L. Rev. Online 184, 187 (2017); Slavery and the Death Penalty A Study in Abolition (2018) by Bharat Malkani.

122.    A black man in America, along with everyone else, is entitled to the full protection of the Federal Constitution and a correct application of the Federal Constitution in his case based on the correct facts. By allowing state court judges or justices to decide otherwise, leaves him marked as an inferior person with the "badges and incidents" of slavery in violation of the Thirteenth Amendment. The minds and hearts of many state court judges and justices remain filled with explicit bias, implicit bias and structural bias. Implicit Bias in the Courtroom, 59 UCLA L. Rev.1124 (2012). Biased: Uncovering the Hidden Prejudice That Shapes What We See, Think and Do (2019), by Dr. Eberhardt; Blindspot, Hidden Biases of Good People (2013), Mahzarin R. Banaji & Anthony G. Greenwald.

123.    By passing 28 U.S.C. § 2254(d), Congress has violated the Thirteenth Amendment. Rather than enforcing the elimination of "badges and incidents" of slavery, § 2254(d) reinstates the "badges and incidents" of slavery by leaving it up to state court judges and justices to define the Federal Constitution based on incorrect facts and incorrect application of rights secured by the

35

Federal Constitution or otherwise fundamental to citizens and other free people. The state court judges and justices must only give a "reasonable" if incorrect application of the facts and Federal Constitutional law.

124.    28 U.S.C. § 2254(d) must not be applied to this case because it is a badge and incident of slavery in violation of the Thirteenth Amendment and deprives the Petitioner of the full protection of the Federal Constitution he otherwise enjoys.

### G.    Section 28 U.S.C. 2254(E) Is Inapplicable To This Case

28 U.S.C. § 2254(e) of AEDPA states:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

125.    Under the arguments above that § 2254(d) violates the Fourteenth and Thirteenth Amendments, likewise this Court is not bound by § 2254(e). As a federal court with a sworn duty to uphold the Constitution based on a correct application of the Constitution and a correct finding of fact, the court must not be limited or restrained by § 2254(e).

126.     Thus, this Petition must be decided without application of § 2254(e).

## GROUNDS FOR RELIEF

## FIRST GROUND FOR RELIEF

**WHEN CONSIDERING THE APPROPRIATE SENTENCE IN A CAPITAL TRIAL, THE SENTENCING JUDGE MUST CONSIDER AND GIVE EFFECT TO ALL MITIGATING EVIDENCE. A TRIAL COURT'S REFUSAL TO CONSIDER MITIGATING EVIDENCE IS A VIOLATION OF A CAPITAL DEFENDANT'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS UNDER THE CONSTITUTION AND IN VIOLATION OF *SKIPPER V. SOUTH CAROLINA*, 476 U.S. 1 (1986), *EDDINGS V. OKLAHOMA*, 455 U.S. 104 (1982) AND *LOCKETT V. OHIO*, 438 U.S. 586 (1978).**

### A.     Introduction

127.     Petitioner Roberts incorporates all other statements as if rewritten here.

128.     This claim was raised in the second and third direct appeal to the Ohio Supreme Court and is therefore ripe for federal habeas review.

### B.     Background

129.     After the second remand by the Ohio Supreme Court for resentencing, the trial court sentenced Ms. Roberts to death for the third time. *State v. Roberts*, No. 2001CR00793 (*Nunc Pro Tunc* Findings of Fact and Conclusions of Law Regarding Imposition of Death Penalty, Trumbull Cty. Ct. of Common Please, June 10, 2014).

130.     Having presided over neither the trial nor Ms. Roberts's unsworn statements/ allocutions, the trial court issued a sentencing opinion. The trial court listed the evidence it considered in sentencing Ms. Roberts as all documents contained in the original trial record and resentencing records. *Id.* at 2-3.

131.     The trial court stated expressly and overtly it would not permit Ms. Roberts to provide the court with additional evidence in mitigation. It acknowledged: ". . . the Court did not permit Roberts to update her mitigation at the hearing following the recent remand" because the Ohio

Supreme Court had instructed it not to admit any new evidence. *Id.* at 3.

132.    The Ohio Supreme Court and, subsequently, the trial court's refusal to allow Ms. Roberts
to present additional evidence in mitigation was clearly contrary to United States Supreme Court
precedent. *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104
(1982); *Lockett v. Ohio*, 438 U.S. 586 (1978).

133.    After the second remand, Ms. Roberts wanted to present evidence that was never presented
in the initial sentencing hearing but was available at that time. Such evidence included Ms.
Roberts's severe mental health issues, which may have been caused in part by several head injuries
she sustained in automobile accidents.

134.    Ms. Roberts also desired to present evidence that arose post sentencing, regarding her
adjustment to prison. Like the pre-sentencing evidence, this evidence included considerable mental
health documentation, including the medications she was taking to stave off her mental health
symptoms. The identification in the prison records of Ms. Roberts's longstanding and chronic
mental health conditions also demonstrates they pre-dated the homicide in this case.

135.    Post-sentencing evidence also included facts about Ms. Roberts's ability to adapt favorably
to her prison environment when she was not hallucinating or suffering from the adverse effects of
her mental health conditions.

136.    Additionally, the trial court's refusal to hear critical background information that mitigated
the offense and supported Ms. Roberts's allocution, undermined it. The trial court's decision to
prevent Ms. Roberts from exercising her right to present mitigating evidence violated her rights
pursuant to the Eighth Amendment. The Ohio Supreme Court's ineffectual attempts to distinguish
United States Supreme Court landmark mitigation cases were an unreasonable application of that
Court's precedent. 28 U.S.C. § 2244(d).

## C.    Clearly Established Federal Law

137.    The United States Supreme Court has historically held a death sentence may not stand if the sentencing body has been precluded from considering relevant evidence suggesting the death penalty would be inappropriate. The Eighth and Fourteenth Amendments mandate an individualized assessment of the appropriateness of the death penalty. In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court held the Eighth and Fourteenth Amendments require the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604 (emphasis in original).

138.    In *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Supreme Court reiterated *Lockett*'s Eighth and Fourteenth Amendment mandate when it struck down an Oklahoma death sentence where the sentencing judge concluded, as a matter of law, that he was unable to consider mitigating evidence of the youthful defendant's troubled family background. Applying *Lockett*, the Supreme Court held, "[J]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." 455 U.S. at 113-114 (emphasis in original).

139.    Finally, in *Skipper v. South Carolina*, 476 U.S. 1 (1986), the Supreme Court once again determined that a capital defendant's right to present evidence in mitigation is sacrosanct. The *Skipper* Court held a defendant's right to present evidence of his positive adjustment to prison life could not be excluded from consideration by the capital sentencer.

140.    Interpreting the above Supreme Court precedent, the Sixth Circuit Court of Appeals also has held the scope of mitigation evidence presented in a re-sentencing hearing cannot be limited.

*Davis v. Clark*, 475 F.3d 761 (6th Cir. 2007).

141.   These cases underscore the Ohio Supreme Court's unreasonableness in determining Ms. Roberts was not permitted to present new mitigating evidence in her resentencing hearings and its contrariness to well-established United States Supreme Court precedent.

142.   There was substantial and powerful mitigating evidence the capital sentencer never knew. This evidence is outlined below.

**D.**     **Evidence The Trial Court Refused To Consider Was Substantial**.

143.   After a 1999 motor vehicle accident, Ms. Roberts applied for Social Security Disability benefits. The Social Security Administration Records (SSA) and the prison records reveal the following facts, which should have been considered by the judge when making his sentencing determination. These records were proffered as Defense Exhibit A at the October 22, 2007, resentencing hearing.

144.   In 1999, Ms. Roberts applied for SSI disability due to the change in her mental condition after an auto accident. The psychological evaluation was prepared by Donald Degli, M.A. (Petition to Vacate or Set Aside Sentence Pursuant to Ohio Revised Code § 2953.21, Ex. G. Aug. 20, 2008, hereinafter, "Degli Rep.") The reports were filed with the SSA on November 3, 1999, some two years prior to the murder, for the purpose of a Disability Determination. The report disclosed that Ms. Roberts tested to a full-scale IQ of 65. The verbal IQ score was 79 and the performance IQ score was 55. (Id. at 2.)

145.   On remand from the Ohio Supreme Court, Dr. James R. Eisenberg proffered in an affidavit that he believed there was a strong indication of a Bipolar Disorder diagnosis. (Id. at Ex. C, p. 3.) He could not aver that diagnosis was beyond a reasonable degree of psychological certainty, however, due to his limited access to Ms. Roberts and the record, as the trial judge refused

40

appointment of an independent psychologist. The prison records did reflect this diagnosis.

146.     The records both pre-offense and post-offense are replete with references of Ms. Roberts's

mental health diagnoses. Mr. Degli concluded that, in 1999, Ms. Roberts was a fifty-five-year-old

woman "who presents a rather odd diagnostic picture. Unfortunately, no formal history

accompanied the referral to this office for this claimant who suffered multiple injuries including

head trauma in a reported automobile accident which occurred in April of 1999." (Degli Rep. at

3.)

147.     The report noted that when asked if she was a happy person, Ms. Roberts responded, "Well,

I used to be. Now- - there is no reason to be happy. I am waiting to die now ... any second. Don't

you think so?" (Degli Rep. at 2.) She also reported that her ex-husband, the decedent, was tired of

her at the time. She also mentioned that she thought of suicide constantly but just could not pull

the trigger, even though she had guns. (Id.)

148.     In concluding his report, Mr. Degli observed that dementia could not be ruled out. He also

could not rule out malingering but noted that the head injuries required further testing. He

observed:

> "Psychologically, Donna does present herself as genuinely impaired to some
> degree, probably not able to follow directions or do routine tasks in a competitive
> work environment at the present time. She has the ability and judgment to manage
> basic money matters appropriately. Interpersonal functioning was particularly
> impaired, if today is an example. She will have difficulty in simple social
> interactions and at best, presents marginal capacity to interact appropriately in a
> competitive workplace. Provisionally, Donna is moderately impaired in her ability
> to meet the demands of competitive adult employment. These observations are
> made without regard to whatever physical limitations she may have."

(Degli Rep. at 3.)

149.     The Delgi Report contains important psychological testing results and an opinion that

would have been instrumental to the jury's or sentencing judge's determination of the appropriate

sentence. The report notes of the test results:

> The intellectual assessment yielded questionable functioning and an intelligence quotient in the mild mental retardation range. Memory functioning, as measured by the Wechsler Memory Scales was also impaired, although her responses were suggestive of confabulation and malingering. Reading skills proved to be functional at the high school level. Personality and emotional assessment reveals an individual who is rather blunted, expressionless, preoccupied, worrisome and evidencing some rather strange ideation if she is being genuine in her presentation. Diagnostically, there is a need to rule out consideration of dementia. There is certainly a need for thorough review of whatever medical/neurological records are available.

(Id.)

150.    It is important to note, again, that the report was prepared approximately two years prior to

the homicide and that, based on this report, Ms. Roberts started receiving SSI benefits for mental

disability.

151.    Fingerhut himself had called the SSA to urge that she receive the benefits. He informed the

SSA Ms. Roberts had not been herself since the accident. Fingerhut was afraid someone would

grab her after one of her memory problems. She was a changed person.

152.    She did not have the emotional stability to work anymore. In his statements to the SSA,

Fingerhut gave examples: Donna had previously known all members of the Cleveland Indians but

now could not recall any of them.

153.    Fingerhut also noted Ms. Roberts was getting worse. She was not thinking clearly. She

forgot where she was in familiar places and would forget where she placed items in the home. She

could not even remember the dogs' names. *State v. Roberts*, No 01CR00793, Trumbull Cty. Ct. of

Common Pleas (Resent. Tr., Ex. A, at p. 7.)

154.    Fingerhut reported Ms. Roberts had violent mood swings, including one in the doctor's

office. This necessitated her being admitted to the "mental ward" at St. Joseph's Health Center in

Warren, Ohio. (Id. at pp. 8-9.)

42

155.    The records from St. Joseph's reveal a diagnosis of psychotic disorder, personality disorder

in the records. (Id. at p. 11.) The admitting diagnosis was depression, suicidal, major depression,

recurrent Bipolar Disorder. Medications were numerous. (Id. at p. 16.)

156.    The records included the discharge summary for St. Joseph's. This report noted that:

> The immediate reason for this hospitalization was because of severe anxiety,
> agitation, depression, auditory and visual hallucinations and suicidal ideations and
> intention by CO2 [sic] poisoning. Roberts stated that she has been getting quite
> tense, restless and depressed lately, having frequent mood swings, losing interest
> in doing things, having difficulties concentrating and started hearing voices talking
> to her. She has been seeing shadows around the room when no one is home and has
> the feeling that someone is after her.

(Resent. Tr., Ex. A, at p. 17.) The final diagnosis was Bipolar Disorder, circular type. (Id. at 18.)

157.    Emergency room documentation of February 10, 2000 indicates the doctors found Ms.

Roberts depressed and suicidal. (Id. at pp. 19-20.) She was admitted to the general psychiatric unit

in stable condition. Feelings of paranoia were noted, in addition to psychiatric problems with her

father.

158.    At the time she was admitted to St. Joseph's, Ms. Roberts revealed to doctors that she had

had some psychiatric problems and had taken some medicines from a psychiatrist in the past. She

admitted to having frequent mood swings, going from elation to depression throughout her life.

(Id. at p. 22.) She believed she would be better off dead than alive and thought of killing herself

with carbon monoxide. She admitted hearing voices and seeing shadows in her rooms and believed

that someone was after her and trying to hurt her. (Id. at p. 23.)

159.    At her allocution, Ms. Roberts disclosed she had been sexually abused as a child by her

cousin. The judge did not consider these statements as mitigation and did not address it. The

judge's failure to assign evidence provided in Ms. Roberts's statement any weight may have been

the reason he did not mention sexual abuse as a mitigating factor in his opinion.

43

160.    Dr. Thomas Gazley, who testified at Ms. Roberts's competency to be resentenced hearing, acknowledged that post-traumatic stress syndrome is sometimes an effect of sexual abuse. (Resent. Tr. at 28) However, it was not part of his diagnosis because he did not recall seeing references to a Post-Traumatic Stress Disorder (PTSD) in the prison records. He did remember some reference to the abuse but could not remember if he had read it from records he received or heard Ms. Roberts speak about it. (Id.)

161.    The SSA records revealed Ms. Roberts indeed had been an "abuse victim." (Resent. Tr., Ex. A, at p. 38.) Those records also indicated Ms. Roberts had "probable post-concussion syndrome with memory loss and confusion." (Id. at pp. 43; 48; 50.) An MRI of the brain was recommended. Depression again was noted.

162.    An EEG was performed on June 25, 1999. The result was suggestive of psychological dysfunction and thought less likely to be structural damage. (Id. at p. 96.)

163.    Ms. Roberts displayed bizarre behavior in a January 14, 2000, interview where she pulled gum from her bosom and repeatedly licked the filters of her cigarettes. She heard noises that others could not hear, felt rage and saw a light to the side of her head that others could not see, but denied that they were hallucinations. (Id. 118.) She was obsessed with sex and death. She had obsessive thoughts of bad things happening to her if she did not complete her rituals. She was experiencing auditory and visual hallucinations. (Id.)

### E.    Ms. Roberts's Prison Records Demonstrate Her Ongoing Mental Impairment.

164.    The records below were obtained from the Ohio Department of Rehabilitation and Correction. The evidence from these records, the post-conviction records and the trial record are factors in mitigation that the capital sentencer should have considered. These records are described below.

165.  These records were proffered to the trial court on September 20, 2007. The records

consistently confirm Ms. Roberts's Bipolar Disorder and Depression diagnoses. They also indicate

a diagnosis of PTSD, possibly from child abuse. The prison records indicate a further deterioration

of Ms. Roberts's mental health such that she was continuing to hallucinate. The prison records

reveal Ms. Roberts told prison personnel her father abused her mother when she was a child. They

confirm Ms. Roberts's Bipolar diagnoses and demonstrate with meticulous detail her daily mental

health struggles while incarcerated. Finally, the records below reveal Mr. Roberts's childlike

characteristics and confirm a diagnosis of PTSD is in remission.

### F.    Evidence From Prison Records

166.  The records below were developed between 2003 – 2007 and were presented to the Ohio

courts. The Court therefore can consider them here. *Cullen v. Pinholster*, 563 U.S. 1170 (2011).

The records presented demonstrated the evidence of Ms. Roberts's mental conditions as follows:

> Report dated 6/26/03. Initial Medical/Mental Health/Substance Use Screening
> Crisis/Safe cell assignment requested and special housing assignment requested
> under mental health disposition. Current problems are depression and anxiety.

> Report dated 7/02/03. Mental Health Caseload Classification Confirms bipolar
> disorder. Has on/off depression all her life. Was admitted for inpatient treatment in
> 2002; she had suicidal thoughts. Occasionally feels euphoric which leads to high
> energy, low need for sleep and risk-taking behavior. Admits to spending sprees and
> having unprotected sex with a young man. Started using pot after her accident in
> 1999. Father was abusive to mother, she was sexually abused by cousins (Page 7);
> Axis I: BPAD Type II and psychotic feelings. Brief Psychiatric Rating Scale Scored
> 5 (moderately severe) on depressive mood and hostility scales.

> Report dated 9/24/03. Treatment Plan. Experiencing symptoms of depressed mood
> that interfere with areas of daily functions such as, past suicide attempts, high
> feelings of anger and isolation, crying spells and low appetite.

> Report dated 10/15/03. Interdisciplinary Progress Notes: Donna reports crying
> spells, loss of appetite, difficulty sleeping and is struggling to get out of bed in the
> mornings.

<u>Report dated 10/24/03</u>. Bureau of Mental Health Services. Feeling sad as it would have been her husband's birthday.

<u>Report dated 11/13/03</u>. Interdisciplinary Progress Notes: Donna feels good at the moment but highlights the fact that she often feels bad and her mood can never stay even.

<u>Report dated 12/17/03</u>. Interdisciplinary Progress Notes: Donna says she feels much better and that she isn't afraid to die. However, she also said she thinks people can see and hear her thoughts when she is alone and that she has always felt this way (claims it does not affect her daily functions though). She also has negative feelings towards her body; she always wears make up and nobody has seen her naked.

<u>Report dated 12/24/03.</u> Interdisciplinary Progress Notes: Insists on the death penalty to show how the racism, the injustice, the corrupt system also states she is not afraid of death. She believes she can communicate to others through her thoughts.

<u>Report dated 4/26/04</u>. Interdisciplinary Progress Notes: Donna feels she has brought shame on her family by going to prison and that she misses her husband, she was very teary eyed.

<u>Report dated 1/11/05</u>. Interdisciplinary Progress Notes 1/21/05: Donna states her depression is with her all the time.

<u>Report dated 4/28/05</u>. Referral to Mental Health Services: Donna is sad, has been crying frequently, will not engage in conversation, is not wearing makeup and has poor eye contact. This is presumed to be a reaction to her mother's terminal illness.

<u>Report dated 4/29/05</u>. Interdisciplinary Progress Notes (2nd page): Having more difficulty with her memory than normal and her mood is depressed.

<u>Report dated 5/06/05</u>. Interdisciplinary Progress Notes (2nd page): Donna is in a lot of pain due to a general medical condition. She also states she is having a hard time dealing with the lack of control in her life, she feels guilty that people have to do things for her; she feels that no one really cares about her, they only visit because it is their job. She says she wrote to her lawyer telling him to stop fighting as there was no use.

<u>Report dated 6/03/05</u>. Addendum to Mental Health Evaluation (page 1): On a selection of medication, was coping fine but now feels depressed as to her situation; her physical pain is also too much (it is now affecting her sleep). History includes on/off depression since the age of 6. Was an inpatient in 2000 for 2 weeks. Has seen a psychiatrist and has been on medication since 2000. Used pot on/off on the street but did not do drugs while incarcerated. She was sexually abused by her 2

46

cousins. Her mother suffers from depression and is terminally ill. Her mood is sad. Diagnostic impression; BPAD type II, currently depressed. Treatment included medication for depression and pain.

Report dated 6/8/05. Interdisciplinary Progress Notes: Mood is tearful and depressed, but her thoughts are organized though they may be inaccurate due to wishful thinking. This is exasperated by her back pain.

Report dated 6/28/05. Referral to Mental Health Services: Urgent Call was received from a Ms. Weaver (unit manager at NC) stating Donna was acting strangely. On arrival told that she was disorientated. When spoken to, found that she was orientated but she felt nervous and anxious, she also kept running her sheet through her hands saying she was trying to fix the bed.

Report dated 8/14/05. Interdisciplinary Progress Notes: Donna was disorganized and stated that whilst she had no intention of hurting herself, she had fallen down several times. Had bruises on her arms and legs and was a little unstable on her feet.

Report dated 8/14/05. Referral to Mental Health Services: Donna was not intending to harm herself, but she had bruises on her arms and legs. She did admit to feeling down. She put her arm against the wall and said she feels like she isn't there. She is unsteady on her feet and says her hands and feet keep twitching.

Report dated 9/12/05. OSU Electronic File Report-Radiology: Suffered from memory loss, chronic dizziness and gait disturbance. MRI found a few punctuate white matter signal abnormalities which are non-specific in nature and are most likely due to small vessel ischemic disease or age-related changes. Also, minimal punctuate mucosal thickening within the right mastoid air cells and a small left frontal sinus retention cyst, polyp, or localized mucosal thickening.

Report dated 9/19/05. Interdisciplinary Progress Notes: Had a family visit, coped well, spoke of how her father was physically and mentally abusive towards her mother (though was less so as they got older).

Report dated 11/25/05. Interdisciplinary Progress Notes: Has two bruises on her left arm and cannot recall how they got there.

Report dated 12/14/05. Mental Health Treatment Plan Review: Increased depressive symptomology over the past several months.

Report dated 1/24/06. Referral to Mental Health Services: Donna appears very stressed, irrational and is sleeping more frequently.

Report dated 3/12/06. Referral to Mental Health Services: Call received from CO stating behavior was "bizarre." Donna was seeing ants (none could be seen). She stated she "saw ants, put down coffee grounds to get rid of them and got rid of food

in room(?)." She appeared disheveled, wearing no makeup, speech soft, mumbling and she is wearing sweats. Spontaneously started saying "men always play sports and balls-golf-little ball, little hole, little man; basketball, big ball, big hole, big man." Abruptly ends by saying "it's been nice talking to you." Donna was confused and disorganized. Had not eaten last 3 meals and has severe cognitive impairment-placed on suicide watch.

Report dated 3/13/06. Interdisciplinary Progress Notes (2nd page): Spoke with a childlike voice. Donna tried to force her way out of the cell, she was laughing and smiling saying that she felt very happy and her appeal is "working." Again, she used a childlike voice.

Report dated 3/21/06. Interdisciplinary Progress Notes (2nd page): Donna has expressed confusion, agitation and disorganized behavior during the night. She also fell and hit her face on a metal desk but is adamant that she slipped accidentally. She has had previous gait disturbances and a MRI showed multiple lesions. She denies self-harm etc and is strongly opposed to being placed on suicide watch. Suspect she may be experiencing delusions.

Report dated 3/22/06. Interdisciplinary Progress Notes (2nd page): Was dumping food outside her window. Determined medical attention was needed-was placed in infirmary for testing and observation. Donna was staring into space, was unsteady on her feet and withdrawn. She has poor recent memory and her thought process is slurred, she is confused and is suffering from cognitive impairment.

Report dated 3/27/06. Interdisciplinary Progress Notes (2nd page): Has bruises around left eye from a fall last week.

Report dated 5/17/06. Interdisciplinary Progress Notes (2nd page): Reports she has not slept properly for two nights and claims to have dozed off whilst showering/shaving-wonders if this is a problem.

Report dated 6/13/06. Mental Health Caseload Classification (annual): Cl Categorical (SMI); Bipolar D/O.

Optometry Report dated 6/13/06. Addendum to Mental Health Evaluation: Has difficulty falling and staying asleep. Has nerve pain and heart burn. Page 2: sexually abused by 2 cousins. Page 3: BPAD Type II in remission.

Report dated 11/22/06. Interdisciplinary Progress Notes (2nd page): Recently lost brother-in-law to suicide. Donna states her despair and how she could relate to what he was feeling.

Report dated 12/12/06. Mental Health Treatment Plan Review: Reiterates history of depressive mood.

Report dated 2/20/07. Interdisciplinary Progress Notes (2nd page): Donna states she wishes she knew a way to die without killing herself, she says she has tried holding her breath. Still experiencing problems setting boundaries and is giving away her commissary items.

Report dated 3/13/07. Mental Health Treatment Plan Review: Currently in depressed phase, she has to learn to set appropriate boundaries and not to be so trusting of inmates who will take advantage of her.

Report dated 05/14/07. Bipolar Group Pre-test: Has 4 symptoms of a bipolar disorder; sadness, euphoria, agitation and intolerance. On a scale of l(low)-l0(high) Donna says her disorder interferes with her life at number 8. Her compliance for taking medication was only 95% but she claims to have taken all of them. Says her mood is affected by inconsideration from others, others being mean and fear. Her disorder is controlled by medication.

Report dated 6/12/07. Mental Health Treatment Plan Review: Confirms bipolar II disorder and is a borderline diabetic. Problem described as mania/hypomania. States she has depression more often than mania and she did not attend her Bipolar Group.

Report dated 6/13/07. Mental Health Caseload Classification Confirms bipolar disorder.

Report dated 6/18/07. Addendum to Mental Health Evaluation: Inmate has suffered from depression since 6, was treated on/off with counseling but is now purely on medication; wonders if she would die without it. Experiences depression when thinks of her husband. She has had 3 head injuries, the first being aged 19, second in 1983 and the third in 1999. Reports of a personality change after the 1999 injury- felt like she was 18 and not afraid of anything. Brief Psychiatric Rating Scale Scored 4 (moderate) on depressive mood scale.

Report dated 7/11/07. Interdisciplinary Progress Notes BPAD type Il and PTSD are in remission.

### G.     List of Medications Ms. Roberts was Prescribed in Prison

167.     While in prison, Ms. Roberts was receiving the following medication prescribed by medical experts.

1.     Trazodone

2.     Depakote - mood stabilizer

3.     Lithium

49

4.      Bupropion

5.      Valproic Acid

6.      Wellbutrin

7.      Cymbalta

8.      Elavil

9.      Depakene

10.    Buspar

168.    It is doubtful that the above would be prescribed throughout her term of incarceration if she were malingering.

### H.    Additional Mitigating Evidence The Ohio Courts Refused To Consider

169.    The trial court refused to consider a statement of testimony from Ms. Roberts's son, Michael Raymond, a military veteran. Mr. Raymond averred that Ms. Roberts volunteered to assist the poor, had a dysfunctional family and was a good mother until the automobile accident caused her to start smoking marijuana and generally lose her way.

170.    Dr. James Eisenberg, a forensic psychologist, also offered an incomplete affidavit for the state court record. Dr. Eisenberg admittedly could not testify as he had not been able to fully evaluate her mental condition. However, his preliminary findings were completely consistent with the above evidence and corroborate Ms. Roberts's mental health diagnoses and symptoms found by ODRC personnel and the descriptions contained in her September 20, 2007, proffer.[4]

---

[4] Ms. Roberts suffers from the following physical ailments, which she attempted to introduce to the trial court for sentencing consideration and are gleaned from the ODRC records from 2003 - 2007: (1) Has a problem with her lower spine and pelvis, often causing her great amounts of pain; (2) Has suffered from sciatica; (3) Had a fall in prison and hit her head/face on a metal desk; (4) Has borderline diabetes; (5) Had at least 3 head injuries (first at 19 years of age); (6) Had cysts removed from her ovaries; (7) Has suffered hypertension, and shows a few punctuate white matter signal abnormalities which are non-specific in nature, found via an MRI (likely to be age related).

I.      **Another Judge On This Court Has Granted Co-Defendant Jackson's Federal Habeas Writ Based On The Identical Claim Raised Here**

171.    On February 23, 2021, another judge on this Court granted Ms. Roberts's co-defendant, Nathaniel Jackson's petition for writ of habeas corpus based on the identical claim raised here. *Jackson v. Houk*, 4:07-CV-00880-JG, ECF # 80 (Opinion & Order.) There, Jackson presented the identical claim of the Ohio Supreme Court remanding his case for resentencing with instructions to the trial court to not admit or consider any new mitigating evidence. The district court found the Ohio Supreme Court's limitations on the presentation of mitigating evidence during Jackson's capital sentencing hearing violated his rights under *Lockett*, *Eddings* and *Skipper*. Following the Sixth Circuit's decision in *Davis*, a case nearly factually identical to that presented in *Jackson*, the district court found a writ was warranted. It held:

> The Ohio Supreme Court said that it was not bound by *Davis* or any "rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court." [*State v. Jackson*, 73 N.E.2d 414 (Ohio 2016) (quoting *State v. Roberts*, 998 N.E.2d 1103, 1108 (Ohio 2013)].
>
> But the *Davis* Court correctly interpreted the U.S. Supreme Court's *Lockett*, *Eddings*, *Skipper* holdings. The Ohio Supreme Court's finding guts the Supreme Court's requirement that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating" and "[u]nder *Eddings*, such evidence may not be excluded from the sentencer's consideration."

*Id.* at PageID 23853.

172.    The Court concluded it was "bound by *Davis* and the Sixth Circuit's understanding of the dictates of the Supreme Court's *Lockett*, *Eddings*, and *Skipper* precedent. It found the Ohio Supreme Court's interpretation of these cases "destroys the Supreme Court's holding that defendants be given a chance to offer mitigating evidence." *Id.* The Court granted the writ based on these findings.

173.    The Warden filed an appeal to the Sixth Circuit Court of Appeals on March 24, 2021.

*Jackson v. Houk*, No. 21-3280, to which Jackson filed a cross-appeal. *Jackson v. Houk*, No. 21-3207. The Appellee/Cross-Appellant's Motion for Certificate of Appealability currently is pending before that Court. *Id.* at ECF 12.

### J.    Conclusion

174.    Ms. Roberts's SSA and prison records reveal a great deal of mitigation evidence that the trial court refused to consider when deciding the appropriate sentence in this case.

175.    The affidavits of Dr. Eisenberg and Michael Raymond also would have provided strong testimony in mitigation had the trial court considered them. They would have supported Ms. Roberts's ignored allocution.

176.    Because the evidence in this case included Depression, Bipolar Disorder, child abuse, hallucinations, post-traumatic stress disorder, dysfunctional family, and head injuries but was never considered by the capital sentencer, the Ohio Supreme Court was unreasonable in upholding Ms. Roberts's sentence of death under *Lockett v. Ohio*, 438 U.S. 586 (1978) and its progeny. 28 U.S.C. § 2244(d).

177.    This Court should follow the factual findings and legal conclusions of *Jackson v. Houk*, *supra*, and conclude, based on identical grounds, the Ohio courts violated Ms. Roberts's Eighth and Fourteenth Amendment rights.  Habeas relief should be granted on this issue.

### SECOND GROUND FOR RELIEF

**MS. ROBERTS'S RIGHT TO DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL WAS DENIED BY COUNSEL'S DEFICIENT PERFORMANCE DURING THE PENALTY PHASE OF HER TRIAL IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

178.    Ms. Roberts incorporates by reference all other paragraphs of this petition as if rewritten here.

179.     Ms. Roberts raised this ground for relief on direct appeal to the Supreme Court of Ohio. It

is therefore ripe for habeas review.

180.     One of the most basic obligations of capital defense counsel is to humanize the client to

the jury. When a capital jury is empaneled, the only information it knows about the client is that

is she or he is accused of committing a horrible act. It is capital defense counsel's duty to obtain

and present to the jury information that assists the jury in understanding the client's humanity.

(ABA Guideline 10.5, Commentary (2003)).

181.     Where, as here, the prosecution presents significant evidence of a client's guilt, defense

counsel must make the additional effort to explain the homicidal act in a way that mitigates it,

either because of the circumstances of the homicide, the client's background, or both.

182.     Trial counsel were deficient when they failed to make a timely and reasonable investigation

of Ms. Roberts's character, history, and background. Counsel's mitigation presentation was

deficient and deprived the jurors of evidence that was worthy of weight and effect.

183.     Defense counsel failed to provide the jurors with any insight into Ms. Roberts's childhood,

mental and physical health, as well as her social, educational, economic and employment history.

### A.     Clearly Established Federal Law

184.     The United States Supreme Court has addressed the issue and found, without equivocation:

trial counsel have an "obligation to conduct a thorough investigation of the defendant's

background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

185.     In the seminal case regarding counsel's responsibilities in the penalty phase of a capital

trial, the Supreme Court determined that cloaking a perfunctory mitigation investigation by

asserting it was "strategy" does not shield the investigation from subsequent judicial review. The

Supreme Court held, "*Strickland* does not establish that a cursory investigation automatically

justifies a tactical decision with respect to sentencing strategy." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). Trial counsel's failure to investigate and present this voluminous mitigating evidence to the jury prejudiced the outcome of the penalty phase of Ms. Roberts's trial.

186.    Trial counsel were unable to provide this essential personal background of Ms. Roberts because they did not fully investigate the possible mitigation evidence. To begin, counsel failed to hire a mitigation investigator or specialist. This is required by ABA Guideline standards.

187.    According to the revised ABA Guidelines, mitigation specialists are mandated as part of the defense team's function. The Guidelines detail the "current consensus" of a capital defense and require each defense team, at a minimum, consist of two attorneys, an investigator, and a mitigation specialist. *See* (ABA Guidelines I.I, 4.1 and commentary (2003)).

188.    The United States Supreme Court endorsed the ABA Guideline standards in, among other cases, *Rompilla v. Beard*, 545 U.S. 374 (2005). The Court, quoting the ABA standards as to how reasonable capital counsel should perform, found:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

*Rompilla*, 545 U.S. at 387 (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)).

189.    Defense counsel failed to conduct a constitutionally sufficient mitigation investigation. Counsel failed to take the necessary time to speak to family members, including Ms. Roberts's son, Mike Raymond, her sister, Janice and even Ms. Roberts herself about her upbringing and background. Had they done so they would have uncovered powerful mitigation evidence.

54

**B.  Ms. Roberts Had A Difficult Upbringing And Early Life Yet Cared For And Mothered Her Younger Sister, Janice**

190.  Ms. Roberts's mother suffered from severe depression. (2008 PCR Petition, Ex. E.)

191.  Ms. Roberts's sister Janice also suffered from depression for most of her adult life until she received treatment and medication for it. (Id.)

192.  Ms. Roberts was 15 years old when Janice was born. Because of their mother's condition, Ms. Roberts essentially raised Janice. She taught her everything. When she left the house to move to Florida, Janice was crushed. Ms. Roberts paid for Janice's medical care, taught Janice right from wrong, and even helped pay college tuition for at least three different institutions; including the University of Pittsburgh and a correspondence course with Louisiana State University. Janice ultimately graduated from Florida Atlantic University. (Id.)

193.  Growing up was difficult because of all the fights between Ms. Roberts's mother and father. Their father never struck the kids, but he was always threatening and chasing her mother. Ms. Roberts's father was always breaking chairs and tables and glasses when he would lose his temper. Ms. Roberts told Janice that on one occasion she saw their dad chase their mother with a gun, although he did not shoot it. Ms. Roberts became so frightened when this occurred that she hid under her bed for a prolonged period of time. (Id.)

194.  On another occasion, Ms. Roberts told Janice their mother fell down the steps during a fight. Janice described that while growing up in their household, she constantly feared her father would kill her mother. (Id.)

195.  Janice believes their father may have been an alcoholic. (Id.)

196.  Ms. Roberts's father had an erratic temper. One minute he would be threatening her mother and the next minute her father and mother would get along wonderfully.

197.  Ms. Roberts always felt alone. She did not feel she belonged anywhere. She desperately

55

wanted affection and love from others. She was always trying to keep the family together. She was always afraid of being abandoned. (2008 PCR Petition, Exs. E, F.)

198.     When Janice was 17, she moved to Florida to live with Ms. Roberts and her second husband, Bert Gelfand. Donna was working as an assistant for Dr. Morton Freiman, who was a plastic surgeon. Donna was not certified as a nurse but worked under him. She converted to Judaism at that time, probably as the result of the influence of Dr. Freiman, who was Jewish. Ms. Roberts was raised Catholic. Ms. Roberts thought the family did not approve, but Janice believed that the conversion did not bother the rest of the family as much as Ms. Roberts believed. According to Janice, it was typical of Ms. Roberts to make a decision based on her desire to be accepted by others whom she was with at a particular time. Ms. Roberts's father did not approve of the conversion. (Id.)

199.     When Ms. Roberts was in her middle thirties and married to Mr. Gelfand, she became pregnant. Her husband did not want the child. He talked her into an abortion. She never forgave herself for this. She became inconsolable. She divorced Mr. Gelfand because of this incident. Ms. Roberts was extremely depressed and isolated herself from people after this incident. She agreed to have the abortion because she was afraid that her drinking and drug usage would cause medical problems for the baby. (PCR Exs. E, F.)

200.     Ms. Roberts met Fingerhut after she left Bert. Her isolation continued with him. She did not keep up with family gatherings. Fingerhut perpetuated her isolation. Janice only brought her son to see Ms. Roberts when Fingerhut was not home. Mr. Fingerhut did not encourage her to keep up with the family.

201.     Ms. Roberts and Fingerhut moved back to the Youngstown area after a man tried to hi-jack her car with her as a captive. They both gave up good jobs to move back to Northeast Ohio from

56

the Miami area. (2008 PCR Petition, Exs. E, F.)

      **C.**    **Ms. Roberts Was Involved In Three Automobile Accidents Involving Head Injuries. Trial Counsel Never Investigated The Possibility Of Traumatic Brain Injury**

202.     Ms. Roberts was involved in at least three automobile accidents throughout her life. One was in the l960's, another was in the 1980's. The final accident in 1999 altered Ms. Roberts's behavior. She completely isolated herself from friends and family. She stopped calling Janice, to whom she has spoken most every day.

203.     After her 1999 accident, Fingerhut informed Michael Raymond, Ms. Roberts's son, that she was not behaving normally and feared she was either on drugs or had a major chemical imbalance. She even began smoking although she had previously been anti-smoking. (2008 PCR Petition, Exs. E, F,)

204.     Fingerhut called the Social Security Administration to urge the agency to provide Ms. Roberts with benefits. He informed that agency that Ms. Roberts had not been herself since the accident. Fingerhut was afraid someone would grab her after one of her memory problems. She was a changed person. She did not have the emotional stability to work anymore. She had lost some of her memory. (Id. at Ex. A, pp. 1, 3.) Fingerhut provided the agency with examples: While Ms. Roberts previously had known all members of the Cleveland Indians, she could not recall any of them. (Id. p. 5.)

205.     The examiner, Donald Degli, M.A., noted the change in Ms. Roberts's mental condition since the accident. (Degli Rep. at 4, 6.) This all occurred two to three weeks after the accident. He noted she became moody and thought irrationally. She was not the same person that she had been. She had lapses of time. A half of an hour may pass, and Ms. Roberts would believe half the day had passed. She could not remember dates after repeated prompting. She went into rages. (2008

PCR Petition, Ex. A, pp. 6, 9.)

206.    An EEG was taken on June 25, 1999. The results were suggestive of psychological dysfunction and thought less likely to be structural damage. (Id. at p. 96.)

207.    Fingerhut reported to the Social Security Agency that Ms. Roberts had not been thinking clearly. She would forget where she was in familiar places and where she placed items in the home. She could not even remember their dogs' names.

208.    The accidents were verified by Dr. Thomas Gazley of the Forensic Diagnostic Center. Dr. Gazley, who is not a neuropsychologist (Resent. Tr. at 24-25), noted that he did not know if there was "such a thing as competency to be resentenced criteria." (Id. at 25.) It was difficult for him to determine what effect a head injury in 1999 might have several years later. There is no evidence that Dr. Gazley reviewed any of the Social Security records. Certainly, these records were not available for the competency evaluation prior to the actual trial.

209.    A brain injury could be a diagnostic question; that is if the injury changes the person's ability to process thought, as it has to do with the cognitive process, the use of language and memory. (Id. at 26-27.) It may also cause one's personality to change. This could affect a defendant's ability to interact with counsel, but Dr. Gazley did not observe this process in his evaluation. (Id. at 27.)

210.    Trial counsel failed to uncover Social Security records which revealed the extent of Ms. Roberts's head injuries, and which resulted in her receiving disability payments.

211.    Trial counsel also failed to hire a neuropsychologist to determine the extent of Ms. Roberts's head injuries and the effect that these injuries had on her thinking and actions. As noted, even Fingerhut noted to the Social Security Administration that she had been acting peculiarly since the accident.

58

212.     During her unsworn statement/allocution after the first remand, Dr. Gazely conceded that

he was unsure whether Ms. Roberts's mental health issues were the result of some sort of injury

or illness of the brain. (Resent. Tr. at 25.)

   **D.     Ms. Roberts Has Always Lived With Multiple Mental Health Issues
   Complicated By Possible Traumatic Brain Injury**

213.     After her automobile accident in April 1999, Fingerhut reported that Ms. Roberts

experienced severe mood swings, including one in the doctor's office. This outburst necessitated

her being admitted to the psychiatric ward at St. Joseph's Health Center in Warren, Ohio. (2008

PCR Petition, Ex A, pp. 8, 9.)

214.     Once at the hospital, Ms. Roberts informed doctors that she had psychiatric problems and

had taken some medicines from a psychiatrist in the past. She admitted to having frequent mood

swings, going from elation to depression all throughout her life. (Id. at p. 22.) She believed that

she would be better off dead than alive and thought of killing herself with carbon monoxide. She

admitted hearing voices and seeing shadows in her rooms and believed that someone was after her

and trying to hurt her. (Id. at 23.) Ms. Roberts was diagnosed with Major Depression with possible

Bipolar Disorder. She thought of killing herself "everyday." (Id. at 37.)

215.     From the records at St. Joseph's, it appears Ms. Roberts was diagnosed with Psychotic

Disorder and a personality disorder. (Id. at p. 11.) The admitting diagnosis was Depression,

suicidal, Major Depression, recurrent Bipolar Disorder.

216.     The discharge records at St. Joseph's included the following information: Ms. Roberts

stated that she had been getting quite tense, restless and depressed, having frequent mood swings,

losing interest in doing things, having difficulties concentrating and started hearing voices talking

to her. She had been seeing shadows around the room when no one is home and has the feeling

that someone is after her.

217.     At that time Ms. Roberts was prescribed: Remeron (15 mg), Zyprexa (526mg), Vistaril (50

mg), Premarin, Provera, Paxil (20 mg), Depakote (500 mg), Risperdal (1 mg). (2008 PCR Petition,

Ex. A, p. 17.)

218.     The final diagnosis was Bipolar Disorder, circular type. (Id. at p. 18.)

219.     Ms. Roberts displayed bizarre behavior in a January 14, 2000, interview where she pulled

gum from her bosom, repeatedly licked the filters of her cigarettes. She heard noises that others

could not hear, felt rage and saw a light to the side of her head that others could not see, but denied

that they were hallucinations. (Id. at 118.) She was obsessed with sex and death. She had obsessive

thoughts of bad things happening to her if she did not complete her rituals. She was experiencing

auditory and visual hallucinations. (Id.)

220.     Trial counsel failed to hire an independent psychologist and spend the necessary time with

their client. Had they done so, they would have discovered that she had suffered from Depression

for a great many years and was probably Bi-Polar. (2008 PCR Petition Exs. C, D, G.)

221.     Ms. Roberts's IQ following her 1999 auto accident revealed an IQ of 65. (Id. at Ex. C, p.

3.) Even if a subsequent hearing would not have resulted in Ms. Roberts meeting the criteria for

intellectual disability under *Atkins v. Virginia*, 536 U.S. 304 (2002), the report of her post-accident

IQ should have been admitted as evidence in mitigation. Low intelligence is a recognized

mitigator, regardless of whether it meets Ohio's intellectual disability standards.

222.     In addition, the 1999 Social Security Administration report contained important

psychological testing results and an opinion that was instrumental to the jury's determination of

the appropriate sentence. The report concluded as follows:

> This is the evaluation of a fifty-five-year-old woman who presents a rather odd
> diagnostic picture. Unfortunately, no formal history accompanied the referral to this
> office for this claimant who suffered multiple injuries including head trauma in a
> reported automobile accident which occurred in April of 1999. Thus, today's

60

evaluation leads to rule out differential diagnostics. At times, she seemed to be genuinely confused as she well complained of memory problems. At other times, her responses seemed to be an exaggeration, dramatization, confabulation, or malingering. She reports medications for dizziness. She also takes antidepressant medication. Yet, she reports no formal mental health care. The intellectual assessment yielded questionable functioning and an intelligence quotient in the mild mental retardation range. Memory functioning, as measured by the Wechsler Memory Scales was also impaired, although her responses were suggestive of confabulation and malingering. Reading skills proved to be functional at the high school level. Personality and emotional assessment reveals an individual who is rather blunted, expressionless, preoccupied, worrisome and evidencing some rather strange ideation if she is being genuine in her presentation. Diagnostically, there is a need for rule out consideration of dementia. There is certainly a need for thorough review of whatever medical/neurological records are available.

Psychologically, Donna does present herself as genuinely impaired to some degree, probably not able to follow directions or do routine tasks in a competitive work environment at the present time. She has the ability and judgment to manage basic money matters appropriately. Interpersonal functioning was particularly impaired, if today is an example. She will have difficulty in simple social interactions and at best, presents marginal capacity to interact appropriately in a competitive workplace.

Provisionally, Donna is moderately impaired in her ability to meet the demands of competitive adult employment. These observations are made without regard to whatever physical limitations she may have.

(Degli Rep. at p. 3.)

223. It is important to note that the report was prepared approximately two years prior to the homicide. It notes, consistently, the "Interpersonal functioning was particularly impaired," which may explain the difficulty Ms. Roberts had with her attorneys. She had a "marginal capacity to interact appropriately in a competitive workplace." (Id.)

224. The report also noted that, "There is certainly a need for thorough review of whatever medical/neurological records are available." This is consistent with the affidavit Dr. James Eisenberg provided to the Ohio courts during state post-conviction proceedings. (2008 PCR Petition, Ex. C.) This type of thorough mental health examination is required by the ABA Guidelines for the representation of a capital defendant. ABA Guidelines for the Appointment and

Performance of Counsel in Death Penalty Cases 11.4.1(C) (2003).

225.     Counsel neither took the time to become acquainted with Ms. Roberts personally nor procured her records. Had counsel done so, they could have developed a trusting relationship where she would have trusted their advice to proceed with the presentation of mitigating evidence.

### E.     Conclusion

226.     Aside from their deficient mitigation investigation, perhaps counsel's most egregious failure was their failure to prepare Ms. Roberts for her unsworn statement. Because of her memory loss and mental conditions, counsel could have directed her statement. Had counsel conducted the proper investigation, Ms. Roberts could have been provided materials that she could have used to refresh her recollection. This information included references to sexual abuse to which she was subjected as a child, causing her to develop an imaginary friend (Resent. Tr. at 30.)

227.     Alternatively, had trial counsel performed a constitutionally adequate investigation, they could have convinced Ms. Roberts to permit them to present evidence during the penalty phase of her trial in addition to her unsworn statement. They could have presented evidence: that she was a good student in school, (Id. at 48); of her automobile accidents, (Id. at 49, 50); of the changes she underwent after the accidents; of her depression and that she had been in a psychiatric ward; that Fingerhut made her go to the Social Security Administration to get help and that she was placed on SSI and Medicaid. (Id. at 53.) Counsel also could have clarified the extent of her work in Israel with plastic surgery for injured soldiers. (Id. at 56-57.) They could have demonstrated she was a financially successful woman who had no need to murder her husband for money. They could have demonstrated Ms. Roberts often helped her family financially. (Id. at 60, 62.)

228.     Ms. Roberts's sister Janice recommended attorney Jerry Ingram represent Ms. Roberts because he had represented Janice previously. Mr. Ingram seemed disinterested in talking to the

family. Janice told him about the family history and that family members were willing to talk to him, but he never set up a meeting to discuss Ms. Roberts's family history. Janice asked Mr. Ingram about the video tape of Nathaniel Jackson's statement, which cleared Ms. Roberts. He said maybe they would use it in mitigation. He never did. The family was very frustrated because the lawyers would not communicate with them. (2008 PCR Petition, Ex. E, p. 3.)

229.    The jury heard none of the above information and could not include it in their deliberations.

230.    As a result of trial counsel's deficient mitigation investigation, Ms. Roberts's rights guaranteed by the United States Constitution's Fifth, Sixth, Eighth, and Fourteenth Amendments were violated.

231.    When a capital defendant is deprived of an individualized assessment because of trial counsel's failure to investigate, the integrity and reliability of the sentencing determination is undermined, thus establishing prejudice. *Williams v. Taylor*, 529 U.S. 362, 393, n.17 (2000). Counsel did not conduct a reasonable investigation here. Counsel's penalty phase performance fell far below prevailing professional norms as articulated in the ABA Guidelines, *Wiggins v. Smith*, 539 U.S. 510 (2003).

232.    Ms. Roberts was prejudiced by her counsel's deficient performance, particularly in the cumulative, which undermines confidence in the outcome of her capital sentencing hearing under the Sixth, Eighth and Fourteenth Amendments.

233.    This Court must grant the writ of habeas corpus on this claim.

## THIRD GROUND FOR RELIEF

**TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY ALLOWED MS. ROBERTS TO WAIVE HER RIGHT TO PRESENT MITIGATION EVIDENCE BECAUSE TRIAL COUNSEL FAILED TO FULLY INFORM HER OF THE CONSEQUENCES OF THE WAIVER AND THE WAIVER WAS THEREFORE NOT KNOWING, VOLUNTARY AND INTELLIGENT.**

234.    Ms. Roberts incorporates by reference all other paragraphs of this petition as if realleged here.

235.    Ms. Roberts raised this ground for relief on direct appeal to the Supreme Court of Ohio. It is therefore ripe for habeas review.

236.    Ms. Roberts has a clearly established constitutional right to the effective assistance of trial counsel under the Sixth and Fourteenth Amendments. Just as the penalty phase of a capital trial must individualize a defendant, *Zant v. Stephens*, 462 U.S. 862, 878-79 (1983), so too is there a right to the effective assistance of trial counsel during the penalty phase of a capital trial. *Strickland v. Washington*, 466 U.S. 668 (1984). Because counsel failed in their basic duty to investigate and provide the mental health expert with documents that could have saved their client's life, counsel were ineffective during this critical stage of mitigation in a capital penalty phase hearing.

237.    Here, trial counsel's conduct fell below acceptable standards of reasonableness. Ms. Roberts was prejudiced by counsel's inadequate performance because they permitted her to waive the presentation of mitigating evidence during the penalty phase of her trial.

238.    Ms. Roberts's trial counsel were ineffective because they failed to ensure that Ms. Roberts's mitigation waiver was knowingly, voluntarily, and intelligently entered into with a full understanding of its consequences. *See Strickland*, *supra*.

239.    Trial counsel failed to consider the severe mental illness and brain trauma Ms. Roberts had suffered before they accepted her waiver. Despite knowing of these debilitating conditions, trial

counsel readily and openly agreed that Ms. Roberts was competent to waive her mitigation hearing.

240.    Ms. Roberts did not have a clear understanding of the process and the ramifications of the waiver. She sought to waive only part of her right, as she expressly wanted to provide an unsworn statement. Ms. Roberts was angered by the outcome of her trial. Counsel failed to request a continuance of the penalty phase so that the Ms. Roberts could calmly consider her fate for sentencing.

241.    Counsel also failed to address with Ms. Roberts that the failure to present mitigation, in which Ms. Roberts maintains the burden of going forward under Ohio law, results in an automatic death verdict in a weighing state such as Ohio. The record does not reflect that Ms. Roberts was aware that she was committing state assisted suicide. In fact, the mitigation offered in her unsworn statement and her dismay at the verdict and the trial process, contradicts her stated desire to waive mitigation and demonstrates her confusion.

242.    The Ohio state courts' denial of Ms. Roberts's claims of ineffective assistance of counsel in the penalty phase were contrary to or an unreasonable application of clearly established case law from the United States Supreme Court or were based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254. This Court must grant the writ of habeas corpus based on this claim.

    A.    Background

243.    As stated in the Second Ground for Relief, *supra*, Ms. Roberts sought to waive the presentation of mitigating evidence at the penalty phase of her trial. She very much wanted, however, to present an unsworn statement to the jury. In essence, Ms. Roberts wanted only a partial waiver of her mitigation hearing.

244.    Trial counsel were aware of the frustration Ms. Roberts felt at the jury's verdict. The trial

judge tried to explain it was unusual to waive the presentation of mitigating evidence "because it allows the Jury an opportunity to know something about Donna Roberts that was not brought out during trial." (Trial Tr. Vol. XXVIII, at 6222.) Ms. Roberts's contempt for the verdict was apparent when she responded: "May I interrupt? If we let them know the real me, they will think they are in the wrong place, so let's not get them more mixed up than they are." (Id.)

245.    Counsel should have sought a continuance of the penalty phase of the trial so that Ms. Roberts could gain some time and therefore perspective regarding the jury's verdict and their ability to accept the mitigating evidence she could present and find for a sentence less than death. Trial counsel's failure to request a continuance prejudiced the outcome of the penalty phase of trial.

246.    Trial counsel were aware of Ms. Roberts's previous psychiatric health issues and traumatic brain injury. They stated: "We have obtained hospital records relating to a six-day psychiatric stay in the year 2000. There was a hospitalization in April of - - two hospitalizations of April of 1999 relating to a traffic accident. We have obtained counseling records from Valley Counseling." (Id. at 6224-25.)

247.    Prior to ruling on Ms. Roberts's competence, the trial court heard the testimony of Dr. Thomas Eberle. Dr. Eberle "spent a couple of hours" with Ms. Roberts on the morning of the hearing. (Trial Tr., Vol. XXVIII, at 6228.) Dr. Eberle conceded he "didn't do any formal psychological testing." (Id. at 6228-29.) The trial court then perfunctorily inquired whether Dr. Eberle thought Ms. Roberts was competent to waive the presentation of mitigation evidence. Dr. Eberle responded, "I do." (Id. at 6230.)

248.    There is absolutely no indication in the record that trial counsel provided Dr. Eberle with records of Ms. Roberts's psychiatric illnesses, hospitalizations, or traumatic brain injury. Trial

66

counsel's decision not to convey these records to Dr. Eberle is *per se* ineffective. It clearly prejudiced the outcome of the trial court's decision. Indeed, the trial court stated that it partially based its finding that Ms. Roberts was competent to waive mitigation on Dr. Eberle's opinion. (Id. at 6235.)

249.    Not only did counsel fail to provide basic information to an evaluating psychologist, they overtly conceded her competence on the trial record. Despite knowing her history of brain dysfunction based on mental illness or brain injury, Mr. Ingram inexplicably conceded,

> I'll state on the record that it is my personal and professional opinion that Donna's decision making process was rational and that she's competent to make the decision. I believe Mr. Juhasz should explain his own feelings on that matter, but those are my opinions. My own perspective is that this is a rational, competent decision on her part.

(Id. at 6225.)

250.    Ms. Juhasz did nothing to correct Mr. Ingram's folly, conceding meekly, "I am comfortable that what Donna is doing in [sic] indeed knowing, voluntary and intelligent." (Id. at 6227.)

251.    Counsel's failure to ensure that their client and psychological expert were fully informed rendered the finding of Ms. Roberts's competence and the waiver of the mitigation hearing itself to be unknowing, involuntary, and unintelligent. *See Strickland, supra*.

252.    Because of the multiple failures of trial counsel, Ms. Roberts was in actuality acting without counsel at the critical penalty phase of her capital trial, and she was presumptively prejudiced. *United States v. Cronic*, 466 U.S. 648, 659 (1984).

253.    Ms. Roberts was prejudiced by her counsel's deficient performance, which undermines confidence in the outcome of her capital sentencing hearing under the Sixth, Eighth and Fourteenth Amendments.

254.    This Court must grant the writ of habeas corpus on this claim.

## FOURTH GROUND FOR RELIEF

**MS. ROBERTS WAS DENIED HER RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE CULPABILITY PHASE OF HER TRIAL IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

255.    Ms. Roberts incorporates by reference all other paragraphs of this petition as if rewritten here.

256.    Ms. Roberts raised this ground for relief on post-conviction appeal to the Eleventh District Court of Appeals. It is therefore ripe for habeas review.

257.    The Federal Constitution guarantees a minimum standard of proficiency of a criminally accused's counsel. The Sixth Amendment of the United States Constitution guarantees that "in all criminal prosecutions, the accused shall enjoy the right...to take the assistance of counsel for his defense." In *Powell v. Alabama* 287 U.S. 45 (1932), the United States Supreme Court first recognized that a defendant has a right not only to the timely appointment of counsel but also to the quality of performance above a minimal level of effectiveness. Federal courts recognized that the failure of trial counsel to properly represent his or her client might affect the legitimacy of the fact-finding process just as errors by the court or prosecution might require the reversal of a conviction.

258.    Here, the acts and omissions of trial counsel deprived Ms. Roberts of the Sixth Amendment right to effective assistance of counsel. Counsel did not provide an articulated defense for Ms. Roberts at trial. Counsel failed to object to the exclusion of at least two jurors of African American heritage during the jury selection. Although counsel did cross-examine and challenge evidence throughout the culpability stage of trial, counsel failed to give an

68

opening statement, present a tape of the co-defendant Jackson, in which he excludes Ms. Roberts's participation in the homicide, failed to present the co-defendant's claim of self-defense, obstructed Ms. Roberts's right to testify, and failed to provide a closing argument to the jury. This confusing strategy would only suggest to the jury that Ms. Roberts was not professing her innocence. There is no articulable reasonable strategy for trial counsel's actions or inactions at trial.

### A. Clearly Established Federal Law

259.    Counsel's performance here violated the standards set by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). The two-step test commands that, first, the defendant must show that counsel's performance was deficient. *Id*. That right is violated when counsel's performance falls below an objective standard of reasonableness and the client is prejudiced by counsel's breach of duty. *Strickland,* 466 U.S. at 690; 696.

260.    While indulging a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance, a court hearing an ineffective assistance claim must determine whether counsel's conduct caused a breakdown in the adversary process so as to destroy the fundamental fairness of the proceeding. Under the appropriate test for prejudice, the defendant must demonstrate a reasonable probability that, but for the counsel's errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 692. A "reasonable probability" of a different outcome means that defense counsel's error, or deficient performance, undermines the confidence in the adversarial nature of the trial. *Id* at 694.

### B.     Failures to Make *Batson* Challenge

261.     Counsel failed to object to the use of peremptory challenges on at least two Black jurors by the prosecution. These jurors were dismissed in violation of in *Batson v. Kentucky*, 476 U.S. 79 (1986). In *Batson,* the United States Supreme Court recognized that the Equal Protection Clause of the Fourteenth Amendment precludes purposeful discrimination by the state in the exercise of its peremptory challenges so as to exclude members of minority groups from service on petit juries. *Id*. at 89.

262.     The United States Supreme Court, in *Batson,* explicitly "rejected the evidentiary formulation * * * which required a defendant * * * to demonstrate the systematic exclusion of a group of jurors** *." *Id.* at 84. Whether or not other African American jurors remained on the jury does not exonerate the State for the discriminatory exercise of a race-based peremptory challenge, nor defense counsel for their failure to object. In Ms. Roberts's case, no Black jurors remained on the jury and the two or three that were in the venire were excused by the State. (2008 PCR Petition, Ex. D.)

### C.     Failure To Make Opening Statement

263.     Counsel for Ms. Roberts did not present an opening statement. Counsel had Ms. Roberts read a statement to the jury. Counsel did discuss having her read the statement to the jury prior to the opening statement, but not indicate to her or make clear to her that counsel themselves would **not** be addressing the jury. The statement provided by Ms. Roberts was ambiguous at best and did not state a defense. (Id.) This failure to make any opening presentation on Ms. Roberts's behalf was patently unreasonable and prejudicial to Ms. Roberts.

### D. Failure To Introduce Defense Of Co-Defendant

264. Ms. Roberts's counsel failed to present the defense of the co-defendant Jackson to the jury. At his trial, Jackson argued self-defense as the basis for his actions resulting in the death of Robert Fingerhut. *State v. Jackson*, 839 N.E.2d 362, 370 (Ohio 2006). The consideration of Jackson's self-defense claim was relevant to Ms. Roberts's claim that she did not conspire to have her husband killed.

265. Counsel failed to introduce a video tape of the co-defendant Jackson in which he exculpates Ms. Roberts and explains how the homicide occurred. (2008 PCR Petition, Ex. B).

266. The tape is a video recording of Jackson's interview with police detectives. Jackson, who described himself as a street hustler, explained that on the day of the incident the decedent Fingerhut had purchased a small amount of marijuana from Jackson for about $100.00. Jackson had known Fingerhut for a couple of years. Jackson had been to Fingerhut's house previously. (Id.)

267. Fingerhut took Jackson to Fingerhut's home to watch a sporting event. Fingerhut pulled the car into the garage. The two exited the car and went into the house. They sat at the kitchen table. Fingerhut was looking over his mail. Jackson was hoping Fingerhut could give him some work at the restaurant. Fingerhut then said words to the effect of "you black guys are the same, you don't want to do anything for yourself." Fingerhut continued to lecture Jackson. (Id.)

268. Jackson did not want to be subjected to the lecture and be "disrespected." He asked to be taken home. Fingerhut told him to walk. Jackson refused to walk. When Jackson looked up, Fingerhut was pointing a gun at him. Jackson felt that Fingerhut had "flipped." Jackson

described the change in Fingerhut's demeanor as being like, "Dr. Jekyll and Mr. Hyde." (Id.)

269.    In the interview, Jackson then said, "He squeezed on me, man," referring to Fingerhut

pulling the trigger. Jackson had grabbed the gun which had been pointed at him. The shot

injured Jackson's finger. Jackson thought that he "was a done deal," meaning himself.  He

then shot Fingerhut. After the first shot, Fingerhut kept coming at him. Jackson shot again and

killed him. (Id.)

270.    Jackson said that he did not intend to kill Fingerhut.  He had not thought about shooting

Fingerhut ahead of time. (2008 PCR Petition, Ex. B.)

271.    The videotape of Jackson's rendition of the events is evidence of Ms. Roberts's actual

innocence. An attorney performing within the professional norms would have presented it for

the jury's consideration. Trial counsel's actions were patently unreasonable and prejudicial to

Ms. Roberts's defense.

### E.    Waiver Of Closing Argument

272.    Defense counsel waived closing argument in the culpability phase of the trial. They

did not discuss this decision with Ms. Roberts prior to the closing. No strategic reason for not

providing an argument is apparent from the record. Counsel's failure to provide a

closing  statement to argue for Ms. Robert' innocence was unreasonable and prejudicial to Ms.

Roberts.

### F.    Refusal To Allow Ms. Roberts's Testimony

273.    A defendant's right to testify is fundamental. *See Rock v. Arkansas,* 483 U.S. 44,

52-53, (1987) ("An accused's right to present his own version of events in his own words"

is "even more fundamental to a personal defense than the right of self-representation"); *see*

*also Rogers-Bey v. Lane,* 896 F.2d 279, 283 (7th Cir. 1990). The right is personal to the

accused

and not capable of being waived by counsel on the defendant's behalf. *See Jones v. Barnes,* 463 U.S. 745, 751 (1983).

274.    Ms. Roberts's personal waiver of this fundamental right, which protects the fairness of the criminal proceeding, must be made in a knowing and intelligent manner to be valid. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 241 (1973) ("A strict standard of waiver has been applied to those rights guaranteed to a criminal defendant to insure that he will be accorded the greatest possible opportunity to utilize every facet of the constitutional model of a fair criminal trial."); *see also Johnson v. Zerbst,* 304 U.S. 458, 464 (1938) ("Courts indulge in every reasonable presumption against waiver of fundamental rights, and ... we do not presume acquiescence in the loss of fundamental rights.") (internal quotation marks and citation omitted).

275.    Counsel's failure to thoroughly advise Ms. Roberts of her right to testify was unreasonable and prejudicial.

276.    The failure of defense counsel to adequately represent Ms. Roberts during the trial stage resulted in a finding of guilt and sentence of death that does not comply with the minimum constitutional standards of reliability required by the Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

## FIFTH GROUND FOR RELIEF

**PERVASIVE PRE-TRIAL PUBLICITY DEPRIVED MS. ROBERTS OF HER RIGHT TO A FAIR TRIAL AND DUE PROCESS IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

277.    Ms. Roberts incorporates by reference all other paragraphs of this petition as if rewritten here.

278.    Ms. Roberts raised this ground for relief on direct appeal to the Supreme Court of Ohio. It

73

is therefore ripe for habeas review.

279.    Ms. Roberts has a constitutional right to an impartial jury guaranteed by the Due Process clause of the Fourteenth Amendment of the United States Constitution in all state criminal cases.

280.    In Ms. Roberts's case, the pretrial publicity was so pervasive that the jury could not reasonably have been expected to set it aside and decide the case with an open mind, uninfluenced by the media stories. Co-defendant Jackson had been tried in the same courthouse only months before Ms. Roberts's trial. He had been convicted and sentenced to death for the offense. The news media had saturated the relatively small county· with reports of the offense, including the state's theory regarding Ms. Roberts's complicity in the homicide. Proof of the prejudice is almost impossible. Jurors honestly believe that they can follow the law and ignore the influence of the media stories. To ask them to disregard a conviction and sentence of a co-defendant in this situation is simply too difficult of a task for jurors to undertake, try as they might.

### A.    Background

281.    The voir dire process here revealed that a jury should not have been seated in Trumbull County. Defense counsel questioned all prospective jurors in regard to their knowledge regarding this case prior to being called for jury service. The court had permitted a jury questionnaire which had aided in the questioning. At least sixteen of the jurors had basic knowledge of the facts of the case from either television or newspaper accounts. (Trial Tr. Vol. IV at 773; Vol. XIII at 2896, 2907, 2931, 2998; Vol. XIV at 3037, 3158; Vol. XV at 3260, 3305, 3441; Vol.XVI at 3515, 3587; Vol. XVII at 3699, 3898, Vol. XVIII at 3936; Vol.

XIX at 4094; Vol. XX at 4263, 4308) In addition, jurors who had not heard of the case, overheard conversations from other jurors in the pool about the case and its facts. (Tr. Vol. XII at 2894; Vol. XIV at 3086, 3158; Vol. XV at 3305, 3438)

282.     The following exemplify the process. Prospective Juror William Hall stated that he had followed the case pretty closely on the television news. (Trial Tr. Vol. XIII at 2907)  He also followed the case in the newspaper. (Id.)  This juror was dismissed for cause as he admitted having a preconceived notion as to the defendant's guilt. (Id. at 2910) Prospective Juror Robert Hamilton recalled seeing some of the case on television news reports or from the newspaper. He remembered reading that Jackson entered the home of the victim and shot and killed him. (Id. at 2931) He was aware that the murder occurred in Howland and that Ms. Roberts was implicated in the murder.  (Id. at 2958)

283.     Prospective Juror Carol Selak read about the case in the newspaper and had discussed the case with her co-workers. (Id. at 2998-3005) She recalled that Jackson was found guilty, and Ms. Roberts was involved. (Trial Tr. Vol. XIV at 3036-7) She was told that there were some letters admitted in the first trial. (Id. at 3043)

284.     Prospective Juror Margaret Fellows recalled reading about the case when it occurred. (Trial Tr. Vol. XVII at 3698) She recalled the name Nate Jackson and that he was arrested and convicted. (Id. at 3699) She knew the incident occurred in Howland and that Ms. Roberts had been arrested. (Id. at 3700)

285.     Prospective Juror Amy Bartlett stated that she had overheard a few women in the jury pool discussing what they had read in the newspaper about the case. (Trial Tr. Vol. XIV at 3158) She heard discussions regarding a death and who may have been involved. (Id.)

286.     Prospective Juror Helene Messersmith stated that one juror discussed with her in general the things the juror recalled from television reports. (Trial Tr. Vol. XV at 3305) Specifically, that juror told her that there were some letters admitted in the prior trial of the co-defendant. (Id. at 3306) That juror was talking with Ms. Messersmith, but there were other jurors in the area. (Id. at 3308)

287.     Prospective Juror Christine Hake stated that other jurors were talking about the case. The jurors stated that they thought they were being called for the "Roberts" case. (Id. at 3438) The jurors asked each other if they had read about the case in the newspaper. (Id.) A juror specifically asked Ms. Hake if she had read about the case and she stated that she had. (Id. at 3441) She told that juror that she knew it was about a guy from Howland, and a boyfriend had already been convicted, "now they're coming after her." (Id.).

B.     **Clearly Established Federal Law – Venue**

288.     Nearly sixty years ago, the United States Supreme Court spoke with regard to the necessity of change of venue in order to assure that due process of law would be secured for the defendant in the case of *Rideau v. Louisiana*, 373 U.S. 723 (1963). There, the Supreme Court found the petitioner's due process rights were violated when the trial court did not grant the defense change of venue motion.  A film of the petitioner confessing to the crimes was played on local television and several of the jurors stated during voir dire that they had viewed the film. As the Supreme Court held, "the question of who originally initiated the idea of the televised interview is, in any event, a basically irrelevant detail." 373 U.S. at 725.  The result was that the petitioner's rights were violated when the trial court did not move the trial to a different venue.

289.     The Supreme Court, two years earlier, in the case of *Irvin v. Dowd*, 366 U.S. 717

(1961), stated:

> The right to a jury trial guarantees to the criminally accused a fair trial by a
> panel of impartial, "indifferent" jurors. The failing to accord an accused a fair
> hearing violates even the minimal standards of due process... In the ultimate
> analysis, only the jury can strip a man of his liberty or life. In the language of
> Lord Coke, a juror must be "indifferent as he stands unsworn." Co Litt 155b.
> His verdict must be based upon the evidence developed at the trial. This is true,
> regardless of the heinousness of the crime charged, the apparent guilt of the
> offender or the station in life which he occupies. It was so written into our law
> as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807). The
> theory of the law is that a juror who has formed an opinion cannot be impartial.
> *Reynolds v. United States*, 98 U.S. 145 (1878).

Mr. Justice Frankfurter concurring in the *Irvin v. Dowd* case said:

> More than one student of society has expressed the view that not the least
> significant test of the quality of a civilization is its treatment of those charged
> with crime, particularly with offenses which arouse the passions of the
> community.

> One of the rightful boasts of Western civilization is that the State has the burden
> of establishing guilt solely on the basis of evidence produced in court and under
> circumstances assuring an accused all the safeguards of a fair procedure. These
> rudimentary conditions for determining guilt are inevitably wanting if the jury
> which is to sit in judgment on a fellow human being comes to its task with its
> mind ineradicable poisoned against him. How can fallible men and women
> reach a disinterested verdict based exclusively on what they heard in court
> when, before they entered the jury box, their minds were saturated by press and
> radio for months preceding by matter designed to establish the guilt of the
> accused. A conviction so secured obviously constitutes a denial of due process
> of law in its most rudimentary conception.

366 U.S. at 729.

290.     In addressing one's constitutional right to be tried by a fair and impartial jury, the United

States Court of Appeals for the Sixth Circuit stated as follows:

> In essence, the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136. In the ultimate analysis, only the jury can strip a man of his liberty. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworn." His verdict must be based upon the evidence developed at trial. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies . . .. "The theory of the law is that a juror who has formed an opinion cannot be impartial." *Reynolds v. United States*, 98 U.S. 145, 155.

*Goins v. McKeen*, 605 F.2d 947, 951 (6th Cir. 1979) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).

### C.     Voir Dire Requirement

291.    Defense counsel filed for a change of venue for Ms. Roberts. The motion contained numerous exhibits, at least sixty-seven, depicting the level of pretrial publicity. (Trial Tr., Vol. III at 529) The trial court held the decision in abeyance in an attempt to discover the level of the jurors' knowledge of the facts of this case. (Trial Tr., Vol. I at 146)

292.    "Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966).

293.    Beginning with *Irvin v. Dowd,* the United States Supreme Court has on occasion presumed prejudice on the part of the jury when a defendant has been able to "show[ ] the actual existence," albeit unexpressed, "of such an opinion in the mind of the juror as will raise the presumption of partiality." 366 U.S. at 723.  The Court stated, "The influence that lurks in an opinion once formed

78

is so persistent that it unconsciously fights detachment from the mental processes of the average man." *Id.* at 727.

294.    The Court has also emphasized the importance of the size and characteristics of the community in determining the prejudice from pretrial publicity. In *Skilling v. United States,* 561 U.S. 358 (2010), the Court distinguished the jury pool available in the small parish in *Rideau* from that of Houston, the fourth most populous city in the country, with a jury pool of 4.5 million. 561 U.S. at 382. Trumbull County had a population of only 225,000 people at the time of the trial.

295.    A thorough voir dire on the impact of pretrial publicity was necessary during the course of Ms. Roberts's jury selection, but such a thorough questioning was never conducted. Habeas relief should be granted on this issue.

## SIXTH GROUND FOR RELIEF

**A TRIAL COURT'S REFUSAL TO DISMISS BIASED JURORS FROM THE PANEL DEPRIVED MS. ROBERTS OF A FAIR TRIAL AND HER PROTECTIONS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

296.    Ms. Roberts incorporates by reference all other paragraphs of this petition as if rewritten here.

297.    Ms. Roberts raised this ground for relief on direct appeal to the Supreme Court of Ohio. It is therefore ripe for habeas review.

298.    The trial court refused to excuse two potential jurors for cause, even though they demonstrated in voir dire that they could not be fair and impartial. Ms. Roberts was forced to use her peremptory challenges to excuse these two veniremen.

299.    The trial court's failure to excuse the two biased veniremen for cause violated Ms. Roberts's rights to a fair trial and due process under the Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution.

**A.      Background Regarding Jurors' Inability To Fairly Consider Life Option**

**i.      Prospective Juror Andrew Kotwis:**

300.    Upon examination by the State, Mr. Kotwis responded that he recognized that "the death

penalty is an accepted way for law enforcement to provide comfort to the families of the harmed."

(Trial Tr. Vol. XVIII at 4022) "I don't look at it as punishment." (Id.)

301.    Defense counsel informed the prospective juror that they had concerns about him being a

penalty phase juror because of his views on the death penalty. (Id. at 4111) Defense counsel

believed that Mr. Kotwis was in favor of the death penalty and in the second phase would favor

death and directly said so to the prospective juror. (Id.) Mr. Kotwis responded that he understood

the concern but did not deny the assessment. (Id. at 4112)

302.    Defense counsel questioned Mr. Kotwis regarding his inclination to consider sympathy for

the survivors of the victim in the deliberation process. "You have to decide between death and life.

In making that decision are you going to consider sympathy or comfort for the victim's survivors?"

(Trial Tr. Vol. XVIII at 4120) Mr. Kotwis responded that "It will be a factor." (Id.)

303.    The following voir dire of the juror continued:

> Q. And the death penalty offers immediacy and life imprisonment does not?
>
> KOTWIS: Correct. (Id. at 4122)
>
> Q: The immediacy works for the victim's survivors, at least that's what I'm sensing.
>
> KOTWIS: Yeah, that's what I feel that's behind the debate between capital
> punishment and life imprisonment and death penalty. (Id. at 4123)

304.    The trial court attempted to clarify the situation and rehabilitate the juror. The trial court

conducted the following voir dire:

> THE COURT: Okay. From this standpoint, and you correct me if I'm wrong
> because maybe Jerry is right and I'm wrong on what he's picking up here, I think

that you are talking on two levels. You have apparently given some thought to this whole idea of the capital punishment debate we have going on and you have rationalized it in your mind that the only - you don't believe that it's a deterrent.

KOTWIS:     No.

THE COURT: A deterrent factor. And that the only rationale you can put on as to why this debate continues is that it does give comfort to the families of the victims.

KOTWIS: Uh-Huh.

COURT: Or the victims of the crime. But the point that the defense is trying to get you to state in a more definitive way, you've skirted around it and I think I know what your answer is but you're not really giving them a definite answer, and that is this question of sympathy. Now, the way you answered it I understood to be this: Of course I'm going to have feelings of sympathy because they're human emotions. You can't ask people to get in that jury box and not have feelings of anger or whatever. We all suffer from our emotions. But Mr. Ingram is concerned that because of your answer on that philosophical level that you are going to bring that in and apply it in this case as a determining factor in that second phase, that if you feel sorry for the family of the victim, that that may be a deciding part or a big part of any decision that you make.

KOTWIS: Un-huh.

THE COURT: And it maybe, I don't know.

KOTWIS: I mentioned to him that it would be a factor. (Id. at 4124-25.)

305.    The court explained to Mr. Kotwis that an instruction will be given that the law does not permit sympathy to be a determining factor on the evidence.  Mr. Kotwis responded as follows: "It wouldn't be a determining factor but it would be, in all honesty, I think it would be a small factor in your consideration." (Trial Tr. Vol. XVIII at 4126.)

306.    Defense counsel again tried to clarify Mr. Kotwis's opinion as follows:

MR. INGRAM: But we will agree that before you ever start a second phase that glass already has something in it and that the something in it favors the imposition of death, correct?

KOTWIS: Uh-huh.   (Id. at 4130.)

307.     The voir dire questioning of this juror continued for over one hundred pages of transcript. The parties questioned Mr. Kotwis for well over one and one-half hours.

308.     The defense objected for cause and requested that the court remove the juror based upon his answers. The defense believed that sympathy for the victim would improperly be a determining factor in Mr. Kotwis's decision in the second phase of the trial. (Id. at 4141.) The court overruled the objection and placed Mr. Kotwis in the jury pool. (Id. at 4142.)

## ii.    **Prospective Juror Michael Blake**

309.     Defense counsel also challenged prospective juror Michael Blake for cause. (Trial Tr. Vol. XX at 4408.) Defense counsel believed that Mr. Blake had a fixed impression of Ms. Roberts's guilt. Mr. Blake stated that he recalled the incident. He described his recollection that a man was found shot and that the defendant and the other guy were found to be lovers and had murdered the guy for his insurance money. (Id. at 4361.) Mr. Blake knew the defendant was Donna Roberts and the other co-defendant was Nate Jackson and Mr. Jackson was sentenced to death. (Id. at 4362.)

310.     Defense counsel questioned Mr. Blake regarding the information he had from the pre-trial publicity.

ATTY. JUHASZ: . . . if you take all that publicity and put it together, what impressions did you have about Donna Roberts?

BLAKE: Well they must have had a good reason to arrest her, so. . .

ATTY JUHASZ: Okay.

BLAKE: There must be some truth. That's what I look at it. (Id. at 4365.)

ATTY JUHASZ: ...you have some impression that she must have been involved in this, is that a fair characterization?

BLAKE: Yes. (Id. at 4366.)

ATTY JUHASZ: …  taking in all of this publicity did you ever read or see or hear anything that sort of changed that impression that sort of said maybe she wasn't involved . . . or does it all sort of lean to the conclusion or the impression that she was involved?

BLAKE: Yes.

ATTY JUHASZ: All pretty much one-sided?

BLAKE: Yeah.

ATTY JUHASZ: So nothing you've seen or read or heard has really done anything to change your impression that she might have been involved in this?

BLAKE: Right.

ATTY JUHASZ: Is that impression something that you would want to hear evidence in this trial to sort of dispel that impression?

BLAKE: Of course.

ATTY JUHASZ: You would anticipate hearing that evidence from Donna Roberts or somebody acting on her behalf?

BLAKE: Yes. (Id. at 4367.)

This juror could not presume the appellant innocent, yet the court refused to dismiss the juror for cause.

311.    Defense counsel used only five of the six allowed peremptory challenges on the prospective panel. Mr. Kotwis was prospective juror number 29 and Mr. Blake was prospective juror number 30. The state used all six peremptory challenges. (Id. at 4603.) At

the time of the sixth peremptory for the defense, the next two jurors to be placed on the jury panel would have been Mr. Kotwis and Mr. Blake.

312.    Mr. Kotwis and Mr. Blake were the first two alternate jurors seated on the panel. Defense counsel used its only two peremptory challenges to remove both Mr. Kotwis and Mr. Blake as alternate jurors. (Trial Tr. Vol. XXIII at.5032.) Clearly because the court failed to properly dismiss these two jurors for cause, the defense was forced to reserve one of its peremptory challenges in order to keep Mr. Kotwis and Mr. Blake off the jury panel. The defense was then forced to use both peremptory challenges for Mr. Kotwis and Mr. Blake during alternate juror selection.

### B.    Clearly Established Federal Law

313.    A prospective juror should be excused for cause whenever the juror holds a particular belief or opinion that will prevent or substantially impair the performance of his duties as a juror. *United States v. Salamone,* 800 F.2d 1216 (3rd Cir. 1986). Once actual prejudice is shown, the court must grant a challenge for cause. *United States v. Daly.* 716 F.2d 1499 (9th Cir. 1983). Any claim of an erroneous ruling denying a challenge for cause in reality reduces the number of peremptory challenges that are available and thereby constitutes reversible error. *United States v. Nell*, 526 F. 2d 1223 (5th Cir. 1976).

314.    In *Adams v. Texas*, 448 U.S. 38 (1980), the United States Supreme Court created the following standard for granting dismissal for cause in death penalty cases:

> A juror may not be challenged for cause based upon his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.  The State may insist, however, the jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Adams, supra,* at 589. The application of this minimum constitutional standard was confirmed

by the Court in *Wainwright v. Witt*, 469 U.S. 412 (1985).

315.     In *Witt*, the United States Supreme Court adopted the standard test as whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." But however much the *Witt* Court sought to clarify its position in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), it acknowledged that the *Witt* standard "*in addition to dispensing with Witherspoon's reference to 'automatic' decision making, this standard likewise does not require* that a juror's bias be proved with 'unmistakable clarity.'" *Witt*, 469 U.S. at 424. And in addressing the dissent's concerns, the majority noted, "[w]e adhere to the essential balance struck by the *Witherspoon* decision rendered in 1968, if not to the version of it presented by today's dissent; *we simply modify the test* stated in *Witherspoon*'s footnote 21 to hold that the State may exclude from capital sentencing juries that 'class' of veniremen whose views would prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths." 469 U.S. at 426, n.5. In other words, the *Witt* "substantial impairment" test, as a practical matter, modifies the *Witherspoon* test.

316.     Similarly, the *Witt* Court considered the difficulty that would possibly be encountered when shifting from the *Witherspoon* test to the *Adams* test:

> The state of this case law leaves trial courts with the difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial. Although this task may be difficult in any event, it is obviously made more difficult by the fact that the standard applied in *Adams* differs markedly from the language of footnote 21. The tests with respect to sentencing and guilt, originally in two prongs, have been merged; the requirement that a juror may be excluded only if he would never vote for the death penalty is now missing; gone too is the extremely high burden of proof. In general, the standard has been simplified.

85

*Witt*, 469 U.S. at 421.

317.    The jurors addressed above clearly fit within the *Witt* exclusion standard. As noted, the

modified standard does not require that a juror's bias be proved with "unmistakable clarity."

If the bias is apparent although not specified or admitted directly, the juror must be excluded

under *Witt-Adams.* The failure to dismiss jurors for cause who could not follow the law as it

related to this case was in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to

the United States Constitution.

318.    Jurors Kotwis and Blake were clearly substantially impaired. *Wainwright v. Witt*,

469 U.S. 412 (1985); *Adams v. Texas*, 448 U.S. 38, 45 (1980). The judge's refusal to

remove them for cause rendered Ms. Roberts's jury panel unconstitutionally constituted.

319.    The presence of a biased juror is a "structural defect in the constitution of the trial

mechanism" that defies harmless error analysis. *Arizona v. Fulminante,* 499 U.S. 279, 309

(1991).

320.    For the foregoing reasons, habeas relief should be granted.

<u>**SEVENTH GROUND FOR RELIEF**</u>

**MS. ROBERTS'S RIGHT TO DUE PROCESS AND FAIR TRIAL WERE VIOLATED WHEN SHE WAS TRIED AND RESENTENCED WHILE SHE MAY HAVE BEEN INCOMPETENT.**

321.    Ms. Roberts incorporates by reference all other paragraphs of this petition as if rewritten

here.

322.    This claim was raised in the Ohio Supreme Court on direct appeal and in post-conviction

proceedings and are therefore ripe for federal habeas review.

323.    A criminal defendant has a fundamental right not to stand trial when she cannot understand

86

the nature of the charges, fully comprehend the possible sentences that could be imposed against her, and effectively and rationally assist in her defense. *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Drope v. Missouri*, 420 U.S. 162 (1975); *Pate v. Robinson*, 383 U.S. 375 (1966); *Dusky v. United States*, 362 U.S. 402 (1960); *see also Mackey v. Dutton*, 217 F.3d 399 (6th Cir. 2000); *Pate v. Smith*, 637 F.2d 1068 (6th Cir. 1981); *McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001); *Lafferty v. Cook*, 949 F.2d 1546 (10th Cir. 1991).

324.    In *Drope*, the Supreme Court held a defendant's right to due process and a fair trial is violated when the totality of the circumstances at the trial raised a bona fide doubt as to the defendant's competency to stand trial, but the trial court did not provide a reasonable opportunity for the defendant to litigate the question. The Court identified three indicia of incompetence, and any could raise sufficient concerns that the trial court should order a psychiatric examination. These indicia are:

> evidence of 1) a defendant's irrational behavior, 2) his demeanor at trial, and 3) any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient.

*Drope*, 420 U.S. at 180. The Supreme Court further held:

> Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.

*Id.*, at 181. A procedural claim to a fair competency determination invokes a lower standard of proof that one must demonstrate a reasonable suspicion of incompetency, while a substantive claim to not be tried while incompetent invokes demonstrating one was incompetent at trial.

325.    At her first trial, Ms. Roberts may not have been competent to make knowing and intelligent decisions concerning the penalty phase because of her severe mental illness untreated at the time. The decision to waive mitigation and her unsworn statement to the jury were illogical,

disjointed, and self-defeating. It is more likely than not she could not assist counsel in her representation in a meaningful fashion. Trial counsel failed to investigate her obvious mental health issues.  Ms. Roberts's constitutional rights to due process and a fair trial were therefore violated.

326.    Ms. Roberts's severe mental illness, Bipolar Disorder, was treated once she was incarcerated on death row. Resentencing counsel raised concerns about her competency at the 2006 resentencing. (Resent. Tr. at 5.) Counsel moved for a neuropsychologist to conduct a thorough evaluation. Initially the trial court indicated it had "no problem with approving" the motion for funds for a mental health expert. (Resent. Tr. at 8.) But the court also wondered whether the remand order from the Ohio Supreme Court allowed it to consider any competency issue. (Id.)

327.    The trial court noted on the record that if Ms. Roberts "does not cooperate" with resentencing counsel in signing releases so they can obtain her medical and mental health records, the court would aid "in any way that it is determined to be proper" to obtain the record. The trial court also directed the Forensic Psychiatric Center of Northeast Ohio to conduct a competency to be sentenced evaluation. (Resent. Tr. at 9.) Although the State suggested Ms. Roberts should be evaluated for competency before she could be resentenced, Judge Stuard was adamant that "there are no more competency evaluations that are going to be done." (Id. at 11.)

328.    Dr. Thomas Gazley performed the evaluation by going to the Ohio Reformatory for Women and spending two and half hours with Ms. Roberts. He also reviewed her mental health records from the prison, police reports associated with the case, and had a telephone call with the defense counsel. Dr. Gazley found Ms. Roberts "does have a mental illness, specifically a Bipolar II Disorder; however, her Bipolar Disorder is currently in partial remission due to the positive effects of appropriately targeted medication. Her current symptoms do not interfere with her ability

to accurately perceive reality." Dr. Gazley also found Ms. Roberts "has the cognitive ability and functioning to understand, in a general way, the penalties that could or will be imposed as a result of her conviction." He also found she "has the capacity to communicate relevant facts in mitigation to her attorney," because she did so with him during the examination. (Report of Dr. Gazley, dated September 5, 2007, admitted at Oct 22, 2007, hearing; Resent. Tr. at 44.)

329.     Trial counsel did not stipulate to Dr. Gazley's report which prompted a hearing on the question of Ms. Roberts's competency for the resentencing hearing. (Resent. Tr. at 12; 16.)

330.     On October 22, 2007, the trial court convened for a hearing where Dr. Gazley was called as a witness by the prosecution.

331.     Most striking of Dr. Gazley's testimony was his statement "I don't know if there is such a thing as a competency to be resentenced criteria." (Resent. Tr. at 24-25.) Dr. Gazley reviewed none of Ms. Roberts's prior mental health records. He was never aware of the severity of the head injuries she suffered years before the murder of her husband. He was not aware that she had been awarded Social Security Disability benefits because of her mental illness. He had no direct observation of her interactions with defense counsel, but rather he assumed she was capable to interact with them because of her ability to communicate with him. (Id. at 27.) He was unaware she had experienced hallucinations while incarcerated on death row. (Id. at 29.)

332.     Trial counsel called no witnesses at the hearing because the trial court denied defense counsel's request for funds to procure an independent expert to evaluate Ms. Roberts. The trial court's reason was "that is for another court and another day." (Id. at 42). Trial counsel renewed the request for appointment of a neuropsychiatrist which again was denied by the trial court as "not relevant." (Id. at 44.)

333.     Resentencing counsel proffered several records demonstrating Ms. Roberts's extensive

mental health issues both before she was incarcerated and while she was on death row before the resentencing hearings. (2008 PCR Petition, Ex. A; G.) The records reflect a history of depression with suicidal tendencies and hallucinations. These records pre-date Ms. Roberts's refusal to cooperate with counsel at the penalty phase presentation to the jury at her first trial.

334.    Despite Dr. Gazley's limited review, there was no reliable, credible evidence that Ms. Roberts could rationally assist in her own defense, and, therefore, she should not have been found competent to stand trial or be resentenced. The issue is not whether she was mentally ill, or even to what extent she was mentally ill, but, rather, the issue was whether she could rationally participate in the trial process. Experts who have examined Ms. Roberts agreed she was obsessively and persistently fixated upon a factual analysis not based in reality. She essentially entertained no other considerations in assisting in her own defense.

335.    Ms. Roberts used her trial to show to the world that racial inequality exists. Because co-defendant Jackson received the death penalty, then she too should receive it. (2008 PCR Petition, Ex. D.) She stated as much to the jury. (Trial Tr., Vol. XXVIII, at 6256, 6263.)

336.    In her unsworn statement, Ms. Roberts explained to the jury she was not providing any mitigation. (Tr. 6253-4.)  She wanted to expose people she believed were untruthful.  (Id. at 6255.)

337.    Ms. Roberts could not work with counsel. The sentencing hearing is replete with defense counsel's frustration with his inability to communicate with his client.

338.    At the time of Dr. Gazley's competency examination, the testing results from Dr. Donald Degli, including the IQ testing, was unknown. (Degli Rep.)

339.    Dr. Gazley was unaware there was a 24-point disparity between verbal and performance IQ, which strongly suggests head trauma suffered from severe automobile accidents. (2008 PCR Petition, Ex. C.) This evidence would have been important to any competency determination.

340.    The trial court failed to conduct a full evidentiary hearing where both sides could present evidence. While counsel for Ms. Roberts had to prove incompetency by a preponderance of the evidence, the trial court tied counsel's hands by denying their request for an independent mental health expert. The proceedings were not a fair and reasoned search for the truth.

341.    Ms. Roberts was denied the fundamental right to not stand trial while incompetence, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, and for the foregoing reasons, the Court should grant habeas relief on this claim.

### EIGHTH GROUND FOR RELIEF

**THE SENTENCING COURT'S USE OF THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AS NON-STATUTORY AGGRAVATING FACTORS IN ITS SENTENCING DECISION IN VIOLATION OF MS. ROBERTS'S RIGHTS OF DUE PROCESS AND IS IN VIOLATION OF HER RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

342.    Ms. Roberts incorporates by reference all other paragraphs of this petition as if rewritten here.

343.    Ms. Roberts raised this ground for relief on direct appeal to the Supreme Court of Ohio. It is therefore ripe for habeas review.

### A.    Background

344.    In a capital case, the sentencing court may not use its findings regarding the nature and circumstances of a case to negate the presence of available factors in mitigation.

345.    Although the sentencing court here recognized that it could not use the nature and circumstances of the offense as a non-statutory aggravating factor, that is precisely what the court did to negate the weight of Ms. Roberts's recognized mitigating factors.

346.    After addressing the identifiable factors in mitigation, the court essentially negated any

weight for these factors because of the nature and circumstances of the offense. It noted in its

sentencing opinion:

> Roberts planned and plotted for the murder of Fingerhut over a period of at least three months. She conspired with Jackson, her imprisoned lover, to murder Fingerhut for his life insurance proceeds. The murder plan was well documented through telephone calls recorded from Jackson's residence; the Lorain Correctional Institute. In addition, detailed letters were exchanged between the loving couple outlining their plans. These plans included the acquisition of supplies, the procurement of a hotel room, and the promise of a new vehicle for Jackson - all provided by Roberts. Ultimately, Roberts provided access to the residence in order for Jackson to carry out the murder as planned.
>
> Despite these intricate details, Roberts "forgot" to include Jackson as one of her named lovers to the police during interviews. In addition, Roberts attempted to thwart the investigation into the Fingerhut murder by implicating other individuals; not Jackson. In addition, Roberts's feigned emotional outbursts over Fingerhut's death do not correlate to the insidious behavior relative to the same
> .
> *Therefore, the Court has granted little to no weight to any of the mitigating factors outlined by Roberts in her unsworn statement or her allocution.* In addition, the Court finds Roberts's request for "equal treatment" to Jackson is inconsistent with the primary body of her allocution and has not given any weight to that request either.

(Nunc Pro Tunc Findings of Fact And Conclusions of Law Regarding Imposition of Death Penalty,

at pp. 22-23, June 10, 2014) (Emphasis added).

347.     It is clear from the language in the trial court's sentencing opinion that it admittedly granted

little or no weight to the available mitigation because of the manner in which the homicide was

carried out and how the trial court perceived Roberts's role in that offense.

> **B.     Clearly Established Federal Law**

348.     The United States Supreme Court has condemned consistently a factfinder's consideration

of non-statutory aggravating factors not enumerated in a state's statutory scheme. *See, e.g.,*

*Espinosa v. Florida,* 505 U.S. 1079, 1081 (1992) (per curium); *Barclay v. Florida*, 463 U.S. 939

(1983), *reh'g denied*, 464 U.S. 874.

349.    Moreover, in a weighing state such as Ohio, the consideration of aggravators not part of the statutory scheme is improper. *Lockett v. Ohio*, 438 U.S. 586 (1978).

350.    The trial court's consideration of a non-statutory aggravating factor in the weighing process violated the Supreme Court's requirement that a capital sentencer must find that a death sentence is appropriate when making its determination and that it must genuinely narrow the class of death-eligible defendants. *Zant v. Stephens*, 462 U.S. 862 (1983).

351.    Because the trial court in its independent decision improperly used the nature and circumstances of the offense to negate available mitigation instead of the required independent weighing, the trial court's sentencing was arbitrary and capricious in violation of United States Supreme Court precedent. *Stringer v. Black*, 503 U.S. 222, 231-235 (1992); *Boyde v. California*, 494 U.S. 370, 380-81 (1990); *Gregg v. Georgia*, 428 U.S. 153, 193-195 (1976).

352.    The trial court apparently did not understand that Ohio's death penalty statutes require a court to independently weigh the statutory aggravators found by the jury and independently weigh available mitigation and thereafter determine if the aggravators outweighed the mitigation beyond a reasonable doubt. Here, the trial court failed to comply with this weighing process. Instead, the trial court based its determination on the nature and circumstances of the offenses of which Ms. Roberts was convicted. It used the nature and circumstances of the offenses to devalue the mitigation.

353.    The trial court failed to limit its weighing to solely aggravating factors the jury found, *i.e.*, the felony-murder specification under Ohio Revised Code § 2929.04(A)(7).

354.    Because the trial court unreasonably applied United States Supreme Court precedent and the Ohio Supreme Court followed suit on direct appeal, the Court should find Ms. Roberts's sentence of death violates Supreme Court precedent. 28 U.S.C. § 2244(d).

355.    The Court should grant Ms. Roberts habeas relief for this claim.

### NINTH GROUND FOR RELIEF

**THE TRIAL COURT ACCEPTED MS. ROBERT'S WAIVER OF THE PRESENTATION OF MITIGATING EVIDENCE DURING THE PENALTY PHASE OF TRIAL WHEN IT WAS NOT KNOWING, VOLUNTARY AND INTELLIGENT IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

356.    Ms. Roberts incorporates by reference all other paragraphs of this petition as if rewritten here.

357.    Ms. Roberts raised this ground for relief on direct appeal to the Supreme Court of Ohio. It is therefore ripe for habeas review.

358.    Ms. Roberts has a clearly established constitutional due process right requiring the trial court to assure that any waiver of presenting mitigating evidence is knowing, voluntary and intelligent.  As with other fundamental rights, the right to present mitigating evidence during a capital trial may be waived, but only when the waiver is indeed knowing, voluntary and intelligent. *Dusky v. United States*, 362 U.S. 402 (1960).

359.    Here, the trial court failed to ensure that Ms. Roberts understood all consequences of her waiver. Specifically, it failed to inquire if Ms. Roberts understood that waiving the presentation of mitigating evidence all but assured that the jury would return a death verdict.

360.    Additionally, Ms. Roberts's waiver was not a full waiver, but a partial one. Although Ms. Roberts would not permit her attorneys to present mitigating evidence to the jury, she was adamant about making a statement to the jury. Once the trial court decided Ms. Roberts's decision to waive the presentation of mitigating evidence was done "[f]reely, knowingly and voluntarily, intelligently," (Trial Tr., Vol. XXVIII, at 6235.), Ms. Roberts agreed only conditionally: "Just as long as I get to make a statement tomorrow. I do get to make a statement tomorrow?" (Id.) Ms.

94

Roberts only wanted to waive the presentation of mitigating evidence on the condition that she have the opportunity to make an unsworn statement.

361.    In essence, Ms. Roberts was attempting only to waive her mitigation hearing partially. The Constitution does not countenance such a waiver. Partial waiver exists nowhere in the law. In no other area of the law are partial waivers accepted. One cannot partially waive Fifth Amendment protections. One cannot partially plea. One cannot partially waive the Right of Confrontation. A true waiver of mitigation would encompass the presentation of any evidence, including a defendant's unsworn statement.

362.    Ms. Roberts's waiver was not an intelligent one. The trial court accepted her waiver without informing her of crucial information. When the trial court informed Ms. Roberts that the presentation of mitigation evidence would give the jury an opportunity to view her as a "real person," (Trial Tr., Vol. XXVIII, at 6223.), and that without presenting such evidence the jury would have "little to go upon in coming up with something other than the death penalty," (Id. at 6232.), Ms. Robert's response was "That is what I hope for." (Id.) The trial court informed Ms. Roberts she could not revoke her decision and asked again if she was absolutely sure of it. (Id. at 6233-34.)

363.    The trial court also heard the opinion of Dr. Thomas Eberle, a clinical psychologist. Dr. Eberle testified that he believed Ms. Roberts was competent. (Id. at 6231.) The court indicated that his decision to find the waiver was properly entered was at least partially predicated on Dr. Eberle's testimony. (Id. at 6235.)

364.    The problem with the hearing in this matter is two-fold. First, at no time did anyone directly address the issue that the failure to present mitigation would result in a death sentence. The court alluded to this result by indicating there would be "little to go upon" but did not explicitly inform

Ms. Roberts that it would have little choice in its sentencing decision. The trial court failed to inform Ms. Roberts directly that because Ohio is a weighing state, by law the jury would be required to sentence her to death. The court also failed to secure her waiver in writing or put in writing the true consequences of Ms. Roberts's mitigation waiver. At a minimum, a knowing and intelligent waiver requires a defendant to acknowledge that death will result from the waiving of mitigation evidence. The trial court failed to provide Ms. Roberts with such critical instruction here.

365.     In her unsworn statement, Ms. Roberts never admitted her guilt. (Id. at 6253-4.) Rather, she wanted to expose people she believed were untruthful during her trial. (Id. at 6255.)

366.     During her unsworn statement, Ms. Roberts provided much of her life history to the jury. She explained that she had been a businesswoman for about forty years. She had worked for a plastic surgeon. She had assisted in running an Avis franchise. She also ran a restaurant in Youngstown. (Trial Tr., Vol. XXVIII, at 6259.)

367.     She informed the jury that she had traveled around the world a couple of times. She had been exposed to other lifestyles, races, and beliefs. She believed that she was educated, resulting in her better acceptance and understanding of different lifestyles (Id. at 6260.)

368.     Ms. Roberts told the jury that she had spoiled her husband as much as she could. She walked with him at the mall. She admitted that she had been spoiled in her lifestyle. She wanted her husband to have every comfort available. She encouraged him to purchase objects for his extensive sports collection. (Id. at 6267-8.) She informed the jury that Mr. Fingerhut had a very bad relationship with his sons from a previous marriage. She encouraged him to resolve the issues in those relationships. (Id. at 6269.)

369.     Ms. Roberts informed the jury of many things, but never expounded on her guilt. In fact,

she believed the verdict was going to be not guilty. (Id. at 6269-70.) During her unsworn statement, she listed each trial witness, explaining how she believed the evidence should have been interpreted. This statement was all in an apparent effort to convince the jury it had incorrectly decided the verdict. (Id. at 6270-92.)

370.    During her unsworn statement, Ms. Roberts also informed the jury she was not going to beg for her life. However, she did want to beg for justice. (Id. at 6295.) She implored the jury to give her the death penalty because co-defendant Jackson had received it. Because he was a Black male, she stated, she should not receive a lesser sentence as a white woman. Her argument apparently was that equality demanded that she receive the same sentence for the same offense, although she was not guilty of that offense. (Id. at 6295-6.)

371.    Ms. Roberts's unsworn statement reveals the confusion she felt at the time of the waiver. She insisted that she was not guilty, yet she was torn between her conviction and receiving a different sentence than Jackson had received. Jackson did not receive justice because of inequality based upon race and money. Ms. Roberts felt an obligation to sacrifice herself or become a hypocrite by benefitting from superior attorneys or the fact that she is white.

372.    These statements demonstrate clearly that Ms. Roberts's waiver was not knowing, voluntary and intelligent. The trial court's acceptance of her waiver therefore was a violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

373.    The Court should grant Ms. Roberts habeas relief on this claim.

## TENTH GROUND FOR RELIEF

**DONNA ROBERTS WAS DENIED HER RIGHT TO DUE PROCESS AND A FAIR TRIAL WHEN A DIFFERENT JUDGE, WHO HAD NEVER HEARD THE TESTIMONY NOR MS. ROBERTS'S ALLOCUTION, SENTENCED MS. ROBERTS TO DEATH WITHOUT PERMITTING HER TO SPEAK ON HER OWN BEHALF OR OTHERWISE SUBMIT NEW TESTIMONY IN MITIGATION. U. S. CONST. AMENDS. 6, 8 & 14.**

374.     Ms. Roberts incorporates by reference all other paragraphs of this petition as if rewritten here.

375.     Ms. Roberts raised this ground for relief on direct appeal to the Supreme Court of Ohio. It is therefore ripe for habeas review.

376.     In Ms. Roberts's first resentencing, the trial court permitted Ms. Roberts to make her allocution, yet failed to give it any consideration when handing down the ultimate punishment. In *State v. Roberts II*, the Ohio Supreme Court's second remand, the court determined that a sentencing judge must consider the defendant's allocution in determining whether the sentence of death is appropriate but did not require a new sentencing hearing. 998 N.E.2d 1100, 1113 (Ohio 2013). Because the original trial judge had died, the new sentencing judge had never heard any of the evidence presented, nor had he heard Ms. Roberts's allocution.

377.     The key aspect of the allocution is both the actual words spoken by the defendant and the manner in which they are spoken. In determining the weight to be provided to the potential mitigation contained within the wording, the sentencing court must assess the sincerity of those words. This can only be ascertained by hearing the voice of the defendant. Without actually listening to the words from the defendant, it is impossible for

a judge to know what weight to provide the intonation, the struggling for composure, the hurt and perhaps the shame of the defendant.

378.    The judge to whom Ms. Roberts provided her allocution passed away prior to the third resentencing and did not ultimately write the required sentencing opinion. The sentencing option of death should have been precluded.

379.    Ohio's statutory scheme does not provide a procedure for a rewriting of the capital sentencing opinion required in Ohio Revised Code § 2929.03(F) where the original judge is no longer available to write the opinion. This is not a situation where a completely new sentencing hearing or penalty phase was conducted.  This is a case where a new judge was ordered to correct the error of the original judge without having the benefit of having heard any aspect of the trial or the allocution. It is impossible to properly consider and weigh mitigating factors by only reviewing a cold record.

### A.    Clearly Established Federal Law

380.    The Ohio Supreme Court's order in *Roberts II* required the trial court to assess Ms. Roberts's credibility based on the bare transcript alone. 998 N.E2d at 1118-19 As in all cases, weight given to witness statements are based upon that witnesses demeanor, sincerity, facial expressions, emotion, body language, tone of voice, and the list goes on. This is impossible from the reading of a transcript alone.

381.    The United States Supreme Court has long held that a death sentence may not stand if the sentencing body has been precluded from considering relevant evidence suggesting that the death sentence would not be appropriate. The Eighth Amendment mandates an individualized assessment of the appropriateness of the death penalty. In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court held that the Eighth and Fourteenth Amendments

require that the sentencer "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the **defendant proffers** as a basis for a sentence less than death." *Id.* at 604 (emphasis in original). Thus, the Court held unconstitutional the Ohio death penalty statute which mandated capital punishment upon a finding of one aggravating circumstance unless one of three statutory mitigating factors were present.

382.    The Constitution limits a state's ability to narrow a sentencer's discretion to consider relevant evidence that would "cause it to *decline to impose* the death sentence." *McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) (emphasis in original). "Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." *Penry v. Lynaugh.* 492 U.S. 302, 327-328 (1989).

383.    The importance of hearing and seeing a witness or defendant cannot be underestimated and failing to take that personal testimony into consideration for mitigation purposes violates the defendant's right to Due Process and a fair trial. By not permitting Ms. Roberts to speak, the procedure on remand limited her ability to have her mitigation fully considered and accurately assessed. Courts have recognized that "[a]mong those advantages is a [trial] court's unique factfinding position, which allows it to hear evidence, make credibility determinations, and interact directly with the defendant (and, often, with his victims), thereby gaining insights not always conveyed by a cold record." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012) (citing *Gall v. United States,* 552 U.S. 38, 51–52 (2007); *see also Harvard v.*

*Florida*, 459 U.S. 1128, 1134–35 (1983) (Marshall, J., dissenting from denial of petition for certiorari) ("the hearing on remand was inadequate because the judge had heard all the other pertinent evidence five years earlier. Even if he went back and read the transcript of the earlier proceedings, a cold record cannot recreate testimony. A witness may be credible on paper but not on the stand. In evaluating petitioner's new evidence and argument, and in considering it in the context of all the evidence introduced with respect to sentencing, the judge could have taken the credibility of the witnesses into account only in the unlikely event that he somehow remembered his impression of the testimony at the first proceeding.").

384. Because the final sentencing judge was different than the original judge who conducted the trial and subsequent allocution at the first remand, the trial court minimally should have permitted Ms. Roberts to make a second allocution, or, ideally is should have conducted a completely new penalty phase hearing. Permitting the new sentencing trial judge to pass sentence on a cold record deprived Ms. Roberts of her protections under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

385. For the foregoing reasons, habeas relief should be granted.

## ELEVENTH GROUND FOR RELIEF

**MS. ROBERTS WAS DENIED HER RIGHT TO DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL COURT FAILED TO GRANT HER AN EVIDENTIARY HEARING TO ALLOW HER TO ESTABLISH THE PREJUDICE OF THE ERRORS WHICH OCCURRED DURING HER CAPITAL TRIAL.**

386. Ms. Roberts incorporates by reference all other paragraphs of this petition as if rewritten here.

387. Ms. Roberts raised this ground for relief on post-conviction appeal to the Eleventh District

Court of Appeals. It is therefore ripe for federal habeas review.

388.     The trial court summarily dismissed Ms. Roberts's post-conviction action without granting her relief or an evidentiary hearing. The trial court also denied her discovery and her ability to supplement the record with the trial record of co-defendant Jackson. The trial court's action denied Ms. Roberts´s constitutional rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

389.     The trial court dismissed Ms. Roberts's post-conviction petition without a hearing. Ms. Roberts had included evidence outside the record to support her claim that she had not been afforded effective assistance of counsel during the penalty phase of trial.

390.     As addressed above, Ms. Roberts was unable to develop the record raised in post-conviction proceedings without discovery and without a hearing. Nevertheless, the record did include sufficient evidence including additional affidavits and other documents (tape of co-defendant's confession) to mandate a hearing if no outright granting of the petition.

### A.     Present Case

391.     Ms. Roberts argued in post-conviction petition that her counsel failed to perform their duties within the boundaries accepted as permissible under the professional norms. The petition was supported by affidavits and evidence *dehors* the record as required by state law.

392.     The issue to be determined is whether the trial judge could find the exhibits attached to the petition to be unworthy of a hearing. Under state law, the trial judge has discretion in determining whether a petitioner met her proof burden to permit a hearing. *State v. Calhoun*, 714 N.E.2d 905 (Ohio 1999).

393.     The guarantees of due process call for a "hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 313 (1950).  Indeed, the right

to a hearing is mandated by the Due Process Clause. In *Powell v. Alabama*, 287 U.S. 45 (1932). the court stated, "[t]he fact that the right involved is of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions' is obviously one of those compelling considerations which must prevail in determining whether it is embraced within the due process clause of the Fourteenth Amendment." *Id.* at 67 (quoting *Hebert v. State of Louisiana*, 272 U.S. 312, 316 (1926)).

394.　　There was no clear showing by the trial court that Ms. Roberts was not entitled to relief. She was denied her right to due process of law as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Habeas Relief should be granted on this issue.

### TWELFTH GROUND FOR RELIEF

**THE EVIDENCE THE PROSECUTION PRESENTED AT TRIAL DID NOT ESTABLISH THE THEFT ELEMENT OF OHIO'S AGGRAVATED ROBBERY STATUTE, OHIO REVISED CODE § 2911.01, AND THE ATTENDANT CAPITAL SPECIFICATION UNDER OHIO REVISED CODE § 2929.04(A)(7). THE EVIDENCE WAS THEREFORE INSUFFICIENT TO SUPPORT GUILTY VERDICTS ON THESE CHARGES.**

395.　　Under the Due Process Clause of the Fourteenth Amendment, a defendant in a criminal trial is protected against conviction except upon proof beyond a reasonable doubt of every element necessary to constitute the crime with which he or she is charged. *In re Winship*, 397 U.S. 358, 364 (1970); *Davis v. United States*, 160 U.S. 469, 487-88 (1895).

### A.　　The State Failed To Establish The Theft Element Of Ohio's Aggravated Robbery

396.　　During trial, the prosecution charged and obtained a conviction of Ms. Roberts of complicity in the Aggravated Robbery of her roommate/ex-husband, Robert Fingerhut. However,

the evidence presented during trial never established there was anything taken from the household, except for the possibility of a firearm. Both of Fingerhut's wallets were found on his body with $130 in his front pocket and $231 in his wallet. (T. 5679)

397.    The alleged theft was therefore based upon Mr. Fingerhut's car being driven from the house by co-defendant Jackson. The automobile was found a few blocks away from the residence where Jackson was residing.

398.    The fact that Jackson used the automobile to escape from the house does not establish a theft offense under Ohio law. Clearly, there was no attempt by Jackson to keep the vehicle or sell it for profit. The car was utilized to drive from the scene and then abandoned, with the car keys left in the vehicle at a very public location. (Trial Tr., Vol. XXVI, at 5654, 5655.)

399.    Without proof of a theft offense, the conviction for Aggravated Robbery and attendant capital specification should have been dismissed.

400.    The evidence the State introduced at trial showed merely that Jackson used the vehicle to escape from the scene. The State failed to prove Jackson intended to deprive the owner of property under Ohio law.

### B.    Ohio Statutes At Issue And Proof Required For Conviction

401.    In Ohio, there are two elements of Aggravated Robbery, a theft element and a harm element. While the homicide suffices to establish the second element, the State failed to prove a theft occurred. Ohio Rev. Code § 2911.01(A).

402.    Ohio defines theft in Ohio Revised Code §2913.02 as follows in relevant part:

(A) No person, *with purpose to deprive the owner of property or services*, shall knowingly obtain or exert control over either the property or services in any of the following ways:
        (1) Without the consent of the owner or person authorized to give consent (Emphasis added)

Ohio Rev. Code § 2913.02.

403.    Here, the State failed to establish Mr. Jackson's purpose to deprive the owner of the property when the automobile was used.

404.    At most, the State proved Jackson was guilty of Unauthorized Use of a Vehicle under Ohio Law. That statute reads in pertinent part:

> (A) No person shall knowingly use or operate an aircraft, motor vehicle, motorcycle, motorboat, or other motor-propelled vehicle without the consent of the owner or person authorized to give consent.

Ohio Rev. Code § 2913.03.

405.    In viewing the evidence in a light most favorable to the State, the evidence establishes only that Jackson used the decedent's automobile to leave the crime scene. It is not challenged that the decedent owned the car. (T. 5308.) The automobile was found three blocks from where Jackson resided at this time, with the keys in the vehicle. (Trial Tr., Vol. XXVI, at 5654, 5655.)

406.    The decedent was found with large sums of money on his person. This fact strongly suggests the homicide was not motivated by a robbery. As the State never established anything was taken from the decedent's home, the only possible theft offense would have been the automobile. Based upon the evidence at trial, the state failed to establish this element beyond a reasonable doubt.

407.    The evidence of Aggravated Robbery and the companion death specification were insufficient under the standards of *Jackson v. Virginia*, 443 U.S. 307, (1979), to have found Jackson and Ms. Roberts guilty. Ms. Roberts's convictions and death sentence must be vacated and the petition granted.

105

## THIRTEENTH GROUND FOR RELIEF

**THE TRIAL COURT FAILED TO ENSURE THE INCLUSION OF AFRICAN AMERICAN JURORS ON THE JURY PANEL IN MS. ROBERTS'S CAPITAL TRIAL TO HER EXTREME PREJUDICE, AND THEREBY DEPRIVED MS. ROBERTS OF HER RIGHT TO DUE PROCESS, A FAIR TRIAL, TO EQUAL PROTECTION, AND TO A JURY THAT REPRESENTS A FAIR CROSS SECTION OF THE COMMUNITY.**

408.     Ms. Roberts combines all other paragraphs of her Petition as if fully written herein.

409.     This claim was raised in state post-conviction proceedings and is therefore ripe for federal habeas review.

410.     The trial court failed to ensure the inclusion of African American jurors on Ms. Roberts's panel. The trial court's failure deprived Ms. Roberts of her rights under the Due Process Clause of the Fourteenth Amendment. *Peters v. Kiff*, 407 U.S. 493, 501 (1972); the Fair Cross Section requirement of the Sixth Amendment; *Taylor v. Louisana*, 419 U.S. 522, 531 (1975); and the Equal Protection Clause of the Fourteenth Amendment. *Flowers v. Mississippi*, 588 U.S. ___, 139 S.Ct. 2228 (2019); *Taylor*, 419 U.S. at 531.

411.     In preparation for Ms. Roberts's capital trial, 300 potential jurors showed up for jury selection on the first day. (Trial Tr., Vol II at 299.) Ms. Roberts recalled that there were ultimately no Black jurors on her panel and she recalled that there were only two or three in the jury pool. Two potential Black jurors were challenged and removed during voir dire. (2008 PCR Petition, Ex D.)

412.     The inclusion of Black jurors in the venire and on the jury would have been particularly important in this case where Ms. Roberts's co-defendant was Black and in a relationship with Ms. Roberts.

413.     With the exception of voting, serving on a jury is the most substantial opportunity most citizens have to participate in the American democratic process. *See Powers v. Ohio*, 499 U.S. 409

(1991). To help enforce the newly enacted Fourteenth Amendment, Congress passed the Civil Rights Act of 1879. The Act made it a crime for state officials to exclude individuals from jury service on account of race. 18 U.S.C. § 243. The Supreme Court has consistently held that statutes disallowing jury service based on race are unconstitutional. *Strauder v. West Virginia*, 100 U.S. 303 (1879). In *Flowers v. Mississippi*, the Supreme Court took up the issue of discrimination in striking jurors. The Court reiterated the importance of jury service and a jury representing a cross section of the community at large. Through a historical analysis of the Equal Protection Clause, the Court determined that, "[i]n addition to that practical point, the Court stressed a basic equal protection point: In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers*, 139 S.Ct. at 2241.

414.    While *Flowers* is a case involving preemptory strikes, the rationale should extend to the lack of African American jurors in Ms. Roberts's case. The racial issues that tainted Ms. Roberts's case deprived her a fair trial.

415.    By failing to ensure the inclusion of African American jurors on Ms. Roberts's panel, the trial court deprived her of her rights under the Due Process Clause of the Fourteenth Amendment, the Fair Cross Section requirement of the Sixth Amendment, and the Equal Protection Clause of the Fourteenth Amendment. Ms. Roberts must be granted relief, and the petition granted.

416.    Ms. Roberts's convictions and sentences are void and/or voidable because she was denied her right to a fair and impartial jury and Equal Protection because there was an under-representation of African Americans in the venire from which her jury was drawn. Racial discrimination in the selection of the members of a petit jury venire constitutes a denial of an impartial jury as guaranteed by the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment.

417.    The record does not reveal which jurors were of African American heritage. The jury questionnaires are also silent as to the racial heritage of the prospective jurors.

418.    African Americans comprised 7.9 percent of the population in Trumbull County at the time of trial. Consequently, there should have been approximately 24 African Americans in the 300 who appeared for jury duty.

419.    Trumbull County has a history of underrepresenting African Americans on trial juries. In *State v. Davie*, Trumbull C.P. No. 91 CR 288, the Trumbull County Court of Common Pleas presided over another capital case in which the clerk drew two hundred names and approximately one-hundred thirty of the one-hundred fifty individuals appeared for jury duty. Not one African American appeared for jury duty. *See State v. Jackson*, 2006-Ohio-2651, 2006 WL 1459757, *18-19 (Trumbull 2006)

420.    Subsequent to Mr. Davie's jury trial, Diane Wiley of the National Jury Project reviewed the venire that was drawn in that case. Ms. Wiley has conducted jury evaluations in more than fifty cases throughout the United States. She is co-author of one of the leading treatises on juries, Jurywork: Systematic Techniques. Ms. Wiley's affidavit and CV filed in the *Davie* case are attached as Exhibit 1. Ms. Wiley made the following findings concerning the racial discrimination in the *Davie* case:

> The number of African American citizens called to serve as jury venirepersons for *State of Ohio v. Roderick Davie,* on February 3, 1992 in Trumbull County Common Pleas Court underrepresented the percentage of African Americans in Trumbull County by 100%.

> This underrepresentation represents a statistically significant deviation from the number of African American persons who would be expected utilizing a truly random sampling method from a truly random pool representative of the county.

*** 

108

It is disturbing to find a venire of this size without even one African American juror being included in a jurisdiction with 6% African Americans. This simply should not occur unless there was some kind of systematic discrimination.

(Exhibit 1, Wiley Affidavit at ¶¶ 9-10)

421.     The under-representation of African Americans on juries in Trumbull County continued in both Donna Roberts's case and that of her co-defendant, Nate Jackson. There were no African- Americans on the jury that convicted her of capital murder and returned a death recommendation.

422.     The under-representation of a cognizable group in a petit jury venire constitutes denial of the Due Process Clause of the Fourteenth Amendment, *Peters v. Kiff*, 470 U.S. 493, 501 (1972); the Fair Cross Section requirement of the Sixth Amendment, *Taylor v. Louisiana,* 419 U.S. 522, 531 (1975); and the Equal Protection Clause of the Fourteenth Amendment, *Taylor v. Louisiana,* 419 U.S. at 531.

423.     The wrongful exclusion of African Americans from the venire is a structural error and Ms. Roberts is entitled to relief without the demonstration of prejudice.

## <u>FOURTEENTH GROUND FOR RELIEF</u>

**THE DEATH PENALTY ON ITS FACE AND AS APPLIED TO MS. ROBERTS IS ARBITRARY, CRUEL AND UNUSUAL, AND VIOLATES DUE PROCESS IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

424.     Ms. Roberts incorporates by reference all other paragraphs of this petition as if realleged here.

425.     This issue was raised in Ms. Roberts's first direct appeal to the Ohio Supreme Court and is therefore ripe for federal habeas review.

426.     The Eighth Amendment to the United States Constitution prohibits the infliction of cruel

and unusual punishment. The underlying principle of governmental respect for human dignity is

the Court's guidepost for determining whether a statute is constitutional. These protections apply

to the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660 (1962).

Punishment that is "excessive" constitutes cruel and unusual punishment. *Coker v. Georgia*, 433

U.S. 584 (1977); *see also Furman v. Georgia*, 408 U.S. 238 (1972) (Brennan, J., concurring);

*Rhodes v. Chapman*, 452 U.S. 337, 361 (1981); *Trop v. Dulles*, 356 U.S. 86 (1958).

> The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." Our cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it involves arbitrary enforcement. . . . . These principles apply not only to statutes defining elements of a crime, but also to statutes fixing sentences.

*Johnson v. United States*, 576 U.S. 591, 595 (2015) (internal citations omitted).

427.     The Ohio scheme offends these bedrock principles because it lacks reliability, is an

arbitrary application of a serious and irreversible punishment, allows for individual suffering by

long delays, and the penalty lacks any penological purpose. As Justice Breyer stated in his dissent

in *Glossip v. Gross*, 576 U.S. 863, 945 (2015) (Ginsburg, J. joining), these are "quintessentially

judicial matters" that should be addressed, and remedied, by the court.

### A.     Arbitrary And Unequal Punishment

428.     The Fourteenth Amendment's guarantee of equal protection requires similar treatment of

similarly situated persons. This right extends to the protection against cruel and unusual

punishment. *Furman*, 408 U.S. at 249 (Douglas, J., concurring). The Supreme Court has attempted

to interpret the death penalty to make it applicable to only the "worst of the worst" offenders.

*Kansas v. Marsh*, 548 U.S. 163, 206 (2006) (dissenting opinion), but clearly that is not what

modern-day cases reveal.

> [S]tudies indicate that the factors that most clearly ought to affect application of the death penalty—namely, comparative egregiousness of the crime—often do not. Other studies show that circumstances that ought not to affect application of the death penalty, such as race, gender, or geography, often do.

*Glossip*, 576 U.S. at 918 (Breyer, J. dissenting).

429.    Ohio's capital punishment system allows the death penalty to be imposed in an arbitrary and discriminatory manner in violation of *Furman* and its progeny. Prosecutors' virtually uncontrolled indictment discretion allows arbitrary and discriminatory imposition of the death penalty. Mandatory death penalty statutes were deemed fatally flawed because they lacked standards for imposition of a death sentence and were therefore removed from judicial review. *Woodson v. North Carolina*, 428 U.S. 280 (1976). The prosecutors' uncontrolled discretion lacks the same standards.

430.    Ohio's capital punishment system imposes death in a racially discriminatory manner. African Americans and those who kill white victims are much more likely to get the death penalty. While African Americans account for less than twenty percent of Ohio's population, about half of Ohio's death row inmates are African American. Few Caucasians are sentenced to death for killing African Americans but over thirty African Americans sit on Ohio's death row for killing a Caucasian. Ohio's statistical disparity follows national findings. The General Accounting Office found victim's race influential at all stages, with stronger evidence involving prosecutorial discretion in charging and trying cases. *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities*, U.S. Gen. Accounting Office, Rpt. to Senate and House Comm. on the Judiciary (Feb. 1990).

431.    Due process prohibits taking life unless the state can show a legitimate and compelling state interest. *Commonwealth v. O'Neal*, 339 N.E.2d 676, 678 (Mass. 1975) (Tauro, C.J., concurring); *Utah v. Pierre*, 572 P.2d 1338 (Utah 1977) (Maughan, J., concurring and dissenting).

Where fundamental rights are involved, personal liberties cannot be broadly stifled "when the end can be more narrowly achieved." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). The Supreme Court has recognized that the fundamental right to "life" deserves the highest protection possible under the Fourteenth Amendment's protection of "life, liberty and property." *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 290 (1998) (five Justices recognized distinct "life" interest protected by Due Process Clause in all stages of a capital case, above and beyond protected liberty and property interests). Death is different; and for that reason, more process is due, not less. *See Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280 (1976).

432.    To justify a risk to this protected, fundamental life interest, the State must show it is the "least restrictive means" to a "compelling governmental end." *O'Neal*, 339 N.E.2d at 678. Yet despite the most exhaustive research by noted experts in the field, there is no convincing evidence that the death penalty is a deterrent superior to lesser punishment. "In fact, the most convincing studies point in the opposite direction." *ld*. at 682. Studies in Ohio, more particularly, have similarly shown no deterrent effect by imposition of the death penalty. Research 40 and 50 years ago found no evidence that Ohio executions have any discernible effect on decreasing homicide rates. Ohio Legisl. Serv. Comm'n, Capital Punishment (1961); *see also* Bailey, *The Deterrent Effect of the Death Penalty for Murder in Ohio: A Time-Series Analysis*, 28 Cleve. St. L. Rev. 51, 68, 70 (1979). More recent studies, as Justice Breyer observed in his *Glossip* dissent, show nothing has changed:

> Recently, the National Research Council (whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine) reviewed 30 years of empirical evidence and concluded that it was insufficient to establish a deterrent effect and thus should "not be used to inform" discussion about the deterrent value of the death penalty. National Research Council, Deterrence and the Death Penalty 2 (D. Nagin & J. Pepper eds. 2012).

*Glossip*, 576 U.S. at 930-31 (Breyer, J. dissent).

433.    The death penalty is neither the least restrictive nor an effective means of deterrence. Both isolation of the offender and retribution can be effectively served by less restrictive means. Society's interests do not justify the death penalty.

### B.    Unreliable Sentencing Procedures

434.    The Due Process and Equal Protection Clauses prohibit arbitrary and capricious procedures in the State's application of capital punishment. *Gregg v. Georgia*, 428 U.S. 153; 188; 193-95 (1976); *Furman*, 408 U.S. at 255; 274. Ohio's capital punishment system does not meet those requirements. The Ohio statute does not require the state to prove the absence of any mitigating factors or that death is the only appropriate penalty.

435.    The Ohio statutory scheme is unconstitutionally vague and so leads to the arbitrary imposition of the death penalty. The language "that the aggravating circumstances . . . outweigh the mitigating factors" invites arbitrary and capricious decisions. "Outweigh" preserves reliance on the lesser standard of proof by a preponderance of the evidence. The statute requires only that the sentencing body be convinced beyond a reasonable doubt that the aggravating circumstances were marginally greater than the mitigating factors. This creates an unacceptable risk of arbitrary or capricious sentencing.

436.    And the mitigating circumstances are vague. The decision-maker must be given "specific and detailed guidance" and be provided with "clear and objective standards" for their sentencing discretion to be adequately channeled. *Gregg,* 428 U.S. at 198; *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

437.    Ohio courts continually hold that the weighing process and the weight to be assigned to a given factor is within the individual decision-maker's discretion. *State v. Fox*, 631 N.E.2d 124, 132 (Ohio 1994). Giving so much discretion inevitably leads to arbitrary and capricious judgments.

113

438.     Empirical evidence is developing in Ohio and around the country that, under commonly

used penalty phase jury instructions, juries do not understand their responsibilities and apply

inaccurate standards for decision. That Ms. Roberts waived the presentation of mitigating evidence

at her first trial does not alter this conclusion. *See* Cho, *Capital Confusion: The Effect of Jury*

*Instructions on the Decision To Impose Death*, 85 J. Crim. L. & Criminology 532, 549-557 (1994),

and *Free v. Peters*, 12 F.3d 700 (7th Cir. 1993) (discussing findings of Zeisel). Due to its

deficiencies, Ohio's statutory scheme does not meet the requirements of *Furman* and its progeny.

### C.     Ohio Revised Code § 2929.04(A)(7) Is Constitutionally Invalid When Used To Aggravate Ohio Revised Code § 2903.01(A) Aggravated Murder

439.     "[T]o avoid [the] constitutional flaw of [vagueness and over breadth under the Eighth

Amendment], an aggravating circumstance must genuinely narrow the class of persons eligible for

the death penalty and must reasonably justify the imposition of a more severe sentence on the

defendant compared to others found guilty of (aggravated) murder." *Zant v. Stephens*, 462 U.S.

862, 877 (1983). Ohio's statutory scheme fails to meet this constitutional requirement because

Ohio Revised Code § 2929.04(A)(7) fails to genuinely narrow the class of individuals eligible for

the death penalty.

440.     Ohio Revised Code § 2903.01(B) defines the category of felony-murderers. If any factor

in Ohio Revised Code § 2929.04(A) is specified in the indictment and proved beyond a reasonable

doubt, the defendant becomes eligible for the death penalty. Ohio Rev. Code §§ 2929.02(A) and

2929.03.

441.     The scheme is unconstitutional because the aggravating circumstances in Ohio Revised

Code § 2929.04(A)(7) merely repeats, as an aggravating circumstance, factors that distinguish

aggravated felony-murder from murder. Ohio Revised Code § 2929.04(A)(7) repeats the definition

of felony-murder as alleged, which automatically qualifies the defendant for the death penalty.

114

Ohio Revised Code § 2929.04(A)(7) does not reasonably justify the imposition of a more severe sentence on felony murderers. However, the prosecuting attorney and the sentencing body are given unbound discretion, both in charging and weighing, that maximizes the risk of arbitrary and capricious action and deprivation of a defendant's life without substantial justification. *Zant*, 462 U.S. at 877.

442.    As compared to other aggravated murderers, the felony-murderer is treated more severely. Each Ohio Revised Code § 2929.04(A) circumstance, when used in connection with Ohio Revised Code § 2903.01(A), adds an additional measure of culpability to an offender such that society arguably should be permitted to punish him more severely with death. However, the aggravated murder defendant alleged to have killed during a felony is automatically eligible for the death penalty—with not a single additional fact need be proven.

443.    Felony-murder also fails as constitutional justification for a death sentence because the Supreme Court of Ohio has interpreted Ohio Revised Code § 2929.04(A)(7) not to require that intent to commit a felony precede the murder. *State v. Williams*, 660 N.E.2d 724, syl. ¶ 1 (Ohio 1996). The asserted state interest in treating felony-murder as deserving of greater punishment is to deter the commission of felonies in which individuals might die. Generally, courts have required that the killing results from an act done to further the felonious purpose, referencing the Model Penal Code. *Id.* Without such a limitation, no state interest justifies a stiffer punishment. Having done away with this limitation, the Supreme Court of Ohio has discarded the only arguably reasonable justification for imposing the death sentence on such individuals, a position that results in unconstitutional executions. Further, the Supreme Court of Ohio's position contradicts previous cases, thus creating the likelihood of arbitrary and inconsistent applications of the death penalty. *See e.g., State v. Rojas*, 592 N.E.2d 1376 (Ohio 1992).

444.     Equal protection of the law requires legislative classifications to be supported by, at least, a reasonable relationship to legitimate state interests. *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942). The state has arbitrarily selected one class of murderers who may be subjected to the death penalty automatically. This statutory scheme contradicts the purported state interests. There is no rational basis or any state interest for this distinction and its application is arbitrary and capricious.

### D.     Mandatory Death Penalty And Failure To Require Appropriateness Analysis

445.     The Ohio death penalty scheme precludes a mercy option, either in the absence of mitigation or when the aggravating circumstances "outweigh" the mitigating factors. The statutes in those situations mandate that death shall be imposed. Ohio Rev. Code §§ 2929.03; 2929.04. The limit on the sentencing authority's ability to return a life verdict is impermissible.

446.     In *Gregg*, the Supreme Court stated, "nothing" in any of its case law suggests the decision to afford an individual defendant mercy violates the Constitution. 428 U.S. at 199. *Gregg* held only that, "in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Id*. *Gregg* requires the State to establish, according to constitutionally sufficient criteria of aggravation and constitutionally mandated procedures, that capital punishment is appropriate for the defendant. Nothing requires the State to execute any defendant for whom such a finding is made. The Georgia statute, approved in *Gregg* as following *Furman*, permits the jury to make a binding recommendation of mercy even though the jury found no mitigating circumstances in the case. *Hayes v. Georgia*, 282 S.E.2d 208 (Ga. 1981); *Fleming v. Georgia*, 240 S.E.2d 37 (Ga. 1977).

447.    After *Lockett*, the Fifth and Eleventh Circuits repeatedly reviewed and remanded cases for error in the jury instructions when the trial court failed to instruct the jury clearly they had the option to return a life sentence even if the aggravating circumstances outweighed mitigation. *Tucker v. Zant*, 724 F.2d 882 (11th Cir. 1984); *Westbrook v. Zant*, 704 F.2d 1487 (11th Cir. 1983); *Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982); *Gray v. Lucas*, 677 F.2d 1086 (5th Cir. 1982); *Spivey v. Zant*, 661 F.2d 464 (5th Cir. 1981); *Chenault v. Stynchcombe*, 581 F.2d 444 (5th Cir. 1978); *Prejean v. Blackburn*, 570 F. Supp. 985 (W.D. La. 1983).

448.    Capital sentencing that is constitutionally individualized requires a mercy option. An individualized sentencing decision requires the sentencing authority possess the power to choose mercy and to determine that death is not the appropriate penalty for this defendant for this crime. In *Barclay v. Florida*, 463 U.S. 939, 950 (1983), the Court stated the jury is free to "determine whether death is the appropriate punishment." Absent the mercy option, a defendant faces a death verdict resulting from a *Lockett*-type statute, *i.e.*, a statute that mandates a death verdict absent one of three specific mitigating factors. Under Ohio law, the jury lacks the option of finding a life sentence appropriate in the face of a statute that requires when aggravating circumstances outweigh mitigating factors "it shall impose [a] sentence of death on the offender." Ohio Rev. Code § 2929.03(D)(3).

449.    A non-mandatory statutory scheme that affords the jury the discretion to recommend mercy "avoids the risk that the death penalty will be imposed in spite of factors 'too intangible to write into a statute' which may call for a less severe penalty, and avoidance of this risk is constitutionally necessary." *Conner v. Georgia*, 303 S.E.2d 266, 274 (Ga. 1983) (citation omitted). Other state courts have also required a determination of "appropriateness" beyond mere weighing of

aggravating circumstances and mitigating factors. *California v. Brown*, 726 P.2d 516, 540 (Cal. 1985), *rev'd on other grounds*, 479 U.S. 538 (1987).

450.     In *California v. Brown*, 479 U.S. 538, 543 (1987), the Supreme Court repeated "the Eighth Amendment's need for reliability in the determination that death is the appropriate punishment in a specific case." In *Brown*, the Court agreed that jurors may be cautioned against reliance on "extraneous emotional factors," and that it was proper to instruct the jurors to disregard "mere sympathy." *Id.* at 545. This instruction referred to the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase. The Court's analysis approved and mandated that jurors be permitted to consider mercy, *i.e.*, sympathy tethered or engendered by the penalty phase evidence.

451.     The Ohio statute permits no appropriateness determination; a death sentence is mandated after a mere weighing. Finally, while the Supreme Court of Ohio has claimed that a jury "is not precluded from extending mercy to a defendant," *State v. Zuern*, 512 N.E.2d 585, 593 (Ohio 1987), Ohio juries are not informed of this capability. The Supreme Court of Ohio has permitted penalty phase jury instructions in direct contradiction to this extension of mercy capability. The Ohio "no-sympathy" instructions do not distinguish between "mere" sympathy (untethered) and that sympathy tied to the evidence presented in penalty phase, and therefore commit the very violation of the Eighth Amendment which the California instruction had narrowly avoided.

452.     The Supreme Court of Ohio claims extending mercy is permissible in Ohio and acknowledges that "[s]entencing discretion[] is an absolute requirement in any constitutionally acceptable capital punishment statute." *Id.* at 594. However, there is no such indication on the statute's face, and no state court assurance that juries are so informed. Bald, unsupported assertions of compliance with the constitution are inadequate.

118

### E. Recommendations From The Joint Task Force To Review The Administration Of Ohio's Death Penalty

453.     In 2011, Chief Justice O'Connor of the Supreme Court of Ohio convened a Joint Task

Force with the Ohio State Bar Association to review the Ohio death penalty. The Task Force

comprised retired judges, law enforcement, law professors, prosecutors, and defense attorneys. In

April 2014, the Task Force issued its final report with 56 recommendations that covered every

aspect of a capital punishment in Ohio, from charging to clemency.[5] The Task Force was

specifically instructed not to consider whether Ohio should have capital punishment. While the

entire report of the Task Force is important and relevant, these recommendations are specifically

relevant to Ms. Roberts's request for habeas relief on this ground.

> RECOMMENDATION 33: Based upon data showing that prosecutors and juries overwhelmingly do not find felony murder to be the worst of the worst murders, further finding that such specifications result in death verdicts 7% of the time or less when charged as a death penalty case, and further finding that removal of these specifications will reduce the race disparity of the death penalty, it should be recommended to the legislature that the following specifications be removed from the statutes: Kidnapping, Rape, Aggravated Arson, Aggravated Robbery, and Aggravated Burglary.

> RECOMMENDATION 36: To ensure a more representative jury pool, enact legislation that requires every jurisdiction to create jury pools from the lists of all registered voters and all licensed drivers, who are U.S. citizens, rather than only the voter registration list.

> RECOMMENDATION 37: Enact a court rule that allows prosecutors and defendant's attorneys in death penalty cases full and complete access to all documents, statements, writings, photographs, recordings, evidence, reports or any other file material in possession of the state, any agent or agency of the state, or any police agency involved in the case, or in the possession of the defendant's attorneys which is known to exist or which, with due diligence, can be determined to exist and to allow the attorneys to inspect, test, examine, photograph or copy the same. This shall not be construed to require the disclosure of attorney work product or privileged matters, nor to the disclosure of inculpatory information possessed by

---

[5] The full report is available at http://www.sconet.state.oh.us/Boards/committees/default.asp#.

the defendant's attorneys described in Crim.R. 16(H)(3), nor to materials protected by Crim.R. 16.

RECOMMENDATION 45: The Ohio Judicial Conference shall review and revise as necessary the Ohio Jury Instructions to institute the use of "plain English" and "plain English" shall be used throughout capital trials.

RECOMMENDATION 47: The Ohio Judicial Conference shall study the Ohio Jury Instructions to make clear that a jury must always be given the option of extending mercy that arises from the evidence as cited in Justice Scalia's dissent in *Morgan v. Illinois*, 504 U.S. 719, 751 citing to *Woodson v. North Carolina,* 428 U.S. 303-305.

454.     These recommendations demonstrate the Ohio capital punishment statute and scheme is flawed. Because of political considerations, it is unclear whether the Ohio legislature can enact the legislation needed to remedy the situation. Even if that were to happen, it most likely would be too late for Ms. Roberts.

455.     Ohio's death penalty scheme fails to ensure that arbitrary and discriminatory imposition of the death penalty will not occur. The procedures actually promote the imposition of the death penalty and are constitutionally intolerable. Ohio Revised Code §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution. As Justice Breyer stated in his dissent to *Glossip v. Gross*:

> Thus we are left with a judicial responsibility. The Eighth Amendment sets forth the relevant law, and we must interpret that law. See *Marbury v. Madison*, 1 Crunch 137, 177, 2 L.Ed. 60 (1803); *Hall*, 572 U.S., at __, 134 S.Ct. at 2000 ("That exercise of independent judgment is the Court's judicial duty."). We have made clear that "'the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.'" *Id.*, at ___, 134 S.Ct. at 1999 (quoting *Coker v. Georgia*, 433 U.S. 584, 597, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion)); see also *Thompson v. Oklahoma*, 487 U.S. 815, 833, n. 40, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (plurality opinion).

> For the reasons I have set forth in this opinion, I believe it highly likely that the death penalty violates the Eighth Amendment.

576 U.S. 925-26. Furthermore, as the Supreme Court has held:

The dynamic of our constitutional system is that individuals need not await legislative action before asserting a fundamental right. The Nation's courts are open to injured individuals who come to them to vindicate their own direct, personal stake in our basic charter. An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act.

*Obergefell v. Hodges*, 576 U.S. 644, 677 (2015).

456.     Habeas relief is warranted. The Ohio Supreme Court's summary dismissal of this claim without any analysis was an unreasonable application of clearly established federal authority under 28 U.S.C. § 2254(d)(1). This Court should find the death penalty unconstitutional and vacate Ms. Roberts's death sentence.

## FIFTEENTH GROUND FOR RELIEF

**THE CUMULATIVE EFFECTS OF THE ERRORS AND OMISSIONS SET FORTH IN THE PRECEDING CLAIMS FOR RELIEF PREJUDICED MS. ROBERTS AND DEPRIVED HER OF HER RIGHT TO A FAIR TRIAL AND SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

457.     Ms. Roberts incorporates by reference all other paragraphs of this petition as if rewritten here.

458.     Ms. Roberts raised this ground for relief on direct appeal to the Supreme Court of Ohio. It is therefore ripe for federal habeas review.

459.     Even assuming that none of the Claims for Relief in her Petition for Writ of Habeas Corpus individually warrants the issuance of a writ of habeas corpus, the cumulative effects of the errors and omissions as presented in the preceding grounds for relief prejudiced Ms. Roberts and deprived her of her rights as guaranteed by the United States Constitution.

460.     In cases where "no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United*

*States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (reversing denial of writ of habeas corpus after finding cumulative errors infected the proceedings and violated the appellant's due process rights); *see also Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (stating cumulative effect of errors may be so prejudicial as to require reversal). In cases such as Ms. Roberts's, replete with numerous, egregious errors during trial and on appeal, a "'balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *Frederick*, 78 F.3d at 1381 (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).

461.     Cumulative errors consisting both of trial court errors as well as trial counsel deficiencies have required new trials. In *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992), the court found it did "not need to decide whether [counsel's] deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively," required a grant of relief. If this Court found that counsel's performance was not sufficiently deficient and prejudicial to require reversal on the ineffective assistance of counsel claim alone, taken in combination with two other errors, counsel's performance contributed to the denial of Ms. Roberts's due process rights. *Id.*

462.     In *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995), the court affirmed the grant of a writ of habeas corpus using a cumulative error analysis. Specifically, the court cited, among other deficiencies, trial counsel's failure to properly investigate, prepare for trial, consult with petitioner, or assess the mental state of the petitioner. *Id.* Numerous errors by counsel at trial and sentencing constituted cumulative prejudice that rendered the proceedings improper. *Id.*

463.     Assuming that this Court does not deem any individual Claim for Relief as meriting the relief sought, the errors presented in this petition taken together are of sufficient magnitude to warrant the issuance of a writ of habeas corpus.

464.     The Court should grant habeas relief on this claim.

## CONCLUSION

465.     As stated above, now is the time for this Court to step in to correct the constitutional errors that occurred throughout this case. For all of the foregoing reasons, this Court should grant the writ and order a new, fair trial. In the alternative, this Court should grant the writ and order a new, fair penalty phase. Again, in the alternative, this Court should grant discovery and an evidentiary hearing on the foregoing claims for relief.

## REQUEST FOR RELIEF

Ms. Roberts requests the following relief from this Court:

A.     That this Court declare Ms. Roberts's convictions to have been obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and other provisions of the U.S. Constitution, as well as the various treaties and charter obligations of the United States;

B.     That this Court declare that Ms. Roberts's sentence of death was obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and other provisions of the United States Constitution, as well as the various treaties and charter obligations of the United States;

C.     That this Court grant Ms. Roberts leave to amend this petition;

D.     That this Court grant Ms. Roberts leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in her convictions and sentences;

E.     That this Court grant Ms. Roberts the authority to obtain subpoenas in forma pauperis for witnesses and documents necessary to prove the facts asserted in this petition;

F.     That this Court permit expansion of the Record with any documents necessary for resolution of Ms. Roberts's Petition for Writ of Habeas Corpus;

G.      That this Court grant Ms. Roberts an evidentiary hearing pursuant to Rule 8 of the

Rules Governing 28 U.S.C. § 2254 cases; and

H.      That this Court grant such other relief as law and justice require.


Respectfully submitted,

STEPHEN C. NEWMAN (0051928)
FEDERAL PUBLIC DEFENDER

*/s/ Lori B. Riga*                                  */s/ Vicki Ruth Adams Werneke*
LORI B. RIGA (0066994)                  VICKI RUTH ADAMS WERNEKE (0088560)
Research and Writing Attorney          Assistant Federal Public Defender
Office of the Federal Public Defender
1660 W. Second Street, Suite 750
Cleveland, OH 44113
(216) 522-4656
(216) 522-1951 (fax)
Lori_Riga@fd.org
Vicki_Werneke@fd.org

124

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 20, 2021, a copy of the foregoing <u>PETITION FOR WRIT OF</u>

<u>HABEAS CORPUS BY DONNA ROBERTS</u> was filed electronically. Notice of this filing will be

sent by operation of the Court's electronic filing system to all parties indicated on the electronic

filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing

through the Court's system.

*/s/ Lori B. Riga*
Assistant Federal Public Defender
Capital Habeas Unit
