```
 1                IN THE COURT OF COMMON PLEAS
                    TRUMBULL COUNTY, OHIO
 2              TRIAL COURT CASE NO. 01-CR-793
              SUPREME COURT OF OHIO CASE NO. 03-1441
 3

 4   STATE OF OHIO          )              VOLUME I
                            )
 5            Plaintiff     )         SEARCH WARRANT
                            )          ARRAIGNMENT
 6   -vs-                   )        PRE-TRIAL MOTIONS
                            )        MOTIONS TO SUPPRESS
 7   DONNA M. ROBERTS       )      WAIVER OF SPEEDY TRIAL
                            )
 8            Defendant     )

 9
          BE IT REMEMBERED, that on December 20, 2001,
10
     December 21, 2001, December 31, 2001, January 30, 2002,
11
     July 18, 2002, October 10, 2002, January 2, 2003,
12
     February 26, 2003, and March 26, 2003, these proceed-
13
     ings came on to be heard before one of the Judges of
14
     this Court, John M. Stuard, in Courtroom No. 2, on
15
     High Street, Warren, Ohio, before the case heretofore
16
     filed herein.
17

18

19

20
     Mary Ann Mills, RPR
21   Official Court Reporter
     Trumbull County, Ohio
22
```

2

A P P E A R A N C E S

On Behalf of the State of Ohio:
    Dennis Watkins, Prosecuting Attorney
    Charles L. Morrow, Ass't. Prosecuting Attorney
    Christopher D. Becker, Ass't. Prosecuting Attorney
    Kenneth N. Bailey, Ass't. Prosecuting Attorney
    160 High Street, N.W.
    Warren, OH 44481

On Behalf of the Defendant, Nathaniel Jackson:
    Anthony V. Consoldane, Attorney at Law
    James F. Lewis, Attorney at Law
    State of Ohio Public Defendant's Office
    328 Mahoning Avenue, N.W.
    Warren, OH 44481

On Behalf of the Defendant, Donna M. Roberts:
    John B. Juhasz, Attorney at Law
    J. Gerald Ingram, Attorney at Law
    7330 Market Street
    Youngstown, OH 44512

On Behalf of The Vindicator Printing Co.
    Ann Millette, Attorney at Law
    3200 National City Center
    1900 East Ninth Street
    Cleveland, OH 44114

On Behalf of WFMJ Television, Inc.:
    Stephen T. Bolton, Attorney at Law
    201 E. Commerce Street, Atrium Level Two
    Youngstown, Oh 44503

1                      I N D E X

2

3      VOLUME I:

4      Search Warrant (December 20, 2001)          3
       Appearance on Complaint (December 21, 2001)  9
5      Motion to Intervene (December 31, 2001)     19
       Arraignment (December 31, 2001)             57
6      Waiver of Speedy Trial (January 30, 2002)   63
       Pre-Trial Motions (July 18, 2002)           67
7      Pre-Trial Motions (October 10, 2002)        97
       Pre-Trial (January 2, 2003)                153
8      Motion to Suppress (February 26, 2003)     154

9      Individual Voir Dire:
        Ralph Roberts                             155
10      Rita Roberts                              167
        Capt. Karl Compton                        194
11      Det. Sgt. Frank Dillon                    203
        Det. Sgt. Paul Monroe                     225

12
       Waiver of Speedy Trial (February 26, 2003) 292
13     Pre-Trial (March 26, 2003)                 293

14

15

16

17

18

19

20

21

22

I N D E X

VOLUME II:

Hardship Excuses                                    298
(April 8, 2003)

Jurors Initial Appearance                           303
(April 8, 2003)

1
                              I N D E X

2

3
          VOLUME III:

4
          (Thursday, April 10, 2003 & Friday,
5         April 11, 2003)

6         Defendant's Motion for Change of Venue        525

7         Individual Voir Dire:
           W. Jean Rowley                               534
8          Tilghman Gray                                593
           Richard Caraway                              686
9

10

11

12

13

14

15

16

17

18

19

20

21

22

I N D E X

VOLUME IV:

(Friday, April 11, 2003)

Individual Voir Dire:
 Frederick Calhoun                                773
 Sheri Senek                                      886
 Maxine Howard                                    966

1

<u>I N D E X</u>

2

3     <u>VOLUME V</u>:

4     (Monday, April 14, 2003)

5     Individual Voir Dire:

6     Maxine Howard (Continuing exam)          1023
      George Dermer                            1071
7     Douglas Jones                            1155
      Lisa Jaskowiak                           1171
8     Karen Tipton                             1172
      Walter Dawson                            1255
9

10

11

12

13

14

15

16

17

18

19

20

21

22

I N D E X

VOLUME VI:

(Tuesday, April 15, 2003)

Individual Voir Dire:
  Irene Zahornek                              1313
  Brad Seelbach                               1349
  Diane Parke                                 1424
  Gary OMalley                                1470
  Thomas Carmichael                           1473

1

<u>I N D E X</u>

2

3  <u>VOLUME VII</u>:

4  (Wednesday, April 16, 2003)

5  Individual Voir Dire:

   Linda Black                              1537
6  Panda Lantz                              1614
   Lawrence King                            1698
7  Cynthia Sase                             1705
   Shirley Biel                             1761

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

I-N-D-E-X

VOLUME VIII

INDIVIDUAL VOIR DIRE

SHIRLEY A. BIEL

EXAMINATION BY THE COURT.............................1770:8
EXAMINATION BY MR. BAILEY............................1773:7
EXAMINATION BY MR. INGRAM............................1800:7

MICHAEL HILDACK

EXAMINATION BY THE COURT.............................1801:11
EXAMINATION BY MR. BECKER............................1804:7

ROBERT J. YOUNG

EXAMINATION BY THE COURT.............................1813:23
EXAMINATION BY MR. BAILEY............................1817:4
EXAMINATION BY MR. INGRAM............................1826:4

JOHN D. LANAM, SR.

EXAMINATION BY THE COURT.............................1828:4
EXAMINATION BY MR. BECKER............................1831:11
EXAMINATION BY MR. INGRAM............................1853:3

NANCY J. MARSH-McGARRY

EXAMINATION BY THE COURT.............................1884:12
EXAMINATION BY MR. BAILEY............................1888:16
 EXAMINATION BY MR. JUHASZ...........................1917:2
                        * * *

```
1                          I-N-D-E-X

2                          VOLUME IX

3                     INDIVIDUAL VOIR DIRE

4
                       KEVIN B. PATTERSON
5
```

EXAMINATION BY THE COURT...............................1939:6
EXAMINATION BY MR. BECKER..............................1943:2
EXAMINATION BY MR. INGRAM..............................1966:7

```
7

8                      MARSHA J. DANADIC
```

EXAMINATION BY THE COURT...............................2006:5
EXAMINATION BY MR. BAILEY..............................2009:9
EXAMINATION BYMR.JUHASZ................................2042:22

```
10

11                      KASEY S. KELLY
```

EXAMINATION BY THE COURT...............................2074:17
EXAMINATION BY MR. BECKER..............................2077:19
 EXAMINATION BY MR. INGRAM.............................2107:9

```
14                     MOSELLE DICENSO
```

 EXAMINATION BY THE COURT..............................2133:20
EXAMINATION BY MR. BAILEY..............................2136:14
EXAMINATION BY MR. JUHASZ.............................2173:22

```
17

18

19

20

21

22

23
```

I-N-D-E-X

<u>VOLUME X</u>

<u>INDIVIDUAL VOIR DIRE</u>

<u>THELMA L. RANKIN</u>

EXAMINATION BY THE COURT.............................2200:14
EXAMINATION BY MR. BECKER...........................2203:15
EXAMINATION BY MR. INGRAM...........................2235:4


<u>MARY J. COSTELLO</u>

EXAMINATION BY THE COURT.............................2272:5
EXAMINATION BY MR. BAILEY...........................2275:9
EXAMINATION BY MR. JUHASZ...........................2309:13

1                              I-N-D-E-X

2                              VOLUME XI

3

                         INDIVIDUAL VOIR DIRE
4

5

                         RODGER KILLINGSWORTH
6

7   EXAMINATION BY THE COURT...............................2340:6
    EXAMINATION BY MR. BECKER.............................2343:22

8

                          ROBIN SCHLAEGEL
9

10  EXAMINATION BY THE COURT...............................2345:6
    EXAMINATION BY MR. BECKER..............................2348:6
11  EXAMINATION BY MR. INGRAM............................2394:15

12                        GARY S. PHILLIPS

13  EXAMINATION BY THE COURT..............................2444:17
    EXAMINATION BY MR. BAILEY.............................2447:21
14   EXAMINATION BY MR. JUHASZ............................2484:7

15

                        MICHAEL P. EVANS
16

17  EXAMINATION BY THE COURT.............................2512:22
    EXAMINATION BY MR. BECKER............................2516:22
18   EXAMINATION BY MR. INGRAM...........................2549:6

19

20

21

22

23

1           **I N D E X**

2

3                                    PAGE/LINE NO.

4

5           VOLUME XII

6    **MONDAY, APRIL 28, 2003**................... 2558:2

7    BARBARA ALBRIGHT, JUROR NUMBER 153......... 2558:6

8    TODD DAVIDSON, JUROR NUMBER 167 .......... 2603:9

9    MICHAEL ARCURI, JUROR NUMBER 168 ......... 2694:18

10   REPORTER'S CERTIFICATION................. 2778:3

11

12           VOLUME XIII

13   NATHAN CROCKER, JUROR NUMBER 171.......... 2779:4

14   **TUESDAY, APRIL 29, 2003**.................. 2882:1

15   LUCILLE K. KUFCHAK, JUROR NUMBER 172....... 2882:3

16   WILLIAM M. HALL, JUROR NUMBER 178.......... 2899:8

17   ROBERT L. HAMILTON, JUROR NUMBER 180 ...... 2913:13

18   REGINA DAY, JUROR NUMBER 115.............. 2971:18

19   CAROL SELAK, JUROR NUMBER 184............. 2981:2

20   REPORTER'S CERTIFICATION................. 3030:3

21

22

23

1    **VOLUME XIV**

2    CONTINUED EXAMINATION OF CAROL SELAK,

3    JUROR NUMBER 184........................... 30:31:3

4    **WEDNESDAY, APRIL 30, 2003**................. 3073:1

5    DENNIS M. COOK, JUROR NUMBER 185........... 3073:3

6    AMY BARTLETT, JUROR NUMBER 199............. 3087:9

7    VICTOR SABULSKY, JUROR NUMBER 200......... 3198:17

8    REPORTER'S CERTIFICATION.................... 3252:3

9

10   **VOLUME XV**

11   CONTINUED EXAMINATION OF VICTOR SABULSKY,

12   JUROR NUMBER 200........................... 3253:3

13   HELENE MESSERSMITH, JUROR NUMBER 209........ 3301:9

14   MARTHA MULDOWNEY, JUROR NUMBER 217.......... 3309:11

15   **THURSDAY, MAY 1, 2003, at 1:15 p.m**.......... 3314:1

16   JUDITH ELLIOTT, JUROR NUMBER 218............ 3314:3

17   CHRISTINE HAKE, JUROR NUMBER 223............ 3420:1

18   **FRIDAY, MAY 2, 2003** ........................ 3445:1

19   SALINE M. SNYDER, JUROR NUMBER 228......... 3445:3

20   REPORTER'S CERTIFICATION.................... 3501:4

21

22

23

1      **VOLUME XVI**

2    CONTINUED EXAMINATION OF SALINE M. SNYDER,

3    JUROR NUMBER 228............................ 3502:3

4    RONALD WYNN, JUROR NUMBER 229 .............. 3551:1

5    THOMAS J. HITT, JUROR NUMBER 227............ 3553:10

6    REGINA C. PALETTE, JUROR NUMBER 233......... 3556:1

7    JESSIE CHASE, JUROR NUMBER 238 ............. 3565:11

8    LANCE M. TAYLOR, JUROR NUMBER 240........... 3577:1

9    REPORTER'S CERTIFICATION..................... 3686:3

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

2

3          MAY 5, 2003

4                          *INDIVIDUAL VOIR DIRE*

5

6          PROSPECTIVE JUROR MARGARET FELLOWS.................... 3688:4

7          PROSPECTIVE JUROR MARGARET L. KAY.................... 3752:9

           PROSPECTIVE JUROR EDWARD S. COLUCCI................. 3852:12

8

9                              *MOTIONS*

10

11         motion made to dismiss for cause.................... 3915:22

12

13

14

15

16

17

18

19

20

21

22

23

1

### INDEX FOR VOLUME XVIII

2

MAY 5, 2003 Cont'd

3

### INDIVIDUAL VOIR DIRE

4

PROSPECTIVE JUROR KENNETH ROBERTS.................... 3930:2

5

6

MAY 6, 2003

7

PROSPECTIVE JUROR MICHAEL S. MERRIMAN............... 4001:14

8

PROSPECTIVE JUROR BRAD MASTERS...................... 4004:11

9

PROSPECTIVE JUROR RUTH A. BUNKER.................... 4011:17

10

PROSPECTIVE JUROR ANDREW KOTWIS.................... 4015:17

11

12

### MOTIONS

13

motion of both sides................................ 4001:3

14

15

16

17

18

19

20

21

22

23

*INDEX FOR VOLUME XIX*

MAY 6, 2003 Cont'd

*INDIVIDUAL VOIR DIRE*

PROSPECTIVE JUROR ANDREW KOTWIS CONTINUED........... 4084:2

PROSPECTIVE JUROR SHELLEY A. MYERS.................. 4142:22

PROSPECTIVE JUROR MICHELENE MARUCA.................. 4223:8

*OBJECTIONS*

ATTY. JUHASZ:  Your Honor, we object................. 4141:9

*INDEX FOR VOLUME XX*

**MAY 7, 2003**

*INDIVIDUAL VOIR DIRE*

PROSPECTIVE JUROR LARRY P. JORDAN.................. 4235:11

PROSPECTIVE JUROR SHERYL E. BRAUN.................. 4298:16

PROSPECTIVE JUROR MICHAEL E. BLAKE.................. 4301:17

PROSPECTIVE JUROR REBECCA A. PIERCE.................. 4412:5

PROSPECTIVE JUROR DAVID P. RATCLIFFE.................. 4416:6

*MOTIONS AND OBJECTIONS*

THE COURT:  Your motion............................ 4408:17
ATTY. INGRAM:  I object ........................... 4250:13
ATTY. INGRAM:  I object to any assertion that Ohio law is like
New York law....................................... 4337:3
ATTY. INGRAM:  Yes, Your Honor.  The defense challenged Mr.
Blake for cause.................................... 4408:9

1
### INDEX FOR VOLUME XXI
MAY 8, 2003

2
### INDIVIDUAL VOIR DIRE

PROSPECTIVE JUROR MICHAEL ARCURI..................... 4490:7

3
PROSPECTIVE JUROR W. JEAN ROWLEY..................... 4496:3
PROSPECTIVE JUROR TILGHMAN GRAY...................... 4499:1

4
PROSPECTIVE JUROR RICHARD CARAWAY.................... 4501:11
PROSPECTIVE JUROR MAXINE HOWARD..................... 4503:3

5
PROSPECTIVE JUROR GEORGE DERMER..................... 4504:6
PROSPECTIVE JUROR KAREN TIPTON...................... 4505:8

6
PROSPECTIVE JUROR BRAD SEELBACK..................... 4506:14
PROSPECTIVE JUROR THOMAS CARMICHAEL................. 4507:17

7
PROSPECTIVE JUROR LINDA BLACK....................... 4511:8
PROSPECTIVE JUROR PANDA HEATHERLY-LANTZ............. 4513:14

8
PROSPECTIVE JUROR JOHN D. LANAM, SR................. 4514:23
PROSPECTIVE JUROR KEVIN B. PATTERSON................ 4516:2

9
PROSPECTIVE JUROR MARSHA J. DANADIC................. 4517:15
PROSPECTIVE JUROR MOSELLE DICENSO................... 4519:5

10
PROSPECTIVE JUROR THELMA L. RANKIN.................. 4524:16
PROSPECTIVE JUROR KASEY S. KELLY.................... 4526:4

11
PROSPECTIVE JUROR MARY J. COSTELLO.................. 4527:3
PROSPECTIVE JUROR ROBIN SCHLAEGEL................... 4528:21

12
PROSPECTIVE JUROR GARY S. PHILLIPS.................. 4531:2
PROSPECTIVE JUROR NATHAN CROCKER.................... 4532:7

13
PROSPECTIVE JUROR CAROL K. SELAK.................... 4533:19
PROSPECTIVE JUROR AMY BARLETT....................... 4535:3

14
PROSPECTIVE JUROR VICTOR V. SABULSKY................ 4536:12
PROSPECTIVE JUROR JUDITH M. ELLIOTT................. 4537:18

15
PROSPECTIVE JUROR SALINA M. SNYDER.................. 4539:4
PROSPECTIVE JUROR MARGARET E. FELLOWS............... 4540:13

16
PROSPECTIVE JUROR MARGARET L. KAY................... 4541:19
PROSPECTIVE JUROR ANDREW KOTWIS..................... 4543:2

17
PROSPECTIVE JUROR MICHAEL E. BLAKE.................. 4544:9
PROSPECTIVE JUROR DAVID R. RATCLIFFE................ 4545:15

18
PROSPECTIVE JUROR TODD DAVIDSON..................... 4547:16
PROSPECTIVE JUROR THOMAS A. CARMICHAEL.............. 4555:19

19
PROSPECTIVE JUROR LINDA J. BLACK.................... 4560:3
PROSPECTIVE JUROR KEVIN B. PATTERSON................ 4563:9

20
PROSPECTIVE JUROR MOSELLE DICENSO................... 4571:22
PROSPECTIVE JUROR ROBIN SCHLAEGEL................... 4576:7

21

### OBJECTIONS AND MOTIONS

22

motion for change of venue.......................... 4589:16

23
the State objects................................... 4587:1
your objection is noted............................. 4591:20

*INDEX FOR VOLUME XXII*

**MAY 9, 2003**

*INDIVIDUAL VOIR DIRE*

PROSPECTIVE JUROR JOSEPH CHETSKO.................... 4617:2

PROSPECTIVE JUROR BRAD PETAK....................... 4682:17

PROSPECTIVE JUROR MARY JANE O'HARA................. 4687:16

PROSPECTIVE JUROR ROBERT D. MORGAN................. 4785:21

PROSPECTIVE JUROR JOHN M. BRDEK, JR................ 4788:2

PROSPECTIVE JUROR TROY KAHLER...................... 4796:13

*OBJECTIONS*

ATTY. INGRAM:  Objection........................... 4627:18

1               I N D E X - VOLUME XXIII

2

3                    MONDAY, MAY 12, 2003

4

5     INDIVIDUAL VOIR DIRE:

6

7     KRISTINA M. HOLMES................................. 4862

8     LISA R. MASSARY................................... 4873

9     JOANNE M. BATES.................................. 4958

10

11    GENERAL VOIR DIRE................................ 5030

12    MOTION FOR MISTRIAL............................. 5042

13

14                   TUESDAY, MAY 13, 2003

15

16    MOTIONS......................................... 5044

17

18    OPENING STATEMENT ON BEHALF OF THE STATE OF OHIO....... 5065

19    OPENING STATEMENT BY THE DEFENDANT.................. 5095

20

21

22

23

I N D E X - VOLUME XXIV

TUESDAY, MAY 13, 2003

WITNESSES:

CHRISTOPHER MONYAK

DIRECT EXAMINATION BY MR. BAILEY.........................5098

CROSS EXAMINATION BY MR. INGRAM.........................5119


FRANK REYNOLDS

DIRECT EXAMINATION BY MR. BAILEY......................... 5125

CROSS EXAMINATION BY MR. INGRAM.........................5136


GERALD FUNELLI

DIRECT EXAMINATION BY MR. BECKER.........................5143


ALBERT RAY

DIRECT EXAMINATION BY MR. BAILEY......................... 5155

CROSS EXAMINATION BY MR. INGRAM......................... 5162

REDIRECT EXAMINATION BY MR. BAILEY....................... 5166

 RECROSS EXAMINATION BY MR. INGRAM..................... 5167

WEDNESDAY, MAY 14, 2003

JILL KENYON

DIRECT EXAMINATION BY MR. BAILEY...................... 5169

CROSS EXAMINATION BY MR. INGRAM.........................5179

**WITNESSES (CONTINUED):**

**PAULA CARSON**

DIRECT EXAMINATION BY MR. BAILEY........................5181

CROSS EXAMINATION BY MR. INGRAM........................5188

**BRIDGET PAUL**

DIRECT EXAMINATION BY MR. BAILEY........................5190

CROSS EXAMINATION BY MR. INGRAM........................ 5199

**JAMES DANIELS**

DIRECT EXAMINATION BY MR. BECKER.......................5203

CROSS EXAMINATION BY MR. INGRAM........................5220

REDIRECT EXAMINATION BY MR. BECKER.....................5226

RECROSS EXAMINATION BY MR. INGRAM......................5228

FURTHER REDIRECT EXAMINATION BY MR. BECKER.............5229

**JOSE SANCHEZ**

DIRECT EXAMINATION BY MR. BAILEY....................... 5231

CROSS EXAMINATION BY MR. INGRAM........................ 5250

REDIRECT EXAMINATION BY MR. BAILEY..................... 5260

**WITNESSES (CONTINUED):**

**KATHRYN THOMAS**

DIRECT EXAMINATION BY MR. BAILEY....................... 5267

CROSS EXAMINATION BY MR. INGRAM........................5280

**KRIS ELLINGTON**

DIRECT EXAMINATION BY MR. BECKER.......................5291

CROSS EXAMINATION BY MR. INGRAM....................... 5296

**BARRY RICKER**

DIRECT EXAMINATION BY MR. BECKER....................... 5298

CROSS EXAMINATION BY MR. JUHASZ....................... 5308

**CARMEN OLIVIA**

DIRECT EXAMINATION BY MR. BECKER....................... 5311

CROSS EXAMINATION BY MR. JUHASZ....................... 5319

**JOSE FLORES**

DIRECT EXAMINATION BY MR. BAILEY....................... 5325

**EXHIBITS:**

State's Exhibit Number 403 marked for identification.... 5178

**REPORTER'S CERTIFICATE**.................................5341

I N D E X - VOLUME XXV

WEDNESDAY, MAY 14, 2003 (CONTINUED)

<u>WITNESSES</u>:

JOSE FLORES

CROSS EXAMINATION BY MR. INGRAM......................... 5342

REDIRECT EXAMINATION BY MR. BAILEY.......................5350


CHRISTOPHER GEAR

DIRECT EXAMINATION BY MR. BECKER.........................5357

THURSDAY, MAY 15, 2003

JEFF DIAMANTES

DIRECT EXAMINATION BY MR. BECKER.........................5375

CROSS EXAMINATION BY MR. INGRAM .........................5385


JENNIFER ROBINSON

DIRECT EXAMINATION BY MR. BECKER.........................5387

CROSS EXAMINATION BY MR. INGRAM..........................5393


MIKE YANNUCCI

DIRECT EXAMINATION BY MR. BECKER.........................5396

CROSS EXAMINATION BY MR. INGRAM..........................5405

1    **WITNESSES (CONTINUED):**

2    **ANTHONY LESHNACK**

3    DIRECT EXAMINATION BY MR. BAILEY........................5409

4    CROSS EXAMINATION BY MR. JUHASZ........................5426

5

6    **SANTIAGO MASON**

7    DIRECT EXAMINATION BY MR. BECKER........................5436

8    CROSS EXAMINATION BY MR. INGRAM........................ 5449

9    REDIRECT EXAMINATION BY MR. BECKER...................... 5472

10   RECROSS EXAMINATION BY MR. INGRAM...................... 5472

11   FURTHER REDIRECT EXAMINATION BY MR. BECKER.............. 5475

12   FURTHER RECROSS EXAMINATION BY MR. INGRAM.............. 5476

13

14   **FRANK DILLON**

15   CROSS EXAMINATION BY MR. INGRAM........................5479

16   DIRECT EXAMINATION BY MR. BECKER.......................5480

17   RECROSS EXAMINATION BY MR. INGRAM......................5481

18

19   **REPORTER'S CERTIFICATE**................................5487

20

21

22

23

1

## I N D E X

2

3   VOLUME XXVI:
    (Tuesday, May 20, 2003 & Wednesday, May 21,
4    2003)

5   STATE'S WITNESSES:
    Jim McCoy
6   Direct Examination by Mr. Bailey          5500
    Cross Examination by Mr. Ingram           5510
7

    James Campbell
8   Direct Examination by Mr. Bailey          5514
    Cross Examination by Mr. Ingram           5522
9   Redirect Examination by Mr. Bailey        5525

10  Agent Ed Lulla
    Direct Examination by Mr. Bailey          5526
11  Cross Examination by Mr. Juhasz           5556

12  Dr. Humphrey Germaniuk
    Direct Examination by Mr. Becker          5572
13  Cross Examination by Mr. Juhasz           5603
    Redirect Examination by Mr. Becker        5603
14  Recross Examination by Mr. Juhasz         5604

15  Sgt. Frank Dillon
    Direct Examination by Mr. Becker          5605
16  Cross Examination by Mr. Juhasz           5672

17  Dale Laux
    Direct Examination by Mr. Becker          5715
18  Cross Examination by Mr. Juhasz           5742

19

20

21

22

<u>I N D E X</u>

<u>VOLUME XXVII</u>:
(Wednesday, May 21, 2003 & Thursday, May 22, 2003)

<u>STATE'S WITNESSES</u>:   (May 21, 2003)

<u>Brenda Gerardi</u>
Direct Examination by Mr. Becker          5753
Cross Examination by Mr. Juhasz           5776

<u>Michael Roberts</u>
Direct Examination by Mr. Becker          5788
Cross Examination by Mr. Juhasz           5814

<u>Cynthia Mayle</u>
Direct Examination by Mr. Becker          5826
Cross Examination by Mr. Juhasz           5843
Redirect Examination by Mr. Becker        5852
Recross Examination by Mr. Juhasz         5855

<u>Chief Paul Monroe</u>
Direct Examination by Mr. Becker          5856


(Thursday, May 22, 2003)

   Continuing Direct Examination by Mr.
   Becker of Chief Paul Monroe            5951
   Cross Examination by Mr. Ingram        5960
   Redirect Examination by Mr. Becker     6042
   Recross Examination by Mr. Ingram      6050

1
### I N D E X

2

3    **VOLUME XXVIII**:

4    (Friday, May 23, 2003, Tuesday, May 27, 2003
     Wednesday, May 28, 2003, Tuesday, June 2,

5    2003, Wednesday, June 4, 2003 & Friday,
     June 20, 2003)

6

   Exhibits Proffered (May 23, 2003)             6056

7    Rule 29 Motion (May 27, 2003)                 6101
   Closing Argument by Mr. Bailey                6117

8      (May 27, 2003)
   Closing Argument Waived by Mr. Ingram         6146

9      (May 27, 2003)
   Jury Charge                                   6147

10      (May 27, 2003)
   Verdict  (May 28, 2003)                       6210

11    In-Chamber Hearing with Dr. Eberle            6220
     (June 3, 2003)

12    In-Chamber re Jury Instructions              6239
     (June 4, 2003)

13

14    **Mitigation Hearing** - (June 4, 2003)

15    Opening Statement Waived by Mr. Ingram        6252
   Opening Statement Waived by Mr. Bailey        6252

16    Defendant's Unsworn Statement                 6253
   Closing Argument by Mr. Becker                6301

17    Closing Argument Waived by Mr. Ingram         6309
   Jury Charge                                   6310

18    Verdict                                       6329
   Sentencing Hearing (June 20, 2003)            6336

19

20

21

22

IN THE COURT OF COMMON PLEAS

TRUMBULL COUNTY, OHIO

TRIAL COURT CASE NO. 01-CR-793

SUPREME COURT OF OHIO CASE NO. 03-1441


STATE OF OHIO vs. DONNA M. ROBERTS


LIST OF TRIAL EXHIBITS

AND MITIGATION HEARING EXHIBITS

EXHIBITS FROM MOTION TO SUPPRESS HEARING


STATE'S EXHIBITS:

    1.  Consent to search form by D. Roberts  Admitted


DEFENDANT'S EXHIBITS:

    A.  Property receipt         Admitted

    B.  List of medications     Admitted

| Exhibit No. | Description | Admitted |
|---|---|---|
| 1 | 911 Tape | No objection |
| 1A | 911 Paper work | No Objection |
| 2 | Crime Scene Video | No objection |
| 3 | Crime Scene Diagram | No objection |
| 4 | Photo | No Objection |
| 5 | Photo | No Objection |
| 6 | Photo | No Objection |
| 7 | Photo | No Objection |
| 8 | Photo | No Objection |
| 9 | Photo | No Objection |
| 10 | Photo | No Objection |
| 11 | Photo | No Objection |
| 12 | Photo | No Objection |
| 13 | Photo | No Objection |
| 14 | Photo | No Objection |
| 15 | Photo | No Objection |
| 16 | Photo | No Objection |
| 17 | Photo | No Objection |
| 18 | Photo | No Objection |
| 19 | Photo | No Objection |
| 20 | Photo | No Objection |
| 21 | Photo | Obj sustained |
| ~~22~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~23~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 24 | Photo | Obj sustained |
| 25 | Photo | Obj sustained |
| 26 | Photo | Obj sustained |
| 27 | Photo | Adm. over obj |
| 28 | Photo | withdrawn |
| ~~29~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~30~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 31 | Photo | Obj sustained |
| ~~32~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 33 | Photo | |
| ~~34~~ | ~~Photo~~ | ~~Adm. Over obj~~ |
| ~~35~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~36~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 37 | Photo | Obj sustained |
| 38 | Photo | Obj sustained |
| 39 | Photo | Obj sustained |
| 40 | Photo | No Objection |
| ~~41~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~42~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 43 | Photo | Obj sustained |
| 44 | Photo | Obj sustained |
| ~~45~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~46~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 47 | Photo | No Objection |
| 48 | Photo | No Objection |
| 49 | Photo | No Objection |
| ~~50~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 51 | Photo | No Objection |
| 52 | Photo | No Objection |
| 53 | Photo | No Objection |
| 54 | Photo | No Objection |
| 55 | Photo | No Objection |
| 56 | Photo | No Objection |
| 57 | Photo | Adm over obj |
| 58 | Photo | Obj sustained |
| 59 | Photo | Obj sustained |
| 60 | Photo | Obj sustained |

| # | Item | Objection |
|---|------|-----------|
| 61 | Photo Shirt | No Objection |
| 62 | Photo Shirt | Obj sustained |
| 63 | Photo - Victim | Obj sustained |
| 64 | Bullet Recovered from Brain of Victim | No Objection |
| 65 | Bullet Recovered from Brain of Victim | No Objection |
| 66 | Clothes and Jewerly | No Objection |
| 67 | Photo X-Ray | No Objection |
| 68 | Photo Reds Jacket | No Objection |
| 69 | Tire Marks in Grass | No Objection |
| ~~70~~ | ~~N Side Exterior of House~~ | ~~No Objection~~ |
| ~~71~~ | ~~Front Exterior of House~~ | ~~No Objection~~ |
| ~~72~~ | ~~Rear Exterior of House~~ | ~~No Objection~~ |
| ~~73~~ | ~~S Side Exterior of House~~ | ~~No Objection~~ |
| ~~74~~ | ~~Main Bathroom~~ | ~~No Objection~~ |
| ~~75~~ | ~~View of man door screen from house~~ | ~~No Objection~~ |
| 76 | View of man door screen from garage | No Objection |
| ~~77~~ | ~~Spare Bedroom~~ | ~~No Objection~~ |
| ~~78~~ | ~~Clothing Spare Bedroom~~ | ~~No Objection~~ |
| ~~79~~ | ~~Blood spatter - peninsula~~ | ~~Withdrawn~~ |
| ~~80~~ | ~~Blood Spatters on wall by door~~ | ~~Withdrawn~~ |
| ~~81~~ | ~~Blood Spatters and smear~~ | ~~Withdrawn~~ |
| ~~82~~ | ~~Blood Spatters~~ | ~~Withdrawn~~ |
| ~~83~~ | ~~Inside Garage looking into residence~~ | ~~No Objection~~ |
| ~~84~~ | ~~Blood drops - garage~~ | ~~No Objection~~ |
| ~~85~~ | ~~Garage~~ | ~~Withdrawn~~ |
| ~~86~~ | ~~Blood Spatters - garage~~ | ~~No Objection~~ |
| ~~87~~ | ~~Overview garage~~ | ~~No Objection~~ |
| ~~88~~ | ~~Peninsula & Wall - blood splatters~~ | ~~Withdrawn~~ |
| ~~89~~ | ~~Different view as #88~~ | ~~Withdrawn~~ |
| ~~90~~ | ~~Blood Drops in garage~~ | ~~No Objection~~ |
| 91 | Kitchen door closed | No Objection |
| 92 | Overview garage | No Objection |
| 93 | Back of man door w/ blood | No Objection |
| 94 | Interior side of man door | No Objection |
| ~~95~~ | ~~Eye glasses and broken lag bolt - garage~~ | ~~No Objection~~ |
| ~~96~~ | ~~Eye glasses - garage~~ | ~~No Objection~~ |
| ~~97~~ | ~~Stairwell ceiling~~ | ~~No Objection~~ |
| ~~98~~ | ~~recent dated 9-26-94~~ | ~~No Objection~~ |
| 99 | Victim | No objection |
| 100 | Victim -back close up | No objection |
| 101 | Small key found under victim | No Objection |
| ~~102~~ | ~~overview bedroom~~ | ~~No Objection~~ |
| ~~103~~ | ~~bedroom master~~ | ~~No Objection~~ |
| 104 | bedroom closet | No Objection |
| ~~105~~ | ~~Photo~~ | ~~No Objection~~ |
| ~~105A~~ | ~~Photo~~ | ~~No Objection~~ |
| ~~106~~ | ~~Photo~~ | ~~No Objection~~ |
| ~~106A~~ | ~~Photo~~ | ~~No Objection~~ |
| ~~107~~ | ~~Photo~~ | ~~No Objection~~ |
| ~~107A~~ | ~~photo~~ | ~~Withdrawn~~ |
| ~~108~~ | ~~Victim~~ | ~~No Objection~~ |
| ~~108A~~ | ~~Victim Face Down~~ | ~~Withdrawn~~ |
| 109 | Dry Wall Hole | No objection |
| ~~109A~~ | ~~Victim face down~~ | ~~Withdrawn~~ |
| 110 | Victim in Kitchen | No Objection |
| ~~111~~ | ~~Victim lower torso~~ | ~~Withdrawn~~ |
| ~~112~~ | ~~Victim - Forearms w/ small dots~~ | ~~Withdrawn~~ |
| ~~113~~ | ~~Ashtray~~ | ~~No Objection~~ |
| ~~114~~ | ~~Ashtray~~ | ~~No Objection~~ |
| ~~115~~ | ~~Living Room~~ | ~~No Objection~~ |
| ~~116~~ | ~~Living Room~~ | ~~No Objection~~ |
| ~~117~~ | ~~Living Room~~ | ~~No Objection~~ |

| # | Description | Status |
|---|---|---|
| ~~117~~ | ~~Living Area~~ | ~~No Objection~~ |
| ~~118~~ | ~~Office Area~~ | ~~No Objection~~ |
| ~~120~~ | ~~Office Area~~ | ~~No Objection~~ |
| ~~121~~ | ~~Office Area~~ | ~~No Objection~~ |
| ~~122~~ | ~~Front Door Looking In~~ | ~~No Objection~~ |
| ~~123~~ | ~~Dining Room - Orioles Jacket~~ | ~~No Objection~~ |
| 124 | Office Area w/ ball cap | No Objection |
| 125 | Dry Wall Hole | No Objection |
| 126 | Front View of Car | No Objection |
| ~~127~~ | ~~Left rear red car~~ | ~~No Objection~~ |
| ~~128~~ | ~~Left view red car~~ | ~~No Objection~~ |
| ~~129~~ | ~~Garage door & Driver door~~ | ~~No Objection~~ |
| ~~130~~ | ~~Family Room - overview~~ | ~~No Objection~~ |
| ~~131~~ | ~~Table w/ 2 roaches~~ | ~~No Objection~~ |
| 132 | Garage w/ view of Gun | No Objection |
| ~~133~~ | ~~Blood Drops in garage~~ | ~~Withdrawn~~ |
| ~~134~~ | ~~Overview - Office~~ | ~~No Objection~~ |
| ~~135~~ | ~~Kitchen - Door~~ | ~~Withdrawn~~ |
| ~~136~~ | ~~Open Door, Kitchen area~~ | ~~Withdrawn~~ |
| ~~137~~ | ~~Kitchen - Receipt Wallmart 6:38 p.m.~~ | ~~No Objection~~ |
| 138 | Stainless Steel Revolover | No Objection |
| 139 | Close - up Footprint & Garage | No Objection |
| ~~140~~ | ~~Stairwell & Basement~~ | ~~No Objection~~ |
| 141 | Stairwell & Basement | No Objection |
| ~~142~~ | ~~Cabinet~~ | ~~No Objection~~ |
| ~~143~~ | ~~Close - Up Cabinet~~ | ~~No Objection~~ |
| ~~144~~ | ~~Kitchen - Different View~~ | ~~No Objection~~ |
| ~~145~~ | ~~Pier One Import Bag w/ wine glasses~~ | ~~No Objection~~ |
| ~~146~~ | ~~Front View of Car~~ | ~~No Objection~~ |
| ~~147~~ | ~~Rt Side View of Car~~ | ~~No Objection~~ |
| ~~148~~ | ~~Rear view of Car~~ | ~~No Objection~~ |
| ~~149~~ | ~~Left Side view of Car~~ | ~~No Objection~~ |
| ~~150~~ | ~~Double Lined Bag "Nate Jackson"~~ | ~~No Objection~~ |
| ~~151~~ | ~~Receipt - Pier One Import - Lorain Rd~~ | ~~No Objection~~ |
| ~~152~~ | ~~Assorted Candy, toothpaste~~ | ~~No Objection~~ |
| ~~153~~ | ~~Customer Reciept~~ | ~~No Objection~~ |
| ~~154~~ | ~~Handcuff Box w/ key - no cuffs~~ | ~~No Objection~~ |
| ~~155~~ | ~~Hair Comb~~ | ~~No Objection~~ |
| ~~156~~ | ~~Front View of Car~~ | ~~No Objection~~ |
| 157 | Rear view of Car | No Objection |
| ~~158~~ | ~~Wide Angle Rear of Car~~ | ~~Withdrawn~~ |
| 159 | Rt Side View of Car | No Objection |
| 160 | Front View of Car - Left Corner | No Objection |
| ~~161~~ | ~~Rear View of Car - Damage to Bumper~~ | ~~Withdrawn~~ |
| 162 | Front View of Car | No Objection |
| ~~163~~ | ~~Exterior to Interior - Blood Smears~~ | ~~No Objection~~ |
| 164 | Visor Area | No Objection |
| 165 | Interior area above head w/ blood | No Objection |
| 166 | Exterior | No Objection |
| ~~167~~ | ~~Front Driver Seat~~ | ~~Withdrawn~~ |
| 168 | Visor Area - Removed | No Objection |
| 169 | Door Handle | No Objection |
| 170 | Door Handle w/ blood | No Objection |
| 171 | Driver side visor clamp | No Objection |
| 172 | Front Passenger Seat - Cell Phone | No Objection |
| ~~173~~ | ~~Front Passenger Seat - Cell Phone~~ | ~~No Objection~~ |
| 174 | Interior - Left Console | No Objection |
| ~~175~~ | ~~Interior w/ Blod Smear~~ | ~~No Objection~~ |
| ~~176~~ | ~~Floormat~~ | ~~Withdrawn~~ |
| ~~177~~ | ~~Trunk Open~~ | ~~No Objection~~ |
| 178 | Keys in Ignition | No Objection |

| | | |
|---|---|---|
| 180 | ~~Driver Side Console~~ | ~~No Objection~~ |
| 181 | Passenger Side Dashboard | No Objection |
| 182 | Passenger side door - interior | No Objection |
| 183 | ~~Driver side car door w/ to garage door opener~~ | ~~No Objection~~ |
| 184 | Left side of car w/ dashboard | No Objection |
| 185 | ~~Rt side back seat~~ | ~~No Objection~~ |
| 186 | ~~Front driver compartment~~ | ~~No Objection~~ |
| 187 | ~~Exterior the rear left door~~ | ~~No Objection~~ |
| 188 | ~~Keys~~ | ~~Withdrawn~~ |
| 189 | ~~Cell Phone~~ | ~~Withdrawn~~ |
| 190 | ~~Keys - Blue Matt~~ | ~~Withdrawn~~ |
| 191 | Driver side - release button | No Objection |
| 192 | Wagon Wheel Photo | No objection |
| 193 | Wagon Wheel Photo | No objection |
| 194 | Wagon Wheel Photo | No objection |
| 195 | Wagon Wheel Photo | No objection |
| 196 | Wagon Wheel Photo | No objection |
| 197 | Photograph Items Recovered Days Inn | No objection |
| 198 | Photo of Chrysler | No objection |
| 199 | Days Inn Photographs | No objection |
| 200 | Days Inn Photographs | No objection |
| 201 | Days Inn Photographs | No objection |
| 202 | ~~Days Inn Photographs~~ | ~~Objection Sustained~~ |
| 203 | Days Inn Photographs | No objection |
| 204 | ~~Days Inn Photographs~~ | ~~Objection Sustained~~ |
| 205 | Days Inn Photographs | No objection |
| 206 | Days Inn Photographs | No objection |
| 207 | Days Inn Photographs | No objection |
| 208 | Days Inn Photographs | No objection |
| 209 | Days Inn Photographs | No objection |
| 210 | Days Inn Photographs | No objection |
| 211 | Days Inn Photographs | No objection |
| 212 | Days Inn Photographs | No objection |
| 213 | Days Inn Photographs | No objection |
| 214 | Days Inn Photographs | No objection |
| 215 | Days Inn Photographs | No objection |
| 216 | Days Inn Photographs | No objection |
| 217 | Days Inn Photographs | No objection |
| 218 | Days Inn Photographs | No objection |
| 219 | Days Inn Photographs | No objection |
| 220 | Days Inn Photographs | No objection |
| 221 | Days Inn Photographs | No objection |
| 222 | Days Inn Photographs | No objection |
| 223 | Days Inn Photographs | No objection |
| 224 | Days Inn Photographs | No objection |
| 225 | Days Inn Photographs | No objection |
| 226 | Days Inn Photographs | No objection |
| 227 | Photographs of Wirt Street | No objection |
| 228 | Photographs of Wirt Street | No objection |
| 229 | Photographs of Wirt Street | No objection |
| 230 | Photographs of Wirt Street | No objection |
| 231 | Photographs of Wirt Street | No objection |
| 232 | Photographs of Wirt Street | No objection |
| 233 | Wirt Street Photographs | No objection |
| 234 | Wirt Street Photographs | No objection |
| 235 | ~~Front view - Nate Jackson~~ | ~~No Objection~~ |
| 236 | ~~Rear view - Nate Jackson~~ | ~~No Objection~~ |
| 237 | ~~Full body shot~~ | ~~No Objection~~ |
| 238 | ~~Left and Hand~~ | ~~No Objection~~ |
| 239 | Front view - Nate Jackson | No Objection |
| 240 | ~~Left & Rt knee~~ | ~~No Objection~~ |
| 241 | View of Hands & Wound | No Objection |

| 271D | Letters From Donna to Nate | |
|---|---|---|
| 271D1 | 12/03/01 | Admitted |
| 271D2 | 11/29/01 | Admitted |
| 271D3 | 11/29/01 | Admitted |
| 271D4 | 11/28/01 | Admitted |
| 271D5 | 11/28/01 | Admitted |
| 271D6 | 11/27/01 | Admitted |
| 271D7 | 11/27/01 | Admitted |
| 271D8 | 11/26/01 | Admitted |
| 271D9 | 11/25/01 | Admitted |
| 271D10 | 11/24/01 | Admitted |
| 271D11 | 11/23/01 | Admitted |
| 271D12 | 11/23/01 | Admitted |
| 271D13 | 11/22/01 | Admitted |
| 271D14 | 11/22/01 | Admitted |
| 271D15 | 11/22/01 | Admitted |
| 271D16 | 11/22/01 | Admitted |
| 271D17 | 11/21/01 | Admitted |
| 271D18 | 11/21/01 | Admitted |
| 271D19 | 11/20/01 | Admitted |
| 271D20 | 11/20/01 | Admitted |
| 271D21 | 11/20/01 | Admitted |
| 271D22 | 11/20/01 | Admitted |
| 271D23 | 11/19/01 | Admitted |
| 271D24 | 11/19/01 | Admitted |
| 271D25 | 11/19/01 | Admitted |
| 271D26 | Empty | Admitted |
| 271D27 | 11/16/01 | Admitted |
| 271D28 | 11/16/01 | Admitted |
| 271D29 | 11/15/01 | Admitted |
| 271D30 | Empty | Admitted |
| 271D31 | 11/12/01 | Admitted |
| 271D32 | 11/10/01 | Admitted |
| 271D33 | 11/10/01 | Admitted |
| 271D34 | 11/10/01 | Admitted |
| 271D35 | 11/10/01 | Admitted |
| 271D36 | 11/09/01 | Admitted |
| 271D37 | 11/09/01 | Admitted |
| 271D38 | 11/09/01 | Admitted |
| 271D39 | 11/09/01 | Admitted |
| 271D40 | 11/08/01 | Admitted |
| 271D41 | 11/08/01 | Admitted |
| 271D42 | 11/08/01 | Admitted |
| 271D43 | 11/07/01 | Admitted |
| 271D44 | 11/07/01 | Admitted |
| 271D45 | 11/07/01 | Admitted |
| 271D46 | 11/07/01 | Admitted |
| 271D47 | Empty | Admitted |
| 271D48 | 11/06/01 | Admitted |
| 271D49 | 11/06/01 | Admitted |
| 271D50 | Empty | Admitted |
| 271D51 | 11/05/01 | Admitted |
| 271D52 | 11/05/01 | Admitted |
| 271D53 | 11/03/01 | Admitted |
| 271D54 | 11/03/01 | Admitted |
| 271D55 | 11/02/01 | Admitted |
| 271D56 | 11/02/01 | Admitted |
| 271D57 | 11/02/01 | Admitted |
| 271D58 | 11/01/01 | Admitted |
| 271D59 | 11/01/01 | Admitted |
| 271D60 | Halloween card | Admitted |
| 271D61 | 10/31/01 | Admitted |

| | | | |
|---|---|---|---|
| 271D62 | | 10/30/01 | Admitted |
| 271D63 | | 10/29/01 | Admitted |
| 271D64 | | 10/29/01 | Admitted |
| 271D65 | | 10/28/01 | Admitted |
| 271D66 | | 10/27/01 | Admitted |
| 271D67 | | 10/26/01 | Admitted |
| 271D68 | | 10/26/01 | Admitted |
| 271D69 | | 10/26/01 | Admitted |
| 271D70 | | 10/25/01 | Admitted |
| 271D71 | | 10/25/01 | Admitted |
| 271D72 | | 10/24/01 | Admitted |
| 271D73 | | 10/24/01 | Admitted |
| 271D74 | | 10/23/01 | Admitted |
| 271D75 | | 10/23/01 | Admitted |
| 271D76 | | 10/23/01 | Admitted |
| 271D77 | | 10/23/01 | Admitted |
| 271D78 | | 10/22/01 | Admitted |
| 271D79 | Empty | | Admitted |
| 271D80 | | 10/21/01 | Admitted |
| 271D81 | | 10/20/01 | Admitted |
| 271D82 | | 10/20/01 | Admitted |
| 271D83 | | 10/20/01 | Admitted |
| 271D84 | | 10/20/01 | Admitted |
| 271D85 | | 10/19/01 | Admitted |
| 271D86 | | 10/19/01 | Admitted |
| 271D87 | | 10/19/01 | Admitted |
| 271D88 | | 10/19/01 | Admitted |
| 271D89 | | 10/18/01 | Admitted |
| 271D90 | Empty | | Admitted |
| 271D91 | | 10/18/01 | Admitted |
| 271D92 | | 10/17/01 | Admitted |
| 271D93 | | 10/16/01 | Admitted |
| 271D94 | | 10/16/01 | Admitted |
| 271D95 | | 10/15/01 | Admitted |
| 271D96 | | 10/15/01 | Admitted |
| 271D97 | | 10/15/01 | Admitted |
| 271D98 | | 10/13/01 | Admitted |
| 271D99 | | 10/13/01 | Admitted |
| 271D100 | | 10/13/01 | Admitted |
| 271D101 | | 10/12/01 | Admitted |
| 271D102 | | 10/12/01 | Admitted |
| 271D103 | | 10/12/01 | Admitted |
| 271D104 | Empty | | Admitted |
| 271D105 | | 10/12/01 | Admitted |
| 271D106 | | 10/12/01 | Admitted |
| 271D107 | | 10/11/01 | Admitted |
| 271D108 | | 10/11/01 | Admitted |
| 271D109 | | 10/11/01 | Admitted |
| 271D110 | | 10/10/01 | Admitted |
| 271D111 | | 10/10/01 | Admitted |
| 271D112 | | 10/10/01 | Admitted |
| 271D113 | | 10/08/01 | Admitted |
| 271D114 | | 10/08/01 | Admitted |
| 271D115 | | 10/06/01 | Admitted |
| 271D116 | | 10/06/01 | Admitted |
| 271D117 | | 10/06/01 | Admitted |
| 271D118 | | 10/05/01 | Admitted |
| 271D119 | | 10/05/01 | Admitted |
| 271D120 | | 10/05/01 | Admitted |
| 271D121 | | 10/05/01 | Admitted |
| 271D122 | | 10/05/01 | Admitted |

| | | | |
|---|---|---|---|
| 271D124 | | 10/05/01 | Admitted |
| 271D125 | | 10/04/01 | Admitted |
| 271D126 | | 10/04/01 | Admitted |
| 271D127 | | 10/02/01 | Admitted |
| 271D128 | | 10/02/01 | Admitted |
| 271D129 | | 10/02/01 | Admitted |
| 271D130 | Unknown | | Admitted |
| 271D131 | Unknown | | Admitted |
| 271D132 | Unknown | | Admitted |
| 271D133 | Unknown | | Admitted |
| 271D134 | Unknown | | Admitted |
| 271D135 | Unknown | | Admitted |
| 271D136 | Unknown | | Admitted |
| 271D137 | Unknown | | Admitted |
| 271D138 | Unknown | | Admitted |
| 271D139 | | 11/26/01 | Admitted |

| 273N | Letters from Nate to Donna | Admitted |
|------|---------------------------|----------|
| 273N1 | 12/01/01 | Admitted |
| 273N2 | 11/30/01 | Admitted |
| 273N3 | 11/29/01 | Admitted |
| 273N4 | 11/28/01 | Admitted |
| 273N5 | 11/27/01 | Admitted |
| 273N6 | 11/26/01 | Admitted |
| 273N7 | 11/25/01 | Admitted |
| 273N8 | 11/23/01 | Admitted |
| 273N9 | 11/22/01 | Admitted |
| 273N10 | 11/20/01 | Admitted |
| 273N11 | 11/19/01 | Admitted |
| 273N12 | 11/17/01 | Admitted |
| 273N13 | 11/16/01 | Admitted |
| 273N14 | 11/14/01 | Admitted |
| 273N15 | 11/14/01 | Admitted |
| 273N16 | 11/13/01 | Admitted |
| 273N17 | 11/12/01 | Admitted |
| 273N18 | 11/12/01 | Admitted |
| 273N19 | 11/10/01 | Admitted |
| 273N20 | 11/09/01 | Admitted |
| 273N21 | 11/07/01 | Admitted |
| 273N22 | 11/06/01 | Admitted |
| 273N23 | 11/08/01 | Admitted |
| 273N24 | 11/05/01 | Admitted |
| 273N25 | 11/03/01 | Admitted |
| 273N26 | 11/01/01 | Admitted |
| 273N27 | 11/01/01 | Admitted |
| 273N28 | 10/31/01 | Admitted |
| 273N29 | 10/30/01 | Admitted |
| 273N30 | | Admitted |
| 273N31 | 10/28/01 | Admitted |
| 273N32 | 10/27/01 | Admitted |
| 273N33 | | Admitted |
| 273N34 | 10/25/01 | Admitted |
| 273N35 | 10/25/01 | Admitted |
| 273N36 | 10/25/01 | Admitted |
| 273N37 | 10/24/01 | Admitted |
| 273N38 | 10/23/01 | Admitted |
| 273N39 | 10/22/01 | Admitted |
| 273N40 | 10/21/01 | Admitted |
| 273N41 | 10/21/01 | Admitted |
| 273N42 | 10/20/01 | Admitted |
| 273N43 | 10/19/01 | Admitted |
| 273N44 | 10/18/01 | Admitted |
| 273N45 | 10/17/01 | Admitted |
| 273N46 | 10/16/01 | Admitted |
| 273N47 | 10/16/01 | Admitted |
| 273N48 | 10/15/01 | Admitted |
| 273N49 | 10/14/01 | Admitted |
| 273N50 | 10/12/01 | Admitted |
| 273N51 | 10/10/01 | Admitted |
| 273N52 | 10/10/01 | Admitted |
| 273N53 | 10/08/01 | Admitted |
| 273N54 | 10/05/01 | Admitted |
| 273N55 | 10/07/01 | Admitted |
| 273N56 | 10/04/01 | Admitted |
| 273N57 | 10/04/01 | Admitted |
| 273N58 | 10/02/01 | Admitted |
| 273N59 | 10/01/01 | Admitted |
| 273N60 | 10/01/01 | Admitted |
| 273N61 | 09/30/01 | Admitted |

| | | | |
|---|---|---|---|
| 273N62 | | 09/27/01 | Admitted |
| 273N63 | | 09/27/01 | Admitted |
| 273N64 | | 07/12/01 | Admitted |
| 273N65 | | 06/28/01 | Admitted |
| 273N66 | | 06/09/01 | Admitted |
| 273N67 | | 05/18/01 | Admitted |
| 273N68 | | 05/15/01 | Admitted |
| 273N69 | | 05/12/01 | Admitted |
| 273N70 | | 05/10/01 | Admitted |
| 273N71 | | 05/09/01 | Admitted |
| 273N72 | | 05/06/01 | Admitted |
| 273N73 | | 05/04/01 | Admitted |
| 273N74 | | 05/03/01 | Admitted |
| 273N75 | | 04/28/01 | Admitted |
| 273N76 | | 02/24/01 | Admitted |
| 273N77 | | 04/23/01 | Admitted |
| 273N78 | | 04/22/01 | Admitted |
| 273N79 | | 04/19/01 | Admitted |
| 273N80 | | 04/16/01 | Admitted |
| 273N81 | | 04/16/01 | Admitted |
| 273N82 | | 04/15/01 | Admitted |
| 273N83 | | 04/11/02 | Admitted |
| 273N84 | | 04/10/01 | Admitted |
| 273N85 | | 04/10/01 | Admitted |
| 273N86 | | 04/09/01 | Admitted |
| 273N87 | | 04/08/01 | Admitted |
| 273N88 | | 04/04/01 | Admitted |
| 273N89 | | 04/02/01 | Admitted |
| 273N90 | Unknown | | Admitted |
| 273N91 | | 03/31/01 | Admitted |
| 273N92 | | 03/29/01 | Admitted |
| 273N93 | | 03/26/01 | Admitted |
| 273N94 | | 03/25/01 | Admitted |
| 273N95 | | 03/23/01 | Admitted |
| 273N96 | | 03/22/01 | Admitted |
| 273N97 | | 03/20/01 | Admitted |
| 273N98 | | 03/20/01 | Admitted |
| 273N99 | | 03/20/01 | Admitted |
| 273N100 | | 03/19/01 | Admitted |
| 273N101 | | 03/19/01 | Admitted |
| 273N102 | | 03/19/01 | Admitted |
| 273N103 | | 03/19/01 | Admitted |
| 273N104 | | 03/15/01 | Admitted |
| 273N105 | | 03/13/01 | Admitted |
| 273N106 | | 03/12/01 | Admitted |
| 273N107 | | 03/11/01 | Admitted |
| 273N108 | | 03/09/01 | Admitted |
| 273N109 | | 03/06/01 | Admitted |
| 273N110 | | 03/04/01 | Admitted |
| 273N111 | | 03/03/01 | Admitted |
| 273N112 | | 03/02/01 | Admitted |
| 273N113 | | 02/27/01 | Admitted |
| 273N114 | | 02/25/01 | Admitted |
| 273N115 | | 02/20/01 | Admitted |
| 273N116 | | 02/23/01 | Admitted |
| 273N117 | | 02/22/01 | Admitted |
| 273N118 | | 02/19/01 | Admitted |
| 273N119 | | 02/16/01 | Admitted |
| 273N120 | | 02/15/01 | Admitted |
| 273N121 | Unknown | | Admitted |
| 273N122 | | 02/13/01 | Admitted |
| 273N123 | | 02/12/01 | Admitted |

| | | | |
|---|---|---|---|
| 273N124 | | 02/09/01 | Admitted |
| 273N125 | | 02/07/01 | Admitted |
| 273N126 | | 02/04/01 | Admitted |
| 273N127 | | 02/01/01 | Admitted |
| 273N128 | | 02/01/01 | Admitted |
| 273N129 | | 01/26/01 | Admitted |
| 273N130 | | 01/19/01 | Admitted |
| 273N131 | | 01/17/01 | Admitted |
| 273N132 | | 01/21/01 | Admitted |
| 273N133 | | 01/16/01 | Admitted |
| 273N134 | | 01/12/01 | Admitted |
| 273N135 | | 01/05/01 | Admitted |
| 273N136 | | 01/01/01 | Admitted |
| 273N137 | | 12/27/00 | Admitted |
| 273N138 | | 12/27/00 | Admitted |
| 273N139 | Unknown | | Admitted |
| 273N140 | | 12/11/00 | Admitted |
| 273N141 | Unknown | | Admitted |
| 273N142 | Unknown | | Admitted |
| 273N143 | | 05/01/01 | Admitted |

| # | Description | Objection |
|---|---|---|
| 243 | Left Hand - Wound | No Objection |
| 243 | Front view w/ bandage | No Objection |
| 244 | Side view Finger | No Objection |
| 245 | Left Hand - wrist to finger tip | No Objection |
| 246 | Left Hand Palm up | No Objection |
| 247 | Back side of Hand | No Objection |
| 248 | Both Hands | No Objection |
| 249 | Head and Shoulders | Admitted over Obj |
| 250 | Full body shot | Objection Sustained |
| 251 | Handgun - .38 Taurus | No Objection |
| 252 | Five (5) Live Rounds from Taurus | No Objection |
| 252A | Envelope Containing Test Fire Rounds | No Objection |
| 253 | Right Eye glass Lens | No Objection |
| 254 | Eye glasses Missing Right Lens | No Objection |
| 255 | Cotton Swab - Front Door Hallway | No Objection |
| 256 | Dry Wall Cut out w/ Bullet Hole | No Objection |
| 257 | Bullet Recovered from Dry Wall | No Objection |
| 258 | Cincinnati Red's Jacket - From Victim | No Objection |
| 259 | Bullet Recovered from Clothing of Victim | No Objection |
| 260 | Death Certificate | No Objection |
| 261 | Coroner's Verdict | No Objection |
| 262 | Autopsy Protocol - 11 pages | No Objection |
| 263 | Microscopic Examination | No Objection |
| 264 | Toxicology - 1 page Front and Back | No Objection |
| 264A | Radiology Report | No Objection |
| 265 | Blood - Drawn from Robert Fingerhut | No Objection |
| 266 | Bullet Recovered from Brain of Victim | No Objection |
| 267 | Driver's Side Visor | No Objection |
| 268 | Visor Clamp | No Objection |
| 269 | Keys Recovered from Ignition | No Objection |
| 270 | Bag Containing Letters | No Objection |
| 271 | Letters from Donna to Nate (See Attached) | No Objection |
| 271 | No Exhibit | |
| 272 | Letters from Nate to Donna (See Attached) | No Objection |
| 274 | No Exhibit | |
| 275A | Hand Writing Analysis | No objection |
| 275B | Hand Writing Analysis | No objection |
| 275A | Hand Writing Standard | No Objection |
| 275B | Hand Writing Standard | No Objection |
| 276A1 | CCA Records | No Objection |
| 276B2 | CCA Records | No Objection |
| 276B3 | CCA Records | No Objection |
| 276B4 | CCA Records | No Objection |
| 276B5 | CCA Records | No Objection |
| 276B6 | CCA Records | No Objection |
| 276B7 | CCA Records | No Objection |
| 276C | Hand Writing Standard | No Objection |
| 276C1 | Prison Records | No Objection |
| 276C2 | Prison Records | No Objection |
| 276C3 | Prison Records | No Objection |
| 276C4 | Prison Records | No Objection |
| 277 | 01-35755 - Two (2) pages | No Objection |
| 278 | 01-35755-A | No Objection |
| 279 | 01-35755-B | Obj sustained |
| 280 | 01-35755-C | |
| 281 | 01-35755-D | Admitted over Obj |
| 282A | 01-35755 - Mike Roberts (2) Pages | No Objection |
| 282B | | No Introduced |
| 282C | 01-35755 - Mike Roberts Supplemental | No Objection |
| 283 | 01-35755 - Cindy Maylee (2) Pages | No Objection |
| 284 | Dale Laux - (2) Pages | No Objection |

| | | |
|---|---|---|
| 286A | Brenda Gerardi (3) Pages | No Objection |
| ~~286B~~ | | ~~Not Introduced~~ |
| 286C | Brenda Gerardi Supplemental 1 Corrected (2) Pages | No Objection |
| 286D | Brenda Gerardi Supplemental 2 - (3) Pages | No Objection |
| ~~287~~ | ~~Plastic Bag With Three (3) Boxes of Swabs~~ | ~~Withdrawn~~ |
| 287A | Box Containing Blood Swab - Days Inn | No objection |
| 287B | Box Containing Blood Swab - Days Inn | No objection |
| 287C | Box Containing Blood Stain - Days Inn | No objection |
| 288 | Wash Cloth - Days Inn - Days Inn | No objection |
| 289 | Hand Towel - Days Inn | No objection |
| 290 | Tape Lifts - Hairs Toilet | No objection |
| 291 | Finger Print Cards - Jennifer Robinson | No objection |
| ~~292~~ | ~~White Stain Neckline from Dumpster~~ | ~~Withdrawn~~ |
| ~~293~~ | ~~Dish Cloth - From Dumpster~~ | ~~Withdrawn~~ |
| 294 | Dressing from Dumpster | No Objection |
| ~~295~~ | ~~Dressing from Dumpster~~ | ~~Withdrawn~~ |
| ~~296~~ | ~~Dressing and Tape from Dumpster~~ | ~~Withdrawn~~ |
| ~~297~~ | ~~White Stain Neckline~~ | ~~Withdrawn~~ |
| ~~298~~ | ~~Stained White Wash Cloth~~ | ~~Withdrawn~~ |
| ~~299~~ | ~~One (1) Condom~~ | ~~Withdrawn~~ |
| ~~300~~ | ~~One (1) Condom~~ | ~~Withdrawn~~ |
| ~~301~~ | ~~Hydrogen Peroxide Bottle~~ | ~~Withdrawn~~ |
| ~~302~~ | ~~Empty Package for Bandages~~ | ~~Withdrawn~~ |
| ~~303~~ | ~~Empty First Aid Tape Box~~ | ~~Withdrawn~~ |
| ~~304~~ | ~~Empty Bandage Roll~~ | ~~Withdrawn~~ |
| ~~305~~ | ~~Empty First Aid Sponge Package~~ | ~~Withdrawn~~ |
| ~~306~~ | ~~Empty First Aid Sponge Package~~ | ~~Withdrawn~~ |
| ~~307~~ | ~~Empty First Aid Sponge Package~~ | ~~Withdrawn~~ |
| ~~308~~ | ~~Empty First Aid Sponge Package~~ | ~~Withdrawn~~ |
| 309 | Empty Days Inn Room Key Card Envelope #29 | No Objection |
| ~~310~~ | ~~Empty Days Inn Room Key Card Envelope #138 w/ To~~ | ~~Withdrawn~~ |
| 311 | Envelope Containing Receipts | No objection |
| 311A | Check Inn | No objection |
| 311B | Credit Card Receipt | No objection |
| 311C | Register Audit | No objection |
| 311D | Phone Log | No objection |
| 311E | Credit Card Receipt | No objection |
| 312 | Check Inn | No Objection |
| 313 | Photographic Line -Up Jose Flores | No Objection |
| 314 | Evevlope Continaing Guest Log (5) pages | No Objection |
| 314A | Guest Log | No Objection |
| 314B | Guest Log | No Objection |
| 314C | Guest Log | No Objection |
| 314D | Guest Log | No Objection |
| 314E | Final Bill | No Objection |
| 315 | Guest Check | No Objection |
| 316 | Photgraphic Line - Up Jill Kenyon | No Objection |
| 317 | Black Gloves | No Objection |
| 318 | Black & Red Nike Tennis Shoes | No Objection |
| 319 | Composite Video Tape | No objection |
| ~~320~~ | ~~Envelope Continaing 9 Photos~~ | ~~Overruled over Obj~~ |
| ~~320A~~ | ~~4 X 5 Black and White Photo~~ | ~~Objection Sustained~~ |
| ~~320B~~ | ~~4 X 5 Black and White Photo~~ | ~~Objection Sustained~~ |
| ~~320C~~ | ~~4 X 5 Color Phot~~ | ~~Objection Sustained~~ |
| 320D | 4 X 5 Color Photo | No objection |
| ~~320E~~ | ~~8 1/2 X 11 Photo~~ | ~~Withdrawn~~ |
| ~~320F~~ | ~~8 1/2 X 11 Photo~~ | ~~Withdrawn~~ |
| ~~320G~~ | ~~8 1/2 X 11 Photo~~ | ~~Withdrawn~~ |
| ~~320H~~ | ~~8 1/2 X 11 Photo~~ | ~~Withdrawn~~ |
| 320I | 8 1/2 X 11 Photo | No objection |
| 321 | Dobson Communication Phone Records 17 pages | No objection |
| 322 | $250,000 - ZurichLife Insurance Policy 24 pages | No objection |

| | | |
|---|---|---|
| 323 | $300,000 - State Farm Insurance Policy 17 pages | No objection |
| ~~324~~ | ~~Constitutional Rights Waiver~~ | ~~No Objection~~ |
| ~~325~~ | ~~Video Tape Confession~~ | ~~No Objection~~ |
| ~~326~~ | ~~Transcript of Video Tape Confession 88 Pages~~ | ~~No Objection~~ |
| 327A | Certification - ATF - 1page | No objection |
| 327B | Taurus IL46854 - 2 pages | No objection |
| 327C | Taurus JH14188 - 1 page | No objection |
| 360 | Cd containing 19 Telephone Conversations | No Objection |
| 361 | Telephone Log Record 3 pages | Adm. over obj |
| 362 | Audio Tape of 10-05-01 Recording | No Objection |
| 362A | Transcript of 10-05-01 Recording | No Objection |
| 363 | Audio Tape of 10-25-01 Recording | No Objection |
| 363A | Transcript of 10-25-01 Recording | No Objection |
| 364 | Audio Tape of 10-27-01 Recording | No Objection |
| 364A | Transcript of 10-27-01 Recording | No Objection |
| 365 | Audio Tape of 11-03-01 Recording | No Objection |
| 365A | Transcript of 11-03-01 Recording | No Objection |
| 366 | Audio Tape of 11-08-01 Recording | No Objection |
| 366A | Transcript of 11-08-01 Recording | No Objection |
| 367 | Audio Tape of 11-10-01 Recording | No Objection |
| 367A | Transcript of 11-10-01 Recording | No Objection |
| 368 | Audio Tape of 11-11-01 Recording | No Objection |
| 368A | Transcript of 11-11-01 Recording | No Objection |
| 369 | Audio Tape of 11-15-01 Recording | No Objection |
| 369A | Transcript of 11-15-01 Recording | No Objection |
| 370 | Audio Tape of 11-17-01 Recording | No Objection |
| 370A | Transcript of 11-17-01 Recording | No Objection |
| 371 | Audio Tape of 11-22-01 Recording | No Objection |
| 371A | Transcript of 11-22-01 Recording | No Objection |
| 372 | Audio Tape of 11-24-01 Recording | No Objection |
| 372A | Transcript of 11-24-01 Recording | No Objection |
| 373 | Audio Tape of 11-24-01 Recording | No Objection |
| 373A | Transcript of 11-24-01 Recording | No Objection |
| 374 | Audio Tape of 11-25-01 Recording | No Objection |
| 374A | Transcript of 11-25-01 Recording | No Objection |
| 375 | Audio Tape of 11-29-01 Recording | No Objection |
| 375A | Transcript of 11-29-01 Recording | No Objection |
| 376 | Audio Tape of 12-01-01 Recording | No Objection |
| 376A | Transcript of 12-01-01 Recording | No Objection |
| 377 | Audio Tape of 12-02-01 Recording | No Objection |
| 377A | Transcript of 12-02-01 Recording | No Objection |
| 379 | Audio Tape of 12-06-01 Recording | No Objection |
| 379A | Transcript of 12-06-01 Recording | No Objection |
| 380 | Audio Tape of 12-08-01 Recording | No Objection |
| 380A | Transcript of 12-08-01 Recording | No Objection |
| 381 | Audio Tape of 12-08-01 Recording | No Objection |
| 381A | Transcript of 12-08-01 Recording | No Objection |
| ~~349~~ | ~~Photographic Line-Up - Frank Reynolds~~ | ~~Not Introduced~~ |
| ~~350~~ | ~~Consent to Search - Wirt Street - Shelia Fields~~ | ~~No Objection~~ |
| 351 | (2) two cotton tipped swabs | No Objection |
| ~~352~~ | ~~Search Warrant for Oral Swabs and Photographs~~ | ~~Withdrawn~~ |
| 385 | Swabs | No Objection |
| 386 | Swabs | No Objection |
| 387 | Swabs | No Objection |
| 388 | Swabs | No Objection |
| 389 | Swabs | No Objection |
| 390 | Gerardi - Cutting | No Objection |
| 391 | Envelope Containing Jackson Prints | No Objection |
| ~~391A~~ | ~~Jackson Prints~~ | ~~No Objection~~ |
| ~~392~~ | ~~Photograph - Lifts~~ | ~~No Objection~~ |
| ~~393~~ | ~~Photograph - Lifts~~ | ~~No Objection~~ |
| ~~394~~ | ~~Envelope Containing 2 Photos~~ | ~~No Objection~~ |

| 395 | Enevlope Containing Lift Sheets | No Objection |
| 395A | Lift Sheets | No Objection |
| 395B | Lift Sheets | No Objection |
| 396 | Walmart Receipt | No objection |
| 397 | Audio Tape of Excerpts | withdrawn |
| 397A | Transcript of Audio Tape Excerpts | withdrawn |
| 398 | Preston Automobile Service Records Red Chrysler | No objection |
| 398 A-P | Preston Automobile Service Records Red Chrysler | No objection |
| 399 | Preston Automobile Service Records Silver Chrysler | No objection |
| 399 A-J | Preston Automobile Service Records Silver Chrysler | No objection |
| 400 | Trumball County Recorder 484 Olive Street | Admitted over Obj |
| 400 A-G | Trumball County Recorder 484 Olive Street | Admitted over Obj |
| 401 | Trumball County Recorder Washington Street | Admitted over Obj |
| 401 A-B | Trumball County Recorder Washington Street | Admitted over Obj |
| 402 | Trumball County Recorder - Ponderlac | Admitted over Obj |
| 402 A-F | Trumball County Recorder - Ponderlac | Admitted over Obj |
| 403A 403B | Defendant's school records | No Objection |

**Defendant's Exhibits**

| Deft A | Deft is Criminal History | No Objection |
| Deft B | Contains 5 subbarts of Blood Swabs | No Objection |
| Deft F | Credit Application | No Objection |
| Deft G | BMV Registration Card | No Objection |
| Deft H | Sales Agreement | No Objection |
| Deft I | Lease Agreement | No Objection |
| Deft J | Car Registration | No Objection |
| Deft K | Credit Application | No Objection |
| Deft L | BMV Registration Card | No Objection |
| Deft M | Real Estate Records | No Objection |
| Deft N | Real Estate Records | No Objection |
| Deft O | Real Estate Records | No Objection |
| Deft P | Psychological Report | No Objection |
| Joint 4 | Fingerhut Jewelry | No Objection |

| Court Exhibit 1 | Orientation Instructions | |
| Court Exhibit 2 | Exhibit List | |
| Court Exhibit 3 | Brief in Opposition to Acquittal | |
| Court Exhibit 4 | Jury Charge | |
| Court Exhibit 5 | Corrected Instruction | |
| Court Exhibit 6 | Jury Question | |
| Court Exhibit 7 | Penalty Instruction | |

STATE'S EXHIBITS:

| 378. | Audio tape | No objection |
|------|------------|--------------|
| 378A. | Transcript | No objection |
| 309A. | Days Inn envelope | No objection |
| 403. | Photos (D. Roberts) | No objection |
| 404. | Wallet | No objection |
| 405. | Wallet | No objection |
| 406. | Greyhound video | No objection |
| 407. | Key | No objection |
| 408. | Key tag | No objection |

DEFENDANT'S EXHIBITS

    1.  Photo                 No objection

    2.  Photo                 No objection

    3.  Photo                 No objection

    4.  Photo                 No objection

    5.  Consent to Search form  No objection

    6.  Consent to Search form  No objection

    A.  Yellow shirt


JOINT EXHIBIT NO. 1     Photos


COURT'S EXHIBITS:

    1.  Jury verdict form

    1A. Court's answer to jury question

    2.  Jury questions

    2A. Court's answer to jury question

    3.  Jury question

    3A. Court's answer to jury question

    4.  Jury question

    4A. Court's answer to jury question

    5.  Jury question


SENTENCING EXHIBIT "A" (sealed by the Court)

1          **DECEMBER 20, 2001, AT 6:05 P.M.**

2                    <u>**IN-CHAMBERS**</u>

3

4               THE COURT:  For the record, it is

5     about 6:05 p.m., December 20, 2001.  I have been

6     requested to make myself available by Dennis

7     Watkins, County Prosecutor, for purposes of a matter

8     for which I have, as a result thereof, have been

9     given certain information by way of primarily

10    letters that appear to have been written between one

11    Donna Marie Roberts and Nathaniel E. Jackson over a

12    period of the last several months or years.  At this

13    time, Mr. Watkins and Detective Sergeant Monroe,

14    please raise your hand.

15

16    (Whereupon, Mr. Watkins & Detective Monroe were

17    sworn by the Court.)

18

19               THE COURT:  I have reviewed this

20    information to see whether or not there is probable

21    cause to permit the filing of a complaint by the

22    Prosecuting Attorney upon affidavit.  Would you be

23    kind enough, Mr. Monroe or Detective Sergeant

1 Monroe, you have reviewed that affidavit which you

2 have presented to me and which you have written and

3 caused to be prepared?

4     DETECTIVE MONROE:  Yes, I have.

5     THE COURT:  And what is contained

6 therein is true to the best of your knowledge from

7 the evidence that you have gathered in working on

8 this case the last couple of days?

9     DETECTIVE MONROE:  Yes, it is.

10    THE COURT:  And although apparently

11 it does not intend to state all of the evidence

12 because a lot of it hasn't been developed yet, you

13 have, in talking with various persons and what's

14 contained in and reviewing these articles and some

15 of which have been shown to me, have come to the

16 conclusion in your mind, after consultation with the

17 Prosecutor, that this matter should be presented to

18 a Judge on the basis of there being sufficient

19 probable cause to file the warrant?

20    DETECTIVE MONROE:  Yes.

21    THE COURT:  Okay, would you be kind

22 enough to sign that?

23

1    (Whereupon, the Affiant, Detective Sergeant Paul

2    Monroe signed the affidavit.)

3

4             ATTY. WATKINS:  If the Court

5    please, I am going to have Detective Sergeant Monroe

6    also sign copies of the Affidavit for Arrest,

7    Warrant for Arrest, Howland Police Department and

8    the Prosecutor's Office.

9             THE COURT:  Okay, I am accepting

10   the affidavit and after reviewing it and speaking

11   with Detective Monroe, and Detective Monroe affixing

12   his name to it, having been sworn prior to signing.

13   And do you have anything further Prosecutor Watkins?

14             ATTY. WATKINS:  I understand

15   further, Judge, you have found probable cause from

16   the many pages of the letters, and the record speaks

17   for itself, and the affidavits speak for itself.

18             THE COURT:  There is no question,

19   if I have ever reviewed a case, there does appear to

20   be probable cause and surely this fits that bill and

21   there is more than sufficient probable cause to

22   execute the arrest warrant.  What happens thereafter

23   is another matter, but there is sufficient probable

1    cause.

2               ATTY. WATKINS:  And we are also

3    requesting that the warrant be issued for their

4    arrest, to wit, the arrest of Donna Marie Roberts

5    and Nathaniel E. Jackson, and we also request for

6    the Court to sign an order sealing the record until

7    the arrest of both of these individuals.

8               THE COURT:  That motion will be

9    granted.  The motion will be sealed and the warrant

10    to be served and that record will not be opened

11    without permission of the Court.  I am also signing

12    the warrants as prepared, the complaints that have

13    been duly signed by the Prosecutor, Dennis Watkins,

14    who has been previously sworn before signing.  And I

15    am also signing the warrant to arrest.  And I am

16    signing the motion and order to seal the record

17    until the warrants are executed.  Check it, I think

18    I got everything.

19               ATTY. WATKINS:  Paul, you know you

20    have the original and you will serve the Defendants

21    the warrant and you will make a return on the

22    original and bring it to the Court.  And I am going

23    to request, Your Honor, if possible, to have the

1    Court seal the affidavit and have it kept in its own

2    secure room or assigned by the court reporter to

3    seal the envelope and not file it with the Clerk of

4    Courts until both are arrested.

5              THE COURT:  That will be fine.

6    Should we not have a date issuing on the warrant?

7              ATTY. WATKINS:  Yes, that should

8    be.

9              THE COURT:  For the record, I am

10   going to instruct the court reporter to retain under

11   seal all the information here other than the

12   original warrant, which will be issued to the

13   police.  And that once you have been notified that a

14   return is made on that, please properly file it with

15   the Clerk of Court's Office.

16             ATTY. WATKINS:  And the complaint

17   and warrant are sealed along with the affidavits

18   correct, Judge?

19             THE COURT:  Correct.

20             ATTY. WATKINS:  After both have

21   been arrested.

22

23   (End of proceedings at 6:20 p.m.)

1

2

3          REPORTER'S CERTIFICATE

4

5      This is to certify the foregoing represents a

6   true and correct copy of the proceedings had in the

7   aforementioned cause as reflected by the stenotype

8   notes taken by me on the same.

9

10

11

12

13                                    Maribeth Hoolihan

14   DATE:   September 10, 2002   Maribeth Hoolihan

15                                Official Court Reporter

16

17

18

19

20

21

22

23

9

1    FRIDAY, DECEMBER 21, 2001;  In Open Court:

2                    THE COURT:  Mr. Consoldane, do you

3    want to bring your client up here, please?  Mr.

4    Consoldane, has your client received a copy of the

5    Complaint?

6                    ATTY. CONSOLDANE:  Yes, Your Honor.

7    Mr. Jackson has received a copy of the Complaint.

8    He was served with that earlier today at the county

9    jail.  He understands it and waives any further

10   reading in Open Court.  He would like to enter a

11   plea of not guilty and request that reasonable bond

12   be set.

13                   THE COURT:  This plea of not guilty

14   will be entered on your client's behalf.  The

15   Prosecution wish to speak to the issue of bond?

16                   ATTY. WATKINS:  Yes, Your Honor.

17   The charges are Aggravated Murder with second count

18   of Aggravated Burglary.  We believe the evidence

19   presented shows that this is a potential capital

20   case and we request under the circumstances as

21   presented to the Court and in the affidavit, that

22   no bond be set.

10

1          THE COURT:  This Court has had

2    occasion in the issuance of the Complaint to review

3    some of the State's evidence and I've made a

4    finding of probable cause to file a Complaint.  I

5    believe that there is good and sufficient evidence

6    that as to the filing of this charge, that I would

7    not set a bond at the present time due to the

8    seriousness of the charges.  Your client has a

9    right to a preliminary hearing.  I would ask you to

10   get together with the Prosecutor and pick an

11   appropriate date within that time frame permitted

12   by statute.  Anything else, Mr. Consoldane?

13          ATTY. CONSOLDANE:  Yes, Your Honor.

14   Earlier today the Prosecutor approached me and

15   asked about giving consent to look at Mr. Jackson's

16   finger.  They said they wanted to remove the

17   bandage and take pictures of it.  I said that we

18   would not give consent to that, and he said that

19   would be fine, that he would get a search warrant.

20   Well, I was talking with Mr. Jackson and the

21   Sheriff's department had already done that without

22   a search warrant.  They had already removed his

11

1    band-aid and took pictures of his finger.  I would

2    just request the Court to instruct the Prosecutor

3    and the Sheriff's department to not take any

4    further evidence from Mr. Jackson without first

5    obtaining a search warrant.  We unilaterally

6    disagreed with any type of consent, and I think

7    that's not proper and they shouldn't be allowed to

8    do this.

9              THE COURT:  Well, you will have the

10   appropriate time to enter any objections you have

11   to any of the procedures used.  We have a very

12   capable, in my opinion, law enforcement personnel

13   around, and I think that they are well aware that

14   anything of that nature has to be obtained either

15   with the consent or by a search warrant.  I'm sure

16   that Mr. Watkins will see that everything is done

17   in an appropriate manner.

18             ATTY. WATKINS:  I believe it has

19   been, Your Honor.  This man went for medical

20   treatment.  This should be litigated in the proper

21   forum.

22             THE COURT:  That's what I'm saying.

12

1        ATTY. CONSOLDANE:  I'm just saying

2   this happened, and I don't want it happening any

3   more.

4        THE COURT:  It's on the record.

5        ATTY. WATKINS:  It may happen

6   depending on the facts and circumstances.

7        THE COURT:  I understand.  We'll get

8   into that at the appropriate time.  Anything

9   further?

10       ATTY. CONSOLDANE:  No, Your Honor.

11       THE COURT:  Mr. Ingram, do you want

12  to bring your client forward?

13       ATTY. INGRAM:  Your Honor, this is

14  the Defendant, Donna Roberts.  She will acknowledge

15  receipt of a copy of the Complaint filed herein.

16  This is an initial appearance and we will abide by

17  the Ohio Rules of Criminal Procedure, which

18  provides that you are not called upon to enter a

19  plea in a felony case at an initial appearance.

20  So, we will not do that.  We will not request bail

21  at this time, but we reserve the right to raise

22  that issue at a later time.

13

1          THE COURT:   It's always an issue to

2   be raised.  Okay, you do acknowledge receipt of the

3   Complaint?

4          ATTY. INGRAM:   Yes.

5          THE COURT:   You've read it and

6   understand it?

7          ATTY. INGRAM:   Yes.  We do waive the

8   reading.

9          THE COURT:   Do you have a date for

10  preliminary hearing you wish to set?

11         ATTY. WATKINS:   Your Honor, we would

12  request considering the holiday, a preliminary

13  hearing on December 31st at 11:00 a.m.

14         THE COURT:   Is that convenient to

15  both counsel?

16         ATTY. CONSOLDANE:   Yes, Your Honor.

17         ATTY. INGRAM:   I'll make it

18  convenient.

19         THE COURT:   There will be no bond

20  set on this matter at the present and defense has

21  reserve the right to enter a plea at a later date.

22  (OFF THE RECORD)

14

1          ATTY. WATKINS:  Your Honor, the

2     affidavits pursuant to the filing of our charges

3     yesterday were sealed and the order is until both

4     parties were arrested and therefore, I at this

5     point would request the Court to unseal the record

6     unless the Court --

7          THE COURT:  I have already

8     instructed the reporter to file those.

9          ATTY. WATKINS:  I wanted to make

10    sure we were conforming with the public records

11    law.

12    (OFF THE RECORD)

13          ATTY. INGRAM:  On behalf of Donna

14    Roberts, I would request that the affidavit for

15    arrest warrant remain unsealed.  It contains

16    references to evidentiary matters.  Attached to it

17    are several letters, which I have not had an

18    opportunity to review, but I imagine that the State

19    will allege that these letters constitute

20    documentary evidence in this matter.  Eventually,

21    we are going to have to pick a jury, our pool of

22    jurors is in Trumbull County.  They will be exposed

15

1    to this pre-trial and I would respectfully submit

2    that the affidavits should remain sealed, at least

3    until we empanel a jury.

4              ATTY. CONSOLDANE:  I would join in

5    that motion, on behalf of Mr. Jackson.  The

6    Complaint should be enough to satisfy the needs of

7    the press at this time.  I don't believe that there

8    is any reason to unseal the affidavit at this time.

9              ATTY. WATKINS:  Your Honor, the

10   public records law on this issue, I believe is

11   clear.  We have had cases before where affidavits

12   have been filed with this Court, and always they

13   have been released as a public record at the

14   appropriate time.  I have joined in with defense

15   counsel on various times for example to eliminate

16   disclosure of video confessions prior to trial,

17   which are always litigated prior to trial, and in

18   fact, the State lost on that case and that is the

19   Danny Lee Hill case and another one was the case

20   against a man named Parks.  Therefore, it is the

21   State's position from its knowledge of the law and

22   looking at the circumstances that it is a public

16

1   record, just like all filings and all hearings

2   before the trial and the State does not object to

3   its release.

4           ATTY. INGRAM:  I think I would

5   request that you at least not unseal the affidavit

6   until Monday and that you give us an opportunity to

7   brief the public records.

8           THE COURT:  Well, that is exactly

9   where I'm going.  The Court -- I don't want to get

10  into a situation where we are going to have a

11  problem with empaneling a jury in this county

12  because of pre-trial publicity.  I think the press

13  at some point has every right to review

14  particularly what has been filed.  I think that the

15  Prosecutor is correct on that, but I'm going to

16  allow you, because of the nature of the contents,

17  until Monday to brief the thing, to find out why

18  Mr. Watkins is not correct.  Part of that was the

19  material you are referring to was used as a basis

20  of the probable cause by way of affidavit, to have

21  the Complaint issued.  That is a matter of public

22  record probably.  Your task is to explain to the

17

1  Court, convince the Court that there is some

2  prejudice or bias that is going to be put upon your

3  Defendant, other than any other Defendant in the

4  similar circumstance.  So, I'll allow you until

5  Monday.  I'll order that that portion of the record

6  be sealed.

7          ATTY. WATKINS:  I would suggest that

8  if the Court is going to do that, that under public

9  records law that the press be invited to

10  participate, because they have an interest in

11  litigating this and I think the law requires that

12  the press --

13          THE COURT:  We have many spokesmen

14  here.  Who wishes to address this?

15          ATTY. WATKINS:  I think they would

16  have the opportunity.

17          THE COURT:  For purposes of this

18  motion, do you have anything further than what you

19  have heard?

20          ATTY. WATKINS:  I would suggest to

21  give them until Monday so their attorney can

22  respond.

18

1          ATTY. CONSOLDANE:  The Court is

2     closed Monday and Tuesday.

3          ATTY. INGRAM:  I'll do a memorandum.

4     I'll then send a copy of that memorandum to Mr.

5     Watkins, and I'll also send a copy of it to the

6     Warren Tribune and the Youngstown Vindicator and if

7     they then choose to move to intervene, that is

8     certainly something that they are entitled to do.

9          THE COURT:  I am thinking of time

10    element here.

11          ATTY. WATKINS:  It would have to be

12    early next week.  I don't know how you could do it

13    otherwise.

14          THE COURT:  I think the appropriate

15    thing here, we have this set for 11:00 on the 31st,

16    that gives everyone sufficient time to get your

17    briefs filed.  I think that is appropriate.

18          ATTY. CONSOLDANE:  Thank you.

19    (End of Hearing at 11:15 a.m.)

20

21

22

19

1 | Monday, December 31, 2001:

2 | (In-chambers at 11:00 a.m.)

3 | THE COURT:  At the request of the

4 | Court, we are conducting some preliminary matters

5 | in-chambers, prior to going into Court.  The Court

6 | has several motions before it this morning.  The

7 | first I would like to deal with is Motion to

8 | Intervene, filed by Steve Bolton on behalf of WFMJ

9 | Television, Inc.  And there is a motion by the

10 | Vindicator Printing Company in opposition, too.

11 | Vindicator has filed a motion in opposition to

12 | Defendant Roberts' motion to seal Court records.  I

13 | have also received Defendant's motion in memorandum

14 | to hold affidavit and Exhibits under seal.  Are

15 | there any other motions that have been filed?

16 | ATTY. CONSOLDANE:  First of all, I'd

17 | object to Mr. Bolton's motion being heard.  I have

18 | not been given a copy of that.  I didn't know he

19 | was going to intervene.  I don't think he has any

20 | business to intervene in this matter.  He hasn't

21 | served me with a copy and I represent one of the

22 | Defendants in a capital murder case.  I don't

20

1    believe he has any right to have this motion heard

2    today.  The other motion as far as the _Vindicator_,

3    I was handed the motion just as we walked into

4    Court today and I would like to clarify one thing.

5    One thing on that motion, is that motion is

6    opposing the Defendant's request to seal the

7    record, and we did not request to seal the record.

8    The Prosecutor, on their own, sealed that affidavit

9    with the Court.  We are only opposing them trying

10   to unseal at this time.  They sealed it, we think

11   that it should remain sealed.

12              THE COURT:  Steve, it is your

13   motion.  You should address the thing.

14              ATTY. BOLTON:  You are talking about

15   just the motion?

16              ATTY. WATKINS:  This is the motion

17   to intervene.  You are going to hear our responses

18   to that.

19              THE COURT:  It is his motion.

20              ATTY. CONSOLDANE:  Even though I

21   object.

22              ATTY. WATKINS:  I'm going to object

21

1   to the intervening.

2                    THE COURT:   He has the right to

3   address the motion.   You have the right to object

4   to it.

5                    ATTY. CONSOLDANE:   I can't object to

6   it, if I haven't seen it.

7                    THE COURT:   Mr. Bolton, what is the

8   reason that you can give why that motion should be

9   granted?

10                   ATTY. BOLTON:   Your Honor, this

11  obviously affects the First Amendment rights of the

12  news media, both the news media who are present

13  here by counsel as well as other news media who,

14  for reasons best known to them, decided not to

15  appear by counsel.   I understand that perhaps one

16  segment of the news medium, a local newspaper here

17  appeared by letter or asked you by letter to

18  consider this matter.

19                   THE COURT:   Let me interrupt you.

20  For the record, besides the Vindicator and WFMJ, I

21  have also received correspondence from the Tribune,

22  from a Frank Robinson, Editor, whereby he calls

22

1  upon the freedom of information act, 5 U.S.(c) 552

2  for eliciting response from the Court as to justify

3  the actions that have been taken.  Go ahead.

4          ATTY. BOLTON:  After I filed this

5  motion, I did serve Mr. Juhasz and Mr. Ingram.  I

6  was not aware of Mr. Consoldane's involvement, but

7  I served them with a copy of my motion.  And I will

8  point out that my similar motion in a case some

9  years ago had been denied and that that denial had

10  been affirmed by the Court of Appeals or been

11  denied by the Court of Appeals, had actually been

12  filed in the Court of Appeals and the idea of

13  intervention in the Eleventh District, I can't

14  misrepresent the situation to the Court, in the

15  Eleventh District, the State, the case which Mr.

16  Juhasz cites is still good law.  I would submit

17  that it is distinguishable because at the time, the

18  State, ex rel Vindicator Printing Company vs.

19  Watkins was tried.  The issue in that case was

20  whether the paper could have access to the

21  Prosecutor file, to portions of the Prosecutor

22  file, as opposed to a document which was filed in

23

1    the Court.  We simply seek a way in which we can be

2    heard, which we come before the Court and make some

3    effort to protect our client's rights, our First

4    Amendment rights to examine matters which are

5    concedingly public records.  An affidavit filed

6    with the Court is by definition, any definition, a

7    public record, but certainly statutorily a public

8    record.  We simply seek a vehicle by which we can

9    be heard and protect our rights.  Short of mandamus

10   at this point, we feel there is no reason to file a

11   mandamus action.  The Court has not taken any

12   action which would warrant a mandamus action at

13   this point.  We simply seek a vehicle to be heard,

14   and to express to the Court such law as we believe

15   might be appropriate in guiding the Court, which

16   might be of assistance in guiding the Court towards

17   a decision in this matter.  We have no wish to

18   effect the outcome of the criminal case or

19   interfere or intervene in it for the purpose of

20   affecting any substantive result in the criminal

21   case.

22                    THE COURT:  Fair enough.  Dennis?

24

1          ATTY. WATKINS:  I would indicate in

2    prefacing the record that this began as a result of

3    the State requesting the Court to seal the record

4    when we received warrants for the arrest of the

5    Defendants in this case, pursuant to an affidavit

6    filed by Detectives from the Howland Police

7    Department and that has been done in this county

8    for years and counties throughout Ohio for years

9    and the reason that we do that is that an officer,

10   and officers that go out with arrest warrants,

11   there could be danger, if this were to be released

12   at the point in time before a person is

13   apprehended, that it is necessary to have a period

14   of time, the affidavit be secret until the person

15   is arrested and charged.  This is commonly done

16   with secret indictments, however, Grand Jury

17   transcript is not made public record pursuant to

18   criminal rules.  Once the person has been or

19   persons have been arrested, the purpose of the

20   dealing is finished, is completed, and becomes

21   public record, and that has been the policy of the

22   Trumbull County Common Pleas Courts, since I can

25

1  remember in the early 80's, and that is why at that

2  point, that I indicated in as far as I was

3  concerned, my motion was limited for the purpose of

4  having these Defendants arrested.  They were

5  arrested and there is now a public case number, a

6  public complaint and a public affidavit.  And my

7  view is that that would be a public record.

8  However, there are Exhibits that are attached to

9  the affidavit, that are pieces of evidence, such as

10  a confession, heretofore the Supreme Court of Ohio

11  and I believe still the law has maintained that and

12  a change of venue is a remedy, if there is pretrial

13  publicity and I have for a long period of time been

14  dealing with cases where the press has access to

15  affidavits and information and we still are able to

16  obtain trials locally for example in the Stanley

17  Adams case, even though this Honorable Court had a

18  trial the year before, we tried Adams, and even

19  though the media endlessly printed in the paper

20  stories about his being, about him being a serial

21  killer and going through his record, to the

22  astonishment of many, there are people in this

26

1    county who do not read the newspapers and who do

2    not watch local T.V. and we were able to obtain a

3    jury. I believe that I would go personally to the

4    English system where we have very little

5    information when the case is tried. However, that

6    is not the law and that is why I express my opinion

7    to the Court at the time that these Defendants were

8    arraigned on affidavit of complaints. I believe

9    further, however, that at this point in time, and

10    Attorney Bolton has mentioned, that I don't believe

11    the newspaper or the media can intervene in a

12    criminal case, and their remedy would be mandamus,

13    so I'll object as a matter of principle that they

14    can not intervene in this case.

15                THE COURT: You have already stated

16    your objection?

17                ATTY. CONSOLDANE: I'll go last.

18                ATTY. MILLETTE: We base our motion

19    on our First Amendment right to public access

20    documents and this is particularly important in the

21    context of these documents, these are police

22    affidavits supports the arrest warrant, and the

27

1   First Amendment is in public records to access, is

2   most important in that context and the Government's

3   exercise of that kind of power.  There are many

4   other ways in which the Defendants' rights can be

5   protected, other than keeping these documents

6   sealed.  There is a change of venue.  There is Voir

7   Dire, as Attorney Watkins said, there are many

8   people who aren't going to read the papers, don't

9   even get the papers, won't see this news and I

10  think the case law strongly supports that position.

11                  THE COURT:  John?

12                  ATTY. JUHASZ:  Judge, one of the

13  first things I want to say is I understand what Mr.

14  Watkins has said about the Supreme Court's decision

15  about change of venue.  Two things strike me as

16  curious about that.  The first is that seldom do

17  they cite or go into any analysis of what I think

18  is still the seminal case, which is the Sheppard

19  case.  And that is the case that makes it very

20  clear that it is the obligation of the trial judge

21  to do what is necessary, before a trial starts,

22  before it becomes a media circus to make certain

28

1   that the Defendant's rights to a fair trial are

2   protected.  Secondly, it is easy and with all due

3   respect, I would have to say a bit cavalier for

4   representatives of the media to say, "Well, don't

5   worry, you can have a change of venue or all sorts

6   of other things that can be done."  That is easy to

7   say, but there are to my recollection about two

8   hundred people on death row, and I believe only

9   eight cases where venue has been changed and some

10  of those had to do with the Lucasville riots and

11  the reason I bring that up is because as a

12  practical matter, while everybody stands here in a

13  hearing like this and says, "Don't worry, don't

14  worry, there is a change of venue."  The fact of

15  the matter is this doesn't happen very often.  I

16  know you and I were involved in a case where it did

17  happen.  I have submitted there were other issues

18  besides pre-trial publicity that warranted that

19  particular change of venue.  With regard to the

20  media, I would have to mirror what Mr. Watkins and

21  Mr. Consoldane have said and even what Mr. Bolton

22  has agreed to and that is that the Watkins case

29

1   outside of the Eleventh District, which was tacitly

2   affirmed by that point by the Supreme Court of Ohio

3   is good law in this district.

4              THE COURT:  Do you agree John or

5   Steve that it is somewhat distinguishable from the

6   fact situation here?

7              ATTY. JUHASZ:  I don't and I'll tell

8   you why.  If you look through the Supreme Court

9   opinion, when the case got to the Supreme Court,

10  one of the things they talk about and one of the

11  things we quoted in our memo was the concern that

12  trial judges also should have, to insure that a

13  Defendant has his right to a fair trial.  There are

14  as we set forth, at least two reasons these are not

15  public records in our estimation.  Without

16  question, I think that is clear and I, and Mr.

17  Watkins have conceded as much, that is clear about

18  the items which are potentially evidentiary

19  materials.  Setting the affidavit to one side.  But

20  as we also tried to make clear in our memorandum,

21  the Watkins case and I don't see that Steckman,

22  which was the later Supreme Court case and I guess

30

1   the seminal public records case, from the Supreme

2   Court, I don't see anything in Steckman that has

3   changed what happened in the Watkins case, and in

4   those cases, they make it clear that when the

5   disclosure of those items is prohibited by State or

6   Federal law, then they are not public records.

7   That goes to the Constitutional fair trial stuff.

8                  THE COURT:  Did not the previous

9   Vindicator, Watkins case go on (a)(2) of that

10  section of confidential enforcement?

11                 ATTY. WATKINS:  Dealt with work

12  product and investigatory.

13                 ATTY. CONSOLDANE:  I think that

14  neither the T.V. or the newspaper, or the newspaper

15  can intervene in a criminal case.  I think they

16  have a proper remedy, and it is not a motion to

17  intervene.  They can certainly file for writ of

18  mandamus to enforce that.  I don't think it is

19  proper for them to intervene in a criminal case.

20  Then, secondly, is that at this point in time, both

21  Defendants have been indicted by the Grand Jury.

22  The minutes in the Grand Jury are secret and they

31

1   are not going to be released.  If they would have

2   directly presented this to the Grand Jury, there

3   would be no need for this affidavit to have been

4   filed.  This affidavit also contained a lot more in

5   that, than what was necessary to go out and arrest

6   these two individuals.  There is a lot of things

7   that were put in there, just to appeal to people's

8   pure interest and I think that is wrong upon the

9   State to do something of that nature and also is

10  that of all of these cases that we have, in these

11  death penalty cases that do get press, it is

12  amazing that everybody comes in here and says that

13  they don't remember reading anything about it, or

14  formed any opinion, but that gets stuck in the back

15  of their minds and as soon as it is brought up in

16  Court, it triggers something and they remember, and

17  it is too late at that time for them to raise their

18  hand.  Nobody wants to admit that they read the

19  newspaper and have already formed an opinion, when

20  they come in here to sit in a trial, and it is

21  unfair to the Defendant to have to phrase it.  It

22  is the whole procedure of a death penalty case is

32

1  unfair, because you have to get jurors that wanted

2  to say, "Yes, I can invoke the death penalty."  And

3  they are already slanted towards law and order.  To

4  get this type of pre-trial publicity on things that

5  we can't comment about, and actually the Prosecutor

6  can't comment about, is a lot of that stuff is

7  evidence and a lot of stuff in that affidavit are

8  purely conjecture of what the police officer thinks

9  might have happened, because of a couple other

10  things that he has picked up as evidence.

11          THE COURT:  That is what an

12  affidavit is.  Many times it contains some

13  assumptions and conjecture based on facts that are

14  presented and then the probably cause, of course,

15  is a different standard from beyond a reasonable

16  doubt.

17          ATTY. CONSOLDANE:  One last thing, I

18  think that the newspaper and the press should be

19  able to look at that, but not until it is presented

20  in Court.  What is the difference?  They are going

21  to get it.  They are going to get to see this

22  information eventually, after it's presented in

33

1  Court.  Why is it so necessary that they have it

2  now before the Defendants go to trial?  They are

3  going to get the information.  Everything that is

4  contained in the affidavits will probably be

5  presented at trial, after a jury has been picked

6  and they have been admonished.  To keep that sealed

7  until we pick a jury, what is the different?  They

8  are going to get the information anyhow.  What is

9  the difference in the time?

10                ATTY. BOLTON:  The holding or the

11  language in State, ex rel Vindicator vs. Watkins,

12  that newspapers or media couldn't intervene in a

13  criminal case was essentially in that case dicta.

14  It was simply supporting the holding.  The Supreme

15  Court has made in that case and elsewhere that the

16  proper remedy after a Court has acted is mandamus,

17  which is, that is in the statute.  But as the Court

18  knows, there is a long history in Ohio of media

19  intervening in criminal cases.  For example, before

20  it was established that the media had a right to be

21  present at certain parts of the criminal case, the

22  media regularly intervened in criminal cases to

34

1   gain access to suppression hearings and matters of

2   that kind.

3              THE COURT:  That is on a different

4   issue.

5              ATTY. BOLTON:  I understand, but the

6   principle is the same.  We are not intervening in

7   any substantive way, we are simply speaking in a

8   forum to be heard before the possibility of our

9   rights being foreclosed comes up, and trying to

10  foreclose other lengthy litigation, which may well

11  have the effect of prejudicing the Defendant, far

12  more than anything that might be done here today.

13  The second point here is that both the statute and

14  all of the case law which bears on this issue,

15  clearly indicate that an affidavit filed with the

16  Court, filed with the Clerk of Courts here in the

17  Courthouse is a public record, and the Defendant,

18  the Defendants have the duty to show why it should

19  not be disclosed.  What they are arguing is, they

20  are arguing, "Well, this might prejudice a

21  Defendant, somehow this information might be

22  difficult for the Defendant to overcome in Voir

35

1　Dire.　Somehow this information might be

2　prejudicial if let out in the community."　But what

3　they are not able to show is why it is not a public

4　record, and why it should not be disclosed under

5　149.143 and there is a good reason for that.　There

6　is no reason why it should not be disclosed under

7　149.143 and the statute and case law is quite

8　explicit that cases, all of the cases decided under

9　149.143 says if it is filed with the Court, it is a

10　public record and even counsel for the Defendants

11　have agreed.　If an Exhibit is filed with the

12　Court, it is a public record.　Nobody even

13　questions that, well an affidavit is filed with the

14　Court, public record.　That is the end of the story

15　and whether we are simply heard on the issue, or

16　whether we are allowed to intervene on the issue,

17　that doesn't, substantially that does not matter at

18　all, what does matter is that the Court in looking

19　at the statute, hold the Defendant to their burden

20　of proof in this matter, and if they are hold to

21　their burden of proof, they can't meet it.

22

36

1            ATTY. CONSOLDANE: He's right that

2 it is a public record, but this Court sealed that

3 public record, and we are not saying that he

4 shouldn't be entitled to it some day, I'm saying to

5 protect the Defendants' interest, leave it sealed

6 for a while longer. And then allow it to be

7 reviewed by the press. What harm is that going to

8 cause to the First Amendment? It is already

9 sealed. Give our clients a fair trial and then

10 release all of the information to the press.

11            ATTY. WATKINS: Just to make the

12 record, the record was, we made a motion in-camera

13 pursuant to the affidavits and the warrants, for a

14 sealment for a finite period of time. And they

15 made a motion, and I think it was Jerry, you wanted

16 to object to that, and they made a motion.

17            THE COURT: I never granted their

18 motion, what I did was fail to act on their motion.

19 The seal was maintained.

20            ATTY. INGRAM: The Prosecution moved

21 to seal, the Prosecution then moved to unseal. I

22 objected.

37

1          ATTY. WATKINS:   No.   The original

2    motion ex-parte was, we made a motion, when we got

3    together and Paul Monroe came in, we made a motion

4    to seal until the Defendants were arrested.   That

5    was the motion.

6          ATTY. CONSOLDANE:   We don't know

7    that.

8          ATTY. WATKINS:   I mentioned to the

9    Court under the motion granted, that it should be

10   unsealed.   That is the standard motion that I make

11   in all of these for the last 20 some years.

12          THE COURT:   Let the Court of Appeals

13   deal with that.   Criminal case is a case between

14   the State and an individual or individuals.   They

15   are the only parties to the action.   The news media

16   have no right to intervene in this action.   They do

17   have a right to mandamus under the information act

18   for public records.   There is no question the

19   affidavit, upon which the warrants were issued has

20   been filed.   I think anybody other than somebody

21   representing a news organization would have to

22   agree that the English have a better system to see

38

1  that this abstract thing of justice is probably

2  done, because inevitably, it divulges upon so many

3  people to sit and listen to the facts.  We can

4  argue both sides all day and never come to any

5  reasonable conclusion as to what effect it has on a

6  trial.  Any sane person has to acknowledge that

7  pre-trial publicity has at times a monumental

8  affect upon a fair trial.  But we happen to live in

9  a country, which has, thank God, the bill of rights

10  and one of those is the First Amendment right.

11  Although the newspapers seem to think that is

12  exclusively their right.  It is a right that

13  belongs to everyone.  The newspapers have no

14  greater right than any other individual to the

15  rights contained in the First Amendment.  You

16  wouldn't believe that by reading some of the cases.

17  In any event, the public record law has exemptions.

18  The case alluded to before against Mr. Watkins from

19  the Vindicator dealt with this (a)(2) which was

20  confidential law even for the investigator, and the

21  case went through great length through the history

22  of what happened and how they were called in.  The

39

1   newspaper was trying to get the material found by

2   that investigation.  There is another essential,

3   (a)(4) that says trial preparation record means any

4   record that contains information that is

5   specifically compiled in reasonable anticipation of

6   in defense of, a civil or criminal action.  I don't

7   know that that directly applies here.  It goes on

8   to say including the independent thought process

9   and personal trial preparation but that says,

10  specifically compiled in reasonable anticipation

11  of.  I would think that this affidavit is

12  specifically compiled in anticipation of, but it is

13  filed as a public record, and here's the rub on

14  this whole thing, which the upper Courts are going

15  to have to deal with.  We all start out and say, we

16  got to balance the First and Sixth Amendment right

17  of Defendant to have a fair trial.  If you accept

18  the undebatable fact that pre-trial publicity

19  contained at trial, the Courts have held, well, you

20  have right to Voir Dire, and then you end up with

21  what the Defense is afraid of here, people get up

22  and say, "No, I don't remember anything about it.

40

1   I read something about it, and I don't recall the

2   details."  That is for anybody who reads the

3   newspapers, a person who takes the time of reading

4   a newspaper is usually of the level of intelligence

5   that they aren't going to be so cavalier as I would

6   get, but that is part of the system.  The Courts

7   say, Voir Dire can cure that.  And they say that if

8   you can't, then you have the change of venue to

9   cure it.  And then it is transferred to another

10  jurisdiction, where it is put in the news media

11  again.  I would note, for the Appeals Court that

12  the affidavit contains facts, some conclusions,

13  which are absolutely necessary in order to get a

14  probable cause finding.  The thing that does

15  concern me is so many quotes contained in here,

16  that I think should be evidentiary material.  I

17  think it is possible to go through this affidavit,

18  to give to the media all of the necessary details.

19  I don't really agree, although I have ruled, you

20  are not a part of it, you will be granted an

21  opportunity to express your opinion.  The whole

22  purpose for the First Amendment is to keep

41

1   Government honest.  Things don't happen in secret,

2   what have you.  You have perhaps the duty, by way

3   of the media to make sure that when the Government

4   is prosecuting, that the public is informed as to

5   the basis of it, otherwise you could hold people

6   for long periods of time and nobody would know

7   whether or not the Government is acting on good

8   grounds or not, so that is the right we don't want

9   to give up.  But the other aspect and I think it is

10  very present in this case is there is a salacious

11  part of this that everyone just kind of has picked

12  up, must be present.  That is the part that

13  concerns me, because that doesn't add anything to

14  the First Amendment, it might be good for selling

15  newspapers or T.V. programs, but that is the part

16  that concerns me where we start getting into the

17  balancing act with the Sixth Amendment right being

18  affected.  Mr. Juhasz has mentioned that the Court

19  has to do a balancing act at some point.  I think

20  that this public records act is short sides in some

21  way, but it is the law we must follow.  I think

22  what I'm going to do here is to order that the

42

1   Prosecution turn over most of this affidavit, with

2   certain parts redacted and I am doing that, by

3   saying that those portions may be very essential to

4   the Defense, does not hinder the Prosecution in any

5   way, except that it keeps out some of these matters

6   that have no justifiable use at this point, other

7   than to possibly taint a future jury pool.

8               ATTY. BOLTON:  Speaking perhaps as

9   an officer of the Court and not as an intervenor,

10  if I may, I had heard, I don't know what is in this

11  affidavit, but I have heard perhaps rumors that

12  there was some material in it that might be

13  interesting, but not particularly publishable.

14              THE COURT:  That is true.  I think

15  some of this you would not publish because of its

16  very nature.  It would not be in good taste.

17              ATTY. INGRAM:  You can't speak for

18  the Tribune.

19              ATTY. BOLTON:  Anticipating that

20  such an issue might come up, I believe that the

21  Supreme Court has spoken to this issue, and I refer

22  to State ex rel Beacon Journal Publishing Company

43

1    <u>vs. Maurer</u>, 91 Ohio St. 3rd, 74.  It was decided on

2    February 14th of this year and if I might read a

3    little portion of this.  This was about incident

4    reports, which everybody considers to be public

5    records, and incident reports don't even rise to

6    the level of filing like an affidavit, which is far

7    more clear.  The Court ruled that incident reports

8    which contain material from 911 tapes were public

9    records, even though the stuff from the 911 tapes

10   might not be otherwise public records and it said,

11   "We rule this way despite the risk that the report

12   may disclose the identity of an uncharged suspect.

13   A deputy incorporated the typed narrative

14   statements by reference in the incident report.

15   He consequently incorporated them in a public

16   record.  He can not now remove the public records

17   cloak."  "It does not matter that release of the

18   tapes might reveal the identity of an uncharged

19   suspect or contain information, which if disclosed,

20   would endanger the life of physical safety of a

21   witness."  "Once clothed with the public records

22   cloak, the records can not be defrocked of their

44

1  status."  Now, what this case says and what the

2  Supreme Court has said, is that once material that

3  would otherwise be prohibited from disclosure under

4  the public records act is placed in a public record

5  act, in a --

6              THE COURT:  You are saying once it

7  is turned over you can't ever get it back?

8              ATTY. BOLTON:  In this cae, it was

9  an incident report, what the Court has before it is

10  an affidavit.  Everybody concedes an affidavit is a

11  public record.  This affidavit may contain

12  material, which the Court believes in good

13  conscience ought not to see the light of day, for

14  reasons of either good taste or for reasons that it

15  might make it more difficult to pick a jury, but it

16  is an obtained public record status by reason of

17  the fact that it is included in the body or

18  attached to an affidavit and therefore, I believe

19  the Supreme Court has ruled that it must be

20  disclosed.

21              THE COURT:  You are saying that the

22  Supreme Court by virtue of that case, just gives

45

1   the total power to the Prosecution, the State, to

2   put it all out there, and let the newspaper grind

3   it up.

4                ATTY. BOLTON:  Having defended, I

5   have never been a Prosecutor, but I have defended a

6   few people here and there, and as we all know,

7   there is more than one type of affidavit.  There is

8   a notice affidavit, which basically sets out the

9   basic elements of the crime and little else, and

10  then there are affidavits such as we have seen come

11  through in the course of all of the prosecutions

12  from Mahoning County, against the judges and

13  lawyers, which are extra ordinarily detailed.

14  Extra ordinarily detailed and contain virtually the

15  Government's entire case.  And the Government has a

16  right to do that.  They have the right to, they

17  have the right to file an affidavit which contains

18  their whole case, and risk the possibility that it

19  may, that the defense may come back and say, you

20  prejudiced our client, we have to have a change of

21  venue, and force the Prosecution to go out of the

22  county.  Now the Prosecution knows that when it

46

1   files the affidavit and knows that it is giving the

2   Defendant's remedies, both at the trial level and

3   subsequent, down the years on appeal on a capital

4   case.  Now, the Prosecutor in this county is

5   unusually experienced in capital cases.  He's had

6   quite a number of them, which he's tried himself,

7   so the Prosecutor in this case knows what he's

8   doing in capital cases.  Whatever other

9   disagreements I have had with Mr. Watkins over the

10  years, he does know what he's doing in capital

11  cases and if he chooses to say put the matter in an

12  affidavit, it is because he thinks the public ought

13  to know about it and Court ought to know about it.

14            ATTY. CONSOLDANE:  Let me say one

15  thing, is that Mr. Watkins would not go and say any

16  of these things in the newspaper.  He'd be barred

17  under the code of ethics, you can't talk about the

18  case.  This is a way around him being able to

19  discuss his case, to the public, by putting it in

20  an affidavit.  It is an affidavit, I have to agree,

21  it is filed there, and it is subject to being

22  public information, but there is nobody that said

47

1  when it has to be released.  It doesn't have to be

2  released today, tomorrow or next week.

3             THE COURT:  If it is a public

4  record, it's a public record.

5             ATTY. CONSOLDANE:  If it was just a

6  public record if it was just filed, that is correct

7  but it was under seal, there is not one case that

8  says when it has to be unsealed.

9             ATTY. WATKINS:  May I respond?

10  John, do you want to go first?

11

12             ATTY. JUHASZ:  I wanted to clear up

13  a couple of things, one if it is not clear, our

14  motion is that we don't agree with Mr. Bolton that

15  it is a public record.  I understand what the Court

16  is saying, and the authority for that is not only

17  in the Statutes, but in the Watkins case.

18             THE COURT:  Where do you get the

19  authority under the statute?

20             ATTY. JUHASZ:  Under statute and I

21  am talking about the statute as it is presently

22  numbered.  It is (a)(1)(q) and basically if you

48

1   will permit me to paraphrase it, it defines public

2   record as being records kept by public office

3   except that public record does not mean any of the

4   following, and when you drop down to (q), it says

5   records the release which is prohibited by State or

6   federal law.  Now, while that might sound

7   unnecessarily broad, that doesn't give us a whole

8   lot of guidance.  Let me direct the Court to the

9   quote we have on page 3 of our memo which is from

10  the Ohio Supreme Court in again, <u>Vindicator</u>

11  <u>Printing vs. Watkins</u>, and the first thing to do of

12  course is talk about the concerns the United States

13  Supreme Court had in <u>Sheppard vs. Maxwell</u>.  "Many

14  devices are available to a trial court to prevent

15  the prejudicial effect of such pretrial publicity,

16  including a change of venue and sequestration of a

17  jury.  However, if during the pendency of the

18  criminal proceeding, such measures have not been

19  undertaken or are ineffective in assuring an

20  impartial determination of the issues and a danger

21  of material prejudice to a criminal defendant is

22  posed thereby, the criminal defendant clearly

49

1    possesses standing to challenge the release of such

2    information in an action brought pursuant to R.C.

3    149.43.   Inasmuch as such disclosure would

4    prejudice the Defendant's rights under the State

5    and Federal Constitutions, the information at issue

6    would constitute records the release of which is

7    prohibited by State or Federal law."   The Ohio

8    Supreme Court has said that if these are records,

9    the disclosure of which would prejudice the

10   Defendant's rights under the State and Federal

11   Constitutions, and again by implication, state

12   Constitutional rights, then under (q), they are not

13   in fact public records.

14            ATTY. BOLTON:   Assuming you're

15   right, where's the beef?   Where's your showing of

16   prejudice?

17            THE COURT:   That gets to the very

18   heart of this argument here.

19            ATTY. WATKINS:   I need to respond.

20   I would like to indicate that the affidavit that

21   was filed, I think it is clear that in our opinion

22   that there is some discretion with the Court and I

50

1  have already reiterated it twice, once the reason

2  for the sealment is completed, per the original

3  motion, then it becomes a public record. I want to

4  go back to a case with Dave McLain, with the Danny

5  Lee Hill case where Jim Lewis made a motion to

6  close the Courtroom for the suppression hearing

7  confession, video confession, which is as awful and

8  salacious as any confession anyone would hear, and

9  I agreed with Defense counsel to close the

10 Courtroom.

11            THE COURT:  And that, of course, is

12 improper.

13            ATTY. WATKINS:  And participation,

14 but the bottom line is that Ohio law, well, you can

15 close the Courtroom, but you have to have a hearing

16 to show that there is this prejudice which John

17 alluded to, and at that point in time, Judge McLain

18 overruled both motions, where I joined in, and it

19 was made public, and there are a lot of confessions

20 that right before trial, that we ar going to play

21 in Court that are very salacious and these other

22 evidence and letters are going to be public.  This

51

1   is prejudicial.  Timing may be of importance as to

2   when something is released at suppression right

3   before trial or at the initial appearance.  If I

4   had my way, I would have the -- I think the other

5   problem here is that you have a number of cases,

6   since Sheppard that modify and we are dealing with

7   McVeigh, just looking at the publicity of the

8   McVeigh case, Murphy vs. Florida which discusses

9   pre-trial publication where we deal with the media

10  presence in the Courtroom, right to T.V. cameras,

11  we have historically taken the First Amendment and

12  given the information to the press, and we have

13  been able to go through the process.  I objected

14  when Robert Parks, when the T.V. cameras wanted to

15  go into the Courtroom, because I have felt this

16  kind of publicity is negative.  I still have great

17  concern for it, but in my opinion, the Court has

18  here, a public document, that contains in my

19  opinion, evidence that goes to circumstantial

20  evidence dealing with motivation, which proves

21  probably cause in this case.  And so it is subject

22  to some control and should be subject to more

52

1    control by the Court, but the problem I see is the

2    historical development in the past 20 or so years

3    against the Sheppard case, especially with the

4    public records law.  I have no problem with the

5    Court ruling in the sense that I agree with the

6    fact that there should be some control dealing with

7    for example letters or maybe parts of the

8    affidavit, but I'm not too much in favor of the

9    climate here is not as good as it should be and I

10   think the law dealing with, that dealing with the

11   911 tape, where it is an incident report, it is a

12   public record, is different from when we are

13   dealing with filing an affidavit and the control of

14   the proceedings and the Court record, so I think it

15   is a gray area here and I guess that is where I am

16   ending.

17                 THE COURT:  I think we have a public

18   record that's been filed.  The Court has listened

19   to arguments from all sides.  I agree with the case

20   cited by Mr. Bolton that once you have a cocoon

21   that goes into a butterfly, you can't put it back

22   into the cocoon.  So it is a public record.  But I

53

1    think that the Court still has a duty to see that

2    the First Amendment is complied with and that is to

3    give the media the basic information as to why this

4    charge is pending.  I think there are portions of

5    this affidavit, that there is no legitimate use for

6    the newspaper to have when balancing against the

7    right of the Defendants.  This information will

8    come out during trial.  There is no harm done to

9    the public in the meantime, and I'm going to order

10   that portions of it be redacted.  I would suggest

11   that that be done with both input from the State

12   and the Defense and the balance of that will be

13   turned over to the news media as soon as possible.

14   That is the only thing I can see here.  If I had my

15   druthers, I would give the press none of this,

16   because it does nothing except cause possible

17   prejudice in picking a Jury.  They will find out

18   about it in due course, but I don't think that the

19   law permits me to take that position.  I think that

20   the public records law quite clearly explains this

21   or shows this to be a public record and I don't

22   think the exceptions apply, with all due respect,

54

1    Mr. Juhasz, I see a difference between this and the

2    argument made in the previous Watkins case.   Jerry,

3    you have been awful quiet.   That bothers me, but

4    that will be my ruling.   I would ask someone from

5    both sides here to get together with this affidavit

6    and go through that and give them that as soon as

7    possible.

8                    ATTY. WATKINS:   Then the Court will

9    decide if we can't agree.

10                   ATTY. BOLTON:   Your Honor, may it

11   please the Court, having heard the Court's ruling,

12   it is my understanding that the Court intends that

13   the parties review this affidavit, then submit and

14   ten say, "All right, these are the parts that we

15   would jointly like to be redacted."   I would

16   request that the Court, nevertheless exercise its

17   independent judgment.

18                   THE COURT:   I'm asking them to get a

19   proposal.   It will be my call on it, and I'm sure

20   they are not going to agree on all parts.   Of

21   course, the original affidavits are a part of the

22   record that will be available for review by the

55

1   Court of Appeals.

2              ATTY. BOLTON:  And the second

3   request I have is that the Court place a deadline,

4   so that the news media, this is a --

5              THE COURT:  I would hope by tomorrow

6   morning this could be done, if not today.

7   Wednesday morning.  Tell them by mid-morning, if

8   somebody wants to stop here and pick it up.

9              ATTY. WATKINS:  I'd like to go on

10  record, once the press leaves.

11             THE COURT:  Do you waive the

12  presence of your client?

13             ATTY. CONSOLDANE:  Depends on what

14  he's going to say.

15             THE COURT:  Waive his presence until

16  we find out?

17             ATTY. CONSOLDANE:  Until we find

18  out.

19             ATTY. WATKINS:  I will say this that

20  the State is taking the position --

21             ATTY. JUHASZ:  We also waive the

22  presence of the Defendant.

56

1          ATTY. WATKINS:  We take the

2    position, looking at the history of affidavits and

3    referring to confessions and to different things

4    that to be consistent, it is our position that the

5    affidavit, as it stands is public record, and we'll

6    participate, but that is our position that the

7    affidavit -- however, I believe that the Exhibits

8    are excludable because that is in my mind evidence.

9          ATTY. CONSOLDANE:  How about the

10   drawings?

11         ATTY. WATKINS:  I think that the

12   Exhibits themselves, the letters themselves are

13   going to be introduced, however, to go through a

14   journey of picking out what is good and bad in the

15   affidavit for release, which we'll do pursuant to

16   Court order, we would note we would object as a

17   matter of policy.

18         THE COURT:  They are not part of the

19   thing.  I'm going to order that the Exhibits are

20   not included.  That is not to be given to the

21   media.  That is evidence.

22         ATTY. WATKINS:  I can defend the

57

1    Exhibits, but I cannot defend the redacting of an

2    affidavit, because there are many in the past and

3    in the future, where we'll be doing this quite a

4    bit.

5               THE COURT:  I am looking here this

6    morning and I couldn't see -- there's a whole bunch

7    of evidence that is -- what I was thinking to begin

8    with that should not be in here.  I'll make this

9    very simple.

10               ATTY. WATKINS:  We have quotes from

11   evidence and there are going to be confessions and

12   motivation, we can't create the scenario here.

13               THE COURT:  The affidavit will be

14   given, no attachment.  You don't have to redact.

15   (End of in-chamber discussion.)

16

17   IN OPEN COURT AT 12:05 P.M.:

18   Arraignments before Judge Stuard

19               THE COURT:  Case number 01-CR-793,

20   State of Ohio versus Donna Roberts.

21               ATTY. INGRAM:  This is the

22   Defendant, Donna Roberts.  She will acknowledge

58

1    receipt of the copy of the indictment, she has read

2    the indictment, she's discussed it with counsel.

3    She understands the allegations contained therein,

4    and at this time, she would waive the reading and

5    she would enter a plea of not guilty to each count,

6    and each specification attached to each count.

7                    THE COURT:  That plea of not guilty

8    is entered for the record.  Concerning bond, Mr.

9    Watkins?

10                   ATTY. WATKINS:  This is a capital

11   offense, where the presumption is great from the

12   evidence contained in the affidavit, no bond should

13   be given.  It is the State's position, there should

14   be no bail in this case, and for both cases.

15                   ATTY. INGRAM:  Donna is 57 years of

16   age.  She has no prior criminal record.  She has

17   been a resident of Trumbull County for a prolonged

18   period of time.  She owns real estate here.  Her

19   family resides in this area.  And we would

20   accordingly request that the Court set a reasonable

21   bail.

22                   THE COURT:  I'm not going to set any

59

1   bail at the present time.  I'm going to ask, if you

2   wish to have a pre-trial set now, or if you wish to

3   take care of that.  We should have a definite date

4   as to the next step on this.  Do you have a date in

5   mind?

6              ATTY. INGRAM:  I would suggest 30

7   days.  It would be incumbent upon the Defense to

8   request discovery and in order for a pre-trial to

9   be meaningful, we should have some discovery in our

10  possession by the date of pre-trial.  30 days would

11  seem reasonable to me.

12             ATTY. WATKINS:  That is fine.

13             THE COURT:  I'm going to set this

14  for the afternoon of January 30, which is a

15  Wednesday, and at that time, if need be, we'll

16  revisit the question of bail, but for the time

17  being, there is no bail set.

18             ATTY. INGRAM:  Thank you, Your

19  Honor.

20             THE COURT:  State of Ohio versus

21  Nathaniel Jackson.  Case number 01-CR-794.

22             ATTY. CONSOLDANE:  This is Nathaniel

60

1  Jackson and he's received a copy of his indictment,

2  has read it, and understands the same, including

3  the possible penalties.  Waives any further reading

4  in open Court, and would like to enter a plea of

5  not guilty and request that a reasonable bond be

6  set.

7              THE COURT:  Pleas of not guilty are

8  entered.  Mr. Watkins?

9              ATTY. WATKINS:  We make the same

10  recommendation, no bail.

11              THE COURT:  There will be no bail

12  set.  Pre-trial will be the same date, January 30,

13  2002.  There is another matter before the Court,

14  which we have had extensive discussion with all

15  parties, including representatives of the press,

16  and although the Court has ruled that the press

17  cannot intervene in this matter, I did extend the

18  courtesy of allowing their counsel to participate

19  by way of assisting the Court in resolving the

20  matter.  The Court sealed the affidavits in this

21  matter, prior to the warrants being issued.  That

22  is commonly done.  There was a motion by both

61

1   Defendants at the initial hearing, wherein it was

2   requested the Court not break that seal until

3   further argument had occurred.  We had extensive

4   argument from all interested parties this morning,

5   and the Court's resolution is that once the

6   affidavit was filed, it is a public record.  There

7   was also, there were also attachments to that

8   affidavit, which the Court has ruled, based on the

9   Sixth Amendment rights of the Defendants, that

10  those will not be unsealed, until they are

11  introduced at trial, and at that time, they will be

12  within the public record domain.  The Court is

13  called upon to, at times, balance the Sixth

14  Amendment rights of any particular Defendant

15  against the right of the public to know under the

16  First Amendment.  The public will have access by

17  way of the affidavit to all factual matters and

18  content upon which the affidavit was originally

19  filed to get the arrest warrant, and that is my

20  humble attempt to try to rationalize the situation

21  that we are at presently.  The media will have an

22  opportunity to pick up a copy of the affidavit this

62

1   morning, if they wish to wait around, and the Court

2   will have the matter, has the matter set for

3   hearing on January 30, 2002. Everyone have a nice

4   New Year.

5                   ATTY. CONSOLDANE: Do you want to

6   pick a date for motions, we are going to need a

7   date for that.

8                   THE COURT: I anticipate that

9   discovery will be given. You will get your motions

10  filed within the next two months.

11                  ATTY. WATKINS: We'll have to

12  consider speedy trial and evidentiary problems,

13  with a number of witnesses from all over.

14                  THE COURT: Let me ask that the

15  parties involved here, get a schedule and submit it

16  to me for approval. We have the overriding problem

17  here.

18                  ATTY. WATKINS: I'll talk to both

19  sides. We'll talk to both sides and try to work

20  out a schedule and get back to the Court within a

21  week or so.

22                  THE COURT: That is fine.

63

1          ATTY. CONSOLDANE:  Even though I

2     made a lot of my reasons on the record in there, I

3     wanted to make it clear that I am still objecting

4     to the release.

5          THE COURT:  All objections are

6     noted.

7     (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT OF

8     HEARING)

9          ATTY. WATKINS:  The Court at side

10    bar, the Court also included a two page affidavit

11    for a search warrant as being the public record,

12    with the same caveat that none of the letters or

13    Exhibits are to be given for that second affidavit.

14    I am simply clarifying what was discussed at side

15    bar.

16    (COURT IN RECESS)

17

18

19    <u>Wednesday, January 30, 2002; Waiver of Speedy Trial:</u>

20          THE COURT:  Mr. Juhasz, would you

21    come forward with your client?  After talking in

22    chambers with representatives on both sides, it is

64

1    my understanding that you gentlemen have agreed

2    upon a trial date as well as all necessary motions

3    that are going to be heard prior to that time; is

4    that correct?

5              MR. JUHASZ:  That is correct, Your

6    Honor.

7              MR. WATKINS:  That is correct, Your

8    Honor.

9              THE COURT:  We will journalize those

10   dates.  I further understand that the Defense is

11   considering a waiver of time to comply with that,

12   is that correct?

13             MR. JUHASZ:  That is correct, Your

14   Honor.  And I should represent to the Court and for

15   the record that Mr. Ingram and I have previously

16   met with Mrs. Roberts and gone over these matters

17   and I've discussed them again with her today.  I've

18   advised her of her Constitutional and statutory

19   rights to a speedy trial and likewise have advised

20   her of the implications of waiving the same.  She

21   has executed a waiver and I'm confident that she

22   understands the implications of waiving her

65

1  Constitutional and statutory right to a speedy

2  trial.

3              THE COURT:  Mr. Ingram is not able

4  to be here today.  There's no problem with

5  proceeding with just Mr. Juhasz?  I don't mean that

6  to sound like it come out, but you're willing to go

7  forward with Mr. Juhasz and not both attorneys, is

8  that correct?

9              THE DEFENDANT:  Yes.

10             THE COURT:  May I see the waiver,

11  please?  Mrs. Roberts, you understand that by

12  Constitutional guarantees and various statutory

13  provisions, the State is required to bring you to

14  trial within a certain time period.  Should they

15  fail to do that, it would be grounds for moving to

16  have the matter dismissed.  This waiver of speedy

17  trial on your part is in effect your motion to

18  permit the State an additional amount of time in

19  which to bring you to trial.  Do you understand

20  that?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Do you wish me to

66

1   approve that?

2                   THE DEFENDANT:  Yes.

3                   THE COURT:  I will do so.  This

4   matter will be set for trial on November 18, 2002.

5   That's an additional 300 days beyond the statutory

6   time period, which is extended to the State by

7   agreement of the Defense.  Is there anything else?

8                   MR. WATKINS:  Yes, Your Honor.  We

9   have worked out the 23rd and 24th of May as motion

10  dates for any motions the Defense would file in

11  this case.

12                  THE COURT:  That's agreeable?

13                  MR. JUHASZ:  Yes, Your Honor.

14                  THE COURT:  Any other matters that

15  occur between now and then or after that May date,

16  we will deal with in due course.  I expect both

17  sides will be ready for trial on November 18, 2002.

18  I thank you all.

19  (Court in Recess)

20

21

22

67

1   Thursday, July 18, 2002; In Open Court at 1:50 p.m.:

2   Hearing on Pre-Trial Motions:

3               THE COURT:  Good afternoon.  We have

4   various motions before the Court.

5               MR. BECKER:  That is correct.

6   There's actually, I believe, four pending motions

7   filed before the Court.  There are four Defense

8   motions.  They are -- and I am giving you in no

9   particular order, the Defendant's motion to

10  prohibit death qualification of jurors until the

11  Government has established probable cause that the

12  case will proceed to a second phase with an

13  evidentiary hearing requested.  Motion to determine

14  proper standards to excuse jurors for cause with a

15  request for hearing, Defendant's motion for

16  comprehensive Voir Dire examination.  And then

17  probably the most important motion is a Defendant's

18  motion to suppress, with an evidence request for

19  evidentiary hearing for a statement allegedly made

20  by the Defendant on December 20 of 2001.  May it

21  please the Court, with respect to the first three,

22  other than the motion to suppress, the State has

68

1   filed a Memorandum in response to all three of

2   those motions, and I would like to give those to

3   the Court right now.  Copies were provided earlier

4   this afternoon to Defense counsel, so I'll give the

5   State's response to those.

6           The only one I think that we really are

7   concerned about here today, however, is the motion

8   to suppress.  It is my understanding that we have a

9   stipulation signed by the parties, actually the

10  attorneys, and I'll basically relate that to the

11  Court.  This is in reference to the motion to

12  suppress filed on July 9, 2002.

13          The State would stipulate at this time,

14  that the Defendant's video taped statement that was

15  taken on December 20, 2001 at approximately 8:20

16  p.m., was in fact taken in violation of her <u>Miranda</u>

17  rights, and the State would not use the statement

18  in the State's case in chief.  However, the parties

19  are further going to stipulate that the video taped

20  statement was given voluntarily, and that that

21  statement may be used by the State, should the

22  Defendant take the witness stand, for impeachment

69

1    purposes only.

2            The State is also going to advise and we

3    have advised counsel and Officer Monroe is here,

4    who is the lead investigator, that there were no

5    other inculpatory or exculpatory statements taken

6    from the Defendant on December 20, 2001.  The

7    concern that Mr. Ingram had was that the statement

8    was made by Miss Roberts earlier at the home, and

9    Mr. Monroe is here basically to say that he's

10   already spoken to Defense counsel.

11           The only statements were taken from her,

12   they weren't really statements where Miss Roberts

13   wanted to give a statement, Detective Monroe told

14   her he would not take a statement from her at her

15   residence, but instead at the Sheriff's Department,

16   and that is when the video taped statement came in

17   that we're stipulating would not be used in the

18   State's case in chief.

19           I have an entry, reiterating what I just

20   advised the Court of, regarding the motion to

21   suppress, signed by all parties involved.  There

22   was recently or just this morning, I think filed by

70

1   Defense counsel another motion.  It is a

2   Defendant's motion to dismiss the indictment, and

3   dismiss the death specifications due to the death

4   penalty being unconstitutional in Ohio.  Obviously

5   the State would need time to respond to that.

6          I don't know if Mr. Juhasz or Mr. Ingram

7   have anything further to add today.  We would just

8   ask the Court to rule on the other three motions

9   based upon the filings of the Court.

10         THE COURT:  Before we proceed here,

11  I see on this entry of stipulation that all parties

12  have signed, that is, everyone is in agreement;

13  correct?

14         MR. INGRAM:  That is correct.

15         THE COURT:  I'll approve that.  Will

16  the Defendant then address each of the motions that

17  are remaining this afternoon?

18         MR. JUHASZ:  I think there are only

19  three that Mr. Becker has responded to, because one

20  of them correctly was filed today.  One, I believe

21  was filed last week.

22         THE COURT:  The proper standard to

71

1    excuse jurors.

2                    MR. JUHASZ:  That is one of the ones

3    he filed a response to.

4                    THE COURT:  The other is asking for

5    comprehensive Voir Dire and Defendant's motion to

6    prohibit death qualifications until probable cause

7    has been shown that the case will proceed to a

8    second phase, which would only be after the Jury

9    has returned a verdict in the first phase, I

10   assume.

11                   MR. JUHASZ:  That is not what the

12   motion asks for, no.  Does the Court want to hear

13   argument on them or take them under advisement?

14                   THE COURT:  Brief argument.

15   Emphasis on the brief.

16                   MR. JUHASZ:  I'll do my best.  Any

17   particular one of those three that you want to have

18   heard first?

19                   THE COURT:  No, whatever you are

20   comfortable with is fine.

21                   MR. JUHASZ:  The one that the Court

22   has mentioned, the one to prohibit death

72

1    qualification until probable cause is shown.  The

2    gist of the motion is essentially this.  That the

3    State and Federal institutions require a fair trial

4    by an impartial Jury.  That is a Jury of course

5    committed to the presumption of innocence.  As we

6    cited in the 1986 Supreme Court of Laukhart against

7    McCree, the United States Supreme Court, even

8    though they said death qualifications are in

9    essence a necessary evil, for a truly capital case,

10   they did and I think here's the gist of the

11   disagreement between the Government's responses as

12   I read this afternoon.  And our portion the Supreme

13   Court in that Laukhart opinion did say that they

14   are assuming that the studies that were placed

15   before it were in fact legitimate and accurate in

16   that death qualification, that is, asking the

17   jurors their attitudes about the death penalty if

18   voir diring does in fact produce a Jury which is

19   conviction prone.

20            Our argument is therefore, because death

21   qualifications produces a Jury which is conviction

22   prone, and recognizing that although we disagree

73

1    with the holding, recognizing that the holding of

2    Laukhart against McCree is that it is a necessary

3    evil in a capital case, we're saying that process

4    of death qualification should only be undertaken in

5    the case which is truly capital, and then the

6    postscript or footnote to that is, of course, this

7    case is indicted as a capital case but that is

8    simply at the invitation of the County Prosecutor.

9          Most lawyers in this State are not

10   comfortable with or familiar with the new

11   grievances of capital specifications.  It is

12   perfectly reasonable to believe that the jurors who

13   sat on the Grand Jury were not either, so what

14   we're saying is that the addition of the death

15   specification was at the invitation of the

16   Prosecutor before the Court allows death

17   qualification, that is voir diring those jurors on

18   their attitudes about the death penalty to

19   commence, the Courts should hear some evidence to

20   be satisfied that this is truly a capital case and

21   not one simply indicted that way to give the

22   Government the strategic advantage of having a

74

1　death qualified and therefore conviction prone

2　Jury.

3　　　　　　　　THE COURT: Interesting argument.

4　Mr. Becker.

5　　　　　　　　MR. BECKER: Your Honor, I believe

6　that there's a long history in not only Trumbull

7　County, but these Courts of Ohio, Common Pleas

8　Courts of Ohio, procedurally to handle a death

9　penalty case. There's no evidence in this case in

10　fact, that this prospective Jury, which we have not

11　even called yet, is guilt prone or death biased

12　against this particular Defendant. In fact, I can

13　probably, if the Court gave enough time, find you a

14　number of cases where jurors have, using this

15　system of choosing and voir diring a Jury, have in

16　fact found Defendants not guilty, not only of the

17　underlying charges, but also of the death

18　specification, and I don't believe that whether or

19　not there's some studies out there that may

20　indicate that they would be guilt biased or

21　prosecution prone, I don't think we're going to run

22　into that problem in this case, because the Court

75

1    is going to instruct the Jury properly, that

2    Attorneys are going to instruct the Jury

3    properly -- or rather Voir Dire the jurors

4    properly, that in fact, the Defendant is presumed

5    innocent of all charges, including the

6    specifications, until and such time as they have

7    heard the evidence and until they begin their

8    deliberation.  And I think the Court, through its

9    Jury instructions, would properly admonish the

10   jurors, and I truly believe that the jurors will

11   follow the Court's admonish.

12        In addition to that, <u>Laukhart vs. McCree</u>

13   has, of course, provided the proper procedure for

14   handling this type of situation, and I would ask

15   the Court respectfully not to deviate from a

16   procedure which has been upheld numerous times by

17   the Appellate Courts of Ohio, including the Ohio

18   Supreme Court and the Federal Courts.

19        I don't think there's any reason to start

20   tinkering with the proceedings that we have used in

21   the past, and I believe this would be a bad

22   precedent based upon particularly the case law that

76

1   has been cited by the State, and the fact that this

2   procedure has been overwhelmingly approved time and

3   time again by both Federal and State Courts.

4               THE COURT:  You have last word, if

5   you care to.

6               MR. JUHASZ:  I would simply say that

7   again, <u>Laukhart vs. McCree</u> assumes those studies

8   are accurate, that death qualification does produce

9   conviction prone Juries.  While that is a necessary

10  evil as the Supreme Court found in getting the work

11  done of a capital trial, it has to be recognized

12  that nevertheless, it does give the State an

13  advantage because a conviction prone Jury is at

14  odds with the Fifth Amendment privilege of

15  innocence, and a Jury committed to that prospect.

16              I disagree with Mr. Becker respectfully

17  when he says that we are asking to change the

18  procedure.  We're not talking about changing the

19  procedure of death qualification, we're simply

20  saying that before we engage in that step, the

21  Government has to satisfy this Court by the lowest

22  standard of probable cause, that this is indeed a

77

1  capital case where we should break the rules, so to

2  speak.

3              THE COURT:  You would agree that

4  that has never been done?  You are asking for some

5  sort of an intermediary call from the Court as to

6  whether or not the Prosecutor got factual evidence

7  that leads to a probable cause finding, even, it is

8  in fact a capital case?

9              MR. JUHASZ:  Yes, Sir.

10              THE COURT:  The statistics that you

11  refer to referencing a death prone Jury, does that

12  not take into account that out of the general

13  populace, there are going to be a certain number of

14  people, who under no circumstances, would be able

15  to sit.  You hear this all the time when you are

16  going through the death qualification.  "I couldn't

17  under no circumstances vote for a death penalty."

18          So, by its very nature with the test of

19  Witherspoon and everything we have to follow, you

20  weed those people out, right?

21              MR. JUHASZ:  Yes.

22              THE COURT:  But if that procedure is

78

1  not followed, then by just choosing people at

2  random, knowing that certain percentage, whatever

3  it is, I think rather high percentage at times,

4  that would become impossible for the State to have

5  a fair trial if the law says that they have to be

6  able to consider and if the facts warrant finding

7  the death penalty.

8            MR. JUHASZ:  That actually goes, I

9  think to the other motion which has to do with the

10  proper standards.  I'm not suggesting that we

11  somehow leave on what is called in the case law,

12  Witherspoon excludable.  I'm not suggesting that at

13  all.  I'm simply saying the Supreme Court in

14  Laukhart vs. McCree, we agree these studies are

15  accurate.  A Jury, which has gone through the

16  qualification, the death qualification pro se and

17  had Witherspoon excludables called out, is more

18  conviction prone than the average Jury.  And of

19  course, the argument was in some of the lower case

20  that were decided under Laukhart's name was --

21  well, that violates the presumption of innocence.

22  You have got a conviction prone Jury, how can they

79

1   possibly be able to abide by the presumption of

2   innocence, they are already conviction prone which

3   a Jury has committed to the presumption of

4   innocence should not be.

5           What I'm saying is that the Supreme Court

6   said, "Yes, you're right about that," but there is,

7   and basically, what they said, this is kind of a

8   necessary evil, this is the only way to effectively

9   get Voir Dire done in capital cases, and to the

10  extent that that death qualification process

11  produces conviction prone Juries, we're all just

12  basically going to have to live with it.  I don't

13  particularly like that holding or think it is

14  reasonable, but I do agree that is the holding.

15          That having been said, however, before we

16  engage in that, what I think is an extraordinary

17  process of picking a Jury, which the Supreme Court

18  admits is conviction prone and, therefore, less

19  committed to the presumption of innocence than the

20  average Jury.  That process, of course, gives the

21  Government an advantage, because instead of the

22  normal Jury committed to the presumption of

80

1    innocence, they sort of have a leg up if there's a

2    conviction prone Jury, and I'm saying before we

3    engage in that process of picking that type Jury,

4    the Government, other than simply the bare face of

5    the indictment, should try to adduce some evidence

6    that this is indeed a capital case.  Because if you

7    look down the road for a second, let's say that

8    they get there, we go through the death

9    qualification process without them having to adduce

10   any evidence before this Court.  They then try the

11   case with a conviction prone Jury.  That conviction

12   proneness applies not only to the underlying

13   charges, but to the specification.  If there's not

14   sufficient evidence for the specifications, will

15   they find the Defendant not guilty of the

16   specification?  But the fact of the matter is they

17   then use that conviction prone nature of the Jury

18   to secure conviction on the underlying charge.  I

19   hope I'm explaining that clearly.

20              THE COURT:  I understand what you

21   are saying.  It seems to me somewhat of a leap of

22   faith of some sort here to say that -- I think it

81

1   is a bad choice of words for him to say conviction

2   prone.  A better term I think would be that you

3   have a Jury that has the possibility after you go

4   through the Witherspoon at least considering the

5   death penalty as opposed to the general populace

6   where you would have quite clearly someone on there

7   who would under no circumstances ever make a

8   finding of guilty for the purposes of imposing the

9   death penalty.  So, the conviction prone

10  terminology goes to the fact that you have a group

11  of people who at least have agreed they might

12  consider, rather than outright rejecting any

13  capital finding.  You understand what I'm saying?

14          MR. JUHASZ:  I think I have to

15  disagree with you and here's why.  Because if I

16  understand the Court's statement, you are talking

17  about the inclination of the jurors to impose the

18  death penalty.  These studies said that when you

19  call out the Witherspoon excludables that you end

20  up, regardless of the death penalty, just in terms

21  of guilt or innocence, these Juries are more

22  inclined to convict than the average juror.

82

1            THE COURT:  How would they possibly
2    know the answer to that though?
3            MR. JUHASZ:  Through the
4    methodology -- how do you know any of those things
5    other than the methodology of the study?
6            THE COURT:  You will never have
7    Witherspoon excludables make those decisions.
8            MR. JUHASZ:  You would have
9    Witherspoon excludables on a non-capital Jury to
10   compare conviction proneness.
11           THE COURT:  You are of necessity
12   comparing apples to pears.
13           MR. JUHASZ:  I would agree with the
14   Court as far as sentence.  I don't think I would
15   agree with the Court as far as conviction on the
16   underlying offenses.
17           THE COURT:  Out of all of the other
18   cases compared to capital cases, you get more not
19   guilties on those type.  To me it doesn't seem like
20   you are comparing equals.  Statistics are --
21           MR. JUHASZ:  You may or may not be
22   right about that.  I would simply say that the

83

1    Supreme Court and the opinion in Laukhart was

2    written by Chief Justice Renquist.

3              THE COURT:  On your second phase of

4    your argument you are asking a Court then to be

5    gate keeper of some sort over not only what the

6    Prosecutor's actions are, but the Grand Jury,

7    assuming that the two are separable.

8              MR. JUHASZ:  Which I would in all

9    due respect characterize as a leap of faith.

10             THE COURT:  But I know of no

11   provision of law that gives the Court that duty and

12   perhaps even that right, if you look at the

13   separation powers.  It is an interesting argument.

14   I find it very interesting.  I'll review it.

15             MR. JUHASZ:  The second one that

16   I'll address and then I'll allow Mr. Ingram to

17   address the last one, is the motion to determine

18   the proper standard to excuse the jurors for cause.

19   This is a little bit related to what we just talked

20   about.  I have read Mr. Becker's submission this

21   afternoon, and I would have to say that I agree in

22   part and don't agree in part with what he has to

84

1    say.  Because at some points, he cites <u>Witherspoon</u>,

2    and other points, he cites <u>Wainwright vs. Witt</u>.

3         The gist of this argument is I think,

4    incredibly simple, and with due respect to the

5    Supreme Court of Ohio, I don't think they have

6    gotten it right.  I'll tell the Court what I mean

7    precisely by that.

8         The statute on excludables for cause

9    which is I believe Revised Code 2945.25, has a

10   specific provision in Division C that deals only

11   with jurors in capital cases; and as we all know,

12   specific provisions govern over general provisions.

13   That specific provision in Division C is a

14   codification of the 1968 <u>Witherspoon</u> decision of

15   the United States Supreme Court.  If you look at

16   the syllabus and the holdings in <u>Witherspoon</u> and

17   you look at the statute, they are on a par.  That

18   was the law until 1985.  In 1985, the United States

19   Supreme Court changed the Federal standard in

20   <u>Wainwright vs. Witt</u>, and what the Ohio Supreme

21   Court does, and the Court will see in the motion

22   that I filed today, there's a section where I have

85

1   complained rather bitterly what I regard as the

2   ineffective Appellate review of capital cases in

3   Ohio; and one of the things that we mentioned in

4   there is that when _Witt_ came out, the Ohio Supreme

5   Court in _State vs. Rodgers_ suddenly said the

6   standard is now substantially impaired, which is

7   the _Witt_ standard.

8           Our argument is that is absolutely dead

9   bang wrong for Ohio. It is fine for any other

10  State that doesn't have a specific statute that has

11  to rely on the interpretation of the United States

12  Supreme Court and the Federal Constitution in Ohio.

13  We have that statute. We have not abolished,

14  repealed that statute in any way. Every time I

15  have tried to check a case, the Ohio Supreme Court,

16  since _Rodgers_, the Ohio Supreme Court frankly just

17  ignores it. And they have now said that you should

18  go to Division O, which is the General, any other

19  reason why the juror can't serve.

20          This may or may not become an issue in

21  this case depending upon what a particular juror

22  has to say on Voir Dire about his or her views

86

1    about the death penalty.  The reason we filed the

2    motion is because if it does come up, if we have a

3    juror who is in essence a <u>Witherspoon</u> excludable --

4    or excuse me, a <u>Witt</u> excludable, we're saying that

5    is not the proper standard, that Ohio has a

6    statute.  There are some cases I believe I have

7    cited, including a 1983 case from the U.S. Supreme

8    Court called <u>Michigan</u> against <u>Long</u> which says

9    States can do anything they wanted to as long as it

10    doesn't conflict with or take away more liberties

11    from a citizen than what our interpretation of the

12    Federal Constitution does.

13            It is our submission that in Ohio, this

14    statute actually gives more liberties to a citizen

15    than does <u>Wainwright vs. Witt</u>, therefore, nothing

16    inconsistent with <u>Michigan vs. Long</u> in Ohio,

17    applying the statute.

18            One of the things that I frequently hear

19    when I stand up and argue death penalty motion is

20    has anybody else ever done this?  And to answer the

21    Court's question in that regard, other Judges have

22    in fact done this.  Judge Krichbaum regularly in

87

1    Mahoning County does it in capital cases.  I also

2    did an appeal in Columbiana County, called State

3    vs. Reynolds, where Judge Bettis employed the

4    statute.  When the issue comes up --

5                    THE COURT:  It is a general

6    proposition of law.  You say the statute governs

7    over this ruling, is that what you are saying?

8                    MR. JUHASZ:  I'm saying that Witt is

9    an interpretation of the United States

10   Constitution.  Ohio has a statute that no one has

11   declared unconstitutional, abrogated, repealed or

12   anything else.  It does not conflict under the

13   Michigan vs. Long theory.  The Federalism theory of

14   Michigan vs. Long, we ought to apply the specific

15   statute rather than the general statute.

16                And as a final thing, even though the

17   Supreme Court since Rodgers has looked at

18   Wainwright vs. Witt and the Division O of the

19   statute, nothing bad has happened to the Judges who

20   went under Subsection C, we assume is the

21   appropriate standard.  They didn't get defrocked,

22   they didn't get their license taken away.

88

1           THE COURT:  Mr. Becker?

2           MR. BECKER:  I want to clarify

3   something.  The reason <u>Witherspoon</u> cited in the

4   State's response to give it historical context to

5   the U.S. Supreme Court's arrival at this issue, is

6   currently the state of the law.  I suppose the best

7   way to think about this is, and I'm probably the

8   least experienced here out of any of these four --

9   of the four gentlemen here, but I think we have all

10  tried capital cases, I know the Court has.  It is

11  probably a little bit like obscenity.  We all know

12  a juror that is not qualified when we see one.

13  Trying to put that in the context of what that is.

14  And I'm sure that we're going to have shades of

15  gray that obviously, they may disagree on.

16          And the State may have a different

17  opinion and ultimately that is the decision that

18  falls on the Court, but I think we're always safe

19  by following the pronouncement of the U.S. Supreme

20  Court, and we're talking if this case were going to

21  trial and actually result in a death conviction, or

22  conviction with a recommendation of death.  I

89

1  believe we're always much more safer following the

2  United States Supreme Court pronouncement in a case

3  such as this, and I believe we should follow the

4  Wainwright vs. Witt standard in determining whether

5  prospective Jurors may be excused for their views

6  on capital punishment.

7            I understand what Mr. Juhasz is saying.

8  I'm not familiar with Judge Krichbaum's

9  proceedings, never having practiced in that Court.

10  I don't know if Mr. Bailey knows the exact

11  procedure used.  Maybe it is used since Mr. Bailey

12  is no longer practicing in Mahoning County.

13            I would simply state that we follow the

14  pronouncement in Wainwright vs. Witt.  I think

15  those have repeatedly been upheld by the U.S.

16  Supreme Court and Federal Court, specifically the

17  Sixth District and the Ohio Supreme Court, and I

18  know we're much better off following that

19  procedure, and the procedure that has been used by,

20  I would say the majority and probably the

21  overwhelming majority of the Courts in this State.

22  I think we're dealing with an issue that may or may

90

1    not become a problem down the road, and I am

2    certain that we're going to have, if this case were

3    to go to trial and does go to trial, that

4    obviously, we're going to have some people that are

5    going to fall into this category and we're going to

6    have to make a determination on it.

7              It has been my experience though, and my

8    limited experience in trying capital cases that

9    generally with a reasonable State and/or a

10   reasonable Prosecution and Defense team, that

11   agreement can come in almost 90, 95 percent of

12   those.

13             I would at least ask the Court to defer

14   ruling on this until the time, but I think we're

15   better off following the Federal standards and that

16   would be the State's position.

17                  THE COURT:  It sounds to me like one

18   of those issues that probably rather than saying

19   one side or the other is correct at this point,

20   that if and when the situation applies, I'll

21   familiarize myself with the arguments and then at

22   that time, I think it would be more appropriate to

91

1    rule specifically.

2            You have one other motion?

3            MR. INGRAM:  Yes.  The motion for

4    comprehensive Voir Dire examination.  The Supreme

5    Court of the United States and the Supreme Court of

6    the State of Ohio have both recognized that

7    individually sequestered Voir Dire is the preferred

8    method of Jury selection in a capital case.

9    Accordingly, both Mahoning County and Trumbull

10   County have established a practice of individually

11   sequestered Voir Dire in capital cases.

12           For the moment, I believe I'm speaking

13   now for all of the lawyers here.  Collectively the

14   four of us have significant death penalty

15   experience.  All told, I would guesstimate that

16   between the four of us, we have tried well in

17   excess of 50 capital cases.  I say that because

18   Courts and lawyers both know that the Voir Dire

19   process in capital cases is a time consuming and a

20   burdensome procedure.

21           I believe that we'll jointly recommend

22   that we utilize individually sequestered Voir Dire,

92

1 and that we Voir Dire each potential juror on all

2 issues relating to the prospective juror's ability

3 to serve.  That each side be limited to 45 minutes

4 absent some extraordinary disclosure during the

5 Voir Dire, which would justify extra time.

6 We have all tried procedures to try to

7 shorten this.  We have tried procedures where you

8 Voir Dire ten, you Voir Dire them individually on

9 publicity and death penalty and then you either do

10 a panel Voir Dire or you Voir Dire ten at a time.

11 None of these alternatives really seemed to save

12 time.  That is why we jointly recommend the

13 individually sequestered Voir Dire.

14 Now, we don't want to waste time, either.

15 And we're all bright enough to know that the first

16 thing you should ask a prospective juror is

17 pre-trial publicity, and that is exactly what we'll

18 do.  But we respectfully submit that this is

19 actually the most time efficient manner of picking

20 the jurors.  We jointly submit that 45 minutes is a

21 reasonable period.  That does not mean that we have

22 to use the 45 minutes but --

93

1           THE COURT:  Many times it is much

2    shorter.  What we have in the past, I think, the

3    past two capital cases that we have tried, done

4    that very thing.  After we have gone through, we

5    weeded out the <u>Witherspoon</u>, then we conduct an

6    ordinary Voir Dire with the group.  But up front,

7    each side has an opportunity to ask those questions

8    that are relevant to their side of the case and you

9    avoid the possibility of tainting other jurors that

10   might be sitting there and listening.  I have no

11   problem with that.  You say that the Prosecutor

12   agrees with that?

13           MR. INGRAM:  Yes.  We'll also submit

14   a questionnaire.  That will be a jointly submitted

15   questionnaire.  But I think what we're saying to

16   you is if you limit us to 45 minutes per side, that

17   is a reasonable limitation.  Then we can do all

18   issues relating to the juror's ability to serve

19   within that time frame, and we select 32 or however

20   many the Court determines and then we proceed from

21   there.

22           THE COURT:  That is workable.  In

94

1    regard to the questionnaire, we have had a lot of
2    arguments in the past.  The Defense particularly.
3    The State has a pretty standardized questionnaire
4    that we send out to most Juries.  You may have
5    peculiar questions, peculiar to this type of case.

6               I would ask you, and I don't mean to
7    offend you because I know you are both very
8    reasonable as well as qualified.  Some of the
9    submissions that I have seen from other lawyers
10   have just been in my mind ridiculous, asking
11   things.  You have some questions, put them down,
12   talk them over and if I have to, I'll make a call
13   on it.

14               MR. BAILEY:  Mr. Ingram and I have
15   developed a questionnaire in the past that I think
16   we can modify and I think it will cut out most of
17   the questions that Attorneys ask, like background
18   questions, so we'll know the answer in advance.  I
19   would rather have the jurors spend two hours
20   filling out a questionnaire and go right into the
21   key questions rather than delving into all of those
22   things in Open Court.

95

1          MR. INGRAM: I don't think I have

2    ever tried a capital case where the State and

3    Defense have not agreed on a joint questionnaire.

4    Mr. Bailey and I, if we can do it, anybody can do

5    it.

6          THE COURT: Anything else today

7    then?

8          MR. BECKER: I think the only other

9    matter would be to set another pretrial down the

10   road, and maybe at that time, we can address the

11   renewal that is filed today regarding the motion to

12   dismiss the indictment due to the

13   unconstitutionality of Ohio --

14          THE COURT: One thing I find unusual

15   here. I know you are spending a lot of time on

16   your motions, maybe that is the answer. But there

17   are a lot of motions that are made by the Defense

18   almost from necessity. I think everybody at times

19   feels that they are not really necessary, but they

20   are necessary. I would like to, at the earliest

21   opportunity, get the standard motions, if I can put

22   them that way, before the Court so that we can have

96

1    a hearing and dispose of those.

2            I am always concerned that we go through

3    these, and there are motions left hanging that

4    everyone has forgotten about, even though we all

5    try to make sure that doesn't happen.  I always

6    enjoy reading briefs from Youngstown and I haven't

7    been disappointed in any of these.  Let's keep this

8    moving.

9            MR. BECKER:  We have a trial date

10   schedule of November 18th.

11           MR. INGRAM:  Before the next hearing

12   there's going to be more motions in addition to

13   that one.  Why don't we set another motion hearing

14   towards the end of August or the beginning of

15   September?

16           MR. BECKER:  Nothing further from

17   the State.

18           MR. JUHASZ:  Nothing else from the

19   Defense.

20   (End of Hearing at 2:25 p.m.)

21

22

97

1   <u>Thursday, October 10, 2002; In Open Court at 2:20 p.m.</u>:

2   <u>Hearing on Motions</u>:

3               THE COURT:  Does anyone have a

4   proposal as to your preference for handling these

5   or just take them as I have them here?

6               MR. JUHASZ:  Fine with us if you

7   take them as you have them.

8               MR. BECKER:  One I don't have here,

9   but I'll file a response to that tomorrow.

10              THE COURT:  The first one is

11  Defendant's motion to prohibit the Government from

12  using preemptory challenges to exclude the venire

13  men who express concerns about imposing capital

14  punishment.  Request for oral hearing.  This is the

15  one that they do not wish to exclude potential

16  jurors because they have a concern about imposing

17  the capital punishment.  If you have a better way

18  to do this, John.

19              MR. JUHASZ:  No.

20              THE COURT:  Go ahead, Mr. Juhasz.

21              MR. JUHASZ:  If it please the Court,

22  it is not my intent with all of the motions before

98

1    the Court to simply regurgitate the memos for you,

2    but to simply highlight what the premise of the

3    motion is, and the premise of this motion is

4    actually a logical and we submit a Constitutional

5    extension of the Batson and Powers rule.  As the

6    Court knows, the U.S. Supreme Court ruled in Batson

7    that Prosecutors may not preemptorily challenge

8    jurors even though the right to a preemptory

9    challenge is otherwise unfettered, may not

10   preemptorily challenge jurors based upon race and

11   when there's a challenge brought by the Defense,

12   then it is incumbent upon the Government to

13   demonstrate some good faith and race neutral

14   reason.

15           That reasoning was extended of course by

16   the Supreme Court in Powers against Ohio, which

17   said basically the same thing, and Larry Joe

18   Powers, to my recollection was a white fellow, and

19   of course, the Government's argument was that you

20   can't make that Batson challenge, because you are

21   white and you are challenging removal of blacks.

22   And the Supreme Court said, "No, that is not the

99

1   case.   What we're looking for is a fair Jury

2   regardless of the race of the Defendant."   The

3   reasoning, of course, is based upon the fact that

4   blacks are a cognizable group in society, and we

5   submit that people who are death scrupled are

6   likewise a cognizable group in society.

7              There are, I believe, experience has

8   shown numerically, that the vast majority of people

9   are somewhere in the middle; that is, they are

10  people who are neither unalterably opposed to, or

11  unalterably webbed to capital punishment.   That is,

12  they can fairly consider the life or death

13  alternative.

14             There are on either end of that spectrum

15  what are typically known as Witherspoon

16  excludables, people who are unalterably opposed to

17  the death penalty, and under no circumstances could

18  follow the instructions of law.   And under

19  Witherspoon and under the Ohio Statute, they are

20  not permitted to serve.

21             On the other end of the spectrum are

22  those people who, what I prefer to call Morgan

100

1    excludable, because under Morgan against Illinois,

2    the Supreme Court said that people who may

3    demonstrate by their answer that they are death

4    prone, should likewise be excluded from a Jury.

5         Experience has taught us that the number

6    of people who are just off the position of the

7    Witherspoon excludable, that is people who are

8    generally opposed to the death penalty but disclose

9    in their Voir Dire answer that they could

10   nonetheless consider all of the penalties, that

11   that is a fairly small number, and it is a number

12   that is usually so small in any capital venire that

13   the Prosecutor can simply remove all of those

14   people without stating any basis for doing so by

15   using the preemptory challenge.

16        In essence what they have then done is

17   created a Jury which is more skewed towards those

18   who favor capital punishment.  We're simply

19   suggesting that the powers in Batson line of

20   reasoning say that if there are people who they

21   challenge preemptorily, who have indicated by their

22   answer on individual Voir Dire, that they are

101

1  people who are generally opposed to the death

2  penalty, that the Prosecutor must, under the

3  reasoning of Batson and Powers, give some good

4  faith reason for removing them, other than their

5  opposition to the death penalty, in order that the

6  Defendant have a Jury which is composed of a fair

7  cross section of the community.

8           THE COURT:  Mr. Becker?

9           MR. BECKER:  Very briefly.  I would

10  concur with Mr. Juhasz.  I don't want to

11  regurgitate these issues.  Quite simply, the

12  State's right to use its preemptory challenge is

13  for this very reason, for any reason as long as it

14  is related to that juror's particular views

15  concerning the outcome of the trial.  And I think

16  it is somewhat of a stretch to say, well, when you

17  are talking about Batson in the sense of racial

18  profiling and excluding jurors because of their

19  race or nationality, you are talking now about

20  their determinative outcome of what the jurors want

21  to do in each particular case.

22           And I think because we have granted, we

102

1    previously granted in this Court, I believe 45

2    minutes for individual Voir Dire for each and every

3    juror in this matter, we're going to be able to

4    sort through each and every one of these jurors, I

5    believe relatively thoroughly, or very thoroughly,

6    the fact of what their position is on the death

7    penalty.

8              And in fact, if the State is not

9    satisfied that a juror, despite their answer, could

10   not impose the death penalty, if the facts warrant

11   and the law allows it in this particular case, the

12   State has every right to remove that juror

13   preemptorily.  This issue has been ruled on at

14   least twice, I think directly, by the U.S. Supreme

15   Court, and in each and every instance, it is

16   permissible for the State to use its preemptory

17   challenges to exclude those individuals, who

18   somehow reflect or infer to the Court, or the

19   Attorneys, that they would not be able to impose

20   the death penalty in any particular case.

21             And just as if, and I think that in this

22   particular case, we're going to run into certainly

103

1  individuals who are on both sides of the issue,

2  there will be individuals who absolutely will not

3  consider, it has been my experience, that there

4  will be jurors, potential jurors, that absolutely

5  will not consider any other penalty but death.

6  They will obviously be excluded.

7       There will be jurors, who for whatever

8  religious, moral or other convictions they may

9  have, will absolutely not impose the death penalty

10  in any particular case.

11       And what we're going to be left with is,

12  I believe, a fair mix of jurors, who will respond

13  either way, that they will consider all of the

14  evidence in mitigation.  They will consider all of

15  the penalties before they impose a verdict, whether

16  it be death, life with no parole, life with parole

17  after 30 years.

18       However, I think the State obviously and

19  the Defense will have a preemptory challenge.  I

20  believe within those zones and the zone of those

21  jurors that will be not automatically excluded

22  because their views either favor capital punishment

104

1 | or oppose it. Within those views, there are

2 | various shades of gray and that is what preemptory

3 | challenges are there for.

4 | They are going to exercise preemptory

5 | challenges on those individuals that may have

6 | initially started out and said death is the only

7 | option in any murder case, but may have been

8 | rehabilitated by the State and said that they would

9 | consider mitigation, and that they understand that

10 | a death penalty does not have to be imposed in

11 | every case, and particularly, in this case. And I

12 | think you are limiting the State and its right to

13 | exercise its preemptory challenge, which has

14 | routinely been upheld or consistently been upheld

15 | by the U.S. Supreme Court to allow us to strike

16 | those jurors using preemptory challenges who

17 | express concerns about imposing it.

18 | Because I guarantee you that the Defense

19 | is going to do the same thing to those jurors that

20 | initially expressed concern that they could not

21 | impose any other penalty than death, an eye for an

22 | eye type of juror. And I think the law is pretty

105

1 | well settled on this issue, and we would ask the
2 | Court to overrule that motion.

3 | THE COURT: As one of counsel
4 | mentioned here, you get a broad spectrum of
5 | society, that is the whole purpose of the random
6 | selection. In my experience, and I think in
7 | experience of probably all counsel here, from the
8 | pool of usual jurors one gets in, you will have
9 | more who have a moral or religious opposition to
10 | ever participating in the imposition of the death
11 | penalty than you do those who feel that an eye for
12 | an eye, tooth for a tooth, if you kill somebody,
13 | the death penalty should be imposed.

14 | Now somewhere in between there, as we
15 | have gone over with some of the jurors in this
16 | other case, you get the ideal juror, and probably
17 | most of those people in the middle are going to
18 | say, "Well, I don't particularly like the death
19 | penalty, but if the State proves its case beyond a
20 | reasonable doubt and the law requires that that be
21 | considered," they are willing and able to consider
22 | it, and if the facts justify it to impose it.

106

1          Counsel for the State brings up a good

2     point that if you get somebody that has made some

3     statements which they retract during the course of

4     the Voir Dire, or they initially said, "I am in

5     favor of the death penalty," that person is going

6     to be held suspect in the Defense's mind, and I

7     think that it would be very improper to, because

8     what is good for the goose is good for the gander,

9     and it would not be proper to have the Defense in

10    any way hesitant about exercising a preemptory if

11    they have any doubt at all about the thinking of

12    someone who may be death prone.  So I think it cuts

13    both ways.

14          If it is a question of using your

15    challenges, I think that the State, if that is a

16    consideration, is going to lose a lot more of their

17    preemptory challenges on a person who may be

18    hesitant to give the death penalty, as opposed to

19    the Defense being required to strike people that

20    they may have some residual fear that they may be

21    death prone.

22          I think there's a big difference also

107

1    between the reasoning in <u>Batson</u>  and cases that

2    followed, where a person is excluded because of

3    race or possibly religion, or something of that

4    nature.  That to me is a much more insidious thing

5    than to have either side in a case like this, use

6    that preemptory challenge to remove somebody who

7    they become convinced cannot give a fair hearing

8    from their side.

9            So for that reason, I would overrule the

10   motion to require <u>Batson</u>, justification on that

11   basis.

12           The next one is to prohibit the

13   Defendant -- that is the same one.  Defendant's

14   motion to have reasons for objections and reasons

15   for overruling objections placed on the record.  I

16   don't think we need any argument on this.  I think

17   it is essential as far as both sides are concerned,

18   and in this Court's view is concerned that anything

19   that transpires during the course of this trial

20   with very rare exceptions, should be placed on the

21   record.  What happens many times during the course

22   of any trial is that there will be slight contact

108

1   at side bar, somebody comes up and says, "Judge, I

2   need ten minutes, I have got to go to the

3   bathroom."  What I try to do is tell Mary Ann that

4   to put something on the record that the side bar

5   had nothing to do with the trial.  There are times

6   that that does not occur.  So keeping that in mind,

7   it is everyone's responsibility to preserve this

8   record, not just mine.

9         And if both sides have times when they

10  feel it is necessary to put something on the record

11  for your protection, you are free to do that at any

12  time.  You are free to proffer anything at any

13  time.  Sometimes I'll request that you wait until

14  we get through the certain phase, but the record is

15  open to anyone at any time.

16        Defendant's motion to dismiss death

17  penalty specification because the method of

18  execution was unconstitutional.  I would like you

19  to just address that briefly.

20        MR. JUHASZ:  If it please the Court,

21  one of the things that makes me happy is about

22  being able to address this motion is because I'll

109

1    get to mention that Robert Bork is quoted in the

2    Memorandum.

3              THE COURT:  One cannot go wrong on

4    that.

5              MR. JUHASZ:  And Robert Bork, we

6    submit, substantiates our portion because way back

7    in 1976, when after Furman in 1972 when the States

8    had all gone back and tried to enact capital

9    schemes that would satisfy the demands of Furman as

10   they understand the panapley of opinions on that

11   case, then those cases all reached the Supreme

12   Court in 1976, Robert Bork was then the Solicitor

13   General of the United States and argued as an

14   amicus for the United States.  I quoted on page

15   eight of the Memorandum, a conversation, a question

16   and answer that he and the late Justice Potter

17   Stewart had, and the reason I put that in there is

18   because I think what Bork is saying is that the

19   Eighth Amendment prohibits punishment which society

20   comes to recognize as being cruel and unusual.  Of

21   course, Bork's opinion -- or I'm sorry, Bork's

22   position in Gregg and in the other cases was that

110

1    the death penalty wasn't.  Because when Stewart

2    asked him about, what if we put a guy on the rack

3    and disembowel him and those kinds of things, what

4    would you say about that?  He says that we can't

5    return to those types of punishment.  What I think

6    is important about that statement though made by

7    then Solicitor General Bork, is at one time those

8    punishments were all regarded as punishments, which

9    society could validly impose through Government in

10   the name of citizenry.

11            Justice Arthur Goldberg in the early

12   sixties kind of caught onto that idea and was

13   actually the first guy to suggest the death penalty

14   may be cruel and unusual per se.  He didn't really

15   get many takers on the Supreme Court, but what I

16   think has happened is that you have seen over time,

17   a trend in the methods of execution; that is, we

18   have gone from the firing squad and hanging through

19   the gas chamber to the electric chair.  And now

20   just about everybody uses lethal injection, and in

21   fact, Ohio just a few years after they put lethal

22   injection in as an option to the electric chair,

111

1    now said, "No, you can't use the electric chair at

2    all, you have to use lethal injection."

3           All of those forms of punishment had

4    their own horror stories for want of a better

5    phrase, and if you go all the way back to Kenlar,

6    the case we cite from, I believe it is 1897, where

7    the Supreme Court says that if you are going to

8    impose the death penalty, it can't be pain and

9    suffering, it has got to be the extinguishment of

10   life and not punishment.

11          The history even of lethal injection has

12   demonstrated that that can't, that that is not

13   necessarily the case, that there have in fact been

14   botched executions with legal injections just as

15   there have been with botched executions with

16   hanging and electrocution. And the thing that is

17   not in this motion, but I think is probably an

18   update to this motion, is that although in another

19   sense I think the Atkins decision from this Summer

20   where the Supreme Court, an opinion by Justice

21   Stephens said it is no longer permissible under the

22   Eighth Amendment to execute retarded people. That

112

1   is not the same thing obviously, as the method of

2   punishment that we're talking about here.

3          But I think it is important, because it

4   is a recognition of the evolving standards of the

5   Eighth Amendment that as time wears on, punishments

6   are deemed by society to be cruel and unusual, we

7   submit that even though Ohio does not use the

8   electric chair any more, and this Defendant, if a

9   Jury convicts her and sentences her to death would

10  be subject to lethal injection, we nonetheless

11  submit that based upon the reasoning that has

12  developed over the years in the Eighth Amendment,

13  juris prudence combined with the fact of botched

14  executions, even with lethal injection, make that

15  method unconstitutional under the Eighth Amendment

16  and also under Section 9 of Article I of the Ohio

17  Constitution.

18          THE COURT:  Thank you.

19          MR. BECKER:  I'll be very brief.  I

20  would point out, I was listening to the radio this

21  morning and there's actually a play, I know

22  Mr. Juhasz cited extensively the Tafero case out of

113

```
 1   Florida, where I believe Mr. Tafero was actually
 2   executed and I believe it was his wife or
 3   girlfriend was on death row and she was
 4   subsequently acquitted, but there's actually a play
 5   about that incident, and really going along the
 6   lines of her wrongful conviction.  With that said
 7   though, this motion, and I think the most important
 8   thing to remember and it was highlighted by
 9   Mr. Juhasz when he spoke of the Atkins case and I
10   think he properly noted, Atkins dealt with the
11   culpability of the individual.  Are we ready to
12   impose culpability?  And I would obviously, having
13   read that opinion, say that we have evolved and
14   that is what the Eighth Amendment is about.  It's
15   about an involvement of the punishment that our
16   society deems proper.  I guess it is a credit to
17   the framers of our Constitution, that they gave us
18   a document on which this country is founded upon
19   that is so fluid and liquid, that we can make these
20   determinations.  I can't tell --
21                THE COURT:  There are those that
22   disagree with that view, but your view is accepted.
```

114

1           MR. BECKER:  I think we have a

2   document that gives us the ability to evolve in

3   many ways, not just on this issue, but on many

4   issues that come up involving our Government and

5   our politicians and our punishment, our legal

6   system.  But the fact of the matter is, we're

7   dealing with the here and now.  I know two hundred

8   years ago what was thought to be cruel and unusual

9   or what was thought not to be cruel and unusual, is

10  probably considered cruel and unusual today.

11  Obviously, two hundred years ago, we had tarrings

12  and featherings.  We had public hanging.  We had

13  public hangings within the last one hundred years

14  in this country; and certainly, if we were to try a

15  case in 1902 as opposed to 2002, our standards

16  would be different.  Just as our standards will

17  probably be different in 3002 than they are here in

18  2002 or 2,102.

19          Our problem is that we have to deal with

20  the here and now, and the here and the now today,

21  as we stand here on October 10, 2002, is that Ohio,

22  through just a recent decision within the last two

115

1  years, State vs. Carter has permitted and has

2  acknowledged or has said that lethal injection is

3  not cruel and unusual punishment under the

4  standards as they exist in this here and now.  And

5  Mr. Juhasz, in his motion, has not cited one case

6  and I don't believe there exists as we stand here

7  today, one case from the United States, any Court

8  in this country that says that lethal injection is

9  a cruel and unusual punishment.

10          Again, I can't speak for what the future

11  may hold.  But we have to deal with the here and

12  now and the here and now is that this case, it is

13  scheduled for trial on November 18 and the current

14  state of the law, as it exists is that lethal

15  injection has not been found by the Supreme Court

16  of the State of Ohio, nor the Courts of any other

17  jurisdiction in this country to be unusual

18  punishment that would warrant under the Eighth

19  Amendment, a prohibition of its use or a

20  possibility as its punishment in any trial.

21          We would ask that the motion be

22  overruled.

116

1          THE COURT:  I think that

2     Mr. Juhasz's real assertion here is, as the one

3     justice he cited, the position was that any taking

4     of life is cruel and unusual punishment.  We live,

5     however, first of all, any Government's ultimate

6     power of any people, has the right to set its own

7     standards.  That is done through the legislature.

8          In England at one time, the late sixteen

9     hundreds, I believe there was 230 some capital

10    offenses.  Children as young as eight years old

11    were put to death.  Women were ordered to death,

12    but very seldom executed.  Our standards have

13    changed over the years.  Some of those were brought

14    about by decisions of Courts, but primarily it was

15    the change in the feeling of the people in general,

16    that one should not lose one's life for stealing a

17    loaf of bread.  And the last century, there's been

18    a big change, cruel and unusual punishment is a

19    very subjective thing depending on a person's

20    personal point of view.

21          I agree with Mr. Becker that society's

22    view does change, but it is not up to the Courts to

117

1    implement those changes.  It is up to the

2    legislatures.  Only in extremely, when a

3    legislature uses extremely bad judgment where

4    there's some directs infringement on the

5    Constitution, should the Courts be tempted to

6    strike down a law or to make new law.  And there's

7    a question whether the Court should ever do

8    anything other than just say, "Go make another law.

9    It is unconstitutional what you did."  But our

10   Courts have been very prone to make law and they

11   are not elected, particularly the Courts in the

12   higher benches.

13          The legislature has promulgated law,

14   which we must deal with that says that lethal

15   injection is not cruel and unusual punishment, and

16   until the legislature sees fit to change that, or

17   some Court of Appeals takes it upon themselves to

18   say that, that it is cruel and unusual punishment,

19   this Court is bound to follow the law as it exist.

20          So that motion is denied.  The next is

21   Defendant's motion to have reasons for objections

22   and reasons for overruling objections placed on the

118

1    record.

2              MR. JUHASZ:  That's a duplicate.

3              THE COURT:  Defendant's motion to

4    dismiss death penalty specification -- that is the

5    same thing.  Defendant's motion to dismiss death

6    specifications due to inadequate Appellate review

7    requests for hearing.  Now this is one I find

8    interesting here.  Mr. Juhasz?

9              MR. JUHASZ:  If it please the Court,

10   when I mentioned a few moments ago in the previous

11   motion about the Furman and the other cases decided

12   in 1976, that reviewed what the legislatures had

13   done after Furman -- one of those cases in 1976, of

14   course, was Gregg against Georgia.  And when Gregg

15   made arguments in the United States Supreme Court

16   about why Georgia's efforts, after Furman to

17   requite its death penalty law were still

18   unconstitutional, he complained about a number of

19   things.  And the Supreme Court, in addressing, and

20   I guess at the same time were buffing those

21   challenges and finding that Georgia statute to be

22   unconstitutional said, "One of the things that we

119

1    find to be of significance and why we find this

2    Georgia statutory scheme to be unconstitutional is

3    that there's a built in system for Appellate

4    review."  If there are mistakes made, somebody up

5    the line is going to pay attention to them.  And if

6    there are mistakes indeed made, correct them.

7              It is particularly noteworthy, I think,

8    that in 1980, four years after Gregg, in a case

9    called Godfrey against Georgia, the United States

10   Supreme Court actually declared unconstitutional,

11   one of the subsections of the Georgia death penalty

12   scheme that it upheld in 1976, and paraphrasing its

13   holding in Godfrey, what it basically said is in

14   Gregg, we entrusted the Courts of Georgia with the

15   obligation and the responsibility to engage in

16   effective review of these death sentences and in

17   essence with regard to that particular subsection

18   that was being litigated in Godfrey to give it a

19   narrow reading because that was the argument that

20   the statute was over broad.  And the Supreme Court

21   of the United States in Godfrey said, "The Courts

22   didn't do that.  And so, therefore, we're finding

120

1    that particular provision of the Georgia code to be

2    unconstitutional."

3         I use that as the starting premise

4    because it seems to me that in 1976, in <u>Gregg</u> when

5    they said, "We're serious about this Appellate

6    review being a necessary and indispensable part of

7    insuring reliability for the process of imposing

8    death, we really mean it."  And that is what they

9    said in <u>Godfrey</u>, "We're showing you guys we really

10   mean it, because you in Georgia didn't do that and

11   so we're declaring that provision to be

12   unconstitutional."

13        So I don't think that there's really any

14   question, but that effective Appellate review is an

15   indispensable part of the process of imposing

16   death.  And the Eighth Amendment, and 14th

17   Amendment reasons for that are to provide a

18   safeguard to ensure that the death penalty is

19   reliably determined when it is in fact imposed.

20        All of that having been said, I have in

21   the Memorandum, gone through for you, and trust me

22   when I say this, that I could find others where

121

1    Ohio, what I'll call post <u>Lockett</u> or beginning with

2    Jenkins Appellate review of death penalty cases, is

3    seriously lacking.  The four areas that I discussed

4    in Memorandum have to do with mercy and the

5    limitations upon mitigation, the so-called

6    independent weighing that the Appellate Courts do.

7            The application of non-aggravating

8    circumstances, and in each one of these cases, I

9    have gone through in the Memorandum and pulled out

10   the portions of the opinion, so that you can see

11   that these aren't simply my opinions about what the

12   Supreme Court is saying.  These are actually what

13   they are saying and the fourth of those areas of

14   course, proportionality, which has become perhaps

15   the most fallacious of all is the things that are

16   addressed in Ohio, Appellate review.  If you then

17   take those areas, and others that I'm sure the

18   Court can probably think of on its own, having

19   reviewed Ohio Appellate death penalty cases and

20   compare them with a well known study which came out

21   in the past couple of years done by Professor

22   Liebman and his colleagues, called a broken system.

122

1          And basically, what Liebman and his

2    colleagues did was went through a bunch of states,

3    and studied all of their death penalty cases, and

4    he divided them down into areas where

5    Constitutional error was found at State direct

6    appeal, State post conviction, Federal habeas.  The

7    error rates on a National average are about 40 or

8    41 percent.  If you then compare what Ohio has done

9    post <u>Lockett</u> or post <u>Jenkins</u>, whichever phrase you

10   prefer to use, you will see that only about ten

11   percent of the death sentences in Ohio have been

12   vacated, and sometimes it has been the conviction

13   and death sentence vacated.  Sometimes only the

14   death sentence vacated, but the important point is

15   that when you combine all of those together, it has

16   only been about ten percent.

17          Now, I'm trying to not to be too cynical

18   about this.  It means either one of two things.  It

19   either means that in Ohio we're imposing the death

20   penalty so well and so reliably, that with the

21   scrupulous Appellate review, only ten percent of

22   the cases is there serious Constitutional error; or

123

1  I submit that the other option is actually the

2  option which is that the Appellate review is so

3  effective, is so lacking, as to be completely

4  ineffective and that in reality the error rate in

5  Ohio is probably approaching or exceeding the

6  National average, and we're simply not catching

7  them because of --

8              THE COURT:  It is built into the

9  process.

10             MR. JUHASZ:  I hate to say that, but

11 there's no other honest way for me to say this.

12 Many times these Appellate opinions seem to be

13 result oriented juris prudence.  They are bad

14 facts.  They are cases where just about every human

15 being has a natural revulsion to what the Defendant

16 has done, where it is not difficult to understand

17 why a Jury said, "You have to die for these crimes

18 that you have submitted."  And then of course, the

19 cases reach the Ohio Supreme Court, and they are

20 stuck with the proposition of now you want us to

21 take this bad case, and --

22             THE COURT:  Do you recall how the

124

1   intermediate Appellate step was done away with?

2                MR. JUHASZ:  I do indeed.  One of

3   the motions I don't have yet filed that I am

4   finishing up has to do, and I think you and I

5   talked about that quite a bit during the Santine

6   case, because I filed it then.  It was fairly new

7   then.

8                Incidentally, as an aside if I may, one

9   of the reasons for that, of course, that whole

10  Issue One was done in response to a then Governor

11  Voinivich's State of the State address made to the

12  General Assembly, about how after the Lucasville

13  riots, we have to do something about the death

14  penalty.  It is taking too long to put these guys

15  to death.  There are too many appeals.

16               And the legislature acted with what I

17  regard as sort of uncharacteristic of Lackerty in

18  getting something going and getting the

19  Constitutional Amendment on that Fall and passed.

20               What I find interesting about that is I

21  now have several cases which are pending in the

22  Ohio Supreme Court; and frankly, it is taking

125

1   longer to get the cases decided down there

2   because -- and a couple of them, incidentally, are

3   old pre Issue One cases, which means they are cases

4   that have gone, in this case, the Seventh District

5   Court of Appeals, they are still sitting down there

6   languishing.  I suppose reason and common sense

7   would say, "Well, those are cases that they should

8   get to first, because there's at least been some

9   narrowing of the issues and discussion of the

10  issues by looking at the Appellate Court opinion."

11  But not withstanding that, it is not happening.

12          I know Stephen Vrabel's case, my

13  recollection is that last May, Mr. Vrabel filed

14  some pro se motions to dismiss his appeal and to be

15  executed.  And we were required by the Supreme

16  Court to respond to those.  That was last May; that

17  is May of 2001.

18          It is further my recollection that our

19  brief had been filed in that case about a year

20  before that.  So Mr. Vrabel's case has been pending

21  in the U.S. Supreme Court for over two years.

22  Whatever it was that Issue One was designed to

126

1    accomplish clearly isn't happening.

2           At any rate, all of that having been

3    said, the premise of this motion is that there's

4    not effective Appellate review going on in Ohio,

5    and I know some people would say, "That is not up

6    to me.  I'm a Trial Judge -- I'm not an Appellate

7    Judge, I can't make this call."  I frankly don't

8    agree with that.  I think that the Court can make

9    this call, because I think we have provided enough

10   information where the Court can conclude that there

11   is, in fact, not the type of effective Appellate

12   review that guarantees that the death penalty, if

13   its imposed in this case, is going to be reliably

14   imposed and that is a violation of both the Federal

15   and State Constitutions.

16           THE COURT:  Thank you.  Mr. Becker?

17           MR. BECKER:  I'll be very brief on

18   this issue.  The State has submitted and in its

19   Memorandum, and I would tend to disagree.  I think

20   the former applies to the logic that I do believe

21   Ohio is doing a good job of its Appellate review.

22   The last time I checked the Attorney General

127

1  statistics approximately two years ago, and I

2  realize a number of the Issue One cases had not,

3  were not included in these statistics. I believe

4  Ohio was near or if not last in the length of time,

5  from conviction to actual execution. And of

6  course, there were a number, I believe, at this

7  time that this study came out by the Attorney

8  General's Office, Ohio had only executed one or two

9  individuals, because the Court recalls there was a

10  lengthy period of time between executions in Ohio,

11  I believe close to 40 years. But Ohio, if not

12  last, one of the last of the 30 some odd states

13  that had the death penalty that in the time that it

14  took from actual conviction to the imposition of

15  that sentence.

16         With that said, and I certainly agree

17  with what Gregg vs. Georgia says, that the

18  Appellate -- Appellate scheme is just as important

19  as what goes on at the trial phase. However, I

20  would point out to the Court that since the

21  decision in Gregg vs. Georgia in 1976, the United

22  States Supreme Court has never found any Appellate

128

1   scheme of any state unconstitutional and overturned

2   a conviction based upon its Appellate scheme.  I

3   believe we do have it right here in Ohio.  I think

4   that is evidenced by the fact that we do have death

5   penalty sentences overturned.

6         I believe there's a lot of reasons, if we

7   want to sit here we could spend all afternoon,

8   probably the rest of the week, discussing why

9   decisions in other states are overturned at a much

10  greater rate than they are here in Ohio.

11        One of the reasons is, I think it isn't

12  so much the Appellate Court process, but it is the

13  trial process we engage here in Ohio.  And I

14  believe it is a reflex that only those very limited

15  cases are first of all, charged and prosecuted

16  under the death penalty scheme of Ohio.  And I

17  don't mean to boil it down to too simple, but it is

18  a very difficult thing to impose a death penalty on

19  a person and very well it should be.

20        And I think in Ohio, we take that

21  responsibility seriously.  I think that is

22  reflected in the number of convictions.  I believe,

129

1　as of last year, there were 208 or 209 people on

2　death row.  Obviously there are many, many death

3　penalty cases filed much more than that, probably

4　filed each year, throughout this state.

5　　　　　So, I think when you boil it down to, it

6　is too simplistic to say, "Well, only ten percent

7　of our cases are being overturned on appeal."  That

8　is where we're at at the end.  But what we're

9　putting into that system and how well are we

10　running those through the trial Court system before

11　they got to the Appellate level?

12　　　　　I think it is a simplistic way to argue

13　the question, is that not a lot of our cases are

14　overturned on appeal, and therefore, other

15　jurisdictions have a much higher rate of death

16　penalty cases being overturned on appeal.  And my

17　answer to that would be quite simply, maybe a lot

18　of those jurisdictions are putting people on death

19　row that shouldn't have been there at the Trial

20　Court in the first place.  That is where their

21　systems may be flawed.

22　　　　　In any event, I would stress to the Court

130

1    that I'm unaware of, and I know that since <u>Georgia</u>,

2    or <u>Gregg vs. Georgia</u>, there has been no ruling by

3    the -- or by the U.S. Supreme Court that any

4    States, Appellate review procedure is

5    unconstitutional, and certainly Ohio is included in

6    that.  And Ohio Appellate scheme has never been

7    declared unconstitutional.  And we would simply ask

8    that the motion be overruled.

9                THE COURT:  This is a very

10   interesting argument that the Defendant puts forth

11   here.  You all know at common law, there was no

12   right of appeal from the judgment of the Court, and

13   our Constitution merely says both the State and

14   Federal was set up.  The Supreme Court are called

15   upon to set up all of the rules and regulations

16   thereunder.  I often question why we needed the

17   Constitutional Amendment, and the answer to that

18   probably is that because the Supreme Court did not

19   see fit to do, to vary the process that they grew

20   over time and that involved a multi-layered, at

21   least two-layer appeal process.  One could argue

22   that two heads are usually better than one.  That

131

1    the Supreme Court has a tremendous burden and that

2    for them to be called upon to be as thorough as, in

3    evaluating any case, as would be done when a case

4    has gone through that same process below, and then

5    they, the Supreme Court reviews it, and has all of

6    the various personnel check out everything, it is a

7    good example of how a popular thought -- that

8    sounds good, in theory can be addressed through a

9    Constitutional Amendment, and you end up with a

10   system that is worse than you had to begin with.

11            The Constitution should not be amended

12   for such things, in my opinion.  But here's the

13   problem here.  John, you mentioned and you

14   mentioned further in your brief certain statistics,

15   and I think you say in here, that Ohio was not

16   included in that Liebman study.  Mr. Becker makes a

17   good point that we could argue forever and that is

18   because none of us have any empirical evidence in

19   which to decide.  I would think the only way a

20   motion of this nature would have much of a chance

21   at this level would be if you had a good <u>Brandeis</u>

22   type brief that gave me something to chew on, and I

132

1   don't have that, and I don't think it would

2   probably be possible for you to amass that.

3              So, on that basis, I'll respectfully deny

4   your motion.  Defendant's motion to suppress

5   references to the Jury that a verdict of death is

6   only a recommendation.  Mr. Juhasz?

7              MR. JUHASZ:  Judge, I don't have an

8   awful lot to say about this.  I know that you have

9   read the memos.  I would simply really like to

10  point out, I think two things, and that is that I

11  think we have made clear in the Memorandum that the

12  Supreme Court of Ohio is not applying Caldwell vs.

13  Mississippi and they haven't really given a good

14  reason for not doing so, and the Caldwell opinion

15  makes it pretty clear, the dangers of letting a

16  Jury know that if you tell them that what they do

17  is a recommendation, they are going to have some

18  false sense of security.  I think it is in this

19  Memorandum, if not it is in another one, I think

20  it's in this one.  I think there are now only eight

21  cases in Ohio out of all of the cases that

22  Mr. Becker mentioned, where there are people on

133

1   death row.  And then of course, there were other

2   capital cases that were indicted and other things

3   happened to them.

4          You and I had an enjoyable experience a

5   couple of years ago up in Ashtabula where we had

6   one such case that was capitally indicted, but the

7   Jury found the Defendant not guilty of the capital

8   specifications.

9          The point for present purposes is that I

10  believe there are only eight cases in Ohio where

11  the Jury actually recommended the death sentence,

12  where a Judge didn't do it.  So, we do have some

13  empirical data here because we have, I think, 212

14  people on death row and eight guys where the Judge

15  reversed the Jury's finding.  And as you know, in

16  Ohio, unlike states like Florida, a Judge can't

17  give the death sentence unless the Jury first

18  returns that verdict.  So we know that the numbers

19  are basically two to 12 versus eight -- or I'm

20  sorry, 212 versus eight.

21         That having been said, it is important to

22  keep from the Jury this notion of it only being a

134

1   recommendation, because in virtually factual

2   reality in Ohio when the Jury returns a death

3   sentence, it becomes a death sentence.  And so, if

4   anything, I think that the failure to follow

5   Caldwell in Ohio is even more dangerous, because

6   the empirical data we do have says to them, if you

7   think it is only a recommendation, that is a false

8   sense of security.

9               THE COURT:  Let me stop you.  Our

10  scheme is not the only one of its nature.  There

11  are several other states and I can't give a number.

12  This issue has been litigated in those other

13  states, has it not?

14              MR. JUHASZ:  The issue of the

15  recommendation?

16              THE COURT:  Yes.

17              MR. JUHASZ:  Yes.

18              THE COURT:  Do you have any

19  knowledge of the statistics in the other case as

20  opposed to, you say, there's only been eight that

21  were granted here, and there's 212 or whatever on

22  death row?

135

1          MR. JUHASZ:  No, I don't.

2          THE COURT:  Do you not suspect that

3    they would be similar to ours?

4          MR. JUHASZ:  I think I would be

5    inclined to agree with the Court on that, yes.

6          THE COURT:  Go on.

7          MR. JUHASZ:  You mentioned and I

8    certainly understand the Court's thinking and

9    reasoning with regard to the last motion about the

10   Brandeis brief, I didn't actually produce a

11   Brandeis brief, but I think we have more empirical

12   data here than we do the other one.

13         THE COURT:  I agree with you.

14         MR. JUHASZ:  I think that highlights

15   the reason, and I really don't understand it,

16   because it is certainly possible, even if you

17   overrule every other motion the Defendant files in

18   a capital case, it is possible to try a death

19   penalty case and to do it under the presently

20   existing recognized scheme that has been approved

21   by the Ohio Appellate Courts without talking to

22   this Jury about a recommendation.

136

1          And when you look at the numbers and

2     compare that fact to the real danger that the Court

3     recognized in <u>Caldwell</u> is that they will say, "Hey,

4     if we're kind of on the fence about giving this guy

5     the chair, we're not really," or I shouldn't say

6     the chair, I should say, "the needle now, we're not

7     really adept at this stuff. He did a real bad

8     thing, so let's go ahead and do it, and if we're

9     wrong, we have got these Courts to fix it."

10         And the only other thing that I would

11    like to say which is a pet peeve of mine is that

12    the Ohio Supreme Court has not addressed the

13    <u>Caldwell</u> arguments in lieu of the State

14    Constitution. In fact, even though they keep

15    shooting me down about this and chastised me about

16    this in <u>State vs. Sean Carter</u>, I think that I have

17    textural support for the fact that they have never

18    analyzed any provision of the death penalty under

19    the Ohio Constitution, and I think that is

20    something the Court has to be mindful of in

21    considering this motion.

22              MR. BECKER:  The Court is well

137

1   versed on this issue I would point out, and sitting

2   here discussing these numbers and it is all fine

3   and good and stand here and say, "Well, there's

4   eight cases and 212 guys on death row," but I think

5   from our own practical experiences which is what we

6   have to bring into any Courtroom, at least I hope

7   we bring in a lot of that as our practical common

8   sense is this Court's very own experience that I'm

9   familiar with is that within the last, I believe

10  within the last two years, a Defendant was

11  convicted of aggravated murder, death penalty

12  specifications, and this Court prior to -- and

13  we're talking about a stage not even getting to the

14  death penalty and that recommendation being given

15  to the Court, but this Court on its own motion,

16  gave a verdict, or judgment notwithstanding the

17  verdict in the Stanley Adams case on the morning --

18              MR. INGRAM:  Did that involve Sarah

19  Kovoor?

20              MR. BAILEY:  Yes.

21              MR. BECKER:  I don't know if the

22  Court kept any statistics on how often that has

138

1    happened.  I know it has happened in this Court

2    within the last two years and this very County, and

3    I'm sure it has happened in other jurisdictions.

4    So, we may not be getting the full picture when we

5    say only 3.7 percent of death recommended verdicts

6    have been not imposed by the Court, and those

7    recommendations have not been followed because we

8    have again another layer, before we even get to

9    that point.

10         I would like to see, it might be

11   interesting to see how many death penalty

12   convictions of Juries returned in this state, and a

13   judgment notwithstanding the verdict has been

14   returned by the Court not to proceed to the death

15   penalty stage.  Because I am certain it has

16   happened before.  But despite all of that, the

17   Court is well aware of the Caldwell arguments, and

18   I don't want to belabor the issue any more than it

19   should be.

20         Quite simply, I don't see -- this is a

21   fact of the way the scheme is set up, and I don't

22   see any other way around it.  I don't think we can

139

1    pretend that the big elephant that walked in the

2    room isn't an elephant, and I don't know of any

3    psychological studies that are going to say if

4    someone knows their responsibility may be

5    overturned by the Court, they would shirk from it.

6              I think it has been my experience, not

7    only jurors, but Juries and Judges, find it a very

8    difficult thing to sit down, and I realize that

9    approximately 70 percent of the United States

10   population is in favor of the death penalty, but

11   the number of death penalty cases that go to trial

12   in which the verdict is recommended is death, I'm

13   sure is well below 70 percent.  And I submit to the

14   Court that the reason it is, is because it's very

15   easy for you to stand out on the street corner or

16   go to the local bar or discuss with your family at

17   turkey dinner at Thanksgiving that yes, this guy

18   should get the death penalty and comment on the

19   news, but it is a wholly different matter for 12

20   people to get together and walk into that Jury room

21   and sign a piece of paper that they know is going

22   to possibly result in the death of another human

140

1   being.

2         And along those same lines, I have had

3   discussions with Judge McKay, and Judge McKay told

4   me -- and this is a former Prosecutor, in fact the

5   former chief of the Prosecutor's Office here in

6   Trumbull County, the very first death penalty case

7   that he had in front of him, in which the Jury

8   recommended that the death sentence be imposed, he

9   has personally told me that that order, for him to

10  sign that document, sat on his desk literally the

11  entire day and consumed him the entire day as to

12  what he was doing and the ramifications of what he

13  had done.  And I suspect, that just like his

14  feelings that he's expressed to me, that each and

15  every juror that is charged with that duty, takes

16  that awesome responsibility just as seriously when

17  they step back into the Jury room.  And I would

18  tend to argue to the Court, that the fact that they

19  are told that that is a recommendation only, that

20  doesn't relieve them of their awesome

21  responsibility and their awesome duty.  And it has

22  been my experience and I believe there's no

141

1    empirical studies on it, but I believe that if you

2    were put, even the staunchest Prosecutor, into a

3    Jury room and asked him to sign a piece of paper in

4    which the ultimate death of another individual

5    could result, that person would do some very

6    serious soul searching and some long and hard

7    thinking, even if they knew it was a

8    recommendation.

9          With all of that said, I think the law is

10   pretty clear in this area, and we would ask that

11   the Court overrule the motion.

12          THE COURT:  I think Mr. Becker makes

13   a very good point and that is that again my

14   observation, and I think probably all counsel, is

15   that jurors take their job very seriously.  They do

16   take it as a sacred obligation.  I don't think that

17   they ever lightly grant a recommendation of death.

18   The problem that I have with this is that I agree

19   with both sides to a degree.  I think there's

20   always the danger that if the Jury feels that a

21   recommendation is merely a recommendation, and if

22   they would take the position, Mr. Juhasz propounds

142

1　that, "Well, we think he ought to get the death

2　penalty, but let's go ahead and do it, and if we're

3　wrong, the Judge will set it aside."  They don't

4　understand the criteria.  They have no way of

5　knowing the Judge merely has to review the evidence

6　to see if the evidence supported their verdict.  I

7　think since the law states that it is a

8　recommendation, that it is not improper to use the

9　term.

10　　　　　　I have already used the terms and part of

11　Voir Dire in this case we're presently trying, I'll

12　go this far; however, I'll accept a proposal

13　because I think there's nothing wrong with

14　addressing the problem that is of concern to the

15　Defense.  And that is based on the statistics that

16　you are putting out.  I would think it not improper

17　to inform the Jury on the final instructions that

18　the law refers to this as a recommendation;

19　however, I would caution you that a Court is only

20　empowered to set aside your verdict if and when.  I

21　don't know how anybody could disagree with that

22　type of an instruction.  We'll deal with it at the

143

1   time.

2                    MR. BECKER:  For purposes of this

3   hearing, that motion is going to be under

4   advisement.

5                    THE COURT:  Motion under advisement,

6   if and when we get to that point in the trial.

7               Defendant's motion to dismiss indictments

8   or in the alternative to dismiss the death

9   specifications because the death penalty in Ohio is

10  unconstitutional.

11                   MR. JUHASZ:  Judge, believe it or

12  not, I think that I'm actually comfortable relying

13  on the Memorandum.  There are set forth in here, a

14  number of reasons.  The reason I'm comfortable

15  relying on the Memorandum is first of all, I am

16  comfortable and confident that you read it and you

17  will look at it again if need be, before ruling on

18  the motion.

19              Secondly, many of the issues that are

20  discussed in there about why the death penalty is

21  unconstitutional, we have discussed in dealing with

22  other motions, we have talked about the conviction

144

1    proneness of the Jury the last time we were here.

2    We have talked about issues, even today, of Batson

3    and things like that in terms of getting a Jury

4    that is not a fair cross section of the community.

5    It is --

6              THE COURT:  I always enjoy your

7    briefs on the review of the American history and

8    the law, and I assume you are writing them and not

9    Mr. Ingram.

10             MR. INGRAM:  I can assure you

11   Mr. Ingram is not.

12             MR. JUHASZ:  The Memorandum is 150

13   pages long, and for that reason, I don't think it

14   is necessary to say anything else.

15             THE COURT:  I'll review these again.

16   I haven't found your response to that.

17             MR. BECKER:  All of the State's

18   responses are included here.  We have one motion

19   that the State is bringing today.

20             THE COURT:  That particular motion

21   at the beginning of the new death penalty scheme

22   has been reviewed repeatedly.  I think that the

1   Supreme Court recently just said, we have ruled on

2   this so many times that it is whether you have

3   raised anything that is new.

4              MR. JUHASZ:  The only thing I would

5   say, and I just mentioned a few minutes ago is that

6   I take great issue with them, and I think they got

7   a little bit upset with me, because in the <u>Carter</u>

8   brief, I attached the portions of <u>Jenkins</u> and <u>Marr</u>,

9   where they purported to rule on the death penalty

10  under the Ohio Constitution.  And so I think the

11  only thing that bears emphasis with regard to this

12  particular motion is I still contend nobody has

13  done that in Ohio.

14             THE COURT:  The motion for

15  comprehensive Voir Dire.

16             MR. JUHASZ:  If I may, Mr. Becker

17  and I did talk about that if the Court recalls,

18  last time we were here.  We agreed to a procedure

19  for Voir Dire, 45 minutes where we would deal with

20  all of the issues, and I think Mr. Becker and I

21  have agreed in our discussions today, that based

22  upon that, that motion would actually be moot

146

1  because we have agreed on a procedure.

2           THE COURT:  You have been through

3  enough cases up here to know the procedure we

4  usually use.  You always reserve the right to bring

5  up any motion.

6           MR. BECKER:  Every jurisdiction is a

7  little bit different here.  My recollection was, we

8  were going to do 45 minutes individually for each

9  juror, including everything, death penalty.

10           THE COURT:  Let me suggest this.

11           MR. BECKER:  General and venue and

12  everything.

13           THE COURT:  The two main issues that

14  I think lend themselves to the individual Voir Dire

15  is the question of venue, and the Witherspoon

16  questions.  Your ordinary other questions, I think

17  you do that when you get the 12 in the box,

18  otherwise the individual Voir Dire, you take 45

19  minutes and you don't even get started on the

20  thing.  I ask various questions when we start that

21  first day, we have this, this and this, hold your

22  hand up.  We go through and we weed those out.

147

1          When we start the individual Voir Dire,

2     pretty much there's no absolute, but pretty much

3     limited to the question of venue.  Did you get a

4     fair trial here, and the question of whether this

5     person has anything that would disqualify him on

6     the second phase.  If there's some other matter

7     that is relevant, of course, but, this isn't the

8     time to go into other questions that would properly

9     be put to the Jury once you have 12 seated there,

10    and start your weeding out selection, as you

11    usually would do in an ordinary case.

12         Now is there any thoughts contra to that?

13         MR. INGRAM:  I actually thought we

14    addressed this issue to its conclusion the last

15    time.  I believe that we jointly submitted to you a

16    proposal where each side would be allotted 45

17    minutes --

18         THE COURT:  No matter what you

19    wanted to ask.

20         MR. INGRAM:  In toto, you are to

21    Voir Dire that juror in 45 minutes.

22         THE COURT:  You mean then after we

148

1    do this individually, when we put them in the box,
2    you just issue your strikes?
3                    MR. INGRAM:  You go to your strikes.
4                    THE COURT:  I have no problem with
5    that.
6                    MR. BECKER:  We were just having
7    this discussion earlier today.  I don't think we
8    formulated it yet, but we're in agreement that we
9    would like to use a questionnaire.  I believe it
10   would save a lot of time and we may not even need
11   45 minutes per juror.  But just to show you how
12   different jurisdictions are, where I was at
13   previously, the jurisdiction, we would bring in
14   batches of jurors and generally 15 to 20, general
15   Voir Dire them, including venue, and go ahead and
16   Voir Dire them generally as to their
17   qualifications.
18                    THE COURT:  I like that idea, but
19   they hear things they wouldn't have heard
20   otherwise.
21                    MR. BECKER:  There's pros and cons
22   to every system.  What it saved us doing we didn't

149

1  have to individually them death penalty wise.  Once

2  we got 32 individually death qualified, we have got

3  our 16 per se.  Including our preemptory.  Whatever

4  the number is we needed to be bullet-proof to get

5  our jurors.  We could do that and we saved

6  ourselves the time of doing that.  I think this

7  process may go much quicker than we anticipate if

8  we get 45 minutes for each individual for

9  everything and we have the questionnaires to go

10  along in addition to that 45 minutes.

11            THE COURT:  I have no problem with

12  trying that.

13            MR. INGRAM:  We have also agreed by

14  the way, to jointly submit a questionnaire which --

15            THE COURT:  You will get one

16  together?

17            MR. INGRAM:  We'll agree on one.

18            MR. BECKER:  It is my understanding

19  that perhaps Mr. Ingram and Mr. Bailey have pretty

20  much formulated one that they have used in the past

21  and been successful with and been comfortable with.

22  I believe it was in Mahoning County.

150

1           MR. INGRAM:  If Mr. Bailey and I can

2   agree, anybody can agree.

3           THE COURT:  Motion to determine

4   proper standard to excuse jurors for cause.

5           MR. BECKER:  I thought we discussed

6   that one before.  I believe the Court has already

7   ruled on that.  I believe the only one I have left

8   from the Defense side is the motion for alternating

9   Voir Dire.

10          MR. JUHASZ:  Which again, that was

11  one basically to say that we are -- the State goes

12  first and then we go first with the next one, since

13  we have agreed on a procedure.  We would simply

14  withdraw that motion as being moot, since we have

15  come up with a procedure.

16          THE COURT:  Very good.

17          MR. BECKER:  The only other motion

18  that we have today, and I just filed today and the

19  Court has and Defense counsel was given today, the

20  State is asking for motions for the Defendant to

21  submit to handwriting exemplars.  As the Court is

22  probably aware, there are a number, a large number

1    of letters that the State intends to use in

2    evidence.  I don't know if they want to stipulate

3    to that.  I think there's probably statements that

4    they were her letters that have not been suppressed

5    at this point, but we would ask that that motion be

6    granted.  It was also granted in the co-Defendant's

7    case, State of Ohio vs. Nathaniel Jackson, and we

8    would either employ the Ohio Bureau of Criminal

9    Identification to obtain those handwriting

10   exemplars or the Trumbull County Sheriff's

11   department.

12              MR. INGRAM:  We just got that

13   motion.

14              MR. BECKER:  I apologize for that.

15              MR. INGRAM:  We would like a little

16   bit of time to look at it.  As to the merits of the

17   motion requesting a handwriting exemplar in

18   relation to these letters, there's a pending motion

19   to suppress, which raises serious questions as to

20   the admissibility of those letters.  I am only

21   bringing that to your attention.  The State may

22   intend to introduce them, but we don't know yet,

152

1   whether those letters are admissible evidence.

2            THE COURT:  You have to determine

3   that at the time.

4            MR. INGRAM:  What we would like is 7

5   days to respond to that motion.

6            THE COURT:  Okay.  That is fine.

7            MR. BECKER:  The only other matter,

8   I don't know if Mr. Juhasz or Mr. Ingram wants to

9   address it.  Perhaps, do you want to approach the

10  bench?  I believe that takes care of the motions

11  today.

12       I would note for the record, I provided

13  fourth supplemental discovery today, including five

14  video tapes and one compact disk to Defense

15  counsel.  I apologize, I only had one copy for

16  each.  I guess they will have to share.

17           THE COURT:  Are all pending motions

18  other than those that have been reserved for ruling

19  have been ruled on.

20           MR. BECKER:  They have a pending

21  motion to dismiss -- or I'm sorry, a pending motion

22  to suppress and we have the motion for the

153

1    handwriting exemplar.

2              MR. INGRAM:   Before we retire in

3    chambers, there may be the necessity to revisit the

4    motion to suppress that we dealt with the last

5    time, because new fruits of that conversation have

6    come to light which may require that that issue be

7    revisited.

8              MR. BECKER:   We may have a

9    stipulation on that in any event, because of the

10   previous ruling.

11   (End of hearing at 3:30 p.m.)

12

13

14

15   Thursday, January 2, 2003; In Open Court at 9:55 a.m.

16              MR. BECKER:   This is 01-CR-793.

17   State of Ohio versus Donna Roberts.

18              We're here for a pre-trial today.

19   There's been a pending motion to suppress for maybe

20   60 days or so.  We have talked to the assignment

21   clerk and scheduled that motion to suppress for

22   February 26, 2003 at 9:00.  I think there may be

154

1    one or two other outstanding motions that may be

2    argued at that point.  But at this time, the motion

3    to suppress is the bulk of that issue.

4              We already have a trial date scheduled.

5    I don't believe we need another pre-trial before

6    that date.  The trial date is April 7.

7              THE COURT:  The motion to suppress

8    is February 26?

9              MR. BECKER:  Yes.  February 26, a

10   Wednesday.

11             THE COURT:  Very good.

12             MR. INGRAM:  Thank you.

13   (End of hearing.)

14

15

16

17

18

19   Wednesday, February 26, 2003:

20   Hearing on Defendant's Motion to Suppress Evidence:

21   (In Open Court at 1:10 p.m.)

22             THE COURT:  I notice Mr. Juhasz is

155

1  not here today.

2  MR. INGRAM:  He's not.

3  THE COURT:  I have something I wish

4  you to give him.  Nothing to do with this case.

5  MR. INGRAM:  I would be happy to.

6  THE COURT:  Mr. Becker, are you lead

7  on this?

8  MR. BECKER:  We anticipate calling

9  six witnesses on this motion to suppress, and we'll

10  waive opening statements.

11  MR. INGRAM:  The Defense waives

12  opening statements, but would move for a separation

13  of witnesses, and I believe both parties have

14  already separated the witnesses.

15  MR. BECKER:  Yes.  My first witness

16  will be Ralph Roberts.

17  THE COURT:  For the record, that

18  motion will be granted.

19  <u>RALPH ROBERTS</u>

20  being duly sworn according to law, on his oath,

21  testified as follows:

22  <u>DIRECT EXAMINATION BY MR. BECKER:</u>

156

1   Q.   State your name for the record, please.

2   A.   Ralph Roberts.

3   Q.   Where do you live at?

4   A.   931 Kirwin Drive, Youngstown.

5   Q.   Mr. Roberts, are you related to a Donna

6        Roberts?

7   A.   Yes, she's my sister.

8   Q.   I want to direct your attention to December

9        12, 2001, specifically a Tuesday

10       afternoon -- or I'm sorry, Tuesday

11       morning, would have been just after

12       midnight, very early in the morning.

13       Were you contacted by I believe the

14       Austintown police?

15  A.   Yes.

16  Q.   What was that in reference to?

17  A.   Said there was a problem at my sister's house

18       and I was to go there.

19  Q.   Did you know, and I assume Donna is your only

20       sister?

21  A.   I have two sisters.

22  Q.   Did they specify what sister?

157

1    A.    Yes.

2    Q.    Which sister?

3    A.    Donna.

4    Q.    Do you know where Donna was living on December

5            12, 2001?

6    A.    Yes.

7    Q.    Where was that at?

8    A.    In Howland.  I don't know the name of the

9            street.  Fonderlac.

10    Q.    You knew where this house was on Fonderlac?

11    A.    Yes.

12    Q.    Did you in fact go to that residence?

13    A.    Yes, I did.

14    Q.    Approximately what time did you get to that

15            residence?

16    A.    As early in the morning, 1:00, 2:00.

17    Q.    In the morning?

18    A.    Yes.

19    Q.    Did you go with anyone?

20    A.    My wife.

21    Q.    What is her name?

22    A.    Rita.

158

1   Q.   When you got to the residence, can you in your

2        own words, describe what you saw when you

3        got there?

4   A.   I walked into the house and they wouldn't let

5        me --

6   Q.   Who is they?

7   A.   The police, would not let me go to the kitchen

8        area.  They directed me towards the

9        hallway in the bedroom and they told me

10       that my brother-in-law was dead and my

11       sister was there and she was hysterical.

12  Q.   And that was your brother-in-law would be

13       Robert Fingerhut?

14  A.   Yes.

15  Q.   At the time, did the police say, did they say,

16       "Donna is a suspect, we're going to

17       arrest her"?

18  A.   Not at all.

19  Q.   What did they tell you about Donna, that she

20       was distraught?

21  A.   Very much so.

22  Q.   And did you speak to an officer, I don't know

159

1              if you know his name, by the name of Paul

2              Monroe?

3   A.    Probably.

4   Q.    Do you remember him?

5   A.    Yes, I believe I do.

6   Q.    Did he explain to you what the police were

7              doing there?

8   A.    There was a homicide situation.

9   Q.    And did he explain what they were going to do

10             at the house?

11  A.    Homicide situation and to the effect that they

12             wanted to go through the house.

13  Q.    And was Donna there when this was being said?

14  A.    He directed the question to Donna.

15  Q.    And what was Donna's response?

16  A.    Specifically, I don't know, but it was

17             positive, do what you got to do, or yes,

18             okay.  There was no negative there at

19             all.  She was very cooperative.

20  Q.    And she decided to leave with you that evening

21             or that morning?

22  A.    That is the reason they called me to take her

160

1              away from the situation.

2    Q.    Did you in fact leave with her?

3    A.    I left with her, yes.

4    Q.    And your testimony is you never heard your

5              sister in any way, shape or form, say no,

6              I don't want you looking through my house

7              or get out of my house?

8    A.    No.

9    Q.    Nothing like that?

10   A.    No.

11              MR. BECKER:  I have nothing further.

12   CROSS EXAMINATION BY MR. INGRAM:

13   Q.    Good afternoon, Mr. Roberts.

14   A.    Hi.

15   Q.    We have met before?

16   A.    Yes.

17   Q.    When you arrived at the Fonderlac residence

18              and approached the house, as entering the

19              house, what did you observe?

20   A.    I observed there was a lot of commotion in the

21              kitchen area and my sister was there

22              yelling, "Oh, my God, Oh, my God."  She

161

 1              must have said it a thousand times.  She
 2              was very hysterical.
 3    Q.    Yelling --
 4    A.    "Oh, my God, Oh, my God."
 5    Q.    Was she yelling, "Oh, my God, Oh, my God," in
 6              a conversational voice or quietly?
 7    A.    Hysterically.
 8    Q.    And what part of the house was she in, do you
 9              know?
10    A.    The bedroom and the hallway area.
11    Q.    Can you estimate for me the number of
12              policemen that you observed while you
13              were in that house?
14    A.    I don't know.  I guess there was paramedics
15              there also and I know there was a
16              paramedic woman there with Donna at the
17              time.  To estimate, I would say four or
18              five people in the house.
19    Q.    When you say that there was a paramedic woman
20              with Donna, could you describe the
21              interaction between this paramedic woman
22              and Donna Roberts?

162

1   A.   Seems she was trying to comfort her and also

2        get the clothes together to come over to

3        my house, and my wife and the paramedic

4        and Donna proceeded to do that.

5   Q.   And in your presence, did the paramedic ever

6        suggest that perhaps Donna should go to

7        the hospital?

8   A.   Not to my knowledge.

9   Q.   Did you observe the paramedic take Donna's

10       blood pressure?

11  A.   No.

12  Q.   All told, how long do you think you were at

13       the house from the point when you got

14       there until you left?

15  A.   Ten, 15 minutes at the most.

16  Q.   And during that ten or 15 minute period, did

17       you attempt to engage Donna in

18       conversation?

19  A.   It was pretty hard.  She was very hysterical.

20       She was not saying too much of anything,

21       just, "Oh, my God, Oh, my God."

22  Q.   Would you ask her questions?

163

1   A.   Not really.

2   Q.   Would she say things to you?

3   A.   No, not to my knowledge.  If I would have

4        known this was going to happen, I would

5        have taken notes.  I really don't know.

6   Q.   Do you know if whether on December 12 of 2001,

7        your sister was under the care of a

8        psychiatrist?

9   A.   No, I did not know that.

10  Q.   You have described for Mr. Becker a police

11       officer saying something to Donna about

12       what that police officer wanted to do at

13       the home.  Did you hear that police

14       officer use the term crime scene?  Do you

15       recall that?

16  A.   I think that is what he said, yes, crime scene

17       or something along that line.  Indicating

18       it was a crime scene.  Whether Donna

19       comprehended what he said under her

20       condition, I don't know.

21  Q.   Do you recall that officer saying that they

22       would be at the house for quite some

164

1         time?

2  A.   Yes, he said, "We'll be hear awhile."  They

3         were going to go overhead and things like

4         that.

5  Q.   Did the police officer say, "We're going to be

6         here for awhile," and use the crime scene

7         phase before he asked Donna if it was

8         okay?

9  A.   I really don't know.  I really can't say.

10  Q.   Did he ever, did this police officer ask Donna

11         a question or did he simply make a

12         statement of fact?

13  A.   He said to the effect that this is a crime

14         scene and we have to go through the house

15         and things like that and she cooperated

16         with him.

17  Q.   She did not respond negatively?

18  A.   No negative.  She was very cooperative, even

19         as long as I can remember, throughout the

20         investigation the days following that.

21  Q.   Who gathered Donna's belongings, do you

22         recollect?

165

1   A.   I think it was the paramedic and my wife.

2   Q.   Do you know if she got -- if she gathered any

3          medication?

4   A.   I think so, but I'm not sure.  You might have

5          to ask my wife that.

6   Q.   Did she take any medication in your presence?

7   A.   No.

8              MR. INGRAM:  I have no further

9  questions.

10  REDIRECT EXAMINATION BY MR. BECKER:

11  Q.   Mr. Roberts, did anything on the night of the

12         12th or the early morning hours of the

13         12th, indicate to you that the police

14         felt Donna Roberts was a suspect in

15         Mr. Fingerhut's death?

16  A.   No.

17  Q.   Eventually, I think on the next morning, you

18         did take Donna home and she arrived at

19         your house?

20  A.   Right.

21  Q.   And I don't know if you were asleep or awake,

22         but the next morning the police came by

1                with some paperwork?

2    A.   I believe so.

3    Q.   You don't recall that?

4    A.   I don't recall offhand, but they were over at

5             my house a few times, interviewing me.

6    Q.   Your wife may have a better recollection of

7             that?

8    A.   She might.

9    Q.   To reiterate on the 12th of December, in the

10            morning hours when you drove from your

11            home in Austintown to the Fonderlac

12            address, there was no impression that you

13            got that Donna Roberts was a suspect in

14            this crime or they weren't arresting her,

15            she was never in handcuffs?

16   A.   Never.

17   Q.   Wasn't shackled?

18   A.   No.

19   Q.   And the police never indicated to you or

20            pulled you aside and said, "Hey, we think

21            your sister has something to do with

22            this"?

167

1    A.    Not at all.

2                   MR. BECKER:   Nothing further.

3                   MR. INGRAM:   Nothing further.

4                   THE COURT:   You may step down.

5    Thank you.

6                   MR. BECKER:   We would call Rita

7    Roberts.

8                        RITA ROBERTS

9    being duly sworn according to law, on her oath,

10   testified as follows:

11   DIRECT EXAMINATION BY MR. BECKER:

12   Q.    Would you state your name, please?

13   A.    Rita Roberts.

14   Q.    And Miss Roberts, where do you live at?

15   A.    Kirwin Drive in Austintown.

16   Q.    And are you the wife of Mr. Ralph Roberts?

17   A.    Yes.

18   Q.    How long have you been married?

19   A.    34 years, 35 years.  That is a tough one.

20   Q.    Mr. Roberts has a sister by the name of Donna?

21   A.    Yes.

22   Q.    And I wanted to direct your attention to

168

```
1              December 12th of 2001, in the hours

2              sometime after midnight.  Did the police

3              from Austintown call your residence?

4    A.   They actually came to the residence.

5    Q.   They actually came to the residence?

6    A.   Yes.

7    Q.   And do you know what the police wanted when

8              they came to your residence on December

9              12, 2001?

10   A.   They wanted us to make a phone call to Donna

11             at her house.

12   Q.   Which was located where at the time?

13   A.   In Vienna.

14   Q.   Howland?

15   A.   Howland, yes.

16   Q.   And did you in fact call there?

17   A.   Yes.

18   Q.   And was it you or your husband?

19   A.   It was my husband.

20   Q.   After your husband phoned the residence in

21             Howland, did you and your husband go

22             somewhere?
```

169

1  A.  Yes.  We went to the residence.

2  Q.  And when you got to the residence, can you

3       describe the scene that you saw when you

4       got there?

5  A.  We entered through the front door and I went

6       to the bedroom where Donna was at the

7       time.

8  Q.  And how did Donna appear to be to you?

9  A.  Very upset, distraught.

10  Q.  Was she saying anything?

11  A.  Just, "Oh, my God.  Oh, my God."

12  Q.  Did she say anything about Robert Fingerhut,

13       that you recall?

14  A.  No.  She did not.

15  Q.  Were there any police there?

16  A.  There were.  I didn't see them but I know they

17       were there.

18  Q.  At some point, were you present when some

19       officers spoke to Donna in the residence?

20  A.  No, I stayed with Donna in the bedroom.

21  Q.  At some point, some officers did speak to her

22       though before you guys left with Donna if

170

1           you recall?

2  A.   I am assuming they did.

3  Q.   You weren't either in the room or Donna had

4           left the room or do you recall how it

5           happened?

6  A.   They may have spoken to her before we got

7           there.

8  Q.   And eventually, you left with Donna?

9  A.   Correct.

10 Q.   Now later in that same date on the 12th --

11          well, let me ask you this.  Going back to

12          the house at Fonderlac, was there any

13          impression that you had that Donna was a

14          suspect in anything?  Did they ever

15          handcuff her?

16 A.   No.

17 Q.   Were they interrogating her or questioning her

18          about Mr. Fingerhut?

19 A.   No.

20 Q.   And your impression of Donna that night was

21          that -- was what?

22 A.   She was distraught, very upset.

171

1  Q.  Do you know over what?

2  A.  The fact that her husband was shot, dead in

3     the kitchen.

4  Q.  And you left with Donna, the police let you

5     leave with her, correct?

6  A.  Right.

7  Q.  And you and Ralph and Donna went to your

8     residence in Austintown?

9  A.  Correct.

10  Q.  Now, the next morning, or actually that same

11     morning of December 12th, did some

12     Howland police officers show up at your

13     residence?

14  A.  I know they came to our residence.  I can't

15     swear that that was the day.

16  Q.  Do you recall what their purpose was in coming

17     there?

18  A.  No, I didn't speak with them at all.

19  Q.  How was Donna at that time?

20  A.  She had remained very quiet.  Hadn't said

21     much.  Still very upset.

22  Q.  And did the officers speak to her at your

172

1          residence?

2   A.   I'm sure they did, yes.

3   Q.   At any point, either on the 12th when you were

4          at the Fonderlac residence or on the 12th

5          when they were at your residence in

6          Austintown, did you ever hear Donna

7          indicate that she did not want the police

8          at her residence?

9   A.   No.

10  Q.   Did you ever hear her indicate that they were

11         to leave her residence?

12  A.   No, I did not.

13         MR. BECKER:  I have nothing further.

14  CROSS EXAMINATION BY MR. INGRAM:

15  Q.   Good afternoon, Mrs. Roberts.

16  A.   Good afternoon.

17  Q.   When you arrived at the Fonderlac residence,

18         you go into the bedroom where Donna is

19         located?

20  A.   Correct.

21  Q.   When you enter that bedroom is there anyone

22         else in there besides Donna?

173

1  A.   The woman, I believe she was a Coroner, was

2       there.

3  Q.   And what was that woman doing?

4  A.   I felt she was keeping Donna under control,

5       trying to calm her, and then once family

6       was there, she left the room.

7  Q.   When you entered the room, there was a female

8       in the room that you thought was with the

9       Coroner's office who was trying to keep

10      Donna calm?

11 A.   Yes.

12 Q.   You described Donna's emotional state for

13      Mr. Becker as very upset and distraught.

14      What do you mean by that?  How was she

15      acting?

16 A.   She was in tears.  She was standing, didn't

17      want to sit.  She was very agitated.

18 Q.   Moving around?

19 A.   Right.

20 Q.   Did you try to talk to her?

21 A.   Yes.

22 Q.   Would you say things to her?

174

1    A.    Yes.

2    Q.    Was she able to respond to you?

3    A.    She didn't respond much at that point, no.

4    Q.    When you were in the bedroom, did you assist

5          in gathering Donna's personal belongings,

6          so that she could accompany both you and

7          Ralph back to your home?

8    A.    She pretty much did that herself, gathered her

9          things that she was going to take.  I

10         went with her.

11   Q.    Did you see Donna gather or did you gather any

12         medication?

13   A.    I don't recall.

14   Q.    Do you know if on December 12th of 2001,

15         whether Donna was under the care of a

16         psychiatrist?

17   A.    I did not know that, no.

18              MR. INGRAM:  No further questions.

19              MR. BECKER:  I have nothing further.

20              THE COURT:  Thank you.  You are

21   excused.

22              <u>PATROLMAN ALBERT RAY</u>

175

1  DIRECT EXAMINATION BY MR. BECKER:

2  Q.   Would you state your name for the record,

3       please?

4  A.   Officer Albert Ray, Howland Police Department.

5  Q.   How long have you been with the Howland Police

6       Department?

7  A.   26 years.

8  Q.   I want to direct your attention to December

9       12, 2001, were you on duty just after

10      midnight on that date?

11 A.   Yes, Sir, I was.

12 Q.   And do you recall being called to a residence

13      at 254 Fonderlac?

14 A.   Yes, Sir.

15 Q.   Do you recall what the reason was you were

16      dispatched there?

17 A.   The 911 center dispatched myself and Officer

18      Pollcino to that address in response to a

19      hysterical female calling the 911 center.

20 Q.   Were they able to describe what she was

21      hysterical about?

22 A.   Not to our knowledge, no.

176

1    Q.    Were you able to discern what the call was

2          about?

3    A.    No.

4    Q.    Before I go any further, Officer Pollcino,

5          he's no longer employed with the Howland

6          Police Department?

7    A.    He's not.  He's retired.

8    Q.    Just for the record, he has a medical

9          condition?

10   A.    He does have a medical condition, yes, Sir.

11   Q.    I believe he's suffering from a life

12         threatening illness?

13   A.    Yes, he is.

14   Q.    Going back to December 12th of 2001, can you

15         describe for this Court, what you

16         observed when you first got to the 254

17         Fonderlac address?

18   A.    As I pulled up out front of the residence,

19         myself and Officer Pollcino parked our

20         cruisers on the street, and as we looked

21         towards the front of the residence, we

22         observed Donna Roberts coming from the

177

1          open front door of the residence yelling

2          and screaming hysterically, running

3          towards our location out by the street.

4          We met her about halfway between the

5          house and the roadway.  Officer Pollcino

6          took her aside and she had made mention

7          during some of the rambling that was

8          going on, that something had happened to

9          her husband and he was inside the

10         residence.

11   Q.   Did you then go in the residence?

12   A.   Yes, Sir.  Myself, and Officer Pollcino and

13         Donna Roberts went into the residence

14         together.  Entering the residence, we

15         were in the foyer area.  To the right was

16         a living room, to the left was a dining

17         room, which then led into a kitchen area.

18         Officer Pollcino took Donna Roberts into

19         the living room area to the right.  I

20         proceeded to check the residence.  Going

21         through the dining room and into the

22         kitchen, once I came into the kitchen, I

178

1           found the victim laying on the floor at a

2           doorway that led out into the garage.

3    Q.   And was the door opened?

4    A.   The door to the garage, the man door, yes.

5    Q.   And in the garage area or on the steps area,

6           did you observe anything?

7    A.   As I looked over the deceased, I stepped

8           carefully over top of him, observing the

9           bloody condition of the body and also in

10          the walls and the floor underneath or

11          around the body.  I stepped into the

12          garage looking for possible suspects or

13          any evidence or something that would lead

14          me to believe what took place here, and

15          as I started to go into the garage, I

16          noticed on the first step, that was one

17          step between the residence and the garage

18          floor, a small blue steel revolver laying

19          on the step.

20   Q.   At that point in time, did you believe this

21          was a homicide or suicide or did you have

22          any impression?

179

1   A.   I didn't draw any conclusions at that point.

2        It could have been either at that point.

3   Q.   Do you know if any other officers who were at

4        the scene drew any conclusions whether it

5        was a homicide or suicide initially?

6   A.   No.

7   Q.   And the reason you were in that residence was,

8        I assume, at the urging of Miss Roberts?

9   A.   That is correct.

10  Q.   Do you recall how she told you to come into

11       the house or what she told you about

12       coming into the house?

13  A.   We met her in the front yard of the residence,

14       and she was yelling and screaming.  Some

15       of what we could make out, I made out of

16       her hysterical statements was her husband

17       was down in the kitchen, which led me to

18       go into the kitchen area to look for him.

19  Q.   And after checking the residence, was a

20       decision made to call the detectives from

21       your department?

22  A.   Yes, Sir.  Based on what I observed there,

180

```
 1                    myself and Officer Pollcino jointly
 2                    decided to contact our investigators and
 3                    have them come out to the scene as a
 4                    precautionary measure to make sure
 5                    everything was okay or depending on what
 6                    the outcome was going to be.
 7   Q.   At this time, did you suspect that Donna
 8                    Roberts had killed the man that was in
 9                    the doorway?
10   A.   No, Sir.
11   Q.   Was she giving you any indication that she had
12                    done this?
13   A.   No, Sir.
14   Q.   And Eventually, I believe on December 12,
15                    2001, Detective Paul Monroe of the
16                    Howland Township Police Department, along
17                    with Detective Dillon, and I believe
18                    maybe some officers from the Sheriff's
19                    department did arrive?
20   A.   Yes, Sir, that is correct.
21   Q.   Also Miss Roberts' brother, Ralph Roberts was
22                    called to that scene, is that correct?
```

181

1   A.    Yes, Sir.

2   Q.    Were you present when Detective Monroe asked

3         for permission to search the house and

4         process that house as a crime scene?

5                  MR. INGRAM:  I object to that

6   question.  It assumes a fact not in evidence.

7                  MR. BECKER:  Let me rephrase it.

8   I'll strike that.

9                  THE COURT:  Sustained.

10  Q.    Were you present in that residence when

11        Detective Monroe had a conversation with

12        Donna Roberts?

13  A.    Yes, Sir.

14  Q.    Do you know what that conversation was

15        regarding?

16  A.    One of the conversations that I overheard was

17        in the room -- bedroom of Donna Roberts,

18        and Detective Monroe -- the conversation

19        from Detective Monroe to Donna Roberts

20        was that he did believe this was a crime

21        scene and that this would need to be

22        processed.  The residence would need to

182

 1              be processed as a crime scene, meaning

 2              that we would have to look everywhere for

 3              evidence and/or possible suspects, and

 4              her response was, "Do whatever you have

 5              to do to catch him."

 6    Q.    To catch the suspect.  There was no indication

 7              that she was, didn't want them there?

 8    A.    No.

 9    Q.    Was there any indication that she was a

10              suspect at that point?

11    A.    Not to my knowledge.

12    Q.    And in fact, Donna Roberts did leave with her

13              brother and sister-in-law?

14    A.    I didn't see that, no.

15    Q.    But they were there?

16    A.    Yes, Sir.

17    Q.    And their purpose there was to --

18    A.    They were called to the scene to aid her.

19    Q.    Do you recall the mood that Donna Roberts was

20              in during the time period and time frame

21              that you were there at the Fonderlac

22              residence?

183

1   A.   I recall spending some time with Donna in her

2        bedroom consoling her.  At a time she

3        would be very hysterical and other times

4        she would be very calm.

5   Q.   During the period of time that Detective

6        Monroe was speaking to her and explaining

7        this crime scene and how he was going to

8        have to look for evidence, did she --

9        what type of mood was she in?

10  A.   Somber and excited at times.  She wanted to

11       make sure that we caught whoever did

12       this.

13            MR. BECKER:  I have nothing further.

14  CROSS EXAMINATION BY MR. INGRAM:

15  Q.   My name is Gerry Ingram, I just have a couple

16       of questions.  You are dispatched from

17       the 911 center right around midnight?

18  A.   That is correct, approximately midnight.

19  Q.   And the dispatcher, whether that would be a

20       Howland police dispatcher or 911

21       dispatcher, whoever you talked to, told

22       you it was regarding a call from a

184

1          hysterical female?

2     A.   That was their summation, yes.

3     Q.   And you and Officer Pollcino, were you in one

4          cruiser or two cruisers?

5     A.   Two separate cruisers.

6     Q.   Who arrived first?

7     A.   We arrived together, him being in front of me.

8     Q.   And it is my understanding that both of you

9          pulled your cruisers on the street, in

10         front of the residence on Fonderlac?

11    A.   That is correct.

12    Q.   And as you look at the residence, you observed

13         Donna in the area of the front door,

14         yelling and screaming and acting

15         hysterically?

16    A.   Yes, Sir.

17    Q.   Did you hear what she was yelling, what she

18         was screaming?

19    A.   To the best of my recollection, she was

20         hysterical and it took us a while to get

21         out of her what she was upset about, but

22         from what we were able to obtain, it was

185

| | | |
|---|---|---|
| 1 | | something in regards to her husband and |
| 2 | | he was down in the kitchen area. |
| 3 | Q. | It took a while for you to obtain from Donna |
| 4 | | information to enable you to decide what |
| 5 | | she was hysterical about, is that |
| 6 | | correct? |
| 7 | A. | Small amount of time, maybe ten, 15 seconds. |
| 8 | Q. | And she was having a difficult time giving you |
| 9 | | information? |
| 10 | A. | Trying to make sense of what she was saying |
| 11 | | was a problem, yes. |
| 12 | Q. | And actually when you were talking with |
| 13 | | Mr. Becker, I believe you stated that she |
| 14 | | was rambling? |
| 15 | A. | Correct. |
| 16 | Q. | So, you would ask her questions, and she |
| 17 | | couldn't always give you appropriate |
| 18 | | responses? |
| 19 | A. | That is correct. |
| 20 | Q. | And as a matter of fact, while Donna Roberts |
| 21 | | was in your presence on December 12th of |
| 22 | | 2001, her emotional state ran the full |

186

1          gamut from hysteria to calm?

2  A.   That is correct.

3  Q.   Have you ever seen anyone in the state of

4          shock?

5  A.   Yes, Sir.

6  Q.   Did she appear to be in shock to you?

7  A.   She could have had some of the symptoms.

8  Q.   And what symptoms would those be?

9  A.   As you described, a roller coaster of

10          emotions.

11  Q.   Now I'm going to ask you a couple of questions

12          and I don't mean to sound silly, I have

13          got to get this clear in my own mind.

14          The first thing you want to do is protect

15          everybody, including yourself?

16  A.   That is correct.

17  Q.   When you enter the residence, do either you or

18          Detective Pollcino conduct a protective

19          sweep of the residence, the interior

20          portion?

21  A.   As we all three entered the residence, a

22          visual sweep was done immediately, yes.

187

1   Q.   And the results of that visual sweep led you

2        to conclude that it was safe to enter the

3        house?

4   A.   That is correct.

5   Q.   Detective Pollcino then accompanies Donna to

6        the living room area?

7   A.   To the right, as you entered the door to the

8        right would have been the living room

9        area.

10  Q.   And you proceed to the kitchen?

11  A.   That is correct.

12  Q.   Paramedics arrive?

13  A.   Within, after we secured the scene, we called

14       them and allowed them into the scene,

15       yes.

16  Q.   What do you mean by secured the scene?

17  A.   Checked the residence to see if there were any

18       suspects, any problems, areas of danger.

19  Q.   This is a little more than the visual

20       inspection that you told me about

21       earlier?

22  A.   That is correct, a little more thorough.

188

1   Q.   And is it both you and Officer Pollcino the

2        that conduct the protective sweep or just

3        you?

4   A.   Both of us.

5   Q.   You go into the basement?

6   A.   Yes, Sir.

7   Q.   You go into all of the rooms?

8   A.   Yes, Sir.

9   Q.   And open the closets?

10  A.   We checked the -- primarily any windows, we

11       checked any doors leading inside and

12       outside.  All of the windows we found

13       were locked and secured.  The sliding

14       glass door on the rear of the residence

15       was locked and secured.  To my knowledge,

16       the areas that I checked were mostly in

17       the south end of the residence.

18  Q.   This is before you permitted emergency medical

19       personnel to enter the residence?

20  A.   Yes, Sir.

21  Q.   This is also before you called dispatch and

22       asked for Detectives Monroe and Dillon?

189

1   A.   It was approximately the same time, within a
2        few minutes of each other.
3   Q.   Well, before the arrival of Detectives Dillon
4        and Monroe?
5   A.   They were approximately 20 to 30 minutes after
6        our initial arrival.
7   Q.   And how long before their arrival, by their, I
8        mean Detective Dillon and Detective
9        Monroe?
10  A.   That was the 20 to 30 minutes after we
11       initially arrived, they arrived.
12  Q.   You complete the protective sweep before they
13       arrive, correct?
14  A.   Correct.
15  Q.   Do you also do a sweep of the exterior portion
16       of the residence?
17  A.   Yes, Sir, Officer Pollcino went out and walked
18       around the outside of the residence.
19  Q.   And he reported the results of that exterior
20       sweep to you?
21  A.   That is correct.
22  Q.   And he told you there was nothing unusual?

190

1   A.   That is correct.

2   Q.   And that again is before Detectives Dillon and

3        Monroe arrive?

4   A.   No, I believe that that time frame would have

5        been the time I was calling them, he went

6        outside.

7   Q.   If you are calling them on the phone, they

8        haven't arrived yet?

9   A.   Correct.

10  Q.   He does his protective sweep of the exterior

11       before they arrive on seen?

12  A.   That is correct.

13  Q.   And when you called them, you secured the

14       residence as a crime scene?

15  A.   Yes, Sir.

16  Q.   After the emergency medical people tell you

17       that Mr. Fingerhut is deceased, it is my

18       understanding that you asked the

19       emergency medical personnel to attend to

20       Donna Roberts?

21  A.   Yes, at the request of Patrolman Pollcino, I

22       believe, said they might want to see her

191

1          just to make sure she's okay.

2   Q.   Did you have some concerns over her well

3          being?

4   A.   Sure.

5   Q.   What led you to request or --

6   A.   As a cursory thing, we do that.

7   Q.   Because of her hysteria?

8   A.   That is correct.

9   Q.   You overheard as you described for Mr. Becker,

10          a conversation between Detective Monroe

11          and Donna Roberts, while she was in the

12          bedroom; do you recall describing that

13          conversation?

14  A.   Yes, Sir.

15  Q.   Were medical personnel still in the bedroom at

16          that time attending to Donna?

17  A.   No, Sir.

18  Q.   They had gone?

19  A.   I don't know where their presence were, but

20          they were not in the bedroom with myself

21          and Donna and Sergeant Detective Monroe.

22  Q.   Do you know if the emergency medical personnel

192

```
 1            ever recommended that Donna go to the
 2            hospital?
 3    A.   No.
 4    Q.   Do you know whether they ever took her blood
 5            pressure?
 6    A.   No.
 7    Q.   Now the conversation you overheard between
 8            Donna and Detective Monroe, is Detective
 9            Monroe telling Donna that her residence
10            on Fonderlac is a crime scene and it
11            needed to be processed as a crime scene?
12    A.   That is basically the gist of the
13            conversation, yes, Sir.
14    Q.   Well, you want to take a few seconds and
15            search your memory bank and try to
16            recollect Detective Monroe's exact words,
17            if you can?
18    A.   I don't recall the exact words, no.
19    Q.   What is your best recollection of what
20            Detective Monroe said to Donna Roberts?
21    A.   That the residence was a crime scene and it
22            would need to be processed as a crime
```

193

1                scene.

2    Q.    And after that statement was made to Donna, I

3          believe it was your testimony that she

4          said, "Go ahead, do whatever you have

5          to"?

6    A.    To catch the individual, that is correct.

7    Q.    Let me ask you, in order to be fair, let me

8          ask you the same question about Donna

9          that I did about Detective Monroe.  Can

10         you try to give me as close as you can to

11         her exact words and in response to

12         Detective Monroe?

13   A.    Her response to the best of my recollection

14         was, "Do whatever you have to do to catch

15         the individual," or suspect or whatever,

16         how she described the individual,

17         perpetrator.

18   Q.    In your presence, was Donna Roberts ever told

19         that her consent was needed for the

20         police to process the residence at 254

21         Fonderlac?

22   A.    In my presence, no.

194

Q.    In your presence was Donna Roberts ever told
            she had a right to refuse consent?

A.    Not to my knowledge, not in my presence.

            MR. INGRAM:  No further questions.

            MR. BECKER:  Nothing further.

            THE COURT:  Thank you.  You may step
down.

                CAPT. KARL COMPTON

being duly sworn according to law, on his oath,

testified as follows:

DIRECT EXAMINATION BY MR. BECKER:

Q.    State your name for the record.

A.    Karl Compton.

Q.    And you are a Captain with the Howland Police
            Department?

A.    Yes.

Q.    How long have you been there?

A.    Coming on 32 years.

Q.    Going to retire?

A.    Yes.

Q.    Captain Compton, I want to direct your
            attention to December 12, 2001, around

195

1              10:00 in the morning, probably before

2              10:00, did you and Detective Paul Monroe

3              go to a residence in Austintown, here in

4              Ohio?

5  A.   Yes.

6  Q.   Do you know whose residence that was that you

7              went to?

8  A.   I believe it was the Roberts family.

9  Q.   Do you know what your purpose was in going to

10             that residence on December 12, 2001?

11 A.   Yes.

12 Q.   What was it?

13 A.   To have Donna Roberts sign a consent to search

14             form.

15 Q.   And were you present -- well, describe what

16             happened when you got to that Austintown

17             residence address.

18 A.   We were invited in, sat in the living room

19             with Donna Roberts.  Detective Monroe

20             read her the form, explained any

21             questions she had and then she signed it.

22 Q.   Did she have -- or what was her emotional

196

```
 1              state as it appeared to you?
 2    A.    A little bit tired, but she was okay.  She was
 3              not out of control or anything.
 4    Q.    Do you know how the form was presented to her?
 5              Was it read to her or a copy to read or
 6              both?
 7    A.    She was read the form by Detective Monroe, and
 8              it was handed to her.  I don't know if
 9              she read it herself then or not.
10    Q.    And did she indicate at any point that she did
11              not want to consent to a search of her
12              residence?
13    A.    No.
14    Q.    And she freely and voluntarily signed the
15              form?
16    A.    Yes.
17    Q.    Did she appear to be under the influence of
18              drugs or alcohol?
19    A.    No.
20    Q.    You have dealt with people who have been under
21              the influence of drugs or alcohol?
22    A.    Yes.
```

197

1    Q.    Did she appear to you to be unstable in any

2          manner?

3    A.    No.

4    Q.    I'm going to hand you a two page document that

5          has been marked for identification as

6          State's Exhibit No. 1.  Do you recognize

7          State's Exhibit No. 1?

8    A.    Yes.

9    Q.    How do you recognize State's Exhibit No. 1?

10   A.    It is a copy of our consent to search form.

11         It has got my signature as a witness on

12         the bottom.

13   Q.    Is that a fair and accurate copy of the

14         consent to search form?

15   A.    Yes.

16   Q.    Is there a portion on that form that advises

17         the Defendant that she has a right to

18         refuse consent?

19   A.    Yes.

20   Q.    And did Miss Roberts, was that read to Miss

21         Roberts?

22   A.    Yes.

198

1   Q.   And she signed that document?

2   A.   Yes.

3   Q.   In your presence?

4   A.   Yes.

5   Q.   For the record, do you see the individual who

6          signed State's Exhibit No. 1 on December

7          12, 2001?

8   A.   Yes.

9   Q.   Is she here?

10   A.   She's wearing the blue jump suit, seated next

11          to Mr. Ingram.

12          MR. BECKER:  Allow the record to

13   reflect that the witness has identified Donna

14   Roberts, the Defendant in this case.

15          THE COURT:  The record will reflect

16   that.

17          MR. BECKER:  Thank you.

18

19   CROSS EXAMINATION BY MR. INGRAM:

20   Q.   Hi, Captain.  How are you?

21   A.   Good.

22   Q.   32 years?

199

1    A.    Yes.

2    Q.    Congratulations.  It is a long time.  You

3          accompanied Detective Monroe to the

4          residence of Ralph and Rita Roberts?

5    A.    Yes.

6    Q.    To see Donna?

7    A.    Yes.

8    Q.    And the purpose of traveling to the Roberts'

9          residence in Austintown, Ohio was to get

10         Donna Roberts to sign a consent to search

11         form?

12   A.    Yes.

13   Q.    The purpose in traveling to Austintown, Ohio

14         was not to question Donna Roberts?

15   A.    Yes.

16   Q.    All you two were after was a signed consent to

17         search form?

18   A.    Yes.

19   Q.    And the consent to search form which I believe

20         is in front of you, marked State's

21         Exhibit No. 1, was executed at

22         approximately 10:25 A.M.?

200

1   A.   I believe we put on the time here somewhere.

2   Q.   I believe the time is on the bottom of the

3        second page?

4   A.   10:25 A.M.

5   Q.   Do you, Sir, know whether evidence had already

6        been removed from 254 Fonderlac at the

7        time that consent to search form was

8        executed?

9   A.   I believe there was, yes.

10  Q.   I'm going to hand you what has been marked for

11       identification purposes as Defendant's

12       Exhibit A.  I'll ask you to review it and

13       tell me what it is, please?

14  A.   It is a property receipt form that we use at

15       the Howland Police Department.

16  Q.   Itemizing items removed from Fonderlac Drive?

17  A.   Yes.

18  Q.   And items number one through -- what would the

19       final number be?  It is eight pages long,

20       correct?

21  A.   Yes, eight pages.  Item 53 would be the last

22       one.

201

1   Q.   And do you know whether every one of those 53

2        items was removed from the Fonderlac

3        Drive residence before State's Exhibit

4        No. 1 was signed at 10:25 in the morning?

5   A.   I have no knowledge of that, as to when any of

6        these 53 items were taken, before or

7        after.

8   Q.   You do know, however, that some items were

9        taken before, correct?

10  A.   I believe they were.  The crime scene unit was

11       just finishing up to leave when I got

12       there.  That was closer to 6:00 in the

13       morning.

14  Q.   You arrived at the Fonderlac residence at 6:00

15       A.M.?

16  A.   Around 5:00 or 6:00 in the morning.

17  Q.   When were you notified of the call?

18  A.   Just prior to that.

19  Q.   When you arrived at the residence, was

20       Detective Monroe there?

21  A.   Yes.

22  Q.   Was Detective Dillon there?

1    A.    Yes.

2    Q.    Was -- were there representatives of the

3          Trumbull County Sheriff's Department

4          there?

5    A.    Tony Leshnack was there from the Sheriff's

6          Department.

7    Q.    Was there anyone there from the Coroner's

8          office at the time you arrived?

9    A.    No.

10   Q.    Were there any other police officers there?

11   A.    Some of our midnight shift, but I couldn't

12         name them right now as to who all was

13         there of the uniformed midnight shift.

14   Q.    You have identified three police officers.

15         Can you estimate the total number of

16         police officers that were there when you

17         arrived?

18   A.    At least four, I know there was one uniform

19         there.

20   Q.    Was the uniformed officer stationed outside?

21   A.    I don't remember that.

22   Q.    When you arrived at the scene, do you know

203

```
 1          where Donna Roberts' automobile was
 2          located?
 3  A.   No, I don't.
 4              MR. INGRAM:  No further questions.
 5              MR. BECKER:  Nothing further of this
 6  witness.
 7              THE COURT:  You may step down.
 8              DET. SGT. FRANK DILLON
 9  being duly sworn according to law, on his oath,
10  testified as follows:
11  DIRECT EXAMINATION BY MR. BECKER:
12  Q.   State your name for the record.
13  A.   Sergeant Frank Dillon.
14  Q.   Where do you work at?
15  A.   Howland Township Police Department.
16  Q.   How long have you been with the Howland Police
17          Deposition?
18  A.   15 years.
19  Q.   Detective Dillon, I want to direct your
20          attention to December 12, 2001, sometime
21          after midnight, were you contacted at
22          your residence by Officer Albert Ray to
```

1        respond to 254 Fonderlac Drive?

2    A.  Yes, Sir, I was.

3    Q.  Do you know what that was in reference to?

4    A.  They said they had a male subject down there

5        which they anticipated may have expired

6        already.

7    Q.  And did you in fact go to that residence?

8    A.  Yes, Sir, I did.

9    Q.  When you got to that residence, can you

10       describe the scene and who was there?

11   A.  It was a ranch home.  Present in the house

12       were Patrolman Ray, Patrolman Pollcino,

13       the victim's wife Donna Roberts, and the

14       victim.

15   Q.  How did Donna Roberts appear to be to you?

16   A.  She was hysterical.  Upset.

17   Q.  And did you have a chance then to finally

18       speak to Donna Roberts?

19   A.  Yes, Sir, I did.

20   Q.  What did she tell you about the evening

21       leading up to her finding Mr. Fingerhut?

22   A.  She told me that she had talked to her husband

205

1              or to Mr. Roberts on the phone a couple

2              of times throughout the evening.

3   Q.   You mean Mr. Fingerhut?

4   A.   Mr. Fingerhut.  I'm sorry.  Throughout the

5              evening and that eventually during the

6              last phone call, I believe, he told her

7              to go ahead and go out shopping, since

8              she liked shopping because he might be

9              home a little late.

10   Q.   Were you able to ascertain where he worked at?

11   A.   At the Greyhound bus terminal in Youngstown.

12   Q.   So Miss Roberts then proceeded to tell you

13              that she came home I assume, after she

14              went shopping?

15   A.   Yes, Sir.

16   Q.   What did she tell you about the residence that

17              she felt was unusual when she came home?

18   A.   She explained how she came down the street.

19              She pushed the button to open the

20              overhead garage door and as she began to

21              pull into the driveway, she noticed that

22              it was going down and the light had

206

1      already been on.

2  Q.  Indicating what?

3  A.  That she thought that the garage door was open

4      when she pushed the button to make it go

5      up.  It was already up.

6  Q.  And did she say that was unusual for her and

7      her husband to leave that garage door

8      open?

9  A.  Yes.  She said they close it all the time.

10  Q.  Did she describe to you whether Mr.

11      Fingerhut's car was home when she

12      returned from shopping?

13  A.  She said that it was not.

14  Q.  And was that unusual in her opinion?

15  A.  I believe she anticipated he had been home by

16      then.

17  Q.  When she got home, did she tell you what she

18      did?

19  A.  She told me she got out of her car and when

20      she went to go into the house through the

21      garage door which leads into the kitchen,

22      she saw her husband's lying on the floor.

207

1   Q.   And did Donna Roberts, while she's telling you

2        this story, was she very lucid or was she

3        in a state of distress?

4   A.   She would shout out, "Oh, my Robert.  Oh, my

5        God, Robert, what's happened," and I

6        would calm her down.  Then we would talk

7        a little bit more and then she would

8        become emotional again.

9   Q.   And she portrayed to you that she was nothing

10       more than a now widowed woman whose

11       husband had been criminally murdered?

12  A.   Yes, Sir.  She was a victim.

13  Q.   And you had no reason to suspect otherwise,

14       did you?

15  A.   No, Sir.

16  Q.   Now, did she describe for you that, or did she

17       tell you that she had contacted anyone

18       when she had found Mr. Fingerhut, her

19       husband deceased, in the man door from

20       the garage to the home?

21  A.   Yes, Sir.  She said when she saw Robert that

22       she freaked out and ran by his body and

208

```
 1              got a portable telephone and called 911.
 2    Q.   And you knew that basically because you were
 3              dispatched by the other officers who
 4              confirmed that?
 5    A.   Yes, Sir.
 6    Q.   Eventually then, other detectives were
 7              contacted to return to the residence --
 8              or I'm sorry, to come to the residence,
 9              that would include Detective Monroe?
10    A.   Yes, Sir.
11    Q.   Were you there before or after Detective
12              Monroe?
13    A.   I was there probably five minutes before him.
14    Q.   And while speaking to Miss Roberts again,
15              could you hear her when you were in other
16              parts of the house?
17    A.   During the course of the time that we were
18              there, yes, we could hear.  She was in
19              the master bedroom and we could hear
20              crying out and sobbing.
21    Q.   Could you hear anything that she was saying?
22    A.   I believe she just repeated things like, "Oh,
```

209

1          my God.  My Robert.  I can't believe he's

2          there.  I can't believe he's dead."

3          Things in that nature or of that nature.

4     Q.   And when you had a chance to -- well, strike

5          that.  Did there become a need to try and

6          contact family members of Donna Roberts?

7     A.   Yes, Sir.

8     Q.   Explain how that came about.

9     A.   Well, at one point, we realized that we

10         should, she needed somebody to console

11         her.  We didn't know if she had local

12         family members or not, so we talked to

13         her about that and she indicated she had

14         a brother in Austintown.

15    Q.   What was done to contact the brother in

16         Austintown?

17    A.   I believe our dispatch tried to call the

18         residence and got an answering machine,

19         so they sent the Austintown Police

20         Department to the house to make personal

21         contact with her brother.

22    Q.   And in fact, did her brother arrive at the

210

1        residence in the early morning hours of

2        December 12th?

3   A.   Yes, Sir.

4   Q.   And at some point, was Donna Roberts taken

5        from that house by Ralph Roberts, her

6        brother?

7   A.   Yes, Sir.

8   Q.   Prior to either his arrival or her leaving,

9        did Detective Monroe explain to Donna

10       what was going on at her house and what

11       Detective Monroe would need and the

12       Howland police would need to do?

13  A.   Yes, Sir.

14  Q.   And as best as you can recall, what did

15       Detective Monroe tell Miss Roberts?

16  A.   He explained to her that he would have to go

17       through the entire house, that it was a

18       crime scene and everything in it to

19       search for evidence to try and determine

20       who may have committed the crime upon

21       her -- upon Mr. Fingerhut.

22  Q.   And Donna Roberts was in no way arrested for

211

1             this crime that night, was she?

2    A.    No, Sir, she was not.

3    Q.    She was not -- she was not indicating that she

4             was a suspect in this crime, was she?

5    A.    No, Sir, she did not.  She was a victim in my

6             eyes.

7    Q.    Do you recall what Donna Roberts' statement

8             was to Detective Monroe when he advised

9             her that they needed to treat this as a

10            crime scene and look for evidence?

11   A.    She was adamant through most of the night that

12            she wanted us to get the people who did

13            this, whoever did this to Robert.  And I

14            believe at that time she made a statement

15            saying, "I don't care, you do what you

16            have to do.  I want you to get the person

17            who did this to my Robert."

18   Q.    And you said she was adamant about that?

19   A.    Absolutely.

20   Q.    And do you recall if she said it more than

21            once?

22   A.    I remember hearing it at least once, if not

212

1          more.  Her attitude was that she wanted

2          to cooperate with us and do whatever she

3          could do.

4               MR. INGRAM:  This a speech, it is

5     not responsive to a question that has been put to

6     the witness.

7               THE COURT:  It is overly responsive.

8     Rephrase your question.  Sustained.

9     Q.   Describe her in general on the early morning

10         hours of December 12th and how she

11         portrayed herself and how she treated the

12         Howland Police Department.

13    A.   She treated us with respect and appeared to be

14         a grieving widow.

15    Q.   And from her actions and statements, can you

16         describe for this Court what she wanted

17         the Howland Police Department to do about

18         Mr. Fingerhut's death?

19    A.   She wanted us to find out who was responsible

20         for it.

21    Q.   And she permitted you to go through her

22         residence?

213

1   A.   Yes.

2   Q.   You were there for a number of hours you

3        assume with Miss Roberts, maybe two

4        hours?

5   A.   I believe so.

6   Q.   At any point during the time you were in the

7        Fonderlac residence, did Mrs. Roberts

8        indicate to you that she wanted the

9        Howland Police Department to leave?

10  A.   No, Sir.

11  Q.   At any point during that time, did she

12       indicate to you that she did not want you

13       looking in any area of her home?

14  A.   No, Sir.

15  Q.   Did she indicate that she didn't want you to

16       do anything?

17  A.   No, Sir.

18  Q.   When she left the residence with Ralph

19       Roberts, did she give you any indication

20       that she wanted you to leave at that

21       time?

22  A.   No, Sir.

214

```
 1   Q.   When she left with Ralph Roberts, did she
 2             indicate that you were not to search in
 3             her residence anywhere?
 4   A.   No, Sir.
 5   Q.   The individual who you spoke to and who you
 6             referred to as Donna Roberts, is she here
 7             in the Courtroom?
 8             MR. INGRAM:  Stipulation
 9   identification of Donna Roberts for purposes of
10   this hearing.
11             THE COURT:  Okay.
12             MR. BECKER:  I have nothing further.
13   CROSS EXAMINATION BY MR. INGRAM:
14   Q.   Good afternoon, Sergeant Dillon.  How are you,
15             Sir?
16   A.   Good, thank you, Sir.
17   Q.   You arrive at 254 Fonderlac about five minutes
18             before Detective Monroe?
19   A.   I believe so.
20   Q.   And when you arrive at the residence, you
21             confer with Officer Ray and Officer
22             Pollcino?
```

215

1   A.   Yes, Sir.

2   Q.   And they told you that when they had arrived,

3        they were met in the front yard by a

4        hysterical Donna Roberts?

5   A.   Yes, Sir.

6   Q.   And they also told you, did they not, that

7        they had conducted a protective sweep of

8        the interior and exterior of the

9        residence?

10  A.   Yes, Sir.

11  Q.   Were emergency medical personnel present at

12       the Fonderlac residence when you arrived?

13  A.   Yes, Sir.

14  Q.   Were any of those emergency medical personnel

15       attending to Donna Roberts while you were

16       in that house at all?

17  A.   I don't recall.

18  Q.   After talking with Officers Ray and Pollcino,

19       what do you then do?

20  A.   Talked to Mrs. Roberts.

21  Q.   And your purpose in talking with Mrs. Roberts

22       was to gain information?

216

1   A.   Yes, Sir.

2   Q.   Is it fair to say that because of her

3        emotional state, you were having a

4        difficult time getting information from

5        her?

6   A.   Not really, Sir.  I was being patient and

7        giving her time to grieve and as she

8        would calm down, then we would continue

9        our conversation.

10  Q.   Shortly into your conversation, let me back

11       up.  Before you started to talk with her,

12       did you have to ask her to try to calm

13       herself down, so that she could engage

14       you in discussion?

15  A.   Yes, Sir, I believe so.

16  Q.   And did it take some time for her to calm

17       herself down to the point where she was

18       able to engage you in discussion?

19  A.   A few minutes.  She was on again and off

20       again.

21  Q.   And after she calms herself down, you and she

22       have a conversation?

217

1    A.    Yes, Sir.

2    Q.    And shortly into that conversation, she breaks

3          down and says, "I can't take this any

4          more.  Look, I see Robert lying there on

5          the floor with all of that blood"?

6    A.    Yes, Sir.

7    Q.    And at that time, you have to ask her to calm

8          herself down again?

9    A.    Yes, Sir.

10   Q.    So you stopped the interview process and said,

11         "Donna, please try to calm yourself down,

12         I need to talk with you"?

13   A.    Yes, Sir.

14   Q.    And you ask her to calm herself down because

15         she's having a difficult time answering

16         what you are asking her?

17   A.    I believe she had a difficult time coming back

18         to the fact that we had to have a

19         discussion.

20   Q.    After you get Donna to calm down the first

21         time -- well, you get her to calm down

22         once.  She begins a conversation, then

218

```
 1              you get her to calm down a second time.

 2              She continues the conversation, then she

 3              breaks down yet again, does she not?

 4   A.   I believe so.

 5   Q.   And you get her to calm down the third time?

 6   A.   Yes, Sir.

 7   Q.   And does that take her some time to calm

 8              herself down?

 9   A.   It is not a long period of time, it is a

10              matter of a few minutes.  As I said,

11              she's in and out.

12   Q.   Have you seen anyone in shock?  Have you dealt

13              with anyone in shock?

14   A.   I believe so.

15   Q.   Do you know if, use your own words, going in

16              and out would be a symptom of shock?

17   A.   I don't believe she was that -- that she was

18              in shock at the time I was talking to

19              her.  No, I believe it was more emotional

20              than anything else.

21   Q.   She was emotional?

22   A.   Yes.
```

219

1   Q.   She was distraught?

2   A.   To a certain degree, yes, there was crying.

3   Q.   Was she crying the entire time?

4   A.   No, Sir.

5   Q.   Off and on?

6   A.   Yes, Sir.

7   Q.   Do you recall whose idea it was to call Ralph

8        Roberts?

9   A.   No, Sir.

10  Q.   But Ralph Roberts was called so that he could

11       come to the Fonderlac residence and

12       provide some support to Donna?

13  A.   Yes, Sir.

14  Q.   To console her was the term you used for

15       Mr. Becker?

16  A.   Yes, Sir.

17  Q.   Did I ask you if you saw emergency personnel

18       and medical personnel attending to Donna

19       at all?

20  A.   Yes, Sir, you did, but I answered that

21       question.

22  Q.   And you do not recall seeing that, correct?

220

1   A.   No, Sir.

2   Q.   At some point in time, Ralph Roberts, Rita

3          Roberts and Donna Roberts are leaving the

4          residence?

5   A.   Yes, Sir.

6   Q.   And at that point, you overhear a conversation

7          between Detective Monroe and Donna

8          Roberts?

9   A.   Yes, Sir.

10   Q.   Are you party to any conversation between

11          Detective Monroe and Donna Roberts before

12          Ralph, Rita and Donna are actually

13          leaving the residence?

14   A.   I don't recall.  I believe I was outside

15          walking the exterior of the house or I

16          was inside taking pictures.

17   Q.   You had other things to do?

18   A.   Yes, Sir.

19   Q.   The only conversation between Detective Monroe

20          and Donna Roberts that you recollect is

21          in the hallway off of the living room as

22          the three Roberts are leaving the

221

1          residence?

2    A.    Yes, Sir.  They are stopped in the hallway
3          having the discussion.

4    Q.    And it is during that discussion that you
5          heard Detective Monroe say to Donna
6          Roberts, that we, meaning the Howland
7          Police Department, would have to go
8          through the entire house, that it was a
9          crime scene?

10   A.    Yes, Sir.

11   Q.    That is a statement of fact, is it not?

12   A.    Yes, Sir.

13   Q.    And Donna's response was what?

14   A.    I believe, "Do whatever you have to do.  I
15         want you to get the person who did this
16         to my Robert."  She said that more than
17         once.  "I want you to get this person
18         that did this to my Robert."  Not
19         particularly at that time.

20   Q.    But in response to Detective Monroe's
21         statement of fact that this is a crime
22         scene and we have to process the crime

222

```
 1              scene, Donna states, "Do whatever you
 2              have to do, just find this person"?
 3   A.   Yes, Sir.
 4   Q.   Was Donna ever told in your presence that her
 5              consent was needed for the Howland Police
 6              Department to process 254 Fonderlac?
 7   A.   No, Sir.
 8   Q.   Was Donna Roberts ever told in your presence
 9              that she could refuse consent to the
10              processing of 254 Fonderlac?
11   A.   No, Sir.
12   Q.   Was her car in the garage when you arrived?
13   A.   Yes, Sir.
14   Q.   What time did you leave the scene, the Roberts
15              home, about 6:00 in the morning?
16   A.   Yes, Sir, somewhere around there.
17   Q.   I believe you cleared the scene at 6:27 A.M.,
18              that is approximately right?
19   A.   Yes, Sir.  6:27.
20   Q.   At the time you leave, is anyone moved to
21              Donna Roberts' motor vehicle from the
22              garage into the driveway or moved it at
```

223

1              all?

2    A.    I believe it was pulled out of the garage at

3              one point.

4    Q.    Who did that, do you know?

5    A.    I believe a towing service did.

6    Q.    I'm going to hand you, but not mark, a copy of

7              your supplemental report.  And first of

8              all, you can look at it and satisfy

9              yourself that it is your report, and then

10             I would direct your attention to page

11             five.

12   A.    Yes, Sir.

13   Q.    Does that refresh your recollection at all

14             about anything about the moving of the

15             car?

16   A.    Yes, Sir.

17   Q.    Was the car moved by a police officer?

18   A.    I don't recall.

19   Q.    Do you recall if the keys to the car were in

20             the motor vehicle?

21   A.    I don't recall that, either.

22   Q.    Do you recall if the keys of the car were in

224

1           the residence?

2   A.   I don't recall.  I didn't deal too much with

3           the car.

4   Q.   Would you take a -- I'll take that from you.

5           Would you take a gander at Defendant's

6           Exhibit A, please.  What is Defendant's

7           Exhibit A?

8   A.   It's a property receipt.

9   Q.   For items removed from 254 Fonderlac on

10           December 12, 12001?

11  A.   Yes, Sir.

12  Q.   Eight pages long, items one through 53?

13  A.   Yes, Sir.

14  Q.   Were all of those items removed from 254

15           Fonderlac by the time you cleared the

16           scene at 6:27?

17  A.   I would believe so.

18           MR. CONSOLDANE:  I have no further

19  questions.

20           MR. BECKER:  I have nothing further.

21           THE COURT:  You are excused.  Thank

22  you.

225

1          MR. BECKER:  Can we take a short

2   recess?

3          THE COURT:  Let's take a ten minute

4   break.

5   (Court in recess at 2:20 p.m.)

6   (Resumed in Open Court at 2:50 p.m.

7              DET. SGT. PAUL MONROE

8   being duly sworn according to law, on his oath,

9   testified as follows:

10  DIRECT EXAMINATION BY MR. BECKER:

11  Q.   You are Detective Sergeant Paul Monroe?

12  A.   Yes, Sir.

13  Q.   You work with the Howland Township Police

14       Department?

15  A.   Yes, I do.

16  Q.   You have been there approximately 17 years?

17  A.   Yes.

18  Q.   I want to direct your attention to December

19       12, 2001, sometime after midnight; were

20       you called in reference to a case that

21       had occurred at 254 Fonderlac Drive?

22  A.   Yes, Sir, I was.

226

1   Q.   When you were called at your residence, did

2        you know at the time what the call was

3        for?

4   A.   The only information I had at the time was

5        there was a shooting, that there was a

6        white male subject that was shot and

7        deceased with a bullet wound to the head.

8        He was bleeding from the head, assumed it

9        was a bullet wound and a firearm laying

10       near the victim.  That's the only

11       information I believe I had.

12  Q.   When you eventually got to the scene at 254

13       Fonderlac, can you describe for this

14       Court what you observed?

15  A.   When I arrived at the scene there were police

16       cars out in the street.  Walked up into

17       the residence, spoke with Officer Ray.

18       Gave me a brief run down as far as

19       information he knew as to where the

20       victim was, what they had done, who had

21       been contacted, that they contacted the

22       Coroner's office and they were going to

227

```
 1              send someone to our location there on
 2              Fonderlac, that the victim's wife was at
 3              the residence, that she was in the rear
 4              bedroom.
 5   Q.   When you got to the residence on December 12,
 6              2001 and spoke to Officer Ray, were you
 7              able to determine how the Howland police
 8              were contacted to this location?
 9   A.   Yes.
10   Q.   And how were they contacted to go to 254
11              Fonderlac?
12   A.   The Howland police were contacted by the
13              Trumbull County 911 center after they
14              received a 911 call from Donna Roberts.
15   Q.   Now, after you spoke to Patrolman Ray, did you
16              actually see Donna Roberts in the
17              residence?
18   A.   Yes, I did.
19   Q.   Can you describe how she appeared when you
20              first observed her?
21   A.   She was in the master bedroom and she was
22              screaming, "My Robert, my Robert."
```

228

1                   Appeared to be emotional.

2    Q.   Did she tell you that she had done anything

3              that night to Mr. Fingerhut?

4    A.   No, she did not.

5    Q.   Now what did you do initially after you spoke

6              to Patrolman Ray?

7    A.   There were still some firemen at the

8              residence.   Knew that they had a crime

9              scene.   I spoke with Captain Phillips of

10             the Howland Fire Department, told him

11             that we weren't going to need the

12             services of the fire department and I

13             asked them to clear all of the medics

14             that were there out.

15   Q.   And that was done?

16   A.   Yes, Sir, it was.

17   Q.   Then you and the other officers there, what

18             did you do in terms of investigating this

19             scene?

20   A.   I felt that we needed a little more

21             assistance.   I contacted Detective

22             Leshnack of the Trumbull County Sheriff's

229

1                      department.  Asked him if he could come

2                      out and assist.  He's part of the

3                      Trumbull County homicide squad, assist

4                      with the crime scene.  I also contacted

5                      Detective Daniel Mason of the Warren City

6                      Police Department and requested his

7                      assistance.

8    Q.   And they did come to the house?

9    A.   Yes, they did.

10   Q.   What was the purpose in them coming to the

11                     residence?

12   A.   To assist in photography and collection of

13                     evidence.

14   Q.   Now when you were going through this house,

15                     did you have a chance to speak to Miss

16                     Roberts about what had actually happened

17                     to Mr. Fingerhut?

18   A.   Yes.

19   Q.   And what did you tell Miss Roberts had

20                     happened to Robert Fingerhut?

21   A.   I told Donna Roberts that it appeared that her

22                     husband had been shot to death and we

230

```
 1              needed to explore or investigate as to
 2              what happened.  Donna then began
 3              screaming, "Someone shot my Robert."  Got
 4              very emotional again.  Told her that I
 5              needed her to try to be strong and calm
 6              down and answer a few questions for me to
 7              tell me what her whereabouts for the day
 8              were.
 9   Q.    Did she do that?
10   A.    Yes, she did.
11   Q.    Did she indicate that it was -- well, tell me
12              about when she came home from where she
13              went.  We already heard testimony that
14              she went shopping.  Can you tell us what
15              she described for you when she returned
16              from her shopping earlier that evening,
17              which I guess would have been December
18              11th actually?
19   A.    Donna Roberts told me that as she came down
20              Fonderlac, she often plays this game
21              where she pushes the garage remote to see
22              how far from the house you can get the
```

231

1       garage door to open and after she pushed

2       the garage door opener button, she

3       realized the garage door was going down

4       and not up.  Pushed it again and it was

5       going up.  She parked her vehicle to the

6       right side of the garage, exited the

7       vehicle, and as she went to walk in the

8       garage man door, there's an opening into

9       the garage from the house, realized that

10      the door was standing open, and saw her

11      husband -- or I'm sorry, Robert Fingerhut

12      laying in a pool of blood.

13  Q.  And did she indicate that something was

14      missing from the residence?

15  A.  She indicated that her husband's Chrysler,

16      silver Chrysler 300-M was missing.

17  Q.  Which she indicated was obviously -- she

18      indicated it had been stolen?

19  A.  She told me it was stolen.

20  Q.  I think at some point, she told you, "Where's

21      Robert's car?  Someone stole his car".

22  A.  Right.  We asked questions about it.  She said

232

```
 1              that she had answered all of these

 2              questions, she already told the other

 3              officer all of the questions that I was

 4              asking.  She said she already answered

 5              all of these questions.  I told her I

 6              needed her to go over it again with me.

 7              She said that she kept asking, "Where's

 8              my Robert's car.  Somebody stole it."

 9              She also indicated, we asked her about

10              firearms, what kind of firearms were in

11              the house, and she told me that they had

12              several small hand guns, that typically

13              there was one in the night stand next to

14              the bed.  It wasn't there.  She said that

15              Robert Fingerhut kept it in his car,

16              which was the missing silver Chrysler.

17    Q.   So, were you able to determine that a firearm

18         and a motor vehicle were missing from the

19         residence?

20    A.   Yes.

21    Q.   I guess technically the vehicle was missing

22         and inside that vehicle, Miss Roberts
```

233

1                indicated to you that a firearm was

2                normally kept in that car?

3   A.   She said she wasn't sure that the firearm was

4                either in the night stand or the vehicle

5                and she didn't know what the case was,

6                whether it was in the car or in the night

7                stand, but it was missing.

8   Q.   But it was not in the night stand pursuant to

9                your discussions with her and your

10              investigation that night?

11  A.   No, Sir.

12  Q.   Now, Miss Roberts went on to tell you that

13             upon coming home and observing Robert

14             Fingerhut, did she tell you who she had

15             called?

16  A.   Say that again.

17  Q.   When she was telling you the story about

18             coming home with the garage door and

19             pulling into the garage, she observed

20             Robert Fingerhut on the floor, did she

21             tell you if she called anyone?

22  A.   She told me that she went in the house,

234

1          grabbed the portable phone and then ran

2          out the front door and called the

3          Trumbull County 911 or she told me she

4          dialed 911 and talked to the dispatchers.

5     Q.   Did she tell you why she went outside to make

6          the call?  Was she in fear that there was

7          an intruder?

8     A.   Yes.

9     Q.   So, she was portraying to you that her house

10         had been burglarized or someone had

11         entered the home and that her husband had

12         been killed by someone else?

13    A.   Yes.

14    Q.   And throughout these early morning hours of

15         December 12th, did she give you any other

16         indication that anyone other than -- or

17         I'm sorry, strike that.  On December 12,

18         2001, did she say that anyone other than

19         herself had been involved in this crime?

20    A.   No.

21    Q.   In fact, she never implicated herself?

22    A.   No, Sir.

235

1    Q.    She portrayed herself as, what would you

2             describe her portrayal of herself?

3    A.    As the victim.

4    Q.    And throughout the early morning hours, I

5             guess, she made statements to you about

6             what your role was to be in her eyes, is

7             that correct?

8    A.    Yes, Sir.

9    Q.    And what were her statements that your role

10           was supposed to be?

11    A.    My role was to investigate the crime and find

12           out whoever was responsible for this and

13           arrest them.

14    Q.    And did she say that more than once?

15    A.    Yes, she did.

16    Q.    Do you recall how many times she may have said

17           it?

18    A.    I'm certain she said it at least three times,

19           if not more.

20    Q.    Eventually, and what was her emotional state

21           during this time as at least she

22           portrayed it to you?

236

1  A.   She was to me, she appeared to be the grieving

2       spouse of the victim.  She told me that

3       it was her husband that had been murdered

4       and appeared to be grieving over her

5       loss.

6  Q.   Now, did she tell you -- or I'm sorry, did you

7       make a decision at some point or the

8       other officers make a decision that

9       someone should be there to console her?

10 A.   Yes.

11 Q.   Who made that decision and what was done?

12 A.   I made the decision.  There were times where

13      we were trying to discuss certain

14      findings at the scene that we couldn't

15      talk in a loud manner or just a normal

16      conversation with respect to Donna

17      Roberts being in another room, the door

18      standing open.  She could hear our

19      conversations.  We could hear her

20      bellowing and screaming and crying from

21      the back room and at times we knew that

22      she was listening to our conversations.

237

```
 1                    MR. INGRAM:  Objection.
 2                    THE COURT:  What is your objection?
 3                    MR. BECKER:  I'll stipulate to that.
 4    Let me move on.
 5    Q.   Did in fact Ralph -- or I'm sorry, did some
 6              relatives of Donna Roberts actually
 7              arrive at the residence?
 8    A.   Yes.
 9    Q.   And who were those relatives, if you know?
10    A.   Ralph Roberts and Rita Roberts.
11    Q.   Do you know what their relationship was to
12              Donna?
13    A.   Ralph Roberts is Donna Roberts' blood brother
14              and Rita Roberts is her sister-in-law.
15    Q.   And do you know how they were advised to come
16              to the Fonderlac residence?
17    A.   We had attempted to have the 911 center make
18              calls to the residence, and have them
19              come to our location without any luck.
20              The Trumbull County 911 center contacted
21              the Austintown Police Department and had
22              them send a cruiser to Mr. Roberts'
```

238

1      house.

2   Q.   And the Austintown police then notified him to

3        come to the Fonderlac residence?

4   A.   Yes.

5   Q.   And in fact, Rita and Ralph Roberts did come

6        to that residence?

7   A.   Yes.

8   Q.   How long after you got to the scene, do you

9        believe they came to that residence?

10  A.   Approximately an hour and a half later.

11  Q.   And did they speak to Donna Roberts?

12  A.   Yes, they did.

13  Q.   At some point, was there a decision by someone

14       that Donna Roberts should go back with

15       Ralph and Rita Roberts to their

16       residence?

17  A.   Yes.

18  Q.   And how was that decision made or who was it

19       made by?

20  A.   Donna Roberts.

21  Q.   And she agreed to go back to Ralph and Rita's

22       residence?

239

| 1 | A. | Yes, that was her decision. |
| 2 | Q. | Prior to and I want to maybe try and narrow |
| 3 | | this down, either prior to the Ralph and |
| 4 | | Rita Roberts arrival or after their |
| 5 | | arrival, did you have the discussion with |
| 6 | | Donna about searching the house and |
| 7 | | looking for further evidence? |
| 8 | A. | Yes, I did. |
| 9 | Q. | When did that conversation happen or was there |
| 10 | | more than one conversation? |
| 11 | A. | There was more than one conversation. |
| 12 | Q. | Did the first conversation occur before or |
| 13 | | after Ralph and Rita arrived, if you |
| 14 | | know? |
| 15 | A. | It was before Ralph and Rita arrived. |
| 16 | Q. | And what was your discussion with Donna |
| 17 | | Roberts about looking into her home? |
| 18 | A. | As I was telling you earlier, because of some |
| 19 | | of the things we were talking about, at |
| 20 | | certain points Donna Roberts would become |
| 21 | | very emotional and screaming and crying |
| 22 | | and we felt that it might be better if |

240

1        she went or at least had somebody -- she

2        said she didn't really know any of the

3        neighbors, had somebody come to the house

4        and at least sit with her.  And I

5        explained to her that we don't know

6        anything other than your husband has been

7        shot.  I didn't tell her how many times

8        he had been shot.  We don't know where or

9        why there had been an intrusion into her

10        home or why the shooting occurred.  I

11        asked her if she knew of anything that

12        was missing.  I had walked through the

13        house already looking for signs that the

14        electronic equipment -- things that are

15        commonly stolen during burglaries, might

16        be missing.  Just basically gathered

17        information of where valuables might be.

18        She opened a drawer and pulled out a

19        stack of two dollar bills.  We couldn't

20        determine anything other than the vehicle

21        and the gun was missing, told her that we

22        needed to process the entire house as a

241

1          crime scene to determine where else a

2          suspect may have gone in the house and

3          what else he may have done.  She told me

4          that do whatever you have to do, search

5          the whole place, just find the guy.

6  Q.   And you took that as what from Donna Roberts,

7          to do your duty as to why the police were

8          called there?

9  A.   That she wanted me to fully investigate this

10          crime, to search the entire residence and

11          basically gave me cart blanche to look

12          anywhere on their property while I was

13          there, to find clues as to who had

14          committed this act.

15  Q.   And did she ever that morning, give you any

16          indication that she didn't want you to

17          search either the house or any portion of

18          the house?

19  A.   No, she did not.

20  Q.   Did she ever give you any indication that she

21          didn't want you to search any portion of

22          the outside property or the garage?

242

1    A.    No, she did not.

2    Q.    Did she give you any indication that she did

3          not want you to search the motor vehicle?

4    A.    No, she did not.

5    Q.    And in fact, she was very cooperative with

6          you?

7    A.    She told me she wanted me to search the whole

8          place and find out who had done this to

9          her Robert.

10   Q.    And that is what you did?

11   A.    Yes, Sir.

12   Q.    Now, there was another time, I guess, when

13         Ralph and Rita Roberts did arrive and you

14         indicated there were at least three

15         occasions where she said, "Find this

16         person and find out who did this"?

17   A.    Yes.

18   Q.    There was at least one time that occurred

19         before Ralph and Rita Roberts arrived?

20   A.    Yes.

21   Q.    Did the second one occur either before they

22         arrived or after they arrived?

243

1   A.    Before.

2   Q.    So twice at least before the Roberts, Ralph

3         and Rita, that is arrived, Donna

4         indicated to you that you were to search

5         her entire residence and the property?

6              MR. INGRAM:  I object to the form of

7   the question.

8              MR. BECKER:  I'll strike that.

9              THE COURT:  Sustained.

10  Q.    She indicated that she wanted you to find the

11        killer?

12  A.    Yes.

13  Q.    And to do whatever it took for you to find

14        them?

15  A.    Yes.

16  Q.    There came a third time, at least, where she

17        indicated that she wanted you to do this,

18        correct?

19  A.    Yes.

20  Q.    And explain that situation.

21  A.    When Ralph and Rita Roberts arrived at the

22        home, at 254 Fonderlac, I briefly spoke

244

1    with Ralph Roberts, told him that Robert

2    Fingerhut was, had been shot and killed.

3    He asked me if he was still in the house.

4    I told him he had been shot in the

5    kitchen.  He asked if he was still in the

6    house, and I said that he was and that it

7    was a pretty graphic scene, and that it

8    would probably be best if Donna left the

9    residence, at least for the remainder of

10   the night.  I didn't want to expose her

11   to the mess that was there.  She had

12   already seen it once.  He went in the

13   bedroom and spoke with Donna.  There was

14   more crying and they embraced with each

15   other, hugged each other and had

16   conversation with them.  Then again I

17   talked with Donna and told her, Ralph

18   Roberts was standing there, I don't know

19   if Rita Roberts was standing there or

20   not, that we were going to probably be

21   all night processing the crime scene, and

22   that we needed to process the entire

245

1          house as a crime scene, and explained to

2          them again that we needed to go and

3          search the whole house because we didn't

4          know where a suspect may have gone within

5          the residence.

6    Q.   Or maybe what had been taken?

7    A.   Exactly, and Donna Roberts again agreed, she

8          said, "I told you, whatever you have to

9          do, search the whole place, just find

10         this guy."

11   Q.   And when she left that residence with Ralph

12         and Rita Roberts, in the entire hour and

13         a half that you had been there with her

14         or maybe two hours now -- how long was

15         she there when Ralph and Rita Roberts

16         were there?

17   A.   Probably about a half hour.  She had some pets

18         there, two small dogs that she wanted to

19         take with her and they gathered some

20         clothing and were trying to support her

21         and basically had to walk out of the

22         house with her.  She had problems getting

246

1     one of the dogs out from under the bed.

2 Q. Now, in this entire approximately two hour

3     period that you were there with Donna

4     Roberts, did she ever give you any

5     indication that you were not to search

6     the house or any portion thereof?

7 A. No.

8 Q. Did she ever give you any indication that you

9     were not to search her vehicle?

10 A. No.

11 Q. In fact, it was quite the opposite?

12 A. Exactly.

13 Q. And I believe you were there until

14     approximately 6:30 in the morning?

15 A. Yes.

16 Q. And you have in front of you Defendant's

17     Exhibit A, which is an eight page

18     document with a blue sticker on it.  I

19     believe those are the items you took from

20     that residence?

21 A. Yes.

22 Q. Were those items all taken in the early

247

1           morning hours of December 12, 2001?

2    A.    No.

3    Q.    Were some of those items taken at a later time

4           on December 12, 2001?

5    A.    Yes.

6    Q.    Are you able to discern which ones were taken

7           at what times or not?

8    A.    I am in error.  I was looking at sequence

9           sheet number seven and it is in error.

10          There's a mistake on the date at the top.

11          It shows December 13th.  This should

12          actually be December 12th.  These were

13          taken, all taken in the morning hours of

14          December 12th, not the 13th.  These items

15          were all taken in the early morning hours

16          on December 12th.

17   Q.    Now, you are referring to page 7, specifically

18          when you say the 13th, right?

19   A.    Yes.  There's a mistake on the date.

20   Q.    Now, later on, I believe you left and you

21          actually went home, is that correct?

22   A.    Yes, I did.

248

```
 1   Q.   Sometime earlier or later that day at

 2        approximately 10:00 A.M. in the morning

 3        on December 12, 2001, you went to the

 4        Ralph and Rita Roberts residence in

 5        Austintown?

 6   A.   Yes, prior to Donna Roberts leaving the

 7        residence, I told Donna that I was going

 8        to need to talk to her again about this.

 9        Later the same day, I left the crime

10        scene well after she did, and went home

11        and got a couple of hours sleep.  There

12        were some, in my opinion, what I

13        observed --

14             MR. INGRAM:  I'm going to object to

15   the opinion and my objection is this is not

16   responsive to the question.

17             THE COURT:  Sustained.

18   Q.   Let me ask you this.  When Donna Roberts left

19        with Ralph and Rita on December 12, 2001,

20        did you indicate that you may need to

21        speak to her again?

22   A.   Yes, I did.
```

249

1    Q.   What was her response to that?

2    A.   She told me she would make herself available

3              to me any time I needed her.  And she

4              did.

5    Q.   Now, on December 12, 2001 at approximately

6              10:00 A.M., did you go to Austintown to

7              Ralph and Rita Roberts?

8    A.   Yes, I did.

9    Q.   What was your purpose in going there?

10   A.   I wanted to obtain a written consent to

11             search, to further search the house and

12             their two vehicles.

13   Q.   The one had still not been recovered?

14   A.   Yes, the silver Chrysler had yet to be

15             recovered.

16   Q.   And you went to her, I believe, with a form

17             that has been marked and it is in front

18             of you as State's Exhibit No. 1.  It is a

19             two page document.  Is that a fair and

20             accurate copy of the consent to search

21             form that you obtained from her later in

22             the morning of December 12, 2001?

250

```
1   A.   Yes, it is.

2   Q.   And can you explain to this Court how that

3        form was executed?

4   A.   Personally went to the Ralph Roberts'

5        residence located in Austintown, with

6        Captain Compton from the Howland Police

7        Department.  I was greeted at the door by

8        Mr. Roberts, told him I needed to speak

9        with Donna.  He invited me into the

10       residence.  Donna was lying on a couch in

11       the living room.  She was friendly with

12       us.  She was tired.  I sat down on the

13       couch next to her.  Explained to her that

14       we wanted to go back in and continue

15       searching her house.  We had left an

16       officer there at the house when we left

17       the scene and that we wanted to continue

18       to search the house as well as her two

19       vehicles?  And she again told me do

20       whatever you have to do.  She was very

21       cooperative.  Explained the form, the

22       consent form, what we were going to
```

251

1              search, and explained to her that she

2              didn't have to allow us to continue to

3              search and read the waiver to her, and

4              she was very positive about it and said

5              do whatever you have to do.

6    Q.    And in fact, she did sign that form?

7    A.    Yes, she did.

8    Q.    And your signature is on that form?

9    A.    Yes, it is.

10   Q.    And that is a fair and accurate copy, State's

11             Exhibit No. 1 is, of the waiver -- or I'm

12             sorry, the consent to search form?

13   A.    Yes, it is.

14   Q.    Now, I want to go back to early in the morning

15             of the 12th on 2001, while you were

16             speaking to Miss Roberts, did she tell

17             you where she was and why she was not

18             home prior to finding Robert deceased?

19   A.    Yes, she did.

20   Q.    Just briefly, what story did she tell you?

21   A.    Donna Roberts told me that Robert Fingerhut

22             called her on the telephone, told her

252

```
 1                  that he wanted her to go shopping, she
 2                  deserved it, and to buy herself something
 3                  nice.  So she went to Giant Eagle to buy
 4                  some rotisserie chicken for her dogs.
 5                  She went to Wal-Mart, and she said she
 6                  also went to Super K-Mart and walked
 7                  around the store for a couple of hours
 8                  and then she came home.
 9      Q.  And that is when she discovered, that is when
10                  she played this game with the garage door
11                  and discovered Robert Fingerhut?
12      A.  Yes.
13      Q.  At that time, did you have any reason to
14                  believe that her story was false?
15      A.  In fact, there was a bag on the kitchen table
16                  with some of the items she told me she
17                  purchased, some make-up and lighter and a
18                  receipt.  I'm not certain but I am pretty
19                  sure the time on the receipt was 9:37
20                  P.M., which was consistent with what she
21                  told us.
22      Q.  Eventually though -- well, strike that.  On
```

253

1         December 11, 2001 and December 12, 2001,

2         was Donna Roberts ever handcuffed?

3 A.   Never.

4 Q.   Was she ever placed under arrest?

5 A.   Never.

6 Q.   During your interactions with her, bolstering

7         the midnight to 2:00 A.M. time period and

8         the time period again at 10:00 in the

9         morning on December 12th, did she appear

10        to you to be under the influence of

11        drugs?

12 A.   No.

13 Q.   During that same time period, did she appear

14        to be under the influence of alcohol?

15 A.   No.

16 Q.   Did she freely and knowingly give you consent

17        to search her residence?

18        MR. INGRAM: Objection.

19 Q.   Based on what you observed.

20        THE COURT: He can describe what she

21 looked like and her attitude, but it is a

22 conclusion I don't think he may make. Sustained.

253

1            December 11, 2001 and December 12, 2001,

2            was Donna Roberts ever handcuffed?

3    A.   Never.

4    Q.   Was she ever placed under arrest?

5    A.   Never.

6    Q.   During your interactions with her, BOLSTERING

7            the midnight to 2:00 A.M. time period and

8            the time period again at 10:00 in the

9            morning on December 12th, did she appear

10           to you to be under the influence of

11           drugs?

12   A.   No.

13   Q.   During that same time period, did she appear

14           to be under the influence of alcohol?

15   A.   No.

16   Q.   Did she freely and knowingly give you consent

17           to search her residence?

18              MR. INGRAM:   Objection.

19   Q.   Based on what you observed.

20              THE COURT:   He can describe what she

21   looked like and her attitude, but it is a

22   conclusion I don't think he may make.   Sustained.

254

1   Q.   Did eventually Donna Roberts become a suspect
2             and was in fact actually charged?
3   A.   Yes.
4   Q.   And I believe you presented to this very
5             Court, an affidavit charging her with the
6             murder of Robert Fingerhut over a week
7             later, is that correct?
8   A.   Yes, it is.
9   Q.   So, until that affidavit was actually filed,
10            she was not -- well, strike that.  It was
11            not until a number of days later, over a
12            week later she was actually determined to
13            be the suspect and involved in this to
14            the extent that you could file a criminal
15            charge?
16  A.   Yes.
17  Q.   The individual that you spoke to on December
18            12, 2001, who gave you consent to search
19            her house, is she here in this Courtroom?
20            MR. INGRAM:  Objection.
21            THE COURT:  Defendant has already
22  been identified.

255

1   Q.    I would like this witness to identify.

2               MR. INGRAM:   I'll stipulate

3   identification of the Defendant but that is not why

4   I objected.   There's a factual conclusion contained

5   in the question and that is why I objected.

6   Q.    Is the individual who told you to do whatever

7         it took to catch the person who did that

8         to Robert Fingerhut on December 12, is

9         she in the Courtroom?

10  A.    Yes, she is.

11              MR. INGRAM:   Stipulate

12  identification of Donna Roberts.

13              MR. BECKER:   Thank you.

14  CROSS EXAMINATION BY MR. INGRAM:

15  Q.    How are you?

16  A.    Good, Sir.

17  Q.    We know each other, don't we?

18  A.    Yes, Sir.

19  Q.    I got a couple of questions that -- Ken Bailey

20        says no.   First off, what do you have in

21        front of you there?   Those are Exhibits?

22  A.    I have Defendant's Exhibit A, which is an

256

```
 1              eight page, eight copy pages of Howland
 2              Police Department property receipts.
 3              State's Exhibit No. 1 is a two page
 4              document which is an accurate copy of the
 5              Howland Police Department consent to
 6              search form.
 7    Q.    You have no police reports in front of you?
 8    A.    No, Sir.
 9    Q.    And while you testified on direct examination,
10              you were reading from no police reports?
11    A.    No, Sir.
12    Q.    You responded to 254 Fonderlac at
13              approximately 1235?
14    A.    Yes.
15    Q.    And you were actually the third Howland police
16              officer on the scene?
17    A.    I believe --
18    Q.    The first would be Ray, Pollcino, Sergeant
19              Dillon and then you?
20    A.    That would make me the fourth, yes.
21    Q.    I can't add very well, can I?  You were the
22              fourth.  When you arrived, you first
```

257

1          spoke with Patrolman Albert Ray?

2    A.   Yes.

3    Q.   And you inquired of Patrolman Ray as to what

4          he observed and what he did when he

5          arrived at the scene?

6    A.   Yes.

7    Q.   And it is a fact, is it not, Patrolman Ray

8          told you that he and Officer Pollcino had

9          conducted a protective sweep of the

10         interior and the exterior of the

11         residence, correct?

12   A.   Yes.

13   Q.   After you talked with Patrolman Ray, do you

14         talk to Sergeant Dillon at all?

15   A.   I'm sure I did.

16   Q.   Do you recall what you spoke with Sergeant

17         Dillon about?  Do you remember?

18   A.   No, I don't.

19   Q.   Fair enough.  When you entered the residence

20         where is Donna Roberts?

21   A.   She's in the master bedroom.

22   Q.   She in there alone or in the company of

258

| | | |
|---|---|---|
| 1 | | someone? |
| 2 | A. | She's alone. |
| 3 | Q. | Do you know if she was attended to by |
| 4 | | emergency medical personnel on this |
| 5 | | particular evening at all? |
| 6 | A. | Yes. |
| 7 | Q. | She was? |
| 8 | A. | They spoke to her, yes. |
| 9 | Q. | Did they treat her?  Did they try to calm her |
| 10 | | down?  Were you present for this? |
| 11 | A. | Yes. |
| 12 | Q. | Were you in the room when emergency personnel |
| 13 | | were with her? |
| 14 | A. | No. |
| 15 | Q. | Do you know if they took her blood pressure? |
| 16 | A. | No. |
| 17 | Q. | Do you know if they requested that she go to |
| 18 | | the hospital? |
| 19 | A. | No, I don't. |
| 20 | Q. | Did you first see Donna Roberts or did you |
| 21 | | first hear Donna Roberts? |
| 22 | A. | First heard Donna Roberts. |

259

1   Q.   What did you hear Donna Roberts, what did you
2        hear?
3   A.   "Oh, my Robert.  Oh, my Robert."
4   Q.   And was she screaming this?
5   A.   Repeatedly, yes.
6   Q.   When you talked to Patrolman Ray, did he tell
7        you that when he and Officer Pollcino
8        arrived that Donna Roberts was
9        hysterical?
10  A.   I don't know, Sir.
11  Q.   You described the 911 call or at least a
12       portion of it for Mr. Becker.  Are you
13       aware that the 911 caller described
14       Mrs. Roberts as hysterical?
15  A.   Yes.
16  Q.   And you knew that at the time, yet you walked
17       into the bedroom and began talking to
18       her?
19  A.   I'm not sure what your question is.
20  Q.   When you first approached Donna Roberts in the
21       bedroom, you knew that the 911 caller had
22       described her as hysterical?

260

1    A.    At that time, I wouldn't have known that.    I

2          do know later that she was.

3    Q.    Would you say she was hysterical when you

4          first talked to her?

5    A.    I have seen a lot of people and I guess I

6          would describe hysterical a little

7          different.    She appeared to me to be

8          overcome with grief.

9    Q.    Do you recall telling Mr. Becker that she was

10         emotional?

11   A.    Yes.

12   Q.    She was distraught?

13   A.    I guess that is fair.

14   Q.    That is a fair statement?

15   A.    That is fair.

16   Q.    And when you would talk to her, before you

17         could get information from her, you had

18         to calm her down so that you could

19         actually speak with her, correct?

20   A.    Yes.

21   Q.    Because initially, you would ask questions,

22         but she was unable to give you responses?

261

1   A.   No.

2   Q.   She was able to respond before or after you

3         calmed her down?

4   A.   Well, she would go in and out of these periods

5         where sometimes she would appear

6         emotional and other times she wasn't

7         emotional at all.

8   Q.   Ran the full gamut from emotional to calm?

9   A.   Yes.

10   Q.   Have you ever see anyone in shock?

11   A.   Yes.

12   Q.   Would you say running the full gamut of

13         emotions is someone in shock?

14   A.   No.

15   Q.   Was Donna Roberts crying?

16   A.   Yes.

17   Q.   And when you first saw her, she was screaming,

18         crying, and then appeared very emotional?

19   A.   Yes.

20   Q.   And those are your words in your police

21         report, are they not?

22   A.   I can look at that.  I would say that is

262

1              accurate.

2    Q.    Page one, the fourth paragraph?

3    A.    Okay.

4    Q.    The fourth line, "The victim screaming, crying

5              and appeared to be very emotional for

6              several minutes."

7    A.    What you have handed me, that's not what it

8              says.

9    Q.    I must have handed you the wrong thing.  I'm

10             sorry.  I'll give you this one.  Are

11             those your words, "screaming, crying and

12             very emotional"?

13   A.    Yes.

14   Q.    For several minutes?

15   A.    Yes.

16   Q.    And that is when you are first trying to

17             elicit information from her?

18   A.    Yes.

19   Q.    And then you tell her that she has to be

20             strong?

21   A.    Yes.

22   Q.    And she has to try and answer some questions?

263

1    A.    Yes.

2    Q.    And she takes a couple of minutes, she

3          composes herself and she begins answering

4          questions?

5    A.    Yes.

6    Q.    Now you made the decision that someone should

7          be called to assist Donna Roberts?

8    A.    Yes.

9    Q.    Was that due in part to her emotional

10         condition?

11   A.    Typically any time that we deal with a death

12         of anyone, we always try to bring a

13         neighbor, a family member, a close friend

14         or someone to sit with the grieving

15         person.

16   Q.    Fair enough.  You have described for

17         Mr. Becker a series of conversations you

18         had with Donna Roberts regarding the

19         house as a crime scene and procession of

20         the crime scene or processing the house?

21   A.    Yes.

22   Q.    Do you recall discussing that with Mr. Becker?

264

1    A.    Yes.

2    Q.    I believe you told Mr. Becker that the first

3          two -- that there were three of those

4          conversations in total, am I correct?

5    A.    Yes.

6    Q.    The first two of those conversations preceded

7          the arrival of Ralph and Rita Roberts?

8    A.    Yes.

9    Q.    Where are you and Donna Roberts physically

10         located when you have these first two

11         conversations?

12   A.    In the master bedroom of the house.

13   Q.    Do you have a witness to these conversations?

14   A.    It would be Albert Ray or Detective Sergeant

15         Dillon.

16   Q.    When you go in there and discuss with Donna

17         Roberts that the house is a crime scene,

18         that it is going to take a long time to

19         process it, is that the kind of

20         conversation where you wanted to have a

21         witness present for, so at a later time

22         you could say it is not just in my word,

265

1        I have somebody else that heard this?

2  A.    No.

3  Q.    So you don't know if you have a witness to

4        these two conversations or not?

5  A.    No.  Whenever I went into the bedroom and

6        spoke with Donna Roberts, somebody went

7        in with me.  That wasn't the reason that

8        I took someone in the bedroom with me.

9  Q.    So that you would have a witness?

10  A.    No, that is not the reason.

11  Q.    But it is your testimony that these two

12        conversations were witnessed either by

13        Patrolman Ray or Sergeant Dillon?

14  A.    Yes.

15  Q.    And you began the first conversation by

16        stating to Donna that the house had to be

17        handled as a crime scene and searched

18        because you have no idea where or what

19        the perpetrator may have done or where in

20        the house the perpetrator may have gone;

21        is that correct?

22  A.    Yes.

266

1    Q.    And she told you in your words, "Do whatever

2          you have to, just find who did this"?

3    A.    Yes.

4    Q.    Is that the end of the first conversation

5          regarding the processing of the home?

6    A.    The first conversation we started talking to

7          her, Donna Roberts almost appeared mad,

8          because I was asking her some of the

9          questions in which Officer Ray had asked

10         prior to my arrival, and indicated to me

11         that she had already answered some of

12         these questions and just wanted us to get

13         on with our job and find out who did

14         this.  The reason that I would have

15         somebody with me is that with her being

16         upset, sometimes it is easier for two of

17         us to go in and talk to her.  Maybe I

18         can't think of something to try and calm

19         her down, the other officer can.

20   Q.    Okay.  So do you recall who you took into the

21         bedroom with you to assist in calming

22         Donna Roberts down, Officer Ray, Sergeant

267

1             Dillon or a combination?

2   A.   I believe it was Officer Ray that was with me.

3   Q.   And did I fairly describe that conversation?

4   A.   Yes.

5   Q.   Basically it is a crime scene, we have to

6        process it, go ahead and do it?

7   A.   Yes, that is fair.

8   Q.   When you said it is a crime scene, we have to

9        process the scene, that is a statement of

10       fact, is it not?

11  A.   What do you mean?

12  Q.   You declared the residence a crime scene, did

13       you not, that was your statement?

14  A.   No.  I told her that there could be evidence

15       anywhere in the house, and that we had no

16       idea what happened, that her husband had

17       been shot, a perpetrator could have went

18       anywhere in the house and could have left

19       a clue as to what had transpired, a

20       bullet lodged in the wall.

21  Q.   Why don't you go to the second page of your

22       report, second paragraph?

268

1   A.   Okay.

2   Q.   Does it say R.O., meaning you explained to

3        Donna the entire house needed to be

4        handled as a crime scene?

5   A.   Which line are you referring to?

6   Q.   First line of the second full paragraph on

7        that page.

8   A.   Yes.

9   Q.   Is that what you told her?

10  A.   Yes.

11  Q.   That is not a factual assertion to you?

12  A.   Is the entire house a crime scene in my

13       opinion?

14  Q.   Is that what you told her?

15  A.   Yes.

16  Q.   You told her it was a crime scene, right?

17  A.   Yes.

18  Q.   And you told her you were going to process the

19       crime scene, correct?

20  A.   With her consent, yes.

21  Q.   Was that what it says there?  You said you

22       told her it was a crime scene and that we

269

```
 1            had to process the scene?
 2  A.   Yes.
 3  Q.   Then she tells you, "Do whatever you have to,
 4            just find the guy," correct?
 5  A.   Yes.
 6  Q.   Now when is the second conversation regarding
 7            the house is a crime scene and the
 8            processing of the house?
 9  A.   Well, up there if you are reading, I did type
10            every single word or every conversation I
11            had.
12  Q.   I'm not asking you from the report, I'm asking
13            you from your recollection.
14  A.   Before this paragraph, that conversation would
15            have taken place.
16  Q.   It is not described in your report, correct?
17  A.   No.
18  Q.   Is there someone who was within ear shot of
19            the first conversation, Patrolman Ray,
20            Sergeant Dillon perhaps?
21  A.   Pretty much anywhere on the first floor of
22            that residence, other than the back
```

270

1     computer room, I would say you are within

2     ear shot of where we were at.

3 Q. Did you purposely try to have somebody within

4     ear shot of that first conversation?

5 A. You know, when I needed information from Donna

6     Roberts, she was cooperative.  I would

7     try to get someone to walk in with me and

8     take for example, the bag of, from

9     Wal-Mart, I don't see it here in my

10     report, I know that we recovered it and

11     that she told me about it, but it is not

12     here in the report.

13 Q. Basically, I think what you are telling me, is

14     you don't know if there was someone

15     within ear shot of this first

16     conversation or not?

17 A. No.  I told you other than the computer room,

18     there would have been somebody within ear

19     shot of me.

20 Q. And who would that have been?

21 A. Patrolman Ray or Sergeant Dillon.

22 Q. The three conversations you had with Donna

271

```
 1                Roberts in terms of being within ear
 2                shot, we would be talking about Patrolman
 3                Ray or Sergeant Dillon?
 4     A.   Okay.
 5     Q.   Am I correct?  I'm asking you a question.
 6     A.   Yes.
 7     Q.   And they have already testified?
 8     A.   Yes.
 9     Q.   Now the third conversation is after Ralph and
10                Rita Roberts arrive, correct?
11     A.   Yes.
12     Q.   Let me back up to the first one, the one not
13                described in your report.  When that
14                conversation takes place, is Donna
15                Roberts in the bedroom if you remember?
16     A.   The first conversation I had with Donna
17                Roberts?
18     Q.   Yes.
19     A.   It would have been in the bedroom.
20     Q.   Third one is as the three, as Ralph, Rita and
21                Donna are leaving, so that is sort of in
22                the hallway near the living room, am I
```

272

1         correct?

2    A.   I believe it started in the bedroom and they,

3         that one kind of moved back and forth

4         between the bedroom and the hallway, and

5         the formal living room, because Donna

6         kept going back to get clothing and her

7         dogs, supplies for her dogs.

8    Q.   And on the way out, did Donna ask you what you

9         were going to do now?

10   A.   I don't recall that.

11   Q.   What do you recall the third conversation

12        about the crime scene and the processing

13        of the crime scene?

14   A.   I reiterated to Donna Roberts that we needed

15        to search the entire house.  Look for

16        evidence that may have been left

17        somewhere in the house.  And she again

18        told me to do whatever you have to do,

19        search the whole place.  She was pretty

20        positive about it, and she just wanted us

21        to find out who killed Robert Fingerhut.

22   Q.   Would you go to page three of your report, the

273

1                last full paragraph on that page?

2    A.   Yes.

3    Q.   Is that the conversation we're talking about,

4          described in that paragraph?

5    A.   No.

6    Q.   The conversation you are talking about now,

7          does that occur before the conversation

8          described at page three of your report or

9          after?

10   A.   I don't know if you are trying to confuse me

11        or what conversation you are referring

12        to, but I am under the impression you are

13        talking about the conversation I had with

14        Donna Roberts in the presence of her

15        brother Ralph, and Rita, which is

16        referred to in the final page, I believe,

17        of the supplemental or close to it.  If

18        you can point out exactly what you are

19        asking me, I'll certainly be glad to

20        answer it.

21   Q.   On page three, the last paragraph, it says

22        that Donna spoke with Ralph and decided

274

```
 1              to leave with her brother and
 2              sister-in-law.  Donna asked R.O., that
 3              would be you, correct, "What are you
 4              going to do now?"  And you responded that
 5              officers are going to continue processing
 6              the crime scene and search for more
 7              evidence."
 8    A.   Okay.
 9    Q.   And Donna said, "Okay, do whatever you have
10              to."  Is that the conversation we're
11              talking about, where Ralph and Rita
12              Roberts are present?
13    A.   No, when that took place, she had talked to
14              Ralph on the phone, I believe, and Ralph
15              wasn't standing there when that took
16              place.
17    Q.   Why don't you read the rest of that paragraph?
18    A.   "Donna's brother Ralph Roberts was contacted
19              by the Austintown Police Department and
20              asked to come to the scene at the request
21              of the Howland Police Department.  Donna
22              spoke with Ralph and decided to leave
```

275

```
 1              with her brother and sister-in-law, Rita
 2              Roberts.  Donna asked R.O., "What are you
 3              going to do now?  R.O. told Donna that
 4              officers are going to continue to process
 5              the crime scene and search for more
 6              evidence.  Donna said, 'Okay, do whatever
 7              you have to do.'  R.O. again told Donna
 8              officers would need to spend most of the
 9              night processing the house and it would
10              be best if she left with her brother for
11              support.  R.O. also told Donna officers
12              would need to speak with her later in the
13              day, to further discuss the
14              investigation.  Donna told R.O. to
15              contact her any time at Ralph's.  Ralph
16              Roberts provided his address, 931 Kirwin
17              Street, Austintown, Ohio, telephone
18              number, area code 330/792-9554 and told
19              R.O. to call if anything was needed."
20   Q.   Okay.  Is that the conversation where they are
21        leaving?
22   A.   Yes, where they are going out the door.
```

276

```
 1   Q.   Yes.   That is the third conversation regarding
 2             the crime scene and the processing of the
 3             crime scene, right?
 4   A.   Yes.
 5   Q.   So, I was right, it is on page three?
 6   A.   Yes.
 7   Q.   Thank you.   You drove to the Roberts'
 8             residence in Austintown after catching a
 9             few hours sleep at approximately 10:00 to
10             get Donna Roberts to sign a consent to
11             search form, is that right?
12   A.   No.
13   Q.   When you went to the Roberts' residence that
14             morning at approximately 10:00 A.M. --
15             did you go there at 10:00 A.M.?
16   A.   I went there and I was driven there by
17             Detective Compton.
18   Q.   You did go there?
19   A.   Yes, Sir.
20   Q.   Wasn't the purpose in going there to get a
21             consent to search form signed?
22   A.   Yes.
```

277

1   Q.   Did I ask you something differently?

2   A.   Yes.

3   Q.   What did I ask you?

4   A.   You threw in a bunch of information, some of

5        which wasn't correct exactly.

6   Q.   What wasn't correct?

7   A.   You said, "You drove to Ralph Roberts house."

8   Q.   The two of you went there to get a consent to

9        search form?

10  A.   Yes.

11  Q.   Had you received any communication from Donna

12       Roberts from the time you left the

13       residence at approximately 6:49 and

14       10:00, when you head to the Roberts'

15       residence in Austintown?

16  A.   No.

17  Q.   So, she did not call you and say, "By the way,

18       I revoke or cancel that consent you got

19       earlier"?

20  A.   No.

21  Q.   Is it your idea to drive to Austintown to get

22       the consent to search form signed?

278

```
1   A.   We need to --

2   Q.   Was it your idea?

3   A.   No.

4   Q.   Was it Dennis Watkins' idea by any chance?

5   A.   It was Detective Compton contacted me.

6   Q.   Captain Compton?

7   A.   Yes.

8   Q.   He contacted you?

9   A.   Yes.

10  Q.   Told you that we should go get a consent to

11       search form signed?

12  A.   Yes.

13  Q.   So, it was his idea?

14  A.   He's the one that contacted me, Sir.

15  Q.   What role did he have in this investigation,

16       Captain Compton?

17  A.   Well, at the point of us leaving, he would

18       have handled, assisted in handling public

19       relations with the chief, speaking with

20       witnesses.

21  Q.   Did he speak with any witnesses?

22  A.   I believe he did, but I'm not certain.  Yes,
```

279

1          he did.

2    Q.    Who did he speak with?

3    A.    He spoke with Donna Roberts, he spoke with

4          Ralph Roberts, and Rita Roberts.

5    Q.    Other than those three, did he talk to anyone?

6          Withdraw the question.  At 254 Fonderlac

7          before you leave, did you tell Donna

8          Roberts at any point in time that her

9          consent was necessary for you to process

10         the house?

11   A.    Did I tell her it was necessary?

12   Q.    Yes.

13   A.    I requested her consent to continue searching

14         her house.

15   Q.    That is not my question.  Did you ever tell

16         her, "We can not process this house, we

17         can not search this house, unless you

18         give us your consent"?

19   A.    No.  I felt that we already had her consent.

20         It had been implied.

21   Q.    You never told her that before you thought you

22         had consent or after you thought you had

280

1            consent, correct?

2 A.   I knew I had consent. She told me I had

3            consent.

4 Q.   Let's back up. At any point in time when you

5            are in this house, do you tell her, "We

6            can't do this unless you give us your

7            consent"?

8 A.   No, I did not tell her that.

9 Q.   At any point in time while you are in the

10           Fonderlac residence, do you tell Donna

11           Roberts that she does not have to

12           consent?

13 A.   At Fonderlac?

14 Q.   Yes.

15 A.   No.

16 Q.   I don't want to belabor a dead horse and I

17           know that I have an interminable

18           reputation for doing that. We have

19           talked about three conversations you had

20           with Donna Roberts about the house is a

21           crime scene, the processing of it, and

22           her telling you to go ahead. Do you

281

1                    recall the interchange we have had?

2    A.   Yes.

3    Q.   I want you to think about these three

4              conversations and is there anything about

5              those conversations you haven't told us

6              about?

7    A.   There's a lot.  There's a lot of stuff there.

8    Q.   Then you are going to have to tell me about

9              it?

10   A.   Well, Donna throughout the time she was there,

11             during that two hours, occasionally there

12             would be passing and exchanging in words.

13   Q.   I am only talking about -- I'm not talking

14             about the questions you asked her about

15             her whereabouts, what she did or any of

16             that.  I am only talking about the three

17             conversations you had about the house is

18             a crime scene, and the processing of the

19             house?

20   A.   Okay.

21   Q.   Are there anything about those three limited

22             conversations that you haven't told us

282

1        about?

2  A.   No, I don't think so.

3  Q.   Now you have before you State's Exhibit No. 1.
4        And that is the consent to search form
5        that is signed later in the day at the
6        Roberts' residence at approximately 10:25
7        A.M.

8  A.   Yes.

9  Q.   And that document specifically describes
10       Donna's motor vehicle?

11  A.   Two of them, Sir, yes.

12  Q.   In your oral conversations with Donna Roberts
13       earlier at 254 Fonderlac, you and she
14       never discussed the motor vehicles
15       specifically, did you?

16  A.   There was slight conversation about, during
17       some of our conversations about her
18       whereabouts, she indicated she had been
19       at Red Lobster and had dinner.  I had
20       noticed there was some king crab legs
21       laying on the floor, so when I told her
22       about that, and she says, "Yes, I

283

```
 1              remember I had king crab legs."
 2   Q.   I'm not asking about crab legs.  When you
 3              asked her, when you told her that you had
 4              to search the house, you never told her
 5              you had to search the car, did you?
 6   A.   No, I did not.
 7   Q.   And in fact, the first document or the first
 8              time her car is mentioned is at 10:25 as
 9              set forth in State's Exhibit No. 1,
10              correct?
11   A.   As far as on paper and written down, yes.
12   Q.   Are you saying that she verbally told you to
13              go ahead and search the car?
14   A.   She told me to do whatever I had to, the car
15              was there.
16   Q.   Did she ever tell you it is okay to search my
17              car?
18   A.   Specifically her car?
19   Q.   Specifically.
20   A.   No.
21   Q.   But you are saying in your opinion, because
22              the car was there, you had permission to
```

284

1           search the car?

2  A.   Yes.  Yes, I did.

3  Q.   And you searched the car, in point of fact,

4        well before that consent to search form

5        was executed, correct?

6  A.   Portions of it, yes.

7  Q.   The trunk portion?

8  A.   We briefly looked over the whole car.

9  Q.   Did you seize the letters in the trunk before

10       or after the consent to search form was

11       executed?

12  A.   Before.

13  Q.   On December 12, 2001, do you know if Donna

14       Roberts was under the care of a

15       psychiatrist?

16  A.   She told me she was being treated by Dr. Ariza

17       for post menopausal depression.  I don't

18       know if he's a psychiatrist or what kind

19       of doctor he is, Sir.

20  Q.   Did you know her before December 12th of 2001?

21  A.   No, Sir.

22  Q.   You have no idea what her emotional condition

285

```
 1                was prior to that date?
 2   A.   No.
 3   Q.   Handing you what has been marked as
 4            Defendant's Exhibit B.  Would you
 5            identify State's Exhibit or Defendant's
 6            Exhibit B, please?
 7   A.   Defendant's Exhibit B is a second page of a
 8            supplemental Howland police report
 9            written by Sergeant Frank Dillon, dated
10            12-12-01, December 12, 2001.
11   Q.   Describing what?
12   A.   A list of prescription medications that were
13            found in the residence that were written
14            in the name of Donna Roberts.
15   Q.   About how many medications are listed?
16   A.   23.
17   Q.   Do you know if any of those are psychotropic
18            medications?
19   A.   No, I don't.
20   Q.   Do you know if any of those are mind altering
21            substances?
22   A.   No, I don't.
```

286

1   Q.    Do you know if Donna Roberts had consumed any

2             of that medication on December 12, 2001

3             before you spoke with her?

4   A.    No, I don't.

5   Q.    Was their marijuana discovered in the

6             residence at 254 Fonderlac?

7   A.    Yes.

8   Q.    Do you know if Donna Roberts had smoked any of

9             that marijuana on that particular evening

10            before you had talked to her?

11  A.    No.

12  Q.    And again before you proceeded to the Roberts

13            residence in Austintown, no one had

14            withdrawn or revoked the oral consents

15            you claimed to have been previously

16            granted, correct?

17  A.    Yes, Sir.

18            MR. INGRAM:  Thank you.  I have no

19  further questions.

20  REDIRECT EXAMINATION BY MR. BECKER:

21  Q.    Detective, defense counsel asked you if Miss

22            Roberts ever gave you or specifically

287

1           said to you, "Search my car."  And your

2           indication was that she had not?

3   A.    Right.

4   Q.    Did she ever give to you the words, "Search my

5           home"?

6   A.    No.

7   Q.    In fact, her words were much broader, correct?

8   A.    Yes.

9   Q.    And those words, not to be repetitive and I

10          have killed a few dead horses myself,

11          were what?

12  A.    "Do whatever you have to do."

13  Q.    And did you take, "Do whatever you have to

14          do," to include searching the home?

15  A.    Yes.

16  Q.    Did you take that to search the vehicle?

17  A.    Yes.

18              MR. WATKINS:  I have nothing

19  further.

20              MR. INGRAM:  Nothing further.

21              THE COURT:  Thank you, Paul.  You

22  are excused.

288

1      MR. BECKER:  The State would have no
2  further witnesses in this matter.  We would move
3  for the admission of for the limited value that
4  there was the consent to search, State's Exhibit
5  No. 1, which is a two page document.  We have no
6  objection to the Defendant's Exhibits A and B.
7      THE COURT:  Any objection?
8      MR. INGRAM:  I have no objection.  I
9  move to introduce A and B.
10      MR. BECKER:  We have no objection.
11      THE COURT:  Plaintiff's Exhibits 1
12  and Defendant's Exhibits A and B are admitted.
13  Anything that the Defendant wishes to present at
14  this time?
15      MR. INGRAM:  The Defense rests.
16      THE COURT:  Is there any argument at
17  this time or briefs?
18      MR. BECKER:  Just very briefly, I
19  think according to earlier discussions with
20  Attorney Ingram, we would like to brief this matter
21  and I know the initial motion to suppress was filed
22  back in October.  I'm sure the Court has read that.

289

1   The State's tact obviously is going to be we
2   realize, there's no exception for murder exception
3   to the search warrant, to the fourth amendment.
4   Our argument here, and I think it has been borne
5   out, is clearly that it was implied consent by her
6   inviting them to her home, pursuant to the 911
7   call.  I would like at least a week, if I could.  I
8   would anticipate I would be able to get this done
9   this weekend providing Court with a lengthy list of
10  authority, detailing the law and implied consent as
11  an exception to the search warrant.  And I don't
12  know if Mr. Ingram would need an additional week or
13  two to respond to that.

14              MR. INGRAM:  Since the only time I
15  have ever heard of implied consent is when it
16  involves a motorist who is detained for drunk
17  driving, it would probably require me some time to
18  read these cases.

19              THE COURT:  Let me bring up a couple
20  of issues that you should cover, and that is, it
21  was argued in the brief that there's no such thing
22  as a crime scene investigation.  I think that is

1   pretty well established.

2               MR. BECKER:  Absolutely agree with.

3               THE COURT:  On this consent that the

4   State alleges was given by Miss Roberts, there's a

5   consent before and after evidence arose, whereby

6   she might become a suspect.  I think the law maybe

7   makes a distinction there.  From the evidence

8   presented, there's no reason to suspect -- the

9   facts can be argued whether that was valid consent.

10  I know what the other point was.  I think that the

11  Defense is arguing objectivity or subjectivity

12  rather than objectivity and I think that there has

13  to be something on the police looking at the

14  situation objectively as opposed to your argument

15  that well, she wasn't cognizant or aware of what

16  she was doing.  That is devoid of proof at this

17  point.  One can assume things, but I think those

18  points should be covered in your briefs.

19              MR. BECKER:  That will be done and I

20  don't know, do we want to set time frames?

21              THE COURT:  I would think that --

22              MR. BECKER:  If I could have until

291

1    next Thursday.

2              THE COURT:  This should be done

3    within the next, two, three weeks.  Mr. Ingram is

4    indicating I should take two weeks, if that is okay

5    with the Court.

6              MR. INGRAM:  Give the Prosecutor two

7    weeks, and we'll file a response within one week

8    thereafter.

9              THE COURT:  That is fine.  One other

10   point before I leave you go here.  We have a

11   conflict with that Jury date, you are aware of

12   that?

13             MR. BECKER:  Yes.

14             THE COURT:  Is there any objection,

15   they have the regular Jury coming in that day and

16   the Jury Commissioner cannot handle that many

17   people on two Juries.  Could we have this start the

18   day after that?

19             MR. INGRAM:  Yes.

20             MR. BECKER:  We probably need

21   another waiver of a day then.

22             THE COURT:  That's reason I bring it

292

1   up.  Is there a time problem?

2                MR. INGRAM:  Considering the fact

3   that we have had Defense motions filed whatever.

4   We would waive the statutory period for speedy

5   trial by one day and consent to a one day

6   continuance of the trial.

7                THE COURT:  We have got a form here.

8                MR. BECKER:  It is obvious that the

9   motion to suppress has followed the speedy trial

10  time.

11               MR. INGRAM:  We're happy to sign the

12  waiver.

13  (OFF THE RECORD)

14               MR. INGRAM:  I'll proffer to the

15  Court a waiver of speedy trial, duly executed by

16  Donna Roberts, extending the speedy trial period by

17  an additional 45 days until April 8, 2003.

18               THE COURT:  Ms. Roberts, you

19  understand what this?

20               MS. ROBERTS:  Yes.

21               THE COURT:  I'll approve the waiver.

22  Thank you all.

293

1        MR. BECKER:  Thank you.

2   (End of Hearing at 4:05 p.m.)

3

4

5

6   Wednesday, March 26, 2003; In Open Court at 1:55 p.m.

7            THE COURT:  I have had a brief

8   meeting with counsel, and I think this hearing that

9   was set for today is somewhat premature.  There's a

10  motion to suppress that I expect to have ruled on

11  by the first of the week.  And the other matter

12  that we have discussed here probably could have

13  been handled by a phone conversation.

14            So, in any event, there's nothing of

15  substance that we're able to cover today.  I did

16  mention to you gentlemen that there are some

17  outstanding motions that we have to get journalized

18  before April 8.

19            MR. BECKER:  If the Court would

20  prefer the State to prepare those, I will.  The

21  Court never directed me.

22            THE COURT:  It's not blaming you.

294

1  It is my fault as much as anybody.  I'll discuss

2  that with you later as to what procedure we wanted

3  to use here.  Anything else before the Court today

4  on this matter?

5          MR. INGRAM:  No, Your Honor.  Well,

6  there's one issue on the orientation instructions.

7  We'll work on a draft of that and submit it

8  jointly.

9          THE COURT:  I understand you pretty

10  much have an agreement.  If you have any problems,

11  let me know.

12  (End of Hearing at 1:56 p.m.)

13

14

15

16

17

18

19

20

21

22

295

1

2

3

4                    REPORTER'S CERTIFICATE

5

6          I do hereby certify that the above and

7   foregoing is a true and correct transcript of

8   the proceedings had in the within hearing as

9   shown by stenotype notes written by me in the

10  presence of the witnesses at the time of the

11  hearing.

12

13          _____
                MARY ANN MILLS, R.P.R.
14              Official Court Reporter
                Trumbull County, Ohio
15

16

17

18

19

20

21

22

296

1          IN THE COURT OF COMMON PLEAS
                TRUMBULL COUNTY, OHIO
2         TRIAL COURT CASE NO. 01-CR-793
          SUPREME COURT OF OHIO CASE NO. 03-1441
3

4   STATE OF OHIO          )          VOLUME II
                           )
5          Plaintiff       )
                           )    JURORS INITIAL APPEARANCE
6   -vs-                   )
                           )    HARDSHIP EXCUSES
7   DONNA M. ROBERTS       )
                           )
8          Defendant       )

9

10         BE IT REMEMBERED, that on Tuesday, April 8,

11   2003, and Wednesday, April 9, 2003, these proceedings

12   came on to be heard before one of the Judges of this

13   Court, John M. Stuard, in Courtroom No. 2, on High

14   Street, Warren, Ohio, before the case heretofore

15   filed herein.

16

17

18

19   Mary Ann Mills, RPR
     Official Court Reporter
20   Trumbull County, Ohio

21

22

297

<u>A P P E A R A N C E S</u>

On Behalf of the State of Ohio:
    Dennis Watkins, Prosecuting Attorney
    Charles L. Morrow, Ass't. Prosecuting Attorney
    Christopher D. Becker, Ass't. Prosecuting Attorney
    Kenneth N. Bailey, Ass't. Prosecuting Attorney
    160 High Street, N.W.
    Warren, OH 44481

On Behalf of the Defendant, Nathaniel Jackson:
    Anthony V. Consoldane, Attorney at Law
    James F. Lewis, Attorney at Law
    State of Ohio Public Defendant's Office
    328 Mahoning Avenue, N.W.
    Warren, OH 44481

On Behalf of the Defendant, Donna M. Roberts:
    John B. Juhasz, Attorney at Law
    J. Gerald Ingram, Attorney at Law
    7330 Market Street
    Youngstown, OH 44512

On Behalf of <u>The Vindicator Printing Co</u>.
    Ann Millette, Attorney at Law
    3200 National City Center
    1900 East Ninth Street
    Cleveland, OH 44114

On Behalf of WFMJ Television, Inc.:
    Stephen T. Bolton, Attorney at Law
    201 E. Commerce Street, Atrium Level Two
    Youngstown, Oh 44503

I N D E X

VOLUME II:

Hardship Excuses                                    298
(April 8, 2003)

Jurors Initial Appearance                           303
(April 8, 2003)

298

1  Tuesday, April 8, 2003; In-chambers at 9:25 A.M.:

2           THE COURT:  For the record, we're

3  in-chambers, prior to starting this matter.  The

4  prospective Jury is awaiting us.  We have had

5  submitted a request to be excused by Juror No. 142,

6  Rick Hall, and for medical purposes.  It is my

7  understanding that both sides are in agreement that

8  he should be excused.

9           MR. BAILEY:  That is correct.

10          MR. INGRAM:  That is correct.

11          MR. JUHASZ:  That is correct.  This

12  morning Attorney Ray Tisone, who was on our Jury

13  list, came in.  I had a conversation with

14  Mr. Bailey, and we both agreed that he should be

15  excused without objection from either side.  I

16  think he's Juror No. 327.

17          MR. BAILEY:  No objection.

18          THE COURT:  Attorney Bluedorn

19  approached me concerning a Robin Iftt, I F T T.

20  Their office has a civil action against Donna

21  Roberts.  No problem with excusing her.

22          MR. JUHASZ:  No objection.

299

1                MR. BAILEY:  No objection.

2      (OFF THE RECORD)

3                THE COURT:  For the record, it is

4      difficult to explain on the record at this juncture

5      the conundrum that has been raised this morning by

6      various motions that have been filed.  We have

7      awaiting us in the Courtroom, 300 of our citizens

8      of Trumbull County who have given their time today

9      to be here, and there has been a notice of appeal

10     filed to the Eleventh District Court recently of

11     appealing the motion to suppress ruling.  There's

12     an argument or a thought that this Court has no

13     jurisdiction to proceed at this point until that

14     matter is decided.  I'm sure that every effort will

15     be made to have The Court of Appeals rule on that

16     motion as swiftly as possible.  The Court has

17     requested of all parties an opportunity to proceed

18     through the preliminary orientation of this Jury in

19     order to facilitate the problem that will exist if

20     we send them all home today without doing anything.

21     I have requested of all parties that we be

22     permitted to go through the standard introduction

300

```
 1   of why we're here and cover some of the proceedings

 2   that will be involved in this trial once it does go

 3   forward -- well, it will go forward at some point.

 4            Both sides have thought this through, and

 5   it is my understanding that they are in agreement

 6   to permit the Court to orientate the Jury, to cover

 7   nothing of any substance other than deciding this

 8   morning which jurors will not be able to serve in

 9   any event for whatever reason or excuse they have

10   and to allow that remaining pool of jurors an

11   opportunity to be sent home and await whatever

12   future direction this case takes.

13            Have I pretty well stated the situation?

14   Anybody wish to add anything to that?

15            MR. BAILEY:  I have a question.  Can

16   we have them fill out questionnaires, too, at this

17   point?  Would you waive that so they would be able

18   to fill out their questionnaires today?  Or bring

19   them back in to fill their questionnaires out at a

20   later date?

21            MR. INGRAM:  I was of the opinion

22   that they should fill out the questionnaires when
```

301

1   they come to be questioned anyhow.

2              THE COURT:  Any problem with giving

3   them the questionnaires?  Most of them will fill

4   them out and bring them back; of the ones that

5   don't, we give them one that morning.

6              MR. INGRAM:  I have no problem with

7   that.

8              THE COURT:  Have I stated it

9   correctly that there's no objection to proceeding

10  on that limited basis?

11             MR. INGRAM:  You have from the

12  Defense prospective.

13             MR. BAILEY:  And with the State.

14             THE COURT:  I thank you all for

15  that.  For the record, the point on the presence of

16  the Defendant, do you waive at this point her

17  presence?

18             MR. JUHASZ:  Yes, Sir.

19             THE COURT:  For the rest of the

20  trial, and again I am uncomfortable as you are

21  about setting a rule that applies throughout the

22  trial, because there's always things that come up.

302

1    I'll usually ask when we have a side bar or

2    in-chambers, do you waive the presence of the

3    Defendant?  I'm going to ask you when you waive the

4    presence of the Defendant throughout the trial

5    unless you specifically need her presence.

6                 MR. JUHASZ:  Yes.

7                 THE COURT:  I'll ask you at any time

8    that I feel that she should be here, I'll mention

9    that, but I find that during most of the argument,

10   the presence of the Defendant adds nothing.  It is

11   nothing they understand most of the time I suspect.

12               One last point, all motions that have not

13   been granted that have been previously filed are

14   hereby overruled.  There are some motions on the

15   record that have not been ruled upon that have to

16   be ruled upon during the course of the trial.  The

17   Court will endeavor to do that.

18                 MR. INGRAM:  But there's also been

19   motions that have been granted or granted in part,

20   and I believe Mr. Becker was going to do a judgment

21   entry, then he got side tracked with this trial

22   that he's in.  He has not done this judgment entry.

303

1    What I submit is that the three of us at the first

2    opportunity, try to sit down and create that

3    judgment entry.

4                    THE COURT:  I talked with Ken

5    yesterday about this and you're right, this has

6    been delayed because of that, and I think it is

7    most proper that you be able to inspect those

8    before.  Because these were all done on the record,

9    but nothing was journalized as such.

10                   MR. BAILEY:  I think that by the

11   time The Court of Appeals rules, he will be done by

12   this week.  He should be done by the end of the

13   week.

14                   MR. INGRAM:  You don't want to do

15   it.  He's trying the case.

16   (End of in-chamber discussion.)

17

18   In Open Court at 9:50 A.M.:

19                   THE COURT:  My name is John Stuard.

20   I'll be the presiding Judge on the case that has

21   been set for today.  You have all been summoned in.

22   This is a larger panel than we usually have.

304

1   Ordinarily, there will be 30, 40 people called in

2   on an ordinary case.  You have been summoned in on

3   the case of the State of Ohio versus Donna M.

4   Roberts.  This case is a case that whereby the

5   Defendant has been charged with murder, with the

6   capital sentence being a possible verdict.

7          For those of you who have served as a

8   juror in the past, you know that there are many

9   times during the course of any trial, that it seems

10  like everybody has forgotten you, like the

11  Attorneys and the Judge must be, have gone to lunch

12  or something and forgot you were here.  Let me

13  assure you that is never the case.  The Attorneys

14  and the Judge, all of the staff, try to take the

15  comfort of the Jury into account.  You folks are

16  here at our request, you are taking time from your

17  lives.  I'm sure each of you have other places and

18  other things that you would rather be doing right

19  now.

20         This country of ours is one that is based

21  on the common man and woman.  We do not have a

22  judicial system that is run by elites.  We were all

305

1   blessed by being born Americans or become citizens

2   of this great country by choice.  And the Jury

3   system is an integral part of the law that we all

4   enjoy.  There's no other country in the world where

5   if you were charged by the State with some crime,

6   where the State can put you in prison, or even

7   perhaps ask for your life.  No other country where

8   you can call upon fellow citizens, people just like

9   yourself, to sit in judgment.  That Jury is the

10  wall protecting each of us from the collective

11  power of the State.  And many countries, if you are

12  charged with a crime, you are brought in secret

13  before a tribunal of a bunch of Army officers or a

14  bunch of Judges that some dictator has appointed,

15  that people haven't even elected.  And your life

16  can be taken by those persons without anyone even

17  knowing about it.

18          And in this country, we have a right to a

19  public trial.  The whole world has a right to see

20  how the trial is conducted.  And a Defendant has

21  the right to call upon ordinary citizens, who are

22  in most part not trained in the law, have a general

306

1    knowledge of the law, but are not people who are

2    usually well informed in the law.

3         That is the function of the Judge during

4    the trial, to give the law necessary to those

5    ordinary citizens, so that they can make an

6    informed decision.  The Jury system is one of the

7    three pillars of our system of Government.

8    Throughout our history, there has been a solid

9    third of our citizenry who have been there at times

10   of crisis and the Revolutionary War, a third of the

11   people wanted a revolution, a third didn't care,

12   and the other third wanted to remain loyal to King

13   George.

14        If you look at your voting statistics

15   throughout our history, there's been a solid third

16   of us who have voted.  That is the block of people

17   that pay attention to what is happening in the

18   world and in this country.  That is composed of

19   people like yourselves, because your names were

20   picked by a computer from the voter registration

21   roles.  So we know one thing about all of you up

22   front and that is that you are interested citizens

307

1    of what is going on.

2           The other thing that we all know about

3    you at this point is that you are residents of

4    Trumbull County, Ohio.  You could not be on this

5    Jury.  We don't bring jurors in from another state

6    or from Cincinnati to try cases.  We're all friends

7    and neighbors in a very true sense, and that goes

8    back through a long history of our Jury system

9    where at one point, the jurors were expected to

10   know the facts of the case.  That no longer is

11   true.

12          The ideal juror now doesn't know much

13   about what the facts are.  That is up to the

14   Prosecution to prove, what the facts are, or not

15   prove.  Serving on a Jury is part of being a

16   citizen of this country.  It is a legal duty and a

17   moral obligation.  Enough said about all of that.

18          This case, as I said, involves the

19   Defendant named Donna M. Roberts.  Before we

20   proceed any further, Mr. Bailey, would you be kind

21   enough to identify yourself and your position?

22          MR. BAILEY:  Yes.  Good morning,

308

1   ladies and gentlemen.  My name is Ken Bailey.  I'm

2   Assistant Prosecutor with the Trumbull County

3   Prosecutor's Office and I'm going to be joined

4   later this week by Attorney Chris Becker, who is

5   occupied in another trial.  He's another Assistant

6   Prosecutor.  Thank you.

7                THE COURT:  Gentlemen.

8                MR. JUHASZ:  Good morning.  My name

9   is John Juhasz, I am a lawyer from Boardman, in

10  Mahoning County and I am one of the lawyers

11  representing Donna Roberts.

12               MR. INGRAM:  My name is Jerry Ingram

13  and I am helping John here represent Donna.  Donna,

14  do you want to stand, please?

15               THE COURT:  Thank you, folks.

16  Mr. Becker is tied up presently.  He will be here

17  later.

18               MR. BAILEY:  Yes, Your Honor.  He's

19  in trial.

20               THE COURT:  As you all know, the

21  purpose of the Jury is to determine the facts, the

22  facts as presented by the Prosecution.  The burden

309

1  of proof will be on the Prosecutor to prove the

2  facts that they are alleging by the burden of proof

3  known as beyond a reasonable doubt.  How do we get

4  here today?  Well, at some time in the past, a

5  Grand Jury considered evidence.  The Grand Jury is

6  a group of people usually nine people just like

7  yourself, some of you may have sat on a Grand Jury

8  in the past.  The State presents evidence, it is a

9  one side presentation.  Very seldom does the

10  Defendant or representative of the Defendant

11  testify before a Grand Jury.  That isn't the

12  function of it, because the only thing that a Grand

13  Jury does is listen to the evidence that is

14  presented, and they have to make a return of an

15  indictment or they decide not to return an

16  indictment.

17       And the test that they use is what -- is

18  there probable cause to think the accused might be

19  guilty of the crime?  That is what the Grand Jury

20  does.  They find probable cause to think the

21  Defendant may be guilty.  The Petit Jury, which

22  this Jury will be, is called upon to determine the

310

1   guilt or innocence of the Defendant.  An indictment

2   was returned in this case against Donna Roberts by

3   that Grand Jury, wherein she was charged with

4   aggravated murder with specifications of

5   aggravating circumstances.

6           There was a second count that was exactly

7   as I read.  There was only -- there was one death

8   here.  I'll explain to you how there can be two

9   murder counts at the proper time.  There was a

10  third count of aggravated burglary with a firearms

11  specification.  A fourth count of aggravated

12  robbery with a firearms specification.

13          Now to these charges, at a time before

14  today, Donna Roberts has entered a plea of not

15  guilty.  That puts all issues before this Jury for

16  decision and this Jury will be called upon to

17  decide the guilt or the innocence of the Defendant,

18  based upon the presentation of the evidence by the

19  State.  There's no duty or requirement of any

20  Defendant at any trial to take the stand.  Each of

21  us have the right to remain silent.  It is a

22  Constitutional right.

311

1          And as we start into this case, as in any

2     case, there's a presumption of innocence.  Any

3     Defendant who walks into a Court of law, as is

4     often said is clothed in a cloak of innocence and

5     that cloak remains unless and until the Prosecution

6     removes the presumption by showing beyond a

7     reasonable doubt the guilt of the Defendant.

8          Now in Ohio at the present time, if a

9     person is found guilty beyond a reasonable doubt of

10    the crime of aggravated murder and guilty beyond a

11    reasonable doubt of an attached specification, the

12    law provides for the possibility of the death

13    penalty being imposed.  You as prospective jurors,

14    we go through a process here of picking a Jury of

15    12 with four alternates.  Those chosen as a Jury

16    will be called upon to sit during the trial, and

17    determine whether they are going to make a finding

18    of guilty or not guilty on the charges that have

19    been levied against Miss Roberts.  No one knows

20    what that decision will be at this point in time.

21    Nobody has heard evidence.

22          If that Jury made a finding of not

312

1    guilty, that would be the end of the trial.  If

2    that Jury, however, makes a finding of guilty, then

3    the same Jury will be called upon to go through a

4    second trial, a second part of the trial.  At that

5    time, the burden would be upon the State of Ohio to

6    present aggravating circumstances and the Defense

7    has an opportunity to present what is known as

8    mitigating factors.

9             As an example, mitigating factor, if you

10   have an 18 year old person, the youth could be

11   taken as a mitigating factor.  If the State

12   convinces that Jury that the aggravating

13   circumstances outweigh any mitigating factors

14   presented beyond a reasonable doubt, then that Jury

15   has to make the decision of whether they will

16   impose the death penalty.  If the State fails to

17   carry that burden of proof, then the Jury has the

18   opportunity and the duty to consider life in prison

19   without chance of parole, life in prison with no

20   chance of parole before 30 years, and life in

21   prison without chance of parole before 20 years.

22             MR. INGRAM:  Judge, it is 25.

313

1            THE COURT:  I'm sorry.  They changed

2   it.  It is 25 years.  The Jury is called upon in

3   that second phase to make a recommendation.  The

4   Court is required to independently review that

5   recommendation.  The Court is required as part of

6   the duties of the Court, if it is determined that

7   the Jury had sufficient evidence and that the

8   aggravating circumstances outweighed the mitigating

9   factors, to certify that recommendation.  If the

10  Court would find that the Jury did not have

11  sufficient presentation of aggravating

12  circumstances outweighing the mitigating factors,

13  the Court would have the power to vary that

14  recommendation.  The Court can never place a higher

15  penalty than the Jury has found and can only

16  reduce, and I have to advise you that since we have

17  had this law in Ohio in the eighties, there have

18  only been a handful of times when any Judge has

19  changed the recommendation of the Jury.

20           The trial of this case being as serious

21  as it is, I can think of no possible trial on any

22  subject that is more serious than a capital murder

314

1   case.  That will involve a longer period of time

2   than the average case would take.  I think that it

3   is not unreasonable to say that you can look at two

4   to three weeks as a reasonable time.  Could take

5   longer, could take less time.  I mention this

6   because part of the reason you are here is to find

7   out reasons why some of you will not be able to

8   participate.

9          Many of you will have legitimate reasons

10  why you should not be required to be here.  We'll

11  listen to those at the proper time.  There are

12  others of you who are able and willing and have no

13  problem with sitting on a Jury of this type.  Those

14  are the ones we're looking for.  We have no idea

15  which of you qualify at this point.  So that will

16  take over the next week or so some time where we'll

17  call each of you in individually, and probably take

18  15 minutes to a half hour asking you various

19  questions.  Both sides will have an opportunity.

20  I'll have an opportunity to go through whether you

21  are going to be comfortable and able to sit on a

22  Jury of this type.

315

1          The last point on what will happen here.
2    Depending on what this Jury decides, if that, if
3    the Jury should go into that second phase, and
4    again, none of us know at this point what the
5    future holds, but if that should occur, the Jury
6    will be sequestered.  Some of you have heard that
7    word and some of you may not, but you will probably
8    have a good idea what it is.  That means that the
9    Jury and the alternates, during the time that the
10   case is given to them for deliberation, until they
11   arrive at a verdict, will be kept over here at the
12   Park Hotel during the evenings.  So, the jurors are
13   required to bring whatever is necessary that they
14   need.  Families can bring things down.  There will
15   be a deputy with them, if you have forgotten
16   something.  We have had no problem with getting
17   everything you need.  That is something to
18   consider.
19          There are some people who have health
20   problems where that would pretty much not be
21   possible that they could participate.  Let me ask a
22   few questions here and I want you to raise your

1  hand if you have a specific answer to the question.

2  By doing that, those who raise their hand will be

3  kept here.  The ones that haven't raised their

4  hands to any of these questions, we'll send home

5  for the day, and the ones who have raised their

6  hands, we have to go through each of you to find

7  out whether you are going to be excused or not at

8  this point.

9          Does anyone have plans to be away from

10  the county during the next 30 days?  Any of you

11  have a planned vacation during that time period?

12  Remember who you are.  You have raised your hand.

13  Does anyone have any illness in the family at the

14  present time or personal problem of some nature

15  that would require that you could not be here?  Are

16  there any of you in an employment situation of such

17  a nature that to be away for a period of time that

18  I have mentioned would be an economic burden or

19  cause some other problem?  The way we're going,

20  folks, we're not going to have a Jury here.  Anyone

21  have a doctor's appointment or plans to enter a

22  hospital during the next 30 days?  Those can

317

1   usually be worked around.  Does anyone else have

2   any very important reason why they can be not be

3   available during this time period?  Do any of you

4   have a problem with working?  We usually start at

5   9:00 in the morning and go until 4:30.

6           Occasionally, one side or the other has a

7   witness on that can't appear the next day.  We may

8   go until 5:00.  Usually don't go longer than that.

9   Any of you with young children that have to be

10  there to pick them up at school or anything of that

11  nature?  Sometimes you can work things out for

12  that.  We'll discuss that with you.  We take an

13  hour for lunch.  Anyone have a medical problem with

14  sitting for that period of time?  Usually an hour

15  and a half at a time.  An hour and a half and a ten

16  or 15 minute break.  Usually end at 4:30.

17          I have a rule for all of you women also,

18  that your husbands are to have supper ready for you

19  when you get home.  You both have a list of

20  potential witnesses that you could read off for

21  these folks.  Do you have those with you?

22          MR. BAILEY:  I don't have that

318

1    today.

2                    THE COURT:  This case, as any case

3    of this nature has been given attention by the

4    local news organization.  That is what the news

5    does.  They tell us about things that are happening

6    in our community.  Part of a fair trial for any

7    Defendant is to have a Jury that decides the case

8    on the evidence presented in Court.  The case

9    should not be tried in the newspapers or on T.V.

10                   One of the things that goes with people

11   in that third that I am talking about such as

12   yourselves is that you are better informed than the

13   average two-thirds.  You vote, you usually read the

14   newspapers.  You usually watch T.V.  You are

15   interested in the world around you.  And because of

16   the type of people that you are, you may well have

17   read something about this case in the paper and

18   that is fine.

19                   But there are two sides to this case and

20   the one thing that applies to both sides is they

21   deserve a fair trial.  If someone has read

22   newspaper accounts and watched something on T.V.

1  and they have their mind made up that one side or

2  the other is correct, then somebody isn't going to

3  get a fair trial.  So the ideal juror -- Mark Twain

4  had a quote about an ideal juror, "It is somebody

5  that doesn't know very much and doesn't read

6  newspapers."  Well, he was being facetious, but in

7  a way that is what the attorneys look at as an

8  ideal juror, at least on the later point and that

9  is somebody who doesn't have any idea what this

10  case is about, blank mind as far as the facts.

11  Because that requires the State to prove their case

12  the way it is supposed to be proven beyond a

13  reasonable doubt, and any decision is based

14  strictly on what happens in the Courtroom.

15           You are not going to -- we're not going

16  to get 12 jurors that are going to have blank minds

17  and that is okay.  The important thing that each of

18  you have to be able to do is look within your

19  yourself when you're asked these various questions.

20           And the process we go through is called

21  Voir Dire.  It comes from a French term from the

22  1600 Common Law Courts of England.  And it means

320

1   translated, to speak the truth.  There's no right

2   or wrong answer you can give on Voir Dire.  The

3   only proper answer is a truthful answer.

4           You have to look, I think, at the entire

5   procedure in this manner.  If I were the person

6   sitting up in that defense chair, I would want

7   someone like myself sitting in judgment.  If you

8   found that you were called into an ordinary

9   criminal trial where someone was accused of

10  breaking into someone else's home, some of you have

11  had that experience.  Very traumatic.  A sense of

12  violation that is hard to explain.  Someone broke

13  into your home and went through your personal

14  items.  You are called to sit in judgment on

15  somebody who is accused of breaking into somebody's

16  home.  Some of us would be totally incapable of

17  sitting on such a trial because we could not

18  divorce our own experience from what you know you

19  are going to hear in this trial.  Nothing wrong

20  with that.  When asked, the proper and truthful

21  answer is, "I'm sorry, I had a personal experience

22  and I could not be fair in this matter."  Others of

321

1   us could sit on such a trial and very easily say to

2   ourselves, "My case had nothing to do with this.  I

3   can sit and decide this matter on the merits of the

4   case."  It is just a difference in people.

5          So, part of the questions will be geared

6   towards, do you have anything in your make up.  We

7   all have our individual life experiences.  We're

8   all unique in the eyes of you know who.  That is

9   part of the value of the Jury.  You have the

10   collective common sense of the community of

11   Trumbull County, and you have the individual life

12   experiences of each individual juror, and you put

13   that into a Jury room, and I am always amazed at

14   what you come up with.  Usually works pretty much

15   on the money.  But you have to have 12 people going

16   in that are fair, unbiased, unprejudiced, and have

17   no preconceived ideas or beliefs about what the

18   evidence is going to show.  That doesn't sound like

19   too much to ask, does it?  It is difficult to get

20   people who could be fair and impartial.

21          The reason I go into all of this, part of

22   the questioning will be what you have read, what do

322

1    you know about the case or you think you know about

2    the case from the newspapers.  And I have to say,

3    we all know that news information is often times

4    very incorrect.  We'll see it with the war going on

5    over in Iraq right now.  You get an initial news

6    release and then you find out two or three days

7    later, that isn't what happened at all.  Well, the

8    same thing happens locally.  Reporters try to be

9    factually correct, but they are only going on what

10   somebody told them.  And many people have different

11   reasons to tell the press things.

12          You folks have to decide this case on the

13   merit or lack of merits of the Prosecution's

14   presentation.  That is the fair thing to do.  And

15   that is the only thing that Mr. Bailey and these

16   gentlemen are asking you to do is to be fair to

17   both sides.

18          How many of you have read something about

19   this particular case or seen something on T.V.?

20   That seems to be -- there's another thing that

21   happens.  A lot of times you will read something as

22   the daily paper comes out and I have had this

323

1   happen and it will happen in this case.  Many of

2   you will find as you go through this -- you didn't

3   hold your hands up.  When we start talking to you

4   individually, I'm sure some of you are going to

5   find you do have a recollection of having read

6   something.  It is going to happen.  That is fine.

7   Really that makes these folks probably more

8   comfortable, because whatever you read wasn't that

9   important that you placed much emphasis on it.

10  Others of you will have followed the case closely,

11  I'm sure.

12          That doesn't necessarily disqualify you.

13  You have to answer the questions for yourself.  Can

14  I be fair to both sides?  And we're pretty much

15  stuck with your answer on that.  We can't look

16  within your minds.  You are all called upon to

17  speak the truth.

18  (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT OF

19  HEARING)

20          THE COURT:  Do any of you folks know

21  Mr. Bailey, Mr. Juhasz, Mr. Ingram?  All three of

22  these gentlemen have been through many trials and

324

1  they are well known in the area, and it wouldn't be

2  unusual if any of you knew them.  I'm going to read

3  through one other thing.  I have covered some of

4  these points, so I apologize for any repetition, so

5  we get this all done properly.

6         As I said, the process we're about to

7  begin is called the Voir Dire.  The attorneys for

8  the State and the Defendant will ask you questions

9  regarding your qualifications to serve on this

10 Jury.  You should understand that although it is

11 your duty as a citizen to serve on Juries, it is

12 also your duty as a citizen not to serve if there's

13 any reason whatsoever why you cannot do so in

14 fairness to the State, to the Defendant, or to

15 yourself.  What is important is that you are as

16 honest as you can be in your response to the

17 questions that will be put to you by the Court and

18 the attorneys.  You are not here to be judged and

19 you will not be judged.  It should not be an

20 embarrassment to you in any way if you are excused

21 from this case.  I'm sure many of you will be.

22 That happens in every case.  That does not mean

325

1    that you could not serve on some future Jury.  If

2    you are excused, it will mean that you have been

3    honest and forthright.  And that is all we're

4    asking you to do.

5              I said this case is that brought against

6    Donna M. Roberts.  She's charged with aggravated

7    murder with a specification.  As in such a case,

8    one possible penalty is the death penalty.  Because

9    of that possibility, it is necessary that counsel

10   ask you certain questions about your views

11   regarding the death penalty.

12             The death penalty is an issue about which

13   people have various and sundry opinions.  Some

14   favor it.  Some oppose it.  And there are arguments

15   for either position.  You will be asked your

16   opinion and we urge you to be as candid and honest

17   as you can be in your answer.  Can't give a right

18   or wrong answer.  It is your opinion.

19             Now the questions the lawyers will be

20   asking are asked in every case of aggravated murder

21   with specifications.  The law requires that such

22   questions be asked.  And the inquiry has no

326

1   relationship whatsoever to whether or not Donna M.

2   Roberts is guilty or not guilty of the offense

3   charged.  As Miss Roberts sits before you, she's

4   presumed innocent.  And the State must prove that

5   if it is able to do so, her guilt beyond a

6   reasonable doubt.

7        Now because we only have the opportunity

8   of questioning you regarding your feelings about

9   the death penalty at this stage of the trial,

10  before the State produces any evidence about

11  whether or not the Defendant is guilty or not, I

12  must caution you that you should not conclude that

13  just because the attorneys are asking you questions

14  about a possible death penalty, that Donna Roberts

15  is guilty.  It is simply part of the Jury selection

16  process that occurs in every case.  Does every one

17  understand that?  Does anyone have any questions

18  about what I have read at this point?

19        As I have said before, this is a capital

20  case.  This is a case where the death penalty and

21  life imprisonment are potentially sentencing

22  options.  There are common misconceptions as to the

327

1  procedure in such a case, and this preliminary

2  instruction is designed to help eliminate any

3  misconceptions you may hold.

4          The trial of a capital case may be, but

5  it is not necessarily a two stage process.  The

6  issue in the first phase of this trial is the same

7  as in any other criminal case, that is to determine

8  whether Donna M. Roberts is guilty or is not

9  guilty.

10          In the event the State satisfies you

11  beyond a reasonable doubt, by that burden of proof

12  of the Defendant's guilt on either charge of

13  aggravated murder, and her guilt on the

14  specification that the aggravated murder was

15  committed during the course of an aggravated

16  robbery or aggravated burglary, then the case would

17  go to a second phase.  If the case does not proceed

18  to a second phase -- I'm sorry.  If that case does

19  proceed to a second phase, then the Jury would be

20  called upon to determine the appropriate

21  punishment.

22          At that time, you will be called upon to

328

1  determine which of four sentencing alternatives

2  should be imposed.  The sentencing alternatives are

3  death by lethal injection, life imprisonment

4  without any opportunity for parole, life

5  imprisonment with parole eligibility only after

6  serving 30 full years, and life imprisonment with

7  parole eligibility only after serving 25 full

8  years.  There's a common misconception that upon a

9  finding of guilty on a charge of aggravated murder

10 with a death specification, that the Jury must

11 sentence to death.  That simply is not so.  As I

12 have stated repeatedly, the death penalty is only

13 one of four possible penalties that the Jury is

14 called upon to compose.  And the Jury must fairly

15 consider following the instructions of the Court,

16 life imprisonment as well as a death penalty.

17         If this case does proceed to a second

18 phase, you should enter that second phase with an

19 open mind, not favoring the imposition of one

20 penalty over another.

21         Now if you do have to decide upon a

22 sentence, your decision will not be made in a

329

1    vacuum.  At that time, I would instruct you to

2    weigh the balance of the law that is called

3    aggravating circumstances, that is, the facts which

4    the State claims justifies imposition of the death

5    penalty against certain mitigating factors.  Those

6    are positive things brought out about the

7    Defendant.  At that time, I would more fully

8    describe what is meant by aggravating circumstances

9    and mitigating factors.

10            You would further be instructed that the

11   burden would be upon the Prosecuting Attorney to

12   prove to you beyond a reasonable doubt, that the

13   aggravating circumstances outweigh the mitigating

14   factors, and that death is the appropriate

15   sentence.  Only if the Prosecutor were to meet the

16   burden of proof and firmly convince you that the

17   aggravating circumstances outweigh the mitigating

18   factors, would the law require a verdict of death

19   by lethal injection.

20            On the other hand, if the Prosecutor does

21   not convince you that the aggravating circumstances

22   outweigh the mitigating factors beyond a reasonable

330

1    doubt, the law would require imposition of one of

2    the life sentence options. Each of the sentencing

3    options is entitled to equal consideration in the

4    event this case proceeds to a second phase. And a

5    juror should not automatically favor imposition of

6    one sentence over another.

7          Let me caution you once again that

8    neither the preliminary instructions on procedure

9    in a criminal capital case, nor the questions of

10    the Court regarding your views on capital

11    punishment has any bearing on the guilt or

12    innocence of the Defendant. Donna M. Roberts is

13    presumed innocent and you must test the evidence

14    presented by the State in this case, just as you

15    would in any other case.

16          Is there anyone who could not fairly

17    consider either the death penalty or life

18    imprisonment as a sentencing option? We'll handle

19    that on the individual Voir Dire.

20          Now this is most important what I'm going

21    to advise you at this point. And that is, you are

22    all under an instruction from this point on, not to

331

1   discuss anything about this case among yourselves

2   or with anyone else.  You are not to read anything

3   that appears in the newspapers or watch anything

4   that occurs that might occur on T.V.  And I'm sure

5   again, due to the nature of this case, there will

6   be coverage by the press.  Something wrong if there

7   wasn't.  You are not to partake of that.  If you

8   have as you sit here that you wish to be a juror in

9   this case, don't put yourself through listening to

10   the news accounts because you are not permitted to

11   do that.  You have to decide this case fairly on

12   the evidence presented in Court and the evidence by

13   both sides.  Both sides will be given an

14   opportunity to present their evidence fairly.

15         Now I have given this instruction on

16   other capital cases and we have had one that ended

17   up having to be sent to another county, because

18   many of the jurors did not regard the instruction

19   as important.  It cost all of us as taxpayers a

20   considerable amount of extra money.

21         You should not permit anyone to talk with

22   you about it.  If you are on this panel and

332

1   particularly if you are chosen on this Jury, anyone

2   who finds that you are on this type of a case, it

3   happens in an ordinary run of the mill criminal

4   case, if somebody finds you are on a Jury, they are

5   going to be asking you questions. Most people

6   never get an opportunity to sit on a Jury. Many

7   people would like to. So it will bring up interest

8   from your family and your friends. "Tell me what

9   happened. Boy, I would like to get on a Jury

10  sometime." And it is a very human response to want

11  to talk about it. If you do so, you are violating

12  your oath and you are not permitted to do that.

13  You have to remain that blank slate from this point

14  on, as much as possible.

15          It is up to these folks to fill the

16  picture in as to what the eventual decision will

17  be. That is most important. That is what each of

18  you would want if you were a Defendant in a case.

19          Folks, I'm going to ask all prospective

20  jurors to stand and be sworn in this matter, if you

21  will. Sworn or affirmed.

22                  BAILIFF: Do each of you swear that

333

1   you will truthfully answer the questions put to you

2   by this Court and by counsel of record in this

3   case, touching upon your qualifications to act as

4   jurors?

5   (All answered "I do.")

6            THE COURT:  Now I'm going to excuse

7   those who did not hold their hand up and ask

8   everyone to stop downstairs at the Jury

9   Commissioner's Office.  There is a form that will

10  be given to you.  Please complete that form and

11  bring it back when you are notified to return.

12  That is an information sheet, which will help the

13  attorneys in the questions they are about to put.

14  Please read the media form and sign that, too.

15            When you call in, your communication with

16  the Court will be through a Jury Commissioner

17  Office by calling that number you were given or

18  will be given.  You all will be on Panel S.  They

19  are having problems with the phone down there, of

20  all times.  I assume we'll get that fixed.  If you

21  did not raise your hand, then I'm going to excuse

22  those folks momentarily.  The rest will have to

334

1   remain and we have to go through each of the

2   reasons why you cannot serve as a juror.

3   (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT OF

4   HEARING)

5              THE COURT:  One more time, those of

6   you who are excused, please don't forget to stop

7   down at this lady's office on the second floor.  No

8   newspaper or talking about the case.  Keep your own

9   counsel until we get through this process of where

10  we're at on this Jury.  Call in tomorrow night,

11  Panel S.  That will tell you when to appear.

12             What will happen from this point is, as

13  of Thursday, we'll have the first ten on the list.

14  You were all given a number.  We have to go by

15  those numbers, so you will be called probably ten

16  each day from Thursday on.

17             We go through this individual Voir Dire

18  process, and each of you will be asked various

19  questions, and I ask all of you not to be

20  apprehensive about that.  You will find that

21  this -- there are no questions that we put to you

22  that will cause you embarrassment.  You must have

335

1   some apprehension, if you have never been through

2   this.  I ask you to put that aside.  If there's any

3   reason at all why you legitimately cannot or do not

4   wish to serve on this Jury, you have an opportunity

5   to express that, and we'll accept your decision in

6   that matter.  But just don't be afraid about the

7   whole process.  I know it is probably intimidating

8   to some of you.  It shouldn't be.  This is your

9   Court as much as ours.

10          Call in tomorrow night that number, you

11  will be given further instructions.  All who did

12  not raise their hand are free to go at this time.

13  Stop downstairs.

14  (Court in recess at 10:50 A.M.)

15  (Jury room at 11:15 A.M.)

16          THE COURT:  For the record, the

17  questionnaire that will be presented to the

18  prospective jurors today has been agreed upon by

19  both sides after reviewing it.

20          MR. BAILEY:  Yes.

21          MR. INGRAM:  That is correct.

22  (Juror No. 1, Albert Depto, entered the Jury room.)

336

 1                    THE COURT:  You are Albert Depto?

 2                    MR. DEPTO:  Yes, Sir.

 3                    THE COURT:  Good morning.  You held

 4    your hand up when I went through the various

 5    things.  What was the reason?

 6                    MR. DEPTO:  For number two, my

 7    wife's got scleroderma.  I take care of her, and my

 8    mother is in a nursing home and I go there once a

 9    day to feed her at noontime.

10                    THE COURT:  I'm sorry to here about

11    your problems.

12                    MR. DEPTO:  I serve daily mass the

13    third week of the month and I serve for funerals.

14                    THE COURT:  Any objection to

15    dismissing for cause?

16                    MR. BAILEY:  No.

17                    MR. JUHASZ:  No, Sir.

18                    THE COURT:  You have a right to ask

19    questions if you want.

20                    MR. JUHASZ:  No, Sir.

21    (Patricia Molendyke, Juror No. 13 entered the

22    Jury room.)

337

1            THE COURT:  Miss Molendyke, you held

2   your hand up when I asked various questions.  What

3   was the reason for that?

4            MS. MOLENDYKE:  I'm self employed.

5   I work for myself, and right now, I'm not very

6   busy, but I never know when I might become busy.

7            THE COURT:  What type of business do

8   you have?

9            MS. MOLENDYKE:  Graphic Arts.

10           THE COURT:  You are waiting for

11  somebody to walk in?  You never know when that will

12  happen?

13           MS. MOLENDYKE:  Yes.

14           THE COURT:  Mr. Bailey, any

15  questions you wish to ask?

16           MR. BAILEY:  Would you be able to

17  survive missing maybe three weeks of work?

18           MS. MOLENDYKE:  I think that is kind

19  of hard to do because I wouldn't be making any

20  money at all.

21           MR. BAILEY:  Is that your only

22  source of income?

338

1          MS. MOLENDYKE:  Yes.  My husband.

2          MR. BAILEY:  Your husband works with

3     you?

4          MS. MOLENDYKE:  No.  He works for

5     Kent State.

6          MR. BAILEY:  Would you be able to

7     survive on his income for three weeks?

8          MS. MOLENDYKE:  I suppose.

9          MR. BAILEY:  You are the only one

10    who knows whether it would be an extreme economic

11    hardship on you, because the trial itself will take

12    maybe two weeks and if we go into a second phase,

13    that could take maybe another part of a week.

14         MS. MOLENDYKE:  When does it start?

15         THE COURT:  We don't know that.  It

16    could be within the next two weeks, any time within

17    the next two weeks probably.  Then it would be two

18    weeks and then depending, it could be another few

19    days.  Here's the thing, this is what it all boils

20    down to.  Sometimes you have a person that is self

21    employed and they are wanting to serve on a Jury,

22    and they are willing to give up whatever income

339

1   they are going to lose. What I don't wish to have

2   and I'm sure neither side here is a juror, who is

3   sitting there worried about their loss of income

4   and that could very easily happen. I have no idea

5   nor do these folks, what your situation is. You

6   are the one that pretty much has to decide whether

7   you are willing to serve as a juror when you are

8   losing your income.

9             MS. MOLENDYKE: I don't think I

10  would want to do that. I don't want to pass up

11  jobs. It has been very slow to begin with right

12  now. If I get a job that comes in, I want to take

13  it.

14            THE COURT: Do you think that would

15  be on your mind?

16            MS. MOLENDYKE: Yes.

17            THE COURT: Any questions?

18            MR. INGRAM: As I understand and

19  maybe I'm a little bit off base here, but are you

20  sort of a one person operation?

21            MS. MOLENDYKE: Yes.

22            MR. INGRAM: If we were to take you

340

1   away from your business for two weeks, not only

2   would you lose income, but you would potentially

3   lose your customers; is that what you are telling

4   us?

5                    MS. MOLENDYKE:  Yes.

6                    MR. INGRAM:  It is the loss of the

7   customers that would cause you consternation?

8                    MS. MOLENDYKE:  Yes, Sir.

9                    MR. INGRAM:  Thank you.  I'm

10  satisfied.

11                   MR. BAILEY:  We're satisfied.

12                   THE COURT:  Thank you for your time.

13  You are excused.

14  (Donna Metz, Juror No. 16, entered the Jury room.)

15                   THE COURT:  You raised your hand.

16  What was that about?

17                   MS. METZ:  I don't feel -- I have a

18  job that requires -- like they schedule you say on

19  Friday, and like, for instance you know like they

20  said, how long would you have to be there.  Well, I

21  had to tell them, I don't know.  It is not like a

22  scheduled time that I can --

341

 1              THE COURT:  It is the uncertainty of

 2   it?

 3              MS. METZ:  Right.  They pay, but if

 4   it is longer than four weeks, they don't.  If it

 5   would be longer than that.

 6              THE COURT:  It will not be longer

 7   than four weeks.  It may take four weeks of time,

 8   but you won't be here all that four weeks.

 9              MS. METZ:  They don't know how to

10   schedule my schedule.

11              THE COURT:  You can't call them up

12   tomorrow and say, "I'll be at work tomorrow"?

13              MS. METZ:  Exactly, because there's

14   so many people that can work at one time and we

15   don't have that many people.  We're short right

16   now.  They don't schedule you day to day.  It  has

17   to be a weekly thing.  I have to work because I got

18   one in medical college and one getting married next

19   year, so it is kind of tough.  We have to save for

20   that.

21              MR. BAILEY:  You would get some

22   advance notice before we would start the actual

1   trial.  We would question you for one day, not the

2   whole day, but for a part of the time, and then

3   sometime after that probably in about two weeks, we

4   probably start the trial.  And then the trial may

5   take two weeks straight, and then there may be a

6   break, depending on what happens, whether or not we

7   go into a second phase.  That may take part of a

8   week.  So, you would probably be dealing with maybe

9   two and a half to three weeks at the most.  You

10   would have some advance notice there, and they

11   would have some advance notice to schedule somebody

12   for you.  Would that be okay?

13            MS. METZ:  Yes, probably, but I'm

14   not really happy about trying to convict somebody,

15   either.  I'm not comfortable with it.

16            MR. BAILEY:  Nobody would be, but it

17   is an obligation that we have to make sure our

18   system works, but your major problem at this point

19   is scheduling at work?

20            MS. METZ:  Yes.

21            MR. BAILEY:  You think that would be

22   able to be overcome?

343

1          MS. METZ:  It is pretty difficult.

2   It is difficult.

3          MR. BAILEY:  You indicated you have

4   economic hardship if you are not able to work.  Are

5   you saying you think they wouldn't schedule you and

6   you would actually lose work?

7          MS. METZ:  I am already this week

8   because of this.

9          MR. BAILEY:  And that concern about

10  economic hardship, would that affect you so that

11  you wouldn't be able to concentrate on what is

12  going on here?

13         MS. METZ:  I don't know if it would

14  affect me that much.  It would affect my income

15  with having to pay a college tuition of $2300 every

16  other month.

17         MR. BAILEY:  You are saying that

18  that would cause severe economic hardship on your

19  family?

20         MS. METZ:  Yes, it would in that

21  respect.  It is very expensive right now.  She's

22  got like almost a half year to go yet.  It is

344

1   pretty tough right now.

2               THE COURT:  I imagine.  You folks

3   have any questions?

4               MR. INGRAM:  If I may.  Wherever you

5   work, your work for the following week is scheduled

6   on Friday of the preceding week?

7               MS. METZ:  Right.

8               MR. INGRAM:  You are already off for

9   all of this week?

10              MS. METZ:  I'm not off all this

11  week, no.  They gave me off like two days, which if

12  I don't come tomorrow, then I don't get paid for

13  tomorrow, and then they scheduled me late in the

14  day after that, only thinking that I would be done

15  by then.  That would mean that if I would have to

16  be here all day, then I have to go directly from

17  here to there and work the rest of the day.  We

18  work in an office with just a few people and it is

19  customer service.

20              MR. INGRAM:  If you are on Jury

21  duty, they actually expect you to go to work?

22              MS. METZ:  Yes, they do.

345

1              MR. INGRAM:  That would be a

2   hardship to me.

3              MS. METZ:  They expect at least a

4   few hours of work even if you are on Jury duty.

5              MR. BAILEY:  We have no problem

6   excusing her.

7              MR. JUHASZ:  No objection.

8              THE COURT:  Number 16 is excused

9   then for cause.  You are done with everything here.

10  (Juror No. 366, Vicki Martin entered the Jury room.)

11             THE COURT:  You held your hand up?

12             MS. MARTIN:  I moved to Mahoning

13  County a week ago, but my voting record is in

14  Trumbull County, but I lived in Trumbull County my

15  whole life.  I want to do this, but I feel I would

16  be an excellent juror and be fair and unbiased, and

17  I understand the importance of Jury duty.

18             THE COURT:  We appreciate that.  It

19  raises an interesting question.  I think you

20  must -- you have moved to Mahoning County?

21             MS. MARTIN:  One week ago.

22             THE COURT:  With the intention of

346

1    staying there?

2                    MS. MARTIN:  Yes.  When I was

3    summoned, I was in Trumbull County where I had been

4    living.

5                    THE COURT:  Do you have any

6    different views?

7                    MR. BAILEY:  No.

8                    MR. JUHASZ:  I think it is a legal

9    requirement that she live here.

10   (Juror No. 23, Aaron Florek entered the Jury room.)

11                   THE COURT:  Why did you have your

12   hand up?

13                   MR. FLOREK:  I'm moving to Florida

14   for school.

15                   THE COURT:  You are not going on

16   Spring break?

17                   MR. FLOREK:  No.

18                   THE COURT:  You are leaving -- what

19   is the date?

20                   MR. FLOREK:  April 27.  Between then

21   and May 3.  We're not sure what date exactly.

22                   THE COURT:  That could end up right

347

1    in the middle here.

2                    MR. BAILEY:  I believe it will.  We

3    have no problem with excusing him.

4                    MR. JUHASZ:  Neither do we.

5                    THE COURT:  You are excused for

6    cause.  You are done with any further

7    responsibilities.

8    (Juror No. 30 Shawn Woods entered the Jury room.)

9                    THE COURT:  Your held your hand up.

10   What was that about?

11                   MS. WOODS:  I had seen about it on

12   the news and read it in the paper.  I honestly

13   don't remember what I read, but I know I have seen

14   it in the paper or on the news, but I do have a

15   question for you.  When we were filling out our

16   papers before, I don't know if I -- I wasn't

17   personally involved, but you had ruled on my one

18   Aunt's case, and you are doing my sister's civil

19   case right now.  I don't know if that has any

20   bearing on anything.

21                   THE COURT:  What case is that?

22                   MS. WOODS:  The first one was

348

1    Annalee versus Rota, and my sister is Schmidt
2    versus Burns.
3              THE COURT:  I don't remember each of
4    those.  Was there something that happened?  Please
5    answer very truthfully.
6              MS. WOODS:  My Aunt's case was a
7    very long running case.  I think it is the longest
8    running case on record for Trumbull County.  I felt
9    you could have gotten it settled sooner than it
10   was.
11             THE COURT:  What type of case was
12   it?
13             MS. WOODS:  Her partner was paying
14   my Uncle back and my Uncle passed away and they
15   stopped making payments and my Aunt took them to
16   Court.  She said if there was an understanding that
17   my Uncle and she didn't have to pay back.
18             THE COURT:  I remember that.  There
19   was a dispute about the money she had already taken
20   out of the estate and what she was entitled to.  I
21   don't recall that being an unduly long case.  It
22   wasn't the longest case we had.

349

1              MS. WOODS:  I wasn't personally

2  involved with it.

3              THE COURT:  I think if you would

4  check what happened in that case, you may have got

5  a different view of maybe their opinion of what

6  happened than what happened.  You gentlemen can

7  inquire.

8              MR. BAILEY:  You are just concerned

9  that you had seen it on -- something on television?

10             MS. WOODS:  I just had seen it.  I

11 didn't really think about it a whole lot.  I had

12 seen it on T.V. about Miss Roberts.

13             MR. BAILEY:  Okay.  We'll cover that

14 at a later time.  The other thing with the Judge,

15 there's nothing about those cases that would affect

16 this case.

17             MS. WOODS:  I wasn't personally

18 involved.

19             MR. BAILEY:  Other than that, you

20 are able to serve?

21             MS. WOODS:  Well, to tell you the

22 truth, in my heart, I don't think I have the right

350

1    to judge whether someone should ever die.

2                    MR. BAILEY:  We'll get into that,

3    too, at a later time.

4                    MS. WOODS:  I might have a problem

5    with that, if it comes right down to it.

6                    MR. BAILEY:  You are able to be here

7    during the time?

8                    MS. WOODS:  Yes, I am.

9                    MR. INGRAM:  Nothing at this time

10   from the Defense.

11                   THE COURT:  Miss Woods, just so

12   there's no question on this, even if you have the

13   view that the Judge at some point in the past

14   hasn't done something that your Uncle at least

15   thought was not done in a timely manner, that would

16   not affect your ability to sit on this case and

17   decide it fairly for both sides, would it?

18                   MS. WOODS:  I honestly don't know if

19   it would affect me.

20                   THE COURT:  You feel that strongly

21   about it, that it might?

22                   MS. WOODS:  Yes, I think I do.

351

1            THE COURT:  That is fair enough.  I

2    think that is the reason that you may not want her.

3            MR. INGRAM:  I have no objection to

4    Miss Woods being excused.

5            MR. BAILEY:  We have no problem

6    excusing her.

7            THE COURT:  Excused for cause.  We

8    thank you very much for your time.

9    (Juror No. 33, Twila Bartek entered the Jury room.)

10           THE COURT:  Good morning.  You are

11   Miss Bartek?

12           MS. BARTEK:  Yes.

13           THE COURT:  Any relation to Bea

14   Bartek?

15           MS. BARTEK:  No.

16           THE COURT:  I understand from

17   reading your medical excuse here that you have

18   someone in your family you care for daily.

19           MS. BARTEK:  My Grandma and my Mom.

20   They both had three strokes.  They can't walk or

21   talk.

22           THE COURT:  That is a full time job.

352

```
 1                    MS. BARTEK:  Very much.

 2                    THE COURT:  Mr. Bailey, do you wish

 3      to inquire?

 4                    MR. BAILEY:  No objection.

 5                    MR. INGRAM:  No questions.

 6                    THE COURT:  You are excused for

 7      cause.  That means you are done with any further

 8      proceedings here.  Thank you very much.

 9      (Douglas L. Jones, No. 38 entered the Jury room.)

10                    THE COURT:  You raised your hand.

11                    MR. JONES:  I strongly oppose the

12      death penalty.  I just couldn't decide for that.

13                    THE COURT:  Okay.  We usually get

14      into that part of it later, but do you have any

15      objection to me asking him a few questions here to

16      see if we can get past this?

17                    MR. BAILEY:  No problem.

18                    MR. INGRAM:  No.

19                    THE COURT:  Doug, you understand we

20      have the law.  We're all bound to follow it.  I

21      don't know of anybody that enjoys sitting on a case

22      of this nature.  In fact, if anybody did enjoy it,
```

353

1   I suspect neither side here would want them to sit

2   on the case.  You don't have to agree with the law

3   to be a juror in this case.  The thing is, you have

4   to be able to follow the law.  Now most people have

5   a fixed opinion one way or the other about the

6   death penalty.  It's a controversial issue.  Some

7   people in good faith could never impose the death

8   penalty under any circumstances.  You have other

9   people that feel that if a murder is committed, the

10  person should forfeit their life.  Neither type of

11  American can sit on a Jury.  The juror that they

12  are looking for is somebody who is able to make the

13  determination first of their guilt or innocence,

14  and if the Jury in their wisdom comes to the

15  conclusion of a finding of guilt, then it has to go

16  to the second phase, and the jurors in that second

17  phase have to give assurance to both sides, that

18  they are able to evaluate those aggravating

19  circumstances against the mitigating factors.  And

20  even though they may not agree with the death

21  penalty, if the State proves its case in that

22  regard, they are duty bound to consider whether the

354

1    death penalty is the proper imposition.  Now that

2    is a fine distinction I am making.  But you

3    understand what I'm saying.

4                    MR. JONES:  I understand what you

5    are saying, yes.

6                    THE COURT:  And only if you could

7    never under any circumstances, impose the death

8    penalty, would that be a basis for you being

9    excused.

10                   MR. JONES:  Well --

11                   THE COURT:  If you had a mass

12   murderer that killed 15 kids and the State proved

13   it, and there were no mitigating factors that

14   outweighed the aggravating circumstances, are you

15   of such a type that you couldn't, in that case,

16   consider a death penalty?

17                   MR. JONES:  I think we have to be

18   better than that.  I can't say I would never say

19   never.

20                   THE COURT:  You are saying under

21   some circumstances, you could visualize it?

22                   MR. JONES:  I don't see the

355

1   circumstances, but --

2             THE COURT:  Realize you don't know

3   anything about this case yet.

4             MR. JONES:  No, I don't.

5             THE COURT:  Mr. Bailey, do you wish

6   to ask any questions?

7             MR. BAILEY:  Not at this time.

8   We'll get another chance.

9             MR. INGRAM:  Nothing at this time.

10            THE COURT:  I'm going to -- you will

11  be in the pool.  You will have an opportunity to

12  explain your position.  They will have an

13  opportunity to explain their positions further.

14  Call that number and stop downstairs.

15  (Juror No. 40, Steven Bokan entered the Jury room.)

16            THE COURT:  You held your hand up.

17  What was that about?

18            MR. BOKAN:  Basically, I'm asking

19  for dispensation because of my employment.  I work

20  in Akron.  I commute 50 minutes each day.

21  Secondly, I manage a team of six data base

22  administrators up there.  It is an operational type

356

1    job.  Basically, wired, I am on call 24/7, and

2    being away from work for an extended period of time

3    would be an extreme hardship for me personally.  It

4    is not like that work is going to be done by

5    somebody else.  There's nobody there that would

6    pick up my job and do it.

7                    THE COURT:  That is an enviable

8    position to be in.

9                    MR. BOKAN:  Not really.

10                   MR. INGRAM:  How about when it comes

11   time for a raise?

12                   MR. BOKAN:  The entire rubber

13   company is not in a position to be giving a lot of

14   raises.

15                   THE COURT:  Mr. Bailey, do you have

16   any questions you wish to ask?

17                   MR. BAILEY:  What happens with

18   vacations and sick time?

19                   MR. BOKAN:  Operationally it is not

20   a real problem.  Again, we're talking for about two

21   to three weeks here.  That is an extended period of

22   time.  Over the last probably four years since I

357

1  have worked for Goodyear, I haven't been gone for

2  more than a week.  It is just too tough for me to

3  stay away for more than a week at a time.

4              MR. INGRAM:  No questions.

5              THE COURT:  Okay.  You are excused

6  for cause.  You need not worry about anything

7  further on this.

8  (Juror No. 43, Thomas Savanyu entered the Jury room.)

9              THE COURT:  You held your hand up.

10             MR. SAVANYU:  It was for financial

11 reasons.  They depend on me for a paycheck and plus

12 being away that long from my family, I don't think

13 it would be good for me.

14             THE COURT:  You are the sole support

15 of your family?

16             MR. SAVANYU:  My wife and I

17 together.

18             THE COURT:  What type of job that

19 you would not get paid by your employer if you

20 missed?

21             MR. SAVANYU:  I believe so, for me,

22 right now it is financial, it is hard to pay the

358

1    bills.

2                    THE COURT:  You don't get paid as

3    much, of course?

4                    MR. SAVANYU:  Not a whole lot.

5    We're pretty close though on our pay checks.

6                    THE COURT:  Mr. Bailey?

7                    MR. BAILEY:  You said you and your

8    wife are the sole support of your family.  Just the

9    two of you?

10                   MR. SAVANYU:  Yes.

11                   MR. BAILEY:  I take it your finances

12   are such -- do you work overtime?

13                   MR. SAVANYU:  Not right now, no, but

14   during the holidays, I would.

15                   THE COURT:  Let me ask you this.  Is

16   there some other reason besides the financial?

17                   MR. SAVANYU:  I think that and being

18   such a high profile case, it might be on my

19   conscience for a while as well, Sir.

20                   THE COURT:  It is that more than the

21   financial?

22                   MR. SAVANYU:  Pretty much, yes.

359

1          MR. INGRAM:  I have a question.  We

2     really want jurors who will keep a case on their

3     conscience.  That is the best kind of juror that

4     you can ask for is one who takes their

5     responsibilities seriously.  Do you think this case

6     will affect you so much that you just shouldn't be

7     asked to deal with it?  That is sort of what I

8     sense.

9          MR. SAVANYU:  It probably would

10    bother me for awhile, and on my conscience and I

11    don't think I have a right to pass judgment on

12    someone like that.

13         THE COURT:  Let me say this to you

14    and you answer from your heart on the matter.  It

15    is a rare person that is asked to do something of

16    this particular nature, that feels very comfortable

17    with it.  You have to have something wrong with you

18    if you felt comfortable with it.  Some of us are

19    more sensitive than others, but for a case of this

20    nature, don't you really believe that everybody who

21    decides to sit on this Jury have feelings like you

22    are expressing now to a degree?

360

1            MR. SAVANYU:  Maybe some yes, maybe

2    other individuals, no.  It is based on an

3    individual person.

4            THE COURT:  Everybody is an

5    individual, no question about it.  And the point

6    is, it isn't fair to the Defense if you get 12

7    people on a Jury that say, "Yes, give the death

8    penalty," without any second thought.  And it isn't

9    fair to the Prosecution to have somebody that is

10   willing to consider the thing, their conscience is

11   very much involved, but will never under any

12   circumstances consider or impose the death penalty.

13   That wouldn't be fair to the Prosecution.  What we

14   need are people of conscienceness, that have a

15   moral conscience that are willing to sit and

16   whatever the law requires them to do to follow the

17   law, that is a difficult thing we ask of people.

18            MR. SAVANYU:  Yes, it is.

19            THE COURT:  But none of us can look

20   within your mind.  You are the one that has to

21   answer it, when you would be able to know the law.

22            MR. SAVANYU:  I don't know.  Like I

361

1   say, under all of the circumstances and with the

2   stress and things, it would have an effect probably

3   on me.

4                  THE COURT:  I take from what you are

5   saying, you are a person of great sensitivity.

6                  MR. SAVANYU:  Yes.

7                  THE COURT:  Do you have any

8   questions?

9                  MR. JUHASZ:  Just for a second.  You

10  strike me as a sensitive person and you frankly

11  strike me as being a little stressed out right now

12  just sitting here.

13                 MR. SAVANYU:  A little bit.

14                 MR. JUHASZ:  When we try this case

15  as lawyers, I don't talk to anybody.  I don't talk

16  to my wife, I don't talk to my kids.  I am thinking

17  about this case.  That is sort of what we ask of

18  you, but we don't want you to blow a gasket doing

19  that and am I sensing from you that you think that

20  may happen?  We need you to stay objective and pay

21  attention.  If you are so stressed out that you

22  can't do that as much as we want you, we don't want

362

1  you stroking out on us or anything, and I am

2  sensing that from you.  Am I reading that

3  correctly?

4          MR. SAVANYU:  Yes, Sir.

5          MR. JUHASZ:  Nothing else.

6          THE COURT:  Mr. Bailey?

7          MR. BAILEY:  You are saying that you

8  would be so stressed just by being here, because

9  you seem pretty stressed today, that you don't

10 think you would make it through the trial?

11         MR. SAVANYU:  Probably not, no.

12         MR. BAILEY:  We wouldn't have a

13 problem excusing him.

14         MR. JUHASZ:  No objection.

15         THE COURT:  We thank you for showing

16 up and we thank you for your time.  You are excused

17 from any further responsibilities.

18 (Juror No. 229, Ronald Wynn, entered the Jury room.)

19         THE COURT:  Ronald, you heard the

20 questions, you held your hand up.

21         MR. WYNN:  I am a diabetic and I

22 didn't know if that was important or not, because I

363

1   have to get a shot every day at ten and six and I

2   need to eat when I am getting my shots and I

3   haven't ate yet, that is why she told me to come in

4   now.  I have to eat at ten, 12, and I don't know if

5   that was a problem for me to get up and go get

6   shots and eat.

7                    THE COURT:  We usually take a break

8   about ten every morning, and if need be, we could

9   stop the trial for a few minutes for you to get

10  your shot.  You could make preparations for any

11  food you would have to have.

12                    MR. WYNN:  I could bring that with

13  me?

14                    THE COURT:  Yes.  We have a

15  refrigerator that you can put in anything you need.

16  Is there any other reason why you could not be

17  seated here?

18                    MR. WYNN:  No.

19                    THE COURT:  Mr. Bailey?

20                    MR. BAILEY:  No questions.

21                    MR. INGRAM:  If we accommodated you

22  as best we can, you think you could live with it?

364

1        MR. WYNN:  Yes.  I didn't know that

2   long thing this morning if it meant me having to do

3   all of my blood sugar testing throughout the days

4   and evenings, if I could bring all of that stuff

5   and all of my needles and insulin.

6        THE COURT:  We could provide a place

7   for you to check that.  How often do you do that?

8        MR. WYNN:  I am supposed to do it

9   twice a day.

10        MR. INGRAM:  I don't know if the

11   deputies will let the stuff in the Court, in the

12   Courthouse.

13        THE COURT:  I understand the only

14   thing it requires is the -- you would only have to

15   bring one insulin shot and your testing kit which

16   is a very small thing.  And that could be put

17   somewhere.  I think if I can speak for Mr. Ingram,

18   his concern is that it is going to be awful

19   inconvenient for you.

20        MR. WYNN:  More or less is, because

21   I would have to lug this stuff every day and this

22   morning they wanted me to check out my needle this

365

 1 | morning when I brought it in.

 2 | THE COURT:  All of that we could

 3 | handle, but you have to be comfortable with being

 4 | here.  Now, if it arose, the situation where the

 5 | Jury had to be sequestered, you would be for the

 6 | time of the deliberation, kept together over at the

 7 | hotel there, back and forth.  And your parents or

 8 | somebody could bring your insulin in to you, but

 9 | that should not cause you any particular problem,

10 | should it?

11 | MR. WYNN:  No.

12 | THE COURT:  Any other questions?

13 | MR. INGRAM:  No.

14 | THE COURT:  We'll put you in the

15 | pool, you call that number, stop downstairs and

16 | pick those papers up.

17 | (Juror No. 68, Michael Burzenski, entered the Jury

18 | room.)

19 | THE COURT:  Michael, you held your

20 | hand up this morning.  What was that about?

21 | MR. BURZENSKI:  Medical.

22 | THE COURT:  What is your problem?

366

1              MR. BURZENSKI:  Blood pressure.

2              THE COURT:  You are on medication?

3              MR. BURZENSKI:  Right.

4              THE COURT:  Does that keep it

5    controlled?

6              MR. BURZENSKI:  Sometimes it gets

7    out of control.

8              THE COURT:  There's blood pressure

9    problems and blood pressure problems -- does it get

10   extremely high on you?

11             MR. BURZENSKI:  Sometimes I have a

12   nose bleed, but recently, it has been pretty good.

13             THE COURT:  That is one of those

14   things that we have a hard time gauging.  It boils

15   down to whether you are comfortable or not.  It is

16   a good reason if you don't want to sit on this Jury

17   to be excused.

18             MR. BURZENSKI:  One day it would be

19   okay, but I suspect after I go about three or four

20   days, I would be getting into a bind.

21             THE COURT:  You are having

22   continuing problems?

367

1              MR. BURZENSKI:  Yes.

2              MR. INGRAM:  No questions from the

3    Defense.

4              MR. BAILEY:  No questions.

5              THE COURT:  No objection to me

6    dismissing for cause?

7              MR. BAILEY:  No objection.

8              MR. JUHASZ:  No objection.

9              THE COURT:  We thank you for coming,

10   though.  You are excused.

11   (Court in recess at 12:00 noon.)

12   (Resumed in Jury room at 1:10 p.m.)

13   (Juror No. 69, Tabatha Lovejoy, entered the Jury

14   room.)

15             THE COURT:  You held your hand up?

16             MS. LOVEJOY:  I have four small

17   children and my Mom has cancer surgery next week

18   and I want to be there.

19             THE COURT:  How young are they?

20             MS. LOVEJOY:  Seven, five, four and

21   two.

22             THE COURT:  24-hour a day job.

368

1            MR. BAILEY:  Do you have anybody

2     else who can watch your children?

3            MS. LOVEJOY:  My Mom is my

4     babysitter, but she has surgery next week.

5            MR. BAILEY:  How about after next

6     week?

7            MS. LOVEJOY:  I guess she probably

8     could.  My husband, he works.  He leaves at 7:00

9     and he's home at 4:00 and the kids --

10            MR. BAILEY:  Is this fairly

11     extensive surgery?

12            MS. LOVEJOY:  She's having her

13     breast removed.

14            MR. BAILEY:  She's not going to be

15     in any shape for awhile.

16            MS. LOVEJOY:  Yes.

17            MR. BAILEY:  No objection.

18            MR. INGRAM:  No questions.

19            THE COURT:  You are excused for

20     cause.

21     (Juror No. 74, Frank King, entered the Jury room.)

22            THE COURT:  You held your hand up

369

1   this morning.  Tell us what that is about.

2              MR. KING:  To take the pledge?

3              THE COURT:  No.

4              MR. KING:  To be excused?

5              THE COURT:  Yes.

6              MR. KING:  On the 18th, I'm going to

7   Florida and I'll be down there for six days until

8   the 24th.  Any time -- I think we'll be back by

9   then.  Any time after that, I am okay.

10             THE COURT:  I think that is going to

11  be right in the middle of probably what we're doing

12  here.  You gentlemen have any questions?

13             MR. JUHASZ:  No, Sir.

14             MR. BAILEY:  No questions.

15             THE COURT:  You are excused.  You

16  have no further responsibilities with this.  Have a

17  good trip.

18  (Juror No. 84, Darrell Skaggs, entered the Jury room.)

19             THE COURT:  You held your hand up.

20             MR. SKAGGS:  I am starting a full

21  time job.  I'm a full time student.  I have a two

22  year old son that my Mom is watching for me.  A

370

1    four, five week trial would be pretty hard for me

2    to manage.

3                    THE COURT:   Any questions?

4                    MR. INGRAM:   Impossible to manage

5    seemed fairly clear.  How about you, Mr. Bailey?

6                    MR. BAILEY:   Seems clear to me, too.

7                    THE COURT:   No objection?

8                    MR. BAILEY:   No objection.

9                    MR. BECKER:   No objection.

10                   MR. JUHASZ:   No objection.

11   (Juror No. 368, Tracie Pirigyi, entered the Jury

12   room.)

13                   THE COURT:   You held your hand up.

14                   MS. PIRIGYI:   I'm in the process of

15   being diagnosed with what they think is MS and I am

16   on muscle relaxers and my bladder both, and I am

17   very uncomfortable right now.  I can't sit or stand

18   very long.

19                   MR. BAILEY:   No objection.

20                   MR. INGRAM:   No objection.

21                   THE COURT:   You are excused.   We

22   thank you for your time.  Good luck to you.

371

1   (Juror No. 281, Joseph Natali, entered the Jury room.)

2                   THE COURT:  You held your hand up

3   this morning.  For what reason?

4                   MR. NATALI:  I am on layoff status

5   from work right now, so I have to be available,

6   plus I have a three-year old son and my wife works

7   during the day, so I have to watch him.  And I am a

8   part time paid fire fighter, EMT, so if I have to

9   do Jury duty, I have -- they don't pay Jury duty

10  down there, so I have to call off, which is taking

11  money out of my pocket, which puts a hardship on

12  helping to pay bills.

13                  THE COURT:  Mr. Bailey?

14                  MR. BAILEY:  No objection.

15                  MR. INGRAM:  None.

16                  MR. JUHASZ:  No questions.  No

17  objection.

18                  THE COURT:  Joe, you are excused.

19  We thank you for your time.

20  (Juror No. 254, Kathryn Sarisky entered the Jury

21  room.)

22                  THE COURT:  You held your hand up?

372

1          MS. SARISKY:  My husband is having a

2    major back surgery April 22nd  at Cleveland

3    University Hospital and I know he's going to be

4    there at least two days.  That is on April 22nd.  I

5    have no one to take care of him.  There's no one

6    else to take care of him.  I don't know how long he

7    will be laid up.

8          THE COURT:  It will be awhile.  Any

9    objections?

10          MR. BAILEY:  No objection.

11          MR. INGRAM:  No objection.

12          THE COURT:  You are excused.  We

13    thank you for your time.

14    (Juror No. 106, William Kennedy entered the Jury

15    room.)

16          THE COURT:  Mr. Kennedy, you held

17    your hand up this morning.  What was the reason for

18    that?

19          MR. KENNEDY:  Medical.  I have had

20    surgery, back and heart this Summer, and I have to

21    go get my blood checked every month.  Like

22    tomorrow, I got to go for a CAT scan.

373

1          THE COURT:  You are having

2    continuing problems then?

3              MR. KENNEDY:  Mostly check-ups.

4          THE COURT:  Would it make it

5    difficult for you to sit for periods of time?

6              MR. KENNEDY:  Yes.  I was having

7    trouble this morning sitting on those hard benches,

8    and walking, too.

9          THE COURT:  Any objections?

10             MR. INGRAM:  None.

11             MR. BAILEY:  No.

12         THE COURT:  You are excused and we

13   thank you for your time.

14   (Juror No. 194, Ellin Grantz, entered the Jury room.)

15         THE COURT:  Ms. Grantz, you held

16   your hand up this morning?

17             MS. GRANTZ:  Right.  I got bladder

18   problems.  I can't sit long periods of time, and I

19   am miserable if I can't go.  So I am miserable

20   right now.

21         THE COURT:  That is an ongoing

22   thing?

374

1          MS. GRANTZ:  Right.

2          THE COURT:  Any objections?

3          MR. BAILEY:  No objection.

4          MR. JUHASZ:  No objection.

5          THE COURT:  You are excused.  We

6   thank you for your time.

7   (Juror No. 85, Shirley Biel, entered the Jury room.)

8          THE COURT:  Miss Biel, you raised

9   your hand this morning?

10          MS. BIEL:  Yes.

11          THE COURT:  For what reason?

12          MS. BIEL:  I seen something on the

13   news.  That was why I raised my hand.

14          THE COURT:  The question then is, do

15   you have your mind made up about the facts of the

16   case?  Are you able to sit and listen to the case

17   and decide it fairly on the evidence presented?

18          MS. BIEL:  I feel I would be able to

19   judge it on whatever was presented.  I didn't -- at

20   the time I heard it, I didn't pay that much

21   attention to it.

22          THE COURT:  I bet probably half or

375

1   better of the people in that room probably heard

2   some explanation, but that doesn't disqualify you

3   as long as you feel comfortable that you would be

4   able to set aside anything that you may have heard

5   or you may remember that you heard as not being the

6   evidence.  The evidence has to come in the

7   Courtroom.  Do you feel comfortable?

8                   MS. BIEL:  Could I ask a question?

9                   THE COURT:  Sure.

10                  MS. BIEL:  On the indictments that

11  came down, were there four indictments?  Was there

12  one on each count?

13                  THE COURT:  There's four counts on

14  one indictment.  There are actually two charges of

15  murder although there was only one murder done, but

16  that is a legal thing that I'll have to explain at

17  the proper time.  Any questions?

18                  MR. BAILEY:  We'll cover this at the

19  next session.  No questions at this time.

20                  MR. INGRAM:  Not at this time.

21                  THE COURT:  You will be in the pool

22  then and you should call that number.  Stop

376

1   downstairs and get those papers before you leave.

2   Thank you.

3          I got the ruling from the Court of

4   Appeals.  The Court of Appeals, Judge Nader,

5   Christley and Ford, they have, the sum and

6   substance -- I'll get a copy of it -- they don't

7   have jurisdiction.  The Court of Appeals doesn't

8   have jurisdiction in murder cases.  It goes

9   directly to the Supreme Court, but they went over

10  and above that, and said even if we had

11  jurisdiction, not a final appealable order, and

12  case law was cited.

13               MR. JUHASZ:  Okay.

14  (Juror No. 86, Ronald Conrad, entered the Jury room.)

15               THE COURT:  You held your hand up

16  this morning.  What was the reason?

17               MR. CONRAD:  I recently divorced and

18  my children live -- I have three children who live

19  with my ex-wife in Champion.  I go out there every

20  morning and get my 11 year old and 13 year old on

21  the bus and I take my seven year old to school and

22  he starts at 8:35, and it is 8:40 before I get out

377

1    of there.  I am the only one available in the

2    family.  My oldest son lives with me in Warren and

3    my father takes him to school.  He's not available

4    to be able to take the other ones.

5                    THE COURT:  What about in the

6    afternoon?

7                    MR. CONRAD:  In the afternoon, my

8    ex-wife gets off work and she's there when they get

9    home from school.

10                   THE COURT:  Would you be hard

11   pressed to get here by 9:00?

12                   MR. CONRAD:  If I was sequestered, I

13   don't know how I would take care of the children,

14   especially the seven year old taking him to school.

15   He's so broken up over our divorce and stuff, he

16   doesn't want to ride the bus and he's really

17   emotional about it, so that is why I take him to

18   school every morning.

19                   THE COURT:  Mr. Bailey?

20                   MR. BAILEY:  No problem excusing

21   Mr. Conrad.

22                   MR. JUHASZ:  No questions.  No

378

1   objection.

2                   THE COURT:  You are excused.  We

3   thank you for your time.

4   (Juror No. 90, Rebecca Miller, entered the Jury room.)

5                   THE COURT:  You heard the questions

6   this morning.  You held your hand up.  What was

7   that about?

8                   MS. MILLER:  Truthfully, I forget

9   which one it was.  I don't remember, but actually,

10  I had two reasons and they weren't specific

11  questions.  One was that I read about everything

12  extensively to date and I formed some rather strong

13  opinions.  And secondly, about 27 years ago, my

14  house was broken into and I was attacked and I was

15  robbed and I was beaten and I don't feel I could be

16  objective about this case at all.  I would request

17  to be excused.

18                  THE COURT:  Mr. Bailey?

19                  MR. BAILEY:  No questions.  No

20  problem excusing her.

21                  MR. JUHASZ:  No questions.  No

22  objection.

379

1   (Juror No. 110, Stephen Luzar, entered the Jury room.)

2                   THE COURT:  Mr. Luzar, you held your

3   hand up this morning.  Can you tell us what that is

4   about?

5                   MR. LUZAR:  Well, I got a 96 year

6   old mother and I watch her every day.  My sister

7   comes in from Detroit and she takes her on the

8   weekend.  She's 96.  That is what I have been doing

9   for a few years.

10                   THE COURT:  That would be, you feel

11   that would be too much to ask your other two

12   siblings to take that over?

13                   MR. LUZAR:  One sister stays here at

14   night every day, all night long, and my brother, he

15   goes home at noon and I take it in the afternoon.

16                   THE COURT:  Mr. Bailey?

17                   MR. BAILEY:  No questions and no

18   problem excusing him.

19                   MR. JUHASZ:  No questions and no

20   objection.

21                   THE COURT:  Good luck to you.  You

22   are excused and you have no further

380

1  responsibilities in this matter.

2  (Juror No. 116, Walter Smusz, entered the Jury room.)

3              THE COURT:  Walter, good afternoon

4  to you.  You held your hand up this morning.  Tell

5  us why.

6              MR. SMUSZ:  I have reservations for

7  Carlyle, Pennsylvania for a car meet on April 24th

8  and April 25th.

9              THE COURT:  What is the date of

10  that?

11             MR. SMUSZ:  April 24th and April

12  25th.

13             THE COURT:  Any questions?

14             MR. BAILEY:  No questions.  No

15  objection.

16             MR. INGRAM:  None from us.  No

17  objection.

18  (Juror No. 119, Gayle Barbarini, entered the Jury

19  room.)

20             THE COURT:  You held your hand up

21  this morning.  What was that about?

22             MS. BARBARINI:  I have a situation,

381

```
 1    an ill family member and it is my mother's husband,

 2    and I am the only sibling in this area.  She

 3    depends on me 100 percent.  She's 77 years old, and

 4    I am in touch with her on a day-to-day basis,

 5    probably five, six times a day.  I leave work and I

 6    go to her home.  I help take care of him.  Also, I

 7    have an employment situation, where my employer

 8    will cover me, but I still have to go to work.  I

 9    have to make up.  I have to go and do my work

10    because no one will do it for me.

11                    THE COURT:  You might be working

12    into the night if you were sitting on a Jury?

13                    MS. BARBARINI:  Yes.  I have those

14    two situations where I am very concerned.

15                    MR. BAILEY:  Based on the first

16    reason, the State has no objection and we would

17    excuse her.

18                    MR. JUHASZ:  No questions.  No

19    objection.

20                    THE COURT:  You are excused.  We

21    thank you for your time.

22    (Juror No. 120, James Fetherolf, entered the Jury
```

382

1   room.)

2               THE COURT:  You held your hand up.

3   For what reason?

4               MR. FETHEROLF:  I have a couple of

5   doctor appointments.  I have one on April 9th for

6   prostate, and Monday, the 14th, I have an

7   appointment and my wife has a follow up

8   appointment.  She had major back surgery on the

9   18th.

10              THE COURT:  How is she doing?

11              MR. FETHEROLF:  Still has some pain.

12   My Mom had surgery yesterday with a hip replacement

13   and she should be coming home the end of next week.

14              THE COURT:  You have had a bad run.

15   Mr. Bailey?

16              MR. BAILEY:  With the prostate you

17   can't sit for any long period of time?

18              MR. FETHEROLF:  It is just a check.

19              MR. BAILEY:  So with the other two

20   things with your wife and your Mom, are you going

21   to have to take care of your Mom?

22              MR. FETHEROLF:  Yes.

383

1          MR. BAILEY:  And that starts next

2    week?

3          MR. FETHEROLF:  The end of next week

4    she should be home.

5          MR. BAILEY:  I take it your wife

6    can't handle that herself?

7          MR. FETHEROLF:  She can't lift

8    nothing over five pounds.

9          MR. BAILEY:  No further questions,

10   and we have no problem excusing him.

11         MR. JUHASZ:  No questions.  No

12   objection.

13         THE COURT:  You are excused.  We

14   wish you well with your family.

15   (Juror No. 123, Mary Costello, entered the Jury room.)

16         THE COURT:  Good afternoon.  You

17   held your hand up?

18         MS. COSTELLO:  I have to bring it to

19   everybody's attention.  I do know Jerry Ingram.

20   He's married to my sister's sister.  She's my

21   husband's sister.  We see each other occasionally

22   on holidays.

384

1          THE COURT:  You feel that that would

2   have -- make it uncomfortable for you to sit?

3          MS. COSTELLO:  Maybe not.  I wanted

4   to bring it to your attention.  I don't think it

5   would have a bearing either way.

6          THE COURT:  The question boils down

7   to whether or not you could be seated and be fair

8   to both sides.  We all know different people.  You

9   are in affect related to him by marriage, then?

10          MS. COSTELLO:  Yes.

11          THE COURT:  The statute says, within

12   third degree of blood, but --

13          MR. INGRAM:  I certainly don't think

14   we make the statute.

15          MS. COSTELLO:  We don't.  It may not

16   be a bearing.

17          THE COURT:  You are doing what we

18   asked you to do.  We appreciate that.  Mr. Bailey,

19   why don't you ask whatever questions you have?

20          MR. BAILEY:  Basically, what it

21   boils down to is, because of your relationship, if

22   we were able to prove our case beyond a reasonable

385

1    doubt, would you be able to return a guilty verdict

2    in the case?

3                    MS. COSTELLO:  Sure.

4                    MR. BAILEY:  If you felt that

5    circumstances, let's say we went to a second phase

6    and you did that balancing test that the Court is

7    going to talk about later and you found that the

8    death penalty was an appropriate verdict, would you

9    be able to return that verdict, in spite of the

10   fact that you know Jerry and you see him?

11                   MS. COSTELLO:  Yes.

12                   THE COURT:  John?

13                   MR. JUHASZ:  I have no questions.

14                   THE COURT:  You will be a part of

15   the pool, and you should call that number given to

16   you after tomorrow night.  Stop downstairs and get

17   the papers you have to fill out.  We thank you.

18   (Juror No. 125, Kirk Evans, entered the Jury room.)

19                   THE COURT:  Mr. Evans, you held your

20   hand up today?

21                   MR. EVANS:  Three times.

22                   THE COURT:  What was that about?

386

1          MR. EVANS:  The first one is I went

2     to high school with Jerry Ingram.  This is the

3     first time I have seen him since.

4          MR. INGRAM:  We spent a fair amount

5     of time in detention together.

6          MR. EVANS:  I think I still hold the

7     record.  The other two things were financial

8     hardship.  I work at Defireco Steel in Sharon and I

9     am laid off right now, and according to questions

10    the Unemployment asks, that would leave me, if I

11    was available to work, with no money coming in.

12    The third thing, it brings me to my second job.

13    You mentioned sequestration, my wife and I own a

14    small business.  We do computer hardware and

15    software for physicians, which I normally do after

16    three and on weekends.  If they had a problem

17    during that two to three week period, I wouldn't be

18    able to help them out at all.

19          THE COURT:  You are probably the

20    brains as far as the technical part.

21          MR. EVANS:  The hardware, she's the

22    software.

387

1              THE COURT:  Mr. Bailey?

2              MR. BAILEY:  No questions and no

3    objection.

4              MR. JUHASZ:  No questions.  No

5    objection.

6              THE COURT:  Mr. Evans, we thank you.

7    You are excused.

8    (Juror No. 141, John Drummond, entered the Jury room.)

9              THE COURT:  Mr. Drummond, you held

10   your hand up this morning.  What was the reason for

11   that?

12             MR. DRUMMOND:  I could be very

13   unbiased and listen to both sides and do all of

14   that.  It is just that my wife passed away in June

15   and I got a 12 and 13 year old boy and I am doing

16   what I can to support them.  I am a single parent

17   and I got two young boys and they are at a tough

18   age and they are going through a lot, and I got to

19   really be there for them.  I could do everything.

20   That is where I am at with my kids, because my wife

21   was only 33 years old and they are going through a

22   hard time.

388

1          THE COURT:  Hopefully you can get

2    through that and I'm sure you will.  Mr. Bailey?

3          MR. BAILEY:  No questions and no

4    problem with excusing him.

5          MR. JUHASZ:  No questions.  No

6    objection.

7          THE COURT:  You are excused.

8    (Juror No. 148, Jessie Pilney entered the Jury room.)

9          THE COURT:  You raised your hand

10   this morning.  Tell us for what reason.

11         MS. PILNEY:  I know about the case.

12   I heard about it.  I heard about it on T.V. and in

13   the paper.

14         THE COURT:  Well, over half the

15   people out there have.  The question is, would you

16   be able to sit and listen to the evidence and

17   decide the case on the evidence without having your

18   mind made up beforehand, and setting aside anything

19   you heard on T.V. or the news?  Because the case

20   has to be decided fairly on the evidence presented

21   in the Courtroom.  Some people are able to do that,

22   and some aren't.  The question here is, are you

389

1   able to?

2               MS. PILNEY:  No.

3               THE COURT:  You don't think so?

4               MS. PILNEY:  No.

5               THE COURT:  You think you have your

6   mind firmly fixed that what you read is probably

7   correct?

8               MS. PILNEY:  What I saw on T.V.

9               THE COURT:  Okay.  Fair enough.

10  Mr. Bailey?

11              MR. BAILEY:  Sometimes you go to

12  school and you take classes and you set aside

13  everything you learned before and it is like coming

14  in with a blank slate.  If the Judge tells you

15  under the law, you are only allowed to consider

16  what is on that slate in the Courtroom and you have

17  to ignore everything else, can you set aside your

18  own opinions that you have?  Now, it is sort of an

19  intellectual exercise when you are told to just

20  focus in on what happens in the Courtroom.  Are you

21  able to do that?  Even though you may know

22  things --

390

1          MR. INGRAM: I object to not giving

2    the juror an opportunity to answer the question.

3          THE COURT: You are trying to

4    explain before she answers.

5          MS. PILNEY: I saw on T.V., the 911

6    call that came in. I heard her when she walked in

7    and could that be a lie?

8          THE COURT: Any other questions?

9          MR. BAILEY: Well, it may well be

10   that this case is a different case from what you

11   heard on T.V. And you may hear the same tape in

12   this case. If the Judge tells you to ignore what

13   you heard outside of this Courtroom and just listen

14   to what you hear in the Courtroom, can you do that

15   or you are not able to do that?

16         MS. PILNEY: I don't know.

17         MR. BAILEY: You can't do that?

18         MS. PILNEY: No.

19         MR. BAILEY: No further questions.

20   No problem with excusing her.

21         MR. JUHASZ: No questions. No

22   objection.

391

1           THE COURT:  You are excused.  We

2      thank you for your time.

3      (Juror No. 155, Joseph Foor, entered the Jury room.)

4           THE COURT:  You held up your hand

5      today.  What was the reason?

6           MR. FOOR:  I have got a vacation

7      coming on the 28th of this month.  I plan on

8      leaving the State; and another reason, you spoke

9      that if it goes any further like the second trial,

10     we'll be in the hotel for a week.  I am a single

11     parent of three kids and that is not going to work.

12          THE COURT:  How old are your

13     children?

14          MR. FOOR:  16, 15 and 13.

15          MR. INGRAM:  I am laughing because I

16     have teenagers.  If I wasn't there for a week, I

17     wouldn't have a home when I came back.

18          MR. BAILEY:  No objections, no

19     questions.

20          MR. JUHASZ:  No questions.  No

21     objections.

22          THE COURT:  You have fun.  Good

                                                              392

1    luck.  You are excused.

2    (Juror No. 159, Everette Shaulis entered the Jury

3    room.)

4                    THE COURT:  You held your hand up

5    this morning?

6                    MR. SHAULIS:  I have a medical

7    excuse.

8                    THE COURT:  It looks like

9    hypertension and coronary heart.  You would have a

10   problem sitting for any period of time?

11                   MR. SHAULIS:  Yes.

12                   THE COURT:  And stress doesn't go

13   well with you probably.

14                   MR. SHAULIS:  Not very well.

15                   THE COURT:  Do you have any

16   questions, Mr. Bailey?

17                   MR. BAILEY:  No questions.  No

18   objection to excusing him.

19                   MR. JUHASZ:  No questions.  No

20   objection.

21   (Juror No. 160, Timothy Best, entered the Jury room.)

22                   THE COURT:  You held your hand up

393

1   this morning out there?

2                    MR. BEST:  Yes, Sir.

3                    THE COURT:  What was the reason for

4   that?

5                    MR. BEST:  I am currently going

6   through a divorce that involves child custody

7   issues, and I would love to do my duty, I always

8   wanted to do this.  I believe because of what is

9   going on in regards to the children and their newly

10  appointed guardian ad litem, would further harm my

11  children if I was involved for a longer period of

12  time.

13                   THE COURT:  You have got more

14  important things in your life at this time.

15                   MR. BEST:  Yes.

16                   THE COURT:  Mr. Bailey?

17                   MR. BAILEY:  No questions.  No

18  objection to excusing him.

19                   MR. JUHASZ:  No questions.  No

20  objection.

21                   THE COURT:  You are excused.  We

22  thank you for your time and wish you well.

394

1   (Juror No. 165, Russell Humphrey, entered the Jury

2   room.)

3                   THE COURT:  You are Russell

4   Humphrey?  Russell, you held your hand up this

5   morning.  What was the reason for that?

6                   MR. HUMPHREY:  My mill is supposed

7   to close in October.  It might be a financial

8   hardship.

9                   THE COURT:  Where do you work at?

10                  MR. HUMPHREY:  Oxford Automotive in

11  Masury.

12                  THE COURT:  I'm sorry to hear that.

13                  MR. HUMPHREY:  It is part of life, I

14  guess.

15                  THE COURT:  But a bad part.  You

16  will be looking for work then in the meantime or

17  what?

18                  MR. HUMPHREY:  Right now, it is

19  going to be a matter of trying to save some money

20  to keep ahead of the bills a little bit.

21                  THE COURT:  You are worried, the

22  concern you have that might interfere with your

```
                                                             395
 1    ability to sit here?

 2                    MR. HUMPHREY:  Right.

 3                    THE COURT:  Mr. Bailey, do you have

 4    any questions?

 5                    MR. BAILEY:  Your business doesn't

 6    pay you while you are on Jury duty?

 7                    MR. HUMPHREY:  That I don't think

 8    so, but I'm not sure.  I wouldn't swear to it.

 9                    MR. BAILEY:  Do you work overtime?

10                    MR. HUMPHREY:  There's been no

11    overtime for two years.

12                    MR. BAILEY:  If they did pay you,

13    would you be able to sit during this time?  It

14    would be between two and three weeks, probably over

15    the course.

16                    MR. HUMPHREY:  Yes, Sir, I would.

17                    THE COURT:  You would have no

18    problem with that?

19                    MR. HUMPHREY:  I have no problem.

20                    THE COURT:  Do you have any

21    questions?

22                    MR. JUHASZ:  No.
```

396

1          THE COURT:  Let's leave it this way.

2    You will go into the pool for potential juror here.

3    You check with your employer, if there's no problem

4    and you are willing to serve, get in touch with

5    Connie downstairs, and tell her that you are

6    available.  If there's a problem, is there any

7    objection to him being dismissed?

8          MR. BAILEY:  No objection.

9          MR. JUHASZ:  No objection.

10   (Juror No. 174, Brenda Morris-Bolger, entered the

11   Jury room.)

12          THE COURT:  You are my cousin,

13   aren't you?

14          MS. MORRIS-BOLGER:  Yes.

15          THE COURT:  Brenda, you held your

16   hand up this morning.  What is the reason for that?

17          MS. MORRIS-BOLGER:  Family

18   situation.  My father passed away three weeks ago.

19   Currently taking care of my Mom, she lives with me.

20   She has dementia, so I am responsible for doctors,

21   lawyers, anything of that nature.

22          THE COURT:  I'm sorry to hear that.

397

1   I wasn't aware that your Dad had passed away.  I'm

2   sorry to hear that.  Any questions by Mr. Bailey?

3                   MR. BAILEY:  No questions and no

4   problem excusing her.

5                   MR. JUHASZ:  No questions.  No

6   objection.

7   (Juror No. 189, Sheria Grayer, entered the Jury room.)

8                   THE COURT:  Miss Grayer, you held

9   your hand up this morning.  What was the reason for

10  that?

11                  MS. GRAYER:  I wasn't sure what was

12  said, but I couldn't -- I have reasons for why I

13  can't be in the Jury.  I'm self-employed, and right

14  now I am on a lease basis from week to week.  I am

15  an independent contractor, so if I don't work, I

16  lose total income.  My family is in a situation --

17  it wouldn't be so bad, but my family is in a

18  situation right now where me and my brother had to

19  come back home to help him.  He got into a car

20  accident in November, so he's dealing with health

21  issues, no health insurance.  So we're in a hard

22  way right now.  If it wasn't for that, I would

398

1    probably be better, because I could work my

2    schedule in some kind of way.  I have never been

3    picked for Jury duty.  I don't know how the

4    schedule is.  If I was not at work, I lose total

5    income because I am self-employed.

6               THE COURT:  The schedule that we'll

7    follow here is somewhat hectic and that

8    particularly with your situation, that might cause

9    an awful lot of problems for you.  Mr. Bailey?

10              MR. BAILEY:  No questions and no

11   objection to excusing her and wish her well on her

12   current situation.

13              MR. JUHASZ:  No questions.  No

14   objection.

15              THE COURT:  You are excused and good

16   luck to you.

17   (Juror No. 197, Patrick Russell, entered the Jury

18   room.)

19              THE COURT:  You heard the questions

20   this morning, what was that?

21              MR. RUSSELL:  I started a new job

22   and have only been there seven weeks.  I won't get

```
                                                      399
 1   paid.

 2                 THE COURT:  Where are you working?

 3                 MR. RUSSELL:  Niles Drill Service.

 4                 THE COURT:  How long have you been

 5   there?

 6                 MR. RUSSELL:  Eight weeks.

 7                 THE COURT:  Mr. Bailey?

 8                 MR. BAILEY:  You have a child, a

 9   young child at home and you need the money for your

10   family?

11                 MR. RUSSELL:  Yes.

12                 MR. BAILEY:  If you are not getting

13   paid, it is an extreme financial hardship?

14                 MR. RUSSELL:  Yes.

15                 MR. BAILEY:  No objection to him

16   being excused.

17                 MR. JUHASZ:  No questions.  No

18   objection.

19                 THE COURT:  Mr. Russell, you are

20   excused.  You have no further responsibilities in

21   this matter.

22   (Juror No. 199, Amy Barlett, entered the Jury room.)
```

400

1            THE COURT:  Miss Barlett, you held

2   your hand up this morning.  What was that for?

3            MS. BARLETT:  I don't feel as though

4   I am capable of making a decision like that right

5   now.

6            THE COURT:  Would it make you feel

7   any different if I told you that probably 99 out of

8   the 100 people out there would say the same thing?

9            MS. BARLETT:  Really?

10           THE COURT:  Who could feel about

11  being asked to sit on a case.

12           MS. BARLETT:  I can see that.

13           THE COURT:  The point is that some

14  people under no circumstances, could ever make that

15  decision.  That is just not in them.  People on the

16  other side of the coin, that could very easily make

17  it because they feel any time a murder is

18  committed, a person should forfeit their life.

19  That isn't the law.  The law is to take 12 ordinary

20  people and put them on a Jury, and have them decide

21  first guilt or innocence and then once that is

22  done, if they make a finding of guilty, they are

401

 1  called upon to weigh these factors, aggravating
 2  circumstances, mitigating factors, and I'm sure, I
 3  have never been on such a Jury, I never will.  I
 4  can't be.  But there's just people like yourself
 5  that we ask to do that.  That is one of the hard
 6  parts about being a juror.  Again, it is something
 7  you have to look within your own heart and answer,
 8  can you follow the law no matter where that may
 9  lead you, based on the facts?
10            MS. BARLETT:  Yes, okay.
11            THE COURT:  You have to answer for
12  yourself first, and give us the primary assurance
13  that you are able and will follow the law wherever
14  that leads.
15            MS. BARLETT:  Yes.
16            THE COURT:  Are you able to do that?
17            MS. BARLETT:  Yes.
18            THE COURT:  Questions?
19            MR. BAILEY:  Amy, I guess it is sort
20  of like being back in school.  You are just a year
21  away from high school, and I take it you have been
22  in classes before where the teacher has given you

402

1   instructions, you listen closely in class.  You

2   can't take notes like you do in school, but pay

3   attention, and you have to remember certain things.

4   And then, you go back with other folks on the Jury,

5   if you are on the Jury, and you listen to the

6   Judges instructions, and you apply the Judges

7   instructions to the facts that you heard, and

8   determine if it fits in there and whether we proved

9   what we're supposed to prove.  And if we do, then

10  you go onto a second phase.  You find the Defendant

11  guilty in the first phase, then we move onto a

12  second phase, and you would have to determine what

13  the appropriate punishment would be.  And the same

14  thing happens, you listen to maybe more evidence

15  and you hear more instructions from the Judge.  It

16  is like being back in school and you would go back

17  with the other folks and then you make a decision

18  as to what the appropriate punishment would be.  Do

19  you think you could do that?

20            MS. BARLETT:  I don't know.  To tell

21  you will the truth, I am nervous.

22            MR. BAILEY:  I imagine everybody is

403

1   nervous. It is not something that we ask people to

2   do every day to sit on a death penalty case. You

3   have made decisions before, right? You do work?

4                MS. BARLETT: Right.

5                 MR. BAILEY: And do you think that

6   you may be younger than most of the other jurors,

7   but you are an adult, do you think you would be

8   able to sit there and listen to things and be able

9   to make up your own mind and reach a decision?

10               MS. BARLETT: Yes.

11               THE COURT: Mr. Juhasz?

12               MR. JUHASZ: No questions.

13               THE COURT: You will be in the pool,

14   so you will have to call that number after tomorrow

15   evening, 4:30. Stop downstairs before you leave

16   and pick up those papers to bring back. Thank you.

17   (Juror No. 201, Katherine Blackann, entered the Jury

18   room.)

19               THE COURT: Katherine, you held your

20   hand up this morning?

21               MS. BLACKANN: Yes.

22               THE COURT: What was the reason for

404

1    that?

2              MS. BLACKANN:  You had asked about

3    capital punishment and I don't agree with that, and

4    the other reason was because we're going to be

5    going on vacation before Easter and after Easter,

6    but I wanted to say one thing because you told me

7    to be truthful.  I wanted to say that I don't feel

8    that I can stand in judgment upon this woman.  I

9    don't feel that I can do it because I am too

10   convicted of that.  I could never say to her, for

11   her to be guilty or not guilty.

12             THE COURT:  Is that a religious

13   conviction?

14             MS. BLACKANN:  Very religious.

15   Conviction in my heart.  I live with it.  I feel it

16   would be an injustice to the Court system to put me

17   on there.  I wouldn't be able to say one way or the

18   other.  That is how I feel.

19             THE COURT:  Fair enough.

20             MR. BAILEY:  That is not just this

21   case, it is any case?

22             MS. BLACKANN:  Right.  Anything.  I

405

1   have a deep conviction about that.

2              MR. BAILEY:  No objection and no

3   further questions.

4              THE COURT:  She will be on vacation.

5   Any objection?

6              MR. JUHASZ:  No objection.  No

7   questions.

8              THE COURT:  We thank you very much.

9   (Juror No. 203, Edward Schmidt, entered the Jury

10  room.)

11             THE COURT:  Edward, you held your

12  hand up this morning.  What would that be for?

13             MR. SCHMIDT:  That would be

14  financial.  I work for Maverick Tube now.  It is

15  LTV, old LTV in Youngstown.  They are going to

16  close next week.  I'm going to lose my job.  I

17  don't know if State funds will pay for me when I'm

18  here.

19             THE COURT:  If they are closing,

20  after the first week, I think there's one week you

21  don't collect.

22             MR. SCHMIDT:  I have been on and off

406

1   Unemployment now for awhile.

2                    THE COURT:  You haven't used the

3   time up?

4                    MR. SCHMIDT:  No.  Not all of it,

5   what happens is my TRA and TAA time are from

6   December 13th of last year, and it only runs for a

7   certain amount of time.  I did want to go back to

8   school.  I don't know how long the trial is going

9   to last.

10                    THE COURT:  Nor did we.  That leaves

11  you up in the air then.

12                    MR. BAILEY:  Mr. Schmidt, I take it

13  once the mill closes, then you are going to be

14  looking for other work?

15                    MR. SCHMIDT:  Yes.

16                    MR. BAILEY:  You would rather be

17  spending your time doing that?

18                    MR. SCHMIDT:  I have put a couple of

19  interviews on hold because of this.

20                    MR. BAILEY:  No further questions.

21  No objection.

22                    MR. JUHASZ:  No questions.  No

407

1    objection.

2                    THE COURT:   You are excused.   We

3    wish you good luck.

4    (Number 208, Melissa Buhala, entered the Jury room.)

5                    THE COURT:   You held your hand up

6    this morning.   Why is that?

7                    MS. BUHALA:   Because of work and

8    school.   I'm going to YSU.   I work a full time job,

9    plus I waitress on the weekends.   My only day off

10   is Wednesdays when I get to do all of my homework

11   and do all of my running around to get things done.

12                   THE COURT:   Do you get any sleep?

13                   MS. BUHALA:   I try to.

14                   THE COURT:   You have a lot of things

15   going?

16                   MS. BUHALA:   Yes.

17                   MR. BAILEY:   Spending two, three

18   weeks here, that would kill school, wouldn't it?

19                   MS. BUHALA:   I think so.   Finals are

20   coming up.

21                   MR. BAILEY:   No objection to

22   excusing her.

408

1          MR. JUHASZ:  No questions.  No

2    objection.

3    (Juror No. 210, Kara Gillespie, entered the Jury

4    room.)

5          THE COURT:  Kara, you held your hand

6    up this morning?

7          MS. GILLESPIE:  Yes.

8          THE COURT:  What was that for?

9          MS. GILLESPIE:  I am out of a job

10   right now.  I am supposed to be starting a new job.

11   I am on my own, I am 21.  I won't be able to afford

12   it.

13         THE COURT:  When are you starting

14   your job?

15         MS. GILLESPIE:  Sometime this week.

16         THE COURT:  Mr. Bailey?

17         MR. BAILEY:  No questions.  No

18   problem excusing her.

19         MR. JUHASZ:  No questions.  No

20   objection.

21         THE COURT:  You are excused.  Thank

22   you very much.

409

 1    (Juror No. 212, James Weller, entered the Jury room.)

 2                  THE COURT:  You held your hand up?

 3                  MR. WELLER:  It would be work

 4    related.  I'm president of the local steel service

 5    center.  We have four here and one in Knoxville,

 6    Pennsylvania, and I travel a tremendous amount.

 7    Normally I don't even go on vacation for a week.

 8    To be out three or four weeks would be very

 9    difficult.

10                  THE COURT:  Mr. Bailey?

11                  MR. BAILEY:  I take it that would

12    make it rough for everybody else at work, if you

13    are not there?

14                  MR. WELLER:  Yes.

15                  MR. BAILEY:  No further questions.

16    No objection to excusing him.

17                  MR. JUHASZ:  No questions.  No

18    objection.

19    (Juror No. 218, Judith Elliott entered the Jury room.)

20                  THE COURT:  You held your hand up

21    this morning.  Tell us what that was about.

22                  MS. ELLIOTT:  Because I took an oath

410

1   not to discuss anything that I would hear in the

2   news media or discuss it with my family, in this

3   case and really not to judge ahead of time.   I

4   lumped that all into one when I raised my hand.   I

5   put it all in one thing when I raised my hand

6   because it is what I believe a vow is, you don't

7   discuss it.   I raised my hand because I agreed not

8   to discuss it.   That is what I would want if it

9   happened to me.

10              THE COURT:   You think then that you

11  would be able to sit?

12              MS. ELLIOTT:   Yes, I would.

13              THE COURT:   You understand that a

14  good portion of the people in this prospective Jury

15  have read or heard something about the case, but

16  that doesn't disqualify you if you are able to set

17  that aside, because the case, to be tried fairly,

18  has to be on what comes out in the Courtroom.

19              MS. ELLIOTT:   I haven't heard hardly

20  anything, I can honestly tell you that.

21              THE COURT:   You have no problem with

22  doing that?

411

1          MS. ELLIOTT:  No problem.

2          MR. BAILEY:  You are saying you

3  could be a juror?

4          MS. ELLIOTT:  Yes, I could.

5          MR. BAILEY:  No questions at this

6  time.

7          MR. INGRAM:  I have one.

8          THE COURT:  You will be in the pool

9  from which the Jury will be drawn, and call that

10  number tomorrow evening after 4:00  and stop

11  downstairs and pick up the papers you have to fill

12  out.

13  (Juror No. 219, Janine Veits entered the Jury room.)

14          THE COURT:  You held your hand up

15  this morning?

16          MS. VEITS:  I work for a law firm in

17  Twinsburg and I have a letter from my employer.  We

18  handle foreclosure.  I am in charge of training and

19  the case flow in my office.  For me to be out any

20  length of time would result in a lot of our cases

21  being dismissed.

22          THE COURT:  This reads it is from

412

1   Riemer, LPA. "Gentlemen, Janine Veits is a

2   critical support person at our firm. Her absence

3   at this time would create a hardship. I

4   respectfully request that she be excused from Jury

5   duty."

6                    MR. BAILEY: You have to be there

7   during the day when these things are done? You

8   can't do some work in the evening?

9                    MS. VEITS: Right now, our case

10  flow, we specialize in foreclosures and our case

11  flow is so heavy, that I have got four people that

12  I am training. They have only been there a couple

13  of weeks.

14                   MR. BAILEY: That would throw the

15  whole office off?

16                   MS. VEITS: Right.

17                   MR. BAILEY: No problem with

18  excusing her.

19                   MR. JUHASZ: No questions. No

20  objection.

21  (Juror No. 222, William Schultz entered the Jury

22  room.)

413

1          THE COURT:  Mr. Schultz, you raised

2    your hand this morning.  What was that for?

3          MR. SCHULTZ:  I have a disability

4    and it is tough for me to drive over here.  If it

5    is sunny out -- I have one eye and I'm going blind

6    in that one eye and this morning, it was heck for

7    me to get here.

8          THE COURT:  You are not comfortable

9    with driving that far?

10         MR. SCHULTZ:  Correct.  I live in

11   Hartford.

12         THE COURT:  You work locally there

13   or what?

14         MR. SCHULTZ:  Disabled.

15         THE COURT:  Any questions?

16         MR. JUHASZ:  I take it, whenever it

17   is sunny, with only one eye, it makes it really

18   difficult?

19         MR. SCHULTZ:  Hard to drive and when

20   it is raining.

21         MR. BAILEY:  Driving home in the

22   afternoon would make it difficult.  No objection.

414

1          MR. JUHASZ:  No questions.  No

2   objection.

3          THE COURT:  We thank you for your

4   time.

5   (Juror No. 223, Christine Hake, entered the Jury

6   room.)

7          THE COURT:  You raised your hand

8   this morning.  What was the reason for that?

9          MS. HAKE:  Read about it in the

10  paper.

11         THE COURT:  As I have told other

12  people here, most of the people out there have read

13  something probably about this, and that doesn't

14  disqualify you unless it would be so fixed in your

15  mind, one way or another, that you could not set

16  that aside and listen to the case on the merits.

17         MS. HAKE:  I don't even really

18  remember.

19         THE COURT:  I think that is probably

20  true of most people that did read something,

21  remember the name and that is it.  We could have

22  your assurance that you would be able to listen to

415

1 | the evidence, and gauge the case on the merits of

2 | the evidence presented to you in Court, not on

3 | something you have read or think you have read

4 | outside of Court? You wouldn't have any problem

5 | doing that?

6 | MS. HAKE: I don't think so.

7 | THE COURT: Any other reason why you

8 | could not be seated on this Jury?

9 | MS. HAKE: I don't really think I

10 | have the right to pass judgment.

11 | THE COURT: Again I would suggest to

12 | you that you are not unusual.

13 | MS. HAKE: Other than that --

14 | THE COURT: The question on that is

15 | whether you are able and willing to follow the law.

16 | Most people that sit on a Jury, any person of any

17 | sensibility at all is going to be very reluctant to

18 | be asked to make the decision that the Jury might

19 | have to make, maybe won't get to that point. If

20 | you do, do you think there would be many people, if

21 | any, in a Jury that would look with relish towards

22 | making that decision? I don't think so.

416

1          MS. HAKE:  Probably not.

2          THE COURT:  But the system is set

3   up, so taking into account, people's reluctance to

4   consider such things, we're called upon to ask

5   people to do that very thing, to make those

6   judgments.  Do you feel that if the State proved

7   its case and got a guilty plea, a guilty verdict --

8   I'm sorry, do you think you could go into a second

9   phase and follow the law, deciding the facts and

10  applying them to the law?

11         MS. HAKE:  As far as -- I don't

12  understand.

13         THE COURT:  Making the decision on

14  what penalty should be imposed?

15         MS. HAKE:  I guess, yes, I know what

16  laws you said were out there.

17         THE COURT:  You have no way of

18  knowing at this point.  The bottom line is, can you

19  follow the law, setting aside any feelings you have

20  about you not thinking you should be called upon to

21  make those decisions?

22         MS. HAKE:  You are asking like, as

417

1    far as like a religion thing?

2                    THE COURT:  Do you have a religious

3    objection or moral objection?

4                    MS. HAKE:  That is what I mean by I

5    don't believe I have the right to pass judgment.

6                    THE COURT:  I would suggest that

7    most people feel that same way.  They are very

8    reluctant to make those decisions.  A lot of people

9    feel human beings shouldn't be asked to do that.

10                   MS. HAKE:  I don't think I should

11   be.

12                   THE COURT:  There are a few people

13   who really feel that strongly.  Most people I think

14   would feel that the law is the law and I am willing

15   to follow the law.

16                   MS. HAKE:  I could follow the law,

17   yes, I could.

18                   THE COURT:  If you have a religious

19   or moral or ethical position that would not allow

20   you to make that decision --

21                   MS. HAKE:  No.

22                   THE COURT:  You do not?

418

1          MS. HAKE:  No.

2          THE COURT:  Mr. Bailey?

3          MR. BAILEY:  You are saying you

4    could reach a conclusion?

5          MS. HAKE:  Yes, I could.  If I was

6    picked to be a juror, yes, I could.  I'm not saying

7    I can't do it.

8          MR. BAILEY:  You feel there's God's

9    law, there's man's law and we're asking you under

10   man's law, you could listen to the facts and

11   certain instructions from the Judge and then render

12   a decision?

13         MS. HAKE:  Yes, I could.

14         MR. INGRAM:  I don't think there's

15   any questions at this time.

16         THE COURT:  You are in the pool,

17   from which this Jury will be selected.  Call that

18   number after 4:30 tomorrow evening, and stop

19   downstairs and get those papers to fill out and

20   bring back.  Thank you.

21   (Juror No. 230, William Danklefsen entered the Jury

22   room.)

419

1          THE COURT:  William, you held your

2    hand up this morning?

3          MR. DANKLEFSEN:  I'm asking to be

4    excused because of work related.  I work at

5    Continuous Run-over at Delphi.  It is a three day

6    on, three day off job.  And I have a commitment at

7    home to a wife and family.  I have three kids under

8    four years old.

9          THE COURT:  Your work again, you

10   work three days and off three days?

11         MR. DANKLEFSEN:  Yes.  It is

12   continuous run.  I work at night.  I'm obligated to

13   be in at work at 5:30 at night and work until six

14   A.M.

15         THE COURT:  What do you do there?

16         MR. DANKLEFSEN:  Engineer.

17         THE COURT:  Mr. Bailey?

18         MR. BAILEY:  Do they pay if you are

19   on Jury duty?  Do they pay you for that?

20         MR. DANKLEFSEN:  I don't believe so.

21         MR. BAILEY:  And if you are not

22   there, what happens?

420

1          MR. DANKLEFSEN:  They usually cover

2     my position with someone else.

3          MR. BAILEY:  This would take

4     probably between two and three weeks, over the next

5     month or so.  Would you -- you are saying you

6     wouldn't be able to stay away that long from work

7     and they wouldn't be able to cover you.

8          MR. DANKLEFSEN:  I'm not sure.  I'm

9     not sure what the work would do.

10          MR. BAILEY:  Could you check with

11     them to see if you could get paid?  What about your

12     home obligations?  Is your wife able to take care

13     of the kids?

14          MR. DANKLEFSEN:  On occasion, I do

15     help out.  They go to Day Care one day a week and

16     commitment with the kids just in general.

17          MR. BAILEY:  On your three days off,

18     I take it you help more at home?

19          MR. DANKLEFSEN:  Yes.

20          MR. BAILEY:  If you weren't there

21     for those three days, like let's say we don't work

22     weekends unless you are sequestered, sequestration,

421

1　that is not like from a week or two at a time, that

2　would only be when you are deliberating at the end

3　of the first phase and if we get to a second phase

4　would be when you are deliberating in the second

5　phase.　And we don't know how long that will be.

6　That could be a day, it could be two or three days

7　or more.　Each Jury is different, but would you, do

8　you think you would be able to get off that much

9　time from work?　It would be like, if you are on

10　three days and off three days, you probably would

11　be missing six or nine days of work during the

12　course of the entire trial.

13　　　　　MR. DANKLEFSEN:　It depends on how

14　it falls as far as my schedule and the weekends.　I

15　can look into that.

16　　　　　MR. BAILEY:　Could you check that

17　and see whether you are getting paid?

18　　　　　MR. DANKLEFSEN:　Sure.

19　　　　　MR. BAILEY:　If they did pay you and

20　you are able, if your wife would be able to pick up

21　some slack with the kids for that period of time,

22　do you think you might be able to serve?

422

1          MR. DANKLEFSEN:  Yes, I would say

2    so.

3          THE COURT:  Fair enough.

4          MR. JUHASZ:  No questions.

5          THE COURT:  For the time being, you

6    will be in the pool.  You will notify Connie

7    downstairs if any of these contingencies don't fall

8    into place where you can serve.  You should call

9    that number after 4:30 tomorrow evening and pick up

10   the papers to be filled out.

11         MR. DANKLEFSEN:  If my employer

12   would request me to work, I still would be working

13   my night turn 5:30 until 6:00 A.M. and then coming

14   here to work as a juror as well.

15         THE COURT:  We wouldn't want you to

16   do that.  If you can get off and get paid, the way

17   I understand it, then you will serve.  If you

18   can't, fine.

19         MR. DANKLEFSEN:  You still want me

20   to fill out the paperwork?  How do I let you know

21   so that you are aware of that condition?

22         THE COURT:  Call Connie downstairs

423

1    and tell her.

2              MR. BAILEY:  You have got to be

3    awake in here.

4              MR. DANKLEFSEN:  I understand.

5    (Court in Recess at 2:35 p.m.)

6    (Juror No. 235, Dawn Hanna, entered the Jury room.)

7              THE COURT:  Dawn, you raised your

8    hand this morning?

9              MS. HANNA:  Yes.

10             THE COURT:  What was that about?

11             MS. HANNA:  Well, economically, I

12   don't think -- well, it would be difficult for me

13   to miss a lot of work.  I have two kids at home.  I

14   am a single parent.  If the Jury were to be

15   sequestered, it would be hard for me to get someone

16   to stay with the kids.

17             THE COURT:  How old are they?

18             MS. HANNA:  13 and 14.

19             THE COURT:  You sure don't want to

20   leave them home alone by themselves.

21             MS. HANNA:  No, not overnight.

22             THE COURT:  Mr. Bailey?

424

1            MR. BAILEY:  No questions.  No

2  objection.

3            MR. INGRAM:  None from us.  No

4  objection.

5            THE COURT:  You are released for

6  cause.

7  (Juror No. 236, Jack Rusnak entered the Jury room.)

8            THE COURT:  You held your hand up

9  this morning?

10            MR. RUSNAK:  Yes.

11            THE COURT:  What was that

12  concerning?

13            MR. RUSNAK:  I was sworn in.

14            THE COURT:  Besides when I asked if

15  anybody had any reason why they couldn't serve on

16  the Jury.

17            MR. RUSNAK:  I am opposed to capital

18  punishment, the death sentence.

19            THE COURT:  You are not alone in

20  that.  There's a lot of people that -- you ask

21  people, "Are you for or against capital

22  punishment?"  Some are going to say, "I am for it,"

425

1   and some are going to say, "I am against it," and

2   everybody is entitled to their opinion.  The

3   question that is put to a prospective juror is, no

4   matter what your personal opinion is about the

5   subject, are you able to follow the law?  And the

6   law in Ohio says that in certain circumstances, the

7   juror is called upon to decide whether or not that

8   is an appropriate punishment or not.  Now you have

9   a few people to the extreme of the one side of the

10  issue who say, "I have a religious or moral

11  conviction, I could under no circumstances, ever

12  impose a death penalty on somebody.  I don't care

13  if it is a mass killer that kills 50 people in cold

14  blood, I could never impose that penalty."  You

15  have people on the other side of the spectrum, who

16  just as fervently believe that anybody who takes

17  another life should forfeit their life.  Well,

18  neither of that type of person could sit on a Jury,

19  because they can't follow the law.  And the law

20  says that capital punishment is a darn serious

21  thing, and that they set up the procedure, the two

22  step procedure years ago.  The Jury just made a

426

1    finding of guilty or not guilty and that was it.

2    The Judge sentenced.  Now, they put that extra step

3    in there so that the Jury has to consider the

4    aggravating factors and weigh it against any

5    mitigating or aggravating circumstances, against

6    the mitigating factors.  So the Jury is then called

7    upon to look and see if the State has proven all of

8    those things beyond a reasonable doubt, where the

9    aggravating portion outweighs the mitigating.  And

10   then the Jury is called upon to make a very tough

11   decision, what is an appropriate sentence.  And

12   whatever the facts are -- I don't think that is an

13   easy decision for anybody to make and I don't know

14   anybody in their right mind who would really ask to

15   be put in that situation, but that is what the law

16   requires, is to choose 12 people who are able to at

17   least consider the possibility if the facts and the

18   law require it, to impose it.  You get the picture?

19              MR. RUSNAK:  I do.

20              THE COURT:  I don't know if that

21   makes you feel any better or what, you tell us.

22              MR. RUSNAK:  First of all, with all

427

1   due respect to the laws of Ohio, which I try to,

2   with which I try to abide, I don't know that the

3   State should have the right to take someone's life.

4           THE COURT:  You are getting into a

5   more basic position and that is fine.  You have the

6   right to that.  If I take from your answer, if I

7   said that you feel that that is not something that

8   the law should require, is that right?

9           MR. RUSNAK:  That is correct.  I

10  base that on a lot of thinking in that area.

11          THE COURT:  You hold that as a moral

12  or religious tenant?

13          MR. RUSNAK:  Yes, both.

14          THE COURT:  You don't think you

15  could set that aside and follow the law?

16          MR. RUSNAK:  I think I would have

17  great difficulty doing that.

18          THE COURT:  You are being very

19  candid and that is what we ask.  Mr. Bailey, you

20  may inquire.

21          MR. BAILEY:  I take it, your

22  conviction is so -- you felt this for a long time?

428

1          MR. RUSNAK:  Yes.

2          MR. BAILEY:  And you have only, you

3   have become more set in your conviction as time has

4   gone on, the move thinking you have done about it.

5          MR. RUSNAK:  And the more reading.

6          MR. BAILEY:  I take it that it is so

7   firmly set that no matter what the State's

8   evidence -- well, let me ask you this.  Would it

9   affect your ability in the first phase that deals

10  with guilt or non-guilt, not the penalty, but guilt

11  or non-guilt of the specific crimes that are

12  charged here, would it affect your ability to

13  render a decision if we were able to prove the

14  facts, the elements of the crimes, by proof beyond

15  a reasonable doubt so that you are firmly convinced

16  of the truth of the charge to a moral certainty;

17  would you be able to return a guilty verdict in the

18  first phase, finding the Defendant guilty?

19          MR. RUSNAK:  Knowing the

20  possibility --

21          MR. BAILEY:  Knowing what the

22  possibility was, if you did so of the possible

429

1  death penalty?

2              MR. RUSNAK:  I think not.

3              MR. BAILEY:  You think it would

4  affect you in the first phase?

5              MR. RUSNAK:  I am afraid so, yes,

6  and there have been a number of reasons, other

7  countries that have decided this, and it is not a

8  comfortable position, I can assure you.

9              MR. BAILEY:  It shouldn't be.

10              MR. RUSNAK:  Somebody commits a

11  heinous crime, and for example, someone would say

12  to someone, what if somebody injured one of your

13  family, did a terrible thing, what would you do?

14  Well, I might kill them in a fit of rage or

15  something, but if I thought about it, I would

16  prefer to see them put away.

17              MR. BAILEY:  And I take it then,

18  that based on your -- the firmness of your beliefs,

19  both moral and religious, that if we were to get

20  into a second phase where the question would be

21  what the appropriate penalty would be and the State

22  were to convince you by proof beyond a reasonable

430

1    doubt, that the aggravating circumstances, whatever

2    we have got in the second phase, would outweigh the

3    unreasonable doubt, whatever mitigating factors

4    there were, so that the appropriate penalty would

5    be the death penalty, in this case, there's no way

6    you would ever be able to return that verdict; is

7    that what you are telling us?

8              MR. RUSNAK:  I think that is

9    correct.  There would be no way that I could do it.

10              MR. BAILEY:  You understand, people

11   hold opinions on all sides of the spectrum, and

12   there's nothing wrong with that?

13              MR. RUSNAK:  I understand the law

14   and I understand why they have it.  Maybe it is a

15   deterrent.  That is another subject.

16              MR. BAILEY:  Our issue today is

17   whether you feel that you are a fit juror to sit on

18   this particular case.  You may be able to sit on

19   any other case, but this type of case is the type

20   of case where you feel that you would not be able

21   to give the people of the State a fair shake; is

22   that fair?

431

1              MR. RUSNAK:   That is a fair

2     statement.

3              THE COURT:   Any questions by the

4     Defense?

5              MR. INGRAM:   Yes.  How are you?

6              MR. RUSNAK:   Fine, thank you.

7              MR. INGRAM:   Thank you for your

8     candor and we certainly respect your opinions.  You

9     understand that the parties in any criminal case

10    are entitled to a Jury that reflects a cross

11    section of the community?

12             MR. RUSNAK:   Yes.

13             MR. INGRAM:   It is by asking all

14    kinds of people from the varying walks of life to

15    come and sit on a Jury and share their views, that

16    we're confident that when those 12 people can

17    agree, that they have arrived at a right decision;

18    does that make sense?

19             MR. RUSNAK:   Sure.

20             MR. INGRAM:   Some people in this

21    State support the death penalty.  Some people in

22    this State oppose the death penalty.  It would not

432

1  be fair to have a Jury composed only of people who

2  opposed the death penalty, do you agree?

3              MR. RUSNAK:  Yes.

4              MR. INGRAM:  And conversely, it

5  would not be fair to only have a Jury composed of

6  people who would be in favor of the death penalty?

7              MR. RUSNAK:  Particularly if it

8  reflects the public in what they want.

9              MR. INGRAM:  As a result, all -- as

10  a result, all we really ask of jurors is that they

11  temporarily set aside their personal feelings and

12  follow the instructions of the Court, so that the

13  Jury can indeed reflect a cross section of the

14  community.  Do you think you could do that?

15              MR. RUSNAK:  No.

16              MR. INGRAM:  Fair enough.

17              MR. RUSNAK:  Incidentally, I could

18  go into some religious aspects, but I would be

19  taking your time.

20              THE COURT:  You are being very

21  honest, we appreciate that.  Any objection to

22  dismissing for cause?

433

1           MR. INGRAM:  No.

2           MR. BAILEY:  No objection to

3    dismissing him.

4           THE COURT:  Thank you.

5           MR. INGRAM:  If we object to the

6    excusal of any particular juror, we'll note our

7    objection for the record, absent an objection.  We

8    do not object.

9           MR. BAILEY:  Me too.

10   (Juror No. 241, Charles Fink, entered the Jury room.)

11          THE COURT:  You held your hand up

12   this morning.  What was that about?

13          MR. FINK:  I have two daughters, one

14   in Junior High and one in elementary school, and

15   their mother goes to school full time and she works

16   full time and in 2000, I had open heart surgery and

17   I'm not allowed to work, and we moved here in 1992

18   and we really don't know too many people around

19   there.  There would be no one to pick up my

20   children from school.  They have to be picked up

21   from school at 2:20 and 2:45.

22          THE COURT:  You are not from Warren

434

1   originally?

2               MR. FINK:  No.

3               THE COURT:  So you have a very

4   difficult situation with getting your children

5   picked up, dropped off and whatever?

6               MR. FINK:  Yes.

7               THE COURT:  No one to help you very

8   much with that?

9               MR. FINK:  No.

10              MR. BAILEY:  No objection to

11  excusing him.

12              THE COURT:  You are excused.  We

13  thank you for your time.  You have a good day.

14              MR. INGRAM:  We have no questions

15  and based upon my past rule, we have no objection,

16  because I didn't state one.

17  (Juror No. 250, Patricia Sawyer, entered the Jury

18  room.)

19              THE COURT:  You held your hand up

20  this morning in response to what question?

21              MS. SAWYER:  I have multiple

22  sclerosis and I have an appointment with the

435

1    Cleveland Clinic on the 10th, and they found --

2    they are doing ultrasound.  They found a mass in my

3    thyroid.  I have an appointment with Dr. Newman.  I

4    don't know what is going to come out of that.  I

5    have a shot once a week.  My daughter-in-law gives

6    me that.

7                 MR. BAILEY:  Based on these doctors'

8    appointments, you may need to schedule further

9    doctors' appointments.

10                 MS. SAWYER:  Yes.

11                 MR. BAILEY:  We have no problem

12   excusing her.

13                 THE COURT:  Okay.  You are excused.

14   We wish you well.

15   (Juror No. 255, Diane Petsko, entered the Jury room.)

16                 THE COURT:  Diane, you held your

17   hand up this morning.  What was the reason for

18   that?

19                 MS. PETSKO:  It is really medical.

20   I have a lot of arthritis in my back and leg, and

21   it is hard for me to sit.  My leg as well as --

22   next week I have to go to the doctor, because I

436

1  have a nodule on my thyroid which they did two

2  biopsies on.  I don't know what they will do about

3  that.  And after that, I have gallstones.  I have

4  quite a bit going.

5              THE COURT:  Sounds like it.

6              MR. BAILEY:  And based on that, you

7  don't know if you are going to need more

8  treatments?

9              MS. PETSKO:  They aren't sure, I

10  don't know what they are going to do.  They can't

11  really get a piece of my thyroid.  They have done

12  it twice.  I haven't seen the doctor.  I don't know

13  what they are going to want me to do with that.

14  After that the surgeon said, the gallstones.

15              MR. BAILEY:  With the arthritis

16  alone though, that makes it very difficult to sit?

17              MS. PETSKO:  My leg will swell

18  really bad if I sit really long.

19              MR. BAILEY:  You are saying you

20  would rather not be here?

21              MS. PETSKO:  Right.

22              MR. BAILEY:  No objection.

437

1           MR. INGRAM:  No questions.  No

2    objection.

3    (Juror No. 258, Kenneth Roberts, entered the Jury

4    room.)

5           THE COURT:  Good morning, Sir.

6    Mr. Roberts, you held your hand up this morning.

7           MR. ROBERTS:  Yes, Sir.

8           THE COURT:  What was that about?

9           MR. ROBERTS:  Just that I read

10   something in the newspaper.

11          THE COURT:  Most of the people out

12   in that Courtroom probably did.  The question is,

13   are you able to set aside anything, any impression

14   you may have had, and if called upon to be a juror,

15   to decide this case on the evidence that is

16   presented in the courtroom?

17          MR. ROBERTS:  Yes, Sir.

18          THE COURT:  You think you can do

19   that?

20          MR. ROBERTS:  Yes, Sir.

21          THE COURT:  So many times newspapers

22   get things all messed up, and it is not -- no one

438

1    should be tried in the newspapers.  It is on the

2    evidence presented, after the Jury has had an

3    opportunity to review that evidence and to make a

4    decision.

5                    MR. ROBERTS:  Yes.

6                    THE COURT:  Are you able to do that?

7                    MR. ROBERTS:  Yes.

8                    THE COURT:  Any other reason why you

9    could not be seated here?

10                   MR. ROBERTS:  No, Sir.

11                   THE COURT:  You are willing to do

12   so?

13                   MR. ROBERTS:  Yes.

14                   MR. BAILEY:  No questions.

15                   MR. INGRAM:  No questions.

16                   THE COURT:  Mr. Roberts, you are

17   going to be in the pool for this Jury.  We would

18   ask you to call that number after tomorrow evening,

19   4:30.  Stop down and see Connie downstairs and get

20   those two papers to take with you.  We'll be seeing

21   you later.

22   (Juror No. 259, Barry Schecht, entered the Jury room.)

439

1          THE COURT:  We all know you,

2     Mr. Schecht.  I remember you from years back.  Good

3     afternoon to you.  You held your hand up this

4     morning.

5          MR. SCHECHT:  I am employed by B.J.

6     Alan Company, the fireworks company.  I am in their

7     corporate division, a couple of different levels,

8     and I have a letter from my employer anyway.  Our

9     season is 90 days and it is right now through July

10    4th.  I have no problem with serving on a Jury and

11    I would only ask if we could continue this until

12    after the 4th.  At this time, I am involved in some

13    rather important things that I am working on and my

14    absence would be a real problem for the company.

15    If I could have some consideration, that would be

16    most appreciated.

17          THE COURT:  There's no mechanism to

18    continue your possible service.  You are drawn for

19    a particular case.  So, unfortunately, we can't

20    continue it.  Mr. Bailey, why don't you ask

21    whatever questions you want to ask?

22          MR. BAILEY:  Let me see your letter.

440

1    No questions.  No problem with excusing him.

2                    MR. INGRAM:  No questions.  No

3    objection.

4                    THE COURT:  Mr. Schecht, you are

5    excused.  We thank you for your time.

6    (Juror No. 263, David Gordos, entered the Jury room.)

7                    THE COURT:  Mr. Gordos you held your

8    hand up this morning.

9                    MR. GORDOS:  Yes.

10                    THE COURT:  What was that

11    concerning?

12                    MR. GORDOS:  I have a concern about

13    being sequestered.  I am on a special diet and I

14    don't think I can have anyone bring in my food if I

15    am sequestered.

16                    THE COURT:  That would make too much

17    of a problem, you think?

18                    MR. GORDOS:  Yes.

19                    THE COURT:  Mr. Bailey?

20                    MR. BAILEY:  This special diet, you

21    have got to follow that with all three meals?

22                    MR. GORDOS:  Yes.

441

1          MR. BAILEY:  And you need to eat

2   more often during the day, other than three meals?

3          MR. GORDOS:  No, regular three

4   meals.  It is just a special diet.

5          MR. BAILEY:  You have to personally

6   prepare that at home?

7          MR. GORDOS:  Yes.

8          MR. BAILEY:  And does it take

9   special types of preparation?

10          MR. GORDOS:  Special food.  It is

11  organic food.  I eat all organic, no pesticides, no

12  additives.

13          MR. BAILEY:  That's doctor's orders

14  or do you personally just do that?

15          MR. GORDOS:  It is not doctor's

16  orders, it is more my choice, my preference.  But

17  so many additives are like aluminum for one, it is

18  supposed to be harmful, so I don't eat foods that

19  have that.

20          MR. BAILEY:  I take it then, you

21  wouldn't be able to partake in whatever the other

22  jurors would have in the restaurant?

442

1              MR. GORDOS:  That is right.

2              MR. BAILEY:  I take it, would that

3     cause so much concern for you, that, well okay, you

4     wouldn't be able to prepare foods in advance to

5     take them with you if you are sequestered?

6              MR. GORDOS:  I'm not sure if I can

7     do that or not.  It would be kind of difficult to

8     do.  I don't eat in restaurants anymore.  There's a

9     few restaurants that have organic food, but not

10    very many.  To prepare everything myself ahead of

11    time it would be difficult.

12             MR. BAILEY:  Go ahead.

13             MR. INGRAM:  None.

14             MR. BAILEY:  I have no objection.

15             MR. INGRAM:  Neither do I.

16             THE COURT:  You are excused.  Thank

17    you for your time.

18    (Juror No. 265, Ruby Ramsey, entered the Jury room.)

19             THE COURT:  Miss Ramsey, you held

20    your hand up this morning.  What was that

21    concerning?

22             MS. RAMSEY:  Well, I have rectal

443

1   bleeding and I'm having a colonoscopy on the 25th.

2   I have to be off the 24th and 25th because I get

3   ready on the 24th, because I can't leave the

4   bathroom.

5                    THE COURT:  That is right in the

6   middle of when we'll be going.

7                    MR. BAILEY:  No objection.  No

8   questions.

9                    MR. INGRAM:  No objection.  No

10  questions.

11  (Juror No. 285, Nicholas Ewanish entered the Jury

12  room.)

13                   THE COURT:  You held your hand up

14  this morning.

15                   MR. EWANISH:  Saying that I would

16  tell the truth.

17                   THE COURT:  Not that part.  When I

18  asked questions about why you might want to be

19  excused.  What was that about?

20                   MR. EWANISH:  The main reason I

21  would want to be excused is my father passed away a

22  few years back.  It is just me and my Mom and

444

1   sister.  I take care of most of the chores around

2   the house, any hard work and I can't miss work.

3                    THE COURT:  Where do you work?

4                    MR. EWANISH:  Auto Zone.  I pay for

5   a little bit more than half of the bills.

6                    THE COURT:  You don't get paid if

7   you don't work?

8                    MR. EWANISH:  Not that I know of.

9                    THE COURT:  I'm sure you probably

10  don't.  Mr. Bailey?

11                   MR. BAILEY:  No questions.  No

12  objection.

13                   MR. INGRAM:  No questions.  No

14  objection.

15                   THE COURT:  You are excused.  We

16  thank you for your time.

17  (Juror No. 271, Jean Sprinkle entered the Jury room.)

18                   THE COURT:  You held your hand up.

19  For what reason this morning?

20                   MS. SPRINKLE:  I had an aneurysm and

21  I get extremely tired.  I always lay down.  I would

22  rather not be here if it is possible.

```
 1                    THE COURT:  Any questions?
 2                    MR. BAILEY:  When you get tired, is
 3      that at specific times?
 4                    MS. SPRINKLE:  When I had the
 5      aneurysm in the plant, I would work and come home
 6      and just lay down.  I get such bad headaches, I
 7      carry ice with me all the time and I take Ginger,
 8      and if I stay up, then I'll start vomiting.
 9                    MR. BAILEY:  And that getting tired
10      can happen even at any time?
11                    MS. SPRINKLE:  I lay down faithfully
12      every six, eight hours since I had the aneurysm.
13      Before that, I worked like a horse.  Since the
14      aneurysm, I am shot.
15                    MR. BAILEY:  You feel you can't sit
16      on this Jury?
17                    MS. SPRINKLE:  I think it is very
18      intense.  I'm sorry.
19                    MR. BAILEY:  We have no objection to
20      her being excused.
21                    MR. INGRAM:  The Defense has no
22      questions and no objection.
```

446

1          THE COURT:  Take care of yourself.

2   Thank you.  You are excused.

3   (Juror No. 282, Sandra Clark entered the Jury room.)

4          THE COURT:  You held your hand up

5   this morning in response to one of my questions.

6   What was that about?

7          MS. CLARK:  Actually, all of them.

8          THE COURT:  Give me a couple.

9          MS. CLARK:  My Mom is in the

10  hospital.  She's 80 some with pneumonia.  I have

11  rheumatoid arthritis.  Plus I just got X-rays and

12  I'm probably going to have therapy for sciatic

13  nerve.  Sitting like that is really hard I am

14  supposed to go on vacation in May.

15         THE COURT:  You got the bases

16  covered.

17         MS. CLARK:  Yes.

18         THE COURT:  Mr. Bailey, take your

19  pick.

20         MR. BAILEY:  I have no questions and

21  I have no problem excusing her.

22         MS. CLARK:  The worst is the health

447

1    thing.  That hurts.

2                    MR. INGRAM:  No questions.  No

3    objection.

4                    THE COURT:  Good luck to you.  Thank

5    you for your time.  You are excused.

6    (Juror No. 283, Lora Getts entered the Jury room.)

7                    THE COURT:  You held your hand up in

8    response to some of my questions this morning.

9                    MS. GETTS:  Only one.  I have kids.

10   They come home from school.  I don't know if I can

11   get a babysitter.

12                   THE COURT:  Let me ask you this.

13   Would you be willing to try and if you are

14   comfortable with whatever arrangements you can

15   make, would you consider sitting on the Jury?

16                   MS. GETTS:  I would if my

17   mother-in-law could watch the kids, but right now

18   she's taking chemotherapy.

19                   THE COURT:  You don't have anyone

20   else that you could call?

21                   MS. GETTS:  My mother lives in

22   Rogers.  I don't have Day Care.  I would love to

448

1    see how this works and my grandfather was a Judge.

2    It has always been fascinating.  With the kids, if

3    they were a little older, yes, but at six years old

4    and ten and 12, I want my house still standing.

5                    THE COURT:  Do you have any

6    questions?

7                    MR. BAILEY:  Really, you don't think

8    there's any way you are going to be able to get a

9    babysitter?

10                   MS. GETTS:  No.  The only babysitter

11   I have is in Mahoning County.

12                   MR. BAILEY:  We have no objection to

13   her being excused.

14                   MR. INGRAM:  No questions.  No

15   objection.

16                   THE COURT:  You are excused.  We

17   thank you for your time.

18   (Juror No. 287, Harold Deraud entered the Jury room.)

19                   THE COURT:  Harold, you held your

20   hand up this morning.  What was that in regard to?

21                   MR. DERAUD:  You hit me twice, one

22   on the financial problem.  My wife said, "How are

449

1    we going to miss a week's work and still keep up

2    with our bills?"  I am retired and I am working on

3    income tax, and then you hit me again on the

4    doctor's appointment.  I have one on the 20th and

5    the 21st.

6                    THE COURT:  That is right in the

7    middle of what we'll be doing here.  Any objection

8    to dismissing for cause?

9                    MR. BAILEY:  No problem.

10                   THE COURT:  Nobody has a question?

11                   MR. INGRAM:  No.

12                   THE COURT:  We thank you for your

13   time.  Sorry to keep you here.  We couldn't avoid

14   it.

15   (Juror No. 291, Michael Blake, entered the Jury room.)

16                   THE COURT:  Michael Blake, you held

17   your hand up this morning.  What was that

18   concerning?

19                   MR. BLAKE:  Once when you asked if I

20   watched the news and or read the newspaper, and I

21   raised my hand for that and also the, any medical

22   appointment within the next 30 days, and I said yes

450

```
 1    to that.
 2                   THE COURT:   Tell us about that, the
 3    medical.
 4                   MR. BLAKE:   Just a doctor's
 5    appointment.
 6                   THE COURT:   What date, do you know?
 7                   MR. BLAKE:   April 22nd.
 8                   THE COURT:   Is that a, like a yearly
 9    check up?
10                   MR. BLAKE:   It is like -- I go like
11    every three or four months for blood work and he's
12    monitoring my heart for high cholesterol and high
13    blood pressure.  I'm taking all of this medication
14    I have to take.  I have to get a blood test every
15    three, four months.
16                   THE COURT:   In regard to the second
17    issue, most of the people out there probably have
18    read something in the newspaper.  It is a question
19    of whether you think you have your mind made up as
20    to the facts, or are you able to set that all aside
21    and listen to the evidence, because that is what
22    the case has to be decided on.
```

451

1              MR. BLAKE:  I could do that.

2              THE COURT:  What about this doctor's

3    appointment?

4              MR. BAILEY:  With the medication

5    that you are taking, can you push the appointment

6    back to a week?

7              MR. BLAKE:  I can change the

8    appointment.  That is not a problem.

9              MR. BAILEY:  Is it going to affect

10   your high blood pressure and cholesterol?  Is it

11   lowered enough with the medication?

12             MR. BLAKE:  It is fine.  I have to

13   do this blood work every so often.

14             THE COURT:  Why don't you leave that

15   on until closer to the time.  If it looks like you

16   are going to be tied up for that day, if you are

17   called, then you can change it.  Rather than do it

18   now.  We have days in between.  A lot of times you

19   might not be here.  You will be in the pool.  Call

20   after 4:30 tomorrow evening, that number.  Stop

21   down and see Connie and get those papers off her

22   before you leave today.  Thank you very much.

452

1    (Juror No. 298, Jeffrey Proctor, entered the Jury

2    room.)

3                    THE COURT:   You held your hand up

4    this morning.   What was that concerning?

5                    MR. PROCTOR:   Financial.   I'm self

6    employed and I couldn't take the time off work.

7                    THE COURT:   What do you do?

8                    MR. PROCTOR:   Carpenter.

9                    THE COURT:   You work for somebody?

10                   MR. PROCTOR:   Yes, a contract off a

11   few companies.

12                   THE COURT:   You are an independent

13   contractor and you get work, you don't have anybody

14   paying you if you are not working?

15                   MR. PROCTOR:   Right.

16                   THE COURT:   Mr. Bailey?

17                   MR. BAILEY:   No questions.

18                   MR. INGRAM:   No questions.   No

19   objection.

20                   THE COURT:   Jeff, you are excused.

21   (Juror No. 301, Susan Booth entered the Jury room.)

22                   THE COURT:   Susan, you held your

453

1   hand up this morning.  What was that in relation

2   to?

3                  MS. BOOTH:  I got injured about a

4   week ago, and I just can't sit for more than like

5   about 20 minutes without my leg starts going numb.

6   That is really my main reason.  I have a doctor's

7   letter here.

8                  MR. INGRAM:  No questions, no

9   objection.

10                  MR. BAILEY:  Same.

11                  THE COURT:  You are excused.  Thank

12   you very much.

13   (Juror No. 303, Marilyn Rooks, entered the Jury room.)

14                  THE COURT:  Marilyn, good afternoon.

15   You held your hand up this morning.

16                  MS. ROOK:  Basically, I was

17   listening to instructions about facts that have

18   already been known about this case from reading in

19   the newspaper or watching T.V. or media, and I have

20   not only read and followed the case, but I have

21   discussed it with others, and I'm not sure I can be

22   fair.  I recognized her as soon as she walked into

454

1  the Courthouse.

2              THE COURT:  You held your hand up --

3  probably, I don't know how many, but eight out of

4  ten out there should have held their hand up.  Most

5  people have heard something about the case.  It has

6  been kicking around for some time.

7              MS. ROOK:  I don't know at what

8  point do you consider --

9              THE COURT:  Let me give you the low

10  down on it.  That has nothing to do, unless you

11  fixed your mind to the point that the Defendant is

12  either not guilty or guilty and you are not going

13  to bother about listening to evidence.  You already

14  have your mind made up.  Everybody has, when you

15  read anything you form some impressions, that is

16  natural.  But the question you have to ask yourself

17  is, can you set aside all of that because you

18  realize that newspapers are notorious for getting

19  things wrong.  Sometimes they get it right, but you

20  never know which is which, so the Jury that is

21  chosen here is going to have to be able to say, "I

22  am starting out fresh here.  I'm going to listen to

455

1   the evidence, and I'm going to decide the case on

2   that evidence.  If the evidence comes in different

3   from what I read in the newspaper, that newspaper

4   has nothing to do with it.  I got to accept the

5   evidence presented in Court."  Now I don't know

6   how -- well, I have no way of looking within your

7   mind.

8            MS. ROOK:  I'm greatly influenced by

9   the fact that another person has been already

10  convicted of this, the same charge.

11           THE COURT:  I don't find that

12  unusual.  But again, I have to point out to you,

13  the duty of the juror is to set things like that

14  aside.  It might be at first blush important, but

15  it isn't.

16           MS. ROOK:  It is hard to do.

17           THE COURT:  Well, some people would

18  find it more difficult than others, I'll give you

19  that.  But a lot of times during the course of any

20  trial, there would be a question and answer given,

21  and the Judge turns to the Jury and says, "You

22  disregard both that question and answer, it is not

456

1    proper evidence." And Juries seem to have a way of

2    setting that aside and deciding the case on the

3    evidence that they have to review. But you have to

4    tell us if you are firmly convinced that you are

5    not able to do that, that is fine and we'll

6    appreciate your honesty.

7                MS. ROOK: I know I could not set it

8    aside.

9                THE COURT: You know that you could

10   not?

11               MS. ROOK: Correct. Sorry. It is

12   one of my biggest faults. I am very stubborn in my

13   opinions and I believe I have already formed one.

14               THE COURT: You are doing what we

15   asked you to do is to tell the truth. Any

16   objections to dismissing? Anybody wish to

17   question?

18               MR. BAILEY: No objection to

19   excusing her.

20               MR. INGRAM: I have a question.

21   This morning while we were all here, did you

22   discuss the case with any of the other prospective

457

1  jurors?

2              MS. ROOK:  No.

3              MR. INGRAM:  Did you hear it

4  discussed at all?

5              MS. ROOK:  No.

6              MR. INGRAM:  I have no other

7  questions.

8              THE COURT:  Thank you.  You are

9  excused.  No further responsibilities.

10  (Juror No. 309, Paul Drotar, entered the Jury room.)

11              THE COURT:  Mr. Drotar, you held

12  your hand up this morning.  What was that about?

13              MR. DROTAR:  Medical.  I'm diabetic

14  and I just got out of the hospital passing a kidney

15  stone, and right now I am pretty well chemically

16  dependent on about seven different drugs.

17              THE COURT:  You would not feel that

18  you would be able to sit for days on end?

19              MR. DROTAR:  At work, I am still

20  having a hard time eating until 9:00.  The boss is

21  lenient and I can work over instead of working ten

22  to seven.  If you want to work my times, it would

458

1   be nice.  I don't think you want to do that.

2              MR. INGRAM:  I think I would.

3              MR. DROTAR:  He's been lenient that

4   I can work over that way and miss the time in the

5   mornings, because sometimes the drugs are fine and

6   sometimes they are not.  I get nauseated.

7              THE COURT:  Are you on insulin, too?

8              MR. DROTAR:  Correct.  Insulin and

9   another drug for depression and another drug for

10  diabetes.  I am on a blood thinner, and a medicine

11  for inactive thyroid.  Right now it is a new one.

12  In the afternoons here, I have a tendency to fall

13  asleep.

14             THE COURT:  Most of us have that

15  problem.

16             MR. DROTAR:  The memory loss, I'm

17  having trouble with memory loss.  I think I would

18  have a hard time going back -- I would have to

19  refer back all the time to what is going on in the

20  case.

21             THE COURT:  You have outlined a

22  bunch of potential problems.

459

1    MR. DROTAR:  The third one, I met

2    Donna, I don't know if she remembers me, but we

3    closed a loan with her and the fellow that passed

4    away.  The home loan when you bought up in Avalon

5    there.  I work for American Land Title.  That is

6    where I work.

7    THE COURT:  Anybody wish to

8    question?

9    MR. INGRAM:  No questions.  No

10   objection.

11   MR. BAILEY:  No objection.

12   THE COURT:  You are excused.  We

13   thank you for your time.  Sorry to keep you so

14   long.

15   (Juror No. 312, Rebecca Pierce, entered the Jury room.)

16   THE COURT:  Ma'am, you held your

17   hand up this morning?

18   MS. PIERCE:  Yes.

19   THE COURT:  And what was the reason

20   for that?

21   MS. PIERCE:  There was one point,

22   you said anybody that had a doctor's appointment --

460

1    I am supposed to be starting some physical therapy

2    for my arm, but I just found this out yesterday

3    when I went to the doctor, but I didn't make any

4    appointment until I came down here today.

5                    THE COURT:  What happened to your

6    arm?

7                    MS. PIERCE:  It is numb.  I have had

8    an MRI, which didn't show any rotator cuff tear,

9    which is good.  So he thinks I have a nerve that is

10   pinched.

11                   THE COURT:  Is that uncomfortable

12   for you?

13                   MS. PIERCE:  Very.

14                   THE COURT:  Mr. Bailey?

15                   MR. BAILEY:  You say it is

16   uncomfortable, it is numb?

17                   MS. PIERCE:  From the shoulder to

18   the fingertips.

19                   MR. BAILEY:  Would that affect your

20   abilities to concentrate on testimony of witnesses?

21                   MS. PIERCE:  I have been working.

22                   MR. BAILEY:  You are able to work

461

1    with it?

2                    MS. PIERCE:  I have to.  I have to

3    support myself and my daughter.

4                    MR. BAILEY:  Do they pay you from

5    work if you are here?

6                    MS. PIERCE:  Fifteen working days.

7                    MR. BAILEY:  That would be three

8    weeks.  This case would take two weeks of trial and

9    maybe part of a week if it went to a second phase.

10   Do you think you would be able to survive through

11   that?

12                   MS. PIERCE:  Sure.

13                   MR. BAILEY:  Your therapy scheduling

14   would have to be scheduled in the evenings or on

15   weekends.

16                   MS. PIERCE:  I am assuming I could.

17                   MR. BAILEY:  You think you might be

18   able to serve?

19                   MS. PIERCE:  Sure.

20                   THE COURT:  You would be willing to

21   take on the duties, if called?

22                   MS. PIERCE:  Yes.

462

1          MR. INGRAM:  I don't know where you

2     are going to get your physical therapy, but I think

3     that Mr. Bailey may be expecting more than the

4     physical therapist is willing to deliver.  I don't

5     know that they work after 4:00 or 5:00.  Are you

6     going to try to schedule your physical therapy and

7     then let us know?

8          MS. PIERCE:  Actually, the first

9     thing I have to do is find out if my insurance

10    company is going to pay for it, because it is quite

11    expensive if I have to pay for it myself.  The

12    doctor will have to find some other method if they

13    are not going to pay.  I can't afford it.

14         MR. INGRAM:  How badly does your arm

15    bother you?

16         MS. PIERCE:  I am a nurse.  This

17    past weekend I had to pass meds, and pushing the

18    med cart, by the end of my shift, then my arm was

19    pretty numb and felt kind of useless.  Sometimes it

20    bothers me at night.  I'm not able to sleep very

21    well sometimes at night because of it.  I have

22    rested it all day yesterday and all day today, and

463

1    it doesn't feel too awful bad.  Hopefully, a lot of

2    rest would be good for it.

3                    MR. INGRAM:  Maybe we can arrange

4    for that rest and you could spend some time with

5    us.  Is your arm distracting?  I think that is what

6    I want to know.  Is it something that would

7    distract you from what is going on in the

8    Courtroom?

9                    MS. PIERCE:  No.

10                    MR. INGRAM:  No further questions.

11                    THE COURT:  You will be in the Jury

12   pool.  And call that number after 4:30 tomorrow

13   evening.  Stop down to see the girl downstairs and

14   get those two forms to fill out and bring back.

15   Thank you.

16   (Juror No. 322, Ellyn Biles, entered the Jury room.)

17                    THE COURT:  You held your hand up

18   this morning.  What was that in reference to?

19                    MS. BILES:  The finances.

20                    THE COURT:  Explain that to us.

21                    MS. BILES:  I am a single mother of

22   two elementary school age kids and I'll get

464

1  reimbursed from my facility, but it is after I give

2  them the check from here and I cannot afford to go

3  without pay.  It is like my mortgage on my house is

4  $800 a month.  I bring home a little over a

5  thousand each pay, which is paid every other week.

6  I am a single mother.

7           THE COURT:  It would make it very

8  difficult for you then?

9           MS. BILES:  Yes, it would.

10           THE COURT:  Mr. Bailey?

11           MR. BAILEY:  I don't have any

12  problem with excusing her.

13           MR. INGRAM:  Neither do we.

14           THE COURT:  You are excused.  Sorry

15  to keep you so long.

16  (Juror No. 333, Todd Anerino, entered the Jury room.)

17           THE COURT:  Todd, you held your hand

18  up this morning.  What was that in reference to?

19           MR. ANERINO:  A little bit of

20  personal and financial.  My mother, I mean my

21  wife's mother has cancer and she had to quit her

22  job to help take care of her, and I am the only one

465

1   with the paycheck coming in.  It would hurt.

2                    THE COURT:  You don't get paid if

3   you don't work?

4                    MR. ANERINO:  Right.

5                    THE COURT:  Where do you work?

6                    MR. ANERINO:  Dybrook Products in

7   Lordstown.

8                    THE COURT:  Mr. Bailey?

9                    MR. BAILEY:  No questions.  No

10  objection to excusing him.

11                   MR. INGRAM:  No questions.  No

12  objection.

13                   THE COURT:  Todd, you are excused.

14  We thank you for your time today.

15  (Juror No. 337, Susan Somich, entered the Jury room.)

16                   THE COURT:  Susan, you held your

17  hand up this morning.  What was that in reference

18  to?

19                   MS. SOMICH:  With respect to work,

20  and I know that sounds pretty lame, but I am the

21  only person in my entire office.  I don't have

22  anybody that does the same job that I do.  I don't

466

1  have anyone else that fills in for me and I have

2  just recently taken on this position, so I haven't

3  had any experience with having anyone fill in for

4  me.  It is not that I don't understand the

5  responsibility that goes along with this

6  opportunity, it is just that I don't know exactly

7  what response is going to lend to my staying there

8  on a long term basis.

9           THE COURT:  Where do you work?

10          MS. SOMICH:  I work for Wal-Mart in

11  Macedonia, and I work for a district manager.  We

12  have eight stores we oversee.  There's just me in

13  that office and him, and two weeks coming up of

14  travel, the week of the 21st, which means the

15  office would be left without any assistance.  We

16  notify the stores and we have recalls, things of

17  critical nature that they would have to be notified

18  in the event of something like that, so they rely

19  upon me to get that word out to those stores and

20  those employees that work in those stores.

21          MR. BAILEY:  If you are not there,

22  what happens to the store?

467

1           MS. SOMICH:  The stores still run if

2  I'm not there to lend assistance.  If they have --

3  like a lot of times they will filter information in

4  regards to recalls or customer issues or associate

5  issues through our office, and it is the

6  responsibility through the district manager, and I

7  have to resolve those issues.  Somebody in higher

8  authority would have to ultimately make that

9  decision.

10          MR. BAILEY:  Do you get paid if you

11  are here?

12          MS. SOMICH:  Yes, Sir, I do.

13          MR. BAILEY:  That wouldn't be a

14  problem?

15          MS. SOMICH:  No.

16          MR. BAILEY:  It is not a problem for

17  you, it would be more of a problem for the store?

18          MS. SOMICH:  It would be a problem

19  for the store and it -- well, yes.

20          MR. BAILEY:  What happens if you

21  were out sick?

22          MS. SOMICH:  They would have to --

468

1    someone would have to step in, but I have worked

2    for Wal-Mart 12 years, I have only had four days

3    off in that length of time.

4              MR. BAILEY:  No vacation?

5              MS. SOMICH:  Vacation, but not in

6    this particular position.  I have only been in this

7    position for a short time.  I have worked in a

8    variety of other jobs for Wal-Mart.

9              MR. BAILEY:  Not being there, if you

10   were here, that it would affect your ability to

11   concentrate on the evidence, worrying about what is

12   going to happen over there?

13             MS. SOMICH:  It would be a big

14   concentration factor for me, only because I would

15   be continually thinking what is piling up there

16   waiting for me once I get back.  A lot would depend

17   on the length of time I would be away from that

18   office.

19             MR. BAILEY:  We're talking two weeks

20   trial and maybe a couple of days on the second

21   phase.

22             MS. SOMICH:  I would have some

469

1    concerns about what was happening at work, yes.

2    Would I be able to focus my attention on this, yes.

3    And I would say that with respect to the fact that

4    this is a job I have been asked to do and I would,

5    I would give it my full attention.

6                    MR. INGRAM:   Let me be candid with

7    you.  I think we would all love to have you sit as

8    a juror in this case if we could have you sit.  As

9    I understand what you are saying, your boss is

10   going on a two week vacation.

11                   MS. SOMICH:   He's going down -- it

12   is called high string training.  He goes to

13   Arkansas for stores that have inventories that are

14   not within limits.

15                   MR. INGRAM:   He's leaving the office

16   for two weeks to go to a duty assignment?

17                   MS. SOMICH:   Absolutely.

18                   MR. INGRAM:   And if you are here and

19   he's at the duty assignment, the office is

20   unattended?

21                   MS. SOMICH:   Correct.

22                   MR. INGRAM:   You tell us.  Is that

470

1   something that is such a hardship upon you that we

2   should excuse you?

3             MS. SOMICH: I think that it is

4   that, coupled with when you already start to have

5   some preconceived idea about what is going to

6   unfold as the trial. What am I going to be exposed

7   to, that type thing, it automatically conjures up,

8   am I going to be able to face that kind of evidence

9   and not feel uncertain about it? Everybody goes

10   through that, I know. It is a matter of loyalty

11   and I know that I have a civil responsibility to

12   this, but at the same time, I still have only had

13   that. I don't have any children, I am married, so

14   this is the thing I know, which is going to work

15   and being responsible and so forth.

16             MR. BAILEY: When is he leaving?

17             MS. SOMICH: The 21st.

18             MR. INGRAM: You have lost me now.

19             THE COURT: I think Jerry's question

20   is the proper thing. You tell us. You got a basis

21   to be excused if you want to. If you want to stay,

22   I think everybody would be glad to have you.

471

1                    MS. SOMICH:  And given the fact that

2       you gave us that prerogative in saying there's no

3       shame in saying that you don't want to, I would

4       prefer to be excused if I have that option, yes,

5       Sir.

6                    THE COURT:  Fair enough.

7                    MR. INGRAM:  No further questions.

8       No objection.

9                    MR. BAILEY:  No objection.

10                   THE COURT:  I think Wal-Mart has a

11      good employee.  We thank you for your time.

12      (Juror No. 341, Lisa Massary, entered the Jury room.)

13

14                   THE COURT:  You held your hand up

15      this morning.

16                   MS. MASSARY:  Yes.  Well, I have a

17      doctor's appointment scheduled for the end of the

18      month on April 22nd.

19                   THE COURT:  Is that something, Lisa,

20      that is a must?

21                   MS. MASSARY:  I have had -- it took

22      me six weeks to get the appointment.

472

1            THE COURT:  It would be hard to

2    reschedule?

3            MS. MASSARY:  Yes.

4            THE COURT:  Mr. Bailey?

5            MR. BAILEY:  This doctor's

6    appointment, is it like a physical, annual physical

7    or something that needs some immediate care?

8            MS. MASSARY:  Immediate care.

9            MR. BAILEY:  And would there be any

10   follow up to that?

11           MS. MASSARY:  I'm not sure.  It

12   depends on what they find at the initial visit.

13           MR. BAILEY:  If you were here, would

14   that be on your mind?

15           MS. MASSARY:  No.

16           MR. BAILEY:  You are the only one

17   who really knows.  Do you think you would be able

18   to serve?

19           MS. MASSARY:  Yes.  I don't want to

20   miss that appointment for that particular day.

21   That is the only day that I would have a problem

22   with.

473

1              MR. BAILEY:  Could you check with

2    the doctor to see if you could reschedule?  What

3    time of the day is your appointment?

4              MS. MASSARY:  3:15.

5              THE COURT:  How long would it take

6    you to get to the doctor?

7              MS. MASSARY:  In Howland.

8              THE COURT:  If we broke at 2:45 or

9    3:00, you could conceivably get there?  It is up to

10   you folks.

11             MR. JUHASZ:  Okay.

12             THE COURT:  You will remain in the

13   pool then.  We thank you for that.  Call that

14   number after 4:30 tomorrow evening and stop and get

15   the papers downstairs.  Thank you.

16             MR. INGRAM:  If she gets selected,

17   remember to tell us about the doctor's appointment.

18   (Juror No. 345, Sandra Marchionte emtered the Jury

19   room.)

20             THE COURT:  You held your hand up

21   this morning.

22             MS. MARCHIONTE:  You asked did

474

1   anyone read the news and I do recall seeing it on

2   the news.

3                   THE COURT:   Is that the only reason?

4                   MS. MARCHIONTE:   That's the only

5   reason, yes.

6                   THE COURT:   You understand that most

7   of the people out there, even though many of them

8   did not hold their hands up, they probably all

9   heard or seen something.  The case has been around

10  awhile.  The important thing is whether you are

11  able to set that aside and listen to the evidence

12  and decide this case on what you hear in the

13  Courtroom.  Would you have any problem doing that?

14                  MS. MARCHIONTE:   No, I would not.

15                  THE COURT:   That is the only reason

16  then that you held your hand up?

17                  MS. MARCHIONTE:   Yes.

18                  THE COURT:   Any questions?

19                  MR. BAILEY:   No questions at this

20  point.

21                  MR. JUHASZ:   No, Sir.

22                  THE COURT:   You will be in the pool

475

1    then from which this Jury is chosen.   Call the

2    number tomorrow evening after 4:30 for further

3    instructions.   Stop downstairs and get those two

4    papers to fill out and bring back with you.

5    (Juror No. 357, Linda McCombs, entered the Jury room.)

6                    THE COURT:   Good afternoon.   You

7    heard the questions this morning.   You held your

8    hand up.   What was that in regard to?

9                    MS. McCOMBS:   I only get paid for

10   two weeks of Jury duty, get reimbursed, and I

11   really felt that was a hardship.

12                   THE COURT:   Any other reason you

13   held your hand up?

14                   MS. MARCHIONTE:   I'm not sure

15   whether I can judge people.

16                   THE COURT:   Isn't that the real

17   reason you are here?

18                   MS. MARCHIONTE:   I think it would be

19   very difficult.

20                   THE COURT:   We all understand that.

21   You are not unusual.   You are in the bulk of the

22   people out there.   Nobody really wants to say to

476

1   themselves, "I want to be on a Jury of this

2   nature." The fact is, we have to get 12 people who

3   are willing to sit on any Jury, I suspect. I have

4   no way of knowing, but I suspect that you have the

5   whole gamut of people who favor the death penalty.

6   It runs to the other side, people who don't think

7   it is a very good idea. And maybe that is good.

8   You have a good cross section. But, we have to

9   have the assurance of everybody that they are able

10  and willing to listen to the evidence, and then

11  apply the law, as the law is, and this is a

12  difficult thing at times. These attorneys, myself,

13  many times we're called upon to see that the law is

14  followed when we don't necessarily agree with the

15  law ourselves. It is not uncommon. The law has to

16  be maintained. Would you feel, would it be

17  possible for you to sit and to judge this case on

18  the law, as it is given to you by the Court?

19              MS. McCOMBS: Yes. I'm not

20  prejudiced in any way. I don't know anything about

21  the trial. I don't know anything about it. I have

22  never been involved in anything like this before.

477

1               THE COURT:  You understand that the

2      Jury has to first of all decide the question of

3      guilt or innocence.  If they make a finding of

4      innocence or not guilty, then it, the other issue

5      doesn't come up.  If it does, you are going to have

6      12 people sitting and they all have their own idea

7      of the death penalty itself in the vacuum, but they

8      have to be able to listen to that second part of

9      the case, and apply the law, wherever that leads

10     you to.  Would you feel comfortable that you would

11     be able to do that?

12               MS. McCOMBS:  Yes.  Well, I don't

13     know.

14               THE COURT:  I suspect you don't, but

15     at least you are not telling me no, you could not

16     do it.

17               MS. McCOMBS:  No.  I feel I could be

18     fair and impartial.

19               THE COURT:  There are some people

20     that say I couldn't ever possibly even consider.

21               MS. McCOMBS:  I could consider it.

22               THE COURT:  Mr. Bailey?

478

1              MR. BAILEY:  Mrs. McCombs, where do

2     you work?

3              MS. McCOMBS:  Toys 'R Us regional

4     office.

5              MR. BAILEY:  They pay you for up to

6     two weeks?

7              MS. McCOMBS:  Yes.

8              MR. BAILEY:  This case could be

9     tried in two different phases; the first phase, it

10    deals with guilt or non-guilt and that could take

11    up to two weeks.  Your husband works?

12             MS. McCOMBS:  Yes, he does.

13             MR. BAILEY:  You would be paid for

14    those two weeks, I assume it probably won't go much

15    longer than that, if it goes that long.  If it goes

16    to a second phase which deals with the issue of

17    punishment, what is the appropriate punishment, and

18    that probably wouldn't go more than a few days, and

19    it could take longer, but probably not more than

20    two or three days.  We can't tell how long the Jury

21    is going to deliberate, because each Jury is

22    different.  It could be decided maybe in a day or

479

1   two days, most likely.  If you were to lose two or

2   three days of pay, would that be such an economic

3   hardship?

4               MS. McCOMBS:  Not really.

5               MR. BAILEY:  You would be able to

6   serve in that case?

7               MS. McCOMBS:  Yes.

8               MR. INGRAM:  Right after you told us

9   about the hardship, you told us that you thought it

10  might be difficult for you to serve.  And then I

11  think we all started jumping to conclusions about

12  we thought you would find it difficult.  Do you

13  mind if I ask you what you meant?  What do you

14  think you might find difficult?

15              MS. McCOMBS:  I think it is hard for

16  any human being to judge another human being.  Just

17  would be -- I don't know what to tell you.

18              MR. INGRAM:  It is a hard thing to

19  do.  Let me tell you this.  I think we all want

20  jurors to think it is a hard thing to do.  Anybody

21  that comes in here and tells us, "Hey, this is

22  easy, it's a piece of cake," we probably don't

480

1   want.  I have no further questions and I am

2   certainly satisfied.

3            THE COURT:  Very good.  You will be

4   in the pool from which this Jury is selected.  Now

5   there's another procedure, you get another crack at

6   answering these questions, but you should call the

7   number after 4:30 tomorrow evening.  Stop and pick

8   up those two pieces of paper to fill out and bring

9   back with you.

10  (Juror No. 373, Daniel Border, entered the Jury room.)

11           THE COURT:  Good afternoon.  Daniel,

12  you held your hand up today.  What is that about?

13           MR. BORDER:  I have got to take some

14  stress test, another test the 17th of April, and my

15  boy got in some trouble and I have got to go to

16  Court the 24th with him.  I'm kind of stressed out

17  a little bit.

18           THE COURT:  Mr. Bailey, do you have

19  any questions?

20           MR. BAILEY:  The stress test, that

21  is the 17th, which would be -- well, okay.  You

22  think you are going to need follow up from that

481

1   stress test?  It is hard to say?

2                MR. BORDER:  I don't know.

3                MR. BAILEY:  What about, is there

4   anything else other than that, the stress test?

5                MR. BORDER:  No, just I have to go

6   to Court with my boy.

7                MR. BAILEY:  He's 19, so he would be

8   an adult.  Which Court?

9                MR. BORDER:  Niles first.  Niles

10  Municipal Court.

11               MR. BAILEY:  Was it a felony or

12  misdemeanor?

13               MR. BORDER:  Misdemeanor.

14               MR. BAILEY:  What time is that set,

15  is that in the morning?

16               MR. BORDER:  Yes, Sir, I think it is

17  9:30 in the morning.

18               MR. BAILEY:  Do you know what he was

19  charged with?

20               MR. BORDER:  Yes, Sir.  Resisting

21  arrest, and unruly conduct.  He was at Dillard's.

22  Anyway, I have an attorney and I think we're going

482

1   to be okay.

2                    MR. BAILEY:  You got an attorney,

3   your attorney could be there with him on that

4   particular day, I take it?

5                    MR. BORDER:  Yes.

6                    MR. BAILEY:  Other than that, your

7   stress test will be probably before the trial

8   starts?

9                    MR. BORDER:  Okay, I thought it was

10  starting right away.

11                   MR. BAILEY:  We have got to pick a

12  Jury.  We're going to be talking to folks for the

13  next week.  Other than those two things, do you

14  think you would be able to sit in this case?

15                   MR. BORDER:  Yes, Sir.

16                   MR. INGRAM:  No questions.

17                   THE COURT:  The question I would put

18  to you is, you appear to me to be a little bit --

19  you might be nervous or whatever, you mentioned you

20  were stressed out.  Do you feel comfortable, you

21  won't be called upon other than a day, to come in

22  here for 15, 20 minutes during the next two weeks

483

1    and after that, if you are chosen as a juror, then

2    it would be eight hours a day for whatever time it

3    takes to try the case.

4                    MR. BORDER:  I have been on Jury

5    duty three other times.

6                    THE COURT:  You think if you are

7    given the next couple of weeks, you would be in

8    good shape?

9                    MR. BORDER:  I hope so.

10                    THE COURT:  We'll keep you in the

11    pool and call that number tomorrow evening after

12    4:30.  Stop down and get those two papers to take

13    with you.

14    (Juror No. 374, Carol Dietz, entered the Jury room.)

15                    THE COURT:  Carol, you held your

16    hand up this morning in reference to one of the

17    questions I asked.  What was that about?

18                    MS. DIETZ:  First I asked about it

19    because of work, but I called there since then to

20    see if I could get off for that length of time, and

21    I guess I can.

22                    THE COURT:  You can.

484

1          MS. DIETZ: Yes. But I also don't
2    want to do this.

3          THE COURT: We have had numerous
4    other people make that same comment in one form or
5    another.

6          MS. DIETZ: I don't think I could
7    decide on somebody's life. I couldn't do that.

8          THE COURT: Let me explain this to
9    you. Occasionally, we'll have somebody that
10   believes that fully that they could not make that
11   determination. And that may be based on religious,
12   moral and ethical principles that you do not think
13   it is right for the State to take a life. We're a
14   long way from that in this case. That may never
15   become a contingency. If the Jury makes a finding
16   of not guilty, then that second phase doesn't
17   arise, but if it does, you are going to have a Jury
18   that has the broad spectrum of opinions about the
19   question in a vacuum of the death penalty itself.
20   You will have some people who think it's a good
21   idea when anybody is killed, you are going to think
22   somewhere in between. But every person on that

485

1  Jury has to look at the evidence and take the law,

2  and apply the law in order for both sides to have a

3  fair Jury.  Now, if you are of a mind that you

4  could not follow the law, then that is fine.  But

5  it is a question of whether you can follow the law

6  or not.  Because a lot of times people will say to

7  themselves, yes, I think the death penalty is a

8  good idea, but if they sat on a particular Jury,

9  they might find, well, in this case, maybe I'm

10  going to change my opinion here.  Maybe it

11  shouldn't be imposed in this case.  You don't know

12  until you have heard all of the evidence.  The only

13  thing nobody else wishes to do is put you in a

14  position where if you do have a deep seated feeling

15  against the imposition of the death penalty, then I

16  would like to see you put in the position where you

17  might have to consider that, but only you can

18  answer that.

19          MS. DIETZ:  Well, I don't know.

20  Really I have high blood pressure, and I don't know

21  that I could handle that, the whole thing.

22          THE COURT:  The whole thing just

486

1    kind of frightens you a little bit?

2                    MS. DIETZ:  Yes, it does.

3                    THE COURT:  Ken, any questions?

4                    MR. BAILEY:  You are indicating that

5    the high blood pressure, you think the stress of

6    the situation, being on this Jury --

7                    MS. DIETZ:  I think it would be very

8    stressful.

9                    MR. BAILEY:  You think it would

10   adversely affect your health?

11                   MS. DIETZ:  I do.

12                   MR. BAILEY:  You are the only person

13   who really knows.  If it is a health matter, the

14   stress of this situation, just being here on this

15   Jury and being forced to come to grips with the

16   situation where you may have to make a decision

17   under the law, that it may go against your personal

18   beliefs or religious beliefs, where that may

19   exacerbate your blood pressure, we don't want to

20   make you sick over this.  You are the only one who

21   can tell us if you think it would be a medical

22   condition, where you would be really unable to

487

1 | serve, you could tell us.

2 | MS. DIETZ:  I think it would be very

3 | stressful.

4 | MR. BAILEY:  It would adversely

5 | affect your health?

6 | MS. DIETZ:  Probably.  Probably my

7 | blood pressure, I'm sure.

8 | MR. BAILEY:  Are you saying it would

9 | make you unable to serve on this Jury, physically?

10 | MS. DIETZ:  Probably not serve, but

11 | I think it would be very stressful for me.

12 | MR. INGRAM:  Ma'am, I think what you

13 | are telling us, and I am way down at the end of the

14 | table and I could be wrong, was that, is that you

15 | think that this is going to be so stressful for you

16 | personally that serving on this Jury would be a

17 | hardship for you personally?

18 | MS. DIETZ:  True.

19 | MR. INGRAM:  Am I correct?

20 | MS. DIETZ:  True.

21 | MR. INGRAM:  We can't answer that

22 | question.  Only you can answer the question, and if

488

1   you think that this is going to be a hardship on

2   you, you tell us that.

3                MS. DIETZ:  I do believe that.

4                MR. INGRAM:  Then I am satisfied.

5                MR. BAILEY:  I am, too.

6                THE COURT:  Carol, thank you for

7   your time.  Sorry to keep you all day here.  We

8   appreciate it.  You are excused.

9   (Juror No. 378, Neil Countryman, entered the Jury

10  room.)

11               THE COURT:  You held your hand up

12  this morning.  What was that in regard to?

13               MR. COUNTRYMAN:  Travel.  I travel

14  for my job for a living and I want to be honest

15  with you, you asked if you had any travel plans.  I

16  take care of Cleveland and Pittsburgh in my travel

17  work.

18               THE COURT:  Where do you stand, if

19  you are required to be here two weeks and then

20  another week, within the next week, two or three

21  days?

22               MR. COUNTRYMAN:  I believe that

489

1   actually I'm probably one of the better jurors that

2   you are looking for.  I don't think you are going

3   to excuse me today because I raised my hand in

4   honesty to tell you that I do travel for a living.

5   Because I travel, I don't read the local news.  I

6   haven't read a local paper for years.  I kind of

7   fit in what you are looking for in all honesty. I

8   raised my hand because I do travel for a living.

9   It doesn't mean I can't cancel my trip to fill my

10  need here.

11                  THE COURT:  You would be willing to

12  serve?

13                  MR. COUNTRYMAN:  My company is not

14  so great on the idea, but as a citizen, yes.

15                  THE COURT:  If you found yourself on

16  the Jury and you found that there was some piece of

17  evidence presented and you would say to yourself,

18  you say, "I did read a newspaper back and I

19  remember something about this."  Are you able to

20  put that out of the your mind and decide this case

21  only on the evidence?

22                  MR. COUNTRYMAN:  Yes, Sir.  I

490

1   believe I can.  I am almost 50 years old.  I have

2   seen a lot of things.  I have got a pretty good

3   outlook and opinion on life and I like to set my

4   own opinions.

5                    MR. BAILEY:  No questions.

6                    MR. JUHASZ:  No questions.

7                    THE COURT:  Neil, you will be in the

8   pool.  Call that number that was given to you after

9   4:30 tomorrow evening.  Stop down and see Connie

10  and get those two forms to fill out and bring back

11  with you.

12  (Juror No. 382 Lisa Persons, entered the Jury room.)

13                    THE COURT:  We have Lisa Persons,

14  No. 382.  You held your hand up this morning.  What

15  was that about?

16                    MS. PERSONS:  I asked the lady

17  actually, because I have really low sugar.  If I

18  don't eat many times a day, I'll pass out.  I have

19  to eat breakfast, snack, lunch, snack.

20                    THE COURT:  You can take a candy

21  bar, whenever you eat it.

22                    MS. PERSONS:  But I didn't know if I

491

1   was allowed.  That is why I stayed.  I was going to

2   leave earlier, but she said to stay and ask you.

3                  THE COURT:  That is no problem as

4   far as the Court is concerned.

5                  MS. PERSONS:  I can have snacks up

6   there?

7                  THE COURT:  We have accommodated

8   many things like that.  Any other reason why you

9   couldn't sit here?

10                  MS. PERSONS:  No.  That is the only

11   reason.

12                  THE COURT:  You will be in the pool.

13   Call that number after tomorrow evening.

14   (Juror No. 383, Donald Meszaros entered the Jury

15   room.)

16                  THE COURT:  What is the reason you

17   held your up your hand this morning?

18                  MR. MESZAROS:  I have work related

19   reasons.  I was off, I have suffered a heart

20   attack.  I was off three months and I just

21   returned.  My employer doesn't think I could afford

22   to miss another month or two.

492

1          THE COURT:  Where do you work?

2          MR. MESZAROS:  Western Reserve

3   Transit.  I'm director of transit.

4          MR. BAILEY:  We have no problem

5   excusing him.

6          MR. JUHASZ:  No problem.

7          THE COURT:  Don, you are excused and

8   we thank you for your time.  Sorry to keep you all

9   day.

10  (Juror No. 388, Juan Scott, entered the Jury room.)

11         THE COURT:  Mr. Scott, you held your

12  hand up this morning.  What was that about, the

13  reason why you thought you might not be able to

14  serve?

15         MR. SCOTT:  Well, several different

16  reasons.  I'm taking care of an elderly parent, and

17  also, I have a reconstructive knee surgery that I

18  just went through March 3rd, last month, and that

19  is basically it.

20         THE COURT:  You had knee surgery?

21         MR. SCOTT:  Yes.

22         THE COURT:  Do you have trouble

493

1    sitting?

2                    MR. SCOTT:  For long periods of

3    time.  For what you are expecting, it would be

4    somewhat difficult.

5                    THE COURT:  You say you care for an

6    elderly parent?

7                    MR. SCOTT:  Yes.

8                    THE COURT:  Explain about that.

9                    MR. SCOTT:  She's just an elderly

10   woman.  She's an 80 year old woman.  She's elderly.

11   She's independent.  She's not like bed ridden or

12   anything like that.

13                   THE COURT:  Where do you work?

14                   MR. SCOTT:  I don't.  My knee -- I

15   used to do construction landscaping.

16                   THE COURT:  Are you there with your

17   Mom most of the day then to take care of her?

18                   MR. SCOTT:  No, not most of the day.

19                   MR. BAILEY:  If you had to be

20   sequestered for a couple of days, you wouldn't be

21   there to take care of her.  That would cause a

22   hardship?

494

1           MR. SCOTT:   I have other siblings.

2   I have other brothers and sisters, but it is just

3   that she stays with me.

4           THE COURT:   You are the primary care

5   giver?

6           MR. SCOTT:   Yes, I can make

7   arrangements for her to have -- my other brother

8   and sister.

9           MR. BAILEY:   If you are here for two

10  weeks and then maybe half a week, that would cause

11  a problem with the rest of the family?

12          MR. SCOTT:   No.   My orthopedic

13  surgeon, I'll talk to him about it.   I have a

14  doctor's appointment, but I can make arrangements

15  to see him during the daytime, whenever Court would

16  convene, I could see him during the daytime or

17  after.

18          MR. BAILEY:   The Court goes in the

19  daytime from like nine to 4:30.

20          MR. SCOTT:   His office is open at

21  8:00 in the morning.   I could see him in the

22  morning.   There's ways of getting around that.

495

1                    THE COURT:   What you're telling us,
2    if I understand correctly, is that you are willing
3    to serve.   There's no reason why you can't?
4                    MR. SCOTT:   There's no reason why I
5    can't.   I'm trying to say my situation.   I can
6    serve.
7                    THE COURT:   You can work around
8    that?
9                    MR. SCOTT:   Yes.
10                   THE COURT:   You don't think if you
11   are seated, you are going to have anything come up
12   because of these various potential problems that
13   would be on your mind while you are sitting on that
14   Jury?
15                   MR. SCOTT:   My mind would be clear.
16   It wouldn't be like my mind wouldn't be on anything
17   else except for serving this Court.
18                   THE COURT:   Fair enough.
19                   MR. INGRAM:   I only have one
20   question.   You have just had knee surgery?
21                   MR. SCOTT:   Yes.
22                   MR. INGRAM:   How is it going?

496

1        MR. SCOTT: Well, first of all it is

2   going along pretty good. It is coming along faster

3   than I expected for a reconstruct. I don't have

4   crutches, no strong pain.

5        MR. INGRAM: Are you able to sit

6   with your leg bent for like an hour and a half at a

7   time?

8        MR. SCOTT: I have been out there

9   all day except for the time we were standing and

10  the remainder of the time we were sitting. I am

11  sitting now.

12        THE COURT: Any problems?

13        MR. INGRAM: No.

14        THE COURT: Mr. Scott, you are going

15  to be in the pool. Call that number that will be

16  given to you, if you haven't got it already, after

17  4:30 tomorrow afternoon for instructions, and then

18  stop down and see Connie today and get those two

19  forms to fill and bring back.

20  (Juror No. 390, Kathryn Carr entered the Jury room.)

21        THE COURT: Kathryn, you held your

22  hand up this morning. What was that concerning?

497

1          MS. CARR:  First of all, I take care

2   of my mother.  She has Alzheimer's and then I'm a

3   the sole provider at home right now.  I don't get

4   paid for being here.

5          THE COURT:  How long has she had

6   Alzheimer's?

7          MS. CARR:  Diagnosed three or four

8   years ago.

9          THE COURT:  You are the primary care

10  giver?

11         MS. CARR:  My Dad takes care of her.

12  I help him.  He's 80.

13         MR. BAILEY:  No questions.  Sorry

14  for your situation.

15         MR. INGRAM:  No questions.  No

16  objection.

17         THE COURT:  Kathryn, you are going

18  to be excused.  We thank you and I'm sorry to keep

19  you here all day.

20  (Juror No. 393, Sandra Gillespie, entered the Jury

21  room.)

22         THE COURT:  Good afternoon.  You

498

1    held your hand up this morning.  What was that

2    about?

3                    MS. GILLESPIE:  I followed the

4    story.  I live in Howland.  It was close to home

5    where it happened.  That is why.  You said if

6    anybody had followed the story, that is why I

7    raised my hand.

8                    THE COURT:  Let me ask you this.  Do

9    you have your mind made up about anything?

10                    MS. CARR:  No.

11                    THE COURT:  You read the stuff in

12   the newspaper, perhaps saw something on T.V.  That

13   is not evidence.  Evidence has to be given in the

14   Courtroom.  Some people might have pretty much

15   their mind made up, from I read it in the

16   newspaper, must be something to it.  You have to be

17   able to sit on the Jury and say to yourself, "I

18   didn't read anything or what I did, it is not

19   important here.  I have to listen to all the

20   evidence and then make my own judgment on the

21   facts."

22                    MS. CARR:  Right.

499

1          THE COURT:   Are you in the position

2    where you feel you can do that?

3          MS. CARR:   I don't know.   I have no

4    idea.

5          THE COURT:   That is a better answer

6    than saying yes right out.   That is not uncommon

7    for someone to think that.   Very few people say

8    that, but you have to examine within yourself,

9    because you have to decide if both sides are to get

10   a fair trial.   You have to decide on what happens

11   in the Courtroom not what some newspaper said.

12   That wouldn't be fair to anybody.   Newspapers are

13   wrong many times.   Some people may not be able to

14   set aside what they read.   I don't know which type

15   you are, you do.

16         MS. CARR:   You know what has worried

17   me, because it was close to home and wasn't far

18   from where I live.   I heard about it and people

19   talk.   Howland Giant Eagle, everybody talks.

20         THE COURT:   You are in a different

21   situation that you heard it in the neighborhood.

22         MS. CARR:   I work in Howland, I live

500

1  in Howland.  People talk.  I would have to say I

2  can't talk about it.

3              THE COURT:  Because of where you

4  live alone makes you more apprehensive than maybe

5  somebody else would be?

6              MS. CARR:  Yes.

7              THE COURT:  Mr. Bailey?

8              MR. BAILEY:  No questions.

9              MR. INGRAM:  Would you be satisfied

10 with a juror who has been exposed to the things

11 that you have been exposed to about your case?

12             MS. CARR:  No.

13             MR. INGRAM:  Do you think that it

14 would be better that you be excused?

15             MS. CARR:  I would think so, yes.

16             MR. INGRAM:  And that is because you

17 would find it difficult to remove from your mind

18 some of your perceptions, or your conclusions from

19 what you have seen, read or heard?

20             MS. CARR:  Yes, I have a tendency to

21 do that.  I remember flashback, "I heard that.

22 That person told me that."

501

1              MR. INGRAM:  No objection.

2              THE COURT:  Sandra, you are excused

3    for cause.  We thank you for your time.

4    (Juror No. 395 John Marsco, entered the Jury room.)

5              THE COURT:  Good afternoon, John.

6    You held your hand up this morning.  What was that

7    about?

8              MR. MARSCO:  I am very good friends

9    with the Assistant Prosecutor, Chris Becker.  He

10   lives in Cortland.  I'm changing my job at work,

11   rotating jobs, and I am the only one with an income

12   in my family.  I don't think it would be fair to

13   Miss Roberts, knowing the Assistant Prosecutor and

14   that I could be fair to both parties.

15             THE COURT:  Any objection to

16   dismissing for cause?

17             MR. BAILEY:  No objection.

18             THE COURT:  We thank you for your

19   time.  Sorry to keep you so long.  You are excused.

20   (Juror No. 398, James Ziegler, entered the Jury

21   room.)

22             THE COURT:  Mr. Ziegler, you held

502

1   your hand up today?

2                    MR. ZIEGLER:   The reason I held my

3   hand up is that blood pressure medicine that I am

4   taking causes me to go to the restroom quite

5   frequently.  I know being a juror, you can't just

6   keep popping up like that.  That is the reason why

7   I raised my hand.

8                    THE COURT:   Ken, any questions?

9                    MR. BAILEY:   When you say

10  frequently, more than every hour and a half or so?

11                   MR. ZIEGLER:   Yes.

12                   MR. BAILEY:   Maybe every 15 minutes?

13                   MR. ZIEGLER:   Yes, Sir.

14                   MR. BAILEY:   No problem with

15  excusing him.

16                   MR. INGRAM:   No objection.

17                   THE COURT:   You will be excused.   We

18  thank you for your time.  For the record, we have

19  spent the day going through the people who held

20  their hand up this morning with potential problems.

21  We have completed that.  For the record, I would

22  note that the following people failed to appear

503

1    after being subpoenaed in.  Number five, Yvette

2    Bonner; Valentheia Mitchell, 14.  Kristen Lodwick,

3    number 15.  Matthew McCrimmon, number 21.  George

4    Dermer, number 22; Dino Ziccardi, Junior, number

5    28.  Matt Vigus, number 70; Mary Hall, number 104.

6    Thelma Rankin, number 117; Donald Byerly, number

7    132.  Rodger Killingsworth, number 135; Robin

8    Schlaegel, number 137.  Norma Calhoun, number 149;

9    Gary Driscoll, number 175.  Margaret Kay, number

10   248; Lee Silvis, number 256; John Langley, number

11   261.  John Vance, number 262.  Michael -- no, not

12   Michael.  Judy Rees, number 296; Danny Thomas,

13   number 304.  Larry Bequeath, number 318; Richard

14   Long, number 347.  John Gates, number 364; Carla

15   Daniel, number 367.  Katherine Kellar, number 372;

16   Eugene Malandro, number 377.  Vonetta Cato, number

17   392.

18           It is my understanding that the Defendant

19   and the Prosecution both do not wish to have the

20   Court issue further process to try and bring these

21   names in, these people; is that correct?

22                   MR. JUHASZ:  That is correct, but

504

1   before we agree to that, could I point out for

2   clarification, the Court read three names that

3   according to my list are circled, I presumed that

4   they were here.  Specifically, number 22,

5   Mr. Dermer; I have circled, number 135,

6   Mr. Killingsworth, is circled on my list, and

7   number 137, Miss Schlaegel.  Those are circled on

8   my list.

9              THE COURT:  They are circled on

10  mine, too.  Did I not read any that were not

11  circled?

12             MR. JUHASZ:  No. with the exclusion

13  of those three names that we agree that those

14  people do not need to appear and process need not

15  be issued.

16             MR. INGRAM:  If I may just put on

17  the record from the Defense's prospective, the

18  jurors who were not here were not present for the

19  preliminary instructions, the orientation

20  instructions, or the cautionary instruction.

21  Additionally, they did not receive a copy of the

22  questionnaire.  And at this time, I don't think it

505

1  would serve any good purpose to bring them in.

2  Accordingly, we would just consent to their

3  excusal.

4              MR. BAILEY:  We would, too.

5              THE COURT:  Very good.  So

6  stipulated.  I thank you for checking my work

7  product.  It is very necessary.  Nothing further.

8  That completes the record for the day.  We'll start

9  Thursday afternoon at 1:00.

10  (Court in recess at 5:00 p.m.)

11

12

13

14  Wednesday, April 9, 2003; In Open Court at 10:25 A.M.

15  (Juror No. 117, Thelma Rankin, and Juror No. 248,

16  Margaret Kay, entered the Courtroom.)

17              THE COURT:  Good morning.  Yesterday

18  we had several hundred people in here that were

19  subpoenaed in on this particular case which is

20  State of Ohio versus Donna M. Roberts.  We're about

21  to begin the process known as Voir Dire.  That is a

22  term that comes from the old common law Courts of

506

1   England.  It means to speak the truth.  That is the

2   process by which the Jury is selected.  This being

3   a capital case, there's a whole different procedure

4   that is used to choose a Jury.  Ordinarily we have

5   30 or 40 people come in from a panel of jurors on

6   an ordinary felony case.  There's the potential in

7   the case before us where the Jury may be called

8   upon to go into a second phase because the death

9   penalty is a possible final conclusion that a Jury

10  might arrive at.

11          If after the trial the Defendant were

12  found not guilty, then that second phase would not

13  come up.  No one knows at this point what the

14  evidence will show and what the Jury's decision

15  will be.

16          Now the attorneys for the State and the

17  Defendant will ask you questions concerning your

18  qualifications to serve as a juror.  At this point,

19  we only know that you are citizens of Trumbull

20  County and that you vote.  That is the way we got

21  your name.

22          You should understand that although it is

507

1   your duty as a citizen to serve on a Jury, it is

2   also your duty as a citizen not to serve on a Jury,

3   if there's any reason whatsoever why you cannot do

4   so in fairness to the State, to the Defendant and

5   to yourself. What is important is that you be as

6   honest as you can be in your response to questions

7   put to you by the Court and the Attorneys. You

8   cannot give a right or wrong answer on Voir Dire.

9   The only proper answer is a totally honest one. It

10  would be terrible to have a person sit on a Jury,

11  particularly of this type, if you would be called

12  upon to do something that was totally against the

13  grain of what your religious or moral beliefs are.

14  You are not here to be judged, and you will not be

15  judged.

16          It should not be an embarrassment to you

17  in any way, if you are excused in this case. Many

18  of you will be. That is part of the whole process.

19  People are excused in most cases for one reason or

20  another. And just because you might be excused on

21  this particular matter does not mean that you could

22  not serve on some other Jury. If you are excused,

508

1    it will probably mean that you have been honest and

2    forthright in your answer as to what your feelings

3    are.

4              Now in this case, Donna M. Roberts is

5    charged with aggravated murder with specifications.

6    As in all such cases, one possible penalty is the

7    death penalty.  Because of that possibility, it is

8    necessary that counsel ask you certain questions

9    about your views regarding the death penalty.  The

10   death penalty is an issue about which people have

11   varying opinions.  Some favor it, some oppose it,

12   and there are strong arguments to both sides of the

13   issue.  You will be asked your opinion, and I urge

14   you to be as candid and honest as you can be in

15   your answer.

16             Now the questions the lawyers will be

17   asking you are asked in every aggravated murder

18   case where there's specifications.  The law

19   requires that such questions be asked of you.  And

20   the inquiry has no relation whatsoever as to

21   whether or not Donna M. Roberts is guilty or not

22   guilty of the offense.  As she will sit in this

509

1    Courtroom before this Jury, throughout the trial,

2    she's presumed innocent.  It is the right that

3    every person has, as is the presumption of

4    innocence, unless and until the State is able to

5    prove by evidence beyond a reasonable doubt the

6    person is guilty, they are innocent.

7            Now because we'll only have the

8    opportunity of questioning you regarding your

9    feelings about the death penalty at this stage of

10   the trial before the State produces any evidence

11   about whether the Defendant is guilty or not, I

12   must caution you that you should not conclude that

13   just because the attorneys are asking you about a

14   possible death penalty, that that has any bearing

15   whether or not Donna M. Roberts is guilty or not.

16   You understand that?  Do you have any questions

17   about that?

18           As you know, this is a capital case and

19   that is a case where the death penalty and the life

20   imprisonment are potentially sentencing options.

21   Now there are common misconceptions as to the

22   procedure in such a case.  And this preliminary

510

1    instruction is designed to help you eliminate any

2    misconceptions that you may hold.

3            The trial of a capital case may be, but

4    is not necessarily a two stage process.  The issue

5    in the first phase of the trial is the same as in

6    any other criminal trial, and that is the Jury will

7    be called upon to decide whether Donna M. Roberts

8    is guilty or not guilty.  In the event that the

9    State satisfies the Jury by proof beyond a

10   reasonable doubt that the Defendant's guilt on

11   either charge of aggravated murder and/or guilt on

12   the specification attached to that count was

13   committed, in which case they would have proven the

14   aggravated murder was committed during the course

15   of an aggravated robbery or aggravated burglary.

16   If they prove both of those factors in either

17   count, this case would go onto a second phase.  If

18   the case does not, does proceed to a second phase,

19   as I said they return a not guilty, it wouldn't go

20   to it.  If it does go to a second phase, the Jury

21   would be called upon to determine the appropriate

22   punishment.  At that time, you would be called upon

511

1    to determine which of four sentencing alternatives

2    should be imposed.  And the sentencing alternatives

3    are one, death by lethal injection; two, life

4    imprisonment without any opportunity of parole.

5    Three, life imprisonment with parole eligibility

6    only after 30 years.  Four, life imprisonment with

7    parole eligibility only after serving 25 years.

8         Now there's a common misconception that

9    upon a finding of guilty on a charge of aggravated

10   murder with a death specification, that the Jury

11   must sentence a Defendant to death.  That simply is

12   not correct.  The death penalty is only one of four

13   possible penalties.  And the Jury must fairly

14   consider by following the instructions of law

15   whether life imprisonment as well as the death

16   penalty or instead of the death penalty should be

17   imposed.

18        If this case does proceed to a second

19   phase, you should enter the second phase with an

20   open mind, not favoring the imposition of one

21   penalty over the other.  The Jury will be called

22   upon to separate the two in their mind.  Make a

512

1  finding of guilt or not guilty, and then you have

2  to weigh certain things in the second part.

3  If you do have to decide upon a sentence,

4  your decision will be made, will not be made in a

5  vacuum. On the second trial, it is reasonable to

6  question what do we decide there. At that time, I

7  would instruct you to weigh or balance what the law

8  calls aggravating circumstances. Those are facts

9  which the State claims justifies the imposition of

10 the death penalty.

11 You weigh those aggravating circumstances

12 against certain mitigating factors. Those are

13 positive things brought out by the Defendant as to

14 why the death penalty should not be imposed. At

15 that time, I would more fully describe what is

16 meant by aggravating circumstances and mitigating

17 factors. You would further be instructed that the

18 burden would be upon the Prosecuting Attorney, the

19 burden is always on the Prosecuting Attorney to

20 prove to you beyond any reasonable doubt that the

21 aggravating circumstances outweigh the mitigating

22 factors, and that death is the appropriate

513

1   sentence.  Only if the Prosecutor were to meet that

2   burden of proof and firmly convince you that the

3   aggravating circumstances outweigh the mitigating

4   factors, would the law require a verdict of death

5   by lethal injection.

6          On the other hand, if the Prosecutor did

7   not convince you that the aggravating circumstances

8   outweighed the mitigating factors beyond a

9   reasonable doubt, the law would require the

10  imposition of one of the life sentence options.

11  Each of the sentencing options is entitled to equal

12  consideration in the event this case does proceed

13  to a second phase.  And a juror should not

14  automatically favor imposition of one over the

15  other.

16         Let me caution you once again that

17  neither this preliminary instruction or the

18  procedure in a capital case, nor the questions of

19  the Court or counsel regarding your views on

20  capital punishment has any bearing upon the

21  ultimate question of the guilt or innocence of

22  Donna Roberts.  She's presumed innocent.  And you

514

1   must test the evidence presented by the State in

2   this case as you would in any other case, to make

3   that determination.

4           Are either of you planning any vacations?

5   This case will take place, various portions of it,

6   during the next month or so. And that doesn't mean

7   you are going to be here all that time. The next

8   couple of weeks will be taken up by having four or

9   five people each morning and afternoon come in out

10  of the entire Jury pool. We go through a process

11  primarily to see if the person is able to sit on a

12  Jury. That usually takes a week and a half to two

13  weeks. We'll be going for 36 people.

14          MR. BAILEY: I think we need 32 plus

15  two to be safe. I think we have agreed on 34.

16          MR. JUHASZ: With the challenges, we

17  need 32 and with two more it would be safe.

18          THE COURT: After we have a pool of

19  32 people from that point, the trial proceedings,

20  like an ordinary case where we bring all of that

21  pool of people in. We put the first 12 in the box

22  by their numbers and then we go through the

515

1    ordinary Voir Dire, asking questions about this,

2    that and another.

3            The question that you have to answer

4    today is do you have anything in the future that

5    you know about that would interfere with your being

6    able to participate in this process.  Vacations,

7    medical problems, children, work schedules?  Are

8    you self employed?  Any reason that you could not

9    sit through this trial and not have some outside

10   influence on your mind?  Neither of you have any

11   problems with that?

12           MS. RANKIN:  I don't.

13           MS. KAY:  I don't.

14           THE COURT:  Yesterday we went

15   through 80 people and there was every reason under

16   the sun that people can't be here and most of them

17   are legitimate, I'm sure.  Mr. Bailey?

18           MR. BAILEY:  There's a questionnaire

19   that they are going to have to pick up and fill

20   out.

21           THE COURT:  Do you have any

22   questions you want to ask?

516

1           MR. BAILEY:  Not at this time.

2           MR. JUHASZ:  No.

3           THE COURT:  By the way, this is

4    Mr. Ken Bailey.  He's our Prosecutor and Attorney

5    on this matter.  This is John Juhasz, the Defense

6    Counsel.  There's another Attorney, Defense

7    Attorney by the name of Jerry Ingram, that will be

8    with Mr. Juhasz.  Two attorneys are required to

9    represent a Defendant on a case of this nature.

10   They have to be what the State refers to as death

11   qualified.  They have to take special training and

12   to be certified by the Ohio State Supreme Court

13   before they are permitted to defend a person in a

14   case of this magnitude.

15           Mr. Bailey is a Prosecutor of many years

16   training, and with him will be Attorney Chris

17   Becker, who is also with the Prosecutor's Office.

18   All of these gentlemen are very well qualified to

19   handle a matter of this nature.  In fact, they keep

20   the Judge hopping to keep up with them sometimes.

21           We're going to release you at this time.

22   I would ask you to stop downstairs and see Connie,

517

1   very nice lady.  If you have any problems during

2   the trial, talk to Connie.  This is Mary Ann Mills,

3   our Court Reporter.  Talk to Mary Ann, she's always

4   got an open ear, and Laurie Brown is our bailiff.

5   She's not in here right now.  If you have any

6   problems, address them.  There are two forms you

7   are to pick out down there to fill out and bring

8   back with you.  You should call that number that

9   was given to you this evening after 4:30.  You will

10  be on panel S.  So when you call in, you listen for

11  that instruction.  Is there anything else?

12              MR. JUHASZ:  The only thing I can

13  think of is the standard admonition concerning

14  information about the case.

15              THE COURT:  Very important.  I place

16  you under the admonition at this point that you are

17  not to discuss anything about this case with

18  anyone.  Allow no one to talk with you.  And it is

19  very important that you not read anything in the

20  newspapers or watch anything on T.V.

21              This type of case always engenders a lot

22  of publicity.  And I like to condemn the

1  newspapers, but I have no right to do that.  They

2  are doing a job and a very necessary job.  But it

3  can become very detrimental to seeing that a fair

4  trial is allowed to occur.  Not always on the part

5  of the Defense.  Cases where the State doesn't have

6  a fair trial, because of adverse publicity of one

7  sort or another, although it usually works against

8  the Defendant.  And you will be asked about whether

9  you have read anything about this and most of the

10  people that are on this Jury panel, I'm sure have

11  read something or heard something about it.  It has

12  been around for awhile, and has gotten a lot of

13  publicity, and the point is that a person should

14  not be tried in the newspapers.  There's no way to

15  test the facts that are presented.  The case has to

16  be decided, if it is going to be done fairly, on

17  the evidence that is received in this Courtroom.

18  If we have jurors who, when they get back in that

19  Jury room, start saying things like, "Well, I read

20  in the paper and that doesn't agree with -- I

21  believe the paper."  Somebody isn't going to get a

22  fair trial.  You have to make your decision based

519

1    on the evidence you hear in this Courtroom.  I feel

2    comfortable that most people are able to do that,

3    but I would caution you to not find out anything

4    more about this case.

5            You will be given everything necessary at

6    the proper time by way of evidence.  That is the

7    only thing that we all try to do here is give both

8    sides a fair trial.  The State as well as the

9    Defendant is entitled to a fair trial, but the

10   Defendant is the one that we most ordinarily think

11   of as not getting a fair trial or getting a fair

12   trial, but it works both ways.

13           Laurie, would you give these ladies the

14   oath?

15               THE BAILIFF:  Do each of you swear

16   to truthfully answer the questions put to you by

17   this Court and by Counsel of record in this case,

18   acting upon your qualifications to act as jurors.

19               MS. RANKIN:  I do.

20               MS. KAY:  I do.

21               THE COURT:  Do you have any

22   questions, ladies?

520

1          MS. KAY: We filled out a

2     questionnaire when we came in. Do these gentlemen

3     get that?

4          THE COURT: Yes. And there's

5     another form that we want you to fill out. The

6     reason I stress that point so much is we have had a

7     couple of cases where the whole matter has gotten

8     sidetracked because of the jurors not following

9     that instruction. We had one case that in fact,

10    Mr. Juhasz was on it, we ended up going to

11    Ashtabula County. Had to have a change of venue,

12    and part of the reason for that was the misconduct

13    of some jurors. I gave the instruction a couple of

14    times and somebody, there were several of them

15    sitting out here waiting to go back into the Jury

16    room so we could question them further. They are

17    talking about the case. It is most important part

18    to not discuss it. When you are with the other

19    jurors during the trial, you go to lunch or

20    something together, it is only natural that you

21    want to talk about what you have heard during the

22    day, but you can't do it. It just can't be done.

521

1    Keep that in mind.  You are released until you are

2    notified by that recording to come back in.  We

3    thank you very much for appearing also.

4    (Jurors Ms. Rankin and Ms. Kay excused.)

5                    THE COURT:  Do we have any loose

6    ends before we start tomorrow?

7                    MR. JUHASZ:  I am waiting until now,

8    although we discussed in-chambers that we would do

9    this for purposes of this limited discussion, I

10   would waive the appearance of the Defendant, and

11   also I spoke with Mr. Ingram and Mr. Bailey this

12   morning.  Mr. Ingram was on his way here, but

13   couldn't be here by the time we wanted to start to

14   avoid further inconveniencing these jurors, so I

15   would ask that his presence likewise be waived.

16                    THE COURT:  I appreciate that.

17   (End of hearing at 10:50 A.M.)

18

19

20

21

22

522

## REPORTER'S CERTIFICATE

I do hereby certify that the above and foregoing is a true and correct transcript of the proceedings had in the within hearing as shown by stenotype notes written by me in the presence of the witnesses at the time of the hearing.

*Mary Ann Mills*
MARY ANN MILLS, R.P.R.
Official Court Reporter
Trumbull County, Ohio

523

```
1              IN THE COURT OF COMMON PLEAS
                     TRUMBULL COUNTY, OHIO
2            TRIAL COURT CASE NO. 01-CR-793
             SUPREME COURT OF OHIO CASE NO. 03-1441
3

4    STATE OF OHIO         )          VOLUME III
                           )
5              Plaintiff   )
                           )     MOTION FOR CHANGE OF VENUE
6    -vs-                  )
                           )        INDIVIDUAL VOIR DIRE
7    DONNA M. ROBERTS      )
                           )
8              Defendant   )

9

10        BE IT REMEMBERED, that on Thursday, April 10,

11   2003, and Friday, April 11, 2003, these proceedings

     came on to be heard before one of the Judges of this
12
     Court, John M. Stuard, in Courtroom No. 2, on High
13
     Street, Warren, Ohio, before the case heretofore
14
     filed herein.
15

16

17

18
     Mary Ann Mills, RPR
19   Official Court Reporter
     Trumbull County, Ohio
20

21

22
```

136

524

1

A P P E A R A N C E S

2

3

On Behalf of the State of Ohio:
4       Dennis Watkins, Prosecuting Attorney
        Charles L. Morrow, Ass't. Prosecuting Attorney
5       Christopher D. Becker, Ass't. Prosecuting Attorney
        Kenneth N. Bailey, Ass't. Prosecuting Attorney
6       160 High Street, N.W.
        Warren, OH 44481
7

On Behalf of the Defendant, Nathaniel Jackson:
8       Anthony V. Consoldane, Attorney at Law
        James F. Lewis, Attorney at Law
9       State of Ohio Public Defendant's Office
        328 Mahoning Avenue, N.W.
10      Warren, OH 44481

11  On Behalf of the Defendant, Donna M. Roberts:
        John B. Juhasz, Attorney at Law
12      J. Gerald Ingram, Attorney at Law
        7330 Market Street
13      Youngstown, OH 44512

14  On Behalf of The Vindicator Printing Co.
        Ann Millette, Attorney at Law
15      3200 National City Center
        1900 East Ninth Street
16      Cleveland, OH 44114

17  On Behalf of WFMJ Television, Inc.:
        Stephen T. Bolton, Attorney at Law
18      201 E. Commerce Street, Atrium Level Two
        Youngstown, Oh 44503

19

20

21

22

1

<u>I N D E X</u>

2

3

<u>VOLUME III</u>:

4

(Thursday, April 10, 2003 & Friday,

5　April 11, 2003)

6　Defendant's Motion for Change of Venue　　525

7　Individual Voir Dire:
　　W. Jean Rowley　　　　　　　　　　　534
8　　Tilghman Gray　　　　　　　　　　　593
　　Richard Caraway　　　　　　　　　　686

9

10

11

12

13

14

15

16

17

18

19

20

21

22

525

1   <u>Thursday, April 10, 2003; In Open Court at 1:20 p.m.:</u>

2   (No morning session)

3   <u>Defendant's Motion for Change of Venue:</u>

4            THE COURT:  We're ready to begin

5   with the first of these individual Voir Dire of

6   prospective jurors.  Before we do that, I think we

7   should address the Defendant's motion for change of

8   venue.  I think the request was made by the Defense

9   prior to actually starting the Jury selection.  I

10  have no problem with allowing a closed hearing.  I

11  think it would be appropriate.  The thing that I

12  would point out, however, is that we have two

13  approaches to determining the answer to that

14  question.  The first is the one set forth quite

15  nicely in Defendant's brief, wherein they have

16  methodically laid out the particulars of this case

17  with an overlay of other cases of similar

18  situations or what they allege to be similar

19  situations.

20           It appears to me that the Acid test is to

21  question the prospective jurors, and although that

22  I have to go on really is my personal experience in

526

1   other cases, which quite frankly is rather limited,

2   only had four or five of these.  But in one of

3   them, particularly, and it started to raise its

4   head in the other and then it seemed to go away,

5   but by questioning these people individually, and

6   that is the whole purpose for it, you have an

7   opportunity to really delve into such areas.  And I

8   find that most people are embarrassingly honest.

9   The fear is always that you are going to have

10  people that get up here and don't tell you exactly

11  what they think or what they remember or whatever,

12  and I don't think that the majority of people do

13  that.  I think people take their Jury duty very

14  seriously and they honestly try to answer the

15  questions the way that they think.

16          Now by saying that, if you want a closed

17  hearing to present the one phase of your argument,

18  you are entitled to that, I'll not deny that.  I'm

19  saying that I think it is more appropriate to go

20  through several of these people to find out whether

21  or not you have any chance of picking a fair Jury

22  here.  I quite truthfully think that you do.  And

527

1  let me state on the record my reasons for that.

2          Twenty years ago, any murder case in this

3  County would have had people you never see in the

4  Courthouse here watching it every day, like going

5  to the theater.  Today you have very few people

6  that come in that aren't directly associated with

7  any murder case, even a capital case, we have a lot

8  of those, and people read about them any more in

9  the paper, not only in our County, but in the

10  adjoining County, which has a much higher murder

11  rate, Mahoning County, that the bloom is off the

12  flower.  Everything runs together.  If you talk to

13  people that have done this, they have a hard time

14  keeping track of which murder you are talking

15  about.

16          Now I think arguably in this particular

17  case, primarily based on the fact that we had a

18  prior codefendant that was tried, that case drew

19  its ordinary coverage.  It may be because of that

20  fact alone that this is a different situation, but

21  I don't know how that is a provable situation

22  unless and until we engage in some conversation

528

1    with these folks to determine that.  On the basis

2    of the brief that you put forth, I think that any

3    Judge sitting and reading this could go either way

4    on it.  I could say, "Yes, there's been an undue

5    amount of publicity," or I could say, "No, I don't

6    think that is the case."

7          I think the real test comes from an

8    attempt to question some of these people, and I

9    think before we spend more than a couple of days,

10   you are going to find out very clearly whether this

11   is an unusual case that sticks in the mind of the

12   public.  What I'm asking for are your thoughts on

13   the matter.  Both sides.

14               MR. JUHASZ:  Judge, it is obvious

15   that you have spent some time going over the motion

16   for change of venue, including Exhibits.  I'm not

17   going to reiterate all of that.  I am only going to

18   supplement to this extent and degree.  And probably

19   some of my colleagues will chastise me for making

20   this argument, but it is essentially an argument

21   about Federalism.  And Federalism these days is

22   like the weather, that people talk about it and

529

1    nobody does anything about it.

2         The reason I point that out is because I

3    quite agree with you that a Trial Judge in your

4    particular situation, can look at cases like

5    Shephard vs. Maxwell and Irvin vs. Dowd; and look

6    at the State Court cases that say, "Well, you

7    should try to pick a Jury before you go to the

8    inconvenience and expense of just automatically

9    changing a case to another County."

10        My only point that I would like to make

11    is that in this particular case, I think the number

12    of newspaper articles and as the Court pointed out

13    the fact that there was a prior trial, makes this a

14    case that there has been a saturating amount of

15    publicity.  I think we noted some 67 articles and

16    attached as Exhibits.  The Federalism point is that

17    Shephard against Maxwell is a 14th Amendment case,

18    States are of course under the 1983 decision in

19    Michigan against Long, the Supreme Court made it

20    quite clear when you construe your State

21    Constitution if you want to do them in a way that

22    varies with the Federal Constitution, that is all

530

1    right with the United States Supreme Court, as long

2    as you don't railroad the guarantees that are

3    provided in the Federal Constitution. For purposes

4    of this argument, it seems to me that the Supreme

5    Court's construction of the due process clause in

6    Shephard against Maxwell, which says that when

7    there's this kind of publicity, the due process

8    clause says don't even take a chance, be safe, and

9    simply transfer the case out of the community. And

10   so that is the only argument that I want to make.

11   Thank you.

12              THE COURT:  Mr. Bailey?

13              MR. BAILEY:  May it please the

14   Court, Counsel for the Defense, I think the best

15   path to follow would be to Voir Dire the jurors on

16   the issue of pre-trial publicity. We're doing it

17   individually. There would be an opportunity to see

18   exactly how much knowledge they have of the prior

19   case and about this case, in particular. And

20   whether they formed opinions. And the key test is

21   whether they are able to set aside their prior

22   knowledge and any opinions that they have formed,

531

1    and make a decision basically on a clean slate in

2    here.

3              Because as a practical matter, because we

4    live in modern times, people have access to the

5    Internet that they didn't have 20 years ago or back

6    in the fifties, when the Shephard case arose.  I

7    remember delivering the Cleveland Press with the

8    headlines and the editorials blaring that there was

9    a killer on the street and how come he wasn't

10   arrested and in custody.  It is a totally different

11   situation today.  People, unless they are ostriches

12   with their heads buried in the sand, they look at

13   the Internet.  They get local news and National

14   news.  They get newspapers, T.V. and radio, too,

15   and they talk to other people in the community.  So

16   it is pretty hard today to find people who really

17   have no knowledge whatsoever about a case,

18   especially a high publicity case.

19             And before we jump to the time and undue

20   expense of changing venue, I think that we should

21   at least take the opportunity here to see how these

22   people have been affected and whether they are able

532

1   to set aside anything that they have read, any

2   opinions that they may have formed, and be able to

3   determine this particular case fairly and

4   impartially, and I think we're going to find that

5   we probably will be able to impanel a Jury.

6           THE COURT:  For the record, the

7   Court at this point in time is taking -- there's

8   been no one in the Courtroom, so we have in affect

9   had a closed hearing on the issue of venue.  No one

10  other than the necessary parties.  I am taking that

11  motion under advisement, and I'm going to request

12  that we go forward with some of the Voir Dire, and

13  I think that the responses that we get could work

14  both ways in my eventual decision on this, of

15  course.  It is on that first layer, that is the

16  legal argument on the facts that already exist,

17  rather than just on what we're about to go through.

18  Does that make any sense?

19          MR. JUHASZ:  Yes, Sir.

20          MR. INGRAM:  This is on an entirely

21  different thing.  I noticed when I walked out in

22  the hallway that there are three jurors sitting on

533

1   the bench right over here and I'm assuming that the

2   three individuals are Jurors Rowley, Gray and

3   Caraway.  I would simply respectfully submit that

4   since Miss Rowley will be a while, that the other

5   two might be far more comfortable sitting in the

6   Jury room.

7                    THE COURT:  That is a good idea.

8   Any objection to that?

9                    MR. BAILEY:  No objection.

10                   MR. JUHASZ:  One more thing for the

11  record.  We filed today and I delivered to the

12  Court and Mr. Bailey a Defendant's submission for

13  preliminary instruction except for a couple of

14  typo's, that is literally the same thing that the

15  parties have agreed to give the prospective jurors,

16  so I would like the record to reflect that although

17  it is captioned as the Defendant's submission for

18  purposes of the filings, it is in essence, the

19  joint agreement of the parties that that

20  preliminary instruction be something that each of

21  the jurors will read prior to coming in here for

22  individual Voir Dire.  It being our hope that by

534

1  giving them sort of a primer on the death penalty,

2  that we can spend less time teaching them about the

3  death penalty and spending more time asking about

4  their attitude on it.  I believe I have accurately

5  stated our agreement on how to handle that.

6            MR. BAILEY:  Right.  I made six

7  copies for the Jury Commissioner, because I

8  understand we're bringing in six at a time.  We

9  could have one of those also marked as Court's

10  Exhibit for Appellate purposes.

11           THE COURT:  There's a copy then on

12  file.  I usually ask them if they have read it

13  before we start.

14  (Juror No. 4, W. Jean Rowley entered the Courtroom.)

15           THE COURT:  Ma'am, you probably have

16  an idea by this time.  You read that information

17  sheet that was given to you?

18           MS. ROWLEY:  Yes.

19           THE COURT:  You are called here as a

20  prospective juror, and the purpose of this inquiry

21  today is to find out your thoughts and feelings in

22  regard to sitting on such a Jury, and whether you

535

 1   would be able to do what the law requires that each

 2   of the jurors do.

 3          As you know by now, this case will go

 4   forward on trial as any ordinary trial, to

 5   determine whether or not the Defendant is guilty or

 6   not guilty of the charges that have been filed

 7   against her.  One of those is aggravated murder

 8   with aggravating circumstances.  And no one at this

 9   point has any idea what the result of that will be.

10          If the Jury should return a verdict of

11   not guilty, then that is the end of the trial.  If

12   the Jury should make the opposite finding, however,

13   then that same Jury will be brought back.  That is

14   a very -- usually one day affair, but just as

15   important of course, and they are called upon then

16   to listen to the aggravating circumstances as put

17   forth by the Prosecution.  And the Prosecution has

18   to prove beyond a reasonable doubt, which is the

19   standard that is used throughout this trial, that

20   those aggravating circumstances outweigh any

21   mitigating factors.  The mitigating factors come in

22   through anything that the Defense would want to

536

1   present, and mitigating factors would be reasons

2   why the death penalty should not be imposed.  And

3   the Jury is called upon to make that decision.  Did

4   the Prosecution carry the burden of proof beyond a

5   reasonable doubt to outweigh any mitigating

6   factors?

7           Now, all of the folks you were in that

8   room with have their own idea about the law.  And

9   most people carry some feelings about the question

10  of the death penalty.  Probably some in that room

11  have never thought about it before.  It would be

12  the first time they would actually be required to

13  think it through.  Some of us could never, under

14  any circumstances, engage in any activity where we

15  had to make such a decision.  Others of us feel

16  just as firmly in our hearts that if a person takes

17  another person's life, they should be put to death.

18          Well, neither person with those extreme

19  positions, if I can call them that, could very well

20  sit on a Jury of this type because each of the

21  jurors are going to have to follow the law and

22  those two positions I have stated is not the law.

537

1    But the law requires this two phase inquiry.

2              At the conclusion, if the Jury decides

3    that the Prosecution has proven that the

4    aggravating circumstances outweigh the mitigating

5    factors beyond a reasonable doubt, then that Jury

6    has to consider the possibility of imposing the

7    death penalty.  They have other choices.  But the

8    law says they have to consider and if appropriate

9    under the law, which you will be given at the

10   appropriate time to be able to make that decision

11   to impose the death penalty.

12             That is what these folks are primarily

13   going to make inquiry about.  You should freely

14   state your opinion.  This is the time to do it.

15   And anything that you state as your opinion, we'll

16   respect.  You are entitled to your opinion on

17   everything.  And being a school teacher, I imagine

18   you have an opinion on most things.  The other

19   issue that they will inquire into is that of

20   whether or not this case could be fairly tried in

21   this County.  Both sides have a right to have a

22   fair trial.

538

1         And particularly the Defendant.  The

2    Defendant is here with the possibility that this

3    Jury could decide that she will forfeit her life.

4    The worst thing that could happen would be if, in

5    starting this trial, we have a Jury that is not

6    able to assure her and the State a fair trial.

7    This case has to be decided on the evidence given

8    to them in this Courtroom, and the Jury then has to

9    accept the law as given by the Court, even though

10   they may not agree with the law.  They have to

11   accept it and to apply it.

12        This case has had some publicity.  All

13   cases of this nature have publicity.  It is a

14   question whether or not the publicity that has

15   occurred is such that it has tainted the Jury pool

16   to the point where they can not in good conscience

17   say, "I can be unbiased and unprejudiced and set

18   aside anything that I did hear about this."  You

19   have the picture, right?

20              MS. ROWLEY:  Yes.

21              THE COURT:  Fair enough.

22   Mr. Bailey, you may inquire.

539

```
 1    EXAMINATION BY MR. BAILEY OF MS. ROWLEY:

 2    Q.    Mrs. Rowley, good afternoon.  My name is Ken

 3          Bailey.  You saw me in Court the other

 4          day.  This is Chris Becker.  I told you

 5          he would be here and he is.  We're going

 6          to ask you some questions about these

 7          proceedings.  First, you indicated on

 8          your questionnaire that you had read

 9          about this case, you gained some

10          information from the local paper, the

11          Tribune, is that right?

12    A.    Yes.

13    Q.    And I take it you read it fairly extensively

14          daily?

15    A.    I always scan.  I don't always read the

16          details.

17    Q.    How close attention did you pay to this?

18    A.    I know the general circumstances.  I don't

19          think I know any details really.

20    Q.    Now you understand, because we live in modern

21          times, folks are exposed to T.V. and

22          radio and the newspapers, the Internet,
```

540

1          talking to folks in the community,

2          talking to your husband or family

3          members, or other people regarding things

4          that you read in the paper.  Since you

5          filled out the questionnaire, has

6          anything come to mind about whether you

7          had any discussions about this?

8    A.   We had some discussion, my husband and I, but

9          not in our family and not in any detail,

10         other than to mention that we knew that

11         it had happened.  That was about it.

12   Q.   And because publicity is so persuasive these

13         days, the important thing isn't about

14         whether you read about the case or even

15         if you formed an opinion, the key thing

16         is, can you set aside what you have heard

17         before or any opinions that you might

18         have formed before, and try this case,

19         with a clean slate?

20   A.   Since I have never done it, I don't know for

21         sure.  I would hope that I could try to

22         do it.

541

1   Q.   You are a retired teacher?

2   A.   Yes.

3   Q.   What did you teach?

4   A.   Business education and I was a school

5        counselor for 12 years.

6   Q.   And as a teacher, you would teach students,

7        they would come into your class, the

8        chalkboard, a clean slate, so to speak,

9        and they would come in without any

10       knowledge, where sometimes they had some

11       knowledge and you would correct what they

12       learned before.  And I take it you are

13       aware that the newspaper always doesn't

14       get things right; is that right?

15  A.   Yes.

16  Q.   And there's a reason for that.  As you look

17       around the Courtroom today, there's no

18       news media here.  I'm sure maybe tonight

19       there will be some type of story in the

20       newspaper or on T.V., and it is going to

21       be based on a reporter coming in for

22       maybe two or three minutes, getting an

542

```
 1                impression of what is happening at that

 2                time and then doing some type of feature

 3                on the trial.  It is important that you

 4                don't pay any more attention, that you

 5                not read the papers or listen to the

 6                T.V., if it comes on, regarding this

 7                particular case while you are on this

 8                particular Jury.  You can do that?

 9   A.   Yes.

10   Q.   When a reporter does a story based on what

11                happens in three minutes, you realize

12                that they miss everything that happened

13                before they came in here and everything

14                that happens after they leave here,

15                right?

16   A.   Yes.

17   Q.   So their impression could be totally different

18                from what actually occurs in the

19                Courtroom.  You would agree with that?

20   A.   Yes.

21   Q.   And if you were to be picked and you served on

22                this Jury, and then let's say somebody
```

543

```
 1            would save the newspapers for you and you

 2            read them afterwards, you would look at

 3            them after the trial was over and say, "I

 4            sat in that trial and what is in this

 5            paper, it is totally wrong."  The

 6            impression you get is it is totally

 7            different.  So, it is very important that

 8            you make a decision based only on what

 9            you hear here in the Courtroom, from the

10            witnesses, that may testify, and from the

11            instructions given to you by the Judge.

12            It is an intellectual exercise basically,

13            that we're asking you to do.  Something

14            that you do in the classroom.  You are

15            used to doing that?

16   A.   Yes.

17   Q.   It is not a strange experience that we're

18            asking you to come to grips with here.

19            You think you could do that?

20   A.   Yes.

21   Q.   And you think, can you be fair and impartial

22            to both sides in this case, give this
```

544

```
 1              Defendant a fair trial?
 2    A.   I think so, since I have never done it, I
 3              don't know for sure whether something
 4              would influence me that I haven't even
 5              thought about at this point.
 6    Q.   At this point, there's nothing that you are
 7              aware of that would make you biased
 8              against either side, right?
 9    A.   No.
10    Q.   And you think you can give both sides a fair
11              shake in this trial?
12    A.   I think so.
13    Q.   Now, let's go to this issue of the death
14              penalty as a possible punishment.  I take
15              it, looking at your questionnaire, that
16              you are in favor of the death penalty for
17              certain types of cases, in cases of
18              homicide?
19    A.   I think I am, yes.
20    Q.   And you have held this view for awhile?
21    A.   Yes.
22    Q.   Has it become stronger over the years?
```

545

```
 1    A.    No.

 2    Q.    Or weaker or stayed about the same?

 3    A.    About the same.

 4    Q.    And you believe in the death penalty being

 5          appropriate for some crimes, is that

 6          based upon a personal, religious, moral

 7          or ethical belief or some combination

 8          thereof?

 9    A.    Probably a combination.

10    Q.    And you understand that this case could be

11          tried in two different phases.  It is

12          like two separate trials.  The first part

13          deals with the issue of guilt or

14          non-guilt.  And if the State convinces

15          you in the first phase that the Defendant

16          is guilty of a crime called aggravated

17          murder and one or more specifications of

18          aggravating circumstances, then we would

19          then move onto a second phase that would

20          deal with the issue of punishment.  And

21          in a second phase or second trial, the

22          issue there would be what is the
```

546

```
 1              appropriate punishment for this

 2              Defendant, for this crime.  You

 3              understand the death penalty is not an

 4              automatic punishment?

 5   A.   Yes.

 6   Q.   Because in the first phase, the issue of

 7              punishment would never come up, right,

 8              and because it is not appropriate in the

 9              first phase, you wouldn't hear any

10              testimony or evidence dealing with this

11              issue of punishment.  The only question

12              in the first phase deals with guilt or

13              non-guilt.  You agree with that?

14   A.   Yes.

15   Q.   Now, let's say we get to a second phase.  The

16              State has the burden of proof in both

17              phases, and let's say we convince you

18              beyond a reasonable doubt that there are

19              aggravating circumstances, and that the

20              aggravating circumstances beyond a

21              reasonable doubt, outweigh any mitigating

22              factors presented.  We don't know what
```

547

```
 1              these mitigating factors are at this
 2              point, because it is not pertinent at
 3              this point, but mitigating factors are
 4              things that would work to a Defendant's
 5              benefit, and work against returning a
 6              death penalty verdict.
 7   A.   Okay.
 8   Q.   If the State convinces you beyond a reasonable
 9              doubt, so that you are convinced to a
10              moral certainty that the aggravating
11              circumstances that the State presents,
12              would outweigh these mitigating factors
13              beyond a reasonable doubt, would you be
14              able to return the death penalty verdict
15              in that case?
16   A.   I don't know.  It would be very difficult.
17   Q.   If the Judge gives you instructions of law,
18              would you be able to follow those
19              instructions of law?
20   A.   I think I could.
21   Q.   That is all we can ask people to do.  You say
22              it would be very difficult, and we would
```

548

1            expect nothing less, that it would be a

2            difficult decision because the death

3            penalty is not applied in every case, it

4            is not applied lightly.  Under our system

5            of justice, all we can ask is that people

6            who come in to serve as jurors, pay close

7            attention and render a decision based on

8            the facts that are presented, the

9            evidence that is presented, and to follow

10           the law given to you by the Court.  And

11           it is a new experience for you.  It is

12           not an easy experience, but you

13           understand that to make our system work,

14           we have certain obligations of

15           citizenship.  You agree with that?

16   A.   Right.

17   Q.   As citizens, one of our obligations is to go

18           out and vote when the time comes?

19   A.   Yes.

20   Q.   Another obligation may be to serve in the

21           military.  We have young men and women

22           now, who are overseas fulfilling their

549

```
 1            obligations.  And another obligation as
 2            citizens is to serve as jurors when we're
 3            summoned in, if we're able to.
 4   A.   Yes.
 5   Q.   And I take it, you would be able to do that?
 6   A.   Yes, that's the only reason I'm here is
 7            because I think it is something that has
 8            to be done.  It is not something I want
 9            to do.
10   Q.   It should be a very interesting experience,
11            and you have served your community as a
12            teacher before.  This is another
13            opportunity to serve your community to
14            make sure the system works.  That is what
15            our system is about, people taking part
16            in our system of Government.  There's one
17            other thing that I want to get into.  You
18            understand that the Defendant here is not
19            charged as the triggerman, as the
20            principal offender, but rather is what we
21            call an accomplicer, somebody who
22            purposely solicits or procures another
```

550

1      person or aids and abets another person,

2      helps another person.  The Judge will

3      instruct you as to the meaning of those

4      terms at a later time, but she's charged

5      with helping another person plan this

6      particular killing, and doing it with

7      prior calculation and design, and it was

8      done on purpose.  Let me ask you.  At

9      this point, this is the only chance we

10     get to talk together until this case is

11     all over.  If there are two phases, we

12     can't talk to you in between.  If you

13     have questions, you have to address it to

14     the bailiff, or to the Court, and we're

15     not being anti-social or anything, it is

16     just by our rules of conduct.  We're not

17     allowed to have any communication with

18     you outside of the Courtroom here.  Do

19     you have any questions that you think

20     that you would like to ask that you think

21     we could answer at this point that

22     pertain to what we're doing here?

551

1   A.   Not that I can think of.

2                MR. BAILEY:  Thank you very much for

3   your candid answer.  Defense counsel will now get

4   an opportunity to ask you some questions.

5   EXAMINATION BY MR. INGRAM OF MS. ROWLEY:

6   Q.   Good morning, Ma'am.  How are you finding your

7         Jury experience thus far?

8   A.   I don't really know how to answer.  I had no

9         expectations one way or the other,

10        because I have never done it before.  I

11        had done it like a County Court thing one

12        time, and as I indicated, it was settled

13        out of Court, so we didn't go through all

14        of this information that you have

15        provided for this trial.

16   Q.   My name is Jerry Ingram.  John Juhasz and I

17        share the responsibility of representing

18        Donna Roberts, who is on trial for her

19        life, and obviously, we take our

20        responsibilities seriously.  We think we

21        should take reasonable precaution in

22        selecting a fair minded Jury, the same

552

```
 1            type of Jury that you or I would want if
 2            we were on trial.  Does that sound fair
 3            enough to you?
 4   A.   Yes.
 5   Q.   This is the only opportunity we'll have to get
 6            to know you to determine whether you are
 7            comfortable sitting on this panel.  And
 8            this the only opportunity that you will
 9            have to talk directly to the lawyers.
10            So, if during my conversation with you,
11            there's anything that pops into your mind
12            that you would like to discuss with me,
13            that you would like to ask me, that you
14            would like to volunteer, please feel free
15            to do so.
16   A.   Okay.
17   Q.   This is alot like a job interview, except when
18            you go to a job interview, you select the
19            job you get to be interviewed for.  Here
20            we selected you and we're interviewing
21            you today for the most serious job there
22            is, the job of finding the truth and
```

553

1              determining the fate of another person.

2              Not everyone is going to be up to that

3              responsibility.  And some people have

4              already told us, for one reason or

5              another, that they would prefer not to

6              assume that responsibility.  How do you

7              feel about being asked to assume this

8              responsibility?

9    A.    As I indicated on the questionnaire, if I had

10             a choice, I would choose not to do it,

11             but if it is a responsibility that has to

12             be done, I would try to do it.

13   Q.    Donna Roberts and Robert Fingerhut were

14             divorced, but continued working together

15             at the Greyhound bus station in

16             Youngstown and Warren and living together

17             in Howland Township.  In a nutshell, this

18             case boils down to the Government's

19             allegation that Donna Roberts plotted or

20             conspired with a male companion, Nate

21             Jackson, to cause the death of Robert

22             Fingerhut.  You understand that this

554

```
 1              trial is only about one person and one

 2              person only, and that is Donna Roberts?

 3   A.    Yes.

 4   Q.    Now throughout the course of these proceedings

 5              you will hear the name, Nate Jackson, and

 6              it won't take long for you to conclude

 7              that Nate Jackson did what the State says

 8              he did.  But that is not the question you

 9              are here to resolve.  The question you

10              are here to resolve is, did Donna Roberts

11              help him do it.  Can you keep this case

12              separate from any other, anything that

13              you may have read, seen or heard, about

14              Mr. Jackson?

15   A.    I think so.  I didn't really pay that much

16              attention.  I knew the circumstances, but

17              did not know details, didn't really want

18              to know details.

19   Q.    We'll get back to that in a minute, if that is

20              okay with you.  In support of the

21              allegations that Donna aided or

22              participated in the death of Robert
```

555

1          Fingerhut, the State will present various

2          letters and recorded conversations

3          between Donna and Nate.  Some of these

4          letters and conversations are sexually

5          explicit.  And to be downright candid

6          with you, they might be rather offensive.

7          But you understand that the allegation

8          here is murder, not loose morality.  You

9          understand that?

10   A.   Yes.

11   Q.   And no matter how shocked or offended you may

12          be by the sexual nature of some of the

13          State's evidence, your job responsibility

14          as a trial juror will be to test that

15          evidence, to see if it ties Donna to this

16          alleged crime.  You think you are up to

17          that?

18   A.   I think so.

19   Q.   I want you to search your own mind for a

20          minute, and do you think that sexually

21          explicit evidence will cause you an undue

22          problem during the course of this trial?

558

1    A.   That is what I understood from the paper.

2    Q.   Can you recall with any more detail what you

3         may have read or heard about these

4         letters?

5    A.   No.  As I said, I don't pay attention to a lot

6         of those details because they are

7         offensive to me.  I skip over them.

8    Q.   Your daughter Susan is a lawyer?

9    A.   Yes.

10   Q.   By the way, you are to be complemented on the

11        job you did with raising your children.

12        You obviously were great parents.  All

13        four of them have done very well.

14   A.   Thank you.

15   Q.   Since you got your summons to appear for Jury

16        duty in this case, did you talk to your

17        daughter about the case at all?

18   A.   I said that I was called for Jury duty.  That

19        is all.

20   Q.   Is she a local lawyer?

21   A.   She's in Wilmington Delaware and at this time,

22        she's not practicing.

559

1    Q.   How about your granddaughter, she's a second

2         year law student?

3    A.   At Case Western Reserve.

4    Q.   Have you discussed your Jury summons with her

5         at all?

6    A.   No.

7    Q.   How does she like Case?

8    A.   She loves it.

9    Q.   In the conversations that you had with your

10        husband about this case, did you express

11        any kind of an opinion about whether

12        Donna was likely involved or not?

13   A.   Not really.  We discussed in general terms

14        that we read it and saw it and wondered

15        what was going on, but really didn't

16        pursue it, because it didn't really

17        affect us in any way.

18   Q.   You did read in the newspaper that Nate

19        Jackson was tried and convicted?

20   A.   Yes.

21   Q.   Does that fact make you believe anything about

22        Donna's involvement?

560

1   A.   Not necessarily, not unless I think I would

2             have to know more about the

3             circumstances.

4   Q.   You and I talked a moment ago about this isn't

5             Nate's trial?

6   A.   Right.

7   Q.   And the issue here is not whether he did

8             anything, we know he did something.  The

9             issue here is whether Donna helped him or

10            not.

11  A.   Yes.

12  Q.   And you will hold the State of Ohio to its

13            burden of proving that beyond a

14            reasonable doubt, if they can?

15  A.   Yes.

16  Q.   Mr. Bailey gave you a bunch of reasons why you

17            are told not to listen to the news or

18            read the newspaper about the case.  Did

19            you see during the O.J. Simpson trial and

20            I hate to go there, but every night there

21            would be a bunch of hot shot lawyers on

22            the T.V. station, and some would be

561

```
 1              Prosecutors and some would be Defense
 2              Attorneys, and they would be putting a
 3              different spin or perspective on the
 4              evidence that had been elicited in Court
 5              that day.
 6    A.   Yes.
 7    Q.   Did you see how that could affect a juror
 8              being exposed?
 9    A.   Certainly.
10    Q.   To those things?
11    A.   Certainly.
12    Q.   It is the same in this case and that is why we
13              ask you to avoid news media coverage.
14              Will you do your best to do that?
15    A.   Yes.
16    Q.   And you do understand the news coverage is
17              brief, designed to sell and sometimes
18              inaccurate?
19    A.   Yes.
20    Q.   You yourself, you have noticed discrepancies
21              in the newspaper, haven't you?
22    A.   Yes.
```

562

1   Q.   If you are selected as a trial juror, you will

2        be told to keep an open mind, that is,

3        not form any impression about the

4        evidence in this case, until the case is

5        over.  Because if you form an early

6        impression, that impression might prevent

7        you from objective listening to the rest

8        of the evidence.  Do you understand what

9        I am getting at there?

10  A.   Yes.

11  Q.   So you really have to do your best to keep an

12       open mind until the case is all the way

13       over with.  Will you do your best to do

14       that?

15  A.   Yes.  I think at times that could be very

16       difficult, too, because I think you don't

17       know for sure how something that is

18       presented is going to relate back to

19       something that you already experienced or

20       read.

21  Q.   That is right.

22  A.   That is tough.

563

```
1   Q.   But that is exactly why we ask you to keep an

2            open mind because you can't know how

3            everything fits together until you have

4            it all and you won't have it all until

5            the end of the case.  Let me put it like

6            this.  The State goes first, because they

7            have the burden of proof.  If you were to

8            decide this case, just after you heard

9            what they had to say, it might prevent

10           you from listening to what you would hear

11           from the Defendant's perspective, if the

12           Defense elected to present evidence.  Do

13           you understand?

14  A.   Yes.

15  Q.   And your family and friends are going to know

16           you are sitting on this Jury.  They are

17           going to know you are here for awhile.

18           And because of your involvement, they are

19           going to follow these proceedings closer

20           than they ordinarily would.  And not that

21           they intended to cause a problem, but

22           naturally, they are going to want to talk
```

564

1          with you about your experience.

2     A.   Probably.  I only have two children around to

3          discuss it.  They are pretty busy and we

4          don't discuss a lot of things outside of

5          our family.

6     Q.   Well, the Judge is going to tell you that you

7          are not allowed to talk about this case

8          with anyone, even your own jurors, until

9          it is over.  You think you could do that?

10    A.   Yes.

11    Q.   We have to talk about penalties.  And that is

12         something that troubles me a little bit.

13         Because I'm standing up here talking to

14         you about penalties, and we don't even

15         know if Donna did anything wrong or not.

16         Seems to me, a whole heck of a lot like

17         putting the cart before the horse.  Does

18         that old adage make sense to you in this

19         perspective?

20    A.   Yes.

21    Q.   You understand that this is potentially and

22         only potentially a two phase process?

565

```
1    A.    Yes.

2    Q.    Like if Donna is found not guilty what would

3          happen here.  We would all pack up our

4          bags and go home, wouldn't we?

5    A.    Yes.

6    Q.    You understand that you may never have to

7          consider the issue of punishment.  So

8          basically, what we're doing and only

9          lawyers can do this, we're standing up

10         here asking you some hard questions about

11         difficult issues that you may never even

12         have to address?

13   A.    Yes.

14   Q.    A capital trial, not necessarily this one, any

15         one, never gets to a second phase unless

16         the State proves beyond the existence of

17         a reasonable doubt the Defendant's guilt

18         on an aggravated murder charge, and

19         additionally, proves beyond a reasonable

20         doubt the Defendant's guilt on a death

21         specification.  You think you understand

22         that?
```

566

1  A.    I think I do.

2  Q.    And it is hard.  I bet you 20, 30 percent of

3        the lawyers don't understand this.  Maybe

4        more.  It is a difficult process.  It

5        certainly is something that you don't

6        think about in your daily lives, nor do

7        you study.  If you go into a second

8        phase, the issue with that second phase

9        is the appropriate penalty.  And the

10       State is interested in knowing if you

11       could fairly consider the death penalty

12       as a sentencing option, if you had to

13       decide on a sentence.  The flip side of

14       that is could you consider one of the

15       life imprisonment penalties as a

16       sentencing option if you ever had to

17       consider penalty?

18 A.    That would probably be an easier decision.

19 Q.    There are three life options.  One is life

20       imprisonment without parole.  And that is

21       permanent.  You do not get out.  You

22       understand that?

567

1   A.   Yes.

2   Q.   And the others are life imprisonment with

3         parole eligibility after serving 30 full

4         years or 25 full years.  And that is day

5         for day, 30 years; day for day 25 years.

6         You got that?

7   A.   Yes.

8   Q.   If you are called upon to decide a sentence,

9         the Jury's decision is not made in a

10        vacuum.  Judge will give you guidelines,

11        and the law allows the Jury to vote for a

12        life sentence if the Jury believes a life

13        sentence is appropriate; and conversely,

14        the law permits the Jury to vote for

15        death if the Jury believes that the death

16        penalty is appropriate.  The most

17        important point for you as a juror to

18        remember is that the law will never

19        require you to vote for a sentence you do

20        not feel is warranted by the evidence.

21        And the Judge will tell you, you have to

22        balance and you read the preliminary

568

```
 1              instructions, and Mr. Bailey talked to
 2              you about aggravating circumstances, bad
 3              things against mitigating circumstances,
 4              positive things that can be said about
 5              Donna Roberts.  You are as a juror, you
 6              are the sole judge of the weight of the
 7              evidence.  So, in weighing that evidence,
 8              the buck stops with you.  And it is up to
 9              you to determine appropriateness.  Do you
10              understand that?
11  A.   Yes.
12  Q.   Have you ever donated time, money, or services
13              to a political campaign or issue?
14  A.   No.
15  Q.   Do you belong to any group or organization
16              which is active in any political matter?
17  A.   No.
18  Q.   You are the secretary for the retired
19              teachers?
20  A.   I was.  I'm not right at the present time.
21  Q.   In the last five years or so, have you signed
22              a petition on any public issue?
```

569

1    A.    No.

2    Q.    Do you belong to or associate with any group

3          which has crime prevention or law

4          enforcement as a goal, like MADD, SADD,

5          Neighborhood Crime Watch?

6    A.    No.

7    Q.    What do you think that we, and by we, I mean

8          society as a whole, can do to reduce the

9          crime problem we're having in this

10         country?

11   A.    I do not know.  I have thought about it.  I

12         don't know.

13   Q.    When you have thought about it, have you come

14         up with any ideas at all?

15   A.    Other than family.

16   Q.    Stronger families?

17   A.    It is about the only solution I can see, and I

18         don't know how you do that, because you

19         surely can't legislate morality or

20         decency or common sense, I guess.

21   Q.    You understand that sympathy has no place in

22         the Courtroom.  The Court will tell you

570

1    the feelings of sympathy should not

2    affect your judgment.  This is a Court of

3    law, not a Court of sympathy.  We ask

4    jurors to do really hard things in this

5    country.  We ask you to set aside a lot

6    of your beliefs and follow the law.  And

7    we ask you to do things that are simply

8    difficult for all of us to do.  And in

9    this case, if you are a juror, some of

10   the testimony and evidence will arouse

11   naturally, the feelings of sympathy.  You

12   may hear testimony that at the time

13   Robert Fingerhut was shot and killed that

14   he was fighting for his life.  I do know

15   that you will see photographs.  Robert

16   was shot in the back of the head at point

17   blank range.  You may see Coroner's

18   photographs; some of those might be

19   enlarged.  What I wanted you to

20   understand about this evidence, is that

21   even though it evokes an emotional

22   response from you, say sympathy or anger,

571

1         you are still going to have to evaluate

2         or test that evidence to determine

3         whether it ties Donna to this offense.

4         Do you understand that?

5  A.  Yes.

6  Q.  And will you do your best to do that?

7  A.  Yes.

8  Q.  You have heard the Judge talk about, and I

9         think in the preliminary instructions he

10        wrote, he wrote about the presumption of

11        innocence.  How do you personally feel

12        about this rule of law which requires

13        that jurors presume the Defendant

14        innocent?

15  A.  I think that is pretty basic to our whole

16        Judicial system, our whole way of life.

17  Q.  That is what makes this country what it is?

18  A.  Yes.

19  Q.  Do you understand that the presumption of

20        innocence remains with Donna until it is

21        removed, if ever, by proof beyond a

22        reasonable doubt?

572

```
 1   A.    Yes.

 2   Q.    It is like a cloak, and that cloak stays with

 3             her until it is taken away from her, if

 4             ever, by proof beyond the existence of a

 5             reasonable doubt.  And I would like to

 6             try and spend a few moments talking to

 7             you about the presumption of innocence,

 8             and what I perceive to be some more human

 9             terms.  Presumption of innocence, that's

10             sort of like legalese.  If one of your

11             four children were accused of some kind

12             of wrongdoing, and you honestly in your

13             heart felt that whichever child it was,

14             did not do it, you would require evidence

15             that the kid did it, before you would be

16             willing to change your mind, wouldn't

17             you?

18   A.    Yes.

19   Q.    Does that sound like the presumption of

20             innocence to you?

21   A.    Yes.

22   Q.    And you understand that that presumption is
```

573

1          basically the same as an honest belief in

2          the innocence of another?

3  A.   Yes.

4  Q.   And if your friend or loved one or one of your

5          children were accused of wrongdoing and

6          evidence was presented to you, you just

7          wouldn't accept it willy nilly, would

8          you?

9  A.   No.

10  Q.   You might look at it with a critical eye, to

11          see if it amounts to what it is supposed

12          to amount to and will you do that in this

13          case?

14  A.   Yes.

15  Q.   Because of the presumption of innocence, the

16          State has the burden of proof.  And as

17          the Judge is going to tell you, the State

18          has the burden of proving each and every

19          essential element of the offenses charged

20          beyond a reasonable doubt.  Essential

21          elements are like necessary ingredients.

22          At the end of the case the Judge is going

574

1    to give the Jury all of the essential

2    elements, the necessary ingredients, and

3    the State of Ohio has to prove each and

4    every one of those essential elements by

5    proof beyond a reasonable doubt or they

6    have not met their burden of proof.  Does

7    that sound right to you?

8 A.  Yes.

9 Q.  It is not two out of three, it is not three

10    out of five.  They have to prove each and

11    every essential element.  Donna doesn't

12    have to prove anything.  The State has

13    levied these accusations and now the

14    State must prove what it alleges.

15    Basically it is time to put up or shut

16    up.  You do understand that Donna is on

17    trial for murder and not for being a

18    woman of loose moral character?

19 A.  Yes.

20 Q.  And while the State may prove that Donna is a

21    loose woman, the State's burden in this

22    case is to prove that Donna intentionally

575

1            participated in the death of Robert

2            Fingerhut.  Do you understand that?

3    A.    Yes.

4    Q.    Will you hold the State to that burden?

5    A.    Yes.

6    Q.    There are two aggravated murder counts.  The

7            first count is purposely with prior

8            calculation and design; that is advance

9            planning.  That's the old premeditation

10           we used to talk about -- causing the

11           death of Robert Fingerhut.  The Judge

12           will give you definitions of all of those

13           things.  But the State has to prove all

14           of those.

15               And there's a second aggravated

16           murder count which is felony murder,

17           which is purposely causing the death of

18           another while committing aggravated

19           burglary or aggravated robbery.  And

20           again, the Judge will define those for

21           you, but the State has to prove each and

22           every one of those.  And each of those

576

| | | |
|---|---|---|
| 1 | | has, each of the aggravated murder counts |
| 2 | | has a death or two death specifications |
| 3 | | attached that the aggravated murder was |
| 4 | | committed during an aggravated robbery or |
| 5 | | aggravated burglary. That is sort of |
| 6 | | hard to understand. You think you have a |
| 7 | | grip on it? |
| 8 | A. | Yes, I think so. |
| 9 | Q. | Now, purpose is an essential element of both |
| 10 | | of these aggravated murder charges. And |
| 11 | | as the Judge will tell you, purpose is |
| 12 | | the same as intent. A person acts |
| 13 | | purposely if it is his or her specific |
| 14 | | intent to cause a specific result. That |
| 15 | | is simple enough, isn't it? Would you |
| 16 | | agree that the facts and circumstances |
| 17 | | surrounding an act can shed light on the |
| 18 | | actor's intent? |
| 19 | A. | I would think so. |
| 20 | Q. | For instance, if you leave a paper trail as |
| 21 | | opposed to covering your tracks, it is |
| 22 | | less likely your objective is unlawful? |

577

1   A.    Yes.

2   Q.    Or if you openly meet in the light of day as

3         opposed to a secret rendezvous under

4         cover of darkness, it is less likely the

5         objective of the meeting is lawful.

6             Count three is aggravated burglary.

7         And aggravated burglary is trespass by

8         stealth, force or deception.  Either

9         snuck in or forced your way in, in an

10        occupied structure, when Robert Fingerhut

11        was present, with purpose to commit any

12        criminal offense.  So there's four here.

13        And trespass the Judge will define that

14        for you, is to enter or remain on the

15        land or premises of another.  That makes

16        sense, doesn't it?

17  A.    Yes.

18  Q.    The trespass is an essential element of

19        aggravated burglary.  Will you hold the

20        State to its burden of proving trespass

21        by proof beyond the existence of a

22        reasonable doubt?

578

1    A.    Yes.

2    Q.    And aggravated burglary is the offense alleged

3          in the first death specification to the

4          two aggravated murder counts.  Remember

5          the two aggravated murder counts had

6          death specifications that the aggravated

7          murders were caused during an aggravated

8          burglary and aggravated robbery.  So

9          aggravated burglary is the first death

10         specification.  Then the last count of

11         the indictment is aggravated robbery,

12         that in committing, attempting to commit

13         or fleeing after committing a theft

14         offense, the perpetrator of that offense,

15         that the person who was committing the

16         offense, had a deadly weapon on his

17         person.  Does that make sense to you,

18         too?

19   A.    Yes.

20   Q.    And a theft offense is necessarily one that

21         involves the taking or an attempt to take

22         the property of another.  That is what a

579

1           theft is about.  Will you hold the State

2           of Ohio to its burden of proving that

3           there was an intended theft offense by

4           proof beyond a reasonable doubt?

5  A.   Yes.

6  Q.   And there are some firearm specifications, the

7           Judge will talk to you about that.

8               Now because the burden of proof is

9           on the State, Donna doesn't have to

10          present evidence.  She doesn't have to

11          testify.  And you already knew that,

12          didn't you?

13  A.   Yes.

14  Q.   If she doesn't testify, the Judge will tell

15          you, you can't hold it against her.  Do

16          you understand that?

17  A.   Yes.

18  Q.   Can you answer, because it makes the Court

19          Reporter's job a little more difficult,

20          if she has to try to indicate on the

21          record that you are nodding yes, instead

22          of answering yes.

580

1   A.   I'm sorry.

2   Q.   That is okay.  But in every day life, whenever

3        you are called upon to resolve a dispute,

4        what is the first thing we say to

5        ourselves, are I want to hear both sides

6        of the story?

7   A.   Yes.

8   Q.   Well, I know that most jurors would actually

9        like to hear what the Defendant has to

10       say.  And that makes sense to all of us,

11       doesn't it?

12  A.   Yes.

13  Q.   Well, sometimes your oath as a juror requires

14       that you do your best to put aside that

15       natural inclination to want to hear both

16       sides.  And if your oath requires you to

17       do that in this case, will you do your

18       best to do that?

19  A.   Yes, I think that will be tough.

20  Q.   Why don't you talk to me about that for a

21       moment?  Why would it be tough.  I think

22       I know.

581

1   A.   Because you have those thoughts in your mind

2          of how you think something ought to be,

3          and if it is not that way, I think it is

4          hard to accept.

5   Q.   Let me see if I understand that correctly and

6          do not let me put words in your mouth.

7          I'm sure you won't. Do not let me put

8          words in your mouth. If I start doing

9          that, stop me, and tell me that I'm

10         wrong. If things don't work out as you

11         expect, then there's questions in your

12         mind -- am I paraphrasing what you just

13         told me?

14  A.   yes.

15  Q.   If you expect Donna to testify and she doesn't

16         testify, that will raise questions in

17         your mind?

18  A.   Right.

19  Q.   In this country, in any criminal proceeding,

20         the Defendant does not have to testify.

21         That is a Constitutional protection

22         designed for all of us, not just for

582

```
 1              Donna Roberts, and not just for someone
 2              in this Courtroom.  So, if you are called
 3              upon as a -- if you are called upon to be
 4              a juror in a criminal case, I guess you
 5              can't expect that the Defendant will
 6              testify.  So if that expectation goes
 7              unfulfilled, if she elects not to
 8              testify, and I'm not saying that will
 9              happen -- if she elects not to testify,
10              how will that make you feel?
11    A.   Probably not as comfortable as if she did
12              testify.  There's a whole lot of
13              information and circumstances that I
14              don't know anything about right now.  I
15              can't answer specifically, I don't think
16              for certainty.
17    Q.   Mr. Juhasz here uses an example that I'm not
18              very good at.  The burden of proof is on
19              the State of Ohio, right?
20    A.   Yes.
21    Q.   To prove Donna Roberts' guilt by proof beyond
22              a reasonable doubt?
```

583

1   A.   Yes.

2   Q.   And you see this pitcher of water.  Let's say

3        that this is proof beyond a reasonable

4        doubt and somewhere there's a line that

5        says proof beyond a reasonable doubt, and

6        that is for each individual juror to draw

7        that line, or he or she.  Are you with

8        me?

9   A.   Yes.

10  Q.   It is the State's responsibility to fill that

11       pitcher up above the line.

12  A.   Okay.

13  Q.   The fact that a Defendant elects not to

14       testify adds nothing to the container.

15       Am I making any sense?

16  A.   I see what you are getting at.  I think it

17       makes it a little more difficult, but

18       again I assume that the rest of the

19       information and circumstances will

20       clarify that or help.

21  Q.   So I guess all I can do is ask you, if Donna

22       elects not to testify, will you do your

584

1              best to follow the instruction of the

2              Court in that regard?

3   A.  Of course.

4   Q.  Since lawyers speak out of both sides of their

5              mouth all the time.  If she does testify,

6              she's a witness just like any other

7              witness, do you understand that?

8   A.  Yes.

9   Q.  And you would judge her testimony by the same

10             rules and standards that you apply to

11             other witnesses?

12  A.  Yes.

13  Q.  You have heard the word indictment.  Judge

14             told you about an indictment yesterday.

15             You understand an indictment is a piece

16             of paperwork?

17  A.  Yes.

18  Q.  It informs the Defendant of the nature of the

19             allegations leveled by the State.  It is

20             not evidence and no matter how many times

21             it is read to you or referred to

22             throughout the course of these

585

1          proceedings, it is not magically

2          transformed into evidence.  You

3          understand that?  Grand Jury proceedings

4          were secret.  Did you know that?

5   A.   No, I did not.

6   Q.   Donna didn't know if this case went to the

7          Grand Jury.  Mr. Juhasz and I didn't

8          know.  None of us were there.  Did you

9          know that?

10  A.   No.

11  Q.   The Grand Jury only heard from one side, and

12         only determined that Donna should stand

13         trial.  You are here as a trial juror.

14         Your role is different.  You don't

15         determine whether someone gets to stand

16         trial.  You determine whether someone is

17         innocent or guilty.

18  A.   Right.

19  Q.   And here Donna will have an opportunity to

20         test the evidence presented, because the

21         evidence before the Grand Jury was not

22         tested by her lawyers or by her.  You

586

1          understand that?

2    A.    Yes.

3    Q.    A big part of your job responsibility is to

4          determine the credibility of the

5          witnesses.  The Judge will tell you that

6          as a juror, you are sole judge of the

7          facts, the credibility of the witnesses,

8          and the weight of the evidence.  He's

9          going to tell you you can believe all of

10         what a witness says, part of what a

11         witness says, none of what a witness

12         says.  You have to determine who is

13         telling the truth, and who is not.  That

14         is that job responsibility we started

15         talking about.  Do you recall that?

16   A.    Yes.

17   Q.    And you think you are up to that

18         responsibility?

19   A.    I think so.

20   Q.    He's going to give you a whole list of

21         factors, manner of testifying, whether

22         there's a tell-tale sign or

587

1           reasonableness of testimony.  Say

2           somebody testifies and it just doesn't

3           make sense to you, well, that is

4           something you would want to keep in mind,

5           isn't it?

6 A.   I would think so.

7 Q.   And in your daily life, you are frequently

8           called upon to determine whether someone

9           is telling you the truth or not, whether

10          it was one of your kids when they were

11          young, whether it is the dry cleaning

12          guy, whether it is the co-worker; and

13          over the course of our lives, we develop

14          a sixth sense for that, intuitive sense,

15          to help us determine whether someone is

16          telling the truth or not.  Does that

17          sound familiar to you?

18 A.   Yes.

19 Q.   And the Judge is going to tell you that you

20          should take those tests of truthfulness

21          which you apply in your daily life, and

22          bring them into this Courtroom and apply

588

1      them to the testimony of each and every

2      person that testifies.  Will you do that?

3 A.  Yes.

4 Q.  Now you have heard a lot about proof beyond a

5      reasonable doubt.  Reasonable doubt is

6      doubt based on reason and common sense.

7      And the Judge will tell you that proof

8      beyond a reasonable doubt requires that

9      you be firmly convinced of the

10      allegations, and is proof of such

11      character that an ordinary person would

12      be willing to rely and act upon it in the

13      most important of his or her own affairs.

14      You have made important decisions in your

15      life, haven't you?

16 A.  I think so.

17 Q.  And before you make those decisions -- well,

18      sure you did.  You decided to get

19      married, you decided to buy a house.  You

20      decided to have four kids.  You decided

21      to pay for college.  Before you make an

22      important decision, don't you look at the

589

1              positives and the negatives?

2    A.    Yes.

3    Q.    And you keep the positives over on one side in

4              your mind or maybe even on a sheet of

5              paper and you keep the negatives over

6              here?

7    A.    Yes.

8    Q.    And after you get the list done, you sort of

9              focus on the negatives, because if you

10             can remove those negatives, the decision

11             is easy, isn't it?

12   A.    Yes.

13   Q.    So let's say it is a decision to buy the

14             house.  And on your negative list, you

15             have the house might have termites.

16             Well, you would call in an exterminator

17             and have them check out the house, and he

18             tells you there's no termites, so you

19             scratch that off.  Doesn't have enough

20             bathrooms.  You call in a plumber who

21             says he can easily put another one in for

22             you.  You scratch that off.  But maybe it

590

1           is the interest rate.  The interest rate

2           is troubling you and no matter how hard

3           you think about it, how hard you

4           investigate the interest rate, you still

5           have this reasonable doubt in your mind

6           that it is going to go down and you could

7           save money.  As long as there's one

8           negative that is reasonable, you couldn't

9           say beyond a reasonable doubt that that

10          decision was the right thing for you, do

11          you understand that?

12   A.   Yes.

13   Q.   And do you understand that it is the same in

14          this case, if after evaluating and

15          weighing the evidence, you have one

16          reasonable doubt, you must return a

17          verdict of not guilty?

18   A.   Yes.

19   Q.   And you have heard the phrase circumstantial

20          evidence.  Haven't you?

21   A.   Yes.

22   Q.   It is proof of one thing by direct evidence,

591

1          which somebody saw or heard or felt.

2          From what you can infer something else?

3  A.   Yes.

4  Q.   So in other words, in any case involving

5          circumstantial evidence, you are asked to

6          make like a leap in logic, aren't you?

7  A.   Yes.

8  Q.   And if you are going to make a leap in logic,

9          you certainly wanted to make sure that

10         that leap is reasonable, don't you?

11  A.   Yes.

12  Q.   And if you are asked to make inferences in

13         this case, will you test those inferences

14         to make sure they are reasonable?

15  A.   Yes.

16  Q.   And you remember talking to me about the

17         presumption of innocence and how that

18         might be the same as a belief in the

19         innocence of one of your kids, if he were

20         accused of wrongdoing?

21  A.   Yes.

22  Q.   Well, if one of your kids were accused of

592

```
 1              wrongdoing and you were given

 2              circumstantial evidence and told that it

 3              led to an inference that indicated your

 4              child had done the wrongdoing, you think

 5              you might look for other reasonable

 6              inferences that didn't lead to

 7              wrongdoing?

 8   A.   I'm sure I would.

 9   Q.   Will you do that here?

10   A.   Yes.

11   Q.   And in order to properly test circumstantial

12              evidence, because it is like a chain,

13              isn't it, it would only be as strong as

14              its weakest link.

15   A.   Yes.

16   Q.   Will you look for weak links?

17   A.   Yes.

18              MR. INGRAM:  I thank you for your

19   time and attention.  You have a pleasant afternoon.

20              THE COURT:  Challenge for cause.

21              MR. BAILEY:  Pass for cause.

22              MR. INGRAM:  Pass for cause.
```

593

1            THE COURT:  Ma'am, you will be in

2   the pool of jurors from which this Jury will be

3   selected.  I don't know if I told you, but we'll go

4   through the prospective jurors until we get 34

5   people that have gone through this process that are

6   acceptable to both sides, and from that, the 12

7   will be chosen, plus four alternates.  You should

8   call that number.  Thank you very much.

9   (Juror No. 4 excused from the Courtroom)

10  (Juror No. 8, Tilghman Gray, entered the Courtroom.)

11            THE COURT:  You read that paper that

12  was given to you, that you were asked to read?

13            MR. GRAY:  Yes.

14            THE COURT:  Have you ever had an

15  occasion to sit on a Jury before?

16            MRS. GRAY:  No.

17            THE COURT:  You know from what I

18  said the other day and from what you have read what

19  this case is about.  The purpose of this afternoon

20  is to allow both sides an opportunity to ask you

21  various questions, and primarily that is to

22  determine whether you feel comfortable with sitting

594

1    on such a case, and whether or not there's

2    something that would make either side reluctant to

3    have you sit on the case.  This trial at the first

4    phase, and it may be the only phase, will go

5    forward as any trial, and the Jury will be called

6    upon to determine whether or not the indictment

7    that was brought against Miss Roberts based on the

8    evidence and the law presented, will find at the

9    hands of this Jury, either a guilty or not guilty

10   verdict.  If that Jury returns a not guilty

11   verdict, then the case would end at that point.  If

12   the determination of the Jury is one of guilt, then

13   they would be called upon to sit through a second

14   phase of the trial.  And at that phase, the State

15   is required to produce evidence on what we call

16   aggravating circumstances, and that is reasons why

17   the Jury should consider imposing the death

18   penalty, rather than one of the other lessor

19   offenses or sentences.  They have to prove their

20   facts beyond a reasonable doubt.

21          The Defense is given an opportunity at

22   that time to present what are known as mitigating

595

1   factors.  And those are things put to the Jury that

2   would mitigate the aggravating circumstances and

3   thereby allow the Jury to disregard the imposition

4   of the death penalty, and think it more appropriate

5   to give a lesser sentence.  Because there's nothing

6   in Ohio law that says just because you kill someone

7   illegally, that you are to be put to death.  There

8   are other people who -- there are some people who

9   might think that, no, I could never under any

10  circumstances would I want to sit on such a case,

11  because I don't care what anybody did, I could

12  never ask for their life, even though the law may

13  ask her to do that.  A person that has an

14  entrenched view on either extreme, should not be on

15  the Jury because they can't do justice to one side

16  or the other.

17          The person that is the ideal juror is

18  somebody with an open mind that is able and willing

19  to accept the law of Ohio; we all have to follow

20  the law.  After they make the determinations,

21  determination of fact, if we get to that second

22  phase, and that perhaps is every bit as difficult

596

1   or perhaps more than the first phase, because it is

2   a very important decision this Jury will make and

3   have to live with, whatever it is.

4           So the questions that will be put to you

5   by these folks will be geared towards what is your

6   view.  Do you have any entrenched positions.  If

7   you do, that is fine.  We're all entitled to our

8   own thinking, but it is whether you could follow

9   the law and be fair and impartial to both sides.

10  There will be some people that won't be able to do

11  that, and that is fine.

12          The other issue that will be put to you

13  is concerning any pre-trial publicity that you may

14  be aware of.  Now it is easy for all of us to say I

15  read something about this, but that isn't going to

16  influence me.  Every prospective juror has to look

17  within their own heart and they know whether that

18  is true or not.  Again, the ideal juror in this

19  matter has to truly be able to say to themselves,

20  whatever the newspaper said or whatever the T.V.

21  said, that isn't the evidence.  I have to decide

22  this case on the evidence.  That is the only way I

1    can be fair to both the State and the Defendant.

2              The worst thing that could happen, is to

3    have anybody tried in any criminal trial, and

4    particularly one of this magnitude, where one side

5    or the other isn't getting a fair trial.  You agree

6    with that?

7              MRS. GRAY:  Yes.

8              THE COURT:  Mr. Bailey?

9    EXAMINATION BY MR. BAILEY OF MS. GRAY:

10   Q.   Good afternoon.  I am Ken Bailey, Assistant

11            Prosecutor with the Trumbull County

12            Prosecutor's Office, and like I promised

13            the other day, Chris Becker, another

14            Assistant Prosecutor, my co-counsel, is

15            with me today.  And this is the one

16            chance we get to engage in a little

17            conversation with each other until this

18            case is all over, because according to

19            our rules of conduct, if we run into each

20            other out in the hallway or in the

21            elevator, we're not allowed to have any

22            communication with you, except to say

598

1    good morning or good afternoon.  If you

2    have any questions, you have got to

3    address them to the bailiff or to the

4    Court.  Laurie is not here right now, but

5    she will be.  And we're not being

6    antisocial, but under our rules of

7    conduct, this is the only chance we

8    really get to talk until the trial is all

9    over and if we get into two phases, that

10   means at the conclusion of the second

11   phase.

12       With that, we're going to talk a

13   little bit.  If you have any questions

14   about what we're doing here that is

15   pertinent to the proceedings, feel free

16   to ask them at this point because it is

17   sort of a give and take here.  It helps

18   us if you have questions, we want to

19   clear those up, too, if we can.

20       Now, let me ask first about this

21   issue of pre-trial publicity.  I

22   understand looking at your questionnaire

599

1              that you get the Tribune only on

2              Saturday?

3    A.   And only if I work Friday night and I pick it

4              up on my way home, otherwise we don't get

5              it.

6    Q.   And there's a case involving -- there was

7              another fellow by the name of Nate

8              Jackson.  You indicated you read the home

9              section, I believe?

10   A.   I usually read the home section first and then

11             maybe the front page and a little bit of

12             the inside.

13   Q.   You basically skim?

14   A.   Yes.

15   Q.   You pay close attention to the crime news or

16             no?

17   A.   No.

18   Q.   And you look at some of the local television

19             channels, right, maybe Fox?

20   A.   We watch Fox news.  We don't usually watch 27,

21             33, any of those.  We very rarely look at

22             those.  We're usually on Fox news.

600

```
 1    Q.   The name Donna Roberts, it doesn't ring a
 2              familiar bell?
 3    A.   No.
 4    Q.   Now it may be during the course of the
 5              proceedings, you may recollect having
 6              heard something when you hear some
 7              testimony, but we're going to ask you to
 8              set that aside and determine this case
 9              based solely on what you hear here from
10              the witness that is going to take that
11              chair and from any physical Exhibits that
12              are admitted into evidence, and the
13              instructions of law given to you by Judge
14              Stuard.  You can do that, I take it?
15    A.   I think so.
16    Q.   We're going to ask you, also the Judge is
17              going to order you, he already has, not
18              to read the newspaper or watch T.V. or
19              have any communication with anybody about
20              this case while these proceedings are
21              ongoing.  And maybe the family member may
22              pick up the newspaper for you, and the
```

601

```
 1                    reason for this is that when something is

 2                    reported in the newspaper or there's

 3                    something on television, the reporter

 4                    tries to do a feature on what is

 5                    happening, and you will notice there's

 6                    nobody from the media here right now?

 7    A.    I wondered about that when I walked in

 8                    earlier.

 9    Q.    Why nobody is here?

10    A.    Why they were here.

11    Q.    Somebody was here for a minute and they are

12                    not allowed to photograph the prospective

13                    jurors.  They sometimes take a picture of

14                    the Attorneys or the Defendant or the

15                    Judge, but they are not allowed to

16                    photograph the jurors at all.  If they

17                    show jurors you will notice that they

18                    show feet if there's a Jury view, but

19                    that is about the size of it.  And

20                    there's another trial going on

21                    downstairs, so the reporters are in the

22                    building, and that is probably why they
```

602

1   are here.  But it may be, we'll see

2   reporters from time to time, T.V.

3   cameras, things like that.  But they

4   won't be here very long.  Generally, they

5   will be here for a matter of minutes,

6   then a reporter will do a feature,

7   newspaper reporter will write a column on

8   it.  But that is based on their few

9   minutes here, and if you have somebody

10  save the papers for you, and at the end

11  of this case if you served on the Jury,

12  you may look at it, and may read those

13  articles and say, "I sat in that

14  Courtroom for the entire trial and that

15  reporter who was here for a few minutes,

16  what he put in the paper was totally out

17  of context, because he missed everything

18  that happened before he walked in and he

19  missed all of the questions that came

20  after he left and the testimony was just

21  the opposite of the impression he gives

22  in the newspaper."  It is really not fair

603

```
 1              to rely on what is in the newspaper.  You

 2              are going to hear it firsthand.  It is

 3              like going back to school and starting

 4              out with a clean slate.  Whatever is

 5              going to be written on the board is going

 6              to be here in this Court.

 7                   I take it you would agree that would

 8              be the fair thing to do to both sides,

 9              both to the Defendant and the people of

10              the State of Ohio, right?

11   A.   Yes.

12   Q.   Let's talk about the death penalty for a

13              minute as a possible punishment.  This is

14              a death penalty case where the Defendant

15              is charged with -- she's charged with

16              four different crimes.  Two counts of

17              aggravated murder, even though there's

18              only one death here.  There are two

19              separate charges of aggravated murder,

20              which the State is allowed to do, and

21              there are two other crimes called

22              aggravated burglary and aggravated
```

604

1          robbery.  By the case, the counts, the

2          charges that involve the death penalty,

3          are the counts of aggravated murder with

4          specifications of aggravating

5          circumstances.  That is where the death

6          penalty could come in as a possible

7          punishment.

8               Now, I understand, reading your

9          questionnaire you favor the death penalty

10         for certain crimes?

11   A.    Right.

12   Q.    And I take it that would be in cases of

13         murder?

14   A.    Right.

15   Q.    Now you understand the legislature sets down,

16         writes the law and they set down the

17         possible penalties.  The Judge is going

18         to instruct you as to the law at the end

19         of this case.

20              Now, do you understand that this

21         case can be tried in two different

22         phases?  You read a little handout

605

```
1            downstairs an orientation instruction,

2            and the first phase deals with the issue

3            of guilt or non-guilt where the State has

4            to prove the entire burden of proving the

5            elements of the crimes are entirely on

6            us, the people of the State, and we have

7            got to convince you of the elements, the

8            essential component parts of these

9            charges by proof beyond a reasonable

10           doubt.  If we do, if you and the other

11           jurors go back and you deliberate and you

12           find that we met our burden beyond a

13           reasonable doubt so that you are firmly

14           convinced of the truth of the charges to

15           a moral certainty of aggravated murder

16           and one or more of these specifications,

17           these special findings of fact, then we

18           would move on to a second phase.

19               And in that second phase, the issue

20           there is not of guilt or non-guilt,

21           because you would have already decided

22           that, the issue would be what is the
```

```
 1                  appropriate punishment for this

 2                  Defendant, for this crime.  You

 3                  understand that if you find the Defendant

 4                  guilty in the first phase, the death

 5                  penalty is not an automatic punishment

 6                  under the law?

 7   A.    Right.

 8   Q.    That you have to consider all of the

 9                  penalties.  Now, in the second phase, the

10                  reason for this, that it is not automatic

11                  is because you wouldn't have heard

12                  anything that relates to mitigating

13                  factors.  Things that would work in favor

14                  of the Defendant, and against the death

15                  penalty as a possible punishment.

16                      And then there's a balancing test

17                  that the Judge will instruct you on.

18                  Basically, you have to weigh the

19                  aggravating circumstances or aggravating

20                  circumstances against any mitigating

21                  factors presented.  And what these

22                  mitigating factors are, I can't tell you
```

607

1                           at this time, because it is not relevant.

2                           We don't know what they are, but the

3                           Defense has an opportunity to present

4                           evidence as to these mitigating factors,

5                           things that will work to a Defendant's

6                           benefit.  And then you would do this

7                           balancing test.

8                                Now if you find that the aggravating

9                           circumstance or circumstances outweigh

10                          these mitigating factors by proof beyond

11                          a reasonable doubt, then you must return

12                          a death penalty verdict.  You understand

13                          that?

14     A.    Yes.

15     Q.    On the other hand, if you find that we don't

16                          prove that the aggravating circumstance

17                          or circumstances outweigh the mitigating

18                          factors by proof beyond a reasonable

19                          doubt, then you must go on under our law

20                          to consider the other three possible

21                          punishments; the punishment of life in

22                          prison without parole; the sentence of 30

608

1              full years in prison before parole

2              eligibility up to life; and life in

3              prison with parole eligibility after 25

4              full years.  You understand that?

5  A.   Yes.

6  Q.   Now, I notice in your questionnaire, that you

7              indicated that you thought that if

8              somebody were convicted of a murder

9              charge or aggravated murder, that you

10             felt that there shouldn't be any

11             possibility of parole, I think is what

12             you indicated?

13  A.   I'm not sure what the difference is between

14             murder and aggravated murder.

15  Q.   Okay.  Let me explain.  We are, the

16             legislature writes the laws.  And they --

17             there are different kinds of killings.

18             Some killings could be accidental.

19             Somebody slides on the ice, they are

20             doing 25 miles an hour in a 50 mile an

21             hour zone and they hit some black ice and

22             slide and somebody gets killed.  That

609

1              could be an accident, or somebody could

2              be chopping some wood and the head of the

3              axe flies off and kills somebody standing

4              nearby.  I take it, you would agree there

5              shouldn't be any punishment for that?

6    A.   Right.

7    Q.   There are other types of killings that are

8              more serious.  There are killings that

9              arise out of a traffic accident -- or

10             let's say not a traffic accident, but a

11             traffic crash, where somebody may be

12             driving drunk and killed somebody.  I

13             take it you would agree the death penalty

14             would not be an appropriate punishment

15             for that.  Maybe the person should go to

16             prison.  Then there are other killings

17             that occur.  Let's say there's a bar

18             fight and somebody punches somebody and

19             the victim falls down and hits his head

20             against the table and dies as a result of

21             that.  That might be a manslaughter

22             charge.  I take it, you would agree the

610

1          death penalty wouldn't be warranted for

2          that, a prison sentence perhaps?

3     A.   Right.

4     Q.   Then there are other killings, and those, they

5          have special names for those killings,

6          but then we have murders and aggravated

7          murders.  Basically a murder is when

8          somebody kills somebody on purpose.  And

9          under our law, there's no death penalty

10          for just a plain murder where somebody

11          killed somebody on purpose.  You may

12          think that there should be a death

13          penalty, but there would be a different

14          punishment.  Some type of prison

15          sentence.

16               Then there are more aggravating

17          circumstances that would apply to crimes

18          of aggravated murder.  The legislature

19          writes the law and says that for example

20          if somebody killed somebody on purpose,

21          with prior calculation and design, that

22          is one type of aggravated murder.  And

611

1          there's another type of aggravated murder

2          where somebody may kill somebody on

3          purpose in the course of committing a

4          special felony, like an aggravated

5          robbery or aggravated burglary.  That is

6          another type of aggravated murder.  And

7          that carries a certain penalty.

8               The legislature sets forth certain

9          things called aggravating circumstances,

10         death penalty specifications.  That could

11         be attached to a charge of aggravated

12         murder.  Because the death penalty is not

13         something that should be applied lightly.

14         Would you agree about that?

15   A.    Right.

16   Q.    It should be applied only in special cases in

17         the worst of crimes?

18   A.    Right.

19   Q.    And the legislature writes the laws, so that

20         they set down certain factors that may

21         apply, and if those factors are charged

22         and then a Jury considers those at a

612

```
 1                 trial, and then if the Jury finds the

 2                 Defendant guilty of a crime called

 3                 aggravated murder and one or more of

 4                 these special circumstances, special

 5                 findings of fact, then the death penalty

 6                 could be a possible punishment.  Does

 7                 that help answer your question?

 8      A.   Yes, a little bit.

 9      Q.   We're in one of those types of cases where

10                 there are these -- the Defendant is

11                 charged with a crime called aggravated

12                 murder, and one or more of these special

13                 circumstances were alleged.  And there

14                 are two different theories of it.  One of

15                 these is the prior, the purposeful

16                 killing with prior calculation and design

17                 on the one hand with these circumstances;

18                 and the other is purposeful killing

19                 during the commission of a special felony

20                 like aggravated robbery, or aggravated

21                 burglary.

22      A.   Okay.
```

613

```
1    Q.   Now, could you -- you had indicated on your
2              questionnaire that you thought that there
3              shouldn't be any possibility of parole
4              for certain types of crimes?
5    A.   Yes.
6    Q.   Now that may be, that would be your own
7              personal belief, is that right?
8    A.   Yes.
9    Q.   Is that based on personal religious, moral or
10             ethical belief or some combination
11             thereof?
12   A.   I think it just is based on the fact that if
13             somebody kills somebody on purpose, I
14             don't think they should be back on the
15             streets.  So I don't believe they should
16             be eligible for parole.
17   Q.   That is your own personal feeling?
18   A.   Right.
19   Q.   You understand that the legislature doesn't --
20             didn't write the law that way.
21   A.   Okay.
22   Q.   And the legislature says that you have to
```

614

1          consider certain penalties to be fair to

2          both sides, and it is important --

3     A.   I am basing mine not on any kind of law,

4          because I don't know what law is, I don't

5          know what the law is.

6     Q.   If the Judge tells you that if you find the

7          Defendant guilty of aggravated murder,

8          with the death penalty specification and

9          then you do this balancing test where you

10         find that the aggravating circumstance or

11         circumstances outweigh the mitigating

12         factors beyond a reasonable doubt, would

13         you be able to come back with a death

14         penalty verdict?

15    A.   If that is the way it came out.

16    Q.   And let's say it didn't come out that way.

17         Let's say you looked at the evidence and

18         we failed to meet our burden of proof.

19         Let's say we didn't convince you beyond a

20         reasonable doubt that the aggravating

21         circumstances outweighed the mitigating

22         factors by proof beyond a reasonable

615

1            doubt, so then you would have to go on

2            and consider the other three possible

3            punishments; the punishment of life

4            without any possibility of parole; the

5            punishment of life in prison with parole

6            eligibility after 30 full years; and life

7            in prison with parole eligibility after

8            25 full years.  And you would have to get

9            together with the other 11 jurors, and

10            then decide based on whatever evidence

11            that you hear, what the appropriate

12            punishment would be for this Defendant.

13            Could you treat all of those three

14            equally and look at them equally, if the

15            Judge told you to look at them equally as

16            possible punishment before making up your

17            mind?

18    A.    If that is the way the rules go, then I would

19            have to follow the rules.

20    Q.    You would follow the law?

21    A.    Yes.

22    Q.    You wouldn't take your own personal belief

616

```
 1                  against any possibility of parole, then
 2                  I'm going to automatically come back with
 3                  that verdict?
 4    A.    No, not automatically.  Individual to follow
 5                  the law.
 6    Q.    It may well be based on what you hear, that
 7                  you decide that one of the lesser
 8                  punishment would be appropriate?
 9    A.    Yes.
10    Q.    You keep an open mind?
11    A.    Yes.
12    Q.    Now it may well be, after you hear all of the
13                  evidence, and you and the other jurors
14                  deliberate that you may say, life without
15                  parole would be the appropriate
16                  punishment in this case.  You may reach
17                  that conclusion, but you would consider
18                  them all equally, right?
19    A.    Yes.
20    Q.    Now, I mentioned the Defendant is charged here
21                  with two counts of aggravated murder with
22                  specifications.  And these crimes, as
```

617

1    well as aggravated robbery and aggravated

2    burglary.  And the Defendant is charged

3    not as the trigger person, but rather as

4    an complicitor.  I think you will find

5    the State's allegation is that a fellow

6    by the name of Nate Jackson was the

7    person who actually did the killing, who

8    committed the aggravated burglary and the

9    aggravated robbery, but the Defendant is

10   charged as a person who solicited or

11   procured or aided and abetted this Nate

12   Jackson.  They planned in advance, this

13   killing.  So it was done with prior

14   calculation and design on purpose.  And

15   these specifications, these death penalty

16   specifications, are first that there's

17   a -- there's aggravating circumstances of

18   aggravated burglary, that the aggravating

19   murder was committed during the course of

20   an aggravated burglary, and the

21   aggravated murder was committed with

22   prior calculation and design.

618

1           And there's a second specification,

2           the death penalty specification that the

3           aggravated murder was committed during an

4           aggravated robbery and it was committed,

5           the Defendant committed the aggravated

6           murder even though it was committed by

7           this Nate Jackson, with prior calculation

8           and design.  And there's a firearms

9           specification in there, that a working

10          gun was used.

11  A.    What is the legal difference between robbery

12          and burglary?

13  Q.    The Judge will define that for you.  Basically

14          aggravated burglary is breaking, it is

15          trespassing by force, stealth or

16          deception into a dwelling, or separately

17          secured portion of that dwelling with the

18          intent to commit a crime inside, a felony

19          or some other crime.  And there are other

20          things that will apply, but the Judge

21          will tell you.  It is really crossing the

22          threshold when you are not supposed to,

619

```
 1                with that intent to commit some crime and
 2                somebody is present and you cause serious
 3                physical harm to that person or you have
 4                a weapon, and aggravated robbery is when
 5                you steal something.  You are already
 6                inside.  Or you are fleeing immediately
 7                after committing a crime, and you steal a
 8                car or something.  And you use force and
 9                violence.  You have a weapon or
10                something -- in this case a gun.
11   A.   Okay.
12   Q.   And you hurt someone or kill somebody.  I know
13                people in every day life often use those
14                terms interchangeably.  Say I was robbed.
15                I came home and my house was robbed.  If
16                they were held up and somebody has forced
17                violence against them or somebody used
18                force and violence on you on the street
19                to steal your money, that would be a
20                robbery.
21                     Now, these crimes are composed of
22                certain elements, and I'm not going to go
```

620

```
 1            into them in detail, because the Judge is

 2            going to instruct you on them at the end

 3            of this case.  But for example, let's

 4            say, we have to show that it happened on

 5            or about a certain date and time, like

 6            December 11, 2001.  That it happened here

 7            in Trumbull County, in the State of Ohio,

 8            so we can try the case in this Courtroom,

 9            rather than in Cuyahoga County.  Third,

10            that it was committed by the Defendant,

11            and we have to have somebody identify the

12            Defendant.  Fourth, let's say take a

13            charge of aggravated murder, that she did

14            it purposely, and the Judge will define

15            that term for you in great detail at the

16            conclusion of this case, so and here

17            she's charged as a complicitor, not the

18            actual trigger person, that she caused

19            the death of Robert Fingerhut and that it

20            was done with prior calculation and

21            design.  That is an example of elements,

22            the essential component parts of a crime.
```

621

1           It is like the ingredients in a recipe.

2           You have baked before?

3  A.   Yes.

4  Q.   We have got to use the recipe in filling all

5           of those ingredients.  If we leave one of

6           the ingredients out, then we may have

7           somebody -- if we left the chocolate out

8           in a chocolate cake, it would be a cake

9           but not the chocolate cake that we

10          promised to make.  That is our burden of

11          proof.  We have to put in all of those

12          ingredients.  It may well be that you

13          have some special interest like in

14          something, if you sold shoes you might be

15          interested in foot wear.  What was

16          somebody wearing at the time of the

17          crime.  We may never answer that, because

18          it doesn't go to the elements.  We're

19          going to have our focus of the evidence

20          on the elements of the crime, proving the

21          elements, the essential component parts

22          of the crime, and we may never get to

622

1              some things that you might be interested

2              in, but if we can convince you beyond any

3              reasonable doubt of the truth of the

4              charge, these elements, could you return

5              a conviction?

6    A.   Yes.

7    Q.   You are a nurse?

8    A.   Yes.

9    Q.   As an R.N., you work at the hospital.  You

10             ever deal with gunshot victims?

11   A.   We don't deal with that very much up on our

12             floor.  We're a cardiac floor.  Generally

13             they go to the surgical floor.

14   Q.   Have you ever in your career worked on gunshot

15             victims?

16   A.   I think I have had them post surgery, but

17             never before.

18   Q.   You may hear different types of evidence.

19             There's when we have direct evidence

20             where a person can come in and testify to

21             something he's learned through the use of

22             his five senses.  "I heard the gunshot

623

```
 1                  and it was loud," or "I smelled the

 2                  smoke," or "I touched the body and it was

 3                  cold."

 4                       But there's another way of proving

 5                  elements.  Sort of a round about way.  We

 6                  call it circumstantial evidence.  You

 7                  have heard that term before.  And it is

 8                  where we present a fact or series of

 9                  facts and ask you to a draw logical

10                  deduction to another fact or facts, which

11                  you are allowed to do.  It is basically,

12                  it is piling evidence on evidence.  And

13                  then making your own decision as if

14                  there's enough.  Can you follow what the

15                  Judge tells you the law is on this?

16     A.    Yes.

17     Q.    And you understand that circumstantial

18                  evidence is just as good as direct

19                  evidence?  Often times, would you agree

20                  that often times crimes are committed in

21                  secret without a whole lot of people

22                  around?
```

624

1    A.    I would imagine.

2    Q.    Especially something like an aggravated

3          murder, right?  If somebody plans in

4          advance to kill somebody, generally they

5          are not going to blurt it out to the

6          whole world and tell them, "Hey, I'm

7          going to kill my ex-husband to get the

8          insurance money" or something?

9    A.    Right.

10   Q.    If you don't have somebody telling you that in

11         person, you have to rely on other types

12         of evidence; would you agree with that?

13   A.    Right.

14   Q.    You might have to rely on things like the

15         person's actions or a person's

16         communications, if you have letters or

17         things like that, where the person has

18         written something or phone calls, where

19         you can hear what the person says about

20         them, right, or look at the person's

21         actions beforehand and afterward or at

22         the time that this is going on.  If you

625

1      have witnesses to testify to that.  And

2      would you be able to look at all of those

3      facts and circumstances, and then make

4      your own conclusions as to whether it

5      proves the elements of the crimes

6      charged?

7  A.   Yes.

8  Q.   The charge here is that the crime occurred

9       here in Trumbull County, and in Howland

10      Township, in a residence located on

11      Fonderlac in Howland.  Are you familiar

12      with that area?

13 A.   I'm not quite sure where Fonderlac is.

14 Q.   One thing -- well, that is good.  We want to

15      make sure that jurors don't go out on

16      their own to investigate.  If you are

17      taken there, it would only be by a view

18      of the scene when you are accompanied by

19      the bailiff.  Other than something like

20      that, can you assure us that you were not

21      going to go out on your own to the

22      neighborhood to investigate?

626

1  A.  I can assure you of that.

2  Q.  Because we have actually -- we had a case once

3          where a juror went out and did his own

4          investigation and they do that sometimes

5          in the movies, but that would cause a

6          mistrial and you would have to do it all

7          over again.  We wouldn't want anything

8          like that to happen?

9  A.  No, I don't think so.  I have enough

10          investigation to do at work.

11  Q.  You understand that you are stuck with the

12          questions that the lawyers ask.  Because

13          we're lawyers, we look at these elements

14          of the crime and questions generally are

15          geared to proving or disproving these

16          particular elements.  You understand you

17          are not allowed to ask questions of your

18          own.  Sometimes on T.V. programs and

19          sometimes in other states, jurors may be

20          allowed to submit questions to a Judge

21          and have the Judge ask them.  You might

22          see that on Court T.V. or some place, but

627

1           that doesn't happen in this state.  And

2           one thing you can't do here is you can't

3           take notes.

4    A.    Okay.

5    Q.    You have to remember the testimony.  Sort of

6           like going back to school without the

7           notes and being asked, it's like when we

8           had radio.  Everybody listened to the

9           radio.

10   A.    I remember radio.

11   Q.    And remember those old radio programs where

12          you would pay close attention?  Today the

13          kids look at Sesame Street and they got a

14          15 second attention span, but we would

15          have to rely on what we heard and we have

16          to remember it.  That is what we're going

17          to ask you to do, to remember the

18          testimony.

19              This may take up to two weeks of

20          trial in the first phase, and we would

21          ask you and your other jurors to pay very

22          close attention to the testimony and the

628

1          evidence, and then when you go back to

2          deliberate you will have your collective

3          recollection.  You understand you won't

4          be getting instant transcripts like they

5          did in the O.J. Simpson trial.  I think

6          they did, but they had millions of

7          dollars to pour into Court Reporter

8          equipment and a lot of Court Reporters.

9          Mary Ann doesn't have the ability here.

10         I'm sure she wishes she does, but she

11         can't get out instant transcripts, so you

12         won't be getting transcripts of that

13         testimony to take back in the Jury room

14         to review.  You are going to have to rely

15         on your collective recollection.

16    A.   Can they ask for a clarification?  I think I

17         have seen that somewhere or to have

18         something read back to them.

19    Q.   That depends on the Judge, but generally the

20         question is, "Can we have the testimony

21         of so and so?"  And the answer is that

22         the Judge is going to give you is, "No."

629

1   A.   Just asking.

2   Q.   That is okay.  Doesn't hurt to ask, but

3        generally that is what happens.  So that

4        is why it is so important that all 12

5        jurors pay very close attention.  No

6        instant replays, unlike the T.V.

7        programs.

8   A.   I don't like that in football anyway.

9   Q.   Now, during the course of the trial, you are

10       going to be face to face with the

11       Defendant and perhaps during the course

12       of the trial as you come face to face

13       with her and as her chair is turned

14       towards you, you are going to become more

15       acquainted with her.  My question to you

16       is this.  When you go back inside the

17       Jury room to deliberate on your verdict

18       at the conclusion of this case, can you

19       lay aside all thoughts you might have of

20       sympathy and be conscientious in your

21       deliberations and base your verdict on

22       the evidence that you hear, and the

630

1              instructions of law given to you by the

2              Judge, and lay aside all thoughts

3              whatsoever of sympathy that you might

4              have for the Defendant?

5    A.   I think I would try very hard.  I can't

6              promise that it would be absolute.

7    Q.   I know it is human to feel compassion for

8              people.  There's nothing wrong with that.

9    A.   Unfortunately that is my job.

10   Q.   As a nurse.  Your job is to save lives?

11   A.   Right.

12   Q.   What we're asking you to do -- well, in the

13             first phase, you understand that

14             punishment has no bearing on the first

15             phase?

16   A.   Right.

17   Q.   It is a question of guilt or non-guilt?

18   A.   Right.

19   Q.   But let's say we get to the second phase as to

20             what the appropriate punishment is.  It

21             is okay to feel compassion.  It is okay

22             to feel sympathy for a person, but could

631

1          you make your decision based on the

2          evidence and the law?

3   A.   And I would try very hard.

4   Q.   That is all we can ask you to do.

5   A.   That is as much as I can say.

6   Q.   That is fair, that is all we can ask.  Just

7          both sides get a fair shake in this

8          trial.  Do you have any other pressing

9          matters at home or work that are going to

10          affect your ability to concentrate on the

11          evidence for two weeks of the trial?

12  A.   No.

13  Q.   Now there's something called sequestration.

14          At the conclusion of the first phase when

15          the Jury goes out to deliberate, you are

16          sequestered.  That means you are kept

17          separate and apart from the general

18          public.  You are kept in the hotel if it

19          takes that long to make a decision.

20          Every Jury is different.  It could take

21          hours, it could take days, we don't know.

22          Let's say we get into a second phase.

632

```
1              You would go home in between.  You are
2              told not to read the papers or any
3              publicity, and then in the second phase,
4              you would come back in, you would hear
5              more testimony or evidence, and then the
6              Judge would instruct you on the law
7              again.  And when you go back to
8              deliberate in the second phase, at that
9              point, you would be sequestered again.
10             And again, we don't know how long that
11             will take, but I expect the testimony
12             phase, would take maybe generally one to
13             three days generally.  And then
14             deliberations, however long it takes for
15             jurors to decide, because every Jury is
16             different.  Would that cause any hardship
17             for you?
18   A.   No.  My husband won't be too thrilled, but he
19             will live with it.
20   Q.   I take it you would agree that there's certain
21             obligations of citizenship that we have
22             in this country?
```

633

1   A.    Right.

2   Q.    One of them would be at election time we vote.

3         Another is if we're at war, we serve in

4         the military if we're called to do so and

5         we have young people overseas today in

6         several areas.  And a third obligation of

7         citizenship would be to serve as jurors

8         if we're summoned, to make sure that our

9         American system of justice works.  You

10        would agree with that?

11  A.    Yes.

12  Q.    Would you be willing to undertake that

13        obligation of citizenship and serve as a

14        juror in this case?

15  A.    Yes.

16        MR. BAILEY:  Thank you very much.

17  The Defense Attorney will have an opportunity to

18  ask you some questions.

19  EXAMINATION BY MR. JUHASZ OF MS. GRAY:

20  Q.    I'm going to move this a little bit so that

21        Jerry can see.  The Judge had us

22        introduce ourselves the other day.  My

634

```
 1              name is John Juhasz, my friend Jerry

 2              Ingram and I are representing Donna

 3              Roberts.  Donna, as you know everything

 4              you have read and what you have read, is

 5              on trial for her life.  This is an

 6              important thing for us.  I know it is a

 7              little bit frustrating, maybe even

 8              annoying for you to sit here and answer

 9              these questions, but it is kind of like

10              being interviewed for a job.  We want to

11              find out something about you and about

12              your qualifications for the job, and as

13              even Mr. Bailey suggested to you, you

14              also have the chance to ask some

15              questions too, just like you would for a

16              job interview.  You appreciate that?

17   A.    Right.

18   Q.    The only difference instead of you applying

19              for the job, someone sent you a little

20              yellow paper and told you to come to

21              Court?

22   A.    Yes.
```

635

```
 1   Q.   There aren't many ground rules as to what
 2             we're doing here today other than as
 3             Judge Stuard said the other day, tell us
 4             honestly what you think or what you feel.
 5             And if you have some question or you
 6             don't understand something I'm asking
 7             you, please ask, just like when you asked
 8             Mr. Bailey the difference between robbery
 9             and burglary.  Fair enough?
10   A.   Right.
11   Q.   This case is essentially about Donna Roberts
12             and Robert Fingerhut who were divorced,
13             but after they were divorced, they
14             continued to live together over on
15             Fonderlac in Howland and they also worked
16             together at the Youngstown and Warren
17             Greyhound Bus Stations.  And what the
18             case is about essentially is the
19             Government's claim or allegation that
20             Donna Roberts was involved with another
21             fellow by the name of Nate Jackson and
22             they planned or made up a plot to kill
```

636

1          Mr. Fingerhut. Now, if you are selected

2          as a juror during the course of this

3          case, you are probably going to conclude

4          fairly quickly that Mr. Jackson was

5          involved in this case, but the reason I

6          bring that up is to make certain that you

7          understand that this trial is not about

8          Mr. Jackson. It is about Donna Roberts

9          and about whether she had anything to do

10          with Mr. Fingerhut's death. Do you

11          appreciate that?

12    A.    Yes.

13    Q.    During the course of the trial, if you are

14          picked as a juror, some of the things

15          that you may be exposed to in the way of

16          evidence would be letters written by

17          Donna, or phone conversations which were

18          recorded between Donna Roberts and Nate

19          Jackson. And I'm going to tell you that

20          some of those items are sexually explicit

21          and probably offensive. Now, you

22          mentioned a few moments ago that you have

637

 1            compassion and that is part of your job,

 2            correct?

 3   A.   Right.

 4   Q.   And I think you would agree with me that part

 5            of your job is to be able to sort of use

 6            that compassion constructively, but still

 7            objectively do whatever it is medically

 8            that you have to do to help that person

 9            you are charged with, correct?

10   A.   Correct.

11   Q.   The reason I bring that up is if it calls for

12            you to sort of set that compassion aside

13            and say, "Geez, I know I'm going to hurt

14            this person when I stick this needle in

15            their arm, but it is really for their

16            benefit.  That is what I have to do."

17            You are able to do that, correct?

18   A.   Yes.

19   Q.   If you hear the type of evidence in this case

20            that would offend you, would offend just

21            about anybody, my question is, do you

22            think you would be able to set aside any

638

1              feelings of offense that you might have

2              and be able to say, "Well, okay, what

3              does this mean in terms of whether the

4              Government is able to prove or not prove

5              their allegations against Miss Roberts?"

6              Do you think you could do that?

7    A.   I think so.  I hear offensive things every

8              night.

9    Q.   If I understand it, you don't really recall

10             hearing anything about Miss Roberts, the

11             allegations against her about being on

12             trial or anything like that?

13   A.   No, I don't.

14   Q.   When I said that is okay, that is all right.

15             That is what lawyers like actually.  When

16             I said the name Nate Jackson or when I

17             think Mr. Bailey said it earlier, did

18             that ring a bell with you?

19   A.   No.

20   Q.   Have you heard -- I know that although I have

21             never been a juror, I know from doing

22             this kind of work for awhile, that Juries

639

```
 1              experience a lot of things, including

 2              sometimes generating some apprehension,

 3              because you come to the Courthouse and

 4              you don't know what the heck is going to

 5              happen.  The reason I bring that up is

 6              I'm interested in finding out, have you

 7              heard the case discussed since you have

 8              been in the Courthouse for Jury service?

 9    A.   No, I haven't heard anything going on here,

10              except for what the Judge has told us and

11              what you guys have told us.

12    Q.   I don't think this is going to be a problem

13              for you based upon what you have said.

14              And I think Mr. Bailey covered this a

15              little bit.  It is important and I think

16              Judge Stuard alluded to this the other

17              day, it is important that if you are

18              picked as a juror on this case you decide

19              the case from what you hear in the

20              Courtroom, not from what the news media

21              or anybody else outside the Courtroom has

22              to say.  Would you agree with that?
```

640

1  A.    Absolutely.

2  Q.    There are any number of famous U.S. trials

3        everywhere from Rodney King to O.J.

4        Simpson to William Kennedy-Smith, you

5        name it.  And it is probably easy for

6        people to watch that news coverage and

7        draw their own opinions and say, either

8        that Jury was right or what the heck was

9        that Jury thinking of.  But you see,

10       don't you, that we, not being at that

11       trial, all of us, didn't have the

12       advantage of seeing or hearing what that

13       Jury heard and saw.  Does that make sense

14       to you?

15 A.    Right.

16 Q.    So you think you could avoid the temptation to

17       say, "Well, let me see what they are

18       talking about, about the trial I am

19       involved in today on the T.V. or in the

20       newspaper."

21 A.    Like I said, we listen to Fox news and

22       basically, we have been listening to the

641

1          war news lately.  Generally, we listen

2          more to National news, unless it is

3          around election time and then we try and

4          get some insight on who is running for

5          what; but otherwise, we don't generally

6          listen to local news.

7  Q.   Even if you don't follow the news, if you are

8          selected for this Jury, people you know,

9          family, friends, work acquaintances,

10         whatever may say, she's on that Jury, and

11         they may try to talk to you about it.

12         First of all, you understand that if you

13         are selected as a juror, one of the

14         things Judge Stuard is going to tell you,

15         if somebody tries to do that, you have to

16         say, "I can't talk about it"?

17  A.   And the only person that knows anything about

18         this is my manager and the coordinator,

19         and as far as I'm concerned, that is as

20         far as it goes.

21  Q.   We like jurors to keep an open mind.  In fact

22         a lot of times, we like to say that we

642

1          like jurors to come in with their minds

2          as blank as that board over there behind

3          you, so that we can without any

4          preconceptions on the part of the jurors,

5          we can just say, "Here's the evidence."

6          As Mr. Bailey said, we as lawyers sort of

7          focus on the elements and have you make a

8          decision.  There's another aspect to that

9          open mind thing, however, and that is

10         just because we have to put some

11         structure to the trial, the State goes

12         first in the case, because they have the

13         burden of proof.  And just so that we

14         don't argue about me or Mr. Bailey or

15         Mr. Ingram or Mr. Becker saying, "I want

16         to go, I want to go," we have rules about

17         how things are presented.  Does that make

18         sense to you?

19    A.    Yes.

20    Q.    When the State is presenting its evidence, it

21         is important -- do you see that you are

22         not to come to any conclusions just based

643

1              upon what you hear from the State's

2              evidence, that it is important to wait

3              until you hear everything.  Does that

4              make sense to you?

5     A.   Yes.

6     Q.   I have a story that I like to tell about that,

7              and usually whenever I am telling a

8              story, I either make me or my son somehow

9              involved in the story.  I often tell this

10             story in Youngstown, so I'll change the

11             geography just a little bit.  I want you

12             to pretend for a little bit that I am on

13             trial for a murder and that the claim is

14             out here at the corner of Market Street

15             and Pine Street that I got out of a car

16             and walked up to somebody and shot them

17             at 4:00 on January the first.  And let's

18             assume that in the course of that trial

19             the Government produces a witness who

20             gets on the stand and says basically

21             that.  "I saw that guy get out of his car

22             at that intersection and shoot somebody

644

1          else at that time and on that date."

2          Now, that is not looking so good for me

3          at that point, wouldn't you say?

4     A.   True.

5     Q.   But let's assume that I hired Ben Matlock and

6          Ben Matlock, as he usually does, instead

7          of following the rules of evidence, he

8          pulls an exhibit out of his pocket and he

9          goes up to that witness now in what we

10         call cross examination and says, "You

11         know, I have got a receipt here from

12         Kaufmann's at the Southern Park Mall down

13         in Youngstown, and it is dated January

14         1st, at 4:00.  Looks to me like you were

15         down at Southern Park Mall buying a suit

16         that day, weren't you?"  The guy says,

17         "As matter of fact, I was."  Now the case

18         is looking a little better for me,

19         wouldn't you agree?

20    A.   Yes.

21    Q.   And the reason I like to tell that story is if

22         you had just made a decision about my

645

```
 1              guilt when you heard the witness testify

 2              when the Prosecutor was asking him

 3              questions, I would be, as the phrase

 4              goes, toast.  But now that you have heard

 5              the cross examination, maybe you might

 6              have a reasonable doubt that we'll talk

 7              about later.  Does that make sense to

 8              you?

 9  A.    Yes.

10  Q.    Now do you think you can take that idea and

11              translate it to this whole trial, that

12              is, not make up your mind about anything

13              until you have heard everything in the

14              case?

15  A.    Yes.

16  Q.    We talked a couple of minutes ago about some

17              of those famous U.S. trials like O.J. and

18              Rodney King and like that.  This case

19              won't get that kind of coverage, but it

20              may get some coverage and it is popular

21              even on the local talk shows for people

22              to do what I was talking about earlier,
```

646

1         which is to say, "What was that Jury

2         thinking? How in the world could they

3         come up with that verdict?"

4             Now here's why I bring that up in

5         connection with this case. Regardless of

6         what the evidence persuades you of, if it

7         persuades you that Donna Roberts is

8         guilty or if it persuades you that Donna

9         Roberts is not guilty, that the State

10        hasn't proved their case, would you

11        hesitate in any fashion to vote what you

12        felt the evidence showed just because you

13        would sit back there and go, "I can't

14        come up with this verdict. As a Jury,

15        we're going to get lambasted in the news

16        media or the talk radio."

17  A.   I don't think so.

18  Q.   You wouldn't hesitate to do that? And so, if

19        in this case, you felt that the State had

20        not proved its case beyond a reasonable

21        doubt, you wouldn't hesitate to vote not

22        guilty?

647

1    A.    Right.

2    Q.    This is, of course, a death penalty case and

3          you have been asked some questions about

4          your views on the death penalty.  I'll

5          try not to reiterate what has already

6          been talked about.  But I have one

7          concern as Donna's lawyer.  Earlier, I

8          said that we have to have a procedure to

9          everything so the lawyers aren't getting

10         up and saying, "Let me go first.  Let me

11         go first."  One of those procedures is

12         that even though as you know from reading

13         that paper that you were given this

14         afternoon, this case might not get to a

15         second phase.  Here we're asking you all

16         sorts of questions about punishment that

17         you may never have to get to.  And my

18         concern is, is the fact that we're

19         talking to you about it, give you any

20         inkling or impression that Donna must be

21         guilty because they are already talking

22         to me about what the penalty is in this

648

```
 1            case?
 2   A.    I think it was made quite clear in the
 3         beginning.
 4   Q.    Now I want to ask you just a couple of
 5         questions about, I think you have made
 6         your views pretty clear about the death
 7         penalty.  What I wanted to make certain
 8         is are you able to distinguish between
 9         what your own views are, and what the law
10         is, particularly if what Judge Stuard
11         tells you the law is, is different from
12         your own views.
13   A.    I think so.
14   Q.    And let me -- and this seemed, I sort of got a
15         troubled or maybe a surprised look on
16         your face when Mr. Bailey was talking to
17         you about murder.  Whether any of us
18         agree with it or not, and I can candidly
19         tell you that probably everybody in this
20         room who is a lawyer or a Judge, there's
21         something about the law that we don't
22         agree with, but we all took an oath to
```

649

```
 1              uphold.  Does that make sense to you?
 2    A.   Right.
 3    Q.   And similarly, you take an oath as a juror
 4              that you are going to follow the law, so
 5              just like we have to set aside our
 6              disagreements, you would have to do the
 7              same thing.
 8    A.   Right.
 9    Q.   If I were to pull out a gun right now and
10              shoot Mr. Ingram -- I meant to do it.  It
11              wasn't like Mr. Bailey was talking about
12              accidents or the head flew off the axe or
13              whatever.  I pulled out a gun and I shot
14              Jerry because I wanted to.  That would be
15              murder.  And you may find that to be a
16              heinous thing, and indeed it is, but the
17              legislature in our state has said that I
18              don't get the death penalty for that.
19              I'm not eligible for that.  Even if I
20              planned it.  Even if I said, "Tomorrow,
21              I'm going to bring a gun to Judge
22              Stuard's Court and I'm going to pull it
```

650

```
 1                    out and I'm going to shoot Jerry and kill

 2                    him."  That is what we call prior

 3                    calculation and design.  And that is what

 4                    we call actually one form of aggravated

 5                    murder.  And again, even though you may

 6                    find that to be heinous and I may find

 7                    that to be heinous, in our state, without

 8                    something more than that, I can't get the

 9                    death penalty.

10   A.    Okay.

11   Q.    Now you may disagree with that, but that is

12                    the law in this state.

13   A.    Okay.

14   Q.    There has to be something more and that is

15                    these specifications or aggravating

16                    circumstances that you have been given

17                    papers about.  Now you seem to have some

18                    concerns about somebody who does even

19                    those things that I described, because I

20                    did it on purpose, getting out on parole.

21                    Correct?

22   A.    Yes.
```

651

1   Q.   And that again is okay.  Because as Judge

2          Stuard said to you earlier, we're not

3          here to debate you or try to change your

4          minds about what your feelings are, we're

5          just simply here to find out if okay, "I

6          have those feelings, these are my

7          thoughts about how the legal system

8          should be, but the Judge and the lawyers

9          are telling me it is not that way, so I

10         have to follow what they say."  We want

11         to make sure you can do that.

12   A.   Okay.

13   Q.   Two of the options if we would get to a second

14         phase in this case, would involve the

15         possibility, not the guarantee, because

16         what may be nobody has said clearly

17         enough for you today, is that if you get

18         one of those sentences of life

19         imprisonment with a possibility of parole

20         after 30 full years or after 25 full

21         years, all that does is get you a chance

22         to go in front of the parole board and

652

```
 1              say, "Hey, let me out.  I'm sorry.  I
 2              have been a good person," whatever
 3              argument you wanted to make.  And I don't
 4              know if you have saw the Shawshank
 5              Redemption or not, but the Morgan Freeman
 6              guy, they stamped his thing and said
 7              "Rejected".  That's the same thing here.
 8              It doesn't mean that the person gets out.
 9                   Now having said all of that, what I
10              need to know is, even though that may not
11              square with those two options, may not
12              square with your own personal feelings,
13              would you be able to set your feelings
14              aside and if we got to a second phase,
15              consider all of those options fairly and
16              equally?
17    A.    I would have to consider them.
18    Q.    Is there anything about how you feel that
19              would make you say, "Well, I'll consider
20              them, but listen, she doesn't have a shot
21              at getting either the 25 or the 30 year
22              sentence from me, because it just isn't
```

653

1           right in my mind"?

2    A.    I couldn't say that now.

3    Q.    So you, at least you would be willing, even if

4           those don't square with how you think the

5           law should be, you would be willing to

6           set that aside and say, "I'll consider

7           them all and I'll listen objectively to

8           whatever evidence is presented to me

9           about what penalty," if we get that far?

10   A.    Right.

11   Q.    Because you believe that the death penalty is

12          appropriate for some crimes, is there

13          anything about your feelings about the

14          death penalty that would make you, if you

15          found a person guilty at the first phase

16          of aggravated murder and at least one of

17          the specifications, that would make you

18          say, "Well this is a heinous crime and

19          this person is getting the death

20          penalty," sorts of automatically.  You

21          know what I mean?

22   A.    No.

654

```
 1   Q.   Anything about the way you feel that would
 2             give the death penalty a leg up in your
 3             mind going into that second phase?  And
 4             again, I want to emphasize whether you
 5             can set aside your own personal feelings
 6             from what the Judge tells you the law is?
 7   A.   Right now, I would have to go by the law.
 8   Q.   I notice that you put on your questionnaire if
 9             I am reading this right, your husband is
10             a self-employed contractor, correct?
11   A.   Yes.
12   Q.   And he had some tools stolen?
13   A.   Two or three times.
14   Q.   Did they ever catch the person who did that?
15   A.   No.
16   Q.   Is there anything about the way that was
17             investigated or not investigated by the
18             police or the fact that nobody could ever
19             be prosecuted that gives you some bad
20             feeling either about the police or the
21             legal system in general?
22   A.   No.  He just automatically realized that he
```

655

1          was never going to get them back.

2  Q.    I think that you have some guns in your home,

3          but as I understand it you -- is it you

4          that reads the Civil War Times?

5  A.    We both do.

6  Q.    I used to get that, and just got busy doing

7          other things any more and I kind of miss

8          it.  And if I am understanding the

9          questionnaire, the guns you have are more

10         in the nature of --

11  A.    Black powder rifles and pistols.  He makes his

12         own bullets.  My son does have a handgun.

13         I'm not sure what it is, but they go up

14         to Vienna Rod and Gun and whatever that

15         place is up there, and target practice.

16  Q.    Is this your first time on Jury service?

17  A.    Yes.

18  Q.    One of the things that you probably have

19         learned already in your very short career

20         in Jury service is that the way it works

21         in the real world is nothing like the

22         T.V. or the movies?

656

```
1   A.   Right.
2   Q.   For example, they never show in the movies you
3             sitting out in the hallway waiting for
4             two or three hours for the lawyers to ask
5             you questions, do they?
6   A.   Right.
7   Q.   On the hard bench.  One of the things that
8             people have a misconception about the
9             legal system that I think the movies and
10            the T.V. play into is what we call
11            objections, and probably you have seen
12            some T.V. show or some movie or something
13            involving a trial where one lawyer or the
14            other stands up with blue saliva running
15            down his jaw screaming, "Objection,
16            objection, objection."  I think the
17            misconception is that when the lawyer
18            does that, he's trying to hide something
19            from the Jury.  It is like if the Jury
20            hears that, "My client is going to go up
21            the river for 100 years, I have to
22            object."  The real truth about that, the
```

657

1      real world way that it works, is that as

2      you might expect, we have a lot of rules

3      for how to run things.  Those include

4      rules of evidence and rules of procedure.

5      And the law says that if one side thinks

6      that the other side is not following

7      those procedures, that the way we bring

8      that to the Judge's attention, because

9      he's the umpire, he makes the call, is we

10     say objection.  So, the point is, and it

11     doesn't matter whether it is me or

12     Mr. Ingram or whether it is Mr. Bailey or

13     Mr. Becker doing it, we have an

14     obligation under the law if we think our

15     adversary is not following the rules to

16     say "objection".  You appreciate that?

17  A.    Yes.

18  Q.    And the reason I bring all of that up is if

19     you hear objections during the trial, and

20     you almost certainly will, can I have an

21     assurance that you won't hold that

22     against the lawyer who is making those

658

```
 1              objections or against the client?

 2   A.   No.

 3   Q.   For example, if I make an objection or

 4              Mr. Ingram makes an objection or maybe we

 5              do it repeatedly because we don't agree

 6              with what our adversaries are doing, we

 7              don't want you to hold that against Miss

 8              Roberts.  Do you think you could do that?

 9   A.   Right.

10   Q.   The other thing the Judge will do, and we do

11              lots of things in this business, that I

12              won't philosophize about this too much,

13              but sometimes I think we ask jurors to do

14              the unexpected.  And one of them is if a

15              Judge sustains an objection, he will tell

16              you, "Now, don't speculate about what the

17              heck the answer to that question might

18              have been."  That is probably a hard

19              thing to do sometimes, but do you think

20              you could do your best to follow that

21              admonition if you are given it by the

22              Judge?
```

659

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | I talked a few minutes ago about your husband |
| 3 | | having some tools stolen.  And I have in |
| 4 | | the past also been the victim of crime, |
| 5 | | so I know that sort of frustrating and |
| 6 | | angering feeling.  Have you given much |
| 7 | | thought to the crime problem in general |
| 8 | | in our country? |
| 9 | A. | I know that we're -- we have a big crime rate. |
| 10 | | Other than those tools, I have not been |
| 11 | | privy to it, so, I can't talk with any |
| 12 | | kind of knowledge about what is going on. |
| 13 | | You see the crime things on television |
| 14 | | all the time. |
| 15 | Q. | I am actually more interested in your opinion |
| 16 | | than your knowledge, and I am interested |
| 17 | | in your opinion about what you think may |
| 18 | | be we could do to lessen or solve the |
| 19 | | crime problem, if you have any thoughts |
| 20 | | about that? |
| 21 | A. | I don't know how you are going to lessen it. |
| 22 | | I think that there's not enough money |

660

1          spent on law enforcement.  Too much money

2          spent on paperwork and not enough on the

3          actual people that go out there and do

4          the work.  I feel the same about

5          hospitals.

6  Q.   These days practicing medicine is sort of

7          defensive.  You are making a paper trail.

8  A.   Yes.

9  Q.   I'm not suggesting any of these to you, people

10         have different views about this.  Some

11         people say they should give harder

12         sentences.  Other people say we should

13         focus more on rehabilitation.

14  A.   I think it depends on the crime.  I think it

15         depends on the person who committed the

16         crime.  I don't think you can make one

17         blanket statement.

18  Q.   Mr. Bailey asked you about if you were

19         selected as a juror about having to look

20         at Miss Roberts, whether you might have

21         some sympathy for her.  I wanted to turn

22         that around a little bit and I think

661

```
 1              we're both talking about the same thing,
 2              which is something I alluded to earlier,
 3              that you have to be objective as you can
 4              about your job in this case.  Just like
 5              you might feel sympathy for Donna
 6              Roberts, you might also feel sympathy for
 7              Mr. Fingerhut or other members of his
 8              family, because you can anticipate
 9              hearing testimony about how he died.  You
10              can anticipate seeing photographs, and
11              some of them might be gruesome or
12              graphic.  That all makes sense to you in
13              a homicide case, correct?
14   A.   Yes.
15   Q.   And although I made a little bit of a joke
16              earlier and said that we as lawyers would
17              like you to come in here with your mind
18              as blank as that sheet of paper back
19              there, we all know that can't be done,
20              because we're human beings and we have
21              got thoughts and experiences and
22              feelings.  And my question to you is,
```

662

1        even though it is natural for anybody to

2        feel sympathy for the victim in a case

3        like this, can you once again just like

4        you would have to do as Mr. Bailey asked

5        you about Miss Roberts, can you push that

6        sympathy off to the edge of that paper

7        and say, "Well, you know what," just like

8        you have to do at work, "I feel sorry for

9        this person, but I need to push that

10       aside and objectively decide whether the

11       State has proved this case to me or not."

12       Do you think you could do that?

13  A.   I think like I answered before, I would try

14       very hard.

15  Q.   I have mentioned a few times that the State

16       has to prove its case.  And they have to

17       prove it by proof called proof beyond a

18       reasonable doubt.  Have you heard that

19       phrase before today?

20  A.   Yes.

21  Q.   Lots of people will stand up here and tell you

22       all kinds of things that it means.  In

663

1          the final analysis, Judge Stuard will

2          tell you at the end of the case what it

3          really means.  But we like to talk about

4          these things a little bit to make sure

5          that you are comfortable with sitting as

6          a juror on this case.  Have you ever

7          heard the phrase before, "taking the

8          Fifth"?

9     A.   Yes.

10    Q.   And you have probably either seen that on T.V.

11         or in a movie, and again, just as the

12         objection has sometimes gotten a bad play

13         in the movies or the T.V., the Fifth

14         Amendment sort of has, because that

15         phrase taking the Fifth, means asserting

16         your right under the Fifth Amendment?

17    A.   Right.

18    Q.   And the Fifth Amendment says that nobody in a

19         criminal case has to do anything to

20         incriminate themselves.  And what the

21         Courts have basically said over the years

22         is, what that really means is if you are

664

1    charged with a crime, or you are

2    suspected of a crime, you don't have to

3    do anything to help the Government make

4    its case against you.  All of that has

5    washed out into or translated into what

6    we all now today call the presumption of

7    innocence.  Have you heard that phrase

8    before?

9  A.   Yes.

10  Q.   In fact, there was a book and a movie out, I

11    think, called "Presumed Innocent".

12    Instead of twisting your minds up with

13    lots of fancy legal phrases, which don't

14    make much sense to me either, I thought

15    about this and a few years ago, I came up

16    with a way of thinking about this that

17    doesn't involve a whole lot of law.  We

18    tell you during the course of all of

19    these proceedings that your decision

20    won't be made in a vacuum, that you will

21    be given guidelines for this and you will

22    be told what the elements of the offenses

```
 1              are, and you will be told what proof
 2              beyond a reasonable doubt means, but the
 3              bottom line is -- and did you used to be
 4              a med tech?
 5    A.   Yes.
 6    Q.   My wife is a med tech, and med tech's as
 7              opposed to liberal arts majors have more
 8              scientific minds, and those more
 9              scientific minds are looking for
10              precision.  My wife used to say when I
11              was in law school, she's going, here I'm
12              talking about two plus two equals four or
13              X squared or whatever she's talking
14              about, and I am talking about what would
15              a reasonable man do in these
16              circumstances.  Now, here's why I bring
17              that up because you as a scientific
18              person may find it a little troubling
19              that when you hear all of these
20              definitions and you are told to weigh one
21              thing against another, no one is going to
22              give you any numbers or any
```

666

```
 1              quantification.  Nobody is going to say
 2              if the State has got 12 witnesses, they
 3              prove their case and if the State only
 4              had ten witnesses, they didn't prove
 5              their case, because the truth is they
 6              could prove their case or not with one
 7              witness if they meet all of the elements.
 8    A.   Right.
 9    Q.   So all of that having been said, because
10              there's no magical formula, I tried to
11              think about this, and I think that a
12              helpful thing for a juror to do, because
13              you don't have a formula, is to go back
14              into the Jury room and now you say,
15              "Well, I have to decide whether the State
16              proved this case beyond a reasonable
17              doubt.  How the heck am I going to do
18              that?"  Think of an empty box in your
19              mind's eye.  Somewhere on that box is a
20              line that you the juror will draw,
21              because there's no precise formula for
22              where it is.  That line is a line that
```

667

1      you are going to call reasonable doubt,

2      because the Judge is going to tell you

3      the State has to prove its case beyond a

4      reasonable doubt.  Then in your mind's

5      eye, you have to take all of the evidence

6      that was given to you by the State in

7      this case, and you have to pour it into

8      the box.  And you have to decide as a

9      juror, did they fill up that box, not to

10     that line, but a little bit beyond that

11     line, because it is called proof beyond a

12     reasonable doubt.  Now, again, there's no

13     place on that, I can't tell you where to

14     draw that line.  The only thing I can

15     suggest to you is that it is pretty high

16     up on the box, because proof beyond a

17     reasonable doubt is the highest standard

18     of proof we have in our law.  When you

19     are thinking about evidence, you have to

20     pour it into the box in your mind's eye

21     and decide whether it goes beyond there.

22     Really, I think we mislead jurors a

668

```
 1              little bit because we say guilty or not
 2              guilty, and really what it should be in
 3              my estimation anyway, and I think a
 4              helpful way to think about it is proved
 5              or not proved, because when you start out
 6              the case -- have you heard any evidence
 7              yet as we sit here today?
 8   A.   No.
 9   Q.   So that box would have to be empty, correct?
10   A.   Right.
11   Q.   There's nothing to pour in that box.
12   A.   Right.
13   Q.   And what is a little bit tricky about this is
14              that it is the State that has to give you
15              the evidence to pour into the box.  So if
16              they don't put any evidence in the box,
17              it didn't get filled up beyond the line
18              called beyond a reasonable doubt, did it?
19   A.   Right.
20   Q.   If they gave you some evidence, but you say,
21              "You know, what if in my mind's eye when
22              I poured it in that box, it didn't get up
```

669

```
 1              to that line, they have given me some
 2              evidence, but they haven't proved their
 3              case beyond a reasonable doubt in both of
 4              those cases," you would have to say the
 5              verdict was not guilty, right?
 6   A.   Right.
 7   Q.   And any problem doing that?
 8   A.   No.
 9   Q.   The tricky thing about this is, the Defendant,
10              because of the Fifth Amendment that says,
11              "I don't have to do anything to help the
12              Government prove its case," the Defendant
13              doesn't pour anything into the box, and
14              she doesn't take anything out of the box;
15              do you see how that works?
16   A.   Yes.
17   Q.   She may want to call witnesses, or she may
18              want to testify or she may want to have
19              her lawyer cross examine the State's
20              witnesses, and when that happens, that
21              may affect how you look at whether the
22              State filled up the box.  Does that make
```

1           sense to you?

2  A.   Yes.

3  Q.   For example, that case I gave you a little

4         while ago where I was charged with that

5         murder, after the witness testifies when

6         the Prosecutor asked some questions, if

7         you stop right then, that box would be

8         probably filled up beyond that line, but

9         then after you heard Ben Matlock, my

10        lawyer, pull out that receipt, may be in

11        your mind's eye there's nothing in that

12        box or certainly not so much.  You see

13        how that works?

14  A.   Right.

15  Q.   The tricky part about this is most of us want

16        to be fair, and certainly when you are a

17        juror you want to be fair, correct?

18  A.   Yes.

19  Q.   And when most of us want to be fair in life,

20        if I accused you of some wrongdoing, and

21        somebody else had to make a decision, you

22        would certainly want that other person to

671

1    at least say, "Before you decide if I did

2    what you, John Juhasz said I did, don't

3    you want to hear my side of the story?"

4    That is how it works most of the times

5    when it is a dispute at work.  When it is

6    something with children, that is how we

7    do things, right?

8  A.    Right.

9  Q.    The problem is, once again the legal system

10    has taken reality and turned it on its

11    ear, use of the Fifth Amendment, because

12    of that presumption of innocence, because

13    the burden of proof is on the State, the

14    Defendant may not do anything in the

15    case.  Do you see that?

16  A.    Yes.

17  Q.    Literally under the Fifth Amendment, she could

18    sit there literally or figuratively, fold

19    her arms and say, "I don't have anything

20    to say.  I don't want my lawyer to ask

21    any questions of the State's witness.  I

22    don't want to call any witnesses, because

672

1               you know why, I don't think the State
2               filled up Mr. Juhasz' box beyond the line
3               called reasonable doubt."  Do you see how
4               that works?
5   A.    Yes.
6   Q.    Now, there's sort of a natural inclination in
7               all of us to say, "I want to hear both
8               sides.  I want to hear what she's got to
9               say.  She made a not guilty plea.  She
10              must not think she did it.  I want to
11              hear what she has to say."  My question
12              is, having asked you all of these other
13              questions about my silly little boxes,
14              are you going to hold that against her if
15              she makes that decision to say, "I got
16              nothing to say"?  I'm saying they didn't
17              fill up the box.  Are you going to hold
18              that against her and say, "You know what,
19              she must be guilty or she would get up
20              here and talk to me."  Am I making that
21              clear?
22  A.    Yes, I understand what you are saying.  I just

673

1           never thought of that aspect before.  I

2           don't think.

3   Q.   And again, it is one of those things where you

4           sort of have to put aside your natural

5           inclinations or your own opinions, like

6           when we talked about the death penalty,

7           and say, "Listen, even though I might

8           like to hear from her, the fact of the

9           matter is, Juhasz stood up here and did

10          all of those silly little box examples

11          for 20 minutes and the Judge didn't use

12          the box example, but he did tell me about

13          the presumption of innocence and the

14          burden of proof is on the State.  Even if

15          I didn't want to hear that, I have to set

16          that aside and objectively decide."   Did

17          they fill up the box?

18  A.   Right.

19  Q.   Do you think you could do that?

20  A.   I can sure try.

21  Q.   I am going to make it just slightly more

22          complicated and then we're going to leave

674

1    it alone.  There's not just one box.

2    There are boxes for -- you heard

3    Mr. Bailey talk about elements.  Well,

4    every crime has parts, or elements, and

5    each one of those little boxes has to be

6    filled up beyond that line.  Because when

7    the State says, "I am charging a person

8    with a crime and it has four elements,"

9    they impliedly represent to you when they

10   come to a trial, "I'm going to prove all

11   four of those elements by proof beyond a

12   reasonable doubt," and the Judge is going

13   to tell you that you have to hold them to

14   that burden.  That also applies to the

15   specification.  That circumstance gets us

16   from a regular murder case to a death

17   penalty case.  They have to prove that

18   specification beyond a reasonable doubt.

19        And let me try to use a -- it is a

20   little bit of a silly example, but one of

21   the specifications that has nothing to do

22   with this case, is that if you kill

675

1 somebody who is the Governor of this

2 State, you are eligible for the death

3 penalty.  So, let's assume that we have a

4 trial and the State comes in and says,

5 "This is a death penalty case, we're

6 going to prove to you that John Juhasz

7 killed Bob Taft," and Bob Taft was the

8 Governor of the State of Ohio and John

9 Juhasz killed him.  And they bring in 35

10 eyewitnesses, three video taped

11 confessions, 244 photographs, and all of

12 them prove beyond a reasonable doubt that

13 I have killed Bob Taft.  However, guess

14 what?  By whatever proof, when they

15 wanted to bring some certified copy of

16 the thing that says he was sworn in as

17 the Governor, when they wanted to bring

18 Thomas Moyer, the Chief Justice up to

19 say, "Yes, that dead guy is the guy I

20 swore in as the Governor," whatever

21 proof, they decide not to do it.  You see

22 in a circumstance like that, they filled

676

| | | |
|---|---|---|
| 1 | | up the box called aggravated murder |
| 2 | | proving I killed Taft, but they neglected |
| 3 | | to prove to you that specification.  Do |
| 4 | | you see that? |
| 5 | A. | That he was the Governor? |
| 6 | Q. | Yes.  If they don't prove that beyond a |
| 7 | | reasonable doubt, and remember, and |
| 8 | | here's one of the reasons I use that |
| 9 | | example.  You have to go from evidence |
| 10 | | presented in the Courtroom, you can't go |
| 11 | | back in the Jury room, and I don't know |
| 12 | | what these jerks were doing, but I know |
| 13 | | Taft is the Governor.  You can't do that, |
| 14 | | because you have to decide the case from |
| 15 | | the evidence in the Courtroom.  Does that |
| 16 | | make sense to you? |
| 17 | A. | Yes. |
| 18 | Q. | In that situation, you would have in essence a |
| 19 | | split verdict.  Would you say Juhasz is |
| 20 | | clearly guilty of aggravated murder, but |
| 21 | | they clearly didn't fill up the box on |
| 22 | | the specification.  Do you see that? |

677

1   A.   Yes.

2   Q.   You think you could do that?

3   A.   Yes.

4   Q.   Any problems holding the State to that burden

5        of proof?

6   A.   No.

7   Q.   You have made important decisions in your

8        life, haven't you?

9   A.   Yes.

10  Q.   Everybody has.  When you do it, you sort of

11       weigh the pros and the cons, don't you?

12       Whether in your mind's eye or even some

13       people do it on a piece of paper.  You

14       sort of draw a line down the middle and

15       say here's the pros, here's the cons.

16       When you decide whether the State has

17       proved its case beyond a reasonable

18       doubt, you pretty much have to do the

19       same thing.  You have to decide on one

20       side, there's going to be all of the

21       things that the Prosecutors are going to

22       say.  Here's how we proved our case, and

678

1      on the other side are going to be doubts.
2      They may be doubts that you came up with
3      on your own, doubts that you came up with
4      talking to other jurors.  Doubts that you
5      came up with hearing from the lawyers
6      talking to you.  The State doesn't have
7      to prove its case beyond all doubt, but
8      they have to prove it beyond any doubt
9      based on reason and common sense.
10         So, just like when you make an
11     important decision in your life, you have
12     to go over to that doubt side of the
13     check list and analyze each one of those
14     and say, "Is this an imaginary doubt or
15     is this a doubt based on reason and
16     common sense?"  If it is based on reason
17     and common sense, whether there's one
18     left or more than one, then you see the
19     State hasn't proved its case, correct,
20     because you have at least one doubt left
21     that is that is reasonable, that is a
22     doubt you have about whether they have

679

1             proved their case?

2  A.   It has to be beyond all reasonable doubt.

3  Q.   Beyond all reasonable doubt.  Not beyond all

4           doubt.  For example, if we got up in some

5           imaginary trial as the Defense lawyer and

6           say, "Listen folks, there's one and only

7           one doubt about the Government's case,

8           and that is that the witness they brought

9           in was transported from Mars."  Well, I

10           guess that is possible, but it is really

11           not a reasonable doubt, is it?

12  A.   Right.

13  Q.   But if there's one doubt left that is

14           reasonable, then the State hasn't proved

15           its case, do you see that?

16  A.   Yes.  If has to be beyond all reasonable

17           doubt.

18  Q.   When the State is proving their elements, as I

19           talked about earlier, one of the things

20           that they are going to have to prove is

21           this case's intent.  Now, the Judge will

22           probably tell you some things at the end

680

```
 1              of the case, like you can't look into

 2              somebody else's mind to figure out what

 3              their intent was, you have to do it from

 4              the evidence that is available to you.

 5              That makes sense, right?

 6   A.   Yes.

 7   Q.   Do you think that the circumstances of doing

 8              something might prove or fail to prove

 9              intent?  In other words, let's say that I

10              wanted to commit an illegal act by

11              selling Mr. Ingram there, four bags of

12              heroin for 80 bucks.  It would make more

13              sense if I knew that was an illegal act

14              that I would do it in the alley behind

15              the Park Hotel than right here in front

16              of Judge Stuard, right?

17   A.   True.

18   Q.   Similarly, if I wanted to send Mr. Ingram a

19              bribe of a thousand dollars for doing

20              something illegal, it would make more

21              sense that I meet him in the restroom and

22              slip him an envelope full of cash, and
```

681

```
 1              wearing rubber gloves so there's no

 2              fingerprints than if I would send him a

 3              letter and a check saying, "Dear Jerry,

 4              here's my personal check for a thousand

 5              dollars for a bribe," correct?

 6   A.    Right.

 7   Q.    I want to talk to you about one more thing and

 8              then we're done.  Have you ever heard the

 9              phrase, "circumstantial evidence"?

10   A.    Yes.

11   Q.    I would like to talk about circumstantial

12              evidence.  I said earlier that I like to

13              tell the story about either me or my son.

14              This one involves my son.  Let's pretend

15              that it's a late Summer's day and you are

16              at my house.  And it is one of those

17              storms that are blowing, the wind is

18              starting to kick up.  It is starting --

19              the sun is getting occluded by the

20              clouds.  I am out in the kitchen and all

21              of sudden, I hear this big crash in the

22              living room, and as I go into the living
```

682

```
 1            room to investigate, the cat comes
 2            running, darting between my legs.  I go
 3            in and I have kind of a big living room,
 4            and there's a mantel on this side, and I
 5            look, and there's my wife's Norman
 6            Rockwell plate that she really liked
 7            laying on the ground smashed up.  I look
 8            to my left and there's my son Mike going
 9            like this.  (Indicating)  I suppose
10            circumstantially I might say that Mike
11            broke the plate, correct?  I might,
12            right?
13  A.   Might.
14  Q.   But it could also be that the cat knocked the
15            plate off, and that is why the cat was
16            running out, not scared from the noise of
17            Mike breaking the plate, but because the
18            cat broke the plate and Mike is going,
19            "Oh man, Mom is going to kill me and the
20            cat."  That makes sense, right?
21  A.   Yes.
22  Q.   It could also be that the breeze that that
```

683

1          little Summer storm knocked the plate

2          off, scared the cat and Mike is going,

3          "Somebody is taking the fall for this and

4          nobody is going to believe it's the

5          wind," right?

6  A.    Right.

7  Q.    Now here's why I tell you that story.  Because

8          any one of those are plausible stories

9          from that circumstantial evidence I gave

10         you, correct?

11  A.    Right.

12  Q.    The reason I give you that example is,

13         thinking back what we said about

14         reasonable doubt, if you hear

15         circumstantial evidence in a case like

16         this, and it leaves you with other

17         plausible explanations, then you see that

18         that circumstantial evidence has improved

19         the case beyond a reasonable doubt.  You

20         agree with that?

21  A.    Yes.

22  Q.    Any problem holding the State to that kind of

684

```
 1          burden?
 2   A.    No.
 3   Q.    Are there any questions that have popped up in
 4              your mind since I have been up here or
 5              Mr. Bailey has been up here talking to
 6              you?
 7   A.    I think you clarified everything I was having
 8              a problem with.
 9   Q.    Any reason you can think of as we were talking
10              to you why you couldn't be a juror in
11              this case?
12   A.    No.
13              MR. JUHASZ:  Thank you.
14              THE COURT:  Ma'am, you will be in
15   the pool from which this Jury is selected.  We'll
16   choose 34 people.  It will take the next couple of
17   weeks to do that.  I again remind you, no talking
18   about anything or reading anything.  Thank you for
19   your time.
20   (Juror No. 8 excused from the Courtroom.)
21   (SIDE BAR DISCUSSION OFF THE RECORD AND OUT OF
22   HEARING)
```

685

1              THE COURT:  For the record, I had

2    counsel come up to Side Bar and ask them if they

3    had a challenge for cause.  Neither side had a

4    challenge for cause, is that correct?

5              MR. BAILEY:  That is correct.

6              MR. INGRAM:  That is correct.

7              THE COURT:  So the juror will go

8    into the pool.  I don't know what your experience

9    is, maybe you have been in more efficient Courts

10   than ours in the past.  But it continually comes up

11   I suspect in every trial, you have Side Bars many

12   times that are, "I have to use the restroom."  It

13   is important that any Side Bar goes on the record

14   because the Court, the Appellate Attorneys always

15   make great hay out of that.  So if I should forget

16   doing something, I would appreciate it, that

17   someone call it to my attention.  We'll see you

18   tomorrow morning at 9:00.

19   (Court in recess at 4:30 p.m.)

20

21

22

686

1   Friday, April 11, 2003; Continuing Voir Dire:

2   (Juror No. 9, Richard Caraway entered the Courtroom.)

3                THE COURT:  You have read the

4   handout that was given to you?

5                MR. CARAWAY:  Yes.

6                THE COURT:  You have a good idea of

7   why you are here?

8                MR. CARAWAY:  Yes.

9                THE COURT:  The main purpose of the

10  inquiry this morning is to allow these folks to

11  delve into a couple of different things.  To

12  explain the type of juror that we're trying to find

13  is to say that everyone has some opinion to some

14  degree on the question of the death penalty.  There

15  are those on the one side who think that it is

16  proper and just that if person takes another's life

17  illegally, that that person should thereby forfeit

18  their own life.  That is not the law of Ohio.

19  There are those who feel that they could not

20  participate in any undertaking that would

21  ultimately lead to a recommendation to take

22  someone's life no matter what that person had done.

687

1    That is fine for both sides of people to hold those

2    opinions, but neither of them could perform what is

3    necessary of a juror in this particular matter.

4            The law of Ohio is such that every murder

5    does not merit the imposition of the death penalty.

6    It is only an aggravated murder.  And there's a

7    definition, which you will get on what is

8    aggravated murder, but only on certain types of

9    aggravated murders where there are specifications.

10   Those are outlined in the statute, killing the

11   Governor, killing a police officer, and other

12   specifications.  This particular case falls within

13   one of those categories where the Grand Jury saw

14   fit to attach specifications to the aggravated

15   murder.

16           Therefore, this Jury depending on how the

17   guilty phase goes, the Jury is called upon at the

18   trial to make a determination first of whether they

19   find the Defendant to be guilty or innocent.  The

20   proper term is guilty or not guilty.  Based on the

21   evidence that will be produced.

22           The burden is entirely upon the State to

688

1   prove their case by the test, which is known as

2   beyond a reasonable doubt.  That is the highest

3   standard of proof in our law.

4          As you further note from reading that

5   literature that there's a presumption of innocence.

6   The Defendant need do nothing.  The burden is

7   entirely upon the State to prove their case.  So

8   part of the questions that will be presented to you

9   will delve into your thoughts on the question of

10  the death penalty.  Now assume that a person in

11  your position has a feeling, either for or against

12  the death penalty.  That is not unusual.  The

13  question is whether it is so fixed that you would

14  not be able to follow the law because in order for

15  both sides here to have a fair and impartial Jury,

16  each juror must be open minded, and above all be

17  able to follow the law as it is in Ohio, whether

18  any of us might agree with it or disagree with it.

19  That is the only way that both sides can receive a

20  fair Jury here.

21         The second issue that will be inquired

22  about is concerning the pre-trial publicity this

1   case has received.  Any murder case, aggravated or

2   not, always generates a certain amount of

3   publicity.  Anything that happens in our community

4   that is newsworthy, you are going to read about in

5   the newspaper.  This case is no different.  It

6   received one might say a lot of publicity.  There

7   are probably few people -- there will be some from

8   that whole group over there the other day, that had

9   not read something about this issue.  If anybody

10  reads the paper daily, they would have read

11  something about the case.

12          Again, you can't have 12 people there

13  that don't know what is going on in the community.

14  It isn't very practical.  But we do require each

15  juror to be open minded and not to have made their

16  mind up based on reports out of newspapers.

17  Initial reports and many times, once something has

18  been published, it is perpetuated, even though it

19  is later found to be untrue, seemed to keep getting

20  kicked around in an incorrect manner, so you will

21  be asked whether or not you are familiar with the

22  facts of this case from that contact with the

690

1    media.  And if so, do you have fixed opinions, or

2    are you able to assure both sides here that you

3    have an open mind that you are willing to set aside

4    what you have read, and determine this case on its

5    merits.  And that will be based on what you hear in

6    this Courtroom as presented by the Prosecution.

7    Fair enough?

8                    MR. CARAWAY:  Okay.

9                    THE COURT:  Mr. Bailey?

10   EXAMINATION BY MR. BECKER OF MR. CARAWAY:

11   Q.    Mr. Caraway, good morning.

12   A.    Good morning.

13   Q.    My name is Chris Becker.  I am an Assistant

14            Prosecutor and I think if you remember,

15            the questionnaire you probably saw my

16            name as well as Mr. Bailey's name on

17            there, and the names of all of the other

18            assistants.  And we're representing the

19            State of Ohio, and these gentlemen are

20            representing Donna Roberts, Mr. Ingram

21            and Mr. Juhasz; and I think the Court has

22            given you a lay of the land as to what

691

```
 1        we're going to discuss with you this
 2        morning.
 3              And I guess the first issue we're
 4        going to ask you about is your opinion on
 5        the death penalty and basically, what
 6        we're doing is we're going to be a little
 7        presumptuous today, because this case is
 8        really going to be like two trials.  It
 9        is going to be a first part where you are
10        going to determine whether or not you and
11        your fellow jurors feel that Miss Roberts
12        is guilty or not guilty of the crimes
13        that she's charged with.  And then if you
14        make that determination, we're going to
15        have a second trial, and a second part of
16        the trial, which you are going to
17        determine and recommend a sentence, and
18        that possible sentence could be the death
19        penalty.  And the real question that we
20        have to ask you is, first we have to ask
21        you to be presumptuous and say that you
22        are going to find her guilty and you may
```

692

1      not find her guilty.  That may be the end

2      of the trial.  But what we want to ask

3      you is, and the basic question we want to

4      ask you is, if we get to that second

5      phase and the Court is going to instruct

6      you on what the law is, and there's some

7      things that he will explain to you as to

8      how you make your determination and

9      because it is a criminal trial, the State

10     has to prove all of the elements, even

11     when we get to the second phase, by proof

12     beyond a reasonable doubt.  So when we

13     get to that second phase, if the law

14     allows it, if the law as the Court gives

15     it to you, and I can't give you the law,

16     that is what the Court's job is, if the

17     Court gives you the law and the facts of

18     this particular case warrant it, could

19     you go back in this Jury room and sign a

20     piece of paper with 11 other jurors that

21     basically recommends the death penalty

22     for Miss Roberts?

693

1   A.    Yes, if necessary.

2   Q.    And you also understand though as the Court

3         explained to you that there's going to be

4         a weighing, a balancing of certain

5         factors.  They are called aggravating

6         circumstances and mitigating factors, and

7         the Court will explain all of that, and

8         if we get to that second phase, and you

9         get the case to determine what penalty is

10        appropriate in this case, you don't have

11        to give the death penalty.

12              So, I guess the second and follow up

13        question that I have would be to you is,

14        if the facts don't warrant it, even

15        though you may find in the first part

16        that she played some role in the death of

17        another individual, you could recommend a

18        sentence less than death?

19  A.    Yes.

20  Q.    You understand that?

21  A.    Yes.

22  Q.    You are going to have basically four choices,

694

```
 1              if we get to that second phase.  And
 2              again we're being presumptuous, if you
 3              get to that phase where you find her
 4              guilty and then we come back for this
 5              penalty phase of the trial, you will be
 6              given a list of options as to what you
 7              can do, from 25 years to life or life
 8              imprisonment with no parole eligibility
 9              for 25 years; or of course, the worst
10              penalty and the ultimate penalty which
11              would be death.  You would have a range
12              to choose from and you would listen
13              fairly to the Court's instructions, and
14              any evidence that her and her attorneys
15              may put on, as well as any evidence we
16              may have and follow the Court's
17              instructions and weigh that?
18    A.    Yes.
19    Q.    So, you are not so convinced that if you find
20              her guilty of a role in some type of
21              murder, that you would automatically have
22              to go back there and sign a verdict form
```

695

1   calling for the death penalty?

2 A. No.

3 Q. You would listen to the evidence and make a

4   determination based upon the evidence as

5   to whether or not this particular

6   Defendant deserved to have that penalty

7   imposed upon her?

8 A. Yes.

9 Q. Now, I also noticed in your questionnaire that

10   we have and one of the reasons we gave

11   you these questionnaires is because

12   otherwise we would be asking a lot of

13   these questions.  There's certain things

14   Attorneys pick up on and we see that we

15   feel are important, and we circle them or

16   highlight them or put red checks by them.

17   And I notice that you apparently know a

18   lot of deputies here in Trumbull County,

19   is that correct?

20 A. Yes.

21 Q. What deputies do you know?

22 A. I know a lot of them buy their first names.

696

```
 1   Q.   Do you know Pete Pizzulo?

 2   A.   Yes.

 3   Q.   Do you know Tony Leshnack?

 4   A.   There's somebody named Tony, I don't know if

 5        that is the person or not.

 6   Q.   Usually he hangs around with Pete.  Do you

 7        know Captain Bacon here?

 8   A.   Yes.

 9   Q.   Now, I assume you haven't spoke to them about

10        this case, have you?

11   A.   No.

12   Q.   Because in your questionnaire, you indicated

13        that I think you are a daily reader of

14        the Tribune Chronicle?

15   A.   Right.

16   Q.   I am assuming as a daily reader, you have

17        heard about this case?

18   A.   Yes.

19   Q.   And the second sort of issue or hurdle we have

20        to get over here is despite what you may

21        have read, I assume you maybe have seen

22        some things on television, is that
```

697

1            correct?

2    A.    Yes.

3    Q.    And I don't know if you listen to the radio or

4            if it has been discussed on radio?

5    A.    Yes.

6    Q.    It has been in the media quite a bit?

7    A.    Yes.

8    Q.    The second issue and the second hurdle we're

9            going to have to clear with you is

10           despite what you have heard or read or

11           seen on television, can you set that

12           aside and not let that influence your

13           decision as to whether or not she's

14           guilty or innocent?  And also your

15           decision whether or not she should get,

16           if we get to that second phase, the death

17           penalty or some lesser penalty?

18   A.    Yes.

19   Q.    You don't feel that that publicity and the

20           things that you have read have influenced

21           your decision that you are going to come

22           in here and automatically say, "Well, I

698

```
 1               read in the Tribune, this, that and

 2               another," or "I saw on the news, I don't

 3               care what Mr. Juhasz and Mr. Ingram say,

 4               I'm going to find her guilty"?

 5   A.   No.

 6   Q.   You wouldn't do that?

 7   A.   No.

 8   Q.   You would be fair and open minded and be able

 9               to set aside whatever it is you heard,

10               read or saw on television about this

11               case?

12   A.   Yes.

13   Q.   Now, Mr. Caraway, we were talking a little bit

14               about you knowing some of these deputies.

15               And you speak to them or do you deal with

16               them in your work?  How is it that you

17               know so many?

18   A.   Well, the reason I know them, that several

19               years ago, when G.B. Brown's Restaurant

20               in Champion, at the time it was open

21               there were some of them would come in for

22               lunch every now and then, it wouldn't be
```

699

```
 1              every day.  It would be a different
 2              person and I would be there every day
 3              myself and so I like to talk to people,
 4              so I would talk to the people that are
 5              around me.  Sometimes they would be
 6              around me and I would be talking with
 7              them.
 8   Q.   And you also know -- do you know the Howland
 9              police officers?
10   A.   I have heard their names.  I don't believe I
11              have met any of them.
12   Q.   You are not very friendly with them or
13              shouldn't say friendly, but you are not
14              acquainted with them?
15   A.   No.
16   Q.   The fact that you know some of the deputies
17              and maybe them, they may even take the
18              witness stand, Pete Pizzulo and Tony
19              Leshnack, maybe in particular.  If you
20              were seated here as a juror in this case,
21              would you give their testimony any more
22              credibility than any other witnesses?
```

700

1  A.    I tried to treat everybody fairly.

2  Q.    You would follow the Court's instruction, and

3        you wouldn't let the fact that you had

4        seen them around and maybe saw them at a

5        restaurant some day and spoken to them,

6        you wouldn't let that influence your

7        decision?

8  A.    No.

9  Q.    So, if it comes down to a decision of, you

10       know, "I believe the State has proven

11       their case, but, not quite to beyond a

12       reasonable doubt, but you know, I know

13       Tony Leshnack and he testified and he's a

14       good guy and he wouldn't lie about

15       anything, so therefore, because I know

16       Tony, I'm going to vote to find her

17       guilty."

18  A.   I would try to do it fairly.

19  Q.   Even if the case boiled down to something, and

20       you felt that the State either hasn't

21       proven its case, or the death penalty

22       wasn't warranted, you wouldn't let the

701

1           fact that you know some of these deputies

2           influence your decision?

3  A.   No.

4  Q.   Because you may be at that restaurant or you

5           may be somewhere and you may be on that

6           Jury and you may be on a Jury that they

7           don't find her guilty or they don't give

8           her the death penalty, and if they see

9           you somewhere and they say, "Mr. Caraway,

10          what were you thinking, how could you not

11          have done that?"  You won't let that

12          impact your decision?

13  A.   No.

14  Q.   You are sort of your own man?

15  A.   Right.

16  Q.   Now, this case involves a homicide obviously.

17          And the accusation that's you are going

18          to find if you serve on this Jury are not

19          that Donna Roberts shot anybody.  She

20          never pulled the trigger and pointed it

21          at anyone, but she's charged as a

22          complicitor, an aider and abetter; do you

702

1              understand that?

2    A.    Yes.

3    Q.    And you don't have a problem, you wouldn't

4              treat her any differently, you would

5              follow the Court's instruction as to what

6              an aider and abetter is, correct?

7    A.    Right.

8    Q.    You would follow the Court's instructions as

9              to the type of punishment that she were

10             to receive if she were convicted of an

11             aider and abetter and you got to that

12             second phase?

13   A.    Yes.

14   Q.    Now one of the things that we talk about all

15             of the time in criminal cases is this

16             idea of what reasonable doubt is.  And

17             I'm sure you are very familiar with that

18             term.  You have probably read it in some

19             of the stories you read in the newspaper.

20             I don't know what television shows you

21             watch, but I'm sure you have seen that on

22             television or radio programs or books you

1          may have read, correct?

2    A.   Yes.

3    Q.   You understand that for the purposes of this

4              hearing, the only definition, the only

5              term of reasonable doubt is going to be

6              what Judge Stuard tells you reasonable

7              doubt is; correct?

8    A.   Yes.

9    Q.   And you will be able to follow that

10             instruction as to what reasonable doubt

11             is?

12   A.   Yes.

13   Q.   Now, there's a lot of different ways of trying

14             to approach this question.  But, because

15             everybody is going to have a different

16             idea of what reasonable doubt is, and

17             sometimes people can quantify that, they

18             can say, well, if it is 90 or 95 percent.

19             Some people might say 98 percent.  Some

20             might say 99 percent, but everybody has

21             got a different area where they think

22             that would be.  And some people refer to

704

```
 1              it as say like a swimming pool or glass
 2              of water, how full it is, that is when
 3              you get to reasonable doubt.  You
 4              understand though, and the Court is going
 5              to tell you, everything in your life has
 6              doubt, correct?
 7   A.   I would imagine so.
 8   Q.   And we're only talking about beyond a
 9              reasonable doubt here, not all doubt, not
10              possible doubt, not imaginary doubt, just
11              reasonable doubt.  And the State has to
12              prove it beyond a reasonable doubt.  And
13              you also understand that Miss Roberts has
14              a Constitutional right not to do anything
15              in this case.  Do you understand that
16              concept?
17   A.   Yes.
18   Q.   We often refer to that as her Fifth Amendment
19              right.  I'm not sure if you are familiar
20              with that?
21   A.   Yes.
22   Q.   And we could be here, Mr. Bailey and I, we
```

705

1          could stay in this Courtroom until the

2          end of July, present 85 witnesses, 370

3          Exhibits, take you out to the scene, show

4          you video tapes, show you movies; we

5          still may not be able to prove to you

6          reasonable doubt, right?

7    A.    Right.

8    Q.    Proof beyond a reasonable doubt?

9    A.    Yes.

10   Q.    And we may go through two months of presenting

11         evidence and testimony, and her and her

12         attorneys may say -- stand up and say,

13         "Your Honor, we don't have anything to

14         present to you." You could still find

15         her not guilty if the State hasn't met

16         its burden of proof to all of the

17         elements of the crimes, right?

18   A.    Yes, I try to be fair about it.

19   Q.    And you understand that in our system of

20         justice, it's the State's burden to prove

21         her guilt beyond a reasonable doubt?

22   A.    Yes.

706

1    Q.   And you wholly subscribe to that?

2    A.   Yes.

3    Q.   And the fact that she sits here today with two

4         attorneys and sits in this Courtroom

5         accused by a piece of paper called an

6         Indictment, you don't think she's guilty

7         of anything, do you?

8    A.   I don't know what to think right now.  I

9         haven't heard the evidence.

10   Q.   So, if the Court told me, "Mr. Becker, go sit

11        down.  I'm going to send Mr. Caraway back

12        there with 11 other people and they are

13        going to determine whether she's guilty

14        or innocent."  What would your verdict

15        have to be?

16   A.   Wait and see what the evidence is.

17   Q.   If you hadn't heard one bit of evidence and

18        the Court told you right now to go to

19        that Jury room, your automatic vote is

20        going to be what, not guilty?

21   A.   It would have to be, because they are assumed

22        innocent until proven guilty.

707

```
 1   Q.   You understand that concept very well?

 2   A.   Right.

 3   Q.   You understand that the Indictment is just

 4             basically an accusation, someone is

 5             pointing a finger at someone.  It is a

 6             little bit like at my house sometimes.  I

 7             have four kids and they range in age from

 8             eight to one year old, and I got them all

 9             over, boys and girls, and sometimes

10             something happens, somebody will come up

11             and they are holding their head and they

12             will be crying and the other one will be

13             saying, "I didn't do it," and the third

14             one will be saying, "Yes, they did.  They

15             pushed him down."  It is just a bunch of

16             accusations, right?

17   A.   Right.

18   Q.   Now sometimes this happens where one of them

19             will have a plastic bat or a yard stick

20             or they will have some other device and

21             I'll see them swinging it around and the

22             other one walking away holding their head
```

708

```
 1              and crying.  I may not have seen them hit
 2              my other child, but I can fairly surmise
 3              that the kid who is swinging the stick or
 4              the plastic bat or whatever it is they
 5              are swinging, probably hit the other one
 6              in the head, right?
 7   A.    It would be a good possibility.
 8   Q.    That is an inference, I am making an
 9              inference?
10   A.    Right.
11   Q.    I didn't see it, but from the circumstances, I
12              can infer that one of my children hit the
13              other one, maybe not on purpose, but they
14              have done it in their play and struck the
15              other child?
16   A.    Yes.
17   Q.    That is called circumstantial evidence.  And
18              the Court is going to tell you that
19              circumstantial evidence is just, it is
20              just as important as direct evidence.
21              One of the examples that I always use is,
22              and I think you watch channel 27 news?
```

709

1   A.   Yes.

2   Q.   I forget who the weather man is.

3   A.   There's several of them.

4   Q.   Who is the one that -- is that Dr. Dave?

5   A.   There's Don that is on there.

6   Q.   I assume this has happened to you and I hope I

7        know it is April, but I'm not going to

8        use the snow, if you went home tonight

9        and they said, and you watched the

10       weather on channel 27 and they said, and

11       it seems to be a pretty sunny day out

12       today.  Looks pretty warm out.  But if

13       they told you on the weather, "Listen,

14       we're getting a cold front in tonight,

15       there's going to be some rain.  It is

16       probably going to be heavy at times.

17       Maybe get some lightning and thunder."

18       And it is 11:00 and you look out your

19       window, it is still clear.  You see the

20       stars and you look out on your driveway

21       and you don't see anything there.  You

22       say, "I'm going to go to bed," and you

710

```
 1              wake up the next morning, your driveway
 2              is wet, your car is wet, your neighbor's
 3              driveway, the street has got water
 4              running down the gutter; you never saw
 5              the rain, right?
 6    A.   Right.
 7    Q.   But you can infer that it rained last night?
 8    A.   Right.
 9    Q.   You will be able to make those kind of
10              conclusions?
11    A.   Yes.
12    Q.   Now this happens to me sometimes though.
13              Sometimes in the Summer, my wife and I
14              will turn the sprinkler on or the kids
15              will be running through it and we may
16              leave the water on.  This usually happens
17              once a Summer and you get up, and
18              everybody's yard is dry and everybody's
19              driveway is dry, except for mine.  I can
20              infer that we probably left the sprinkler
21              on if I look out the window and I see the
22              sprinkler going and it didn't rain,
```

711

1           right?

2    A.   Right.

3    Q.   You will be able to make those kind of

4         inferences?

5    A.   Yes.

6    Q.   If they are proven to you again by proof

7         beyond a reasonable doubt?

8    A.   Right.

9    Q.   Now like I mentioned in this case, Miss

10        Roberts is charged with a number of

11        counts.  It is actually four different

12        counts.  Two of those counts are what we

13        call aggravated murder.  They have

14        specifications, which are called the

15        aggravating circumstances, and those are

16        the kinds of things that if we get to

17        that second phase, you will have to

18        weigh.  Some of the aggravating

19        circumstances -- and there also happen to

20        be two other crimes in this case, are

21        what we call aggravated burglary and

22        aggravated robbery.  And I assume that

712

1          when I say the terms burglary and robbery

2          you get an idea in your head as to what

3          those crimes may be, correct?

4   A.   Yes.

5   Q.   And again, the Court though will instruct you

6          as to what the definition of those crimes

7          are, correct?

8   A.   Yes.

9   Q.   You will follow the Court's instructions?

10  A.   Yes.

11  Q.   One of the things we always worry about

12         sometimes is, and this may go more to the

13         death penalty portion, but you wouldn't

14         try and change the law, if you didn't

15         agree with it, would you?

16  A.   No.

17  Q.   And if the Court gives you what the law is,

18         you are not so set that you would say, "I

19         don't think that should be the law," or

20         "They should have to prove something

21         else, so I'm not going to find her

22         guilty, even though the State met its

713

1        burden of proof in all of the elements of

2        the crime and even though they proved

3        them beyond a reasonable doubt.  I think

4        there should be something more that they

5        have to prove."  You wouldn't do that to

6        the State, would you?

7   A.   No.

8   Q.   Now, as I mentioned to you, this case involves

9        complicity to murder.  It is a

10       complicity, it is an aider and abetter.

11       Well, strike that.  This case involves an

12       accomplice to the murder and you are

13       going to hear some things about the

14       person who actually pulled the trigger.

15       You are probably going to see some

16       photographs of a deceased individual, the

17       individual who is the victim in this

18       case.  Is that something that you feel

19       you could do, and it wouldn't affect you?

20  A.   I would be all right.

21  Q.   Some of these photographs may be unpleasant.

22       You wouldn't look at the photographs and

714

```
 1              say, "My gosh, look at this poor human
 2              being.  If she had anything to do with
 3              it, I don't care if she talked to
 4              somebody that knew something about it,
 5              she should be convicted."  You wouldn't
 6              do that, would you?
 7    A.   No.
 8    Q.   You would be fair and even if it was a heinous
 9              crime and if the crime looked bad to you,
10              or the crime scene or the victim looked
11              as if he may have suffered, you wouldn't
12              say, "Well, you know what, I know the
13              State didn't prove all of the elements by
14              proof beyond a reasonable doubt, but it
15              is such a terrible crime, I can't let her
16              walk out of here."  You wouldn't do that,
17              either?
18    A.   No.
19    Q.   Now this case does involve the use of a gun.
20              And I didn't really see in your
21              questionnaire any feelings you may have
22              one way or another.  Do you actually own
```

715

1              any guns?

2    A.   No, I don't.

3    Q.   Have you ever used a firearm?

4    A.   No, I haven't.

5    Q.   I also notice that you work, is it in

6              maintenance at the K-Mart Distribution

7              Center?

8    A.   Yes, it is.

9    Q.   You are still working there?

10   A.   Yes.

11   Q.   And I know they are having some problems out

12             there and some things out there.  Is

13             there anything either related to your

14             job, because I think there have been some

15             layoffs out there, I believe?

16   A.   There have been.

17   Q.   Is there anything in your personal life that

18             you feel would interfere with your

19             ability to serve as a juror in this case?

20   A.   No.

21   Q.   You don't have anything weighing on your mind,

22             such as I might lose my job or K-Mart is

716

1           in trouble or a sick relative or spouse

2           or child or anything that may detract you

3           from being able to sit as a fair and

4           impartial juror in this case?

5    A.  No.

6    Q.  You understand that because of the seriousness

7           of these charges and the procedure and

8           the time, it may take a while to present

9           everything to you.

10   A.  Yes.

11   Q.  And you would be comfortable being away from

12          your job and your family and your friends

13          for a month of time, because the Court is

14          going to tell you, you can't talk about

15          this to anybody.  If you see those

16          deputies come in the restaurants, you

17          say, "Hey, I am sitting on this Donna

18          Roberts' trial.  I want to know this,

19          that and the other thing."  You are going

20          to take an oath and follow the Court's

21          instruction and not speak to anybody

22          about this case?

717

1   A.   Right.

2   Q.   You won't have a problem in doing that?

3   A.   No.

4   Q.   I noticed at one point, I think it was on your

5        questionnaire, that you had actually done

6        some things for a probation department?

7   A.   Yes.

8   Q.   And I understand it was a while ago.  And I

9        think you basically dealt with people

10       that had been convicted of crimes, it was

11       like a diversionary program.  Instead of

12       going to jail, you did something with

13       them?

14  A.   Yes.

15  Q.   What exactly did you do for these people?

16  A.   Well, what I did was, there's a Judge that

17       decided that there were some people that

18       were first time offenders,

19       misdemeanors -- and he felt that some of

20       the people could deserve a second chance.

21       There were other people that may have had

22       the same type of crime that were supposed

718

```
 1                to have committed and he figured they
 2                didn't, but how he decided one or the
 3                other, it is not up to me to decide, but
 4                he decided there were some of them that
 5                deserved a chance, that they would be
 6                better off by not going to jail, by going
 7                through a diversary program, so I helped
 8                them out.
 9    Q.   What exactly did you do?  Did you have them
10                call you every day or did you help them
11                look for jobs?  What is it that you did
12                specifically?
13    A.   What I did, what my particular case, I was
14                with a person that had several problems
15                really.  One was that he was an
16                alcoholic.  He had parents that were
17                alcoholics.  He was, I suppose, like
18                mentally diminished or however the legal
19                word is for it there.  He had a low I.Q.
20                and he was operating at about a second
21                grade level for reading and whatever it
22                would be, so the rest of his life was
```

719

1    going to be that way and he had some
2    other problems, like shoplifting was what
3    his main problem was, what he was
4    actually arrested for.  I guess from what
5    he was saying, that his, I guess his Dad
6    took him into a store somewhere and
7    encouraged him to shoplift and so this
8    was his background, and so, finally he
9    did.  I guess this had been going on
10   throughout his life.  It wasn't just a
11   one time thing, and so I was helping him
12   to find a way around this, because he
13   didn't have a job, and so I figured that
14   one thing I wanted to do was show him
15   what kinds of jobs were available for
16   him, based on second grade education.
17   Even though he was an adult, he was at a
18   second grade level of education.  There
19   are a lot of jobs that he would be able
20   to do and he didn't think about those.  I
21   would go through a newspaper and show him
22   what section of the newspaper the jobs

720

```
 1              are located and I would show him the

 2              types of jobs that he could probably do.

 3              I would say, "Most of these jobs you

 4              won't be able to do," and I would tell

 5              him why.  He knew the type of jobs he

 6              could do.  I told him that he should

 7              apply for this, this or this, these types

 8              of jobs, I would see in the newspaper.

 9              If he had another one he was interested

10              in, he could ask me about that and I

11              could say, "If you think you could do

12              that," he would apply for it, also.  I

13              would work with him that way and also

14              since he didn't have a car, he wasn't

15              able to drive, he took a bus everywhere,

16              so I showed him where the bus stops were,

17              how to get on a bus, what you do, to pay

18              some money.

19    Q.    You were sort of like a tutor for this

20              individual?

21    A.    Right.

22    Q.    It was just the one individual, the one time?
```

721

1    A.    Well, this, I was a volunteer in that
2          particular case, where I was with
3          Citizens Probation Authority was the name
4          of the place I was with there.  So they
5          had the number of cases, and their
6          caseworker were being swamped with cases
7          and cases, like what they considered to
8          be of a more serious nature, not that he
9          wasn't serious, but there were people
10         that could be convicted of maybe felonies
11         or something, and they could help them
12         more than this person.  They were all
13         important, but they had to prioritize it.
14         So a Judge come up with this idea of
15         helping people that were first time
16         offenders that were the cases that were
17         not serious when compared to a felony.
18   Q.    And you helped out and you volunteered?
19   A.    Yes.
20   Q.    Did you enjoy that experience?
21   A.    Yes, I did.
22   Q.    And you understand we're dealing with a little

722

1                bit more and the only reason I ask is

2                that this is a much more serious offense

3                and you understand that?

4   A.    Yes.

5   Q.    You indicate, I think on your questionnaire

6                that you could serve or you could not

7                serve, you kind of take it or leave it.

8                You don't really care?

9   A.    I could do whatever, that is the purpose of

10               being here is to decide whether people

11               are going to be qualified or not

12               qualified for whatever reason.

13  Q.    You have been through this process you

14               mentioned, somewhere in Michigan?

15  A.    Yes.

16  Q.    I understand you didn't get to actually render

17               a decision, but you actually served until

18               a mistrial was declared?

19  A.    Yes.

20  Q.    Is there anything you gained out of that

21               experience that you feel whether it was

22               positive or negative that would say, "I

723

1          prefer not to," or "I would really like

2          to again and actually get to make the

3          ultimate decision," or you just sit here

4          and do your job and if this case ended up

5          somewhere along the lines not getting to

6          you for whatever reason, you would be

7          more than happy to serve?

8    A.    Yes.  I think this is an interesting type of

9          thing to do.

10              MR. BECKER:  Thank you very much

11   Mr. Caraway.

12   EXAMINATION BY MR. INGRAM OF MR. CARAWAY:

13   Q.    I got bad news for you, your deal is only

14         halfway over.  When I am done, you can

15         then leave.  How are you doing over there

16         this morning?

17   A.    Doing good.

18   Q.    Do you want a glass of water or anything?

19   A.    No thanks.

20   Q.    My name is Jerry Ingram, and John Juhasz and I

21         share the responsibility of representing

22         Donna Roberts who is on trial for her

724

```
 1              life.  Obviously we feel, we take our
 2              responsibilities very seriously and feel
 3              we should take every reasonable
 4              precaution in selecting a fair minded
 5              Jury, the same type of Jury that you or I
 6              would want to hear our case if we were on
 7              trial.  That sound fair enough to you?
 8    A.    Yes.
 9    Q.    This is the only time that we can talk
10              directly to one another.  After the trial
11              starts, the lawyers can talk at you, but
12              they can't talk to you.  And right now, I
13              am allowed to talk to you, but more
14              importantly, you are allowed to talk to
15              me.  I would very much like to have a
16              conversation with you, where you and I
17              talk about some things, but you know I'm
18              trained to be a lawyer, and it is a
19              professional hazard that we monopolize
20              the conversations, so whenever there's
21              something you would like to say or any
22              question you would like to ask me, would
```

725

1           you please do so?

2    A.    Okay.

3    Q.    This process is a lot like a job interview.

4           Except for job interviews, you determine

5           which jobs you are going to go be

6           interviewed for, and here, the Jury wheel

7           sort of selected you to come be

8           interviewed?

9    A.    Yes.

10   Q.    And we're selecting you, we're interviewing

11          you today for one of the most important

12          jobs there is.  The job of finding the

13          truth and determining the fate of another

14          human being.  Would you agree with me

15          that that is a big responsibility?

16   A.    Yes.

17   Q.    Some people have already told us that it is

18          too big of a responsibility for them and

19          we can understand that.  My first

20          question to you is, how do you feel about

21          being asked to assume that

22          responsibility?

```
 1   A.   Well, as I mentioned with the other person who
 2             has already spoken, I have done this once
 3             before and I am interested in this type
 4             thing.
 5   Q.   So you think you are up to the responsibility?
 6   A.   Yes.
 7   Q.   That Jury experience that you had in Michigan,
 8             I understand that there was a mistrial
 9             because the main witnesses all claimed
10             that they didn't know anything?
11   A.   Right.
12   Q.   So the trial actually began, the Jury was in
13             the box, and you were hearing evidence at
14             the time the case was declared a
15             mistrial, am I correct?
16   A.   Yes.
17   Q.   Did that experience leave a sour taste in your
18             mouth?  How did you feel about that?
19   A.   No.  The only thing I wondered about was what
20             happened to the main witnesses, because
21             evidently, the case being brought to
22             trial, these people, at least the lawyers
```

727

1          thought there was a case, or they

2          wouldn't have brought these people in.  I

3          wondered what happened there, naturally,

4          because the lawyer was saying, "Well,

5          this is based on my whole case."  He

6          didn't use those exact words.  That is

7          what he was saying.  The other thing was

8          supporting the evidence and all of a

9          sudden these people say, "I don't know a

10         thing."  He told me in his office whether

11         his lawyer's office or wherever he talked

12         with him there, he said he told him an

13         entire story, summarized the best he

14         could without going into detail, what the

15         story was.  And all of a sudden these

16         people are now saying they don't remember

17         a thing.  They told me this earlier

18         before the trial and now they are on the

19         stand and say they don't remember a

20         thing.

21    Q.   So you talked to the Prosecutor after the case

22         was mistried?

728

```
 1    A.    No, I didn't.

 2    Q.    This case involves an allegation, the State's

 3          allegation that Donna Roberts plotted or

 4          conspired with a male companion, Nate

 5          Jackson, to cause the death of Robert

 6          Fingerhut.  Donna and Robert were

 7          divorced, but continued to work together

 8          at the Greyhound bus station in Warren

 9          and Youngstown, and to live together in

10          Howland.  This trial is about the guilt

11          or innocence of one person and one person

12          only, Donna Roberts.  Do you understand

13          that?

14    A.    Yes.

15    Q.    Throughout the course of these proceedings,

16          you will hear the name Nate Jackson, and

17          it won't take long for you to conclude

18          that Mr. Jackson did what the State says

19          he did.  The issue here is did Donna help

20          him?  You understand that?

21    A.    Yes.

22    Q.    And when Mr. Becker was up here, he told you
```

729

```
 1              this case involved complicity.  Do you
 2              recall that?
 3   A.   Yes.
 4   Q.   This case involves an allegation of
 5              complicity?
 6   A.   Yes.
 7   Q.   You understand that?
 8   A.   Yes.
 9   Q.   The State says that Donna aided and abetted
10              Nate Jackson.  Now they have got to prove
11              it.  Does that make sense to you?
12   A.   Yes.
13   Q.   That is what our entire system of justice is
14              about.  The State makes an allegation,
15              you go to Court, the State is required to
16              prove that allegation by proof beyond a
17              reasonable doubt.  Do you have any
18              problem with that concept whatsoever?
19   A.   No.
20   Q.   In support of its allegation that Donna
21              participated in the death of Robert
22              Fingerhut, the State will present various
```

730

```
 1            letters and recorded conversations

 2            between Donna and Nate.  Now, some of

 3            these letters and conversations are

 4            sexually explicit.  And to be candid with

 5            you, they may be rather offensive.

 6            However, the allegation is murder, not

 7            loose morality.  Do you understand that?

 8   A.   Yes.

 9   Q.   No matter how shocked or offended you may be

10            by the sexual nature of this evidence,

11            your job responsibility as a trial juror

12            will be to test that evidence, to

13            determine whether it ties Donna to the

14            death of Robert Fingerhut.  Do you

15            understand that?

16   A.   Yes.

17   Q.   And will you do that, Sir?

18   A.   Yes.

19   Q.   Donna denies that she participated by

20            conspiracy, plot or otherwise in the

21            murder of Robert Fingerhut.  Do you feel

22            you might have any kind of a problem
```

731

1           giving a scarlet woman a fair shake

2           during a trial?

3    A.     No.

4    Q.     Would you have the courage to acquit, if you

5           felt a not guilty verdict was supported

6           by the evidence?

7    A.     Yes.

8    Q.     Now you have read in the Warren Tribune, some

9           articles about this case, am I correct?

10   A.     Yes.

11   Q.     Can you summarize for me what you read?

12   A.     Basically, from what I remember, they

13          mentioned that Nate Jackson and the

14          Defendant were, as I remember, were going

15          to where her husband was living.  And

16          basically, the husband I guess, some kind

17          of argument or something was supposed to

18          have gone on and somehow the husband

19          ended up being dead.  That's basically

20          what I remember.  Other than that, the

21          newspaper went into more detail, but I

22          forgot what else was actually in there.

732

1    Q.    You, in your questionnaire answered that you

2             believe what you read in the newspaper?

3    A.    Yes.

4    Q.    What you read about Donna, has that led you to

5             form any impressions about whether or not

6             she was involved in this?

7    A.    No.

8    Q.    Have you seen any T.V. coverage about this

9             case or about Nate Jackson?

10   A.    There has been some, yes, not since we started

11           with the trial here, but in the past,

12           there has been some.

13   Q.    And do you recall what you may have seen on

14           T.V.?  Did that differ from what you just

15           told me about?

16   A.    Basically, it was pretty much the same.  They

17           didn't go into all of the details I

18           remember on the T.V. programs, the news

19           programs, but they mentioned something

20           about it.  Sort of headline type of

21           thing.

22   Q.    I understand from listening to your answer,

733

```
 1              that you are here because you believe you

 2              can be a fair juror?

 3   A.    Yes.

 4   Q.    Being a fair juror in this case, would require

 5              that you set aside, erase from your

 6              memory banks, so to speak, any

 7              impressions that you may have formed

 8              about this case as a result of what you

 9              have seen or heard about it; does that

10              make sense to you first off?

11   A.    Yes.

12   Q.    And some impressions are easier to set aside

13              than others, would you agree with that?

14   A.    Yes.

15   Q.    Do you think that you can set aside, erase

16              from your memory bank, anything you have

17              seen, read or heard about this case, and

18              judge the guilt or innocence of Donna

19              Roberts solely on what you see here, what

20              you hear here?

21   A.    Yes.

22   Q.    Because that is what your oath as a juror will
```

734

```
 1                  require you to do, and will you do your

 2                  best to do that?

 3      A.    Yes.

 4      Q.    Because this is a capital case, we're required

 5                  to learn your feelings about capital

 6                  punishment and life imprisonment as

 7                  potential sentencing options.  As you

 8                  have been told, this is potentially --

 9                  only potentially a two phase process.

10      A.    Yes.

11      Q.    The issue in the first phase is whether Donna

12                  did it or not.

13      A.    Right.

14      Q.    And if the Jury finds she did not do it, what

15                  would happen, we would all pack up our

16                  bags and go home.

17      A.    Yes.

18      Q.    We would never get to the second phase.  So

19                  you understand you may never have to

20                  consider the question of punishment?

21      A.    Right.

22      Q.    And as odd as it sounds and I guess only
```

735

1              lawyers can do this, we're asking you

2              hard questions about difficult issues you

3              may never have to consider.

4    A.   Yes.

5    Q.   I don't want you to think by standing up here

6              talking to you about sentencing

7              alternatives that we're predicting that

8              we're going to get to a second phase and

9              that you will have to decide on

10             punishment.  Nothing could be farther

11             from the truth.  We're lawyers, not

12             fortune tellers, we don't predict the

13             future.  Do you understand that?

14   A.   Yes.

15   Q.   Odds are in the morning when you get in your

16             car or when you are going to K-Mart, you

17             get in your car, you buckle up your seat

18             belt?

19   A.   Yes.

20   Q.   And you are doing that, just in case you get

21             in an accident, correct?

22   A.   Well, actually for a number of reasons.  That

736

```
 1                is one of the reasons, though, yes.
 2    Q.    We don't think we're ever going to get to a
 3                second phase, but we have to ask you
 4                these questions now, because the law
 5                requires; do you understand that?
 6    A.    Yes.
 7    Q.    And that concerns me a little bit.  It is
 8                like -- it seems to me a lot like putting
 9                the cart before the horse.  We're talking
10                about punishment, when I think we should
11                be talking about guilt or innocence.  Do
12                you understand my concern?
13    A.    Yes.
14    Q.    Let me ask you straight up.  Do these
15                questions about possible punishment make
16                you think that Donna was probably
17                involved or we wouldn't be asking you
18                these questions?
19    A.    No.
20    Q.    And the Prosecutor has asked you if you would
21                fairly consider the death penalty if we
22                ever got to the second phase, to a second
```

737

1          phase.  The flip side of that is whether

2          you would fairly consider the life

3          sentencing options.

4    A.    Yes.

5    Q.    And in general, philosophically, pretend you

6          are back in one of those high school

7          classrooms and you are asked, "How do you

8          feel about life imprisonment as an

9          alternative to the death penalty?"

10   A.    In some cases that is a good alternative.

11   Q.    And in some cases the death penalty would be a

12         good alternative?

13   A.    Possibly, depending on the evidence.

14   Q.    Have you ever engaged anyone in debate about

15         the death penalty or discussed it with a

16         friend, family member?

17   A.    Well, in the past, there have been times where

18         people say, what do you think about this,

19         that or the other, and there wasn't any

20         prolonged debate.  Just something once in

21         a while.

22   Q.    And in any of those conversations, did anybody

738

```
 1              every raise to you the cost factor of
 2              housing someone in prison?
 3   A.   I have heard numbers about how much it is
 4              supposed to cost for that.
 5   Q.   Do you have any opinion about this cost issue
 6              at all?
 7   A.   No.
 8   Q.   In the life sentencing options, you understand
 9              that life without parole is indeed life
10              without parole?
11   A.   Right.
12   Q.   It means you go, you don't get out?
13   A.   Right.
14   Q.   And the other two life options with parole
15              only after 25 full years, with parole
16              only after 30 full years, means whoever
17              gets that sentence does day for day 25
18              years, or day for day 30 years, before
19              that person would be eligible for parole.
20   A.   Right.
21   Q.   Have you ever considered a political
22              candidate's views on capital punishment
```

739

1              in determining whether or not to vote for

2              that candidate?

3    A.   No, not really.  It's not one of the main

4              issues I think about.

5    Q.   We have had some renewed debate in this

6              country recently.  The State of Illinois

7              put a moratorium on executions.  And then

8              the Supreme Court recently issued a

9              decision upon whether or not, and I'm not

10             sure I got the words right myself,

11             mentally challenged people could be

12             executed.  Have you been exposed to any

13             of these debates?

14   A.   I heard something about it.  I don't know all

15             of the details, but I have heard

16             something about it.

17   Q.   Have you ever seen the movie "True Crimes"

18             starring Clint Eastwood?

19   A.   No, I didn't.

20   Q.   If we ever get to this second phase, the Judge

21             will tell you that the Jury will have to

22             weigh, and that is balance, aggravating

740

```
 1              circumstances, bad facts, against

 2              mitigating factors, positive things, that

 3              could be said about a Defendant, because

 4              this is a make up second phase, I am

 5              talking about.  It is the responsibility

 6              of the State of Ohio, at a second phase

 7              proceeding, to prove to the Jury that the

 8              aggravating circumstances outweigh the

 9              mitigating factors by proof beyond the

10              existence of a reasonable doubt and to

11              prove beyond a reasonable doubt the

12              death -- that death is the appropriate

13              punishment.  Do you understand that?

14   A.   Yes.

15   Q.   Will you hold the State to that burden?

16   A.   Yes, whatever legal part is, yes.

17   Q.   As a juror, you are the sole judge along with

18              your other jurors, you are the sole judge

19              of the weight of the evidence.

20   A.   Right.

21   Q.   So, when you are weighing these aggravating

22              circumstances against these mitigating
```

741

1          factors, that is a personal

2          responsibility that you must assume.

3  A.    Right.

4  Q.    And you must make a personal judgment.

5  A.    Yes.

6  Q.    Will you do that?

7  A.    Yes.

8  Q.    So basically, when it comes to weighing

9          evidence, whether you are weighing

10         evidence at the first phase of the trial

11         or whether you are weighing evidence at

12         the second phase of the trial, the bucks

13         stops with you?

14 A.    Yes.

15 Q.    The Judge doesn't do it, we don't do it.  That

16         is the most important responsibility in

17         this Courtroom, and that is what we're

18         interviewing you for.  You understand

19         that?

20 A.    Yes.

21 Q.    By the way, I am intrigued.  How many

22         languages do you speak?

742

1  A.    I do Spanish and English and I have had some

2        German.

3  Q.    You went to graduate school for German?

4  A.    I was in undergraduate class where I had

5        German.

6  Q.    You talked to Mr. Becker a little bit about

7        the Citizens Probation Authority.  Were

8        you also a halfway house counselor for

9        delinquent boys?

10  A.    Yes, I was.

11  Q.    Can you tell me a little bit about that,

12        please?

13  A.    That place was a place where the boys that

14        were -- well, they had committed

15        felonies.  All of the boys that were in

16        there committed felonies of one kind or

17        another, except murder.  They wouldn't

18        permit a murder charge for somebody in a

19        halfway house.  Anything else they had

20        done, they could have committed and

21        probably have for one time or another,

22        because it is on the record.  When we see

743

1      them, we know everything they have done.

2      It is not just one or two times.  They

3      have had ten, 15, sometimes 20 felonies

4      in their background and it is not

5      exaggerating, we have seen those records

6      and we discussed them when they come into

7      the house.  These people then, when they

8      get there, whichever Judge was in the

9      Court there, decided that these people

10     need more than just what maybe a Court

11     can say, or whatever he can do that need

12     more structure in their lives is

13     basically what he was saying.  They would

14     go and send them to a place in Ohio.

15     They call it Fairfield School for Boys or

16     used to, and they have it in Michigan.

17     They send them there for a certain amount

18     of time.  I forget the exact amount of

19     time it is, but after that time, while

20     they are in that place, they are not

21     allowed to do anything without permission

22     except breathe.  That is the way it is.

744

1    Because they need structure.  They need

2    more structure that they wouldn't get in

3    their life.  After they get out of this

4    situation, they know we are not going to

5    be able to put them into a regular home

6    life situation.  It is going to be

7    exactly the opposite where they came

8    from, where there was no structure.  They

9    put them in our halfway house, where

10    there were some rules, but it wasn't

11    super strict rules that they had, that

12    they had just come from, a training

13    school in Michigan.

14 Q. Did you actually live in the halfway house or

15    just go there for duty shift?

16 A. I was there for duty shift.

17 Q. How long were you involved with the halfway

18    house -- months, years?

19 A. It was about nine months, I believe in that

20    area; nine months to a year.

21 Q. And any success stories during that nine

22    months?

745

A.    Yes.   Everybody that works there has
individual boys that they work with, and
so they assigned me to one of the boys
and the boy that I particularly had
turned out -- he had done the usual, some
of the things I feel was auto theft or
whatever it was he did, but he had a
range of things in his background, all
felonies like the other boys.  I was able
to talk with him, counsel him and
eventually he was released from our
halfway house structure and he did go
back to where he was from and from what I
understood, he did have a very nice life
and a normal, what we consider normal
life.  He didn't go back into his crime
life again and he got married from what I
understand and had a job.  And as I
understand, he was almost what you call a
pillar of the community type thing.
Exact opposite of what he was in his past
life.

746

1   Q.   Great.  In your questionnaire, there was a

2            question about problems facing the

3            criminal justice system?

4   A.   Right.

5   Q.   And my recollection is that you answered that

6            question, that we could fix some of those

7            problems if we citizens and those of us

8            involved in the system worked together

9            better?

10   A.   Right.

11   Q.   Do you have any ideas how we could work

12           together better?

13   A.   Well, I think some of the ideas would be

14           similar to what I did with the volunteer

15           job when I was in Michigan.  That would

16           be one case where I wasn't paid to do

17           that.  I was a volunteer when I went with

18           that boy that was mentally challenged or

19           whatever the legal term is there, and

20           this wasn't a halfway house situation.

21           This was the other one.  That is one

22           example where a Judge had an idea and he

747

```
 1              talked with Citizens Probation

 2              Authorities, and what do you think of

 3              this, and really both sides thought that

 4              was good.  And they ended up asking for

 5              volunteers and I was the one that figured

 6              I could help people in that way.  That is

 7              one example that I can think of.

 8    Q.  Before you went to work at K-Mart, you were a

 9              teacher for a number of years?

10    A.  Yes.

11    Q.  How long did you teach?

12    A.  Well, all together, it was probably about

13              eight years.  I was in more than one

14              school district.  All together about

15              eight years.

16    Q.  For a portion of your teaching time, I believe

17              that you were, you spent time with

18              challenged students?

19    A.  Yes.

20    Q.  Were those high school students or younger?

21    A.  They were all ages.  The youngest I had was in

22              Kindergarten and the oldest was in high
```

748

1            school and everything in between there.

2   Q.   You are also a lay leader in your church?

3   A.   Yes, I am.

4   Q.   What are the responsibilities of a lay leader?

5   A.   Well, in our church, it may be different in

6            every church, in our church, what a lay

7            leader does is he gives up and when we

8            give the offering, he gives a little talk

9            of some type, whatever the person wants

10           to give, but give a little talk before

11           the offering.  Then we have an offering

12           and after the offering is brought back

13           and received by the minister and the lay

14           leader, and the people that are there, he

15           gives a little prayer and that is

16           basically what the lay leader does in our

17           church.  They can be other things, if

18           things need to be done, that is usually

19           what a lay leader does.

20   Q.   The Judge is going to tell you that sympathy

21           has no place in the Courtroom.  Feelings

22           of sympathy should not affect your

749

```
 1              judgment.  It is a Court of law, not a

 2              Court of sympathy; do you agree with

 3              that?

 4   A.    Yes.

 5   Q.    We ask jurors to do hard things.  We ask

 6              jurors to set aside, and you have heard

 7              those words from the Judge, from

 8              Mr. Becker, from me.  Whether you can set

 9              aside your opinions of the law if you

10              have them, whether you can set aside

11              impressions.  We would ask you to do

12              really difficult things, and one of the

13              things we ask you to do is set aside

14              natural feelings of sympathy.  Because

15              you will here testimony in this case that

16              will arise that you remember feelings of

17              sympathy.  You may hear testimony that

18              Robert Fingerhut suffered or was

19              struggling for his life.  You will see

20              photographs of a point blank gunshot

21              wound.  You will see Coroner's

22              photographs, and they may be enlarged.
```

750

1    All of those things will naturally arouse

2    feelings of sympathy with you.  You

3    understand that?

4 A. Yes.

5 Q. You have to do your best to set those feelings

6    of sympathy aside and test that evidence.

7    Will you do that?

8 A. Yes.

9 Q. And do you understand that even though

10    evidence evokes an emotional response

11    from you, sympathy, anger -- you have to

12    get over the emotional response and test

13    that evidence to determine whether it

14    ties Donna Roberts to the crime or not;

15    are you up to that, Sir?

16 A. Yes.

17 Q. You talked with Mr. Becker about the

18    presumption of innocence.  How do you

19    feel about the rule of law that says that

20    jurors are to presume the accused

21    innocent?

22 A. Well, that is the law, so we don't have an

751

```
 1              opinion about that.  It's the law, so
 2              that is what we have to do.
 3    Q.   Well, this is a free country.  It is the law,
 4              that is what you have to do as a juror.
 5              That doesn't mean that you can't have an
 6              opinion on the issue as long as you can
 7              set aside your opinion.  Am I clear to
 8              you there?
 9    A.   Okay.  I understand, I think, what you are
10              saying there.
11    Q.   Do you have an opinion as to whether that is a
12              good rule or a bad rule?
13    A.   Well, I think that if it is the law, then
14              whether we agree or disagree, it is still
15              the law and we have to follow it.
16    Q.   If you had a -- strike that.  You are a Union
17              representative in your building, is that
18              correct?
19    A.   Not presently, no.
20    Q.   You used to be?
21    A.   I used to be, yes.  Not at K-Mart though.
22    Q.   If you had a close friend at work, who was
```

752

```
 1                 accused by management of some wrongdoing,
 2                 and you honestly in your heart believed
 3                 that your friend was not responsible for
 4                 that wrongdoing, you would require
 5                 evidence that that person did those
 6                 things before you would be willing to
 7                 change your mind, wouldn't you?
 8    A.   Yes, I would need to hear what both sides had
 9                 to say and what both sides had as
10                 evidence.
11    Q.   But if you honestly believed that your
12                 co-worker did not do that, whatever the
13                 wrong was, you would require evidence,
14                 and we'll get to both sides later, you
15                 would require evidence before you would
16                 change your mind?
17    A.   I would need some evidence, yes.
18    Q.   And the evidence, you think you would take
19                 that evidence at face value or you think
20                 you might test it and look at it with a
21                 critical eye?
22    A.   First, I would assume everybody is telling me
```

753

1           the truth is what I start with, then I'll

2           work from there.

3  Q.   In this trial, one of your big job

4           responsibilities is going to be to

5           determine the credibility of the

6           witnesses.  The Judge is going to tell

7           you -- tell you that you can believe all

8           of what someone says, part of what

9           someone says, or none of what someone

10          says.  You have to determine who is

11          telling the truth and who is not.  And

12          just because a witness is sworn to tell

13          the truth, you can't assume that they are

14          telling the truth.  Do you understand

15          that?

16  A.   Yes.

17  Q.   You have to test the believability of each and

18          every witness that testifies in this

19          case?

20  A.   Yes.

21  Q.   Will you do that?

22  A.   Yes.

754

| | | |
|---|---|---|
| 1 | Q. | Now, in that work problem that you and I |
| 2 | | talked about.  The first natural |
| 3 | | inclination in that work problem is to |
| 4 | | want to hear both sides of the story, |
| 5 | | isn't it? |
| 6 | A. | Right. |
| 7 | Q. | In this case, you may be called upon to put |
| 8 | | aside that natural inclination because |
| 9 | | unlike that problem at work, in this |
| 10 | | Courtroom there's a burden of proof and |
| 11 | | there's only one burden of proof, and |
| 12 | | that burden of proof will be on who? |
| 13 | A. | On the State. |
| 14 | Q. | And you are going to hold them to that burden |
| 15 | | of proof? |
| 16 | A. | Yes. |
| 17 | Q. | You understand during this trial, Mr. Juhasz |
| 18 | | and I, we could basically sit over here |
| 19 | | and we could sit on our hands, if we |
| 20 | | wanted to.  I doubt that that will |
| 21 | | happen, but we could.  And if after they |
| 22 | | have presented their evidence, you are |

755

```
 1                    not firmly convinced, you would have to
 2                    vote not guilty, do you understand that?
 3    A.    Yes.
 4    Q.    Do you have any problem with the fact, and I
 5                    know that you will follow the
 6                    instructions of the Court, how do you
 7                    think about -- what do you think about
 8                    the rule that says the State has the
 9                    burden?
10    A.    That is what is legally set up, we have to
11                    agree with it.  Whether we agree or
12                    disagree, that's the way it is.
13    Q.    The presumption of innocence and the burden of
14                    proof, those are concepts that make this
15                    country what it is.  Do you understand
16                    that?
17    A.    Yes.
18    Q.    Other countries don't have it.  Forget about
19                    Iraq, for European countries don't have
20                    them.  We're one of the few countries in
21                    the world that honor and protects these
22                    liberties.  Do you appreciate that?
```

756

A.   Yes.

Q.   Crimes are made up of essential elements.
     Essential elements are necessary
     ingredients, and the Judge will define
     for you, he will list at the end of the
     case, all of the essential elements and
     he will define them for you.  The State's
     burden of proof applies to each and every
     essential element.  They have to prove
     all of them.  Do you understand that?

A.   Yes.

Q.   Two out of three, three out of five doesn't
     cut the mustard?

A.   Yes.

Q.   There are two counts of aggravated murder.  It
     is called alternative pleading, I guess.
     There's one death, but alternative
     theories.  The first count is prior
     calculation and design, aggravated
     murder.  That is purposely causing the
     death of another by prior calculation and
     design.  That is the old premeditation,

757

1         advance planning.  Do you have a handle

2         on that?

3    A.   Yes.

4    Q.   The second aggravated murder count is felony

5         murder, which is purposely causing the

6         death of another while committing another

7         felony, a special felony, in this case,

8         aggravated burglary or aggravated

9         robbery.  Do you have a handle on that?

10   A.   Yes.

11   Q.   Purpose is an essential element of both of the

12        aggravated murder charges, which the

13        State must prove beyond a reasonable

14        doubt.  As the Judge will tell you,

15        purpose is the same as intent.  A person

16        acts purposely if it is his or her

17        specific intention to cause a specific

18        result.  You got that?

19   A.   Yes.

20   Q.   Would you agree that the facts and

21        circumstances surrounding an act shed

22        light on the actor's intention?

758

1  A.  It would usually seem so.

2  Q.  For instance, if you leave a paper trail as

3       opposed to covering your tracks, it is

4       unlikely that your objective is unlawful?

5  A.  Could be.  I don't really know.  Depends on

6       the individual situation, but could be.

7  Q.  Let's look at it another way.  If someone

8       openly meets in the light of day as

9       opposed to a secret rendezvous under

10      cover of darkness, it is unlikely the

11      object of that meeting is unlawful?

12 A.  It would seem so.

13 Q.  Will you hold the State to its burden of

14      proving Donna's intent by proof beyond a

15      reasonable doubt?

16 A.  Yes.

17 Q.  And you are also going to hear about

18      aggravated burglary, that's the third

19      count.  And aggravated burglary is the

20      first death specification to the

21      aggravated murder counts.  Do you

22      understand that?

759

1  A.  Yes.

2  Q.  One of the essential elements of aggravated

3      burglary is trespass.  And the Judge will

4      define trespass to you, and I believe

5      that will be along the lines of to enter

6      or remain on the land or premises of

7      another.  That make sense to you?

8  A.  Yes.

9  Q.  Will you hold the State to its burden of

10     proving trespass?

11 A.  Yes.

12 Q.  The fourth count is aggravated robbery, and

13     that is the second death specification to

14     the two aggravated murder counts.  Do you

15     have a handle on that?

16 A.  Yes.

17 Q.  And in that, they are going to have to

18     convince you that there was an intent to

19     commit a theft offense.

20 A.  Yes.

21 Q.  And a theft offense necessarily involves the

22     taking or attempt to take property.

760

1          Correct?

2    A.    Yes.

3    Q.    Will you hold the State to its burden of

4          proving an intended theft offense?

5    A.    Yes.

6    Q.    You understand that the indictment in this

7          case is a piece of paperwork.  All it

8          does is it informs Donna of the nature of

9          the allegations leveled by the State?

10   A.    Yes.

11   Q.    It is not evidence?

12   A.    Right.

13   Q.    No matter how many times it is read to you or

14         referred to during the course of this

15         trial, it does not become evidence.

16   A.    Yes.

17   Q.    Did you know that Grand Jury proceedings were

18         secret?

19   A.    I understand they usually are.

20   Q.    Did you know that Donna didn't know when this

21         case went to the Grand Jury, and

22         Mr. Juhasz and I didn't know.  We weren't

761

```
 1              there to test the evidence?
 2   A.   I have no idea one way or another about that.
 3   Q.   We were not there, I'm telling you.  You can
 4              accept my representation on this one.
 5              Here, we can test the evidence, so the
 6              evidence is different and your role is
 7              different.  You understand that?
 8   A.   Yes.
 9   Q.   You know a lot of police officers.  You know
10              Captain Bacon here as I understand it?
11   A.   Yes.
12   Q.   Do you socialize with Captain Bacon?
13   A.   I only saw him at the restaurant.  That is the
14              only time I ever saw him.
15   Q.   The other police officers you talked to us
16              about, Pete Pizzulo, Tony Leshnack, do
17              you socialize with those guys or do you
18              see them at the restaurant?
19   A.   Just at the restaurant.
20   Q.   When you would see them at the restaurant, do
21              you engage them in conversation?
22   A.   I would talk with them, yes.
```

762

1    Q.    Did you ever talk about their jobs?

2    A.    Just in general, not about the individual

3          cases, but just in general.

4    Q.    Well, there's going to be a whole bunch of

5          policemen that testify.  Do you know Paul

6          Monroe, Detective Dillon, Albert Ray?

7          They are all from Howland.

8    A.    I may have heard some of those names.  I'm not

9          sure.  I may have met them in the past.

10         I can't put a face with a name though.

11   Q.    You understand as a trial juror, you will have

12         to test the credibility, determine the

13         believability of the police witnesses

14         just as you would any other witnesses?

15   A.    Right.

16   Q.    You agree with me, that uniform doesn't make

17         the man?

18   A.    By itself, no.

19   Q.    You have got to penetrate that uniform and

20         evaluate the testimony of the person

21         wearing the uniform; will you do that?

22   A.    Yes.

1    Q.    And policemen are, they are human beings just

2         like you and I, aren't they?

3    A.    Yes.

4    Q.    They have the same frailties, the same

5         limitations, they make the same mistakes,

6         correct?

7    A.    Yes.

8    Q.    The State's burden in this case is by a degree

9         of proof called proof beyond a reasonable

10        doubt.  Did you know that that was the

11        highest degree of proof that we have in

12        this country?

13    A.    I hadn't really thought about it.  I suppose

14        you're right though.

15    Q.    The Judge is going to define it to you at the

16        end of the case and I believe he's going

17        to tell you that proof beyond a

18        reasonable doubt requires that you be

19        firmly convinced of the allegations.  And

20        proof of such character that an ordinary

21        person would be willing to rely and act

22        upon it in the most important of his own

764

1           affairs.  You have made important

2           decisions in your life, whether to change

3           jobs, whether to get married, correct?

4    A.   Yes.

5    Q.   And before you make an important decision,

6           sometimes you make a check list, whether

7           it's in your mind's eye, or some people

8           actually write it out on a piece of

9           paper.  Have you ever done that?

10   A.   Sometimes.

11   Q.   You put the positive things on one side and

12          the negative things on the other?

13   A.   Sometimes.

14   Q.   And then what most people would then try to do

15          is strike the negatives, because if you

16          can strike all of the negatives and you

17          still have the positives, you know that

18          that is the right decision for you,

19          right?

20   A.   In most cases that is probably true.

21   Q.   And I don't know what the decision is, but

22          we're striking the negatives from our

765

1           list, and we get down to one.  And we

2           think about it, we investigate it, and no

3           matter what, it remains a reasonable

4           negative.  You got me?

5    A.   Yes.

6    Q.   If that were to happen, you could not say

7           beyond a reasonable doubt that that

8           decision was the right thing for you?

9    A.   Yes, I see what you are saying.

10   Q.   And the same standard applies in this case.

11          And have you ever said to yourself, I am

12          going to give someone the benefit of the

13          doubt?

14   A.   Yes.

15   Q.   We sort of intuitively know, don't we, that

16          whether it is reasonable doubt or whether

17          it is unreasonable doubt, you never said

18          to yourself, "I'm going to give him the

19          benefit of an unreasonable doubt," have

20          you?

21   A.   You're right.

22   Q.   And will you hold the State of Ohio to its

766

```
 1              burden of proof beyond a reasonable
 2              doubt, during the course of this trial?
 3   A.    Yes.
 4   Q.    As Mr. Becker told you, the State may elicit
 5              or rely on some circumstantial evidence.
 6              And I believe he gave you a plastic bat
 7              as an example.  I have four brothers, and
 8              there were numerous occasions when one of
 9              us got whacked in the head with a whiffle
10              bat.  If it was me doing the whacking,
11              and I knew that Jamie was running to Mom
12              and I was left holding the bat, "Hey,
13              Ken, would you hold this bat for me," so
14              that when Mom came in, Mom assumed that
15              Ken whacked him with the bat.  So you
16              have got to test these inferences that
17              you are asked to make; do you understand
18              that?
19   A.    Yes.
20   Q.    Will you do that?
21   A.    Yes.
22   Q.    And an inference is nothing more than a leap
```

1            in logic, isn't it?

2   A.   Yes.

3   Q.   So you have to make sure that the leap is

4            reasonable?

5   A.   Yes.

6   Q.   And one final thing and I'll sit down.  I'm

7            glad I don't have Mr. Becker's water

8            bill, but let's change this from water to

9            snow.  You go to sleep at night, you wake

10           up in the morning and there's snow on the

11           ground, you know it snowed?

12  A.   Yes.

13  Q.   It is Sunday morning, you got your cup of

14           coffee, you want your newspaper, you look

15           out and there's footprints from your

16           neighbor's yard across the driveway to

17           your front door, across your yard to your

18           front door and onward.  So you assumed

19           that your newspaper is delivered and that

20           might be a reasonable assumption, right?

21  A.   Yes.

22  Q.   Until you go to the door to see if it is your

768

1          newspaper, and instead of your newspaper,

2          it is your Giant Eagle coupons.  All you

3          can really infer is that somebody walked

4          across your yard.  You can't infer who

5          that was.  Am I making sense to you?

6     A.   Yes.

7     Q.   Will you test every inference that the State

8          asks you to make in this case?

9     A.   Yes.

10              MR. INGRAM:  I thank you for your

11    time and attention.  After our conversation,

12    whereas predicted, I did most of the talking.  Is

13    there anything you want to bring up?  Is there

14    anything you want to share with us?

15              MR. CARAWAY:  No.

16              MR. INGRAM:  I thank you very much.

17    Have a pleasant day.

18    (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

19    OF HEARING)

20              THE COURT:  Sir, you will be in the

21    pool from which this Jury will be selected.  Check

22    with Connie downstairs to get instructions on when

769

1   you are to call in.  I would again remind you that

2   you are not to read anything in the newspaper or

3   watch anything on T.V. or have any discussion with

4   anybody concerning this matter until you return.

5   Thank you for your time.

6   (JUROR NO. 9, MR. CARAWAY, LEFT THE COURTROOM.)

7                THE COURT:  For the record, both

8   sides have passed for cause on Mr. Caraway.  Let's

9   take a five minute recess.

10  (Court in recess at 10:35 A.M.)

11

12

13

14

15

16

17

18

19

20

21

22

770

1

2

3

4                    REPORTER'S CERTIFICATE

5

6            I do hereby certify that the above and

7     foregoing is a true and correct transcript of

8     the proceedings had in the within hearing as

9     shown by stenotype notes written by me in the

10    presence of the witnesses at the time of the

11    hearing.

12

13    _____

      MARY ANN MILLS, R.P.R.

14    Official Court Reporter

      Trumbull County, Ohio

15

16

17

18

19

20

21

22

771

1                IN THE COURT OF COMMON PLEAS
                   TRUMBULL COUNTY, OHIO
2             TRIAL COURT CASE NO. 01-CR-793
           SUPREME COURT OF OHIO CASE NO. 03-1441
3

4    STATE OF OHIO          )           VOLUME IV
                            )
5              Plaintiff    )
                            )      INDIVIDUAL VOIR DIRE
6    -vs-                   )
                            )
7    DONNA M. ROBERTS       )
                            )
8              Defendant    )

9

10          BE IT REMEMBERED, that on Friday, April 11,

11   2003, these proceedings came on to be heard before

12   one of the Judges of this Court, John M. Stuard,

13   in Courtroom No. 2, on High Street, Warren, Ohio,

14   before the case heretofore filed herein.

15

16

17
     Mary Ann Mills, RPR
18   Official Court Reporter
     Trumbull County, Ohio
19

20

21

22

772

<u>A P P E A R A N C E S</u>

On Behalf of the State of Ohio:
    Dennis Watkins, Prosecuting Attorney
    Charles L. Morrow, Ass't. Prosecuting Attorney
    Christopher D. Becker, Ass't. Prosecuting Attorney
    Kenneth N. Bailey, Ass't. Prosecuting Attorney
    160 High Street, N.W.
    Warren, OH 44481

On Behalf of the Defendant, Nathaniel Jackson:
    Anthony V. Consoldane, Attorney at Law
    James F. Lewis, Attorney at Law
    State of Ohio Public Defendant's Office
    328 Mahoning Avenue, N.W.
    Warren, OH 44481

On Behalf of the Defendant, Donna M. Roberts:
    John B. Juhasz, Attorney at Law
    J. Gerald Ingram, Attorney at Law
    7330 Market Street
    Youngstown, OH 44512

On Behalf of <u>The Vindicator Printing Co</u>.
    Ann Millette, Attorney at Law
    3200 National City Center
    1900 East Ninth Street
    Cleveland, OH 44114

On Behalf of WFMJ Television, Inc.:
    Stephen T. Bolton, Attorney at Law
    201 E. Commerce Street, Atrium Level Two
    Youngstown, Oh 44503

1

## I N D E X

2

3

<u>VOLUME IV</u>:

4

(Friday, April 11, 2003)

5

Individual Voir Dire:

6
Frederick Calhoun                                    773
Sheri Senek                                          886

7
Maxine Howard                                        966

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

773

1   (Friday, April 11, 2003)

2   (Juror No. 18, Frederick Calhoun, entered the

3   Courtroom.)

4                   THE COURT:  Mr. Calhoun, you have

5   read that handout given to you, is that correct?

6                   MR. CALHOUN:  Which one?

7                   THE COURT:  The explanation of what

8   this is all about.

9                   MR. CALHOUN:  Yes, downstairs.

10                  THE COURT:  So you have a pretty

11  good idea at this point.  It is necessary that we

12  go through what is about to follow here.  There are

13  those among us who believe in the Old Testament

14  covenant of an eye for an eye.  Someone kills

15  someone, they should forfeit their life.  That is

16  not the law of Ohio.  There are others who could

17  under no circumstances, because of the religious,

18  ethical and moral considerations, put themselves in

19  a position where they would be called upon to

20  determine the possibility of imposing a death

21  sentence on someone.  Now this case will proceed as

22  any ordinary case in that the trial will consist of

774

1   one question and one question only, and that is

2   whether the Defendant is guilty as charged or not.

3   It will be required that the State of Ohio, through

4   the Prosecutor's Office establish proof beyond a

5   reasonable doubt by showing this Jury evidence

6   concerning that question. If this Jury decides

7   after that presentation that the State has failed

8   to carry their burden of proof, and a proper

9   verdict would be that of not guilty.

10          However, if the State should maintain and

11  prove that burden of proof, then this Jury would be

12  required to sit on a second phase, and that

13  question -- the question presented to that Jury on

14  the second phase would be that they would have the

15  burden of proving this also. The burden is always

16  on the State. The Defendant has to do nothing.

17  There's the presumption of innocence that applies

18  throughout the trial, unless and until the State

19  proves beyond a reasonable doubt those elements

20  necessary to prove their case. So at that second

21  phase, the State would present evidence showing

22  aggravating circumstances. Those are reasons that

775

1   the State is proffering to the Jury to show why the

2   Jury should consider and perhaps impose the death

3   penalty.

4           The defense has an opportunity to present

5   mitigating factors, and those are things that are

6   explained for the Jury to mitigate or to show the

7   reason why they should not impose the death

8   penalty.  So you get a person that has extreme

9   views, an eye for an eye or, "I can't ever do

10  that."  They could not be fair to one side or the

11  other by sitting on a Jury.

12          And from this entire panel, we'll have a

13  panel of both types, and that is fine.  Everybody

14  has a right to their opinion on this issue.  But I

15  suspect the majority of people that were called in

16  are of the type that whether they favor the death

17  penalty in some ways or look disfavorably upon it,

18  in other ways, they are capable and willing to tell

19  us and to accept the fact themselves that, "I'm

20  able to follow the law, whether I agree with it or

21  disagree with it.  I don't have any fixed opinion

22  that I'm not able to follow the law."  That is the

776

1  only way that we can assure both sides that they

2  have a fair trial.

3        Now if you happen to be a person that

4  feels you can't do that, that is fine.  You have a

5  right to have your own feelings, but it just

6  wouldn't be fair to sit on any Jury of this type,

7  if there's some overriding consideration in your

8  mind that would cause you difficulty in listening

9  to the evidence and deciding this matter fairly on

10  the evidence, and then being able to fairly listen

11  to both sides if it goes to a second phase, and

12  give them a fair call.  That is all that both sides

13  here are asking for is fairness.

14        So, the questions that will be put to you

15  will be geared towards your feelings and thoughts

16  on the death penalty itself, whether you are able

17  to give them your assurance that you could be fair

18  and impartial.  And the other issue is that

19  concerning pre-trial publicity.  We live in a

20  rather small county.  We have two newspapers

21  really.  They have both covered this matter, which

22  is not unusual.  Anything of any notoriety is going

777

1    to be covered in the newspapers.  But the issue is

2    whether you or the rest of the jurors have been so

3    immersed in the coverage that it would deny a fair

4    Jury to one side or the other.  And more

5    rationally, that would be probably on the

6    Defendant's side.  It would not do us much good to

7    go through this exercise having a Jury, if the Jury

8    have already pretty much made their mind up about

9    the facts, because the facts that any of you know

10   at this point may be totally in error or they may

11   have been improper conclusions drawn.

12              This Jury has to listen to the evidence

13   they will hear in this Courtroom and decide this

14   matter only on that evidence, not something that

15   appeared sometime prior to today in the newspaper.

16   So you understand where we're going?

17              MR. CALHOUN:  Yes.

18              THE COURT:  Mr. Bailey.

19   EXAMINATION BY MR. BAILEY OF MR. CALHOUN:

20   Q.   My name is Ken Bailey.  I'm Assistant

21            Prosecutor with the Trumbull County

22            Prosecutor's Office, and I'm going to be

778

1              joined this morning maybe, by Chris

2              Becker, my co-counsel, another Assistant

3              Prosecutor, who is engaged in another

4              Courtroom right now in a proceeding.  And

5              I'm going to ask you some questions this

6              morning about pre-trial publicity, the

7              death penalty, and your views on it, and

8              then some general questions pertaining to

9              this case, and things that we usually go

10             through with jurors.  Now, I know that we

11             live in modern times, and we have the

12             advantage of looking at your

13             questionnaire, the answers that you

14             filled out.  And I know that you read the

15             local paper, right, the Tribune?

16   A.   Warren Tribune.

17   Q.   And you are aware that the co-defendant's

18             case, that Nate Jackson's case has

19             already been disposed of?

20   A.   Yes.

21   Q.   Now, because we live in modern times, it is

22             normal for folks to gain information, if

779

1          they are aware of what is going on in

2          their community.  They read the

3          newspapers, they watch T.V., they talk to

4          other people in the community about

5          something.  It is hard to get away from

6          the news that is on T.V. and radio.  It

7          is on the Internet, if you have got a

8          computer.  So, being a citizen today is

9          different from maybe 40 or 50 or 70 years

10         ago, where publicity wasn't so

11         persuasive.  The key thing is, not

12         whether you have heard about something,

13         or whether you have discussed it or even

14         formed an opinion, the important thing

15         is, can you set aside what you learned

16         before and come into this proceeding, and

17         start out with a clean slate?  And

18         there's a reason for that.  When a

19         newspaper reporter comes in to a

20         Courtroom and reports on something, they

21         do a feature based on the time that they

22         have been in the Courtroom, and as you

780

1           look around the Courtroom today, there's

2           nobody here from the media.  It may be

3           that somebody comes in, T.V. cameras, may

4           come in to do a feature, they are not

5           allowed to photograph the jurors.  If

6           they photograph jurors on a Jury view,

7           all you see are feet.  But they can't

8           show your faces.  They may come in and

9           may take pictures of the Judge or the

10          Attorneys or the Defendant, sometimes

11          some of the witnesses.  But they don't

12          photograph the jurors.  But they are not

13          here all the time.  You will see they may

14          be popping in or out.  They may stay for

15          a little bit of time, but one important

16          thing about that is, if they are here for

17          maybe three minutes or ten minutes or 20

18          minutes, they are going to miss

19          everything that happened before they came

20          in, and they are going to miss all of the

21          questions and answers that occurred after

22          they leave, so their impression may well

781

1    be lopsided.  It may be accurate or it

2    may be totally inaccurate, so if you have

3    the occasion to serve as a juror on this

4    particular case and you have somebody

5    save the newspapers for you and you go

6    back and you read them afterward, you may

7    say to yourself, "Well, Gosh, I sat on

8    this trial for the whole trial, and I

9    remember I was in Court that day and I

10   heard these witnesses testify, and what

11   this reporter had, that was just a little

12   portion of it and it totally gave a

13   misimpression of what happened in Court

14   that day."  It was totally different,

15   because they missed everything that

16   happened before and after.

17        So, you understand that there's room

18   there, not deliberately on the part of

19   the reporter, but by the very nature of

20   their business, rushing into print and

21   not being here all the time, they may

22   have misinformation in their prior

782

1              articles.  So that is why it is very,

2              very important when we come into Court

3              here with another trial, and another

4              Jury, that you gain all of your

5              information from what happens in this

6              Courtroom.  Can you do that?  Can you set

7              aside anything you might have read before

8              or any opinions you might have formed?

9    A.   I haven't -- I have read about it, but I

10             haven't like, if I would just start

11             reading an article -- I felt I know

12             enough about that and I wouldn't finish

13             the article lots of times.  Like when the

14             other gentleman was convicted, I didn't

15             read the whole story.  I just read that

16             he was convicted and --

17   Q.   You skipped it?

18   A.   I didn't read it to try to get every little

19             detail that had happened in the case,

20             which I don't know if they put in the

21             paper, but I skipped it.  I know some, I

22             can't say I know nothing about the case,

783

1                    but I feel I do know some things that I

2                    have read in the paper that I assume are

3                    true, but I don't know to be true, but I,

4                    if I were put on the Jury, I would look

5                    at the stuff in front of me and be honest

6                    and try to be fair.

7     Q.    That is all we can ask you to do.  It is

8                    important that based on our American

9                    system of justice, that we have jurors

10                   who come in and try to be fair to both

11                   sides, so that both sides get a fair

12                   shake, both the Defendant and the people

13                   of the State of Ohio.  It is not like the

14                   system overseas where maybe in Europe or

15                   France where somebody may be presumed

16                   guilty and they have got to prove their

17                   innocence or in Turkey or Iraq or

18                   somewhere else.

19                        Now, we're sort of asking you to go

20                   back to school and it is like taking a

21                   class and whatever you learn, you are

22                   starting with a blank slate and it is

784

1              going to be written on that chalkboard,

2              here in this Courtroom.  You will have to

3              rely on the testimony of the witnesses

4              who testify from that stand, and the

5              physical Exhibits that are admitted into

6              evidence, and the instructions of law

7              given to you by the Judge.  I take it you

8              have done things before like that, when

9              you learn to cook, you set aside any

10             preconceived notions you might have had,

11             or safety rules for hunting, you learn

12             those things and you set aside the stuff

13             maybe from when you were a little kid and

14             you learned how to do things and you made

15             your decisions as an adult based on what

16             you learned after, right?

17   A.   Right.

18   Q.   The death penalty itself.  I noticed you are

19             in favor of the death penalty as a

20             punishment for certain types of crimes?

21   A.   For certain things.  I would have to say that

22             for certain things, I do definitely favor

785

```
 1              the death penalty.  I don't go eye for an

 2              eye or something like that, but on

 3              certain things that I think it is only

 4              fair.

 5   Q.   What is it based on, a personal, morale or

 6              religious belief or a combination?

 7   A.   To kill somebody is doing the worst thing you

 8              can do to them, but to plan it and you

 9              know a person can say, "I'm going to kill

10              you," and if they think about it long

11              enough, they should straighten themselves

12              out.  If you plan it and plan it, and do

13              it, then you should be thinking, "If I

14              get caught doing this, I'm going to have

15              to pay the penalty."  That is how I feel

16              about it.

17   Q.   You feel people should be held accountable for

18              their actions?

19   A.   Right.

20   Q.   Now you understand that your personal feelings

21              about what the possible penalty should be

22              may be different from what the State
```

786

```
 1            legislature sets out?
 2    A.    Yes.
 3    Q.    And under our system of justice it is
 4            important, being a nation of laws, that
 5            we follow the law, that it is important
 6            we set aside our personal views and
 7            follow the instructions of law given to
 8            us by the Judge.  Can you do that?
 9    A.    I hope so, yes.
10    Q.    Now, for example, you talk about a
11            premeditated killing.  You understand
12            under our system of justice in this
13            state, the State legislature has said,
14            "Well, if Ken Bailey goes out there and
15            tells the whole world on Courthouse
16            steps, I'm going to kill my co-counsel,
17            Chris Becker, I am going to take a gun
18            and shoot him on April 12th, at high
19            noon," and I do that, that is not a death
20            penalty offense under the laws of the
21            State of Ohio.  Just for purposely
22            killing another person, it is prior
```

787

```
 1              calculation and design.  There have to be
 2              certain extra factors, certain findings
 3              of fact in addition to that, to make me
 4              eligible for a death penalty offense the
 5              way the legislature has written the law.
 6   A.   All right.
 7   Q.   You understand that all killings are not
 8              treated equally under the law.  For
 9              example, let's say you are out in the
10              woods, you are building a campfire and
11              you get some logs out there and you got
12              an axe and you are chopping the wood, and
13              the axe head flies off the axe handle and
14              killed somebody who is standing there
15              nearby.  That is an accident?
16   A.   That is an accident.
17   Q.   There wouldn't be any punishment for that?
18   A.   No.
19   Q.   Somebody who is driving drunk down the road
20              and goes off the road and kills a little
21              girl, that probably wouldn't be a death
22              penalty offense, would it?
```

788

1    A.   No.

2    Q.   Because it wasn't done on purpose and it

3         wouldn't make the other standards the

4         legislature would set up. For killing

5         somebody on purpose, maybe I get angry

6         with somebody in a bar, and I punch them

7         out and he falls back and hits his head

8         on the counter and dies as a result of

9         that, that may be a manslaughter, right?

10   A.   Yes.  I couldn't consider that -- I don't

11        think you mean to kill even though you

12        are fighting with them.

13   Q.   Let's say I mean to kill somebody.  I pull out

14        a knife and stab them in the heart.  That

15        could be murder, but that type of

16        offense, I'm not going to get the death

17        penalty for.  I may go to prison for

18        life, some type of penalty for that, but

19        it won't be the death penalty most

20        likely.

21   A.   Right.

22   Q.   Now, the legislature has set up certain

789

1          parameters for the death penalty in the

2          State of Ohio.  They have set up a two

3          phase trial proceeding.  So that this

4          case is tried in two different parts.

5          The first part of this trial deals with

6          the issue of guilt or non-guilt.  The

7          Defendant is charged with the number of

8          crimes, and those crimes contain certain

9          elements or essential component parts.

10         And we have to prove those elements of

11         the crime by proof beyond a reasonable

12         doubt so that you are firmly convinced of

13         the truth of the charge to a moral

14         certainty.

15              And the Judge is going to give you

16         instructions about proof beyond a

17         reasonable doubt, and what these elements

18         are, and he's going to tell you, you have

19         got to use your reason and your common

20         sense and you are used to doing that.

21         Somebody who hunts has to use a lot of

22         reason and common sense, right?

790

1    A.    Right.

2    Q.    And because of the fact that the first -- the

3          first part of this trial, the first phase

4          of this trial deals with guilt or

5          non-guilt, there are certain things that

6          would not be relevant to that first

7          phase, like the issue of punishment would

8          not come in at all in the first phase.

9          Just the issue of whether we prove that

10         the Defendant did what she's charged with

11         doing by proof beyond a reasonable doubt.

12         If we do prove those things, the Jury

13         finds the Defendant guilty of a crime

14         called aggravated murder, and guilty of

15         one or more specifications of aggravating

16         circumstances, that make her eligible for

17         the death penalty.  Then and only then,

18         we would go on to a second phase and the

19         second phase would deal with what is the

20         appropriate punishment for this

21         Defendant, for this crime.  And in that

22         second phase -- Mr. Becker is here.  And

791

1          in the second phase, there would be a

2          balancing test that would be performed,

3          and in the second phase, you could hear

4          different testimony.  You might hear the

5          same testimony.  We present it, but the

6          Defendant at the second phase has an

7          opportunity to produce what we call

8          mitigating factors.  These are things

9          that would work to a Defendant's benefit,

10         and would work against the imposition of

11         the death penalty as a possible

12         punishment.  Because -- and you wouldn't

13         have heard any of that stuff in the first

14         phase, because it is not relevant.  The

15         only issue in the first phase is guilt or

16         non-guilt, right?

17    A.   Right.

18    Q.   So, let's say we get to the second phase.  At

19         that point, you would have to do a

20         balancing test.  You would have to

21         balance on one side of the scale the

22         aggravating circumstance or circumstances

792

1        that the State would have presented, and

2        on the other side are these mitigating

3        factors presented by the Defense.  We

4        don't know what they are at this point.

5        It is not relevant.  It is not really

6        important at this point, but if we get to

7        that second phase, you will hear about

8        them.  And then you have to decide

9        whether the aggravating circumstance or

10       circumstances outweigh these mitigating

11       factors by proof beyond a reasonable

12       doubt.  And if they do, and after you and

13       the other 11 jurors deliberate, and if

14       you decided that the aggravating

15       circumstance outweighs the mitigating

16       factors, then you would return a verdict

17       as to the death penalty.  You understand

18       the death penalty is not an automatic

19       punishment for somebody who has been

20       found guilty in the first phase of

21       aggravated murder with one or more death

22       penalty specifications.

793

1   A.   I don't really understand that at all.

2   Q.   You don't understand because you haven't heard

3          anything at all about what the mitigating

4          factors would be. You have no idea what

5          would be the appropriate punishment at

6          the end of the first phase. All you have

7          decided at the end of the first phase is

8          that the Defendant is guilty of their

9          four different charges here and different

10        specifications or special findings tacked

11        on. If you find she's guilty at the end

12        of the first phase of aggravated murder

13        with one or more death specifications, it

14        just makes her eligible for the death

15        penalty. It is not an automatic death

16        penalty --

17  A.   If she's convicted of that, then you have to

18        go that way.

19  Q.   Under our law in this state, then you must

20        consider the evidence presented at the

21        second phase. It's not an automatic

22        death penalty. Because there may be a

794

```
 1              whole lot of things that can come into
 2              play on behalf of the Defendant, and you
 3              may say, "Gosh, if I learn these things,
 4              I won't impose the death penalty.  It's
 5              not a fair punishment for this
 6              Defendant."  There may be things that
 7              work in her favor.  And in that case, if
 8              she's not allowed to present those, it
 9              wouldn't be fair.
10                   And what I want is you want to hear
11              everything in the second phase so you can
12              make a decision.
13    A.   So you are saying, first we'll have the trial?
14    Q.   First part of the trial is the guilt phase
15              like any other trial.
16    A.   If convicted, then we go through like another
17              trial type phase?
18    Q.   Yes.
19    A.   I thought it was like you sat in the office
20              and decided.
21    Q.   It is two trials?
22    A.   Two trials.
```

795

1    Q.    The first trial is like any other trial, you

2          hear testimony relating to basically the

3          issue.  In the first phases can we prove

4          her guilty of the elements of these

5          crimes by proof beyond a reasonable

6          doubt?  And you and the jurors make a

7          decision.  If you find that we don't live

8          up to our burden of proof then and you

9          don't find her guilty of aggravated

10         murder with one or more of these death

11         penalty specifications of aggravating

12         circumstances, then we don't go on to the

13         second phase.  The only time we go on to

14         that second phase, if we convince you

15         beyond a reasonable doubt that she's

16         guilty of aggravated murder and one or

17         more of these death specifications.

18                Let's say we go to the second phase.

19         And in this second phase, there are four

20         possible punishments.  The first possible

21         punishment is the death penalty.  The

22         second possible punishment is life

796

1    without any possibility of parole.  The

2    third possible punishment is the sentence

3    of life in prison with parole eligibility

4    after 30 full years.  And the fourth

5    possibility is a sentence of life in

6    prison with parole eligibility after 25

7    full years.

8         Now, if evidence is presented in the

9    second phase, and you do this balancing

10   test, you and the other jurors, and you

11   decide that we have proved beyond a

12   reasonable doubt that the aggravating

13   circumstance outweighs the mitigating

14   factors, then you must return a death

15   penalty verdict.  You understand that?

16   A.   Right.

17   Q.   If we don't convince you beyond a reasonable

18        doubt that the aggravating circumstance

19        outweighs these mitigating factors beyond

20        a reasonable doubt, then you go on to the

21        three life factors or three life

22        sentences.  And you understand, you have

797

```
 1              to consider each of those three possible
 2              life sentences equally to start out with.
 3              Then you and the other jurors deliberate
 4              and decide which is the appropriate
 5              penalty for this Defendant after you have
 6              listened to all of the evidence.  Can you
 7              do that?
 8   A.   Yes.
 9   Q.   The legislature says you are supposed to do
10              that.
11   A.   Yes.
12   Q.   And it is important, it is very important that
13              you do that, so that both sides get a
14              fair shake.  It is important that the
15              Defendant gets a fair trial.  It is
16              important that the people of the State
17              get a fair trial.
18   A.   Okay.
19   Q.   You would be able to do that?  You would be
20              able to set aside your personal feelings?
21              You indicated on your sheet, you tend to
22              favor the death penalty?
```

798

A.   I do on certain things.  If somebody hits
        somebody over the head with a frying pan
        for just a thing like that, it is
        different.  I think if you plan on it,
        you should have time to come to your
        senses.  That is my feelings.

Q.   And that is good.  It is important that we
        have all kinds of opinions in our
        society.  We have a lot of diversity in
        our society and it may well be after you
        hear all of the evidence, and you
        deliberate with the other jurors, you all
        come to the same conclusion that the
        death penalty should be the appropriate
        penalty in this case, but it may be after
        you listen to all of the testimony,
        whatever is presented in that second
        phase, that would work to the Defendant's
        benefit, that you and the other jurors
        decide, "Hey, the death penalty really
        isn't the right penalty in this case, it
        should be something less."

799

```
 1    A.    Okay.

 2    Q.    Because the State hasn't proved that the

 3                aggravating circumstance or

 4                circumstances, outweigh the mitigating

 5                factors?

 6    A.    Right.

 7    Q.    On the other hand, if it does, if the

 8                aggravating circumstances do outweigh the

 9                mitigating factors beyond a reasonable

10                doubt, then the death penalty would be

11                appropriate?

12    A.    Right.

13    Q.    But we won't know that until all of the

14                evidence is in on both phases.  Now you

15                understand that as she sits there, this

16                Defendant is presumed innocent, as are

17                all other Defendants tried in this

18                Courtroom.  It is only fair.  As she sits

19                there now, no evidence has been

20                presented.  If you had to vote right now

21                which nobody would ever do, you would

22                have to find her not guilty, because we
```

800

1    haven't presented any evidence of guilt

2    as to these elements.  And the burden of

3    proving those elements is on us, the

4    people of this state.  If we screw up, if

5    we leave out one of these elements, you

6    have got to find her not guilty of that

7    particular crime.  And you are to

8    consider each of these crimes and their

9    elements separately.

10        There are four different crimes that

11    are charged here.  The Defendant is

12    charged with -- there's two counts of

13    aggravated murder.  There are two

14    different theories of aggravated murder.

15    There's one dead person, but the State

16    has allowed to and has charged the

17    Defendant two different ways on two

18    alternate theories of this crime of

19    aggravated murder.

20        One of these counts or charges of

21    aggravated murder deals with prior

22    calculation and design.  That is the old

801

1      sort of like the old premeditation.  It

2      requires lot of forethought and planning.

3      The second count of aggravated murder

4      deals with what we call felony murder,

5      that the killing was done purposely, and

6      that it occurred during the course of an

7      aggravated burglary and/or aggravated

8      robbery.

9          Now, there's also, there are also

10     specifications, these death penalty

11     specifications that are attached to these

12     counts of aggravated murder.  And the

13     specifications are basically a fancy word

14     that just means a special finding of fact

15     that a Jury has to consider.  And these

16     special findings of fact are aggravating

17     circumstances, first of aggravated

18     burglary, that the aggravated murder was

19     committed during the course of an

20     aggravated burglary and the Defendant

21     committed the aggravated murder with

22     prior calculation and design.  And the

802

1          second specification is that the

2          aggravated murder was committed during an

3          aggravated robbery as opposed to

4          aggravated burglary and that the

5          Defendant committed the aggravated murder

6          with prior calculation and design.  Now,

7          another important thing is the Defendant

8          is not the trigger person in this case.

9          The fellow by the name of Nate Jackson

10          that you are going to hear about.  That

11          is the person who actually committed the

12          crimes, the aggravated murder, the

13          aggravated burglary, the aggravated

14          robbery.  But, the Defendant is charged

15          as a compliciter, somebody who solicits

16          or procures or aids or abets another

17          person in purposely committing the crime.

18          In this case, the aggravated murder of a

19          fellow by the name of Robert Fingerhut

20          with prior calculation and design and/or

21          during the course of an aggravated

22          burglary and aggravated robbery and with

803

```
 1            a working gun, a firearm.  In other
 2            words, she's charged with inviting him or
 3            leading him on or getting him or helping
 4            him or assisting or strengthening him in
 5            planning this crime, planning with him in
 6            committing this crime and the killing of
 7            her ex-husband for insurance money and to
 8            steal a car.
 9                 Now, each of these crimes is
10            composed of certain elements.  An element
11            is an essential component part of a
12            crime.  Like you like to cook, what do
13            you cook?  What kind of cooking do you
14            do?
15   A.   I Cook chili.  I have been in chili cook-offs
16            and things like that.  Prime rib.  I cook
17            everything.
18   Q.   Let's say you make chili.  You have got
19            certain ingredients in that recipe,
20            right?
21   A.   Right.
22   Q.   And there are a lot of different recipes for
```

1              chili, but you have a favorite recipe.

2              And does it include some hot sauce?

3    A.    Yes.

4    Q.    So let's say each of these crimes, just like a

5              recipe has certain key ingredients.  For

6              example, let's take the crime of

7              aggravated murder with prior calculation

8              and design.  The Judge is going to

9              instruct you on the elements of these

10             crimes at the end of this case.  And you

11             have got to follow his instructions.

12             What I tell you now, isn't the law.  But

13             I'll give you an example, for instance

14             here.  We're going  have to prove for

15             instance, that it happened on or about a

16             certain date and time, like December 11,

17             2001.  That it happened here in Trumbull

18             County, Ohio, so that we can try this

19             case in this Courtroom and not up in

20             Cuyahoga County or down in Tuscarawas.

21             Third, identification that the Defendant

22             is a person that committed this crime is

805

1      a compliciter.  Somebody is going to have

2      to come in and point her out.  Fourth,

3      that she did it purposely, not by

4      accident, but rather she did this

5      purposely and the Judge will define that

6      term for you, basically on purpose.

7      Fifth, that she caused the death of

8      Robert Fingerhut, a living person.  And

9      sixth, that she did it with prior

10     calculation and design.  We're going

11     have to prove those particular things.

12          Now the Defendant doesn't have to do

13     anything.  Under our system of justice,

14     they just have to sit there.  They can

15     sit on their hands if they want.  They

16     don't have to do anything.  And it is

17     totally up to us and it is only fair,

18     because we're asking you to consider the

19     death penalty in this case.  It is only

20     fair that that burden is entirely on us,

21     the people of this state.  You agree with

22     that?

806

1    A.    Yes.

2    Q.    Now, these -- if we leave out an element.

3          Let's say we go through this whole trial

4          and we forget to say that it happened in

5          Trumbull County.  You have to find her

6          not guilty, because we screwed up and

7          didn't put on the elements.  We weren't

8          able to convince you beyond a reasonable

9          doubt of all of the elements.

10   A.    You mean --

11   Q.    That is the law.

12   A.    That seems to be like a loophole.

13   Q.    And you mentioned loopholes.  You don't like

14         loopholes?

15   A.    No.  If you would find somebody guilty and

16         they said, you know, you didn't say they

17         were shot at such and such an address.

18         To me that is not right.

19   Q.    But that is the law.

20   A.    That is the law.

21   Q.    And I mean there are different types of

22         loopholes, and one of the basic concepts

807

```
 1              of criminal law in this country is the
 2              Prosecution has to prove the elements of
 3              the crime.  And that is why your tax
 4              dollars go to paying our salaries to see
 5              that we do a good job in doing that.  We
 6              have got to put on evidence.  And let's
 7              say for some reason, we're not able to
 8              prove an element.  Then under the law --
 9              and you may say, "Hey, they gave it a
10              good try, but the testimony just wasn't
11              there for something on one of these
12              crimes."  Let's say for aggravated
13              burglary, you didn't like the way
14              something happened.  You may say there's
15              an aggravated robbery, but not aggravated
16              burglary, then you would have to find the
17              Defendant not guilty if we can't convince
18              you beyond a reasonable doubt that all of
19              those elements exist in that particular
20              crime.  You are to consider each crime
21              separately.
22    A.    I don't know the difference between aggravated
```

808

```
 1                    burglary or a robbery anyway.
 2    Q.   Well, the Judge is going to tell you at the
 3              end of this case and he will give you
 4              instructions.  Basically, burglary is
 5              when you trespass inside a structure that
 6              is occupied and you go in and commit some
 7              type crime.  Whether you are going to
 8              steal something, you are going to kill
 9              somebody, and there are more elements
10              there.  On a certain date in the County,
11              identification of the person, but the
12              Judge will tell you what those elements
13              are.  Robbery basically is taking
14              something from another person by force or
15              threat.  But the Judge is going to tell
16              you what those elements are and you are
17              bound under the law.  Under our system of
18              justice to follow what Judge Stuard tells
19              you; can you do that?
20    A.   I hope so.
21    Q.   That's all we can ask.  It is important that
22              we get a cross section of the community,
```

809

1    with all kinds of educational background.

2    Some folks have finished high school.

3    Some people have gone on to college.  But

4    one thing that is important with every

5    juror is use of reason and common sense.

6    That is the test for proving something by

7    proof beyond a reasonable doubt.  You

8    understand it is not beyond all doubt or

9    a shadow of a doubt.  I think there's an

10   Alfred Hitchcock movie, "Beyond the

11   Shadow of a Doubt".  That is not the test

12   in this Courtroom.  The test in this

13   Courtroom is the test that is used in

14   every criminal cases that is tried.

15   Whether it is a shoplifting or burglary

16   or robbery or aggravated murder or

17   possible death penalty case.  And the

18   Judge is going to tell you, you are going

19   to use your reason and common sense in

20   coming to a conclusion and you use that

21   every day.  You use it at work when you

22   are working.  You use it when you are

810

1              cooking, when you are mixing up the food.

2              You use it when you are hunting.  It is

3              something that you are used to dealing

4              with.  You have raised kids.  You got to

5              use a lot of reason and common sense when

6              you are raising your kids.

7    A.   Yes.

8    Q.   This is no stranger to you, this process?

9    A.   Right.

10   Q.   It is something you are used to.  There's also

11              a specification of a firearm attached to

12              the crimes of aggravated robbery, and

13              aggravated burglary.  And that charges

14              that basically, the Judge will instruct

15              you as to the elements of that, but a

16              working gun was used.

17   A.   My opinion of that is I would rather be shot

18              than hacked to death with an axe, so I

19              know there's a lot of stuff on guns and

20              stuff now where people are, "Well, he

21              used a gun."  Well, I would rather them

22              use a gun than an axe.

811

```
 1   Q.    I agree with you, but the legislature hasn't

 2         set up any axe specifications.

 3   A.    Maybe at one time it was.  Use an axe.

 4   Q.    Guns are much more violent if you are going to

 5         kill somebody.  Now, while I am at it, do

 6         you have any questions that we can

 7         answer?  Because this is the only chance

 8         that we get to talk face to face until

 9         the whole proceeding is over and that

10         means both sets of the trial, assuming we

11         get to a second phase.  Because we're not

12         allowed to have any communication with

13         you during the course of this trial,

14         except for this part right here.  If you

15         have any questions, you have got to ask

16         Laurie Brown, the Bailiff, or Mary Ann or

17         the Judge.  If we see you out in the

18         corridor or the hallways, the elevator,

19         we're not being anti-social, it is just

20         that under our rules of conduct, we're

21         not allowed to have any contact with the

22         jurors, otherwise it could result in a
```

812

```
 1              mistrial.  So I want you to understand
 2              that both sides aren't being anti-social
 3              here, it is just the way we're forced to
 4              conduct ourselves.
 5                   And while we're having this give and
 6              take right now, this Jury selection
 7              process, do you have any questions that
 8              you have about what we're doing that
 9              pertains to this case that you think
10              maybe we can clear up?
11    A.   No, not really.  I can't think of anything
12              right offhand.
13    Q.   Now you have had the experience of being a
14              juror in a prior civil case?
15    A.   Yes.
16    Q.   And the instructions of the burden of proof is
17              totally different in a civil case.  There
18              it is by a preponderance of the evidence.
19              The scale has to tip a little bit.  In
20              this case, we're talking about proof
21              beyond a reasonable doubt, and the Judge
22              is going to define that for you.  It is a
```

813

1           heavier burden of proof, but it's not

2           beyond all doubt or beyond a shadow of a

3           doubt.  It is based on the use of your

4           reason and common sense.  So that if you

5           are firmly convinced to a moral

6           certainty, then we have proved our case.

7           And you have had the experience of

8           deliberating before with other jurors?

9  A.    We really didn't have to decide whether a

10          person was guilty or anything.  It was

11          more like how much damage they should

12          get, and it wasn't really like it was

13          somebody's fault.  The guy admitted that

14          he ran into the other person.  It is just

15          I guess they were suing for more than the

16          insurance company wanted to pay or

17          something.  So we had to decide what the

18          payoff would be.

19  Q.    And the Judge instructed you as to the law,

20          and you were able to follow the law in

21          coming to a conclusion, right?

22  A.    Right.

814

1    Q.    So you have had experience doing something

2          like this before?  This is a different

3          type of case.  Now, there are different

4          types of evidence that can be produced in

5          a criminal case.  Some of these, some

6          types of evidence what we call direct

7          evidence, where a witness can testify to

8          what he's learned through the use of his

9          five senses; like for example, "I heard

10         the gunshot and it was loud," or "I

11         smelled the smoke and it was acrid," or

12         "I touched the body and it was cold."

13         There's another type of evidence that

14         comes in that is just as good as direct

15         evidence, and this is what we call

16         circumstantial evidence.  It is sort of

17         round about evidence where you can be

18         presented with a fact or series of facts,

19         and then you draw a logical -- logical

20         deduction to another fact or series of

21         facts.  For example, let's say you go to

22         sleep at night and you look out across

815

1      the neighborhood from your second story

2      window in your bedroom and the night is

3      clear.  The moon is beaming, it is

4      shining.  The stars are twinkling.  Not a

5      cloud in the sky.  You have got the T.V.

6      on before you go to sleep and the weather

7      forecast predicts a storm overnight.

8      Cold front is moving in.  And you draw

9      the blinds and you go to sleep and

10     sometime in the middle of the night, you

11     are awakened by a distant booming sound

12     that comes closer, and then there's a big

13     crash above the house, and just before

14     this big boom, there's a real bright

15     flash of light from outside.  Now, the

16     blinds are drawn and you can't see what

17     is going on out there, but you hear

18     pitter patter on the roof and then a

19     heavy boom and you fall back to sleep.

20     You get up, you open up the blinds, the

21     sun is shining, not a cloud in the sky,

22     and there's water all over, the streets

816

```
 1              are running with water, drops of water
 2              are dripping off the leaves of the trees
 3              as far as you can see across the
 4              neighborhood.  There's no fire plug
 5              nearby where a car could have hit it
 6              during the night and spurted water up,
 7              and you know, using your reason and
 8              common sense what happened during the
 9              night, don't you?
10   A.    Right.
11   Q.    There's a rain storm, thunder storm, you saw
12              the flash of lightning, you heard the
13              thunder, and you know that beyond any
14              reasonable doubt; don't you?
15   A.    Right.
16   Q.    And you learned that by circumstantial
17              evidence, didn't you?
18   A.    Well, yes.  I guess you could say so.
19   Q.    You didn't see it, but using all of those
20              other factors, you found out what
21              happened?
22   A.    Right.
```

817

1   Q.   Now, there's room in there for some possible
2        doubt, some imaginary doubt.  You can
3        imagine that Martians fly by in their
4        space ship and flew by and put on a light
5        show.  That would be a foolish or
6        imaginary doubt?
7   A.   Yes.
8   Q.   You know beyond a reasonable doubt is all that
9        happened was a rain storm.  That is the
10       same type of stuff that you can consider
11       in a criminal case.  And they use that
12       term circumstantial evidence.  Sometimes
13       people use it rather disparagingly, but
14       that is very good evidence.  And there's
15       a reason for it.  I think you would agree
16       that often times serious crimes happen in
17       secret?
18  A.   They try to.
19  Q.   Sometimes criminals aren't the brightest
20       rocket scientist?
21  A.   You have a better chance of getting caught.
22  Q.   Because of the fact that crimes are often

818

```
 1              crimes committed in secret and maybe
 2              secret planning, we have to rely on other
 3              types of evidence, unless the Defendant
 4              tells you exactly what they were planning
 5              at the time.  And you can rely on things
 6              like, may be like letters or phone calls,
 7              if we have those things, to determine
 8              what a person was planning; is that
 9              right?
10   A.    I would guess, yes.
11   Q.    Now, you would agree that criminals aren't
12              always the brightest people in covering
13              up their tracks.  For example, you are
14              aware of cases you might have read in the
15              paper where bank robbers have gone into a
16              bank with a holdup note handing it to the
17              teller, and taken the money and left.
18              And sometimes, they are captured on
19              camera and they are not wearing a mask,
20              and sometimes that note that they have
21              written is on the back of an envelope
22              that's addressed to them and they have
```

819

1        left that at the scene.

2   A.   I have heard of that.

3   Q.   Or burglars leaving their wallets at the scene

4        of the crime?

5   A.   I have heard that.

6   Q.   You are aware that sometimes criminals aren't

7        the brightest people in the world?

8   A.   I would say, yes, some.  Some are really good.

9   Q.   Some are good and some aren't so good, are

10       they?  Now, another thing, this crime

11       happened in this County and up in

12       Howland, and you understand that you are

13       not allowed unless you are conducted to

14       the scene by, on a view by the bailiff,

15       you are not allowed to go out to the area

16       to investigate yourself.

17  A.   I have no idea where it is at.  I wouldn't

18       want to do it anyway.

19  Q.   You are not allowed to, because you understand

20       that could cause a mistrial.  We had one

21       case where a juror went out and did his

22       own investigation.  Sometimes I think

820

```
 1              there are one or two movies where they do

 2              that.  That is movies and T.V., but it

 3              caused a mistrial.  You understand that

 4              we don't want to do something all over

 5              again, that would be improper to do

 6              something like that?

 7    A.   Yes.  Sometimes you want to ask a question,

 8              but you wish somebody would ask the

 9              question, but you can't say, "Hey, how

10              about asking this?"

11    Q.   And that is another thing.  You understand

12              that under our justice system in this

13              state, you are not allowed to ask the

14              questions, you are stuck with the

15              questions that the lawyers ask, and

16              because we're lawyers, we're probably

17              going to confine ourselves to facts that

18              prove the elements of the crimes charged.

19              That is all we have got to prove under

20              the law, just those particular elements

21              that the Judge is going to instruct you

22              of later on.  And because of that, there
```

821

1          may be things of which you may have some

2          special interest.  You may wonder what

3          they were cooking on a certain day.  Or

4          where they got their degrees from and

5          because it may not be relevant to proving

6          the elements of the crimes charged, we

7          may never get into that.  You will never

8          know what the answer is to those

9          questions that you may have, but if it

10          had nothing to do with proving the

11          Defendant's guilt or non-guilt on these

12          elements of the crimes charged, you

13          understand you could still return a

14          guilty verdict, even though there may be

15          some unanswered questions about some

16          unrelated factors?

17    A.    Yes, I understand, but the unrelated factors

18          doesn't mean nothing to me.  I don't care

19          what they were cooking as far as what

20          they had for dinner that day is

21          immaterial to me.

22    Q.    The key thing is, are we able to prove the

822

```
 1                    elements of the crime by proof beyond a
 2                    reasonable doubt in the first phase?  The
 3                    fact that the Defendant is a woman, does
 4                    that bother you in any way if you are
 5                    called upon to return a guilty verdict in
 6                    the first phase or death penalty verdict
 7                    in the second phase?
 8   A.   Maybe years ago, but in the last 20 years
 9                    where things have changed, compared --
10                    well, woman are more equal to men now.
11                    Even in the war, they are over in the war
12                    and everything else, so they are more
13                    equal as far as everything.
14   Q.   Than what they used to be years ago?
15   A.   Yes.
16   Q.   Another thing we were getting into before, you
17                    understand that you are not allowed to
18                    take notes during the course of the
19                    trial.  You might like to, but under our
20                    system of justice, you are going to have
21                    to remember the testimony and it is like
22                    when we were kids, you listen to the
```

823

1          radio, pay close attention, and you are

2          able to remember things.  Then at school,

3          they let you take notes, generally, but

4          here you don't take notes.  They want you

5          to pay close attention to the witnesses

6          to watch their demeanor, determine their

7          truthfulness, their credibility.  The

8          Judge will give you an instruction on

9          that and it's the same test that you use

10         in your every day life.

11              And you are going to have to rely on

12         your recollection along with the

13         collective recollection of the other 11

14         jurors who are on the Jury with you.  And

15         when you go back to deliberate, often

16         times jurors come in with the question,

17         "Well, can we get the testimony of so and

18         so?"  That is not going to happen,

19         because Mary Ann is very good as a Court

20         reporter, but she can't do instant

21         transcripts.  We don't have millions of

22         dollars to spend on special transcribing

824

1     facilities that they had in the O.J.

2     Simpson case or whatever those cases, the

3     high publicity cases are in California,

4     or elsewhere.

5         So, the Judge will probably tell you

6     that you have got to rely on your

7     collective recollection and you are not

8     going to get the transcripts of the

9     testimony.  So it is very important you

10    pay close attention to all of the

11    testimony.

12        Now this case is probably going to

13    take somewhere, once we get into trial,

14    it could take up to two weeks to try, I

15    would expect.  Maybe a little bit less,

16    could take more, but about that period of

17    time and then at the end of the first

18    phase when you go out to deliberate at

19    that point, you are sequestered, it means

20    you are not allowed to talk to anybody

21    else, just the other jurors when you are

22    deliberating.  You can talk about other

825

1              things other than the case when you are

2              not deliberating, but you can't -- the

3              only time you are allowed to talk about

4              the case is when all of you are together,

5              all 12 of you, and you are in

6              deliberations.

7     A.   Not just like two people?

8     Q.   Two people, that would cause a mistrial.

9              Don't want that to happen.  It is

10             important that you don't engage in any

11             conversations about the case from now on

12             until you reach a verdict.  And that

13             would cover both phases.  And let's say

14             we -- go, you would be sequestered at the

15             end of the first phase until you reach a

16             verdict and we have had jurors go from a

17             couple of hours to a couple of days.

18             Every Jury is different.  You take as

19             long as you need.

20                  Now let's say you returned a verdict

21             of aggravated murder with a specification

22             at the end of the first phase.  You go

826

```
 1              onto a second phase, you would be home in
 2              between, and then within a couple of days
 3              or a week, generally we would be back for
 4              a second phase, and you may hear a couple
 5              of days of testimony, and then you would
 6              be sequestered again at the end of the
 7              second phase.  And that again, with that
 8              sequestration, who knows how long that
 9              could take.  Again, it could be anywhere
10              from a couple of hours to a couple of
11              days depending on the Jury, and you would
12              take as long as you need.  Would that
13              cause any undue hardship for you?
14     A.   No.  It wouldn't be fun, but I could do that,
15              to go along with it.
16     Q.   And you understand that this Jury, or our Jury
17              system here, there's certain obligations
18              that we have as citizens in this country,
19              the right to make sure the country works.
20              One of these obligations is if it is
21              election time we vote, if we can, to
22              participate in our Government.  If it is
```

827

| | | |
|---|---|---|
| 1 | | War time, we serve in the military.  We |
| 2 | | have got young people overseas right now |
| 3 | | in several countries serving.  And |
| 4 | | another obligation of citizenship is to |
| 5 | | serve as jurors if we're summoned in if |
| 6 | | we're able to, and it is really important |
| 7 | | to make sure the system works.  Would you |
| 8 | | be willing to undertake that obligation |
| 9 | | of citizenship? |
| 10 | A. | Yes, I have to. |
| 11 | Q. | It may not be an easy thing to do? |
| 12 | A. | I would say I prefer not to, but I would if I |
| 13 | | have to. |
| 14 | Q. | It is not an easy thing to sit on a death |
| 15 | | penalty case.  And the death penalty is |
| 16 | | not an every day punishment.  It should |
| 17 | | be applied only in the most serious of |
| 18 | | cases.  And that's why we're here, for a |
| 19 | | Jury to determine what the -- whether the |
| 20 | | Defendant is guilty and if she is, then |
| 21 | | what the appropriate punishment would be. |
| 22 | | Now, I am almost done.  Now during |

828

```
 1            the course of the trial, you are going to
 2            be face to face with the Defendant and
 3            perhaps during the course of the trial as
 4            her chair is turned towards you, you are
 5            going to become more acquainted with her,
 6            and my question to you is this.  When you
 7            go back inside that Jury room to
 8            deliberate with the rest of the jurors,
 9            can you set aside all thoughts of
10            sympathy that you may have for this
11            Defendant and be conscientious in your
12            deliberations and base your verdict on
13            the testimony and evidence that you hear
14            and the instructions of law given to you
15            by the Court, and lay aside all thoughts
16            of sympathy that you have for this
17            Defendant?
18     A.    Yes.
19     Q.    Is there any other pressing matter at home or
20            work that would affect your ability to
21            concentrate on the evidence here?
22     A.    I am retired.  I have no excuses.
```

829

Q.    There are days I wish I were, too.

            MR. BAILEY:  Thank you very much for
your candid answer.  Now Defense counsel will have
an opportunity to ask you questions.

EXAMINATION BY MR. JUHASZ OF MR. CALHOUN:

Q.    Mr. Calhoun, good morning.  The Judge had us
        introduce ourselves the other day.  My
        name is John Juhasz.  My friend Jerry
        Ingram and I are representing Donna
        Roberts, who as you know, is on trial for
        her life.  Many times we say to jurors at
        this point of questioning that this is
        sort of like a job interview.  I want to
        change that a little bit, and hopefully
        convey to you the reason why we do this,
        and maybe it will help you understand why
        we ask some of the questions that we do
        and also help you in answering those
        questions.  I like to tell stories about
        my son Mike.  He's a senior in high
        school now.  When he was a younger kid,
        he played baseball, T-ball and all of

830

1    that stuff and Little League, and I

2    coached, and sometimes we would find

3    ourselves at a game and the umpires

4    wouldn't show up, and so, they would ask

5    one of the parents if they would umpire.

6    And sometimes if we had an extra coach,

7    one of the coaches would umpire.  Now,

8    the reason I bring that up is because if

9    you are selected as a juror in a case

10   like this, you are an umpire of what the

11   facts are.  So, one of the reasons that

12   we ask these questions is that if

13   somebody would come up to me in one of

14   those games where they don't have an

15   umpire and say, "Do you want to umpire?"

16   I would say to myself, "What the heck,

17   I'm a fair guy, yes, I can do this."  But

18   let's fast forward for a second.  Let's

19   go to the end of the game.  The score is

20   tied, my son Mike is on second base.

21   There's two outs, it's the bottom of the

22   ninth inning.  There's a hit to the

831

1    outfield.  Mike comes, I don't want to

2    say charge, because he's a big kid,

3    lumbering down second base to third base.

4    He gets the sign to go home, there's a

5    throw from the outfield, there's a play

6    at the plate, and there I'm having to

7    make the call.  And if I call him safe,

8    the home team wins three to two and they

9    all run off happy.  And if I call him

10   out, we go into extra innings and who

11   knows what the heck is going to happen.

12   The reason I bring up that story is

13   because we try in the beginning of a case

14   like this to think about everything that

15   could happen including that play at the

16   plate with two outs and the score tied

17   and the bottom of the ninth.  In those

18   circumstances, maybe I should have said

19   to myself, or maybe they should have

20   asked me some more questions like, "Hey,

21   do you really think that you can do this?

22   After all, your kid is one of the players

832

1        on this team."  Am I making sense about

2        all of that?

3  A.   Yes, I have been through it.

4  Q.   I suppose if we look back and think about it

5        from the perspective of the play at the

6        plate, maybe both of the parents on both

7        of the teams should have maybe asked me

8        some questions to find out if, really

9        even though I am a fair guy, if I am the

10       guy to do that job in this particular

11       situation; you see how that works?

12 A.   Sure.

13 Q.   We're sort of doing the same thing here.  Now,

14       by asking you questions is saying, you

15       are not a fair person, or anything like

16       that.  In that particular case I told you

17       about with my son, because of my personal

18       experiences, he's my son, I love him very

19       much, he's very special to me, maybe I

20       should umpire some other game, but not

21       one where Mike is a player.  And we kind

22       of do the same thing here.  We ask

833

1               questions to get a look at you, like the

2               job interview, but also to sort of ask

3               you to look inside yourself, and say, "Is

4               this a game I should be umpiring, or is

5               there something about the way I think or

6               the way I have feel, or my past

7               experiences, that maybe I shouldn't

8               umpire this game?"  You okay with all of

9               that?

10  A.   Fine.

11  Q.   This case, I'm sure you have gathered is not

12          about Nate Jackson.  It is about Donna

13          Roberts.  You appreciate that?

14  A.   Right.

15  Q.   And basically, Donna and the victim in this

16          case, Robert Fingerhut, were married.

17          They got divorced but after they got

18          divorced they continued to live together.

19          They lived together up in Howland and

20          they worked together at the Youngstown

21          and the Warren Greyhound bus stations.

22          You have already read some things about

834

```
 1              what has happened with Mr. Jackson,
 2              correct?
 3   A.    Yes.
 4   Q.    And in fact, I think you said on your
 5              questionnaire that you actually know what
 6              was the ultimate outcome of his case?
 7   A.    Yes.
 8   Q.    Now, when you heard the name Donna Roberts the
 9              other day, when you were first called for
10              Jury service, that name I take it wasn't
11              new to you at that point?
12   A.    No.
13   Q.    You knew about that from what you picked up in
14              the paper about Mr. Jackson?
15   A.    Down here you asked me who is Donna Roberts, I
16              know.  If you asked me at the grocery
17              store, I wouldn't have known.  "Do you
18              know Donna Roberts?  No, I don't."  But
19              here, yes.
20   Q.    Once you put it in that setting --
21   A.    Right.
22   Q.    And don't let me put words in your mouth.  I
```

835

```
 1              just want to make this sort of move so
 2              we're not here forever, but don't let me
 3              rush by you and put words in your mouth.
 4              I'm going to guess from that, that when
 5              you heard the name Donna Roberts in the
 6              confines or the context of this
 7              Courthouse, it sort of brought back what
 8              you read about Mr. Jackson and about
 9              allegations against Donna; is that fair
10              to say?
11  A.    Yes.
12  Q.    Tell me if you can recall, what your
13              impressions were back then when you read
14              those things.  What did you think about
15              Mr. Jackson?  What did you think about
16              Donna Roberts when you read those
17              articles?
18  A.    Negative.
19  Q.    You have also mentioned a little bit about
20              your thoughts on the death penalty and
21              for a second, I'm going to blend the two
22              because one of your concerns seems to be
```

836

```
 1              that somebody who thinks about a murder
 2              beforehand --
 3   A.   That is not the only thing.  On the
 4              questionnaire, it was like what was the
 5              main thing.  Well, I also think I put
 6              down killing for money.
 7   Q.   You did?
 8   A.   And I don't think -- there's probably other
 9              ones, too, but I don't think you should
10              go around killing people anyhow, but
11              those were the top of the list.
12   Q.   Well, here's the reason I bring it up, and it
13              wasn't to take issue with you, it is
14              because I want to try to focus on what
15              may come out in this case.  You heard
16              Mr. Bailey tell you that Donna is charged
17              two separate ways with aggravated murder?
18   A.   Right.
19   Q.   One of those is as he told you, what lawyers
20              call prior calculation and design.  What
21              we used to have is a law that called it
22              premeditation, but they changed that a
```

837

1          while back and now they call it prior

2          calculation and design, but in essence,

3          it means making some sort of a decision

4          beforehand to commit the murder.

5    A.    Right.

6    Q.    Now, having said all of that, first of all,

7          when you read those articles before and

8          you said you had negative impressions,

9          did any of those negative impressions

10         have to do with this idea, that there was

11         some, either, any of the things you

12         mentioned in the questionnaire, that it

13         was planned or that it was done for

14         money?

15   A.    I didn't know why it was done.  When it first

16         come out, I didn't think it said why it

17         was done, that he was murdered and then

18         his wife was -- I didn't know they were

19         divorced and lived together.  I didn't

20         know that.  I didn't know they worked at

21         the bus stations or whatever.  I didn't

22         know that.  I just knew basically that

838

1           some woman and another guy killed her

2           husband for insurance money.  Later on,

3           as the papers went through it, but I

4           can't say I followed that to the letter

5           of everything they put in the paper.  I

6           don't know a lot of things about this.

7    Q.   Understood, and this is not so much designed

8           to be a quiz about what you know or what

9           you don't know what was in the paper as

10          what impression the things that you did

11          read that you recall.  And I want to

12          follow up for a second, you said that you

13          had negative impressions about

14          Mr. Jackson and about Donna Roberts.

15          Could you elaborate on that?  I want you

16          to tell me.

17   A.   It just irks me when people do something like

18          that.  It just don't make sense to me,

19          because to me, I think 90 percent of the

20          people get caught that try it and they

21          have to know they are going to get

22          caught, or I would assume, I would expect

839

```
 1                to get caught if I tried to do it.  I

 2                just can't understand why they would do

 3                something like that, knowingly that they

 4                are more than likely going to get caught.

 5   Q.   All right.  Did you have a perception then

 6                from those articles that these folks had

 7                in fact done that?

 8   A.   Sure, I think that is the way the article sort

 9                of went.  That is the impression you get

10                from reading the paper.

11   Q.   How about today?  Do you still have that

12                impression today?

13   A.   I can't say, because I have to clean that off

14                I feel, because one time I had an

15                instance where I had a card game and I

16                went to bed.  It was all friends that

17                were playing cards, and I said, "I am so

18                tired, I can't play any longer."  I put

19                my money on the dining room table and I

20                let the guys just play out in the

21                kitchen.  Next morning I got up, all of

22                my money was gone.  In my mind, I went
```

840

```
 1                  through circumstantial evidence and so
 2                  forth and I had decided who the person
 3                  was that took my money, and I was wrong.
 4                  And after I found out I was wrong, it is
 5                  harder for me to say that that person did
 6                  it right off the bat.
 7     Q.   I'm going to do something I normally don't do
 8                  when I stand up here and do this, which
 9                  is jump ahead a little bit and I hope
10                  that I can tie some of these things
11                  together.  Mr. Bailey talked to you
12                  earlier about the presumption of
13                  innocence and I think you read some
14                  things about that, correct?
15     A.   I can't remember reading anything about the
16                  innocence.  Are you talking about in the
17                  instructions?
18     Q.   What you were given by the Court.
19     A.   Yes.
20     Q.   You heard Mr. Bailey talk about that is how
21                  our system is set up.
22     A.   Right.
```

841

1    Q.    Everybody, it has been my experience in doing

2          this for a little while now, comes to

3          Courts like this wanting to do a good

4          job.  The jurors want to do a good job,

5          they want to be fair, and it is my

6          impression anyway, everybody else may

7          disagree with me, that they want some

8          guidance, they want some help.  They want

9          a formula, how the heck do we figure out

10         what proof beyond a reasonable doubt --

11         how the heck do we figure out that the

12         State proved their case beyond a

13         reasonable doubt?  And I'm probably going

14         to disappoint a little bit when I tell

15         you that if you are selected as a juror,

16         at the end of the case when Judge Stuard

17         gives the instructions, he's not going to

18         give you numbers.  That is not his fault.

19         He didn't write the law.  He just gives

20         you the law as it exists, but he's not

21         going to say for example, well, if the

22         State has 12 witnesses, you have to find

842

1    that they proved this case beyond a

2    reasonable doubt, but if they only have

3    ten, they didn't meet the burden.  It

4    doesn't work that way.  There's no

5    formula.

6         Now, one of the ways that I like to

7    think about this and I talk to jurors

8    about this hoping that it helps them

9    think about it, is you somehow have to

10   try to in essence quantify the

11   unquantifiable.  What I would mean by

12   that is, nobody gives a formula, but

13   somehow the Judge goes, "You guys go back

14   in the Jury room and figure out what the

15   State proved this beyond a reasonable

16   doubt."  So, the concept I came up with

17   is you go back there and you sort of in

18   your mind's eye, draw a box.  And some

19   somewhere on that box, put a line that

20   you call reasonable doubt.  You then take

21   the evidence and you sort of close your

22   eyes in your mind's eye, you pour all of

843

1      the evidence that the State gave you into

2      that box. If they fill up in your

3      estimation, that box beyond that line,

4      because the proof has got to be beyond a

5      reasonable doubt, then they have proved

6      their case. But if they haven't, if they

7      either didn't put any evidence into the

8      box in your mind's eye, or if they put

9      some in there, but it doesn't get past

10     that line, then they didn't make their

11     case.

12         It is a little bit different from

13     what we're normally accustomed to, which

14     is where we want to hear both sides of

15     the story, because see the way our system

16     is set up, the State either wins the case

17     or loses it. In essence, the only thing

18     Donna Roberts has to do is show up here,

19     because the law says if you are going to

20     have a trial, you have to be here, but

21     you don't have to do anything, Miss

22     Roberts, because you don't pour any

844

```
 1                    evidence into the box yourself, and you
 2                    don't take any out as the accused person.
 3                    The State either wins their case by
 4                    filling the box up with enough evidence
 5                    beyond that line or they lose the case,
 6                    because they don't fill the box up beyond
 7                    that line.  Does all of that make sense
 8                    to you?
 9    A.   Sure.
10    Q.   And so to sort of tie that up with the idea of
11                    the presumption of innocence, a Defendant
12                    is presumed innocent.  And what that
13                    means is when we start out this case
14                    right now, that box is empty, because you
15                    haven't heard any evidence.  All of this
16                    making sense to you so far?
17    A.   Sure.
18    Q.   Now, what I need to know, and you are the only
19                    person who can answer this is because of
20                    what you have read or heard, about either
21                    Donna Roberts or Nate Jackson or both of
22                    them, is there anything in that box right
```

845

1              now?  In other words, is it going to take

2              some evidence to sort of unconvince you,

3              that she and Mr. Jackson did this thing?

4    A.   When I was home by myself where it didn't

5              matter, then I had an opinion.  Now the

6              box is already empty.

7    Q.   What is it that makes the difference between

8              home and here?

9    A.   Because it doesn't matter what I think at

10             home.  Here it does.  I'm saying not

11             being a juror, with just a person at home

12             that reads the paper, and when you bring

13             most of the people down here read that

14             paper, and you put them here, then they

15             got to change -- not necessarily change,

16             but what they read in the paper, they

17             have to say, "Well, I got to be more

18             honest or more fair and not just take the

19             one side."  That is all I can say.

20   Q.   One of the other things I mentioned when I

21             first got up here that one of the jobs

22             that you have to do if you are picked as

846

```
 1              a juror, is be sort of an umpire of the

 2              facts.  You have to decide what the facts

 3              are in this case.  The Judge does not do

 4              that.  He only tells you what the law is,

 5              so that you can apply the law to the

 6              facts.  You okay with all of that?

 7   A.   Yes.

 8   Q.   For example, I think you told Mr. Bailey, like

 9              most people, you don't know what the

10              definition of aggravated burglary or

11              aggravated robbery is.

12   A.   To me, you say I have been robbed.

13   Q.   And that is really honestly, that is what

14              everybody does who is not a lawyer.  And

15              so the Judge would define for you,

16              "Listen, here's the definition of

17              aggravated burglary.  Here is the

18              definition of aggravated robbery."  Your

19              job is then to go back in the Jury room

20              and say, "Well, he told us what it is,

21              now we have to decide what facts are

22              there."  Are there enough facts to meet
```

847

```
 1              that definition and fill up that box I
 2              have been talking about?  When you do
 3              that, when you decide whether that case
 4              has been proven, how much evidence there
 5              is, part of what you have to do is decide
 6              whether you believe the witnesses or not,
 7              what we call judging their credibility.
 8              Are you comfortable doing that in this
 9              case?
10  A.   Yes.
11  Q.   You don't think that just because somebody
12              tells us, takes an oath to tell the
13              truth, that everything they say is going
14              to be the truth?
15  A.   No.
16  Q.   You have learned over the course of your life,
17              how to figure out whether somebody is
18              telling you the truth and how they
19              haven't, right?  It could be by their
20              demeanor.  It could be by circumstantial
21              evidence, what they say versus what you
22              know other facts to be; all sorts of
```

848

```
 1            tests, correct?
 2   A.    Yes, but I have been fooled, too.
 3   Q.    We all have.  The only point of me bringing
 4            that up is the Judge will tell you,
 5            basically, that although he's going to
 6            list some of them for you, you are
 7            basically going to find out that the test
 8            that you use to decide whether somebody
 9            is telling you the truth or not, are the
10            same tests you use in your ordinary life.
11            Okay?
12   A.    Yes.
13   Q.    Now, here's why I bring that up in connection
14            with what we were talking about, about
15            the newspaper articles before.  You have
16            read some things and you have said,
17            "Look, I read those as Joe Citizen,
18            reading the newspaper, now, I am Joe
19            Juror and I have to put that stuff aside,
20            I have to empty that box."  What I need
21            to find out from you, Mr. Calhoun, is if
22            you hear testimony in the Courtroom that
```

849

```
 1              matches what you read in the newspaper,
 2              are you going to sort of give up that
 3              function of deciding whether or not to
 4              believe that witness by saying, "Well,
 5              you know what, I have got to believe this
 6              guy, because that matches what I read in
 7              the newspaper"?
 8    A.   I don't know.  I don't know precise things.
 9              Matter of fact, I don't know if he shot
10              him with a rifle or pistol.  There's a
11              lot of things I don't know.
12    Q.   And some of them honestly may come back to
13              you, because just like you had said
14              before, if I saw you in Giant Eagle and
15              said, "Mr. Calhoun, who is Donna
16              Roberts?"  You would say, "No idea."  If
17              I bring you down to the Courthouse and I
18              say, "Who is Donna Roberts?"  You would
19              say, "Oh yeah, that's the thing with Nate
20              Jackson."  My point in bringing that up
21              is, as you go through the testimony,
22              because you have read some things, things
```

850

1          that you can't think about right now, may

2          pop back when you hear witnesses testify?

3     A.    Yes.

4     Q.    What I need to know and this is a question

5          only you can answer, because you have

6          read things, if a witness says something

7          and you go, "You know what, I didn't

8          remember that when I was talking to that

9          crazy John Juhasz, but now I remember I

10         read what that witness is saying in the

11         newspaper, it has got to be true."  You

12         see, that is sort of giving up your job

13         as deciding independently whether that

14         person is really telling you the truth.

15         I need to know if you think you could

16         separate those two.

17    A.    I hope so.  That is all I can say.

18    Q.    We have talked to you a lot today about the

19         death penalty and your views on the death

20         penalty.  And I'm going to ask you some

21         more questions about that, but before I

22         do, there's a concern that I want to

851

1          address with you, and that is do you have

2          any thoughts, either because we're doing

3          this right now, before you have heard any

4          evidence, or maybe even because of what

5          you read about Mr. Jackson's case, that

6          this woman is going -- we're going to

7          find her guilty and get to a second phase

8          and that is why they are talking to me

9          about the death penalty now?

10   A.   I think you are doing it because they have got

11          to prepare the people for what is coming

12          if it happens.  You can't have people

13          over here saying, "I don't understand

14          that."  That is why I think it is being

15          done now, to make sure you know.  I

16          didn't know it was two trials.  I thought

17          there was one trial.  You went and that

18          was it.  I didn't know it was going to be

19          two phases of this at all.

20   Q.   You are exactly right.  That's the reason we

21          do it, just like my little story about

22          umpiring, because we try to think in

852

```
 1              advance about everything that could

 2              happen, but it doesn't mean that it is

 3              going to happen.

 4   A.   Right.  You have to be prepared.

 5   Q.   That is right.  And so, my question is, do you

 6              have any thoughts, because we're talking

 7              about this now, that we're automatically

 8              going to get to that second phase just

 9              because we're talking about the death

10              penalty?

11   A.   No.  I think it is just part of the procedure.

12   Q.   Now, you have talked about a couple of things

13              where you think that the death penalty is

14              appropriate.  And before we get into this

15              discussion, please understand it is not

16              my purpose to engage you in a quarrel or

17              to get you to change your opinions about

18              anything.  I just simply need to know

19              what your opinions are, and let's see how

20              those square with what has to happen in

21              this case.  Fair enough?

22   A.   Fair enough.
```

853

```
 1   Q.   Your view, I believe if I am stating this
 2        correctly, is if -- and you mentioned two
 3        things specifically on your
 4        questionnaire, if somebody does this for
 5        money or if they plan it, and they commit
 6        that murder, they should get the death
 7        penalty?
 8   A.   Not just those, but I feel those definitely
 9        deserve capital punishment.
10   Q.   Let's talk about -- let's not even talk about
11        this case.  Let's just talk about an
12        imaginary case where the allegations are,
13        and you understand, I'm not trying to
14        mimic your views, but I want to focus on
15        a couple so we're not here all day.
16        Let's talk about the planning it, and
17        that it is done for profit.  So let's say
18        that there's a case, and the State proves
19        to you at the first phase, that the
20        person or persons who did it, thought
21        about it in advance, planned it.  And if
22        I am understanding your thinking about
```

854

1            this, had a chance to say, "Wait a

2            minute, this is crazy, I shouldn't be

3            doing this," but they went ahead and did

4            it anyway.  That is really what kind of

5            irks you if I am reading you correctly?

6     A.    You know, not that -- well, planning a murder,

7            is, I feel that you shouldn't be doing it

8            and I think if you do it, you deserve the

9            death penalty.  But you can kill

10           somebody, you can walk into a 7-11 down

11           there and the guy doesn't give you the

12           money fast enough and you shoot him in

13           the head, you don't have anything against

14           that person, you are not thinking about

15           it.  If you shoot that guy, you still

16           deserve the death penalty.  But there's

17           other things, that you don't, and every

18           case is different.  I don't know what

19           else to say about it.

20    Q.    That is what we're trying to do is find out

21           your feelings about it.  And actually,

22           the thing you just mentioned would be

855

1              another one of the ways that somebody

2              could get the death penalty in this

3              state, but just so that we're not here

4              all day, let's focus on those two where

5              it is done with a plan or somebody could

6              have backed out, and it is done for some

7              kind of profit.

8    A.    Yes, profit.

9    Q.    So, let's say that the State at this imaginary

10             case that I am making up, proves that to

11             you.  They fill up that box beyond a

12             reasonable doubt, the first trial.  They

13             prove to you that this person or persons

14             killed some unfortunate individual, that

15             they planned to do it, that they could

16             have stopped, and they did it for money

17             and they didn't stop, and they went ahead

18             and did it anyway.  Is that person who

19             you found guilty, is the death penalty

20             going to have sort of a leg up when you

21             go into that second phase because of how

22             you feel about these things?

856

1    A.    I would say so, yes.

2    Q.    In that kind of a situation, is it going to be

3              sort of up to the person who committed

4              the murder, to talk you out of giving

5              them the death penalty?

6    A.    I don't know.  I don't think the person -- I

7              don't know.  I don't know how to answer

8              that.  You mean -- this is all looking

9              ahead, if she were convicted and give me

10             a break, I'll do life in prison.  You

11             say, you know, I hate to be the guy, so I

12             don't know.  But the way I feel right

13             now, if convicted of this crime, it would

14             be capital punishment.  That is all I can

15             say unless there were some circumstances.

16             Everything has something, nothing cement

17             or whatever you call it.  Nothing is the

18             same all the time.  There's all

19             extenuating circumstances to things.

20   Q.    But what I am sensing from you, is see, that

21             box that I talked about, of the first

22             phase?

857

```
 1   A.   We filled that box up.

 2   Q.   You filled that box up.  That is right, and

 3             part of filling that box up is that you

 4             found that the person did it for profit,

 5             and that they planned it, and they could

 6             have stopped and they didn't.

 7   A.   Right.

 8   Q.   Now, there's a different box at the second

 9             phase.  And that box also has to be

10             filled up beyond a reasonable doubt.

11   A.   That is the part I didn't understand before

12             this happened here.  I didn't realize

13             what was -- I thought it was all one

14             trial, but it isn't.  So I would have no

15             idea what I am even in for as far as what

16             would be presented.  To say, well, I'm

17             not going to do this or not going to go

18             with the original -- well, like I say, if

19             you kill somebody for premeditated or for

20             profit, then you deserve the death

21             penalty.  But on the second part of the

22             trial, if there's something in there that
```

858

1           would say, you know, I don't want to go

2           that far, it could happen.  But as I feel

3           right now, if she was convicted of what

4           she's accused of, then I would have to go

5           death penalty.  I don't know what to say

6           anything different.

7    Q.   I appreciate your answer and I want to make

8           sure that I understand then.  Because of

9           how you feel and it is okay how you feel,

10          I'm not here to quarrel with that, it

11          sounds to me like when you start that

12          second phase, because of how you feel,

13          there's already some stuff in this box to

14          say, give her the death penalty?

15   A.   It probably is.  I would say right now, but I

16          don't know what is down in the future.

17          Somebody may change my mind, but the way

18          I feel about you do the crime, you do the

19          time.

20   Q.   In those circumstances we have been talking

21          about, whether it is this case or that

22          case that I am making up where it is the

859

1           same allegations that it is for profit,

2           it is planned.  Tell me if you can, your

3           thoughts about life imprisonment as an

4           alternative to the death penalty in a

5           situation like that, or are your views so

6           strong --

7    A.   Life imprisonment would have to be one of the

8           worst things, because if I am a juror and

9           I have to go over to the Park Hotel for a

10          week and I'm not going to have a T.V., I

11          have never been in prison, but I'm not

12          going to be able to listen to the T.V.,

13          the radio, no newspaper and I'm going to

14          sit there, I am like sentenced myself.

15          That is how I feel.  I don't want to

16          spend a week over there.  And to do life

17          in a little room, I couldn't do it.

18   Q.   So you see that as a substantial penalty?

19   A.   I think it is very bad, but I'm not saying it

20          is bad.  It is bad for the person that

21          gets it, but it is justified at times,

22          too.

860

1  Q.   But having said all of that, does it change
2        what you said to me before, if it is that
3        kind of murder that we talked about,
4        where it is planned and for profit, that
5        the death penalty sort of has a leg up in
6        your mind?
7  A.   The death penalty still has a leg up.
8  Q.   A lot of times what people will say to you is,
9        "Well, listen, but can you follow the
10       law."  And everybody wants to go, "Well,
11       yes, Judge Stuard is a nice guy, he's a
12       judge and I want to do the right thing.
13       I'm not going to thumb my nose at him and
14       say I can't follow the law."  Nobody is
15       suggesting that.  What we're talking
16       about here is your feelings about these
17       particular types of homicides.  And it
18       seems to me just from standing here
19       talking to you and watching you, that
20       those things really kind of irk you, and
21       that you feel that somebody should pay
22       with their life for that type of a crime?

861

1   A.   Right, that's the worst thing you can do.

2   Q.   You also mentioned in your questionnaire I

3        think it was something about the death

4        penalty, why do we have the death penalty

5        or something and I think you put

6        "justice"?

7   A.   Justice for the person who has been killed or

8        whatever.  That is what I meant by that.

9        I don't mean that the State deserves it.

10       The person that has been wronged, they

11       could never be given their life back, but

12       at least this is like the way I

13       understand justice.  I don't believe in

14       an eye for an eye, but some things I do.

15  Q.   Some things you do?

16  A.   Yes.

17  Q.   And these types of things we have been talking

18       about here this morning that seem to irk

19       you and correct me if I am wrong, but I'm

20       judging from your demeanor, those seem to

21       really get to you?

22  A.   Yes.

862

1   Q.   Those are more eye for an eye things than some

2          other offenses, not saying it is the

3          exclusive list?

4   A.   I say if you do the crime, you do the time.

5          If you go out and rob a bank, then they

6          are not going to put you on death row for

7          that. If you get ten years for robbing

8          banks, you get ten years. Whatever the

9          penalty is, if you do that, you should be

10         willing to pay the penalty, and I don't

11         say, "Well, I'm going to give this guy 20

12         years for robbing a bank or for murder."

13         It is what the law says. The law says

14         that you do this, then we give you 20

15         years. But really, I would rather not

16         even be in that part of the phase. I

17         would say, okay, guilty or not guilty,

18         but I don't know if I am qualified to

19         pick a sentence for a person, for me to

20         be the final Judge, to say, "Okay, death

21         sentence." And now I understand that the

22         Judge can also say, "No, we're not going

863

1          to do that," that we're going to go life

2          imprisonment over what we say.  And I

3          kind of feel that is the way I would

4          prefer it was to begin with, that the

5          Judge, they take care of the sentence

6          more than myself.

7    Q.   This is a case, however, where this type of a

8          case, a capital case in Ohio, is the type

9          of a case -- it is the only case, where

10         the Jury votes on the sentence.

11   A.   Is that right?

12   Q.   Yes.  I understand your discomfort about that,

13         but what I am sensing from you still, is

14         that even though you would rather not be

15         doing this, even though you would rather

16         have the Judge do it, if it is your

17         decision to make and if the Judge tells

18         you it's your decision to make and he

19         says, "You weigh these things."  The fact

20         that it is a premeditated murder with a

21         profit motive, is going to make you favor

22         the death penalty?

864

1    A.    Yes.

2    Q.    Now, I mentioned to you before this box that

3          we have been talking about, and the

4          State, at the first phase, has to fill up

5          that box that we talked about, but to

6          sort of make life a little more

7          complicated, there are also little boxes

8          within the big box that lawyers call

9          elements.  And they are just parts of the

10         crime.  So that when the Judge -- when

11         you say like most jurors do, "I don't

12         know what aggravated robbery is.  I don't

13         know what the legal definition is," or "I

14         don't know what the legal definition for

15         aggravated burglary is," when the Judge

16         tells you at the end of the case what

17         they are, those things are broken down

18         into what we call elements.  The only

19         reason I talk to you about that for a

20         second is, those elements, each one of

21         them has to be proved by proof beyond a

22         reasonable doubt.  And I brought that up

865

```
1          because you mentioned to Mr. Bailey and

2          you put in your questionnaire that one of

3          the -- I think the problems that you see

4          in our justice system is that there are

5          loopholes?

6    A.    Like he said earlier, if I didn't say this was

7          done in Trumbull County, now, if those

8          particular words aren't said, then no

9          matter if a person is guilty or not

10         guilty, and it goes through the trial,

11         they are released because of something

12         like that, to me is a loophole that

13         doesn't make sense to me.  I'm not saying

14         that they can't say, "Well, I don't want

15         to try to pick out evidence or anything,"

16         but I'm just saying that to me is not

17         justice for anybody.

18   Q.    Let me talk to you about a silly example I

19         used with somebody yesterday.  One of the

20         aggravating circumstances, not in this

21         case, but that we have in Ohio, because I

22         think now you understand that if a murder
```

866

1          is -- if an aggravated murder is

2          committed under certain special

3          circumstances, then that person can be

4          eligible for the death penalty.  You are

5          okay with that now?

6    A.    Yes.  I'm going to say one thing.  You have

7          say we filled the box up.  Now if the box

8          isn't all the way filled, but I still

9          feel that that person is definitely in on

10         that, but how much in on the murder and

11         so forth, I would say the box is not all

12         the way full.  Now do I go the full

13         penalty of the law or do I say, I have

14         got to go somewhere in between?  What I'm

15         saying is if that box is full, it has got

16         to be full on the top for the penalty.

17         You know what I mean?  It is not like

18         it's three-quarters.  You say it has to

19         be over 50 percent or over such a

20         percent, the box, and it goes to 75

21         percent, it is hard for me to say, well,

22         I believe the 75 percent of this, but

867

1           now, I don't know if I am willing to say

2           death penalty on when I say 75 percent of

3           over the box being full, which when the

4           box is full there's no doubt it is 100

5           percent, and because he did say there's

6           some circumstantial evidence here.  Now,

7           I don't know if I'm going to believe it

8           or if I'm not going to believe it.

9    Q.    Let's jump ahead then to another thing that

10          goes along with this, and actually, it is

11          probably -- I probably misspeak when I

12          say fill the box up.  And here's why.

13          Because when the Judge talks to you about

14          what reasonable doubt is, he's going  to

15          tell you that it is doubt, it is proof

16          beyond all doubt based on reason and

17          common sense.  It is not proof beyond all

18          possible doubt.  It is not proof beyond a

19          shadow of a doubt.  It is not proof

20          beyond imaginary doubt.  I can't tell you

21          where to draw that line on the box.  I

22          can just tell you that it is going to be

868

1        pretty far up there because this is the

2        highest standard of proof we have in our

3        law.  But for you to come back with a

4        guilty verdict at the first phase, you

5        have to be convinced that the State

6        filled that box up beyond that line

7        called reasonable doubt.  It is never

8        going to be 100 percent, because you

9        can't ever prove a case beyond a shadow

10       of a doubt, beyond possible doubt, beyond

11       imaginary doubt.  But if when you are

12       looking at the evidence that the State

13       presents to you, when you make important

14       decisions in your life, some people do it

15       on a piece of paper and some people just

16       do it in their mind's eye.  They make a

17       list of pros and cons.  If you are going

18       to decide to change jobs, get married,

19       buy a house, how to fund your kids'

20       college, whatever it is, when you make an

21       important decision, you weigh the pros

22       and the cons, correct?

869

1   A.    Right.

2   Q.    You have to do the same thing here.  On the

3              one side of the check list has to be all

4              of the reasons why the State says, "I

5              have proved to you, ladies and gentlemen,

6              that this woman is guilty beyond any

7              reasonable doubt."  On the other side of

8              that list, have to be doubts.  And let's

9              break them down for a second.  First of

10             all, they could be doubts that you think

11             about yourself as you listen to the

12             evidence.  They could be doubts that

13             other jurors mentioned to you in the Jury

14             room when you are talking about the

15             evidence.  They could be doubts that

16             Mr. Ingram and I bring up when we talk to

17             you in final argument about the case and

18             why we think there are reasonable doubts,

19             why you should find reasonable doubts.

20             You have to sort of leave the pros side,

21             the one side of the board, go to the

22             other side and say, let me analyze these

870

```
 1              doubts.  Here's doubt number one.  And
 2              you talk about it with the other jurors
 3              and you go, you know what, that doubt is
 4              not reasonable.  Let me throw that one
 5              out.  And the same thing with number two
 6              and number three, if you end your
 7              accounting for all of those doubts on
 8              that side of the list and you say, sorry,
 9              none of these doubts are based on reason
10              and common sense, then the State has
11              proved its case beyond the existence of
12              any reasonable doubt.  If on the other
13              hand, you have one or more than one, if
14              you have one or more than one doubt, then
15              the State hasn't proved their case beyond
16              a reasonable doubt, they haven't filled
17              that box up past that line called
18              reasonable doubt.  Do you see how that
19              works?
20    A.    Right.
21    Q.    If you get to a second phase, you have in
22              essence already at the first phase said,
```

871

1          look, I talked about all of those doubts

2          on the right hand side of the check list

3          that Mr. Juhasz was ranting and raving

4          about and guess what, none of them are

5          based on reason and common sense, so I

6          found her guilty. I don't know if that

7          helps you with that filling up the box

8          thing, but to get to the second phase,

9          you have already eliminated in your mind

10         all of those doubts and said, none of

11         them are based on reason and common

12         sense. Does that help or not help?

13    A.   Not really a lot, I don't think.

14    Q.   I get that a lot.

15    A.   Being a juror isn't easy. And all I can say

16         is, I don't want to be a juror. I would

17         rather be home, but if I have to be, I'll

18         be as fair as I can. That is all I can

19         say. As far as if convicted, I'll have

20         to say, I am of the believer if you do

21         it, you have to pay for it. That is all

22         I can say.

872

```
 1   Q.   And that paying for it in the type of homicide
 2        where it is planned --
 3   A.   Not just that.  I mean there's more.  The guy
 4        that shoots the guy in the 7-11 deserves
 5        it as much as somebody that thinks about
 6        it.  I just put those down as two things
 7        that I felt deserved capital punishment.
 8   Q.   And again, I didn't mean to limit you by that,
 9        so let's take and even take someone that
10        we haven't mentioned today.  There are
11        certain things that if you find that
12        those exist and you find that person
13        guilty beyond a reasonable doubt of doing
14        that type of offense, when you go into
15        that second phase, the death penalty has
16        a leg up in your mind?
17   A.   In my mind right now, yes.  I would say yes.
18   Q.   Even if the Judge says, "Look, that's not
19        supposed to happen."  You are telling
20        me --
21   A.   I don't put myself above the law.  I have an
22        opinion right now, but if somebody else
```

873

```
 1              tells me the law, well, I can't say, "I
 2              don't care what the law says, this is
 3              what I think."  I have to go by the law,
 4              too.
 5    Q.   And do you think you can do that?
 6    A.   I hope I can be fair, because like I said,
 7              that card game incident, I was sure and I
 8              was wrong.  It made me think different
 9              about what you think is true and what
10              isn't.  So you have to really know, you
11              have to see the evidence before -- I
12              don't know anything.  I know what I read
13              in the paper, which isn't much.  But what
14              I know isn't good for the Defendant.
15              I'll say that, but you read the paper,
16              that is what you are going to get and you
17              never expect to be down here explaining
18              why you don't want to be here.
19    Q.   Who would have thought?
20    A.   Yes.
21    Q.   Let's say that what you have read that you
22              find all of that to be true.
```

874

1    A.    Like I said, I haven't read that much.  I know

2          that she's accused of killing her

3          husband, and I just read the parts so and

4          so, killed her boyfriend, is in jail and

5          so forth, and they were corresponding and

6          he got out and did the murder.  I know

7          that.  If the facts of the case, where it

8          was done, I have no idea.  What kind of

9          gun, I have no idea.  There's a lot of

10         stuff that I have no idea and I'm sure it

11         has been in the paper, maybe they said it

12         was a rifle or gun of some sort, but I

13         don't know a lot.

14   Q.    Mr. Calhoun, I appreciate you taking the time

15         and being patient with me for answering

16         my questions.

17   A.    Well, I have no choice.

18   Q.    I appreciate your honesty on that one, too.

19   (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

20   OF HEARING)

21   EXAMINATION BY THE COURT OF MR. CALHOUN:

22   Q.    Mr. Calhoun, I have to ask you one question

875

```
 1                    here.  I have heard your answers to the

 2                    questions, so I have formed my opinion

 3                    about what type of fellow you are, and I

 4                    can be presumptuous to a degree, a part

 5                    of the way you think and are answering

 6                    the questions here.  I am of the

 7                    impression that you feel that you can be

 8                    reasonable and fair, and that is the

 9                    primary thing they are looking for here.

10                    You have kind of got -- I'm given the

11                    impression and I want to be sure this is

12                    right, because if it is the way you

13                    absolutely feel, you are entitled to it.

14                    You mentioned something about someone

15                    takes a gun into a 7-11 and shoots

16                    somebody, they deserve the death penalty.

17                    They were robbed of money and there's no

18                    excuse for that.  That is your thing,

19                    right?

20      A.    That is, yes.

21      Q.    I notice that you are a hunter and you own

22                    firearms and probably may be aware, I am
```

876

 1     very much aware of how people with that

 2     background see the world.  You understand

 3     that the law says that even if you feel

 4     that way, you can't impose that, just as

 5     a blank check on any fact situation in

 6     any murder case, because that isn't what

 7     the law calls for.  The law says no

 8     matter what your personal feelings may

 9     be, that if you are going to be able to

10     sit on a Jury of this nature, you have to

11     be able to truthfully say to yourself and

12     assure these folks this is what I

13     believe.  But, I understand what the law

14     is, and the law, if I got to that second

15     phase, would require me to set aside that

16     black and white situation, and look at

17     the facts of this case.  Let me say to

18     you, you have this strong opinion about

19     somebody takes a gun and goes into a 7-11

20     and robs somebody.  We usually think of

21     some drug addict, and got some kind of

22     deficiency.  I'm saying what you may

877

1          think, maybe me too, the lack of any

2          moral back bone, and no reason for that,

3          it is senseless.  Poor innocent person

4          with the job got killed.  What about if

5          you sat on a Jury and you found out that

6          that fellow has lost his job somewhere,

7          exhausted all possibilities, had a child

8          that had brain cancer, was going to die

9          and he had no money to help the child.

10         Now the crime is still a terrible crime.

11         But the question is, could you just in a

12         black and white situation say, I don't

13         care?  Some people would.  Some people

14         would find that there's never a

15         justification to do certain things.  And

16         if that is the way you believe, I am the

17         first to tell you, you have the right to

18         that belief.

19  A.   That is basically how I feel.  I don't think

20         that because you have problems in your

21         life, doesn't give you the right to take

22         somebody else's life.

878

1              THE COURT:  Fair enough.  You have

2    answered my question very well.  I'll allow either

3    side, if you wish to ask any other questions, but I

4    think he's made his point quite clear.

5              MR. BAILEY:  Just have one or two

6    more questions.

7    CONTINUING EXAMINATION BY MR. BAILEY OF MR. CALHOUN:

8    Q.    What it boils down is, you have that personal

9              belief that no matter what --

10   A.    I'm not saying no matter what.  No matter

11             what.  If a person is proven to have done

12             a certain thing beyond a reasonable

13             doubt, I'm just saying if they are guilty

14             as sin, they have got to pay the penalty.

15             That is my opinion.  That is all I can

16             say.

17   Q.    You are entitled to your opinion.  But, if the

18             Judge tells you that in this case, that

19             you find the Defendant guilty and we move

20             on to a second phase, can you with an

21             open mind, listen to whatever evidence is

22             produced at a second phase on behalf of

879

```
 1              the Defendant and set aside your personal
 2              opinion?  And there may be things, we
 3              don't know what, but, there may be
 4              factors that could be presented that
 5              would have some weight on a scale, that
 6              would at least put it to balance, the
 7              aggravating circumstance in your mind,
 8              and the minds of the other jurors, so
 9              that the death penalty would not be the
10              only penalty on that scale.
11    A.   I can't say no, because I don't know what the
12              circumstances are.  I don't know what it
13              would be there to change my opinion.
14              There could be something possibly there
15              that I would say, well, you know, but
16              maybe there isn't.  I don't know.  I
17              don't know what the thing is.
18    Q.   If the Judge told you that you have to keep an
19              open mind at that point and consider it,
20              and would you then if evidence is
21              presented on behalf of a Defendant, would
22              you at least consider it?
```

880

```
 1   A.   If I have to go to that second phase, when I
 2             go in there and I sit down, the box is
 3             empty.
 4   Q.   So the box would be empty at the second phase
 5             and the burden would be on us to prove
 6             beyond a reasonable doubt --
 7   A.   The burden would be on you to say that she
 8             deserved -- if this is the law.  This
 9             isn't my idea.  The two trial type thing,
10             like I said, I didn't understand this
11             part of the thing, but now we have got
12             another phase that I wasn't aware of.
13             Now, there must be something to this,
14             because why bother with it.  If you say
15             guilty, and then you deliberate and say
16             guilty -- I don't understand why, to say
17             you are going to do 20 years, get life,
18             do the death penalty.  I really don't
19             think that is a good thing for jurors to
20             do.  I have no choice.  It is the law,
21             but I give you my opinion what I think he
22             should do if he's the Judge, and he's
```

881

1              supposed to -- I would say he should give

2              the death penalty for the crime that was

3              committed and proven in Court.

4    Q.   If the Judge told you, let's say we go into a

5              second phase, can you start out with that

6              box being empty just like you did in the

7              first phase?  If the Judge told you that

8              you are in the second phase, you try that

9              the way with the first one, with an open

10             mind?  If factors are presented on behalf

11             of the Defendant, you have to balance

12             them against whatever the State presents,

13             these aggravated circumstances, could you

14             do that with an open mind, put aside your

15             personal opinion?

16   A.   Sure.  It is just like, right now, all I know

17             was negative.  I have got to take all of

18             that and forget everything that I have

19             read or wait and judge by the evidence.

20             Or not judge, I guess it is judging

21             somebody.  I have to decide whether they

22             are guilty or innocent and I have to do

882

1          it with an open mind and when it comes --
2          this is how I feel death penalties --
3          definitely should be a death penalty, in
4          my feeling, but then there are other
5          parts of the law that I have to go by the
6          law.  It is an empty box and you start up
7          the thing.
8     Q.   But the important thing is, so the death
9          penalty is not an automatic punishment?
10    A.   Like I tried to say earlier, there's nothing
11         set in stone or I think I said concrete,
12         but I meant stone.  There's nothing set
13         in stone where this is how I feel, and it
14         would take something to change my mind.
15    Q.   Now your own opinion, your own opinion if I
16         understand, is the death penalty is a
17         proper punishment.  You understand under
18         our system of law in this case, you have
19         to set this aside?
20    A.   I know.  I have to set everything aside.  I
21         have to come in here completely blank.
22    Q.   And that is what we need to have a fair juror?

883

```
 1   A.   All I can say, I tried to be as fair as I can,
 2            but in all honesty, I would just prefer
 3            not to be here and I could very easily
 4            say, the death penalty, death penalty no
 5            matter what, which I do believe in the
 6            death penalty, but I could be swayed in
 7            the other trial.  I'll say that, too.
 8   Q.   It may well be that there are some factors
 9            that come in that may bring into balance
10            the scale or outweigh the State's
11            evidence.
12   A.   Like the Judge gave me the 7-11 deal where the
13            guy lost his job.  That still doesn't
14            give a person the right to kill somebody.
15            I don't care how bad your luck is.  When
16            you kill somebody, they are done.  They
17            have nothing left.
18   Q.   You may hear that somebody is mentally
19            deficient.  That their I Q --
20   A.   That's another thing.  If a person is not
21            mentally competent.
22   Q.   Let's say they are competent.  That is another
```

884

```
 1              standard under the law.  Let's say that
 2              you hear that the person has some mental
 3              defects in such a way that you feel that
 4              it has some weight on the scale, that
 5              puts this into balance, that the person
 6              has been horribly abused through his
 7              whole life.  Everything has gone wrong
 8              for him, and there are things that here
 9              in a second phase, I imagine there's some
10              things that you can imagine that might be
11              on the Defendant's side of the scale that
12              could bring the scale into balance as far
13              as a life sentence, right?
14    A.   Possibly, yes.  But like I say, I still say,
15              do the crime, you do the time, and I
16              basically -- that is my principles and
17              that is basically how I am.  There could
18              be something here that would change my
19              mind, but I can't say there is and I
20              can't say there isn't.
21    Q.   You may fill up that box.
22    A.   I'm not trying to lie to anybody.  I'm just
```

885

1           trying to tell you how I feel, and I'm

2           not trying to get out of doing my civic

3           duty or anything like that.  I am telling

4           you how I feel.  That is all I can do.

5                MR. BAILEY:  Thank you.

6                MR. JUHASZ:  We have no further

7    questions.

8    (SIDE BAR DISCUSSION OFF THE RECORD AND OUT

9    OF HEARING)

10                THE COURT:  I'm going to grant the

11   motion.  Mr. Calhoun, you and I would be better

12   off, if we were living in 1803.

13                MR. CALHOUN:  Probably right.

14                THE COURT:  Listen, you have been

15   most honest and we respect your view.  Not

16   everybody in here would disagree with your view,

17   but I'm going to excuse you.  Let me explain to you

18   why.  You feel very strongly that anyone who

19   misuses a firearm or particularly a firearm, or

20   kill anybody --

21                MR. CALHOUN:  Firearm is not the

22   thing at all.  I think a firearm has nothing to do

886

1    with it as far as I'm concerned.

2                    THE COURT:  Taking another person's

3    life?

4                    MR. CALHOUN:  Taking another

5    person's life for no reason.  If your daughter is

6    being raped and you go in and kill the guy, that is

7    justifiable homicide.  If your girlfriend/boyfriend

8    is in there having sex and you kill him, that is

9    murder.  And the same thing with the frying pan,

10   but different situation.

11                   THE COURT:  I respect that.  I'm

12   excusing you.  We thank you so much for your time.

13                   MR. CALHOUN:  It has been an

14   experience.

15   (Juror No. 18 excused from the Courtroom.)

16                   THE COURT:  Let's take a lunch

17   break.  Be back at 1:45.

18   (Court in recess at 12:45 p.m.)

19   (Resumed in Open Court at 1:45 p.m.)

20   (Juror No. 19, Sheri Senek, entered the Courtroom.)

21                   THE COURT:  Good afternoon.  You

22   read the handout that was given to you?

887

1           MS. SENEK:  Yes, I have.

2           THE COURT:  You have a pretty broad

3   idea of why we're going through this procedure.

4   This is an opportunity that both sides have to ask

5   you questions that are more individual, in a more

6   individual setting than what we went through the

7   other day.  You understand that this case involves

8   two counts of aggravated murder with

9   specifications.  Under Ohio law, just because a

10  person commits murder does not make them face the

11  death penalty.  The legislature has designated

12  certain actions that puts a person in that

13  position.  One example is if you kill a police

14  officer, that is a specification that can be

15  attached that could bring up the death penalty.

16  There are specifications attached to the

17  indictment, the counts of aggravated murder in this

18  case that raise the possibility of that occurring

19  in this case.  The case will go forward at trial

20  like any ordinary trial, wherein the Jury is called

21  upon to determine one question and that is, is the

22  Defendant guilty or not guilty.  If that Jury comes

888

1   to the decision that Miss Roberts is not guilty,

2   then that would be the end of the trial.  If,

3   however, the State proves all of the elements of

4   those two charges beyond a reasonable doubt, and

5   proves the specifications to be true beyond a

6   reasonable doubt, and the Jury makes a finding of

7   guilty, then the matter will go to a second phase.

8   And at the second phase, there would be additional

9   evidence presented.

10        The State would present evidence

11   concerning what are known as aggravating

12   circumstances.  Those are reasons that the State

13   would put to the Jury to convince them that the

14   proper decision here would be to impose the death

15   penalty.  The Defendant would put forth mitigating

16   factors and those are reasons that the Defense puts

17   forward for the Jury to weigh against the

18   aggravating circumstances, and to decide that this

19   isn't a case where the death penalty should be

20   involved.  Something lesser, by way of a life

21   sentence.

22        And the Jury has three different choices

889

1    on that, the lesser degree without chance of parole

2    and the others.  Now some people in society believe

3    that whenever a human life is taken, that the

4    perpetrator of that wrong should lose their life,

5    an eye for an eye.  That is not the law.  As I

6    explained, only under certain circumstances can

7    that come up.  There are other people who through

8    religious, moral, ethical considerations, can't

9    visualize themselves being placed in a situation

10   where they have to make such a serious decision.

11   That is fine.  Everybody is entitled to their view

12   of life.  But the law mandates that we pick a Jury

13   to try this matter under the law.  Therefore, this

14   search is for 12 people to sit on that Jury no

15   matter what they may personally feel about the

16   issue of the death penalty, for people who are able

17   to analyze everything that are going to go through

18   there and decide in their own mind no matter what

19   my personal feelings are, I am comfortable that

20   I'll be able to sit and listen to the evidence and

21   determine the matter on the evidence and apply the

22   law, as given by the Court.

890

1          So that means that someone who may be

2   sitting on this Jury who isn't quite sure that they

3   like the idea of the death penalty, you know in the

4   broad context, they have to be able to sit and

5   apply the law in this case no matter where that

6   leads them.  Some people are comfortable with that,

7   others are not.

8          So part of the inquiry here will be to

9   find out what your feelings are, whatever your

10  feelings are, we'll of course respect them.  You

11  have the right to your own opinions, and it is an

12  issue that is in great controversy and the

13  attitudes run the whole gamut of opinions.

14         The second issue will be the matter of

15  any pre-trial publicity.  We live in a small area,

16  most people who vote also read the newspapers.

17  Many of the people, I'm sure the vast majority of

18  the people in that room the other day have read

19  something about this case.  That is only to be

20  expected.  But the attorneys for both sides here

21  will be interested in knowing if you have read

22  something or you formed some opinion about the

891

1   facts of this case, that you are not able to set

2   aside, or at least that you are not able to allow

3   the evidence to prevail.  Because in order to have

4   a fair trial, both sides here have to be assured

5   that all 12 jurors are going to have the ability to

6   decide this case on the evidence, and that evidence

7   doesn't exist unless it is presented in this

8   Courtroom.

9           A Jury who isn't quite sure that they

10  like the idea of the death penalty, you know in the

11  broad context, they have to be able to sit and

12  apply the law in this case, no matter where that

13  leads them.

14          Sheri, suffice it to say, both sides will

15  want to be satisfied if you are a person that is

16  not prejudiced in some way at this point.  Some

17  people can read articles and pay very little

18  attention to them.  There are few people that

19  believe everything they read in the newspaper and,

20  but most people don't.  If a person is going to be

21  tried in the newspapers, you wouldn't have much of

22  a judicial system.  And whenever the fairness of

892

1    any tribunal is called into question, then the

2    entire system has a problem.  So you will get the

3    idea.  This is what they are trying to find out,

4    primarily those two issues.  No question will be

5    put to you that is intended to be embarrassing.  If

6    it is, tell them, "I'm not going to answer that."

7    <u>EXAMINATION BY MR. BECKER OF MS. SENEK</u>:

8    Q.    Miss Senek, my name is Chris Becker, I work at

9          the County Prosecutor's office and this

10         is Mr. Ken Bailey.  He and I are both on

11         this case together.  Mr. Juhasz and

12         Mr. Ingram are the Defense Attorneys in

13         this case and they represent Miss Donna

14         Roberts over here, and as the Judge sort

15         of gave you a little outline, we're

16         trying to pick 12 jurors for this case.

17         Twelve people really is what we want that

18         don't know anything about the case, or if

19         they do know something, they are not

20         going to let it influence what they hear,

21         because if you are picked for this Jury,

22         we're going to bring in witnesses that

893

1        are going to sit in that same seat that

2        you are seated at, and we're going to

3        present Exhibits to you, and we have to

4        prove the case beyond a reasonable doubt.

5        And it is not fair to Miss Roberts or to

6        any Defendant, if you have read about the

7        case or heard about the case, and come in

8        with your own idea about whether she's

9        guilty or innocent based upon what you

10       read in the newspaper or saw on

11       television, and I think I'm going to go

12       this way first, because I think you are

13       one of those people that has not heard

14       about this case, right?

15  A.   That is correct.

16  Q.   You don't have any idea what this case is

17       about?  You never saw it on television

18       and I'm going to ask you maybe again, you

19       didn't hear about Nate Jackson or Donna

20       Roberts or any other case from Howland in

21       the last year or so?

22  A.   No.  If I did --

894

1   Q.   You have completely forgot about it?

2   A.   Yes.

3   Q.   There's nothing wrong with that.  That makes a

4            better juror than other people.  Because

5            some people come in and say, "I have read

6            about it, I can't put aside whatever I

7            have heard in the newspaper."  In some

8            cases -- I tried a case earlier this week

9            and it was involving a Newton Falls

10           police officer who allegedly had beat

11           someone while he was on duty and it was

12           caught on video tape and the video tape

13           has been shown throughout the past couple

14           of weeks, and it was shown when it first

15           happened.  Well, if you just saw that

16           video tape, that's not the whole case.

17           You might have to know what happened

18           before and what happened afterwards, and

19           of course the news is only going to give

20           you 15 seconds of an hour long tape.  So,

21           I guess I'm going to forget about

22           anything you have heard about this case,

895

1    because you have heard nothing about it,

2    so we're not going to touch upon that.

3    The other area that we have to ask you

4    about, we have some answers from you from

5    your questionnaire that you filled out

6    the other day.  We're going to be a

7    little presumptuous, because this is

8    probably the most important in the

9    criminal setting type of trial that we

10   can have.  It's a capital murder trial,

11   and capital murder trials are basically

12   in two phases.  They call them phases, or

13   like two mini trials, and the important

14   thing to know or some of the important

15   things to know are that we're going to be

16   presumptuous, because we may not get to

17   the second phase, but we have to ask the

18   questions this way and we have to presume

19   that we're already in this phase where

20   you get to decide if someone should get

21   the death penalty, and in this case that

22   someone is Miss Roberts.

896

1                    So, because we can't go and say,

2             "Let's have a trial and we have to prove

3             all of the elements of the crimes and

4             she's guilty and now we're going to come

5             back next week, and you jurors are going

6             to decide if you can sign a verdict form

7             that calls for the death penalty."  And

8             two or three of the jurors say, "Wait a

9             minute, no one ever told me about that.

10            I can't do that for religious beliefs or

11            for ethical beliefs or morality, or for

12            whatever reason I can't do that."  So we

13            have got to ask you now, even though we

14            may never get there.  I know it sounds a

15            little crazy, but that is the way we do

16            things.

17                    You gave some statements I think on

18            your questionnaire, that you believe, I'm

19            going to interpret as you believe in some

20            cases the death penalty is warranted?

21  A.   Correct.

22  Q.   In this case, as in every other capital murder

897

1      case though, there are other penalties

2      that you can give.  You can give life

3      with no parole, you can give life with no

4      parole after 30 years, and life with no

5      parole after 25 years, so there's really

6      four different options that you will have

7      again, if we get to that point.  And that

8      second part of the trial is going to be

9      just like the first part in a lot of

10     respects.

11          There's some law that the Court will

12     tell you as to what it is.  There's some

13     things that again, the State has to

14     prove, and in both phases of the trial,

15     Miss Roberts doesn't really have to

16     present anything to you.  She could sit

17     there and never get up.  Her attorneys

18     could sit there and never speak, never

19     say a word.  Now if you found that we had

20     proved our case beyond a reasonable doubt

21     and she was guilty, she could do the same

22     thing in the second trial and you

898

1           wouldn't have to give her the death

2           penalty. We might not meet our burden,

3           which is proof beyond a reasonable doubt

4           in either phase.

5               So, I guess what I'm going to try to

6           ask you is, first of all, if the facts of

7           the case warranted it, and if the

8           evidence proved it beyond a reasonable

9           doubt, and the Court will tell you later

10          on what reasonable doubt is, if you are

11          picked for this Jury, could you sign a

12          verdict form calling for the death of

13          this Defendant?

14  A.   Yes, I could.

15  Q.   Now, I am going to come at it from the other

16          side. I'll put on their hat. Now, if

17          the facts didn't warrant it and again

18          we're in the second phase. You already

19          found she's guilty of some things that

20          get her eligible for that. Now we're in

21          the second phase, and there may be one of

22          two ways that you might not sign a

899

1    verdict form calling for the death

2    penalty.  One is, we may not prove that

3    the aggravating circumstances, which the

4    Court will explain to you what those are

5    when we get there, outweigh any

6    mitigating factors that she has.  You may

7    say, "Well, the State didn't prove to me

8    that she deserved the death penalty."

9    You would have no problem signing a

10   verdict form calling for one of those

11   lesser penalties then, would you?

12   A.    No, I would not.

13   Q.    And the other way it maybe is, we may present

14   aggravating circumstances to you, but

15   they may present mitigating evidence, and

16   our aggravating circumstances not

17   outweigh the mitigation by proof beyond a

18   reasonable doubt.  We may present to you

19   some terrible things, but it doesn't

20   outweigh by proof beyond a reasonable

21   doubt what their mitigation circumstances

22   are, so again, you could sign a verdict

900

1         form that might not call for the death

2         penalty?

3 A.   Correct.

4 Q.   And I guess what we're driving at is, you

5         would be fair and listen to all of the

6         evidence and all of the testimony and all

7         of the Exhibits and you would make your

8         decision accordingly?

9 A.   Yes.

10 Q.   And I know again we're talking about making a

11         leap in presumption here, but we're

12         trying to predict the future.  We get to

13         the phase where it is guilt, whether

14         she's guilty or innocent and you find her

15         guilty by proof beyond a reasonable doubt

16         and we come back two weeks later and now

17         jurors, "By the way, you might have to

18         sign a form calling for a death penalty,"

19         we don't want anyone to say, "I can't do

20         that.  No one told me I was going to have

21         to do that."  We would have to start the

22         whole trial over and start this whole

901

1    process.

2         Now, there's some other things that

3    you need to know about this case, and

4    because it is a criminal case, one of the

5    things that is going to happen is the

6    Court is going to instruct you on the

7    important concept for both phases, if we

8    need both phases is called reasonable

9    doubt.  I'm sure you probably heard of

10   that through television or movies or

11   reading in the newspaper.  And the Court

12   will give a definition of what reasonable

13   doubt is.  But one of the best ways to

14   explain it is sort of the old fill up the

15   glass.  The Court will tell you, and in

16   so many words, that reasonable doubt

17   isn't the glass filled to the top of the

18   ring.  It is not so high that if you just

19   touch it, water comes off over the side.

20   It is well beyond 50 percent because this

21   is a different standard under the law.

22   Fifty percent if the glass were half

902

1    full, half empty, if you put another drop

2    in to get it over half full.  That is

3    what we call preponderance of the

4    evidence.  That is where someone is suing

5    someone for, they were in a car wreck and

6    their legs were broken and they need some

7    money or they want to sue them for money

8    or something like that.  That is when we

9    use that standard.

10        Then there's another standard that

11   is clear and convincing and to tell you

12   the truth, I don't know what that is, but

13   the one that I deal with the most,

14   because I have been in the criminal

15   setting is proof beyond a reasonable

16   doubt.  And it is a little bit different

17   for everybody else, because we're talking

18   about -- we're talking about terms that

19   we just can't put numbers on them.  We

20   can't say 75 percent or 80 percent.  For

21   some people it might be a number like 90

22   percent or 95 percent or 98 percent.  Do

903

```
 1              you feel that you will be able to make a

 2              determination like that, determining

 3              someone's fate, but not knowing that

 4              every possible doubt is gone, but beyond

 5              a reasonable doubt?

 6   A.   Yes, I can do that.

 7   Q.   And you don't have any problem judging anyone,

 8              correct?

 9   A.   Correct.

10   Q.   And in this case, we're going to have some

11              witnesses, obviously, and one of the

12              things the Court is going to tell you

13              about the witnesses is, that your job as

14              a juror, if you are chosen for this case,

15              is you sort of figure out in addition to

16              finding reasonable doubt, you also sort

17              of determine whose evidence is

18              believable, is it worthy, can you trust

19              it, can you rely on it; that is totally

20              up to you, and your fellow jurors, if you

21              are picked for this case.  And you are

22              basically just going to that, using the
```

904

```
 1              same test you use every day, for maybe if
 2              you have a co-worker that comes in and
 3              says every day, "I won the lottery," or
 4              "I have done this," or "I am dating some
 5              girl on television," or I am doing this
 6              or that and you kind of look at him and
 7              say, "That doesn't make sense.  I know
 8              this guy, he lives in a trailer and he's
 9              kind of a pig, and no know way this is
10              happening."  You have the ability to do
11              that, right?
12   A.   Yes.
13   Q.   And to judge people and that is kind of what
14              you are going to be doing here and you
15              have got other people that you trust, I
16              think on your questionnaire.  You admire
17              your mother quite a bit?
18   A.   Correct.
19   Q.   And I am assuming you trust her, and if your
20              mother tells you something like, "I don't
21              have any money to loan you," or "I can't
22              help you with this," you believe her
```

905

```
 1            and --

 2                 MR. BECKER:  I'm sorry, I am in this

 3    other trial.  I'll let Mr. Bailey take over for

 4    you.  I'll be back and I'm sure these gentlemen

 5    will still be speaking to you, but I have a verdict

 6    downstairs.

 7                 THE COURT:  Why don't we wait for a

 8    couple of minutes and see if Chris comes back in a

 9    few minutes or whether Mr. Bailey will proceed?

10    EXAMINATION BY MR. BAILEY OF MS. SENEK:

11    Q.   Good afternoon, Miss Senek.  My name is Ken

12              Bailey, and as you know, I am taking over

13              for Mr. Becker who is occupied downstairs

14              right now.  I'll try to pick up where he

15              left off.  The Defendant here is charged

16              with four different crimes or counts.

17              Two counts deal with or two of the

18              charges deal with the crime called

19              aggravated murder, with specifications of

20              aggravating circumstances that make her

21              eligible for the death penalty.  And

22              there are two more counts of -- there's
```

906

```
1              one of aggravated burglary with a

2              firearms specification, and another count

3              of aggravated robbery with a firearms

4              specification.  And this word

5              "specification," it is a fancy word that

6              just means an extra finding of fact for

7              the Jury to consider.

8    A.   Okay.

9    Q.   Now, you are going to learn that the Defendant

10             is not the trigger man in this case, that

11             the person who actually committed these

12             crimes physically is a fellow by the name

13             of Nate Jackson.  The Defendant is

14             charged also as a complicitor, somebody

15             who solicited or procured or aided or

16             abetted another person in the commission

17             of a crime purposely.  That means that

18             she helped or encouraged, strengthened

19             him in some way in committing these

20             crimes.

21                  And with the crime of aggravated

22             murder as I mentioned, there are two
```

907

 1        different theories of this crime.  The

 2        State is allowed to charge two different

 3        theories.  There's only one person who

 4        has been killed, but there are two

 5        separate charges for the killing.  The

 6        State is allowed do that and we have done

 7        that in this particular case.

 8            Now, with the first count of

 9        aggravated murder, that deals with the

10        prior calculation and design.  What we

11        used to call the old premeditated murder.

12        They changed that a little bit and it

13        requires some planning and forethought in

14        advance of the killing in this prior

15        calculation and design.  The other count

16        of aggravated murder deals with the

17        killing during the felony murder,

18        purposeful killing during the course of

19        an aggravated burglary and/or aggravated

20        robbery.  And as I mentioned, there are

21        these death penalty specifications of

22        aggravating circumstances attached to

908

1          these counts of aggravated murder.  The

2          first specification charges a count of an

3          aggravating circumstance of aggravated

4          burglary that the aggravated murder was

5          committed during the course of an

6          aggravated burglary and that the

7          Defendant committed the aggravated murder

8          with prior calculation and design.

9               The second specification to the

10          counts of aggravated murder, are that the

11          aggravated murders were committed during

12          an aggravated robbery, and the Defendant

13          committed the aggravated murder with

14          prior calculation and design.  Is there

15          anything about that that bothers you, so

16          that you wouldn't be able to consider

17          these?

18     A.    No.

19     Q.    And basically, this planning, the charge here

20          is that the Defendant and this Nate

21          Jackson planned this killing of the

22          Defendant's ex-husband for insurance

909

```
 1          money and he stole a car.  People often
 2          ask what the difference is between
 3          aggravated burglary and aggravated
 4          robbery.  The Judge is going to instruct
 5          you on the elements of these crimes at
 6          the end of this case and you are bound to
 7          follow his instructions.  Those are going
 8          to guide you, but basically, the
 9          difference between a burglary and a
10          robbery is a burglary is when somebody
11          trespasses inside a structure, an
12          occupied structure.  In this case where
13          somebody is present with the purpose to
14          commit some kind of criminal offense
15          inside, and maybe they are armed with a
16          weapon like a gun that works, and they
17          cause serious physical harm to the person
18          inside.  There is -- and the aggravated
19          robbery, aggravated robbery basically
20          deals with the use of force or threat
21          against the person as opposed to
22          trespassing in the structure, and it is
```

910

1              usually the commission of a theft

2              offense, and the Defendant either has a

3              weapon, a gun, or causes serious physical

4              harm to the person.  So there's a

5              difference between those types of crimes.

6                   Now, we talk about elements.  Each

7              crime is composed of certain elements or

8              key component parts of the crime.  You

9              ever bake?

10   A.   Not really.

11   Q.   You have -- well, you ever try to make an

12            instant cake with the package?

13   A.   Yes, I have done that.

14   Q.   Ever watch your Mom bake a cake?

15   A.   Yes.

16   Q.   When your Mom baked a cake, she used a recipe,

17            right?

18   A.   Yes.

19   Q.   And she probably had different recipes for

20            different cakes?

21   A.   Yes.

22   Q.   Chocolate cake, strawberry cake, whatever?

911

1    A.    Right.

2    Q.    Whatever she was going to make, chili or

3          whatever, and if you follow that recipe

4          and you put in all of the ingredients you

5          come up with your cake or whatever you

6          are baking, right?

7    A.    Yes.

8    Q.    If she was making a chocolate cake and she

9          left out the chocolate, the key

10         ingredient, she would have a cake, but it

11         wouldn't be a chocolate cake, would it?

12   A.    Correct.

13   Q.    The same thing with a crime holds true.  Each

14         crime has certain ingredients that have

15         to go into the recipe for that crime.

16         The burden is on us, the people of the

17         State, to prove to you by proof beyond a

18         reasonable doubt each of the elements of

19         the crime.

20              For example, let's take this crime

21         called aggravated murder with prior

22         calculation and design.  The Judge will

912

1    instruct you on the law afterward, and
2    I'm just going to give you a for instance
3    and you are bound to follow the Judge's
4    instruction.  Let's say the first
5    elements would be, it happened on or
6    about a certain date, December 11, 2001.
7    The second element would be venue, that
8    it happened in Trumbull County, Ohio, so
9    we can try the case in this Courtroom,
10   rather than in Tuscarawas County or
11   Portage County.  The third element is
12   identification.  That the person who
13   committed the crime is here in the
14   Courtroom and someone would point her
15   out.
16        The complicity, that she acted
17   purposely, basically on purpose, but it
18   has a definite legal meaning that the
19   Judge will define for you at the end.
20   That she caused the death of Robert
21   Fingerhut, a living person; and six, that
22   she acted with prior calculation and

913

1           design.

2                So, the State would have to convince

3           you of the truth of those charges, so

4           that you are firmly convinced of the

5           truth of all of those elements, and only

6           those particular elements in each crime.

7           And you understand you are to consider

8           each crime individually, separately?

9   A.   Yes.

10  Q.   Because you might find her guilty of one, you

11          might find her guilty of one

12          specification on aggravated murder, but

13          not the other?

14  A.   Okay.

15  Q.   You may find her guilty of the aggravated

16          robbery and not of the aggravated

17          burglary.  It is up to you, depending on

18          how you feel we have proved the elements

19          of the crimes -- you and the other 11

20          jurors.  Now, it may well be that you

21          have an interest in something that we

22          never answer, a question that we never

914

1        ask.  Like you might have an interest in

2        shoes and my wife has 50 trillion pairs

3        of shoes.  She would be interested in

4        what somebody was wearing at the time.

5        But let's say, because we're

6        Prosecutor's, we're Attorneys, we have

7        got Defense Attorneys and Prosecutors are

8        all Attorneys.  We're geared towards

9        proving or disproving elements, and we

10       would be looking at where it happened, or

11       proving prior calculation and design and

12       we never get to tread wear.  We'll never

13       get into that area at all.  You may

14       wonder what kind of shoes were they

15       wearing, but if it wasn't relevant to the

16       crime, that question would never get

17       answered and you would always wonder

18       about that.  But if you feel that we have

19       proved the elements by proof beyond a

20       reasonable doubt, then you can return a

21       conviction even though there are some

22       unanswered questions?

915

1   A.   Yes.

2   Q.   Now, you understand the Defendant as she sits

3              there is presumed innocent and this

4              presumption of innocence cloaks her all

5              through the course of this trial, from

6              now until the end of the case, until you

7              are back in the Jury room deliberating on

8              the evidence.

9   A.   Yes, I understand.

10  Q.   And if you had to vote now, you couldn't vote

11             for any type of guilty verdict, because

12             we haven't produced any evidence?

13  A.   Correct.

14  Q.   And this presumption of innocence is an

15             important part of our system of justice

16             in this country, just like proof beyond a

17             reasonable doubt.  There's a presumption

18             of innocence and the burden of proof is

19             on us, the people of the State.  That

20             stays with us.  The Defendant doesn't

21             have any burden to prove anything.  The

22             burden of proving those elements is on

916

1          us.  They can sit there on their hands

2          for the course of the trial, and if we

3          haven't produced enough evidence to

4          convince you of the Defendant's guilt

5          beyond a reasonable doubt, then you find

6          her not guilty.  Even if they haven't

7          done anything.  Okay?

8    A.    Yes.

9    Q.    And that burden never shifts.  It always stays

10         with us, the people of the State.  Now,

11         this is the only chance that we really

12         get to talk to each other during the

13         course of the case, until both phases are

14         over.  Let's say we get into two phases

15         and if we run into each other in the hall

16         or on the elevator, when we bump into

17         each other, all we're allowed to do is

18         say, "Good morning."  We're not being

19         anti-social.  If you have any questions,

20         you have got to address it to the bailiff

21         or you can ask Mary Ann or the Judge, but

22         we can't actually talk to you.  By our

917

1      rules of conduct, they could cause a

2      mistrial if we do that and we don't want

3      to do that.  We're not being anti-social,

4      it is both sides aren't allowed to have

5      any conversation with you until the whole

6      case is over?

7  A.   Okay.

8  Q.   After it is over, feel free to come up and ask

9      us any questions.  If you have any

10      questions during this process right now,

11      about what is going on here, and that is

12      germane to what we're doing, feel free to

13      ask it.  It is a give and take.

14          Now, would you agree that in serious

15      crimes like crimes of murder for example,

16      most crimes in the planning take place in

17      secret without a whole lot of people

18      around.  Sometimes somebody is silly

19      enough to stand on the Courthouse steps

20      and say, like I might say, "I'm going to

21      kill my co-counsel, Chris Becker tomorrow

22      at noon on the Courthouse steps."  Then

918

```
 1              everybody would know my intention.  If I

 2              actually did it, then I would be in big

 3              trouble, right?

 4    A.   Correct.

 5    Q.   But, a lot of times, criminals don't plan

 6              things in public with a lot of people

 7              around to hear them.  They plan it

 8              covertly.  And because of that, there are

 9              different types of evidence that can be

10              used in a criminal case.  There's what we

11              call direct evidence, where a person can

12              come in and testify what he or she has

13              learned through the use of his five

14              senses.  "I heard the gunshot and it was

15              loud.  I smelled the smoke, I touched the

16              body and it was cold."  On the other

17              hand, there's what we have called round

18              about evidence or circumstantial

19              evidence.  Sometimes people use that term

20              disparagingly, "circumstantial evidence,"

21              but really circumstantial evidence deals

22              with a situation where you are presented
```

919

1 with a fact or series of facts and then

2 you are asked to draw a logical deduction

3 to another series of facts, that you can

4 do based on the earlier facts.  For

5 example, if you went to bed at night, you

6 live in a two story house.  You look out

7 over your neighborhood.  There's a clear

8 night.  There's not a cloud in the sky.

9 The moon is beaming and you close the

10 blinds and you lay down.  You have got

11 your radio on and the weather forecast is

12 predicting overnight, saying a cold front

13 is coming in.  You fall asleep and

14 sometime during the night you awake and

15 you look toward the window that is

16 covered and you see a bright flash from

17 outside and couple of seconds later, you

18 hear a big boom up in the sky.  And a

19 couple of seconds later, there's another

20 brighter flash, and really close in time,

21 instant boom up ahead and a pitter patter

22 on the roof.  And then you hear a steady

920

1           drumming on the roof and you fall back

2           asleep and you get up in the morning and

3           open the window and you look out, the sky

4           is clear, not a cloud in the sky, the sun

5           is beaming and you look out.  As far as

6           you can see across the neighborhood, the

7           streets are running with water, the drops

8           of water are dripping off the leaves of

9           the tree, and it is flooded everywhere

10          that you can see.  And there's no fire

11          hydrant nearby where any car hit it to

12          knock water on your house or anything.

13          You know what happened during the course

14          of the evening, don't you?

15   A.   Yes.

16   Q.   What happened?

17   A.   There was a thunderstorm.

18   Q.   Right, and that is what you heard.  You didn't

19          see it with your own eyes, but you saw

20          different circumstances that led you to

21          believe that, and you know that beyond

22          any reasonable doubt, don't you?

921

```
 1   A.    Yes.

 2   Q.    Now there's room in there for some silly or

 3               imaginary doubt.  You can imagine that

 4               ET and his Martian buddies flew by in a

 5               flying saucer over the night and

 6               sprinkled some wet stuff and put on a

 7               light show, but that would be a foolish

 8               or imaginary doubt, wouldn't it?

 9   A.    Correct.

10   Q.    Now you know that you can return a conviction

11               based on circumstantial evidence, if you

12               believe that it proves the elements of

13               the crime charged?

14   A.    Yes.

15   Q.    By proof beyond a reasonable doubt.  And

16               sometimes some criminals are somewhat

17               silly in the commission of their crimes.

18               For example, you have read in the paper,

19               I imagine occasionally, or heard on T.V.

20               about maybe a bank robber going into a

21               bank, handing the teller a note in a

22               envelope saying, "Give me all of the
```

922

1      money," and takes some money and runs.

2      And it turns out the envelope, on the

3      back of it was his address, it was

4      written, the envelope was addressed to

5      him.  And they find him, the burglar who

6      leaves his wallet at the scene.  Just

7      goes to show that criminals aren't always

8      rocket scientists, right?

9   A.  Correct.

10  Q.  And when we talk about circumstantial

11     evidence, to know what a person was

12     planning in advance, you can look at

13     things like make letters or telephone

14     conversations if you have them, right?

15  A.  Correct.

16  Q.  And then you would know what was in the

17     person's mind?

18  A.  Correct.

19  Q.  Now, this happened in this County, this crime

20     that is charged with happening in this

21     County, and you may or may not be

22     conducted on a view of the scene, but if

923

```
 1              you are, you will be in the custody of

 2              the bailiff.  Other than that, you are

 3              asked not -- you are not allowed to go up

 4              to that neighborhood to do your own

 5              investigation.  I know there have been

 6              movies sometimes and they are only movies

 7              or T.V. or things like that, because if

 8              you do that in real life, it causes a

 9              mistrial.  We had one case where a juror

10              went out to investigate on his own and

11              created a mistrial, or he went to the

12              scene to see what he could see.  So you

13              know, you wouldn't do anything like that,

14              right?

15    A.   No, I wouldn't do anything like that.

16    Q.   I take it you feel that people should be held

17              accountable for their actions?

18    A.   Correct.

19    Q.   And because lawyers are geared toward looking

20              at elements of crimes, generally we focus

21              our questions to witnesses on proving

22              those elements.  Things that would be
```

924

1          relevant and material to what is at hand

2          here.  And sometimes, you might think,

3          "Well, gosh, I wish I could ask this

4          question."  But in our system in Ohio,

5          you are not allowed to ask questions of

6          the witnesses.  You can't submit them to

7          the Judge.  They may do that in some

8          other jurisdictions, but it doesn't

9          happen in Ohio, and you have to rely on

10         the questions asked by the lawyers.  So,

11         if we don't ask the questions, then you

12         are sort of stuck without that question

13         being asked, right?

14    A.   Yes.

15    Q.   You also can't take notes.  Back in school,

16         you could take notes.  You ever listen to

17         the radio when you were a kid?

18    A.   Yes.

19    Q.   And you paid close attention, other than

20         music, you ever listen to soap operas on

21         the radio or anything like that?

22    A.   Yes, I have.

925

1    Q.    And you pay close attention, right, because

2          there's no picture there?

3    A.    Yes.

4    Q.    So, you would be listening for half an hour,

5          or hour, depending on how long that

6          production was going on.  We're going to

7          ask you to do the same thing here.  You

8          have a witness in front of you and we're

9          going to ask you to pay very close

10         attention to the testimony of the

11         witness, because unlike the O.J. Simpson

12         trial or these other trials where they

13         got a million dollars worth of equipment

14         where they can do instant transcripts.

15         There aren't going to be any transcripts

16         of the testimony.  You are going to have

17         to rely upon your memory and the

18         collective recollection of the other 11

19         jurors when you go back to deliberate.

20             Sometimes jurors ask, "Can we get

21         the testimony of so and so," and the

22         Judge is going to tell you generally no,

926

1        you can't have that, you have to rely

2        upon your recollection.  Mary Ann is very

3        good as a Court Reporter, but she can't

4        get out instant transcripts.  We don't

5        have that ability.  So just like Juries

6        have done for ages, you are going to have

7        to rely on your recollection of the

8        testimony.

9    A.   Okay.

10   Q.   You will be able to do that?

11   A.   Yes, I am.

12   Q.   I wanted you to know there aren't any instant

13        replays or things like that in the

14        Courtroom.  Maybe 50 years down the road,

15        but not today.  We don't have that.

16            During the course of the trial, you

17        are going to be face to face with the

18        Defendant, and perhaps during the course

19        of the trial, as you come face to face

20        with her as your chair is turned towards

21        you, you will become more acquainted with

22        her.

927

```
 1              My question to you is this.  When
 2         you go inside that Jury room to
 3         deliberate on your verdict with the other
 4         jurors, can you lay aside all thoughts
 5         whatsoever you might have of sympathy for
 6         the Defendant, because it is only a
 7         natural human emotion to feel some
 8         sympathy for somebody and lay aside that
 9         sympathy, and base your verdict on the
10         testimony and the evidence that you
11         receive and the instructions of law given
12         to you by Judge Stuard, and lay aside all
13         thoughts of sympathy that you might have
14         for this Defendant?
15   A.    I believe I can do that.
16   Q.    Now, at the conclusion of the first phase of
17         the case when the Jury goes out to
18         deliberate, you are going to be
19         sequestered.  It means you will be kept
20         together and you won't be able to go home
21         at night.  Some jurors, we don't know how
22         long it is going to take, because every
```

928

1          Jury is different, the trial may take up

2          to two weeks, perhaps.  The Jury

3          deliberations can take anywhere from two

4          hours to a few days, or a week.  And

5          let's say you and the other jurors return

6          a verdict finding the Defendant guilty of

7          aggravated murder with one or more of the

8          death penalty specifications of

9          aggravating circumstances.  Then you

10         would go home for maybe a week or so and

11         then we would go into a second phase.

12         And at a second phase, you come back in

13         and that could take one to three days, it

14         depends.  And then again, you would go

15         out to deliberate and you would be

16         sequestered again for the second time.

17         And again, the deliberations would take

18         as long as it takes, anywhere from a

19         couple of hours to a couple of days or

20         whatever.  And you take whatever time you

21         needed to make your deliberations, right?

22    A.    Yes.

929

1    Q.   And being sequestered, that wouldn't bother

2         you?

3    A.   No.

4    Q.   Do you have any personal matters at home or

5         work that will affect your ability to

6         concentrate on the evidence here?  I

7         expect we'll be starting the trial in a

8         couple of weeks.

9    A.   No, I don't.  The only thing I want to say is

10        if I had a choice to be here, I would say

11        no, for the fact that I just recently got

12        this job, and I have already been out for

13        two to three months due to a major

14        accident and I am finally going back to

15        work and it is just the fact that I have

16        this time off.  I know it is my civil

17        duty to be down here and everything, I

18        don't have a problem with that, it is

19        just --

20   Q.   They are not going to fire you or anything?

21   A.   No, it is nothing like that.  It is a personal

22        thing.

930

1    Q.    I understand what you are saying.  I mean,

2          Jury duty is a difficult thing to do.

3          Especially with a new job.  But would you

4          agree with me that to make sure our

5          system of justice works in this country,

6          it is important that we fulfill our

7          obligations as citizens?

8    A.    I agree with that totally.

9    Q.    One of our obligations would be, if it is

10         election time, we try to read up on the

11         candidates and issues and vote?

12   A.    Yes.

13   Q.    If it is war time, we serve in the armed

14         forces, if we're called?

15   A.    Yes.

16   Q.    We have young people overseas today in

17         different countries and another

18         obligation of citizenship is to serve as

19         a juror, to serve if we're able to?

20   A.    I agree.

21   Q.    Sometimes it is difficult.  It causes

22         financial hardship for some people.  It

931

```
 1              causes disruption in their lives at home

 2              and at work, but if we're able to, to

 3              make sure the system works, it is

 4              important we get people from all walks of

 5              lives, people who are intelligent with

 6              all kinds of training and experience.

 7                   THE COURT:  I think you are

 8    preaching to a choir.  She's agreeing with you.

 9    A.   I wanted to make a note of it, on your

10              opinion.  You said I could throw out

11              questions and comments.

12                   MR. BAILEY:  I thank you for your

13    candid answer and the Defense counsel will have an

14    opportunity to address you.

15    EXAMINATION BY MR. INGRAM OF MS. SENEK:

16    Q.   My name is Jerry Ingram.  This is John Juhasz

17              and John and I share the responsibility

18              of representing Donna Roberts here, who

19              is on trial for her life.  Obviously, you

20              take your responsibilities very

21              seriously.  John and I feel we should

22              take every reasonable precaution in
```

932

```
1              selecting a fair minded Jury, the same

2              type of Jury you or I would want if we

3              were on trial.  This is the only

4              opportunity we can talk directly to one

5              another.  I can talk directly to you, but

6              more importantly, you can talk directly

7              to me.  So, we should try to have a

8              conversation, but lawyers being lawyers,

9              we're trained to monopolize the

10             conversation.

11                  If there's any questions you would

12             like to ask or anything that pops into

13             your mind, please feel free to volunteer

14             information.  When you walked in, I got

15             the sense that you were a little nervous?

16   A.   Yes, very nervous.

17   Q.   Are you more comfortable now?  Nobody here

18        bites.  We're not bad guys.

19   A.   It is the fear of the unknown.

20   Q.   Do you feel a little more comfortable now?

21   A.   Yes, I do.  Thank you.

22   Q.   This is a lot like a job interview, except
```

933

```
 1              when someone goes into WCI to be

 2              interviewed, they choose to come in to be

 3              interviewed, and in this situation, the

 4              Jury wheel sort of chose you.  You had no

 5              choice.  And let me ask you just one

 6              quick question about that.  About what

 7              you just told Mr. Bailey about your job.

 8              You have been off for a couple of months?

 9    A.   Yes.

10    Q.   If we ask you to spend a couple of weeks with

11              us, will your mind be here or will your

12              mind be elsewhere?

13    A.   My mind would be here.

14    Q.   We're interviewing you today for one of the

15              most important jobs there is, the job of

16              finding the truth and determining the

17              fate of another human being.  Now, would

18              you agree with me that that is an awesome

19              responsibility?

20    A.   I don't know if I would use the word

21              "awesome."

22    Q.   What word would you use?
```

934

1   A.   I don't know the word I want to use, but it
2        carries a lot of weight on you.  It is a
3        huge responsibility.
4   Q.   How do you feel about being asked to undertake
5        that responsibility?
6   A.   I feel like I can handle it.  It is like the
7        ultimate job you could ever do.
8   Q.   Your job responsibility now, if you are
9        selected to sit, will be to fairly and
10       impartially determine facts.  Your job
11       responsibility now is to tell us if you
12       would have any problem giving either side
13       a fair shake; does that sound reasonable
14       to you?
15  A.   I do not have a problem with giving either
16       side a fair shake.
17  Q.   Donna Roberts and Robert Fingerhut were
18       divorced, but continued working together
19       at the Greyhound bus station in
20       Youngstown and Warren and living together
21       in Howland Township.  In a nutshell, this
22       case boils down to the Government's

935

1           allegation that Donna plotted or

2           conspired with a male companion, Nate

3           Jackson, to cause the death of Robert

4           Fingerhut. You understand this trial is

5           about the innocence or guilt of one

6           person, and one person only, and that

7           person is Donna Roberts?

8     A.    Yes.

9     Q.    Throughout the course of these proceedings,

10          you will hear the name Nate Jackson, and

11          you may conclude that Nate Jackson did

12          what the State says he did, but that is

13          not the issue you are here to resolve.

14          The issue you are here to resolve is did

15          Donna Roberts help him.

16    A.    Yes.

17    Q.    In supporting its allegation, that Donna aided

18          or participated in the death of Robert

19          Fingerhut, the State will present various

20          letters and recorded conversations

21          between Donna and Nate. Some of these

22          letters and conversations are sexually

936

1    explicit.  And to be candid with you,

2    some of them are offensive.  But you

3    understand here that the allegation is

4    murder, not loose morality?

5 A.  Correct.

6 Q.  And no matter how shocked or offended you may

7    be by the sexual nature of some of this

8    evidence, your job responsibility as a

9    trial juror will be to test the State's

10    evidence to determine whether it ties

11    Donna to the death of Robert Fingerhut;

12    do you understand that?

13 A.  Yes.

14 Q.  Donna Roberts denies that she actually

15    participated by conspiracy, plot or

16    otherwise in the murder of Robert

17    Fingerhut.  Some people would have a

18    difficult time giving a scarlet woman a

19    fair shake.  Do you have any problem

20    giving a scarlet woman a fair shake?

21 A.  I have no problem.

22 Q.  Would you have the courage to acquit, if you

937

1               felt a not guilty verdict was warranted

2               by the evidence?

3   A.   I have no problem.

4   Q.   Because this is a capital case, I have to talk

5               to you about penalties. You understand

6               that this is potentially and only

7               potentially a two phase process?

8   A.   Yes.

9   Q.   The first phase is called the trial phase, and

10              if Donna is found not guilty at that

11              trial phase, what happens?

12   A.   That is it.

13   Q.   We all go home. Do you understand you may

14              never have to consider the question of

15              punishment?

16   A.   Yes.

17   Q.   I am a little bit -- I have a personal concern

18              about at this stage of the proceedings

19              talking with jurors about punishment. It

20              seems a lot to me like putting the cart

21              before the horse. You know we're talking

22              about what you might do to someone, and

938

```
 1              you don't even know if that person has
 2              done anything wrong.  Does that make
 3              sense to you?
 4    A.   Yes, it does.
 5    Q.   Can you understand my concern?
 6    A.   Yes.
 7    Q.   You don't think that by asking you these
 8              questions about punishment, that we're
 9              predicting we'll get to a second phase.
10              Because we're lawyers, we're not fortune
11              tellers.  So, let me ask you just
12              straight up.  Do these questions about
13              possible punishment lead you to believe
14              that Donna was involved or we wouldn't be
15              asking you these questions?
16    A.   No.
17    Q.   If a juror in any capital case, not
18              necessarily this one, anyone, we could
19              make up a capital case -- if that Jury
20              gets to a second phase, there are four
21              punishments.  Death, life imprisonment
22              without possibility of parole, life
```

939

```
 1                imprisonment with parole eligibility
 2                after serving 30 full years, life
 3                imprisonment with parole eligibility
 4                after serving 25 full years.  Life
 5                without parole is exactly what it says.
 6                You go in, you don't get out.  You
 7                understand that?
 8   A.   Yes.
 9   Q.   And the 25 full years and the 30 full years
10                you are not eligible for parole until you
11                have done 25 full years, day for day, 30
12                years, day for day.  Have you ever
13                engaged anyone in the conversation about
14                the death penalty or someone has maybe
15                volunteered to you, that I think they
16                should execute those people down in
17                Texas, because it is not fair that we
18                have to pay to keep them in prison?  You
19                ever hear anybody say anything like that?
20   A.   Yes.
21   Q.   Do you have a view on this cost issue?
22   A.   To a certain degree, yes, I have.
```

940

1   Q.   Could I ask you what that view is?

2   A.   That is a hard question.

3   Q.   I'm going to press you for that.  If I were

4        sitting where you are and you were

5        standing here, and I would loan you my

6        notebook, you could ask me the same

7        questions I'm asking you, and I also

8        would have a hard time answering these

9        questions, so I understand it is

10       difficult.  We only ask that you do your

11       best.  So what are your views about the

12       cost issue?

13  A.   I feel that if an individual is proven guilty,

14       there's no doubt, no question in your

15       mind, I feel that that individual should

16       get the death penalty.  If it has an open

17       state, instead of going to prison and

18       having the prisons educate criminals,

19       having prisoners that are able to sue the

20       individual that put them away.  I believe

21       that when you go to prison, it shouldn't

22       be a luxury.  I don't care what the crime

941

```
 1                    is.  I don't care if you are in prison

 2                    for three months because you stole a

 3                    Snickers candy bar.  You go there, you do

 4                    your time.

 5     Q.    I sort of liken them to take the telephones

 6                    out because then people couldn't call me

 7                    on the telephone.  That is my own

 8                    personal wish.  Generally,

 9                    philosophically, how do you feel about

10                    life imprisonment as an alternative to

11                    the death penalty?

12     A.    It all depends on the crime I think, and the

13                    evidence that was presented in the case.

14                    Life imprisonment for my understanding,

15                    and I am no lawyer, I don't think you

16                    have to commit a murder to have life

17                    imprisonment.  You could commit another

18                    crime, for instance, you get in a car

19                    accident and, I don't know what it is

20                    called.

21     Q.    Vehicular homicide.

22     A.    It was an accident.  I don't think that
```

942

```
 1              individual that was behind the wheel, he

 2              didn't or she didn't have intentions of

 3              killing somebody else when they got in

 4              the car.  It just happened to be that the

 5              roads were slippery that day.  So I think

 6              it all depends on the evidence in a case.

 7    Q.   How about in cases of planned murder?

 8    A.   Without knowing the circumstances and perhaps

 9              knowing how somebody is thinking at that

10              time or trying to understand how that

11              person is thinking, again it all depends

12              on what is presented to me.  I can't say

13              yes or no to your question.

14    Q.   I wasn't calling for a yes or no.  You have

15              answered my question.  I'm going to ask

16              you an equally hard question, I think and

17              I apologize.  In your questionnaire, you

18              were asked why you thought we -- or why

19              you were in favor of the death penalty, I

20              think, and your answer was, "You do the

21              crime, you do the time."  Can you explain

22              that to me?
```

943

1   A.   I cannot think of his name.

2   Q.   Robert Blake?

3   A.   The guy over in California.  He was in the

4        cult.

5   Q.   Charles Manson.

6   A.   Take him for instance.  Totally insane, this

7        is my personal opinion, totally insane,

8        committed vicious murders.  Just went out

9        and just randomly killed people, a

10       pregnant woman of all people to kill, and

11       he still is sitting in jail because from

12       my understanding at that time, they

13       didn't have the death penalty.  Well, the

14       next best thing for him is to rot his

15       life away.  He was committed or he was

16       found guilty.  Am I answering these

17       questions right?

18  Q.   I am making you uncomfortable all over again.

19       I'm sorry.  I want to emphasize that I

20       know these questions are unpleasant for

21       you to answer and I know they are hard

22       questions to answer, and there are no

944

1          right or wrong answers.  The only mistake

2          you could possibly make is if instead of

3          telling me how you really feel, you tell

4          me what you think I want to hear.  You

5          are doing a great job.  I am the one that

6          is probably stumbling and stammering up

7          here.

8               In your questionnaire, you were also

9          asked a question, I believe it was --

10         that questionnaire comes back to haunt

11         you, doesn't it?  You were asked the

12         question about why we have a death

13         penalty in this country and I think your

14         answer was, "I don't know.  We don't use

15         it."

16    A.   We don't use it enough.

17    Q.   So you think we should use it more often?

18    A.   Yes.  Yes, I do, when an individual is found

19         guilty.  Without any questions, any

20         questions.  I'm not just saying anybody

21         should have the death penalty.  There are

22         certain cases where individuals get life

945

```
 1                  in prison and I don't believe they should

 2                  go there.

 3   Q.    Is there anything that characterizes those

 4                  cases where someone gets life and you

 5                  don't think they should go to prison for

 6                  life?

 7   A.    One I can think of is like a crime of passion.

 8                  For instance, you are married, and you

 9                  walk in and my husband is having an

10                  affair, and I kill him.  For that split

11                  second, I don't feel I'm insane, but for

12                  that split second, yes, I was insane.  I

13                  didn't know what I was doing, so no, I

14                  don't think that individual should get

15                  the death penalty.

16   Q.    We used to have a murder statute in this state

17                  called premeditated murder.  And that

18                  statute -- we no longer have that statute

19                  and I'm just using this as an example.  I

20                  don't want to confuse the present law.

21                  Is that understood?

22   A.    Okay.
```

946

1   Q.   Premeditated murder said that you

2           intentionally purposely planned to kill

3           somebody and then you undertook the

4           actions to implement your plan and killed

5           that person.  Premeditated murder.  You

6           did it on purpose.  You did it with

7           planning.  In your view of things, is a

8           life sentence alternative an appropriate

9           sentence under those circumstances?

10   A.   No.

11   Q.   I'm going to back up for a second.  All of us,

12           because of who we are, what we are and

13           our life's experiences, have thoughts,

14           feelings and attitudes about one thing or

15           another.  You agree with that?

16   A.   Yes.

17   Q.   And I'm going to use me for an example.  You

18           can ask me to temporarily surrender and

19           put aside some of my thoughts, feelings

20           and attitudes, and I feel more strongly

21           about some things than other things.  Are

22           you like that?

947

1    A.    Yes.

2    Q.    Some things I would be willing to set aside,

3          and other things, I would not be willing

4          to set aside.  Does that make sense to

5          you?

6    A.    Yes, it does.

7    Q.    There are four possible penalties in the

8          second phase of any capital trial.  You

9          and I have already discussed those.  You

10         know what they are.  Are your views on

11         capital punishment such that if you went

12         to a second phase in a premeditated

13         planned murder case, where you had found

14         beyond a reasonable doubt that the

15         Defendant committed the murder, are your

16         views such that the death penalty would

17         have a leg up over the other three?

18   A.    I have no question in my mind.

19   Q.    You have returned a verdict of guilty on the

20         aggravated murder charge.  You have found

21         the Defendant guilty.  You have found the

22         Defendant committed a premeditated

948

| | | |
|---|---|---|
| 1 | | planned murder.  You are now called upon |
| 2 | | to determine punishment.  I think what |
| 3 | | you are telling me is that you would |
| 4 | | favor death? |
| 5 | A. | Correct. |
| 6 | Q. | So, if you were called upon in those |
| 7 | | circumstances to determine a punishment, |
| 8 | | the death penalty would have a leg up |
| 9 | | over life imprisonment because you have |
| 10 | | convicted someone of an intentional |
| 11 | | murder? |
| 12 | A. | Key word is leg up.  Yes, it is favored, I am |
| 13 | | favored that way, but there's always a |
| 14 | | but -- there could be. |
| 15 | Q. | What is the but? |
| 16 | A. | It has a leg up, but it may not be, if that |
| 17 | | makes sense. |
| 18 | Q. | I think it does, but I'm sure it makes sense. |
| 19 | A. | It is like you said earlier, I favor this view |
| 20 | | over this view.  How's that? |
| 21 | Q. | That is good.  So if you were called upon to |
| 22 | | determine sentence in a case of the kind |

949

```
 1              we're already talking about, the four
 2              alternative sentences would not start out
 3              equally in your mind, would they?
 4   A.   No.
 5   Q.   The death penalty would start out with a head
 6              start, is that right?
 7   A.   Yes.
 8   Q.   Would you then expect the Defendant in that
 9              case, to convince you that it should be
10              one of the other sentences?
11   A.   Who else is going to convince me otherwise,
12              besides my jurors?
13   Q.   Well, the State has the burden of proving that
14              death is the appropriate punishment.
15   A.   Okay.
16   Q.   And I'm going to have to make an editorial
17              comment.  If you find me putting words in
18              your mouth, don't let me do it.
19   A.   I won't.
20   Q.   I didn't think you would.  I forget where I
21              was at.
22   A.   The State has the burden of proof.
```

950

1  Q.   Because of your views, and the fact that the

2           death penalty will have a leg up, are you

3           going to require the Defendant to prove

4           to you that life is the appropriate

5           penalty?

6  A.   I guess.  Can you rephrase that, because I'm

7           not quite sure what you are asking.  I

8           think I do, but if you rephrase it.

9  Q.   I'll do my best.  We have already established

10          that in your view, the death penalty will

11          start out with a leg up over the others.

12          A head start.

13  A.   Right.

14  Q.   Because the death penalty has a head start in

15          your mind, will you then expect the

16          Defendant to satisfy you that life

17          imprisonment is the appropriate penalty,

18          not death?

19  A.   No, I wouldn't think it would be the

20          Defendant.

21  Q.   How so, if you are giving the death penalty a

22          head start?

951

```
 1   A.    It would have to be the other side that would
 2             have to present the facts to me.
 3             Although it could go the other way, the
 4             Defendant, if you are not doing your job
 5             and you are being laxidazical or
 6             sometimes things get switched around, I
 7             would put the burden of proof on the
 8             State more so than the Defendant.  It is
 9             not the Defendant's job.
10   Q.    Is that on guilt or innocence or is that on
11             punishment?
12   A.    I would say both.  It is on both guilt and
13             punishment.
14   Q.    I'm going to go back a little bit.  You
15             remember the orientation instructions
16             that the Judge gave on Tuesday?  Were you
17             present for that?
18   A.    Yes, I was.
19   Q.    And just a little editorial comment.  Remember
20             him telling you that if a juror was
21             excused, it was because the juror was
22             giving an honest and a forth right
```

952

```
 1              answer?
 2    A.    Yes.
 3    Q.    Do you recall him also telling you in that
 4              orientation instruction, that if a Jury
 5              were to go to the second phase, that all
 6              four punishments should start out equally
 7              in the juror's mind?
 8    A.    Yes.
 9    Q.    And you read preliminary instructions before
10              coming up here this afternoon, and I
11              believe also in those preliminary
12              instructions the Judge indicated that all
13              four penalties should start out equally
14              in your mind?
15    A.    Yes.
16    Q.    I want you to and I'm sure you will do this.
17              I want you to search your soul for a
18              second.  And if you have to determine
19              punishment, do those four punishments
20              start out equally in your mind or does
21              the death penalty have a head start?
22    A.    Are we talking about any kind of case?
```

953

1     Q.    Talking about a premeditated planned murder

2            case.

3     A.    I honestly would have to say the death

4            penalty.  I have stronger feelings

5            towards that.

6     Q.    I know you are being honest and I appreciate

7            that fact, and I really, I am sort of mad

8            at myself that I'm not very artful at

9            this, forgive me.  I should be able to do

10           a better job.  Your views are simply such

11           that for someone who has been convicted,

12           proven guilty beyond a reasonable doubt

13           of aggravated murder, planned

14           premeditated murder, that the appropriate

15           penalty should be death?

16     A.    No, I didn't say that.

17     Q.    The death penalty has a head start?

18     A.    Yes.

19     Q.    So, you are honestly telling me that the death

20           penalty then has a head start at a second

21           phase, is that right?

22     A.    Yes.

954

```
 1    Q.    Is there anything that I have talked with you

 2                about that you would like to ask me

 3                about?

 4    A.    No.

 5    Q.    No questions that popped into your mind?  I

 6                would want to get rid of me as quickly as

 7                I could, too.

 8                     MR. INGRAM:  I thank you for your

 9    time.

10                     THE COURT:  Thank you.

11    (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

12    OF HEARING)

13                     THE COURT:  Sheri, it is my

14    perception, you sat here and totally were honest

15    and that is what we asked you to do and we

16    appreciate that.  I make that observation because I

17    think that you have stated something that probably

18    is very simply true, doesn't take a lot to

19    understand it, and that is that on its face, if

20    somebody has committed a murder that falls within

21    the death penalty possibility, maybe most jurors

22    will think even though they don't express it the
```

955

1   way you have, that that is kind of the starting

2   point for the second phase.  They have already been

3   convicted by this Jury, so death penalty is

4   probably next.  You have answered the question very

5   wisely as put to you by Mr. Ingram.  Mr. Ingram

6   could profess all day, he's not very good at asking

7   questions.  That isn't true.  He's very skilled.

8   You caught the distinction I suspect, most people

9   probably would not, and that is that to expect that

10  the Defense on that second phase would have to

11  prove something to rebut and that isn't true, of

12  course, as you stated.  The burden is always on the

13  State.  The mitigating factors are presented by the

14  Defense, but that is merely something for the

15  Prosecution to shoot at and to overcome.

16          The bothersome part here is, however you

17  have stated that you would have, I guess, a

18  presumption that the death penalty should apply.

19  That isn't what the law is.  The law requires that

20  you go into that second phase, if we got to that,

21  with the term that has been used here quite a bit,

22  a blank slate.  Now that is asking a lot of

956

1   anybody, but that is what we ask of the jurors,

2   that you could begin that second phase with an open

3   mind of -- the same thing applies if somebody that

4   is going to be a juror starts out, "Well, I'm going

5   to go for life without chance of parole, rather

6   than even consider the death penalty."  That means

7   the State doesn't get a fair trial that they are

8   entitled to.  Now you may hold that as a conviction

9   as we told you, that you are entitled to your

10  convictions.

11          My question to you is and Mr. Ingram did

12  ask you several different times in different ways

13  and you answered the same, so it may be your

14  thought on the matter.  You really feel or do you

15  not that you would have a difficult time if need be

16  going into that second phase, with the mind set

17  that we're asking you to have?

18              MS. SENEK:  An open mind set on the

19  four different --

20              THE COURT:  That you don't have any

21  preconceived opinion until you have heard the

22  evidence as to what the outcome should be?

957

1           MS. SENEK:  I can walk in here with

2    an open mind.  It is like your favorite kind of ice

3    cream is chocolate and every time you go into the

4    Baskin Robbins, always get chocolate, but there's

5    so many other different flavors, and then it is

6    just that one time you walk in there and you order

7    vanilla.  Just because you go in thinking you are

8    going to get chocolate this time, sometimes it

9    doesn't always happen that way, and I am and I do

10   have an open mind enough to try something else or

11   to have another view.  I also like to add, not

12   being in the Court system, what do you always hear.

13   You always hear about the death penalty.  You never

14   hear about 25 years to life or 30 to life.  You

15   don't hear about that stuff.  So, my opinion is I

16   have always grown up with knowing the death penalty

17   and not knowing the other three and what they

18   actually mean.  So I think that is another reason

19   why --

20           THE COURT:  You are saying it has

21   been thrust upon you out of the blue here and you

22   are kind of overwhelmed?

958

1           MS. SENEK:  Right.

2           THE COURT:  Well, the simplest way I

3   can put it is, you understand what the law requires

4   and that is that each juror, not that they don't

5   have other opinions or prior opinions, but that

6   they are able to set them aside and to follow the

7   law, and that requires in effect, a show me

8   attitude in that second part that I'm here, you,

9   Mr. Prosecutor, have proven to me that these

10  aggravating circumstances outweigh the mitigating

11  factors.  I'm going to listen to that.

12          MS. SENEK:  Yes.

13          THE COURT:  What is your answer?

14  Are you able to do that or not?

15          MS. SENEK:  I believe I'm able to

16  follow the law.

17          THE COURT:  You have no reservations

18  in your mind about that?

19          MS. SENEK:  No, I do not.

20          THE COURT:  You can give the

21  assurance to these folks that you will follow the

22  law?

959

1          MS. SENEK:  Yes, I can.

2          THE COURT:  You may inquire, if you

3    wish.

4          MR. BAILEY:  I think she's answered

5    that.

6    EXAMINATION BY MR. INGRAM OF MS. SENEK:

7    Q.   He's back.  I'm sorry.

8    A.   Don't be sorry, you are doing your job.

9    Q.   Let's go to Baskin Robbins.  As I understand

10          it, you go into Baskin Robbins, your

11          favorite flavor is chocolate.  Someone

12          might talk you into vanilla, but

13          ordinarily you get chocolate?

14   A.   Right.

15   Q.   When you walk through the door odds are, you

16          are getting chocolate?

17   A.   Correct.

18   Q.   Now I have to translate that to the situation

19          we're in.  And I may have a hard time

20          doing that.  I'm not nearly as artful as

21          the Judge might like to think.  In a case

22          where somebody has been convicted of

960

1            premeditated aggravated murder, planned

2            deliberately, if you are called upon to

3            determine a sentence, just as you like

4            chocolate, you are going to be inclined

5            to favor the death penalty?

6   A.   I'll say this, only because of how I believe

7            or in this case, if you go with

8            chocolate, because that is my favorite

9            flavor.  I guess what I'm trying to say

10           is, you keep asking me the same question,

11           and I keep answering it the same way.

12           The death penalty does have a leg up.

13           But if I am picked and like the Judge

14           asked me, that I need to follow the law.

15           And I have got to set some of my opinions

16           aside and some of my strong beliefs, and

17           I have got to go in with an open mind.

18           Somebody's life is in my hands and I'm

19           not going to just all right, she's

20           guilty, he's guilty, that is it.  Let's

21           get rid of them.  That is not how I

22           believe.  I don't just take a life for

961

1            granted, no matter who that person is.

2            So, yes, I can go in that back room and

3            weigh the four different ways equally,

4            even though before I went into that room,

5            I may have a stronger opinion on one than

6            the other.

7     Q.    I never meant to intimate that you would do

8            anything other than a fair and serious

9            job, because I'm sure you would, but you

10           have told me a bunch of times in response

11           to numerous questions that I have asked,

12           that the death penalty would have a leg

13           up and you just repeated that.  And that

14           is an honest and a heartfelt response,

15           isn't it?

16    A.    Correct.

17    Q.    Because that is the way you feel?

18    A.    Correct.

19                 MR. INGRAM:  Thank you.  I have no

20    further questions.  Thank you.

21                 THE COURT:  Sheri, we thank you for

22    your time.  You are excused from -- I do want to

962

1    thank you again for your total honesty.  I don't

2    perceive that you have answered these questions

3    just to get off this Jury.  I am very convinced

4    that you are willing to serve, but you have

5    answered the questions very honestly, and we do

6    appreciate that.

7    (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

8    OF HEARING)

9    (In-chambers)

10                THE COURT:  Mr. Calhoun, when we had

11   him, there was a side bar conference, wherein the

12   Defense made a general objection for cause, and

13   after further inquiry, the Court decided to excuse

14   him.  Is that correct, gentlemen?

15                MR. INGRAM:  Yes.

16                MR. JUHASZ:  Yes.

17                MR. BECKER:  Yes.

18                MR. BAILEY:  Yes.

19                THE COURT:  There's been a side bar

20   conference in this regard twice.  After the first,

21   I asked the additional questions which prompted

22   Mr. Ingram to ask further questions.  We're

963

1   in-chambers at the request of the Prosecution to

2   put something on the record because I have, without

3   totally discharging her, come close to it.  What is

4   your objection?

5               MR. BAILEY:  My understanding of

6   what she's saying, she's telling us that her

7   personal belief, the death penalty has a leg up.

8   If she were to be on the Jury and she were sent

9   into the Jury room to deliberate, she would follow

10  the law.  She would set aside her personal belief

11  where the death penalty has a leg up and she would

12  consider all of the punishments, and that she would

13  be fair to both sides.

14              THE COURT:  That is what she told

15  me.

16              MR. BAILEY:  I think that is what

17  she's saying.

18              MR. BECKER:  The last answer isn't

19  the definitive answer.

20              THE COURT:  I thought that her last

21  answer and the reason that Ingram sat down was that

22  she pretty much went back -- his last question, if

964

1   I remember was to the effect, but your preference

2   is going to be the death penalty.

3               MR. BAILEY:   That meant her personal

4   belief.

5               MR. BECKER:   She's expressing her

6   personal belief and it's not what the last thing

7   she says to Mr. Ingram, because in this case, if

8   Mr. Ingram or Mr. Juhasz went last, I'm sure as

9   talented as they are, they could get every juror to

10  say what they want them to say.   It is not the last

11  answer.

12              THE COURT:   I agree it's a close

13  call.   I have made my mind up a long time ago, when

14  it is a real close call to go with the Defendant,

15  not always.

16              MR. BAILEY:   I think if you ask her

17  one more question.

18              THE COURT:   I think that the girl,

19  as I stated before is being embarrassingly honest.

20  She's drawn a very fine line here.   She has

21  testified that she understands if she has a

22  preference, which she stated, she could not

965

1    exercise that preference.  She has to follow the

2    law.  She stated, "I can follow the law."  But the

3    last question was, I still have the preference.  I

4    don't know where that leaves us, but --

5                MR. BAILEY:  I think you have to ask

6    her can she, if she's on the Jury, can she set it

7    aside.  If she says yes, then there's your answer.

8                MR. JUHASZ:  I would have to say as

9    often is the case, I don't agree completely with

10   anybody.  I agree with you that she should be

11   excused.  I would respectfully disagree with you

12   that I don't think it is as close a case, as we're

13   trying to paint it.  I think she's a classic Morgan

14   vs. Illinois juror, and Morgan made very clear,

15   that when the Trial Judge turns to somebody and

16   keeps saying, as I have had happen in capital

17   cases, and say, "But can you follow the law?"  Of

18   course they all want to follow the law and Morgan

19   makes very clear, and even has language that says,

20   but when their personal beliefs are such that it is

21   very clear what their beliefs are and that they

22   can't follow the law, even though they want to be

966

1  | fair, and the language for <u>Morgan</u> is --

2  |           THE COURT:  It is just natural to

3  | believe that -- she started her answer in her

4  | thing, the answer up through to the point where you

5  | really pinned her down, was such that death

6  | conviction, death.  Or conviction for aggravated

7  | murder, death.  You kind of got her to fudge on

8  | that to say that she will accept the instruction,

9  | but there's no question in any of our minds, nor

10 | should there be, that this girl holds a pretty

11 | strong conviction that if somebody is convicted for

12 | this, they should start out with considering the

13 | death penalty, so I grant the Defendant's motion.

14 | (End of In-chamber discussion.)

15 |           THE COURT:  Miss Senek, you get back

16 | to your job.  We're not going to keep you.  We do

17 | appreciate your time.

18 | (Miss Senek excused from the Courtroom.)

19 | (Juror No. 20, Maxine Howard, entered the Courtroom.)

20 |           THE COURT:  Miss Howard, you had an

21 | opportunity to read that letter, the instructions

22 | we gave you?  You had an opportunity to read that

967

1     handout sheet?

2                    MS. HOWARD:  Yes, Sir, I did.

3                    THE COURT:  As you know by now, this

4     case is against this lady over here, Miss Roberts.

5     She's charged with two counts of aggravated murder

6     with the specifications.  In Ohio, just because

7     someone is found guilty of murdering someone, does

8     not mean that they have to face the death penalty.

9     It is only under certain specific things set forth

10    in the statute.  The person who murders a police

11    officer or the Governor, and other things, there

12    are two specifications attached, being aggravated

13    burglary and aggravated robbery, to both of these

14    aggravated murder counts, which raises the specter

15    that if this case would go to a second phase and

16    that means only if Miss Roberts was found guilty of

17    the murder to begin with, then this Jury in that

18    second phase would have to consider the possibility

19    of imposing the death penalty.

20                   Some people think that the death penalty

21    should be imposed any time a murder is committed.

22    That is not the law of Ohio.  Other people because

968

1    of religious, moral or ethical considerations, just

2    can't visualize being on a Jury where they have to

3    make that decision or at least consider it.  The

4    ideal juror for this trial or any trial similar,

5    would be a person who has some feelings one way or

6    the other concerning the death penalty.  We all do.

7    But it has to be people that are able to follow the

8    law.  And if they have any personal preference or

9    feeling about the death penalty, that would

10   conflict with them being able to follow the law,

11   then they're duty bound to tell these gentlemen

12   when they are asked, so that that can be taken into

13   consideration.

14           We have had a couple of people here, who

15   did not qualify for this Jury because they answered

16   the questions truthfully, and it avoids them being

17   placed in an unpleasant position.  Part of the

18   questioning will be directed towards that issue.

19   Are you able to sit and follow the instructions of

20   law without being bound by some preconceived idea

21   of what the law is or should be?

22           MS. HOWARD:  Yes, Sir.

969

1          THE COURT:  Now the second issue

2    that they will inquire about concerns pre-trial

3    publicity.  This matter, as any other murder case,

4    gets a certain amount of publicity, some more than

5    others.  The question is, whether you have read

6    about this case before, whether you have any ideas

7    about the guilt or innocence of anybody involved in

8    the matter, or whether if you have picked up any

9    information you are able to set that aside.  This

10   case has to be determined on the evidence presented

11   in this Courtroom.  Something that didn't appear in

12   the newspaper, you may have read, is not evidence.

13   Many times those accounts are not very correct.

14   That is the purpose of having you in here today.

15   Okay?

16          MS. HOWARD:  Yes, Sir.

17   EXAMINATION BY MR. BAILEY OF MS. HOWARD:

18   Q.   Good afternoon, Mrs. Howard.  How are you?

19   A.   I'm fine, thanks.

20   Q.   My name is Ken Bailey, I Am assistant

21          Prosecutor.  I'm going to be joined by

22          Chris Becker, who is here.  He had to run

970

1          out and handle some other things right

2          now.  He will be coming back to the

3          counsel table with me.  And he's going to

4          be, the two of us are going to be

5          handling this case together.  As the

6          Judge indicated, this is the one

7          opportunity that we get to talk together

8          during the course of the trial.  And

9          if -- we're going to ask you questions,

10         and if you have any questions about what

11         is going on, that is pertinent to what is

12         occurring here to this trial, feel free

13         to ask them, because once we finish up

14         today, we're not allowed to have any

15         communication with you until the whole

16         case is over, and if it goes into two

17         different phases of the trial, the phase

18         dealing with guilt and non-guilt and the

19         phase dealing with what is the

20         appropriate penalty for this Defendant,

21         we're not allowed to talk to you in

22         between until the whole case is over.

971

```
1              So, if we run into each other out in the
2          hallway or on the stairs, we're not being
3          anti-social, it is just we're not allowed
4          to have any communication with you.
5              If you have any questions during
6          that time, you can ask them to the
7          bailiff, who will be in here next week,
8          or Mary Ann, the Court Reporter, or the
9          Judge, but we're not allowed to talk to
10         you.  It could result in a mistrial.  I
11         want you to understand that.  I
12         understand that you get, you read the
13         Warren Tribune and the Youngstown
14         Vindicator, right?
15    A.   I wrote that.
16    Q.   You read the front page?
17    A.   Okay.
18    Q.   The Defendant here is charged with a number of
19         crimes.  She's charged with two counts of
20         aggravated murder with death penalty
21         specifications and she's charged with
22         aggravated burglary and aggravated
```

972

1                    robbery with firearm specifications

2                    attached.  The word "specification," it

3                    is just a fancy word that means a special

4                    finding of fact for a Jury to consider.

5                    So, basically, she's charged with being

6                    part of a plan to kill her ex-husband, a

7                    guy named Robert Fingerhut.  And that she

8                    planned with a fellow by the name of Nate

9                    Jackson, to kill her ex-husband for the

10                   insurance money and stole a car.  And

11                   that this Nate Jackson broke into a house

12                   and committed an aggravated burglary and

13                   aggravated robbery, as well as the

14                   aggravated murder in this case.  Does

15                   that ring a bell at all?

16   A.   No.

17   Q.   It may well be, because you read the

18        Vindicator every day?

19   A.   No, Sir.  I wrote on there rarely.  Hardly

20        ever.

21   Q.   But it may well be on those times where you

22        did read it, when you say rarely, how

973

1          often is rarely?

2    A.   I never read the whole front page.  I'm not

3          from this area.  If I see a name I have

4          heard of, I might read something about

5          that, but I have never read the whole

6          front page.  I have only read about names

7          I have heard of, and that may be six

8          times a year at the most.

9    Q.   That really is rarely.

10   A.   I don't know people really in this area.

11   Q.   Do you pay very close attention to the crime

12          news in the paper at all or on T.V. or

13          radio?

14   A.   No, Sir, but I do try to listen to news every

15          day, but I work afternoons at work.  A

16          lot of times by the time I get to the

17          news, they already gave the top story, so

18          I catch whatever I can.

19   Q.   People at work talk about the different crimes

20          in the news?

21   A.   If it is somebody who used to work there, that

22          is the only things they bring out.

974

1  Q.    The reason we go through these questions about

2            pre-trial publicity is because as you

3            look around the Courtroom now, there's

4            nobody here from the news media.

5            Occasionally during the course of the

6            trial, you see cameras come in and you

7            see some reporters come in and they may

8            stay for a few minutes, then they write a

9            story, and what is in the paper is based

10           on a couple of minutes here and they miss

11           everything that went on before that and

12           everything that went on after that.  So,

13           if you sit on this Jury, you may have

14           somebody save all of the papers for you

15           and read it afterward, and you will say,

16           "Gosh, I sat through that whole trial and

17           that reporter, it was like they were in a

18           different Courtroom.  I sat in Judge

19           Stuard's Courtroom and it was like they

20           were in Judge McKay's Courtroom.  Because

21           it certainly doesn't reflect what I

22           remember on this case."  Because of that

975

```
 1              possibility for error and on the part of
 2              the newspapers and the media, the Judge
 3              is going to instruct you not to read the
 4              papers or listen to T.V. about this case.
 5   A.  Sure.
 6   Q.  Or talk to anybody else.  You will get all of
 7              your knowledge firsthand from inside this
 8              Courtroom.
 9   A.  All right.
10   Q.  Now, the next area that we're going to talk
11              about is your view of the death penalty
12              as a possible punishment.  I understand
13              you don't favor the death penalty as a
14              punishment?
15   A.  Not as a rule, no.  I really don't know that
16              much about law things, and I have never
17              heard all of the facts in any case ever.
18              So I wouldn't have anything to base
19              whether it is something that should be
20              done or not, because I have never had all
21              of the facts on any case.
22   Q.  Now, I understand from your questionnaire you
```

976

```
 1                  are a very religious person.  You have

 2                  worked as a missionary?

 3     A.   Yes.

 4     Q.   Where have you worked as a missionary?

 5     A.   In the Church of God in Christ.  You take a

 6                  task and I am a missionary, but I haven't

 7                  been overseas or anything like that.

 8                  Just going different places and helping

 9                  people.

10     Q.   Is there anything in your religious beliefs

11                  that prohibits imposing the death penalty

12                  as a punishment?

13     A.   No one has ever told me if there is.

14     Q.   How do you feel personally about it?

15     A.   Personally I don't feel -- I don't know.  I

16                  don't think that it serves as much of a

17                  benefit to the person as if they had to

18                  live with their mistake or whatever, but

19                  I don't know.  I'm sure -- I was thinking

20                  about, what is it called, death row and

21                  sometimes people are on that for so many

22                  years.  I guess a person would still be
```

977

1        able to consider what they had done.  I'm

2        sure there are cases where it is

3        necessary, but I don't know.  I can't say

4        definitely if I knew more about it, and

5        if there's certain crimes that

6        automatically go with it, I don't know.

7   Q.   There's no automatic death penalty?

8   A.   Okay.

9   Q.   Each case is different, and that is why the

10       legislature in Ohio has set up a special

11       procedure and set up trials to be in two

12       different phases.  It is like two

13       separate trials.  The first phase of the

14       trial deals with the issue of guilt or

15       non-guilt, whether the Defendant, whether

16       the State can prove the Defendant guilty

17       of this crime of aggravated murder with a

18       death penalty specification.  And if we

19       do -- if we do, if we can convince you

20       and the other 11 jurors that the

21       Defendant did what she's charged with

22       doing, these elements of the crime

978

1    charged that were talked about beyond a

2    reasonable doubt, so that you are firmly

3    convinced of the truth of the charge to a

4    moral certainty, then we would go on to a

5    second phase.  And in a second phase, the

6    issue would be different.  It wouldn't be

7    guilt or non-guilt.  Because you would

8    have already decided guilt.  You would

9    have decided the Defendant did do what

10   she's charged with, and so the issue in

11   the second phase would be what is the

12   appropriate punishment for this Defendant

13   for these crimes, or for this crime of

14   aggravated murder, with the death penalty

15   specification.

16        And then you have four different

17   choices.  There's the first choice is the

18   death penalty.  And if -- and there's a

19   balancing test that would have to be

20   performed.  You have read that handout

21   downstairs?

22   A.    Right.

979

1   Q.   And they talked about a balancing test, I

2        believe on there a little bit, and what

3        you would have to do is you would have to

4        balance in the second phase, the

5        aggravating circumstance, that the State

6        would have to prove by proof beyond a

7        reasonable doubt that this aggravating

8        circumstance or aggravating

9        circumstances, outweigh any mitigating

10       factors presented by, on the Defendant's

11       behalf.  Mitigating factors are things

12       that would work against the death penalty

13       and in favor of the Defendant.

14  A.   Okay.

15  Q.   I can't tell you what they are at this point,

16       because we don't know.  It is not

17       relevant at this point.  We're jumping

18       the gun so to speak, but these are things

19       that can be brought on on behalf of the

20       Defendant.  And if the State proves the

21       Defendant, that the aggravating

22       circumstance or circumstances outweigh

980

1           the mitigating factors by proof beyond a

2           reasonable doubt, then you must return a

3           death penalty verdict.  You understand

4           that?

5    A.   Yes, okay.

6    Q.   Would you have any problem with that?

7    A.   No, Sir.

8    Q.   On the other hand --

9    A.   When I read that, I didn't understand it to

10          say what you just said just now.  You

11          broke it down better for me.

12   Q.   Now let's say the State doesn't convince you

13          beyond a reasonable doubt, that the

14          aggravating circumstance or aggravating

15          circumstances outweigh these mitigating

16          factors beyond a reasonable doubt.  In

17          that event, you would go on to consider

18          one of three life sentences; one of those

19          sentences is life in prison without any

20          possibility of parole.  The next

21          possibility is the sentence of life in

22          prison with parole eligibility after 30

981

1            full years, and the fourth option is life

2            in prison with parole eligibility after

3            25 full years.  So those would be the

4            options that you have to consider.  But

5            you wouldn't get to the life sentences if

6            you found that we proved the aggravating

7            circumstances outweighs the mitigating

8            factors beyond a reasonable doubt.  It is

9            not an automatic death penalty if you

10           find the Defendant guilty in phase one.

11   A.   All right.

12   Q.   Guilty of the crime with a specification.  You

13           haven't heard anything in the Defendant's

14           favor until you get to the second phase,

15           right?

16   A.   Okay, yes, Sir, I understand.

17   Q.   In the first phase, the evidence is all geared

18           towards guilt or non-guilt, did she do it

19           or not.  Can we prove it?  And in the

20           second phase, you have already decided

21           the guilt, you are looking at what is the

22           right punishment.

982

1    A.   Okay.

2    Q.   Now, I understand as an LPN, you are working

3           saving lives, right?  You care for them

4           and saving lives?

5    A.   Yes.

6    Q.   And do you have any problem considering the

7           death penalty as a punishment?  It is so

8           different than what you usually do.  You

9           usually work to save a life and in the

10          church you are working to save a life,

11          but here you are being asked to consider

12          the taking of a life.  Does that cause

13          conflict for you?

14    A.   I have never had to do it before, and I don't

15          know -- I'm not saying I wouldn't be able

16          to do it, I'm just saying that I would

17          have to.  Everything would have to be

18          weighed out, and you said that with the

19          death penalty, there would have to be no

20          mitigating.

21    Q.   It is a balancing test with the death penalty.

22          There may be mitigating factors

983

1    presented.  And then you would have to

2    look at those mitigating factors and you

3    have to look at the aggravating

4    circumstances.  The aggravating

5    circumstances here that are charged are

6    that at least there are two

7    specifications of aggravating

8    circumstances that are attached to each

9    of the counts of aggravated murder.

10   And again, there's only one killing,

11   but the State is allowed to proceed on

12   two theories of that killing.  That is

13   why we have two counts.  Two separate

14   charges of aggravated murder.  One of

15   these counts of aggravated murder

16   charges, that it was a purposeful

17   killing, with prior calculation and

18   design.

19   The other count of aggravated murder

20   charges the killing was done purposely in

21   the course of a felony murder, and it

22   occurred during the course of an

984

1          aggravated robbery and/or aggravated

2          burglary.  So two separate types of

3          aggravated murders that are charged.  Is

4          that clear?

5     A.   For me, I have no idea --

6     Q.   What I said?

7     A.   Not what you said, about the case period.

8          When you are saying the aggravated

9          robbery.

10    Q.   Aggravated robbery and aggravated burglary and

11         the Judge is going to define these terms

12         for you at the end of the case.  But

13         basically folks are sometimes confused by

14         these terms of aggravated burglary and

15         aggravated robbery.  They use them

16         interchangeably.  They have a different

17         meaning in the law.

18              Aggravated burglary is when somebody

19         trespasses in an occupied structure like

20         a dwelling house, and there's somebody

21         inside and the person comes in with the

22         purpose to commit some kind of crime

985

```
 1              inside, and seriously hurts the person or
 2              kills them, and they are armed with a
 3              weapon, let's say like a gun.
 4                   An aggravated robbery would be, on
 5              the other hand, it doesn't involve
 6              necessarily a house or any type of
 7              structures.  It involves the use of force
 8              or threat by another person to commit
 9              some kind of crime, maybe a theft
10              offense, and they have a weapon, and they
11              seriously hurt somebody in the course of
12              doing that of stealing the property.
13    A.   In order for the term aggravated to be in
14              front there has to be a weapon; is that
15              what you are saying?
16    Q.   Not necessarily a weapon.  We have robbery,
17              then we have aggravated robbery.  But the
18              Judge will define those terms, and
19              burglary and aggravated burglary.  And
20              then there's a little type of burglary
21              called breaking and entering.
22                   We have all of these magic terms in
```

986

1          the law and each one has certain

2          elements, like the ingredients in a

3          recipe, for each of these.  We have all

4          of these different kinds of cakes that

5          we're going to bake.  Now, with these

6          aggravated circumstances, that the first

7          specification of an aggravating

8          circumstance attached to the aggravated

9          murder charges, is the aggravating

10         circumstance of an aggravated burglary,

11         that the aggravated murder was committed

12         during the course of an aggravated

13         burglary, breaking into the house with

14         the other parts of the crime, and that

15         the Defendant committed the aggravated

16         murder with prior calculation and design.

17         We used to have a term called

18         premeditation in the law, and they

19         changed that, so it requires some

20         planning and forethought in committing

21         the crime of the aggravated murder.

22              There's a second specification that

987

1          the aggravated murder was committed

2          during an aggravated robbery, as opposed

3          to the aggravated burglary, and the

4          Defendant committed the aggravated murder

5          with prior calculation and design.  So we

6          have these specifications, and you had

7          asked about what happens -- these

8          mitigating factors, so let's say on one

9          side of the scale, we have got these

10         aggravating circumstances.  Let's say you

11         and the other jurors have come back

12         finding the Defendant guilty of having,

13         being guilty of the crime of aggravated

14         murder, and one or more of these

15         specifications of aggravating

16         circumstances.  And there they are on one

17         side of the scale.  On the other side of

18         the scale, the Defendant has an

19         opportunity to present evidence of

20         mitigating factors.  Things that work in

21         a Defendant's favor.  And then, it

22         doesn't matter how many of these things

988

1    there are, it is up to you and the other

2    jurors to determine how much weight you

3    wanted to give each of these mitigating

4    factors and how much weight you want to

5    give the aggravating circumstance or

6    circumstances.  That is entirely up to

7    you, how much weight to give.

8        And then you are asked to do this

9    mental balancing test.  And if you find

10   that the aggravating circumstance or

11   circumstances outweigh these mitigating

12   factors beyond any reasonable doubt, then

13   you have got to come back with a death

14   penalty verdict.  If you and the other

15   jurors decide that these mitigating

16   factors, that the aggravating

17   circumstances, don't outweigh these

18   mitigating factors by proof beyond a

19   reasonable doubt, then you have got to

20   come back with one of the life verdicts.

21   And it is up to you, which verdict you

22   think is appropriate for this Defendant.

989

1   A.    Yes, Sir.

2   Q.    If I'm not making it really clear, you stop me

3         and I'll try to explain it a little

4         better.

5   A.    It is clear.

6   Q.    Now, so you understand, you may be called upon

7         to do this balancing test if we get to

8         the second phase.  Now, the Defendant is

9         charged here with these crimes, but she's

10        charged as a complicitor.  A Complicitor

11        is somebody who solicits or procures

12        another person or aids and abets another

13        person in committing a crime.  You are

14        going to find that these crimes were

15        actually committed by a fellow by the

16        name of Nate Jackson.  He's the one who

17        really did the killing.  He's the one

18        that committed the aggravated burglary

19        and the aggravated robbery.  He's the guy

20        that had the gun.  And the Defendant is

21        charged not as a trigger man, but rather

22        as an complicitor, somebody who helped

990

1           him, encouraged him, planned with him, to

2           commit this killing, and these other

3           crimes.  Is there anything about that

4           that bothers you?

5    A.     You are saying the other, the gentleman that

6           you mentioned, that has already been

7           proven.  That is already a case that is

8           done?

9    Q.     That is all done.

10   A.     I didn't know.  Okay.

11   Q.     This case stands on its own.  Each case stands

12          on its own, and you have got to consider

13          whatever evidence is presented in this

14          Courtroom.  We're starting with a clean

15          slate.  It is like going back to school,

16          you have got a chalkboard up there and

17          whatever is going to be written on that

18          chalkboard is going to be right here by

19          the witnesses, the physical evidence that

20          comes in and the instructions given to

21          you by Judge Stuard.  You can't consider

22          anything else outside this Courtroom from

991

```
 1                 any other trial or anything else.

 2     A.   That is why I was wondering why his name was

 3               brought up.   If I'm not supposed to pay

 4               attention to anything like that.

 5     Q.   Whatever is presented is going to be presented

 6               in this Courtroom.

 7     A.   Okay.

 8     Q.   You may hear about some other proceedings or

 9               things, but you are going to have to make

10               your decision based on only what happens

11               here, to give both sides a fair shake in

12               this trial, both the people of the State

13               and the Defendant.

14     A.   Yes, Sir.

15     Q.   Now, we talk about proof.   Well, you

16               understand the burden of proving these

17               elements of the crime are on us, the

18               people of the State.   The Defendant

19               doesn't have any burden of proof.   The

20               burden of proof is totally on us.   And

21               each crime is composed of certain

22               elements.   It is like the ingredients in
```

992

1          a recipe that I mentioned.  I take it you

2          bake?

3  A.   Yes.

4  Q.   And let's say you are going to bake a cake.

5          What is your favorite cake?

6  A.   Carrot cake with pineapple.

7  Q.   Let's say you are going to make a carrot cake

8          with pineapple.  You have got all of your

9          ingredients, you have eggs and flour and

10          your pineapple and carrots and whatever.

11          You grind them up.

12  A.   Grate them up.

13  Q.   And you are going to bake it.  If you leave

14          out one of those ingredients, if you

15          leave out the carrots, you are going to

16          have a cake, but it is not going to be a

17          carrot cake with pineapple, is it?

18  A.   That is right, no, Sir.

19  Q.   Just like the ingredients, just like these

20          recipes, we have got the same thing with

21          the crimes, we have got to prove certain

22          key ingredients.  We call these key

993

1    ingredients, elements.

2         Let me give you a for instance and

3    the Judge is going to instruct you at the

4    end of this case on the law, as to what

5    those elements are and you have got to

6    follow the law.  With the crime of

7    aggravated murder with prior calculation

8    and design, the State is going to have to

9    show for instance, it happened on or

10   about a certain date, on December 11,

11   2001.

12        Another element might be, it

13   happened here in Trumbull County, Ohio.

14   So we can try this case in this Courtroom

15   rather than in Cuyahoga County or down in

16   Mahoning County.

17        Third element would be

18   identification.  That the person who

19   committed this crime is the person who is

20   sitting at that table.  Somebody will

21   have to come in and point her out and not

22   somebody else as complicitor.

994

1           Fourth, that she acted purposely, on

2       purpose, and the Judge will give you

3       detailed instruction as to purpose at the

4       end of this case.

5           Fifth, that she caused the death of

6       Robert Fingerhut.  A living person.

7           And six, that she acted with prior

8       calculation and design.  Those are, those

9       might be the ingredients of that

10      particular crime.  Now if we leave out

11      one of those ingredients, then you got to

12      find the Defendant not guilty of that

13      crime.  But if we do prove all of the

14      elements of that crime to your

15      satisfaction, so that you are firmly

16      convinced of the truth of the charge to a

17      moral certainty, using your reason and

18      your common sense because that is the

19      test that is used, and you are used to

20      using reason and common sense?

21  A.   Yes, I have to at work.

22  Q.   You have to use it at work?

995

1   A.    And in life.

2   Q.    Then, if you find the Defendant guilty, if we

3         prove it to your satisfaction, then you

4         have got to find her guilty of that

5         crime.  The same thing is true with these

6         specifications and the other charges.

7         Now, there are different ways to prove

8         these elements of the crime.  One of

9         these ways is by direct evidence.  And

10        that is where a person could come in and

11        testify to what he or she is learning

12        through the use of their five senses.

13              For instance, "I saw the blood and

14        it was red," or "I heard the gunshot, and

15        it was loud," or "I smelled the smoke and

16        it was acrid," or "I touched the body and

17        it was cold."  That is one type of

18        evidence.  But I think you would agree

19        that when we have serious crimes, most

20        serious crimes aren't committed in public

21        with a whole lot of people around, when

22        people plan serious crimes -- crimes of

996

1          murder.  Those are usually done secretly,

2          where people are sneaking around or

3          talking outside of the hearing of other

4          people.

5             So, you ask yourself, how do you

6          prove what a person intended?  You look

7          at their actions, and sometimes, you may

8          look at things like maybe letters that a

9          person has written or phone calls, if you

10         got them, right?

11  A.  Right.

12  Q.  To see what the person said about what they

13         were planning to do.  And we call this --

14         there may be circumstantial evidence.

15         Have you heard that term before?

16  A.  Yes, Sir, I have.

17  Q.  Have you heard it in a bad context, somebody

18         saying it is only circumstantial

19         evidence?

20  A.  I heard it like on Perry Mason.

21  Q.  Good old T.V. show.  I used to watch all of

22         those.  But in those Perry Mason shows,

997

1        it gave a sort of a distorted view of

2        criminal law, because people would jump

3        up, come in from the back of the

4        Courtroom and say, "I did it," or

5        something like that.  In real life, that

6        doesn't happen, all right?  But

7        circumstantial evidence, it is where you

8        are given a fact or set of facts and then

9        you are asked to use your reason and

10       common sense and draw a logical deduction

11       to another fact or a set of facts.

12           For example, let's say you will go

13       to bed at night and you live in a two

14       story house and you look out across the

15       neighborhood before you go to sleep and

16       you look out and it is a beautiful night

17       outside, the moon is beaming, the stars

18       are twinkling, not a cloud in the sky.

19       You draw the blinds and just before you

20       go to sleep, you are listening to the

21       radio and the weatherman comes on and

22       says, you know, "We have got a cold front

998

1     coming in.  There's going to be a storm

2     tonight."  So, you fall asleep and

3     sometime during the night, you are

4     awakened by a distant booming sound and

5     you look toward the window and even

6     though the blinds are drawn you can see

7     flashes of light coming from outside.

8     And after each flash, a couple of seconds

9     later there's a distant boom, and all of

10    a sudden, there's a big flash like it is

11    right outside and the big boom right over

12    the house and a pitter patter on the roof

13    and heavy drumming.  And you fall back

14    asleep and you wake up sometime later,

15    you go to the window and open the blinds,

16    and the sun is shining, not a cloud in

17    the sky.  But the streets are running

18    with water.  There are drops of water

19    dripping off leaves of the trees.  The

20    rooftops across the way are all wet and

21    there's no fire plug nearby where some

22    car could have hit it and squirted water

999

1              all over the place.  You know what

2              happened during the night, don't you?

3              What happened?

4    A.    A storm.

5    Q.    And you know that beyond any reasonable doubt,

6              right?

7    A.    Yes.

8    Q.    Your reason and common sense says, "Hey, there

9              was a thunder storm."  There's room in

10             there for some possible or imaginary

11             doubt, isn't there?  You can imagine that

12             ET and his Martian buddies flew by in a

13             flying saucer overnight, and put on a

14             light show and sprinkled some wet stuff.

15             That would be an imaginary doubt,

16             wouldn't it?

17   A.    Yes.

18   Q.    You know that all that happened was a thunder

19             storm.  That is circumstantial evidence.

20             And you can use circumstantial evidence

21             as well as direct evidence to return a

22             guilty verdict if you believe that it

1000

1           proves the elements of the crime charged

2           by proof beyond a reasonable doubt.  You

3           understand that?

4  A.   Yes.

5  Q.   You think you can do that?

6  A.   Yes, Sir.  I never heard it like that.

7  Q.   That is different from Perry Mason?

8  A.   Very.

9  Q.   Now, do you have any questions that about what

10           we're doing, because this is one chance

11           we get to have some give and take.  If

12           you have questions about our proceedings,

13           feel free to ask them at this point, as

14           long as it pertains to what we're doing.

15  A.   I didn't know before I came that, before I

16           came in this room, and may have been said

17           the other day, the first day, I was

18           trying to hear everything, but I heard

19           you say, sometimes we'll listen, today I

20           heard, I heard you say that she didn't

21           actually do the crime.

22  Q.   She didn't pull the trigger.  She's charged

1001

```
 1              with what we call a complicitor, somebody

 2              who solicited or procured another person,

 3              aided and abetted him, strengthened him,

 4              encouraged him to commit the crime.

 5                   MR. INGRAM:   I respectfully object

 6    to the assertion that she's involved.   She's

 7    allegedly involved.

 8    BY MR. BAILEY:

 9    Q.   That is a charge, she's charged with allegedly

10              being involved.

11    A.   You are saying the death penalty can apply to

12              a complicitor?

13    Q.   As long as we prove the elements of the crime

14              and the specifications.

15    A.   Okay.

16    Q.   So the death penalty occurs only -- can be

17              applied only, it is a possible penalty

18              only if we prove the crime of aggravated

19              murder and the specification that I

20              mentioned.   One of those two

21              specifications of aggravating

22              circumstances, and that she's a
```

1002

1      complicitor, that she purposely engaged

2      with prior calculation and design in this

3      killing.

4   A.   Okay.

5   Q.   Now, because crimes are committed in secret, I

6        think you would agree that all criminals

7        aren't the brightest people in the world.

8        They are not rocket scientists.  For

9        example, you have heard on T.V. or radio

10       or read where a criminal has gone in a

11       bank to rob it and handed over an

12       envelope with a holdup note written on

13       it, and then he leaves with the money and

14       well, they turn the envelope over, it has

15       got his name and address on it, because

16       it was sent to him; or a burglar who

17       breaks into the house and he left his

18       wallet behind at the scene of the crime.

19  A.   No.

20  Q.   Or the criminal who goes into the bank to

21       commit the crime and he's not wearing a

22       mask and they catch him on the video

1003

1    cameras and then they publish his picture

2    everywhere.  All criminals aren't the

3    brightest people, right?

4    A.    No.

5    Q.    And they get caught sometimes because of that.

6          Now I notice you had written on your

7          questionnaire about innocent people being

8          found guilty.  Have you experienced any

9          actual cases of that?

10   A.    No, not of anyone that I know personally, but

11         I am from Columbus, Ohio and there was a

12         doctor years ago and he was in prison for

13         like 11 years, and then they found this

14         person that looked just identical to him,

15         I don't know how many years later, right

16         after that, then he was freed and that is

17         the only case I really know of.

18   Q.    That would have been a terrible injustice for

19         that person?

20   A.    Right.

21   Q.    The other people, you think that all people

22         who are convicted of crimes are

1004

1    wrongfully convicted?

2    A.   I think I have wrote on that, that thank God

3         it rarely happens, and it does.  It

4         rarely happens.  I certainly don't think

5         that all people are wrongfully charged.

6    Q.   Do you think that your concern about that

7         doctor, or any other cases that you might

8         have read or heard about, would affect

9         your ability to render a guilty verdict

10        in this case if we can prove to you, the

11        Defendant is guilty of the crime charged?

12   A.   No.

13   Q.   You said that you had taken a position against

14        the death penalty in the past.  When was

15        that?

16   A.   I think the question prior to that or

17        somewhere in there asks if there was ever

18        a discussion with a person, just in

19        talking, I don't know who I was talking

20        to.  I was probably in Columbus and I

21        know people have asked different times,

22        "What do you think?"  It might have been

1005

1    on my job or whatever.  I certainly, I

2    would not agree to a death penalty

3    without the facts.  I have never had the

4    facts in any situation.  I only had like

5    one person's point of view, so I think it

6    makes a difference when you have all of

7    the facts.

8  Q.  Let's say you had all of the facts.  For what

9    type of crime do you think the death

10   penalty might be an appropriate penalty?

11 A.  If I could say the first thing to my mind,

12   President Saddam Hussain, or somebody

13   like I guess a person who kills like

14   multiple people, but you still have to

15   have all of the facts.  I would have to

16   just automatically say because they

17   killed ten people, and this person only

18   killed one, a life is a life.  I would

19   need the facts still.

20 Q.  And when you say you need the facts --

21 A.  I still am not certain of all of the terms

22   used, like mitigating factors and

1006

1     circumstantial evidence.

2  Q.  Aggravating circumstances.

3  A.  All of that.  Not just a blanket thing if

4     somebody killed ten people, they should

5     die, I don't think that.

6  Q.  That's the way the law is written in the State

7     of Ohio, if you come back with a guilty

8     verdict in the first phase finding the

9     Defendant guilty of aggravated murder

10    with one of those specifications, you

11    understand the death penalty is not an

12    automatic punishment?

13 A.  Yes.

14 Q.  Because you wouldn't have heard anything about

15    mitigating factors.  And you wouldn't

16    have anything to balance at that point.

17    And it is only after you hear the second

18    phase of the trial, where there would be

19    facts that could be presented in favor of

20    the Defendant against the death penalty,

21    that you would be able to vote.  You

22    understand that?

1007

1    A.    Yes.

2    Q.    You had indicated on your questionnaire, you

3          said if a person says they are innocent,

4          I believe them.  Would that, is that a

5          religious belief or personal belief?

6    A.    All of my life.  I just have believed in

7          people.  If a person says they didn't do

8          it, I just believed them, but I never had

9          but one side of the story, either.

10   Q.    Let's say you are going to be on this Jury.

11         You are called upon to judge the

12         credibility of witnesses.  The Judge will

13         instruct you as to the test that you are

14         going to use, but it is the same test

15         that you use in your every day life.  You

16         have raised kids?

17   A.    Yes.

18   Q.    And there are times where your kids have come

19         in and said, "I didn't do it," but you

20         knew they did it, right?

21   A.    Yes.

22   Q.    You could tell by the way they were acting and

1008

1   all of the evidence around, to either

2   what you saw with your own eyes or the

3   circumstantial evidence that was there,

4   maybe breaking a vase or something like

5   that or a lamp, or taking something that

6   wasn't there's or something like that.

7   The things that kids do, because we raise

8   kids and it is part of growing up?

9   A.   Right.

10  Q.   So, like how would you know if your son wasn't

11       telling you the truth?

12  A.   Because my son is the only one I had a problem

13       with.  I never had problems with my

14       daughters.  He really didn't not tell the

15       truth, but I would end up at these places

16       and I would have to answer for him.  I'm

17       trying to think if it would be the way he

18       looked.  He would looked ashamed.  He

19       wouldn't look me in the eye.  He wouldn't

20       say he didn't do it or did do it.  He

21       wouldn't look me in the eye and just have

22       his head down.

1009

1  Q.  You knew he did it?

2  A.  I knew he did it.

3  Q.  Like at work, you can tell if somebody is

4      telling you the truth or not at work?

5  A.  Yes.

6  Q.  If something, if you are asking him about

7      something.  And it is the same test that

8      you use in your every day life to

9      determine the test of the believability

10     of the witnesses who are going to

11     testify.  I take it you are not going to

12     believe everything a witness says

13     automatically, just because a witness

14     says something happened and because they

15     are under oath?

16 A.  No, I'm not.

17 Q.  You understand you can believe all of what a

18     witness says, some of what a witness

19     says, or none of what a witness says.

20     But it is up to you and the other jurors

21     to decide if they were telling the truth.

22 A.  Okay.

1010

1    Q.   And that is something you are going to be

2         asked to do probably.  If you hear from

3         witnesses if they are telling the truth

4         and how much you want to believe.  You

5         think you could do that?

6    A.   Yes, Sir, I could do that.

7    Q.   Now, you understand you can't go out to the

8         scene to investigate on your own.  This

9         happened out in Howland.  And the only

10        time you can go there is if you are

11        conducted on a view with the rest of the

12        jurors of the scene by the bailiff in the

13        custody of the bailiff.  But it would

14        cause a mistrial if you were to go out

15        and do an investigation on your own.

16             Sometimes in the movies, they have

17        jurors going out and investigating, maybe

18        Perry Mason, but that is a big no-no.

19        You can't do that.  We had a case where

20        that happened, you and just can't do that

21        because it would cause a mistrial.

22   A.   Okay.

1011

1  Q.    Now, during the course of the trial, you are

2        going to be face to face with the

3        Defendant and perhaps during the course

4        of the trial as her chair is turned

5        towards you, you are going to become more

6        acquainted with her.  My question to you

7        is this.  When you go inside the Jury

8        room to deliberate on your verdict, can

9        you set aside all thoughts you might have

10       of sympathy for this Defendant, and base

11       your deliberations and your verdict on

12       the testimony that you hear from the

13       witnesses, the physical Exhibits that are

14       admitted, and the instructions of law

15       given to you by the Judge, and lay aside

16       all thoughts of sympathy for this

17       Defendant whatsoever?  Can you do that?

18  A.    I can do that.

19  Q.    It is only natural to feel sympathy for

20       people, but we have to set that aside

21       when we're considering something in a

22       Court of law?

1012

1   A.   Yes, Sir, I can do that.

2   Q.   Now there's going to come a time at the end of

3        the first phase, where the Jury is going

4        to go out to deliberate and you are going

5        to be sequestered.  That means you are

6        not allowed to go home.  You are put up

7        at the hotel like the Judge says, if it

8        takes that long, and each Jury is

9        different.  Some Juries may take a couple

10       of hours, some Juries may take a couple

11       of days or a week.  You will take as long

12       as necessary to deliberate to reach a

13       verdict.

14  A.   Yes, Sir.

15  Q.   Let's say you and the other jurors reach a

16       verdict of guilty of aggravated murder

17       with one or more of these specifications

18       in the first phase.  We go on to a second

19       phase.  You would go home in between, and

20       then we would come back from like a

21       second trial dealing with this issue of

22       punishment.  And then you would hear

1013

1    testimony, and then you would go out to
2    deliberate again and you would be
3    sequestered for a second time.  And
4    again, it is up to the Jury to determine
5    how long you are going to be out
6    deliberating.  Would that cause any
7    inconvenience for you?
8    A.    No.
9    Q.    Are there any other pressing matters at home
10         or work that you think are going to
11         affect your ability to concentrate on the
12         evidence here?
13   A.    None.
14   Q.    Would you agree that serving on a Jury is one
15         of the obligations of citizenship in this
16         country, to make our system work?
17   A.    Yes, Sir.
18   Q.    You understand we have certain obligations as
19         citizens, if it is election time, we're
20         called upon to vote if we can, to go out
21         and learn as much as we can on the issues
22         and the candidates and cast a ballot.

1014

```
 1              Another obligation is war time.  We may
 2              be called to serve in the military, we
 3              have got young people overseas in a
 4              couple of countries today serving in war,
 5              as an obligation of citizenship.  And
 6              this other obligation is if we're
 7              summoned in as jurors, if we're able to
 8              serve, it is important that we have
 9              people come from all walks of life in the
10              community to serve on a Jury.  Will you
11              be willing to undertake that obligation
12              of citizenship?
13    A.    As being --
14    Q.    A juror?
15    A.    Yes.
16    Q.    It is a difficult thing when we ask you to
17              consider whether a -- to consider whether
18              a person is guilty of an aggravated
19              murder with these specifications, and it
20              is even more difficult when we ask you to
21              consider the death penalty as a possible
22              punishment, because the death penalty is
```

1015

1    not applied in all cases of homicide.  It

2    is in certain cases sought out by the

3    legislature where it becomes a possible

4    penalty.  Do you think that you would be

5    able to live up to that obligation, and

6    return a verdict that is properly based

7    on the evidence?

8  A.    Based on the evidence, yes, Sir.

9  Q.    Any questions you have for me at this point?

10 A.    No, I don't.

11          MR. BAILEY:  Thank you for your

12 candid answers and the Defense Attorneys will have

13 an opportunity to address you.

14 (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

15 OF HEARING)

16          THE COURT:  How long did you have to

17 wait today?  Were you downstairs all afternoon?

18          MS. HOWARD:  Since 1:30.

19          THE COURT:  We're going to have you

20 come back on Monday morning because you are only

21 half done.  We'll commence at 9:00 on Monday, and

22 probably take about another 45 minutes to an hour

1016

1 and you will be done. We thank you for your

2 attendance today.

3 (Juror No. 20 excused from the Courtroom.)

4          MR. BAILEY: On the record, we have

5 got one thing we have to put on. I talked to my

6 boss and that we had an offer that was out. We're

7 going to hold that open until Monday morning, then

8 we're going to revoke it. We'll probably keep

9 another offer open with consecutive time after

10 that, but we have a deadline on our current offer.

11          MR. INGRAM: I don't know why you

12 had to put that on the record, but it's on record.

13 Now Mr. Bailey has chosen to go on the record, I

14 believe it is improper for him to Voir Dire jurors

15 on the fact that a Defendant in another case has

16 been convicted. If it comes up of its own, that is

17 one thing, but for the Prosecutor to tell a

18 prospective juror that another Defendant has been

19 convicted is improper.

20          MR. BAILEY: I don't think I used

21 the term convicted. The case was disposed of.

22          MR. INGRAM: How about found guilty?

1017

1       MR. BAILEY:   I thought I said the

2   case was disposed of.

3       THE COURT:   It is a question of what

4   relevancy it has at this point in this case at all.

5   It is a fact that there's a co-defendant, and that

6   is going to come up at some point in time on the

7   Prosecution's case.  I guess it is more the form,

8   you can argue semantics on the thing.  What is your

9   preference for the Defense on any reference to

10  that?

11      MR. INGRAM:   If a juror brings it

12  up, then we simply have to deal with it to the

13  extent that we affirmatively either one of us bring

14  up that case, it is something that I guess has to

15  be proven just like anything else.

16      THE COURT:   The point is, I am

17  rather surprised we have had two of these people

18  that said they didn't know anything about the case.

19  I tend to believe them, but in questioning those

20  who do have some prior knowledge of it, I don't

21  know how you avoid the prior conviction.

22      MR. INGRAM:   Neither do I.

1018

1        THE COURT:  I agree with you, it

2    should not gratuitously be brought up by the

3    Prosecution.  There's no point to that, but I think

4    that it is something that is going to be an

5    integral part of the Voir Dire to some degree or

6    another.

7        MR. INGRAM:  I agree with you, but

8    for this particular juror, it was not.

9        THE COURT:  She had no knowledge of

10    it.  I agree with that.  Mr. Bailey, you will act

11    accordingly, Sir?

12        MR. BAILEY:  Yes, Sir.

13        THE COURT:  You all have a nice

14    weekend.

15    (Court in recess at 4:35 p.m.)

16

17

18

19

20

21

22

1019

## REPORTER'S CERTIFICATE

I do hereby certify that the above and foregoing is a true and correct transcript of the proceedings had in the within hearing as shown by stenotype notes written by me in the presence of the witnesses at the time of the hearing.

_____

MARY ANN MILLS, R.P.R.
Official Court Reporter
Trumbull County, Ohio

1020

1   IN THE COURT OF COMMON PLEAS
    TRUMBULL COUNTY, OHIO
2   TRIAL COURT CASE NO. 01-CR-793
    SUPREME COURT OF OHIO CASE NO. 03-1441

3

4   STATE OF OHIO          )          VOLUME V
                           )
5          Plaintiff       )
                           )      INDIVIDUAL VOIR DIRE
6   -vs-                   )
                           )
7   DONNA M. ROBERTS       )
                           )
8          Defendant       )

9

10          BE IT REMEMBERED, that on Monday, April 14,

11   2003, these proceedings came on to be heard before

12   one of the Judges of this Court, John M. Stuard,

13   in Courtroom No. 2, on High Street, Warren, Ohio,

14   before the case heretofore filed herein.

15

16

17

18   Mary Ann Mills, RPR
     Official Court Reporter
19   Trumbull County, Ohio

20

21

22

```
                                                          1021
```

1

                    A P P E A R A N C E S

2

3

On Behalf of the State of Ohio:
4       Dennis Watkins, Prosecuting Attorney
        Charles L. Morrow, Ass't. Prosecuting Attorney
5       Christopher D. Becker, Ass't. Prosecuting Attorney
        Kenneth N. Bailey, Ass't. Prosecuting Attorney
6       160 High Street, N.W.
        Warren, OH 44481

7

On Behalf of the Defendant, Nathaniel Jackson:
8       Anthony V. Consoldane, Attorney at Law
        James F. Lewis, Attorney at Law
9       State of Ohio Public Defendant's Office
        328 Mahoning Avenue, N.W.
10      Warren, OH 44481

11   On Behalf of the Defendant, Donna M. Roberts:
        John B. Juhasz, Attorney at Law
12      J. Gerald Ingram, Attorney at Law
        7330 Market Street
13      Youngstown, OH 44512

14   On Behalf of The Vindicator Printing Co.
        Ann Millette, Attorney at Law
15      3200 National City Center
        1900 East Ninth Street
16      Cleveland, OH 44114

17   On Behalf of WFMJ Television, Inc.:
        Stephen T. Bolton, Attorney at Law
18      201 E. Commerce Street, Atrium Level Two
        Youngstown, Oh 44503

19

20

21

22

1
## I N D E X
2

3  VOLUME V:

4  (Monday, April 14, 2003)

5  Individual Voir Dire:

6  Maxine Howard (Continuing exam)      1023
   George Dermer                        1071
7  Douglas Jones                        1155
   Lisa Jaskowiak                       1171
8  Karen Tipton                         1172
   Walter Dawson                        1255
9

10

11

12

13

14

15

16

17

18

19

20

21

22

1022

1   Monday, April 14, 2003; In Open Court at 9:30 a.m.:

2              THE COURT:  You had something for

3   the record, John?

4              MR. JUHASZ:  On Friday, the State

5   did their examination of the prospective juror,

6   Miss Howard.  Mr. Bailey also mentioned on the

7   record at the end of the day that the plea bargain

8   offer, which had previously been made would be

9   revoked as of today.  Although Mr. Ingram and I

10  have had meetings with Miss Roberts.  He has asked

11  for permission to be excused from the questioning

12  this morning of Miss Howard, so he's back in the

13  Jury room going over some things with Miss Roberts.

14             In an effort to keeping things going

15  because Friday we had two jurors excused, so we

16  didn't make a lot of progress.  We would,

17  therefore, waive Miss Roberts' presence for the

18  purpose of examination of this juror and ask that

19  Mr. Ingram be excused for the same reason.

20             THE COURT:  Fine.  Any objection to

21  that?

22             MR. BAILEY:  No objection, Your

1023

1   Honor.

2                    THE COURT:   That motion is granted

3   then.   It has been requested by co-counsel,

4   Mr. Juhasz, that your presence and Miss Roberts' be

5   excused for this first -- for the next prospective

6   juror.   And just for the record, Miss Roberts, are

7   you in agreement with that?

8                    THE DEFENDANT:   Yes, Sir.

9                    THE COURT:   Thank you.

10                   MR. INGRAM:   We do request your

11  indulgence in that.

12                   THE COURT:   Sure.   No problem.

13  Thank you.

14  (Juror No. 20, Maxine Howard entered the Courtroom.)

15                   THE COURT:   For the record, this

16  witness of course has been -- or prospective juror

17  has been previously questioned by Mr. Bailey.

18  EXAMINATION BY MR. JUHASZ OF MS. HOWARD:

19  Q.   Good morning.   How are you?

20  A.   Fine.   Thank you.

21  Q.   Last Wednesday, Judge Stuard had all of us

22          introduce ourselves and my name is John

1024

1    Juhasz, one of the lawyers who is

2    representing Donna Roberts.  Because we

3    are, as the Judge says, we have kind of

4    run you around, there are sometimes more

5    than one thing going on at the same time.

6    So because of that, Mr. Ingram and Miss

7    Roberts are actually in another room

8    going over a couple of things.  They are

9    actually in Court, but not in the

10   Courtroom.  Did you get a chance to see

11   Miss Roberts the other day when you were

12   here or maybe last Wednesday when you

13   were first called?

14  A.   Yes, Sir.

15  Q.   I know that you told Mr. Bailey and the Court

16   on Friday that you had not read or heard

17   anything about the case.  Was there

18   anything about her face or figure that

19   looked familiar to you that sort of

20   brought anything back?

21  A.   No.

22  Q.   As far as you know, you know nothing about

1025

1        Miss Roberts or about any of the lawyers

2        or about the case whatsoever?

3  A.  No.

4  Q.  One of the reasons that we do this, that we

5        take the time to question jurors

6        individually is because this is a serious

7        case and everybody on all sides of the

8        case take the responsibility very

9        seriously.  It is a little bit like a job

10       interview, except that instead of you

11       applying for the job, we sort of sent you

12       an invitation called a Petit Jury

13       Summons.  And as you and I talk a little

14       bit this morning, if there's anything --

15       lawyers are accustomed to asking

16       questions, because we try to keep things

17       moving along, but I don't want you to let

18       me put any words in your mouth.  If

19       there's something that pops into your

20       head that you think we should talk about

21       relating to your willingness or ability

22       to serve as a juror, I want you to stop

1026

1   me so we can talk about.

2   A.   Sure.

3   Q.   Mr. Bailey told you on Friday that this is the

4        only chance during the whole case that we

5        actually get to talk to each other or

6        with each other, is the best way to say

7        it.  After that, the lawyers can only

8        talk to you, they can't listen to

9        anything from you.  If something comes

10       up, you will let us know?

11  A.   I will.  Something came up over the weekend.

12  Q.   Tell me about that.

13  A.   I know that I can't -- well, I won't say that

14       part.  I felt bad because I said

15       something on Friday that I don't believe

16       in, but it just came out.  The

17       Prosecutor, I don't remember everybody's

18       names yet, he asked me what crime did I

19       think deserved the death penalty, and I

20       said a name, and I was wrong in that,

21       because I don't know anything about him.

22       I said Saddam Hussein.  I don't believe

1027

1   that, because no one has put any evidence

2   in front of me about him and I'm sorry

3   that I said that.  I think his name was

4   just in my brain, but that wasn't the

5   question.  I was asked about a crime, I

6   don't know what his crime is and I gave

7   his name.  I just felt bad that I said

8   that, because I don't believe that,

9   because I don't know anything about him.

10   That is all.

11   Q.   I appreciate you telling us about that.  One

12        of the things that I sensed from your

13        answer on Friday is that, and again,

14        don't let me put words in your mouth, I

15        want to try to make this move along, is

16        that you are a person who doesn't

17        necessarily think the death penalty

18        accomplishes much, but we do it as part

19        of the law, and if you were going to vote

20        to impose it, you would want to be really

21        certain about the guilt of the person?

22   A.   Absolutely.

1028

1    Q.   And if I am reading you right, that is one of

2         the reasons why you now bring up

3         President Saddam Hussain.  Although

4         there's been coverage about what he's

5         supposed to have done, you yourself have

6         not heard any evidence?

7    A.   I have not.

8    Q.   Even though you are a person who generally has

9         the opinion that the death penalty

10        doesn't accomplish much and I think you

11        said on Friday that sometimes a life

12        sentence might be better because it gives

13        the person an opportunity to sit around

14        and think about their mistakes.  Am I

15        recounting what you said Friday

16        accurately?

17   A.   Yes.

18   Q.   But there are circumstances where if you felt

19        that the evidence warranted it, that is

20        if you were convinced about the person's

21        guilt in the first phase, you could

22        consider imposing the death penalty in

1029

1    the second phase, correct?

2  A.   Yes, Sir, I could.

3  Q.   Are you pretty clear on -- I am sort of

4       glossing over that, are you pretty clear

5       on what we do in the first phase and what

6       we do in the second phase?

7  A.   I'm not really clear.

8  Q.   Let's talk about that for a second.  The first

9       phase of a trial like this is really just

10      like any other criminal trial and we're

11      going to talk in a few minutes about the

12      burden of proof and things like that.

13      But it is like any other criminal trial.

14      That is, evidence has to be presented and

15      the Jury has to decide, did the State

16      prove that this person is guilty beyond a

17      reasonable doubt of what the State says

18      he or, in this case, she did.  In the

19      second phase, if you get that far, it is

20      more or less a sentencing type of phase

21      and so what you will be asked to weigh

22      and consider are on the one hand -- and

1030

1    I'm going to tell you the fancy names and
2    I'll tell you what they really mean for
3    people that aren't lawyers.

4         On the one hand, you are asked to
5    weigh what the law calls the aggravating
6    circumstances.  And that is just a fancy
7    lawyer name for reasons to consider
8    imposing the death penalty.  And you are
9    asked to weigh those against on the other
10   hand, what the law calls the mitigating
11   factors or the mitigation evidence, and
12   that is really things, reasons to
13   consider for not imposing the death
14   penalty.

15  A.  Okay.

16  Q.  So, even though we say fancy things like you
17   will be instructed at the second phase to
18   weigh the aggravating circumstances
19   against the mitigating factors and decide
20   if the aggravating circumstances outweigh
21   the mitigating factors by proof beyond a
22   reasonable doubt, that is stuff that

1    lawyers say.  What it really means is

2    that you are going to have to do -- is

3    you are going to have to take the reasons

4    that are given to you for considering

5    imposition of the death penalty, and

6    weigh them against reasons that are given

7    to you not to impose the death penalty.

8    And if you are firmly convinced that the

9    reasons to impose the death penalty

10   outweigh the reasons not to, then you

11   vote for death, otherwise then you don't,

12   because the State hasn't met that burden

13   of proof that it has at the second phase.

14   Is that helping a little bit?

15 A.   It does.

16 Q.   In the first phase I know that you don't know

17   much at all or maybe anything at all

18   about what it is that the State is

19   claiming, but the allegations are

20   basically these.  Donna Roberts, our

21   client, and the man who died in this

22   case, a fellow by the name of Robert

1032

1    Fingerhut had once been married.  They

2    divorced, but after they divorced, they

3    continued to live together over in

4    Howland and they also continued to work

5    together at the Youngstown and Warren

6    Greyhound bus stations.  The State's

7    allegation is that Miss Roberts and

8    another fellow by the name of Nate

9    Jackson got together and came up with an

10   idea to kill Mr. Fingerhut.

11       Now, some of the evidence that you

12   might hear the State introduce in the

13   first phase when they are deciding if

14   what I just repeated to you is those

15   allegations are true, are some letters

16   and telephone conversations and recorded

17   telephone conversations between Donna

18   Roberts and Nate Jackson.  Some of those

19   honestly are sexually explicit and

20   offensive.  And the reason I bring that

21   up is there are things that would offend

22   just about anybody with normal

1033

1     sensibilities and you strike me as that

2     kind of person.  So, what I need to find

3     out from you when we're deciding on

4     whether you are able to do this job, even

5     if you are offended by those things, do

6     you think you could set that aside and

7     say, "I have to decide objectively

8     whether or not the State proved this

9     case, not convict this person because she

10    said or did some things that were

11    offensive to me."  Do you think you could

12    do that?

13  A.   Yes.

14  Q.   Even though we have gone through all of this

15       hoopla thus far, which is bringing you in

16       last Wednesday and having you fill out

17       all sorts of questionnaires, and I think

18       you have to hold the record probably for

19       having to come back to Court for a number

20       of times to be questioned, even though we

21       have gone through all of that, the first

22       phase of this trial is really like any

1034

1    other criminal trial, which is you have

2    to decide whether the State met its

3    burden of proof.

4         My question to you is, if the State

5    does not meet its burden, even though we

6    have gone through all of this, would you

7    still have the ability or the courage to

8    say, "Sorry, they didn't prove it.  I

9    vote not guilty?"

10  A.  Yes.  Excuse me, would you say that one more

11      time?

12  Q.  Here's the reason I ask.  Sometimes, and you

13      know what, let's go back to Saddam

14      Hussain for a second.  That is a pretty

15      good example.  There's been so much

16      hoopla about the war in Iraq, about the

17      weapons of mass destruction before that,

18      about his use of chemical weapons and all

19      of the publicity that you have heard,

20      that you actually said it accurately,

21      even though there has been all of those

22      going-ons, you haven't heard any evidence

1035

1    yet really, hard evidence about whether

2    this guy is guilty of what people say he

3    did.

4  A.   Right.

5  Q.   On a much smaller scale, we have sort of had

6         the same kind of hoopla here.  Even

7         though you haven't been exposed to it,

8         there's been some publicity.  We have

9         gone to the special effort to bring in a

10        whole bunch of extra jurors as Judge

11        Stuard said last week.  We made you fill

12        out lengthy questionnaires, that we don't

13        ordinarily make jurors do.  We're going

14        through this process of talking to you

15        individually, which we also don't

16        normally do.  And my question to you is,

17        just because we have gone through all of

18        that, if when you finally hear the

19        evidence if you say, "You know what, we

20        went through all of this, but the State

21        didn't produce enough evidence to

22        convince me she's guilty," would you

1036

1　　　　　　still have the courage to say, "I'm going

2　　　　　　to vote her not guilty. I'm going to

3　　　　　　find that she's not guilty"?

4　A.　　Yes. I thought I understood that the first

5　　　　　　time. I wanted to be sure.

6　Q.　　That is fine. I'm going to talk for a second

7　　　　　　about the difference between this case

8　　　　　　and an ordinary criminal case. In this

9　　　　　　case, in addition to criminal charges of

10　　　　　aggravated murder and aggravated burglary

11　　　　　and aggravated robbery, the type of

12　　　　　charges we might have in any criminal

13　　　　　case -- in this case, there are also what

14　　　　　are called death specifications. They

15　　　　　are allegations that in addition to an

16　　　　　aggravated murder, there was something

17　　　　　else that happened, that if you as a

18　　　　　juror find that to be true, that is what

19　　　　　really makes this case eligible to go to

20　　　　　the second phase, to decide whether or

21　　　　　not you should vote for the death

22　　　　　penalty. Now, I want to use an example

1037

1    that really doesn't have to do with our

2    case, to sort of explain my point.  One

3    of the reasons that the General Assembly

4    in Ohio has said that an ordinary

5    aggravated murder might be elevated to

6    the death penalty considerations if you

7    kill the Governor.  So, if the person is

8    charged with killing Bob Taft, then if

9    the State wanted to get the death

10   penalty, let's just say that I am the

11   person who is charged.  I sort of always

12   make myself the bad guy in these

13   examples.  Let's say I'm the guy who is

14   charged and they say, "Look, Mr. Juhasz

15   thought about this.  He planned it out.

16   What we call prior calculation and design

17   and he killed Bob Taft.  Those are our

18   allegations against him.  But, we also

19   want you, ladies and gentlemen, to

20   consider the death penalty for him and so

21   we're making an additional allegation

22   that when Juhasz killed him, Bob Taft was

1038

1　　　　　the Governor of the State of Ohio."　That

2　　　　　is the special circumstance, because

3　　　　　otherwise, if I just kill a guy named Bob

4　　　　　Taft, even though his job at the time

5　　　　　happens to be Governor of the State of

6　　　　　Ohio, if the State doesn't ask for you as

7　　　　　the Jury to make that separate finding

8　　　　　that I was the Governor, then I can't get

9　　　　　the death penalty.

10　A.　　Okay.

11　Q.　　Let's just go forward a little bit to the

12　　　　　trial and let's just say that they have

13　　　　　me cold.　They got 15 witnesses and three

14　　　　　confessions and seven video tapes, all of

15　　　　　which show me planning and shooting a guy

16　　　　　named Bob Taft.　Now, even though you

17　　　　　don't know anything about this case, you

18　　　　　know that Bob Taft is the Governor of the

19　　　　　State of Ohio?

20　A.　　Yes.

21　Q.　　Let's say that and in my imaginary

22　　　　　circumstance, it would be up to the

1039

1  State, I don't know who you think would

2  prove it, they might come in with some

3  certified certificate with ribbons and

4  seals dripping off of it, saying this

5  guy, Bob Taft was sworn in as the

6  Governor of the State of Ohio on such and

7  such a date, or they might call Thomas

8  Moyer, the Chief Justice of the Supreme

9  Court that says, "That guy in the

10  photograph dead, is the person I

11  personally swore in as the Governor of

12  the State of Ohio." Let's say, however,

13  they forgot to do that. They just either

14  forget or maybe they rely on the fact,

15  that hey, you know, Bob Taft is the

16  Governor. You see in that circumstance,

17  let's go back to what we were talking

18  about evidence before. You may have

19  found me guilty based on evidence.

20  Confessions and witnesses, and all of

21  that stuff I talked about of the

22  aggravated murder, but when you go back

1040

```
 1          in the Jury room, you go, "Wait a minute.

 2          The Judge told me I had to decide this

 3          case based on the evidence in the

 4          Courtroom.  I may know Bob Taft is the

 5          Governor, but these guys didn't prove to

 6          me.  They didn't bring in the certificate

 7          or they didn't bring in Tom Moyer, so I

 8          am therefore going to find that

 9          Mr. Juhasz is guilty of aggravated

10          murder, but not guilty of the

11          specification that Bob Taft was the

12          Governor.  He may have been, but they

13          didn't prove it to me."  Do you see how

14          that works?

15     A.   Okay.

16     Q.   Some people might regard that -- many times

17          when we talked to jurors, one of their

18          difficulties with the legal system is

19          they have problems with what they call

20          technicalities.  Would you regard that as

21          a technicality or do you understand that

22          the burden of proof is on the State of
```

1041

```
 1              Ohio, and if they fail to meet it, your

 2              job as a juror is to say, "I have to find

 3              this person not guilty either of that

 4              offense or that specification."  Do you

 5              think you can do that?

 6    A.   Yes, Sir.

 7    Q.   And my silly imaginary example, would you have

 8              any problem finding me guilty of

 9              aggravated murder, but finding me not

10              guilty of the specification that Bob Taft

11              was the Governor?

12    A.   Yes, because that wasn't proven.  That wasn't

13              brought into Court.

14    Q.   Now, one of the things that I think that, in

15              my years of talking to jurors, that I

16              think jurors would really like, when we

17              bring them into a Courtroom like this, is

18              they had like some help.  You know what,

19              you have never had to decide, you have

20              never had to apply before in your life,

21              have you, the standard of proof beyond a

22              reasonable doubt?
```

```
                                                          1042
 1   A.    No, Sir.

 2   Q.    You have probably heard that phrase before,

 3         but you never had to actually use it

 4         yourself, correct?

 5   A.    Never.

 6   Q.    And I suspect that like most jurors who come

 7         in here, you want to do a good job if you

 8         are selected as a juror and do the fair

 9         thing?

10   A.    Yes, absolutely.

11   Q.    Part of the problem with our system is that, I

12         shouldn't say part of the problem, part

13         of the nature of it is because we're not

14         dealing necessarily with things

15         scientific.  We're dealing with things

16         like witnesses and whether you believe

17         them or not and how many witnesses might

18         be available based upon the

19         circumstances.

20             So, my point is that the Judge can't

21         give you a formula.  He can't give a

22         definition and say, "Look, if the State
```

1043

1    produces "x" number of witnesses, then

2    you have to find the Defendant guilty

3    beyond a reasonable doubt, but if they

4    only produce Y number of witnesses, then

5    they haven't proved the case."  It

6    doesn't work like that.  Do you see that?

7    A.   Yes, Sir.

8    Q.   The reason I am bringing that up is because

9         there are several things that you would

10        have to do as a juror, if you are

11        selected in this case, and although the

12        Judge will give you some guidance, it is

13        ultimately up to you to decide.  Those

14        include weighing the credibility of

15        witnesses.

16             The Judge will give you some tests

17        and I think you are going to find out

18        that those tests that he gives you are

19        basically the same ones that you use in

20        your every day life in deciding whether

21        somebody is telling you the truth.

22        Because an astute person, I am assuming

1044

1   you realize that not everybody that talks

2   to you tells the truth 100 percent of the

3   time.  You also don't assume just because

4   somebody comes and takes an oath to tell

5   the truth, they may not be telling the

6   truth all the time, even though they took

7   the oath, correct?

8   A.  Yes, Sir.

9   Q.  Part of your job is to decide whether those

10  people are telling you the truth at all,

11  completely, or maybe some of it is the

12  truth and none of it is the truth.  And

13  although as I said, the Judge can give

14  you some help and give you some tests

15  that you can use, that in the long run

16  has to be your call as a juror; do you

17  think you are up to that?

18  A.  Yes, Sir.

19  Q.  You are also -- he's going to define for you

20  proof beyond a reasonable doubt.  But as

21  I told you before, he's not going to be

22  able to give you any sort of numerical

1045

| | | |
|---|---|---|
| 1 | | formula. So while he's going to define |
| 2 | | it for you, you are ultimately going to |
| 3 | | have to make the decision, did the State |
| 4 | | prove its case beyond a reasonable doubt. |
| 5 | | Do you think you are up to that? |
| 6 | A. | I'm sorry. Ask that again, please. |
| 7 | Q. | The Judge is going to give you the definition |
| 8 | | of proof beyond a reasonable doubt. But |
| 9 | | when you go back into the Jury room and |
| 10 | | talk with the other jurors, you have to |
| 11 | | make a decision that you, as an |
| 12 | | individual juror, are comfortable with. |
| 13 | | Did the State prove its case beyond a |
| 14 | | reasonable doubt? And do you think you |
| 15 | | are up to doing that? |
| 16 | A. | Yes, Sir. |
| 17 | Q. | There's also a little aspect of that, which is |
| 18 | | that the law requires in a criminal case |
| 19 | | that all 12 of the jurors agree. And of |
| 20 | | course, we all like them to, but the |
| 21 | | phrase that should get added to that is |
| 22 | | "if you can." The reason I bring that up |

1046

```
 1              is, and it doesn't matter which side you

 2              are taking.  We can do it both ways.

 3              Let's say the other 11 jurors say, "The

 4              State proved its case beyond a reasonable

 5              doubt," and you say, "Sorry, I have

 6              doubts based on reason and common sense.

 7              I can't vote guilty just because I like

 8              you people or just so I want to be nice

 9              and we can get done with our business

10              here."  Do you think you have the ability

11              to hold out if you are put in that

12              position?

13    A.   Yes, if I don't have enough evidence for me.

14    Q.   And it works the other way, too.  Let's say

15              the other 11 go, "Hey, we don't think the

16              State proved its case."  And you go,

17              "Well, I sure do."  And you guys talk

18              back and forth.  They might say to you,

19              "Look, 11 of us think she's not guilty,

20              you are the only one.  Can we just get

21              out of here?  Will you vote not guilty?"

22              Your oath requires that you can't do
```

1047

```
 1              that.  You can't give up your convictions
 2              about what the evidence either shows or
 3              doesn't show.  You think you can do that?
 4   A.   I can do that.
 5   Q.   And if you get to a second phase, although we
 6              can give you those definitions and
 7              instructions I talked about before, about
 8              weighing the reasons to impose the death
 9              penalty against reasons not to impose the
10              death penalty, the ultimate decision
11              about how you weigh that is finally up to
12              you.  Nobody -- we can tell you how to
13              weigh the evidence, how to do it, but
14              what weight you actually assign to that
15              evidence is your individual judgment.  Do
16              you see that?
17   A.   Yes, Sir.
18   Q.   And you think you are up to that?
19   A.   Yes, Sir.
20   Q.   We talked a little while ago about if you were
21              offended by some of the letters that are
22              shown to you or some of the tape recorded
```

1048

1           phone conversations that are played for

2           you, that while it is okay to be

3           offended, you can't let that affect how

4           you decide the case.  You are okay with

5           that, correct?

6 A.   Yes, Sir.

7 Q.   You may also in a case like this, feel

8           sympathy for somebody and it depends on

9           the circumstances, and it depends on your

10          background.  You may feel sorry for the

11          Defendant as I think Mr. Bailey said the

12          other day.  You are sitting in the Jury

13          box, she's sitting over here, you are

14          kind of looking at each other through the

15          course of the trial.  You may ultimately

16          end up feeling some sort of sympathy for

17          her.  You may feel sympathy for Mr.

18          Fingerhut because you would expect in a

19          case like this, that you would be shown

20          photographs of him dead.  That makes

21          sense to you, correct?

22 A.   Yes.

1049

1   Q.   You may feel sorry for him or for members of
2             his family.  All of those things are
3             okay, because nobody asks you to stop
4             being a human being when you take on the
5             responsibilities of being a juror.  But,
6             part and parcel of taking on those
7             responsibilities is saying, "Okay, I
8             recognize that I feel sorry for her, for
9             him, whoever, but can I set that aside
10            and not let that cloud how I objectively
11            look at the evidence?"  Do you think you
12            could do that?
13  A.   I could do that.
14  Q.   Have you ever heard before the phrase, "Taking
15            the Fifth"?
16  A.   Yes, Sir.
17  Q.   Does that mean anything particular to you?
18            Some people have a definition of that.
19            Some people don't.
20  A.   I can't remember.  I have the right -- I don't
21            remember.  "I have the right to remain
22            silent on the grounds that it may

1050

1    incriminate me."

2  Q.    That is right.

3  A.    Perry Mason.

4  Q.    That is exactly right.  And the Fifth, I'll

5        help you out a little bit since I have

6        wasted the flower of my youth studying

7        this stuff.  The Fifth is actually --

8        when they say taking the Fifth is

9        actually the Fifth Amendment to the

10       United States Constitution.  And part of

11       that Fifth Amendment says that you have a

12       right as a citizen, not to incriminate

13       yourself.  You had it exactly right.

14       What the Courts have translated to over

15       the years, instead of we're going to give

16       this any practical application is that a

17       person who is accused of something, some

18       wrongdoing by the Government, a crime,

19       has a presumption of innocence.  They

20       don't have to do anything to help the

21       Government prove them guilty in this

22       case.  So that means in a variety of

1051

1   context that first of all, if a police

2   officer wants to talk to somebody, you

3   don't have to answer any questions that

4   are going to incriminate yourself, which

5   is probably the thing you are most

6   familiar with.  It also means though in a

7   trial like this, that when the Government

8   says you as a citizen, in this case,

9   Donna Roberts, did something wrong, the

10  Government has to prove it.  And so

11  because of that Fifth Amendment, Donna

12  Roberts doesn't have to do anything in

13  this case.  She can sit over there

14  literally or figuratively and fold her

15  arms and say, "You guys brought this case

16  against me.  You have to prove it, if you

17  can."

18       One of the ways that I like to think

19  about that is since you don't have any

20  formulas that we give you, like if

21  there's this much evidence, she's guilty

22  and if there's only this much evidence,

1052

1           she's not, is that you have to sort of

2           pour the evidence that the Government

3           gives you into a box.  Up on that box,

4           you have to draw a line called reasonable

5           doubt.  And if the evidence that the

6           Government gives you during the course of

7           this trial persuades you that the box is

8           filled up beyond the line called

9           reasonable doubt, because it is proof

10           beyond a reasonable doubt, then you would

11           have to find the Defendant guilty.  But

12           conversely, if when you get done, when

13           you go back in the Jury room and you sort

14           of close your eyes and say, "Let me do

15           this imaginary box thing," and you close

16           your eyes and you think about the

17           evidence they have given you, and you

18           say, "It doesn't come up to the line."

19           Therefore, even though they have produced

20           some evidence, they haven't convinced you

21           beyond a reasonable doubt.  Do you see

22           that?

1053

1    A.    Yes.

2    Q.    Now, the reason I like to use that example is

3          because of the Fifth Amendment

4          presumption of innocence, when we start

5          the trial the box is empty.  It has

6          probably been mentioned to you, I can't

7          recall, but we're here because the Grand

8          Jury issued a piece of paper called an

9          Indictment.  Have you heard that word

10         before?

11   A.    Yes, Sir.

12   Q.    And an indictment is another one of those

13         fancy legal words that doesn't mean

14         anything so complicated.  It is a piece

15         of paper where the Government says to a

16         person, "We think you did something

17         wrong.  Now, come to Court."  You don't

18         have to do anything once you get there,

19         because of the Fifth Amendment.  We have

20         to do everything.  Here's again why I

21         like to use that box.

22               First of all, that indictment is not

1054

1    evidence.  Just like all of the things

2    that you have heard about Saddam Hussain

3    are not evidence.  Those are allegations

4    that people are making, but if he's to

5    ever come to trial, somebody is going to

6    have to produce some evidence that he did

7    that.  Does that make sense to you?

8  A.  Yes.

9  Q.  In this case, the indictment is not evidence

10   and because you haven't heard any

11   evidence if I sent you back into that

12   Jury room right now to look in that

13   imaginary box, it would have to be empty.

14   Would you agree?

15 A.  Yes.

16 Q.  The reason that I also like to use the box is

17   empty is because although it is typical

18   that most of us want to hear both sides

19   of a story, to be fair, if somebody makes

20   an allegation against you, you would want

21   to have the opportunity to say, "Wait a

22   minute.  That is not true and let me tell

1055

1              you why."  Correct?

2   A.    Right.

3   Q.    It works a little bit different in a criminal

4              trial, however, because of this

5              presumption of innocence, the State is

6              charged with the responsibility of

7              pouring the evidence into the box.  And

8              so it isn't a situation where the

9              Defendant wins the case or loses.  It is

10             a situation where the State wins the case

11             or loses.  They win the case, if in your

12             mind, they fill up the box beyond the

13             line called reasonable doubt.  They lose

14             the case if they don't put any evidence

15             in the box at all, like that thing I told

16             you about with the Governor, remember

17             that?  Or if they put some evidence in,

18             but you as a juror say, "Sorry, nice try,

19             but you didn't fill up the box beyond the

20             line called reasonable doubt."  Do you

21             see how that works?

22   A.    Yes, I do.

```
                                                    1056

 1    Q.   And I like to use the box because the

 2         Defendant, because of the presumption of

 3         innocence, doesn't have to take anything

 4         out of the box and doesn't have to pour

 5         anything into the box herself.  You see

 6         how that works?

 7    A.   Okay.  I didn't know that.

 8    Q.   And it runs a little bit contra to what we as

 9         fair people like to do in ordinary life.

10         You have got some children, and I assume

11         are very proud of them, because they have

12         accomplished a lot.  When they were

13         growing up, I'll bet you that from time

14         to time, one came and said the other one

15         did something bad, correct?

16    A.   I didn't have those kind of kids.  They were

17         unusual.  I didn't have that situation.

18    Q.   You were incredibly lucky.

19    A.   Brothers and sisters, but not children.

20    Q.   If your brother or sister accused you of

21         something, you certainly would want a

22         chance to get to make a response,
```

1057

```
 1    correct?
 2  A.   Yes.
 3  Q.   And you wouldn't want your Mom or Dad or
 4       whoever was making the decision about
 5       whether you had done something wrong and
 6       if so whether you should be punished,
 7       until they heard both sides of the story,
 8       correct?
 9  A.   Right.
10  Q.   You see this presumption of innocence thing,
11       because it puts the burden of proof on
12       the State, works a little bit different.
13       So, the Defendant in a case like this
14       might not have to testify.  Do you see
15       that?  Because if she makes a decision,
16       "Listen, I don't think these guys have
17       filled up the box.  I don't have anything
18       to say."  She can do that.
19            Now my question is, if that happens
20       in this case, would you hold that against
21       her or would you recognize that is just
22       part of the way the presumption of
```

1058

```
 1           innocence works?
 2   A.   I would recognize that.
 3   Q.   And let's flip it around, because even though
 4           she has the right not to testify, she
 5           also has the right to testify.  So if she
 6           does, you see that she's just like any
 7           other witness in the case?  You would
 8           judge -- remember how we talked about
 9           believability or credibility before?  You
10           would judge her believability just like
11           you would any other witness, correct?
12   A.   Right.
13   Q.   You wouldn't automatically disbelieve
14           everything she told you just because she
15           was the person charged in the case.  That
16           would not be fair, would it?
17   A.   No.
18   Q.   You may choose to disbelieve her, but you
19           wouldn't do it just because she's the
20           Defendant in the case?
21   A.   No.  I wanted to make sure, because I never
22           heard this before.  The Defendant doesn't
```

1059

1      have to prove anything, so you never get

2      two sides of the story, is that what

3      you're saying?

4  Q.   You may not.  There are cases where it

5      happens.  Where the Defendant testifies

6      or the Defendant calls witnesses or both.

7      But, because of that presumption of

8      innocence, because it is up to the

9      Government to fill up that box, she may

10      not.

11          And let me digress for a second and

12      give you an example that I sometimes like

13      to use with jurors, and again, I am the

14      Defendant.  I am the bad guy and the

15      charge is that at the corner of Market

16      Street and Pine Avenue here in Warren, on

17      January 1 at 4:00, the charges are that I

18      got out of my car, walked up to somebody

19      else's car and shot the guy.  So now we

20      come to the trial and the State calls a

21      witness who says, "January 1st, 4:00,

22      there I was, Market Street and Pine

1060

1    Avenue, I saw that guy, Juhasz, walk up

2    and shoot that person."  And now, that is

3    not looking so good for me right then.

4    They got a witness who says he's there at

5    the time and place and under the

6    circumstances, and he gets a good look at

7    me and he points me out in the Courtroom

8    as the guy who did the shooting.  It is

9    not looking so good for me, is it?

10   Let's pretend that I hired Ben

11   Matlock, and I like to use him, because

12   he always pulls stuff out of his pocket,

13   instead of stuff out of a folder, and he

14   stands up on cross examination of a

15   witness and he reaches into his pocket

16   and he pulls out a receipt from

17   Kaufmann's in the Southern Park Mall in

18   Boardman for January 1st at 4:00, and

19   says, "Mr. Witness, isn't it true that on

20   that date, you were buying the new navy

21   blue suit at Kaufmann's?"  And the guy

22   looks at the things and says, "Yes, that

1061

```
 1              is true."  Now, the case is looking a lot

 2              better for me now, isn't it?  Because all

 3              of a sudden the State's witness who

 4              looked like I was going to be toast, has

 5              now been impeached or cross examined and

 6              there's a pretty good suggestion here

 7              that the witness wasn't at the corner

 8              here, but he was down at the Southern

 9              Park Mall 25 miles from here.  You see

10              that?

11   A.   Yes.

12   Q.   The reason I bring that story up is because in

13              the course of a case, the Defendant --

14              what in essence that did was, if you had

15              looked into that box after the witness

16              got done answering the Prosecutor's

17              questions, that box would be pretty full

18              or close to it, right?  Because they got

19              somebody who is putting me there.  Now,

20              based upon what the Defendant did, what

21              my lawyer, Ben Matlock did, maybe when

22              you look in the box you say, "There's a
```

1062

1    little bit of evidence in there, but it

2    doesn't look too good to me."  You see

3    how that works?

4 A.    Yes, Sir, I do.

5 Q.    So, the Defendant by what she does, may affect

6    how you look at the evidence in the box,

7    but if she doesn't think that the

8    evidence is filling up the box, she

9    doesn't have to do anything.  That is how

10    that whole thing works.  Does that help

11    you out now?

12 A.    Yes, it does.  Thank you.  I am more familiar

13    with the term beyond a shadow of a doubt.

14    Is that television?

15 Q.    That is just television.  At least as far as I

16    have always known, it is always proof

17    beyond a reasonable doubt.  Now, and that

18    is really one of the last things that we

19    need to talk about.

20       The State has to prove its case

21    beyond a reasonable doubt.  It doesn't

22    have to prove its case beyond a shadow of

1063

1    a doubt.  It doesn't have to prove its

2    case as the Judge will tell you beyond

3    possible or imaginary doubt.  He's going

4    to tell you at the end of the case that

5    everything which is the subject of human

6    affairs, that is things that we're doing

7    as we move around this planet, is subject

8    to some possible or imaginary doubt.

9        Here's a way that I like to think

10   about that or ask jurors to think about

11   it.  When you have made important

12   decisions in your life, whether you have

13   done it on a piece of paper as some

14   people do or maybe in your mind's eye,

15   don't you sort of weigh out the pros and

16   the cons?  You put the pros on one column

17   and the pros on another.  Well, you have

18   to do the same thing here, when you are

19   deciding whether the State prove its case

20   beyond a reasonable doubt.  On one side,

21   maybe all of the reasons why the

22   Government will tell you that you should

1064

1    find Donna Roberts guilty of the crimes

2    they have charged her with, and guilty of

3    those specifications.

4         On the other side would be all of

5    the doubts that you might have about the

6    case.  And the doubts can essentially

7    come from several sources.  They may be

8    as you listen to the evidence yourself,

9    things that you said, that doesn't quite

10   sit with me.  So it could be stuff you

11   thought of yourself.  It could be things

12   that Mr. Ingram and I point out to you

13   during the course of the case, either in

14   cross examining witnesses or making a

15   closing argument to you, or it could be

16   things that have popped up when you and

17   the other 11 jurors go back to deliberate

18   and talk about the case.  Because that is

19   one of the things you do is talk about

20   the evidence.  So, those are the basic

21   areas where you could get those doubts

22   from.

1065

1            Now, what you have to do, weighing

2      the pros and the cons, is to say, "Well,

3      here are the reasons they tell me why I

4      should find this person guilty.  Here are

5      the things that I have come up with," or

6      the jurors have come up with or the

7      lawyers have come up with.  These are the

8      doubts about the case.  You have to then

9      analyze each one of those doubts and talk

10     about it with the other jurors and think

11     about it, and maybe when you get done

12     talking about it, you say, "You know

13     what, I thought that was a legitimate

14     doubt, but now that I think about it,

15     that doubt is not reasonable."  So you

16     scratch it off.  If you go through and

17     scratch off every one of those doubts as

18     not being reasonable or based on common

19     sense, then the State has proved its

20     case, because here were all of the doubts

21     that you had and none of them were

22     reasonable.

1066

1            If on the other hand, when you got

2        done, there was one doubt or could be

3        more than one, that was left on that side

4        of the check list, and you have talked

5        about it and you have thought about it,

6        and you have argued about it with the

7        other jurors and you go, "No, there's no

8        way that I can account for that doubt

9        other than to say, in my mind, it is

10       based on reason and common sense."  Then

11       do you see in that circumstance, because

12       you haven't eliminated all of the doubts

13       based on reason and common sense.  The

14       State has not proved its case beyond any

15       reasonable doubt.  Does that work for

16       you?

17   A.   Yes, Sir.

18   Q.   So, my question is, can you hold them to the

19       burden of proving the case beyond a

20       reasonable doubt but not beyond the

21       shadow of a doubt?

22   A.   Yes, Sir.

1067

1   Q.    That same standard would apply in the second

2              phase if you get there.  Which is when

3              you sit down in the first phase, the pros

4              are going to be reasons to find her

5              guilty and the cons are going to be

6              reasons, doubts that you might have or

7              reasons to find her not guilty.

8                  In the second phase, you are

9              weighing something else.  You are

10             weighing reasons to impose the death

11             penalty versus reasons not to.

12             Similarly, the State would tell you at

13             the second phase, on this check list,

14             here are all of the reasons why we say

15             you should vote for the death penalty.

16             And you, or the jurors or Mr. Ingram and

17             I would give you reasons not to impose

18             the death penalty.  Once again, the

19             State's burden of proof has to be beyond

20             a reasonable doubt.  So, if after you

21             talk about it you eliminate all of the

22             doubts on that side of the check list and

1068

1    say, "None of them are based on reason

2    and common sense," then the State has met

3    its burden.  If on the other hand, you

4    have one or more than one doubt about

5    whether death is the appropriate penalty,

6    then they haven't proved their case

7    beyond a reasonable doubt.  Are you okay

8    with that?

9    A.   Yes, Sir.

10   Q.   Any problem holding the State to that burden

11       of proof?

12   A.   No, Sir.  I was just thinking.  I wanted to

13       make sure I understand the word

14       reasonable.  Reasonable in this Court

15       means reason and common sense?

16   Q.   The Judge will actually -- what I tell you is

17       not the instructions of law.  It is just

18       what we're used to dealing with as

19       lawyers.  We have heard those instruction

20       a million times and so that is why we can

21       talk about the words.  But if you ever

22       have any problems about what the actual

```
 1              definition is, Judge Stuard reads them to

 2              you at the end of the case.  But in

 3              general, that is what we're talking about

 4              is reason and common sense.

 5   A.   Okay.

 6   Q.   Any problem applying those standards we have

 7              talked about, burden of proof, beyond a

 8              reasonable doubt, any problem with the

 9              presumption of innocence?  Do you have

10              any problem presuming that Donna is

11              innocent right now?

12   A.   No.   Everything you say, I say to myself,

13              reason and common sense.

14   Q.   Any problem holding the State to that burden

15              of proof in the first phase?

16   A.   No, Sir.

17   Q.   How about if we get to the second phase?  Any

18              problem holding them to that burden of

19              proof there?

20   A.   No.

21   Q.   Anything that is coming up while I have been

22              questioning you, that you think we should
```

1070

1    talk about, about questions you have or

2    maybe reasons you thought of why you

3    couldn't or shouldn't serve as a juror in

4    this case?

5  A.    I can't think of any.

6  Q.    Do you think you can serve as a juror in this

7        case?

8  A.    I think I can serve as a juror.

9             MR. JUHASZ:  Thank you for your

10  time.

11  (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

12  OF HEARING)

13             THE COURT:  You are going to be in

14  the pool from which this Jury will be selected.

15  Call that number this Friday after 4:30.  You will

16  receive further instructions.  The 36 that are

17  picked will be brought back and then we'll actually

18  select the Jury from that body of people.  I would

19  again remind you not to read anything in the

20  newspaper or have any discussion with anybody or

21  watch anything on T.V. until you return.  We thank

22  you for your time.

1071

1 (Juror No. 20 excused from the Courtroom.)

2 (Juror No. 22, George Dermer, entered the Courtroom.)

3          THE COURT:  Good morning Mr. Dermer.

4 You read that handout that was given to you?

5          MR. DERMER:  Yes.

6          THE COURT:  The purpose of this

7 inquiry this morning is to allow both sides an

8 opportunity to ask you some questions primarily

9 aimed at two different areas.  You understand that

10 Donna Roberts is charged by indictment with two

11 counts of aggravated murder with specifications.

12 Under the law of Ohio, the unlawful taking of

13 another person's life, murder, is not something

14 that automatically puts a Defendant in the position

15 of the death penalty, facing the death penalty.  If

16 there are specifications attached, however, and one

17 of the examples that is often given is if a person

18 would murder Bob Taft and the State put on as a

19 specification that he's Governor, then that would

20 bring up the issue of the death penalty.  The same

21 thing applies with killing a police officer or

22 other reasons.

1072

1    In this particular case, there are other

2    specifications attached to the indictment charging

3    her with aggravated murder, which raises the

4    specter of the death penalty being considered.

5    Now the State has the burden of proving

6    beyond a reasonable doubt all of the elements of

7    the aggravated murder charge and the specifications

8    attached.  Should the State fail to do that, then

9    the Jury would make a finding of not guilty and

10   that would be the end of the case.  Should,

11   however, the State carry the burden of proof, then

12   this Jury would be called upon to sit in a second

13   phase of the trial in which the State has an

14   opportunity to present what are known as

15   aggravating circumstances.  And those are reasons

16   why the Jury should consider the death penalty or

17   impose it.  The State has to do that beyond a

18   reasonable doubt.  At that same second hearing, the

19   Defendant has an opportunity to present mitigating

20   factors, and those mitigating factors are reasons

21   why the Jury should consider not imposing the death

22   penalty.  So the Jury has to at that second phase

1073

1  weigh the aggravating circumstances against the

2  mitigating factors in order to determine whether

3  they will in fact impose the death penalty or

4  impose one of three other lesser penalties of life

5  without chance of parole and then two lesser from

6  that even.

7           There are those among us who believe in

8  the old Testament of an eye for an eye.  If you

9  murder somebody, you forfeit your life.  That is

10  not the law of Ohio.  There are people on the other

11  extreme who feel that they could never participate

12  in any activity where a person's life may be in

13  question.  Everyone is entitled to their own

14  opinion, but in between those two extremes, you

15  have the majority of the population, who have

16  feelings one way or the other on the question of

17  the death penalty.  Some feel it is not a very good

18  idea, but at times might be called for.

19           Others feel more strongly that it should

20  be granted more liberally.  But the perfect juror

21  is someone who could give the assurance to these

22  folks that no matter what their personal ideas are

1074

1  about the death penalty, that they will be able to

2  follow the law as it is.

3       The Court will give an instruction of

4  what law has to be followed.  And to have an

5  adequate Jury we must have 12 people who are able

6  to follow the law, setting aside their own ideas of

7  what the law should be.  Otherwise, if that isn't

8  done, one side or the other can't get a fair trial.

9       So, the questions will be put to you

10  concerning your thoughts on the death penalty,

11  whatever your thoughts are.  As I say, you have a

12  right to those opinions and they will be respected

13  by everybody here.

14       The other issue is whether or not you

15  have, by reading or seeing something about this

16  case, have fixed opinions that you are not able to

17  set aside.  Again, in order for both sides to

18  receive a fair trial here, each juror will have to

19  be able to decide this case on the evidence, and

20  that evidence will only be presented in this

21  Courtroom.  So, if a person were on the Jury and

22  they hear the evidence and that doesn't square with

1075

1　something they thought might be the facts, they

2　have to follow the facts as presented here.  Any

3　questions about that?

4　　　　　　　　MR. DERMER:  No.

5　　　　　　　　THE COURT:  Mr. Bailey?

6　EXAMINATION BY MR. BECKER OF MR. DERMER:

7　　　　　　　　THE COURT:  I'm sorry, Mr. Becker.

8　Q.　Is it Mr. Dermer?

9　A.　Yes, that is right.

10　Q.　Good morning, Mr. Dermer.  My name is Chris

11　　　　　Becker.  I work for the County

12　　　　　Prosecutor's Office and this is

13　　　　　Mr. Bailey.  He's involved in this case

14　　　　　also with the State.  He's what we call

15　　　　　the first chair or the lead counsel.  I

16　　　　　am assisting him.  This is Mr. Ingram and

17　　　　　Mr. Juhasz and this is the Defendant in

18　　　　　this case, Donna Roberts.

19　　　　　　　One of the things that we're going

20　　　　　to try and do here is this is really the

21　　　　　only opportunity that we get to speak

22　　　　　directly to you and you can ask us

1076

1            questions and we can ask you questions,

2            and we can try and explain things and as

3            best we can here, because once we get 12

4            jurors and if you are one of the 12

5            jurors and you get to sit over here in

6            the juror box, we can't ask you questions

7            and you can't ask us questions.  Once we

8            start this case and the Court says,

9            "Okay, you call your first witness," and

10           we start calling witnesses, we can't lean

11           over to you and say, "Hey, Mr. Dermer,"

12           or you can't conversely -- you can't talk

13           to us and say, "I got a question about

14           something in this case."  So, it is

15           really important that we get to know you

16           and I realize we have a very short period

17           of time here to get to know you, but it

18           is important that we get your thoughts

19           and your ideas about this case.

20               And what we're trying to do is find

21           out if you are the right juror for this

22           particular case.  Both the State is going

1077

1    to try to do that and they are going to

2    try to do that.  And we may find that for

3    whatever reason, you are or you aren't,

4    that doesn't mean you are not a good

5    juror, doesn't mean you are not a good

6    person.  It just means we can't get you

7    on this particular case or we can't use

8    you in this case.

9        So, with that in mind, and by all

10   means, if you have any questions or if

11   I'm not explaining something clearly,

12   say, "Wait a minute.  You are going to

13   have to re-explain that or give me

14   another idea."  Or if you have questions

15   that come up in your mind by all means

16   stop me and say, "I have a question about

17   this."  With that in mind, let's start on

18   the first issue.

19       I think pursuant to your

20   questionnaire you indicated that you do

21   believe the death penalty is an

22   appropriate penalty in certain cases,

1078

1     correct?

2  A.    I do.

3  Q.    And the fact that you believe in the death

4              penalty in this case, means that you may

5              be a prospective juror, that you would

6              not say, "I don't believe in it, I could

7              not under any circumstances impose the

8              death penalty," because ultimately, and

9              we're going to talk about something in

10             the law here.  It is one of those strange

11             cases where we're actually going to have

12             two trials here and we may only have one,

13             but we may have two phases to this trial.

14             And we have to be a little presumptuous

15             here with you and assume we're going to

16             get to that second phase, even though we

17             may never get there.

18                  You and your fellow jurors may find

19             that there's no reason to get to that

20             phase because she's innocent, she's not

21             guilty.  And you may get to this point,

22             and you may not get to this point, but

1079

1     like I said, when I started out, we can't

2     go through the first phase and then you

3     find her guilty and then all of a sudden,

4     say, "I got some concerns about the death

5     penalty," or "I have some questions about

6     the death penalty."  Once we start, we

7     can't speak to you again.  It is

8     important that we go through the whole

9     length of this trial and both stages to

10    determine if you could sit as a juror in

11    this case.

12        So, with that in mind, we're going

13    to take some liberties here.  We're going

14    to assume we have gone through this first

15    phase and you found her guilty.  You may

16    not find her guilty, and then we may all

17    go home, but let's say we get to this

18    phase and we get through the first part

19    where she's found guilty and you find

20    what is called in the indictment and the

21    Court will explain all of these terms for

22    you, that she's committed murder,

1080

```
1    aggravated murder, with some -- what we

2    call aggravating circumstances.  And I'm

3    not going to explain what those are to

4    you because that will really be what the

5    Court's job is.  Then we're going to come

6    back in a couple of days if we get to

7    that point and we're going to have the

8    mitigation phase of the trial.  And

9    basically, what that is and just to be

10   over simplistic, is we're going to say as

11   the State and the Prosecution, that some

12   bad things happened and these are bad

13   things that make her eligible to get the

14   death penalty.

15       The Defense is going to present to

16   you and may present to you, a lot of good

17   things, things that maybe would tip the

18   scale.  They don't have to, but they may

19   present to you some things throughout

20   this trial.  It is always going to be the

21   State's burden.  We always are going to

22   have to prove to you beyond a reasonable
```

1081

1    doubt.

2         Now, I can't really quantify it, and

3    I can't really tell you what it is,

4    .    because every person is going to have a

5    different view of reasonable doubt, and

6    the Court is going to give you a term,

7    that is not really quantified.  The Court

8    is not going to say, "Well, if you are 80

9    percent convinced or 90 percent

10   convinced," reasonable doubt is just

11   reason and common sense.  It is not all

12   doubt and it is a little bit like a cup

13   of water or pitcher of water.  You may

14   say an inch or two from the top for

15   reasonable doubt, someone else maybe an

16   inch and a half.  Someone maybe a quarter

17   of an inch from the top.  It is not all

18   the way to the top is reasonable doubt,

19   but it is pretty close to the top, and

20   where that is, is going to vary for

21   different people and it is a heck of a

22   lot more than 50 percent.  It is probably

1082

1  a heck of a lot more than 75 percent, but

2  where it is, whether it is 85, 89, 90, 95

3  percent, 99 percent.  That is going to

4  vary from juror to juror.  It is

5  basically, are you firmly convinced based

6  on reason and common sense?

7  But when we get to this point where

8  we're having this second phase, we're

9  going to have to again prove to you and

10  your fellow jurors that beyond a

11  reasonable doubt she deserves to get the

12  death penalty, and we're going to present

13  some evidence to you.  They may or may

14  not have to present evidence to you.

15  But you are going to get four

16  choices basically if we get to that

17  second phase.  You are going to get

18  death.  You will get life with no parole,

19  you will get life with no parole after 30

20  years, and life with no parole after 25

21  years.  Those will be your four choices

22  and you and your fellow jurors will have

1083

1    to agree to that, and go back to that

2    Jury room and sign a verdict form,

3    calling for one of those four penalties.

4        And I want to make certain and I'm

5    sure the Defense does to, if we get to

6    that point, you are not going to

7    automatically impose a certain penalty,

8    are you?

9  A.  No.

10  Q.  You will balance and weigh the factors and the

11       circumstances as the Court gives them to

12       you.  You will do this balancing test?

13  A.  Yes.

14  Q.  And I realize it is presumptuous and we can't

15       tell you what the evidence is in this

16       case, but first of all, if the case did

17       prove beyond a reasonable doubt that the

18       aggravating circumstances outweighed any

19       mitigating factors that she were to

20       present to you, could you go back to the

21       Jury room and sign a piece of paper, a

22       verdict, that calls for the imposition of

1084

1         the death penalty?

2  A.   Yes.

3  Q.   And on the other side of that coin is, if we

4         don't prove beyond a reasonable doubt

5         that the aggravating circumstances

6         outweigh the mitigating factors, you

7         would consider the other options and in

8         fact, if we didn't prove it, you couldn't

9         consider the death penalty, correct?

10 A.   Yes.

11 Q.   And you understand that balancing test.  I

12        hope I have explained it to you.  Do you

13        understand what I'm asking you?

14 A.   Yes.

15 Q.   I know we're kind of talking about terms that

16        I'm sure we don't use every day in our

17        normal lives, because they are legal

18        terms, but you believe that you could

19        fairly and impartially consider whether

20        the death penalty should be imposed in

21        this case?

22 A.   Yes.

1085

1    Q.   You are not so convinced and so much in favor

2         of the death penalty that you would say,

3         "Well, she killed somebody.  It is an eye

4         for an eye, she's involved in the

5         homicide.  Therefore, I have to give her

6         the death penalty"?

7    A.   No.

8    Q.   And again we're being very presumptuous,

9         because we may never get to that point.

10        The next thing that you touched upon was

11        that you have heard some of this in the

12        paper and the television, is that

13        correct?

14   A.   Yes, I have.

15   Q.   While we like to have jurors come in here and

16        know the community, one of the reasons

17        you were selected is because you are

18        involved in this community.  You are a

19        voter.  You are a registered voter, who

20        actually exercises their right to vote.

21        We also can't have people coming in here

22        with such a mindset that they have

1086

1    already made up their minds.

2        Now I understand the television and

3        media and the newspapers and the radio,

4        they report things and if you are

5        interested in your community, which

6        obviously, I am and you are as well, you

7        are going to read things, and obviously,

8        when you read about this case, or saw it

9        on television months and months ago, you

10       had no idea you were going to be here?

11   A.  No, I didn't.

12   Q.  And my question to you is do you have such an

13       opinion of this case, of this particular

14       Defendant that you can't set those

15       opinions -- first of all, do you have an

16       opinion about her guilt or innocence as

17       you sit here right now?

18   A.  No.

19   Q.  You have read a lot and seen a lot on

20       television about this case, correct?

21   A.  I don't know what you mean by a lot.  I have

22       seen some.

```
                                                        1087
 1    Q.    When you sat down and I think it says you
 2                said, "What I saw on T.V. and read in the
 3                paper."  Let's say you were watching the
 4                news one night and they said, "Donna
 5                Roberts is accused of complicity because
 6                she's" -- she's not accused of actually
 7                pulling the trigger and shooting this
 8                deceased individual Robert Fingerhut.
 9                You are not going to say, "Well, I read
10                the paper and boy, it sounds bad for her,
11                and as soon as I read that article, I
12                knew she was guilty.  There's no doubt
13                about it.  It was in the paper, or it was
14                on television, why would they show it if
15                she wasn't guilty?"  You don't believe
16                that, do you?
17    A.    No.
18    Q.    Have you formed an opinion about this case,
19                about whether she's guilty or innocent?
20    A.    No.
21    Q.    So you don't have anything really in terms of
22                coming in here and saying, "There she is,
```

1088

1  she's the one I saw on television.  She's

2  guilty"?

3  A.  No.

4  Q.  And the real question, I guess here is and

5  there's a lot of different ways of saying

6  this.  What we want you to do is what the

7  Court wants you to do and myself and

8  Mr. Ingram and Mr. Juhasz is, we want you

9  to come in here and if you are selected

10  for this Jury, only determine whether

11  she's guilty or innocent based upon what

12  you hear in this Courtroom, not what you

13  read in the newspaper, what you have seen

14  on television.  And in fact, the Court,

15  if you are picked as a juror in this

16  case, will tell you not even to read the

17  newspaper and don't watch anything about

18  this case as it unfolds during this

19  trial.  So, you believe that you have not

20  formed an opinion, whether or not it was

21  from the media, the television, the

22  newspaper that you could sit there and be

1089

1    a fair and impartial juror?

2  A.   I think I could be fair and impartial.

3  Q.   Another way of approaching this, I guess is,

4       if you were the Defendant in this case,

5       would you be satisfied with a juror such

6       as yourself, someone who may have read

7       something about it?  But you wouldn't

8       say, "I don't know about this guy, he's

9       read the newspaper, seen the television

10      in stories, boy that really bothers me."

11      You really feel that you could be honest

12      and impartial and fair and impartial in

13      this case?

14 A.   Yes, I do.

15 Q.   Now you have already indicated that you know

16      some of the things about this case.  In

17      fact, there were some letters written

18      from prison.  You indicated that and I am

19      assuming you are basing that either from

20      television stories or newspaper articles?

21 A.   Yes.

22 Q.   And you are also aware that there is in this

1090

1    |    case, a co-defendant, a Mr. Nate Jackson,
2    |    and you know he was involved in this case
3    |    and he was charged and found guilty of
4    |    murder.  In fact, he received the death
5    |    penalty, correct?
6    A.   Yes, I do.  I was told that a couple of days
7    |    ago, just a few days ago about the death
8    |    penalty.
9    Q.   Was that prior to you being notified you were
10   |    a juror on this case or how did you find
11   |    that out?
12   A.   I believe it was that morning in the paper,
13   |    when I was supposed to come in that said
14   |    he was already found guilty.
15   Q.   When you came in that morning, you didn't know
16   |    you were going to be called for this
17   |    particular Jury.  You happened to read
18   |    the article that day and when they
19   |    started talking to you and you said, "I
20   |    just read about that in the paper"?
21   A.   Yes.
22   Q.   That article, and knowing what you know that

1091

1   in fact he has been convicted and

2   received the death penalty, you will be

3   able to separate that out from this case,

4   correct?

5   A.   Yes.

6   Q.   The fact that he's been convicted and the fact

7   that he's been given the ultimate penalty

8   would have no bearing on you determining

9   Miss Roberts' guilt?  First of all, her

10  guilt, because we have got to get over

11  that first hurdle; and second of all, if

12  you do get over that hurdle, what penalty

13  you may give her, correct?

14  A.   Yes.

15  Q.   Now, we talked a little bit about reasonable

16  doubt, and what reasonable doubt is in

17  any particular case.  In this case, we

18  have to prove, the State has to prove

19  each and every element of the crimes that

20  are charged by proof beyond a reasonable

21  doubt.

22  And basically that is breaking it

1092

1    down even further.  There's five or six

2    little elements to each and every crime.

3    Some have seven, some have five, some

4    have four; but each crime has an element,

5    and one of the first elements that is

6    almost always involved in any case, is

7    that the crime was committed in this

8    jurisdiction, and this jurisdiction,

9    obviously is Trumbull County.  If we were

10   to present to you all of the other

11   elements, the fact that it was a

12   homicide, it was aggravated murder, it

13   was committed during the course or

14   commission of say a burglary or robbery,

15   and that the offense involved the death

16   of another, it was complicity that we

17   proved that she aided and abetted another

18   in committing this offense.  But we

19   failed to have one witness come in here

20   and say, "All of this happened in

21   Trumbull County, Ohio."  What would your

22   verdict have to be if we failed to

1093

1   present to you one of the elements of

2   those crimes?

3   A.   I don't know what you mean.

4   Q.   We have to prove to you, we have to prove to

5        you first of all, that there was a death.

6        We have to prove to you that it was, that

7        it was committed -- well, there's

8        actually a couple of different theories

9        in this case, but one of the crimes is

10       we'll have to prove to you, that it was

11       planned, what we call premeditated murder

12       was committed.  It was planned and

13       thought out.  I don't want to get into

14       the legal definitions.  We have to prove

15       to you certain things, obviously there

16       was a death, that somehow it was planned,

17       it was committed during the course of

18       either an aggravated robbery or

19       aggravated burglary, and we have to prove

20       that it was committed here in Trumbull

21       County, Ohio.

22            Let's say we get four out of those

1094

1   five elements or whatever. Three out of

2   four. But we never mention, we never

3   have one person or one document that says

4   to you that this happened in Trumbull

5   County, Ohio. Let's say the coroner

6   doesn't say that he found this body here

7   in Trumbull County. None of the police

8   officers say that the body was found in

9   Trumbull County. We present no evidence

10  to that. Your verdict would have to be,

11  as much as you may not like it, it would

12  have to be not guilty, right?

13  A.   I don't know.

14  Q.   I'll tell you that it would have to be. You

15  would have to do that, and the reason, I

16  guess, that you have to do that, is

17  because every person has -- every person

18  is presumed innocent until they are

19  proven guilty. You understand that

20  concept?

21  A.   Yes.

22  Q.   So, if the Judge asked you or if I asked you

1095

1    right now, "Is Donna Roberts guilty of

2    anything?"  Your answer would be what?

3  A.    No.

4  Q.    And you may not get to the point where we get

5    that glass of water full to the point

6    where you would be satisfied by reason

7    and common sense that she's guilty of

8    anything.  And one of those elements that

9    we have to put in there, is the element

10    of venue.  We have to prove that it

11    happened here in Trumbull County.  So we

12    may prove that she was involved.  She

13    knew about it, she was an aider and

14    abetter.  There was an aggravated

15    robbery, aggravated burglary.  We may

16    never prove to you that it happened here.

17    For all you know, it may have happened in

18    New York, Michigan, Florida, and if that

19    element isn't proved that it happened

20    here in Trumbull County, you would have

21    to find her not guilty, right?

22  A.    Yes.

1096

1    Q.    And despite the fact that you know that Mr.

2          Fingerhut may be deceased, and you may

3          know even that she was involved to some

4          extent, until we prove all of those

5          elements, you would not find her guilty

6          and sign a verdict form finding her

7          guilty by proof beyond a reasonable

8          doubt, would you?

9    A.    No.

10   Q.    You would hold us to our standard of proof?

11   A.    Yes.

12   Q.    Now, along those lines of presumption of

13         innocence is the fact that they don't

14         have to do anything.  They may present to

15         you a defense.  They may present to you

16         some things and try to explain to you,

17         but in essence the Defense in any

18         criminal trial, not just this trial,

19         never has to say a word.  They could sit

20         over there and do crossword puzzles

21         during this entire trial.  I know

22         Mr. Juhasz and Mr. Ingram aren't going to

1097

1   do that, but we could call in a parade of

2   witnesses.  We could have 30 witnesses in

3   this case, 300 Exhibits.  They don't have

4   to even cross examine them.  And you may

5   find as a juror, "Well, the State didn't

6   prove their case.  They had all of these

7   witnesses and all of these documents, but

8   they never had anybody come in and say

9   she was involved or they never had

10  anybody come in and say it happened in

11  Trumbull County."  You understand that it

12  is not the quantity of the evidence, it

13  is really the quality?

14  A.   Yes.

15  Q.   And I guess on the other side of that coin is

16       the fact that we could present to you,

17       just one witness.  One witness may know

18       everything.  If this were a different

19       type of case, maybe let's say a robbery

20       or let's say a burglary case where

21       someone had broken into someone's home

22       and stole some items and let's say it was

1     the home owner that came home, found this

2     guy red handed, saw him coming out.  He

3     knew who the guy was, he had his

4     television.  He saw that his window was

5     broken through the back.  The guy had

6     unplugged the T.V., carrying it out, gets

7     caught red handed.  We could probably

8     prove that case with just one witness.

9     And the guy is going to say, "Yes, I live

10    here in Trumbull County."  So you

11    understand that it is really the quality

12    of the evidence, not the quantity,

13    correct?

14  A.    Yes.

15  Q.    Now, some of the -- also I noticed on your

16        questionnaire, that I believe it was your

17        daughter was assaulted, is that correct?

18  A.    Yes.

19  Q.    What was the result of that case?  Was anyone

20        charged?

21  A.    Yes.  She was dating somebody and he got sent

22        to jail for ten months or something.

1099

1   Q.   Was that here in Trumbull County?

2   A.   Yes.

3   Q.   Was that handled by the County Prosecutor's

4        office or one of the municipalities like

5        Warren City?

6   A.   It was some Prosecutor in Warren.  I don't

7        know which one.

8   Q.   In the city?

9   A.   In the city.

10  Q.   So it happened in the city.  That is not going

11       to have any bearing on your ability to

12       sit as a juror in this case, is it?

13  A.   No.

14  Q.   How long ago was that?

15  A.   Probably four or five years ago.

16  Q.   That wouldn't have involved the County

17       Prosecutor's office?

18  A.   No.

19  Q.   That would have involved like with Gregg Hicks

20       and maybe like Judge Gysegem down at Muni

21       Court or Judge Ivanchak?

22  A.   I don't know.  I don't remember.

1100

1    Q.   In this particular case, you are going to hear

2         from a lot of police officers.  And I

3         didn't really see where you had

4         indicated.  Do you know anybody that is

5         in law enforcement, any police officers,

6         any Deputy Sheriffs?

7    A.   No.  I knew a couple, but they are retired,

8         from Howland.

9    Q.   How long ago?

10   A.   Only the one I knew was Bill Cranston.  I went

11        to school with him.

12   Q.   And he obviously works for Howland Police

13        Department.  I believe he still does,

14        correct?

15   A.   I don't believe so.  I don't see him, but I

16        knew him from school.

17   Q.   One of the things that the Court is going to

18        tell you is the fact that all of the

19        witnesses that you hear from in this

20        Courtroom, you, if you are picked as a

21        juror, have the ability to use all of

22        their testimony and believe all of it,

1    believe some of it, or believe none of

2    it.  That is really what your job is as a

3    juror is to determine, one of the jobs,

4    one of the functions you have is to

5    determine who is telling you the truth

6    and who is not.

7        One of the scenarios that sometimes

8    I talk about is let's say you go out

9    today for lunch and there's an accident

10   down here right on the corner of High

11   Street and Park Avenue.  Big

12   intersection, two cars smacked together

13   on each other.  And now we come to Court

14   for a trial.  And the trial basically

15   is -- it's a civil case, it's not a

16   criminal case.  But it's a civil case and

17   it's my client, I am suing the other

18   driver.  And we'll just say it is driver

19   B.  I represent client A.  And he says,

20   "I am driving east on High Street and

21   this guy just barrels through the

22   intersection.  I had the green light.  I

1102

1   am traveling east, and I'm going up to

2   the Mocha House to get my cup of coffee

3   like I always did and this guy came

4   flying out of nowhere, completely blew

5   the red light at Park Avenue right here

6   at Park and High and he T-boned me, hit

7   me on the passenger side.  I got some

8   injuries, I am hurt.  I haven't been able

9   to work because I have got these terrible

10  headaches."  And I present one witness.

11  And the one witness is the guy who is

12  standing on the corner says, "Yes, I saw

13  the whole thing.  The guy was traveling

14  east on High Street, he had the green

15  light.  The guy coming through the

16  intersection is red."

17      And let's go back and let's say this

18  is a criminal case, he's been charged

19  with going through that light, basically

20  running the red light.  I have to prove

21  it by proof beyond a reasonable doubt.

22  And I may present to you only those two

1103

1    witnesses.  That is probably going to be

2    good enough for you to find him beyond a

3    reasonable doubt guilty, that the guy

4    traveling on Park, driver B was guilty of

5    driving through that red light; correct

6    or not?

7  A.  It is possible.

8  Q.  What else would you need or what else would

9    you like to see?

10  A.  Depends on the witness to me.

11  Q.  Depends on who he was?

12  A.  Yes.

13  Q.  And that is an excellent point.  Now let's say

14    that that witness happens to be the

15    brother of driver A.  Cause you some

16    concerns, doesn't it?

17  A.  Yes.

18  Q.  And let's say that the guy at the intersection

19    is not only the brother of driver A, who

20    is the victim in this case, but also he's

21    a convicted felon and he's been to prison

22    for stealing and he's got a bad record.

1104

1    And to top it all off, he wears glasses.

2    He comes into the Courtroom with these

3    big thick coke bottle glasses and the

4    Defense still hasn't presented anything

5    to you.  They haven't questioned him or

6    anything.  You are going to have some

7    real problems with this guy now, aren't

8    you?

9  A.    Yes.

10  Q.    And now let's say the Defense asks him one

11    question and says, "Well, Mr. Witness,

12    isn't it true that on this day, you

13    didn't even have those glasses on that

14    you need to see the end of your nose?"

15    He says, "Yes, I was going down to the

16    optometrist and they were broken that

17    day, I didn't have them on."  That is

18    probably not going to be enough for you,

19    right?  You have got a guy who has got a

20    bad record, crimes of dishonesty, doesn't

21    have his glasses on and related to the

22    victim.  Those are a lot of things that

1105

1         you are going to consider against

2         believing his testimony, right?

3   A.   Yes.

4   Q.   And it may be a horrible crime and you may

5         find out that the guy who was driver B

6         has a horrible record.  He didn't have a

7         license, couldn't even drive, maybe was

8         drunk.  But the fact of the matter is, we

9         didn't prove to you the case beyond a

10        reasonable doubt, right?

11  A.   No, you didn't.

12  Q.   Now, let's change that up a little bit and the

13        guy who is the witness, Mr. Witness is

14        let's say, Reverend, Priest, Minister,

15        local church, and he happened to come

16        down to the Courthouse here to get some

17        documents for the church.  He's walking

18        back up the street to go back to the

19        church and doesn't know either one of

20        them.  Clearly was paying attention.  He

21        says, "I walk this Courthouse Square

22        every day at lunch time.  I walk around.

1106

1    I am really careful to watch the lights.

2    In fact, it is my habit that I walk

3    around the Courthouse Square and I look

4    out, because I don't want to get hit.

5    And I happened to be at the light and I

6    saw this sign that said "walk," that the

7    light was green, but I know because I see

8    some of these crazy drivers, that I

9    always look both ways, because even

10   though I have the right of way, with the

11   people on High Street that are traveling

12   east I know sometimes miss that traffic

13   light coming down Park Avenue.  And I

14   always check both ways.  And as I looked

15   to my right, this guy was just flying up

16   on Park.  He was going north and I knew

17   there was going to be an accident and

18   just as I stepped on the curb, I stopped

19   and saw him barreling this guy going down

20   High Street."  That would be enough for

21   you, right?

22  A.    Yes.

1107

1    Q.    In a nutshell, that is sort of what we're

2          talking about here.  We're talking about

3          you making those determinations.  And

4          again, every witness you are going to

5          have to go through, and they may go

6          through questioning, not required to, but

7          they are going to show you things and try

8          and show you things and we're going to

9          show you things.  You feel you will be

10         able to make those determinations as to

11         the witnesses, and the credibility of

12         those witnesses then, correct?

13   A.    Yes.

14   Q.    And you understand how that works, that there

15         are various things that play into any

16         witness' perception, whether or not they

17         have good eyesight, whether or not they

18         have a criminal record, whether or not

19         they were paying attention, whether or

20         not they have some kind of bias or

21         interest with either the victims or the

22         Defendant, correct?

1108

1   A.   Yes.

2   Q.   Now, in every case we're going to have, I

3        guess, evidence to present to you.

4        Sometimes it is just witnesses, but in

5        this case, we're going to have some

6        evidence for you.

7             MR. INGRAM:  Excuse me, but the

8   testimony of witnesses is evidence.

9   Q.   I'll rephrase that.  We'll have some physical

10       evidence.  Sometimes the only evidence

11       we'll have will be the testimony, what

12       someone saw or heard.  In this case, I

13       anticipate that we're going to have some

14       actual physical evidence.  One of the

15       things we're going to have is some

16       letters and some phone calls and that is

17       one of many, many things.  Some of the

18       many, many things that I anticipate we'll

19       present to you.  You understand that in

20       every case, even in a case as big as

21       this, there's probably things out there

22       that no one has thought of or maybe no

1109

1    one bothered to look at, whether it be

2    the Defense side or the State's side.

3         You as a juror, though, you can't go

4    out and do your own tests and your own

5    testing of the evidence and testing of

6    the witnesses.  For instance, if the

7    witness says something and maybe how long

8    it took to get somewhere, let's say we're

9    going back to our traffic case and the

10   witness says, "Well, this guy came down

11   at such and such a speed and did this."

12   You are not allowed to go jump in your

13   car and say, "I'm going to see if this

14   really does happen and I'm going to drive

15   down Park Avenue and North and see if

16   this really happens, if I can make it

17   through both the light at Park and High

18   and the light at Park and Market Street

19   and see if I can hit both of those lights

20   at the same time and make them both."

21   You are not allowed to do that.  You

22   can't go out and test that.  You

```
                                                          1110
 1              understand that?

 2   A.    Yes.

 3   Q.    We're here today because there was what is

 4              called an indictment, and the indictment

 5              is issued by the Trumbull County Grand

 6              Jury in this particular case.  Have you

 7              ever served on the Grand Jury?

 8   A.    No.

 9   Q.    Do you have any idea how the Grand Jury works?

10   A.    I have some understanding of how it works.

11   Q.    Do you know that at the Grand Jury, Miss

12              Roberts and her attorneys were not there.

13              They didn't present anything.  They

14              weren't permitted to even come in there.

15              They didn't show up.  They didn't present

16              any evidence.  There was no Judge there.

17              It was basically Assistant Prosecutor and

18              some witnesses, not even all of the

19              witnesses, that presented this case to

20              the Grand Jurors.  And at Grand Jury, it

21              only takes seven of the nine voting

22              members to issue that piece of paper and
```

1111

1    that indictment.  You understand that

2    that estimate is just merely an

3    accusation.  It is just merely a group of

4    people in this community saying, "Hey, we

5    think this person did something wrong."

6    You won't take the fact that she's

7    charged with these horrendous crimes and

8    say, "Listen, we got to find her guilty

9    of something, because look at all of

10   these crimes."  We have got aggravated

11   murders, you have got death penalty

12   specifications.  You have got aggravated

13   robbery, aggravated burglary.  You

14   wouldn't say, "Hey, she's guilty of

15   something.  I'm not walking out of here

16   if the State didn't prove the elements of

17   those offenses."  You would have no

18   problem finding her not guilty, correct?

19  A.   Correct.

20  Q.   Despite the fact that some Grand Jury

21       somewhere that didn't hear anything from

22       her, didn't hear anything from her

1112

1            Attorneys, didn't have a Judge with them,

2            found that there was the need to indict

3            her, correct?

4    A.   Yes.

5    Q.   One of the things in this case that we're

6            going to talk about is this, and you are

7            going to be instructed on some of the

8            actual crimes involving what we call

9            complicity, and I am assuming, and maybe

10           I'm wrong, but I am assuming you have

11           heard those terms used before, like you

12           are an aider and abetter.  You are a

13           complicitor?

14   A.   Yes.

15   Q.   And I'm going to tell you flat out right now,

16           no one in this case is going to come in

17           here and say, "I saw her pull the

18           trigger."  Or, "She's the one who pulled

19           the trigger," or "We ran a gunshot

20           residue test on her hand and we found

21           evidence that she had fired a gun this

22           night in question."  So that is

1113

1    completely out of the equation here.  How

2    does it change the fact for you in being

3    a juror, and making these determinations,

4    or does it that she's accused as an aider

5    and abetter and not the actual principal

6    offender?  Is that going to, I guess what

7    I'm asking you, does that make this a

8    more difficult case for you to find her

9    guilty or not guilty or is this going to

10    be a case where you are going to say,

11    "Hey, I'm going to follow the Judge's

12    instructions on what that term means"?

13    A.   I'll follow the Judge's instructions.

14    Q.   And you may have some preconceived ideas

15    coming in here today, as to what some of

16    these terms mean, reasonable doubt,

17    complicity, aider and abetter,

18    presumption of innocence.  But you

19    believe that you will follow whatever the

20    Court instructs you on in terms of the

21    law and what those terms mean and what

22    you have to do as a juror, correct?

1114

1   A.   Yes.

2   Q.   Do you have any questions for me that you feel

3        that you need to ask me in terms of how

4        you are going to decide this case or

5        problems that may arise or questions that

6        you may have in deciding this case?

7   A.   No.

8   Q.   You believe you can be a fair and impartial

9        juror in this matter and put aside

10       whatever you have read or heard about

11       this case, and put aside your personal

12       opinion about the death penalty, and

13       decide this case fairly and honestly, and

14       give her the benefit of the doubt,

15       because you have to do that.  She gets

16       the reasonable doubt.  We have to prove

17       that beyond a reasonable doubt.  You feel

18       you can be a fair and impartial juror?

19  A.   Yes.

20  Q.   We don't want to run into this situation,

21       where if you are picked as a juror, two

22       or three weeks in this trial or a couple

1115

1    of days into this trial, you are now

2    sitting there saying, "Hey, Mr. Bailey,"

3    or "Mr. Becker," or "Your Honor, I have a

4    question about this.  I can't do this.

5    No one ever told me this."  You feel you

6    have a good understanding of what this

7    case is about and what your duty is going

8    to be as a juror?

9  A.    Yes.

10 Q.    And you can fulfill that obligation?

11 A.    Yes.

12              THE COURT:  Let's take a ten minute

13 break.

14 (Court in recess at 11:05 A.M.)

15 (Resumed in Open Court at 11:25 A.M.)

16 EXAMINATION BY MR. INGRAM OF MR. DERMER:

17 Q.    Good morning, Mr. Dermer.  John Juhasz and I

18        share the responsibility of representing

19        Donna here, who is on trial for her life.

20        And obviously, we feel we should take

21        every reasonable precaution in selecting

22        a fair minded Jury, the same type of Jury

1116

1    you or I would want if we were on trial.

2    Does that sound fair enough to you?

3  A.    Yes.

4  Q.    As Mr. Becker told you, this is the only time

5    we can talk directly to one another, and

6    more importantly than me being able to

7    talk to you, it is the fact that you are

8    allowed to talk to us.  So, if there's

9    anything that pops into your mind during

10   the period of time that I am standing up

11   here, please let me know and we'll talk

12   about it.

13   The process that you are going

14   through here is a lot like a job

15   interview, except when you go for a job,

16   you get to choose the job you are going

17   to be interviewed for.  And in this

18   situation, the Jury wheel actually chose

19   you, and brought you in here.  We're

20   interviewing you today for one of the

21   most important jobs there is, the job of

22   finding the truth and determining the

```
                                                      1117
 1                  fate of another human being.  So my first
 2                  question to you is, how do you feel about
 3                  being asked to assume that
 4                  responsibility?
 5    A.    It is hard.  Difficult.
 6    Q.    You are up to it?
 7    A.    Yes.
 8    Q.    In a nutshell, this case boils down to the
 9                  Government's allegation that Donna
10                  Roberts plotted or conspired with a male
11                  companion, Nate Jackson, to cause the
12                  death of Robert Fingerhut.  Donna and
13                  Robert were divorced but continued to
14                  work with one another at the Greyhound
15                  bus station in Warren and Youngstown, and
16                  continued to live together in Howland.
17                  This trial, you will understand, is about
18                  the guilt or innocence of one person and
19                  one person only, Donna Roberts.  You
20                  understand that?
21    A.    Yes.
22    Q.    Throughout the course of this trial, you will
```

```
                                                        1118
1              hear the name Nate Jackson and you have

2              already talked to Mr. Becker about Nate

3              Jackson.  And shortly into the

4              proceedings, you may quickly conclude

5              that Nate Jackson did what the State says

6              he did.  That is not the issue here.  Do

7              you understand that?

8    A.   Yes.

9    Q.   The issue here is, did Donna help him do it or

10             not, and that is what we're here to

11             determine.  Will you hold the State of

12             Ohio to its burden of proving beyond a

13             reasonable doubt that Donna helped Nate?

14   A.   Yes.

15   Q.   In support of its allegation that Donna helped

16             Nate, the State will present during this

17             trial various letters and recorded

18             conversations between Donna and Nate.

19             Some of those letters and some of those

20             conversations are sexually explicit and

21             to be honest with you, rather offensive.

22             However, the charge here is murder, not
```

```
                                                              1119

 1             loose morality.  Do you understand that?

 2   A.    Yes.

 3   Q.    No matter how shocked or offended you may be

 4             by the sexual nature of some of this

 5             evidence, as a trial juror it will still

 6             be your job responsibility to test that

 7             evidence, to determine whether it ties

 8             Donna to the death of Robert Fingerhut.

 9             Will you do that?

10   A.    Yes.

11   Q.    Now Donna denies that she actually

12             participated or by conspiracy, plot or

13             otherwise to murder Robert Fingerhut.  Do

14             you think you might have a problem giving

15             a scarlet woman such as Donna a fair

16             shake?

17   A.    No.

18   Q.    Would you have the courage to acquit if you

19             felt a not guilty verdict was warranted

20             by the evidence?

21   A.    I could do it.

22   Q.    I know you talked with Mr. Becker about
```

1120

1    pre-trial publicity.  I have to talk with

2    you a little more about that.  What all

3    do you recall seeing, reading or hearing

4    about either this case, or the Nate

5    Jackson case?

6  A.  One thing I remember in this case was, what

7    caught my attention the first time, I

8    believe it said somebody from Howland and

9    I live in Howland.  I didn't know him.  I

10    never heard of them.  That is the first

11    thing that caught my eye.  As far as Nate

12    Jackson, I didn't know when his trial was

13    up or going, because I didn't know that

14    he was found guilty until just like last

15    week in the paper.

16  Q.  Let me talk to you about that.  You found out

17    about the Jackson verdict Tuesday of last

18    week when we all assembled down at the

19    other end of the hallway?

20  A.  I believe it was in the paper that morning on

21    the front page.

22  Q.  Does the fact that Mr. Jackson was convicted,

1121

| | | |
|---|---|---|
| 1 | | create any impression in your mind that |
| 2 | | Donna was involved? |
| 3 | A. | Involved with him somehow, but not with murder |
| 4 | | or anything, no. |
| 5 | Q. | You do have an impression that Donna was |
| 6 | | involved with Nate Jackson? |
| 7 | A. | You said he was. |
| 8 | Q. | And that is from the letters and the tapes? |
| 9 | A. | Yes, that is the only reason.  Do I know she |
| 10 | | had any physical contact with him or |
| 11 | | anything?  No, I don't know.  If she did, |
| 12 | | I don't know. |
| 13 | Q. | You don't know whether she had anything to do |
| 14 | | with the death of Robert Fingerhut or |
| 15 | | not? |
| 16 | A. | No. |
| 17 | Q. | And that is what you are here to determine? |
| 18 | A. | Yes. |
| 19 | Q. | It is extremely important that jurors avoid |
| 20 | | news media coverage about any trial that |
| 21 | | the jurors are hearing.  It is so |
| 22 | | important that the Judge asked you |

1122

1            actually to sign a written document.  Do

2            you recall that?

3   A.   Yes.

4   Q.   Let me explain the reason.  And I think I can

5            do it by, although I hate to ever mention

6            the O.J. Simpson trial, I think I can

7            explain the importance by going to that

8            trial.  Every night in that proceeding

9            you would turn on the news, and there

10           would be some hot shot lawyers, maybe not

11           even hot shot lawyers, just someone they

12           could get to come and sit in front of a

13           camera and one would be pro Defense and

14           one would be pro Prosecution, and they

15           had each put a different spin or

16           interpretation on the evidence.  Did you

17           see any of that?

18  A.   Yes.

19  Q.   Would you agree with me that a juror should

20           not have been exposed to that because the

21           impressions of the juror could have been

22           affected by seeing what those people were

1123

1   saying about that trial?

2   A.   Yes, I could see how it could.

3   Q.   That is the same here and that is why we ask

4        you to avoid news coverage.  Will you do

5        your best to do that?

6   A.   Yes.  Well, as far as seeing the news, on my

7        job I work 12 hour days and I work from

8        four in the morning to four in the

9        afternoon or four in the afternoon to

10       four in the morning.  I don't see the

11       news probably, the local news, three to

12       six days a week usually.

13  Q.   You work at Delphi, right?

14  A.   Yes.  I just finished up at four in the

15       morning.

16  Q.   When we all assemble -- sorry to keep you up.

17  A.   That is okay.

18  Q.   I'll try to go as quick as I can.  When we all

19       assembled down at that other hallway, did

20       you recognize any of your coworkers by

21       the way?

22  A.   No, I didn't see anybody I knew.

1124

1  Q.  If you are selected as a juror, you and all of
2          your other jurors will be told to keep an
3          open mind until the case is over.  If you
4          hear the testimony of let's say --
5          there's ten witnesses in the case.  And
6          the first witness takes the witness stand
7          and testifies that, "I was in front of
8          the delicatessen at this corner on May 5,
9          1999."  And you decide that you believe
10         that witness, and that that witness was
11         there and that is an important fact to
12         resolving that case.  You then would not
13         listen with the same degree of openness
14         to the rest of the testimony, and if the
15         third or fourth witness in that trial
16         were to say, "Hey, that guy couldn't have
17         been there, because he was with me at the
18         Southern Park Mall in Youngstown," you
19         might have missed that because you
20         already decided that preliminary question
21         of fact.  Are you with me?
22  A.  Yes.

1125

1   Q.   So the Judge will instruct you that it is
2             important to keep an open mind until the
3             final gavel pounds; will you do that?
4   A.   Yes.
5   Q.   And you can't talk about this case with your
6             fellow jurors.  And you know that is
7             hard.  Because odds are you won't know
8             most, if not all of your other jurors.
9             The only thing you guys are going to have
10             in common are what you see, hear and what
11             goes on here, so since that is the only
12             thing you have in common, the natural
13             inclination is to discuss what you all
14             have in common, but you are going to have
15             to do your best to resist the temptation
16             to do that.  You think you are up to
17             that?
18   A.   Yes.
19   Q.   As you know, this is a capital case and we're
20             required to learn your feelings regarding
21             the death penalty and life imprisonment
22             as sentencing options.  Do you understand

1126

1            that this is potentially and only

2            potentially a two phase process?

3    A.   Yes.

4    Q.   At the first phase, if the State of Ohio

5            doesn't meet its burden of proof and the

6            Jury determines that Donna Roberts is not

7            guilty, what happens?

8    A.   She goes free.

9    Q.   And we all go home?

10   A.   Yes.

11   Q.   Only if the Jury returns a verdict of guilty

12           on the charge of aggravated murder and a

13           verdict of guilty as to a death

14           specification, do we get to a second

15           phase.  You read about that, when

16           yesterday in the preliminary

17           instructions -- or was that this morning

18           you read the preliminary instructions?

19   A.   I read that Friday.

20   Q.   How has your juror experience been treating

21           you so far?  Have we been keeping you

22           waiting long enough?  We try to do the

1127

1    best we can, but sometimes it gets

2    difficult with scheduling.

3  A.   I got three days off, so I can rest.

4  Q.   The mere fact that I am sitting up here

5    talking to you about possible punishment,

6    actually causes me some concern.  Seems a

7    little odd that we're talking about

8    punishment when you haven't even

9    determined whether the person we're

10   talking about has done anything wrong or

11   not.  Does that seem odd to you?

12 A.   A little bit.

13 Q.   Does it seem like you are putting the cart

14   before the horse or we're putting the

15   cart before the horse?

16 A.   Some.

17 Q.   Let me explain my concern.  I don't want you

18   to think that just because we're standing

19   up here asking you about punishment that

20   we're predicting you're going to get to a

21   second stage.  You understand that is not

22   so?

```
                                                              1128
 1    A.    Yes.

 2    Q.    The State has asked whether you would fairly

 3          consider the death penalty as a

 4          sentencing option if we ever got to a

 5          second phase.  The flip side of that

 6          question is, could you consider the three

 7          life sentence options fairly if we ever

 8          get to a second phase?

 9    A.    Yes.

10    Q.    You understand that life without parole is

11          indeed life without parole?

12    A.    Yes.

13    Q.    You go in, you don't get out?

14    A.    Yes.

15    Q.    And the other two are parole eligibility after

16          25 and life with parole eligibility after

17          30 years.  You do day for day, 25, before

18          you are even eligible, or day for day,

19          you do 30 years before you are even

20          eligible?

21    A.    Yes.  It was in the paper I read.

22    Q.    Generally, and let me back up.  We could
```

1129

```
 1              change roles.  You could stand up here
 2              and ask me the same questions I'm asking
 3              you and I want you to understand, I would
 4              have a difficult time answering these
 5              questions.  I am talking to you about
 6              things that we don't normally think about
 7              in our daily lives and they are hard
 8              things to sort of intellectualize, and I
 9              apologize for the difficulty of the
10              questions, but they must be put to you.
11              Do you understand that?
12    A.   Yes.
13    Q.   Generally, how do you feel about life
14              imprisonment as an alternative to the
15              death penalty in capital cases?
16    A.   I suppose if it was me -- well, I don't know.
17              I have never been in prison but I guess
18              the alternative is better than death.
19              Maybe, I don't know.  It is hard to say.
20    Q.   Have you ever heard someone in passing or in
21              conversation say that they did not
22              believe in life imprisonment as an
```

1130

1    alternative to the death penalty because

2    of the cost of incarceration?

3    A.    I have heard that, yes.

4    Q.    Do you have any particular feelings on this

5          cost issue?

6    A.    No.

7    Q.    Have you ever considered a political

8          candidate's views on capital punishment

9          in determining whether or not to vote for

10         that candidate?

11   A.    Have I ever or would I ever?

12   Q.    Have you ever?

13   A.    Not that I can recall, no.  Would I?  I might.

14         If somebody came out and was strictly

15         against it, no, I wouldn't.  I couldn't

16         vote for him if he said he was strictly

17         against it.  I haven't.

18   Q.    Do you remember when Celeste was Governor?

19   A.    Yes.

20   Q.    And were you exposed to any of the publicity

21         or discussion about the fact that there

22         were no death sentences carried out while

1131

1   he was Governor?

2   A.   I didn't know.  We haven't had one for a long

3        time.  If it was just him or not, I don't

4        know.  As far as I know, Ohio hasn't had

5        any for quite awhile.

6   Q.   How do you feel about that?

7   A.   I think some of them deserve it.  They should

8        have been put to death, depending on

9        their crime.

10  Q.   Recently, there's been some debate in this

11       country about the appropriateness of the

12       death penalty.  The State of Illinois,

13       Illinois put on a moratorium.  The

14       Supreme Court recently issued a decision

15       about death sentences for the mentally

16       and mentally impaired.  Have you seen or

17       heard anything about these issues?

18  A.   No.

19  Q.   Have you ever seen the movie "True Crimes,"

20       starring Clint Eastwood?

21  A.   I don't know.  I can't remember if I did.

22  Q.   He's a reporter and the plot -- as the plot

1132

```
 1              unfolds, there's a person who has been

 2              convicted and is awaiting execution.  It

 3              was on HBO.

 4   A.   I don't remember it, no.

 5   Q.   I want to underscore before I ask you this

 6              question.  I'm asking you your personal

 7              vow and not whether you can follow

 8              instructions of will you or not.  We'll

 9              get to that.  Those are two separate

10              issues.  Do you see that?

11   A.   Yes.

12   Q.   As I understand your views on capital

13              punishment, it is appropriate for some

14              cases?

15   A.   Yes.

16   Q.   And I believe you said some premeditated

17              murders, murders involving children and

18              serial killers?

19   A.   Yes.

20   Q.   Could I ask you to be a little more definite,

21              to explain your view a little more to me?

22   A.   Well, premeditated, even though it is planned
```

1133

1   ahead of time by certain individuals, I

2   would not consider the death penalty, but

3   some cases I would.  But as far as serial

4   killers, they have planned their murders.

5   They are going to shoot random people.  I

6   believe they should get the death penalty

7   and people that do things to children,

8   they should get the death penalty, but

9   not everybody that is premeditated should

10   get the death penalty, not necessarily.

11  Q.    I am switching horses and I'm going to your

12   ability to follow instructions.  I want

13   to be fair.  One of the -- well, there

14   are two aggravated murder counts in this

15   indictment.  Both of those counts allege

16   that the killing of Robert Fingerhut was

17   purposely done.  And we'll talk more

18   about that in a few minutes.  And the

19   other count, one count alleges that the

20   murder was done with prior calculation

21   and design, advance planning.  You

22   understand that?

1134

1   A.    Yes.

2   Q.    The law says that if there's an aggravated

3            murder with advance planning, and if the

4            Defendant is convicted of that aggravated

5            murder, and I'm not talking about this

6            case, I am talking about some made up

7            case.  If the Defendant is convicted of

8            the aggravated murder charge, and

9            convicted of a death specification, that

10           the Jury should equally and fairly

11           consider the four sentence options.  Are

12           you with me there?

13   A.    Yes.

14   Q.    In other words, none of those options should

15           start with a head start.  Does that make

16           sense?

17   A.    Yes.

18   Q.    Let me tell you how it usually comes up.

19           Usually, it comes up when a juror's views

20           about the death penalty are such that the

21           juror -- and I'm not saying you have

22           expressed this opinion, because you have

1135

```
 1              not.  It usually comes up when the juror

 2              says, "Well, if convicted of an

 3              aggravated murder, I would automatically

 4              lean towards the death penalty.  If

 5              convicted of murder with advance

 6              planning, I would lean towards the death

 7              penalty."  That is when it usually comes

 8              up.  But your views are not like that or

 9              are they like that?

10   A.    No.

11   Q.    They are not?

12   A.    No.

13   Q.    Now if you are ever called upon to decide a

14              sentence, you don't decide upon a

15              sentence in a vacuum.  The law gives you

16              instructions and the Judge will give you

17              instructions.  You will be instructed to

18              weigh aggravating circumstances, bad

19              things, against mitigating factors,

20              positive things that can be brought out

21              about the Defendant.  You understand

22              that?
```

1136

```
1    A.   Yes.

2    Q.   And weigh it.  You remember Mr. Becker telling

3              you that the Jury is the sole judge of

4              the weight of the evidence?

5    A.   Yes.

6    Q.   So when you weigh this evidence, that is your

7              personal responsibility.  You got me

8              there?

9    A.   Yes.

10   Q.   And do you understand that before any juror

11             can ever vote for death at this made up

12             second phase, that juror would have to be

13             convinced beyond a reasonable doubt that

14             the aggravating circumstances outweigh

15             the mitigating factors, and the death is

16             the appropriate sentence?

17   A.   Yes.

18   Q.   And if we ever get to such a second phase, I

19             am certain you will hold the State of

20             Ohio to its burden of proof?

21   A.   Yes.

22   Q.   The incident with your daughter.  I hope she
```

1137

1    wasn't hurt.  Was she hurt?

2  A.  She was beat up pretty good.

3  Q.  Did you go to any of the Court proceedings?  I

4      understand that you did not go as a

5      witness.  You did not participate.  My

6      son was assaulted and I can assure you

7      that when there was a Court proceeding, I

8      went to the Court proceeding.  Did you go

9      to the proceedings in Municipal Court?

10 A.  I think, yes, I did.  I don't know if I went

11     to all of them, because I might have been

12     working.  I think it only lasted one day.

13 Q.  Is there anything about that case that left

14     sort of a sour taste in your mouth

15     regarding the criminal justice process?

16 A.  No.

17 Q.  Do you belong to or associate with any group

18     which has crime prevention or law

19     enforcement as a goal?

20 A.  No.

21 Q.  Have you ever donated any time, money or

22     services to a political campaign or

1138

1    issue?

2    A.  No.

3    Q.  Do you belong to any group or organization

4        which is active in any political matter?

5    A.  No.

6    Q.  And the last five years or so, have you signed

7        a petition on any public issue?

8    A.  No.

9    Q.  Do you hold any office in Local 717?

10   A.  No.

11   Q.  Have you ever?

12   A.  No.

13   Q.  Does it trouble you at all that this occurred

14       in Howland and you lived in Howland for

15       30 years?  That doesn't pose a problem

16       for you, does it?

17   A.  No.

18   Q.  The Judge will instruct you that sympathy has

19       no place in the Courtroom.  Feelings of

20       sympathy should not affect your judgment.

21       It is a Court of law, not a Court of

22       sympathy.  Do you agree with that?

```
                                                      1139
 1   A.    Yes.

 2   Q.    And sympathy for Donna Roberts shouldn't

 3              affect the way you evaluate the evidence

 4              in this case.  That sound fair to you,

 5              right?

 6   A.    Yes.

 7   Q.    The other side of that coin is, it is only

 8              natural to feel some sympathy for someone

 9              whose life is unexpectedly and suddenly

10              taken.  So sympathy for the victim, Mr.

11              Fingerhut also should not affect your

12              evaluation of the evidence.  Do you agree

13              with that?

14   A.    Yes.

15   Q.    And you will see some evidence in this case,

16              which we're all human.  And I'm going to

17              tell you, some of the evidence you are

18              going to see is going to arouse natural

19              feelings of sympathy.  You will see

20              photographs.  You may see photographs of

21              a point blank wound to the back of Mr.

22              Fingerhut's head.  Coroner's photographs,
```

1140

```
 1          some of these may be blown up.  Even

 2          though this evidence evokes an emotional

 3          response from you, let's say sympathy or

 4          anger, it is still going to be your job

 5          responsibility to evaluate, test that

 6          evidence, to determine whether it ties

 7          Donna to this offense.  Will you do that?

 8   A.  Yes.

 9   Q.  How do you personally feel about the rule of

10          law which requires a trial juror to

11          presume a Defendant not guilty?

12   A.  That is the way it should be.

13   Q.  I want to talk just briefly about that.  That

14          presumption of innocence, it sounds like

15          a lot of legal mumbo jumbo.  If one of

16          your daughters had been accused of some

17          wrongdoing, say in high school or

18          afterwards and you honestly in your heart

19          felt that your daughter did not do what

20          she was accused of, you would require

21          evidence that she did it before you would

22          be willing to change your mind, wouldn't
```

1141

1    you?

2  A.   Yes.

3  Q.   Does that sound like the presumption of

4       innocence to you?

5  A.   Yes.

6  Q.   You presumed someone is innocent and that

7       presumption remains until it is removed,

8       if ever, by evidence?

9  A.   Yes.

10 Q.   And in this case, that is by evidence beyond a

11      reasonable doubt.  And if your daughter

12      were accused of wrongdoing and evidence

13      was presented to you, I doubt you would

14      just willy nilly accept that evidence at

15      face value.  You would probably look at

16      it with a critical or jaundiced eye to

17      see what it is really supposed to be.

18      Does that make sense?

19 A.   Yes.

20 Q.   Will you do that here?

21 A.   Yes.

22 Q.   Because of the presumption of innocence, the

1142

1     State has the burden of proof, and as

2     Mr. Becker told you, Mr. Juhasz and I can

3     sit here and play crossword puzzles.  I'm

4     not very good at crossword puzzles, but

5     we don't have to do anything, and if they

6     don't convince you beyond a reasonable

7     doubt, you would have to return a verdict

8     of not guilty.  Do you understand that?

9  A.  Yes.

10 Q.  You also understand, Donna is on trial for

11    murder, not for being a woman of loose

12    moral character?

13 A.  Yes.

14 Q.  That burden of proof applies to each and every

15    essential element, and I think for the

16    sake of brevity, that Mr. Becker sort of

17    compacted the two aggravated murder

18    charges.  There are two charges, one

19    death.  The State is allowed to plead

20    alternatively, so two counts here, one is

21    purposely causing the death of Robert

22    Fingerhut with prior calculation and

1143

1   design.  That is advance planning, that

2   is the old premeditation.  The other

3   aggravated murder count is purposely

4   causing the death of Robert Fingerhut,

5   while in the commission of an aggravated

6   burglary or aggravated robbery.  Are you

7   with me?

8   A.   Yes.

9   Q.   They have to prove each and every essential

10       element and purpose is an essential

11       element.  And as the Judge will tell you,

12       purpose is the same as intent.  A person

13       acts purposely, if it is his specific

14       intention to cause a specific result.

15       Would you agree that the facts and

16       circumstances surrounding an act shed

17       light on the actor's intent?

18  A.   Yes.

19  Q.   For instance, if you leave a paper trail as

20       opposed to covering your tracks, it is

21       unlikely that you are engaged in unlawful

22       activity.  Does that make sense to you?

1144

1   A.   What was that again?

2   Q.   If you leave a paper trail as opposed to

3        covering your tracks?

4   A.   What is the difference?  Just because you

5        cover your tracks doesn't mean you are

6        not guilty.

7   Q.   How about if you act openly in the light of

8        day as opposed to secretly undercover of

9        darkness?

10  A.   No.  No difference.  What would be the

11       difference?  If you committed a crime, it

12       is a crime.  Daytime or nighttime.

13  Q.   That is true.  If I am meeting someone in the

14       middle of that intersection at 12 noon in

15       front of 50 people, don't you think it is

16       less likely that the object of our

17       meeting is unlawful, than meeting with

18       him at 2:00 at night in the back alley

19       where nobody can see or hear us?

20  A.   Seems like it would be, but not necessarily.

21  Q.   I agree.  You have to test those

22       circumstances.  Will you do that?

1145

1    A.    Yes.

2    Q.    Now the aggravated burglary charge of trespass

3            is an essential element and the Judge

4            will define trespass to you.  And I

5            believe he will define that as to enter

6            or remain on the land or premises of

7            another.  Will you hold the State to its

8            burden of proving trespass?

9    A.    Yes.

10    Q.    And the aggravated burglary charge which is

11            count three, is the first death

12            specification to the two aggravated

13            murder counts.  Do you think you have a

14            handle on that?

15    A.    Yes.

16    Q.    The fourth count is aggravated robbery, and

17            the State has to prove to you that there

18            was an intended theft offense.  Theft

19            offense is one that necessarily involving

20            or the taking or attempting to take

21            someone else's property.  Will you hold

22            the State to the burden of proving that?

1146

1   A.   Yes.

2   Q.   And you understand that the aggravated

3        robbery, which is the fourth count of the

4        indictment, is the second death

5        specification to the two aggravated

6        murder counts?

7   A.   Yes.

8   Q.   Now Donna doesn't have to testify, doesn't

9        have to do anything.  And the Judge will

10       tell you that if she doesn't testify, you

11       can't hold it against her.  That is part

12       and parcel our heritage in this country.

13       How do you personally feel about that

14       rule?

15  A.   She has her right to that.

16  Q.   On the other hand, if she does testify, she's

17       a witness just like any other witness,

18       you would judge her or you should judge

19       her testimony by the same rules, the same

20       standards that apply to each and every

21       witness that testifies?

22  A.   Yes.

1147

```
 1    Q.   If she testifies, she obviously has an
 2              interest or stake in the outcome of this
 3              case, because she's the Defendant, right?
 4    A.   Yes.
 5    Q.   And that is one of the things the Judge will
 6              tell you that you should consider.  If
 7              you do it fairly, however, if you find
 8              that any other witness has an interest or
 9              stake in the outcome of this case, you
10              would also apply that factor in
11              determining whether you believe the other
12              witnesses.  Are you with me?
13    A.   Yes.
14    Q.   Mr. Becker told you all of the reasons that
15              the indictment is not evidence.  And you
16              understand it is not evidence?
17    A.   Yes.
18    Q.   After he talked to you, do you understand why
19              it is not evidence?
20    A.   Yes.
21    Q.   And it will be read to you throughout the
22              course of this trial.  No matter how many
```

1148

1   times that indictment is read, no matter

2   how many times that indictment is

3   referred to, it doesn't suddenly become

4   evidence.  Fair enough?

5   A.  Yes.

6   Q.  And as the trial juror, you will have to judge

7   the credibility, the believability of

8   each and every witness that testifies.

9   And the Judge will give you a list of

10  factors that you should consider.  Will

11  you take each of those factors and apply

12  them to each and every witness that

13  testifies?

14  A.  Yes.

15  Q.  He's also going to tell you that you should

16  take the test of truthfulness that you

17  apply in your every day life.  And apply

18  those tests to each and every witness

19  that testifies.

20  Now, in your daily life, you are

21  frequently called upon to determine

22  whether somebody is telling you the truth

1149

1    or trying to hoodwink you?

2    A.   Yes.

3    Q.   And whatever test you use in making that

4         determination, that is what we mean by

5         test of truthfulness you apply in your

6         daily life.  So whatever test you

7         intuitively use, will you apply those to

8         each and every witness that testifies?

9    A.   Yes.

10   Q.   Now, the State's burden is proof beyond a

11        reasonable doubt.  And at some point in

12        your life or another you have said to

13        yourself I would imagine, "I am going to

14        give them the benefit of the doubt."  Or

15        "I'm going to give my girl the benefit of

16        the doubt."  Well, you never said to

17        yourself, "I'm going to give her the

18        benefit of an unreasonable doubt."  Did

19        you?

20   A.   No.

21   Q.   I think we intuitively know what is reasonable

22        and what is unreasonable.  Proof beyond a

1150

1   reasonable doubt requires that you be

2   firmly convinced and is proof of such a

3   character that an ordinary person like

4   you or me, would be willing to rely and

5   act upon it in the most important of our

6   affairs.  And we have all made important

7   decisions, haven't we?

8   A.   Yes.

9   Q.   And when we're called upon to make important

10       decisions, sometimes we make a check

11       list, when we do it in our mind's eye or

12       whether we actually get a piece of paper

13       and write pros or cons.  We write the

14       good things for the decision, the

15       favorable things, and then the bad

16       things, the unfavorable things, right?

17  A.   Yes.

18  Q.   And while we're trying to determine whether we

19       should make the decision, the natural

20       focus goes back to the things on the bad

21       side.  The unfavorable, because if you

22       can subtract all of those away, then you

1151

1                can say you are firmly convinced that the

2                decision is the right thing for you.

3                Does that make sense?

4  A.    Yes.

5  Q.    All you would be left with are the positives?

6  A.    Yes.

7  Q.    If you are making a decision, and you are

8                checking out those negatives and you

9                start scratching, like you are buying a

10               house.  You had a concern about the

11               structural stability of the house.  Well,

12               you called in an exterminator, you don't

13               have termites.  You called in a

14               contractor, you start striking those

15               negatives.  But you just have a nagging

16               doubt about whether you can say, maybe

17               making the mortgage payment, and no

18               matter how much you think about it, no

19               matter how much you investigate it, that

20               doubt still remains reasonable in your

21               mind about the mortgage payment.  So

22               there's still one negative?

1152

1    A.    Yes.

2    Q.    If there's one negative, you cannot say beyond

3          a reasonable doubt that that decision was

4          the right thing for you.  Do you

5          understand that?

6    A.    Yes.

7    Q.    And will you hold the State to that burden in

8          this case?

9    A.    Yes.

10   Q.    And you will hear, you have heard of

11         circumstantial evidence?

12   A.    Yes.

13   Q.    Circumstantial evidence is proof of a fact by

14         direct evidence from which you are asked

15         to make an inference or a leap in logic

16         to something else.

17   A.    Yes.

18   Q.    Are you with me?

19   A.    Yes.

20   Q.    If you are asked to make a leap in logic, do

21         you think you had better test the

22         reasonableness of that leap?

1153

1    A.   Yes.

2    Q.   Because if the leap is unreasonable, then you

3         shouldn't make it?

4    A.   Yes.

5    Q.   Do you agree with that?

6    A.   Yes.

7    Q.   And you recall talking to me about the

8         presumption of innocence and your girls

9         and how you might look at evidence with a

10        critical eye?

11   A.   Yes.

12   Q.   If you were presented with circumstantial

13        evidence regarding your girls, you think

14        you might look for other inferences that

15        may be pointed in other directions?

16   A.   Yes.

17   Q.   And will you do that here?

18   A.   Yes.

19   Q.   Now that we have talked, is there anything

20        that has popped into your mind that you

21        would like to discuss with anyone here,

22        either Mr. Becker, the Judge or I?

1154

1   A.   No.

2              MR. INGRAM:   Thank you for your time

3   and attention.

4   (SIDE BAR DISCUSSION, OFF THE RECORD AND

5   OUT OF HEARING)

6              THE COURT:   Mr. Dermer, you will be

7   in the pool from which this Jury will be selected.

8   So you are to call that number given to you Friday

9   night after 4:30, for further instructions.   I

10  would again remind you that you are not to discuss

11  anything about the case, or read anything or watch

12  anything on T.V. about it.   We'll get you back here

13  and we'll have 34 or 35 of you -- pick the Jury

14  from that group.   Thank you.

15  (Juror No. 22 excused from the Courtroom.)

16             THE COURT:   I have got one thing for

17  the record.   Let the record reflect that both Miss

18  Morgan -- that Miss Howard and Mr. Dermer, both

19  sides have passed for cause, is that correct?

20             MR. BAILEY:   Yes.

21             MR. JUHASZ:   Yes, Your Honor.

22             THE COURT:   Fine.   Let's take a

1155

1  lunch break.  I'll see you at 1:00.

2  (Court in recess at 12:05 p.m.)

3  (Resumed in Open Court at 1:20 p.m.)

4  (Juror No. 38, Douglas Jones, entered the Courtroom.)

5              THE COURT:  Good afternoon,

6  Mr. Jones.  You read the hand out that was given to

7  you?

8              MR. JONES:  Yes, I did.

9              THE COURT:  We're here today to make

10  inquiry of two areas, and the first is whether or

11  not you have read anything much about this case

12  that would make it difficult or impossible to set

13  aside any preconceived idea you might have, and

14  whether you would be able to decide the issue based

15  on the evidence that would be presented in the

16  Courtroom.

17              The second issue is to delve into your

18  thoughts about the death penalty.  Under Ohio law,

19  just because someone murders another person does

20  not mean that they necessarily have to face the

21  death penalty.  Only if there are what we call

22  specifications attached to the aggravated murder

1156

1. charge does that possibility arise.  In this case,
2. both of the murder charges have aggravating
3. circumstances attached by way of specification.
4. Now all that means is that during the trial, the
5. Prosecutor is always called upon to prove their
6. case beyond a reasonable doubt.  The Defense need
7. do nothing.  It's strictly up to the State to prove
8. the charges.  If the State fails to do that, then
9. that would be the end of the trial, the Defendant
10. would be released.
11.          If the State does maintain their burden
12. of proof and this Jury should return a finding of
13. guilty, then this same Jury would have to go
14. through a second phase, and at that time they would
15. have to listen to the aggravating circumstances
16. presented by way of evidence by the State.
17.          Aggravating circumstances are merely
18. reasons that the State would put before the Jury as
19. to why the Jury should consider imposing the death
20. penalty.  The Defendant has an opportunity to
21. present what is called mitigating factors and those
22. are reasons why the Jury should not impose the

1157

1  death penalty, but should look to some lesser

2  penalty of life in prison.

3         There's three degrees of that.  Some

4  people are of the mind that if you kill someone,

5  you should have your life taken.  That is not the

6  law of Ohio.  There are other people who could

7  under no circumstances make that decision.  And

8  what is needed to have a fair trial for both sides

9  here are people who undoubtedly will have some

10  personal opinion about the death penalty, but they

11  have to be of such a mind that they are able to

12  follow the law.  If their personal opinion would be

13  at variance with the law, they would have to set

14  aside their personal opinion and follow the law,

15  and that is to weigh those aggravating

16  circumstances against the mitigating factors.  If

17  the State proves beyond a reasonable doubt that the

18  aggravating circumstances outweigh the mitigating

19  factors, then this Jury would be called upon to

20  consider the death penalty.

21         MR. JONES:  I understand.

22  EXAMINATION BY MR. BAILEY OF MR. JONES:

1158

1   Q.    Good afternoon, Mr. Jones.  My name is Ken

2              Bailey.  I'm an Assistant Prosecutor with

3              the Trumbull County Prosecutor's Office,

4              and as I promised in Court last week,

5              Chris Becker, another Assistant

6              Prosecutor in our office and my

7              co-counsel, is with us on presenting this

8              particular case.

9                   Now, this afternoon we're going to

10             be asking you some questions and the

11             reason that we ask you these questions is

12             to make sure that both sides get a fair

13             shake in this trial, both the Defendant

14             and the people of the State of Ohio.  And

15             for that reason, we ask your views on

16             different issues like the death penalty,

17             and there aren't right answer or wrong

18             answers.

19                  Under our system, it is important to

20             focus, hold different view points

21             regarding different issues.  It is like

22             politics, folks don't always agree on the

1159

1   same candidate or the issues.  Same thing

2   with the death penalty.  And there's

3   nothing wrong with that.

4       The important thing is we find out

5   if anybody has so much feeling one way or

6   the other that they can't give both sides

7   a fair shake, that they are so far to one

8   side of the issue or the other, that they

9   would either automatically impose the

10  death penalty or never impose it.

11  There's nothing wrong with that.

12      It is just important that we find

13  out who those folks are and they can sit

14  on other Juries like a civil case, as you

15  have.  I take it you thought it was an

16  interesting experience?

17  A.  Yes.

18  Q.  There are other indications where a death

19  penalty is not an option.  In this case

20  it is an option.  If you have any

21  questions that arises as to what we're

22  doing here, feel free to ask.  This is

1160

1       the chance where we get a little give and

2       take here and you understand, that if we

3       run into each other out in the hallway or

4       restaurant or something, we can't have

5       any communication with you until the

6       whole case is over -- both phases if we

7       get to the second phase.  We're not being

8       anti-social or anything like that, it is

9       just that under our rules of conduct, the

10      Attorneys can't talk to you or answer any

11      questions until both phases are over.

12         You indicated on your questionnaire

13      and I believe in Court the other day,

14      that you would not be able to decide a

15      death penalty verdict if it was

16      appropriate?

17  A.  No, I don't believe I could.  I have always

18      been against the death penalty.

19  Q.  Is there a reason for that?

20  A.  It is just on every level.  You have the

21      chance of getting an innocent person and

22      beyond that, I think we have to be above

1161

```
 1              that.  We have to be better than that.
 2    Q.   So is it based on philosophical belief and
 3              ethical belief?
 4    A.   Yes.
 5    Q.   And religious belief?
 6    A.   Not really religious, no.
 7    Q.   It is ethical and philosophical and moral?
 8    A.   That is it, yes.
 9    Q.   And how long have you held this belief?
10    A.   As long as I can remember.
11    Q.   You ever have any personal experience with
12              anybody who had been wrongfully
13              convicted?
14    A.   No.
15    Q.   Just reading it?
16    A.   Yes.
17    Q.   Are there any circumstances that you can think
18              of where you think the death penalty
19              might be justified?
20    A.   No, I can't think of any.
21    Q.   I take it you said you expressed an opinion on
22              this in the past.  Have you had occasion
```

1162

1             to discuss the death penalty as a

2             possible punishment or any conversations

3             with family members or friends or any

4             organization concerning your view on the

5             death penalty?

6   A.  I debated with people on it before just in

7             conversation.

8   Q.  Do you remember for instance, what you talked

9             about?  Did anything in particular come

10            up?  Any specific case that gave rise to

11            the conversation?

12  A.  I can't remember what brought it up.  It has

13            come up.

14  Q.  A number of times?

15  A.  Yes.

16  Q.  Would it be fair to say maybe when

17            specifically heinous crimes have come up

18            in the paper or something?

19  A.  Yes.

20  Q.  And I imagine coworkers or friends would take

21            one view in favor of the death penalty

22            and you would be there opposing the death

1            penalty?

2   A.   Or agreeing with them for opposing the death

3            penalty.

4   Q.   Now, is your opposition to the death penalty

5            such that you would automatically vote

6            against a sentence of death for this

7            Defendant regardless of the facts of the

8            case?

9   A.   Yes, it is.

10   Q.   And regardless of the evidence and the

11           instructions of law given to you by the

12           Court?

13   A.   I couldn't recommend death.

14   Q.   Do you think that -- your opposition to the

15           death penalty -- you understand this case

16           will be tried in two different phases.

17           First phase deals with the issue of guilt

18           or non-guilt.  Did she do it or not?

19              The second phase deals with the

20           issue of what the appropriate punishment

21           is for this Defendant, for this crime.

22           Assuming we get to a second phase.  If

1164

```
 1    she's found guilty of the crime called

 2    aggravated murder and one or more

 3    specifications or special findings of

 4    fact regarding the death penalty, then

 5    the Jury would consider the death penalty

 6    as a possible punishment in the second

 7    phase.

 8         And in a second phase if the State

 9    were to convince the Jury by proof beyond

10    a reasonable doubt, doing a balancing

11    test that the aggravating circumstance or

12    circumstances outweigh the mitigating

13    factors, then under the law the Judge or

14    the Jury would have to recommend the

15    death penalty as a punishment.  Do you

16    understand that?

17  A.   Yes.

18  Q.   Now, knowing that we're seeking a verdict for

19    aggravated murder with a death penalty

20    specification, and if the Defendant is so

21    convicted, then as Assistant Prosecutor

22    for Trumbull County, we would be seeking
```

1165

```
 1              to have the Defendant sentenced to death

 2              by you, the Jury, with that type of

 3              verdict.  Would your opposition to the

 4              death penalty be such that it would

 5              substantially impair your ability to

 6              follow the law, and finding the Defendant

 7              guilty in the first phase of aggravated

 8              murder with a death penalty

 9              specification, when that is proven beyond

10              a reasonable doubt?

11   A.   Would it be such that I couldn't return a

12              guilty verdict?  I believe I could do

13              that.

14   Q.   You could return a guilty verdict?

15   A.   I just couldn't recommend death.

16   Q.   You are saying you would be able to do your

17              job in the first phase, you would be able

18              to follow the law.  If it got to a second

19              phase, no matter what the evidence

20              showed, if we were able to convince, if

21              we were able to put on enough evidence to

22              convince you beyond a reasonable doubt
```

1166

1    that the aggravating circumstance did

2    outweigh any mitigating factors

3    presented, you would still be unable to

4    follow the law and recommend the death

5    penalty verdict?

6  A.    Yes, that is right.

7  Q.    And if I understand that, this opposition to

8    the death penalty regarding the facts and

9    circumstances of this case, are such that

10    you could not follow the law that the

11    Judge would give you regarding the second

12    phase?

13  A.    Right.

14          MR. BAILEY:   Thank you very much.

15  EXAMINATION BY MR. INGRAM OF MR. JONES:

16  Q.    Good afternoon.  How are you?

17  A.    Good.

18  Q.    I just have a couple of questions.  How do you

19    feel about the American Jury system?

20  A.    I think it is impressive.

21  Q.    So do I.  You understand that the Jury system

22    is predicated upon the theory that if we

```
 1              can put 12 people in this box from

 2              different walks of life who have

 3              different prospectives, that the 12 of

 4              them can hear evidence and then come to a

 5              collective decision that then we, and by

 6              we, I mean all of us, society as a

 7              whole -- can have a great deal of

 8              confidence in the fact that that Jury has

 9              arrived at a right decision.

10    A.   I have seen it happen.

11    Q.   Does that make sense, the principles upon

12              which the system is based, do those make

13              sense to you?  The theory I have just

14              explained?

15    A.   Yes.

16    Q.   Do you understand that the Defendant is

17              entitled to a Jury which reflects a cross

18              section of the community?

19    A.   Yes.

20    Q.   And a Jury which reflects the cross section of

21              the community would have wide ranging

22              views on matters of evidence and
```

1168

```
 1            punishment.  Do you agree with that?
 2    A.    Yes.
 3    Q.    There are people in this country who are in
 4            favor of the death penalty.  There are
 5            people in this country who are opposed to
 6            the death penalty.  You understand that?
 7    A.    Of course, yes.
 8    Q.    The State feels it would not be fair to have a
 9            Jury composed of people who would not
10            fairly consider the death penalty as a
11            sentencing option, if a sentence ever had
12            to be determined.  Do you understand
13            that?
14    A.    Yes, of course.
15    Q.    The flip side of that is the Defense feels it
16            would not be fair to have a Jury that
17            would not fairly consider the life
18            sentencing options if a sentence ever had
19            to be determined.  Do you understand
20            that?
21    A.    Yes.
22    Q.    And a Jury composed only of people at one of
```

1169

1    those extremes or the other end of that

2    extreme, whatever the extreme, such a

3    Jury would not reflect a cross section of

4    the community, would it?

5    A.  Right.

6    Q.  So what we ask jurors to do if they can, is to

7    temporarily set aside their personal

8    beliefs and follow the instructions of

9    the Court.  Do you understand that that

10    is what we ask of jurors?

11    A.  I do.

12    Q.  Do you understand that the law would never

13    require you to vote for a penalty you did

14    not feel was justified by the evidence?

15    A.  Yes.

16    Q.  And if a Jury were to ever get to a second

17    phase, the Jury would have to weigh

18    aggravating circumstances, bad things

19    against mitigating factors.  Do you

20    understand that?

21    A.  I do.

22    Q.  And as a juror, you would be the sole judge of

1170

1    the weight of the evidence.  So what

2    weight to give those aggravating

3    circumstances, what weight to give those

4    mitigating factors, would be up to you?

5  A.    Yes.

6  Q.    One final question.  Knowing all of that, can

7    you temporarily set aside your feelings

8    and follow the instructions of the Court?

9  A.    Not on a death recommendation, no, I don't

10    believe I can.

11    MR. INGRAM:  Fair enough.  Thank

12  you.

13  (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

14  OF HEARING)

15    THE COURT:  I have got to ask you

16  something.  Any relationship to Eleanor Jones?

17    MR. JONES:  No.

18    THE COURT:  You are excused from any

19  further participation.  We thank you for your time.

20  You have stated your feelings and you are entitled

21  to your feelings.  To have a Jury composed of

22  people that feel like you do would not allow the

1171

1    State their fair shot.

2    (Juror No. 38 excused from the Courtroom.)

3                    MR. BAILEY:  We objected for cause.

4                    THE COURT:  Court granted that

5    motion over the objection of the Defense.  Do you

6    wish to put any reason on the record for your

7    objection?

8                    MR. JUHASZ:  The only objection

9    would be as to guilt or innocence, Mr. Jones stated

10   that he could be a fair and impartial juror.

11                   THE COURT:  Thank you.

12   (Juror No. 41, Lisa Jaskowiak, entered the Courtroom.)

13                   THE COURT:  Before we get involved

14   in the other questions, I notice you have attached

15   a letter here that indicates you have personal

16   problems at home that would make it difficult for

17   you to serve.

18                   MS. JASKOWIAK:  Yes, Sir, I do, Sir.

19                   THE COURT:  You didn't hold your

20   hand up the other day when I asked about that.

21                   MS. JASKOWIAK:  I thought I would be

22   able to rearrange things.

1172

1   THE COURT:  You have had these

2   things come up since that time?

3   MS. JASKOWIAK:  Yes.

4   THE COURT:  Mr. Bailey, rather than

5   me going through the usual, do you have any

6   questions you wish to ask?

7   MR. BAILEY:  No, Your Honor.

8   MR. JUHASZ:  We have no questions.

9   THE COURT:  The letter speaks for

10  itself attached.  You have a multitude of problems.

11  Is there any objection to the Court dismissing for

12  cause?

13  MR. INGRAM:  No objection from the

14  Defense.

15  MR. BAILEY:  No objection from the

16  State.

17  (Juror No. 41 excused from the Courtroom.)

18  (Juror No. 36, Karen Tipton, entered the Courtroom.)

19  THE COURT:  Good afternoon.  You

20  read that handout that was given to you, right?

21  MS. TIPTON:  Yes.

22  THE COURT:  You understand why we're

1173

1   here?  Donna Roberts, that lady sitting over there,

2   is charged with two counts of aggravated murder

3   with specifications.  Under Ohio law, just because

4   a person is found guilty of murder, does not mean

5   that they face the death penalty.  It is only under

6   certain circumstances that the legislature has put

7   in the statute.  One of them is if you kill the

8   Governor, you can have your life up for grabs.  And

9   there are other things too, which will be explained

10  at the proper time, but the important thing to

11  understand at this point is that on the two counts

12  of aggravated murder brought against Miss Roberts,

13  there are specifications.

14          And if the State were able to prove

15  beyond a reasonable doubt first of all, the guilt

16  of the Defendant, and secondly, convince the Jury

17  that the specifications were correct, then that

18  could mean that the case would go to a second

19  phase, where the Jury would be called upon to sit

20  like in a second trial and listen to the

21  aggravating circumstances put forth by the State.

22  If the State is able to prove those beyond a

1174

1   reasonable doubt that they outweigh the mitigating

2   factors presented by the Defense, then the Jury may

3   well be called upon to decide the question of

4   capital punishment.

5           Aggravating circumstances are reasons why

6   the Jury should give the death penalty, and

7   mitigating factors are reasons why they should not.

8   They should give a lesser life imprisonment

9   sentence.  You get as many people as we had in

10  there last Tuesday, and you are going to have a

11  wide range of opinions about the death penalty.

12  Some people think that it is outdated, barbaric,

13  and would never under any circumstances participate

14  in any type of Jury.  On the other side of the

15  spectrum, you have people who think that if

16  somebody took someone else's life, they should

17  forfeit their life.

18          Well, anybody with those fixed opinions

19  to that extreme could not give both sides a fair

20  trial here.  And the whole object, of course, is to

21  get a fair trial.  So that means that we need 12

22  people, all of whom are going to have their own

1175

1    opinion about the death penalty. But we need 12

2    who are able to assure these folks that they are

3    able to follow the law, set aside any preference or

4    non-preference they may have in regard to the death

5    penalty and judge the case on the evidence fairly.

6          So part of the questioning here will be

7    designed to see if you are able to do that. You

8    are entitled to your own opinion. We'll all

9    respect your opinion, whatever that is. The other

10    thing that they will ask you about is whether you

11    have read, talked about, heard things about this

12    particular case that have made some lasting

13    impression on you that you could not set aside.

14          Because again, to get a fair trial, all

15    of these jurors are going to have to start out

16    fresh and decide this case only on the evidence

17    presented in this Courtroom. And it would be

18    unfair to one side or the other, if all of the

19    jurors didn't decide the case on what they hear in

20    the Courtroom. You get the idea?

21          MS. TIPTON: Yes.

22    EXAMINATION BY MR. BAILEY OF MS. TIPTON:

```
                                                            1176
1    Q.    Good afternoon, Miss Tipton.  How are you?

2    A.    Fine.

3    Q.    My name is Ken Bailey.  I'm Assistant

4               Prosecutor with the Trumbull County

5               Prosecutor's Office, and as I promised

6               last week, my co-counsel, Chris Becker is

7               here in the Courtroom today assisting me.

8               And the two of us are going to be

9               presenting this particular case on behalf

10              of the people of Trumbull County and the

11              State of Ohio.

12                   Now, as the Judge explained, the

13              reason we're here asking folks questions

14              is because we want to make sure that the

15              people who get to serve on this

16              particular Jury can be fair and impartial

17              to both sides in this trial.  Both the

18              Defendant and to the people of the State.

19              And we're not being nosey because we, in

20              asking questions -- we're not being

21              nosey, rather just to make sure that

22              folks can be selected who don't have any
```

1177

1    extreme bias on either side, so that

2    there are -- especially in a death

3    penalty case sometimes some people feel

4    that they would automatically impose the

5    death penalty as a punishment, and that

6    wouldn't be fair to a Defendant.  And by

7    the same token, sometimes people would

8    never be able to impose the death penalty

9    as a punishment in a proper case.  And

10   that wouldn't be fair to the State.  So

11   that is why we go through this

12   questioning process.

13        Now, there aren't any right answers

14   or any wrong answers to these particular

15   questions, only candid answers as to what

16   you believe and how you feel.

17        A couple of things I wanted to point

18   out.  Under our rules of conduct, this is

19   sort of a give and take.  If you have any

20   questions that come up that are pertinent

21   to what we're doing here, feel free to

22   ask, and if we can, we'll answer them.

1178

```
 1              Because of our rules of conduct, we're

 2              not allowed to have any communication

 3              with you outside of the Courtroom after

 4              we get done today until the entire trial

 5              is done, and that may be one or two

 6              phases, depending on how it goes.  So,

 7              just so you know, if we run into each

 8              other in the hallway or elevator or

 9              something, we're not being anti-social to

10              either side, we're just not allowed to

11              have any communication with you, because

12              it could result in a mistrial, and we

13              don't want to do it all over again.

14                  Now, you had indicated on your

15              questionnaire that you had read in the

16              paper that the Defendant and another man

17              had been indicted?

18   A.    Yes.

19   Q.    I take it the paper that you get your

20              information from, that was the Tribune,

21              the Warren Tribune?

22   A.    Yes.
```

1179

1   Q.   You indicated you read the local news about

2        maybe twice a week?

3   A.   Yes, whenever I get my hand on the paper.

4   Q.   And what about -- and you watch channel 27

5        every night, pretty much?

6   A.   Pretty much.

7   Q.   The local news?

8   A.   Yes.

9   Q.   Other than the fact that they were charged

10       with a crime, did you hear anything about

11       any follow up as to what happened?

12  A.   No.  I didn't follow it.  When something comes

13       out, you look at it or it is just all

14       over the news.

15  Q.   The reason we ask these questions about

16       pre-trial publicity is it may well be

17       that during the course of the trial, if

18       you are sitting on this Jury, that you

19       may recollect when you hear some

20       testimony, you may say, "Gosh, I read

21       something about it," or "I remember

22       hearing this on the news," and it may

1180

1  bring in some other facts, and it is

2  important that we start out here with a

3  clean slate.  Every case is different,

4  and one thing to notice as we look around

5  the Courtroom today, there's nobody here

6  from the news media and it may well be

7  that when a trial gets started, we'll

8  have a reporter come in, maybe a whole

9  lot of reporters come in.  Well, three

10  T.V. stations and two papers, the Tribune

11  and the Vindicator from time to time,

12  they will be popping in -- sometimes with

13  cameras.  And they are not allowed to

14  photograph the jurors.  They photograph

15  the Attorneys or the Judge or the

16  Defendant, sometimes a witness.  But,

17  they are not allowed to photograph the

18  jurors.  And that reporter may be here

19  for maybe three minutes or five minutes,

20  and will write a feature based on what

21  they learned in that short period of

22  time.  And naturally with that short

1181

1   period of time, they are going to miss

2   everything that was asked and answered

3   before they came in and everything that

4   happens after they leave.  So, it may

5   well be that if you sit here as a juror

6   and you have somebody save the newspapers

7   for you and you read them after the

8   trial, after both phases of the trial,

9   then you may say, "Gosh, I sat in Judge

10  Stuard's Courtroom for that entire trial,

11  and reading this newspaper article, it is

12  like they were in Judge McKay's Court

13  reporting on a case, because it certainly

14  doesn't bear much relation to what I

15  remember happening in Court."  They just

16  took a little bit and piece out of it.

17  So you understand that is why it is

18  important that you not pay any attention

19  to the news while these proceedings are

20  going on.  Do you have any problem with

21  that?

22  A.    No.

1182

1  Q.    And again, we want to start out with a clean

2        slate.  It is like going back to school,

3        and coming to a classroom and the teacher

4        has a chalkboard and whatever you learn,

5        has to be written on that chalkboard here

6        in this Courtroom.  And you have to

7        disregard everything else.  It is sort of

8        mental gymnastics.  We ask you to set

9        everything else you might have learned

10       aside, any information you obtained, any

11       opinions you might have formed, and start

12       from scratch in this Courtroom; can you

13       do that?

14  A.   Yes.

15  Q.   This is the only fair thing to do to both

16       sides?

17  A.   Yes.

18  Q.   Now, this is a criminal trial, and the State

19       has to prove the elements of certain

20       crimes that are charged.  Elements are

21       essential component parts of a crime.  It

22       is sort of like the ingredients in a

```
                                                          1183
 1                    recipe.  Do you ever bake?

 2   A.   I try.

 3   Q.   Your Mom ever bake, your grandmother?

 4   A.   Yes.

 5   Q.   You have watched your grandmother bake?

 6   A.   No, but I know about baking.

 7   Q.   She's got to come up with certain ingredients

 8             for each recipe that she has.  Do you

 9             have any favorite recipes like cakes or

10             pies?

11   A.   Potato pie.

12   Q.   Sweet potato pie?

13   A.   Yes.

14   Q.   And I bet your Grandma has a special recipe.

15             She might not have written it down, but

16             she knows it.  She's got to have so much

17             of each ingredient.  Same thing with a

18             crime.  If she makes that sweet potato

19             pie and she leaves out the potatoes, you

20             are going to have some kind of pie, but

21             it won't be a sweet potato pie, right?

22   A.   Yes.
```

1184

1    Q.    Same thing with a crime.  We'll have -- the

2          Defendant has been charged with a number

3          of crimes, two counts of what we call

4          aggravated murder.  Even though there's

5          one person who was killed here, there are

6          two different stories and the State is

7          allowed to pursue two different theories

8          of the crime and prove two different

9          theories.  And each of these crimes have

10         different elements.

11               The Defendant is also charged with

12         certain specifications to these counts of

13         aggravated murder.  Specification is just

14         a fancy word that means a special finding

15         of fact for a Jury to consider.  And so

16         there are two of these specifications

17         attached to each of these counts or

18         charges of aggravated murder.  And then

19         there's another two counts that are added

20         on.  A charge of aggravated burglary and

21         a charge of aggravated robbery, and each

22         of those has a special finding of fact; a

1185

1   specification of a firearm, that is a

2   working gun was used in the commission of

3   those crimes.

4       Now, you understand that the charge

5   here basically is -- the Defendant is not

6   the trigger person, in these crimes.

7   She's not the person who physically

8   killed the victim, but rather she's a

9   complicitor, somebody who solicited and

10  procured or aided and abetted another

11  person in the commission of these crimes.

12      MR. INGRAM:  I object to

13  Mr. Bailey's assertion of fact.  He can certainly

14  say that there's an allegation and she's alleged to

15  be, he can not say the Defendant is.

16      THE COURT:  I think that is a valid

17  objection.  Rephrase.

18  Q.  The Defendant is charged with being a

19      complicitor, a person who solicits or

20      procures or aids and abets, helps,

21      encourages, strengthens another person in

22      the commission of the crime.  And the

1186

1   charge here is that the Defendant and a

2   fellow by the name of Nate Jackson were

3   involved in planning the murder of a

4   fellow by the name of Robert Fingerhut

5   for insurance money, and that during the

6   commission of the crime, this Nate

7   Jackson broke into the house where Robert

8   Fingerhut lived and killed the victim and

9   also stole a car.  And the Defendant is

10  charged with helping him, planning this

11  murder and these crimes.

12      Now, each of these crimes, the

13  aggravated murder for instance as I said,

14  is composed of certain elements.  At the

15  end of this case, Judge Stuard is going

16  to give you the law as to what these

17  elements are, but I'm going to give a for

18  instance, like the ingredients in the

19  recipe.

20      We may have to prove that it

21  happened on or about a certain date, for

22  example, December 11 of 2001.  Second,

1187

1    that it happened here in Trumbull County,

2    Ohio.  And the reason we would have to

3    prove that it happened in Trumbull County

4    is so we could try this case in this

5    Courtroom, in this Courthouse, rather

6    than up in Cuyahoga County.  Third,

7    identification.  Somebody is going to

8    have to point out that the Defendant is

9    the person in this crime.  Fourth, that

10   she acted on purpose, purposely, and the

11   Judge will define that term in detail for

12   you.  Fifth, that she caused the death of

13   Robert Fingerhut.  And six, that she did

14   it with prior calculation and design.  It

15   means it is not like a spur of the moment

16   like if I drop my pen and I catch it

17   instantly with my other hand.  That might

18   be a reflex or something, but rather,

19   that there was some advance planning.  It

20   is like that old term, you heard that

21   term premeditation under the old law.

22   They changed the law a little bit, so now

1188

1   we call it prior calculation and design,

2   and that also has a specific meaning that

3   the Judge will give you at the end of the

4   case.  But it requires some forethought

5   in advance.  If I drop my pen and I look

6   down and say, "Gosh, I dropped my pen.

7   I'll have to bend down and pick it up."

8   That requires some forethought and some

9   planning.

10  Can you, if the Judge tells you, we

11  have to prove these elements of each

12  crime whatever those elements are, can

13  you hold us to our burden of proof of

14  proving those particular elements by

15  proof beyond a reasonable doubt?

16  A.  Yes.

17  Q.  You understand it is only fair, that because

18  the State has charged the Defendant with

19  a crime, we have to prove it.  It is

20  basically put up or shut up basically.

21  That is what it comes down to with the

22  trial.

1189

1    You understand the Defendant doesn't

2    have any burden.  The Defense, they can

3    just sit there.  It is their right during

4    this entire trial to sit there.  They

5    don't have to do anything at all.  They

6    have no burden of proof.  The burden of

7    proof is entirely on us to prove those

8    elements.  And because we're lawyers and

9    we're geared toward proving elements of a

10   crime, there may be some questions that

11   may come up in your mind during the

12   course of the trial that may never get

13   answered because you are stuck with the

14   questions that we ask.

15   And in some other places, some other

16   states maybe, they may allow jurors to

17   submit questions to the Judge, to ask the

18   witnesses, but that doesn't happen in

19   Ohio.  In Ohio, you are stuck with the

20   questions that the lawyers ask.  And you

21   got to pay close attention.  You ever

22   listen to the radio when you were a kid,

```
                                                    1190
 1              other than music?

 2   A.    Yes.

 3   Q.    You ever listen to soap operas on the radio?

 4   A.    Yes.

 5   Q.    Remember when you did that, you paid close

 6              attention to what was, because there

 7              weren't any instant replays, were there,

 8              on the radio?

 9   A.    No.

10   Q.    And we're going to ask you to do the same

11              thing with the other jurors.  There are

12              going to be 12 of you on there, and you

13              will hear the testimony of the witnesses,

14              and then at the end of the case -- and

15              the trial might last up to two weeks.

16              You are going to have to remember the

17              testimony day-to-day as it goes on, and

18              then, you and the other 11 jurors will go

19              back and deliberate and you would have to

20              remember what the witnesses said.  Unlike

21              a trial like O.J. Simpson where they may

22              have instant transcripts, where they got
```

1191

1    million of dollars worth of equipment and

2    a lot of Court Reporters.  We have one

3    Court Reporter, Mary Ann Mills, but she

4    can't get us instant transcripts.  If you

5    and the other jurors ask, "Can we get the

6    testimony of so and so, a transcript of

7    the testimony?"  That is not going to

8    happen.  The Judge is going to tell you

9    most likely that you will have to rely on

10   your collective recollection of the

11   testimony.  You think you would be able

12   do that?

13  A.   Yes.

14  Q.   Another thing is you can't take notes.  Unlike

15       going to college and going to class and

16       taking notes that you are used to doing.

17       In Ohio, you can't take notes.  You have

18       to -- the reason for that is they want

19       you to pay close attention to the

20       witnesses, to watch their demeanor when

21       they testify, and if you take notes,

22       somebody may think one thing is important

1192

```
 1          and somebody else may think something

 2          else is important and you might give too

 3          much credence to one person's notes over

 4          another.  You know back in school, some

 5          people are better note takers than

 6          others, right?

 7  A.   Yes.

 8  Q.   You are going to have to pay close attention

 9          to that.  Now, we mentioned the

10          specifications that are attached to the

11          count of aggravated murder.  And there

12          are two of these specifications.  The

13          first specification or special finding of

14          fact for the Jury to consider is the

15          charge of aggravated burglary, that the

16          aggravated murder was committed during an

17          aggravated burglary, and that the

18          Defendant committed the aggravated murder

19          with prior calculation and design.  And

20          the second specification to the charge of

21          aggravated murder is that the aggravated

22          murder was committed during an aggravated
```

1193

1     robbery and the Defendant committed the

2     aggravated murder with prior calculation

3     and design.  Remember she's not the

4     triggerman.  There's a difference between

5     aggravated burglary and aggravated

6     robbery; and basically, the Judge will

7     define those terms for you, but

8     basically, sometimes folks get confused.

9     Every day on the street, when you hear

10    the terms, somebody says, "I was robbed,"

11    and they came home and said, "I was

12    robbed."  They really mean their home was

13    burglarized.  Burglary refers to the

14    trespass inside an occupied structure, a

15    dwelling house, where somebody may be

16    present and the bad guy comes in and

17    maybe with a weapon and maybe causes

18    serious physical harm to that person.

19         An aggravated robbery usually refers

20    to taking property of another by force or

21    threat of force, and a person may be

22    armed with a gun and may cause serious

1194

1          physical harm to the victim.  So, there's

2          a distinction there.

3             Now, this type of trial that we have

4          as the Judge indicated, this case can be

5          tried in two different phases.  The first

6          phase deals with the issue of guilt or

7          non-guilt of these crimes that are

8          charged, and the first phase is tried

9          just like any other criminal case that is

10         tried in this Courtroom.  Whether it is a

11         theft case or a robbery or burglary or

12         aggravated murder with specifications.

13            And if you and the other jurors

14         decide the Defendant is guilty of a crime

15         called aggravated murder with one or more

16         of these specifications, the special

17         findings attached to it, then we would

18         move onto a second phase, and in the

19         second phase, the issue there is the

20         issue of punishment.  What is the

21         appropriate punishment for this Defendant

22         for this crime?  You understand that the

1195

1          death penalty is not an automatic

2          punishment?

3   A.   Yes.

4   Q.   Because it wouldn't be fair to a Defendant if

5          the death penalty were an automatic

6          punishment because you wouldn't have

7          heard anything in favor of a Defendant

8          mitigating against the death penalty as a

9          punishment in the first phase, because it

10         is not relevant.  In the first phase, the

11         only issue is guilt or non-guilt.  When

12         you get to the second phase, you have

13         already decided guilt.  And then the

14         issue there would be, what are the

15         aggravating circumstances, and then what

16         mitigating factors or things that are in

17         favor of the Defendant that work against

18         the death penalty, what is going to be

19         presented here.  And you may hear

20         additional testimony in the second phase.

21            And then you would have to do a

22         balancing test.  You would have to

1196

1    balance on one hand or weigh the

2    aggravating circumstance or circumstances

3    on one side of the scale against whatever

4    mitigating factors are presented.  And

5    you understand it is entirely up to you

6    and the other jurors how much weight you

7    want to give to these mitigating factors

8    and aggravating circumstances.  And if

9    you find that we prove that the

10   aggravating circumstance or circumstances

11   outweigh these mitigating factors beyond

12   any reasonable doubt, then you must

13   return a verdict as to the death penalty.

14   You understand that?  It is not

15   automatic, but if we convince you of

16   that, then you must come in with that

17   verdict.  Will you have any problem with

18   that?

19  A.    No.

20  Q.    Now, let's say that we don't convince you

21        beyond a reasonable doubt that the

22        aggravating circumstance outweighs the

1197

1    mitigating factors.  Then in that case,
2    you would have to go on and consider one
3    of the three possible life sentences.
4    Life in prison without any possibility of
5    parole.  Life in prison with parole
6    eligibility after 30 full years, and life
7    in prison with parole eligibility after
8    25 full years.  You understand that?  You
9    would be able to consider those factors
10   equally, right?
11  A.  Yes.
12  Q.  Now, you had mentioned on your questionnaire
13      that you thought there were some problems
14      in the criminal justice system,
15      unfairness due to prejudices.  What do
16      you mean by that?
17  A.  Because some people don't get a fair trial
18      because of who they are.  It depends on
19      where you live.  If you are poor, if you
20      are wealthy, depends on what kind of
21      trial you get.  I think I mean if it is
22      going to be equal, it should be one

1198

1    standard, not a whole bunch for this race

2    of people or that race of people or who

3    is involved.

4  Q.  Okay.  And you say there would be a

5    discrepancy in the way the criminal

6    justice treats people depending maybe on

7    race or their wealth?

8  A.  Yes.

9  Q.  Or lack of wealth?

10  A.  Yes.

11  Q.  Do you think we would be able to get a fair

12    trial in this particular case?

13  A.  Yes, I believe we should be able to, if

14    everybody is doing their job.

15  Q.  Now, you indicated your feelings about the

16    death penalty.  Had you ever engaged in

17    any discussions or conversations with any

18    family members or friends about your view

19    on the death penalty?

20  A.  No.

21  Q.  Back in school, you ever have to take a speech

22    class or debate class where you had to

1199

```
 1              present a side?
 2   A.   Not on the death penalty.
 3   Q.   How about, did you ever belong to any
 4              organization where you had to express
 5              your view on the death penalty?
 6   A.   No.
 7   Q.   Did it ever come up maybe in church expressing
 8              your view on the death penalty as a
 9              possible punishment?
10   A.   It may have been brought up through the pastor
11              or something, but it didn't phase me.
12   Q.   In church, does your religion prohibit or
13              favor the imposition of the death
14              penalty?
15   A.   It has never been brought up.
16   Q.   Your view about capital punishment, the death
17              penalty, I take it you are in favor of
18              the death penalty as a punishment?
19   A.   Yes, if all of the facts are brought out.
20              Depends on the crime.  I think it depends
21              on the crime.  It is just senseless.
22   Q.   Senseless murder?
```

1200

1   A.   Yes.

2   Q.   Would you -- for which senseless crimes would

3          you think the death penalty would be

4          appropriate?

5   A.   It deals with facts also what brought it to

6          that point.  If I was saying anything

7          right now, it, be like on children, the

8          senseless things on children.  On

9          innocent people.

10   Q.   And it would be a killing, right?

11   A.   Yes.

12   Q.   You understand that not all killings are

13          punished by the possibility of the death

14          penalty?  Because there are some killings

15          that may be accidental.  Somebody may be

16          out chopping wood and the head of the axe

17          flies off and strikes somebody.

18   A.   I understand that.  I'm not saying just

19          because you kill somebody, you get the

20          death penalty.  I'm not saying that.

21          Like you said, some killings are -- I

22          mean sometimes you may have to hurt

1201

1     someone because, to save your own life.

2  Q.   That might be self-defense?

3  A.   Yes.

4  Q.   There may be some killings that are done in

5          the heat of passion, a wife comes in and

6          sees her husband in bed with another

7          woman, and she may get a gun if she has a

8          gun nearby and just pick it up and shoot

9          it, right?  Or things like that.  But

10         something that -- what about killing that

11         is planned in advance?  Do you think that

12         may make a person eligible for the death

13         penalty?

14 A.   If all of the facts are in and it weighs that

15         way, and it is planned out to hurt

16         somebody, yes, I guess.

17 Q.   I'm just saying, it makes them eligible for

18         the death penalty as punishment.  Not

19         that it would be automatic punishment.

20         Because you wouldn't have heard anything

21         at the beginning of whether there was

22         anything in behalf of the Defendant's

1202

```
 1           favor that would prevent the death

 2           penalty.  Your view about the death

 3           penalty, have those views changed over

 4           the years or did you always have this

 5           opinion?

 6    A.    I guess it has probably changed over the

 7           years.  I got a son, a grown son, and I'm

 8           saying if someone did something to him

 9           that was just senseless, then yes, I

10           think that it changed over the years.

11           Instead of before you say well, if

12           something happened to my family member,

13           but you never know how you feel about

14           different things.

15    Q.    When you were younger, did you favor the death

16           penalty or were you against the death

17           penalty?

18    A.    I don't think it even phased me when I was

19           younger.

20    Q.    You didn't have any feeling about the death

21           penalty?

22    A.    I think because now we live in a society where
```

1203

1    things are done so many times to innocent

2    people, because we're living in that

3    time.

4  Q.   Do I understand it correctly, that as you got

5    older, you began to favor the death

6    penalty more for certain crimes because

7    of seeing all of the senseless crimes?

8  A.   Yes.

9  Q.   Now, you wrote down on your questionnaire,

10   there's a question, "Why do we have the

11   death penalty?"  And you wrote down a

12   misinterpretation of the Biblical term,

13   an eye for an eye, a tooth for a tooth.

14   What do you mean by that?

15 A.   Misinterpretation, I think, because it was

16   somebody that got killed, so they would

17   kill them.  If somebody stole something,

18   they would cut off their arm.  I think in

19   those times, no questions asked.

20 Q.   It was sort of like an automatic punishment?

21 A.   Yes.

22 Q.   And you would take into and didn't take into

1204

```
 1              consideration that would work in the
 2              Defendant's favor as to whether maybe a
 3              person, if he stole a loaf of bread,
 4              maybe he was starving?
 5   A.    But they didn't care back then.
 6   Q.    Now, you understand that under our system of
 7              justice, the Defendant is cloaked by the
 8              presumption of innocence.  That cloak of
 9              the presumption of innocence surrounds
10              her all through the course of this trial,
11              all the way up to the time that all of
12              the evidence is in and the Judge
13              instructs you on the law and you go back
14              into your Jury room to deliberate with
15              the other jurors, on the guilt of the
16              Defendant, whether she's guilty or not.
17              And I take it you agree with that
18              presumption of innocence?
19   A.    Yes.
20   Q.    It is only fair, because some other countries,
21              maybe in France, they don't have that
22              presumption.  The Defendant has to prove
```

1205

```
 1              their own innocence in certain countries,

 2              but in this country, that is not our

 3              system.  Our system is the Defendant is

 4              presumed innocent and it is up to the

 5              State to prove the crimes by proof beyond

 6              a reasonable doubt.

 7                   Now, of course, if you go back in

 8              the Jury room with the other jurors at

 9              the end of the case and you find we have

10              been able to prove these elements of the

11              crime charged by proof beyond a

12              reasonable doubt, then of course, that

13              cloak or the presumption of innocence

14              would be gone, right?

15   A.   Yes.

16   Q.   Because then you would be convinced that she

17              was guilty after considering all of the

18              facts and the evidence.  That may well be

19              during the course of the trial, because

20              we gear our questions toward proving

21              these elements of the crimes, the

22              ingredients in the recipe that you may
```

1206

1    have some questions that never get

2    answered.

3         For example, if you had -- I know my

4    wife has like 50 million pairs of shoes.

5    You might have some interest in footwear,

6    what somebody was wearing.  And if it had

7    no bearing on proving the facts of this

8    particular case, we may never get into

9    what somebody was wearing at the time.

10   And it would be an unanswered question.

11   But if you felt it had no bearing on

12   proving the elements, then you would be

13   able to reach your decision without those

14   questions ever being answered, right?

15   A.   Yes.

16   Q.   It sounds sort of silly.  Now, we talk about

17        proving the case beyond a reasonable

18        doubt.  You have heard that term before?

19   A.   Yes.

20   Q.   You understand the Judge is going to define

21        that term for you, but basically it talks

22        about the use of your reason and common

1207

1   sense.  That is something you deal with

2   in your every day life, isn't it?

3   A.   Yes.

4   Q.   Especially raising a child, you use a lot of

5        reason and common sense.  You have to

6        gauge the credibility of people,

7        including your children.  Having kids, we

8        know when your kids are lying or not,

9        right?

10  A.   Yes.

11  Q.   And the same test that you use in determining

12       other people's truthfulness outside of

13       the Courtroom, these are the same tests

14       you use in determining the credibility or

15       truthfulness of the witnesses who take

16       the stand.  There's nothing magical about

17       it.  It is something you are used to

18       doing in your every day life.  You would

19       be able to do that?

20  A.   Yes.

21  Q.   Now, when we use this term proof beyond a

22       reasonable doubt, you understand that it

1208

```
 1              is not proof beyond all doubt or beyond a

 2              shadow of a doubt?  Sometimes folks read

 3              books and they watch movies and Hollywood

 4              productions.  And those terms are sort of

 5              bandied about.  There's an Alfred

 6              Hitchcock movie called "Shadow of a

 7              Doubt," but there's no such animal in

 8              criminal law in this State or in this

 9              country.  Do you understand that?

10    A.   Yes.

11    Q.   It is like 100 percent proof.  It is like if

12              you fill up a box and you have got to

13              fill it up to a certain point in there,

14              where you are convinced that it proves

15              the Defendant's guilt as to these

16              elements.  Doesn't have to go all the way

17              to the top with stuff that you put in the

18              box, but just enough so that you are

19              firmly convinced of the truth of the

20              charge to a moral certainty.  You think

21              you would be able to do that?

22    A.   Yes.
```

1209

1   Q.    Now there's different types of evidence that

2             we can use to prove our case.  There's

3             what we call direct evidence, where a

4             witness can come in and testify to the

5             use -- or to what he's learned through

6             the use of his five senses like, "I heard

7             the gunshot.  It was loud."  Or "I

8             smelled the smoke, and it was acrid," or

9             "I touched the body and it was cold."

10            But there's another type of proof.  That

11            we have it is sort of round about proof.

12            It is where you are presented with a fact

13            or a series of facts, and then you are

14            asked to make a logical deduction to

15            another fact or facts.  You have done

16            that in college, right?

17   A.   Yes.

18   Q.   You do it in your every day life?

19   A.   Yes.

20   Q.   And we call that circumstantial evidence.  And

21            there's a reason for it.  I would expect

22            that you would believe that most serious

1210

1    crimes are committed in secret without a

2    whole lot of people around, right?

3  A.   Yes.

4  Q.   Especially when we're talking about a crime

5    like murder.  Usually it is not committed

6    on the Courthouse steps with everybody

7    taking pictures of the crime.  And if

8    planning would occur for that, it would

9    again happen in secret, right?

10 A.   Yes.

11 Q.   Rather than having people yell out to the

12    whole world what they are planning.  And

13    because of that, we have to rely on,

14    unless somebody tells you what they are

15    planning, you have to rely on looking at

16    what their actions are, and if you can

17    learn what they are thinking of in some

18    way.  May be with letters, or phone

19    calls, perhaps, if you had things like

20    that.

21    Circumstantial evidence.  Let's

22    say -- let me give you an example of

1211

1   that.  Let's say you go to bed at night.

2   You live in a two story house and you

3   look out across your neighborhood before

4   you go to sleep and it is a nice night.

5   The moon is beaming, not a cloud in the

6   sky, and you draw the blinds and before

7   you fall asleep, you listen to the

8   weather forecast on the radio and the

9   weatherman says, "We're getting a cold

10  front in, so we're going to get a storm

11  overnight."  And you shut off the radio

12  and you go to sleep and at some point you

13  fall asleep.  And you have awakened in

14  the middle of the night by -- you look

15  toward the window and even though the

16  blinds are drawn, you can see there's a

17  flash outside and a couple of seconds

18  later, there's a distant booming sound.

19  And a few seconds later another flash and

20  in closer in time another booming sound,

21  and suddenly there's a big flash outside

22  the window and great big boom above the

1212

| | | |
|---|---|---|
| 1 | | house and pitter patter on the house and |
| 2 | | a drumming sound on the roof.  And you |
| 3 | | fall back asleep and you get up the next |
| 4 | | morning.  You open up the blinds and you |
| 5 | | open up the window.  Sun is shining, not |
| 6 | | a cloud in the sky, but as far as you can |
| 7 | | see, the rooftops are wet, the streets |
| 8 | | are running with water and there's no |
| 9 | | fire hydrant outside where any driver |
| 10 | | could have hit it and knocked water all |
| 11 | | over the place.  You know what happened |
| 12 | | during the course of the night, don't |
| 13 | | you? |
| 14 | A. | Yes. |
| 15 | Q. | What happened? |
| 16 | A. | It rained.  A storm came. |
| 17 | Q. | And you know that beyond any reasonable doubt, |
| 18 | | don't you? |
| 19 | A. | Yes. |
| 20 | Q. | You learned it by circumstantial evidence, |
| 21 | | right?  You didn't see the rain with your |
| 22 | | own eyes, but based on everything, all of |

1213

1             these facts and circumstances surrounding

2             that, you know there was a thunder storm?

3  A.    Yes.

4  Q.    There's room in there for some possible or

5             imaginary doubt.  You can imagine that

6             during the night, E.T. flew by and

7             sprinkled some wet stuff, but that would

8             be a foolish or imaginary doubt, wouldn't

9             it?

10  A.    Yes.

11  Q.    You know beyond any reasonable doubt that all

12             that happened was there was a thunder

13             storm.

14  A.    Yes.

15  Q.    Now, would you be able to return a conviction

16             in this case, if we were able to convince

17             you of the elements of the crime, using

18             circumstantial evidence, so that we

19             convinced you beyond a reasonable doubt,

20             as to these particular elements of the

21             crimes charged?

22  A.    Yes.

1214

1  Q.    Now, you would be able to pile evidence on

2        evidence and make your own decision as to

3        if there's enough and follow what the

4        Judge will tell you, right?

5  A.    Yes.

6  Q.    You believe people should be held accountable

7        for their actions?

8  A.    Yes.

9  Q.    One other thing, you can't go out on your own

10       to investigate.  You will hear about

11       testimony about this happening in a

12       certain neighborhood in this county up in

13       Howland.  And you understand it would be

14       improper for a juror to go out and

15       conduct your own investigation for

16       whatever reason, either to look at the

17       scene yourself or different things like

18       that.  It could cause a mistrial.  The

19       reason I mention this is we had one case

20       where a juror did go out.  There were

21       movies where jurors go out, and that is

22       T.V., and you can't do that in real life.

1215

1    A.    Okay.

2    Q.    And the reason I ask some of these silly

3            questions is, things like that have

4            happened.  Now, you understand that

5            sometimes we catch people because some

6            criminals may be sort of silly or not the

7            brightest in the world, like I imagine

8            you have heard stories on T.V. or radio,

9            about the criminal armed robber who goes

10            into the bank to hold up the bank, hands

11            them a note with writing on the back of

12            the envelope and gets the money and they

13            turn the note over afterward and it has

14            got the Defendant's address on it; or the

15            burglar who leaves his wallet at the

16            crime scene, breaking into the house, he

17            drops his wallet.  You have heard stories

18            like that over time?

19    A.    Yes.

20    Q.    Or the robber who goes in the bank and is

21            caught on video tape and he's not wearing

22            a mask and they got his picture all over

1216

1    the place.  You know that criminals don't

2    have to be the brightest in the world,

3    right?

4  A.    Yes.

5  Q.    Now, there's something called sequestration.

6        All that means is at the end of the first

7        phase, the jurors are kept together when

8        you go out to deliberate and you can't go

9        home during that time at the end of the

10       first phase.  The Judge will give you

11       enough notice to be able to bring in a

12       suitcase, and each juror is different.

13       Sometimes some folks may take a couple of

14       hours, and it may take several days to

15       reach a verdict in a case.  If they reach

16       a verdict and you would have to be kept

17       together during that period of time.  You

18       wouldn't be able to discuss the case

19       outside the presence of the other 11

20       jurors.  You have to all be together when

21       you are talking about it.  Would you be

22       able to do that?

1217

1    A.    Yes.

2    Q.    Now, there's a second time where you may get

3          sequestered if the Jury comes back with a

4          guilty verdict in the first phase finding

5          the Defendant guilty of aggravated murder

6          with one or more of these specifications

7          and you go on to the second phase.  You

8          go home in between, but then you would be

9          hearing more testimony in the second

10         phase and that could take anywhere from

11         one to three days, and then you would be

12         sequestered at the end of that second

13         phase while you are deliberating.  And

14         again, we don't know how long that would

15         take.  It could be a couple of hours, it

16         could be a couple of days.  It is up to

17         the Jury.  Would you have any problem

18         with being sequestered a second time?

19         Now, I am almost done.

20              During the course of the trial as

21         you come face to face with the Defendant,

22         perhaps as her chair is turned towards

1218

1          you perhaps you will become more

2          acquainted with her.  And my question to

3          you is this.  When you go back inside the

4          Jury room to deliberate on your verdict,

5          can you lay aside all thoughts you might

6          have of sympathy for the Defendant, and

7          be conscientious in your deliberations

8          and base your verdict on the evidence and

9          testimony that you get, and the

10         instructions of law given to you by the

11         Judge, and lay aside all thoughts

12         whatsoever of sympathy that you might

13         have for the Defendant?

14  A.   Yes.

15  Q.   Now, do you have any pressing matters at home

16         or work that are going to affect your

17         ability to concentrate on the testimony

18         of the witnesses and the evidence?

19  A.   No.

20  Q.   Under our system of Government, there's

21         certain obligations that we have as

22         citizens.  One of them is if it is

1219

1    election time, we're supposed to learn

2    something about what is going on in the

3    world around us and candidates, the

4    issues and go out and cast a ballot.

5         Another obligation of citizenship is

6    if we're at war, we may have to serve in

7    the military.  And we have got young

8    people, young men and women overseas in a

9    couple of places today.

10        Another obligation of citizenship is

11   if we're summoned in as jurors, it is

12   important that we get people from all

13   walks of life in the community to serve

14   on a Jury, if at all possible, to make

15   sure our system of justice works.  Would

16   you be willing to undertake that

17   obligation?

18   A.    Yes.

19   Q.    And make sure our system works?

20   A.    Yes.

21             MR. BAILEY:  Thank you very much.

22   EXAMINATION BY MR. JUHASZ OF MS. TIPTON:

```
                                                        1220

 1   Q.     Good afternoon.  I don't know if you remember

 2                from last week, I am John Juhasz, and

 3                that is Jerry Ingram over there, and

 4                Jerry and I are representing Donna

 5                Roberts, who is also sitting over there.

 6                What we're doing is sort of like a job

 7                interview where we're interviewing you

 8                for the job of being a juror.  And as you

 9                know from what has already been told to

10                you here today and what you have read, it

11                is a pretty serious job, because you are

12                deciding the truth, the guilt or

13                innocence of the charges, and you may be

14                deciding the fate of another individual.

15                That is the reason why we take this much

16                time and that is the reason why we ask

17                you some questions like you might be

18                asked in a job interview.  That might

19                seem a little tougher or a little more

20                prying than maybe you would like.  If I

21                do that, please don't take offense.  It

22                is simply part of the process.  If we
```

1221

1     were going to test to see how strong the

2     sleeve was on this coat I am wearing, I

3     would have to do that by tugging on it,

4     but so if I tug a little bit, please

5     forgive me, all right?

6          You have heard a little bit about

7     this case from the Tribune and I am

8     interested in what impressions those

9     things left in your mind.  And I

10    understand and appreciate before you

11    answer it, that you may have forgotten

12    all about that until you got back to the

13    Courthouse and said, "Yes, Donna Roberts,

14    I read something about that."  But

15    assuming that is what happened and I see

16    you nodding your head, is that pretty

17    much what happened or did you sort of

18    have this case in your mind when you got

19    here?

20  A.   No.  I didn't follow it.  All I know is like a

21       woman and a man and a murder.

22  Q.   When you read the articles in the Tribune,

1222

```
 1            what impression did they leave with you?
 2            Did they leave the impression that these
 3            people probably did this or what?
 4   A.   I didn't give much thought to it.
 5   Q.   How about when you came to the Courthouse last
 6            week and found out what case it was, and
 7            then you sort of thought back to what you
 8            had read.  What was left in your mind
 9            then?
10   A.   It wasn't nothing left in my mind.  That is
11            the lady.  That is all.
12   Q.   We had a juror -- well, actually let me ask
13            you a couple of other things.  Since you
14            have been hanging around the Courthouse
15            and I know you have been here for a
16            little bit and we apologize for that.  We
17            do the best thing with scheduling, but it
18            doesn't always work out too well.  Since
19            you have been hanging out around the
20            Courthouse, have you heard the case
21            discussed, Miss Roberts, or anything
22            about her case or anything like that?
```

1223

1   A.   No, Sir.

2   Q.   Have you seen anybody in the Courthouse who

3        you know?  One of the other jurors, I

4        notice, lives on the same street as you

5        and are you acquainted with her or not?

6   A.   She used to go to my church.

7   Q.   Did the two of you see each other in the

8        Courthouse or anything like that or have

9        any conversations?

10  A.   Yes.  "Hi, how are you doing?"  That is it.

11  Q.   If she's selected as a juror and you are

12       selected as a juror, is there anything

13       about your past acquaintanceship that

14       would cause you to hesitate to express or

15       stick to your views?

16  A.   No.

17  Q.   Particularly let's say that she ends up on one

18       side of the case when you are in the Jury

19       room and you end up on the other side, is

20       there anything about that relationship

21       that would cause you to surrender your

22       honest convictions about how you viewed

                                                            1224

1       the evidence?

2   A.   No.

3   Q.   One of the reasons that we do this is to find

4        out, even though you have read some

5        things, whether you are able to set that

6        aside.  And let me sort of jump ahead a

7        little bit and talk for a second about

8        the burden of proof in this case.  You

9        heard Mr. Bailey talk a little while ago

10       about a box.  And I agree with him in

11       this case, the State of Ohio has to fill

12       up a box.  Somewhere pretty far up on

13       that box is a line called reasonable

14       doubt.  He doesn't have to prove his

15       case, he and Mr. Becker.  They don't have

16       to prove their case beyond a shadow of a

17       doubt or beyond all possible doubt or

18       imaginary doubt.  So, I guess the

19       difference between what he's got to prove

20       and what is left in that box would be

21       shadow of a doubt and imaginary doubt and

22       all of that.

1225

```
 1            What I'm trying to find out from you
 2       is, and only you can answer this.  Is
 3       there anything that you have read about
 4       this case or having heard us talk about
 5       it now that brings back what is in those
 6       articles that in essence constitutes
 7       stuff that is already in the box, or can
 8       you start this case with the box being
 9       empty?
10  A.   It would have been empty.
11  Q.   Let's say that, and I like to think that this
12       is a normal psychological human reaction,
13       but I don't know.  Sometimes my wife will
14       tell me something, and I'll swear up and
15       down that she has not told me, and then
16       minutes, days, or months later, something
17       will happen and I'll go, "You know what,
18       I apologize, you did tell me about that."
19       I couldn't remember it, but whatever it
20       was, made me think about it.  Has that
21       ever happened to you, where you don't
22       think that you know something or you have
```

1226

1    been told something, but something else

2    happens later on to make you realize that

3    you had been told something about this?

4  A.   Yes, I guess.

5  Q.   Here's the reason I bring that up.  If we sit

6       here now and say, "Here's a pen and a

7       piece of paper.  Write down everything

8       you remember reading about Donna Roberts

9       and the case."  I am suspecting that what

10      you would write down is pretty much what

11      you told is here today, correct?

12 A.   Yes.

13 Q.   As the case goes on, you may hear things that

14      may make other articles that you have

15      read that you can't presently remember,

16      pop back into your head.  And I want --

17      and that is okay, except I want to find

18      out a couple of things about that.

19      First, you can't let those articles

20      substitute for evidence in this case.

21      I'm sure you appreciate that, correct?

22 A.   Yes.

1227

1    Q.    Secondly, if you hear something in the

2             Courtroom, and you go, "You know what, I

3             remember reading something like that."

4             What I need from you is an assurance that

5             even if what you hear in the Courtroom

6             matches what you read in the paper

7             before, you won't let that substitute for

8             your job as a juror of deciding whether

9             or not this person is telling the truth.

10            Am I making that clear?

11    A.    Yes.

12    Q.    If a witness gets on the stand, part of your

13             job is to decide whether that witness is

14             telling you the truth or not, you

15             appreciate that?

16    A.    Yes.

17    Q.    And you need to do that independently, not

18             say, "You know what?  What that guy just

19             said is what I read in the Tribune six

20            months ago, so therefore he's telling the

21             truth."  You appreciate that would be an

22            incorrect way of doing it?

                                                        1228

1    A.    Yes.

2    Q.    Any problem with doing that?

3    A.    No.

4    Q.    Let's say that -- well, I'm sorry, before I

5          ask you that.  Is there anything else

6          that has come into your mind that you may

7          have heard or read about this case, since

8          people have been talking to you today?

9    A.    No.

10   Q.    You know that there have been some things in

11         the paper and you know that the

12         Government has made allegations against

13         Donna Roberts, correct?

14   A.    Yes.

15   Q.    Let's say that the Government does not fill up

16         that box we were talking about a minute

17         ago.  Would you have any hesitation to

18         vote and say, "Well, I have to find her

19         guilty because they brought these charges

20         and there was all of this stuff in the

21         paper"?  Would you still have the courage

22         to say, "They didn't prove the case, so

1229

```
 1            I'm going to find her not guilty"?  Would
 2            you have any problem doing that?
 3   A.   No problem.
 4   Q.   Do you have any thought in your mind that
 5            because we're talking to you and asking
 6            you questions now about the death penalty
 7            case, and about the death penalty, that
 8            well, Donna Roberts has to be guilty or
 9            else these guys wouldn't be asking me
10            these questions?
11   A.   No.   I think you are just doing your job.
12   Q.   You appreciate we have to have rules for
13            everything we do, otherwise, all of us
14            being lawyers and liking to talk, me and
15            Mr. Bailey and Mr. Becker and Mr. Ingram
16            would be all saying, "Let me go first."
17            We have to have rules and procedures for
18            how we do things.  You appreciate that?
19   A.   Yes.
20   Q.   And part of that as Mr. Bailey said to you,
21            this is the only time we get to talk to
22            you during the case, so we have to talk
```

```
                                                        1230
 1              about everything that might possibility

 2              happen.  Are you okay with that?

 3    A.   Yes.

 4    Q.   You don't have any thought in your mind,

 5              "Well, these guys are talking to me about

 6              the death penalty, we must be getting to

 7              the second phase"?

 8    A.   No.

 9    Q.   Are you comfortable that you understand

10              basically how those two phases work, that

11              is what happens at each phase?

12    A.   Yes.

13    Q.   You are soft spoken, so I want to make sure

14              that I heard what you said before.

15              Mr. Bailey asked you some questions and

16              you put some things in your questionnaire

17              about problems that you see in the

18              criminal justice system, and if I

19              understood you, and please don't let me

20              put words in your mouth, I'm just trying

21              to keep this moving along.  Basically,

22              you see some problems with the system
```

1231

```
 1              because depending upon your race or

 2              depending upon your affluence or lack of

 3              it, you may not necessarily get a fair

 4              trial?

 5   A.    Yes, that is what I'm saying.

 6   Q.    Help me out with that just a little bit more.

 7              Who in your mind has been the victim of

 8              those injustices?

 9   A.    I am thinking over a time period.  People in

10              the south.  That is what I am thinking

11              about, they weren't given fair trials.

12              If they caught them, then they right then

13              and there, they were guilty.

14   Q.    There were a number of cases like that, some

15              very interesting law actually began to

16              develop in the 30's and the 40's as a

17              result of those types of cases.  And you

18              are basically talking about lynch mob

19              trials, where they grab guys -- and let's

20              not pull punches, most of those cases

21              were the big pot bellied one southern

22              sheriff with the drawl, going out and
```

1232

1    grabbing three or four black guys that

2    someone said did something, and before

3    you know it, were tried if at all, and

4    executed.  Is that what you are talking

5    about?

6  A.    Yes.

7  Q.    Do you still see any of that stuff going on

8        today?

9  A.    I think it still goes on, but not to a point.

10       I think it is under cover.

11  Q.    Now, Miss Roberts is white.  She's a female.

12        Do you have any perception from what you

13        think about the criminal justice system

14        that she might not be able to get a fair

15        trial here?

16  A.    No.  I don't think so.

17  Q.    And of course, the other thing is that even if

18        you perceive those shortcomings in the

19        system and I might be well inclined to

20        agree with you, you appreciate that both

21        of us doing our jobs in this case, can't

22        do anything to deviate from what we have

1233

```
 1              to do.  We can't sort of make up for past

 2              injustices?

 3    A.    I am.

 4    Q.    You are okay with that?

 5    A.    I am okay with that.

 6    Q.    I want to talk to you for a little bit about

 7              your views on the death penalty, and some

 8              of the things that you have written and

 9              some of the things that you have said.

10              And I want to make sure that I understand

11              them.  In your questionnaire when we

12              asked what were your views concerning

13              capital punishment, you said making sure

14              that all of the facts are presented in

15              the case.  And I want to press you for a

16              minute about that.  Are you saying that

17              before you can consider the death

18              penalty, you would have to make sure that

19              the Defendant's guilt is established

20              unquestionably -- or don't let me put

21              words in your mouth.  What are you saying

22              there?
```

1234

1   A.   Ask that again.

2   Q.   You put in your questionnaire when we said,

3        "What are your views concerning capital

4        punishment?"  You said, "Making sure that

5        all of the facts are presented in the

6        case."

7   A.   That is nothing is left out to bring you to

8        that point, because sometimes if

9        something is left out, or a witness isn't

10       presented that could have been, could

11       have worked in their case, but that is

12       what I'm saying.

13  Q.   You also talk about senseless killings and

14       about the killings of innocent people.

15       And I am wondering what are your thoughts

16       about the death penalty in relation to

17       that?  Are you saying that any time a

18       killing is senseless, that the person

19       should get the death penalty?

20  A.   No, I'm not saying any time.  I mean if it

21       goes to Court like that, and it is just

22       something that could have been done

1235

1     without.  It shouldn't have even

2     occurred.

3  Q.   We have had a couple of examples that we used

4       during the course of this trial, and let

5       me go back and talk with you about one of

6       them.  Let's say that facts are presented

7       to you that I walked into a 7-11 or a

8       Dairy Mart or whatever, and pulled out a

9       gun and said to the teller, "Give me all

10      your money."  That is what lawyers would

11      typically call an aggravated robbery

12      because we're taking property from

13      somebody and we're using force to do it.

14      A gun.  And so the teller or the clerk

15      gives me the money, and then as I'm ready

16      to leave and they are looking scared and

17      they are going, "Please don't hurt me,"

18      and I just go boom and they are dead.

19      Now, I think just about everybody on the

20      planet can agree that would be a

21      senseless killing, correct?

22  A.   Yes.

1236

1    Q.    And my question to you is in that type of fact

2          situation, is your view of the death

3          penalty such that I should get the death

4          penalty for that, because that was a

5          senseless killing?

6    A.    Honestly, I would say yes, because you had the

7          opportunity to get away.

8    Q.    If in a case like that, you found me guilty at

9          the first phase of the trial, that is,

10         you found that I did the robbery and the

11         murder, and now we went to the second

12         phase, is the death penalty -- and you

13         found that I had a chance to get away and

14         I didn't.  Maybe there's even a security

15         camera so that you can see the teller

16         going, "Please don't hurt me," and I

17         shoot him or her anyway.  And my question

18         is then if we get to the second phase, in

19         a case like that, is the death penalty

20         going to be -- is it your preferred

21         option?  Am I going to have to talk you

22         out of giving me the death penalty?  I

1237

1        need to know how you think about that in

2        a situation like that?

3   A.  You say would it be my preferred option?  It

4        probably would come up.  But then you

5        have these other options, also.

6   Q.  And that is really what I'm trying to find

7        out.  Even though you think that is a

8        senseless killing, at the second phase,

9        you know from your reading, that there

10       would in essence be four options you

11       would have if there were a death penalty

12       case.  You could give me the death

13       penalty, life without parole, life with

14       30 and life with 25.  What I need to know

15       from you is, given those facts that I

16       told you, that senseless killing, are

17       those penalties that I just mentioned

18       going to start out equally in your mind

19       or because of how you feel about the

20       death penalty as related to senseless

21       killings, are you going to say, "You know

22       what?  I found this guy guilty.  I found

1238

1     this to be a senseless killing, and he's

2     going to get the death penalty unless

3     somebody talks me into something else"?

4     A.   I think it would be equal.  It would be

5     balanced out.

6     Q.   Because even with the senseless killing like

7     the one I just talked to you about, you

8     understand that the second phase, the

9     State would still have to convince you

10    beyond a reasonable doubt that I should

11    get the death penalty, right?

12    A.   Yes.

13    Q.   There may be things that you would hear at

14    that second phase, maybe I needed the

15    money because my son had some horrible

16    disease, and maybe I myself suffered from

17    not really a mental illness that would

18    make me not guilty by reason of insanity,

19    but maybe it affected my judgment and my

20    perception, and I didn't want my son to

21    suffer from the same thing, so I was

22    desperate.  And those would be things to

1239

1             weigh against that senseless killing.  Do

2             you see how that would work?

3   A.   Yes.

4   Q.   Now, I don't know what to take from your

5             reaction there.  Are you saying that

6             those would be things to consider, but

7             too bad, you are still getting the death

8             penalty?

9   A.   No.

10  Q.   I'm not asking how you would vote on those

11            facts that I have just given you, because

12            that is unfair because you haven't heard

13            everything.  What I'm trying to find out

14            from you is, would you be willing to

15            listen to that type of evidence and would

16            you go into that second phase with all of

17            those sentencing options sort of equal in

18            your mind?

19  A.   Yes.

20  Q.   And if I presented that type of evidence that

21            I just told you, the State would come

22            back with their reasons for why I should

1240

```
 1              get the death penalty and they would

 2              still have to persuade you by proof

 3              beyond a reasonable doubt, that the death

 4              penalty would be appropriate for me.

 5              Would you hold them to that burden?

 6    A.   Yes.

 7    Q.   Are you saying then that for senseless

 8              murders, for murders, and that 7-11 clerk

 9              by the way is clearly an innocent person,

10              we can agree on that, correct?

11    A.   Yes.

12    Q.   We can agree on two things, that is, senseless

13              killing and it is an innocent person,

14              correct?

15    A.   Yes.

16    Q.   Are you saying that the death penalty, the

17              consideration of the death penalty should

18              be reserved for those types of murders?

19              What I'm trying to find out is, do you

20              think that the person should always get

21              the death penalty for those types of

22              murders or those are just the types of
```

1          murders for which they ought to at least

2          be considered for the death penalty?

3  A.   I would say be considered, not always.

4  Q.   And I think that ties into what you said about

5          we have a death penalty because it is

6          sort of a misapplication of an eye for an

7          eye and a tooth for a tooth; am I reading

8          you correctly about that?

9  A.   Yes.

10  Q.   So, you are saying that maybe sometimes an eye

11          for an eye is appropriate, depending on

12          the circumstances.  If you take a life,

13          you give a life, but sometimes maybe not;

14          is that what you are saying?

15  A.   Yes.

16  Q.   Let me ask you sort of two opposite versions

17          of the same question.  What in your mind

18          are the strongest arguments for best

19          reasons for having a death penalty?

20  A.   For having it?

21  Q.   For having the death penalty.  Not to

22          interrupt you, you think that for some

1242

1      crimes, the death penalty is a good idea

2      or is appropriate?

3   A.   Yes.  It is appropriate.

4   Q.   Why do you think that?  Don't get me wrong,

5        I'm not challenging your view on that,

6        I'm interested in the thinking that goes

7        behind that.  Do you think it is a

8        retribution thing, that is to, somebody

9        took a life they should give their life?

10       Do you think it is more of a vengeance

11       thing?  You mentioned like if your son is

12       18 -- my son just turned 18, too.  God

13       forbid we wouldn't want anybody to do

14       anything horrible to them and I'm sure

15       that if somebody did, the natural human

16       reaction first is, you want that person.

17       Is that any part of the equation for you,

18       that is, sort of a private retribution as

19       opposed to a public justice sort of thing

20       or is it not?

21  A.   I think it is -- it seems like you are saying

22       why shouldn't we have it, have the death

1243

1      penalty?

2  Q.  I'm asking your own opinions about that.  I'm

3          not asking the law's version or anything,

4          your own opinions of why we should have

5          the death penalty for some offenses?

6  A.  Because some offenses deserve it.

7  Q.  How about let's take the other side of that

8          question.  Do you think that there are

9          some arguments for why we should have

10          life imprisonment for some offenses?

11  A.  Yes.

12  Q.  What do you think about that?

13  A.  To have life over some of the things that goes

14          on.  I don't think death is always the

15          answer to every murder or every senseless

16          murder, but I think life could be.

17  Q.  How about if it is a planned murder?  The

18          reason I ask about that obviously is

19          because you mention when I talked about

20          the 7-11 that I had the chance to walk

21          away, and obviously, with a planned

22          murder, you have a chance to walk away.

1244

1    Do you think that everybody who commits a
2    planned murder should automatically get
3    the death penalty?
4  A.  No.
5  Q.  And what about a crime of passion?  I think
6    Mr. Bailey maybe mentioned a crime of
7    passion to you.  I think he mentioned --
8    I can't remember now, the woman walks in
9    and catches her husband.  A crime of
10   passion thing, do you think those people
11   should always get the death penalty?
12 A.  No.  Because I think sometimes you might flip.
13 Q.  And that flipping sort of takes out of the
14   equation being able to avoid it as with
15   my 7-11 case?
16 A.  Yes.
17 Q.  Have you heard the phrase before taking the
18   Fifth?
19 A.  Where you don't say anything?
20 Q.  You hear it on T.V. or in the movies and
21   everybody thinks, "Don't say anything,
22   don't get yourself in trouble."  It

1245

1    actually comes from the Constitution's

2    Fifth Amendment, and it does say that you

3    don't have to say anything to incriminate

4    yourself.  The logical way that works in

5    a trial like this is it means that a

6    person, a citizen who is charged with a

7    crime has a presumption of innocence.  If

8    the Government says, I think Mr. Bailey

9    even said this to you, that if the

10   Government charges them with something,

11   they have to put up or shut up.  It is

12   different from other countries where may

13   be you have to prove yourself not guilty.

14   In America, if you are charged with a

15   crime, as citizen, you don't have to do

16   anything.  You can just show up at the

17   trial, sit there if you want to literally

18   or figuratively and fold your arms.  And

19   if the Government is able to fill up that

20   box we talked about earlier, then they

21   have proved their case and the Jury finds

22   you guilty, but, you don't take anything

1246

```
 1                 out of the box, and you don't pour
 2                 anything into the box yourself as the
 3                 person charged with the crime.  So, if
 4                 the Government doesn't fill up the box,
 5                 then this in essence lost the case.  It
 6                 is not the Defendant wins, it is a
 7                 question of whether the Government meets
 8                 its burden of proof or not.  Are you okay
 9                 with that?
10    A.    Yes.
11    Q.    Any problem presuming Donna Robert is innocent
12                 as we sit here now?
13    A.    No.
14    Q.    You have a son who is about my son's age.  You
15                 and I are about the same age and we have
16                 children about the same age is a better
17                 way of saying it.  If, I don't know if
18                 your son has graduated or not yet.  Mine
19                 is a Senior in high school.  If the
20                 principal calls and says, "Hey, John, you
21                 want to explain to me why Mike had a
22                 loaded nine millimeter Smith and Wesson
```

1247

```
 1              in his locker?"  I'm going to get this
 2              look of astonishment.  He might have a
 3              picture of a girl pasted on his locker or
 4              a picture of some race car or revved up
 5              pickup truck, but not Mike.  He's not
 6              going to have a Smith and Wesson, and for
 7              him to prove Mike guilty of having that
 8              crime, I'm not going to take the
 9              principal's word for it that Mike had a
10              gun.  I'm going to want some proof and I
11              am assuming the same thing happened with
12              your son, you would also want some proof,
13              correct?
14    A.   Yes.
15    Q.   And pretty doggoned proof that you are going
16              to test and not take it at face value,
17              correct?
18    A.   That is true.
19    Q.   That is because you have a presumption of
20              innocence that your son as I do, just
21              didn't do that.  Any problem going into
22              this case with that same sort of
```

1248

1   presumption as far as Donna, and testing

2   the evidence the same way you and I just

3   talked about?

4   A.   No problem.

5   Q.   Because of that presumption of innocence and

6   because the burden of proof is on the

7   Government, and because Donna doesn't

8   have to do anything, one of the things

9   that may happen in this case, I'm not

10   saying it will, it just might, is that

11   she might not testify.  You might not

12   hear what she has to say.  That sort of

13   runs contra to our natural human

14   inclination that we want to hear both

15   sides of the case, would you agree?

16   A.   Yes.

17   Q.   But do you see that because of the way that

18   works with the Government either filling

19   up the box or not filling up the box, she

20   has an absolute right to just say, "I

21   don't think they filled up the box, I'm

22   not doing anything."  Are you going to

```
 1              hold that against her if she does that?

 2   A.   No.

 3   Q.   Now, how about the other side of that?  Let's

 4              say that she testifies, she's a witness,

 5              like any other witness in this case,

 6              would you agree with that?

 7   A.   Yes.

 8   Q.   Whether you decide whether or not to believe

 9              her, it is certainly fair to take into

10              account, well, she's the Defendant, she

11              has a lot to lose in this case and that

12              is something that it would be fair to

13              take into consideration in deciding

14              whether you believe her or not, correct?

15   A.   Yes.

16   Q.   But, you don't just reject her testimony

17              because she's the Defendant, would you

18              agree with that?

19   A.   Yes.

20   Q.   The Government in the first phase of the case,

21              is like any other trial, has to prove its

22              case beyond a reasonable doubt.  When you
```

1250

```
 1              have made important decisions in your
 2              life, whether you do it on a piece of
 3              paper or sort of in your mind's eye,
 4              don't you kind of make a list of the pros
 5              and the cons?
 6   A.   Yes.
 7   Q.   And then you have to resolve all of those cons
 8              before you decide that decision is the
 9              right one for you, correct?
10   A.   Yes.
11   Q.   It is kind of the same thing here.  In your
12              mind's eye or on a piece of paper back in
13              the Jury room, you sort of make a check
14              list on one side, are all of the reasons
15              why the Prosecutors are going to say,
16              "You should find Donna Roberts guilty."
17              On the other side are all of the reasons
18              why either Mr. Ingram and I say that you
19              should have a reasonable doubt, maybe it
20              is something you come up on your own as
21              you listen to the evidence.  With that
22              sort of mind set that we just talked
```

1251

1               about, about my son and the gun or it may

2               be doubts that the other jurors have come

3               up with as you guys have talked about the

4               case when you are deliberating; all of

5               that make sense to you?

6  A.    Yes.

7  Q.    As we said before, when they fill up that box,

8               they don't have to prove that case beyond

9               the shadow of a doubt or beyond imaginary

10              or possible doubt, but they do have to

11              prove it beyond any doubt based on reason

12              and common sense.  So, if when you talk

13              to the other jurors about the doubts you

14              have on that side of the check list, if

15              you have one or more than one that you

16              talk about and you think about it, and

17              you say, "Sorry, there's no other way for

18              me to account for this, other than this

19              is a doubt I have about the Government's

20              evidence," and it's a doubt based on

21              reason and common sense, it is not

22              foolish, it is not silly, it is not

1252

1      imaginary, it's a real legitimate doubt

2      based on reason and common sense.  You

3      see in that case then, the Government has

4      not proved its case beyond a reasonable

5      doubt.  You okay with that?

6   A.  Yes.

7   Q.  Any problem holding the Government to that

8      type of burden?

9   A.  No.

10  Q.  You think that is a fair way to do things by

11     the way, this presumption of innocence

12     and the burden of proof beyond a

13     reasonable doubt?

14  A.  Yes.

15  Q.  That same type of burden applies to the second

16     phase, if in fact we get to a second

17     phase, and that is the Government in

18     essence is going to give you reasons why

19     you should consider imposing the death

20     penalty.  We call them aggravating

21     circumstances.  And you will hear from

22     the Defendant if you get to that phase,

1253

```
 1            reasons why you should not impose the

 2            death penalty called mitigating factors

 3            or mitigation evidence.  You have to

 4            weigh those.  And as Mr. Bailey correctly

 5            said, nobody can tell you what weight to

 6            apply to that evidence.  You have to

 7            decide that for yourself as a juror.  Are

 8            you comfortable taking on that

 9            responsibility?

10   A.   Yes.

11   Q.   Only if you find that the reasons to impose

12            the death penalty outweigh the reasons

13            not to, by proof beyond a reasonable

14            doubt, and if you find again by proof

15            beyond a reasonable doubt that the death

16            penalty is appropriate, then and only

17            then, do you vote for death.  Do you

18            understand that?

19   A.   Yes.

20   Q.   And you are comfortable again holding the

21            Government to that type of heavy burden

22            in the second phase?
```

```
                                                        1254
 1   A.    Yes.
 2   Q.    Is there anything that has come up since you
 3              and I have been talking that you either
 4              have questions about how the process
 5              works or concerns or reasons why you
 6              couldn't serve as a juror?
 7   A.    No.
 8   Q.    Would you like to be a juror in this case?
 9   A.    Yes.
10              MR. JUHASZ:  Thank you.
11   (SIDE BAR DISCUSSION, OFF THE RECORD AND
12   OUT OF HEARING)
13              THE COURT:  Ma'am, you are going to
14   be in the pool from which this Jury will be
15   selected.  You are going to call that number after
16   4:30 this Friday for further instructions.  I would
17   again you remind you not to read anything or have
18   any discussion or watch anything on T.V.  Thank you
19   for your time.
20              For the record, both Defense and the
21   Prosecution have passed for cause on this last
22   juror.  Let's take a ten minute recess.
```

1255

1    (Court in recess at 3:10 p.m.)

2    (Resumed in Open Court at 3:30 p.m.)

3    (Juror No. 47, Walter Dawson, entered the Courtroom.)

4              THE COURT:  You read that handout

5    that was given to you?

6              MR. DAWSON:  Yes.

7              THE COURT:  The questions that you

8    will be asked this afternoon are along two lines,

9    and that is whether or not you have read anything

10   in the papers or watched something on T.V. to the

11   point where you have your mind made up on this

12   case.  Both sides have a right to have jurors who

13   don't have any preconceived ideas that they are

14   unable to set aside.

15             Any case of this nature is going to

16   appear in the papers and most people, you have

17   heard me say before, that appear on Juries, are

18   usually the type that keep informed of what is

19   going on.  So it is not unusual to have many of the

20   people that are familiar with having read something

21   out of a newspaper.  In my experience, most people

22   don't seem to retain much of it, but sometimes they

1256

1    do, if they take a particular interest in a

2    particular case.  You may be totally saturated with

3    what the news media has portrayed, so they will ask

4    you about where you stand on that.

5            As you know, Miss Roberts is charged with

6    aggravated murder with specifications.  The person

7    who does murder in Ohio is not necessarily eligible

8    for the death penalty.  It is only under certain

9    circumstances.

10           We do not follow an eye for an eye

11   because some murders do not qualify for the Jury

12   even being asked the question of the death penalty.

13   These particular charges, however, are in that

14   category.  We all have our opinion on the death

15   penalty, that covers the whole spectrum of

16   possibilities.  There are those who feel an eye for

17   an eye, tooth for a tooth, you kill somebody, you

18   forfeit your life.  That is not the law of Ohio.

19           There are other people who could under no

20   circumstances feel like they could make that

21   decision.  There's nothing wrong with either of

22   those opinions.  We're all entitled to our own

1257

1   opinion.  Whatever your opinion is, is fine.  We'll

2   all respect your opinion.

3           What we're looking for is 12 people who

4   can sit and start out anew on this case.  Because

5   if both sides are to have a fair trial, it has to

6   be decided on what evidence is presented in this

7   Courtroom.  Somebody comes in and is on the Jury

8   and they read something in the newspaper and

9   evidence doesn't square with that, if they went

10  with what the newspaper said, somebody is not going

11  to get a fair trial.  And I imagine everybody on

12  this Jury, whoever it is, will have some sort of

13  opinion on the death penalty.  And that is fine.

14  But each of them will have to assure these folks

15  that they are able to follow the law that is given

16  to them, so that everybody is on the same page.  We

17  may have one person that says, "I really don't like

18  the death penalty, I'm not going to go that way."

19  Or somebody says, "I think anybody that commits a

20  murder should be put to death."  And somebody isn't

21  going to get a fair trial, either the State or the

22  Defendant.  So you understand what we're looking

1258

1   for, right?

2                  MR. DAWSON:  Yes.

3                  THE COURT:  Fair enough.

4   <u>EXAMINATION BY MR. BECKER OF MR. DAWSON:</u>

5   Q.   Good afternoon, Mr. Dawson.  My name is Chris

6             Becker.  I work for the County

7             Prosecutor's Office and this is

8             Mr. Bailey.  He's what we call the lead

9             counsel and I'll assist him in this

10            trial.  You see Mr. Ingram and Mr. Juhasz

11            over here and their client, Donna

12            Roberts.

13                 This is really the only opportunity

14            we get to speak to you as a juror in this

15            case, because once it starts, we can't

16            turn to you and you can't ask us, "Hey,

17            what did that witness say," or "I got to

18            ask you something about what they said."

19            And in fact, if we see you out in the

20            hall or if we see you may be at lunch

21            time, we won't even be able to speak to

22            you and it is not that we're rude and we

1259

```
 1          don't like you or don't want to speak to

 2          you, we can't speak to you and then have

 3          Mr. Juhasz or Mr. Ingram come in and say,

 4          "Mr. Becker is talking to these jurors, I

 5          don't know what he's telling them."  Once

 6          we get by this phase here, we can't talk

 7          to you again, so what may seem like

 8          prying to you in trying to find out more

 9          about you is really what we have to do

10          right now.  We have to find out as much

11          as we can about you in just a little bit

12          of time here this afternoon to determine

13          whether we think you will be a good juror

14          in this particular case.  That doesn't

15          mean somewhere down the road we might not

16          cross paths again in two years or six

17          months or ten years, but you may be a

18          good juror in another case.

19               So, with that in mind, I hope you

20          don't have too much of a problem

21          answering the questions that both sides

22          are going to ask of you.  And as we ask
```

1260

1   these questions of you, feel free to ask

2   me questions because if I can answer

3   them, I'll be happy to answer them,

4   because this is the only time in this

5   proceeding that we're going to get to

6   speak directly to you.

7       So, one of the first things I'm

8   going to start out right off the bat.  I

9   don't know if you didn't have time to

10  finish the questionnaire or not, as the

11  Court said, two of the main topics that

12  we need to speak to you about, relate to

13  the death penalty, and I am looking at

14  your questionnaire and it is just not

15  filled out to that point.  Can you tell

16  us --

17  A.  Where is that?  Show it to me, please.

18  Q.  It is on the last couple of pages there.

19  A.  I didn't see it.

20  Q.  We're not prying, and let me back up a little

21      bit.  We're being presumptuous here,

22      because this case is really going to have

1261

1    two components, two parts to it.  The

2    first part is going to be whether or not

3    the State, us, can prove Donna Roberts

4    guilty by proof beyond a reasonable

5    doubt.  We may not be able to do that and

6    you and your other fellow jurors may say,

7    "Hey, they didn't prove the case, she's

8    not guilty," and everybody goes home.

9    We'll go back to our offices, but you

10   will get to go home.  But like I said to

11   you we may not, we're definitely not

12   going to be able to speak to you again

13   after today, at least individually like

14   this, and if we get to a point where you

15   are picked for this Jury and you do find

16   her guilty, we can't now come back and

17   say, okay 12 jurors, how are we going to

18   get to the part where we do impose the

19   death penalty if the State proves this

20   case beyond a reasonable doubt?  We can't

21   have someone saying, "Hey, no one told me

22   about that.  I can't do that.  I have a

1262

1    moral belief or religious belief.  I

2    can't impose the death penalty."  I'll

3    tell you, we have had people do that

4    already here today.  That is fine, you

5    are entitled to your opinions and there's

6    no right answer here.  You are not going

7    to give us something and say everybody is

8    entitled to their opinions.  You may have

9    opinions on the war with Iraq or abortion

10   or the death penalty or all of that.  The

11   only one that really matters right now is

12   on the death penalty, so I'm going to ask

13   you, do you have an opinion about the

14   death penalty?

15   A.   Yes.  It won't bother me a bit.

16   Q.   And that is fair enough.  So I guess what you

17       are telling me is that you could serve as

18       a juror in a case where the death penalty

19       would be an option for you?

20   A.   Yes.

21   Q.   Now, the way the law works in Ohio and pretty

22       much our country, we're being

1263

1    presumptuous that we're going to get to

2    that point in the trial.  Let's assume we

3    go through the first part of this trial

4    and you find Donna Roberts guilty by

5    proof beyond a reasonable doubt of some

6    crimes and some specifications, that

7    would make her eligible for the death

8    penalty.  Now we're going to get to the

9    second phase, and you are going to have

10   four options for which to give her a

11   penalty.  Death would be one of them.

12   Life with no parole would be another,

13   life with no parole after 30 years, and

14   life with no parole after 25 years.

15   Those would all be options for you.

16        Now, let's assume we're in this case

17   and we go through the first phase, and it

18   is proven by the State beyond a

19   reasonable doubt that she was involved in

20   a homicide.  She aided and abetted

21   another person.  And you found that she

22   committed these specifications, that she

1264

```
 1              assisted or aided and abetted another in

 2              killing Robert Fingerhut.  And I'm going

 3              to try to be brief here, but there's sort

 4              of two theories on the case; one is that

 5              she did it with prior calculation and

 6              design during the commission of a robbery

 7              and a burglary, but let's just assume

 8              that we get those specifications, she's

 9              proven guilty, that she di aid and abet

10              in this homicide.  Do you think that

11              automatically means you have to impose

12              the death penalty?

13   A.    I kind of think so.

14   Q.    Let's back up here a minute.  If I were to

15              tell you that the law does not require

16              that, are you going to be able to listen

17              to this second phase testimony and say,

18              "You know, the State proved that she was

19              involved in planning this murder, and she

20              aided and abetted another, and it

21              happened during the course of," say "an

22              aggravated burglary or aggravated
```

1265

1   robbery," or maybe both. But now we're

2   in the second phase and the Court will

3   instruct you. "I know what the Court is

4   going to tell me, but you know what, my

5   position is if you kill someone, you

6   should get the death penalty." Is that

7   what your mind set is?

8   A.   Yes, Sir.

9   Q.   Do you feel that mind set is so strong or so

10       prevalent that you could not follow the

11       Court's instructions?

12  A.   Who could say?

13  Q.   The only one that can say is you. You are the

14       one that we have got to ask.

15  A.   You would have to prove it to me.

16  Q.   We would have to prove what to you?

17  A.   That --

18  Q.   That she deserved not to get the death

19       penalty?

20  A.   Yes.

21  Q.   You wouldn't come in in the second phase

22       assuming you found her guilty of a

1266

1    premeditated murder, even if the Judge
2    told you that all of those options are
3    equal to you, you could equally choose
4    any one of those four options?
5  A.  Yes, I could do that.
6  Q.  You could do that?
7  A.  Sure.
8  Q.  You are not going to let this mind set, that
9    the death penalty has to be a penalty for
10   a homicide, a pre-planned homicide to the
11   extent that it will interfere with you?
12 A.  No.
13 Q.  You would be fair and open to some other
14   things?  I'm going to try and explain
15   this, maybe, at a -- just a common sense
16   level.  When we get, if and when we get
17   to that second phase, the State, we still
18   have to prove that there's some
19   aggravating circumstances.  We have to
20   prove that some bad things happened, and
21   we have to prove that she's responsible
22   for these bad things, these aggravating

1267

1    circumstances.

2         Now, there's sort of two hurdles we

3    have to get over.  First, we have to

4    prove to you enough that there's proof

5    beyond a reasonable doubt that she

6    deserves the death penalty.  They may not

7    present any evidence.  You may say,

8    "Well, there's just not enough evidence

9    for me to sign a verdict calling for the

10   death penalty," and you may find one of

11   the others.  So, let's assume we're in

12   this second phase and she's been

13   convicted of aggravated murder.  Prior

14   calculation and design and she aided and

15   abetted somebody.  There's no allegation

16   in this case that she's even the shooter

17   in this case, and we're not even going

18   to present you evidence that she was the

19   shooter.  Let's assume that she conspired

20   with another individual to kill Robert

21   Fingerhut, who is the victim in this

22   case.  And now we're in the second phase,

1268

1  and we show you some evidence that we

2  feel shows that she committed the offense

3  by proof beyond a reasonable doubt, and

4  that these aggravating circumstances, or

5  these bad things, warrant her to get the

6  death penalty.  She doesn't have to

7  present you anything because we may not

8  have proven the aggravating

9  circumstances, the bad things, outweigh

10 the mitigating circumstances.  Now I

11 don't think that is going to happen, but

12 that could happen.  We have to get over

13 that first hurdle of proving that some

14 aggravating circumstances even happened

15 in that second phase.

16     So, let's assume we're in the second

17 phase and we show that those aggravating

18 circumstances, or those bad things, we

19 don't prove them by proof beyond a

20 reasonable doubt.  You would agree then,

21 that you couldn't impose the death

22 penalty if that is what the Judge

```
                                                            1269
 1               instructed you?
 2    A.   You can't prove it, I can't do it.
 3    Q.   Even though you have the mind set that the
 4               death penalty is a good thing?
 5    A.   Like the Judge said, I am from the old school,
 6               an eye for an eye and tooth for a tooth,
 7               that don't go in Ohio.
 8    Q.   You would follow the law?
 9    A.   Got to.
10    Q.   Even though you are an old school kind of guy?
11    A.   Yes.
12    Q.   So you believe you can separate out your
13               personal opinion of what the penalty
14               should be for this kind of case and
15               follow the law as the Court were to
16               instruct you?
17    A.   I think I could.
18    Q.   And it is not good enough that you think you
19               could, you have to be able to do it.  I
20               know we're getting presumptuous, we're
21               trying to predict your future behavior,
22               but it is only fair to her.
```

1270

1   Let's assume we prove that first

2   part, we get to that first part.  She's

3   guilty, you say proof beyond a reasonable

4   doubt, you sign a verdict form with your

5   fellow jurors that said, "Yes, she's

6   guilty, yes, she's committed these," what

7   we find that she's guilty of these things

8   that make her death penalty eligible.

9   Now you will get to the death penalty

10  phase, the second phase for this

11  mitigation phase, and the part where you

12  are going to determine whether or not

13  that is an appropriate penalty.  And we

14  don't do much of anything.  Mr. Bailey

15  and I sit over here, we kind of twiddle

16  our thumbs and say, "This is a real bad

17  thing, find her guilty and give her the

18  death penalty."  And they don't present

19  anything, they don't have to.  And you

20  say, "Well, you know what, I am so much

21  in favor of the death penalty, I know

22  Mr. Bailey and Mr. Becker, they didn't do

1271

1    a very good job on the second phase, but

2    I don't care, I'm going to sign the death

3    penalty."  We have to be certain that you

4    wouldn't do that.  Because the Court is

5    going to tell you unless we prove it,

6    that these aggravating circumstances, or

7    these bad things outweigh any mitigating

8    factors she has, you can't impose the

9    death penalty.  And you feel you can do

10   that?

11   A.    I think so.

12   Q.    Now, there's a second way to sort of approach

13         this.  Let's assume we get to the second

14         phase and there's some aggravating

15         circumstances, and Mr. Bailey and I do a

16         good job, which I hope we will, and we

17         present to you some aggravating

18         circumstances by proof beyond a

19         reasonable doubt, and you said -- now,

20         they may present to you some mitigating

21         factors, some good things.  And that may

22         balance the scale and we may not be able

1272

1   to prove it.  And I guess the best way to

2   illustrate this is to maybe give you some

3   examples.  If I am a bad guy and I go

4   down here to the convenient store, the

5   Dairy Mart up on Elm Road and I go in

6   there and I demand that I got a gun and I

7   go and say, "Clerk, give me all the

8   money."  And he gives me all the money

9   and I shoot and kill him.  I have

10  committed an offense that will make me

11  death penalty eligible.  I have committed

12  that offense.  But now, let's say in the

13  mitigation phase, you find me guilty and

14  now let's say in the mitigation phase we

15  get there, and the evidence is that I

16  have got six kids, one of them has got

17  leukemia.  My wife just left me for

18  another man.  I am feeding and taking

19  care of all of these kids.  I have never

20  done any crime before.  In fact, I just

21  bought the gun that day and I was so

22  desperate to get the money.  You would be

1273

1              able to weigh that against the fact that

2              I shot and killed the clerk, right?

3   A.   Yes, I could weigh it.

4   Q.   Would you say, "Well, even if all of these

5              terrible things this Defendant has been

6              through in his life and all of these

7              hardships that the Defendant has been

8              through," and let's also say I

9              volunteered at the hospital, at Trumbull.

10             I help burn kids and I took kids to

11             Disney World and take them to Sea World,

12             and have done a lot of positive things

13             for the community.  But I have just run

14             into a bad stretch.  I didn't know what

15             to do.  You could weigh that, right?

16  A.   Yes, I could weigh that.

17  Q.   And depending upon the circumstances, you may

18             go all the way down and just recommend

19             life with no parole until after 25 years,

20             correct?

21  A.   Yes.

22  Q.   And I understand we're talking hypotheticals

1274

1    here, but you wouldn't say, "Hey, that
2    guy killed somebody." I don't care if
3    he's the second coming of whomever,
4    Mother Theresa's son, he deserves the
5    death penalty because he killed someone.
6    That's not your mind set?
7  A.  No, you can't do that.
8  Q.  Now, the other thing I want to ask you about
9    is, and I did note on your questionnaire
10   that you indicated that you did hear
11   about this case?
12 A.  Yes.
13 Q.  When did you hear about it? When it first
14   happened?
15 A.  Yes, on T.V. and in the paper.
16 Q.  And what do you remember about it?
17 A.  I just remember what the paper says mostly.
18 Q.  And did you see it on television as well?
19 A.  Yes.
20 Q.  And I think you even pointed out in your
21   questionnaire that obviously sometimes
22   the newspaper, they don't always get it

1275

1     right?

2  A.   Right.

3  Q.   And the same for television?

4  A.   Right.

5  Q.   You understand that when you read an article

6            in the newspaper about a case like this,

7            or really any case or see something on

8            television, they have only got so much

9            print space and so much time to give to

10           any story.  This case is going to go on

11           for a number of weeks.  We're going to be

12           here picking Juries and there's no

13           television here, there's no newspaper

14           reporter, nobody is covering it, but you

15           might see an article today.  So many

16           jurors were picked for a capital case or

17           so many jurors were excused.  They may

18           have just gone down and asked the bailiff

19           or checked with the clerk's office.  They

20           weren't even here.  So, you understand

21           that what you may have read or seen may

22           not be true?

1276

1   A.   Yes.

2   Q.   You obviously seem like you have had some

3        experience with that or realize that?

4   A.   With our newspaper, it is common.

5   Q.   Now the next question I'm going to ask you is,

6        having read or seen something about this

7        case either on television or in the

8        newspaper, you don't come in here with a

9        mind set saying, "Hey, you know what, I

10       read this article in the newspaper.  I

11       saw this on channel 27, and you know

12       what, she's guilty as she sits here,

13       because I saw it on T.V."  Are you of

14       that mind set?

15  A.   No, Sir.

16  Q.   And do you feel that you have formed an

17       opinion about this case based upon

18       anything you have read or seen on

19       television?

20  A.   I did, yes.

21  Q.   Do you feel you can set aside your opinion

22       based upon what you have seen and

1277

| | | |
|---|---|---|
| 1 | | determine whether she's guilty or |
| 2 | | innocent only by what you hear in this |
| 3 | | Courtroom? |
| 4 | A. | Going to have to. |
| 5 | Q. | That is going to be hard for you? |
| 6 | A. | It will be hard, but I can do it. |
| 7 | Q. | You won't be sitting here, let's say you are |
| 8 | | one of the jurors and you are sitting |
| 9 | | here in the front row and we present some |
| 10 | | testimony and the testimony says, "Yes, I |
| 11 | | remember reading about the police dog," |
| 12 | | this or that, or the DNA or the |
| 13 | | something.  I don't know what it is going |
| 14 | | to be, but something is going to remind |
| 15 | | you and you say, "You know what, I saw it |
| 16 | | in the newspaper.  They didn't cover it |
| 17 | | too well here, but I remember what I read |
| 18 | | in the newspaper," was A B and C.  "I |
| 19 | | don't care what that witness says, but |
| 20 | | when I go back in that Jury room, I'm |
| 21 | | going to tell these other jurors, I |
| 22 | | remember the newspaper said this, that |

```
                                                      1278

 1              and the other thing about this.  I don't
 2              think the witness was right, and I think
 3              it is this way because I read it in the
 4              newspaper."  You wouldn't do that, right?
 5   A.    No, Sir.
 6   Q.    You do have an opinion about this case, you
 7              believe you can set aside your opinions
 8              and determine this case solely on what
 9              you hear in this Courtroom and from the
10              witness chair?
11   A.    Yes.
12   Q.    Because we got to be certain of that, and
13              particularly Mrs. Roberts has to be
14              certain of that, as she sits over there.
15              You have heard of the presumption of
16              innocence, right?
17   A.    Yes.
18   Q.    You sitting here and looking at her, you are
19              not saying, "She's guilty.  I know she's
20              guilty because I saw it in the newspaper.
21              I saw it on television"?
22   A.    No.
```

1279

1  Q.  You may have an opinion, because you have seen
2         some things but you can set that aside
3         and determine this case solely from what
4         you hear in this Courtroom?
5  A.  Yes, Sir.
6  Q.  I'm going to ask you, because they may ask you
7         and I think it is an important question
8         to ask.  If you were the accused, and you
9         were sitting over there, how would you
10        feel if someone had come in here and
11        said, "Yes, I formed an opinion."  Would
12        you want this person on that Jury?  Would
13        you want a person like you on this Jury?
14 A.  Of course.
15 Q.  I'm not asking you --
16 A.  I know what you are saying.
17 Q.  You believe you could be fair and impartial?
18 A.  Yes.
19 Q.  And you are an old school guy.  You said that
20        and you have read the newspaper and no
21        one is faulting you for reading the
22        newspaper.  Obviously you are watching

1280

1   television, when you saw this on

2   television or when you read it in the

3   newspaper, you didn't know a year later,

4   you are going to be picked for this Jury,

5   and obviously, you are here because you

6   are a person that cares about the

7   community.  You vote, and that is how we

8   pick them, is you vote so you like to

9   take an interest in the community and

10  know what is going on, and whether this

11  case was about Donna Roberts and Mr.

12  Fingerhut and the death, it may very well

13  have been about something that was going

14  on in the City of Warren with the police

15  department and maybe the police were

16  suing or the Union was suing the City

17  because of something unfair.  You want to

18  know about the things in your community,

19  right?

20  A.   Yes.

21  Q.   Now in this particular case, like every other

22       criminal case, the Defendant is presumed

```
                                                      1281
 1                  innocent.  I assume you have heard that

 2                  term before?

 3    A.    Yes.

 4    Q.    And if you had to vote right now at 4:00 on

 5                  April 14, if you had to vote guilty or

 6                  not guilty in this case, what would your

 7                  vote have to be today?

 8    A.    I couldn't make a decision like that.  Ain't

 9                  got no evidence.

10    Q.    You would have to vote not guilty, right?

11                  She's presumed innocent and we may never

12                  get to the point where we prove her

13                  guilty, right?  You may hear some

14                  terrible things, you may hear that

15                  someone got killed.  You may hear some

16                  things about conversations she may have

17                  had with people, but unless we prove to

18                  you and in your mind that she's guilty,

19                  and your fellow jurors, you can't find

20                  her guilty, right?

21    A.    Right.

22    Q.    And every case has what we call elements and
```

1282

1   it is just basically pieces of the

2   puzzle.  And a lot of times people refer

3   to it as filling a jug of water or a pail

4   of water.  Let's say that you got a two

5   gallon bucket, and we have to prove our

6   case by proof beyond a reasonable doubt.

7       Now, proof beyond a reasonable doubt

8   is going to mean something different to

9   every person that comes in here.  Some

10  people are going to say it is 99 percent.

11  Some people are going to say it is 90

12  percent.  Some may say it is 85 per cent.

13  whatever it is, it is hard to give a

14  number to it, so sometimes we use this

15  bucket of water example.  I'm going to

16  tell you it is not completely full.  That

17  is not reasonable doubt, that is all

18  doubt, and the Judge is going to tell

19  you, we don't have to fill that bucket up

20  completely.  It doesn't have to be filled

21  to the rim.  Even if you lift it up,

22  water is going to spill out.  It has got

1283

1     to be pretty close to the top.  Maybe an

2     inch or two, if it is a two gallon

3     bucket.  It is going to be a gallon and

4     seven-eighths, maybe a gallon and

5     three-quarters.  It has got to be up

6     there near the top.

7          And on the other hand, it certainly

8     has got to be much more than half and it

9     has got to be getting close to the top

10    there, so let's say we're in this case

11    and we present to you and Mr. Bailey and

12    I, we do okay, but there's some things we

13    leave out, and maybe we don't prove one

14    or two of the elements, and we're just

15    not doing a good job and the evidence

16    isn't there.  There's something there

17    that is missing.  You have to, even if

18    you knew this case was about someone who

19    has been shot and killed or even if you

20    knew some other things about this case,

21    maybe conversations that she had with

22    other people, if we didn't meet the

1284

1    elements of the crimes, you would have to

2    find her not guilty, right?

3 A.  Yes.

4 Q.  So you believe that and you would hold us to

5    the, first of all, the standard of proof

6    beyond a reasonable doubt?

7 A.  Yes.

8 Q.  Because we have to prove our case.  Now, the

9    other thing is in this presumption of

10   innocence, you understand she doesn't

11   have to do anything.  Now I certainly

12   don't expect Mr. Ingram and Mr. Juhasz to

13   sit there and not ask one question from

14   any of our witnesses, and I don't know if

15   they are going to present any witnesses

16   in their defense and I don't know if Miss

17   Roberts is going to take the witness

18   stand.  And that is really irrelevant.

19   Because she does have that presumption of

20   innocence.  But theoretically, Mr. Bailey

21   and I, we could present 30 or 40

22   witnesses.  We could present 300 or 400

1285

1   Exhibits.  They could sit over there and

2   do the crossword puzzle or play dice over

3   there, as long as they were quiet over

4   there.  They could stand up and say, "We

5   don't have any evidence," and sit back

6   down.  You wouldn't hold that against

7   her, would you, and if we didn't prove

8   our case, the State's case by proof

9   beyond a reasonable doubt?  Your verdict

10  would have to be what?

11  A.   Not guilty.

12  Q.   And even, if there was a death involved, or

13  some things that you didn't like about

14  Miss Roberts, you wouldn't find her

15  guilty based upon what you have read in

16  the newspaper or things that you came in

17  here with, with the media, would you?

18  A.   Right.

19  Q.   Now, this case is going to involve a concept

20  of what we call complicity.  It is an

21  aider and abetter.  She's a helper.  I'm

22  going to tell you right now as we stand

1286

1    here, she's not the shooter.  You are not

2    going to hear any evidence that she got a

3    gun and shot somebody.  But you may hear

4    some evidence that she aided and abetted

5    or helped somebody do this.  You

6    understand that that also could make her

7    eligible for the death penalty if we

8    prove that and some other elements and

9    the specifications that are alleged in

10   the indictment, correct?

11  A.   Right.

12  Q.   Do you think that changes things for you, if

13       she's not the actual shooter?

14  A.   Don't change nothing.

15  Q.   And on the other side, the flip side of that,

16       you would be able to impose the death

17       penalty if you felt that the State had

18       proved, even though she's not the

19       shooter, if we had proved our case beyond

20       a reasonable doubt and we got to the

21       second phase, and we proved that the

22       aggravating circumstances outweighed the

1287

1    mitigating factors?

2  A.   Yes.

3  Q.   Again, I'm not trying to pry, but we would

4       like to know some things sometimes.  I

5       notice that you are retired.  Where are

6       you retired from?

7  A.   Packard.

8  Q.   What did you do there at Packard?

9  A.   I did various jobs.  I ended up on a semi.

10 Q.   And I also notice that you are not originally

11      from Trumbull County, right?

12 A.   No, Belmont County.

13 Q.   Bellaire, Big Red?

14 A.   Yes.

15 Q.   How long have you been in Trumbull County?

16 A.   Since 1957.

17 Q.   You have been around a while then?

18 A.   Yes.

19 Q.   How long is it that you have been retired?

20 A.   Since 1994.

21 Q.   So, about eight or nine years?

22 A.   Yes.  I'm not retired.  I am on total

```
                                                     1288

 1              disability.

 2    Q.   It said retired.  There's also some questions

 3              and I didn't see, and they are blank

 4              here, but we asked you if you had any

 5              problems at home maybe or any health

 6              problems that would affect you sitting as

 7              a juror.  Is there anything that you

 8              wouldn't feel comfortable sitting here

 9              for maybe six, seven hours a day and

10              hearing testimony?

11    A.   You don't sit straight?

12    Q.   No, we take breaks.  We come in and we take --

13              we may start at 9:00 and believe me, our

14              Court Reporter would kill us if we went

15              straight.

16    A.   My legs would go numb.  I have to move.

17    Q.   And by all means, I think Judge Stuard is like

18              most of the other Courts that I have

19              practiced in front of, if you have to use

20              the restroom or if you have got to stand

21              up and stretch, let him know or say, "I

22              have got to move my leg," and sometimes
```

1289

```
 1              jurors stand up and stretch and move

 2              around, but believe me, we don't want to

 3              sit here for six, seven hours straight.

 4              But we take breaks.  We usually take a

 5              morning break and always a lunch break

 6              and we'll take a break in the afternoon.

 7              And sometimes we take more breaks than

 8              that.  Things come up and we may have to

 9              take breaks and send the Jury away.  Is

10              there anything that you feel that you

11              couldn't serve as a juror, physically or

12              any pressing issue at home?

13   A.   No.

14   Q.   Just remember, now I noticed on your

15              questionnaire that you really didn't know

16              anybody from law enforcement?

17   A.   No.

18   Q.   Don't know any of the Sheriff's deputies?

19   A.   The only sheriff I bowl with him is Bob Davis.

20   Q.   Okay.  One of the things you have to do in

21              this case is you have to sort of weigh

22              and test the credibility of witnesses.
```

1290

1  Some of the witnesses, and I usually use
2  this example because it is real easy to
3  sort of see what I am talking about.
4  Let's say the case isn't about a
5  homicide.  It is not about a murder.  But
6  let's say it is about a guy who went
7  through a traffic light, and he went
8  through the traffic light right down here
9  at Park and High Street.  And let's use
10  the example of a guy is coming up, he
11  crosses Market and he's going north on
12  Park, and he blows through this
13  intersection right here on the corner of
14  High and Park.  And the light is red.  He
15  hits a guy that is going east on High
16  Street, T-bones him, hits him right in
17  the middle.  The guy slides around and
18  gets some injuries, broken arm or bangs
19  his head against the driver's side door
20  and gets some serious injuries.
21       Now, we're in Court and we're
22  charging this guy.  We have got him

1291

1    charged with some kind of traffic offense

2    for blowing through this traffic light,

3    going through a red light.  Now you would

4    expect us to obviously present some

5    witnesses, right?

6  A.  Yes.

7  Q.  If the witness says, "We call our first

8    witness," let's say it is our only

9    witness in this case, do you believe we

10   could prove our case with just one

11   witness?

12  A.  Yes.

13  Q.  And let's say the witness is Monsignor

14   Whomever from Cleveland and he happens to

15   be here.  Let's say he's one of the

16   Reverends or Priest or Ministers here of

17   a local church and he says, "I walk the

18   Courthouse Square every day and this

19   happened at 12 noon, and I always walk

20   around the same block and I really pay

21   attention to the traffic lights, because

22   I have almost been hit myself sometimes.

1292

1    And I am walking east on High Street and

2    just as I step off the curb, I see the

3    light change and I have got the green

4    light.  I'm going east and the little

5    walk sign says in white letters, walk,

6    and but every time I have learned,

7    because there's some people that don't

8    pay attention, I look both ways before I

9    actually start to walk.  And as I'm

10   standing there and I see the light turn

11   green and I see, walk, I look both ways

12   and I see this guy barreling like a bat

13   out of Hades coming across Market and

14   he's coming up North Park, and I step

15   back and I see him just crash into this

16   guy.  We had the light, because we're

17   going east on High Street."  You have no

18   problem finding, assuming we proved all

19   of the elements by proof beyond a

20   reasonable doubt, you would have no

21   problem finding the guy guilty, right?

22   A.   Yes, Sir.

1293

1   Q.    Now, let's change it up a little bit, because

2              this is the thing you may have to do and

3              I am exaggerating things, but let's

4              assume that the guy at the corner wasn't

5              a man of the clergy.  Let's assume it was

6              a guy that had just stumbled out of a bar

7              down here.  He had been coming up from

8              Raiders, he had been drinking all night,

9              been drinking all morning.  Started again

10             in the morning and now it is 12 noon and

11             he's been drinking since 6:00 A.M.  He's

12             the brother of the guy that is allegedly

13             injured in this.  He wears glasses, but

14             he wasn't wearing them that day and he

15             tells you that this guy who came through,

16             barreled through the thing -- let's also

17             assume the guy can't read.  He doesn't

18             know if the sign says walk or don't walk

19             and he's color blind too, and he doesn't

20             know if it is green, red, pink or yellow

21             up there.  You have some problems with

22             this witness now?

1294

1    A.    Yes.

2    Q.    I am exaggerating for effect, but that is a

3          little bit what you are going to have to

4          do here.  You are going to have to look

5          at some of the biases and interests that

6          they have.  You will be able to do that,

7          right?

8    A.    Yes, Sir.

9    Q.    Hopefully we're not going to have any blind,

10         drunk witnesses, but you never can tell.

11         Now, one of the other things the Court is

12         going to tell you is that we don't really

13         want sympathy in this case.  We want you

14         to decide this case without being

15         sympathetic.  That is a silly notion and

16         we have a lot of silly notions.  We want

17         you to be a voter, because you are here,

18         but we don't want you to know anything

19         about this case.  We want you to come in

20         and if you have an opinion about the

21         death penalty, we don't want you to put

22         it aside.  One of the other things is, it

1295

1    is natural to be sympathetic sometimes to

2    people, right?

3    A.    Sometimes, yes.

4    Q.    And you may be sympathetic, I'm not sure where

5          you are going to fall and who you may

6          fall for or if you will be sympathetic.

7          You may feel sympathy for Miss Roberts,

8          because she's a woman and she's the

9          Defendant in this case charged with these

10         terrible crimes.  You may feel

11         sympathetic for the victim and his

12         family, because there's going to be

13         testimony about a death.  You are

14         probably going to see some photographs of

15         a dead individual.  Do you believe you

16         will be able to decide this case without

17         sympathy and determining sympathy?  You

18         are not going to say, "You know what, I

19         don't care, the State didn't prove all of

20         the elements, but you know what, I saw

21         pictures of this guy and he looked

22         horrible and he had these terrible

1296

1    injuries, and you know what, she was

2    rumored to have been involved.  And I

3    read some newspapers, she's got to be

4    guilty and I'm going to find her guilty."

5    You are not going to do that or are you?

6  A.  No, I won't do that.

7  Q.  Mr. Dawson, I guess I want to ask you and

8    leave you with one more question.  And I

9    guess that question is, is there anything

10    that I haven't covered that you feel you

11    ought to tell me about, or these

12    gentlemen or the Court, about why you

13    could not serve as a juror in this case?

14  A.  No, Sir.

15  Q.  You feel you could serve as a juror and be

16    fair and impartial and determine this

17    case based solely upon what you hear in

18    this Courtroom?

19  A.  Yes, Sir.

20    MR. BECKER:  Thank you very much for

21  your time.  Thank you.

22    THE COURT:  Before we proceed with

1297

1    your questioning, there's a note here I would like

2    you to read.  We have to get an answer back to them

3    from one of the prospective jurors.

4    (SIDE BAR DISCUSSION, OFF THE RECORD AND

5    OUT OF HEARING)

6    EXAMINATION BY MR. INGRAM OF MR. DAWSON:

7    Q.    My name is Jerry Ingram, and John Juhasz and I

8              share the responsibility of representing

9              Donna Roberts, who is on trial for her

10             life.  Obviously, we feel we should take

11             every reasonable precaution in selecting

12             a fair minded juror, the same type of

13             Jury that you or I would want to decide

14             our case if we were on trial.  Does that

15             sound fair enough to you?

16   A.    Yes, Sir.

17   Q.    This is a lot like a job interview.  Except

18             when you went to Packard to be

19             interviewed, you chose to go, didn't you?

20   A.    Yes.

21   Q.    When you go for a job interview, you get to

22             choose.  In this situation, the Jury

```
                                                      1298
 1              wheel chose you, and we asked you by way

 2              of a summons to come in.  We're

 3              interviewing you today for one of the

 4              most important jobs there is.  The job of

 5              determining the truth and deciding the

 6              fate of another human being.  How do you

 7              feel about being asked to assume that

 8              responsibility?

 9    A.   It is a little hair raising, you know.  You

10              ain't used to it.

11    Q.   How do you feel, what is your personal opinion

12              about the American Jury system?

13    A.   The American Jury system.  You don't want to

14              hear it.

15    Q.   I do want to hear it.  You approve of it, you

16              don't like it?

17    A.   I think it is too easy most of the time.

18    Q.   How so?

19    A.   I am from the old school, an eye for an eye

20              and tooth for a tooth.

21    Q.   We have had Juries since we fought the

22              Revolutionary War, so Juries are indeed
```

1299

```
 1              old school.
 2    A.    But they seem like they are getting too
 3              lenient.
 4    Q.    You think Courts are too lenient, too?
 5    A.    Yes.
 6    Q.    What do you think we should do about that?
 7    A.    I don't know.  I really have never studied the
 8              Court that well.
 9    Q.    Do you have any ideas about what we can do
10              about the Juries being too lenient?
11    A.    I have no idea.
12    Q.    I guess I need to know.  Do you approve of the
13              Jury system or do you disapprove of the
14              Jury system?
15    A.    It is the best we got.
16    Q.    The Jury system will only work when we can
17              find good people.  Whether they are old
18              school, new school, middle school, good
19              people, to come in here give of
20              themselves, hear evidence and resolve the
21              case.  Do you agree with that?
22    A.    Yes, Sir.
```

1300

1    Q.    If you are selected to be a juror, your job
2           responsibility will be to fairly and
3           impartially determine the facts of this
4           case.  Do you understand that?
5    A.    Yes, Sir.
6    Q.    Your job responsibility now is to openly and
7           honestly tell us, if you would have any
8           problems giving either side a fair shake
9           in this case.  Do you understand that?
10   A.    Yes, Sir.
11   Q.    And there are no right or wrong answers here.
12          There's only honest heartfelt answers,
13          and there's only one mistake you can
14          make.  And that is if in the course of
15          our conversation, you tell me what you
16          think I want to hear instead of how you
17          really feel, and I would ask you not to
18          do that.  I think I know you well enough
19          after just about 45 minutes to know that
20          you are going to tell me the way it is,
21          and that is what I want you to do, and
22          will you please do that?

1301

1    A.    I will.

2    Q.    And do you recall the Judge's orientation

3          instruction on Tuesday when we were down

4          at the other end of the hall?

5    A.    Yes.

6    Q.    And there was part -- a part in there where he

7          said that many of you may be excused.

8          And if you are excused, it is just

9          because you have given honest and

10         heartfelt answers which is what you

11         should do during this stage of the

12         process; do you recall that?

13   A.    Yes, Sir.

14   Q.    So I'm going to ask you some questions.  They

15         are probably not going to be easy

16         questions, and if you were asking me the

17         same questions, they wouldn't get any

18         easier, they would still be hard.  I

19         would have a hard time answering them,

20         too.  I want you to understand that.

21   A.    Okay.

22   Q.    First off, what all do you remember seeing,

1302

1    reading or hearing about this case, or

2    the case of Nate Jackson?

3  A.  Well, all I remember, just that she had a

4    boyfriend, I guess you would call it, and

5    they connived to shoot her -- was it her

6    husband or live-in?

7  Q.  Live-in.

8  A.  Shoot her live-in for insurance money.

9  Q.  She had a boyfriend.  What you read and I want

10    to summarize it, is that she had a

11    boyfriend and that she and her boyfriend

12    got together and shot her live-in to get

13    the insurance money.  Is that about it?

14  A.  That is about the main thing.

15  Q.  And as a result of what you saw, read or heard

16    and that was way back when this occurred?

17  A.  Yes, Sir.

18  Q.  So that was in December of 2001.

19  A.  Okay.

20  Q.  How long ago was that?  About a year and a

21    half ago?

22  A.  Yes.

1303

1  Q.  I'm bad with math, which is why I asked you to

2      help me.

3  A.  So am I.

4  Q.  They gave us the answer.  As a result of what

5      you saw, read or heard back in December

6      of 2001, you told Mr. Becker that you

7      formed opinions about this case?

8  A.  Yes, Sir.

9  Q.  He didn't ask you what those opinions were,

10     and I don't believe you volunteered those

11     opinions, so I'm going to ask you.  What

12     are those opinions?

13 A.  She's guilty.

14 Q.  And you have held that opinion that she was

15     guilty since December of 2001?

16 A.  Yes.

17 Q.  And when you came into the Courtroom on

18     Tuesday, did you talk to any other jurors

19     about this case?

20 A.  No, Sir.

21 Q.  Did you read any newspaper articles shortly

22     before you came on Tuesday?

1304

1   A.   No, not before.

2   Q.   How about afterwards?

3   A.   Yes, the day after.

4   Q.   The day after?

5   A.   Yes.

6   Q.   So if you were here on Tuesday, you read the

7        newspaper article on Wednesday?

8   A.   I believe so.

9   Q.   And that article would have been in what

10       newspaper?

11  A.   Tribune.

12  Q.   Do you recall what that newspaper article

13       said?

14  A.   That they were starting the Jury process,

15       picking a Jury.

16  Q.   At this stage of the proceedings, she works

17       harder than the rest of us, so we have to

18       be considerate.  If we hear her sigh, we

19       assume that we're responsible.  That

20       newspaper article on Wednesday of last

21       week went back and rehashed the things

22       that you had previously read, seen or

1305

1   heard, correct?

2   A.   Right.

3   Q.   And did it reaffirm your previous opinion that

4        she was guilty?

5   A.   Didn't change it either way.

6   Q.   So the opinion that you had had since December

7        of 2001 simply remained steady?

8   A.   Yes.

9   Q.   I have to candidly ask you a question.  I need

10       to know how you are going to unwind your

11       mind.  I need to know how you are going

12       to unwind your mind and let me explain

13       what I mean by that.  By unwind, I don't

14       mean relax.  I want to know how you

15       propose to unwind your mind so that this

16       opinion that you have held since December

17       of 2001, will no longer affect your --

18   A.   You will have to do that in the Jury room.

19   Q.   Who?

20   A.   You and your partner.

21   Q.   So we're going to have to convince you of

22       Donna's innocence to get you over this

```
                                                    1306
 1              opinion of guilt?

 2   A.   Right.

 3   Q.   And you are telling me that after you have

 4              heard the orientation instruction,

 5              correct?

 6   A.   Yes.

 7   Q.   And after you have read the preliminary

 8              instructions downstairs this afternoon?

 9   A.   Yes, Sir.

10   Q.   And after you spent a great deal of time in

11              talking with my friend and colleague,

12              Mr. Becker here about the presumption of

13              innocence?

14   A.   Right.

15   Q.   And you do understand and know about the

16              presumption of innocence, don't you?

17   A.   Yes, Sir.

18   Q.   And notwithstanding, notwithstanding what you

19              know and understanding of the presumption

20              of innocence, because of your opinions

21              since December of 2001 that Donna is

22              guilty, you will require the Defense
```

```
                                                      1307
 1               during the course of this trial to prove
 2               her innocence?
 3    A.    Right.
 4    Q.    And that is an honest and heartfelt response,
 5               correct?
 6    A.    Yes, Sir.
 7    Q.    Some things I'm old school.  In some things, I
 8               am really new school.  But in some things
 9               I'm old school, and I can feel different
10               ways about different things.  Does that
11               make sense?
12    A.    Yes, Sir.
13    Q.    And some of those things I'm willing to
14               surrender.  Some of those things, I am
15               willing to temporarily set aside, but
16               there are others, that dang it, I am
17               sticking to.  Does that make sense?
18    A.    Yes, Sir.
19    Q.    And this opinion of guilt and this requirement
20               that you have in your mind, and there's
21               nothing wrong with that.  I want you to
22               understand it.  This requirement that you
```

1308

1    have in your mind that the Defense has to

2    prove her innocence.  That is something

3    that is going to stay with you, isn't it?

4   A.    Yes, Sir.

5   Q.    That is something you are not going to readily

6    surrender because it is something you

7    feel strongly about?

8   A.    Yes, Sir.

9   Q.    And being an old school guy, that is the way

10    it is.  It is sort of a black letter

11    thing, correct?

12  A.    Black and white.

13  Q.    Black and white?

14  A.    Yes, Sir.

15          MR.  INGRAM:  Your Honor, may we

16  approach Side Bar?

17  (SIDE BAR DISCUSSION, OFF THE RECORD AND

18  OUT OF HEARING)

19          THE COURT:  Mr. Dawson, you have

20  done what we have asked you to do and that is to

21  state your opinion.  I am releasing you from any

22  further responsibilities in this matter.  We thank

1309

1 you for your time and your participation.  You have

2 answered the questions quite truthfully and that is

3 all we can ask of you.  Thank you.

4 (Juror No. 47 excused from the Courtroom.)

5                 THE COURT:  The Side Bar

6 conversation was, as we have agreed from the

7 beginning of the trial, not to make these motions

8 in front of the prospective jurors.  The Defense

9 has moved on the basis of the questions put for

10 challenge for cause without objection from the

11 State.

12 (Court in recess at 4:25 p.m.)

13

14

15

16

17

18

19

20

21

22

1310

1

2          REPORTER'S  CERTIFICATE

3

4          I do hereby certify that the above and

5   foregoing is a true and correct transcript

6   of the proceedings had in the within hearing

7   as shown by stenotype notes written by me in the

8   presence of the witnesses at the time of the

9   hearing.

10

11                      _Mary Ann Mills_____
                        MARY ANN MILLS, R.P.R.
12                      Official Court Reporter
                        Trumbull County, Ohio

13

14

15

16

17

18

19

20

21

22

1311

1   IN THE COURT OF COMMON PLEAS
    TRUMBULL COUNTY, OHIO
2   TRIAL COURT CASE NO. 01-CR-793
    SUPREME COURT OF OHIO CASE NO. 03-1441
3

4   STATE OF OHIO        )            VOLUME VI
                         )
5            Plaintiff   )
                         )       INDIVIDUAL VOIR DIRE
6   -vs-                 )
                         )
7   DONNA M. ROBERTS     )
                         )
8            Defendant   )

9

10          BE IT REMEMBERED, that on Tuesday, April 15,

11   2003, these proceedings came on to be heard before

     one of the Judges of this Court, John M. Stuard,
12
     in Courtroom No. 2, on High Street, Warren, Ohio,
13
     before the case heretofore filed herein.
14

15

16

17
     Mary Ann Mills, RPR
18   Official Court Reporter
     Trumbull County, Ohio
19

20

21

22

1312

1

<u>A P P E A R A N C E S</u>

2

3

On Behalf of the State of Ohio:
4      Dennis Watkins, Prosecuting Attorney
       Charles L. Morrow, Ass't. Prosecuting Attorney
5      Christopher D. Becker, Ass't. Prosecuting Attorney
       Kenneth N. Bailey, Ass't. Prosecuting Attorney
6      160 High Street, N.W.
       Warren, OH 44481
7

On Behalf of the Defendant, Nathaniel Jackson:
8      Anthony V. Consoldane, Attorney at Law
       James F. Lewis, Attorney at Law
9      State of Ohio Public Defendant's Office
       328 Mahoning Avenue, N.W.
10     Warren, OH 44481

11  On Behalf of the Defendant, Donna M. Roberts:
       John B. Juhasz, Attorney at Law
12     J. Gerald Ingram, Attorney at Law
       7330 Market Street
13     Youngstown, OH 44512

14  On Behalf of <u>The Vindicator Printing Co.</u>
       Ann Millette, Attorney at Law
15     3200 National City Center
       1900 East Ninth Street
16     Cleveland, OH 44114

17  On Behalf of WFMJ Television, Inc.:
       Stephen T. Bolton, Attorney at Law
18     201 E. Commerce Street, Atrium Level Two
       Youngstown, Oh 44503

19

20

21

22

1

<u>I N D E X</u>

2

3     <u>VOLUME VI</u>:

4     (Tuesday, April 15, 2003)

5     Individual Voir Dire:

      Irene Zahornek                    1313
6     Brad Seelbach                     1349
      Diane Parke                       1424
7     Gary OMalley                      1470
      Thomas Carmichael                 1473

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1313

1    Tuesday, April 15, 2003; In Open Court at 9:40 a.m.:

2    CONTINUING VOIR DIRE EXAMINATION:

3    (Juror No. 52, Irene Zahornek, entered the Courtroom.)

4                THE COURT:  Good morning.  You have

5    read the handout sheet that was given to you.

6                MS. ZAHORNEK:  Yes.

7                THE COURT:  The purpose of today is

8    to allow both sides to ask each of the prospective

9    jurors some individualized questions about two

10   areas in particular.  This type of case always

11   generates some media interest, of course.  And over

12   the past year or so there's been, there have been

13   numerous articles that appeared in the newspaper

14   and things on T.V.  Now most of the people probably

15   will have some general knowledge about this case

16   from the publication that occurred.  And that

17   doesn't disqualify anybody from being a juror, but

18   the concern is that both sides would hold is that

19   some of those jurors will have some pretty hard and

20   fixed and firm ideas of what they think the facts

21   are about in this case.

22                In this matter, in order to see that both

1314

1    sides have a fair trial, has to be decided on the

2    evidence that is presented.  If something they read

3    in the newspaper is used to determine the outcome

4    of this case, then that is not fair to one side or

5    the other.  The questions that will be put to you

6    as to whether or not you have your mind made up

7    from what you have already read, if you have read

8    anything, there have been a couple that said they

9    have not read anything, or read very little about

10   it.

11          The other issue is what your thoughts are

12   on the death penalty.  Now Miss Roberts is charged

13   with aggravated murder with specifications.  Under

14   the law of Ohio, a person does not face the

15   prospect of the death penalty just for murdering

16   somebody.  It is only murders done under certain

17   circumstances or certain people that are killed,

18   police officers and the Governor.  And that brings

19   up the question of death penalty.

20          But in the charges that were filed

21   against Miss Roberts, there were specifications

22   attached which raises the specter of this Jury

1315

1  possibly having to consider the death penalty.

2  Now, the State always has the burden of

3  going forward and of proving beyond a reasonable

4  doubt each and every element that is necessary to

5  prove the charges and the specifications. The

6  Defense need do nothing if they care not to,

7  because every Defendant has a right to remain

8  silent and the burden as I said is entirely upon

9  the State to prove their case.

10  Some people feel that the eye for an eye,

11  tooth for a tooth, you murder somebody and you

12  should be put to death. That is not the law of

13  Ohio. There are other people who could under no

14  circumstances feel that they could sit on a Jury

15  where that question might come up on the death

16  penalty.

17  So, if the Prosecution, after they have

18  completed their case, have failed to carry their

19  burden of proof, then this Jury would make a

20  finding of not guilty. But if the Jury find that

21  the State has done all things necessary to prove

22  their case and made a finding of guilty on the

1316

1  aggravated murder, then the case would go into a
2  second phase.

3       Ordinarily in any other type of case
4  under Ohio law, the Jury never determines the
5  sentencing. That is up to the Judge, but because
6  of the seriousness of this type of matter, the Jury
7  is called upon to review and listen to the evidence
8  presented by the Prosecution, which we call
9  aggravating circumstances. Those are reasons why
10  the Jury should consider imposing the death
11  penalty.

12       And the Defense has an opportunity, if
13  they care to, to show mitigating factors, and those
14  would be factors or reasons why the Jury should not
15  impose the death penalty.

16       The State always has the burden of
17  proving beyond a reasonable doubt that those
18  aggravating circumstances do outweigh any
19  mitigating factors. Now again if the State carried
20  that burden of proof, this Jury may be faced with
21  the prospect of determining one of four
22  recommendations of sentencing. We use that term

1317

1    recommendation.  The Jury recommends and the Jury's

2    decision is rarely overturned by Judges.  There

3    have been very few cases.  It would have to be that

4    the Judge has to independently review what the Jury

5    determines, but that is not for the purpose of the

6    Judge upsetting the Jury's verdict unless he found

7    that there was some element that was missing as a

8    question of law.  Do you understand?

9                    MS. ZAHORNEK:  Yes.

10                    THE COURT:  So the Jury makes the

11   decision, which the Judge has an opportunity only

12   of possibly reducing if the Jury came back with a

13   life sentence.  This Court could not impose a death

14   penalty.  That is only done through the decision of

15   the Jury.  So, the second question that will be put

16   to you will be your thoughts on the death penalty.

17   Whatever your thoughts are is fine.  You are

18   entitled to your opinion and we'll respect that.

19   But we must have 12 people, some of them will more

20   than less favor the death penalty.  Some will

21   think, "I don't know if it is a good idea or not,"

22   and that is fine.  We have to have 12 people that

1318

1   are willing to assure all parties that they will

2   follow the law regardless of what your personal

3   opinion is.  Does that make sense?

4                    MS. ZAHORNEK:  Yes.

5                    THE COURT:  Fine.

6   EXAMINATION BY MR. BAILEY OF MS. ZAHORNEK:

7   Q.   Mrs. Zahornek, good morning.  My name is Ken

8            Bailey, I am Assistant Prosecutor with

9            the Trumbull County Prosecutor's Office,

10           and as I promised in Court last week, I

11           am joined by co-counsel, Chris Becker,

12           who is also an Assistant Prosecutor.  And

13           the two of us are going to be

14           representing the people of the State of

15           Ohio and Trumbull County in this

16           particular case.

17               Now, a couple of things I want to

18           bring out right up front.  We're going to

19           be asking these questions regarding your

20           prior experiences and background and your

21           personal opinions, not because we're

22           snoopy and we like to pry into people's

1319

1  background, but rather to make sure that

2  the folks that are selected to be on this

3  Jury can be fair can be fair and

4  impartial to both sides, both to the

5  Defendant and the State of Ohio.

6      It may well be that you have a

7  certain feeling about some issue in this

8  particular case that would affect your

9  ability to sit in this particular case,

10  and you would be fine for any other case

11  but maybe there's something that would

12  affect you in this particular case.  And

13  that is what we wanted to find out.

14      Also, there aren't any right answers

15  or wrong answers to these questions, only

16  open and candid answers to the questions,

17  so it is important that you tell us how

18  you really feel about things.  We're not

19  allowed to have any contact with you by

20  our rules until this case is over.  Right

21  now we can talk to each other, but if we

22  run into each other out in the hallway or

1320

1    in the elevator, we're not allowed to

2    have any communication with you, except

3    for good morning or good afternoon.  I

4    want you to know that, so you know we're

5    not being anti-social and trying to snub

6    you or anything, it is just that we can't

7    have any communication.  If you have any

8    questions, you will have to direct those

9    questions to the Judge or to the bailiff.

10   Sometimes that comes up, and people

11   wonder why they can't talk to us out in

12   the hallway, and if this case goes into

13   two phases, then you have to wait until

14   both phases are done.  After that, feel

15   free to come up to us and ask us anything

16   you want.

17        Because this is the one chance we

18   get to talk to each other, and there's

19   some give and take here, feel free if you

20   have any questions about what we're

21   doing, as long as it pertains to what

22   we're doing here.  Feel free to ask and

1321

1    maybe we can answer those questions for

2    you.  Now, you understand you got a

3    chance to read that handout downstairs,

4    right?

5  A.   Yes.

6  Q.   You know the Defendant is charged here with

7    two counts of aggravated murder.  There

8    are two different theories.  There's one

9    death and two separate theories, if the

10   State is allowed to pursue and we have

11   elected to pursue two different theories

12   regarding that death.  And attached to

13   these charges of aggravated murder are

14   what we call specifications, or special

15   findings of fact for a Jury to consider.

16   That would make a Defendant eligible for

17   the death penalty as a possible

18   punishment.  So, you are aware that this

19   case can be tried in two separate phases.

20        The first phase deals with the issue

21   of guilt or non-guilt.  We have the

22   burden of proving the elements or

1322

1  essential component parts of a crime, of

2  these crimes of aggravated murder.  And

3  there are two other charges of aggravated

4  burglary and aggravated robbery, and

5  there were some firearms specifications,

6  special findings that a working gun was

7  involved in these particular crimes.  And

8  if the Jury, you and the other 11 jurors

9  returned a verdict finding the Defendant

10  guilty of a crime called aggravated

11  murder, and one or more of these special

12  findings, these specifications that have

13  attached to it, one special finding is an

14  aggravating circumstance of aggravated

15  burglary, that the aggravated murder was

16  committed during the course of an

17  aggravated burglary and the Defendant

18  committed the aggravated murder with

19  prior calculation and design.  And that

20  other specification is that the

21  aggravated murder was committed during an

22  aggravated robbery, as opposed to an

1323

```
 1              aggravated burglary.  And the Defendant
 2              committed the aggravated murder with
 3              prior calculation and design.  And these
 4              terms, these will all be defined for you
 5              by the Judge at the end of the case.
 6                   If you and the other jurors find the
 7              Defendant guilty of aggravated murder and
 8              one or more of these specifications,
 9              these special findings, then we would go
10              on to a second phase.  It is like having
11              two separate trials.  You understand
12              that?
13    A.   Yes.
14    Q.   In the second phase, the issue is not guilt or
15              non-guilt, because you would have already
16              decided that, rather the issue would be
17              one of punishment.  What is the
18              appropriate punishment for this
19              Defendant, for this crime?  And then you
20              would expect to hear either the same
21              testimony or new testimony dealing with
22              different things, and in the second
```

1324

```
 1              phase, would deal with the aggravating

 2              circumstances that I have mentioned,

 3              these bad facts, I guess you call them,

 4              that would justify a death penalty

 5              verdict.  And on the other hand would be

 6              things that work in the Defendant's

 7              favor.  We call those mitigating factors.

 8              That would go on to a scale for a

 9              balancing test.  And if you and the other

10              11 jurors find beyond a reasonable doubt

11              that the aggravating circumstances

12              outweigh these mitigating factors, then

13              you must return a verdict recommending

14              the death penalty as a punishment.  You

15              understand that?

16   A.    Yes.

17   Q.    Now, it is only if you find that the

18              aggravating -- if you find that we

19              haven't proved beyond a reasonable doubt

20              that the aggravating circumstance

21              outweighs the mitigating factors beyond a

22              reasonable doubt, that you go on to
```

1325

```
 1                consider the three possible life
 2                sentences; life in prison without any
 3                parole possibility, life in prison with
 4                parole eligibility after 30 full years,
 5                and life in prison with parole
 6                eligibility after 25 full years.  Do you
 7                understand that?
 8     A.    Yes.
 9     Q.    Now, I notice on your questionnaire that you
10                indicate that you don't believe in the
11                death penalty as a possible punishment?
12     A.    No.   That is why I wrote that on there,
13                because first is my religion, and I don't
14                know how I could actually feel knowing
15                that I have been a part of having to put
16                a person to death, but I do feel that no
17                crime should go unpunished.
18     Q.    You believe in holding people accountable for
19                their actions?
20     A.    Yes.
21     Q.    There's nothing wrong with your personal
22                belief system.   There are a lot of people
```

1326

1    that feel that way.  They are against the

2    death penalty as a punishment.  That is

3    why we're asking these questions now.  It

4    is important to know how people feel, so

5    that they can be fair to both sides.  I

6    take it you would agree that you

7    understand the death penalty is not an

8    automatic punishment for somebody who is

9    found guilty of aggravated murder with a

10   specification, because you wouldn't have

11   heard anything about the Defendant or

12   mitigating factors in the first phase.

13   It would be relevant in the second phase

14   dealing with what is appropriate

15   punishment, right?

16  A.   Yes.

17  Q.   And for somebody to come in and say, "Well, I

18       believe in the death penalty as a

19       punishment and anybody who commits an

20       aggravated murder should be punished by

21       death and I would automatically vote for

22       the death penalty, no matter what."  It

1327

```
 1              wouldn't be fair to the Defendant to have

 2              somebody like that sit on a Jury, is that

 3              right?

 4    A.   Right.

 5    Q.   By the same token, if somebody doesn't believe

 6              in the death penalty as punishment and

 7              says, "Well, for various reasons, for

 8              religious reasons or my personal belief

 9              system is such that I could never vote

10              for the death penalty, no matter what,

11              even if the State were able to prove that

12              these aggravated circumstances outweighed

13              the mitigating factors beyond a

14              reasonable doubt," and under the law, the

15              death penalty in that case would be the

16              appropriate punishment, and a person

17              would say to himself, "That may be the

18              law, but I really can't follow the law in

19              that particular case.  Then it is

20              important we find out about that.  Then

21              it wouldn't be fair to the people of the

22              State.
```

1328

1                   Now, I guess what I am really asking

2               is, is your belief against the death

3               penalty so strong that you would never be

4               able to reach a verdict in favor of the

5               death penalty?

6    A.  I would say so, because I couldn't live with

7               myself knowing that if 11 say yes, and I

8               was the only one saying no, and since

9               I -- and in a sense I would say yes just

10              to go along with the 11.

11   Q.  We couldn't ask you that.

12   A.  If the judgment came to me and depended upon

13              my vote more or less, I don't think I

14              could do it.

15   Q.  You are the only person who really knows what

16              you would do.  And that is why we ask you

17              to seek into your mind and into your

18              heart to know.  You know yourself better

19              than any of us know you.

20   A.  I don't think that anything as far as the case

21              is concerned, that it should go

22              unpunished.  No crime should go

1329

1   unpunished.

2   Q.   The issue here at this point is this issue

3        with the death penalty as a possible

4        punishment.  Now, I take it, you have

5        held this view for a very long time?

6   A.   Yes.

7   Q.   Has it gotten stronger over the years?

8   A.   Certain things, I could say I could change my

9        thoughts to yes it could be done, should

10       be done with the death penalty, but I

11       don't know if I could actually be the one

12       to say, "Yes, do it."

13  Q.   You think the death penalty does have a place

14       in society?

15  A.   It does have its place, but I couldn't be the

16       one to do it.

17  Q.   There's nothing wrong with that.  Because you

18       would agree it is important to have

19       people from all different walks of life,

20       with all different types of opinions, but

21       so long as they are able to follow the

22       law on a specific Jury?

1330

| | | |
|---|---|---|
| 1 | A. | Right. |
| 2 | Q. | By your saying this belief, it is based on I |
| 3 | | take it, religious beliefs? |
| 4 | A. | I would say so. |
| 5 | Q. | Also you are a nurse? |
| 6 | A. | Right. |
| 7 | Q. | Retired nurse, but a nurse, and I take it your |
| 8 | | entire career was always saving lives? |
| 9 | A. | Right, not to take a life. |
| 10 | Q. | So that would be contrary to what you have |
| 11 | | done all of your life? |
| 12 | A. | Right. |
| 13 | Q. | To ask you to come back with a recommendation |
| 14 | | of the death penalty? |
| 15 | A. | Very much so. |
| 16 | Q. | And so I take it, it is so deeply ingrained |
| 17 | | that you can't picture yourself ever |
| 18 | | signing a verdict for the death penalty? |
| 19 | A. | I would say so. |
| 20 | Q. | You would say so that you could not sign a |
| 21 | | verdict form? |
| 22 | A. | Right. |

1331

1  Q.  Under any circumstances, right?

2  A.  Yes.  I couldn't feel comfortable with myself

3       knowing that I had taken someone else's

4       life, when all of my life it has always

5       been to save a life.  If there's no other

6       alternative and that person dies, you

7       can't do anything about that, but you

8       still feel bad that the person has left,

9       that the person has died.

10  Q.  You go to mass every day?  You are Roman

11       Catholic?

12  A.  Right.

13  Q.  And I take it the church has taken a position

14       against the death penalty?

15  A.  Yes.

16  Q.  You feel that would be a sin to come back with

17       a death penalty verdict if you were to be

18       asked to do that?

19  A.  Well, as far as I would, I guess the church

20       teaches it is a sin to take a life, but I

21       would be more inclined to think of what I

22       feel as a person and go with my

1332

1    conscience with myself.

2  Q.    A matter of conscience.  As a matter of

3        conscience, you could never sign a death

4        penalty verdict?

5  A.    Right.

6  Q.    Do you think, knowing that the death penalty,

7        if you came back with a verdict in the

8        first phase, let's say you sat on the

9        Jury.  And you knew that if you came

10       back, you and the other jurors came back

11       with a verdict finding the Defendant

12       guilty of aggravated murder with one or

13       more specifications, it would make the

14       Defendant eligible for the death penalty

15       in the second phase.  You feel your

16       opposition to the death penalty is such

17       that it would be difficult for you to

18       even decide the first phase?

19 A.    Yes, I think it would be.

20 Q.    It would be hard to come back with something

21       that would make her death eligible in the

22       second phase?

1333

1   A.    Right.

2   Q.    You could certainly never sign the form in the

3            second phase?

4   A.    Right.

5            MR. BAILEY:  Thank you very much.

6   The Defense counsel will have an opportunity to ask

7   you some questions.

8   <u>EXAMINATION BY MR. JUHASZ OF MS. ZAHORNEK</u>:

9   Q.    Mrs. Zahornek, my name is John Juhasz.  I

10           introduced myself last week when all of

11           us were gathered down in Judge Logan's

12           Courtroom.  This is my friend, Jerry

13           Ingram, and Jerry and I represent Donna

14           Roberts, who as you know from what you

15           have heard, is on trial for some pretty

16           serious offenses.  As Judge Stuard said,

17           what we want to do is talk to you about a

18           couple of areas, and I don't want to

19           repeat or belabor what either the Judge

20           or Mr. Bailey said, but it does bear

21           repeating, I guess anyway, that we're not

22           here to change your mind about how you

1334

```
 1              feel.  And the best answer you can give
 2              us is how you honestly feel about
 3              something.
 4                   You talked to Mr. Bailey for a
 5              little while about the death penalty, and
 6              if I am reading you correctly, and please
 7              don't let me put words in your mouth for
 8              you, this is a matter of conscience, that
 9              you don't think that you could vote to
10              impose the death penalty, is that right?
11   A.   Yes.
12   Q.   Now, let's take a step away from the death
13              penalty for a second.  You read the form
14              that the Court provided you that tells
15              you basically how these trials work; is
16              that right?
17   A.   Yes.
18   Q.   And we're not going to give a quiz on it, but
19              do you feel pretty comfortable that you
20              understand the difference between the two
21              phases?
22   A.   Yes.
```

1335

```
 1   Q.   And the first phase is in essence just like a

 2            trial, like any other criminal trial,

 3            where you decide whether the Defendant is

 4            guilty or not.  Do you understand that?

 5   A.   Right.

 6   Q.   If this were not a death penalty case, and we

 7            were bringing you in here and asking you

 8            about your ability to be a juror on this

 9            case, I assume from the other comments

10            that you have said about no crime should

11            go unpunished, that as a matter of

12            conscience, would you not have a problem

13            finding someone who was proved guilty of

14            a crime, guilty of that offense, correct?

15   A.   Right.

16   Q.   You would have no problem signing your name to

17            a guilty verdict if the State could prove

18            to you beyond a reasonable doubt that

19            that person was guilty, correct?

20   A.   Right.

21   Q.   In reality, I guess what you would be doing is

22            you would both be following the law, the
```

1336

1           instructions Judge Stuard would give you

2           in a criminal case like that, but it

3           would also be a matter of conscience for

4           you because you were doing the correct

5           thing; am I right about that?

6   A.   Excluding the death penalty, yes.

7   Q.   If it was just a plain old criminal trial?

8           Let's make it a robbery trial.

9   A.   I would have no problem deciding that, no.

10  Q.   And I'm going to say this the wrong way, but

11          only because I'm not trying to put too

12          many words in your mouth and I don't want

13          you to let me do that.  If it is not

14          something of how you feel, stop me.  I am

15          gathering from what I have heard you say

16          today that if it were just a plain old

17          robbery trial, somebody robbed a gas

18          station, that as the dictates of your

19          conscience serve you, the appropriate

20          thing would be to find that person guilty

21          if they were found guilty, correct?

22  A.   Yes.

1337

1    Q.    And would the converse be true, that is if you

2          came in here and somebody said, "Well,

3          this is a robbery case and the guy

4          sitting over there is charged with

5          robbery, and the State has to prove to

6          you beyond a reasonable doubt that he's

7          guilty of the robbery," but they don't

8          prove it.  Then as a matter of

9          conscience, would you feel duty bound to

10         find that person not guilty?

11   A.    Yes.

12   Q.    Because it wouldn't be appropriate to punish

13         someone when the State had not proved

14         them guilty, correct?

15   A.    If the circumstances are not there to complete

16         it.

17   Q.    When you consider the subject of punishment --

18         well, before we go there let's talk about

19         this for a second.  When we do this, when

20         we try to pick jurors, we try to get a

21         cross section of people from all over

22         Trumbull County, and I would assume that

1338

```
 1              if you were on trial, you would want that

 2              same type of Jury, would you not?

 3   A.   Yes.

 4   Q.   You wouldn't just want -- let's say it's a

 5              robbery trial and it is a -- the charge

 6              is that the person robbed the Dairy Mart.

 7              It wouldn't seem to you to be fair, would

 8              it, if we got 12 people in here who all

 9              worked as store clerks and said, "You

10              guys decide whether this guy is guilty of

11              robbery."  That wouldn't seem fair, would

12              it?

13   A.   No.

14   Q.   It sort of makes sense to you, doesn't it,

15              that you would want to get people from

16              all over the community with different

17              thoughts and different experiences and

18              different ideas, so they can talk about

19              the evidence in the Jury room.  Does that

20              seem fair?

21   A.   Right.

22   Q.   I know that I am jumping around a little bit
```

```
                                                            1339
 1                    and I don't mean to do that.  I

 2                    apologize.  A lot of times when we're

 3                    called upon to do things in the law, the

 4                    law asks us to set aside our own personal

 5                    opinions or beliefs about something.

 6                    Does that make sense to you?

 7    A.    Yes.

 8    Q.    For example, there may be -- well, there are

 9                    five lawyers in this room, the two

10                    Prosecutors and me, and Mr. Ingram and

11                    Judge Stuard.  And I don't want to speak

12                    for them, but I am willing to bet based

13                    upon my experiences, that something in

14                    the law that in one circumstance or

15                    another, every one of us disagrees

16                    with -- in other words, it is the law,

17                    but we have a personal disagreement with

18                    it.  Does that make sense to you?

19    A.    Yes.

20    Q.    And even though it is the law and we disagree

21                    with it, we take an oath that we have to

22                    set aside our personal disagreement and
```

1340

```
 1              do what is in essence that has to be done
 2              anyway.  You see how that works?
 3   A.   Right.
 4   Q.   If we all come in and substitute our own
 5              personal opinions, for example, it would
 6              be unfair in a case like this, if Judge
 7              Stuard, maybe he's personally opposed to
 8              the death penalty, and the Jury comes
 9              back and says, "Well, we just signed a
10              verdict for death."  And instead of doing
11              the process that he talked about, about
12              reviewing it, he just goes, "Well, I
13              personally don't believe in the death
14              penalty, so I'm just going to nix this."
15              That wouldn't be fair, because he would
16              not be following the law, he would be
17              substituting his own judgment.  Do you
18              agree?
19   A.   Yes.
20   Q.   I don't know what his opinion is.  I am using
21              it as an example.  You see how he would
22              have to set aside his personal opinion in
```

1341

1              that case, correct?

2  A.  Right.

3  Q.  What we're trying to find out today is even

4              though you have these personal opinions

5              about the death penalty, are they things

6              that you can set aside, because as

7              Mr. Bailey said, it wouldn't be fair to

8              Miss Roberts if we had 12 people who just

9              said, "I want the death penalty.  I like

10             the death penalty.  The death penalty is

11             a good thing."  That wouldn't be fair,

12             correct?

13 A.  Right.

14 Q.  You would want to have a cross section of

15             people, some to say, "Well, it might and

16             good thing," but others to say, "Well,

17             maybe it's not a good thing and before we

18             do it, we should think about it and be

19             careful."  You agree with that?

20 A.  Yes.

21 Q.  And conversely, as I think Mr. Bailey said, it

22             wouldn't be fair to the Government if

1342

```
 1              they had 12 people here who just said,
 2              "Can't do the death penalty, it just
 3              doesn't seem right, I'm not going to do
 4              it."  That wouldn't be fair to the State,
 5              right?
 6   A.    Right.
 7   Q.    All of those people that we would mix up in a
 8              Jury would be called upon, if they can,
 9              to set aside their personal opinions,
10              just like in the examples I have given
11              you, and say, "Well look, I may find this
12              something that I personally disagree with
13              for whatever reason, political
14              philosophy, religious or moral training,
15              my own ethical or moral background, it
16              may be something I disagree with, but I
17              have to set that aside and do my job."
18              That is the type of jurors that we're
19              looking for.  You were a nurse for quite
20              some time, correct, an R.N.?
21   A.    Forty-two years.  Too many.
22   Q.    My wife is a medical technologist and even
```

1343

1    though we have been married for going on

2    25 years, I have to profess that I still

3    don't know a heck of a lot about

4    medicine, and I am convinced from hearing

5    her talk that I know even less about how

6    hospitals work.  That being said, I'm

7    going to guess that there are probably

8    procedures that were set down to be

9    followed in the hospital over your course

10   of being a registered nurse that you

11   didn't agree with, am I right?

12  A.   Yes.

13  Q.   And you would have to sort of set aside your

14   personal disagreement and say, "This is

15   how they are telling me I have to do my

16   job, I have to do it anyway," correct?

17  A.   Right.

18  Q.   And you would do that, correct?

19  A.   Right.

20  Q.   Similarly, I'll bet, because people who are

21   called to your calling have a tremendous

22   amount of compassion, I'll bet that over

1344

1    the years you felt a huge amount of

2    compassion for your different patients,

3    but when there was an emergency situation

4    instead standing there saying, "This guy

5    must feel terrible," you had to set this

6    aside and go in and objectively do

7    whatever it is that a nurse would do in

8    that situation, correct?

9  A.    Yes.

10  Q.    Now, all of those things having been said, and

11    understanding that you personally don't

12    think that you could vote for the death

13    penalty as a matter of personal

14    conscience, is it something that you

15    could set aside as in the examples that

16    we have talked about and say, "Well,

17    look, it isn't like it is my

18    responsibility that I am doing this

19    personally, I am being an objective juror

20    in the case and I am weighing the

21    evidence that has been provided to me."

22    Is that something you think that you

1345

```
 1          could do?

 2   A.   No, not when it comes to the actual death

 3          penalty that still is an ingrainment that

 4          I could let loose of.  Even though it was

 5          the thing to do with all of the evidence,

 6          I still couldn't do it.

 7   Q.   No matter how horrible you found the offense

 8          to be?

 9   A.   No, I would still have to say that my

10          conscience is deeper rooted in that

11          sense.  If I had to know any kind of

12          little incident that came about, that

13          would revert to me that I was part of

14          this, I don't think I could do it.  I

15          believe in the punishment.  That is why I

16          wrote there that I can't go with the

17          death penalty, but I do believe that you

18          should be punished for whatever you have

19          done.  I don't think it should be say,

20          just go ahead and a couple of months in

21          jail and a couple of months of rehab and

22          let it go at that.
```

1346

1    Q.    But if I am reading you, and all of these

2          situations we have talked about and

3          please again, I'm not trying to change

4          your mind, I'm just trying to find out

5          how you feel.  In all of these situations

6          I have talked about where we set aside

7          our own personal beliefs and say, "You

8          know what, I don't feel good about this

9          personally, but this is my job," because

10         just like your job was a nurse for all of

11         those years and just like his job is a

12         Judge and my job is a lawyer, your job

13         for purposes of this case would be a

14         juror, who if you can, puts aside her

15         personal feelings and says, "I have to

16         objectively weigh this evidence, first on

17         guilt or innocence and if I get to that

18         phase, on death penalty or not"?

19   A.    I know what you are saying as far as the

20         determination as far as each individual

21         as far as your actual job is concerned,

22         but my job was to save a life, and it

1347

1   would be very hard for me to know that I

2   was part of taking a life.

3   Q.   Although it is a different job now.  You see

4        that?

5   A.   Right.

6   Q.   But you are telling me that even though it's a

7        different job, your own personally

8        feelings would be such, and I tell jurors

9        this from time to time, I don't mean to

10       suggest that when somebody says, "Look, I

11       can't follow the Judge's instruction,"

12       but you turn around to Judge Stuard and

13       going like this, thumbing your nose at

14       him.  I don't mean that.  One of the

15       reasons we ask these questions is to find

16       out if your feelings of personal

17       conscience are such that even if the

18       Judge says, "Look, this is what you have

19       to do in this case," that you are telling

20       us now, "I'm not trying to be rude to the

21       Judge or I'm not trying to violate the

22       law, I just have feelings that I can't

1348

1   follow the law"?

2   A.   Right.

3   Q.   You don't see any circumstances where you

4        could regardless of the evidence, vote

5        for the imposition of capital punishment?

6   A.   No, I don't believe so.

7        MR. JUHASZ:  I appreciate your time

8   and your honesty.  Thank you.

9        THE COURT:  Any objection for cause?

10       MR. BAILEY:  Yes.

11  (SIDE BAR DISCUSSION, OFF THE RECORD AND

12  OUT OF HEARING)

13       THE COURT:  We thank you very much

14  for your time.  You are excused from any further

15  duty in this matter.  Maybe you will get called for

16  another type of Jury duty.

17       MS. ZAHORNEK:  This is my first.

18  (Juror No. 52 excused from the Courtroom.)

19       THE COURT:  The last juror is

20  dismissed for cause with both sides agreeing, is

21  that correct?

22       MR. JUHASZ:  Correct.

1349

1    MR. BAILEY: Yes.

2    MR. INGRAM: The record should

3    reflect the fact that the Defense has no objection

4    to Deputy Tony Leshnack attending to professional

5    obligations in the Courtroom during Jury selection.

6    Apparently, he's a prospective State's witness, and

7    it will be necessary for him to relieve Captain

8    Bacon and we have no objection.

9    THE COURT: Thank you.

10   (Juror No. 54, Brad Seelbach, entered the Courtroom.)

11   THE COURT: Good morning,

12   Mr. Seelbach.

13   MR. SEELBACH: Good morning.

14   THE COURT: You read the handout

15   that was given to you?

16   MR. SEELBACH: Yes, Sir.

17   THE COURT: You have a pretty good

18   idea of why we're here. Miss Roberts is charged

19   with two counts of aggravated murder with

20   specifications. Under the law of Ohio, just

21   because a person is found guilty of murder does not

22   mean that they face the death penalty. It is only

1350

1    under certain circumstances that have been put in

2    the statute by the legislature, if you kill the

3    Governor or a police officer, that is reasons why

4    the Jury must consider the question of the death

5    penalty.  Miss Roberts has two specifications

6    attached, which also raise that specter of the

7    possibility.

8           The State has the burden of going forward

9    and proving each and every element of the crime of

10   aggravated murder.  They would have to prove the

11   attached specifications beyond a reasonable doubt

12   before the Jury could return a finding of guilty.

13   Should they fail to do that, then of course, the

14   trial would be over and the finding of not guilty

15   and that would be the end of it.

16          If the Jury returns a verdict of guilty,

17   however, it will go into a second hearing, and at

18   that second hearing, the Jury will be presented

19   with by the State, what is known as aggravating

20   circumstances.  And that is reasons why the Jury

21   should consider imposing the death penalty.  The

22   Defense has an opportunity to present mitigating

1351

1   factors at that point, and those are reasons why

2   the Jury should not impose the death penalty.

3          So, if the State proves beyond a

4   reasonable doubt to that Jury that the aggravating

5   circumstances outweigh the mitigating factors, and

6   the Jury would be called upon to consider the death

7   penalty.

8          And this Jury will have one of four

9   different possible recommendations for sentencing,

10  and that is death, life without chance of parole,

11  the two lesser life imprisonment terms with

12  possibility of parole after 25 and 30 years.

13         Practically everyone has some view on the

14  death penalty.  Some favor it, some are opposed to

15  it.  That is natural.  A person who feels that the

16  death penalty should be imposed every time someone

17  is convicted of murder should not sit on this Jury,

18  because that isn't the law of Ohio.  Likewise, a

19  person who, and that person couldn't be fair to the

20  Defendant.  And a person cannot be fair to the

21  State who under no circumstances could visualize

22  themselves imposing the death penalty.

1352

1         You have people with both persuasions,

2 but most people are somewhere in the middle. They

3 may favor or not favor the death penalty to some

4 degree, but the type of person that these folks are

5 looking for is someone who is able to set aside

6 whatever their own personal thoughts or beliefs are

7 and to follow the law. Both sides have the right

8 to have jurors that will follow the law and are

9 able to follow the law. Now if a person is unable

10 because of their thoughts on the matter, not able

11 to follow the law, that is fine. Everyone is

12 entitled to their own beliefs, but in order to pick

13 a fair juror, we have to have that certain middle

14 ground in a person.

15         The other question that will be put to

16 you is concerning any pre-trial publicity that you

17 may have been exposed to. Again, can't have a fair

18 trial if we have anyone on the Jury that has their

19 mind made up about the outcome. Each juror is

20 going to have to decide this case on the evidence

21 and the law presented in this Courtroom.

22         Now it is not unusual that many of the

1353

1 prospective jurors are familiar to some degree with

2 the facts of this case, which receive publicity as

3 most cases of this nature do.  But the questions,

4 the question you have to ask yourself is, "Do I

5 have something in my mind about this case that

6 would make it difficult or impossible to set aside

7 so that I could judge the matter fairly on the

8 evidence that I'll hear?"  Those are the two main

9 issues.

10 EXAMINATION BY MR. BECKER OF MR. SEELBACH:

11 Q.    Good morning, Mr. Seelbach.  Mr. Seelbach, my

12            name is Chris Becker.  I work for the

13            County Prosecutor's Office.  This is

14            Mr. Bailey.  You may recall last week, he

15            was in Court with you and I was in

16            another matter, so I couldn't join him at

17            that time.  I assume you recall

18            Mr. Juhasz and Mr. Ingram and Miss

19            Roberts from last week as well.

20                 As the Judge has indicated to you,

21            and it is really important that we get to

22            speak to you for this short period of

1354

1  time, because this is really the only

2  time in this case where we get to talk to

3  you directly.  We get to find out what

4  your views are and by all means, if you

5  have any questions about this procedure

6  or the process or the questions that I'm

7  asking you, by all means, stop me and

8  say, "Hey, I don't understand, or explain

9  that to me," because what happens is if

10  you are selected as one of the jurors in

11  this case and we start this trial, and

12  you are seated over here in the Jury box,

13  we can't speak to you anymore.  It is the

14  rules of the Court, it is the law that we

15  can't speak to the jurors while the case

16  is pending.  After the case, you can feel

17  free to talk to us and now before, but

18  when you are hearing the evidence and the

19  testimony, and when you are deliberating,

20  we can't go to you and say, "Hey, by the

21  way, Mr. Seelbach, vote this way or this

22  is what this one piece of evidence

1355

1    meant."  We have to talk to the

2    witnesses, and you have to listen.  So, I

3    want to make, emphasize that by all

4    means, if you have any questions or if

5    you don't understand what I'm asking you

6    or I'm not making it clear, by all means,

7    stop me and tell me.

8        First of all, let me thank you very

9    much.  This is, I think you are going to

10   find that this is one of the most

11   important civic duties that you can

12   perform as a citizen of this country and

13   probably short of serving in the Armed

14   Forces, it is one of the most important

15   functions that you can perform as a

16   citizen of our country.  Starting out

17   here, the Judge has indicated to you that

18   there's really sort of two areas that

19   we're going to talk about and then just

20   some general questions.

21       You filled out a questionnaire and

22   you have provided it to us and you have

1356

1           indicated that you could and you do

2           believe in the death penalty in capital

3           punishment?

4   A.   Yes.

5   Q.   This particular case is a case involving that

6           issue.  And we're going to be a little

7           presumptuous here because if you recall,

8           I told you we can't speak to you once the

9           case gets going, and in Ohio, capital

10          cases are sort of two phase cases.

11          There's a first part where you are going

12          to determine and we have to prove whether

13          she's guilty by proof beyond a reasonable

14          doubt.  And if we get to that point and

15          if you find her guilty by proof beyond a

16          reasonable doubt of the homicide crimes

17          as well as some specifications to those

18          crimes, then we'll come back a couple of

19          dates later in a second phase and that is

20          the phase where you will determine

21          whether or not the punishment should be

22          the death penalty.  It doesn't have to be

1357

1    the death penalty, because as the Court

2    indicated to you, there are four

3    different penalties that would be

4    potential.  There would be death, there

5    would be life with no parole, life with

6    parole after 30 years, and life with

7    parole after 25 full years served in

8    prison.

9        But like I said to you, we have to

10    be a little presumptuous here and assume

11    we're in that second part here now.  But

12    remember, we may never get to that part

13    because you may find her innocent and we

14    may all go home after that first part.

15    You may say the State didn't prove their

16    case by proof beyond a reasonable doubt,

17    that is the end of the story, we're all

18    going home.

19        Assume we're in that second phase

20    now where the death penalty is an option

21    for you.  Are you of such a belief in the

22    death penalty, that you feel no matter

1358

1           what her circumstances may be, and what

2           evidence may be presented, that you would

3           have to impose the death penalty?

4   A.   No, not necessarily.

5   Q.   You would fairly consider all of the other

6           options?

7   A.   Yes.

8   Q.   What we call the life options?

9   A.   Right.

10  Q.   You don't have a mind set that if you got to

11          this second phase and you went into the

12          Jury room to deliberate on the penalty

13          portion, that you would say, "I know we

14          have these other life options, but I'm a

15          real strong death penalty person, and I'm

16          not going to change my mind.  She has to

17          prove to me why she shouldn't get the

18          death penalty"?

19  A.   No.

20  Q.   You would follow the Court's instructions and

21          you would follow, because the burden is

22          on the State, we have to prove to you why

1359

1               the death penalty, and we have to prove

2               it by proof beyond a reasonable doubt,

3               why the death penalty is an appropriate

4               penalty in this case.  So you would

5               follow the law?

6   A.   Yes, Sir.

7   Q.   And your opinion is not so strong regarding

8               the death penalty that you would sort of

9               gravitate or move towards that penalty or

10              that option and exclude the others?

11   A.   Automatically, no.

12   Q.   And I noticed in your questionnaire that you

13              indicated that you feel the punishment

14              should fit the crime, correct?  And a lot

15              of people will come in here and say, "You

16              kill somebody, you should die."  You are

17              not of that mind set, are you?

18   A.   No.

19   Q.   You feel that you would be able to weigh all

20              of the different factors and follow the

21              Court's instructions in making a

22              determination as to what the sentence in

1360

```
 1              this case should be?

 2   A.   Yes.

 3   Q.   And I thank you very much.  There's no right

 4              or wrong answer here, we're just trying

 5              to get your opinions, because we're

 6              trying to decide a very important case

 7              here that obviously involves a death.  It

 8              involves Miss Roberts and her life, the

 9              rest of her life, and we want to be fair

10              to everyone involved here, both the

11              Defense and the State.

12                  Now, I think you also mentioned that

13              you had heard some things about this case

14              in the media, is that correct?

15   A.   Well, when they mentioned her name, her name

16              didn't mean anything.  I didn't remember

17              her name at all.

18   Q.   What did you remember?  What did come to mind?

19   A.   Again, if this isn't true, then let me know,

20              but just from recalling back what murder

21              this was, whether she allegedly is

22              involved in the name that I remember is
```

```
 1              Mr. Fingerhut.  If that is it.  That is

 2         the only name I remember out of this

 3         whole thing.

 4    Q.   Do you remember that back from over a year ago

 5         when this happened, back in December of

 6         2001, or do you remember it just

 7         recently?

 8    A.   This was way back.

 9    Q.   So you remember that about a year and a half

10         ago when these events were alleged to

11         have occurred?

12    A.   Yes.

13    Q.   Did you form an opinion at the time?

14    A.   I really didn't know anything about it other

15         than what I read in the paper.  I didn't

16         form an opinion.  A lot of murders in

17         Youngstown, Warren area.  I didn't really

18         follow it.

19    Q.   You were just basically --

20    A.   It is just news that I heard about.

21    Q.   And one of the reasons you are here and one of

22         the reasons all of the jurors are here is
```

1362

```
 1              because you are voters and of course, it

 2              is not mandatory that you vote in this

 3              country, it is optional, and most people

 4              that vote do so because they have an

 5              interest in their community.  So it is

 6              not unreasonable that people have an

 7              interest in their community.  We read

 8              about not only the crimes, but what the

 9              County Commissioners are doing and their

10              elected officials, the Mayor and the

11              Council people and the Engineer and the

12              Auditor and the Prosecutor and the Judges

13              do in their community.  No one is

14              faulting you for knowing something about

15              the case.  What we have to know, what we

16              have to know is from what you have heard

17              about this case, have you formed an

18              opinion about whether Miss Roberts is

19              guilty or innocent?

20     A.    No.

21     Q.    And I can't recall from your questionnaire,

22              have you ever served on a Jury before?
```

```
                                                    1363

 1   A.   No, Sir.

 2   Q.   You understand that the basic premise, and

 3             what we're trying to do here is you and

 4             your fellow jurors, we want you to

 5             determine this case based solely upon the

 6             evidence you hear in this Courtroom?

 7   A.   Right.

 8   Q.   And that is sort of why we're asking you these

 9             questions.  It is not sort of.  It is the

10             reason we're asking you these questions.

11             I'll tell you, we have already had some

12             jurors come in here and say, "I read

13             about the thing.  I saw it on television.

14             I follow the local news pretty heavily.

15             I think she's guilty and I can't change

16             my mind."  That is not a fair juror, you

17             would agree?  We need somebody who is

18             going to come in here and say, "I may

19             have read something about it.  I may have

20             seen something about it.  I may not know

21             anything about it.  I'm going to

22             determine whether she's guilty or
```

1364

1   innocent based on what I hear in this

2   Courtroom and the witnesses in that chair

3   and any Exhibits and testimony or

4   evidence, whether they be physical or

5   whatnot.  That is what I'm going to do."

6   You feel you could do that, correct?

7   A.  Yes, Sir.

8   Q.  And what little you do know about this case

9   that you have heard in the media has not

10  influenced you in having an opinion about

11  it?

12  A.  No, I didn't recognize her name.  I didn't put

13  her with that situation at all.

14  Q.  I notice on your questionnaire that you

15  actually, you watch a couple of shows

16  that actually involve criminal

17  investigations and trials and whatnot.

18  you watch CSI and JAG.  I assume you have

19  probably seen Law and Order sometimes?

20  A.  Never watch that.

21  Q.  I watch Law and Order, I used to anyway before

22  I had four kids.  Only because it is a

1365

1     little more truthful.  Because sometimes

2     the Prosecutor in those cases do lose.

3     To me that is reality sometimes.  You

4     understand that these are television

5     shows and they are a lot different.  One

6     of the things that we have a problem with

7     is particularly, I almost want to say

8     that CSI is one of the worst shows for

9     Prosecutors ever, because people now

10    expect the State to have evidence of

11    everything.  Fingerprints -- well, they

12    touched the thing, there should be

13    fingerprints there and this should be

14    everything.  It just doesn't work that

15    way sometimes.

16        You are probably familiar with some

17    of the local police departments, if we

18    got a crime and I'm not trying to

19    disparage any local law enforcement

20    agency.  If we got a crime in some little

21    podunk burg in Trumbull County, we might

22    have a guy who is a part-time police

1366

1   chief, works at the mill for security

2   most of the time.  They had to come out

3   and check the lock, there may be

4   fingerprints, smudges all over a window

5   and they may put their hand on to look

6   in.  You understand that reality

7   sometimes is different than what you see

8   on television?

9   A.   CSI and JAG are more entertaining.

10  Q.   I have not seen JAG a whole lot, but I have

11       seen CSI.  One of the things that you are

12       going to have to deal with in this case

13       is what is called the burden of proof,

14       which in this case, obviously because

15       it's a criminal case is proof beyond a

16       reasonable doubt.  And a lot of people

17       will describe that and probably the best

18       way I have heard it described is

19       basically looking at a glass of water.

20       The old saying I guess is that glass half

21       empty or half full.  In civil cases, for

22       instance, if this was a case involving --

1367

1   if Miss Roberts were a doctor and

2   Mr. Bailey and I represented someone who

3   had been operated on and lost their sight

4   or lost their sense of feeling in their

5   right arm because of negligent operation,

6   we would have to fill that glass up just

7   beyond half.  That would be our burden of

8   proof.  That is called a preponderance of

9   the evidence.  But in this setting, the

10  burden of proof for the State and for

11  Mr. Bailey and I is going to be proof

12  beyond a reasonable doubt.  Now, I'm

13  going to tell you flat out, that doesn't

14  mean the glass is full to the very top.

15  So, if you touch it, water spills out of

16  the top.  It is pretty close to the top.

17  It maybe depends on the size of the

18  glass, an inch, quarter inch, maybe two

19  inches from the top, but it is definitely

20  more than half and it is getting up there

21  towards the top.  It may be 90 percent

22  full, it may be 85 percent.  It may be 99

1368

1       percent full.  Depending on each

2       individual juror, everyone is going to

3       have a different idea of what beyond a

4       reasonable doubt is.  You understand that

5       concept?

6  A.   Yes.

7  Q.   And you would hold to us that burden and you

8       wouldn't say, "Hey, listen, they proved a

9       couple of things.  I know they didn't

10      prove the one element that the Judge

11      instructed on, but I'm not really worried

12      about that."  You had told us, because

13      every case, every case here, every charge

14      in this indictment has different

15      elements.  So we have to prove all of

16      those elements by proof beyond a

17      reasonable doubt.  And in fact, it is

18      sort of like maybe a waitress putting

19      drinks on a table and there might be five

20      drinks on the tray that she's bringing

21      over.  All of those have to be proved by

22      beyond a reasonable doubt.  She can't

1369

```
 1              bring over any empty glasses.  We can't
 2              bring any empty glasses to you and say,
 3              "Don't worry about that one element."
 4              You know some other things have happened.
 5              You would agree that you would hold us to
 6              our standard of proof, where ever in your
 7              mind that glass gets to beyond a
 8              reasonable doubt, correct?
 9    A.   Yes, Sir.
10    Q.   Now, sort of dovetailed into that or in
11              association with that, is what we call
12              Miss Roberts and every Defendant's Fifth
13              Amendment right, and the presumption of
14              innocence.  I assume you have heard of
15              those terms before as well, correct?
16    A.   Yes.
17    Q.   The essence of that right is, Miss Roberts can
18              sit over there and Mr. Ingram and
19              Mr. Juhasz can do nothing.  And in fact,
20              they -- I don't think this is the kind of
21              case where they are going to do that and
22              I would be very surprised if you never
```

1370

1    heard another word from them after today,

2    but in reality, every criminal Defendant

3    can sit over there with their Attorney,

4    and not say a thing to the Jury.  Not

5    question one witness, not present to you

6    one exhibit, and you would have to find

7    her -- I'm sorry, not guilty if we didn't

8    meet our burden.  Ball is in our court in

9    every criminal case and we have to prove

10   beyond a reasonable doubt.  You wouldn't

11   have a problem for instance in this case,

12   if you found out that someone was dead,

13   because it is a homicide case, and the

14   State proved maybe three or four of the

15   elements of the crimes or four or five of

16   the elements, and they never presented

17   anything.  You would have to vote to find

18   her not guilty, correct?  If we didn't

19   prove all of the elements.  Even if you

20   knew there was a homicide involved,

21   correct?

22   A.   Correct.

1371

1   Q.   And you wouldn't have a problem doing that?

2   A.   No.

3   Q.   You would follow the Court's instructions,

4            correct?  Now, in this particular case,

5            you are going to hear a term that we

6            refer to which is complicity to murder.

7            I'm going to tell you right now as we

8            stand here on April 15th that Miss

9            Roberts is not the trigger person.  There

10           is going to be no evidence presented to

11           you indicating that she fired a gun and

12           killed the deceased in this case.  Do you

13           believe you would still be able to

14           impose, if the facts warrant it and

15           assuming we got to the second phase,

16           would you be able to impose the death

17           penalty if we were able to prove the

18           elements that we had to prove in that

19           second phase.  Do you think you could

20           sign a verdict calling for the death

21           penalty if we proved our case?

22  A.   Yes, if you proved that she was a part of it.

1372

1           If they proved that they were all a part

2           of this.

3    Q.   Again, you wouldn't do that automatically,

4           because she was involved in it, would

5           you?

6    A.   No.

7    Q.   You would listen to the evidence and the

8           testimony and the way the second phase

9           sort of works is there's an obligation

10          upon us, just like in the first phase,

11          where we have to prove some things to you

12          beyond a reasonable doubt.  And we have

13          to meet that burden.  We may not meet it.

14          If we don't meet it, you can't impose the

15          death penalty.  You agree with that?

16   A.   Yes.

17   Q.   But we may very well meet it.  And they may

18          present to you some things to try and tip

19          the scale back, and in her favor.  You

20          have to do this weighing again and you

21          are going to have to do that throughout

22          the case.  You don't have a problem doing

1373

1    that?

2  A.  No.

3  Q.  Now, only because you haven't served on a Jury

4       trial before, I want to touch on you with

5       sort of what your function is.  Again,

6       this isn't a test.  There's no right or

7       wrong answer, but coming in here today,

8       what do you think your job as a juror

9       will be in this case if you are selected?

10 A.  To listen to the evidence.

11 Q.  And then you make your determination based

12      upon the evidence, whether there's guilt

13      or innocence and whether the State has

14      proven its case by proof beyond a

15      reasonable doubt.  Sometimes the

16      examples -- we use different examples

17      sometimes, but you would agree that you

18      have to weigh the evidence.  Whether it

19      is testimony or whether it is physical

20      Exhibits.  You have to say, "Hey, does

21      this really match up to what the State is

22      alleging," correct?

1374

```
 1   A.    Correct.
 2   Q.    And I'll use this because I can't think of any
 3         other examples and I have used it for a
 4         long time.  So I just keep using it.
 5         Let's say there's an accident out here on
 6         High Street and Park Avenue, right out
 7         here on the corner.  Right outside the
 8         Courthouse and we're prosecuting the
 9         individual for blowing through a traffic
10         light there.  Just barreling through the
11         red light and hitting somebody and maybe
12         there's some injuries, maybe even a death
13         in that case.  Now let's say Mr. Bailey
14         and I present to you one witness.  Do you
15         believe in any case, the State could meet
16         all of its burdens with just one witness,
17         if that witness was good enough?
18   A.    If that witness saw everything.
19   Q.    And on the same side, we may present five or
20         six witnesses and still not meet our
21         burden of proof, correct?
22   A.    Correct.
```

1375

1    Q.      So, let's assume the car wreck happens and the

2                person who is going let's say west on

3                High Street and they are coming down from

4                Howland.  They come up High Street, they

5                are coming across and they are going to

6                park right out in front of the

7                Courthouse.  As they were coming across

8                Park Avenue, this guy blew the

9                intersection at Market, blew the

10               intersection here at High and crashed

11               into the poor guy who is in this car.

12               Now, if the one witness out there is a

13               very credible witness, let's say maybe a

14               clergyman or maybe it is one of the

15               Judges here in the Courthouse.  Maybe it

16               is someone that is highly respected in

17               the community, very fair and impartial

18               person and says, "Yes, I saw the whole

19               thing.  I walk this Courthouse Square at

20               noon.  I walk around the block and I have

21               noticed that sometimes people miss the

22               light, so I am always very careful to go

1376

1   with the walk signals and I only cross at

2   the corners and the walk signals.  But

3   even before I do that, if I get the walk

4   signal and the light is green, I look

5   both ways before I cross, because I have

6   seen people miss that light.  And as I

7   was there that day, I saw the light

8   change.  I saw the walk signal, I looked

9   both ways and I saw this guy coming

10  through the intersection at Market and he

11  just blew through."  That might be enough

12  for you.  Assuming that the other

13  elements were proven in the crime.  And

14  now let's change that up a little bit.

15  Let's assume the witnesses are Mr. Bailey

16  and I.  The victims, that it is his

17  family.  They were waiting there for him

18  and they were going to meet him in front

19  of the Courthouse, but they went to go

20  get ice cream at Hippodrome.  It is his

21  wife, his brother, his mother, his father

22  and two of his kids.  Let's assume they

1377

1    say, "This guy barreled through the

2    thing."  You might have some concerns

3    about their testimony, right?

4    A.   Could be.

5    Q.   Based upon their relationship.  Let's assume

6    that they all -- some kind of genetic

7    defect in the family and all had to wear

8    glasses, those coke bottle glasses, and

9    all the of them had forgotten them that

10   day.  Might have some more problems with

11   their testimony.  That is the kind of

12   thing that you would have to do as a

13   juror.  And you feel you would be able to

14   do that function and to determine maybe

15   who has got more interest or bias in any

16   particular case?

17   A.   Yes.

18   Q.   Now, one of the other things that we may run

19   into in this particular case is what we

20   call circumstantial evidence.  And I am

21   assuming you have heard of that term as

22   well.  And there's many, many ways to

1378

1            describe circumstantial evidence, but one

2            of the ways is, and I don't know, do you

3            watch the local news?

4  A.   Yes.

5  Q.   Local weather?

6  A.   Yes.

7  Q.   I don't know which channel you watch, but

8            let's assume you go to bed at 11:00 or

9            11:30 and you watch the news. At 11:15,

10           right before the sports, and they got the

11           weather on there, you look out your

12           window and it looks pretty clear tonight.

13           Maybe a couple of clouds floating by, but

14           you can see some stars and the weatherman

15           comes on and says, "We're going to get a

16           bad thunderstorm tonight. Bad weather,

17           going to rain, going to get a lot of

18           rain." And it hasn't rained in three or

19           four days, your driveway is dry. He

20           shows you the big weather map that he

21           stands in front of and he says, "There's

22           this line of green and yellow and red

1379

```
 1              from Toledo to Cincinnati and it is

 2              moving east at 30 miles an hour."  You go

 3              to bed, look outside, your car is in the

 4              driveway completely dry, go to bed.  You

 5              might wake up in the middle of the night

 6              and you hear some thunder or hear

 7              something.  You hear some noise.  You see

 8              some flashes of lightning through your

 9              blind that's pulled down, that you see it

10              is lightning up outside.  You wake up,

11              the ground is all wet.  The car is wet.

12              Water trickling down the street into the

13              sewers.  You can assume it had rained the

14              night before.  It may be clear as a bell

15              the next morning and drying up again, but

16              you can make that inference, even though

17              you never saw one drop of rain hit the

18              ground, you can assume that it rained?

19   A.   Right.

20   Q.   And sometimes we ask jurors to do that.  And

21              in fact, the Court is going to tell you

22              that that kind of evidence where you can
```

1380

```
 1              make that inference, is just as much
 2              weight as direct evidence.  If you had
 3              gone outside at midnight and got rained
 4              on and held an umbrella there, that is
 5              just as good as evidence as the
 6              circumstantial evidence and the direct
 7              evidence are equal.  So you could do that
 8              as well, you feel?
 9   A.    Yes, Sir.
10   Q.    And we're being probably over simplistic here,
11              but we're trying to do, trying to find
12              out about you and your qualifications as
13              a juror.  Another important area that the
14              Court is going to tell you and the Court
15              tells everybody in every criminal case,
16              and it is difficult sometimes, is that
17              you cannot consider sympathy in making
18              your determination of guilt or innocence.
19              For instance, you can't feel sympathetic.
20              You are going to see, I'm going to tell
21              you right now, you are probably going to
22              see some pictures, because it's a
```

1381

1   homicide case of a victim.  It is Mr.
2   Fingerhut.  You don't feel that you would
3   look at those photos and say, "My gosh,
4   look at what happened to this poor guy.
5   I know the State didn't prove everything,
6   but I'm going to find her guilty anyway,
7   because I can't get these pictures out of
8   my mind."  Would you do that or would you
9   not do that?
10  A.   I could do it.  You have to prove it.
11  Q.   I would still have to prove it to you, even if
12       you saw some pictures that were gruesome.
13       On the other side of that, you wouldn't
14       say, "Well, the State proved their case,
15       they have proven every element beyond a
16       reasonable doubt, but I see Miss Roberts
17       over there, I really feel sorry for her.
18       She seems sympathetic.  She seems so
19       nice, I can't find her guilty or I can't
20       impose the death penalty.  I just really
21       feel sorry for her."  You wouldn't do
22       that either, would you?

1382

1   A.   No.

2   Q.   Is there anything that you feel you should

3              tell us or that I have not covered or

4              that you feel is important for me to know

5              that maybe has come to mind as we have

6              been speaking here?  Anything that you

7              feel would affect your ability to sit as

8              a fair and impartial juror?

9   A.   No.

10            MR. BECKER:  Thank you very much.

11   <u>EXAMINATION BY MR. INGRAM OF MR. SEELBACH:</u>

12   Q.   Good morning, Mr. Seelbach.  I am Jerry

13             Ingram, and there is John Juhasz.  We

14             share the responsibility of representing

15             Donna Roberts who is on trial for her

16             life.  And as you can understand, it is a

17             very serious thing and we feel we should

18             take every reasonable precaution in

19             selecting a fair minded juror and the

20             same type of juror that you or I would

21             want to decide our case if we were on

22             trial; does that sound fair enough to

1383

1    you?

2  A.   Yes.

3  Q.   This experience, this Voir Dire experience you

4       are going through right now is a lot like

5       a job interview.  And you work where at,

6       Altronics in Girard?

7  A.   Yes.

8  Q.   When you got the job at Altronics or at Disney

9       Land or wherever, you chose the job that

10      you were going to apply for?

11 A.   Right.

12 Q.   In this particular situation, I guess you were

13      lucky or unlucky enough that the spin of

14      the Jury wheel resulted in you being

15      asked to come here?

16 A.   Correct.

17 Q.   But it's a job interview.  And we're

18      interviewing you for the most important

19      job there is, or one of the most

20      important jobs there is.  The job of

21      finding the truth and determining the

22      fate of another human being.  Not

1384

1    everyone is up to assuming that

2    responsibility.  My first question to you

3    is, how do you feel about being asked to

4    assume that responsibility?

5  A.  I feel it is my responsibility as a citizen

6    and as part of this country.

7  Q.  You think it is a challenge?

8  A.  Yes, I believe it's a challenge.

9  Q.  You think you are up to the challenge?

10  A.  Sure.

11  Q.  If selected, your job responsibility will be

12    to fairly determine the facts of the

13    case.  You understand that?

14  A.  Correct.

15  Q.  Right now, your job responsibility is to tell

16    us if you would have either, if you would

17    have a problem giving either side a fair

18    shake during any stage of these

19    proceedings.  Do you understand that?

20  A.  Yes.

21  Q.  How do you feel about the American Jury

22    system?

1385

1    A.    On a whole?

2    Q.    On a whole.

3    A.    It is a fair system.  There's checks and

4          balances.  I suppose you see what is

5          going on in Iraq, we have a pretty good

6          justice system.

7    Q.    Do you understand that our system only works

8          when we can get 12 good people like

9          yourself to come in here to sit in the

10         Jury box, share their views, assume their

11         responsibility and do fairness?

12   A.    Yes.

13   Q.    Do you also understand that it only works when

14         jurors who are being interviewed for

15         their jobs, the job of being jurors,

16         openly and honestly answer the questions

17         put to them?

18   A.    Yes.

19   Q.    And you know there are no right or wrong

20         answers here.  There's only one mistake

21         that you can conceivably make, and that

22         is if you have answered a question and

1386

```
 1              instead of telling me the way you really
 2              feel, you would tell me what you think we
 3              want to hear.  Am I making sense?
 4    A.   Yes, I understand.
 5    Q.   I would ask you not to do that.  No matter
 6              what it is, no matter how you feel,
 7              please share your thoughts with me so we
 8              can make a determination whether you are
 9              comfortable sitting on this Jury.  Does
10              that sound fair to you?
11    A.   Sure.
12    Q.   Now as you know, I believe by now, this case
13              boils down to the Government's allegation
14              that Donna Roberts plotted or conspired
15              with a male companion, Nate Jackson, to
16              cause the death of Robert Fingerhut.  And
17              as I understand it, back in December of
18              2001, you saw, read or heard something
19              about this case?
20    A.   Yes.
21    Q.   When you came to the group orientation down
22              the hallway last Tuesday, you did not
```

1387

1     recognize the name Donna Roberts?

2  A.  No.

3  Q.  But as you went through the orientation

4      process, the name Mr. Fingerhut popped

5      into your head?

6  A.  I was trying to associate what murder trial it

7      was associated with because I do read the

8      papers and I watch the news.  Her name

9      was not familiar to me at all.  I think

10     after I left the Courthouse, it dawned on

11     me that this must be the Fingerhut case,

12     but that is the only thing I knew.  I

13     never associated her name with it.

14 Q.  Can you tell me everything, and you probably

15     are going to have to search your memory

16     bank for this one.  Can you tell me

17     everything you remember seeing, reading

18     or hearing from the news media about the

19     death of Robert Fingerhut?

20 A.  What I remember hearing or reading that

21     someone broke into the house, he was

22     shot, something about a car being stolen

1388

1    or taken.  That is most of what I really

2    remember about it.

3  Q.  Do you remember hearing --

4  A.  I don't remember details or anything like

5    that.  I don't remember details of how

6    they got into the house, if they broke

7    through a window or something of that

8    nature.  I just don't recall.

9  Q.  Do you remember hearing or reading anything

10    about letters or tape recordings?

11  A.  No.

12  Q.  What you saw or read or heard about this case,

13    from what you saw, read or heard about

14    this case, have you formed any

15    impressions?

16  A.  The only impression that someone was murdered.

17    That was it.

18  Q.  Do you recognize the name Nate Jackson?

19  A.  No, I didn't recognize that name, either.

20  Q.  Can I ask you when in point of time you filled

21    out your questionnaire, was it today, or

22    a couple of days ago?

1389

1   A.   It was last night.

2   Q.   I have asked you to be honest with me, so I'm

3        going to be honest with you.  In reading

4        this questionnaire, particularly your

5        responses on your views regarding capital

6        punishment, I have some concern in my

7        mind about your ability to fairly

8        consider the life imprisonment sentencing

9        alternatives if we ever get to a second

10       phase.  Thinking back on your answers as

11       they are in here, you remember them?  Can

12       you understand my concern?

13  A.   Yes, I believe so.

14  Q.   If you thought I was all wet, I want you to

15       tell me.

16  A.   I remember in there and I thought when I wrote

17       it, I put down capital punishment for

18       murder and rape.  I know I put that.  I

19       thought it will probably spark some

20       questions.

21  Q.   It will spark some questions.  Could you in

22       further detail explain your views on

1390

1         capital punishment to me?

2   A.   I feel those are things that -- I mean I look

3         as if it was my wife or daughter that was

4         raped or something, I feel there should

5         be a death penalty with that.  Same thing

6         with murder, if someone takes someone

7         else's life.  There's extenuating

8         circumstances.  If it was a temper thing

9         or something that happened, possibly no

10        death penalty.  If it is a premeditated,

11        planned out, thought about it, I'm going

12        to take your life type thing, there

13        should be a death penalty for that.

14  Q.   In a couple of your responses, you include the

15        word "justice," and in response to the

16        question about why we have a death

17        penalty, I believe you said, "to serve

18        justice, punishment should fit the

19        crime."

20  A.   Yes.

21  Q.   And in response to another question, you said

22        there needs to be justice, I believe the

1391

```
1              death penalty is a deterrent?
2    A.   Yes.
3    Q.   I am talking to you right now about your
4              personal views.  We'll talk about the
5              law, instructions of law and your ability
6              to follow the law later.  I want to
7              determine first of all how you personally
8              feel about these things, and then we'll
9              talk about whether they impact your
10             ability to follow the law or not.
11   A.   I understand.
12   Q.   And if they do impact your ability to follow
13             the law, whether you can set that aside.
14             But for now, we're just talking about how
15             you personally feel.  By the way, do you
16             have a relative by the name of Larry?
17   A.   No.
18   Q.   Aggravated murder in the State of Ohio is
19             purposely and for the sake of our
20             discussion, purposely is the word on
21             purpose.  Does that sound reasonable?
22   A.   Right.
```

1392

1    Q.    Purposely causing the death of another with

2          prior calculation and design.  And prior

3          calculation and design is advance

4          planning.  You familiar with the old term

5          premeditation?

6    A.    Yes.

7    Q.    It is sort of like premeditation.  Advance

8          planning.  Are your views regarding

9          capital punishment such that in cases

10         where a Defendant has been found guilty,

11         now you can only be found guilty, and I'm

12         sure after your conversation with

13         Mr. Becker, someone can only be found

14         guilty after the Jury has been convinced

15         beyond a reasonable doubt of the

16         Defendant's guilt?

17   A.    Correct.

18   Q.    So after conviction, the only doubt that would

19         remain would be possible, imaginary or

20         unreasonable doubt.  Does that make sense

21         to you?

22   A.    Okay.

1393

```
 1    Q.   In your personal views, for someone who has

 2              been convicted of aggravated murder, that

 3              is planned in advance, planned murder.

 4              Would capital punishment be the preferred

 5              punishment?

 6    A.   Preferred, automatic, or if they are found

 7              guilty and it is proven beyond the shadow

 8              of a doubt and the death penalty is an

 9              option, that would be an option, yes.

10              Whether it is preferred, it is going to

11              depend on proof, if they prove their

12              case.

13    Q.   They have already proven guilt.  Do you

14              understand that?

15    A.   Okay.

16    Q.   So when you say they proved their case, are

17              you talking about guilt or are you

18              talking about the appropriateness of

19              punishment?

20    A.   You are talking about appropriate punishment?

21    Q.   I am.  I'm trying to figure out what you meant

22              by if they proved their case.  You
```

1394

```
 1          understand, you never decide penalty
 2          until somebody has been convicted?
 3   A.   Correct.
 4   Q.   So the State has already proven beyond a
 5          reasonable doubt in any case, in which a
 6          juror is called upon to determine
 7          punishment that the Defendant did it.
 8   A.   Okay.
 9   Q.   Now, knowing that a Defendant has committed an
10          aggravated murder with premeditation, in
11          your personal view now, do you think that
12          the death penalty should be the automatic
13          penalty, that it should be the preferred
14          penalty, that there should be options?
15          You tell me how you feel.
16   A.   I don't feel it's automatic, no, but is it a
17          possibility and top of the list, well,
18          yes, it is one of the options.  I am told
19          there's four options.  That is one of
20          them.  And if she's found guilty of
21          planning and plotting this all out, then
22          yes, that would be a high option.
```

1395

1  Q.    The Judge told you on last Tuesday in the
2            orientation instruction and I believe
3            told you this morning in the preliminary
4            instruction, that if you start a second
5            phase, that all four penalties should
6            start out equally in your mind?
7  A.    Correct.
8  Q.    Can you explain for me, please generally,
9            philosophically, your views on life
10           imprisonment as an alternative to the
11           death penalty?
12  A.    My views as opposed to -- I don't understand
13           the question.
14  Q.    Some people don't believe in life imprisonment
15           for people convicted of murder.  Are you
16           of that school?
17  A.    Not necessarily.  We have already come up with
18           one scenario that I have already been
19           told, she didn't pull the trigger so
20           there's a question right there as to
21           death penalty or life in prison in my
22           mind.

1396

1   Q.   Okay.  Have you ever heard someone say that

2        they don't believe in life imprisonment

3        because society shouldn't have to pay the

4        cost of incarceration?

5   A.   I have heard that, yes.

6   Q.   Do you have any particular feelings about the

7        cost issue?

8   A.   No.  Sometimes life in prison could be worse

9        than death.

10  Q.   In your questionnaire, you answered the

11       question regarding problems with the

12       justice system by the main problem is

13       repeat offenders, too much crime, drugs

14       aren't being stopped.  That answer

15       regarding repeat offenders, does that

16       have anything to do with the parole

17       process?

18  A.   I don't really -- my answer to that wasn't

19       thinking of parole, no.  I was thinking

20       of light sentences or people on drugs and

21       they get off and go out again.  Somebody

22       is pulled in here, in Court, that they

1397

1         have got a rap sheet a mile long.  Why

2         does it take so long to get so far that

3         they are still out committing crimes?

4         That is what I meant by repeat offender.

5         I wasn't thinking of parole.

6   Q.  You were referring to as I understand what you

7         are saying, and don't let me put words in

8         your mouth --

9   A.  I wasn't thinking of parole.  I was thinking

10        if someone burglarized this house, they

11        are arrested and they are out walking the

12        streets.  They burglarize this house.

13        They attack this person.  They are out

14        walking the streets and they are back in

15        Court again for something else.  That is

16        what I was looking at as repeat

17        offenders.

18  Q.  When you debated, you did take a position in

19        some debate or discussion regarding the

20        death penalty?

21  A.  Yes.

22  Q.  Do you recollect any of those discussions?

1398

```
 1   A.    Yes.   It was a long time, it was during a
 2              college course actually in business.   It
 3              was part of a course, capital punishment
 4              came up.
 5   Q.    It was an assignment?
 6   A.    No.   I think it was a class discussion.   I
 7              can't remember the details how it came
 8              up.   The capital punishment came up.   The
 9              whole essence of the thing became a race
10              thing at that time.   People believed in
11              the death penalty because most people
12              were black and some people were black in
13              the class and they said that is the only
14              reason you are for the death penalty
15              because everybody in prison was black.
16              That is why I basically remember that.
17              It was a conversation that came up in a
18              business class.
19   Q.    Have you ever considered a political
20              candidate's views on capital punishment
21              in determining whether or not you would
22              vote for that candidate?
```

1399

1   A.   Solely on that?   No.

2   Q.   Have you ever considered a candidate's views,

3        not solely, but as one factor in

4        determining whether or not you would vote

5        for that candidate?

6   A.   Specifically, I can't remember any candidate's

7        platform of capital punishment being a

8        determining factor, no.

9   Q.   When was it that you applied for a job at the

10       Ohio State Patrol?

11  A.   This would have been late seventies, I

12       believe.  I had done security work and

13       was interested in the State Highway

14       Patrol.

15  Q.   Where did you do your security work at?

16  A.   Penney's at the Eastwood Mall and I worked at

17       Wells Fargo.

18  Q.   When you talk about retail in your

19       questionnaire, is that Penney's?

20  A.   I was the store director at Toys 'R Us at the

21       Eastwood Mall for approximately nine

22       years.

1400

1  Q.   You had some involvement with processing

2       shoplifting cases -- was that at Penney's

3       or Toys 'R Us or both?

4  A.   Toys 'R Us.

5  Q.   Would you sign the complaints?

6  A.   Yes.

7  Q.   And you would give the police statements, then

8       you would go testify?

9  A.   Yes.

10 Q.   You know that Donna Roberts has been indicted?

11 A.   Yes.

12 Q.   I also understand, I believe from the Judge's

13      orientation instruction that the fact

14      that she's been indicted is not evidence,

15      and should not be considered by you for

16      any purpose?

17 A.   Correct.

18 Q.   Does the fact that she's been indicted lead

19      you to believe she must have done

20      something wrong or she wouldn't be here?

21 A.   Not necessarily, no.

22 Q.   What do you mean by not necessarily?

```
                                                         1401
 1    A.    There's been people on death row that have
 2          been proven to be innocent.
 3    Q.    Grand Jury proceedings are secret.
 4    A.    Right.
 5    Q.    They only hear one side of the issue.  Donna
 6          Roberts didn't know this case went to the
 7          Grand Jury.  Mr. Juhasz and I weren't
 8          there.  We weren't there to test the
 9          evidence and all a Grand Jury does is
10          decides if someone should stand trial.
11    A.    Correct.
12    Q.    Basically, they pass on the hard decision to
13          the jurors who will hear the case.
14    A.    Right.
15    Q.    The evidence is different, the role is
16          different and it would be unfair to
17          consider that indictment as evidence; do
18          you agree with that?
19    A.    Yes.
20    Q.    How do you personally feel about the rule of
21          law which requires that jurors presume a
22          Defendant innocent, not guilty?
```

1402

```
 1   A.    I think you need to presume someone is
 2             innocent.  You have to be based on what
 3             is proven in Court.  I did have a
 4             question about this.  The day we were all
 5             in Court and we were told to presume
 6             she's innocent and they bring her in in
 7             handcuffs.  To me that is like how -- you
 8             expect us to presume she's innocent.  But
 9             they are leading her in here with her
10             hands behind her back.
11   Q.    That is an interesting problem, isn't it?
12   A.    Why don't they take them off in the back room?
13             It was just a question.
14   Q.    I'm going to explain that to you.  The deputy
15             that did that is sort of a green horn, a
16             rookie.  The deputy that did that was, I
17             think reprimand is too strong of a word.
18             She was not reprimanded, but certainly
19             told about it, and it was a mistake,
20             but --
21   A.    That wasn't a normal procedure?
22   Q.    It was a mistake.
```

1403

1   A.   The Judge instructs you to presume she's

2        innocent and they have got her handcuffs

3        on.

4   Q.   I'll be honest with you again.  All that means

5        is she's not out on bail.

6   A.   Right.

7   Q.   People can't afford bail every day.

8   A.   Right.

9   Q.   And you talked about innocent people who were

10       on death row that had been convicted.

11       Well, I bet they didn't get bail, and

12       there's people who are admitted to bail,

13       who are convicted every day.  Bail has

14       nothing to do with it.  Do you agree with

15       me?

16  A.   Yes.

17  Q.   And I got way ahead of myself with you.

18       Forgive me.  I have a concern about

19       standing up here talking with you about

20       punishment.  And my concern is quite

21       simply this.  That you might get some

22       inkling in the back of your mind that if

1404

```
 1              Ingram and Becker are standing up here
 2              and talking to me about punishment, they
 3              must think I'm going to have to decide
 4              the issue of punishment.  I want you to
 5              know that nothing could be farther from
 6              the truth.
 7   A.   The Judge explained that the very first day.
 8   Q.   You got a handle on that?
 9   A.   Right.
10   Q.   We're not predicting you will ever have to
11              decide the question of punishment.
12   A.   Right.
13   Q.   And if at the first phase, the Jury finds
14              Donna Roberts not guilty, what would
15              happen?
16   A.   We're done.
17   Q.   We would all pack up our bags and go home,
18              wouldn't we?
19   A.   Right.
20   Q.   The trial that you are called for, is State of
21              Ohio versus Donna Roberts.  It is about
22              the guilt or innocence of one person and
```

1405

1     one person only.  Donna.  Throughout the
2     course of these proceedings, you will
3     hear the name Nate Jackson.  And you may
4     conclude that Nate Jackson did what the
5     State says he did.  That is not what
6     we're here to determine.  You understand
7     that?
8  A.  Correct.
9  Q.  You would be here to determine whether Donna
10     Roberts helped him or not.  Will you hold
11     the State of Ohio to its burden of
12     proving that beyond a reasonable doubt?
13 A.  Yes.
14 Q.  In support of its allegations, that Donna
15     aided or participated in the death of
16     Robert Fingerhut, the State will present
17     various letters, or recorded
18     conversations between Donna and Nate.
19     How about that?  I ask you, if you heard
20     anything about letters and conversations,
21     and then I tell you about them.  You are
22     going to get letters and conversations.

1406

```
 1              And to be further honest with you, some
 2              of them are sexually explicit and down
 3              right offensive.  But the charge here is
 4              murder, not loose morality.
 5    A.   Right.
 6    Q.   Would you have any problem giving a scarlet
 7              woman a fair shake?
 8    A.   No.  I feel one doesn't have anything to do
 9              with the other.
10    Q.   No matter how shocked or offended you may be
11              by the sexual nature of the evidence,
12              your job responsibility as a trial juror
13              will be to test the State's evidence to
14              determine whether it ties Donna to the
15              death of Robert Fingerhut.  Will you do
16              that?
17    A.   Yes.
18    Q.   Would you have the courage to acquit, vote not
19              guilty, if you felt a not guilty verdict
20              was justified by the evidence?
21    A.   Yes, if they can't prove it.
22    Q.   Have you ever seen the movie True Crimes
```

1407

1     starring Clint Eastwood?

2  A.    No.

3  Q.    I want to go back to penalties for just a

4        second.  You understand that it is

5        potentially -- and potentially only a two

6        phase process?

7  A.    Correct.

8  Q.    We only get to a second phase in any capital

9        case if the Jury finds beyond a

10       reasonable doubt that the Defendant is

11       guilty of an aggravated murder charge,

12       and guilty of one or more death

13       specifications.  Any such Jury that gets

14       to a second phase is then instructed on

15       aggravating circumstances and mitigating

16       factors.  And they are told they have to

17       weigh one against the other.  And before

18       they could impose, come back with a

19       verdict of death, they would have to find

20       beyond a reasonable doubt that the

21       aggravating circumstances, bad things,

22       outweigh the mitigating factors, by

1408

1     beyond a reasonable doubt, and that death

2     is the appropriate penalty.

3  A.  Right.

4  Q.  And the State has that burden.  Do you

5     understand that?

6  A.  Right.

7  Q.  Now in light of your view on the death

8     penalty, if you have got to a second

9     phase, and it doesn't have to be in this

10    case, it could be any case.  Just a made

11    up case.  If you ever got to a second

12    phase, would you expect the Defense to

13    satisfy you that life was the appropriate

14    punishment?

15 A.  No, I don't expect the Defense to have to

16    prove anything at this point.

17 Q.  Because the burden is on these guys, right?

18 A.  Right.

19 Q.  When you filed those shoplifting cases, did

20    you ever get cross examined?

21 A.  Yes.

22 Q.  Was the cross examination of you

1409

1    professionally conducted?  I guess what

2    I'm asking, the lawyer that asked you

3    questions, was he a dork or a decent guy?

4  A.  I guess he was fine.

5  Q.  Anything about that experience that left you

6    with a sour taste in your mouth that we

7    ought to know about here?

8  A.  No.

9  Q.  And you do understand that during the course

10    of this trial as Mr. Becker predicted,

11    Juhasz and I won't sit on our hands.

12    We'll cross examine witnesses.  And we'll

13    try to do it in as professional manner as

14    we can, but if we do something wrong, you

15    hold it against us, not Donna Roberts,

16    right?

17  A.  Right.

18  Q.  Have you ever donated any time, money or

19    services to a political candidate?

20  A.  No.

21  Q.  Do you belong to any group or organization

22    which is active in any political manner?

1410

1   A.   No.

2   Q.   In the last five years or so, have you signed

3        a petition on any public issue?

4   A.   No.

5   Q.   Do you belong to or associate with any group,

6        which has crime prevention, or law

7        enforcement as a goal?

8   A.   No.

9   Q.   Mr. Becker talked to you briefly about

10       sympathy.  The Judge will instruct you,

11       sympathy should have no part in your

12       deliberations, your analysis of the

13       evidence.  This is a Court of law, not a

14       Court of sympathy, right?

15  A.   Correct.

16  Q.   And you shouldn't let feelings of sympathy

17       affect Donna Roberts.  Do you agree with

18       that?

19  A.   Yes.

20  Q.   The flip side, it is only natural to feel

21       sympathy for somebody that has suddenly

22       and unexpectedly lost his life.  Sympathy

1411

```
 1              for Robert Fingerhut should not affect
 2              your evaluation of the evidence.  Do you
 3              agree with that?
 4    A.   Yes.
 5    Q.   And that may be tougher to do than it sounds,
 6              because you are going to see some
 7              photographs.  A gunshot wound point blank
 8              to the back of the head.  Coroner's
 9              photographs.  All of that will arouse an
10              emotional response from you.  And
11              whatever that emotional response is,
12              sympathy or anger, still your job
13              responsibility to test that evidence, to
14              see if it ties her to this offense.  And
15              are you willing to do that?
16    A.   Yes.
17    Q.   We talked briefly about the presumption of
18              innocence, in legal terms.  You got two
19              kids, 17 and 14?
20    A.   Yes.
21    Q.   If you got a call one day that your kids had
22              done something wrong, and you listened to
```

1412

```
 1              it and said, "Not my kids, that is just

 2              too far out of the character."  Now, if

 3              you were me, usually, you would go okay,

 4              yes, they did it, but you get a call.  It

 5              is out of character.  You believe in your

 6              heart that they didn't do it.  Are you

 7              with me?

 8    A.   Okay.

 9    Q.   Would you be willing to change your mind

10              without somebody giving you some

11              evidence?

12    A.   I already have.  I have been called by school

13              principals and I have had to go to

14              school.

15    Q.   And what happened?

16    A.   And my son said, "Well, I didn't do that."

17              And the principal says -- I sided with

18              the principal.

19    Q.   But before you sided with the principal -- by

20              the way, I have also done that, more

21              times than I would like to recollect.

22              But before I sided with the principal, I
```

1413

```
 1              required that he present to me sufficient
 2              information to lead me to conclude that
 3              he was in fact correct; did you do that?
 4   A.   Let's see.
 5   Q.   If not, I'll have to switch from kids to
 6              something else here.
 7   A.   I know my kids.  I have raised my kids.  I
 8              know what my kids will do and won't do.
 9   Q.   Let's make this Notre Dame shift from kids to
10              anyone else.  A close friend or family
11              member is accused of some wrongdoing.
12   A.   They would have to prove it.
13   Q.   And they would have to present evidence with
14              you to remove your heartfelt belief?
15              Does that sound like the presumption of
16              innocence to you?
17   A.   Yes.
18   Q.   Will you presume Donna innocent throughout
19              this proceeding?
20   A.   Yes.
21   Q.   And if you presumed a friend or a family
22              member innocent, would you willy nilly
```

1414

1    accept that evidence at face value or you

2    think you will might look at it with a

3    critical or jaundiced eye?

4  A.  The evidence?

5  Q.  Yes.

6  A.  I'm trying to understand the question.  You

7    mean would I fluff it off or just accept

8    it because they said it?

9  Q.  Look at it.

10  A.  Look at it.  Study it.

11  Q.  Would you do that in this case?

12  A.  Yes.

13  Q.  And by the way, whenever one of my many

14    questions doesn't make sense to you, I

15    understand that that is my fault, not

16    yours.  What it means is that in my usual

17    customary fashion, I have once again

18    failed to make myself clear.  I try to do

19    my best, but I get tongue tied.  Excuse

20    me.  You understand that they got the

21    only burden of proof in this case?

22  A.  Yes.

1415

1  Q.   And you understand that Donna is on trial for
2       murder, not for being a woman of loose
3       moral character?
4  A.   Yes.
5  Q.   There are essential elements, there's two
6       murder charges.  Purpose is an element of
7       both of those murder charges requiring
8       the State to prove that essential
9       element.  You are going to require them
10      to prove it, aren't you?
11 A.   Yes.
12 Q.   Purpose is the same as intent.  A person acts
13      purposely if its specific intention is to
14      cause a specific result.  Will you look
15      at all of the facts and circumstances to
16      determine intent?
17 A.   Yes.
18 Q.   You understand that the Defendant doesn't have
19      to testify or present any evidence?
20 A.   Yes.
21 Q.   Do you have any problem with that rule?
22 A.   No.

1416

1  Q.    How would you feel if she elected not to

2        testify?

3  A.    It is her choice.

4  Q.    How would you feel if she elected not to

5        present any evidence?

6  A.    She doesn't have to.

7  Q.    Now let me play lawyer and speak out of both

8        sides of my mouth.  If she does testify,

9        she's a witness just like any other

10       witness, you should use the same rules or

11       standards to evaluate her testimony that

12       you used to evaluate the testimony of

13       other witnesses.

14 A.    Correct.

15 Q.    But let's be fair about this.  She's the

16       Defendant.  She's got an interest or

17       stake in the outcome of this case,

18       doesn't she?

19 A.    Yes.

20 Q.    And that is something you would want to keep

21       in mind in determining whether you

22       believe her?

1417

1   A.   Correct.

2   Q.   If we're going to be uniform about this, if

3            you then determine that anyone else has

4            an interest or a stake in this case, you

5            would also apply that to them?

6   A.   Yes.

7   Q.   And the Judge will give a whole list of other

8            factors.  He's also going to tell you

9            that you should use these tests of

10           truthfulness which you use in your every

11           day life.  And now we can use your kids.

12           You frequently got to determine whether

13           those kids of yours or someone else's is

14           trying to be straight up with you or

15           hoodwink you, right?

16  A.   Right.

17  Q.   And over the years, you have developed a sixth

18           sense, intuitive method of doing so?

19  A.   Yes.

20  Q.   The Judge will tell you not to leave that

21           sixth sense at the Courtroom door, bring

22           it in here and apply it to each and every

1418

1    witness that testifies.  Will you do

2    that?

3   A.   Yes.

4   Q.   Truth beyond a reasonable doubt requires that

5        you be firmly convinced of the

6        allegations and its proof of such

7        character that you would be willing to

8        rely and act upon it in the most

9        important of your own affairs.  You

10       understand that?

11  A.   Right.

12  Q.   Do you know that was the highest burden of

13       proof known in the Court of law?

14  A.   Reasonable?

15  Q.   Beyond a reasonable doubt, proof beyond a

16       reasonable doubt.  That is the highest

17       burden in any Court in this country.

18  A.   Okay.

19  Q.   Did you know that?

20  A.   I wasn't aware of it in those terms, no.

21  Q.   I think Mr. Becker was talking to you about

22       containers and filling them up.  And the

1419

1    entire container would be proof beyond

2    all doubt?

3 A.    Right.

4 Q.    And what did he tell you that somewhere near

5        the top there is proof beyond a

6        reasonable doubt?

7 A.    Right, not barely half way full, that is not

8        reasonable doubt.  Close to the top.

9 Q.    And how close to the top?  Only you can

10       answer.  You understand that?

11 A.   Right.

12 Q.   This juror that sits in this box may have one

13       line.  Someone else will have another

14       line.  Individual decisions that you have

15       to make.  You make important decisions

16       all the time.  Not all the time, but you

17       have made important decisions in your

18       life.  Sometimes in your mind's eye or

19       even on a piece of paper you write down

20       the pros, the good things about the

21       decision on one side of a piece of paper,

22       the negatives on the other side?

1420

1    A.    Yes.

2    Q.    And if you are anything like me, what you try

3          to do is you then try to strike the

4          negatives because if you can scratch all

5          of those off and you are only left with

6          the favorable factors, you are making the

7          right decision?

8    A.    Right.

9    Q.    And if you go through that process and you

10         strike all of these negatives, save and

11         except one, and no matter how much you

12         think about it and no matter how much you

13         investigate it, that one negative remains

14         reasonable in your mind.  You cannot say

15         beyond a reasonable doubt that that

16         decision is the right thing for you?

17   A.    I guess so, if I'm trying to understand what

18         you are saying.

19   Q.    Am I not making myself clear again?

20   A.    You are weighing one item against a stack of

21         others.

22   Q.    I am, but that one negative remains a

1421

1          reasonable negative?

2   A.   Right.

3   Q.   And for the sake of our discussion, whether

4          you make this decision or not, depends

5          upon whether you convince yourself beyond

6          a reasonable doubt that that decision is

7          right for you?

8   A.   Right.

9   Q.   If you are left with one reasonable negative,

10         you can't say to yourself beyond a

11         reasonable doubt that that decision was

12         the right thing for you?

13  A.   Right.

14  Q.   You may be able to say it was the right thing

15         for you, by another standard, but not by

16         proof beyond a reasonable doubt.  You

17         understand that?

18  A.   Yes.

19  Q.   Will you hold the State to its burden of proof

20         beyond a reasonable doubt?

21  A.   Yes.

22  Q.   And Mr. Becker talked to you about

1422

1    circumstantial evidence, didn't he?

2    A.   Yes.

3    Q.   I think about a rain storm.  Instead of

4         raining, it snows.  You get up on a

5         Sunday morning, you got your coffee, and

6         if you are me, you got a cigarette and a

7         cup of coffee and you want your

8         newspaper.  You are upstairs, look

9         outside, there's foot tracks, footprints

10        from your neighbor's to your door, across

11        the other neighbors.  You conclude that

12        your newspaper is down there and that was

13        the paperboy.  It seems like a reasonable

14        inference, doesn't it?

15   A.   Right.

16   Q.   Until you go down and open the door, there's

17        your Giant Eagle coupons, or some bag of

18        coupons from someplace.  Whenever you are

19        asked to make an inference, you have to

20        look for other equal inferences.  Do you

21        see that?

22   A.   Right.

1423

1   Q.   Will you do that in this case?

2   A.   Yes.

3   Q.   Will you make sure that every inference you

4        are asked to make is reasonable?

5   A.   Yes.

6   Q.   And in the long time that I have belabored up

7        here, has there been anything that has

8        popped into your mind that you would like

9        to discuss?

10  A.   No.

11            MR. INGRAM:  Thank you very much for

12  your time and attention.

13  (SIDE BAR DISCUSSION, OFF THE RECORD AND

14  OUT OF HEARING)

15            THE COURT:  Mr. Seelbach, you are

16  going to be in the pool from which this Jury is

17  chosen.  You should call that number given to you

18  after 4:30 on Friday.  After we get 34 members into

19  the pool, then we'll have you all come in together

20  and we'll pick the Jury on this matter from then,

21  from that group of people.

22            I would again remind you not to discuss

1424

1  anything about the case, not to read anything in

2  the newspaper or watch anything that might occur on

3  T.V.  Thank you for your participation.

4          For the record, both Defense and

5  Prosecution have passed for cause on this last

6  prospective juror, is that correct?

7               MR. INGRAM:  Correct.

8               MR. BECKER:  Correct.

9  (Juror No. 54 was excused from the Courtroom.)

10              THE COURT:  I would suggest, rather

11  than us starting, that we break early and come back

12  early.  Be back at 12:45.

13  (Court in recess at 11:35 a.m.)

14  (Resumed in Open Court at 1:10 p.m.)

15  Juror No. 55, Diane Parke, entered the Courtroom.)

16              THE COURT:  You read the handout.

17              MS. PARKE:  Yes.

18              THE COURT:  You will be asked

19  questions this afternoon concerning two different

20  areas.  One is whether or not you have read about

21  this case prior to today and you will not be

22  unusual if that is the case.  Many of the people

1425

1    who read something about the matter, a case of this

2    nature always generates a lot of interest in the

3    media.   The question is whether or not you will be

4    able to set aside anything that you have heard and

5    not allow that to interfere with the evidence.

6           Each juror will have to decide this

7    matter on the evidence presented in this Courtroom,

8    and the law that is given to the Jury for

9    instructions.

10          The second area of inquiry will be

11   regarding the question of the death penalty itself.

12   That question may never come up in this case.   If

13   the Jury, after listening to the evidence find that

14   the State has failed to prove beyond a reasonable

15   doubt each and every element of the various things

16   contained in the indictment, then they may well

17   return a verdict of not guilty.   And that would be

18   the end of the trial.

19          If, however, the State should carry the

20   burden of proof, then if they return a verdict of

21   guilty, this case would go into a second phase, and

22   at that time, the Jury would be called upon to

1426

1   listen to further evidence presented by the

2   Prosecution, and that is what we refer to as the

3   aggravating circumstances.  That merely means the

4   State would give you reasons why the Prosecution

5   feels that this Jury should consider and impose the

6   death penalty.

7          Now the Defense, at that same second

8   phase has an opportunity to present mitigating

9   factors.  And those are reasons why, reasons that

10  the Jury should consider in favor of not imposing

11  the death penalty.  The burden is always on the

12  Prosecution to prove their case beyond a reasonable

13  doubt.  Even if the Prosecution presented no

14  evidence, the State still has to present evidence

15  to show you the reason why that should be

16  considered.

17         Now the Jury has at that point, to weigh

18  those two factors, the aggravating circumstances

19  against the mitigating factors.  And if they would

20  reject the death penalty, they have three other

21  possible recommendations that can be made.  One,

22  being life without chance of parole or life without

1427

1  chance of parole before 25 years or 30 years.  Some

2  of the prospective jurors are of the mind that they

3  could never find themselves in a position, can't

4  visualize themselves in a position where they would

5  have to make a decision of deciding whether or not

6  to impose the death penalty.  That is fine.  There

7  are others who feel very strongly that a person who

8  takes a life should forfeit their life, and that is

9  fine also.

10         But neither one of those people on the

11  extreme positions, could serve on a Jury because

12  they have to be unfair with one side or the other.

13  So what these folks are looking for are jurors who

14  are going to have their own opinion on the death

15  penalty.  That is only natural.

16         But each person of the 12 has to be of

17  such a mind that they can set aside and not allow

18  their personal belief to interfere with doing the

19  job that each of these jurors are going to have to

20  do, and that is to follow the law.

21         Now in Ohio, a person who commits murder,

22  does not automatically get the death penalty.  But

1428

1    a person who commits murder with certain

2    aggravating circumstances, under our law, then the

3    Jury has to consider the possibility of imposing

4    death, if the State proves each of those elements

5    leading to that particular conclusion.

6    EXAMINATION BY MR. BAILEY OF MS. PARKE:

7    Q.    Good afternoon, Miss Parke.  My name is Ken

8          Bailey, I'm an Assistant Prosecutor with

9          the Trumbull County Prosecutor's Office,

10         and as I promised last week, my

11         co-counsel, Chris Becker is here with us

12         today.  And the two of us are going to be

13         representing the people of the State of

14         Ohio and Trumbull County in prosecuting

15         this particular case.

16             Now, this is the one chance that we

17         get during the course of the proceedings

18         to talk to you face to face, and if you

19         have any questions that arise during this

20         time, feel free to ask as long as it

21         pertains to the proceedings.  We'll see

22         if we can get an answer for you.

1429

1    This question and answer process,
2    Jury selection, we ask you questions as I
3    said, about your prior experiences, your
4    background and the opinions you hold.  We
5    do not because we're snoopy and prying
6    into people's background, but rather we
7    want to make sure that the folks that sit
8    on this Jury can be fair to both sides,
9    both the Defendant and the people of the
10   State of Ohio.  That is why we ask these
11   particular questions.
12       It may well be that some folks have
13   something, some opinion they hold or
14   something in their background that
15   affects their ability to sit on one
16   particular type of case.  They would be
17   fine jurors in all of the other cases,
18   but in one particular case, as we go
19   through the questioning, something might
20   crop up.  Probably won't, but you never
21   can tell.
22       Now, there aren't any right answers,

1430

```
 1        there aren't any wrong answers to these
 2        questions.  Only open, candid answers,
 3        and another thing I want to bring out is
 4        that because of the nature of our rules
 5        of conduct, we're not allowed to have any
 6        contact with you after we're done talking
 7        to you here today until this case is all
 8        over, and it may be two different phases
 9        in this trial, assuming we get to a
10        second phase.  We can't talk to you in
11        between the phases, either.  So, if we
12        run into each other outside in the
13        hallway on the stairway, elevator, at a
14        restaurant or something, and we don't
15        talk to you, that is not that we're
16        trying to snub you and be antisocial, it
17        is that we're not allowed to have any
18        communication with you or it could result
19        in a mistrial.  We want you to know that.
20        If you have questions that come up, you
21        can ask them to the bailiff who will be
22        here a little bit later, or our Court
```

1431

1         Reporter, Mary Ann, or you can ask the

2         Judge.  But the attorneys, we're just not

3         allowed to have any contact with you.

4             I take it you had a chance to read

5         through that handout that was prepared

6         for the jurors downstairs, right?

7 A.    Yes, Sir.

8 Q.    And did you understand all of that or was it

9         clear as mud?

10 A.    I wouldn't say it was clear as mud, but it was

11          pretty understandable.

12 Q.    You haven't served on a Jury before, so this

13         is kind of a new experience for you.

14         Now, the Defendant here is charged with a

15         number of crimes.  The charges are two

16         counts of aggravated murder.  There's

17         only one dead body, but there are two

18         different theories of the killing, and

19         the State is allowed to pursue two

20         different theories, and we have elected

21         to do that.

22             So, we're proceeding on two separate

1432

```
 1              theories; one of these is aggravated

 2              murder with prior calculation and design,

 3              and the other is what we call aggravated

 4              murder, felony murder, that the

 5              purposeful killing occurred in the course

 6              of another specific felony.  In this

 7              case, an aggravated burglary and/or

 8              aggravated robbery.  Attached to these

 9              charges of aggravated murder are what we

10              call specifications of aggravating

11              circumstances.  This word that we use

12              "specification" is just a fancy term that

13              means a special finding of fact for a

14              Jury to consider.  An extra fact for you

15              to look at.  And those specifications

16              deal with -- first, there's an

17              aggravating circumstance of aggravated

18              burglary.  That the aggravated murder was

19              committed during the course of an

20              aggravated burglary and the Defendant

21              committed the aggravated murder with

22              prior calculation and design.  And the
```

1433

1    second specification that is attached to

2    the two counts of aggravated murder, is

3    that the aggravated murder was committed

4    during the course of an aggravated

5    robbery, and the Defendant committed the

6    aggravated murder with prior calculation

7    and design.  So, we have two counts of

8    aggravated murder with the

9    specifications, and there are two

10   additional counts with which she's

11   charged.  Those charges are aggravated

12   burglary and aggravated robbery.  And

13   attached to those are firearms

14   specifications, or special finding of

15   fact, that a working gun was used.  And

16   you hear the term aggravated burglary and

17   aggravated robbery.  Sometimes folks get

18   confused by those terms, and they use

19   them interchangeably sometimes in every

20   day life.  But in the law, the Judge is

21   going to define those terms for you.

22   They have a specific legal meaning.  But

1434

1    basically the difference is, an

2    aggravated burglary usually involves

3    trespass into an occupied structure, like

4    a house, somebody's home.  And somebody

5    goes in with the purpose to commit some

6    type of offense.  It could be an

7    aggravated murder.  It could be a theft.

8    And the person could be armed with a

9    weapon, and somebody could be seriously

10   hurt.  And in an aggravated robbery, as

11   opposed to the aggravated burglary, you

12   don't have to go into a structure.  It is

13   just taking property, usually by force or

14   by threat, and the perpetrator can be

15   armed with a weapon and can hurt the

16   victim in that particular case.  So,

17   there's the two charges of aggravated

18   burglary and aggravated robbery.

19        Now, each of these crimes is

20   composed of certain elements, or

21   essential component parts of a crime.  I

22   take it, you have probably baked over the

1435

1    years, right?

2  A.  Yes.

3  Q.  I would imagine.  And probably for your

4       children, right?

5  A.  Right.

6  Q.  Ever bake cakes?

7  A.  Yes.

8  Q.  What is your favorite?

9  A.  Harvey Wall Banger cake.  It burns out the

10      alcohol.

11 Q.  It has bananas in it?

12 A.  No.  Orange juice, eggs, vodka, wine.

13 Q.  I kind of like chocolate cake.

14 A.  I like chocolate cake, too.

15 Q.  That recipe has certain key ingredients that

16      you put in that you just mentioned, along

17      with the sugar and the eggs and milk or

18      whatever, and baking powder, baking soda,

19      one of the two.  I get those confused.

20      And you need those key ingredients.  If

21      you were to bake that and you left out

22      the orange juice, you would have a cake,

1436

```
 1              but it wouldn't be the Harvey Wall
 2              Banger, would it?
 3   A.   No.
 4   Q.   It would be a different cake.  I don't know
 5              what it would taste like, but it would be
 6              a different cake.  The same thing with
 7              crime.  Each of these crimes have certain
 8              key ingredients and we have got to mix
 9              the right ingredients up and put them all
10              in there, so that you are convinced of
11              the truth of the charge, of each of these
12              elements of the crime by proof beyond a
13              reasonable doubt.  And if we do, then we
14              bake that cake and we have got to bake
15              four different cakes here and we have got
16              to bake these specifications.
17                   Now, if we don't meet our burden of
18              proof, and the burden of proof is always
19              on us, the people of the State, to prove
20              these particular elements.  Then, if we
21              don't do that, then of course, you would
22              have to find the Defendant not guilty of
```

1437

1    that particular crime.  And if we were to

2    convince you by -- when the Judge will

3    instruct you as proof beyond a reasonable

4    doubt, then you would be able to return a

5    conviction on that particular charge,

6    right?

7         Now, let me give a for instance of

8    what these elements are.  The Judge is

9    going to instruct you as to the elements

10   at the end of this case and you are bound

11   to follow his instructions, but this is

12   just a for instance.  Let's take the

13   crime of aggravated murder with prior

14   calculation and design.  Let's say the

15   first element would be that it happened

16   on or about a certain date, like December

17   11, 2001.  The second element would be

18   that it happened in Trumbull County,

19   Ohio, and we need to prove that, so that

20   we can try the case in this Courthouse

21   rather than down in Cuyahoga County.

22        The third element is identification,

1438

1    that the person who committed these

2    crimes is the person who is sitting here

3    at that table, somebody is going to have

4    to point her out.  Otherwise, we would be

5    missing that element.  The fourth element

6    would be that she acted purposely,

7    basically on purpose.  But the Judge will

8    give a detailed definition.  The fifth

9    element is that she caused the death of a

10   living person by the name of Robert

11   Fingerhut.  And the sixth element would

12   be that she acted with prior calculation

13   and design.  We would have to prove all

14   of those particular elements.  Now, the

15   Defendant, the charges here are not that

16   she's the trigger person.  The charge

17   here, the trigger person is a fellow by

18   the name of Nate Jackson.  And the

19   Defendant is charged as a complicitor,

20   somebody who solicits or procures another

21   person, or aids and abets another person

22   in committing the crime.  In other words,

1439

1    plans with them, strengthens them,

2    encourages them, helps them in some way

3    to commit these particular crimes.  You

4    understand that?  Does that bother you,

5    that she's charged not as the trigger

6    person, but rather as the complicitor or

7    aider and abettor?

8    A.    No.

9    Q.    Now, let me get to this, some other issues

10         first.  The issue of pre-trial publicity

11         comes up.  And you indicated I believe,

12         you will watch the Cleveland news

13         channels.  You don't keep up on the local

14         news?

15   A.    No.

16   Q.    So this case, there's nothing about this case

17         that rings a bell?

18   A.    No.

19   Q.    The charge here, this complicity charge is

20         basically that she planned with this

21         fellow, Nate Jackson, to kill her

22         ex-husband, Robert Fingerhut, to get

1440

1   insurance money and to steal the car.

2   And the killing and the stealing of the

3   car and the trespassing of the house were

4   actually done by this Nate Jackson.  That

5   is what the gist of the charge is.

6        Now, as you -- you haven't heard

7   anything about this case that you

8   recollect?  It may well be as we go

9   through the course of the trial, you may

10  think back and say, "You know, I did see

11  a headline or something like that or

12  heard something on the news in the past."

13  But we're going to ask you to set that

14  aside and make your determination based

15  on what happens only in this Courtroom.

16  And there's reason for it.

17       As we look around the Courtroom,

18  there's nobody here from the news media.

19  There may well be as the trial starts,

20  we'll see some of the reporters from the

21  newspapers or some of the T.V. people

22  come in, and they are not allowed to

1441

1    photograph the jurors.  If they ever

2    photograph jurors, they photograph feet

3    or shoes.  But generally, they are here

4    for a couple of minutes, two or three

5    minutes, maybe five minutes, and then

6    they are back out.  And they try to do a

7    feature on the trial based on their two

8    or three minutes.  Now you know that if

9    they are only here for a couple of

10    minutes, they are going to miss all of

11    the questions and answers that were asked

12    and given before they got in, and after

13    they left the Courtroom.  So whatever is

14    in the paper may be totally distorted.

15    It may distort what happened that

16    particular day, because of the impression

17    they get just from picking up a little

18    bit of something out of the context.  It

19    is the nature of their business to rush

20    into print.  It wouldn't be fair to make

21    a decision based on what is in the news.

22    That is why the Judge tells the jurors

1442

1    that you can't read the papers or watch

2    T.V. about this case during the course of

3    the trial.  You can have somebody save

4    the papers for you and read it afterward,

5    which might be an interesting experience,

6    because you will probably say, "I sat in

7    the Judge's Courtroom during the course

8    of the trial, and I remember the

9    testimony and the evidence, what

10   happened, and reading these papers, it is

11   like they were sitting in Judge McKay's

12   Court on another trial."  That could well

13   happen.

14        Now, there's another issue that

15   we're going to talk about here.  I

16   mention the burden of proof and the

17   elements of the crimes and the

18   specification is on the State, and that

19   burden never changes, it is always on us.

20   The Defendant doesn't have any burden of

21   proof.  The Defense can sit there during

22   the course of the trial, they can sit on

1443

1    their hands.  They won't do that,

2    probably, but they don't have to do

3    anything.  The burden is entirely on us.

4        The Judge explained that this case

5    will be tried in two different parts.  It

6    is like two separate trials.  The first

7    parts deals with the issue of guilt or

8    non-guilt.  Can we prove what these

9    crimes that the Defendant is charged

10   with, by proof beyond a reasonable doubt?

11   If we do, and you and the other jurors

12   return a verdict finding the Defendant

13   guilty of the crime called aggravated

14   murder, and one or more of these

15   specifications, then we would move on to

16   the second phase, because that would make

17   the Defendant eligible for the death

18   penalty as a possible punishment.

19       If we don't prove one of these

20   specifications, at least one of these

21   specifications and the crime of

22   aggravated murder, then we don't go on to

1444

```
 1            a second phase.  It would be the end of

 2            it, basically.  But if we do, you

 3            understand that the death penalty is not

 4            an automatic punishment for somebody

 5            convicted of aggravated murder with

 6            specifications?

 7   A.   Yes.

 8   Q.   And the reason for that is that in the first

 9            phase, because we're putting on evidence

10            that goes to prove elements of the crime,

11            the issue is guilt or non-guilt of a

12            Defendant.  And we wouldn't have any

13            evidence as to what would be the

14            appropriate punishment for a person

15            convicted of that crime.  You wouldn't

16            have heard anything that would work to

17            the favor of the Defendant, so it

18            wouldn't be fair to automatically impose

19            the death penalty sentence.  Right?

20   A.   Right.

21   Q.   Now, in the second phase, the issue is

22            different, the issue is what is the
```

1445

1     appropriate punishment.  And you may hear

2     some of the same evidence over again.

3     You may hear new evidence and you would

4     have to do a balancing test.  On one

5     hand, you would have the aggravating

6     circumstance or circumstances, and on the

7     other hand you have what would be called

8     mitigating factors that could be produced

9     on behalf of the Defendant.  And I can't

10    give a for instance of that right now,

11    because I don't know what would really

12    apply.  But the Defense would have an

13    opportunity to present these things, and

14    it may well be that there would be a lot

15    of mitigating factors, we don't know, but

16    you would have to consider those.

17         Now, the issue of how much weight

18    you want to give to these things, the

19    aggravating circumstance or

20    circumstances, and how much weight to

21    give to these mitigating factors, that is

22    entirely up to you and the other jurors.

1446

```
 1            You might decide that they have a whole
 2            lot of weight, or you may decide they are
 3            have as much weight as a feather.  That
 4            is entirely up to you.
 5                 Now, if you and the other jurors
 6            find that the aggravating circumstance or
 7            circumstances outweigh these mitigating
 8            factors beyond a reasonable doubt, then
 9            you must return a verdict as to the death
10            penalty.  You understand that?
11  A.   Yes.
12  Q.   It is not automatic, but if you do that
13            balancing test and find that we proved
14            beyond a reasonable doubt that the
15            aggravating circumstance outweighs the
16            mitigating factors, then you must
17            recommend the death penalty.
18  A.   Okay.
19  Q.   If we fail to live up to that burden of proof,
20            if we don't convince you beyond a
21            reasonable doubt that the aggravating
22            circumstance or circumstances outweigh
```

1447

```
 1            the mitigating factors, then you must go

 2            on to consider the three other life

 3            punishments.  The life without parole

 4            eligibility, life with parole eligibility

 5            after 30 full years, and life with parole

 6            eligibility after 25 full years.  And

 7            then it is up to you and the other jurors

 8            to decide which is appropriate.  You

 9            wouldn't have any problem with that?

10  A.   No.

11  Q.   Now, you indicated you believe in the death

12            penalty for murder and other heinous

13            crimes, right?

14  A.   Right.

15  Q.   And how long have you held this belief?

16  A.   Ten, 15 years.

17  Q.   And before that, did you believe in the death

18            penalty as a punishment?

19  A.   I didn't think about it when I was younger,

20            really young.

21  Q.   Was there something ten or 15 years ago that

22            occurred where you thought, "Gosh, we
```

1448

1    really should have a death penalty"?

2  A.  These people that commit vicious, unspeakable

3       crimes, that is the way I feel.

4  Q.  And that belief in favor of the death penalty,

5       has it stayed the same or gotten stronger

6       or weaker over the last 15 years?

7  A.  I would say about the same on that issue.

8  Q.  Now, you understand that and I notice you felt

9       that repeat offenders are a problem in

10      the criminal justice system today?

11 A.  Yes, I do.

12 Q.  Why is that?

13 A.  Because you do read about people that get out

14      and commit crimes again of the same type

15      after a period of years.

16 Q.  Now, because you favor the death penalty for

17      certain bad crimes, vicious crimes, you

18      wouldn't automatically come back with a

19      death penalty verdict in this case,

20      right?

21 A.  No.

22 Q.  If you found her guilty?

                                                                      1449

1   A.    Not necessarily, no.

2   Q.    I mean you would have to hear things that are

3               in her favor before you would be in a

4               position to be able to make a decision as

5               to what the right punishment is?

6   A.    Right.

7                    MR. INGRAM:  Objection.

8                    THE COURT:  What do you object to?

9                    MR. INGRAM:  The statement that the

10  juror would have to hear things about the

11  Defendant's life.  She would be required to --

12                   MR. BAILEY:  Let me rephrase that.

13  I'll withdraw that question.

14                   THE COURT:  Rephrase it.

15  Q.    Before you would agree that -- before you

16              could make a decision as to what the

17              appropriate penalty is, you would have to

18              determine whether -- you would have to

19              determine whether the State met its

20              burden of proving that the aggravating

21              circumstance or circumstances outweigh

22              any mitigating factors?

```
                                                         1450

 1   A.    Yes.

 2   Q.    And --

 3                   THE COURT:  It is a point that is a

 4   very important point.  The Defense does not have to

 5   do anything throughout the trial if they don't wish

 6   to.   That is the point.  The burden is always on

 7   the State to prove all evidence on each point.  In

 8   that second phase, if we got to that point, the

 9   Defense would have the opportunity to present

10   evidence, but the burden, if they don't do

11   anything, the burden is still on the State to prove

12   the aggravating circumstances outweigh any

13   mitigating factors.

14                   MS. PARKE:  I understand.

15   Q.    (By Mr. Bailey)  We talk about this standard

16              of proof beyond a reasonable doubt.  The

17              Judge is going to define that term for

18              you at the end of the case.  Basically,

19              when we talk about reasonable doubt,

20              we're talking about using your reason and

21              your common sense and you have done that

22              raising a family and you have done that
```

1451

```
 1              in your every day life, you use reason

 2              and common sense?

 3   A.   Yes.

 4   Q.   And so it is not a strange test for you.  You

 5              have got to be firmly convinced of the

 6              truth of the charge, to what we call a

 7              moral certainty, using your reason and

 8              your common sense.  And it is sort of

 9              like having a box, and you have to fill

10              it up.  We have to fill it up with enough

11              things that it would be certainly be more

12              than halfway, it would be pretty close to

13              the top, but you understand it doesn't

14              have to be all the way to the top of this

15              box.  We would have to put enough

16              evidence in there to convince you of the

17              truth of the charge.

18   A.   Right.

19   Q.   And sometimes people watch T.V., they read

20              books and watch movies and they use

21              Hollywood terms like proof beyond all

22              doubt or beyond a shadow of a doubt.
```

1452

1    There's an Alfred Hitchcock movie called

2    "Shadow of a Doubt," but in real life,

3    there's no such animal in the criminal

4    justice system as proof beyond a

5    reasonable doubt.  Would you be able to

6    follow the Judge's instructions on that?

7  A.  Yes.

8  Q.  You wouldn't make us fill that box up all the

9    way to the top, it is not 100 percent

10   proof.  So that you are firmly convinced

11   of the truth of the charge using your

12   reason and your common sense?

13  A.  Yes.

14  Q.  There are different types of evidence that we

15   can use to prove our case.  Sometimes we

16   can use what is called direct evidence

17   where a witness learns something through

18   the use of his or her five senses, and

19   can testify to something like, "Well, I

20   heard the gunshot and it was loud.  I

21   smelled the smoke and it was acrid.  I

22   touched the body and it was cold."  That

1453

1    is direct evidence.

2        But there's another type of evidence

3    that we can use.  It is just as good as

4    direct evidence.  And it is sort of round

5    about evidence where you are given a fact

6    or a set of facts, and you are asked to

7    draw a logical conclusion to another fact

8    or set of facts.  We call that

9    circumstantial evidence.  For example,

10   let's say you go to bed at night, you

11   live in a two story house.  You look out

12   across your neighborhood that night and

13   it is a beautiful night out.  The moon is

14   beaming, the stars are twinkling, not a

15   cloud in the sky.  And you draw the

16   blinds, you get into bed, you have the

17   radio on and you hear the weather

18   forecaster say, "There's a cold front

19   coming in, we're going to get a storm

20   overnight."  And you turn off the radio

21   and you go to sleep.  Sometime in the

22   middle of the night, you are suddenly

1454

1   awakened.  You look toward the window,

2   but the blinds are drawn, but you can see

3   a flash of light coming from outside and

4   suddenly there's a distant booming sound.

5   And then a few seconds later, there's

6   another flash of light outside and you

7   hear another closer in time, booming

8   sound, and then there's a really bright

9   flash of light outside and a great big

10  ripping boom above the house and pitter

11  patter on the roof and heavy drumming

12  sounds.  You fall back asleep and

13  sometime later, you wake up.  You open

14  the blinds, you look out and it is a

15  beautiful day, not a cloud in the sky.

16  The sun is shining and the birds are

17  singing, but the streets are running with

18  water, the rooftops are wet across the

19  way.  Drops of water are dripping down

20  the leaves of the trees and it is flooded

21  outside and there's no fire hydrant

22  nearby where any car could hit it and

1455

1           knock water all over the house.  As far

2           as you can see, it is wet outside.  You

3           know what happened during the night,

4           don't you?

5  A.  It stormed.

6  Q.  Thunder storm.  You know that beyond any

7           reasonable doubt, right?  You didn't see

8           it from your own identification but based

9           upon all of the other facts and

10          circumstances that were presented, you

11          were able to make that determination and

12          you did that beyond a reasonable doubt,

13          right?

14 A.  Right.

15 Q.  Now there's room in there for some possible or

16          hypothetical or imaginary doubt.  You can

17          imagine that E.T. flew by in his flying

18          saucer and sprinkled some stuff and put

19          on a light show, but that would be a

20          foolish or imaginary doubt, wouldn't it?

21 A.  Yes.

22 Q.  Now, there's a reason for us using

1456

```
 1          circumstantial evidence.  The law allows
 2          it.  Because sometimes when you are
 3          dealing with criminal law, you are
 4          dealing with serious crimes, you can
 5          imagine that when people plan serious
 6          crimes, they often times do that in
 7          secret without a whole lot of witnesses
 8          around, right?
 9    A.    Right.
10    Q.    Usually, they don't step outside on the
11          Courthouse steps and say, "Hey,
12          everybody, we're going to pull a bank
13          robbery or kill so and so."  And you can
14          rely on circumstantial evidence, for
15          example, like letters or phone calls if
16          we were to get something like that, that
17          would show what the Defendant was
18          thinking at the time of the crime.  You
19          would be able to consider things like
20          that, right?
21    A.    Right.
22    Q.    And I think you would agree that sometimes
```

1457

1  criminals may not be the brightest people

2  in the world.  Criminals may be silly or

3  sometimes stupid.  For example, you

4  probably are aware of cases over the

5  years where you have read or seen on T.V.

6  or radio, something about the burglar who

7  breaks into a house and leaves his wallet

8  behind, or the armed robber who goes into

9  the bank and hands the teller a stick up

10  note on the back of an envelope and after

11  he leaves, there's his address and name

12  on the envelope.  You are aware of things

13  like that over time?

14  A.   I suppose that could happen.

15  Q.   Now, one of the key concepts in our American

16  system of justice is the presumption of

17  innocence.  And you understand that this

18  Defendant, as she sits there, is presumed

19  to be innocent as are all other

20  Defendants tried in this Courtroom.  And

21  that presumption of innocence acts like a

22  cloak, shielding her all through the

1458

1          course of this trial and that stays with

2          her all the way through the trial, up

3          until the time you go back in that Jury

4          room to deliberate with the other jurors.

5          And then if you decide that we presented

6          enough evidence to convince you beyond a

7          reasonable doubt of the elements of the

8          crimes charged, then that presumption of

9          innocence would be gone.

10  A.    Right.

11  Q.    Now, if the State were to prove to you and the

12          other jurors that the aggravating --

13          let's say we prove her guilty in the

14          first phase to your satisfaction, so that

15          you are firmly convinced that she

16          committed the crime charged by proof

17          beyond a reasonable doubt.  We proved the

18          elements.  And one thing about that,

19          about proving the elements, we're

20          lawyers.  And we're sort of geared toward

21          asking questions that prove elements.

22              Jurors being laymen, aren't geared

1459

```
 1              toward elements so much.  You may have
 2              other questions that may arise, but you
 3              are sort of stuck with the questions that
 4              the lawyers ask.  It may well be that you
 5              have some special interest.  Like my
 6              wife.  My life loves shoes, she has 50
 7              trillion pairs of shoes and if you had an
 8              interest in say footwear, what kind of
 9              shoes people were wearing at the time.
10              It wouldn't have any bearing on proving
11              the elements of the crime.  That type of
12              question might never get asked.  You
13              understand that?
14    A.    Yes.
15    Q.    And you would never get an answer to it in the
16              course of the trial, and if it had no
17              bearing on the case, you would still be
18              able to return a verdict in the case
19              based on the evidence, without ever
20              getting an answer to some questions like
21              that.  Right?
22    A.    Right.
```

```
                                                          1460

1    Q.    Now, another thing about that is you can't go

2          out to the scene on your own to

3          investigate.  We have had a juror who did

4          that in one case and it caused a

5          mistrial.  You wouldn't want to do that

6          and you can't take notes during the

7          course of the trial.  Sometimes on Court

8          T.V., they have some jurisdictions where

9          the Court may allow the taking of notes.

10         In Ohio, generally the Courts don't allow

11         the taking of notes.  They are concerned

12         that it would take away from your being

13         able to concentrate on the witnesses and

14         the witnesses' demeanor at the time and

15         they want you to pay close attention to

16         what the witness says and how he says it

17         or she says it.  You would be able to do

18         that?

19   A.    Yes.

20   Q.    And you would be able to, I take it, you

21         remember radio programs, maybe when you

22         were a kid, you ever listen to soap
```

1461

```
 1              operas or dramas on radio?

 2   A.   To tell you honestly, no.  I am right -- no, I

 3              never listened to radio programs.

 4   Q.   You are too young?

 5   A.   Yes.

 6   Q.   But it is important that you pay very close

 7              attention to the testimony, because Mary

 8              Ann is a very good Court Reporter, but we

 9              don't have the million dollars worth of

10              equipment to do instant transcripts like

11              they did in O.J. Simpson or some other

12              trials and there aren't going to be any

13              transcripts of the testimony.  Jurors

14              sometimes ask the question, "Can we get

15              the testimony of so and so," and the

16              Judge tells them no, you have got to rely

17              on your collective recollection.  It is

18              important that you and other jurors pay

19              very close attention to the testimony,

20              because there aren't going to be any

21              instant replays like on T.V. or any

22              transcripts.  Can you do that?  Sort of
```

1462

1    like going back to school and remembering
2    things, going back as a nurse?
3  A.    I am looking straight at you and remembering
4    what you are saying to me now.
5  Q.    If we're able to convince you and the other
6    jurors beyond a reasonable doubt that the
7    Defendant is guilty as charged of the
8    crimes of which she's charged, would you
9    be able to sign a verdict finding her
10    guilty in the first phase?
11  A.    Yes.
12  Q.    And let's say we get onto a second phase where
13    the issue is punishment and we convince
14    you and the other jurors beyond a
15    reasonable doubt, that the aggravating
16    circumstance or circumstances outweigh
17    these mitigating factors, would you be
18    able to sign a verdict in favor of the
19    death penalty?  And the reason I ask that
20    is it is not an easy thing that we ask
21    folks to do.  Most trials don't involve
22    the Jury getting involved in any

1463

1  punishment.  But this type of a case

2  does, and it is a very difficult thing

3  that we ask people to do, and it should

4  be difficult.  The death penalty should

5  only be imposed in rare cases, not in

6  every case.

7  The legislature sets down the

8  parameters for these types of cases.  Not

9  all murders have the death penalty as an

10 option, only certain murders, so we ask

11 you to search your mind, search your

12 heart, and to see if you can actually do

13 that, because let's say we go through a

14 couple of weeks of trial, and then we got

15 into a second phase and we go through a

16 day or two or three of the mitigation

17 phase, and we get right down to it and

18 you are in there with the other jurors,

19 and you say, you know, "Gosh, I have gone

20 through this whole trial.  I told them I

21 could be fair and impartial at the

22 beginning, but when it comes right down

1464

```
 1          to it, I'm a nurse by profession and I am

 2          used to saving lives for my whole career

 3          and now they are asking me to return the

 4          death as a punishment and I found the

 5          State has met its burden of proof, they

 6          have proved that is the appropriate

 7          penalty because the aggravating

 8          circumstance outweighs the mitigating

 9          factors.  When it comes right down to it,

10          I just can't do it."  Then the State

11          wouldn't get a fair shake.  That is why

12          we ask that question.

13   A.   Honestly, I don't know whether I could or not.

14          I don't think I could.

15   Q.   You don't think, why is that?

16   A.   It would depend on the crime and the severity

17          of it and the proof of it.

18   Q.   Let's say we convinced you -- let's say we

19          convinced you that she's guilty of the

20          crime.  And then we get into a second

21          phase and you hear, you do this weighing

22          process about the aggravating
```

1465

```
 1              circumstance or circumstances against

 2              whatever mitigating factors there are,

 3              and you determine that we have met our

 4              burden of proof, that the aggravating

 5              circumstance outweighs the mitigating

 6              factors, and that under the law given to

 7              you by Judge Stuard, that you have to

 8              recommend the death penalty, because it

 9              would be the right punishment under those

10              circumstances.  Would you, when it comes

11              down to it, would you be able to sign

12              that form?

13    A.   I don't think so.  I'll honestly say that.  I

14              don't think so when it came right down to

15              it.

16    Q.   Fair enough.  Because you are the only one who

17              really knows.  And it is important that

18              both sides get a fair shake.  If we had

19              somebody up there who said, "I am such a

20              strong believer in the death penalty for

21              the crime of murder, an eye for an eye

22              and tooth for a tooth, when it comes
```

1466

1    right down to it, I couldn't give the

2    Defendant a fair shake.  I couldn't

3    consider the mitigating factors, because

4    I would always come back with an

5    automatic death penalty."  It wouldn't be

6    fair to the Defendant, and it is

7    important to find out before somebody

8    gets seated on the Jury.

9    The same thing is true with the

10   State.  The State is entitled to have

11   jurors who would be able to consider

12   everything.  So, you are the only one

13   that would know that.

14   A.   Right.

15   Q.   You say you don't think you can do it?  It is

16   based on what?

17   A.   It would be specifically the crime, I think.

18   Q.   I mean based -- why don't you think you could

19   do it?  Is it based on religious beliefs

20   or moral or ethical belief or because you

21   are a nurse and it just goes against your

22   grain?

1467

1   A.   Probably religious.

2   Q.   You are Protestant, right?

3   A.   Right.

4   Q.   Is there anything in your religion that

5        prohibits imposing the death penalty?

6   A.   God says that you should not judge other

7        people in their life sentence.  I can't

8        exactly explain, but I'm saying, when it

9        comes right down to it, I probably

10       couldn't do it.

11  Q.   And it is based on religious belief?

12  A.   Yes.

13  Q.   You are entitled to that belief, and if you

14       can't do that in this type of case, fair

15       enough.  Because you are entitled to hold

16       that opinion.  Nobody can force you to

17       sign a death penalty verdict and nobody

18       can force you to sit on this type of

19       case.  It wouldn't be fair to the State.

20       We have had jurors who believe in the

21       death penalty as a punishment, but they

22       told us they can't be the people who

1468

1      actually go and sit on that Jury and make

2      that decision.  You think that this would

3      then substantially --

4              MR. INGRAM:  Excuse me, Mr. Bailey.

5  (OFF THE RECORD)

6              MR. BAILEY:  Thank you very much.

7  EXAMINATION BY MR. INGRAM OF MS. PARKE:

8  Q.    When you told Mr. Bailey you didn't know if

9              you could personally sign a verdict of

10             death if you ever had to?

11  A.    Right.

12  Q.    That was an honest answer?

13  A.    That was an honest answer.

14             MR. INGRAM:  Thank you.  No further

15  questions.

16             THE COURT:  Any objection to the

17  Court dismissing for cause?

18             MR. BAILEY:  No.

19             MR. INGRAM:  No, Your Honor.

20             THE COURT:  Ma'am, you have done

21  everything we have asked you to do.  We thank you,

22  and you are excused from any further participation.

1469

1   (Juror No. 55 excused from the Courtroom.)

2                MR. INGRAM:  Before we bring in the

3   next juror, I do have a request.  I can tell by

4   reading Mr. Omalley's questionnaire that Mr. Bailey

5   will consider Mr. Omalley a fine juror and will do

6   everything that he can to get Mr. Omalley to sit.

7   However, in response to question number 52, which

8   is hardship, Mr. Omalley sets forth a whole litany

9   of reasons that he has to attend to his business.

10  And he says that if he were to serve he would have

11  to start at four or five in the morning and that is

12  just to cover his one job, and that wouldn't cover

13  his second job, which is his own business.

14  Further, if we have to, I would request that in

15  your introductory questions, you ask Mr. Omalley,

16  and I really don't think you are going to have to

17  go there, because I think he wants off for business

18  reasons, but I think you should ask Mr. Omalley if

19  his views on the death penalty would prevent or

20  substantially impair him from considering the life

21  sentencing options if he ever had to.

22                THE COURT:  Ask him that his

```
                                                          1470
 1    views --
 2                    MR. INGRAM:  If his views on the
 3    death penalty would substantially impair his
 4    ability to fairly consider the life sentencing
 5    options.
 6                    MR. BAILEY:  If he's not going to be
 7    able to get any sleep, we would hate to put him in
 8    that position, so I think if he's got a good excuse
 9    there, we wouldn't have any problem excusing him.
10    (OFF THE RECORD)
11    (Juror No. 58, Gary Omalley, entered the Courtroom.)
12                    THE COURT:  Good afternoon, Gary.
13                    MR. OMALLEY:  Good afternoon.
14                    THE COURT:  You read that handout
15    that was given to you?
16                    MR. OMALLEY:  Yes.
17                    THE COURT:  The purpose of having
18    each of you here today is to ask questions along
19    two particular lines.  But before we start on that,
20    everyone has noticed that you look like you are a
21    busy man.  Would you explain to us your work
22    situation, your business situation?  Is that
```

1471

1    something that would make it difficult for you to

2    sit on this case?

3              MR. OMALLEY:   It certainly will.   At

4    least at this point, because we're applying for

5    grants down at the housing authority and naturally

6    that grant money is very important, and there's

7    time dead lines as well as spending dead lines.

8              THE COURT:   You work two different

9    places or have a business and you work someplace

10   else?

11             MR. OMALLEY:   I have a bowling pro

12   shop that is open in the evenings.

13             THE COURT:   We don't wish to have,

14   to place a burden on anyone time wise that it is

15   possible to avoid.  And the underlying reason is, I

16   guess that this is, as you know, a very important

17   thing to both the State and to the Defense, and you

18   have to have somebody that is able to give their

19   full attention to it.  We have had situations in

20   the past, where someone is working afternoon turn

21   or midnight turn and they show up, and it is pretty

22   hard to stay awake, and that is understandable.

1472

1  So, you tell us, we don't know what your capacity

2  is, what your wishes are, if you feel that it would

3  be difficult to give your full attention, because

4  of these other matters, you should tell us about

5  that.

6              MR. OMALLEY:  I really at least at

7  this point, I feel if it was different months of

8  the year where the applications and the other

9  contracts were not finishing up and other ones

10  going out.  There's nobody sitting behind me at

11  work that is going to be able to accomplish these

12  job assignments.  Being that we're dealing with

13  federal dollars out here, I believe it is important

14  to the housing authority that I am there and acting

15  accordingly and keeping with the regulations.

16              THE COURT:  This will affect your

17  personal life at this point, is that what you are

18  saying?

19              MR. OMALLEY:  Yes.

20              MR. BAILEY:  We have no objection to

21  having him excused due to hardship.

22              MR. INGRAM:  No questions.  No

1473

1   objection.

2              THE COURT:   You are excused then

3   from any further participation.   We wish you good

4   luck with your business.

5   (Juror No. 58 excused from the Courtroom.)

6   (Juror No. 59, Thomas Carmichael, entered the

7   Courtroom.)

8              THE COURT:   Good afternoon.   You

9   read the handout that was given to you.

10             MR. CARMICHAEL:   Yes, I did.

11             THE COURT:   The purpose of the

12  questioning today is to delve in two areas to find

13  out what your beliefs or your opinions are.

14  Whatever you believe is fine.   No right or wrong

15  answer.   Whatever your opinions are, everyone here

16  will respect them.

17             First issue will be concerning your

18  exposure, if any, to any pre-trial publicity that

19  may have occurred.   This case, being a murder case,

20  generated a certain amount of publicity, which is

21  not uncommon.   The question that will be asked of

22  you is whether you know anything about the case

1474

1  from reading in the paper, or watching something on

2  T.V., and if so, whether you formed any fixed

3  opinions that you could not set aside.  In order

4  for both sides here to have a fair trial, this

5  matter has to be decided on the evidence present in

6  the Courtroom and the instruction of law given.

7            It would be unfair to one side or the

8  other if the person let something they thought had

9  occurred because they read it in the newspaper

10  override what the evidence shows.  The second issue

11  would concern the question of death penalty itself.

12  You have a wide spectrum of thought on the death

13  penalty.  Some people very much favor it, and some

14  are equally as opposed to it.  A person who thinks

15  that someone who takes another's life should

16  forfeit their life, if they really firmly believe

17  that, then they would be unfair to the Defense.

18  Because the defense has a right to have the Jury

19  determine other matters according to the law.  It

20  is not the law of Ohio that you forfeit your life

21  if you take a life.  Everyone who commits murder in

22  Ohio, does not face the death penalty.  It has to

1475

1     be under certain circumstances. We call -- they

2     are attached to the aggravated murder indictment,

3     we call them the specifications.

4            It is necessary for the State to prove

5     beyond a reasonable doubt, first of all, all of the

6     elements of the aggravated murder. The Jury has to

7     consider those to come to the conclusion of whether

8     the Defendant was guilty or not. If they decide

9     that the State has not proven their case, then that

10    is the end of the trial. If the State does

11    maintain that burden of proof, and this Jury would

12    come back with a finding of guilty, then it would

13    go to a second phase. At that second phase, the

14    burden is still on the State to prove beyond a

15    reasonable doubt that the circumstances outweigh

16    the mitigating factors. Now the Defense need not

17    present any evidence of any kind if they don't care

18    to. They have an opportunity in that second phase

19    to present what are known as mitigating factors.

20    And those are reasons given to the Jury to consider

21    why the death penalty should not be imposed. The

22    State's aggravating circumstances are why the State

1476

1   feels the death penalty should be considered and

2   imposed.  So, if you have somebody on this Jury who

3   could under no circumstances sit on a Jury, where

4   they had to decide that issue, the death penalty,

5   they have a religious or ethical consideration

6   opposed to it, well, that type of person cannot be

7   fair to the State.  Because the State has the

8   right, if they prove their case, to at least have

9   the Jury consider that question according to the

10  law.  And someone on the other side that believes

11  an eye for an eye, they could not be fair to the

12  Defendant.  You understand?

13              MR. CARMICHAEL:  Yes.

14              THE COURT:  That is where these

15  questions will be going.  Do you have any

16  questions?

17              MR. CARMICHAEL:  Not right now.

18  EXAMINATION BY MR. BECKER OF MR. CARMICHAEL:

19  Q.    Mr. Carmichael, my name is Chris Becker.  I'm

20              Assistant Prosecutor at the County

21              Prosecutor's Office, and I think last

22              week you were down the hall in Judge

1477

1    Logan's Courtroom, the very large

2    Courtroom, and I think Mr. Bailey was

3    there, and I was in another trial, so I

4    finished that case up and I am now here.

5        First of all, let me thank you for

6    being here.  I think you are going to

7    find if you are selected for this Jury,

8    that it is probably the most important

9    civic duty that you can undertake as a

10   citizen of our country, and probably

11   short of serving the country in the

12   military, it is probably one of the most

13   important functions you can perform for

14   your community.  Obviously, you are

15   interested in the community, because you

16   are a voter and you have registered to

17   vote and that is how we poll people for

18   the prospective Juries here in Trumbull

19   County.

20       You are already well aware that this

21   is a capital murder case, and it involves

22   the Defendant, Donna Roberts, who is

1478

```
 1    represented by Mr. Ingram, who stepped

 2    out, and Mr. Juhasz, who is here.  This

 3    is really the only chance that the State

 4    gets -- and that is why we're here,

 5    Prosecution and the Defense get to speak

 6    to you.  We're never going to have this

 7    opportunity again at this trial to speak

 8    to you, because once the trial starts, we

 9    have some ethical obligations that we

10    can't speak to the jurors.  Once you are

11    seated as a juror, you sit in this juror

12    box, we can't speak to you, and we don't

13    want you to think we're rude or don't

14    like you.  If you are picked for this

15    Jury and you are seated over in this Jury

16    box and we start putting witnesses on, we

17    can't speak to you.  If we see you at

18    lunch are or in the parking lot or in the

19    hallways, we can't speak to you, because

20    obviously, it would seem as if we're

21    trying to influence you one way or the

22    other, or even if we're not, we want to
```

1479

```
 1        say, "Nice day outside," we can't speak

 2        to you about that, because we don't want

 3        to give the appearance that we're doing

 4        something wrong.

 5             It is really important right now,

 6        that in the short period of time we're

 7        going to have here this afternoon that we

 8        get to know as much about you as relates

 9        to this case.  And we're not trying to

10        pry into your background.  We're not

11        trying to snoop into your life or

12        anything like that, but there are certain

13        things that we have to know, so that we

14        can feel, we can find out if you are a

15        good juror for this particular case.

16             And obviously both sides, we have

17        different ideas of what a good juror is

18        going to be in this case.  So with that

19        in mind, as the Court has indicated to

20        you, and by all means, if you have any

21        questions or I'm not explaining something

22        clearly, put your hand up and say, "Wait
```

1480

1              a minute, you are going to have to

2              rephrase that, because I don't understand

3              what you are saying."

4                  This is a death penalty case, and

5              really what it boils down to and what the

6              issue boils down to is, if the facts

7              warrant it and the law allows it, can you

8              go back in that Jury room at some point

9              and sign a piece of paper, put your name

10             to a piece of paper that would call for

11             the death penalty against this Defendant,

12             Donna Roberts?

13 A.    I could.

14 Q.    And we're really going to be a little

15             presumptuous here in this part of the

16             phase. As I said, we can't speak to you

17             once this case begins. And this case,

18             because it is a capital case, is going to

19             have two parts to it. It is going to

20             have a first part where you are going to

21             determine whether she's guilty or

22             innocent and you and your fellow jurors

1481

1                      may find she's innocent, and she doesn't

2                      even need to be considered for the death

3                      penalty, and we all go home and that is

4                      the end of case.  We go back to our

5                      offices, you go back to the things you do

6                      and your work and your enjoyment, and you

7                      get back on with your life.

8                          So, we're being presumptuous here,

9                      if we get to the point where you do find

10                     her guilty, we can't stop the trial and

11                     say, "Who is in favor of the death

12                     penalty?"  There may be two or three that

13                     say, "I'm not in favor of that," so we

14                     have to ask you that up front.  And it

15                     seems a little straining, but sometimes

16                     the law is a little straining.  So, you

17                     believe that you could impose the death

18                     penalty on a person and sign a piece of

19                     paper that calls for the imposition of

20                     the death penalty in certain indications?

21  A.    I could.

22  Q.    Now, in Ohio, it is not mandatory that every

1482

1    homicide has the death penalty as a

2    potential penalty.  In fact, in this

3    particular case, you are going to be

4    given four options.  You are going to

5    have life with no parole, life with

6    parole after 30 years, and life with

7    parole eligibility after 25 years.  And

8    then of course, the ultimate penalty is

9    that you could consider the death

10   penalty.  Are you under such a belief

11   here today, that if the State, if we get

12   to that first phase and we prove our case

13   beyond a reasonable doubt, and we prove

14   that it is a planned or premeditated

15   murder or that she's an accomplice in a

16   murder that you have to sign the death

17   penalty or will you favor the death

18   penalty over the other penalties?

19   A.   No, I would consider all options.

20   Q.   You would consider all options equally?

21   A.   Yes.

22   Q.   And when we get to the second phase, one of

1483

1  the things, because the burden is always

2  on us, Mr. Bailey and I always have the

3  burden of proof and that is proof beyond

4  a reasonable doubt.  We'll talk about

5  that in a little bit.  But one of the

6  things that we always have to prove to

7  you is proof beyond a reasonable doubt.

8  And in that second phase, it is going to

9  be -- do the aggravating circumstances,

10  which are basically the things that make

11  her death penalty eligible, do they

12  outweigh any mitigating circumstances.

13  And there's really two ways, two sort of

14  hurdles that we would have to prove to

15  you.

16  First, we would have to prove to you

17  that those aggravating circumstances

18  exist and that they outweigh by proof

19  beyond a reasonable doubt.  Then we have

20  to prove that they outweigh the

21  mitigating circumstances, which would be

22  the good things about Miss Roberts,

1484

1  things that they would present to you,

2  but they may not have to present to you

3  anything, because we may not get to our

4  burden of proof on the aggravating

5  circumstances.  You may find her guilty

6  of the crime, and we may present some

7  aggravating circumstances, but it may not

8  be enough to prove by proof beyond a

9  reasonable doubt, that she deserves the

10  death penalty.  Am I making myself clear?

11  A.  Kind of.

12  Q.  It is sort of a strange way of proving things?

13  But we may not be able to prove our case,

14  in either the first phase or the second

15  phase.  We always have the burden of

16  proof.  Now, I am very confident that

17  Mr. Ingram and Mr. Juhasz are going to do

18  something in this trial, but

19  theoretically, in any criminal trial, the

20  Defendant and the Defendant's attorney,

21  never have to do anything.  They don't

22  have to ask one witness one question.

1485

```
 1              They don't have to leave their seats.
 2              They don't have to do anything.  They can
 3              sit over there and do the New York Times
 4              crossword puzzle or read a magazine.
 5              They could put on a head phone and listen
 6              to music all the time.  Because we have
 7              the burden of proof, we have to prove
 8              every element of the crimes, by proof
 9              beyond a reasonable doubt.  Does that
10              make sense to you?
11   A.   Yes.
12   Q.   So, if we don't prove the case, they can just
13              say, "Your Honor, we don't have anything
14              to add to this."  And then they will sit
15              down or we'll argue, we have done all of
16              these wonderful things and they can say
17              they didn't prove squat.  We were here
18              for three weeks and they wasted your time
19              because they haven't proved anything.
20              And you may agree with that, and say,
21              "Hey, they didn't prove their case."  So
22              I guess what I'm saying to you is we
```

1486

1  have -- it is our burden.  It is always

2  our burden to prove things to you and

3  your fellow jurors, that either the crime

4  was committed by proof beyond a

5  reasonable doubt, or in the second phase,

6  if we get there, that we have proved that

7  the death penalty is warranted by proof

8  beyond a reasonable doubt.  Do you

9  understand that?

10  A.  Yes.

11  Q.  We're over that hurdle, I guess, that you

12  would fairly consider the death penalty,

13  and all of the other options, you could

14  in fact, if the facts warranted it, and

15  the law allowed it, you could sign a

16  verdict calling for the death penalty,

17  correct?

18  A.  Yes.

19  Q.  Now the next question I have, and it is not

20  really clear from your questionnaire, it

21  doesn't appear as if you have heard

22  anything about this case, have you?

1487

1   A.    No, I don't get the paper.  I don't watch the

2         local news.

3   Q.    You watch things other than 33 and 27?

4   A.    I usually don't watch T.V. at all.  I have

5         been catching Fox news about Iraq, but

6         other than that, I don't watch it.

7   Q.    And there's nothing wrong with that.  A lot of

8         people come in here and people that live

9         in the northern part of the County, they

10        watch the Cleveland channels or some

11        people don't watch television, they watch

12        CNN or Fox news.  And lot of people don't

13        subscribe to the newspapers.  So you have

14        not heard anything about this case?

15  A.    No, I don't know anything about it.

16  Q.    That is in some sense good for this

17        proceeding.  I was talking to you a

18        little bit about this, a criminal case,

19        and in a criminal case we have to prove,

20        as I mentioned, things beyond a

21        reasonable doubt.  We have to prove that

22        is the level of proof and every person is

1488

1    going to have a different idea in their

2    mind of what proof beyond a reasonable

3    doubt is.  I may have a different notion

4    of it than you.  You may have a different

5    notion than say your family members or

6    your friends.  But, I'm going to tell you

7    one of the ways it has always been

8    compared to is, it is sort of like this

9    cup of water over here.  These pitchers

10   of water.  Their pitcher of water over

11   there is well below half full.  That is

12   not proof beyond a reasonable doubt.

13       In the law, there's three really

14   basic, three basic standards.  One is

15   preponderance of the evidence.  That is

16   if we were here, let's say some doctor

17   had operated negligently on our patient

18   and he couldn't walk because of the

19   operation.  The doctor botched it up and

20   he was chewing skiddles or something and

21   something fell and he cut our patient's

22   spinal cord.  Now the guy can't walk.  We

1489

1  would have to prove to you by

2  preponderance of the evidence.  That is

3  basically one drop over half full.  If we

4  can prove that to you, we win our case

5  and you should find for us.

6      But in this case it is reasonable

7  doubt.  It is proof beyond a reasonable

8  doubt.  And everybody is going to have a

9  different idea of where that is in that

10 pitcher.  Now it may be a quarter inch,

11 it may be an inch.  It may be an inch, it

12 may be two inches from the top.  It is

13 not all doubt.  Because everything in

14 your life has doubt about it and there's

15 possible doubt, imaginary doubt.  If I

16 suppose -- if a juror is not competent,

17 they could say, "Well, Martians came down

18 and killed people," and no one has done

19 any crime.  It is all the devil or

20 something like that, so it is not filling

21 that pitcher up to the very top to the

22 point where the next drop overflows the

1490

```
 1              pitcher, but it is pretty close to the
 2              top, and it changes for every person.  Do
 3              you understand that concept?
 4    A.   Yes.
 5    Q.   And in this case, not only do we have to prove
 6              the four crimes that Miss Roberts is
 7              charged with, we have to prove all of the
 8              elements of those crimes by proof beyond
 9              a reasonable doubt and every crime has
10              elements.  And has sort of sections, so
11              if you kind of look at it like each crime
12              is may be a waitress's tray, and on that
13              tray are five or six drinks, and those
14              drinks don't have to be filled up to the
15              top, but they better be pretty close to
16              the top for reasonable doubt, maybe
17              within an inch or two or quarter inch or
18              half inch.  When she brings them over to
19              you as a juror, when we bring those to a
20              juror, we better have all of those
21              glasses filled pretty close to the top to
22              prove our case beyond a reasonable doubt.
```

1491

```
 1              If we bring over a tray and it has got
 2         five glasses, and four of them are filled
 3         to about an inch to the top and the other
 4         one is empty, we haven't proved our case.
 5              Tied into that notion, I guess is
 6         the idea that what we call the -- or I'm
 7         sorry, what we call the presumption of
 8         innocence and Miss Roberts' Fifth
 9         Amendment right. As I mentioned to you
10         before, every Defendant, not just this
11         Defendant, every Defendant has the right
12         to not take the witness stand, to not
13         present to you any evidence, because it
14         is our burden. And I don't know what
15         their game plan is and I don't know if
16         she's going to take the witness stand or
17         not take the witness stand, but if she
18         sat over there and didn't do anything,
19         didn't mention a word, didn't present a
20         witness, you would still be able to find
21         her not guilty if we hadn't proved our
22         case, correct?
```

1492

```
 1    A.    One more time.

 2    Q.    If our case when we're presenting it to you,

 3          and we're done with our case, let's say

 4          we present 30 witnesses, the best way I

 5          can describe this for you is to use a

 6          little example.  Let's say there's a

 7          traffic accident down here on Mahoning

 8          Avenue and High Street and some guy

 9          barrels through Mahoning Avenue and hits

10          a guy who is turning left on High Street,

11          and going south on Mahoning.  Just

12          absolutely plows through it.  We could

13          prove our case with probably one witness.

14          Would you agree with that, if that

15          witness was reliable enough?

16    A.    No, I think you need more than that.

17    Q.    What if the witness is -- I don't know if you

18          are religious or not religious?

19    A.    No.

20    Q.    Let's say our witness is the Pope.  The Pope

21          happens to come to Warren, Ohio -- and

22          let's say it is the Pope.  And he's out
```

1493

1     here on the corner of High Street and

2     Mahoning Avenue and he says, "I saw the

3     whole thing myself.  I swear to tell the

4     truth, I have never lied.  You know I'm a

5     good person and I saw the whole thing.

6     And this guy came through the

7     intersection.  I saw the light, the light

8     was red.  He clearly went through the red

9     light.  The guy was turning left onto

10    Mahoning Avenue.  He had the little green

11    arrow, and I saw the whole thing."  Would

12    that be enough for you to find that the

13    person who drove through that

14    intersection is guilty?

15  A.  I don't know.

16  Q.  You don't know?

17  A.  No.

18  Q.  If there were two witnesses there?

19  A.  Possibly.

20  Q.  And your perception of how those witnesses --

21      really what your job is as a juror is,

22      you are going to determine who is telling

1494

1    the truth and who is not and who might

2    have a bias or interest in this case and

3    maybe not being truthful with you, right?

4  A.  Right.

5  Q.  Let's assume that the witnesses are two guys

6    that have stumbled out of Omalley's Bar

7    down here.  There's an Irish bar down

8    there, they have been drinking there

9    since 6:00 a.m., it is now 7:00 at night.

10   They stumbled down the street and they

11   are related to the guy who has allegedly

12   been injured in this accident, turning

13   left.  Kind of create some reasonable

14   doubt in your mind, doesn't it?

15  A.  Right.

16  Q.  About whether or not they really saw what they

17   say they saw?

18  A.  Being the relationship.

19  Q.  If they were brothers, the two brothers of the

20   guy who is accused of doing the

21   wrongdoing.  You will be able to do those

22   kinds of things and test those kinds of

1495

1    various evidence in this case, right?

2    A.    Right.

3    Q.    And again, I guess the point I'm trying to

4          drive home to you is, you would agree

5          that it is the quality of the evidence,

6          not the quantity?  We may have 30 drunks

7          out there and they all may be cousins and

8          Uncles and Aunts of these alleged

9          Defendants, but that might not be enough

10         for you, because they may have some bias

11         and interest on whether their nephew and

12         brother gets off of the charge, right?

13   A.    Correct.

14   Q.    And you will look for those kinds of things,

15         those kind of biases or interests, and if

16         there is any, Mr. Ingram and Mr. Juhasz

17         will point them out to you if the State

18         has any witnesses here.

19         One of the things that you will be

20         unable to really consider in this case

21         and the Court will tell you is, you

22         really can't be sympathetic.  You have

1496

1    kind of got to eliminate sympathy from

2    your decision, so you may feel

3    sympathetic for the Defendant because

4    she's charged with these terrible crimes.

5    But if we prove our case, you would have

6    to set that aside.  Do you think you can

7    do that, whatever sympathy you may have

8    for her?

9  A.  Right.

10 Q.  You would be able to do that?

11 A.  Yes.

12 Q.  In this case, you are probably going to see

13   some photographs of Mr. Fingerhut, who is

14   the victim in this case and they may be

15   rather gruesome.  They are going to show

16   perhaps some injuries that aren't going

17   to be pleasant to look at, things that

18   most people don't see in their normal

19   lives and you may be sympathetic to him

20   and his family because he's dead.  But

21   you wouldn't convict Miss Roberts, if we

22   didn't prove our case, and let's say that

1497

```
1              waitress, we gave you that tray full of
2              drinks and one of them is empty, you are
3              not going to say, "I know the State
4              didn't prove all of the elements beyond a
5              reasonable doubt, but boy, I feel sorry
6              for that Fingerhut guy.  He got shot.
7              He's dead.  His family.  I have got to
8              vote to convict."  You wouldn't do that
9              unless we have proven our case?
10   A.   No.
11   Q.   Now in this case, one of the things that some
12              of the evidence we may have is what we
13              call circumstantial evidence.  And I'm
14              going to use, I guess, an example that
15              may be will be near and dear to you.
16              Apparently one of your major hobbies is
17              you do a lot of paint balling.  I think
18              you are wearing a paint ball shirt today?
19   A.   That is fine.
20   Q.   That is a very interesting hobby that you
21              have.  Do you guys play at a regular
22              place or engage in this activity at
```

1498

1    regular locations?

2  A.  Usually in the back, in somebody's woods of

3       somebody we know.

4  Q.  And I am assuming that when you guys play, is

5       there a rule like you have got to be hit

6       so many times?

7  A.  It is one shot.

8  Q.  And I don't know, is there a certain color

9       paint that they use?

10 A.  Whatever.

11 Q.  Let's say four of you are in there and I

12      assume you do it like we used to do it

13      when I was younger.  You break up into

14      teams and there's two or three teams?

15 A.  Two teams.

16 Q.  And you got two teams in there and there's two

17      guys on each, and you go in and you see

18      you and your team mate and the other

19      team, and they go in there, they don't

20      have anything on, on them as far as

21      paint, no paint on them, and about an

22      hour later, you are in the woods and you

1499

```
 1                    fired three or four times and people
 2                    fired at you, things over, you guys come
 3                    out, and your partner let's say is your
 4                    friend, and he comes up to you and he's
 5                    covered.  He's got paint on his head,
 6                    he's got it on his chest, his legs.  You
 7                    never saw him get hit, but you can assume
 8                    the other team got him, right?
 9   A.    Right.
10   Q.    That is circumstantial evidence.  You didn't
11                    see him get hit, but you can see he's
12                    covered in paint, right?  Can you use
13                    those kinds of things in this case -- or
14                    I'm going to tell you, the Court is going
15                    to tell you, you can use circumstantial
16                    evidence in this case, and it has the
17                    same weight as direct evidence.  So, the
18                    fact you see your buddy covered in paint
19                    and he's back in the woods, you can
20                    assume one of the other two guys got him?
21   A.    I can assume that, yes.
22   Q.    And you will be able to make that inference in
```

1500

1   this case?  You won't have to have seen

2   directly that someone had shot him and to

3   know that he got shot, right?

4 A.   I can't say it was the Defendant.

5 Q.   I understand that.  And that is a good point.

6   You can't say -- let's go back to the

7   example.  Your buddy comes out, he's got

8   paint on the head, chest and leg, you

9   can't say which one of the two guys got

10   him, but somebody got him, right?

11 A.   Right.

12 Q.   And if the proposition was that one of the

13   elements we had to prove that he got hit,

14   you would agree that he got hit.  If the

15   element was we had to prove who hit him,

16   you might have some trouble with that.

17   You might say, there are two guys in the

18   woods, I don't know which guy got him.

19 A.   Right.

20 Q.   Let's assume the two guys in the woods, one

21   guy has green paint and one has red

22   paint.  Your buddy comes out with red and

1501

1     the other one says, "I got him, I got the
2     red paint gun," you are going to tend to
3     believe that.  Even though you didn't see
4     him get hit, he's the one that got the
5     red paint in his gun?
6  A.   Right.
7  Q.   You can make inferences and assume things
8     based on one inference upon a fact,
9     right?
10 A.   Right.
11 Q.   Because you may have to do some of that in
12     this case.  Now, Mr. Carmichael, I want
13     to ask you, in this particular case,
14     we're going to get, maybe trying to get a
15     little more specific as to what is
16     charged here.  In this particular case,
17     Miss Roberts is charged with complicity,
18     and I don't know if you are familiar with
19     that term or know what it, but it is
20     aiding and abetting.  It basically means
21     to help.  And the Judge will give you all
22     kinds of definitions as to what it is --

1502

1    encourage, incite, help, aid and abet.
2    We're going to tell you right now, she's
3    not the one that killed the person who is
4    the deceased in this case.  She didn't
5    pull the trigger.  She didn't shoot him.
6    She didn't do that.  Does that change
7    anything for you in terms of whether or
8    not you could find her guilty or not
9    guilty?
10           MR. INGRAM:  Objection.  It is
11   simply unreasonable.
12           MR. BECKER:  I'll withdraw.
13   Q.  Are you going to require more or less proof
14       because someone is charged with helping
15       someone or are you going to follow what
16       the Court says and if the Court tells you
17       that these elements have been satisfied,
18       you are going to be satisfied with it?
19   A.  I'm trying to understand the last part what
20       you said.
21   Q.  Let me come about this a different way.  Is it
22       going to change for you, or make it more

1503

1    difficult for you, let's assume we get
2    through this first part where we prove
3    all of the elements of the crimes beyond
4    a reasonable doubt, you are satisfied and
5    now we're in the second phase. Are you
6    going to be more likely not to impose the
7    death penalty or less likely to impose
8    the death penalty because she's not
9    actually what we call the person that
10   pulled the trigger, the trigger man, or
11   is that not going to change anything?
12   A.   That is not going to change nothing.
13   Q.   And proving that case to you, back in that
14   first phase, is it going to be more
15   difficult for us to prove our case
16   because she may not be the actual trigger
17   man or are you just going to follow the
18   law as the Court gives it to you, and it
19   is not going to make a difference one way
20   or another? There's no right or wrong
21   answer.
22   A.   I can't answer that, I don't know.

1504

1   Q.   You would feel comfortable, even if we can't

2        prove that she's the trigger person, you

3        could still find her guilty if we met our

4        burden of proof as the Court instructs

5        you as to what the elements are?

6   A.   Okay, yes, I can do that.

7   Q.   Do you have any questions that you feel you

8        need to ask myself or Mr. Bailey or the

9        Court about this service?

10  A.   I'm just wondering, because I'm going to be

11       leaving town at the end of July.  I

12       wanted to make sure.

13  Q.   If we're not done by July, we'll all leave

14       town.

15  A.   That is my only thing.

16  Q.   You don't have any pressing concerns with work

17       or employment or anything?

18  A.   Work seems to be pretty good with this.

19  Q.   They realize that once you get summoned here

20       to appear as a juror, they realize they

21       have an obligation to let you come here?

22  A.   Right.

1505

1    Q.    It is not going to create any hardships for

2          you other than in July, you have some

3          kind of trip planned?

4    A.    Yes.

5    Q.    As long as we don't go into July, which we

6          won't, you will be okay?

7    A.    Okay.

8    Q.    Anything else you can think of?

9    A.    No, not offhand.

10              MR. BECKER:  Thank you.

11   EXAMINATION BY MR. JUHASZ OF MR. CARMICHAEL:

12   Q.    Hi, Mr. Carmichael.  I don't know if you

13         remember from last week or not when Judge

14         Stuard had everybody stand up.  My name

15         is John Juhasz, and my friend, Jerry

16         Ingram over there sitting at the table,

17         he and I are representing Donna Roberts

18         who is also sitting over there at the

19         table.  What we're really doing here

20         today is sort of a modified version of

21         interviewing you for a job -- because you

22         have a job right now?

1506

1    A.    That is what I seemed that it was.

2    Q.    This is a special job.  The difference is,

3          where do you work, Kraftmaid?

4    A.    Yes.

5    Q.    You probably went to Kraftmaid and applied for

6          the job, right?

7    A.    Yes.

8    Q.    Here, you didn't apply, you voted and as a

9          result of voting, somebody pulled your

10         name out of a drum and they sent you a

11         little invitation to come?

12   A.    Right.

13   Q.    You can probably tell from everything you have

14         read and everything that everybody has

15         talked to you about, it's a pretty

16         serious job, because there's the

17         potential that this case could go to a

18         second phase where you may have to decide

19         if the Defendant receives a death

20         sentence or a life sentence.  You

21         appreciate that?

22   A.    Yes.

1507

| | |
|---|---|
| 1 | Q.    One of the reasons that we're up here asking |
| 2 | you all of these silly questions is |
| 3 | there's an example that I like to use |
| 4 | sometimes, which has to do with my son. |
| 5 | My son is 18 now.  And he used to be a |
| 6 | paint baller, too, by the way.  I |
| 7 | probably have some guns that may be you |
| 8 | want to talk to me about later that are |
| 9 | sitting in my den.  When he was younger |
| 10 | and I coached baseball, sometimes, we |
| 11 | would show up for a game and the umpires |
| 12 | wouldn't show up.  They went and got |
| 13 | drunk or because we didn't pay them very |
| 14 | much or whatever, but we would have a |
| 15 | time with parents and kids ready to play |
| 16 | and no umpire.  Once in a while, they |
| 17 | would say, "You guys have three coaches |
| 18 | and we only have two, why don't you take |
| 19 | one of your extra coaches and have him be |
| 20 | the umpire."  Seems fine.  Let's say they |
| 21 | asked me and I say, "What the heck, I'm a |
| 22 | fair guy, I can do this."  What I didn't |

1508

1    think about, however, might be a
2    situation like, we get to the bottom of
3    the ninth and the game is tied two to
4    two, and Mike, my son, is on second base,
5    there's two outs.  Somebody comes up,
6    there's a base hit to the outfield.  Here
7    comes Mike -- I won't say tearing down
8    third base, because he's a big kid, so
9    lumbering down from second to third and
10   making the turn, because he's getting
11   waved home and there's the big play at
12   the plate.  And if I call him safe, his
13   team wins the game.  If I call him out,
14   he's probably mad at me, the coaches are
15   mad at me and we have got to go into
16   extra innings and all of that extra
17   stuff.  Here's my point about all of
18   that.  Before taking on that
19   responsibility of umpiring that game, I
20   should have thought about the possibility
21   that something like that could happen and
22   maybe even the coaches from both teams

1509

1        should have asked me about that and said,

2        "If we let you do this, and something

3        like this happens, are you going to set

4        aside your feelings for your son, and

5        call the balls and strikes and the safe

6        and outs objectively?"  Does that make

7        sense to you?

8   A.   Yes.

9   Q.   It is what we're doing here is a little bit

10       like that also, because we want to see if

11       there's something about how you feel

12       about the things that we're talking

13       about, and the things that you might be

14       called upon to do that might keep you

15       from doing it.  But at the same time,

16       we're trying not to say, "Well, if this

17       guy slides in and this guy puts the tag

18       on him, how would you call that

19       particular play?"  And the reason it is

20       unfair to ask you that latter question is

21       because you haven't heard any evidence in

22       this case yet.

1510

```
 1   A.    Right.

 2   Q.    So, really all we're trying to do, and all

 3             we're asking you to do is sort of look

 4             inside yourself and tell us, if based

 5             upon how you think or feel about the

 6             issues that we're talking to you about,

 7             if there's something that would keep you

 8             from following the instructions that

 9             Judge Stuard is going to give you later

10             if you become a juror.  Now, it seems to

11             me that you don't know anything about

12             this case, correct?

13   A.    No.

14   Q.    So, there's nothing that is likely to pop into

15             your head if you hear evidence that might

16             conjure up some newspaper article or T.V.

17             story.  You think that is pretty unlikely

18             that is going to happen?

19   A.    It is very unlikely.

20   Q.    Let's jump to the second thing then.  The

21             second major topic that we talk about and

22             that is the death penalty and you have
```

1511

```
 1              written down on your questionnaire, your
 2              views about the death penalty.  All I
 3              really want to find out from you about
 4              that are a few things.
 5                   First of all, do you feel
 6              comfortable with understanding not
 7              necessarily what the particular facts are
 8              in this case, or what you might be asked
 9              to consider, specifically, but generally,
10              do you understand how the two phase trial
11              works in a case like this?
12   A.   No.   I have never done this before.
13   Q.   Let's take a second and talk about that.
14              Mr. Becker has talked to you about the
15              State having the burden and all of that
16              stuff.   You remember those conversations?
17   A.   Yes.
18   Q.   The first part of a trial like this is like
19              any other criminal trial.  You almost
20              have to put it out of your mind for a
21              second.   That it is what we call a
22              capital trial or a death penalty trial.
```

1512

```
 1              Because first of all, you and I can
 2              probably agree and I think probably
 3              everybody in the room can agree, that if
 4              you find the person not guilty, there
 5              wouldn't be any punishment that would be
 6              appropriate, correct?
 7    A.   Correct.
 8    Q.   You don't want to punish somebody if you find
 9              out they didn't do anything wrong,
10              correct?
11    A.   Correct.
12    Q.   The first thing we need to do is think about
13              the trial like any other criminal trial,
14              and I'm going to give you a silly little
15              example that I like to use for two
16              reasons.  One, it doesn't have anything
17              to do with this case; and two, I think it
18              is actually easier to talk about than
19              some of the things we have to talk about
20              in this case if you are picked as a
21              juror.  Judge Stuard has told you that if
22              you commit murder in this State, you
```

1513

1    don't automatically get the death

2    penalty, you recall that?

3  A.    Yes, I do.

4  Q.    The legislature, the General Assembly in

5        Columbus that writes all of the laws that

6        we live by, has said then only for

7        certain murders are you even eligible to

8        get the death penalty.  And in a statute,

9        in a law, they have listed out what those

10       things are that make sort of, I don't

11       want to say ordinary murder, because any

12       murder is tragic, but aggravated murder

13       is what makes it more serious where you

14       could be considered for the death

15       penalty.  One of those that I want to

16       talk about this afternoon is if you kill

17       the Governor.  Because, let's just jump

18       back for one second.  Even if I planned

19       it, if I said, "You know what, if I come

20       up here tomorrow, I am going to bring a

21       gun with me and I'm going to kill my

22       buddy Jerry Ingram.  I just can't take it

1514

1    anymore.  He's driving me crazy during

2    this trial.  I can't handle it anymore.

3    I'm going to kill him.  I have thought

4    about it, I have planned it out."  I made

5    the steps of sneaking a gun into a

6    Courthouse and I walk up to him and I

7    shoot him.  That is what we would call

8    aggravated murder, because I did it with

9    planning or prior calculation and design.

10   But -- and while I can go to jail for a

11   very long time for that, I could not get

12   the death penalty unless it is one of

13   these murders that made it special.  So

14   now, as I told you, one of the things

15   that the General Assembly has said makes

16   a murder special or more serious, that we

17   can consider imposing the death penalty

18   is if the person you kill is the

19   Governor.  So, let's say that I get

20   charged for that.  And the Grand Jury

21   gives me a piece of paper and says,

22   "Juhasz, you killed Bob Taft.  We say you

1515

```
 1              did that, you planned it, and you did
 2              it."  Aggravated murder.  "Juhasz, we're
 3              telling you something else in this piece
 4              of paper.  It is called a specification."
 5              But what it really is, it is a notice to
 6              me to say, hello, this is not just your
 7              ordinary aggravated murder case, Juhasz,
 8              you could get the death penalty, because
 9              we're adding a special allegation that
10              says the guy that you killed was Bob Taft
11              and he was the Governor of the State of
12              Ohio.  So, we're saying to you that if we
13              can prove this, this is a more serious
14              murder for which you might get the death
15              penalty.  Are you with me so far?
16    A.   Yes.
17    Q.   Now, as in any other criminal trial, they have
18              to go about proving that.  In the case I
19              told you about with Jerry, they might, if
20              I did it here in the Courtroom, they
21              might call all of these people who are
22              here as witnesses, and say, "I know
```

1516

| | | |
|---|---|---|
| 1 | | Juhasz, that is him sitting over there |
| 2 | | with his lawyer, Ben Matlock.  I saw him |
| 3 | | pull out a gun.  I saw him walk over to |
| 4 | | Ingram and I saw him shoot him." |
| 5 | A. | Right. |
| 6 | Q. | And if that pitcher Mr. Becker was talking |
| 7 | | about, if you as a juror, believed what |
| 8 | | all of those witnesses said beyond a |
| 9 | | reasonable doubt, then I would be guilty |
| 10 | | of aggravated murder? |
| 11 | A. | Right. |
| 12 | Q. | Let's distinguish that now from that special |
| 13 | | case I am talking about where they said, |
| 14 | | "Juhasz, you killed Bob Taft."  So maybe |
| 15 | | they produced witnesses again, and they |
| 16 | | fill up the box called aggravated murder |
| 17 | | with all of its elements, which |
| 18 | | Mr. Becker talked to you about, the tray |
| 19 | | with the glasses, but they prove to your |
| 20 | | satisfaction that I killed a guy named |
| 21 | | Bob Taft.  They fill up that box, but |
| 22 | | they forgot to do something in this case. |

1517

1    They forgot to prove to you that Bob Taft

2    was the Governor, because remember that

3    is the thing that makes it a special

4    murder.  And who knows how they would do

5    it, maybe they would come in with some

6    fancy looking piece of paper with ribbons

7    and sealing dripping off it that says,

8    "Bob Taft was elected the Governor of the

9    State, and he was sworn in on this date,"

10   and so, you know that I killed him after

11   that, and so maybe you could conclude

12   from that, that they proved he was the

13   Governor when I killed him or maybe they

14   called in Thomas Moyer, the Chief Justice

15   of the Ohio Supreme Court who says, "Yes,

16   see the picture of that dead guy Bob

17   Taft, I swore him in on the steps of the

18   Capital.  I am the Chief Justice of the

19   State of Ohio, I swore him in.  He was

20   the Governor."  Now they proved it.  But

21   let's say they didn't do that.  They just

22   proved that I killed a guy named Bob

1518

```
 1              Taft.  You might be able to find me
 2              guilty of aggravated murder, but if they
 3              didn't do one of those extra things I
 4              talked about, even though you go back in
 5              the Jury room and say to yourself, "I
 6              read the newspaper, I look at the news on
 7              the Internet," whatever, "I listened to
 8              it in the car, I know Bob Taft is the
 9              Governor."  You wouldn't be able to find
10              me guilty and do you know why?
11    A.   Because they didn't prove it.
12    Q.   So, we're okay with all of that?
13    A.   Yes.
14    Q.   So, the first phase of one of these trials
15              works just like that.  First they have to
16              prove the person guilty of the crime, if
17              they can do that, and then they
18              separately have to prove one of those
19              special circumstances.  If they do that
20              in this imaginary case where I killed Bob
21              Taft, then we would go to a second phase,
22              because now you found me guilty of the
```

1519

1             aggravated murder and you found me guilty

2             of a special circumstance that says that

3             it is more serious than the ordinary

4             aggravated murder, and you should

5             consider whether or not to give me a more

6             serious penalty, i.e., the death penalty.

7  A.     I have a question.  If you only go to the

8             second phase, if you do the special

9             circumstance --

10 Q.     Yes, Sir.  In those two examples that I gave

11            you where the Taft trial goes either way,

12            the first one they forgot to prove that

13            he's the Governor, your job would be done

14            if you found me guilty of aggravated

15            murder, but not guilty of that special

16            circumstance.  Because then, you don't

17            get to that special phase where you

18            decide penalty.  That would be up to the

19            Judge to decide what happens to me.  Your

20            job would be done.  It is only if they

21            prove not only the crime, but that

22            special circumstance beyond a reasonable

1520

1    doubt, that you then go to the second
2    phase.
3  A.   Okay.
4  Q.   Are you okay with that?
5  A.   Now, yes.
6  Q.   It is new territory and believe me, there are
7       tons of lawyers in this State who don't
8       know how this works.  Don't feel bad.
9  A.   Okay.
10 Q.   Now, if we go to that second phase, because
11      now you have found me guilty, and you
12      found one of those special circumstances,
13      it is appropriate to consider punishment
14      for me because I am guilty, right?
15 A.   Right.
16 Q.   And, you found one of those special
17      circumstances by proof beyond a
18      reasonable doubt, so it is appropriate to
19      consider whether I should get a more
20      severe penalty, maybe even the death
21      penalty?
22 A.   Right.

1521

1    Q.    So that is the second part of the trial.  And
2          in a way, we start over again.  Because
3          now the State has to fill up a pitcher
4          again.  They have to convince you, really
5          of two things.  That the reasons to
6          impose the death penalty outweigh the
7          reasons not to impose the death penalty.
8          And that the death penalty is appropriate
9          for me in this case.  And they have to
10         prove that by proof beyond a reasonable
11         doubt.
12   A.    Okay.
13   Q.    You okay with all of that?
14   A.    Yes.
15   Q.    If you got to a second phase like that, as I
16         think the Judge told you -- but let's go
17         over it again, it is all new material.
18         There are four potential penalties, you
19         remember that?
20   A.    Yes.
21   Q.    Death, life without parole, and two life
22         sentences where I could get parole,

1522

1  doesn't mean I'll get parole, just means

2  I get a shot at a parole hearing down the

3  road.  Remember -- you ever see Shawshank

4  Redemption with Morgan Freeman?  In that

5  movie he keeps going up to parole and

6  they keep stamping reject and he stays in

7  prison.  It is the same thing here, after

8  30 years I might get a hearing, but they

9  may reject it, or 25 years.

10  Here's the point that I wanted to

11  find out from you, if we got to a second

12  phase like that, is there anything about

13  how you feel about the death penalty that

14  would give one of those penalties a leg

15  up going into the second phase or would

16  you consider them all equally?

17  A.  I would consider them all.

18  Q.  And the State would have to prove to you as I

19  said before, in order me to get the death

20  penalty, they would have to prove to you

21  that the reasons to give me the death

22  penalty outweigh the reasons not to give

1523

1       me the death penalty by proof beyond a

2       reasonable doubt, and you would make them

3       do that?

4   A.  Right.

5   Q.  And they would have to prove to you that the

6       death penalty was the appropriate penalty

7       for me in this case and you would make

8       them do that?

9   A.  Yes.

10  Q.  Mr. Becker also asked you some questions about

11      aiding and abetting, or complicity.  And

12      I think he told you that they are saying

13      they are coming right out and telling you

14      that they are not saying Donna Roberts is

15      the person who killed Mr. Fingerhut in

16      this case.  You appreciate that?

17  A.  Right.

18  Q.  I wanted to talk for a second about aiding and

19      abetting just to make sure that you are

20      clear with that, because one of the

21      things that we do as lawyers is that in a

22      way, and I don't think we mean to do it,

1524

```
 1            but we're kind of arrogant, because we
 2            take you away from your job at Kraftmaid
 3            and say, "Come on here and be a juror,"
 4            and we're going to give you all of these
 5            new rules for how to do your job.  It
 6            would be sort of like you start at
 7            Kraftmaid and they say you need to know
 8            everything about your job within the
 9            first 15 minutes and say go to work.  We
10            kind of do that?
11   A.   Actually, they did do that.
12   Q.   So I want to take some time to talk about
13            that, so you don't feel that same way,
14            because we're giving you all new rules
15            and saying, "Here, these are the rules to
16            do your job by."  Let's change the figure
17            for a second.  Let's pretend that you and
18            I are out driving around one night.  And
19            you know, we're sort of ne'er-do-well, we
20            don't have a lot of money.  We're on our
21            last six pack and in front, we have just
22            thrown the last two cans in the back
```

1525

```
 1              seat.  And I look at you and say, "Hey,
 2              we need some more beer."  And you go,
 3              "Yes, got any money?  No.  You got any
 4              money?  No."  I say, "Pull into this 7-11
 5              right here."  You say, "What are you
 6              going to do?  Just pull in here.  I'm
 7              going to get us some money."  And I reach
 8              in and I pull a gun out of my pocket.
 9              You go, "What the hell are you going to
10              do?  Listen, you just watch for the cops,
11              I'm going to go get us some money and
12              some beer."  Now, you have a pretty good
13              idea that I don't have any money and when
14              I say I'm coming out with money and beer
15              and I have got a gun, I'm going to do
16              something wrong, correct?
17    A.    Correct.
18    Q.    You don't go into the 7-11 with me?
19    A.    Right.
20    Q.    But you are sitting in the car, right?
21    A.    Right.
22    Q.    When I come out and I got the beer and I got
```

1526

1        the money, you are going to take off,

2        right?

3   A.   I would probably take off once you got to the

4        door.

5   Q.   Let's just pretend that you probably would and

6        you would be smart if you did that.  You

7        are hanging around with me so you are not

8        too smart in the first place.  So you

9        wait and you know what I am doing.  First

10        of all, if the robbery goes the way I

11        want it to go, even though all you did

12        was sit in the car and drove me away, you

13        might get charged the same as me for

14        participating in that robbery.  That is

15        what we call complicity or aiding and

16        abetting.  Because you did something to

17        help me.  Maybe even the cops come while

18        I am in there and you hit the horn.  So

19        that I'll know to take off, you have done

20        something now to help me.  And your

21        argument is going to be, if you get

22        charged, "I didn't go in there, I didn't

1527

1    have a gun."  And their argument is going

2    to be, "But you knew Juhasz did and you

3    knew what he was going to do and you

4    helped him, because when the cops drove

5    by you hit the horn.  When he came out

6    with the beer and the money and the gun,

7    saying, let's get the hell out of here

8    and he jumped in the car, you took off

9    and you didn't drive him to the police

10   station, you went and split up the money

11   and drank the beer."  They are going to

12   say you are just as guilty as me under

13   what we call complicity or aiding and

14   abetting.

15   A.   Okay.

16   Q.   Let's change it a little bit, because you

17        sound to me from the answer that you gave

18        Mr. Becker, like the kind of guy who is

19        going to make the State stick to its

20        burden of proof, if they don't convince

21        you beyond a reasonable doubt you are

22        going to vote not guilty, am I right

1528

```
 1          about that?
 2   A.    Right.
 3   Q.    So let's change my story a little bit.  We're
 4          out drinking and we run out of the beer.
 5          And I say, "We need some more beer."  And
 6          I say to you, "Do you have any money?"
 7          No.  "Well, you know what, pull in here.
 8          What are you going to do?  I am going to
 9          get us some more beer."  You haven't seen
10          me pulling out a gun.  I haven't told you
11          whether I have any more money.  And you
12          wait for me.  I come out, and I got some
13          beer.  Maybe I pulled a gun in there, and
14          said, "Honey, give me a six pack of Busch
15          and also empty the drawer while you are
16          at it."  And when I came out, I got the
17          gun stuck away, I got the money stuck
18          away, I don't even split it with you.
19   A.    Okay.
20   Q.    In that circumstance, you didn't do anything
21          to help me knowingly, did you?
22   A.    Right.
```

1529

1   Q.   You didn't do anything to make my job of

2          robbing easier knowingly, right?

3   A.   Right.

4   Q.   So in that case, you see where you would have

5          a much better case to say, "I didn't

6          encourage him, I didn't strengthen him, I

7          didn't aid him in any way"?

8   A.   Correct.

9   Q.   So, one of the things that you are going to

10         have to decide in this case is whether

11         the State can prove that Miss Roberts did

12         any of those things to help the person

13         they say killed Mr. Fingerhut. You think

14         you can hold them to a burden of proving

15         that beyond a reasonable doubt?

16   A.   Yes.

17   Q.   If they don't prove it to you beyond a

18         reasonable doubt, do you have any

19         problems voting to find her not guilty?

20   A.   No.

21   Q.   Even though there's a dead guy, you still okay

22         with that?

1530

```
 1    A.   Right.   Somebody else is guilty, not this
 2              trial.
 3    Q.   How are you doing?
 4    A.   I got a headache.
 5    Q.   I am almost done, so your headache is going to
 6              get better shortly.   Any problem
 7              presuming -- let me ask it this way.   You
 8              have been accused of something you didn't
 9              do.
10    A.   Yes.
11    Q.   How did that make you feel?
12    A.   Like shit.
13    Q.   And in this case, there's sort of the same
14              kind of presumption in the case.   We have
15              a constitutional provision that says,
16              just because the Government charges you
17              with something, just because they say you
18              did you something, it is still as if you
19              are being accused of something you didn't
20              do.   We call that the presumption of
21              innocence.
22    A.   Okay.
```

1531

1   Q.   To overcome that, you would expect that the
2             Government is going to have to give you
3             some pretty substantial proof, correct?
4   A.   Right.
5   Q.   And you are going to want to test that proof
6             to make sure that it is really good
7             evidence, correct?
8   A.   Yes.
9   Q.   Because the person who is accused is sort of
10            in that same situation.  They are accused
11            of something that they say they did not
12            do.  And any problem with testing the
13            Government's evidence that way?
14  A.   No.
15  Q.   Any problem holding them to the burden of
16            proof?
17  A.   No.
18  Q.   Anything that I have made unclear to you?
19  A.   No.
20  Q.   Do you have questions at all about the process
21            or anything like that?
22  A.   Not that I can think of.

1532

```
 1   Q.    And just to make sure that you and I are on
 2               the same page, there's nothing about how
 3               you feel about the death penalty that
 4               would make you favor one penalty over
 5               another?
 6   A.    No.
 7               MR. JUHASZ:  Thank you very much.  I
 8   appreciate it.
 9   (SIDE BAR DISCUSSION, OFF THE RECORD AND
10   OUT OF HEARING)
11               THE COURT:  Mr. Carmichael, you are
12   going to be in the pool from which this Jury will
13   be selected.  You should call a week Friday, not
14   this coming Friday, after 4:30 to get further
15   instructions of when to return.  We're going to
16   spend all next week going through questions with
17   other people until we get 34 of you from which the
18   Jury can be selected.  I would again advise you not
19   to discuss anything about this case with anyone,
20   you should read nothing in the newspaper, and
21   nothing on T.V.  I doubt if anything will appear on
22   the Internet, but in any event.
```

1533

1   (Juror No. 59 excused from the Courtroom.)

2              THE COURT:  For the record, both

3   parties have passed on cause for Mr. Carmichael, is

4   that correct?

5              MR. BAILEY:  Yes, Sir.

6              MR. JUHASZ:  Yes, Sir.

7   (OFF THE RECORD)

8   (Court in Recess at 3:05 p.m.)

1534

1

2         REPORTER'S  CERTIFICATE

3

4         I do hereby certify that the above and

5    foregoing is a true and correct transcript

6    of the proceedings had in the within hearing

7    as shown by stenotype notes written by me in the

8    presence of the witnesses at the time of the

9    hearing.

10

11    _____
          MARY ANN MILLS, R.P.R.
12        Official Court Reporter
          Trumbull County, Ohio
13

14

15

16

17

18

19

20

21

22

1535

1    IN THE COURT OF COMMON PLEAS
     TRUMBULL COUNTY, OHIO
2    TRIAL COURT CASE NO. 01-CR-793
     SUPREME COURT OF OHIO CASE NO. 03-1441

3

4    STATE OF OHIO          )          VOLUME VII
                            )
5          Plaintiff        )
                            )    INDIVIDUAL VOIR DIRE
6    -vs-                   )
                            )
7    DONNA M. ROBERTS       )
                            )
8          Defendant        )

9

10        BE IT REMEMBERED, that on Wednesday, April 16,

11   2003, these proceedings came on to be heard before

12   one of the Judges of this Court, John M. Stuard,

13   in Courtroom No. 2, on High Street, Warren, Ohio,

14   before the case heretofore filed herein.

15

16

17

18   Mary Ann Mills, RPR
     Official Court Reporter
19   Trumbull County, Ohio

20

21

22

136

1536

```
 1                        A P P E A R A N C E S
 2


 3
      On Behalf of the State of Ohio:
 4        Dennis Watkins, Prosecuting Attorney
          Charles L. Morrow, Ass't. Prosecuting Attorney
 5        Christopher D. Becker, Ass't. Prosecuting Attorney
          Kenneth N. Bailey, Ass't. Prosecuting Attorney
 6        160 High Street, N.W.
          Warren, OH 44481
 7
      On Behalf of the Defendant, Nathaniel Jackson:
 8        Anthony V. Consoldane, Attorney at Law
          James F. Lewis, Attorney at Law
 9        State of Ohio Public Defendant's Office
          328 Mahoning Avenue, N.W.
10        Warren, OH 44481

11    On Behalf of the Defendant, Donna M. Roberts:
          John B. Juhasz, Attorney at Law
12        J. Gerald Ingram, Attorney at Law
          7330 Market Street
13        Youngstown, OH 44512

14    On Behalf of The Vindicator Printing Co.
          Ann Millette, Attorney at Law
15        3200 National City Center
          1900 East Ninth Street
16        Cleveland, OH 44114

17    On Behalf of WFMJ Television, Inc.:
          Stephen T. Bolton, Attorney at Law
18        201 E. Commerce Street, Atrium Level Two
          Youngstown, Oh 44503
19


20


21


22
```

1

# I N D E X

2

3  <u>VOLUME VII</u>:

4  (Wednesday, April 16, 2003)

5  Individual Voir Dire:

Linda Black                     1537
6  Panda Lantz                     1614
   Lawrence King                   1698
7  Cynthia Sase                    1705
   Shirley Biel                    1761

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
 1    Wednesday, April 16, 2003; In Open Court at 9:30 a.m.
 2    (Juror No. 63, Linda Black, entered the Courtroom.)
 3              THE COURT:  Linda, you read the
 4    handout that was given to you?
 5              MS. BLACK :  Yes, I have.
 6              THE COURT:  The purpose of having
 7    you in this morning is to ask you questions
 8    concerning two main areas of inquiry.  This case,
 9    as any case of this type, received its due share of
10    publicity.  I notice you take the Sharon Herald.
11              MS. BLACK :  I used to subscribe to
12    it.  I haven't for probably over a year.  I always
13    say at the most I read it once a month.
14              THE COURT:  You don't subscribe to
15    the Tribune?
16              MS. BLACK :  No.
17              THE COURT:  I am from that area
18    myself and I know most of the people still get the
19    Herald because Sharon is where you look at as town,
20    right?
21              MS. BLACK :  I'm more interested in
22    Pennsylvania news, because I am from Pennsylvania
```

1538

1  originally.

2          THE COURT:  These folks will want to

3  know what exposure you have had to the facts of

4  this case, if any, and if you are familiar with

5  anything concerning the matter of whether it is

6  something that would influence your ability to sit

7  on a Jury.  Many of the folks will have read

8  something about it or seen something or saw

9  something on television.  That doesn't disqualify a

10  juror, it is whether they have a fixed opinion.

11  Because the case has to be decided on the evidence,

12  which this Jury will hear in this Courtroom.  So

13  that is one area they will ask you about.

14          The second area is what your thoughts are

15  on the death penalty itself.  Now, Donna Roberts is

16  charged with aggravated murder, with attached

17  specifications.  Under the law of Ohio, everyone

18  who or anyone who commits a murder does not

19  necessarily qualify for the death penalty.  It has

20  to be under certain circumstances which have been

21  set forth by the legislature as reasons why the

22  Jury would be called upon to consider the death

1539

1   penalty.  The burden is always on the State to go

2   forward to prove all elements of any charge against

3   any Defendant.  The Defendant need do nothing.  We

4   all have that right, and this case will be put to

5   this Jury to determine the guilt or innocence of

6   Donna Roberts concerning the charge of aggravated

7   murder.  The State must prove each and every

8   element beyond a reasonable doubt along with the

9   specifications attached.

10           This case, it concerns a robbery and a

11  burglary.  If the State fails to maintain that

12  burden of proof and present each element of the

13  charge beyond a reasonable doubt, then this Jury

14  would rightly find not guilty.  If the State does

15  maintain that burden of proof, then the Jury could

16  return a verdict of guilty.  If that would occur,

17  then the matter would go to a second phase, and at

18  that time, the Jury would be called upon to listen

19  to further evidence, whereby the aggravating

20  circumstances would have to be proven again by the

21  State beyond a reasonable doubt, and the Defense

22  has an opportunity to present at that point

1540

1    mitigating factors.  And those are reasons why the

2    Jury should not impose the death penalty.

3              So, as I say, the case may not get to

4    that point, but if it does, each potential juror

5    has to be able to follow the law.  The law is under

6    certain circumstances, where the State has proven

7    their case, that raises the specter of the death

8    penalty being one of four possible recommendations

9    this Jury will give to the Judge.

10             If they determine that the death penalty

11   is not warranted, then they have three other

12   options concerning life without chance of parole

13   and life with lessor time of 25 or 30 years before

14   parole.  Some people strongly believe that a person

15   who takes another's life should forfeit their own.

16   An eye for an eye.  That is not the law of Ohio.

17             There are other people who under no

18   circumstances could participate in a Jury where

19   they had to make that decision.  I suspect most

20   people are somewhere in between.  Some more

21   favorable to the death penalty.  Some less.  Those

22   are the type of people that probably should be

1541

1    sitting on this Jury.  The is whether they are able

2    to follow the law, setting aside their own

3    preference in the matter.

4              MS.  BLACK :  Okay.

5              THE  COURT:  Mr.  Bailey?

6    EXAMINATION BY MR. BAILEY OF MS. BLACK:

7    Q.    Good morning, Miss Black.  My name is Ken

8              Bailey.  I'm Assistant Prosecutor with

9              the Trumbull County Prosecutor's Office,

10             and as I promised you last week, I would

11             be joined this week by Chris Becker,

12             another Assistant Prosecutor in our

13             office.  And together we're responsible

14             for handling this case on behalf of the

15             people of Trumbull County and the State

16             of Ohio.  Now, a couple of things, when

17             we start out and you have been through

18             this process before, you served on two

19             Juries, a criminal case and a civil case.

20             So you are pretty well familiar with it.

21             This case is a little bit different

22             because it could go into the second

1542

```
 1              phase.  The first phase would be just

 2              like your other trials, the issue is

 3              guilt or non-guilt of the Defendant.  You

 4              are aware the Defendant is presumed

 5              guilty -- I mean presumed innocent as are

 6              all other Defendants tried in this

 7              Courtroom and that presumption of

 8              innocence stays with her through the

 9              entire course of the trial.

10              And the burden as the Judge said of

11              proving the elements of the crime are

12              entirely on us, the people of the State.

13              If we fail to prove one of those

14              elements, even though you feel, based on

15              the testimony and the evidence that she

16              really did it, you still have to find her

17              not guilty if we leave out one of the

18              elements.

19    A.   I understand that.

20    Q.   You are familiar with elements, because you

21              had it in your last criminal case?

22    A.   Yes.
```

1543

1   Q.    Now, this is -- because it is a capital murder

2            case, because the death penalty is a

3            possible punishment, and because if the

4            case moves to a second phase, the Jury

5            gets involved with a recommendation as to

6            the appropriate penalty in this case.

7            Then, the situation here is a little

8            different.  The questions that we're

9            going to be asking you compared to what

10           you underwent before, and if you have any

11           questions during these proceedings, feel

12           free to ask them, because it is sort of a

13           give and take right now, and if you have

14           questions about what we're doing, if we

15           can get an answer for you, that would be

16           fine.

17               You are aware that you can't have

18           any contact with us after we're done

19           talking today until both phases are over,

20           assuming we get to the second phase.  If

21           you have questions, you have got to

22           direct them to the bailiff, who will be

1544

```
 1              here later and during the course of the
 2              trial.  Or to Mary Ann, our Court
 3              Reporter or to the Judge.  You are aware
 4              you can't go out to the scene of the
 5              crime to investigate on your own, because
 6              that would cause a mistrial.  Only if you
 7              are taken under the direction of the
 8              bailiff.
 9                  And the prior criminal case on which
10              you served -- what kind of case was that?
11    A.   A murder.  I can't remember if it was Ricky
12              somebody.  It was more or less a drug
13              deal.  It was somewhere in Warren and
14              they did take us there, so I'm not
15              familiar with Warren, so they did take us
16              there.  Some little store or something
17              and he also was eligible, if that is how
18              you wanted to say it, for the death
19              penalty, but he chose life without
20              parole.  We never had to come back for
21              the second phase.
22    Q.   No second phase?
```

1545

1    A.    No, he pleaded, I don't know the legal terms.
2          He pleaded down more or less for life
3          imprisonment without chance of parole to
4          avoid the death penalty.
5    Q.    Now, as the Judge indicated, the Defendant
6          here has been charged with a number of
7          crimes, and you indicated you had no
8          prior knowledge of this case, but you
9          watch 21 news on occasion for local news?
10   A.    A lot of times my T.V. is always on, not
11         necessarily on local stations.  I'm in
12         and out of rooms.  I can't honestly say
13         that I watch the news.
14   Q.    It may well be, if during the course of these
15         proceedings, somebody says something and
16         it jogs a recollection of something you
17         might have seen on T.V., or heard or
18         maybe glanced at it in the paper, you
19         would be able to set that aside and you
20         would be able to make your determination
21         based on what happens here in this
22         Courtroom?

1546

1  A.  Yes.

2  Q.  It is the old concept of coming in with a

3      blank slate, whatever is going to be

4      written on that slate has to be written

5      in this Courtroom by the testimony of the

6      witnesses, the evidence and the

7      instructions by the Court.  There are

8      four charges here.  There are two counts

9      of aggravated murder.  There's one person

10     who was killed, but there are two

11     theories of the killing.  And the State

12     is allowed to do that and we have elected

13     to proceed under both theories, which

14     we're entitled to do.

15         Attached to the counts of aggravated

16     murder are some specifications, special

17     findings of fact that you are probably

18     familiar with from an earlier case.  That

19     would make a Defendant eligible for the

20     death penalty as a punishment.  And the

21     charges of aggravated murder, the first

22     is a charge of aggravated murder with

1547

| | |
|---|---|
| 1 | prior calculation and design. Sort of |
| 2 | like the old premeditation in a way, but |
| 3 | they changed it and now it requires some |
| 4 | planning and forethought. |
| 5 | A. I understand that. |
| 6 | Q. The second type of aggravated murder is with |
| 7 | purposeful killing and it is a felony |
| 8 | murder, that it occurs during the course |
| 9 | of an aggravated burglary and/or |
| 10 | aggravated robbery. And burglary is |
| 11 | where you go into a structure like a |
| 12 | dwelling house, and the Judge will define |
| 13 | those terms for you in some detail at the |
| 14 | end of the case. In short, basically it |
| 15 | is trespass in a dwelling house with the |
| 16 | intent to commit some type of offense |
| 17 | inside. And maybe the offender has a gun |
| 18 | or some weapon and somebody gets |
| 19 | seriously hurt inside. |
| 20 | The robbery, the aggravated robbery |
| 21 | is basically taking of property of |
| 22 | another by force or by threat. And |

1548

```
 1              again, the offender might be armed with a

 2              weapon and maybe the victim gets hurt in

 3              that type of a case.  But there's a

 4              difference between breaking into the

 5              house and taking stuff by force and by

 6              threat.  The specifications that are

 7              attached to the counts of aggravated

 8              murder, there are two of those.  And the

 9              first special finding is the aggravating

10              circumstance of an aggravated burglary,

11              that the aggravated murder was committed

12              during an aggravated burglary and the

13              Defendant committed the aggravated murder

14              with prior calculation and design.  And

15              the second specification or special

16              finding is one of an aggravated robbery.

17              That the aggravated murder was committed

18              during an aggravated robbery and the

19              Defendant committed the aggravated murder

20              with prior calculation and design.  You

21              understand that?

22    A.    Yes.
```

1549

```
 1   Q.    There are also two counts of -- two other
 2             counts, aggravated burglary and
 3             aggravated robbery.  And attached to
 4             those are special findings or
 5             specifications that a working gun, a
 6             firearm was used.
 7                  Now, the Defendant, the charge here
 8             is the Defendant was a complicitor, not
 9             the trigger person, not the person who
10             actually went into the house or stole the
11             car, but rather she's charged with
12             planning with another fellow by the name
13             of Nate Jackson in the aggravated
14             murdering of her ex-husband, Robert
15             Fingerhut for insurance money.  And in
16             the course of this, the house was broken
17             into or trespassed in, and a car was
18             taken.  Complicitor is somebody who
19             solicits or procures purposely another
20             person or aids and abets, helps,
21             encourages or strengthens the other
22             person in the commission of the offense.
```

1550

1        Would it bother that she's charged as a

2        complicitor and that if you found her

3        guilty of aggravated murder with one or

4        more of the specification, she would be

5        eligible for the death penalty?

6  A.  No, that was more or less the first case that

7        I was on was the same thing.

8  Q.  Now, looking at your questionnaire, you are

9        generally in favor of the death penalty

10       for serious offenses?

11  A.  Yes.

12  Q.  And by serious offenses what do you mean?

13  A.  If it is proven without a doubt that they

14       participated in the death of someone

15       else.  And probably there are probably a

16       lot, some people in prison who don't

17       belong there, but I would think that the

18       majority who are convicted are rightfully

19       so convicted and I don't believe in an

20       eye for an eye in that sense, but I

21       believe that there are situations where

22       the death penalty would apply definitely.

1551

1    Q.   And to get to that point, you understand that

2              in the first phase, you and the other 11

3              jurors have to find beyond a reasonable

4              doubt that we proved the elements of the

5              charge of aggravated murder, and one or

6              more of these specifications.

7    A.   I understand that.

8    Q.   And then we go on to a second phase and

9              because the first phase is geared toward

10            the issue of guilt or non-guilt, you

11            wouldn't hear anything about what the

12            appropriate punishment would be in the

13            first phase, because it is not relevant.

14            And in the second phase, the issue there

15            would be the issue of what is the

16            appropriate punishment and then you have

17            to do this balancing test.  I imagine,

18            you didn't get to that point in the other

19            trial, but you would be asked to balance

20            on one hand these aggravating, the

21            aggravating circumstance or aggravating

22            circumstances, and on the other hand, any

1552

1       mitigating factors, things that could be

2       brought out in favor of the Defendant,

3       and that would mitigate against the death

4       penalty as a punishment.

5              You understand that the death

6       penalty is not an automatic punishment,

7       if you are found guilty of aggravated

8       murder with a specification? That

9       wouldn't be fair, because you wouldn't

10      hear anything about mitigation in the

11      first phase. And the Defendant has no

12      burden of proof at all. The burden of

13      proving the elements is entirely on us.

14  A.  I understand that.

15  Q.  Now, in the event that we don't convince you

16      by proof beyond a reasonable doubt that

17      the aggravating circumstance or

18      circumstances outweigh the mitigating

19      factors, then you would have to go on and

20      consider the three life sentences, life

21      without parole eligibility, life with 30

22      full years before parole eligibility, and

1553

1     life with 25 full years before parole

2     eligibility.

3   A.   I understand that.

4   Q.   And you would be able to consider those three

5     life penalties equally, is that right?

6   A.   Yes.

7   Q.   All the penalties basically start out equally

8     until you would hear evidence, right?

9   A.   Definitely.

10  Q.   And how much weight you want to give to the

11    aggravating circumstances or the

12    mitigating factors, you understand that

13    is entirely up to you and the other

14    jurors?

15  A.   Yes.

16  Q.   You understand you can decide that those

17    circumstances or factors can have a whole

18    lot of weight, tipping the scale or they

19    could have about as much weight as a

20    feather, right?

21  A.   Yes.

22  Q.   Now you talked about proving beyond all doubt.

1554

1    You understand that the burden here on
2    the State isn't proof beyond all doubt or
3    beyond the shadow of a doubt.  It is
4    proof beyond a reasonable doubt, and
5    sometimes there are a lot of examples
6    that can be used.  But one example is
7    filling up a box.  And each juror, it
8    would be more than halfway, because as
9    soon as you get halfway full in the box
10   that would be like your civil case that
11   you decided, the preponderance of the
12   evidence.  In a criminal case, beyond a
13   reasonable doubt, it would be pretty much
14   full, not all the way to the top, but
15   there would be enough stuff in there,
16   evidence, to convince you to a moral
17   certainty of the Defendant's guilt,
18   right?
19  A.   I understand that.
20  Q.   Using your reason and your common sense,
21   right?
22  A.   Yes.

1555

1   Q.   You have heard that before?

2   A.   Yes.

3   Q.   And as a mother, you have to use your reason

4        and common sense in raising your family

5        and doing your job at work every day,

6        right?

7   A.   Yes.

8   Q.   So it is something you are used to doing.

9        Now, there are different types of

10       evidence that we can use in a case.  You

11       are used to this from the other trials,

12       but there's the direct evidence that you

13       are familiar with where a witness can

14       come in and testify what he or she has

15       learned through the use of their five

16       senses.  "I heard the gunshot and it was

17       loud.  I smelled the smoke and it was

18       acrid.  I touched the body and it was

19       cold."

20            But there's another round about

21       proof.  Circumstantial evidence.  Where

22       you are given a fact or sets of facts and

1556

1   you can draw a logical deduction to

2   another set of fact or facts.  You

3   understand that that would be necessary

4   in some cases because serious crimes are

5   usually not committed in public with a

6   whole lot of people around and the

7   Defendants don't always tell the whole

8   world exactly what they intend to do or

9   what they mean.  They usually don't stand

10  out on the Courthouse step and say, "I am

11  going to kill so and so at such and such

12  a time."  The State has to rely on

13  circumstantial or round about evidence

14  sometimes to give you circumstances.

15      Let me give a quick example of that.

16  Let's say you live in a two story house.

17  You go to bed at night, you look out

18  across the neighborhood from your bedroom

19  window and it is a beautiful night.  The

20  moon is beaming, the stars are twinkling,

21  there's not a cloud in the sky.  You draw

22  the blinds.  You go to bed and before you

1557

```
 1        fall asleep, you listen to a weather

 2        report and he says there's a cold front

 3        moving in and we're going to get a storm

 4        tonight.  You turn off the radio and

 5        sometime after that, you fall asleep.

 6        And during the night you are awakened,

 7        even though the blinds are drawn, you can

 8        see a big flash of light outside and

 9        distant booming, and maybe a couple of a

10        minutes later, there's a closer, big

11        flash of light outside, and closer in

12        time, boom, and then a couple of seconds

13        later, there's a great big flash outside.

14        And immediately after, there's a big boom

15        above the house, and you hear pitter

16        patter on the roof and then a steady

17        drumming sound and you fall back asleep.

18        Sometime later you awaken, go to the

19        window and open the blinds and you look

20        out across the neighborhood and it is a

21        beautiful day.  The sun is beaming,

22        there's not a cloud in the sky, but the
```

1558

1        streets are flooded with water.  There's

2        water dripping off the leaves of the

3        trees, the roof tops, all the way across

4        the neighborhood are soaking wet and

5        there's puddles of water all over.

6        There's no fire hydrant nearby where any

7        car could have hit it and spurted water

8        up over the house.  You know what

9        happened beyond a reasonable doubt during

10       the night, don't you?

11  A.   Yes.

12  Q.   What happened?

13  A.   There was a thunder storm.

14  Q.   And there's room in there for some possible or

15       imaginary doubt.  You can imagine that

16       Alf and his Martian buddies flew by and

17       put on a sound and light show and

18       sprinkled the ground with some wet stuff

19       but that would be foolish or imaginary

20       doubt?

21  A.   Yes.

22  Q.   Even though you didn't see it with your own

```
 1              eyes, there was a thunder storm?
 2    A.   I understand that.
 3    Q.   You understand that criminals aren't always
 4              rocket scientists.  Sometimes we get some
 5              criminals who are silly or stupid.  You
 6              have probably read about the bank robber
 7              who goes in with a stick-up note.  It is
 8              on the back of an envelope, hands it to
 9              the teller, gets the money and flees and
10              leaves the note behind.  And when you
11              turn the envelope over, there's the
12              robber's name and address, right?
13    A.   Yes.
14    Q.   Where the burglar who leaves his wallet
15              behind.  You are aware that sometimes
16              criminals aren't the brightest people in
17              the world and we can prove our case, you
18              understand, by the circumstantial
19              evidence.  Maybe if we got letters or
20              phone calls that would show what a person
21              was planning, right?
22    A.   Yes.
```

1560

1    Q.    Now, if we're able to convince you beyond a

2           reasonable doubt, let's say we get to a

3           second phase.  You and the other jurors

4           have found the Defendant guilty of

5           aggravated murder with one or more

6           aggravating circumstances.  And we go

7           through a second phase.  And you find and

8           the other jurors find that the

9           aggravating circumstance or

10          circumstances, outweigh the mitigating

11          factors that are presented beyond a

12          reasonable doubt.  So that the death

13          penalty under the law, would then be the

14          appropriate punishment.  Would you be

15          able to sign that verdict form?

16    A.    Yes.

17    Q.    And when the Judge asks you in Open Court,

18          would you be able to say, yes, it was

19          your verdict?

20    A.    Yes.

21    Q.    You understand under our system, you can't

22          take notes.

1561

1    A.    Yes.

2    Q.    Some places in the country, they let you take

3            notes, but in Ohio, we're not allowed.

4            The jurors aren't allowed to take notes.

5            And you have got to pay close attention

6            like you did in the other case.  They

7            didn't let you take notes in the other

8            case, right?

9    A.    No.

10   Q.    You are stuck with the questions asked by the

11           lawyers.  Some places, they let the Jury

12           submit the questions to the Judge to ask,

13           but because we're geared toward proving

14           elements, as lawyers, we're going to

15           focus our questions that way and there

16           may be some questions you might have that

17           may never get answered.  For example, if

18           you had an interest in shoes, in footwear

19           like my wife does, you might wonder what

20           kind of shoes somebody was wearing.  You

21           may never get to that, because it

22           wouldn't be relevant to these charges.

```
                                                            1562
 1   A.   I understand that.

 2   Q.   Sequestration.  You had that at the end of

 3        your criminal case in the first phase?

 4   A.   One day, yes.

 5   Q.   And how long did it take the Jury in that case

 6        to reach a verdict?

 7   A.   That was probably eight or nine years ago, so

 8        we were there until late evening one

 9        night and then they took us to dinner and

10        we went back to the rooms and I think the

11        next afternoon, I honestly can't

12        remember, but I am thinking we were there

13        four or five more hours, but I don't

14        really recall.

15   Q.   Over a two day period?

16   A.   Yes.

17   Q.   Sequestration, that would occur, again at the

18        end of the first phase, and it would

19        occur at the end, if you got to a second

20        phase, it would occur at the end of the

21        second phase.  And every Jury is

22        different.  Some Juries may take a few
```

1563

```
 1              hours, some Juries may take a few days.

 2              It depends.  And you wouldn't have any

 3              problem with that?  You have been through

 4              it before?

 5    A.   Yes.  I live by myself and I do have dogs, so,

 6              I could probably find something to do

 7              with them, but I do live by myself.  If

 8              that would get really lengthy it could

 9              make a problem.

10    Q.   Do you have any friends that have dogs?

11    A.   I do, yes.

12    Q.   That could watch the dogs for a couple of

13              days?

14    A.   They could come in the house or I have my

15              girlfriend who could take my bigger ones,

16              probably.

17    Q.   How many dogs do you have?

18    A.   Four.

19    Q.   I have got two.  What kind?

20    A.   Two German Shepherds and two Yorkies.

21    Q.   The Yorkies I imagine keep you pretty busy.

22              They get kind of active.  During the
```

1564

1           course of the trial, you are going to be

2           face to face with the Defendant.  Perhaps

3           as her chair is turned towards you, you

4           will become more acquainted with her.  My

5           question to you is this.  When you go

6           back inside your Jury room to deliberate,

7           can you set aside all thoughts of

8           sympathy that you might have for the

9           Defendant and be conscientious in your

10          deliberations and base your verdict on

11          the evidence that you receive, the

12          testimony of the witnesses, and the

13          instructions of law, given to you by

14          Judge Stuard and lay aside all thoughts

15          of sympathy that you might have?

16 A.   Yes.

17 Q.   Are there any other pressing matters at home

18          or work other than your dogs that would

19          affect your ability to concentrate on the

20          evidence?

21 A.   No.

22 Q.   You understand that we have certain

1565

```
 1              obligations of citizenship.  When it is
 2              election time, we're called upon to cast
 3              a ballot if we can, to learn as much as
 4              we can about the issues and the
 5              candidates.  Another obligation would be,
 6              if it is war time, we're called to serve
 7              in the military and we have got young
 8              people overseas right now, and in a
 9              couple of places.  And the third
10              obligation would be if we're summoned in
11              as jurors to serve as a juror if we're
12              able to, and you have done that twice
13              before.
14   A.   Yes.
15   Q.   Would you be willing to undertake that
16              obligation one more time in another most
17              serious type of cases to make sure our
18              system works?
19   A.   Yes, I would.  I have a Court date on May 22nd
20              for my divorce.  I'm divorced and have
21              been divorced, but he's taking me back to
22              Court to reduce his spousal.  I don't
```

1566

1          know if that would interfere or be able

2          to be changed.

3  Q.   If you are on here, I'm sure it could be

4          changed.  But I wouldn't expect us to go

5          to May 22.  I would be deeply concerned

6          if I'm here on May 22nd.

7  A.   Okay.  I wanted to mention that.

8  Q.   It may take a while to pick a Jury, but we

9          should get a Jury by April 30th and trial

10         generally doesn't take -- it may take

11         forever to pick a Jury, but it is going

12         to take a week to two weeks at the most

13         to try the case, and maybe an extra

14         couple of days in the second phase.

15  A.   Okay.

16         MR. BAILEY:  Thank you very much.

17  EXAMINATION BY MR. INGRAM OF MS. BLACK:

18  Q.   Good morning.  My name is Jerry Ingram.  John

19         Juhasz and I share the responsibility of

20         representing Donna Roberts, who is on

21         trial for her life.  So we feel we should

22         take every reasonable precaution in

1567

1                selecting a fair minded Jury, the same

2                type Jury that you or I would want if we

3                were on trial; does that sound fair

4                enough to you?

5  A.    Yes.

6  Q.    This is the only time during a trial where

7                lawyers and jurors can talk directly to

8                one another.  Not only am I permitted to

9                ask you questions, but you are permitted

10              to ask me questions.  And it is actually

11              far more important that you ask your

12              questions, than I ask mine.  So if during

13              the course of this discussion, there's

14              something that pops into your mind, or

15              there's something you would like to

16              discuss with me, just tell me to hold up,

17              bring it to my attention and we'll try to

18              address that issue, okay?

19  A.    Okay.

20  Q.    As you know -- by the way, are you a lucky or

21              unlucky person?  I'm trying to figure

22              that out.  Three times for Jury duty?

1568

1   A.   That is what I said and I know people have

2            never been chosen.

3   Q.   You know this is a lot like a job interview,

4            except when you go to be interviewed for

5            a job, you select the job that you are

6            applying for.  Here the Jury wheel pulls

7            your name and in your case, I guess the

8            Jury wheel just keeps pulling and

9            pulling.  We're interviewing you today

10           for one of the most important jobs there

11           is.  The job of finding the truth and

12           determining the fate of another human

13           being.

14              Now not every one is up to that.  We

15           have already had some people tell us that

16           they thought the responsibility was just

17           too much for them.  So my first question

18           to you is how do you feel about being

19           asked to assume that responsibility and

20           in your case, not once, but twice?

21   A.   I would accept that.

22   Q.   I am a little confused by your prior criminal

1569

1        juror experience in 1994.  You went

2        through the Voir Dire process.  Was it

3        individual or was it a group process at

4        that time, do you remember?

5   A.  I believe it was individual.

6   Q.  Do you remember what Courtroom that was in?

7   A.  I think it was at the other end of the hall,

8        whatever one that is.

9   Q.  You started the trial, heard evidence during a

10       first phase?

11  A.  Yes.

12  Q.  Did you actually render a verdict at the end

13       of that first phase?

14  A.  Yes.

15  Q.  Then you never started a second phase?

16  A.  No.  We were supposed to come back and I

17       forget the time, like in a three month

18       period to come back and I believe the

19       bailiff who called and said that he

20       decided to take life in prison without a

21       chance of parole, to avoid the death

22       penalty.  So I never came back for the

1570

```
 1              second phase.
 2    Q.   As you know, the job responsibility of a trial
 3              juror is to fairly determine the facts of
 4              any case?
 5    A.   Yes.
 6    Q.   Your job responsibility now is to tell us if
 7              you have any problem giving either side a
 8              fair shake?
 9    A.   No.
10    Q.   I'm going to ask you some hard questions.  And
11              I am candidly going to admit to you, that
12              if you were asking me the same questions
13              I'm asking you, they would be hard for
14              me.  What I really want you to understand
15              about that, there are absolutely no right
16              or wrong answers.  The only mistake you
17              could possibly make is if you tell me
18              what you think I wanted to hear.
19    A.   I understand that.
20    Q.   Rather than how you honestly feel.  Mr. Bailey
21              talked to you about complicitors, aiders
22              and abetters?
```

```
                                                              1571
 1   A.    Yes.

 2   Q.    In a nutshell this case boils town to the

 3         Government's allegation that Donna

 4         Roberts plotted or conspired with a male

 5         companion, Nate Jackson, to cause the

 6         death of Robert Fingerhut.  Donna and

 7         Robert Fingerhut were divorced, but

 8         continued to work together at the

 9         Greyhound bus station in Youngstown and

10         Warren, and also continued to live

11         together in Howland Township.  You

12         understand that this trial is about the

13         guilt or innocence of one person and one

14         person only?

15   A.    Yes.

16   Q.    And that person is Donna Roberts?

17   A.    Yes.

18   Q.    Now, the State of Ohio alleges that she's a

19         complicitor and an aider and abetter.

20         Basically, a helper.  You going to hold

21         them to their burden of proving that?

22   A.    To the point where they can convince us of it,
```

1572

1         yes.

2   Q.   Because that's what this is all about,

3         correct?

4   A.   Yes.

5   Q.   In support of its allegations that Donna aided

6         or participated in the death of Robert

7         Fingerhut, the State will present various

8         letters and recorded conversations

9         between Donna and Nate Jackson.  Now, I

10        have to tell you that some of that

11        evidence, some of those letters, those

12        recorded conversations, are sexually

13        explicit.  And to be honest with you,

14        down right offensive.  You understand

15        that the allegation here is murder, not

16        loose morality?

17  A.   Yes.

18  Q.   You also understand that no matter how shocked

19        or offended you may be by the sexual

20        nature of this evidence, you are still

21        going to have to test the evidence to

22        determine whether it ties Donna to the

1573

1           offense.  Can you do that?

2   A.   Yes.

3   Q.   Donna denies that she participated by

4           conspiracy, plot or otherwise, in the

5           murder of Robert Fingerhut.  Would you

6           have a problem giving a scarlet woman a

7           fair trial?

8   A.   No.

9   Q.   Would you have the courage to acquit, that is

10          vote for not guilty, if you thought a not

11          guilty verdict was supported by the

12          evidence?

13  A.   No.

14  Q.   When you came here last Tuesday and you met

15          down at the other end of the hall, down

16          there, did anything happen there that

17          jogged your recollection as to anything

18          you may have seen, read or heard about

19          this case?

20  A.   I know absolutely nothing about it before

21          then.

22  Q.   Did anything happen in that room that caused

1574

1   you any concern whatsoever?

2   A.   No.

3   Q.   It is extremely important that trial jurors

4        avoid as best they can, because sometimes

5        it is hard and sometimes it is not

6        possible, but they must avoid as best

7        they can exposure to news coverage?

8   A.   I understand that.

9   Q.   And the best example I have of that and I hate

10       to ever mention his trial, and that is

11       O.J. Simpson.  Every night you turn on

12       the T.V., and there would be some high

13       flautin Prosecutor and then right next to

14       him is a high flautin Defense lawyer.

15       And they put a different spin or

16       interpretation on the evidence.  A juror

17       shouldn't be exposed to that, it might

18       affect him; do you understand that?

19  A.   Yes.

20  Q.   You see it is the same in this case?

21  A.   Yes.

22  Q.   It is so important that the Judge even asked

1575

1    you to sign a written document; do you

2    recall that?

3  A.   No.

4  Q.   I believe that there's a piece of paper like

5    this that you signed.  If you haven't

6    been asked to sign it, you will be asked

7    to sign it.  But the bottom line is, you

8    will do your best to avoid exposure to

9    the newspaper?

10  A.   Yes.

11  Q.   And you understand why we ask you to do that?

12  A.   Yes.

13  Q.   And even trial jurors are told to keep an open

14    mind, that is, not form any impression

15    about the facts of the case until the

16    case is over.  And the reason for that

17    is, if you form an opinion or an

18    impression early on, it might stop you or

19    prevent you from objectively listening to

20    the rest of the evidence as the case

21    unfolds.

22  A.   I understand that.

1576

1    Q.    And will you do your best to avoid forming any

2          early impressions?

3    A.    Yes.

4    Q.    As you know, this is a capital case, and we're

5          required to learn your feelings regarding

6          the death penalty and life imprisonment

7          as sentencing options.  But before I go

8          there, I want to explain to you a concern

9          that I have.  I don't want you to get the

10         idea that just because I'm standing up

11         here talking to you about punishment,

12         that I am predicting that you are going

13         to have to decide the issue of

14         punishment.  Do you understand that?

15   A.    Yes, I do.

16   Q.    I am a lawyer, I'm not a fortune teller.  No

17         one here is predicting that we're going

18         to get to a second phase.  Do you

19         understand that?

20   A.    Yes, I do.

21   Q.    The law requires that we ask you these

22         questions now and that is why we're doing

1577

```
 1              it.  To me and maybe I just look at
 2              things a little differently, but to me it
 3              seems like putting the cart before the
 4              horse.  You understand what I mean by
 5              that?  We're talking about punishment,
 6              when actually in my mind, we should be
 7              talking about guilt or innocence?
 8    A.   I understand.
 9    Q.   No punishment is ever appropriate for an
10              innocent person, is that right?
11    A.   Definitely.
12    Q.   You understand that this is potentially and
13              only potentially a two phase process?
14    A.   Yes.
15    Q.   If the Jury returns a not guilty verdict at
16              the first phase, what happens?
17    A.   There's not a second phase.  There's no reason
18              for it.
19    Q.   I'm going to talk to you about a second phase.
20              But when I talk to you about a second
21              phase, it is not even in this case.  I am
22              making up some second phase in some
```

1578

```
 1              imaginary case.

 2    A.    Okay.

 3    Q.    Whenever a Jury starts a second phase in a

 4              capital trial, they are to consider four

 5              sentencing options.  And you think you

 6              have a handle on those four options?

 7    A.    Yes.

 8    Q.    Do you understand that life without parole is

 9              indeed without parole?

10    A.    Yes.

11    Q.    You don't get out and the other two, the 25

12              and the 30 year eligibility, you do day

13              for day?

14    A.    Yes.

15    Q.    And you understand that in our imaginary

16              second phase, it is the jurors'

17              responsibility, upon their oath, to

18              consider all four of those equally with

19              an open mind?

20    A.    Yes.

21    Q.    And that not one punishment cannot start with

22              a head start or a jump start over the
```

1579

1   others, do you understand that?

2   A.   Yes, I do.

3   Q.   How do you feel about life imprisonment as an

4        alternative to the death penalty in a

5        premeditated murder case where it is

6        proven to you, and I'm going to use your

7        words, beyond all doubt.  We know that

8        that is not the burden here and we'll

9        talk about that.  But you are a juror in

10       an imaginary case that has convicted the

11       Defendant of premeditated, which is

12       advanced planning murder, and in your

13       mind not only has the State met its

14       burden of proof beyond a reasonable

15       doubt, but the State has met a burden of

16       proof beyond all doubt.  Now in that

17       case, or in such a case, how do you feel

18       about the death penalty as the life

19       imprisonment as an alternative for the

20       death penalty?

21   A.   I more or less, with the death penalty,

22        naturally you are taking a life, but life

1580

1       imprisonment is also probably in some

2       people's eyes as bad.  It is life in

3       prison period.  The only difference is

4       that person would not be suffering by

5       being in prison.

6   Q.  Have you ever heard anybody say to you that,

7       "I don't like this idea of life

8       imprisonment, because I am a tax payer

9       and I shouldn't have to pay to house

10      people."  What is your opinion of that

11      argument?

12  A.  I think sometimes I could agree with them

13      because our prisons are so full of

14      people, but I don't think the alternative

15      is to execute people because of lack of

16      room or because of taxpayers.  I think

17      sometimes they have too much comfort, not

18      that they should be uncomfortable in

19      prison, but I mean, sometimes they have

20      too much comfort.  And maybe I don't know

21      what prisons are really like, but just

22      what you read and hear about.

1581

1    Q.    Have you ever considered a political

2          candidate's views on capital punishment

3          in determining whether or not to vote for

4          that candidate?

5    A.    No.

6    Q.    Recently in this country, we have been having

7          some renewed debate about whether we as a

8          nation should have a death penalty.

9          There was a moratorium put on executions

10         in the State of Illinois and the Supreme

11         Court recently decided a case prohibiting

12         executions of the mentally impaired.

13         Have you seen or heard anything about

14         that debate?

15   A.    No.

16   Q.    In your questionnaire, you indicate that you

17         have expressed an opinion either in

18         conversation or debates about the death

19         penalty, and that you were usually in

20         favor.  I take it that sometimes you were

21         not, but in favor -- but usually you

22         were?

1582

1   A.   Yes.

2   Q.   Is that accurate?

3   A.   Yes.

4   Q.   Can you tell me what separates those occasions

5        when you were not in favor, from those

6        occasions when you were in favor?

7   A.   I would think it would be the degree of the

8        crime.

9   Q.   What do you mean by the degree?

10  A.   There's been so many children kidnapped lately

11       and so many abuse cases like that, and I

12       just don't think that that person, if

13       they have taken a child's life or an

14       innocent person's life in different

15       situations, should be allowed to continue

16       life in prison.

17  Q.   In your personal view, a child victim is a

18       significant aggravating circumstance?

19  A.   Definitely, I think.

20  Q.   So do I.

21  A.   Probably somebody who has lost a loved one to

22       murder, of 40 years old, wouldn't have

1583

```
 1              that same opinion, but I don't have those
 2              situations.  I don't even have a child
 3              situation like that, but thinking about
 4              children, it would be more of a severe --
 5              and how do you say, because of age, one
 6              is more severe than the other, but that
 7              is my thoughts.
 8    Q.   Did I also hear you use the words innocent
 9              victim?  I thought I did.
10    A.   Possibly.
11    Q.   You understand whenever anyone loses their
12              life because of a murder, they are an
13              innocent victim?
14    A.   Definitely.
15    Q.   By the way, how old are your boys, 28 and 26?
16    A.   Yes.
17    Q.   Can you give me some gratuitous advice?  I
18              have 21 year old and 18 year old.  How
19              did you manage the teen years?
20    A.   The oldest one gave me a run for my money.
21    Q.   Jason is a policeman in Atlanta?
22    A.   Yes.
```

1584

```
 1    Q.   You admire him and we all admire police
 2              officers, because they protect us and
 3              they put their lives on the line?
 4    A.   Definitely.
 5    Q.   I'm not so sure that we -- and by we, I mean
 6              society as a whole really appreciate what
 7              they do on a daily basis?
 8    A.   Absolutely agree.
 9    Q.   But in this case and in most criminal cases,
10              you are going to hear the testimony of
11              one or more police officers.
12    A.   I understand that.
13    Q.   And you will have to determine whether you
14              believe those police officers just as you
15              have to determine whether you believe
16              other witnesses.  Are you going to
17              believe a police officer just because
18              he's a police officer?
19    A.   No.
20    Q.   Would you agree with me that the uniform
21              doesn't make the man?  What you are going
22              to have to do is see past the uniform and
```

1          evaluate the testimony of the man wearing

2          the uniform?

3   A.   Absolutely.

4   Q.   And police officers are human just like you

5          and I?

6   A.   Definitely.

7   Q.   They have the same limitations.  They make the

8          same mistakes and they have the same

9          interests.

10  A.   Definitely.

11  Q.   You will judge the testimony of police

12         witnesses just as you will everyone else?

13  A.   Yes.

14  Q.   In our made up second phase, you understand

15         that the Jury will be called upon to

16         determine a sentence and that you will be

17         given guidelines?

18  A.   Yes.

19  Q.   You will be told about aggravating

20         circumstances and mitigating factors?

21  A.   Yes.

22  Q.   And you will have to balance those, and you

1586

1    can only vote for death if you are

2    satisfied beyond a reasonable doubt that

3    the aggravating circumstances outweigh

4    the mitigating factors, and that death is

5    the appropriate penalty?

6  A.  I understand that.

7  Q.  Will you hold the State of Ohio to that burden

8    of proof if there ever is a second phase?

9  A.  Yes.

10 Q.  When you are weighing evidence, that is the

11   Jury's job, right?

12 A.  Yes.

13 Q.  So basically, in terms of weight, what weight

14   to give those mitigating factors -- if

15   you hear mitigating factors, the buck

16   stops with you, correct?

17 A.  It is up to the attorneys to prove the cases,

18   but yes.

19 Q.  This is not a trick question.  I want to make

20   sure that we're on the same page.  Whose

21   burden is it to prove that death is the

22   appropriate punishment?

1587

1    A.    I think it is the attorneys place to prove to

2          give us the information to work on to

3          come to a conclusion.

4    Q.    However, we have two different attorneys here.

5          We have four attorneys.  Mr. Juhasz and I

6          are Defense attorneys, and Mr. Becker and

7          Mr. Bailey are Prosecutors.  So, who

8          bears the burden in an imaginary second

9          phase of convincing the Jury that death

10         is the appropriate penalty?

11   A.    The Prosecutor.

12   Q.    And you will hold these two guys to their

13         burden if you ever have to decide the

14         issue of punishment?

15   A.    Yes.

16   Q.    Have you ever donated any time, money or

17         services to a political campaign or

18         issue?

19   A.    No.

20   Q.    Do you belong to any group or organization

21         which is active in any political matter?

22   A.    No.

1588

1    Q.   In the last five years, have you signed a
2         petition on any public issue?
3    A.   No, not that I can recall, no.
4    Q.   Do you belong to or associate with any group,
5         which has crime prevention or law
6         enforcement as a goal?  And by that, I
7         mean neighborhood block watch, MADD,
8         SADD, anything like that?
9    A.   No.
10   Q.   Mr. Bailey talked to you about sympathy and he
11        asked you if you could decide this case
12        and set aside all sympathy for Donna
13        Roberts and you should do that, you
14        understand that?
15   A.   Yes.
16   Q.   But there's a flip side to that.  Whenever
17        someone unexpectedly loses his life, it
18        is natural to feel sympathy for that
19        person, correct?
20   A.   Probably.
21   Q.   Well, if you suddenly and unexpectedly lost
22        your life because somebody takes it from

1589

1    you, it is natural to feel sympathy?

2  A.    Yes.

3  Q.    And you will have to decide this case, setting

4         aside natural feelings of sympathy for

5         Robert Fingerhut.  Can do you that?

6  A.    Yes.

7  Q.    That may be easier said than done, and we

8         actually ask jurors to do all kinds of

9         things that are easier said than done.

10        And I say that it is easier said than

11        done because you are going to see

12        evidence, you are going to hear evidence.

13        You will see photographs of gunshot

14        wounds.  And one of these wounds is point

15        blank right in the back of the head.

16        Coroner's photographs, some of them may

17        be enlarged.  And this evidence may evoke

18        an emotional response from you, sympathy

19        or anger.  Even though evidence evokes an

20        emotional response from you, you are

21        going to have to test that evidence to

22        see if the evidence ties Donna to this

1590

```
 1              offense.  Do you think you are up to
 2              that?
 3   A.   Yes.
 4   Q.   How do you feel personally about the rule of
 5              law which says that jurors are to presume
 6              a Defendant innocent?
 7   A.   You can have mixed feelings there, but I think
 8              that is only fair that you should prove
 9              that the person is guilty.  It would
10              probably be harder to prove that the
11              person is innocent, if in our country
12              that they were guilty from the start.
13   Q.   Either countries do it that way -- France,
14              some of the European countries.  What
15              separates our heritage and obviously our
16              heritage involves the English heritage,
17              from basically the rest of the world is
18              the Bill of Rights, and the Constitution
19              and a fundamental precept is the
20              presumption of innocence.  Not everybody
21              agrees with it.  And I have some friends,
22              they are actually good friends, who like
```

1591

```
 1              you, see an increase in the crime
 2              problem.  And they would actually do away
 3              with the presumption of innocence and
 4              replace it with a presumption of guilt.
 5              How do you feel about that?
 6    A.   I don't think that is right.  I don't know
 7              what the solution is to reduce crime, but
 8              I don't think that would do it.
 9    Q.   Why don't you think for a second and tell me
10              if you have any ideas about what we, and
11              by we I mean society as a whole, might be
12              able to do to increase the -- to decrease
13              the crime problem that we have been
14              talking about?
15    A.   I have absolutely no idea, but other countries
16              don't have it.  I don't know if I read
17              correctly, Canada has had so many
18              killings opposed to just in Youngstown
19              and here, I don't understand what they
20              are doing different than us.  I don't
21              know what the solution is for that.
22    Q.   I sense from what you are telling me that you
```

1592

1              have actually devoted some thought to the

2              issue, but you have been unable to arrive

3              at any answer?

4   A.   I wouldn't say that I got in deep thought

5              about it.  I think anybody would think,

6              what can you do to decrease crime.  I

7              don't know what you can do to decrease

8              crime.

9   Q.   You understand that your oath as a juror would

10             require that you afford Donna the full

11             benefit of the presumption of innocence?

12  A.   Yes.

13  Q.   Let's talk about that a little differently.

14             If one of your boys were accused of some

15             wrongdoing and you, in your heart,

16             honestly felt that he didn't do it, you

17             would require evidence before you would

18             be willing to change your mind, wouldn't

19             you?

20  A.   Yes, definitely.

21  Q.   You would be presuming your son innocent in

22             that circumstance?

1593

1    A.    Yes.

2    Q.    It's the same here, do you understand that?

3    A.    Yes.

4    Q.    And in that situation where your son was

5        accused of wrongdoing, I imagine you

6        wouldn't willy nilly accept that evidence

7        at face value. You might look at it with

8        a critical or jaundiced eye to make sure

9        it really says or says what it is

10       supposed to mean. Will you do that here?

11   A.    Yes.

12   Q.    Because of the presumption of innocence, the

13       State has the burden of proof. Let's go

14       back to our conversation about the

15       presumption of innocence for a moment.

16       And again, this is a trick question. If

17       we were to replace the presumption of

18       innocence with a presumption of guilt,

19       who would have the burden of proof?

20   A.    You would.

21   Q.    That is right. But that is not the way we do

22       things in this country, and you believe

1594

1          in that?

2   A.   Yes.

3   Q.   So you are going to hold these fellows to

4          their burden of proof?

5   A.   Yes.

6   Q.   Because that is what your oath requires you to

7          do?

8   A.   Yes.

9   Q.   And if you think at all that you are going to

10         have a problem with that, now is the time

11         to tell us.  I don't think you are.

12  A.   No, you have to follow the laws of the Court

13         and that was the same situation with the

14         first trial I was on.  Not to reflect

15         back on that, we were never positive that

16         he shot that person, but if I understood

17         the laws of the Court correctly, if we

18         could place him within that area of that

19         gun at any time, you have to prove one

20         way or the other.  You have to come to a

21         conclusion by the laws of the Court one

22         way or another.

1595

1   Q.   Let's talk about that.  I'm not so sure that I
2        agree with the principle of law, which
3        you have just described, but I don't have
4        to agree with it.  But in this case, your
5        law, the law that you will apply, comes
6        from one Judge and one Judge only and
7        he's sitting right there.
8   A.   I understand that.
9   Q.   Whatever that Judge in that other case may
10       have told you does not apply here?
11  A.   I understand that totally.
12  Q.   You can separate those things from your mind?
13  A.   Definitely.
14  Q.   You understand that Donna is on trial for
15       murder, not for being a woman of loose
16       moral character?
17  A.   Yes.
18  Q.   And while the State may prove that Donna was a
19       loose woman, their burden of proof in
20       this case is to prove that she
21       intentionally participated in the death
22       of Robert Fingerhut?

1596

1   A.   Okay.

2   Q.   Will you hold the State to that burden?

3   A.   Yes.

4   Q.   Mr. Bailey talked to you about essential

5        elements.   There's two aggravated murder

6        charges.   You think you have a handle on

7        that?   There's two aggravated murder

8        charges.   One is premeditated murder --

9        actually it is now called prior

10       calculation and design.   The essential

11       elements are venue, which is that it

12       happened here -- identity, purposely

13       caused the death of Robert Fingerhut,

14       with prior calculation and design?

15  A.   I understand that.

16  Q.   Then there's another count of aggravated

17       murder, which is felony murder, purposely

18       caused the death of Robert Fingerhut,

19       while in the commission of an aggravated

20       burglary or aggravated robbery.

21  A.   I understand that.

22  Q.   You understand that purpose is an essential

1597

```
 1              element of both of the murder charges?
 2    A.    Yes.
 3    Q.    And I believe the Judge will tell you at the
 4              end of the case, that purpose is the same
 5              as intent.  A person acts purposely if it
 6              is his specific intention to cause a
 7              specific result.  Would you agree with me
 8              that the facts and circumstances
 9              surrounding an act, can shed some light
10              on the actor's intent?
11    A.    Yes.
12    Q.    For instance, if you do something and you
13              leave a paper trail all over the place,
14              it is less likely that your objective is
15              unlawful as opposed to covering your
16              tracks; does that make sense to you?
17    A.    Yes.
18    Q.    Or another way of looking at it, I guess.  If
19              you do something in broad daylight out in
20              the open in the presence of others, it is
21              less likely your objective is unlawful as
22              opposed to doing it in secret under cover
```

1598

1  of darkness?

2  A.  I understand that.

3  Q.  The third count in the indictment is the

4      aggravated burglary count.  That is also

5      the first death specification to the two

6      aggravated murder counts.  Are you with

7      me there?

8  A.  Yes.

9  Q.  And when Mr. Bailey told you the essential

10     elements of aggravated burglary, do you

11     recall hearing the word "trespass"?

12 A.  Yes.

13 Q.  And I think the Judge will define trespass as

14     to enter or remain on the land or

15     premises of another.  Will you hold the

16     State to their burden of proving

17     trespass?

18 A.  Yes.

19 Q.  The fourth count is aggravated robbery, which

20     is in committing or attempting to commit

21     a theft offense, someone had a deadly

22     weapon on or about their person.

1599

1   A.    Okay.

2   Q.    And a theft offense necessarily involves the

3           taking or an attempt to take the property

4           of another, right?

5   A.    Yes.

6   Q.    Will you hold the State to their burden of

7           proving that there was an intended theft

8           offense?

9   A.    Yes.

10   Q.    And that aggravated robbery charge is the

11           second death specification to the two

12           counts of the indictment. We have talked

13           about how we ask jurors to do hard

14           things.

15   A.    Yes.

16   Q.    And sometimes we ask them to do unnatural

17           things, because in our daily lives,

18           whenever we're called upon to resolve a

19           dispute, the first thing we ever say,

20           either to ourselves or to the people

21           involved in the dispute is, "Whoa, let me

22           get both sides of the story."

1600

1    A.   Yes.

2    Q.   In this case, your oath as a juror may require

3         you to put aside that natural

4         inclination, because you understand,

5         Donna doesn't have to testify.

6    A.   I do.

7    Q.   If she were to elect not to testify, how would

8         you feel about that?

9    A.   I don't think I would have an opinion on that.

10        That is her right.

11   Q.   If she does testify, you understand she's a

12        witness just like any other witness.  We

13        talk about determining the credibility of

14        police officers.

15   A.   Yes.

16   Q.   The same rules and standards that you employ

17        to determine the credibility, the

18        believability of policemen, any other

19        witness, would apply to Donna Roberts.

20        You should take the same rules, the same

21        standards and apply them to every witness

22        that testifies.

1601

1    A.    Yes.

2    Q.    You feel that because a Defendant and the case

3          is a Defendant, that there ought to be

4          some special qualification on her

5          testimony or his testimony?

6    A.    No.

7    Q.    Let me be fair about this.  She's the

8          Defendant, right?

9    A.    Yes.

10   Q.    She does have an interest or a stake in the

11         outcome of these proceedings.

12   A.    Yes.

13   Q.    And that is obviously something you had wanted

14         to keep in mind, isn't it?

15   A.    Yes.

16   Q.    So to do it the right way, you would take that

17         factor, interest or stake in the outcome,

18         and you would apply it to Donna, you

19         would apply it to the policeman, you

20         would apply it to every witness that

21         testifies, if it applied.  Will you do

22         that?

1602

1   A.   Yes.

2   Q.   I don't want to spend a lot of time on the

3        fact on an indictment, but this case

4        began with the filing of an indictment.

5        And an indictment is not evidence, and

6        merely informs the Defendant of the

7        nature of the allegations leveled against

8        him or her.  You got me?

9   A.   Yes.

10  Q.   The Judge told you in the orientation

11       instructions and I believe in the

12       preliminary instruction, that the

13       indictment is not evidence.  Did you know

14       that Grand Jury proceedings were secret?

15  A.   No.

16  Q.   They are.  And when this case went to the

17       Grand Jury, Donna was not there.  I was

18       not there.  Mr. Juhasz was not there.  We

19       didn't even know it was scheduled.  So

20       there was no opportunity to test the

21       evidence presented to the Grand Jury.

22       You understand that?

1603

1  A.  Yes.

2  Q.  And the Grand Jury, they just decided that,

3        "Well, yes, there's reasons she should

4        stand trial, and we're going to leave the

5        hard decisions to another Jury."  That is

6        your job.  You understand where the role

7        is different?

8  A.  Yes.

9  Q.  The evidence is different?

10  A.  Yes.

11  Q.  And this indictment will be read to you, and

12        referred to throughout the course of the

13        trial.  What I want you to understand is

14        no matter how many times it is read to

15        you, no matter how many times it is

16        referred to, it does not magically become

17        transformed into evidence.  Do you

18        understand me?

19  A.  Yes.

20  Q.  As you know, because of your prior

21        involvement, one of the big job

22        responsibilities of the trial Jury is to

1604

```
 1              determine the credibility of the

 2              witnesses.  The Judge will tell you, you

 3              can believe all of what a witness says,

 4              part of what a witness says, none of what

 5              a witness says.  And the Judge will give

 6              you a set of standards to help you do

 7              that, and you should apply those

 8              standards to each and every witness that

 9              testifies.  Will you do that?

10    A.   Yes.

11    Q.   But he's going to give you one standard called

12              the test of truthfulness, which you apply

13              in your every day life.  And working at

14              the bank, you frequently have to

15              determine whether a coworker or when you

16              were a teller, whether a customer was

17              being straight up with you or trying to

18              hoodwink you?

19    A.   Yes.

20    Q.   And over the years, you developed a sort of

21              sixth sense or an intuitive way of doing

22              that.
```

```
                                                      1605
1   A.   Yes.

2   Q.   Whatever that sixth sense or that intuitive

3        way is, we don't want you to leave it out

4        there at the Courtroom door.  You are

5        supposed to bring it in here, and apply

6        it to everyone that testifies.  Will you

7        do that?

8   A.   Yes.

9   Q.   You do understand, by the way, the green

10       Martians and sound and light shows have

11       nothing to do with this case?

12  A.   Yes.

13  Q.   We're talking here about proof beyond a

14       reasonable doubt.  Do you ever say to

15       yourself, I'm going to give him -- maybe

16       one of the boys, the benefit of the

17       doubt?

18  A.   Definitely.

19  Q.   Well, did you ever say to yourself, I'm sure

20       you did, that you never said I'm going to

21       give him the benefit of an unreasonable

22       doubt, did you?
```

```
                                                    1606
 1   A.   No.

 2   Q.   It sounds silly, but my point is this.  I

 3        think we all intuitively know what is

 4        reasonable from what is unreasonable.

 5   A.   Yes.

 6   Q.   Does that make sense to you?

 7   A.   Yes.

 8   Q.   The Judge will tell you that proof beyond a

 9        reasonable doubt requires that you be

10        firmly convinced of the allegation, and

11        is proof of such a character that an

12        ordinary person would be willing to rely

13        and act upon it in the most important of

14        his or her own affairs.  That is a

15        definition you have heard before?

16   A.   Yes.

17   Q.   We're all called upon to, in our lives, to

18        make important decisions and you have

19        obviously made important decisions.

20        Sometimes we actually make a check list.

21        Either some people actually do it on

22        paper, some people do it in their mind's
```

1607

```
 1              eye, put a line and they put the positive
 2              things, the favorable things on one side,
 3              and the bad things, the negatives on the
 4              other side.  And what I do in that
 5              situation is I look at the negatives,
 6              because if I can scratch off the
 7              negatives, I know I'm making the right
 8              decision.
 9   A.   Okay.
10   Q.   Are you with me?
11   A.   Yes.
12   Q.   And if you are exploring negatives and you
13              start scratching them, because they are
14              unreasonable, because your investigation
15              leads you to conclude that it won't
16              happen, let's say it is a house, you are
17              buying a house and you are worried about
18              the structural stability of the house.
19              You call in a termite inspector, you call
20              in an engineer, and you scratch that.
21              But there's a nagging doubt about whether
22              or not, let's say you can make the
```

1608

|   |   |   |
|---|---|---|
| 1 |   | mortgage payment.  Or I have not bought |
| 2 |   | homes, because I was concerned whether I |
| 3 |   | could make the mortgage payment.  And go |
| 4 |   | to the bank, see if I can get a lower |
| 5 |   | rate.  I try to come up with more of a |
| 6 |   | down payment.  No matter what I do, I |
| 7 |   | cannot scratch that doubt from the |
| 8 |   | negative side.  It remains reasonable. |
| 9 |   | If there's one negative doubt on the |
| 10 |   | negative side, I cannot say to myself |
| 11 |   | beyond a reasonable doubt that that |
| 12 |   | decision is the right thing for me.  Do |
| 13 |   | you understand that? |
| 14 | A. | I understand that. |
| 15 | Q. | And that is proof beyond a reasonable doubt? |
| 16 | A. | Yes. |
| 17 | Q. | And Mr. Bailey is right.  The State of Ohio |
| 18 |   | can attempt to meet its burden by using |
| 19 |   | direct evidence and circumstantial |
| 20 |   | evidence.  I think you understand what |
| 21 |   | circumstantial evidence is, don't you? |
| 22 | A. | Yes. |

1609

1   Q.   Let's talk number one, about the example

2        Mr. Bailey gave you.  It is nighttime.

3        You hear the pitter patter as he said of

4        rain on the roof.  You hear the clap of

5        thunder.  You see the flash of lightning.

6        That is direct evidence of all of those

7        things?

8   A.   Yes.

9   Q.   Because you are hearing rain, right?

10  A.   Yes.

11  Q.   You do see the lightning?

12  A.   Yes.

13  Q.   Or the flash from the lightning and you do

14       hear the thunder, but you don't see the

15       rain storm itself.  So that is a

16       reasonable assumption, under the

17       circumstances, when you get up in the

18       morning, that it rained?

19  A.   Definitely.

20  Q.   Let's change this a little bit.  On Sunday

21       mornings, I like my Sunday paper.  So I

22       might be upstairs and because I smoke too

```
                                                              1610
 1               much, I would have a cigarette in one
 2               hand and a cup of coffee in another.  I
 3               look out the window and I want to see if
 4               the paper boy is in sight and I don't see
 5               the paper boy, but I see footprints in
 6               the snow from my neighbor's house to my
 7               front door, from my front door to the
 8               other neighbor's house.  So, I infer,
 9               because that is what is circumstantial
10               evidence is, an inference that my paper
11               is at the front door.  I go downstairs, I
12               open the door, I go to get my paper, and
13               low and behold, there are my Kroger
14               coupons, my Giant Eagle coupons.  It's
15               not my newspaper, it is the grocery store
16               coupons.  You have to test the inferences
17               that you are asked to make.  Do you
18               understand that?
19    A.   Yes.
20    Q.   And let's go back to the presumption of
21               innocence with your children, where they
22               may have been accused of some wrongdoing
```

1611

```
 1              and I made that up.  I'm not saying they
 2              were really accused.  But in that
 3              situation, if you were asked to make
 4              inferences, certainly you would number
 5              one, test the inference, wouldn't you?
 6    A.   Yes.
 7    Q.   Make sure it is reasonable?
 8    A.   Yes.
 9    Q.   Because an inference after all is a leap in
10              logic, right?
11    A.   Yes.
12    Q.   And if the leap isn't logical, if the leap
13              isn't reasonable, that leap shouldn't be
14              made; you agree with that?
15    A.   Yes.
16    Q.   In a situation where you are asked to make
17              leaps in logic with someone that you
18              honestly feel to be innocent, you would
19              look for alternative leaps, wouldn't you
20              or other inferences, like with my coupon
21              scenario.
22    A.   I understand what you are saying, yes.
```

1612

```
 1    Q.   Will you do that in this case?

 2    A.   Yes.

 3    Q.   So you will test the circumstantial evidence

 4              and all inferences that you are asked to

 5              make?

 6    A.   Yes.

 7    Q.   And would you agree with me that

 8              circumstantial evidence is basically like

 9              a chain?  It can only be as strong as its

10              weakest link?

11    A.   Probably, yes.

12    Q.   Will you look for weak links?

13    A.   Yes.

14    Q.   I have been up here quite long enough and if I

15              have tried your patience, I humbly

16              apologize, but is there anything that has

17              come to your mind that you would like to

18              ask any of us here or discuss with us?

19    A.   No.

20    Q.   Now that I have asked you that question,

21              something has popped into my mind.  Your

22              dogs.  Have you tried to make
```

1613

1    arrangements, have you forwarned anyone

2    that you may need someone to take care of

3    your dogs?

4  A.   I have mentioned it at work.

5  Q.   And has someone indicated that they would be

6    able to help you out?  Let me tell you,

7    if we're going to have a problem with

8    that, we really should know it now.  I

9    have should have asked you that question

10   first off.

11  A.   I originally thought I would have a problem

12   with that, but I know that where I got my

13   German Shepherd, she would take them if

14   she needed to, and my smaller ones

15   probably wouldn't be a problem for anyone

16   to come in and let them out through the

17   day.

18        MR. INGRAM:  Thank you.

19  (SIDE BAR DISCUSSION, OFF THE RECORD AND

20  OUT OF HEARING)

21        THE COURT:  Miss Black, you will be

22  in the pool from which this Jury is selected.  You

1614

1  should call that number next Friday evening after

2  4:30 for further instructions.  We should have a

3  pool together by then, so that following week we'll

4  try to pick the Jury in this matter.  I would again

5  remind you not to discuss anything, or read

6  anything.  Thank you.

7           Both Plaintiff, Prosecution and the

8  Defense have passed for cause on this last lady,

9  Miss Black?

10                 MR. BAILEY:  Yes, Sir.

11                 MR. JUHASZ:  Yes, Sir.

12  (Court in recess at 10:50 a.m.)

13  (Resumed in Open Court at 11:20 a.m.)

14  (Juror No. 76, Panda Heatherly-Lantz, entered the

15  Courtroom.)

16                 THE COURT:  Miss Lantz, you have

17  read the handout that was given to you?

18                 MS. LANTZ:  Yes.

19                 THE COURT:  You have a pretty good

20  idea of why we're here.  The purpose of the

21  individual questioning is to inquire in two areas.

22  Nothing to be nervous about.

1615

1    MS. LANTZ:  I had ear surgery

2  yesterday on this ear.

3    THE COURT:  Are you okay?

4    MS. LANTZ:  Yes.

5    THE COURT:  As you know, Donna

6  Roberts is charged with two counts of aggravated

7  murder with specifications.  Under Ohio law, a

8  person who commits murder does not necessarily face

9  the death penalty, it is only under certain

10  circumstances.  Miss Roberts has specifications as

11  to that indictment that places that with the

12  possibility for the Jury to consider.  The State is

13  called upon to try this case, present evidence and

14  after the Jury reviews the evidence, according to

15  the law which will be given, they are called upon

16  to determine the guilt or innocence of Miss

17  Roberts.  If they found that she's not guilty, then

18  that would be the end of the trial.

19    If they return a finding of guilty,

20  however, the matter will go on to a second hearing.

21  At the second hearing, the State is called upon to

22  present aggravating circumstances, which are

1616

1   reasons why the State is requesting the Jury to

2   consider and to impose the death penalty.  At that

3   same second hearing, the Defense has an opportunity

4   to present mitigating factors, if they care to.

5   And those would be reasons why the Jury should not

6   impose the death penalty.  So these folks are going

7   to want to know something about your views.

8   Whatever your views are on the death penalty is

9   fine.

10          Some people will have, it covers a whole

11  gamut of opinion.  There are those who think that

12  if you kill somebody, should forfeit their life.

13  That person cannot very well sit because it

14  couldn't be fair to the State.  Other people could

15  not see themselves as ever determining that a

16  person be put to death.  And I'm sorry.  I

17  misquoted.  A person who thought an eye for an eye

18  could not be fair to the Defendant.  A person who

19  could never impose the death penalty could not be

20  fair to the State.  Do you understand?

21          Now everyone else in between has some

22  view of the death penalty.  Some would favor it

1617

1    more than others, some would think it is probably

2    not a very good idea.  So we're not going to get

3    people on this Jury that don't have some opinion.

4    What it all boils down to is whether or not each of

5    the 12 jurors can set aside their personal thoughts

6    and follow the law in this matter.

7           The law of Ohio says that if you are

8    charged and found guilty of aggravated murder with

9    certain aggravating circumstances, then the Jury is

10   called upon to consider the imposition of the death

11   penalty, along with three lesser penalties of life

12   imprisonment.

13          The other area will be whether or not you

14   have been influenced by pre-trial publicity.  I see

15   in here that you indicate you were not, but there

16   was one comment made by somebody that morning.

17                 MS. LANTZ:  Correct.

18                 THE COURT:  Apparently before I gave

19   the instructions, so they will want to know whether

20   or not you have any fixed opinion that you are not

21   able to set aside.

22   EXAMINATION BY MR. BECKER OF MS. LANTZ:

```
                                                            1618
 1    Q.    Good morning.  My name is Chris Becker, I work

 2                with the Prosecutor's Office and this is

 3                Mr. Bailey, and I think if you recall

 4                last week, Mr. Bailey indicated that I

 5                would be joining him later on.  I don't

 6                know if you remember that or not.  I was

 7                in another case last week.  First of all,

 8                I want to ask you a couple of questions.

 9                I have noticed on your questionnaire and

10                obviously you have had some ear surgery?

11    A.    Yes.

12    Q.    Is that going to affect your ability to sit as

13                a juror in this case?

14    A.    No.  My hearing is already restored.  It is

15                just echoing because there's packing in

16                there.

17    Q.    There's no complication or side affects that

18                you are going to suffer from this?

19    A.    I went back to work Sunday.

20    Q.    The reason I ask this, the way this Courtroom

21                is configured.  It is your right ear and

22                the witnesses, as they come in this Court
```

1619

1    will be to your right and I don't know if

2    that would create a problem for you.

3         As the Judge indicated to you, we

4    need to ask you some questions, and if

5    you are selected for this Jury I think

6    you will find it is a very rewarding

7    experience.  It is certainly a unique

8    experience and it is really one of the

9    most civic duties that you can perform as

10   a member of our country as a citizen of

11   our country.  And we're not trying to pry

12   and if it seems that way, forgive us for

13   that, because we're trying to determine

14   whether you are what we think a good

15   juror should be in this case.  And the

16   same thing with Mr. Ingram and

17   Mr. Juhasz, they are trying to determine

18   if you are a good juror for them.  So we

19   need to know as much about you as we can.

20   We have a very short time to do it.  If

21   there's anything that you feel is

22   relevant as I am speaking to you that you

1620

1  need to tell me, or by all means

2  particularly, if you have any questions,

3  questions about this process or questions

4  about what your role may be, by all means

5  stop me and say, "Hey, I have got a

6  question."  Because this is really the

7  only opportunity in this case that we get

8  to speak to you as the attorneys.

9  If you are selected as a juror, and

10  you are seated over here in the Jury box

11  during this trial, the rules of conduct

12  for attorneys and the law relating to

13  attorneys, we can't speak to you once the

14  trial begins.  We can't say, "Hey, did

15  you hear that witness?"  And you can't

16  lean over to us and say, "Hey, what did

17  they mean when they said this?"  We can't

18  do that.  Once the trial begins, even if

19  we see you in the hallway or lunch or

20  something, we're not being rude, but we

21  can't give even the appearance that we're

22  trying to influence your decision, so

1621

1    that is why that rule exist.  So it is

2    really important that we discuss with you

3    today, your role and your feelings about

4    this case, and particularly this case

5    because it does involve the potential

6    penalty of the death penalty.

7        One of the things that is sort of

8    strange about a death penalty case is, is

9    that the death penalty is a potential

10   penalty that a Jury can return in a case

11   like this.  And we're going to be

12   presumptuous here in assuming we get to

13   that portion of this trial, because this

14   case is going to have two parts.  We may

15   never get to that part where you

16   determine that death is the appropriate

17   penalty, because the first thing we have

18   to do is, the State has to prove to you

19   and your fellow jurors that she's even

20   guilty by proof beyond a reasonable

21   doubt.  It is our burden to prove that,

22   and if we don't do that, then we don't

1622

1    end up getting onto that second phase.

2         So, bear with me, and that falls a

3    little bit in line of, like I said, once

4    the trial begins, we can't speak to you

5    so we couldn't very well have the trial

6    and you guys as a Jury determine that

7    she's guilty, and then we say, "Now the

8    next part of this trial is going to be

9    where you are going to determine whether

10   she should receive the death penalty."

11   There might be two or three or four

12   jurors on there that say, "Wait a minute.

13   I can't go along with that, my religious

14   beliefs or my personal opinion is, I

15   don't believe the death penalty should

16   exist."  Then we're stuck and we have to

17   start all over again.  That is why we

18   have got to ask you this in advance and

19   prepare you for it.

20        I notice on your questionnaire, also

21   that you had, I think a concert that you

22   are going to on May 13th?

1623

1   A.   Yes.

2   Q.   I don't know what day of the week that is.  Is

3        this a local concert?

4   A.   Yes, it's in Cleveland.

5   Q.   It is a Tuesday night.  I don't know if we'll

6        be done on May 13th.  We're going to try

7        and obviously get done as quickly as we

8        can, but this is a long process.  You

9        weren't planning on like taking the whole

10       day off or anything?

11  A.   No.

12  Q.   I am assuming you would be back late that

13       night?

14  A.   Yes.

15  Q.   We usually break here at 4:30, sometimes five

16       at the latest.  I am assuming the concert

17       maybe starts at seven or eight at night?

18  A.   Something like that.

19  Q.   It wouldn't affect you one way or the other,

20       in terms of that?  We won't want to keep

21       you here until 8:00 or 9:00.

22            THE COURT:  Mr. Becker, May 13th,

```
                                                    1624
 1   could conceivably be the case could be to the Jury

 2   by then.

 3               MR. BECKER:  That is true.

 4   Q.   There could be an issue of you may have the

 5             case.  You may be deliberating.  And

 6             depending on where we're at in the

 7             stages, you may be if we're in the second

 8             phase, you may be sequestered, meaning

 9             you may be holed up in a hotel.  I assume

10             that would be a problem for you?

11   A.   Yes.  I won't throw temper tantrums if I can't

12             go.

13   Q.   If you got to that point, you won't say, "I

14             don't care what happens.  I just lost 100

15             bucks on this concert.  I'll do

16             whatever."  You wouldn't feel that way,

17             would you?

18   A.   No.  I would give them to my Mom or sister.

19   Q.   As much as it would be an inconvenience, but

20             it wouldn't affect your ability to sit as

21             a juror in this case?

22   A.   Exactly.
```

1625

1   Q.    And I hope we don't get to that point, but if

2         we do inconvenience some people,

3         sometimes that does happen.  The first

4         thing I want to talk about, you indicated

5         in your questionnaire that you do believe

6         that the death penalty is appropriate in

7         some circumstances, correct?

8   A.    Exactly.

9   Q.    Now, this particular case is, and I'm going to

10        talk to you a little bit about this, is

11        that Miss Roberts is charged with two

12        different counts of murder.  It is

13        basically two different ways of going

14        after the same thing or approaching this

15        case.  And both of the murder charges,

16        the aggravated murder charges, carry the

17        potential penalty of the death penalty.

18        We're going to tell you right now, that

19        Miss Roberts is not the trigger person.

20        She didn't pull the gun in this case.

21        She didn't pull the trigger on the gun

22        and fire the gun.  She's alleged to be in

1626

1    one instance, what we call an aider and

2    abetter or complicitor.  She helped or

3    she encouraged or she incited someone

4    else to commit this crime.  And there's

5    probably going to be some testimony that

6    it is committed with prior calculation

7    and design which basically what that

8    means is, it was planned.  It was

9    premeditated.  It was discussed

10   beforehand to do this.  You don't

11   necessarily think that if it was proven

12   to you that it was a planned homicide

13   that that would necessarily mean that you

14   had to give the death penalty, would you?

15   A.   No.

16   Q.   And you understand that in this case, if you

17        get by the first phase where you find --

18        you and your fellow jurors find her

19        guilty, you would have four potential

20        penalties.  You could give the penalty of

21        death, you could give life in prison with

22        no parole, you could give life in prison

1627

```
 1            with no parole until 30 full years have
 2            been served, and life in prison with no
 3            possibility of parole until 25 full years
 4            have been served.  So, you would have a
 5            range of penalties to choose from if you
 6            get to that second phase.
 7                 And I guess the important question
 8            to ask you is, are you so in favor of the
 9            death penalty that you would
10            automatically give the death penalty in a
11            case where someone had been convicted of
12            premeditation or planning the killing of
13            another?
14  A.   No.
15  Q.   You would fairly consider all four of those
16            options?
17  A.   Correct.
18  Q.   Now when we get to that second phase and if we
19            get there, it would be again the State's
20            burden to prove that Miss Roberts
21            deserves that penalty.  The first thing
22            we would have to do in the first phase,
```

1628

```
 1          we have to prove that she's guilty by
 2          proof beyond a reasonable doubt.  The
 3          second thing we would have to do if we
 4          were able to convince you and your fellow
 5          jurors of that would be that the
 6          appropriate penalty is death.  And the
 7          Court will instruct you on how to do
 8          that.  There's a weighing process.  You
 9          take the aggravating circumstances, which
10          the Court will tell you what those are,
11          and you weigh them against any mitigating
12          factors.  And you may find that the State
13          didn't prove that the aggravating
14          circumstances outweigh the mitigating
15          factors, or the mitigating circumstances.
16          And what you may discover is that the
17          death is not the appropriate penalty and
18          you may find one of those other three,
19          what they call life options.  So you are
20          not such a firm believer in the death
21          penalty that you would come in and say,
22          "She was involved in a planned murder.
```

1629

```
1            Someone is dead.  I believe that you have

2            to suffer the consequence of death, if

3            you have been involved in planning the

4            death of another."

5  A.   No, I don't feel that way.  I would have to

6            hear everything.

7  Q.   You would have to hear and follow the Court's

8            instructions and weigh what the evidence

9            was.  And by the same token, the mere, I

10           guess on the other side of that is, the

11           mere facts that she didn't pull the

12           trigger, and she wasn't actually the

13           actual killer, the actual shooter in this

14           case, you would still consider the death

15           penalty as an option, if we were able to

16           prove to you by proof beyond a reasonable

17           doubt that the aggravating circumstances

18           outweigh the mitigating factors, correct?

19  A.   Correct.

20  Q.   And basically, what I'm asking you is, if the

21           facts warranted it, and the law allowed

22           it, you could go back to the Jury room
```

1630

1       here in a couple of weeks and sign a

2       piece of paper, with 11 other jurors that

3       recommended the death penalty, correct?

4   A.  Yes.

5   Q.  Now, the Court also in your questionnaire

6       asked you some questions about what you

7       have heard about this case.  And I think

8       on your questionnaire, you indicated that

9       until last Tuesday when you came here,

10      you had not heard about this case.

11  A.  No.

12  Q.  Now we're here and you are here on Tuesday,

13      April 8th, and one of your fellow

14      prospective jurors tells you about this

15      case or mention something?

16  A.  Just that she killed somebody and there was a

17      boyfriend or husband or something.

18  Q.  Did he indicate how he got his information?

19  A.  He said it was in that day's paper.

20  Q.  You understand that -- let me ask you this.

21      Has that influenced you to such an extent

22      that you think, "My goodness, this juror

```
                                                        1631
 1              next to me said that she was involved in

 2              this killing, I'm going to go in there

 3              and find her guilty"?

 4  A.   No.

 5  Q.   Did you know this juror beforehand or just

 6              meet him that day?

 7  A.   Did not know him at all.  Didn't even know his

 8              name.

 9  Q.   And that would have no bearing on this case,

10              because you understand that in this case,

11              the only thing that really matters is

12              what, the evidence that comes before you,

13              either through the witness stand or

14              through the Exhibits that are introduced

15              by the parties.  What someone may have

16              said in the newspaper or read in the

17              newspaper or saw on television, that is

18              not evidence, right?

19  A.   Exactly.

20  Q.   So, based upon what this juror told you on

21              April 8th, you are not going, if you are

22              selected for this Jury, you are not going
```

1632

```
 1              to automatically find her guilty because
 2              some person that you don't know mentioned
 3              that this is what happened?
 4   A.   No.
 5   Q.   You will independently make a determination as
 6              to whether or not she's guilty or
 7              innocent?
 8   A.   Yes, exactly.
 9   Q.   Now, I think you indicated, you have never
10              served on a Jury before?
11   A.   No, I have not.
12   Q.   And you are -- I think you indicated that you
13              or someone in your family, I believe was
14              a victim of a crime, is that correct?
15   A.   Correct.
16   Q.   What was the -- was anyone ever charged with
17              that crime?
18   A.   Yes.
19   Q.   What was the results, if you know?
20   A.   He went to prison.
21   Q.   Was it here in Trumbull County?
22   A.   Yes, over there in that Courtroom.
```

1633

1   Q.   Judge Logan's Courtroom?

2   A.   Yes.

3   Q.   Recently?

4   A.   No.  It has been at least ten years.

5   Q.   And was your -- it was your sister?

6   A.   Correct.

7   Q.   How old was she at the time that the action

8        took place?

9   A.   Eleven.

10  Q.   So she was a minor, obviously.  She was very

11       young.  Is that person still in prison?

12  A.   No.

13  Q.   He got out?

14  A.   Correct.

15  Q.   Is there anything in that experience, I am

16       assuming the County Prosecutor's Office

17       prosecuted that individual, was that a

18       plea agreement or was that a trial?

19  A.   Trial.

20  Q.   He actually went to trial and was found guilty

21       of some crimes?

22  A.   Yes.

1634

1   Q.   And I am assuming --

2   A.   He might have been a plea agreement, because

3        it wasn't actually rape, it was sexual

4        imposition or something.

5   Q.   Whatever happened in that experience, would

6        that affect you in this particular case?

7   A.   No.  They have nothing to do with one another.

8   Q.   And the reason we ask is, obviously the

9        Prosecutor's Office, which is in Trumbull

10       County, that is who Mr. Bailey and I

11       worked for, handled that case.  I wasn't

12       here ten years ago and Mr. Bailey wasn't

13       either, we were in different counties

14       with different Prosecutor's Offices, but

15       we don't want you coming in and saying,

16       "Boy, those Prosecutors in my sister's

17       case did a great job and I know whatever

18       the Prosecutor's Office does is the best,

19       and if they charge somebody, they must be

20       guilty," or conversely, "Those guys

21       really botched the case up and this

22       person should have got a lot more time.

1635

```
 1              I don't believe anything those guys tell

 2              me."  It really has no bearing on you in

 3              this case?

 4    A.    No.

 5    Q.    I assume you have, through the years, through

 6              television, newspapers, whatever, even

 7              may be your sister's case, have come

 8              across some of the terms that are going

 9              to come up in this case.  Such as

10              reasonable doubt, presumption of

11              innocence and those types of things.  You

12              understand that in this case and just

13              like in every other criminal case, the

14              State, which is Mr. Bailey and I, which

15              is the people that are prosecuting Donna

16              Roberts, we have to prove our case by

17              proof beyond a reasonable doubt.  And we

18              have to prove all of the elements of the

19              crimes by proof beyond a reasonable

20              doubt.

21                   And in this case there's four crimes

22              and I'm not going to get into what the
```

1636

```
 1      elements are, but let's say each crime
 2      has four or five or six elements.  Let's
 3      say for the sake of argument, say that
 4      each crime has five elements and it is a
 5      little bit like maybe a waitress bringing
 6      over some drinks to a table if you are
 7      out for dinner or something and before
 8      you eat, everybody orders drinks.  You
 9      are with four other people and they are
10      all there, and the reasonable doubt
11      aspect is going to be like those drinks,
12      those glasses, whether they are beer or
13      mixed drinks or pop or water.  Reasonable
14      doubt isn't to the very top of the glass.
15      So, if you just move it a little bit, it
16      spills out.  It is pretty close to the
17      top.  It may be different for every juror
18      and different for every person.  Some
19      people may say it is an inch or two from
20      the top.  Some may say it is a quarter
21      inch.  Some may say it is a half inch.
22      It is certainly not to the very top and
```

1637

1    certainly well beyond the halfway point.

2    Because it is proof beyond a reasonable

3    doubt.  And if the waitress comes over

4    with five drinks and one of those glasses

5    is empty, if those are like the elements

6    of the crime, and one glass is empty, we

7    haven't proved our case.  And even if one

8    of those glasses is half full, we still

9    haven't proven that element by proof

10   beyond a reasonable doubt.  All of the

11   other ones may be filled up to the top

12   and I don't know if that is a good

13   example or not?

14   A.   I understand.

15   Q.   If you heard bad things in this case, bad

16        language by Miss Roberts -- letters,

17        phone calls, that were explicit sexually

18        that talked about things that most people

19        don't talk about, and the State proved to

20        you, let's say four out of the five

21        elements, you wouldn't find her guilty,

22        just because she used bad language or

1638

```
 1              just because she indicated she was going

 2              to do some bad things, would you?

 3    A.   No.

 4    Q.   You would need proof to show that she had a

 5              role or involvement in these things,

 6              correct?

 7    A.   Exactly.

 8    Q.   And where that proof is beyond a reasonable

 9              doubt, is going to be different for every

10              juror, but you would hold the State to

11              their burden of proof?

12    A.   Yes.

13    Q.   Now tied into that is the, and sort of

14              related, sort of related concepts here is

15              the, what they call the presumption of

16              innocence.  You agree, or you are

17              familiar with that concept, that every

18              person is presumed innocent until they

19              are proven guilty by proof beyond a

20              reasonable doubt?

21    A.   Exactly.

22    Q.   Just like your sister, I'm sure someone
```

1639

```
 1              probably explained, I don't know how much
 2              you were involved in speaking to the
 3              Prosecutor's Office, but even though he
 4              was charged with these heinous crimes of
 5              sexually abusing her, he came into the
 6              Courtroom, presumed innocent.  You
 7              personally may not have felt that way,
 8              because you were close to the case, but
 9              someone who sat in this Jury box for his
10              trial, was told that he was presumed
11              innocent until his guilt was proven by
12              proof beyond a reasonable doubt.  You
13              don't have a problem giving Donna Roberts
14              the same presumption of innocence, do
15              you?
16  A.   No.  Because it could have very well possibly
17              be me and I would want somebody to be
18              giving me a fair trial.
19  Q.   It could have been you or someone from your
20              family or something like that?
21  A.   Exactly.
22  Q.   So you have a good handle of why we have that?
```

1640

1   A.    Exactly.

2   Q.    And you don't have a problem giving her the

3         presumption of innocence?

4   A.    No, I don't.

5   Q.    Now, one of the things that you are going to

6         hear about this case and find out about

7         is that obviously, a person has died, and

8         I'm going to predict, because I'm sure

9         you will, you are going to see, hear some

10        testimony about how he died.  You are

11        going to probably hear from the County

12        Coroner or one of his assistants, who did

13        the autopsy.  You are going to hear in

14        detail how the death occurred, what

15        caused the death, the type of injuries.

16        You are probably going to see some

17        photographs of some injuries that are not

18        going to be pleasant to look at.  And you

19        are probably going to feel sympathetic

20        for someone.  You may feel sympathetic

21        for Miss Roberts.  You may feel

22        sympathetic for Mr. Fingerhut who is the

1641

1    victim in this case or his family, but

2    you understand the Court is going to tell

3    you, you are going to have to leave that

4    sympathy outside of your decision.  You

5    can't find Donna Roberts guilty just

6    because you saw some photographs and you

7    feel sympathetic for the way someone

8    died.  And on the other side of that

9    coin, you can't find her not guilty

10   because you feel sympathetic to her, that

11   these options that you may have

12   eventually, death, life with no parole,

13   life with parole after 30 years, and life

14   with parole after 25 years, you can't

15   feel sorry for her because that is a long

16   time.  You wouldn't do that, would you?

17 A.   No.

18 Q.   Now, what happens in any criminal trial and

19      basically, what your role is going to be

20      is, you are going to have to sort of

21      decide who is telling the truth and

22      whether you should believe that person's

1642

1    testimony.  And that goes for the

2    Defendant, should she take the witness

3    stand as well.  I don't know if she's

4    going to or not going to.  If she does

5    take the witness stand, you have to treat

6    her just like any other witness.  Now if

7    she doesn't take the witness stand, you

8    cannot consider that for any purpose.  Do

9    you understand that?

10   A.   Yes.

11   Q.   Because she has that presumption of innocence

12   and she has her Fifth Amendment right not

13   to be compelled to testify against

14   herself.

15        But let's say we're talking about

16   another witness, on here, and let's say

17   the witness' testimony is crucial and I'm

18   not saying this is going to be in this

19   case let's say the witnesses testimony is

20   going to be crucial to establishing

21   something, whether he saw something, or

22   did something.  You are going to look for

1643

```
 1              certain signs that what this witness is
 2              telling you is truthful, right?
 3    A.    Exactly.
 4    Q.    If he says he sees something in a dark alley
 5              at midnight, and it is later proven that
 6              that alley doesn't even have any lights
 7              in the back, the individual doesn't see
 8              well at night.  You are going to be a
 9              little suspicious of his testimony,
10              correct?
11    A.    Yes.
12    Q.    As opposed to someone who may say that they
13              were here in Courthouse Square at 12 noon
14              on a bright sunny day in June of last
15              year and they saw some tragic event, a
16              shooting, a stabbing, whatever it was,
17              and they have very good vision.  They
18              were only five to ten feet away from when
19              this shocking event occurred.  They
20              happen to carry a note pad with them and
21              they wrote down the license number and
22              that is going to be a little bit more
```

1644

```
 1           credible in your opinion.  Those are the
 2           kind of things you have to do as a juror,
 3           correct?
 4   A.   Yes.
 5   Q.   You don't think you would have a problem
 6           determining maybe who has more of a bias
 7           or interest in this case or maybe who had
 8           an opportunity to see things or do things
 9           in this case?
10   A.   I don't think I will have a problem with that,
11           no.
12   Q.   How did you feel when you first got found out
13           that you were actually called for this
14           case for Jury duty?
15   A.   Curiosity.
16   Q.   Did you feel as if, were you eager to do it,
17           or did you look at it as a burden or did
18           you say, "I would like to do that, I have
19           never served on a Jury"?
20   A.   I was kind of eager.
21   Q.   You wanted to do it?
22   A.   Exactly.
```

1645

1   Q.   And I assume you still want to serve?

2   A.   Yes, I think I'm a pretty fair person.

3   Q.   And you can look at both sides of the

4        situation?

5   A.   I am the peacemaker in the family, everybody

6        tells me.

7   Q.   In this particular case, and I highly doubt

8        that this is going to happen, but in any

9        criminal case, including this one, the

10       Defendant doesn't have to convince you of

11       anything.  It is sort of a unique

12       situation.  You may want to know certain

13       things about why they were done and you

14       may want to know certain things about

15       Donna Roberts, but you may never find

16       them out, because she has this

17       constitutional right not to testify.  And

18       in fact, her and her attorneys could do

19       nothing in this case.  Again, I highly

20       doubt that that is going to happen, but

21       the burden is completely on the State to

22       prove her guilt or innocence.  And we may

1646

1   present to you 30 or 40 witnesses, and

2   still not convince you and your fellow

3   jurors that she's guilty beyond a

4   reasonable doubt, correct?

5   A.   Correct.

6   Q.   Just as if we may be able to present, and I'm

7        not saying this is the case, but if there

8        were a different case, we may present one

9        witness who is so credible and so

10       believable and whose story is so accurate

11       that you may be able to find her guilty

12       just on one witness, correct?

13  A.   Yes.

14  Q.   And we often discuss that a lot of times, in

15       cases like your sister's, in rape cases,

16       if the victim is so compelling and so

17       detailed or so accurate in her

18       description, that sometimes is enough to

19       convince a Jury that a rape or sexual

20       assault did occur, correct?

21  A.   Correct.

22  Q.   And I imagine there are cases where again, we

1647

```
 1              could present 20 or 30 witnesses and
 2              still not prove much of anything.  And if
 3              we sat down and we still hadn't proved
 4              our case, they may feel confident enough
 5              and in fact, it is their right to say,
 6              "Your Honor, we don't have anything to
 7              present," and then we would go into the
 8              closing arguments and we would say what
 9              these 20 or 30 witnesses, what they felt
10              they proved and they may say, "Those 20
11              or 30 witnesses didn't prove squat.  You
12              have to acquit our client."  You would
13              agree that it is the quality of the
14              testimony, as opposed to the quantity?
15   A.   Exactly.
16   Q.   In this particular case, I know we touched on
17              it earlier, Miss Roberts is charged as
18              the complicitor, she's charged with
19              aiding and abetting.  She's not charged
20              as the principal offender.  There's not
21              going to be one witness that comes in
22              this Courtroom and says "I saw her pull a
```

1648

1                 trigger and shoot this guy."  I believe

2                 there's going to be a lot of other

3                 testimony, but relating to her

4                 involvement, you wouldn't have a problem,

5                 if the facts were there and the proof was

6                 there, of finding her guilty beyond a

7                 reasonable doubt of aiding and abetting?

8  A.  Not if the facts are proven, I wouldn't.

9  Q.  And you would agree with me that there are

10                 ways to aid and abet people and you might

11                 not even be there, correct?

12  A.  Correct.

13  Q.  So I could help somebody commit a crime and do

14                 a lot of things for them, before and

15                 maybe even afterwards, do things for them

16                 to help them in their crime, and I might

17                 not even be in the same town when it

18                 happens, right?

19  A.  Yes.

20  Q.  So you don't have a problem convicting someone

21                 along those lines?

22  A.  No, I don't.

1649

1   Q.   I believe you said you knew Stanley Elkins, is

2        that correct, or you knew who he was?

3   A.   I knew who he was, that is all.

4   Q.   Just from reading the newspaper?

5   A.   Basically.

6   Q.   Have you ever had any contact directly with

7        him?

8   A.   Not that I can recall.

9   Q.   I believe you live in Warren Township,

10       correct?

11  A.   Yes.

12  Q.   I believe Stanley lives in Warren Township as

13       well, and I know his girls are active in

14       sports out there.  He used to be one of

15       the Prosecutors in the City of Warren.

16       About 15 years ago, he used to work for

17       the County Prosecutor's Office, then he

18       went there and now he's back in our

19       office.  He no longer works for the City

20       of Warren.  He works again for the County

21       Prosecutor's Office.  The fact that you

22       know who he is, that is not going to make

1650

1   a difference for you in this case?

2   A.   No.   I know this is the Judge.   That is it.

3   Q.   That is not going to change your opinion?   Is

4        there anything that you feel that you

5        need to reveal or to divulge or tell us

6        about your ability to sit as a juror?   Do

7        you have any questions?

8   A.   No, no questions.   I just feel that everybody

9        deserves a fair trial.   They are innocent

10       until proven guilty and I don't feel that

11       I'm the type of person, if I have six

12       people on a Jury that says, "She's

13       guilty," and then five others that

14       doesn't, I'm not going to change my mind

15       just because --

16  Q.   You are not going to go along with somebody

17       else?

18  A.   I'll not change my mind because somebody else

19       feels differently than me.

20  Q.   I assume that works both ways.   If you are the

21       only one who said, "Hey, listen guys, I

22       think they proved their case, and she's

1651

```
 1              guilty and here's why, I think so."  If

 2              the other 11 jurors are sitting there

 3              saying, "You are crazy, you are nuts."

 4              You are not going to say, just to go

 5              along with you, "I have got to get out of

 6              here at 5:00 today.  I'll say she's not

 7              guilty."  You wouldn't do that either,

 8              would you?

 9    A.    No, because I would be at the Park Hotel, no

10              kids, no cleaning, no cooking.  I'm not

11              going to change my mind or views.

12    Q.    How many children do you have?

13    A.    I have three.  I have a stepdaughter and two

14              of my own.

15    Q.    What are their ages?

16    A.    My stepdaughter is 19.  My son is 14 and my

17              daughter is ten.

18    Q.    And I think you mentioned this morning that

19              sometimes you sort of play peacemaker

20              sometimes?

21    A.    Yes.

22    Q.    And in that role, sometimes I'm assuming you
```

1652

```
 1              have to determine, you have to do
 2              basically what a juror does, you have to
 3              determine who is telling the truth or who
 4              is not telling the truth?
 5   A.   Basically.
 6   Q.   And you are going to use those same tools or
 7              the same ideas as you would here in this
 8              Courtroom.  I have got four kids, and I
 9              know sometimes there's fights between
10              them and there's screaming and hollering
11              or there's crying or someone has been hit
12              or something has been taken from someone.
13              And for instance sometimes -- I have two
14              daughters, and they are three and four
15              years old.  They are soon to be four and
16              five.  But one of the hot topics of
17              dispute among them is Polly Pockets or
18              Barbies or some other child's toy that
19              one or the other has that the other, it
20              belongs to one of them, but the other one
21              wants it or needs it.  And I usually can
22              tell when I approach them if I hear the
```

1653

1    crying or the screaming or the hitting,

2    who is more at fault.  Usually if I see

3    the older one pushing the other one down

4    and she's got the doll, and my youngest

5    daughter is crying and I see the other

6    one has got the doll up in her hand, I

7    can usually assume that she probably took

8    it from her.  Because I know how my

9    youngest daughter is, she's not the kind

10   that would be aggressive to take it.  She

11   probably had it and my bigger child took

12   it from her.  Some of those things, that

13   is probably not the best example, but a

14   lot of those things are what we call

15   circumstantial evidence.  You think you

16   have a handle on what circumstantial

17   evidence is?

18 A.   Yes.

19 Q.   And the Judge is going to tell you the rule of

20      law is, circumstantial evidence has the

21      same weight as direct evidence.  One of

22      the examples that sometimes I can use is,

1654

1   my son who is eight years old, usually

2   gets everybody else riled up.  He's the

3   one who wrestles with them and chases

4   them and screams and yells.  And the

5   girls are fine, usually 99 percent of the

6   time when they are on their own, except

7   when they are fighting over these dolls,

8   but for the most part, they play quietly

9   with the dolls, they share, they do

10  things.  Now, my son is the type that

11  would usually throw a ball in the house

12  like he's not allowed to or swing a

13  baseball bat or a plastic golf club or

14  some kind of Star Wars toy or something.

15  And this probably happens once every week

16  or two, someone gets hit by something

17  that he's thrown or swung or hit, and

18  usually I can tell without hearing from

19  my informant, my oldest one, what had

20  happened.  And this has happened before.

21  I'll come down to the basement and I'll

22  see my youngest daughter holding her head

1655

```
 1              crying and I'll see my son with a plastic
 2              bat standing there with this amazed look
 3              on his face like, "Well, it was sort of
 4              an accident."  Knowing full well that
 5              he's caught, knowing full well that he's
 6              not supposed to be swinging this thing in
 7              the house and particularly not near my
 8              daughters.  He may be a foot or two from
 9              the youngest one who is crying.  Even
10              though I didn't see him personally hit,
11              and the informant, my four year old,
12              hasn't told me what has happened yet, I
13              can make that inference that my son has
14              hit my daughter in the back of the head
15              with a bat, correct?
16   A.    Exactly.
17   Q.    I assume you have seen that before?
18   A.    Yes.
19   Q.    On occasion, I have been wrong, and usually
20              those instances when I am wrong is my son
21              immediately will not have the same look
22              on his face.  He may have the bat, but he
```

1656

1    may be poking something, poking the cat

2    or doing something else he's not allowed

3    to do, but he's nowhere near my daughter.

4    If I see my youngest child crying, it

5    might be something else.  It might have

6    been she was bouncing on the sofa and

7    fell off the sofa down the basement and

8    cracked her head.  You have to be careful

9    of the inferences you make, correct?

10   A.   Correct.

11   Q.   If there's enough inferences, going back to

12   the first example with my son with the

13   bat in his hands two feet from her and

14   she's crying and she's not near the sofa,

15   she's not near the couch, there's no

16   other reason she would be crying other

17   than him hitting her in the head with

18   this bat, you can make that inference and

19   assume that he had hit her in the head

20   with the bat.

21   You are going to have to do some of

22   that in this case.  Because this crime

1657

1    like most crimes, wasn't committed out in

2    the open streets.  It wasn't committed in

3    a house full of people.  It wasn't

4    committed while people were in church on

5    Sunday or downtown in the middle of

6    Courthouse Square on a Friday afternoon

7    with 10,000 workers in the downtown area

8    walking around or driving around.  So you

9    will be able do that, and you will give

10   the circumstantial evidence, the same

11   weight as the direct evidence?

12   A.   I feel I could, yes.

13   Q.   Now, one of the other things that happens

14   sometimes and it happens in criminal

15   cases a lot, is that something happens

16   that is so unbelievable that you can't

17   believe somebody did something this

18   stupid and got caught.  I assume you have

19   heard of stories like that.  Criminal

20   cases where the bank robber goes in, and

21   he forgets to pull the mask down or he

22   writes the ransom note or the note for

1658

| | | |
|---|---|---|
| 1 | | the money on the back of his own deposit |
| 2 | | slip and it turns out that that is his |
| 3 | | address.  You have heard of things like |
| 4 | | that? |
| 5 | A. | Exactly. |
| 6 | Q. | And one of the things is that the Court will |
| 7 | | tell you is, we don't have to prove why |
| 8 | | they did it, just that they did it.  You |
| 9 | | won't hold us to a higher standard of |
| 10 | | proof or why the heck did they do |
| 11 | | something that stupid?  There may be some |
| 12 | | questions you have about this case, and |
| 13 | | about why something happened, but that |
| 14 | | doesn't necessarily mean that it is |
| 15 | | reasonable doubt, correct? |
| 16 | A. | Correct. |
| 17 | Q. | Given all of this discussion here, is there |
| 18 | | any questions or anything that you feel |
| 19 | | that you got to tell us or that you feel |
| 20 | | may impact on your ability to serve as a |
| 21 | | juror? |
| 22 | A. | Just that I feel that I'm pretty unbiased. |

```
                                                              1659
 1   Q.   You would be a fair person for both sides?

 2   A.   I feel so, yes.

 3   Q.   And you seem that way to me.  You seem

 4             genuinely that you would listen to both

 5             sides and you would be fair to both sides

 6             and you would make your determination

 7             fairly and impartially.  That is what we

 8             want.  We had some people prior to today

 9             that said, "I believe in the death

10             penalty if the charge is murder and she's

11             found guilty, I am giving her the death

12             penalty."  We had other people who read

13             too much about the case, or seen too much

14             on T.V., whether or not the news

15             reporting is accurate.

16   A.   I was attempted to go home and grab a paper

17             and look at it, and I thought, no, I

18             can't do it.  I know to myself I'm not

19             being fair.

20   Q.   That is not evidence, either.

21   A.   Exactly.

22   Q.   If you are selected for this Jury, you are
```

1660

```
 1              going to find that throughout the course

 2              of these proceedings, there might be a

 3              reporter popping in, you might hear the

 4              cameras setting in back there.  They will

 5              put up a tripod.  They can't photograph

 6              you as jurors.  They may photograph the

 7              Judge or the Court Reporter, and then

 8              they will pack up five minutes later and

 9              leave, and then on the 6:00 news, they

10              will say the testimony today was this,

11              and they said this and that.  They will

12              cram in a whole day of testimony into

13              about 15 minutes or maybe a minute.  They

14              are going to cram in hours of testimony

15              into a minute, and they may leave lots of

16              stuff out.

17   A.   Exactly.

18   Q.   And it sounds to me like you are already

19              following the Court's instructions on not

20              reading about this case or following it

21              on television or listening to the radio.

22              Even though you had curiosity, you have
```

1661

1    refrained from doing that?

2  A.  Exactly.

3  Q.  You did mention on your questionnaire, you

4       knew in law enforcement, Jeff Fusco?

5  A.  I went to school with him and he was a

6       neighbor.  He lived up the street from

7       me.

8  Q.  When was the last time you had contact with

9       Jeff?

10 A.  Probably two years ago.  I seen him at the

11      store and said "Hi".

12 Q.  The fact that you know Jeff Fusco who is a

13      Warren Police officer, that is not going

14      to affect you one way or the other?

15 A.  No.

16 Q.  And you are not going to be more favored for

17      the State, because you know a police

18      officer or more favored for the Defendant

19      because you know a police officer?

20 A.  No.

21 Q.  Going back to your question about the media.

22      You did tell us in your questionnaire

1662

1    that not everything in the paper is true

2    anyway?

3  A.  Exactly.  I have had experiences with it.

4  Q.  I am assuming that experience may have been

5    related to your sister's case?

6  A.  Correct.

7  Q.  And so you understand the fact that sometimes

8    things are in there that are misreported,

9    misunderstood.  Inaccurately reported,

10    and that is very important that you not

11    follow what is in the newspaper, because

12    there may be things in there that are

13    incorrect or inaccurate or just plain

14    wrong.

15  A.  Exactly.

16  Q.  You have personally had that experience?

17  A.  Yes.

18    MR. BECKER:  Thank you very much,

19  and Mr. Ingram or Mr. Juhasz will ask you some

20  questions.

21    THE COURT:  Can you come back in a

22  hour?

1663

1    MS. LANTZ:  Yes.

2    THE COURT:  Be back here at 1:00.

3    MS. LANTZ:  Okay.

4  (Court in recess at 12:00 noon)

5  (Resumed in Open Court at 1:05 p.m.

6  <u>EXAMINATION BY MR. JUHASZ OF MS. LANTZ:</u>

7  Q.    Good afternoon.  Last week, Judge Stuard had

8            all of us introduce ourselves and my name

9            is John Juhasz, and this is Jerry Ingram

10           over here, and he and I are representing

11           Donna, who as you know, is on trial for

12           her life.  The reason we make you come up

13           here and ask you all of these questions

14           is because it is sort of like a job

15           interview, where you are being

16           interviewed of being a juror.  And I

17           suppose you would anticipate that we

18           would want to ask some questions of

19           somebody who might take on that job,

20           particularly if you or I were sitting

21           over there in that chair and being the

22           person on trial?

1664

1   A.   Correct.

2   Q.   I think when you talked about the presumption

3        of innocence, you said that is a pretty

4        good idea, because if you were sitting

5        over there, you would want to have the

6        presumption of innocence?

7   A.   Exactly.

8   Q.   It is a little bit different than the normal

9        job interview, however, because instead

10       of you applying for the job, we sent you

11       a notice to come down here.  Because you

12       probably want to know something about the

13       people who would sit in judgment on you

14       if you were sitting over at that table,

15       does it make sense to you that we would

16       ask you some questions and maybe some of

17       them are -- they are not meant to be

18       prying or offensive, but sort of testing

19       a little bit.

20  A.   Sure.

21  Q.   So if I do something that offends you, that is

22       not my purpose.  It is to simply find out

1            how you feel about things.

2  A.    Fair.

3  Q.    The two major areas that we have to talk to

4            you about obviously, are the death

5            penalty because this is potentially a

6            capital case, and pre-trial publicity or

7            things that you may have heard about the

8            case and I understand you said you have

9            not read much about the case?

10  A.    Correct.

11  Q.    Let's talk for a second about the death

12           penalty and I'm going to try not to

13           reiterate things that people have already

14           talked to you about, so this doesn't

15           become even more boring than it already

16           is.  I think you would agree with me,

17           that if somebody is not guilty of an

18           offense, then there would be no

19           punishment that would be appropriate,

20           correct?

21  A.    Correct.

22  Q.    If you didn't do anything wrong, you shouldn't

1666

1   be punished, correct?

2  A.   Correct.

3  Q.   Here we're at the beginning of the trial,

4       before you have heard any evidence about

5       whether Donna Roberts is guilty, and

6       we're talking about punishment already.

7       And the concern frankly that I have is as

8       one of Donna's lawyers, I want to make

9       sure you understand that just because

10      we're talking about penalty doesn't mean

11      that anybody necessarily thinks we're

12      going to get to that stage.  Do you see

13      that?

14 A.   Yes.

15 Q.   We have to have procedures, otherwise the

16      lawyers will be fighting over each other,

17      who gets to talk first and things like

18      that, and one of the procedures is that

19      we talk about everything that might

20      potentially come up, whether it ends up

21      coming up or not.

22 A.   Okay.

1667

1  Q.    That is one of the reasons for example, why

2        the lawyers will talk to you about well,

3        how about if the Defendant testifies, or

4        how about if she doesn't testify.  We

5        don't know at this point whether she's

6        going to testify or not, but we have to

7        see your feelings on both of those

8        issues.  Does that make sense to you?

9  A.    Yes.

10 Q.    My understanding is that, well, before we'll

11       get there -- and I should ask this

12       question because we bring you in here and

13       we give a whole bunch of new rules that

14       you are not used to dealing with and

15       assume that you understand how it all

16       works.  You did have a chance to read

17       that handout, correct?

18 A.    Yes.

19 Q.    Do you think you are pretty comfortable with

20       how the two separate phases of a capital

21       trial work?

22 A.    Yes.

1668

1   Q.   You don't think we need to spend any time

2        going over that?

3   A.   No.

4   Q.   One thing I would like to spend a minute or

5        two on, however, is we use some big fancy

6        words and I wanted to make sure that you

7        understand them and how they work.  And

8        as I often like to do when I am giving an

9        example, I want to talk about something

10       that has nothing to do with this case, so

11       let's go back for a second.  Maybe you

12       knew, maybe you didn't before you came in

13       here, not everybody who gets found guilty

14       of a murder in Ohio, can get the death

15       penalty; did you know that?

16  A.   Yes.

17  Q.   Not everybody who gets found guilty of --

18       let's talk about a premeditated,

19       aggravated murder, is also eligible for

20       the death penalty.

21  A.   Correct.

22  Q.   There has to be an additional special

1669

```
 1              circumstance.  The one that I like to

 2              talk about that has nothing to do with

 3              this case is that in Ohio, if you get

 4              charged with an aggravated murder, and

 5              the Government alleges that this isn't

 6              just any aggravated murder, that you

 7              should get the death penalty because the

 8              person you killed is the Governor.

 9              There's a few of them listed in the

10              statute.  The President, the

11              Vice-president, the Governor, Lieutenant

12              Governor; the General Assembly in Ohio

13              said that is a more serious type of

14              offense if you are found guilty of that,

15              you should be eligible for the death

16              penalty.  Fair enough?

17  A.    Yes.

18  Q.    And that allegation in essence in an

19              indictment like that, let's say for a

20              second that the Government accuses me of

21              that.  They say, "Juhasz, on such and

22              such a date in Trumbull County, Ohio, you
```

1670

1  killed a guy named Bob Taft and you

2  planned it.  You did it with prior

3  calculation and design."  That is

4  allegation number one, that we call

5  aggravated murder.  The second one is

6  what we call a specification.  Something

7  that if you the Jury find it to be true,

8  could make me eligible for the death

9  penalty and that specification in this

10 indictment, I am talking about would

11 be -- and by the way, Juhasz, the Bob

12 Taft that you killed on such and such a

13 date in Trumbull County was the Governor

14 of the State of Ohio and it is sort of a

15 warning to go, "Hello, if you get found

16 guilty of this, you could get the death

17 penalty."  Let's just say at my imaginary

18 trial where I am on trial for killing

19 this guy, that they bring in all kinds of

20 proof that convinces you.  There's 27

21 eyewitnesses, and three confessions and

22 two video tapes.  And they all prove

1671

```
 1            beyond a doubt, beyond any reasonable
 2            doubt, that I'm the guy that killed Bob
 3            Taft.  But, whether by mistake or not,
 4            whether by omission or not, the
 5            Prosecutor in my case failed to prove
 6            that he was the Governor of the State of
 7            Ohio.  And you know we could spend all
 8            day talking about how they might do that.
 9            Maybe they introduced some fancy
10            certificate dripping with ribbons and
11            seals, saying he was the Governor.  Or
12            they bring in the Chief Justice, who says
13            that the dead guy is the Governor.  I
14            swore him in.  They forgot to do that.
15            In that case do you see there are two
16            separate burdens of proof, one of them
17            they met, the 27 eyewitnesses and the
18            three confessions and the two video
19            tapes; the other one they didn't meet.
20            Any problem distinguishing between those
21            two?
22    A.    No.
```

1672

1   Q.   Any problem holding the Government to a
2            separate burden of proof beyond a
3            reasonable doubt for both of them?
4   A.   No.
5   Q.   And so in my imaginary case, if they didn't
6            bring in the certificate of the Chief
7            Justice or whatever, you could rightfully
8            find me guilty of aggravated murder and
9            then the case would be over as far as you
10           are concerned, do you see that?
11  A.   Yes.
12  Q.   Because it is not a death penalty case, you
13           would have nothing to do with the
14           punishment then?
15  A.   Correct.
16  Q.   And then you would find me not guilty based
17           upon the examples I have given you or the
18           facts I have given you of the
19           specification.  You are okay with all of
20           that?
21  A.   Yes.
22  Q.   And the only other thing I want to talk to you

1673

1    about the death penalty for a second

2    is -- let's say that they did bring in

3    the Chief Justice or they did bring in

4    that certificate and whatever proof and

5    you were now persuaded not only I was

6    guilty of the aggravated murder but

7    guilty of the specification.  In those

8    circumstances, we would then go to a

9    second phase, correct?

10   A.   Yes.

11   Q.   And as you know, there are four potential

12        penalties that I am facing in that second

13        phase.

14   A.   Yes.

15   Q.   My question to you is, if you found yourself

16        in that situation, would you go into that

17        second phase with all of those penalties

18        sort of equal in your mind starting out,

19        or would one of them have a leg up over

20        the other?

21   A.   They would all be equal.

22   Q.   And then you understand that the burden would

1674

1    be on the State to prove again, if it

2    could, by proof beyond a reasonable doubt

3    that, and I'm going to sort of translate

4    into layman's terms, some of these big

5    fancy words that we use, we call them

6    aggravating circumstances.  They are

7    really reasons to impose the death

8    penalty.  In my imaginary case, the

9    aggravating circumstance would be the guy

10   was the Governor.  The specification at

11   the first phase actually becomes the

12   reason to impose the death penalty at the

13   second phase.  Against that, you would

14   weigh whatever evidence I would present

15   to you for why you shouldn't give me the

16   death penalty.  If the gentlemen from the

17   Prosecution who are prosecuting me,

18   proved to you at the second phase beyond

19   a reasonable doubt, that the reason to

20   impose the death penalty outweighs the

21   reasons not to, and if they persuade you

22   that death is the appropriate punishment

1675

```
 1              for me in this case, then they will have
 2              met their burden of proof.  And under
 3              those circumstances I take it, you would
 4              have no trouble signing a verdict for the
 5              death penalty?
 6   A.   Correct.
 7   Q.   You decide, as I think maybe you have been
 8              told, what weight to give those
 9              circumstances at the second phase; do you
10              understand that?
11   A.   Yes.
12   Q.   And if somebody didn't persuade you, then you
13              would have no trouble returning one of
14              those life sentences, correct?
15   A.   Correct.
16   Q.   Do you have any questions about that, or about
17              the death penalty itself, how it works in
18              a case like this?
19   A.   No, I don't.
20   Q.   I think you would agree with me, you said you
21              were curious when you got your Jury
22              summons?
```

1676

```
1    A.    Correct.

2    Q.    And I think you would agree with me that if

3          you are selected as a juror in this case,

4          it would be an awesome responsibility,

5          correct?

6    A.    Yes.

7    Q.    Do you feel that you are up to that

8          responsibility?

9    A.    Yes.

10   Q.    We do, as Mr. Becker's questions suggested to

11         you, we do try, we want you to serve as a

12         juror, but we also don't want it either

13         that we ruin your personal life or

14         equally important, that you are thinking

15         something about your personal life so

16         much that you are not giving us all of

17         your attention, and that is why we asked

18         you questions about your surgery and your

19         concert tickets and things like that.

20         And you were a little bit soft spoken,

21         I'm not sure that I heard you, you said

22         as far as the concert tickets, if you
```

1677

1    ended up stuck in the hotel in

2    sequestration, you would give those

3    tickets away and it wouldn't be a big

4    deal?

5  A.  No, it wouldn't be a big deal at all.

6  Q.  Who are you going to see?

7  A.  Fleetwood Mac.

8  Q.  That would hurt to give those away?

9  A.  My Mom would enjoy it.

10  Q.  Now, I want to talk to you a little bit about

11    pre-trial publicity and in your case, the

12    pre-trial publicity takes on a little bit

13    different form because it can be

14    something either that you heard in the

15    news or in the paper, or it could be

16    people talking in the community, or in

17    your case, even in the Courthouse.  So, I

18    think I know the answer to this first

19    one, but let me ask you.  Have you heard

20    anybody at work or any of your social

21    acquaintances or anything like that,

22    talking about this case?

1678

1   A.   No, I have not.

2   Q.   You have read nothing in the paper or seen

3        nothing on T.V.?

4   A.   No.

5   Q.   We can eliminate all of that?

6   A.   Exactly.

7   Q.   Now let's go back to last week when you were

8        here.  And I'm going to ask you a lot of

9        questions and just ask you to do your

10       best with them as far as your

11       recollection serves you.  First of all,

12       tell me if you can remember specifically,

13       what this gentleman said?

14  A.   He said he read the article in the paper that

15       they were doing Jury selection that day

16       and he believes that we were there as

17       possible jurors for a lady that killed

18       her husband or boyfriend.  And I said,

19       "Oh, this is not a traffic accident

20       then?"

21  Q.   A very astute observation on your part?

22  A.   That is basically, that was the end of it.

1679

```
1              Just started talking to somebody else.

2    Q.    He did or you did?

3    A.    He did.  I had a book, I am ready to read.

4    Q.    Were you able to hear what he said when he was

5              talking to the other person?  Was he

6              talking about the same thing?

7    A.    Some of it, I think.  They were talking about

8              their jobs.

9    Q.    You mentioned I think when Mr. Becker was

10             asking you questions, it might have been

11             when Judge Stuard was asking you

12             questions, I thought I heard you say that

13             he said that there was an article in that

14             day's paper?

15   A.    Yes.

16   Q.    Not the day before?

17   A.    That day.

18   Q.    So last Tuesday when were you here, there was

19             something that day that he had read?

20   A.    That is what he said.  I didn't see the paper.

21   Q.    When I ask you these questions, I am assuming

22             that you don't know anything about it,
```

1680

| | | |
|---|---|---|
| 1 | | that you are relating to me what this |
| 2 | | gentleman said to you? |
| 3 | A. | Yes. |
| 4 | Q. | And now you said that after that conversation, |
| 5 | | he turned to someone else? |
| 6 | A. | Yes. |
| 7 | Q. | And you think that at least part of that |
| 8 | | conversation was sort of a repetition of |
| 9 | | what he said to you? |
| 10 | A. | I believe so.  I wasn't really paying that |
| 11 | | much attention.  I'm not a person for |
| 12 | | gossip.  I kind of blow it off. |
| 13 | Q. | I think I heard you say that you don't know |
| 14 | | this guy's name? |
| 15 | A. | No, I don't. |
| 16 | Q. | Have you seen him since then, either in the |
| 17 | | Courthouse, either today, when you have |
| 18 | | been here or when you were here last |
| 19 | | week; did you have any other contact with |
| 20 | | him? |
| 21 | A. | No. |
| 22 | Q. | Are you able to describe him at all for me? |

```
                                                          1681
 1    A.    Honestly, no, I'm not good with faces.  I have
 2             to see you like a lot.
 3    Q.    If you remember, and again, accept my
 4             apologies in advance, I'm asking you the
 5             best you can, with your recollection.  If
 6             you remember, when did this conversation
 7             take place in relation to when the
 8             lawyers were in the Courtroom and the
 9             Judge was talking to you and that kind of
10             thing?
11    A.    It was before.  We were in the Courtroom, but
12             nobody was talking yet or anything like
13             that.  It was just everybody was coming
14             in at that point.
15    Q.    Was Miss Roberts there or was she not, did you
16             notice her in the Courtroom?
17    A.    At the point, no, she was not there.
18    Q.    When, well, I'm sorry, before I'll ask you
19             that -- do you remember where you were in
20             the Courtroom -- that is a big Courtroom?
21    A.    When you walk in the Courtroom on the left
22             hand side at the very end of the window
```

1682

1           sill.

2    Q.   You walk in through these big doors down

3           there, you would turn to your left?

4    A.   Correct.  I was standing all the way at the

5           end by the window, actually I was sitting

6           in the window.

7    Q.   So, as Judge Stuard faced you when he came on

8           the bench, you would be to his right?

9    A.   Correct.

10   Q.   And you said you were sitting on the window.

11          Was this gentleman sitting or was he

12          standing?

13   A.   He was standing, leaning against it.

14   Q.   Were there people behind you and in front of

15          you?

16   A.   There was one gentleman in front of me and

17          then everybody else was lined up behind

18          me along the wall.

19   Q.   And you are moving your left hand as if the

20          people were lined up behind you and to

21          your left?

22   A.   If I am looking at this direction, yes.  If I

1683

1          would be sitting there, it would be to my

2          right.

3    Q.  I'm sorry, do that again for me.  The people

4          were to your right?

5    A.  When I was sitting there, yes.  Sitting where

6          I am sitting now, they would be to the

7          left.

8    Q.  And you said there were people behind you?

9    A.  Not behind me, beside me.

10   Q.  And people in front of you?

11   A.  One gentleman, that was all.

12   Q.  When this gentleman who spoke to you turned

13         after your conversation to speak to other

14         people, if you noticed, did he talk to

15         one person or more than one person?

16   A.  I think it was more than one.  There was like

17         three of the guys standing there, kind of

18         like talking.

19   Q.  So when I say more than one, it wasn't

20         necessarily more than one conversation

21         that he had after you, it was a

22         conversation where there were two or

1684

1   three or four participants?

2   A.   Yes, and I know they were talking.  He had

3        conversation about where he worked.

4   Q.   What was your impression when you heard him

5        say this?

6   A.   Honestly, what I thought?

7   Q.   Yes.  Let me stop you before you answer that,

8        because when you say honestly, if nobody

9        said this to you, I should tell you that

10       the only answer we're looking for are

11       honest ones.

12  A.   I thought he was an asshole.  That was my

13       first opinion.  Who are you to say?  You

14       don't know.

15  Q.   I take it that is an opinion at that time, you

16       kept to yourself.  You didn't say that to

17       him?

18  A.   I didn't say that to him.

19  Q.   And your conclusion was, how could you say

20       that if he hasn't heard any evidence yet?

21  A.   Exactly.

22  Q.   Did he leave you with the impression, and I

```
                                                        1685

 1            don't want to beat up too much on the

 2            words or change the words that you said,

 3            but is there something about it, or the

 4            words he said that left you with the

 5            impression that he thought this woman was

 6            guilty?

 7   A.   Basically, yes.  I got the impression that

 8            whatever he read in the paper, he

 9            believed.

10   Q.   Have you talked to anybody else, I mean you

11            wrote it on your questionnaire and we

12            appreciate that, that you brought it to

13            our attention, have you talked to anybody

14            else about that; that is about that

15            conversation?

16   A.   No.

17   Q.   How would you describe his level of voice?  Is

18            he talking pretty much like we're talking

19            now or was it a whisper?

20   A.   It wasn't exactly a whisper.  It wasn't our

21            volume of level.  It was lower.

22   Q.   You mentioned that he said something about, or
```

```
                                                      1686
 1              that he talked to these other fellows

 2              when he turned away from you, and I take

 3              it from your reaction to him that you

 4              didn't care to have much more

 5              conversation with him?

 6    A.   Exactly.

 7    Q.   Is there anything at all that you can recall

 8              about him that is distinguishing, that he

 9              had on a bright red shirt or bald or

10              glasses or he had a lot of hair?

11    A.   He did not have glasses.  He was like medium

12              build.  Receding hairline.  Probably

13              35-ish.

14    Q.   So you didn't care to have much more of a

15              conversation with him when he turned to

16              these other fellows, you said that you

17              think that part of it was the same thing

18              he had said to you, correct?

19    A.   Correct.

20    Q.   And then he also talked about with these guys?

21    A.   They were talking about -- I knew Kraftmaid

22              was mentioned.  Whether they both did or
```

1687

1          not.

2  Q.  So as far as places that you think he might

3        have worked -- I'm not holding you to

4        this, but the only name you heard

5        mentioned was Kraftmaid?

6  A.  I don't know if he mentioned it or the other

7        guy.

8  Q.  I take it from what you have said to me today

9        and what you have said to the Court and

10        all of the lawyers, that if you were

11        seated over there and a fellow like that

12        were on your Jury, you wouldn't feel

13        comfortable with him?

14  A.  No, I would not.

15  Q.  How about if you get seated on this Jury and

16        when you show up for the first day where

17        there's 12 of you, you see him, how would

18        you feel about that?

19  A.  I would probably say something because I feel

20        that he wouldn't be unbiased, just from

21        that remark.

22  Q.  If, well -- I presuppose something when I

1688

1  asked you the last question, because when

2  I said before if you did show up on the

3  panel of 12, do you think you would be

4  able to recognize this guy?

5  A.  It is a possibility, yes.  I'm not going to be

6  looking.  I have got a vague idea of what

7  he looked like.  He had really receding

8  hairline and his hair was dark and his

9  built was medium build.

10  Q.  Let me talk to you about a couple of other

11  things, if I may.  We have already talked

12  a little bit and you talked with

13  Mr. Becker a little bit, about the

14  concept of proof beyond a reasonable

15  doubt.  And I don't want to reinvent the

16  wheel, but one of the things that

17  Mr. Becker talked to you about is I think

18  he said something like, well, you may

19  have a question like how could people be

20  this stupid, why would they commit this

21  crime when they could be so easily

22  caught.  And what his suggestion to you

1689

```
 1              was is that when he has the burden of

 2              proving the case beyond a reasonable

 3              doubt, he doesn't necessarily have to

 4              answer all of your questions about motive

 5              about why somebody would do something.

 6              You appreciate that?

 7   A.   Okay.

 8   Q.   But by the same token, you don't know what

 9              questions you might have about the

10              State's evidence, because you haven't

11              heard any yet, right?

12   A.   Correct.

13   Q.   If you have questions that are questions other

14              than those, that you think constitute a

15              doubt, a reasonably legitimate doubt

16              about the Defendant's guilt, would you

17              hesitate to vote to find her not guilty?

18   A.   No, I wouldn't hesitate.

19   Q.   I said to you before when talking about my

20              silly little case where I got charged

21              with killing that Bob Taft guy, who the

22              State claimed was the Governor.  That
```

1    piece of paper where they would notify me

2    is called an indictment.  Have you heard

3    that term before?

4  A.    Yes.

5  Q.    And lot of people have misconceptions about

6    that and I want to talk about it for just

7    a few seconds.  An indictment is a piece

8    of paper issued by a Grand Jury.  Did you

9    know that?

10 A.    Yes.

11 Q.    Did you know that Grand Jury proceedings are

12    secret?

13 A.    Yes.

14 Q.    Did you know that they are one side, that is,

15    that neither Mr. Ingram nor I were there,

16    Donna Roberts, wasn't there?

17 A.    Correct.

18 Q.    It is simply a finding that hey, you know

19    what, we find that there's some reason

20    here why this person should stand trial.

21    And jurors, we're in essence to give it

22    to another Jury, we're going to hand the

1691

1  ball off to you and other jurors to make
2  it harder finding of is she guilty beyond
3  a reasonable doubt.  Do you appreciate
4  that?

5  A.  Yes.

6  Q.  The reason I ask you about all of that is, you
7  don't have any misconception do you, that
8  just because Donna has been indicted by
9  the Grand Jury, that constitutes some
10  proof that she committed this offense?

11  A.  No, I understand that.

12  Q.  And I don't mean to be condescending,
13  sometimes we run into that with jurors,
14  because they don't understand how the
15  Grand Jury process works.  I like to talk
16  about the State's burden as being one
17  where they have to fill up a beyond the
18  line called reasonable doubt.  And the
19  reason I like to do that is because if
20  the State fills up that box with enough
21  evidence to go beyond the line called
22  reasonable doubt, then they have made

1692

```
 1              their case.  And your obligation, your
 2              oath would be to find the Defendant
 3              guilty.  But by the same token, if they
 4              don't, then your obligation would be to
 5              find the Defendant not guilty; you
 6              appreciate that?
 7    A.   Yes.
 8    Q.   And the reason I like to use that example is
 9              because Mr. Becker, I think also talked
10              to you about the Fifth Amendment and the
11              idea that the Defendant doesn't have
12              to -- Mr. Ingram and I can sit over there
13              and do crossword puzzles if we wanted to
14              during the trial.  We don't have to do
15              anything.  You are okay with that?
16    A.   Okay.
17    Q.   Because they either win the case or lose the
18              case, by giving you enough proof or
19              failing to give you enough proof that
20              she's guilty.  She doesn't have to do
21              anything to take evidence out of the box,
22              and she doesn't have to pour any evidence
```

1693

```
 1            in the box herself; do you see how that
 2            works?
 3    A.   Yes.
 4    Q.   No problem holding the State to that type of
 5            burden?
 6    A.   No.
 7    Q.   Mr. Becker also talked to you a little bit
 8            about circumstantial evidence, and I
 9            think he used an example where his little
10            daughter, because his son was swinging
11            the plastic bat like he wasn't supposed
12            to be in the house, there's his little
13            daughter and she's crying and there's his
14            son standing there holding the bat.
15            Mr. Becker didn't see the bat being
16            swung, but he could conclude from the
17            circumstantial evidence that his son had
18            whacked his daughter with the bat.  You
19            recall that example?
20    A.   Yes, I do.
21    Q.   And if you are selected as a juror in this
22            case, Judge Stuard will tell you at the
```

1694

1   end of the case, that you can in fact use

2   circumstantial evidence, to find the

3   Defendant guilty.  You are all right with

4   that?

5   A.   Yes.

6   Q.   The reason I wanted to talk to you about that

7        is there could be based on the same

8        circumstantial evidence, there could be

9        other theories, which also explain that

10       circumstantial evidence and may give a

11       reasonable doubt about the Defendant's

12       guilt.  Do you see how that might happen?

13  A.   Yes.

14  Q.   For example, let's twist around the example a

15       little bit that Mr. Becker gave you.

16       Let's say that his little daughter, who

17       ultimately was the one who was crying,

18       picked up the bat and she was swinging it

19       around herself and as little kids

20       sometimes do, she accidentally whacked

21       herself on the back of the head, and now

22       she's crying and she drops the bat and

1      she goes running looking for Mom or Dad,

2      and the brother comes out, and goes, "Oh,

3      boy, I'm going to get nailed for leaving

4      this bat somewhere where somebody could

5      trip on it."  He picks it up and walks

6      into the other room to see why his sister

7      is crying, and there's Mr. Becker and

8      sees his daughter and sees his son

9      holding the bat.  Under his theory of

10     circumstantial evidence, you might be

11     able to conclude that his son swung the

12     bat like he's not supposed to, correct?

13  A.  Correct.

14  Q.  Under the facts I just told you, the same

15     circumstantial evidence might give a

16     reasonable doubt, in essence about his

17     son's guilt, correct?

18  A.  Correct.

19  Q.  The reason I use that little example is, I

20     want to make certain that if you are

21     presented with circumstantial evidence in

22     this case, you will test it.  If you have

1696

1          a reasonable doubt about that

2          circumstantial evidence, you would still

3          find that the Government had not met its

4          burden of proof.  Are you okay with all

5          of that?

6 A.    Yes.

7 Q.    Is there anything else that has come up while

8          I have been up here that you either have

9          questions about our process, something

10         else that has come up about why you could

11         or could not serve on this Jury?

12 A.    Not really.  I pretty much understand

13         everything and that example kind of

14         reminded me of parenthood with children.

15         You deal with it every single day and the

16         Fifth Amendment.  I tell my kids, "I

17         plead the Fifth, I don't have to tell you

18         why I said you can't do it."

19 Q.    You told the Prosecutor you understand all of

20         this.  I heard you say that you were

21         going, that your ear is fine, you are

22         going back to work on Sunday?

1697

1    A.    Yes.

2    Q.    If you get selected as a juror there's no

3          problem getting off work to be here?

4    A.    There's no problem.

5    Q.    The only reason I ask, is sometimes we have

6          jurors who so want to do their duty that

7          they will like come to Court all day and

8          work the afternoon shift and after a day

9          or two pretty soon they are snoozing.

10         They are not going to make you come to

11         work if you are working as a juror?

12   A.    No, they won't.

13              MR. JUHASZ:  Thank you very much.

14   (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT OF

15   HEARING)

16              THE COURT:  You are going to be in

17   the pool from which this Jury will be selected, so

18   that number that was given to you to call, not this

19   Friday, but the following Friday after 4:30, call

20   that number and you will get further instructions.

21   That following week, we'll probably have you all in

22   here again.

1698

1    Just remember the admonition.  You get

2    sick of me saying this, but I have to repeat it.

3    You are not to read anything, watch anything on

4    T.V., nor to discuss anything about the case.  I

5    hope your ear is feeling better.

6    (Juror No. 76 excused from the Courtroom.)

7         THE COURT:  For the record, both

8    Defense and Prosecution have passed on challenge

9    for cause of the last prospective juror.

10   (Juror No. 72, Lawrence King, entered the Courtroom.)

11        THE COURT:  You read that handout

12   that was given to you?

13        MR. KING:  Yes.

14        THE COURT:  You have been called in

15   here so that you could be asked questions

16   concerning two areas of inquiry, and the one is

17   whether you have read something or seen something

18   about this case that you have your mind made up and

19   would not be able to set aside.  The second issue

20   is about your opinion on capital punishment.  In

21   order for both sides to get a fair trial here,

22   we're going to have to seat 12 people who even

1699

1    though they may not necessarily be for the death

2    penalty or against it, they are able to follow the

3    law.  If somebody believes that an eye for an eye,

4    that person could not be very fair to the

5    Defendant.  If a person could never impose the

6    death penalty, then that person could not be fair

7    to the State.

8         So, these gentleman will ask you

9    questions concerning your personal opinion.

10   Whatever your personal opinion is, is fine.  You

11   are entitled to that, and we'll respect it.  But

12   the attempt is to get 12 people who can be fair and

13   impartial to both sides.

14        In Ohio, it is not the law that if you

15   murder somebody, you automatically get the death

16   penalty.  Miss Roberts is charged with aggravated

17   murder with specifications.  That means that this

18   Jury could face the possibility of deciding the

19   question of the death penalty, if they would find

20   her guilty of the aggravated murder.  The case

21   would then go into a second phase.  If they didn't

22   find her guilty, there would be no second phase.

1700

1   That second phase, the Prosecution has to prove

2   beyond a reasonable doubt, the aggravating

3   circumstances.  That is reasons why the death

4   penalty should be imposed, outweigh any mitigating

5   factors, that the Defendant would have an

6   opportunity to raise.  Those being factors of why

7   the death penalty should not be imposed.  You get

8   the picture?

9            MR. KING:  Yes.

10  EXAMINATION BY MR. BAILEY OF MR. KING:

11  Q.   Mr. King, my name is Ken Bailey and I am

12            Assistant Prosecutor with the Trumbull

13            County Prosecutor's Office.  And as I

14            promised you last week, my co-counsel,

15            Chris Becker is here with me today and

16            we're presenting this case on behalf of

17            the State of Ohio.

18                 Usually, I go through a litany of

19            questions, but I'm going to cut to the

20            chase.  You have got two problems, the

21            first you have got a back problem and

22            that is causing you substantial pain?

1701

1   A.    That is not a major problem.

2   Q.    Other problem is you know the Defendant's

3           brother, and you formed an opinion. You

4           followed this case very closely, I

5           believe, you are aware of all of the

6           details, and you formed an opinion that

7           she's guilty and she should receive the

8           maximum punishment?

9   A.    Yes, I have.

10   Q.    I take it no matter what the Judge instructs

11           you, you wouldn't be able to set that

12           opinion aside?

13   A.    As Judge Stuard said in the first day, you

14           have to ask yourself, could I be fair and

15           impartial. And if I was a Defendant,

16           would I want me on the Jury, and I would

17           have to say honestly, no.

18           MR. BAILEY: Thank you very much. I

19   have no further questions.

20   EXAMINATION BY MR. INGRAM OF MR. KING:

21   Q.    I want to thank you for your honesty and your

22           candor. Last Tuesday when we were at the

1702

1               other end of the hall, were you one of

2               the seated jurors or were you one of the

3               jurors who was standing?

4   A.  I was standing.

5   Q.  Can you tell me where you were standing?  Say

6               I am walking in the door of the

7               Courtroom, would you be to the left?

8   A.  To your left.

9   Q.  That would be to the Judge's right as you walk

10              in the door, you would turn left?

11  A.  Yes.

12  Q.  You were standing against the wall?

13  A.  Right by the door back there.

14  Q.  While you were there, did you say anything to

15              any of the other jurors about this case?

16  A.  Not really, no.  I said I knew Nick Roberts.

17              I coached with Nick Roberts, which is her

18              brother, which was one reason -- I have

19              been following it, because I knew who it

20              was.

21  Q.  Did you say anything about the allegations in

22              the case?  Did you say the name of the

1703

1    Defendant before the Judge said her name,

2    if you said the name Nick Roberts?

3  A.  No, her name was already brought up.  I think

4    her name was mentioned.

5  Q.  Did you mention anything about what had been

6    in the newspaper or on the T.V. about the

7    case?

8  A.  The only thing I said was that I have read the

9    newspaper and watched T.V. and that I

10    probably would not make a good juror.

11  Q.  Do you have any idea to whom you said that?

12  A.  No, I don't know.

13  Q.  Was it one person or more than one person?

14  A.  Well, I think I was speaking to one person,

15    but another person was listening.

16  Q.  The person you were speaking to, was that a

17    man or woman?

18  A.  A man.

19  Q.  The person that was listening, was this a man

20    or a woman?

21  A.  I think that was a woman.

22  Q.  Did you overhear any other jurors say anything

1704

1   about the case of any kind?

2   A.   No, not at all.

3               MR. INGRAM:  Thank you.  Excuse me,

4   Your Honor.  I do have something.

5   Q.   (By Mr. Ingram)  Your conversation with the

6           one gentleman when the woman was

7           listening, was that before or after the

8           Judge started talking?

9   A.   After, I believe.

10              MR. INGRAM:  Thank you.

11              THE COURT:  We thank you for your

12  candor, and your time.

13              MR. KING:  I would like to serve on

14  a Jury, but I feel that I would not make a good

15  juror.

16              THE COURT:  You are just doing what

17  we're asking you to do.

18              MR. KING:  I am being honest.

19              THE COURT:  We appreciate it.  You

20  are excused from any further responsibility.

21              MR. BAILEY:  Can I ask one question?

22              THE COURT:  Yes.

1705

1 | <u>EXAMINATION BY MR. BAILEY OF MR. KING</u>:

2 | Q.   When you said you were speaking after the

3 |           Judge started to speak, was it before the

4 |           Judge admonished you not to talk about

5 |           the case with anyone?  I think that was

6 |           at the end of the session.

7 | A.   I think it was at the end of the session, when

8 |           all I said was that I know too much about

9 |           this case.

10 | Q.   You never really discussed the case?

11 | A.   No.

12 |                MR. BAILEY:  Thank you.

13 |                THE COURT:  Fine.  Thank you, Sir.

14 | You are excused.

15 | (Juror No. 72 excused from the Courtroom.)

16 |                THE COURT:  For the record, the last

17 | juror, Mr. King, has been excused for cause,

18 | without objection.

19 |                MR. INGRAM:  That is correct.

20 |                MR. BAILEY:  That is correct.

21 | (Juror No. 81, Cynthia Sase, entered the

22 | Courtroom.)

1706

1    THE COURT:   How are you?

2    MS. SASE:   Fine.

3    THE COURT:   You read that handout

4    that was given to you?

5    MS. SASE:   Yes.

6    THE COURT:   The purpose of this

7    afternoon will be to allow both sides to ask you

8    questions, primarily in two areas; the one being

9    the question of any pre-trial publicity that you

10   may have been exposed to, and the second part will

11   be on your thoughts concerning the death penalty.

12   As the various attorneys have pointed

13   out, it seems like putting the cart before the

14   horse to get into asking you questions about the

15   death penalty, because we don't know what the Jury

16   is going to do on the guilt or innocence.  But, we

17   can't very well have a Jury of 12 people decide the

18   question of guilt or innocence and then start this

19   process because just wouldn't work.  So the law has

20   evolved that this is the way we do it.

21   Now, Donna Roberts is charged with two

22   counts of aggravated murder with specifications.

1707

1    Under the law of Ohio, just because a person does

2    murder does not mean that they are facing the death

3    penalty.  It is only under certain circumstances,

4    and those are specifications, that have to be

5    proven along with the murder charge before the

6    issue comes up.  So, assuming that the State is

7    able to carry its burden of proof, and to prove

8    beyond a reasonable doubt both the aggravated

9    murder charge and the specifications, only then,

10   upon a finding of guilty, would the second phase of

11   the trial come up.  If she were found not guilty,

12   that would be the end of it.

13           At that second phase, if this trial would

14   go to that point, then the State always has the

15   burden.  They would have to prove beyond a

16   reasonable doubt that the aggravating

17   circumstances, that is the reasons that the Jury

18   should consider imposing the death penalty,

19   outweigh any mitigating factors, which the Defense

20   is permitted to present.  Mitigating factors are

21   reasons why the Jury should not impose the death

22   penalty.

1708

1    Some people believe that the taking of a

2    life means that person should forfeit their life.

3    That is not the law of Ohio.  Other people could

4    under no circumstances feel that they would be able

5    to sit on a Jury where they would have to make the

6    decision of life or death and that is fine.  We're

7    all entitled to our own opinion.

8    To have a fair Jury, we have to have 12

9    people who are going to have a wide range of

10   opinions, no doubt, on the question of death

11   penalty.  But 12 who could give assurance to these

12   folks that they are able to set aside their own

13   position and follow the law.  That is the important

14   thing.  And the law says that if certain things

15   happen, we go to that second phase, that Jury would

16   then have to consider whether or not the death

17   penalty or life imprisonment should be imposed.

18   You get the picture?

19                 MS. SASE:  Yes.

20                 THE COURT:  At this time, then these

21   gentlemen are going to be asking you questions

22   along that line.

1709

1  EXAMINATION BY MR. BAILEY OF MS. SASE:

2  Q.  Good afternoon.  My name is Ken Bailey and I'm

3  Assistant Prosecutor with the Trumbull

4  County Prosecutor's Office, and as I

5  promised you last week, I am joined today

6  by Chris Becker, another Assistant

7  Prosecutor in our office.  And the two of

8  us are responsible for prosecuting this

9  particular case on behalf of the people

10  of Trumbull County, and the people of the

11  State of Ohio.

12  And as the Judge said, this is a

13  chance where we get to ask you some

14  questions to make sure that whoever is

15  selected could be fair to both sides,

16  both to the Defendant, and to the people

17  of the State of Ohio.  And we ask these

18  questions not because we're snoopy and we

19  like to pry, but to make sure that people

20  can be fair to both sides.  Another thing

21  I want to bring out is there aren't any

22  right answers or wrong answers, only

1710

1  open, candid answers to these questions,

2  because we're going to ask you about your

3  opinions and feelings about different

4  things.

5      If, because this is one chance we

6  get to have a give and take here, if you

7  have any questions that are pertinent to

8  what we're doing, you could -- it would

9  be a good time to be asking them during

10  this proceeding and maybe we can get an

11  answer for you to those questions.

12  Because after we're done here today,

13  we're not allowed to have any

14  conversation with you until the entire

15  trial is over.  And if the case were to

16  proceed to two different phases, we have

17  to wait to the end of the second phase

18  before you are allowed to come up to us

19  and ask us any questions about what was

20  going on.  If you have any of questions

21  in the meantime, Laurie Brown, who is not

22  here now, but she's our bailiff and she

1711

1  will be around during the course of the

2  trial.  You could go up to her or you can

3  ask Mary Ann Mills, our Court Reporter,

4  and she will help you with something or

5  the Judge.  If we pass each other in the

6  hallway or in the elevator or restaurant

7  or something, we just want you to know

8  that we're not being anti-social and

9  trying to snub you or anything, it is

10  just that under our rules of conduct, all

11  we're allowed to say to you is, "Good

12  morning," or "Good afternoon," under

13  those circumstances until the whole trial

14  is over.

15      And there are a couple of other

16  things.  You are not allowed to go out to

17  the scene to do an investigation on your

18  own.  Sometimes people watch T.V. or the

19  movies, and they, I think Matlock, they

20  did that once or something like that.

21  And it would cause a mistrial in real

22  life and we wouldn't want to do it all

1712

1   over again.  You are not allowed to take

2   notes in the Courtroom.  Sometimes in

3   different jurisdictions in the country,

4   they may allow jurors to take notes, but

5   in Ohio, generally, the Judges do not

6   allow that.  They want you to pay close

7   attention to the witnesses who are

8   testifying, and their demeanor.

9   Sometimes in other jurisdictions they may

10  allow jurors to submit questions to the

11  Judge to ask the witnesses, and that

12  doesn't happen here.  You are pretty much

13  stuck with the questions that are asked

14  by the lawyers, and we gear our questions

15  basically to the elements of the crime

16  that we're going to be talking about.

17       Now, let me get to two issues first.

18  This issue of pre-trial publicity.  I

19  notice you subscribe or you get the

20  Warren Tribune and you read it daily

21  pretty much.  And you had some knowledge

22  of this case from the newspaper and maybe

1713

1   T.V.  You watch I believe it was channel

2   27, the local news on occasion?

3  A.  Yes.

4  Q.  And how much did you find out about this case

5   from the media?

6  A.  That mostly was from the media.  That is the

7   only way I really knew about this story.

8  Q.  What were you aware of?  I mean from the media

9   what facts basically did you become aware

10   of?

11  A.  That it was a murder trial.  They were

12   involved in a murder.

13  Q.  Did you skim it or did you pay very close

14   attention?

15  A.  I kind of skipped it over.  I read it over,

16   but it wasn't like it was something that

17   was really personal.

18  Q.  Sort of blended together with all of the other

19   murder cases that have been in the paper

20   lately?

21  A.  Sort of.

22  Q.  Now, the Judge instructs you not to, once you

1714

1    come into this process -- last week the

2    Judge instructs you not to be reading the

3    paper or watching T.V. regarding this

4    case.  If something comes on, you have

5    got to walk out of the room or turn off

6    the T.V. or stack the newspapers up until

7    this is all done, which might be an

8    interesting experience to have your

9    family save the newspapers for you and

10   then when it is all over, read the

11   papers.  As you look around the Courtroom

12   today, there's nobody here from the news

13   media.  And that is the way it has been

14   most of the proceedings so far.  But, I

15   imagine, when the trial actually starts,

16   from time to time we'll see

17   representatives from the different

18   newspapers come in, and the reporters may

19   be here or cameraman from the different

20   T.V. stations.  And they will be here for

21   maybe three minutes or five minutes, just

22   long enough.  They don't photograph the

1715

1   jurors, they photograph the witness maybe

2   or the Judge or the lawyers or the

3   Defendant.  And then they will be on

4   their way and they will do a feature

5   based on those couple of minutes that

6   they have been here.  And because of

7   that, you are aware that they will have

8   missed everything that was asked and the

9   questions that were answered before they

10  got here and the questions that were

11  asked and the questions that were

12  answered after they left here, so

13  whatever is in the paper, since they try

14  to make a big story out of it, it may be

15  somewhat misrepresentative of what

16  happens in Court.  As a matter of fact,

17  if you were to read the newspapers

18  afterward, you might say, "Gosh, I sat in

19  Judge Stuard's Court for the entire trial

20  and especially the days that the

21  reporters were here, and it looks like

22  whoever covered this story was covering a

1716

```
 1              trial in Judge McKay's Court, rather than

 2              Judge Stuard's Court."  So because of

 3              that, because of those misrepresentations

 4              or inaccuracies the Court asks you, the

 5              Court tells you not to read the papers or

 6              watch T.V. and basically to start out

 7              here with a blank slate.  To put aside

 8              whatever you might have learned before,

 9              and try this case based solely on the

10              testimony of the witnesses that you

11              receive, the evidence that comes in, and

12              the instructions of law given to you by

13              the judge.  Can you do that?

14    A.   Yes.

15    Q.   Sort of like going back to school and starting

16              with a blank slate and whatever is

17              written on that slate, has to be written

18              in school, right here in this Courtroom.

19              It is the only fair thing to both sides.

20                   It may well be that during the

21              course of the trial you may recollect

22              after hearing some testimony, you may
```

1717

1    say, "Gosh, I read that in the paper, but
2    I'm going to put aside what I read in the
3    paper and base it solely on what I heard
4    in Court," even though it may reinforce
5    what you heard before.  Now, based on
6    what you read before or skimmed before, I
7    take it you didn't form any opinion as to
8    this Defendant's guilt or non-guilt?
9  A.   No.
10 Q.   And the other issue that we're going to ask
11      some questions about are your views on
12      the death penalty as a punishment.  I
13      take it, reading your questionnaire, you
14      are in favor of the death penalty for
15      premeditated and cruel murders, and you
16      have held this view for awhile?
17 A.   Yes.
18 Q.   And what is that based on?  Is it based on a
19      religious, moral, ethical, personal
20      belief or what, combination of those?
21 A.   Combination of those, yes.
22 Q.   Combination of which factors, basically?

1718

1    A.    Personal belief. I guess religious in some

2         respect.

3    Q.    How do you mean? You indicated you are

4         Methodist, right, United Methodist, and

5         the Methodist Church, it doesn't take a

6         position one way or another on capital

7         punishment?

8    A.    I believe they are against it.

9    Q.    But that doesn't bother you that the church

10        might be a contrary view to your view?

11    A.    No.

12    Q.    You make up your own mind?

13    A.    Yes.

14    Q.    And your view is in favor of the death penalty

15        in certain cases?

16    A.    Yes.

17    Q.    You have discussed your position on the death

18        penalty with whom over the years, in

19        school or in church or with family or

20        friends?

21    A.    Yes.

22    Q.    What would give rise to those discussions?

1719

1    A.    Something that we would read in the paper,

2           watch on T.V. and say, well, we would get

3           upset about something that we saw that

4           just didn't seem fair.

5    Q.    Like how do you mean didn't seem fair, which

6           way?

7    A.    Didn't seem fair that they were allowed to

8           live and they had murdered someone.

9    Q.    Now, you understand that under our system, the

10          State legislature writes the law.  They

11          set out the parameters, what are going to

12          be crimes and what the punishment are for

13          those particular crimes and not every

14          killing is punishable by the death

15          penalty in Ohio.  It is rare when we get

16          to a death penalty case.  Because there

17          are all kinds of killings.  Some killings

18          may be innocent.  For example, where

19          somebody is chopping wood, and the head

20          of the axe flies off and kills somebody.

21          That would be an accident, right?  And

22          you wouldn't want to punish anybody for

1720

1    that?

2  A.    No.

3  Q.    And there are other types of killings where

4        somebody might go driving drunk, and run

5        into somebody and kill somebody.  I think

6        you don't think the penalty would be an

7        appropriate punishment for that type a

8        killing?

9  A.    No.

10 Q.    Maybe some type of prison sentence, but not

11       the death penalty?

12 A.    Yes.

13 Q.    Then, there are other killings where somebody

14       may get angry in a bar and just punch

15       somebody and kill them, maybe kill them

16       on purpose.  And for that type of a

17       killing, you might expect some kind of

18       maybe a life sentence or serious

19       sentence, but not a death penalty?

20 A.    No, not really, no.

21 Q.    Let's say a wife comes in, comes home and

22       catches her husband in bed with another

1721

1           woman, and there's a gun just sitting on

2           the table there, and she picks it up

3           because she's so angry and shoots him.

4           That may be a voluntary manslaughter or

5           something.  But I take it, you wouldn't

6           impose the death penalty for that type of

7           offense?

8  A.   No, not if it was an accident or it was a

9           crime of passion.

10  Q.   Now, in Ohio, if somebody were to stand on the

11          Courthouse steps, and let's say I were to

12          stand on the Courthouse steps, and say,

13          "I'm going to kill my co-counsel, Chris

14          Becker tomorrow at noon."  That may be a

15          planned murder, premeditated or killing

16          with prior calculation and design, but

17          without more, and let's say I did it,

18          Chris wouldn't be too happy, but that may

19          be killing with prior calculation and

20          design.  But the way our laws are written

21          by the legislature, that wouldn't be an

22          offense that would be punishable by the

1722

1             death penalty.  And you may feel, because

2             it is a premeditated murder, maybe it

3             should be punishable by the death

4             penalty, but in that, would you be able

5             to put aside your own personal belief and

6             follow the law given to you by the Judge?

7  A.  Yes.

8  Q.  Now, you read that handout that was given to

9             the jurors downstairs?

10  A.  Yes.

11  Q.  So you understand and the Judge has told you

12             that the Defendant here is charged with

13             four different crimes.  There are two

14             charges of aggravated murder, one of

15             these aggravated murder charges is that

16             it is a purposeful killing of another

17             person with prior calculation and design.

18             And there's a second charge of killing

19             the same person, purposely, in the course

20             of a special felony; in this case, an

21             aggravated burglary and/or aggravated

22             robbery.

1723

```
 1              So you can see we have one killing,
 2          but we have two different theories that
 3          the State is pursuing.  The State is
 4          allowed to do that.  We have elected to
 5          proceed that way with two separate
 6          charges of aggravated murder.  And each
 7          of these crimes is composed of certain
 8          elements or essential component parts,
 9          sort of like the ingredients in a recipe.
10          I take it you bake on occasion?
11   A.    Occasionally.
12   Q.    And you are familiar with ingredients in a
13          recipe?  The same thing with crimes, each
14          crime has its own recipe.  Attached to
15          these charges of aggravated murder,
16          attached to each charge are two
17          specifications.  Specification is just a
18          fancy word that means a special, extra
19          finding of fact for the Jury to consider.
20          And these specifications, the first is of
21          aggravated burglary, that the aggravated
22          murder was committed during an aggravated
```

1724

1    burglary and that the Defendant committed

2    the aggravated murder with prior

3    calculation and design.  The second

4    special finding or specification is that

5    the aggravated murder was committed

6    during an aggravated robbery as opposed

7    to an aggravated burglary and it was

8    committed with prior calculation and

9    design.  So you have got these two

10    special findings.  If the Jury, you and

11    the other 11 jurors find the Defendant

12    guilty beyond a reasonable doubt of the

13    crime called aggravated murder and one or

14    more of these specifications, then we

15    would proceed to a second phase.  Now, in

16    the first phase, the only issue is guilt

17    or non-guilt.  Punishment would never

18    come up in the first phase, because it is

19    not relevant.  You wouldn't have decided,

20    did she do it or not?  Can we prove that

21    she did it?  And it wouldn't be fair to

22    consider punishment in the first phase,

1725

1   right?

2   A.   Right.

3   Q.   If we move then to a second phase, let's say

4        we have met our burden of proof in the

5        first phase, and we move to a second

6        phase.  Then the issue there is what is

7        the appropriate punishment for this

8        Defendant, for this crime.  And there are

9        four options that you are aware of,

10       right?

11  A.   Yes.

12  Q.   Death penalty, life in prison with no parole

13       eligibility, life with eligibility for

14       parole after 30 full years, and life with

15       parole eligibility after 25 full years.

16            Now, you understand that the death

17       penalty is not an automatic punishment

18       for somebody who has been found guilty in

19       the first phase?

20  A.   Right.

21  Q.   Because in a second phase, you could hear the

22       same evidence, or maybe more evidence

1726

1    presented.  And you would be asked to do

2    a balancing test.  You would have to

3    weigh certain things.  You would have to

4    weigh the aggravating circumstance or

5    circumstances on one side of the scale

6    against the other side, whatever

7    mitigating factors were presented.

8    Mitigating factor would be something that

9    would work in favor of the Defendant, and

10   would work against the imposition of the

11   death penalty as a punishment.  I don't

12   know what those are at this point, it is

13   not relevant.  But whatever is presented,

14   you would have to consider.

15        Now, it is entirely up to you and

16   the other jurors how much weight you want

17   to give to these aggravating

18   circumstances, or mitigating factors.

19   You might decide that one of these

20   circumstances or factors has a whole lot

21   of weight, in tipping the scale.  And on

22   the other hand you might decide that one

1727

```
 1        of these factors may weigh about as much

 2        as a feather.  That is entirely up to

 3        you.  Now, if you and the other jurors

 4        find by proof beyond a reasonable doubt,

 5        that the aggravating circumstance or

 6        circumstances outweigh these mitigating

 7        factors, then you must return a verdict

 8        as to the death penalty.  And in that

 9        case you wouldn't go on to consider the

10        life factors.  Because then we would have

11        met our burden of proof in the second

12        phase, and proved that the aggravating

13        circumstance outweighs the mitigating

14        factors.  In the event you find that we

15        didn't prove it beyond a reasonable doubt

16        that the aggravating circumstance

17        outweighs the mitigating factors, then

18        you would go on and look at the other

19        three life sentences and you would have

20        to treat them equally to start out with.

21        And then, you would look at everything

22        and make your own determination as to
```

1728

| | | |
|---|---|---|
| 1 | | what is appropriate, which of those three |
| 2 | | life sentences.  You think you could do |
| 3 | | that? |
| 4 | A. | Yes. |
| 5 | Q. | You might, under your own personal belief |
| 6 | | system, you might favor the death penalty |
| 7 | | for certain crimes, but could you set |
| 8 | | aside your personal belief system and |
| 9 | | follow the law and judge this case solely |
| 10 | | on the facts and the evidence presented, |
| 11 | | and the law given to you by the Judge? |
| 12 | A. | Yes. |
| 13 | Q. | Now, I mentioned elements of a crime.  The |
| 14 | | ingredients in the recipe, the Judge is |
| 15 | | going to instruct you at the end of this |
| 16 | | case as to what those elements are.  He |
| 17 | | will give you the law and you are bound |
| 18 | | to follow his instructions of law.  But |
| 19 | | I'm going to give you a for instance. |
| 20 | | Let's take a for instance of aggravated |
| 21 | | murder with prior calculation and design. |
| 22 | | The State would have to prove |

1729

1   certain key ingredients and one of them

2   would be that it happened on or about a

3   certain date, December 11, 2001.  The

4   second element would be that it happened

5   here in Trumbull County, Ohio.  And the

6   reason we have to prove that it happened

7   in this county and so we could try this

8   case in this Courthouse, rather than down

9   in Cuyahoga County.

10      The third element is identification.

11  That the person who committed this crime

12  is the person who is sitting at that

13  table.  Somebody is going to have to

14  point her out.  The fourth element would

15  be that she acted purposely, basically on

16  purpose, but the Judge will give a

17  detailed legal definition at the end of

18  this case.

19      Fifth is that she caused the death

20  of a living person.  In this case a

21  fellow by the name of Robert Fingerhut.

22  And six is that she acted with prior

1730

1       calculation and design.

2              Now, we have to prove those

3       particular elements, so that you are

4       firmly convinced of the truth of the

5       charge to a moral certainty.  And the

6       Judge is going to give a definition of

7       proof beyond a reasonable doubt.  All of

8       these legal terms.

9              But basically, you use your reason

10      and your common sense in coming to that

11      conclusion.  You are used to doing that.

12      You do that at work, and you teach

13      sometimes, you substitute.  What do you

14      teach?

15  A.  I used to teach English.

16  Q.  What grade?

17  A.  High school, Junior high.

18  Q.  Literature and grammar?

19  A.  Yes.

20  Q.  Composition?

21  A.  Yes.

22  Q.  Still do that?

1731

1     A.     No.

2     Q.     Now, we're talking about the elements of the

3              crime.  The Defendant here, the charge

4              here is not that the Defendant is a

5              trigger person in this case, but rather

6              the charge as a complicitor, somebody who

7              solicits or procures another person to

8              commit an offense or aids and abets

9              another person, encourages, helps,

10             strengthens another person in some way,

11             in committing the actual offense.  And

12             the charge here is that the fellow by the

13             name of Nate Jackson is the one who

14             actually killed the victim.  The fellow

15             who actually broke into the house or

16             trespassed in the house.  The person who

17             actually stole the car.

18                  The Defendant is charged as an aider

19             and abetter, complicitor, solicitor, to

20             kill her ex-husband for the insurance

21             money.  Now, the fact that she's charged

22             as an complicitor and is not charged as

1732

1     the actual trigger person, would that

2     affect your ability to follow the law as

3     to let's say we get to a second phase, as

4     to the imposition of the death penalty if

5     you deem it appropriate under the facts

6     and the law?

7  A.  Would that?

8  Q.  Would you be able, if we were able to prove

9     all of the elements of the crime and then

10    specifications, and that the

11    specifications outweighed the mitigating

12    factors beyond a reasonable doubt, would

13    you be able to come back with a death

14    penalty verdict if you felt it was

15    appropriate?

16 A.  Yes.

17 Q.  Now, in addition to the crimes of aggravated

18    murder with these specifications, there

19    are two other charges that the Judge

20    mentioned.  Aggravated burglary and

21    aggravated robbery.  And basically, the

22    difference between those charges, the

1733

1       Judge will define those for you.

2              Basically an aggravated burglary is

3       somebody trespasses in an occupied

4       structure; could be a dwelling house

5       where somebody lives, with the intent to

6       commit an offense, like an aggravated

7       murder or theft or something inside.  And

8       the perpetrator may be armed with a

9       weapon like a gun, and may cause serious

10      physical harm, like killing the victim

11      inside.  That is an aggravated burglary.

12      It deals with the dwelling house,

13      trespassing.

14             An aggravated robbery, on the other

15      hand, doesn't deal with the structure, it

16      rather deals with the use of force or

17      threat of force against the person, to

18      maybe steal something.  And the

19      perpetrator may be armed with a weapon

20      and may cause serious physical harm to

21      the victim.  You understand the

22      distinction?

1734

1    A.    Yes.

2    Q.    Now, attached to these two charges, the

3          aggravated burglary and the aggravated

4          robbery, are specifications of a firearm,

5          a working gun was used.  And again, you

6          understand the Defendant is charged as a

7          complicitor.  She's not charged with the

8          person that physically broke in.

9                Now, there are different types of

10         evidence that we can use to prove our

11         case.  There's something that we call

12         direct evidence where a witness can come

13         in and testify as to what he or she is

14         going to use through the use of the five

15         senses.  "I heard the gunshot and it was

16         loud.  I smelled the smoke and it was

17         acrid.  I touched the body and it was

18         cold."  On the other hand, there's some

19         round about evidence that we can use, I

20         think you would agree, most serious

21         crimes, that are planned, are not planned

22         out in public with a whole lot of people

1735

```
 1              walking around.  Like if you are going
 2              to plan a murder, you are not going to
 3              tell the whole world about it usually,
 4              right?
 5   A.   Right.
 6   Q.   And because of that, we have to use
 7              circumstantial evidence where you are
 8              presented with a fact or series of facts,
 9              and then you are asked to draw a logical
10              deduction to another fact or series of
11              facts.  Let me give a for instance.
12                   Let's say you live in a two story
13              house.  You go to bed at night and your
14              bedroom is on the second floor and you
15              look out your bedroom window across the
16              neighborhood and it was a beautiful
17              evening.  Moon is beaming, not a cloud in
18              the sky.  You draw the blinds, you get
19              into bed, and before you fall asleep, you
20              hear the weather forecast that says,
21              "Folks, there's a cold front coming in,
22              and we're going to get a storm
```

1736

1    overnight," and you fall asleep.  And

2    sometime during the night, you are

3    awakened by a bright flash from outside

4    the window.  You can't see what it is

5    because the blinds are covering it.

6    There's a bright flash and five seconds

7    later there's boom sounds in the sky and

8    a minute goes by and there's another

9    bright flash outside and closer in time,

10   another booming sound and suddenly

11   there's a great big flash outside and

12   great big ripping boom above the house

13   and pitter patter on the roof and you

14   fall back asleep.  Sometime later you

15   awaken, you go to the window, open the

16   blinds and you look out, beautiful day

17   outside.  The sun is beaming, not a cloud

18   in the sky.  But as far as you can see

19   across the neighborhood, the streets are

20   running with water, drops of water are

21   dripping off the leaves of the trees.

22   The rooftops are all wet, puddles all

1737

```
 1              over and you know what happened during

 2              the night, don't you?  What happened?

 3   A.   It rained.

 4   Q.   There was a thunder storm and you know that

 5              beyond any reasonable doubt, right?

 6   A.   Yes.

 7   Q.   Now there's room in there for some possible or

 8              imaginary doubt.  You can imagine that

 9              Alf and his Martian buddies came by in a

10              flying saucer, sprinkled the ground with

11              some wet stuff and put on a sound and

12              light show.  But you know that is foolish

13              or imaginary, and all that really

14              happened was there was just a thunder

15              storm.  And even though you didn't see

16              the lightning with your own eyes, and

17              seen the water coming down with your own

18              eyes, based on all of the other facts and

19              circumstances that you were aware of, you

20              know that there was a thunder storm.

21              That is circumstantial evidence.

22                   And you understand we can prove our
```

1738

1   case by circumstantial evidence.  It is

2   just as good as direct evidence, if we

3   can convince you that it proves the

4   elements of the crimes charged, by proof

5   beyond a reasonable doubt.  Now this term

6   reasonable doubt sometimes -- one example

7   that is given is about a box and it is

8   filling up that box so that there's

9   enough evidence in there, so that you are

10  firmly convinced of the truth of the

11  charge to a moral certainty.  Now it

12  certainly would be more than halfway in a

13  civil case for money damages.  Somebody

14  is in an auto crash or something like

15  that, you would have to fill the box just

16  over half.  But in a criminal case, the

17  burden is a lot higher.  It is not all

18  the way to the top of the box, we don't

19  have to do that.  It is not 100 percent

20  proof, it is not proof beyond all doubt

21  or beyond a shadow of a doubt, because

22  there's no such animal in criminal law as

1739

1   shadow of a doubt.  Alfred Hitchcock made

2   a movie like that, but it's a movie.  We

3   have got to fill that box up pretty full,

4   so that it convinces you, so that you are

5   firmly convinced that we're right.

6        Each juror may have a different

7   feeling about how high that evidence

8   should be in that box.  But again it is

9   not all the way to the top.  It is

10  getting pretty close though.

11       Now, you understand there's another

12  concept here in criminal law.  In our

13  system of juris prudence, and it says

14  that the Defendant is presumed innocent

15  as are all other Defendants tried in this

16  Courtroom.  She's cloaked by that

17  presumption of innocence, and that cloak

18  of the presumption of innocence shields

19  her all the way through these proceedings

20  unless and until, you are back in your

21  Jury room and you look at all of the

22  evidence and the testimony, and you say,

1740

1    "Gosh, it proves her guilty."  At that
2    point, the presumption of innocence would
3    be gone, right?

4  A.  Right.

5  Q.  Now, I think you would agree that all
6    criminals are not necessarily rocket
7    scientists, right?

8  A.  Right.

9  Q.  Sometimes they are kind of silly and sometimes
10    they are downright stupid.  I take it you
11    have heard it over time about the burglar
12    who leaves his wallet in the residence or
13    the bank robber who goes in with a stick
14    up note, written on the back of an
15    envelope and hands it to the teller and
16    runs out and you turn the envelope over
17    and there's his name and address on
18    there, right?

19  A.  Yes.

20  Q.  And when we talk about circumstantial
21    evidence, there are different types of
22    things that we can use.  Because we use

1741

1     circumstantial evidence, because you

2     can't always get inside the mind of a

3     Defendant, but sometimes, if you have

4     evidence like maybe letters or tapes of

5     phone conversations, that might show what

6     a Defendant is thinking, right?

7   A.  Yes.

8   Q.  Now, if we prove to you -- let's say we get to

9     a second phase.  And we prove to you,

10     that not only is the Defendant guilty of

11     aggravated murder with a specification,

12     but that the aggravating circumstance

13     outweighs the mitigating factors beyond

14     any reasonable doubt.  So that the death

15     penalty in your mind, and the mind of

16     other jurors is the appropriate

17     punishment.  Would you be able to sign a

18     verdict form recommending the death

19     penalty in this case?

20   A.  Yes.

21   Q.  And let's say after you return that verdict,

22     the Judge asks you if it is your verdict,

```
                                                      1742
 1              would you be able to say, yes, it is your

 2              verdict?

 3    A.    Yes.

 4    Q.    You believe people should be held accountable

 5              for their actions?

 6    A.    Yes.

 7    Q.    Now, I mentioned you can't take notes and you

 8              have got to pay really close attention to

 9              the testimony here, because you are going

10              to have to remember it.  Mary Ann may be

11              a very good Court Reporter, but we don't

12              have a million dollar transcribing system

13              that they have in the O.J. Simpson case

14              or some other high publicity case and we

15              don't get instant transcripts.  It takes

16              a long time to prepare a transcript, so

17              you and the other jurors are going to

18              have to rely upon your collective

19              recollection as to what the testimony

20              was, what the evidence is.  So, you can't

21              ask the Judge for a transcript of the

22              proceedings because you are not going to
```

1743

```
 1              get one.  Would you be able to pay close

 2              attention to that?

 3   A.   Yes.

 4   Q.   It is like you tell your class, pay close

 5              attention?

 6   A.   Yes.

 7   Q.   Now, at the conclusion of the first phase of

 8              this trial, you are going to be

 9              sequestered.  That means you will be kept

10              together, all of the jurors are kept

11              together.  And while you deliberate you

12              won't be able to go home during that

13              time, and then it goes overnight, you

14              will be taken to a hotel and be lodged

15              there and come back the next day and

16              begin your deliberations again or

17              continue on with your deliberations.  And

18              each Jury is different.  Some Juries may

19              take a couple of hours, some Juries may

20              take days to reach a decision.  You would

21              give whatever time is necessary, I take

22              it, to reach a decision?
```

```
                                                    1744

1    A.    Yes.

2    Q.    And the sequestration doesn't bother you?

3    A.    No.

4    Q.    That wouldn't cause any undue hardship?

5    A.    No.

6    Q.    Let's say that you and the other jurors find

7                the Defendant guilty of aggravated murder

8                and one or more of these specifications

9                in the first phase.  Then you go home and

10               after a short period of time, within a

11               week probably, you would be coming back

12               in for the second phase.  And that

13               usually takes one to three days, and

14               then, you would be sequestered again.

15               And the amount of time that that would

16               take, each Jury is different.  Whatever

17               time that the Jury takes, that second

18               sequestration then wouldn't cause any

19               undue hardship for you?

20   A.    No.

21   Q.    Now, let's say as, during the course of the

22               trial, as you come face to face with the
```

1745

1   Defendant, perhaps as her chair is turned

2   towards you, you are going to become

3   better acquainted with her.  Now my

4   question to you is this.  When you go

5   inside that Jury room to deliberate on

6   your verdict, can you set aside all

7   thoughts whatever of feelings of sympathy

8   for this Defendant and base the decision

9   on the testimony and the evidence that

10  you have been given and the instructions

11  of law given to you by the Judge, and lay

12  aside all thoughts of sympathy that you

13  may have?

14  A.  Yes.

15  Q.  Are there any other pressing matters at home

16      or work that might affect your ability to

17      concentrate on the evidence?

18  A.  No.

19  Q.  Now, I take it you would agree that there are

20      certain obligations that we have in this

21      country to make sure our system works.

22      One of these obligations when it is

1746

1    election time, we try to find out as much

2    as we can about the issues, the

3    candidates and cast a ballot.  It is one

4    of our rights that we have got under our

5    system, and it is also an obligation, if

6    we're at war, then we may be called to

7    serve in the military.  Right now we have

8    got men and women overseas in different

9    countries doing their duty.

10            There's a third obligation that when

11   we're summoned in as jurors in cases to

12   serve in, we're able, as long as it

13   doesn't cause an undue economic or

14   personal hardship on you, to make sure

15   that our system works, it is important

16   that we get people from all walks of life

17   to serve as jurors.  Would you be willing

18   to undertake that obligation to serve as

19   a juror in this most serious of criminal

20   cases?

21   A.    Yes.

22            MR. BAILEY:  Thank you very much.

```
 1    EXAMINATION BY MR. INGRAM OF MS. SASE:

 2    Q.   Good afternoon.  How are you?  My name is

 3              Jerry Ingram.  John Juhasz and I share

 4              the responsibility of representing Donna

 5              here, who is on trial for her life.  And

 6              this is obviously a very serious matter.

 7              You would agree with that?

 8    A.   Yes.

 9    Q.   John and I think that we should take every

10              reasonable precaution in selecting a fair

11              minded Jury, the same type of Jury that

12              you or I would want if we were on trial.

13              That sound fair to you?

14    A.   Yes.

15    Q.   This is the only opportunity we're going to

16              have to get to know one another, and

17              determine whether you are comfortable

18              sitting on this Jury.  Do you understand

19              that?

20    A.   Yes.

21    Q.   After this, we can certainly talk at you, but

22              we can't talk to you.  And more
```

1748

```
 1              importantly than us being able to
 2              communicate with you, you are able to
 3              communicate with us.  So, if there's
 4              anything you would like to say, any
 5              information you would like to volunteer,
 6              you really should do that.  Will you,
 7              please?
 8   A.   Yes.
 9   Q.   Now this is a little bit like a job interview.
10              Except when you went to Wal-Mart to get
11              that job, you chose to go to Wal-Mart.
12              Here, someone spun a Jury wheel and your
13              name was kicked out and we sent you a
14              special invitation by way of a summons.
15              But we're interviewing you today for like
16              the most important job there is.  The job
17              of finding the truth and perhaps
18              determining whether another human being
19              lives or dies.  Not everyone is up to
20              that responsibility.  Some people have
21              already told us that it is too much for
22              them.  My first question to you is, how
```

1749

```
 1           do you feel about being asked to assume
 2           that responsibility?
 3  A.   It is a big responsibility.  I think I can be
 4           fair.  I think I can do this.
 5  Q.   I'm sure you understand.  I want to emphasize
 6           this.  Our entire justice system is
 7           predicated upon the fact that we get 12
 8           good people to come in here and fairly
 9           determine the facts of the case.  You
10           understand that?
11  A.   Yes.
12  Q.   And you and I should talk for a moment about
13           some ground rules.  I noticed while I was
14           sitting over there that you have a
15           tendency to nod a lot rather than
16           verbally respond.  In normal
17           conversation, we do that, but it drives
18           Mary Ann crazy.  So could you please make
19           an effort to verbalize your responses?
20  A.   Yes.
21  Q.   You actually have a job responsibility now.
22           And your job responsibility now is to
```

```
                                                         1750
 1                openly and honestly tell us if you would

 2                have a problem giving either side a fair

 3                shake at any point in these proceedings.

 4                Do you understand that?

 5    A.    Yes.

 6    Q.    And do you understand why it is important that

 7                you let us know if you would have such a

 8                problem?

 9    A.    Yes.

10    Q.    There are no right or wrong answers.  The only

11                mistake you can possibly make in our

12                conversation is if you tell me what you

13                think I want to hear, rather than how you

14                honestly feel.  Do you understand that?

15    A.    Yes.

16    Q.    So what I would ask you to do is whenever I

17                ask you a question that causes you to

18                hesitate in your response, because I'm

19                going to ask you some hard questions.

20                Whenever I ask you a question that causes

21                you to hesitate in your response, please

22                take a couple of seconds, search your
```

1751

1              mind, search your soul and give me an

2              honest answer.  Fair enough?

3   A.   Fair enough.

4   Q.   What all do you recollect seeing, reading or

5              hearing about this case?

6   A.   When it was first in the paper, I read about

7              the Defendant.

8   Q.   Donna Roberts?

9   A.   Yes.  And that she was involved in some kind

10            of murder.  And she had hired someone to

11            do it.

12   Q.   That was back in December of 2001?

13   A.   Yes.

14   Q.   Did you read any newspaper stories since the

15            initial coverage, between then and today?

16            Have you read any stories about this

17            case?

18   A.   Yes.  About the man that was accused, Nate

19            Jackson, I read a little bit about his

20            trial.

21   Q.   What do you recollect reading about his trial?

22   A.   That he was found guilty and he was sentenced.

1752

1    Q.    Do you recall what the sentence was?

2    A.    I believe it is life in prison.

3    Q.    In the last week or so, have you been exposed

4          to any news coverage about this case?

5    A.    No.

6    Q.    We're all human.  And what we're exposed to in

7          our daily lives leaves us with thoughts,

8          feelings or impressions.  That sound

9          right to you?

10   A.    Yes.

11   Q.    As a result of what you may have seen, read or

12         heard about this case, are you left with

13         any impressions about this case?

14   A.    I don't know how to answer that.

15   Q.    It is a hard question.  I know it is difficult

16         to answer.  So I guess I'm just going to

17         ask you to do your best.

18   A.    Do I have an impression?

19   Q.    Yes.

20   A.    I just was stunned that a woman was involved

21         and that it had to do with her

22         ex-husband.

1753

1    Q.    You are stunned because a woman was involved?

2          And don't look so sad.  You are looking

3          sad.  As long as you are honestly

4          answering the questions put to you,

5          there's no reason to feel bad whatsoever.

6          Honest.  You want a glass of water?  You

7          want to take a two minute break?

8    A.    I am okay.

9    Q.    You have me feeling like an ogre up here.  I'm

10         sorry.  The fact that you were stunned

11         that a woman was involved.  Does that

12         mean that you have an impression that

13         Donna was involved?

14   A.    Yes.

15   Q.    An impression that she was involved in the

16         killing of her ex-husband?

17   A.    Not the killing, maybe the planning.

18   Q.    Does the fact that Nate Jackson was convicted,

19         that obviously leaves you with an

20         impression, doesn't it?

21   A.    Yes.

22   Q.    What impression does that leave you with?

1754

| | | |
|---|---|---|
| 1 | A. | That he was guilty. |
| 2 | Q. | Does it leave you with any impression about |
| 3 | | Donna? |
| 4 | A. | No, not really.  I don't think that she was |
| 5 | | automatically guilty. |
| 6 | Q. | Let's try to work from there.  There's a |
| 7 | | ground rule that you have to understand. |
| 8 | | You cannot let me put words in your |
| 9 | | mouth.  So if any point in time, you find |
| 10 | | I am doing that, will you please stop me? |
| 11 | A. | Yes. |
| 12 | Q. | The words that I believe I said, we were going |
| 13 | | to work from was that she's not |
| 14 | | automatically guilty.  Is that right |
| 15 | | first of all? |
| 16 | A. | Yes. |
| 17 | Q. | From what you have read about her, or seen |
| 18 | | when I say read, I mean read or seen, is |
| 19 | | that okay? |
| 20 | A. | Fine. |
| 21 | Q. | From what you read about Donna and from what |
| 22 | | you read about Nate, do you have an |

1755

```
 1             impression that she's probably guilty?
 2   A.   Probably.
 3   Q.   So the answer is yes?
 4   A.   Yes.
 5   Q.   Can you tell me how long you have held that
 6             impression?
 7   A.   I probably believe after he was convicted.
 8   Q.   So for a couple of months or so.  I don't know
 9             when that was.
10   A.   Somewhere around there.
11   Q.   Do you still hold that impression today?
12   A.   Yes.
13   Q.   Because you believe -- strike that.  Ignore
14             that.  Because you have the impression
15             that Donna is probably guilty?  Do you
16             expect Donna to convince you that she's
17             not involved?
18   A.   Yes.
19   Q.   So in your mind, it is the obligation of the
20             Defense in this case to convince you that
21             Donna Roberts was not involved in the
22             death of Robert Fingerhut?
```

1756

1  A.  Yes.

2  Q.  That is an open and honest response, right?

3  A.  Right.

4  Q.  And that is the way you really feel?

5  A.  Yes.

6  Q.  And I would imagine there's nothing I can

7        really say that would change your mind in

8        that respect, is there?

9  A.  Not really, no.

10  Q.  If I can't change your mind.  I imagine

11        there's not too much that Mr. Bailey here

12        said that can change your mind either,

13        because that is how you feel?

14  A.  That is how I feel.

15  Q.  When he was talking with you, did he have some

16        guy kill somebody with the head flying

17        off of an axe?

18  A.  Yes.

19  Q.  And did he put that man in jail when he was

20        talking to you about him?

21  A.  No.

22  Q.  I thought he did.  That is the first time I

1757

1   have seen somebody going to jail for

2   accidental killing.  Keeping in mind,

3   what you have just told us about your

4   impressions of Donna and about your

5   expectations that the Defense should

6   convince you that she was not involved.

7   If you were driving down the street, and

8   you blow a stop sign, and you get

9   involved in an automobile accident, and

10  as a result of that automobile accident,

11  someone passes away.  That is a crime.

12  But the culpable mental state is

13  negligence, but it is a crime.  Something

14  unfortunate like that happens to you.

15  And instead of finding yourself there, in

16  a juror chair, you find yourself sitting

17  over here defending yourself against

18  accusations leveled by the State of Ohio.

19  If you were sitting over here and you

20  heard a prospective juror say, "I have

21  these impressions and I have these

22  expectations," would you want that juror

1758

1    to hear your case?

2  A.    No.

3  Q.    In light of that, do you think it is best that

4        I ask that you be excused?

5  A.    Yes.

6  Q.    I do, too.  I wanted to know if you shared

7        that opinion.

8             MR. INGRAM:  I respectfully request

9  that Miss Sase be excused.

10             THE COURT:  Any objection?

11             MR. BAILEY:  I think it is

12  premature.  I think there's a question that can be

13  asked.

14             THE COURT:  Do you wish to ask a

15  question?

16             MR. BAILEY:  Yes.

17  EXAMINATION BY MR. BAILEY OF MS. SASE:

18  Q.    If the Judge tells you that the Defendant is

19        presumed innocent under our system of

20        law, and it is okay to hold your own

21        opinions, but, to take part in this

22        proceeding, you have to be able to

1759

```
 1              actually take your own opinions and set

 2              them aside and start out here with a

 3              blank slate, and actually presume her

 4              innocent.  For the entire proceedings,

 5              and put the burden of proof on us, so

 6              that if we mess up, and we don't, if we

 7              leave out one of these elements, like it

 8              happened in this county, you would have

 9              do find her not guilty.  Would you be

10              able to do that?

11    A.   Yes.   It would only be right.

12    Q.   It would only be right.  Under our system of

13              justice.  Can you set aside your personal

14              opinion here, anything you have formed

15              from reading the newspapers or talking to

16              folks, watching T.V., and start out with

17              a blank slate here, and give this

18              Defendant the benefit of the presumption

19              of innocence, so that you understand she

20              doesn't have to prove anything.  The

21              opinion you formed may be right, it may

22              be wrong, we don't know, because it is
```

1760

1     based on newspaper reports and stuff that

2     aren't the most accurate in the world.

3     And just like you would want to be, if

4     you were here on a traffic case, or your

5     car slid on the ice or something, and you

6     were charged with killing somebody,

7     negligent type of vehicular homicide,

8     maybe you were going too fast, you would

9     like to have that same presumption,

10    right?

11  A.    Yes.

12  Q.    You think you are actually physically able,

13    mentally able to set aside that opinion

14    that you formed before and come here with

15    a fresh slate in the Courtroom?  We're

16    asking you to perform like mental

17    gymnastics, going into a classroom and

18    starting over there.  You could do that?

19  A.    Yes.

20          THE COURT:  I'm going to grant the

21  challenge for cause over the objection of the

22  State.  This lady has done everything that we have

1761

1    asked her to do and that is to be very truthful.

2    She struggled here with some of the questions that

3    have been put.  Only by the art of Mr. Bailey's

4    questioning, does there appear to be any great

5    entrenchment from that.  But Ma'am, you have done

6    what we have asked you to do and that is the most

7    we can expect.  You are excused.  We thank you very

8    much for your time.

9    (Juror No. 81 excused from the Courtroom.)

10   (Juror No. 85, Shirley Biel, entered the Courtroom.)

11             THE COURT:  Good afternoon.  You

12   read the handout that was given to you?

13             MS. BIEL:  I read it more than once,

14   because like it wasn't sinking in.

15             THE COURT:  Good for you.

16             MR. INGRAM:  That reflects totally

17   on our writing of that.

18             THE COURT:  As you know, Donna

19   Roberts, the lady sitting over here to my right is

20   charged with two counts of aggravated murder and

21   those counts have specifications attached to them.

22   Under Ohio law, a person who does murder is not

1762

1   necessarily facing the death penalty, but if there

2   are specifications, those are additional things

3   that the State has to prove beyond a reasonable

4   doubt, if those are attached.  And if the State

5   proves the guilt first and the specification, then

6   the trial has to go to a second phase, wherein the

7   Jury has to determine the issue of capital

8   punishment.  And at that stage, it is incumbent

9   upon the State again by the burden of proof known

10  as beyond a reasonable doubt, to present

11  aggravating circumstances which are reasons why

12  they are trying to convince the Jury to impose the

13  death penalty.  At that time, the Defense has an

14  opportunity, if they care to, to present mitigating

15  factors, and that would be reasons why the Jury

16  should not impose the death penalty.

17          The Jury is called upon to consider those

18  factors and circumstances, and to make a

19  recommendation to the Court of either death, life

20  in prison without chance of parole and two other

21  lesser life imprisonments with the possibility of

22  parole.

1763

1    Everyone has some opinion on the death
2    penalty.  There are those who think that a person
3    who does murder should forfeit their life.  That
4    isn't the law of Ohio.  That person could not be
5    fair to the Defendant, because the Defendant has
6    the right, if we get to that stage, to have the
7    Jury make that balance.  To the other extreme,
8    there are people who feel that under no
9    circumstances could they participate in any
10   proceeding where a person's life hung in the
11   balance.  A person of that belief could not be fair
12   to the State.  So what we're trying to seek here
13   are 12 people, all of whom will have some opinion
14   one way or another on the death penalty.  But who,
15   if those opinions are at variance with the law,
16   they will feel comfortable with giving assurance
17   that they could set that personal opinion aside,
18   and follow the law.  Nobody gets a fair trial
19   unless all 12 jurors follow the law.
20          The other issue is that about any
21   possible prejudice or bias that might be caused
22   because of pre-trial publicity that any juror was

1764

1  exposed to.  Before we get to all of that, I would

2  like to ask you.  I notice on your questionnaire,

3  you say that you are caring for your 93 year old

4  mother-in-law.

5              MS. BIEL:  I do.

6              THE COURT:  This case could take two

7  weeks, into the third week, possibly into the

8  fourth week.  Would that be something that you

9  would be able to work around?

10              MS. BIEL:  If I can get some other

11  family members to help.  It shouldn't be.

12              THE COURT:  We're going to have to

13  have you come back next Tuesday, because I have to

14  be out of here at 4:00.  Why don't we just take the

15  time now, gentlemen, to at least have Mr. Bailey

16  start or would you prefer just starting fresh -- or

17  I'm sorry, Mr. Becker.

18              MR. JUHASZ:  I have no objection if

19  Mr. Becker wants to start.

20              MR. INGRAM:  I was going to make a

21  suggestion.  As I understand, what we have just

22  been told, you are taking care of your 93 year old

1765

1  mother-in-law.  And it is not a problem, if you can

2  find somebody to carry on for you while you are

3  away?

4              MS. BIEL:  What I do for her is I

5  get her pills for her ready for like two weeks, and

6  I do her shopping and I do her washing and all of

7  that kind of stuff.  It is not something that I

8  couldn't work around.  If I was going to be

9  sequestered, then it might be a problem.

10             MR. INGRAM:  What I was going to

11  suggest is between now and Tuesday, do you want to

12  see if you can get somebody to sort of carry the

13  slack for you?  If you can't, let us know Tuesday

14  and if you can, then we'll begin.  Does that make

15  sense?

16             MS. BIEL:  Yes, I didn't want to go

17  ahead and do anything until I came here and found

18  out what was going on.

19             MR. BECKER:  I do want to suggest to

20  you that there may be a point in this proceeding

21  where you may be sequestered.

22             MS. BIEL:  It was mentioned before.

1766

1    MR. BECKER:  That would be the

2    problem.  It wouldn't be so much coming to Court

3    and going home and doing the things you normally do

4    for her.  It would be if you are sequestered for a

5    couple of days or maybe three days?

6    MS. BIEL:  Well, if it was like

7    three days or so, that is not really a big problem,

8    but if it was a couple of weeks at a time.

9    MR. BECKER:  It could be twice

10   during these proceedings that you could be

11   sequestered, maybe a couple of days each time.

12   That is okay with you?  That is what you are

13   referring to when you say you could get someone

14   else to help out?

15   MS. BIEL:  Right, or I can like get

16   it done ahead of time.  I could work around it.

17   MR. BECKER:  It is not going to be

18   such a distraction that you couldn't give your

19   attention to this case, is it?

20   MS. BIEL:  No.  It is my

21   mother-in-law.

22   THE COURT:  We'll see you next

```
                                                      1767

1    Tuesday.   I again remind you not to discuss

2    anything or read anything or watch anything on T.V.

3    (Juror No. 85 excused from the Courtroom.)

4    (Court in Recess at 3:10 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

1768

1

2                    REPORTER'S CERTIFICATE

3

4              I do hereby certify that the above and

5      foregoing is a true and correct transcript

6      of the proceedings had in the within hearing

7      as shown by stenotype notes written by me in the

8      presence of the witnesses at the time of the

9      hearing.

10

11      _____
                MARY ANN MILLS, R.P.R.
12              Official Court Reporter
                Trumbull County, Ohio
13

14

15

16

17

18

19

20

21

22

1      IN THE COURT OF COMMON PLEAS
       TRUMBULL COUNTY, OHIO

2

3      STATE OF OHIO,                    ) Case No. 2001-CR-0793
            Plaintiff                    )
4                                        )
       -vs-                              ) Judge John M. Stuard
5                                        )
       DONNA M. ROBERTS,                 )    **VOLUME VIII**
6           Defendant                    ) <u>**VOIR DIRE PROCEEDINGS**</u>

7

8      Capital Murder trial held on Tuesday, April 22, 2003

9      BEFORE:        HONORABLE JOHN M. STUARD

10

11     AT:            Trumbull Co. Court of Common Pleas
                      161 High Street, NW
                      Warren, Ohio 44481

12

13     <u>APPEARANCES</u>:

14

       On behalf of the Plaintiff:

15

       Messrs. Kenneth N. Bailey and Christopher Becker,
16     Attorneys at Law

17

       On behalf of the Defendant:

18

       Messrs. J. Gerald Ingram and John B. Juhasz,
19     Attorneys at Law

20

21

22

23     Official Court Reporter:  Richelle J. Guerrieri

ORIGINAL

1                           I-N-D-E-X

2                        VOLUME VIII

3                INDIVIDUAL VOIR DIRE

SHIRLEY A. BIEL

EXAMINATION BY THE COURT...............................1770:8
EXAMINATION BY MR. BAILEY..............................1773:7
EXAMINATION BY MR. INGRAM..............................1800:7


MICHAEL HILDACK

EXAMINATION BY THE COURT..............................1801:11
EXAMINATION BY MR. BECKER..............................1804:7


ROBERT J. YOUNG

EXAMINATION BY THE COURT.............................1813:23
EXAMINATION BY MR. BAILEY..............................1817:4
EXAMINATION BY MR. INGRAM..............................1826:4


JOHN D. LANAM, SR.

EXAMINATION BY THE COURT...............................1828:4
EXAMINATION BY MR. BECKER.............................1831:11
EXAMINATION BY MR. INGRAM..............................1853:3


NANCY J. MARSH-McGARRY

EXAMINATION BY THE COURT.............................1884:12
EXAMINATION BY MR. BAILEY.............................1888:16
EXAMINATION BY MR. JUHASZ.............................1917:2

* * *

1               (For prior proceedings, please see the

2    transcript of Mary Ann Mills, Volume VII.)

3                   **TUESDAY, APRIL 22, 2003**

4    WHEREUPON,

5                    SHIRLEY A. BIEL

6    being first duly sworn, according to law, was examined and

7    testified as follows:

8                    EXAMINATION

9    BY THE COURT:

10    Q       How are you?  Ma'am, you read the handout that was

11    given to you?

12    A       Right.

13    Q       You know then that we're here on an aggravated

14    murder case, two counts of aggravated murder with

15    specifications.

16          Under Ohio law a person who does murder is not

17    necessarily eligible for the death penalty, it's only under

18    certain circumstances.  Two of those special circumstances

19    are included in this indictment.  So that makes, raises the

20    possibility that the death penalty might be something that

21    this jury has to consider.

22          The State has to prove each and every element beyond

23    a reasonable doubt of these crimes before the State would be

1771

1   entitled to a finding of guilty. If the State fails to do

2   that, then this jury would make a finding of not guilty and

3   that would be the end of the matter.

4        But if the State proves its case then it will go

5   into a second phase. And during that second phase the

6   prosecutor is again called upon to present evidence about

7   what we call aggravating circumstances. Those are reasons

8   why the jury should consider and impose the death penalty.

9   The defense at that second hearing has an opportunity to

10  present mitigating factors. Those are reasons why the jury

11  should consider not imposing the death penalty.

12       But again, at that second phase the burden is

13  entirely on the State to prove those factors before the jury

14  could proceed with considering of the death penalty. And

15  along with the death penalty, in any event, the jury is

16  called upon to consider three possible life imprisonment

17  findings: life without parole; life in prison without the

18  chance of parole before 25 or 30 years. So that brings us to

19  the reason why you're here today.

20       In order for this jury to be, return a fair verdict

21  it has to be fair to both sides, and that requires a person

22  who is able to follow the law. Some people hold that the

23  death penalty should be imposed whenever a person is guilty,

1772

1   found guilty of aggravated murder.  Other people feel they

2   could never participate in such a decision, that they could

3   never decide on such an important thing as whether someone is

4   going to be put to death or live.

5            A person that, both of the extreme positions could

6   not serve as a juror because they couldn't be fair to both

7   sides.  If you're never going to be able to impose a death

8   penalty, then the State hasn't had a fair trial.  And if you

9   believe that just because you kill somebody you should

10  forfeit your life, then you can't be fair to the Defendant.

11  Because the State has to prove all those elements and has to

12  prove that the aggravating circumstances outweigh those

13  mitigating factors.

14           So that will be the primary thing that you'll be

15  questioned about, is what your views are.  Whatever your

16  views are, are fine.  You're entitled to your own opinion.

17  Everyone here will respect your personal opinion.  It's just

18  that they have to have an opportunity to find out what your

19  opinion is.

20           The second issue will be about pretrial publicity.

21  Have you read or heard something about this case that would

22  make it impossible to set that aside?  Because this case has

23  to be decided on the evidence presented in this courtroom.

1   If it isn't, again, someone will not receive a fair trial.

2   So they'll ask you about what you know, if anything, about

3   the facts of this case and about your views on the death

4   penalty.  Okay?

5   A      Uh-huh.

6                   THE COURT:  Fair enough.

7                       EXAMINATION

8   BY MR. BAILEY:

9   Q      Good morning, Mrs. Biel.  Am I pronouncing it right?

10  A      Yes.

11  Q      My name, as you're aware, is Ken Bailey.  I'm an

12  assistant prosecutor with the Trumbull County Prosecutor's

13  Office.  And as I promised the other week I'm going to be,

14  I'm joined by my co-counsel, Chris Becker, from our office.

15  And the two of us are responsible for prosecuting this

16  particular case.

17          Now, as the Judge said, we're going to be asking you

18  some questions regarding your viewpoint on different issues

19  and your knowledge about certain things.  And the reason we

20  do this is to make sure that the folks who are selected to

21  serve on this jury can be fair and impartial to both sides,

22  both to the Defendant and to the people of the State, not

23  because we're snoopy and we like to pry and ask a lot of

1   questions of folks.

2        I want to point out a couple of things here at this

3   time.  There aren't any right answers or wrong answers to

4   these questions, only open and candid answers.  And if we run

5   into each other out in the hallway maybe or in the elevator

6   or in a restaurant or something during the course of the

7   trial, which could include up to two phases here, we're not

8   allowed to have any communication with you outside the

9   courtroom here.  Okay?  It would be improper for us to do

10  that.  So if we run into each other and you say good morning,

11  all we're allowed to say maybe is good morning.

12       If you have any questions you have to address it to

13  the bailiff who will be here later, Laurie Brown, or to

14  Richelle, our court reporter, or to the Judge.  But we're not

15  being antisocial or trying to snub you in any way.  I just

16  want you to be aware of that.  Both sides, we have to follow

17  these rules of conduct.  Because if we talk to you it could

18  result in a mistrial and we don't want to have to do it all

19  over again.

20       You can't go out to the scene to investigate on your

21  own.  We had a juror do that.  Sometimes folks do it in the

22  movies, TV.  And sometimes people get the impression that

23  they can do that.  That would be improper.  That would also

1775

1    result in a mistrial.  We certainly don't want to have that

2    happen.

3          Now let me ask you -- oh.  If you have any questions

4    that come up during the proceedings about what we're doing,

5    this is sort of a give and take, and this is an opportunity

6    for you to ask these questions, too.  You can get an answer

7    to any of those.  Feel free as long as it pertains to what

8    we're doing here.

9          Now the first thing I want to ask you about is this

10   issue of pretrial publicity.  You indicated in your

11   questionnaire that you were familiar with the name of

12   Fingerhut.

13   A         Right.

14   Q         I looked at your questionnaire and it indicated that

15   you read the Vindicator and you listen to Fox News.  Okay.

16   You weren't familiar with the Defendant's name, Donna

17   Roberts, or the co-defendant's name?

18   A         Right.

19   Q         But you did, the name Fingerhut rang a bell.  How

20   so?  I mean, you've had time to think about this over the

21   last week.

22   A         I heard it in the news before and, in fact, what I

23   was referring to there was, I had just heard, the weekend

1    before I came in I had just heard that it was going to trial

2    that week, the week that I was called.  I was called

3    April 8th.  And I didn't really hear the name Roberts or

4    anything.  I heard Fingerhut.  And then in retrospect

5    thinking back on it then it was like, oh, you know, I kind of

6    figured.

7    Q        What do you recollect about the name Fingerhut and

8    what it was associated with?

9    A        He was murdered.  But I don't, I didn't really know.

10   I didn't follow it so I don't really know that much about it.

11   Q        Okay.  It may well be that during the course of the

12   trial you may hear something, some testimony that might

13   strike another bell and bring back a memory of something you

14   read or saw, but it's very important you get all your

15   information about this case from what happens here in this

16   courtroom, from the testimony of the witnesses, the physical

17   exhibits that might be introduced and the instructions of law

18   given to you by Judge Stuard.

19            It wouldn't be fair to take something that you heard

20   from, maybe you read in the newspaper or heard on TV.

21   Because as you look around the courtroom today there's nobody

22   here from the news media.  It may well be that during the

23   course of the trial we'll see the TV cameras set up.  And

1   they can't photograph the jurors.  They're not allowed to.

2   But they may set up for a few minutes, five or ten minutes

3   and film something, where maybe ten seconds is on TV, okay,

4   at most, or three seconds, and they may do a feature on the

5   trial based on the time that they were here.  Or the

6   newspaper reporters may sit in for a little bit, but they're

7   going to miss everything that was asked and answered before

8   they got in here and everything that happens after they leave

9   here.  So their story, not intentionally, but because of the

10  nature of their business, they have to rush in to print,

11  they're on the air, it's going to be slanted.  And it could

12  be distorted.

13        So it may well be that if you sit on this jury you

14  may have somebody save the newspapers for you and when it's

15  all over you look at them and say, you know, gosh, I sat in

16  Judge Stuard's courtroom for the entire trial.  I heard the

17  testimony of the witnesses, and what I read in these papers

18  bears no relation to that.  It's like they were listening to

19  a case in Judge McKay's court.  And say that information

20  wasn't very accurate.

21        So you understand that's why the Judge admonishes

22  you not to read the papers or listen to the news on TV or

23  radio.  If that happens, you walk out of the room or shut it

1     off or put it aside; right?

2     A          Right.

3     Q          And you wouldn't have any problems starting with a

4     blank slate in this courtroom?

5     A          I don't think so.

6     Q          Because you don't really remember anything?

7     A          No, I really didn't pay that much attention to it.

8     I heard it.  I heard it.  But a lot of times the radio is on

9     and I'm not really listening to it, I just, it's on, you

10    know.  I mostly listen to the radio.  But TV is the same way,

11    I can be easily distracted.

12    Q          With all the murders that are in the news, it's hard

13    to keep track of one from the other; right?  They sort of

14    sometimes blend together?

15    A          Right.

16    Q          Now, the second thing I wanted to get into was this

17    issue of the death penalty as a possible punishment.  Now,

18    you read that handout that we have downstairs?

19    A          Yes.

20    Q          You heard what the Judge told you.  The Defendant

21    here is charged with four different crimes.  Okay.  There are

22    two counts of aggravated murder.  There's one person who was

23    killed but there are two separate theories the State is

1779

1   allowed to pursue.  And we've elected to use both theories.
2   Okay.  And we're allowed to do that.  It's proper.  And we're
3   doing that.

4        And there's one type of aggravated murder charge
5   with prior calculation and design, the purposeful killing of
6   another with prior calculation and design.  And there's a
7   second type of aggravated murder, and we call that felony
8   murder.  It's a purposeful killing of another during the
9   course of a special felony, like an aggravated burglary or an
10  aggravated robbery.  Okay?  So those are the two counts of
11  aggravated murder.  And attached to each of these two counts
12  of aggravated murder are these specifications or special
13  findings of aggravating circumstances.

14       It's a lot of fancy words that basically mean that,
15  the first one is an aggravating circumstance of an aggravated
16  burglary.  And this term aggravating, or specification, is
17  just a fancy word for a special extra finding of fact for a
18  jury to consider.  Similar facts you got to look at.  And
19  there are two of those.  The first is that the aggravated
20  murder was committed during an aggravated burglary and that
21  the Defendant committed the aggravated murder with prior
22  calculation and design.  This term prior calculation and
23  design, sort of like the old type of premeditated murder that

1780

1    you probably heard about, but they changed the law a bit so

2    it requires some planning in advance.

3           The second specification or special finding of fact

4    charges an aggravated murder that was committed during the

5    course of an aggravated robbery as opposed to an aggravated

6    burglary, and that the Defendant committed the aggravated

7    murder with prior calculation and design.  So these special

8    findings of fact, those are special findings that would make

9    a defendant eligible for the death penalty as a possible

10   punishment.

11          So if the jury returns a guilty verdict on a charge

12   of aggravated murder and one or more of the specifications we

13   would go into a second phase.  Okay.  That's unusual.  It

14   doesn't often happen in Ohio, because in a usual jury trial

15   the jury never considers the issue of punishment.  That's up

16   to the judge alone.  But only in this type of a case we go to

17   a second phase where the jury considers that issue of

18   possible punishment.

19          Now, there are two more charges here the Defendant

20   is charged with.  There's a crime called aggravated burglary,

21   and attached to that is a firearm specification or a special

22   finding, a charge here that a working gun was used.  And then

23   there's a fourth count of aggravated robbery also with that

1    special finding of a working gun, a firearm specification.

2    So there are four separate counts, okay, with these special

3    findings attached.

4         The Defendant also is charged as a complicitor.  A

5    complicitor is someone who solicits or procures another

6    person to commit a crime or aids and abets another person in

7    committing a crime.  The Defendant is charged here with being

8    a complicitor, with not being the trigger person so to speak.

9    Not the person who actually went into the house.  Not the

10   person who actually committed an aggravated robbery or stole

11   a car, but being a complicitor with another person by the

12   name of Nate Jackson.  Okay?  The charge is that Nate Jackson

13   actually did these things.

14        Do you understand, do you have any problem with her

15   being charged as a complicitor, not with being the trigger

16   person but rather somebody who --

17   A     No, I understand that.

18   Q     Okay.  Now, each of these crimes is composed of

19   certain elements, key ingredients in a recipe so to speak.

20   It's like baking a cake.  I take it over the years you've had

21   occasion to bake a cake?

22   A     Oh, yeah.

23   Q     Any favorite cake that your children might have had?

1    A        No.   They just like sweets.   It doesn't matter.

2    Q        Is chocolate cake okay?

3    A        Yes, that's fine.

4    Q        Let's take a chocolate cake.   You've got your key

5    ingredients in your chocolate cake.   And if you put all those

6    ingredients together and put them in the oven, mix them

7    together, 350 degrees, you know, for a certain amount of

8    time, 40 minutes or something, whatever the recipe calls for,

9    the cake will rise.   If you leave one of those ingredients

10   out, like the chocolate, you may get a cake but it won't be

11   that chocolate cake; right?

12            Same thing with a crime.   We have certain key,

13   essential elements, key essential component parts to these

14   crimes, and these are called elements.   Let me give you a

15   for instance because the Judge is going to define these terms

16   for you at the conclusion of this case, and he'll go into it

17   in great detail.   And you're bound to follow his

18   instructions.   But let's take this crime of aggravated

19   murder.   Let's take the aggravated murder with prior

20   calculation and design.

21            Let's say one of these elements would be that it

22   happened on or about a certain date.   Let's say December

23   11th, 2001.   We have to prove that.   So there will be

1     testimony.  Somebody has to come in and testify to that.

2          The second element would be called what we call

3     venue, that it happened here in Trumbull County, Ohio.  It

4     happened in Howland, but in this county, so that we can try

5     this case in this courthouse rather than up in Ashtabula or

6     down in Tuscarawas or somewhere.

7          The third element is identification, that the person

8     who committed this crime as a complicitor is the Defendant.

9     And somebody would come in and point her out somewhere in the

10    trial.

11         The fourth element is that she acted purposely,

12    basically on purpose.  But the Judge will define that.

13         The fifth is that she caused the death of a living

14    person, a fellow by the name of Robert Fingerhut.

15         And the sixth, that she acted with prior calculation

16    and design.

17         Now, can you hold us to proving those elements that

18    the Judge will instruct you we have to prove?  You won't

19    force us to prove anything more than what the Judge says we

20    have to prove?

21    A         The only thing I'm confused on is when you talked

22    about robbery and burglary with a working gun, I mean, I

23    don't understand how you would kill somebody without a

1784

1    working gun.

2    Q        You can use a knife or you can use a baseball bat.

3    A        Right.  But if you're going to use a gun --

4    Q        But in the state of Ohio the state Legislature

5    passes the laws and they define the elements of the crimes.

6    And they also add these special findings that can be attached

7    to certain crimes.  And one of these special findings or

8    specifications that can be attached is if you use a working

9    gun or a firearm to commit a crime, then it's an extra type

10   of offense.

11   A        Okay.

12   Q        Okay.  I mean, there are different types of working

13   guns.  There could be fully automatic weapons, or if you have

14   a silencer or a muffler on the gun.  But there's, there are

15   different types of specifications regarding firearms.

16   A        Okay.  Legal mumbo-jumbo.

17   Q        Right.

18   A        Okay.

19   Q        But that would be something you would have to

20   consider.  We have to prove that, too.  It's sort of like

21   elements to that specification of a working firearm.  We got

22   to prove that it would be, the Judge will define the term

23   firearm for you, and it would be capable of expelling a

1   projectile by means of combustion or explosion.  It's a

2   working gun.  The bullet comes out and you pull the trigger,

3   boom.  Okay.  Good question.

4          The term aggravated burglary and aggravated robbery,

5   there's a distinction there.  Sometimes the newspapers or

6   just people on the street get those terms confused.  And in

7   law they have very specific meaning.  Basically when we talk

8   about aggravated burglary it means going into an occupied

9   structure, like a dwelling, house, okay, where you trespass

10  in that structure in one of several ways.  And you go in with

11  the purpose to commit some type of offense inside.  Maybe an

12  aggravated murder or a theft offense or something like that.

13  And you, the perpetrator can be armed with a deadly weapon,

14  like a working gun, or he could cause serious physical harm

15  to somebody inside that residence.  Okay.

16         The term aggravated robbery generally refers to the

17  taking of property of another through the use of force or

18  threat of force.  And again, the perpetrator can be armed

19  with a weapon of some kind, and the perpetrator can cause

20  serious physical harm to the victim.

21  A       But isn't it the same thing?

22  Q       Well, burglary deals with breaking into a house or

23  trespassing in a house or a structure of some kind, dwelling,

1786

1     house.  And robbery, there doesn't have to be a house.  You

2     could do it on the street.

3     A       Okay.

4     Q       You can do it in a car.  It can happen on a boat or,

5     or just out in the park.

6     A       Okay.

7     Q       No structure is needed.  So there are different

8     elements, like the recipe.  Now, it may well be that you have

9     a special interest in footwear, let's say.  My wife likes

10    shoes.  She's got like a trillion pairs of shoes.  And let's

11    say you had a special interest in shoes.  You were wondering,

12    what was somebody wearing during this offense?  And because

13    we're lawyers, you're sort of stuck with our questions.

14    We're geared toward proving elements, and we might never

15    think of something about shoes if they don't relate to

16    proving the elements.  And that may be the type of question

17    that may never get answered during the course of the trial.

18    It may never arise.  But you might have that special interest

19    wondering about it.  And if we never prove something like

20    that and never get into it, but you feel that we've proved

21    these elements of the crime by proof beyond a reasonable

22    doubt so you're firmly convinced of the truth of the charge,

23    you would be able to return a conviction, wouldn't you?

1    A        Yeah.

2    Q        Okay.  Now, you understand that under our system of

3    justice this Defendant, as are all other defendants tried in

4    this courtroom, she's presumed innocent.  She's cloaked by

5    this presumption of innocence, and that presumption of

6    innocence stays with her all through the course of this

7    trial.  She doesn't have to prove anything.  The burden of

8    proving the elements is entirely on us.  She and her defense

9    attorneys can just sit there and not do anything during the

10   course of the trial.  They're allowed to do that.  That, I

11   doubt, will happen.  I'm sure they're going to ask a lot of

12   questions.

13          But you understand she's cloaked with this

14   presumption of innocence, and that presumption stays with her

15   all through the course of this trial.  We're at ground zero

16   right now.  There's no evidence presented.  And it's only

17   after you've heard all the evidence and the trial is over,

18   you go back with the other jurors into the jury room to

19   deliberate that at that point if you find that we proved the

20   elements of the crime beyond a reasonable doubt at that point

21   that presumption of innocence will be gone.  I mentioned the

22   burden of proof.  Proof of the elements is on us.  The

23   Defendant has no burden of proof.

1788

1        Now, there are different types of evidence that we

2   can use to prove these elements.  There's direct evidence

3   where a witness can come in and testify what he or she has

4   learned during the use of their five senses like I, I heard

5   the gunshot and it was loud.  I smelled the smoke and it was

6   acrid.  I touched the body and it was cold.

7        There's another type of proof that you're used to

8   dealing with.  And when you used to drive a school bus you

9   would be presented with certain facts, like get a weather

10  report.  And you drive down the road and you might see, you

11  know, it's really cold out or it rained just before that.

12  You may be very careful because you're aware, based on your

13  experience, it could be icy out there somewhere.  You may not

14  see the ice, but you just have that feeling based on all the

15  other things.  The rain that's fallen before, okay, and the

16  fact that it's freezing outside, that the road and prior

17  driving experience tells you that that roadway may freeze.

18  And there may be signs out there saying "Bridge Freezes

19  Before Roadway," so you would be very careful going over that

20  bridge.

21        The second type of evidence we call circumstantial

22  evidence.  Sometimes people hear that term and they think,

23  well, that's terrible.  But they don't really know what

1   circumstantial evidence is.  Basically you're presented with

2   a fact or series of facts, and then you're asked to draw a

3   logical conclusion to another fact or series of facts.  And

4   it's just as good as direct evidence.

5          Let me give you an example of that, other than

6   driving a school bus.  Let's say you go to bed at night.  You

7   live in a neighborhood, you live in a two-story house and you

8   look out your window before you go to sleep on the second

9   floor and it's a beautiful night.  The moon is beaming.  The

10  stars are twinkling.  There's not a cloud in the sky.  It's

11  dry as far as you can see across the neighborhood.  So you

12  close the blinds and you get into bed.  And just before you

13  fall off to sleep you hear a weather report on the radio, the

14  announcer says there's a cold front moving in.  We expect a

15  storm later tonight.  And you fall asleep.

16         And some time during the night you're awakened by a

17  distant booming sound.  And you look toward the window and

18  there's this bright flash of light coming from outside, but

19  you can't see what's happening outside because the blinds are

20  drawn.  And a few seconds after that flash there's a distant

21  boom, and a minute goes by and then there's another bright

22  flash outside, and closer in time boom.  And suddenly there's

23  a big flash of light outside and a big ripping booming sound

1  above the house and a pitter-patter on the roof.  A steady

2  drumming.  And you fall back asleep.

3          And some time later you wake up, open the blinds and

4  you look out.  A beautiful day.  The sun is shinning.  Not a

5  cloud in the sky.  But as far as you can see the rooftops are

6  all wet, streets are running with water.  Drops of water are

7  dripping off the leaves of the tree.  There's no fireplug

8  out there for somebody to hit it.  You know what happened

9  during the night, don't you?

10  A       Right.

11  Q       What happened?

12  A       It rained.

13  Q       A thunderstorm; right?

14  A       Yeah.

15  Q       And you know that beyond any reasonable doubt, don't

16  you?

17  A       Right.

18  Q       The same thing is true with proving a crime.  We can

19  put on circumstantial evidence, because that's what that is.

20  There's room in there for some possible or imaginary doubt.

21  You can imagine that Alf and his martian buddies flew by in

22  flying saucers overnight and put on a sound and light show

23  and sprinkled the ground with some wet stuff.  But that would

1  be a foolish or imaginary doubt, wouldn't it?

2  A       Yes.

3  Q       And your reason and common sense tells you that all

4  that happened was that there was a thunderstorm?

5  A       Right.

6  Q       The Judge is going to define this term, proof beyond

7  a reasonable doubt for you at the end of this case.  But

8  basically it's where you're convinced using the use of your

9  reason and your common sense that you use raising a family,

10  driving a school bus, dealing with other people during the

11  course of your life where you're firmly convinced of the

12  truth of the charge to a moral certainty.  Okay?  And that's

13  something you are used to doing in your every day life, isn't

14  it?

15  A       (Witness nods head affirmatively.)

16  Q       You understand it's not 100 percent proof.  It's not

17  proof beyond all doubt or beyond a shadow of a doubt.

18  Sometimes you hear that term, shadow of a doubt.  It's an

19  Alfred Hitchcock movie type.  But there's no such animal in

20  criminal law in Ohio or elsewhere in this country.  Okay.

21         It's sort of like having a box, and we've got to

22  fill that box with enough evidence to convince you that what

23  these charges are are true.  Okay.  And that box doesn't have

1    to go completely to the top.  That would be 100 percent

2    proof.  And that's not our burden.  Okay.

3         And it's up to you and each individual juror to

4    determine how high you want to draw that line on the box that

5    we have to fill.  But it's going to be more than halfway,

6    right?  In a civil case it would be just over halfway.  But

7    in a criminal case it's proof beyond a reasonable doubt so

8    that we've got to get that box pretty full, convince you as

9    to the truth of these elements; right?

10   A       Right.

11   Q       Now, under our system the Legislature passes the

12   law.  And I think you would agree we're a nation of laws.

13   It's not whatever each person decides.  We have to follow

14   these laws for our system to work.

15        We may have our personal views about what the law

16   should be, but we have to obey what the Judge tells us the

17   law is; right?  Now, you have your own views on the death

18   penalty as a punishment.  And you've noted on your

19   questionnaire that you think cases involving the willful rape

20   of children and kidnapping, the perpetrator should get the

21   death penalty?

22   A       I do.

23   Q       You also feel kidnapping or cases of deliberate

1   murder of another, that should be a death penalty offense?

2   A       Yes.

3   Q       Right.  And for child murder and killing for money

4   or monetary gain; right?

5   A       Yes.  But --

6   Q       But there are mitigating circumstances; right?

7   A       Yes.

8   Q       You had mentioned some in your questionnaire that if

9   it was a parent taking his own child, something happened.  Or

10  if it was an accident, accidental killing, like you said an

11  accidental manslaughter.  Are you talking about a traffic

12  crash or --

13  A       Yes.

14  Q       Now, you understand --

15  A       Something that wasn't done purposely.

16  Q       Okay.  And that's fine.  That's fine that folks have

17  their own views because that's what makes up our society,

18  different viewpoints.  But are you able to set aside your own

19  feelings of what should be the law and follow what Judge

20  Stuard tells you?

21  A       Do you want me to answer that now?

22  Q       Sure.

23  A       I have these -- when I wrote that, that was this

1    first day I was in here, and I have those views on the death

2    penalty.  But to be very truthful with you, I could not

3    sentence that woman to die.  I couldn't.  I pray for her

4    every night.  I don't know her, but it has affected me and I

5    just, there's no way I can sentence her to death.  I don't

6    want that on my conscious.

7    Q        Are you saying --

8    A        I'm for the death penalty.  But I'm thinking like, I

9    don't know that I could do it.  I mean, the more I think

10   about it the more I don't think I can do it.

11   Q        Well, it's important that you tell us now because

12   it's important that both sides get a fair trial.

13   A        Exactly.

14   Q        And the Defendant has a right to a fair trial.

15   Somebody who would come in and would automatically impose the

16   death penalty as a punishment or recommend the death penalty

17   as a punishment, no matter what mitigating circumstances,

18   mitigating factors are presented, things that would work

19   against the death penalty, wouldn't be fair to her; right?

20            And for the State it's fair, it's important that the

21   State gets a fair shake, too.  That if somebody who could

22   never impose or never come back with a verdict for the death

23   penalty, that we're aware of that too.  And it's obvious

1    you've given a lot of thought to this.

2    A        I think about it constantly.

3    Q        It's important --

4    A        But it's, it's like ruling my life.  I just couldn't

5    do that.  I just couldn't.  I don't want it on my conscious

6    that I sentenced somebody else to die.  Then I'm not any

7    better than somebody that took somebody else's life.

8    Q        Is that based on a personal, moral, ethical or

9    religious belief?

10   A        I don't know where it came from, I really don't.

11   It's just been bothering me.

12   Q        Let's talk about it.  If I understand, you're saying

13   logically you're in favor of the death penalty.  You think

14   society should have that as a punishment?

15   A        I do.  And I think there are certain cases where I

16   could give the death penalty.

17   Q        Certain cases?

18   A        Yeah.  Like if somebody, if somebody maimed a child

19   or like this Laci case, something like -- I mean that is so

20   extreme.  I, I just --

21   Q        Now, you indicated in your questionnaire that you

22   thought that a murder for monetary gain would be --

23   A        And I thought that when I filled it out, I thought

1    that.  I don't know if this -- this obviously must have

2    something to do with that but --

3    Q        Well, the charge here is, it's a killing of another

4    person, of the Defendant's ex-husband for insurance money and

5    for the stealing of a car.

6    A        But could I sentence her to die for that?  I don't

7    know.

8    Q        Okay.  Well, it's important that you search your --

9    let's say we get to the point where -- the Judge is going to

10   explain to you, this case is going to be tried in two

11   different phases.  The first phase deals with the issue of

12   guilt or not guilt on these elements; right?  Okay.  And

13   let's say we convinced you and the other jurors by proof

14   beyond a reasonable doubt that she's guilty as charged of the

15   aggravated murder or murders, counts with the specifications.

16   There are two specifications, and we convince you that she's

17   guilty of aggravated murder with one or more of these

18   specifications, these special findings.  Your feeling about,

19   you're telling me, if I understand, you really don't think

20   you could be part of imposing a death penalty verdict?

21   A        I don't think I could.

22   Q        Now, is your opposition, your own personal feeling

23   about that such that you think it would affect your ability

1   to return a guilty verdict in the first phase if we convinced

2   you beyond a reasonable doubt that she was guilty knowing

3   that if you found her guilty of aggravated murder with one or

4   more specifications that she would be eligible for the death

5   penalty in the second phase?

6   A       I don't know.  As you can see on my form, I was a

7   prior juror in another case and we did find him guilty.

8   Q       What kind of case was that?

9   A       It was a rape, kidnapping and robbery.  But

10  afterward it effected me so bad I nearly had a nervous

11  breakdown because I felt, I felt he was truly guilty of rape.

12  I truly felt he was.  But then they put on kidnapping

13  because he carried her from one room to another.

14  Q       That's under the law.

15  A       And according to the way we were charged we needed

16  to find him guilty.  Also, they got him for stealing $2 out

17  of her purse.

18  Q       Which would be the robbery?

19  A       Which would be the robbery.  And the way we were

20  charged it was like, okay, these were crimes by law, and we

21  found him guilty on all the charges.  And I have felt so bad

22  ever since because I think they just loaded down charges on

23  that man.  I mean, I know he was guilty of rape, but there

1     were extenuating circumstances.  His wife had just left him.

2     It was his birthday.  This woman had invited him into her

3     house.  They were drinking.  I mean, as time passes on it's

4     something I carry as a burden because I think we overcharged

5     him.  And I talked to the judge and the judge said he's been

6     in the system before and, you know, and he, he committed this

7     and everything.  And I talked to his lawyer.

8     Q       Who was the judge?

9     A       I don't know.  Some judge down in Columbus.  And now

10    I don't know if they're going to like slap a bunch of, if

11    you're going to slap a bunch of charges on her that, okay, I

12    don't know what caused her to do this.  I don't know what

13    extenuating circumstances there were.  The man did not

14    deserve to die.  Nobody deserves to die because somebody else

15    wants them dead.  But I don't want to carry this burden

16    through my life.

17    Q       Fair enough.  You're saying your prior jury service

18    has effected you to such an extent that it's still with you

19    and you think about it all the time?

20    A       Because I wonder what happened to him.

21    Q       Now, this case is even more serious than the last

22    one.

23    A       Yeah, right.

1799

1    Q        And if I understand, are you telling me that because

2    of second thoughts you might have had about your first jury

3    case, that this would affect you or have some substantial

4    impact on you in determining guilt in this case if you

5    were --

6    A        I don't know that.  I don't know that.  I don't know

7    that.  I just, I think I should be excused.  I don't think I,

8    I don't think I can handle it.

9    Q        Okay.  That's fair enough.  And are you telling me

10   then in the second -- let's say we got to the second phase

11   and the issue was punishment.  If you -- and we convince you

12   that the death penalty was the right punishment under the

13   circumstances, you wouldn't be able to sign that verdict

14   form?

15   A        I don't think I would.

16             MR. BAILEY:  Okay.  Thank you very much.

17             MR. INGRAM:  We have no objection to the

18   juror's request to be excused.

19             MR. BAILEY:  Nor do we, Your Honor.

20             THE COURT:  Ma'am, we thank you.  Sorry to

21   put you through this.

22   A        That's okay.  I just don't feel that I could.

23             THE COURT:  Well, that's what we have to

1  find out.

2  A       Okay.  I'm sorry I get so emotional.  It's

3  somebody's life in the balance and I just, I pray for her

4  every night.

5              MR. INGRAM:  Wait.  I have a couple

6  questions, if I may.

7                        EXAMINATION

8  BY MR. INGRAM:

9  Q       When you were called a couple Tuesdays ago to the

10 other end of the hallway.

11 A       Yes.

12 Q       Did you see or hear anything a little untoward in

13 that room or a little out of the ordinary?

14 A       That was -- beg your pardon?

15 Q       Did you happen to hear or see anyone talking about

16 the case?

17 A       No.

18 Q       That's all I wanted to know.

19             THE COURT:  Okay.  Ma'am, thank you for

20 your time.  You have a nice day.

21 A       I wish you the best of luck.

22             MR. INGRAM:  If I may humbly suggest to

23 Mr. Bailey that if he would move his death penalty voir dire

1    to the beginning where it's supposed to be, we could save

2    some time in these matters.

3              THE COURT:  I can only point out to you,

4    Mr. Ingram, that Mr. Bauer has been trying for years to get

5    Mr. Bailey to change his M.O. with no success.

6                           *  *  *

7    WHEREUPON,

8                        MICHAEL HILDACK

9    being first duly sworn, according to law, was examined and

10   testified as follows:

11                        EXAMINATION

12   BY THE COURT:

13   Q       Good morning, Mr. Hildack.  You read that handout

14   that was given to you?

15   A       Yes, sir.

16   Q       That, hopefully, explains it pretty well.  But I

17   have to go through a few more things here.  The purpose for

18   this morning is to find out your thoughts on two main issues.

19   As you're aware, Miss Roberts is charged with two counts of

20   aggravated murder with specifications.

21              Under Ohio law a person who is found guilty of

22   murder does not necessarily, or does not automatically get

23   the death penalty.  It's only under certain circumstances.

1802

1   The Legislature determines what those reasons are.  If you

2   murder the Governor, then that could qualify you for the

3   death penalty.

4           There are specifications attached to these

5   indictments which also raises that possibility.  So that

6   requires this jury to sit and listen to the evidence on the

7   aggravated murders and determine whether or not the State has

8   proven beyond a reasonable doubt each and every necessary

9   element to substantiate that.  If the State fails to do that,

10  to carry the burden, then the verdict would properly be not

11  guilty.  That would be the end of the trial.

12          If the prosecution proves its case then the trial

13  would go into a second phase, and at that time the jury would

14  be called upon to listen to the aggravating circumstances

15  introduced by the prosecution.  Those are reasons why the

16  jury should consider and impose the death penalty.

17          Now the defense has an opportunity at that time to

18  present mitigating factors, which are reasons why the jury

19  should not in this particular case impose the death penalty

20  even though it's possible.  But the burden is on the State to

21  prove beyond a reasonable doubt that those aggravating

22  circumstances outweigh the mitigating factors.  I'm sure

23  you'll get sick of hearing these terms, but we have to go

1   through the thing the way that the statute reads.

2        There are people who believe that a person who takes

3   another human being's life should forfeit their own life.

4   That is not the law of Ohio.  There are, on the other side of

5   the question, people who under no circumstances feel that

6   they could make such a decision no matter what the law is.

7   Well, if you have people from both extremes somebody can't

8   get a fair trial.  So the ideal juror on this case is someone

9   who is going to have their own personal view of the death

10  penalty.  Some more for it, some against it.  We have to have

11  12 people who are able to say to themselves and to give these

12  folks assurance that they will be able to follow the law no

13  matter where that law leads once the facts are established.

14  That's the main area of inquiry which will be put to you.

15        The other issue concerns pretrial publicity.  It

16  isn't and cannot be fair for either side to have any jurors

17  who already have their mind made up because of something they

18  think they know about the case.  This case has to be tried in

19  this courtroom on the facts and determined on the facts of

20  the law.  So that takes people who, even though they may have

21  read something in the newspaper, whatever, are willing and

22  able to set that aside out of their mind and decide the case

23  fairly on the facts presented here.  So that's what you will

1    be asked about.

2           No right or wrong answers.  Whatever your opinion

3    is, that's fine.  We will all respect that.  It's just they

4    have to know what your true thoughts are on the issues.  Fair

5    enough.  Mr. Becker.

6                    MR. BECKER:  Thank you, Your Honor.

7                              EXAMINATION

8    BY MR. BECKER:

9    Q       Good morning.  Is it Mr. Hildack?

10   A       Yes.

11   Q       My name is Chris Becker.  I work for the county

12   prosecutor's office.  And this is Mr. Ken Bailey.  He's an

13   assistant there as well.  And we are both trying this case

14   together.  And of course the defense attorneys in this case

15   are Mr. Juhasz and Mr. Ingram, and they represent Miss

16   Roberts.

17          This is really the only chance that we get to speak

18   to you like this where we can ask questions, and you can ask

19   questions of us, if you have questions about this procedure,

20   because I don't believe you served on jury service

21   previously, have you?

22   A       Yes, I have.

23   Q       Oh, you have.  And you probably went through it a

1805

1   little bit differently with a group of individuals seated

2   here, and then maybe they were all together.

3           I want to start out, first of all, by the two areas

4   that the Court indicated. And the first is the publicity

5   aspect. I assume you've heard some of this case?

6   A       Yes.

7   Q       Have you formed an opinion about the guilt or

8   innocence of this Defendant based upon anything you've read

9   or seen or heard on the television?

10  A       No.

11  Q       So you come into this courtroom not thinking she's

12  guilty or innocent based on what you read?

13  A       Correct.

14  Q       You just merely read the articles for the

15  information that they contained and maybe didn't even follow

16  them that closely?

17  A       Right.

18  Q       So you have heard of the case?

19  A       Yes.

20  Q       Mr. Fingerhut, Miss Roberts. I'm assuming you also

21  heard of Nate Jackson?

22  A       Yes.

23  Q       All right. You don't believe that any of that

1    publicity would affect you in terms of being a juror in this

2    particular case?

3    A       I don't think so, no.

4    Q       So as you sit here today you don't look at Miss

5    Roberts and say, well, I read this about the case and I think

6    she's guilty or not guilty.  I think it was the other guy.

7    Or I think it was both of them in the plan.  You don't have

8    any preconceived notions as to her guilt or innocence?

9    A       No.

10   Q       Now there may come a point in this case where

11   testimony is presented that may coincide or may bump up

12   against something you read or saw on television.

13   A       Uh-huh.

14   Q       Are you going to be able to put aside what you've

15   seen on television or heard on the radio or read in the

16   newspaper in making your determination?

17   A       I don't see any reason why not.

18   Q       You wouldn't say, for instance, if a piece of

19   evidence came to light during the trial or the testimony was

20   a certain way, you wouldn't sit here and say, boy, you know,

21   that's different than what I read in the paper.  That's

22   different than what I remembered seeing on television so this

23   witness must be lying.  Or that's consistent with what I read

1    in the paper?

2    A      I don't see any reason why.

3    Q      You could decide this case based upon the evidence

4    and the testimony you hear just inside these four walls of

5    this courtroom?

6    A      I believe I could.

7    Q      Okay.  And again, there's no right or wrong answers

8    here as the Court indicated.  What we're trying to do

9    obviously is just find jurors that are fair and impartial

10    that could be fair to both the State and to the Defendant,

11    Miss Roberts.

12          I notice in your questionnaire that you've indicated

13    that you are in favor of the death penalty?

14    A      Yes.

15    Q      And that you in fact could sentence someone to death

16    if the circumstances warranted it and the law allows it?

17    A      Correct.

18    Q      So you could sit on a jury and determine not only

19    the guilt or innocence, but then determine what penalty

20    should be given to that defendant and actually go back to

21    this jury room and sign a piece of paper calling for the

22    death penalty?

23    A      Yes, sir.

1    Q       You would not have a problem doing that?

2    A       No, sir.

3    Q       Now, we're being a little presumptuous here because

4    what we're talking about are two different trials.  I think

5    the Court touched on that.  There's sort of two different

6    parts of this trial.  We may never get to that point where

7    you have to sign the death penalty.  You may find her not

8    guilty, or at least not guilty of the crimes that would lead

9    to the death penalty being imposed, or the specifications

10   thereto, and we wouldn't have to do deal with any of that.

11   Do you understand that concept?

12           I mean, one of the problems is, like I said, this is

13   the only opportunity we get to speak to you.  And because

14   this is sort of a two-part trial, we can't put you in the

15   jury box, have you determine her guilt or innocence and then

16   say, okay, she's guilty.  Okay.  By the way jurors, you're

17   going to have to stick around for a couple more days because

18   you're going to determine if she's eligible for the death

19   penalty and whether she should receive the death penalty.

20   Because we may have some jurors here raise their hand and

21   say, wait a minute, no one ever told me that.  And in fact,

22   we've had some jurors this morning who have said under no

23   circumstances I could not impose the death penalty, for

1    whatever beliefs, religious, moral or just their personal

2    opinion. You're not of that type, ilk, though? You could do

3    that?

4    A       No.

5    Q       This case obviously involves an investigation

6    conducted by the Howland Police Department. And one of the

7    things that was on your questionnaire is that apparently you

8    do know Paul Monroe. He's now the chief but he --

9    A       Yes.

10   Q       -- was one of the lead investigators, if not the

11   lead investigator in this case. Have you spoken to him about

12   this case?

13   A       No, I have not.

14   Q       You indicated to the Court through the questionnaire

15   that you are friends with him?

16   A       My wife was a life-long friend in high school

17   growing up, went on many vacations with him together. And

18   then in college we went, attended Kent State together at

19   which time we were friends.

20   Q       So you knew him from attending Kent State which is,

21   that's about 18, 20 years ago maybe?

22   A       Well, we've stayed in touch throughout the years.

23   In fact, he goes to our church.

1   Q        Yeah, I saw you guys go to the same church.

2   A        Add we converse not about this case of course, but

3   we've talked quite a few times as friends, yes.

4   Q        Well, I'm going to tell you, he is probably going to

5   be the lengthiest witness you may see in this trial.  He's

6   going to sit right where you are seated and he will probably

7   testify more than any other witness in this case.

8            The fact that you know him, that you went to college

9   with him, your wife apparently went to high school with him,

10  is that going to cause a problem for you in terms of

11  determining this case?

12  A        I'm not going to say it's going to cause a problem.

13  I do consider him a good friend.  And also working, I know

14  Paul as being very thorough at what he does and I feel that

15  he's pretty good at what he does.

16  Q        Obviously they're going to have some concerns

17  because --

18  A        Right.

19  Q        -- obviously you know this witness for the State.

20  Are you going to give his testimony any more credibility than

21  anyone else's?

22           Let's say, for instance, Paul says, comes in here

23  and sits right where you're seated and says Donna Marie

1    Roberts did or said something.  And we're going to get into,

2    touch something here, but she doesn't have to take the stand.

3    But let's assume she's either cross-examined on that or --

4    I'm sorry.  Mr. Monroe is cross-examined on that, or Miss

5    Roberts or some witness from the defense says, no, whatever

6    Paul Monroe said was not true.  Now, you have to make the

7    determination, not based upon knowing Paul Monroe but knowing

8    how they testified here, their accuracy, their ability to see

9    what they saw.  And the Court will give you a bunch of rules

10    to determine how you're going to tell who's telling the

11    truth.

12          Are you going to have a tendency, though, to say,

13    listen, I know they presented some witnesses or they

14    cross-examined Mr. Monroe about certain things but, you know,

15    and he may have lied about something or may have been

16    inaccurate about something, but I know the guy and he's a

17    good guy and I'm going to believe what he said even though

18    they questioned him in a manner that really made him look

19    like he didn't know what he was talking about, or they

20    presented another witness who presented evidence that he was

21    either lying or was mistaken or didn't know what he was

22    talking about.  Do you think you'll be able do that?

23    A          Yeah.  You have to weigh the evidence and what was

1    said.  I mean, if it's, if it's Paul's word and the defense

2    brings up five other witnesses that, you know --

3    Q        You may say to yourself --

4    A        -- contradiction.  You may have to look at, weigh

5    the evidence of the five other people.

6    Q        What if it's only one person?  What if it's one

7    person says one thing and Paul says another, are you going to

8    let that, is that going to effect your ability?

9    A        It may.  It may.

10   Q        Do you think you could separate out that

11   relationship?

12   A        That would be tough because I know Paul and, like I

13   said, I feel he does a good job at what he does.

14   Q        But you wouldn't give his testimony any more

15   importance than any other witness, would you?

16   A        I wouldn't give it any more importance.  I would, I

17   don't know.  I guess it would be real tough for me to sit

18   there and say, you know, I've know him for 20 years.  I don't

19   know this person at all.  I can't say that it, I wouldn't do

20   that.

21   Q        Would you feel more comfortable if you were on a

22   case that he wasn't involved in?  Or does it make you

23   uncomfortable?

1813

```
 1    A        Probably.

 2                    MR. BECKER:  Your Honor, I think we have a

 3    consensus on this only because of the relationship of Mr.

 4    Monroe who I agree everything, with everything you said.  I'd

 5    give Paul the benefit of the doubt, too.

 6                    THE COURT:  Well, I agree, it would make

 7    it extremely difficult.

 8                    MR. BECKER:  I think it's going to be too

 9    difficult as well as you know Mr. Monroe, as lengthy and as

10    often as you do.

11                    THE COURT:  Well, without objection then

12    the Court will dismiss for cause.  Michael, we thank you for

13    your time and your participation.

14    A        Thank you.

15                    THE COURT:  Let's break for lunch.

16                    (Whereupon, a luncheon recess was taken.)

17                             *  *  *

18                    THE COURT:  Ready for the next one?

19    WHEREUPON,

20                         ROBERT J. YOUNG

21    being first duly sworn, according to law, was examined and

22    testified as follows:

23                         EXAMINATION
```

1    BY THE COURT:

2        Q        How are you doing today?

3        A        Pretty good.

4        Q        You read that handout that we gave you?

5        A        Yes, sir.

6        Q        You understand that the Defendant here, Miss

7    Roberts, is charged with two counts of aggravated murder with

8    specifications.

9             Under the law of Ohio a person who is found guilty

10   of murder only is subject to the consideration of the death

11   penalty if certain specifications are attached to the

12   indictment.  Just because someone murders another person does

13   not automatically mean that they face the death penalty.  The

14   indictment returned in this matter has specifications.

15            Now, the burden is upon the State through the

16   Prosecutor to try this case.  The defense has no obligation

17   to do anything if they care not to, because the burden of

18   proof is totally upon the State.  So this case will be put to

19   this jury and the State must prove beyond a reasonable doubt

20   each and every element of the crime and the elements of the

21   specifications before a verdict could be asked of this jury

22   of guilty.  If the State fails to do that, then of course the

23   proper verdict would be one of not guilty.

1    But assuming that the State would be able to prove

2    their case then the matter would go into a second phase.  And

3    since that's too late to ask whether or not the person, any

4    person on the jury could make that decision, we have to do it

5    up front to find out what each potential juror's view is of

6    the death penalty.  And everybody has their own view of that.

7    Some people believe in the old testament covenant, an eye for

8    an eye.  And that is not the law of Ohio.  Other people, for

9    various reasons, could never sit on a jury where they had to

10    make that decision.

11    Now the law of Ohio says that if the State proves

12    its case then the State has the right to have that

13    determination made by a jury as to whether or not the death

14    penalty will be imposed.  But that question only comes up if

15    the State proves beyond a reasonable doubt in that second

16    hearing that the aggravating circumstances, that is reasons

17    why the death penalty should be imposed, outweigh any

18    mitigating factors.  Mitigating factors are reasons given to

19    the jury asking that the death penalty not be imposed.

20    The purpose of the inquiry today of yourself will be

21    to find out a little about, I guess a lot about what your

22    personal views are.  Whatever your personal views are, are

23    fine.  You're entitled to your own view of those things.  But

1  both sides here need an assurance of each of the potential

2  jurors that they're able to follow the law.  We've had people

3  on both sides that said they couldn't follow the law because

4  they feel that if a person is guilty of murder they should

5  forfeit their life.  Well, that person can't sit because they

6  can't be fair to the Defendant.

7  Likewise, a person who could never make that

8  decision to give the death penalty as a sentence could not be

9  fair to the State.  So what these folks will be asking you

10  is, can you follow the law as this jury will have to in order

11  to be fair to both sides?

12  Now, the second area that they will ask you

13  about is any pretrial publicity.  Many of the jurors have

14  read something about the case, are aware of some things

15  about it.  We had a couple that knew a lot about it.

16  It, for whatever reason, drew their interest.  And, again,

17  this jury is going to have to decide this case not on what

18  they've read or think they know about the case presently,

19  but what they will know about the case after they've

20  heard the facts presented in this courtroom.  And this

21  decision that they make will have to be made strictly

22  on what they've heard in that courtroom.  So

23  they will ask you questions along that line also.  Fair

1  enough?

2  A       Yes, sir.

3                    THE COURT:  Prosecution.

4                         EXAMINATION

5  BY MR. BAILEY:

6  Q       Good afternoon, Mr. Young.  My name is Ken Bailey.

7  I'm an assistant prosecutor with the Trumbull County

8  Prosecutor's Office.  And as I promised the other week, I'm

9  joined today by Chris Becker, another assistant prosecutor,

10  my co-counsel in this case.  And the two of us are

11  responsible for prosecuting this particular case.

12          Now, as the Judge indicated, the reason we ask these

13  questions is to make sure that folks are, whoever is selected

14  to serve on this jury can be fair to both sides, both to the

15  Defendant and the people of the state of Ohio.  And that's

16  why we're asking these questions.  Not because we're snoopy

17  and we like to pry into what you believe about different

18  things and your background, but rather just to make sure that

19  the folks who are selected can be fair to both sides.  And

20  there aren't any right answers.  There aren't any wrong

21  answers.  Just open, candid answers to these questions.

22          Now, because of the rules of conduct that we have to

23  abide by here, we're not allowed to have any contact with you

1    until -- after we're done here today, until this case is

2    over.  If it goes into two different phases, then we have to

3    wait until that second phase is over.  If you have any

4    questions that come up pertaining to what we're doing, you

5    can feel free to ask them during this question and answer

6    session that we're having now, okay, that pertains to this

7    case.

8              If we run into each other out in the hallway, the

9    elevator or a restaurant or something, all we're allowed to

10   do is say good morning or good afternoon.

11             If you have questions or anything outside the

12   courtroom here you're going to have to address them to the

13   bailiff when she's here, Laurie Brown, or Richelle or to the

14   Judge.  Because if you talk to us, if we said anything more

15   than good morning or good afternoon, it would probably cause

16   a mistrial.  We don't want that to happen.  So you understand

17   why we don't talk to you.  It's not that we're being

18   antisocial or trying to snub you or anything like that.

19             Now, the first query I want to ask you about is your

20   view on the death penalty.  Now, the first time you learned

21   that this was potentially a death penalty case was when?

22   A        When I came in the first time.

23   Q        Is that April 8th or something?

1   A       I believe that's when it was.

2   Q       Okay.  Now, before that had you ever had any

3   discussions or conversations with any family members or

4   friends or co-workers or somebody concerning your view on the

5   death penalty as a possible punishment?

6   A       Not really.

7   Q       I mean, if cases, do you ever follow criminal cases

8   in the paper or the news, on TV or radio?

9   A       I have some.

10  Q       And has anybody ever commented, well, gosh, I think

11  this should happen to that person?  Did you ever join in that

12  type of a conversation?

13  A       Yes, occasionally I have.

14  Q       When would that be?  At work or at home or where?

15  A       At home.  I can't really remember any particular

16  matter, you know what I mean?

17  Q       Did the death penalty as a punishment ever come up

18  in those particular instances?

19  A       No, not that I know of.

20  Q       Have you ever expressed any opinion on the issue of

21  the death penalty, either for it or against it?

22  A       Never really thought about it that much until just,

23  until this here, this happened, you know what I'm saying?

1    Q        Okay.  Well, you've had, what's it been, about two

2    weeks or so?

3    A        Yes.

4    Q        I imagine since you came into court you've been

5    thinking about it quite a bit?

6    A        Yes.

7    Q        And after having those two weeks to think about it,

8    what's your view now of the death penalty as a punishment?

9    A        I don't really feel that I could, you know what I

10   mean?  I'm just, I don't feel that I could judge a person,

11   you know what I mean, to that point.

12   Q        Okay.  Fair enough.  What's your viewpoint based on?

13   I mean, is it based on a religious belief?  A personal

14   belief?  Some ethical or moral belief, or a combination of

15   those?

16   A        It's a combination.

17   Q        Combination of what?

18   A        Of religious, you know what I mean, belief and

19   morals.  It's --

20   Q        Okay.  Religious and moral.  Your religion is --

21   A        Protestant.

22   Q        Is there anything in your religion that prohibits

23   the death penalty as a punishment?

1821

```
 1   A       Not that I'm aware of.  I don't know.

 2   Q       When you say it's partly religious, how do you mean?

 3   A       I don't know.  I just feel it's not right for

 4   another human being to judge, you know, to me.

 5   Q       A lot of folks may feel that way.  It's important in

 6   our system in America that folks have viewpoints on all sides

 7   of the issue; right?

 8           And as the Judge said, if somebody would come in and

 9   say, well, I think for a planned murder for profit the person

10   should automatically, if they're found guilty they should

11   automatically get the death penalty.  That wouldn't be fair

12   to the Defendant, would it?

13   A       No.

14   Q       And by the same token, if somebody came in and said,

15   you know, I believe the death penalty has a place in our

16   society but I personally can't have any part in it.  And it

17   would be unfair for the State to have somebody like that sit

18   on a jury because they would never be able to return a death

19   penalty verdict in an appropriate case; right?

20   A       Right.

21   Q       So if I understand what you're saying, do you

22   believe in the death penalty as a punishment for certain

23   crimes?
```

1    A        For certain crimes.

2    Q        What types of crimes?

3    A        For murder, you know, and things of that nature, you

4    know what I mean?  It's --

5    Q        Okay.  But you're saying that your own beliefs don't

6    allow you to sit on a jury and render a verdict?

7    A        I would rather not, you know what I'm saying?  It's

8    like, like I said, I have problems with it.

9    Q        Well, are the problems to such an extent that you

10   think that would affect your ability to return -- well, the

11   Judge explained in a death penalty case the case is tried in

12   two different, it can be tried in two different phases.  The

13   first phase deals with the issue of guilt or non guilt.  Did

14   she do what she's charged with?  Can we prove that she did

15   what she's charged with or not?  Okay.

16           Now, if we don't prove that to your satisfaction by

17   what we call proof beyond a reasonable doubt, then you got to

18   find her not guilty of that; right?

19   A        Right.

20   Q        But let's say we do prove her guilty so that you and

21   the other jurors are convinced that she did what she's

22   charged with doing; right?  Okay.  If you and the other

23   jurors find her guilty of a crime called aggravated murder

1823

1    and one or more of these special findings, special findings

2    of fact that make her eligible for the death penalty, we

3    would go on to a second phase where the issue would be

4    punishment, and the death penalty would be one of those

5    options.

6         Now, do you think, your personal feeling about the

7    difficulty that you have not judging people would effect you

8    in the first phase so that if we were to prove the crime of

9    aggravated murder and one or more of these specifications

10   beyond a reasonable doubt so you're convinced she did it, do

11   you think it would effect your ability to sign a guilty

12   verdict in that first phase knowing that she would be

13   eligible for the death penalty in the second phase?

14   A    I don't know.  It's hard to say.  Like I said, it

15   probably would.

16   Q    It probably would effect your ability to return that

17   verdict?

18   A    Yes.

19   Q    Now let's say we got to a second phase.  Let's say

20   you found her guilty in the first phase, and the issue in the

21   second phase is one of punishment.  Punishment is not

22   relevant in the first phase because the issue is guilty or

23   not guilty; right?

1824

1    A        Right.

2    Q        In the second phase you've already determined her

3    guilty of aggravated murder and a death penalty specification

4    or two.  Okay.  In the second phase the Judge talked about

5    doing this balancing test where on one side of the scale you

6    got these special circumstances, the aggravating

7    circumstances, special findings of fact that make her

8    eligible for the death penalty, that it was committed during

9    an aggravated robbery with prior calculation and design.  It

10   was committed during an aggravated murder, burglary with

11   prior calculation and design.

12          On the other side of the scale there can be what we

13   call mitigating factors.  That's a fancy word.  It just means

14   certain facts that may work in favor of the Defendant, that

15   would work against the death penalty.  Okay.  You would have

16   to do this balancing test.  And if you and the other jurors

17   found that the, that we prove that the aggravating

18   circumstance or circumstances outweigh these mitigating

19   factors, then in that case, beyond a reasonable doubt, then

20   the death penalty would be an appropriate punishment and you

21   would have to come back with a verdict finding that for the

22   death penalty; do you understand that?

23   A        Right.

1825

1    Q      Are you saying that based on your personal beliefs,

2    your religious beliefs, would you be able to sign the death

3    penalty verdict form in a second phase?

4    A      I really don't believe I could.

5    Q      You think that your personal beliefs are such that

6    it would effect your ability to sign that verdict form?

7    A      Yes, sir.

8    Q      And fair enough.  I mean, if that's how you feel

9    it's important that you tell us because not only should the

10    Defendant get a fair shake in the trial, but it's important

11    that the people of the State get a fair shake.  And if you

12    can never sign that verdict form it would be too late to go

13    through the whole trial, and we get to the end of the case

14    and you say, gosh, I told him I could be fair and impartial

15    when we get to this point, and now based on my personal

16    beliefs and my religious beliefs there's no way, no way in

17    creation that I could sign that form, and I'm not going to do

18    it.  The State would never get a fair shake there even though

19    we proved everything beyond a reasonable doubt.  And we would

20    never know that; right?

21    A      Right.

22    Q      Okay.  So you're saying it would effect you to such

23    an extent that you would never sign that verdict form?

1     A       Yes.

2     Q       Okay.  There's nothing wrong with that.  Defense

3     counsel will have an opportunity to talk to you.

4                            EXAMINATION

5     BY MR. INGRAM:

6     Q       Good afternoon.  You're gripping that coat mighty

7     hard over there.  Are you a little uncomfortable?

8     A       Nervous.

9     Q       My name is Jerry Ingram, John Juhasz, we represent

10    Donna Roberts.  I just got a couple questions.  Were you here

11    for the general orientation instruction Tuesday, I think it

12    was Tuesday, April 8th?  It was down at the other end of the

13    hallway.

14    A       Yes, sir.

15    Q       Where were you during those instructions?  Were you

16    seated or were you standing?

17    A       Standing.

18    Q       As you walked into the courtroom did you go to the

19    left or to your right?

20    A       To the left.

21    Q       Were you standing along, near the windows there?

22    A       Right by the door.

23    Q       Right by the door.  While you were standing there

1    did you hear any of the other prospective jurors discuss

2    anything about this case?

3    A        Nothing that I remember.

4    Q        Did you say anything about this case to anyone else?

5    A        No.

6    Q        Did anyone say anything about the case to you?

7    A        Not that I remember.

8                      MR. INGRAM:  I have no further questions,

9    Your Honor.

10                     THE COURT:  Bob, can I ask you one

11   question?  Is part of the reason you feel like you do because

12   this happens to be a female rather than a male?

13   A        That could have quite a bit to do with it.

14                     THE COURT:  That's something that's

15   entered your mind?

16   A        Yes.

17                     THE COURT:  Okay.  Anyone have objection

18   to me moving him for cause?

19                     MR. BAILEY:  No, Your Honor.

20                     MR. INGRAM:  No.

21                     THE COURT:  Sir, thank you very much.

22                              *  *  *

23   WHEREUPON,

1                          JOHN D. LANAM, SR.

2      being first duly sworn, according to law, was examined and

3      testified as follows:

4                              EXAMINATION

5      BY THE COURT:

6      Q        Mr. Lanam, have a seat up here.  How are you doing

7      this afternoon?

8      A        Okay.

9      Q        John, you read the handout that was given to you?

10     A        Yes, I did.

11     Q        You have a pretty good idea of why we're here.  The

12     reason that you're in here individually today is to allow

13     both sides to ask you questions concerning two main areas.

14     Some of the attorneys have pointed out that it seems like

15     we're putting the cart before the horse, but no one knows

16     what this jury will do with the charge of aggravated murder

17     when it's heard.

18             If the State is unable to prove beyond a reasonable

19     doubt each and every element of the charge of aggravated

20     murder with the specifications, then this jury could return a

21     verdict of not guilty.  But if the prosecution is able to

22     prove their case beyond a reasonable doubt, then this jury

23     would be called upon to sit and listen to further evidence on

1829

1    the aggravating circumstances.  Now, those are reasons that

2    the State would put forward to the jury to convince the jury

3    that the death penalty would be warranted.

4        The defense has an opportunity to present mitigating

5    factors at that hearing.  And those are reasons why the jury

6    should, after consideration, not impose the death penalty.

7    The burden is always on the State to prove their case beyond

8    a reasonable doubt.  The Defendant need prove nothing.

9        Some people feel that whenever a life is taken the

10   person who took that life should forfeit theirs.  That is not

11   the law of Ohio.  So that type of person could not be fair to

12   a defendant, because the law doesn't say that.  Other people

13   could, under no circumstances, ever see themselves making

14   such a decision that would address whether a person lives or

15   dies.  And that's fine.  But that person could not be fair to

16   the State by sitting on the jury.

17       So what both sides to this lawsuit, through their

18   attorneys, are looking for are 12 people to sit on this jury

19   who could follow the law.  Every person on this jury,

20   whenever we get it picked, are going to have some view of the

21   death penalty.  It's only natural.  Some will be more in

22   favor of it than others.  But whatever their personal view

23   is, they have to be able to set aside any feeling that they

1    have and follow the letter of the law.  If that doesn't

2    happen then we haven't had a fair trial.  And that's the

3    worst thing that can happen in any trial, if there's been

4    something that has made it unfair.

5         Now that's quite a bit to ask of people.  But I

6    suspect a good portion of the population are able to do that.

7    I don't know that anybody really likes to do that.  But it

8    depends on the person's motivation, and they feel it's their

9    duty, which it is all of our duty to serve if possible.  Then

10   they're willing to do that.

11        The questions that will be put to you is to inquire

12   into your personal beliefs on this matter.  Whatever your

13   personal thoughts and beliefs are, are fine.  You're entitled

14   to them.  We will not judge you or say anything to you to

15   embarrass you.  We'll accept whatever your view is.  But it

16   is important that you answer these questions as you really

17   believe so that they're able to make up their mind as to

18   whether they feel you could be fair.

19        The other line of inquiry will be about any pretrial

20   publicity, whether you were particularly interested in this

21   case, whether you had a passing knowledge of it, or whether

22   you have something in your mind that would make it difficult

23   to set that all aside.  Because, again, in order to have a

1    fair trial this jury is going to have to start out fresh and

2    decide only on the evidence presented in this courtroom.

3    Many of those things that appeared in the newspapers may or

4    may not be correct, you never know which.  And it just

5    wouldn't work if anybody decided the matter on anything other

6    than the evidence presented here and the law which the Court

7    will give.  Fair enough?

8    A        Yes.

9                        THE COURT:  Okay.  Mr. Becker.

10                       MR. BECKER:  Thank you, Your Honor

11                              EXAMINATION

12   BY MR. BECKER:

13   Q        Is it Mr. Lanam?

14   A        Yes.

15   Q        My name is Chris Becker.  I'm with the county

16   prosecutor's office.  And this is Mr. Bailey.  I think

17   probably about two weeks ago he was in the courtroom.  I was

18   in another matter so I couldn't be there.  I'm assuming you

19   recall Mr. Ingram and Mr. Juhasz were there as well as their

20   client.

21            The Court sort of gave you a ground, sort of a

22   framework or ground rules for what we're going to be asking

23   you here today.  And it's very important that if you have any

1   questions you ask here, because this is really the only time

2   that we get to ask you questions.  And if you have any

3   questions, you can ask us.  Because once the trial starts and

4   once you're seated in the jury box, assuming you are, we

5   can't speak to you again.  We can't say, hey, what did you

6   think of that?  Or what do you think of that?

7          And one of the problems that we kind of have, sort

8   of an awkward situation, but one of the things we have to do

9   here is we have to be presumptuous and assume we're going to

10  get to a point in this case where one of the penalties and

11  one of the options is going to be the death penalty.  You may

12  not get that far.  You and your fellow jurors may determine

13  that she committed no crimes or she didn't commit crimes that

14  warrant the imposition of the death penalty.  But we have to

15  ask you these questions now because if we get close to the

16  end, when we get to that point and someone says I can't do

17  it, then we've come a long way for no reason.  So looking at

18  your questionnaire, I believe that your feelings are that you

19  could impose the death penalty?

20  A       Yes.

21  Q       Not in every circumstance but in some situations?

22  A       Yes.

23  Q       And as the Court indicated to you, the death penalty

1   is not automatic.  There's no crime where you automatically

2   get the death penalty, but it's a weighing process.  And it's

3   going to be just like that in the first phase dealing with

4   guilt or innocence.  And then you're going to get to the

5   second phase and you're going to have to weigh some different

6   things about what we call aggravating circumstances and

7   mitigating factors.  And you'll again have to weigh that.

8   And you will be given four options if we get to that point of

9   the death penalty: life with no parole; life with parole

10  after 30 years in prison, and; life with parole after 25

11  years in prison.  So you understand you will have all four of

12  those options.

13          And I guess the questions that we want to ask is, do

14  any of those options have a head start or an advantage in

15  your mind if you were to get to that phase?

16  A       No.

17  Q       You would equally consider all of them?

18  A       All of them, yes.

19  Q       And you would follow the Court's instructions

20  regarding how you were to weigh this evidence and this

21  testimony if we got to the second phase.  And you would make

22  a finding as to which one of those four penalties would be

23  appropriate; correct?

1 A  Right.

2 Q  So you wouldn't come in here -- and it's perfectly

3 fine to tell us. I mean, everybody has their opinions.

4 And, again, there's no right or wrong answers. But some

5 people come in here and they obviously can't be jurors

6 because they say, listen, I'm so in favor of the death

7 penalty that if you're convicted of a crime involving the

8 killing of someone else, I think you should die, so I would

9 give the death penalty in every case where I found that

10 someone killed another person. You don't have that mindset;

11 right?

12 A  No, I don't.

13 Q  And on the other side of that coin, there's some

14 people that have come in here already that have said I, you

15 know, maybe I believe in the death penalty but I could not

16 personally do it, or, I don't believe in the death penalty

17 and I'm against the death penalty. Well, that's not fair to

18 the State either because our Legislature has said that that

19 is a fair penalty in this state if you commit certain crimes

20 and certain things are proven in that second phase. So our

21 Legislature has said under certain circumstances it's okay to

22 impose the death penalty.

23     You would give them all equal value and you would

1  weigh the evidence, and if the State were able to prove that

2  the aggravating circumstances outweighed beyond a reasonable

3  doubt the mitigating circumstances, once we got to that point

4  you would be able to find the Defendant deserved the death

5  penalty?

6  A       Yes, I would.

7  Q       And you could sign a verdict form calling for the

8  death penalty with 11 other jurors?

9  A       Yes.

10  Q       And on the same line of reasoning, if the State were

11  not able to prove that the aggravating circumstances

12  outweighed the mitigating factors by proof beyond a

13  reasonable doubt, you would have no problem considering one

14  of the other, what we call life options?

15  A       No.

16  Q       Now I want to ask you a little bit about, I think on

17  your questionnaire you indicated that you have not heard

18  anything about this case?

19  A       When I did that, I did that the day of the thing.

20  And after that I learned that -- I didn't recognize her name.

21  I recognized whatever the name was used, Fingerhut.

22  Q       Fingerhut?

23  A       Yeah, I think that's what I recognized.

1    Q      The deceased individual?

2    A      Yeah.  That's the name I took to the thing.  But I

3    didn't recognize her that day when I filled out the

4    questionnaire.  And I didn't want to go whiting it all out

5    and change it.

6    Q      No problem.  That's what this process is for, so we

7    can figure out maybe what you do or don't know, or maybe

8    things have come up since this.  Because obviously it's been

9    a couple weeks now since you filled this out.  What is it

10    that you know about this case?

11    A      Very, very little.  All I just know is just the way

12    I understand it from what I picked up, and I haven't read a

13    lot about it so, it was for, her and a boyfriend killed her

14    husband or other boyfriend, whatever it was, and for money.

15    That's about all I, I know of.

16    Q      And where did you get that information from?

17    A      I think when it first happened.  It's been a long

18    time ago.  And some things I read and some things I don't pay

19    that much attention to.  If it doesn't catch my interest I

20    won't read it.

21    Q      Now, what you know about this case and what you

22    would have read, that's not going to effect your ability to

23    sit as a juror, would it?

1    A     No.

2    Q     You don't come in here with a mindset of, boy, I

3    read this in the paper, it's got to be true. She's sitting

4    here with two attorneys. They wouldn't have charged her.

5    A     No.

6    Q     You understand that the process by which she got

7    charged is called a grand jury indictment. And the grand

8    jury has no judge there. The grand jury has no defense

9    attorneys. In fact, Miss Roberts is not even there. There's

10    really only one side of the case, and that's the prosecution

11    side. And the standard of proof is much lower as opposed to

12    proof beyond a reasonable doubt. So you don't hold the fact

13    that she's indicted in this case, you read something about

14    it, against her?

15    A     No.

16    Q     And you don't come into this courtroom saying, well,

17    we're here, they're asking me questions, she's got to be

18    guilty.

19    A     No.

20    Q     Have you ever sat -- I didn't see in your

21    questionnaire. Have you ever served on a jury before?

22    A     No.

23    Q     So this would be your first time?

1    A          I got called one time when I lived in California,

2    but I sat around for about an hour, then our whole group was

3    excused.  That's the closest I ever got.

4    Q          When you realized you had to serve on this jury,

5    what was your first reaction or what did you say?

6    A          I don't know.  I always thought to myself if I ever

7    got on one I would like it to be something more than a car

8    accident or something.  But now --

9    Q          Well, you understand, I mean obviously this is a, in

10   essence, a life and death situation.  It is serious.  Does

11   that have any play in it?

12   A          No.

13   Q          Would you rather say, boy, I don't want to be

14   involved with something that serious?

15   A          I feel it's my duty, like the Judge says.

16   Q          And you would be able to fulfill your obligation,

17   you believe, as a juror in this case?

18   A          Yes.

19   Q          One of the things that we talked about is, like I

20   said, we may never get to the point where we determine what

21   penalty is appropriate in this case.  You may find her not

22   guilty of the crimes charged.  Mr. Bailey and I certainly

23   believe you will, but that's up to the evidence and what we

1   have to convince you of.

2         One of the things that you're going to have to deal

3   with is some concepts that are involved in the legal system.

4   And you hear them on TV. You probably read them in the

5   newspaper. And that's proof beyond a reasonable doubt. And

6   everybody has I guess a different idea of what that term

7   means.

8         The best example I ever heard of people speaking

9   about reasonable doubt is people talking about glasses of

10   water, being whether they're full or not full. The Court is

11   going to give you a definition of what reasonable doubt is,

12   but it's not going to be, well, the State, if the State has

13   seven witnesses they win or if you, if you're here for three

14   days the State wins or anything like that. So it's nothing

15   quantitative that you can measure. It's really sort of a

16   quality type of standard.

17         And one of the things that we sometimes tell people

18   and we ask people are, do you believe that the case could,

19   that the State, rather, could prove its case with just one

20   witness if that witness was so good and so reliable? For

21   instance, if there was a traffic accident, like you

22   mentioned, and the witness happened to not have anything to

23   do with either party, witnessed the whole thing. Is very

1   observant.  Wrote everything down right after it happened.

2   Saw the whole thing.  It was a clear day.  Has no vision

3   problems.  Do you believe you could probably find a person

4   guilty based upon just one witness; correct?

5   A        If the evidence was there, right.

6   Q        If that witness was good enough and if the facts

7   were good enough?

8   A        Right.

9   Q        On the other side of that coin, though, I guess we

10  could parade in ten witnesses on an issue and, that same

11  traffic accident, for instance, and, you know, seven of them

12  may be nearsighted or farsighted, not even have their glasses

13  on.  And two of them may have been paying attention to

14  something else that was going on in courthouse square, if the

15  accident happened here on say High Street and Elm Road -- I'm

16  sorry -- Park Street here and High Street.  And two of them

17  were watching a band playing on the courthouse square.  And

18  five or six of them couldn't see because they were going to

19  go get their doctor's prescription or their eyeglass

20  prescription filled.  And the other one was related to one of

21  the drivers.  That would kind of be a bad group of witnesses

22  to have.  So there's differing degrees of witnesses.  And you

23  might be able to get by with one.  You might not be able to

1    get by with ten; right?

2    A        Yeah.

3    Q        And when we go to that glass of water, the State has

4    to prove that that glass is pretty full for reasonable doubt.

5    Maybe not all the way to the top, but maybe within an inch or

6    some people might say half an inch or even a quarter inch,

7    depending on how big the glass was.  But we would have to get

8    pretty close to the top.

9            You wouldn't hold the State, though, to filling that

10   glass up beyond all doubt because the Court is going to tell

11   you you can't do that.  So you'll follow the Court's

12   instructions?

13   A        Yes.

14   Q        And you understand it's reasonable doubt.  And

15   that's doubt based on reason and common sense.  There may be

16   things out there, for instance, if we're talking about our

17   car wreck, the guy may go through the intersection and hit

18   somebody who had, who had the -- I'm sorry -- had the green

19   light.  And the guy may have gone through the red light.  And

20   there may be witnesses to it.  There maybe two or three

21   witnesses.  There may be five.

22           You have to look at each and every one of those

23   witnesses to see how observant they are, whether they have

1    some kind of interest.  Maybe one of them is related to the

2    defendant.  Maybe one of them is related to the victim.

3    Those are all kind of things that would play into your

4    weighing of who's telling the truth; right?

5    A        Right.

6    Q        And you believe you can do that?

7    A        I believe I can do it.

8    Q        And additionally, there may be scientific evidence.

9    There may be a guy from the Highway Patrol who come out and

10   measured the skidmarks and said, listen, not only did this

11   guy go through the red light, he was speeding.  The speed

12   limit is 25 here.  And I measured the skidmarks marks and how

13   long it took him to skid and the impact.  He was probably

14   going about 45 through that intersection.  But if he didn't

15   know what he was talking about or had never done that before,

16   or if it was just some guy who said, I just measured them and

17   I've never done this before, you would be a little less

18   skeptical than somebody who had done that maybe for ten years

19   and testified in many courts many, many times; right?

20   A        Right.

21   Q        All right.  But that's kind of what being a juror is

22   about.  You've got to determine who's, who's telling the

23   truth, who has more to gain or lose by their testimony.  Who

1   is in a good position to see something or hear something or

2   be a part of something. And eventually what all that means

3   as it relates to the elements of the crimes, because we have

4   to prove all of the elements by proof beyond a reasonable

5   doubt, not just two or three. You feel you could make those

6   kind of decisions and judgments?

7   A      Yes.

8   Q      Now, in this particular case, as in every criminal

9   case, the Court is going to tell you that you can't consider

10  sympathy. And that's a hard thing to do sometimes. And it's

11  easy to be sympathetic to people, whether it be a car wreck

12  or a homicide case or maybe somebody is suing somebody over

13  money because their house wasn't built right or they didn't

14  get a car that was reliable and something was wrong with the

15  car. Do you feel you could separate any sympathy you may

16  have out of this case?

17  A      Yeah.

18  Q      Because you're going to see some photographs

19  involving Mr. Fingerhut. And they're not going to be pretty

20  pictures. They're going to be difficult to look at. And

21  some people may look at those and say, boy, this poor guy,

22  look what happened to him. And I know they've proven some

23  things, and they kind of implicated her, but they really

1   didn't prove it.  But I can't let this poor guy end up like

2   this so I'm going to find her guilty; you wouldn't do that?

3   A       No.

4   Q       And by the same token, on the other side of that

5   coin you wouldn't say, listen, the State proved all of the

6   elements beyond a reasonable doubt and I'm convinced she's

7   guilty but, boy, I look at her and I think, boy, she looks

8   like a nice lady.  I can't imagine she did this.  I don't

9   want to see her go to prison.  I don't want to see her get

10   the death penalty.  I'm going to find her not guilty.  You

11   wouldn't do that either?

12   A       No, I wouldn't do that.

13   Q       The charges in this case are basically four counts.

14   And the Court will later on tell you if you're selected as a

15   juror what the elements are for those crimes, and what

16   they're defined and what we have to prove to you.

17         The crimes basically are aggravated burglary,

18   robbery, and then there's two death penalty charges.  There

19   are two different theories, I guess, of the case as to how

20   the State is going to present this.  And the Court will tell

21   you, you're free to find her guilty if we prove our case of

22   all of them, some of them or none of them.

23         The death charges or the aggravated murder charges

1   also include what we call specifications.  And you have to

2   make those findings as well to get to that second phase, to

3   get to the death penalty consideration.  So you have to find

4   her guilty of the charges, especially the aggravated murder

5   charges, then you have to find her guilty of some

6   specifications, and then we would go to the second stage.

7        In this particular case I'm going to tell you,

8   Mr. Bailey and I will be very honest with you and very open,

9   you are not going to hear testimony that Donna Roberts was

10  the actual killer.  She did not pull the trigger in this

11  case.  And we're going to tell you that right now.  And we'll

12  probably tell you that again if you're selected for the jury.

13  Does that change in your mind how you feel about this case?

14  A        No.

15  Q        You feel that you could still, if the State met all

16  of its burdens throughout the trial and proved to you beyond

17  a reasonable doubt the elements of the crimes, and that also

18  proved beyond a reasonable doubt that the aggravating

19  circumstances outweigh the mitigating factors, that you could

20  still impose the death penalty if we would prove all of that

21  to you?

22  A        Yeah.

23  Q        Even though she's not the actual killer?

1    A        Yeah.

2    Q        All right.  Now, along those lines, what the Court

3    is going to tell you is that she's what we call an aider and

4    abettor or a complicitor.  That doesn't change anything for

5    you, though; correct?  You will follow the Court's

6    instructions and make your determination appropriately, okay,

7    and you agree with that?

8    A        I agree with that.

9    Q        Now, in this particular case you're going to hear

10   from a lot of police officers as well.  Some Howland Police

11   officers.  Some Trumbull County Sheriff's deputies.  You

12   don't have any connection, other than I think I saw that you

13   had some correction officers that are relatives?

14   A        Yeah, in California.

15   Q        The fact that you -- yeah.  And they're not even in

16   this state.  The fact that you are related to people that I

17   guess are, would be, we would consider working in law

18   enforcement, is that going to effect your ability to serve as

19   a juror?

20   A        No.

21   Q        Because sometimes people that have law enforcement

22   officers in their family may say, boy, I got an uncle that

23   works for the sheriff in Summit County or he's a police

1847

1   officer in Youngstown, I couldn't find him guilty because --

2   or not guilty because if I don't, boy, I'm going to get a lot

3   of heck from him.  That wouldn't have any --

4   A       No.

5   Q       -- feeling in your case?  Now, I noticed it was your

6   father that worked for the, for the --

7   A       Fire department.

8   Q       -- fire department.  Is he still involved in that

9   business?

10  A       No.  He's retired.

11  Q       And you indicated one of the things that concerns

12  you about the justice system is that sometimes the rich are

13  able to drag out their cases long and get better

14  representations?

15  A       Yeah, that's the way I see it.

16  Q       Is that generally the --

17  A       It seems like they go a long time.  It takes a long

18  time for it to all be done.

19  Q       Do you have any particular case that leaps out at

20  mind at you?

21  A       Mostly your high profile.

22  Q       You're talking about like O.J. Simpson?

23  A       O.J. type stuff like that, yes.

1    Q        I hate to use that example in the courtroom.  Is

2    there anything else that you feel is wrong with the judicial

3    system?

4    A        No.   It's all in all, fair.  Like I said on there,

5    sometimes it seems to me that the less fortunate don't get

6    the same kind of representation.  I can't say that the judge

7    or the attorney ain't doing the best that he can do, but it

8    just, it just seems that way to me.

9    Q        You would agree, at least in this particular case,

10   Mr. Ingram and Mr. Juhasz are going to do their best to

11   present their side of the case.  And obviously Mr. Bailey and

12   I are going to do our best.  And, you know, none of us I

13   don't think here are millionaires, so we don't have those

14   kind of worries in this case; right?

15   A        Yeah.  But that's just the way I --

16   Q        That's one of your big problems that you see with

17   the justice system?

18   A        Yes.

19   Q        Is there anything that leaps out at you that you

20   feel you want to tell us about?

21   A        No.

22   Q        Now, in this case, in addition to testing the

23   witnesses and determining the witness' credibility, you have

1  to look at evidence, too.  And the evidence can include their

2  testimony and then maybe physical exhibits that you'll have

3  before you.

4  In this case there's probably going to be what we

5  call some circumstantial evidence.  When I say circumstantial

6  evidence, does that bring up an image to your mind?

7  A        No.

8  Q        You say, boy, that's bad if they have to say

9  circumstantial evidence?

10  A        No.  I understand what it is.

11  Q        It's sort of, it's sort of -- the example that we

12  often use is sort of, if you go to bed at night and watch the

13  weather and they say, boy, it's going to rain.  And they got

14  those green globs on the radar that are from maybe Sandusky

15  down to Columbus.  And you're watching Channel 33 or 27, or

16  21, whatever news you watch, and you go to bed and look out

17  your window and it's clear out there.  You can see the moon.

18  You go to bed.  And the next morning you wake up and

19  it's raining, pouring rain.  You didn't see it but you heard

20  it on the roof.  And you saw lightening maybe in the night

21  sky at 4:00 in the morning.  And you wake up and everything

22  is wet in the driveway.  Your car is wet.  Your neighborhood

23  is wet.  There's water running down the sewer into the

1    gutter.  You never saw it rain, but you can infer that it

2    rained.  You don't have a problem making those kind of

3    inferences?

4    A      No.

5    Q      And you understand some inferences you may have to

6    be careful of.  For instance, if you watch the same weather

7    reports and if you're like me, sometimes they don't get it

8    right.  And you woke up the next morning and they said, boy,

9    it's going to rain tonight.  And they showed you those same

10    green globs, but they were kind of scattered around.  They

11    said, boy, there's a good chance it's going to rain tonight.

12    Close the windows.  Don't let your dogs out.

13    And you wake up the next morning and you look out

14    your window and it's all wet.  You say, boy, it might have

15    rained last night.  And then you look further down the window

16    and you see your wife out there with the hose spraying off

17    the driveway and sidewalk.  And you look at your neighbor's

18    driveway and it's dry, and the street is dry.  And there's no

19    water in the gutter.  You might say to yourself, well, she's

20    just watering and spraying off the driveway or washing the

21    car or whatever.  It didn't rain last night.  So you have to

22    be careful how you make those inferences.  But you can make

23    those inferences if you have to?

1    A       Yes.

2    Q       And the Court is going to tell you that those kind

3    of inferences will have the same weight as direct evidence.

4    For instance, if somebody says, yeah, I was up all night.  I

5    was standing in the rain and I got wet.  I saw it.  So those

6    kind of inferences can have the same weight as something that

7    someone actually saw; correct?

8    A       Right.

9    Q       And you wouldn't have a problem making those

10   decisions?

11   A       No.

12   Q       I want to go back a little bit to -- you had

13   mentioned in your questionnaire that with reference to the

14   death penalty you felt that it was basically to be for crimes

15   against elderly and kids because they were the least able to

16   defend themselves.  There are other situations where you

17   would be able to find the death penalty appropriate?

18   A       Oh, yeah.  Those are kind --

19   Q       Those just pop to mind?

20   A       Right.

21   Q       Because in this case I don't think anyone would

22   consider Mr. Fingerhut elderly.  He certainly wasn't a child.

23   But if we were able to prove to you the first phase, get past

1    that first phase and get to the second phase and prove to you

2    by proof beyond a reasonable doubt that the aggravating

3    circumstances outweigh the mitigating factors, he's certainly

4    not going to be proving to you that he's in his '70s, '80s or

5    '90s.  And he's certainly not going to be a four or five-year

6    old child.  But we believe there may be circumstances there

7    that would warrant the death penalty.  You would still be

8    able to impose it if we met our burden?

9    A       Yeah.

10   Q       Okay.  Nothing else, anything that leaps out to your

11   mind?  Any questions?

12   A       No.

13   Q       A little bit bigger than a traffic case, huh?  You

14   filled out a little two-page questionnaire, and then you

15   filled out the lengthy one.  On one you said you were a

16   victim of a crime or knew the victim, and then the other one

17   you said you didn't.

18   A       No, I've never been --

19   Q       Okay.  You must have circled the wrong box?

20   A       I might have.

21   Q       You don't know anyone from the prosecutor's office,

22   never had to deal with the prosecutor's office?

23   A       No.

1    Q         Thank you very much.

2                        THE COURT:  Mr. Ingram.

3                             EXAMINATION

4    BY MR. INGRAM:

5    Q         Hi.  How are you?

6    A         All right.

7    Q         I'm Jerry Ingram.  John Juhasz.  We share the

8    responsibility of representing Donna Roberts who's on trial

9    for her life.  As you can imagine, we take our responsibility

10   serious.

11   A         Uh-huh.

12   Q         Feel we should take every reasonable precaution in

13   selecting a fair-minded jury, the same type of jury that you

14   or I would want if we were on trial; does that sound fair

15   enough to you?

16   A         That's sounds fair.

17   Q         This is the only opportunity we can talk directly to

18   one another and determine whether you're comfortable sitting

19   on this case.

20                        Lawyers are trained, I guess, in that three-year

21   ordeal that we have to go through called law school to

22   monopolize conversations.  And during our discussion up here

23   my tendency will be to monopolize the conversation.  But why

1   don't you try to stop me from doing that?  And whenever

2   anything pops into your mind, whenever there's a question,

3   whenever there's something that you would like to volunteer,

4   would you please do that?

5   A      Yes, I will.

6   Q      This is a lot like a job interview but when you went

7   to get the job you chose the job that you were going to go

8   apply for?

9   A      Right.

10  Q      In this case the jury wheel spun your name out and

11  we chose you and summoned you down here.  But the process is

12  the same.  And we're interviewing you today for the most, one

13  of the most important jobs there is, the job of finding the

14  truth and determining the fate of another human being.

15         My first question to you is, how do you feel about

16  being asked to assume that responsibility?

17  A      I have no problem.  I feel it's my duty.  And that's

18  why I vote all the time.  I, like I said, I always, I always

19  felt, you know, if it was my time I wasn't going to try to do

20  anything to get out.  I don't have no problem doing it.

21  Q      I believe that, that you thought to yourself about

22  jury duty that you always wished that you, if you got called

23  that it wasn't for a rear-ender, so to speak?

1    A       Right.

2    Q       Well, this isn't a rear-ender.  Have you thought

3    about the challenges, being a juror in this type of case,

4    poses since you left here on Tuesday, April 8th?

5    A       Yes.  Once I realized, you know, and thought about

6    it all, yeah.  It's a pretty big deal, I would say.

7    Q       Well, what did you think about it?

8    A       I, I know I can do it, I mean, if I was in that

9    spot.  I never had doubts or thought, no, I wouldn't want to

10   be in on that one as far as that goes.  I have no problem

11   doing it.

12   Q       If you're selected as a juror your job

13   responsibility would be to fairly determine the facts of this

14   case.

15   A       Uh-huh.

16   Q       You also have a job responsibility now, and that job

17   responsibility is to tell us if you think you would have any

18   type of a problem giving either side a fair shake?

19   A       No, I wouldn't.  I would be fair.  As the

20   evidence --

21   Q       In a nutshell, this case boils down to the

22   government's allegation that Donna Roberts plotted or

23   conspired with a male companion, Nate Jackson, to cause the

1 | death of Robert Fingerhut.

2 | Donna and Robert were divorced, but they continued

3 | to work together at the Greyhound Bus Station in Warren and

4 | Youngstown, and to live together in Howland Township.  And

5 | you understand that this trial is about the guilt or

6 | innocence of one person and one person only, and that's Donna

7 | Roberts.

8 | Throughout the, throughout the course of these

9 | proceedings you'll hear the name Nate Jackson.  And you may

10 | be convinced shortly into these proceedings that Nate Jackson

11 | did what the State says he did.  The question here is, did

12 | Donna help him or not; do you understand that?

13 | A        Right.

14 | Q        So we're not concerned about Nate Jackson.  We're

15 | concerned about Donna Roberts.  Do you have that clear in

16 | your mind?

17 | A        Got it.

18 | Q        And when Mr. Becker was talking to you about

19 | accomplices; do you remember that?

20 | A        Uh-huh.

21 | Q        And I think he told you that Donna was an

22 | accomplice.  Well, Donna is alleged to have been an

23 | accomplice.  It's only an allegation.  And you are here to

1    determine whether that allegation is true or not; do you

2    understand that?

3    A       Right.

4    Q       Just because the allegation is leveled doesn't mean

5    that it's true, does it?

6    A       No.

7    Q       In support of this allegation that Donna aided or

8    participated in the death of Robert Fingerhut, the State will

9    present various letters and recorded conversations between

10   Donna and Nate Jackson.  Some of those letters and tape

11   recordings are sexually explicit.  And to be absolutely

12   candid with you, some of them are rather offensive.  The

13   allegation here is murder not loose morality; do you

14   understand that?

15   A       Right.

16   Q       And no matter how shocked or offended you may be by

17   the sexual nature of some of this evidence, it's going to be

18   your job responsibility to test that evidence to see if it

19   ties Donna Roberts to the death of Robert Fingerhut.  You

20   think you're up to that?

21   A       Yeah.

22   Q       Donna denies that she participated by conspiracy,

23   plot or otherwise in the murder of Robert Fingerhut.  Do you

1   think you would have a problem giving a woman such as Donna

2   Roberts a fair shake during a trial like this?

3   A       Yeah, I can do that.

4   Q       You can give her a fair shake?

5   A       Yeah.

6   Q       Would you have the courage to acquit, that is vote

7   not guilty, if you felt a not guilty verdict was warranted by

8   the evidence?

9   A       Yes, I would.

10  Q       Now, when you were talking with Mr. Becker about

11  publicity the two of you used the word know, what you knew or

12  what you know.  And I believe when you were talking with him

13  you said that you knew that her and her boyfriend killed her

14  husband for money.

15  A       That's what I believe I know about it.

16  Q       That's what you read in the newspaper?

17  A       Yeah.

18  Q       You don't know that to be true, do you?

19  A       I don't know that to be true, no.

20  Q       And you sometimes believe what you read in the

21  newspaper, sometimes don't believe what you read in the

22  newspaper?

23  A       Yeah, I guess.  Depending on what it is, I guess.

1    Q        When you read this, when you read about this back in

2    December of 2001, because I think you said that you read it

3    shortly after --

4    A        After the incident.

5    Q        After the incident.  That was back in December

6    of '01.  Did what you read or see on TV create any

7    impressions in your mind?

8    A        No, I never thought much about it.

9    Q        Do you recall reading anything or hearing anything

10   about letters, tape recordings?

11   A        No.

12   Q        Do you recall seeing, reading or hearing anything

13   about Nate Jackson?

14   A        I don't know the name.  I just know there was,

15   whoever the other person was.

16   Q        Do you recall seeing, reading or hearing anything

17   about the other person's case?

18   A        No.

19   Q        I'm going to get off this publicity issue but before

20   I do, and so listen, some of these questions I'm going to ask

21   you, they're hard questions.  And if, if we were representing

22   you, wouldn't you expect us to get up here and ask hard

23   questions?

1    A        Absolutely.

2    Q        Nobody means to put you on the spot.  And I'm going

3    to tell you that if you were asking me some of the questions

4    I'm going to be asking you, I would have a difficult time

5    answering them.  So all I can ask you to do is, when you find

6    the question is a little hard to answer, just take your time,

7    ponder it a little bit and give it the best you got.  Does

8    that sound fair?

9    A        That sounds fair.

10   Q        In order for justice to be done in this courtroom we

11   need for you to tell us that you will do your very best to

12   put aside any impressions, opinions, innuendoes, insinuations

13   that you have about this case from any source and decide it

14   solely on what happens here.  Are you up to that?  Can you do

15   that?

16   A        Yes, I could do that.

17   Q        We'll take your word at that.  When you were here on

18   Tuesday, April 8th, do you recall that we were at the other

19   courtroom back there?

20   A        Yes.

21   Q        Where were you located in that room when the Judge

22   was giving his orientation instructions?

23   A        In the front row like where the --

1    Q        Up close to the Judge?

2    A        Right in front of the railing in the front.

3    Q        Did you hear anyone talking about this case at that

4    time at all?

5    A        No.

6    Q        Now, even the jurors that are selected are told to

7    keep an open mind until the case is over.  And the reason for

8    that is, is if early on you listen to someone say something

9    and you form an opinion about the case, it may prevent you

10   from objectively listening to the rest of the evidence as the

11   case unfolds.  Do you get where I'm coming from there?

12   A        Uh-huh.

13   Q        Let's say that the first witness said, I saw a car

14   drive down the street and the car was red.  And you decided

15   at that time, okay, the car was red.  Well, then the other

16   witnesses come and say it's blue, green or gray, you might

17   not give that testimony equal weight because you've already

18   formed an impression from the first witness.  Do you got me?

19   A        I know what you're saying.

20   Q        So you have to keep an open mind until the whole

21   case is over.  Can you do that?

22   A        Right, yeah.

23   Q        And you won't even be allowed to discuss it with

1    your other jurors.  Are you up to that?

2    A        I understand that.

3    Q        Now, as you know, this is a capital case and we are

4    required to learn your views on the death penalty and life

5    imprisonment as sentencing options.

6              I have a concern about that, about asking you these

7    types of questions.  Not you, any juror.  I actually have a

8    concern about this particular process.  And my concern is

9    this:  By all of us, the Judge, the prosecutor and myself,

10   standing up here asking you questions about penalty, you

11   might get the idea in your mind, well, these fellows must

12   think I'm going to have to decide this issue of penalty or

13   they wouldn't be asking me these questions.  That's my

14   concern.  Do you understand my concern?

15   A        Right.

16   Q        Well, I want you to understand, we're asking you

17   these questions now because we have to.  We're not predicting

18   we're going to get to a second phase; do you understand that?

19   A        Right.

20   Q        If Donna is found not guilty at the first phase what

21   happens?  That's it; right?

22   A        It's over.

23   Q        We pack up our bags and we go home.  You understand

1   you may never have to consider the question of punishment?

2   A       Uh-huh.

3   Q       So as odd as it sounds, we're asking you hard

4   questions about a difficult issue you may never even have to

5   consider.

6           When you were talking with Mr. Becker he asked you

7   about your questionnaire where you said the death penalty

8   would be appropriate for crimes against the elderly and the

9   young.  And then he asked you if there were other situations

10  where you would consider it, I guess is the appropriate term.

11  Do you recall that?

12  A       Right.

13  Q       If I asked you to think about it, can you give me

14  some examples of those circumstances, other than with old

15  people and kids where you would want to --

16  A       My belief is if it was purposely, purposely took the

17  life of another person for whatever reason in a, not

18  necessarily brutal but any way that it, it's taken their

19  life, why, you know, you know, not accidentally, I believe

20  that that's my real opinion on the death penalty.  I put

21  children and elderly because I really believe that they

22  don't, can't protect themselves.

23  Q       As you know, there are two murder, aggravated murder

1   charges here.  One of them has an essential element.  And

2   Mr. Becker talked to you about those, and I'll talk to you

3   more about those in a minute, called prior calculation and

4   design.  And prior calculation and design, one of the last

5   jurors gave me this legal mumbo-jumbo for advanced planning.

6   It's the old premeditated murder; you've heard that?

7   A       Right.

8   Q       So in a -- I'm making up a case.  It's not this

9   case.  It's some other case.  It's an aggravated murder case

10  where the jury has found that the defendant by prior

11  calculation and design premeditated, advanced planning,

12  purposely caused the death of another.  Now, in that

13  situation is it your view that the death penalty is the

14  appropriate penalty?  I'm not sure you and I -- I may have

15  gotten myself confused.

16  A       No.  My guess is they would have to show, I mean,

17  that -- I don't know that every case, I guess.  I would have

18  to look at it individually, I guess, as to how, what my

19  belief and how I would interpret what I believe is a cause

20  for the death penalty type of thing.  I don't know.

21  Q       All right.

22  A       I don't know how to answer you on that.

23  Q       Well, what are your feelings about life imprisonment

1    as an alternative to the death penalty?

2    A        Yeah, that's, that's my belief in it, is some cases

3    I guess call for the death penalty and some are life

4    imprisonment.  And I don't know, I would have to be there, I

5    guess.

6    Q        Who wants to be there; right?  Did you ever hear

7    anyone tell you that, I don't want to pay for the cost of

8    housing these people, that's why I'm for the death penalty?

9    A        Yeah.

10   Q        Do you have any opinions on this cost issue?

11   A        No.

12   Q        Now, in your questionnaire you indicated that you

13   have concerns or you are in favor of capital punishment

14   provided it is fairly imposed.

15   A        Uh-huh.

16   Q        Do you have concerns that it is not fairly imposed?

17   A        No.   There's been a lot of issues that come up

18   recently like --

19   Q        The state of Illinois?

20   A        Yeah, that's one.  Turning over death penalties.

21   I'm sure it's not a perfect world out there.  Some of the

22   things that don't always go the way they're supposed to.

23   Q        So you actually were exposed to some of the

1  publicity about the moratorium on the death penalty in the

2  state of Illinois?

3  A       Yeah, I heard about that.

4  Q       What was your opinion on that?

5  A       I don't know.  My opinion was, I don't know that he

6  should have overturned or put off, on hold or however you

7  call that.  I think they should have continued to review the

8  cases as far as all of the people.

9  Q       Have you ever seen --

10  A       I guess some of them in my opinion would have

11  probably deserved the death penalty as their case was tried

12  and convicted and all that, as far as that, that one.

13  Q       Did you ever see the movie True Crimes starring

14  Clint Eastwood?

15  A       No.

16  Q       Even in cases of purposeful premeditated murder the

17  death penalty is simply a sentencing option; do you

18  understand that?

19  A       Yes, I do.

20  Q       And if you were a juror in a case where there was a

21  conviction for deliberate, purposeful murder, all four

22  penalties would have to start out equally in your mind?

23  A       Uh-huh.

1    Q        Would they all start out equally in your mind?

2    A        Yes.

3    Q        Do you think you have a handle on what those

4    penalties are?  It's life without parole.  And you understand

5    that is exactly what it means?

6    A        Life without parole.

7    Q        Life without parole.  There's life with parole

8    eligibility in 30 years.  That's 30 full years you have to

9    serve.  And life imprisonment with parole eligibility after

10   25 full years.  That's 25 full years you would have to serve.

11            And the first thing that happens in the second phase

12   of a capital case is, and all of the jurors are reminded that

13   they have promised to keep an open mind and those penalties

14   should start out equally in their mind.  And if that ever

15   happens on your oath as a juror they would have to start out

16   equally in your mind.  Would they?

17   A        Yes, they would.

18   Q        And you understand that before any juror in any

19   capital case can vote for death the state of Ohio has to

20   firmly convince you by proof beyond a reasonable doubt that

21   the aggravating circumstances, the bad things, outweigh the

22   mitigating factors, positive things that can be said about

23   the person being sentenced.  So it's their burden to prove to

1    you that death is the appropriate punishment.

2            If you ever have to decide the issue of punishment,

3    will you hold them to that burden?

4    A       Yes, sir.

5    Q       And you understand that any reasonable doubt as to

6    the appropriateness of the death penalty would require what?

7    A life sentence; right?

8    A       A life sentence.

9    Q       Your father was investigator for the fire marshal.

10   Was that locally?

11   A       No.  He did a lot of investigating all around the,

12   all around I guess southern Ohio, East Liverpool.

13   Q       Do you know if he ever investigated any arson fires

14   that resulted in death?

15   A       I don't know.

16   Q       Have you ever donated any time, money or services to

17   a political campaign or issue?

18   A       No, I haven't.

19   Q       I almost laughed when I asked you that question

20   because you're the treasurer for the United --

21   A       I'm a union president.  They call it union chair

22   now.  Union president.

23   Q       For the Steelworkers?

1   A       Yeah, for my local.

2   Q       Have you campaigned on any public issues for

3   political candidates?

4   A       No.

5   Q       Do you belong to any group or organization, with the

6   exception of the Steelworkers, which is active in any

7   political matter?

8   A       No.

9   Q       In the last five years or so, have you signed a

10  petition on any public issue?

11  A       Yeah.  We, as the International will send in copies

12  that they want us to send to our representatives like, and

13  you just read what they wrote on it and send your thing in.

14  It's more or less their map to vote against NAFTA, world

15  trade organization, stuff like that.

16  Q       Most of those would be trade-related issues the

17  Steelworkers are interested in?

18  A       Yeah.

19  Q       Do you belong to or associate with any group which

20  has crime prevention or law enforcement as a goal?

21  A       No.

22  Q       Have you ever considered a candidate's views on

23  capital punishment in determining whether or not you were

1   going to vote for that candidate?

2   A        No.

3   Q        We -- by "we" I mean society.  We've got a bit of a

4   crime problem in this country.  Have you ever pondered what

5   we and, again, society as a whole, might do to at least begin

6   addressing that problem?

7   A        Invest more money into this country instead of

8   others.

9   Q        And do what with it?  Educate?

10  A        Education.  Inner city help for crime, because

11  that's where I think a lot of the crime flows out of.

12  Q        Okay.  And as Mr. Becker and you discussed, this is

13  a court of law.  It's not a court of sympathy.

14  A        Uh-huh.

15  Q        So sympathy has no place in your deliberations.

16  A        No.

17  Q        So I don't want you feeling sorry for Donna here.

18  And that shouldn't affect your deliberations; right?

19  A        I didn't hear you.

20  Q        I don't want you to feel sorry for Donna.

21  A        Right.

22  Q        And feelings of sympathy for her shouldn't affect

23  your deliberations; correct?

1    A        Correct.

2    Q        The flip side.  It's only natural to feel sympathy

3    for someone who suddenly, unexpectedly and against his will I

4    guess lost his life.

5    A        Uh-huh.

6    Q        So sympathy for Robert Fingerhut should play no role

7    in your deliberations.

8    A        Exactly.

9    Q        And Mr. Becker talked to you about some of the

10   evidence.  You'll see coroner's photographs.  Point blank

11   wounds.  Some of these coroner's photographs may be enlarged.

12            Even though this evidence or some of it evokes an

13   emotional response from you, anger, sympathy, you have to get

14   over that emotional response to test the piece of evidence to

15   determine whether it ties Donna Roberts to this offense.  Are

16   you up to that?

17   A        Yes.

18   Q        How do you personally feel about the rule of law

19   which requires that jurors presume a defendant innocent?

20   A        You mean if we find them innocent?

21   Q        No.  Have you ever heard the phrase presumption of

22   innocence?

23   A        Yeah.

1    Q        And remember the orientation instruction on Tuesday
2    of last week, the Judge told you that Donna Roberts is
3    presumed innocent?

4    A        Right.

5    Q        I know some people who have problems with that rule
6    of law.  Actually there's some good friends of mine.  And
7    this is a free country, and all of us are entitled to our
8    opinions.  But my point with my friends who feel that way is,
9    you're certainly entitled to feel that way, but if you can't
10   put that feeling aside you wouldn't make a good juror in our
11   country.

12             So what I'm asking you is, how do you feel about the
13   rule of law, the presumption of innocence which says that
14   jurors are to presume a defendant innocent?

15   A        I feel that's the law.  That's your right as a
16   citizen of America to be presumed innocent.  That's the way
17   I've always heard the law.

18   Q        It is the law.  And it's our heritage.  But let's
19   talk about it a little bit differently.  You have two kids;
20   right?

21   A        Yeah.

22   Q        If one of your two kids were accused of some act of
23   wrongdoing, maybe throwing an egg, throwing a roll of toilet

1873

1    paper, whatever it is, but it's an accusation of wrongdoing

2    that you don't think they did, you firmly, you believe in

3    your heart that they didn't do it.  You would be willing to

4    change your mind if someone presented evidence to you; right?

5    A        Uh-huh.

6    Q        But they would have to present evidence to you that

7    your child had done that; correct?

8    A        Right.

9    Q        Well, does that sound like you're presuming your

10   children innocent?

11   A        Well, yeah, presume them innocent.

12   Q        Right.  And in the case with your children, the

13   evidence that's presented to you, you wouldn't just accept it

14   willy-nilly, would you?  You would look at it with a critical

15   eye to make sure that it amounts to what it's supposed to

16   amount to?

17   A        Right.

18   Q        And will you do that in this trial?

19   A        Yes, I would.

20   Q        Do you need water or anything?

21   A        No, I'm fine.

22   Q        The last gentleman that was sitting up there was

23   literally gripped to his coat the entire time he was there.

1874

1   You seem a little bit more relaxed.

2           Because of the presumption of innocence the State

3   has the burden of proof.  Now it's time for these guys to put

4   up or shut up.  They've leveled these accusations, now they

5   have to prove them.  And it will be your responsibility to

6   hold them to their burden of proof.  Will you do that?

7   A       Yes.

8   Q       I doubt that it will happen, but Juhasz and I, we

9   can sit over there and just sit on our hands and not say a

10  word.  And if they don't prove their case they don't prove

11  their case.  You understand that?

12  A       Uh-huh.

13  Q       You understand that Donna is on trial for being, for

14  murder, not for being a woman of loose moral character.

15  While the State may prove that Donna was a loose woman, the

16  State's burden in this case is to prove that she

17  intentionally participated in the murder of Robert Fingerhut.

18  Will you hold them to that burden?

19  A       Yes, I will.

20  Q       The two aggravating murder charges, they have

21  essential elements.  Mr. Becker discussed a few of them with

22  you.  The Judge will go through them with you in detail, and

23  he'll define them for you.

1875

1           But an essential element of both of the aggravated

2    murder charges is that the Defendant acted purposely.  And

3    the Judge will tell you that purpose is the same as intent.

4    Intent:  A person acts purposely if it is his specific intent

5    to cause a specific result.

6           Would you agree with me that the facts and

7    circumstances surrounding an event or an act can shed light

8    on the actor's intent?

9    A       Uh-huh.

10   Q       For instance, if I engage in some act of wrongdoing,

11   is it more likely for me to try to cover my tracks or am I

12   going to leave a paper trail?

13   A       You're going to try to cover your tracks.

14   Q       Am I going to do it in secret at night or in the

15   open, in the light of day?

16   A       I guess that would depend.

17   Q       That would probably depend.  Will you look at the

18   facts and circumstances of what you hear here to determine

19   intent?

20   A       Yeah.

21   Q       The aggravated burglary charge has an essential

22   element of trespass, and that is to enter or remain on the

23   land of another.  Will you hold the State to proving beyond a

1    reasonable doubt that essential element?

2    A    Yes.

3    Q    And the aggravated robbery charge, that's in

4    committing or attempting to commit a theft offense -- someone

5    had a gun.  So they have to prove a theft offense and a theft

6    offense necessarily involves the taking or an attempt to take

7    property from someone.  Will you hold the State to its burden

8    of proving that?

9    A    Yes.

10    Q    Donna does not have to testify in this case.  And if

11    she chose not to testify you couldn't consider that for any

12    purpose; you understand that?

13    A    Right.

14    Q    In our every day lives it's only natural to want to

15    hear both sides of a dispute.  Like when there's an argument

16    between your kids, all right, the first thing you say is, you

17    guys tell me both sides of the story.

18    In this case your oath as a juror may require that

19    you put aside that natural inclination.  Do you think you

20    could do that?

21    A    Yeah.

22    Q    How would you feel if Donna elected not to testify?

23    A    I would feel that's probably in her best defense.  I

1    would think that would the reason for it.

2    Q        You understand that that is her right to make that

3    decision?

4    A        Right.

5    Q        Now, the flip side of that, if she does testify

6    she's a witness just like any other witness, so you should

7    use the same rules or the same standards for determining her

8    credibility or believability that you use for other

9    witnesses.  Got me there?

10   A        Right.

11   Q        But let's be fair about this.  She is the Defendant

12   in this case, isn't she?

13   A        Yeah.

14   Q        So she has an interest or a stake in the outcome.

15   And that's something you would want to consider; right?

16   A        Right.

17   Q        And I think that's something the Judge is going to

18   tell you you should consider.  My point, though, is, if you

19   consider that with her, you should also consider interest or

20   stake in the outcome with every other witness that testifies

21   if you find that any other witness has an interest or stake

22   in the outcome; does that sound fair to you?

23   A        Right.

1878

1    Q        So you would not reject the testimony out of hand.

2    You would listen to it and judge it like you would other

3    testimony?

4    A        Right.

5    Q        Now, the indictment is a piece of paperwork.  All it

6    does is informs Donna of the nature of the allegations

7    leveled against her by the State.

8             The Judge has already told you that it's not

9    evidence.  And throughout this trial it's going to be

10   referred to and it's going to be read.  Nowhere along that

11   process is it magically transformed into evidence; you

12   understand that?

13   A        Right.

14   Q        Let me tell you why it's not evidence.  Mr. Becker

15   dealt with it briefly.  I'll try to be quick.  The Judge

16   wasn't there.  Donna wasn't there.  Her lawyers weren't

17   there.  No one tested the evidence.  And the issue before the

18   grand jury is not guilt or innocence, it's only should

19   someone stand trial.  So you understand why it's not

20   evidence?

21   A        Right.

22   Q        The Judge is going to tell you that one of your big

23   job responsibilities is to determine the credibility of the

1    witnesses.  You can believe all of what someone says, none of

2    what someone says or part of what someone says.  He's going

3    to give factors.  Will you take those factors and apply them

4    to everyone that testifies?

5    A       Yes.

6    Q       He's also going to tell you that you can use one

7    factor that's called the test of truthfulness that you use in

8    your every day life.

9            At work, you've got to decide sometimes if one of

10   your union members is giving you the straight up or trying to

11   hoodwink you, don't you?

12   A       Right.

13   Q       And over the years you've developed a sixth sense or

14   an intuitive sense for aiding you in that process?

15   A       Right.

16   Q       We don't want you to leave that sixth sense out

17   there.  We want you to bring it in here and apply it to

18   everyone that testifies.  Will you do that?

19   A       Yes.

20   Q       Proof beyond a reasonable doubt is based on reason

21   and common sense.  It requires that you be firmly convinced

22   of the allegations and is proof of such character that you

23   would be willing to rely and act upon it in the most

1    important of your own affairs.

2           Firmly convinced, rely and act upon in the most

3    important of your own affairs.  You've made important

4    decisions in your life, haven't you?

5    A      Yes, I have.

6    Q      You own a home?

7    A      Yes, I do.

8    Q      That was a big decision, wasn't it?

9    A      Yeah.

10   Q      When some people make a decision like that, either

11   on paper or in their mind's eye, they do a list.  They put

12   the good things, the positive over here, the bad things, the

13   negatives over here and they list them all out.  Love the

14   house.  Enough bedrooms.  Good school.

15          Bad things:  It's old.  I don't know about the

16   structural stability.  I don't know about the plumbing.

17   Maybe there's termites.  And I don't know about the interest

18   rate.  If you're like me you try to scratch off those

19   negatives.

20   A      Right.

21   Q      So you call a housing inspector.  He comes and says

22   you don't have termites.  You call an engineer, he says, this

23   house is solid.  But you go to the bank and no matter how

```
 1    hard you think about it, you cannot get clear in your own

 2    mind that interest rates aren't going to go down or that you

 3    can afford the house payment.  That one negative still

 4    remains reasonable on that list.  Do you see me?

 5    A       Right.

 6    Q       If that happens you can't say beyond a reasonable

 7    doubt that that decision is the best thing for you?

 8    A       Right.  I understand what you're saying.

 9    Q       It's the same here.  Will you hold the State to that

10    burden?

11    A       Yes, I will.

12    Q       And Mr. Becker talked to you about circumstantial

13    evidence; remember that?

14    A       Right.

15    Q       It's evidence where they prove something by direct

16    evidence.  You're asked to make a leap in logic.  Well, if

17    it's a leap in logic that leap better be logical; right?

18    A       Right.

19    Q       Will you test all those leaps to determine if

20    they're logical?

21    A       Yes.

22    Q       Let's go back to your kids.  I know I'm going fast.

23    I'm sorry.
```

 1              If your kids in that situation where they were

 2     accused of some wrongdoing, if circumstantial evidence was

 3     presented to you do you think you would look for other

 4     inferences that maybe pointed in other directions?

 5     A       Right.

 6     Q       And will you look for other inferences in this case?

 7     A       Yes, I will.

 8     Q       And would you agree with me that circumstantial

 9     evidence is like a chain, it's only as strong as its weakest

10     link?

11     A       Right.

12     Q       And will you look for weak links?

13     A       Yeah.

14     Q       If you're anything like me, on Sunday morning we

15     sometimes like our Sunday paper.  And I smoke way too much.

16     So at about 8:00 o'clock in the morning I've got a cigarette

17     in one hand, a cup of coffee in the other hand.  I go to the

18     upstairs window, because I don't want to open the door and

19     get cold unless it's necessary.  It's obviously winter.  And

20     I'm looking for the footprints in the snow.  I see footprints

21     from the house next door to my door to the house on the other

22     side.  Well, I infer that it's the paperboy and that's my

23     Sunday paper.  That seems reasonable, doesn't it?

1    A        Uh-huh.

2    Q        Until I go to the door, I open the door expecting my

3    Sunday paper and there's my Giant Eagle coupons.  You have to

4    test all inferences that you're asked to make.  And will you

5    do that during this trial?

6    A        Yeah.

7    Q        Now that I've taken a lot of your time and asked you

8    some rather hard questions, is there anything that's popped

9    into your mind that you would like to discuss with any of us?

10   A        No.

11   Q        I thank you for your time and attention, sir.

12                    THE COURT:  Gentlemen approach, please.

13                    (Whereupon, a discussion was held off the

14   record.)

15                    THE COURT:  Mr. Lanam, you're going to be

16   in the poll from which this jury will be selected.  You

17   should call back this Friday after 4:30 to see what

18   instructions we have for you.  This is going a little bit

19   slower than we anticipated.  It maybe over into the following

20   week before we actually get the jury in here to be picked.

21   But we're trying.

22            But again, I remind you not to read anything,

23   discuss anything about the case.  And we thank you for your

```
 1    participation.  So call that number after 4:30 Friday night.

 2    A        All right.

 3                        THE COURT:  Thank you, sir.  Let's take a

 4    ten minute break, folks, and we'll get this last lady in

 5    here.

 6                    (Whereupon, a recess was taken.)

 7                            *  *  *

 8    WHEREUPON,

 9                      NANCY J. MARSH-McGARRY

10    being first duly sworn, according to law, was examined and

11    testified as follows:

12                          EXAMINATION

13    BY THE COURT:

14    Q        Good afternoon.  Ma'am, you read the handout that

15    was given to you?

16    A        I have a few questions.

17    Q        That should bring you up to speed pretty much with

18    the details.  But this case, as you know, involves two counts

19    of aggravated murder with specifications.

20            In Ohio, just because a person murders someone does

21    not necessarily mean that they face the death penalty.

22    A        Which seems to me the opposite.

23    Q        How is that?
```

1    A      Well, why wouldn't it be that that alone would be

2    enough? I mean, if you're going to believe that death is the

3    way to go, then why wouldn't just murder be enough? Why does

4    it have to be a bundled robbery?

5    Q      The law in Ohio is not an eye for an eye. The

6    Legislature has seen fit to say that if you murder the

7    Governor under an aggravated murder circumstance, that that

8    qualifies you for the death penalty. If you murder a

9    policeman. And as in this case, if you commit what we used

10    to call the old felony murder doctrine, if you're in the

11    commission of a robbery, you have a gun, that's a felony, and

12    you end up shooting somebody as a result of that robbery,

13    intentionally pre-planned or not, the mere fact you're

14    committing another felony and you do murder at that time,

15    that qualifies you for the death penalty. You'll have to

16    listen to the instructions on what does or does not. But the

17    point is that all murderers do not face the death penalty.

18    A      So unintentional is worse than intentional under the

19    penalty?

20    Q      No. To make it aggravated robbery there has to be a

21    prior calculation and design.

22    A      But not of murder? Just of the robbery you're

23    saying?

1    Q        No.  Let me start it this way.  At the proper time

2    we'll give you all the if, ands and don'ts and buts.

3           The point you have to take into consideration right

4    now is that Miss Roberts is charged with aggravated murder

5    with specifications.  That means that the state of Ohio has

6    to go through a trial on the aggravated murder portion with

7    the specifications.

8           Now, if the State is able to prove all elements

9    beyond a reasonable doubt, then this jury would return a

10   finding of guilty.

11          If they failed to do that, then the jury would

12   properly return a verdict of not guilty.  If the jury found

13   beyond a reasonable doubt that Miss Roberts was guilty of all

14   elements of the crime of aggravated murder with the

15   specifications, then you would go to a second phase.

16          At that second phase the burden is always on the

17   State.  They would have to prove beyond a reasonable doubt

18   that the aggravating circumstances, that is the reasons why

19   the jury should consider and impose the death penalty,

20   outweigh any mitigating factors.

21          Mitigating factors would be reasons why the jury

22   should temper that decision and not impose the death penalty.

23          Now, you have, we've had people on both sides of the

 1  │ spectrum here already.  Some believe that anybody who commits
 2  │ murder should lose their life.  That's not the law of Ohio.
 3  │ Such a person could not be fair to the Defendant because that
 4  │ isn't the law.

 5  │        Other people could never see themselves engaging in
 6  │ any activity where they had to make a decision concerning a
 7  │ person's life.  That person couldn't, that type of person
 8  │ could not give the State a fair trial.  Because the State in
 9  │ this case is entitled to ask for the death penalty.

10  │        Now everybody we pick on this jury is going to have
11  │ some opinion on the death penalty, some more in favor, some
12  │ less.  That's natural.  But the assurance that must be given
13  │ to each side here is that whoever sits on this jury is able
14  │ to set aside their own view and follow what the law is.
15  │ That's a pretty big thing to ask if people have very fixed
16  │ opinions.  But I suspect most people don't have that strong
17  │ an opinion one way or the other.

18  │        All that they're asking you to do is to state what
19  │ your opinion is.  Whatever your opinion is, you're entitled
20  │ to it.  We will respect it.  But they have to know of each
21  │ juror whether or not they would be able to consider the death
22  │ penalty if the situation arises -- it may not -- and if
23  │ they're able to do it according to the dictates of the law.

1    The other area of inquiry will be concerning any

2    pretrial publicity you may have been exposed to.  A good many

3    of the people here, some had really, I don't think knew

4    anything about the case.  Others have read something about

5    it.  Some more than others.  And we can't avoid that.  But

6    the question is, have you read something that has fixed your

7    opinion to the point where you're not able to set that aside

8    and listen to the evidence and let the evidence be the

9    determining factor of guilt or innocence?  Okay?

10   A       Am I answering you or them?

11   Q       Do you have a question?

12   A       No.

13   Q       They're going to ask you questions.  Mr. Bailey for

14   the prosecution or Mr. Becker, which is it?

15                   MR. BAILEY:  Yes, Your Honor.  Thanks.

16                          EXAMINATION

17   BY MR. BAILEY:

18   Q       Good afternoon, Mrs. Marsh-McGarry.  Your name is

19   hyphenated?

20   A       Yeah, but you can just use Marsh.

21   Q       Is it Mrs. or Miss?

22   A       Ms.  But Nancy would be okay just to eliminate this.

23   Q       I don't want to be presumptuous.  My name is Ken

1889

1    Bailey, as you know.  I'm an assistant prosecutor from the

2    Trumbull County Prosecutor's Office.  And as I promised you

3    the other week, I'm joined by Chris Becker in our office

4    who's also an assistant prosecutor.  And the two of us are

5    responsible for prosecuting this particular case.  Okay?

6         And as the Judge said, the reason we ask these

7    questions of the jurors is we want to make sure the folks who

8    are selected to sit as jurors can be fair and impartial to

9    both sides, both to the Defendant and to the people of the

10   State.  We're not asking these questions because we're snoopy

11   and we like to pry into your opinions and your background,

12   your experiences.  Okay.  So that's, that's why we're asking

13   this.  Also, there aren't any right answers.  There aren't

14   any wrong answers.  They're only open, candid answers.

15        Another thing I want to point out is, if we run into

16   each other out in the hall or elevator, restaurant or

17   something, we're not allowed to have any communication with

18   you during the course of the proceedings.  And if this case

19   goes into two phases, that would encompass both phases.

20   Okay.  And we're not trying to snub you or be antisocial.

21   It's just that under our rules of conduct we would end up in

22   big trouble if we started talking to you other than saying

23   good morning or good afternoon.  And it could cause a

 1  mistrial.  So we don't want to do it all over again.

 2  A       Furthermore, you don't know me so there would be no

 3  reason for you to talk to me.

 4  Q       Right.  I mean, unless to say good morning or

 5  something.

 6  A       Yes.

 7  Q       If you do have any questions that come up during

 8  these proceedings direct them to the bailiff.  She's not here

 9  now but she'll be here, Laurie brown, or Richelle or to the

10  Judge.  If you have any questions during -- this is sort of a

11  give and take right now.  I notice you were asking some

12  questions of the Judge.  And the same thing holds true with

13  us.  If you have any questions as to what we're asking or

14  what we're doing, feel free to ask them because this is the

15  only chance you get until the case is all over.  Okay?

16       The Judge said that we're going to be directing our

17  questions to two major areas at first.  The first question is

18  pretrial publicity.  And the second area deals with your view

19  on the death penalty.

20       Before we get into that, let me ask you about two

21  different things that you had brought up on your

22  questionnaire.  You know Jerry Ingram's brother.  Is it Tim?

23  A       Yeah.

1     Q       How do you know him?

2     A       Just around.

3     Q       Pardon?

4     A       Just from being around, I guess, north side.

5     Q       You mean you grew up together?

6     A       No, no, no.  I think I indicated acquaintances would

7     be the --

8     Q       I mean, you see each other at school functions or

9     what?

10    A       No.

11    Q       How do you, how are you acquaintances?

12    A       Probably through family friends.  Mutual friends.

13    Q       Has he ever discussed Attorney Ingram's cases?

14    A       No.

15    Q       There's nothing about that relationship that would

16    affect your ability to be fair and impartial to both sides?

17    A       No.

18    Q       Now there --

19    A       I thought I had, I just thought I had to disclose

20    that.

21    Q       You mentioned sequestration might be a problem.  You

22    have a 12-year old son; right?

23    A       Yeah.

1892

```
 1    Q        And your, because of your husband's job -- he's been

 2    in the fire department over there as a battalion chief for

 3    how long, approximately?

 4    A        Seven years maybe.

 5    Q        Now, he's on call for what, several days at a time?

 6    A        He works 24 on and 48 off.

 7    Q        If you were to be sequestered, let's say this case

 8    went through a second phase.  Well --

 9    A        I'm thinking now it's going to be like June; right?

10    I mean, when is this going to get underway?

11    Q        This is April, May.  I hope it would be in May.  I

12    really don't want to be here in June.

13    A        I was just thinking about school timing so --

14    Q        Okay.  Let's say that we start this trial in two

15    weeks, which would be like the beginning of May, May 5th or

16    something like that.  I'm just guessing.

17    A        Right.

18    Q        And the case would take a week or a week and a half

19    or up to two weeks maybe.  At the conclusion of the first

20    phase the jury would be sequestered.  And you would take

21    that, I take it you would take as long as it would take to

22    deliberate; right?  You wouldn't rush your deliberations

23    because you have a son at home?
```

1893

1    A        Uh-huh.

2    Q        When we say you would be sequestered, some juries

3    take a couple of hours.  Some juries take up to a week in

4    deliberating.  If you and the other jurors found the

5    Defendant guilty of aggravated murder with one or more of

6    these special findings of fact, specifications, then we would

7    have to go into a second phase.  And that would generally

8    take anywhere from one to three days, and then you would be

9    sequestered again.  During that second sequestration that

10   again could take anywhere from a couple of hours to maybe a

11   week.

12   A        Let me go back.  There's sequestering after the

13   first phase --

14   Q        And the end of the second phase.

15   A        Considering the mitigation and aggravation?

16   Q        What the punishment would be.  The first phase deals

17   with guilt or not guilty.

18   A        Then is the aggravation or mitigation.  Are you

19   saying --

20   Q        If she's found guilty of aggravated murder and one

21   or more of these specifications, then we would go to a second

22   phase and you would end up getting sequestered.

23   A        During the second phase, and then furthermore into

```
 1      the sentencing; is that what you're saying?  Or the

 2      sentencing is just part of the mitigation?

 3      Q       Well, that --

 4      A       I've got it.

 5      Q       We call it a mitigation hearing.  And really it's a

 6      second phase.  But you would only, you would have to

 7      deliberate again at the end of that phase to see if we prove

 8      -- you've got to do a balancing test.  You have to decide if

 9      these aggravating circumstances, the special findings of fact

10      that would make her eligible for the death penalty, outweigh

11      any mitigating factors that are presented.  Okay.

12              If you and the other jurors find that the

13      aggravating circumstance or circumstances outweigh these

14      mitigating factors, and we don't know what these are at this

15      point because it's not relevant at this point.  But there are

16      things that can be brought out in the Defendant's favor that

17      would mitigate against the death penalty as a punishment.

18      But if you find the aggravating circumstances outweighs the

19      mitigating factors then you have to come back with a death

20      penalty verdict beyond a reasonable doubt.

21                      MR. INGRAM:  Objection.

22                      THE COURT:  What is your objection?

23                      MR. INGRAM:  He did not state the burden
```

1895

```
 1    of proof.  He just said if they find that the aggravating
 2    circumstances outweigh the mitigating factors.
 3                    MR. BAILEY:  I think I added beyond a
 4    reasonable doubt at the end of that.
 5                    MR. INGRAM:  That's why I objected.  I
 6    don't think he did.
 7                    THE COURT:  It's beyond a reasonable
 8    doubt.
 9    Q       If we prove beyond a reasonable doubt that the
10    aggravated circumstance or circumstances outweigh the
11    mitigating factors, then you and the other jurors have to
12    come back with a death penalty verdict.  And you would have
13    to be, during that second phase when you're making that
14    determination you would be sequestered again.  Okay.  That's
15    two times you would be sequestered.
16    A       That's what I was --
17    Q       Would that cause an undue hardship for you?  I mean,
18    would the fact that your husband's working and he's on for 24
19    hours and off for 48, I mean, if you had to go for three or
20    four days in your deliberations, would that affect your
21    ability to concentrate on the evidence and deliberate and
22    give both sides a fair shake, or would you find yourself
23    rushing to judgment?
```

1    A        I don't know.

2    Q        Because that could happen twice.  And the reason I

3    ask it --

4    A        I know you're pinning it on my son.  I don't mean to

5    be glib but I just think that being sequestered period is

6    going to be stressful.  That just sounds like a stressful

7    situation.

8    Q        It may or may not be.  I mean, of course -- have you

9    ever seen --

10   A        When you're cut off from your normal life.  And I

11   know that must sound trivial.

12   Q        Some people find it stressful.  Some people find it

13   sort of a break away from their regular family functions.  It

14   depends on your family life, I suppose, and what you have to

15   do every day.  If you've got a million students that are,

16   that you've got to teach and prepare, grade tests and stuff

17   like that it would be a different type of thing that you

18   could do.

19   A        And again, not to be glib or crass, it would be my

20   work as much as my kid that I would be anxious about, I

21   think.  Would that keep me from deliberating?  I mean, if

22   that's --

23   Q        Would it rush your deliberations?  Do you think it

1897

```
1    would affect your ability to deliberate?

2    A        I don't know.  I don't know.  I'm --

3    Q        The reason I'm sort of pushing you on this --

4    A        I know.

5    Q        Because let's say you're selected to sit on the jury

6    and we get down to that point and we're at deliberations.

7    And let's say it's the first set of deliberations and you

8    say, gosh, I think the State has proved its case beyond a

9    reasonable doubt that, that she's guilty of the crimes

10   charged of aggravated murder and a specification, but we're

11   deliberating here.  There may be hundreds of exhibits to go

12   through.  There may be a lot of letters to read.  There may

13   be, you know, 100, 200 letters to read.  It's going to take a

14   lot of time.  We want to make sure we read through all this

15   stuff to make sure we've considered all of the evidence.  And

16   I know my husband was just off and now he's going to be

17   working tomorrow, and we're going to be here.  And I know my

18   12-year old is going to be home.  Do you have anybody who

19   could watch him or take care of him for a number of days?

20   A        Well, we would make arrangements.

21   Q        But would it affect you, you would be so concerned

22   that it would affect you?  Because if you got in there and

23   you say, gosh, I've got to leave, I can't stay.  I'm
```

1898

1   concerned.  You know, it's flu season or something and he's

2   got a bad cold or something.

3   A        I don't know.  I don't --

4   Q        Let's say you were sequestered once and then you got

5   to come back the following week and you're in a situation

6   where you're getting sequestered a second time.

7   A        And I had time off in between?

8   Q        For maybe a couple of days.  And then all of a

9   sudden you're faced with a second sequestration.  And you,

10  and you, and it's going to take some more time to deliberate

11  on the second.

12  A        I don't think that, I don't think there would be any

13  difference between the first or second if there was time in

14  between.  I think it's going to be the duration of which --

15  Q        Let's say with the two sequestrations it could take

16  a total of six days or more.

17  A        Six days doesn't seem so bad.

18  Q        Okay.

19  A        I don't know.  I don't --

20  Q        You're the only one who knows.  You're the only --

21  A        Right.  And I don't know because I haven't done

22  that, so I don't know what it's going to be.  How nervous

23  would I be being away?  I've never been away under that

 1    I-can't-get-out circumstance.

 2    Q        Let's talk about publicity here for a minute,

 3    pretrial publicity.  Now, I noticed in your questionnaire

 4    that you read the Vindicator every day.  And you recollect

 5    something about two other men being involved and one of them

 6    is dead.

 7    A        I think.

 8    Q        When you filled out the questionnaire.  And you also

 9    watch the nightly news on the three local stations 21, 27

10    and 33.  Other than that, you understand the charge here.

11    The Defendant is charged with complicity, being a

12    complicitor, with helping or aiding and abetting or

13    soliciting or procuring another person, a fellow by the name

14    of Nate Jackson, in planning the murder of her ex-husband for

15    insurance money and the theft of a car in the course of

16    aggravated burglary and aggravated robbery.  And that a

17    working gun was used, a firearm.

18          Now, does any of that, those charges ring a bell

19    with what you heard in the news?

20    A        Yes, but not that I had recalled.

21    Q        Okay.  Now, the Judge admonishes you that you can't

22    read the newspapers while this is going on or listen to the

23    news reports.  You have to turn off your TV or walk out of

1    the room or something if it's going on.  And if you read the

2    paper you can have your husband save the newspapers for you

3    and read it at the end of the case.

4         But as you look around the courtroom today, we have

5    a reporter in the courtroom today.  That's unusual.  But

6    you'll notice he's been here for awhile.  And he may be here

7    for a couple more minutes, or he may stay the rest of the

8    afternoon.  But then, again, he may not be.  He may

9    disappear.  And reporters, generally when they come in

10   they're here for a couple minutes, the TV cameras, except

11   they can't film the jurors, but they may be here for three to

12   five minutes.  They may film something that was going on and

13   try to do a feature on it, on the trial based on what's

14   happened while they've been here.

15        Now, you'll notice that they won't have been here

16   for everything that was asked and answered before they got

17   here, or everything that was asked and answered after they

18   left here.  And if you sat on this jury and you had the

19   papers saved, or you taped the TV coverage, you might say,

20   gosh, you know, I sat through Judge Stuard's courtroom

21   through that entire trial, I remember the testimony.  And

22   what I read in the paper is slanted.  It didn't happen that

23   way.  They missed all this stuff that happened before.  They

1   missed the impact of the questions and answers afterwards.

2   And it's a distorted view.  Not intentionally, but because of

3   the nature of the business they have to rush in to print to

4   get it on the air.  That's why the Judge tells you that

5   you're not to read the papers or watch TV stations.

6           Because of that you understand it's important that

7   you get all your information, it's like starting a class with

8   a fresh or a blank slate, and whatever is going to be written

9   on that slate is going to be written here in this courtroom

10  from the testimony of the witnesses and the exhibits that

11  come in and the instructions from the Judge.

12  A       I'm allowed to sensor myself and not read about the

13  case; right?  I'm allowed to read other things?

14  Q       Sure.  But if there's an article in there you have

15  to put that article aside.

16  A       Yes.

17  Q       Right.  No, we're not telling you not to read

18  anything in the paper, like about Iraq or anything else.

19  Just anything dealing with this case you have to push aside.

20  Do you think you could do that?

21  A       Yeah.

22  Q       It may well be that during the course of the

23  proceedings you may hear some testimony that may jog a bell

1   and you may say, gosh, I remember this and this and this from

2   before.  Can you set that aside?

3   A        (Witness nods head affirmatively.)

4   Q        Now let's get to this issue of the death penalty as

5   a possible punishment here.  When was the first time you

6   learned that this was a potential death penalty case?

7   A        I don't remember exactly.

8   Q        Was it when you first came into court a couple weeks

9   ago?

10  A        No.  Just before that.

11  Q        Any idea?  Well, was it through the news media or

12  what?  Through conversation with other people?

13  A        Yeah.

14  Q        Conversations?

15  A        Yeah.

16  Q        At school or at home or where?

17  A        I think socially.

18  Q        Talking with friends?

19  A        Yeah.  When I said I was being called for jury duty.

20  Q        And which friends?  I mean, neighbors or family

21  or --

22  A        I guess it was -- no, it was just social friends.

23  It wasn't school.  I teach in Portage County.

```
1   Q       I used to prosecute there years ago.

2   A       So they don't know anything about over here.  And I

3   really don't follow Trumbull County news all that carefully.

4   So when I said, when I said I was being called for jury, they

5   said, oh, I'll bet it's that case.

6   Q       And did they mention a name?  Like did they mention

7   the name Fingerhut?

8   A       No.

9   Q       Did they mention any names?

10  A       They said they thought this was, that was probably

11  going to be that case.  And I didn't, maybe the names were

12  said but I didn't pay attention to the names because I didn't

13  know.

14  Q       Did they tell you anything about what it was about?

15  A       Nothing more than what I kind of gleaned from the

16  news, not very carefully.  What I said on that paper, I knew

17  it kind of had -- I mean that other name wasn't familiar to

18  me actually.

19  Q       Which name?

20  A       Nate.

21  Q       Nate Jackson?

22  A       Yeah.

23  Q       Now, you have taken some stance on the death penalty
```

1904

1    as a possible punishment; right?  I take it you're, at least

2    reading your questionnaire you're pretty much against it?

3    A        Yeah.  And the way it's explained here it makes even

4    less sense to me.

5    Q        You mean in what?  In the --

6    A        What I'm trying to say that just murder is, has to

7    have the specifications with it, but just murder isn't,

8    that's --

9    Q        You understand that the Legislature writes the

10   crimes.  They're responsible for setting out --

11   A        I'm just trying to understand what the theory is.  I

12   mean, when you say it's not an eye for an eye, then on what

13   possible grounds would it be based?

14   Q        Well, there are different theories.  I think you

15   would agree there are different theories for punishment.  One

16   can be punishment.  One can be deterrence.  One can be

17   rehabilitation.

18   A        Well, and as I suggested, if it's about

19   rehabilitation certainly death is out.  And it's, for

20   deterrence it's not working.

21                    THE COURT:  Let me interject something

22   here.  We live in a republic, not a Democracy, so we delegate

23   to the Legislature the right.  Ohio, from the very beginning,

1905

1    did not adopt common law crimes.  If it wasn't written by the

2    Legislature as a crime it was not a crime.  And through their

3    infinite wisdom they saw fit some years ago to say that we

4    shouldn't kill our Governor.  We shouldn't kill our

5    policemen.  We shouldn't allow felony murders, and a few

6    other things.  And those constitute the death penalty cases.

7    All other murders get life in prison.  But there's no rhyme

8    nor rationale to it except what the Legislature saw fit to

9    impose.

10   Q       So I take it you've expressed a view against the

11   death penalty over the years?

12   A       (Witness nods head affirmatively.)

13   Q       You're indicating yes?

14   A       Yeah.

15   Q       Is that a pretty strong yes or kind of a weak yes?

16   A       Well, as I thought about it, the more I thought, I

17   mean, in recent years the more I thought about it as a, as a

18   reflection of the culture I guess.

19   Q       So your view against the death penalty has gotten

20   stronger over the last several years?

21   A       Yeah.

22   Q       And in reading your questionnaire, if I remember,

23   you felt that the death penalty was statistically applied

1906

 1   unfairly based on race and economic status?

 2   A        Well, I think when I look around the country and

 3   what I do read about it, yes, it doesn't seem to be --

 4   Q        And I take it you've done a lot of reading and a lot

 5   of --

 6   A        Not a lot.

 7   Q        -- considering?

 8   A        I do a lot of considering.

 9   Q        A lot of philosophizing to reach that decision;

10   right?  I mean, it's not a view that you hold lightly?

11   A        It's not something that I would consider lightly.

12   Q        Which?  Your viewpoint?

13   A        The consideration of it.  I mean, I'm still taking

14   in information about it but --

15   Q        But this is a heartfelt belief; right?  You're

16   against the death penalty?  I mean, I take it --

17   A        Yeah.  I just don't think it's working.  I don't

18   know what it's supposed to be doing.

19   Q        Well, philosophically --

20   A        If it's not an eye for an eye, if that's not what it

21   is --

22   Q        Well, it could be.

23   A        When you rule out the other possibilities of what

1  it's supposed to do and they're not doing it, then what's it

2  come down to?

3  Q       It could be, would you agree that society has a

4  right to impose punishment in the most severe cases, for the

5  most severe crimes?

6  A       Uh-huh.

7  Q       Now, if you were, if you had a say in the

8  Legislature, if you could design the criminal justice system

9  in this state, would you include the death penalty as a

10  possible punishment?

11  A       No.

12  Q       Fair enough.  And would you agree it's important as

13  part of our American system of government and of justice to

14  have people with all different types of viewpoints partake in

15  that system?

16  A       Do I think it's important that --

17  Q       All the citizens with different viewpoints --

18  A       Participate in our --

19  Q       -- participate in our system of government, right,

20  in making the determinations?

21  A       Yeah, all 30 percent who vote.

22  Q       No.  I mean everybody.

23  A       Well, we ought to.

1    Q        We ought to.  Okay.  Now, how long have you held

2    this view about capital punishment?

3    A        I don't know.

4    Q        I mean, from when you were a kid in high school?

5    A        No.

6    Q        When did it start to develop?

7    A        Maybe, maybe in college.  Probably when

8    conversations would, you know, when that kind of discussion

9    would be part of the evening's entertainment I suppose,

10   talking about this sort of issue.

11   Q        Which issue?

12   A        Death penalty.

13   Q        This sort of issue?

14   A        Yeah.  Things of philosophical concerns.

15   Q        It's not a religious belief, I take it; right?

16   Because you've chosen not to participate in a formal

17   religion?

18   A        No.

19   Q        What about an eastern philosophy?

20   A        No.

21   Q        Do you follow any eastern philosophies?

22   A        No.  I'm not schooled in anything like that, no.

23   Q        Well, if you wouldn't include the death penalty as a

1    possible punishment, do you think you could partake or

2    participate in making a decision involving the death penalty

3    as a possible punishment?

4    A      Obviously I've been thinking about it since I got --

5    Q      The questionnaire?

6    A      Well, that. And sitting in court hearing all of

7    this when I got the first hint that that's what this was

8    about and why there's going to be such a process of

9    selection, I don't know. I don't know if I could sit here

10    and do that.

11    Q      Okay. Fair enough. That's why we go through this

12    process. I take it you agree it's important that both sides

13    in this trial get a fair shake, both the Defendant --

14    A      Absolutely.

15    Q      You understand there are some folks who can come in

16    here and say, well, if she's found guilty of aggravated

17    murder with one or more of these specifications, I believe

18    that she should automatically get the death penalty, do you

19    understand there are people who believe that?

20    A      Yes. Because -- and if that's the law, I mean.

21    Q      No, that's not the law. It's not an automatic --

22    A      Not automatic.

23    Q      But you agree, it wouldn't be fair to have somebody

1   sitting on this jury who would automatically impose the death

2   penalty if they found her guilty in the first phase; right?

3   A       Right.

4   Q       It wouldn't be fair to the Defendant?

5   A       Right.

6   Q       And by the same token, if we, the State is also

7   allowed to have a fair trial, and have people fairly consider

8   the punishments in this case.  And it's because we have

9   people with all different types of viewpoints in this

10  country.  It's important to know, and you're the only one who

11  really knows how you feel, whether somebody can actually come

12  back with a death penalty verdict in an appropriate case.

13  Okay.  So you would agree with that, it's important to know?

14  A       Yes.  I understand this process.

15  Q       So you think your opposition to the death penalty,

16  can you picture any situation where the death penalty would

17  be appropriate?

18  A       I tried to do that, too, and I just can't.

19  Q       That's fair enough.  There are a lot of people in

20  this country who feel that way.  It's part of our system.

21  A       I mean, I want to be --

22  Q       Fair and honest; right?

23  A       Right.

1    Q        And do you think that knowing that if you and the

2    other jurors -- well, let's say you got the first phase of

3    the case.  The first phase deals with guilt or non guilt.

4    And these crimes, the Judge is going to instruct you as to

5    what these crimes are and what the elements are, the

6    essential component parts of the crimes, like the ingredients

7    in a recipe.  If we proved all those elements of the crime by

8    proof beyond a reasonable doubt so that you're firmly

9    convinced of the truth of the charge to a moral certainty,

10    moral certainty using your reason and your common sense,

11    let's say we convince you of that, that she's guilty of

12    aggravated murder and one or more of these specifications of

13    aggravating circumstances, that the aggravated murder

14    occurred using prior calculation and design, and that it was

15    during the course of an aggravated burglary, and that it,

16    using prior calculation and design, it was part of an

17    aggravated robbery.  Okay.  There are two possible

18    specifications, special findings.

19          Let's say we convince you of that beyond a

20    reasonable doubt, do you think that your opposition to the

21    death penalty is such that it would substantially affect your

22    ability to sign a verdict form finding her guilty in the

23    first phase knowing that if you did so it would make her

1   eligible for the death penalty in the second phase?

2   A       Do you know what I'm honestly thinking right now?

3   That I could, I could find guilty but that I would, I'm sure

4   that I could get into that room and convince them not to

5   sentence to death.

6   Q       Okay.  So what you're saying is, you think you would

7   be able to sign a guilty verdict in the first phase, but

8   let's say we get --

9   A       Knowing that I have other options and I have to

10  convince them too.

11  Q       Okay.  So if I understand what you're saying, you

12  could participate in the first phase okay, right, without

13  being unduly influenced by your anti-death penalty feeling,

14  you could return a guilty verdict in the first phase?

15  A       Because I absolutely have those other choices,

16  right?

17  Q       Well, that's the thing.  If you get to the second

18  phase and then -- in the second phase that deals with the

19  issue of punishment, what's the appropriate punishment for

20  this crime for this Defendant, and not guilty or non guilty

21  because you've already decided guilt.  So in the second phase

22  the issues would be these aggravating circumstance or

23  circumstances on one side of the scale.

1    A        But there's none of them that eliminate the other

2    possibilities.

3    Q        Well --

4    A        Just imprisonment.

5    Q        If you find, you and the other jurors find in this

6    weighing process that the aggravating circumstance or

7    circumstances outweigh beyond any reasonable doubt any

8    mitigating factors presented, then you must return a death

9    penalty verdict under the law.

10   A        You know what else?  I can't imagine that there

11   aren't mitigating circumstances.

12   Q        Well, but then again it's a question of weight.

13   A        Give me an example of weight.

14   Q        How much do these things weigh?  It's a balancing

15   test.  So it's entirely up to you and the other jurors how

16   much weight to give to these mitigating factors and the

17   aggravating circumstances.

18            You can decide it has a whole lot of weight or it

19   might weigh about as much as a feather.  But do you think

20   your opposition to the death penalty as a punishment is such

21   that it would effect your ability to fairly weigh these

22   factors, that you would automatically come back with a life

23   sentence and against the death penalty even if we proved that



1   the aggravating circumstance outweighs the mitigating factors

2   beyond a reasonable doubt?  Let's say we proved our case to

3   your satisfaction.

4   A       Yes.

5   Q       Would you be --

6   A       But even proving your case doesn't warrant the death

7   penalty.

8   Q       No.  If we prove --

9   A       It's not automatic.

10  Q       It's not automatic.  You have to do a balancing

11  test.  You have to have a second phase.  But let's say we go

12  into that second phase and we convince you, so intellectually

13  you know in your mind, in your heart that we proved our case

14  that the aggravating circumstance or circumstances outweigh

15  these mitigating factors beyond a reasonable doubt, then

16  would you ignore that and not be able to follow the Judge's

17  instruction of the law and go into the second, go into a life

18  verdict?

19  A       I might find that my mitigating beliefs would

20  outweigh --

21  Q       Your mitigating beliefs outweigh the law; is that

22  what -- am I right?  Pardon?

23  A       Yeah, I'm trying to imagine me sitting there and

1    that being the --

2    Q       Because remember, if you get picked for this jury

3    and we get to that point, the State wouldn't have a fair

4    trial.  They wouldn't have their day in court if you would

5    automatically come in with a life verdict, if you can't

6    fairly consider the death penalty and return that type of a

7    verdict if we prove our case beyond a reasonable doubt.

8    A       Because that's what's being, I mean, that, that's

9    what, that's where you start is with the death penalty?

10   Q       Yeah.  You start out --

11   A       That's where the law starts there and it goes down

12   from that?

13   Q       Well, you can consider all the penalties but --

14                   MR. INGRAM:  Objection.

15                   THE COURT:  Just a minute.  What's your

16   objection?

17                   MR. INGRAM:  Mr. Bailey is saying you

18   start out with the death penalty and you do not.

19                   THE COURT:  Rephrase.

20   A       So I don't.  I have all of those options open right

21   from the start.

22   Q       But you have to do a weighing test, a balancing

23   test.  And when you do this balancing test --

1    A       It will never weigh to that.

2    Q       You're saying, you're telling us it will never weigh

3    in favor of the death penalty no matter what the evidence is

4    in your mind?  I mean, you've got to be candid here.

5    A       Right.  And I think that there, that's why I'm

6    saying, I think that just the mitigating circumstances would

7    be my belief that that's not an appropriate choice.

8    Q       Are you saying that you wouldn't be able to fairly

9    weigh the aggravating circumstance then, that the mitigating

10    factor is always going to weigh heavier or come into balance

11    with the aggravating circumstance because you have that

12    option?

13    A       For the option of sentencing, yes.

14    Q       Is that what you're saying?

15    A       Right.  That I'm going to go for --

16    Q       Life sentence?

17    A       -- B, C or D, yeah.

18    Q       You'll never come back with a death verdict if I

19    understand; that's correct?

20    A       Yeah.

21    Q       Okay.  Thank you.

22                 THE COURT:  Any questions?

23    A       Because that's not the only thing that's out there.

1    THE COURT:  Do you have any questions?

2                              EXAMINATION

3    BY MR. JUHASZ:

4    Q        Miss Marsh, how are you doing?

5    A        Good.

6    Q        It doesn't look like it.  Do you need some water or

7    something?

8    A        No.

9    Q        I'm John Juhasz.  That's Jerry Ingram.  He and I

10   represent Donna Roberts.  You seem a little bit frustrated

11   and I want to -- believe me, nobody --

12   A        I just think this is really hard.

13   Q        It is hard.  Jerry is fond of saying --

14   A        I mean, you're asking me about questions about how I

15   feel about being sequestered, and I'm thinking we're saying

16   this in front of somebody who's --

17   Q        Jerry is fond of saying that if any of the lawyers

18   were sitting up there asking the questions that you're being

19   asked --

20   A        And you never do.

21   Q        We learned that in law school, by the way, where

22   professors get to pick on people, and we just sort of carry

23   that through during voir dire because we didn't like being

1   picked on when we were in law school, so our chance to get

2   even is in voir dire.

3   A        You know, and I really don't want to trivialize that

4   but could you spell that?

5   Q        Spell what?

6   A        Voir dire.

7   Q        Yes.  V-o-i-r, second word, d-i-r-e.

8                    THE COURT:   To speak the truth.   French.

9   Q        Let's do a couple of ground rules.  First of all, if

10  I say something that you don't understand what the heck I'm

11  talking about, stop me.  Okay.  Because you're, in my

12  opinion, really trying to get this and understand it.   And

13  I'm going to tell you something, and I'm not kidding when I

14  say this, a good chunk of the lawyers in Ohio don't know what

15  we're talking about when we do this.  I mean, there's lawyers

16  out there who do real estate and personal injury law and when

17  you're talking about the death penalty and how all this

18  works, they don't know what we're talking about.

19             So my only point there is, don't feel bad about that

20  because we're hitting you with a whole bunch of new stuff and

21  trying to see if you understand it, and trying to ask you

22  what the heck you would do in a given situation.  Okay?

23             We're not, nobody here is trying to change your

1    opinion. We just want to see if there's something about your

2    opinion that's either going to allow you or prevent you from

3    being a juror in this case.

4    A       And realize this: That my opinions have been just,

5    have been formed, I think I said they've been formed out

6    there.

7    Q       That's okay.

8    A       And it's easy to hold them, you know. Now my

9    opinion is on trial, and I know there's not a right or wrong

10   but that's what's being challenged. I mean, that's what I'm

11   having to decide, what is it? How far will I, how far does

12   this go, I guess is my thinking.

13   Q       I want you to understand, your opinion is not being

14   challenged. It's not on trial. It's not on trial.

15   A       I know. It's my thinking, thinking it through an

16   application instead of just in theory.

17   Q       And I'm going to tell you something. We've been

18   doing this now for a little while, as you probably know.

19   We're not close to being done, to be honest with you. And

20   we've had a range of people. So I don't want you to think

21   that just because you think a certain way or because you

22   formed your opinion out there. We have people come in here

23   who feel badly, you know what? I read about this case.

1    Well, you know what?  When you were reading the

2    paper you didn't know you were going to get a jury summons.

3    Don't feel bad about it.  Okay.  But we have to ask the

4    questions.  And if you end up not serving on this case you're

5    going to join a long list of people.  Don't feel bad about

6    that either.  I want to ask you a couple of things.

7    First of all, before I forget, the week before last,

8    April the 8th when you first came in, do you remember being

9    down in Judge Logan's courtroom down at the other end of the

10   hall?  Do you remember where you were seated or standing that

11   day?

12   A    Uh-huh.

13   Q    Can you tell me?  If you go in the double doors --

14   A    I was on the left side.  They had already filled up

15   the benches and there were some chairs up front.  And there

16   was one woman sitting on the first seat and nobody else, so I

17   went up and sat in the second seat.

18   Q    Let me see if I have this straight.  When you go in

19   the doors, you would have gone off to the left side of the

20   courtroom?  Actually as the Judge came out on the bench, you

21   would be on his right then?

22   A    Yes.  Does that mean something?

23   Q    No.  It's probably easy to get paranoid sitting in

```
1    that chair with lawyers and judges asking you questions.  I

2    just wanted to to make sure that I understood where you were.

3    And you were up closer toward the front because the seats

4    were all filled up?

5    A        Right.

6    Q        Did you, that morning, other than what Judge Stuard

7    said when he was telling you about the case, did you hear

8    anybody else in the courtroom talking about the case?

9    A        Uh-huh.

10   Q        Can you tell us about that?

11   A        There were two or three women, I couldn't tell,

12   behind me who had apparently read in detail.  And they were

13   really -- I think, again, as I said on my paper, I know I

14   read a lot, but a lot of it just goes in and out.  I don't

15   pay that much attention to this county.  So they had a whole,

16   they brushed me up on the newspaper readings more than

17   anything.

18   Q        Tell me about that.  What do you remember them --

19   A        Well, I think that's where I heard the name

20   Fingerhut.

21   Q        Down there?

22   A        But I still didn't hear that other name that showed

23   up on the paper when I took it home to fill it out.
```

1922

1  Q        Nathaniel Jackson?

2  A        Yeah.  I think maybe they were talking about e-mail.

3  Q        Okay.  E-mail in connection with the case?

4  A        Yeah.

5  Q        If you remember, was this before or after Judge

6  Stuard came off the bench?

7  A        Before.  We were quiet once he came in.

8  Q        We always are when Judge Stuard comes into the

9  courtroom.  Other than, you seem to remember something about

10 e-mails, you said that they sort of brought you up to speed.

11 And I have the impression from your questionnaire that you

12 kind of read some things about the case?

13 A        Yeah.  But it seemed like it was a long time ago.

14 Q        And now these ladies obviously seemed to know

15 obviously more about the case than you do?

16 A        Oh, yeah.

17 Q        And the way you say, oh, yeah, tells me they had

18 quite a bit of information?

19 A        Well, they talked about a lot of things.  They were

20 retired and --

21 Q        All right.  I'm less interested in that because --

22 A        I wasn't listening to all of it, but I know they

23 were, why we were all here and that sort of thing.

1   Q       Specifically about this case, do you remember

2   anything that they said?

3   A       No.   That I could, you know, say infiltrated my

4   opinion, no.   I can barely remember what they said.   I mean,

5   I didn't walk away with any impression that oh, boy, I don't

6   want them on this jury, nothing like that.

7   Q       But they did seem to know what case they were there

8   for?

9   A       Yeah.

10  Q       Do you remember how many of them were talking?

11  A       As I say, I kind of glanced once.   I saw two women.

12  I don't know if a third one joined them or not.

13  Q       Anything else you remember about them?   What they

14  looked like?   What they were wearing?

15  A       One woman had short gray hair.   The other one was

16  directly behind me so I didn't see her.   Not particularly

17  well put together.

18  Q       Not particularly --

19  A       Well put together or anything.   Just ordinary.

20  Q       Have you seen either of those people in the

21  courthouse since you've been coming back for this service or

22  anything like that?

23  A       No.   Are you kidding?   There's nobody out there.

```
 1    I'm the last person here, I'm pretty sure.

 2    Q        Well, sometimes we've had some jams and people have

 3    spent some time together.  You haven't seen them in a

 4    situation like that?

 5    A        No.  And frankly, I wouldn't recognize them if I

 6    did.

 7    Q        Did either of them express an opinion about Miss

 8    Roberts or about Mr. Jackson, anything like that?

 9    A        No.

10    Q        Let's talk for a couple of minutes about this thorny

11    death penalty issue.  And all I want to do is, first of all,

12    make sure that you understand generally how the process

13    works.  And do you think you're okay with that or do we want

14    to spend a couple minutes talking about that?

15    A        I'll ask questions if it comes up.

16    Q        All right.  You've probably heard the phrase before

17    taking the Fifth; correct?

18    A        Uh-huh.

19    Q        We're not going to talk about what all that means

20    right now, but I'm going to ask you to sort of take as a

21    given, in a criminal case that means that the government

22    always has the burden of proof.  They either prove the case

23    or they fail to.
```

1    A       Without me?

2    Q       Without you or without us.  Without the defense.  We

3    don't have to do anything.  They either convince you of the

4    correctness of their case by what we call proof beyond a

5    reasonable doubt, and if that's the case then they win.  You

6    find the Defendant guilty.  But if they don't do that you

7    find the Defendant not guilty.  All right?

8    A       Okay.

9    Q       You have to do that.  And I'm going to step away

10   from this case for a second.  I think Judge Stuard mentioned,

11   he's been mentioning to some of the jurors that one of the

12   reasons that the Legislature has said that a murder is more

13   serious to warrant consideration of the death penalty as a

14   possible punishment is if the person you kill is the

15   Governor.  Okay?  Now, you and I may agree or disagree with

16   that.  It kind of doesn't matter because the Judge or any of

17   the lawyers in this room could tell you that, all of us who

18   practice law have certain areas of the law where we just

19   don't personally agree with what the law is.  But because we

20   all have to play by the same set of rules to make everything

21   fair for everybody across every case, I can't come in here

22   and say, for example, well, you know, Judge, I know this is a

23   death penalty case but I don't personally believe in the

1    death penalty so therefore I refuse to do anything in this

2    case.  That would not be fair because we have to make the

3    rules work the same in every case.  Am I making sense to you?

4    A      Uh-huh.

5    Q      So whether we think that's a good idea or not, one

6    of the things for which you can get the death penalty is if

7    they killed the Governor.  The State, in a case like that,

8    would have to prove two things to you beyond a reasonable

9    doubt at the first phase of a trial, which really pretty much

10    works like any other criminal trial, any robbery or

11    shoplifting or anything.

12    First they would have to prove to you that that

13    person killed a guy named Bob Taft.  And then secondly they

14    would have to prove to you that Bob Taft was the Governor.

15    And I like to use that example because, see, they have to do

16    it with evidence.  You can't just sit there and go, well, I

17    live in Ohio, I know that Bob Taft is the Governor.  They

18    have to prove it to you.  All right?

19    A      Uh-huh.

20    Q      Interesting.  You seem to be pondering that.  But

21    they would in a case --

22    A      Prove identity.  Well, that shouldn't take too long.

23    Q      No.  It would be fairly easy to do.  But they just

```
1    may forget to do it.  They may say to themselves, what the
2    heck, everybody knows Bob Taft is the Governor.  And if the
3    jurors are really doing their job they're going to go, yeah.
4    But those folks, they have to do it with evidence and they
5    didn't do it, so therefore I might find the person guilty of
6    murder but not guilty of the specification.  And the
7    specification would be that additional allegation that, not
8    only did you commit murder but you killed the guy who was the
9    Governor of the state of Ohio.  Are you okay with all that?
10   A       Go on.
11   Q       If they prove both of those things, if they prove an
12   aggravated murder, and if they prove a death penalty
13   specification, a reason to go to a second phase, then that's
14   what happens.  The jury comes back and goes to a penalty
15   phase.
16           If at the first phase they either don't prove that
17   the person, they don't prove the aggravated murder, well,
18   then what happens?  You find the person not guilty and
19   everybody goes home; right?  No need to have a penalty trial
20   for somebody who's found not guilty; correct?
21   A       Uh-huh.
22   Q       Or maybe they proved the person guilty, as I said
23   before, but not guilty of the death penalty specification.
```

1928

1    They forget to prove he's the Governor.  They assume

2    everybody knows so they don't bother proving it and the jury

3    does their job and says they didn't prove it to you.  I find

4    that Juhasz killed a guy named Bob Taft, but I find him not

5    guilty of the specification, that he killed the Governor of

6    the state of Ohio.  Are you okay with that?

7    A        And the intent and the reasons behind it don't enter

8    into that first phase?  That doesn't come until you're

9    considering the aggravation, what brought it about?  I mean

10   isn't intent --

11   Q        I don't want --

12   A        Did I kill Bob Taft in my car, or did I do it with a

13   handgun?

14   Q        I don't want to go too far down this path because I

15   won't be allowed to.  But for present purposes I'll tell you

16   that the Judge gives you the instructions about what

17   constitutes aggravated murder.  It is basically that a person

18   purposely and with prior calculation and design, what we used

19   to call premeditation, purposely causes the death of another.

20   All right?

21   A        Okay.  And is that separate from the other

22   specifications?  Could it have been brought just at -- is

23   there just aggravated murder?

1   Q       Yes.

2   A       Does that stand alone ever or are there always these

3   other attachments?  So people can be --

4   Q       That's right.

5   A       -- just killing to kill.

6   Q       Right.  In fact, let me give you --

7   A       Without robbery or anything else attached?

8   Q       Right.

9   A       And does that charge also have a death penalty?

10  Q       No.  So let me try to do this for you.  You don't

11  like it.  It doesn't make any sense to you?

12  A       It makes no sense.

13  Q       But it's the law.

14  A       It seems to me with those attachments the mitigation

15  is that it was, it was a robbery that went bad and it ended

16  up with a killing.  I mean that's, that's what that's open

17  for it seems to me.  In other words --

18  Q       Let's try to do it in stages and then we'll talk

19  about mitigation.  First of all, if I pull out a gun right

20  now and shot my buddy Jerry, that would be murder.  I

21  purposely caused his death.  I pulled out a gun and shot him

22  and killed him.  Okay?

23  A       Uh-huh.

1930

1     Q       I can't get the death penalty for that. We call

2     that just plain murder in Ohio. Aggravated murder is murder

3     plus prior calculation and design. Say I killed Jerry

4     tomorrow, because today I go, you know, Jerry has been

5     getting to me this whole damn trial, and tomorrow I'm

6     bringing a gun and I'm going to plug him, and I do. Now I

7     have purposely caused his death, which is murder, plus

8     because I thought about it, because there was prior

9     calculation and design, now the law calls it aggravated

10    murder. I still can't get the death penalty for that. I go

11    to jail for a very long time for both of those offenses but I

12    can't get the death penalty. Right or wrong, the Legislature

13    has said that it's only if you take an aggravated murder and

14    something else with it that makes it serious enough for

15    consideration for the death penalty.

16    A       Then they don't really believe in it either.

17    Q       Well, I would love to sit down and have a cup of

18    coffee with you some time and talk about the death penalty,

19    because you have a lot of interesting views. And you may

20    well be right about that. But as Judge Stuard said, it's the

21    law and that's what we have to deal with.

22            Now, if you find in my imaginary example before

23    where I'm charged with killing the Governor, if you find me

1    guilty of killing the guy and they prove that he was the

2    Governor when I killed him, now you found me guilty of both

3    of those things, then we would go to a second phase.  And now

4    you would have to decide punishment.  And you would have to,

5    to do essentially two things.  You would have to take the,

6    what the law calls the aggravating circumstances, the reason

7    to consider imposing the death penalty -- and let me give you

8    a little bit of help here because the aggravating

9    circumstances at the second phase is actually the

10   specification from the first phase.

11          So when we go to the second phase in my imaginary

12   trial and the State stands up and says, give Juhasz the death

13   penalty, and they're going to tell you why.  They're going to

14   say, look, he was the Governor.  That's the aggravating

15   circumstance, that specification.  Okay?

16   A      Okay.

17   Q      My lawyers will stand up and say, don't give Juhasz

18   the death penalty.  There could be a million reasons.  Maybe,

19   you know, I've got some mental problems and I thought Bob

20   Taft was a martian, whatever it is.  Maybe I had a bad

21   childhood, you know.  Maybe I was --

22   A      Maybe you're in education.

23   Q      But whatever those reasons would be, then you have

1932

1    to weigh them.  And Mr. Bailey was right, you have to weigh

2    the reason to impose the death penalty against the reasons

3    not to and decide whether the reasons to impose the death

4    penalty outweighs the reasons not to by proof beyond a

5    reasonable doubt.  Now --

6    A        And what I'm saying is, what would enter into that I

7    believe would be my, you know, it's not just going to be two

8    scales.  It's going to have a third piece on it and I'm going

9    to be saying, but I don't think that should be there.  I

10   don't think that that should be what I'm having to decide,

11   the death penalty.

12   Q        You do not think you should have to decide that?

13   A        I think that would be the part that would tip me,

14   would tip the scale.

15   Q        Okay.

16   A        If that's my only choice and if that's what the law

17   says, that if you kill the Governor here's your option:

18   Death.

19   Q        Okay.  It does not work that way.  See, if you kill

20   the Governor you have four options.  And frankly --

21   A        The same four that I have?

22   Q        Yes.  That's really why I stood up to ask you

23   questions, because you said something about choice at the end

1    and I want to see if there's a true choice in your mind or

2    there's not.   And the choice is, you have, there are four

3    potential penalties.  Are you okay?  Do you understand what

4    those are?

5    A        Uh-huh.

6    Q        The question is, and you heard Mr. Ingram object

7    because going into the second phase none of those penalties

8    should have a leg up or be at a disadvantage.

9    A        Okay.

10   Q        And so if you can, nobody can ever say to you,

11   listen, even if the State proves Juhasz planned it and he

12   killed the guy named Bob Taft, and even if the State proves

13   that Bob Taft was Governor so they met their burden at the

14   first and second phase; you're standing there at the second

15   phase --

16   A        Here's where you still fall down.  That you did it

17   with absolute malice, with hatred, intent, calculated and you

18   planned and you plotted it all out step by step.

19   Q        Right.

20   A        For no other reason than, that you are a bad person.

21   Q        A mean, nasty guy.

22   A        A bad person.

23   Q        Can you consider?

1934

1    A      So there would be no mitigating circumstance to

2    outweigh the aggravation?

3    Q      I'm just a bad guy.

4    A      I don't know that I could have you killed.

5    Q      All right.

6    A      I mean, I don't know.  You're not, you're not, I

7    mean, I know what they did to that presidential candidate.

8    What would you do if it was your child that was shot?  Would

9    I want him killed, the person who did it?  In theory it's

10    easy to say no.  I still even -- why should two people die if

11    one already has?  I might be, I mean that, that might be a

12    lost human --

13    Q      Let me try to do this.  And I'm going to try to boil

14    this down to one question, see if I can do it.  If you got to

15    a second phase in this or any other death penalty case, would

16    you be able to fairly consider those four sentencing options

17    or are you telling me that the death penalty is --

18    A      I'm considering three of them.

19    Q      The death penalty is just out of the equation for

20    you?

21    A      Yeah.  All right.

22    Q      That, listen, there's nothing wrong with that.  The

23    only reason I got up here and asked you questions, because I

1    kept hearing you say stuff about choice and if you make the

2    choice between the four, that's okay.  But if you're telling

3    us honestly there's only three in the equation, that's also

4    okay, we just need to know that.  And you're saying there's

5    only three in the equation; right?

6    A        Uh-huh.

7    Q        I appreciate that.  Thank you.

8                        THE COURT:  Any objections, fellows?

9                        MR. JUHASZ:  No.

10                       MR. INGRAM:  No.

11                       THE COURT:  I'm going to excuse you.  You

12   have answered the questions the way that you were asked to

13   answer them.  You told us what you believe.  Thank you so

14   much.

15   A        So what do I do now?

16                       THE COURT:  You're excused from any

17   participation.  Like I said, we have to have 12 people who

18   are able to make that determination.  And you fall into a

19   pretty large group we've had here that they're not able to do

20   that.  That's understandable.  Everybody has their own view

21   on things.  But we thank you for your time.

22                       (Whereupon, court adjourned for the

23   evening.)

1                                    * * *

2

3

4

5                        REPORTER'S CERTIFICATE

6

7          This is to certify the foregoing represents a true and

8     correct copy of the proceedings had in the aforementioned

9     cause as reflected by the stenotype notes taken by me on the

10    same.

11

12

13

14

15                              Richelle J. Guerrieri,
16                              Official Court Reporter

17

18

19

20

21

22

23

1          IN THE COURT OF COMMON PLEAS
              TRUMBULL COUNTY, OHIO
2

3   STATE OF OHIO,              ) Case No. 2001-CR-0793
         Plaintiff             )
4                               )
    -vs-                        ) Judge John M. Stuard
5                               )
    DONNA M. ROBERTS,           )      **VOLUME IX**
6        Defendant             ) **VOIR DIRE PROCEEDINGS**

7

8   Capital Murder Trial held on Wednesday, April 23, 2003

9   BEFORE:      HONORABLE JOHN M. STUARD

10

11  AT:          Trumbull Co. Court of Common Pleas
                 161 High Street, NW
                 Warren, Ohio 44481
12

13  APPEARANCES:

14

    On behalf of the Plaintiff:
15
        Messrs. Kenneth N. Bailey and Christopher Becker,
16      Attorneys at Law

17

18
    On behalf of the Defendant:
19
        Messrs. J. Gerald Ingram and John B. Juhasz,
20      Attorneys at Law

21

22

23  Official Court Reporter:  Richelle J. Guerrieri

ORIGINAL

136

1

I-N-D-E-X

2

VOLUME IX

3

INDIVIDUAL VOIR DIRE

4

5

KEVIN B. PATTERSON

6  EXAMINATION BY THE COURT.................................1939:6
   EXAMINATION BY MR. BECKER.............................1943:2
7  EXAMINATION BY MR. INGRAM.............................1966:7

8

MARSHA J. DANADIC

   EXAMINATION BY THE COURT.............................2006:5
9  EXAMINATION BY MR. BAILEY............................2009:9
   EXAMINATION BYMR.JUHASZ..............................2042:22

10

11

KASEY S. KELLY

12 EXAMINATION BY THE COURT.............................2074:17
   EXAMINATION BY MR. BECKER............................2077:19
13  EXAMINATION BY MR. INGRAM...........................2107:9

14

MOSELLE DICENSO

15  EXAMINATION BY THE COURT............................2133:20
    EXAMINATION BY MR. BAILEY...........................2136:14
16  EXAMINATION BY MR. JUHASZ...........................2173:22

17

18

19

20

21

22

23

1     **WEDNESDAY, APRIL 23, 2003**

2     WHEREUPON,

3                        KEVIN B. PATTERSON

4     being first duly sworn, according to law, was examined and

5     testified as follows:

6                        EXAMINATION

7     BY THE COURT:

8     Q        Good morning.  Mr. Patterson, you read that handout

9     that was given to you?

10    A        Yes, sir.

11    Q        You have a pretty good idea of why we're here then?

12    A        Right.

13    Q        Miss Roberts, the Defendant here is charged with

14    aggravated murder with specifications.  Under Ohio law a

15    person who is found guilty of aggravated murder or murder

16    does not necessarily qualify for the death penalty, does not

17    necessarily face the death penalty.

18             The Legislature has designated certain things that

19    have to be associated with the murder before the death

20    penalty arises.  The example used all the time, if you shoot

21    the Governor or kill the Governor, the fact that he is

22    Governor is a specification to be attached to the aggravated

23    murder charge which would then raise the specter of the death

1940

1   penalty.  There are other things, a police officer.  And in

2   this particular case the specifications concern a burglary

3   and a robbery.

4        Now, the burden of proof in any criminal case rests

5   entirely with the prosecution.  The defense has the right to

6   remain silent throughout the entire trial.  Attorneys need do

7   nothing.  Most trials don't go that way.  The attorneys at

8   least ask questions, whatever, but they don't have any

9   obligation to do so.

10        The prosecution at this trial will be called upon to

11   prove all the elements of the aggravated murder and the

12   specifications before the case, and the jury would have to

13   find that they proved them beyond a reasonable doubt before

14   the matter would go to a second phase.

15        Now, if the State failed to prove by the requisite

16   burden all elements of the crime, then the jury would

17   properly return a finding of not guilty.  If the verdict

18   would be one of guilty, however, then this jury would be

19   called upon to listen to further presentation of fact, and

20   the prosecution then has the burden of proving beyond a

21   reasonable doubt that the aggravating circumstances, which

22   are reasons submitted to the jury in favor of imposing the

23   death penalty, weigh those against the mitigating factors,

1     which would be reasons given to the jury as to why they

2     should overlook the death penalty and impose some lesser life

3     imprisonment.

4          We can't wait until the jury has already heard the

5     case and made a decision to ask these questions.  The reason

6     the questions have to be asked is that everybody has their

7     own view on capital punishment.  There are some that believe

8     that if a life is taken that person taken the life should

9     forfeit their own life.  An eye for an eye, the old

10     testament.  That is not the law of Ohio.  It's only under

11     certain types of aggravated murder does this arise.

12          On the other end, you have people that feel for

13     whatever reason, moral, religious reasons that they could

14     never participate in any situation where they had to decide

15     whether a person receives the death penalty.  Now, whatever

16     opinion anybody has is fine.  That's their own opinion.

17     We're all entitled to our own opinion.  But in order for a

18     fair trial to occur, if you had a person who believed in an

19     eye for an eye, the Defendant could never get a fair trial.

20     If you had somebody who could never impose the death penalty

21     under any circumstances, then the State couldn't get a fair

22     trial.

23          So the questions that will be put to you is to find

1    out what your position is.  And whatever your position is, is

2    fine.  These folks will accept that.  But we need 12 people

3    who are able to follow the law.  And the law says that if the

4    State proves what they have to, then the situation might

5    arise where this jury would have to consider the four

6    possibilities of sentence, one of them being the death

7    penalty.  If a person isn't able to do that, that's fine.

8    But a person can't just take a murder and automatically

9    impose the death penalty.  That isn't the way it works.

10           The other issue will be questions concerning what

11   pretrial publicity you have been subjected to.  Many of the

12   people on this jury have read something about this matter.

13   This case had its share of publicity, as anything of this

14   nature would.  And just because a person has had some prior

15   exposure does not disqualify them as a juror, unless they're

16   not able to say to themselves I could set that aside.  This

17   matter has to be decided on the evidence presented in this

18   courtroom.  Anything outside this courtroom is not evidence,

19   can't be used in making the determination it has to be made.

20   So you get the picture; right?

21   A       Right.

22              THE COURT:  Gentlemen of the prosecution,

23   do you wish to inquire?

1          MR. BECKER:  Thank you, Your Honor.

2                        EXAMINATION

3    BY MR. BECKER:

4    Q       Good morning, Mr. Patterson.

5    A       Good morning.

6    Q       My name is Chris Becker.  I work for the county

7    prosecutor's office.  This is Mr. Bailey.  I don't know if

8    you recall seeing him about two weeks ago?

9    A       Right.

10   Q       And I was involved in another matter so I, I'm able

11   to join Mr. Bailey now.   I assume you recall Mr. Ingram and

12   Mr. Juhasz?

13   A       Right.

14   Q       And they I believe were in court with Miss Roberts,

15   the Defendant in this case.  I want to first of all thank you

16   for attending to this service.   It's a very important civic

17   duty.  And I think other than probably serving in the

18   military, you'll find it's probably the most important civic

19   duty you can perform short of being in the military.

20           As the Judge indicated to you, there's really no

21   right or wrong answers here.  Your opinions may and your, you

22   know, no matter how ingrained they are in your mind, your

23   opinions may or may not keep you on or off this jury.  And

1944

1    there's no right or wrong answers.  I mean, if you have

2    something that's important, and it's a conviction of yours,

3    by all means we're not asking you to give that up.  But you

4    just may not be a particularly good juror for either

5    ourselves or for the defense in this case.  So that's why we

6    have to ask you some of these questions.  It's not to say you

7    might not be a good juror in another case or a different kind

8    of case.

9          Throughout this process this morning, if you have

10    something you want to question me about or ask me about, by

11    all means do that, because this is the only opportunity that

12    we're really going to have to interact with each other.

13          Once the case starts and once we choose you and you

14    sit in this jury box over here, we can't lean over to you and

15    say, hey, by the way, Mr. Patterson, what's your feelings on

16    this?  Or, what do you think about that witness?  I mean, we

17    have to live by a strict code of conduct that we can't even

18    speak to you if we see you in a restaurant or if we see you

19    in the restroom or out in the hallway during one of the

20    breaks other than we can acknowledge you and maybe say hi.

21    Because we don't want anyone to think there's anything going

22    on, you know, we're influencing the jurors in this case.  So

23    it's very important that we, you know, discuss the issues in

1    this case right now at this time because it's the only

2    opportunity we have to do that.

3         First of all, I want to start out with the two areas

4    that the Court mentioned.  It appears by your questionnaire

5    that you do believe in the death penalty?

6    A     Yes.

7    Q     And you do believe in some cases it would be

8    appropriate; correct?

9    A     Correct.

10   Q     Now, one of the odd things about this kind of case,

11   and the Court mentioned it as well, is that we're being

12   presumptuous here.  We may never get to the point in this

13   case where you have to consider the death penalty because you

14   may find that we don't prove her guilty or guilty of the

15   specifications that call into play the death penalty.  Is

16   that kind of clear?

17   A     Right.

18   Q     This case is actually, if it goes that far, is

19   actually going to have two phases.  We'll have a first phase

20   where we're going to determine her guilt or innocence.  And

21   then if you determine she's guilty by proof beyond a

22   reasonable doubt we would come back for a second phase where

23   you would have to consider the death penalty and three other

1    options that we refer to as life options:  Life with no

2    parole; life with parole after 30 years, and; life with

3    parole after 25 years of service.

4         What we're looking for is just simply people that

5    will fairly consider, if we get to that point, and again

6    we're being presumptuous, but if we get to that point they

7    will fairly consider all four of those options.

8         Do you believe that you could fairly consider all

9    four of those options as a penalty for this Defendant in a

10   criminal case?

11   A       I believe I could.

12   Q       You wouldn't say, boy, I'm so in favor of the death

13   penalty that I would give the death penalty a head start?

14   Or, I would place more importance on trying to push her into

15   the death penalty?  Or maybe the other way, I feel not so

16   strongly about the death penalty that I'm going to exclude

17   the death penalty and consider the other life options before

18   I give her the death penalty?

19   A       No, I would have to look at all the facts before I

20   made a determination.

21   Q       And you would, you would be willing to do that, look

22   at all the facts in evidence?  And the Court will give you

23   certain instructions when we get to that point.  As the Court

1    indicated to you, the death penalty, if you were to get to

2    that second phase and if the State would prove its case, is

3    not automatic.  It's not required.  It's not automatic.  It's

4    an option that you have.  And it's one of the four options

5    that you have once you get to that phase.

6              But I guess what I'm hearing you say is, if it came

7    down to it you could sign a verdict, sign a piece of paper

8    with 11 fellow jurors once you went back in the jury room, if

9    the State proved its case, you could sign a verdict form

10   calling for the imposition of the death penalty if the facts

11   warranted it and the law allowed it?

12   A       I believe I could.

13   Q       Now, you also mentioned in your questionnaire that

14   you had heard of this case; is that correct?

15   A       Yes, I have.

16   Q       Where did you hear from it?  I think you watch

17   Channel 21, you said?

18   A       Once in awhile when I have time I watch TV.

19   Q       And --

20   A       Not too often.

21   Q       You're probably like me.  Read it in the newspaper?

22   A       I saw a little bit in the paper, and I saw a little

23   bit on the television.

1  Q        Coming into this courtroom today based upon what

2  you've heard and, I don't know if you've discussed this with

3  anybody you work with or discussed it --

4  A        No.

5  Q        Family, friends or anything like that.  As you come

6  into the courtroom today, do you have an opinion about

7  whether she's guilty or innocent here today?

8  A        Not really, no.

9  Q        So you just read the information because you're

10  involved in the community and want to know what's going on,

11  maybe happened to see it on the news or read it in the

12  newspaper?

13  A        I was one of the people when Judge Stuard said,

14  raise your hand if you heard anything, I didn't raise my hand

15  because I couldn't remember.  He mentioned that, you'll

16  probably remember in an hour or two.  And I got down the road

17  an hour or two and I said, yeah.

18  Q        And that was before you filled out the

19  questionnaire?

20  A        Yes.

21  Q        Obviously, because you filled out the questionnaire

22  that obviously you had heard something in this case?

23  A        Right.

1    Q        Does the fact that you now I guess recalled your

2    memory, do you think that's going to have any ability or --

3    I'm sorry -- any affect on your ability to serve as a juror

4    in this case?

5    A        No, I don't think it would.

6    Q        Because you understand what we're trying to do here

7    is get 12 people to decide this case not about what they read

8    in the Tribune Chronicle, not about what they read in the

9    Vindicator or saw on television, but what they hear and see

10   in this courtroom.

11            And we can't let, as it hard it may be, we can't let

12   those outside influences come in and taint your decision in

13   this case.

14   A        I don't feel that would be a problem.

15   Q        Now, this case involves probably one of the most

16   serious crimes and probably the most serious crime in the

17   state of Ohio, and perhaps some of the most important cases

18   in these courtrooms, and that's a life and death situation.

19   It obviously involves the death of an individual.   It

20   involves the potential death of the Defendant because she's

21   facing the death penalty.

22            How do you feel coming in here having to decide a

23   case of that magnitude?   Is that going to create more

1    problems for you?  Or would you say, boy, I wouldn't mind

2    serving on jury duty but I wish it wasn't as deep or as heavy

3    as this case was or as involved as this case is?

4    A        That really doesn't affect me one way or the other.

5    Q        Now, in every criminal case the State has the

6    burden, and I'm sure you've heard it on television or read it

7    in the newspaper or read it in a novel, somewhere run across

8    the term reasonable doubt.  That's the standard that is used

9    in our courtrooms to determine the guilt or innocence.  And

10   it's proof beyond a reasonable doubt.  And I think every

11   person gets a different idea or connotation of what proof

12   beyond a reasonable doubt means.  The Court will give you a

13   definition of that.

14             And I noticed in your questionnaire that you

15   actually I think work somewhat in the court system or prepare

16   cases for litigation; is that correct?

17   A        I, part of my job is to investigate cases and apply

18   them to statutes and laws.

19   Q        And that's a little bit what you'll be doing here.

20   You won't be doing it from the investigatory side but you'll

21   be doing it from the juror side.  Have you ever testified in

22   any of those cases?

23   A        No, I haven't had to testify.

1    Q      Do those cases that you investigate, do they end up

2    going to like a Common Pleas Court or a Federal District

3    Court?

4    A      No, Federal District Court.  It's basically job and

5    benefit rights.

6    Q      And have you ever been called to testify in any one

7    of those cases?

8    A      No.

9    Q      This case is going to be a little bit different role

10   for you.  You understand that the police and the sheriff's

11   department and the crime investigators, they've done the

12   investigation.  And one of the things that you will not be

13   permitted to do is to investigate this case on your own.

14   That's not going to be a problem for you, is it?

15   A      No.

16   Q      Because we don't want you to say, boy, you know, I

17   heard about this location and I'm going to drive out to the

18   house and take a look at it, or this place and see it for

19   myself and do those types of things.

20          When you prepare your cases I assume that they are

21   not for criminal proceedings.  They're probably for civil

22   lawsuits?

23   A      Right.

1    Q      And I suppose investigating those cases they told

2    you what they, the evidence that they need is a preponderance

3    of the evidence in those cases?

4    A      That's correct.

5    Q      But you understand that there are really two

6    different burdens of proof there.  And we're talking about

7    reasonable doubt and preponderance of the evidence.  And I

8    guess one of the ways to look at it, and I don't know,

9    probably since I was in law school one of my professors

10    mentioned it, sort of stuck in my head is, it's sort of like

11    a glass water.  Your, your cases that you investigate that

12    have to be proved by a preponderance of the evidence, that's

13    basically one drop over the halfway mark.  That's basically

14    what preponderance of the evidence means.

15         Now, when we get to this second we have to prove

16    things like proof beyond a reasonable doubt.  And that's

17    pretty close to the top of the glass of water.  It's not to

18    the very top, because that's proof beyond all doubt.  And the

19    Court is going to tell that we don't have to prove a case

20    beyond all doubt, just beyond a reasonable doubt.  But it may

21    vary.  Some people it may be an inch or two from the top.

22    Some people, it may be a quarter of an inch.  But it's not

23    quite to the top.  But it's getting pretty close to the top.

1     Do you feel that you will be able to make a

2   determination in such a case as the magnitude of this case

3   involving the death of an individual, a potential death of

4   the Defendant, and do you feel that you will be able to make

5   a determination based on reasonable doubt and not all doubt,

6   not having that cup filled up all the way but reasonable

7   doubt, maybe within an inch or two or quarter inch of the

8   top?

9   A     I believe I can do that.

10  Q     Because one of the things that happens sometimes in

11  criminal cases, people say, boy, you know, we just had

12  somewhat, it's a very important case and we know they did it

13  and we know that they were guilty of it.  We know the State

14  proved its case.  But, boy, to suffer the death penalty we

15  couldn't find that, so we found her not guilty.  You wouldn't

16  be of that kind of mindset, would you?

17  A     No.

18  Q     And on the other side of that coin, you wouldn't

19  say, well, you know, the State proved most of the case to me.

20  There were a couple things they didn't prove.  But it was

21  such a terrible crime that I had to find her guilty even

22  though the State didn't prove some of the elements of the

23  crime.  They didn't fill that glass of water up near the top.

1    You wouldn't do that either, would you?

2    A        No.

3    Q        Now, in this particular case because it does involve

4    the death of an individual and the potential death of the

5    Defendant in this case, all criminal cases the court requires

6    every juror as much, and as difficult as it may be, not to

7    consider sympathy in the case.

8            You are going to see some graphic photographs of the

9    deceased in this case, I imagine.  I believe you are a

10   Vietnam Veteran?

11   A        Right.

12   Q        So I imagine you've seen your share of suffering?

13   A        Some.

14   Q        I don't know what exactly you did in the war, but

15   I'm sure you've seen some suffering.  I'm assuming that's not

16   going to affect you or play a part in your decision?

17   A        No.

18   Q        Because the Court will tell you, you can't consider

19   sympathy for the victim, who's obviously deceased.  And you

20   can't consider sympathy for the Defendant because she may

21   face this potential death penalty, or some other penalties

22   that may be not good at all.

23           I think you even mentioned in your questionnaire

1   that the, sometimes it's worse to spend life in prison as

2   opposed to the death penalty.  And you may very well be right

3   on that.

4          So you believe that you could decide this case

5   without being sympathetic to either party?  In other words, I

6   guess what I'm saying is, you could look at these photographs

7   and say, boy, this poor guy got shot and killed and I saw the

8   photographs.  I know the State didn't prove the case but I

9   can't let this go unpunished.  And there's been some

10  indication that she was involved, I've got to find her

11  guilty.  You wouldn't do that, would you?

12  A       No.

13  Q       And by the same token, you wouldn't say, boy, I've

14  been in the courtroom two or three weeks now and I've seen

15  her and I know the State proved beyond a reasonable doubt her

16  guilt.  I know the State proved beyond a reasonable doubt the

17  aggravating circumstances outweigh the mitigating factors in

18  the penalty phase.  But, boy, I can't sign the death verdict

19  because I really feel sorry for her for whatever has happened

20  in her life or for whatever reason.  You wouldn't do that

21  either, would you?

22  A       No, I wouldn't do that either.

23  Q       Okay.  Now, this case is a little bit different in

1   some respects because we're going to tell you right now and

2   be very up front with you.  Miss Roberts is not the actual

3   killer.  She is not the person who pulled the trigger in this

4   case.  She's what we call a complicitor, an aider and

5   abettor.  She assisted the individual.  I think that you --

6               MR. INGRAM:  Objection.  She's alleged to

7   have assisted.

8               MR. BECKER:  Alleged.  And I apologize.

9   Q       The allegation is that she is alleged to have aided

10  and abetted, I think you mentioned in your questionnaire

11  Mr. Nate Jackson.  So she is alleged to have assisted him in

12  that crime.

13          Does that change anything for you in terms of, first

14  of all, determining whether she would be guilty or innocent?

15  Would you have a more difficult time or require more proof?

16  And second of all, does that require, does that change things

17  for you regarding the death penalty?

18          So let me ask you, first of all, is that going to

19  create a problem in determining her guilt or innocence?

20  A       No, I don't think it would, no.

21  Q       Because you understand in this case she's not the

22  shooter.  There will probably be no ballistics, gunshot

23  residue showing that she fired a gun because we're telling

1    you right now, she's not alleged to have done that. And the

2    allegation is not that she fired the gun. When we get to the

3    death penalty phase, if we get that far, and if we're able to

4    prove the case, the allegation again is that she is not the

5    actual shooter, but the allegation is that she aided and

6    abetted someone.

7            We believe that we will still be able to prove to

8    you that the death penalty is an option and is warranted in

9    this case. But some people may have a difficult time if we

10   get to a scenario like that and they may say, I can't

11   consider the death penalty for this person because they

12   didn't actually do the killing. They only aided and abetted

13   or they only aided and assisted.  Would you have a problem

14   doing that?

15   A       No, I wouldn't.  I would have to sort it out.

16   Q       You still would have to sort it out and fairly

17   determine those four options?

18   A       Right.

19   Q       One of the other concepts that we deal with here is

20   sort of the flip side of the reasonable doubt issue, and

21   that's the presumption of innocence. You understand that in

22   our system Miss Roberts is presumed innocent as she sits here

23   today?

1    A        Right.

2    Q        And the fact that she's been charged and indicted

3    cannot be considered by you for any purpose.  And I don't

4    know how familiar you are with the grand jury process, but

5    you understand that when the indictment in this case was

6    issued Miss Roberts was not there.  Her attorneys were not

7    there.  Judge Stuard or no other judge was there.

8            The only people that were there were the prosecutors

9    and the prosecution witnesses as well as the grand jurors.

10   So they've only heard one side of the story.  And basically

11   all that grand jury indictment is is just simply an

12   accusation pointing the finger at her and making an

13   allegation of these crimes.

14           You don't sit here today on April 23rd and look at

15   her and say, well, she must be guilty, they're talking about

16   a potential death penalty.  They're discussing reasonable

17   doubt and guilt.  She sits here in this courtroom with two

18   attorneys, she's got to be guilty, do you?

19   A        No.

20   Q        You give her that presumption of innocence that is

21   available in our court system as required in our legal

22   system; correct?

23   A        I can do that.

```
 1    Q        Now, what you're going to have to do as a juror is a

 2    little bit like what you've done as an investigator.  We've

 3    already done the investigation.  The Howland Police, the

 4    sheriff's department, other investigatory agencies, BCI have

 5    done an investigation.  You're now going to have to

 6    determine, I'm sure you're familiar with this through your

 7    work, as to who has bias or interest in this case.  Who maybe

 8    was in the best opportunity to see or hear or do things in

 9    this case that they said they did, and what all this evidence

10    adds up to.  Does it get you to that point on the cup where

11    it's reasonable doubt?

12             You're going to find, I guess, that -- I use this as

13    a simple, very simple example.  But you would agree with me

14    that if there were a car wreck at lunch today here somewhere

15    on courthouse square, let's say on Mahoning Avenue and High

16    Street where they come together at that sort of odd

17    intersection here on the northwest corner of courthouse

18    square.

19             Let's say someone is coming down High Street going

20    west and they make an illegal left turn, and they turn left

21    on the red light and they get struck by someone coming

22    through on Mahoning Avenue, coming down from the north or the

23    south.  If this was a criminal case charging someone with a
```

1    criminal violation of say illegal left turn, do you believe

2    the State could prove that case with just one witness if that

3    witness was credible enough for you?

4    A        With one witness, a credible witness?

5    Q        Yes, it was a credible witness.

6    A        Possibly.

7    Q        It's possible.  I'm not saying that it would be

8    certain.  And you also probably believe from what you know of

9    investigations and doing things, that it probably could be

10   seven or eight witnesses, and if they were not, none of them

11   were credible the State could probably theoretically not

12   prove its case even with seven or eight witnesses; right?

13   A        That's right.

14   Q        If they were not credible or they were, you know,

15   blind guys all going to the doctor to get their eyes

16   examined, or they were maybe related to the parties involved

17   in the dispute.  Maybe they were related to the defendant and

18   he had just dropped five or six guys off and he was making an

19   illegal left turn because he was in a hurry and they all were

20   his buddies and his relatives.  And they said, oh, no, he had

21   the green arrow.  He didn't turn left on the right light.

22   That may raise some doubt for you if they were friends with

23   the defendant in the case; right?

```
1    A        Right.

2    Q        And that's a little bit of what you have to do as a

3    juror.  You have to determine who's, who's biased, whose

4    interest, what reason they're testifying and is that evidence

5    quality enough to get you to convict and to fill up those

6    glasses beyond a reasonable doubt; correct?

7    A        Correct.

8    Q        You'll be able to do that I'm assuming?

9    A        I think so.

10   Q        I'm assuming also in your investigations that you

11   have run across what we call circumstantial evidence?

12   A        Uh-huh.

13   Q        And you've probably even had to gather yourself

14   circumstantial evidence, which is just basically evidence

15   that you can make an inference from.  I don't even know if

16   this is an example that's going to fit by what you do, but

17   you deal with sometimes I guess discrimination against

18   veterans?

19   A        Right.

20   Q        So sometimes you may have, you may investigate let's

21   say a company that has hired zero veterans even though they

22   maybe had 50 apply?

23   A        Right.
```

1    Q        There's an inference there that they're

2    discriminating against veterans; correct?  That would be

3    circumstantial evidence that they discriminated against them?

4    A        Right.

5    Q        It's a little bit like the example that, again, an

6    old law school example is, if you go to bed at night and you

7    watch Channel 21 and you're watching the weather and they

8    show you the big green globs that represent on the radar the

9    storm is coming, and you see a line of those from say Dayton

10   all the way up to Sandusky, and they're slowly moving across

11   the radar.  And the weather guy says well, we expect some

12   rain tonight.  Expect thunderstorms.  And you look out your

13   window before you go to bed, you pull the shade down.  It's

14   dry out.  You can see some of the stars and maybe the moon

15   out.  You go to bed and the next morning you wake up and your

16   grass is wet.  Your driveway is wet.  Your street is wet.

17   Your car is wet.  All the neighbors driveways are wet.

18   There's water trinkling down the gutter.  You may not have

19   seen it rain but you can infer that it rained; right?

20   A        Right.

21   Q        And there's varying, sometimes there's varying

22   inferences.  There's things that can be different.  Let's

23   say you have the same scenario but you wake up in the morning

1    and you hear water running and you look out and your driveway

2    is wet and your car is wet.  But you look across the street

3    and your neighbor's driveway is not wet.  There's no water in

4    the street.  There's no water going down the gutter.  And

5    then you look out and you look down and you see maybe your

6    wife or your kids hosing the car off getting ready to wash

7    it.

8         Obviously it didn't rain, but the moisture is

9    related to the hose that your wife or your child has there;

10   right?

11   A      Right.

12   Q      So you have to be careful sometimes with those

13   inferences as to how you make it.  But you can do that if you

14   feel confident enough that the inference leads to a

15   conclusion you can draw; right?

16   A      Correct.

17   Q      And I'm assuming you've had to do that in some of

18   the cases you presented, you said, here are some documents.

19   I know they don't necessarily say we're going to discriminate

20   against veterans but there may be some documents there or

21   there may be some testimony there that would get you to the

22   point where you could say, hey, listen, I know they say this,

23   this and this, but you look at this and this is what they're

1    doing, they're obviously discriminating or not hiring

2    Veterans; correct?

3    A        Correct.

4    Q        So you're familiar with the, I guess the term

5    circumstantial evidence and circumstantial evidence through

6    your work. Here in this courtroom, and I don't know whether

7    you noticed or not, circumstantial evidence and direct

8    evidence have the same weight. You can consider them for the

9    same weight. So you'll be able to, if you can make that

10   inference and make a reasonable inference that you can draw,

11   you can do that; correct?

12   A        Correct.

13   Q        Is there anything that would prevent you over the

14   next say two or three weeks from serving as a juror in this

15   case? I know you, you're obviously busy with your work. But

16   is there anything pressing at work or even at home that would

17   prevent you from serving as a juror?

18   A        No. I would be able to.

19   Q        Okay. Your, was it your cousin that was involved in

20   a crime back about 30 years ago?

21   A        Right.

22   Q        That doesn't play any role in your determination

23   today?

1965

```
 1    A        No.

 2    Q        Of this case?

 3    A        No.  I didn't even know about it until a couple

 4    years ago.

 5    Q        Really?  Okay.  Is there anything that you feel that

 6    you need to advise us of that, any questions you have or any

 7    concerns you have going into this process?

 8    A        No.  I think you've cleared up some stuff for me by

 9    what you said.

10    Q        And you feel that you could serve as a fair and

11    impartial juror in this case?  You won't let the influences

12    of whatever media you've read influence your decision;

13    correct?

14    A        That's correct.

15    Q        You can decide this case without sympathy to either

16    party, the deceased or the Defendant; correct?

17    A        Correct.

18    Q        And you believe that you will give her the benefit

19    of the doubt and proof beyond a reasonable doubt?  You'll

20    hold the State to its burden of proving this case in both

21    phases if we get to that second phase by proof beyond a

22    reasonable doubt; correct?

23    A        I could do that.
```

1    Q       And if the facts warranted it and the law permitted

2    it, you could sign a verdict imposing the death penalty in

3    this case; correct?

4    A       I could also do that.

5                    MR. BECKER:   Thank you very much.

6                    MR. INGRAM:   Thank you, Your Honor.

7                              EXAMINATION

8    BY MR. INGRAM:

9    Q       Good morning, Mr. Patterson.  Are you doing all

10   right up there?  Do you need some water or something?

11   A       No, I'm fine.  Thank you.

12   Q       John Juhasz and I share the responsibility of

13   representing Donna Roberts who's on trial for her life.  As

14   you can imagine, we take our responsibility very seriously.

15   We feel that we should take every reasonable precaution in

16   selecting a fair-minded jury, the same type of jury that you

17   or I would want if we were on trial.  Does that sound fair

18   enough to you?

19   A       That sounds fair, sure.

20   Q       This is a lot like a job interview, except when you

21   apply for your job with the Veterans Department you chose to

22   go apply for that position.  Here the jury wheel sort of spun

23   your name out and chose you and we summoned you to come.

1          We are interviewing you today for one of the most

2     important jobs there is:  The job of finding the truth and

3     determining the fate of another human being.

4          Now, I understand from your conversation with

5     Mr. Becker that the responsibilities which we are asking you

6     to undertake do not pose a problem for you?

7     A       I don't believe they do, no.

8     Q       How do you feel about being asked to assume such

9     responsibilities?

10    A       I think it's very, very important.  And whenever you

11    said, it's probably the most important thing that I could be

12    doing, I was actually off of this jury at one time but I put

13    myself back on.  So I looked at it as a privilege to be here.

14    Q       I candidly, I have to tell you that some of your

15    answers in the questionnaire interest me a great deal.  We're

16    going to talk about some of those answers.  You studied

17    criminal justice at YSU?

18    A       Right.

19    Q       And when asked in the questionnaire about problems

20    with the justice system one of the things that you noted was

21    that the system is embedded in tradition?

22    A       Uh-huh.

23    Q       And I assume by that that we are so embedded in

1    tradition that sometimes it's a problem in your mind?

2    A        Occasionally, right.

3    Q        Do you believe in the American jury system?

4    A        Yes.

5    Q        And you understand that the American jury system

6    only works when we can get 12 good people to come in here,

7    give of themselves, give of their time and fairly determine

8    the cause before them?

9    A        That's reasonable, sure.

10   Q        And it will only work if people tell us whether they

11   will have a problem giving either side a fair shake.

12   A        Right.

13   Q        In a nutshell, this case boils down to the

14   Government's allegation that Donna Roberts plotted or

15   conspired with a male companion, Nate Jackson, to cause the

16   death of Robert Fingerhut.

17             Donna and Robert were divorced.  They continued to

18   work with one another at the Greyhound Bus Station in

19   Youngstown and Warren and continued to live with one another

20   in Howland Township.

21             Now, you understand that this trial is about the

22   guilt or innocence of one person and one person only, and

23   that person is Donna Roberts?

1    A       Yes.

2    Q       Throughout the course of these proceedings you'll

3    hear the name Nate Jackson.  And shortly into these

4    proceedings you very well may conclude that Nate Jackson did

5    what the State says he did.

6    A       All right.

7    Q       You're here to determine whether Donna helped him or

8    not.  You have that straight?

9    A       Okay.  I've got it.

10   Q       Now, in its allegation that Donna participated in

11   the death of Robert, the State will introduce various tape

12   recordings and various letters written between Donna and Nate

13   Jackson.  Some of those are sexually explicit in nature and,

14   to be honest with you, some of them are downright offensive.

15   You understand that the allegation here is murder, not loose

16   morality?

17   A       Right.

18   Q       So no matter how shocked or offended you may be by

19   the sexual nature of some of this evidence, your job

20   responsibility is still going to require you to test that

21   evidence to determine whether it ties Donna to this offense.

22   You got that?

23   A       Right.

1    Q        Now, Donna denies that she participated by

2    conspiracy, plot or otherwise in the death of Robert

3    Fingerhut.  Would you have any problem whatsoever giving a

4    scarlet woman a fair trial?

5    A        No, I don't believe so.

6    Q        Would you have the courage to acquit, that is vote

7    not guilty if you thought a not guilty verdict was warranted

8    by the evidence?

9    A        I could do that.

10   Q        Would you agree with me that whatever we see, read

11   or hear may leave impressions upon us?

12   A        Sure.

13   Q        And you talked with Mr. Becker about pretrial

14   publicity.  And he asked you if you had any opinions.  And I

15   believe your response was, not really.

16   A        That was it.

17   Q        First off, can you tell me everything you remember

18   seeing, reading or hearing about this case, Nate Jackson or

19   the death of Robert Fingerhut?

20   A        Okay.  I, I did see it on the news.  I remember

21   seeing him in trial and being sentenced.  I believe I saw

22   Miss Roberts, too, a picture of her on the news.  Then I read

23   one newspaper article in the Tribune on it.

1971

```
 1    Q        When did you read the article in the Tribune?  A
 2    long time ago?
 3    A        Quite a while ago, right.  Quite a while ago.
 4    Q        You saw or read about Mr. Jackson being sentenced,
 5    so you obviously know he was convicted?
 6    A        Right.
 7    Q        The fact that Mr. Jackson was convicted, does that
 8    lead you to form any impression as to whether or not Donna
 9    was involved with Mr. Jackson?
10    A        No.  I mean, I have no idea.
11    Q        Okay.  And that's what you're here to test; right?
12    A        Right.
13    Q        You saw or heard about Mr. Jackson's sentencing.  Do
14    you know what the sentence was?
15    A        I'm not sure.
16    Q        Would you agree with me that whenever we're called
17    upon to decide a sentence, we should know something about the
18    person we're sentencing?
19    A        Yes.
20    Q        So to some extent sentencing should be an
21    individualized process and focused upon the person being
22    sentenced; am I correct?
23    A        And the evidence.
```

1   Q        You made the orientation instruction Tuesday,

2   April 8th down at the other end of the hallway here?

3   A        Yes, I did.

4   Q        Where were you in the courtroom?  When you walked in

5   the door did you go to your left or to your right?

6   A        I went to the left.

7   Q        Were you seated or standing?

8   A        I was seated.

9   Q        While you were there, did you hear any discussions

10  about this case at all?

11  A        No.

12  Q        One last thing about newspapers or TVs.  You know,

13  if we wanted to try people by way of the newspaper or by way

14  of the TV news there would be no need, no need for

15  courthouses.  We could just give some people a telephone and

16  say, hey, call this number and let us know.  And that

17  wouldn't be right.  That wouldn't be fair; do you agree with

18  that?

19  A        I agree with that.

20  Q        Even the jurors who are selected are going to be

21  told that they have to keep an open mind, that is not form

22  any impression about the facts of this case until it's over.

23  Let me try to explain the reason for that.

1    If early on, let's say the first witness testifies

2    and you assume, based on that juror's testimony, let's say

3    the car was red.  That might prevent you from objectively

4    listening to other evidence as the case unfolds from witness

5    three, four and five that the car wasn't red, it was blue.

6    The car wasn't red, it was green.  You get me?

7    A       Right.

8    Q       You can't form any impressions until the entire case

9    is over.  Now that's probably a hard thing to do.  So all I

10   can ask you, will you do your best to do that?

11   A       I will do my best to do that, right.

12   Q       You would be told that you're not allowed to discuss

13   this case with your fellow jurors until it's over.  And I

14   think that's also a hard thing to ask of jurors.  And the

15   reason I think it's hard is, there's going to be 12 of you up

16   here and, in all likelihood, you don't know one another.  So

17   the only thing you're going to have in common is what you see

18   here, what you hear here.  And because that's what you have

19   in common it's sort of natural to discuss what you have in

20   common.  We ask jurors to resist that natural temptation to

21   discuss the case.  And it's very important that you do that.

22   And, again, will you do your best?

23   A       I would do my best.  And I also have to do that in

1    my investigative work, I can't discuss what I'm doing with

2    anybody else.

3    Q       You also act as mediator sometimes?  In addition to

4    investigations, do you on occasion try to mediate or resolve

5    differences between the claimant and the employer?

6    A       Yes.

7    Q       I have to talk to you about your feelings regarding

8    the death penalty and life imprisonment as sentencing

9    options.  But before I go there I want to explain a concern I

10   have.  I'm afraid that you may conclude that because we're

11   all up here talking to you about punishment that we're

12   predicting that you're going to have to decide the issue of

13   punishment.

14          Do you understand, we're lawyers, we're not fortune

15   tellers.  We're not making such a prediction; do you

16   understand that?

17   A       You do talk about punishment a lot.

18   Q       And in your studies at -- I like that answer

19   because it's a truthful answer.  In your studies at YSU, did

20   you study anything about the effects of the death

21   qualification process in criminal cases?

22   A       Boy, I really don't remember.  That was back in

23   '70-71.

1     Q          To me asking you questions now about punishment is a

2     lot like putting the cart before the horse.  I don't think we

3     should be talking to you about punishment now.  I think we

4     should be talking to you about guilt or innocence now and

5     only guilt or innocence.  But the law requires that we ask

6     you these questions at this time.

7                These questions have nothing to do with the guilt or

8     innocence of Donna; do you understand that?

9     A          Okay.

10    Q          And even though we're talking to you about

11    punishment, as she sits there she is presumed innocent.  You

12    got that?

13    A          I've got that.

14    Q          And your oath as a juror will require you to presume

15    her innocent as we start these proceedings even though you're

16    being asked all these questions.  Can you do that?

17    A          I can do that.

18    Q          And do you understand you may never even have to

19    consider the issue of punishment?

20    A          Right.

21    Q          Because if during the first phase of these

22    proceedings you and the rest of the jurors find Donna not

23    guilty, what happens?

```
 1    A        It's done.

 2    Q        It's done.  We pack up our bags and we go home.  So

 3    as odd as it sounds, we're asking you hard questions about a

 4    difficult issue that you may never have to determine.  Only

 5    lawyers can do that, huh?

 6    A        I guess.

 7    Q        Every morning when you go to work, put your seat

 8    belt on?

 9    A        Absolutely.

10    Q        You don't expect to be in an automobile accident,

11    you put it on just in case; right?

12    A        Just in case.

13    Q        I don't expect to get to a second phase, but we have

14    to ask you these questions now just in case.

15    A        Okay.

16    Q        How do you feel about life imprisonment as an

17    alternative to the death penalty?

18    A        I'm not sure if I was in that position would I

19    rather have, to be truthful with you.

20    Q        I understand that answer.

21    A        I almost in certain instances I guess I would want

22    the death penalty over going to prison for life.  But I hope

23    I'm never in that situation.
```

1977

1     Q       And I understand from your questionnaire that you --

2     I'm talking about your personal beliefs now.  We'll talk

3     about whether your personal beliefs interfere with your

4     ability to follow the law if we have to later.  Does that

5     sound fair?

6     A       Sure.

7     Q       You believe that capital punishment is necessary to

8     eliminate certain people from society, mainly as a way to

9     ensure that they don't repeat violent actions?

10    A       Correct.

11    Q       And in making that determination I assume that you

12    would want to look at the history of the person?

13    A       Correct.

14    Q       In order to determine if there's a likelihood of

15    repetition; am I right?

16    A       That's correct; right.

17    Q       Then in response to another question -- and the more

18    I talk to people here and the more I read this question, I'm

19    beginning to conclude that the question was inartfully

20    written, which actually pangs me because I may have written

21    it.

22            In response to a question, "State whether you

23    believe that certain crimes should require a sentence of

 1    death."  Your answer is, yes, I do believe that certain

 2    crimes should require a sentence of death.  And those crimes

 3    would be premeditated offenses which are violent and affect

 4    the victim's quality of life.

 5    A        Correct.

 6    Q        Well, just about all murders are violent and affect

 7    quality of life; right?

 8    A        Right.

 9    Q        This is a question that Mr. Bailey used to ask years

10    ago and I'm going to steal it from him.  Thanks, Ken.

11            If you were rewriting the laws for the state of

12    Ohio -- we got rid of the Legislature and Kevin Patterson is

13    a Legislature of one.  And you had to write the punishment or

14    punishment for murder, premeditated, planned murder, you got

15    me so far?

16    A        Got you.

17    Q        What penalty or penalties would you include in your

18    sentencing scheme?

19    A        I think probably the penalties that were given to me

20    by Judge Stuard, because I really didn't understand until I

21    started to read that stuff and he went over that that, that

22    was even a -- that there were even options.  I knew the death

23    penalty, that was it.

1    Q       Do you think you have a handle on the four options

2    or would you like me to go over them?

3    A       I think I've got a good handle on them.

4    Q       So at this time if you were writing the sentencing

5    statutes for the state of Ohio you would include as

6    sentencing options in aggravated murder cases: death, life

7    without parole and then life without parole until certain

8    points of time?

9    A       Yes, correct.

10   Q       Is there any offense for which you think the death

11   penalty should be automatic?  In other words, that if you're

12   convicted there's no options, you go to death?

13   A       I would have to say premeditated murder, you know,

14   or something with premeditation, planned out, violent.

15   Violent act I would still say that, right.

16   Q       You have me a little confused, or I have myself a

17   little confused.  I have a long history of confusing myself.

18   Forgive me.  And let's see if I can work through this.

19           We just talked about you rewriting the laws for the

20   state of Ohio.  And we're talking now about rewriting the

21   penalties for premeditated murder.

22   A       Okay.

23   Q       Would you only have one penalty for premeditated

1  murder, the death penalty?  Or would you have other options?

2  A        I think you could have other options, depending upon

3  all the circumstances.

4  Q        Let's forget about rewriting laws for a minute.  For

5  someone in your personal belief system what is the

6  appropriate penalty for someone who has been convicted of

7  premeditated murder?

8  A        That would be the death penalty.

9  Q        And that's the way you honestly feel about that

10  issue?

11  A        That's correct, right.

12  Q        What I need to know from you only you can tell me.

13  And before I ask you the question, you've been told there are

14  no right or wrong answers in this dialogue.

15  A        That's right.

16  Q        There is, however, a mistake that you can make.  And

17  the mistake is, if instead of telling me how you honestly

18  feel you tell me what you think I want to hear so I won't

19  bother you anymore.

20  A        Okay.

21  Q        And don't do that, okay?

22  A        I won't do that.

23  Q        In light of your feeling that in cases of

1981

```
 1    premeditated murder the penalty should be death.

 2    A        That's correct.

 3    Q        In light of that, if you had to decide a penalty in

 4    a premeditated murder case, would the death penalty start

 5    with a leg up?

 6    A        No, I don't think so, no.

 7    Q        Would your feelings regarding the appropriateness of

 8    the death penalty in premeditated murder cases pose a problem

 9    for you in fairly considering the life sentence alternatives?

10    A        No, I don't believe it would.

11    Q        Just a couple more questions and I'm going to get

12    off this issue.  A capital juror who has reached a second

13    phase -- you understand where I'm at here?

14    A        Right, right.

15    Q        The oath of that juror would require that the juror

16    fairly and equally consider four sentencing options: death;

17    life without parole; life without parole until serving 30;

18    life without parole until serving 25.  The oath would require

19    that the juror equally consider all four of those options.

20    If you had to decide the issue of penalty, can you fairly and

21    equally consider all four of those options?

22    A        I think I could honestly do that, yes.

23    Q        You understand that your oath would require that one
```

1982

1  of those cannot have a headstart over the other?

2  A        Right.

3  Q        And if you ever get to that point where you have to

4  decide punishment you would be sitting here, and the first

5  thing a defense lawyer is going to say to you is, remember,

6  folks, you all promised to fairly and equally consider the

7  four sentencing options.  So if your personal view is going

8  to pose a problem for you in that respect now is the time to

9  tell us.  And I'll accept your answer, whatever it is.

10  A        No, I think I can make a decision on the evidence

11  and consider it.

12  Q        Thank you.  Now, in a made up second phase -- we're

13  at a second phase not in this case, in some other case.

14  Before you could ever vote for death the state of Ohio would

15  have to convince you beyond a reasonable doubt that the

16  aggravating circumstances, bad things, outweigh mitigating

17  factors, positive things that can be said about the

18  defendant; do you understand that?

19  A        Right.

20  Q        So it would be the State's burden to prove to you

21  beyond a reasonable doubt that the death penalty was the

22  appropriate penalty.  Will you hold them to that burden if

23  you have to decide the issue of penalty?

1983

```
 1    A        I could do that.

 2    Q        Do you understand that any reasonable doubt as to

 3    the appropriateness of penalty, as to the appropriateness of

 4    the death penalty would require one of the life sentence

 5    options?

 6    A        Right.

 7    Q        When you were talking with Mr. Becker about getting

 8    to a second phase, I believe he told you that you couldn't

 9    get to a second phase unless you found the Defendant guilty

10    beyond a reasonable doubt on the charge of murder.  Do you

11    recall that discussion with him?

12    A        Yes.

13    Q        Well, there would have to be a verdict of guilty on

14    a charge of aggravated murder and additionally there would

15    have to be a verdict of guilty on a death specification, so

16    the State would have to meet its burden on both of those

17    things.  And the Judge will explain that later.  But do you

18    think you have a preliminary understanding of it?

19    A        Yeah, a basic understanding.

20    Q        Have you ever donated any time, money or services to

21    a political campaign or issue?

22    A        A political campaign?

23    Q        Yes.
```

1    A        Yeah, a little bit of money.

2    Q        Do you mind if I ask you what the campaign was?

3    A        No.   The presidential campaign, Political Action

4    Committee.   Our union puts into it.

5    Q        Do you belong to any group or organization which is

6    active in any political matter?  Obviously your union.

7    A        Right.

8    Q        The Veterans, they're active, aren't they?

9    A        Somewhat.   The Veterans organizations are, yes.

10   Q        Any other groups which are active in any political

11   manner?

12   A        None at all.

13   Q        In the last five years or so have you signed a

14   petition on any public issue?

15   A        Probably, but I don't remember what it was.

16   Somebody coming around the neighborhood for something

17   probably.   Nothing of real relevance or importance.

18   Q        Do you belong to or associate with any group which

19   has crime prevention or law enforcement as a goal, like a

20   neighborhood block watch group or MADD Mothers against --

21   A        No, no.

22   Q        In the justice problem answer in your questionnaire

23   you note that there is too much crime and not enough

1    financial or state resources.

2    A        That's my opinion.

3    Q        Well, it's probably right on.  But it leads me to

4    another question, if it's okay with you.  What resources do

5    you think are needed?

6    A        I don't think there probably are enough resources.

7    I mean, I think this is the best system going.  It's what we

8    have.  You probably couldn't build enough courthouses and get

9    enough people going fast enough to move everyone.  There's

10   probably not enough money.

11   Q        What do you think we need more of, courtrooms?

12   Prosecutors?  Education?

13   A        That's a real good question.  I really don't know.

14   I really don't have the answers to what makes it better.

15   Q        And I should take a step back and tell you that I

16   understand that some of the questions that I'm asking you are

17   hard questions.  And I would like you to understand that if

18   we just changed roles for even a couple of minutes and you

19   took this notebook and paged through it and said, this is a

20   good one, let me ask him that.  They would be hard questions

21   for me to answer.

22   A        Sure.

23   Q        I guess I apologize about that.  But the goal here

1    is for all of us to get to know as much about you in a short

2    period of time.  So it's a necessity to ask some hard

3    questions.

4    A      Sure.

5    Q      So here's another one.  We obviously have a crime

6    problem in this country, don't we?

7    A      I agree.

8    Q      Do you have any idea what we -- and by "we" I mean

9    society as a whole, might be able to do to at least begin

10   addressing that problem?

11   A      Not at this point in my life, no.  I really don't

12   know.

13   Q      As Mr. Becker told you, sympathy has no role in this

14   courtroom.  This is a court of law, not a court of sympathy.

15   A      Yeah.

16   Q      And you told Mr. Becker that you wouldn't let

17   sympathy effect your deliberations; right?

18   A      That's what I said, right.

19   Q      Well, you may find that that's easier said than

20   done.  So I want to spend just a few minutes on it.  We have

21   Donna here, and you may feel sympathy for her.  But feeling

22   sympathy for the Defendant should not effect your

23   determinations.  Are we square on that?

```
 1    A         Right.

 2    Q         On the other hand, we have a victim here who lost

 3    his life.  It's only natural to feel sympathy for

 4    Mr. Fingerhut.  And by the same token, sympathy for

 5    Mr. Fingerhut should not effect your evaluation of the

 6    evidence; do you agree with that?

 7    A         Correct.

 8    Q         And then back to asking jurors to do hard things.

 9    You're going to see evidence, pictures, photos that will

10    evoke an emotional response from you.  Maybe sympathy.  Maybe

11    anger.  You're going to see photographs, wounds, maybe point

12    blank to the, close to Mr. Fingerhut's head.  There may be

13    coroner's photographs.  They may be enlarged.  Crime scene

14    photographs.  Some of that evidence may evoke an emotional

15    response from you.  And whether that emotional response is

16    sympathy or anger, you're still going to have to test that

17    evidence to determine whether it ties Donna to this offense.

18    Will you do that?

19    A         I think I can do that.

20    Q         And you see why I say it might be, might be harder

21    done than said?

22    A         Absolutely.

23    Q         In the orientation instruction on Tuesday, April 8th
```

1    the Judge talked to you about the presumption of innocence.

2    Mr. Becker, in his conversation with you, talked to you about

3    the presumption of innocence.

4           How do you personally feel about this rule of law

5    which requires that jurors presume a defendant innocent?

6    A        I've never known anything else in the justice

7    system.  I mean, that's what has been ingrained in me.

8    Q        And we've had such rules, such traditions since the

9    days of the revolution.  That's one of the things that we

10   fought for.  Not all countries do it the same way.  As a

11   matter of fact, there's only a couple that do it this way.

12   And the only ones I can think of off the top of my head are

13   us and Great Britain.

14          I eat breakfast and lunch sometimes at a place in

15   Youngstown called the Newport Deli.  It's a small

16   delicatessen.  And the people there, the people that own it

17   are friends of mine.  They -- remember the crime problem we

18   talked about a little bit ago?

19   A        Right.

20   Q        In order to deal with this crime problem, Doug and

21   Ceas proposed to do away with the presumption of innocence

22   and replace it with a presumption of guilt.  They believe

23   that defendants should be required to prove their innocence.

1   And they're certainly entitled to feel that way.  But they

2   probably wouldn't make good jurors in a criminal case in this

3   country; do you agree with that?

4   A       I would agree with that.

5   Q       Your imbedded-in-tradition comment in your

6   questionnaire is what led me to this issue.

7           Is that one of the traditions you think we're

8   embedded with that maybe we should consider changing?

9   A       I don't see how you could change that, no.

10  Q       You understand that your oath would require you to

11  presume Donna innocent?

12  A       Right, correct.

13  Q       If Lisa or Shelly were accused of some act of

14  wrongdoing by a neighbor, by a teacher, and you honestly in

15  your heart felt that they didn't do what they were accused of

16  doing wrong, you would require evidence that they did it

17  before you would be willing to change your mind, wouldn't

18  you?

19  A       That's right.

20  Q       Well, you're presuming your daughter is innocent

21  under those circumstances?

22  A       Right.

23  Q       Donna is entitled to the same presumption.

1    A        Okay.

2    Q        Can you afford it to her?

3    A        I can do that.

4    Q        And because of the presumption of innocence, the

5    burden of proof in this case is solely and exclusively on the

6    state of Ohio, these fellows right here.  Basically it's time

7    to put up or shut up.  You've leveled these allegations, now

8    try to prove them; you understand that?

9    A        Yes.

10   Q        We don't have to do anything over there.  Remember

11   Mr. Becker talking to you about a glass?

12   A        Right.

13   Q        I guess that glass, there's a name for that glass

14   and that's proof.  And they have to fill that glass up to

15   proof beyond a reasonable doubt.  And that's their burden.

16   So if Mr. Juhasz and I sit over here and we sleep, or we sit

17   on our hands, we haven't added anything to that glass, have

18   we?

19   A        No.

20   Q        It's their duty to fill it up.  Will you hold them

21   to their duty of filling that glass up?

22   A        I can do that.

23   Q        And it's also their duty to fill that glass up if we

1991

1    ever get to a second phase.  Will you require a full glass at

2    a second phase if we ever get there?

3    A        I can do that, too.

4    Q        You understand that Donna is on trial for murder,

5    not for being a woman of loose moral character.  And while

6    they may prove she's a woman of loose moral character, the

7    State's burden is to prove that Donna intentionally

8    participated in the death of Robert Fingerhut.  Are you going

9    to hold the State to that burden?

10   A        I can do that.

11   Q        The Judge is going to talk to you about essential

12   elements.  Do you remember studying those back in the '70s at

13   YSU?

14   A        Some.  Not much.

15   Q        Well, they're simply necessary ingredients.  He'll

16   tell you what they all are.  There's two aggravated murder

17   charges.  Purpose is an essential element.  And the Judge

18   will tell you that purpose is the same as intent.  A person

19   acts purposely if it is his or her intention to cause a

20   specific result.  Are you with me?

21   A        Okay.

22   Q        Would you agree that the facts and circumstances

23   surrounding an act can shed light on the actor's intent?

1   A        Yes.

2   Q        For instance, if I go out there and commit some kind

3   of wrongdoing, would you expect me to try to cover my tracks

4   or to leave a paper trail?

5   A        Cover your tracks.

6   Q        If I go out there and purposely engage in some

7   wrongdoing, would you expect me to do it openly in the light

8   of day or to try to do it secretly at night?

9   A        Maybe secretly at night.

10  Q        There's another charge, aggravated burglary.  That's

11  the third count of the indictment, but it's also the first

12  death specification.  You think you understand that?

13  A        Could you explain that a little bit?

14  Q        Sure.  The first two counts of the indictment are

15  aggravated murder charges.  One is causing the death of

16  another with prior calculation and design.  There are other

17  elements, but basically that's the premeditated murder which

18  is now prior calculation and design.

19           There's another aggravated murder charge, which is

20  causing the, causing the death of another, purposely causing

21  the death of Robert Fingerhut while committing aggravated

22  burglary or aggravated robbery.  That's felony murder.  The

23  State is entitled to plead both of those sort of like

1993

1    alternative pleadings.  There's one death but there's two

2    theories.

3    A       All right.

4    Q       Each of those charges have two death specifications.

5    The first death specification is that the murder was

6    committed during an aggravated burglary.  And then there are

7    some other things, but I think that should suffice for now.

8    And then the second death specification is that the murder

9    was committed during an aggravated robbery.  Is that a little

10   better?

11   A       Yeah, that's better.

12   Q       And remember when we talked about, you can only get

13   to a second phase if you returned a verdict of guilty on an

14   aggravated murder charge and a death specification, that

15   would be one of those two specifications?

16   A       Okay.

17   Q       The Judge will define aggravated burglary to you.

18   And he'll tell you that it requires a trespass, to enter or

19   remain upon the land or premises of another.  Will you hold

20   the State to their burden of proving that?

21   A       Yes.

22   Q       And then aggravated robbery is while committing or

23   attempting to commit a theft offense, someone had a deadly

1994

1  weapon on their person.  That's basically the essential

2  elements of aggravated robbery.  And a theft offense

3  necessarily involves the taking or an attempt to take the

4  property of another.

5  A     Right.

6  Q     Will you hold the State to proving an intended theft

7  offense?

8  A     Yes.

9  Q     Donna Roberts doesn't have to testify in this case.

10 Whenever you were called upon to resolve a dispute between

11 your two girls, I bet the first thing you said to them is,

12 okay, you sit there and you sit there.  I want to hear both

13 sides of the story.

14 A     Right.  Sometimes.

15 Q     Other times you didn't have to hear both sides?

16 A     I didn't have to hear anything.

17 Q     The black eye was staring you right in the eye?

18 A     Right.

19 Q     Most jurors candidly would like to hear what a

20 defendant has to say; we can agree on that, can't we?

21 A     Right.

22 Q     Well, sometimes your oath as a juror will require

23 you to put aside that natural inclination.  And let me try to

1995

```
 1    explain.  Remember Mr. Becker's glass?
 2    A        Right.
 3    Q        If Donna Roberts sits here and elects not to
 4    testify, that doesn't add anything to the glass; do you
 5    understand that?
 6    A        Okay.
 7    Q        If she elects not to testify, you cannot consider it
 8    for any purpose.
 9    A        Okay.
10    Q        How do you feel about that?
11    A        You have to follow that.  I mean, that's the rule.
12    Q        Yeah, it is a rule.  Is it a rule that you might
13    have a problem following?
14    A        I could follow it.  If you're asking me, do I agree
15    with it?
16    Q        Yes.  Do you agree with it?
17    A        Not really, no.
18    Q        Fair answer.  If we try this case and Donna elects
19    not to testify, will that trouble you?
20    A        It wouldn't trouble me, no.
21    Q        So your personal feeling is something that you can
22    set aside?
23    A        Absolutely.
```

1    Q        That's one of those hard things that we ask jurors

2    to do.

3    A        Absolutely.

4    Q        And how you feel is, I think, only natural.  And to

5    be candid with you, I think 95 out of 100 jurors that we talk

6    to feel the same way.

7            Now, the flip side of that is that if Donna does

8    testify she's a witness just like any other witness.  You

9    would have to use the same rules or standards for judging her

10   credibility as you use for judging the credibility of other

11   witnesses.

12   A        Okay.

13   Q        There's not a separate standard for her.  The

14   standard that you judge the witnesses by should be uniformed.

15   They should be the same.  And the Judge will tell you that.

16   Do you agree with that?

17   A        That's fine.

18   Q        Let's be fair about this.  She's the Defendant here,

19   isn't she?

20   A        Correct.

21   Q        So that gives her an interest or a stake in the

22   outcome?

23   A        Surely.

1    Q        And that's one of the things the Judge is going to

2    tell you that you can consider and believe in someone.  And

3    even if he didn't tell you that, that's one of the things we

4    would naturally consider in believing someone, isn't it?

5    A        Sure.

6    Q        So if we're going to do it uniformly, we apply that

7    to her and then we apply it also to each and every witness

8    that testifies.  Will you do that?

9    A        Yes, I can do that.

10   Q        And he's going to give you a whole list of things

11   about credibility.  You can believe all of what someone says,

12   none of what someone says, part of what someone says.  You

13   determine the truth.  He's going to give you factors.  And

14   he'll list those for you.  And I just gave you one example:

15   interest or stake in the outcome.

16            Another one is reasonableness of testimony.  If

17   someone testifies and it just doesn't make sense to you,

18   that's something you would want to consider, isn't it?

19   A        Yes, it would be.

20   Q        But he's going to give you another factor that is

21   called the test of truthfulness that you use in your every

22   day life.  Over the course of years you will have frequently

23   had to determine whether someone, whether the girls, whether

 1    a claimant, whether an employer was telling you the truth or

 2    not or trying to hoodwink you?

 3    A       Right.

 4    Q       And over the years I imagine you've developed a

 5    sixth sense or an intuitive sense to assist you in making

 6    those determinations?

 7    A       Correct.

 8    Q       Well, you're not supposed to leave that sixth sense

 9    at the courtroom door.  We want you to bring it in here and

10    apply it to everyone that testifies.  Will you do that?

11    A       I can do that.

12    Q       Did you ever hear of the old saying, where there's

13    smoke there's fire?

14    A       Right.

15    Q       Well, the fact that Donna Roberts has been indicted

16    is not evidence and should not be considered as such; do you

17    understand that?

18    A       I do now, right.

19    Q       Let me explain why.  Mr. Becker I think did a pretty

20    good job of it, so I'm going to be short unless you want me

21    to slow down.

22            There's no judge there in a grand jury.  The

23    Defendant is not there.  Her lawyers aren't there.  The

1999

```
 1    evidence isn't tested.  It's a one-side thing.  The only
 2    person that's there besides the grand jurors are, is the
 3    prosecutor.  So it just wouldn't be fair to hold that against
 4    someone.  It would be like using secret evidence; do you
 5    agree with that?
 6    A       Correct.
 7    Q       Now, this indictment is going to be read to you or
 8    referred to throughout the course of these proceedings.  What
 9    I want you to understand is that there is no point in time at
10    which it is magically transformed into evidence.  It's not
11    evidence now.  It's never evidence.  Do you understand that?
12    A       Okay.
13    Q       Do you think -- do you want to talk anything about
14    the grand jury process?
15    A       No.  That's pretty good.
16    Q       Reasonable doubt is a doubt based on reason and
17    common sense.  Did you ever say to yourself, I'm going to
18    give, I'm going to give one of my girls the benefit of the
19    doubt?  Did you ever say that to yourself?
20    A       Right.
21    Q       Well, you never said, I'm going to give her an
22    unreasonable doubt, did you?
23    A       No.
```

2000

```
 1    Q       We intuitively know what's reasonable or what's
 2    unreasonable, don't we?
 3    A       Right.
 4    Q       The Judge will tell you that proof beyond a
 5    reasonable doubt requires that you be firmly convinced of the
 6    allegations, and is proof of such character that an ordinary
 7    person, you or me, would be willing to rely and act upon it
 8    in the most important of our own affairs.  Firmly convinced,
 9    rely upon in the most important of our own affairs.
10            Now, you made important decisions in your life,
11    haven't you?
12    A       Yes.
13    Q       And sometimes when making important decisions we
14    make a checklist either in our mind, and sometimes people do
15    it on paper.  You put a line down the middle, you write the
16    pros, good things over here, negatives, bad things over here.
17            Let's say it's buying a house.  You write
18    everything.  Love the house.  Enough bathrooms.  Good school
19    district.  The negatives:  It's an old house.  I don't know
20    about the structural stability.  The plumbing looks a bit
21    shaky to me.  And I just don't know if I can cut the mortgage
22    payment.
23            So you investigate those negatives, or at least I
```

```
 1    do, because if I can strike those negatives off, then I can

 2    say that I'm firmly convinced that's the right thing for me.

 3    So I call the plumber and say, hey, listen, check out these

 4    pipes.  How expensive is it going to be?  He tells me it's a

 5    couple hundred bucks.  I can scratch that negative off;

 6    right?

 7    A        Right.

 8    Q        The structural stability.  I call a contractor and

 9    say, hey, listen check out this foundation for me.  I'm a

10    little bit worried about it.  I want an inspection.  He says,

11    this house is brick solid.  So I strike that one off.

12            I go to the bank, I talk to my banker about interest

13    rates.  I talk to my banker about the term of the loan.  And

14    no matter how much I deal with the, whether I can afford the

15    payment question, it remains reasonable in my mind.  I don't

16    know whether I can do it.

17    A        Right.

18    Q        I still have one negative that is reasonable, and if

19    I still have one negative that is reasonable I cannot say

20    beyond a reasonable doubt that that decision is the right

21    thing for me; do you understand that?

22    A        Right.

23    Q        That's the same thing in this case.  If you have one
```

1   solitary reasonable doubt the State has not met its burden of

2   proof.

3   A        Okay.

4   Q        Now, Mr. Becker talked to you about circumstantial

5   evidence.  And you'll be glad to know I'm just about done.

6   Circumstantial evidence is proof of a fact by direct

7   evidence, what someone saw, heard, felt, from which you can

8   infer something else.  You got a handle on that?

9   A        Right.

10  Q        Basically it's proof of one fact and you are then

11  asked to make a leap in logic.  Does that sound reasonable?

12  A        Right.

13  Q        So the first thing you want to do if you're asked to

14  make a leap in logic is to test that leap to see if it's

15  reasonable; right?

16  A        Right.

17  Q        Because it's a leap.  If the leap is not reasonable

18  you don't want to make it; right?

19  A        That's correct.

20  Q        And we talked about your girls when they were, may

21  have been accused of wrongdoing and you presumed them

22  innocent.

23          In that situation if you were asked to make

```
 1    inferences on circumstantial evidence, do you think you would

 2    look for other inferences that you could make that maybe

 3    didn't point to wrongdoing that were equally reasonable?

 4    A       Sure.

 5    Q       Will you do that here?

 6    A       Right.

 7    Q       And would you agree with me that circumstantial

 8    evidence is like a chain; it can only be as strong as its

 9    weakest link?

10    A       That's a fair assumption.

11    Q       So with circumstantial evidence I guess you got to

12    look for weak links.  Will you do that?

13    A       I can do that.

14    Q       Now, one example, there's a danger when you start

15    piling inferences on inferences.  And that's tough, so let me

16    try to explain this.

17            It's the middle of winter.  It's Sunday morning and

18    I want my newspaper.  So I'm upstairs.  I've got a cigarette

19    in one hand, a cup of coffee in the other hand.  I look out

20    the window and it had snowed the night before.  And I see

21    footprints in the snow from my neighbor's house on one side

22    to my doorway, and from my doorway to the neighbor on the

23    other side.  Now, I didn't see anybody walk across that snow,
```

1    but I can infer someone did; correct?

2    A        Correct.

3    Q        And that's a pretty good inference, isn't it?

4    A        Not bad.

5    Q        Well, I also infer that it was my paperboy.  So

6    what I'm doing is I'm piling an inference on an inference

7    here; correct?

8    A        Right.

9    Q        Until I go down and open my door, expecting to see

10   my paper and it's my Giant Eagle coupons.  So you've got to

11   test these inferences.  And when you start piling an

12   inference on an inference you got to really test them.  You

13   got me?

14   A        Yeah.

15   Q        Now that I've taken up so much of your time and

16   attention, has anything popped into your mind while you were

17   talking with me or Mr. Becker that you would like to discuss

18   with the Judge or any of us?

19   A        No, not really.  I think I've got some questions

20   answered here today.

21   Q        Do you have any questions left that have not been

22   answered?

23   A        Pardon me?

1    Q        Do you have any questions left that have not been

2    answered?

3    A        No, sir.

4    Q        Thank you very much, sir.  Have a pleasant day.

5    A        You're welcome.

6                          THE COURT:  Pass, or do you wish to

7    approach?

8                          MR. JUHASZ:  Pass.

9                          MR. INGRAM:  Pass.

10                         MR. BECKER:  Pass.

11                         THE COURT:  Very good.  Mr. Patterson, you

12   will be in the poll from which this jury is selected.  I

13   would ask you to call that number given to you after 4:30

14   Friday for further instructions.  Probably sometime next week

15   we'll be picking the jury on this.  You'll be notified when

16   to return.

17        I would again remind you not to discuss anything

18   about the case.  You should not read anything in the

19   newspaper, watch anything on TV until you return.  We thank

20   you very much for your participation.  Thank you.  We're

21   going to take a break now.

22                         (Whereupon, a recess was taken.)

23                              * * *

1    WHEREUPON,

2                              MARSHA J. DANADIC

3    being first duly sworn, according to law, was examined and

4    testified as follows:

5                              EXAMINATION

6    BY THE COURT:

7    Q        Good morning.

8    A        Hi.

9    Q        How are you?

10   A        I'm okay.

11   Q        You read the handout that was given to you?

12   A        Yes.

13   Q        As you know then, we're here on an aggravated murder

14   case, being two different counts in the indictment,

15   aggravated murder with specifications.

16            Under the law as we have it in Ohio, a person who is

17   found guilty of murder does not necessarily face the death

18   penalty.  Legislature has passed a statute that says only in

19   certain circumstances when a person is found guilty of murder

20   do they face the death penalty.

21            This case will begin with picking a jury.  And the

22   State will then be called upon to present evidence showing

23   the facts of this matter.  They must prove beyond a

1  reasonable doubt each and every element of the crime of

2  aggravated murder and the specifications are true.  The jury

3  must find so unanimously before they would be entitled to a

4  finding of guilty.  If the State fails to do that then of

5  course this jury would properly return a finding of not

6  guilty.

7       If the State is able to maintain that burden of

8  proof then this matter would go to a second phase.  And

9  during that second hearing the State is again called upon,

10  because the burden of proof is always on the State.  The

11  Defendant doesn't have to do anything if they care not to, if

12  she cares not to.  She has an absolute right to remain

13  silent.  And the presumption of innocence is with her until

14  the State, until the State would carry their burden of proof.

15       Now, at the second phase, if we get to that, the

16  State has to prove beyond a reasonable doubt that the

17  aggravating circumstances, which are the reasons why the jury

18  should consider imposing the death penalty, outweigh any

19  mitigating factors.  Those would be reasons for the jury to

20  consider why in this particular case the death penalty should

21  not be imposed.  And again, the defense need do nothing.  The

22  burden is entirely upon the State.

23       It would not be workable to not bring this up and

1    ask questions at this point because if an ordinary jury sat

2    and heard the matter and decided on the aggravated murder

3    portion they got to -- and made a finding of guilty, if they

4    got to the second portion and we had people on there that

5    believe that if you took a life you should lose your own

6    life, that would not be fair to the Defendant.  Or if there

7    were people on there that felt under no circumstances would

8    they ever consider imposing the death penalty, then the State

9    couldn't get a fair trial.  So this whole thing is geared to

10   find out what your views are.

11         Whatever your views are is perfectly fine.  It's

12   just that both sides here need some assurance that all the

13   jurors will be able to follow the law.

14   A    Right.

15   Q    Okay.  Are you nervous?

16   A    Yes.

17   Q    Please don't be.  You've got nice, very good

18   attorneys who will not embarrass you in any way.  That's not

19   always true.  But these fellows will not.

20         The second area that they might inquire into will be

21   whether you've been subjected to any pretrial publicity.

22   Have you read anything in the newspapers and, if so, has that

23   been fixed in your mind to the point where you would not be

1    able to set it aside, because this case has to be decided on

2    the evidence presented in this courtroom.

3    A        Right.

4    Q        In order for both sides to get a fair trial.  You're

5    still nervous.  Please don't be.  Okay?

6    A        Okay.

7    Q        That's what they're going to ask you questions

8    about, so we'll go from there.  Mr. Bailey.

9                                EXAMINATION

10   BY MR. BAILEY:

11   Q        Good morning, Mrs. -- is it Danadic or Danadic?

12   A        Danadic.

13   Q        My name is Ken Bailey.  I'm an assistant prosecutor.

14   And as I promised you a couple weeks ago that Chris Becker,

15   my co-counsel, will be here in court with me today.  The two

16   of us are responsible for presenting this particular case.

17   And as the Judge said, you can relax, because I have to think

18   of these questions to ask you, so I'm the one who ought to

19   really be nervous.

20            So we're here to make sure that -- the reason we go

21   for these questions is to make sure that the folks who are

22   selected to serve as jurors in this case could be fair and

23   impartial to both sides, both to the Defendant and to the

1    people of the State. And that's why we ask these questions.

2    Not because we're snoopy and we like to pry into your

3    background and opinions and things. Now, and we're not

4    asking you out of any mere curiosity. There aren't any right

5    answers. There aren't any wrong answers. Just open and

6    candid answers about what you think about certain things.

7         And one thing I want to bring out is, under our

8    rules of conduct we're not allowed to have any communication

9    with you outside of the courtroom here today until this case

10   is all over. And it may go into two phases. And if it does,

11   we can't talk to you in between until both phases are over.

12   So if we run into each other out in the hallway or the

13   elevator or restaurant or something, all we're allowed to do

14   is say good morning or good afternoon. And the reason I

15   mention that is, I don't want you to think that we're being

16   antisocial or trying to snub you or something like that.

17   A        Okay.

18   Q        Now, the first two areas that I want to get into are

19   the areas of publicity and the death penalty. You have some

20   prior knowledge of this case. I believe you watch TV 27 as

21   well as maybe some of the other channels a couple times a

22   week. You don't read any newspapers, I understand; right?

23   A        No, not usually.

1    Q        Ever?

2    A        If I do it's the Ann Landers, that's it.  But Ann

3    Landers isn't even in the paper anymore.

4    Q        Right.  She passed away.  It was Ann Landers and, I

5    couldn't keep them straight, and her sister Abigail.

6             Any reason you don't read the newspapers?

7    A        I have five kids.  I work full time.  I just don't

8    have time, really.

9    Q        Been there, done that.  Now, with what you saw on

10   television, I take it you're aware that, let's see, you had

11   indicated that you were aware of a co-defendant in this case,

12   a fellow by the name of Nate Jackson.  What do you recollect

13   about Nate Jackson?

14   A        Well, at first I just recognized the name.  And I

15   just, I didn't really remember everything about it.  I just,

16   I just kind of, I don't even know if he got -- I think he got

17   convicted.  I wrote down what I think I know.  I mean, I

18   really didn't write, I don't even know if that's true.

19   That's what I think I know.

20   Q        Okay.  Is there some reason that name rang a bell?

21   A        I don't know.  Because I, the reason I listen to the

22   news in the morning, I'm a nurse's aide in a nursing home so

23   while I'm getting people up I kick on the TV.  And I always

1    watch Channel 4.  And I want to watch the weather.  And then

2    I can hear, you know, the news.  But it's just, I just

3    probably heard it and that's what I -- you know what I mean?

4    It's not anything that ever really I thought it was a big

5    deal because I don't --

6    Q        Well, the reason the Judge instructs you once you

7    get in here is, you're not to read the newspapers anymore

8    until the case is all over or watch TV or, because if you

9    hear something coming on you walk out of the room or shut it

10   off.

11   A        Right.

12   Q        As you look around the courtroom, there's nobody

13   here right now from the media, no newspaper reporters, no TV

14   people.  But from time to time they'll pop in.  They'll come

15   in with their cameras, the TV people.  And they can't film

16   the jurors, but they may film the witnesses or the Judge or

17   the attorneys or the Defendant.  Then they'll do a feature on

18   it.  And they'll only be here for a couple minutes.  And the

19   newspaper reporters, they'll pop in for maybe five minutes or

20   15 minutes or a half an hour or so.

21          But the thing is, they're going to miss everything

22   that happened before they got in here, all the questions and

23   answers.  And then they're going to miss everything that was

1    asked and answered afterwards.  So because of the nature of

2    their business, they don't intentionally slant things or miss

3    report things, but they have to rush in to print so it's

4    still news.

5            But you may be, if you're picked to sit on this jury

6    you can have somebody save the papers or tape the TV spots on

7    the news.  And when the trial is all over you might look at

8    it and say, you know, gosh, I sat in Judge Stuard's court for

9    a week and a half or two trying this case and I remember the

10   testimony.  And it's like whoever that reporter was, they

11   must have covered a trial in Judge McKay's court rather than

12   Judge Stuard's court because it's so different from what I

13   recollect.  That's because they're not here for the entire

14   trial.  So that's why it's so important that you start off

15   here with a blank slate.

16           It's like going back to school with a clean

17   chalkboard.  And you get up there and whatever is going to be

18   written on that board is going to be what you hear from this

19   courtroom from the testimony of the witnesses, the evidence

20   that is introduced and the instructions of law given to you

21   by the Judge.  And I take it you can do that, you can start

22   out with a clean slate?

23   A        Right.

1   Q        It may well be that as you hear the testimony you

2   might recollect having heard something on TV before, or maybe

3   on the radio.  But you would be able to set that aside and

4   base your decision on what happens here; right?

5   A        Yes.

6   Q        And you certainly don't know enough about this case

7   to form any opinions about this Defendant; right?

8   A        No.

9   Q        Now let's get into this issue of the death penalty

10  as a possible punishment.  When was the first time that you

11  learned that this was potentially a death penalty case?

12  A        In the courtroom.

13  Q        That was a couple weeks ago?

14  A        Right.

15  Q        I imagine it was kind of a shock?

16  A        Yes.

17  Q        Because the death penalty is not the usual type of

18  case that's tried in the courtroom.  The usual type of case

19  that, a criminal case that a jury hears, the jury isn't

20  concerned with punishment at all as an issue.  That's usually

21  totally up to the judge to decide.

22           In this type of a case, because of the way the

23  Legislature wrote the law, the jury gets involved in this

1   issue of punishment.  It could go into a second phase.  And

2   as the Judge indicated in that handout that you read, you

3   understand that some of the charges here are called

4   aggravated murder.  Okay.  And there are two counts or

5   charges of aggravated murder.  One with prior calculation and

6   design, and one with felony murder as a different concept.

7   There are two different theories here of a killing.  There's

8   only one killing but two separate theories.  And under the

9   law the State is allowed to proceed under both theories of

10  aggravated murder, which we have elected to do, which we're

11  allowed to do that.

12          And attached to this crime of aggravated murder are

13  what we call specifications.  These are, it's a fancy word

14  that just means a special extra finding of fact for a jury to

15  consider.  And there are two of those, okay, attached to each

16  of these charges of aggravated murder.  One of them is that

17  the aggravated murder occurred with prior calculation and

18  design, and that it was during the course of an aggravated

19  burglary.

20          And the second special finding of an aggravating

21  circumstance, fancy word, is that it occurred with prior

22  calculation and design and that it occurred during the course

23  of an aggravated robbery compared to the aggravated burglary;

1    right?

2    A        Right.

3    Q        Now, if the jury, you and the other 11 jurors,

4    return a verdict of guilty beyond a reasonable doubt of a

5    crime called aggravated murder and one or more of the

6    specifications, we go into a second phase.  Okay.  The first

7    phase the issue is guilt or non guilt.  And because of the

8    fact the issue is guilt or non guilt, it's not relevant to

9    produce any evidence at all about what the appropriate

10   punishment is because we wouldn't be at that phase; right?

11   A        (Witness nods head affirmatively.)

12   Q        So in the second phase the issue becomes, what's the

13   appropriate punishment for this Defendant for this offense?

14   Okay?  And because you've already decided guilt, we never get

15   into the guilt phase here, we get into this issue of the

16   appropriate punishment.  And in the second phase you have to

17   do this balancing test that the Judge mentioned.  Okay?

18            And on one hand you have the aggravating

19   circumstance or circumstances from the first phase that you

20   would have found, okay, and on the other hand there's what we

21   call mitigating factors.  Mitigating factors are things that

22   work to a defendant's benefit and would work against the

23   death penalty as a punishment.  Okay.  We don't know what

1      those are at this point because it's not relevant.  We have

2      no clue what they may be.  But there could be something

3      there.  And it's up to you and the other jurors how much

4      weight to give to the aggravating circumstance or

5      circumstances on the one hand, and the mitigating factors on

6      the other.  You can determine that something has a whole lot

7      of weight, might weigh about a ton or something.  And on the

8      other hand, you might decide that a certain thing is

9      presented might have some weight but it might weigh about as

10     much as a feather.  So it's up to you and the other jurors to

11     decide how much weight to give it.

12             Now, in this type of a case, a capital murder case,

13     you get involved in this punishment issue.  That's what makes

14     it so unique in Ohio.  It's not applied in every murder.

15     It's only in certain types of crimes that the Legislature has

16     set out to be where the death penalty is an option.

17             Now, you indicated in the past that you believe the

18     death penalty has a place in society; right?

19     A       Sometimes.

20     Q       Sometimes.  If you could design the criminal justice

21     system, if you sat on the Legislature would you include the

22     death penalty as a possible punishment for certain crimes?

23     A       I think I would.

1    Q      If you designed the system, for which crimes would

2    you make that a possible punishment?

3    A      Well, I've been thinking about this a lot for two

4    weeks, and I've gone back and forth.  What I think is, people

5    like, crimes I should say, like serial killers, somebody

6    that's going to keep going out and killing somebody like that

7    is not right.  And we're paying a lot of money for them to

8    keep going to trial or keep going to, paying for them to live

9    while we're out there working and they're going out there

10    killing everybody.  And they can't be fixed.  There's

11    something wrong with them in the head.  So --

12    Q      Okay.  Any other crimes other than serial killers?

13    A      I thought if somebody ever did something to my kids

14    I probably would, if somebody purposely hurt my kids I

15    probably wouldn't want to ever see them again.

16    Q      That's understandable.

17    A      That's about what I can think of.

18    Q      Okay.  Now, the charge here, the Defendant's charged

19    as a complicitor.  Okay.  That means she's charged with

20    soliciting or procuring another person to commit the offense,

21    felony, Nate Jackson, or aiding and abetting him in the

22    killing.  And the charge is that this Nate Jackson is the

23    one who actually did the killing, and he's the one who

1    actually committed the aggravated burglary and the aggravated

2    robbery.  And he had the loaded gun that worked.  Okay.

3              Anything about the fact that she's charged as a

4    complicitor, an aider and abettor that would bother you in

5    reaching a decision in this case, and not being the trigger

6    person?  She's charged with doing this purposely with prior

7    calculation and design.

8    A        I can't say right now.  I can't say.  I can't tell

9    you what I would think because I don't know enough about it.

10   I mean, that's my honest truth.  I can't tell you what I

11   think.

12   Q        Okay.  But the question is basically, does it bother

13   you that she's, anything about the fact that she's charged

14   with somebody who's helping plan the murder as opposed to

15   being the actual trigger man?

16   A        How do I feel about that?

17   Q        Right.  Does that bother you in any way?  Do you

18   think that would effect your ability to decide this case?

19   A        I don't think.  I don't know what you mean by that.

20   Does it bother me that --

21   Q        That she's not --

22   A        -- you guys are asking for a death penalty for

23   somebody who didn't actually kill him but wanted him to be

1  killed?

2  Q        Right.  Under the law, the Legislature has written

3  the law in such a way that the death penalty can become an

4  option in this type of a case.

5  A        No, it doesn't bother me.  The law has to be written

6  some way.  You can't draw the line anywhere.  That's why you

7  have a jury; right?

8  Q        Right.  Okay.  Now, your feeling about the death

9  penalty being appropriate in certain types of cases, how long

10  have you had this viewpoint?

11  A        I don't know, because I never really thought about

12  it a lot until lately.  I can't tell you that either.

13  Q        Okay.  Have you ever had a chance to discuss this

14  issue of the death penalty being appropriate in certain

15  cases?  For example, cases that come up in the news, if you

16  hear it on TV and other people are working, or maybe people

17  at home, family members or family gatherings or other things

18  where the issue comes up, oh, I think this punishment should

19  happen to that person or something?

20  A        Not particularly about the death penalty, no.

21  Q        Now, you understand that if you and the other jurors

22  find the Defendant guilty of the crime of aggravated murder

23  with one or more of these specifications that make the

 1    Defendant eligible for the death penalty, we go to the second

 2    phase; right?

 3    A       Uh-huh.

 4    Q       In that second phase you can hear the same evidence

 5    or you can hear new evidence.  Okay.  And you understand the

 6    burden of proving all the elements of the offense is on us,

 7    the people of the State?

 8    A       Right.

 9    Q       The Defendant doesn't have any burden.

10    A       Right.

11    Q       As she sits there she's presumed innocent.  That's

12    like a cloak shielding her all the way through the course of

13    this trial.  She's presumed innocent, as are all other

14    defendants tried in this courtroom.

15    A       Right.

16    Q       Now, our burden of proof, we have to prove these

17    elements, the different crimes that are charged here.

18    There's two counts of aggravated murder with the

19    specifications.  And there's a crime called aggravated

20    burglary and another crime called aggravated robbery.  And

21    attached to those two crimes are some more specifications,

22    special findings of fact, that there was a firearm, okay, a

23    working gun that was involved and used.

1          Now, these elements -- do you ever bake for your

2     kids, ever bake a cake?

3     A          Yes.

4     Q          What's their favorite?  Each one has a different

5     one?

6     A          Yes.

7     Q          How about plain old chocolate cake?

8     A          Yes.

9     Q          You've got your certain key ingredients for your

10    standard chocolate cake; right?  The eggs and the flour and

11    sugar, the chocolate and baking -- I don't remember if it's

12    Baking Powder or Baking Soda.  It's Baking Powder.  And a

13    couple other things you add to it.  And you've got to mix it

14    all together, put it in the pan and put the oven at what, 350

15    for about 40 minutes or whatever it is, and the cake rises.

16    And if your kids want a chocolate cake, you've met your

17    burden as a mom by making that chocolate cake.

18         Now, if you left out a key ingredient in the recipe,

19    let's say you left out the chocolate, you can make a cake but

20    it's not going to be chocolate cake; right?

21    A          Right.

22    Q          Same thing with these crimes.  We have what are

23    called elements.  Each crime is composed of certain elements,

1    and elements are essential component parts of a crime, like

2    the ingredients in a recipe.  Okay.

3            Let me give you a for instance.  Let's take the

4    crime of aggravated murder with prior calculation and design.

5    And the Judge is going to give you an instruction at the end

6    of this case about the law and all the elements of the

7    crimes.  And you're bound to follow his instruction.  But,

8    for instance, with aggravated murder the State would have to

9    prove first that it happened on or about a certain date, like

10   December 11, 2001.  Okay.

11           The second element or ingredient would be, we have

12   to prove that it happened in Trumbull County, Ohio.  Happened

13   up in, let's say Howland Township.  Okay.  But we're going to

14   have to prove that.  And you're going to hear testimony.  You

15   may get tired of hearing testimony if I ask the question a

16   million times, "In what county and state did it occur?"

17           Third:  Identification of the Defendant.  Somebody

18   is going to have to come in and point out the Defendant.

19   Okay.  Fourth:  That she acted purposely, as a specific legal

20   definition meaning that the Judge will give you, but

21   basically it's on purpose.

22           Fifth:  That she caused the death of a living

23   person, in this case a fellow by the name of Robert

1    Fingerhut.  And sixth:  That she did it with prior

2    calculation and design.  And the Judge will define that term.

3    But you heard the old term premeditation?  Well, they changed

4    the law and they required some planning and forethought to

5    have prior calculation and design.  It's more than just

6    dropping my pen and catching it by reaction.  If I drop my

7    pen, I look down and say, oh,  my goodness, I dropped my pen,

8    maybe I better get down and pick it up, and I do that, that

9    requires some prior calculation and design; right?

10   A       Yes.

11   Q       Now, in the second phase, okay, let's go to the

12   second phase for a minute here.  We have to prove the

13   elements by proof beyond a reasonable doubt.  And the Judge

14   will define that term for you, too.  But basically when we

15   talk about proof beyond a reasonable doubt we're talking

16   about using your reason and your common sense that you use

17   every day as a mom.  You use it every day as a nurse.  You

18   use it in your life, your reason and your common sense.  And

19   we have to firmly convince you of the truth of the charge to

20   a moral certainty using your reason and common sense.  Okay.

21            One example that's been given, an analogy, is having

22   a box and filling the box up.  You know, in a civil case

23   where somebody sues for money damages, they've got to fill

1    the box just over halfway.  That's by a preponderance of the

2    evidence.  But in a criminal case that's proof beyond a

3    reasonable doubt.  So we've got to have it filled not to the

4    top.  That's like 100 percent proof.  Okay.  There's no such

5    burden of proof in criminal law.  We don't have to fill it

6    all the way to the top.  We've got to fill it close enough to

7    the top so that you're convinced, that you're satisfied that

8    we met our burden there.  That it's reasonable.  Okay.

9    There's no reasonable doubt.  That's what reasonable is, we

10   prove the truth of the charge, these elements.

11          And each juror, you and each of the other 11 jurors

12   will decide for yourself how high on the box do you want us

13   to fill that box with evidence until you're satisfied with

14   it.

15          You understand there's no such animal as proof

16   beyond a shadow of a doubt?  Sometimes that term is bantered

17   about.  It's a nice title for an Alfred Hitchcock movie, but

18   it's not a criminal law concept.  Some folks come in and

19   said, I want it proved 100 percent beyond all doubt.  That's

20   not our burden.  If the Judge tells you that our burden of

21   proof is proof beyond a reasonable doubt you'll hold us to

22   that burden; right?

23   A        Right.

1    Q        You wouldn't force us to a higher burden than what

2    the Judge says our burden is?

3    A        No.

4    Q        So let's say we're in the second phase and we have

5    to prove to you beyond a reasonable doubt that the

6    aggravating circumstance or circumstances outweigh whatever

7    mitigating factors are presented.  Now there are four

8    possible penalties.  You're aware of that.  The Judge told

9    you about the four penalties:  The death penalty; life in

10   prison with no parole eligibility; life in prison with parole

11   eligibility after 30 full years, and; life in prison with

12   parole eligibility after 25 full years.  And they should all

13   start out equally in your mind, right, as possible

14   punishments?

15   A        (Witness nods head affirmatively.)

16   Q        Because they're there.  But if the State convinces

17   you and the other jurors that the aggravating circumstance or

18   circumstances outweigh these mitigating factors beyond a

19   reasonable doubt, then you and the other jurors must return a

20   verdict finding for the death penalty as a punishment, okay,

21   because that's our burden.  Okay.  At that point you don't

22   consider the life sentences because we've met our burden of

23   proof.

1          It's only if we fail to meet that burden and we

2    don't prove that the aggravating circumstance or

3    circumstances outweigh the mitigating factors beyond a

4    reasonable doubt, that then you go on to consider the three

5    life sentences.

6    A       Okay.

7    Q       Can you follow that law if the Judge gives it to

8    you?

9    A       Yes.

10   Q       Okay.  Now, if you decide that the death penalty is

11   the appropriate punishment for this Defendant for this

12   offense, can you sign a verdict for the imposition of the

13   death penalty?

14   A       I guess if something was proved.

15   Q       If we proved it beyond a reasonable doubt, which is

16   our burden, that that's the appropriate punishment under the

17   law?

18   A       That's a big job to prove.

19   Q       Absolutely.  And it's only right.  This is the most

20   serious of cases in criminal law.  It's only right that that

21   heavy burden be on us.  But if we meet that burden so that

22   you're convinced in your heart and in your mind you're

23   convinced that we met that burden of proof, that we have

 1    proved that the aggravating circumstance outweighs these

 2    mitigating factors beyond a reasonable doubt, then that's the

 3    appropriate punishment in this case.  Would you be able to

 4    sign a verdict form?  And the reason I'm asking you that, I'm

 5    asking to search your heart and your mind right now because

 6    you're the only person who knows if you're capable of doing

 7    that.

 8         And it's important, you would agree, that both sides

 9    get a fair shake in this trial; right?

10    A         I agree.

11    Q         It's important that the Defendant get a fair shake.

12    Because you understand the death penalty is not an automatic

13    punishment for somebody who's found guilty of aggravated

14    murder with these specs; right?

15    A         Right.

16    Q         And it wouldn't be fair to her if somebody came in

17    and said, you know, I believe that anybody who's found guilty

18    of aggravated murder, who commits a premeditated murder,

19    let's say, with prior calculation and design, somebody who

20    kills another maybe for the insurance money should

21    automatically get the death penalty, and I don't care what

22    the judge says the law is and I don't care about the

23    prosecutor's burden of proof, if she's found guilty of that

1    then I'm going to automatically vote for the death penalty as

2    a punishment, that wouldn't be fair to the defendant, would

3    it?

4    A       No, it wouldn't.

5    Q       And by the same token, if somebody says, you know, I

6    favor the death penalty but I could never take part in

7    actually returning that type of a verdict, and I would never

8    be able to sign the verdict form -- let's say somebody said,

9    well, yeah, I could do it, but then they get in there and

10   they think about it and they say, I've been thinking about

11   this for a while and when it comes down to it, they've met

12   their burden of proof, they proved the death penalty is the

13   appropriate penalty in this case, but I could never sign that

14   form so I can't do it, and the person doesn't; the State

15   wouldn't get a fair shake; right?

16   A       Right.  I understand what you're saying.  You're

17   trying to find somebody fair for both sides.

18   Q       Right.

19   A       I understand that.

20   Q       Do you think --

21   A       If I didn't think I could do it I would have wrote

22   that on the paper.

23   Q       If we met our burden of proof and convinced you that

1    that's the right penalty in this case, you would be able to

2    sign that verdict form?

3    A        If it was the right thing to do.

4    Q        And if it came time in court to announce your

5    verdict, if the Judge said, "Is this your verdict," would you

6    be able to say, yes, it's my verdict?

7    A        Yes.

8    Q        Do you think that anybody might criticize the death

9    penalty verdict if you were to return it in this case, maybe

10   a family member, friend or coworker?

11   A        I'm sure there is people that, I mean, they would

12   know, and I'm sure they would.   But --

13   Q        But you would make your own decision?

14   A        Yeah, I do.

15   Q        And I notice you're a nurse?

16   A        I'm a nurse's aide.   There's a difference.

17   Q        You help people?

18   A        Right.

19   Q        So what we're asking sort of, it's almost, as a

20   nurse's aide you help people that help save lives; right?

21   A        Yes.

22   Q        And what we're asking is sort of contrary to that in

23   a way.   We're asking you to consider the taking of a life.

1   Okay.

2          Now, the reason for the death penalty in this

3   country, you believe that the death penalty is necessary

4   because, when you said a person doesn't have a conscious and

5   has to answer for something; it's his punishment?

6   A       Right.

7   Q       An appropriate punishment for --

8   A       In other words, like if you tell your kids you

9   better not use the whatever, if they go against you they know

10  there's going to be a punishment for them.  There has to be a

11  punishment in society or there would be chaos.  There's

12  consequences for everything.

13  Q       And I take it you believe in holding people

14  accountable for their actions then, their deliberate actions?

15  A       Yeah.

16  Q       We don't punish people for accidents.  For example,

17  let's say somebody is chopping wood and the head of the ax

18  flies off and kills somebody, that would be an accident and

19  you wouldn't expect the person to be held accountable for

20  that?

21  A       Right.

22  Q       Now, another thing I want to bring out is if you

23  have any questions that come up during this question and

1    answer period, feel free to ask them as long as it pertains

2    to what we're doing here.  It's the one shot you get at

3    asking the Judge or the lawyers some questions.

4            Now, because we've got to prove these elements of

5    the crimes charged, we're lawyers, we gear our questions

6    toward proving elements; right?  You would expect that;

7    right?

8    A       Uh-huh.

9    Q       And you may have some questions that arise that we

10   may never get to, but you're stuck with the questions that we

11   ask.  And when I say certain questions, like let's say, let's

12   say you have an interest in footwear.  Like my wife has,

13   she's probably got a trillion pairs of shoes, maybe more, and

14   she --

15                   MR. INGRAM:  Did you say a trillion?

16                   MR. BAILEY:  Yes.

17   Q       Okay.  Let's say you have an interest in footwear,

18   like what kind of footwear was somebody wearing at a certain

19   time.  And let's say it's not relevant to proving the

20   elements of the crime.  You can make your decision in the

21   case without any concern for the footwear, but because maybe

22   you sold shoes or you manufactured shoes, you have an

23   interest in them.  Were they wearing wing tips or Nikes or

1   whatever? But that question never gets asked and never gets

2   answered. So that would be something that you would never

3   get an answer to in a case. But if it had no bearing on

4   proving the aggravated murder, you would be able to make your

5   your decision without that, right, instead of unanswered

6   questions? Sort of a silly example but it's an example.

7           Now, to prove these elements we rely on different

8   types of evidence.

9   A       Okay.

10  Q       The State can rely on what we call direct evidence

11  where somebody comes in and testifies to something he or she

12  has learned through the use of his or her five senses. Like

13  for example, I heard a gunshot and it was loud. I smelled

14  the smoke and it was acrid. I touched the surface and it was

15  cold. Okay.

16          But there's another type of evidence that we rely

17  on. I think you would agree that when people commit serious

18  crimes like murder, or if they plan murders, they don't go

19  out on the courthouse steps at noon and announce to the whole

20  world what they're planning to do usually; right?

21  A       Right.

22  Q       So usually they plan those things in secret. And

23  because of that, because we may not have a person expressing

 1    what's in his mind or her mind, we have to rely on sort of

 2    roundabout evidence, we call that circumstantial evidence.

 3    You might have heard that term before.  Sometimes people who

 4    aren't familiar with circumstantial evidence sort of say,

 5    it's only circumstantial evidence like in Perry Mason.  Okay.

 6    But circumstantial evidence is where you're presented with a

 7    fact or series of facts and then you're asked to draw a

 8    logical conclusion to another fact or series of facts.

 9         Let me give you a for-instance of that.  Let's say

10    you live in a two-story house and you go to bed at night and

11    you're up in your bedroom and you look out across the

12    neighborhood through the window, and it's a beautiful night.

13    The moon is beaming.  The stars are twinkling.  There's not a

14    cloud in the sky.  And you close the blinds, get into bed.

15    And just before you drop off to sleep you hear on the radio

16    the announcer says, folks, there's a cold front moving in

17    tonight.  There's going to be a storm.  And you fall asleep.

18    And sometime during the night you're awakened.  You like

19    toward the window and there's a bright flash coming from

20    outside, and a few seconds later there's a distant booming

21    sound from the sky.

22         And you can't see what's going on outside because

23    the blinds are closed.  And a few seconds later there's

1    another bright flash outside, a closer booming sound.  And

2    about half a minute goes by and then there's a really bright

3    flash from outside and a heavy ripping, booming, cracking

4    sound above the house and a pitter-patter on the roof, and

5    then you fall back asleep.

6              And then sometime later you awaken, you go to the

7    window, open the blinds, you look out.  It's a beautiful day.

8    The sun is shining.  Not a cloud in the sky.  But as far as

9    you can see across the neighborhood where it was dry the

10   night before it's totally soaked.  The rooftops are all wet.

11   The streets are flooded with water.  Drops of water are

12   dripping off the leaves of the trees.  And there's no fire

13   hydrant nearby where some car could have hit it and sprayed

14   it.  There's no volunteer fire department nearby where they

15   could have hosed down the whole neighborhood that night.

16             You know what happened during the night, don't you?

17   A       Right.

18   Q       What happened?

19   A       There was a thunderstorm.

20   Q       Absolutely.  There was a thunderstorm.  And you know

21   that beyond any reasonable doubt; right?

22   A       I would say.

23   Q       I would say so, right.  And you would say so.  And

1    that is circumstantial evidence.  And you understand that we

2    can prove these elements with circumstantial evidence because

3    it's just as good as direct evidence.  Sometimes maybe even

4    better.

5         Now, we can prove these elements using

6    circumstantial evidence.  And I think you would agree that

7    not all criminals are rocket scientists.  They're not always

8    really bright; right?

9         For example, have you ever seen on TV or read in the

10   magazines maybe that you read where a burglar goes into a

11   house and drops his wallet, leaves it behind?  Or the robber

12   goes into the bank and hands them an envelope with a stick up

13   note, and they read the stick up note and give him the money.

14   And he leaves, and they turn the envelope over and it's got

15   his name and address on the other side.  You're familiar with

16   situations like that?

17   A       Right.

18   Q       So sometimes you're aware that criminals are really,

19   really stupid; right?

20   A       I guess.

21   Q       And we can prove these with circumstantial evidence

22   like if we had letters or telephone conversations of a crime

23   being planned, that would be circumstantial evidence of a

1   crime, wouldn't it?

2   A     (Witness nods head affirmatively.)

3   Q     With circumstantial evidence, that rain storm

4   example I gave you, there is sometimes things you can't tell,

5   I mean, from it. You may not know, because you were

6   sleeping, how long that storm lasted, whether it was 20

7   minutes or two hours, or how much rain fell. But you know

8   beyond any reasonable doubt that there was a thunderstorm;

9   right?

10   A     Right.

11   Q     Now, there's room in there for some possible or

12   imaginary doubt. You can imagine that during the night Alf

13   and his martian buddies flew by in a flying saucer and put on

14   a sound and light show and sprinkled the ground with some

15   white stuff, but that would be a foolish or imaginary doubt,

16   wouldn't it?

17   A     Right.

18   Q     And you know beyond any reasonable doubt, filling

19   that box up closest to the top that there was just a

20   thunderstorm?

21   A     Right.

22   Q     Another thing is, under our system you can't take

23   notes. When you're in school you're used to taking notes;

1    right?

2    A       Uh-huh.

3    Q       Me, too.  College, law school, we sat there and we

4    took a lot of notes.  But under our system in Ohio you have

5    to sit and listen to the witnesses.  Okay.  That's important

6    to pay very close attention.

7            Our judges don't let you take notes because they're

8    afraid that it's going to distract you from looking at the

9    witness, listening to the testimony and observing the

10   witness's demeanor.

11           Also in some jurisdictions if you ever watch Court

12   TV there's some jurisdictions where jurors can hand notes

13   with questions to the judge and the judge can ask questions.

14   That doesn't happen here in Ohio.  Each state is different.

15   You have to rely on questions asked by the attorneys.

16           And there aren't going to be any instant

17   transcripts.  It's not like O.J. Simpson where they had a

18   million dollars for recording equipment.  We don't have that

19   in the budget.  We have very good court reporters, but

20   Richelle is not going to get you an instant transcript.  So

21   sometimes the question is asked, can we have the testimony of

22   so and so?  And the answer is going to be no, you have to

23   rely on your collective recollection.  That's why there are

1    12 of you.  So I'm sure with 12 of you somebody is going to

2    remember what another person might not pick up?

3    A       Right.

4    Q       So you will talk together, reason together, all the

5    jurors, coming to your conclusion.  And there won't be any

6    instant replays, unlike TV where they show you something and

7    then a couple seconds later they show it to you, like maybe a

8    football game or a baseball game or something like that.  Not

9    going to happen in this case.  It's important that you pay

10   very close attention.

11              You're not allowed to go out to the scene to

12   investigate on your own.  That can cause a mistrial.  We've

13   had that happen, because one time when a juror did that, he

14   was probably watching some movie or something where one of

15   the actors do it in TV or a movie, and in real life you can't

16   do that; you understand that?

17   A       Uh-huh.

18   Q       At the conclusion of the case, at the end of the

19   first phase you're going to be sequestered.  And

20   sequestration just means that after all the testimony is in

21   and after the Judge instructs you on the law the jury is kept

22   together.  If you can't decide the case within that day, then

23   you are taken back and you go to a hotel.  And then the next

1    day you come back and you get back together.  And you're only

2    allowed to deliberate when you're all together.

3    A        Right.

4    Q        And each jury is different.  Some juries, I've seen

5    juries come back in the first phase in an hour and a half.

6    I've seen juries take up to five days.  Okay.  There's no way

7    to predict how long it's going to take.

8    A        Right.

9    Q        And then let's say you and the other jurors come

10   back at the end of the first phase with a guilty verdict

11   beyond a reasonable doubt of aggravated murder and one or

12   more specifications, there would be a short break, and then

13   come back, within a week probably, and we would move into a

14   second phase.  And we hear some more testimony perhaps in the

15   second phase for one to three days.  And then you would be

16   sequestered again.  And again, it depends on the jury how

17   long it takes you to decide in the second phase.

18            Would that cause you any undue hardship to be

19   sequestered?  I know you've got the children.  But your

20   husband, can he handle that?

21   A        The youngest are 11.

22   Q        So --

23   A        They're all right.

1    Q        And I take it, are there any problems or pressing

2    concerns at home or work that are going to effect your

3    ability to concentrate on the evidence?  I expect we're going

4    to start this trial at the beginning of next month and it's

5    probably going to take a week and a half to two weeks to try

6    this case.  And the second phase may take one to three days.

7    A        Everything is okay.

8    Q        Okay.  Now, during the course of this case as the

9    case goes on as you're face to face with the Defendant and

10   perhaps as her chair is turned toward you you're going to

11   become more acquainted with her.  My question to you is this:

12   When you and the other jurors go back in your jury room to

13   deliberate on your verdict, can you set aside any sympathy

14   you might have toward the Defendant and be conscientious in

15   your deliberations and base your verdict on testimony and the

16   evidence that you receive and the instructions of the law

17   given to you by Judge Stuard, and lay aside whatever thoughts

18   you might have of sympathy for the Defendant in reaching a

19   decision?

20   A        I think that you have to listen to the facts of

21   everything no matter what anybody, somebody could -- you

22   can't count on that, I don't think.

23   Q        Anything that, any questions that you have at this

```
 1    point that you think you need an answer to?

 2    A         No.  I just want to know if you ask every single

 3    person these questions?  Don't you get tired of it?

 4    Q         That's why we get paid all these big bucks.

 5                        MR. INGRAM:  You have no idea how tired we

 6    are.

 7    A         I really don't have any questions.

 8    Q         I'm done asking questions.  The defense counsel will

 9    have an opportunity to address you.  The Court may want to

10    break for lunch at this point.

11                        THE COURT:  Yeah.  Can you come back at

12    1:00?

13    A         Yes.

14                        (Whereupon, a luncheon recess was taken.)

15                   A-F-T-E-R-N-O-O-N S-E-S-S-I-O-N

16                        THE COURT:  I have to make one observation

17    about this lady.  You notice she put the person she most

18    admires as her mother-in-law.  That speaks volumes both ways.

19    That's very unusual.  Your mother-in-law should be pleased

20    with that.  Were you done?

21                        MR. JUHASZ:  Thank you, Your Honor.

22                             EXAMINATION

23    BY MR. JUHASZ:
```

1    Q        Good afternoon.

2    A        Hi.

3    Q        Are you still nervous or not?

4    A        I'm all right.

5    Q        Do you need water?

6    A        No, thanks.

7    Q        I'm John Juhasz.  This is Jerry Ingram over there.

8    And he and I are representing Donna.  I'm going to try not to

9    ask you all the same questions you've already been asked, all

10   right, so that we don't make this any longer and more

11   laborious for you than it already is.

12            And I'm sure you appreciate this:  Jerry and I have

13   a serious responsibility here because we're representing

14   Donna who's on trial for some very serious charges.

15   A        Right.

16   Q        And what we're doing right now, and we all admired

17   and appreciated your comment earlier about asking these

18   questions of everybody individually.  We are.  And the reason

19   we're doing it is, it's sort of like a job interview.  We're

20   interviewing you for kind of a temporary job, one that

21   wouldn't last real long but an important job which is

22   deciding whether or not somebody is guilty.  And if you find

23   that person is guilty, deciding what's the appropriate

1    punishment.

2            So even though it's taking a long time, even though

3    it's probably not a lot of fun for people who are sitting in

4    the chair where you are, what we're trying to do obviously is

5    get a jury of fair and impartial people.  And I'm sure if you

6    or somebody you cared about were sitting over there, that's

7    the same type of jury you would want in a case like this.

8    Does that all seem fair to you?

9    A       Yes.

10   Q       We bring folks like you into the courthouse.  You

11   didn't really apply for this job but you're being interviewed

12   for, you got sent a notice.  And we bring you down here, and

13   a lot of times things that seem second nature to us, because

14   we do it all the time, are of course foreign to people who

15   don't do it all the time.  I bring that up because if, as I'm

16   talking to you, anything that comes up that you have a

17   question about, I don't want you to feel reluctant about

18   asking it because I don't want to stand here and take a bunch

19   of time explaining things you already know, but I also want

20   to make sure that if you don't understand something you stop

21   and ask.  Fair enough?

22   A       Yes.

23   Q       One of the things that is second nature to us but

1    maybe isn't to you is that there are a bunch of rules that we

2    have to follow.  You can imagine, I think you mentioned

3    earlier something about what, it would be chaos if, if we

4    didn't have some rules and procedures to follow.  It would be

5    the same thing here.  If we didn't have rules to follow maybe

6    Mr. Bailey and Mr. Becker would be saying, I want to go

7    first, and Mr. Ingram and I would be saying, no, I want to go

8    first.  So we have to have rules.

9          Here's why I bring that up.  One of those rules is

10   that at the beginning of the trial before you heard any

11   evidence about whether Donna Roberts is guilty or not, we're

12   standing up here asking you all kinds of questions about the

13   death penalty.  And all I want to make certain about that is,

14   do you have any inclination that because we're all asking you

15   these questions about the death penalty when you haven't even

16   heard anything about whether she's actually guilty or not, do

17   you have some inkling in your mind, well, these guys must all

18   think she's guilty because they're all talking to me about

19   the death penalty?

20   A          No.  I think you're just being careful who you get

21   on your jury.

22   Q          And one of the other lawyers, I think it's Mr.

23   Becker, has a pretty good example that he uses which is, if

1    we don't do it now we can't wait until later, and then if the
2    jury finds the person guilty and say, okay, now we're going
3    to talk about the death penalty. We would have a bunch of
4    people going woo, woo, woo, nobody told me about that. I
5    can't do that. So we have to find out now. Are you okay
6    with all that?

7    A       Yes.

8    Q       You don't have any inkling in your mind, Donna must
9    be guilty because they're talking to me about the death
10   penalty already?

11   A       No.

12   Q       You heard a little bit about the case and that's
13   okay, because when you had the news on you obviously didn't
14   know you were going to get a jury summons for this particular
15   case. We just need to talk about that and make sure that
16   you're comfortable being on this case.

17           As a result of anything that you heard or saw, do
18   you have an impression right now that she is guilty?

19   A       I can't say that because I really don't know what
20   happened. I just know what I think. I don't even know for
21   sure what's going on.

22   Q       That's okay. Let's talk about that for a second.
23   Because here's the reason we ask some of these silly

1    questions about that.  And I think the Judge has said to you,
2    if you can set aside some impression that you have and decide
3    the case based only on the evidence, then you're qualified to
4    be a juror and we want you.

5           If you have a preconceived notion that you can't set
6    aside, either that she's guilty or that she's not guilty,
7    then we have to spend some more time talking about that.

8           One of the things that we need to know, and only you
9    can answer this question for us is, let's say that even
10   something that you can't think about right now, maybe you
11   hear something during the trial and you go, you know what, I
12   heard that on the news.  That's okay also.  But what we need
13   to find out is, if you hear that and it's the same thing as
14   what's, what the witness says on the witness stand, you
15   understand, don't you, that you have to evaluate that
16   witness's testimony?  You can't say, you know what, that
17   witness must be telling the truth because that's the same
18   thing I heard on TV?

19   A        Right.  No, I understand what you're saying.

20   Q        So I'm going to ask you to sort of look inside
21   yourself.  If you were sitting over at that table now and
22   there was a juror who had been exposed to some publicity, not
23   a lot but some, would you feel comfortable having a juror

1    decide your case who's got the mindset that you have?

2    A        Would I care if I was sitting over there?  If I was

3    the one sitting here I wouldn't care because I think I'm

4    fair.  And that's what I think.

5    Q        Okay.  And that's the bottom line.  And really what

6    I'm asking you is, even though you heard some of those TV

7    reports, there's nothing about that that, that says, I've got

8    my mind made up and these guys are going to have to prove to

9    me she's not guilty.  You don't feel like that?

10   A        No.

11   Q        Besides the TV stuff, have you heard anybody else

12   discuss the case at all?

13   A        No.  Except during here.

14   Q        Except for in here.  How about on April the 8th or

15   whatever it is when we started down in Judge Logan's

16   courtroom, did you hear anybody talk about the case that day

17   other than Judge Stuard?

18   A        No.

19   Q        Other people assembled in the room?

20   A        No.

21   Q        You had a four-wheeler stolen out of your garage?

22   A        Yes.

23   Q        You live in Weathersfield Township; correct?

1   A       Yes.

2   Q       I live not too far from you.  And I've been

3   fortunate my four-wheelers have not been stolen.  All I want

4   to find out about, is there anything -- did they ever catch

5   anybody who did that?

6   A       No.

7   Q       It looks to me from your questionnaire like maybe

8   you gave the police a statement about the four-wheeler being

9   taken; correct?

10  A       Right.

11  Q       Anything about -- I know there's a sense of

12  frustration when you're the victim of a crime and they never

13  find the person, because that actually happened to me once so

14  I understand that frustration.  Anything about that that

15  makes you have some negative feeling about the criminal

16  justice system?

17  A       No.

18  Q       That may seem like a silly question.  The reason we

19  ask it, sometimes we get people who do, who, because they got

20  victimized and nobody was ever found, all of a sudden they're

21  going to sort of extract their revenge through being a juror?

22  A       We can't find everybody that steals stuff.

23  Q       I was also impressed, like Judge Stuard, I noticed

1    on your questionnaire that the person you admire the most is

2    your mother-in-law.  That's a, with all the mother-in-law

3    jokes going on, that's a little bit unusual.  I'm interested

4    in that for a second.  Can you tell me why that is?

5    A        She's the best person I know.  She just is very

6    smart.  She can do a lot of stuff.  And she's loyal and she's

7    honest.  And she taught me how to cook.  I don't know.  I

8    just trust her.  I would trust her with my kids.  I don't

9    know.

10   Q        It sounds like she's accomplished a lot, and

11   obviously earned your admiration.  You two have a lot going

12   on though, I see.  You've got five kids.  You're working and

13   you're involved in a lot of things.  If I'm reading this

14   right, you coach fast pitch softball.  Is that girls

15   softball?

16   A        Uh-huh.

17   Q        There was something else on there that I couldn't

18   make out.  It looked like a coach or something like that.

19   A        Odyssey of the Mind.

20   Q        Odyssey of the Mind.  Okay.  You have, have you guys

21   gone away to do that or just do it locally or --

22   A        No.  Well, kind of.  YSU we've gone to.  And I don't

23   know the name of the school.  Kind of.  It's not more than an

1    hour away.

2    Q        My son was in that a few years ago and we ended up

3    going to Columbus which was --

4    A        We didn't go that far.

5    Q        It was a little bit more of an ordeal.  Count your

6    blessings.  It was a little bit more of an ordeal than you

7    might wish for.  So you find time to do a lot of things?

8    A        Uh-huh.

9    Q        One thing we want people to do, as we like to say,

10   their civic duty.  We also, however, don't want people who

11   are going to be so distracted that they're not going to be

12   giving us their full attention.

13            You're okay with doing this as far as work and

14   everything else going on?  I know you said no problem with

15   your kids.  But all this other stuff you're doing?

16   A        No.  I'm all right.

17   Q        What about the volunteer fire thing; is that just a

18   you get --

19   A        I have a pager, two-way radio.  And when I'm not

20   busy I can go on a call.  We only have to do certain

21   percentage of calls per month.  They don't call us and tell

22   us when to come.  We go when we can.

23   Q        And you've had training to be a firefighter and the

1    whole nine yards?

2    A        I just went through it, yes.

3    Q        I don't want to spend a lot more time on the death

4    penalty, I just want to make sure that I understand how you

5    think about it.  And, again, if there's a question tell me,

6    otherwise I'm going to assume that you're okay with that.

7    You understand how the process works basically?

8    A        Yes.

9    Q        You understand that if you do get to a second phase

10   there are four penalties available to you?

11   A        Yes.

12   Q        Is there anything about how you feel about the death

13   penalty that, that if you get to that phase one of them is

14   going to have a leg up over the other?  Or can you start out

15   with all four of them equal in your mind and make the

16   government prove, if they can, that the person should get the

17   death penalty?

18   A        I think it's their job to prove that.

19   Q        And if they don't, you have no problem saying you

20   didn't prove it so even though we're at the second phase I'm

21   going with one of the life sentencing options?

22   A        Right.  If they don't prove it, yes.

23   Q        All right.  I just stopped because you're soft

 1    spoken.  I didn't know if I caught all your answer.

 2             One of the questions that we put in the

 3    questionnaire is if you think there's something wrong with or

 4    what the problem is with the criminal justice system.  And

 5    you put down, do you recall you put down an answer about

 6    O.J., listed O.J. Simpson as part of it?

 7    A        Yes.

 8    Q        Can you elaborate on that a little more?  I'm not

 9    necessarily talking about the O.J. thing.  I mean, your

10    feelings about the criminal justice system and what you think

11    the problems are?

12    A        I think sometimes when you don't have the money --

13    this is what I think.  I don't know it's a fact.

14    Q        That's okay.

15    A        That sometimes people don't get a defense that they

16    deserve.  Sometimes people get walked on because they don't

17    have somebody sticking up for them the right way.  Obviously

18    the more money you have the more you can get away with

19    sometimes.  That's how I feel.

20    Q        All right.  When you -- now, you seem to be telling

21    me two different things and I want to make sure I understand.

22    Because you seem -- the last part of it you said get away

23    with.  Do you have the impression that if somebody is rich

1   and hires a big fancy lawyer that they, that they always get

2   off?

3   A        Not always.  I just think sometimes, I think that

4   sometimes maybe evidence disappears or there's, something

5   always can change when you have money.  Sometimes, I think

6   maybe somebody just gets a new, just say a new public

7   defender that's not experienced.  He doesn't know how to do

8   something and he's defending somebody and he doesn't know the

9   right way, and then that's how it goes.

10  Q        All right.  So that's why you're saying if people

11  don't have money they end up with, as you said, a new public

12  defender who really doesn't know the ropes of trial law yet.

13  That person, even though they're innocent, might end up

14  getting, for want of a better phrase, railroaded?

15  A        I just think that happens.  I think it's harder now

16  with DNA and stuff like that, but I think back in the day it

17  happened a lot.

18  Q        Part of -- and believe me, when I use this I'm not

19  attempting to shift blame to you as a potential juror in this

20  case or to any jury, but part of -- there are a number of

21  safeguards in our system.  Okay.  One obviously is that if a

22  person is accused of something they have a right to have a

23  lawyer represent them.  And we just talked about that, so

 1    let's not rehash that.

 2          The other part is, as you know I think from talking

 3    to the prosecutors, is that the Government has to prove its

 4    case beyond a reasonable doubt; correct?

 5    A      Right.

 6    Q      And if they don't, then it's the jury's job to say,

 7    listen, you didn't prove your case.  I have to find this

 8    person not guilty.

 9    A      Right.

10    Q      You're okay with that?

11    A      Yes.

12    Q      And so even if the lawyer does kind of a yucky job

13    in the right case, a jury that has the right frame of mind

14    may provide a safeguard.  Am I making sense how I say that?

15    A      Right.  But you're only, you're counting on evidence

16    that's being brought before you.  What if somebody wasn't

17    bringing the right evidence in front of you or something gets

18    skipped over?  That's what I'm referring to.

19    Q      That's what you're referring to.  But in the

20    ordinary case where the evidence is brought out.

21    A      Right.

22    Q      The jury can provide that additional safeguard.  You

23    see that?

1    A        Right.

2    Q        I like to talk about that in terms of -- and I'm

3    sure you've heard the phrase proof beyond a reasonable doubt

4    before?

5    A        Uh-huh.

6    Q        I like to talk about that in terms of a box.  And

7    I'll tell you why, why I came up with that.  Okay.  Now

8    you're looking at me like I'm nuts already.  Hopefully you

9    won't think I'm nuts when we're done.  But we'll see what

10   happens.

11            I said a few minutes ago that we bring you in here

12   and we say, hey, sit there and be fair and impartial.  Listen

13   to everything and follow all these rules that you never heard

14   before.  My experience has been that juries really come in

15   here, they want to do their civic duty.  They want to be

16   fair.  And the problem sometimes is, I don't

17   understand all the things you people are doing because you

18   haven't explained it.  Now here's why I bring that up.

19            At the end of the case, I think you've heard, Judge

20   Stuard will give you instructions on the law.  In fairness to

21   him, some of those instructions are what the law requires him

22   to give.  Even if he wanted to do something else the law

23   says, this is what you say.  And there's a statute that talks

1    about how reasonable doubt is defined.

2           Now, I bring all this up because there's really no

3    way to quantify reasonable doubt.  You come in here and you

4    want to do a good job and you want to be fair to the State,

5    you want to be fair to the Defendant.  If they prove their

6    case beyond a reasonable doubt, then the guilty verdict

7    should go to them.  If they didn't prove their case beyond a

8    reasonable doubt, then the not guilty verdict should be

9    entered; right?

10   A       Uh-huh.

11   Q       But there's no way to quantify it.  Nobody is going

12   to say to you, listen, if you have four pieces of physical

13   evidence and three witnesses on the State's behalf you have

14   to find the Defendant guilty.  But if you have less than

15   that, not guilty.

16          Because in a given case one witness who can testify

17   to everything that meets all of the elements of a crime, and

18   if the jury believes that person, that can be enough to prove

19   the case beyond a reasonable doubt.  And conversely, a case

20   with 50 witnesses that the Government produces, if the jury

21   doesn't find that they proved the case, even though there's

22   50 witnesses, you can still find reasonable doubt.  Do you

23   see how that works?

1    A        Yes.

2    Q        All right.  And so there's no way to quantify

3    reasonable doubt.  So I came up with my silly little box

4    example.  And what you have to do as a juror is kind of in

5    your mind's eye when you go back into the jury room is, you

6    have to take all the evidence that's been given to you by the

7    State and pour it into this imaginary box.

8             Now, the standard of proof beyond a reasonable doubt

9    is the highest standard of proof we have in our law.  But the

10   State doesn't have to prove its case beyond all doubt, just

11   beyond any doubt based on reason and common sense.  Okay.

12            So all that having been said, you as a juror would

13   draw a line on that box.  And because it's the highest

14   standard of proof, it would be pretty high on the box.  But

15   because they don't have to prove their case 100 percent

16   beyond possible or imaginary doubt, it's not all the way to

17   the top of the box; does that make sense?

18   A        Uh-huh.

19   Q        If they pour in enough evidence to fill that box up

20   beyond the line that you call reasonable doubt, then you find

21   the person guilty because they proved their case beyond a

22   reasonable doubt.  Okay.  But if you look in the box and you

23   say at the end of the trial here, there's no evidence in

1    there, or there's some evidence but they didn't get beyond

2    that line called beyond a reasonable doubt, it isn't so much

3    that the Defendant wins the case; it's that the State loses

4    the case by not giving you enough proof; does that make sense

5    to you?

6    A        Uh-huh.

7    Q        The reason I like to talk about the box is because I

8    think it clarifies the idea that a criminal case isn't like

9    the state wins or the defendant wins.  It's really the state

10   wins or the state doesn't win because they either prove the

11   case or they don't.  Does that make sense to you?

12   A        (Witness nods head affirmatively.)

13   Q        And the other reason I like to talk about it is is

14   because they've got to pour all the evidence into the box.

15   The Defendant doesn't have to pour any in and she doesn't

16   have to reach in and take any out.  Okay?

17   A        (Witness nods head affirmatively.)

18   Q        All of that having been said, do you have any

19   problem in this case holding the State to that burden of

20   proof?

21   A        No.

22   Q        Okay.  That burden would apply in two separate

23   phases, if we get that far.  Okay.  If you find that they

1    filled up their box at the first phase they would have to

2    fill up another box at the second phase which is to convince

3    you again beyond a reasonable doubt that the reasons to

4    impose the death penalty outweigh the reasons not to.  And

5    you're okay with holding them to that burden?

6    A       Right.

7    Q       It is natural -- I only have one child.  You have

8    five.  I'm going to assume that from time to time somebody,

9    one child has made an allegation against the other one.  He

10   pulled my hair.  He tripped me.  She did this; right?

11   A       Uh-huh.

12   Q       As a parent you want to find out, first of all, did

13   the child do that?

14   A       Uh-huh.

15   Q       And then if they did, what's the appropriate

16   punishment; correct?

17   A       Yes.

18   Q       Because you don't go handing out punishment until

19   you find out if the child actually did the thing that they

20   were accused of; right?

21   A       Right.

22   Q       And when you try to be fair, you want to hear both

23   sides.  You wouldn't just take one child's allegation without

1    hearing what the other one had to say; correct?

2    A        Right.

3    Q        All right.  That's what most of us like to do in our

4    ordinary lives when we want to be fair.  And as a jury you

5    want to be fair.  But it's a little bit different rule that

6    we operate under because of what I just said about the box.

7    See, that's why the defendant doesn't have to take the

8    witness stand and the defendant doesn't have to testify in a

9    criminal case.  Okay.  Does that make sense to you?

10   A        Uh-huh.

11   Q        All of that having been said, let's say that Ingram

12   and I decide to do the crossword puzzle or go to sleep during

13   the trial because we don't have any other legal obligation

14   except to be here.  My question is, if we decide not to put

15   on evidence, or if Donna decides not to testify, are you

16   going to sort of hold that against her because of the natural

17   inclination that we all have to hear both sides?

18   A        Okay.

19   Q        Do you want me to do that again?

20   A        No.

21   Q        You want to think about it?

22   A        No.  I'll just tell you that if he -- obviously if

23   he's proven something you're going to want to help her;

1    right?

2    Q        Right.

3    A        So you're not just going to sit there and sleep.

4    Q        We're probably not, to be honest with you.  We could

5    but we probably won't.  We probably won't.

6    A        So I understand what you're saying.

7    Q        All right.  And some of the things that we do aren't

8    really reaching in and taking stuff out of my imaginary box,

9    but here's an example I like to use.

10            Let's say that I'm accused of killing somebody out

11   at the corner of High Street and Pine Street, okay, on

12   January 1st at 4:00 o'clock in the afternoon.  So the State

13   brings in a witness and he says, yep, that guy sitting over

14   there, Juhasz, I saw him.  He got out of his car, he walked

15   up to this poor person and he shot him.  It was 4:00 o'clock

16   on January the 1st.  Even though we tell jurors not to form

17   an impression until they hear all the evidence, let's be

18   honest with each other.  It's not looking too good for me at

19   that particular juncture, is it?  I mean, we've got a witness

20   who puts me there and says I shot this person; right?

21   A        Right.

22   Q        Well, let's assume that instead of Juhasz and Ingram

23   I hired Matlock.  Okay.  And I like to use Matlock because

1   he's always pulling stuff out of his pocket.  So he gets up

2   and he talks to this witness and he says, 4:00 o'clock on

3   January 1st, huh?  Yep.  You saw the whole thing, huh?  Yep.

4   And then he pulls out a receipt from Kaufmann's at the

5   Southern Park Mall with the guy's credit card impression

6   showing that he was down there buying a new suit.  And the

7   guy kind of goes, well, yeah, I guess I was at the mall.  Now

8   it's not looking quite so bad for me as it was five minutes

9   earlier, was it?

10  A       No.

11  Q       Okay.  I may not even have to get on the witness

12  stand to say I didn't do anything, because if that's their

13  case, a jury may find reasonable doubt.  Do you see how all

14  that works?

15  A       Yes.

16  Q       I asked this question with some trepidation because

17  sometimes I get a no, but usually I get a yes.  Ever been

18  accused of anything you really didn't do?

19  A       I'm sure I have in my lifetime.

20  Q       I'm not talking about crime or anything, just

21  somebody says here's what she did.

22  A       Yeah.

23  Q       And your like, how does that make you feel?

1    A        It depends what it is.  Mostly mad.

2    Q        If that same thing happened to somebody you cared

3    about, husband, child, family member, and I'll use my kid as

4    an example rather than yours.  Let's say that Mr. Malamisura,

5    the school principal, calls and says, John, do you want to

6    explain to me why Mike has a nine millimeter semiautomatic

7    handgun in his locker?  You know, I'm going to kind of go

8    back like this and because that's not Mike.  Okay.  And Mr.

9    Malamisura is a nice guy, but I'm not just going to take his

10   word for that because -- and the reason I bring that up is,

11   it's sort of like the presumption of innocence.  Do you see

12   that?  That you have to sort of go into the situation

13   assuming that the person in this situation, my son Mike

14   didn't do what they're accused of, okay, and test that

15   evidence.  I mean, if he comes forward with a substantial

16   amount of evidence that convinces me beyond a reasonable

17   doubt, then if I'm being fair about it I have to change my

18   mind, correct?

19            But prior to that point in time I'm not just going

20   to take his word for it.  I'm going to test the evidence;

21   correct?

22   A        Uh-huh.

23   Q        All right.  As a juror you kind of have to do the

1    same thing with the State's evidence.  Are you prepared to do

2    that?

3    A        (Witness nods head affirmatively.)

4    Q        You don't have any problem at the end of the trial,

5    let's say that these guys don't prove their case in your

6    mind, you don't have any problem looking them in the eye and

7    saying sorry, guys, you didn't prove the case?

8    A        Right, no.

9    Q        We talked a little while ago about not letting those

10   couple of news reports that you might have heard influence

11   how you look at the case.  And I think you may have been

12   asked about this but I want to make certain.

13            If you feel sympathy in this case, we like to say as

14   lawyers that we would like you to come in with your mind as

15   blank as that easel back there behind you so that we can just

16   give you the evidence and you make a fair decision.

17   A        Uh-huh.

18   Q        But that's not really possible.  The best we can do

19   is to say look, the experiences that you have, the thoughts

20   and feelings that you have, can you just sort of push them

21   off to the edge of the paper so you can focus on the evidence

22   that we put there?  All right?

23            Now, I bring that up because nobody is going to say

1    to you, if you're selected as a juror, that you cannot or

2    should not feel sympathy maybe for Mr. Fingerhut, maybe for

3    his family members, maybe for Donna Roberts because she's the

4    person accused of the crime. However you feel about it, the

5    question is, if you have those feelings of sympathy, can you

6    promise that you'll push them off to the edge of the paper

7    and decide the case objectively based on the evidence?

8    That's the only fair way to do it; would you agree?

9    A    Based on facts.

10    Q    Based on facts. Exactly. I mentioned before that

11    because of the way the box works that Donna may not have to

12    testify. Let's take the flip side of that for a second. If

13    she does testify, would you agree, she's like any other

14    witness in the case? Do you automatically say I'm not going

15    to believe anything this woman says because she's the

16    Defendant and she's got a stake in the outcome?

17    A    No.

18    Q    That could be one thing that in fairness you would

19    take into account; right? She may have a stake in the

20    outcome, and you may or may not decide to believe her. But

21    my point is, can you promise to treat her like any other

22    witness?

23    A    Yeah.

1    Q        Here's another silly little thing that we have that

2    I think we don't tell jurors enough about.  Have you heard

3    the word indictment before?

4    A        Yes.

5    Q        You know that there's an indictment in this case, or

6    do you?

7    A        No, I didn't know.  But --

8    Q        Well, let's talk about that for a second.  Have you

9    heard the phrase grand jury before?

10   A        Yes.

11   Q        The grand jury issues a piece of paper called an

12   indictment.  It tells the defendant, it's the way in our law

13   that when the government says you do something wrong, that

14   they give you a piece of paper saying, here's what we say you

15   did wrong.

16   A        Right.

17   Q        The body that issues that indictment is called a

18   grand jury.  Okay.  But it's different from the kind of jury

19   that you would sit on in this case because it only hears sort

20   of one-side of the evidence.  The prosecution is there, and

21   the witnesses they choose to bring are there.  But Mr. Ingram

22   wasn't there.  I wasn't there.  Donna Roberts wasn't there.

23   And they didn't hear any cross-examination of those

1   witnesses, those grand jurors didn't.  Nor did they hear

2   anything that Donna Roberts might have had to say about that.

3          Now, I bring that up because I want to make certain

4   that, since it's kind of a one-sided proceeding you're not

5   going to regard the fact that since there's an indictment in

6   this case that somehow that means she's guilty?

7   A       No.

8   Q       And, again, as you keep saying, base it on the facts

9   that you hear in here; correct?

10  A       Right.

11  Q       Now, you do some volunteer fire work, and I assume

12  that you have some acquaintance with some police officers?

13  A       I guess, yes.

14  Q       I mean, I assume if nothing else you know the guys

15  from Weathersfield because if you get called out on a fire

16  sometimes they're there?

17  A       I just went through training so -- but there was a

18  Weathersfield cop in my class.

19  Q       Here's why I bring it up.  If you hear a police

20  officer -- we just talked about a few minutes ago about if

21  Donna testifies you judge her testimony independent of who

22  she is, that is the fact that she is the Defendant.

23         You have to do the same thing with police officers

1   or anybody else who comes in here and testifies;  do you see

2   that?

3   A        Uh-huh.

4   Q        Even somebody that the law calls an expert witness.

5   Okay.  And to clue you in on that, an expert witness is

6   anybody who, because of some specialized training or

7   education or experience, knows more about something than the

8   rest of us do.  Okay?

9            You can have an expert witness on automechanics.

10  Anybody who would talk to me about the operation of cars

11  would, in my estimation would be an expert witness because

12  they know more than I do.  But, and here's the point:  Just

13  because they're an expert witness doesn't mean that you have

14  to buy everything that they're saying hook, line and sink.

15  You could still use your reason and common sense to decide

16  with whether, to decide whether what they're telling you

17  makes sense.  Okay?

18  A        (Witness nods head affirmatively.)

19  Q        If you get a guy who comes in and says, I have a

20  Ph.D. in astrophysics and space science from the

21  Massachusetts Institute of Technology.  And in this imaginary

22  case for some reason the tides are important.  And he says,

23  listen, I'm telling you that it was high hide and I'm basing

1    that upon the fact that the sun rises in the west and sets in

2    the east.   Well, he may be a Ph.D. from M.I.T., but if he

3    says the sun rises in the west and sets in the east you can

4    say, I'm not buying what he's selling.  Okay.  Do you feel

5    comfortable taking that responsibility?

6    A        (Witness nods head affirmatively.)

7    Q        Two more things and then you're going to be out of

8    here.  We've already talked about reasonable doubt so I don't

9    want to belabor that except to this extent.  We talked about

10   the box and about them filling the line up.

11            Another way to think about that is, if you've made

12   important decisions in your life, and I'm sure you have,

13   before you make them you sort of make a checklist of pros and

14   cons.  I don't care whether you do it on a piece of paper or

15   your mind's eye, you don't just walk into something; right?

16   I mean, you just don't walk out and say, I want a new car; I

17   bought a new car.  You have to think about, can I afford it,

18   the interest rates and all that kind of stuff.  You kind of

19   have to do the same thing with reasonable doubt.  You make a

20   checklist.  On one side are going to be the reasons why the

21   State says you should find this person guilty.

22            On the other side, they are going to be doubts about

23   the case.  They can be doubts that Mr. Ingram and I bring up.

1   They can be doubts that you think about yourself.  They can

2   be doubts that you think about back in the jury room after

3   you talk to the other jurors, things that they may bring up.

4       My point is simply this:  They do not have to prove

5   their case beyond all doubt, beyond a shadow of a doubt or

6   imaginary doubt or possible doubt, but they have to prove it

7   beyond any doubt that's based on reason and common sense.  So

8   what you really have to do when you analyze their case is

9   look at the evidence and talk about those doubts that you

10  have on that side of the checklist.  And after talking about

11  the first one you might say, you know what, I thought that

12  was a reasonable doubt but now that I think about it that's

13  just simply foolish, so I'm going to scratch it off.

14      If you have, when you're done, one doubt left, it

15  could be more but if you have at least one, then you see they

16  have not proved their case beyond a reasonable doubt.  No

17  problem holding them to that high standard?

18  A       No.

19  Q       I think you've heard today the phrase called

20  circumstantial evidence, have you not?

21  A       (Witness nods head affirmatively.)

22  Q       Everybody has a shtick they like to do ,and here's

23  mine.  I want you to pretend for a second that it's a summer

1   afternoon at my house, one of those late summer days where

2   the sun is shining but it's starting to blow and you know

3   you're going to get one of those late afternoon thunderstorms

4   in an hour or so.

5          So I'm out in the kitchen, and all of a sudden I

6   hear a crash in the living room.  As I go in to investigate

7   here comes Mike's cat running out between my legs hell-bent

8   for leather.  I go in, I have kind of a big, long living

9   room.  I look to the left.  There's my son Mike going like

10  this.  I look to the right and falling off of the mantel is

11  one of my wife's Norman Rockwell plates.  And all the king's

12  horses and all the king's men aren't going to put that back

13  together.

14         Now, I suppose circumstantially you could conclude

15  that Mike was throwing the ball in the house again like he's

16  been told 75,000 times not to do, hit the plate, broke it.

17  He's going, mom's going to kill me.  Dad's going to kill me.

18  And the cat is scared.

19         But it could also be that the cat knocked the plate

20  off and figured, I'm in trouble, so it's running away.  Mike

21  is going oh, boy, dad told me not to have that cat in house

22  up on that mantel.

23         Or it could be that the wind from that approaching

1      thunderstorm knocked the plate off. The cat thinks it's

2      going to get blamed and Mike thinks he's going to get blamed.

3      All of those are possibilities based upon the few facts that

4      I gave you; correct?

5      A      Yes.

6      Q      My only point of telling you that whole story is,

7      while it is possible and while the State may ask you to take

8      circumstantial evidence and say, use this evidence to find

9      somebody guilty beyond a reasonable doubt, if you have doubts

10      based upon that circumstantial evidence that are -- and those

11      doubt are reasonable, they're based on reason and common

12      sense, then they haven't proven their case with

13      circumstantial evidence; you agree with that?

14      A      (Witness nods head affirmatively.)

15      Q      No problems holding them to that standard?

16      A      No.

17      Q      Anything that we have talked about, any questions

18      that you have about how all this works? Any other concerns

19      you have about serving as a juror?

20      A      No.

21      Q      I appreciate your time. Thanks.

22                  THE COURT: Pass or side bar?

23                  MR. JUHASZ: Pass.

1          MR. BAILEY:  Pass.

2          THE COURT:  Pass.  Very good.  You will be

3   in the poll from which this jury will be selected.  You

4   should call the number given to you after Friday night at

5   4:30.  Sometime next week hopefully we can get everybody in

6   here to pick the jury.  You're probably aware, we need about

7   34 people who have gone through this process that are

8   potential jurors from which to choose that 12-person jury.

9          I would again remind you not to discuss anything

10  about the case, nor read anything in the newspaper, watch

11  anything on TV in the meantime.  Okay.  Thank you very much.

12                          * * *

13  WHEREUPON,

14                     KASEY S. KELLY

15  being first duly sworn, according to law, was examined and

16  testified as follows:

17                      EXAMINATION

18  BY THE COURT:

19  Q        Good afternoon.  You're Kasey Kelly?

20  A        Yes.

21  Q        Kelly, you read that sheet that was given to you?

22  A        Uh-huh.

23  Q        This case is a charge of aggravated murder filed

1    against Miss Roberts with specifications.

2         Under the law of Ohio just because a person is

3    convicted of murder does not mean that they face the death

4    penalty.  It's only under certain specific circumstances

5    where the Legislature has passed the law on aggravated murder

6    where they list certain conditions that if they occur, we

7    call specifications.

8         An example is, if you murder a person who happens to

9    be the Governor of Ohio, the State would have to prove beyond

10   a reasonable doubt all the elements of the aggravated murder

11   charge beyond a reasonable doubt, together with the

12   specifications that he was the Governor.  That would then put

13   the case into the second hearing where the jury would be

14   called upon to determine whether the aggravating

15   circumstances outweigh the mitigating factors.

16        Aggravating circumstances are reasons a person

17   should be put to death.  And the mitigating factors are

18   reasons why they should not, he or she should not.

19        The burden throughout the trial of proof is upon the

20   prosecutor by the standard of beyond a reasonable doubt.  The

21   defense can sit and do nothing if they care to.

22        Now, if a person, if you get to the second part of

23   that trial, if the person were found guilty, if it turned out

1    that you had someone on the jury that thought that whenever a
2    person kills someone else they should forfeit their life,
3    that's not the law and the Defendant could never get a fair
4    trial that way.

5         If you got to that same point and you had a person
6    on there that could under no circumstances make that
7    decision, even though the law may require that to be
8    considered anyways, then the State could not get a fair
9    trial.  So even though this is very premature, because we
10   don't know what this jury is going to do on the case itself,
11   if the State fails to prove its case in the jury's mind
12   beyond a reasonable doubt they would come back with a not
13   guilty verdict.

14        But if it came back with a guilty verdict, there's
15   no way at that point to find out which jurors feel what about
16   the death penalty.  So we go into all this questioning at the
17   beginning of the trial knowing that it may not even arise.
18   Okay.

19        Now, whatever your personal views are of the death
20   penalty are fine.  We all have our own personal views, as
21   does everyone else probably.  The question is, could you sit
22   on this jury and follow the law which says, as I told you,
23   certain circumstances of this, the aggravated murder count

1    here or counts have specifications attached to them.   No

2    matter what your personal view is, if it isn't to one side or

3    the other to the extent that you could not set your personal

4    views aside and follow the law.   It's the only way both sides

5    can get a fair trial.   You may be able to do that.   You may

6    not be able to.   That's the purpose of the questioning to

7    find out.

8          The other area that they will ask you about is

9    whether you've been subjected to much pretrial publicity

10   about this matter.   And if so, do you have your mind made up?

11   Because this case has to be tried on the evidence and the law

12   that will be given in this courtroom.

13         If you have half the jury that have something

14   sticking in their mind from something they've read, you know,

15   in the past, and that comes into the trial, somebody again

16   isn't going to get a fair trial.   Okay.   Good enough.

17   Mr. Becker.

18                    MR. BECKER:   Thank you, Your Honor.

19                         EXAMINATION

20   BY MR. BECKER:

21   Q        Good afternoon, Miss Kelly.

22   A        Hi.

23   Q        First of all, let me introduce myself.   I'm Chris

1    Becker.  I'm from the county prosecutor's office.  This is

2    Mr. Bailey.  I assume you remember Ken Bailey from about two

3    weeks ago when you were here on a Tuesday.  You all met in

4    the big courtroom down the hall.  We're here representing the

5    state of Ohio.  Mr. Ingram and Mr. Juhasz as well were there

6    as well as their client, Donna Roberts.  So you're familiar

7    with all of us.

8           What I want to start out by saying is that we are

9    going to ask you some personal questions.  We may not ask

10   you what books you read on the side, but would do need to

11   know some things about you that we believe may be able to

12   affect your ability to sit as a fair and impartial juror in

13   this case.  And both sides are going to get a chance to do

14   that.

15          It's very important that we go through this process

16   now because if you are selected as a juror to sit on this

17   jury trial, we won't get to ask you the case, you know, the

18   questions once the case gets started.  And as the Judge said,

19   it's sort of a two-phase process.

20          The first phase you may ultimately decide that

21   there's no guilt here, and that there's no reason to go on to

22   the second phase, and she'll go home and we'll go home and

23   move on to our other work and our other cases.  But if you

1   get to that second phase and if you do find by proof beyond a

2   reasonable doubt that she's guilty of the crimes and some of

3   the specifications, which require the imposition of the death

4   penalty, we have to know how you would react in that

5   situation, whether or not you could actually go through with

6   the death penalty.

7        And there's really no right or wrong answers.  We've

8   been going on this process now for about two weeks.  And a

9   lot of people have come in here and said, I can't do it.  I

10  can't impose the death penalty.  Or, I can't judge someone

11  like that.  Or other people have come in and said, if you are

12  convicted of killing someone you should get the death penalty

13  and that's it, and they won't consider the other options.

14       So I guess what I'm trying to say to you is, don't

15  worry.  There's no right or wrong answers.  You're not being

16  graded.  You're not going to get more money for serving on

17  jury duty for giving us the right answers or not.  We just

18  want you to be open and honest with us and tell us how you

19  really feel about these, because it's conceivable in this

20  case that you may be the person or one of the other 12 people

21  in that jury room, and it may come to a point where you're

22  going to have to sign a piece of paper that would call for

23  the death penalty.  And I know that's a very awesome

1    responsibility.  But this is a very important case.  One

2    person is already dead.  And the fate and the life of another

3    person, the Defendant in this case, rests in potentially your

4    hand and the hands of your fellow jurors.  So we have to ask

5    you these questions.  They may seem like they're probing.

6    They may seem like they're too personal or too much of a

7    nuisance, but we have to know.  And it's only fair to us and

8    the State, because we prosecute the crimes.  And it's only

9    fair to Miss Roberts, because it's ultimately her life that

10    hangs in the balance here in this courtroom.

11           I guess the first thing, and by all means, if you

12    have any questions or if you, if I'm not making myself clear,

13    by all means stop me and say, I don't understand your

14    question, you big mouth attorney.  And I can't understand

15    what you're talking about.  So if you don't understand, just

16    stop me and say I don't understand.

17    A      All right.

18    Q      The way we'll do this is, we're going to go into two

19    areas and then we'll cover sort of general stuff.  But the

20    first is going to be particularly about the death penalty.

21           Now, we're going to be real presumptuous here

22    because we may not get to that point.  And that depends on

23    you and your fellow jurors and what evidence we present to

1    you to begin with.  But let's assume we prove her guilt and

2    we prove her guilt as it relates to these death penalty

3    specifications.  Now we're into this second phase.

4            Do you believe, if the facts in the case warranted

5    it and the law permitted it, could you go in the jury room

6    and sign the verdict form, a piece of paper calling for the

7    imposition of the death penalty?

8    A       I think if it was a certain circumstance, I could.

9    But it would depend upon what the circumstance was.

10   Q       Okay.  And that's fine.  And that's what we're sort

11   of trying to figure out here.  Because every case is

12   different.  Every defendant is different.  The facts of every

13   case are different.  In fact, in many cases you can have two

14   people convicted of what we call capital murder and two

15   different penalties given out.  Juries are different.  Facts

16   are different.  The evidence is going to be different.

17           This case involves and the allegation is that, the

18   allegation against Miss Roberts is, and we still have to

19   prove that before we get to the second phase, but if we prove

20   the allegations which are that she aided or abetted, and we

21   will tell you right now, she did not pull the trigger that

22   killed the individual who is dead in this case.  She didn't

23   do it.  But the law in Ohio is that if we get to that case

1    where we prove those elements and prove the specifications

2    beyond a reasonable doubt, that one of the penalties you

3    could consider is the death penalty.  Now, you have three

4    other options you can consider, and you have to weigh them

5    equally.  You have life with no parole.  Life with no parole

6    after 30 years, and life with no parole after 25 years.

7         This case involves the death of just one person.

8    There's two murder counts but it's sort of two different

9    theories or two different ways to get to that second phase,

10   if we prove those allegations in the first phase.

11        Is this the type of case where you believe if the

12   facts warranted it and the law allowed it, you could sign a

13   piece of paper calling for the death penalty?  There's going

14   to be a lot more information that we're going to be giving to

15   you if we get to that phase and if we prove our case beyond a

16   reasonable doubt in the first phase.  But I guess what I'm

17   asking you is, the framework that we're talking about is

18   going to be one death and that this person is not the

19   shooter, not the actual killer.

20        Ohio law permits it, if we prove certain things

21   beyond a reasonable doubt we have to prove what are called

22   aggravated circumstances, and they have to outweigh by proof

23   beyond a reasonable doubt the mitigating factors, the good

1    things about her.  And we'll present some bad things that we

2    feel are applicable, which are basically the aggravated

3    circumstance of this case, that she aided and abetted another

4    in causing his death.

5         This isn't going to be a case where you're going to

6    hear five children were killed or, you know, this isn't

7    Saddam Hussein who killed numerous people.  This is just one

8    death, and it's against the person who didn't even pull the

9    trigger.

10        Now, how do you -- are you going to be able to

11   consider the death penalty, or do you think that that's not

12   the kind of case that you feel the death penalty should be

13   imposed?

14   A       Right now with that little bit of information I

15   probably wouldn't want to consider the death penalty, because

16   I don't think that I understand enough about what actually

17   happened.

18   Q       So you need to have the facts before you?

19   A       (Witness nods head affirmatively.)

20   Q       Assume we can get to a point where maybe we can

21   convince you if we prove it beyond a reasonable doubt?

22   A       If there was, I'm not saying that I wouldn't if I

23   didn't think the circumstances warranted it, but with that

1    little bit of information I don't think that I would.  If you

2    came to a point where the evidence was there, I mean, it

3    might, I might consider that.

4    Q       Okay.  Let me ask it a different way.  And it's real

5    hard here because, you know, we can't -- I can't tell you

6    everything about the case.  And I know -- and we can't get

7    into really the meat, I guess the facts of the case.

8            But if you were put in the position, again, assuming

9    that we get to that second phase, which we may never get to,

10   but assuming we're in that second phase and we present to you

11   evidence about the aggravating circumstances and they present

12   to you some mitigating evidence, or maybe they don't, when

13   you go back to that jury room and you're seated there are you

14   going to give the death penalty, or are you going to put that

15   to the side and say, listen, I've got these other options

16   here.  I've got life with no parole.  Life with parole after

17   25 and life with parole after 30 years.  I can't consider the

18   death penalty in this kind of case.

19                   MR. INGRAM:  I'm sorry but I -- I must

20   hesitate to object.  The only reason is, the question says

21   you have some aggravating circumstances over here.  You have

22   some mitigating factors over here.  It says nothing about

23   weighing, nothing about --

1    MR. BECKER: No, no. Let me rephrase the
2    question. Let me rephrase it.
3    Q    Again forgive me, because we have to talk in these
4    jumbled terms and these legalese terms.
5    Let's assume that we proved our case beyond a
6    reasonable doubt that she's guilty of the crimes and the
7    specifications that make her eligible for the death penalty.
8    It doesn't mean you automatically give it but she can be
9    considered for it. And that's what we do in this second
10   phase. So now we're in the second phase and the State has
11   to prove, we still we have to prove again --
12   A    Can I ask you a question?
13   Q    Sure.
14   A    Are you asking me whether I would give it or whether
15   I would consider it?
16   Q    Would you consider it?
17   A    Then I can say, yes, I would consider it.
18   Q    And that's what we want to know. We want to know,
19   would you consider it? In this particular case, given the
20   fact that there's just one death, and the allegation is that
21   she's not even the actual killer, just an aider and abetter,
22   a helper. That's the allegation. You would consider the
23   death penalty?

```
 1    A         (Witness nods head affirmatively.)

 2    Q         Now my follow up question to that is, would you

 3    really consider it or would you be more leaning towards these

 4    other life options and say, well, I'll consider the death

 5    penalty but, you know, they proved beyond a reasonable doubt

 6    the aggravating circumstances outweigh the mitigating

 7    factors, but I'm going to take the easy way out and vote for

 8    life in prison?

 9    A         Well, going with the information that you've given

10    me, I can say with that little bit of information right

11    now --

12    Q         Right.

13    A         -- I would lean towards maybe the life imprisonment

14    charges.  But if there were more information, I mean, I can't

15    really give you an answer whether I would or I wouldn't

16    without any more information about what actually happened and

17    what the circumstances were.

18    Q         So you would be open to consider all of the options?

19    A         Right.

20    Q         And it's important because, believe me, we've had

21    people come in here who wouldn't be fair to either side.  We

22    have a right for the jurors to be fair to us to consider all

23    four of those options if we get to that stage and if we prove
```

1    beyond a reasonable doubt that the aggravating circumstances

2    outweigh the mitigating factors.  And it's sometimes hard.

3    One of the judges I know that was first on the bench, he told

4    me one of the hardest things he ever had to do was to sign a

5    death warrant, which is what happens after somebody gets

6    that.  He let it sit on his desk for days before he did it, a

7    whole day.

8            And that's the kind of mind frame you're going to

9    have to put yourself into.  Imagine sitting in that jury room

10   with a piece of paper and your fellow jurors, your 11 fellow

11   jurors have said, we believe the aggravating circumstances

12   outweigh the mitigating factors and we believe that this case

13   warrants the death penalty, and now you're the last person,

14   you're going to be able to sign that verdict form if, if we

15   prove to you that the aggravating circumstances outweigh the

16   mitigating factors beyond a reasonable doubt?

17   A        Yeah.

18   Q        You can put your pen to paper and sign that form?

19   A        Yeah, if you prove to me that without a --

20   Q        Beyond a reasonable doubt the aggravating

21   circumstances outweigh the mitigating factors?

22   A        Right.

23   Q        Because you understand the reason we're going

 1    through this process is, in two or three weeks or four weeks,

 2    or whenever we get there, if we get to that stage we don't

 3    want to hear a knock on the door and say, I can't do this.

 4    But you feel you could do that?

 5    A       Right.

 6    Q       Okay.  Now, this particular case has received, as

 7    most homicides do, some publicity.  And I think you've heard

 8    about this case maybe in passing?

 9    A       No.  I don't watch the news.

10    Q       I thought I saw on your questionnaire that you did.

11    So you don't come in here with any preconceived notions of

12    guilt or innocence?  You've not heard anything about this

13    case through anybody you work with or anybody you've spoken

14    to?

15    A       No.

16    Q       When you came in here about two weeks ago, did you

17    hear anyone speaking about this case when you were down in

18    the other courtroom?

19    A       No.

20    Q       So you have really no idea about this case?

21    A       Right.

22    Q       And in a lot of ways that's a good thing, because

23    some people come in here and say, I saw it on TV or the

1    newspaper and I couldn't be fair.

2           You've been, I guess, not exposed to that so that's,

3    that's very good, at least in one respect.

4           I notice that you, you've lived in some, quite a bit

5    of different places around the country.  I saw you were in

6    Orlando and Huntersville, which would be near Charlotte;

7    right?

8    A      It's just north of Charlotte.

9    Q      Off of 77 there.  Is that relating to your bakery?

10   A      No.

11   Q      Or you just happen to move a lot?

12   A      Uh-huh.

13   Q      Mostly for jobs?

14   A      No.

15   Q      Just wanting to?

16   A      I moved to Pittsburgh because I went to school out

17   there.

18   Q      Right.  The Culinary Institute.

19   A      And I moved to Orlando because I did my externship

20   down there.  Then I had some friends move to Huntersville,

21   and I moved up there.

22   Q      And now you're back here.  And I didn't really,

23   wasn't clear on your questionnaire.  What is that you do now?

```
 1    A         I'm a cake decorator.

 2    Q         Here locally some place?

 3    A         At Super Kmart in Niles.

 4    Q         Okay.  And do you still live up in Southington?

 5    A         Yes.

 6    Q         Now, this is a criminal case and, as with most

 7    criminal cases, you're going to hear -- well, let me start

 8    again.

 9              In all criminal cases you're going to hear some

10    certain, some concepts that you might have heard on

11    television or read in the newspaper, or read in novels

12    perhaps that you've read or books that you've read.  And one

13    of the terms you're going to hear is reasonable doubt.  And

14    I'm assuming you've heard of that, either through school or

15    reading the newspaper, television or reading a book somewhere

16    you've read something about that.

17              The Court is going to give you instruction on

18    reasonable doubt and what it is.  And it's a pretty simple

19    concept to state, but to actually see it in action it's

20    sometimes a very difficult concept to grasp.

21              One of the professors that I had in law school sort

22    of made it sound like it was just a glass of water.  And we

23    used to talk about burdens of proof.  And there's really
```

1     three burdens of proof under the law.  There's preponderance

2     of the evidence, which is basically one drop over half.  As

3     soon as you get to half and you add a little bit of water,

4     that's preponderance of the evidence.  It's just who, who has

5     more evidence.

6          Then there's a crazy concept called clear and

7     convincing evidence.  I don't know if attorneys even know

8     what that is.  But my professor used to say, well, that's

9     about 75 percent.  It's three quarters full with the glass.

10         And then we have reasonable doubt.  And reasonable

11    doubt is the one that everyone is going to have a different

12    idea of.  Reasonable doubt is not having the glass completely

13    full, because that's all doubt.  And I couldn't prove to you

14    that, probably that I'm Chris Becker beyond all doubt.  I

15    could show you a license.  But you might say, well, how do I

16    know that that's not forged or he didn't buy that.  Or I

17    could give you a fingerprint and you can compare it to some

18    other fingerprint, but even experts sometimes argue over

19    fingerprints.

20         So there's very few things that I could prove to you

21    beyond all doubt.  It's sort of like, I have an eight-year

22    old at home who's a real inquisitive young boy and he may ask

23    me questions about why the sun comes up in the east and sets

1    in the west.  And I explain it to him and he still doesn't

2    believe me.  And I can show him all week, it's coming up in

3    the same spot and going down in the same spot, and he's just

4    going to ask me more questions.

5         But reasonable doubt is going to be pretty close to

6    the top.  And it's going to change for every person.  It may

7    be a quarter an inch from the top for some people.  It may be

8    only an inch from the top.  If you think of it numerically,

9    maybe 90 percent certain.  Maybe 95 percent.  Maybe 98

10   percent for some people.  Everybody is going to have a

11   different idea of what reasonable doubt is.

12        In both phases, if we get to the second phase and in

13   the first phase, again, if we get to the second phase we have

14   to prove our case beyond a reasonable doubt.  Not all doubt.

15   I don't have to fill that glass so that water is coming out

16   over the edges.

17        If we're in the first phase and we prove our case

18   beyond a reasonable doubt, we have to prove the elements.

19   There's usually five or six elements to every crime.  And we

20   have to fill those glasses up, reasonable doubt for every one

21   of those elements.

22        Now you're going to get to the second phase,

23   assuming you find proof beyond a reasonable doubt in that

1    first phase, now we're going to get to a second phase.  And

2    again, it's going to come to reasonable doubt.  Not all

3    doubt.  I can't, I'm going to tell you right now I probably

4    can't fill that up to where it's to the top and overflowing.

5    But would you feel comfortable by proof beyond a reasonable

6    doubt signing a death verdict?

7    A        Without ever having been in that type of situation

8    before.

9    Q        Right.

10   A        I think right now at this point I could say yes.

11   Q        And you understand that if we get to that point, and

12   I'm assuming -- again, we're being presumptuous here, but I'm

13   assuming we'll get to that point.  If we get to that point --

14   keep in mind, you can't knock on that door and say, wait a

15   minute, I want out of this.  This isn't what I bargained for.

16   Because it may be a very difficult situation for you.  And

17   the only reason I keep harping on this a little bit is

18   because I do sense some maybe hesitation in your voice.

19   A        I think the hesitation is just that I've never come

20   across anything like this before and I don't have any kind of

21   previous experience.

22            And in the past, I've come across different types of

23   circumstances where I would say, oh, if this happened I would

1   do this or I wouldn't do that.  But when that circumstance

2   actually happened, I might have not felt as confident about

3   it.

4   Q        You reacted differently to situations that maybe you

5   thought about beforehand, and then when they actually arose

6   it wasn't even at all what you expected?

7   A        Right.

8   Q        And your reactions were much different than what you

9   maybe would have expected?

10  A        Right.

11  Q        That's fair enough.  Again, there's no right answers

12  here.  No wrong answers.  One of the other things that goes

13  along sort of hand-in-hand with reasonable doubt is what we

14  call the presumption of innocence.

15          And again, every criminal trial and every criminal

16  defendant has what's called the presumption of innocence.

17  And sort of the easiest way to say that is, and again, I'm

18  not saying that this is going to happen, but it might happen,

19  is that the State presents its case.  Mr. Bailey and I will

20  call witness after witness here.  And we may be here two

21  weeks.  And Mr. Ingram and Mr. Juhasz may be over there

22  reading their horoscopes and doing crossword puzzles and not

23  say a word.  I highly doubt if that's going to happen but

1    they can do that.  And we can present to you 25 or 30

2    witnesses and 300 exhibits.  And you may still sit there and

3    say, I have reasonable doubt in my mind that the elements and

4    the offenses have been proven.  You would have to find Donna

5    Roberts what?

6    A       Not guilty.

7    Q       Right.  You don't have a problem with that concept,

8    do you?

9    A       No.

10   Q       I assume that you believe that all defendants should

11   be given the presumption of innocence unless and until their

12   guilt is proven beyond a reasonable doubt; correct?

13   A       Right.

14   Q       Sort of hand in hand with that is, is that

15   presumption of innocence.  And I guess if you go back to the

16   glass example.  Mr. Bailey and I are the ones that have the

17   responsibility of filling that glass up to that one inch or

18   half inch line near the top, to fill that.

19           They don't have any responsibility at all to put

20   anything under those glasses, to put any water in.  And they

21   don't have to take any water out either.  We have to prove

22   the case on its own merits and through our evidence and

23   through our testimony.  Do you agree with that?

1    A        Uh-huh.

2    Q        This is a case, and you're already well aware from

3    the questionnaire and from when I've spoken to you here

4    today, that involves the death of an individual.  There is a

5    dead individual.  And during the course of this trial you

6    will see photographs of a deceased individual.  Some people

7    don't want to be involved in that.  They don't want to see

8    that.  It may evoke emotions of sympathy.

9            And on the other side of that coin, Miss Roberts is

10   also, her life is on the line because of the nature of the

11   charges and the potential penalty.  And, again, some people

12   may feel sympathetic for her.

13           Do you feel you will have a problem with being

14   sympathetic to either the deceased and his family or

15   Miss Roberts and her family?

16   A        No.

17   Q        You won't -- and I ask this question of everyone.

18   You won't feel sympathetic for Mr. Fingerhut, the deceased in

19   this case, because of the manner of death.  He died.  Or

20   because in fact he's dead and there's an allegation of murder

21   here, actually it's aggravated or capital murder, you

22   wouldn't say, well, I know the State did prove some of these

23   things but they didn't prove a couple of these other things.

1    They didn't fill up their glasses all the way.  You know

2    what?  I'm going to find Donna Roberts did it though, anyway,

3    because I feel sorry for Mr. Fingerhut, the manner he died.

4    And if you had to say not guilty because we didn't prove our

5    case and fill those glasses up, you could do that?

6    A       All right.  I'm confused.  Did you just -- can you

7    just ask me the question that you're going to ask me?

8    Q       Yeah.  Are you going to be sympathetic for either

9    party and not require --

10   A       No, I don't think I'm going to be sympathetic.

11   Q       On the other side, if we prove our case beyond a

12   reasonable doubt you wouldn't find her not guilty because you

13   felt sorry for her and because you felt you're going to have

14   to go into this second phase and perhaps find her, or impose

15   the death penalty if we prove the elements beyond a

16   reasonable doubt in that part?

17   A       No.

18   Q       I know that's kind of a lot.  You're not going to

19   find her not guilty because you may have to get to a point

20   that you're considering the death penalty if we proved our

21   case beyond a reasonable doubt?

22   A       No, I wouldn't do that.

23   Q       This case involves really two -- well, there's four

1    charges in the indictment. And let me ask you right off.

2    And again, there's no right or wrong answers. If you don't

3    know, you don't know. Do you know how an indictment is

4    handed down or how an indictment is issued?

5    A      No.

6    Q      Okay. There is a body called the grand jury. I'm

7    assuming you've heard of grand jury. The grand jury is

8    nothing more than up to 14 individuals, nine of whom vote.

9    It takes seven of the nine voting members to issue basically

10    a piece of paper. And that piece of paper describes the

11    charges. Prosecutors are not in the room when the grand jury

12    votes, but we're in there for everything else. We present

13    the evidence. Although Mr. Bailey and I personally didn't --

14    well, I was in there but Mr. Bailey wasn't. But there were

15    other prosecutors in the room at the time of the presenting

16    of the evidence there, but there was no judge there. Miss

17    Roberts was not there. Her attorneys were not there. It was

18    a one-sided affair, let's put it that way.

19           The indictment in this case is just merely an

20    accusation. It's the mechanism which puts all of this into

21    play. And it's what gets the attorneys involved. It's what

22    gets the courts involved. They give it a number down at the

23    clerk's office.

1        The fact that she's accused of this, and the fact

2    that we're here talking about potential penalties, including

3    the ultimate penalty, death, that doesn't necessarily bring

4    to you any notion that she must be guilty of something?

5    A        (Witness shakes head negatively.)

6    Q        So the fact that we're here and we're having this

7    discussion about the death penalty and life options, you

8    understand that you can still be free to find her not guilty

9    and not even get to that phase?

10   A        Right.

11   Q        All right.  Now, as I mentioned to you, this case

12   involves an accusation that she is not the shooter.  An

13   accusation that she is an aider and abettor.

14        I believe the testimony is probably going to show

15   you in this case that she wasn't even in the location where

16   the death occurred, in the actual home or the structure.

17   Does that change any of this for you?  Does that make it

18   easier or harder?  Or are you still under the mind-set and

19   the framework that you could, if we prove our case beyond a

20   reasonable doubt in the first phase, and if we get to the

21   second phase, if we prove beyond a reasonable doubt that

22   these bad things, these aggravating circumstances outweigh

23   the mitigating factors, you could still sign the death

1   penalty?

2   A       Right.

3   Q       Now, most criminal cases also have in them some

4   circumstantial evidence.  Do you have an idea of what

5   circumstantial evidence is?

6   A       Vaguely.

7   Q       It's a little bit like -- let's say we're out here

8   on the street, and it's High and Pine Street right here, and

9   -- I'm sorry, Park and High Street.  And we're standing there

10  at the intersection.  You and I are talking.  And we're

11  looking at each other.  The intersection is off to our right.

12  We really don't, aren't paying attention, and all of a sudden

13  we hear brakes skid and we hear a crash.  And we look over

14  and we see two cars that are smashed into each other.  We

15  didn't actually see the accident but we heard it.  And we

16  heard tires screeching.  We heard metal crashing.  And we see

17  two cars there.  That's kind of circumstantial evidence.

18          Another example that sometimes I use is, I have four

19  kids.  And I have two daughters that are very close in age

20  and I have a son who's older and a younger son who's an

21  infant.  Sometimes, and this probably happens more than it

22  should, but my son will swing a rope around with a baseball

23  on the end of it or he'll swing a bat down in the basement

1    where he knows he's not supposed to.  And of course

2    invariably he will hit one of his sisters, and one of the

3    sisters may be crying.  And I'll go downstairs and my wife

4    will go downstairs and we'll see one of my daughters crying,

5    holding their head.  My son there with an orange wiffle ball

6    bat, and the other one pointing to my son saying he was

7    swinging the bat.  He was swinging the bat.

8           Now, let's take my oldest daughter out of the

9    equation.  It's just my youngest daughter, she's holding her

10   head and my son has got the bat.  The circumstantial evidence

11   and the inference is that he was swinging that bat around and

12   he hit my daughter.

13          Now, we can make other inferences from that.  We can

14   make an inference that my daughter had the bat herself and

15   would throw it up in the air and she was throwing it up in

16   the air and it dropped down on her head and she's trying to

17   catch it and my son just picked it up to get it away from

18   her, and he gets caught in the middle.  So there's other

19   inferences you can draw; correct?

20   A       Right.

21   Q       And what we're talking about here is reasonable

22   inferences.  Certainly an alien or a ghost didn't come in the

23   house and whack her in the head with it, so we can exclude

1   that.  And that's kind of what we get into when we talk about

2   all doubt.

3          But we may have to present to you, because we've got

4   two competing inferences, one is that she threw it up and hit

5   her on the head, and the other is my son was swinging it

6   around and hit her.

7          We may be able to prove our case a little bit more

8   if there were testimony to you that my daughter has never

9   picked up the bat, she has no interest in baseball.  And if

10  we find her, when she's crying, holding her head with two

11  Barbies in her hand, because she was playing Barbies as my

12  son was swinging this bat around, and now she's holding

13  Barbie in one hand and holding her head with her hand with

14  the one Barbie and she's got a Barbie in another, those are

15  facts that are important to you as a juror as to what

16  happened; correct?

17  A       Right.

18  Q       You'll be able to make these kind of inferences and

19  make those leaps I guess and infer certain things if the

20  evidence is presented to you?

21  A       I believe so.

22  Q       All right.  One of the other things that we

23  sometimes talk about is the credibility of witnesses in a

1    criminal case.  And that's really kind of what your job is,

2    to test all these inferences and you test all these

3    credibilities and say, boy, that just didn't make any sense

4    what they're telling me.  Or that just doesn't fly with me.

5    I have to have more than that.  Or maybe I have enough.

6            Let's go back to our example out here on Park and

7    High Street.  And it's a traffic accident.  We're trying a

8    traffic accident.  And let's say the guy is coming north on

9    Park Street and another guy is coming west on High, and the

10   guy going west on High, he has the green light.  He goes

11   through it.  And the guy coming up on Park Street, he blows

12   through the light down here at Market Street and he blows

13   through this light.  They're both red.  He smacks into the

14   guy and now the guy is injured.  Now we're here in court.

15           Do you believe that we could present and prove to

16   you beyond a reasonable doubt that the guy who was driving

17   north on Park Street caused the accident with just one

18   witness, if that witness was good enough?

19   A        Yes.

20   Q        All right.  And on the other side of that coin, do

21   you believe that even if we presented to you five witnesses,

22   those witnesses, those witnesses may have, may have such

23   little credibility that you couldn't find him guilty?

```
 1    A         Yeah.

 2    Q         We may have five guys stumbling out of Maddigan's

 3    down the street and they're drunk and not wearing glasses and

 4    not paying attention, and maybe they're even related to the

 5    defendant.  And they'll come in and say, no, it was green.

 6    He had the green light.  Our buddy Mike had the green light.

 7              So you would agree that that's the kind of thing you

 8    have to do as a juror.  You have to look at who has a bias,

 9    an interest in the case.  Who was in the best position to see

10    something or do something; right?

11    A         Right.

12    Q         And those are all things that weigh into your

13    decision as to whether someone is guilty or innocent beyond a

14    reasonable doubt; correct?

15    A         Right.

16    Q         All right.  One of the other things that we talk

17    about sometimes is, you've probably seen this if you read

18    anything about a crime, or heard anything on television or

19    the radio about a crime.  Sometimes, do you ever find

20    yourself saying, how dumb is this person when they get

21    caught?  And I can give you a whole list of examples.  But

22    I'm assuming you've heard of John Wayne Gacy I think was his

23    name.  And he killed a lot of kids I think in the Chicago
```

1    area.  And these people, he buried them under his house.

2    They were buried in his yard at his house.  And you kind of

3    say to yourself, well, how dumb that is.  He would lure them

4    off the streets in the darkness of the night, he would take

5    them to his house where he lived alone and he would kill

6    them.  And then instead of taking them 50 miles away and

7    dumping them in a garbage pit or taking them to Lake Michigan

8    and throwing them into Lake Michigan, he would burry them in

9    his own yard.  So he sort of caught himself; right?  And

10   you're familiar with defendants doing that; right?

11   A      I guess.

12   Q      You've heard of that?  You've heard of a situation

13   like that?  So you wouldn't find it unbelievable if a

14   criminal defendant, as best as they may have tried to hide

15   things, actually did something stupid and left the gun with

16   their fingerprints right at the murder scene?  Things like

17   that happen.  Or the bank robber who goes into the bank,

18   writes a ransom note to the teller and says, give me all the

19   money or I'll blow your brains off.  And she gives him the

20   money.  And he goes out.  And the teller flips the note over

21   and it's got the, a letter addressed to the guy at his own

22   home address.  And the police go there and he was there

23   counting the money.  Those things happen; right?

1    A        Yeah.

2    Q        And whether it's the fact that people aren't good at

3    being criminals or the fact that maybe they wanted to get

4    caught, those kinds of things happen.  And you're familiar

5    with those?

6    A        Okay.

7    Q        Sometimes people just do dumb things and they get

8    caught.  Do you have any questions that you feel that you

9    have about this process?

10   A        (Witness shakes head negatively.)

11   Q        Do you feel that you will be able to make the

12   inferences on circumstantial evidence if you can exclude

13   other inferences, and you feel that if it's a reasonable

14   inference you can make that inference even if we don't have

15   maybe a direct eyewitness to something, if it's a reasonable

16   inference you can do that?

17   A        Yeah.

18   Q        Do you feel that you can decide this case without

19   sympathy to either the victim or the state of Ohio, and

20   without sympathy to the Defendant?

21   A        Yes.

22   Q        You feel that you could determine this case beyond a

23   reasonable doubt, not just all doubt but a reasonable doubt?

1    And you feel that if, if the facts warranted it and the law

2    permits it and we prove our case beyond a reasonable doubt

3    that the aggravating circumstances, if we get to that second

4    phase, outweigh the mitigating factors, you could sign a

5    piece of paper calling for the death penalty of this

6    Defendant?

7    A        Yes.

8    Q        Okay.  Thank you very much.

9                          EXAMINATION

10   BY MR. INGRAM:

11   Q        Are you ready?

12   A        (Witness nods head affirmatively.)

13   Q        How are you?

14   A        Okay.

15   Q        John Juhasz and I share the responsibility of

16   representing Donna Roberts who's on trial for her life.  And

17   as I'm sure you can imagine, we take our responsibilities

18   very seriously.

19           And we feel we should take every reasonable

20   precaution in selecting a fair-minded jury, the same type of

21   jury that you or I would want if we were on trial; does that

22   sound fair enough to you?

23   A        Yes.

1    Q     When you walked in this afternoon you appeared to be

2    a whole lot nervous.  And as you're sitting here now you

3    don't seem to be much less nervous.  Are you a little

4    uncomfortable?

5    A     I'm not used to having any kind of responsibility

6    like this, so it makes me a little uncomfortable.

7    Q     Well, this process is a lot like a job interview.

8    But when you got the job you have, you chose to go apply for

9    it?

10    A     Right.

11    Q     In this case somebody spun the jury wheel, you were

12    lucky or unlucky enough, depending upon how you look at it,

13    that your name was drawn, and we summoned you to come talk to

14    us.

15        This is the only opportunity that we can talk to one

16    another and determine whether you're comfortable sitting on

17    this jury.  And it really should be a conversation.

18    Although, you know, lawyers are trained to monopolize

19    conversations.  So why don't you try not to let me do that?

20    A     Okay.

21    Q     When there's something you would like to say, if you

22    have a question, you have a comment, or you just want to tell

23    me anything, you stop me and tell me what you wish to

1    discuss.  Okay?

2    A        Okay.

3    Q        And inevitably during our conversation I'm going to

4    ask you a question which simply doesn't make sense to you.

5    When that happens it's my fault, not yours.  What that means

6    is that I have, once again, in my indubitable fashion, failed

7    to make myself clear.  So whenever I ask you a question that

8    just seems a little convoluted to you, because lawyers can do

9    that, let me know and I'll do my best to rephrase the

10   question.

11   A        Okay.

12   Q        We're interviewing you today for one of the most

13   important jobs there is, the job of finding the truth and

14   determining the fate of another human being.  And you've

15   already commented that that's a big responsibility.

16            My first question to you is, how do you feel about

17   being asked to undertake that responsibility?

18   A        I don't know.  I don't really feel much one way or

19   the other, I guess.

20   Q        Do you think you're up to that responsibility?

21   A        I think so.

22   Q        In a nutshell, this case boils down to the

23   government's allegation that Donna Roberts plotted or

1    conspired with a male companion, Nate Jackson, to cause the

2    death of Robert Fingerhut.

3         Donna and Robert were divorced but they continued to

4    work with one another at the Greyhound Bus Stations in

5    Youngstown and Warren, and to live with one another in

6    Howland Township.

7         This trial is only about one person, and that person

8    is Donna Roberts. There's no one else sitting at the defense

9    table as a defendant. We're here only concerning the guilt

10   or innocence of Donna Roberts; do you understand that?

11   A      Yes.

12   Q      Throughout the course of these proceedings you will

13   hear the name Nate Jackson. And you may conclude that Nate

14   Jackson did what the State says he did. Your responsibility

15   as a juror in this case is to determine whether Donna helped

16   him do that. Whether she was -- there's fancy legal words --

17   a complicitor, aider and abettor. You're here simply to

18   determine whether she helped him. Does that make sense to

19   you?

20   A      Yes.

21   Q      In support of its allegation that Donna aided or

22   participated in the death of Robert Fingerhut, the State will

23   elicit some letters and some tape-recorded conversations

1    which are sexually explicit in nature and, to be candid with

2    you, may be offensive.  You understand that the allegation

3    here is murder, not loose morality?

4    A        Yeah.

5    Q        And even if you are offended by the sexually

6    explicit nature of some of this evidence, your job

7    responsibility will require you to test that evidence to

8    determine whether it ties Donna to this offense.  Are you up

9    to that?

10   A        (Witness nods head affirmatively.)

11   Q        Would you have the courage to acquit, that is vote

12   not guilty, if you felt a not guilty verdict was warranted by

13   the evidence?

14   A        Yes.

15   Q        When you came on Tuesday, April 8th, the Judge I

16   think asked you, the jury commissioner asked you to sign a

17   piece of paper where you promised that you would do your best

18   to avoid news media coverage.

19   A        Right.

20   Q        And the Judge will repeatedly tell you when you're

21   called that you're to do your best to avoid all exposure to

22   publicity, whether it's in the newspaper, the radio or TV.

23   Now that sometimes is hard to do.  You know if you're driving

1   down the street and the news comes on, you don't know what

2   they're going to say?

3   A       Right.

4   Q       But if you hear something, you would have to shut

5   the radio off or change the channel for a reasonable period

6   of time.  Or if you're sitting at home watching TV and

7   something comes on the news, you would again either have to

8   shut it off or change the channel.  Do you understand that?

9   A       That's fine.

10  Q       I want to explain to you why.  In the last week we

11  have been inundated, besieged with publicity regarding the

12  arrest of a Scott Peterson for the death of his wife, Laci

13  Peterson in California.  Have you seen any of that, heard any

14  of that?

15  A       As unbelievable as it may seem, I don't read the

16  newspaper and I don't watch the news.

17  Q       Well, let's go to another example.  Awhile back

18  there was a notorious trial in this country in California

19  where the defendant had the name O.J. Simpson.

20  A       Uh-huh.

21  Q       And whether you saw any of this or not, I think we

22  can still make our point.  Every night on the evening news

23  programs they would have a highfalutin prosecutor sitting in

1   one chair, they would have a highfalutin defense lawyer

2   sitting in another chair.  And depending upon their

3   perspective, that prosecutor and that defense lawyer would

4   put a different spin or a different interpretation on that

5   day's occurrences in the Simpson trial.  Do you see why a

6   juror, jurors should not be exposed to that kind of

7   commentary?

8   A       Right.

9   Q       And that's why we ask you to avoid publicity.  So

10  all we can ask is that you do your best.  Will you do your

11  best?

12  A       Yes.

13  Q       And even the jury is told to keep an open mind until

14  the case is over.  And that may be easier said than done.

15  But if you listen to the first witness and you make up your

16  mind about some fact, let's say at issue -- and I'm making

17  this up.  At issue is whether a car was red or blue.  And

18  witness No. 1 says the car was red.  And that sounds pretty

19  good to you.  You say, okay, the car was red.  Well, that

20  might affect the way you listen to the testimony of witness

21  two, witness three or witness four.  And they may testify

22  that the car was blue or green.  So you have to keep an open

23  mind until everything is done.  And, again, that may be

1   easier said than done.  But all we can ask of you is that you

2   do your best.  Will you do your best?

3   A       Yes.

4   Q       And if you're selected for this jury you're going to

5   be here with, well, 12 out of -- no, there would be more than

6   12 here.  But the jury is 12 and then there's some

7   alternates.  And more than likely you guys aren't going to

8   know one another.  So the only thing you're going to have in

9   common is what unfolds in this courtroom.  And since it's the

10  only thing you have in common, it's natural that that's what

11  you want to discuss, because it is the common thread that

12  holds you all together.  Am I making sense to you?

13  A       Yeah.

14  Q       The Judge is going to tell you that you can't do

15  that.  You can't talk about this case with your fellow jurors

16  until the case is over.

17         Now, again, all we can ask is that you do your best.

18  And will you do your best to do that?

19  A       Yes.

20  Q       And a lot of people have stood up here and asked you

21  your views about punishment, the death penalty, life in

22  prison.  Well, I have a concern about that.  And let me try

23  to explain myself.  My concern is that because we all, the

1   Judge, the prosecutor, me, we're standing up here asking you

2   questions about punishment, that you may conclude in your

3   mind that we're predicting you're going to have to decide the

4   question of punishment.  Is that clear to you?

5   A       I don't know.  Are you asking me a question or are

6   you telling me something?

7   Q       I'm trying to tell you something.  Probably not

8   doing a very good job at it.

9   A       I understand you said, you just don't want me to

10  think that I'm required to make a decision because you guys

11  are talking about all this?

12  Q       That's part of it.  I also don't want you to think

13  that anybody here thinks Donna is guilty just because we're

14  asking you about punishment.

15  A       Okay.

16  Q       And I will give you an old adage to maybe explain

17  the way I feel about it.  It seems to me that it's a lot like

18  putting the cart before the horse.  We're talking to you now

19  about punishment when I think we should be talking to you

20  about guilt or innocence; does that make sense to you?

21  A       Yeah.

22  Q       When you go to work or when you get up in the

23  morning to go anywhere, do you customarily put on your seat

1   belt?

2   A        No.

3   Q        Do you know people who do?

4   A        Yes.

5   Q        Do those people that put on their seat belt, do they

6   expect to be involved in an accident?

7   A        No.

8   Q        They put it on just in case; right?

9   A        Right.

10  Q        Well, I don't expect to get to a second phase, but I

11  have to --

12                      MR. BECKER:  I'm going to object to what

13  he expects.

14                      THE COURT:  Rephrase.

15  Q        We have to ask you these questions now just in case.

16  A        Right.

17  Q        Do you understand that?

18  A        Yes.

19  Q        How do you feel about life imprisonment as an

20  alternative to the death penalty?

21  A        It would be something I would consider.

22  Q        Do you think you have a -- you read the Judge's

23  preliminary instructions before you came up here?

1   A        Right.

2   Q        Do you think you have a handle on the four

3   sentencing options if we ever get to a second phase?

4   A        Yes.

5   Q        You understand, life without parole is indeed

6   exactly what it says:  Life without parole.  And then there's

7   life without parole eligibility for 25 full years, and that's

8   25 full years.  And then there's life without parole

9   eligibility for 30 full years.  And, again, that's 30 full

10  years.

11  A        Right.

12  Q        Have you ever considered a political candidate's

13  views on capital punishment in determining whether or not to

14  vote for that candidate?

15  A        No.

16  Q        Have you ever heard someone say to you, I don't

17  believe in life imprisonment because I don't believe that we,

18  the taxpayers, should have to pay?

19  A        I guess I've heard that argument before.

20  Q        Do you have any opinions on that particular cost,

21  that issue, the cost issue?

22  A        No.

23  Q        When Mr. Becker was talking to you he asked you a

1    lot about your willingness to sign verdict forms.  Do you

2    recall those questions?

3    A        Yes.

4    Q        If a juror in a capital case -- and it doesn't have

5    to be this case.  It could be any case.  If a juror in a

6    capital case gets to a second phase, there are guidelines

7    that are given to the jury.  And basically you're instructed

8    that you have to weigh aggravating circumstances, that are

9    bad facts, the death specifications, against mitigating

10   factors, positive things that can be said about the

11   defendant.  You understand that weighing process?

12   A        Right.

13   Q        You're also going to be told that the jury is the

14   sole judge of the weight of the evidence.  And as a juror it

15   is your individual responsibility to arrive at your own

16   personal decision as to how much weight you give this

17   evidence; do you understand that?

18   A        Yes.

19   Q        So as far as the weight of the evidence, the buck

20   stops with you.  You got that?

21   A        (Witness nods head affirmatively.)

22   Q        Do you understand that the law will never require

23   you to vote for a sentence that you do not feel is warranted

1     by the evidence?

2     A      Yes.

3     Q      The Pennsylvania Institute of Culinary Arts, is that

4     located on Grant Street in downtown Pittsburgh?

5     A      I think so.

6     Q      And that lasted 16 months?

7     A      It was a year in Pittsburgh and then a four-month

8     externship.

9     Q      And the externship was down in Florida?

10    A      Right.

11    Q      Have you ever donated any time, money or services to

12    a political campaign or issue?

13    A      No.

14    Q      Do you belong to any group or organization which is

15    active in any political matter?

16    A      No.

17    Q      In the last five years or so, have you signed a

18    petition on any public issue?

19    A      No.

20    Q      Do you belong to or associate with any group which

21    has crime prevention as a goal?

22    A      No.

23    Q      You talked with Mr. Becker about sympathy; do you

1    recall that exchange?

2    A        (Witness nods head affirmatively.)

3    Q        You would agree with me, would you not, that this is

4    a court of law and not a court of sympathy?

5    A        Right.

6    Q        I want you to understand that we ask jurors in this

7    country to do very hard things.  And we ask them sometimes to

8    do things that run against our natural inclinations.

9              When you evaluate the facts of this case you should

10   do so free of sympathy for anyone; do you understand that?

11   A        Yes.

12   Q        So sympathy for Donna over here should not effect

13   the way you look at the evidence.

14   A        Right.

15   Q        It's only natural to feel sympathy for someone whose

16   life was taken.  So sympathy for Robert Fingerhut also should

17   not effect your evaluation of the evidence.

18   A        Right.

19   Q        I say that maybe easier said than done because

20   you'll see pictorial evidence, photographs, crime scene

21   photographs.  Do you ever watch C.S.I.?  You'll see crime

22   scene photographs.  You'll see photographs showing almost

23   point-blank gunshot wounds to Mr. Fingerhut's head, I

 1    believe.  You'll see coroner's photographs.

 2              And it's only natural, some of that evidence may

 3    evoke an emotional response from you.  Whether that evidence

 4    evokes an emotional response from you or not, and it may,

 5    sympathy, anger, you're still going to have to test that

 6    evidence and determine whether it ties Donna to this offense.

 7    Are you up to that?

 8    A       Yes.

 9    Q       Did you ever read the book Presumed Innocent?

10    A       No.

11    Q       How do you feel about the rule of law which requires

12    that jurors presume a defendant innocent?

13    A       I don't know.  I, I don't know how to -- I don't

14    know what you want me to say as far as how I feel.  I don't

15    really feel anything about it.  I guess that's the way it

16    should be.

17    Q       Okay.  Well, the reason I ask that question is, I

18    know some people who would do away with that rule.  And

19    actually they are some pretty good friends of mine.  And

20    their point is that we have a crime problem in this country

21    and they would like the way, they would like to do away with

22    the presumption of innocence and replace it with the

23    presumption of guilt like they have in other countries.  And

1  they are certainly free to have that thought.  But if they

2  truly believe that way they wouldn't make good jurors in a

3  criminal case in this country.  Do you agree with that?

4  A       Right.

5  Q       So do you have any feelings like that?

6  A       No.

7  Q       And let's talk about the presumption of innocence in

8  a little bit of a different way.  How many years age

9  difference is there between you and your brother?

10  A       Three.

11  Q       While you all were growing up, if your brother was

12  accused of some type of wrongdoing, I don't know, throwing an

13  egg, toilet paper, talking out, and you felt in your heart

14  that your brother didn't do what he was accused of doing, you

15  would require evidence that he did it, whatever the

16  wrongdoing was, before you would be willing to change your

17  mind, wouldn't you?

18  A       Right.

19  Q       That's like the presumption of innocence.  Will you

20  afford Donna Roberts the presumption of innocence throughout

21  the course of these proceedings?

22  A       Yes.

23  Q       Because of the presumption of innocence the State

1    has the burden of proof.  The State has leveled these

2    accusations.  Now, to put it bluntly, it's time to put up or

3    shut up.

4         I talked to you a moment ago about my friends who

5    would replace the presumption of innocence with a presumption

6    of guilt.  They would also change the burden of proof.  They

7    would make the defendant prove his or her innocence.

8         And, again, they're certainly free to think that

9    way.  But if they truly think that way they couldn't, they

10   would not make good jurors in this country in a criminal

11   case.  You agree with that also?

12   A       Yes.

13   Q       I'm not going to go through them all with you, but

14   there are four charges, and all of those charges are made up

15   of what are called essential elements.  And the Judge is

16   going to define those for you.  What they are, they're

17   necessary ingredients.  In order to prove an offense the

18   State has the burden of proving each and every one of those

19   essential elements.  And the Judge will give them to you at

20   the end of the case.  That's his job.  I don't want to step

21   on his toes.  Okay.  Will you hold the State to their burden

22   of proving each and every essential element of each offense

23   charged?

1    A       Yes.

2    Q       You understand that Donna is on trial for murder,

3    not for being a woman of loose moral character?

4    A       Right.

5    Q       And will you hold the State to prove that Donna

6    intentionally participated in the death of Robert Fingerhut?

7    That's their burden here.

8    A       Yes.

9    Q       Donna doesn't have to testify.  And the Judge will

10   tell you if she doesn't testify you can't consider that for

11   any purpose.  First of all, do you understand that?

12   A       No.  Could you repeat that?

13   Q       Sure.  Donna does not have to testify in this case.

14   A       Okay.

15   Q       And if she doesn't testify you can't hold that

16   against her.

17   A       Okay.

18   Q       Do you have any problems with that?

19   A       No.

20   Q       When Mr. Becker was up here, I'm not sure, did he

21   use the glass example where you fill the glass to a line on

22   top and that's reasonable doubt?

23   A       (Witness nods head affirmatively.)

```
 1   Q        Well, if Donna elects not to testify, that doesn't
 2   add anything to that glass; do you see that?
 3   A        Right.
 4   Q        Now, the other way of looking of that, she may
 5   testify.  And if she does testify you should use the same
 6   rules and standards for determining her credibility or
 7   believability as you use for determining the credibility of
 8   the other witnesses; will you do that?
 9   A        Yes.
10   Q        And let me give you an example.  She's the Defendant
11   here; right?
12   A        Yeah.
13   Q        So she has an interest or a stake in the outcome of
14   this case, doesn't she?
15   A        Yes.
16   Q        And that's something that you would want to keep in
17   mind in determining whether or not you believe her; right?
18   A        Right.
19   Q        So to be uniformed about it then, if you found that
20   any other witness had an interest or a stake in the outcome
21   of the case, that's something you would also want to consider
22   in determining whether or not you believe that witness;
23   correct?
```

1    A        Right.

2    Q        Mr. Becker talked with you about why an indictment

3    is not evidence.  Do you recall that discussion?

4    A        (Witness nods head affirmatively.)

5    Q        Did you know that grand jury proceedings were secret

6    before he talked with you?

7    A        (Witness shakes head negatively.)

8    Q        Do you think you have a good grip on why indictments

9    are not evidence and should not be considered as evidence?

10   A        Yes.

11   Q        Even though you know that, the indictment will be

12   read to you throughout the course of these proceedings.  It

13   will be read and it will be referred to.  What I want you to

14   understand is that, nowhere along the line is it suddenly

15   transformed into evidence; do you understand that?

16   A        Right.

17   Q        Part of your big job responsibilities will be to

18   determine the credibility of the witnesses.  And basically

19   you're going to have to determine whether everyone that

20   testifies here in this trial is telling you the truth or not.

21   Are you up to that responsibility?

22   A        Yes.

23   Q        The Judge is going to give you a list of factors at

1    the end of the case that you should keep in mind in

2    determining whether you believe the witnesses.  All I want to

3    know now is, will you take those factors and apply them

4    uniformly to everyone that testifies?

5    A        Yes.

6    Q        Then he's going to give you another factor that's

7    called the test of truthfulness that you apply in your every

8    day life.  And throughout the years you've had to determine

9    whether someone, your brother, a fellow student, a friend was

10   being straight up with you or trying to hoodwink you.  And

11   over the years I would imagine that you've developed a sixth

12   sense or an intuitive sense to aid you in that process?

13   A        (Witness nods head affirmatively.)

14   Q        It would make Richelle's job a lot easier --

15   A        I'm sorry.

16   Q        That's okay.  But if you can, please try to respond

17   verbally.  It makes her life a little easier.

18            The Judge is going to tell you that you should take

19   those tests of truthfulness that you use in your every day

20   life and apply them to each and every witness that testifies.

21   Will you also do that?

22   A        Yes.

23   Q        Now, the State's burden in this case is proof beyond

1      a reasonable doubt. Obviously reasonable doubt is based on

2      reason and common sense. And it is, proof beyond a

3      reasonable doubt requires that you be firmly convinced of the

4      allegations and is proof of such character that an ordinary

5      person would be willing to rely or act upon it in the most

6      important of his or her own affairs.

7              So firmly convinced, willing to rely and act upon in

8      the most important of our own affairs. He'll define it for

9      you at the end, the Judge. But that's just a preliminary

10     overview. Okay?

11     A       Okay.

12     Q       You've made some pretty important decisions in your

13     life, haven't you?

14     A       Yes.

15     Q       And sometimes when we're called upon to make

16     important decisions we make a checklist, sometimes in our

17     mind, sometimes we even do it on a piece of paper. We put a

18     line down the middle of it and we put the positives on one

19     side, the negatives on the other. Have you ever done that?

20     A       Yes.

21     Q       Well, for the sake of our discussion let's pretend

22     I'm buying a house.

23     A       Okay.

1    Q      And I write the positives on the left-hand side.  I

2    need four bedrooms.  It has four bedrooms.  I need three

3    bathrooms.  It has three bathrooms.  It's in a school

4    district that I want.  It's in a neighborhood that I, that I

5    like.  And my wife likes the house.  Those are all positives.

6            On the negative side, the house is 45-years old and

7    I just have some nagging doubts about the structural,

8    structural stability of the house.  There's some plumbing

9    work that needs done, and I don't know about the plumbing

10    repairs.  And I don't know whether I can afford the mortgage

11    payment.  So those are the negatives.  And what I'm trying to

12    make a decision, I try to strike off the negatives.

13            So in my house-buying decision I call a plumber.  I

14    say, hey, come on and look at this.  How much will it cost to

15    fix the plumbing?  And he says $200.  And I can afford the

16    $200 so I scratch off the plumbing negative.

17            I still have that question about the stability, so I

18    write in the purchase agreement that I want an inspection, a

19    housing inspection.  I call a contractor, he comes in and

20    says, don't worry about it.  This foundation is brick solid.

21    So I strike that one.  I go to the bank and I say, listen,

22    can I lower the interest rates?  Can I stretch the payments

23    over a longer period of time?  And no matter how much I work

1    at it, no matter how much I think about it, I still have a

2    reasonable concern about whether I can afford that amount of

3    money every month.  Are you with me?

4    A       Yeah.

5    Q       I scratched off all of those negatives except one,

6    and that negative has remained reasonable; correct?

7    A       Okay.

8    Q       I cannot say that buying that house is the right

9    thing for me beyond a reasonable doubt; do you understand

10   that?

11   A       Yes.

12   Q       And will you hold the state of Ohio to that burden

13   throughout this case?

14   A       Yes.

15   Q       I just want to talk to you briefly about

16   circumstantial evidence and then we'll be done.  It's proof

17   of a fact by direct evidence, what somebody says they saw,

18   what somebody says they heard, what somebody says they

19   smelled, from which you can infer other reasonable facts or

20   circumstances.  Does that make sense to you, first of all?

21   A       Yes.

22   Q       Let me give you the simplest example I can think of,

23   because I sometimes have problems with this myself.  It's a

1    December night and I walk the dog at 11:00 o'clock at night

2    and there's no snow on the ground, I put the dog in the

3    house, I go to bed.  I wake up at 7:00 o'clock in the

4    morning, I look out the window and there's four inches of

5    snow on the ground.  I have not seen it snow, so I do not

6    have direct evidence that it snowed.  But I can certainly

7    have, I certainly have circumstantial evidence that it

8    snowed, don't I?

9    A       Right.

10   Q       Now, this just so happens to be a Sunday morning.

11   And Sunday mornings are actually fairly important for me

12   because on Sunday mornings I'll have a cup of coffee in one

13   hand, a cigarette in the other and I'm looking out the

14   upstairs window for my newspaper.  And I see the fresh snow.

15   And I also see from my neighbor to the right footprints from

16   that house to my house.  And then foot -- to my front door.

17   And footprints from my front door off to the neighbor to the

18   left.  From that I can infer that someone walked in that

19   snow.  And because I'm anxious to get my paper, I might even

20   pile an inference upon an inference here, and if I do that I

21   may try to infer as to who made those footsteps --

22   footprints.  Excuse me.

23              So I infer that it was the paperboy, which seems

1    reasonable to me, until I go to the front door and open it

2    up, expecting to find my paper, and there's my Giant Eagle

3    coupons.  So you have to test all the inferences that you're

4    asked to make.  And will you do that?

5    A       Yes.

6    Q       And do you see how you really have to test, when you

7    start piling inferences on inferences?

8    A       Yes.

9    Q       You recall when we were talking about your brother

10   maybe being accused of wrongdoing, if you were given

11   circumstantial evidence in that case and asked to make an

12   inference, you might look for other inferences that you could

13   reasonably make that pointed in another direction.  Do you

14   see that?

15   A       Yeah.

16   Q       Would you do that here?

17   A       Yes.

18   Q       Now that you've had this occasion to talk to all of

19   us, Mr. Becker, myself, the Judge, has anything popped into

20   your mind that you would like to discuss with us, that you

21   would like to bring to our attention?

22   A       No.

23   Q       Now I thank you for your time and attention.

```
1              THE COURT:  Pass or side bar?
2              MR. BECKER:  Pass.
3              MR. INGRAM:  Pass.
4              THE COURT:  Very good.  You're going to be
5   in the poll from which this jury will be selected.  The
6   number that was given to you to call in, call in after 4:30
7   Friday, this Friday.  Hopefully we'll be in a position to get
8   everybody back in to pick the jury next week some time.
9   You're not to discuss anything about the case, form any
10  opinion, read anything on the, in the newspaper, TV,
11  whatever, until you come back.  Okay?
12  A       Okay.
13             THE COURT:  Let's take a ten-minute break.
14             (Whereupon, a recess was taken.)
15                        *  *  *
16  WHEREUPON,
17                    MOSELLE DICENSO
18  being first duly sworn, according to law, was examined and
19  testified as follows:
20                     EXAMINATION
21  BY THE COURT:
22  Q       Good afternoon.  How are you?
23  A       I'm fine.  Thank you.
```

1    Q       You read that handout that was given to you?

2    A       Yes.

3    Q       You understand why we're here.  The purpose of

4    talking to each of the prospective jurors individually is a

5    couple areas we have to cover.  Miss Roberts is charged with

6    aggravated murder, two counts with specifications.

7           Now, under the law of Ohio just because a person is

8    found guilty of murder does not mean that they also face the

9    death penalty.  Legislature has seen fit to put certain

10   situations where the death penalty becomes a possibility.

11          Now, when this trial begins of course it's like any

12   trial, the burden will be upon the State to prove each and

13   every element of the charge of aggravated murder beyond a

14   reasonable doubt.  It's a pretty high standard of proof.  One

15   of the highest standard of proof we have.  And they also

16   would have to prove beyond a reasonable doubt the

17   specifications attached.  In this case that concerns a

18   burglary and a robbery.

19          If they fail to carry that burden then of course the

20   jury would properly return a verdict of not guilty, that

21   would be the end of the trial.  If they maintain their burden

22   and the jury would come back with a guilty verdict, however,

23   we would go into a second hearing at which time the

1   prosecution is called upon to present aggravating

2   circumstances.  Those are reasons given to the jury as to why

3   they should consider and impose the death penalty.  And the

4   jury has to balance those aggravating factors against,

5   aggravating circumstances against the mitigating factors

6   which are reasons why the jury should not consider imposing

7   the death penalty.

8         Now, the jury, in any event, in that second phase

9   has the options of the death penalty, life without chance of

10  parole, life with no chance of parole before 25 or 30 years.

11        A person who would sit on such a jury who believed

12  in an eye for an eye, if you take a life you forfeit your

13  life, that person could not follow the law and could not be

14  fair to the Defendant.  You take a person who could under no

15  circumstances ever consider making that decision, even

16  considering it, that person could not be fair to the State.

17        Everyone has their own personal views on the death

18  penalty.  As everything else, you're entitled to your views.

19  The reason that the questions will be asked of you this

20  afternoon is to find out if you're in the majority of the

21  population where, even though you may favor the death penalty

22  or maybe look upon it with a little disfavor, you're able to

23  give them the assurance that you can follow the law and you

1    will follow the law.  And the law says if all those things

2    happen I've gone over, then the State has the right to

3    request the jury to consider the death penalty along with any

4    other penalty and under the correct circumstances where they

5    carried their burden of proof, to impose it.

6           The other area of inquiry will be about any pretrial

7    publicity, whether you've read something, have fixed

8    opinions.  Many of the jurors have read something about the

9    case, which is not unusual.  But it's a question of whether

10   you feel sure in your own mind that you could set aside

11   anything you may have heard and decide this case fairly on

12   the evidence that you'll receive in this courtroom.  That's

13   what they'll be asking you.  Okay.  Mr. Bailey.

14                            EXAMINATION

15   BY MR. BAILEY:

16   Q        Is it pronounced Dicenso?

17   A        Right.

18   Q        Miss Dicenso, good afternoon.  My name is Ken

19   Bailey.  I'm the assistant prosecutor.  And as I promised the

20   other week, I guess it's been a couple weeks ago in court,

21   I'm joined today by Chris Becker, who is another assistant

22   prosecutor.  And the two of us are responsible for

23   prosecuting this particular case.

1          And this is sort of a give and take session here

2     this afternoon.  We get to ask you some questions.  And if

3     you have any questions that come up pertaining to what we're

4     doing, feel free to ask them.  Because this is, this is the

5     one chance that we get to talk to each other until the case

6     is all over.

7          During the time, if this case goes into two phases,

8     we have to wait until the end of the second phase before, if

9     you have questions that come up to us during that time.  If

10    other questions come up, you need help with something, you'll

11    have to ask the bailiff, Laurie Brown, who's not here right

12    now, or our court reporter, or the Judge, because we're not

13    allowed to have any communication with you outside the

14    courtroom, okay, after today, except to say good morning or

15    good afternoon.

16         If we run into each other in the hallway or in the

17    elevator or restaurant or something, under our rules of

18    conduct, we're not trying to be antisocial or snub you, it's

19    just that we're not allowed to communicate with you.

20    Otherwise it could result in a mistrial, and we wouldn't want

21    to do that.

22    A     Okay.

23    Q     And we're asking questions regarding your prior

1    experiences, your opinions about different things not because

2    we're snoopy and we like to pry into people's backgrounds and

3    stuff, but rather, to make sure that the folks who are

4    selected to sit on this jury can be fair and impartial to

5    both sides, both to the Defendant and to the people of this

6    State.

7    A        Okay.

8    Q        There aren't any right answers.  There aren't any

9    wrong answers to these questions.  Just open, candid answers.

10           Now I'm going to ask you questions initially, first

11   regarding pretrial publicity, and second regarding the death

12   penalty as a punishment, then we'll get into some other

13   questions.  First let's get to this issue of pretrial

14   publicity.  Okay.  I noticed that you read the Tribune and

15   you pretty much follow all Cleveland news, Channel 3, NBC up

16   in Cleveland, WKYC, is it?

17   A        Yes.

18   Q        And you indicated that you had read the first

19   article because you live in Howland?

20   A        Right.

21   Q        What do you recollect reading about this case?

22   A        Just that there was a murder.

23   Q        Okay.  Now, did you follow anything regarding this

1    case or the case involving the other fellow?

2    A        No, not after the first day.

3    Q        Did you, if it hit headlines, did you just ignore

4    the headlines or what did you do?

5    A        I don't always read the paper.  I'm not much of a

6    relaxing kind of person.  So a lot of nights by the time I'm

7    done with whatever I'm doing I don't even open it.

8    Q        Okay.  What about your family, would they discuss

9    any of this with you?

10   A        No, not really.  My children are both gone and my

11   husband reads the paper and usually falls asleep.

12   Q        I noticed you have a daughter in law school.

13   A        Right.

14   Q        What type of law is she pursuing?

15   A        She's in her first year.  She hasn't decided.

16   Q        Now, so you really don't have very much knowledge

17   about this case except to know it's a murder case?

18   A        Right.  I don't.

19   Q        Now, the Judge instructs you that you're not to read

20   the newspaper or watch TV regarding this case.  If anything

21   comes on TV you either walk out of the room or turn it down

22   or something.  Or if the newspaper comes, you can have your

23   husband save the papers for you, which might be kind of

1    interesting, and I'll explain why in a minute.

2        But as you look around the courtroom, we don't have
3    anybody from the news media here right now.  There was a
4    reporter here a few minutes ago but he didn't stick around
5    for this.  And it may well be during the course of the trial
6    as we get into testimony in a couple of weeks that the
7    newspaper reporters will come in and sit for a little while,
8    and then they'll go to another courtroom or somewhere else in
9    the county.  And the TV crews, they'll come in.  They're not
10   allowed to film the jurors, but they'll come in for a few
11   minutes and they'll take some pictures of the Judge or us or
12   the Defendant, or witnesses.  And then they'll do a feature
13   on that day.  And they may have something for 30 seconds or
14   for a minute or something like that.  And the reporters will
15   write stories.

16       Now, the interesting thing about that is, they're
17   going to have written a story missing everything that
18   happened before they got in here with all the questions that
19   were asked and the answers and everything that was asked and
20   answered after they left here, okay, which would put an
21   unusual slant on the story, perhaps, especially if the
22   testimony turned out to be something totally different from
23   when they were here.  And sometimes the editor that puts the

1    headlines on, the headlines may bear no relation to the story

2    itself.  And they don't do that intentionally.  It's because

3    they rush to get it into the air or into print and sometimes

4    you get a misimpression based on what they report.

5            And it may well be, if you have your husband save

6    the newspapers for you and you sit on this case you're going

7    to look at it afterwards and say, you know, gosh, I sat in

8    Judge Stuard's courtroom for a week and a half or two weeks

9    during the course of the trial and I remember the testimony.

10   And I'm reading these newspapers now after it's all over.

11   And whoever that reporter was he must have been reporting on

12   that case in Judge McKay's court, not Judge Stuard's court.

13           So to keep that misinformation away from you, we ask

14   you to ignore the media and to make your decision based

15   totally on what happens here in this courtroom starting out

16   with a clean slate.

17           It may well be that during the course of the

18   testimony you may recollect having read something in the

19   paper in the initial article, but you'll put that aside and

20   make your decision based on what happens here.  Sort of like

21   going back to school or starting over with a new course;

22   right?

23   A       Right.

1    Q        You make your decisions based on the testimony, the

2    evidence and the Judge's instructions of law.  Okay.

3              Now, so much for pretrial publicity.  Now let's get

4    into the issue of the death penalty as a punishment.  I was

5    looking at your questionnaire, and you indicated that you

6    thought, you weren't really sure about the death penalty as a

7    punishment.  You said it's sort of a case-by-case basis.  And

8    I notice you're Catholic, and the church has taken a position

9    against the death penalty as a punishment; right?

10   A        Right.

11   Q        I notice you go to church I believe every week;

12   right?

13   A        I do.

14   Q        You're active in the church?

15   A        Uh-huh.

16   Q        Committee.  You help people.  And, but you think

17   that the death penalty might be appropriate for crimes

18   against children?

19   A        I sometimes think that it's not right.  But then --

20   Q        The death penalty?

21   A        Right.  But then I think if someone did something to

22   my children or my mother, my husband, I would feel different.

23   But then everyone, everyone is someone's son or father or --

1    so if everyone felt, you know, you could only do it if it's

2    mine, that that wouldn't be appropriate.  So there has to be

3    a time when I guess I feel that it is.  But I can't just say,

4    yes, I am for it or, no, I'm not, unless you tell me all the

5    circumstances.  I couldn't give you an answer one way or

6    another.

7    Q       We can't tell you all the circumstances.

8    A       I know.

9    Q       But what we need to do -- I think you agree that

10   it's important that both sides get a fair shake in this

11   trial?

12   A       Absolutely.

13   Q       And you read that handout downstairs?

14   A       Yes.

15   Q       And the Judge has talked to you a little bit about

16   what happens in this type of a case.  And not every case is a

17   death penalty case.  Every murder isn't a death penalty

18   murder case.  It's unusual.  It's only in the most severe

19   cases.  And the Legislature writes the law.

20           And in Ohio the Legislature has written the law in

21   such a way that if a person commits a crime called aggravated

22   murder, and attached to that charge is a specification, and

23   that's a fancy word for an extra finding of fact for a jury

 1    to consider.  But there are these two specifications attached

 2    to two different counts of aggravated murder.  There's only

 3    one killing, one dead body, but there are two different

 4    theories in this case.  One is an aggravated murder with

 5    prior calculation and design.  And there's a second theory of

 6    aggravated murder, felony murder, that it occurred during the

 7    course of aggravated burglary or aggravated robbery.  Okay?

 8         And the State is allowed to pursue two different

 9    theories.  And we've elected to do that.  That's proper under

10    the law.  But if the jury comes back with the charge of

11    guilty beyond a reasonable doubt of aggravated murder and one

12    of these specifications, these special findings, that the

13    aggravated murder was committed with prior calculation and

14    design, and it occurred in the course of an aggravated

15    burglary, and there's a second one, that the aggravated

16    murder was committed with prior calculation and design, and

17    it occurred in the course of an aggravated robbery, if you

18    find the Defendant guilty beyond a reasonable doubt of the

19    aggravated murder and one or more of these specifications,

20    then we would move to a second phase that would make the

21    Defendant eligible for the death penalty as a punishment.

22         And you read that four possible punishments that you

23    can consider.  And you should consider them initially all

1    equally.  The death penalty; the sentence of life in prison

2    with no eligibility for parole; life with parole eligibility

3    after 30 full years, and; life with parole eligibility after

4    25 full years.

5           But let's say, you understand in the first phase the

6    issue is guilt or non guilt, and we have to prove certain

7    elements of the crime.  We'll talk more about that later.

8    But there are certain essential key component parts of each

9    crime, like the ingredients in a recipe.  And the burden is

10   on us, the people of the State, to prove those things beyond

11   a reasonable doubt.

12          And in the first phase, dealing with guilt or non

13   guilt, as to whether we can prove it, punishment has no part

14   there.  The first phase is tried like any other criminal

15   case, any other jury trial in this state.  The jury makes a

16   decision with no concern for punishment.  If the jury makes

17   that finding of guilty of agg. murder and one or more of

18   these specifications, we then move to the second phase.

19          In that second phase you have a different issue.

20   The issue of guilt having already been decided, the issue now

21   becomes, what's the appropriate punishment for this Defendant

22   for this crime?  And then you have to do a balancing test.

23   You can hear the same evidence or maybe some new evidence.

 1    Different evidence in a second phase.  And on one side of the

 2    scale, on this balancing test you have the aggravating

 3    circumstance or circumstances that you would have found in

 4    the first phase, okay, these special findings.  On the other

 5    side of the scale are what we call mitigating factors.  And

 6    mitigating factors, we don't know what they are at this

 7    point.  I would have no way of guessing at them for you.  But

 8    these are things that work in a defendant's favor that

 9    mitigate against the imposition of the death penalty.  And

10    then you have to decide if the aggravating circumstance or

11    circumstances outweigh beyond a reasonable doubt the

12    mitigating factors.  And if they do, then the appropriate

13    punishment under the law is the death penalty.  Okay?

14         And at that point you and the other jurors, if you

15    found that way, that we proved that, met our burden of proof,

16    you would then return a verdict with that recommendation of

17    the imposition of the death penalty.  You would not go on to

18    the other three life factors.  Okay?

19         Now, for a defendant in a case like this to have

20    somebody come in on a jury and say, well, the way I

21    personally feel is that if somebody commits a crime, like

22    aggravated murder with one or more of the specifications, and

23    the charge here is a killing that occurred with prior

1    calculation and design, there was some planning that took

2    place, and the charge that it was a killing that occurred for

3    insurance money and for the theft of a car, and for somebody

4    to come in and say, well, somebody who commits a premeditated

5    murder or a murder with prior calculation and design for

6    profit, I would automatically impose the death penalty, that

7    wouldn't be fair to the Defendant; right?

8    A        Right.

9    Q        Because it's not an automatic punishment.  Because

10   you wouldn't have heard anything in the second phase at that

11   point about mitigating factors, because mitigating factors

12   aren't relevant in the first phase.

13           Now, by the same token, if somebody couldn't return

14   a death penalty verdict in the second phase, then it wouldn't

15   be fair to the people of the State.  That's why we ask you

16   these questions, for you to seek your mind, search your mind

17   and your heart and determine whether or not you could return

18   a verdict for the death penalty in a second phase, if we got

19   to that point.  And it's not easy to decide.  It's not easy

20   to answer.  But it's the only chance we get to ask you that.

21   Because if we went through this whole trial and we went for

22   another couple of weeks and we went through two different

23   phases and then we got to that point and we said, gosh, I sat

1   through this whole trial.  We found the Defendant guilty of

2   aggravated murder with one or more of the specifications, and

3   we did this balancing test that the Judge said, and we found

4   that the State met its burden of proof that the aggravating

5   circumstance or circumstances outweigh the mitigating factors

6   beyond any reasonable doubt, so the appropriate punishment

7   here is the death penalty.  But now I get to this point, I

8   just can't sign the verdict form.  I mean, I believe that

9   maybe the death penalty should be appropriate in some cases,

10  but I just can't partake in it.  We would never know that and

11  we wouldn't be getting our fair shake in court; right?  So

12  it's important that we ask people these questions to

13  determine that.  And you're the only one who knows the

14  answer; right?

15  A       I don't know if I know the answer, though.

16  Q       Okay.  Well, let's, let's discuss it.  If you can

17  have a say in designing the criminal justice system, let's

18  say you sat on the Legislature, would you include the death

19  penalty as a possible punishment for any crimes?

20  A       Probably.

21  Q       For which crimes?

22  A       Probably anything against children.  I mean, I just

23  think that is the worst.

1    Q        Okay.  What if it wasn't a crime against children.

2    What if it was a murder-for-profit against an adult?

3    A        Probably if it was, you know, malicious and, like

4    you said, preplanned.  I don't know.  I honestly don't know.

5    I'm just trying to be honest.  I don't know.

6    Q        Now, with your religion, your church has taken a

7    position against the death penalty; right?

8    A        Uh-huh.

9    Q        Would you be able to make your own decision

10   different from what the church says?

11   A        Yes, I think so.

12   Q        So that wouldn't be a problem for you?

13   A        I don't think so.

14   Q        Now, your view that it, the death penalty is

15   appropriate in certain crimes, how long have you held this?

16   A        All my adult life.

17   Q        Is there anything that led you to that decision?

18   A        Probably having children and making life be more

19   precious.

20   Q        Are there any crimes that you became aware of over

21   the years that made you think about the death penalty as a

22   punishment?

23   A        No, not specifically.

1    Q        Has the issue of the death penalty as a punishment

2    ever come up in discussions where you've been present, maybe

3    in church or maybe in, maybe at work or at home or with your

4    children or husband?

5    A        My husband believes in the death penalty.  My

6    daughter who's in law school does not.  My other daughter

7    just doesn't have, she doesn't get into that.  It's, so

8    that's not, you know.

9    Q        Okay.

10   A        But we don't have any discussions about it.

11   Q        Do you think people should be held accountable for

12   their actions?

13   A        Oh, yes.

14   Q        Now, when we talk about this weighing procedure,

15   this balancing test, you have to decide, you're going to have

16   to weigh these different things.  But you understand it's up

17   to you and the other jurors how much weight you want to give

18   to these factors or circumstances.

19            You may find that certain circumstances may weigh a

20   whole lot, like maybe a ton or something, 50 pounds or

21   something.  On the other hand, there may be something that's

22   presented to you where you think it has about as much weight

23   as a feather.  So it's entirely up to you and the other

1    jurors how much weight you want to assign to each of these

2    things.  You wouldn't have any problem with that?

3    A       I don't think so.

4    Q       Let's say -- let me get to the hard questions.

5    A       All right.

6    Q       Let's say we get to the end of the first phase,

7    okay, and we've convinced you beyond a reasonable doubt --

8    and we'll talk about that term in a little bit.  But let's

9    say you're convinced beyond a reasonable doubt that we've met

10   our burden of proof.  We proved the elements of the crime

11   charged and we proved the elements of the specifications

12   beyond a reasonable doubt, so you're firmly convinced to a

13   moral certainty as to the truth of the charge, the elements

14   of the charge.  Okay.  Would you be able to sign a verdict

15   form finding the Defendant guilty in that case in the first

16   phase --

17   A       If --

18   Q       -- knowing that, finding her guilty of the crime of

19   aggravated murder with one or more of these specifications

20   would make her eligible for the death penalty in the second

21   phase?  Or do you think that your feelings about the death

22   penalty as a punishment, or your uncertainty about it would

23   substantially affect your ability to sign that verdict form?

1   A        You're asking me to tell you something that I

2   haven't experienced.  I just can't, without knowing about it,

3   I just can't tell you one way or the other.

4   Q        Let me put it this way.  We've had a number of folks

5   come in here who strongly believe in the death penalty as a

6   punishment, and then they come down to it and they've thought

7   about it and they say, you know, gosh, I'm in favor of the

8   death penalty intellectually as a punishment, I believe it

9   has a place in society for various reasons, whether it's

10  punishment, deterrence, or whatever, but they've told us that

11  they personally can't take part in that process because when

12  it came right down to it, they didn't think they could sign

13  the form, either in the first phase or sometimes in the --

14  well, usually in the second phase but sometimes in the first

15  phase it would effect their ability to sign that verdict form

16  when we've met our burden of proof, and they said they

17  wouldn't be able to follow the law in that case because of

18  that.

19           And that's why I'm pushing you a little bit to

20  search your mind and your heart and really think about it,

21  because I imagine you've been thinking about it since you

22  found out this was a death penalty case; right?

23  A        Right.

1    Q       So you've had the last two and a half weeks to think

2    about it; right?

3    A       Right.

4    Q       And you're the only person who really knows

5    yourself, because we're just meeting for that.  So if I ask

6    you again, do you think it would substantially interfere with

7    your ability to sign a guilty verdict in the first phase

8    knowing that it would make her eligible in the second phase,

9    do you think that that would effect you?

10   A       I don't know.  I mean, I'm just trying to be honest.

11   I just don't know.

12   Q       Let's get to the really hard question, the second

13   phase.  Let's say we've made it to the second phase, you and

14   the other jurors have found her guilty in the first phase of

15   aggravated murder and the specifications beyond a reasonable

16   doubt.  We go to the second phase.  You're presented with

17   different things and you do the balancing test.  And you say,

18   the State has met its burden beyond a reasonable doubt, the

19   aggravating circumstance or circumstances outweigh these

20   mitigating factors, so under the instructions of law from the

21   Court you have to come back with the death penalty verdict.

22   Do you think that you would be able to sign that verdict form

23   for the death penalty?

1   A        It would just depend on what I had heard.  I just

2   can't tell you without, you know, knowing.  And I know that

3   puts you in a bad place because you wouldn't know which way I

4   would go.

5   Q        We're not asking you to consider the actual facts of

6   the case now.

7   A        I know.  But how can you say that you can or can't

8   if you don't know what's gone on in the case?

9                    THE COURT:  Can I?

10                   MR. BAILEY:  Sure.

11                   THE COURT:  Ma'am, the question is, and I

12  understand, I'm sure that we all understand what you're

13  saying.  It's pretty difficult for us to ask you at this

14  point.  The bottom line is, are you in your mind of such a

15  nature that you could not consider the death penalty or you

16  at least know that if you did consider it, under no

17  circumstances could you participate in such a verdict?  Or is

18  it something that you are able to consider under the right

19  circumstances if the State proves its case that you wouldn't

20  rule it out?

21  A        No, I wouldn't rule it out.

22                   THE COURT:  That's where I think you're

23  going.

1          MR. BAILEY:  I'm sorry.  I missed what the

2     answer was.

3     A        I wouldn't say that I would rule it out.

4     Q        You wouldn't rule out the death penalty?

5     A        No.

6     Q        And if, if we convinced you, assuming that whatever

7     the facts were, you're convinced that the death penalty is

8     the right punishment under the law.  Okay.  We've met your

9     criteria that it's, it's, you know, the burden of proof,

10    we've met that, you're assuming that, and the Judge has given

11    you instructions of law, could you then follow the law and

12    sign that verdict form?

13    A        I don't know.  If I really believe that all of the

14    circumstances were there, I guess I could.

15    Q        Well, assume -- okay.  Assume that the aggravating

16    circumstances outweigh the mitigating factors, we've

17    convinced you of that beyond a reasonable doubt, and the

18    Judge instructs you that in that case, if we prove beyond a

19    reasonable doubt that the aggravated circumstance outweighs

20    the mitigating factors, then you must come back with a death

21    penalty verdict; you would be able to sign that form?

22    A        I think so.

23    Q        Okay.  And if you're asked, "Is that your verdict,"

1    in open court by the Judge, you would be able to say yes?

2    A       If I, yeah, if I believed that you have proven it

3    without a doubt.

4    Q       Let me ask you something.  You attend the Blessed

5    Sacrament Church, right, in Howland?

6    A       Yes.

7    Q       Do you know Paul Monroe?

8    A       No.

9    Q       He's a police chief up there now, and he attends

10   that church.  You don't know him?

11   A       I do know one police.  What's he look like?

12   Q       He looks kind of young.

13                   THE COURT:  Just recently made police

14   chief.

15   A       Was he a police officer before?

16   Q       Yes.

17   A       Okay.  I think I know.  He's thin?

18   Q       Yeah.  How well do you know him?

19   A       I don't.  I mean, I just, I know if it's this man

20   one time a boy was harassing my daughter and he came to our

21   house and that is -- if that's him.  I don't even remember if

22   that's what his name was.

23   Q       Okay.  Assuming it was him, were you satisfied with

1    the way he handled the situation with the boy and your

2    daughter?

3    A        Well, he didn't really handle it.  It kind of just

4    stopped.

5    Q        The fact that you might know him, would that affect

6    your ability to --

7    A        No.

8    Q        -- listen to his testimony and judge it the way you

9    would the testimony of any other witness in this case?

10   A        No.

11   Q        Now let me get off this death penalty issue and get

12   back to some regular questions here.  Okay.  We were talking

13   about the elements of the crimes.  And do you understand the

14   Defendant here is charged as a complicitor, somebody who

15   helps another person or aids and abets another person or

16   solicits or procures another person to commit a crime.  That

17   she's not the trigger, she's not charged as the trigger

18   person in the crime but rather as somebody who planned with

19   another fellow, Nate Jackson.  And that the charge is that

20   this Nate Jackson is the person who actually committed the

21   killing, that he's the person who actually trespassed in the

22   residence, that he's the person who actually committed the

23   aggravated robbery, stole the car and had the working gun.

1    Okay.

2          The fact that she's charged as a complicitor,

3    somebody aiding in the planning of an aggravated murder,

4    would that bother you in such a way that you wouldn't be able

5    to decide this case based on the evidence?

6    A       No.

7    Q       You understand under Ohio law a person can be

8    charged and be eligible for the death penalty as a punishment

9    as a complicitor?

10   A       Right.

11   Q       If the person acts with prior calculation and design

12   and meets the other elements.  Now, I had mentioned that each

13   crime has certain elements, like the ingredients in a recipe,

14   like if you were baking a cake.  And the burden is on us to

15   bake that cake, put in all the ingredients.  And if we don't,

16   if we leave one out you've got to find her not guilty of that

17   particular charge.  You consider each crime and its elements

18   separately.

19         And there are four crimes that are charged here.

20   Two counts of aggravated murder, one with prior calculation

21   and design.  And one with felony murder, it occurred during

22   an aggravated burglary and aggravated robbery.  And the Judge

23   is going to instruct you at the end of this case as to the

1    elements of the crimes.  And you're bound to follow his

2    instructions.

3          I'm going to give you a for instance, though.  The

4    crime of aggravated murder with prior calculation and design.

5    Let's say, for instance, we have to prove certain key

6    essential component parts of that crime.  They happened on or

7    about a certain date.  Let's say December 11th, 2001.  Second

8    would be that it happened in Trumbull County, Ohio.  We call

9    that venue.  And we have to prove that.  And we ask that

10   question, you may get tired of, what county and state did

11   this occur, so that we can try the case in this courthouse

12   rather than up in Ashtabula County or over in Cyahoga or

13   Tuscarawas.

14         Third:  Identification.  That the person who's, who

15   committed this crime is the person who is sitting over there.

16   And somebody is going to have to point her out.  Okay.

17         The fourth element is that she did it purposely,

18   basically on purpose.  But the Judge will give you a detailed

19   legal definition of that term.

20         Fifth:  That she caused the death of a living

21   person, in this case a fellow by the name of Robert

22   Fingerhut.

23         And sixth:  That she did it with prior calculation

1   and design, which requires some advanced planning.  Sort of

2   like the old type of premeditated murder that we used to talk

3   about in Ohio, but it's a little different.  It's not a

4   momentary action like if I drop my pen and I caught it by

5   reflex, that wouldn't count.  But if I dropped my pen and I

6   looked down and said, oh, my goodness, I dropped my pen,

7   maybe I better bend down and pick it up, and I planned and

8   did it, you know, that requires some planning and

9   forethought; right?

10  A        (Witness nods head affirmatively.)

11  Q        Each of these crimes is composed of these particular

12  elements, and we have the burden of proving these elements by

13  proof beyond a reasonable doubt.  It's a high burden of proof

14  in the law.  And folks hear that term, proof beyond a

15  reasonable doubt, and sometimes folks say, well, gosh, I want

16  it proved 100 percent, or I want it beyond all doubt or

17  beyond a shadow of a doubt.  You understand that's not our

18  burden of proof.

19          It's sort of like a box, and we have to fill that

20  box with evidence, enough to convince you of the truth of the

21  charge to a moral certainty when you use your reason and your

22  common sense.  That box -- there are different types of

23  cases.  In a civil case whoever fills that box just over

1   halfway is going to win.  Okay.  But in a criminal case we

2   got to fill it pretty close to the top.  Not all the way to

3   the top.  We don't have to have 100 percent proof.  You used

4   to work as a bank teller; right?

5   A       Right.

6   Q       As a bank teller you're used to juggling down to the

7   last penny; right?

8   A       Yes.

9   Q       Everything has to balance.  Not so in a criminal

10  case.  Okay.  In a criminal case we don't have to balance to

11  the last penny.  We have to do it with enough evidence so

12  that you're firmly convinced of the truth of the charge.

13  Okay.  And that line would, you would have to draw a line

14  maybe on the box how full you want it to be where you're

15  satisfied personally with that amount of evidence.  For every

16  person on that jury it may be at a different point, but it's

17  going to be pretty close to the top of the box.

18          That term, proof beyond a shadow of a doubt, that's

19  a nice Alfred Hitchcock movie but it doesn't exist in

20  criminal law.  So you understand, you wouldn't force us to a

21  higher burden of proof than what the Judge instructs, would

22  you?

23  A       No.

1    Q        Now, there's also a concept here, the presumption of

2    innocence.  You understand that the Defendant is presumed to

3    be innocent of these charges, as are all other defendants

4    tried in this courtroom.  And that presumption of innocence

5    acts like a cloak shielding her all through the course of

6    this trial.  And that stays with her, under our system of

7    justice, all the way until the end of this case.  Until

8    you're back in the jury room deliberating with the other

9    jurors and you get together and you decided that we presented

10   enough evidence to convince you beyond a reasonable doubt of

11   the elements of the crime.  Okay.  And if so, then that

12   presumption of innocence would be gone; right?

13   A        Right.

14   Q        You understand that there are different types of

15   evidence that we can use to prove the elements of the crimes

16   in a criminal case.  There's something called direct

17   evidence.  That's where a witness comes in and testifies from

18   what he or she has learned through the use of his or her five

19   senses.  For example, I heard the gunshot and it was loud.  I

20   smelled the smoke and it was acrid.  I touched the surface

21   and it was hot.   That's one type of evidence.

22            There's another type of evidence.  It's sort of a

23   roundabout type of evidence, and we call that circumstantial

1    evidence.  People sometimes hear the term circumstantial
2    evidence and they think there's something wrong with it, but
3    it indicates they really don't know what it means.  It's
4    where you're presented with a fact or set of facts and you
5    have to draw a logical conclusion to another fact or set of
6    facts.  It's deductive reasoning.  You're familiar with that,
7    right?

8           And let me give you a for instance of that.  Let's
9    say that you live in a two-story house and you go to bed at
10   night, and you look out your bedroom window all over the
11   neighborhood and as far as you can see it's a beautiful
12   night.  The moon is beaming.  The stars are twinkling above.
13   And it's dry as far as you can see across all the rooftops
14   and all the streets.

15          You draw the blinds, get into bed, and before you
16   fall asleep you hear on the radio the announcer saying
17   there's a cold front coming in and there's going to be a
18   storm.  And sometime after that you fall asleep.  Then
19   sometime later you're awakened in the middle of the night.
20   You look toward the window and a flash of light from outside,
21   and a couple seconds later there's a distant bombing sound in
22   the sky.

23          And a couple, half a minute later there's another

1   big flash of light outside and a closer-in-time booming

2   sound.  And suddenly there's a great big ripping flash of

3   light outside.  You can't see what it is because the blinds

4   are closed.  And then right above the house a second later or

5   almost instantly there's a big ripping booming crack and

6   pitter patter on the roof and a steady drumming sound, and

7   you fall back asleep.

8           And sometime later you awaken and you go to the

9   window, open the blinds and look out.  It's a beautiful day

10  outside.  The sun is beaming.  And there's not a cloud in the

11  sky.  But the streets are running with water.  Drops of water

12  are dripping down from the leaves of the trees.  It's flooded

13  outside.  There's no fire hydrant outside for anybody to hit

14  it and knock water all over the neighborhood.

15          You know what happened during the night, don't you?

16  What happened?

17  A       It rained.  It stormed.

18  Q       Right.  There was a thunderstorm.  And you know that

19  beyond any reasonable doubt, don't you?

20  A       Yes.

21  Q       You didn't see the rain with your own eyes.  You

22  didn't see the flashes of lightening.  But based on all the

23  other circumstances and the facts that were presented, you

1    know that that's what happened.

2    A        Yes.

3    Q        And you, there's some limitations for it.  You don't

4    know how long the storm lasted or how much rain fell.  But

5    the issue, the issue is was -- what happened?  You know there

6    was a thunderstorm; right?

7    A        Right.

8    Q        Now, there's room in there for some possible or

9    imaginary doubt.  You can imagine that some time during the

10   night Alf and his martian buddies flew by in a flying saucer,

11   put on a sound and light show, sprinkled the ground with some

12   wet stuff, but that would be a foolish or imaginary doubt,

13   wouldn't it?

14   A        Uh-huh.

15   Q        Now, there's a reason for us being able to use

16   circumstantial evidence.  Okay.  It's just as good as direct

17   evidence, maybe better sometimes.

18                        MR. INGRAM:  Objection.

19                        THE COURT:  What is your objection?

20                        MR. INGRAM:  To the "may be better."

21   Circumstantial --

22   Q        At least as good.

23                        MR. INGRAM:  Well, that's the legal --

1          THE COURT:    Rephrase it.

2     Q         Okay.  Circumstantial evidence has, is, can weigh

3     the same as direct evidence, right.  And you understand you

4     can find somebody guilty if we prove the elements of the

5     crime charged by circumstantial evidence alone.

6          And there's a reason for us being allowed to use

7     circumstantial evidence.   You would expect in a serious

8     crime like an aggravated murder, most criminals don't go out

9     on the courthouse steps at noon and announce to the whole

10    world that they're planning to kill somebody; right?

11    A         Right.

12    Q         And so the State is allowed to look at different

13    facts and circumstances in coming to what a person's intent

14    was.  Okay.  And it may well be, we can use circumstantial

15    evidence if we have things like letters or phone calls;

16    right?

17    A         Right.

18    Q         To show what was in a person's mind when they were

19    planning something.  You understand that all criminals are

20    not necessarily all rocket scientists.  They're not the

21    brightest people.

22         For example, a stickup artist goes to a bank and

23    hands the teller a note.  You're familiar with cases where

1    he's handed a note over, it says, "Give me all the money."

2    And he gets the money, runs out, leaves the note behind.  And

3    if you turn the note over there's his name and address on the

4    back of the envelope; right?

5    A        Right.

6    Q        Or the burglar who climbs in the house and steals

7    something and drops his wallet and leaves it behind with his

8    identification.  So some criminals might be really, really

9    stupid; right?

10   A        Right.

11   Q        And they get caught.  Now, a couple other things.

12   Because we're lawyers and we go, we went to law school, we're

13   sort of geared and trained to prove the elements of the crime

14   charged.  And there may be some questions that you might have

15   that we never ask.  Okay.

16           For example, let's say you had an interest in shoes

17   like my wife.  My wife might have 30,000 pairs of shoes or

18   something like that.  And if you sold shoes or collected

19   shoes you might wonder what somebody was wearing at a certain

20   time.  Okay?  But it may not be relevant to proving the

21   elements of the crime, and that question never gets asked

22   during the course of the trial.  And if you determine it has

23   no bearing on proving the elements of the crime, then we've

1    met our burden of proof beyond a reasonable doubt as to the

2    elements.  You can return a conviction even though you may

3    have certain unanswered questions; right?

4    A        Right.  If I feel that you've proved --

5    Q        Proved?

6    A        What she -- yes.

7    Q        Okay.  You're also stuck with the questions that we

8    ask.  Sometimes in Court TV or different shows different

9    jurisdictions across the United States, they may allow jurors

10   to submit questions to judges and have the judge ask the

11   questions.  But that doesn't happen here in Ohio.

12            In our jurisdiction you're stuck with the questions

13   that we ask or what we don't ask.  And you have to pay very

14   close attention to the testimony.  And the reason for that is

15   that there aren't going to be any instant transcripts.  Just

16   like when we were young and you listened to the radio.  We

17   used to listen real close to the Soaps on radio or dramas?

18   A        No.

19   Q        You never listened to the radio?

20   A        We always had TVs since I can remember.

21   Q        Gosh, you're younger than I am.  Let me think.

22   Okay.  Well, you understand that like in the O.J. Simpson

23   case they might have had instant transcripts because they had

1   a million dollars worth of the recording equipment and lots

2   of stenographers.  We have our court reporter.  Richelle

3   might be excellent, but she's not going to be able to get out

4   instant transcripts.  And when the jury asks, can we have the

5   testimony of so and so, the Judge is going to say no.  You've

6   got to rely on your collective recollection.  Because there

7   were 12 of you, and you'll remember the testimony.  So that's

8   why it's so important to pay close attention to the

9   testimony.

10  You also can't take notes because it's felt that if

11  jurors take notes it would distract from their ability to pay

12  attention to what the witness is saying.  They might be

13  writing one thing down and missing the next thing the witness

14  says.  And they won't be able to watch the witness's body

15  language or their face or their demeanor.  So that's why you

16  can't take notes.  There aren't any instant replays like on

17  TV, not like a football or baseball game or something else.

18  You're also not allowed to go out and investigate on

19  your own.  Sometimes -- we had one case where a juror did

20  that and the case was declared a mistrial.  And I think

21  they've done that in one or two movies, maybe on Matlock

22  where they went out and investigated.  That would cause a

23  mistrial.  That's a no, no.  You can't do that.

1       A       Okay.

2       Q       Now, at the end of this case you're going to be

3       sequestered at the end of the first phase, the jury goes out

4       to deliberate.  And each jury is different.  Some juries come

5       back, depending on the case, I've had juries come back in an

6       hour and a half in the first phase; some juries have taken up

7       to five days.  There's no telling how long it will take.

8               However long it takes, you'll take that time.  But

9       you'll be sequestered during that time.  You can't go out

10      into the community except, you'll be kept together as a

11      group.  You'll go to the hotel.  You'll go out for meals.

12      You will only discuss the case when you're all together, all

13      12 of you.  But there's that period of time.

14              And let's say we get into a second phase.  You and

15      the other jurors have found the Defendant guilty, let's say

16      of aggravated murder and one or more of the specifications,

17      and we move to a second phase.  There would be a break in

18      between.  Maybe up to a week or something.  And we get into

19      the second phase.  And that usually would last maybe one to

20      three days, and then you would be sequestered again.  And

21      again, it depends on, each jury is different, how long it

22      takes in a second phase.

23              Would that sequestration cause you any undue

1    inconvenience or hardship?

2    A    No.

3    Q    Now, during the course of the trial, as you come

4    face to face with the Defendant and as her chair is turned

5    toward you, you're going to become more acquainted with her.

6    And my question to you is this:  When you go inside that jury

7    room to deliberate on your verdict with the rest of the

8    jurors, can you lay aside all thoughts of sympathy whatsoever

9    you might have for the Defendant and base your decision

10    solely on the testimony and evidence presented and the

11    instructions of law given to you by the Judge and lay aside

12    all thoughts of sympathy?

13    A    Yes.

14    Q    Do you have any problems, pressing problems at home

15    or work that are going to effect your ability to concentrate

16    on the evidence?

17    A    No.

18    Q    Now, I take it you would agree with me that we have

19    certain obligations as citizens in this country.  For

20    example, if it's election time we try to learn as much as we

21    can about the candidates and the issues and cast a ballot;

22    right?

23    A    Uh-huh.

| | |
|---|---|
| 1 | Q        And if it's war time, then we have an obligation to |
| 2 | serve in the military.  And we have young people overseas |
| 3 | right now in a number of countries; right? |
| 4 | A        Right. |
| 5 | Q        Another obligation is, if we're summoned in as |
| 6 | jurors to serve, if we're able, even though it might cause |
| 7 | some hardship on our daily life, would you be able to |
| 8 | undertake that obligation of citizenship to serve on this |
| 9 | jury in the most serious of criminal cases? |
| 10 | A        Yes. |
| 11 | Q        And be fair and impartial to both sides and follow |
| 12 | the law? |
| 13 | A        Yes. |
| 14 | Q        Okay.  Thank you.  I've got one more question here. |
| 15 | You indicated you got called here before for jury service |
| 16 | about -- |
| 17 | A        Less than two years ago. |
| 18 | Q        What kind of case was it? |
| 19 | A        I wasn't seated on the jury.  It was a criminal |
| 20 | case. |
| 21 | Q        Criminal case.  Do you know who the prosecutor was? |
| 22 | A        Yeah.  A black gentleman. |
| 23 | Q        Stan Elkins or Rodger Dixon? |

1    A        Rodger Dixon.

2    Q        Do you remember what kind of case it was?

3    A        Something with JC Penney's, but I didn't get that

4    far.

5    Q        Did you go through a general selection process?

6    A        Yes.  But Rodger used to work for my husband when he

7    worked at Delphi so the other attorney let me go.

8    Q        Okay.  Is there anything, was that an interesting

9    process?

10   A        Yes.

11   Q        Did they ask as many questions or --

12   A        No.  He started off pretty much with, that he used

13   to work for my husband and did my husband ever talk about

14   him.  And I didn't have a clue what he was talking about.

15   But just a few questions and then they dismissed me.

16   Q        Okay.  Thank you very much.  Now the defense

17   attorney is going to have an opportunity to talk to you.

18                      THE COURT:  Ma'am, you have the option.

19   Do you want to stay until about a quarter after or come back

20   tomorrow?  It's up to you.

21   A        I can stay.  It's fine.

22                              EXAMINATION

23   BY MR. JUHASZ:

1    Q        Miss Dicenso, how are you doing?

2    A        Fine.   Thank you.

3    Q        Before we start, do you need a break?  Do you want

4    some water, anything like that?

5    A        No.   Thank you.

6    Q        I'll try to get you out of here as quick as I can.

7    My name is John Juhasz.  That's Jerry Ingram over there.  And

8    Jerry and I are representing Donna who, as you know from

9    everything you've heard, is on trial for her life.

10            So it's a pretty serious business we're engaged in.

11   And that's the reason why we take this time, even though I

12   know it's a time-consuming process.  That's the reason that

13   we do it is because it's so serious.

14            We are really in essence interviewing you for a job,

15   kind of a short term job but a job nonetheless of deciding

16   whether or not Donna is guilty.  And if she's guilty, what's

17   the appropriate penalty.  And so really what we're trying to

18   do is get a fair-minded jury like I'm sure you or I would

19   want if we were in the situation sitting over there.  Seem

20   okay to you?

21   A        Right.

22   Q        Tell me if you can remember, please, April the 8th,

23   the first day you were called here down in Judge Logan's jury

1    room, did you hear any discussions about the case?  You've

2    been asked about the articles.  And we're going to talk about

3    that just for a minute.  But another aspect of this is

4    discussions you may have heard.  Did you hear anybody talking

5    about the case down there that day?

6    A        In Judge Logan's?

7    Q        Yes.

8    A        I wasn't -- I was in your --

9    Q        I'm sorry.  Forgive me.  It was that courtroom.  We

10   were using Judge Logan's courtroom because it was bigger.

11   Judge Stuard was there; right?

12   A        No, no.

13   Q        I know that you said that you read an article when

14   the case first came out, and that's because you live in

15   Howland and it was a murder in Howland; correct?

16   A        Uh-huh.

17   Q        From that article or from anything else which you

18   may have heard, did you hear any discussions in Howland, for

19   example, people talking about the murder of somebody who

20   lived in Howland?

21   A        No.

22   Q        No.  Do you remember hearing Mr. Fingerhut's name?

23   A        Just, I read it in the first article.

1    Q        When you read it in the paper?

2    A        Yes.

3    Q        Did you know, not necessarily that you were

4    acquainted with him, but did you know who Mr. Fingerhut was?

5    When you read that name did you say, oh, that's the guy?

6    A        No.

7    Q        Before you got your jury summons, did you know that

8    Donna Roberts had been charged in connection with his death?

9    A        I think I did.

10   Q        Okay.  If you remember -- and these questions, I

11   should tell you, are, we only want you to do the best that

12   you can, whatever you can remember.  And certainly always

13   tell us the honest answer and not something that we want to

14   hear.  So from what you can remember, how did you learn that

15   information?

16   A        I honestly don't remember.

17   Q        This case is essentially the government's allegation

18   that Donna and another fellow by the name of Nathaniel

19   Jackson -- does that name ring a bell with you or does it

20   not?

21   A        When I filled the questionnaire, I filled it out the

22   day I received it and I did not, and I wrote no.  But after I

23   thought about it, I thought it must be the gentleman that was

1    with her.  But I did not know until after that, what he had

2    even, the sentence he had even received.  But someone I work

3    with did tell me that.

4    Q        Okay.  So that had to be between now -- I'm sorry --

5    between the day that you got the questionnaire and today?

6    A        Right.

7    Q        And tell me for a second about that.  If I'm

8    understanding -- and don't let me put words in your mouth.  I

9    just don't want this to take all day so you don't get home at

10   9:00 o'clock.  Since you got the questionnaire you, you saw

11   the name Nathaniel Jackson on there obviously?

12   A        Right.

13   Q        You did not at that time know what the name was?

14   A        I did not.

15   Q        And I assume, I'm taking a leap here so stop me if

16   I'm wrong, that you talked with somebody at work and, about

17   the fact that you were going to be on the jury, and that, and

18   the name Nathaniel Jackson came up?  Or did you mention the

19   name?

20   A        No, no.  I filled out the questionnaire that day.

21   And the, a person that I work with knew, because I had to

22   take off work to come here, and he said something about, "He

23   was convicted and given the death penalty."  But until that

 1    day I did not know --

 2    Q        You did not know?

 3    A        -- what sentence he got.

 4    Q        All right.  Anything else that person told you

 5    about?

 6    A        No.

 7    Q        About Nathaniel Jackson?  About Donna Roberts or

 8    anything else?

 9    A        No.

10    Q        From those things, that is, from the newspaper

11    article that you read early on, from this conversation you

12    and I have just talked about, do you have any impression now

13    that Donna is probably guilty, must be guilty?

14    A        I don't know.

15    Q        Mr. Fingerhut, the fellow who died, and Donna had

16    been divorced but they continued to live together in Howland.

17    And they continued to work together at the Youngstown

18    Greyhound Bus Station -- I'm sorry.  The Youngstown/Warren

19    Greyhound Bus Stations.  And the government's allegations are

20    essentially that Mr. Jackson and Donna got together and

21    planned Mr. Fingerhut's murder and carried it out.  All

22    right.

23            Now, you and I have already talked about

1    Mr. Jackson.  Okay.  And you've heard about the fact that he

2    was sentenced.  And obviously that means that he was

3    convicted; correct?

4    A        Uh-huh.

5    Q        And I think you've already said, based on that you

6    don't really know yet whether she is guilty or not; correct?

7    A        Correct.

8    Q        And that's principally because you haven't heard any

9    evidence; right?

10   A        Right.

11   Q        And that's really what I want to make sure with you,

12   is that her trial is separate from his trial; you understand

13   that?

14   A        Yes.

15   Q        And even if the State was successful at that trial

16   in proving that he participated in Mr. Fingerhut's killing,

17   this trial is about whether Donna participated with Mr.

18   Jackson; do you understand that?

19   A        Correct.

20   Q        Now, we think that as part of what the State is

21   going to offer as evidence to attempt to convince you that

22   she participated will be some letters written by Donna and

23   some phone conversations.  And I'm going to tell you up front

1    that those recorded phone conversations are sexually

2    explicit. Really offensive at points.

3            The reason I bring that up is, if you hear that type

4    of evidence, that may cause you to have a negative impression

5    about Donna, about her person, about her morals, about her

6    ethical standards. Do you appreciate that? Because that may

7    run contra to how you feel people should conduct themselves.

8    Are you with me on that?

9    A        Uh-huh.

10   Q        And my question is, if you hear that type of thing

11   and if you draw those negative inferences about her, you

12   understand that's still not evidence of her guilt?

13   A        Yes.

14   Q        You may not like somebody. You may think that they

15   live their life-style in a fashion completely unacceptable to

16   you. But I guess what I need from you is an assurance that

17   that won't substitute for proof of her guilt. And can you

18   give me that assurance?

19   A        Yes, I can.

20   Q        I appreciate that. Now, one of the things that we

21   talk to people about, because this is a death penalty case,

22   is the death penalty. And I want to assure you, we're not

23   going to go down the road that you've been already because a

1    part of what we do I think as lawyers is, because we're

2    trying to find out if somebody can serve on a jury, sometimes

3    we ask them to do the impossible.  We bring you in here.

4    There are rules and procedures you're not familiar with and

5    we ask you how might you act in a certain situation.

6         I was, as I was listening to you I had a thought

7    that, you know, if today you said to me well, look, suppose

8    when you leave the courthouse today, Juhasz, there's a guy

9    standing out there who's got a gun and says, give me all your

10   money, what would you do?  Well, I've never been in that

11   situation.  I might like to say, well, I would grab my

12   briefcase and I would smack the gun out of his hand and I

13   would call Captain Bacon to arrest him.  But the truth is, I

14   don't know because I've not been in that situation.

15   A      Exactly.

16   Q      And I sense that's where you're at.

17   A      That's exactly right.

18   Q      There's only a couple things that I want to talk

19   then about the death penalty, and I promise we'll leave it

20   alone.  The first is I want to make certain that you at least

21   have a working knowledge of how a death penalty case works.

22   In other words, you understand the State would have to

23   convince you at the first phase, like any other criminal

1   trial, that the person was guilty; correct?

2   A       Correct.

3   Q       Not only of the murder but of the extra findings

4   that you have to make in order to go to a second phase.  You

5   understand all that?

6   A       Right.

7   Q       And then at the second phase you would be asked to

8   do this weighing process.  All right.  The only thing I would

9   like to find out from you are a couple things.  First of all,

10  I assume that you can recall -- this isn't going to be a

11  test.  But you have clear in your mind what the four

12  penalties are?

13  A       Yes.

14  Q       I assume there's nothing about how you feel about

15  the death penalty that would cause you either to go into that

16  second phase, if you got there, with one of those penalties

17  sort of having a leg up?  Or conversely, that you would

18  refuse to consider any penalty; am I reading you correctly

19  about that?

20  A       Yes.

21  Q       Okay.  And the burden would still be on them to

22  prove, if they could do that, that those aggravating

23  circumstances outweigh the mitigating factors?

1    A        Right.

2    Q        All right.  So all four of those, you can have an

3    open mind about all four of those penalties; correct?

4    A        Right.

5    Q        The other thing I would like to make certain that

6    you understand is, that while the Judge can tell you, listen,

7    you have to weigh the reasons to impose the death penalty

8    against the reasons not to, nobody can ever tell you that you

9    have to assign a particular weight to any of those factors;

10   do you understand that?

11   A        Uh-huh.

12   Q        And the law will never require you to vote for any

13   sentence that you don't feel is warranted by the evidence,

14   you appreciate that?

15   A        I do.

16   Q        Do you have any thought that because we're talking

17   to you now about the death penalty before -- as we've already

18   said.  You haven't even heard the evidence about whether or

19   not Donna did this -- that she must be guilty and we're going

20   to get to that phase?

21   A        No.

22   Q        You appreciate the fact that we have to talk to

23   jurors about everything that might possibly happen in a case?

1    A        Yeah.

2    Q        I heard you talk to Mr. Bailey, and I read in your

3    questionnaire about your being called for prior jury duty.  I

4    assume there's nothing about that situation that gave you a

5    bad impression about the Court system that would make you not

6    want to participate in this case?

7    A        No.

8    Q        You have probably heard before the phrase taking the

9    Fifth, have you?

10   A        Yes.

11   Q        And I think just like the TV and the movies do with

12   a lot of things that we do here in courtrooms, they sort of

13   misportray that.  Because a lot of times if you say he's

14   taking the Fifth, it's some guilty guy sitting there with his

15   lawyer saying, I'm taking the Fifth, meaning I'm not going to

16   say anything that's going to get me in trouble because I'm

17   already in enough trouble.  That is part of the Fifth

18   Amendment.

19            But basically the Fifth Amendment says you don't

20   have to do anything if you're the person accused of a crime

21   to help the government.  The government makes allegations

22   against you.  They have to prove them if they can.  Okay.

23   Any problem presuming Donna to be innocent as you sit here?

1    A        No.

2    Q        I mentioned a few minutes ago that one of the things

3    that we do is we bring folks down here and we sort of expect

4    them to play our ballgame by our rules without them really

5    having had much prior initiation.  Although the Judge will

6    give you at the close of the case, as he would in any other

7    criminal case, a definition of proof beyond a reasonable

8    doubt, I'll give you a hint and tell you that there are no

9    numbers in there.

10              In other words if, you know, they have 12 witnesses

11   it's enough; if they have 11, it's not.  There's nothing like

12   that.  So I like to talk to jurors about the idea that you

13   have sort of an imaginary box.  And when you start out the

14   trial the box is empty.  You've heard about the concept of

15   proof beyond a reasonable doubt.  It's the highest standard

16   of proof we have in our law.  So you as a juror, nobody can

17   tell you where to draw that line, but because it's the

18   highest standard of proof somewhere near the top of that box

19   you're going to draw a line called reasonable doubt.

20              The reason I like to talk about that in conjunction

21   with this Fifth Amendment is, because of the way the Fifth

22   Amendment works, it isn't that they win if the verdict is

23   guilty and she wins if the verdict is not guilty.  It's

2186

```
 1   really that they either win or they lose; do you see that?
 2   A        Uh-huh.
 3   Q        Because they either have to pour enough evidence
 4   into that box to convince you that it's filled up beyond that
 5   line called reasonable doubt.  And if they do, the verdict is
 6   guilty.  Or if they failed to put enough evidence in there,
 7   even though you may look in the box and see, well, there's
 8   some evidence.  I don't know if I really like what's going on
 9   here, but they didn't prove it to me beyond a reasonable
10   doubt, then they didn't meet their burden.  And you have no
11   problem holding them to that burden?
12   A        No.
13   Q        And out of abundance of caution, and forgive me for
14   repeating myself, sympathy, or if you're upset at the
15   Defendant because of something she wrote in a letter or said
16   in a phone conversation, those things don't substitute for
17   the government's evidence in that box; do you see that?
18   A        (Witness nods head affirmatively.)
19   Q        Because of this Fifth Amendment thing that we've
20   been talking about the corollary of that is, the logical
21   extension is that since the Government either has to win the
22   case or lose it, the Defendant doesn't have to take the
23   witness stand and she doesn't have to put on evidence if she
```

1    doesn't want to. She doesn't even have to have her lawyer

2    ask questions of the government's witnesses if she doesn't

3    want to; do you appreciate all that?

4    A        Uh-huh.

5    Q        That runs a little bit contra to what most of us

6    usually do when we're trying to decide something fairly,

7    which is to hear both sides. So having said all that, if in

8    this case Donna decides not to take the stand, would you hold

9    that against her? Or do you understand, it's simply a

10   question of whether the Government convinces you or not?

11   A        I understand.

12   Q        Ditto for, if she decides not to call witnesses.

13   Besides not taking the stand herself, maybe she says, I'm not

14   going to call any other witnesses. I don't think they filled

15   up the box. You would not hold that against her?

16   A        Yes.

17   Q        Very well. Conversely, if she does take the stand

18   you see, don't you, she's like any other witness who takes

19   the stand? You would not automatically discount everything

20   she has to say and say, well, she's a liar because she has a

21   stake in the outcome, you would not do that; correct?

22   A        No.

23   Q        That may be something you want to take into

1     consideration when the Judge tells you how to judge the

2     credibility or believability of witnesses. It's fair for you

3     to consider that she has a stake in the outcome. But my

4     point is, you don't just reject her testimony out of hand

5     just because she's the Defendant; correct?

6     A     Right.

7     Q     Along the same vein, when you're deciding the

8     believability of witnesses, I assume you would not believe

9     the testimony, for example, of a police officer simply

10     because he was a police officer?

11     A     Right.

12     Q     And that would also be true, by the way, if expert

13     witnesses are called. You understand your job as a juror

14     even though this person comes in and says, look, I know about

15     medicine. I know about science. And I know more about this

16     -- he might not say these words but he's going to imply, I

17     know more about it than you folks do.

18         If you, based on your reason and common sense, find

19     out that what that expert is saying just doesn't wash with

20     you, just doesn't make sense, you can reject that testimony;

21     do you understand that?

22     A     I can, but I don't know how I would know more than

23     an expert.

1    Q        Well, about certain things you may not.  I have a

2    little silly example that I like to use.  And I like to use

3    it because it combines expert testimony with things that

4    people who aren't experts know.  So let's assume in my silly

5    little trial that, forget about this homicide case for a

6    second.  Let's pretend that we've got some case and whether

7    it was high tide or not at a given time was material to

8    something that had to be decided.  So an expert comes in, he

9    sits down in his gray pinstripe suit with his Brooks Brothers

10   striped tie and says, my name is Dr. So and so.  And as they

11   go through his qualification we discovery that he's got a

12   Ph.D. in astrophysics from the Massachusetts Institute of

13   Technology, and he teaches now at Cal Tech where he's the

14   department chair of the department of astrophysics and space

15   science.  And everybody is going, wow.  And he gets up and

16   says, at the time involved in this lawsuit the tide was high,

17   and I can tell you that based upon two things:  The position

18   of the moon, and the fact that the sun rises in the west and

19   sets in the east.  Okay.  Well, we all know that's not true.

20   Okay?

21            And my only point is, you are free as a juror then

22   to say, I don't care if this guy has got degrees with ribbons

23   dripping off of them, I'm not buying that testimony.

1    A        Okay.

2    Q        I don't know if you're familiar or not with the

3    phrase, the word indictment or how an indictment comes about.

4    Do you understand generally that a grand jury proceeding is a

5    one-sided proceeding?

6    A        Uh-huh.

7    Q        The reason I bring that up is, there has to be some

8    way to notify a person that the government says that you did

9    something wrong, to notify them of that.  And that piece of

10   paper is called an indictment.

11           The proceeding for issuing that, a grand jury

12   hearing is a one-sided proceeding.  And I bring that up only

13   to make certain that, once again, you understand that that

14   indictment, whether it's read to you once or 50 times in this

15   trial is not evidence that goes into my silly little box.

16   You appreciate that?

17   A        Uh-huh.

18   Q        We're almost done.  We talked about proof beyond a

19   reasonable doubt in this box.  Here's another way that that

20   works.  If you have to make an important decision, whether

21   you do it in your mind's eye or on a piece of paper, you kind

22   of make a checklist of the pros and cons, don't you?

23   A        Uh-huh.

1    Q        I mean, you just don't run out and say, you know,

2    the car shop closes at 5:00.  I think I can get there and buy

3    a new Mercedes.  I mean, you have to stop and say, can I

4    afford this?  What am I thinking?  You know, those kind of

5    things.

6            It's the same thing with reasonable doubt.  You have

7    to make a checklist, again, whether you want to on paper in

8    the jury room or in your mind's eye, on one side will be all

9    the reasons why the government is going to tell you that the

10   Defendant is guilty.  On the other side will be doubts.  And

11   those doubts will come, at least in my experience,

12   principally from three places.  There will be doubts that you

13   think about as you listen to the evidence.  There will be

14   doubts that the defense lawyers will point out to you during

15   the course of the cross-examination or final arguments.  Or

16   there will be doubts that other jurors have come up with as

17   you sit back there and deliberate and talk about the case.

18            My point is this:  You have to go through -- the

19   government does not have to prove its case beyond a shadow of

20   a doubt, beyond imaginary doubt.  Mr. Bailey talked about Alf

21   sprinkling the water and all that light show and all that

22   stuff.  So there's some room between that line and the top of

23   the box.  And that's where imaginary doubt and possible doubt

1 | reside.  But they have to prove the case beyond reasonable

2 | doubt.

3 | So what you, in essence, have to do as a juror is

4 | look at those doubts on that side of the checklist and say,

5 | now let me think about this.  Let me look at the evidence

6 | again.  Is this doubt based on reason and common sense?  If

7 | it's not, then you scratch it off of your checklist and say,

8 | well, I thought that was a reasonable doubt but now that I

9 | think about it and talk to the other jurors, it's not.

10 | When you are done doing that for each one of those,

11 | if you've got one doubt left or more than one, and no matter

12 | how you talked about it with the other jurors, no matter how

13 | you think about it you say to yourself, no, there's no way

14 | for me to account for this doubt other than to say, this is a

15 | doubt that I have based on reason and common sense.

16 | Then you see, in that circumstance the State has not

17 | proved its case beyond a reasonable doubt.  That's a heavy

18 | burden.  But do you have problems holding the Government to

19 | that burden?

20 | A     No.

21 | Q     Any problem if at the end of the case you find that

22 | they haven't met that burden, coming out and sitting down

23 | here and looking at Mr. Bailey and Mr. Becker and saying,

1    sorry, I don't think you proved your case?

2    A        No.

3    Q        We're going to talk about one more thing and then I

4    will not further sully a beautiful afternoon.  Mr. Bailey

5    talked to you a little bit about circumstantial evidence.

6    And my experience with that is that every lawyer has what I

7    sort of call his shtick about how to talk about

8    circumstantial evidence, and here's mine.  And it will just

9    take a minute.

10           I would like you to pretend for a moment that it's a

11   warm afternoon in late August and we're at my house.  It's

12   one of those afternoons where the sun is shining but the wind

13   is starting to pick up, and you know there's going to be one

14   of those late afternoon thunderstorms.  You're out in the

15   kitchen with me.  And I'm making a glass of ice tea, when all

16   of a sudden we hear a big crash.  And as I run into the

17   living room to investigate my son Mike's cat comes running

18   out between my legs.

19           I look to the left as I go into the living room and

20   there's my son Mike like this with his hands over his face.

21   I look to the right and there's, one of my wife's Norman

22   Rockwell plates has taken a tumble off the mantel, is laying

23   down in front of the fireplace on the hearth.  And all the

1 king's horses and all the king's men cannot put Norman back

2 together again.

3   From those facts that I have given you, I suppose

4 circumstantially you can conclude that Mike was fooling

5 around, throwing a ball or something like that like he's not

6 supposed to do in the house, broke the plate, and he goes,

7 oh, boy, I know I've been told.  I know I've been told.  I

8 know I've been told.  The noise scared the cat.  The cat

9 takes off.

10   But maybe the cat knocked the plate off.  Okay.  The

11 cat knows it's in trouble and Mike's going -- well, Mike

12 could be doing several things like, you know, dad wasn't that

13 wild about me getting this cat in the first place.  Or, you

14 know, the cat did it but maybe I'm going to take the fall

15 anyway.

16   Or another option could be that that breeze from

17 that approaching storm knocked the plate off and the cat and

18 Mike are both worried they're going to get blamed for it.

19 Now, here's the reason I tell that story.  The State may ask

20 you to take circumstantial evidence and say, we proved our

21 case beyond a reasonable doubt.  Maybe they can do that.

22   But my point is if, as in the situation I just gave

23 you, that same circumstantial evidence leads to other

1    reasonable inferences, then in that case, even though there

2    are circumstantial evidence that the State says proved its

3    case beyond a reasonable doubt, you could certainly have a

4    doubt based on reason and common sense, could you not?

5    A       Yes.

6    Q       And, for example, in the case I just gave you, I

7    certainly would not be able to convict my son Mike by proof

8    beyond a reasonable doubt, would I?

9    A       No.

10   Q       Any problem applying that same principle to any

11   circumstantial evidence you're presented in this case?

12   A       No.

13   Q       It's been a long day.  We appreciate your patience.

14   Is there anything that's come up about which you have

15   questions or any reason why you think you cannot or should

16   not serve on this jury?

17   A       No.

18   Q       Thank you for your time.  I appreciate it.

19                      MR. JUHASZ:  Thank you, judge.

20                      THE COURT:  Pass?

21                      MR. JUHASZ:  Pass.

22                      MR. BAILEY:  Pass.

23                      THE COURT:  Miss Dicenso, you will be in

1   the poll from which this jury will be selected.  We would ask

2   you to call that number given to you after 4:30 Friday, this

3   Friday.  Hopefully by next week we'll be able to get

4   everybody in to pick the jury.

5          I would again remind you you're not to talk with

6   anybody about the case, read anything in the newspaper or

7   watch anything on TV.  And, well, you know the drill.  Call

8   after 4:30 on Friday.  Gentlemen, 1:00 o'clock tomorrow.

9                        (Whereupon, court adjourned for the

10  evening.)

11                              *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

1

2

3                        REPORTER'S CERTIFICATE

4

5        This is to certify the foregoing represents a true and

6   correct copy of the proceedings had in the aforementioned

7   cause as reflected by the stenotype notes taken by me on the

8   same.

9

10

11

12

13   _____
     Richelle J. Guerrieri,
14   Official Court Reporter

15

16

17

18

19

20

21

22

23