1                    IN THE COURT OF COMMON PLEAS
                       TRUMBULL COUNTY, OHIO
2

3   STATE OF OHIO,               ) Case No. 2001-CR-0793
        Plaintiff                )
4                                )
    -vs-                         ) Judge John M. Stuard
5                                )
    DONNA M. ROBERTS,            )     **VOLUME X**
6       Defendant                ) **VOIR DIRE PROCEEDINGS**

7

8   Capital Murder Trial held on Thursday, April 24, 2003

9   BEFORE:      HONORABLE JOHN M. STUARD

10

11  AT:          Trumbull Co. Court of Common Pleas
                 161 High Street, NW
12               Warren, Ohio 44481

13  APPEARANCES:

14

    On behalf of the Plaintiff:
15
        Messrs. Kenneth N. Bailey and Christopher Becker,
16      Attorneys at Law

17

18
    On behalf of the Defendant:
19
        Messrs. J. Gerald Ingram and John B. Juhasz,
20      Attorneys at Law

21

22

23  Official Court Reporter:  Richelle J. Guerrieri

1                              I-N-D-E-X

2                             VOLUME X

3
                         INDIVIDUAL VOIR DIRE
4

5
                         THELMA L. RANKIN
6
EXAMINATION BY THE COURT..............................2200:14
7    EXAMINATION BY MR. BECKER............................2203:15
     EXAMINATION BY MR. INGRAM............................2235:4
8

9                         MARY J. COSTELLO

10   EXAMINATION BY THE COURT..............................2272:5
     EXAMINATION BY MR. BAILEY............................2275:9
11   EXAMINATION BY MR. JUHASZ............................2309:13

12

13

14

15

16

17

18

19

20

21

22

23

1                    **THURSDAY, APRIL 24, 2003**

2                         THE COURT:  MR. Juhasz has requested

3     permission to leave at 2:00 o'clock for another appointment

4     that he cannot reasonably put off.  I take it there's no

5     objection from your co-counsel or from the State; is that

6     correct?

7                         MR. BAILEY:  No problem.

8                         MR. JUHASZ:  In fact, Mr. Bailey, the

9     record should reflect, looked slightly gleeful, Your Honor.

10    WHEREUPON,

11                        THELMA L. RANKIN

12    being first duly sworn, according to law, was examined and

13    testified as follows:

14                        EXAMINATION

15    BY THE COURT:

16    Q        Good afternoon.  You've got two kids in college --

17    or am I reading the next one.  I'm reading the wrong one.

18    A        I have two daughter-in-laws.  One finished college

19    and she's going back in the fall to get a master's degree.

20    Q        Is that right?  You're the lady that had the one son

21    that works as a machinist in Disneyland?

22    A        Yep.

23    Q        I made the comment, that sounds like a good job to

1   me.

2   A        Hopefully.  He took my grandkids out there.

3   Q        Thelma, you read that handout that we gave you?

4   A        Yes, sir.

5   Q        You understand why we had you come in here today?

6   A        Yes, I do.

7   Q        This lady seated over here, Donna Roberts, has been

8   charged by the Trumbull County Grand Jury with two counts of

9   aggravated murder with specifications.

10          Under Ohio law just because someone commits murder

11  does not mean that they necessarily face the death penalty.

12  The Legislature by law has said that if you commit murder

13  under certain circumstances, then the death penalty becomes a

14  possibility.

15          An example is, if you murder a person who is also

16  the Governor of Ohio, if that fact that he's a Governor is

17  put on as a specification and the State proves that there was

18  a murder, and that the person murdered was the Governor, that

19  becomes a death situation.

20          There are some people who feel very strongly that if

21  a life is taken the person taking that life should forfeit

22  their own:  An eye for an eye.  That is not the law of Ohio.

23  A person who had that as a fixed belief could not ever be

1    fair to a defendant in a trial.

2            On the other side, you have a, you have people who

3    under no circumstances could ever participate in such a

4    hearing because they could never consider the death penalty.

5    A person of that type could not be fair to the State.

6            So the questions that will be put to you by both

7    sides here will be to inquire into your belief, opinion,

8    whatever, on the question of the death penalty.  Whatever

9    your opinions are, are fine.  It's just that they need some

10   assurance that each of the 12 jurors on this case will be

11   able to follow the law.  And that means that if the State

12   proves their case beyond a reasonable doubt on the aggravated

13   murder and the specifications, then it would go into a second

14   phase where this jury would be called upon to decide whether

15   the aggravating circumstances, which would be reasons to

16   consider the death penalty, outweigh beyond a reasonable

17   doubt the mitigating factors, which are reasons that the jury

18   could take into consideration for not imposing the death

19   penalty.

20           The second area will be concerning pretrial

21   publicity.  Many of the prospective jurors have read

22   something about this case.  It was carried in the newspapers,

23   as a case of this type would ordinarily be.  And whoever

1    decides this case by sitting on this jury has to do so based

2    on the evidence that will be presented in this courtroom, not

3    something that's appeared on TV or in the newspaper.  No way

4    to test what they say there.

5        And a person who has had some exposure has to be

6    able to say to themselves, I can in good conscious assure

7    these folks that that will not, have no bearing on my

8    determination.  I can listen to the evidence and use that to

9    decide this matter.  So those are the two main things they'll

10   ask you about.  Okay?

11   A        Do you mind if I take my sweater off?

12   Q        Please.  You should be comfortable at all cost.

13                      MR. INGRAM:  It is a bit hot in here.

14                      MR. BECKER:  Thank you, Your Honor.

15                           EXAMINATION

16   BY MR. BECKER:

17   Q        Is it Mrs. Rankin?

18   A        Yes, sir.

19   Q        My name is Chris Becker.  I work for the county

20   prosecutor's office.  This is Mr. Bailey.  I assume you

21   remember seeing him about, maybe two weeks ago on a Tuesday

22   when you were in the big --

23   A        It's been a while.

1   Q        I know it's been a while.  I assume you also

2   remember Mr. Ingram and Mr. Juhasz.  And their client was

3   there, Donna Roberts.

4   A        She wasn't here but the attorneys were.

5   Q        The attorneys were.  This is -- by all means, if we

6   get too warm we've got water here.  It is kind of warm in the

7   courtroom today.

8            First of all, I want to thank you for your service

9   on this jury.  And potentially you may be one of our 12

10  jurors.  This is really the only opportunity that we get to

11  speak to you as attorneys.   And it's very important that we

12  talk to each other, we find out your views on certain issues.

13  And obviously the Court has already mentioned two of those

14  issues, which are pretty important:  The death penalty and

15  the pretrial publicity.

16           And this is the only time when you get to ask us

17  questions and we get to have an interaction.  So don't let me

18  dominate the conversation here.  If you want to ask me

19  something or if you feel you have to tell me something, by

20  all means, stop me and say, I need to address this issue.

21  Because once you end up over here, if you do end up over

22  here, we can't have that discourse anymore.  We can't discuss

23  things with you.   Parties from either side are not free to

1   discuss that with you.  And you just have to listen to the

2   evidence and the testimony in this case.

3           So with that in mind, we're going to touch upon some

4   of the areas that the Court had indicated to you.  One of the

5   first things that we want to talk about is what was contained

6   in your questionnaire.  If I'm reading your questionnaire

7   correct, you indicated that you are in favor of the death

8   penalty?

9   A       Depends on the circumstances.

10  Q       I understand.  It depends on the circumstances.  But

11  you believe then for certain crimes the death penalty should

12  be an option?

13  A       Yes.

14  Q       But you're not so convinced that the death penalty

15  is an option that it should be imposed automatically in every

16  case where there's a death; correct?

17  A       No.

18  Q       And a lot of it depends, you said, I think on the

19  severity of the crime?

20  A       Yeah.

21  Q       This particular case is going to involve the death

22  of one individual.  And I believe that you will be presented,

23  the accusation is that the death was premeditated and that

1   the death was committed or caused during the course of an

2   aggravated robbery or an aggravated burglary.

3          I will tell you right now that this Defendant is not

4   the person who pulled the trigger that killed the Defendant

5   in this case.  However, under Ohio law if we get to the

6   second phase of this case, which is the death penalty phase,

7   you would be given an option as a juror and your fellow

8   jurors of selecting death, life with no parole, life with no

9   parole after 30 years and life with no parole after 25 years.

10   Is that the kind of I guess circumstance that you referred

11   to, or could you conceivably see a circumstance that would

12   warrant the death penalty?

13   A     No, I don't -- if she didn't pull the trigger.

14   Q     You could not impose the death penalty in a

15   situation like that, even if the Court instructed you that

16   you could do that?

17   A     Well, I would have to listen to all the evidence

18   first.

19   Q     And that's what we're trying to find out here.  Let

20   me back up a little bit.  First of all, we're going to be

21   real presumption because we may never get to that point.  We

22   may not get to the death penalty portion of this case because

23   you may find her not guilty.

 1          This case is going to have two parts to it.  It's

 2    going to have the first part where you and your fellow jurors

 3    have to be determine whether or not the State, that's Mr.

 4    Bailey and I, proved her guilty beyond a reasonable doubt.

 5          If we prove her guilty beyond a reasonable doubt and

 6    you and your fellow jurors find her guilty of aggravated

 7    murder and then some, what we call, they're called death

 8    specifications, but they're basically special circumstances

 9    about the death that give death as an option.  It's not a

10    requirement, but it's an option under those four that I

11    mentioned for you.

12          So let's assume, we're going to be presumption, and

13    I know that's hard to do.  But like I said, if this case gets

14    started we can't speak to you, so we can't have the guilt

15    phase and you guys find her guilty, you and your fellow

16    jurors find her guilty and then say, oh, guess what, jurors,

17    now we're going to ask you to consider whether or not you

18    would give her the death penalty.  And somebody says, wait a

19    minute.  I'm very religious.  Or I have an ethical or a moral

20    position that I cannot impose the death penalty.  Well, then

21    we have to start all over from scratch.  So that's why we

22    have to do it sort of this cumbersome way.

23          In the second phase, if we get there, again, it

1    would be our burden of proof, Mr. Bailey and I will have to

2    prove to you beyond a reasonable doubt that what some things

3    and what the Judge is going to refer to as aggravating

4    circumstances outweigh the mitigating factors.  And basically

5    what it is is, it's the bad things about this case and all

6    the good things that she may want to present to you.

7    So if you find that we prove again beyond a

8    reasonable doubt that the aggravating circumstances outweigh

9    by proof beyond a reasonable doubt, that's going to be your

10    standard in both cases, could you impose the death penalty if

11    what you know about this case is just that little framework

12    of she was not the trigger person but she's what we call an

13    aider and abettor, a helper?

14    A      I don't know.

15    Q      You would have to hear the facts?

16    A      (Witness nods heard affirmatively.)

17    Q      And I guess the real question that I have for you

18    is, if the facts warranted it, and I'm not, I can't tell you

19    what the facts are yet because you haven't heard any

20    testimony, so we have to kind of make a little assumption

21    here, but if the facts were warranted, warranted it -- and

22    we're in the second phase now -- and the law allowed it,

23    could you sign a verdict, a piece of paper calling for the

1   death penalty for this Defendant who is charged with planning

2   a murder and committing these circumstances, these special

3   circumstances surrounding the death?

4   A        I guess I could if I --

5   Q        You're not 100 percent sure?

6   A        I'm not 100 percent sure.

7   Q        The question, I guess maybe the other way to

8   approach it would be this way:  You're going to be given

9   those four options.  Are you going to shirk your

10  responsibility or your duty to consider all four of them

11  equally, or are you going to exclude the death penalty

12  because you just don't think this is the kind of case where

13  the death penalty should fit, and immediately run to the

14  other three life options?

15  A        No.

16  Q        You will not do that?

17  A        No.

18  Q        You will fairly consider all four?

19  A        Yes.

20  Q        And that's all we can ask of you.  Because, again,

21  we're being presumptuous, assuming we get to the second

22  phase.  We may not be able to prove that death is warranted

23  in this case, and you and your fellow jurors may not return

1    that.

2           But if we do and we, again, we can't go through the

3    facts and say okay, well, it's A, B, C, D, E and F and they

4    have A, B, C, D, E and F.  You've got to weigh them.  And

5    that's the case.  And can you do it because that would be

6    basically trying the case to you right now.  We can't do

7    that.  But you believe that you could fairly consider all

8    four options?

9    A     Yes.

10    Q     And if the facts warranted it and the law allowed

11    it, you could sign a verdict calling for the death penalty?

12    A     I could do it.  It probably would bother me.

13    Q     Well, would it bother you to the point where you

14    wouldn't want to do it?  Where you would take the easy way

15    out and say, you know, I know the State proved its case

16    beyond a reasonable doubt that the aggravating circumstances

17    outweigh the mitigating factors, but it's just going to

18    bother me too much the rest of my life knowing that I signed

19    a piece of paper that called for the death of another human

20    being?

21    A     No, because nobody has a right to take anybody's

22    life away from them.

23    Q     So it wouldn't bother you?

```
 1    A        No.

 2    Q        Well, that's kind of contradictory to what you just

 3    told me.  You said nobody has the right to take --

 4    A        I don't believe that anybody has a right to just

 5    plan a murder and go kill somebody and --

 6    Q        Okay.  So you believe, though, that you could,  as a

 7    juror if the facts warranted it and the State proved its case

 8    beyond a reasonable doubt, you could sign that death penalty

 9    verdict?

10    A        Yes.

11    Q        Even though you would be the one then -- do you

12    understand what I'm saying?  You would be --

13    A        Yeah.  I would feel uneasy because I had to do that,

14    but I could do it if that's what the law allowed.

15    Q        And I understand we're asking you to be

16    presumptuous.  We're asking you these hard questions that you

17    probably have never had to answer any question like this

18    before.  And there's really no right or wrong answer, you

19    understand.  And we just have to make sure that we have a

20    fair chance in this trial and that Miss Roberts has a fair

21    chance.  And that's all we're trying to do here.  So don't

22    be afraid to give an answer that you think is going to be

23    right or wrong, because there really is no right or wrong
```

1    answer.  You may be a great juror for either side or neither

2    side, and you may have to come back for another case.  So

3    don't try and tell us what you think we want to hear.

4    A       No, I won't.

5    Q       Okay.  And by all means, don't let me put words in

6    your mouth either.  Because I don't want you to think that

7    you have to say a certain answer.

8           Now, you mentioned, I think in your questionnaire,

9    that you had heard of this case through the media; is that

10   correct?

11   A       I -- you know what?  I can't remember if I did or

12   not.

13   Q       No, you did not.  Okay.  You did not indicate that

14   you had heard of this case.  So you have not heard anything

15   about this case?

16   A       No.

17   Q       Not on the television or the news, radio, anything

18   like that?  Nothing that you recall?

19   A       Well, one day when I was reading the newspaper it

20   wasn't in there, I was reading the newspaper in the living

21   room and the news came on.  It was after I was up here I

22   heard.

23   Q       You turned away?

1    A       Right.

2    Q       You did what the Judge instructed you to do?

3    A       Yeah.

4    Q       Okay.   And that's what you're supposed to do.

5    Because you understand the reason for that is because the TV

6    is not trying this case?

7    A       I don't want to be influenced by anybody.

8    Q       Right.   And you could only be influenced by what you

9    hear in this courtroom.

10   A       Right.

11   Q       Now, you made a comment I think on your

12   questionnaire that, that a couple of things.   And I don't

13   know if you remember answering this question.

14   A       I answered?

15   Q       You indicated no on all the questions, but then you

16   said you came by some information from the Judge.   I'm

17   assuming that was when the day the Court told you about the

18   case?

19   A       Right.

20   Q       That's the only thing you know is what he told you

21   on that first day?

22   A       Right.

23   Q       Now, you also indicated I think at one point on your

1    questionnaire that the, one of the bigger problems with the

2    criminal justice system is that lesser crimes do more time

3    than serious crimes.  Do you remember answering that?

4    A        Yes, I do.

5    Q        Can you explain maybe that a little bit?

6    A        Well, let's say a person that's done drugs or

7    robbery that hasn't done any physical harm and took

8    somebody's life, it seems to me they spend more time in jail

9    than a person that took somebody's life.

10   Q        Is that based upon some personal experience you've

11   had?

12   A        No.  I just --

13   Q        Just a perception?

14   A        Just a perception.

15   Q        You can't point to any particular case where you

16   think that would be true or --

17   A        No.

18   Q        All right.

19   A        That's what it seems like happens to me.

20   Q        And that opinion is probably not going to have any

21   influence on your decision in this case, is it?

22   A        No.

23   Q        Now, we're going to talk, I want to talk to you a

1    little bit about this case in particular.  And it's a

2    criminal case.  I don't believe you have served on a jury

3    before; correct?

4    A       No.

5    Q       One of the things that always comes up in a criminal

6    case, in every criminal case is what we call the presumption

7    of innocence.  And I'm assuming you've heard that.  Maybe you

8    read it in a novel or seen it on television or read in the

9    newspaper.  The presumption of innocence and reasonable doubt

10   sort of go hand in hand.  And as we sit here today Donna

11   Roberts is presumed innocent; correct?

12   A       Correct.

13   Q       There's only been an accusation made against her.

14   That accusation was made by a body called the grand jury.

15   And I'm assuming you've heard through the years the term

16   grand jury?

17   A       I've heard it.

18   Q       The grand jury is nothing more than, they meet on

19   the second floor of this building.  In fact, they met today.

20   There's a different grand jury every four months.  But they

21   get together every couple weeks or so and they consider

22   criminal cases.  And they're just citizens like yourself that

23   happen to vote and happen to get called to jury service,

1    except instead of sitting in a Common Pleas Petit Jury they

2    sit in a grand jury.  And it's a lot more secretive.  No one

3    is allowed to be in there when they vote other than the grand

4    jurors.

5           The only people that present evidence generally at a

6    grand jury are the prosecution.  And so the grand jury is

7    only getting our side of the story.  There's no judge in the

8    grand jury.  Occasionally defendants will come and testify.

9    But I'll tell you, this Defendant did not come to that grand

10   jury.  She probably didn't even know when they were going to

11   meet.  There were no other attorneys.  No defense attorneys

12   there.  So it's basically a one-sided affair.

13          And the grand jury issued an indictment which is

14   just a fingerpointing, it's an accusation that Miss Roberts

15   has done something wrong, and it charged her with four

16   criminal counts.  Two murder counts, two aggravated murder

17   counts.  Different theories.  There's only one death in this

18   case but different theories as to what had happened.  And

19   then an aggravated burglary and an aggravated robbery charge.

20          The fact that she's accused here today, if I were to

21   ask you, is she guilty or innocent, you would have to say

22   what?

23   A        I don't know.

1    Q        Well, if I asked you to vote, what would your vote

2    be?  Not guilty; right?  You haven't heard any evidence.

3    A        No, I haven't heard any.

4    Q        And you can't determine her guilt until the State

5    proves its case by proof beyond a reasonable doubt.  I'm

6    assuming that's another term that you've heard --

7    A        Yes.

8    Q        -- through television, media, novels, newspaper,

9    whatever?  And the best way I can describe for you, the Court

10   will give you a definition of what reasonable doubt is.  But

11   reasonable doubt was described by my first year criminal law

12   professor as basically being a glass of water.  And in the

13   law we have different standards of proof.

14          When we have a civil case where I sue you because

15   you ran into my car and hurt my neck, that level of proof is

16   called preponderance of the evidence.  And that's basically

17   taking a glass of water and filling it up to the halfway

18   point and then putting one more drop of water in there.  That

19   is basically preponderance of the evidence.  It's just who

20   has more evidence.

21          Then we have another piece of evidence we call clear

22   and convincing, which really has no place in this setting.

23   And then we have the most important piece of proof, and

1    that's proof beyond a reasonable doubt.  And everybody is

2    going to have a different idea of what proof beyond a

3    reasonable doubt is.  It's not to the top of the glass,

4    because I cannot possibly, nor can Mr. Bailey, prove to you

5    beyond all doubt probably anything.  I probably can't prove

6    to you beyond all doubt that today is Thursday, April 24th.

7          You may get somebody in here who says well, you

8    know, when they started the calendar they misplaced a day.

9    They've added all these times over the years.  You can argue

10   about things like that.  But for our purposes, we know today

11   is Thursday, April 24th.

12         And there may be some people in China that follow

13   the Chinese New Year or the Chinese calendar and their New

14   Year I think starts some time in February.  Maybe it's not

15   Thursday April 24th for them.

16         So we're not required to prove beyond all doubt to

17   you, just beyond a reasonable doubt.  And reasonable doubt in

18   that cup of water is going to be different for everybody.  It

19   may be an inch from the top.  It may be half an inch.  It may

20   be a quarter inch from the top, but it's not all the way to

21   the top.  And that's what you're going to have to determine

22   in this case at both phases.

23         First you're going to have to determine whether we

1    proved the crimes that are alleged against her by proof

2    beyond a reasonable doubt.  And there's elements to every

3    crime.  There's five or six elements to every crime.

4    Sometimes a little more.  Sometimes a little less.  But it's

5    a little like a waitress bringing over a glassful of drinks

6    to a table.  Let's say the crime is charged and it has five

7    drinks in it.  We have to fill up all five drinks by proof

8    beyond a reasonable doubt.  Again, it's not so it's spilling

9    out of the cup, but it has to be pretty close to the top.

10   And if the waitress comes over and gives you five drinks, and

11   one of those cups is empty we haven't proven the case.  We

12   have to fill all the elements up, prove all the elements.

13   And again, the Court will tell you when the time comes as to

14   what those elements are.

15          Do you feel comfortable -- and we have to do this

16   twice in this case.  We have to do it at the guilt phase to

17   get to that second phase.  And then if we get to the second

18   phase we have to prove beyond a reasonable doubt that these

19   bad things, these aggravating circumstances outweigh by proof

20   beyond a reasonable doubt the good things, the mitigating

21   factors.  Is that going to be a problem for you?

22          Are you going to require more proof than reasonable

23   doubt?  Because we are talking about a very, very serious

1   matter here.  We're talking about the death of a man and

2   we're talking about the potential death of another person.

3   Are you going to want to have it proven to you beyond all

4   doubt?

5   A        No.

6   Q        No.  You'll be comfortable if we prove it beyond a

7   reasonable doubt?

8   A        Right, yes.

9   Q        And you would be comfortable if we proved it beyond

10  a reasonable doubt that death was warranted in this case?

11  A        Yes.

12  Q        Even though you have these concerns that maybe later

13  on you would feel uncomfortable with?

14  A        Yes.

15  Q        Because some people come in here and say, I couldn't

16  sign that death verdict unless I was absolutely 100 percent

17  certain.  You understand I just can't do that.  It's very

18  difficult to prove just about anything 100 percent.  You feel

19  comfortable you could still do that?

20  A        Yes.

21  Q        Now, we talked a little bit about the presumption of

22  innocence.  And the presumption of innocence really means

23  that throughout this proceeding Mr. Bailey and I have to do

1    all of the convincing.  We have to convince you and your

2    fellow jurors at that high standard of proof beyond a

3    reasonable doubt.  Not the impossible standard of all doubt,

4    but just reasonable doubt.  And we have to prove it beyond

5    reason and common sense.

6           The Defendant, on the other hand, though, she and

7    her attorneys, theoretically they don't have to present

8    anything to you.  They could read their horoscopes for the

9    next couple weeks.  They could do crossword puzzles.  I don't

10   think that they're going to do that, but theoretically they

11   could do that.  And Mr. Bailey and I could spend days on end,

12   maybe even weeks presenting witnesses and witnesses and

13   witnesses, and we still may not get you convinced beyond a

14   reasonable doubt that she either did the crime or that she

15   deserves the death penalty.  You wouldn't hold it against

16   Miss Roberts if you never heard a peep from the defense side,

17   would you?

18   A       What did you say?

19   Q       Well, sometimes people want to know both sides of

20   the story.  You're going to hear our side first because we

21   get to go first all the time.  And one of the things that you

22   can't do when you sit here is say, boy, I wish they would

23   answer this question for me.  I wish they would present a

1    witness that would tell us about that.  You can't do that.

2    We have to prove our case through our own witnesses.  They

3    don't have to disprove anything.  Do you kind of understand

4    that concept, or am I making that clear?

5    A      Yeah.  But I'm going to have to listen to their side

6    of the story.

7    Q      What I'm telling you is, they may not present to you

8    their side of the story.  They're not required to.  And I

9    don't know if they want to or if they're going to.  But we

10   still have to prove our case beyond a reasonable doubt.  We

11   may be here days and weeks trying to do that and we still may

12   not convince you beyond a reasonable doubt.

13   A      Yeah.

14   Q      I'm being a little facetious here, but we may never

15   prove the case.  And they may stand up and say, Your Honor,

16   we don't have anything to say.  And then in closing arguments

17   they're going to say, listen, you heard from 50 witnesses,

18   they didn't say nothing.  You've got to find her not guilty.

19   And you may find her not guilty.

20          Do you understand that concept about the presumption

21   of innocence?  She's under no obligation to testify or

22   present evidence or exhibits or witnesses or anything.

23   A      I just have to go on all the testimony that your

 1  side gave.

 2  Q        Right.  They're probably going to cross-examine some

 3  of our witnesses.  And they're probably going to maybe even

 4  present some witnesses of their own.  But they don't have to;

 5  do you understand that?

 6  A        Yes.

 7  Q        It's a little bit like -- I keep using the same

 8  example because I'm too dumb probably to think of anything

 9  else.

10        But there's a traffic accident out here on the

11  corner of Park and High Street.  Let's say it's a guy driving

12  down High Street, and he goes through the green light and

13  he's going to the county administration building.  And he's

14  traveling east to west on High Street.  And a guy coming

15  through Park blows the light at Market Street, comes through

16  and blows the red light at High Street and he crashes into

17  the guy.

18        Now Mr. Bailey and I are here in court and we've got

19  this guy charged with running a red light, the criminal

20  offense of running a red light.  It's a traffic violation but

21  this guy wouldn't plead guilty and he won't take a deal we've

22  offered him and now we're here.  We're going to prove him

23  guilty.  And we present to you one witness.

1          Now that witness is the Reverend at the local church

2     down here who walks the courthouse square every day.  He

3     says, hey, I got to be careful when I walk out on the street

4     because I see these guys go through red lights sometimes, so

5     even if the light tells me to walk, and I know I've got the

6     green light to walk, I always look both ways because I don't

7     want to get hit.  And I know how terrible some of the drivers

8     are here in down town Warren.

9          And as I did this on this day of this accident, I

10    saw the light was green.  I looked.  The sign was flashing

11    "Walk."  I saw this car coming down High Street.  I'm going

12    the opposite way but I had the green light and I started to

13    walk.  But before I did I looked down and, from Market

14    Street, I saw this red car come barreling through the red

15    light there, and he went through the red light here at High

16    Street and crashed into the guy.  You could probably find the

17    guy guilty of running the red light based upon a good,

18    credible, one witness; right?

19    A      Right.

20    Q      Who paid attention, didn't have any vision problems.

21    And theoretically in this case you could perhaps find the

22    Defendant guilty if we presented one witness that was

23    credible and testified to all of the elements of the offense;

1    correct?

2    A        Correct.

3    Q        Now let's change our scenario a little.  Now we've

4    got three guys at the corner.  They've been drinking all

5    morning at Maddigan's.  They got there at 6:00 o'clock when

6    they opened.  They've had, each had at least 12 or 13 beers.

7    They stumble down the street.  And they're at this

8    intersection.  They're going the same way as the car on High

9    Street.  And they come into this court.  And all three of

10    them wear glasses.  None of them were wearing their glasses

11    that day because they got in a fight at Maddigan's earlier

12    and they all had their glasses broken.  They had been

13    drinking.  And the guy that's going through the intersection

14    at High Street, he happens to be their cousin.  And they like

15    him and he bought them beer all day.

16        Now, if these three guys come in and say, yeah, we

17    were there and this guy blew through the light at Market

18    Street and blew through the light at High Street and hit our

19    cousin Mike, you would have a little bit of a problem with

20    that testimony; right?

21    A        Right.

22    Q        Because that's what you're going to have to do as a

23    juror.  You're going to have to evaluate and weigh whose got

1    the most interest or bias.  Who's being truthful.  Who is in

2    a good position to see or do the things they say.  And those

3    are some of the things you're going to have to do as a juror.

4    And you feel you could do that?

5    A        Yes.

6    Q        And I know that's kind of a simplistic example, but

7    in a larger sense that's what you're going to have to do

8    here.

9            Now, one of the other things that we're going to

10   present to you is what we call circumstantial evidence.  And

11   circumstantial evidence and direct evidence are two different

12   things but they have, the Court will tell you, the same

13   weight.  You can consider them for the same thing.

14           Direct evidence would be my reverend who's there at

15   the corner and says he sees what he saw.  And he saw the

16   traffic light.  He saw the light.  He saw the car come

17   through the intersection.  You have direct evidence of that.

18           But you might have, in this case or any criminal

19   case, what we call circumstantial evidence.  And that's

20   evidence that's sort of, you have to make inference.  You

21   have to infer that something happened.

22           And at my house I have four children, and I love

23   them to death.  They're great kids.  And I wouldn't give them

1     up for anything.  But like all kids, they do things they

2     shouldn't.  And my son Clayton is the oldest and he routinely

3     is usually doing something, not that he's mean-spirited or

4     bad-hearted but just, he's a boy.  And he's a boy growing up.

5     And he may have a wiffle bat, and he has his wiffle bat down

6     in the basement, he's swinging it around.  He's been told 100

7     times not to swing a bat in the house or in the basement,

8     living room or whatever.

9            And one of my daughters maybe down there because

10    they have all their Barbie stuff and all their Pretty

11    Princess games and whatever else they play with, girly stuff

12    down there.  And he's swinging his wiffle ball bat and it

13    hits my youngest daughter Cameron in the head.

14           Now I come downstairs.  Now I'm mad because I see

15    Clayton with a bat in his hand.  I see Cameron crying,

16    holding her head.  And I can only assume that Clayton was

17    swinging the bat around and he hit her.  That's the kind of

18    inference you can make.  And you may have to make some of

19    those inferences in this case; correct?

20    A      Correct.

21    Q      I didn't see it, but I can infer based upon that

22    that he whacked Cameron in the head.

23    A      Right.

1    Q        Now there's other inferences that we can draw from

2    that.  Perhaps Cameron was throwing the bat up herself and

3    she was doing something with it.  And she threw it up and she

4    tried to catch it and it whacked her on the head and she

5    missed it and Clayton picked it up and said, Cameron, you're

6    going to hurt yourself.  You can't throw the bats because I

7    get in trouble for doing that, and I come down and catch him

8    at the inopportune time.  You can make that inference, too;

9    right?

10   A        Yes.

11   Q        But the more evidence you have, the more clearly you

12   can make the inference.  For instance, if I come down and

13   Cameron is holding two of her Barbie dolls and holding her

14   hand with one at her head crying, and Clayton is standing

15   there with a look on his face that says, oh, no, you can

16   infer perhaps that it was him swinging it rather than if

17   she's sitting there and he's ten feet across the room and the

18   bat is laying there and she's still crying.  So there's

19   different ways to make those inferences.  You will be able to

20   make those inferences in this type of a case?

21   A        Yes.

22   Q        And on the other side of that coin, you won't make

23   those inferences if they're not based on reason and common

1    sense; correct?

2    A        Correct.

3    Q        Because that's the standard you're going to use

4    based on reason and common sense.  Okay.

5         Now, we already talked to you about this particular

6    case.  And the charges are, as I mentioned to you, two counts

7    of aggravated murder.  And there's just sort of two different

8    ways of getting to the same conclusion that Mr. Bailey and I

9    will present to you in the course of this case.

10        We have to prove this case beyond a reasonable doubt

11   as well as the specifications to those charges, as well as

12   the aggravated burglary and aggravated robbery.  And the

13   Court is going to instruct you that you can find some of

14   those offenses, all of them or none of them.  You could

15   choose, pick and choose as a juror.  And in this particular

16   case, because there is a death involved, we have to present

17   to you the aggravated murder charge.

18        You wouldn't say, well, the State proved their case

19   beyond a reasonable doubt but, you know, I don't want to get

20   to this unpleasant task of determining guilt or -- I'm sorry

21   -- determining the death penalty, so I'm going to find her

22   not guilty.  You wouldn't do that, find her not guilty just

23   because you didn't want to have to undergo the task later on

1    of determining death or the --

2    A      No.

3    Q      And when you go into a jury room and go in there,

4    how do you think you're going to react?  Let's say, and I

5    don't care if it's for guilt or not guilt or for the death

6    penalty or not for the death penalty.  How strong do you

7    think you're going to be in there?  Are you the type of

8    person to say, well, you know these other 11 jurors, they

9    want to find her guilty, or they want to give her the death

10   penalty.  Or they don't want to give her the death penalty

11   but I do.  Or they don't want to find her guilty but I do.

12   How strong of a juror do you think you're going to be?  Are

13   you going to go along with them just to be congenial and just

14   say, well, you know, it's 2:00 in the afternoon, we've been

15   here a couple days, I want to go home and eat pizza.  Or are

16   you really going to stick to your guns?

17   A      No.  I'm going to go with what I've listened to and

18   what I feel.

19   Q      And part of the process is you have to discuss,

20   because other jurors may hear things differently than you did

21   and you have to discuss it.  But you believe you'll stick to

22   your convictions regardless of which direction they are,

23   you're going to stick to your convictions?

1    A        Right.  I'm good at doing that.

2    Q        People have told you that, huh?

3    A        Well, when I feel something strongly I --

4    Q        You stick with it?

5    A        I stick with it.

6    Q        Now, we told you before that Miss Roberts is not the

7    shooter.  She's an aider and abettor.  She's what we call a

8    helper.  That's the allegation.  And we believe that we will

9    be able to prove that to you.

10                        MR. INGRAM:  Objection.

11                        MR. BECKER:  I'm sorry.  Strike that.

12   Q        The allegation is that she is not the shooter.  And

13   there would be no doubt that we will present to you evidence

14   that she's not the shooter.

15             And the question I have for you is, is that going to

16   make your determination even on the guilt phase or the

17   penalty phase, any more difficult, or will you follow the law

18   as it's given to you?

19   A        I'll follow it as the Judge gives it to me.

20   Q        And you understand that this courtroom, Judge Stuard

21   didn't write the law.  I didn't write the law.  Mr. Bailey,

22   Mr. Ingram, none of us wrote the law.  The law was written by

23   our legislatures in Columbus.  It's not our place here, and

1    it's not your function as a juror to say, you know, I don't

2    think someone who has done what she is accused of doing

3    should have the death penalty as an option.  You won't vote

4    one way or the other because of what you think the law should

5    be, will you?

6    A        No.

7    Q        You'll follow the law as the Court gives it to you?

8    A        Right.

9    Q        So you won't try and rewrite the law or say, that's

10   a dumb law, even though they proved their case, I'm not going

11   to find her guilty because I think it's dumb that someone

12   should be convicted of the, should be facing the death

13   penalty if they're convicted of this offense, even if we

14   proved our case beyond a reasonable doubt; you wouldn't do

15   that?

16   A        No.  I'll follow the law.

17   Q        You won't try and change it here?

18   A        No.

19   Q        Now, one last area I want to touch on is, you may

20   find, as a lot of people find in criminal cases, that there

21   are some shockingly dumb things that criminals do.  I don't

22   know if we're going to see that in this case, but you have

23   heard in criminal cases just really dumb things that

1    criminals do.

2           They may go to the bank, go up to the teller and

3    say, here's my note, and have a gun and the teller says --

4    the note says, "Give me all your money." And she gets $5,000

5    and the guy runs out of the bank. And he's got a mask on and

6    a Groucho Marx' nose and mustache and glasses. And lo and

7    behold, when the teller turns the note over it's got some

8    address with the guy's name and address and a letter

9    addressed to him, and they track the guy down at the house.

10   They go to the address and there he is counting the money

11   out. You've heard of crazy situations like that; right?

12   A       Yes.

13   Q       So sometimes the best laid plans go astray I guess

14   is what I'm saying. You heard that saying before; right?

15   A       Yes.

16   Q       And you've heard of cases maybe where they shoot the

17   guy and kill him, but when they leave their wallet falls out,

18   or they leave their wallet there or they leave a lighter

19   that's got their name on it and that's how the police catch

20   them. And I don't know if we're going to hear anything

21   like that. But sometimes even the best laid plans don't work

22   out; right?

23   A       Right.

1    Q       You could impose the death penalty in this case if

2    the facts warranted it and the law allowed it; correct?

3    A       Yes.

4    Q       You've not been influenced by any media or outside

5    influence regarding your opinion?  You have no preconceived

6    notions?

7    A       No.

8    Q       You'll hold Mr. Bailey and I to our burden of proof

9    beyond a reasonable doubt?

10    A       Yes.

11    Q       You'll give Miss Roberts the benefit of the doubt or

12    the presumption of innocence throughout this trial?

13    A       Yes.

14    Q       And you believe you'll be a fair and impartial juror

15    that will stick to your guns, if we get to a point where you

16    may be outnumbered 11 to 1 and you're not firmly convinced

17    that the case, the State has either proven its case or if the

18    State has proven its case beyond a reasonable doubt, you'll

19    firmly stick to your guns that we've proven it to you after

20    you discuss it with your fellow jurors?

21    A       Yes.

22    Q       You'll stick to what your convictions are either

23    way?

```
 1    A         Yes.

 2                        MR. BECKER:  Thank you very much.  Mr.

 3    Ingram will ask you some questions.

 4                           EXAMINATION

 5    BY MR. INGRAM:

 6    Q         How are you?

 7    A         Good.

 8    Q         I share the responsibility of representing Donna

 9    Roberts with John Juhasz.  And I believe you saw him stand up

10    and leave?

11    A         Yes.

12    Q         He abandoned us for a dental appointment.  And

13    candidly, I think we got the better end of that trade.

14              Obviously the responsibility we have to Donna here

15    we take quite seriously.  And we think we should take every

16    reasonable precaution in selecting a fair-minded jury, the

17    same type of jury that you or I would want if we were on

18    trial.  Does that sound fair enough to you?

19    A         Yes, sir.

20    Q         It's hot in here.  Do you need some water?

21    A         No, not -- no, thank you.

22    Q         If at any point in time during our conversation you

23    get thirsty, let me know.  This voir dire process -- and
```

1   that's what we're talking to you is called voir dire.  I

2   guess it's an old fancy French term.  It's a whole lot like a

3   job interview, except when you go apply for a job, you select

4   the job that you're going to go be interviewed for.

5          And in the situation in which you find yourself now,

6   someone, a county employee was spinning a jury wheel and they

7   pulled your name out and we sent you an invitation by way of

8   a summons to come here.

9   A       Correct.

10  Q       We're interviewing you today for one of the most

11  important jobs there is:  The job of finding the truth and

12  determining the fate of another human being.  So my first

13  question to you, ma'am, is, how do you feel about being asked

14  to assume that responsibility?

15  A       I feel fine.  I feel it's my job as a citizen of the

16  United States to participate.

17  Q       And we thank you for your willingness to

18  participate.  You know not everyone is.  And you believe in

19  the American jury system?

20  A       Yes, sir.

21  Q       So do I.  So does everyone in this room.  And I

22  think we would all like you to know that the jury system only

23  works as long as we can find 12 good people who are willing

1    to give of themselves, come into the courtroom and do hard

2    things; do you understand that?

3    A        Yes, sir.

4    Q        And obviously you understand that we're asking you

5    to do hard things?

6    A        Yes, sir.

7    Q        Because we, we're asking you hard questions already,

8    aren't we?

9    A        Yes, sir.

10   Q        I want you to understand a couple things about these

11   questions.  If we were to trade roles, you and I, in other

12   words, if I was to sit over there and you were to stand over

13   here and maybe borrow my notebook, you could go through there

14   and ask me some of the questions I'm going to ask you and I

15   would have a darn hard time doing it.

16           The reason is, we don't walk around in our daily

17   lives thinking about the things that we're asking you about.

18   So if you have to take some time, ponder your responses,

19   would you please feel free to do so?

20   A        Okay.

21   Q        I also want you to understand that all of us are

22   lawyers by vocation.  And I guess one of the bad side things

23   of being a lawyer or trying to be a lawyer is we get

1     accustomed to monopolizing conversations and speaking at

2     people.

3             I would like you to stop me whenever you want.  So

4     if there's something that pops into your mind you want to

5     discuss, something you want to volunteer, a question you want

6     to ask, would you please feel free to do that?

7     A       Yes, sir.

8     Q       In a nutshell, this case boils down to the

9     government's allegation that Donna Roberts plotted or

10    conspired with a male companion by the name of Nate Jackson

11    to cause the death of Robert Fingerhut.

12            The first thing I want to get straight with you is

13    that the trial we're interviewing you for is about one person

14    and one person only, and that person is Donna Roberts.  You

15    got that straight?

16    A       Yes, sir.

17    Q       You know, throughout the course of these proceedings

18    you're going to hear the name Nate Jackson.  And you may, you

19    may decide that Mr. Jackson did what the State says he did.

20    But that's not what you're here to determine.  You got that

21    straight?

22    A       Yes, sir.

23    Q       You heard Mr. Becker say the words accomplice, aider

 1   and abettor, those fancy legal words.  Do you remember those

 2   words?

 3   A        Yes, sir.

 4   Q        The government's allegation here is that Donna

 5   Roberts helped Nate Jackson.  You're here to determine

 6   whether that's true or not.  Do you understand that?

 7   A        Yes, sir.

 8   Q        Will you hold them to their burden of proving that

 9   it's true by proof beyond a reasonable doubt?

10   A        Yes, sir.

11   Q        And my name is Jerry.  You can call me anything but

12   sir, please.

13   A        Okay.

14   Q        In support of its allegation that Donna aided or

15   participated in the death of Robert Fingerhut, the State will

16   present various letters and recorded conversations between

17   Donna and Nate.  Some of those letters and some of those

18   conversations are sexually explicit in nature and, to be

19   honest with you, some of them are downright offensive.  You

20   understand that the allegation here is murder, not loose

21   morality?

22   A        Yes, sir.

23   Q        And no matter how shocked or offended you may be by

1  the sexual nature of this evidence, you're still going to

2  have to examine that evidence, test that evidence to

3  determine whether it ties Donna to this offense; do you

4  understand that?

5  A      Yes.

6  Q      Do you think you're up to that?

7  A      Yes.

8  Q      Would you have the courage to acquit, that is vote

9  not guilty, if you felt that the evidence warranted a verdict

10  of not guilty?

11  A      No.  If the evidence warrants not guilty, I would be

12  able to do that.

13  Q      When we all got together about two and a half weeks

14  ago on a Tuesday, April 8th, we were down in the other end of

15  this hallway here in the big courtroom; do you remember?

16  A      I was not here.  I was on vacation.  I came in the

17  next day.

18  Q      Where did you go?

19  A      I went to the southern -- I went on an eastern

20  Caribbean cruise.

21  Q      Did you have fun?

22  A      Oh, yeah.

23  Q      I hope you avoided --

1          THE COURT:  You were sworn in, I take it?

2     A        Yes, sir.

3     Q        Now, when you were home and a news broadcast about

4     this case came on -- those things will happen.  And you're

5     supposed to do exactly what you did, which is get out of the

6     room as quick as you can or change the channel as quick as

7     you can.  Do you understand why we ask you to do that?

8     A        Don't want to impair my thoughts on the case.

9     Q        That's right.  And let me give you an example of how

10    I think that could happen.  Have you seen any of this stuff

11    in the last two weeks about Laci Peterson and Scott Peterson?

12    A        Yes, I have.

13    Q        Well, do you think that Scott Peterson could get a

14    fair trial by someone who's been watching TV for the last

15    month and a half and paying attention to all of these things?

16    A        Depends if they can separate what they saw on TV

17    from the facts they heard in the courtroom.

18    Q        Excellent answer.  If a juror is not exposed to any

19    of that we don't have to worry about separation, which is why

20    we ask you to do your best not to watch the news.  Will you

21    do that?  I'm sure you will.

22    A        Yes, sir.

23    Q        I'm sorry.  Now I'm going to talk to you a little

1    bit here about penalties.  And before I do I want to explain

2    a couple things to you.  I have a concern about the mere fact

3    that we're standing up here talking to you about penalty.

4    Did you ever hear that old adage, you're putting the cart

5    before the horse?

6    A        Yes.

7    Q        Well, to me -- and maybe I'm all wet.  A lot of

8    people think I am.  Richelle is one of them.  We're talking

9    to you about how you might punish someone you haven't even

10   decided that has done anything wrong or not; do you

11   understand?  Do you see what I mean?

12   A        Yes.

13   Q        When you read the Judge's preliminary instruction,

14   you would have read them yesterday or this afternoon?  I

15   don't know when.

16   A        Yesterday.

17   Q        But did those instructions sort of make sense to

18   you?

19   A        Yes.  I have to weigh the facts and the evidence

20   before I make a decision what her penalty should be.

21   Q        And before you could ever decide what the penalty

22   should be, you have to make sure she did something wrong,

23   don't you?

```
 1    A        Right.

 2    Q        In those instructions the Judge told you that these

 3    questions about penalty have absolutely nothing to do with

 4    Donna's guilt or innocence; do you understand that?

 5    A        Yes.

 6    Q        Do you wear your seat belt when you motor about,

 7    when you go to work?

 8    A        Most of the time.

 9    Q        When you buckle that seat belt you don't expect to

10    be in an automobile accident, do you?

11    A        No.

12    Q        You just buckle, you buckle up just in case; right?

13    A        Yes.  It's the law, too.

14    Q        As Mr. Becker told you, we're being presumptuous,

15    and we're just asking you these questions now just in case.

16    The law requires that we ask them now.  You've got that

17    straight?

18    A        Yes.

19    Q        This is potentially a two-stage process.  The issue

20    in the first stage is whether or not Donna Roberts is guilty

21    or not guilty.  If the jury finds her not guilty, what

22    happens?

23    A        She goes free and clear.
```

1    Q        And we all go home; right?

2    A        Right.

3    Q        There's no second phase then, is there?

4    A        No.

5    Q        Only if the jury returns a verdict of guilty on the

6    charge of aggravated murder and a verdict of guilty on a

7    death specification do we ever get to a second phase.  Do you

8    think you have that straight in your mind?

9    A        Yes, sir.

10   Q        And I want you to understand that I would be willing

11   to bet a full 60, 70 percent of the lawyers that practice law

12   in Youngstown or Warren don't understand the process that was

13   set forth in those preliminary instructions.  So these aren't

14   easy concepts.  And they're not concepts that we're

15   customarily familiar with, which is why I may spend some time

16   going over them with you.  Does that make sense to you?

17   A        Yes.

18   Q        And I'm going to ask you some questions about your

19   views on punishment.  But before I do that, Mr. Becker, I

20   want to say repeatedly, but that's probably not a fair word,

21   like four or five times asked you if the facts warranted it

22   and the law permitted it, whether you could sign a verdict of

23   death.  Do you remember those questions?

1    A        Yes.

2    Q        Do you understand that nobody is asking you, and he

3    was not asking you to prejudge this case?

4    A        Yes, I understand that.

5    Q        And we're going to make up a case.  It's some other

6    case where, let's make it an aggravated murder charge with a

7    death specification.  I don't think it matters what the death

8    specification is.  But it's aggravated murder, which is by

9    prior calculation and design.  And that's premeditation,

10   advanced planning, causing the death of another.  So the

11   defendant has been convicted of aggravated murder and

12   convicted of a death spec.  Are you with me?

13   A        Yes, sir.

14   Q        And a jury goes to a second phase.  They're

15   instructed on that balancing that Mr. Becker went over with

16   you.  Do you think you have that straight or do you want me

17   to go over that again?

18   A        I think I have it straight.

19   Q        As a juror you are the sole judge of the facts in

20   this case, the credibility of the witnesses and the weight of

21   the evidence.  Nobody tells you how to weigh evidence.

22   That's your decision, your decision alone.  Do you, do you

23   understand that?

1    A        Yes.

2    Q        So you could say that an aggravating circumstances

3    has a lot of weight.  You could say that it has no weight.

4    You could say that a mitigating factor has a lot of weight,

5    or it has no weight.  That's a personal decision that you

6    have to make, as you say, after you've heard the evidence and

7    you thought about the evidence and the instructions of law.

8            Do you understand that the law will never require

9    you to vote for a penalty you do not feel is warranted by the

10   evidence?

11   A        Yes, sir.

12   Q        I think I know how you feel about the death penalty.

13   Not a very pleasant subject, is it?

14   A        No.

15   Q        Are you able to tell me -- it's a hard question

16   which is why I'm saying, are you able to tell me your views

17   on life imprisonment as, as a sentencing option in aggravated

18   murder cases?

19   A        Well, I guess their, they have to live with the

20   guilt that they murdered somebody and that's, that's a severe

21   punishment also.

22   Q        Have you ever heard someone say that they don't

23   approve of life imprisonment in any type of case because I'm

1    a tax payer.  I shouldn't have to pay to keep somebody in

2    prison for the rest of their life?

3    A        No, I never heard that.

4    Q        Well, do you have any opinion about that cost issue?

5    Do you understand what the cost issue is?

6    A        Yes.

7    Q        Do you have an opinion about that issue?

8    A        Better they're off of the streets than out here to

9    maybe do somebody else in.

10   Q        And let's talk about sentencing.  You've had to

11   punish people in your life, haven't you?  You had a couple

12   kids?

13   A        Yep.

14   Q        And whenever you're called upon to punish someone,

15   you're going to want to know something about the person

16   you're punishing?

17   A        Yes.

18   Q        You may want to know about the past, about any

19   problems they may have.  There's lots of things you would

20   want to know about that person; am I right?

21   A        Yes.

22   Q        So to some extent sentencing is individualized

23   because it has to focus on the person being sentenced;

1    correct?

2    A        Yes.

3    Q        Now, a juror that gets to a second phase is

4    instructed, and I think the Judge in the preliminary

5    instructions already told you is, is instructed that all of

6    the sentencing options must start out equally in your mind.

7    A        Yes.

8    Q        Do you understand that?

9    A        Yes.

10   Q        And if you had to, would they all start out equally

11   in your mind?

12   A        I guess it would because that's what I was

13   instructed to do.

14   Q        Okay.  Well, let's forget about the instruction.

15   And I'll tell you, disregard that question.  Penalties are

16   presently determined by the state Legislature.  We're going

17   to forget that they exist for a moment.

18            We're going to pretend that you are a Legislature of

19   one, and you get to rewrite the laws for the state of Ohio.

20   If you were rewriting the penalties for aggravated murder as

21   we have already described it to you, what penalties would you

22   provide for?  Would it be one?  Would it be more than one?

23   And if my question is confusing let me know.

1    A        It's not confusing.

2    Q        It's just a little hard, huh?

3    A        Yeah.  I would have to, well, think about it.  And

4    I'm sure they would have to go to prison if they committed

5    murder.  Or if it was, if premeditated murder and it was

6    proved beyond a shadow of a doubt, they deserve to die.

7    Q        Okay.  I'm talking about your views right now.

8    We'll talk about how your views impact your ability to follow

9    the instructions of the Judge, if at all, a little bit later.

10            But if you were rewriting the penalties for

11   aggravated murder, which is planned, premeditated murder,

12   upon conviction, which is beyond a reasonable doubt, it's not

13   beyond a shadow of a doubt.  It's beyond a reasonable doubt.

14   Would you provide one penalty, and that would be

15   automatically death, or would you provide options?

16   A        We're talking on premeditated murder?

17   Q        Yes, ma'am.

18   A        Planned on doing it?

19   Q        Yes, ma'am.

20   A        No, they would have to have the death penalty.

21   Q        So in your sentencing scheme the death penalty would

22   be automatic for premeditated murder?

23   A        If that's what they planned, set out to do.

1     Q        Yes.

2     A        Yes.

3     Q        Do you understand that that's not the present

4     statute in the state of Ohio?

5     A        Yes.  They have four options.

6     Q        Okay.  Now, and let me back up for a second.  There

7     are no right or wrong answers in this exchange.  There's only

8     one possible mistake.  And I have kids, and when I ask them

9     hard questions more often than not they try to tell me what

10    they think I want to hear rather than really answer the

11    question.  So the only mistake that you could possibly make

12    in my, in our discussion is if you tell me what you think I

13    want to hear instead of how you really feel.  Does that make

14    sense to you?

15    A        Yes, sir.

16    Q        In your personal penalty scheme the death penalty

17    would be automatic for premeditated murder?

18    A        Yes, sir.

19    Q        In Ohio's statutory scheme it is not automatic;

20    right?

21    A        Right.

22    Q        And the Judge told you, not only is it not

23    automatic, he also told you that all four penalties would

1    have to start out equally in your mind; do you remember that?

2    A       Yes.

3    Q       In light of the way you feel --

4    A       Now, remember, you told me to rewrite the law.

5    Q       I know.

6    A       Okay.

7    Q       And then I told you we would talk about the Judge's

8    instructions.  And then I told you we would ask, we would

9    talk about how your personal feelings impact your ability to

10   follow the instructions of the Judge.

11   A       Correct.

12   Q       And you've anticipated right where I'm going here.

13   We're now right to the third one.  Does your personal

14   feeling -- and I'll accept your answer on this.  Does your

15   personal feeling that the death penalty should be automatic

16   for premeditated murder affect your ability to fairly

17   consider the life sentencing options at a second phase of a

18   capital case?

19   A       Yes, it does, because I have to listen to all the

20   facts and evidence.

21   Q       Okay.  You're just starting this second phase so you

22   haven't heard any evidence yet.

23   A       Okay.

1    Q        And can we agree that as you read in the preliminary

2    instructions, when you start that, you haven't heard any

3    evidence about mitigating factors, but as you start that

4    hearing all four of Ohio's potential sentences should start

5    out equally in your mind?

6    A        Correct.

7    Q        Does your personal belief, as you rewrote the law,

8    impact your ability to equally consider --

9    A        I can weigh the other three options out.

10   Q        Okay.  That's all I wanted to know.

11   A        (Witness nods head affirmatively.)

12   Q        And I'm sorry that it took so long to get there, but

13   it's not an easy thing to do.  If you ever get to a second

14   phase, you understand that your oath as a juror will require

15   that you equally consider all four of those sentencing

16   options?

17   A        Yes, sir.

18   Q        Your oath would also require that you not give one

19   option a head start over the others?

20   A        Yes, sir.

21   Q        You have a son, Tim is a California Highway

22   Patrolman?

23   A        Yes.  Right now he's an EMT officer.

1    Q        Okay.  I thought in your questionnaire, did you

2    write down flight officer?

3    A        Yeah, flight officer, that's what he is.   Paramedic

4    flight officer.  And now he's flying the chopper.

5    Q        Dave Rankin is your --

6    A        That's my brother-in-law.  He's no longer a sheriff

7    for Jamestown.  He's just a park --

8    Q        Cooks Forest?

9    A        Yes.

10   Q        How long has your son been a California Highway

11   Patrolman?

12   A        Almost six years.

13   Q        Do you, have you, you and he engaged in discussions

14   about his job?

15   A        He does not reveal anything about his job to me.

16   Q        How about Mr. Rankin, do you engage Mr. Rankin in

17   any discussions about his job when he was with the Jamestown

18   Sheriff's Department?

19   A        No, sir.

20   Q        Part of your job responsibilities in this case will

21   be to determine the credibility of the witnesses.  And some

22   policemen are going to testify.  You'll have to determine

23   their credibility or believability just as you would everyone

1    else.  Do you understand that?

2    A        Yes.

3    Q        And you can't believe what a policeman tells you

4    just because he's a policeman.

5    A        That's true.

6    Q        Would you agree with me that the uniform doesn't

7    make the man?

8    A        No, it doesn't.

9    Q        You have to penetrate the uniform and evaluate the

10   testimony of the person wearing that uniform?

11   A        Yes.

12   Q        And will you do that?

13   A        Yes, sir.

14   Q        Have you ever donated any time, money or services to

15   a political campaign or issue?

16   A        You mean, have I served on any committee?

17   Q        Yes.

18   A        No.

19   Q        Do you belong to any group or organization which is

20   active in any political matter?

21   A        No.

22   Q        In the last five years or so, have you signed a

23   petition on any public issue?

1    A        No.

2    Q        Do you belong to or do you associate with any group

3    which has crime prevention or law enforcement as a goal?

4    A        No.

5    Q        The Judge will instruct you at the end of this case

6    that sympathy should play no part in your evaluation of the

7    evidence or your deliberations.  I'm sure you would agree

8    with me that this is a court of law and not a court of

9    sympathy?

10   A        Correct.

11   Q        Well, we've talked before about asking jurors to do

12   hard things.  And listen, asking people to not let sympathy

13   affect how you look at some things is a hard thing sometimes.

14   A        Sometimes.

15   Q        Donna Roberts here is the Defendant in this case.

16   And straight out, any sympathy for her should not affect your

17   evaluation of the evidence.  And I'm sure you have that

18   clear.

19   A        Yes.

20   Q        There's also a victim, Robert Fingerhut, who lost

21   his life.  It's natural to feel sympathy for someone who's

22   lost his life.  So the flip side of that coin is, sympathy

23   for Robert Fingerhut should not affect the way you evaluate

```
1    the evidence.

2    A        No, it shouldn't.  He's not here for me to have any

3    association with him.

4    Q        Well, you're going to see some photographs.  You'll

5    see crime scene photographs.  They're going to show

6    Mr. Fingerhut's body on the ground.  You'll see coroner's

7    photographs, gunshot wounds to the head.  And some of these

8    photographs may evoke an emotional response from you.

9    Sympathy; right?  But even though this evidence may evoke an

10   emotional response, you're still going to have to test that

11   evidence, evaluate that evidence to see whether it ties Donna

12   to this offense.  Are you up to that?

13   A        Yes.

14   Q        Do you recall talking to Mr. Becker about the

15   presumption of innocence?

16   A        Yes.

17   Q        I want to go back to that.  But before I do, how do

18   you personally -- and again, then we'll talk about whether

19   your personal opinions affect your abilities later.

20            But how do you personally feel about the rule of law

21   which requires a juror to presume the defendant innocent?

22   A        That's fine with me.

23   Q        Now, here's why I want to go back to your discussion
```

1    with Mr. Becker.  Do you remember Mr. Becker asking you,

2    right after you talked to him about the presumption of

3    innocence, if you had to vote now how you would vote?

4    A        Yes.  But I don't remember my answer.

5    Q        Your first answer was, I have to hear, I would have

6    to hear all the evidence.  And that is the logical answer.

7    However, the presumption of innocence requires that you

8    presume the Defendant innocent until it is removed, if ever,

9    by proof beyond the existence of a reasonable doubt.

10   A        Yes.

11   Q        So if you presume Donna Roberts innocent and you had

12   to decide this case now, and you haven't heard any evidence,

13   your answer would have to be, you would find her not guilty;

14   do you see that?

15   A        Yes.

16   Q        I want to talk to you about it a little differently.

17   Say one of the kids is accused of some kind of wrongdoing,

18   and you in your heart believe that the kid didn't do it.  You

19   would require evidence that the child did it before you would

20   be willing to change your mind, wouldn't you?

21   A        Yes.

22   Q        Does that sound a lot like the presumption of

23   innocence to you?

1    A        Yes.

2    Q        And in that case where you believe in your heart

3    that the child didn't do it, you wouldn't willy-nilly accept

4    that evidence, would you?  Wouldn't you look at it with a

5    critical eye to see that it really does tie the child to the

6    wrongdoing it's supposed to tie the child to?

7    A        Yeah.  I would have to have the evidence.

8    Q        And you would look at that evidence sort of with a

9    critical eye, in other words, you would test it; right?

10   A        Yes.

11   Q        Will you do that here?

12   A        Yes, sir.

13   Q        Now, the state of Ohio, these guys, they represent

14   the State.  Here is Mr. Bailey.  He's a good friend of mine.

15   They've got the burden of proof here.  Do you understand

16   that?

17   A        Yes, sir.

18   Q        The State has leveled these accusations.  Now it's

19   time for the State to put up or shut up.  Got that?

20   A        (Witness nods head affirmatively.)

21   Q        And this is Mr. Juhasz.

22                     MR. JUHASZ:  Hi.

23   Q        Now, Mr. Becker, when he was talking he talked to

1     you about essential elements.  And the Judge, we, you and I

2     may talk a little bit about essential elements, but at the

3     end of the case the Judge will give you all of them.  That's

4     his job.  Not only will he list them for you, he'll define

5     them for you.  But for now the State has the burden of

6     proving each and every one of those beyond a reasonable

7     doubt.  Will you hold them to that burden?

8     A      Yes.

9     Q      Now, Juhasz and I and Donna, we don't have to do

10    anything.  We could actually sit on our hands throughout the

11    course of this trial and not do anything.  It's still their

12    burden; do you understand that?

13    A      Yes.

14    Q      You understand that Donna is on trial for murder,

15    not for being a woman of loose moral character?

16    A      Yes.

17    Q      And while the State may prove she's a woman of loose

18    moral character, the State's burden in this case is to prove

19    that Donna intentionally participated in the death of Robert

20    Fingerhut.  Will you hold them to that burden?

21    A      Yes, sir.

22    Q      There's two aggravated murder charges.  And one of

23    the essential elements of those charges is that the Defendant

1    acted purposely.  And the Judge will tell you that at the

2    end.  And he'll define purposely for you.  And I believe

3    he'll tell you that purpose is the same as intent.  That

4    sounds reasonable to you, doesn't it?

5    A       Yes.

6    Q       A person acts purposely if it is his specific intent

7    to cause a specific result.  Would you agree with me that the

8    facts and circumstances surrounding an act can shed some

9    light on the actor's intent?

10   A       Yes.

11   Q       For instance, if I go out there and commit some

12   horrible wrong, would you expect me to try to cover my tracks

13   or leave a papertrail?

14   A       You'd probably cover your tracks.

15   Q       And if I went out there to do some horrible wrong,

16   would you expect me to do it openly in the light of day or to

17   try to do it secretly under the cover of darkness?

18   A       Probably do it under darkness.

19   Q       Will you hold the State to its burden of proving

20   Donna's intent by proof beyond a reasonable doubt?

21   A       Yes.

22   Q       The Judge will define the elements, the other

23   elements of aggravated murder.  And then there are elements

1       of aggravated robbery and aggravated burglary.

2               Do you understand that aggravated burglary and

3       aggravated robbery are actually the two death specifications,

4       or should I spend some time on that?

5       A       You better define that.

6       Q       Okay.  You remember that each of the aggravated

7       murder counts has two death specifications?

8       A       Yes.

9       Q       The first death specification to each of those

10      counts is that the murder was committed during an aggravated

11      burglary.

12      A       Okay.

13      Q       And that aggravated burglary itself is the third

14      count.  Have I straightened that out at all?

15      A       They went there to -- I'm going to give you a

16      scenario.  She went there to commit a robbery and in the

17      process of committing the robbery she ran into the guy and

18      she shot him and killed him?

19      Q       That's what the allegation is.  Then the second

20      death specification is aggravated robbery.  And that

21      aggravated robbery is the fourth count of the indictment.

22      Now, because they have the only burden of proof and we can

23      sit on our hands, you understand Donna doesn't have to say

1    anything throughout these proceedings?

2    A       Right.

3    Q       She doesn't have to testify.  Doesn't have to utter

4    one word.

5    A       Right.

6    Q       And if she chooses not to testify, chooses not to

7    utter a word, you can't hold it against her?

8    A       No.

9    Q       How do you feel about that?

10   A       That's the Defendant's -- what is she called?

11   Q       Right.

12   A       Okay.  It's her choice.

13   Q       Well, when those three kids of yours, I'm sure that

14   they collectively had a dispute at a time or two?

15   A       (Witness nods head affirmatively.)

16   Q       Where you had to get to the bottom of it.  And the

17   first thing you would do is, all right, come on, you tell me

18   your side of the story.  You tell me your side of the story.

19   I've got to hear both sides of the story.  That's a natural

20   inclination, isn't it?

21   A       Yeah.

22   Q       Remember we talked about jurors, us asking jurors to

23   do hard things and put aside natural inclinations.  In this

 1   case your oath may require that you put aside that natural

 2   inclination.  Can you do that?

 3   A        Yes.

 4   Q        Now, if she does testify she's a witness just like

 5   any other witness.  You would use the same rules or

 6   standards -- and we'll talk about those.  But you would use

 7   the same rules or standards in determining whether to believe

 8   her that you use in determining whether to believe everyone

 9   else who testifies.

10   A        Yes.

11   Q        I want to be fair about that.  She's the Defendant

12   in this case; right?

13   A        Yes.

14   Q        But because she's the Defendant she certainly has an

15   interest or a stake in the outcome of these proceedings,

16   doesn't she?

17   A        Yes.

18   Q        And that's what, that's something you want to keep

19   in mind in determining whether to believe her, isn't it?

20   A        I would think so.

21   Q        Okay.  I think the Judge will tell you that's one of

22   the factors you can consider.  And it seems to be reasonable

23   that that's one of the factors most people would want to

1    consider.  But if you consider interest or stake in the

2    outcome in evaluating her testimony you have to consider

3    whether any other witness has an interest or a stake in the

4    outcome of this case; would you do that?

5    A        Yes.

6    Q        And would you look at whether any witness has

7    anything to gain by the outcome of this case?

8    A        Yes.

9                        THE COURT:  Are you okay, Richelle?

10                       COURT REPORTER:  Yes, Judge.

11   Q        You understand that the indictment is

12   fingerpointing, as Mr. Becker said.  It's not evidence.

13   A        Right.

14   Q        Do you understand why it's not evidence?

15   A        Haven't heard the facts yet.

16   Q        That's right.  The only thing I want to tell you

17   about the indictment is, it's going to be read through you --

18   to you.  And, matter of fact, it may be read throughout these

19   proceedings more than once.  It may be referred to more than

20   once.  No matter how many times it's read, no matter how many

21   times it's referred to, it is not evidence.  Are we clear on

22   that?

23   A        Yes.

1    Q       Now, we talked about one of your big job

2    responsibilities being, to determine the credibility of the

3    witnesses.  The Judge is going to tell you, you can believe

4    all of what someone says, part of what someone says or none

5    of what someone says.

6            In other words, you've got to, you've got to

7    determine who's telling the truth, who's trying to hoodwink

8    you.  Are you up to that responsibility?

9    A       Yes.

10   Q       And the Judge will give you a list of factors.  We

11   talked about one, interest or stake in the outcome of this

12   case.  The reasonableness of testimony.  If someone testifies

13   and it just doesn't make sense to you, that's something you

14   would want to consider; right?

15   A       Yes.

16   Q       I'm not going to go through all of that list of

17   things you should consider, because that's the Judge's job.

18   But will you take each of the factors he gives you and apply

19   them to the testimony of each and every witness?

20   A       Yes.

21   Q       Now, there's one factor there that I think we have

22   to talk about, and that is, I think he'll describe it to you

23   as the test of truthfulness that you apply in your every day

1    life.

2          You frequently, throughout the course of your days,

3    have had to determine whether someone was being straight with

4    you or whether they were bending it a little bit?

5    A       Yeah.

6    Q       And throughout the years you've developed an

7    intuitive or a sixth sense that aids you in making that type

8    of a decision?

9    A       Yes.

10   Q       The Judge is going to tell you that you should bring

11   that test, whatever it is, because they may differ from

12   person to person, but whatever that test is you're supposed

13   to bring it in here and apply it to everybody that testifies.

14   Will you do that?

15   A       Yes.

16   Q       Now, we talked a little bit about reasonable doubt

17   and proof beyond a reasonable doubt.  Reasonable doubt,

18   No. 1, is based on reason and common sense.  Did you ever say

19   to yourself with the hubby, with one of the kids, with

20   someone, I'm going to give them the benefit of the doubt?

21   A       Yes.

22   Q       And when you said that to yourself, was the doubt

23   you were giving him the benefit of a reasonable doubt?

2267

```
 1    A        I guess so.

 2    Q        Of course it was.  Because you will certainly, we're

 3    not going to say to ourselves, I'm going to give him the

 4    benefit of an unreasonable doubt.  The point of that is, I

 5    think we all intuitively know what is reasonable doubt and

 6    what's an unreasonable doubt.  Does that make sense to you?

 7    A        Yes.

 8    Q        Proof beyond a reasonable doubt requires that you be

 9    firmly convinced -- and Mr. Bailey uses the words firmly

10    convinced to a moral certainty -- firmly convinced, and is

11    proof of such character that an ordinary person, you or me,

12    would be willing to rely and act upon it in the most

13    important or our own affairs.  I've made some important

14    decisions, and I'm sure you've made some important decisions.

15    A        (Witness nods head affirmatively.)

16    Q        Have you ever, in making an important decision, made

17    a checklist where you draw a line down a sheet of paper and

18    you write the good things, the positive things for the

19    decision on one side and the negatives on the other?

20    A        Yes.

21    Q        When I do that I like to scratch off the negatives

22    if I can, because that helps me to decide whether or not I'm

23    doing the right thing.
```

1              Let's say my decision is, I want to buy a new house.

2    And I need four bedrooms; and the house has four bedrooms.  I

3    need three bathrooms; it has three bathrooms.  Good schools.

4    Nice neighborhood.  Then I write out -- those are the

5    positives; right?

6              Then I write out the negatives.  It's 45-years old.

7    I don't know about the structural stability.  There might be

8    termites.  There's some plumbing problems.  I don't know how

9    much the plumbing is going to cost.  And I don't know if I

10   can afford the monthly mortgage payment.

11             So you investigate those negatives, don't you?  You

12   think about them.  And with my structural stability problem I

13   write in, I want an inspection.  I get a contractor to come

14   out and look at the house, and he tells me that it's brick

15   solid.  So what can I do then?  I scratch it right off.

16             I get a plumber.  That's a couple hundred bucks to

17   fix that plumbing.  I scratch it off.  But I go to the bank,

18   they won't give me a lower interest rate.  The bank won't

19   extend the mortgage from ten years to 15 or from 15 to 20.  I

20   can't get the mortgage payment down, and I don't know whether

21   I can meet that monthly mortgage payment.  That doubt remains

22   reasonable in my mind.  Are you with me?

23   A         (Witness nods head affirmatively.)

1    Q       As long as there's one doubt on that right side of

2    that paper, I cannot say to myself beyond a reasonable doubt

3    that that decision is the right thing for me.  Do you

4    understand that?

5    A       Yes.

6    Q       It's the same in this case; do you understand that?

7    A       Yes.

8    Q       If there's one reasonable doubt the State has not

9    met its burden of proof.

10   A       Got you.

11   Q       Now, you talked to Mr. Becker about circumstantial

12   evidence.  And you'll be happy to know that as soon as we're

13   done with circumstantial evidence I'm done.

14           Do you understand what circumstantial evidence is?

15   It's proof of a fact by direct evidence, what you saw, what

16   you heard, what you smelled, what you tasted, what you

17   touched, from which you can infer other reasonable facts and

18   circumstances.  So the first thing you do, and that's because

19   they're asking you to make an inference.  So the, the leap in

20   logic that you're asked to make is the inference.  So would

21   you agree with me that whenever you're asked to make an

22   inference you should test that inference to see if it's

23   reasonable?

```
 1    A         Yes.

 2    Q         And like with Mr. Becker's children, the first time

 3    he went downstairs, there's more than one inference, isn't

 4    there?

 5    A         Yeah.

 6    Q         Either it was the boy holding the bat or the girl

 7    threw it up.

 8    A         (Witness nods head affirmatively.)

 9    Q         So you have to look for other equally reasonable

10    inferences; right?

11    A         Right.

12    Q         And let's go back with the kids when they were

13    accused of some wrongdoing and someone presented you

14    circumstantial evidence regarding the kids.  You would look

15    for other reasonable inferences, wouldn't you?

16    A         Yes.

17    Q         Will you do that in this case?

18    A         Yes.

19    Q         And will you test every inference that you're asked

20    to make?

21    A         Yes.

22    Q         Okay.  Now that I've been up here quite long enough,

23    and I'm sure I've tried your patience, and I will apologize
```

1    for that.  But you do understand that I'm doing my job?

2    A      Yes.

3    Q      And if I were representing you, you would expect me

4    to take the same time and efforts.

5    A      Yes.

6    Q      Has anything popped into your mind that you would

7    like to discuss with any of us here?

8    A      Not that I can think of.

9                     MR. INGRAM:  Thank you very much.

10                    THE COURT:  Prosecutor, pass?

11                    MR. BECKER:  Yes, Your Honor.

12                    MR. INGRAM:  Pass.

13                    THE COURT:  Ma'am, you are going to be in

14   the poll from which this jury will be selected.  You should

15   call the number given to you after 4:30 Friday.  Hopefully by

16   next week sometime we'll have everybody back in here to pick

17   this jury.  Again, you're not to read anything, watch

18   anything on TV.  Don't discuss with anybody until we return.

19   Okay.  We're going to take a recess for 15 minutes.

20                    (Whereupon, a recess was taken.)

21                              * * *

22

23

1    WHEREUPON,

2                          MARY J. COSTELLO

3    being first duly sworn, according to law, was examined and

4    testified as follows:

5                              EXAMINATION

6    BY THE COURT:

7    Q        You read that handout that was given to you?

8    A        Yes.

9    Q        We are here on an aggravated murder case with

10   attached specifications.  Under the law of Ohio just because

11   a person murders another person does not mean that that

12   perpetrator is necessarily going to have their life in

13   jeopardy through the death penalty.

14           We need to seat 12 people on this jury who are able

15   to be fair and impartial and follow the law.  Some people

16   have the opinion that if a life is taken a person taking the

17   life should forfeit theirs.  An eye for an eye.  That is not

18   the law of Ohio.

19           A person with a fixed opinion of that nature could

20   not be a good juror in a capital murder case under our law

21   because there would be no way they could be fair to the

22   Defendant.

23           Likewise, a person who's of the nature that they can

1    never see themselves making such a decision as to whether
2    someone should have the death penalty imposed or not, that
3    person could not make a good juror either because they would
4    never be able to be fair to the prosecution.

5         The law in Ohio says that if you do murder under
6    certain circumstances, which we call specifications, such as
7    murdering the Governor, if you plan to murder the Governor,
8    carry out the murder, and it happens to be the Governor, then
9    the State upon proving those, the aggravated murder with the
10   specification, that means the death penalty has to be
11   determined, decided upon by the jury.

12        Well, in this case the aggravated murder charges
13   have specifications set forth in the statute which means that
14   this jury, should they find after the trial that the State
15   has proven beyond a reasonable doubt each and every element
16   of the aggravated murder and the specifications, the case
17   would go into a second phase.

18        Now, if the State fails to prove that then the jury
19   would properly make a finding of not guilty and that would be
20   the end of the trial. But assuming it went to the second
21   phase, the jury then has to listen to further evidence. And
22   the burden is upon the State, again, always upon the State to
23   prove that the aggravating circumstances, that is reasons why

1   the death penalty should be considered and imposed, that

2   those circumstances outweigh any mitigating factors which

3   speak in favor of the Defendant as to why the death penalty

4   should not be imposed.

5          We ask all these questions at this point in time not

6   having any idea what the jury is likely to do with this case.

7   But we can't wait until if it, if that second part of the

8   trial arises that would be too late to make inquiry as to

9   whether people could follow the law.  So you get the idea.

10  That's the main reason that they will be asking you questions

11  on that issue.

12         And whatever your personal opinions or beliefs are,

13  that's fine.  Everyone will respect that.  As you go through

14  this, I suspect most people in your chair there are answering

15  some questions they've never really thought through to the

16  point that you will be asked.  So it's a learning process on

17  your own part as to what your opinion really is.

18         The other area is in regard to pretrial publicity.

19  Many of the folks that we've interviewed have read something

20  in the newspaper.  This case, by its very nature, draws a lot

21  of media attention.  And that's fine.  The question that each

22  prospective juror has to answer is, do I have my mind made up

23  or are there facts that I think I know so fixed in my mind

1    that I'm not able to set them aside.  Because in order for

2    both sides to have a fair trial here this jury is going to

3    have to decide this case solely on the evidence presented in

4    this courtroom and the law that will be given by the Court.

5    So anything that anyone has heard or observed outside the

6    courtroom cannot be used in deciding this matter.  Okay?

7    A       Okay.

8                     THE COURT:  Good.  Mr. Bailey.

9                          EXAMINATION

10   BY MR. BAILEY:

11   Q       Good afternoon, Mrs. Costello.

12   A       Good afternoon.

13   Q       I'm Ken Bailey.  I'm an assistant prosecutor for the

14   Trumbull County Prosecutor's Office.  And as I promised two

15   and a half weeks ago approximately, Chris Becker, another

16   assistant prosecutor in our office, has joined me.  And we're

17   responsible for prosecuting this case together on behalf of

18   the people of Trumbull County and the state of Ohio.

19             Now, as the Judge indicated, this is a chance for us

20   to ask you some questions regarding your opinions on certain

21   things, your background and prior experiences.

22             And the reason we do this isn't because we're snoopy

23   and we like to pry into people's backgrounds and what they

1　believe but rather, because we want to make sure that the

2　folks who are selected to serve on this particular jury, can

3　be fair and impartial to both sides, both to the Defendant

4　and the people of the state of Ohio.

5　　　　　And there aren't any right answers.  There aren't

6　wrong answers to these questions.  Just open, candid answers

7　as to how you personally feel.

8　　　　　One thing I want to point out is, under our rules of

9　conduct the lawyers aren't allowed to have any contact with

10　you until this case is all over, after we finish talking

11　today.  Now, if you have questions that come up, feel free to

12　stop me.  If I'm asking a question, as long as it pertains to

13　what we're doing in here, you can ask.  And we'll try to

14　answer what it is that you have a question about.

15　　　　　But if we run into each other in the hallway or the

16　elevator or a restaurant or something, all we're allowed to

17　do is say good morning or good afternoon.  Otherwise, it

18　could result in a mistrial.  And we don't want to have to do

19　it all over again.

20　A　　　　I understand.

21　Q　　　　The first two areas I want to talk about are going

22　to be this issue of pretrial publicity and the death penalty

23　as a possible punishment.  And let's start off with this

1     pretrial publicity issue.

2            Now, you had indicated in your questionnaire that

3     you filled out about two weeks ago that you had some

4     knowledge of this case?

5     A       Yeah.

6     Q       If I understand, you live in Howland?

7     A       I do.

8     Q       And this, you're aware that the case occurred up in

9     Howland?

10    A       I was, yes.

11    Q       And you paid, I would imagine, fairly close

12    attention to the first newspaper article that came out?

13    A       Absolutely.  Just to make sure, I mean, it wasn't

14    somebody I know.  Yeah.

15    Q       And from time to time you would, I take it, look at

16    the headlines or maybe some of the articles?

17    A       Sure.

18    Q       And you would have followed this case a lot because

19    it occurred in Howland?

20    A       Right.

21    Q       And because we live in a fairly small community,

22    sometimes it's amazing how small the whole world is,

23    especially in this area, in the valley.  This case was

1   discussed at work with coworkers?

2   A       Yeah.

3   Q       Coffee hour?

4   A       Yeah.

5   Q       Or coffee break?

6   A       Sure.

7   Q       Conversation.  So did you find out, did you pay

8   attention to what occurred to the other person that was

9   charged in this case?

10  A       No, I didn't.

11  Q       Okay.

12  A       I just vaguely know.  But I don't know what happened

13  to him.

14  Q       What do you recollect?

15  A       I recollect that he, he was there when the shooting

16  happened.  But I don't even know when he came to trial if he

17  was, what his punishment was, you know.

18  Q       Okay.

19  A       I didn't follow that.

20  Q       Nobody mentioned that at work or on the radio or

21  anything?

22  A       No.  Because it was after.  When we talked about it

23  it was like when it first happened.  Hey, a guy was shot in

1    Howland, did you hear?  That's the kind of conversation it

2    was.

3    Q        Was there talk about why the shooting occurred?

4    A        No.

5    Q        You had indicated in your questionnaire, I think,

6    that the victim had been killed for insurance money?

7    A        That's right.  That's right, I did.

8    Q        Now, and I take it you haven't, you stayed away from

9    the newspapers and the TV and radio?

10   A        Yeah, basically I do.

11   Q        And you understand there's a reason for that?

12   A        Sure.

13   Q        As you look around the courtroom there's nobody here

14   from the news media today.  But as the trial progresses I

15   expect we'll be seeing TV crews and reporters coming in.  And

16   the thing is, they'll be here for two minutes.  They can't

17   film the jurors.  But they film the other participants.  And

18   they'll try to do a whole article based on the few minutes

19   that they're here.  And of course you realize they'll have

20   missed everything that occurred, all the questions that were

21   asked and answered before they got here and after they leave.

22          So their story, not because they want to slant it

23   that way, but it's going to maybe be totally out of

1    proportion to what happens, totally misrepresented?

2    A        Sure.

3    Q        So it's important that you put aside whatever you

4    remember hearing or reading and make your decision in this

5    case based solely on what occurs in this courtroom from the

6    testimony of the witnesses and the exhibits that are admitted

7    and the instructions of law given to you by the Judge; you

8    can do that?

9    A        Yes, I can do that.

10   Q        It's like going back to school and starting with a

11   clean slate?

12   A        Right.

13   Q        Whatever happens here it has to be written in this

14   classroom, in this courtroom?

15   A        I understand that.

16   Q        Because that's only fair to both sides?

17   A        Definitely.

18   Q        Now, the second issue here is this issue of the

19   death penalty as a possible punishment.  Now, I understand

20   that you've struggled with this concept of the death

21   penalty --

22   A        Very much.

23   Q        -- as a punishment?  And you've changed your opinion

1   about it somewhat over the years?

2   A       Sure.

3   Q       The first time you learned this was a potential

4   death penalty case was when?

5   A       When I came for my --

6   Q       A couple weeks ago?

7   A       Yeah.

8   Q       And before that, I take it you've had discussions

9   with family members, friends, organizations with your view on

10   the death penalty?

11   A       Right.

12   Q       Can you tell us how that, what that view was and how

13   that changed over the years?

14   A       Well, when we sat down and talked about it prior to

15   like someone getting a death penalty I would say, I don't

16   know that we, I have that right to ever say that someone

17   should die before their time, you know.

18       But since then, I mean, like I look at Timothy

19   McVeigh and I stated him in my, I agreed with that because

20   he, there was no shadow of a doubt, he did what he did.  And

21   he was guilty and --

22   Q       I think you also mentioned 9/11?

23   A       Right, right.  To me those --

1    Q       With terrorists?

2    A       Terrorists.  I mean, those are big things.  And I,

3    I, that's where I feel an eye for an eye does fit.  But there

4    would have to be, I would have to know the facts.  There

5    would have to be no shadow of a doubt.

6    Q       You talk about shadow of a doubt.  We'll get to that

7    in a little bit.  But you understand that's not the test in a

8    criminal case.  The test that we use, the burden of proof is

9    proof beyond a reasonable doubt.  It's not 100 percent proof.

10   It's not beyond all doubt.  But we'll talk about that

11   concept.  But the Judge will define that term for you.  And

12   you would have to follow the Judge's instruction of law.  Do

13   you think you would be able to do that?

14   A       I think so.

15   Q       Now, you filled this form out about two weeks ago,

16   if I remember?

17   A       Right.

18   Q       And you've had the last two weeks to think about the

19   death penalty as a punishment?

20   A       I have.

21   Q       And how it, it might affect you on this particular

22   case.  Now, your view as the death penalty being proper in

23   certain cases, you mentioned cases of mass murder and cases

```
 1   involving terrorists you felt, you now feel that that would

 2   be an appropriate punishment for those types of people?

 3   A        That's right.

 4   Q        And I imagine it would be in those cases where

 5   you're convinced that their guilt has been proven using your

 6   reason and common sense?

 7   A        Right.

 8   Q        To a moral certainty?

 9   A        That's right.

10   Q        Now, you understand that the charge in this case

11   isn't one of mass murder.  It's not one of terrorism.  The

12   charge here, the Defendant is charged with planning with

13   another person, a fellow by the name of Nate Jackson, to kill

14   her ex-husband for insurance money, and in the course of it a

15   house was burglarized.  There was a trespass into the house.

16   There was an aggravated robbery, that's charged.  Use of

17   force or threat of force against another person.  And that a

18   working gun was used as a charge.  And that a car was stolen

19   in the course of this.  Okay.  This isn't one of those types

20   of cases that you had mentioned.

21   A        Right.

22   Q        Now, I notice also your religion, you're catholic;

23   right?
```

1    A        I am.

2    Q        And the Catholic church, if I remember, has taken a

3    position against the death penalty as a punishment.

4    A        Right.

5    Q        And I notice that you're, you're active in the

6    church. I believe you're, you're the Eucharistic minister?

7    A        Yes, I am.

8    Q        So do you think that the church's position would

9    affect your ability to make a decision in this case?

10   A        No.

11   Q        You make your own decision?

12   A        I would make my own decision.

13   Q        Now, we've had a number of people come in here and

14   tell us, you know, I believe in the death penalty as a

15   punishment.  I know we've had some people come in and -- let

16   me back step a minute.  You agree it's, it's important that

17   both sides get a fair shot in this case?

18   A        Absolutely.

19   Q        And the death penalty is not, the case will be tried

20   in two different phases.  You read that handout downstairs?

21   A        I did.

22   Q        The case will be tried in two different phases.  The

23   first phase deals with guilt or non guilt.  And if the jury

1    comes back with a finding of guilty of the charge of

2    aggravated murder and one or more of these special findings

3    of fact, that the aggravated murder was committed in the

4    course of an aggravated robbery with prior calculation and

5    design, and that the aggravated murder was committed in the

6    course of an aggravated robbery, with prior calculation and

7    design, then we would move on to the second phase; right?

8         And in the second phase the issue would be not guilt

9    or non guilty, because you've already decided that, but

10   rather the issue would be what's the appropriate punishment

11   for this Defendant for these crimes, right, or for this

12   crime?

13   A        That's correct.

14   Q        You understand there's only one killing but two

15   separate theories that the State is allowed to pursue?

16   A        I understood that, yes.

17   Q        And in the second phase you understand that you can

18   hear the same evidence or more evidence presented, and you

19   would have to do a balancing test.  Okay.

20        On the one side of the scale, you've got the special

21   circumstances, the aggravating circumstances or special

22   findings of fact that you would have found in the first phase

23   attached to the aggravated murder, the prior calculation and

1    design of the aggravated burglary or the prior calculation

2    and design of the aggravated robbery; right?

3    A        Okay.

4    Q        On the other side of the scale could be what we call

5    mitigating factors.  Mitigating factors, we don't know what

6    they are at this point because they're not relevant at this

7    point, but these are factors that could be presented in favor

8    of the Defendant that would work against the death penalty as

9    a possible punishment.  And if you and the other 11 jurors

10   weigh these things and you find that we proved beyond a

11   reasonable doubt the aggravating circumstance or

12   circumstances outweigh these mitigating factors, then you

13   must return a verdict for the death penalty.  Okay?

14        Now, you understand the death penalty is not an

15   automatic punishment for somebody who's been convicted of

16   aggravated murder with specifications.  You've got to hear

17   testimony and evidence in the second phase and do this

18   balancing test.

19        Now, it wouldn't be fair to the Defendant if

20   somebody would come in here and say, you know, I believe that

21   anybody who commits murder with prior calculation and design,

22   or they planned it for profit, that person should always get

23   the death penalty, you know, and I'm always going to vote

1    that way no matter what.  You can't convince me any, I don't

2    care about any mitigating factors, I think that should be the

3    punishment all the time and that's the way I'm going to vote.

4    It wouldn't be fair to the Defendant for somebody to come in

5    and sit on the jury like that; right?

6    A       I agree.

7    Q       And by the same token, we've had people come in and

8    say, you know, I'm in favor of the death penalty as a

9    punishment, but I can't participate in the death penalty

10   verdict because of my personal beliefs.  Some folks would

11   come in and say, I don't believe in the death penalty as a

12   punishment and I would never vote for the death penalty.

13           There are also people who come in -- and it wouldn't

14   be fair to have those folks on the jury either for the State;

15   right?

16   A       That's correct.

17   Q       Because we wouldn't get our fair day in court.  We

18   also have people that come in and say, you know, I believe in

19   the death penalty as a punishment.  I think we should have

20   the death penalty in our system for certain crimes, it's just

21   that I can't personally partake in that decision.  I can't

22   personally sign that guilty verdict form in the first phase

23   knowing that if I did the person would become eligible for

1  the death penalty in the second phase.

2      And we have other people who come in and say, well,

3  I can sign that guilty verdict in the first phase but when we

4  get to the second phase I just could never, ever sign the

5  verdict for the death penalty in the second phase, if I find

6  that it's an appropriate verdict that the State met its

7  burden of proof beyond a reasonable doubt that the

8  aggravating circumstances outweigh the mitigating factors.  I

9  just can't personally do it.  Other people can do it, but I

10  can't do that.  So that's why we ask these types of

11  questions.  Because I know you've probably given it a lot of

12  thought in the last two weeks since you filled out that

13  questionnaire.

14      Having had time to think about it, knowing what kind

15  of case, what the charges are in this case, do you think that

16  your, your feelings about the death penalty and the type of

17  case that it would be in, would it substantially affect your

18  ability to sign a guilty verdict in the first phase if we

19  prove beyond a reasonable doubt the elements of the crime,

20  the essential component parts of the crime, like the

21  ingredients in a recipe, the crime of aggravated murder and

22  these specifications if we prove that knowing that it would

23  make the Defendant eligible for the death penalty in a second

1    phase.

2    A        Okay.  Could I?

3    Q        Sure.

4    A        Sure.

5    Q        I'm turning the floor over to you.

6    A        I could, yes.  I would be okay.

7    Q        You could sign the death verdict?

8    A        I could sign it, yes.

9    Q        Now let's say we get to a second phase.  You're in

10   there and you're determining what the appropriate punishment

11   is.  And when you start out you've got to consider all the

12   penalties equally.  There are four possible punishments.

13   A        Right.

14   Q        But if we meet our burden of proof in that second

15   phase and we convince you beyond any reasonable doubt that

16   the aggravating circumstance or circumstances outweigh

17   whatever mitigating factors are presented beyond a reasonable

18   doubt, then you understand you have to return a death penalty

19   verdict under the law?

20   A        Okay.

21   Q        Now, you understand it's entirely up to you how much

22   weight to give these particular circumstances and factors.

23   You can determine something weighs a whole lot of weight,

1    like maybe a ton.  You can also decide that something has

2    about as much weight as a feather.

3    A       Okay.

4    Q       Knowing that, if we met our burden of proof and you

5    were convinced that the death penalty was the appropriate

6    punishment under the facts and the law, would you be able to

7    sign that verdict form for the death penalty?

8    A       Yes.

9    Q       And I know it's a tough thing to ask because you

10   don't know what the facts are in this case.

11   A       Right.

12   Q       You haven't heard any facts.  But if we went through

13   this whole trial, and a couple weeks go by and then when we

14   get -- let's say you get a guilty verdict in the first phase

15   and we go to the second phase.  And we get in there and

16   there's more testimony and evidence, and more instructions of

17   law.  And you're sequestered with the other jurors.  And you

18   decide they've met their burden of proof.  And then get, you

19   sit there and say, gosh, I've gone through this whole trial

20   and I told them I can do it, and when it comes right down to

21   it I just can't.  We wouldn't have gotten a fair shake;

22   right?

23   A       That's right.

1    Q        That's why I ask you to search your mind and your

2    heart and tell us if you think you would be able to sign that

3    death penalty verdict form.

4    A        Yeah, I probably would be able to.

5    Q        Fair enough.  Now let me get to our regular

6    questions.

7    A        Okay.

8    Q        You understand that the Defendant is charged here,

9    she's not charged with being the trigger person in these

10   crimes, she's charged with being a complicitor.  Somebody who

11   solicits or procures another person or plans with another

12   person or aids and abets, helps another person in committing

13   another offense.

14   A        Okay.

15   Q        And you, I believe you learned through that form

16   downstairs, that handout and the Judge's talking to you

17   before that the Defendant is charged with four different

18   things.  Okay.  We've got four separate crimes.  The two

19   counts are separate charges of aggravated murder and attached

20   to those counts of aggravated murder are those specifications

21   that we had mentioned.

22            There are two counts of, there's a count of

23   aggravated burglary with a firearm specification and a count

1    of aggravated robbery with a firearm specification.  And each

2    of these crimes is composed of certain elements, as I said,

3    like the ingredients in a cake.  You've baked a cake in the

4    past?

5    A       Oh, yeah.

6    Q       Let's take a chocolate cake.  I like chocolate cake.

7    It's easy.  The ingredients are fairly easy.  Each, each

8    recipe has its own set of ingredients.  The same thing with a

9    crime.  Each crime has its own ingredients, and we have to

10   prove those beyond a reasonable doubt.  Okay.  The Judge is

11   going to instruct you at the end of this case as to those

12   elements or ingredients, and you're bound to follow his

13   instructions of law.  I'm going to give you a for instance.

14           Let's take the crimes of aggravated murder.  There

15   are two separate charges or theories here of aggravated

16   murder.  One is with prior calculation and design, and the

17   other is a felony murder charge.  That the purposeful killing

18   occurred during the course of a burglary and/or an

19   aggravated, an aggravated burglary and an aggravated robbery.

20           Let's take this crime with prior calculation and

21   design.  We would have to prove that it happened on or about

22   a certain date, in this case December 11th, 2001.  The second

23   element that we might have to prove here would be what we

1    call venue, that it happened in this county, in Trumbull

2    County, Ohio.  Okay.  That's why you may get sick of hearing

3    that question.  It's going to be asked a lot.  But we, that's

4    why we can try the case in this courthouse rather than up in

5    Cuyahoga or down in Franklin County.

6            The third element is identification.  That the

7    person who committed the crime is the Defendant.  Somebody is

8    going to point her out.  The fourth element would be that she

9    acted purposely, basically on purpose.  But the Judge will

10   give you a detailed legal definition at the end of this case.

11   Fifth is that she caused the death of a living person, a

12   fellow by the name of Robert Fingerhut.  And sixth:  That she

13   did it with prior calculation and design, which used to have

14   a term in the old law called premeditation which folks are

15   familiar with, but the law changed a number of years ago.

16   And it requires some advanced planning.

17           So, for example, let's say I dropped my pen and I

18   catch it.  That would be a reflex.  There's no planning

19   involved.  But let's say I drop my pen and I look down and

20   say oh, gosh, I dropped my pen, maybe I better pick it up.

21   So I bend over and I pick it up.  And that requires some

22   advanced planning.

23   A       Okay.

1    Q        So that's an example of elements of the crime.  I
2    mentioned the specifications.  The special findings of fact
3    that the jury has to consider, it's attached to each charge
4    of aggravated murder.  It's that the aggravated murder was
5    committed during an aggravated burglary, and the Defendant
6    committed the aggravated murder with prior calculation and
7    design.  And the second special finding is it was committed
8    during an aggravated robbery, and the Defendant committed the
9    aggravated murder with prior calculation and design.  Okay.

10        Then we've got the aggravated burglary and the
11   aggravated robbery charges.  Folks sometimes use those terms
12   interchangeably on the street, but in law it has very
13   specific meaning.

14        When we talk about an aggravated burglary generally
15   what we're talking about is break, is trespassing in an
16   occupied structure, like trespassing in a house where people
17   live.  And you go in with, the perpetrator goes in with the
18   intent to commit some type of offense, like an aggravated
19   murder or theft offense or something.  And the perpetrator
20   can be armed with a deadly weapon, like a gun.  And the
21   victim can be seriously harmed.

22        With an aggravated robbery, rather than a structure
23   like a house, we're talking about the use of force or threat

1    against the person for some reason, maybe to steal something.

2    And the victim can be seriously harmed and the perpetrator

3    can have a weapon, okay, a deadly weapon, like a gun or a

4    knife or something like that.

5         Then there are those specifications that I

6    mentioned, the special findings that a loaded working gun was

7    used, okay, to commit the crime.  So those are basically the

8    charges that we're talking about.

9         Now, do you understand that there's certain key

10   concepts that we're, certain protections that we're afforded

11   under our system of justice in this country.  And one of

12   those is, there's something that's guaranteed to everybody,

13   it's called the presumption of innocence.  And you understand

14   that this Defendant is presumed to be innocent, as are all

15   other defendants tried in this courtroom?  That presumption

16   of innocence, it acts like a cloak shielding her all through

17   the course of this trial.

18   A      Okay.

19   Q      Until all the evidence is presented and you get

20   together with the other jurors back in your jury room and you

21   deliberate and you find that we've met the burden of proof

22   proving the elements beyond a reasonable doubt, then that

23   presumption of innocence would be gone.

1    A       Okay.

2    Q       Okay.  You would afford the Defendant that

3    presumption of innocence?

4    A       Okay.

5    Q       Now, there's something else.  There's an important

6    concept called proof beyond a reasonable doubt.  That's the

7    burden of proof.  It's a very heavy burden of proof.  It's on

8    us, the people of the State.  Okay.  And there are different

9    burdens of proof in the law.  In a civil case it's whoever

10   tips the scale a little bit is going to win, a preponderance

11   of the evidence.

12           But proof beyond a reasonable doubt, the Judge will

13   give you a detailed legal definition of that at the end of

14   this case.  But quite simply, it requires the use of your

15   reason and your common sense, something that you use as a

16   mom.  You used it in your daily life at work?

17   A       Yep.

18   Q       You use it at church?

19   A       Yep.

20   Q       Here; right?

21   A       Right.

22   Q       That's something you're used to doing, using your

23   reason and common sense.  And we've got to convince you of

1  the truth of the charge to a moral certainty.  Okay.  There

2  are different examples that are given, but one example is the

3  use of a box.  Okay.  We've got to fill that box up with

4  evidence.  In a civil case they've got to fill it just a

5  little bit over halfway with evidence.

6          In a criminal case we got to fill it pretty close to

7  the top.  It's not 100 percent proof.  We don't have to fill

8  it all the way to the top with evidence.  Just so that you're

9  personally firmly convinced of the truth of the charge based

10  on that evidence.  And you and the other jurors may pick a

11  line somewhere on that box.  You may not all agree where that

12  line may be, but it's going to be pretty close to the top.

13  It's not beyond a shadow of a doubt.  You used that term in

14  your questionnaire.  That's a good movie title for an Alfred

15  Hitchcock movie, but there's no such animal in criminal law;

16  do you understand that?

17  A        I do.

18  Q        And the Judge is going to instruct you as to the

19  law, as to our burden of proof.  But you'll follow the

20  Judge's instruction; right?

21  A        Right.

22  Q        You're not going to come in with your own burden of

23  proof and force us to a higher standard than what the law

1    requires?

2    A         No, I don't think.

3    Q         Okay.  Now, there are different types of evidence

4    that we can use in proving the elements of the crimes

5    charged.  There is what we call direct evidence where

6    somebody can come in and testify from the use of his or her

7    five senses as to what they've learned.  For example, I heard

8    the gunshot and it was loud.  I tasted the liquid and it was

9    bitter.  I smelled the smoke and it was acrid.   I touched

10   the stove and it was hot.  Okay.

11         There's another type of evidence that we can use.

12   It's just as good as direct evidence.  And it's sort of a

13   roundabout type of evidence.  It's where you're presented

14   with a set, with a fact or set of facts and then you're asked

15   to draw a logical conclusion to another fact or set of facts,

16   because that is deductive reasoning.  And we call that

17   circumstantial evidence.

18         Sometimes folks hear that, like old Perry Mason or

19   Law and Order or -- not Law and Order, LA Law, those old

20   reruns that we had.  And they say, oh, it's only

21   circumstantial evidence.  But they really don't know, the

22   writers don't know what they're talking about on those shows.

23         I'm going to give you a for instance of that.  Let's

1   say you lived in a two-story house and you go to bed at night

2   and you go up to your bedroom on the second floor, you look

3   out across the neighborhood through your bedroom window and

4   it's a beautiful evening.  The moon is beaming.  The stars

5   are twinkling.  There's not a cloud in the sky.  And as far

6   as you can see across the neighborhood everything is dry.

7           So you close the blinds.  You get into bed.  And

8   before you fall to sleep you hear on the radio the announcer

9   saying, you know, folks, there's a cold front coming in

10  tonight and we're going to have a storm.  And you fall

11  asleep.

12          Some time during the night you're awakened.  You

13  look toward the window but you can't see outside because the

14  blinds are drawn, but you see a flash of light outside.  And

15  then a couple of seconds later a rolling boom in the sky in

16  the distance.  And then a little bit soon after there's

17  another flash of light outside and a closer in time boom.

18  And then all of a sudden there's a great big flash of light

19  outside and a great big ripping, roaring, cracking boom above

20  the house, and pitter-patter on the roof and a drumming sound

21  and you fall back asleep.

22          And sometime after that you awaken.  You go to the

23  window, open the blinds, you look out.  It's a nice day.  The

1    sun is shining.  There's not a cloud in the sky.  But as far

2    as you can see where it was dry the night before it's soaked

3    outside.  The streets are running with water.  The drops of

4    water are dripping off the leaves of the tree.  It's like

5    almost flooding outside.  And there's no firehydrant nearby

6    where any car can hit it.  And all the rooftops are all wet

7    as far as you can see.  You know what happened during the

8    night, don't you?

9    A       Absolutely.

10    Q       What happened?

11    A       It rained and it stormed.

12    Q       Right.  There was a thunderstorm.  And you know that

13    beyond any reasonable doubt, don't you?

14    A       That's right.

15    Q       Now, there's room in there for some possible or

16    imaginary doubt, isn't there?

17    A       Yeah.

18    Q       You can imagine that Alf and his martian buddies

19    flew by in a flying saucer and put on a sound and light show

20    and sprinkled the ground with stuff.  But that would be

21    foolish or imaginary doubt, wouldn't it?

22    A       Right.

23    Q       Now, there are some limits to circumstantial

1    evidence.  Based on what you observed and heard, you wouldn't

2    be able to tell how long the rain lasted.  You don't know how

3    much rain.  You didn't measure it to tell how much rain fell.

4    But you know beyond any reasonable doubt that there was a

5    thunderstorm; right?

6    A        That's right.

7    Q        Now, we can prove our case, the elements of our case

8    with circumstantial evidence.  Okay.  And if you believe that

9    that circumstantial evidence proves the elements by proof

10   beyond a reasonable doubt, then you can find the Defendant

11   guilty; do you understand that?

12   A        I understand.

13   Q        Now, I think you would agree that oftentimes when

14   serious crimes are planned they're not planned in public in

15   front a whole lot of people for the whole world to hear;

16   right?

17   A        Right.

18   Q        If somebody is going to plan an aggravated murder or

19   something like that, they're not going to shout it to the

20   whole world from the courthouse steps at high noon?

21   A        Absolutely.

22   Q        And you wonder sometimes how can we tell what

23   somebody is thinking.  You may be able to look at

1    circumstantial evidence if we have it.  For example, if you

2    have letters that were written or phone calls that were made,

3    that could be circumstances of what a person was thinking at

4    the time; right?

5    A       Right.

6    Q       Now, I think you would also agree that oftentimes

7    criminals aren't rocket scientists.  They may not be the

8    brightest people in the planning of their crimes or the

9    commission of the crime.  I'm sure you've heard over the

10   years of a bank robber who goes in with a stick up note on

11   the back of an envelope, hands the note to the teller and

12   says, "Give me all the money."  He gets the money at gun

13   point, runs out and leaves the note behind.  And they turn

14   the envelope over and there's his name and address; right?

15   A       Right.

16   Q       Or the burglar who climbs into the window and drops

17   his wallet with his identification inside; right?

18   A       Right.

19   Q       Sometimes you would agree criminals can be really,

20   really stupid; right?

21   A       I agree, sure.

22   Q       Now, and I take it you believe people should be held

23   accountable for their actions; right?

1    A        I do, yes.

2    Q        Couple other things.  You understand that you can't

3    take notes during the course of the trial.  If you watch

4    Court TV, sometimes in different jurisdictions in different

5    states sometimes jurors are allowed to take notes.  Sometimes

6    they're allowed to submit questions to the judge to have, to

7    ask to the witnesses.  That doesn't happen here in Ohio.  The

8    judges don't let jurors take notes because they want the

9    jurors to pay close attention to the witnesses, observe their

10   demeanor as they testify.  And rather than getting distracted

11   by notes and maybe having someone say, well, I took this

12   note, and somebody says, well, I took that note, and

13   emphasizing too much of what was written.  So you understand

14   you're sort of --

15   A        Sure.

16   Q        -- stuck without notes.  And you're stuck with the

17   questions that we ask.

18   A        Okay.

19   Q        There may be something, some questions you may have

20   at the end of the case that never gets asked.  And because

21   we're lawyers, we tend to gear our questions toward the

22   elements.  The prosecutors may go toward building these

23   particular elements, establishing facts that will show these

1    elements.  The defense may try to tear down the elements.

2    Okay.  But you may have a special interest.  Like, let's say

3    you were interested in footwear.  Let's say you sold shoes

4    and you wondered what somebody was wearing at a certain time.

5    If it didn't have any bearing on the elements of the case,

6    you understand you would still be able to return a conviction

7    even though nobody ever asked or answered a question about

8    footwear.  Like my wife might have a thousand pairs of shoes

9    it seems like.

10                    MR. INGRAM:  That's less than a trillion.

11   Q        Less than a trillion.  But I don't know if you're

12   stumbling over them all the time.  But a lot of shoes.  But,

13   you know, people sometimes have interests in those things.

14   But you understand that type of question may never get asked

15   and answered?

16   A        I understand.

17   Q        Another thing is, there aren't going to be any

18   instant replays of the testimony.  And folks often ask the

19   question, can we get the testimony of certain witnesses at

20   the end of the case?  That's not going to happen here.  Our

21   court reporters are very good.  Okay.  But we don't have a

22   million dollars worth of recording equipment and Stenographic

23   equipment and a whole lot of stenographers to get instant

1   transcripts like the O.J. Simpson case; right?

2   A       Yeah.

3   Q       So I expect the Judge in that case is going to tell

4   you, as he does in all of the trials, you're going to have to

5   rely on your collective recollection.  You and the other 11

6   jurors are going to have to pay close attention and remember

7   the testimony.  And unlike TV, you don't get the instant

8   replays like football or baseball games of the testimony.  Do

9   you think you would be able to do that?

10  A       Yes.

11  Q       Another thing that may sound silly is, you can't go

12  out to the scene to investigate on your own.  We had a juror

13  do that in a case.  Probably watched too many Matt Lock

14  episodes.  And there's some movies where they have the jurors

15  go out or one juror go out and investigate a case, and that's

16  fine for TV and Hollywood movies, but in real life it would

17  result in a mistrial.  And we don't want to do it all over

18  again; right?

19  A       Right.

20  Q       Now, there's something called sequestration.  At the

21  end of the first phase of the case when the evidence is all

22  in and the Judge has instructed you on the law you and the

23  other 11 jurors are kept together while you deliberate.  And

1    each jury is different.  I've had juries come back in an hour

2    and a half in the first phase.  I've had juries take up to

3    five days on the first phase.  And you take as long as you

4    need to deliberate.  Because you're kept together.  You're

5    not allowed to go home.  The Court will put you up in a hotel

6    and provide the meals and stuff like that.  And you only

7    discuss the case with the other jurors when you're all

8    together.

9            Now, let's say you and the other jurors return a

10   guilty verdict in the first phase of aggravated murder with

11   one or more of these specifications, these special findings,

12   and you go on to the second phase, there would be a break in

13   between, maybe a few days or a week or something.  You come

14   back for maybe another one to three days for the second

15   phase, and then you get instructions of law and you would

16   deliberate again.  And you would be sequestered again.  And

17   again, it would take as much time as it needs.  Each jury

18   again is different on that.

19           Would the sequestration bother you?  Would it be an

20   undue hardship on you in any way?

21   A        No, it would be all right.

22   Q        Let me take a look at this for one second.

23   A        When I first answered it my husband had surgery.

1   That's why I didn't know anything about the case.  Because

2   from November through January I was back and forth to

3   Cleveland with him.  So he had surgery.  And then right after

4   my first time I was here he was told to stay off his foot.

5   But he's back on.  He'll be all right.

6   Q       So that won't cause you any problems?

7   A       No.  He can take care of himself.

8   Q       And I take it your knowing Jerry isn't going to

9   effect you in any way?

10  A       No.

11  Q       If you have to, if you rule, if you have to rule in

12  his favor if we don't meet our burden of proof --

13  A       It would be fine.

14  Q       -- you won't feel bad about that?  But if we meet

15  our burden of proof and you have to come back with a verdict

16  against his client, that won't affect you?

17  A       No.

18  Q       Now, during the course --

19              MR. INGRAM:  It did cost me Easter dinner.

20  A       Sorry, Jerry.

21              MR. INGRAM:  That's all right.

22  Q       Now, during the course of the trial as the

23  Defendant's chair is turned towards you and perhaps as you

1    become more acquainted with her, you may feel some sympathy

2    for her.  And my question to you is this:  When you go back

3    inside your jury room to deliberate on your verdict, can you

4    lay aside all thoughts whatsoever you might have of sympathy

5    for the Defendant and be conscientious in your deliberations

6    and base your verdict on the testimony and evidence that you

7    receive and the instructions of law given to you by Judge

8    Stuard and lay aside all thoughts of sympathy for the

9    Defendant?

10   A        Just look at the facts, yeah.

11   Q        I take it you would agree that we have certain

12   obligations as citizens in this country to make sure our

13   system works.  For example, if it's election time we learn as

14   much as we can about the issues of the candidates and we go

15   out and cast a ballot; right?

16   A        That's right.

17   Q        To make sure our system, our Democratic system

18   works, Republican, whatever?

19   A        Right.

20   Q        And if it's war time and we have to -- we may have

21   to serve in the military.  In fact, we've got young people

22   overseas in several places today.

23   A        Right.

1    Q        Another obligation of citizenship is when we're

2    summoned in as jurors it may cause some hardship on our daily

3    life, some inconvenience.  But in this most important, most

4    serious of criminal cases would you be willing to undertake

5    that obligation of citizenship and sit on this particular

6    jury?

7    A        Yes.

8    Q        Okay.  Thank you very much.  Is there anything, any

9    questions you want to ask at this point?

10   A        No, I think I'm okay.

11   Q        Now the defense will get an opportunity to ask you

12   some questions.

13                             EXAMINATION

14   BY MR. JUHASZ:

15   Q        Miss Costello, how are you doing this afternoon?

16   A        I'm fine.

17   Q        All right.  I'm the other half of the Ingram team.

18   I'm John Juhasz.  You know Jerry.  You know who Donna is;

19   correct?

20   A        (Witness nods head affirmatively.)

21   Q        It's late in the day.  It's warm in here.  And I'm

22   sure everybody is tired, so I'm going to try not to go over

23   things you've already been over.

1    A        Okay.

2    Q        But I'm sure you also understand why we're doing

3    this as it's an important thing.  If somebody you cared about

4    or if you yourself were charged with something sitting over

5    there --

6    A        Exactly.

7    Q        -- I'm sure you would want somebody to take the same

8    kind of time that we have.  So I hope you humor us in that

9    regard and put up with our questions.

10           I think you told Mr. Bailey the first time you knew

11   this was a capital case is when you were first assembled down

12   in Judge Logan's courtroom; correct?

13   A        That's correct.

14   Q        I note in your questionnaire that you put some

15   things in there about the news gets talked about at the water

16   cooler and --

17   A        Sure.

18   Q        And let me ask you about a couple different things

19   about what you may have heard about the case.  And when I do

20   that, understand that there is of course nothing wrong with

21   having heard about the case.  Because when you read that

22   newspaper article or when you had some conversation, you

23   didn't know you were getting a jury summons for this case, so

1   there's nothing wrong with any of that.  But we do have to

2   talk about it because you have heard something about the

3   case.  All right?

4         And first let me ask you, when you were down in

5   Judge Logan's courtroom on April the 8th, I think it was, did

6   you hear anybody in the courtroom other than when Judge

7   Stuard came out and gave his instructions, did you hear

8   anybody else talking about the case or about Miss Roberts or

9   Mr. Jackson?

10  A       No.

11  Q       Since you've been, you've had to come back to the

12  courthouse for today's festivities, have you heard Miss

13  Roberts or Mr. Jackson, the case discussed in the courthouse

14  since you've been back here today or -- I can't remember if

15  you were here yesterday or not.

16  A       I wasn't here yesterday.  And the answer is, no.

17  Q       Very good.  Understandably, because somebody was

18  shot and killed in Howland and because you live in Howland,

19  you sort of read that first article.  But then if I'm reading

20  you right, and please correct me if I'm wrong, you sort of

21  lost track of the case?  You weren't following it closely?

22  A       That's correct.

23  Q       All right.  I think I did hear you mention that, I

1    think you said, I don't even know what Mr. Jackson's sentence

2    was; correct?

3    A        That's correct.

4    Q        But you do -- I'm reading into this.  I'm making one

5    of Mr. Bailey's inferences.  But I'm reading into it that you

6    do know he was convicted?

7    A        I know he had a trial, yes.

8    Q        Do you know what the outcome of that trial was?

9    A        I don't.

10   Q        Is there anything about any of those things that

11   we've talked about, that you've read about or heard about

12   that makes you think right now that Donna Roberts is guilty?

13   A        No.

14   Q        So Mr. Ingram and I would not sort of have to undue

15   any conception you have in your mind?

16   A        No.

17   Q        Because you live in Howland, and I think I know the

18   answer of this from your questionnaire but I'm going to ask

19   you because you live in Howland, so humor me for a second.

20   Do you know Officer Monroe?  I think he also may go to your

21   church.

22   A        No, I do not know him.

23   Q        This is a death penalty case, as you know, or what

1    we lawyers call a capital case.  And I want to take a second

2    and talk about that.  I don't want to rehash things you've

3    already been through, but I do have a little bit of a concern

4    that I want to talk about with you first.

5         We send summons out to people to come and do jury

6    service.  And I agree with Mr. Bailey, it's a high calling, a

7    high civic calling.  And we appreciate your willingness to

8    serve.

9         With that said, when we send you those summonses we

10   bring you in here and we have our own set of rules that we've

11   been operating by and because you're not a regular

12   participant in the court system you may not know those rules.

13   One of them is that we have to talk about everything that

14   could potentially happen in a case at the beginning of the

15   case.  Do you see that?

16   A       Okay.

17   Q       We couldn't sit here and simply ask you questions in

18   a case like this -- I'm sorry.  Let me interrupt myself,

19   which I do all the time.  Do you feel comfortable that you

20   understand basically how a capital case works?

21   A       Yes.

22   Q       Let's say hypothetically, whether it's this case or

23   some other case, that we brought in jurors and said, and we

1    talked to them about the presumption of innocence.  And we

2    talked to them about any publicity they may have heard.  And

3    they all said, I can be fair, I can afford this person the

4    presumption of innocence and make the State prove the case.

5    And so in this hypothetical case the State does prove its

6    case.  They prove the person guilty of the aggravated murder

7    they charged him with.  And they proved the person guilty of

8    that special circumstance, or specification we call it, to

9    make it eligible to go to the second phase.

10           And so now the Judge says, okay, folks, well, you

11   found the Defendant guilty so now we're going to have a

12   penalty phase and we're going to consider whether this person

13   gets the death penalty or one of those life sentencing

14   options.  That's a pretty bad time -- because a juror who has

15   either reservations about the death penalty or who said, oh,

16   well, I would always impose the death penalty in

17   circumstances, see, that's kind of a bad time to talk to them

18   because they already sat on the jury; am I making sense about

19   all that?

20   A        (Witness nods head affirmatively.)

21   Q        That's, that's the reason that we talk to you in

22   advance.  And here's my concern about all that.  We're

23   standing up here talking to you about the death penalty and

1       your views on the death penalty and what the law is on the

2       death penalty, and you haven't even heard any evidence about

3       whether Donna is guilty.

4       A       That's right.

5       Q       Do you have any idea that, well, if these folks are

6       all talking to me about the death penalty they must think

7       she's guilty?  She must be guilty, and we're just getting to

8       the second phase --

9       A       No, because I strongly believe anybody is innocent

10      until they're proven guilty.

11      Q       As I think you know from what you've heard and what

12      you have been told since you've been here in the courthouse,

13      the basic allegation of the Government is that Donna, who was

14      divorced from Robert Fingerhut, but after they were divorced

15      they continued to live together in Howland, where you live,

16      and to work together at the Youngstown and Warren Greyhound

17      Bus Stations, that Donna and another person by the name of

18      Nathaniel Jackson got together and made up a plan to kill

19      Mr. Fingerhut.  Okay?

20              Part of what we think the Government's evidence in

21      this case will be to try to prove those allegations are some

22      letters written by Donna and some telephone conversations.

23      And I'm going to tell you in advance that those things are

1    sexually explicit and you would probably find them to be

2    offensive.  All right.

3           Now let's take that as a given for a second.  You

4    remember what Mr. Bailey said a little while ago when he was

5    talking about the burden of proof and the presumption of

6    innocence, that they're sort of like a box?  I think he

7    mentioned a box.  You understand, don't you, first of all,

8    that Donna is not on trial for being a person who may have

9    had an extra marital affair?

10   A       I understand.

11   Q       And what we have to satisfy ourselves with, to see

12   if you can sit as a juror in this case is, can you assure us

13   that even if you have bad feelings about her, if you say, I

14   don't approve of that, I don't like that, I don't like what

15   she's done, I don't like what I'm hearing or reading, that

16   doesn't substitute for proof about whether or not she

17   committed this offense; do you see that?

18   A       I understand that.

19   Q       And if in the course of the trial you become

20   convinced, it's not a secret and nobody is going to try to

21   tell you otherwise, other than Mr. Fingerhut is dead, all

22   right, you may become convinced during the course of the

23   trial that Mr. Jackson had something to do with that death.

1    The reason I bring that up is, you appreciate that whatever

2    Mr. Jackson's involvement is, this case is about whether or

3    not Donna helped him; do you see that?

4    A       I see.

5    Q       And do you think you will be able to keep those two

6    things separate and distinct?  Because it may well be that

7    you're persuaded that Mr. Jackson did this, but the real

8    question is, did Donna help him as the law says that if

9    they're going to convict her that they must be able to prove

10   that; do you see that?

11   A       I see that.

12   Q       I'm going to try to summarize what it seems to me

13   your views are on the death penalty, only because we've

14   sullied an already beautiful afternoon and I don't want to

15   rehash everything you've already done.  But if I state

16   something wrong, stop me so that I'm clear on how you feel.

17           If I understand you, some time ago you had feelings

18   that, I don't know if anybody really has the right to take

19   anybody else's life?

20   A       That's right.

21   Q       But since then, because of things like McVeigh and

22   9/11 you've maybe changed that view a bit so that there are

23   some offenses for which you think it's appropriate to impose

1    the death penalty?

2    A        That's right.

3    Q        In a case like this, Mr. Bailey talked to you about

4    weighing the reasons to impose the death penalty against the

5    reasons not to impose the death penalty.  Fancy words we have

6    for them are aggravating circumstances versus mitigating

7    factors.  But in reality they're what I said first.

8    A        Right.

9    Q        And when you weigh those, you understand, as I think

10   Mr. Bailey made clear to you, that nobody can tell you as a

11   juror what weight to assign to those factors; you appreciate

12   that?

13   A        Yes, I do.

14   Q        So the law is not ever going to require you to vote

15   for a sentence that you don't feel comfortable with as being

16   supported by the law and the evidence?

17   A        Right.

18   Q        I take it from everything that you've said, first of

19   all, you understand if you got to a second phase what those

20   four penalties would be?

21   A        Right.

22   Q        The death and the three life sentencing options?

23   A        Right.

1    Q        Are your views about the death penalty such that all

2    of those sort of are on equal footing going into the second

3    phase, and then it would be up to the State to prove to you

4    that the death penalty was warranted?

5    A        Equal?

6    Q        Well --

7    A        Well --

8    Q        Here's what I mean.  Mr. Bailey talked to you about

9    a box.

10   A        Right.

11   Q        And I'm getting a little ahead of myself because I

12   was going to talk to you a little bit about that box, too.

13   Let's go back to the first phase of the trial first.  It's

14   like any other trial.  Okay.  When you start out that box is

15   empty because right now, for example, if you looked in that

16   imaginary box there's no evidence yet; right?  You haven't

17   heard anything.

18   A        Right.

19   Q        You as a juror have to decide whether the State

20   filled that box up beyond the line that you draw in there

21   called reasonable doubt.

22   A        Okay.

23   Q        And a criminal case is different from a lot of

1    things that we're used to dealing with in life because -- and

2    I suspect that many people think that, well, let's see, if

3    the State puts on enough evidence they win, and if they don't

4    put on enough evidence the defendant wins.

5         It's really a little bit different than that in my

6    estimation because the State has to convince you, and if they

7    do the verdict is guilty, and I guess they win, for want of a

8    better phrase.  But if they don't they lose, because they

9    didn't do what it is they said they were going to do.  Do you

10   see that?

11   A       I see that.

12   Q       And so their job at the first phase is to fill up --

13   and let's simplify it down to one charge for a second.  Their

14   job is to fill up two boxes, if they can.  One is called

15   aggravated murder and one is called a specification or a

16   special reason to consider imposing the death penalty.  Do

17   you see that?

18   A       I see it.

19   Q       All right.  If they do that, then of course your

20   verdict has to be guilty.  That's what your oath would

21   require.

22   A       Okay.

23   Q       At the second phase, if we get there, there's

1    another empty box.

2    A       Okay.

3    Q       And they now again have to prove to you by proof

4    beyond a reasonable doubt that those reasons to impose the

5    death penalty, whatever they are, outweigh reasons not to

6    impose the death penalty, whatever they are.  And again, if

7    they fail to convince you of that beyond a reasonable doubt

8    they have not met their burden.  Do you see that?

9    A       I see that.

10   Q       If they meet their burden and the death penalty in

11   your mind is appropriate, then you would sign a verdict for

12   the death penalty.  Okay?

13   A       Okay.

14   Q       If they don't fill up that box then you as the

15   jurors have to choose one of those other three life

16   sentencing options.  All right?

17   A       All right.

18   Q       So now having said all that, that's why I say, can

19   you go into that second phase with them all sort of equal,

20   because the burden is on them to prove to you that that

21   special penalty should be applied?

22   A       Yes.

23   Q       And you think you can do that?

1   A        I think so.

2   Q        I like to talk about that box for a bunch of

3   reasons.  One of them we sort of, well, actually in two ways

4   we've already addressed it.  Our conversation we just had

5   about the death penalty, and earlier when we talked about

6   publicity.  Because really what I'm asking you is, if you can

7   promise that whatever you heard about this case won't be

8   evidence in that box right now.  And I think you said it's

9   not; correct?

10  A        That's correct.

11  Q        Another thing that shouldn't go into that box would

12  be any feelings of sympathy you might have.  Okay.  In a

13  case like this you might expect to see some pretty nasty

14  crime scene and autopsy photographs, correct, in a homicide

15  case.  Not going to be pleasant to look at.

16          Nobody expects you or anybody else who sits in this

17  box to say, well, I'm not human.  I'm just an objective

18  decider of facts here.  The real test I guess is, to take any

19  feelings of sympathy that those photographs might engender

20  and say, okay, I feel real sorry that this person is dead,

21  but now my job here isn't to feel sorry for this person, it's

22  to decide whether or not they proved that she had some role

23  in it.  Do you see that?

1    A        I see that.

2    Q        Yes.  And so any feelings of sympathy you might have

3    for Mr. Fingerhut or for his family, sometimes depending on

4    the case and the circumstances and the evidence you hear, you

5    may have feelings of sympathy for the Defendant.  Those, too,

6    would be improper.  Do you see that?

7    A        I understand that.

8    Q        Not improper to have them.  Improper to put them in

9    my little box.  And do you think you can avoid that?

10   A        Separate them.

11   Q        In that little box that I keep talking about the

12   State has to try to fill it up with evidence beyond that line

13   called reasonable doubt.  We've talked about that.  One of

14   the ways you might expect them to do that would be with the

15   testimony of witnesses.  Kind of makes sense to you; correct?

16   A        That's correct.

17   Q        If you're chosen as a juror in this case at the end

18   of the case the Judge will tell you that one of your jobs is

19   to determine the credibility, the believability of the people

20   who testify.  All right.  I assume that you don't think that

21   just because somebody comes into this courtroom and takes an

22   oath to tell the truth, that everything they say is

23   necessarily going to be the truth; correct?

1    A        That's correct.

2    Q        Just as in your daily life, not everything that

3    everybody says to you is the truth?

4    A        That's correct.

5    Q        And I would assume that in your life experiences,

6    and you've had some interesting ones it seems to me from your

7    questionnaire, that you've had to resolve those dilemmas and

8    decide, is somebody telling me of the truth or aren't they?

9    A        That's right.

10   Q        The Judge will tell you a set of factors to apply in

11   deciding whether or not somebody is telling you the truth.  I

12   think you'll find, however, that many of them are things that

13   you would think about and do in your ordinary, daily life.

14   And in fact, that's part of what he will tell you:  Apply the

15   test that you use in your daily life.  And I think you can do

16   that; correct?

17   A        I can do that.

18   Q        Things like whether somebody has some stake in the

19   outcome of a case, or maybe even a stake in their testimony

20   might be things that you want to consider; would you agree?

21   A        Yeah.

22   Q        For example, if a police officer takes the stand,

23   you're not going to believe that person simply because he's a

1    police officer; right?

2    A        No.

3    Q        All right.  And I didn't mean to be silly about

4    this, but a police officer could theoretically have a stake

5    in the case because he might want to see the result of his

6    investigation, for want of a better term, vindicated.  Would

7    that make sense to you?

8    A        Yeah.

9    Q        It doesn't necessarily mean that you reject his

10   testimony.  It's just something you think about as you listen

11   to him or her deciding whether or not to believe them;

12   correct?

13   A        That's correct.

14   Q        And in fairness, if the Defendant would take the

15   stand, you would do the same thing, would you not?  You might

16   say, hey, she's got a stake in this case.  Man, this is a

17   death penalty case and they're charging her with aggravated

18   murder.  So it would be something to think about; right?

19   A        Absolutely.

20   Q        But you wouldn't necessarily reject her testimony

21   just because she's the Defendant?

22   A        No.

23   Q        That also applies, by the way -- and sometimes I get

1    some raised eyebrows about this -- with expert witnesses.

2    And an expert witness is nothing more than somebody who has

3    some specialized training or experience or education in a

4    field that maybe you or I or the jurors don't.  Okay.  It

5    could be science.  It could be medicine.  It could be

6    whatever.  And the reason I get some raised eyebrows

7    sometimes is because people go, well, if a doctor comes in

8    I'm not a doctor so I guess I have to believe everything he

9    says.  Well, no, you don't, because you can still apply

10   those tests of credibility.  Do you see that?

11   A       Yeah.

12   Q       Do you feel comfortable doing that?

13   A       I feel comfortable.

14   Q       All right.  Have you ever heard the phrase before

15   taking the Fifth?

16   A       Oh, sure.

17   Q       Sometimes that gets a little bit of, for want of a

18   better term, I guess a bad wrap in movies and TV because, you

19   know, you see some guy who you know is some big Mafia figure

20   and he goes, "I'm taking the Fifth."  And it's sort of like,

21   well, here's this guilty guy and he's not going to say

22   anything that puts himself in jail.  And that's part of the

23   Fifth Amendment.

1          But the whole premise behind it is is that any

2    citizen who's charged with an offense does not have to do

3    anything to help the Government convict them.  That's where

4    we get the presumption of innocence.  Okay.  You're presumed

5    not to have done anything.  If the Government says you do

6    something, they have to prove it if they can.  You're okay

7    with all that?

8    A          I'm okay with that.

9    Q          How do you feel about that presumption of innocence?

10   Do you think it's a good idea or do you think it's a bad idea

11   in light of some of the crime problems we have going on?

12   A          I think it's a good idea.  I truly believe that

13   you're innocent until someone proves you guilty.

14   Q          Okay.  Because of that, and I mentioned a few

15   minutes ago that the way it works is a little bit different

16   than some of our life experience.  Because of that a person

17   who's charged with a crime, whether it's Donna Roberts in

18   this case or Joe Smith in the next case, does not have to

19   take the witness stand, does not have to call any witnesses,

20   doesn't even have to have her lawyers get up and ask any

21   questions.  Do you see that?

22   A          Okay.

23   Q          That's a little bit different than what we're used

1    to.  You've got some children and you've probably had to

2    resolve some disputes in your life?

3    A        Absolutely.

4    Q        And the first thing you want to be, you want to do

5    when you're being fair is obviously hear both sides of the

6    story; correct?

7    A        Correct.

8    Q        And I think most of us always want to do that.  It's

9    a little bit different in a situation like this because of

10   how that presumption of innocence works.  Do you see that?

11   A        Yeah.

12   Q        Now, although Ingram and I could theoretically sit

13   over there and fold our arms and do crossword puzzles or play

14   Yahtzee or whatever it is we wanted to do, we probably won't

15   do that but the point is, if there's something that you are

16   expecting from the Defendant, do you understand that you kind

17   of have to dissuade yourself from thinking that way and

18   saying, now wait a minute, when I had to listen to that goofy

19   Juhasz up there on that hot afternoon I've got to think about

20   that box.  It's not a question of, did she do something or

21   not do something that I wanted to hear.  It's a question of,

22   did they fill up that box behind the line called reasonable

23   doubt.  Do you see that?

1    A        I see that.

2    Q        Now having said all that, you think that's also a

3    good idea, like the presumption of innocence?

4    A        So what I'm understanding, make sure I understand

5    that she doesn't have to take the stand to prove herself?

6    Q        Right.

7    A        That she has to be proven -- yeah, I understand.

8    Q        Okay.  How would you feel if she decided not to take

9    the stand in light of what we said about everybody wanting to

10   be fair and hear both sides of the story?

11   A        I don't know.  I don't know.

12   Q        Okay.  Everybody has got those -- most everybody who

13   gets up here has hesitations like that because of our natural

14   experiences.  The best I can ask you is, if you start to have

15   that kind of hesitation, if she doesn't do that stuff, and

16   I'm not saying whether she's going to or not.  We're talking

17   about all the possibilities.  But if she would decide not to

18   do that, can you kind of go back and say, well, I've got to

19   remember what that goofy Juhasz said.  They have to fill up

20   the box.  She doesn't pour anything into the box and she

21   doesn't take anything out of the box.  Do you see that?

22   A        Yeah.

23   Q        It's different than what we're used to.  So that's

1    why I like to spend some time talking about it.  Are you

2    comfortable with it?

3    A       I believe she has that right.

4    Q       I've got two more things to talk about, then I'm

5    done.  One is, you've heard a lot about reasonable doubt.

6    Give me two minutes to have you think about this in maybe a

7    little bit different way than you've been asked to think

8    about.

9           You've made lots of important decisions.  You own a

10   house.  You have children.  They've gone to college.  You've

11   made important decisions; yeah?

12   A       Yes.

13   Q       Whether you do it on a piece of paper or in your

14   mind's eye, you kind of make a list of pros and cons before

15   you make a decision; right?

16   A       Correct.

17   Q       You wouldn't leave here today going you know what,

18   the Mercedes dealership is open until 5:00, let me go get a

19   new Benz?

20   A       No.

21   Q       You would have to think about that; right?

22   A       Yeah.

23   Q       All right.  What we ask you to do in a case like

1   this is kind of the same thing.  When you decide whether or

2   not the State has proved their case beyond a reasonable

3   doubt, on one side of that checklist are going to be the

4   reasons why the State says you should find the Defendant

5   guilty in this or any other case.

6         On the other side are going to be doubts that you

7   have about the case, either because you thought of them

8   yourself as you listen to the evidence.  You heard Ingram and

9   I say something that made you think, yeah, I've got a doubt

10  about that.  Or you heard other jurors as you talked about it

11  back in the jury room when you deliberate.  What you have to

12  do with those doubts is analyze them.  Look at them in light

13  of all the evidence you've heard.  Discuss them with the

14  other jurors.  If you get to the first doubt and say, you

15  know what, I thought that was reasonable but now that I

16  talked about it with the other jurors, that's not reasonable.

17  I'm scratching that off my list.  That doubt is not based on

18  reason and common sense.  Okay?

19  A       Okay.

20  Q       You go through each one of the doubts that you have.

21  If you can scratch them all off as not being based on reason

22  and common sense, the State proved its case.  But if you have

23  at least one, could be more, but if you have at least one

1    doubt where you talked about it, thought about it and said,

2    no, there is no way that I can account for this doubt about

3    the State's evidence, except to say that's a doubt based on

4    reason and common sense, then you see, that if there's even

5    one of those on that side of the checklist they haven't

6    proved their case.

7            Any problem holding them to that type of a burden?

8    A       No.

9    Q       It's a pretty high burden, but that's the way the

10   law is.  Are you okay with that?

11   A       I'm okay.

12   Q       All right.  Mr. Bailey also said, said that they can

13   prove their case with circumstantial evidence.  And indeed

14   they can.  That's the law.  However, because of everything

15   that we've talked about, about reasonable doubt, you may be

16   able to draw more than one inference from the same set of

17   facts.  Do you see how that could happen?

18   A       Sure.

19   Q       I have a little story that I like to tell about

20   being at home on a late summer afternoon where the storm

21   clouds are starting to come in from the west and the wind is

22   kicking up a little bit.  And all of a sudden I hear a noise

23   in the living room.  When I run in to see what's going on the

1    cat comes running out between my legs.  I look over to my

2    left there is my son Mike with his hands over his face.  Over

3    to the right is one of my wife's Norman Rockwell plate

4    knocked off the mantel in a million pieces.  Okay.

5          Now, I suppose that the cat could have broken it

6    and it knows it's in trouble and Mike's going, oh, boy, who's

7    taking the fall for this?  All right?

8    A        Right.

9    Q        It could be that Mike was throwing the Nerf ball

10   again, you know, again and again being told, but he still did

11   it, the noise scared the cat, and Mike's going, oh, boy,

12   everybody told me not to throw the Nerf ball but I did it

13   anyway.

14         It could be that the wind from that storm came in,

15   knocked the plate off, scared the cat and Mike's going, I'm

16   going to take the fall for this and I'm completely innocent;

17   right?

18         Now, I tell that story because based upon those

19   limited facts I gave you, any one of those scenarios makes

20   sense; correct?

21   A        That's correct.

22   Q        And so in a case like that if we were to indict my

23   son for breaking the Norman Rockwell plate, while you might

1     say well, yeah, the circumstantial evidence is consistent

2     with his guilt, you also see that are other inferences, that

3     there are other reasonable inferences that can be drawn from

4     that same evidence?

5     A        That's right.

6     Q        And so we wouldn't be able to find him guilty beyond

7     a reasonable doubt in that case, would we?

8     A        That's right.

9     Q        Any problem holding the Government to that type of

10    burden when you analyze any circumstantial evidence they give

11    you in this case?

12    A        No.

13    Q        I have promised to stop and I will.  But before I

14    do, is there anything that you have thought of why you would

15    not be able to sit as a juror, or are there any questions you

16    have?

17    A        Do you have any idea when this starts?  Like --

18    Q        Well, I guess we're hoping by what, maybe the end of

19    next week Mr. Bailey is saying.  I probably have to agree

20    with that.

21    A        That will be all right.

22    Q        And I would guess a couple of weeks' involvement

23    after that.

```
 1    A        Yeah.

 2    Q        So we're talking mid May, maybe the third week of

 3    May.

 4    A        Up until the third week of May?

 5    Q        Could be.

 6    A        Like May 10th is graduation for daughter No. 2.  I

 7    definitely would be going to that.  But that's a Saturday.

 8    Is there any chance that that would fall into that weekend?

 9    Q        I would say that your chances of being, where you

10    might be sequestered?

11    A        Yeah.

12    Q        I would say that her chance of being sequestered are

13    pretty -- Mr. Becker and Mr. Bailey are saying real slim, and

14    I would tend to agree.

15    A        That's right.  That is Mother's Day.  That's my

16    present.

17    Q        Anything else?

18    A        No.

19    Q        All right.  I appreciate your time.  Thank you.

20                        MR. BAILEY:  Pass.

21                        MR. JUHASZ:  Pass.

22                        THE COURT:  You will be in the poll from

23    which this jury is selected.  I would ask you to call that
```

1  number given to you tomorrow night after 4:30.  Hopefully by

2  the middle of next week we'll have enough jurors to start

3  picking a jury.

4  A       Okay.

5              THE COURT:  I would again remind you not

6  to read anything, watch anything on TV or talk to anybody

7  until you get back.  Okay.  Thank you very much.

8         For the record, just to clean up any inadequacies on

9  some of the ones that you have passed on, we don't have

10  anything really definite from both sides, unless the reporter

11  has noted them as such, but all the ones that we have on your

12  list, you've passed for cause on; is that correct?

13             MR. BAILEY:  Yes, Your Honor.

14             MR. JUHASZ:  Yes, Your Honor.

15             THE COURT:  Okay.  See you tomorrow.

16             (Whereupon, court adjourned for the

17  evening.)

18                      *  *  *

19

20

21

22

23

1

2

3

4

5                              REPORTER'S CERTIFICATE

6

7          This is to certify the foregoing represents a true and

8     correct copy of the proceedings had in the aforementioned

9     cause as reflected by the stenotype notes taken by me on the

10    same.

11

12

13

14

15    _____

16    Richelle J. Guerrieri,
      Official Court Reporter

17

18

19

20

21

22

23

2339

1                    IN THE COURT OF COMMON PLEAS
                        TRUMBULL COUNTY, OHIO
2

3    STATE OF OHIO,                ) Case No. 2001-CR-0793
          Plaintiff               )
4                                  )
     -vs-                          ) Judge John M. Stuard
5                                  )
     DONNA M. ROBERTS,             )     **VOLUME XI**
6          Defendant              ) **VOIR DIRE PROCEEDINGS**

7

8    Capital Murder Trial held on Friday, April 25, 2003

9    BEFORE:        HONORABLE JOHN M. STUARD

10

11   AT:            Trumbull Co. Court of Common Pleas
                    161 High Street, NW
                    Warren, Ohio 44481
12

13   APPEARANCES:

14

15   On behalf of the Plaintiff:

16        Messrs. Kenneth N. Bailey and Christopher Becker,
          Attorneys at Law

17

18

19   On behalf of the Defendant:

20        Messrs. J. Gerald Ingram and John B. Juhasz,
          Attorneys at Law

21

22

23   Official Court Reporter:  Richelle J. Guerrieri

ORIGINAL

136

1                            I-N-D-E-X

2                            VOLUME XI

3

4                      INDIVIDUAL VOIR DIRE

5

6                    RODGER KILLINGSWORTH

7    EXAMINATION BY THE COURT.............................2340:6
     EXAMINATION BY MR. BECKER............................2343:22

8

9                      ROBIN SCHLAEGEL

10   EXAMINATION BY THE COURT.............................2345:6
     EXAMINATION BY MR. BECKER............................2348:6
11   EXAMINATION BY MR. INGRAM............................2394:15

12                     GARY S. PHILLIPS

13   EXAMINATION BY THE COURT.............................2444:17
     EXAMINATION BY MR. BAILEY............................2447:21
14    EXAMINATION BY MR. JUHASZ...........................2484:7

15

16                     MICHAEL P. EVANS

17   EXAMINATION BY THE COURT.............................2512:22
     EXAMINATION BY MR. BECKER............................2516:22
18    EXAMINATION BY MR. INGRAM...........................2549:6

19

20

21

22

23

1                        **FRIDAY, APRIL 25, 2003**

2       WHEREUPON,

3                        RODGER KILLINGSWORTH

4       being first duly sworn, according to law, was examined and

5       testified as follows:

6                        EXAMINATION

7       BY THE COURT:

8       Q        You read that handout that was given to you?

9       A        (Witness nods head affirmatively.)

10      Q        You are aware that we're here on the aggravated

·11     murder charge filed against this lady over there, Donna

12      Roberts.  In Ohio, a person charged with a killing of another

13      human being does not automatically stand in position facing

14      the death penalty.  It's only certain murders.  An example is

15      if a person is found guilty of aggravated murder and the

16      State proves beyond a reasonable doubt the additional factor,

17      and that is if the person murdered was our Governor, that

18      then becomes a capital murder case.

19              The case before us in this matter has what we call

20      specifications attached to the charge of aggravated murder.

21      The burden is on the State to go forward.  The defense

22      doesn't have to do anything if they don't wish to do.  Every

23      person has a right to remain silent.  The burden is always on

1    the State to prove their case beyond a reasonable doubt.  The

2    highest burden of proof that we have of the law.

3              The case is divided into two phases possibly.  The

4    State has to prove, first of all, as I said, the aggravated

5    murder charge with the specifications beyond a reasonable

6    doubt.  If they fail to do that then that would be the end of

7    the trial.  The jury would return a verdict of not guilty and

8    we all go home.  However, if they prove the necessary

9    elements then the case would go into a second phase.  And

10   during that second phase the jury is called upon to determine

11   whether or not the aggravating circumstances, as presented by

12   the prosecution, are such of a nature that beyond a

13   reasonable doubt outweigh any mitigating factors, that would

14   be reasons given to the jury as to why the death penalty

15   should not be imposed.

16             If we don't go through this questioning process

17   before we start the whole trial not knowing which, whether

18   the second phase is going to come up or not, we would have a

19   real mess on our hands when we got to that second phase.  We

20   would have people on there, for instance, that would say to

21   themselves, I believe that anyone who takes another person's

22   life should forfeit their own.  Well, such a person cannot

23   follow the law and cannot be fair to the Defendant.

1    Conversely, if a person under no circumstances could make

2    that decision, would put themselves in an issue where they

3    were called upon to make a decision, then the State could not

4    receive a fair trial.  So what these folks need to know

5    before we even start is, the personal attitude of any

6    potential juror so that if we get to that second phase both

7    sides can be assured that they are going to have a fair

8    trial.

9         So the questions will be put to you about your

10   personal beliefs on the death penalty.  Everyone holds some

11   belief about this subject, although many people may not have

12   thought about it very much.  Part of this will be to help you

13   in your own mind establish what you really feel about it.

14        You can't be right or wrong.  There's no right or

15   wrong answer.  And whatever your personal opinion is will be

16   respected by these folks.  You're entitled to your opinion,

17   but they have a right to know.

18        The second issue that they will probably inquire

19   about concerns pretrial publicity.  Many of the people that

20   were examined already have, to varying degrees, read

21   something or heard something about this case, which is not

22   unusual.  A case of this nature is going to give a certain

23   amount of publicity.  And again, the question has to be, are

1    any of the potential jurors, do they have such fixed ideas

2    about what did or didn't happen that they're not able to set

3    that aside and listen to the evidence in this case.  This

4    matter could be fairly tried.  It has to be decided upon the

5    evidence presented in this courtroom, not by what somebody

6    wrote in the newspaper or some reporter thought they had

7    heard on TV.  You get the picture?

8    A        Yes, sir.

9    Q        Fair enough.

10   A        Can I ask you one thing?

11   Q        Yes.

12   A        I've got a vacation planned for May 10th.

13   Q        May 10th?

14   A        When we started this a week and a half ago you said

15   probably three weeks and I'm hoping I can work into this.

16   Q        You have a week or two weeks?

17   A        I'm taking a week.

18   Q        I hope you're going to Hawaii or something.  Okay.

19   These folks will take that into account.  Thank you.  Another

20   thing, if you have any questions at any time, if somebody

21   asks you something, don't be hesitant to inquire.

22                            EXAMINATION

23   BY MR. BECKER:

1   Q       We might as well bring this issue up, the vacation

2   and where he's going.  Is it prepaid or is it out of town?

3   A       I'm going to Myrtle Beach.

4   Q       We can almost guarantee you, we're going to tell you

5   that you're not going to be able to sit in this case unless

6   you want to cancel your vacation.

7               THE COURT:  I suspect that that's very

8   true.

9   Q       We're still anticipating starting May 15th.  That's

10  certainly not going to be done in time for May 10th.

11              THE COURT:  Unless you want to tell the

12  gentleman he can't go on vacation.

13              MR. BECKER:  I don't want to tell anybody

14  they can't go on vacation.

15  A       What about the alternates, couldn't they fill in for

16  a little while until I get back?

17              THE COURT:  No.  Whoever starts the trial

18  has to finish the trial.  Your time scheduling is definitely

19  not going to work out for you because you would end up

20  missing your vacation and we don't want that.  That's too

21  much to ask.  But we do thank you for coming and for

22  participating in the program.  Have a good time on that trip.

23  Okay.  Thank you.

1                              * * *

2    WHEREUPON,

3                         ROBIN SCHLAEGEL

4    being first duly sworn, according to law, was examined and

5    testified as follows:

6                          EXAMINATION

7    BY THE COURT:

8    Q        You read that handout that was given to you?

9    A        Yes.

10   Q        Okay.  You know that we are here on a charge of two

11   counts of aggravated murder with specifications filed against

12   Donna Roberts.  The prosecution is required of course to

13   prove each and every element of the aggravated murder and the

14   specifications attached by the burden of proof that is beyond

15   a reasonable doubt.

16          Now, this jury, after they hear the evidence and the

17   law, are called upon to make the decision as to whether or

18   not the prosecution has carried that burden of proof.  If

19   they failed to do so, then of course the proper verdict will

20   be not guilty.  If the jury should find that the State has

21   proven their case, then the matter would go to a second

22   phase.  And during that second trial, the second part of the

23   trial the prosecution is required to prove beyond a

1    reasonable doubt that the aggravating circumstances outweigh

2    the mitigating factors.  Aggravating circumstances being

3    reasons why the jury should sit there and impose the death

4    penalty.  And the mitigating factors are reasons why the jury

5    should not do that.  Those have to be weighed.  As I say, the

6    burden is always on the State.  Any defendant need not do

7    anything during a trial.  There's no burden to prove

8    anything.  The State has to carry the burden.

9        Now, we don't have any idea at that point what that

10   jury is going to decide on the murder charge.  But it would

11   be impractical to wait until that is known, because if they

12   would go into the second phase and these folks haven't had an

13   opportunity to examine each person individually, you may end

14   up with somebody on that jury that believes in the old

15   testament, an eye for an eye.  And if a person really held

16   that as a strict belief, they could never be fair to a

17   defendant.  The Defendant has a right to have those factors

18   balanced.

19       Conversely, if a person thinks to themself, I could

20   never decide such a thing as life or death, then that person

21   could never be fair to the State because the State, if they

22   prove their case, has a right to have this jury make that

23   determination.  So we must ask these questions before that

1    may arise.

2         Now, whatever a person's belief is, is fine.  That's

3    their belief.  These folks will accept that.  We have a wide

4    divergence of opinion on the issue.  The questions will be

5    geared primarily toward that end.  Are you able to follow the

6    law of Ohio?  Because the law of Ohio is not an eye for an

7    eye, it's only an aggravated murder with specifications.  And

8    there's a limited number of those.  Do you -- and if you do

9    aggravated murder and it happens to be the Governor, that

10   would be a death penalty case.  In committing a murder on an

11   ordinary person without some other specifications, it's not a

12   death penalty case.  This case has specifications attached so

13   it is potentially a death penalty case.

14        The other area that you will be asked about concerns

15   pretrial publicity.  Any matter of this nature is going to

16   get media attention naturally.  So it's not unusual to find

17   any of these folks, as yourself, who have had some exposure

18   to the newspapers, TV and that.  But the question is, do you

19   have something fixed in your mind so firmly that you're not

20   able to disregard that and be able to set it aside in order

21   that both sides get a fair trial here?

22        This matter has to be decided on the evidence that

23   is presented in this courtroom.  Nothing else exists except

1    what they hear in the courtroom and the law that's given to

2    them.  So you'll be asked questions along that line also.

3    Okay?

4    A        Uh-huh.

5    Q        Thank you.

6                        EXAMINATION

7    BY MR. BECKER:

8    Q        My name is Chris Becker.  I work for the county

9    prosecutor's office.  And I assume you remember Mr. Bailey.

10   He's seated over here.

11   A        Yeah.

12   Q        I'm moving the podium here.  But he was the attorney

13   that was in court back on Tuesday April 8th when you came

14   down in Judge Logan's courtroom.

15   A        Yes.

16   Q        I assume you remember Mr. Juhasz and Ingram.  They

17   were there as well.

18   A        Him, but not him.

19   Q        We're going to ask you some questions.  And I want

20   to start off by telling you, first of all, there's no right

21   or wrong answers here.  We're not trying to change your

22   opinion.  Every opinion is what it is.  And we had a number

23   of people in this process that couldn't serve on this jury

1    because of their opinions were one way or the other, they

2    couldn't be fair to the defense.  They couldn't be fair to

3    the State.  And as the Judge indicated to you, we have to

4    have people that will fairly consider all the options.  We

5    have to have people that will be fair.  Maybe they're not

6    influenced by what they read in the newspaper or what they

7    seen on television.

8              But before I get into any of that and really start

9    getting into the meat of this case, I notice on your

10   questionnaire you indicated that you work at a car

11   dealership, and there's really only two people that I guess

12   do the work that you do there?

13   A        Correct.

14   Q        This case may take, you know, three weeks.  There

15   may be a point where you will be sequestered and have to

16   spend one or two or maybe three nights with your fellow

17   jurors here in a hotel in town.  Is that going to create such

18   a hardship for you that you don't think you can give your

19   undivided attention to this case?

20   A        As far as, it's my employer, he was concerned.

21   Q        Have you spoken to him about this?

22   A        Yes.

23   Q        And what did you tell him?

1  A        I told him that there was the possibility that I

2  would be gone for at least three weeks or a longer period of

3  time and that during the last phase, if it got to that, that

4  I may be sequestered.

5  Q        What was his response?  Not good or --

6  A        His response was not real favorable.

7  Q        Okay.  By all means, we don't want to jeopardize

8  your source of income here.

9  A        Correct.

10 Q        And your job, is that going to be somewhat of a

11 problem that you don't feel you can serve on this jury?  And

12 again, you don't have to tell me, yeah, I really want to

13 serve.  We understand it's a civic duty, but we're not here

14 to force you, to create trouble for you at your place of

15 employment or create trouble between you or your employer and

16 certainly not --

17 A        My employer is a very fair person.  He would

18 understand.  He would understand.  I mean, we would muddle

19 through if that were to happen.  My feeling is if I, if I

20 needed to do my civic duty I'm willing to do that.

21 Q        And I'm not trying to convince you that you should

22 come or go or stay, but the last thing we want you to do is

23 serve on this jury and find you, you go back to your boss and

1    he says, boy, we're going to put you in the broom closet for

2    now on.

3    A        I think my job is secure.  But it would cause,

4    because we do title work and especially more Pennsylvania

5    title work, but there are those occasional Ohio titles that

6    need to be done and they do have a 30-day specification.  But

7    the other person in the office could, does know how to do

8    those so she could.

9    Q        It may just be a little bit more work for one

10   person?  It's not much different?  It may be someone had

11   gotten in a car accident or been injured or maybe had some

12   surgery done and whatnot?

13   A        Correct.

14   Q        So it's something that you feel you could do and

15   give your attention to in this case without being concerned

16   about what's going on at work or what's going to happen?

17   A        Correct.  If they needed to they could even bring

18   them home and do them in the evening.

19   Q        That wouldn't be too much of a distraction for you?

20   A        Because the office manager, the office manager is my

21   daughter, so I work for her.

22   Q        That's good.  I just, we just noticed that your

23   questionnaire, I just wanted to make sure that that was not

1   going to be too much of a problem for you.

2   A        Of course my employer would like it that I would not

3   be picked, but it's my decision that if I would be needed, I

4   would be willing to serve.

5   Q        And we appreciate that.  Getting back to what we're

6   really here for.  And let's talk about the two areas that

7   we're, the Judge had indicated to you, which would be your

8   stance on the death penalty and then any media coverage that

9   you may have heard about this case, and then we'll get into

10  some more general things about criminal cases and what your

11  role is as a juror here.

12          First and foremost, I guess as the Judge indicated

13  to you, we're going to be kind of presumptuous here.  This is

14  a capital murder case and all capital murder cases in Ohio

15  have two phases.  There's a first phase where you have to

16  determine guilt or innocence.  And the Court will give the

17  instructions.  And there are certain elements that have to be

18  proved.  And there are also specifications to this count, and

19  those specifications are what make this a capital murder

20  case.

21          We have to prove, Mr. Bailey and I have to prove our

22  case by proof beyond a reasonable doubt in that first phase.

23  And one of the problems we have here in criminal cases -- and

1   this is the only chance I get to speak to you and you get to

2   speak to me and we get to talk like this.  Because if you're

3   selected as a juror and you're seated in this jury box, Mr.

4   Bailey and I can't even lean over to you and say, hey, what

5   did you think of that witness?  Or, do you think we ought to

6   ask him more questions?  We can't speak to you anymore.  It's

7   unethical for us to do that.  Even if we see you down the

8   hallway or getting a drink of water, we can't say to you,

9   other than, you know, nod and say hello or good morning or

10  good afternoon.  And there's reasons for that.  Because

11  you're supposed to decide this case based upon what you hear

12  here.

13          So getting back to this sort of two phase process.

14  We may not get to the second phase.  You may say, and your

15  fellow jurors may find that we haven't proved our case, she's

16  not guilty, and you get to go home.  And you get to go back

17  to work sooner than that.  But if you do get to this phase

18  and you do find her guilty, then we move on to the second

19  phase.  And that's why we have to know now potentially, if we

20  get to that phase, what are your decisions on the death

21  penalty.  And we have obviously your questionnaire.  We know

22  your position.  You certainly, I believe, believe in the

23  death penalty?

1    A        Yes.

2    Q        According to your questionnaire.  And I assume you

3    heard when the Court was speaking to you that the death

4    penalty is not automatic.  Homicide cases, there are

5    different types of and varying degrees of homicides.  And in

6    this particular case what would happen is if we proved her

7    guilty beyond a reasonable doubt we go to the second phase.

8    Mr. Bailey and I would also have the obligation in that

9    second phase of proving by proof beyond a reasonable doubt

10   that some things called the aggravating circumstances, which

11   are really those specifications and those bad things,

12   outweigh the mitigating factors, which may be good things

13   about the Defendant in this case.

14           You will have four options to consider.  One would

15   be the death penalty.  One would be life in prison with no

16   parole.  One would be life with no parole eligibility until

17   after 30 years, and life with no parole eligibility until 25

18   years had been served.

19           And the real concern that everyone has here is that

20   you don't give any of those a heads up or a head start if we

21   got to that second phase.  And we've had people, to be honest

22   with you, come in here and say, if you kill someone and it's

23   a purposeful killing or planned or premeditated you should

1    get the death penalty.  And there's no way they could

2    consider the life options.  And on the other side of that

3    coin, we've had people come in here and say, I have religious

4    or moral or ethical beliefs that I don't believe that I have

5    the right to, you know, sign a death penalty verdict and I

6    would not do that.  And I couldn't even consider the death

7    penalty.

8            So the question I have to ask you is, would you

9    fairly consider all four of those options if we got to that

10   phase?

11   A        I think I could.

12   Q        You say it with a little hesitation.  Which way

13   don't you think you could be fair?

14   A        I guess in my mind before I read downstairs, I guess

15   I had always just assumed that there was not all the four

16   different levels.

17   Q        The options?

18   A        Right.  I did not realize that before.  So in my

19   questionnaire I definitely said, yes, death penalty, you

20   know.

21   Q        But you weren't aware what the law was?

22   A        Right.  I did not realize that there were -- and my

23   feelings, I guess it would be I would have to understand what

1   those were, if there was a murder committed what were the

2   other reasons that went along with that.  I mean, not just --

3   Q       You want the facts, the full facts and as much as

4   you can get?

5   A       Right.  And then I think at that point I could, I'm

6   not so strong with the, what Ohio law is then to say, yes,

7   death penalty definitely.  I think I could give open

8   consideration to all of those different --

9   Q       And that's what we're looking for.  You're the kind

10  of person we want to hear fairly consider all of those.  This

11  case I'm going to tell you right now from the very getgo is a

12  case involving an allegation that Miss Roberts was an aider

13  and abettor.  She is not the person that actually pulled the

14  trigger.

15          Now, we're alleging that she planned this homicide

16  with another person who was actually the shooter.  She was an

17  aider and abettor.  We allege that she did some things that

18  are going to point to that.

19          So let's assume we're in the second phase and this

20  case is proven, the State has proven its case by proof beyond

21  a reasonable doubt that it's a premeditated murder.  We've

22  proven the elements of the aggravated murder.  We've proven

23  that there was planning and premeditation.  And we actually

1    call it prior calculation and design now.  But you wrote, I'm

2    using your term premeditate.  It's pretty much the same

3    thing.  But you're not going to be of such a mindset that

4    you're going to say, hey, it was a planned murder, I'm going

5    to go in there, and I think the death penalty is the

6    appropriate situation or appropriate penalty in that

7    situation because those are my feelings.  You didn't know

8    coming in until you read the paper the Court gave you that

9    you had options?

10   A       Correct.

11   Q       Now that you know you have options, you're willing

12   to consider all of those options?

13   A       Correct.

14   Q       And you wouldn't give the death penalty any more

15   weight than you would any of the other penalties?

16   A       I would not give it any more unless, as you just

17   stated, that it was, unless I knew beyond a reasonable doubt

18   that, yes, this was a definite.  It was all completely

19   planned out, that there were contingencies, that it was

20   definitely a planned --

21   Q       You understand a --

22   A       Calculated.

23   Q       This is where we're going to get a little confusing.

1    A         Right.

2    Q         If we get to the second phase you are definitely

3    going to know because you will have found her guilty of

4    aggravated murder, and you will have found her guilty of

5    committing the aggravated murder with prior calculation and

6    design.  Plus you will have found these specifications, these

7    special circumstances in this case that make it eligible for

8    the death penalty.  So you will know going in that second

9    phase when you come back, and it's almost like we start a new

10   trial, you're going to know all that.  You're going to know,

11   not only are you going to know it you're going to have to

12   find her guilty of prior calculation, of planning it and

13   premeditation.

14         You can't find her guilty, though -- I'm sorry.  You

15   can't give her the death penalty though merely because of

16   that.  We have a burden, and the Court will instruct you that

17   our burden is, we have to prove these aggravating

18   circumstances in this second phase outweigh beyond a

19   reasonable doubt again the mitigating factors.  So it's

20   almost like you wipe the slate clean.  You almost start from

21   a clean slate again.

22         Is that going to change anything or preclude you

23   from considering the life options knowing, if that's what the

1    law is?  And I'm telling you that's what the law is.

2    A        So I just want to make sure I'm perfectly clear.

3    Q        I'm probably making it as clear as mud for you.

4    A        So at that phase, during the first phase if I only

5    hear your side of the story; is this correct?

6    Q        Well, you may hear only our side of the story.

7    A        Okay.

8    Q        And we're going to get to that.  But under the

9    presumption of innocence they don't have to present anything

10   to you.  We have to prove the case.

11   A        So it's more you than them?

12   Q        Right.  At the second, it's our obligation --

13   A        It's your obligation.

14   Q        It's our obligation.  Again, we could be here for

15   the full three weeks.  You could be sequestered.  You may,

16   and I serious doubt if this is going to happen, but you may

17   never hear Mr. Juhasz or Mr. Ingram say a word.  They don't

18   have to say anything.  They don't have to get up.  They don't

19   have to object.  They don't have to do anything.  That may be

20   part of their strategy.

21            Mr. Bailey and I have to convince you beyond a

22   reasonable doubt that she's guilty, first of all, and guilty

23   of these specifications beyond a reasonable doubt.  Then we

1    get into the second phase.  Then we have to prove to you and,

2    again, they can do crossword puzzles, look at their

3    horoscope, read magazines, do what it is they want to do over

4    there and, again, it's our burden to prove to you that these

5    aggravating circumstances, these bad things outweigh any good

6    things that may be said about her or that may be committed to

7    her in this case.  And if we don't prove that then you, you

8    can't say that we, you can't give the death penalty as an

9    appropriate penalty because we haven't met our burden.

10   Again, we sort of have two hurdles we have to cross.  They

11   don't have to.

12   A       So I don't get to really hear her side of the story?

13   Q       Absolutely not.  You may, and we don't know that

14   yet.  I can't tell you what evidence is going to be in any

15   criminal case.  You as a juror may never hear from the

16   Defendant.  You may want to hear two sides of the story but

17   you may never hear it.  Let me give you a little bit better

18   example.

19          This is my little dumb example that I've probably

20   used since some law professor gave it to me 14, 15, 16 years

21   ago.  Let's say you go out today and there's an accident at

22   High Street and Park Avenue here, right here in Park and High

23   Street.  And Mr. Bailey and I are now prosecuting an

1   individual for running that traffic light.  It's a criminal

2   violation for going through the red light.

3         We come to court and Mr. Bailey and I, we bring all

4   our books and we're real confident and we sit down here and

5   we pick our jurors, and you're one of our jurors there.  And

6   we put our first witness on.  And our first witness is Mr.

7   Magoo.  Do you remember Mr. Magoo from cartoons?  The guy

8   couldn't see past his nose.  And he was always walking off

9   cliffs.  Our star witness is Mr. Magoo.  We call Mr. Magoo.

10  And on his way getting up there he bumps into the table.  He

11  falls down before he gets up there.  He has got glasses on.

12  He stands over here.  And I say, Mr. Magoo, I'm over here.

13  And I say, Mr. Magoo, do you remember back on the corner of

14  Market or -- I'm sorry -- High and Park Street on April 23rd

15  you saw a car wreck?  Oh, yeah, I saw the whole thing.  He

16  had a red car and it whacked into the blue car.  Okay.  Thank

17  you very much, Mr. Magoo.  And, oh, by the way, and he's

18  looking over here.  Again, he doesn't even know where I'm at

19  in the courtroom.  He's not a very good witness, is he?

20  A     No.

21  Q     Now I sit down.  They may say, that's not a good

22  witness, and they let Mr. Magoo walk out of here.  They don't

23  ask him a question.  They don't present their client's side

1    of the story.  Have I proved my case beyond a reasonable

2    doubt to you?  We say, that's it, rely on Mr. Magoo to prove

3    that this guy ran the red light.  Would you believe the guy?

4    I mean, he couldn't even find his way in the courtroom;

5    right?

6    A       Right.

7    Q       So we have to -- that's an instance where the

8    presumption of innocence is for their client.  You come in

9    here, you have to presume their client's innocent.

10   A       Right.

11   Q       And I assume you can do that right now?

12   A       Correct.

13   Q       Because you haven't heard any evidence or any

14   testimony about this case.  You don't know?

15   A       I really don't.

16   Q       We may, I mean, that's the kind of for instance we

17   may have.  We may present a witness or a case that is so

18   horrible, that is so unreliable, that isn't proven beyond a

19   reasonable doubt, you may, and your fellow jurors may go back

20   and say, did you hear that guy?  He couldn't find his way in

21   the courtroom.  He couldn't see who he was talking to.  He

22   said he was there.  He said his, he could hardly see five

23   fingers in front of his face, how could he see this?  And to

1    top it off, I asked Mr. Magoo where he was standing at, and

2    he was standing at the other intersection at High and Market

3    Street.  So your verdict would have to be not guilty; right?

4    A        (Witness nods head affirmatively.)

5    Q        That's sort of what the presumption of innocence is;

6    right?

7    A        Yes.

8    Q        You never heard from the defendant in that case.

9    You would never hear their side because he may get up and,

10   you know, say something that maybe -- strike that.  He

11   doesn't have to say anything under our system of law.  He

12   doesn't even have to take the witness stand, the driver of

13   the car that's accused of going through the red light; right?

14   A        Correct.

15   Q        That's his Fifth Amendment right.  That's his

16   presumption of innocence.  He has all of that.  So I don't

17   know if I'm making this clear or not clear.

18   A        Yes, you made it clear.  But I guess, so I'm only

19   really going to hear one?

20   Q        I don't know.  I don't know that.  I don't know if

21   you're only going to hear one side.  You may hear something

22   from them that's entirely within their right.  We can't tell

23   you at this point if you are or aren't.  What we can only

1   tell you, though, is if you don't hear anything from her

2   she's not required to present anything to you.

3   A      Correct.

4   Q      She can testify if she wants to, but she's not

5   required to.

6   A      Okay.

7   Q      Now, there are some cases, there are some criminal

8   cases where, for instance, if I come in and I'm in a bar

9   fight and I go to the bar and I drink after work and I'm all

10   liquored up. And the guy next to me says I don't like you.

11   You prosecuted my brother and put him in prison. I say, who

12   are you? And he says, I'm Joe P. Mills and you prosecuted my

13   brother Don Mills. And I say, well, he was a no good S.O.B.

14   anyway and he deserves to be in prison. And now he starts

15   fighting me and I'm fighting him. I shot him. That

16   defendant may have an obligation to present an affirmative

17   defense but you, and whether she's going to do that in this

18   case or present anything, she's not required to because I

19   still have to prove and, Mr. Bailey and I still have to prove

20   to you that she's guilty of something.

21   A      Okay.

22   Q      All right. We may never get to that point.

23   A      So you're -- I'm really not dense.

1    Q        You know what?  We're trying to cram into you things

2    that Mr. Bailey and I, myself and Mr. Juhasz and Ingram,

3    we've been doing for years.  We went to school for three

4    years to learn things like this.  We go to seminars.  We read

5    books about it.  And I know it's difficult.  And I'm not

6    trying to, I'm not trying to --

7    A        I just want to do what's right.  And so I just want

8    to make sure that I understand completely what would be

9    required of me.

10   Q        Okay.

11   A        So that I could give you just and right answers.

12   Q        The simplest thing I can say of what is required of

13   you is that you follow the law as the Court gives it to you.

14   A        Uh-huh.

15   Q        And you listen very carefully and you make your

16   determinations based upon the evidence in this case, not from

17   what you may think is the right thing to do or what your

18   neighbor thinks or what you read in the newspaper, but you

19   make your decisions in this courtroom based upon solely what

20   you hear from the witness stand and the evidence and the

21   exhibits that are presented in this case.  That's really what

22   we're trying to do here.

23   A        Uh-huh.

1    Q        We don't want people to come in here with a

2    preconceived notion like I told you before to say, well, you

3    know what?  If you kill somebody it's an eye for an eye for

4    me.  You deserve to forfeit your life.  Because there's

5    different types of homicides.   There's the guy who gets

6    drunk in his car and gets in and, you know, has 20 beers and

7    gets in and goes out and kills a family of four.  That's not

8    a death penalty case.  It's a tragedy.  It's a criminal

9    offense.  It's punishable by going to prison, but it's not a

10   death penalty case.

11       We have, you know, if you and I are looking at a gun

12   and I say, do you want to buy this gun?  And I open it up and

13   show you, I accidentally shoot and kill you, that's not a

14   death penalty case.  I mean, it's a terrible event.  It's a

15   criminal offense.  I may be negligent or reckless in the

16   handling of a firearm but that's not a death penalty offense.

17       If I come home and I find my wife in bed with

18   another man and in the heat of passion I shoot and kill both

19   of them, that's not a death penalty case.  That's probably a

20   manslaughter case.

21       If I'm driving along with my pickup truck and I, I

22   got ladders in there and I don't have them secured and I

23   don't care if they're secured and I got a load in my truck

1    that's unsecured, I hit a bump, all the ladders fall out and

2    crashes into a telephone pole and someone dies, that's not a

3    death penalty offense.  It's a crime and I could be punished

4    for it.  That's probably also another version of a

5    manslaughter offense.  If I just say to you and I don't, I

6    stab him right in the heart and kill him, that's a murder but

7    it's not a death penalty case.  If I go out today and I go

8    out to lunch and I think, I really don't like Ken Bailey.

9    He's really driving me crazy during this trial.  I don't like

10   the way he dresses.  I'm going to run over to the Army Navy

11   store and buy a knife.  And I come back at 1:00 o'clock and

12   stab him, now I've premeditated and done all that, but that's

13   still not a death penalty case.  We need these special

14   circumstances to do that.

15           And I think the Court mentioned, and one of the

16   examples that we've used here is the Legislature has defined

17   what death penalty offenses are.  And in Ohio, killing the

18   Governor or the president is a death penalty offense that can

19   be a specification.  So let's say I purposely, and I planned

20   to kill President Bush.  He was in town yesterday, I think in

21   Canton.  And I hate him so much, in fact, I had Al Gore signs

22   on my truck and I had them in my front yard and I wore an Al

23   Gore shirt for 12 months during the election last 2000.  And,

1  boy, I really hate that Bush because, you know, Gore got more

2  votes than Bush and he should have won anyway.  So I find out

3  he's coming to Canton, Ohio, and I call off and I tell them

4  I'm sick.  I get the biggest rifle I can find with the

5  biggest scope on it.  I know a good place down in Canton

6  where I'll get a good shot on this guy.  I go down there and

7  I shoot and kill him.  I've got prior calculation and now

8  I've got that special circumstance of killing President Bush.

9  I killed the president.  Now I'm eligible for the death

10  penalty.

11       That still doesn't mean you have to give me the

12  death penalty because if they're prosecuting me they still

13  have to prove beyond a reasonable doubt that I committed

14  these aggravating circumstances.  And they have to again

15  outweigh by proof beyond a reasonable doubt any mitigating

16  factors.

17       Now, in that case, maybe my mitigating circumstances

18  are my wife left me.  My children are, all died of leukemia.

19  My mother and father have died of cancer in the last month.

20  I lost my job.  I lost my house.  It has been foreclosed on.

21  Those would be mitigating factors for you; right?  You may

22  understand how -- that doesn't mean you have to believe any

23  of them, but those are the kind of balancing and weighing you

1    would have to do.

2    A        Right.

3    Q        Am I making myself any clearer?

4    A        Yes.  So say you give me all of it and it looks

5    really bad and it's, it's like, it looks like those things

6    you did but they -- they don't have to prove --

7    Q        I still have to prove that those aggravating

8    circumstances --

9    A        Who gives me mitigating circumstances then?

10   Q        They may give you mitigating circumstances.  But

11   they're not required to give you mitigating circumstances

12   here because -- let's look at it this way.  We may get to the

13   second phase, we'll prove to you the aggravating

14   circumstances, let's say the aggravating -- this is going to

15   be silly because it's not really an aggravated circumstance.

16            Let's say the aggravating circumstance is this

17   person wore a red suit when they did this.  Well, you may say

18   well, so what?  What does that have to do with anything?  So

19   you have to, you have to weigh this.  You have to weigh this.

20            Now, I seriously expect that they will give you some

21   mitigating factors, but they don't have to, if we get to that

22   phase.

23   A        All right.  If I did not have mitigating

1    circumstances to take into consideration and you prove to me

2    beyond a shadow of a doubt --

3    Q        It's not a shadow.

4    A        Doesn't that, all those things, then I would have to

5    go --

6    Q        Then you could give the death penalty.

7    A        Right.  If I did not have mitigating circumstances.

8    But if I did, I think I could weigh those.

9    Q        Okay.

10   A        Okay.  You're telling me that I might not have, I

11   think is the part that's getting me confused.

12   Q        There's sort of three ways -- first of all, first of

13   all we have to, we have to, Mr. Bailey and I, prove to you

14   that there are aggravating circumstances.

15   A        Okay.

16   Q        And we have to prove to you that those aggravating

17   circumstances outweigh any mitigating factors.

18   A        Right.

19   Q        Now, theoretically in a little box they don't have

20   to prove any mitigating factors exist.  They're probably

21   going to.  And they're going to put some mitigating factors

22   out there, and you're going to have to determine which weighs

23   more beyond a reasonable doubt.  Do our aggravating

```
 1    circumstances outweigh their mitigating factors?  But

 2    theoretically they don't have to give you any mitigating

 3    factors.

 4    A       All right.

 5    Q       And even if they put some mitigating factors in

 6    there on their side of the scale, it still may not be enough

 7    to tip that scale; right?

 8    A       Correct.

 9    Q       It may be.  It may not be.  You don't know because

10    we can't tell you what they're going to do and we can't tell

11    you what we're going to do.  And you haven't heard any of

12    this case.  And on top of that, we may never get there.

13    Okay?

14    A       Okay.

15    Q       But you believe you can be fair and follow the

16    Court's instructions and make those kind of determinations?

17    A       Yeah.

18    Q       That's all we're looking for.  I know we've, I know

19    we've spent 15 minutes on a -- I hate to do that to you.  And

20    believe me, sometimes when I go home and my wife asks me what

21    did you do at court today?  If I tried to explain to her how

22    we do this, and by all means, I'm not a teacher.  I'm not a

23    professor.  And in a sense we're trying to teach you a little
```

1   bit about this case and I'm asking you very difficult

2   questions that --

3   A       Uh-huh.

4   Q       I think Mr. Ingram has said many times, there are

5   attorneys that don't practice criminal law that if we asked

6   them these questions they don't know the answers to them

7   because they've never done this before.

8           Fortunately in this case we have all done this

9   before.  We learned about it in school and we've done it

10  before.  So if I were sitting there, to be honest with you, I

11  don't know what my opinions would be and my answers would be.

12  So you're not giving me any wrong answers or right answers.

13  But it's important that we figure out, you know, where you're

14  at.

15  A       Right.

16  Q       So I think you're pretty sure that you could be a

17  fair and impartial juror as it relates to the death penalty,

18  and you would fairly consider all of the options and, if push

19  came to shove and you and your fellow jurors had to go back

20  to this jury room, we're in the second phase now, if we

21  proved the aggravating circumstances, which are the bad

22  things, outweigh the mitigating factors by proof beyond a

23  reasonable doubt, you could sign a piece of paper calling for

1    the death penalty?

2    A        Yeah.

3    Q        And that's the essence of what we're trying to get

4    at here.  And you would follow the law.  And if we didn't

5    prove that the aggravating circumstances outweigh the

6    mitigation factors, would you consider the other life options

7    you would have to?

8    A        Yes.

9    Q        And you have to do a weighing.  You have to do a

10   little balancing test there.  And again, we're being real

11   presumptuous because we may never even get there.

12            Now let's talk a little bit about the media exposure

13   that you may have had in this case, because I think you read

14   about it in the newspaper.

15   A        I did.

16   Q        Briefly I think --

17   A        Briefly.  I don't remember when this even took

18   place.  I don't remember.  I don't remember a whole lot about

19   it.

20   Q        Okay.

21   A        I do remember something on TV or reading somewhere

22   about a murder happening in Howland, and it was a girlfriend,

23   boyfriend situation.  But I don't know.  I don't remember who

1   they were supposed to have killed.  I don't know if they, I

2   think they knew him but I don't know if they were relative or

3   non-relative.  I don't remember that part.

4   Q        And I guess the question I'm going to ask you now

5   is, or the question I'm going to ask you is, would any of

6   what you have heard or seen or read about this case affect

7   you as a juror?

8   A        At this point, no, because that's really all I know.

9   Q        And the, the next question that I have to ask you is

10  if you hear testimony in this courtroom and it jolts your

11  memory about something you may have read or seen on TV, are

12  you going to say, wait a minute, that witness was lying, or,

13  I know that witness was wrong because I read in the Tribune

14  Chronicle it happened this way.  Now I remember reading it in

15  the Vindicator.  I now remember what I saw on Channel 27 or

16  33.  You'll be able to separate whatever you have seen or

17  read and not let it influence your decision in this case;

18  correct?

19  A        I would think so, yes.

20  Q        And I know that's a difficult thing to say.  But

21  there's nothing that you read or saw or heard about this case

22  that jumps at you.  And you don't think, boy, I read the

23  Tribune Chronicle and I've heard some terrible things.  And,

1    boy, if they printed it it's got to be true?

2    A        No.

3    Q        Because you understand the media sometimes just

4    gives you a little snippet.  They talk about, I think it's

5    the 12 second sound, but they don't really want the whole

6    story.  We've been in this courtroom now for two and a half

7    weeks picking a jury and we may be here another week and a

8    half picking a jury, and there's no television cameras.

9    There's no newspapers.  There's no radio personalities or

10   reporters.  But you, they may report on this case the whole

11   time and say, the murder trial of Donna Roberts continued

12   today and jurors were selected.  And they may have just

13   called the Judge's bailiff and asked.  So they're not here.

14   They don't know the full story.  And that happens with the

15   evidence, too.  They didn't have anybody investigate this

16   case.  They didn't have anybody go and speak to witnesses.

17   They didn't, you know, do any forensic work in this case, so

18   how would they know?

19            They could just report what they know, and they've

20   got to condense that down so many lines in the paper and so

21   many seconds on the radio and so many minutes on a

22   television, so you're just getting sort of the super

23   condensed version of the things; right?

1    A       Yes.

2    Q       And you'll be fair and open and determine this case

3    just from the evidence you hear from the witness stand and

4    the exhibits that are presented to you; correct?

5    A       Correct.

6    Q       We're moving along pretty well.  I want to go back a

7    little bit and start talking to you about some of the general

8    criminal concepts that we have here in criminal court.  And

9    one of the first things I want to talk to you about is how

10    this case came to be.

11    The reason we're here is because a body called the

12    grand jury issued a piece of paper that's an indictment.  And

13    that indictment contained four counts.  Two of them were

14    aggravated murder.  There's only one death in this case but

15    there's two aggravated murder counts.  It's sort of different

16    ways to get to the same place.

17    And the Court is going to tell you that you can find

18    the Defendant guilty of all of the counts, some of the counts

19    or none of the counts.  We have to prove every case beyond a

20    reasonable doubt of all four charges, plus these

21    specifications that would get us to the death penalty phase.

22    Have you ever, or, how much do you know about the

23    grand jury process?

1    A        Little.

2    Q        The grand jury is basically a group of jurors such

3    as yourself who were called.  They were voters in the county

4    and they were called to serve on grand jury.  Grand jury

5    serves for about a four-month period, and they may, our grand

6    jury here in Trumbull County meets every other week for two

7    or three days.  And they sit in a little room down on the

8    second floor.

9            And the grand jury only hears evidence presented by

10   assistant prosecutors and the prosecutor, like Mr. Bailey and

11   myself.  There's no defendant there.  There's no defense

12   attorney there.  Well, occasionally there would be a

13   defendant.  Maybe they sometimes come and testify.  But for

14   the most part they don't come.  There's no defense attorneys.

15   There's no judge.  There's the prosecutor's staff and a court

16   reporter.  And then when they vote on the cases it only takes

17   seven of the nine voters or jurors to issue an indictment, to

18   issue their accusation.  And the accusation is just that.

19   It's an accusation.

20           A lot of defense attorneys will say it's not even

21   worth the paper it's printed on.  Well, that may be true, but

22   all it is is, it's the legal document that sets in motion all

23   of these proceedings, and it gets us to this point.

1           The fact that she's been charged with this offense

2    and these terrible offenses you don't think she's guilty of

3    just because someone has accused her of that, do you?

4    A        No.

5    Q        And by the same token, you don't think she's guilty

6    because we're standing here talking about the death penalty

7    and that sort of thing, do you?

8    A        No.

9    Q        And I mean, it's difficult to sort of put the cart

10   before the horse here and start talking about these potential

11   penalties because someone may think they're talking about

12   executing this life in prison, she's got to be guilty of

13   something.  You understand she's not guilty of anything;

14   right?

15   A        Yes.

16   Q        That's the presumption of innocence.  That's what

17   we're talking about.  And she has that, not only does she

18   have that, every defendant that is charged by an indictment

19   in a criminal case -- we indict about 800 cases a year here,

20   felony cases.  Every one of those 800 defendants has those

21   rights and that presumption of innocence.

22           And that fact, it's not just this county and it's

23   not just this state but it's this country that has the

1    presumption of innocence.  And it's very unique to our

2    judicial system.  So would you give her the presumption of

3    innocence throughout the proceedings here?

4    A       Uh-huh.

5    Q       Now, one of the other things that you're going to

6    find is, and you may have an inclination is, Mr. Bailey and I

7    get to go first in this case, and we're going to present to

8    you the evidence first.  And it may look pretty bad for her.

9    But you have to remember that in some cases they may present

10   evidence to you or they may cross-examine our witnesses.

11   They're not required to, but they may do that.  So you have

12   to sort of keep an open mind throughout the trial.

13           You and your fellow jurors can't discuss the case or

14   make any kind of determination until all the evidence is

15   given to you.  And that is sort of like along the lines of my

16   traffic example.  If I come in and the first witness we call

17   is, let's say he's a minister at the local church here and he

18   walks, he walks around the courthouse square every day

19   religiously for his exercise.  And he says, I pick up garage

20   as I go, and I'm very careful, very observant.  And in fact,

21   I don't cross Park Street here because I have seen people

22   come up north on Park and blow through intersections, and

23   they don't pay attention.

1          So before I cross the street, even if I have to walk

2     to the light and the light is green I look both ways because

3     I don't want to get hit.  And I walk these streets every day.

4     And on the day in question I looked both ways and I saw this

5     red Camaro barreling through the Market Street intersection.

6     That light was red and he went.  I saw the whole accident.

7          Now, you may think that's a great witness for us,

8     right?  You may be thinking over there, wow, this is really

9     guilty.  Well, they may get up and say, well, pastor, isn't

10    it true that you wear glasses and you're very, very -- it's

11    very difficult for you to see more than five feet in front of

12    your face without your glasses?  Yes.  Isn't it true that you

13    didn't have your glasses on that day?  Well, you know, you're

14    right, I usually don't wear them when I walk because I don't

15    have to see more than five feet.  I get sweaty when I walk

16    and I didn't have them on that day.  It doesn't look too good

17    for Mr. Bailey and I now, does it?

18    A        Correct.

19    Q        Those are the things you have to keep in mind.  And

20    you can't just jump to the conclusion.  You have to

21    rationally evaluate the evidence; right?

22    A        Correct.

23    Q        Now, one of the other things that we have to do here

1    is we have to prove our case, and we mentioned this term

2    quite a bit, by proof beyond a reasonable doubt. And the

3    Court is going to define for you what reasonable doubt is.

4    And it's, I'm sure it's a term that you've heard on

5    television or read in a novel or seen in the newspaper. But

6    the only definition that counts is what Judge Stuard is going

7    to define for you. And what it boils down to is reason and

8    common sense. We want jurors that are reasonable and have

9    common sense. And usually those are people like yourself

10   that have jobs, are involved in the community and have

11   children and have lived. We kind of shy away from the jurors

12   that come in here with nose rings and their hair spiked up

13   with purple hair and tatoos all over their arms. You ask

14   them what they do in their spare time and they say, well, I

15   play video games. You're 18-years old and we may not want

16   you.

17        But reasonable doubt, and, again, I want to use one

18   of my law professor's little analysis, it's a little bit like

19   a glass of water. There's varying standards of proof in the

20   law in civil cases. If I were suing someone and this was a

21   case about suing Miss Roberts because she backed into our

22   client in the parking lot, in the parking lot of Giant Eagle

23   and our guy suffered a broken back because she didn't even

1    look what she was doing, we have to prove our case by a

2    preponderance of the evidence.  And basically that is a glass

3    a water half full with one more drop of water in there.  That

4    gets us over the halfway mark.  Anything over the halfway

5    mark gets us our preponderance of the evidence and we win the

6    case.

7             In this case because it's reasonable doubt, it is

8    the highest standard of proof but it's reasonable doubt.  I

9    heard you mention earlier shadow of a doubt.  It's not shadow

10   of a doubt.  It's not all doubt because Mr. Bailey and I

11   could never possibly prove to you beyond a reasonable, beyond

12   all doubt probably anything.

13            I probably couldn't prove to you beyond all doubt

14   that I'm married.  I'm standing here with a wedding band on,

15   but that doesn't really mean I am unless you see my wife come

16   in here.  And I may pay someone to come in here and give me a

17   kiss and bring two kids in here.  Now, if I show you a

18   certificate of marriage and I show you that we were married

19   on December 28th, 1991 in Hudson, Ohio, and if I show you

20   some wedding pictures, a photo album, and I show you some of

21   the bills that my wife and I had, you may believe these kids

22   are mine and those kind of things.  You still may say well,

23   gee, I don't know, maybe he's not.  So you understand there's

1    a little bit of doubt in everything, in all of our lives.

2         We're only required to prove to you beyond a

3    reasonable doubt, and in criminal cases that's going to be

4    pretty close to the top of that glass of water.  It's not

5    going to be to the very top because that's all doubt.  It's

6    not going to be a little more than halfway because now we're

7    too close to preponderance of the evidence.  It may be an

8    inch or half an inch from the top.  It's going to vary for

9    every one of you and your fellow jurors.

10         Do you think you could decide a case as important as

11   this one is?  Because it is very important, because we have,

12   we know right now that there's a dead individual.  We know

13   potentially another individual could be killed.  Are you

14   going to require us to prove our case beyond all doubt or

15   that shadow of a doubt, if the Judge, if the Court instructs

16   you, because it is reasonable doubt.  It's not all doubt.

17   A         So I won't, so I won't necessarily, definitely --

18   you don't -- I don't -- you only have to give me --

19   Q         Reasonable doubt?

20   A         Reasonable.

21   Q         And wherever that level is in that glass of water

22   for you, it may be an inch.  It may be a quarter inch.  It

23   may be a half inch.  It's not to the top.  It's not all doubt

1    because I can't prove to you anything beyond all doubt.

2    A       Okay.

3    Q       If I'm able to prove, and Mr. Bailey and I are able

4    to prove to you beyond a reasonable doubt that those crimes

5    were committed in the first phase, and the specifications,

6    your verdict would have to be guilty; right?

7    A       Correct.

8    Q       If we get to the second phase and I would prove that

9    these aggravating circumstances, these bad things outweigh

10   the good things, the mitigating factors by proof beyond a

11   reasonable doubt, not all doubt, would you feel comfortable

12   signing a certificate or a verdict rather calling for the

13   death penalty if that's what the law allows?

14   A       Yes.

15   Q       Okay.  You could do that?

16   A       Yes.

17   Q       And that's all we ask of you.  Because some people

18   come in here and they want, in this particular, in this kind

19   of a case because it is so serious they want the State to

20   prove their case beyond all doubt.  And I'm telling you right

21   now, I can't prove anything, and I don't believe Mr. Bailey

22   can prove anything to you beyond a reasonable -- beyond all

23   doubt.  You won't hold us to that unreasonable standard, will

1    you?

2    A        (Witness shakes head negatively.)

3    Q        Just remember, you've got to speak up for the Court

4    reporter.

5    A        Yes.

6    Q        Now, going back a little bit to the presumption of

7    innocence and these glasses of water.  It's sort of like we

8    have to fill up the glass to the point where you're

9    satisfied.  It's proof beyond a reasonable doubt not to the

10   top, but we have to fill it up pretty high.  They don't have

11   to fill anything up.  They don't have to take any water out.

12   They don't have to put any water in.  They don't have to do

13   any of that.  You're clear on that now, this presumption of

14   innocence?

15   A        Uh-huh.

16   Q        Now, this case is going to involve, like I said,

17   four counts.  And there's two aggravated murder charges each

18   with death specifications.  They're just sort of the extra

19   things that make this case eligible for the death penalty.

20   And again, we may not get there.  But if we do, you have to

21   find first those things beyond a reasonable doubt.

22            Does it bother you that the State is presenting to

23   you two different theories of the death and how we would get,

1    make her eligible for the death penalty?  Does that concern

2    you?  Do you think, boy, they're not really certain.  They've

3    got two different ways of going at this thing?  Or

4    conversely, on the other side of that, does it leave an

5    impression in your mind, boy, she really must have done

6    something bad, there's only one dead person, they've got her

7    charged with two murder counts?

8    A        It concerns me but that doesn't mean that I have to

9    convict if you proved beyond a reasonable doubt.

10   Q        If we proved beyond a reasonable doubt you have to

11   convict.

12   A        You know, but I do have to convict on both.

13   Q        Right.  There are two separate matters.  And you may

14   convict on both.  You may convict on one.  You may convict on

15   none.

16   A        Right.

17   Q        You don't have a problem doing that?

18   A        I don't think so.

19   Q        And the fact that there's two, two death penalty,

20   two different death penalty charges, two aggravated murder

21   counts, each with death specifications, that doesn't concern

22   you one way or the other in terms of saying, boy, Mr. Bailey

23   and Becker must not know what they're doing.  They have this

1    woman charged with being involved in a murder, there's only

2    one dead person but they've got two different aggravated

3    murder counts.

4         And on the other end of that, it doesn't cause a

5    concern to you to say, boy, she must be really bad that she

6    only killed one person and she's got two different death

7    penalty charges?  You understand that they're just theories

8    on how the case can be proven?

9    A        Correct.

10   Q        And that doesn't impact you in terms of finding her

11   guilty or not guilty at this point?

12   A        No.

13   Q        You would make us prove beyond a reasonable doubt

14   all of the elements of those charges before you would find

15   her guilty?

16   A        Yes.

17   Q        And if we were able to prove beyond a reasonable

18   doubt the elements of both of those separate charges, you

19   could find her guilty of both charges?

20   A        Yes.

21   Q        Fair enough.  I already told you that Miss Roberts

22   is not the shooter in this case.  She's an aider and abettor.

23                    MR. INGRAM:  Objection.

1          MR. BECKER:  I apologize.

2    Q          She's alleged to be an aider and abettor.  By all

3    means, if I say something this morning that makes you think

4    she's guilty of anything right now, stop me and interrupt me

5    and obviously say something, because that's the farthest

6    thing I want to do is convince you that she's guilty of

7    anything this morning.

8          There may come a time in the future when I, when we

9    are going to try to do that, but today we don't want you to

10   consider her guilty of anything.

11         Some of the evidence that you're going to hear in

12   this case is going to be -- let me go back to where I was at.

13         The allegation is that she is not the shooter but

14   the allegation is that she was an aider and abettor in

15   committing this crime and committing these crimes that she's

16   charged with.  Does that present to you a problem in terms of

17   deciding this case, and then in the second phase, if we get

18   there, deciding the death penalty?  Are you going to be more

19   reluctant to find her guilty or not guilty if she's not the

20   shooter or are you going to be more reluctant to find her

21   eligible for the death penalty if we prove our case because

22   she's alleged to be an aider and abettor?

23   A          I don't think so.

1    Q        This case, like all criminal cases, is probably

2    going to have what we call circumstantial evidence.  Not all

3    the case is going to be circumstantial, but I'm sure that we

4    will present to you some circumstantial evidence.

5            Circumstantial evidence is evidence that you can

6    make an inference from.  And the example that I've been using

7    recently probably, because it happens at my house, is that I

8    have four children.  I have a baby who's just over a year old

9    and I have two girls that are four and five and a son who's

10   eight.

11           And my son is a typical rambunctious eight-year old.

12   He plays soccer.  He plays baseball.  He runs around like a

13   nut.  He wants to play football and he wants to wrestle his

14   sisters all the time.  Just a lot of energy.  And this

15   usually happens once every two or three weeks, my son will be

16   in the basement and he'll have a plastic club and wiffle

17   ball.  Mostly in the winter that happens because he can't get

18   outside and run around.  And the toys are now downstairs in

19   the basement.  And he'll swing his bat or else toss a ball up

20   in the basement and whack it.  And my daughters may be down

21   there playing Barbie dolls or Polly Pockets or whatever it is

22   they do, because all the toys are down in the basement and we

23   just let them run amuck down there.

1        Well, my son has been told numerous times that he's

2   not to hit balls in the house.  He's not to swing bats.  And

3   I'm upstairs, and all of a sudden I hear my youngest daughter

4   Cameron crying.  I run downstairs and there's Cameron holding

5   her head.  My son is standing a foot or two away from her

6   with a plastic wiffle ball, bat and a look like this.  As I

7   come down the steps.  The inference is he was swinging the

8   bat and hit her in the head.  I may not have seen it and I

9   wasn't in the room but I can infer that that happened.

10       Now, you have to be careful about making those

11  inferences, right, because sometimes they could have other

12  inferences.  And one of the inferences may have been that my

13  son didn't have the bat and my daughter in fact had the bat.

14  She was throwing it around and it went up and she tried to

15  catch it and it hit her head, and my son Clayton went and got

16  the bat and said, Cameron, we're not allowed to throw the bat

17  in the house.  You're going to get in trouble.  And now I see

18  my son sort of red-handed.  I have to be careful before I

19  accuse him because that could be what had happened; right?

20  A        Uh-huh.

21  Q        But there are other things that tend to make

22  inferences more believable.  For instance, if I find my

23  daughter down there with a bunch of Barbies and the Barbie

1   swimming pool and kitchen and all that and she's got the

2   dolls in her hands and has, she's holding her head and my son

3   is standing there with the bat, that strengthens the

4   inference that he's swinging the bat, not her; right?

5   A        Correct.

6   Q        You can make those kinds of inferences?

7   A        Yes.

8   Q        You can make them to determine a case of this

9   magnitude?

10  A        I think so.

11  Q        Now, the last thing I want to touch on with you is

12  you all sort of -- I'm assuming you've heard throughout your

13  life cases where criminal defendants have done really dumb

14  things.  They've laid out the best laid plans to commit a

15  crime and all of a sudden they get caught and they didn't

16  expect to get caught and they did certain things.

17          The example that I know I've seen on television or

18  heard is the guy who goes into the bank, the bank robber and

19  he goes into the bank and he goes to the teller and says

20  "Stick em up."  And he puts a note down and the note says,

21  "Give me all your money."  And the teller puts $5,000 in the

22  bag and the guy says, okay.  He's got glasses on and it's a

23  sunny day.  And he's got a hat pulled down to here.  And he's

1     got his shirt pulled up like this.  And he's maybe even got a

2     fake beard on.  And he's got a trench coat on.  And as soon

3     as he gets out the door -- he leaves the trench coat there.

4     And lo and behold, the note that he gives the teller has his

5     name and address on the other side.  It's a letter he got

6     from his mom or dad.  You've heard of things like that;

7     right?

8     A      Yeah.

9     Q      And he had been planning this bank robbery for

10    weeks.  He and his buddy made sure he got the car tuned up

11    the day before to make sure the car wouldn't stall, and

12    checked all the tires and everything.  So you've heard the

13    best laid plans can go astray; right?

14    A      Right.

15    Q      And sometimes that's how people get caught; right?

16    A      Uh-huh.

17    Q      Is there anything that you have any questions about

18    that you have, anything that I said that I've thoroughly

19    confused you on?

20    A      No, I don't think so.

21    Q      You feel that you could be a fair and impartial

22    juror in this case?

23    A      Yes.

1   Q        You're not going to be influenced by anything you've

2   read or seen prior to coming to this Court; right?

3   A        Correct.

4   Q        You can make the inferences on circumstantial

5   evidence, if there is any in this case, using your common

6   sense?   You'll be able to determine the credibility of the

7   witnesses based upon what they saw, what they did, what their

8   biases are, what their interests may be, what their training

9   and experience may be; right?

10  A        Uh-huh.

11  Q        You will be able to find this case and find, hold

12  the State to the reasonable doubt standard, not to the beyond

13  all doubt standard; right?

14  A        Yeah.

15  Q        And if we get to that second phase and if the facts

16  warrant it and the law allows it, you could sign a verdict

17  form calling for the death penalty?

18  A        Yes.

19  Q        Okay.  Thank you very much.

20                    THE COURT:  Gentlemen, we're going to take

21  five minutes.  I've got a very important gentleman back there

22  I would like to speak with.

23                    MR. BECKER:  Can I ask one last question

2394

```
 1    Mr. Bailey asked me?  I promise just one.

 2    Q        You were in the navy?

 3    A        No.

 4    Q        I just --

 5    A        I have an uncle that was in the navy.

 6    Q        We were a little confused on your questionnaire

 7    because I think it said retired officer.

 8    A        It had asked for anyone in my family.

 9    Q        Okay.  I see.  And it says -- okay.  I guess the

10    question, I didn't read it correctly.  Thank you.  I'm sorry.

11                   MR. BECKER:  Thank you, Your Honor.

12                   (Whereupon, a recess was taken.)

13                   THE COURT:  Now the defense gets an

14    opportunity to ask you some questions.

15                            EXAMINATION

16    BY MR. INGRAM:

17    Q        Good morning, ma'am.

18    A        Good morning.

19    Q        My name is Jerry Ingram and this is John Juhasz, and

20    we share the responsibility of representing Donna Roberts

21    who's on trial for her life.  And as I'm sure you can

22    imagine, we take our responsibility very seriously, and feel

23    that we should take every reasonable precaution in selecting
```

2395

1    a fair-minded jury, the same type of jury that you or I would

2    want to decide our case if we were on trial.  Does that sound

3    fair enough to you?

4    A       Definitely.

5    Q       As Mr. Becker told you, this is the only time during

6    the course of the trial we can talk directly to one another.

7    I can talk to you.  You can talk to me.  And because lawyers

8    by training tend to monopolize conversations, I would ask you

9    to try to stop me from doing that.  And whenever anything

10   comes to your mind that you would like to discuss or there's

11   a question that you have, please let me know and I'll try to

12   address that question.  Okay?

13   A       Okay.

14   Q       This is a lot like a job interview except when you

15   applied for the job at the motor company you chose to go

16   apply.

17   A       Correct.

18   Q       In this case someone who spun a jury wheel pulled

19   your name out and chose for you to come to apply.  But we are

20   interviewing you today for one of the most important jobs

21   there is, the job of determining the truth, finding the truth

22   and perhaps determining the fate of another person.

23           My first question to you is, how do you feel about

1    being asked to assume that responsibility?

2    A       To be a juror?

3    Q       Yes, ma'am.

4    A       At first I was very apprehensive.  And especially

5    given at first I didn't even know, I thought it was just

6    traffic court or whatever.  But then when I got here and I

7    realized I was like, wow, you know, that's a very serious

8    thing.  I, I feel that I'm a good citizen.  I know you have

9    to have good citizens do these types of things.  It's not my

10   first, I wouldn't put it on my first thing that I want to do,

11   but I would do my civic duty if called upon.

12   Q       You understand of course that the American jury

13   system only works when we can get good people like you to

14   come into court, give of yourself and fairly determine the

15   cause before them?

16   A       That's correct.

17   Q       And if selected as a juror, your job responsibility

18   will be to fairly determine the cause before you?

19   A       Correct.

20   Q       Your job responsibility now is to tell us whether

21   you have any problem giving either side a fair shake

22   throughout these proceedings?

23   A       Okay.

```
 1    Q        And you recall the Judge's preliminary instructions?

 2    A        Uh-huh.

 3    Q        There was a line somewhere on the first page where

 4    you were told that if you were excused it only means that you

 5    were honest and forthright in your answers.  Do you remember

 6    reading that?

 7    A        Yes.

 8    Q        There are no right or wrong answers in this

 9    exchange, but there is a mistake you can make.

10    A        Okay.

11    Q        The mistake you could make is if you, instead of

12    telling us how you really feel you tell us what you think we

13    want to hear.

14    A        Uh-huh.

15    Q        And I would ask you -- I don't think you've done

16    that.  And I would ask you to continue telling us simply the

17    way it is.

18    A        Okay.

19    Q        And you came up with one of the best lines I've ever

20    heard from a juror, "I just want to do what's right."  I

21    mean, that's what this is all about; right?

22    A        Correct.

23    Q        And I'm not saying this is so, but if for some
```

2398

1   reason a juror can't be fair, what's right is for the juror

2   to acknowledge that?

3   A        Correct.

4   Q        Would it surprise you if I told you that those of us

5   sitting over there at the defense table had some concerns

6   about some of your answers in the questionnaire or your

7   answers to Mr. Becker?

8   A        No.

9   Q        And Mr. Becker asked you some hard questions.

10  A        Yes.

11  Q        I've got bad news.

12  A        Okay.

13  Q        I'm going to ask you equally hard questions, or my

14  questions might even be a little harder.

15  A        Okay.

16  Q        And I'm going to apologize in advance for doing

17  that.  But if I were representing you, you would expect me to

18  do no less, would you?

19  A        I would surely hope so.

20  Q        And as we live our lives, would you agree with me

21  that there are feelings that we all have because we're all

22  human?

23  A        Correct.

1    Q        And what we experience leaves us with thoughts,

2    feelings or attitudes about one thing or another?

3    A        Correct.

4    Q        That's what makes us human?

5    A        Uh-huh.

6    Q        Sometimes if you're like me you're able to put

7    thoughts, feelings or attitudes aside, depending upon how

8    strongly you feel about something; right?

9    A        Uh-huh.

10   Q        Other times you're not able to put them aside;

11   right?

12   A        Uh-huh.

13   Q        Sometimes, even though you want to put them aside

14   you say to yourself, okay, I might be able to make a

15   conscious decision to put my thoughts, feelings or attitudes

16   aside, but I don't know that even if I try that they won't

17   effect me subconsciously.  You know what I'm getting at

18   there?

19   A        Yes.

20   Q        Okay.  When Mr. Becker asked you what you recall

21   seeing, reading or hearing about this case, I believe you

22   told him that you heard from the TV that --

23   A        I can't remember if it was TV or if it was the

1    newspaper, because it was quite awhile ago.  And it wasn't

2    something that I followed up on, you know.  I don't know if I

3    was away on vacation, or I don't remember there being a lot

4    brought to my memory about this case.

5    Q        Whether it was from the newspaper or from the TV,

6    what you saw, read or heard was that Donna and a boyfriend

7    robbed someone and someone killed the person being robbed?

8    A        That is what I recall.

9    Q        And when you told those things to Mr. Becker, you

10   said -- and this is a close quote I think.

11   A        Okay.

12   Q        But don't ever let me put words in your mouth.  Slap

13   me on the hand.  Tell me to hold up.  Do something.  Do not

14   let me put words in your mouth.  I believe you told Mr.

15   Becker, "That's all I know"?

16   A        Yes, that's all I know about the case.

17   Q        Would you agree with me that what we see, read or

18   hear leaves impressions on us?

19   A        Correct.

20   Q        Did what you see, read or heard about this case

21   leave the impression on you that Donna was involved in a

22   robbery and someone was killed during that robbery?

23   A        Do you want to say that again?

1    Q         Yes.  As a result of what you heard -- and when I

2    say heard, you could have read or you could have heard it on

3    TV.  As a result of what you heard, did you get the

4    impression that Donna was involved in a robbery and that

5    during that robbery someone was killed?

6    A         I just remember reading or hearing that there had

7    been a robbery.  I remember that, the name of, I didn't even

8    remember her name, I just knew I didn't know her name.  I

9    didn't know the, who the person was.  I just remember that

10   there was a girlfriend, boyfriend and someone killed.

11   Q         Okay.

12   A         That's all I remember.

13   Q         Did what you hear leave you with a lingering

14   impression that she was probably involved with this robbery?

15   Does that question make sense to you?

16   A         Yeah, somehow she was involved.  There was a woman

17   involved.  And now we're assuming that it --

18   Q         Was Donna?

19   A         That it was she.

20   Q         So do you have some impression or am I wrong?

21   A         Yeah, I would assume, yes.

22   Q         And the impression that you have, is that an

23   impression that you expect her to disprove?

2402

```
 1    A        That she was involved?

 2    Q        Right.

 3    A        I guess I want them to prove to me that she was --

 4    Q        Okay.

 5    A        Because like I said, I don't remember her name

 6    specifically.  Just someone, a woman.  I didn't, you know,

 7    her name not recollect to me at all.

 8    Q        Only you can answer that question.  And I'm

 9    certainly going to take your answer.

10    A        Okay.

11    Q        Whatever impressions you have, these lingering

12    impressions that we talked about, are they going to make the

13    State's job any easier, these lingering impressions?

14    A        I don't think so.   I think that they need to

15    definitely prove to me that there was a burglary or, and who

16    was involved and why and where and when.  And --

17    Q        Okay.

18    A        -- how come and --

19    Q        Fair enough.

20    A        -- all of that.

21    Q        So whatever lingering impressions you have, you're

22    pretty certain that you can set them aside both consciously

23    and subconsciously?
```

2403

```
 1    A        Okay.  Yeah.  And I know you need to know.

 2    Q        Whether you can do that?

 3    A        Right.  But I guess my, what I feel, my impressions

 4    are, I don't feel are anything because I don't know --

 5    Q        Okay.

 6    A        -- anything.

 7    Q        So then there's no reason for me to be asking you

 8    these questions?

 9    A        Right.  Because I really don't know.

10    Q        Fair enough.  That's the best answer I can get.  Now

11    we get to talk about penalty for a little bit.

12    A        Okay.

13    Q        And before we do I want to explain to you a concern

14    I have.

15    A        Okay.

16    Q        I'm a bit bothered that we're all standing up here

17    talking to you about possible punishment for someone that

18    you, you don't even know if this person did anything wrong or

19    not?

20    A        Correct.

21    Q        To me it seems a lot like, to use an old saying,

22    putting the cart before the horse.

23    A        Uh-huh.
```

2404

```
 1    Q        You see what I mean by that?

 2    A        (Witness nods head affirmatively.)

 3    Q        Do you see why these questions concern me a little?

 4    A        Uh-huh.

 5    Q        I imagine when you go to work every day, when you

 6    get the kids in the car you buckle up the seat belt?

 7    A        Yes.

 8    Q        And you don't do that because you expect to be

 9    involved in an automobile accident, you do that just in case?

10    A        Right.

11    Q        As Mr. Becker told you, we're being presumptuous

12    here.

13    A        Uh-huh.

14    Q        We have to ask you these questions about a second

15    phase, so we're presuming we get to a second phase just in

16    case, like when you buckle up that seat belt.

17    A        Right.

18    Q        We're not predicting you're going to get there.

19    A        Correct.

20    Q        So as odd as it sounds, and only lawyers could do

21    this, we're asking you very hard questions about a difficult

22    issue you may never have to address.

23    A        Uh-huh.
```

1    Q        Do you understand that you may never have to

2    consider the issue of punishment?

3    A        Yes.

4    Q        Because if Donna is found not guilty at the first

5    phase what happens?

6    A        She's released.

7    Q        And we all pack up our bags and go home; right?

8    A        Correct.

9    Q        Okay.  I guess that gets us right to your views on

10   capital punishment which is, I suspect, where you thought I

11   was going to eventually go.

12   A        I figured.

13   Q        We're going to talk about your personal views.

14   A        Okay.

15   Q        And I will do my best throughout the course of our

16   conversation to be absolutely fair and honest with you.

17   A        Okay.

18   Q        So what I'm going to do is, we'll talk about your

19   personal feelings first.

20   A        Okay.

21   Q        And then we're going to talk about whether those

22   feelings effect your ability to follow the instructions, if

23   we ever get to a second phase.

2406

1    A        Okay.

2    Q        Does that make sense to you?

3    A        Yes.

4    Q        And you recall the Judge, when you came in this

5    morning, who, when he told you that someone who believed in

6    an eye for an eye might not make a good second phase juror?

7    A        Correct.

8    Q        As I read your responses in the questionnaire you

9    believe in the death penalty, first of all?

10   A        Yes.

11   Q        And I want you to understand, there's absolutely

12   nothing wrong with that.  I'm not saying that there is.  And

13   I do not mean to convey to you that I think there is.

14   A        No.

15   Q        But when asked what your views concerning capital

16   punishment are you wrote that, if someone deliberately takes

17   another person's life, that that person should give up his?

18   A        Correct.

19   Q        And then when you were asked if the death penalty

20   should be required for any offenses --

21   A        Uh-huh.

22   Q        You said yes for deliberate, premeditated murder.

23   A        Uh-huh.

```
 1    Q        By required, did you mean that in cases of

 2    deliberate premeditated murder?  And we're talking about your

 3    personal beliefs now.

 4    A        Okay.

 5    Q        That the death penalty would be an automatic penalty

 6    for someone convicted of that offense?

 7    A        I guess that I, at that point when I filled out that

 8    questionnaire I had assumed that before I read --

 9    Q        The preliminary --

10    A        -- downstairs that that is just the way it was done.

11    Q        Okay.

12    A        That if there -- I did not realize that there were

13    other varying degrees of punishment that could be given

14    instead of --

15    Q        Okay.  Do you think you have a handle on the

16    sentencing options, the four of them?  Or do you want me to

17    go over them?

18    A        No, because I really read over that downstairs.  It

19    took me like 20 minutes.

20    Q        Hey, listen --

21    A        And the last part, in fact, I asked her if I could

22    bring it up because I wanted to be sure of the last, the next

23    to the last page and the last page.
```

1    Q       Here.  Why don't you --

2    A       She said that there would probably be a copy up

3    here.

4    Q       I don't know that there is.  Here's my notebook.  I

5    think that, here it is.

6    A       Okay.

7    Q       Would you find me the part that you had a question

8    about?

9    A       All right.

10   Q       And take your time.  Do you want some water up here?

11   I can get water if you want.  I can get you a cup of water.

12   A       Okay.  Where I, where I want a definite

13   clarification of what my responsibility -- I just wanted to

14   make sure I understood.  It was starting right about here.

15   Q       Do you understand and appreciate that as a juror no

16   matter what you think about the death penalty and when it

17   should be applied, you must be able to follow the

18   instructions of the law and apply the Court's instructions

19   rather than your preconceived understanding of what you think

20   the law is?  And I think we talked about that.  And in

21   reading that, that they, there had to be -- let me refer back

22   to this.

23   A       That if they were convicted on the aggravated murder

1    charge and/or the death specifications.

2    Q        Yes, ma'am.

3    A        Okay.  So that's what that is referring to?

4    Q        That's what that is referring to.

5    A        Okay.

6    Q        Before you ever consider punishment, you have found

7    beyond a reasonable doubt, which means you're, as Mr. Bailey

8    here says, that you're firmly convinced to a moral certainty

9    that the person, whoever it is that you're being called upon

10   to determine a punishment for, has deliberately, we're going

11   to use premeditation because that's the word you're familiar

12   with, but the new phrase for that is prior calculation and

13   design.

14   A        Okay.

15   Q        But just premeditated.  That the person is guilty of

16   deliberate, premeditated murder.

17   A        Okay.

18   Q        So you only get to a second phase if you find beyond

19   a reasonable doubt that the person has committed that

20   aggravated murder and one of these death specifications.

21   A        Now the death specifications, I just wanted to make

22   sure, is that, is that the aggravated burglary and the --

23   Q        Aggravated --

```
 1    A          -- aggravated assault?

 2    Q          No.  The aggravated robbery.

 3    A          I'm sorry.  Yes.  Those are the other

 4    specifications?

 5    Q          Those are the death specifications, yes.

 6    A          Okay.  All right.  So are you asking me a question

 7    now?

 8    Q          No.  We were, I'll ask you a question in a second.

 9    But I think --

10    A          I just wanted to make sure that those were it.  I

11    didn't just, you know, not being familiar with this, I wasn't

12    sure if there were other specifications, if that was all

13    lumped together, or if this was -- of course the murder is

14    one part and then these other things are the specifications,

15    the burglary.

16    Q          And the robbery?

17    A          And the robbery.  I've got it now.

18    Q          Are you done with that notebook?

19    A          No.  Can you -- this is where, "Are your feelings

20    about the death penalty such that if you found the Defendant

21    guilty of aggravated murder and at least one specification,"

22    so that would be either the robbery or --

23    Q          Burglary.
```

 1   A        You would refuse to even consider the death penalty.

 2   So that would be like, if I'm not a death penalty person?

 3   Q        Right.  And there are people who do come in here and

 4   say, I don't care what it is I wouldn't consider it.

 5   A        Okay.

 6   Q        I don't mean to interrupt you there.

 7   A        That's fine.

 8   Q        But this seems to be like a good time to tell you

 9   this.  It's the people on either extreme, those who wouldn't

10   consider death and those who wouldn't consider life.

11   A        Right.

12   Q        I'm sorry I interrupted you.

13   A        That's okay.  And then after that, the next point

14   says, "Are your feelings about the death penalty such that if

15   you found the Defendant guilty of aggravated murder and at

16   least one specification you would vote to impose the death

17   penalty in every case?"  So that's one of those types of

18   people that no matter what, because there were, those two

19   things were definitely proven that no matter what I would

20   vote for that?

21   Q        Right.

22   A        Okay.  And then the last one is, "Are your feelings

23   about the death penalty such that if you found the Defendant

2412

```
 1    guilty of aggravated murder and at least one specification

 2    you would consider the death penalty and all the life

 3    imprisonment options equally, and then make your decision

 4    based only upon what is presented to you at the second

 5    phase."  Before in my statement I did not realize that I had

 6    other options, so I feel that I would fall more on this last

 7    one than either of my first two.

 8    Q        Okay.

 9    A        Okay.

10    Q        If you were rewriting the laws for the state of

11    Ohio --

12    A        Okay.

13    Q        You're a Legislature of one.

14    A        All right.

15    Q        And you were writing the penalties for deliberate,

16    premeditated murder.

17    A        Okay.

18    Q        What penalties would you include for that offense?

19    Would you include the life sentence options or would you just

20    include death?

21    A        I think I would include, I think I would include the

22    life sentencing.  I guess I would want to know why they felt

23    they had to do what they did.  What were those, I mean, was
```

```
 1    it just something that sparked -- you had said premeditated;
 2    correct?
 3    Q        Yes.
 4    A        So something they gave thought to?
 5    Q        Yes.
 6    A        And I would want to know why.  I would feel that I
 7    would need to know why they felt that they needed to do that
 8    and what was surrounding that.  What was their emotional, I
 9    mean what, what triggered that?  What did that person do?
10    What was in that whole scenario before I could definitely say
11    yes, death penalty or, no, life imprisonment.
12    Q        When did you fill out this questionnaire?
13    A        I filled out part of it the day that we came.
14    Q        To the other courtroom?
15    A        Yeah.  And then I didn't fill the rest out until
16    last night.
17    Q        When did you fill out the death penalty part?
18    A        Last night.  Because that was the hard part to
19    answer.
20    Q        Yeah, I know.
21    A        So I thought if I didn't have to I wouldn't.
22    Q        By the way, I should tell you that if while you had
23    my notebook you just took it and stood up here and we changed
```

2414

1    rules and I sat where you are --

2    A        Do we do that?

3    Q        No, we won't do that.  I mean if we did, I would

4    have a hard time answering the questions you would be asking

5    me.  I understand these are hard questions.  And when you

6    have to search your mind and search your sole and answer them

7    they're not, the response isn't all that easy.

8    A        Right.  And before, you know, it's easy to say yes,

9    you're for the death penalty, until you get called for jury

10   duty and it's before you and you are definitely deciding what

11   happens to someone.

12   Q        Let me ask you what's going to probably seem like a

13   very bizarre question.  Have your views on the death penalty

14   actually changed in the 24 hours since you wrote out that

15   questionnaire?

16   A        Well, not, not my views.  I just, I guess I never

17   realized I had other options until I read what I did this

18   morning.

19   Q        Okay.

20   A        I just assumed that if all of those things were

21   proven, because I never had any family or anything that has

22   ever gone to this phase and never been in court before so,

23   you know, you just know what you see on TV or whatever.

1    Well, they don't give you all those phases and, you know,

2    they just jump right to here.  And so I guess I just assumed

3    that I didn't have any other choice.  If I believed in the

4    death penalty then this was it.

5    Q        How, how do you feel about the fact that there are

6    life sentencing options?

7    A        I feel that that, that is a good thing.  I feel that

8    there would, there would have to be a lot of evidence for me.

9    There would have to be a lot of evidence given that, that it

10   wasn't something that just, that happened, that it was -- I

11   would need to know the circumstances around it.  I think I

12   would weigh everything that was said.  I think I would weigh

13   everything.

14   Q        Thoughtfully?

15   A        Thoughtfully.  I mean, I was one of those people

16   that I stood up for what I, I stand up for what I believe in.

17   I defended Santa Claus until I was 12 on the bus, okay, and

18   went home and asked mom and then she told me.  I was ready to

19   fight anybody there is.

20   Q        There is Santa Claus.

21   A        So I feel that I'm, I would weigh everything

22   correctly.

23   Q        Okay.  Do you have clear in your mind that a second

1    phase juror has to go into the second phase with all four

2    sentencing alternatives equal?

3    A        In their mind?

4    Q        In their mind.

5    A        Yes.

6    Q        And they have to go into a second phase with these

7    sentencing alternatives equal in their mind after they have

8    found that they are firmly convinced to a moral certainty

9    that the Defendant committed a premeditated murder with a

10   death spec?

11   A        Okay.

12   Q        Do you got that?

13   A        Yes, I do.

14   Q        I'm going to cut right to the chase.

15   A        Okay.

16   Q        Are your personal views on capital punishment such

17   that those four would start out equally in your mind or would

18   one have a leg up over the others?  Do you understand that

19   question?

20   A        Yes, I do.

21   Q        And that's, I understand it's a hard question, but

22   it's one I have to present you on.

23   A        I know.  Because at this point, at this point at the

2417

1  beginning of phase two there you have not been able or -- and

2  I know you don't have to, as they told me earlier, at this

3  point I don't necessarily have any mitigating circumstances

4  to this point.

5  Q       Right.

6  A       So at this point I'm going into that second phase

7  with four options equal and you're going to help me at that

8  point decide why.

9  Q       Why you --

10 A       Why there shouldn't be a death penalty or there

11 should be mitigating -- you're going to show me why there

12 should be leniency toward that.

13 Q       Okay.  Toward one of the other things.  I'm going to

14 ask you another one of these hard questions.

15 A       Okay.

16 Q       It may be I'm pressing you, but if I am it's

17 something I have to do.

18 A       I understand.

19 Q       If you go into to a second phase or if you're a

20 second phase juror, in some cases are you going into a second

21 phase with the mindset that the Defendant should persuade you

22 that death should not be imposed?

23 A       I'm trying to get it straight in my head.

1    Q        It's a hard question.  You take as much time as you

2    need.

3    A        I guess I would have to be honest and say that if

4    during the first phase of the trial it was shown definitely

5    at a reasonable doubt that these things had happened, and

6    that this, and the Defendant was the person that did it, or

7    was involved or whatever, and according to the specifications

8    of that where they were shown that there was the murder and

9    one of the other specifications, I guess I would have to say,

10   yes, I would have to, I guess I would be looking for reasons

11   why not to do a death penalty.

12   Q        So you, I'm going to try to shorten and summarize

13   that answer.

14   A        Okay.

15   Q        Again, we've got a ground rule about words in your

16   mouth.  You're not going to let me do that?

17   A        No.

18   Q        Whenever, whenever a trial juror gets to a second

19   phase in an aggravated murder case there are, there are other

20   felony murder, there are other things -- I'm not talking

21   about those now.

22   A        Right.

23   Q        You have found in your own mind that you are firmly

1  convinced beyond any reasonable doubt that the Defendant

2  planned and premeditated the murder and committed it; right?

3  A       Yes.

4  Q       Along with another specification?

5  A       Okay.

6  Q       And in that situation you would expect the Defendant

7  to persuade you that death was not the appropriate penalty.

8  A       Without knowing all of the circumstances and stuff?

9  This is so hard.

10  Q       I know.  Let's take a step backward.

11  A       Okay.

12  Q       Here's the reason I'm asking you these questions.

13  A       Uh-huh.

14  Q       It appears to me from your answers on the

15  questionnaire that I should be concerned that you were ever

16  asked to decide a sentence.

17  A       Uh-huh.

18  Q       That you would expect the Defendant to persuade you

19  that life should be imposed rather than death.  First of all,

20  do you see why I have that concern?

21  A       Yes.

22  Q       Would you agree with me that it's a legitimate

23  concern?

```
 1    A        Oh, yeah.

 2    Q        And, again, we've got to talk about the conscious

 3    and subconscious layer, too.  Because you may tell me you can

 4    do things consciously, and then on a subconscious plane your

 5    personal view sort of takes over.  Does that make sense to

 6    you?

 7    A        Right.

 8    Q        Do you think that might happen?

 9    A        My subconscious views?

10    Q        On capital punishment.

11    A        I don't think so.  But I mean, it would be something

12    that I would really give a lot of thought to.  I mean, look

13    at you're asking me these questions.  Good grief.  I guess I

14    would be looking throughout the course of the trial,

15    whichever phase, I would be looking for reasons for, I would

16    be looking for reasons for not the death penalty.  Does that

17    make sense?

18    Q        I don't know.  Let me, now let me try the thing.

19    A        I mean, frame of mind, what was going on, you know,

20    all of those types of things.  Those to me are, reasons to me

21    would be what you would call mitigating circumstances.

22    Q        Mitigating?

23    A        Mitigating, yes.  I know you have to have the right
```

 1   words.  But those would be for me as I would -- and that was

 2   one of the things I wanted to ask.  If we are picked are we

 3   allowed to take notes or anything?

 4   Q      No.  You just have to do it all from memory.  Mr.

 5   Bailey frequently talks about, we don't have the resources

 6   like the O.J. trial in California when they tried O.J.

 7   Simpson and all these other people.  Richelle here is a very

 8   competent court reporter but she lacks the financial, or the

 9   county lacks the financial wherewithal to buy her the

10   equipment to generate instantaneous transcripts.

11   A      Sure.

12   Q      So generally what happens is the juror, the jury

13   will send a question, and they are simply told they have to

14   rely upon their collective recollection.

15   A      Okay.

16   Q      So the jury's generally not allowed to write notes.

17   A      Okay.

18   Q      And do you ever watch Court TV?

19   A      No.

20   Q      Some places let the juries ask questions, the jurors

21   ask questions.  Not here.  You're stuck with the questions

22   that we elicit.

23   A      Okay.  Now, if we got to that second phase and we

1    were in deliberation or whatever, if we had questions, those

2    would be brought to you?

3    Q        The foreperson, the foreperson of the jury would put

4    it on the piece of paper, sign it, would press a buzzer that

5    would call the bailiff.  The bailiff would come pick up the

6    question.  The bailiff would then take the question to the

7    Judge.  The Judge would then call the lawyers into his

8    chambers collectively.  We would discuss how to respond to

9    that question.

10   A        Okay.

11                   THE COURT:  Let me say, that's only on

12   questions of law.  Rarely, if ever, is the evidence reviewed

13   by the Court in that situation.

14   Q        Okay.  That's the reason it's so important for

15   everybody to listen to the evidence as you go through it.

16   A        Okay.

17   Q        Okay.  I am sometimes not the most artful person in

18   the world.  I get tongue-tied.  My mouth goes too quick for

19   my brain because I'm a little slow.  And if, if one of my

20   questions here doesn't make sense, that means that I've

21   failed to make myself clear.  So it's my fault.  So if that

22   happens, would you please let me know and I'll do my best, I

23   can't promise that I'll succeed, but I'll do my best to

1    rephrase the question?

2    A        Okay.

3    Q        And let's forget about the first phase here.  This

4    is the second phase.  In some cases, if you go into a second

5    phase, as I understand your responses, you're going to be

6    looking for reasons not to impose the death penalty?

7    A        Right.

8    Q        I'm not so sure this question is going to make

9    sense, and if it does make sense it's probably going to be a

10   hard question.

11   A        Okay.

12   Q        So if you go into a second phase, are you sort of

13   predisposed to impose death and you're looking for reasons

14   not to; does that make sense?

15   A        It makes sense.

16   Q        Is that the way you feel?

17   A        Second phase, I don't think so.

18   Q        Okay.

19   A        I think at that point I know all those options are

20   available and at that point during the second phase I then

21   have to choose or, because we're at that second phase, at

22   that point then I have to choose an option.

23   Q        Right.

1    A        Right.

2    Q        And who has the burden of proof at that second

3    phase?

4    A        Well, we've already determined that she's --

5    Q        Guilty.

6    A        That it's guilty.

7    Q        Right.

8    A        So at this, during the second phase then I have to,

9    I have to pick one of those options.

10   Q        Yes, ma'am.

11   A        And so you're asking me what's going to determine

12   that for me?

13   Q        I'm asking you, first of all, who has the burden of

14   proof in that second phase, do you know?  And it maybe its --

15   A        According to what I heard earlier today, you may not

16   give me anything at that second phase.  You may not tell me

17   anything, so I have to go with only what the State is then

18   telling me.  And at some point they, we've gotten there,

19   they've already proven --

20   Q        Aggravating circumstances?

21   A        Aggravating circumstances.

22   Q        Right.

23   A        And at that point then I have to decide whether or

1    not I feel that it warrants --

2    Q       Death?

3    A       -- death.

4    Q       Right.  Yeah.  I should clear something up here.

5    A       Okay.

6    Q       We, the defense does not have a burden of proof at

7    any point in time throughout any of these proceedings.

8    A       Uh-huh.

9    Q       But in a second phase the defense has the obligation

10   of presenting, if we want to, mitigating factors.

11   A       Right.

12   Q       That you might hear additional evidence in a second

13   phase or you might just have the same evidence that was

14   presented at the first phase.

15   A       Correct.

16   Q       And perhaps a lawyer stands up and says, well, there

17   is mitigating evidence before you, although I'm not going to

18   elicit new evidence now, there's mitigating evidence that was

19   elicited before and here's what it is from the last, from the

20   first phase.

21   A       Okay.

22   Q       Or maybe the defense does introduce additional

23   evidence of mitigating factors.  Mitigating factors is what

1    they're called.  There are mitigating factors.  There are

2    aggravating circumstances.

3    A      Okay.

4    Q      The law is that if you go into a second phase you

5    get the aggravating circumstances.  Now, aggravating

6    circumstance or circumstances would be the death

7    specifications that brought you to the second phase in the

8    first place.

9    A      Uh-huh.

10   Q      So you have aggravating circumstance.  You then are

11   instructed to balance those, weigh those against mitigating

12   factors.

13   A      Uh-huh.

14   Q      And as a juror you're told that you're the sole

15   judge of the facts, the credibility of the witnesses and the

16   weight of evidence.  So your responsibility is to weigh that

17   evidence.  And that's --

18   A      Right.

19   Q      -- an individual decision that each juror has to

20   make.

21   A      Correct.

22   Q      Before you can impose a sentence of death you must

23   find beyond a reasonable doubt or, as Mr. Bailey would say,

1   you must be firmly convinced to a moral certainty that the

2   aggravating circumstances outweigh the mitigating factors and

3   that death is the appropriate punishment.

4   A       Right.

5   Q       So if you ever get to a second phase in any case,

6   the State, whether it's represented by these two fellows or

7   someone else, has the burden of convincing you, firmly

8   convincing you beyond a reasonable doubt that death is the

9   appropriate penalty.

10  A       Right.

11  Q       I guess why I have been asking all these questions

12  is, I have a concern that your personal views at the second

13  phase might sort of shift that burden of proof.  Do you, does

14  that make sense to you?

15  A       Yes.

16  Q       I'm concerned that your personal views on capital

17  punishment might shift that burden of proof at a second phase

18  and in your mind you might expect the defense to convince you

19  that life is the appropriate penalty.

20  A       Uh-huh.  But I think that I would already be looking

21  for that in weighing all of the things from the first phase

22  because, as you just talked about, because not necessarily

23  will you be telling me anything, you know.  You may, you may

1    not tell me anything.  Or you may say, not give me any new

2    evidence.  You may, you know, we might just go over what was

3    already introduced in the first phase.  Well, those things

4    would already be something that I would be weighing.

5    Q        Right.

6    A        I would feel that I would be.

7    Q        Trust me, if you were at a second phase you're going

8    to hear something about mitigating factors.

9    A        Uh-huh.

10   Q        So you will have evidence of mitigating factors.

11   That's not what I'm talking about now.

12   A        Okay.

13   Q        I'm talking about the burden, whose burden it is to

14   prove the appropriate sentence.  Am I making sense to you?

15   A        Yeah.

16   Q        The law is that it's the State's burden to prove

17   that death is the appropriate sentence.

18   A        Right.

19   Q        My concern, and I know just said this a few minutes

20   ago, if you think that I'm all wet with this concern just

21   tell me and I'll take your answer, my concern is, is that

22   your personal views on the death penalty shift the burden.

23              In other words, you wouldn't require the State to

2429

 1    prove to you that death is the appropriate penalty.  You're

 2    going to require the defense to prove to you that life is the

 3    appropriate penalty?

 4    A        I don't think so.

 5    Q        Okay.

 6    A        Let me tell you what I think you're saying to me.

 7    Q        Okay.  You're playing me.  That's good.  I like

 8    that.

 9    A        I think that you're telling me that you, when I get

10    to that second phase you think that I'm going to go in there

11    with already a preconceived idea of what I want, and I want

12    to be persuaded differently?

13    Q        Right.

14    A        No.

15    Q        So it took us a long time to get to that, didn't it?

16    A        Yeah.

17    Q        Well, and in the process you had to take some time

18    to think about your answers.

19    A        Uh-huh.

20    Q        And I had to take some time to think about my

21    questions.  And I'm actually happy that we got to the point

22    where we're at.  We're almost done.  And we can go on to

23    something else.

1    A        Okay.

2    Q        If you ever get to a second phase.

3    A        Uh-huh.

4    Q        Your oath as a juror requires that all four of the

5    sentencing options start out equally in your mind.

6    A        Uh-huh.

7    Q        Are you up to that?

8    A        They all have to be equal.  One can't be any more

9    prevalent than another?

10   Q        Right.

11   A        I think I am.  I think I am up for that but --

12   Q        There's hesitation.

13   A        Not hesitation.  Well, yeah, I guess I'm hesitating.

14   All four that, all four are equal?

15   Q        Uh-huh.

16   A        I just, I guess because the severity of the case I

17   want to make sure that I'm doing --

18   Q        The right thing?

19   A        The right thing, you know.  So sorry it's taking me

20   for --

21   Q        If this has taken forever it's my fault, not your

22   fault.  And don't you ever be sorry for taking time to

23   honestly answer questions.

 1   A        Yeah.  Because this is too serious to be --

 2   Q        Right.

 3   A        So I would feel that I definitely would have,  that

 4   I could start at that blank slate.  Okay.  So they've proven

 5   that it's guilty.  Now I am at that phase, let's see where

 6   this is going to go.

 7   Q        What do they have to prove at that second phase?

 8   A        I guess to me that there are --

 9                     MR. BECKER:  Your Honor, I am going to

10   object.  The Court is going to instruct her on the

11   instruction.

12                     MR. INGRAM:  I'll withdraw the question.

13                     THE COURT:  Okay.

14   A        I guess at that, I would -- when we get to that

15   phase and we're starting over again, okay, at that point

16   everything is going to be okay.  We know that the guilt has

17   been found, so since we're going to be at this phase we have

18   to, again, I guess I would expect that there would be, okay,

19   this is why we found guilt.  This is what happened.  This is

20   this.  And I would imagine that the other side would say,

21   well, this is state of mind.  This is the circumstances.

22   This is what happened.  And so I would feel that at that

23   point, even though a guilty verdict has been given, now we

1   have to deal with the punishment part of that.  I would think

2   that I could do that fairly and across the board, say, okay,

3   this is --

4   Q       Okay.

5   A       Am I making any sense?

6   Q       Yes, you are.  One final question and I'll move on.

7   I know the court reporter's fingers are probably working to

8   the bone.

9           Your oath in a second phase requires that all four

10  start out equally in your mind.

11  A       Uh-huh.

12  Q       Your oath would also require that you hold the State

13  at that second phase to its burden of proving beyond a

14  reasonable doubt that death is the appropriate penalty?

15  A       Correct.

16  Q       Will you hold them to that burden?

17  A       Yes.

18  Q       Okay.

19  A       Yeah.

20  Q       All right.  Have you ever -- I'm moving on.  Is

21  there anything about the penalty thing that you want to

22  discuss?

23  A       No, I think we've gone over it a lot.

1   Q       Have you ever donated -- well, do you think we went

2   over it too much or unnecessarily?

3   A       No.  It just, it just clarifies, it helped clarify

4   all of that so, no.

5   Q       Have you ever donated any time, money or services to

6   a political campaign or issue?

7   A       A political campaign.

8   Q       Do you belong to any group or organization which is

9   active in any political matter?

10  A       No.

11  Q       Do you belong to any or associate with any group

12  which has crime prevention or law enforcement as a goal?

13  A       A long time ago I was with neighborhood block watch.

14  Q       How long ago was that?

15  A       Let's see.  23 years.

16  Q       How long?

17  A       23 years.  It was like 22 years ago because it was

18  when we were first married.

19  Q       I'm going to try to go fast here.  If I go too fast

20  stop me.  You understand that this is a court of law and not

21  a court of sympathy?

22  A       Yes.

23  Q       Sympathy should have no --

1    A      No.

2    Q      -- basis in your evaluating?

3    A      Correct.

4    Q      And you may see evidence that evokes an emotional
5    response.  You might see photographs, crime scene
6    photographs, coroner's photographs.  Even though this
7    evidence evokes an emotional response, let's say sympathy or
8    anger, you still have to test the evidence to determine
9    whether it ties Donna to the crime or not.  Are you up to
10   that?

11   A      Uh-huh.

12   Q      And you understand that this trial is about the
13   guilt or innocence of one person and one person only?

14   A      Yes.

15   Q      Donna Roberts.

16   A      Yes.

17   Q      I believe Mr. Becker used the word accomplice,
18   someone said accomplice, aider and abettor.

19   A      Yes.

20   Q      That's a helper, someone who helped.  So what you're
21   here to do is determine whether Donna Roberts helped.

22   A      Right.

23   Q      When we were, when you came for orientation, in the

1    other courtroom at the other end of the hall, when you walked

2    in the doors did you go to your left or to your right?

3    A        I went to my left.

4    Q        Did you sit down or were you standing?

5    A        I stood for a little while and then I found a space

6    and sat down.

7    Q        Did you hear anyone say anything about this case at

8    that time?

9    A        I was reading a book.  It was really good.

10   Q        So while you were in that room you did not overhear

11   any conversations about this case?

12   A        No.

13   Q        How do you personally -- and, again, same rules as

14   before, if we have to we'll discuss how your personal

15   feelings affect your ability to follow the law.

16            How do you personally feel about the rule of law

17   which requires that a trial juror presume the defendant

18   innocent?

19   A        I think that's only right until you hear the --

20   Q        Evidence?

21   A        Until you hear the evidence.  I mean, I would want

22   somebody to think I was innocent until it was proved one way

23   or the other.

1    Q        And will you afford Donna the presumption of

2    innocence throughout the course of these proceedings?

3    A        Yes.

4    Q        In support of its allegations here the State will

5    elicit some evidence, letters and tape recordings that are

6    sexually explicit and they may be rather offensive.  They are

7    offensive.

8    A        Okay.

9    Q        Even though they're offensive, you still have to

10   test this evidence to see if it ties Donna to the offense; do

11   you understand that?

12   A        Uh-huh.

13   Q        And the burden of proof is only on the state of

14   Ohio.  Do you have any problem with that?

15   A        No.

16   Q        Do you think we have a crime problem in this

17   country?

18   A        Yes.

19   Q        Do you have any ideas what we -- and by "we" I mean

20   society as a whole, might be able to do to begin addressing

21   that problem?

22   A        About the crime?

23   Q        Yes.

```
 1    A         Well, I think it starts kind of like, I don't know,

 2    I think in our home we talk about those types of things.  I

 3    think that there, I don't think every home is like ours.  I

 4    think, I think it's gotten really kind of wild.

 5    Q         So we could start at home?

 6    A         I think it would.  I, personally I feel that it

 7    would start at home.

 8    Q         Okay.

 9    A         I mean, we even talk with our, I only have one child

10    left really at home, and we even talk with his friends and --

11    Q         How did you survive the teenage years?  I'm going

12    through it.  It's tough.

13    A         It is.  And boys are -- my girls were, my girls were

14    good but my son.

15    Q         I'm with you there.

16    A         We're hoping to get him through.

17    Q         You have to determine the credibility of the

18    witnesses.

19    A         Right.

20    Q         You'll test the believability of every witness that

21    testifies.

22    A         Yes.

23    Q         And if the Defendant testifies, she's a witness just
```

1    like any other witness to the extent that you use the same

2    rules or standards in determining her believability as you do

3    with the other witnesses.

4    A       Correct.

5    Q       She's the Defendant, obviously, so she has an

6    interest or a stake in the outcome.

7    A       That's true.

8    Q       And that's something you would want to keep in mind;

9    right?

10   A       Uh-huh.

11   Q       By the same token, if you find another witness has

12   an interest or a stake in the outcome, you would want to keep

13   that in mind in determining whether to believe that witness

14   or not?

15   A       Say that one again.

16   Q       If you found that another witness also had an

17   interest or a stake in the outcome of the case.

18   A       Okay.

19   Q       You would then want to consider that in determining

20   the credibility of that other witness, too, wouldn't you?

21   A       Right.

22   Q       And the Judge will give you a whole list of factors.

23   But one thing he's going to tell you about is the test of

1    truthfulness that you employ in your daily life.  You had to

2    decide numerous times whether those kids were being straight

3    with you or trying to hoodwink you?

4    A        Uh-huh.

5    Q        And at the car dealer you've got to sometimes decide

6    whether a customer is being straight with you or trying to

7    hoodwink you?

8    A        Uh-huh.

9    Q        And over the years you've developed a sixth sense or

10   intuitive sense to help you make that determination?

11   A        I think somewhat, yes.

12   Q        The Judge is going to instruct you to take that

13   test.  He's going to call it the test of truthfulness that

14   you employ in your every day life.  Bring it in here and

15   apply it to every witness that testifies.  Will you do that?

16   A        Yes.

17   Q        We talked a lot about proof beyond a reasonable

18   doubt.  First of all, it's based on reason and common sense.

19   A        Uh-huh.

20   Q        And proof beyond a reasonable doubt requires that

21   you be firmly convinced, and that you would be willing to

22   rely and act upon it in the most important of your own

23   affairs.

1    A       (Witness nods head affirmatively.)

2    Q       You've made some pretty important decisions in your

3    life, haven't you?

4    A       Yes.

5    Q       And I would imagine, although I could be wrong, that

6    at some point in time in your life you've gotten either a

7    sheet of paper and drawn a line down the middle of it and put

8    the negatives on one side and the positives on the other, or

9    you did it in your mind, but you did the same thing?

10   A       Yeah.

11   Q       Have you ever done it on paper?

12   A       Yes.

13   Q       And what do you do after you get -- you get the

14   positives down.  You get the negatives down.  Then you try to

15   scratch off the negatives if you can; right?

16   A       Not normally.

17   Q       Well, if I'm buying a house I write on the good side

18   four bedrooms; I need four bedrooms.  Three bathrooms; I need

19   three bathrooms.  Good school.  Good neighborhood.  My wife

20   likes the house.

21           On the negative side I have, it's 45-years old.  I'm

22   concerned about the structural stability.  There's some

23   plumbing problems.  I'm concerned about the amount of the

2441

1    plumbing bill and, I don't know that I can make the monthly

2    mortgage payment.

3            So I call, I write into the agreement a home

4    inspection.  And they come.  It sounds -- it's brick solid.

5    I strike that off.  I call the plumber, Gary.  It's going to

6    cost you 200 bucks.  I scratch that off.  I go to the bank,

7    though, and I ask him for a lower interest rate and they say

8    no.  I ask them for a longer term of the loan and they say

9    no.  I would, I wanted to say that I asked my boss for a

10   raise but I don't have a boss, so I asked myself for a raise.

11   I can't get one because I don't make enough.

12           No matter how much I think about it that concern

13   about being able to make the monthly mortgage payment remains

14   reasonable in my mind.

15   A       Uh-huh.

16   Q       So as long as I have one reasonable negative on the

17   right-hand column I cannot say beyond a reasonable doubt that

18   that decision is the right thing for me.

19   A       Uh-huh.

20   Q       Do you understand that?

21   A       Uh-huh.

22   Q       It's the same in this case.  Will you hold the State

23   to that burden both at the first phase, and if we ever get to

2442

1    the second phase, to the second phase?

2    A        Yes.

3    Q        And just very quickly about circumstantial evidence.

4    It's evidence from which you ask to make a leap in logic.  Do

5    you think you have a handle on that?

6    A        Uh-huh.

7    Q        It's proof of some fact by direct evidence, what you

8    see, what someone sees, hears, feels, smells --

9    A        Okay.

10   Q        -- from which you can infer other reasonable and

11   other reasonable facts or circumstances?

12   A        Uh-huh.

13   Q        Like the easiest thing, if I go to sleep at night --

14   and it's in the middle of winter.  My grass is green when I

15   go to bed.  I wake up, there's six inches of snow on the

16   ground.  I didn't see it snow but I can infer that it snowed.

17   A        Uh-huh.

18   Q        Now, you might not be able, however, to pile an

19   inference on an inference.  It's a Sunday morning and I have

20   my coffee and I'm smoking a cigarette.  I look out the window

21   to see if my newspaper is here.  Footprints from the house

22   next door to my front door.  Footprints from my front door to

23   the next door.  I could also infer that someone walked

1    through the snow; right?

2    A       Right.

3    Q       Well, I may pile an inference on an inference and

4    assume that that was my paperboy, what seems reasonable,

5    until I go down and open my door and there's my Giant Eagle

6    coupons.  So you, you have to test these inferences.  Do you

7    see that?

8    A       Uh-huh.

9    Q       Will you do that throughout these proceedings?

10   A       Yes.

11   Q       And if you were making inferences where someone you

12   know was accused of some wrongdoing, you might look for other

13   equally reasonable inferences that point in another

14   direction.  Does that make sense to you?

15   A       Yes.

16   Q       Will you do that, please?

17   A       Yes.

18   Q       Thank you.  Listen.  We spent a lot of time with one

19   another.  I'm really impressed by the thoughtfulness of your

20   responses.  And I thank you for your time and consideration.

21   A       You're welcome.

22                    THE COURT:  Pass?

23                    MR. INGRAM:  Pass.

1         MR. BECKER:  Pass, Your Honor.

2         THE COURT:  You will be in the poll from

3    which this jury is selected.  You should call that number

4    given to you tomorrow evening for further instructions.

5    A         I'm supposed to call tonight.

6         THE COURT:  And hopefully by mid week we

7    should have the other people, we can get everybody in here to

8    pick this jury.  Okay.  I remind you you're not to read

9    anything or watch anything on TV or talk with anybody about

10   it.

11   A         Okay.

12                             *  *  *

13   WHEREUPON,

14                   GARY S. PHILLIPS

15   having been first duly sworn, according to law, was examined

16   and testified as follows:

17                     EXAMINATION

18   BY THE COURT:

19   Q         You are Gary?

20   A         Yes, sir.

21   Q         Good afternoon.

22   A         Hi.

23   Q         Did you read the handout that was given to you?

1    A      Yes, sir.

2    Q      You're aware then that this is a case, Donna

3    Roberts, where she stands charged of aggravated murder with

4    specifications.

5         Under the law of Ohio if a person is found guilty of

6    murder it's not necessarily a capital case where you face the

7    death penalty.

8         The Legislature has set forth certain specifications

9    attached to the indictment, as they are here, and if the

10   State proves all the elements of the aggravated murder plus

11   the elements necessary to prove the specifications, they do

12   so beyond a reasonable doubt, being the burden of proof, then

13   this case or a case like this goes into a second phase.

14        If the State fails to carry that burden of proof

15   then the jury could return a verdict of, I guess murder

16   without the specifications or could find the Defendant

17   guilty, then there would be no second hearing.  It's

18   unworkable to wait until this trial gets to that point

19   because by doing so we run the risk that the jury that would

20   have to decide that second phase may have people on there

21   that have very strong feelings about the death penalty.

22        An example would be a person who believes an eye for

23   an eye, tooth for a tooth.  If you take a life you give your

1    life up.  Such a person holding those beliefs would not

2    follow the law and could not be fair to a defendant because

3    the defendant has the right to have that jury decide

4    aggravating circumstances, reasons for the death penalty to

5    be imposed, to weigh that against mitigating factors, reasons

6    given why it should not be imposed.

7              And if the State proves the aggravated circumstances

8    outweigh the mitigating factors beyond a reasonable doubt,

9    then the State has a right to request that jury to consider

10   and impose the death penalty.

11             So if you have people on the jury that under no

12   circumstances could ever impose the death penalty, then the

13   State can't have a fair trial.  So at this point to avoid

14   that problem we ask you questions about your thoughts.

15   Whatever your thoughts are, fine.  You're entitled to your

16   thoughts.  All these folks will respect what your opinion is,

17   because we've had the whole range given by other people here.

18   But it is important that they be assured that you're in the

19   middle somewhere where you're able to set aside whatever

20   personal beliefs you have and follow the law.  Everybody has

21   to follow the law, the jury, the attorneys, the witnesses,

22   myself.  It's the only way you get a fair trial.

23             The other issue will be in regard to pretrial

1   publicity. Most or many of the people in this panel will

2   have read or heard something about this case. It got a fair

3   share of publicity, as a case of this type would. So the

4   question then becomes, even though a person may have heard

5   something about the matter, were they really fixated upon it

6   to the point where they found everything they could about it?

7   And then the bottom line is, is any particular individual

8   able to set aside some information that they received outside

9   this courtroom and let that enter into the case? Because

10  that fair trial is only possible when the matter and issue is

11  decided on the evidence presented in court.

12          Anything that happened outside of court doesn't

13  exist if it's done properly. And we've had some people that

14  said, no, I'm following the case, I can't get all that. And

15  other people were not so familiar with it. But that's the

16  main two areas that we'll inquire about. Okay?

17  A       Yes, sir.

18  Q       Do you have questions before we start?

19  A       No, sir.

20                  MR. BAILEY: Thank you, Your Honor.

21                          EXAMINATION

22  BY MR. BAILEY:

23  Q       Good afternoon, Mr. Phillips.

1     A          Hello.

2     Q          My name is Ken Bailey.  I'm an assistant Trumbull

3     County Prosecutor.  And about over two weeks ago you were in

4     the courtroom across the hall and I promised you that I would

5     be joined by my co-counsel who is here this afternoon.  He's

6     another assistant prosecutor.  And the two of us are

7     responsible for prosecuting this particular case on behalf of

8     the people of Trumbull County and state of Ohio.

9               We're going to ask you some questions like the Judge

10    said.  But I want to set out some basics.  First, you

11    understand that the reason we get, we go through this jury

12    selection process where we get to ask you questions about

13    your prior experiences and your beliefs, your opinions, is to

14    make sure that the folks who are selected to serve on this

15    jury can be fair and impartial to both sides, both to the

16    Defendant and to the people of the state of Ohio.  Okay.

17              And we're not asking you these questions because

18    we're snoopy and like to pry out of mere idle curiosity.  And

19    there aren't any right answers.  There aren't any wrong

20    answers to these questions.  Just open, candid answers.

21              A couple other things.  If you have any questions

22    about anything that we're doing here that pertains to our

23    proceedings, feel free to ask them because this is the one

 1    chance we get for a little give and take.  Because once we're

 2    done in court today we're not allowed to have any other

 3    communication with you.

 4         If we run into each other out in the hall or the

 5    elevator or hallway or restaurant or something, all we can do

 6    is say good morning or good afternoon.  We're not trying to

 7    be antisocial with you.  If we had any communication with you

 8    it would violate our code of conduct as attorneys and it

 9    could result in a mistrial, and we would have to do it all

10    over again.

11    A         I understand.

12    Q         We spend quite a bit of time talking to the folks

13    trying to pick a jury.  The first two areas I want to get

14    into is this issue of pretrial publicity, newspapers, TV and

15    stuff like that, and your advanced knowledge of the case, the

16    issue of the death penalty, then I'll get to some regular

17    questions.

18         Let's start out with this pretrial publicity issue.

19    If I remember reading your questionnaire you read the Tribune

20    on a daily basis?

21    A         Yes, sir.

22    Q         And as far as TV, you don't look at the local news,

23    right, rarely?

1   A        Yeah.  I just skip through it, I think.  If I see an

2   automobile accident I kind of look at things to see if it's

3   anybody I know or something like that.  I more stick to sport

4   sections and stuff.

5   Q        And I notice, though, you wrote down the name

6   Fingerhut in your --

7   A        Yes.

8   Q        -- questionnaire?  What do you recollect having

9   heard or read about this case or discussed about this case

10  with anyone?

11  A        I never discussed it with anybody.  Where I live

12  it's not --

13  Q        Farmdale?

14  A        Yes.

15  Q        It's out, sort of --

16  A        Out near Kinsman.

17  Q        It's out in the rural area?

18  A        And there's not a lot of, there's not really too

19  much that we discuss it with.  I mean, other than I don't

20  know where he's from.  I remember seeing something about it,

21  he owned or ran a Greyhound Bus and that was just about it.

22  I never --

23  Q        So you're pretty much starting out with a clean

1    slate here.  You just remember the name Fingerhut.  And it

2    may well be as we get into the testimony of this case, it may

3    jog a recollection of having read something in the newspaper

4    a little bit more about this particular case.

5    A        Okay.

6    Q        But the important thing is, as you look around the

7    courtroom now there's nobody here from the news media, but

8    when the trial starts, the testimony starts, you'll see

9    occasionally some reporters come in from the two newspapers,

10   the Tribune and Vindicator, and TV crews will come in from

11   the three TV stations.  They're not allowed to film the

12   jurors but they film witnesses or the Judge or the attorneys

13   or the Defendant.

14   A        Okay.

15   Q        But generally they're only going to be here for a

16   couple of minutes.  They'll set up their cameras and stuff.

17   They'll take a couple shots and then they'll use just a

18   fraction of that on TV.  And the newspaper reporter, he may

19   be here for three to five minutes or he may be here for half

20   the day.  But then you're going to notice something.  He's

21   going to leave.  Okay.  And what happens?  He misses all the

22   questions that were asked and answered of the witnesses

23   before he got here.  And he's going to miss everything that

1    was asked and answered after he left.

2         Now, if you sit on this jury you're going to have

3    the chance of hearing all of the testimony.  And because they

4    have to rush in to print, not because they maliciously slant

5    stuff in the paper, they're only going to put in what they

6    heard that particular day while they were there.  And it may

7    well be, if you have somebody, let's say you have your wife

8    save newspapers for you and you read it after the trial is

9    over, both phases.  You've got to wait until both phases.

10   You've got to wait until the second phase.  You may say to

11   yourself reading this newspaper, I remember this trial

12   because I sat through the whole thing.  I remember the

13   testimony, and it was totally different, because he has only

14   reported on parts of it and he missed all the stuff that

15   happened after.  And the reporter that covered it must have

16   been in Judge McKay's court covering a case rather than the

17   case that I sat through.  Okay?

18   A         (Witness nods head affirmatively.)

19   Q         So that's why we don't like you to get any

20   information from the outside during the course of the trial.

21   You are to set aside anything you've learned before.  You

22   would be able to do that; right?

23   A         Yes, sir.

```
 1    Q        That wouldn't be any problem.  So much for this
 2    pretrial publicity issue.  Now let's get to the death penalty
 3    as a possible punishment.  Looking at your questionnaire,
 4    it's my -- well, let me ask it this way.  When was the first
 5    time you learned this was potentially a death penalty case?
 6    A        Can you repeat that?
 7    Q        When did you first learn that this case involved the
 8    death penalty as a possible punishment?  Was it when you
 9    first came to court?
10    A        When the Judge said something last time.
11    Q        About two weeks ago or so, two and a half weeks ago?
12    A        No.
13    Q        And before that had you ever discussed with family
14    members or friends or co-workers the issue of punishment
15    where the death penalty came up as an issue, maybe when
16    certain major crimes appeared in the newspaper, what would be
17    appropriate?  Like Oklahoma City, 9/11 or Jeffrey Dahmer,
18    things like that?
19    A        Maybe me and my wife might have discussed O.J.
20    Simpson's trial, you know.
21    Q        And what possible punishment if he had been
22    convicted?
23    A        Yeah.
```

1    Q        Would be appropriate?

2    A        (Witness nods head affirmatively.)

3    Q        And now let me ask you, how do you feel about the

4    death penalty as a possible punishment?

5    A        I think it should be considered.  I mean if, if all

6    the facts are there.

7    Q        For what types of cases?

8    A        Well, I think, I think a combination of like if

9    there was, I don't know, I have this thing about children, so

10   if somebody went up and kidnapped a child and raped them and

11   killed them, I would be highly upset with that.  I would

12   think that person should die for that, yes.

13   Q        Okay.  Any other types of crimes where you think the

14   death penalty might be a possible punishment?

15   A        I'd probably say like you said about the Oklahoma

16   bombing or some kind of terrorist thing that they just go in

17   there and kill people cold heartedly.

18   Q        Mass murders?

19   A        Yes, sir.

20   Q        What about crimes like murder for profit that are

21   planned in advance?

22   A        I really never thought of it, honestly.  I mean I --

23   Q        Okay.  Now, if you were, if you were in our state

1    the state Legislature writes the laws and they set down what

2    the standards are that make a case eligible for the death

3    penalty as a possible punishment.  And if you could be on the

4    Legislature, if you had a say in designing the criminal

5    justice system would you include the death penalty as a

6    possible punishment for certain crimes?

7    A        Yes.

8    Q        Okay.  The ones you mentioned?

9    A        Yes, sir.

10   Q        Any other crimes?

11   A        Maybe possibly if I thought about it more.  I just

12   really don't, I'm not never involved in something like that.

13   I've never been involved.  It's not part of my process of

14   thinking I guess.

15   Q        Fair enough.  And it's sort of an unusual thing

16   because in most criminal cases tried in our courts the issue

17   of punishment never comes up for the jury.  It's decided by

18   the judge alone.

19            It's only in these types of cases where there's a

20   crime called aggravated murder and one or more of these

21   special findings of fact, we call them specifications, that

22   are attached to these charges of aggravated murder cases

23   where a jury finds the defendant guilty of that beyond a

 1   reasonable doubt, then we go into a second trial or a second

 2   phase of the trial where this issue of punishment comes up

 3   for the jury.  And the jury considers that to determine

 4   what's the appropriate punishment for a defendant convicted

 5   of that type of crime.

 6   A       Okay.

 7   Q       Your view that the death penalty would be

 8   appropriate would be the right penalty for somebody who kills

 9   a child, let's say kidnaps and kills a child, is that based

10   on a personal, moral, ethical or religious belief or some

11   combination of factors?

12   A       No.

13   Q       What is it based on?

14   A       Just I, just as much as I love children I guess.

15   That's just something, they deserve a chance in life.  And I

16   think if somebody takes that away from them being that young

17   that bothers me.  I think they should die for it, yes.

18   Q       Now you understand this case doesn't involve that

19   type of a circumstance?

20   A       Yes, sir.

21   Q       That's not the charge here.  The Defendant here is

22   charged with four different, four crimes, two of these

23   charges deal with the crime of aggravated murder.  And

 1    there's only one person who's dead, but there are two

 2    different theories that the State is allowed to pursue.  And

 3    we've elected to pursue both of those theories.  So there are

 4    two separate or charges of aggravated murder.  One of these

 5    charges of aggravated murder is the killing occurred

 6    purposely with prior calculation and design.  And the other

 7    charge of aggravated murder is that the aggravated murder

 8    occurred purposely, and it occurred, we call it a felony

 9    murder, during a special felony, aggravated burglary and/or

10    aggravated robbery.  Okay.

11         So we, there are two different charges for a jury to

12    consider of aggravated murder.  Attached to those charges of

13    aggravated murder are these specifications of aggravating

14    circumstances.  Fancy words for special findings of fact for

15    a jury to consider.  And the specifications of aggravating

16    circumstances are first that the aggravated murder was

17    committed during an aggravated burglary, and that it was

18    committed with prior calculation and design.

19         The second specification or special finding is the

20    aggravated murder was committed during an aggravated robbery

21    as opposed to an aggravated burglary, and it was committed

22    with prior calculation and design.  There then are two other

23    charges.  There was a charge of aggravated burglary and a

1   charge of aggravated robbery.

2        Sometimes folks who aren't lawyers or judges use

3   those terms interchangeably, but they're different.  The

4   Judge will define those terms for you in great detail.  But

5   basically an aggravated burglary involves a situation where

6   somebody trespasses in a house, an occupied structure where

7   somebody is present or living and the offender may be armed

8   with a deadly weapon, like a gun or knife or something, and

9   may cause serious physical harm to the victim.

10        An aggravated robbery doesn't deal with a trespass

11   in a dwelling house but rather it deals with the use of force

12   or threat of force against the person.  And again to commit

13   some -- in the aggravated burglary the person goes in with

14   the intent to commit an offense like maybe an aggravated

15   murder or theft offense or something.

16        In the aggravated robbery it's the use of force or

17   threat of force against the person basically, and the, it

18   could be to steal something, and the offender can be armed

19   with a deadly weapon like a gun or knife, and he could cause

20   serious physical harm to the victim.  Okay.

21        So you understand those distinctions between the

22   words aggravated burglary and aggravated robbery.  Attached

23   to those two crimes is another specification, and this

1    specification is a fancy word for special findings of fact

2    for you to consider is that there was a firearm involved, a

3    working gun.

4    A        Okay.

5    Q        So we've got all these fancy words but it's fairly

6    simple.  Okay.  Somebody got killed and it was done with

7    prior calculation and design.  And it's either during an

8    aggravated burglary or an aggravated robbery.  And somebody

9    broke into a house, you know, did certain things and stole

10   something using force or threat of force, and a gun was

11   involved; right?

12   A        (Witness nods head affirmatively.)

13   Q        So each of these crimes is composed of certain

14   elements.  The elements is a fancy word that just means the

15   essential component parts of a crime.  It's like, like the

16   ingredients in a recipe.  Your wife has baked a cake before.

17   What's your favorite cake?

18   A        German chocolate.

19   Q        German chocolate.  She's got to add certain things

20   to that German chocolate cake; right?

21   A        Yes.

22   Q        The eggs, flour, baking powder and the water and all

23   that stuff.  Mix the cake, mix all that type of stuff.  But

1   she's got to add the chocolate.  And each recipe is a little

2   bit different, as is with these crimes.  We have to prove all

3   these elements or the ingredients of the crime.  And the

4   burden of proving those is totally on us.  The Defendant, as

5   she sits there, is presumed innocent, okay, as are all other

6   defendants tried in this courtroom.

7        You would agree that that presumption of innocence

8   is important in our American system of criminal justice;

9   right?  It's only fair if somebody is presumed innocent.  In

10   some countries the law is different.  Like if, if I go to, I

11   believe France, or if you went to Iran or Turkey, people are

12   presumed guilty and they have to prove their own innocence.

13   That's not the case in this country.  There's a presumption

14   of innocence here.  So the burden of proving these elements

15   is totally on us.

16        The Defendant can just sit there with her attorneys.

17   She -- because of this presumption of innocence it acts like

18   a cloak shielding her all through the course of this trial,

19   okay, until all the evidence is in and the instructions of

20   law are given to you by the Judge, and then you and the other

21   11 jurors go back to your jury room to deliberate on your

22   verdict.  And only then if you find that we meet our burden

23   of proving these elements beyond a reasonable doubt and you

1    find the Defendant guilty at that point that presumption of

2    innocence would be gone; right?

3    A        Yes, sir.

4    Q        But that stays with her up to that point; right?

5    Because it's the only fair thing to do in this system?

6    A        Right.

7    Q        Now, these elements, the Judge is going to give you

8    detailed instructions of law at the end of the case, but I'm

9    going to give you a for instance.   Okay.  Let's take the

10   crime aggravated murder with prior calculation and design.

11   Like, for instance, what do we have to prove?  Well, let's

12   say we have to prove that it happened on or about a certain

13   date.  For example, December 11th, 2001.  That would be an

14   element.

15         Another element is that it happened here in Trumbull

16   County, Ohio.  So that we could try the case in this

17   courtroom rather than in Ashtabula County or down in

18   Tuscarawas.  We call that venue.  It's just a technical term

19   but it means it happened here in Trumbull County.

20         The third element is identification, the person who

21   committed this crime is the person over at that table.  The

22   Defendant, somebody is going to have to point her out.  The

23   fourth element is that she did it purposely, basically on

1    purpose.  The Judge will define that term in great detail at

2    the end of this case.

3         The fifth element is that she caused the death of a

4    living person, in this case a fellow by the name of Robert

5    Fingerhut.  And sixth:  That she acted with prior calculation

6    and design.

7         Now, you've heard the old term I believe

8    premeditated in the old law.  This is sort of like that but

9    they've changed the law a little bit so it involved a plan to

10   kill.  Okay.  It's not a momentary instant decision like,

11   let's say I drop my pen and I dash down and pick it up,

12   that's not prior calculation and design.

13        But if I drop my pen and I look down and say, oh, my

14   Goodness, gracious, maybe I better bend down and pick it up,

15   and then I did that, that requires some planning; right?

16   A       Right.

17   Q       Now, those would be elements.  And we have to prove

18   those particular elements by proof beyond a reasonable doubt.

19   You've heard that term before?

20   A       Yes, sir.

21   Q       And the Judge is also going to define the term for

22   you in great detail.  But basically when we talk about proof

23   beyond a reasonable doubt we're talking about using your

1    reason and your common sense so that you're firmly convinced

2    of the truth of something to a moral certainty.  Okay?

3    A        Uh-huh.

4    Q        You understand it's not 100 percent proof or proof

5    beyond all doubt or beyond a shadow of a doubt.  There's an

6    old Alfred Hitchcock movie Shadow, that term shadow of a

7    doubt before?

8    A        No.

9    Q        So there's no such animal in criminal law.

10   Sometimes folks seem to think that that's our burden of

11   proof, but it really isn't.

12           The Judge will tell you what our burden of proof is.

13   And he's going to talk about this proof beyond a reasonable

14   doubt.  We sometimes use an example of a box.  Mr. Juhasz

15   likes to use the box.  I'll steal his box.  And we're going

16   to use that box for this proof beyond a reasonable doubt

17   example.  But this box in a civil case, somebody has got to

18   fill it just a little over halfway, okay, if they're suing

19   for money damages in a car wreck or something.

20           But in a criminal case the burden is a whole lot

21   higher.  We've got to fill that box up with enough evidence,

22   not all the way to the top but pretty darn close to the top

23   so that you're firmly convinced of the truth of the charge

1    proving these elements.

2         We've got to have somebody come in and testify and

3    convince you that it happened here in Trumbull County, Ohio.

4    Okay.  Or these other elements.  And they're different ways

5    we can do that.  But it's up to you and the other jurors for

6    each of you to draw your own line on that box as to where

7    you're firmly convinced of the truth of the charge.  And you

8    would use your reason and your common sense in determining

9    that.  And that's something that you're used to dealing with.

10   You've raised kids.  You've got a job.  Sometimes it's a pain

11   in the neck with teenagers but, you know, you use your reason

12   and common sense in living every day so there's nothing

13   magical about that.  You use the same test you will use in

14   your every day life to determine this.

15        And there are different types of evidence that we

16   can use in proving these elements.  For example, there's what

17   we call direct evidence.  It's where a witness comes in and

18   can testify as to what he or she has heard through the eyes

19   of his or her five senses.  I heard the gun shot and it was

20   loud.  I smelled the smoke and it was acrid.  I touched the

21   body and it was cold.  Okay.  I drank the drink and it was

22   bitter, you know, whatever.

23        There's another type of evidence that we can use to

1    prove the elements of the crime, and it's sort of round about

2    evidence.  It's what we call circumstantial evidence.  You've

3    heard that term before?

4    A       Yes.

5    Q       Sometimes people don't know what circumstantial

6    evidence is.  If they watched the old L.A. Law program on TV

7    -- you like sports programs.  You haven't seen the old --

8    A       We don't have regular TV.  We've just got cable.  We

9    don't get nothing like ABC, NBC.  We don't get none of that.

10   Q       You don't get the networks on cable?

11   A       No, sir.

12   Q       You get the superstations like TBS and --

13   A       Yes.

14   Q       Sometimes they'll have old, old movies on?

15   A       All right.

16   Q       Maybe some old Perry Mason movies?  You don't watch

17   those anyway?

18   A       No.

19   Q       Well --

20   A       Sorry.

21   Q       I'm thinking for a second of circumstantial

22   evidence, this round about evidence.  It's, it's where you're

23   given a fact or set of facts and you draw a logical deduction

1    to another fact or set of facts.  Okay.  I'm going to give

2    you an example of that.  Let's say you live in a house.  It's

3    a two-story house and your bedroom is on the second floor.

4    And you're going to go to bed at night.  So you go to the

5    window, you look out and it's a beautiful night.  The moon is

6    beaming.  The stars are twinkling.  There's not a cloud in

7    the sky.  You draw the blinds, get into bed.

8            The radio is on.  And before you fall asleep you

9    hear the announcer say, folks, there's a cold front coming in

10   and I expect we're going to have a storm before the night is

11   over, and you fall asleep.  And some time during the night

12   you're awakened by a distant booming sound.  And you look up

13   and you look towards the window, the blinds are drawn and you

14   can't see outside, but you can see a flash of light.  And

15   then a couple seconds later you'll hear a distant boom.  And

16   half a minute goes by and there's another flash of light

17   outside, and maybe two seconds later there's a closer in time

18   boom.  And then suddenly it's a great big flash of light

19   outside and right outside the house there's a big ripping,

20   booming, crackling sound.  And you hear pitter-patter on the

21   roof and a steady rumbling, and you fall back to sleep.

22           And then sometime later you wake up, go to the

23   window, open the blinds, and you look out.  And you looked

1    out the night before and as far as you could see it was

2    totally dry the night before when you went to bed.  But now

3    you look outside, the sun is beaming.  It looks like a

4    beautiful day.  There's not a cloud in the sky, but the

5    streets are flooded with water.  The rooftops as far as you

6    can see are soaking wet.  The drops of water are dripping off

7    the leaves of the trees and there's no fire plug around for

8    anybody to have hit.  You know what happened during the

9    night, don't you?

10   A       Yes.

11   Q       What happened?

12   A       A storm came?

13   Q       There was a thunderstorm.  And you know that beyond

14   a reasonable doubt, don't you?

15   A       Yes.

16   Q       You didn't see the rainstorm with your own eyes, but

17   you, based on circumstantial evidence that you received, you

18   know that that is what happened?

19   A       Yes.

20   Q       Now there's room in there for some possible or

21   imaginary doubt.  You can imagine that Alf and his martian

22   buddies flew by in a flying saucer during the night and

23   sprinkled the ground with some wet stuff and put on a light

1    and sound show, but that would be an imaginary doubt,

2    wouldn't it?

3    A        Yes, sir.

4    Q        All what really happened was a thunderstorm?

5    A        Yes, sir.

6    Q        Now, there's some limit to this circumstantial

7    evidence based on what you learned.  You might not be able to

8    tell how long it rained during the night because you fell

9    asleep during the storm.  You might not know how much water

10   accumulated.  You might know that out at the airport, but

11   with your own eyes you didn't measure it; right?

12   A        Correct.

13   Q        But you do know beyond any doubt that there was a

14   thunderstorm?.

15   A        Yes, sir.

16   Q        You understand that circumstantial evidence is just

17   as good as direct evidence in proving these elements?

18   A        Yes, sir.

19   Q        And that you can return a conviction based on

20   circumstantial evidence if you believe beyond a reasonable

21   doubt that it proves the elements of the crime charged?

22   A        Yes, sir.

23   Q        Do you think you would have a problem doing that?

1    A        No, sir.

2    Q        So would you be able to pile evidence on evidence to

3    make your determination on this case?

4    A        Correct.

5    Q        Now, the reason for being able to use circumstantial

6    evidence is, I think you would agree that when people are

7    planning serious crimes like a murder, they usually don't do

8    it on the courthouse steps at high noon and announce to the

9    whole world they're going to kill somebody; right?

10   A        Right.

11   Q        Serious crimes, whatever they're planning.  But you

12   can consider other circumstances to determine what was inside

13   a person's mind at the time; right?  For example, if

14   somebody, if you have letters or phone calls or something of

15   the planning you could look at that, couldn't you?

16   A        Yeah.  I guess, yes.

17   Q        If you had to.  Okay.  Now, you understand that all

18   criminals aren't really smart criminals, that sometimes

19   people get caught because they do some really stupid things.

20   Like you've heard the case of the armed robber who goes into

21   the bank and hands the stickup note to the teller.  And on

22   the back of the envelope it says, "Give me all your money."

23   And they give him $5,000 and he runs out with his gun, and he

1    leaves the note behind.  And they turn the envelope over and

2    there's his name and address on the front.  Or the burglar

3    that climbs through the window and drops his wallet with his

4    identification inside.  He gets caught because of that.  Are

5    you aware of those types of things?

6    A       I never heard of any.

7    Q       You haven't seen it on the cable, anything like that

8    on cable channel?

9    A       We don't get news.

10   Q       You don't get?

11   A       MSNBC.

12   Q       MSNBC?

13   A       Only time I ever watch that was when the war was --

14   Q       Sports programs?

15   A       Yeah.  I don't watch it all the time.

16   Q       Do you ever watch sports?

17   A       I've seen it before, yes.

18   Q       Where really stupid things happen out on the field?

19   A       Yes, sir.

20   Q       So you're aware, things like that happen?

21   A       Yes.

22   Q       Okay.  Now, another thing here is the Defendant is

23   charged here not as a trigger person, but rather as a, what

2471

1    we call a complicitor.  Somebody who helps another, plans

2    with another, solicits or procures or aids and abets or helps

3    another person, strengthens them or encourages them in some

4    way in committing the offense.

5              And the Defendant is charged here with planning with

6    a fellow by the name of Nathaniel Jackson in the aggravated

7    murder of her ex-husband for insurance money.  And that the

8    charge is that this Nathaniel Jackson is the person who

9    actually did the killing.  That he's the person who actually

10   trespassed in the house.  That he's the person who actually

11   stole the car, okay, and used the gun; do you understand

12   that?

13   A        Yes.

14   Q        And you understand that under the law in this state

15   the Defendant, if she's found guilty by the jury of these

16   offenses of aggravated murder with one or more of these

17   specifications of aggravating circumstances, she could face

18   the death penalty as a possible punishment; do you understand

19   that?

20   A        Yes, sir.

21   Q        Do you have any problem with that under Ohio law?

22   A        No, sir.

23   Q        If the Judge instructed you as to that law would you

2472

1    be able to follow it?

2    A        Yes, sir.

3    Q        Now, let's say, do you understand this case should

4    be tried in two different phases.  It's like two separate

5    trials.  Okay.  The first -- you read that handout

6    downstairs?

7    A        Yes.

8    Q        Do you have any -- was it clear or was it hard to

9    follow at times?

10   A        I was a little confused.  But I mean I'm, I'm not

11   into law so --

12   Q        And it would be a hard thing for most folks who

13   aren't lawyers to come in and take a look at that and say,

14   what the heck are they talking about.

15            Basically you understand that in the first phase of

16   this case, it's like the first trial, this first trial is

17   tried just like any other criminal case in this courtroom.

18   The issue here is guilty or non guilty.  And can we, the

19   people of the State prove the elements of the crime charged

20   in these specifications.  Okay?

21   A        I understand.

22   Q        And that's the only issue.  The issue isn't

23   punishment.  It has no place in the first phase.  And there

2473

1   won't be any testimony that is directed toward punishment.

2   It's directed totally towards this issue of proving guilt or

3   non guilt; correct?

4   A       Okay.

5   Q       And the burden of those elements is totally on us.

6   They don't have any burden of proof.  They could sit there

7   for this whole trial on their hands.  They wouldn't do that

8   but they can do that.  That's their right.

9           Let's say that you and the other 11 jurors find

10  beyond a reasonable doubt that we prove this crime called

11  aggravated murder and one or more of these specifications, we

12  would then go on to a second phase.  It's like a second

13  trial.

14          And at this second phase you could hear the same

15  evidence or you could hear new evidence presented.  And you

16  would have to do a balancing test, sort of like a scale.  And

17  on one side of the scale are these aggravating circumstances

18  that you would have found from the first phase, okay, the

19  fact that the aggravated murder was committed with prior

20  calculation and design and during an aggravated burglary.

21  And that the aggravated murder was committed with prior

22  calculation and design during an aggravated robbery.  That

23  could be on one side of the scale.

2474

```
 1              On the other side of the scale is what we call
 2    mitigating factors.  These mitigating factors are things that
 3    would work to a defendant's benefit that would work against
 4    the death penalty as a punishment.  Okay?
 5    A         Okay.
 6    Q         You do you understand the death penalty is not an
 7    automatic punishment for somebody who gets convicted in the
 8    first phase of aggravated murder and one or more of these
 9    specifications?
10    A         Yes, sir.
11    Q         Because in the first phase you wouldn't have heard
12    anything about what's appropriate toward punishment for a
13    defendant convicted of that offense.  The second phase is
14    geared toward the issue of punishment.  So you've got to
15    hear, to be fair you've got to hear two phases; right?
16    A         Yes, sir.
17    Q         And you're aware there were four possible penalties
18    in the second phase?
19    A         Yes.
20    Q         The death penalty, sentence of life in prison with
21    no parole eligibility, sentence of life with parole
22    eligibility after 30 full years and life in prison with
23    parole eligibility after 25 full years?
```

1    A       Yes, sir.

2    Q       And at the beginning all four of those have to start

3    out equally.  Okay?

4    A       Okay.

5    Q       You've got to be able to consider all of them to sit

6    on this jury.  Okay?

7    A       Yes, sir.

8    Q       You don't have any problem with that?

9    A       No, sir.

10   Q       Now, let's say we get down to these mitigating

11   factors.  We don't know what they are at this point.  It's

12   not relevant.  But there could be mitigating factors

13   presented.  Okay?

14   A       Okay.

15   Q       And the issue of how much weight to give these

16   different things, the aggravating circumstances and the

17   mitigating factors, that's totally up to you and the other

18   jurors.  You can understand, you can decide that something

19   weighs a whole lot like maybe a ton, okay, and taken the

20   scale down to the bottom.  On the other hand, you can decide

21   that something weighs about as much as a feather; right?

22   A       Yes, sir.

23   Q       That is totally up to you and the other jurors.

1    Okay.  So then you've got to do this balancing test.  And if

2    you and the other jurors find beyond a reasonable doubt so

3    you're firmly convinced of the truth of the charge to a moral

4    certainty that the aggravating circumstance or circumstances

5    outweigh these mitigating factors, then in that case you must

6    return a verdict for the death penalty; do you understand

7    that?

8    A        Yes, sir.

9    Q        Now, that burden is on us.  If we failed to live up

10   to that burden and we don't convince you beyond a reasonable

11   doubt that the aggravating circumstance or circumstances

12   outweigh these mitigating factors, then in that case you

13   consider one of the three life sentences.  Okay?

14   A        Yes, sir.

15   Q        You wouldn't have no problem with that?

16   A        No, sir.

17   Q        Now, let's say we got to that point.  Let's say we

18   got, we're in the first phase and we convince you beyond a

19   reasonable doubt that the Defendant is guilty of the elements

20   of the crimes charged, the aggravated murder and the

21   specifications, would you be able to sign a verdict form

22   finding her guilty?

23   A        Yes, sir.

```
 1    Q        Let's say we get to a second phase and we get to

 2    this issue of punishment and we convince you beyond a

 3    reasonable doubt that the aggravating circumstances outweigh

 4    the mitigating factors beyond a reasonable doubt so the death

 5    penalty is the appropriate punishment.  Okay.  Would you be

 6    able to sign a verdict form for the death penalty in that

 7    instance?

 8    A        Yes, sir.

 9    Q        And if the Judge asked you, is that your verdict,

10    would you be able to say yes in open court?

11    A        Yes, sir.

12    Q        Now, a couple other things.  During the course of

13    this trial you're not allowed to take notes.  Do you know, do

14    you get Court TV on your cable?

15    A        Yes.

16    Q        They have trials from different jurisdictions across

17    this country.  And I don't know, I'm probably one of the few

18    lawyers who doesn't watch Court TV, but I imagine on Court TV

19    they show jurors sometimes taking notes or --

20    A        I've seen, only seen it a few times.

21    Q        Probably haven't paid attention to it?

22    A        My wife likes that more than me.

23    Q        There are probably some places in this country where
```

1   they do let jurors take notes, but in Ohio generally judges
2   do not let jurors, judges don't let jurors take notes.
3   There's a reason for that. They don't want you being
4   distracted from looking at the witness and how the witness
5   appears on the stand, his demeanor, his or her demeanor on
6   the stand. So they want you to pay very close attention to
7   the witnesses and what they're saying.

8           Another thing is, you're stuck with the questions
9   that are asked by the lawyers. And because we're lawyers,
10  we're, we're sort of trained to prove these elements of the
11  crimes charged. Okay?

12  A       Can you repeat that one more time? Just --
13  Q       Okay. Because we're lawyers we're sort of trained
14  in law school to prove the elements. We look at elements.
15  Okay. Whether it's a crime or what we call a civil wrong or
16  something in torts, things like that, we have to prove these
17  elements. So we ask questions that tend to prove these
18  particular elements. Or if on the other side, trying to
19  disprove them or cast doubt on them. Okay. And you are not
20  allowed to submit questions to the Judge to ask questions of
21  your own. So you're stuck with the questions we ask.

22  A       Okay. I understand.

23  Q       And it may well be that you have some questions

1    about something like, let's say you sold shoes and you

2    wonder, because you sold shoes you wonder was somebody

3    wearing Rebox or wingtips or whatever, come on brain, Nikes

4    or things like that; right?

5    A        Yeah.

6    Q        Because we're lawyers we ask questions geared toward

7    proving these elements.  If the issue of footwear never came

8    up, like what kind of shoe it was, if it wasn't important for

9    proving the crime we would never ask anything like that.  And

10    you would sit through that whole trial and nobody would ever

11    find out what kind of shoes somebody was wearing.  Okay?

12           My wife might have a whole lot of interest in shoes

13    because she might have 50 trillion pairs of shoes, but she's

14    not going to get any answers to that.  Would you be able to

15    make your decision in this case and hold us to proving just

16    the elements the Judge says we have to prove?

17    A        Yes, sir.

18    Q        And if there's some unanswered questions that don't

19    relate to that and you're convinced that we proved our case

20    beyond a reasonable doubt as to these elements, you would be

21    able to return a conviction?

22    A        Okay.

23    Q        If we left out one of these elements, like let's say

2480

1     I was silly enough not to ask a question about what county it

2     happened in, you would have to -- do you find, you would find

3     the Defendant not guilty of that crime, right, because the

4     burden is on us and I didn't meet my burden?

5     A       Yes, sir.

6     Q       You would be able to do that?  You would be able to

7     return a not guilty verdict if I messed up and I didn't ask

8     that question and I didn't get an answer that would prove

9     that element?

10    A       Yes, sir.

11    Q       Now, another thing is, and this may sound kind of

12    silly, but you're not allowed to go out to the scene to

13    investigate on your own.  We had, in one case a juror did

14    that.  And sometimes on the movies that they put on TV or the

15    movie theaters they, Matlock, and I don't know if you get

16    Matlock on the Super Station?

17    A       I heard the name.  Go ahead.

18    Q       I think Matlock did that in one case.  And that

19    would cause a mistrial.  We don't want to do this all over

20    again.  That wouldn't be proper.  So you wouldn't do anything

21    like that?

22    A       I don't even know where it is.

23    Q       Now, at the end of the first phase of this case

2481

 1   there's something called sequestration when all the evidence

 2   is in and the Judge instructs you on the law, all the jurors

 3   are kept together.  You can't go home after that.  The Judge

 4   will give you advanced notice and tell you to bring in a

 5   suitcase and they'll put you up at a hotel.  And we don't

 6   know how long it's going to take.  I've had juries come back

 7   in the first phase in an hour and a half, and I've had juries

 8   take up to five days.  So you would take as long as you need

 9   to consider all the evidence and reach a decision in the case

10   if you can?

11   A       Yes.

12   Q       But you would be kept together and you're not

13   allowed to discuss the case with anybody or read any papers

14   or anything else unless all 12 of you are together; right?

15   You can't read papers then but you can discuss the case

16   together, deliberate.  Okay?

17   A       Okay.

18   Q       You wouldn't be allowed to go home during that time?

19   A       Okay.

20   Q       And let's say you found the Defendant guilty of

21   aggravated murder and one or more of these special findings,

22   we would move on to a second phase.  There would probably be

23   a break after a couple days or a week in between and we would

2482

1    go into a second phase which could last for maybe one to

2    three days, usually.  And then you deliberate again.  And you

3    would be sequestered again.  Would that sequestration cause

4    you any undue hardship?

5    A       No.

6    Q       Okay.  Your family would be able to get along

7    without you for a couple of days, if necessary?

8    A       Yes.

9    Q       Yeah.  Now, during the course of the trial as her

10   chair is turned toward you, you become more acquainted with

11   the Defendant.  And my question to you is this:  When you go

12   inside that jury room to deliberate on your verdict can you

13   lay aside all thoughts of sympathy that you might have for

14   this Defendant because it's only natural, I think, for one

15   human being for, you know, to feel sympathy for another human

16   being and lay aside all sorts of sympathy in your

17   deliberations and base your verdict on the evidence, the

18   evidence, testimony you received, the instructions of law

19   given to you by the Judge and lay aside all thoughts of

20   sympathy to the Defendant.  Can you do that?

21   A       Yes, sir.

22   Q       Okay.  Now, I think you'll agree that there are

23   certain obligations that we have being citizens in this

2483

1    country.  And one of those obligations is if it's election

2    time we try to learn what we can about the issues and the

3    candidates and cast a ballot.  Okay.  That's how you got

4    here, you're on the voting list I assume; right?

5    A    Yes, sir.

6    Q    And if we're at war we've got an obligation to serve

7    in the military.  And we've got young folks overseas in

8    several countries right now doing their duty; right?

9    A    Yes.

10    Q    And I think you served in the National Guard?

11    A    Yes, sir.

12    Q    So you're familiar with that.  There's another

13    obligation of citizenship and that's when we're summoned in

14    to sit as jurors, if we're able to.  It may disrupt your work

15    schedule or daily family schedule, but if we can to make sure

16    our system of justice works in this country it's important to

17    have folks from all walks of life in all areas of the

18    community come in to serve as jurors, especially in so

19    serious a criminal case.

20    Would you be able to undertake that obligation of

21    citizenship?

22    A    Yes.

23    Q    Now, do you have any questions?  I've been asking

1    you questions for a while.  Anything that, pertaining to what

2    we're doing here?

3    A        No, sir.

4    Q        Okay.  Now the defense attorneys are going to get a

5    chance to ask you some questions.  Thank you.

6    A        You're welcome.

7                           EXAMINATION

8    BY MR. JUHASZ:

9    Q        Mr. Phillips, how are you doing?

10   A        Good.  If I could --

11   Q        You sure can.  I'm going to get you the cold stuff.

12   It's been awhile since you were here the first day.

13            My name is John Juhasz.  Jerry Ingram and I

14   represent Donna.

15   A        Okay.

16   Q        I'm going to try not to too much further sully a

17   beautiful sunny afternoon by keeping you here.  But I'm sure

18   you appreciate that this is a pretty serious undertaking that

19   we're doing here; correct?

20   A        Yes, sir.

21   Q        And my friend Jerry likes to liken what we're doing

22   here to a job interview.  We're asking you questions to see

23   if you are qualified and able to serve in a particular job.

```
 1    It's kind of a short term job compared to your regular job

 2    but an important one.

 3    A        Yes, sir.

 4    Q        And I'm certain that if you or somebody that you

 5    cared about were sitting over there where Donna is, you would

 6    want lawyers like us to stand up and ask some questions to

 7    make sure that person was competent serving on that jury and

 8    that you were confident having that person.  Does that seem

 9    fair to you?

10    A        Yes.

11    Q        When you were here on April the 8th do you remember

12    being in that big courtroom down there?

13    A        Yes.

14    Q        All right.  As you walked in those, that big set of

15    doors do you remember where you went and sat or stood?

16    A        Yeah.

17    Q        Can you tell me?

18    A        I sat in, when I first walked in sat in the section

19    to the right, first right at the end.

20    Q        First row closest to the back or to the front?

21    A        To the front.

22    Q        So you were closest up to Judge Stuard in that row?

23    A        Yes.
```

1    Q        Close to the tables where the lawyers were?

2    A        I was right off to the side of the jury box in the

3    first row.

4    Q        During that morning -- I know you haven't heard an

5    awful lot about the case, but during that morning did you

6    hear anybody discussing the case down there?  People who were

7    called for jury duty, anything like that?

8    A        Nobody talked to me.

9    Q        I appreciate nobody talked to you, but you didn't

10   hear anybody else like sitting next to you talking about the

11   case, anything going on like that?

12   A        No.

13   Q        All right.  So basically what you heard that day was

14   whatever Judge Stuard told you?

15   A        I heard one guy sit there and say, "I'm going to get

16   out of this," he said to some guy beside him.  I really

17   didn't pay attention.

18   Q        But in terms of saying, I know who that lady is.

19   That's Donna Roberts.  Or, here's what she's charged with, or

20   anything like that?

21   A        No.

22   Q        You just heard one guy saying, I've got to get the

23   heck out of there?

1    A        Yeah.

2    Q        Okay.  Mr. Bailey earlier told you about my little

3    box that I like to use.  And we'll talk about that for a

4    little bit, hopefully not too long.

5            One of the reasons I like to talk about it is, as he

6    said, you sort of have to visualize when they present all

7    this evidence to you, did they give me enough to fill that

8    box up beyond the line called reasonable doubt or didn't

9    they?  The reason I'm bringing it up now is, as you start

10   this case you appreciate that box is empty; correct?

11   A        Yes.

12   Q        Nobody has given you one piece of evidence about

13   whether Donna Roberts is guilty or not; correct?

14   A        Correct.

15   Q        I'm going to take just a second, and in case you're

16   not aware, because you don't know a lot about the case.  The

17   basic allegations here are that, the State's claim, in other

18   words, is that Donna and another fellow by the name of

19   Jackson cooked up a plan to kill Robert Fingerhut.

20           Now, Robert and Donna had been married and they

21   divorced, but after they divorced they continued to live

22   together over in Howland.  And they worked together operating

23   the Greyhound Bus Stations in Warren and Youngstown, which I

1    think you mentioned something about Greyhound Bus?

2    A        Yeah.

3    Q        Now I tell you that for a couple reasons.  First of

4    all, based upon the little bit that you did hear, does that

5    in any fashion in your mind constitute any evidence that you

6    think, well, she must be guilty because I heard this stuff in

7    the paper?

8    A        No, sir.

9    Q        So you are prepared to look at her and say, right

10   now, Donna Roberts, that box for me is empty.  There's no

11   evidence here.  I don't have any idea that you must be

12   guilty?

13   A        Correct.

14   Q        Very good.  Part of the evidence that the State may

15   introduce in their effort to prove that she had some

16   participation in this are some letters written by her and

17   some telephone conversations which were recorded.  And I'm

18   going to tell you now that those conversations and letters

19   are sexually explicit and, in fact, they are in some points

20   downright offensive.  All right.

21           We always tell jurors when they come here, we want

22   your mind to be as blank as that easel over there behind you

23   so that we can just give you the evidence and you can make a

1    fair decision.  But you know what?  That doesn't work because

2    you're a human being with lots of experiences and you've got

3    the thoughts and emotions that a normal human being would

4    have.

5            What we would like you to do, however, if you can,

6    is to sort of take those things and push them off to the

7    side.  And here's why I bring that up, in connection with

8    these letters and these phone calls.  Because if you're

9    offended, you understand that it's okay for you to say, I'm

10   offended.  That's not how I live my lifestyle.  I don't like

11   what she's saying there.  But that doesn't necessarily

12   substitute for proof that, the fact that you don't like what

13   she did is not proof that she committed the crime.  Do you

14   see that?

15   A       Yes, sir.

16   Q       So it's possible for you to say, if the Government

17   doesn't fill up that box we've been talking about, to say,

18   you know what, I'm offended at some of the stuff she said

19   here but they didn't prove her case so I'm going to find her

20   not guilty.  You could do that?

21   A       Yes.

22   Q       You wouldn't say, well, you know what, I don't like

23   her because of what she put here so I'm going to find her

 1     guilty even though I don't think they quite made their case.

 2     A        No, sir.

 3     Q        That would not be fair; right?

 4     A        Correct.

 5     Q        Would you, what did you think about when you found

 6     out that it was a death penalty case a couple weeks ago when

 7     Judge Stuard told you, do you remember?  Do you remember the

 8     first thing that ran through your mind?

 9     A        The only thing I kind of thought is, this is the

10     first time I've ever been picked for one and --

11     Q        And it's a doozy?

12     A        Yeah.

13     Q        Big responsibility, you agree?

14     A        Yes, sir.

15     Q        Mr. Bailey talked to you about civic responsibility,

16     and you know that from your service and from the fact that

17     you honored our jury summons to come down here and be

18     considered for jury duty.  Do you think you're up to that

19     responsibility?

20     A        Yes, sir.

21     Q        Very good.  Because it's a death penalty case we

22     obviously have to talk to you for a little bit about your

23     views about the death penalty.  I'm going to try not to go

1     over the same material that Mr. Bailey went over with you so

2     that we don't keep you here inordinately long.

3           I want to do two things.  I want to, first of all,

4     make sure that you have some kind of a working understanding

5     of how these trials work.  And second of all, make sure I

6     understand how you feel about the death penalty.  Fair

7     enough?

8     A        Yes, sir.

9     Q        Let's talk about the first one first because, the

10    first thing I mentioned, because one of the things we do is a

11    little bit unfair.  We go to college.  Go to law school.

12    Study this stuff.  Come to court and practice this stuff for

13    years.  And it's second nature to us.  And then we bring you

14    in here and say, well, here's all our rules and why don't you

15    get them all right off the bat?  Well, it would be like me

16    coming out to your job and within 45 minutes I'm supposed to

17    know everything that you do.  That would be unfair, too.

18    A        Correct.

19    Q        So let's take some time and make sure that you're

20    comfortable with how it works.  Okay?

21    A        Okay.

22    Q        I have an example that I like to use that's a little

23    bit different than what the allegations are in this case.

1  And please understand that when I ask you these questions I'm

2  not attempting to be condescending.  I want to make sure that

3  you understand how it works.  All right?

4  A       All right.

5  Q       Because we find that a lot of people just don't know

6  because they don't have contact with the legal system like

7  you.

8          If you didn't know, I think you know now that not

9  every murder in Ohio is punishable by death or even eligible

10  for death penalty consideration.  Did you know that or did

11  you not?

12  A       I know that every one of them isn't the death

13  penalty.  I don't know the reasoning why.

14  Q       Whether we can agree with it or not, and our job as

15  the Judge and the lawyers and the jurors is, we can question

16  the law out there and question the wisdom of the decisions

17  made by our elected officials, but once we come in here you

18  have to say, I can't question the law.  I have to follow it.

19          All of that having been said, in its infinite wisdom

20  the General Assembly has decided that for certain homicide

21  offenses you face a prison sentence.  And only for special,

22  certain aggravated murders are you even eligible to be

23  considered for the death penalty.  Okay?

1    A         Okay.

2    Q         We have fancy words for that.  We call them

3    specifications.  It just means a separate finding of fact.

4    They have to make an allegation that -- and let me give you

5    an example.

6              If I pulled out a gun right now and walked over to

7    Mr. Ingram and shot him and killed him, in our law that most

8    likely would be called murder.  I purposely caused his death.

9    Okay?

10             If I did it on Monday because today, as I'm standing

11   here I'm going, you know, I've been in here with Jerry for

12   two weeks.  I can't take it anymore.  On Monday I'm going to

13   put this misery to an end.  I'm going to bring a gun to court

14   and I'm going to shoot him.  Now I thought about it and made

15   a plan, and I'm going to walk over and do it.  So it's

16   purposely causing his death with an additional thing that I

17   thought about.  What we used to call premeditation, now they

18   call it prior calculation and design.  But most people are

19   familiar with premeditation.  You understand --

20   A         Yeah, I can understand that.

21   Q         That is what we would call aggravated murder.  Even

22   for that, even though I planned it, even for that offense

23   while I could go to jail for a very long time I can't get the

 1   death penalty.  It is only an aggravated murder where there

 2   are certain additional things that are special facts that are

 3   set out.

 4          One of them is killing either the Governor or the

 5   Lieutenant Governor or the President or the Vice President.

 6   So let's take a made up case for a second.  Let's say that I

 7   planned to and I killed a guy named Bob Taft, and he's the

 8   Governor of the state of Ohio.  So now the State would bring

 9   an indictment against me and they would say, Juhasz, here's

10   what we say you did wrong.  No. 1, you planned to kill Bob

11   Taft and you did.  A guy named Bob Taft.  Okay.  That crime

12   is called aggravated murder.

13          Juhasz, take notice, we're going to try to get you

14   the death penalty because in addition to you planning and

15   killing a guy named Bob Taft, here's this specification that

16   we want the jury to find, that when he was killed, Bob Taft

17   was the Governor.  See?  Because the Legislature has said

18   that takes an ordinary planned murder and makes it more

19   serious so we can consider the death penalty.  Are you with

20   me on that or not?

21   A      Yes.

22   Q      Okay.  In essence, that makes two separate boxes

23   that the State has to try to fill at the trial.  The first

1   one is, they have to try to fill up that box beyond a line

2   called reasonable doubt, that I planned the murder and did

3   it.  The second thing is that they have to prove in that

4   second box that the guy that I killed was the Governor of the

5   state of Ohio at the time.

6        Now I like to use that example for a couple of

7   reasons.  One, compared to some of the other ones it's a

8   little simpler and easier to talk about.  Two is that a lot

9   of times jurors kind of go, but everybody knows Bob Taft is

10  the Governor.  And the reason I like to use that example is

11  because see, they have to prove it to you.  You can only

12  decide the case from the evidence that's presented to you in

13  the courtroom.  That's actually one of the reasons why we

14  talk to jurors about pretrial publicity, because we want to

15  make sure that they're only going to decide the case from the

16  evidence they hear in the courtroom.  Does that make sense to

17  you?

18  A       Yes.

19  Q       All right.  Now, we can think of a couple quick

20  silly ways that they may do that.  They may come in with some

21  fancy piece of paper with ribbons and seals dripping off it

22  that says Bob Taft was the Governor of the state of Ohio

23  effective such and such a day.  And the jury can say, okay,

1    now they proved the guy that Juhasz killed was the Governor.

2            Maybe they bring in Thomas Moyer, the Chief Justice

3    of the Ohio Supreme Court, and they show him a picture of Bob

4    Taft and they show him a picture of Bob Taft on the morgue

5    table and he goes, yep, that's the guy.  I swore him in on

6    the capitol steps.  I know he's the Governor because I swore

7    him in.  That would be another way.

8            My point is, if they don't do something to prove it

9    then you would be justified in finding me guilty of

10   aggravated murder but not that special consideration to make

11   me eligible for the death penalty.  Does that make any sense

12   to you?

13   A       Yes.

14   Q       Questions about that or are you okay?

15   A       I think I'm okay with that.

16   Q       Now let's say that they either bring in the thing

17   dripping with the ribbons and seals or they bring in the

18   Chief Justice, and so they've convinced you as a juror that

19   the first box is filled, that I planned to kill him and I

20   did, and they filled up the second box by showing that he was

21   the Governor at the time that I killed him.  Now we would go

22   to that second phase.  Do you see that?

23   A       Yes.

1    Q        Because they proved not only the crime but the

2    specification, or that special circumstance, at the

3    conclusion of that second phase where you would expect to

4    hear some evidence and argument about what penalty is

5    appropriate for me for having done this offense, you would

6    have, as I think you know, four possible sentences; correct?

7    A        Correct.

8    Q        That would be death; life without parole, which

9    means I can never get out no matter what anybody says or

10   does; life, but I have a chance for parole after I serve 30

11   years.  It doesn't mean I'll get out.  It just means that I

12   have a chance to go in front of the Parole Board.  They might

13   look like you see in the movies sometimes where they stamp

14   the thing that says "Rejected," Juhasz, you're staying in.

15   And the fourth one is the same thing except I have a chance

16   for that hearing after 25 years.  All right?

17            In the second phase they have another box to fill, a

18   separate box from the ones we've talked about.  In this box

19   they have to fill up, they have to convince you that the

20   reasons to impose the death penalty outweigh by proof beyond

21   a reasonable doubt reasons not to impose the death penalty.

22   Okay?

23   A        Yes.

1    Q        If they do that and you find the death penalty to be

2    appropriate for me, then you would vote for the death

3    sentence.  If they failed to do that, if they failed to

4    convince you by proof beyond a reasonable doubt, then you

5    would pick one of those life sentence options.  Do you see

6    that?

7    A        Yes, sir.

8    Q        The last thing I want to find out about that is,

9    is there anything about how you feel about the death penalty

10   that would keep you from going into that second phase, if you

11   ever got there, with all four of those possible sentences

12   equally in your mind?

13   A        No.

14   Q        Okay.  So just because you find somebody guilty of

15   the murder, the aggravated murder and the specifications,

16   there's nothing about how you feel about the death penalty

17   that says, well, the death penalty has got a leg up and the

18   defendant is going to have to talk me into a life sentence?

19   A        Uh-huh.

20   Q        They're all equal in your mind?

21   A        Yes, sir.

22   Q        And you would hold them to proving that burden, if

23   they could in the second phase, that I should get the death

1  penalty?

2  A        Yes, sir.

3  Q        Very good.  I think the Judge mentioned this to you

4  when he said that this is the most practical time to do this

5  now when we're talking about the death penalty.  The only

6  concern I want to make certain of is, you don't have any

7  thoughts, do you, that because we're talking about the death

8  penalty now she must be guilty of it and we're going to get

9  to that phase?

10  A        No, sir.

11  Q        Do you see, we have to talk to jurors about

12  everything that could possibly happen?

13  A        Yes, sir.

14  Q        We sort of danced around it here a little bit.

15  We've talked about proof beyond a reasonable doubt.  And I

16  don't know if anybody has mentioned to you -- well, Mr.

17  Bailey mentioned the presumption of innocence.  He said it's

18  like a cloak that covers the Defendant.  That presumption of

19  innocence sort of translates into my empty box.  In other

20  words, as a juror when you start the case you have to presume

21  there's no evidence in that box; right?

22  A        Right.

23  Q        And if we sent you back there right now and said,

1    come back with a verdict based upon what we put in the box,

2    it would have to be not guilty because there's no evidence;

3    right?

4    A        Right.

5    Q        Different people have different feelings about that

6    presumption of innocence.  What do you think about that?  Do

7    you think that's a good idea to presume somebody innocent and

8    make the Government prove them guilty?  Or do you think it

9    would be better the other way that if they're charged,

10   they're guilty and they would have to convince you they were

11   innocent?

12   A        No.  I think the State should have to prove them

13   guilty.

14   Q        And in this case you will hold them to that burden;

15   correct?

16   A        Yes, sir.

17   Q        There are a number of ways they may try to do that.

18   One of them would be through presenting testimony through

19   witnesses, people who are going to sit right where you're

20   sitting right now.

21            You seem to me to be a pretty savvy guy.  And you do

22   a lot of things at work.  You have to hire people, discipline

23   people, stuff like that; correct?

 1   A        Yes, sir.

 2   Q        You don't assume, do you, that just because somebody

 3   comes in and sits down and has a chat with you that they're

 4   telling you the truth; right?

 5   A        No, sir.

 6   Q        And I would assume you don't think that just because

 7   somebody comes in here and the Judge or the bailiff gives

 8   them an oath to tell the truth, that everything they're going

 9   to tell you is going to be gospel?

10   A        No, sir.

11   Q        You, as one of your jobs, will have to decide

12   whether somebody is telling you the truth.  They can be,

13   everything they can be telling you is true.  None of what

14   they're telling you is true.  Or some of it you can believe

15   and some of it you don't.  Make sense?

16   A        Yes, sir.

17   Q        Pretty much what you have to do every day in your

18   life at home, with your friends, at work; correct?

19   A        Yes.

20   Q        You may want to consider, and the Judge will tell

21   you things to, tests to use to decide whether somebody is

22   telling you the truth.  I think what you're going to find out

23   is, they're the tests you've been using all your life to

1    decide whether somebody has been telling you the truth or

2    not.  But whether somebody has a stake in the outcome of

3    either their testimony or the case would be one thing you

4    would want to consider; right?

5    A       Yes, sir.

6    Q       For example, let's say that Donna would come up here

7    during the trial and testify.  She's the Defendant; right?

8    A       Yes.

9    Q       She obviously has a stake in the outcome of this

10   case, doesn't she?

11   A       Yes, sir.

12   Q       And that would be something that would be fair for

13   you to at least consider when weighing her testimony; right?

14   A       Yes.

15   Q       It doesn't mean that you automatically reject

16   everything she has to say because she's the Defendant; right?

17   A       No.

18   Q       All right.  That might be true of other witnesses,

19   too.  They might have some interest in the testimony that

20   they're giving.  So that would be one of the things you would

21   have to decide.  Do you feel up to that?

22   A       Yes, sir.

23   Q       Mr. Bailey I think mentioned to you that if you get

1    to sort of know Donna by seeing her every day during your

2    service as a juror, there may come a point where you begin to

3    feel sorry for her, and it would be inappropriate to let that

4    weigh into your consideration of the evidence.  You agree

5    with that; right?

6    A        Of course.

7    Q        The converse is also true, though.  You may see,

8    because it's a homicide case you might expect to see autopsy

9    photographs, crime scene photographs of a dead body; correct?

10   A        True.

11   Q        That would evoke natural feelings of sympathy in any

12   of us; right?

13   A        Yes.

14   Q        You would have to feel pretty sorry for somebody who

15   was shot to death; right?

16   A        Feel sorry for the person dead?  Yeah.

17   Q        That's okay.  Nobody is, that's a natural human

18   reaction.  The only point is, and the only reason I bring it

19   up is if you feel sorry, that again should not be evidence.

20   Sympathy is not, it's not evidence.  Do you see that?

21   A        Correct.

22   Q        Another reason that I like to use the box is because

23   hand and hand with this presumption of innocence is the fact

1    that the State then has the burden of proof, which you and I

2    just agreed a few minutes ago is a good idea; right?

3    A        Yes.

4    Q        What may be a little bit different to you having not

5    been a part of the court system for any reason is that, it

6    isn't a situation where if the verdict is guilty the State

7    wins and if the verdict is not guilty the Defendant wins.

8    Okay.

9             In reality how it works, because of the burden of

10   proof is, if the State fills up that box with evidence which

11   convinces you that the box is filled up beyond the line

12   called reasonable doubt, then they win the case and you vote

13   guilty.  If they fail to do that, then they have lost the

14   case by not giving you enough evidence.  Do you see that?

15   A        Yes, sir.

16   Q        Now, the reason I say it to you that way is because

17   you have had in your life to make -- excuse me -- a lot of

18   decisions.  You've got children.  You have employee personnel

19   situations at work.  You have to make a lot of calls.

20   A        Yes, sir.

21   Q        I'm certain that you enter every one of those

22   wanting to be as fair as you can; correct?

23   A        Correct.

1    Q       Obviously if you're chosen as a juror here you want
2    to be as fair as you can.
3    A       Yes, sir.
4    Q       And in those other situations outside of the
5    courtroom, you probably want to hear both sides of the story
6    before making a decision; right?
7    A       Always.
8    Q       It's a little bit different here, okay, because they
9    have the burden to fill up the box.  And if they fail to,
10   they lose the case.
11           The Defendant doesn't have to do anything.  I think
12   Mr. Bailey suggested that to you before.
13   A       Yes, sir.
14   Q       It's probably not going to happen that Ingram and I
15   are going to do crossword puzzles and play Yahtzee during the
16   trial, but theoretically we could.  Because if they don't
17   fill up the box we can sit over there and go, they didn't
18   fill up the box.
19           Now, I bring that up because that's the reason that
20   a defendant in a case does not have to testify, and that's
21   the reason the Defendant does not have to present evidence.
22           Now, having said that, it does run contra to your
23   normal inclination, you want to hear both sides of the story

1    before making a fair decision; right?

2    A        Correct.

3    Q        Do you think you can sort of change your thinking

4    and hold the State to that burden of proof?

5    A        Yes, sir.

6    Q        And going along with that would be that you would

7    not hold it against the Defendant if she decides not to

8    testify or to present any evidence?

9    A        Right.

10   Q        I said that you have made a lot of important

11   decisions.  I would venture to say that with at least some of

12   the most important ones you probably, either on a piece of

13   paper some people do it or maybe in your mind's eye you kind

14   of draw a line and put the pros on one side and the cons on

15   the other side; correct?

16   A        Yes.

17   Q        Do you do something like that or not?

18   A        Yeah.  I don't write it down but --

19   Q        You don't write it down.  But you, but in your mind

20   you somehow, you don't just --

21   A        You're guilty and throw you out, right.

22   Q        Yeah.  If you have an employee discipline problem

23   you don't come, and somebody goes, hey, Joe hit me over the

1    head with a broom handle on break, you know.  You don't just

2    go, okay, well, that's it.  You have to look at everything;

3    correct?

4    A        Yes.

5    Q        Proof beyond a reasonable doubt kind of works the

6    same way.  You have to go back, when you're deciding if they

7    filled up that box that I keep talking about, you kind of

8    have to put on one side of the checklist the reasons why the

9    Government says the Defendant is guilty.  On the other side

10   are going to be doubts about the case.  Maybe doubts that you

11   thought of as you listen to the evidence.  Maybe doubts that

12   Ingram and I have brought up in the course of us representing

13   Donna.  Maybe doubts that other jurors mention to you as you

14   go back into the jury room and start to talk about the

15   evidence.  Okay?

16   A        Okay.

17   Q        What you have to do is look at those doubts and

18   analyze each one in light of the evidence and say to

19   yourself, is that doubt reasonable?  If it's not, if after

20   you think about it and go, you know what?  I don't even know

21   why I thought that I had a doubt about that, and now that

22   I've talked about it, I don't have that doubt so I'm going to

23   erase it.

1     If you erase them all, then there are no doubts

2 based on reason and common sense and they proved their case.

3 Do you see that?

4 A  Yes.

5 Q  If however you have one, it could be more than one,

6 but if you have at least one doubt that no matter how much

7 you talk about it and think about it with the other jurors

8 and say to yourself, there's no way for me to account for

9 that other than to say that's a doubt I have about the

10 State's case that's based on reason and common sense, not

11 fantasy, not flights of, you know, silliness, if it's a doubt

12 based on reason and common sense then they haven't proved

13 their case.  Do you see that?

14 A  Yes.

15 Q  That's a tough burden for them.  But do you have any

16 problem holding them to that?

17 A  No, sir.

18 Q  Mr. Bailey talked to you about the Government's

19 ability to use circumstantial evidence to make their case.

20 And that, that's a concept that's not readily thought of I

21 think by people who aren't lawyers.  You may use that idea

22 but you probably don't think of it in terms of circumstantial

23 evidence.  He's correct.  The law says that you can use

 1    circumstantial evidence to prove someone guilty beyond a

 2    reasonable doubt if indeed the evidence does that.

 3         And here's what I want to talk about for a second

 4    and then I'm going to be done, believe it or not.  It may be

 5    that the circumstantial evidence that is presented to you may

 6    be consistent with the theory of guilt.  But if you think

 7    about it in another way, you may be able to draw other

 8    inferences from the same evidence that may say that's not

 9    consistent with guilt.  And let me give you an example of

10    that that I like to use.

11         Let's pretend that you're at my house and it's a

12    late summer afternoon.  The sun is shining like it is today.

13    But it's one of those afternoons where you can sort of see

14    the clouds getting dark in the west and the breeze is

15    starting to kick up and you know that we're going to get one

16    of those late afternoon summer thunder bumpers.  Okay.

17         As I'm out in the kitchen you and I are talking, I'm

18    making some ice tea.  Boom, we hear a big crash in the living

19    room.  I go in to investigate.  As I do, my son's cat comes

20    tearing out between my legs.  I go into the living room, I

21    look to my left.  There's my son with his hands over his face

22    in obvious distress of some fashion or form or another.

23         Over to the right laying down now on the hearth

1    having been knocked off the mantle is one of my wife's Norman

2    Rockwell plates smashed to pieces.

3         From that little bit of information I gave you it

4    could be that my son was doing what he's been told 12,000,

5    million times not to do, which is to throw the Nerf ball in

6    the house, he broke the plate and the noise scared the cat.

7         It could be that the cat was climbing up on the

8    mantel, even though she's been yelled at 12 million times not

9    to do that, and Mike is going oh, boy, mom's going to be mad.

10        It could be that the wind from that summer

11   thunderstorm that's coming in blows in through the window,

12   knocks the plate off, the noise scares the cat and Mike says,

13   I'm going to get blamed for this and I had nothing to do with

14   it.

15        Now, any of those scenarios works from the limited

16   facts I gave you; would you agree?

17   A      Yes.

18   Q      Any one of those makes sense?

19   A      Yes, sir.

20   Q      While it would be consistent with proving my son

21   Mike guilty of throwing that Nerf ball, you see that there

22   are other inferences you can draw that are based on reason

23   and common sense; correct?

1    A        Yes.

2    Q        And from those facts that I gave you from that

3    circumstantial evidence it would be unfair to find him guilty

4    beyond a reasonable doubt of breaking that plate; would you

5    agree?

6    A        Yes, sir.

7    Q        Any problem holding the State to that kind of burden

8    and testing their circumstantial evidence in that way?

9    A        No.

10   Q        Okay.  Anything that you have thought of, questions

11   that you might have about this whole process?  Anything I

12   haven't explained clearly?

13   A        No, I understand.

14   Q        Very good.  Anything you can think of why you cannot

15   serve as a juror on this case?

16   A        No, sir.

17   Q        Very good.  Thanks for your time.

18                    MR. JUHASZ:  Thank you, Judge.

19                    THE COURT:  Pass?

20                    MR. JUHASZ:  Yes.

21                    MR. BAILEY:  Yes.

22                    THE COURT:  Mr. Phillips, you will be in

23   the poll from which this jury is selected.  You should call

 1    that number this evening that was given to you for further

 2    instructions.  We expect mid week to have enough people to

 3    start picking this jury.  So I would again remind you not to

 4    talk about the case, read anything, watch anything on TV.

 5    Thank you for being here.  You're excused.  We're going to

 6    take a break.

 7                        (Whereupon, a recess was taken and a

 8    discussion was held off the record.)

 9                              * * *

10                        THE COURT:  Okay.  Humphrey will be the

11    last one called, if needed, because of the problems he has

12    with being here, or had with being here today and next week.

13                        MR. BECKER:  That's by agreement of the

14    parties.

15                        THE COURT:  By agreement of the parties,

16    right.

17                              * * *

18    WHEREUPON,

19                        MICHAEL P. EVANS

20    being first duly sworn, according to law, was examined and

21    testified as follows:

22                        EXAMINATION

23    BY THE COURT:

1    Q        Mr. Evans, good afternoon to you.

2    A        Good afternoon.  I've been here since 10:30.

3    Q        Well, at least you're persistent.

4    A        I'm patient.

5    Q        You read the handout that was given to you?

6    A        Yes, I did.

7    Q        You understand that this case involves this lady

8    over here by the name of Donna Roberts who's charged with two

9    counts of aggravated murder with specifications.

10        The prosecution is required to select a jury in this

11   matter and to proceed with evidence concerning the charge and

12   the indictment of aggravated murder.  There are two counts --

13   we'll explain that to you.  It's not important right now why

14   there's two counts, one murder.

15        Now, if the State is able to prove each and every

16   element of the charge of aggravated murder with the

17   specifications attached, and the specifications means that

18   just because someone murders another person in Ohio does not

19   make them face the death penalty.  There has to be something

20   else included in that indictment, a specification.

21        A good example of what a specification is that, one

22   of the other attorneys mentioned here, if someone is to take

23   a gun and plan on killing Governor Taft.  And over a course

1    of time they carried it out, they shot Bob Taft and killed

2    him.   That would be murder.   It might even be aggravated

3    murder.   But unless the State attaches to that indictment the

4    specification stating that Bob Taft is the Governor of Ohio,

5    and unless they prove that beyond a reasonable doubt the jury

6    couldn't, would not face the issue of the death penalty.

7    Now, if the State proved both of those things, then it would

8    go to a second phase.

9            In this case there are specifications attached.

10   We'll get into that later.   The important thing is now that

11   if the State is able to prove beyond a reasonable doubt each

12   and every element of the crime of aggravated murder and all

13   the elements of the specifications, and the jury would return

14   a finding of guilty, then the case would go into a second

15   phase.   If the State should fail to do that, either of those,

16   then it would not go to a second phase.   Either the Defendant

17   would be found guilty or possibly of something, a less crime.

18           Now, we can't, if the State carries its burden of

19   proof, that would be a bad time to try and find out what the

20   opinion of the jurors were concerning the death penalty

21   because if we had somebody on there that believes, as some

22   people do, that if you take a life you forfeit your life, an

23   eye for an eye, well, if we got to that second phase and

1    there was such a person the Defendant would have no chance of

2    having the law followed.  Because the law dictates that at

3    that second phase each juror has to be able to set aside any

4    personal feelings they have and follow the law.  And the law

5    requires that at the second trial the prosecution presents

6    evidence showing the aggravating circumstances, that is

7    reasons why the jury should consider and impose the death

8    penalty.

9         The Plaintiff has the opportunity, although no duty,

10   to present what is known as mitigating factors.  Mitigating

11   factors were reasons given to the jury as to why they should

12   not impose the death penalty.  The jury has to weigh at that

13   time whether the aggravating factors have been proven by the

14   prosecution to outweigh mitigating factors beyond a

15   reasonable doubt.

16        If we waited until that point, again, and you had a

17   person on there who could never make that decision about

18   giving the death penalty, then the State would not have a

19   fair trial.  So it's necessary at this point, even though

20   that may not arise, to ask these questions to find out who

21   can and who can't in good conscious serve on the jury.

22        We've already had both sides of the spectrum here.

23   We need 12 people, no matter what their personal opinion is,

1    who are able to assure these folks that they can follow the

2    law of Ohio as it's written.  It's not our job to judge the

3    law.  We have to enforce the law.  We have to follow the law,

4    all of us.

5         The second area they'll ask you about is pretrial

6    publicity.  This case generated a lot of interest at the time

7    over the ensuing months, as any case of this nature would.

8    The question is, are there any of the prospective jurors that

9    have something fixed in their mind to the point where they

10   cannot set it aside and decide this case on the evidence that

11   comes to them in the courtroom.  It's the only way we're

12   going to have a fair trial is to decide this case on the

13   evidence and the law that the jury will receive in this

14   courtroom.

15        If somebody heard or read something in the paper

16   that they take back into that jury room, it wasn't presented

17   in evidence, then we're not likely to get a fair trial.

18   Okay?

19   A        Okay.

20                  THE COURT:   Good enough.

21                  MR. BECKER:   Thank you, Your Honor.

22                           EXAMINATION

23   BY MR. BECKER:

1    Q        Good afternoon, Mr. Evans.

2    A        Good afternoon.

3    Q        I want to apologize for keeping you here so long on

4    a beautiful day here in early spring, but sometimes that's

5    the way we get going here in the courthouse.  We can't help

6    it.  We've finally gotten to you and we'll be able to at

7    least get you clear for the weekend hopefully.

8            My name is Chris Becker.  I'm from the prosecuting

9    attorney's office.  I'm one of the assistants there.  This is

10   Mr. Bailey who's also an assistant there.  And we would

11   represent the state of Ohio.  I assume you remember

12   Mr. Bailey from about two weeks ago?

13   A        Yeah.

14   Q        I assume you remember Mr. Ingram and Mr. Juhasz also

15   from last week.  They obviously are representing Donna

16   Roberts who is charged with the most serious crime that you

17   could possibly be charged with in the state of Ohio.

18           So we're going to spend some time with you this

19   afternoon, and we're going to ask you some questions that are

20   going to be admittedly very difficult questions.  And they

21   may be questions that you've not thought of.  And they are

22   certainly questions that I would not want asked of me.  And I

23   don't know how I would respond if somewhere were to ask me

1   these questions.

2        But it's important that both the State and Miss

3   Roberts be given a fair trial and a fair opportunity at both

4   guilt and innocence and acquittal, because obviously we don't

5   want to have in here 12 of my family, friends and people that

6   I know, or 12 of Mr. Ingram's family or friends or Miss

7   Roberts or the deceased in this case.  That's just not the

8   way it works.

9        We really want 12 people that sort of come in here

10  with no preconceived notions because obviously there's, in

11  essence, there's a dispute between the parties.  There's an

12  accusation made by the State.  And there's a denial of that

13  accusation by the accused.  And we're here in this courtroom

14  to settle that dispute.  And you potentially may be one of

15  the jurors called upon to settle that dispute.

16       I'm going to tell you again that, you know, anything

17  you tell us here today, there's no right or wrong answers.

18  You just need to tell us what your honest opinions are and

19  what your feelings are.

20       I'm not trying to change your opinions.  I'm certain

21  defense counsel is not going to try to change your opinions.

22  So just tell it like it is.  And the fact that you have been

23  selected for this jury is probably the most important civic

1    duty you'll perform, other than perhaps your service to the

2    country.  I noticed you were a military veteran?

3    A        Yes, I was.

4    Q        Probably Vietnam?

5    A        No.  During the period but I was never in Nam

6    itself.

7    Q        You served in the Navy; correct?

8    A        Yes.

9    Q        I'm sure this experience was, all of my family

10   members have served in the Navy except for me.  It's going to

11   be a step below that, but it's still a very important civic

12   duty other than serving your country.

13            So let's start off right away and ask about the

14   death penalty.  I noticed in your questionnaire that you are

15   in favor of the death penalty?

16   A        Yes, I am.

17   Q        And I'm assuming that you've had that feeling for a

18   period of time, or you thought about that and you --

19   A        The way I reason it is, I think the Judge mentioned

20   that I believe in the old law, the old testament which is an

21   eye for an eye or a tooth for a tooth.  And even though I've

22   had arguments even with some priests that say, well, Jesus

23   said to forgive.  And I said, yeah, but he said he came --

1   not to change the old law but to add to it.  So that hasn't

2   changed my feeling about it.  As far as imposing, it depends

3   on the crime.

4   Q      You agree, though, that it's a case-by-case

5   situation?

6   A      Yes.

7   Q      It has to be looked at?

8   A      Yes.

9   Q      And you understand that, I think what the Court was

10  saying to you is -- and before I get into that the Court

11  mentioned, and I'm sure myself and Mr. Ingram, Mr. Juhasz

12  when they speak to you are going to tell you, we're going to

13  be real presumptuous here because this is the only chance we

14  get to speak to you as a juror.

15          If you're seated as a juror and you get put in one

16  of these jury chairs in this jury box and the trial starts,

17  we can't lean over to you and say, hey, Mr. Evans, do you

18  think we ought to ask this witness that?  Or how do you think

19  the trial is going?  Or should we do this?  Or should we do

20  that?  We have an ethical obligation that we can't speak to

21  you.

22          So this is really the only time we get to ask you

23  anything.  So by all means, if you have any questions or you

1    don't understand what I'm asking you, say wait a minute,

2    re-explain that. You've completely lost me. Because trying

3    to explain this sometimes to my wife, she gets confused. I

4    think I'm doing a good job but obviously I'm not.

5         You heard the Court and we're going to, we're going

6    to tell you how this case is going to work. There's going to

7    be two parts to this case, potentially. The first is going

8    to be a guilt phase. And it's my burden, along with Mr.

9    Bailey's, to prove the Defendant guilty beyond, proof beyond

10   a reasonable doubt of four criminal charges.

11        Now, we're going to be presumptuous here because as

12   the Court indicated to you, we can't come to you after the

13   guilt phase, assuming you were to find her guilty and say,

14   okay, now everybody, we're going to ask you to determine if

15   she should be sentenced to death. Because there are

16   obviously some people out there who have a different view

17   than you and say, I cannot do that. I could not do that. I

18   don't believe in that. Well, now we've come halfway through

19   the trial and we've got to get rid of some jurors and we

20   start all over again. So that's why we have to be

21   presumptuous.

22        What I'm going to tell you is, during this

23   conversation, even though we're going to talk about a

1    potential penalty and the ultimate penalty which is death,
2    you can't, not only can you not but you should not and cannot
3    infer that she's even guilty.  But we're giving you a
4    hypothetical here that if we get to that point, would you be
5    able to impose the death penalty and would you be able to
6    impose it fairly?

7    A        I have an open mind.  I think I can.  If the
8    crime -- how do I say?  If the guilt is proven beyond a
9    reasonable doubt with, as the Judge mentioned,
10   specifications, I would have no problem with imposing the
11   death penalty.

12   Q        Okay.  And I want to clear up a misconception I
13   think some jurors even today earlier this morning had.
14   Because this is going to be a two-phase process you're going
15   to start out in the first part of this trial, maybe a week, a
16   week and a half, maybe two weeks is going to be evidence that
17   she did some crimes.

18              There are specifications to the two murder counts in
19   this case, that if you find her guilty beyond a reasonable
20   doubt of the specifications you would then move to the second
21   phase.

22              Death is not automatic, even if you make her what we
23   call death eligible, death eligible, because you have to

1    consider in the second phase four punishments, and you have

2    to consider them equally.  One is death.  One is life with no

3    parole.  One is life with no parole after 30 years.  And one

4    is life with no parole until after 25.

5        So we're going to be presumptuous again and we're

6    going to say, okay, we're in the first phase.  Mr. Bailey and

7    I proved to you that she committed murder.  And the

8    allegation in this case is that she is an aider and abettor,

9    which is basically a helper.  She helped someone else commit

10   a murder.  We will tell you right now, she didn't pull the

11   trigger.  She wasn't even in the structure where this crime

12   was alleged to have occurred.  But our allegation is and

13   accusation is that she was a helper.  She helped someone else

14   do this.

15       Now, assuming we proved to you that she did it, that

16   she thought about it or how she planned it, that she did it

17   with what's in the indictment called prior calculation and

18   design, which is premeditation, and assuming we prove to you

19   the specification that makes it a special case where death

20   could be imposed, now we go into that second phase.  Then you

21   have those four options that I talked to you about.

22       And what we're concerned about and what obviously

23   the defense is concerned about is that, when we get to that

1  second phase you're not going to say, well, hey, I found her

2  guilty of aggravated murder and I also found her guilty of

3  planning it, I've got to give her the death penalty, because

4  that's not the law.  Do you understand that?

5  A      Yes, I do.

6  Q      You have, I don't want to say a contrary opinion,

7  but you have a strong opinion about the death penalty?

8  A      Yeah.

9  Q      And there's nothing wrong with that.  You're

10  entitled to that opinion?

11  A      Okay.

12  Q      Can you be fair, though, knowing that if we get to

13  that second phase that you had found her guilty of being a

14  helper in a murder that was planned with prior calculation

15  and found this aggravating circumstance, will you go into

16  that second phase of the trial and equally consider all four

17  of those options?

18  A      Yes, I can.

19  Q      Okay.  And you can do that despite the fact that

20  you're a proponent or you're in favor of the death penalty?

21  A      Yeah, I could.

22  Q      Because it's real important that you don't go back

23  to that jury room, if we get to that second phase, and say

1    you know what?  She killed somebody.  She planned it.  She

2    was a helper.  They talked about it.  Plus we found this

3    aggravating circumstance already.  I'm going to vote for

4    death no matter what.  You wouldn't do that, would you?

5    A        No.

6    Q        So you would go to that second phase equally

7    considering, considering all four options?

8    A        Yeah, all four options equally consider.

9    Q        Because in the second phase we have to prove to you,

10   Mr. Bailey and I, again, they don't have to prove anything,

11   throughout this whole trial they could sit on their hands and

12   play crossword puzzles.  That's what we call the presumption

13   of innocence.  And I'm sure you're familiar with that; right?

14   A        Right.

15   Q        They don't have to prove anything.  They don't even

16   have to tell you anything.  Because if Mr. Bailey and I louse

17   up this case in the first phase, in the guilt phase, and we

18   don't even present to you enough evidence to prove beyond a

19   reasonable doubt she did these things, you're going to find

20   her not guilty; right?

21   A        Right.

22   Q        And we all go home.  We don't even worry about the

23   second phase.  And when we get to the second phase and we

1    talk about the death penalty, the only way you and your

2    fellow jurors can give her the death penalty is again if

3    Mr. Bailey and I prove some things to you beyond a reasonable

4    doubt.  And in that case we have to prove to you that the

5    aggravating circumstances, which you're going to find, you've

6    already had to find in the first phase to get to the second

7    phase, outweigh by proof beyond a reasonable doubt the

8    mitigating factors.  And if Mr. Bailey and I fail to prove to

9    you that the aggravating circumstances do outweigh the

10   mitigating factors, you cannot impose the death penalty; do

11   you understand that?

12   A       Yeah.

13   Q       Okay.  So you won't go in there thinking, well, I've

14   already convicted her of aggravated murder.  I've already

15   convicted her of aggravating specification or the death

16   specification, therefore I have to give her the death

17   penalty?

18   A       No, I don't believe that.

19   Q       And you also wouldn't go in there with a bias

20   towards or giving the death penalty more weight than any of

21   the other selections?

22   A       No.

23   Q       Okay.  And I appreciate your candor here.

1    A        I try to keep an open mind when it comes to stuff

2    like this so I can --

3    Q        And that's kind of what we want.  We want people to

4    keep an open mind.  Because they're not required to, again,

5    they may not present anything to you.  I highly doubt that

6    that's going to happen in this case, but they theoretically

7    could sit there through both phases and do knowing.  And if

8    we don't meet our burden in the first phase, it's a not

9    guilty verdict and we go home.

10            If we don't meet our burden in the second phase then

11   you can't consider the death penalty.  Pretty simple I think.

12   But sometimes it's coming in here and people aren't aware of

13   how that works.  But that's generally how that works.

14            So we have to keep an open mind even though you're

15   in favor of the death penalty personally, you have to

16   separate that out when you go back to that jury room and say,

17   I've got four options.  I'm going to equally consider them.

18   And you know what?  If the State doesn't prove to me beyond a

19   reasonable doubt that aggravating circumstances outweigh

20   these good things about her, and maybe there will be no good

21   things about her, but you still have to have the aggravating

22   circumstances in your mind weigh so heavily and beyond a

23   reasonable doubt that death is the appropriate penalty.  It

1   may not, we may present to you some aggravating circumstances

2   but they may not weigh beyond a reasonable doubt to get you

3   to the point where you're comfortable signing a death

4   verdict.  Okay?

5   A       Okay.

6   Q       Now, I also notice on your questionnaire that you

7   apparently have heard nothing about this case?

8   A       I've caught just bits and pieces in the preliminary.

9   I try not -- it's something I, I try not to watch too much

10  news on TV.  I try to stay away from it.

11  Q       Have you heard it on the radio, read about it in the

12  newspaper?

13  A       The only thing I've read in the newspaper, and I

14  don't read the whole article, I just read something briefly

15  about it.  And then after we were called that first day they

16  had the headline again and I said, well, I just want to see

17  how many were in the courtroom.  I read three paragraphs and

18  there it was, 161.  And I said, wow.  I was kind of amazed

19  that there was that many called.

20  Q       And here's another problem we may have.  You haven't

21  read or seen anything about this case since then?

22  A       No.

23  Q       Because you're not going to be able to read anything

1    or hear anything about this case; do you understand that?

2    A        Yes, I do.

3    Q        And you have to follow the Court's instructions

4    because it's important that you not let what you may have

5    read or seen on television or heard on the radio about this

6    case influence your decision.

7    A        I understand that.

8    Q        The articles that you read prior to coming to court

9    on Tuesday, April 8th, were they like a year and a half ago

10   or a year ago, do you recall?

11   A        They were before the first of the year, that's all I

12   can recall.

13   Q        They were a while ago?

14   A        Yeah.

15   Q        And obviously you read those having no idea you're

16   going to come here; right?

17   A        Most definitely.

18   Q        And those articles wouldn't influence you in terms

19   of how you're going to approach this case, is it?

20   A        No.  Because I feel this way:  It's like you said,

21   it's your burden to prove her guilty.  I mean, whatever I've

22   read, I just have to say that's gone, forget it.  It's up to

23   you to prove to me so that I can make the right call.

1    Q        Now, I'm sure everyone has got a little bit of

2    concern because you were here on the 8th and you read the

3    paper the next day.

4    A        But like I said, the only thing that I read was the

5    first three paragraphs.  And it didn't have nothing, in the

6    first two that even said anything that I even read.  I just

7    glanced through.  I was looking for a number, and I saw 161

8    in the third paragraph.  I said, okay.

9    Q        Now you understand, though, that if you're selected

10   for this jury the Court is going to give you an instruction

11   that says you can't do any of that, even if you want to know

12   how many, how long we went or how many witnesses or even if

13   you want to remember what a witness said because that's an

14   interpretation by some reporter.

15   A        Yeah.

16   Q        So you won't even be able to glance at the

17   newspaper.  If you see the headline that says, State versus

18   Donna Roberts murder trial, you've got to say, oops, I can't

19   read that and flip it over.  And you'll do that; right?

20   A        I will.  The only thing I'll read after that is the

21   obits and the sports.

22   Q        Because you understand, as we sit here today there's

23   no reporters.  There's no television cameras.  But I imagine

1    at some point if we pick a jury in this case and we start

2    presenting evidence and testimony there will be TV cameras in

3    here and newspaper reporters, and they're only going to be

4    here for a few minutes, maybe.  Maybe an hour tops of every

5    day.  And they may hear some witness say something completely

6    out of context.  They may come in and they may say, yeah, I

7    heard Donna Roberts say I, she did it and this is what she

8    did.  And then she did these horrible things.  And she did it

9    for money and lust and greed and all this.  And then the

10   reporter may write that down and run out.  And then the

11   witness may say, but I was mistaken.  That's not what I

12   heard.  And now the reporter is gone, he's going to put that

13   in the paper.  You're going to read that and say, wow, well,

14   I missed that.  I must have missed that.  So you understand

15   that --

16   A        Yeah.

17   Q        -- the reporter has a much different function than

18   you do as a juror.  And he's going to give you a snippet of

19   the case anyway?

20   A        Okay.

21   Q        The little bit that you have read or seen or heard

22   about this case, though, the fact that you heard that there

23   were 161 people here the first day, that doesn't influence

1    your decision?

2    A        No.

3    Q        Now I want to talk to you a little bit about some of

4    the, some of the concepts in general of a criminal case.  And

5    one of the concepts, and I'm sure you're very familiar with

6    and I've already mentioned to you a few times, is what we

7    call the standard of proof beyond a reasonable doubt.  You've

8    heard that I'm assuming on television or radio?

9    A        Yes.

10   Q        I can't remember, you've never served on a jury;

11   right?

12   A        No.

13   Q        Were you the one that was called in Girard?

14   A        Yeah, I was called in Girard.  But because I knew

15   one of the attorneys, he went up and told the Judge and the

16   opposing attorney and I was excused.

17   Q        So it's sort of like this.  You don't know myself

18   and Mr. Bailey.  But obviously if you were my neighbor or

19   something and we were here, you might say, I know Mr. Becker.

20   He lives right beside me.  He told me about this case when it

21   first happened.  I feel uncomfortable.  But you don't have

22   that problem in this case?

23   A        No.

1    Q        Now, when we talk about reasonable doubt I had a law

2    school professor who once told us that, he tried to explain

3    all these different burdens of proof back when I was a first

4    year law student.  He sort of says they're like a glass of

5    water.  And the first standard of proof you have in a civil

6    case, for instance, a car accident where maybe you get

7    whiplash or you break an arm because the guy doesn't maintain

8    the sidewalk properly is what's called presumption -- I'm

9    sorry -- preponderance of the evidence.  And that's basically

10   a glass of water being halfway filled and somebody taking an

11   eyedropper and putting one drop of water in there.  It's the

12   next drop of water over halfway full, that's the

13   preponderance of the evidence.

14        In this case, though -- and there's another standard

15   of proof called clear and convincing, but we won't worry

16   about it here.  The standard of proof, though, that we have,

17   Mr. Bailey and I, that proof is beyond a reasonable doubt.

18   And that's a little bit like having that glass of water

19   filled up to maybe an inch or maybe even a half an inch up to

20   the top.  It's not filled to the top because the Court will

21   tell you and I'm going to tell you that's all doubt, and I

22   can't prove anything to you beyond all doubt.

23        I'm standing here and I've got a wedding band on and

1    you can probably assume that I'm married.  If my wife came

2    down here today, which sometimes she does on Fridays, and

3    brought my kids in, she came over here and gave me a kiss,

4    you could probably assume that's my wife.  But you may have

5    doubt about whether, whether we're really married or we're

6    just living together or something like that.

7         Now, I can probably show you a marriage certificate.

8    I could probably show you the thing from the Methodist Church

9    that says we were married, and I could probably show you some

10   bills that I have from when she goes shopping and that kind

11   of thing, and things that are jointly in our name.  But you

12   still may have some doubt about it.

13        Maybe it's all fictitious.  Maybe it's all made up.

14   So you understand the concept of reasonable doubt and you can

15   differentiate that from all doubt; correct?

16   A       Yeah.

17   Q       And you will never hold the State to proving

18   something to you beyond all doubt?

19   A       No.

20   Q       I don't have to prove to you, assuming we get to the

21   second phase, I wouldn't have to prove to you beyond all

22   doubt that death was the appropriate punishment, would I?

23   A       I don't believe so.

1    Q        Just reasonable doubt?

2    A        Just reasonable doubt.

3    Q        Now, sort of hand in hand with that concept is what

4    we call the presumption of innocence.  As we stand here

5    today on, whatever it is, April 24th or 25th of 2003 you have

6    not heard any evidence in this case; right?

7    A        No.

8    Q        You don't know the first thing about this case.  In

9    fact, you don't even know people's names.  You don't know

10   probably what police agency investigated.  You don't know if

11   there's fingerprints.  If there's DNA.  If there's a gun

12   involved.  If there's a knife involved.  You don't know

13   anything about that?

14   A        No, I don't.

15   Q        All right.  Now, if Judge Stuard said to me, Mr.

16   Becker, sit down.  I want him to go back to the jury room and

17   be a juror of one and vote for guilt or not guilty, your vote

18   would have to be what?  Not guilty; right?

19   A        Yeah.

20   Q        You haven't heard anything.  You haven't heard any

21   testimony.  And that presumption of innocence, that feeling

22   or that idea if she's not guilty stays with you until you

23   begin your deliberations.  In fact, Mr. Bailey and I can

1    present evidence to you for the next two weeks and that may

2    not be enough to prove beyond a reasonable doubt; correct?

3    A        Correct.

4    Q        One of the simple examples that I'll use is, let's

5    assume there's a car wreck and the car wreck happens on Park

6    and High Street right out here in the northeast corner of

7    courthouse square, and the car wreck happens and there's one

8    witness there.

9         Now, that one witness happens to be the priest at

10   the local Catholic church who walks three or four blocks

11   around here every day.  He's very careful to pay attention

12   because he knows drivers can be crazy driving through

13   intersections.  He's on his walk and he says, I looked up, I

14   see the light flashing.  It says walk.  It's in white.  The

15   light is green.  Now I know because I walk all the time

16   around courthouse square to look both ways because sometimes

17   people don't see the lights or they're not paying attention

18   because they just paid their taxes or been to the courthouse

19   and lost their case or their son has been sent to prison or

20   something like that, so I know to be careful.  And before I

21   step off that curb I look both ways.

22        And on this day I looked down and I see a red Camaro

23   blazing through the Market Street and Park intersection.

1    He's going north and he blazes through and blows the red

2    light at High and Park.  And I knew he blew the red light

3    because I saw the "Walk" sign, I saw that he had the green

4    light.  And the guy that was coming at me on High Street

5    going from the east side to the west side, this poor guy

6    didn't have a chance.  He went through the green light and

7    this red Camaro just plowed into him.

8            We could probably prove our case of the guy running

9    the red light with just that one witness for you; right?

10   A        Yes.

11   Q        And on the flip side of that coin, if we had three

12   witnesses who were drinking at Maddigan's, which is the bar a

13   couple blocks down the street past the Post Office, and had

14   been in there since noon and it's 5:00 o'clock and they're

15   stumbling down the street, and all three of them wear

16   glasses.  And all three of them had their glasses broke in

17   the bar because they were all in a fight.  And they were

18   drinking with a guy who bought them three or four beers in

19   there while they were there.  And that's the guy who came

20   down through the intersection and says oh, no, I went through

21   the green light, not the red light, you would have some

22   problems with that case; right?

23   A        Yeah.

1    Q        And if those were our witnesses, Mr. Bailey and I

2    would have some problems.  We would have a lot of convincing

3    to get, for you to get to reasonable doubt; right?

4    A        Right.

5    Q        Now, in both of those examples you haven't heard a

6    word from the defense; correct?

7    A        Correct.

8    Q        And you may not hear a word from the defense in that

9    case or this case.  That's what we're talking about, the

10   presumption of innocence.  So we presented you a lot of

11   witnesses in the second example.  There were three witnesses.

12   They were more, they were three times as many than the first

13   example, but we didn't get to that proof beyond a reasonable

14   doubt; right?

15   A        Right.

16   Q        So you would agree then that the Defendant, we may

17   present 30 witnesses, Mr. Bailey and I, and we still may not

18   prove this case beyond a reasonable doubt; right?

19   A        Correct.

20   Q        We may prove to you that some guy is dead.  We may

21   prove to you that there was somebody that got help.  We may

22   prove to you a lot of different things, but we may not fill

23   up the glass of water to prove beyond a reasonable doubt;

1    right?

2    A        Correct.

3    Q        And each crime has elements.  So in essence there's

4    going to be four or five or six glasses of water that we have

5    to fill to that imaginary line of half an inch or quarter

6    inch or an inch from the top called reasonable doubt; you

7    understand that?

8    A        Yes, I do.

9    Q        Okay.  And I know it's sort of like having a Civics

10   quiz here.  And you've been probably sitting down there and

11   looking at old magazines and you're not really ready for

12   this, so I'll apologize if I'm putting you on the spot or

13   maybe giving you too much information.

14           This case involves two counts of aggravated murder.

15   One count alleges that the crimes -- well, let me suffice it

16   to say, there are two ways to try and prove this case that

17   the State is alleging.  You may find both cases of aggravated

18   murder have been proven beyond a reasonable doubt, but

19   there's only one death in this case.  There's only one person

20   that's dead, so don't be confused when you see that.  Does

21   the fact that the State charged two counts two different ways

22   or two different theories of aggravated murder bother you in

23   any way?

1    A    Can I ask a question?

2    Q    Sure.  Ask away.

3    A    When you say two counts, are they both more or less

4    the same count but different ways of getting --

5    Q    A little different elements, right.  One count

6    alleges that the offense was committed with prior calculation

7    and design.  And then it has this special death

8    specification.  The other count alleges that the, that the

9    death occurred as a result of a murder being committed while

10   there was an aggravated burglary or aggravated robbery.  And

11   then it also has a special little death specification to it.

12   A    Okay.

13   Q    So there's two different theories.  One says that it

14   was planned and thought out and talked about and discussed.

15   And the other one says, well, there was another crime that

16   happened, which is what we call felony murder, and it was

17   either aggravated burglary or aggravated robbery or both, and

18   a death happened as a result of that.  And it was a

19   purposeful death.  I mean, there's a lot of elements, and the

20   Court will explain those to you.  But that doesn't cause you

21   any concern that there are two counts of aggravated murder

22   and only one dead person, does it?

23   A    No.

1    Q        You don't think, well, boy, Mr. Bailey and Mr.

2    Becker must really feel unconfident, you know, not very

3    confident about their case because they've got two different

4    counts.   One of these must be wrong because you'll be

5    instructed by the Court that you could find her guilty of

6    both.   You could find her guilty of both counts, one count or

7    none of the counts.   And there's two other counts, not

8    aggravated murder but there are two other counts, and that's

9    the aggravated burglary and the aggravated robbery counts.

10   A        Okay.

11   Q        And on the other side of that coin, you don't think,

12   boy, she must really be a bad person because they have two

13   counts charged against her and there's only one dead person?

14   You don't think that way either, do you?

15   A        No.

16   Q        And I don't know if you're familiar with how crimes

17   get charged, but you've heard of the grand jury process?

18   A        Yes, I have.

19   Q        The grand jury is a much different animal than what

20   we're talking about here in the jury that you're going to

21   serve on.   The grand jury is generally composed of 14 people.

22   They're selected in the same manner off the voting rolls.

23   But the grand jurors, first of all, when they're picked

 1    there's no defense attorney to help us pick them.  There is

 2    no judge in the room when we, Mr. Bailey and I and the other

 3    assistants present evidence to them and testimony to them.

 4    The defendant is not there.  There's no defense attorney

 5    there.  It's a one-sided affair.

 6              And all the grand jury really does is -- and it only

 7    takes seven of the nine.  They don't even have to be

 8    unanimous.  You folks, if you're selected for this jury, will

 9    have to be unanimous.  The grand jurors only take seven of

10    the nine to issue what's called an indictment.  And the

11    indictment is really just a piece of paper, and it's

12    basically just the legal paperwork that says, okay, Mr.

13    Evans, you did these crimes.  We're going to prove you guilty

14    that you did them.  Now, we may not be able to do that. But

15    that's the, that's our allegation.  And then you say, boy, I

16    better get an attorney.  I can't afford one.  I'll get a

17    court appointed or I'll go hire some attorneys or however it

18    works.  And then we come to court and set trial dates and we

19    talk about when we're going to try this.  And that's the

20    point where we're at now.

21              So you won't take the fact that she's indicted and

22    use that to say, well, we're sitting here talking about death

23    penalty.  We're sitting here talking about aggravated murder.

1    We're sitting here talking about indictments.  She's got to

2    be guilty of something.  You're not going to do that, are

3    you?

4    A       No.

5    Q       Because you've obviously heard that some people go

6    to trial and they get acquitted; right?

7    A       A lot of them do.

8    Q       Sure.  And that could theoretically happen in this

9    case; right?

10   A       Yes.

11   Q       Now, I've already mentioned this to you, but I want

12   to go back a little bit to what we were talking about in the

13   death penalty.  I've already told you that there's only one

14   death.  The indictment -- I'm sorry.  The evidence that we're

15   going to use to prove this case is going to clearly show that

16   this Defendant is not the shooter.  She's a helper or what we

17   call an aider and abettor under the law.

18                   MR. INGRAM:  Objection.

19   Q       She's accused.  For some reason I, I always forget

20   to say that part, accused.  And I apologize.  Because as we

21   sit here today she has that presumption of innocence.

22           But I want to make it clear, she's accused of being

23   a helper and an aider and abettor.  And that's totally my,

1    mine and Mr. Bailey's responsibility to prove to you beyond a

2    reasonable doubt that that's true.  So if I say anything that

3    makes you think she's guilty right now, you've got to

4    disregard it.  And I apologize if I have said that.  And I

5    apologize to the defense and Miss Roberts as well.

6         Is that going to create a problem for you in either

7    determining her guilt or innocence, because she's not accused

8    of being the shooter and she's not accused of actually being

9    at the location when the crime occurred?  Are you going to

10   say, boy, they're really going to have to prove it to me now

11   because she's not even there?  Or are you just going to look

12   at the evidence and say, well, if there's evidence there I'll

13   look at it for you?

14   A       Well, I think I stated before, if the evidence shows

15   beyond a reasonable doubt, I would have no problem.

16   Q       Now, in every criminal case, just about in every

17   criminal case there's evidence that we call circumstantial

18   evidence.  And probably in civil cases too where there's

19   people being sued.  And going back to our little, very simple

20   example of the accident at the intersection there -- well,

21   let me use a better example.

22        Let me use an example that's more close to home.  My

23   wife last Sunday built for my kids a big sandbox.  She built

1    it because I probably couldn't build a house of cards here.

2    I'm pretty inept when it comes to that kind of stuff.  So she

3    built this big eight, maybe ten by ten, eight by eight

4    sandbox for my kids.  She had a big dump truck come in

5    Saturday, it dumped a whole dump truck full of sand in there.

6    The kids loved it.  And I told her this was going to happen

7    because I've got four kids, and I knew it was going to

8    happen.  And I would say within half an hour of this sand

9    being dumped into this sand box I hear in the backyard, "I've

10   got sand in my eye.  I've got sand in my eye."

11            And I look out and I see my eight-year old son who's

12   always, he's a very, very good boy.  I love him to death.

13   But he's rambunctious.  And he's out there with a bucket and

14   he's throwing sand in the air, and got the shovel and

15   throwing sand.  And I know exactly what happened because he's

16   standing there with a shovel, and my youngest daughter is

17   there crying.  And she's got sand in her eye.  And she's

18   screaming about sand in her eye.  It's in her hair.  And my

19   son is there with a shovel.  And I see  some sand going up in

20   the air.  As I turn and he sees me, I can assume that he's

21   the one that got the sand in her eyes; right?

22   A        Right.

23   Q        Now, there may be other examples.  Maybe my daughter

1    had sand on her hand and she wiped it off and my son just

2    happened to be picking up the shovel knowing that he was

3    trying to help get the sand in the sandbox and he just threw

4    it and it went completely opposite of where my daughter was.

5    You can make that inference too; right?

6    A        Yes.

7    Q        But the sand in her hair is going to be a little bit

8    of a giveaway as to somebody threw it up in the air and she

9    didn't just get it by rubbing it in her eye; right?

10   A        Yeah.

11   Q        You can make those kind of inferences?

12   A        Yes, I could.

13   Q        And you can use that to determine guilt beyond a

14   reasonable doubt?

15   A        Yes, I could.

16   Q        One of the last things I want to ask you is, a lot

17   of times if you watch the news or you read things, people

18   sometimes make mistakes.  You've heard the saying, sometimes

19   the best laid of plans go astray?

20   A        Yes.

21   Q        And one of the classic examples that I heard about,

22   and I probably got a newspaper article saved somewhere

23   because I'm a pack rat is the guy who's the bank robber and

1    he goes into the teller and he's got the gun and he's got the

2    ball cap down over his eyebrows.  He's got dark sunglasses

3    on.  He may even have the fake beard on.  He's got the jacket

4    up like this, and he walks in and he says, all right, give,

5    you know, do it.  And the note says, "Give me all the money

6    and put it in a plastic bag."  Or, "No dye.  No exploding

7    dye."

8             So the teller grabs all the money, puts it in the

9    bag, the guy takes it and, you know, "Don't move."  And, "Get

10   on the ground until I leave."  He goes out to where his buddy

11   is that he's planned this robbery with for three or four

12   weeks.  They got the car tuned up to make sure it would run

13   properly.  They had the tires checked and inflated.  They

14   know exactly the route they're going to take back to where

15   their hide out is to where the one guy lives.

16            And it turns out that after he leaves, the teller

17   turns the piece of paper over and it's got the guy's name and

18   address on the thing.  It's a letter that was addressed to

19   him.  And that's what he used to make the ransom note.  So

20   you've heard of things like that?

21   A       Yes.

22   Q       That doesn't surprise you, given the fact that human

23   nature sometimes people can have the best lay of plans and

1    they can go astray; right?

2    A        That's right.

3    Q        Mr. Evans, I want to ask you a few more questions

4    and I'll be done here.   You can rely on circumstantial

5    evidence to prove this case beyond a reasonable doubt;

6    correct?

7    A        Correct.

8    Q        You will give Miss Roberts the presumption of

9    innocence that our constitution requires that she have, and

10   that our law requires she has throughout this proceeding both

11   in the first phase and the second phase?

12   A        Yes.

13   Q        You will hold the State to its burden of proof and

14   not require the defense to prove anything; correct?

15   A        Correct.

16   Q        You will be able to, if the facts warrant it and the

17   law allows, to sign a verdict calling for the death penalty

18   if we get to that second phase?

19   A        Yes.

20   Q        Mr. Evans, I want to thank you very much for your

21   patience today.   I know it's been a long day for you.   And I

22   want to thank you very much for this service if you are

23   selected for this jury in this case.

1          I believe Mr. Ingram or Mr. Juhasz now will ask you

2    some questions.  Thank you, sir.

3                     THE COURT:  I've got to make one quick

4    phone call.

5                     (Whereupon, a recess was taken.)

6                          EXAMINATION

7    BY MR. INGRAM:

8    Q        Mr. Evans, how are you this afternoon?

9    A        Hi.

10   Q        My name is Jerry Ingram.  John Juhasz and I share

11   the responsibility of representing Donna Roberts here who's

12   on trial for her life.  And we think we should take every

13   reasonable precaution in selecting a fair-minded jury, the

14   same type of jury that you or I would want if we were on

15   trial.  Does that sound fair?

16   A        Yes.

17   Q        The process that you're going through here today is

18   a lot like a job interview, except when you went to the

19   church to apply for the job you chose to go apply for the

20   job.  Here we chose you by way of a spin of the jury wheel,

21   and we asked you to come down here.

22          So we're interviewing you today for one of the most

23   important jobs there is, the job of finding the truth and

1    determining perhaps the fate of another human being.  How do

2    you ask about, how do you feel about being asked to assume

3    that responsibility?

4    A       How do I feel?

5    Q       Yes.

6    A       Well, I've always been a believer in the

7    constitution and constitutional duty.  And that's part of the

8    constitutional duty is to, if you're called to serve on a

9    trial and serve correctly.

10   Q       Am I correct, you're a rather strong-willed

11   individual?

12   A       I have my way, but I can bend.  I can flex.  I'm not

13   rigid.  I don't have one set thing that I'm going to say, I'm

14   going to do this and I'm going to do it this way and no other

15   way.  I'm willing to accept different ways of trying to do

16   things and stuff.

17   Q       Well, when you think you're right you sort of tend

18   to stick to it; am I correct?

19   A       If I believe I'm totally right deep down in my

20   heart, yeah.

21   Q       When we all came here on Tuesday April 8th, we were

22   down at the other courtroom there.  When you came in the

23   courtroom door which way did you turn?

1    A        I turned to the left.

2    Q        Were you, did you sit down there?  Did you stand up?

3    A        I stood up for a little bit and then one of the

4    ladies came in court, Judge's assistance and asked everybody

5    to move in a little bit and I was finally able to get a seat.

6    Q        While you were either seated there or while you were

7    standing, did you overhear any conversations regarding this

8    case of any kind?

9    A        Not that I recall it.

10   Q        Did you talk to anyone else then about the case?

11   A        No.

12   Q        Where you were seated could you hear the Judge?

13   A        Yes, I could.

14   Q        I've got to talk to you about something that

15   concerns me here.  And I'll apologize for this in advance.

16            You did hear the Judge tell you you couldn't see,

17   read or hear anything about this case after you walked out of

18   that courtroom?

19   A        Yes.

20   Q        Is that right?

21   A        Yes.

22   Q        As a matter of fact, when you went back downstairs

23   did you sign one of these pieces of paper?

1    A       Yes, I did.

2    Q       And that piece of paper says that you won't obtain

3    any information about this case outside the courtroom; right?

4    A       Yes.

5    Q       And it also says that you're not permitted to watch,

6    listen or view any newspaper publicity; is that correct?

7    A       Correct.

8    Q       The next day, on April 9th you saw some headlines in

9    I believe the Warren Tribune?

10   A       No.  It's the Vindicator.

11   Q       Do you recall what those headlines said?

12   A       No, I don't.  All I know is it said something about

13   the Roberts trial and --

14   Q       When you read the headline you knew that that

15   article was about this trial; correct?

16   A       Yes.

17   Q       And you then proceeded to read the first three

18   paragraphs of that article?

19   A       Yeah.

20   Q       Do you recall if the first paragraph of that article

21   had something to do about the request, the defense requesting

22   a change of venue?

23   A       I don't recall right offhand, no.

1    Q       Well, what do you recall about that particular

2    article?

3    A       Actually, I don't recall much of anything other than

4    all I was interested in was just seeing what the number of

5    jurors was in the courtroom because there was a lot of us

6    there.

7    Q       Okay.  Do you specifically, do you recall the

8    specific number that was included in that article?

9    A       The number said 161.  Now whether that was the

10   actual count or not, I'm not really sure.

11   Q       So you remember the number, you remember the

12   No. 161 specifically, but you don't remember anything else

13   about that article?

14   A       No.

15   Q       Now, after you read the portion of the article with

16   the No. 161, what did you do?

17   A       I turned, put the paper down, picked up the sports

18   page and went on reading the rest of the paper.

19   Q       When you read those first --

20                   MR. INGRAM:  May I have a moment here?

21                   THE COURT:  Yes.

22   Q       When you read those first three paragraphs, did you

23   think you were violating the acknowledgment that you had

1    signed?

2    A        No, I didn't.

3    Q        Did you realize you were reading information about

4    this case?

5    A        Well, as far as, what do you mean?  Just information

6    on the number of jurors.  That's all I was kind of interested

7    in.

8    Q        Did the number of jurors relate to this case, sir?

9    A        Yeah, it did.

10   Q        Do you think that's something you should have done?

11   A        Probably not now in retrospect.

12   Q        How can we be certain you're not going to do it

13   again?

14   A        Because I haven't, I haven't been reading anything

15   in the paper.  I haven't read the paper for three, four days

16   now.  Usually I just look at the headlines and if I do see

17   anything that says anything about a trial or anything, I

18   don't even bother looking at it.

19   Q        Usually?

20   A        Well, I mean, I look at the rest of the paper but I

21   don't read the article that pertains to any trial or

22   anything.  And when I, if I do happen to have the news on,

23   when the news comes on I just walk out of the room if they

1    even mention the name, because I don't want to hear nothing

2    about it.  I want to try to keep an open mind and be fair.

3    Q       What was, what was there that was so intriguing

4    about the number of jurors in that room?

5    A       I don't know.  It was just a comment the Judge made

6    at one time.  He said you usually call 30 to 40 people just

7    for a trial at that time.  And I was just, all I was kind of

8    interested in, I was guessing, I just wanted to see actually

9    how many were there.

10   Q       So in order to find out how many people were there

11   you chose to violate your acknowledge, your written

12   acknowledgment to the Court?

13   A       I assume so.

14   Q       What?

15   A       I assume so.

16                   MR.  INGRAM:  Your Honor, may we approach

17   the bench, please?

18                   THE COURT:  Yes.

19                   (Whereupon, a side-bar discussion was held

20   off the record.)

21                   THE COURT:  Mr. Evans, you've done

22   something that's, I can understand I guess how that, that

23   could happen.  I can't condone it because of the seriousness

1    of the trial.  You understand that?

2    A       Yes, I do.

3                    THE COURT:  We do thank you, however, for

4    your participation.  I'm sorry to keep you here all this

5    time.  But maybe we'll have some other nice days like this.

6    We missed it also.

7    A       I'm sorry.

8                    THE COURT:  That's no problem.  I thank

9    you very much for participating.  You're excused.  The main

10   thing I think was your honesty.

11            For the record, the side bar requested by Mr. Ingram

12   concerned the testimony that's been given here by the witness

13   under the questioning and the challenge for cause, and the

14   Court readily grants it because we've gone to great length to

15   insulate this jury from any contact with the media.

16            Mr. Evans quite clearly, I don't think it was done

17   with malice, but he did admit freely that he did read

18   something after he had been instructed not to, so I've

19   granted the challenge for cause.  Monday morning at 9:00, I

20   guess.

21                    (For further proceedings, please see the

22   transcript of Maribeth Hoolihan, Volume XII.)

23                            * * *



2557

REPORTER'S CERTIFICATE


          This is to certify the foregoing represents a true and
correct copy of the proceedings had in the aforementioned
cause as reflected by the stenotype notes taken by me on the
same.




Richelle J. Guerrieri,
Official Court Reporter

1              IN THE COURT OF COMMON PLEAS

2                 TRUMBULL COUNTY, OHIO

3

4    STATE OF OHIO,              ) Case No. 01-CR-793
                                 )
5           Plaintiff            )
                                 )
6    -vs-                        ) Judge John M. Stuard
                                 )
7    DONNA M. ROBERTS,           )      **VOLUME XII**
                                 )
8           Defendant            )TRANSCRIPT OF PROCEEDINGS

9

10   Voir Dire, commencing April 28, 2003,

11   BEFORE:     HONORABLE JOHN M. STUARD

12   AT:         Trumbull Co. Court of Common Pleas
                 Courtroom Number 2
13               161 High Street, N.W.
                 Warren, Ohio 44481
14

15   APPEARANCES:

16   On behalf of the State of Ohio:
                 Mr. Kenneth N. Bailey and
17               Mr. Christopher D. Becker
                 Assistant Prosecuting Attorneys
18               Warren, Ohio

19   On behalf of the Defendant:
                 Mr. J. Gerald Ingram and
20               Mr. John B. Juhasz
                 Attorneys at Law
21               Youngstown, Ohio

22

23   Official Court Reporter:  Maribeth Hoolihan

136

1                            **VOLUME XII**

2                    **MONDAY, APRIL 28, 2003**

3

4                            **VOIR DIRE**

5

6           **BARBARA ALBRIGHT, JUROR NUMBER 153**

7    **EXAMINATION BY THE COURT:**

8

9                    THE COURT:  Barbara, how are you

10   this morning?

11                   BARBARA ALBRIGHT:  Okay.

12                   THE COURT:  You don't look like

13   you're happy to be here.

14                   BARBARA ALBRIGHT:  No, I worked

15   midnight last night.

16                   THE COURT:  Okay, that will do it.

17   Where do you work at?

18                   BARBARA ALBRIGHT: Kraftmaid.

19                   THE COURT:  You read that handout

20   that was given to you?

21                   BARBARA ALBRIGHT:  Yes.

22                   THE COURT:  This is an aggravated

23   murder case with what we call specifications.  The

1    prosecutor -- it will be necessary for the

2    prosecution here to seat a jury of 12 people.  In

3    Ohio, just because a person takes another's life,

4    that doesn't mean you forfeit your life or that you

5    face capital punishment.  It is only when a murder

6    is done with certain conditions we call

7    specifications.  An example of that is if a person

8    murdered a fellow named Bob Taft; that alone would

9    not cause that person to face the death penalty.  If

10   the prosecution put on that indictment that Bob Taft

11   was also the governor, then the fact that he is the

12   governor, becomes a specification.  And if the State

13   proves that beyond a reasonable doubt, then that

14   person would face capital punishment.

15          Now, there are other specifications

16   also.  In the indictment returned here, there were

17   two counts, and we will explain to you later how you

18   can have two counts of murder on one murder, but

19   there are two counts of aggravated murder with

20   specifications.  Now, that means that if the

21   prosecution at this trial is able to prove that

22   there was an aggravated murder, and that the

23   specifications are proven also beyond a reasonable



1    doubt, then Ms. Roberts could face the prospect of

2    this jury, in the second trial, having to determine

3    whether or not capital punishment should be imposed.

4              Now, some find it odd that we go through

5    this whole thing at this time and ask you questions

6    about capital punishment because that situation may

7    not arise.  If the jury found that the State failed

8    to maintain the burden of proof, then we will never

9    go to the second phase.  But if we don't ask the

10   questions now, if you get to that second phase, then

11   you may have somebody on that jury that believes

12   that whenever a life is taken, a life should be

13   given, an eye for an eye.  Such a person could never

14   be fair to the Defendant, because the Defendant has

15   the right to have a jury decide at a second phase

16   whether or not the aggravating circumstances and

17   those are factors that the prosecution would present

18   for the jury's consideration of imposing the death

19   penalty.

20             The defense has an opportunity to

21   present what we call mitigating factors, and those

22   are reasons why the jury should not impose the death

23   penalty.  If you have somebody on there who has

1     their mind made up, that just isn't fair to one side

2     or the other.  Same thing, some people cannot

3     participate because of religious, moral, ethical

4     considerations in making a decision of that nature,

5     just could not do it.  That person of that type

6     could never be fair to the State because the State,

7     if they prove their case, are entitled to ask the

8     jury to recommend the death penalty.

9              So, we have to ask these questions now

10    because of the possibility that if the State proves

11    their case, it could go into the second phase.  That

12    will be the main part of the questions that are put

13    to you, are your personal views.  And whatever your

14    personal views are, are fine.  We are all entitled

15    to our opinion on things.  Everybody has some

16    opinion about the issue of the death penalty.  Some

17    of us haven't thought about it that much, but I

18    think part of the value of this is it makes you

19    think on definite terms on what your position is,

20    and as I say, whatever your position is, that will

21    be respected by all the parties here.  They just

22    have a right to know whether you could be fair and

23    impartial, and whether you can impose the law as

1     required, because we're all bound by the law.

2                    The second issue will be about pretrial

3     publicity.  This case generated a lot of media

4     attention as anything of that nature would.  And

5     many of the people that are called on the panel,

6     have read something about the case or know something

7     about it, and that is fine.  The bottom line is,

8     though, whether each juror knows anything about the

9     case and whether it's something that is stuck in

10    their mind so firmly that they are not able to set

11    that aside, because if this case is to be tried

12    fairly, has to have every juror decide the matter on

13    the evidence presented in the Courtroom.  Something

14    that happened outside of the Courtroom can't have

15    any bearing on the case.  You get the picture?

16                    BARBARA ALBRIGHT:  Yes, I do.

17                    THE COURT:  Very good.  Gentlemen

18    of the prosecution wish to examine?

19                    ATTY. BECKER:  Thank you, Your

20    Honor.

21    **EXAMINATION BY ATTORNEY BECKER**:

22                    ATTY. BECKER:  Good morning, Mrs.

23    Albright.

1              BARBARA ALBRIGHT:  Good morning.

2              ATTY. BECKER:  My name is Chris

3     Becker, I am one of the assistant prosecutor's over

4     at the Trumbull County Prosecutor's Office.  This is

5     Mr. Ken Bailey, who I think you recall from a couple

6     of weeks ago, back on April 8th, about three weeks

7     ago tomorrow, when you met down in the big room down

8     there.

9              BARBARA ALBRIGHT:  Yes, I do.

10             ATTY. BECKER:  We have the

11    responsibility of prosecuting this case, which

12    involves the death of Robert Fingerhut and the

13    allegation is that the Defendant, Donna Roberts, was

14    involved in the helping in that murder, helping the

15    planning of it and what we call an aider or abettor.

16    She is represented by Mr. Ingram and Mr. Juhasz, who

17    I assume you also remember from Tuesday, April 8th,

18    when they were in Court.

19             BARBARA ALBRIGHT:  Yes, I do.

20             ATTY. BECKER:  And the first thing

21    that I want to tell is that we are very appreciative

22    of your service here on jury duty.  I think that you

23    are going to find that this is probably one of the

1    most important civil responsibilities that you can

2    perform for your country.  It is a very important

3    civic duty and probably short of serving your

4    country in the military, it is the most important

5    civic duty that we have as citizens of our country.

6                    I want to apologize for not getting to

7    you on Friday.  I know you were here.  Sometimes we

8    run late.

9                    The most important thing right now is to

10   remember is that this is the only time in the trial

11   that we get to have some interaction with you.  You

12   get to ask us questions or tell us things about

13   yourself, and we get to ask you questions and we

14   actually have a one-on-one dialogue here.  If you

15   are selected for this jury and you get seated in the

16   jury box here, we cannot have that interaction

17   anymore.  Mr. Bailey and I can't lean over to you

18   and ask you what you may think of a certain witness

19   or what questions you think we should ask because,

20   obviously, we have an ethical obligation that we

21   can't contact a juror once this case gets started.

22   And that goes for both sides.  So, if we see you in

23   the hallway or see you at the drinking fountain or

 1        going to the restaurants around town during a lunch

 2        break or something, we can't say -- ask you, you

 3        know, hey, what did you think about that last

 4        witness, or how are you, what's going on, or you

 5        know so and so.  So, this is really the only time we

 6        get to do that.  And while it may seem like we're

 7        being too personal with you or invading, I guess,

 8        your personal space, we have to know about you, and

 9        you have to know about this case, to know whether

10        you're going to be a fair juror to the State as well

11        as a fair juror to Miss Roberts, so that is why

12        we're here asking these questions, and that is why

13        we have the questionnaire there.

14                The first question, and by all means, if

15        you have any questions that you feel you need to

16        ask, stop me and say, hey, wait a minute, I don't

17        understand your question, or I have something to

18        add, or I want to tell you something about why I

19        feel that way.  And there is no right or wrong

20        answers.  Some jurors may be right in this case, may

21        not be right in another case, and some jurors may

22        not be the right juror in this case and may be

23        better jurors in another case.  So, don't be

1    offended if you're not selected, or if you have

2    concerns or questions about you.

3                  First of all, as the Court indicated to

4    you, we're going to sort of follow the Court's

5    framework that the Court just laid out for you.

6    We're going to get a little bit more detailed.  I

7    believe you indicated on your questionnaire that you

8    could, in fact, impose the death penalty, is that

9    correct?

10                 BARBARA ALBRIGHT:  That's correct.

11                 ATTY. BECKER:  Did you understand

12   what the Court was telling you in terms of what --

13   the death penalty is not an automatic option?

14                 BARBARA ALBRIGHT:  Uh-huh.

15                 ATTY. BECKER:  You are going to

16   have actually four options, and I believe you had a

17   piece of paper that probably explained those to you.

18   There was the death penalty; life imprisonment with

19   no parole; life imprisonment with parole after 30

20   years; and life imprisonment after 25 years.  So you

21   had those four options, right?

22                 BARBARA ALBRIGHT:  Right.

23                 ATTY. BECKER:  Now, one of the

```
1        strange things that we do as lawyers, and

2        particularly in this type of case, it is the most

3        serious crime in Ohio is a death penalty homicide.

4        What we're going to do, though, is be a little

5        presumption here.  This case is going to have two

6        parts to it.  It's going to have a first phase and a

7        second phase.  The first phase, you may find the

8        Defendant not guilty, and we may never get to the

9        second stage where we worry about what the penalty

10       is going to be, so bear with us because, as I

11       mentioned to you, we can't speak to you once we

12       start presenting evidence and you're seated over

13       here in the jury box.  So, the reason we do this and

14       find out about your ultimate feelings on the death

15       penalty is, we can't have you and your fellow jurors

16       determine the guilt or innocence of the Defendant

17       and take the chance if you will find her guilty and

18       then say, okay, jurors, now that you found her

19       guilty, now you have to determine whether the death

20       penalty is appropriate.  Well, some people obviously

21       have moral or religious objections to the death

22       penalty, and then they raise their hand and say, I

23       can't hear this case anymore because I oppose the
```

1    death penalty.  On the other side of that coin, we

2    may have some people who are so staunch for the

3    death penalty that they will not consider any of the

4    life options, so we may -- we may lose four or five

5    or six jurors, based upon those two problems.

6         So, what we're trying to do now is weed

7    out those people that are either so for the death

8    penalty that they could never possibly impose any

9    other penalty, or those jurors that are so opposed

10   to the death penalty that they could never give the

11   death penalty even if we proved our case beyond a

12   reasonable doubt.  So, that is why we have to do

13   this now.

14        You are not so firmly in belief of the

15   death penalty that you would automatically give it

16   as a penalty, correct?

17             BARBARA ALBRIGHT:  No.

18             ATTY. BECKER:  And by the same

19   token, and this is some times hard, you could see

20   yourself as a juror on this case, hypothetically,

21   finding the Defendant guilty in the first phase and

22   guilty of what we call some specifications or

23   special circumstances that would make her eligible

1       for the death penalty, and then assuming the case

2       was presented to you and we proved our case beyond a

3       reasonable doubt, you could go back to that jury

4       room in maybe three or four weeks sign a piece of

5       paper calling for the death penalty, if we proved

6       our case.

7                     BARBARA ALBRIGHT:  If you proved it

8       without doubt, yes.

9                     ATTY. BECKER:  And what the court's

10      instructions would be, so you could find that the

11      death penalty is warranted?

12                    BARBARA ALBRIGHT:  Yes.

13                    ATTY. BECKER:  And you could sign a

14      verdict saying that?

15                    BARBARA ALBRIGHT: Yes.

16                    ATTY. BECKER:  Now, I think in your

17      questionnaire, you mentioned there were certain kind

18      of cases that you felt the death penalty was

19      appropriate for, you basically said, if you do the

20      crime, you should do the time that put down by the

21      jury or Judge, right?

22                    BARBARA ALBRIGHT:  Right.

23                    ATTY. BECKER:  And you understand

```
 1    that as a juror and if we get to that second phase,

 2    it will be you, the jury, to determine what the

 3    appropriate one of those four penalties are.  The

 4    fact that you favor the death penalty, though,

 5    doesn't mean you will give the death penalty a head

 6    start or give it more importance than the other

 7    three options, would you?

 8                        BARBARA ALBRIGHT:  No.

 9                        ATTY. BECKER:  You would fairly

10    consider all four?

11                        BARBARA ALBRIGHT:  Yes.

12                        ATTY. BECKER:  And you would follow

13    the Court's instructions as to how to impose the

14    death penalty?

15                        BARBARA ALBRIGHT:  Yes.

16                        ATTY. BECKER:  Now, one of the

17    answers you gave was, if you take someone's life and

18    you planned it by yourself or with other people, and

19    they have proved that they found you guilty, then

20    you should get the death penalty.  Well, I am going

21    to tell you right now, the allegation in this case

22    is that Miss Roberts did plan the death of Robert

23    Fingerhut with another person.  Mr. Bailey and I are
```

```
 1    going to be very open with you right now.  Miss

 2    Roberts did not pull the trigger.  She is not

 3    alleged to be the trigger person.  She is alleged to

 4    be an aider and abettor or a helper, and the

 5    allegation is that she was probably not even in the

 6    home at the time that the murder took place.  But

 7    the allegation is that she permitted someone else to

 8    enter into that house, and it was planned out.  And

 9    I guess the concern is that you indicated on your

10    questionnaire that if people do plan, that they

11    should receive the death penalty.  Do you understand

12    that is not the law in Ohio now?

13                    BARBARA ALBRIGHT:  Yes, I

14    understand that.

15                    ATTY. BECKER:  So, let's be

16    hypothetical here for a moment.  Assume we prove our

17    allegations in the first phase, that she planned

18    with another to cause the death of Robert Fingerhut

19    and Robert Fingerhut died.  Now, we get to the

20    second phase, and the Judge is going to give you

21    some instructions, again, it's going to be the

22    State's burden, and it's always our burden, Mr.

23    Bailey and I, to prove beyond a reasonable doubt the
```

1    allegations.

2                    Now we're in that second phase.  You

3    understand Mr. Bailey and I have to prove to you

4    beyond a reasonable doubt that the bad things, these

5    special circumstances or aggravating circumstances,

6    outweigh any mitigating factors that you may have.

7    If we don't prove that to you, then you can't find

8    that the death penalty is appropriate.  Do you

9    understand that?

10                   BARBARA ALBRIGHT:  Yes.

11                   ATTY. BECKER:  And you will have to

12   consider the other three.

13                   BARBARA ALBRIGHT:  Yes.

14                   ATTY. BECKER:  And I guess the

15   reason you gave the question you did, is probably

16   you didn't, like most people, there is a lot of

17   lawyers that don't know this and don't practice

18   criminal law, is that that is not the law in Ohio.

19                   BARBARA ALBRIGHT: Correct.

20                   ATTY. BECKER:  So, you had a

21   different idea coming in as to what the law should

22   be or what you thought it was, now that you know

23   what the law is, you will follow the law, right?

1                    BARBARA ALBRIGHT:  Yes.

2                    ATTY. BECKER:  And the fact that

3      when you wrote down your questionnaire, death was

4      the appropriate option for someone who planned a

5      murder, that doesn't mean that you will be unfair if

6      we get to that second phase?

7                    BARBARA ALBRIGHT:  No.

8                    ATTY. BECKER:  Now, one of the

9      things that we talked about, as the Court mentioned

10     to you, that we will also question you about, is

11     what you may have heard in the newspaper.  I do

12     believe -- I think you mentioned that you heard

13     about this case somehow?

14                    BARBARA ALBRIGHT:  Yes.

15                    ATTY. BECKER:  How did you come

16     about to hear about this case, was it television,

17     radio?

18                    BARBARA ALBRIGHT:  Television,

19     newspaper.

20                    ATTY. BECKER:  And do you recall

21     when the last time was that you heard about this

22     case?

23                    BARBARA ALBRIGHT:  When they both

1      got indicted, the alleged killer.

2                     ATTY. BECKER:  All right, do you

3      even recall what his name was?

4                     BARBARA ALBRIGHT:  No.

5                     ATTY. BECKER:  Do you know anything

6      about his case?

7                     BARBARA ALBRIGHT:  That at the time

8      he was in prison and they supposedly wrote letters

9      and had taped conversations on the telephone.

10                     ATTY. BECKER:  All right, and

11     you're probably going to hear those tapes and see

12     those letters in this trial.  One of the dangers

13     that we want to try and clear up here, is that if

14     you are a juror in this case, and maybe one of those

15     phone calls is played for you or one of those

16     letters is given to you to read or maybe even read

17     to you somehow, you are not going to say, oh, now I

18     remember there is all these other letters and all of

19     these other phone calls, or that is not what I

20     remember seeing on television, it was different.

21     You understand that you have to base this case on

22     what you hear and see in this courtroom, correct?

23                     BARBARA ALBRIGHT:  Correct.

1               ATTY. BECKER:  Do you believe that

2     you will let any of the -- what you read or seen,

3     and there is nothing wrong with what you read or

4     saw, I mean, obviously, what you saw, you had no

5     idea that you were going to be called as a juror

6     here.  But you don't have any problems setting aside

7     what you have seen or read in the newspaper or on

8     television in determining this case based solely

9     upon the evidence, do you?

10              BARBARA ALBRIGHT:  No, because I

11    know that not everything on T.V., and in the

12    newspaper is correct.

13              ATTY. BECKER:  Right, and I think

14    that you put that in your questionnaire that you

15    realize that some times they make mistakes and they

16    only give you part of the story, and I think, in

17    your words, you said you only believe about half of

18    what you read, I think.  So, you haven't formulated

19    an opinion, you have no opinion coming in here today

20    that Miss Roberts is guilty or innocent, correct?

21              BARBARA ALBRIGHT:  No.

22              ATTY. BECKER:  Now, one of the

23    things that you probably heard, and I know you some

```
 1      times watch, I think you said you watch some of the

 2      crime shows on T.V. like America's Most Wanted, and

 3      I think CSI, right?

 4                  BARBARA ALBRIGHT:  Yeah.

 5                  ATTY. BECKER:  I am assuming that

 6      on some of those shows or programs the term,

 7      presumption of innocence, correct?

 8                  BARBARA ALBRIGHT:  Correct.

 9                  ATTY. BECKER:  You understand that

10      as we stand here today, Miss Roberts is presumed

11      innocent, correct?

12                  BARBARA ALBRIGHT:  Correct.

13                  ATTY. BECKER:  And it's our burden,

14      Mr. Bailey and I, to prove her guilty beyond a

15      reasonable doubt, and we may never get there, and we

16      may never get to that second phase.  The fact that

17      we're talking about the death penalty and about what

18      you may have read in the newspaper about this case

19      and potential penalties, that doesn't leave an

20      impression with you that she is guilty of anything,

21      does it?

22                  BARBARA ALBRIGHT:  No.

23                  ATTY. BECKER:  You understand that
```

1    we just have to ask these questions for the sort of

2    what if, if we get to that point?

3                    BARBARA ALBRIGHT:  Yes, I do.

4                    ATTY. BECKER:  All right.  You

5    believe that you will be able to give Miss Roberts

6    that presumption of innocence that she is entitled

7    to by our constitution and our system of justice

8    throughout this trial?

9                    BARBARA ALBRIGHT:  Yes, I think so.

10                   ATTY. BECKER:  Now, you understand

11   that hand in hand with the presumption of innocence

12   is what we call proof beyond a reasonable doubt, and

13   that is it's the State's burden to prove her guilty

14   beyond a reasonable doubt.  I suppose you heard the

15   term reasonable doubt in various programs or maybe

16   in the newspaper or on television or books that you

17   may have read, people refer to reasonable doubt,

18   proof beyond a reasonable doubt.  One of the easiest

19   ways that I've had it explained to me was, there is

20   various proof, degrees of proof under the law.  If

21   you take a glass of water and you fill it half way,

22   and then you put one more drop in there, that is

23   what we call preponderance of the evidence.  That is

1    the kind of evidence that you need if, say I was

2    suing you because you rear-ended me, and I hurt my

3    neck and I'm walking around with a collar, and I

4    went and got one of guys off of the T.V., Harshman

5    and Gervelis.  The guys that are out to protect me,

6    and now we're suing you.  They have to prove my

7    case, that you injured me, by that half glass full

8    of water, plus one drop, that is preponderance of

9    the evidence.  That is who has the most evidence.

10                 This case is a little bit different

11   though.  Mr. Bailey and I have to prove our case

12   against Miss Roberts and the allegations against her

13   by proof beyond a reasonable doubt.  And that is

14   sort of like taking that cup of water and filling it

15   up pretty close to top, maybe an inch or two or

16   maybe a half inch from the top.  Not the whole glass

17   because that would be all doubt.  And you understand

18   most things in this life have some kind of doubt,

19   right?

20                 BARBARA ALBRIGHT:  Right.

21                 ATTY. BECKER:  There is doubt to

22   everything.  I doubt if there is very few -- there

23   is very few things that I could prove to you beyond

1    all doubt.  I am standing here today, I have a

2    wedding ring on, I could show you pictures of my

3    wife and kids, but that may not prove to you beyond

4    all doubt that I am married and I have children.

5    There is probably reasonable doubt, if my wife

6    walked in here and sat down and my kids were

7    fidgeting back here, saying hey, daddy, and waving

8    to me.  That would probably be proof beyond a

9    reasonable doubt.  You may still have some doubt

10   about whether we were actually married or just

11   living together.  Maybe they were with my nanny or

12   something but it wasn't my wife.  So, everything in

13   life has some doubt, right?

14              BARBARA ALBRIGHT:  Right.

15              ATTY. BECKER:  Okay.  You wouldn't

16   hold the State to prove beyond all doubt, would you?

17              BARBARA ALBRIGHT:  No.

18              ATTY. BECKER:  That's an impossible

19   standard we could never prove.  You will listen to

20   the Court's instructions on what reasonable doubt is

21   and hold us to what reasonable doubt is pursuant to

22   the law?

23              BARBARA ALBRIGHT:  Yes.

1              ATTY. BECKER:  And that's doubt

2    base on reason and common sense and, obviously, you

3    as well as most jurors that are selected here today

4    can sort through what is reasonable and what is

5    common sense, and I certainly feel that you could

6    perform that job, do you?

7              BARBARA ALBRIGHT:  Yes.

8              ATTY. BECKER:  The -- one of the

9    other things you will have to determine, and this is

10   true for all criminal cases is, you will have to

11   determine this case without any sympathy for either

12   side.  In this case, I am going to say that you will

13   see some very disturbing pictures of the deceased.

14   This case does involve the death of an individual.

15   You will see photographs and hear testimony about

16   his death.  You can't consider sympathy for the

17   deceased and say, well, you know, the State didn't

18   fill up their glasses of water and prove this case

19   beyond a reasonable doubt to me, and fill them up to

20   that one inch line or half inch line that makes me

21   feel comfortable finding her guilty.  But, you know

22   what, someone died and I saw some terrible

23   photographs and the coroner testified to a terrible

1     death, I have to find her guilty anyway.  You

2     wouldn't do that, would you?

3               BARBARA ALBRIGHT:  No.

4               ATTY. BECKER:  And on the other

5     side of the coin, you wouldn't say, well, the State

6     proved beyond a reasonable doubt and they filled

7     their glasses of water up to about the one inch to

8     the top line or half inch, and I am comfortable

9     based on reason and common sense, I find that they

10    have proved their case, but you know I can't

11    possibly find her guilty, she looks like a nice old

12    lady over there who doesn't look like she's harmed

13    anyone.  She sat their quietly throughout the whole

14    trial, didn't disturb anybody, and I just feel sorry

15    for her and maybe her family would show up in Court,

16    and I saw her talk to her family in the hall, I

17    can't find her guilty.  You wouldn't do that either,

18    would you?

19              BARBARA ALBRIGHT:  No.

20             ATTY. BECKER:  So, you understand

21    that as hard as it may be, and it is a difficult

22    task dealing with particularly a case of this

23    magnitude involving the death of one individual and

1    potentially the death of another individual, that

2    it's only natural that you might be sympathetic,

3    correct?

4                    BARBARA ALBRIGHT:  Yes.

5                    ATTY. BECKER:  But you feel that

6    you would be able to set aside your sympathy and

7    decide this case just on the facts and the evidence?

8                    BARBARA ALBRIGHT:  Yes.

9                    ATTY. BECKER:  Okay.  This case

10   involves basically four charges.  There is an

11   aggravated burglary and an aggravated robbery, which

12   are just general crimes that are charged.  Then,

13   there is -- there are two different aggravated

14   murder counts, each with these special circumstances

15   or what we call aggravating circumstances, which

16   make it eligible for the death penalty.  The fact

17   that the State has charged two different theories, I

18   guess, of how the death occurred, that doesn't cause

19   you concern one way or the other, even though there

20   is only one death involved in this case, does it?

21                   BARBARA ALBRIGHT:  No.

22                   ATTY. BECKER:  You understand that

23   we charged two different theories, and the Court

1    will tell you that you can find the Defendant, if we

2    prove our case beyond a reasonable doubt, you can

3    find her guilty of one or some of the charges, or

4    none of the charges, or all of the charges. It's up

5    to you as a juror to determine that, right?

6                    BARBARA ALBRIGHT:  Right.

7                    ATTY. BECKER:  On the other side of

8    the coin, the fact that there is one death and two

9    different aggravated murder charges, that doesn't

10   make you feel that Miss Roberts is worse than the

11   average criminal because, wow, she must of really

12   done something wrong because she only killed one

13   person but there are two counts of an aggravated

14   murder charge.  You understand that there are two

15   different theories --

16                    BARBARA ALBRIGHT:  Yes.

17                    ATTY. BECKER:  -- of the case?

18   Okay.  This case got started through a process known

19   as a grand jury indictment.  I am assuming you heard

20   of the term grand jury and heard of the grand jury?

21                    BARBARA ALBRIGHT: Yes.

22                    ATTY. BECKER:  You have never

23   served on a grand jury?

1                        BARBARA ALBRIGHT:  No.

2                        ATTY. BECKER:  All right, a grand

3        jury is a body of 14 individuals, 9 of whom vote,

4        and it takes 7 of 9 to issue an indictment, so you

5        can have an indictment either by a 9 to 0 vote, an 8

6        to 1 vote or a 7 to 2 vote.  You could actually have

7        some, I guess, dissension in the grand jury.  Here,

8        when you get to a jury, a petit jury, you have to be

9        unanimous.  All 12 of you have to agree on either

10       acquittal or conviction on any of the charges.  Do

11       you understand that?

12                       BARBARA ALBRIGHT: Yes.

13                       ATTY. BECKER:  All right, the grand

14       jury meets on the second floor of this Courthouse,

15       and they basically issue a piece of paper called an

16       indictment.  And an indictment is nothing more than

17       piece of paper that gets this whole process started.

18       It's an allegation.  It may be true or it may not be

19       true.  That is why you are being selected for this

20       jury.  That's why we select juries all the time in

21       this Courthouse.  In fact, I think they're picking a

22       jury downstairs in another case where an indictment

23       is issued and the Defendant has denied the

1 allegations and now we go to trial.  You, basically,

2 and your fellow jurors will decide this case and the

3 disputed facts, correct?

4     BARBARA ALBRIGHT: Correct.

5     ATTY. BECKER:  So, the actual

6 indictment itself is really just a piece of paper

7 that puts into play the whole legal process of

8 having a trial, giving discovery, getting

9 information between the attorneys, and getting us to

10 this point where we pick a jury.

11     When we go to trial -- now when we

12 present this trial to you, one of the examples that

13 I can give you, and it's a very simple example, but

14 I think it's good for a few points.  If this were a

15 case that Mr. Bailey and I were prosecuting because

16 some individual ran a traffic light, let's say on

17 High Street and Park Avenue, right down here on the

18 northeast corner of Courthouse Square.  Let's assume

19 that an individual is travelling down High Street,

20 coming out of the Courthouse, let's say.  And he's

21 driving through down High Street, a car barrels

22 through the Market Street intersection between Park,

23 and blows a red light at Park and Market Street and

1   he comes through this intersection and runs the red

2   light at High and Park Street, Park Avenue.  And he

3   crashes into the guy leaving the Courthouse and

4   heading back out to the east side of Warren where he

5   lives.  Now, we present to you one witness.  Let's

6   say Mr. Bailey and I present to you one witness, and

7   that witness is say one of the Judges here in the

8   Common Pleas Court.  Let's say it's Judge McKay

9   whose courtroom is right downstairs.  Judge McKay

10  has been on the bench for many years, he's got an

11  impeccable reputation for honesty and truth and

12  justice.  And he says, listen, it's my daily routine

13  that I walk four or five block around Courthouse

14  Square and around downtown Warren here, I pay very

15  close attention because I've almost been hit myself

16  a couple times by people running red lights.  So, as

17  I was walking this day, I was walking east on High

18  Street, and I saw the white light flash that says

19  "walk", and I saw the green light, so I knew that I

20  had the right-of-way.  But before I step out into

21  the street, because it's always been a danger around

22  here because some people blow through these lights

23  like there is no tomorrow, I always look both ways.

1    Well, I looked up Park Avenue north, and I didn't

2    see anything.  When I looked down Park Avenue, I saw

3    a red Chevy Beretta blow through the intersection at

4    Market and then he came right through the

5    intersection at High Street here and hit this poor

6    guy who was travelling from west to east.  And I saw

7    the whole accident.

8              If the case was and the elements, you

9    don't know what they are, but let's assume either

10   that the charge was that the guy ran a red light,

11   that one witness would probably be good enough for

12   you to prove the case beyond a reasonable doubt,

13   right?

14             BARBARA ALBRIGHT: Yes.

15             ATTY. BECKER:  Okay.  And then on

16   the other side of that, if we have three or four

17   witnesses that were drinking from 6:00 o'clock in

18   the morning down at Maddigan's, which is an Irish

19   bar down the street there, and they stumble down to

20   the intersection, and all three of them wear glasses

21   and all three of them have their glasses broken

22   because they were involved in a fist fight and they

23   got thrown out of Maddigan's and they're mad anyway,

1    and they're standing at the intersection there, all

2    drunk, each of them has had about 12 beers, glasses

3    are broke, one guy's got a bloody nose, and he's

4    holding his nose up like this so the blood doesn't

5    drip out any further, and the other guy got his eye

6    half shut because he can't see, because he got

7    popped in the eye.  And the other guy is fiddling

8    around in his wallet seeing how much money he has so

9    that they can go to another bar and drink.  If those

10   witnesses tell you they saw something and then to

11   top it all off assuming that the driver of the car

12   that got hit was their cousin who was suppose to

13   come and get them at Maddigan's but was running

14   late, you would have problems with that case, right?

15                  BARBARA ALBRIGHT:  Right.

16                  ATTY. BECKER:  And that is a little

17   bit of what you have to do because, as a juror, you

18   will have to determine who was in the best place to

19   see or hear or do the things that they did.  Who has

20   any bias or interest in the case, who really is

21   telling the truth and knows what they're talking

22   about.  And to a larger extent, that is what you're

23   going to do in this case, correct?

1                    BARBARA ALBRIGHT:  Correct.

2                    ATTY. BECKER:  You will be able to

3        do that?

4                    BARBARA ALBRIGHT:  Yes.

5                    ATTY. BECKER:  This case also, as

6        with just about every criminal case, involves some

7        evidence of what we call circumstantial evidence.

8        And circumstantial evidence is basically evidence

9        that you can make an inference from.  And there is

10       all different kinds of examples.  I will just use

11       the examples that I know that happen in my daily

12       life.

13               Last Sunday, my wife built a big sandbox

14       for my kids.  She made it out of, oh, I don't know

15       18 inch high wood, she screwed in the corners real

16       tight, and it's maybe 8 by 8, maybe even 10 by 10, a

17       big sandbox.  We had to have a big dump truck come

18       in and dump all of this sand in the back.  I have 4

19       kids, and she made it for them and it's a real nice

20       gift for them and the sandbox for them.  But

21       throughout the last week, there have been many

22       disputes in the sandbox, people throwing sand is the

23       biggest complaint in there.  And the person who is

1    doing most of the sand throwing is my daughter,

2    Cameron.  Cameron is 3 years old and she was born in

3    June, and she's just sometimes a little

4    rambunctious.  Her and my son have been accused of

5    most of the throwing sand.  My daughter, Addison,

6    who is the middle daughter, she's usually pretty

7    polite and doesn't do much of that.

8         So, let's say I am in the backyard and

9    picking up sticks because I am getting ready to mow

10   the yard, and they're all in the sandbox.  And all

11   of a sudden I hear my middle daughter, Addison,

12   crying because she's got sand in her eyes, sand in

13   her hair, she's standing there with nothing on her

14   hands, and Cameron looks at me with a shovel, and

15   she's got a shovel, and it's got a full load of

16   sand, and I turn around and says, what's going on

17   over there, and she drops the shovel and the sand

18   falls out, and I don't see what happened, but I can

19   assume that my daughter Cameron was throwing sand up

20   in the air, right?

21             BARBARA ALBRIGHT:  No.

22             ATTY. BECKER:  You can't make that

23   inference?

1                    BARBARA ALBRIGHT:  No.

2                    ATTY. BECKER:  Okay, would you make

3      that inference or  --

4                    BARBARA ALBRIGHT:  No.

5                    ATTY. BECKER:  Okay, why not?

6                    BARBARA ALBRIGHT:  Because it could

7      of been any of them that started it.

8                    ATTY. BECKER:  Those were the only

9      two in the sandbox.

10                    BARBARA ALBRIGHT:  Then, she could

11     of thrown it in her  --

12                    ATTY. BECKER:  In her own face  --

13                    BARBARA ALBRIGHT:  Yeah, in the air

14     and then hit her in the face and then blamed it on

15     her sister.

16                    ATTY. BECKER:  Okay, well, let's

17     assume then my daughter has in her hands two cars,

18     two of the Tonka trucks, and she's crashing them

19     together, and I see her with these two Tonka trucks

20     and she's banging them together.  And now I see

21     Cameron, and I know Cameron has a shovel, and I pick

22     up these sticks on the other side of the yard, I

23     start picking them up.  Now, I see and hear the same

1    thing, sand in Addison's hair, sand in her eyes,

2    she's got the two hands on her truck, still on the

3    ground, and she's leaning over crying and directly

4    in front of her is Cameron with a shovel and she's

5    about ready to throw some more sand on her, but she

6    doesn't do it, I don't see her.  Can you make that

7    inference that now she may be responsible --

8                    BARBARA ALBRIGHT:  No.

9                    ATTY. BECKER:  You won't make an

10   inference like that?

11                   BARBARA ALBRIGHT:  No.

12                   ATTY. BECKER:  Let's try another

13   example.  Let's say you're in bed one night and

14   you're watching whatever news you watch.  I don't

15   know if you watch 33 or 27, or whatever news you

16   watch and you're watching the weather, and it's

17   11:00 o'clock at night.  And they show the radar,

18   the State radar, and you see a big line of green

19   blobs, green and yellow blobs, which are the radar

20   for rain and heavier rain, and the line runs from

21   pretty much across Lake Erie up in Canada, all the

22   way down to Cincinnati, and they're moving at about

23   20 miles an hour, and you see them moving.  And the

1    guy says, listen, it's going to be a thunderstorm,

2    there is going to be some rain tonight, close your

3    windows, roll up the windows in your car, and have a

4    good night.  Tomorrow will be a nice day but tonight

5    we're going to have some thunderstorms.  You turn

6    off the T.V. and go to bed.  You are laying in bed

7    and about 3:00 or 4:00 in the morning, you see some

8    flashes outside.  You hear the crack of thunder.

9    You never see it raining.  You wake up the next

10   morning at 6:00 o'clock, the sun is coming up, the

11   birds are chirping, all of those worms are out on

12   your driveway, they're all kind of soggy, and you

13   know how they come out of the ground.  The ground is

14   all wet, your car that you parked in the driveway

15   has rain drops all over it, there is water rushing

16   down the gutter, the street is wet, your neighbor's

17   yards are wet, you can infer that it rained, right?

18              BARBARA ALBRIGHT:  Right.

19              ATTY. BECKER:  Okay, you never saw

20   it rain though, right?

21              BARBARA ALBRIGHT:  No.

22              ATTY. BECKER:  All right, now let's

23   gets back to my silly kids example.  This is an

1    example that happens about once every two weeks.  My

2    youngest daughter and my oldest daughter are down in

3    the basement.  My son has been told hundreds of

4    times not to swing bats in the house.  He's got a

5    plastic whiffle ball bat down there, he's swinging

6    it around and hits Cameron in the back of the head

7    with it.  I go downstairs and Cameron is holding her

8    head and crying.  My son is there with a bat and has

9    a look on his face like, oh, no.  Would you be able

10   to infer that he swung the bat and hit her in the

11   head?

12              BARBARA ALBRIGHT:  With a look on

13   his face, yes.

14              ATTY. BECKER:  Right, okay, and

15   there may be differences.  Now, let's assume that

16   the facts are a little bit different.  Now, let's

17   assume that I come down there and my daughter is

18   crying, she has nothing in her hands, my son is

19   about two feet away from her and he's holding the

20   bat and he still has a look on his face like, oh,

21   no, but the facts may be different.  What if Cameron

22   picked up the bat and she threw it in the air and it

23   fell on her head and she tried to catch it and my

1    son was just picking it up and saying, Cameron, you

2    can't play with the bat like that.  I have been in

3    trouble with that, you can't either, and he just

4    happens to get caught with a bat in his hand.

5    That's another inference you would make, right?  I

6    mean, you could -- there are two different ways that

7    could go, right?

8                    BARBARA ALBRIGHT:  Yeah.

9                    ATTY. BECKER:  Okay, but there are

10   facts that sort of change that that makes one

11   inference stronger than the other, right?

12                   BARBARA ALBRIGHT:  Right.

13                   ATTY. BECKER:  Just like in the

14   sand example.  If the sand example is, and we'll

15   stick with the baseball bat, but if Cameron has two

16   Barbie dolls in her hands, and she's there crying

17   and holding her hand, and she's got one of the

18   Barbie dolls in her right hand and holding it on top

19   of her head, we could probably assume that she isn't

20   the one that threw the bat up and hit her because

21   she had something in both of her hands, right?

22                   BARBARA ALBRIGHT:  Right.

23                   ATTY. BECKER:  But if she doesn't

1    have any Barbie's in her hand and she's crying and

2    holding them both up, and I had just seen her or I

3    heard, even though I didn't see her, my son say,

4    Cameron put that bat down, and even though I come

5    downstairs and my son's got it, I can probably

6    assume that she's the one that threw it up and

7    dropped it on her head, right?

8                BARBARA ALBRIGHT:  Right.

9                ATTY. BECKER:  Okay, those are the

10    kinds of things you may have to do as a juror.  Do

11    you feel comfortable doing those kinds of things?

12                BARBARA ALBRIGHT: Yes.

13                ATTY. BECKER:  Okay, because there

14    may be some things where nobody saw anybody do

15    anything, but there is some evidence what we call

16    circumstantial evidence that points to someone.  You

17    will be able to take both the inferences that may

18    favor that person and the inferences that may not

19    favor that person's position and make a

20    determination of their guilty or innocence, right?

21                BARBARA ALBRIGHT:  Yes.

22                ATTY. BECKER:  Even though there

23    may be competing inferences or different inferences,

1     right?

2                     BARBARA ALBRIGHT: Yes.

3                     ATTY. BECKER:  Even though it is

4     possible that my daughter threw the bat up or my son

5     was swinging it, you are going to look at all of the

6     evidence to see which is more plausible, which is

7     more likely?

8                     BARBARA ALBRIGHT:  Right.

9                     ATTY. BECKER:  And you will be able

10    to do that?

11                    BARBARA ALBRIGHT: Yes.

12                    ATTY. BECKER:  Okay, now you have

13    heard -- and I want to ask about some of the shows

14    that you watch, particularly, one of the ones that

15    has probably been difficult for us as prosecutors to

16    deal with, and that is, I think you said that you

17    watch CSI?

18                    BARBARA ALBRIGHT:  Once in awhile,

19    not too often because I am usually working.

20                    ATTY. BECKER:  You understand that

21    on that show, a lot of times they may have somebody

22    and may have to say, now, I ask you this question

23    and they will come to dust and find the fingerprint.

1    Chances are, though, there are hundreds of

2    fingerprints on this table, and this wood is not

3    very conducive to fingerprints, it's a rough

4    surface, it may not be good for that, correct?

5              BARBARA ALBRIGHT:  Correct.

6              ATTY. BECKER:  And you understand

7    that the State is some times limited by the

8    resources, I am assuming you know that schools are

9    consolidated or laying off teachers, the government

10   is laying off people, there may not be time to do

11   every possible test that they do like they do on

12   T.V., right?

13             BARBARA ALBRIGHT:  Right.

14             ATTY. BECKER:  You will be able to

15   make a determination of guilt or innocence, though,

16   even if we don't have 18 experts come in and say,

17   yes, we found blood or bullets and all kinds of

18   other evidence against this person?

19             BARBARA ALBRIGHT:  Right.

20             ATTY. BECKER:  You will have to

21   wait and make that determination based upon that

22   theory of reasonable doubt.

23             BARBARA ALBRIGHT:  Yes.

1      ATTY. BECKER:  Okay, so you won't

2      -- again, you're not going to hold the State to

3      proof beyond all doubt, will you?

4      BARBARA ALBRIGHT:  No.

5      ATTY. BECKER:  All right.  The only

6      reason I am going to ask you this is because of what

7      you put in the questionnaire.  They asked you, name

8      a person that you admire, and you put down Mr.

9      Trafficant because he told everyone what he thought

10     without thinking about what they thought about him.

11     And I guess what you're -- and if I'm putting words

12     in your mouth, don't let me do that.  But you seem

13     to me to be the kind of person that you will stand

14     up and do what is right regardless of -- and say

15     what you want to say, right, is that why you admire

16     someone like that?

17     BARBARA ALBRIGHT:  Yeah.

18     ATTY. BECKER:  So, if we're in the

19     jury room and you are in that jury room, and you got

20     the case, whether it be the first phase or the

21     second phase, if you believe that the State has

22     proved its case beyond a reasonable doubt, you will

23     listen to your fellow 11 jurors, but you may be the

1    one that will hold out for either guilt or the death

2    penalty, or on the other side, you may hold out for

3    innocence or acquittal or against the death penalty,

4    correct?

5                    BARBARA ALBRIGHT:  Right.

6                    ATTY. BECKER:  Until you're

7    convinced by the other 11 jurors, correct?  You are

8    not afraid, I guess, to stand up for your values?

9                    BARBARA ALBRIGHT:  No.

10                   ATTY. BECKER:  And what you believe

11   in.  All right, so if you believe that the evidence

12   showed a certain thing, you wouldn't be afraid to

13   stand up for what you saw?

14                   BARBARA ALBRIGHT: Right.

15                   ATTY. BECKER:  You wouldn't be

16   easily intimidated by the other jurors saying, come

17   on, it's 11:00, let's get out of here, we want to

18   eat lunch, come on, would you hurry up  --

19                   BARBARA ALBRIGHT:  No.

20                   ATTY. BECKER:  You wouldn't do

21   that?

22                   BARBARA ALBRIGHT:  No.

23                   ATTY. BECKER:  All right, I did

1    notice that one of the things you said you may have

2    a problem with, is apparently your husband has some

3    health concerns, is that correct?

4                    BARBARA ALBRIGHT:  Yes.

5                    ATTY. BECKER:  And, occasionally,

6    you have to take him to Cleveland?

7                    BARBARA ALBRIGHT:  Yes.

8                    ATTY.. BECKER:  And you don't know

9    when that will happen?

10                   BARBARA ALBRIGHT:  No.

11                   ATTY. BECKER:  All right, and

12   you're the only person that can do that?

13                   BARBARA ALBRIGHT:  Yes.

14                   ATTY. BECKER:  All right, because

15   you understand and there may come a point in this

16   case where you may sequestered?

17                   BARBARA ALBRIGHT:  Yes.

18                   ATTY. BECKER:  You may be

19   sequestered for two or three days.

20                   BARBARA ALBRIGHT:  I understand

21   that.

22                   ATTY. BECKER:  Is that going to be

23   too much of a problem?

```
 1                    BARBARA ALBRIGHT: Yes, because I
 2     never know when I got -- cause he's got ulcerative
 3     colitis.
 4                    ATTY. BECKER:  Okay, well, I guess
 5     I should of started there.
 6                    BARBARA ALBRIGHT:  Sometimes he
 7     gets a blockage and they won't treat him down here
 8     cause   --
 9                    ATTY. BECKER:  Would you rather not
10     serve on this jury because of that concern?
11                    BARBARA ALBRIGHT:  Yeah.
12                    ATTY. BECKER:  I'm sorry, I should
13     have started there in the first place.  I don't know
14     if we want to have a consensus on this?
15                    ATTY. INGRAM:  No objection.
16                    ATTY. BECKER:  I apologize.  I'm
17     sorry.  I guess we had a good conversation.  If I
18     would have known that -- I didn't realize that that
19     was as big a concern as I thought it was.
20                    BARBARA ALBRIGHT:  Yes.
21                    ATTY. BECKER:  All right, thank
22     you, very much.  The Court will tell you what   --
23                    THE COURT:  Thank you, very much,
```

1      for your attendance.  You are excused for cause,

2      thank you, very much.

3

4      (At 10:15 a.m., Barbara Albright, Juror Number 153,

5      was excused.)

6

7

8

9                    **TODD DAVIDSON, JUROR NUMBER 167**

10     **EXAMINATION BY THE COURT:**

11

12                    THE COURT:  Good morning, Todd.

13                    TODD DAVIDSON:  Good morning.

14                    THE COURT:  You read that handout

15     that was given to you, did you not?

16                    TODD DAVIDSON:  Yes, sir.

17                    THE COURT:  That is why we're here.

18     There are two counts of aggravated murder with

19     specifications filed against Miss Roberts.  This

20     jury, once it's selected, the State will proceed by

21     presenting evidence to it concerning the aggravated

22     murders and the specifications.  The idea is to get

23     12 impartial, unbiased, unprejudiced jurors.

1            Now, the law of Ohio is such that every

2    time, or anytime someone commits a murder, that does

3    not mean that they automatically face the death

4    penalty.  It's only under certain circumstances.

5    When the prosecution brings an indictment for

6    aggravated murder with specifications.  An example

7    of what a specification is, is if somebody shot Bob

8    Taft, and the prosecution put a specification that

9    he was a governor of Ohio, then that means that the

10   person killing him could face the death penalty if

11   the State proved, first, that there was an

12   aggravated murder and, secondly, that he was the

13   governor.

14           Now, there are specifications attached

15   to the aggravated murders before us, and the State

16   has the burden of proving that there was an

17   aggravated murder, and that that aggravated murder

18   was committed and these specifications occurred.

19   The State has to do that by proof beyond a

20   reasonable doubt.  The burden is always on the State

21   of Ohio.  The Defendant doesn't have to do anything

22   if they don't care too.

23           Now, most trials, the attorneys will

 1     participate but, theoretically, if the attorneys sat

 2     there and said nothing throughout the trial, it

 3     doesn't change the fact that the prosecution has to

 4     prove the case.

 5              Some think that it is strange that we

 6     talk about the death penalty at this point, because

 7     it's possible that this jury may feel that the

 8     prosecution has failed to prove their case.  If that

 9     occurred, the jury would return a verdict of not

10     guilty, and we would never get to the issue of the

11     death penalty.  But if we didn't ask these questions

12     now, in a case where it got to that second phase,

13     then you may have people on the jury who strongly

14     feel an eye for an eye, if someone takes a life, you

15     should forfeit your life.  Well, if you had a jury

16     of that juncture, a juror that felt that way, then

17     the Defendant would not be able to get a fair trial,

18     because the Defendant has the right to have that

19     jury at any second phase determine the aggravating

20     circumstances or weigh them against the mitigating

21     factors.  If the prosecution hasn't proven beyond a

22     reasonable doubt that those aggravating

23     circumstances outweigh the mitigating factors, then

1    the State hasn't proven that necessary to ask for a

2    capital sentence.

3            Also, if you had a person on the jury

4    that could never make that decision, and many people

5    feel that they could not for religious or ethical

6    beliefs, well, that person could not be fair to the

7    State, because the State has the right to ask the

8    jury for the death penalty, if we get to that point.

9            So it's important that both sides here

10   know something about you, whatever your opinions

11   are, fine, nobody is going to argue with your

12   opinions, you are entitled to them.  But they have

13   the right to know whether or not you feel that you

14   can sit here and be fair and impartial, and that

15   means to follow the law, not to impose what you

16   think the law is, but what law is as told to you by

17   the Court, okay?

18            TODD DAVIDSON:  Okay.

19            THE COURT:  The other area they

20   will ask you about is in regard to what we call

21   pretrial publicity, whether or not you have read or

22   know anything about this case and, if so, are you

23   able to set that aside and determine the case on the

1    merit, the merits of the evidence that is produced

2    in this Courtroom.  As far as the law is concerned,

3    once this trial begins, nothing other than what is

4    presented in the Courtroom has anything to do with

5    the case, okay?

6                    TODD DAVIDSON:  Yes.

7                    THE COURT:  Good enough.  Mr.

8    Bailey.

9    **EXAMINATION BY ATTORNEY BAILEY**:

10                    ATTY. BAILEY:  Good morning, Mr.

11   Davidson.

12                    TODD DAVIDSON:  Good morning.

13                    ATTY. BAILEY:  My name is Ken

14   Bailey and I'm an assistant prosecutor, as you know

15   from a couple of weeks ago here in the Courtroom,

16   and I promised you two and a half weeks ago, I am

17   joined today by Chris Becker, an assistant

18   prosecutor in our office, and the two of us are

19   responsible for prosecuting this case on behalf of

20   the people of Trumbull County and the State of Ohio.

21                    Now, we're going to ask you some

22   questions as the Judge indicated regarding your

23   opinions on different things, your experiences, your

```
 1      background.  And the reason we do that isn't because

 2      we're snoopy and we like to pry into people's

 3      backgrounds but, rather, to make sure that the folks

 4      that are selected to serve on this particular jury,

 5      can be fair and impartial to both sides, both to the

 6      Defendant and to the people of the State of Ohio.

 7                    Now, there aren't any right answers or

 8      any wrong answers to these questions, only open,

 9      candid answers.  And another thing that I ought to

10      bring out is, by our rules of conduct, if we run

11      into each other out in the hallway or elevator or a

12      restaurant or something, we're not allowed to have

13      any communication with you outside of the Courtroom

14      here after today, until this whole trial, if it goes

15      into two phases, until the second phase is over.

16      And it's not because we're snooty and want to snub

17      you or be antisocial or anything, it's just that

18      we're not allowed to communicate with you.  If you

19      have questions, you will have to ask the bailiff,

20      Laurie Brown, when she comes in, or our court

21      reporter, or the judge.  Otherwise, it could result

22      in a mistrial if he talk to you other than to say

23      good morning or good afternoon.
```

1              Also, because this is sort of a give and

2     take here, this questioning and answer period today,

3     if you have any questions that arise as to what

4     we're doing, feel free to ask them and we will see

5     if we can get you an answer.

6              Now, there are a couple of things that I

7     am going to cover, and I am going to get into this

8     pretrial publicity issue and the death penalty, but

9     before I do that, I want to ask you, I noticed that

10    you're separated and going through a divorce, and

11    you have a hearing set, a custody and divorce

12    hearing, I believe on May 8 --

13              TODD DAVIDSON:  Uh-huh.

14              ATTY. BAILEY:  -- in the afternoon.

15    I expect by May 8th, we're going to be in trial in

16    this case.

17              TODD DAVIDSON:  Okay.

18              ATTY. BAILEY:  Is that -- can you

19    get the hearing reset?

20              TODD DAVIDSON:  I'm not sure.

21              ATTY. BAILEY:  Okay, do you think

22    that would cause you -- is it a full hearing that

23    afternoon?

 1                      TODD DAVIDSON:  Yes, it's a custody

 2     hearing at the Courthouse down the street here.

 3                      ATTY. BAILEY:  Do you know if you

 4     have to meet with your lawyer before that hearing,

 5     like if it's a one day thing or afternoon thing?

 6                      TODD DAVIDSON:  Yes, it will be

 7     like an afternoon thing.  It's like at 3:00 or 3:30,

 8     and they usually last maybe not even an hour, but

 9     I'm not sure because, you know, it varies.  I had

10     five hearings so far and  --

11                      ATTY. BAILEY:  So, there could be

12     more after this?

13                      TODD DAVIDSON:  Down the road,

14     that would probably be months down the road.  I

15     mean, not soon after.

16                      ATTY. BAILEY:  So, if you got

17     selected, if we could -- would you have to meet that

18     day with your lawyer beforehand?

19                      TODD DAVIDSON:  No, I just have to

20     show up in court at 3:00 or 3:30.

21                      ATTY. BAILEY:  So, if you got

22     selected and we had a break that day at about 3:00

23     o'clock, that would be okay?

1              TODD DAVIDSON:  Yeah, yeah, that

2     would be okay.

3              ATTY. BAILEY:  Okay.  I noticed

4     that you are also attending YSU, you are a junior

5     there.  Are you a nursing major?

6              TODD DAVIDSON:  Yeah, nursing

7     major.

8              ATTY. BAILEY:  And that is only

9     until May 6th?

10              TODD DAVIDSON:  Yes.

11              ATTY. BAILEY:  Do you have finals

12     coming up?

13              TODD DAVIDSON:  Yes.

14              ATTY. BAILEY:  I expect next week

15     is May 5th, Monday, there is a chance that we could

16     get a jury this week and we could start May 5th, I

17     would expect, and you would have -- your classes are

18     5:40 to 6:30, and what about finals, when are they?

19              TODD DAVIDSON:  Finals are the week

20     after next.

21              ATTY. BAILEY:  Okay, we would be in

22     trial at that point.

23              TODD DAVIDSON:  Yeah, it is at 6:00

1    to 8:00 in the evening.

2              ATTY. BAILEY:  It's 6:00 to 8:00 in

3    the evening?

4              TODD DAVIDSON:  Yes, just one

5    class.

6              ATTY. BAILEY:  Oh, just one class.

7    Any idea what day that would be?

8              TODD DAVIDSON:  Tuesday.

9              ATTY. BAILEY:  Okay, so we

10   shouldn't be sequestered at that point, it would

11   still be the beginning of the second week of the

12   trial.  Would that cause any undue hardship on you

13   being in this trial where you would have to pay

14   close attention during the day?

15             TODD DAVIDSON:  No, I work night

16   turn at Tamarkin's, and if I get picked as a juror,

17   I get paid for time off from work, so that works

18   out.

19             ATTY. BAILEY:  And you would be

20   able to keep up with your studies and it wouldn't

21   cause any problems with your final?

22             TODD DAVIDSON:  No.

23             ATTY. BAILEY:  Okay, now, let's

2613

 1    talk about this issue of pretrial publicity.  Okay,

 2    I noticed that you indicated that you read the

 3    Vindicator occasionally, maybe up to six times per

 4    month.

 5                      TODD DAVIDSON:  Uh-huh.

 6                      ATTY. BAILEY:  Is it usually on the

 7    weekend, or when do you read it?

 8                      TODD DAVIDSON:  Usually at work,

 9    you know, the paper is around.  I usually don't buy

10    a paper or anything like that.

11                      ATTY. BAILEY:  And the local news

12    you catch maybe once or twice a week?

13                      TODD DAVIDSON:  Uh-huh.

14                      ATTY. BAILEY:  Would that be, the

15    local news 21, 27, or 33?

16                      TODD DAVIDSON:  It varies, I don't

17    have a specific station.

18                      ATTY. BAILEY:  Whatever is on at

19    the time?

20                      TODD DAVIDSON:  Yeah.

21                      ATTY. BAILEY:  If you're watching

22    in the evening or morning or something, or catch it

23    at work?

1           TODD DAVIDSON:  Yeah, usually in

2      the evening at work.

3           ATTY. BAILEY:  The 11:00 news or

4      the 6:00 o'clock?

5           TODD DAVIDSON:  11:00.

6           ATTY. BAILEY:  Now, you indicated

7      that you had some prior knowledge of this case, was

8      that from T.V., or discussions with coworkers or --

9           TODD DAVIDSON:  I think it was from

10     discussions from a coworker.

11          ATTY. BAILEY:  What do you actually

12     recollect about this case?

13          TODD DAVIDSON:  The only thing that

14     I recollect is something to the point of this woman

15     and her boyfriend killed her husband or something,

16     and that's about all I recollect from it.

17          ATTY. BAILEY:  Now, the charge here

18     is that the Defendant planned with another fellow by

19     the name of Nate Jackson to kill her husband --

20     ex-husband for insurance money and the theft of the

21     car, okay.  Is there anything about that that rings

22     a bell?

23          TODD DAVIDSON:  No.

1          ATTY. BAILEY:  Okay.  Now, the

2     discussions at work, what kind of discussions came

3     up?

4               TODD DAVIDSON:  On that issue?

5               ATTY. BAILEY:  Right.

6               TODD DAVIDSON:  Just that, I mean,

7     I didn't --

8               ATTY. BAILEY:  You were just

9     present when other people were talking about it?

10              TODD DAVIDSON:  Yeah, yeah,

11    basically.

12              ATTY. BAILEY:  Was there anything

13    that they raised regarding the case or just that

14    there was another murder or something?

15              TODD DAVIDSON:  Yeah, just

16    something brought up on the news.

17              ATTY. BAILEY:  Okay, now, as you

18    look around the courtroom today, there is nobody

19    here from the news media, but there may well be as

20    we get into the trial.  You will see some reporters

21    come in, some T.V. cameras may set up, and they're

22    not allowed to film the jurors, but they will be

23    here for a little bit and they will do a feature on

1    the trial probably, occasionally as the trial goes

2    on, and you will notice that they're generally here

3    just a little bit and then they take off because

4    they have other stories to write or cover.  And

5    they're going to try to do a whole feature based on

6    the limited time that they're here, but they are

7    going to have missed everything that was asked and

8    answered before they got in here, and everything

9    that was asked and answered after they got of here.

10   So, their story, may well be slanted and they may

11   take things out of context, not deliberately but

12   because of the nature of their business.  They have

13   to rush to print, okay, or on the air.  And if you

14   sat on this case and you're picked as a juror and

15   you sat here for a week and a half or two weeks, and

16   you have somebody save the newspapers for you, and

17   you looked at them after the trial, both phases of

18   the trial would have to be over before you could

19   look at anything, you might say to yourself, gosh, I

20   sat in that entire trial here for two weeks, and I

21   remember the testimony, and reading this paper it's

22   like that reporter was covering a separate trial in

23   Judge McKay's court rather than in Judge Stuard's

1    Court.  So that misrepresentation that might be in

2    the newspaper isn't deliberate, but you understand

3    that it is so very important that you disregard

4    anything that you might of heard before or anything

5    else, and that is why you have to stay away from the

6    papers and the T.V., and walk out of the room if it

7    comes on or shut it off, okay.  You will be able to

8    do that?

9              TODD DAVIDSON:  Yeah.

10             ATTY. BAILEY:  You got to be able

11   to start out with a clean slate.  It's like going

12   back to college class.  Forgetting what you learned

13   before, basically, and starting from scratch, that

14   whatever gets written on that slate, its got to be

15   written in class, okay, from court, from the

16   testimony of the witnesses, the exhibits that come

17   in and the instructions of law given to you by the

18   Judge.  I take it you could do that?

19             TODD DAVIDSON:  Yes.

20             ATTY. BAILEY:  All right, so much

21   for pretrial publicity.  Now, let's talk about this

22   issue of the death penalty as possible punishment.

23   Now, I noticed that you favor the death penalty as a

2618

1    possible punishment.  And the reason -- you

2    indicated that it protects society from the shedding

3    of innocent blood or money or other selfish gain.

4    So, you think that society, if I understand that,

5    has the right to punish someone for committing a

6    terrible crime?

7              TODD DAVIDSON:  Well, throughout

8    history they have, I mean, I believe under extreme

9    circumstances, not just any crime.

10             ATTY. BAILEY:  Okay, well, you

11   understand that in Ohio, the State legislature

12   writes the laws, and they set out the circumstances

13   where the death penalty can be a possible

14   punishment.  You understand that just a regular

15   murder isn't punishable -- can't be punished by the

16   death penalty in Ohio?

17             TODD DAVIDSON:  Yes.

18             ATTY. BAILEY:  And if I planned to

19   kill somebody in advance, if I announce it on the

20   Courthouse steps just for the purposeful killing of

21   another with prior calculation and design, I could

22   say, gosh, I am upset with my co-counsel here, and I

23   am going to kill Mr. Becker tomorrow at noon, and I

```
 1    tell the whole world that from the Courthouse steps
 2    today.  And he comes walking up to the Courthouse,
 3    and I didn't like your shoes the other day, so bang,
 4    I shoot him and kill him dead.  That's not
 5    punishable by the death penalty in Ohio.  The
 6    legislature has written the law in such a way that
 7    in addition to that, there would have to be some
 8    specifications or special findings of fact attached
 9    to that that the jury has to find beyond a
10    reasonable doubt to make the death penalty a
11    possible punishment.  Okay, it could be for things
12    like killing a peace officer, or killing the
13    governor or killing the president, or killing a
14    young child.  There are different things that can
15    make a person eligible for the death penalty, okay?
16                    TODD DAVIDSON:  Okay.
17                    ATTY. BAILEY:  And I notice that
18    you also believe that the death penalty would deter
19    some people from committing other crimes in addition
20    to being a punishment?
21                    TODD DAVIDSON:  I do.
22                    ATTY. BAILEY:  Okay, and apparently
23    you have held that view for quite a while because it
```

1    hasn't changed in the last five years?

2                    TODD DAVIDSON:  Yeah, for the most

3    part, it's changed minorly since, you know, five

4    years ago when I became a Christian, you know, the

5    death penalty was a big topic issue.

6                    ATTY. BAILEY:  Okay, how so?

7                    TODD DAVIDSON:  Well, I am more on

8    the lines of forgiveness, but under certain

9    circumstances too, when you do such a heinous crime,

10   I mean, what do you do, I mean life imprisonment or

11   death penalty, you know.

12                   ATTY. BAILEY:  I noticed that you

13   wrote down here nondenominational as a Christian?

14                   TODD DAVIDSON:  Yes.

15                   ATTY. BAILEY:  What church do you

16   go to?

17                   TODD DAVIDSON:  New Life on

18   Tibbetts-Wick Road.

19                   ATTY. BAILEY:  Okay, is there

20   anything about your church or your religion that

21   prohibits you from coming back with a death penalty

22   verdict?

23                   TODD DAVIDSON:  I don't believe so.

```
 1                    ATTY. BAILEY:  Okay.  Would you be

 2     able to follow the law if the Judge instructed you

 3     as to the law and we were able to prove our case

 4     beyond a reasonable doubt that the death penalty was

 5     the appropriate punishment, would you be able to

 6     return a death penalty verdict in this case?

 7                    TODD DAVIDSON:  I believe so.

 8                    ATTY. BAILEY:  Okay, now, you

 9     understand that the Defendant is charged here --

10     well, let me go back for a second.  You read that

11     handout we passed out downstairs?

12                    TODD DAVIDSON:  Yes.

13                    ATTY. BAILEY:  And is it clear as

14     mud or is it  --

15                    TODD DAVIDSON:  It's pretty clear.

16                    ATTY. BAILEY:  It's fairly clear?

17                    TODD DAVIDSON:  Fairly clear.

18                    ATTY. BAILEY:  Okay, now, you

19     understand that in this type of a case where the

20     death penalty is an option or may be an option, if

21     you tried it in two different phases, the first

22     phase of this trial, the first phase deals with the

23     issue of guilt or non-guilt, just like any other
```

1     case tried in this Courtroom, okay?

2                     TODD DAVIDSON:  (Prospective juror

3     nodding head yes.)

4                     ATTY. BAILEY:  And if we convince

5     you and the other 11 jurors that the Defendant is

6     guilty beyond a reasonable doubt for a crime called

7     aggravated murder and one or more of these special

8     findings of fact, these specifications of

9     aggravating circumstances, then we would move to a

10    second phase, okay?  And you understand that in the

11    first phase, the issue of punishment would have no

12    bearing on that, it's not relevant because the first

13    phase is tried just like any other trial where the

14    jury makes its determination without any concern for

15    punishment.  Do you think that you would be able to

16    do that?

17                    TODD DAVIDSON:  Yes.

18                    ATTY. BAILEY:  Okay, let's say you

19    and the other jurors find the Defendant guilty as

20    charged of aggravated murder and one or more of

21    these specifications or special findings, we then go

22    into the second phase, and in the second phase, you

23    could hear the same evidence over again, or you

1    could hear additional evidence. And in the second

2    phase, you would be asked to do a balancing test.

3    In the second phase, you and the other jurors would

4    have to decide if the aggravating circumstance or

5    circumstances outweigh any mitigating factors

6    presented beyond a reasonable doubt. And when I use

7    this term mitigating factors, that just means some

8    extra findings of fact that could be presented and

9    would work to Defendant's benefit and would work

10   against the death penalty as a punishment. We don't

11   know what those are at this point because it's not

12   relevant, but these are some things that could be

13   presented to you, that could be said in favor of the

14   Defendant. Okay, now we have the burden of proof

15   all through the course of this trial, people of the

16   State, it never shifts. The Defendant has no burden

17   at all. Okay, she is presumed innocent as are all

18   other defendants tried in this courtroom. This

19   presumption of innocence is part of our American

20   system of justice. It is a very important

21   presumption, and it acts like a cloak, it shields

22   the Defendant all through the course of the trial,

23   and protects her until all of the evidence is in,

1   all of the testimony is in, the Judge has instructed

2   you on the law and you and the other 11 jurors go

3   back inside that jury room to deliberate, and then

4   if you find that we have met our burden of proof

5   beyond a reasonable doubt as to the elements of the

6   crimes, and you find her guilty, then that

7   presumption of innocence would be gone, right?

8              TODD DAVIDSON:  Uh-huh.

9              ATTY. BAILEY:  Now, we bear the

10  burden of proving elements of crimes.  These are the

11  essential component parts of the crime, sort of like

12  the ingredients of a recipe.  We got to put them all

13  in there.  If we don't, remember, the Defendant

14  doesn't have any burden.  If we mess up and leave

15  out one of these elements, then you've got to find

16  the Defendant not guilty of that crime, right?

17             TODD DAVIDSON:  Uh-huh.

18             ATTY. BAILEY:  And you would be

19  able to do that, right?

20             TODD DAVIDSON:  Yes.

21             ATTY. BAILEY:  Even though you

22  think, well, she probably did it, if we screw up on

23  our burden and we don't prove it to you beyond a

1    reasonable doubt of all of these elements, then

2    you've got to return a not guilty verdict?

3                         TODD DAVIDSON:  Yeah.

4                         ATTY. BAILEY:  Now, let's say we

5    get through a second phase, we meet our burden of

6    proof, you and the other jurors have already found

7    her guilty beyond a reasonable doubt of aggravated

8    murder of one or more of the specifications, you

9    understand that the death penalty is not an

10   automatic punishment for someone convicted of

11   aggravated murder with a specification?

12                        TODD DAVIDSON:  Yes.

13                        ATTY. BAILEY:  Because you wouldn't

14   of heard anything in the first phase about the

15   mitigating factors, right?

16                        TODD DAVIDSON:  Uh-huh.

17                        ATTY. BAILEY:  Because it wasn't

18   relevant in the first phase.  You've got to have an

19   opportunity to hear the mitigating factors before

20   you make up your mind to do this balancing test,

21   right?

22                        TODD DAVIDSON:  Yes.

23                        ATTY. BAILEY:  Okay, it's only

 1     after you do that balancing test, if you find we met

 2     our burden of proof, you find the aggravating

 3     circumstance or circumstances outweigh these

 4     mitigating factors, then at that point, the death

 5     penalty would be the appropriate punishment.  And

 6     you and the other jurors would have to come back

 7     with a death penalty verdict, okay?

 8                    TODD DAVIDSON:  Okay.

 9                    ATTY. BAILEY:  If we don't meet

10     that burden, and you and the other jurors find that

11     the aggravating circumstance or circumstances don't

12     outweigh the mitigating factors by proof beyond a

13     reasonable doubt, then you have to consider one of

14     the other three life sentences.  Okay, life in

15     prison with no parole; life in prison with parole

16     eligibility after 30 full years; or life in prison

17     with parole eligibility after 25 full years.  Okay,

18     if we met our burden on the balancing test, you

19     wouldn't get to the three life sentences.  You

20     understand that?

21                    TODD DAVIDSON:  Okay.

22                    ATTY. BAILEY:  Originally, though,

23     you would have to be able to consider all those

1   penalties equally.

2              TODD DAVIDSON:  Uh-huh.

3              ATTY. BAILEY:  The death penalty

4   and the three life sentences.  You would be able to

5   do that?

6              TODD DAVIDSON:  Yes.

7              ATTY. BAILEY:  Now, the Defendant

8   here is charged with a number of crimes, okay, but

9   she is charged as a complicitor, okay, she's not

10  charged as the trigger person.  She's not charged

11  with doing the actual killing.  She's charged with

12  planning with another person, this Nate Jackson

13  person, with the killing of her ex-husband for

14  insurance money, okay.  And the charge here is that

15  the trespassing to the house was done by this Nate

16  Jackson, that the theft of the car, the aggravated

17  robbery was committed by Nate Jackson and that Nate

18  Jackson is the person charged with having the actual

19  gun, the firearm that was used to kill a living

20  person, okay.

21             Now, is there anything about that, the

22  fact that she is charged not as the trigger person

23  but as an aider and abetter, a complicitor, somebody

1    who solicits or procures another person or

2    strengthens or encourages another person, plans with

3    another person, helps them in some way to commit the

4    crime.  Anything about that that would affect your

5    ability to return a death penalty verdict if it was

6    appropriate?

7                    TODD DAVIDSON:  I am just surprised

8    that the death penalty would be offered to a person

9    that didn't actually commit the murder.

10                    ATTY. BAILEY:  Okay, well, you

11    understand that it's the legislature that writes the

12    law?

13                    TODD DAVIDSON:  Yeah.

14                    ATTY. BAILEY:  And as citizens in

15    this Country, we're bound to follow the law, okay,

16    and it's entirely up to you and the other jurors how

17    much weight to give to the aggravating circumstances

18    and mitigating factors --

19                    TODD DAVIDSON:  For the mitigating

20    circumstances, yes, okay.

21                    ATTY. BAILEY:  You can decide that

22    an aggravating -- something that weighs a whole lot,

23    like a ton but, on the other hand, you might decide

1   that something else would weigh about as much as a

2   feather, right, you would be able to do that balance

3   test?

4               TODD DAVIDSON:  Yes.

5               ATTY. BAILEY:  And the Judge is

6   going to instruct you as to that balancing test at

7   the end of this case, if we get to the second phase

8   okay?

9               TODD DAVIDSON:  Okay.

10              ATTY. BAILEY:  It may be that we

11  don't get to the second phase, we don't meet our

12  burden of proof.

13              TODD DAVIDSON:  Uh-huh.

14              ATTY. BAILEY:  But let's say we do,

15  would you be able to do that?

16              TODD DAVIDSON:  Yeah.

17              ATTY. BAILEY:  And you may be

18  surprised by the fact that she's not the trigger

19  person, but you understand that under Ohio law, she

20  could be eligible for the death penalty just as the

21  trigger man, if we're able to prove beyond a

22  reasonable doubt all of the elements of these

23  charges and the specifications, okay.  Now, there

```
 1    were a number of crimes that she is charged with,

 2    okay, as a complicitor.  There are two counts of

 3    aggravated murder.  There is only one person who is

 4    killed, but there are two separate theories that the

 5    State is allowed to pursue, and we've elected to

 6    pursue that because we're allowed to do that.  There

 7    is one count of aggravated murder that charges that

 8    the killing occurred with prior calculation and

 9    design.  And there is another count or charge,

10    charging that a felony murder, that the aggravated

11    murder occurred during the course of a special

12    felony, an aggravated robbery or aggravated

13    burglary.  There is also -- there are also

14    specifications attached to these charges of

15    aggravated murder.  These specifications --

16    aggravating circumstances that make her eligible for

17    the death penalty.  And the first specification is a

18    charge of aggravated burglary; that the aggravated

19    murder occurred during an aggravated burglary, and

20    that the Defendant committed the aggravated murder

21    with prior calculation and design.  The second

22    specification charges that the aggravated murder was

23    committed during an aggravated robbery as opposed to
```

1      an aggravated burglary, and the Defendant committed

2      the aggravated murder with prior calculation and

3      design.  And the Judge is going to give you a

4      detailed legal definitions of all of these terms at

5      the end of the case, but let me explain, give you a

6      for instance.  Folks who aren't versed in the law,

7      often confuse the terms burglary and robbery, and

8      they say my house was robbed or --  but an

9      aggravated burglary generally deals with a trespass

10     in some way into an occupied structure, like a

11     dwelling house.  Okay, and it could be that the

12     perpetrator is armed with a deadly weapon, goes in

13     and commits an offense like an aggravated murder or

14     theft offense or something, and he could cause

15     serious physical harm to the victim, Okay, where the

16     victim is present.

17                An aggravated robbery, on the other

18     hand, doesn't deal with the structure, doesn't deal

19     with a house.  It's generally the use of force or

20     threat of force against another person to commit an

21     offense, like maybe a theft or something.  And the

22     perpetrator can be armed with a deadly weapon, like

23     a gun or knife, and can cause serious physical harm

1    or death to the victim, okay, so there is a

2    distinction there between the burglary and robbery

3    type charges.

4          Now, there are also two other charges.

5    The Defendant is charged with aggravated burglary

6    and aggravated robbery.  And there is a firearm

7    specification attached to each of the these charges.

8    And the Judge is going to define those terms, the

9    aggravated burglary and the aggravated robbery, and

10   the firearm specification, it's just an extra

11   finding of fact for the jury to consider that a

12   working gun was used.  Okay, the Judge will give you

13   a detailed legal definition but, basically, it means

14   that a working gun is capable of shooting a bullet

15   by combustion or explosion, and it goes on.

16          Now, these crimes, they're composed of

17   certain elements.  I already mentioned elements and

18   told you it is sort of like the ingredients in a

19   receipt.  Let's take this crime of aggravated murder

20   with prior calculation and design.  The Judge is

21   going to define these elements of each crime for

22   you, and you try each crime and specification

23   separately, okay.  But for instance, let's say we

1    have to prove beyond a reasonable doubt that it

2    happened on or about a certain date, like December

3    11, 2001; second, that it happened here in Trumbull

4    County, Ohio, we call that venue, so that we can try

5    this case in this Courthouse rather than up in

6    Ashtabula County or down in Tuscaras County or

7    Franklin County.  The third element might be the

8    identification, the person who committed this crime

9    as a complicitor is the same person sitting over

10   there, and somebody may have to point her out.  The

11   fourth element is that she did it purposely, on

12   purpose, so the Judge will give you the detailed

13   legal definition of that but, basically, it's on

14   purpose.  Fifth, is that she caused the death of a

15   living person.  And in this case a fellow by the

16   name of Robert Fingerhut.  And sixth, that she acted

17   with prior calculation and design.  And by prior

18   calculation and design, you remember the old term

19   premeditation, premeditated murder?

20              TODD DAVIDSON:  Yeah.

21              ATTY. BAILEY:  Well, they changed

22   the law a little bit and now it's prior calculation

23   and design.  And it requires some advanced planning

1     and, for example, let's say, I drop my pen and I

2     catch it with my other hand by reflex.  That's not

3     any planning.  But on the other hand, I drop my pen

4     and I say, oh, my goodness, I dropped my pen, maybe

5     I better bend over and pick it up.  Bend down and

6     pick it up without dropping anything else, and put

7     it back in my pocket, there is some advance planning

8     there, right?

9                    TODD DAVIDSON:  Uh-huh.

10                   ATTY. BAILEY:  Okay, same thing

11    here, we have to show a studied scheme to kill.

12    Okay, now, those are elements and we have to prove

13    each of those to your satisfaction beyond a

14    reasonable doubt, so that you're firmly convinced of

15    the truth of the charges to a moral certainty, and

16    you would be using your reason and your common sense

17    to do it.  The Judge is going to define this term

18     proof beyond a reasonable doubt to you.  Everything

19    has got -- pretty much everything has got a legal

20    definition.  Okay, but it's not a real hard

21    definition, and it's something that you are used to

22    doing in your everyday life.  You made decisions to

23    get married, you made decisions to go to work, you

2635

```
1    make decisions to have kids, you know, you make

2    decisions to get divorced.  Okay, buy a car.  You

3    use your reason and your common sense, and you

4    decide if there is enough -- you are convinced

5    whether it's the right thing or whether there is

6    some reasonable doubt as to whether you shouldn't be

7    doing that, right?

8                    TODD DAVIDSON:  Uh-huh.

9                    ATTY. BAILEY:  Okay.  And some

10   times we talk about -- we use an example of the box,

11   okay, fill in the box with evidence up to a certain

12   point.  And when we talk about proof beyond a

13   reasonable doubt, we're not talking about 100

14   percent proof or proof beyond all doubt or a shadow

15   of a doubt.  I think there is an Alfred Hitchcock

16   movie, Shadow of a Doubt, which makes for a nice

17   movie title, but there is no such animal in criminal

18   law, okay.

19                    If we fill this box, we take an

20   imaginary box and put evidence in, and in a civil

21   case, you got a preponderance of the evidence as the

22   burden, and whoever fills that box just a little

23   over half way is going to win.  In a criminal case,
```

1    we got the highest burden of proof.  We don't have

2    to fill that box entirely to the top, it's got to

3    come pretty close to the top, and it is up to you

4    and each of the other jurors where you want to draw

5    that imaginary line, so that you are personally

6    satisfied using your reason and common sense that we

7    have convinced you that the charges is true to a

8    moral certainty, okay?

9                    TODD DAVIDSON:  Yes.

10                   ATTY. BAILEY:  And only you know

11   whether we hit that point, and you know if we

12   haven't hit that point.  And if we haven't, then you

13   got to find her not guilty of that element or that

14   crime.

15                   Now, let me give you -- and there are

16   different ways that we can fill that box with

17   evidence.  We can put on direct evidence where

18   somebody comes in and testifies to something that

19   they have learned through the use of his or her five

20   senses.  For example, I heard the gunshot and it was

21   really loud, or I tasted the drink and it tasted

22   like lemon, or I touched the surface and it was

23   really hot and it burned my hand.  Okay, that is

1    direct evidence.  But there is another type of

2    evidence that you are used to, and it's sort of

3    roundabout evidence that we can use, and it's where

4    you are presented with a fact or series of facts and

5    you are asked to drawn a logical conclusion to

6    another fact or series of facts.  Deductive

7    reasoning.  We call that circumstantial evidence,

8    and it's just as good as direct evidence, okay.

9              I'll give you a for instance.  Let's say

10   you live in a two story house, and before you go to

11   bed at night you go upstairs to your bedroom and you

12   look out across your neighborhood, out the window,

13   and it's a beautiful night.  The moon is beaming,

14   the stars are twinkling, there's not a cloud in the

15   sky, and you draw the blinds and get into bed, the

16   radio is on and you hear the announcer say, folks,

17   there is a cold front coming in tonight, we're going

18   to have a storm.  And you fall asleep and some time

19   during the night you awaken, you look toward the

20   window but the blinds are drawn and you could see

21   there is a bright flash that came from outside, and

22   a couple seconds later there is a distant booming

23   sound, a roaming boom in the sky, and a couple --

1    half a minute later, there is another flash of light

2    closer in time, maybe two seconds away closer in

3    time, boom.  And then, suddenly, there is this

4    really bright flash from outside and almost

5    instantaneous a cracking, ripping, boom above the

6    house and the pitter patter on the roof and a heavy

7    drumming sound.  You fall back asleep.  Some time

8    later, you wake up, get up and go to a window, open

9    the blinds and look out, it's a beautiful day

10   outside, the sun is shining, not a cloud in the sky.

11   As far as you can see, where it was perfectly dry

12   across the neighborhood the night before, now it's

13   soak and wet.  The roof top are all wet, the streets

14   are running with water, drops of water are dripping

15   off the leaves of the trees and there are puddles

16   all around.  And there is no fire hydrant nearby

17   where somebody could hit it and squirted water all

18   over the place, right.  You know what happened

19   during the night, don't you?

20                    TODD DAVIDSON:  Yes.

21                    ATTY. BAILEY:  What happened?

22                    TODD DAVIDSON:  It rained,

23   thunderstorm.

1               ATTY. BAILEY:  Right, it

2     thunderstormed, and you know that beyond any

3     reasonable doubt.  And you know that from using

4     circumstantial evidence from all of the facts and

5     circumstances with which you were presented, you

6     drew the logical deduction that there was a

7     thunderstorm.  Now, there is room there for some

8     possible or imaginary doubt.  You can imagine that

9     Alf and his martian buddies flew by here in their

10    flying saucer during the night and sprinkled the

11    ground with some wet stuff and put on a sound and

12    light show.  But that would be a foolish or

13    imaginary doubt, wouldn't it?

14               TODD DAVIDSON:  Uh-huh.

15               ATTY. BAILEY:  You know that beyond

16    any reasonable doubt, all that happened was it was a

17    thunderstorm, right?

18               TODD DAVIDSON:  Right.

19               ATTY. BAILEY:  Now, there is some

20    limitations to circumstantial evidence.  You --

21    unless you had more evidence, you couldn't tell just

22    based on what you saw and heard on how long it

23    rained or how much rain accumulated unless you had

1    some way to measure.  But you do know based on that

2    evidence, that there certainly was a thunderstorm

3    during the night, right?

4                    TODD DAVIDSON:  Yeah.

5                    ATTY. BAILEY:  Beyond any

6    reasonable doubt.  You understand that you can use

7    circumstantial evidence, or we can use

8    circumstantial evidence to prove these particular

9    elements, and you can find the Defendant guilty

10   based on the use of circumstantial evidence alone.

11                   TODD DAVIDSON:  Okay.

12                   ATTY. BAILEY:  I mean, for example,

13   criminals don't always -- when they plan serious

14   crimes, like murders, criminals don't always

15   announce to the whole world what their intentions

16   are, do they?

17                   TODD DAVIDSON:  No.

18                   ATTY. BAILEY:  You wouldn't expect

19   that.  They wouldn't stand on the Courthouse steps

20   and say, hey, I am going to kill so and so on such a

21   date and time.

22                   TODD DAVIDSON:  Right.

23                   ATTY. BAILEY:  Okay.  So, if there

1    was circumstantial evidence of a person's mental

2    intent, maybe letters or phone calls or something

3    like that, you might be able to look at certain

4    things that might tell you what's going on in a

5    person's mind, right, to determine their purpose, or

6    whether there was prior calculation and design?

7              TODD DAVIDSON:  Yeah.

8              ATTY. BAILEY:  Now, you understand

9    that criminals are not always necessarily rocket

10   scientists.  They may do a lot of planning and

11   stuff, but sometimes criminals do really stupid,

12   stupid, things, right?

13             TODD DAVIDSON:  Right.

14             ATTY. BAILEY:  For example, you are

15   probably aware of cases where the bank robber goes

16   into the bank, hands them a stick up note on the

17   back of an envelope, says give me all the money, the

18   guy is there with his gun and his mask, and he gives

19   them the money, and he runs out, and leaves the note

20   behind, turn the envelope over, and there is the

21   guy's name and address.  You've heard of things like

22   that?

23             TODD DAVIDSON:  Yes.

1               ATTY. BAILEY:  Or the burglar

2      climbs into the window, gets in the house, drops his

3      wallet with his identification and leaves it behind,

4      right?

5               TODD DAVIDSON:  Uh-huh.

6               ATTY. BAILEY:  So, you understand

7      that criminals don't have to be the brightest people

8      to get caught?

9               TODD DAVIDSON:  Yeah.

10              ATTY. BAILEY:  Okay.  A couple of

11     other things.  You can't take notes.  In school you

12     could take notes, right?

13              TODD DAVIDSON:  Uh-huh.

14              ATTY. BAILEY:  I know that when I

15     was in law school or college, I was able to take

16     some notes.  But here in our courts in Ohio, the

17     judges frown on taking notes.  You have to pay close

18     attention and listen to the testimony of the

19     witnesses and watch their demeanor to determine

20     their truthfulness.  And then you have to rely on

21     your collective recollection at the end of the case,

22     you and the other 11 jurors.  Okay, the trial is not

23     going to last for months, it's going to last for a

1    week and a half or maybe two weeks, I would expect

2    in the first phase.  And if we go into a second

3    phase, usually, that is one day to three days.

4    Every case is different, okay.  But there won't be

5    any instant replays of the testimony.  Some times

6    folks ask for the transcript of the testimony, and

7    our court report may be very good, they are very

8    good, but they're not going to get you instant

9    transcripts.  We don't have millions of dollars to

10   spend like in an O.J. Simpson case or some of the

11   other high publicity cases like the Menendez

12   brothers or something where they have a whole lot of

13   court reporters and million dollars worth of

14   recording equipment.   The County just doesn't have

15   that in the budget, and either do the court

16   reporters.  So, you're not going to be getting

17   transcripts of the testimony.  The Judge will tell

18   you to rely on your collective recollection.  Will

19   you be able to do that?

20                    TODD DAVIDSON:  Yeah.

21                    ATTY. BAILEY:  Okay.  You are also

22   not allowed to go out on your own to investigate

23   because that could cause a mistrial.  Sometimes on

```
 1    T.V. or in movies, they have Matlock or something, I
 2    think, he sends his whole office staff out to
 3    investigate everything.  That would result in a
 4    mistrial.  We would have to do it all over again.  I
 5    think we had that happen in one case where a juror
 6    went out to the scene on their own, and we don't
 7    want to do anything like that, right?
 8              TODD DAVIDSON:  Yes.
 9              ATTY. BAILEY:  You are also stuck
10    with the questions that the lawyers ask, and because
11    we're trained in law school we're sort of geared
12    toward asking questions to proving these elements,
13    right, and there may be other things that you might
14    be interested in.  Let's say you sold shoes, you
15    might have some interest in footwear, what somebody
16    was wearing at the time of a crime.  Okay, but let's
17    say that wasn't relevant to proving any of the
18    elements of the crime but, based on the evidence,
19    you would still be able to return a conviction
20    without ever getting that question answered what
21    somebody was wearing, right?
22              TODD DAVIDSON:  Right.
23              ATTY. BAILEY:  Or if you were a
```

1 chef, you might be interested in what they had to

2 eat that day.  That might never get asked or

3 answered, right?

4      TODD DAVIDSON:  Right.

5      ATTY. BAILEY:  Okay, and if it had

6 no bearing on the case, then unanswered questions,

7 you would still be able to decide the case, right?

8      TODD DAVIDSON:  Yeah.

9      ATTY. BAILEY:  I know that on Court

10 T.V. sometimes, they may show different

11 jurisdictions in this country, and some places they

12 may allow jurors to submit questions to the Judge to

13 ask the witnesses, that doesn't happen in this case.

14 Okay, that doesn't happen here in Ohio.

15      TODD DAVIDSON:  Yes.

16      ATTY. BAILEY:  At the end, let's

17 say we're at the end of the first phase, the Judge,

18 all the testimony and evidence is in, the Judge

19 instructs you on the law, and then you would be

20 sequestered with the other jurors, okay.  Okay, the

21 sequestration takes as long as -- you and the other

22 jurors are kept together for as long as it takes to

23 reach a verdict, and it's hard to say when that

1    would happen.  I have had juries in capital cases

2    come back in the first phase in an hour and a half,

3    and had other juries take up to five days to make a

4    decision.  That -- then, if you and the other jurors

5    came back with a guilty verdict of aggravated murder

6    and one or more of the specifications, we go into a

7    second phase.  And you hear testimony from other --

8    there would be a break in between and then maybe for

9    a couple of days or a week, we can come back for a

10   second phase, and you would hear more testimony and

11   maybe for a day to three days, and then you would be

12   sequestered again to get more instructions of law

13   from the Judge.  And, again, it would take as long

14   as it takes for you to reach a decision, okay.  But

15   you will be sequestered during that time.  You would

16   go over in the evening hours, you would be put up in

17   a hotel, and you and the other juros wouldn't be

18   able to discuss case until all you were all 12

19   together.  Okay, you can't have conversations one on

20   one or one on three or something, okay.  Would that

21   sequestration cause you any undue hardship?

22                 TODD DAVIDSON:  No.

23                 ATTY. BAILEY:  Now, during the

1    course of the trial, you will be face to face with

2    the Defendant.  Perhaps as her chair is turned

3    toward you, you are going to become more acquainted

4    with her.  My question to you is this, when you go

5    back inside that jury room to deliberate on your

6    verdict with the other jurors and you lay aside all

7    thoughts of sympathy that you might have for this

8    Defendant, and basing your deliberations on the

9    testimony in evidence that you're presented with and

10   the instructions of law given to you by the Judge,

11   and can you lay aside all thoughts of sympathy for

12   this Defendant that you might have?

13                    TODD DAVIDSON:  Yeah.

14                    ATTY. BAILEY:  Okay, I know it's

15   only human nature some times to feel sympathy for

16   people, but you have to base your decision on the

17   facts in evidence and the testimony of the

18   witnesses.

19                    TODD DAVIDSON:  I am being

20   unbiased.

21                    ATTY. BAILEY:  Okay.  Now, I

22   noticed that -- you indicated that you had a

23   girlfriend who was a victim of crime?

1            TODD DAVIDSON:  Yes, years ago.

2            ATTY. BAILEY:  Years ago, okay.

3    And where did that occur, what jurisdiction?

4            TODD DAVIDSON:  Trumbull County,

5    yeah, Trumbull.

6            ATTY. BAILEY:  What law enforcement

7    agency handled that case?

8            TODD DAVIDSON:  Girard.

9            ATTY. BAILEY:  And what

10   Prosecutor's Office?

11           TODD DAVIDSON:  I can't remember.

12   It was ten years ago.

13           ATTY. BAILEY:  Was it the County?

14           TODD DAVIDSON:  Yeah, it was here.

15           ATTY. BAILEY:  Okay, were you

16   satisfied with the outcome?

17           TODD DAVIDSON:  Yes.

18           ATTY. BAILEY:  Okay, and you would

19   be able to separate any bad feelings from that case

20   from this case --

21           TODD DAVIDSON:  Yes.

22           ATTY. BAILEY:  The case that stands

23   on its own.

1             TODD DAVIDSON:  Yes.

2             ATTY. BAILEY:  Now, I take it that

3    you understand that there are obligations of

4    citizenship that we have.  When it's election time,

5    it is an obligation on us to learn as much as we can

6    about the candidates and the issues, and then to go

7    out and cast a ballot and make sure our system of

8    government works and try to participate in it.

9    Another obligation is, if it's war time, to serve in

10   the military, if we're called.  We've got young

11   folks who are over seas in different countries doing

12   their duty.  That is another obligation of

13   citizenship.  Another obligation is, if someone is

14   sitting as jurors to make sure our system of justice

15   works to have people from all over the community

16   come in and participate in this decision.  That

17   would be another obligation, even though it may

18   cause problems or hardships in our daily life, we

19   have to make other accommodations for work, for

20   school, for our family, but to make sure the system

21   worked, it would be important to participate.  Would

22   you be willing to undertake that obligation of

23   citizenship?

1                        TODD DAVIDSON:  Yes, I would.

2                        ATTY. BAILEY:  Thank you, very

3       much.  Do you have any questions that you would like

4       to ask me?

5                        TODD DAVIDSON:  No, you answered

6       them, I mean, talking about previous schooling and

7       my court for the 8th was my main concern.

8                        ATTY. BAILEY:  Okay.

9                        TODD DAVIDSON:  Other than that,

10      you know, I think I would have no problem becoming a

11      juror.

12                       ATTY. BAILEY:  Okay, thank you,

13      very much.  Now defense counsel will get an

14      opportunity to talk.

15                       THE COURT:  We are going to take a

16      10 minutes break, and then we will finish.

17

18      (At 11:00 a.m., a recess was taken.)

19

20      (Back in Court at 11:10 a.m.)

21

22                       THE COURT:  All right, Mr. Ingram.

23

1    **EXAMINATION BY ATTORNEY INGRAM:**

2                    ATTY. INGRAM:  Good morning, Mr.

3    Davidson.

4                    TODD DAVIDSON:  Good morning.

5                    ATTY. INGRAM:  My name is Jerry

6    Ingram, this John Juhasz.  John and I share the

7    responsibility of representing Donna Roberts, who is

8    on trial for her life.  And, obviously, we take our

9    responsibilities to Donna very seriously, and feel

10   we should take every reasonable precaution in

11   selecting a fair minded jury.  Simply, the type of

12   jury that you or I would want if we were on trial.

13   Does that sound fair enough to you?

14                   TODD DAVIDSON:  Yes, it does.

15                   ATTY. INGRAM:  This is the only

16   opportunity throughout the course of the trial where

17   we can talk directly to one another, and after the

18   trial starts, we can talk at the jurors, but we

19   can't talk to them.  I can talk to you but, more

20   importantly, you can talk to me.  The purpose of

21   this dialogue is to determine whether you're

22   comfortable sitting on this panel, and this

23   experience that you are going through this morning

1    is a lot like a job interview, except when you went

2    to Tamarkin and applied for that job, you chose to

3    go apply.  Here, there was a spin of the jury wheel,

4    someone reached in and either you were lucky enough

5    or unlucky enough to have your number pulled, and

6    that is what brought you here.  We're interviewing

7    you today for one of the most important jobs there

8    is, the job of finding the truth and determining the

9    fate of another human being.  So my first question

10   to you is, how do you feel about being asked to

11   assume such a responsibility?

12                TODD DAVIDSON:  It's a definite

13   large responsibility.

14                ATTY. INGRAM:  Do you think you're

15   up to you it?

16                TODD DAVIDSON:  I believe so.

17                ATTY. INGRAM:  Since April 8th, you

18   made it to the orientation on Tuesday, April 8th

19   down at the other end of the hall?

20                TODD DAVIDSON:  Uh-huh.

21                ATTY. INGRAM:  Have you thought

22   about serving on this case, and has it popped into

23   your mind, what have you thought about?

```
 1                        TODD DAVIDSON:  I didn't really

 2      think that I would have been eligible since I had

 3      schooling going on as well as court, but as the

 4      weeks progressed, my schooling was ending, and I

 5      just had that one court date for the 8th, so knowing

 6      that, you know, that things were coming in order

 7      that I would have been able to, then I would have.

 8                        ATTY. INGRAM:  In a nutshell, this

 9      case boils down to the government's allegation that

10      Donna plotted or conspired with a male companion,

11      Nate Jackson, to cause the death of Robert

12      Fingerhut.  Donna and Robert were divorced, but

13      continued to work together at the Greyhound Bus

14      Stations in Youngstown and Warren, and to live

15      together in Howland Township.  This trial is about

16      the guilt or innocence of one person, and one person

17      only, do you understand that?

18                        TODD DAVIDSON:  Yes.

19                        ATTY. INGRAM:  This is about Donna.

20                        TODD DAVIDSON:  Uh-huh.

21                        ATTY. INGRAM:  Throughout the

22      course of these proceedings, you will hear the name

23      Nate Jackson, and it won't take -- you may very well
```

1    conclude that Nate did what the State says he did.

2    That is not the issue here.  The issue here is did

3    Donna help him.  Do you understand that?

4                    TODD DAVIDSON:  Yes.

5                    ATTY. INGRAM:  And the State has to

6    prove that beyond a reasonable doubt, you have that?

7                    TODD DAVIDSON:  Yes.

8                    ATTY. INGRAM:  In support of its

9    allegation that Donna aided or participated in the

10   death of Robert Fingerhut, the State will introduce

11   various letters and tape-recordings.  Now, some of

12   this evidence is going to be sexual explicit in

13   nature, and I am going to be candid with you, some

14   of it is down right offensive.  Even though the

15   letters were sexually explicit, you are still going

16   to have to test that evidence to determine whether

17   it ties Donna to this offense.  Do you understand

18   that?

19                    TODD DAVIDSON:  Yes.

20                    ATTY. INGRAM:  Do you also

21   understand that the allegation here is murder, not

22   loose morality.

23                    TODD DAVIDSON:  Yes.

1           ATTY. INGRAM:  Would you have the

2     courage to acquit; that is, vote not guilty, if you

3     felt that a not guilty verdict was warranted by the

4     evidence?

5           TODD DAVIDSON:  Yes.

6           ATTY. INGRAM:  Back on that Tuesday

7     when we were down at the other end of the hallway,

8     did any of the other prospective jurors who were

9     present that day discuss this case with you at all?

10          TODD DAVIDSON:  No.

11          ATTY. INGRAM:  Did you hear any

12    other prospective jurors discussing this case

13    amongst themselves?

14          TODD DAVIDSON:  No.

15          ATTY. INGRAM:  Where were you

16    physically in that courtroom?  When you walked in

17    the door, did you go to the left or to the right?

18          TODD DAVIDSON:  To left of the

19    front row.

20          ATTY. INGRAM:  Were you seated or

21    were you standing?

22          TODD DAVIDSON:  I was seated.

23          ATTY. INGRAM:  Now, you were

1    exposed to some of the media publicity regarding

2    this case, am I right?

3              TODD DAVIDSON:  Yeah.

4              ATTY. INGRAM:  Is that when it

5    first happened or -- and that was back in December

6    of '01, or have you periodically read or seen

7    something about this?

8              TODD DAVIDSON:  The only thing that

9    I recall is that after we had the meeting down the

10   hall, the news channel came on, and it popped up,

11   and I just walked out of the room, because I am

12   living at my parent's house.  And we were told not

13   to listen to anything that goes on through the

14   media.  So, I abided by that and walked out of the

15   room.

16             ATTY. INGRAM:  And that's all that

17   we can ask you to do.  And, periodically, throughout

18   the course of the these proceedings, you may be

19   watching T.V., or listening to the radio, and

20   they're not going to warn you, hey, prospective

21   jurors, we're about to broadcast something, but when

22   you catch it, you either have to get to the T.V.,

23   turn it off or get yourself out of there.  Will you

1    do that, and I am sure you will?

2                    TODD DAVIDSON:  Yes.

3                    INGRAM:  Do you understand why we

4    ask you to do that?

5                    TODD DAVIDSON:  Yes, because you

6    could be biased by hearing someone's opinion.

7                    ATTY. INGRAM:  Did you ever see any

8    of the commentary relating to the O.J. Simpson case?

9    Every night you turn on the T.V., and there would be

10   a high affluent lawyer, some high affluent

11   ex-prosecutor, some high affluent defense lawyer,

12   and they would put a different spin or

13   interpretation of what unfolded in Court that day.

14   Can you see how that would affect a juror?

15                   TODD DAVIDSON:  Oh, yeah.

16                   ATTY. INGRAM:  And would you agree

17   with me that a juror should not be exposed to such

18   things?

19                   TODD DAVIDSON:  Definitely.

20                   ATTY. INGRAM:  Am I correct that

21   you had a conversation with a co-worker about this

22   case at some point in time?

23                   TODD DAVIDSON:  Yes.

1      ATTY. INGRAM:  When was that?

2      TODD DAVIDSON:  That would be when

3 I made jury duty.  They knew I was a juror and they

4 were asking me questions.

5      ATTY. INGRAM:  Is that before you

6 came in or after you came in?

7      TODD DAVIDSON:  It's before.

8      ATTY. INGRAM:  And that is when

9 they told you about the case they thought that you

10 were coming in on, what were you told?

11      TODD DAVIDSON:  No, previous to

12 even getting picked as a juror, they were talking

13 about what I just said earlier to what I heard about

14 this case, and I didn't even know it was this case.

15 It's definitely, because I am not that up to par

16 with what was going on.

17      ATTY. INGRAM:  Would you agree with

18 me that what we see, read, and what we hear, whether

19 it's from a reporter or from a co-worker, can leave

20 impressions on us?

21      TODD DAVIDSON:  Influence, yeah.

22      ATTY. INGRAM:  Influence.  In this

23 case, you are going to have to decide this case on

1    what unfolds in this Courtroom, so whatever

2    impressions that you have, I am not saying you have

3    any, but if you do, you are going to have to set

4    those aside and judge this case on the evidence.

5    Are you up to that?

6                    TODD DAVIDSON:  Yes.

7                    ATTY. INGRAM:  Can I press you a

8    little bit on your views?

9                    TODD DAVIDSON:  Sure, go ahead.

10                   ATTY. INGRAM:  Regarding capital

11   punishment.  Can you explain your views, your

12   personal views on capital punishment in a little

13   more detail for me?

14                   TODD DAVIDSON:  For the death

15   sentence?

16                   ATTY. INGRAM:  Yes.

17                   TODD DAVIDSON:  In extreme cases

18   like the Fife case, stuff like that, I believe that

19   the death penalty should be instituted.

20                   ATTY. INGRAM:  What are your views

21   on life imprisonment as an option.

22                   TODD DAVIDSON:  Yeah, I mean, I

23   don't have any objections to it.

1                    ATTY. INGRAM:  Have you ever heard

2      anyone say that they're not in favor of life

3      imprisonment because they don't want to pay the

4      costs of  --

5                    TODD DAVIDSON:  Of taxes and stuff.

6      Yeah, I heard that.

7                    ATTY. INGRAM:  What do you think of

8      that argument?

9                    TODD DAVIDSON:  I am not sure that

10     I really have a major opinion on that other that I

11     know that the prisons are packed or say overwhelmed,

12     and I don't really have much to say.

13                    ATTY. INGRAM:  Well, would the cost

14     issue or the fact that the prisons are packed, to

15     use your words, they wouldn't affect your balancing

16     of the sentencing options, if you ever have to

17     decide the sentence, would they?

18                    TODD DAVIDSON:  No.

19                    ATTY. INGRAM:  And before I talk

20     anymore about punishment, I think I should explain

21     to you concern that I have.  You know, we're all up

22     here asking you questions about punishment, and we

23     don't even know if Donna has done anything wrong.

1  It seems like to me like putting the cart before the

2  horse, to use an old adage.  Do you see what I mean?

3      TODD DAVIDSON:  Yeah.

4      ATTY. INGRAM:  When you go to work,

5  do you use your seat belt?

6      TODD DAVIDSON:  In the car?

7      ATTY. INGRAM:  Yes.

8      TODD DAVIDSON:  No.

9      ATTY. INGRAM:  Do you know people

10  that do always use their seat belt?

11      TODD DAVIDSON:  Yes.

12      ATTY. INGRAM:  When those people

13  buckle up that seat belt, they don't expect to be in

14  an automobile accident, they buckle up just in case.

15  Do you understand?

16      TODD DAVIDSON:  Uh-huh.

17      ATTY. INGRAM:  Well, we're asking

18  you these questions just in case because the law

19  requires us to ask them of you now.  Do you

20  understand that?

21      TODD DAVIDSON:  Uh-huh.

22      ATTY. INGRAM:  Let me ask you

23  straight up.  These questions about punishment

1    create any inkling in your mind that Donna was

2    probably involved, or we wouldn't be asking you

3    these questions?

4                    TODD DAVIDSON:  Yeah --

5                    ATTY. INGRAM:  I'm sorry?

6                    TODD DAVIDSON:  Yes, you know, you

7    are asking me these questions that I would agree

8    that something could of happened.

9                    ATTY. INGRAM:  Okay.

10                   TODD DAVIDSON:  It'S pretty

11   evident, right?

12                   ATTY. INGRAM:  Well, I am not so

13   sure either that you understood my question, or I am

14   not understanding your answer.

15                   TODD DAVIDSON:  Yeah, okay.

16                   ATTY. INGRAM:  Just because we're

17   asking you questions about punishment --

18                   TODD DAVIDSON:  Okay.

19                   ATTY. INGRAM:  From those

20   questions, are you getting an impression that she

21   was probably involved?

22                   TODD DAVIDSON:  No.  Possibly.

23                   ATTY. INGRAM:  Possibly?

1                   TODD DAVIDSON:  Yeah.

2                   ATTY. INGRAM:  Well, number one,

3        that possibility is what you are here to determine,

4        correct?

5                   TODD DAVIDSON:  Yes.

6                   ATTY. INGRAM:  Number 2, and I

7        believe Mr. Bailey -- I will quote Mr. Bailey on

8        this, when he was talking to you about proof beyond

9        a reasonable doubt, didn't he tell you that

10       everything relating to human affairs is subject to

11       some possible doubt?

12                  TODD DAVIDSON:  Yes.

13                  ATTY. INGRAM:  So everything

14       relating to human affairs is simply possible?

15                  TODD DAVIDSON:  Possible, yeah.

16                  ATTY. INGRAM:  In the orientation

17       instruction two weeks ago Tuesday, and in the

18       preliminary instruction that the Judge gave you when

19       you read, what this morning or yesterday or Friday?

20                  TODD DAVIDSON:  This morning.

21                  ATTY. INGRAM:  Do you recall the

22       Judge telling you that these questions about

23       punishment have absolutely nothing to do with the

1      guilt or innocence of Donna Roberts?

2                     TODD DAVIDSON:  Yes, I do believe

3      that I heard that.

4                     ATTY. INGRAM:  So, are you able to

5      set aside any impression that these questions may

6      raise in your mind and just judge this case on the

7      evidence?

8                     TODD DAVIDSON:  Yes.

9                     ATTY. INGRAM:  And you see why it's

10     important that you do that?

11                    TODD DAVIDSON:  Yeah, definitely.

12                    ATTY. INGRAM:  Because if you were

13     to assume, for lack of a better word, if you were

14     going to assume that she was probably involved or we

15     wouldn't be asking you these questions, then she's

16     not going to get a fair trial, is she?

17                    TODD DAVIDSON:  No.

18                    ATTY. INGRAM:  Do you think that

19     you have a grip on the procedure in a potential

20     capital case from the preliminary instructions that

21     you read?

22                    TODD DAVIDSON:  Yes, it's pretty

23     straightforward.

1                    ATTY. INGRAM:  But it's hard stuff?

2                    TODD DAVIDSON:  Yeah.

3                    ATTY. INGRAM:  And I want to tell

4        you that there are a heck of a lot of lawyers,

5        actually, I would bet more than half, that would

6        have a difficult time understanding those

7        instructions because they don't practice criminal

8        law, and they're not familiar with the concept and

9        it's a difficult thing to follow.  First off, you

10       understand that this is potentially, and only

11       potentially a two phase process.  Let me back up.

12                    TODD DAVIDSON:  No.

13                    ATTY. INGRAM:  The first phase of

14       this case is a trial just like any other trial, and

15       the first phase relates to the guilt or innocence of

16       Donna Roberts.

17                    TODD DAVIDSON:  Yes.

18                    ATTY. INGRAM:  If the jury at the

19       first phase finds Donna not guilty, what happens?

20                    TODD DAVIDSON:  There is no second

21       phase.

22                    ATTY. INGRAM:  That's right.  We

23       all pack up our bags and go home.  That's why I say

1       it's potentially, and only potentially a two phase

2       process.

3                       TODD DAVIDSON:  Yes.

4                       ATTY. INGRAM:  Do you understand

5       that we only get to a second phase if the jury

6       returns a verdict of guilty on a charge of

7       aggravated murder, and a verdict of guilty on one or

8       more of the death specifications.

9                       TODD DAVIDSON:  Yes.

10                      ATTY. INGRAM:  That is when any

11      capital case goes to the second phase.  Do you think

12      that you have that square?

13                      TODD DAVIDSON:  Yes.

14                      ATTY. INGRAM:  Have you ever

15      considered a candidate's views on capital punishment

16      in determining whether to vote for that candidate?

17                      TODD DAVIDSON:  No.

18                      ATTY. INGRAM:  In your

19      questionnaire, there was a question about whether

20      you felt that the death penalty should be required

21      for any crimes, do you recall that question?

22                      TODD DAVIDSON:  Yes.

23                      ATTY. INGRAM:  And the answer was,

1     the shedding of innocent blood for money or any

2     other selfish gain.  Do you think that the death

3     penalty should be required for such an offense or

4     that it should only be an option for such an

5     offense?

6                     TODD DAVIDSON:  Definitely an

7     option.

8                     ATTY. INGRAM:  How about required?

9                     TODD DAVIDSON:  No.

10                    ATTY. INGRAM:  And do you

11    understand that if you have to -- if we ever get to

12    this second phase, that is where you have to do a

13    second balancing, you have to balance the

14    aggravating circumstances and those are the bad

15    things, and they are basically the death

16    specifications that brought us there in the first

17    place.  You got that?

18                    TODD DAVIDSON:  Yes.

19                    ATTY. INGRAM:  And you balance

20    those against mitigating factors, those are good

21    things about the Defendant, things that work against

22    the death penalty.  And the State, these fellows

23    right here, at that maybe second phase, would have

1       to convince you beyond a reasonable doubt that the

2       aggravating circumstances outweighed the mitigating

3       factors, and that death was the appropriate

4       punishment.  Are you square on that?

5                   TODD DAVIDSON:  Yes.

6                   ATTY. INGRAM:  So, at a second

7       phase, whether it's in this case or any other case,

8       the State bears the burden of proving beyond a

9       reasonable doubt that death is the appropriate

10      penalty.  Do you got that?

11                  TODD DAVIDSON:  Yes.

12                  ATTY. INGRAM:  Now, whether an

13      offenses was committed for money or selfish gain, is

14      not an aggravating circumstance.  The only

15      aggravated circumstances that you could consider are

16      the death specifications and the Judge will explain

17      that to you, but you have to set aside any personal

18      feelings that you have about an aggravating

19      circumstance, and only consider those that that you

20      are permitted to consider.  Can you do that?

21                  TODD DAVIDSON:  Yes.

22                  ATTY. INGRAM:  Now, you understand

23      that life without parole is indeed life without

1    parole.  You get in, you don't get out.  Life with

2    parole eligibility after 30 full years, means you

3    are eligible for parole, you go to the board, but

4    not until you have done day for day 30 year.  Got

5    that?

6              TODD DAVIDSON:  Yes.

7              ATTY. INGRAM:  And it's the same

8    thing for the 25 year option.  Whenever a juror

9    begins a second phase in a capital case, and it's

10   another case, not this one.  Whenever a juror begins

11   a second phase in a capital case, that juror must

12   start out with the four sentencing options equal in

13   his or her mind.  Do you understand that?

14             TODD DAVIDSON:  Uh-huh.

15             ATTY. INGRAM:  One cannot start

16   with a leg up, I mean, one of those options cannot

17   have a leg up.  They must start out equally, and

18   they must each be fairly considered.  Do you think

19   that you could do that?

20             TODD DAVIDSON:  Yes.

21             ATTY. INGRAM:  In your opinion,

22   what is the best argument for life imprisonment as

23   an alternative to the death penalty?

1                       TODD DAVIDSON:  Argument for it?

2                       ATTY. INGRAM:  Yes, as an

3     alternative to the death penalty.

4                       TODD DAVIDSON:  Um  --

5                       ATTY. INGRAM:  That's a hard

6     question.

7                       TODD DAVIDSON:  Yeah, it's hard.

8                       ATTY. INGRAM:  Okay, let me explain

9     something to you.

10                      TODD DAVIDSON:  Okay.

11                      ATTY. INGRAM: If I was sitting

12    where you are and you were sitting here and you

13    asked me the same question, I would have a very

14    difficult time answering the question, and I know

15    these questions are hard, we don't think about this

16    stuff in our daily lives.  Are you able to give me a

17    -- can you make a stab at an answer to that

18    question, though?

19                      TODD DAVIDSON:  I could try.

20                      ATTY. INGRAM:  Why don't you try.

21                      TODD DAVIDSON:  I think in some

22    respects that a lifetime imprisonment would be

23    actually a harsher punishment than death.

1              ATTY. INGRAM:  Thank you.  Your

2     girlfriend was the victim of a horrible offense some

3     time back.  Were you dating her at that time?

4              TODD DAVIDSON:  Yes, I was.

5              ATTY. INGRAM:  I understand that

6     you did not play a role in the investigation, did

7     you come to court and see any of the proceedings?

8              TODD DAVIDSON:  Yes, I came to

9     court with her.

10              ATTY. INGRAM:  Every time she came

11     or most of the time?

12              TODD DAVIDSON:  I would say just

13     about every time.

14              ATTY. INGRAM:  How was that case

15     resolved, was that case resolve by a trial or by a

16     plea?

17              TODD DAVIDSON:  Trial as in jurors?

18              ATTY. INGRAM:  Yes.

19              TODD DAVIDSON:  No, there was no

20     jury.

21              ATTY. INGRAM:  He pled guilty to

22     some offense?

23              TODD DAVIDSON:  Yes.

1          ATTY. INGRAM:  And then he was

2    sentenced to prison?

3          TODD DAVIDSON:  Uh-huh.

4          ATTY. INGRAM:  Anything about that

5    that left a sour taste in your mouth regarding the

6    justice system, prosecutors, and from my perspective

7    and most importantly, us poor defense lawyers?

8          TODD DAVIDSON:  No, because I

9    thought justice was served.

10          ATTY. INGRAM:  Have you ever

11    donated any time, money or services to a political

12    campaign or issue?

13          TODD DAVIDSON:  No.

14          ATTY. INGRAM:  Do you belong to a

15    group or any organization which is active in any

16    political matter?

17          TODD DAVIDSON:  No.

18          ATTY. INGRAM:  In the last five

19    years or so, have you signed a petition on any

20    public issue?

21          TODD DAVIDSON:  Not that I recall.

22          ATTY. INGRAM:  Do you belong to or

23    associate with any group which has crime prevention

1    or law enforcement as a goal?

2                    TODD DAVIDSON:  No.

3                    ATTY. INGRAM:  Would you agree with

4    me that to one degree or another, we have a crime

5    problem underfoot in this country?

6                    TODD DAVIDSON:  Definitely.

7                    ATTY. INGRAM:  Do you have any

8    ideas what we, and by we, I mean, society as a

9    whole, might be able to do to at least begin

10   addressing that problem?

11                   TODD DAVIDSON:  Oh, I would say

12   maybe stricter punishment to deter crimes.

13                   ATTY. INGRAM:  Okay  Mr. Bailey

14   talked to you about sympathy, I believe he was

15   talking about sympathy for Donna Roberts.  You would

16   agree with me that this is a court of law and not a

17   court of sympathy, wouldn't you?

18                   TODD DAVIDSON:  Yes.

19                   ATTY. INGRAM:  And we don't want

20   you to feel sympathy for Donna Roberts because

21   sympathy should not affect your evaluation of the

22   evidence.  But there is a flip side to this, there

23   is a victim here, Robert Fingerhut, and whenever

1    anyone loses his life, it's natural to feel sympathy

2    for that person as well.

3                    TODD DAVIDSON:  Uh-huh.

4                    ATTY. INGRAM:  You're oath will

5    require you to put aside all feelings of sympathy

6    whether they're for Donna or whether they are for

7    Robert.  Are you up to that?

8                    TODD DAVIDSON:  I believe so.

9                    ATTY. INGRAM:  And then we're going

10   to make your job a little tougher because, as you

11   can imagine, you are going to see photographs, you

12   will see crime scene photographs of Robert shot, you

13   may see close ups of a gunshot wound.  You may see

14   coroner's photographs, and some of this evidence may

15   invoke an emotional response from you, say, sympathy

16   or anger.  You get me?

17                   TODD DAVIDSON:  Uh-huh.

18                   ATTY. INGRAM:  Even though this

19   evidence evokes an emotional response from you, you

20   are still going to have to test this evidence to

21   determine whether it ties Donna to this offense.

22   Are you up to that?

23                   TODD DAVIDSON:  Yes.

1          ATTY. INGRAM:  How do you

2    personally feel about the rule of law, which

3    requires trial jurors to presume a defendant not

4    guilty?

5          TODD DAVIDSON:  I believe that it's

6    a good system.

7          ATTY. INGRAM:  Let me tell you why

8    I ask that question.  I have some good friends, they

9    run a delicatessen in Youngstown.  And you remember

10   that crime problem question that I asked you a few

11   minutes ago, if I were to ask them that very same

12   question, their response would be to replace the

13   presumption of innocence with a presumption of

14   guilt.  That is how they would propose to deal with

15   the crime problem.  And much of the world has such a

16   presumption.  When you're charged in Afghanistan,

17   when you're charged in Russia, you are presumed

18   guilty, and you have to prove your innocence.

19          TODD DAVIDSON:  Right.

20          ATTY. INGRAM:  You know, after the

21   revolution in our country in 1776, we started doing

22   things differently, and I think only about the

23   United States and Britain do things like this.  Do

1      you approve of this rule of law?

2                          TODD DAVIDSON:  Yes.

3                          ATTY. INGRAM:  Do you see why we

4      have it?

5                          TODD DAVIDSON:  Yes.

6                          ATTY. INGRAM:  Your kids are a

7      little too young to use as an example for this

8      question.  Do you have any brothers or sisters?

9                          TODD DAVIDSON:  I have a sister.

10                         ATTY. INGRAM:  When you were

11     growing, if your sister was accused by let's say a

12     neighbor of somebody wrongdoing, and you honestly in

13     your heart felt that your sister didn't do what the

14     neighbor says she did, you would require evidence

15     before you would be willing to change your mind,

16     wouldn't you?

17                         TODD DAVIDSON:  Yeah.

18                         ATTY. INGRAM:  Does that sound like

19     the presumption of innocence to you, you are

20     presuming your sister didn't do what the neighbor

21     said?

22                         TODD DAVIDSON:  Yes.

23                         ATTY. INGRAM:  And in that

1    situation when the neighbor came over and said,

2    okay, this is the evidence that I had that she did

3    it, well, you wouldn't just take that evidence at

4    face value, would you?  You would test it and look

5    at with a critical eye to make sure it really did

6    tie into what they're saying.

7                TODD DAVIDSON:  Yes.

8                ATTY. INGRAM:  Will you do that in

9    this case?

10                TODD DAVIDSON:  Yes.

11                ATTY. INGRAM:  Because of the

12    presumption of innocence, there is one burden of

13    proof here and that burden is on the State.  Do you

14    understand that?

15                TODD DAVIDSON:  Uh-huh.

16                ATTY. INGRAM:  To get back to my

17    friends that run the Delicatessen.  If we replaced

18    the presumption of innocence with a presumption of

19    guilt, that would also change the burden of proof,

20    wouldn't it?

21                TODD DAVIDSON:  Yes.

22                ATTY. INGRAM:  Because then the

23    Defendant would bear the burden of proving himself

1     innocent.  That's not the way we do it in this

2     country, and your oath as a trial juror requires

3     that you hold the State of Ohio to its burden of

4     proof.  You will do that?

5                    TODD DAVIDSON:  Yes.

6                    ATTY. INGRAM:  And you understand

7     that Donna is on trial for murder not for being a

8     woman of loose moral character?

9                    TODD DAVIDSON:  Yes.

10                   ATTY. INGRAM:  And while the State

11    may prove that Donna was a loose woman, the State's

12    burden in this case is to prove that Donna

13    intentionally participated in the death of Robert

14    Fingerhut.  Do you understand that?

15                   TODD DAVIDSON:  Yes.

16                   ATTY. INGRAM:  Will you hold the

17    State to that burden?

18                   TODD DAVIDSON:  Yes.

19                   ATTY. INGRAM:  You talked to Mr.

20    Bailey a little bit about essential element.  All

21    crimes are made up of essential elements.  Essential

22    elements are nothing more than a necessary

23    ingredient.  Do you understand that?

1              TODD DAVIDSON:  Yeah.

2              ATTY. INGRAM:  Do you remember Ken

3     talking to you about prior calculation and design?

4              TODD DAVIDSON:  Yes.

5              ATTY. INGRAM:  Prior calculation

6     and design, I believe the Judge will tell you, means

7     that purpose to cause the death was reached by a

8     definite process of reasoning in advance of the

9     homicide, and requires more than momentary

10    deliberations.  It's the Judge's job to define this

11    stuff for you.  I am not going to do that, but it

12    doesn't take much decision making to bend down on

13    the floor and pick up a pen, does it?  It's almost

14    like automatic.

15             TODD DAVIDSON:  Uh-huh.

16             ATTY. INGRAM:  Will you listen to

17    the Judge's definition of prior calculation and

18    design and hold the State to its burden?  And I am

19    sure you will.

20             TODD DAVIDSON:  Yes.

21             ATTY. INGRAM:  Purpose is an

22    essential element of both of the aggravated murders

23    charges.  There are two.  The first one is prior

1    calculation and design aggravated murder, and the

2    second one is felony aggravated felony murder.  You

3    got that?

4                    TODD DAVIDSON:  Uh-huh.

5                    ATTY. INGRAM:  Ken talked to you

6    about those.  Do you recall that?

7                    TODD DAVIDSON:  Yeah.

8                    ATTY. INGRAM:  Purpose is the same

9    as intent.  A person acts purposefully if it is his

10   specific intent to cause a specific result.  Do you

11   think you understand that?

12                   TODD DAVIDSON:  Yes.

13                   ATTY. INGRAM:  Would you agree that

14   the facts and circumstances surrounding an act can

15   shed light on the actor's intent?

16                   TODD DAVIDSON:  Yes.

17                   ATTY. INGRAM:  For instance, if I

18   went out there to commit some intentional

19   wrongdoing, would you expect me to try and cover my

20   tracks, or to leave a paper trail?

21                   TODD DAVIDSON:  Cover your tracks.

22                   ATTY. INGRAM:  And if I went out

23   there to engage in some intentional wrongdoing,

1    would you expect me to try and do it in secret under

2    cover of darkness, or to do it in broad daylight out

3    in the open in front of hundred people?

4              TODD DAVIDSON:  In secret.

5              ATTY. INGRAM:  In secret.  Donna

6    Roberts, throughout the course of this trial,

7    doesn't have to testify, doesn't have to present any

8    evidence whatsoever.  The Judge will tell you that

9    if she elects not to testify, you can't hold it

10   against her.  Let's get back to my friends at the

11   delicatessen.  What do you think they would do with

12   this rule?  They would do away with this

13   automatically.  And they would require everyone

14   charged to testify.  How do you feel about our rule

15   that if you don't want to testify, you don't have

16   too?

17             TODD DAVIDSON:  I believe it's our

18   right.

19             ATTY. INGRAM:  In everyday life,

20   now I can use your kids, you've got a dispute

21   between the 7 year old and the 4 year old, you have

22   to resolve the dispute.  What is the first thing you

23   do, probably say, okay, you tell me your side of the

1    story, and you tell me the other side of the story.

2    That is a natural inclination to want to hear both

3    sides of the story.  Do you understand that in this

4    case, your oath as a juror may require you to put

5    aside that natural inclination?

6                 TODD DAVIDSON:  Yes.

7                 ATTY. INGRAM:  Because if she

8    elects not to testify, you can't hold it against

9    her?

10                TODD DAVIDSON:  Yes.

11                ATTY. INGRAM:  Now, the flip side

12   of that coin is if she does testify, she is a

13   witness just like any other witness.  You should

14   apply the same rules and standards in determining

15   whether you believe her that you use to in

16   determining any other witness.  Do you understand

17   that?

18                TODD DAVIDSON:  Yes.

19                ATTY. INGRAM:  Now, let's be fair

20   about this.  Donna is the Defendant here, right?

21                TODD DAVIDSON:  Uh-huh.

22                ATTY. INGRAM:  So, she has an

23   interest or a stake in the outcome of this case,

1    doesn't she?

2                    TODD DAVIDSON:  Yes.

3                    ATTY. INGRAM:  And that is

4    something that you want to keep in mind in

5    determining whether you believe her, isn't it?

6                    TODD DAVIDSON:  Yes.

7                    ATTY. INGRAM:  And if you found

8    that another witness had something to gain, or an

9    interest or a stake in the outcome of this case, you

10   would want to keep that in mind in determining

11   whether to believe that witness, wouldn't you?

12                   TODD DAVIDSON:  Yes.

13                   ATTY. INGRAM:  This case began by

14   the filing of an indictment.  An indictment is a

15   piece of paperwork that informs any defendant of the

16   nature of the allegations leveled against them.  It

17   is not evidence.  Do you understand that?

18                   TODD DAVIDSON:  Yes.

19                   ATTY. INGRAM:  Did you know that

20   grand jury proceedings were secret?

21                   TODD DAVIDSON:  No.

22                   ATTY. INGRAM:  Okay, they are.

23   When this case went to the grand jury, no Judge was

1    there, Donna wasn't there, she didn't even know

2    about it.  Mr. Juhasz and I were not there.  We

3    didn't even know.  The grand jury only heard from

4    one side, the State.  There was no one there to test

5    the evidence.  So, do you understand why an

6    indictment is not evidence and should not be

7    considered by you as evidence?

8                    TODD DAVIDSON:  Yes.

9                    ATTY. INGRAM:  And I am sure you

10   heard that old adage where there is smoke there is

11   fire?

12                   TODD DAVIDSON:  Yes.

13                   ATTY. INGRAM:  Well, that old adage

14   has nothing to do with these proceedings, and the

15   mere fact that she is sitting there, cannot create

16   an impression or lead to an impression in your mind

17   that she must of done something wrong or she

18   wouldn't be sitting here.  Are you up to that?

19                   TODD DAVIDSON:  Yes.

20                   ATTY. INGRAM:  And let me

21   apologize.  Some of my questions, I'm sure, sound

22   silly to you, but I have to ask them.  I have to

23   make sure that you are willing to commit of

1     yourself.  Does that make sense to you?

2                    TODD DAVIDSON:  Yes.

3                    ATTY. INGRAM:  As a trial juror,

4     the Judge is going to tell you that you, the jury,

5     are the sole judges of the facts, credibility of the

6     witnesses, and the wait of the evidence.  You can

7     believe all of what a witness says, part of what a

8     witness says, none of what a witness says.  In other

9     words, you got to decide who is telling the truth or

10    not.  That is a big responsibility.  Are you up to

11    that?

12                    TODD DAVIDSON:  Yes.

13                    ATTY. INGRAM:  Because not

14    everybody is willing to assume that responsibility,

15    but you're up to it, correct?

16                    TODD DAVIDSON:  I believe so.

17                    ATTY. INGRAM:  The Judge is going

18    to give you a list of factors that you should keep

19    in mind and apply to every witness that testifies.

20    One of them is the interest on stake in the outcome

21    that we already talked about.  Yes, all of the

22    factors that he is going to give you, I am not going

23    to go over with you, but you should take each of

```
 1      those factors and apply them to every witness that
 2      testifies.  Will you do that?
 3                     TODD DAVIDSON:  Yes.
 4                     ATTY. INGRAM:  There is one factor,
 5      though, that we have to talk about.  The Judge will
 6      talk to you about something called the test of
 7      truthfulness that you employ in your everyday life.
 8      Over the course of your years, you frequently had to
 9      decide whether someone is being straight with you or
10      trying to hoodwink you, haven't you?
11                     TODD DAVIDSON:  Yes.
12                     ATTY. INGRAM:  And over the years,
13      you have developed sort of an intuitive or a sixth
14      sense to aid you in that respect?
15                     TODD DAVIDSON:  Yes.
16                     ATTY. INGRAM:  You are suppose to
17      bring that test in here and apply it to everybody
18      that testifies.  Will you do that?
19                     TODD DAVIDSON:  Yes.
20                     ATTY. INGRAM:  We all talked to you
21      about reasonable doubt and, obviously, reasonable
22      doubt is based on reason and common sense.  Have you
23      ever said to yourself, I am going to give him or her
```

1    the benefit of the doubt.

2                    TODD DAVIDSON:  Yes.

3                    ATTY. INGRAM:  Whenever you did

4    that, when you were willing to extend to someone the

5    benefit of the doubt.  It was a reasonable doubt,

6    wasn't it?

7                    TODD DAVIDSON:  Uh-huh.

8                    ATTY. INGRAM:  You never said I am

9    going to extend to him an unreasonable doubt.  The

10   point of that is, I think we intuitively know what

11   is reasonable and what is unreasonable.  Do you

12   agree?

13                   TODD DAVIDSON:  Yes.

14                   ATTY. INGRAM:  Proof beyond a

15   reasonable doubt is proof that an ordinary person

16   like you or I would be willing to rely and act upon

17   it in the most important of our own affairs.  You

18   have made some important decisions, haven't you?

19                   TODD DAVIDSON:  Yes, I have.

20                   ATTY. INGRAM:  And when you do, you

21   weigh the good against the bad.  Sometimes when you

22   are making big decisions, some of us make a chart or

23   a page, we get a piece of paper and put a line down

1    the middle of it, the positive, the good things over

2    here, the negative, the bad things on the other

3    side.

4              TODD DAVIDSON:  Uh-huh.

5              ATTY. INGRAM:  Well, if I am buying

6    a house, I put a deposit, it's 4 bedrooms, I need 4

7    bedrooms, it has 3 bathrooms, I need 3 bathrooms.

8    Good schools, nice neighborhood, my wife likes it.

9    The bad things; it's a 50 year old house and I don't

10   know about the structural stability of the house.

11   There are plumbing problems, and I don't know how

12   much the plumbing is going to costs.  And I just

13   don't know if I can cut the mortgage payments.  So

14   when we're balancing those things, we investigate

15   the negatives.  I call an inspector and he says this

16   house is brick solid, I can strike that one, right?

17             TODD DAVIDSON:  Yeah.

18             ATTY. INGRAM:  The plumbing bill is

19   $200.00 bucks, I can strike that.  That leaves me

20   with mortgage payment.  I go to the bank, and I say

21   please, extend the loan, make it another five or ten

22   years.  Nope.  Well, how about lowering the interest

23   rate.  Nope.  I can't get a raise.  No matter how

1   hard I think about it, this one negative about the

2   mortgage payment remains reasonable in my mind.  Are

3   you with me so far?

4               TODD DAVIDSON:  Yes.

5               ATTY. INGRAM:  Under that

6   circumstance, I could not say beyond a reasonable

7   doubt that that decision was the right thing for me.

8   Do you understand that?

9               TODD DAVIDSON:  Yes.

10              ATTY. INGRAM:  Because there is one

11  reasonable doubt.

12              TODD DAVIDSON:  Uh-huh.

13              ATTY. INGRAM:  And in this case, if

14  you have one reasonable doubt, the State has not met

15  its burden of proof.

16              TODD DAVIDSON:  Okay.

17              ATTY. INGRAM:  Do you recall Mr.

18  Bailey telling you that you could find the Defendant

19  guilty on circumstantial evidence?

20              TODD DAVIDSON:  Yes.

21              ATTY. INGRAM:  You can, however,

22  that circumstantial evidence must amount to proof

23  beyond a reasonable doubt.  And in that rain storm

1    that Mr. Bailey described for you, you have a lot of

2    direct evidence leading to the inference that it

3    rained, don't you?

4                    TODD DAVIDSON:  Yes.

5                    ATTY. INGRAM:  You hear the pitter

6    patter of rain on the roof, you hear the thunder,

7    you see the lighting, you have the weather report,

8    that is a fair inference.  Circumstantial evidence

9    basically asks you to make a leap in logic.  Do you

10   understand that?

11                   TODD DAVIDSON:  Yes.

12                   ATTY. INGRAM:  Would you agree with

13   me that you should only make that leap if it's

14   reasonable.

15                   TODD DAVIDSON:  Yes.

16                   ATTY. INGRAM:  Would you also agree

17   with me that before you make a leap in logic, you

18   better test the reasonable of that leap?

19                   TODD DAVIDSON:  Definitely.

20                   ATTY. INGRAM:  And if your sister

21   were accused by the neighbor of wrongdoing, and your

22   neighbor presented you circumstantial evidence, you

23   think you would look for other evidence or other

1    inferences -- I'm sorry, other inferences that

2    pointed in another direction that maybe showed that

3    she didn't do it.

4                    TODD DAVIDSON:  Of course.

5                    ATTY. INGRAM:  And would you do

6    that here?

7                    TODD DAVIDSON:  Yes.

8                    ATTY. INGRAM:  And there is a

9    danger of piling inferences on inferences -- very

10   quick and then I will sit down.  If I go to bed at

11   night in the middle of February and look out my

12   window before I go to sleep, and there is no snow on

13   my grass, and I wake up in the morning and there is

14   snow on my grass, I know it snowed.  And that's

15   circumstantial evidence.  It's a silly example, but

16   it's circumstantial evidence, correct?

17                    TODD DAVIDSON:  Yes.

18                    ATTY. INGRAM:  Now, it's a Sunday

19   morning, and I want my paper, so I look out the

20   window and I see footprints from the house to the

21   right to my door, from my door to the house on the

22   left.  I can also now assume that somebody walked in

23   the snow, correct?

1           TODD DAVIDSON:  Yes.

2           ATTY. INGRAM:  And because it's a

3    Sunday morning and pile an inference on an inference

4    and maybe even on inference, and I am going to

5    assume that its the paperboy.  So I got my cigarette

6    in one hand, my cup of coffee in the other hand, and

7    go down and open the door to get my newspaper.  And

8    guess what's there, my Giant Eagle coupons.  You

9    have to look at these inferences, especially when

10   you pile one on another, if you can.  Are you with

11   me here?

12           TODD DAVIDSON:  Yes.

13           ATTY. INGRAM:  Now that I have

14   taken up so much of your time, is there anything

15   that you want to say to any of us here, any

16   questions that you have?

17           TODD DAVIDSON:  Not off the top of

18   my head, no.

19           ATTY. INGRAM:  Thank you.

20           ATTY. BAILEY:  Pass, Your Honor.

21           ATTY. INGRAM:  Pass.

22           THE COURT:  You will be in the pool

23   from which this jury is selected.  I have to ask

1        Connie when you need to call back in.  We will

2        probably be here Thursday and Friday.   This gives

3        us 20.  I will have him call back in Thursday night.

4        Call in Thursday night to that number that was given

5        for further instructions.  I am hoping to get enough

6        during this week, but I don't know how we're going

7        to accomplish that.  In any event, call Thursday

8        night.  You are not to read anything or talk to

9        anyone about the case or gain any other information

10        about it in the mean time.

11                    TODD DAVIDSON:  All right.

12                    THE COURT:  Listen, thank you, very

13        much, for your time.

14                    TODD DAVIDSON:  Thank you.

15

16        (Whereupon, Todd Davidson, Juror Number 167 was

17        excused until further notice.)

18

19

20                    ATTY. BAILEY:  Judge, I thought

21        Juror Number 165, I thought that he was going -- the

22        mill was closing and he was going to check back to

23        see if it would be a hardship for him, whether he

1      would be able to get paid or not?

2                        THE COURT:  Never heard from him?

3                        ATTY. BAILEY:  We haven't heard

4      from him and he was the juror before this, so before

5      we get much further out of order, I think we ought

6      to check this.

7                        THE COURT:  Stop down and ask

8      Connie to try and contact him maybe.

9                        ATTY. BAILEY:  Okay.

10                       THE COURT:  Okay, let break for

11     lunch and be back here at 1:00 o'clock.

12

13     (At 11:56 a.m., a lunch recess was taken.)

14

15     (Back in Court at 1:10 p.m.)

16

17

18              **MICHAEL ARCURI, JUROR NUMBER 168**

19     **EXAMINATION BY THE COURT:**

20

21                       THE COURT:  How are you this

22     afternoon?

23                       MICHAEL ARCURI:  Okay, how are you?

1              THE COURT:  Fine, thank you.  You

2     read that handout that was given to you?

3              MICHAEL ARCURI:  Yes, sir.

4              THE COURT:  This case involves two

5     counts aggravated murder with specifications.  That

6     means that if the State is able to prove by their

7     evidence all the elements of aggravated murder and

8     also the specifications, this matter, after the

9     trial, could go to a second phase.  Now, in Ohio,

10    just because someone is found guilty of murders,

11    does not mean that they automatically face capital

12    punishment.  Our legislature, in reviewing the

13    matter back in the 80's in the statute that covers

14    aggravated murder included certain things that we

15    call specifications, and that is if murder occurs,

16    under certain circumstances, certain things occur at

17    the same time, then the possibility of the death

18    penalty arises.  This particular case, there are

19    circumstances, specifications, in the indictment

20    which alleges that certain circumstances are

21    present.  Now, the burden is always upon the State

22    to go forward.  The Defendant and her attorneys need

23    do nothing during the entire trial, if they care to.

1      The State has to prove all elements beyond a

2      reasonable doubt.  It's the highest burden of proof

3      that we have.  I am sure that the attorneys will get

4      into a little bit about what that means.

5                  The thought arises why do we ask these

6      questions at this point in time, because we haven't

7      had the trial and it may never come up, if the

8      Defendant is found not guilty.  But the problem is,

9      if we would not review this now, if in fact the

10     State proves their case and we get to that second

11     phase, you may have somebody  on this jury that

12     believes in an eye for eye.  And if you take a life,

13     you forfeit your life.  Well, that isn't the law of

14     Ohio.  And that person could not possibly be fair to

15     the Defendant because the Defendant has the right to

16     have the jury look at a range of circumstances and

17     factors involved.  That second phase, if we get to

18     that, the  prosecution will be call upon to prove

19     beyond a reasonable doubt that these aggravating

20     circumstances, that is, reasons why the jury should

21     consider and impose the death penalty, outweigh the

22     mitigating factors, which are reasons put before the

23     jury to show why the Defendant should not receive

 1     the death penalty, but should receive a lesser

 2     penalty and there are three different possible life

 3     in prison listed in that paper.

 4             Likewise, if you had a person who could

 5     under no circumstances ever consider imposing a

 6     death penalty that was on the jury, then the State

 7     couldn't get a fair trial.  So, what these folks are

 8     after are people somewhere in the middle.  Everybody

 9     has their own opinion about the death penalty, some

10     haven't thought about it too much, but you kind of

11     have a feeling about the death penalty, some are

12     more in favor of it, others are not.  And that is

13     fine, everybody has their own opinion.  What they're

14     searching for is to find out if you have anything in

15     your belief system that would make it difficult or

16     impossible for you to follow the law.  The law of

17     Ohio says that under certain circumstances, the

18     State has the right to ask for the death penalty if

19     they prove their case beyond a reasonable doubt.

20             Now, the other issue that they will

21     touch upon is the question of pretrial publicity.

22     This case garnered some media attention, as any case

23     of type would, and many of the folks that live in

1   the area take the <u>Vindicator</u> and the <u>Tribune</u> and

2   read about the matter.  So, the questions that will

3   be put to you along that line are, is there anything

4   so fixed in your mind that you would not be able to

5   set it aside.  That would not be evidence, anything

6   that you may of heard about the case before.  And in

7   order for both sides here to have a fair trial, it's

8   going to be with a jury that is able to determine

9   the facts of this case strictly on the evidence that

10  will be given within this Courtroom.  And you have

11  to take that evidence, find the facts and apply the

12  law as it will be given by the Court, okay.

13              MICHAEL ARCURI:  Okay.

14              THE COURT:  Very good.  Mr. Becker.

15              ATTY. BECKER:  Thank you, Your

16  Honor.

17

18  **EXAMINATION BY ATTORNEY BECKER:**

19              ATTY. BECKER:  Good afternoon.

20              MICHAEL ARCURI:  Good afternoon,

21  sir.

22              ATTY. BECKER:  Is it Arcuri?

23              MICHAEL ARCURI:  Yes, sir.

1          ATTY. BECKER:  Okay, I just want to

2     make sure that I pronounce that correctly.  Mr.

3     Arcuri, my name is Chris Becker and I work for the

4     County Prosecutor's Office.  Mr. Bailey and I have

5     the responsibility of presenting and prosecuting

6     this case.  I am going to elaborate a little more on

7     what the Judge said.  I assume you remember meeting

8     Mr. Bailey about three weeks from tomorrow, Tuesday,

9     April 8th, I believe, you were in the big courtroom

10    down the hall.

11          MICHAEL ARCURI:  Yes, sir.

12          ATTY. BECKER:  As well as Mr.

13    Juhasz and Mr. Ingram and their client as well?

14          MICHAEL ARCURI:   Yes, sir.

15          THE COURT:  They represent Donna

16    Roberts.  The purpose of this is to determine

17    whether a juror that both the State and the

18    Defendant would want in this particular case.  You

19    may be, you may not be.  We had a lot of people come

20    in here and say they couldn't impose the death

21    penalty or that they would not consider the death

22    penalty.  And we also had people come in and would

23    only put the death penalty -- that they would only

1    consider the death penalty and the death penalty

2    only as a potential penalty.  Some people may know

3    some of the investigating officers or some of the

4    witnesses.  Some people may have pressing matters at

5    home.  But, basically, what we want to do, this is

6    the only opportunity that we get to ask you

7    questions and you get to ask us questions.  And it's

8    very, very important that we have some interaction

9    because once the case starts, we can have no

10   interaction with you once you are seated as a juror

11   and you sit in the jury box.  So, we can have no

12   conversations with you, and we're not trying to be

13   rude, but that is an ethic that we have to abide by

14   as attorneys.  So, this is really the only

15   opportunity that we're going to have to speak to you

16   about this case, and it's the only opportunity that

17   you have, more importantly, to speak to us about the

18   case and your views.

19                I am going to take a little bit

20   different tact.  First of all, I see that you are

21   not working because you suffered a permanent

22   disability.

23                      MICHAEL ARCURI:   Correct.

1           ATTY. BECKER:  I don't want to be

2      nosey or anything, but is that permanent disability,

3      would that affect you in terms of being a juror in

4      this case and maybe being here two or three weeks?

5           MICHAEL ARCURI:  No, I had a

6      stroke in '85 or '86.

7           ATTY. BECKER:  But that wouldn't

8      affect you in terms as being able to sit as a -- I

9      mean, some people maybe have a knee or a leg or

10     something and can't sit or a bad back or something,

11     and they can't sit and maybe get migraine headaches

12     or something like that.  I just want to make sure

13     that you could serve as a juror in this case.

14           MICHAEL ARCURI:  Yes.

15           ATTY. BECKER:  Nothing medical that

16     would prohibit  --

17           MICHAEL ARCURI:  I take medication,

18     but I take that in the morning, so.

19           ATTY. BECKER:  Okay, but there may

20     come a point in this case where you may be

21     sequestered and have to be put up in a hotel room a

22     couple of nights, and I am assuming you can just

23     bring your medicine along?

1           MICHAEL ARCURI:  Right.

2           ATTY. BECKER: Okay, I didn't want

3   to get to the end of the questioning and have you

4   say, by the way, I've got a bad back and lost two or

5   three vertebrae and I can't sit for any lengthy

6   period of time.

7           Let's talk about the first issue, which

8   was the death penalty.  It's my understanding that

9   you are -- you do believe that the death penalty is

10  an appropriate punishment in some cases.

11          MICHAEL ARCURI:  Correct.

12          ATTY. BECKER:  You are not so

13  convinced though or so in favor of the death penalty

14  that you would automatically give it to a person who

15  was convicted of a homicide offense or a murder?

16          MICHAEL ARCURI:  No.  Children is

17  my big thing.

18          ATTY. BECKER:  Okay, I think you

19  mentioned the Raymond Fife case?

20          MICHAEL ARCURI:  Right, something

21  that was that horrible and done to a little innocent

22  kid that couldn't defend himself, definitely.

23          ATTY. BECKER:  Okay.  You

1    understand, I think as the Court indicated to you

2    that the law in Ohio there are only certain offenses

3    that require the death penalty, or in which it's an

4    option.

5              MICHAEL ARCURI:  Uh-huh.

6              ATTY. BECKER:  All right, this case

7    does not involve the death of a child, it involves

8    the death of a man who I believe was in his 50's at

9    the time.  Would you be able to fairly consider the

10    death penalty in that type of a circumstance?

11              MICHAEL ARCURI:  Yes, as long as,

12    you know, evidence was shown to me that  --

13              ATTY. BECKER:  Right, and it has to

14    be shown one way or the other, you have to fairly

15    consider all four of those options.  But you will be

16    able to do that?

17              MICHAEL ARCURI:  Yes.

18              ATTY. BECKER:  Because I want to

19    make sure that you understand that this is not the

20    death of child, but if we get to a second phase,

21    which is the penalty phase, you may determine that

22    death is warranted, but if you're only going to

23    consider it for children then, obviously, we have a

1    problem with you serving because the victim in this

2    case is not a child.

3                    MICHAEL ARCURI:  Right, I

4    understand.

5                    ATTY. BECKER:  All right, this

6    case, and one of the reasons that we have to do

7    things this way and ask you about the death penalty,

8    is this case -- because this case is a capital

9    murder trial, it's the most serious crime in the

10   State of Ohio, has two phases.  We're going to have

11   one phase where we're going to determine the guilt

12   or innocence of Miss Roberts, and it's our burden,

13   Mr. Bailey and I, to prove to you beyond a

14   reasonable doubt that she committed the offenses

15   that she's charged with, and particularly the

16   aggravated murder offenses and what we call the

17   death specifications to those charges.  If we don't

18   prove our case beyond a reasonable doubt to you in

19   the first phase, there is no second phase.  We don't

20   even have to worry about punishment because you

21   would find, you would acquit her and find her

22   innocent and she would go home, and I would go home,

23   and the defense would go home.  And we would go

2705

1     back to more cases, but you folks would go home and

2     there would be no discussion about the death

3     penalty.  But we have to discuss about what

4     potentially could happen in this case and we have to

5     sort of talk about all of the things that could go

6     right for us or wrong for her, and where it would

7     put us in that second phase, and that sort of puts

8     us into this area asking you, sort of the cart

9     before the horse, what you would do if you were in

10    that death penalty section, or part of the case.

11    So, I don't want you to take it that the fact that

12    we're standing here talking about the death penalty

13    to think, oh, boy, she really did something wrong

14    because she's looking at that penalty.  You have to

15    find, you and your fellow jurors would have to find

16    her guilty in that first phase if we proved our case

17    beyond a reasonable doubt, even to get to that

18    second phase.  Do you understand that?

19                    MICHAEL ARCURI:   Yes, sir.

20                    ATTY. BECKER:  All right, the fact

21    that we're talking about the death penalty and this

22    is really the ultimate criminal penalty.  Does that

23    cause you some concern to think, well, she must be

1    guilty of something if they have her charged with a

2    death penalty offense?

3                    MICHAEL ARCURI:   No.  I watch

4    Court T.V. all the time, and I see people are in

5    prison and stuff and they're not guilty or, you

6    know.

7                    ATTY. BECKER:  Sure, that someone

8    else did the crime later on or used DNA and

9    exonerated them?

10                   MICHAEL ARCURI:  Right.

11                   ATTY. BECKER:  So, you come in here

12   with no preconceived notions about whether she is

13   guilty or innocent?

14                   MICHAEL ARCURI:   No, and I don't

15   really recall hearing anything about the case prior

16   to me getting summoned here.

17                   ATTY. BECKER:  And I do vaguely

18   recall that you put in your questionnaire that you

19   had maybe read an article or two but that was a

20   while back?

21                   MICHAEL ARCURI:   No, what

22   happened, when I came into the courtroom when we

23   were in that courtroom --

1                    ATTY. BECKER:  There was an article

2     that morning?

3                    MICHAEL ARCURI:  No, someone was

4     behind me talking about what it was.

5                    ATTY. BECKER:  Okay, and did that

6     make you remember something about the case?

7                    MICHAEL ARCURI:  No.

8                    ATTY. BECKER:  So you, prior to

9     April 8th, you never heard about this case?

10                    MICHAEL ARCURI:  If I did, I do

11    not recall it at all.  I may have been out of town.

12    My wife travels, she's a travelling nurse, so I

13    could have possibly been in Akron or somewhere like

14    that.

15                    ATTY. BECKER:  Do you go with her

16    sometimes?

17                    MICHAEL ARCURI:  Sometimes.

18                    ATTY. BECKER:  All right, when you

19    say you heard somebody talking about this case on

20    April 8th, I am assuming that is before the judge

21    came in and told people not to talk about the case

22    or read something about it?

23                    MICHAEL ARCURI:  Correct.

1           ATTY. BECKER:  All right, you

2    haven't talked to anybody about this case since

3    then, have you?

4           MICHAEL ARCURI:   No.

5           ATTY. BECKER:  And you've not read

6    anything on it or seen anything on television about

7    it?

8           MICHAEL ARCURI:   No, sir.

9           ATTY. BECKER:  So, you really come

10   in here with no preconceived notions whether it be

11   from someone you've spoken to or even those people

12   that you spoke or overheard, I guess, in the

13   Courtroom, that she's guilty or innocent?

14          MICHAEL ARCURI:  No, I have no

15   notion at all.

16          ATTY. BECKER:  All right.  Now, and

17   that's good because that sort of leads us into our

18   next topic here.  You've heard of the presumption of

19   innocence, I assume, since you watch some Court T.V.

20   and what not?

21          MICHAEL ARCURI:  Yes.

22          ATTY. BECKER:  And, basically, that

23   is the rule of law that we have in this system of

1    justice here in the United States; that Miss Roberts

2    is presumed innocent until and unless the State

3    proves her guilty beyond a reasonable doubt.  So,

4    even though we're sitting here talking about all of

5    these terrible things that can happen to her, lethal

6    injection for the death penalty, and maybe life in

7    prison with no parole or life in prison after 30

8    years, or life in prison after serving 25 years, she

9    is presumed innocent and she is, in fact, innocent

10   unless and until we prove our case, correct?

11              MICHAEL ARCURI:  Correct.

12              ATTY. BECKER:  And you will allow

13   Miss Roberts her presumption of innocence throughout

14   these proceedings, will you not?

15              MICHAEL ARCURI:  Sure, I would want

16   it to me.

17              ATTY. BECKER:  Exactly, you would

18   want the same precautions taken against you, if you

19   were accused of some heinous kind of crime, correct?

20              MICHAEL ARCURI:  Correct.

21              ATTY. BECKER:  In this Country, and

22   in there is a number of different ways that cases

23   can be brought.  Generally, in Ohio, most cases, the

1    majority of criminal cases, are charged by the grand

2    jury.  They are charged with a grand jury

3    indictment.  I know you are a uncle of Chris

4    O'Rourke?

5                 MICHAEL ARCURI:  Yes.

6                 ATTY. BECKER:  Are you familiar at

7    all with the grand jury process from either him or

8    maybe Court T.V.?

9                 MICHAEL ARCURI:   Some college

10   classes.

11                ATTY. BECKER:  Okay, but you

12   understand that the grand jury of Trumbull County

13   they meet every two weeks, and they are a different

14   jury than a petit jury, which is what we're picking

15   here.  Your and your 12 jurors are called the petit

16   jury.  The grand jury, though, is selected a little

17   bit differently, and they meet down on the second

18   floor.  There is a special room for them, and they

19   meet, like I say, once every two weeks.  There is no

20   Judge in the room with them, there is no defense

21   attorney with them, very rarely, if ever, is the

22   Defendant even in the room, and when they vote, it

23   only takes seven of the nine voting members of the

1     grand jurors to issue an indictment.  So, they can

2     issue an indictment based on a 7 to 2 vote.  Now, I

3     don't know, and I can't tell you if I did know, how

4     they voted to indict Miss Roberts.  But there was an

5     indictment issued against her, which is really just

6     a piece of paper accusing her of things.  The fact

7     that she is indicted does not affect your

8     presumption of innocence that you are giving her,

9     does it?

10            MICHAEL ARCURI:   It doesn't affect

11    me, no.

12            ATTY. BECKER:  You understand that

13    is just the legal paperwork that gets this whole

14    ball of wax going that gets us to this point?

15            MICHAEL ARCURI:  Correct.

16            ATTY. BECKER:  Just about every

17    Defendant in Trumbull County is indicted by the

18    grand jury, and every Defendant has the right to

19    proceed to a jury trial.  In fact, there is another

20    jury trial going on on the second floor, right below

21    us, in the Courtroom below.  The same kind of

22    circumstance, somebody was accused of crime by the

23    grand jury and an indictment was issued, and now

1    that Defendant is going to trial.  So, you don't

2    take the grand jury process and the indictment for

3    anything other than an accusation, which is what it

4    is?

5                      MICHAEL ARCURI:  Right.

6                      ATTY. BECKER:  And it's now Mr.

7    Bailey's and my responsibility to prove that

8    indictment that she is guilty of those items or

9    charges by proof beyond a reasonable doubt, correct?

10                     MICHAEL ARCURI:  Correct.

11                     ATTY. BECKER:  Now, that is going

12   to bring us to our next point.  You watch a lot of

13   Court T.V., and I am certain that you are familiar

14   with the term reasonable doubt?

15                     MICHAEL ARCURI:  Yes.

16                     ATTY. BECKER:  In this particular

17   case, Judge Stuard will give you a definition that

18   may vary, and probably will be a little different

19   than some of the other cases that you've heard maybe

20   around the country.  Every jurisdiction has a little

21   bit different definition of what it is, but one of

22   my law professor's used to say that reasonable doubt

23   is like having a glass of water and filling that

1    glass of water up to maybe an inch or half an inch

2    from the top of the cup.  That is reasonable doubt.

3            There is another standard of proof that

4    we use and that is, preponderance of the evidence.

5    And preponderance is just the glass half full.  That

6    is the kind of evidence that we use if we were, say

7    for instance, Mr. Bailey and I represented a client

8    who was injured in a car wreck, and Miss Roberts was

9    alleged to have run into him, and we were asking for

10   money.  And a guy came in wearing a neck brace and

11   had some vertebrae broken or something, and we're

12   asking to sue her, and we only have to prove our

13   case to that half full mark plus a drop of water,

14   and then whatever gets us over halfway, we win the

15   case.  If we don't get to halfway, then we don't

16   win.  But this case is a little bit different.  We

17   have to fill that glass a lot further.  Not to the

18   top, because that would be all doubt, and I can't

19   prove to you probably anything in this world beyond

20   all doubt.  I am standing here today and I have a

21   wedding band on, and I can probably pull out of my

22   wallet pictures of my wife and the kids.  That would

23   be proof to you that I am married and that I have

1   children.  And my wife may walk in here with all

2   four of my kids and sit in the back and wave at me

3   and say, hi, daddy, and you may see a wedding ring

4   on her finger.  You can probably presume then that

5   we're married.  But there is always the possibility

6   that we're just maybe living together or maybe that

7   is my sister, my sister brought down my children, or

8   something along those lines.  So, you can't really

9   hold us to that impossible standard of filling that

10  cup up all the way.  It's only reasonable doubt.

11          Do you believe that you could determine

12  the case that is as serious as this based on just

13  reasonable doubt and not all doubt?

14          MICHAEL ARCURI:  Sure.

15          ATTY. BECKER:  And reasonable doubt

16  is based on reason and common sense.  That is

17  something that probably every person that walks in

18  here probably has a good idea of what is right and

19  what is wrong, and under certain circumstances you

20  can make those decisions, even if it involves a life

21  and death situation like this, correct?

22          MICHAEL ARCURI:  Correct.

23          ATTY. BECKER:  Now, this case is

1    really going to have to -- we're going to have to

2    prove to you a number of criminal charges, there is

3    actually four counts that the grand jury indicted

4    Miss Roberts on.  There is aggravated burglary,

5    aggravated robbery, and then there are two

6    aggravated murder charges, and each aggravated

7    murder charge has what we call a death penalty

8    specification or specifications that make this

9    murder eligible for the death penalty.  The fact

10   that Miss Roberts is charged with two death penalty

11   offenses, it's just basically two different theories

12   on what we think happened, Mr. Bailey and I.  The

13   fact that there are two of those counts, does that

14   tend to you to think that maybe this case is maybe

15   worse or maybe weaker.  First of all, do you think

16   it's a weaker case because we had charged two

17   different counts of aggravated murder?

18              MICHAEL ARCURI:  No, not really, I

19   couldn't say.

20              ATTY. BECKER:  And on the other

21   side of that coin, you don't think that she must be

22   guilty of something because there is only one death

23   and she is indicted on two different counts of

1    aggravated murder.

2                    MICHAEL ARCURI:   No, in fact, I

3    was going to ask you, I thought it was only one

4    murder.

5                    ATTY. BECKER:  Yes, there is only

6    one death alleged here, but because we have two

7    theories of the case, we're going to present to you

8    two counts of aggravated murder for only one death,

9    and that happens quite often in a lot of cases,

10   different theories on the case.  And the Court will

11   tell you that you can find, if we prove our case,

12   you may be able to find the Defendant guilty of none

13   of the charges, just acquit her on all of them.  You

14   may find her guilty of some of them, but not guilty

15   of another, or you could find her guilty of all of

16   them.  That is going to be your job with your fellow

17   jurors.  So, the fact that there are two actual

18   murder charges, that doesn't bother you one way or

19   the other?

20                    MICHAEL ARCURI:  No.

21                    ATTY. BECKER:  One of the things

22   that is involved in this case is, and Mr. Bailey and

23   are going to be very up front with you right now.

1    This case does not, and the allegation is not that

2    Miss Roberts pulled the trigger and actually killed

3    the decedent in this case.  The allegation in this

4    case is that she helped someone else do that.  That

5    she is what we call, the legal term is, aider and

6    abettor.  Basically, that means a helper, and that

7    is the allegation against Miss Roberts.  The fact

8    that she is not the person who killed the decedent

9    in this case, and the fact that she is an aider and

10   abettor, rather than what we call the principal

11   offender, the actual shooter, does that change

12   anything for you?

13           MICHAEL ARCURI:  No, basically, I

14   would have to hear the  --

15           ATTY. BECKER:  You would have to

16   hear the determination.  And even if the State were

17   to prove the allegation was true, that she was, in

18   fact, an aider or abettor or helper, you could then

19   still fairly consider the death penalty even if she

20   was not alleged or not proven to be the shooter?

21           MICHAEL ARCURI:  Yes.

22           ATTY. BECKER:  If the law allowed

23   it?

1               MICHAEL ARCURI:  Right.

2               ATTY. BECKER:  Now, this case, as

3     well as almost all criminal cases, involve what we

4     call some element of circumstantial evidence.  And I

5     am sure that you have probably seen that on Court

6     television, the use of circumstantial evidence or

7     the discussion of circumstantial evidence.  And it's

8     basically you and your jurors will have the ability

9     to make an inference, if you want, you are not

10    required to, but if you do make an inference from a

11    fact, that circumstantial evidence has the same

12    weight as direct evidence.  And one of the examples

13    we have been using here for the last few days is, I

14    have four children at home, and some times my son,

15    he will be down in the basement with his whiffle

16    ball bat, he will swing it, throw up a nerf ball and

17    whack it against the wall.  He's not supposed to do

18    that, but he does it, particularly, with the cold

19    winter like we've had, he did a lot of that.  So I

20    may come downstairs and find him with a whiffle ball

21    bat in his hand, hear my youngest daughter screaming

22    at the top of her lungs and holding her head, and my

23    son is standing about two feet away from her

1    swinging this bat.  I never saw him hit her with it

2    but I can make the inference that he struck her in

3    the head with it.  It might be accidentally, but I

4    can make that inference, right?

5                    MICHAEL ARCURI:   Right.

6                    ATTY. BECKER:  And you can make

7    those inferences too?

8                    MICHAEL ARCURI:  Sure.

9                    ATTY. BECKER:  Some times those

10   inferences lead to other inferences.  For instance,

11   my youngest daughter, maybe she was throwing the bat

12   up in the air and she hit herself in the head with

13   the bat, and I come down and my son was trying to

14   get the bat from her because he knows that he's not

15   allowed to swing and throw the bat around, and he's

16   afraid she's going to get in trouble and just sort

17   of catch him at the most inopportune time and the

18   wrong time.  That's an inference too, right?

19                   MICHAEL ARCURI:  Correct.

20                   ATTY. BECKER:  But there is facts

21   and evidence some times that leads you to believe

22   that certain things are probably more true than the

23   other, right?  One set of circumstances may be true

1     -- for instance, if I come downstairs and my

2     daughter's got three or four Barbie dolls, she's got

3     Barbie's swimming pool and the Barbie mini van

4     there, and she's got two Barbie's in each hand  and

5     she's holding one like this, and my son is standing

6     there with the bat in hand, I can probably assume

7     that he is the one who did it, right?

8             MICHAEL ARCURI:  Uh-huh.

9             ATTY. BECKER:  And also some times

10     the look on his face may be a dead give away in

11     terms of, you know, he gets a, oh, my God, I have

12     fear of God, and here comes dad down the steps, and

13     I get caught with the bat, or some times he may

14     adamantly deny that he ever did anything.  He might

15     be, no, she threw it.  So, we have to look at those

16     whole set of circumstances before we can make those

17     inferences, right?

18             MICHAEL ARCURI:  Correct.

19             ATTY. BECKER:  But you will be able

20     to make those inferences in this case, correct?

21             MICHAEL ARCURI:  Sure.

22             ATTY. BECKER:  On a bigger scale?

23             MICHAEL ARCURI:  Sure, sure.

1            ATTY. BECKER:  Now, in this case,

2    well let me give you a little hypothetical here.

3    You were here before the lunch hour, right?

4            MICHAEL ARCURI:  Yes.

5            ATTY. BECKER:  And I apologize for

6    keeping you here into the afternoon.

7            MICHAEL ARCURI:  That's all right.

8            ATTY. BECKER:  Let's assume you

9    went out this afternoon, and there was a big traffic

10   wreck down here on High and Park Avenue, right here

11   on the corner, right outside the Courthouse square.

12   And now it comes for trial and we're going to have

13   the trial this afternoon, let's be a little

14   ludicrous here, but let's assume that we're going to

15   have the trial this afternoon.  Mr. Bailey and I are

16   prosecuting the guy who ran a red light on the

17   corner of High and Park Avenue, and the testimony is

18   going to be that the guy hopped in his Z28 and was

19   down at the Warren Municipal Court, and he just had

20   to pay $150.00 fine for speeding somewhere else.  He

21   jumps in his car and tears out of the police

22   department at Municipal Court down the street there,

23   gets on Park Avenue, zooms up Park Avenue, blows  a

```
 1      red light at Market and Park and blows the red light

 2      here and hits a guy who is coming down from the east

 3      side of High and going down to the Courthouse, where

 4      he crashes into him.  And we're prosecuting him for

 5      running that red light, and we're only going to

 6      present to you one witness, and that one witness

 7      happens to be the Reverend from the Catholic Church

 8      down the street, the minister of the Catholic

 9      Church, the priest.  And we bring in the priest and

10      he says, you know, I have been preaching at this

11      church for 20 some years, for the last 20 years, I

12      walk around the block here, walk around Courthouse

13      Square, and I walk around all the buildings, and I

14      make like a 7 or 8 block loop, and I do it for two

15      or three times.  And I am real careful when I cross

16      the street downtown because I know there is a lot of

17      very bad drivers down here.  And even though I may

18      have the walk light and the green light, I always

19      look both ways.  And the guy's never been convicted

20      of a crime, he's a holy man here in the city and

21      very well respected.  And he says, on this

22      particular day, I was getting ready to cross the

23      street, I see the walk sign, I see the green light,
```

1    but I don't want to step into the street, because I

2    know some drivers are bad drivers.  So, I look to

3    the left, and I don't see anything to the North Park

4    Avenue, but I look to the right down south, and from

5    the Warren Municipal Building, I see this car making

6    a beeline and it's crossing Market and Park Avenue,

7    blows through that red light, and he's got to be

8    doing 70 miles an hour, and he comes through the

9    intersection that I am standing at, High and Park,

10    and he plows into this poor guy who is coming down

11    from the east on High.  That one witness would

12    probably be enough to prove to you beyond a

13    reasonable doubt that the guy went through the red

14    light, correct?

15              MICHAEL ARCURI:  I wouldn't think

16    that he would have a reason to lie, and I'm not

17    saying that because he's a priest.

18              ATTY. BECKER:  Right.  But, you

19    would agree, though, that one person could probably

20    prove a case, a criminal case, if he was accurate

21    enough?

22              MICHAEL ARCURI:  Yes, if they were

23    accurate, but --

```
 1                    ATTY. BECKER:  And I understand
 2     that you have to be careful.  Let's change the
 3     example a little bit.  Let's say now we have four
 4     guys and four guy's are coming down High Street, and
 5     they're at the corner of Park and High Street, and
 6     they have been drinking at Maddigan's all day.  They
 7     got there at 6:00 in the morning and they've been
 8     drinking all day.  All four of them got into a fist
 9     fight down there, all four of them -- three of them
10     wear glasses and one of them wears contacts, three
11     of the guys that have glasses, they got broke in the
12     fight.  The guy who has contacts, both got knocked
13     out in the fight and he couldn't find them, and they
14     are stumbling down the street here and they see the
15     same thing as the priest, except for they are also
16     related to the driver of the guy that got hit, the
17     victim.  That is the guy that was going to come and
18     pick them up Maddigan's, but they have been thrown
19     out because of this fight.  It's also their cousin
20     who is coming to pick them up so they can go
21     drinking some more.  Now, they tell you that they
22     saw this guy going through the light down there and
23     going through the light here.
```

1              Are you going to give their testimony

2       the same weight as you would maybe the reverend or

3       the minister?

4                     MICHAEL ARCURI:  No.

5                     ATTY. BECKER:  And that is the kind

6       of thing that you will have to do as a juror, right?

7                     MICHAEL ARCURI:  Yes.

8                     ATTY. BECKER:  You have to look to

9       see who is telling the truth, who has biases and

10      interests in the case.  What is the people's

11      motivation for saying the things they do, who is in

12      the best position to see something or do something,

13      whether they have any experience.  I mean, if it's a

14      traffic cop that is out here, and he's directing

15      traffic and he directs traffic there everyday, and

16      he sees an accident, you are probably going to

17      believe him a little bit more than somebody who is

18      new in town and didn't know which direction was

19      what, and maybe had glasses as thick as a coke

20      bottle and had them off and was cleaning them with

21      his tie when the accident happened, right?

22                    MICHAEL ARCURI:  That would give

23      him more weight.

1              ATTY. BECKER:  Sure.  That is what

2      you have to do, you have to determine what witnesses

3      you are going to give the most weight to, and what

4      witnesses you are going to give no weight to, and

5      what witnesses you are going to give some weight to,

6      because the Court, again, is going to tell you that

7      you can believe as a juror, all of the testimony of

8      any witness, some of the testimony of any witness,

9      or none of the testimony of any witness.  You

10     understand that?

11             MICHAEL ARCURI:  Correct.

12             ATTY. BECKER:  Okay, and you will

13     be able to make those determinations?

14             MICHAEL ARCURI:  Yes, sir.

15             ATTY. BECKER:  Now, I am assuming,

16     particularly since you are related to Officer

17     O'Rourke, that you have heard of some dumb things

18     that criminals have done?

19             MICHAEL ARCURI:  Yes.

20             ATTY. BECKER:  And you've probably

21     seen some of it on T.V.  As much as people try and

22     cover their tracks, and maybe commit the perfect

23     crime, sometimes they blow it, right?

1                      MICHAEL ARCURI:  Uh-huh.

2                      ATTY. BECKER:  And you think to

3          yourself, gee what an idiot, right?

4                      MICHAEL ARCURI:  Yes.

5                      ATTY. BECKER:  One of the examples,

6          that -- I know personally that I've heard of the

7          story about some guy's going to do a bank robbery.

8          He and his buddies get together, they get the car

9          tuned up the day before and make sure the tires are

10         all inflated, and they make a route on how they are

11         going to get back to their place and count up the

12         money after they do the bank robbery.  They check

13         the timing of the lights, they make sure they know

14         when the shift changes at the police station so they

15         can hit the place right when all of the police are

16         changing shifts, and the guy's that are on duty are

17         going home, and the new guys are just getting in and

18         finding out what is going on, and they make sure

19         they commit it on the farthest part of town, away

20         from the police station.  And the guy puts his hat

21         on, puts his dark sunglasses on, and he even puts on

22         a fake beard and mustache, and puts on the clothing

23         and and sort of slouches in so they won't be able to

1    tell how high he is.  And goes up to the teller and

2    puts the gun in the counter and puts a note

3    demanding all of the money, and the note says, give

4    me all of the cash.  And he stuffs it in there, and

5    takes off.  Well, lo and behold, they turn the note

6    over, and on the note is his name and address.  It's

7    his water bill that he got last month that he wrote

8    the note on.  You've heard some crazy things like

9    that, right?

10                   MICHAEL ARCURI:  Yes.

11                   ATTY. BECKER:  Okay, so despite the

12   fact that criminals for the most part want to do

13   their deeds and not be caught and not be seen,

14   you've heard of and it's possible that the best laid

15   plans can go astray, right?

16                   MICHAEL ARCURI:  Sure.

17                   ATTY. BECKER:  Is there anything

18   that you feel that you need to advise us of, maybe

19   anything you can or can't do in this case, or any

20   questions you have about serving as a juror in this

21   capital murder case?

22                   MICHAEL ARCURI:  The only thing

23   that I was concerned with because I have been

1    calling in for awhile, is the length of time?

2                     ATTY. BECKER:  Okay, well, we

3    anticipate, hopefully, that we're going to get

4    started next week, and we will actually start, and

5    if you're selected, you will be seated as a juror.

6    It may go two or three weeks, and you may have to be

7    sequestered and actually put up in a hotel room for

8    maybe a night or two or maybe even three nights

9    while your deliberating.  Is that going to be a

10   problem for you or your family?

11                    MICHAEL ARCURI:   No.  I think my

12   wife is -- right now, she's in Akron, so she's

13   coming back and forth, but she goes to Cincinnati on

14   her next assignment, and I only have the one child,

15   a ten year old.

16                    ATTY. BECKER:  Do you have

17   relatives maybe that can watch her if it would come

18   to that?

19                    MICHAEL ARCURI:  Sure, yeah, my

20   parents just live down here in Warren, so.

21                    ATTY. BECKER:  So even though it

22   might be a little bit of an inconvenience, you could

23   work around that?

1                    MICHAEL ARCURI:  Sure.

2                    ATTY. BECKER:  All right, when do

3      you think your wife will be out of town?

4                    MICHAEL ARCURI:  She will be out

5      of town -- she leaves some time in the middle of May

6      and that assignment goes in through probably the

7      beginning of July.

8                    ATTY. BECKER:  Okay, hopefully, we

9      will not go that long.  I mean,we're hoping --

10     hopeful that we will be done well before Memorial

11     Day, a week before Memorial Day, but sometimes you

12     can never tell how long things are going to go and

13     that is why we say two or three weeks.  And I know

14     that you have been kind of on the hook here for

15     awhile, you had to call the number, I guess, quite a

16     few times and they said to call back Tuesday or

17     Wednesday or Thursday or whatever.

18                   MICHAEL ARCURI:  It just seemed

19     longer than I -- well, I've ever never done it

20     before, so.

21                    ATTY. BECKER:  Right.  And you

22     understand that this is an important case, correct?

23                   MICHAEL ARCURI:  Correct.

```
 1                    ATTY. BECKER:  And you understand,
 2      obviously, that it is a very serious case.  One of
 3      the other things that we will have to work through
 4      and get over, I guess, is you will probably see some
 5      photographs that are very disturbing because they do
 6      involve the death of a Robert Fingerhut, who is the
 7      victim in this case.  You wouldn't feel that you had
 8      to convict Miss Roberts because of something you saw
 9      or heard, perhaps the coroner's testimony or perhaps
10      because there is an individual that is dead here.
11      You wouldn't say, well, I got to convict here, there
12      is a guy dead.  You wouldn't do that, would you?
13                    MICHAEL ARCURI:  No.
14                    ATTY. BECKER:  And on the other
15      side of that coin, you wouldn't say, well, listen, I
16      sat here for two or three weeks, and the State has
17      proved its case to me beyond a reasonable doubt, it
18      proved all of the elements of the crime beyond a
19      reasonable doubt but, you know, I kind of become
20      kind of close to Miss Roberts, I see her over there,
21      I feel sorry for her.  You know, she is an older
22      woman, I feel sorry for her, how can she have
23      possibly done this, I really can't find her guilty
```

1    even though the State proved to me their case.  You

2    wouldn't do that either, would you?

3                    MICHAEL ARCURI:  No.

4                    ATTY. BECKER:  So, as hard as it

5    may be, you will be able to separate any sympathy

6    that you have for either side?

7                    MICHAEL ARCURI:  Sure.

8                    ATTY. BECKER:  Okay.  I know that

9    your relationship with Officer O'Rourke, how are you

10   related to him?

11                    MICHAEL ARCURI:  He's my sister's

12   youngest boy.

13                    ATTY. BECKER:  And some times it

14   might be difficult if you had to give a verdict that

15   maybe was not for the State, a not guilty verdict,

16   that wouldn't create any problems one way or the

17   other, he's not involved in this case to any extent?

18                    MICHAEL ARCURI:  No, he's more or

19   less a narcotics officer.

20                    ATTY. BECKER:  Right, exactly,

21   right, but you worry about going to the jury room

22   and say, well, boy, I have to find this woman guilty

23   because even though the State didn't prove their

1     case, boy, my nephew, he works for the Warren Police

2     Department, he's going to be all over me if I don't

3     find this woman guilty.  He is going to say, what

4     the heck is wrong with you.  And on the other side

5     of the coin, you wouldn't do something like that,

6     would you?

7                     MICHAEL ARCURI:  He would never be

8     all over me.

9                     ATTY. BECKER:  You indicated on

10    your questionnaire that you thought one of the

11    problems we have is over crowded jails and prisons.

12    You wouldn't take that, I guess, that feeling and

13    say, well, one of the easy ways to have -- or reduce

14    overcrowding is to give the death penalty to some

15    people and she's going to be one of them?

16                    MICHAEL ARCURI:   No, no, because

17    as far as I know, they sit in there for 10 years or

18    better anyhow.

19                    ATTY. BECKER:  Okay.

20                    MICHAEL ARCURI:  To be convicted of

21    it.

22                    ATTY. BECKER:  Any other questions

23    you want to ask?

1              MICHAEL BECKER:  No, but what do

2      you wear basically to  --

3              ATTY. BECKER:  Whatever you're

4      comfortable in.

5              MICHAEL ARCURI:  All right, I know

6      I under dressed today, but I didn't know that I was

7      going to be in the courtroom, I thought it was just

8      a little --

9              ATTY. BECKER:  Believe me, I would

10     be dressed the same way you were, if I could.  It's

11     a nice day out there.  Whatever is comfortable for

12     you.  Whatever you feel comfortable, I am sure,

13     particularly since its been warm in here you can

14     wear shorts, I think if the Judge permits it.  Thank

15     you, very much for your time.  Mr. Ingram or Mr.

16     Juhasz are going to ask you some questions.

17

18     **EXAMINATION BY ATTORNEY JUHASZ**:

19              ATTY. JUHASZ:  Hi, Mr. Arcuri.  Do

20     you need some water or something?

21              MICHAEL ARCURI:  No, I'm fine.

22              ATTY. JUHASZ:  If you do while

23     we're talking, just stop me and let me know, okay?

```
1                    MICHAEL ARCURI:  Sure.

2                    ATTY. JUHASZ:  My name is John

3    Juhasz.  I don't know if you remember when the Judge

4    introduced us, or had us introduce ourselves a

5    couple of weeks ago now.  Jerry Ingram and I

6    represent Donna Roberts.  And like Mr. Becker, I am

7    also going to ask you some questions.  It's a little

8    bit different procedure than we usually do even in

9    an ordinary criminal trial, but that is because of

10   the seriousness of the case.  Really, what we're

11   trying to do is, find a jury of the same type that

12   you would want, or if you had loved one who was

13   sitting over there with an offense, that you would

14   want.  Does that sound fair to you?

15                    MICHAEL ARCURI:  Sure.

16                    ATTY. JUHASZ:  In fact, I think you

17   sort of hit on the idea when you were answering Mr.

18   Becker's questions, you thought the presumption of

19   innocence was a good idea because if you were

20   sitting over there, you would want to be presumed

21   innocent, right?

22                    MICHAEL ARCURI:  Definitely.

23                    ATTY. JUHASZ:  Its been a couple of
```

1   weeks now since you learned that this was a death

2   penalty case, correct?

3                   MICHAEL ARCURI:  Correct.

4                   ATTY. JUHASZ:  Have you had any

5   thoughts about that, about being a juror in a death

6   penalty case in the weeks that have intervened since

7   you learned about it?

8                   MICHAEL ARCURI:  Truthfully, no.  I

9   am in the middle of trying to sell my house and I

10  have been spring cleaning and all of that, and my

11  wife has been working, and I got the ten year old,

12  and the war going on, so I have been preoccupied.

13                  ATTY. JUHASZ:  So your mind has

14  been preoccupied with other things?

15                  MICHAEL ARCURI:  Right.

16                  ATTY. JUHASZ:  I thought I heard

17  you say, before I get too far into this, I want to

18  make certain.  I thought you said your wife goes to

19  Cincinnati about the middle of May, correct?

20                  MICHAEL ARCURI:  Correct.

21                  ATTY. JUHASZ:  Now, if we're in

22  trial then or you end up getting sequestered, are

23  you going to be able to make arrangements for your

2737

```
 1    child?
 2               MICHAEL ARCURI:   Sure, because I
 3    don't typically go with her unless it's a real long
 4    period of time, you know.
 5               ATTY. JUHASZ:   If I understand it,
 6    before you went down to Judge Logan's Court a couple
 7    of weeks ago, you really didn't know much about this
 8    case at all?
 9               MICHAEL ARCURI:   No, sir.
10               ATTY. JUHASZ:   The basic
11    allegations, the claim the government is making here
12    is basically that Donna and another fellow by the
13    name of Nate Jackson got together and cooked up a
14    scheme to kill a fellow by the name of Robert
15    Fingerhut.  Now, Robert and Donna had been married
16    previously.  After they divorced, they continued to
17    live together over in Howland, and to work together
18    at the Youngstown and Warren Greyhound Bus Stations.
19    During the course of this trial, if selected as a
20    juror, first of all, you may hear evidence to
21    suggest to you or convince you that Mr. Jackson did,
22    in fact, kill Mr. Fingerhut.  But do you appreciate
23    that trial is about the guilt or innocence of Donna
```

1    Roberts and not Nate Jackson?

2                MICHAEL ARCURI:   Yes, sir.

3                ATTY. JUHASZ:   The real issue in

4    this case is, did she help him do whatever the

5    government claims that he did, do you see that?

6                MICHAEL ARCURI:   Yes.

7                ATTY. JUHASZ:   One of the things

8    that they may try to do in order to persuade you

9    that Donna is guilty, is to introduce some letters

10   written by Donna and some tapes of some telephone

11   conversations between Donna and Mr. Jackson, and I

12   am going to tell you straight up front that those

13   letters and tapes are sexually explicit, some times

14   to the point, frankly, of being offensive.  The

15   reason that I bring that up is, I need to know from

16   you, sir, if you find that to be true, if you find

17   that you're offended by what you read or what you

18   hear, you understand, of course, that doesn't always

19   substitute for proof about whether or not she did

20   it.  You see that?

21               MICHAEL ARCURI:   Right, yes.

22               ATTY.  JUHASZ:   You may say, I

23   don't approve of what these people are saying, it

1   offends me, but still if it doesn't constitute

2   evidence, it would be unfair to hold that against

3   her in terms of the proof in the case, do you see

4   that?

5               MICHAEL ARCURI:  Sure.

6               ATTY. JUHASZ:  Any problem

7   separating those two in your mind?

8               MICHAEL ARCURI:  None at all.

9               ATTY. JUHASZ:  Very good.  Even

10  though you have not heard much about it, I am sure

11  you know because of the extra steps that we have

12  taken and some of the questions you are being asked

13  that this is a case that has generated some

14  publicity.  Now, that having been said, it is some

15  times fashionable for people who call talk radio or

16  just read the newspaper and sit around and talk over

17  coffee or at the water cooler, to some times

18  criticize what juries do even though they weren't

19  here to hear the evidence.  Am I making sense to

20  you?  Sometimes people call Dan Ryan or some other

21  show and say, what was that jury thinking, how could

22  they have done that?

23              MICHAEL ARCURI:  Yeah, I've heard

2740

1      stuff like that, yeah.

2                      ATTY. JUHASZ:  The only reason I

3      bring that up is, you understand from what you've

4      read and from watching Court T.V., and the questions

5      that Mr.  Becker has asked you, that the State has

6      the burden of proof in this case, correct?

7                      MICHAEL ARCURI:  Sure.

8                      ATTY. JUHASZ:  If they don't meet

9      that burden of proof, would you have any problem

10     coming back with a verdict of not guilty?

11                     MICHAEL ARCURI:  No, I wouldn't.

12                     ATTY. JUHASZ:  Coming out and

13     sitting in this jury box and looking at Mr. Bailey

14     and Mr. Becker, and saying, I'm sorry, you didn't

15     meet your burden of proof?

16                     MICHAEL ARCURI:  Right in the eye.

17                     ATTY. JUHASZ:  Okay.  Although, and

18     I am clear that you did not read anything about this

19     case before?

20                     MICHAEL ARCURI:  I certainly don't

21     recall it.

22                     ATTY. JUHASZ:  You did hear some

23     conversations in the Courthouse, as I understand it?

1                        MICHAEL ARCURI:   Yes.

2                        ATTY. JUHASZ:  Let's take a second

3    and talk about those, if we can, and I am going to

4    ask you to hang in there with me for a minute and

5    let's try to walk through this and sort of recreate

6    a picture of what happened down there.  That was in

7    the other courtroom down the hall in Judge Logan's,

8    the big courtroom?

9                        MICHAEL ARCURI:  Correct.

10                       ATTY. JUHASZ:  On April 8th, the

11   day you were all called here?

12                       MICHAEL ARCURI:  Yes.

13                       ATTY. JUHASZ:  If you remember, can

14   you tell me when you walk in that big set of doors,

15   where did you end up, did you end up to the right or

16   to the left or in the middle?

17                       MICHAEL ARCURI:  Left up front.

18                       ATTY. JUHASZ:  Left up front, okay.

19   And were you seated or standing, if you remember?

20                       MICHAEL ARCURI:  Seated.

21                       ATTY. JUHASZ:  Do you remember if

22   anybody was standing up there or was everybody

23   pretty much seated?

1                    MICHAEL ARCURI:  Everybody was

2   seated there.  There were af few people along the

3   one wall and then along the back wall.

4                  ATTY. JUHASZ:  Okay.  If you can, I

5   want you to sort of look back to that day and

6   recreate for us what it is that you heard.  If I

7   understood your questionnaire, you didn't say

8   anything, you just kind of heard of what other

9   people had to say, correct?

10                MICHAEL ARCURI:  Yes.

11               ATTY. JUHASZ:  Tell me what it is,

12   first of all, what you remember hearing.

13              MICHAEL ARCURI:  Well, there was

14   an older gentleman talking to a younger lady.  I got

15   from the conversation sort of that she was a nurse

16   and he's been on several juries, grand juries, and

17   he loved it, and they said something about, I think

18   they mentioned Miss Roberts name that she had some

19   guy killed, her husband or something.

20               ATTY. JUHASZ:  Okay.

21            MICHAEL ARCURI:  But they were

22   talking the whole time before the Judge came in, and

23   I was actually disgusted with them because I was

1    sitting there saying, please shut up, you know,

2    because they just kept going on about him being on

3    the juries and her -- it sounded like she was kind

4    of disgusted with her nursing profession there and,

5    you know, but that was mostly what the conversation

6    was -- more of them talking about him being on the

7    juries and he loved it, and her a nurse and some of

8    her patient stuff.  Just more aggravating to me to

9    sit there and listen to them, you know.

10             ATTY. JUHASZ:  Okay.  Just humor me

11   again, for a second, because you probably know some

12   of this stuff because you watch Courtroom T.V.  but

13   one the things that lawyers do, is when they have

14   people talking about what they saw or what they

15   heard, they sort of do it in a way that people who

16   work there can sort of recreate their own mind.

17   That is why I asked you where you were seated, which

18   part of the courtroom you were in.  Now, if you can,

19   tell me where these folks were in relation to you.

20   That is, are they in front of you, behind you, off

21   to the side, this gentleman and the woman?

22             MICHAEL ARCURI:  The gentleman was

23   on my right rear, and she was right behind my head.

1            ATTY. JUHASZ:  And do you remember,

2    are you in the front row, or not all the way up to

3    the front?

4            MICHAEL ARCURI:  I was in the front

5    row and then there was chairs seated in front of

6    that.

7            ATTY. JUHASZ:  Did you ever turn

8    around and look at these folks?

9            MICHAEL ARCURI:  I kind of gave

10   them one of these numbers, you know, just a quick

11   glance.

12           ATTY. JUHASZ:  Okay and if I

13   understand you, this is not just a passing comment,

14   this is something that is going on for quite some

15   time, correct?

16           MICHAEL ARCURI:  They didn't shut

17   up the whole time they were sitting there until the

18   Judge walked in really.

19           ATTY. JUHASZ:  Are they talking in

20   -- they're probably not talking as loud as I am

21   talking to you right now, and I hope that you will

22   forgive me that is just sort of my courtroom voice

23   that I can't seem to shut off when I am on my feet,

2745

1       but they weren't whispering, I take it, because you

2       were able to hear what they were talking about?

3                       MICHAEL ARCURI:  Right.

4                       ATTY. JUHASZ:  In fact, so much so

5       because you couldn't even shut it out, right?

6                       MICHAEL ARCURI:  Yeah, I mean, I

7       was aggravated.

8                       ATTY. JUHASZ:  Did you notice if

9       they were talking to other people as well or were

10      they  --

11                      MICHAEL ARCURI:  I believe they

12      kept it between themselves, the conversation, and I

13      am sure that people sitting around had to hear them.

14                      ATTY. JUHASZ:  That was my next

15      question, if it was loud enough for other people

16      sitting around them would be able to hear them?

17                      MICHAEL ARCURI:  Right.

18                      ATTY. JUHASZ:  Because you were

19      able to hear them?

20                      MICHAEL ARCURI:  I even leaned

21      forward in my chair to  --

22                      ATTY. JUHASZ:  To try to get away

23      from it.

1          MICHAEL ARCURI:   Yeah.   If there

2    would of been another seat, I would of got up and

3    moved.

4          ATTY. JUHASZ:   We were pretty

5    jammed in there that day.

6          MICHAEL ARCURI:   Right.

7          ATTY. JUHASZ:   You said that it

8    disgusted you, did this gentleman or this lady

9    express any opinion about whether they thought Donna

10   Roberts was guilty or was it just something you took

11   from the way they were making the comments?

12          MICHAEL ARCURI:   I don't think that

13   they actually said that they thought she was guilty,

14   they just said she was accused of killing her

15   husband or something to that nature.

16          ATTY. JUHASZ:   Okay, you mentioned

17   that you turned around and kind of threw a glance at

18   this fellow, and I don't want to put words in your

19   mouth, don't let me do that.  But I have the

20   impression that you did that kind of hoping that

21   they would shut up?

22          MICHAEL ARCURI:   Yeah, and they

23   didn't shut up.

2747

1              ATTY. JUHASZ:  When you threw that

2    glance at them, were you able to see what this

3    person -- would you recognize them if you saw them

4    again?

5              MICHAEL ARCURI:  I would probably

6    recognize both of them, yeah.

7              ATTY. JUHASZ:  The lady too?

8              MICHAEL ARCURI:  Yes.

9              ATTY. JUHASZ:  Well, I didn't know

10   if you saw her because you said she was directly

11   behind you.

12             MICHAEL ARCURI:  Well, I had to

13   get up to go to the bathroom, and when I got back in

14   my seat, I took a look at her.

15             ATTY. JUHASZ:  Can you do your best

16   to tell me what they looked like, do you recall what

17   they looked like?

18             MICHAEL ARCURI:  Well, they were

19   both sitting, she was bigger than he was as far as

20   seat heights.  He had short like more gray hair than

21   mine, okay, and she had like wavy-type hair,

22   probably shoulder length.  I believe she had a

23   nurses outfit on like blue.

2748

1           ATTY. JUHASZ:  Those like scrub

2     type things they wear?

3           MICHAEL ARCURI:  Correct.

4           ATTY. JUHASZ:  And I am trying to

5     think the color.  Her hair wasn't real dark but the

6     color may of had -- I am on the color blind side and

7     I am thinking it was either a brown or it had an

8     auburn tint to it, something like that.  Average

9     facial features, nothing stuck out there.  That's

10    really about it.  They were dressed decent, you

11    know, he had decent clothes on and she had that

12    uniform-type thing on.

13          ATTY. JUHASZ:  Did either of them

14    mention any, specifically, any newspaper or T.V.

15    coverage, like I heard this on T.V., or I saw this

16    in the paper or anything like that?

17          MICHAEL ARCURI:  Not to my

18    recollection, no.

19          ATTY. JUHASZ:  Was the flavor of

20    their conversation such -- I'm sorry, before I ask

21    you that, forgive me.  Since you left that day, have

22    you seen them in the Courthouse when you've been

23    down here to come back to question you, you haven't

1      --

2                          MICHAEL ARCURI:   No.

3                          ATTY. JUHASZ:  All right.

4                          MICHAEL ARCURI:  This is my first

5      time back.

6                          ATTY. JUHASZ:  Okay, was the flavor

7      of their conversation such that if you had -- if you

8      were selected as a juror in this case and you showed

9      up and they were sitting there, would you feel

10     comfortable about that?

11                         MICHAEL ARCURI:  I know that I said

12     to myself, I hope if I get picked for this jury. I

13     hope that guy isn't there because they just talk too

14     much for me.

15                         ATTY. JUHASZ:  Was it just that he

16     talked too much or was it the nature of the

17     comments?

18                         MICHAEL ARCURI:  They really

19     weren't -- they really didn't seem to have -- how

20     would you say, preconceived notions, other than they

21     said that they heard that she had killed her

22     husband.  They weren't sitting there dwelling on the

23     fact of the case or anything, or anything that they

2750

1    had heard about the case, more or less it was just

2    B.S-ing and aggravating.  Because, I mean, they are

3    in a courtroom and I don't think that they she

4    should of been doing that there.

5              ATTY. JUHASZ:  And if I understood

6    you, they pretty much talked about it from the time

7    that you took your seat, or you took your seat -- do

8    you remember who was seated first?

9              MICHAEL ARCURI:  I was there and

10    then she came in and then the man was in after her.

11              ATTY. JUHASZ:  Other than those

12    conversations, have you heard anything else in the

13    courthouse, that day, either while you were in line

14    or when you went down, I think you had to go get

15    your questionnaires and had to go get that form to

16    sign when you were done, correct?

17              MICHAEL ARCURI:  Uh-huh.

18              ATTY. JUHASZ:  Did you hear any

19    other conversations, anything like what we talked

20    about here?

21              MICHAEL ARCURI:  No, I ran into an

22    old school mate that was here for the same reason

23    that I was.  And we didn't discuss anything other

1     than we hadn't seen each other in probably 15 years,

2     you know.

3                    ATTY. JUHASZ:  I think the Judge

4     mentioned this to you, we have to have rules for

5     everything that we do, maybe he didn't mention it

6     this way, but I think he talked to you about the

7     idea that we have to talk about the death penalty

8     now at this part of trial.  We have to have rules

9     for everything, otherwise, lawyers all want to get

10    up and talk, so Mr. Bailey and Mr. Becker and I

11    would be elbowing each other saying, I want to go

12    first, so we have to have rules.  One of those rules

13    is that anything that could come up in a case like

14    this, we try to talk about now.  Do you see that?

15                    MICHAEL ARCURI:  Uh-huh.

16                    ATTY. JUHASZ:  It wouldn't do us

17    any good to have a trial, obviously, and I think Mr.

18    Becker brought this point up when he was asking you

19    questions.  If we have a trial and you, as the jury,

20    find the State doesn't prove its case, then what

21    happens?

22                    MICHAEL ARCURI:   Not guilty.

23                    ATTY. JUHASZ:  Not guilty and we

 1      all go home, right?

 2                      MICHAEL ARCURI:  Do you feel pretty

 3      comfortable that you understand the two phase

 4      process that we have for death penalty cases?

 5                      MICHAEL ARCURI:  Sure.

 6                      ATTY. JUHASZ:  In that situation I

 7      just gave you where the Defendant is found not

 8      guilty, we go home, there is no penalty for somebody

 9      who is not guilty of anything, correct?

10                      MICHAEL ARCURI:  Correct.

11                      ATTY. JUHASZ:  If we get to that

12      second phase, though, if the jury finds the

13      Defendant guilty, that is a bad time now that we

14      have two people to say, okay, well now that you

15      found the Defendant guilty of aggravated murder and

16      at least one of the specifications, one of the

17      reasons to consider the death penalty, we're going

18      to consider the death penalty, and we have a couple

19      people raising this hand, listen, for this type of

20      offense I would give the defendant death every time.

21      And then someone else down here says, death penalty,

22      I can't impose the death penalty for anything.  And

23      I think you understand from what Judge Stuard said

1    earlier, neither one of those folks would be an

2    acceptable juror for purposes of penalty phase.  Do

3    you see that?

4                    MICHAEL ARCURI:  Yes.

5                    ATTY. JUHASZ:  And so it's too late

6    to wait until then to ask folks about how they feel

7    about the death penalty, do you see that?

8                    MICHAEL ARCURI:  Sure.

9                    ATTY. JUHASZ:  You don't have any

10   thoughts, do you, because we're talking about the

11   death penalty now before you even heard any evidence

12   about whether Donna is guilty, that she must be

13   guilty and we're going to get to that phase?

14                   MICHAEL ARCURI:  No.

15                   ATTY. JUHASZ:  Do you think you

16   have pretty clear in your mind, if we get to that

17   phase, the four sentencing options that would be

18   available?

19                   MICHAEL ARCURI:  Sure.

20                   ATTY. JUHASZ:  Whether it's this

21   case or any other death penalty case, are your

22   feelings about the death penalty such that you would

23   not be able to go into that second phase with all

1    four of those penalties equal in your mind, or would

2    you be able to have them all equal in your mind?

3                    MICHAEL ARCURI:  I would think that

4    I would be equal.

5                    ATTY. JUHASZ:  You see, don't you,

6    just like the State has to prove to you beyond a

7    reasonable doubt at the first phase that the person

8    is guilty, if you get to the second phase in an Ohio

9    capital case, the State again has the burden of

10   proof by proof beyond a reasonable doubt.  This time

11   they have to prove to you that the reasons to impose

12   the death penalty outweigh the reasons not to, and

13   they have to do that by proof beyond a reasonable

14   doubt, and if they don't do that, then you have to

15   choose one of those life options, do you see that?

16                    MICHAEL ARCURI:  Sure.

17                    ATTY. JUHASZ:  So, if you find the

18   person guilty and you go to the second phase, the

19   death penalty doesn't have a leg up in your mind,

20   it's not like the Defendant has to talk you out of

21   giving her the death penalty?

22                    MICHAEL ARCURI:  I don't

23   understand.  Say it again.

```
 1                    ATTY. JUHASZ:  I just want to make

 2      sure that none of your feelings about the death

 3      penalty are such that if you found the Defendant

 4      guilty at the first phase, that that person would

 5      have to talk you out of giving them the death

 6      penalty instead of the State talking you into giving

 7      the death penalty.

 8                    MICHAEL ARCURI: No.

 9                    ATTY. JUHASZ:  You would require

10      them to prove that death was the appropriate

11      punishment?

12                    MICHAEL ARCURI:  Sure.

13                    ATTY. JUHASZ:  And if they don't,

14      no problem coming back with a life sentence?

15                    MICHAEL ARCURI:  No problem.

16                    ATTY. JUHASZ:  I'm not talking

17      about the law now, I am talking more about your

18      personal feelings.  I know for some offenses, you

19      feel that the death penalty is appropriate, correct?

20                    MICHAEL ARCURI:  Correct.

21                    ATTY. JUHASZ:  And I think, in

22      particular, you have a problem with child victims,

23      correct?
```

1              MICHAEL ARCURI:   Correct.

2              ATTY. JUHASZ:  But if the Judge

3      tells you that in a case like this, if the State

4      meets its burden of proof, that it's a capital

5      offense, it's one for which the death penalty can be

6      given, you would at least be willing to consider the

7      death penalty?

8              MICHAEL ARCURI:   I would consider

9      it.

10             ATTY. JUHASZ:  We bring you in here

11     -- and you probably have an advantage over some

12     folks because you watch Court T.V., and you get some

13     exposure, even if it's other jurisdictions and the

14     law is slightly different, you get some exposure

15     about how things are done.  A lot of folks get a

16     summons to come in here like you did, and we're sort

17     of hitting them all at once with our rules and

18     procedures.  That having been said, you understand,

19     don't you, that if you go to a second phase that it

20     is up to you to decide what weight is given to the

21     reasons to impose death and the reasons not to

22     impose death.  Do you see that?

23             MICHAEL ARCURI:   Sure.

1              ATTY. JUHASZ:  We have all of these

2      rules, and we tell you things like the burden of

3      proof is proof beyond a reasonable doubt, well, oh,

4      okay, and the Judge is going to define that for you.

5      But when he does, he is not going to quantify, he's

6      not going to say, listen, there is -- and I think

7      Mr. Becker eluded to this.  If there are four

8      witnesses the State met its burden of proof, but if

9      they have less than four, they didn't meet the

10     burden of proof.  It doesn't work like that.  Do you

11     see that?

12              MICHAEL ARCURI:  Yes.

13              ATTY. JUHASZ:  It's the same way in

14     the second phase, it's not like, well, if they have

15     two reasons to impose the death penalty, that weighs

16     over one not to impose the death penalty.  Do you

17     see that?

18              MICHAEL ARCURI:  Sure.

19              ATTY. JUHASZ:  Because the two

20     reasons, let's say in my imaginary example, there

21     are two reasons to consider imposing the death

22     penalty, and maybe the Defendant will only give you

23     one reason not to impose the death penalty, but you

1    assign the weight to each of those factors, do you

2    see that?

3                   MICHAEL ARCURI:  Yes, sir.

4                   ATTY. JUHASZ:  You may, say you

5    know what, even though there are two of these, they

6    don't mean very much to me in light of the reason

7    that the Defendant has given me not to impose the

8    death penalty.  So you assign the weight to that.

9    You see that?

10                  MICHAEL ARCURI:  Yes, sir.

11                  ATTY. JUHASZ:  And the law, while

12   it requires you to fairly consider those options,

13   can never tell you that you have to vote for a

14   sentence that you don't feel is warranted by the

15   evidence.  Are you okay with that?

16                  MICHAEL ARCURI:  Yes, sir.

17                  ATTY. JUHASZ:  I have mentioned

18   that the State has this burden of proof, and you

19   certainly, from what you have told Mr. Becker, don't

20   have any problem affording the Defendant the

21   presumption of innocence, right?

22                  MICHAEL ARCURI:  Right.

23                  ATTY. JUHASZ:  One of the ways that

1        -- everybody's got their own way that they like to

2        talk to jurors about this stuff, and one of the ways

3        that I am fond of talking about it is that you sort

4        of, when you go back to the jury room, you picture

5        that you have a box, okay, because as I told you the

6        definition of reasonable doubt doesn't give you any

7        way to quantify the evidence, so you sort of have to

8        draw a box in your mind, and take the State's

9        evidence and pour it into that box.  There is a line

10       on that box that you draw called reasonable doubt.

11       Because the burden of proof in a criminal case is

12       the highest standard of proof that we have in any

13       kind of case in our legal system, that line is going

14       to be pretty far up toward the top of that box, do

15       you see that?

16                    MICHAEL ARCURI:  Yes, sir.

17                    ATTY. JUHASZ:  The reason I like to

18       talk about the box, there are several reasons,

19       actually, one is that as we stand here talking right

20       now, if I sent you back there and said, close your

21       eyes and look at that box, there would be no

22       evidence in there, correct?

23                    MICHAEL ARCURI:  Right.

1            ATTY. JUHASZ:  You haven't heard a

2    bit of testimony, have you?

3            MICHAEL ARCURI:  No.

4            ATTY. JUHASZ:  The other reason I

5    like to talk about it is because, in a criminal

6    case, it isn't so much that the Defendant wins the

7    case, because as Judge Stuard told you, a Defendant

8    in a criminal case doesn't have to do anything.  She

9    doesn't have to take the stand, doesn't have to

10   testify, her lawyers don't have to do anything.  The

11   reason for that is, it's a little bit different than

12   many contests that we think about, like a baseball

13   game or a football game.  In this kind of a

14   situation, the State either wins or loses the case.

15   It isn't that the defendant wins the case if the

16   state loses.  They either convince you that they

17   have enough evidence to fill up that box beyond the

18   line called reasonable doubt, because it's proof

19   beyond a reasonable doubt.  Do you see that?

20           MICHAEL ARCURI:  Yes.

21           ATTY. JUHASZ:  If they don't, then

22   the State has lost the case because they failed to

23   carry the burden of proof.  Do you see how that

2761

```
 1    works?
 2                    MICHAEL ARCURI:  Yes, sir.
 3                    ATTY. JUHASZ:  You may, at the end
 4    of the trial, look in the box and say, hey, you know
 5    what, there is some evidence in there.  I don't like
 6    what I'm seeing, there is some evidence, but they
 7    have to prove it to me beyond a reasonable doubt,
 8    and they didn't do that, so in that case, they
 9    failed to meet their burden of proof.
10                    MICHAEL ARCURI:  Yes, sir.
11                    ATTY. JUHASZ:  And would have no
12    problem, as I think you said, before looking them
13    right in the eye and saying, sorry, guys, you didn't
14    meet the burden of proof?
15                    MICHAEL ARCURI:  Right.
16                    ATTY. JUHASZ:  Another reason that
17    I like to talk about that box is because of what I
18    just said before that Judge Stuard mentioned, the
19    Defendant doesn't have to do anything in a criminal
20    case.  Now, let's not kid each other.  Ingram and I
21    are probably not going to be able to sit over there
22    the whole time drinking mao-tai's and playing
23    Yahtzee, we're going to get up and do something.
```

1    But the point is, that we don't have to.  And it's

2    because of that concept that I talked -- that I

3    talked about before where the State has to pour the

4    evidence into the box, the Defendant doesn't pour

5    anything into the box and she doesn't take anything

6    out of the box, do you see that?

7                   MICHAEL ARCURI:  Yes.

8                   ATTY. JUHASZ:  Because they have to

9    fill it up, and if they don't, it's not guilty.

10                  MICHAEL ARCURI:  Okay.

11                  ATTY. JUHASZ:  Any problem with

12   that?

13                  MICHAEL ARCURI:  No, sir.

14                  ATTY. JUHASZ:  If you're like, I

15   would say, every juror that I have talked to in this

16   or any other case, you come in here wanting to do

17   your best and to be fair, right?

18                  MICHAEL ARCURI:  Sure.

19                  ATTY. JUHASZ:  And most times, in

20   most situations in life, when we want to be fair,

21   before we make a decision, we want to hear both

22   sides of the story, right?

23                  MICHAEL ARCURI:  You have to, yes.

```
 1                    ATTY. JUHASZ:  Yes.  Now, this is a

 2       little bit different, however, because you see in a

 3       case like this, we don't know what is going to

 4       happen yet, but for the reasons we just talked about

 5       with my silly box, you may not hear both sides of

 6       the case because Donna may not take the witness

 7       stand and may decide not to call any witnesses.  Do

 8       you see that?

 9                    MICHAEL ARCURI:  Sure.

10                    ATTY. JUHASZ:  That runs sort of

11       contra to our natural inclination that all of us

12       have, that we want, before we make a fair decision,

13       we want to hear both sides.  Do you see that?

14                    MICHAEL ARCURI:  Uh-huh.

15                    ATTY. JUHASZ:  Okay, if she doesn't

16       call witnesses or she doesn't take the witness

17       stand, are you going to think that maybe she is

18       trying to hide something from you?

19                    MICHAEL ARCURI:   No, I think that

20       is her prerogative.

21                    ATTY. JUHASZ:  Okay, because you

22       see, don't you, literally, if she wants to, she

23       could sit there and fold her arms and say, you know,
```

1    ladies and gentlemen of the jury, I don't think they

2    filled up Juhasz's crazy box, so I am not doing

3    anything.  She has the option to do that, right?

4                    MICHAEL ARCURI:  Sure.

5                    ATTY. JUHASZ:  And so I am taking

6    it from your answers then, if she decides not to

7    testify, you would not hold that against her?

8                    MICHAEL ARCURI:  No, sir.

9                    ATTY. JUHASZ:  And if she does

10   decide to testify because she has that option, she

11   is a witness like any other witness who is going to

12   take the stand, would you agree?

13                   MICHAEL ARCURI:  Yes, sir.

14                   ATTY. JUHASZ:  One of the things

15   that you have to do, and I believe Mr. Becker talked

16   to you about this is, as a juror, you have to decide

17   credibility, you have to decide if a witness is

18   telling you the truth.  Do you see that?

19                   MICHAEL ARCURI:  Yes, sir.

20                   ATTY. JUHASZ:  You don't think that

21   just because a witness takes an oath and sits where

22   you are, that everything they are telling you is

23   going to be the gospel, right?

1                    MICHAEL ARCURI:   Definitely not,

2      no.

3                    ATTY. JUHASZ:  And just like any

4      other situation in life, you have to decide whether

5      somebody is telling you the complete truth, a

6      complete lie, or some mixture of what is true and

7      what is not, do you see that?

8                    MICHAEL ARCURI:  Sure.

9                    ATTY. JUHASZ:  One of the things

10     you may want to consider, of course, is does the

11     person have some stake in the outcome of the case?

12     That would be a fair thing to take into

13     consideration, right?

14                   MICHAEL ARCURI:  Yes, sir.

15                   ATTY. JUHASZ:  And to be fair about

16     it, if Donna takes the stand, she certainly does

17     have a stake in the outcome of the case, this is a

18     very serious case, right?

19                   MICHAEL ARCURI:  Yes.

20                   ATTY. JUHASZ:  Does that mean,

21     however, that you just simply reject everything she

22     has to say before weighing it saying, she has an

23     interest in the outcome of the case?

1           MICHAEL ARCURI:  No.

2           ATTY. JUHASZ:  It's a thing to take

3    into consideration, right?

4           MICHAEL ARCURI:  Right.

5           ATTY. JUHASZ:  But not something

6    that you would automatically apply as a rule, and

7    say, I'm not going to believe anything that she

8    says?

9           MICHAEL ARCURI:  No, I wouldn't do

10   that.

11          ATTY. JUHASZ:  Other witnesses

12   could have an interest in their testimony or in the

13   outcome of the case too, doesn't that make sense to

14   you?

15          MICHAEL ARCURI:  Yes, sir.

16          ATTY. JUHASZ:  Maybe a police

17   officer who wants to see the results of an

18   investigation vindicated, maybe some other witness

19   who has an interest in the outcome of the case, or

20   in his or her testimony, and that would be something

21   that you would take and weigh in your consideration,

22   isn't it?

23          MICHAEL ARCURI:  Sure.

1              ATTY. JUHASZ:  Another reason I

2     that I like to talk about my silly little box is

3     because, as lawyers, we like to tell perspective

4     jurors that we like you to come in here with your

5     mind as blank as that easel that is back there in

6     the corner behind you, and that is not realistic.

7     You've had experiences in your life, you have human

8     reactions, that is all understandable.  But the

9     question really I think is more, can you push them

10    off to the side.  It may be in a case like this

11    where you know that there is a homicide, or someone

12    has lost their life and you are going to see

13    photographs and probably hear testimony from the

14    coroner that you are going to feel sorry for that

15    person or maybe that person's family.  That makes

16    sense to you, that might happen, right?

17              MICHAEL ARCURI:  Sure.

18              ATTY. JUHASZ:  Okay.  The real test

19    is, and I think I know the answer to this but I am

20    going to ask it anyway.  You understand if you have

21    feelings of sympathy, it's okay, you just can't let

22    that be evidence that gets thrown in the box,

23    correct?

1                    MICHAEL ARCURI:  Correct.

2                    ATTY. JUHASZ:  But it's not really

3     evidence.  It may be a sympathetic reaction you

4     have, but it's not really evidence.

5                    MICHAEL ARCURI:  Right.

6                    ATTY. JUHASZ:  And you could do

7     that?

8                    MICHAEL ARCURI:  Sure.

9                    ATTY. JUHASZ:  I think Mr. Becker

10    talked to you a little bit about the grand jury

11    process, did he not?

12                   MICHAEL ARCURI:  Yes.

13                   ATTY. JUHASZ:  Again, that

14    indictment, you understand that is a one-sided

15    proceeding of the grand jury, and that indictment is

16    a piece of paper that simply says to Donna, listen,

17    this is what the government says you did wrong,

18    okay.  You see that?

19                   MICHAEL ARCURI:  Yes.

20                   ATTY. JUHASZ:  There has to be some

21    way, you can't just have the prosecutor stand on top

22    of the court and wave, Donna Roberts, we think

23    you're guilty of murder.  There has to be some

1      procedure to get the case going, and that filing of

2      that indictment and serving on her is the procedure.

3      Do you see that?

4                      MICHAEL ARCURI:  Sure.

5                      ATTY. JUHASZ:  Because the grand

6      jury process is a one-sided process, it's why I

7      bring it up, it would be unfair to consider that

8      indictment itself as any evidence that goes into the

9      box.  Do you see that?

10                     MICHAEL ARCURI:  Yes, sir.

11                     ATTY. JUHASZ:  It's not really

12     evidence, it's just a piece of paper that tells her

13     that she has to come to court to be here for the

14     trial of this case.

15                     MICHAEL ARCURI:  Sure.

16                     ATTY. JUHASZ:  We have talked about

17     this concept of proof beyond a reasonable doubt, and

18     there is one other thing that I like to talk about

19     in connection with that.  You, I am sure, have made

20     some important decisions in your life, correct?

21                     MICHAEL ARCURI:  Correct.

22                     ATTY. JUHASZ:  When you do, some

23     people do it on a piece of paper, some people do it

1    in their minds eye, but I think all of us in one

2    form or fashion or another, sort of make a checklist

3    of the pros and cons about something that we're

4    going to do, correct?

5                    MICHAEL ARCURI:  Uh-huh.

6                    ATTY. JUHASZ:  You would, not for

7    example, without thinking about it, just leave here

8    today and say, you know what, it's 2:30 I think I

9    will run down to the Mercedes dealership and buy

10   myself a new Benz.  You wouldn't do that, right?

11                   MICHAEL ARCURI:  No.

12                   ATTY. JUHASZ:  You are going to sit

13   down and think about it, you know, do I need a new

14   car, can I afford this car, why would I get this

15   car, things like that, correct?

16                   MICHAEL ARCURI:  Sure.

17                   ATTY. JUHASZ:  You kind of have to

18   do the same thing when you test the State's evidence

19   in this case, all right.  On the one side of the

20   check list, are things why the government says you

21   should find the Defendant guilty.  On the other side

22   are doubts.  They can be doubts that Ingram and I

23   tell you about, they could be doubts that you think

1     about as you listen to the evidence in this case as

2     it unfolds.  They can be doubts that other jurors

3     bring out to your attention as you're back

4     deliberating after you get all of the evidence,

5     okay?

6                    MICHAEL ARCURI:  Okay.

7                    ATTY. JUHASZ:  The State doesn't

8     have to prove its case beyond possible doubt, an

9     imaginary doubt, and foolish doubt.  That is the

10    reason why there is some space in that box that I

11    talked about between the line called reasonable

12    doubt and all doubt, which would be a hundred

13    percent or the box completely full.  Do you see

14    that?

15                    MICHAEL ARCURI:  Uh-huh.

16                    ATTY. JUHASZ:  But they do have to

17    prove it beyond reasonable doubt, which means any

18    doubt based on reason and common sense.  So what you

19    have to do is look at those doubts on that side of

20    the checklist, think about them, talk to the other

21    jurors about them, and maybe you have a doubt, and

22    after you talk to the other jurors, you go, no, no,

23    look at this exhibit.  You go, you know what, you're

```
 1    right, that doubt is foolish, it's silly,  I don't

 2    know what I thought of that now that I see this

 3    piece of evidence, I don't have that doubt anymore,

 4    so you erase it, okay.  You have to go through each

 5    one of the doubts like that.  If you are left with

 6    one, it can be more than one, but if you are left

 7    with at least one doubt that you have about the

 8    government's evidence, and you think about it and

 9    you talk to the other jurors about it, and you say

10    there is just no way for me to account for this

11    doubt other than to say, this is a doubt that I have

12    based on reason and common sense.  It's not foolish,

13    it's not fanciful, it's a doubt based on reason and

14    common sense.  You see in this situation they

15    haven't proved their case beyond a reasonable doubt,

16    have they?

17                    MICHAEL ARCURI:   No.

18                    ATTY. JUHASZ:  One last thing that

19    I want to talk to you about, and I promise to

20    desist, and not further sully this beautiful

21    afternoon and let you get back to it.

22                    Mr. Becker, I think, talked to you about

23    circumstantial evidence, and mentioned to you that
```

1    if the circumstantial evidence is probative enough,

2    that you could find somebody guilty based on

3    circumstantial evidence and, in deed, you can.  You

4    will hear at the end of this case Judge Stuard tell

5    you that circumstantial evidence and what lawyer's

6    call direct evidence, are of the same weight or

7    probative value.  But, and here is why I bring it

8    up.  They still have to prove their case beyond a

9    reasonable doubt, okay.  Mr. Becker -- everybody

10   likes to talk about his kids, Mr. Becker likes to

11   talk about his kids, I like to talk about my kid, so

12   let me give you a brief scenario for a second.

13   Let's pretend that it's a little bit later in the

14   summer than we are right now.  It's about 85

15   degrees, it's about 4:00 in the o'clock in the

16   afternoon and clouds are getting dark in the west

17   and winds are starting to kick up a little bit, and

18   we all know what's coming.  We're going to get one

19   of those late afternoon thunder bumpers that we're

20   all used to in this area.  So, pretend we're at my

21   house, and I am in the kitchen.  All of a sudden, I

22   hear a crash in my living room.  As I run in there

23   to investigate, my son's cat is shooting out between

1  my legs hell bent for living, I look to my left,

2  there's my son, Mike, with his hads over his face in

3  obvious despair.  I look to my right, and there is

4  one of my wife's Norman Rockwell plates that has

5  left its perch on the mantle and has now shattered

6  on the hearth down below.  And Mary Pat is not going

7  to be happy.  Now, from that little bit of evidence

8  that I told you, there are several scenarios that

9  may explain the evidence.

10  First, is that my son may have been

11  throwing the nerf ball like he's been told

12  12,332,000 times not to do in the house, knocked the

13  plate off, and the noise scared the cat, correct?

14  MICHAEL ARCURI:  Uh-huh.

15  ATTY. JUHASZ:  Could be that the

16  cat was up on the mantel, like she's not suppose to

17  be, knocked the plate off, and Mike's going, mom is

18  going to have a bird.  Or it could be that the wind

19  from that approaching thunderstorm knocked the plate

20  off and the cat is running either because it's

21  scared, or afraid it's going to get blamed, or both,

22  and Mike is pretty much in the same position.  He's

23  afraid he's going to get blamed and it wasn't his

1    fault, plus mom is not going to be happy about the

2    plate.  All those work from the limited evidence

3    that I gave you, correct?

4              MICHAEL ARCURI:  Sure.

5              ATTY. JUHASZ:  You see, in a

6    situation like that, while I could accuse my son

7    Mike of throwing the nerf ball in the house and try

8    to use that circumstantial evidence, there would be

9    other reasonable explanations for that

10   circumstantial evidence, and those other reasonable

11   explanations would constitute reasonable doubt about

12   Mike's guilt, wouldn't they?

13             MICHAEL ARCURI:  Sure.

14             ATTY. JUHASZ:  All right.  Any

15   problem holding the government through that type of

16   rigorous analysis and that burden of proof when you

17   weigh circumstantial evidence they gave you in this

18   case?

19             MICHAEL ARCURI:   No.

20             ATTY. JUHASZ:  All right, very

21   good.  Anything that has come up in your mind while

22   we have been talking, questions you may have or some

23   reason you thought of why you would not be able to

```
 1         stay with us in this case?
 2                        MICHAEL ARCURI:   No, not really.
 3                        ATTY. JUHASZ:  Very good.   I
 4         appreciate your time.  Thank you.
 5                        THE COURT:   Gentlemen?
 6                        ATTY. BECKER:  Pass for cause, Your
 7         Honor.
 8                        ATTY. JUHASZ:  Pass.
 9                        THE COURT:  Okay, you will be in
10         the pool from which this jury is chosen.  If you
11         will call that number Thursday evening after 4:30,
12         you will get further instructions.
13                        MICHAEL ARCURI:  Okay.
14                        THE COURT:  I would again remind
15         you not to discuss anything about the case, form any
16         opinion, read anything in the newspaper, or watch
17         any T.V. about it, okay?
18                        MICHAEL ARCURI:  Okay.
19                        THE COURT:  You are excused.
20
21         (Whereupon, Michael Arcuri, Juror Number 168, was
22         excused until further notice.)
23
```

1                    THE COURT:  Let's take a break.

2

3

4      (At 2:30 p.m., a recess was taken.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

2

3                    <u>REPORTER'S CERTIFICATE</u>

4

5        This is to certify the foregoing represents a

6    true and correct copy of the proceedings had in the

7    aforementioned cause as reflected by the stenotype

8    notes taken by me on the same.

9

10

11

12

13

14    DATE:    January 2, 2004        Maribeth Hoolihan

15                                    Official Court Reporter

16

17

18

19

20

21

22

23

1              IN THE COURT OF COMMON PLEAS

2                 TRUMBULL COUNTY, OHIO

3

4    STATE OF OHIO,              ) Case No. 01-CR-793
                                 )
5              Plaintiff         )
                                 )
6    -vs-                        ) Judge John M. Stuard
                                 )
7    DONNA M. ROBERTS,           ) **VOLUME XIII**
                                 )
8              Defendant         )TRANSCRIPT OF PROCEEDINGS

9

10   Voir Dire, commencing April 28 & 29, 2003,

11   BEFORE:      HONORABLE JOHN M. STUARD

12   AT:          Trumbull Co. Court of Common Pleas
                  Courtroom Number 2
13                161 High Street, N.W.
                  Warren, Ohio 44481
14

15   APPEARANCES:

16   On behalf of the State of Ohio:
                  Mr. Kenneth N. Bailey and
17                Mr. Christopher D. Becker
                  Assistant Prosecuting Attorneys
18                Warren, Ohio

19   On behalf of the Defendant:
                  Mr. J. Gerald Ingram and
20                Mr. John B. Juhasz
                  Attorneys at Law
21                Youngstown, Ohio

22

23   Official Court Reporter:  Maribeth Hoolihan

136

```
 1                        VOLUME XIII

 2      (Back in Court at 2:45 p.m.)

 3

 4            NATHAN CROCKER, JUROR NUMBER 171

 5      EXAMINATION BY THE COURT:

 6                      THE COURT:  Good afternoon, Mr.

 7      Crocker.

 8                      NATHAN CROCKER:  Hello.

 9                      THE COURT:  You read the handout

10      that was given to you?

11                      NATHAN CROCKER:  Yes.

12                      THE COURT:  Okay, thank you.  As

13      you know, we're here on an aggravated murder case.

14      There are two counts of aggravated murder, although

15      there was only one murder.  That will be explained

16      to you later as to why that is.  It also has

17      attached to the counts what we call specifications.

18      In the law of Ohio, just because a person is found

19      guilty of murder, does not mean that they face the

20      death penalty, only under certain circumstances.

21      So, in this case, attached to the aggravated murder

22      count is a specification, which means that if the

23      State proves beyond a reasonable doubt that the
```

2780

1    murder occurred, and it was aggravated murder, and

2    that one of the specifications occurred, that places

3    the possibility of a second phase, if the jury makes

4    that finding of guilty.  And the jury would then

5    have to consider the possibility of imposing a death

6    penalty.

7            Now, the burden is always on the State

8    of Ohio to proceed and to prove the case that has

9    been filed against Donna Roberts.  Miss Roberts nor

10   her attorneys need do nothing if they care not to.

11   Ordinarily, they participate, but technically they

12   need do absolutely nothing but sit there.  Now, the

13   State would, after we get this jury picked, would

14   present their evidence.  If they prove beyond a

15   reasonable doubt all things necessary, then the jury

16   may return a verdict of guilty.  If they fail to do

17   so, then this jury would return a finding of not

18   guilty, and that would be the end of the proceeding.

19           As one of the attorneys said, it seems

20   like putting the cart before the horse to even ask

21   questions about the death penalty at this stage,

22   because we don't know what the jury is going to do.

23   And here is the reason that we do.  If we just seat

2781

```
 1      a jury as we do in an ordinary case, and we went

 2      through the trial, if the State carried its burden

 3      of proof, then we would have a jury that would have

 4      to consider the second phase.  And assume that there

 5      was someone on there that believed that if a life is

 6      taken that that person should forfeit their life.

 7      Well, if that person really believed that, they

 8      could not follow the law of Ohio.  The law of Ohio

 9      says, that the death penalty only applies in certain

10      circumstances.  So, such a person could not be fair

11      to the Defendant.  And the Defendant has the right

12      to have the jury at that second stage weigh the

13      aggravating circumstances, and those are reasons why

14      the jury should impose the death penalty against the

15      mitigating factors.  And those are reasons that

16      speak to why the jury should consider not imposing

17      the death penalty.  And, again, the State has to

18      prove those circumstances outweigh the mitigating

19      factors before they would be entitled to ask for the

20      death penalty.  Likewise, if you have a person on

21      the jury at that point that could under no

22      circumstances ever impose the death penalty, then

23      the State would not have a fair trial.  So, it's
```

2782

1       necessary to inquire about each of the potential

2       jurors beforehand to find if they're somewhere in

3       the middle.

4                   Now, everyone has their own personal

5       view about the death penalty.  Some or more in favor

6       of it than others, but the 12 jurors are going to

7       have to be people that are able to set aside their

8       own personal preference on the question and follow

9       the law.  In order for everyone to have a fair trial

10      they have to have everybody in the courtroom

11      following the law.  Whatever your beliefs are, fine.

12      You are entitled to your beliefs and these folks

13      will respect them.  It's just that they have a right

14      to know where you're coming from.

15                  The second issue, being of the nature

16      that it is, generated a certain amount of pretrial

17      publicity, the news media covered it on various

18      occasions.  Many of the people read something about

19      that, heard it on T.V., maybe discussed it with

20      fellow employees or whatever, and that is to be

21      expected.  But, again, the question is, do you have

22      your mind made up to such degree on something that

23      you could not set that aside and listen to the

1    evidence.  In order to have a fair trial, this

2    matter would have to be decided on the evidence

3    alone that is presented in this courtroom and follow

4    the law that is given by the Court, okay?

5                    NATHAN CROCKER:  Uh-huh.

6                    THE COURT:  Very good.  Mr. Bailey?

7                    ATTY. BAILEY:  Thank you, Your

8    Honor.

9

10   **EXAMINATION BY ATTORNEY BAILEY:**

11                    ATTY. BAILEY:  Good afternoon, Mr.

12   Crocker.

13                    NATHAN CROCKER:  Good afternoon.

14                    ATTY. BAILEY:  My name is Ken

15   Bailey.  We met I think about two and a half weeks

16   ago in the other Courtroom.  As I promised you back

17   then, I am joined by Chris Becker, another assistant

18   prosecutor in our office who is my co-counsel, and

19   the two of us are responsible for prosecuting this

20   particular case on behalf of the people of Trumbull

21   County and the State of Ohio.  So, we're here today

22   on a sort of give and take question and answer

23   session.  We're asking some questions about your

1      opinions and your background a little bit to make

2      sure that the folks who are selected on the jury can

3      be fair and impartial, both to the defendant and to

4      the State.  And we're not asking these questions

5      because we're snoopy and we like to pry but, rather,

6      to make sure that the folks can be fair and

7      impartial to both sides.

8                      There aren't any right answers and there

9      aren't any wrong answers to those questions, just

10     open and candid answers.  And if you have any

11     questions come up as to what we're doing here

12     pertaining to these proceedings, feel free to ask

13     them now.  The reason I mention that is, some times

14     people have some questions and we can get some

15     answers to, and once we're done here today, until

16     this case is all over, if it goes into two phases,

17     you have to wait until the end of the second phase,

18     you won't be able to communicate with us, the

19     attorneys, until that point.  Because under our

20     rules of conduct, if we run into each other out in

21     the hallway or in the elevator or a rest room or

22     something, we are not allowed to have any

23     communication with you, it would be improper and it

 1    could cause a mistrial and we don't want to have to

 2    do it all over again.

 3                    NATHAN CROCKER: Right.

 4                    ATTY. BAILEY:  So, if you have

 5    questions that come up during the course of the

 6    trial, you can direct them to our bailiff, Lori

 7    Brown, who is not here right now, but she will be

 8    during the trial, and she will be able to get you an

 9    answer most likely, okay.  Now, here's what we're

10    going to be doing for the next little bit.  I am

11    going to ask you some questions about pretrial

12    publicity, and about the death penalty and your

13    views on that, and then I will get into some general

14    questions, and the defense counsel will have an

15    opportunity to address you.  And if you have any

16    questions, please feel free to ask.  Now, this issue

17    of pretrial publicity, I notice that you don't read

18    the newspapers?

19                    NATHAN CROCKER:  I don't generally

20    read the paper, no.

21                    ATTY. BAILEY:  Do you ever read the

22    paper?

23                    NATHAN CROCKER:  We don't get the

1    paper and not unless say -- I know my one

2    grandmother occasionally rips out articles for my

3    mother, but they're not usually things of that

4    nature.

5                    ATTY. BAILEY:  Like cooking or

6    something or Ann Landers or one of those types of

7    things?

8                    NATHAN CROCKER:  Well, no.

9                    ATTY. BAILEY:  So what paper does

10   she clip?

11                   NATHAN CROCKER:  I don't know.

12                   ATTY. BAILEY:  The Vindicator or

13   the Tribune.

14                   NATHAN CROCKER:  No, it's over in

15   Pennsylvania.

16                   ATTY. BAILEY:  Okay, and on T.V., I

17   had noticed that you don't watch -- well, the local

18   stations that you watch are 27 and 21, right?

19                   NATHAN CROCKER:  Yeah, I

20   occasionally leave those on the television at night

21   while I am on the computer.

22                   ATTY. BAILEY:  And when the local

23   news comes on like every -- a certain time at night

1   those stations, do you ever pay attention to the

2   local news or murder cases or anything like that?

3                    NATHAN CROCKER:    Not unless

4   something catches my eye while the T.V. is in the

5   background.

6                    ATTY. BAILEY:  Okay, so you don't

7   have any knowledge to the best of your recollection

8   about this particular case?

9                    NATHAN CROCKER:  No, I don't think

10  I do.

11                   ATTY. BAILEY:  Well, the reason we

12  ask these questions, and why the Judge admonishes

13  the jury to have no contact with the papers

14  regarding this case, or the T.V., or communications

15  with anybody else is because they don't want you to

16  be contaminated by any outside knowledge that might

17  be erroneous in nature.  Okay, they're other

18  people's opinions.  As you look around the courtroom

19  today, there is nobody here from the news media, but

20  there may well be as the trial progresses.  As we

21  get into testimony, there will be somebody here from

22  the local newspapers and maybe one or two reporters

23  sitting in for a couple of minutes at a time, or

1          there may be some from the T.V. stations, and they

2          will set up a camera.  They are not allowed to film

3          the jurors.  They may film the participants, the

4          witnesses, or the Judge, or the lawyers, the court

5          reporter, they may some times.  And then they do a

6          feature on what is happening.  And you're aware that

7          because they're only here for a couple of minutes,

8          they're going to have missed all the questions that

9          were asked and answered before they came in and

10         after they leave, so what is in the paper often

11         times may be somewhat slanted or maybe taken out of

12         context.

13                         NATHAN CROCKER: Right.

14                         ATTY. BAILEY:  Like maybe coming

15         into the middle of a chat room discussion or

16         something, right, and just getting the middle

17         portion of it and missing everything that happened

18         before and afterward.

19                         NATHAN CROCKER:  Yeah.

20                         ATTY. BAILEY:  So it gives you a

21         slanted view and you've got to come in here with a

22         clean slate.

23                         NATHAN CROCKER:  Yes.

1              ATTY. BAILEY:  And the only thing

2    that is going to be written on that slate, is going

3    to be written by the testimony of the witnesses,

4    physical exhibits that come in, and the Judge's

5    instructions.  Like going back to the class again in

6    college, right?

7              NATHAN CROCKER:  Right.

8              ATTY. BAILEY:  So, you wouldn't

9    have any trouble doing that?

10             NATHAN CROCKER:  No, I wouldn't,

11   sir.

12             ATTY. BAILEY:  Now, let's talk

13   about the death penalty as the possible punishment

14   here.  When was the first time you learned that this

15   was potentially a death penalty case?

16             NATHAN CROCKER:  That would be the

17   first day that I came in.

18             ATTY. BAILEY:  Back on April 8th or

19   somewhere around there?

20             NATHAN CROCKER:  Yeah, I think it

21   was the 8th, yeah.

22             ATTY. BAILEY:  And before that, had

23   you ever had any discussions or conversations with

1    any family members or friends or some organization

2    maybe back in college or school regarding your view

3    on the death penalty and maybe --

4             NATHAN CROCKER:  Probably have

5    discussed it at some point with people, but nothing

6    really heated.

7             ATTY. BAILEY:  Okay, I notice --

8    are you a gamer?

9             NATHAN CROCKER:  Depends on what

10    you mean?

11             ATTY. BAILEY:  Computer gamer.

12             NATHAN CROCKER:  No, I don't do

13    much on-line gaming.

14             ATTY. BAILEY:  Do you play any

15    video games at home?

16             NATHAN CROCKER:  Yes.

17             ATTY. BAILEY:  And --

18             NATHAN CROCKER:  I am not good

19    enough to compete against other people.

20             ATTY. BAILEY:  Okay, I don't have

21    any hand or eye skills, it's bad enough walking and

22    talking.  Okay, so then do you recollect what

23    brought up the discussion on the death penalty,

1   whether it was some crime in the news or something?

2                   NATHAN CROCKER:  Oh, no, probably

3   not.  Just a lot of general things.  One of the

4   things I do on-line is a discussion group, we

5   discuss a lot of topics.

6                   ATTY. BAILEY:  Like, for example?

7                   NATHAN CROCKER:  Very

8   controversial things.  Like that probably just came

9   up a couple times in the past, things like the

10  abortion issue, religion issues, separation between

11  church and state, schools.

12                  ATTY. BAILEY:  Okay, I notice in

13  the news, the national news, there has been some

14  debate with the Supreme Court taking on cases about

15  mental retardation and the death penalty as an

16  issue, does your discussion group get into any of

17  those issues?

18                  NATHAN CROCKER:  We haven't

19  touched on that, but I might bring it up.

20                  ATTY. BAILEY:  Now, you understand

21  that the Judge's admonishment about no contact with

22  the news media or anything?

23                  NATHAN CROCKER:  Yes.

1              ATTY. BAILEY:  And that's relative

2     to discussing it on-line?

3              NATHAN CROCKER:  I know, I haven't

4     discussed the case, no.

5              ATTY. BAILEY:  What are your views

6     regarding capital punishment as a possible

7     punishment?

8              NATHAN CROCKER:  I don't think I

9     really have any set views on it.  I mean, I think it

10    has its place, but there are a lot of weight on both

11    sides of the issue.  That's not really one of the

12    ones that I really have a firm stance on.

13             ATTY. BAILEY:  Let me ask you this,

14    you understand that in Ohio, the State legislature

15    passes the laws that sets out the punishments for

16    different crimes?

17             NATHAN CROCKER:  Yeah.

18             ATTY. BAILEY:  And not every murder

19    is punished by the death penalty as a possible

20    punishment?

21             NATHAN CROCKER:  Right.

22             ATTY. BAILEY:  For example, if I

23    were to go out on the steps of the Courthouse here

1     this afternoon at 4:00 o'clock, and say, I am going

2     to kill my co-counsel tomorrow because I don't like

3     the way he smiled at me when I was asking a certain

4     question, and I announce it to the whole world.

5     That can be a premeditated murder or murder with

6     prior calculation and design, especially, if he's

7     coming up the steps of the Courthouse tomorrow and I

8     shoot him and kill him.

9                    NATHAN CROCKER:  Uh-huh.

10                   ATTY. BAILEY:  But that is

11    punishable by the death penalty in Ohio.  The

12    legislature has written the law in such a way that

13    there has to be more than just the charge of

14    aggravated murder.  There has to be certain special

15    findings of fact, we call them aggravating

16    circumstances.  It can be things like factors, or

17    circumstances like maybe the killing of the

18    president or the governor or the lieutenant

19    governor, police officer on duty, or a small child,

20    or special felony that is being committed with prior

21    calculation and design, or being the trigger man or

22    something like that.  There could be a number of

23    these particular circumstances.  And then the

1   legislature has written it in such a way that it's

2   not an automatic death penalty, they set it up as a

3   two-phase trial.  And you probably -- when you read

4   that handout downstairs --

5                   NATHAN CROCKER:  Yes, I just read

6   about that today.

7                   ATTY. BAILEY:  It sort of clues you

8   in a little bit about this procedure.  And then you

9   have to hear -- you could hear things about

10  mitigating factors, mitigating factors are things

11  that work against the death penalty, and are in

12  favor of the Defendant, okay.

13                  NATHAN CROCKER:  Yes.

14                  ATTY. BAILEY:  And then you have to

15  do this balancing test that we talked about.  Now,

16  knowing that, that the legislature writes these laws

17  and sets out what crimes, the crimes where the death

18  penalty could be a possible punishment.  If you were

19  able to sit on the legislature and write the laws,

20  would you include the death penalty as a possible

21  punishment for any crimes?

22                  NATHAN CROCKER:  Probably a

23  possible one, yeah, I mean, it probably does have

1    it's place in some circumstances.

2             ATTY. BAILEY:  So, for example,

3    what circumstances?

4             NATHAN CROCKER:  That's a lot

5    harder question.

6             ATTY. BAILEY:  Okay, if you could

7    design the system, would you keep it in there for

8    what?

9             NATHAN CROCKER:  I don't know, I

10    guess it's probably too much of a case by case

11    basis.  Jeffrey Dahmer?

12             ATTY. BAILEY:  Okay, you are

13    talking about a mass murder?

14             NATHAN CROCKER:  Probably, yes.

15             ATTY. BAILEY:  Okay, well, this

16    case is not a mass murder case.

17             NATHAN CROCKER:  I know.

18             ATTY. BAILEY:  Do you think you

19    could follow the law as the Judge gives it to you?

20             NATHAN CROCKER:  Yes.

21             ATTY. BAILEY:  And if you found the

22    death penalty was an appropriate punishment and

23    proved it beyond a reasonable doubt and found her

1       guilty of the crimes charged of aggravated murder

2       and one or more specifications, you would be able to

3       return the death penalty verdict?

4                       NATHAN CROCKER:  Yeah.

5                       ATTY. BAILEY:  Okay, now, even

6       though it's not a mass murder case?

7                       NATHAN CROCKER:  Yeah.

8                       ATTY. BAILEY:  So, you think that

9       the death penalty does have a place in society.

10                      NATHAN CROCKER:  Yeah.

11                      ATTY. BAILEY:  And I know it's not

12      something that folks are asked to think about, but

13      you have had about two and a half weeks now --

14                      NATHAN CROCKER:   Yes.

15                      ATTY. BAILEY:  Knowing that this is

16      potentially a death penalty case, to actually think

17      about it?

18                      NATHAN CROCKER:   Yeah.

19                      ATTY. BAILEY:  Now, is your view on

20      the death penalty being appropriate for certain

21      types of crime, is it based on logic, or personal

22      belief, or religious belief, or morals or ethics or

23      some combination of factors?

1        NATHAN CROCKER:  Well, a

2 combination of factors, yeah, but  --

3        ATTY. BAILEY:  What combination?

4 I know that these are hard questions because these

5 are not things that you are used to dealing with.

6        NATHAN CROCKER:  Well, I suppose

7 moral, ethical, just general.

8        ATTY. BAILEY:  Okay.

9        NATHAN CROCKER:  Outlook, not

10 religious.

11        ATTY. BAILEY:  I noticed on the

12 questionnaire you didn't fill out what religion you

13 belong to.  Do you belong to any religious belief or

14 any religious denomination?

15        NATHAN CROCKER:  Any organized

16 one?

17        ATTY. BAILEY:  Any organized one?

18        NATHAN CROCKER:  No, not an

19 organized one.

20        ATTY. BAILEY:  Any disorganized one

21 or any philosophical one or, you know what I mean?

22        NATHAN CROCKER:  I prefer to say

23 agnostic, but a lot of people tend to look at

1    agnostic and think watered down atheist.  And I

2    don't think the atheists are anymore likely to be

3    correct than anyone else.

4                    ATTY. BAILEY:  Okay, if I

5    understand, agnostic is a person who is not sure if

6    there is a God or not?

7                    NATHAN CROCKER:   No, an agnostic

8    is someone who is not sure who is quite right.

9                    ATTY. BAILEY:  Okay.

10                   NATHAN CROCKER:   There isn't a

11   true agnostic around that will tell you that they

12   don't believe that there is actually some kind of

13   higher force or something.

14                   ATTY. BAILEY:  Like a universal

15   ultimate or something?

16                   NATHAN CROCKER:  Yeah, something

17   like kerma maybe.

18                   ATTY. BAILEY:  Okay.

19                   THE COURT:  Jefferson was an

20   agnostic.

21                   ATTY. BAILEY:  Jefferson?

22                   THE COURT: Yes.

23                   ATTY. BAILEY:  And in your agnostic

2799

```
 1    belief, I take it the death penalty has someplace in

 2    the system?

 3                    NATHAN CROCKER:  Well, I don't

 4    think any connection to that really.

 5                    ATTY. BAILEY:  Is there anything

 6    that prohibits the death penalty as a punishment in

 7    your belief?

 8                    NATHAN CROCKER:  Nothing really

 9    prohibits or enforces it.

10                    ATTY. BAILEY:  Do you think the

11    death penalty serves any purpose in society?

12                    NATHAN CROCKER:  Yeah, probably.

13                    ATTY. BAILEY:  Okay, what purposes?

14    I mean, like some folks say, well, we got the death

15    penalty in society because we should be able to

16    punish people who perform the ultimate

17    transgression, or other people say, well, I think it

18    deters criminals.  I may not be able to prove what

19    it deters, but I have that gut reaction that it

20    deters some criminals, and there are different

21    belief systems there as far as purposes of the death

22    penalty.

23                    NATHAN CROCKER:  Yeah, any of
```

1    those points really has both merit to it or

2    discussion that it could be put against it.

3                    ATTY. BAILEY:  Okay.

4                    NATHAN CROCKER:  It's really hard

5    to find any solid ground on the issue.

6                    ATTY. BAILEY:  Well, you understand

7    that under our system here in Ohio, the way the

8    legislature designed the system, and if the

9    Defendant is charged with one of these crimes of

10   aggravated murder and these specifications are

11   attached to it, special findings, then the case can

12   be tried at two different phases.

13                   NATHAN CROCKER:  Okay.

14                   ATTY. BAILEY:  In the first phase,

15   the issue is guilt or non-guilt.

16                   NATHAN CROCKER:  Right.

17                   ATTY. BAILEY:  Punishment doesn't

18   bear any part in consideration in the first phase

19   because it's not relevant to the issue of guilt or

20   non guilty.  And let's say -- you understand here

21   that the Defendant is charged with two counts of

22   aggravated murder with specification?

23                   NATHAN CROCKER:   Yes.

1            ATTY. BAILEY:  But there are two

2    separate theories that are charged here?

3            NATHAN CROCKER:  Yes.

4            ATTY. BAILEY:  The State is allowed

5    to pursue both theories, we have elected to do that

6    because we're allowed to do that.

7            NATHAN CROCKER:  Okay, so there

8    are two counts because there are two different --

9            ATTY. BAILEY:  Theories of murder.

10            NATHAN CROCKER:  Okay.

11            ATTY. BAILEY:  And attached to

12    these counts or charges are two separate

13    specifications that the aggravated murder was

14    committed with prior calculation and design, and it

15    occurred in the course of an aggravated burglary and

16    the second specification is that the aggravated

17    murder occurred with prior calculation and design

18    and in the course of an aggravated robbery as

19    opposed to an aggravated burglary.

20            NATHAN CROCKER:  Now, I don't

21    understand the difference between a robbery and a

22    burglary.

23            ATTY. BAILEY:  And most folks

1    don't.  They use the terms interchangeably.  They

2    say their house was robbed but they don't really

3    mean that.  In the law, there are a lot of specific

4    legal definitions and the Judge is going to give you

5    a detailed definition at the end of this case.  I

6    will give you a for instance, okay.  With the term

7    aggravated burglary, generally, we're referring to a

8    situation where somebody trespasses in a dwelling

9    house, a person's home.  And with intent to commit

10   some type of offense, whether it's an aggravated

11   murder or a theft offense, somebody can be present

12   and the perpetrator can be armed with a deadly

13   weapon like a gun or a knife and the perpetrator can

14   inflict serious physical harm or death on the person

15   inside of that residence, okay.  That is aggravated

16   burglary, deals with an occupied structure.  On the

17   other hand, there is aggravated robbery and,

18   generally, that involves a situation where the

19   perpetrator uses force or threat of force against

20   another person to obtain something, maybe improper

21   to commit a theft offense, and the perpetrator can

22   be armed with a deadly weapon like a knife or a gun,

23   and can inflict serious physical harm or death on

2803

1    the victim of the aggravated robbery.  And that is

2    an aggravated robbery as opposed to an aggravated

3    burglary, and there is no structure necessarily

4    involved in an aggravated robbery.

5              NATHAN CROCKER:  Okay.

6              ATTY. BAILEY:  Now, the Defendant

7    here is charged as a complicitor.  She's not charged

8    with being the trigger person.  She's not the person

9    who physically killed the victim.  That is not the

10   charge.

11             NATHAN CROCKER:  Okay.

12             ATTY. BAILEY:  The charge here,

13   rather, is that she planned with another person, she

14   solicited or procured or aided and abetted,

15   strengthened, encouraged, helped in some way,

16   another person by the name of Nate Jackson in this

17   aggravated murder and the aggravated burglary of --

18   and of the aggravated robbery, and she is charged

19   with planning with him to kill a living person by

20   the name of Robert Fingerhut, her ex-husband, for

21   insurance money, and this Nate Jackson who is

22   charged with being the person who actually

23   trespassed in the house and stole the car from the

2804

1    residence.  The fact that she is charged not as the

2    trigger man but, rather, as an aider and abettor,

3    which under Ohio law, the way the legislature wrote

4    the law, would make her eligible for the death

5    penalty, if we could prove beyond a reasonable doubt

6    the elements of the crime of aggravated murder and

7    one or more of these specifications, okay.  Does

8    that bother you in any way that she is not charged

9    as the trigger person but rather as a complicitor?

10             NATHAN CROCKER:  No.

11             ATTY. BAILEY:  Okay, and if we

12   proved our case beyond a reasonable doubt so that

13   you were firmly convinced of the truth of the charge

14   to a moral certainty using reason and your common

15   sense, would you be able to return the appropriate

16   verdict based on the law and the facts?

17             NATHAN CROCKER:  I believe so,

18   yeah.

19             ATTY. BAILEY:  Okay, now, so each

20   -- she is charged with aggravated murder with

21   specifications.  She is also charged as a

22   complicitor with aggravated burglary, aggravated

23   robbery and attached to those charges are other

1       specifications of a firearm.  Okay, that is a

2       special finding of fact for the jury to consider

3       that there was a working gun that was used.

4                       NATHAN CROCKER:  Okay.

5                       ATTY. BAILEY:  Not that she is the

6       person who actually went in the house with the gun

7       but as a complicitor.

8                       NATHAN CROCKER:  Okay.

9                       ATTY. BAILEY:  So, you can see that

10      there are four counts, two of aggravated murder and

11      then the aggravated burglary and aggravated robbery,

12      and then there are special findings attached to

13      these charges.

14                      NATHAN CROCKER:  Okay.

15                      ATTY. BAILEY:  Now, let's say you

16      and the other jurors find the Defendant guilty in

17      the first phase of aggravated murder and one or more

18      of the specifications.  We would then move into a

19      second phase.  There will be a break in between,

20      like two separate trials.

21                      NATHAN CROCKER:  Okay.

22                      ATTY. BAILEY:  And where the issue

23      in the first phase had been guilt or non guilt, you

1      would have already decided the issue of guilt of the

2      crimes in the specifications.

3                      NATHAN CROCKER:  Yes.

4                      ATTY. BAILEY:  And in the second

5      phase, the issue is different.  The issues is one of

6      punishment.  What is the appropriate punishment for

7      this Defendant for this crime.  And because the

8      issues are different, you can hear the same

9      testimony from the first phase, and you may hear

10     different testimony in the second phase, and it

11     would relate to the aggravated circumstance or

12     circumstances that you would of found in the first

13     phase, and then there is the opportunity for

14     mitigating factor to be presented.  And these

15     mitigating factors would be things that work against

16     the imposition of the death penalty as the

17     punishment and in favor of the Defendant, okay.  And

18     then you have to do a balancing test.  You have to

19     balance the aggravating circumstance or

20     circumstances that you would have found in the first

21     phase, against any mitigating factors presented that

22     you might find.

23                      Now, how much does this stuff weigh,

1      it's entirely up to you and the other jurors.  You

2      might find something that weighs a whole lot, like

3      maybe a ton.  And you might find another thing that

4      is presented may weigh about as much as a feather,

5      right?

6                     NATHAN CROCKER:  Yes.

7                     ATTY. BAILEY:  Now, there are four

8      possible punishments that you read about, didn't

9      you?

10                     NATHAN CROCKER:  Yes.

11                     ATTY. BAILEY:  There is the death

12     penalty, there is life imprisonment with no parole,

13     there is life in prison with parole eligibility

14     after 30 full years and life in prison with parole

15     eligibility after 25 years, okay.  And at the

16     beginning, you have to consider all of those

17     punishments equally.  Can you do that?

18                     NATHAN CROCKER:  I'm not sure abut

19     the big difference between the 25 to 30, but yeah.

20                     ATTY. BAILEY:  But, initially, in

21     your mind though, they start out equally.

22                     NATHAN CROCKER:  Okay.

23                     ATTY. BAILEY:  Nothing is going to

1    have a leg up on the other, right?

2                    NATHAN CROCKER:   Yeah.

3                    ATTY. BAILEY:   Now, if you find

4    that the aggravated circumstance or circumstances

5    outweigh the mitigating factors beyond a reasonable

6    doubt, then you must return a verdict as to the

7    death penalty under the law.

8                    NATHAN CROCKER:   Okay, that is what

9    it says in the paper that I read earlier.

10                   ATTY. BAILEY:   If we don't meet

11   that burden of proof, the burden is totally on us,

12   the people of the State, and as she sits there, the

13   Defendant has no burden.

14                   NATHAN CROCKER:   Right.

15                   ATTY. BAILEY:   Okay, it's totally

16   on us.  And the reason for that is there is a

17   presumption of innocence.  This Defendant is

18   presumed to be innocent as are all other defendants

19   tried in this courtroom.  It acts like a cloak

20   shielding her all through the course of this trial

21   until the case is all over, all the evidence is in,

22   the instructions of law have been given to you and

23   you're back in the jury room deliberating and you

2809

```
 1          and the other 11 jurors decide beyond a reasonable
 2          doubt that we proved the elements of the crime
 3          charged.  And if we do, then that presumption of
 4          innocence would be gone.  Do you understand that?
 5                    NATHAN CROCKER:  Yes.
 6                    ATTY. BAILEY:  Now, in the second
 7          phase, if we don't meet the burden of proof that the
 8          -- if we don't prove the aggravating circumstance or
 9          circumstances outweigh these mitigating factor
10          beyond a reasonable doubt, then you would want to
11          consider the other three life sentences, right?
12                    NATHAN CROCKER:  Yes.
13                    ATTY. BAILEY:  Okay, and based on
14          what the evidence is, what you and the other jurors
15          find, then you can decide what is appropriate?
16                    NATHAN CROCKER:  Yeah.
17                    ATTY. BAILEY:  Okay, now, I talked
18          about elements.  If we have to prove certain
19          elements by proof beyond a reasonable doubt, and
20          when we use this term -- let's talk the elements for
21          a second.  The Judge is going to instruct you as --
22          at the end of this case, about what the elements of
23          the crimes are, each crime, each specification is
```

1       composed of certain essential component parts, we

2       call them elements.  It's like the ingredients in a

3       recipe book.  Did your grandmother ever bake a cake?

4                       NATHAN CROCKER:  Oh, yeah.

5                       ATTY. BAILEY:  You got a favorite?

6                       NATHAN CROCKER:  Not really.

7                       ATTY. BAILEY:  Chocolate cake,

8       okay?

9                       NATHAN CROCKER:  Not much of a cake

10      person, let's go for pie.

11                      ATTY. BAILEY:  Okay, a chocolate

12      pie.

13                      NATHAN CROCKER:  That'll work.

14                      ATTY. BAILEY:  Me too.  Okay, now

15      let's say your grandma makes a chocolate pie.  She's

16      going to put in the eggs, flour, and all of the

17      stuff you put in a chocolate pie, you got to add

18      chocolate for it to be a chocolate pie.  Those

19      essential ingredients.  Same thing with a crime.

20      Okay, each crime is composed of certain key

21      ingredients.  I'm going to give you a for instance.

22      The crime of aggravated murder with prior

23      calculation and design, the State has to prove

1    beyond a reasonable doubt the following things, and

2    the Judge is going to give you an instruction on

3    this at the end of the case and you are bound to

4    follow that instruction.  But this is a for

5    instance.  Let's say that we got to prove it

6    happened on or about a certain date, like December

7    11, 2001.  The second element might be that it

8    happened here in Trumbull County, Ohio, we call that

9    the venue.  And venue means we have to prove that it

10   happened here, so we can try the case in this

11   Courthouse rather than up in Ashtabula County or

12   down in Tuscaraws or somewhere else.  The third

13   element would be identification; that the person who

14   committed this offense is the same person sitting

15   over there.  Okay, somebody's got to come in and

16   point her out.  The fourth element is that she acted

17   purposely.  Basically, on purpose, but the Judge

18   will give you a detailed legal definition of that

19   term, everything is going to be a detailed legal

20   definition.  The fifth element is that she caused

21   the death of a living person, in this case, a fellow

22   by the name of Robert Fingerhut.  And sixth, that

23   she acted with prior calculation and design.  That

1    requires some study and planning in advance, okay.

2    There used to be a term premeditation, you might be

3    familiar with?

4                    NATHAN CROCKER:  Uh-huh.

5                    ATTY. BAILEY:  They changed the

6    law, and now it's called prior calculation and

7    design.  And, basically, if I take my pen and I drop

8    it and catch it by reflex, that is not prior

9    calculation and design.  If I drop my pen and I look

10   down, and I say, gosh, I dropped my pen, maybe I

11   better pick it up, and it requires some forethought

12   on planning, so I pick it up, that is prior

13   calculation and design.

14                   ATTY. INGRAM:  Objection.  Picking

15   up a pen is prior calculation and design?  He can

16   say that it's advanced planning, he cannot say that

17   it's prior calculation and design.

18                   THE COURT:  I tend to agree at this

19   point, Mr. Bailey.

20                   ATTY. BAILEY:  Okay, let's say you

21   chose advanced planning, okay, prior calculation and

22   design requires a studied scheme to kill, and there

23   are different things that you can look at in making

1    that determination.  Because, ordinarily, you would

2    say somebody who is planning a serious crime like an

3    aggravated murder, planning to kill another person,

4    generally is not going to stand on the Courthouse

5    steps and tell the whole world that they're planning

6    to kill somebody most likely, right?

7                        NATHAN CROCKER:  Yeah.

8                        ATTY. BAILEY:  But there are other

9    things that you can look at in making that

10   determination.  For example, if you have letters or

11   phone calls that shows what is inside a person's

12   mind in advance, you can look at that, right?

13                        NATHAN CROCKER:  Uh-huh.

14                        ATTY. BAILEY:  So, these elements

15   of the crime -- do you understand what these

16   component parts are, right, each crime has certain

17   component parts, elements?

18                        NATHAN CROCKER:  Yes.

19                        ATTY. BAILEY:  And we would have to

20   prove those by proof beyond a reasonable doubt,

21   okay.  The burden of proof or proving those things

22   is on us, the people of the State, that never

23   shifts.  We always have that burden, the Defendant

1    doesn't have to do anything.  The Defendant and her

2    lawyers can sit there on their hands for the whole

3    course of the trial, and if we fail to prove one of

4    these elements, if I fail to ask somebody, did it

5    happen, in what county did it happen and State, then

6    we didn't prove that element, and even though your

7    gut reaction is, hey, she did it, you still have to

8    find her not guilty because we didn't prove the

9    elements.

10                   NATHAN CROCKER:  Right.

11                   ATTY. BAILEY:  Do you understand

12   that?

13                   NATHAN CROCKER:  Yes.

14                   ATTY. BAILEY:  On the other hand,

15   if we do prove it so that you're firmly convinced of

16   the truth of the charge to a moral certainty using

17   reason and common sense, then you can return a

18   conviction, okay?

19                   NATHAN CROCKER:  Okay.

20                   ATTY. BAILEY:  This term proof

21   beyond a reasonable doubt, that also has a detailed

22   definition.  So, basically, it's this use of reason

23   and common sense that you are used to dealing with

2815

1      everyday, right?

2                  NATHAN CROCKER:  Yeah.

3                  ATTY. BAILEY:  In your job -- you

4      work at McDonald's.

5                  NATHAN CROCKER:  Unfortunately,

6      yes.

7                  ATTY. BAILEY:  Did you have any

8      other jobs in between college?

9                  NATHAN CROCKER:  No.

10                 ATTY. BAILEY:  How long ago did you

11     get out of college?

12                 NATHAN CROCKER:  Oh, it was '97.

13                 ATTY. BAILEY:  About five or six

14     years ago.

15                 NATHAN CROCKER:  Yeah.

16                 ATTY. BAILEY:  Okay, your field, I

17     imagine your field since the crash market crashed

18     and all of that, things are pretty tough in

19     engineering?

20                 NATHAN CROCKER:  Well, pretty

21     much.

22                 ATTY. BAILEY:  Okay, you also

23     mentioned you had written down it was H W Fast

1    Track, what is that?

2              NATHAN CROCKER:  That's the guy who

3    owns are McDonald's.

4              ATTY. BAILEY:  Okay, when you work

5    at McDonald's, there are certain things you got to

6    think about everyday, certain decisions that you

7    have to make that require reason and common sense,

8    and you get -- you may not -- you know it does

9    require reason and common sense, like you're not

10   going to leave the food out for hours to spoil or

11   something, you got to take it out, get it into the

12   microwave fast, prepare the stuff when somebody

13   wants something, right?

14             NATHAN CROCKER:  Yeah.

15             ATTY. BAILEY:  So you've got to

16   make some decisions everyday.  And you make other

17   decisions getting to work, getting home, you're

18   thinking about other employment or something like

19   that, and you want to look at the classifieds, is

20   that something I want to apply for or not, right?

21             NATHAN CROCKER:  Yeah.

22             ATTY. BAILEY:  And you made a

23   decision to go to college, and you used reason and

1    common sense there.

2                    NATHAN CROCKER:   Well  --

3                    ATTY. BAILEY:  Well, yeah, you did

4    and that is part of daily life.

5                    NATHAN CROCKER:  Yeah.

6                    ATTY. BAILEY:  And you talk to

7    people and you know, basically, if they're telling

8    the truth about different things you can judge their

9    credibility and use the same tests that use -- you

10   do the same things with the witnesses.  Use the same

11   tests that you use in your daily lives, there is

12   nothing strange about it.  No magic to it, just

13   everyday stuff that you are used to doing.

14                   NATHAN CROCKER:  Yeah.

15                   ATTY. BAILEY:  Just probably a much

16   more serious situation here in Court than what you

17   are used to dealing with in everyday life, that you

18   use the same tests in your everyday life.

19                   NATHAN CROCKER:   Yeah.

20                   ATTY. BAILEY:  I mean, if it's

21   something that you put in the computer and you put

22   all the information in and it spits it out, we would

23   do that, but we rely on people because machines

1        don't use reason and common sense.

2                    NATHAN CROCKER:  Right.

3                    ATTY. BAILEY:  Now, when we talk

4        about proof beyond a reasonable doubt, some times

5        the example of a box is used.  Let's imagine that we

6        got a box here and in civil cases, the burden of

7        proof is different; it's by a preponderance of the

8        evidence.  Whoever fills that box with enough

9        evidence to get over half way is going to win.  In a

10       criminal case, we have a higher burden, a much

11       higher burden.  We have to fill that box up with

12       evidence pretty close to the top, that's not 100

13       percent that that box has to be filled completely to

14       the top, but its got to have enough evidence in it

15       so it's way over half way but it's getting close to

16       the top so that you're personally satisfied, you and

17       the other jurors, and each juror may brought this to

18       his or her own mind as to whether they're satisfied

19       so that you're firmly convinces them of the truth of

20       the charge of these elements of the crime.

21                    NATHAN CROCKER:  Yeah.

22                    ATTY. BAILEY:  And some times folks

23       say, I want to be one hundred percent sure, or

1   beyond a shadow of a doubt, but you understand that

2   is not our burden of proof.  The Judge is going

3   instruct you what our burden of proof is, and tell

4   you that basically it's proof beyond a reasonable

5   doubt.  And I take it that you wouldn't force us to

6   a higher burden of proof than what the Judge tells

7   you the law is.

8                    NATHAN CROCKER:  Okay.

9                    ATTY. BAILEY:  Even though it's a

10  capital case.

11                   NATHAN CROCKER:  Right.

12                   ATTY. BAILEY:  And do you

13  understand that the same burden of proof applies in

14  criminal cases whether it's a shoplifting case, or a

15  burglary, or a rape, or a robbery, or an aggravated

16  murder case like this?

17                   NATHAN CROCKER:  Yeah.

18                   ATTY. BAILEY:  Now, let me give you

19  an example.  Okay, let's say, -- oh, let me back a

20  step for a minute.  Let's say there are different

21  types of evidence that we can use in proving these

22  elements of crimes.  There is something called

23  direct evidence where a witness can come in and

1    testify to something that he or she has learned

2    through use of his or her five senses.  For example,

3    I heard a gunshot and it was loud.  I touched the

4    computer and it was cold.  I smelled the smoke and

5    it as acrid.  Okay, that is direct evidence.  There

6    is another type of evidence that we can use that you

7    are familiar with, it's sort of a roundabout type of

8    evidence where you're presented with a fact or

9    series of facts and you draw a logical deduction to

10   another fact or set of facts.  Okay, that is called

11   circumstantial evidence.  You've heard that term

12   before?

13                  NATHAN CROCKER:  Yes.

14                  ATTY. BAILEY:  Some times people

15   use that in a derogatory sense, you look at the old

16   Perry Mason's or LA Law reruns or something, but it

17   shows that they don't really know what that term

18   means.  Let me give you a for instance of

19   circumstantial evidence.  Let's say you lived in a

20   house that's got two stories and at night time you

21   go to bed, you go up to your room, look out the

22   window, and its a beautiful night.  The moon is

23   beaming, the stars are twinkling, not a cloud in the

1      sky.  And as far as you can see across the

2      neighborhood, it's perfectly dry.  So you close the

3      blinds, get into bed, the radio is on and the

4      announcer says, folks, there is a cold front moving

5      in, and I expect we're going to get a storm come in

6      some time, and you fall asleep.  Some time in the

7      middle of the night, you awaken and you look toward

8      the window, but the blinds are drawn, and you can

9      see that there is a flash of light that comes in

10     from outside.  And two seconds later, there is a

11     distant booming and rolling boom in the sky, and a

12     few minutes go by or two and then there is another

13     bright flash outside and maybe two seconds later

14     there is a cracking and boom not too far away.  And

15     then a half a minute goes by and there is a really

16     bright flash outside and you hear a big ripping,

17     roaring crack above the house and the pitter patter

18     on the roof and a heavy drumming sound, and you fall

19     back asleep.  Some time later, you awaken, go to the

20     window and open the blinds and look out.  It's a

21     beautiful day.  The sun is shining, there is not a

22     cloud in the sky, but where it was perfectly dry the

23     night before, as far as you can see across the

1       neighborhood, the streets are running with water,

2       the roof tops are soaking wet, there are puddles on

3       the ground, leaves are dripping drops of water from

4       the trees.  And you know what happened during the

5       night, don't you?

6                       NATHAN CROCKER:  Yeah.

7                       ATTY. BAILEY:  What happened?

8                       NATHAN CROCKER:  Thunderstorm.

9                       ATTY. BAILEY:  And you know that

10      beyond any reasonable doubt, don't you?

11                      NATHAN CROCKER:  Yeah.

12                      ATTY. BAILEY:  Now, there are some

13      limitations to the circumstantial evidence.  You may

14      not know how long that rain lasts, you may not know

15      how much water fell unless you set up a system to

16      measure it.  But you know beyond any reasonable

17      doubt based on those facts and circumstances, even

18      though you didn't see the rain with your own eyes,

19      that there is a thunderstorm, right?

20                      NATHAN CROCKER:  Yes.

21                      ATTY. BAILEY:  Now, there is room

22      in there for some possible or imaginary doubt.  You

23      can imagine that Alf and his martian buddies flew by

1      during the night in a flying saucer and sprinkled

2      the ground with some wet stuff, and put on a sound

3      and light show, but that would be a foolish or

4      imaginary doubt, wouldn't it?

5                      NATHAN CROCKER:  Yeah.

6                      ATTY. BAILEY:  And you know using

7      circumstantial evidence as to what really happened,

8      right?

9                      NATHAN CROCKER:  Yeah.

10                     ATTY. BAILEY:  And you can

11     understand that we can prove our case, the elements

12     of the crimes charged by circumstantial evidence,

13     and it's just as good as direct evidence, okay?

14                     NATHAN CROCKER:  Okay.

15                     ATTY. BAILEY:  And if we proved

16     these elements by circumstantial evidence, you can

17     return a verdict finding the Defendant guilty.

18                     NATHAN CROCKER:  Okay.

19                     ATTY. BAILEY:  Now, if we prove the

20     elements of the crime of aggravated murder and one

21     or more of the specifications, okay, so that you are

22     firmly convinced that she is guilty of those charges

23     beyond a reasonable doubt, would you be able to sign

1     a verdict form finding her guilty of those charges

2     of aggravated murder and the specifications?

3                    NATHAN CROCKER:  Yeah.

4                    ATTY. BAILEY:  Now, let's say we

5     went to a second phase, and we convinced you beyond

6     a reasonable doubt that the aggravating circumstance

7     or circumstances outweighed any mitigating factors

8     beyond a reasonable doubt, would you be able to sign

9     a verdict for the death penalty as a punishment?

10                    NATHAN CROCKER:  Yeah.

11                    ATTY. BAILEY:  Okay, and would you

12    be able to announce that verdict in open court if

13    the Judge asked you if this was your verdict?

14                    NATHAN CROCKER:  Yeah.

15                    ATTY. BAILEY:  You believe people

16    should be held accountable for their actions?

17                    NATHAN CROCKER:  In general, yeah.

18                    ATTY. BAILEY:  Are there any

19    circumstances where you think people shouldn't be

20    held accountable?

21                    NATHAN CROCKER:  Well, what is the

22    saying that they always refer to, by reason of

23    insanity?

1          ATTY. BAILEY:  Not guilty by reason

2     of insanity.

3          NATHAN CROCKER:  That works.

4          ATTY. BAILEY:  The competency you

5     are talking about versus incompetent or insane.  In

6     that, if somebody is not mentally competent or for

7     somebody who is not sane at the time, doesn't know

8     the difference between right and wrong and suffers

9     from a severe disease or defect of the mind, then

10     you would agree that that person shouldn't be held

11     accountable for his or her actions, right?

12          NATHAN CROCKER:  Yeah.

13          ATTY. BAILEY:  Because it wouldn't

14     be fair to have somebody accountable for something

15     when they're not all there, so to speak, legally.

16          NATHAN CROCKER:  Yeah.

17          ATTY. BAILEY:  Okay, or if somebody

18     were in a hospital bed in a coma, and let's say the

19     person went into convulsions and kicked out and hit

20     an x-ray machine with his or her foot and it fell

21     over and it got smashed, there is a type of crime

22     called vandalism, where you knowingly cause harm to

23     like an X-ray machine, and in this case, the person

```
 1        was really unconscious and it was a convulsion or a

 2        reflex or something, the person shouldn't be held

 3        accountable for that, right?

 4                    NATHAN CROCKER:  Right.

 5                    ATTY. BAILEY:  Okay, but for

 6        something that somebody does deliberately, on

 7        purpose, you think people should be held accountable

 8        for their actions?

 9                    NATHAN CROCKER:  Yeah.

10                    ATTY. BAILEY:  If they're not

11        insane?

12                    NATHAN CROCKER:  Yeah.

13                    ATTY. BAILEY:  Okay.  You

14        understand that you can't take notes in Court, okay.

15        In college you used to take notes --

16                    NATHAN CROCKER:  Right.

17                    ATTY. BAILEY:  With a computer you

18        can take notes, right?

19                    NATHAN CROCKER:  Yeah.

20                    ATTY. BAILEY:  Here, you can't take

21        notes.  Some times you might want to, but you just

22        can't.  If you watch -- have you ever watched Court

23        T.V.?
```

```
 1                    NATHAN CROCKER:  Yes.

 2                    ATTY. BAILEY:  On occasion, you

 3      might notice they have cases from different

 4      jurisdictions and different states.  Some times

 5      folks might be taking notes on there if they're in

 6      another State.  Some times Judges will let them do

 7      that but not in Ohio.

 8                    NATHAN CROCKER:  Okay.

 9                    ATTY. BAILEY:  Most judges will not

10      let a juror take notes because they think it

11      distracts them from what the witness is saying.

12      They want you to look at the witness, observe their

13      demeanor, so you catch all of that and pay specific

14      attention.  Also, if people take different notes,

15      some people aren't as good note takers as others,

16      then they may be arguing over their notes rather

17      than all of the testimony that was given.

18                    NATHAN CROCKER:  That's what the

19      transcripts are for later during the deliberations,

20      right?

21                    ATTY. BAILEY:  Well, that's another

22      thing.  Okay, you understand that you got to pay

23      very close attention in the course of the trial and
```

1    the testimony?

2              NATHAN CROCKER:  Yes.

3              ATTY. BAILEY:  That is why there

4    are 12 of you, you have collective recollection.

5    There aren't going to be any transcripts of the

6    testimony.

7              NATHAN CROCKER:  Okay.

8              ATTY. BAILEY:  We've got court

9    reporters that are very good, but we don't have

10   millions of dollars of transcribing equipment like

11   the O.J. Simpson case or some other high publicity

12   cases like the Menendez brothers or Dahmer or those

13   things, they spend millions of dollars on equipment.

14   The County is pretty much broke and they don't have

15   the funds for that type of stuff.  So, you will have

16   -- if a question is asked, Judge, can we get a

17   transcript of the testimony of so and so, the answer

18   is going to be no, and you're going to be told to

19   rely on your collective recollection.  Will you  be

20   able to do that?

21             NATHAN CROCKER:  Yes.

22             ATTY. BAILEY:  And another is, you

23   can't go out on your own to investigate.  Some times

1    in the old T.V. programs, Matlock or Perry Mason, I

2    think they had cases on there where Matlock would

3    his office staff out to investigate.  Perry Mason

4    went out on a case.  And that is fine for T.V. and

5    the movies, but in real life you can't do that

6    because it would cause a mistrial.  We had a jury do

7    that once, and we ended up with a mistrial and we

8    don't want to do this all over again.

9              NATHAN CROCKER:  No.

10            ATTY. BAILEY:  So, you wouldn't do

11    that?

12            NATHAN CROCKER:  I never heard of

13    a juror doing that.  That's a new one.

14            ATTY. BAILEY:  And another thing

15    is, you are stuck with the questions that the lawyer

16    asks.  Some times on Court T.V., the jurors in

17    different States may be able to submit questions to

18    judges to ask the witness.  That doesn't happen

19    here.

20            NATHAN CROCKER:  Okay.

21            ATTY. BAILEY:  And because we're

22    lawyers and we're trained in law school to prove

23    elements or to try to disprove elements, questions

2830

1      are going to be geared for prove or disproving these

2      elements of the crime charged.  So, if you had a

3      special interest, let's say you sold shoes and you

4      were interested in the footwear that somebody was

5      wearing at the time.  Or if you were a chef, you

6      wonder what did they eat that day.  If it's not

7      relevant to proving the elements of the crime, that

8      question may never get asked or answered, okay, so

9      there may be some unanswered questions that you

10     might have that wouldn't pertain to proving the

11     elements, okay.  Will you still be able to make your

12     decisions in spite of the fact that you have some

13     unrelated questions?

14                    NATHAN CROCKER:  Yeah.

15                    ATTY. BAILEY:  Do you understand

16     that criminals aren't always rocket scientists.  You

17     would expect that criminals may engage in a lot of

18     planning to commit a crime, but you understand that

19     even though they may engage in a lot of planning,

20     they may do some really stupid, stupid things.

21                    NATHAN CROCKER:  Like anyone else.

22                    ATTY. BAILEY:  Like getting away

23     and they get caught.  For example, you've heard of

1     case probably on the internet under the Darwin

2     Awards or one of those type of things, where they

3     have examples of the bank robber who goes into the

4     bank wearing a mask, got a gun in hand, gives the

5     teller a note on the back of an envelope that says

6     give me all of your money, and the teller gives him

7     the money and he runs out, and they turn over the

8     envelope after he leaves and it's got his name and

9     address on there.  Or the burglar climbs in through

10    a window and drops his wallet with his

11    identification inside the residence and they catch

12    him at home with the proceeds and stuff.

13                    NATHAN CROCKER:   Yeah.

14                    ATTY. BAILEY:  Okay, you are aware

15    that that kind of stuff can happen?

16                    NATHAN CROCKER:   Yeah.

17                    ATTY. BAILEY:  Criminals can do

18    really stupid things.

19                    NATHAN CROCKER:  Uh-huh.

20                    ATTY. BAILEY:  Now, there is going

21    to be a period of time at the end of the first phase

22    where you and the other jurors are going to go out

23    and deliberate after all of the testimony and

2832

1       evidence is in and the Judge has instructed you on

2       the law, and you will be kept together to

3       deliberate.  We call the sequestration.  And each

4       jury is different.  I have had juries on capital

5       cases that take an hour and a half in the first

6       phase, and I had them take as much as five days, so

7       it can be different depending on your deliberations.

8       And if you don't decide within a certain period of

9       time, the Judge will make sure that you will be

10      accommodated at a local hotel, okay, and your meals

11      will be brought in, but you don't deliberate until

12      all 12 of you are present.  You can't talk to one or

13      two other jurors about this, you have to wait until

14      all 12 are there, okay.  And then you make your

15      decision, and let's say you find the Defendant

16      guilty of aggravated murder with one or more of

17      these specifications and we go into the second

18      phase.  There would be a break of a couple days to a

19      week maybe and then you would come back in.  And

20      then in the second phase usually takes maybe a day

21      or up to three days generally.  And then again you

22      deliberate, and you would be sequestered again a

23      second time.  Would that sequestration cause you any

1    undue hardship?

2               NATHAN CROCKER:  I am not sure how

3    we get whatever we need if that happens.  That is

4    something that I would try to find out about.

5               ATTY. BAILEY:  For example, like if

6    you need food and stuff, the Court will provide it.

7    The Judge would advise you in advance before you're

8    being sequestered so that you have enough time to

9    get your clothes and all of that.

10              NATHAN CROCKER:  Clothes and

11   contact things, medication?

12              ATTY. BAILEY:  Right.

13              NATHAN CROCKER:  Okay.

14              ATTY. BAILEY:  So, you would be

15   able to take that with you and you would be in the

16   custody of the bailiff.

17              NATHAN CROCKER:  So, we would know

18   ahead of time when that is a possibility?

19              ATTY. BAILEY:  Yes, you will be

20   given the date ahead of time.

21              NATHAN CROCKER:  Okay.

22              ATTY. BAILEY:  You're not going to

23   be suddenly sequestered.  That won't happen.

1               NATHAN CROCKER:  Okay.

2               ATTY. BAILEY:  You will get at

3      least a days notice.

4               NATHAN CROCKER:  Okay.

5               ATTY. BAILEY:  But it could happen

6      over a weekend, you know, if you're still here.  If

7      you're here on Friday and your deliberating and your

8      deliberations take you into the weekend, that could

9      happen, okay.

10               NATHAN CROCKER:  Okay.

11               ATTY. BAILEY:  And you probably

12      won't have access to a computer during that time.

13               NATHAN CROCKER:  Okay.

14               ATTY. BAILEY:  No problem then with

15      that?

16               NATHAN CROCKER:  No.

17               ATTY. BAILEY:  The sequestration?

18               NATHAN CROCKER:  No.

19               ATTY. BAILEY:  Now, during the

20      course of the trial, you are going to be face to

21      face with the Defendant, and perhaps as you come

22      face to face with her and as your chair is turned

23      towards you, you might feel some sympathy for her

1      and you might become more acquainted with her.

2      It's normal, I think, for folks to feel sympathy for

3      another person.  My question to you is this.  When

4      you go inside your jury room with the other jurors

5      to deliberate on your verdict, can you set aside

6      all thoughts that you might have of sympathy for the

7      Defendant and be conscientious in your deliberations

8      and base your verdict on the testimony and evidence

9      you hear and the instructions of law given to you by

10     the Court and lay aside all thoughts of sympathy?

11                     NATHAN CROCKER:  I believe so, yes.

12                     ATTY. BAILEY:  Now, do you have any

13     questions?

14                     NATHAN CROCKER:  No, the only

15     questions that I really had were about the

16     sequestering.

17                     ATTY. BAILEY:  Now, I think you

18     would agree that, as citizens in this Country, we

19     have certain obligations of citizenship.  If it's

20     election time, we got an obligation to make sure

21     that the political process works and to learn as

22     much as we can about the candidates and the issues

23     and cast a ballot, if we're able to.  Another

1     obligation of citizenship is if we're at war with a

2     country to serve, or if the country ends up in a war

3     somewhere and we're called to serve, then we got an

4     obligation to serve.  For example, we have young

5     folks overseas in several places right now who are

6     doing their duty.  And another obligation of

7     citizenship is to make sure that our criminal

8     justice system works and if we're summoned as jurors

9     and we're able to serve and it may cause some

10    inconvenience to our daily lives from our usual

11    routine, we might not be able to do things that we

12    would ordinarily do during that time, but to make

13    sure that we have a cross section in the community

14    of all different types of views that it's important

15    that we serve as jurors, especially in the most

16    serious of criminal cases.  Would you agree with

17    that?

18              NATHAN CROCKER:  Yes.

19              ATTY. BAILEY:  Would you be willing

20    to undertake that obligation of citizenship?

21              NATHAN CROCKER:  Yes.

22              THE COURT:  Excuse me.  Would you

23    have any objection if I called down and had these

1    other two people go home and just come back

2    tomorrow?

3                ATTY. BAILEY:  No problem, Your

4    Honor.

5                THE COURT:  Okay, call down to 226.

6                ATTY. BAILEY:  I am done with my

7    questions and the defense counsel will get a chance

8    to ask you some.

9                THE COURT:  Mr. Ingram.

10

11   **EXAMINATION BY ATTORNEY INGRAM**:

12

13                ATTY. INGRAM:  Hi, Mr. Crocker, how

14   are you doing this afternoon?

15                NATHAN CROCKER:  Oh, just duckey.

16                ATTY. INGRAM:  I imagine that it's

17   not all that enjoyable up there.  Do you need some

18   water or anything, a glass of water?

19                NATHAN CROCKER:  Not yet, no.

20                ATTY. INGRAM:  If during our

21   discussions you need a glass, just stop me and let

22   me know.

23                NATHAN CROCKER:  Okay.

```
 1                    ATTY. INGRAM:  My name is Jerry

 2       Ingram and this is John Juhasz, and John and I share

 3       the responsibility of representing Donna Roberts,

 4       who is on trial for her life.  We take our

 5       responsibility very seriously, and feel that we

 6       should take every reasonable precaution in selecting

 7       a fair-minded jury, the same type of jury that you

 8       or I would want if we were on trial.  Does that

 9       sound fair enough to you?

10                    NATHAN CROCKER:  Yes.

11                    ATTY. INGRAM:  This is the only

12       opportunity that we will have to get to know each

13       other and determine whether you're comfortable

14       sitting on this case.  We can talk to one another.

15       I can say things directly to you and, more

16       importantly, you can say things directly to me.

17       After this trial starts, the lawyers can talk at the

18       jurors, but we can't talk to you.  If during this

19       conversation there is anything that pops into your

20       mind that you would like to ask me, or you would

21       like to discuss, would you stop me and let me know?

22                    NATHAN CROCKER:   Yeah.

23                    ATTY. INGRAM:  This process that
```

1    you're going through right now is a lot like a job

2    interview.

3              NATHAN CROCKER:    Yeah.

4              ATTY. INGRAM:    Except that when you

5    go to the job interview, you select the places to go

6    to be interviewed.  Here, there was a spin of the

7    jury wheel, and depending on how you look at it, you

8    were either lucky or unlucky, your name was pulled

9    out and we asked you to come here.  We're

10   interviewing you today for one of the most important

11   jobs there is, the job of finding the truth and

12   determining the fate of another person.  So, my

13   first question to you, sir, is how do you feel about

14   being asked to assume such a responsibility?

15             NATHAN CROCKER:  Well, it should

16   definitely be interesting.

17             ATTY. INGRAM:  I am going to ask

18   you some questions now like Mr. Bailey did, but

19   before I do that, I want you to understand that if

20   at any point in time, and it will probably happen,

21   if one of my questions isn't clear to you, please

22   understand that that is my fault and not yours.

23   What that means is that I have failed to make myself

 1     clear, and you should then stop me and I will do my

 2     best to rephrase the question.  Fair enough?

 3                     NATHAN CROCKER:  Okay.

 4                     ATTY. INGRAM:  In a nutshell, this

 5     case boils down to the government's allegation that

 6     Donna Roberts plotted or conspired with a male

 7     companion by the name of Nate Jackson to cause the

 8     death of Robert Fingerhut.  Donna and Robert were

 9     divorced, but they continued working together at the

10     Greyhound Bus Stations in Youngstown and Warren, and

11     living together in Howland.  Do you understand that

12     this trial is about the guilt or innocence of one

13     person and one person only?

14                     NATHAN CROCKER:  Yes.

15                     ATTY. INGRAM:  The person on trial

16     here is Donna Roberts, right?

17                     NATHAN CROCKER:  Yes.

18                     ATTY. INGRAM:  Throughout the

19     course of these proceedings, you will hear the name

20     of Nate Jackson.

21                     NATHAN CROCKER:  Yeah.

22                     ATTY. INGRAM:  And you may conclude

23     that Nate Jackson did what the State says he did.

```
 1                      NATHAN CROCKER:  Okay.

 2                      ATTY. INGRAM:  The issue that

 3      you're being called upon to determine is whether or

 4      not Donna helped him do it.

 5                      NATHAN CROCKER:  Okay.

 6                      ATTY. INGRAM:  You see that?

 7                      NATHAN CROCKER:  Yes.

 8                      ATTY. INGRAM:  And, I believe,

 9      when Mr. Bailey was talking to you, he used the

10      words complicitor, aider and abettor.  Do you recall

11      that?

12                      NATHAN CROCKER:  Yeah.

13                      ATTY. INGRAM:  Their burden of

14      proof here is to prove to you beyond a reasonable

15      doubt that Donna helped aid, assisted Nate Jackson.

16      Will you hold them to that burden?

17                      NATHAN CROCKER:  Yes.

18                      ATTY. INGRAM:  In support of its

19      allegation, the State will introduce during this

20      trial various letters and tape-recorded telephone

21      conversations between Donna and Nate Jackson.

22                      NATHAN CROCKER:  Okay.

23                      ATTY. INGRAM:  Some of that
```

1    evidence is sexually explicit in nature and to be

2    absolutely candid with you, some of it is actually

3    offensive.  You understand the allegation is murder,

4    not loose morality?

5                NATHAN CROCKER:  Yeah.

6                ATTY. INGRAM:  And no matter how

7    shocked or offended you may be by the sexual nature

8    of some of this evidence, it will be your job

9    responsibility as a juror to sort of rise above that

10    offense to test the evidence to determine whether it

11    ties Donna to this offense.  Are you up to that?

12                NATHAN CROCKER:  I believe so,

13    yeah.

14                ATTY. INGRAM:  Now, Donna denies

15    that she actually participated by conspiracy, plot

16    or otherwise in the murder of Robert Fingerhut.

17    Would you have the courage to acquit, that is, vote

18    not guilty, if you thought a not guilty verdict was

19    warranted by the evidence.

20                NATHAN CROCKER:  Yes.

21                ATTY. INGRAM:  There is no reason

22    for you and I to discuss pretrial publicity, but you

23    recall the Judge asked you to sign a piece of paper

1      --

2                          NATHAN CROCKER:  Yes.

3                          ATTY. INGRAM:  -- where you

4      promised that you would avoid news media coverage?

5                          NATHAN CROCKER:  Yeah.

6                          ATTY. INGRAM:  Let me briefly

7      explain why we ask you to do that.  Did you see any

8      of the publicity surrounding the trial of O.J.

9      Simpson, I mean, it's hard to avoid.  Did you see

10     any of it?

11                         NATHAN CROCKER:  Oh, yeah.

12                         ATTY. INGRAM:  Every night, you

13     would turn on the boob tube, and there would be a

14     high affluent prosecutor and usually a high affluent

15     ex-prosecutor.

16                         NATHAN CROCKER:  Every night for

17     over a year.

18                         ATTY. INGRAM:  And a high affluent

19     defense lawyer, and no matter who you listened to,

20     they put a different spin or interpretation on the

21     evidence.

22                         NATHAN CROCKER:  Uh-huh.

23                         ATTY. INGRAM:  Do you see how that

1    could affect a trial juror?

2                    NATHAN CROCKER:   Yes, I understand

3    how that could affect a juror.

4                    ATTY. INGRAM:  And that is why we

5    ask you not to watch any of the coverage.  Some

6    times that is hard, because they don't announce,

7    hey, you jurors, we're putting on a story right now,

8    or on the car radio, hey, you jurors, we're about to

9    put something on.

10                   NATHAN CROCKER:  Okay.

11                   ATTY. INGRAM:  If something catches

12   you by surprise, and that very well might happen,

13   you just sort of got to turn the volume down or turn

14   the radio off or leave the room.  Will you do that?

15                   NATHAN CROCKER:  Yes, yes, I will.

16                   ATTY. INGRAM:  And, you know, we

17   all have families, and  --

18                   NATHAN CROCKER:   Oh, the families

19   are interested but I haven't even said the name of

20   what is involved with this.

21                   ATTY. INGRAM:  Because if they

22   knew, they would be curious and they would be asking

23   you, and you would have to avoid that curiosity, are

1    you up to that?

2                        NATHAN CROCKER:   Yes, yes.

3                        ATTY. INGRAM:   I don't have to

4    spend much time with you about penalty alternative

5    because whether a death sentence is appropriate or

6    whether a life sentence is appropriate, is fact

7    determined, correct?

8                        NATHAN CROCKER:  Seems more fact

9    determined than I actually thought it was after

10   reading that paper earlier, yeah.

11                       ATTY. INGRAM:   Now, I want to

12   explain to you a concern that I have about just

13   asking you these questions, and the Judge used my

14   line, that it's a lot like putting the cart before

15   the horse.

16                       NATHAN CROCKER:  Okay.

17                       ATTY. INGRAM:   Do you wear your

18   seat belt?

19                       NATHAN CROCKER:   It's an automatic

20   seat belt.

21                       ATTY. INGRAM:   You know people that

22   have to buckle their seat belts, though, don't you?

23                       NATHAN CROCKER:  Yes.

1              ATTY. INGRAM:  And when they buckle

2    that seat belt, they don't expect to be involved in

3    an accident, do they?

4              NATHAN CROCKER:  Well, I would

5    assume that they hope they aren't.

6              ATTY. INGRAM:  Right, they buckle

7    it just in case.

8              NATHAN CROCKER:  Yeah.

9              ATTY. INGRAM:  We're predicting

10   that we're not ever getting to a second phase, we

11   simply have to ask you these questions now because

12   the law requires that we do so.

13             NATHAN CROCKER:  Yeah.

14             ATTY. INGRAM:  Do you have handle

15   on that?

16             NATHAN CROCKER:  Yes.

17             ATTY. INGRAM:  These questions have

18   nothing to do with Donna's guilt or innocence.

19             NATHAN CROCKER:  Okay.

20             ATTY. INGRAM:  And in the

21   preliminary instructions, the Judge told you that,

22   do you recall reading that?

23             NATHAN CROCKER:  Yes.

1              ATTY. INGRAM:  Now, how -- did the
2    preliminary instructions make sense to you?
3              NATHAN CROCKER:  For the most
4    part, yes.
5              ATTY. INGRAM:  I want you to
6    understand a full half of the lawyers that practice
7    law could read those preliminary instructions and
8    they would have a hard time following them.  It's
9    difficult -- it's difficult stuff, and it's stuff
10   that we're not familiar with in our daily lives.  Do
11   you think you have a handle on the fact that this is
12   potentially and only potentially a two-phased
13   process?
14             NATHAN CROCKER:  Yes.
15             ATTY. INGRAM:  What happens during
16   the first phase if Donna is found not guilty?
17             NATHAN CROCKER:  Then the trial is
18   over.
19             ATTY. INGRAM:  And we all pack up
20   our bags and go home.  Do you have the four
21   sentencing alternatives clear in your mind?
22             NATHAN CROCKER:  I believe so, but
23   like I have said before, I still don't understand

1        what is going to create the difference between the

2        25 and 30.

3                        ATTY. INGRAM:  Well that, number

4        one, I can't tell you that because that would be up

5        to each particular juror, but I can tell you this,

6        there is not much of a difference between those two

7        things so probably not much would determine the

8        difference between the 25 and 30, if a juror was

9        inclined to go along with one of those two.

10                       NATHAN CROCKER:  Okay.

11                       ATTY. INGRAM:  And that is

12       something that an individual juror would have to

13       answer.  That is really not something that a lawyer

14       could answer.  Is that responsive to your question?

15                       NATHAN CROCKER:   I think so.

16                       ATTY. INGRAM:  Did you ever hear

17       anybody say they don't believe in life in prison or

18       life imprisonment because why should us taxpayers

19       have to pay the cost?

20                       NATHAN CROCKER:  Yeah, I am

21       familiar with the view.

22                       ATTY. INGRAM:  Do you have any

23       opinion whatsoever on that cost issue?

2849

1          NATHAN CROCKER:  Like I said

2    before, there are too many arguments both ways with

3    it.  I mean, there is the argument that it does --

4    it is a source of money to go and not return, but

5    then there is the other arguments against.  There is

6    no solid ground with it.

7          ATTY. INGRAM:  Okay, there is no

8    solid ground with any of this, I want you to

9    understand, and no one expects you to have solid

10   views and, as a matter of fact, if we were to change

11   rolls and you were to come up here and ask me the

12   very same questions that I am asking you, I don't

13   know that I would have any solid views.  They are

14   hard questions, and they're actually hard questions

15   but a difficult issue that you might not ever have

16   to address, do you see that?

17          NATHAN CROCKER:  Yeah.

18          ATTY. INGRAM:  The excalibur

19   website, you guys discuss some pretty difficult

20   issues?

21          NATHAN CROCKER:  Yeah, some times,

22   yes.

23          ATTY. INGRAM:  There has been some

1     renewed debate in this country about capital

2     punishment.  There was a moratorium on executions in

3     Illinois, the Supreme Court decided a case regarding

4     executions of the mentally challenged, was any of

5     that discussed on the website?

6                  NATHAN CROCKER:  How recently was

7     that?  I don't think we've discussed any issues like

8     that in the last couple of years.

9                  ATTY. INGRAM:  Both of those have

10    been in the last couple of years.

11                 NATHAN CROCKER:   No, I don't think

12    so.

13                 ATTY. INGRAM:  You guy's actually

14    discuss the separation of church and State on the

15    website.

16                 NATHAN CROCKER:  That comes up a

17    lot.

18                 ATTY. INGRAM:  I am not so sure

19    what this has to do with your role as a juror in

20    this case, but did you see the -- what do they call

21    it, the gazebo in the front of this Courthouse?

22                 NATHAN CROCKER:  Yes, there was

23    somebody talking in it earlier just when I was

1   arriving.

2                   ATTY. INGRAM:  Yes, do you know

3   what that is?

4                   NATHAN CROCKER:  At the gazebo?

5                   ATTY. INGRAM:  It's a marathon

6   Bible reading.

7                   NATHAN CROCKER:  Oh.

8                   ATTY. INGRAM:  That might be an

9   interesting tidbit for your excalibur separation of

10  church and State discussion.

11                  NATHAN CROCKER:  Well, not quite

12  yet.  I haven't actually told them anything about

13  being on this because they would just ask questions.

14  I don't intend to bring this up at all until way

15  after the fact.

16                  ATTY. INGRAM:  Well, afterwards,

17  you can tell them that there was a Bible reading on

18  the Courthouse property.

19                  NATHAN CROCKER:  I noticed that is

20  a bocci court down on the other side?

21                  ATTY. INGRAM:  I believe so.

22                  ATTY. BECKER:  Yeah, it's on the

23  other end.

```
 1                    THE COURT:  Everybody knew the
 2    Italians had come of age and they put the bocci
 3    court up and it stayed because all of that was run
 4    by the old beginners there, the historical society,
 5    so they got special dispensation to put that up and
 6    nobody ever made them take it out, so the Italians
 7    are well entrenched in our society.
 8                    ATTY. INGRAM:  Do you play bocci?
 9                    NATHAN CROCKER:   I know how to
10    play.   I only play usually at family reunions but
11    we've never had a court.
12                    ATTY. INGRAM:  Play it on the
13    grass?
14                    NATHAN CROCKER:  Yeah, but you
15    usually lose the pauline a lot.
16                    ATTY. INGRAM:  In your
17    questionnaire, you were asked a question about the
18    most important problems facing the criminal justice
19    system.  Do you recall that question?
20                    NATHAN CROCKER:   Yeah, I couldn't
21    find a real answer to that at all.
22                    ATTY. INGRAM:  You came up with an
23    answer.
```

2853

```
 1                    NATHAN CROCKER:  That is the dead
 2    last question that I answered.
 3                    ATTY. INGRAM:  I loved this answer.
 4    Is Mr. Bobby here?  No.  Your answer was, the media
 5    probably.
 6                    NATHAN CROCKER:  That's the only
 7    thing I could come up with.
 8                    ATTY. INGRAM:  That's a good answer
 9    actually.  Can you elaborate on that a little bit
10    for me?
11                    NATHAN CROCKER:  I think you have
12    both said pretty much a lot of what it is, the media
13    tends to put its own spin on things and go with that
14    out of just a small part of the total picture.
15                    ATTY. INGRAM:  Okay, it's the
16    generation of the publicity that poses the problem,
17    is that it?
18                    NATHAN CROCKER:  Yeah.
19                    ATTY. INGRAM:  Don't let me put
20    words in your mouth.
21                    NATHAN CROCKER:  I think that is it
22    because a lot of the media centers lately within the
23    past couple of decades have more been focused on
```

1      ratings and publicity.

2                         ATTY. INGRAM:  Would you agree with

3      me that to one degree or another we have a crime

4      problem under foot in this country?

5                         NATHAN CROCKER:  Yeah.

6                         ATTY. INGRAM:  Do you have any

7      ideas what we, and by "we", I mean society as a

8      whole, might be able to do to at least begin

9      addressing that problem?

10                        NATHAN CROCKER:  It's hard to say.

11     Crime seems to increase expedientially with

12     technology, any I certainly don't want to do without

13     that.  It's big dilemma.

14                        ATTY. INGRAM:  Any ideas at all?

15     Education, more prisons, more police, more social

16     services?

17                        NATHAN CROCKER:  Education is a

18     good place to start, education in the schools.  I

19     think that is where it tends to start, earlier and

20     earlier now, but.

21                        ATTY. INGRAM:  When we asked you to

22     come down here, well, tomorrow it will be three

23     weeks to the day, when we were at the other end of

2855

 1      the hallway, when you went into that Courtroom, do

 2      you recall if you went to your left or to your

 3      right?

 4                      NATHAN CROCKER:  I went to the

 5      right.

 6                      ATTY. INGRAM:  Did you take a seat

 7      or were you standing?

 8                      NATHAN CROCKER:  I took a seat.  I

 9      think I went to the right because that was the first

10      large gap to sit where it caught my eye.

11                      ATTY. INGRAM:  While you were in

12      there, did any of other potential jurors engage you

13      in conversation about this case?

14                      NATHAN CROCKER:  No.

15                      ATTY. INGRAM:  Did you hear anyone

16      else discussing this case?

17                      NATHAN CROCKER:  There were two

18      women behind me discussing what it might be, but I

19      didn't know what the case was going to be when I

20      arrived until the Judge started speaking, and from

21      what they were saying, either did they.

22                      ATTY. INGRAM:  Did they say

23      anything about the facts of the case?

1                    NATHAN CROCKER:  No, I remember the

2     two behind speculated that it might be a big one

3     when they saw somebody walk in with the camera and

4     set it up for something but then he took it down and

5     took it back out.

6                    ATTY. INGRAM:  Have you ever

7     donated any time, money, or services to a political

8     campaign or issue?

9                    NATHAN CROCKER:  Probably not money

10    or services definitely.  I haven't supported a

11    particular candidate I don't think in anything, but

12    I have discussed issues on-line.

13                    ATTY. INGRAM:  When you discussed

14    the issues on-line, were you discussing issues

15    on-line with the idea of persuading people to your

16    point of view?

17                    NATHAN CROCKER:  Yes.

18                    ATTY. INGRAM:  What were -- can you

19    give me a short list of those issues?

20                    NATHAN CROCKER:  No, not really.

21                    ATTY. INGRAM:  How about a couple

22    of them?

23                    NATHAN CROCKER:  I think the issues

1    that I have discussed -- that I mentioned already,

2    is -- about the only realistic thing -- there's so

3    much variation on things.

4                    ATTY. INGRAM:  Okay, I am going to

5    ask you this question in a different way.  You

6    participate in an issue oriented website or chat

7    room, so to speak, I am not very good with

8    computers, so I don't know if I have those words

9    right.  What single issue causes you to log on and

10   send your opinions in more than any other issue?

11                   NATHAN CROCKER:  I guess in the

12   past couple of years that would be gay rights.

13                   ATTY. INGRAM:  Do you belong to any

14   group or organization which is active in any

15   political matter?

16                   NATHAN CROCKER:  No.

17                   ATTY. INGRAM:  In the last five

18   years or so, have you signed any petitions on any

19   public issues?

20                   NATHAN CROCKER:  By public issue,

21   do you mean political?

22                   ATTY. INGRAM:  Yes.

23                   NATHAN CROCKER:  No, no.

1              ATTY. INGRAM:  Do you belong to or

2     associate with any group which has crime prevention

3     or law enforcement as a goal?

4              NATHAN CROCKER:  No.

5              ATTY. INGRAM:  Mr. Bailey talked to

6     you a little bit about sympathy and sympathy for

7     Donna Roberts.  I am sure you would agree with me

8     that this is a court of law and not a court of

9     sympathy?

10             NATHAN CROCKER:  Uh-huh.

11             ATTY. INGRAM:  Sympathy, regardless

12    of who that sympathy is for --

13             NATHAN CROCKER:  Uh-huh.

14             ATTY. INGRAM:  -- should have no

15    affect on your evaluation of the evidence.

16             NATHAN CROCKER:  Right.

17             ATTY. INGRAM:  First of all, do you

18    see that?

19             NATHAN CROCKER:  Yes.

20             ATTY. INGRAM:  Secondly, that may

21    be easier said than done, and let me tell you why I

22    say it may be easier said than done.  We're all

23    human and it's only natural for us under certain

```
 1    circumstances to have sympathy.  Do you agree with

 2    that?

 3              NATHAN CROCKER:  Okay.

 4              ATTY. INGRAM:  And whenever there

 5    is a victim in this case, and whenever anyone loses

 6    their life, it's natural to feel sympathy.  And you

 7    are going to see photographic evidence in this case.

 8    You will see crime scene photographs, there will be

 9    a body on the ground.  You will see photographs of

10    gunshot wounds, and some of these photographs may be

11    a close up of point blank gunshot wounds, coroner's

12    photographs, some of them may be enlarged.  Now --

13              NATHAN CROCKER:  Oh, boy.

14              ATTY. INGRAM:   -- that is tough

15    for some people to look at.  So my first question

16    is, are you up to that and will you be able to look

17    at that evidence so that you can begin to evaluate

18    that evidence?

19              NATHAN CROCKER:  I believe that I

20    can, yes.

21              ATTY. INGRAM:  Secondly, that

22    evidence is likely to evoke an emotional response,

23    sympathy, anger, maybe some other emotional
```

1    response, but even though this evidence evokes an

2    emotional response, it is still going to be your job

3    responsibility to test that evidence to see if it

4    ties Donna to this offense.  Now, again, are you up

5    to that?

6                    NATHAN CROCKER:  Yes, I believe so.

7                    ATTY. INGRAM:  How do you

8    personally feel about the rule of law which requires

9    that a trial juror presume the defendant innocent?

10                   NATHAN CROCKER:  Never thought

11   about that one.  I mean, innocent until proven

12   guilty is just how its always been.

13                   ATTY. INGRAM:  Only in a couple of

14   countries in this world --

15                   NATHAN CROCKER:  Well, I mean

16   always in  --

17                   ATTY. INGRAM:  And there are people

18   -- let me tell you why I ask the question, why you

19   think and I don't want you to stop thinking about

20   it.  I have some friends that run a deli in

21   Youngstown, who in order to combat the crime problem

22   that you and I talked about a few minutes ago, they

23   would change the presumption of innocence to

```
1    presumption of guilt.  They are certainly entitled

2    to think like that, but that wouldn't make them good

3    jurors in our system of justice, do you agree with

4    that?

5              NATHAN CROCKER:  Yeah.

6              ATTY. INGRAM:  So, now I will go

7    back to the original question.  How do you

8    personally feel about this rule of law?

9              NATHAN CROCKER:  Well, it's fairly

10   necessary if the legal system is going to remain

11   balanced like that.  I have no problem with it.  I

12   understand how some people can, like almost three

13   weeks ago now when the Judge was talking about

14   people who might have been too close to a similar

15   situation and not being able to separate themselves

16   from it.

17             ATTY. INGRAM:  Okay, let's look at

18   this presumption in a little different light.  If

19   you had a friend who was accused of wrong doing, and

20   you felt in your heart that your friend didn't do

21   it, you would require evidence of your friend's

22   wrong doing before you would be willing to change

23   your mind, wouldn't you?
```

1                    NATHAN CROCKER:  Yeah.

2                    ATTY. INGRAM:  Does that sound to

3     you like you are presuming your friend innocent?

4                    NATHAN CROCKER:  Yeah.

5                    ATTY. INGRAM:  And in that

6     situation would you take the evidence that was

7     presented to you at face value or would you test it,

8     would you look at it with a critical eye so to

9     speak?

10                   NATHAN CROCKER:  With a critical

11    eye, yes, but then again in the case of someone that

12    you know personally, you would also be weighing that

13    against what you know of them.

14                   ATTY. INGRAM:  That's true.  And --

15    but it's the critical eye that we're talking about

16    here for a moment.

17                   NATHAN CROCKER:  Yeah.

18                   ATTY. INGRAM:  Would you use that

19    critical eye throughout this trial?

20                   NATHAN CROCKER:  Yes.

21                   ATTY. INGRAM:  Now, because of the

22    presumption of innocence, the fellows from the State

23    of Ohio have the burden of proof.  You know, Juhasz

1    and I, we can sit on our hands throughout this

2    trial, we don't have to do anything.  Donna doesn't

3    have to testify, we don't have to do anything.  Mr.

4    Bailey talked to you about a box, filling that box

5    up to a line?

6                NATHAN CROCKER:  Uh-huh.

7                ATTY. INGRAM:  Well, they have to

8    pour evidence into that box, and if we don't do

9    anything, we don't call a witness, we don't ask a

10   question on cross-examination, we waive and give up

11   opening statement, waive and give up closing

12   arguments, are we adding anything to that box?

13               NATHAN CROCKER:  I am not quite

14   sure what you are asking.  Aren't you suppose to be

15   stopping things from going into the box?

16               ATTY. INGRAM:  We may be able to

17   stop things from going into the box, we may be able

18   to take things out of the box, but if we don't do

19   anything, we're not adding anything to the box.  Do

20   you understand the difference?

21               NATHAN CROCKER:  Yes.

22               ATTY. INGRAM:  Like if we ask

23   questions on cross examination, we may take

```
 1    something out of the box.

 2                    NATHAN CROCKER:  Okay.

 3                    ATTY. INGRAM:  Got me?

 4                    NATHAN CROCKER:   Yeah.

 5                    ATTY. INGRAM:  You understand that

 6    Donna is on trial for murder, not for being a woman

 7    of loose moral character?

 8                    NATHAN CROCKER:  Yeah.

 9                    ATTY. INGRAM:  And while the State

10    may prove she's a woman of loose moral character,

11    the State's burden in this case is to prove that

12    Donna  intentionally participated in the death of

13    Robert Fingerhut, will you do that?

14                    NATHAN CROCKER:  Yes.

15                    ATTY. INGRAM:  Will you hold the

16    State to that burden of proof?

17                    NATHAN CROCKER:  Yeah.

18                    ATTY. INGRAM:  Mr. Bailey talked to

19    you about the elements.

20                    NATHAN CROCKER:  Uh-huh.

21                    ATTY. INGRAM:  And they're the

22    necessary ingredients that the Judge is going to

23    give us at the end of the case and they have to
```

1    prove each and every one.  Okay, do you think you

2    have that in mind?

3                 NATHAN CROCKER:  Yeah.

4                 ATTY. INGRAM:  And Mr. Bailey

5    talked to you about prior calculation and design.

6    Prior calculation and design means that there is a

7    purpose, and we will talk about purpose in a minute;

8    that the purpose to cause the death was reached by a

9    definite process reasoning in advance of the

10    homicide, and there must have been sufficient time

11    and opportunity for the planning of the act.  There

12    must be more than momentary deliberation, but it's

13    the Judge's job to define them, not mine.

14                 NATHAN CROCKER:  Okay.

15                 ATTY. INGRAM:  But would you agree

16    with me that if I bend over and pick up that paper,

17    that isn't momentary deliberation?

18                 NATHAN CROCKER:  Right.  But if you

19    intended to like drop the paper as an example --

20    never mind.

21                 ATTY. INGRAM:  Go ahead, give me

22    the example.

23                 NATHAN CROCKER:  Just if you

1    intended to drop the paper as an example to pick it

2    up then  --

3                        ATTY. INGRAM:  That's prior

4    calculation and design but there is a big difference

5    between those two, isn't there?

6                        NATHAN CROCKER:  Yeah.

7                        ATTY. INGRAM:  Purpose is an

8    essential element of both of the aggravated murder

9    charges, and the Judge again will define purpose,

10   and tell you that purpose is the same as intent.  A

11   person acts purposely if it his specific intent to

12   cause a specific result.

13                       NATHAN CROCKER:  Uh-huh.

14                       ATTY. INGRAM:  Would you agree that

15   the facts and circumstances surrounding an act can

16   shed light on the actor's intent?

17                       NATHAN CROCKER:  This goes back to

18   the circumstantial evidence part, right?

19                       ATTY. INGRAM:  Part of that ties to

20   that, yes.

21                       NATHAN CROCKER:  Yeah.

22                       ATTY. INGRAM:  For instance, if I

23   am going to go out there and may be do some

1    intentional wrongdoing, would you expect me to try

2    and cover my tracks or leave a paper trail?

3                    NATHAN CROCKER:   Well, I wouldn't

4    expect you to leave a trail, that's for sure.

5                    ATTY. INGRAM:   If I am going out to

6    there to engage in some act of wrongdoing, would you

7    expect me to try and do it in secret and under cover

8    of darkness, or openly in the light of day?

9                    NATHAN CROCKER:   I don't know, I

10   guess that would depend too much on what you're

11   trying to do and when it would seem out of character

12   or not.

13                   ATTY. INGRAM:   Well, will you look

14   for the facts and circumstances throughout the

15   course of this trial?

16                   NATHAN CROCKER:   Yes.

17                   ATTY. INGRAM:   Now, Donna does not

18   have to testify and the judge will tell you that if

19   she doesn't testify, you can't hold it against her?

20                   NATHAN CROCKER:   Right.

21                   ATTY. INGRAM:   Are you familiar

22   with that rule?

23                   NATHAN CROCKER:   Yeah.

1              ATTY. INGRAM:  Do you have any

2    problems with that rule?

3              NATHAN CROCKER:   No.

4              ATTY. INGRAM:  The other side of

5    the coin, if she does testify, she is a witness like

6    any other witness, would you extend that -- you

7    would use the same standards or rules for

8    determining believability that you would use for

9    other witnesses?

10             NATHAN CROCKER:  Uh-huh.

11             ATTY. INGRAM:  But let's be fair

12   about it, she's the Defendant here, right, she's got

13   an interest or a stake in the outcome of this case?

14             NATHAN CROCKER:  Yes.

15             ATTY. INGRAM:  And is that

16   something that you want to keep in mind, certainly

17   isn't it?

18             NATHAN CROCKER:  Yeah.

19             ATTY. INGRAM:  So, to be fair about

20   it, if you found that another witness had an

21   interest or a state in the outcome of the case, you

22   would keep that in mind with the other witnesses,

23   correct?

```
 1                    NATHAN CROCKER:  Yes.

 2                    ATTY. INGRAM:  Whether they have

 3       something to gain?

 4                    NATHAN CROCKER:  Yeah.

 5                    ATTY. INGRAM:  And if you found

 6       that a police officer had interest in exonerating

 7       his investigative techniques, say, I'm not saying he

 8       would, but if you found that, would you keep that in

 9       mind?

10                    NATHAN CROCKER:  Most likely.

11                    ATTY. INGRAM:  When this case

12       began, as all cases do, by filing of an indictment,

13       -- are you ready for water?

14                    NATHAN CROCKER:  Yeah.

15                    ATTY. INGRAM:  An indictment is a

16       piece of paper, it's only legal purpose is to inform

17       the Defendant of the accusations leveled against

18       her.

19                    NATHAN CROCKER:  Yeah.

20                    ATTY. INGRAM:  It's not evidence.

21       Let me briefly explain that.  As you know, the grand

22       jury proceedings are secret.

23                    NATHAN CROCKER:  I didn't know
```

1    that they were secret, no, but okay.

2                        ATTY. INGRAM:  They are.  There is

3    no judge at the grand jury, Donna wasn't at the

4    grand jury.  She didn't even know when this case

5    went to the grand jury.  Mr. Juhasz and I weren't at

6    the grand jury.  The only people at the grand jury

7    were the grand jurors and the prosecuting attorney.

8                        NATHAN CROCKER:  Okay.

9                        ATTY. INGRAM:  It's one-sided, and

10   that is why it's not evidence, can you see that?

11                       NATHAN CROCKER:  Yeah, because

12   that is just discussing whether or not there should

13   be a trial to begin with.

14                       ATTY. INGRAM:  You got it.  Are you

15   doing okay up there?

16                       NATHAN CROCKER:  Yes.

17                       ATTY. INGRAM:  The Judge is going

18   to tell you that it's part of your job

19   responsibility to determine credibility of the

20   witnesses.  You can believe all of what a witness

21   says, part of what a witness says, and none of what

22   a witness says.  You've got to determine who is

23   telling the truth and who isn't.  He's going to give

```
 1      you a list of facts, and we talked about one, the

 2      interest and stake of the outcome of the case.  Will

 3      you take all of the other factors he gives you and

 4      apply them to each and every witness that testifies?

 5                    NATHAN CROCKER:  Yeah, I will

 6      certainly try my best.

 7                    ATTY. INGRAM:  He's going to take

 8      and describe for you one factor that is called test

 9      of truthfulness which you will apply in your

10      everyday life.  You know, when you are at work, you

11      have to occasionally decide whether someone is being

12      straight up with you or trying to hoodwink, you

13      don't you?

14                    NATHAN CROCKER:  Yeah.

15                    ATTY. INGRAM:  And over the years,

16      you have developed an intuitive or a sixth sense to

17      assist you in making those determinations?

18                    NATHAN CROCKER:  Yeah.

19                    ATTY. INGRAM:  He's going to tell

20      you to bring that sixth sense into the Courtroom,

21      and apply it to each and every witness that

22      testifies.  Will you do that?

23                    NATHAN CROCKER:  Yes.
```

2872

1                      ATTY. INGRAM:  Reasonable doubt is

2      based upon reason and common sense.  Have you ever

3      said to yourself, I am going to give him the benefit

4      of the doubt, say a co-worker?

5                      NATHAN CROCKER:   Yes, I am

6      familiar with the expression.

7                      ATTY. INGRAM:  Well, have you ever

8      said it to yourself though?

9                      NATHAN CROCKER:  Yeah, I think so,

10     yeah.

11                     ATTY. INGRAM:  When you were

12     willing to give somebody the benefit of the doubt, I

13     would dare say it was reasonable, not an

14     unreasonable doubt.

15                     NATHAN CROCKER:   Yeah.

16                     ATTY. INGRAM:  We intuitively know

17     the difference between reasonable and unreasonable,

18     though, is my point there.

19                     NATHAN CROCKER:  Yeah.

20                     ATTY. INGRAM:  Proof beyond a

21     reasonable doubt requires that you be --

22                     NATHAN CROCKER:   What I -- I was

23     just apprehensive, people usually apply the

1    expression to unreasonable doubt.

2                    ATTY. INGRAM:  I'm sorry, I'm not

3    sure I see that.  Can you --

4                    NATHAN CROCKER:  Well, people

5    usually only say that they're going to give someone

6    the benefit of the doubt when they don't really

7    believe them.  The expression is usually only used

8    somewhat facetiously.

9                    ATTY. INGRAM:  Okay.  Well, you

10   drive a car, right?

11                   NATHAN CROCKER:  Yeah.

12                   ATTY. INGRAM:  You're riding down

13   the street with someone and you come to a

14   T-intersection --

15                   NATHAN CROCKER:  Yeah.

16                   ATTY. INGRAM:  You look left, and

17   the person sitting in the passenger seat tells you

18   it's okay to go ahead and you pull out.  Do you pull

19   out or do you look right anyway?

20                   NATHAN CROCKER:  I look right

21   anyhow.

22                   ATTY. INGRAM:  That's because you

23   had a reasonable doubt as to whether it was safe to

1      proceed into the intersection.

2                  NATHAN CROCKER:  Yeah.

3                  ATTY. INGRAM:  Proof beyond a

4      reasonable doubt, Mr. Bailey termed that it requires

5      that you be firmly convinced to a moral certainty

6      and it's proof of such character that you would be

7      willing to rely and act upon it in the most

8      important of your own affairs.  And you made

9      important decisions in your life, haven't you?

10                 NATHAN CROCKER:  Yeah.

11                 ATTY. INGRAM:  We all have, and

12     sometimes when we're making big decisions, the big

13     ones, we make a checklist, put a line in the middle

14     of a piece of paper and maybe in our mind's eye,

15     write the good things over here and the bad things

16     over here.  And my decision is, I am going to go buy

17     a house.  On the left-hand side, the good things;

18     four bedrooms, I need them; three bathrooms, I need

19     them; good school system, my wife loves the house;

20     it's a neighborhood I like.  The bad things, 50

21     years old, I don't know if it's structurally stable,

22     there is some plumbing repairs that are needed, and

23     I don't know that I can afford the mortgage payment.

1    So, if you're anything like me, you try to strike

2    those negatives, so if you can strike the negatives,

3    it's pretty certain that you made the right

4    decision, or you're going to make the right

5    decision.  Are you with me?

6                        NATHAN CROCKER:  Probably, yeah.

7                        ATTY. INGRAM:  Well, in my

8    decision, I'm going to buy that house, right.  I am

9    going to --

10                       NATHAN CROCKER:  Financial is a

11   pretty big issue.

12                       ATTY. INGRAM;  that's what I'm

13   getting at.

14                       NATHAN CROCKER:  Okay.

15                       ATTY. INGRAM:  I'm going to call a

16   housing inspector, I write the inspection into the

17   purchase agreement, and if I have a contractor come

18   and tell me that that house is brick solid, I can

19   strike the stability question off that list, can't

20   I?

21                       NATHAN CROCKER:  Yes.

22                       ATTY. INGRAM:  And if I call a

23   plumber, and he tells me that it's a couple of

1    hundred bucks to fix the plumbing, I can strike the

2    plumbing issue, right?

3                   NATHAN CROCKER:  Okay.

4                   ATTY. INGRAM:  That leaves me with

5    the financial issue whether I can afford it.  So, I

6    go to the bank, and I say, come on, why don't you

7    stretch this out for another couple of years, this

8    loan so that my monthly payment is lower.  They say

9    no way.

10                   NATHAN CROCKER:  Okay.

11                   ATTY. INGRAM:  I ask for a lower

12   interest rate, again, no way, Jose.  I can't get a

13   loan, I can't get a raise, and I just don't know

14   that I can make the mortgage payments, so I am left

15   with one reasonable negative.  Do you see that?

16                   NATHAN CROCKER:  Yes.

17                   ATTY. INGRAM:  As long as there is

18   one reasonable negative, I cannot say that beyond a

19   reasonable doubt that that decision is the right

20   thing for me.  Do you see that?

21                   NATHAN CROCKER:  Yeah.

22                   ATTY. INGRAM:  In this case,

23   although there may be more than one, but if you are

1    left with one reasonable doubt, the State has not

2    met its burden of proof.  Do you see that?

3                    NATHAN CROCKER:  Yes, I think I do.

4                    ATTY. INGRAM:  All right, do you

5    remember Mr. Bailey's circumstantial evidence.  It

6    was, I believe, an illustration of the guys from

7    Mars coming down and sprinkling somebody's yard?

8                    NATHAN CROCKER:  Yeah.

9                    ATTY. INGRAM:  Do you have a handle

10   on what circumstantial evidence is?

11                    NATHAN CROCKER:  Yes.

12                    ATTY. INGRAM:  It's a leap, we're

13   asking you to make a leap in logic, right?

14                    NATHAN CROCKER:  Yes.

15                    ATTY. INGRAM:  The first thing that

16   we have to do is test that leap to make sure that

17   it's reasonable.  In a case where your friend is a

18   accused of wrongdoing, and it's hard for your to

19   believe that he didn't do it, you would certainly,

20   number one, test every inference you were asked to

21   make, right?

22                    NATHAN CROCKER:  Yeah.

23                    ATTY. INGRAM:  Number 2, you might

1    look for other equally plausible inferences that

2    lead you to another direction, do you see that?

3                     NATHAN CROCKER:  Yes.

4                     ATTY. INGRAM:  Will you do that

5    here?

6                     NATHAN CROCKER:  Yes.

7                     ATTY. INGRAM:  Very quickly, I got

8    a second story house, I go to bed at night in the

9    middle of February and the grass is green.

10                    NATHAN CROCKER:  Okay.

11                    ATTY. INGRAM:  I wake up the next

12   morning, there is six inches of snow, and I didn't

13   see it snow but, clearly, it snowed.

14                    NATHAN CROCKER:  Yeah.

15                    ATTY. INGRAM:  That's an inference

16   based on circumstantial evidence.  I am going to add

17   a factor here.  It's Sunday morning, and I want my

18   newspaper.  I see footprints from the house to the

19   right leading to my front door, from my front door

20   to the house to the left.  Now, I already made an

21   inference that it snowed, now I can infer that

22   somebody walked through the snow, correct?

23                    NATHAN CROCKER:  Yeah.

1              ATTY. INGRAM:  Now, what I'm doing

2      is I'm piling an inference on top of an inference,

3      right?

4              NATHAN CROCKER:  Uh-huh.

5              ATTY. INGRAM:  And I am going to

6      make a third inference.  I am going to infer that it

7      was my paperboy because it's Sunday morning.

8              NATHAN CROCKER:  Okay.

9              ATTY. INGRAM:  And that inference

10     sounds pretty good and probably because I want my

11     paper.

12             NATHAN CROCKER:  And because it

13     went door to door.

14             ATTY. INGRAM:  I go downstairs and

15     open the door and lo and behold, do you know what I

16     see?  Not my newspaper, but my Giant Eagle coupons

17     for the grocery store for next week.

18             NATHAN CROCKER:  Okay.

19             ATTY. INGRAM:  Whenever you find

20     yourself piling an inference on an inference, you

21     have to test all of that, will you do that?

22             NATHAN CROCKER:  Yes.

23             ATTY. INGRAM:  Now that all of us

```
1      have tried your patience quite enough, is there

2      anything that has popped into your mind that you

3      would like to discuss with us?

4                    NATHAN CROCKER:  I don't think so,

5      no.

6                    ATTY. INGRAM:  Thank you, very

7      much.  You have a pleasant afternoon.

8                    THE COURT:  I have to ask you one

9      question, just out of my curiosity, this dragon

10     maze, is that a sci-fi, medieval fantasy  --

11                   NATHAN CROCKER:   Game magazine.

12                   THE COURT:  Gaming magazine.

13                   ATTY. BAILEY:   Pass, Your Honor.

14                   ATTY. INGRAM:  Pass, Your Honor.

15                   THE COURT:  You are going to be in

16     the final pick for this jury.  You are to call in

17     Thursday evening after 4:30.

18                   NATHAN CROCKER:  Thursday after

19     4:30?

20                   THE COURT:  Right.

21                   NATHAN CROCKER:  Call the same

22     phone number again?

23                   THE COURT:  Yes, and I again would
```

```
 1      advise you not to read anything, watch T.V., or

 2      discuss the case with anybody.

 3                         NATHAN CROCKER:  Okay.

 4                         THE COURT:  Thank you, very much.

 5

 6      (Whereupon, Nathan Crocker, #171, was excused until

 7      further notice.)

 8

 9                         THE COURT:  All right, see everyone

10      tomorrow.

11

12      (At 4:25 p.m., Court adjourned til Tuesday, April

13      29, 2003, at 9:00 A.M.)

14

15

16

17

18

19

20

21

22

23
```

1          **TUESDAY, APRIL 29, 2003**

2

3          **LUCILLE K. KUFCHAK, JUROR NUMBER 172**

4   **EXAMINATION BY THE COURT:**

5

6                    THE COURT:  Good morning.

7                    LUCILLE KUFCHAK:  Good morning.

8                    THE COURT:  You have read that

9   handout that was given to you, right?

10                   LUCILLE KUFCHAK:  Yes.

11                   THE COURT:  Okay, thank you.  We

12  are here on two counts of aggravated murder with

13  specifications.  And this matter will begin by

14  seating 12 people as jurors.  The prosecution will

15  be called upon to present evidence to substantiate

16  their case, if they're able to do so.  The burden is

17  always upon the State to prove these charges.  There

18  is no requirement of any type on the Defendant to do

19  anything.  The Defendant has the absolute right to

20  remain silent, if she wishes.  There is no burden of

21  proof on the defense.  The question is asked, why do

22  we even get into this death penalty because it may

23  not arise if the prosecution is unable to prove

1 their case.

2     Then, the second phase, as mentioned in

3 that handout, doesn't arise.  It's only if the State

4 is able by the burden of proof known as beyond a

5 reasonable doubt, if they're able to prove each and

6 every element of the aggravated murder and the

7 specifications, would the issue go to a second

8 hearing.  But the reason we take the issue up is, if

9 the matter was presented to a jury, and these folks

10 were not aware of what each individual jurors

11 opinion is concerning the death penalty.  Then, at

12 that second hearing, we could run into a real

13 problem.  We have some people who believe that if a

14 life is taken, then the person taking that life

15 should forfeit their life, an eye for an eye.  That

16 is not the law of Ohio.  At that second phase, the

17 reason for having the second part of the hearing, is

18 to determine an appropriate sentence.  This is the

19 only type of trial under our system where the jury

20 participates in the sentence.  All other cases that

21 is the Judge's function.

22     At the second hearing, the State is

23 called upon to prove that the aggravating

1    circumstances; that is, reasons why they should

2    consider and impose the death penalty, the

3    Prosecutor has the burden of proving that those

4    outweigh the mitigating factors, and those are

5    reasons why the jury should not impose the death

6    penalty in this particular case.  So the legislature

7    has left that very important determination in the

8    hands of the jury, rather than leaving it just to a

9    Judge.  At that second phase, if the person was on

10   the jury that believed that a person should lose

11   their life or take that life, then the Defendant

12   could not get a fair hearing in the law.  You see,

13   that person would not be weighing those factors.

14   Likewise, if a person is was on that jury that could

15   not participate in making such a finding, there are

16   those who believe they could not decide the fate of

17   another human being, then that person could not be

18   fair to the State of Ohio.

19            So, what these folks are after are 12

20   people on the jury who each of which will have their

21   own opinion to some degree on the issue of the death

22   penalty, but they need 12 people who are able to

23   follow the law, to set aside whatever their personal

 1    preference may be, and to listen to the law as given

 2    by the court and to apply it fairly to both sides,

 3    okay.

 4              The other issue will be about pretrial

 5    publicity.  Many of the folks that have been called

 6    in here have some knowledge about this from having

 7    read the newspaper, watched T.V., or whatever.  Any

 8    case of this type will generate media attention.

 9    The issue that they will inquire about is whether or

10    not you have been so interested in the matter or

11    have been subjected to enough information that you

12    are unable to set that aside because, again, if this

13    is going to be a fair trial, the jury will have to

14    decide the issues based only on the evidence they

15    hear in the Courtroom.  It would not be fair to one

16    side or other if somebody goes back into the jury

17    room and says, well, I don't care what that evidence

18    showed, I remember reading in the paper that is not

19    evidence.  Do you get the picture?

20                   LUCILLE KUFCHAK:  Uh-huh.

21                   THE COURT:  Fair enough.  Mr.

22    Becker.

23                   ATTY. BECKER:  Thank you, Your

1    Honor.

2

3    **EXAMINATION BY ATTORNEY BECKER:**

4                    ATTY. BECKER:  Good morning, is it

5    Mrs. Kufchak, did I pronounce that right?

6                    LUCILLE KUFCHAK:  Yes.

7                    ATTY. BECKER:  Mrs. Kufchak, my

8    name is Chris Becker, and I am with the County

9    Prosecutor's Office, and this is Mr. Ken Bailey, I

10   believe you saw him three weeks ago today when you

11   were down in the big Courtroom and we had all the

12   jurors down there?

13                   LUCILLE KUFCHAK:  Yes.

14                   ATTY. BECKER:  The first thing I

15   want to tell you is that this is the only

16   opportunity that we have as attorneys, myself and

17   Mr. Bailey, as well as Mr. Juhasz and Mr. Ingram who

18   represent the Defendant, to speak to you one-on-one

19   directly.  And there is no right or wrong answers.

20   Everyone that comes in here, obviously, has opinions

21   on certain subjects and particularly the subjects

22   we're going to ask you about.  We're not trying to

23   change your opinion, we're not trying to get you to

1       do something that you don't want to do or can't  do,

2       but it's important that we find out what your

3       feelings are and what your view points are on

4       various topics, including the death penalty.  And

5       starting right out from the get-go, it appears as if

6       you do not believe that you could sit as a juror in

7       this case because potentially the death penalty may

8       be a penalty that you would have to fairly consider,

9       is that correct?

10              LUCILLE KUFCHAK:  Yes.

11              ATTY. BECKER:  Is your opinion

12      related to some religious belief, or is it just an

13      opinion that you have?

14              LUCILLE KUFCHAK:  Well, religion

15      and my belief too.

16              ATTY. BECKER:  Okay, so -- and I

17      certainly don't want to put words in your mouth, but

18      you don't believe, and let me explain a little bit

19      real quickly how this works.  This is a criminal

20      trial that is charging the most serious crime in the

21      State of Ohio.  It carries the greatest degree of

22      punishment potentially which is the death penalty,

23      and there are two phases to this trial.  There is a

1      guilt phase where you would have to determine

2      whether or not Miss Roberts is guilty of the crimes

3      that she is alleged to have committed, and if you

4      were to find her guilty of those crimes and,

5      particularly, the death specifications to some of

6      those crimes, then we would go to a second phase.

7      And at that second phase, you as a juror, you and

8      your fellow jurors, would have to consider four

9      penalties; the death penalty, life with no parole,

10     life with parole after 30 years, and life with

11     parole after 25 years.  I think that was on that

12     handout that they gave you few weeks ago.

13                    LUCILLE KUFCHAK:  Yes.

14                    ATTY. BECKER:  Are you of such a

15     belief and to such an opposition to the death

16     penalty that you could never fairly consider the

17     death penalty as an option?

18                    LUCILLE KUFCHAK:  Personally,

19     myself?

20                    ATTY. BECKER:  Right.

21                    LUCILLE KUFCHAK:  No.

22                    ATTY. BECKER:  And that's all we're

23     asking, is what you would do, and there is nothing

1       wrong with your opinion, I mean, many, many people

2       in this country have that opinion.  We have people

3       on the other side that feel that the only

4       appropriate penalty is death penalty and, of course,

5       they can't be fair and consider the other options.

6       But you understand that to be a juror in this case,

7       and you may be a juror in another case that doesn't

8       involve the death penalty and you would be a

9       wonderful juror but, in this case, you have to be

10      able to fairly consider all four options and that

11      does include the death penalty.  And I guess what

12      you are telling us is, that you could never fairly

13      consider the death penalty?

14                  LUCILLE KUFCHAK:  No, I couldn't.

15                  ATTY. BECKER:  And you could never

16      see yourself if we got to that second phase going

17      back to that jury room and, if the facts warranted

18      it and the law permitted it, signing the documents

19      that would call for the death penalty against Miss

20      Roberts?

21                  LUCILLE KUFCHAK:  I couldn't do

22      that.

23                  ATTY. BECKER:  And you have had

1     this belief or feeling about the death penalty for

2     many, many years or just recently, how long?

3                    LUCILLE KUFCHAK:  No, I feel --

4     always.

5                    ATTY. BECKER:  Pretty much as long

6     as you can remember?

7                    LUCILLE KUFCHAK:  Yes.

8                    ATTY. BECKER:  And due to your

9     feelings, you don't believe that you could be a fair

10    juror in this case and consider the death penalty as

11    an option?

12                   LUCILLE KUFCHAK:  Yeah --

13                   ATTY. BECKER:  When I say fair

14    juror, when it comes to that aspect?

15                   LUCILLE KUFCHAK:  Yes.

16                   ATTY. BECKER:  You may be a fair

17    juror otherwise, but just as it relates to

18    considering the death penalty don't believe that you

19    could?

20                   LUCILLE KUFCHAK:  I couldn't.

21                   ATTY. BECKER:  All right, is there

22    anything that I could say that maybe could change

23    your mind or not change your mind?  And there is

```
 1   nothing wrong if you do or don't.
 2                   LUCILLE KUFCHAK:  No, I just had
 3   that belief all my life, and I would probably never
 4   change it.
 5                   ATTY. BECKER:  That's fine.  I
 6   don't know if we want to continue or  --
 7                   THE COURT:  Do you wish to --
 8                   ATTY. JUHASZ:  Just briefly, Your
 9   Honor.
10
11   EXAMINATION BY ATTORNEY JUHASZ:
12                   ATTY. JUHASZ:  Mrs. Kufchak, right?
13                   LUCILLE KUFCHAK:  Correct.
14                   ATTY. JUHASZ:  Good morning, I am
15   John Juhasz and Jerry Ingram and I, we represent
16   Donna Roberts.  As the judge told you, we're not
17   here to change your opinion, I simply want to make
18   sure I understand how you feel about this, okay?
19                   LUCILLE KUFCHAK:  Okay.
20                   ATTY. JUHASZ:  If you or somebody
21   else were picked as a juror in this case, or in any
22   capital case in Ohio, any death penalty case, and
23   you got to the second phase, are you comfortable
```

1    with reading that paper, you kind of know how that

2    works?

3                    LUCILLE KUFCHAK:  Yes.

4                    ATTY. JUHASZ:  All right, one of

5    the things that the Judge will tell you at that

6    second phase is, you have to consider fairly all

7    four of those sentencing options, the death penalty

8    and the three life sentencing options.  Do you

9    appreciate that?

10                   LUCILLE KUFCHAK:  Yes.

11                   ATTY. JUHASZ:  And if I understand

12   how you feel, your only views about the death

13   penalty would either prevent or substantially impair

14   you from being able to do that as far as considering

15   the death penalty as one of the options?

16                   LUCILLE KUFCHAK:  I would never

17   consider it.

18                   ATTY. JUHASZ:  Okay, you wouldn't

19   even -- it's not that you wouldn't impose it, you

20   wouldn't even give it a fair consideration back in

21   that jury room?

22                   LUCILLE KUFCHAK:  You're right.

23                   ATTY. JUHASZ:  All right, I

1    appreciate that.  Let me ask you just about one

2    other thing if I may and then we will let you get

3    out of here.  Three weeks ago today, when you were

4    down in Judge Logan's Court, do you remember where

5    you sat as you go into the Courtroom?  Did you go

6    into the right or the left?

7                    LUCILLE KUFCHAK:  The left.

8                    ATTY. JUHASZ:  And do you remember,

9    did you sit in the front or in the back?

10                   LUCILLE KUFCHAK: I sat, I think

11   there was a row of chairs, and I think I was back

12   one from the row of chairs.  There was the chairs

13   and I think the bench.

14                   ATTY. JUHASZ:  So close to the

15   front of the courtroom on the left?

16                   LUCILLE KUFCHAK:  Yes.

17                   ATTY. JUHASZ:  Did you hear anybody

18   talking about, before Judge Stuard came out, about

19   the case or about Miss Roberts or anything like

20   that?

21                   LUCILLE KUFCHAK:   About -- not

22   Miss Roberts, but Nathan?

23                   ATTY. JUHASZ:  Nathaniel Jackson?

1              LUCILLE KUFCHAK:  Yeah, that he

2    already had his trial.

3              ATTY. JUHASZ:  Okay, where was that

4    -- was that person talking to you or somebody else

5    and you overheard them?

6              LUCILLE KUFCHAK:  Well, I was

7    sitting between two other women, and they were like

8    all three of us, you know, discussing it.

9              ATTY. JUHASZ:  Okay.

10             LUCILLE KUFCHAK:  Not to a point,

11   just that he had his trial and he was convicted.  I

12   mean, that was all, it wasn't in detail.

13             ATTY. JUHASZ:  That's okay.  So, if

14   I understand it, you are sitting in between two

15   women who were talking about this?

16             LUCILLE KUFCHAK:  Yes.

17             ATTY. JUHASZ:  Do you remember

18   anything about these women, what they looked like or

19   what their names were?

20             LUCILLE KUFCHAK:  I know one

21   personally, yeah.

22             ATTY. JUHASZ:  Oh, okay, who was

23   that?

1          LUCILLE KUFCHAK:  I don't know her

2     last name.  Sherry is her first name, I don't know

3     the last name.

4          ATTY. JUHASZ:  Okay, now at that

5     point, how did you know that the three of you, how

6     did you know that that was the case you were here

7     on, that was before Judge Stuard came out?  Was

8     there something that they knew from the paper or

9     something somebody said from the Courthouse, how did

10    you know what case you were there on?

11         LUCILLE KUFCHAK:  They said they

12    read it in the paper.

13         ATTY. JUHASZ:  Okay.  So, one or

14    both of these women said, I read about this in the

15    paper and they mentioned Mr. Jackson?

16         LUCILLE KUFCHAK:  Yes.

17         ATTY. JUHASZ:  Anything in

18    particular you remember them saying about Mr.

19    Jackson?

20         LUCILLE KUFCHAK:  Just briefly

21    that you know he already had his trial and he was

22    convicted and sentenced to death penalty, he got the

23    death penalty.

1              ATTY. JUHASZ:  All right.

2              LUCILLE KUFCHAK:  And nothing

3    really into detail about anything that happened.

4              ATTY. JUHASZ:  I notice in your

5    questionnaire, that you indicated you had heard of

6    Miss Roberts, is that correct?

7              LUCILLE KUFCHAK:  I heard of her?

8              ATTY. JUHASZ:  Yeah, I thought --

9              LUCILLE KUFCHAK:  Only thing when

10   it first happened, and other than that, that was it.

11             ATTY. JUHASZ:  Okay.

12             LUCILLE KUFCHAK:  Because I don't

13   read the paper.

14             ATTY. JUHASZ:  Okay, because in

15   your questionnaire, you mentioned something about

16   she premeditated murder, and I am wondering, is that

17   information that you got from this discussion or

18   from another discussion or from the news media?

19             LUCILLE KUFCHAK:  Must have been

20   when -- probably when I was here on the 8th that

21   they probably said something, you know -- I don't

22   know.  I don't know where I heard that from.  I

23   can't remember.  I don't want to say because I can't

1    remember.

2                    ATTY. JUHASZ:  That's okay, that's

3    all right.  All we can ask you to do is the best

4    that you can remember.  The reason that I asked that

5    is, because you indicated that you had only read

6    something initially about the case and in your

7    questionnaire, it says, she premeditated a murder,

8    so that sort of says to me, but I don't want to put

9    words in your mouth, but that is something that you

10   heard later and that is why I am wondering now if

11   you heard that in connection with this conversation

12   or if heard it some place else, or if you can't

13   remember.  Just do your best.

14                   LUCILLE KUFCHAK:  I am trying to

15   think.  I think I heard it when I went home and I

16   said that I had to go back, and somebody said, oh,

17   that was the case where she premeditated murder.  I

18   want to say that was it because I didn't read it in

19   the paper, I know that.

20                   ATTY. JUHASZ:  So, you think that

21   was a conversation that you had at home with

22   someone?

23                   LUCILLE KUFCHAK:  Briefly, because

 1    then I said that I couldn't talk about it.

 2                     ATTY. JUHASZ:  All right.  In this

 3    conversation that you had in the Courthouse, were

 4    you guys talking in conversational tones as we are

 5    right now, or was it kind of a whispered thing?

 6                     LUCILLE KUFCHAK:  No, just normal

 7    talking.

 8                     ATTY. JUHASZ:  All right, in that

 9    conversation, did you or anybody else express any

10    opinion either about Miss Roberts or about Mr.

11    Jackson, about whether they were guilty or about

12    whether they did this, anything like that?

13                     LUCILLE KUFCHAK:  No.

14                     ATTY. JUHASZ:  Okay, I appreciate

15    your time.  Thank you.

16                     LUCILLE KUFCHAK:  Thank you.

17                     ATTY. JUHASZ:  Thank you, Your

18    Honor.

19                     THE COURT:  Any objection to

20    dismiss for cause?

21                     ATTY. JUHASZ:  No objection.

22                     ATTY. BECKER:  No, sir, Your Honor.

23                     THE COURT:  Ms. Kufchak, thank you

1    very much for your time.  You are excused from any

2    further responsibilities in this matter.

3                    LUCILLE KUFCHAK:  Thank you.

4

5    (Whereupon, Lucille Kufchak, Juror Number 172, was

6    excused.)

7

8            **WILLIAM M. HALL, JUROR NUMBER 178**

9    **EXAMINATION BY THE COURT:**

10

11                   THE COURT:  Terrible thing that we

12   have to keep you here on a day like this, isn't it.

13   Well, we have to be here too.

14                   WILLIAM HALL:  I understand that,

15   sir.

16                   THE COURT:  Have you had a chance

17   to read that handout that was given to you?

18                   WILLIAM HALL:  Yes.

19                   THE COURT:  I think that explains

20   it pretty well, but let me go over a few other

21   points.  You understand that Ms. Roberts stands

22   accused of aggravated murder with specifications.

23   There is one murder that was involved in this

1     situation but there are two counts.  That will be

2     explained to you in due course of time.  For now,

3     it's important that you understand that the State is

4     required to see that this panel -- this jury is

5     impaneled and to present their evidence to the jury.

6     That jury will decide, first of all, whether the

7     State has proven beyond a reasonable doubt each and

8     every element of the charge of aggravated murder,

9     and each and every element of the specification

10    attached.

11           In Ohio, every murder does not cause the

12    person who commits the murder to face the death

13    penalty.  It's only if there are specifications

14    attached to it.  An example given is, if you kill

15    the person who happens to be the governor, that is

16    aggravated murder.  If you commit it under

17    circumstances that would constitute aggravated

18    murder.  Unless the prosecution attaches to that

19    indictment the specification that the person is the

20    governor, and they prove that in Court, everybody in

21    the world may know that Bob Taft is the governor,

22    but if they don't attach that and prove it in Court,

23    then that person would not face the death penalty.

1    If they proved the specification with the aggravated

2    murder, then that would make it a capital offense.

3              In this particular case, there are

4    specifications that would qualify this situation for

5    the jury to consider capital murder, if the State

6    proves their case beyond a reasonable doubt.

7              The question arises, why do we talk

8    about the death penalty at this point before we even

9    start the trial.  Wouldn't it be more appropriate

10   after we find out what the jury's decision is.  If

11   they come back with a not guilty plea, then you

12   never get into the issue of capital punishment.

13   Well, that just isn't very workable for this reason.

14   If both sides here have not had an opportunity to

15   know what the personal opinions are of those 12

16   jurors, if we find that they arrive at that second

17   hearing, you may have people on the jury that feel

18   that the law is not correct, and whenever a person

19   takes a life, they should forfeit their own life.

20   Well, that type of person could not be fair to the

21   Defendant because the Defendant has the right, if

22   this case goes to the second phase, of requiring the

23   State to prove that the aggravating circumstances,

1    that is reasons why the jury should consider and

2    impose the death penalty, outweigh the mitigating

3    factors, and those are reasons that will be given to

4    the jury as to why they should not impose the death

5    penalty.  The State has to, again, prove at that

6    second hearing the burden of proof is beyond a

7    reasonable doubt.  You could have one or more people

8    on that jury that believe that they could never

9    under any circumstances impose the death penalty.

10   Well, that would not be fair to the State because

11   thee State has the right to ask the jury to consider

12   that.  So, the only way we could avoid that problem

13   is to have 12 people on the jury up front, each of

14   whom will have their own opinion on the death

15   penalty.  But there must be 12 people on the jury

16   that are able to follow the law.  And we need people

17   that can follow the law even though they may feel

18   one way or the other to a degree.  But it's trying

19   to find out who has fixed opinions that they cannot

20   set aside.  Whatever your opinion is, that is fine,

21   you are entitled to that.  These folks will respect

22   that, but they have the right to know.

23                The second issue is concerning pre-trial

1    publicity. This case garnered a lot of publicity as

2    any case of this type would, and many of the people

3    have heard or read something about it before today.

4    And, there again, the question becomes, are you able

5    to assure both sides that you do not have any fixed

6    opinions that you cannot set aside because the case

7    to be tried fairly has to be based on the evidence

8    presented in the Courtroom. Something that appeared

9    in the newspaper may be correct, or it may be

10    totally erroneous, but it isn't evidence. So that

11    is what the questions will be geared towards. Okay?

12               WILLIAM HALL: Yes.

13               THE COURT: Mr. Bailey.

14               ATTY. BAILEY: Thank you, Your

15    Honor.

16

17    **EXAMINATION BY ATTORNEY BAILEY:**

18               ATTY. BAILEY: Good morning, Mr.

19    Hall.

20               WILLIAM HALL: Good morning, how

21    are you?

22               ATTY. BAILEY: Okay, and you?

23               WILLIAM HALL: Pretty good.

1          ATTY. BAILEY:  My name is Ken

2     Bailey and I am an Assistant Prosecutor, and I spoke

3     briefly I think about three weeks ago in the

4     courtroom.  And I promised you at that time that I

5     was going to be joined by my co-counsel, Chris

6     Becker, who is here with me today, and we're

7     responsible for prosecuting this particular case on

8     behalf of the people of Trumbull County, and the

9     State of Ohio.

10          Now, as the Judge indicated, we're going

11     to ask you some questions this morning, and I will

12     start out with pretrial publicity and death penalty

13     issues, and then I will ask you about some other

14     things.

15          WILLIAM HALL:  Okay.

16          ATTY. BAILEY:  And a couple of

17     other things that I wanted to point out.  The reason

18     that we ask these questions about your prior

19     experiences and your opinions about different things

20     isn't because we're snoopy and we like to pry into

21     people's backgrounds but, rather, it's to make sure

22     that the folks who are selected on this jury are

23     fair and impartial to both sides.  Both to the

1      Defendant and to the people of the State of Ohio.

2      And we're not asking it out of any mere idle

3      curiosity.

4                  There aren't any right answers and there

5      aren't any wrong answers to these particular

6      questions.  Just open, candid answers.

7                  A couple of other things, if we run into

8      each other out in the hallway after today, or after

9      our give and take here this morning, or on the

10     elevator or something, we're not allowed to have any

11     communication with you other than good morning or

12     good afternoon.  If you have any questions, you will

13     have to ask the bailiff, Laurie Brown, who will be

14     here during the course of the trial.  Okay.

15                 If we had any other communication with

16     you, it's not because were being anti-social, or

17     trying to snub you or anything.

18                       WILLIAM HALL:  I understand that.

19                       ATTY. BAILEY:  It's just that it

20     could result in a mistrial, and we don't want that

21     to happen.  Also, if you have any questions about

22     what we're doing here, anything that comes up, feel

23     free to ask because if we can get you an answer to

1       any questions that you might have as long as it

2       pertains to the procedure here, we will see if we

3       can do that.

4                    Now, let's talk first about this issue

5       of pretrial publicity. Now, look at your

6       questionnaire, you indicated that you were aware of

7       the Fingerhut case through, I believe Channel 27?

8                    WILLIAM HALL:  Channel 21 and the

9       newspaper, correct.

10                    ATTY. BAILEY:  And the newspaper,

11      okay. And you were aware of the name Fingerhut.

12      Exactly - now, the Defendant here is charged with a

13      couple of counts of aggravated murder, there is one

14      killing but there are two separate theories that

15      we're allowed to pursue and we have elected to

16      pursue both of those. And with aggravated burglary

17      and aggravated robbery, and some special findings of

18      facts or specifications attached to each of these

19      things. And the charge is that she is a

20      complicitor; that she helped or planned with another

21      fellow by the name of Nathaniel Jackson in the

22      killing of her ex-husband for insurance money and

23      the theft of a car, and an aggravated burglary and

1       aggravated robbery and a gun was used.

2                    Now, what exactly do you recollect about

3       the Fingerhut case?

4                    WILLIAM HALL:  Normally, with the

5       amount of murders that go on around here, it's like

6       a water off of a duck's back, I didn't hear

7       anything.  But the name Fingerhut is what popped out

8       in my head.  It was an unusual name and my wife buys

9       stuff from a company named Fingerhut, and that is

10      why it stuck out.  So, I don't know what, something

11      just clicked every time I heard the name Fingerhut,

12      you know, on the news or in the paper, or saw it, I

13      just drew attention to it by me, you know, I watched

14      it all.  I remember seeing on the news that they

15      lived in Howland, and I remember the news there

16      showing their house and the garage and everything.

17                   ATTY. BAILEY:  Okay, and do you

18      remember -- did you follow the case fairly closely?

19                   WILLIAM HALL:  Yeah, I mean, not

20      purposely, but like I said, every time I heard the

21      name Fingerhut, it's just something clicked and I

22      paid attention to it, very close attention to it.

23                   ATTY. BAILEY:  Okay.  And this Nate

```
1    Jackson fellow, did you pay close attention to his

2    case?

3                    WILLIAM HALL:  No.  I mean, again,

4    if the Fingerhut murder trial came up, I paid

5    attention to it.  I know what happened in his case.

6                    ATTY. BAILEY:  Oh, what happened?

7                    WILLIAM HALL:  Well, he was

8    convicted of murder.  I mean, that I am aware of.  I

9    don't know what specifications came by, but I know

10   that he was convicted and is in prison.  I don't

11   know if he got the death penalty or not, I don't

12   know.  But I know he's in jail or found guilty.

13                   ATTY. BAILEY:  Okay.  I guess the

14   key question is because we live in modern times, we

15   don't expect folks to keep their head in sand and

16   not beware of what is going on.  As a matter of

17   fact, it's important as a citizen, if you want to

18   stay on top of things in your community, you are

19   suppose to watch T.V., read the papers, keep on the

20   candidate's issues, and whatever is going on around.

21   Then, we ask folks to come in here and sort of

22   ignore everything that happens out there.

23                   WILLIAM HALL:  Right.
```

1           ATTY. BAILEY:  The key issue is

2     when things get reported, okay, and we will look

3     around the Courtroom today and there is nobody here

4     from the news media, but I expect when we get into

5     testimony in this case, I expect maybe next week,

6     then we will see reporters coming in from the

7     Vindicator and the Tribune, and the three T.V.

8     stations coming in and setting up their cameras, and

9     they're not allowed to photograph the jurors, but

10    they will photograph the participants, the witnesses

11    and perhaps the Judge and the attorneys and the

12    Defendant.  And they will only be here for a little

13    bit, and then they will do a feature on the trial.

14    So, they will miss everything that was asked and

15    answered before they got in here, and everything

16    that was asked and answer after they leave here.  So

17    some times, the information in the paper may be

18    slanted or taken out of context, okay.

19          WILLIAM HALL:  Uh-huh.

20          ATTY. BAILEY:  Not deliberately,

21    but because they have to rush in to print or on the

22    air, that is the nature of their business.  So, it's

23    important that you set aside everything that you

1    might of heard before and it's sort of an

2    intellectual exercise that we're asking you to do.

3    Mental gymnastics to clear off everything, push it

4    to the side and start out with a clean slate.  It's

5    like going back to school, whatever is going to be

6    written on that slate, is going to be written

7    through the testimony of the witnesses, the physical

8    exhibits that are admitted in this case, and

9    instructions of law given to you by the Judge.

10            Now, do you think that you can set aside

11   everything you might of heard before or whatever,

12   prior knowledge that you would have gained in favor

13   and sort of shelf that on the side and start out

14   fresh in this case, and set aside any opinions that

15   you might have formed?

16                    WILLIAM HALL:  No.

17                    ATTY. BAILEY:  You can't?

18                    WILLIAM HALL:  I don't think so.

19                    ATTY. BAILEY:  Okay, and why is

20   that?

21                    WILLIAM HALL:  I just have a

22   preconceived notion.  I believe that the lady was

23   definitely involved in the murder.  I mean, I can't

1    be impartial to be honest with you.

2                    ATTY. BAILEY:  Fair enough.  And

3    you think that would carry through into this case?

4                    WILLIAM HALL:  Yes.

5                    ATTY. BAILEY:  And you wouldn't be

6    able to afford her the presumption of innocence?

7                    WILLIAM HALL:  Yes.

8                    ATTY. BAILEY:  Okay.  Thank you,

9    very much.

10

11   **EXAMINATION BY ATTORNEY INGRAM**:

12                   ATTY. INGRAM:  I don't think it's

13   necessary to ask any questions, other than -- I'm

14   sorry, how are you doing?

15                   WILLIAM HALL:  Good.

16                   ATTY. INGRAM:  My name is Jerry

17   Ingram.  Three weeks ago today, we all gathered at

18   the other end of this hallway in Judge Logan's

19   Courtroom, were you there?

20                   WILLIAM HALL:  Yes, I was.

21                   ATTY. INGRAM:  When you came in the

22   door of the Courtroom, do you recall if you went to

23   the right or to the left?

1                    WILLIAM HALL:  I went to the right.

2                    ATTY. INGRAM:  Did you then take a

3      seat, or were you one of the jurors that couldn't

4      find a seat.

5                    WILLIAM HALL:  I sat down.

6                    ATTY. INGRAM:  While in that room,

7      did you hear any jurors talking about this case?

8                    WILLIAM HALL:  No.

9                    ATTY. INGRAM:  Did you discuss the

10     case with anyone?

11                   WILLIAM HALL:   No.

12                   ATTY. INGRAM:  Okay, thank you.

13                   WILLIAM HALL:  You're welcome.

14                   THE COURT:  Any objection to

15     dismissing for cause?

16                   ATTY. BAILEY:  No objection, Your

17     Honor.

18                   ATTY. INGRAM:  No objection.

19                   THE COURT:  Sir, we thank you, very

20     much, for your time.  You are excused from any

21     further responsibilities.

22                   WILLIAM HALL:  Thank you, very

23     much.

```
 1                      THE COURT:  And thank you for your

 2    candor.

 3                      ATTY. BAILEY:  Thank you, sir.

 4                      ATTY. INGRAM:  Thank you.

 5

 6    (Whereupon, William Hall, Juror Number 178, was

 7    excused.)

 8

 9

10                      THE COURT:  Call in the next juror.

11

12

13           ROBERT L. HAMILTON, JUROR NUMBER 180

14    EXAMINATION BY THE COURT:

15

16                      THE COURT:  Mr. Hamilton, did you

17    have a chance to read that handout that was given to

18    you?

19                      ROBERT HAMILTON:  Yes, I did.

20                      THE COURT:  Okay, you probably have

21    a good understanding of what is going on.  The

22    questions that will be put to you today concern two

23    issues; that of your opinion on the issue of capital
```

1    punishment, and the question about any pretrial

2    publicity that you may have been exposed to.

3            The State is called upon to prove beyond

4    a reasonable doubt each and every element of the

5    crime of aggravated murder. There are two counts,

6    only one murder. We will explain later why that is.

7    The State has to prove that the elements of

8    aggravated murder with specifications. The

9    specifications are what under our statute place the

10   possibility of the death penalty to coming into the

11   picture. In Ohio, just because a person murders

12   another person, does not necessarily bring up the

13   issue of the death penalty. The legislature, some

14   years ago in redrafting that statute, put certain

15   situations that would cause the death penalty to

16   arise. If you kill a person that happens to be the

17   governor of Ohio and a specification is attached

18   that person is a governor or a police officer, other

19   things, then that raises it to the level where the

20   jury may have to go to a second phase to make a

21   determination as to whether they are going to

22   recommend the death penalty be imposed.

23           Now, the question arises also, why do we

1    even cover the subject now, because if this jury

2    would make a finding of not guilty, then we wouldn't

3    go to a second phase.  But if we didn't cover the

4    issue now, and the jury had to go to a second phase

5    where the State had proven their case, then you may

6    have someone on the jury that believe in an eye for

7    an eye, and that is not the law of Ohio.  So that

8    person could not be fair to the Defendant.  The

9    Defendant has a right at the second phase to have

10   the burden again on the prosecution to prove beyond

11   a reasonable doubt that those aggravating

12   circumstances outweigh any mitigating factors.

13            Aggravating circumstances, reason why

14   the jury should impose the death penalty.

15   Mitigating factors, reasons why they should not.

16   Likewise, if you had someone on there that under no

17   circumstances could ever impose the death penalty,

18   then the State could not receive a fair trial.  So,

19   what we need are 12 people, each of them are going

20   to have their own personal opinion on the death

21   penalty.  But they have to be of such mind that

22   they're able to follow the law.  No one could get a

23   fair trial if everyone isn't following the same

1    rules.

2              The other issue is, many of the folks

3    that we have interviewed, have read or heard

4    something about this case, which is not unusual

5    because any murder, you know, causes a certain

6    amount of media attention.  Many people read the

7    paper, watch T.V., or whatever.  But the issue

8    becomes, is each possible juror able to set aside

9    anything that they think they know about the case,

10   and be able to decide the matter fairly on the

11   evidence presented in this Courtroom.  If something

12   outside this Courtroom is used, there is great

13   danger that you could not have a fair trial.

14   Whatever your opinions are, you are entitled to

15   them, and no one will cause any problem about that.

16   It's just that they have a right to know what your

17   opinions are, okay?

18              ROBERT HAMILTON:  Yes.

19              THE COURT:  Okay, fair enough.  Mr.

20   Becker.

21              ATTY. BECKER:  Thank you, Your

22   Honor.

23

1    **EXAMINATION BY ATTORNEY BECKER:**

2

3                      ATTY. BECKER:  Good morning, Mr.

4    Hamilton.

5                      ROBERT HAMILTON:  Good morning.

6                      ATTY. BECKER:  My name is Chris

7    Becker, and I am with the County Prosecutor's

8    Office, and I'm one of the assistants there.  And I

9    am going to be working on this case with the

10   assistance of -- well, I guess I'll be assisting Mr.

11   Bailey, he's the lead attorney on this.  I believe

12   that you saw Mr. Bailey, I think it's three weeks

13   from today, on April 8th?

14                      ROBERT HAMILTON:  Right.

15                      ATTY. BECKER:  Down in the big

16   Courtroom.

17                      ROBERT HAMILTON:  Uh-huh.

18                      ATTY. BECKER:  And I assume you

19   remember Mr. Ingram and Mr. Juhasz over here?

20                      ROBERT HAMILTON:  Right.

21                      ATTY. BECKER:  They were there also

22   as well as their client, Donna Roberts.

23                      ROBERT HAMILTON:  Uh-huh.

1              ATTY. BECKER:  First of all, I want

2     to thank you for your service on this jury, your

3     potential service on this jury, and I believe you

4     have served in the military.  I believe probably

5     short of serving in the military, jury service is

6     one of the most important civic duties you can

7     perform for your country.

8              ROBERT HAMILTON:  Uh-huh.

9              ATTY. BECKER:  This is the only

10    opportunity that the attorneys get to speak to you

11    and, more importantly, you, as a juror, get to speak

12    to the attorneys about this case.  You understand

13    that ethically -- and may be I will move over here

14    so you don't have look in the bright sun so much.

15    But you understand that once the case begins and

16    once the trial starts, we can't speak to you.  We

17    have an ethical obligation, both the attorneys for

18    both sides have an ethical obligation and we cannot

19    speak to you.

20             ROBERT HAMILTON:  Okay.

21             ATTY. BECKER:  So, if we were to

22    see you at a restaurant or out in the hallway or at

23    the drinking fountain, we can't speak to you about

1     the case, and we can't say, hey, why didn't you ask

2     this question, and why didn't you do that.  I am

3     assuming that you understand all of that because

4     you do have a little bit of background in law

5     enforcement?

6                    ROBERT HAMILTON:  Right.

7                    ATTY. BECKER:  I believe you also

8     served previously on a jury trial a couple of years

9     ago?

10                    ROBERT HAMILTON:  Yes, uh-huh.

11                    ATTY. BECKER:  I want to touch upon

12     really the two issues that the Judge talked about

13     first, and then we will move on to the other issues.

14     But before I do that, like the Judge said, I want to

15     reiterate that there is really no right or wrong

16     answers here.  Whatever your opinions are, we're not

17     trying to change your opinions, but it's important

18     that both the Defendant and the State have a fair

19     trial, and a jury made up that is going to fairly

20     consider all of the evidence.  And if we get to the

21     second phase where the death penalty is an option

22     that the jurors consider fairly, all four options,

23     which would be death, life in prison, life in prison

1    with no parol until 30 full years are served, and

2    life in prison until 25 years of prison have been

3    served.  So, we're going to talk a little bit about

4    the death penalty, and your views on the death

5    penalty, and I recall from your questionnaire that

6    you are, obviously, in favor of the death penalty?

7                     ROBERT HAMILTON:  Yes.

8                     ATTY. BECKER:  And would you say --

9    and I guess that I am going to ask you, how long you

10   have you been in favor of the death penalty, as long

11   as you can remember?

12                    ROBERT HAMILTON:  I have always

13   been.

14                    ATTY. BECKER:  All right, and you

15   are not so in favor of the death penalty, though,

16   that you would exclude the other life options in

17   this trial?

18                    ROBERT HAMILTON:  No.

19                    ATTY. BECKER:  You would be able to

20   fairly consider all four options, if we were to get

21   to that stage?

22                    ROBERT HAMILTON:  Yes.

23                    ATTY. BECKER:  And if we got to the

1    stage where you were considering the death penalty

2    as a potential penalty, you wouldn't say, well, I

3    know that we have these three other life options

4    but, you know, I am really in favor of the death

5    penalty, and the defense would have to convince me

6    that the death penalty is not warranted in this

7    case, because you understand that it is always our

8    burden to prove that?

9                    ROBERT HAMILTON:  Right.

10                   ATTY. BECKER:  Okay.  One of the

11   things that is some times strange, particularly in

12   this type of a case is, we're talking about the

13   probability and potential.  In these types of cases,

14   which are the most serious crimes in the State of

15   Ohio, which carry the greatest punishment, it is not

16   for certain that we will ever get to this stage

17   where you will have to consider the death penalty,

18   and I assume you understand that?

19                   ROBERT HAMILTON:  Right, uh-huh.

20                   ATTY. BECKER:  Capital cases are

21   really tried in sort of two phases.  There is a

22   first phase where it will be your responsibility and

23   fellow jurors responsibility, to determine the guilt

1    or innocence of Ms. Roberts.  If and only if we

2    prove certain things in that circumstance, and in

3    that first phase, particularly the aggravated murder

4    and the death penalty specifications or the

5    aggravating circumstances, as we call them, will you

6    get to that second stage.  So there is a possibility

7    that you may get to that second stage, and there is

8    a possibility that you may not get there.

9              ROBERT HAMILTON:   Right.

10             ATTY. BECKER:  The fact that we're

11   talking about the death penalty and the potential

12   life options, how do you feel about that in terms of

13   Miss Roberts, guilt or innocence.  Do you believe

14   she is guilty or innocent because we're sitting here

15   talking about punishment or are you going to give

16   her the --

17             ROBERT HAMILTON:  No, not at all,

18   because I don't know any of the facts.

19             ATTY. BECKER:  You haven't heard

20   any of the evidence in this case, okay, and that is

21   going to really, I guess, lead me into some of my

22   other questions here.  First, I want to ask you, and

23   I guess what I'm going to ask you to close up on the

1      death penalty, is if the facts warranted it, and the

2      law permitted it, could you -- because we had proven

3      our case, Mr. Bailey and I, could you go back to the

4      jury room and sign a verdict form calling for the

5      imposition of the death penalty?

6                      ROBERT HAMILTON:  I could, yes.

7                      ATTY. BECKER:  And you will not

8      exclude the life options when you come to that

9      consideration.  You will consider all of the options

10     and perhaps in this case, you may find that one of

11     the life options is the appropriate penalty,

12     correct?

13                     ROBERT HAMILTON:  That's right.

14                     ATTY. BECKER:  Now, in this

15     particular case, I think you noted in your

16     questionnaire that there has been some pretrial

17     publicity, and there has been some publicity about

18     this case both in the print media as well as the

19     electronic media.  I am assuming that you have read

20     some of that because you indicated in your

21     questionnaire and you probably saw some of that on

22     television, correct?

23                     ROBERT HAMILTON:  Yes.

1          ATTY. BECKER:  Is that going to

2    have any impact on you as a potential juror in this

3    case?

4          ROBERT HAMILTON:  I don't believe

5    so.

6          ATTY. BECKER:  You understand,

7    obviously, given your background, that it is very

8    important that you not give any deference to what

9    you may have read in the newspaper.  For instance,

10   if Mr. Juhasz and Mr. Ingram may present evidence or

11   testimony, or cross examine one of the witnesses,

12   you can't sit over there and say, boy, that's pretty

13   contradictory to what I read in the Tribune, or what

14   I heard on Channels 21 or 27, or something, you

15   can't do that.  You understand that you have to

16   decide this case based upon what you hear in this

17   Courtroom, correct?

18          ROBERT HAMILTON:  Right.

19          ATTY. BECKER:  Do you believe that

20   you will be able to do that?

21          ROBERT HAMILTON:  Yes.

22          ATTY. BECKER:  And you will be able

23   to give Miss Roberts a fair trial?

1                    ROBERT HAMILTON:  Yes.

2                    ATTY. BECKER:  You will -- and I

3        guess what I want to follow up on both of those is,

4        you understand that every criminal -- I don't know

5        if there is any real way to get you out of the sun

6        there.

7                    ROBERT HAMILTON:  That's better.

8                    ATTY. BECKER:  You understand that

9        every criminal Defendant is presumed innocent until

10       proven guilty?

11                   ROBERT HAMILTON:  Yes.

12                   ATTY. BECKER:  The mere fact that

13       you read something or seen something on television,

14       you don't presume Miss Roberts guilty of any crimes,

15       do you?

16                   ROBERT HAMILTON:  No, not at all.

17                   ATTY. BECKER:  The fact that we are

18       talking about the death penalty and that being a

19       potential penalty in this case, you don't presume

20       her guilty because of that, do you?

21                   ROBERT HAMILTON:  No.

22                   ATTY. BECKER:  You will be able to

23       give Miss Roberts the presumption of innocence that

1      our judicial system requires her to have and which

2      she is required to have throughout these

3      proceedings?

4                          ROBERT HAMILTON:  Yes, I will.

5                          ATTY. BECKER:  And you understand

6      that only that if the State does not prove its case,

7      Miss Robert would go home and we wouldn't even get

8      to this death penalty phase, we would be done in

9      that first phase if we can't prove her guilty,

10     correct?

11                         ROBERT HAMILTON:  That's right.

12                         ATTY. BECKER:  One of the things

13     that we talk about in criminal cases, really in all

14     criminal cases, is the term reasonable doubt, and I

15     am certain that you have heard the term reasonable

16     doubt in your employment back years ago when you

17     worked for the City of Warren, and when you worked

18     for Highway Patrol.  And one of the best ways that I

19     have ever heard it described, and maybe you heard

20     other descriptions, is it's a lot like a glass water

21     or a cup of coffee.

22                         ROBERT HAMILTON:  Uh-huh.

23                         ATTY. BECKER:  We have to prove our

1   case beyond a reasonable doubt.  Not all doubt,

2   because all doubt would be the glass filled to the

3   very top.  But we have to prove it pretty close to

4   the top, maybe where that lip is on the glass there,

5   that cup of water that you have there.  That is what

6   reasonable doubt is, it's beyond that point, and

7   it's a doubt based on reason and common sense.  Do

8   you feel that you will be able to follow the Court's

9   instructions on reasonable doubt?

10                  ROBERT HAMILTON:  Yes.

11                  ATTY. BECKER:  And you will not

12  hold the State to the really unprovable burden of

13  proof beyond all doubt, will you?

14                  ROBERT HAMILTON:  No.

15                  ATTY. BECKER:  Because one of the

16  things that we some times have trouble with is, it

17  may be difficult for me to prove to you beyond all

18  doubt anything in this case, or anything in life for

19  that matter.  I am standing here and I have a

20  wedding band on, I have some photos of my wife and

21  my kids in my wallet, and I can show those to you

22  and that would probably suffice for beyond a

23  reasonable doubt that I am married.

1              ROBERT HAMILTON:  Uh-huh.

2              ATTY. BECKER:  And I can probably

3    prove to you beyond a reasonable doubt if my wife

4    came in here with my four kids and they sort of sat

5    in the front row here and waved at me, and maybe

6    made a little noise like some times they tend to do

7    and wave and say, hi, daddy.  That would probably

8    prove to you beyond a reasonable doubt that I am

9    married.  But beyond all doubt, maybe you would have

10   to see me actually live with her, and go home at

11   night and all of that.  But proof beyond a

12   reasonable doubt is a proof based on reason and

13   common sense.  So, if I came in here and gave you a

14   certified copy of my marriage certificate, that

15   would probably prove to you beyond a reasonable

16   doubt that I was married, correct?

17             ROBERT HAMILTON:  Sure.

18             ATTY. BECKER:  You wouldn't

19   necessarily have to see everything with your own

20   eyes to know that I was married.

21             ROBERT HAMILTON:  Right.

22             ATTY. BECKER:  You wouldn't have to

23   actually see me go home and get in bed with my wife

```
 1      and get up in the morning, bathe my kids, and maybe

 2      see the mortgage and see the bills, there comes a

 3      point where you will be able make that

 4      determination, hey, beyond a reasonable doubt,

 5      pretty close to the top of that glass, I am

 6      convinced that the guy is married, right?

 7                    ROBERT HAMILTON:  Uh-huh.

 8                    ATTY. BECKER:  You will be able to

 9      make those kind of determinations in this case?

10                    ROBERT HAMILTON:  Yes.

11                    ATTY. BECKER:  This case is going

12      to involve some charges that are very serious.  They

13      are, like I mentioned to you earlier, they are the

14      most serious charges that an individual can face in

15      the State of Ohio because they carry the most

16      serious potential penalty.  And that, of course, is

17      the death penalty.  This case has four counts in it,

18      and the four counts are aggravated burglary,

19      aggravated robbery, and then two counts of

20      aggravated murder, even though there is only one

21      death, there are two counts of aggravated murder.  I

22      am assuming that, well, maybe you don't know, but I

23      am assuming that you understand that some times
```

1      there are two theories of a case, and there are two

2      ways to, I guess, skin a cat or prove a point?

3                ROBERT HAMILTON:  Right.

4                ATTY. BECKER:  That is what Mr.

5      Bailey and I have got to prove to you, and there may

6      actually be two death verdicts -- I'm sorry, not two

7      death verdicts; two aggravated murder convictions in

8      this case.  That doesn't disturb you in any way,

9      does it, that there are actually two counts of

10     aggravated murder?

11               ROBERT HAMILTON:  No.

12               ATTY. BECKER:  You wouldn't think

13     that the State, boy, they must not really be

14     confident of their case because they have two counts

15     of murder charged, and they must not know what the

16     heck they're doing.  You understand that there are

17     two separate theories of the case?

18               ROBERT HAMILTON:  Right.

19               ATTY. BECKER:  And on the other

20     side of that coin, you wouldn't hold it against Miss

21     Roberts that there are actually two counts of murder

22     against her, even though there is only one death.

23     You are not going to say, boy, she must be a really

1    bad person if there are two counts and they allege

2    that she has two murder counts.  And you wouldn't

3    hold that against her, would you?

4                    ROBERT HAMILTON:  No.

5                    ATTY. BECKER:  Okay.  Now, in this

6    case, we're going to be very up front with you, Miss

7    Roberts is alleged to be an aider and abettor or a

8    helper, she is not alleged to be the person who

9    pulled the trigger.  I believe in your questionnaire

10   you indicated that you followed the other case?

11                   ROBERT HAMILTON:  Right.

12                   ATTY. BECKER:  And what do you know

13   about the other case, Mr. Jackson's case?

14                   ROBERT HAMILTON:  Only that the

15   newspaper reported that Mr. Jackson had entered the

16   home of the victim.

17                   ATTY. BECKER:  Okay.

18                   ROBERT HAMILTON:  Who I don't

19   recall, and shot and killed him.

20                   ATTY. BECKER:  Do you know what the

21   relationship is between any of the parties, or if

22   there was one?

23                   ROBERT HAMILTON:  The victim and

1   Miss Roberts, I believe, were married.

2                       ATTY. BECKER:  Okay.  You

3   understand that you will have to set aside what you

4   read or seen in the newspaper about this case and

5   decide this case just on the evidence, correct.

6                       ROBERT HAMILTON:  Yes, sir.

7                       ATTY. BECKER:  And you will be able

8   to do that?

9                       ROBERT HAMILTON:  Right.

10                       ATTY. BECKER:  You won't let

11   anything maybe that you read in the paper creep into

12   your decision-making in terms of her guilt or

13   innocence?

14                       ROBERT HAMILTON:   No.

15                       ATTY. BECKER:  And I understand.

16   No one is faulting you for reading the newspaper,

17   obviously, when you read this and read about this,

18   you had no idea that you would be summoned as a

19   juror in this case?

20                       ROBERT HAMILTON:  No.

21                       ATTY. BECKER:  And I am assuming

22   since April 8th, you have followed the Court's

23   admonitions, and if there has been anything in the

1          media about this case, you haven't followed it or

2          read it, or maybe even not seen it?

3                         ROBERT HAMILTON:  No.

4                         ATTY. BECKER:  One of the things

5          that you are going to have to understand, and I am

6          assuming that you do only because you have a law

7          enforcement background, is that throughout this

8          trial in both the guilt phase and the next phase

9          that you are going to consider the death penalty,

10         Mr. Bailey and I, we have the responsibility of

11         proving her guilt.  They don't have any

12         responsibility in terms of not proving her guilt or

13         giving you the other side of the story, as some

14         people like to refer to it, they can sit over there

15         and do cross word puzzles, read their horoscope, and

16         play tiddly winks, if they wanted to.  I don't think

17         that is going to happen in this case, but I

18         certainly think that they are going to ask some

19         questions at least of some of the State's witnesses.

20         But it is quite conceivable that the State may not

21         prove its case beyond a reasonable doubt.  They may

22         not put on any evidence and, Your Honor, we don't

23         have anything to present.  They sit down and you

1      guys go back and deliberate and say, hey, I agree

2      with the defense.  Mr. Bailey and Mr. Becker, they

3      didn't really present anything to us that proved

4      anything in this case.  We got to acquit her, you

5      would be able to make that kind of a determination,

6      right?

7                      ROBERT HAMILTON:  Yes.

8                      ATTY. BECKER:  And you understand

9      that concept which sort of goes hand-in-hand with

10     the presumption of innocence?

11                     ROBERT HAMILTON:  Right.

12                     ATTY. BECKER:  While you were

13     employed by the City of Warren, did you ever have to

14     testify in a case?

15                     ROBERT HAMILTON:  I wasn't employed

16     by the City of Warren.

17                     ATTY. BECKER:  I thought you were a

18     patrolman with Warren?

19                     ROBERT HAMILTON:  State of Ohio.

20                     ATTY. BECKER:  Oh, you were with

21     the highway patrol as a highway patrolman?

22                     ROBERT HAMILTON:  Yes.

23                     ATTY. BECKER:  At the Warren post?

1                          ROBERT HAMILTON:  Yes.

2                          ATTY. BECKER:  Okay, I guess I got

3      that confused there.  So you were actually a

4      dispatcher for a period of time with the patrol, and

5      then you worked as an actual patrolman?

6                          ROBERT HAMILTON:  I was a

7      dispatcher in New Philadelphia for a year, and then

8      I spent six years in Warren as a patrolman.

9                          ATTY. BECKER:  And then you ended

10     up at G.M.?

11                         ROBERT HAMILTON:  General Motors.

12                         ATTY. BECKER:  That probably paid

13     better?

14                         ROBERT HAMILTON:  Yes.

15                         ATTY. BECKER:  I am assuming that

16     is why you left the patrol?

17                         ROBERT HAMILTON:  Right.

18                         ATTY. BECKER:  Better money?

19                         ROBERT HAMILTON:  Right.

20                         ATTY. BECKER:  While you were with

21     the patrol, did you ever have to testify in any

22     cases in Court?

23                         ROBERT HAMILTON:  Yes.

1              ATTY. BECKER:  And I am assuming

2     that you are familiar with a lot of these courtroom

3     proceedings and, basically, testifying as a witness.

4     The case you served on as a juror, was that a civil

5     case?

6              ROBERT HAMILTON:  Yes, it was.

7              ATTY. BECKER:  How long ago was

8     that, if you recall?

9              ROBERT HAMILTON:  I would guess 10

10    years ago.

11             ATTY. BECKER:  Was it in this

12    Courthouse?

13             ROBERT HAMILTON:  Yes, in fact, it

14    was in this room.

15             ATTY. BECKER:  Oh, was it, okay.  A

16    lot of the concepts are going to be similar except

17    for probably the biggest one will be, like I said,

18    that presumption of innocence and the reasonable

19    doubt, which is a different standard than the

20    preponderance of the evidence.  I think it is

21    probably what they used in the civil case, which is

22    just who had more, fifty fifty.  Sort of like that

23    glass of water being half full and putting an extra

1    drop in there.  That is the preponderance of the

2    evidence, that would be siding with the Plaintiff.

3    What type of cases when you were with the Highway

4    Patrol, do you recall investigating?  What, for

5    instance, do you recall being the most serious case

6    that you were involved with?

7                    ROBERT HAMILTON:  You mean that

8    involved testifying or just  --

9                    ATTY. BECKER:  Yeah, or

10   investigating, either way, either investigation or

11   testifying?  I know we're going back a long way.

12                   ROBERT HAMILTON:   Well, there was

13   a plane that crashed on North Road, just north of

14   82.

15                   ATTY. BECKER:  Okay, involving a

16   death, I'm assuming?

17                   ROBERT HAMILTON:  Four people died

18   in the plane.  The plane was overloaded, and it

19   didn't -- it stalled and started to fall down, and

20   one of the wings caught a telephone or power line

21   and it nose-dived in the middle of the street and

22   caught fire and killed everybody.

23                   ATTY. BECKER:  And I am assuming

1    you were one of the first people that responded to

2    that scene?

3                    ROBERT HAMILTON:   Yes, they were

4    still in the plane.

5                    ATTY. BECKER:  And I'm assuming

6    that, obviously, you saw the deceased in the

7    airplane?

8                    ROBERT HAMILTON:   Right.

9                    ATTY. BECKER:  Obviously, in this

10   case, you are going to be involved -- because it

11   does involve a homicide, you are going to see

12   photographs that are disturbing and involve the

13   death of Mr. Fingerhut.  And you are also going to

14   hear testimony from the County Coroner or his

15   pathologist who will testify in this matter as to

16   the cause of death.  I assume, given your training

17   and background, that will not cause you any

18   problems?

19                    ROBERT HAMILTON:   No.

20                    ATTY. BECKER:  And you understand

21   that this case, like all criminal cases, has to be

22   decided on the facts, and cannot be decided for any

23   sympathy that you may have either for the deceased,

```
 1    Mr. Fingerhut, or for the Defendant in this case,

 2    who also faces a potential loss of her life.  So,

 3    for instance, you can't feel sorry for Mr.

 4    Fingerhunt because he died in the manner that he

 5    did, he may have suffered, or feel sorry or sympathy

 6    for his family or his loved ones, just as you can't

 7    make a determination or fail to find Ms. Roberts

 8    guilty if we have proven our case beyond a

 9    reasonable doubt because you may feel sorry for her

10    because she may suffer really the ultimate

11    consequence in the criminal justice system, correct?

12                  ROBERT HAMILTON:  Right.

13                  ATTY. BECKER:  You promise that you

14    will not consider sympathy in your deliberations

15    either for the victim or for the Defendant in this

16    case?

17                  ROBERT HAMILTON:  Right.

18                  ATTY. BECKER:  I am assuming when

19    you were with the Highway Patrol, you investigated a

20    number of cases or some cases where circumstantial

21    evidence was probably used to either get a plea or

22    convict someone?

23                  ROBERT HAMILTON:  Right.
```

1              ATTY. BECKER:  One of the classic

2    examples we use to describe circumstantial evidence

3    would have been last night, and I am not sure where

4    you live -- you live in Cortland, right?

5              ROBERT HAMILTON:  Right.

6              ATTY. BECKER:  Where abouts in

7    Cortland?

8              ROBERT HAMILTON:  I live in

9    Bazetta Township, two miles south.

10             ATTY. BECKER:  Did you have some

11   rain last night, a little bit?

12             ROBERT HAMILTON:  No, I didn't.

13             ATTY. BECKER:  Well, in Cortland

14   last night, I noticed that my deck was wet and my

15   driveway was wet this morning, and when I went to

16   bed last night, I watched the news and they

17   indicated that there was some scattered

18   thundershowers throughout the area and they would be

19   coming through, and I saw the green little blobs and

20   the yellow blobs out in Sandusky, Newark and Lima

21   and out in that western part of the State.  And I

22   went to bed and, obviously, I knew it wasn't raining

23   because I looked out before I turned out the lights

1       and locked the house up.  But when I got up this

2       morning, there was some rain and some dampness on

3       the roadway, and like I said, the deck and my

4       driveway and the neighbor's driveway, and I can make

5       the inference that it rained, correct?

6                   ROBERT HAMILTON:  Uh-huh.

7                   ATTY. BECKER:  Even though I didn't

8       personally see it raining in the middle of the

9       night.  I finally got a good nights sleep, none of

10      the kids woke up, and I didn't hear anything, didn't

11      hear thunder, must of been a very light rain.  I can

12      make that assumption, correct?

13                  ROBERT HAMILTON:  Right.

14                  ATTY. BECKER:  Will you be able to

15      make those kinds of inferences as a juror, if you

16      need be in this case?

17                  ROBERT HAMILTON:  Yes.

18                  ATTY. BECKER:  Because the Court is

19      going to instruct you that circumstantial evidence

20      has the same weight as direct evidence.  Now, there

21      is always a potential for different inferences from

22      an event.  For instance, if I had given you the same

23      set of circumstances last night and the scattered

1    showers, and let's say I lived in Bazetta where you

2    live, and it didn't rain, but I woke up, and my

3    driveway was wet, my yard was wet, but my neighbors

4    driveways weren't wet, and their cars weren't wet.

5    But then I went downstairs and I see my wife putting

6    away the hose and she's got a bucket full of soap

7    and she's dumping it down the drain in the garage.

8    I can assume that it didn't rain, all she did was

9    wash the car in the driveway, right?

10                   ROBERT HAMILTON:  Right.

11                   ATTY. BECKER:  So, you have to be

12   careful some times with the inferences that you

13   make, but you are going to look for certain things

14   like maybe the wetness of the other neighbor's

15   driveways to determine whether or not it rained or

16   not.

17                   ROBERT HAMILTON:  Right.

18                   ATTY. BECKER:  And you can make

19   those kinds of inferences?

20                   ROBERT HAMILTON:  Right.

21                   ATTY. BECKER:  You -- I'm assuming

22   during your time with the Highway Patrol, and

23   probably even since then, have heard of cases

1    involving the not so smart criminal, and the not so

2    smart Defendant?

3                    ROBERT HAMILTON:  Yeah.

4                    ATTY. BECKER:  I don't know, do you

5    have any recollection of anybody that you were

6    personally involved with or working and got solved

7    or got caught because maybe they weren't so smart?

8                    ROBERT HAMILTON:  No, I don't

9    recall.

10                   ATTY. BECKER:  You probably read in

11   the paper though or heard of the guys that have gone

12   into a bank and robbed the bank at gun point and

13   they came with the best laid plans.  They got a

14   get-away driver that they trust and is reliable for

15   them, they check the car out, they even got a tune

16   up, they check the tires, they planned a get-away

17   route to get back to where they're going to count

18   the money and divey it up, time the lights to make

19   sure they can get in and out of there quickly.  They

20   know when the police are going to have a shift

21   change, and they know this bank is on the other side

22   of town from the police station, so they can do this

23   relatively quickly, get in and out of there, and all

1    of the police will be at the shift change at the

2    station on the other side of town.  And the guy goes

3    in there, he's got his hat pulled down, he's got the

4    dark sunglasses on, he's got the fake beard on, he's

5    got the leather coat pulled up over his shoulders so

6    can't really see his ears, he walks up to the teller

7    and he slips her a note.  It says, give me all the

8    money, he pulls his gun out to make sure no one can

9    see it, just the teller, and she puts all of the

10   money in the bag and he leaves, and he leaves the

11   note there and the teller turns the note over, and

12   there is a letter addressed to the guy at his own

13   residence.  So, you have heard of instances like

14   that?

15            ROBERT HAMILTON:  Right.

16            ATTY. BECKER:  That despite the

17   best laid plans, some criminal gets caught because

18   of his own stupidity, correct?

19            ROBERT HAMILTON:  Yes, right.

20            ATTY. BECKER:  As much as he tried

21   to cover his tracks and make all accommodations of

22   getting away, and making sure it was full proof, he

23   slipped up.

1          ROBERT HAMILTON:  Right.

2          ATTY. BECKER:  And that happens a

3     lot, do you agree.

4          ROBERT HAMILTON:  Right.

5          ATTY. BECKER:  I want to ask you a

6     little bit about, and I noticed on the questionnaire

7     that you mention Mr. Bailey's and I's boss, Dennis

8     Watkins, but it appears if you just realize him

9     through the newspaper articles, correct?

10         ROBERT HAMILTON:  That's right.

11         ATTY. BECKER:  You don't have any

12    personal knowledge of Mr. Watkins, do you?

13         ROBERT HAMILTON:  No, I don't.

14         ATTY. BECKER:  And you're just

15    familiar, I guess, because Commissioner Jim Tsagaris

16    was at one point earlier this year, it might have

17    been late last year, was looking into the

18    possibility of hiring outside counsel to represent

19    the County Commissioners?

20         ROBERT HAMILTON:  Yes.

21         ATTY. BECKER:  Is that something

22    that you followed personally for some reason, or it

23    just stuck out in your head?

1          ROBERT HAMILTON:  I just happen to

2     read it in the paper, and the reason I remembered it

3     was because the County was already having money

4     problems, and it seemed to me that he was trying to

5     spend more money that didn't need to be spent.

6          ATTY. BECKER:  You probably were

7     figuring why -- they have their own attorneys down

8     there, why is he going to hire more attorneys

9     outside?

10          ROBERT HAMILTON:  Right.

11          ATTY. BECKER:  And you're probably

12     like the rest of the people, at least the ones that

13     I know, considering why was he doing that?

14          ROBERT HAMILTON:  Right.

15          ATTY. BECKER:  I assume that the

16     only reason that you left the Highway Patrol was due

17     to the fact that you found a better paying job with

18     the General Motors plant?

19          ROBERT HAMILTON:  That's right.

20          ATTY. BECKER:  And you were

21     probably one of the first ones out there at G.M.?

22          ROBERT HAMILTON:  No, I started in

23     '68.

```
 1                        ATTY. BECKER:  Okay, a couple of

 2     years after that, two or three years later?

 3                        ROBERT HAMILTON:  Are you talking

 4     about  --

 5                        ATTY. BECKER:  You worked in

 6     Lordstown?

 7                        ROBERT HAMILTON:  Right, I worked

 8     in Lordstown, but I started there in '68.  There

 9     were other people I worked with at Warren that went

10     out there.

11                        ATTY. BECKER:  All right.

12                        ROBERT HAMILTON:  Before I did.

13                        ATTY. BECKER:  Before you got out

14     there?

15                        ROBERT HAMILTON:  Right.

16                        ATTY. BECKER:  I noticed that

17     you're from Harrison County, do you know the

18     prosecutor, Matt, down there -- I assume you haven't

19     been down there for many years, or do you still have

20     family there?

21                        ROBERT HAMILTON:  Well, I go down

22     for a reunion once a year.

23                        ATTY. BECKER:  Okay, is there
```

1    anything that you feel that you need to advise us

2    that you believe you can be a fair and impartial

3    juror in this case?

4                    ROBERT HAMILTON:   Well, you would

5    just have to take my word for it.

6                    ATTY. BECKER:   And that's all we

7    can do, but you don't seem like the kind of

8    individual who is trying to hide something, do you?

9                    ROBERT HAMILTON:   No.

10                   ATTY. BECKER:   You're not

11   desperately trying to stay on this jury or get off

12   of it, are you?

13                   ROBERT HAMILTON:   Well, I would

14   rather play golf.

15                   ATTY. BECKER:   Well, I think you

16   can probably look around this room and you would

17   have a unanimous conclusion with that.  Other than

18   you maybe would like to be somewhere else, you

19   believe that you could be a fair and impartial

20   juror, correct?

21                   ROBERT HAMILTON:   I think so.

22                   ATTY. BECKER:   And despite the fact

23   that almost 40 years ago or almost 40 years, maybe a

1    little less, maybe 37 years ago, you worked with the

2    Highway Patrol?

3              ROBERT HAMILTON:  Yes.

4              ATTY. BECKER:  You don't have any

5    animosity towards criminal Defendants or any

6    favoritism that you would show the State of Ohio, do

7    you?

8              ROBERT HAMILTON:  No, I don't.

9              ATTY. BECKER:  You will be a fair

10   and impartial juror in this matter?

11             ROBERT HAMILTON:  Yes.

12             ATTY. BECKER:  You will fairly

13   consider and weigh the evidence and hold the State

14   to the standard of proof beyond a reasonable doubt?

15             ROBERT HAMILTON:  Right.

16             ATTY. BECKER:  Not all doubt, but

17   reasonable doubt?

18             ROBERT HAMILTON:  Right.

19             ATTY. BECKER:  If the State is able

20   to convince you that Miss Roberts is guilty of the

21   alleged crimes she's charged with as well as the

22   death specifications and aggravating circumstances,

23   you will find her guilty, correct?

 1                    ROBERT HAMILTON:  Right.

 2                    ATTY. BECKER:  And the Court will

 3     tell you that you can find her guilty of all of the

 4     charges, some of the charges, or none of the

 5     charges, so theoretically, you can do any one of the

 6     four, you can do zero, one, two, three or four of

 7     the charges and the specifications.  If we were able

 8     to get to that second phase, and if we did prove our

 9     case beyond a reasonable doubt, you understand that

10     in that second phase, again, the burden is upon Mr.

11     Bailey and I to prove that death is the appropriate

12     penalty, and we have to prove that to you beyond a

13     reasonable doubt, correct?

14                    ROBERT HAMILTON:  Right.

15                    ATTY. BECKER:  And you will hold us

16     to that standard?

17                    ROBERT HAMILTON:  Yes.

18                    ATTY. BECKER:  You will not

19     automatically impose the death penalty even though

20     you may find out that this case, and the allegation

21     is that she premeditated this homicide, and that she

22     is an aider and abettor; that you will not hold us

23     to the unreasonable standard of proof beyond on all

1    doubt, would you?

2                          ROBERT HAMILTON:  No.

3                          ATTY. BECKER:  And you will not

4    automatically impose the death penalty, or give the

5    death penalty a head start in considering those four

6    options?

7                          ROBERT HAMILTON:  No.

8                          ATTY. BECKER:  And other than the

9    fact that you would probably like to be playing golf

10   here in late April or early May like the rest of us,

11   you believe you could give your undivided attention

12   to this case, and put aside whatever you may have

13   read or seen about it in the media, and decide this

14   case based solely on the evidence and testimony that

15   you will hear in this Courtroom, correct?

16                         ROBERT HAMILTON:  That's right.

17                         ATTY. BECKER:  Mr. Hamilton, I do

18   want to thank you for your time this morning, and

19   Mr. Ingram or Mr. Juhasz are going to ask you some

20   questions at this time.

21                         ROBERT HAMILTON:   Thank you.

22                         THE COURT:  Mr. Ingram.

23                         ATTY. INGRAM:  Thank you, Your

1    Honor.

2    **EXAMINATION BY ATTORNEY INGRAM:**

3                        ATTY. INGRAM:  Good morning, Mr.

4    Hamilton.

5                        ROBERT HAMILTON:  Good morning.

6                        ATTY. INGRAM:  Are you cold up

7    there?

8                        ROBERT HAMILTON:  No, I am all

9    right.

10                       ATTY. INGRAM:  My name is Jerry

11   Ingram and this is John Juhasz, and I share the

12   responsibility of representing Donna Roberts, who is

13   on trial for her life.  And, obviously, we take our

14   responsibilities very seriously, and feel that we

15   should take every reasonable precaution in selecting

16   a fair minded jury, the same type of jury that you

17   or I would want to hear our cause if we were on

18   trial.  Does that sound fair enough to you?

19                       ROBERT HAMILTON:  Sure.

20                       ATTY. INGRAM:  You got this light

21   in your eyes, if you slide a little bit to your

22   right, I think maybe it will be a little bit better

23   for you.

```
 1                    ROBERT HAMILTON:  That's better.
 2                    ATTY. INGRAM:  This is the only
 3      opportunity that we will get to know one other, and
 4      determine whether your comfortable sitting on this
 5      case?  You've had some experience with lawyers, and
 6      I assume that you're accustom to lawyers speaking at
 7      you.
 8                    ROBERT HAMILTON:   Right.
 9                    ATTY. INGRAM:  On this particular
10      occasions, however, we can talk -- we're suppose to
11      talk to one another.  You are suppose to talk to me,
12      and if at any point in time there is something that
13      pops into your head, there is a question that you
14      would like to ask, or something that you would like
15      to talk about,  would you please let me know and we
16      will address that issue?
17                    ROBERT HAMILTON:  Sure.
18                    ATTY. INGRAM:  This is a lot like a
19      job interview, except when you decided to go to G.M.
20      for that job interview, you chose to go.
21                    ROBERT HAMILTON:  Right.
22                    ATTY. INGRAM:  In this particular
23      situation, somebody spun the jury wheel and reached
```

 1    their hand in there, and I guess thereby deprived

 2    you a couple of days on the links and asked you to

 3    come down for this interview.

 4                    ROBERT HAMILTON:   Uh-huh.

 5                    ATTY. INGRAM:   We are interviewing

 6    you today for one of the most important jobs there

 7    is; the job of determining the truth, finding the

 8    truth and, perhaps, determining the fate of another

 9    human being.  How do you personally feel about being

10    asked to assume that responsibility?

11                    ROBERT HAMILTON:   Well, I think

12    it's a privilege, being a citizen of this country,

13    to be involved in the justice system.  And I feel

14    it's the duty of any voter.

15                    ATTY. INGRAM:   If selected, your

16    job responsibility will be to fairly determine the

17    facts for this cause, you see that?

18                    ROBERT HAMILTON:   Yes.

19                    ATTY. INGRAM:   Your job

20    responsibility now in this dialogue, is to tell us

21    if you might have a problem giving either side a

22    fair shake, do you understand that?

23                    ROBERT HAMILTON:   Right.

1       ATTY. INGRAM:  There are no right

2   or wrong answers in this exchange.  The only mistake

3   that you could possibly make is if instead of

4   telling me how you really feel, which I doubt you

5   will do, you tell me what you think I want to hear,

6   you see?

7       ROBERT HAMILTON:  I understand.

8       ATTY. INGRAM:  In a nutshell, this

9   case boils down to the government's allegation that

10  Donna Roberts plotted or conspired with a male

11  companion, Nate Jackson, to cause the death of

12  Robert Fingerhut.  Donna and Mr. Fingerhut were

13  divorced, but following the divorce, they continued

14  to work with one another at the Greyhound Bus

15  Station in Warren and Youngstown, and to live with

16  one another in Howland.  Do you understand that this

17  trial is about the guilt or innocence of one person

18  and one person only?

19      ROBERT HAMILTON:  That's right.

20      ATTY. INGRAM:  And that is Donna

21  Roberts?

22      ROBERT HAMILTON:  Yes.

23      ATTY. INGRAM:  Throughout the

1 course of these proceedings, you will hear the name

2 Nate Jackson, and you have heard the name Nate

3 Jackson in the news media?

4     ROBERT HAMILTON:  Right.

5     ATTY. INGRAM:  If you sit in this

6 case, you may conclude that Nate Jackson did what

7 the State claims that he did.  The issue here is

8 whether or not Donna helped him.  Do you understand

9 that?

10     ROBERT HAMILTON:  Yes, right.

11     ATTY. INGRAM:  In support of its

12 allegation that Donna aided or abetted in the death

13 or Robert Fingerhut, the State will present various

14 letters and tape-recorded conversation between Donna

15 and Nate Jackson.

16     ROBERT HAMILTON:  Okay.

17     ATTY. INGRAM:  Now, some of that

18 evidence is going to be sexually explicit, and some

19 of it, to be honest with you, is going to be down

20 right offensive.

21     ROBERT HAMILTON:  Uh-huh.

22     ATTY. INGRAM:  You understand that

23 the allegation is murder, not loose morality?

```
 1                      ROBERT HAMILTON:   Right.

 2                      ATTY. INGRAM:  No matter how

 3       shocked or offended you may be by the sexually

 4       explicit nature of some of this evidence, it will

 5       still be your job responsibility to test that

 6       evidence to determine whether it ties Donna to this

 7       offense.  Do you see that?

 8                      ROBERT HAMILTON:  Yes.

 9                      ATTY. INGRAM:  Do you think you're

10       up to that?

11                      ROBERT HAMILTON:  Sure.

12                      ATTY. INGRAM:  Donna denies that

13       she actually participated by conspiracy, plot, or

14       otherwise, in the murder of Robert Fingerhut.  Would

15       you have the courage to acquit, vote not guilty, if

16       you felt that a not guilty verdict was supported by

17       the evidence?

18                      ROBERT HAMILTON:  Yes.

19                      ATTY. INGRAM:  I am going to ask

20       you some hard questions while I'm standing up here.

21       And I am going to tell you that if I was sitting

22       where you were, and you were asking me the same

23       questions that I am asking you, I would have a
```

2958

1    difficult time answering those questions.  All we

2    can do is ask you to search your mind, search your

3    heart, and give us the best response that you can.

4    Does that sound fair enough?

5                    ROBERT HAMILTON:  Yes.

6                    ATTY. INGRAM:  Would you search

7    your mind a little bit, and tell me everything that

8    you recollect, reading, seeing or hearing about this

9    case, the Fingerhut case, or the Nate Jackson case?

10                    ROBERT HAMILTON:  Okay, I recall

11   reading in the newspaper some time ago; that is, the

12   Tribune, the Warren Tribune.

13                    ATTY. INGRAM:  Yes, sir.

14                    ROBERT HAMILTON:  That a house was

15   entered in the Howland area and the resident was

16   shot to death.  And Nate Jackson was accused of the

17   murder.  And maybe another article later that Miss

18   Roberts was implicated in that murder.  That's all I

19   generally remember about it.

20                    ATTY. INGRAM:  Am I correct that it

21   was the name Fingerhut that sort of directed your

22   attention to the publicity regarding this particular

23   case?

1              ROBERT HAMILTON:  I don't think so

2    because I didn't remember the victim's name until

3    today, until you brought that up.

4              ATTY. INGRAM:  As a result of

5    anything that you saw, read, or heard, did you form

6    any impressions?

7              ROBERT HAMILTON:  No, not really

8    because a newspaper only reports what they perceived

9    was the situation, whatever happens.

10             ATTY. INGRAM:  Their primary

11   motive, I think in publishing anything is that which

12   will sell newspapers.

13             ROBERT HAMILTON:  Yes.

14             ATTY. INGRAM:  I am sure you

15   understand, and I want to spend some time with you

16   on it.  In order to sit in this case, you have to do

17   your best to set aside any impressions or opinions

18   that you may have formed.  Do you think you're up to

19   that?

20             ROBERT HAMILTON:  I think so.

21             ATTY. INGRAM:  Now, let's talk

22   about penalties a little bit, but before we get

23   there, I want to explain a concern that I have.  I

1    don't want you to get the inkling because of all of

2    these people, the Judge, the prosecutor, myself, are

3    standing up here talking to you about punishment

4    that we're predicting you are going to have to

5    decide the issue of punishment.

6                ROBERT HAMILTON:  Okay.

7                ATTY. INGRAM:  We have to ask you

8    these questions now and, to me, it's a lot like

9    putting the cart before the horse.  You know, we're

10   talking about how you might punish someone, and you

11   don't even know if the person has done anything

12   wrong or not.

13               ROBERT HAMILTON:   Right.

14               ATTY. INGRAM:  Does that make sense

15   to you.

16               ROBERT HAMILTON:  Sure.

17               ATTY. INGRAM:  Do you use your seat

18   belt?

19               ROBERT HAMILTON:   Yes.

20               ATTY. INGRAM:  When you fasten that

21   seat belt, do you expect to be involved in an

22   automobile accident?

23               ROBERT HAMILTON:   No.

 1                    ATTY. INGRAM:  You fashion your
 2        seat belt just in case, am I right?
 3                    ROBERT HAMILTON:  It's the law.
 4                    ATTY. INGRAM:  We're not predicting
 5        here that you're going to get to a second phase.
 6                    ROBERT HAMILTON:  Uh-huh.
 7                    ATTY. INGRAM:  We're simply asking
 8        you these questions now just in case.  Do you see
 9        that?
10                    ROBERT HAMILTON:  Right, I
11        understand.
12                    ATTY. INGRAM:  I understand from
13        your answers on the questionnaire that you have had
14        discussions with other people, maybe debates, we
15        will use the word discussions, regarding the death
16        penalty?
17                    ROBERT HAMILTON:  Right.
18                    ATTY. INGRAM:  And in those
19        discussions, you were pro death penalty or in favor
20        of the death penalty?
21                    ROBERT HAMILTON:  Yes.
22                    ATTY. INGRAM:  Do you recall who
23        those discussions were with?

```
1                    ROBERT HAMILTON:  Yes, sir.

2                    ATTY. INGRAM:  Could you tell me

3       who you had these discussions with?

4                    ROBERT HAMILTON:  Yes, it was a

5       lady that I attended church with.  We talked about

6       it for a few minutes.  I can't remember what brought

7       it up, what brought the issue up.

8                    ATTY. INGRAM:  Was this recently or

9       some years back?

10                   ROBERT HAMILTON:  It was a long

11      time ago.

12                   ATTY. INGRAM:  Do you recall the

13      arguments that you set forth in that discussion in

14      favor of the death penalty?

15                   ROBERT HAMILTON:  Probably the same

16      argument that I would make today.

17                   ATTY. INGRAM:  Which would be?

18                   ROBERT HAMILTON:  Which would be

19      that every act that a person commits requires a just

20      retribution and murder happens to be a situation

21      where capital punishment I think applies in most

22      cases, not in every case.

23                   ATTY. INGRAM:  In response to the
```

1     question in the questionnaire about why we have the

2     death penalty in this country, your response was

3     that in our history we used a lot of biblical

4     precedent or biblical principles to establish our

5     laws.

6                         ROBERT HAMILTON:  Right.

7                         ATTY. INGRAM:  And one of those

8     principles was an eye for eye.

9                         ROBERT HAMILTON:  Yes.

10                        ATTY. INGRAM:  Do you personally

11    subscribe to the biblical principle an eye for eye;

12    a tooth for a tooth?

13                        ROBERT HAMILTON:  Basically, yes.

14                        ATTY. INGRAM:  And in the

15    questionnaire, there was a question about in your

16    opinion, should the death penalty be required for

17    some offenses?

18                        ROBERT HAMILTON:  Yes.

19                        ATTY. INGRAM:  And I believe --

20    well, I'm going to look right at the questionnaire

21    probably the best thing.  You said, yes, for murder

22    while committing a felony.

23                        ROBERT HAMILTON:  Yes.

1          ATTY. INGRAM:  And that is felony

2    murder?

3          ROBERT HAMILTON:  Right.

4          ATTY. INGRAM:  For a premeditated

5    murder?

6          ROBERT HAMILTON: Yes.

7          ATTY. INGRAM:  Which is any murder

8    with advanced planning?

9          ROBERT HAMILTON:  Right, uh-huh.

10          ATTY. INGRAM:  And certain heinous

11    crimes, like anything involving the rape and murder

12    of children?

13          ROBERT HAMILTON:  Right.

14          ATTY. INGRAM:  Let's talk about a

15    case of premeditated murder.

16          ROBERT HAMILTON:  Okay.

17          ATTY. INGRAM:  Premeditated now is

18    prior calculation and design, but it's advanced

19    planning.  Do we have that straight, you and I?

20          ROBERT HAMILTON:  Right.

21          ATTY. INGRAM:  In a case where

22    someone is convicted of premeditated murder, is it

23    your personal view that the death penalty is the

1    appropriate penalty in such a case?

2                    ROBERT HAMILTON:  Yes.

3                    ATTY. INGRAM:  And in the case of

4    felony murder, and that is causing the death of

5    someone purposely, but while you commit -- while you

6    were committing another, let's say, aggravated

7    burglary or an aggravated robbery.  Are we straight

8    on that, you and I?

9                    ROBERT HAMILTON:  Yes.

10                   ATTY. INGRAM:  Is it your personal

11   opinion that the death penalty is the right or just

12   penalty in that type of a case?

13                   ROBERT HAMILTON:  Yes.

14                   ATTY. INGRAM:  How strongly do you

15   hold these views?  And I know that is a hard

16   question.

17                   ROBERT HAMILTON:  Right.  Well, I

18   would say absolute, except if there was evidence or

19   testimony that would be mitigating circumstances.

20                   ATTY. INGRAM:  Right.

21                   ROBERT HAMILTON:  Possibly, I could

22   change my mind on it.

23                   ATTY. INGRAM:  So, your views of

```
 1       the death penalty are that the death penalty is a
 2       just -- or the just penalty, am I right?  The just
 3       penalty?
 4                      ROBERT HAMILTON:  Right.
 5                      ATTY. INGRAM:  In those
 6       circumstances is almost absolute?
 7                      ROBERT HAMILTON:  Yes.
 8                      ATTY. INGRAM:  But you could be
 9       dissuaded from that absolute view if some type of
10       mitigation was presented to you?
11                      ROBERT HAMILTON:  Yes.
12                      ATTY. INGRAM:  What type of
13       mitigation, and this is not case specific, you
14       understand that?  This is about your personal
15       feelings.
16                      ROBERT HAMILTON:  Right.
17                      ATTY. INGRAM:  What type of
18       mitigation would dissuade you from that absolute
19       view?
20                      ROBERT HAMILTON:  I would have to
21       hear it first.  I can't give you any specifics.
22                      ATTY. INGRAM:  In a case where
23       someone has purposely caused the death of another,
```

2967

1    either during a felony or felony murder or

2    premeditated murder, and you're beginning a second

3    phase, not in this case, some other case, are you

4    following me?

5                ROBERT HAMILTON:  Right.

6                ATTY. INGRAM:  Your view, as we

7    begin that second phase, would be that the death

8    penalty is the just penalty?

9                ROBERT HAMILTON:  Yes.

10               ATTY. INGRAM:  And that is almost

11    an absolute view?

12               ROBERT HAMILTON:  Yes.

13               ATTY. INGRAM:  So, if you were

14    going into a second phase, your absolute view would

15    predispose you to the death penalty, would it not?

16               ROBERT HAMILTON:  Yes.

17               ATTY. INGRAM:  And as a result of

18    the fact that you would be predisposed to the death

19    penalty, you would have to be persuaded that life

20    rather than death was the just penalty?

21               ROBERT HAMILTON:  Yes.

22               ATTY. INGRAM:  And would you expect

23    the Defendant to persuade you that life rather than

1    death would be the just penalty?

2              ROBERT HAMILTON:   Well, in

3    consultation with the other juror members, it would

4    have an influence on what their input would be on it

5    based on the evidence presented by the defense and

6    the prosecution.

7              ATTY. INGRAM:   Would you share with

8    the other jurors your personal view that in a case

9    of premeditated murder and felony murder that death

10   was the just punishment?

11             ROBERT HAMILTON:   Yes.

12             ATTY. INGRAM:   So, before you

13   engage in dialogue with your other jurors, as you

14   start the second phase, your predisposed to the

15   death penalty in the first place, aren't you?

16             ROBERT HAMILTON:   Sure.

17             ATTY. INGRAM:   So, at that time,

18   the death penalty has sort of a leg up in your mind

19   over the life sentence options, is that correct?

20             ROBERT HAMILTON:   Yes.

21             ATTY. INGRAM:   And that is

22   something that you truly and honestly feel, am I

23   correct?

1                    ROBERT HAMILTON:  Yes.

2                    ATTY. INGRAM:  And you seem to be a

3    rather strong-willed person, am I correct about

4    that?

5                    ROBERT HAMILTON:  Yes.

6                    ATTY. INGRAM:  And do you feel

7    rather strongly about the death penalty being the

8    just penalty under the circumstances that you and I

9    have talked about?

10                  ROBERT HAMILTON:  Yes.

11                  ATTY. INGRAM:  Listen, I thank you,

12    very much.  I have no further questions.

13                  THE COURT:  Counsel approach for a

14    minute.

15

16    (Side Bar)

17

18                  THE COURT:  Mr. Hamilton, you have

19    done what we have asked you.  You have answered the

20    questions honestly, that is the most we can ask for.

21    You are excused.

22                  ROBERT HAMILTON:  Okay.

23                  THE COURT:  The reason, let me give

1    you the reason, I am sure you know because of your

2    experience, but in that second phase, we have to

3    have people that are able to accept what the law is,

4    and you fall on one side and we have many people

5    that fall on the other side, and there are many

6    people who could not under any circumstances impose

7    a death penalty. And that is the reason we go

8    through this weeding out process. We thank you,

9    very much. Did you work for the Warren Police

10   Department for awhile?

11                    ROBERT HAMILTON:    No.

12                    THE COURT:   Just the OSP?

13                    ROBERT HAMILTON:   Yes.

14                    THE COURT:   Okay, I don't remember

15   you -- you worked at Lordstown after that?

16                    ROBERT HAMILTON:   Right.

17                    THE COURT:   Well, listen, you have

18   a good day.

19                    ROBERT HAMILTON:    Thank you, very

20   much.

21

22   (Whereupon, Robert Hamilton, Juror Number 180, was

23   excused.)

```
 1                        THE COURT:  For the record, the

 2    side bar dealt with the question of whether or not

 3    there would be any objections for excusing for

 4    cause, and there were no objections, is that

 5    correct, gentlemen?

 6                        ATTY. JUHASZ:  Yes, Your Honor.

 7                        ATTY. BECKER:  State is fair and

 8    impartial and seeks justice, and we agree that Mr.

 9    Hamilton should have been excused.

10                        THE COURT:  Very good.  We do not

11    have another prospective juror coming in until one

12    o'clock.  We will take a break until 1:00 p.m.

13

14    (At 11:30 a.m., a recess was taken.)

15

16    (Back in Court at 1:15 p.m.)

17

18              REGINA DAY, JUROR NUMBER 115

19    EXAMINATION BY THE COURT:

20

21                        THE COURT:  Good afternoon.  Miss

22    Day, you read the handout that was given to you?

23                        REGINA DAY:  Uh-huh.
```

1                    THE COURT:  You understand from

2    reading that, that we are here on the case of State

3    versus Donna Roberts, the lady sitting over to my

4    right there.  There are two counts of aggravated

5    murder with attached specifications.  Under Ohio

6    law, just because a person is convicted of murder,

7    does not mean that they necessarily face the death

8    penalty.  It has to be an aggravated murder with

9    specifications.  Those are the reasons that the

10   legislature has attached in the statute.  If

11   attached to the charge of aggravated murder, it

12   raises the possibility of the death penalty being

13   considered.

14                    Now, the burden is on the State to prove

15   the charges contained in the indictment.  They have

16   to do that by evidence beyond a reasonable doubt, to

17   have this burden of proof that we have.  And the

18   attorneys will get into some explanation of what

19   that means.

20                    If the State bears that burden of proof

21   and proves that an aggravated murder was committed

22   with specifications, then and only then, does the

23   trial go to a second phase.  If they fail to do

2973

```
1     that, then this jury would properly return a verdict

2     of not guilty.  It is necessary in picking this jury

3     that each potential juror is inquired into about

4     their personal feelings on the question of the death

5     penalty.  Some people in Ohio feel -- or some people

6     everywhere, not just Ohio, feel that if you take a

7     life, you should forfeit your life, as in the Old

8     Testament, eye for an eye.  And that is not the law

9     of Ohio.  Any person that thought that way could not

10    be fair to the Defendant.  Their are others who,

11    under no circumstances, feel they could participate

12    in any undertaking where the life of a person had to

13    be decided.  That type of person could not be a fair

14    juror as far as the State of Ohio is concerned.  So,

15    these questions are all geared to find out who could

16    sit on this jury and follow the law, and be fair to

17    both sides.  And that is if the State is able to

18    prove their case by the requisite burden, that they

19    be able to at least review and listen to the

20    aggravating circumstances, those are reasons that

21    the State would put before the jury, recommending

22    that the death penalty be imposed.  As opposed to

23    the mitigating factors, which would be reasons in
```

1    favor of the Defendant, why the death penalty should

2    not be imposed.  You get the picture?

3                    REGINA DAY:  Yes.

4                    THE COURT:  The other issue will be

5    on pretrial publicity.  This case generated its fair

6    share of pretrial publicity, as any matter of this

7    nature would.  Some people have read about it, some

8    have not.  The ones that have, they have to be able

9    to look within their own hearts and say I am able to

10   set aside anything that I think I know about the

11   case from the papers or the T.V. or whatever, and

12   decide this matter on the merit of the evidence or

13   lack thereof that will be presented in this Court.

14   Unless the issue is determined by all 12 people on

15   what they hear within this Courtroom, somebody will

16   probably not receive a fair trial.  So, those are

17   the two main issues that you will be asked about,

18   okay?

19                   REGINA DAY:  Uh-huh.

20                   THE COURT:  Mr. Bailey.

21                   ATTY. BAILEY:  Thank you, Your

22   Honor.

23

1    **EXAMINATION BY ATTORNEY BAILEY:**

2                    ATTY. BAILEY:  Good afternoon, Mrs.

3    Day.

4                    REGINA DAY:  Hi.

5                    ATTY. BAILEY:  My name is Ken

6    Bailey, and I think you saw me about three weeks ago

7    in Court in the other Courtroom, and I promised you

8    back then that I would be joined by my co-counsel,

9    Chris Becker, another assistant prosecutor in the

10   office, and together the two of us are responsible

11   for prosecuting this particular case on behalf of

12   the  people of Trumbull County and the State of

13   Ohio.  And because we want to make sure that the

14   folks who are selected can be fair and impartial to

15   both sides on this jury, both to the Defendant and

16   to the people of the State of Ohio, we're going to

17   ask you some questions about your background, your

18   beliefs your opinions on different things.  And not

19   because we're snoopy and like to pry.  And also

20   there aren't any right answers or any wrong answers,

21   just open, candid answers to these questions.

22                    And in the event that we run into each

23   other outside the hallway, the elevator, or a

1    restaurant or something, I want you to understand

2    that we're not allowed to have any communication

3    with you after we get done here today, except to say

4    good morning or good afternoon because under our

5    rules of conduct if we have any further

6    communication with you until this case gets through

7    both phases, until both phases are over, it could

8    cause a mistrial, and we don't want to do it all

9    over again.  Okay?

10                    REGINA DAY:  Uh-huh.

11                    ATTY. BAILEY:  Ordinarily, I would

12    start out with -- oh, if you have any questions as

13    to what we're doing with procedures, feel free to

14    ask, this is sort of a give and take here this

15    afternoon.  And, ordinarily, I would start off with

16    questions about pretrial publicity, and your views

17    on the death penalty and some other questions, but

18    you filled out a questionnaire this afternoon, I

19    believe?

20                    REGINA DAY:  Uh-huh.

21                    ATTY. BAILEY:  And I guess not much

22    has changed in the last hour?

23                    REGINA DAY:   No.

1              ATTY. BAILEY:  And I notice at the

2      end of the questionnaire that you indicated that you

3      are going through a separation?

4              REGINA DAY:  Yes.

5              ATTY. BAILEY:  Which is a difficult

6      time.  You indicated you would rather not be here,

7      you want to be with your son who is 16 years of age?

8              REGINA DAY:  Right.

9              ATTY. BAILEY:  And would that --

10     your personal circumstance and the fact that you are

11     concerned about your son, affect your ability to

12     concentrate on the evidence, because I would expect

13     that this case would start some time next week and

14     it would probably last a week and a half to two

15     weeks in the first phase.  Then there would be a

16     period of time where you would be sequestered at the

17     end of the case.  And the sequestration -- every

18     jury is different.  I've had juries come back at the

19     end of the first phase within an hour and a half,

20     and some have taken up five days, and you're not

21     allowed to go home or have any communication with

22     the outside basically.  You are in the custody of

23     the bailiff, and you are put up in a hotel as long

1    as you're deliberating, and then if you come back

2    with a guilty verdict on the charge of aggravated

3    murder and a specification or two, then we would go

4    into a second phase, there would be like a break for

5    a couple of days or a week in between.  And then you

6    come back and hear more testimony perhaps in the

7    second phase, that could last anywhere from one to

8    three days, and then you would be sequestered again.

9    And I don't know how long that would take.

10           Now, that sequestration and the entire

11   process, would you have trouble concentrating on the

12   testimony and the witnesses because of your personal

13   problems and being concerned about your son?

14           REGINA DAY:  Probably, yes.

15           ATTY. BAILEY:  Okay, and are you

16   telling us that concern about your family situation

17   and your child or such, that you don't think that

18   you would be able to serve on this jury at this

19   time?

20           REGINA DAY:  Right.

21           ATTY. BAILEY:  You would rather

22   like to be called in at a different time, after this

23   is over?

1                     REGINA DAY:  Right, right, yes.

2                     ATTY. BAILEY:  Okay.

3                     ATTY. INGRAM:  Before that, Your

4      Honor, if I may, it has nothing to do with that.

5                     THE COURT:  You want to ask a

6      couple of questions?

7                     ATTY. INGRAM:  Do you recall coming

8      down to the other end of the hall about three weeks

9      ago today?

10                    REGINA DAY:  Uh-huh.

11                    ATTY. INGRAM:  I am trying to avoid

12     the left or right question, but when you enter the

13     Courtroom, do you recall where you went?

14                    REGINA DAY:  Do I recall where I

15     went?

16                    ATTY. INGRAM:  Yes.

17                    REGINA DAY:  Yes, I stood at the

18     back against the wall.

19                    ATTY. INGRAM:  Okay, on the

20     left-hand side or the right-hand side as you enter

21     the door?

22                    REGINA DAY:  On the right.

23                    ATTY. INGRAM:  While you were

1    there, did you discuss this case with anyone?

2                    REGINA DAY:   No.

3                    ATTY. INGRAM:  Did anyone discuss

4    this case with you?

5                    REGINA DAY:   No.

6                    ATTY. INGRAM:  Did you overhear

7    anyone else discussing the case amongst themselves?

8                    REGINA DAY:  No.

9                    ATTY. INGRAM:  Okay, thank you.

10                   THE COURT:  No objections?

11                   ATTY. BAILEY:  No objections.

12                   ATTY. INGRAM:  No objections.

13                   THE COURT:  Okay, the prospective

14   juror will be dismissed for cause.  Listen, we thank

15   you for your trouble.

16                   REGINA DAY:   No problem.

17                   THE COURT:  Good luck to you.

18                   REGINA DAY:   Thank you.

19

20   (Whereupon, Regina Day, Juror Number 181, was

21   excused.)

22

23                   THE COURT:  Let's bring in the next

1      one.

2                    **CAROL SELAK, JUROR NUMBER 184**

3      **EXAMINATION BY THE COURT**:

4                         THE COURT:  Good afternoon.

5                         CAROL SELAK:  Good afternoon.

6                         THE COURT:  You read that handout

7      that was given to you?

8                         CAROL SELAK:  Just now?

9                         THE COURT:  Yes.

10                        REGINA DAY:  Yes.

11                        THE COURT:  Okay, that gives you a

12     good starting point.  The reason for the questions

13     that will be put to you today is that you know this

14     is what we call a capital murder case; aggravated

15     murder with specifications.  In Ohio, everyone who

16     does murder is not necessarily putting their life at

17     risk.  The statute says if you commit a murder under

18     certain circumstances, which they call

19     specifications, then it raises the spector of the

20     jury having to decide the death penalty.  If they

21     have gotten past the first part of the trial,

22     substantially is the case that the State will

23     present.  In attempt to prove that there was an

1    aggravated murder with specifications.  If they fail

2    to do that, prove everything beyond a reasonable

3    doubt, then we don't get into the issue of the death

4    penalty because there is no need for it.

5              It seems strange to have to talk about

6    that possibility when we don't know what is going to

7    happen, but we can't wait until the jury makes its

8    decision, because if they should return a verdict of

9    guilty, then we may have people on that jury that

10   could never under any circumstances impose the death

11   penalty.  That would be unfair to the State, or you

12   could have someone on that jury that firmly believes

13   that if a life is take, that person should forfeit

14   their life.  Well, such a person, although everybody

15   is entitled to their own opinion, that person,

16   either of that type, could not be fair to the one

17   side or the other.  So, it is necessary that before

18   the jury is picked, both sides have an opportunity

19   to make an inquiry about each particular prospective

20   jurors opinion.  Whatever your opinion is, that is

21   fine.  You are entitled to hold your opinion.  No

22   one here will argue with you about that and they

23   will respect it.  What we need, ideally, are 12

1    people who are able to follow the law.  And that

2    says that the State proves everything necessary

3    beyond a reasonable doubt, to get to that point, and

4    then they have the right to request that jury to

5    consider the aggravating circumstances, weigh them

6    against the mitigating factors, and to decide

7    whether the death penalty is appropriate or a life

8    imprisonment, there are three different categories

9    of that.

10            The other issue that they will inquire

11   about is that about pretrial publicity.  This case

12   generated its fair share of pretrial publicity.  And

13   there are some who don't remember it, some who read

14   quite a bit about it at the time, and the question

15   is whether each of these people will be able to

16   decide the matter on the evidence presented in the

17   Courtroom.  It would not be proper and somebody

18   would probably not have a fair trial if when you get

19   back in the jury room at the appropriate time and

20   somebody says, I don't think that evidence is right,

21   I remember reading in the paper, so you can't have a

22   fair trial.  It has to be based on the evidence and

23   the law you get in this Courtroom.  Okay?

2984

```
 1                    CAROL SELAK:  Yes.

 2                    THE COURT:  Fair enough.  Mr.

 3      Becker.

 4                    ATTY. BECKER:  Thank you, Your

 5      Honor.

 6

 7      EXAMINATION BY ATTORNEY BECKER:

 8                    ATTY. BECKER:  Good afternoon, Mrs.

 9      Selak.

10                    CAROL SELAK:  Hi.

11                    ATTY. BECKER:  My name is Chris

12      Becker.  I work for the Prosecuting Attorney's

13      Office.  This is Mr. Bailey and I will be assisting

14      him in this case.  We are working for the State of

15      Ohio, and of course, our job is to hopefully,

16      eventually get to the point where we will ask you

17      for the death penalty in this case.  I assume you

18      remember Mr. Bailey from three weeks ago, in fact

19      today, April 8th, down in the other Courtroom?

20                    CAROL SELAK:  Yes.

21                    ATTY. BECKER:  And also the defense

22      attorneys, Mr. Ingram and Mr. Juhasz, that are

23      seated here behind me with their client Miss
```

1      Roberts?

2                      CAROL SELAK:  Yes.

3                      ATTY. BECKER:  They were all there

4      as well on Tuesday, the 8th.  I will start out just

5      like the Judge said, and go through basically the

6      death penalty, the pretrial publicity issue, and

7      then general questions about your ability to serve

8      as a fair and impartial juror.  And when I am done,

9      Mr. Ingram or Mr. Juhasz will have some questions

10     for you as well.  It's important to keep in mind at

11     this point, that this is the only time that we get

12     to interact with one another.  Once the trial

13     starts, and if you are selected to sit as a juror or

14     an alternate juror, we can't have that interaction

15     even outside of the Courtroom, if I see you

16     throughout the trial, maybe I will bump into you at

17     the grocery store or something, we can't discuss

18     this case because that would be improper, you

19     understand that?

20                     CAROL SELAK:  Yes.

21                     ATTY. BECKER:  So, it's important

22     that now you tell us what your feelings are and what

23     your answers are to the questions, and it's really

1   important that you be very honest and open with us,

2   I don't think that you will do anything but that.

3   But we have to know what your opinions are, and it's

4   not that we -- it's not that we don't like you or

5   want to be nosy in your life and find too much out

6   about you, but we have to know certain things about

7   the way you feel and you think about the specifics

8   of this case, and the issues that may come up in

9   this case.  So, with that in mind, please do keep in

10  mind that if there is something you feel you need to

11  tell us, by all means, tell us that.  We're not here

12  to change your opinion, we're not here to change

13  your view points or change you as a person, but it's

14  important that you know -- that we know, rather,

15  what your feelings are on some of these issues.

16                  CAROL SELAK:  Okay.

17                  ATTY. BECKER:  So, the first area

18  that I am going to discuss is the death penalty.

19  Looking at your questionnaire, it seems to me as if

20  you do believe in the death penalty?

21                  CAROL SELAK:  Yes.

22                  ATTY. BECKER:  And in a certain

23  case, or certain cases, I think you mentioned, you

1    could actually impose the death penalty?

2                    CAROL SELAK:  Yes.

3                    ATTY. BECKER:  And one of the

4    things that I always try and ask people to do is, is

5    to make sure that they're up to this task, if it

6    comes to that point, if the facts warranted it and

7    the law allowed it, and Mr. Bailey and I met our

8    burden of proof, which is proof beyond a reasonable

9    doubt, you could envision yourself sitting in that

10   jury room back there with 11 other people signing a

11   piece of paper that would call for the imposition of

12   the death penalty against Mrs. Roberts?

13                   CAROL SELAK:  I wouldn't like to do

14   that but, yes, I could do it.

15                   ATTY. BECKER:  Even though it is an

16   unpleasant task, you could do it?

17                   CAROL SELAK:  Yes.

18                   ATTY. BECKER:  You wouldn't shy

19   away from that task, if it was proven to you?

20                   CAROL SELAK:   No.

21                   ATTY. BECKER:  And I understand

22   that there are a lot of unpleasant things in life

23   that we don't want to do, or that we may not want to

1       do, and you understand that this is an important

2       civic duty, not only to the State of Ohio but,

3       obviously, to Miss Robert and her attorneys as well?

4                       CAROL SELAK:    Yes.

5                       ATTY. BECKER:  And for that matter,

6       the entire Trumbull County community?

7                       CAROL SELAK:  Yes.

8                       ATTY. BECKER:  I think you will

9       find that serving on jury duty is probably the most

10      important civic duty you can perform probably other

11      than serving in the military, since we don't have

12      the draft anymore, people voluntarily do that.

13                      CAROL SELAK:  Yes.

14                      ATTY. BECKER:  You, I saw on your

15      questionnaire, indicated that religiously you were a

16      Catholic?

17                      CAROL SELAK:  Yes.

18                      ATTY. BECKER:  And I know the

19      Catholic church, obviously, has opposed the death

20      penalty for a number of years.  Does that -- does

21      your religion have any impact or any bearing to how

22      you may approach this case?

23                      CAROL SELAK:  No.

1           ATTY. BECKER:  Now, one of the

2    things that is little bit difficult, there are some

3    things that are a little difficult here.

4           First of all, we're planning for the

5    worst.  This case, like all capital murder trials in

6    Ohio, is a two phase process.  The first phase, Mr.

7    Bailey and I have to prove to you beyond a

8    reasonable doubt that Miss Roberts did the things

9    that she is accused of in the indictment, which is

10   basically just a piece of paper that some grand jury

11   issued a long time ago, and accused Miss Roberts of

12   doing some things, some of those things that would

13   make her eligible for the death penalty if she were

14   convicted of them.

15           Now, we may never get to that point.  It

16   may never come to that because you and your fellow

17   jurors may find her either not guilty of all of the

18   crimes, or not guilty of some of the crimes, or not

19   guilty of the specifications that would call for the

20   death penalty.  You may find her guilty of some of

21   the charges, all of the charges, or none of the

22   charges  contained in the indictment.  And that is

23   entirely up to you and your fellow jurors to decide

1    that.  So, we're being a little bit presumptuous

2    here, and we're trying to project out as far as we

3    can.  We're looking at the what if for Miss Roberts

4    is the worse case scenario.  If she's found guilty

5    of the charges that include the death penalty and

6    these specifications, or special circumstances that

7    would make her eligible for the death penalty, then

8    we get to a second phase, and then we assume that

9    Mr. Bailey and I have proven to you that the bad

10   things, the aggravating circumstances, outweigh the

11   good things.  And that death would be the

12   appropriate penalty.  We may never get to that

13   point, do you understand that?

14              CAROL SELAK:  Yes.

15              ATTY. BECKER:  All right.  And I

16   know that some times that seems a little strange to

17   people, because some people come in here and say,

18   well, if she's not guilty of something, then why are

19   we talking about the death penalty?  But you

20   understand that logically, you could find her not

21   guilty of anything?

22              CAROL SELAK:  Yes, yes.

23              ATTY. BECKER:  And you understand

1    that the grand jury process -- I don't know what you

2    know about the grand jury process, but the grand

3    jury is a body that meets in this very Courthouse.

4    They meet down on the second floor in a special

5    room, and they hear evidence from only one side, and

6    that side is Mr. Bailey and I's side.  Miss Roberts

7    was not at that grand jury, Mr. Ingram was not

8    there, Mr. Juhasz was not there.  Judge Stuard was

9    not there.  In fact, no Judge was there.  The grand

10   jury is basically the accusatory stage.  It's the

11   stage where we set into process or set the wheels in

12   motion for this entire process, and we indict about

13   800 felony cases a year, and just about every one of

14   those 800 felony cases is presented to a grand jury.

15          But the grand jury has a much different

16   function, their standard is much lower.  They just

17   determine if there is probable cause, or is it more

18   likely than not that a crime occurred.  The fact

19   that a grand jury indictment has been issued, all

20   that does in this case is just set the wheels in

21   motion to get to this point.  You would not consider

22   the fact that she is indicted for these heinous

23   crimes for any other purpose, would you?

1              CAROL SELAK:   No.

2              ATTY. BECKER:  So, the mere fact

3     that some other body issued a piece of paper that

4     says State of Ohio versus Donna Roberts, you

5     committed these four crimes, you're not going to

6     say, well, somebody else must of thought she done

7     something, so we've got to find that she did

8     something?

9              CAROL SELAK:   No.

10             ATTY. BECKER:  You understand that

11    on rare occasions Defendants are acquitted of the

12    entire charges or some of the charges, and that

13    every Defendant has a right to proceed to a jury

14    trial, correct?

15             CAROL SELAK:  Yes.

16             ATTY. BECKER:   In fact, there is a

17    jury trial going on down on the second floor, you

18    might of saw some jurors down there.

19             CAROL SELAK:   Yeah.

20             ATTY. BECKER:  Judge McKay has a

21    jury trial going on right now.  If we get to that

22    point where we get to the death penalty stage or

23    proceedings, the second phase where the death

1    penalty is an option, it's Mr. Bailey and I's

2    responsibility, and it's our burden to prove that

3    the aggravating circumstances outweigh the

4    mitigating factors.  And if Mr. Bailey and I don't

5    reach that standard in your mind, and in your fellow

6    jurors mind, you understand that you cannot impose

7    the death penalty?

8                    CAROL SELAK:  Yes.

9                    ATTY. BECKER:  Now, if we do reach

10   that standard and the death penalty becomes an

11   option, you understand that you  have to weigh all

12   four of the options equally, and I think you had a

13   handout that listed the four options?

14                   CAROL SELAK:  Yes.

15                   ATTY. BECKER:  I will briefly run

16   through them, you remember there is the death

17   penalty, life in prison with no parole, life in

18   prison with parole eligibility after she has served

19   30 years, and life in prison with parole eligibility

20   after serving 25 years.  In that second phase,

21   assuming we get there, and we're talking about the

22   death penalty, and even in the first phase, both

23   phases, Mr. Bailey and I are the only ones that have

```
 1    to prove anything to you.  Their attorneys and Miss

 2    Roberts, they don't have to present anything to you.

 3    Do you understand that concept?

 4               CAROL SELAK:  Yes, yes.

 5               ATTY. BECKER:  Because some times

 6    it's difficult, jurors come in here and they want to

 7    hear the other side of the story.  They want to hear

 8    what maybe Miss Roberts has to say.  You understand

 9    that she has a constitutional right not even to

10    testify?

11               CAROL SELAK:  Yes.

12               ATTY. BECKER:  You are not going

13    to hold any of that against her, and I don't know if

14    she will take the witness stand or not take the

15    witness stand in this case, but you understand that

16    she has a right not to do that?

17               CAROL SELAK:  Yes.

18               ATTY. BECKER:  And her and her

19    attorneys have the right not to even present

20    evidence to you, if they feel our case is so weak

21    that it cannot possibly lead to a conviction?

22               CAROL SELAK:  Yes.

23               ATTY. BECKER:  So, they could sit
```

1     over there for two or three weeks and do crossword

2     puzzles and play tiddly winks and deal cards amongst

3     each other and play three handed eucker or

4     something.  And when Mr. Bailey and I are done

5     presenting our case to you, they can say, Your

6     Honor, we don't have anything.  We think their case

7     is no good and they haven't proved anything, and

8     they will tell the jurors that if we haven't proved

9     our case, then your verdict would be not guilty,

10    correct?

11                    CAROL SELAK:  Yes.

12                    ATTY. BECKER:  All right.  So, just

13    to be, just to close up the issue on the death

14    penalty is, you understand that, first of all, we

15    have to get over one hurdle, and that is we have to

16    prove her guilty of some crimes beyond a reasonable

17    doubt, and we have to prove these specifications or

18    these special circumstances to make her death

19    penalty eligible?

20                    CAROL SELAK:  Yes.

21                    ATTY. BECKER:  And if we don't do

22    that, you could find her guilty or not guilty of

23    some or all of those charges.  But assuming that we

1  do that, then we come back for the second phase,

2  which is the phase where you would consider the

3  death penalty.

4       CAROL SELAK:  Uh-huh.

5       ATTY. BECKER:  You would not give

6  the death anymore weight than any of the other

7  options if we got to that second stage, would you?

8       CAROL SELAK:  No.

9       ATTY. BECKER:  But you would fairly

10  consider the death penalty if Mr. Bailey and I were

11  able to prove to you beyond a reasonable doubt that

12  the bad things, the aggravating circumstances,

13  outweigh any mitigating factors by proof beyond a

14  reasonable doubt?

15       CAROL SELAK:  Yes.

16       ATTY. BECKER:  And you believe that

17  you could sit in that jury room at some point and,

18  perhaps, in the month of May, and sign a piece of

19  paper calling for the imposition of the death

20  penalty, providing we proved our case beyond a

21  reasonable doubt?

22       CAROL SELAK:  Yes.

23       ATTY. BECKER:  And that is all that

1    we can ask from you.  Now, I want to ask you a

2    little bit about the pretrial publicity and some

3    things that you may have heard about this case.

4    Obviously, when something happens in the paper or

5    happens on the news or on television, we certainly

6    -- we live in a county of I think 225,000 people, we

7    don't possibly foresee ourselves as being involved

8    in that case as a juror.  So there is nothing wrong

9    with reading things about a case or seeing things on

10   television about a case, or listening to the radio,

11   or even expressing opinions about a case, because

12   you have no idea that you're going to be here.  But

13   now that you are here and you have heard some things

14   about this case, what we're looking for and what we

15   have to have is, that someone who can lay aside or

16   put aside their opinions or maybe even what they

17   heard about this case, and decide this case only

18   from what you hear in these four walls in the next

19   few weeks.  Do you believe that you will be able to

20   do that?

21            CAROL SELAK:  Yes.

22            ATTY. BECKER:  All right.  And I

23   don't know mean to press you on this issue, but I do

1    know, at least according to your questionnaire, that

2    you talked to some of your co-workers about this

3    case?

4                  CAROL SELAK:  Yeah, its been

5    brought up at work, yes.

6                  ATTY. BECKER:  And can you just

7    tell us, because I'm sure both sides are interested

8    in knowing, what is it, can you tell the gist, I'm

9    sure you can't remember verbatim what the

10    conversation was, but what was the general context

11    of the conversation?

12                  CAROL SELAK:  Some of it was about

13    the other trial.

14                  ATTY. BECKER:  All right, Mr.

15    Jackson's trial?

16                  CAROL SELAK:  Yes, yes.

17                  ATTY. BECKER:  I think you

18    indicated that you heard about that.

19                  CAROL SELAK:  Yeah, and just that

20    when it made the newspaper that she was going on

21    trial and there was suppose to be letters submitted.

22                  ATTY. BECKER:  And you work at

23    Delphi, right?

1          CAROL SELAK:  Yes.

2          ATTY. BECKER:  Did any of the

3    workers say, gosh, darn it, I heard about this case,

4    and they gave -- well, first of all, do you know

5    what the penalty was that was received by Mr.

6    Jackson?

7          CAROL SELAK:  No, I might of read

8    it, but I honestly don't know now.

9          ATTY. BECKER:  You don't recall

10   what his penalty was?

11         CAROL SELAK:  No.

12         ATTY. BECKER:  Did anyone express

13   to you an opinion on what should happen to Miss

14   Roberts?

15         CAROL SELAK:  No.

16         ATTY. BECKER:  You didn't hear

17   anyone say, well, gees, you know, she ought to get

18   this or that, or she is not guilty, or she is guilty

19   as sin.  It was just a conversation, did you read in

20   the paper about this?

21         CAROL SELAK:  Yes, yes.

22         ATTY. BECKER:  Did you have an

23   opinion or did you form any opinion from anything

1     that you may have read?

2                    CAROL SELAK:  No.

3                    ATTY. BECKER:  The only reason I

4     ask is because I think your son works for the

5     Tribune, right?

6                    CAROL SELAK:  Yes, he does.

7                    ATTY. BECKER:  Okay, and I assume

8     you're fair minded enough to know, and I am sure you

9     have a good enough understanding of the media, that

10    they can only put so much of the story into the

11    paper, or onto the television news.  Obviously,

12    there are no reporters here today, but perhaps at

13    the end of this week, there will be an article in

14    the Youngstown paper or the Warren paper that jury

15    selection continued this week in the Donna Roberts

16    case, and so far they have selected 31 jurors for

17    the trial and testimony is expected to begin on  May

18    6th, or 7th or 8th, or something, even though there

19    has never been a reporter in the Courtroom.  They

20    may call the Court's bailiff, or may call the

21    assignment clerk or Connie, who you gave the

22    questionnaire, to say, hey, what's going on with

23    this case.  So, you understand some times that the

1    reporters or what is reported in the paper, doesn't

2    encompass everything that has happened. It's a

3    snippet, and I am assuming that you are well aware

4    of that because your son is a reporter?

5               CAROL SELAK: Oh, yeah. I haven't

6    read the paper since we were in here the last time.

7    I didn't think we were allowed.

8               ATTY. BECKER: Because of what the

9    Judge told you.

10              CAROL SELAK: Yeah.

11              ATTY. BECKER: And it's really not

12    whether you read anything or seen anything about

13    this case, it's whether you formed an opinion based

14    upon what you read. Is it your opinion right now or

15    is it your feeling that you have not formed an

16    opinion about Miss Roberts and her guilt?

17              CAROL SELAK: I feel that I

18    haven't.

19              ATTY. BECKER: And you, obviously,

20    followed the Court's admonitions and not even looked

21    at the paper, even though you might want to see what

22    your son is writing, but you don't even want to take

23    the chance of seeing anything about this case?

1              CAROL SELAK:  Yes.

2              ATTY. BECKER:  And you understand

3    that you, theoretically, could watch the news and

4    read the newspaper, provided you didn't read or

5    watch anything about this case.

6              CAROL SELAK:  Yes, yes.

7              ATTY. BECKER:  And heard about a

8    police officer that was shot in Youngstown this

9    morning and that is a tragedy --

10             CAROL SELAK:  I do watch T.V.

11             ATTY. BECKER:  Okay, and you

12   understand that if something were to come and they

13   say, now, we're going to go to Trumbull County and

14   we're going to talk about the Donna Roberts case,

15   you would leave the room or turn the television off

16   or mute it and look away.

17             CAROL SELAK:  Yes.

18             ATTY. BECKER:  But you can't pay

19   attention to those news stories because -- and I

20   assume that you understand the reason is because we

21   want you to decide, both sides want you to decide

22   this case based upon what you hear in this

23   Courtroom.

1                    CAROL SELAK:  Yes.

2                    ATTY. BECKER:  And the evidence and

3     the testimony, and it's not fair to the State and

4     it's not fair to Miss Roberts for you to hear and

5     decide this case based upon some outside influence.

6                    CAROL SELAK:  Yes.

7                    ATTY. BECKER:  I don't think that

8     your son -- your son, I don't think, covers the

9     Courts too much, does he?

10                    CAROL SELAK:  No, he covers -- he's

11    out in Niles, his stories are usually in the local

12    section.

13                    ATTY. BECKER:  Right, the local

14    section, that's right.

15                    CAROL SELAK:  He has, but not --

16                    ATTY. BECKER:  Yes, he's filled in

17    for some of the other reports like Chris Bobby and

18    stuff.

19                    CAROL SELAK:  Yes.

20                    ATTY. BECKER:  But I do remember

21    seeing his byline from a lot of stories in Niles and

22    in Girard and up that way.

23                    CAROL SELAK:  Yes.

1                  ATTY. BECKER:  Does he know

2    anything about this case, if you know?  Have you

3    discussed it with him?

4                  CAROL SELAK:  We haven't discussed

5    it.  The only thing that we have discussed about

6    this case was the day that I had to come and he

7    asked did I want him to come and show me where I had

8    to go.  We never talked about the actual case.

9                  ATTY. BECKER:  And I am assuming

10    that he doesn't know much about it because he is

11    technically not the person that covers the

12    Courthouse on a general regular basis?

13                  CAROL SELAK:  Well, he hasn't

14    really said anything about it.

15                  ATTY. BECKER:  Right, and I am

16    assuming that he wouldn't because, like I said, he

17    usually doesn't cover this beat.  I don't know if

18    they still use that term or not.

19                  CAROL SELAK:  Yeah.

20                  ATTY. BECKER:  That just shows you

21    how old I am getting.  You indicated that you also

22    heard some things about it from television, I guess?

23                  CAROL SELAK:  Yes.

1           ATTY. BECKER: I assume those would

2    have been the stories back when this initially

3    happened in December of 2001, as well as when Mr.

4    Jackson's trial was going on last fall?

5           CAROL SELAK: Yes.

6           ATTY. BECKER: Did any of those

7    television -- did any contact that you had with

8    television, did any of those stories have an impact

9    on you in terms of her guilt or innocence?

10          CAROL SELAK: No.

11          ATTY. BECKER: Just basically for

12   general information?

13          CAROL SELAK: Yes.

14          ATTY. BECKER: Sort of like if you

15   watch the space shuttle, and you may not know anyone

16   on the space shuttle, but the space shuttle crashed

17   and it's a human tragedy and you are interested

18   maybe to see what went wrong and maybe what they can

19   do in the future to prevent it, and just to see if

20   you maybe did know somebody, or maybe there was

21   someone from Ohio involved or someone you might of

22   known.

23          CAROL SELAK: Yes.

1              ATTY. BECKER:  All right, so you

2      feel, first of all, that you will be fair when it

3      comes to the death penalty, you can weigh all four

4      options, including the death penalty.  You're not

5      going to give, even though you believe in the death

6      penalty, you're not going to give the death penalty

7      anymore weight when it comes to deciding her fate

8      than the other four, correct?

9              CAROL SELAK:  Yes.

10             ATTY. BECKER:  You feel that even

11     though you've read about this and seen some of this

12     on television, you have not formed an opinion about

13     this particular case, correct?

14             CAROL SELAK:  Yes.

15             ATTY. BECKER:  And you believe that

16     you could be a fair and impartial juror in this

17     case?

18             CAROL SELAK:  Yes.

19             ATTY. BECKER:  And as difficult as

20     it may be, if the facts warrant it, and the law

21     allows it, you could sign a death penalty verdict?

22             CAROL SELAK:  Yes.

23             ATTY. BECKER:  Now, let's talk a

1    little bit about generally in criminal cases, and I

2    think when I looked at your questionnaire, you have

3    not previously served as a juror, correct?

4                     CAROL SELAK:  I was called but I

5    wasn't chosen.

6                     ATTY. BECKER:  You weren't chosen?

7                     CAROL SELAK:  Yes.

8                     ATTY. BECKER:  Okay, and I am

9    assuming, you, like most other people, I didn't

10   really see any television shows that you indicated.

11   Sometimes people watch like Law and Order or CSI,

12   some people watch Court Television.

13                    CAROL SELAK:  Yeah.

14                    ATTY. BECKER:  But I am assuming

15   that somewhere along the line either in a story

16   you've read in the newspaper, or in a story you

17   heard the term presumption of innocence?

18                    CAROL SELAK:  Yes.

19                    ATTY. BECKER:  And that is sort of

20   what that first part was all about here.  The

21   presumption of innocence is that we don't want

22   people coming in here to say, well, I read the

23   Tribune, or I read the Vindicator about this, or

1    talked to a guy at work, or I saw on television, and

2    you know what, I can't believe it, she is guilty of

3    something.  That is what the presumption of

4    innocence is and that is what we're asking you

5    about.  As she sits here today and throughout this

6    trial, throughout the two or three weeks that it may

7    take for Mr. Bailey and I to present to you the

8    State's case, she is presumed innocent.  Now, there

9    may come a point where Mr. Bailey and I will argue

10    to you, that once you step across the threshold of

11    that jury room, that that presumption is removed.

12    But throughout the proceedings, you have to give

13    her, pursuant to our system of justice, every

14    benefit of the doubt, and every presumption that she

15    is innocent until we've proved our case beyond a

16    reasonable doubt, if we are able to prove our case

17    beyond a reasonable doubt, right?

18                CAROL SELAK:  Yes.

19                ATTY. BECKER:  And you will be able

20    to do that, right?

21                CAROL SELAK:  Yes.

22                ATTY. BECKER:  Despite the fact

23    that you read about this, you've seen it on

1      television, and you've discussed some of it with

2      your co-workers, including the trial of her -- of

3      the other individual alleged to be involved with

4      this Mr. Jackson?

5                   CAROL SELAK:  Yes.

6                   ATTY. BECKER:  Does the fact that

7      Mr. Jackson is convicted and has been convicted, you

8      obviously know of some crimes relating to this, that

9      doesn't affect your opinion about her guilt or

10     innocence, does it?

11                  CAROL SELAK:  No, no.

12                  ATTY. BECKER:  And understand that

13     two people can be charged with crimes and one person

14     may be guilty of them, and one may not?

15                  CAROL SELAK:  Yes.

16                  ATTY. BECKER:  And, conversely,

17     they both may be guilty or they both may be not

18     guilty?

19                  CAROL SELAK:  Yes.

20                  ATTY. BECKER:  But we're already

21     sort of at the halfway point where Mr. Jackson has

22     been proven guilty, and now we're deciding

23     completely and separately and in a completely

1    different trial with completely different jurors,

2    whether this Defendant is guilty of anything,

3    correct?

4              CAROL SELAK:  Yes.

5              ATTY. BECKER:  And it is Mr.

6    Bailey and I's burden to prove to you beyond a

7    reasonable doubt that she is guilty of those crimes,

8    right?

9              CAROL SELAK:  Yes.

10              ATTY. BECKER:  All right, so you

11    think that you have a pretty good idea and handle of

12    what the presumption of innocence is?

13              CAROL SELAK:  Yes.

14              ATTY. BECKER:  And you will afford

15    her and her attorney that presumption of innocence

16    throughout these proceedings?

17              CAROL SELAK:  Yes.

18              ATTY. BECKER:  Now, that sort of

19    leads us to the next area, which is what we call

20    reasonable doubt, and that is where Mr. Bailey and I

21    really sort of come in here.  We have to prove to

22    you this case beyond a reasonable doubt, and the

23    Court will give you an instruction on what

1    reasonable doubt means, and I am sure that you have

2    seen that term in novels or a newspaper article or

3    maybe a magazine that you read.  Maybe you've heard

4    it on television, and everybody has a different idea

5    of what reasonable doubt is but, specifically,

6    everybody has a different idea of where reasonable

7    doubt is.  Some people, if you ask them to quantify

8    it and give you a number, some people may say, well,

9    I think it's 90 percent, if you prove your case

10   about 90 percent, I think you guys should win.  Some

11   people may say, well, no it's 95 percent.  Some

12   people may say it's as high as 98 percent.  It

13   varies from person to person and, in fact, the Judge

14   is not going to instruct you that, well, if the

15   State presents to you seven witnesses, they win the

16   case, or if you believe 7 out of 10 witnesses, or 9

17   out of 10 witnesses, they win the case.  It's a very

18   hard concept to define and quantify, put to terms

19   and numbers.

20            And one of the ways it was described to

21   me when I was a law student many years ago, is it is

22   like a glass of water, and if you fill the glass up

23   to near the top, for instance, let's say this is our

1     little cup here of reasonable doubt, and if you fill

2     it up halfway, and that is the point, and one more

3     drop, that is the point where you have to prove like

4     civil cases, like the guys that are on T.V. that are

5     always talking about how they are going to get you

6     money if you've been in an auto accident.  Those

7     guys have to prove their case to the halfway point,

8     plus one more drop.  And that is a preponderance of

9     the evidence.  So, they can do that and show that

10    Mr. Bailey rear-ended me on the corner of High

11    Street, and Mahoning Avenue, and I hurt my neck and

12    my back has now got some crushed vertebras because

13    of this louse who was driving behind me, then we win

14    our case.  If we prove it to the halfway point and

15    one drop of water.  But that is in the civil

16    setting.

17                We are here in the criminal setting and

18    because this case calls for the imposition of the

19    most serious penalty in Ohio, and it does involve

20    the death and it is a criminal case, we have to

21    prove our case beyond a reasonable doubt.  Now,

22    reasonable doubt does not mean all doubt.  It does

23    not mean that we have to prove -- turn every stone

1    unturned.  And there may be some things in this case

2    that you may want to know.  You may want to know,

3    for instance, what she was wearing that day.  It may

4    not be relevant to anything in this case, and we

5    might not present to you anything about what she was

6    wearing that day, so you can't worry about those

7    kind of things that are irrelevant to the case.

8              One of the things that I like to say to

9    people is, I am standing here today before you on

10   whatever it is, April 29, 2003, and I've got a

11   wedding band on.  I've got pictures of my wife and

12   my kids in my wallet, and I could probably pick up a

13   phone and as long as my one year old is not napping,

14   my wife could probably come down here and see me,

15   and she could come in through the doors, and she

16   could sit in the back there with my kids, and they

17   would  all wave and say, hi, daddy, and probably do

18   some other things and disturb us a little bit.  And

19   that would probably prove to you beyond a reasonable

20   doubt that I am married.  Now, is that all doubt,

21   have you seen a marriage certificate, have you seen

22   our wedding album.  Maybe we're living together.

23   But chances are, beyond a reasonable doubt, I am

1    married to her, and those are my children.  So there

2    comes a point where I just can't prove everything to

3    you.  I mean, you can always say, Mr. Becker that

4    marriage certificate looks phony to me, or anybody

5    could of got dressed up and put on a dress and put

6    on a tuxedo and acted like they were married, and

7    maybe you two are just living together, and you

8    know, I think one of those kids doesn't look like

9    you at all, maybe that's not even your kid.  So, you

10    understand that it would be very difficult for you

11    to prove probably the most important thing in my

12    life is that my wife and kids are, you know, that

13    I'm married and those are my kids.  I can tell you

14    that, I can show you some things, but I can't prove

15    to you probably beyond all doubt that I am married

16    and have kids.

17            You won't hold Mr. Bailey and I to that

18    unreachable standard of all doubt, will you?

19            CAROL SELAK:  No.

20            ATTY. BECKER:  And looking at it

21    sort of like a cup of water, Mr. Bailey and I would

22    have to get pretty close to the top, and maybe up to

23    this rim here.  But we don't have to fill it up to

1      the top because filling it up to the top, that is

2      all doubt, and I can prove to you very few things,

3      if anything, beyond all doubt.  So, you won't hold

4      us to that impossible standard, would you?

5                   CAROL SELAK:  No.

6                   ATTY. BECKER:  Okay.  Now, this

7      case, because it does involve the death of one

8      individual, and the potential death of a second

9      individual, you are probably going to be

10     sympathetic, or feel some emotions relating to

11     sympathy for either the victim, who is deceased and

12     his family, or for the Defendant and her family.  Do

13     you believe you will be able -- are you such a

14     person that you would be too emotional, you won't be

15     able to separate and keep sympathy out of the

16     decision?

17                  CAROL SELAK:  No, I don't think

18     so.

19                  ATTY. BECKER:  Okay, so you will be

20     able to decide this case without feeling sympathetic

21     toward either party?

22                  CAROL SELAK:  Well, I will feel

23     bad, period, but I don't think that would stop me

1      from doing --

2                          ATTY. BECKER:  Doing what you had

3      to do?

4                          CAROL SELAK:  Yes.

5                          ATTY. BECKER:  Okay, and that's all

6      we can ask because, obviously, everyone is

7      sympathetic.  I mean, there are tragedies in life

8      and whether they're crimes that are intentional, you

9      got to feel sympathetic some times -- some times you

10     feel sympathetic for both parties.  But you will be

11     able to let that -- or not let that influence your

12     decision, correct?

13                         CAROL SELAK:  Yes.

14                         ATTY. BECKER:  This case involves

15     four charges.  There is an aggravated burglary,

16     aggravated robbery, and then there are two death

17     penalty -- two aggravated murder counts, each with

18     death penalty specifications.  That even though

19     there is only one person that is deceased in this

20     case, does the fact that there are two death penalty

21     charges, or two aggravated murder counts, each with

22     death penalty specifications, does that cause you

23     any concern?  You understand that there are two

1    different theories to try to get to the same --

2                    CAROL SELAK:  Yes.

3                    ATTY. BECKER:  It's sort of like

4    we're going to go find a cabin out in the woods and

5    somebody gave us directions one way and somebody

6    gave us directions another.  One may not be better

7    than the other, but we might be able to prove to you

8    that we get to that cabin on both routes?

9                    CAROL SELAK:  Yes.

10                    ATTY. BECKER:  You wouldn't take it

11    the fact that there are two aggravated murder

12    charges in the indictment, in which we're trying to

13    present to you to mean that Mr. Bailey and I don't

14    know what we're doing.  That, boy, they don't know

15    what they're doing.  They've got one guy dead and

16    they're trying to convict her of two murder counts.

17    You wouldn't think that, would you?

18                    CAROL SELAK:  No, no.

19                    ATTY. BECKER:  And on the other

20    side of that issue, you don't feel, well, that Miss

21    Roberts she must really be a doozie, because they

22    have charged her with not only one count of murder,

23    but two counts of aggravated murder, and there is

1    only one guy dead.  So, you don't hold that against

2    her either, do you?

3                    CAROL SELAK:  No.

4                    ATTY. BECKER:  All right.  Mr.

5    Bailey and I will be very up front, and I am before

6    going to tell you even before you begin hearing

7    testimony in this case, that in this particular

8    case, Miss Roberts is not the shooter in this case.

9    There is no allegation that she is the shooter, and

10   we will not even attempt to accuse her of being the

11   shooter.  She is accused in the indictment of being

12   a helper, and the legal term for that is an aider

13   and abettor, and the accusation is, that she helped

14   Mr. Jackson, who you read about, commit this murder,

15   and that is the accusation, and that is what we have

16   to prove beyond a reasonable doubt.  That, among

17   other things, we have to prove that she's an aider

18   and abettor.  And we also have to prove some other

19   elements but, in a nutshell, that is what we're

20   trying to prove here.  The fact that she is accused

21   of being a helper or an aider or abettor, would that

22   cause you to be less in favor of opposing the death

23   penalty or more in favor?

1               CAROL SELAK:  No.

2               ATTY. BECKER:  Or would you follow

3      the Court and the law?

4               CAROL SELAK:  Yeah, not what she is

5      accused of but --

6               ATTY. BECKER:  But what the law is?

7               CAROL SELAK:  Yes.

8               ATTY. BECKER:  Okay, because the

9      Court will instruct you, if we get to that point, if

10     we get past that first phase, if we get to the

11     second phase, you, assuming we prove our case, you

12     will be able to impose the death penalty if we prove

13     our case beyond a reasonable doubt, even though she

14     is not alleged to be the shooter, you feel that you

15     can still sign a death penalty verdict?

16              CAROL SELAK:  Yes.

17              ATTY. BECKER:  Now, one of the

18     things a lot of people come in here and they get

19     maybe a little hung up on, is there is also an

20     allegation in this case that it is a premeditated

21     murder, or what we call prior calculation and

22     design; it was planned, is the other term I guess

23     we're looking for, and some people say, hey, listen,

1    if it was planned murder, I think you should

2    automatically receive the death penalty.  You are

3    not in such a position that you would feel that,

4    would you?

5              CAROL SELAK:  No.

6              ATTY. BECKER:  You will listen to

7    the instructions that Judge Stuard gives you about

8    prior calculation and design and make a

9    determination in that first phase along with all of

10   the other elements and determine her guilt or

11   innocence, correct?

12             CAROL SELAK:  Yes.

13             ATTY. BECKER:  And if we're able

14   to prove our case beyond a reasonable doubt and we

15   get to the second phase, you will listen to those

16   jury instructions, and you will equally consider all

17   four options, including the death penalty?

18             CAROL SELAK:  Yes.

19             ATTY. BECKER:  And the fact that

20   it's a murder that has been planned, and the fact

21   that she is an aider and abettor, you will still

22   follow the law, and you won't say, well, boy, I got

23   to give her the death penalty, or I can't give her

```
 1        the death penalty because she didn't pull the

 2        trigger, you wouldn't do either of those things,

 3        would you?

 4                      CAROL SELAK:  No.

 5                      ATTY. BECKER:  Almost all criminal

 6        cases have in them an element, or some evidence that

 7        is what we call circumstantial evidence.  Are you

 8        familiar at all with that term or do you have a

 9        general idea of what circumstantial is?

10                      CAROL SELAK:  Yes.

11                      ATTY. BECKER:  And sort of the

12        mundane example that I can give you, is that if you

13        go home tonight and you watch the 11:00 news, and I

14        don't know if you watch 21, 27, 33, or the weather

15        channel like my wife does before you go to bed.

16        Every eight minutes on the Weather Channel, they

17        show you the radar, local radar, and give you a

18        forecast, and my wife always has to know what the

19        weather is going to be.  And you can't blame her

20        because she's got four kids to dress every morning,

21        so she needs to know.  But you go to bed at night,

22        and you're tucked in bed and you got the remote

23        there and you're watching T.V., and you see those
```

 1    green line of thunderstorms with the yellow in the

 2    middle of them, the really heavy rain, and you see

 3    it extending down through Cleveland, down through

 4    Akron and Canton, and maybe even all the way back

 5    down east of Columbus, and the weather man says,

 6    well, be prepared tonight, we're going to have some

 7    rain tonight, it will clear up by morning and it's

 8    going to blow through here some time between 2:00

 9    o'clock and 4:00 o'clock, and it's moving about 20

10    miles an hour and roll up the windows, and bring the

11    dogs and cats in, and tomorrow will be a beautiful

12    day though after this front moves through.

13            And you go to bed, and before you go to

14    bed, you go to the front door and look out, it's a

15    starry night, turn off the light on the porch, climb

16    upstairs and go to bed.  The next morning, you get

17    up at 6:30, 7:00 o'clock, and you look outside, and

18    sure enough, the ground is wet, the driveway is wet,

19    there is water streaming down the gutter into the

20    sewer there.  Your neighbors driveways are all wet,

21    their cars are all wet, the flowers have water in

22    them, you got some puddles in the yard where you got

23    your low spots.

1           Now, you didn't see it rain, obviously,

2    right, because you were asleep.

3           CAROL SELAK:  Right.

4           ATTY. BECKER:  But you can assume

5    that it rained?

6           CAROL SELAK:  Uh-huh.

7           ATTY. BECKER:  And that is

8    basically what circumstantial evidence is, it's an

9    inference that you can make.  You might not of seen

10   it, but you know what the facts are of what rain

11   looks like and what it can do after it passes

12   through, and you have seen what the affects of what

13   the rain was.  You didn't actually see it rain, and

14   the Court is going to tell you that direct and

15   circumstantial evidence have the same value.  You

16   will be able to decide a case that has some elements

17   of circumstantial evidence in it?

18           CAROL SELAK:  Yes.

19           ATTY. BECKER:  And there are other

20   inferences that you can make, obviously.  If they

21   showed you that same weather pattern but it was a

22   little bit more spread out and there was little gaps

23   between those storms, and the guy says, well, there

1   is a fifty percent chance it's going to rain here

2   tonight, it's hit and miss around here.  It rained

3   in Boardman, and may not rain in Niles, or it may

4   not rain in Cortland, but it may rain up in Kinsman,

5   and it's sort of a hit and miss.

6            Then you wake up the next morning under

7   the same circumstances and you look down and see

8   your driveway is wet and the car is wet and there is

9   some wetness on the grass and the sidewalk, but your

10  neighbor's driveway is not wet.  And the street

11  doesn't have any water on it, and there is no water

12  other than what's coming down your driveway running

13  into the sewer.  And then you look further down out

14  your second story window and you see your husband or

15  your son, you know, somebody, whoever is staying

16  there with you, got the hose out and is washing the

17  car.

18           So, you have to be careful of the

19  inferences that you make, right?

20                  CAROL SELAK:  Yes.

21                  ATTY. BECKER:  And you have to

22  have, not all of the information, but you have to

23  have some more information to be certain that the

1    inference you're making is proper, right?

2                    CAROL SELAK:  Right.

3                    ATTY. BECKER:  But you will be

4    able to decide this case, which is of a very serious

5    nature, and which carries the ultimate penalty, you

6    will be able to determine some aspects of

7    circumstantial evidence in making your determination

8    of guilt or innocence, correct?

9                    CAROL SELAK:  Yes.

10                    ATTY. BECKER:  And you will also

11   may be able to rely on some circumstantial evidence

12   in determining whether the death penalty may be

13   appropriate in this case, if we get that far?

14                    CAROL SELAK:  Yes.

15                    ATTY. BECKER:  All right, now the

16   last thing that I want to touch upon is, some times

17   you wonder how they got caught or what they did.

18   I'm assuming that you have heard, and I don't know

19   if maybe your son has told you about this or maybe

20   you've seen it on the television or the news, but

21   you've heard of criminals doing something where they

22   planned it out, but they really messed something up.

23   They left a fingerprint or left a piece of evidence

1    that is incriminating against them at the scene, or

2    just did something stupid that loused up the whole

3    plans, right?

4                    CAROL SELAK:  Yes.

5                    ATTY. BECKER:  And you've heard of

6    the say, "the best laid of plans can go astray,

7    right?

8                    CAROL SELAK:  Yes.

9                    ATTY. BECKER:  You've probably

10   heard of cases, and I will tell you that I handled

11   one of these cases one time where there was a

12   murder, these guy's got together, they planned to

13   kill this guy, they ended up killing him, and at the

14   scene they were doing some things to him, some

15   really terrible awful things, and while they were

16   there, one of the guy's cigarette lighter fell out,

17   and it just so happened that his cigarette lighter

18   had his name on it.  And they planned this, they had

19   talked about it for a couple of days about how they

20   were going to do this, and they went out and did it

21   and then they -- you know three of them went out to

22   California, they got them out there, and one went to

23   Florida, and ended up catching them all.  But one of

```
 1        the reasons they got caught was this one dummy there

 2        dropped a cigarette lighter at the scene and he left

 3        it there.  So, when you question him he starts to

 4        give you an alibi, and then you say, well, what

 5        about this, oh, yeah, that is mine.  So, you've

 6        heard of criminals being caught because they've done

 7        something really dumb?

 8                        CAROL SELAK:  Yes.

 9                        ATTY. BECKER:  Even though they may

10        have planned something and thought out the options,

11        they get caught some times.  Not always, but it

12        happens, right?

13                        CAROL SELAK:  Yeah.

14                        ATTY. BECKER:  So, to summarize, if

15        the facts warrant it, and the law allows it, you

16        could sign a death penalty verdict?

17                        CAROL SELAK:  Yes.

18                        ATTY. BECKER:  Despite the fact

19        that you talked about this case, seen something it

20        about on television, read something about it, you

21        have not formed an opinion that is so ingrained in

22        you, that you feel that you could not be fair and

23        impartial in this case, you could do that, right?
```

```
 1                        CAROL SELAK:  Yes.

 2                        ATTY. BECKER:  Despite what you

 3       read or seen or heard or discussed with your

 4       co-workers?

 5                        CAROL SELAK:  Yes.

 6                        ATTY. BECKER:  You rely on some

 7       aspects of circumstantial evidence and not only the

 8       State proving guilt of Miss Roberts but also whether

 9       the death penalty is appropriate, correct?

10                        CAROL SELAK:  Yes.

11                        ATTY. BECKER:  You will give her

12       the presumption of innocence throughout this trial

13       and unless and until we prove our case beyond a

14       reasonable doubt?

15                        CAROL SELAK:  Yes.

16                        ATTY. BECKER:  And you will hold

17       Mr. Bailey and I to the reasonable doubt standard

18       and not to the all possible doubt standard, correct?

19                        CAROL SELAK:  Yes.

20                        ATTY. BECKER:  And you feel that

21       you could be a fair and impartial juror in this case

22       for both sides?

23                        CAROL SELAK:  Yes, I do.
```

1              ATTY. BECKER:  All right, I want to

2     thank you, very much, for coming here and answering

3     these questions.  I know it's very difficult some

4     times, and we're not trying to grill you or find out

5     too much about you, but it's very important to both

6     sides that we know who you are and what your

7     thoughts are on these issues.  I am going to sit

8     down and I believe that Mr. Ingram or Mr. Juhasz

9     will have some questions for you.  Thank you.

10              CAROL SELAK:  Thank you.

11              THE COURT:  Mr. Juhasz.

12

13

14

15

16

17

18

19

20

21

22

23

1

2

3                    <u>REPORTER'S CERTIFICATE</u>

4

5        This is to certify the foregoing represents a

6    true and correct copy of the proceedings had in the

7    aforementioned cause as reflected by the stenotype

8    notes taken by me on the same.

9

10

11

12

13

14    DATE:   January 2, 2004      Maribeth Hoolihan

15                                 Official Court Reporter

16

17

18

19

20

21

22

23

1                     IN THE COURT OF COMMON PLEAS

2                        TRUMBULL COUNTY, OHIO

3

4    STATE OF OHIO,              ) Case No. 01-CR-793
                                 )
5              Plaintiff         )
                                 )
6    -vs-                        ) Judge John M. Stuard
                                 )
7    DONNA M. ROBERTS,           )      **VOLUME XIV**
                                 )
8              Defendant         )TRANSCRIPT OF PROCEEDINGS

9

10   Voir Dire, commencing April 29 & 30, 2003,

11   BEFORE:      HONORABLE JOHN M. STUARD

12   AT:          Trumbull Co. Court of Common Pleas
                  Courtroom Number 2
13                161 High Street, N.W.
                  Warren, Ohio 44481
14

15   APPEARANCES:

16   On behalf of the State of Ohio:
                  Mr. Kenneth N. Bailey and
17                Mr. Christopher D. Becker
                  Assistant Prosecuting Attorneys
18                Warren, Ohio

19   On behalf of the Defendant:
                  Mr. J. Gerald Ingram and
20                Mr. John B. Juhasz
                  Attorneys at Law
21                Youngstown, Ohio

22

23   Official Court Reporter:  Maribeth Hoolihan

3031

```
 1                        VOLUME XIV

 2

 3                   CONTINUED EXAMINATION OF

 4            CAROL SELAK, JUROR NUMBER 184

 5    BY ATTORNEY JUHASZ:

 6                    ATTY. JUHASZ:  Is it Selak?

 7                    CAROL SELAK:   Selak, yes.

 8                    ATTY. JUHASZ:  You might remember

 9    from three weeks ago today now already, my name is

10    John Juhasz.  Jerry Ingram and I are representing

11    Donna Roberts.

12                    CAROL SELAK:  Hi.

13                    ATTY. JUHASZ:  And, as you know,

14    the charges are very serious.  The potential

15    penalty, if she is found guilty is very serious, and

16    so we want to take every reasonable effort that we

17    can to get a jury that can be fair to both sides.

18    The same kind of jury that you would probably want

19    if you or some member of your family were sitting

20    over there and charged with an offense, correct?

21                    CAROL SELAK:  Yes.

22                    ATTY. JUHASZ:  Have you ever been

23    accused of something that you did not do?
```

1          CAROL SELAK:  Maybe as a kid, not

2     as an adult.  Nothing major, like maybe she did this

3     or she did that with my brothers and sisters, you

4     know, but not major.

5          ATTY. JUHASZ:  Okay.  You wouldn't

6     want that person who was making that accusation to

7     be the one deciding whether or not you did it,

8     correct?

9          CAROL SELAK:  No.

10          ATTY. JUHASZ:  Especially if you

11     didn't do what you're being accused of, right?

12          CAROL SELAK:  Correct.

13          ATTY. JUHASZ:  You would want to

14     have somebody who was impartial and fair?

15          CAROL SELAK:  Yes.

16          ATTY. JUHASZ:  Okay.  This is sort

17     of like a job interview, except it's a much shorter

18     term than the job that you have right now.  A very

19     important job, obviously, but a short term job and,

20     as you might anticipate in any job interview, you

21     might be asked some questions that are going to sort

22     of test the limits of your abilities to perform in

23     that job.  Does that make sense to you?

3033

```
 1                       CAROL SELAK:  Yes.

 2                       ATTY. JUHASZ:  So, if in the course

 3       of doing it, if I say something that offends you,

 4       please don't take any offense.  We're simply trying

 5       to see how you feel about some of the issues that

 6       are surrounding this case, okay?

 7                       CAROL SELAK:  Yes.

 8                       ATTY. JUHASZ:  It has been three

 9       weeks now since you knew that you might be a juror

10       on this case, and I think you would agree with me

11       that being a juror is a pretty awesome

12       responsibility in a death penalty case.  How do you

13       feel about that responsibility?

14                       CAROL SELAK:  It makes me nervous,

15       I mean, it's a scary thought that you might have the

16       ability to put someone to death, but just exactly

17       what you said, that is how I -- not came to my

18       decision, but I decided if it was me or my family,

19       because I think everyone would say they wouldn't

20       want to be involved in this, you know, that's an

21       awesome responsibility, but I thought if it was me

22       or my family, I would want somebody to be honest and

23       fair with them.
```

1              ATTY. JUHASZ:  Okay, that fairness,

2       by the way, and I think Judge Stuard mentioned this

3       a few weeks ago when we first got together, that

4       fairness, of course, relates even to answering

5       questions now.  I mean, we happen to be talking to

6       you, but this whole process that we're going through

7       in terms of seeing whether somebody is comfortable

8       and able to serve on this, so as we talk this

9       afternoon, and I think you will do this, but I just

10      want to say it out of an abundance of caution, if

11      nothing else, is the only wrong answer that you

12      could give as we talk, is if you're telling me

13      something that you don't really think, or if you

14      think this is what this lawyer wants to hear.

15              CAROL SELAK:  Yeah.

16              ATTY. JUHASZ:  Okay.  You think

17      you're up to this job?

18              CAROL SELAK:  Yes.

19              ATTY. JUHASZ:  The Judge mentioned

20      that we're going to talk about several things,

21      including the death penalty and some pretrial

22      publicity, and you have been exposed to that

23      pretrial publicity, as I understand it, in several

1    ways?

2              CAROL SELAK:  Yes.

3              ATTY. JUHASZ:  I want you to

4    understand, first of all, that just because we're

5    going to talk about it and just because you have

6    been exposed to it, there is nothing wrong with

7    that.  You didn't know when you were reading the

8    paper or when you were watching T.V., or when you

9    were talking about it at work that you might be

10   selected as a juror in this case.

11             CAROL SELAK:  Right.

12             ATTY. JUHASZ:  So, don't draw any

13   negative inference from the fact that we're talking

14   about it, okay?

15             CAROL SELAK:  Okay.

16             ATTY. JUHASZ:  But we do have to

17   talk about it.  Just about everything that we take

18   in with our senses, leaves some kind of impression

19   on us, don't you think?  I mean, you look out the

20   window today and you see that it's a bright sunny

21   day, and then you think, what a beautiful day

22   outside.

23             CAROL SELAK:  Uh-huh.

3036

```
 1              ATTY. JUHASZ:  That said, tell me
 2    if you will, what your impressions are of Donna
 3    Roberts from what you have seen and heard and talked
 4    about before coming in here?
 5              CAROL SELAK:  Do you mean, have I
 6    already made a decision or --
 7              ATTY. JUHASZ:  No, I don't even
 8    want to go that far yet.  We may go there, but first
 9    I just want to know -- I mean, you saw things in the
10    newspaper, you saw things on the T.V., people have
11    talked about it.  It may be a right impression, a
12    wrong impression or an impression that has changed,
13    but I'm assuming that it left some sort of
14    impression.  I am just wondering what were you
15    thinking as you were hearing this stuff, or as you
16    were talking about it?
17              CAROL SELAK:  I basically heard
18    about Mr. Jackson, and that she was involved, and to
19    be honest with you, I don't really recall everything
20    that went on with his trial.  I mean, when I read
21    the paper or hear the news, I mean, I know it's
22    important but it's not something that I dwell on or
23    make a point of grabbing the paper the next day to
```

1    read.

2                    ATTY. JUHASZ:  Sure.

3                    CAROL SELAK:  So, I mean, I didn't

4    form any opinion as to whether -- I know they say

5    that she was going to be tried, but that doesn't

6    necessarily make the fact that she was involved or

7    not involved.  You hear stuff everyday.  I mean, I

8    didn't form an opinion to that.

9                    ATTY. JUHASZ:  Okay, did you have

10   an impression from that that she was involved in

11   this somehow?

12                   CAROL SELAK:  Not really.  I know

13   that the papers said she was involved.

14                   ATTY. JUHASZ:  Okay.

15                   CAROL SELAK:  But I didn't

16   personally say, well, yeah, she had to be -- she had

17   to have done it, I didn't feel that way.

18                   ATTY. JUHASZ:  All right.  You have

19   some impression -- well, you know that Mr. Jackson

20   had a trial, right?

21                   CAROL SELAK:  Yes.

22                   ATTY. JUHASZ:  And do you know what

23   the outcome of that trial was?

3038

1      CAROL SELAK:  I know he was found

2 guilty, but I'm not sure what his sentence was.

3      ATTY. JUHASZ:  All right, but you

4 know he was found guilty?

5      CAROL SELAK:  Yes.

6      ATTY. JUHASZ:  And you know that

7 the Government is claiming that he and Donna Roberts

8 sort of got together to cook up a plan about causing

9 Mr. Fingerhut's death?

10      CAROL SELAK:  Yes, I know that,

11 yeah.

12      ATTY. JUHASZ:  Do you have an

13 impression from knowing that Mr. Jackson was found

14 guilty that Donna must have been involved or may be

15 guilty?

16      CAROL SELAK:  No.

17      ATTY. JUHASZ:  Is there anything in

18 your mind that would sort of require Donna to

19 convince you based on the way you feel right now

20 that she is not guilty?

21      CAROL SELAK:  No, I expect them to

22 prove to me that she is guilty.

23      ATTY. JUHASZ:  Okay, all right.

1      The people -- and we have been talking mostly, I

2      assume, what you picked up through the news media,

3      correct?

4                        CAROL SELAK:  Yes.

5                        ATTY. JUHASZ:  Your son works at

6      the Tribune, and as I understand it, he writes

7      articles relating mostly to Niles and places like

8      that?

9                        CAROL SELAK:  Yes.

10                       ATTY. JUHASZ:  Has he written any

11     articles about this case, do you know?

12                       CAROL SELAK:  No.

13                       ATTY. JUHASZ:  No, he has not, or

14     no, you don't know?

15                       CAROL SELAK:  Well, I won't swear

16     that he hasn't but I don't know of anything.

17                       ATTY. JUHASZ:  Let's put it this

18     way; no, he hasn't to your knowledge, is that fair?

19                       CAROL SELAK:  Yes.

20                       ATTY. JUHASZ:  And guys have not

21     talked about this?

22                       CAROL SELAK:  No, no, we haven't.

23                       ATTY. JUHASZ:  But you have talked

1        about it with some folks at work, and I am

2        interested in, again, what they had to say, what

3        impressions they left in your mind from the

4        conversations they had?

5                    CAROL SELAK:  It wasn't like a

6        major discussion, it was just somebody was passing

7        through the paper, saying, oh, her trial is going to

8        be coming, up, and maybe that they had convicted Mr.

9        Jackson.  It wasn't going into detail of what had

10       happened or anything like.  It was like a casual

11       sentence, not a major discussion on the death

12       penalty or anything like that.

13                   ATTY. JUHASZ:  All right, anything

14       about those conversations that would change the

15       statement that you made to me a couple of minutes

16       ago, which is that you wouldn't require her to prove

17       that she wasn't involved, you would require them to

18       prove that she was involved?

19                   CAROL SELAK:  No.

20                   ATTY. JUHASZ:  And now a few weeks

21       ago, when you came down here to the Courthouse, and

22       we assembled down the hall in Judge Logan's room,

23       which is a much bigger room, as you know, did you

1    hear any discussions about Miss Roberts or Mr.

2    Jackson or the case or any of the facts or the

3    allegations?

4                    CAROL SELAK:  You mean through the

5    people that were in the room with me?

6                    ATTY. JUHASZ:  Yes, yes.

7                    CAROL SELAK:  No.

8                    ATTY. JUHASZ:  Okay, if you

9    remember, where -- when you went into the Courtroom,

10   where were you, were you seated or standing?

11                   CAROL SELAK:  I was seated on the

12   right side.  It was either the last or the next to

13   the last row.

14                   ATTY. JUHASZ: Okay.

15                   CAROL SELAK:  It was the last row.

16                   ATTY. JUHASZ:  All right, and humor

17   me because I am going to ask you three quick

18   questions about that.  You did not have any

19   discussions with anybody about Mr. Jackson?

20                   CAROL SELAK:  No.

21                   ATTY. JUHASZ:  Or Miss Roberts?

22                   CAROL SELAK:  No.

23                   ATTY. JUHASZ:  No one said anything

1    to you about Mr. Jackson or Miss Roberts?

2                CAROL SELAK:  No.

3                ATTY. JUHASZ:  And you didn't hear

4    any other conversation that you were close to but

5    not a part of that discussed Miss Roberts or Mr.

6    Jackson?

7                CAROL SELAK:  No.

8                ATTY. JUHASZ:  Because Delphi

9    employs so many people, I am interested in knowing

10   if there are a couple of people that you know who, I

11   believe, work at Delphi.  Do you know a fellow by

12   the name of George Ernt?

13               CAROL SELAK:  No.

14               ATTY. JUHASZ:  How about Karen

15   Tipton?

16               CAROL SELAK:  No.

17               ATTY. JUHASZ:  How about a fellow

18   by the name of Discenzo?

19               CAROL SELAK:  I heard that name

20   Discenzo.  I don't know him personally, but I've

21   heard the name.

22               ATTY. JUHASZ:  Okay, and how about

23   a lady by the name of Mary Costello?

1          CAROL SELAK:  No.

2          ATTY. JUHASZ:  Do you know her?

3          CAROL SELAK:  No.  Now, any of

4     them I might of seen them, and know them to see

5     them.

6          ATTY. JUHASZ:  Sure.

7          CAROL SELAK:  But not a one on one.

8          ATTY. JUHASZ:  But they're not

9     people that you hang out with at work or talk to or

10    anything like that?

11         CAROL SELAK:  No.

12         ATTY. JUHASZ:   In the publicity

13    that you have taken in or -- or people have talked

14    about, have you heard anything about letters or

15    tapes or anything like that?

16         CAROL SELAK:   Yes.

17         ATTY. JUHASZ:  Okay, tell me about

18    that, if you would, please?

19         CAROL SELAK:  I heard that in the

20    first trial that they allowed letters.

21         ATTY. JUHASZ:  Okay.

22         CAROL SELAK:  Not the extent of it,

23    but that they were allowed.

```
 1                    ATTY. JUHASZ:  All right, let's

 2   talk about a couple of things about that.  First of

 3   all, let's sort of sum up what you have told Mr.

 4   Becker and what you have told me about what you have

 5   been exposed to and, again, don't take offense at

 6   this, but if you were on trial for something, and

 7   somebody who might decide your case had had

 8   conversations with people and read things, you

 9   obviously might have some concerns, correct?

10                    CAROL SELAK:  Yes.

11                    ATTY. JUHASZ:  You would want to

12   make sure that that person could be fair, right?

13                    CAROL SELAK:  Yes.

14                    ATTY. JUHASZ:  All that I am going

15   to ask you is, based upon everything that you have

16   said to us, would you have any problem looking at

17   Donna Roberts saying, look, even though I read this

18   stuff and even though people have talked to me about

19   your case that was before I was selected as juror, I

20   can set this aside and give you a fair trial and

21   presume you innocent and make them prove you guilty.

22   Do you have any problem looking at her and doing any

23   of that?
```

3045

```
 1                    CAROL SELAK:  No.
 2                    ATTY. JUHASZ:  Okay, very good.
 3      And even though there has been a lot of talk and
 4      publicity about this case, you understand, don't
 5      you, that Mr. Jackson's trial was Mr. Jackson's
 6      trial, and this is Donna Roberts' trial?
 7                    CAROL SELAK:  Yes.
 8                    ATTY. JUHASZ:  And the issue here
 9      is not whether Mr. Jackson killed Mr. Fingerhut, the
10      issue here is whether Donna Roberts helped him?
11                    CAROL SELAK:  Yes.
12                    ATTY. JUHASZ:  Do you see that?
13                    CAROL SELAK:  Yes.
14                    ATTY. JUHASZ:  Okay, we talked
15      about some letters and some tapes, and I am going to
16      tell you that I think that you will hear and see
17      some of those things.  Now, the reason I bring that
18      up is, some of those might be sexually explicit and,
19      frankly, offensive.  You talked with Mr. Becker
20      about being able to separate sympathy from evidence.
21      Do you remember having a conversation with him about
22      that?
23                    CAROL SELAK:  Yes.
```

1          ATTY. JUHASZ:  I don't want to

2     repeat that, but I want to analogize.  If there are

3     things that you see or hear that are offensive to

4     you, and you may even think less of Donna because of

5     things that she said or things that she wrote, you

6     appreciate, don't you, that doesn't substitute for

7     evidence that they have to produce that she actually

8     planned and participated in this murder?

9          CAROL SELAK:  Yes.

10          ATTY. JUHASZ:  So, even though you

11     might say, you know what, I think you said some

12     pretty disgusting things, and you know, you're not

13     necessarily a person that I would like to sit down

14     and have a cup of coffee with, but they didn't prove

15     this case, so I have no problem finding you not

16     guilty.  Can you do that?

17          CAROL SELAK:  Oh, yes.

18          ATTY. JUHASZ:  Okay, let's talk

19     for a couple of minutes, if we can, about your views

20     on the death penalty.  And what I would like to do,

21     and believe me, I'm not trying to put you on the

22     spot, it's just that I am more interested in what

23     you have to say, rather, than me asking you

1    questions and having you agree or disagree.  What

2    are your thoughts about the death penalty when it's

3    appropriate, you put some things on your

4    questionnaire about  --

5                    CAROL SELAK:  Yeah, it depends on

6    the circumstances, on not necessarily what the

7    offense is, but what the decisions of the jury is,

8    and probably what the offenses is too.

9                    ATTY. JUHASZ:  Okay.

10                   CAROL SELAK:  You know --

11                   ATTY. JUHASZ:  Help me out a little

12   bit with that.  I want to press you a little bit

13   because I just need you to be a little bit more

14   specific when you say like what the jury --

15                   CAROL SELAK:   I mean, when they

16   -- if they find someone guilty, then, yes, I believe

17   in the death penalty.

18                   ATTY. JUHASZ:  Okay.  If they find

19   someone guilty of -- forgive me, I am interrupting

20   myself, as I often do.  You read the questionnaire

21   -- I'm sorry, the handout?

22                   CAROL SELAK:  Yes.

23                   ATTY. JUHASZ:  Do you think you

```
 1    have a pretty good working knowledge on how death

 2    penalty cases work, or do you want to spend a minute

 3    making sure that you are up to speed on that?

 4                    CAROL SELAK:  I just read it, but

 5    you can go over it again if you want my honest

 6    opinion, you know  my  --

 7                    ATTY. JUHASZ:  That' fine.  And

 8    understand that we bring jurors in here and ask them

 9    to talk about complicated areas of the law that,

10    frankly, there are a lot of lawyers that don't know

11    what the law is on this area, so don't feel bad.  I

12    have an example that I like to use, it's a little

13    bit different than the one that we're talking about

14    here.  I like to use it for a couple of reasons.

15    You do understand, first of all, that not everybody

16    who commits murder is eligible for the death penalty

17    in Ohio.

18                    CAROL SELAK:  Yes, yes.

19                    ATTY. JUHASZ:  Whether we agree

20    with the legislature or not, the legislature writes

21    the laws and in its infinite wisdom, it has said,

22    look, there are certain aggravated murders that we

23    find to be special in one way or another.  And so if
```

1    the State alleges and proves one of these special

2    conditions, then that person is eligible for

3    consideration of the death penalty, all right?

4              CAROL SELAK:  Yes.

5              ATTY. JUHASZ:  Those are things

6    that are set out in the statute that say, for

7    example, the one I want to talk about is, if you

8    kill the governor, the lieutenant governor, or the

9    president or the vice president, they say that that

10   is an aggravated murder, that is more special

11   because of their role in the government, so if

12   you're found guilty of that, you could be eligible

13   for the death penalty, all right.

14              So, let's pretend in this hypothetical

15   case that the government hands me a piece of paper

16   called an indictment, says, hey Juhasz, we say that

17   on January 1, 2003, you committed aggravated murder

18   on a guy named Bob Taft.  Now, if that is all they

19   allege, and that is all they prove against me, and

20   they prove it beyond a reasonable doubt, I am

21   convicted, and I can go to jail for a very long

22   time, but I can't get the death penalty.  Do you see

23   that?

3050

1              CAROL SELAK:  Yes.

2              ATTY. JUHASZ:  In order for me to

3    be eligible for the death penalty, they would have

4    to add a thing in my indictment, a fancy word we

5    call a specification.  But really what they're doing

6    is kind of knocking on my head and saying, hey,

7    listen Juhasz, this isn't just an aggravated murder

8    case, P.S., Bob Taft was the governor of the State

9    of Ohio when you killed him, okay.

10             Now, they, in essence, have two burdens

11   of proof then at that trial.  The first would be to

12   convince a jury beyond a reasonable doubt that I am

13   guilty of aggravated murder of a guy named Bob Taft.

14   The second would be that Bob Taft was the governor

15   when I killed him.  Do you see that?  I like to use

16   that example because you are probably sitting there

17   saying, what are you stupid?  Everybody knows Bob

18   Taft is the governor of the State of Ohio.  That is

19   precisely why I like to use that example because as

20   silly as it sounds, you see, they have to produce

21   for you, just the fact that you know that Bob Taft

22   is the governor isn't proof, just like whatever you

23   read or talked about Donna Roberts case is not

3051

```
 1    proof.  Do you see that?

 2                   CAROL SELAK:  Yes.

 3                   ATTY. JUHASZ:  Okay, so whether

 4    they do it by bringing in some fancy certificate

 5    with ribbons and seals dripping off of it showing

 6    that this guy was the governor, or maybe they bring

 7    in the chief justice of the Ohio Supreme Court and

 8    says, yeah, the guy in that autopsy photograph is

 9    the guy that I swore in as the governor on the

10    capital steps.  How ever  they do it, they have to

11    prove it.  Do you see that?

12                   CAROL SELAK:  Yes.

13                   ATTY. JUHASZ:  And the reason that

14    -- another reason that I bring that up is, it's

15    possible that a jury could find me guilty of

16    aggravated murder, but not guilty of the

17    specification.  Because if they forget to produce

18    that evidence that he was the governor, they might

19    go, this jury is going to know that he's the

20    governor, we don't have to bring any proof in on

21    that.  And if the jury is doing their job, they're

22    going to go, I don't know what those guys think, but

23    the Judge told me, if they don't bring in proof, I
```

1   find the person not guilty.  And so, in those

2   circumstances, you would be justified, in fact,

3   warranted, in finding me guilty of aggravated

4   murder, but not guilty of the specification.  Do you

5   see that?

6               CAROL SELAK:  Yes.

7               ATTY. JUHASZ:  Now, let's say that

8   they prove both of them, then that is when you go to

9   a second phase.  Are your feelings about the death

10  penalty such that if you find somebody guilty of

11  aggravated murder and one of those special

12  conditions, that the death penalty is going to have

13  a leg up when you go into that second phase?

14              CAROL SELAK:  No, I know that's

15  going to be one of the options.  That doesn't

16  necessarily mean I've decided that that is what it's

17  going to be.

18              ATTY. JUHASZ:  All right, and then

19  that is precisely what I want to talk about and what

20  I want to discuss with you because several times Mr.

21  Becker asked you, if in this case, if the facts and

22  the evidence warranted it, and the law permitted it,

23  if you could sign a death verdict, and you said you

1      could, correct?

2                      CAROL SELAK:  Yes.

3                      ATTY. JUHASZ:  But you understand,

4      don't you, if in this case we get to a second phase

5      or in any capital case in Ohio, if you get to a

6      second phase, there are four sentencing options?

7                      CAROL SELAK:  Yes.

8                      ATTY. JUHASZ:  And you know what

9      those are, don't you?

10                     CAROL SELAK:  Yes.

11                     ATTY. JUHASZ:  And maybe you know

12     this, and maybe you don't, those options have to

13     start out equally in your mind.  Are you okay with

14     that?

15                     CAROL SELAK:  Yes.

16                     ATTY. JUHASZ:  So, if in this

17     case, they did prove Donna guilty, and they did

18     prove one or more of the specifications, are your

19     feelings about the death penalty such that they

20     would have to prove to you that the death penalty

21     was appropriate, or are you going to have to make

22     her sort of prove to you that she couldn't get the

23     death penalty because of the seriousness of the

1    finding of guilt?

2                    CAROL SELAK:  No, they would have

3    to prove to me.

4                    ATTY. JUHASZ:  Okay, and so,

5    although you were asked several times, can you sign

6    a death verdict, I will ask you the opposite of

7    that.  If they don't meet that burden of proof at

8    that second phase, if we ever get there, would you

9    have any problem coming back and saying, sorry, she

10   is getting one of the life sentences?

11                   CAROL SELAK:  No, I wouldn't have a

12   problem.

13                   ATTY. JUHASZ:  All right, would

14   you have any problem sitting in this chair and

15   looking at Mr. Becker and Mr. Bailey and saying, you

16   know what, you proved me to me in the first phase

17   that she was guilty, but you didn't meet your burden

18   of proof in the second phase, so you don't get a

19   death sentence out of me.  Any trouble doing that?

20                   CAROL SELAK:  No.

21                   ATTY. JUHASZ:  To get that death

22   penalty, they have to show you, in this case or any

23   Ohio capital case, that the reasons to impose the

1 death penalty, what we call the aggravating

2 circumstances, which are actually, by the way, the

3 specifications.  In my made up trial that I told you

4 a minute ago, if we got to the second phase, the

5 government would stand up and say, listen, the

6 reason to give Juhasz the penalty is because the guy

7 that he killed was the governor.  Okay, so that

8 specification actually gets a new name in the second

9 phase called the aggravating circumstance.  Is that

10 clear to you?

11       CAROL SELAK:  Yes.

12       ATTY. JUHASZ:  My lawyers would

13 give you reasons why, please don't kill this poor

14 slob, whatever the reasons are, doesn't really

15 matter at this point.  Those are what we call, in

16 our fancy legal terms, called  mitigating factors,

17 what it really means is reasons not to impose the

18 death penalty.  Do you see that?

19       CAROL SELAK:  Yes.

20       ATTY. JUHASZ:  They have to show

21 you, if they can, that the reasons to impose the

22 death penalty, outweigh the reasons not to by proof

23 beyond any reasonable doubt.  Do you see that?

1                    CAROL SELAK:  Yes.

2                    ATTY. JUHASZ:  And I think you and

3    I would have no problem holding them to that burden?

4                    CAROL SELAK:  No.

5                    ATTY. JUHASZ:  No one can tell

6    you, even -- even though the Judge will tell you, if

7    you ever get to that phase, he would say, look, in

8    essence, you have to find exactly what Juhasz just

9    said, the reasons to impose the death penalty,

10   outweigh the reasons not to by proof beyond a

11   reasonable doubt.  And that is the only way you

12   impose the death penalty.  But you understand, don't

13   you, nobody can ever tell you how much weight to

14   give to any given fact.  Do you see that?

15                   CAROL SELAK:  Yes.

16                   ATTY. JUHASZ:  So, in a

17   theoretical case, you could have a case where there

18   are 10 specifications, 10 reasons when you go into

19   the second phase, why the government stands up and

20   says, look, you guys found this, this, this, and

21   this, and those are all reasons to give Juhasz the

22   death penalty, okay.  And my lawyer may get up and

23   give you one reason not to give me the death

```
 1        penalty.  And you understand that it is up to you

 2        what weight to assign to all of those.  And so if

 3        you found that this was weighing enough, this one

 4        reason not too, you might say, I don't care if there

 5        are 10 reasons to give the death penalty, I am not

 6        convinced beyond a reasonable doubt, based on this

 7        one single reason he gave me not to give him the

 8        death penalty.  Based on that I think the death

 9        penalty is not appropriate.  Any problem with doing

10        that?

11                    CAROL SELAK:  No.

12                    ATTY. JUHASZ:  We have talked

13        about, in sort of a roundabout way, this burden of

14        proof that the State has.  You know, I said a few

15        minutes ago that we bring folks down here as jurors,

16        and we ask them to do all sorts of things; clear

17        your mind of anything you know about the case, don't

18        think about sympathy, do this, do that, and they're

19        all rules that we deal with everyday, so we're used

20        to them.  We study them, we practice them all of the

21        time, and we're bringing you sort of out of the

22        cold, so to speak, and asking you to do a very

23        important job.
```

3058

1          The Judge will tell you at the end of

2    the first phase of a case like this, just like he

3    would in any criminal trial, that the State has the

4    burden of proving the case by proof beyond a

5    reasonable doubt.  But, guess what, he tells you

6    that, and he is not going to give you any kind of a

7    quantifiable number.  He's not going to say, and I

8    think Mr. Becker even eluded to this, that, you

9    know, if they have seven witnesses and you believe

10   four, then you find him or her guilty but, if not,

11   you don't.  There are no numbers to it.  Do you

12   understand that?

13          CAROL SELAK:  Yes.

14          ATTY. JUHASZ:  Because of that, one

15   of the things that I have become fond of talking

16   about is, you go back in the jury room and you kind

17   of close your eyes and picture a box, and you kind

18   of take the State's evidence and pour it into this

19   imaginary box.  Because Mr. Becker talked to you

20   about the preponderance of the evidence and the one

21   drop more for half the glass, do you remember that?

22          CAROL SELAK:  Yes.

23          ATTY. JUHASZ:  Well, the burden of

1     proof in a criminal case is the highest burden of

2     proof that we have in our law, proof beyond a

3     reasonable doubt.  He gave you some examples about

4     being married and he doesn't have to prove his case

5     beyond all doubt, you remember those?

6                CAROL SELAK:  Yes.

7                ATTY. JUHASZ:  But because it's the

8     highest standard of proof, the line that you draw on

9     that box, in your mind's eye, called reasonable

10    doubt, it is going to be pretty far up on that box.

11    Do you see that?

12               CAROL SELAK:  Yes.

13              ATTY. JUHASZ:  In fact, the only

14    thing that is going to be between that line and the

15    top of the box, are these possible or imaginary

16    doubts that he was referring to before.  Do you see

17    that?

18               CAROL SELAK:  Yes.

19              ATTY. JUHASZ:  The reason I like to

20    talk about a box is for several reasons; one is,

21    first of all, you understand right now the box is

22    empty.  You haven't heard any evidence yet, have

23    you?

1              CAROL SELAK:  No.

2              ATTY. JUHASZ:  The stuff you talked

3     about, the stuff you read about, the stuff you heard

4     on T.V., you and I agree that is all not evidence,

5     right?

6              CAROL SELAK:  Yes.

7              ATTY. JUHASZ:  The indictment isn't

8     in evidence because that is just -- remember when I

9     talked a little while ago about them charging me

10    with killing Bob Taft, and I said they gave me an

11    indictment?

12             CAROL SELAK:  Yes.

13             ATTY. JUHASZ:  That's a piece of

14    paper.  Somehow, we have to get the case started.

15    Do you see that?

16             CAROL SELAK:  Yes.

17             ATTY. JUHASZ:  The prosecutors

18    can't get on T.V. and call a press conference say,

19    Juhasz, if you're listening, you're charged with

20    killing Bob Taft.  Or they can't stand on top of the

21    Courthouse with a bullhorn and scream Juhasz, if

22    you're out there, you're charged with killing Bob

23    Taft.  The legal way they do that is by giving me a

1      piece of paper called an indictment.  Do you see

2      that?

3                      CAROL SELAK:  Yes.

4                      ATTY. JUHASZ:  But that isn't stuff

5      that happened inside of the Courtroom, so that's not

6      evidence either.  Do you agree with that?

7                      CAROL SELAK:  Yes.

8                      ATTY. JUHASZ:  Back to my box for a

9      second.  I like to talk about it because since they

10     have the burden of proof, they have to try to fill

11     up the box beyond the line called reasonable doubt,

12     that is, proof beyond a reasonable doubt.  Are you

13     with me?

14                     CAROL SELAK:  Yes.

15                     ATTY. JUHASZ:  If they don't fill

16     the box up beyond that line, your job is to find the

17     person charged not guilty, do you agree?

18                     CAROL SELAK:  Yes.

19                     ATTY. JUHASZ:  You and I have

20     talked about that, and you have no trouble doing

21     that, correct?

22                     CAROL SELAK:  No.

23                     ATTY. JUHASZ:  Even if when you're

1    done with the case, you look in the box and go, you

2    know, there is some evidence in there, and I kind of

3    don't like where that evidence points, but they have

4    a burden of proof beyond a reasonable doubt and they

5    didn't meet it.  You can do that, correct?

6              CAROL SELAK:  Yes, yes.

7              ATTY. JUHASZ:  I would like to talk

8    about the box also because it isn't a situation

9    where the State either wins or the Defendant wins.

10   It's really a situation where the State either wins

11   or the State loses.  And do you see that difference

12   because they either fill up the box beyond the line

13   called reasonable doubt, and if so, they win, i.e. a

14   guilty verdict, or they fail to put enough evidence

15   in the box to get beyond that line, in which event

16   they lose, because they haven't met the burden of

17   proof.  Do you see that?

18             CAROL SELAK:  Yes.

19             ATTY. JUHASZ:  One of the reasons I

20   like to look at it that way is because of the

21   presumption of innocence that we have in the Fifth

22   Amendment that says, a Defendant doesn't have to do

23   anything in a criminal case except show up, okay.

1    That indictment is, in essence, saying, hey, listen,

2    here is what we're saying you did.  Here is what

3    we're going to try to come to Court and fill up the

4    box to prove.  All you have to do is show up.  You

5    don't have to testify, you don't have to call

6    witnesses.  You can hire Ben Matlock, if you want

7    to, and Ben can sit on his hands and not do anything

8    the whole time, okay.  That's probably not going to

9    happen in this case or any other criminal case, but

10   that is theoretically how it works, do you see that?

11            CAROL SELAK:  Yes.

12            ATTY. JUHASZ:  And the reason for

13   that is, once again, because they either fill up the

14   box or they don't.  Are you okay with that?

15            CAROL SELAK:  Yes.

16            ATTY. JUHASZ:  That is one of the

17   reasons why a Defendant doesn't have to take the

18   stand.  So, let me ask you now, since everybody

19   wants to be fair and hear both sides before you make

20   an important decision, you see how this is a little

21   bit different than the ordinary situation you have

22   in your daily life and you say, well, let me hear

23   both sides before I make a decision.

1               CAROL SELAK:  Yes.

2               ATTY. JUHASZ:  Do you see that?

3               CAROL SELAK:  Yes.

4               ATTY. JUHASZ:  That said, if Donna

5    doesn't take the witness stand, are you going to

6    hold that against her?

7               CAROL SELAK:  No.

8               ATTY. JUHASZ:  If she doesn't call

9    witnesses, are you going to hold that against her?

10              CAROL SELAK:  No.

11              ATTY. JUHASZ:  You see, don't you,

12   that, in essence, what she is doing, if she decides

13   to do those things, is folding her arms and saying,

14   hey, folks, I don't think they filled up the box.

15              CAROL SELAK:  Well, I think she

16   feels it's their job to prove it.

17              ATTY. JUHASZ:  That's right, that's

18   exactly right.  If she does take the witness stand,

19   then she becomes a witness, and when she becomes a

20   witness, you have to judge whether you believe all

21   or part or none of what she tells you, do you see

22   that?

23              CAROL SELAK:  Yes.

1                    ATTY. JUHASZ:   Just like you would

2      any other witness, do you see that?

3                    CAROL SELAK:   Yes.

4                    ATTY. JUHASZ:   If somebody has an

5      interest in the outcome of a case, that is something

6      to take into account if you decide whether you

7      believe them, right?

8                    CAROL SELAK:   Yes.

9                    ATTY. JUHASZ:   For example, to be

10     fair, if Donna gets on the witness stand, one of the

11     things that is allowed to go through your head as a

12     juror in deciding whether to believe her, say, wait

13     a minute, she's on trial for her life her.   She's

14     got a reason to make this stuff up.   It doesn't mean

15     that you reject her testimony, do you see that?

16                    CAROL SELAK:   Yes.

17                    ATTY. JUHASZ:   It's just something

18     to take into account.

19                    CAROL SELAK:   Okay.

20                    ATTY. JUHASZ:   That could also be

21     true of other witnesses, would you agree?   They

22     might have some interest in saying a certain thing

23     that might not be true.   Do you see that?

3066

```
 1                    CAROL SELAK:  Yes.
 2                    ATTY. JUHASZ:  You will find the
 3    tests that you apply are the ones you apply in your
 4    daily life.  Any problem taking on that
 5    responsibility?
 6                    CAROL SELAK:  No.
 7                    ATTY. JUHASZ:  A couple more things
 8    and then I am going to leave you alone and try to
 9    not further ruin this beautiful sunny afternoon.
10                    CAROL SELAK:  Okay.
11                    ATTY. JUHASZ:  When you make
12    important decisions, don't you sort of either --
13    some do it on a piece of paper, some people do it in
14    your mind's eye, you kind of make a checklist with
15    the pros on one side and the cons on the other side,
16    correct?
17                    CAROL SELAK:  Yes.
18                    ATTY. JUHASZ:  You have to do the
19    same thing when you decide if they proved this case
20    to you beyond a reasonable doubt, and here is what I
21    mean by that.  On one side of the checklist there
22    are going to be reasons that they are going to say
23    to you, find Donna Roberts guilty.  On the other
```

```
 1    side, there are going to be doubts that you have,

 2    maybe things you thought of yourself as you listen

 3    to the evidence, maybe things that Ingram and I have

 4    brought up, maybe things that other jurors have

 5    brought up.  When you get done, if you have -- could

 6    be one or could be more than one, you think about

 7    it, talk about it, you say, you know what, that's

 8    not one of Mr. Becker's silly doubts, this is a

 9    doubt that I have based on reason and common sense

10    and then they have to prove their case.  Do you see

11    that?

12                 CAROL SELAK:  Yes.

13                 ATTY. JUHASZ:  There is one other

14    thing that I forgot to ask you about.  When that box

15    starts, you know, and I said it's empty, that's

16    because of what we call the presumption of

17    innocence.  Have you heard that phrase before?

18                 CAROL SELAK:  Yeah.

19                 ATTY. JUHASZ:  Okay, and you

20    understand that in a case like this where the

21    government charges somebody, that they're presumed

22    innocent until -- unless and until they fill up that

23    box that we're talking about?
```

1              CAROL SELAK:  Yes.

2              ATTY. JUHASZ:  What do you think

3     about that rule; that somebody is presumed innocent

4     rather than if the government charges and they're

5     presumed guilty?

6              CAROL SELAK:   I think everybody

7     should be presumed innocent.

8              ATTY. JUHASZ:  So, you think that

9     rule that we have is a good rule?

10             CAROL SELAK:  Yes, until proven

11    otherwise.

12             ATTY. JUHASZ:  All right, one of

13    the ways that they may try to do that is with what

14    lawyers call circumstantial evidence.  The Judge

15    will tell you that if you believe circumstantial

16    evidence, you can use it to find somebody guilty

17    beyond a reasonable doubt, that is the law.  The

18    only thing that I want to ask you about is, there

19    can be situations where the same inference -- I'm

20    sorry, two or more inferences can be drawn from the

21    same evidence, and if those other inferences also

22    make sense, then you see that would be a reasonable

23    doubt?

1              CAROL SELAK:  Yes.

2              ATTY. JUHASZ: Let me give you a

3    real quick example, and then I promise to sit down.

4    I want you to pretend that you're at my house on a

5    late summer afternoon, and it's sunny like today,

6    but, you know, some times like if it's in July and

7    August around here, around 5:00 or 6:00 o'clock, the

8    clouds start darkening up out west and you know that

9    we're going to get a thunder bumper, and the wind

10   starts kicking up.  All of a sudden, we're in the

11   kitchen and I hear a crash in the living room, and

12   when I run in to investigate, my son's cat comes

13   tearing out between my legs.  I walk in and look to

14   my left, and there's my son with his hands over his

15   face.  I look to my right and there is one of my

16   wife's Norman Rockwell plates off the mantle, onto

17   to the hearth, and smashed into a million pieces.

18   Now, it could be that my son was throwing the nerf

19   ball like he's been told not to do 600,000 times in

20   the house, and the noise scared the cat, Mike's

21   going, I'm in trouble.  I know dad told me not to

22   throw the nerf ball.  It could be that the cat

23   knocked the plate off, and the noise scared it, or

 1      it's worried about having a broken plate, and Mike's

 2      going, boy, mom is going to have a fit.  Or it could

 3      be that the wind knocked the plate off, the wind

 4      from that approaching thunderstorm knocked the plate

 5      off, and the cat is scared, or maybe it's worried

 6      it's going to get blamed for the plate, and Mike is

 7      in the same situation.  He's either scared or

 8      worried he's going to get blamed for the plate.

 9                  Here's my point, with that limited

10      evidence that I gave you, all three of those

11      scenarios work from the evidence, don't they?

12                  CAROL SELAK:  Yes.

13                  ATTY. JUHASZ:  And I would not be

14      able to find my son, Mike, guilty of breaking that

15      plate beyond a reasonable doubt with that

16      circumstantial evidence, would I?

17                  CAROL SELAK:  No.

18                  ATTY. JUHASZ:  That wouldn't be

19      fair, would it?

20                  CAROL SELAK:  No.

21                  ATTY. JUHASZ:  Any problem when you

22      test the government's circumstantial evidence

23      holding them to that same type of analysis?

 1                    CAROL SELAK:  No.

 2                    ATTY. JUHASZ:  Anything that we

 3      have talked about here that you have questions about

 4      or any reasons why you don't think you could serve

 5      as a juror in this case?

 6                    CAROL SELAK:  No.

 7                    ATTY. JUHASZ:  Okay, thanks for

 8      your time.  I appreciate it.  Thank you, Judge.

 9                    THE COURT:    Pass?

10                    ATTY. INGRAM:  Pass.

11                    THE COURT:  Does the prosecution

12      pass?

13                    ATTY. BECKER:  Yes, sir, Your

14      Honor.

15                    THE COURT:  Okay, ma'am, you will

16      be in the final group that from which this jury will

17      be picked.  You should call that number given to you

18      after 4:30 on Thursday.

19                    CAROL SELAK:  Okay.

20                    THE COURT:  And, again, I will

21      remind you not to discuss anything about the case,

22      read anything or watch anything on T.V., until you

23      come back.

```
 1                    CAROL SELAK:  Okay.

 2                    THE COURT:  Thank you.

 3                    CAROL SELAK:  Thank you.

 4

 5      (Whereupon, Carol Selak, Juror Number 184, was

 6      excused until further notice.

 7

 8                    THE COURT:  Okay, we're done for

 9      today.  See you tomorrow.

10

11

12      (At 3:30 p.m., Court adjourned til Wednesday, April

13      30, 2003, at 9:00 a.m.)

14

15

16

17

18

19

20

21

22

23
```

1             **WEDNESDAY, APRIL 30, 2003**

2

3        **DENNIS M. COOK, JUROR NUMBER 185**

4    **EXAMINATION BY THE COURT:**

5

6                 THE COURT:  Mr. Cook, how are you

7    this morning?

8                 DENNIS M. COOK:  Fine, thank you,

9    Judge.

10                THE COURT:  You had an occasion,

11   did you not, to read that handout that was given to

12   you?

13                DENNIS M. COOK:  This morning?

14                THE COURT:  Yes.

15                DENNIS M. COOK:  Yes, I did.

16                THE COURT:  Okay, fine, then you

17   have some idea of what we're doing here.  As you

18   know by now, this is an aggravated murder charge

19   with specifications.  In the State of Ohio, just

20   because a person does murder another human being,

21   that does not necessarily mean they face the death

22   penalty.  The legislature back in the 80's when the

23   law was changed because of Supreme Court decisions

3074

```
 1     came up with a statute that says, if you commit
 2     murder under certain circumstances, what we call
 3     certain specifications, then the possibility of a
 4     death penalty case arises.  An example is if you
 5     killed or a person murdered a fellow named Robert
 6     Taft, who is the governor of Ohio.  Unless the
 7     prosecution attaches to that indictment, the
 8     specification that Robert Taft is a governor of
 9     Ohio, that would not be a capital case where the
10     death penalty would be involved.  If the prosecutor
11     attaches that specification, and if the prosecutor
12     at trial proves that there was an aggravated murder,
13     and that the person murdered was a governor of Ohio,
14     proved that beyond a reasonable doubt, then that
15     would mean that upon a finding of guilty, the case
16     would go into a second phase, and at that second
17     phase, the prosecutor is again called upon to prove
18     beyond a reasonable doubt that the aggravated
19     circumstances of the murder; that is, the reasons
20     why the jury should consider imposing the death
21     penalty, outweigh any mitigating factors, and that
22     mitigating factors would be reasons presented to the
23     jury as to why they should not impose the death
```

1      penalty.

2                 Now, the burden is always upon the

3      State.  The Defendant need do nothing during the

4      course of a trial.  The Defendant has a right to

5      remain silent and, technically, a Defendant and the

6      lawyers representing the Defendant need do nothing.

7      Because it's the prosecution that wins or loses

8      their case, okay?

9                 DENNIS M. COOK:  Yes.

10                 THE COURT:  Now, that's kind of

11     hard to understand because many times you would like

12     somebody to say, well, present some defense, but

13     there is no legal requirement, nor can that be taken

14     into account, that a Defendant does or doesn't do

15     something during the trial.  It's the prosecutor

16     that has the duty of proving, okay?

17                 DENNIS M. COOK:  Yes.

18                 THE COURT:  Now, this case,

19     depending on how the jury determines the issue at

20     trial, if they came back with a not guilty plea --

21     I'm sorry, a finding of not guilty, then that means

22     that the State has not proven their evidence beyond

23     a reasonable doubt, then there would be no second

1   part of the trial.  If the State maintains its

2   burden of proof, then this jury will be called upon

3   to consider the aggravating circumstances against

4   the mitigating factors.  We have no way of knowing

5   what the jury is going to do because the evidence

6   hasn't been presented yet.  And it seems premature

7   to talk about a death penalty, but there is a very

8   good reason why we must do it at this point.  If we

9   would get to that second phase, and we had a person

10  on this jury who believed very strongly in the Old

11  Testament, eye for an eye, tooth for a tooth, and if

12  you take a life, you forfeit your own.  That person

13  could not possibly be fair to the Defendant.

14  Because the Defendant has the right to have those

15  circumstances weighed against the factors.

16          Likewise, if you had a person who under

17  no circumstances, because of religious, moral or

18  ethical beliefs could participate in any proceeding

19  where they had to make a decision on whether a

20  person lives or dies, well, that person couldn't be

21  fair to the State because the State has the right,

22  if they prove the elements of this aggravated murder

23  with specifications.  They have a right to ask for

1   the life of the Defendant.  Okay?

2                    DENNIS M. COOK:  Yes.

3                    THE COURT:  So, the questions will

4   be geared to find out what your personal beliefs

5   are, and whatever your personal beliefs are

6   concerning the death penalty, that is fine.  These

7   folks will respect that.  It's just that they have

8   to know whether you would be able to follow the law.

9                    And the law is, if the State proves

10  their case beyond a reasonable doubt, with the

11  specifications, then this jury will have to consider

12  four possibilities; the imposition of the death

13  penalty, a sentence of life without the chance of

14  parole, and that means without any chance of parole.

15  And there are two lesser, life imprisonment without

16  chance of parole before 30 years or 25 years, okay?

17                    DENNIS M. COOK:  Yes.

18                    THE COURT:  Now, the other area of

19  inquiry will be pretrial publicity.  This case, as

20  any murder case, has generated its fair share of

21  publicity in the newspapers and on T.V.  Many of the

22  prospective jurors have read something or heard

23  something about this case, it's not unusual.  But,

1     again, the issue is whether or not any particular

2     individual can set that aside and decide this matter

3     on the evidence and the law presented in this

4     Courtroom.  If we had a situation where the evidence

5     was presented and then the jury gets back in the

6     jury room and somebody says, I don't care what they

7     said was the evidence, I remember reading in the

8     newspaper that this is the way it happened.  You

9     can't have that.  Somebody would not be getting a

10    fair trial.  The matter has to be decided fairly on

11    the evidence that is heard in this Courtroom, okay?

12              DENNIS M. COOK:  Yes.

13              THE COURT:  Fair enough.  Mr.

14    Bailey.

15              ATTY. BAILEY:  Thank you, Your

16    Honor.

17

18    **EXAMINATION BY ATTORNEY BAILEY:**

19              ATTY. BAILEY:  Good morning, Mr.

20    Cook.

21              DENNIS M. COOK:  Good morning.

22              ATTY. BAILEY:  As you remember, my

23    name is Ken Bailey, I'm an assistant prosecutor, and

1      I think you saw me about three weeks ago in the

2      other Courtroom?

3                    DENNIS M. COOK:  Yes.

4                    ATTY. BAILEY:  And I promised you

5      then that I would be joined by my co-counsel, Chris

6      Becker, who is with me today.

7                    DENNIS M. COOK:  Nice to meet you.

8                    ATTY. BAILEY:  And the two of us

9      are responsible for prosecuting this case on behalf

10     of the people of Trumbull County and the State of

11     Ohio.  Now, as the Judge indicated, we are going to

12     be asking you some questions this morning, and those

13     questions will deal with your opinions on different

14     things and your prior experiences, and we're asking

15     these questions not because we're snoopy and like to

16     pry into people's backgrounds but, rather, to make

17     sure that the people who are selected to serve on

18     this jury can be fair and impartial to both sides,

19     both to the Defendant and to the people of the State

20     of Ohio.

21                   And another thing, there aren't any

22     right answers or wrong answers, only open candid

23     answers.  If you have any questions that come up

3080

1     during this question and answer session about what

2     we're doing here, and as long as it pertains to our

3     procedure here, feel free to ask us because this is

4     the one chance that you get to talk to us until this

5     case is all over.

6              If this case goes into two phases, you

7     are not allowed to have any communication with us,

8     we're not allowed to talk to you until the second

9     phase is over.  Okay, if we run into each other in

10    the hallway or an elevator or restaurant or

11    something, all we're allowed to say is good morning

12    or good afternoon.  And if we have any other

13    communication, it could result in a mistrial and we

14    don't want to do it all over again under our rules

15    of conduct.

16              DENNIS M. COOK:  Yes.

17              ATTY. BAILEY:  So, we're not trying

18    to be antisocial or trying to snub you or anything

19    like that, just so you know we're not allowed to

20    communicate.  If you have any questions, you can

21    direct them to our bailiff, Laurie Brown.  She's not

22    here now, but she will be here during the course of

23    the trial.

3081

```
 1                    DENNIS M. COOK:  Yes, I understand.
 2                    ATTY. BAILEY:  Now, let me ask --
 3    before I get into the other questions, let me ask
 4    you about pretrial publicity and the death penalty
 5    first.
 6                    THE COURT:  Mr. Bailey, let's --
 7                    ATTY. BAILEY:  Do you want me to
 8    get to the question about his vacation?
 9                    THE COURT:  Yes, if you would.
10                    ATTY. BAILEY:  Okay, I will start
11    with that, Judge.  This is taking a bit longer than
12    we expected to pick a jury, we started our fourth
13    week here.  And we're going over how long we expect
14    this case may take, and if it goes into two phases,
15    Mr. Becker and I, we were discussing last evening
16    that we may well be ending up at the beginning of
17    June, and I noticed that you wrote down in your
18    questionnaire, that you have a vacation set June 1st
19    thru the 6th.  You have a condo at the beach?  Is
20    that prepaid?
21                    DENNIS M. COOK:  Yes, my daughter
22    leased it and she had paid on it.
23                    ATTY. BAILEY:  Okay, and if this
```

```
 1        case were to go that long, would that cause a

 2        economic hardship for you missing out on that

 3        vacation?

 4                    DENNIS M. COOK:  Well, it's my two

 5        daughters, my wife, and myself, so I mean --

 6                    ATTY. BAILEY:  So, it would be a

 7        hardship on your family?

 8                    DENNIS M. COOK:  I would certainly

 9        enjoy the time with my family now that our daughters

10        have moved away.

11                    ATTY. BAILEY:  Okay, so I take it

12        that if this case goes that long, then, are you

13        saying that you would rather not be able to be here

14        to serve on this particular jury, you would rather

15        serve on a different case?

16                    DENNIS M. COOK:  That would be my

17        choice.  The instruction with Judge Stuard was at

18        the time was a month, so I didn't bring it up at

19        that point, which was April 8th, so even in May or

20        something, I didn't realize that.

21                    ATTY. BAILEY:  I don't think

22        anybody expected it to take this long.

23                    THE COURT:  Yes, this is taking
```

1    much longer than usual.

2               ATTY. BAILEY:  We don't have any

3    objection, Judge.

4               ATTY. INGRAM:  I have no objection

5    but I want to ask a couple of questions.

6               ATTY. BAILEY:  Okay, they may have

7    a question or two that they may ask you about

8    something, but other than that you won't be able to

9    serve.

10              THE COURT:  Vacation is a very

11   important thing to all of us, and you have all of

12   the plans and that, and to have you caught in the

13   middle of a jury trial, that is not good for

14   anybody.  So, you have a couple of questions?

15              ATTY. INGRAM:  Yes, I do.

16

17   **EXAMINATION BY ATTORNEY INGRAM:**

18              ATTY. INGRAM:  Good morning.

19              DENNIS M. BAILEY:  How are you?

20              ATTY. INGRAM:  Where are you going

21   to your beach, North Carolina?

22              DENNIS M. BAILEY:  It's Bethany

23   Beach, which is in Delaware, if I remember right.

1    My daughters moved to the east coast.

2                    ATTY. INGRAM:  You are all going to

3    meet up?

4                    DENNIS M. COOK:  Yes, yes.

5                    ATTY. INGRAM:  Three weeks ago

6    yesterday, we all met in the big Courtroom at the

7    other end of this hallway for orientation.  Do you

8    recall that?

9                    DENNIS M. COOK:  Yes, I do remember

10   that.

11                   ATTY. INGRAM:  When you entered

12   that Courtroom, do you remember if you went to your

13   left or to your right?

14                   DENNIS M. COOK:  I went to my

15   right.

16                   ATTY. INGRAM:  Did you then take a

17   seat or were you one of the souls that had to stand?

18                   DENNIS M. COOK:  I came early, so

19   there were plenty of seats available when I came.

20                   ATTY. INGRAM:  While you were in

21   that room, did any of the other jurors engage you in

22   conversation about this case at all?

23                   DENNIS M. COOK:  No, I don't

1     believe so.  I don't think anybody knew about the

2     case.

3                      ATTY. INGRAM:  But you didn't

4     overhear anyone discussing the case?

5                      DENNIS M. COOK:  I think I heard

6     when they first announced it, some people had heard

7     about this case, but I couldn't remember when they

8     announced who -- as far who was involved in the

9     case, but I couldn't remember.  At that time, I did

10    hear some of the prospective jurors maybe talk, but

11    I don't think anything was carried on to any length.

12                     ATTY. INGRAM:  Okay when you heard

13    some of the other jurors talking, was that before

14    the Judge came out?

15                     DENNIS M. COOK:  I think it was

16    when the Judge really announced what the case was

17    about and who was involved.  I heard nothing before

18    because I don't think anybody --

19                     ATTY. INGRAM:  What do you recall

20    hearing?

21                     DENNIS M. COOK:  I think it was

22    dealing with the publicity, what was said during the

23    case, in the newspapers more or less, more than

1    anything.  I don't think there was any conversation,

2    people had heard about the case and what was implied

3    there from the newspapers.

4                    ATTY. INGRAM:  Was it more than one

5    person -- was it more than one person talking?  Do

6    your best to reconstruct this for me.

7                    DENNIS M. COOK:  It might of been

8    two or three people saying, okay, I remember that

9    now from the Tribune, but I don't think, I couldn't

10   tell who it was -- it was probably behind me, and I

11   couldn't specifically tell who it was.  I don't

12   think it was anybody right next to one another

13   anyway.

14                   ATTY. INGRAM:  Do you recall if

15   anyone described what they may have remembered from

16   reading it in the paper?

17                   DENNIS M. COOK:  I don't think that

18   it went into that depth or that much discussion.

19                   ATTY. INGRAM:  Thank you, very

20   much, sir.  No objection, Your Honor.

21                   ATTY. BAILEY:  No objection.

22                   THE COURT:  Okay, you are excused

23   from any further responsibilities.  You have a good

```
 1    trip, okay?

 2                    DENNIS M. COOK:  Thank you.

 3                    THE COURT:  Thank you for coming.

 4

 5    (Whereupon, Dennis M. Cook, Juror Number 185, was

 6    excused.)

 7

 8

 9            AMY BARTLETT, JUROR NUMBER 199

10    EXAMINATION BY THE COURT:

11

12                    THE COURT:  Amy, good morning to

13    you.

14                    AMY BARTLETT:  Good morning, how

15    are you?

16                    THE COURT:  You had an occasion to

17    read that handout that was given to you?

18                    AMY BARTLETT:  Yes, I did.

19                    THE COURT:  You understand that we

20    are here on a trial involving the lady seated over

21    here, Donna Roberts.  She is charged with two counts

22    of aggravated murder with specifications.  In Ohio,

23    if a person commits murder, that does not
```

1    necessarily bring up the issue of the death penalty.

2    But if a person is charged with aggravated murder

3    with attached specifications, and specifications are

4    things in the statute that, if proven by the State

5    beyond a reasonable doubt in conjunction with an

6    aggravated murder, does bring up the issue of the

7    death penalty.

8              AMY BARTLETT:  Okay.

9              THE COURT:  And the charges filed

10   here have the specifications attached, so it is

11   possible, depending on what the jury's decision is

12   concerning the guilt or innocence.  If the State

13   presents its evidence and fails to carry the burden

14   of proof beyond a reasonable doubt, then the jury

15   would properly make a finding of not guilty and the

16   issue of the death penalty doesn't arise.  If the

17   State is able to prove all of the necessary elements

18   that the aggravated murder did occur, and that the

19   specifications were proven also against the

20   Defendant, then the jury would properly turn a

21   finding of guilty.  At that point, we would have a

22   second phase at the trial concerning the issue of

23   the death penalty.

```
 1                    Now, at that second phase, the State is
 2       called upon to present the aggravating
 3       circumstances; that is, reasons put to the jury as
 4       to why she should consider and to impose the death
 5       penalty.  It would also be put to the jury at the
 6       same time what is called mitigating factors.  Those
 7       are reasons presented for the jury's consideration
 8       as to why the death penalty would not be appropriate
 9       in this particular case.
10                    AMY BARTLETT:  Okay.
11                    THE COURT:  Now, the burden is
12       always on the State.  In that second phase, they
13       have to prove that those aggravating circumstances
14       outweigh the mitigating factors beyond a reasonable
15       doubt before they would be entitled to ask for the
16       death penalty.  The reason we ask these questions
17       now before we even have the trial because nobody
18       knows what is going to happen at the trial, but if
19       we didn't ask the questions now, and we were into
20       the second phase, you may have somebody on that jury
21       that believes in an eye for an eye, tooth for a
22       tooth, if somebody kills somebody, they should lose
23       their life.
```

```
 1                    AMY BARTLETT:  Right.

 2                    THE COURT:  Well, it's okay to have

 3      beliefs, but such a person cannot be fair to the

 4      Defendant, okay?

 5                    AMY BARTLETT:  Yes.

 6                    THE COURT:  Likewise, you could

 7      have somebody on the jury that under no

 8      circumstances could ever put themselves in a

 9      position where they had to make that decision.

10                    AMY BARTLETT:  Uh-huh.

11                    THE COURT:  Well, such a person

12      could not be fair to the State.  The State has the

13      right to ask for the death penalty, if they prove

14      their case.  So, we ask these questions now so that

15      both sides are comfortable with people that

16      eventually become this jury, in order to see if they

17      could follow the law.  We all have feelings about

18      the death penalty one way or the other, --

19                    AMY BARTLETT:  Right.

20                    THE COURT:   -- but each of these

21      people, in order to be a proper juror, are going to

22      have to say, well, -- some will probably say, I

23      don't particularly favor the death penalty, others
```

```
 1        will say, I think it's necessary.  But they all have

 2        to listen to the instruction of law and follow the

 3        law.  And if we're not -- if we don't have a jury

 4        that is composed of that type of people, we can't

 5        have a fair trial, somebody will get short-changed.

 6                       AMY BARTLETT:  Right.

 7                       THE COURT:  The other issue that

 8        they will ask you about is in regard to pretrial

 9        publicity.  Some people, this case garnered its

10        share of publicity as any case of this type would,

11        and so many of the people have read or heard

12        something about it, but the question that has to be

13        answered is, are you able to set that aside and

14        decide this case on the evidence presented in this

15        Courtroom.  If somebody decides some of the facts

16        that are to be presented here are based upon

17        something they read in the newspaper, there is a

18        very large danger that somebody won't get a fair

19        trial.

20                       AMY BARTLETT:  Right.

21                       THE COURT:  It has to be on the

22        evidence contained and given in this Courtroom,

23        okay?
```

```
1                       AMY BARTLETT:  Yep.

2                       THE COURT:  Mr. Becker.

3                       ATTY. BECKER:  Thank you, Your

4    Honor.

5    EXAMINATION BY ATTORNEY BECKER:

6                       ATTY. BECKER:  Is it Mrs. Bartlett?

7                       AMY BARTLETT:  Yes.

8                       ATTY. BECKER:  Okay, good morning,

9    my name is Chris Becker.

10                      AMY BARTLETT:  Good morning.

11                      ATTY. BECKER:  I work for the

12   Prosecutor's Office, and Mr. Bailey and I, who I

13   think you saw on Tuesday, April 8th, down in the

14   other Courtroom --

15                      AMY BARTLETT:  That's correct.

16                      ATTY. BECKER:  We were altogether

17   as well Mr. Ingram and Mr. Juhasz.  I was the only

18   one who was not there that day.

19                      AMY BARTLETT:  Okay.

20                      ATTY. BECKER:  And I apologize, I

21   was in another court.

22                      AMY BARTLETT:  That's fine.

23                      ATTY. BECKER:  We're going to ask
```

1     you some questions that are going to be somewhat

2     maybe personal or find out your view points on

3     certain issues.  And the first thing I want to tell

4     you, and the most important thing I want to tell you

5     is, there is no right or wrong answers.

6                         AMY BARTLETT:  Okay.

7                         ATTY. BECKER:  And your opinions

8     are your own opinions, this isn't like a school

9     where we're going to test you or give you a grade

10    when you leave or anything like that.  We had a

11    number of people, in fact, we probably had the same

12    amounts of people that we have gotten for this jury

13    pool, we have probably excused just as many, maybe

14    more, for reasons that they couldn't impose the

15    death penalty, or that they would impose the death

16    penalty no matter what, or they couldn't be fair or

17    didn't want to make a decision in a case like this,

18    or they had vacations planned, or they couldn't

19    concentrate, or they had physical ailments, or they

20    had a sick relative at home, so there are all kinds

21    of reasons why people could not serve.

22                        AMY BARTLETT:  Right.

23                        ATTY. BECKER:  And there is nothing

1    wrong with that because everybody is different,

2    everyone has their own lives to live and their own

3    problems, and the reason we ask you these questions

4    is not because we want to be nosey, and we don't

5    want to pry into your life or learn too much about

6    you.  But we have to know enough about you so that

7    we know if you're going to be the kind of juror that

8    we want, and the same thing for Mr. Ingram and Mr.

9    Juhasz.  When I'm done, they're going to ask you

10   some questions, because they want to make sure that

11   you're the kind of juror they want as well.  And

12   some times neither side can get what we want, and

13   some times we get a juror who is too strong for the

14   State.  We had number of jurors come in here and

15   say, I am so in favor of the death penalty that if I

16   find the Defendant guilty of killing somebody, I

17   will convict and find the death penalty, I will give

18   the death penalty, and they won't consider the other

19   options that may be available if we get to that

20   stage.

21              AMY BARTLETT:  Uh-huh.

22              ATTY. BECKER:  On the other side,

23   we have people that are so opinionated and have such

3095

```
 1    beliefs that they could never even consider the

 2    death penalty, and if they could not and would not

 3    consider the death penalty, and we have other people

 4    with medical problems or anxiety or worries about

 5    home or their job.  The gentleman we had just before

 6    you that we may end up going into his vacation, so

 7    we didn't want to do that, so we had to let him go.

 8              So, I will start out by reiterating.

 9    Whatever your opinions are, we're not here to change

10    them, we're not here to criticize you or change you

11    or to make you change your opinions, we just want

12    you to be honest with us because this is a very,

13    very, very, serious case.  And, in fact, it is the

14    most serious case under the criminal laws of the

15    State of Ohio.  It is an aggravated murder, which

16    has specifications or special circumstances, which

17    may cause the jury to consider the death penalty at

18    some point.  So, we have a case that could

19    potentially could carry the most serious penalty in

20    the State of Ohio and, obviously, we have the death

21    of an individual involved in that.  So, by all

22    means, don't hold back anything if you feel it's

23    important and don't be embarrassed by any answer
```

```
1    because your answers are what they are, and your

2    feelings are what they are.

3                    AMY BARTLETT:  Okay.

4                    ATTY. BECKER:  Again, I want to

5    reiterate that the purpose for this morning is not

6    to change you, and not to change your opinion, but

7    to find out if you could serve as a juror in this

8    case, and there is nothing wrong if you can't

9    because you wouldn't be the first, and you certainly

10   wouldn't be the first to serve either, so either

11   way, it's fine with us.

12                   AMY BARTLETT:  Okay.

13                   ATTY. BECKER:  So, with that in

14   mind, let's start talking about some things.  First

15   of all, I want to ask you your views on the death

16   penalty.  I believe in your questionnaire that you

17   indicated that you were in favor of the death

18   penalty.

19                   AMY BARTLETT:  Well, really, it's

20   both ways.  I feel as though it's necessary in some

21   cases and some not in others.

22                   ATTY. BECKER:  Okay.  And I am

23   assuming that you're the type of person that would
```

3097

1     listen to evidence, and you would follow the Court's

2     instructions to determine whether the death penalty

3     in any particular case would be a proper punishment?

4              AMY BARTLETT:  Definitely, right.

5              ATTY. BECKER:  Now, the next

6     question that I am going to ask you is going to

7     require you to really look into your heart, your

8     mind, and your soul, and I want you to think about

9     it and take as much time as you need to answer it.

10    If we get to a point in this case, because it is a

11    death penalty case, can you, Amy Bartlett, go back

12    in that jury room right over there, and sit there

13    with 11 other of your fellow jurors and sign a piece

14    of paper that would call for the death penalty

15    against this Defendant?  If you need time to think

16    about that one, that's a tough question sometimes.

17             ATTY. INGRAM:  Your Honor, I think

18    that question is a little unfair.  I think there

19    should be a predicate --

20             ATTY. BECKER:  All right, well let

21    me put predicate -- let me withdraw that.  Let me go

22    back a little bit.

23             AMY BARTLETT:  All right.

1          ATTY. BECKER:  If Mr. Bailey and I

2   -- let me go back a little bit.

3          AMY BARTLETT:  Okay.

4          ATTY. BECKER:  This is a two phase

5   process.  First, we have to -- Mr. Bailey and I have

6   to prove her guilty beyond a reasonable doubt of

7   certain crimes and some certain things called

8   specifications.  If we're able to convince you and

9   your fellow jurors, if you're on this jury, then we

10  would go into a second phase, and in that second

11  phase, it is, again, Mr. Bailey and I's burden to

12  prove to you that some bad things, which we call

13  aggravating circumstances, outweigh beyond a

14  reasonable doubt any good things that may be

15  presented to you.  So it's just the same weighing

16  process, it's just a second time but different

17  elements though.  The same standard of proof, which

18  is proof beyond a reasonable doubt.  So, let's

19  assume we get to that second phase.  We may never

20  get there, but let's assume we get to that second

21  phase where you have to consider the death penalty.

22          AMY BARTLETT:  Okay.

23          ATTY. BECKER:  If we prove to you

1 beyond a reasonable doubt certain bad things about

2 this Defendant, can you go back into that jury room

3 and sign a piece of paper, which is going to have

4 your name on it and your signature from that point

5 forward in time, saying that the death penalty is

6 the appropriate penalty for this Defendant?  And,

7 again, take your time and search your mind and

8 search your heart.

9     AMY BARTLETT:  Well, I could if I

10 have been through all of the steps and heard

11 everything.

12     ATTY. BECKER:  So, you feel that

13 you could do it?

14     AMY BARTLETT:  Yes.

15     ATTY. BECKER:  The only reason

16 that I am stressing this a little bit more than with

17 other jurors, because I think when you were here on

18 the 8th, you might of made a statement that you

19 didn't feel that you were capable of making a

20 decision like that?

21     AMY BARTLETT:  I have thought it

22 over, you know, I have never been through any of

23 this.  I'm nervous.

3100

1      ATTY. BECKER: You may serve with

2  an entire jury that has never served on jury duty,

3  and all 12 of you may have never served before.

4      AMY BARTLETT: Right.

5      ATTY. BECKER: So, you are not the

6  only one out there, you understand?

7      AMY BARTLETT: Yeah.

8      ATTY. BECKER: But you feel now

9  after you've had some time since April 8th to think

10  about it, if the facts warranted it, and we met our

11  burden of proof, you could sign a piece of paper

12  calling for the death penalty?

13      AMY BARTLETT: Yes, I could.

14      ATTY. BECKER: And you wouldn't

15  take the easy way out, if we proved our case beyond

16  a reasonable doubt, you wouldn't say well, I know

17  Mr. Bailey and Mr. Becker proved their case but,

18  boy, this is really a tough decision, and I don't

19  want to be burdened with having to sign a piece of

20  paper calling for the death penalty, I would just

21  rather take the easy way out and do one of the life

22  options. You wouldn't do that, would you?

23      AMY BARTLETT: No.

3101

1           ATTY. BECKER:  Is this a lot of
2   thought you made amongst yourself, or did you speak
3   to anyone about it?
4           AMY BARTLETT:  To myself, yeah.  I
5   mean, did you see the paper, I wanted to ask for
6   help.  I left a lot of blanks.
7           ATTY. BECKER:  That's okay, and
8   some things you don't know.  So, you feel that if we
9   get to this point, you would certainly consider and
10  you have to consider equally all four options, but
11  if we are able to prove to you, Mr. Bailey and I, in
12  that second phase, proof beyond a reasonable doubt
13  that the death penalty is warranted, and the
14  aggravating circumstances outweigh the mitigating
15  factors, then you would feel comfortable signing a
16  death verdict?
17          AMY BARTLETT:  Yeah, that would be
18  fine.
19          ATTY. BECKER:  Now, I know there is
20  a lot of blank answers there, and that's okay.
21  Obviously, you are a younger person, so maybe you
22  don't have some, obviously, -- I am assuming you
23  don't have any children and you're not married, so

1     obviously, those questions would be blank.

2                    AMY BARTLETT:  No.

3                    ATTY. BECKER:  Obviously, you're

4     just starting out working?

5                    AMY BARTLETT:  Yeah.

6                    ATTY. BECKER:  And you're still

7     working at CVS?

8                    AMY BARTLETT:  Yeah.

9                    ATTY. BECKER:  So, you haven't --

10    okay, some people work maybe ten jobs in their life

11    or five jobs in their life, so it's understandable

12    that your questionnaire wouldn't be as full as maybe

13    someone who was 45 or 50 and had kids and a wife, or

14    maybe been divorced or some things like that.

15                   AMY BARTLETT:  Yeah.

16                   ATTY. BECKER:  The next question --

17    the next area that I want to get into and discuss

18    with you a little bit is the topic of any pretrial

19    publicity, or even conversations that you may of

20    heard about this case.  You indicated on your

21    questionnaire that you had not heard about this

22    case?

23                   AMY BARTLETT:  No.

1                    ATTY. BECKER:  You read the

2       Vindicator, I think occasionally?

3                    AMY BARTLETT:  Occasionsly.

4                    ATTY. BECKER:  Usually, you said, I

5       think, when something interests you, or you maybe

6       see something and you want to know more about it,

7       you look in the paper?

8                    AMY BARTLETT:  Right.

9                    ATTY. BECKER:  I assume you're not

10      the kind of person that when you hear about a crime,

11      you want to, boy, I can't wait to read that in the

12      paper tomorrow and see what happens?

13                    AMY BARTLETT:  No, only if it's

14      someone I know.

15                    ATTY. BECKER:  Yesterday, we had a

16      tragedy around here, a police officer was shot and

17      killed, I don't know, would that be something that

18      you maybe want to read about or you don't want to

19      concern yourself with that?

20                    AMY BARTLETT:  Well, I heard a lot

21      about it, and I just, you know, I am not always --

22                    ATTY. BECKER:  And I guess what I'm

23      trying to say is we have a lot of people come in

1       here and watch television, and they want to see cops

2       and they watch CSI and they really want to know

3       about it, that's not you, is it?

4                       AMY BARTLETT:  No, I'm not that

5       type.

6                       ATTY. BECKER:  Now, I notice in

7       your questionnaire that -- well, before I begin to

8       get into that, I guess what you're saying is coming

9       into this Courtroom today, you don't have any

10      opinions about this case that you formed from

11      anything that you seen on television.

12                      AMY BARTLETT: That's right.

13                      ATTY. BECKER:  In fact, you don't

14      ever recall hearing anything about this case?

15                      AMY BARTLETT:  Well, clear headed

16      with it really.

17                      ATTY. BECKER:  Okay, so you could

18      be a fair juror in terms of there is no outside

19      influences, and some times we get people in here,

20      and they have spoken to their co-workers about it,

21      and their co-workers would discuss the case at

22      length, or maybe their coworkers know somebody that

23      is involved and they discuss it, but that's not you,

1     right?

2                    AMY BARTLETT:  No.

3                    ATTY. BECKER:  You indicated on

4     your questionnaire that you have some neck aches, is

5     that correct?

6                    AMY BARTLETT:  Yeah, I think it's

7     from -- I don't know my neck is always cracked, you

8     know it's always shoulders to neck.

9                    ATTY. BECKER:  Do you get any

10    medical treatment for that?

11                   AMY BARTLETT:  No, I was going to

12    get my benefits this year at CVS, but I'm part-time,

13    so I can't pay for it, you know, what I mean.

14                   ATTY. BECKER:  Okay, so you have

15    not been medically treated for this condition or

16    anything?

17                   AMY BARTLETT:  Well, I asked my

18    family doctor, and he said stop cracking your neck,

19    but it cracks on its own.

20                   ATTY. BECKER:  Okay, and the only

21    reason that I am asking that is, I'm not trying to

22    be stupid or nosey or anything, but you may have to

23    sit in these chairs, and they're a little bit like

1    these are, the back is padded.  Is that going to

2    cause any discomfort?

3                    AMY BARTLETT:  It's always really

4    just uncomfortable.

5                    ATTY. BECKER:  All right, is that

6    the kind of pain that's going to cause you problems

7    sitting and paying attention because some people may

8    say, listen, -- we have had people that have had

9    knees or maybe a hip replacement, and they can't --

10   they say, listen, hey, I can't pay attention because

11   of the pain.

12                   AMY BARTLETT:  Yeah, well, if I

13   just crack my neck and it will be loud and will

14   disturb everyone.

15                   ATTY. BECKER:  Okay, but you will

16   be, okay?

17                   AMY BARTLETT:  Yeah.

18                   ATTY. BECKER:  Is this from an

19   automobile accident?

20                   AMY BARTLETT:   No, no, maybe I

21   sleep wrong.  They told me that.

22                   ATTY. BECKER:  Maybe something that

23   you got from your parents or something?

1                    AMY BARTLETT:  Yeah.

2                    ATTY. BECKER:  And you're not

3   taking any kind of medication for it?

4                    AMY BARTLETT:  No, some times I

5   wear those mentholated patches.

6                    ATTY. BECKER:  Okay, and obviously,

7   you could do that, I guess, if your fellow jurors

8   don't care about the smell.

9                    AMY BARTLETT:   Yeah.

10                   ATTY. BECKER:   It's not a bad

11  smell?

12                   AMY BARTLETT:  No.

13                   ATTY. BECKER:  So, that won't cause

14  you any problems, though, sitting as a juror and

15  being fair and impartial?

16                   AMY BARTLETT:  No.

17                   ATTY. BECKER:  Giving your

18  undivided attention to case?

19                   AMY BARTLETT:  Right, I could that.

20                   ATTY. BECKER:  You could do that.

21  Now, I want to go back a little bit and talk about

22  the death penalty portion of this case, we have to

23  kind of prepare for the worse here, well, maybe not

 1    the worst, but in her case, it's the worst, in our

 2    case it's the best.  We have to prepare for all

 3    scenarios and one of the scenarios we have to

 4    prepare for is if we do get to this death penalty

 5    phase.  You understand, though, that in this case,

 6    we may not get there, right?

 7                    AMY BARTLETT:  Right.

 8                    ATTY. BECKER:  Because the first

 9    thing that we have to do, and the first part of this

10    trial is going to be Mr. Bailey and myself proving

11    her guilty beyond a reasonable doubt, and we not

12    only have to prove her guilty of the aggravated

13    murders, because if you found her guilty of the

14    aggravated murders, we wouldn't go to this phase

15    unless you also find her guilty of what's called

16    specifications.  You could find her guilty and the

17    Judge is going to tell you that you can find her

18    guilty -- there are four counts, you can find her

19    guilty of aggravated burglary, aggravated robbery,

20    two aggravated murder counts, even though there is

21    only one death, and we will talk about that a little

22    bit later.

23                    AMY BARTLETT:  Okay.

1          ATTY. BECKER:  And you could find

2     her not guilty of some various specifications.  And

3     if you did that, or if you found her not guilty of

4     the aggravated murders, or if you found her not

5     guilty of everything, we all go home at the end of

6     the case.  You don't have to determine the

7     punishment.  Mr. Bailey and I will go back to our

8     office and worry about other cases and other crimes

9     and other defendants.  And Mr. Ingram and Mr. Juhasz

10    will go back to their offices and Miss Roberts goes

11    home.  So, you understand that there is a

12    possibility that we may never get to the death

13    penalty phase?

14          AMY BARTLETT:  Yeah.

15          ATTY. BECKER:  You wouldn't shirk

16    your responsibility in the guilt phase because you

17    didn't want to get to that decision of having to

18    decide the death penalty, would you?

19          AMY BARTLETT:  No.

20          ATTY. BECKER:  You wouldn't say,

21    boy, I can't find her guilty because I know that if

22    I find her guilty, we're going to have to go into

23    the second phase and then I'm really going to be

1     worried because I have to worry about the death

2     penalty.  You wouldn't do that either, would you?

3                    AMY BARTLETT:  No.

4                    ATTY. BECKER:  Now, one of the

5     reasons that we have do it this way, and ask you,

6     even though we may never get there is because once

7     the case starts, and once you are seated in this

8     jury box and once the case gets started and once we

9     put our first witness in the witness chair where

10    you're sitting at, Mr. Bailey and I, and Mr. Ingram

11    and Mr. Juhasz, we can't speak to you anymore.

12                   AMY BARTLETT:  Right.

13                   ATTY. BECKER:  If we see you at a

14    restaurant or see you in the hallway, or at the

15    drinking fountain or getting on the elevator, we

16    can't talk to you, in fact, we can't turn around,

17    Mr. And Bailey and I, and say, hey Miss Bartlett,

18    what did you think of that last witness?  Should we

19    have asked them this, or what do you think your

20    opinion is going to be of this next witness.  We

21    couldn't do that, do you understand.  It's part of

22    our ethical obligation.

23                   AMY BARTLETT:  Yeah.

1                    ATTY. BECKER:  And would look like

2       we're tainting the jury.

3                    AMY BARTLETT:  Right.

4                    ATTY. BECKER:  The only time that

5       we can talk to you is during opening statements, and

6       closing arguments, and even then, you can't speak to

7       us, we can only speak to you.

8                    AMY BARTLETT:  Right.

9                    ATTY. BECKER:  So, if you're

10      selected for this jury, it's real important that we

11      know your feelings because if we get in the first

12      phase, we can't have a jury say, okay, she's guilty,

13      we found her guilty of these terrible crimes and

14      also these specifications which would get us to the

15      death penalty phase.  And someone says, well, wait a

16      minute, one of the jurors says, well, I'm a very

17      religious person, I can't give the death penalty,

18      and then we would have to start all over again.

19                   AMY BARTLETT:  Okay.

20                   ATTY. BECKER:  So, you understand

21      the reasons that we're asking you these questions is

22      for the just in case.

23                   AMY BARTLETT:  Uh-huh.

1              ATTY. BECKER:  You're not taking

2      the fact that I am speaking to you about the death

3      penalty as any kind of indication that Miss Roberts

4      is guilty, do you?

5              AMY BARTLETT:  No, no.

6              ATTY. BECKER:  And you're not going

7      to hold that against her, the fact that we have

8      talked about this?

9              AMY BARTLETT:  No.

10             ATTY. BECKER:  Now, I don't know

11     how much you follow and how much you know about the

12     criminal justice system.  And, again, there is no

13     right or wrong answers, some people don't know

14     anything about it and other people might say they

15     watch crime T.V., watch Law and Order.

16             AMY BARTLETT:  Right, they know it

17     all.

18             ATTY. BECKER:  Right, they know

19     everything, yes.  So -- or at least they think they

20     do.

21             AMY BARTLETT:  Right.

22             ATTY. BECKER:  And some times

23     they're the worst jurors to ask because they think

1 they know everything.

2      AMY BARTLETT: Yes.

3      ATTY. BECKER: You've heard or I'm

4 assuming that you heard of the concept of the

5 presumption of innocence, that the criminal

6 defendant is presumed innocent until their guilt is

7 proven beyond a reasonable doubt, right?

8      AMY BARTLETT: Right.

9      ATTY. BECKER: And as we sit here

10 today on April 30th, the last day of April of this

11 year, you can't find Miss Roberts guilty of anything

12 because you have not heard one bit of evidence,

13 correct?

14      AMY BARTLETT: Correct.

15      ATTY. BECKER: And we may go

16 through an entire trial of maybe three weeks, Mr.

17 Bailey and I may present to you witness after

18 witness after witness, and we may have four or 500

19 exhibits, but it may not convince you beyond a

20 reasonable doubt that Miss Roberts is guilty of

21 anything, correct?

22      AMY BARTLETT: Right, right.

23      ATTY. BECKER: And you understand

1     that concept of presumption of innocence means that,

2     we, Mr. Bailey and I, we have to prove our case.

3     Miss Roberts doesn't have to do anything.

4                      AMY BARTLETT:  Right.

5                      ATTY. BECKER:  You understand that?

6                      AMY BARTLETT:  Yes.

7                      ATTY. BECKER:  Do you agree with

8     that concept?

9                      AMY BARTLETT:  Yeah.

10                      ATTY. BECKER:  And it's a little

11     bit like, and sort of the way our system works is,

12     our system basically works under the philosophy of,

13     it's much worse to put an innocent person in jail or

14     to punish an innocent person than it is to set the

15     guilty person free, so we want to give every person,

16     including Miss Roberts the benefits that you and I

17     would expect, if seated over there and accused of

18     these terrible crimes, right?

19                      AMY BARTLETT:  Correct.

20                      ATTY. BECKER:   And you will be

21     able to do that, right?

22                      AMY BARTLETT:  Yes.

23                      ATTY. BECKER:  Criminal cases in

1    Ohio, for the most part, there are a few exceptions,

2    but for the most part, they start out with a piece

3    of paper called an indictment, and an indictment is

4    usually issued by a body -- or is always issued by a

5    body called the grand jury.  And the grand jury is

6    different than this jury you are going to serve on.

7    The grand jury is selected from voters, and they

8    meet downstairs on the second floor in the grand

9    jury of this Courthouse, and every Courthouse in the

10   State of Ohio, all 88 Counties have a grand jury

11   system, and the grand jury considers cases based on

12   completely different standards, their standard is,

13   is it more likely or not, or is it probable that

14   this person committed the crime and are these --

15   well, first of all, was a crime committed, and did

16   the person that the State is saying committed the

17   crime, do it.  And they just worry about whether

18   it's more likely or not.  They don't concern

19   themselves with reasonable doubt, which is a much

20   higher standard.

21              AMY BARTLETT:  Okay.

22              ATTY. BECKER:  And a grand jury,

23   and the grand jury that heard this case, only heard

1    the State's side, only heard Mr. Bailey and I's

2    side.

3                    AMY BARTLETT:  Okay.

4                    ATTY. BECKER:  Mr. Juhasz and Mr.

5    Ingram were not there, they didn't get to speak,

6    they didn't even get to come into the room.  Miss

7    Roberts was not there, she was not invited, she

8    didn't get to speak, only the police version and the

9    prosecution version of the story was presented.  In

10   fact, at the grand jury, a Judge isn't even present

11   in the room.  There is no Judge in the room with us.

12   And really all that process is, it creates the piece

13   of paper or the indictment that gets the whole

14   process going, and it sort of says, okay, you done a

15   crime, here is what we allege you done, here are the

16   crimes that we allege you have committed, and then

17   we start the process, okay, does this person need an

18   attorney.  If they can afford one, they hire their

19   own.  If they can't, we hire public defenders for

20   them.  We give what is called discovery, we give the

21   information that we have, pictures, photographs,

22   fingerprints, blood, all of that stuff, and we say

23   here is what we recovered, here is what we say is

1    guilty, makes your client guilty.  And the defense,

2    they may present to us, they're required to, but

3    they may say to us, here are our witnesses, and they

4    are going to say, for instance, if it's an alibi

5    case, here is the guy's ticket that he was in New

6    York City that day, he was away on business, here is

7    a list of three or four people he met in New York,

8    we're going to verify he was in New York City when

9    this crime occurred.  And then it gets to the point,

10   okay, now, can we work out an agreement or a plea.

11   Some cases work out in a plea and some don't, and if

12   they don't, they end up here in this process.  In

13   fact, yesterday, there was a jury trial that

14   concluded downstairs involving a defendant that had

15   a firearm in his car and he was alleged to have a

16   firearm in his car and the jury considered that

17   case.  So, the indictment in the grand jury process

18   is just the accusations, just the piece of paper

19   that really gets the whole process started because

20   you have to have a beginning of every case, right?

21              AMY BARTLETT:  That's right.

22              ATTY. BECKER:  And we're now

23   getting close to the end, we're getting very close

1    to the end, and in fact, the jury will give really

2    the end of the story, and they will determine what

3    really happened between the two parties, what the

4    accusation is as it applies to Miss Roberts, okay?

5              AMY BARTLETT:  Okay.

6              ATTY. BECKER:  The fact that Miss

7    Roberts is indicted, do you consider that for any

8    purpose of her guilt or innocence?  You understand

9    it's just the process by which we got it to this

10   point?

11             AMY BARTLETT:  Right.

12             ATTY. BECKER:  All right, you won't

13   hold it against her and say, boy, somebody in the

14   grand jury that didn't even hear from her, they

15   thought she must of done something because they

16   issued this piece of paper.  You're not of that mind

17   set, right?

18             AMY BARTLETT:  No.

19             ATTY. BECKER:  You understand that

20   this is just how the process got started?

21             AMY BARTLETT:  Yes.

22             ATTY. BECKER:  Now, the death

23   penalty process is not an automatic.  A lot of

```
 1        people think that if you kill someone in a certain
 2        manner, I think the Court explained this to you, if
 3        you do certain acts in the commission of a homicide,
 4        you have to get the death penalty, and that is one
 5        of the reasons why I want to make sure that you
 6        could impose the death penalty, but now I am going
 7        to ask you the sort of flip side to that coin is,
 8        let's assume that this case, Mr. Bailey and I prove
 9        the allegations, and the allegations are that Miss
10        Roberts was a helper, what we call an aider and a
11        abettor, in the death of Robert Fingerhut, that is
12        the allegation.  Let's assume that we further prove
13        our allegation by showing that there were phone
14        calls and discussions and letters that were written
15        among the two people that were involved, or the one
16        person that was involved and Miss Roberts was
17        alleged to be involved, and now you have discovered
18        and convicted her of aggravated murder with the
19        special circumstance that makes it a death penalty
20        eligible case.  Now, we're in the second phase.  You
21        understand that you automatically don't impose the
22        death penalty, correct?
23                       AMY BARTLETT:  Right.
```

1          ATTY. BECKER:  And you understand

2     that it's not her burden to prove anything to you at

3     that second phase even, right?

4          AMY BARTLETT:  Right.

5          ATTY. BECKER:  And you will fairly

6     consider all four of the options that I think the

7     Court gave you on a piece of paper, did you get that

8     today?

9          AMY BARTLETT:  Yeah, I did.  I read

10    it today.

11         ATTY. BECKER:  So you understand

12    that there is four options if we get to that second

13    phase.  There is death, life with no parole, life

14    with parole after 30 years in prison, and life with

15    parole after 25 years, right?

16         AMY BARTLETT:  Right.

17         ATTY. BECKER:  You will be a fair

18    juror and consider all four of those options?

19         AMY BARTLETT:  Uh-huh.

20         ATTY. BECKER:  And you will only

21    consider the death penalty if Mr. Bailey and I prove

22    to you beyond a reasonable doubt that the bad things

23    outweigh the good things?

1                           AMY BARTLETT:  Right.

2                           ATTY. BECKER:  Do you have any

3       questions so far?

4                           AMY BARTLETT:   No, I'm good.

5                           ATTY. BECKER:  Am I making this

6       clear as mud or --

7                           AMY BARTLETT:   Yes, it is.

8                           ATTY. BECKER:  Do you kind of

9       understand it?

10                          AMY BARTLETT:  Yes, I'm feeling

11      better because I understand better.

12                          ATTY. BECKER:  Okay.  And I am

13      going to tell you right now, there are a lot of

14      attorneys around, and I'm sure if you pick up the

15      phone book, and there is a good quarter inch, or

16      half an inch thick of attorneys, and you could

17      probably knock on every other door downtown and you

18      will see attorneys names on the door, particularly,

19      because we're near the Courthouse and stuff.  And

20      Mr. Bailey and I, and Mr. Juhasz and Mr. Ingram,

21      we're criminal attorneys.  We have been doing this

22      for a long time, we have been in these kind of cases

23      before.  But there are attorneys, for instance, that

1    do taxes or the civil guys that sue each other on

2    T.V., the guys you see on T.V. all the time.

3                    AMY BARTLETT:  Yeah.

4                    ATTY. BECKER:  They don't know

5    anything about this, they don't know the process, if

6    you ask them if you find a person guilty of a

7    capital murder, what is the penalty, oh, it's

8    automatically the death penalty.  Well, no it's not

9    automatically the death penalty.  You understand

10   that even attorneys don't understand or even worry

11   about this concept other than attorneys like

12   ourselves?

13                   AMY BARTLETT:  Yeah, okay.

14                   ATTY. BECKER:  So, don't feel bad

15   if you didn't know this coming in because a lot of

16   attorneys that went to law school, they don't know

17   either.

18                   AMY BARTLETT:  Good.

19                   ATTY. BECKER:  Now, we talked a

20   little bit about the presumption of innocence, and

21   you don't consider the fact that Miss Roberts is

22   indicted or the fact that we are talking about the

23   death penalty, as any indication that she is guilty

1    of anything, correct?

2                    AMY BARTLETT:  No.

3                    ATTY. BECKER:  Now, let's talk

4    about the other side of that, which is Mr. Bailey

5    and I's obligation.  We have to prove her guilty

6    beyond a reasonable doubt.

7                    AMY BARTLETT:  Right.

8                    ATTY. BECKER:  Now, the Court is

9    going to tell you what reasonable doubt means, and

10   part of the problem with reasonable doubt is, is

11   that we can't put a number on it.  We can't say,

12   well -- the Judge isn't going to say if the State

13   gives you ten witnesses and you believe nine of

14   them, then you have to find her guilty.  It doesn't

15   work like that.  Do you understand?

16                   AMY BARTLETT:   Yes.

17                   ATTY. BECKER:  There are cases

18   where Mr. Bailey and I could prove the Defendant

19   guilty with just one witness, and let me give you an

20   example of that.  Let's say that this afternoon

21   there is an accident on the corner of High Street

22   and Park Avenue.  And on High and Park Avenue, there

23   is a terrible intersection, a big accident there, a

```
 1      guy who was driving a Ford SUV Bronco something,

 2      barrels through the light down at Park Avenue and

 3      Market.  It comes through the red light here at High

 4      and Park Avenue, and hits a guy who is driving from

 5      the Post Office down to the Courthouse on High

 6      Street, driving west to east.

 7                     AMY BARTLETT:  Right.

 8                     ATTY. BECKER:  And the only witness

 9      that Mr. Bailey and I have happens to be the

10      preacher from the local church down here.  Let's say

11      its a Presbyterian Church down here, the pastor down

12      here from the big Presbyterian Church with the big,

13      tall steeple.  And Pastor Smith says, you know, I

14      always walk a six block radius at lunch time

15      everyday.  I've been doing it for ten years.  I'm

16      very familiar with the downtown Warren area, and I

17      pay attention, and I obviously have been a minister

18      for many, many years.  I am well respected in the

19      community, no problem.  And he says, when I walk the

20      streets down here, I have noticed over the years

21      that people some times go through the red lights,

22      they're not paying attention because it's a busy

23      downtown area.  They may be window shopping, or some
```

1    times there is guys that just speed around and don't

2    pay attention.  And I happened to be on this

3    intersection the day of the accident, and I was

4    making my little walk to stay in shape, and I've

5    learned over the years that even if I see the walk

6    light come on on the other side of the street, and

7    even if I see the green light, that I have the

8    right-of-way across from the crosswalk, I don't step

9    out over that curb until I look both ways because I

10   have almost been hit myself a couple of times.  So,

11   as I was there this afternoon and saw this accident,

12   I saw the walk light, I saw the green light, and I

13   saw this car coming at me from High Street, it

14   looked like he came out from the post office.  And I

15   looked to the left, and I didn't see anything coming

16   down, and I looked to the right, and that's when I

17   saw this Ford SUV just blow through the light down

18   on Market and Park Avenue, and he just kept going

19   and he crashed right into the guy.  It was clearly a

20   red light.

21           If Mr. Bailey and I were trying to prove

22   to you that that guy went through the red light,

23   that one witness would probably convince you beyond

1    a reasonable doubt that the guy went through the red

2    light, correct?

3                AMY BARTLETT:  Yeah.

4                ATTY. BECKER:  Now, on the other

5    side of that coin, we could present to you many,

6    many, many, many witnesses who you may not believe

7    because they may have problems.  There is a bar down

8    the street Maddigan's.  I don't know if you're

9    familiar with it?

10              AMY BARTLETT:  No.

11             ATTY. BECKER:  And it's an Irish

12    Bar and I don't know when it opens or when it

13    closes.  But let's say this accident occurred at

14    about 12:00 midnight, and these guys were coming out

15    of Maddigan's, the three of them.  And they've been

16    in a fist fight, two of them wore glasses and one of

17    them had contacts.  The one guy lost his contacts in

18    the fight; the two guys that wore glasses, their

19    glasses got broken, and they left them at Maddigan's

20    because they got into this fight.  They were thrown

21    out of the bar, and they were agitated at the

22    bartender.  They're coming down the road and they

23    see an accident pretty similar to that other

1    accident, or at least they claim they do.  Not one

2    of them can see ten feet in front of them without

3    their glasses or contacts.  They're drunk, they all

4    have been drinking at least 12 or 15 beers.  They're

5    mad because they got thrown out of this bar, and now

6    all of a sudden, the guy that is alleged to go

7    through the intersection and cause the accident, is

8    one of the bouncers who threw him out of the bar and

9    told him to get out.  And the guy who got hit in

10   the accident, let's say, is their cousin who was

11   coming down to Maddigan's to pick them up and to

12   take them home.  Now, if they all say that the guy

13   who was the bouncer went through the light, and

14   yeah, we're certain of it, you have a lot of

15   questions and you're probably not going to find

16   beyond a reasonable doubt that the case is proven,

17   right?

18            AMY BARTLETT:  Right.

19            ATTY. BECKER:  That, in a nutshell,

20   is the kind of thing you have to do as a juror.  Do

21   you feel you are up to that?

22            AMY BARTLETT:  Yes.

23            ATTY. BECKER:  Now, I want to talk

1    to you about this concept called reasonable doubt,

2    and reasonable doubt, the best way it was ever

3    described to me was by a law professor, I had my

4    first year of law school, it's was my criminal law

5    professor, Professor Merritt.  He's a little oddball

6    but he's a very good professor.  And he used to

7    describe it as like that cup of coffee there.

8    Reasonable doubt, -- well, first of all,

9    preponderance of the evidence, which is just who has

10    the more evidence, that is the kind of the standard

11    that you see these guys on T.V. when you sue

12    somebody, you've been injured in an accident, I can

13    get money for you, we're going to fight the

14    insurance companies.

15              AMY BARTLETT:  Right.

16              ATTY. BECKER:  They have to prove

17    their case, in a civil case, when they sue somebody

18    for money, they have to prove their case to the

19    halfway point, plus one drop of water.  That's all

20    they have to prove is just who has more evidence.

21              AMY BARTLETT:  Right.

22              ATTY. BECKER:  Mr. Bailey and I, we

23    have a higher standard.  We have to proof beyond a

1    reasonable doubt.  Now, it's real important that you

2    understand the concept of not all doubt, because

3    everything in life has doubt.

4              AMY BARTLETT:  Right.

5              ATTY. BECKER:  You know, you may

6    have doubts about me as I stand here today.  I have

7    a wedding ring on, I could probably pull out my

8    wallet and show you pictures of my kids and my wife.

9    In fact, they could probably walk in and I could

10   wave at my kids they would say, hi, daddy.  That's

11   probably proof to you enough, and if my wife has a

12   wedding ring on and we stand and talk to each other

13   a little bit, that is probably proof beyond a

14   reasonable doubt that I am married and those are my

15   children.

16             AMY BARTLETT:  Right.

17             ATTY. BECKER:  I could probably

18   also produce a marriage certificate to you, but you

19   might have -- I can't get rid of all doubt because

20   you might think, well, they're just trying to pull a

21   game on me, they're putting rings on their fingers,

22   the kids, they could of come from anywhere, they

23   could have just picked them up anywhere, this

1        certificate they could have given me that to be made

2        up.  So, you have to test the evidence, you have to

3        test it to see if it's reliable.

4                          AMY BARTLETT:  Right.

5                          ATTY. BECKER:  But I can't probably

6        prove to you beyond all doubt that I'm married.

7                          AMY BARTLETT:  Right.

8                          ATTY. BECKER:  I mean, it would be

9        impossible for me to prove to you beyond a

10       reasonable doubt that I am married -- I mean, all

11       doubt that I am married.

12                         AMY BARTLETT:  No.

13                         ATTY. BECKER: So, reasonable doubt

14       is on your coffee cup there probably up to where the

15       lip of that cup is.  It's not to the top because Mr.

16       Bailey and I, we just can't prove it beyond all

17       doubt to you.

18                         AMY BARTLETT:  Right.

19                         ATTY. BECKER:  Are you going to

20       feel comfortable making a determination based on

21       reason and common sense, and beyond a reasonable

22       doubt of someone's guilt in this type of a case,

23       because we're never going to be able to prove to you

```
 1    beyond all doubt that she is guilty.

 2                    AMY BARTLETT:  Yes, it makes me

 3    iffy feeling, but.

 4                    ATTY. BECKER:  You don't think you

 5    could do that?

 6                    AMY BARTLETT:  Well, I can't really

 7    say.  I feel like I --

 8                    ATTY. BECKER:  You need more?

 9                    AMY BARTLETT:  Right.

10                    ATTY. BECKER:  Do you feel that you

11    can't hold us to just the reasonable doubt standard,

12    you are going to have to have more evidence?

13                    AMY BARTLETT:   Well,  --

14                    ATTY. BECKER:   Even though the

15    Court is going to tell you otherwise that we only

16    have to prove our case beyond a reasonable doubt,

17    not all doubt.

18                    AMY BARTLETT:   Yeah.  Yeah, it

19    would be my decision, yeah.

20                    ATTY. BECKER:  Okay, and if we get

21    to this second phase, Mr. Bailey and I, we don't

22    have to prove to you beyond all doubt that the death

23    penalty is the appropriate penalty, just reasonable
```

1    doubt.  Is that going to cause you some problems?

2                        AMY BARTLETT:  It may be hard, but

3    I am sure I could handle it.

4                        ATTY. BECKER:  And you could find

5    -- assuming that we prove our case beyond a

6    reasonable doubt in that second phase, you could

7    sign a death penalty verdict even though there maybe

8    not -- if we can't prove all doubt, you might have

9    some possible doubt or imaginary doubt that that is

10   the appropriate penalty, but you would only hold us

11   to reasonable doubt, right?

12                       AMY BARTLETT:  Right.

13                       ATTY. BECKER:  Because we can't

14   possibly prove to you anything in this case or

15   anything in life beyond all doubt.

16                       AMY BARTLETT:  Right, I know that.

17                       ATTY. BECKER:  But you promise that

18   you are not going to hold us to that standard of all

19   doubt?

20                       AMY BARTLETT:  No.

21                       ATTY. BECKER:  So, you believe

22   that you could find her guilty if we prove it beyond

23   a reasonable doubt.  You could find her guilty of

1    the crimes and the specifications and you could also

2    find her guilty -- I'm sorry, you could also impose

3    the death penalty if we proved beyond a reasonable

4    doubt that that is the appropriate penalty.

5                         AMY BARTLETT:  Yeah.

6                         ATTY. BECKER:   And the aggravating

7    circumstances outweigh the mitigating factors?

8                         AMY BARTLETT:  Yes.

9                         ATTY. BECKER:  You're certain.  You

10   hesitated a little bit so I badgered you a little

11   bit on it.

12                         AMY BARTLETT:  Yeah, that's okay.

13                         ATTY. BECKER:  Are you sure you

14   could do that?

15                         AMY BARTLETT:  Yeah.

16                         ATTY. BECKER:  Now, one of the

17   other things that you are going to have to deal with

18   in this case is the fact that there are four counts,

19   there is an aggravated robbery, aggravated burglary,

20   and then there are two counts of aggravated murder,

21   even though there is only one death in this case.

22   Does that cause you any concern, the fact that there

23   are two death cases, two death charges, it's sort of

1        two different theories.  Do you understand, there is

2        two different theories.

3                         AMY BARTLETT:  Okay.

4                         ATTY. BECKER:   Not two deaths,

5        only one death.

6                         AMY BARTLETT:  Like accidental and

7        --

8                         ATTY. BECKER:  No, no, no, there is

9        no allegation that it's accidental.  There is an

10       allegation that -- the first allegation is that she

11       aided or abetted, or helped this other person cause

12       the death of someone with what we call prior

13       calculation and design, meaning that they planned it

14       is basically what we used to call premeditated

15       murder.  They talked about it, they discussed it,

16       they planned it, they made certain plans, and that

17       is the allegation.

18                         AMY BARTLETT:  Okay.

19                         ATTY. BECKER:  The other allegation

20       is that the death was caused during the commission

21       of an aggravated burglary or an aggravated robbery,

22       that is what we call felony murder.  So, it's sort

23       of like if I go into the bank and I got my gun there

3135

```
1    and I tell my partner, hey, I'm going to get the

2    money out there, and you know what, if they don't

3    give me the money as quick as I need it, I am going

4    to kill the guard.  Well, it's conceivable, if we

5    prove beyond a reasonable doubt the elements, that

6    both parties could be convicted of the crime and

7    both could face the death penalty.

8                   AMY BARTLETT:  Okay.

9                   ATTY. BECKER:  And it's also sort

10   of along the same lines as the other charge is, Mr.

11   Bailey and I, we don't like our boss, and he's not

12   paying us a lot of money, we knock him off, and

13   maybe one of us could be boss across the street, and

14   we could make a lot of money and whoever gets the

15   boss' job, we'll pay the other guy some more money.

16   So, we talk about it and we figure out where our

17   boss is going to be at night, what his routine is,

18   where he goes, and we get together, I drop Mr.

19   Bailey off at one location so he could shoot and

20   kill our boss, and I'm going to pick him up at the

21   other end of the street when he's done with the job

22   and he jumps in the car.  So, that is sort of the

23   other theory of the case, but there are two theories
```

```
 1        of this particular case.  So, do you understand

 2        that?

 3                        AMY BARTLETT:   Yes.

 4                        ATTY. BECKER:  Does that make

 5        sense?

 6                        AMY BARTLETT:  Yeah, that does make

 7        sense.

 8                        ATTY. BECKER:  So, there are two

 9        different ways to prove this case and, again, as I

10        mentioned to you before, you could find her guilty

11        of all of them, both counts, all four counts, and

12        both counts of the aggravated murder, you could find

13        her not guilty of any one of the charges, or you

14        could find her not guilty of all of the charges.

15        But we just have two different theories.  So, the

16        fact that we have two different theories on how the

17        deaths occurred, you don't look at us and say, boy,

18        they must not what the heck they're doing.  We have

19        two different theories here, I don't think they know

20        what's going on.  You don't think that, do you?

21                        AMY BARTLETT:  No, no.

22                        ATTY. BECKER:  And on the other

23        side of the coin, you don't, boy, that Miss Roberts,
```

1      she must be in a world of trouble because she only

2      killed one person or alleged to have killed one

3      person and they're bringing two charges.

4                          AMY BARTLETT:  No.

5                          ATTY. BECKER:  So, you don't think

6      that either?

7                          AMY BARTLETT:  No.

8                          ATTY. BECKER:  Now, this case

9      because it is a homicide case, it really involves

10     the potential death of two people.  You are going to

11     find out about Mr. Robert Fingerhut, who is the

12     decedent in this case.  He is dead.  Obviously,

13     there is a potential that Miss Roberts may die as

14     well at the end of this case, correct?

15                          AMY BARTLETT:  Correct.

16                          ATTY. BECKER:  One of the things

17     that you may find, and you will see photographs of

18     Mr. Fingerhut, photographs of him in a deceased

19     state, you are going to probably hear testimony from

20     doctors describing his injuries, and his manner of

21     death and his cause of death.  Do you believe you

22     will be able to sit through that kind of testimony?

23                          AMY BARTLETT:  Uh-huh.

1            ATTY. BECKER:   You understand that

2    as hard as it may be, you cannot be sympathetic to

3    either party.

4            AMY BARTLETT:  Right.

5            ATTY. BECKER:   It may be hard and

6    you may look at these photographs and you may hear

7    the medical testimony from the Trumbull County

8    Coroner's Office, and say, boy, that was a terrible,

9    terrible, way to die.  I feel so sorry for that man,

10   or I feel so sorry for his family.  You know Mr.

11   Bailey and Mr. Becker didn't prove their case, but I

12   can't let her walk out of here knowing what I just

13   seen and heard, so I am going to find her guilty,

14   you wouldn't do that, would you?

15           AMY BARTLETT:  No.

16           ATTY. BECKER:   And on the other

17   side of the coin is, you may sit here two or three

18   weeks, and you are going to see her throughout these

19   two or three weeks, and you are going see and hear

20   things about her, statements that she made, you will

21   actually hear her voice in some tape-recorded

22   conversations, you're not going to say to yourself,

23   boy, she seems like such a nice old lady over there,

1    she seems so quiet, so reserved, and she looks kind

2    of dignified to me, I can't possibly, you know, find

3    her guilty and impose this terrible penalty upon her

4    even though Mr. Bailey and Mr. Becker have proven

5    their case beyond a reasonable doubt.  She just

6    seems like such a nice lady.  I've seen her talking

7    to the deputies and her attorneys, and she looks

8    like such a nice sweet, old lady, and I couldn't

9    impose the death penalty.  You wouldn't do that,

10   would you?

11              AMY BARTLETT:  No.

12              ATTY. BECKER:   So, you won't

13   consider sympathy for either party?

14              AMY BARTLETT:  No.

15              ATTY. BECKER:  Now, one of the

16   things that you are going to hear in this case, and

17   I am anticipating that you are not only going to see

18   and hear, are a number of exhibits that include

19   telephone calls as well as letters, and some of

20   those calls are very explicit sexually, they have

21   some very -- I don't know how to describe it, it's

22   very vivid acts described and discussed on those

23   tapes and in those letters, you wouldn't find her

1      guilty just because of what her sexual preferences

2      were or what her sexual activity was, correct?

3                      AMY BARTLETT:  No.

4                      ATTY. BECKER:  Because you

5      understand that really -- in a way, it has nothing

6      to do with this case in terms of the crime charged,

7      it may show some other things, but we're not here

8      charging her with engaging in lewd behavior or

9      immoral or sexual acts.  It may show some other

10     things that Mr. Bailey and I think, but you are not

11     going to convict her because you hear or see these

12     letters or phone calls?

13                     AMY BARTLETT:  No.

14                     ATTY. BECKER:  All right, every

15     criminal case has an element of, just about every

16     criminal case really, has what we call

17     circumstantial evidence in it.  And circumstantial

18     evidence is facts that you can make inference from,

19     and one of the easiest ways to describe it usually

20     is considering the fact that perhaps, I don't know,

21     did you say you watch the news some times?

22                     AMY BARTLETT:  Local news.

23                     ATTY. BECKER:  What channel do you

1    watch?

2                    AMY BARTLETT:  21.

3                    ATTY. BECKER:  I assume that you

4    some times watch the weather?

5                    AMY BARTLETT:  Uh-huh.

6                    ATTY. BECKER:  And I don't know

7    what time, do you watch the late news, 11:00 o'clock

8    or 6:00?

9                    AMY BARTLETT:   Early, 11:00.

10                    ATTY. BECKER:  Did you say 11:00

11   o'clock?

12                    AMY BARTLETT:  Yeah, that's early

13   to me.

14                    ATTY. BECKER:  Okay, so you watch

15   the 11:00 news, and some times you want to know what

16   the weather is going to be like, maybe you have

17   plans for the next day, and you go to bed at night

18   and you're there watching the news and the weather

19   comes on at 11:15 or whatever time the weather comes

20   on, and they have the guy on the weather, I don't

21   know if 21 is Stan Boney, so you have Stan Boney up

22   there and he's there in front of the big screen with

23   all of the weather, and he shows you the radar,

1    triple 21 Doppler radar special stuff, whatever, and

2    you see a big line of green and yellow patches, it's

3    just a string of green and yellow that runs pretty

4    much across Lake Erie all the way down to

5    Cincinnati, and it looks like it's on the other side

6    of Cleveland and Akron, but it's moving, he shows

7    how it's moving maybe 20 miles an hour.  And he

8    says, listen, we're going to get some rain tonight,

9    it's really going to rain hard and you might get an

10   inch of rain.  But it will be fine in the morning,

11   and you say, thank goodness because I got these

12   great outdoor plans tomorrow, it will be 75 degrees,

13   I can go outside.  So, you go to bed, and before you

14   go to bed, you close your garage door, or maybe your

15   car is parked on the driveway, and  say, well, I

16   will roll up the windows and close my sun room and

17   do whatever it is that might get my car wet and you

18   look out and there's not a cloud in the sky and

19   maybe a few wispy clouds out to the west, and you go

20   to bed.  Now, you wake up in the morning and you

21   hear either water running down your gutter, you hear

22   it going down the drain sprouts.  You look out and

23   you hear the birds chirping and the sun is out, but

```
 1        the driveway is soaked in water, and sidewalks are

 2        covered in water, the gutter has water rushing down

 3        into the sewer.  You didn't see it rain,  right?

 4                        AMY BARTLETT:  No.

 5                        ATTY. BECKER:  But you can assume

 6        that it rained, right?

 7                        AMY BARTLETT:  Right.

 8                        ATTY. BECKER:  You can make that

 9        inference?

10                        AMY BARTLETT:  And in this case,

11        some times, as in all criminal cases and civil

12        cases, you may have to make those kind of

13        inferences, you may have to assume one fact from

14        other facts.  Do you think you will be able to do

15        that?

16                        AMY BARTLETT:  Yes.

17                        ATTY. BECKER:  And you think you

18        will be able to determine the guilt or innocence of

19        a criminal defendant, including imposing the death

20        penalty, if the case has been proven to beyond

21        reasonable doubt, based on some circumstantial

22        evidence?

23                        AMY BARTLETT:  Right.
```

1       ATTY. BECKER: Because the Court is

2 going to tell you that circumstantial evidence and

3 direct evidence have the same weight, okay?

4       AMY BARTLETT: Yes.

5       ATTY. BECKER: And you understand

6 that the police can't be everywhere?

7       AMY BARTLETT: Right.

8       ATTY. BECKER: There are crimes

9 committed all of the time that you have to put it

10 together later on, and you have to say, well, we

11 don't have anybody that is going to come in say,

12 well, I was standing in the window on the third

13 floor, and I looked down and I saw the bank robbers

14 go in there, and I know him, and I used my

15 binoculars, and things happened, and they're not

16 seen by witnesses, correct?

17       AMY BARTLETT: Right.

18       ATTY. BECKER: So, some times you

19 have to rely upon things that were said or things

20 that were done prior to and after a crime was

21 committed, right?

22       AMY BARTLETT: Right.

23       AMY BARTLETT: And those things

3145

1      point to guilt or innocence, right?

2                    AMY BARTLETT:   Uh-huh.

3                    ATTY. BECKER:   You will be able to

4      make those inferences, right?

5                    AMY BARTLETT:   Yes.

6                    ATTY. BECKER:   Now, the last thing

7      that I want to touch upon is, -- all right, some

8      times in criminal cases that you may hear about or

9      maybe you seen on the news, they're sort of the dumb

10     criminal, you've heard of the criminal, and one of

11     the examples that I know has happened, I can't

12     recall the case, but a guy goes into the bank and

13     he's going to rob it.  Now, he and his partner

14     planned for weeks about committing this robbery,

15     they figure out when the money truck comes to take

16     the money out of the bank, they know it comes like

17     at 4:30 every Thursday.  They know when the police

18     change their shift, and they know the police

19     department is on the other side of town and all of

20     the police go to the station to check out and the

21     new ones are coming in, so they will be safe because

22     all of the police will be in that other part of

23     town.  They get their car, a get-away car, they get

1       it tuned up, they get their tires checked, they make

2       sure they have a good get away route, they make sure

3       the traffic is not going to be too busy for them to

4       cut through and get back to the house where they

5       divy up the cash.  They take all of these

6       precautions, they take precautions about the guy

7       buys a big baseball hat that pulls down and makes

8       sure he looks good and wears dark sunglasses, and

9       he's going to put on his fake beard that looks real,

10      but it's a really nice looking beard, and when they

11      get out, they are going to have a certain place

12      where they're going to go, they know a guy that has

13      a bon fire every Thursday, and they're going to drop

14      by and throw all of that stuff in there without

15      anybody seeing it catch on fire.  The guy goes in

16      there and he commits the robbery, and he goes in

17      there with his glasses and his fake beard and his

18      hat, and he gives the teller the note, and the note

19      says, give me all of the money quick, and no one

20      will get hurt, and I have gun.  And the guy kind of

21      lifts his jacket and the teller sees the gun, and

22      she gets all of the money.  And the guy gets the

23      money, and he leaves, and he and his partner take

1    off where they're going to go back and count this

2    money at.  And the police come and they turn over

3    the note and they look at it, on the other side of

4    the note, here it turns out it's a letter that this

5    guy had sent to his address, and it's the same

6    address where they're at.  So despite all of the

7    planning they made, they screwed up.  They made a

8    mistake.

9              AMY BARTLETT:  Uh-huh.

10             ATTY. BECKER:  You believe that

11   happens a lot of times, or you seen that or heard of

12   that, things like that happening in criminal cases?

13             AMY BARTLETT:  Yes.

14             ATTY. BECKER:  So, sometimes the

15   best laid plans, they don't work out.

16             AMY BARTLETT:  Right.

17             ATTY. BECKER:  And I assume that

18   you heard the saying, the best laid plans can go

19   astray or fall apart or whatever?

20             AMY BARTLETT:  Right.

21             ATTY. BECKER:  Is there anything

22   that I have asked you this morning, or we talked

23   about, you don't understand, or you feel that you

1    won't be able to perform your duty, or anything like

2    that?

3                        AMY BARTLETT:  No, I feel fine,

4    confident.

5                        ATTY. BECKER:  So, you feel more

6    comfortable now?

7                        AMY BARTLETT:  Definitely.

8                        ATTY. BECKER:  Okay, and it's

9    going to be a monumental task, you understand that?

10                       AMY BARTLETT:  Yes.

11                       ATTY. BECKER:  And it's going to be

12   a difficult decision.  The fact that you may

13   understand it now doesn't mean that it's going to be

14   any easier, right?

15                       AMY BARTLETT:  Right.

16                       ATTY. BECKER:  It's still going to

17   be a very difficult case, because it does involve

18   the death of an individual, and the potential death

19   of the defendant in this case, correct?

20                       AMY BARTLETT: Right.

21                       ATTY. BECKER:  But if Mr. Bailey

22   and I prove our case beyond a reasonable doubt, not

23   all doubt, you will find her guilty of the crimes

1    charged, correct?

2                    AMY BARTLETT:  Uh-huh.

3                    ATTY. BECKER:   If we fill up that

4    glass to the lip or to where that ridge is, not

5    necessarily to the top, wherever you're comfortable

6    with where reasonable doubt is, you will find her

7    guilty, correct?

8                    AMY BARTLETT:  Correct.

9                    ATTY. BECKER:   And if we get to

10   the second phase and in both phases, you will be

11   able to consider circumstantial evidence, even

12   someone may not have seen anything, you will be able

13   to make an inference from the facts that may point

14   to her guilt or innocence, correct?

15                   AMY BARTLETT:  Correct.

16                   ATTY. BECKER:   You will be able to

17   consider this case without sympathy for either Mr.

18   Fingerhut, who is deceased, or Miss Roberts,

19   correct?

20                   AMY BARTLETT:  Correct.

21                   ATTY. BECKER:   You will decide

22   this case and give her the presumption of innocence

23   that she is entitled to under the law, correct?

1              AMY BARTLETT:  Correct.

2              ATTY. BECKER:  And if we get to

3    the point where we prove our case beyond a

4    reasonable doubt and we prove her guilty, if we get

5    to that second phase, and we prove the aggravating

6    circumstances and the bad things outweigh the good

7    things, you will be able to go back in that jury

8    room and sign with your fellow jurors a piece of

9    paper that will call for the death penalty for this

10   defendant, correct?

11             AMY BARTLETT:  Correct.

12             ATTY. BECKER:  Okay, I want to

13   thank you, very much, for your answering these

14   questions this morning and Mr. Juhasz or Mr. Ingram

15   will ask you some questions.  Thank you.

16             AMY BARTLETT:   Thank you.

17             THE COURT:  Mr. Ingram.

18   **EXAMINATION BY ATTORNEY INGRAM:**

19

20             ATTY. INGRAM:  Good morning, Ms.

21   Bartlett, how are you?

22             AMY BARTLETT:  Not bad.  How are

23   you?

3151

1                    ATTY. INGRAM:  Good.  My name is

2    Jerry Ingram, and this is John Juhasz.  John and I

3    share the responsibility of representing Donna

4    Roberts who is on trial for her life.

5                    AMY BARTLETT:  Uh-huh.

6                    ATTY. INGRAM:  And as I am sure you

7    can imagine, we take our responsibilities very

8    seriously.

9                    AMY BARTLETT:  Uh-huh.

10                    ATTY. INGRAM:  And feel that we

11   should take every reasonable precaution in selecting

12   a fair minded jury, the same type of jury that you

13   or I would want if we were on trial.  Does that

14   sound fair enough to you?

15                    AMY BARTLETT:  Very, yes.

16                    ATTY. INGRAM:  There are some

17   ground rules of our conversation here, and Mr.

18   Becker already went over many of those with you.  I

19   have to candidly tell you, I have two boys; one is a

20   year older than you, and one is a year younger than

21   you, and while you're far more mature than they are,

22   I cannot imagine them coming and sitting here and

23   answering these questions.  I'm sure it's not easy

```
 1      for you, and I want you to understand that we all

 2      are aware of that.

 3                       AMY BARTLETT:  Okay.

 4                       ATTY. INGRAM:  As a matter of fact,

 5      if you took this notebook and you stood up here and

 6      asked me to sit there, you could page through here

 7      and ask me questions that I am going to ask you, and

 8      I would have a hard time answering many of these

 9      questions.

10                       AMY BARTLETT:  Okay.

11                       ATTY. INGRAM:  So, if you need

12      some time to think, please take it and let me know,

13      okay?

14                       AMY BARTLETT:   All right.

15                       ATTY. INGRAM:  The other thing is,

16      if at any point in time I ask you a question that

17      you don't understand, that is my fault.

18                       AMY BARTLETT:  Okay.

19                       ATTY. INGRAM:  What that means is,

20      I have once again, in my customary fashion, failed

21      to make myself clear, and that is probably going to

22      happen.

23                       AMY BARTLETT:  Okay.
```

1              ATTY. INGRAM:  So, if that does,

2     stop me and let me know, and I will do my best to

3     rephrase the question.  Fair enough?

4              AMY BARTLETT:  Yes.

5              ATTY. INGRAM:  This process you are

6     going through is a lot like a job interview, except

7     when you went to CVS to get the job, you chose to go

8     apply for the job.

9              AMY BARTLETT:  Right.

10             ATTY. INGRAM:  Here, somebody spun

11    the jury wheel, and I don't know how you look at it,

12    whether you were lucky or unlucky, your name was

13    pulled out and we summons you here.  But we're

14    interviewing you for a job.  It may be a short term

15    job, but it's a job, and it's an important job.

16    Actually, it's one of the most important jobs I can

17    think of.  It's the job of finding the truth and

18    determining perhaps the fate of another person.

19    When we first talked to you back on April 8th.

20             AMY BARTLETT:  Uh-huh.

21             ATTY. INGRAM:  You were hesitant

22    about assuming those responsibilities?

23             AMY BARTLETT:  Yes.

1           ATTY. INGRAM:  You now feel

2     confident in assuming those responsibilities?

3           AMY BARTLETT:  Yeah.

4           ATTY. INGRAM:  Can you explain the

5     conversation that you had with yourself about those

6     responsibilities?  Does that question make sense to

7     you?

8           AMY BARTLETT:  Yeah, just, you

9     know, taking and thinking my own -- it's hard.

10          ATTY. INGRAM:  I understand it's

11    hard, just give us your best attempt.

12          AMY BARTLETT:  Yeah, if I were the

13    one was getting, you know, tried, would I want

14    myself, yes.  I think I would be a good juror, and I

15    think that I am fair, the way I think, and all of

16    that.

17          ATTY. INGRAM:  Fair enough.  In a

18    nutshell, this case boils down to the government's

19    allegation that Donna Roberts plotted or conspired

20    with a male companion by the name of Nate Jackson to

21    cause the death of Robert Fingerhut.  Donna and

22    Robert Fingerhut were divorced but they continued to

23    work with one another at the Greyhound Bus Station

1    in Warren and Youngstown, and to live with one

2    another in Howland Township.  Do you understand that

3    this case is about the guilt or innocence of one

4    person and one person only?

5              AMY BARTLETT:  That's right.

6              ATTY. INGRAM:  And that's Donna

7    Roberts.  Throughout the course of these

8    proceedings, you will hear the name Nate Jackson,

9    and you may conclude that Nate Jackson did what the

10   State says he did.

11             AMY BARTLETT:  Uh-huh.

12             ATTY. INGRAM:  The issue you're

13   here to determine is not whether Nate Jackson did

14   it, the issue you are here to determine is whether

15   Donna Roberts helped him.  Do you understand that?

16             AMY BARTLETT:  Yes, I do.

17             ATTY. INGRAM:   Mr. Becker told you

18   about some sexually explicit evidence that you may

19   see or hear.

20             AMY BARTLETT:  Uh-huh.

21             ATTY. INGRAM:  Even though you may

22   be offended by that evidence, you are sort of going

23   to have to rise above the offense and test that

1    evidence to determine whether it ties Donna to this

2    offense.  Do you think you're up to that?

3                    AMY BARTLETT:  Yes.

4                    ATTY. INGRAM:   And I think you

5    have a handle on this, but you understand the

6    allegation here is murder, not loose morality?

7                    AMY BARTLETT:  That's right.

8                    ATTY. INGRAM:   Donna denies that

9    she participated by conspiracy plot or otherwise in

10   the death of Robert Fingerhut.  Would you have the

11   courage to acquit, that is, vote not guilty if you

12   felt that a not guilty verdict was warranted by the

13   evidence?

14                    AMY BARTLETT:  Yes.

15                    ATTY. INGRAM:   And you have been

16   asked a lot of questions while you were sitting

17   there about what you would do when you went back in

18   that room, if you would sign a death verdict, if you

19   would sign a guilty verdict.  Do you understand that

20   nobody is asking you to prejudge this case?

21                    AMY BARTLETT:  Right.

22                    ATTY. INGRAM:   You don't know any

23   of the facts, you can't really say what you would

1    do, can you?

2                    AMY BARTLETT:  Right.

3                    ATTY. INGRAM:  You have not seen,

4    read or heard anything about this case, am I

5    correct?

6                    AMY BARTLETT:  Correct.

7                    ATTY. INGRAM:  When we last talked

8    back on April 8th, we were in the big Courtroom at

9    the other end of the hall.  When you got there that

10   morning, when you entered the Courtroom, did you go

11   to your left or to your right?  Do you remember?

12                   AMY BARTLETT:  To my right.

13                   ATTY. INGRAM:  Did you sit or did

14   you stand?

15                   AMY BARTLETT:  Stand.

16                   ATTY. INGRAM:  Did anyone else who

17   was there say anything to you about this case at

18   all?

19                   AMY BARTLETT:  No.

20                   ATTY. INGRAM:  Did you overhear

21   anyone talking about this case?

22                   AMY BARTLETT:  Yeah, but I didn't

23   really listen.

1       ATTY. INGRAM:  Okay, are you able

2 to summarize for me what you heard, though?

3       AMY BARTLETT:  Well, that they read

4 in the newspaper that just a death and who may --

5 that's pretty much it.

6       ATTY. INGRAM:  Who may of been

7 involved?

8       AMY BARTLETT:  Right, or, you know,

9 the death of Fingerhut.  That's pretty much what I

10 heard.

11       ATTY. INGRAM:  Was it one person

12 saying this, or more than one person saying this?

13       AMY BARTLETT:  I think just a few

14 women.

15       ATTY. INGRAM:  Were they speaking

16 in conversational tones or voices so that people

17 within ear shot were hearing them, or were they

18 whispering?

19       AMY BARTLETT:  They were keeping it

20 low, uh-huh.

21       ATTY. INGRAM:  Did anyone express

22 an opinion about this case during that conversation?

23 I am not saying that opinion affected you --

1                    ATTY. BARTLETT:  Right.

2                    ATTY. INGRAM:  -- I want to know if

3       one of the persons speaking said anything about the

4       case?

5                    AMY BARTLETT:  No, they didn't say

6       anything.

7                    ATTY. INGRAM:  Okay.  You will be

8       told, if you are selected, that you have to do your

9       best to avoid news media coverage of this case.

10                   AMY BARTLETT:  Uh-huh.

11                   ATTY. INGRAM:  And first I want to

12      discuss with you the fact that that's easier said

13      than done.

14                   AMY BARTLETT:  Uh-huh.

15                   ATTY. INGRAM:  You know, when

16      you're driving down the street in your car, the

17      radio is not going to have a warning, hey, Miss

18      Bartlett we're about to cover something here, so you

19      better turn your radio off.

20                   AMY BARTLETT:  Uh-huh.

21                   ATTY. INGRAM:  And the same with

22      T.V.  So, what you will have to do is if that

23      happens, you have to turn it off as quick as you

1       can, or go into another room, are you willing to do

2       that?

3                       AMY BARTLETT:  Yes.

4                       ATTY. INGRAM:  Although, I hate to

5       ever mention this trial, a couple of years ago in

6       this Country we had a notorious trial where one O.J.

7       Simpson was the defendant.

8                       AMY BARTLETT:  Uh-huh.

9                       ATTY. INGRAM:  And every night when

10      you turned on the T.V., you would find some hot shot

11      ex-prosecutor sitting in one chair, some high

12      affluent defense lawyer sitting in another chair,

13      and they would describe that day's occurrence in

14      that particular trial.

15                      AMY BARTLETT:  Right.

16                      ATTY. INGRAM:  And depending upon

17      their prospective, they would put a different spin

18      or interpretation on the evidence that had been

19      elicited that day.

20                      AMY BARTLETT:  Uh-huh.

21                      ATTY. INGRAM:  Do you see that one

22      of the jurors in that case should not have been

23      exposed to that type of stuff?

1                    AMY BARTLETT:  Yeah.

2                    ATTY. INGRAM:   Do you agree with

3        that?

4                    AMY BARTLETT:  Yes.

5                    ATTY. INGRAM:   Do you see that

6        it's the same here?

7                    AMY BARTLETT:  Right.

8                    ATTY. INGRAM:   It's only natural

9        for your family, their going to figure out what case

10       you're sitting on, it's just natural that they will

11       figure it out.

12                    AMY BARTLETT:  Okay.

13                    ATTY. INGRAM:   And because of your

14       involvement, they will be a little bit more

15       inquisitive than they ordinarily would have been.

16       So, they're going to pay more attention to the T.V.

17       and the newspaper, and we're all inquisitive, we all

18       want to know what our family members are

19       experiencing, so when you get home one day, they may

20       ask you, hey, what is going on in there, how was it

21       today, or they may even go, let me tell you what I

22       think because I watched the news.

23                    AMY BARTLETT:  Right.

1                  ATTY. INGRAM:  You have to stop.

2                  AMY BARTLETT:  Right.

3                  ATTY. INGRAM:  Are you up to that?

4                  AMY BARTLETT:  Yeah.

5                  ATTY. INGRAM:  You are potentially

6  a capital juror, and what I mean by that, is you are

7  a juror who may have to decide between the death

8  penalty and some life option.

9                  AMY BARTLETT:  Uh-huh.

10                 ATTY. INGRAM:  So, I have to ask

11  you some questions, and I have to try to figure out

12  how you feel about those options, do you understand

13  that?

14                 AMY BARTLETT:  Yes.

15                 ATTY. INGRAM:  And, again, those

16  aren't easy questions to answer because we don't go

17  about our daily lives going, gees, how do I feel

18  about the death penalty, or how do you I feel about

19  life imprisonment.

20                 AMY BARTLETT:  Right.

21                 ATTY. INGRAM:  If I just came

22  straight out and asked you a very hard question,

23  which is, what are your views on capital punishment?

1      Now, if this were an essay test and you were in high

2      school, you would be muttering under your breath at

3      that teacher because that is a difficult question.

4      But I am going to ask it of you anyhow, do you think

5      you can make an attempt to give me an answer?

6                    AMY BARTLETT:  Could you fill me in

7      a little bit on --

8                    ATTY. INGRAM:  Sure.  First, let's

9      back up.

10                   AMY BARTLETT:  Okay.

11                   ATTY. INGRAM:  You read the

12      preliminary instructions that the Judge gave you

13      before you came up here this morning?

14                   AMY BARTLETT:  Uh-huh.

15                   ATTY. INGRAM:  Now, those

16      instructions are not easy to follow.

17                   AMY BARTLETT:  Right.

18                   ATTY. INGRAM:  And as Mr. Becker

19      told you, you could give those instructions to half

20      the lawyers in town and then give them a short quiz

21      on it, and half of the ones that read it, aren't

22      going to pass the quiz.

23                   AMY BARTLETT:  Right.

3164

1            ATTY. INGRAM:  This is potentially,

2    and potentially only, a two-stage process.  The

3    first phase of this process is a trial just like any

4    other trial where the issue is the guilt or

5    innocence of Donna Roberts.

6            AMY BARTLETT:  Uh-huh.

7            ATTY. INGRAM:  And at that trial,

8    if the jury finds Donna not guilty, what happens?

9            AMY BARTLETT:  We all go home.

10            ATTY. INGRAM:  We all go home.  If

11    the jury finds Donna guilty beyond a reasonable

12    doubt of the charge of murder, and a death

13    specification, we will talk more about those, but

14    there are two death specifications to each of the

15    counts of aggravated murder.  Do you think you have

16    a handle on that?

17            AMY BARTLETT:  Uh-huh.

18            ATTY. INGRAM:  In order to get to a

19    second phase, you have to find a defendant guilty of

20    aggravated murder and a death specification.  And,

21    you know, let's change this.  Yesterday, we lost a

22    policeman.  If the person that shot that policeman

23    was tried and convicted of aggravated murder,

```
 1    purposely doing it, let's say premeditated with

 2    advanced planning.

 3                    AMY BARTLETT:  Okay.

 4                    ATTY. INGRAM:  And there is a death

 5    specification and the death specification in that

 6    case would be that it was a policeman who was killed

 7    in the line of duty.  So, yet -- then you would go

 8    to a second phase.  Do you understand how you get to

 9    the second phase?

10                    AMY BARTLETT:  Yeah, innocent or

11    guilty.

12                    ATTY. INGRAM:  Even in the case

13    we're talking about with the death of a policeman,

14    when a capital juror gets to a second phase, all

15    four sentencing options have to start out equal --

16                    AMY BARTLETT:  Uh-huh.

17                    ATTY. INGRAM:  -- in the juror's

18    mind.

19                    AMY BARTLETT:  Okay.

20                    ATTY. INGRAM:  Do you understand

21    that?

22                    AMY BARTLETT:  Yeah.

23                    ATTY. INGRAM:  At that second
```

1   phase, the jury is given guidelines, and they are

2   told that they have to balance the aggravating

3   circumstance or circumstances, and those are

4   basically the death specifications that got you to

5   the second phase in the first place.  Do you

6   understand that?

7                    AMY BARTLETT:  Yeah.

8                    ATTY. INGRAM:  So, in our case with

9   a policeman, the aggravating circumstance -- the

10  aggravating circumstance would be that it was a

11  policeman killed in the line of duty.

12                   AMY BARTLETT:  Uh-huh.

13                   ATTY. INGRAM:  You then balance the

14  aggravating circumstance against mitigating factors,

15  and mitigating factors are positive things that can

16  be said about a Defendant that work against the

17  death penalty.  Do you see that?

18                   AMY BARTLETT:  Uh-huh.

19                   ATTY. INGRAM:  You are told to

20  balance the aggravating circumstances against the

21  mitigating factors, and if you find beyond a

22  reasonable doubt that the aggravating circumstances

23  outweigh the mitigating factors, and that death is

1    the appropriate penalty, then you're instructed that

2    the verdict should be death.  If you do not find

3    beyond a reasonable doubt that the aggravating

4    circumstances outweigh the mitigating factors, then

5    you can consider the life sentence option.

6                   AMY BARTLETT:  Okay.

7                   ATTY. INGRAM:  Do you understand

8    everything that we discussed so far?

9                   AMY BARTLETT:  Yeah.

10                  ATTY. INGRAM:  It only took me four

11   years to try to begin and figure this stuff out.

12   You are doing much better than I did.

13                  AMY BARTLETT:  Okay.

14                  ATTY. INGRAM:  The bottom line is

15   -- the reason we're asking you all of these

16   questions is, I am trying to find out if there is

17   anything about your personal views that would stop

18   you from starting a second phase -- that would stop

19   you from starting a second phase, with all of the

20   four sentencing options equal in your mind.  Am I

21   making sense here?

22                  AMY BARTLETT:  Yes, that does.

23                  ATTY. INGRAM:  There are some

1   people who simply do not believe in life

2   imprisonment as an option -- as an alternative to

3   the death penalty in aggravated murder cases.  And

4   that is fine that they feel that way, but if those

5   thoughts stop them from equally considering all four

6   sentencing options at a second stage, they really

7   can't be fair second stage jurors.

8                   AMY BARTLETT:  Right.

9                   ATTY. INGRAM:  So, how do you feel

10  about life imprisonment as an alternative to the

11  death penalty in murder cases?

12                  AMY BARTLETT:  I don't  --

13                  ATTY. INGRAM:  You don't know?

14                  AMY BARTLETT:  Everything you said

15  made sense to me.

16                  ATTY. INGRAM:  Everything I just

17  said to you does not require that you give me a

18  personal answer.  It's sort of a test on the

19  preliminary instructions.  Now, you sort of have to

20  search your mind and give me answers.  And I will

21  back up and try to ask some different questions and

22  we will see if we can go about it that way, but at

23  some point in time, I may have to pressure and if

1    you were sitting over there and -- first of all, if

2    you were sitting over there you would want to learn

3    about your potential jurors, wouldn't you?

4                    AMY BARTLETT:  Yes.

5                    ATTY. INGRAM:  And would you expect

6    your lawyers to press a prospective juror, if you

7    thought it was necessary?

8                    AMY BARTLETT:  Yeah.

9                    ATTY. INGRAM:  Have you ever heard

10   anyone say, I don't believe in this life

11   imprisonment stuff, because why should we, the

12   taxpayers, have to pay to house these people for the

13   rest of their lives?

14                   AMY BARTLETT:  Yeah.

15                   ATTY. INGRAM:  And if a

16   prospective juror really thought that way and those

17   feelings would prevent the potential juror from

18   fairly considering the life sentence options, that

19   person couldn't be a fair second phase juror.

20                   AMY BARTLETT:  Uh-huh.

21                   ATTY. INGRAM:  Do you have any

22   opinion on this cost issue at all?

23                   AMY BARTLETT:   No.

```
 1                      ATTY. INGRAM:  There has been some

 2       renewed debate in this country about whether or not

 3       we should have a death penalty at all.  The State of

 4       Illinois put on a moratorium because DNA was

 5       indicating that innocent people were on death row.

 6       Were you exposed to any of that debate at all?

 7                      AMY BARTLETT:  No.

 8                      ATTY. INGRAM:  The Supreme Court of

 9       the United States recently decided a case which

10       prohibits the execution of the mentally challenged.

11       Did you see, read, or hear anything about that?

12                      AMY BARTLETT:  I heard -- I think I

13       heard about that.

14                      ATTY. INGRAM:  What did you hear?

15       Can you give me your views on that issue?

16                      AMY BARTLETT:  If they're not

17       mentally stable, then probably life imprisonment

18       because -- or, you know, I don't believe that they

19       should have to die if they really don't understand

20       day to day, or I don't know.

21                      ATTY. INGRAM:  Okay, we're not

22       talking about this case, we're talking about the

23       case I made up with the policeman thing.
```

1                          AMY BARTLETT:  Okay.

2                          ATTY. INGRAM:  You're a second

3      phase juror in that case.

4                          AMY BARTLETT:  All right.

5                          ATTY. INGRAM:  Your oath would

6      require you to go into that second phase with all

7      four of those sentencing options equal in your mind,

8      and what I am really trying to say is that the death

9      penalty couldn't have a head start, even though that

10     was a policeman shot in the line of duty.

11                         AMY BARTLETT:  Uh-huh.

12                         ATTY. INGRAM:  Would you be able to

13     do that in that case?

14                         AMY BARTLETT:  Yes.

15                         ATTY. INGRAM:  That is all I am

16     going to ask you about punishment.  But I want to

17     explain something.  I asked you the questions about

18     punishment with a great degree of hesitation,

19     because, to me, it seems a whole heck of a lot like

20     putting the cart before the proverbial horse.  We're

21     asking you questions about how you feel you might

22     want to punish someone, when you don't even know if

23     that person has done anything wrong.  Do you use

```
 1        your seat belt when you drive?

 2                      AMY BARTLETT:  Yeah.

 3                      ATTY. INGRAM:  When you buckle that

 4        seat belt, do you expect to be in an accident?

 5                      AMY BARTLETT:  No.

 6                      ATTY. INGRAM:  You buckle your seat

 7        belt just in case?

 8                      AMY BARTLETT:  That's right.

 9                      ATTY. INGRAM:  We're not predicting

10        a second phase, we're simply asking you these

11        questions just in case.  Do you understand that?

12                      AMY BARTLETT:  Yes, I do.

13                      ATTY. INGRAM:  And these questions

14        have absolutely nothing to do with Donna's guilt or

15        innocence.

16                      AMY BARTLETT:  Yes, I understand.

17                      ATTY. INGRAM:  In order to be a

18        fair juror, you must be able to presume Donna's

19        innocent, and test the State's evidence just as you

20        would in any other case, and you are up to that,

21        aren't you?

22                      AMY BARTLETT:  Yes.

23                      ATTY. INGRAM:  This incident with
```

1  three black guys trying to take your lawn mower, how

2  long ago was that?

3              AMY BARTLETT:  I was probably --

4  well, it was a woman and two black men, and I don't

5  know if I wrote that, I probably got confused.

6              ATTY. INGRAM:  That's all right.

7              AMY BARTLETT:  But it was probably

8  when I was in maybe seventh or eighth grade.

9              ATTY. INGRAM:  You gave a statement

10 to the police when you were in seventh or eighth

11 grade?

12             AMY BARTLETT:  Oh, no, I didn't

13 make a statement.

14             ATTY. INGRAM:  I thought you said

15 you gave a statement.

16             AMY BARTLETT:  Oh, I did describe

17 what they looked like, okay, I described what they

18 looked like.  And I was up, my father was in his

19 room sleeping, my mom was getting me and my brother

20 up for school, and these two men were picking up the

21 lawn mower.  My mom was like, what are you doing,

22 two lawn mowers.  And he was like, your husband told

23 us to pick them up and go fix them.  They were just

1    fixed, we just got them back like the day before,

2    and Phil was in the family room, which is at the

3    front door, and he saw a woman standing there with

4    her hand in her purse.  And I don't know, she was

5    just standing there, and they ended up getting the

6    lawn mowers because they were just like, no, no,

7    we're suppose to take them and they put them in

8    their truck and drove off.  Called the cops, the

9    cops came and we told them what the color of the

10   trucks and everything was, you know, what they

11   looked like.  And my dad ended up seeing them

12   somewhere when he was on his way to install carpet

13   because my parents own a carpet store.

14                 ATTY. INGRAM:  Okay.

15                 AMY BARTLETT:  And he stopped them

16   and got our lawn mowers back.  And the cops, they

17   seemed to be happy about it.

18                 ATTY. INGRAM:  Is there anything

19   about that experience which would sour you to the

20   criminal justice system?  I wouldn't think so.

21                 AMY BARTLETT:  No.

22                 ATTY. INGRAM:  Have you ever

23   donated time, money or services to a political

1    campaign or issue?

2                         AMY BARTLETT:  No.

3                         ATTY. INGRAM:  Do you belong to any

4    group or organization which is active in any

5    political matter.

6                         AMY BARTLETT:  No.

7                         ATTY. INGRAM:  Well, in the last

8    year or so, have you signed a petition on any public

9    issue?

10                        AMY BARTLETT:  Yeah -- well, what

11   is that?

12                        ATTY. INGRAM:  A petition.

13                        AMY BARTLETT:  For anything?

14                        ATTY. INGRAM:  Yeah.

15                        AMY BARTLETT:  No.

16                        ATTY. INGRAM:  Do you belong to or

17   associate with any group which has crime prevention

18   as a goal?

19                        AMY BARTLETT:  No.

20                        ATTY. INGRAM:  SADD would be such a

21   group.

22                        AMY BARTLETT:  Okay.  No, I am

23   not involved in any.

1                    ATTY. INGRAM:  Mr. Becker talked

2     with you about sympathy, and I am just going to

3     briefly -- you would agree with me that this is

4     court of law and not a court of sympathy?

5                    AMY BARTLETT:  Right.

6                    ATTY. INGRAM:  And sympathy for

7     Donna shouldn't affect your evaluation of the

8     evidence, sympathy for Mr. Fingerhut shouldn't

9     effect your evaluation of the evidence?

10                    AMY BARTLETT:  No.

11                    ATTY. INGRAM:  We -- do you know

12     the reason that we have jurors, because that is a

13     hard job, it's a harder job than we could do.  We

14     ask jurors to do hard things.  And asking you to set

15     aside the feelings of sympathy is probably easier

16     said than done because we're all human, and it's

17     only natural for us to feel sympathy under certain

18     circumstances.

19                    AMY BARTLETT:  Right.

20                    ATTY. INGRAM:  And as Mr. Becker

21     told you, you're going to see some graphic evidence;

22     photographs, a body on the floor, maybe photographs

23     of point blank gunshot wounds.  This evidence may

1    elicit an emotional response from you, you may get

2    angry that somebody would do such a thing, you may

3    feel bad for the person that such a thing was done

4    to him.  But even though this evidence evokes an

5    emotional response, you again have to rise above the

6    emotional response and test the evidence to

7    determine whether it ties Donna to this offense.

8    Are you up to that?

9                    AMY BARTLETT:  Yeah.   At CVS, we

10   also develop Hubbard Police's pictures, and I have

11   had a lot of surprising ones in there, and they say

12   this is -- they warn me, and I say, okay.  I mean, I

13   have seen --

14                    ATTY. INGRAM:  You've seen it?

15                    AMY BARTLETT:  Yeah, and they've

16   got some crazy things too.

17                    ATTY. INGRAM:  For awhile here I am

18   going to talk like a civics teacher.

19                    AMY BARTLETT:  Okay.

20                    ATTY. INGRAM:  I would apologize

21   for that except for the fact that I am going to talk

22   to you about things that I feel very strongly about,

23   so I don't feel bad about sounding like a civics

1    teacher when it comes to these things.

2                    AMY BARTLETT:  Okay.

3                    ATTY. INGRAM:  We have in our

4    country some different ways of doing things and,

5    basically, we, the United States State and Britain,

6    do things a little different than most of the rest

7    of the world.  In this country, when someone is

8    accused by the government of wrongdoing, that person

9    is presumed innocent.

10                   AMY BARTLETT:  Uh-huh.

11                   ATTY. INGRAM:  And the people that

12   wrote our laws, wrote it that way because it was

13   curb or a check of government power.  You know, if

14   you're in Iraq, Aghaganistan or Russia, and you're

15   accused of wrongdoing, you are presumed guilty --

16                   AMY BARTLETT:  Yeah, until proven

17   innocent.

18                   ATTY. INGRAM:  Right.  So my

19   question to you is, how do you feel about this rule

20   of law that requires a trial juror to presume a

21   defendant innocence?

22                   AMY BARTLETT:  It's good, very

23   good.

1                    ATTY. INGRAM:  Do you have brothers

2        or sisters?

3                    AMY BARTLETT:  Yes.

4                    ATTY. INGRAM:  If one of your

5        brothers or sisters were accused of some wrongdoing,

6        doesn't have to be in a court, let's say by one of

7        the neighbors.

8                    AMY BARTLETT:  Okay.

9                    ATTY. INGRAM:  They say they threw

10       an egg at the house.

11                   AMY BARTLETT:  Okay.

12                   ATTY. INGRAM:  Now, first of all,

13       we're going to assume that they're not like my kids,

14       because I would have to assume that they did it, but

15       in this case, you believe in your heart and your

16       mind that your brother or sister didn't do it.

17                   AMY BARTLETT:  Uh-huh.

18                   ATTY. INGRAM:  You would require

19       evidence that he or she did it before you would be

20       willing to change your mind, wouldn't it?

21                   AMY BARTLETT:  Yeah.

22                   ATTY. INGRAM:  Does that sound to

23       you like you were presuming your brother or sister

1    innocent?

2                    AMY BARTLETT:  Yeah.

3                    ATTY. INGRAM:  And when the

4    neighbor came and presented to you evidence, you

5    wouldn't just willy nilly except it at face value,

6    you would probably look at it with a critical eye

7    and determine that it really tied your brother or

8    sister to the egg throwing incident.

9                    AMY BARTLETT:  Uh-huh.

10                    ATTY. INGRAM:  Will you do that in

11    this case, look at the evidence with a critical eye?

12                    AMY BARTLETT:  Yes.

13                    ATTY. INGRAM:  And you already got

14    a handle on this because you already answered this

15    question, but if are presumed guilty, who would have

16    the burden of proof, the defendant would have the

17    proof?

18                    AMY BARTLETT:  Yeah.

19                    ATTY. INGRAM:  Again, that is not

20    the way we do things in this Country.  The State has

21    leveled these accusations, now it's time to put up

22    or shut up.

23                    AMY BARTLETT:  Uh-huh.

1              ATTY. INGRAM:  Do you have any

2     problem with that?

3              AMY BARTLETT:  No.

4              ATTY. INGRAM:  And, obviously, you

5     understand that Donna is on trial for murder, not

6     for being a woman of loose, moral character?

7              AMY BARTLETT:  Yeah.

8              ATTY. INGRAM:  There are four

9     charges here, and those charges are all made up of

10    an essential element.  They are necessary

11    ingredients that the legislature says have to be

12    present for an offense to have been committed.  Do

13    you understand that?

14             AMY BARTLETT:  Yes.

15             ATTY. INGRAM:  At the end of the

16    case, the Judge is going to give you the essential

17    elements, that is his job, not mine.

18             AMY BARTLETT:  Uh-huh.

19             ATTY. INGRAM:  But it's the State's

20    burden to prove every one of those essential

21    elements by proof beyond a reasonable doubt.  Will

22    you hold them to that burden?

23             AMY BARTLETT:  Yes.

1           ATTY. INGRAM:  Now, you think you

2    have a handle on the four charges?  Mr. Becker went

3    over those with you.

4           AMY BARTLETT:  Uh-huh.

5           ATTY. INGRAM:  The two aggravated

6    murder charges; one is -- have you ever heard the

7    word premeditated murder?

8           AMY BARTLETT:  Yes.

9           ATTY. INGRAM:  That, for some

10   reason the legislature is always changing things,

11   and, Lord, I can't figure it out, but premeditated

12   murder is now prior calculation and design.

13          AMY BARTLETT:  Okay.

14          ATTY. INGRAM:  It's advanced

15   planning, so that is one count of murder.  The other

16   one is felony murder, you purposely caused the death

17   of someone while in the commission of a felony.

18   Purpose is an essential element of both of those

19   aggravated murder offenses.  You got that?

20          AMY BARTLETT:  Yes.

21          ATTY. INGRAM:  The Judge will tell

22   you that purpose is the same as intent, which makes

23   sense, doesn't it?

1      AMY BARTLETT: Yeah.

2      ATTY. INGRAM: And a person acts

3 purposely if it is his specific intent to cause a

4 specific result.

5      AMY BARTLETT: Uh-huh.

6      ATTY. INGRAM: Would you agree with

7 me that the facts and circumstances surrounding an

8 act can shed some light on the actors intent?

9      AMY BARTLETT: Wait, can you repeat

10 that?

11      ATTY. INGRAM: Sure. The fact and

12 circumstances surrounding an act, can shed some

13 light on the actors intent.

14      AMY BARTLETT: Uh-huh.

15      ATTY. INGRAM: You sort of have to

16 test the facts and circumstances.

17      AMY BARTLETT: Right.

18      ATTY. INGRAM: For instance, if I

19 were going out there to commit some intentional

20 wrongdoing, would you expect me to try to cover my

21 track or to leave a paper trail.

22      AMY BARTLETT: Cover your tracks.

23      ATTY. INGRAM: And if I was going

1    out there to engage in some intentional wrongdoing,

2    would you expect me to try to do it secretly or

3    would you expect me do it openly?

4                AMY BARTLETT:  Secretly.

5                ATTY. INGRAM:  I am almost done.

6    Because these guys got the burden of proof, Juhasz

7    and I, and  Donna, we don't have to do anything.  We

8    could actually sit on our hands throughout the

9    course of this trial, and they -- if they win it,

10    they win it; if they lose it, they lose it.  Do you

11    remember Mr. Becker's container or was it a glass?

12                AMY BARTLETT:  Glass.

13                ATTY. INGRAM:  It was a glass.

14    They have to pour evidence up to where ever you draw

15    the line of reasonable doubt.  And you understand

16    that it's your determination of where that line is.

17                AMY BARTLETT:  Uh-huh.

18                ATTY. INGRAM:  It could be so close

19    to the top, it could be -- wherever, that is your

20    decision, no one can tell you where to draw that

21    line.

22                AMY BARTLETT:  Yep.

23                ATTY. INGRAM:  And if we don't

```
 1    elect to do anything in this trial, that doesn't
 2    pour anything into that glass, do you see that?
 3                    AMY BARTLETT:  Yes.
 4                    ATTY. INGRAM:  We may ask witnesses
 5    questions to try and take something out of the
 6    glass, but if we don't do anything, we're not adding
 7    anything to the glass.
 8                    AMY BARTLETT:  Uh-huh.
 9                    ATTY. INGRAM:  And Donna doesn't
10    have to testify, and the Judge will tell you that if
11    she doesn't testify, you can't hold it against her.
12                    AMY BARTLETT:  Uh-huh.
13                    ATTY. INGRAM:  How do you feel
14    about that?
15                    AMY BARTLETT:  Yeah, that's fine.
16                    ATTY. INGRAM:  And if she elects
17    not to testify, that's not pouring anything into
18    that glass either.
19                    AMY BARTLETT:  No.
20                    ATTY. INGRAM:  The other side of
21    that coin is if she does testify, she is a witness
22    like any other witness, and to be fair about it, the
23    Judge will tell you that you have to use the same
```

1    rules for determining her credibility and

2    credibility is believability that you do for

3    determining the believability of other witnesses.

4                    AMY BARTLETT:  Yeah, uh-huh.

5                    ATTY. INGRAM:  Like she is the

6    defendant, right?

7                    AMY BARTLETT:  Uh-huh.

8                    ATTY. INGRAM:  So, as a Defendant,

9    she has an interest or stake in the outcome of this

10   case, doesn't she?

11                   AMY BARTLETT:   Uh-huh.

12                   ATTY. INGRAM:  And I would imagine

13   that that is something you would want to keep in

14   mind in determining whether you believe her?

15                   AMY BARTLETT:  Definitely, uh-huh.

16                   ATTY. INGRAM:  All right, well,

17   there are other people that are going to testify,

18   and if you find that one of them also has an

19   interest or a stake in the outcome of this case, you

20   would want to keep that in mind in determining

21   whether to believe them, right?

22                   AMY BARTLETT:  Uh-huh.

23                   ATTY. INGRAM:  And whether any

1  witness has something to gain is something that you

2  might look at, or should look at, correct?

3                    AMY BARTLETT:  Yeah.

4                    ATTY. INGRAM:  And the Judge will

5  give you a whole list of factors, and I am not going

6  to take the time to go through those with you, but

7  you should take those factors, all of them, and

8  apply them to everyone that testifies.  But there is

9  one factor that we have to talk about, and I think

10  he's going to refer to it as the test of

11  truthfulness that you employ in your daily life.

12                    AMY BARTLETT:  Uh-huh.

13                    ATTY. INGRAM:  How about that for a

14  legal phrase?

15                    AMY BARTLETT:  Yeah.

16                    ATTY. INGRAM:  You frequently,

17  whether it's at CVS -- say somebody comes in and

18  says, you got my photos, and you say, no, we don't.

19  You've got to decide all the time whether somebody

20  is being straight with or trying to hoodwink you.

21                    AMY BARTLETT:  Right.

22                    ATTY. INGRAM:  And over the years,

23  although, you haven't had many years --

1                    AMY BARTLETT:  No.

2                    ATTY. INGRAM:  --  but over the

3      years, you've developed a sixth sense or an

4      intuitive sense that helps you in making that

5      determination.

6                    AMY BARTLETT:  Uh-huh.

7                    ATTY. INGRAM:  The Judge is going

8      to tell you to bring that sixth sense, that

9      intuitive sense, but he's going to call it the test

10     of truthfulness that you employ in your everyday

11     life.

12                   AMY BARTLETT:  Right.

13                   ATTY. INGRAM:  Into this Courtroom

14     it must apply to everyone that testifies, will you

15     do that?

16                   AMY BARTLETT:  Yeah.

17                   ATTY. INGRAM:  And Mr. Becker went

18     over the indictment issue and an indictment is not

19     evidence.

20                   AMY BARTLETT:  Okay.

21                   ATTY. INGRAM:  You know, that's a

22     one-sided thing and there is nobody there to test

23     the evidence presented.  There is no Judge, there is

1    no defense lawyer to ask questions. Donna didn't

2    know when it was going. It would simply be unfair

3    for you to consider an indictment as evidence, do

4    you agree with that?

5              AMY BARTLETT: Yeah.

6              ATTY. INGRAM: But during the

7    course of this trial, that indictment is going to be

8    read to you, maybe -- I am sure more than once.

9              AMY BARTLETT: Uh-huh.

10             ATTY. INGRAM: And nowhere along

11    the line is it magically transformed into evidence,

12    do you have handle on that?

13             AMY BARTLETT: Right, uh-huh.

14             ATTY. INGRAM: All right, let's

15    talk about reasonable doubt. That seems to be a

16    little bit of a sticky issue. Reasonable doubt,

17    number one, is based on reason and common sense.

18             AMY BARTLETT: Uh-huh.

19             ATTY. INGRAM: Did you ever say to

20    yourself, I'm going to give him or her the benefit

21    of the doubt?

22             AMY BARTLETT: Yeah.

23             ATTY. INGRAM: And when you said

1    that, were you giving the person the benefit of a

2    reasonable doubt or the benefit of an unreasonable

3    doubt?

4                    AMY BARTLETT:  Reasonable doubt.

5                    ATTY. INGRAM:  Yeah, because we

6    intuitively know the difference between reasonable

7    doubt and unreasonable doubt and we would never say

8    to ourselves, I'm giving Maribeth, that's her name,

9    the benefit of an unreasonable doubt.

10                    AMY BARTLETT:  Uh-huh.

11                    ATTY. INGRAM:  Proof beyond a

12    reasonable doubt requires that, in the words of Mr.

13    Bailey here, that you be firmly convinced to a moral

14    certainty  --

15                    AMY BARTLETT:  Uh-huh.

16                    ATTY. INGRAM:  And is proof of such

17    a character that you would be willing to rely and

18    act upon it in the most important of your own

19    affairs.

20                    AMY BARTLETT:  Yeah.

21                    ATTY. INGRAM:  Did you know that is

22    the highest burden of proof known in the court of

23    law?

1                          AMY BARTLETT:  No.

2                          ATTY. INGRAM:  Well, it is.  And

3       let's talk about this just briefly.  You have made

4       important decisions in your life, although, you will

5       make a lot more.  You have made some, haven't you?

6                          AMY BARTLETT:  Yeah.

7                          ATTY. INGRAM:  Well, for the sake

8       of our discussion, we are going to use one of my

9       important decisions.  I want to buy a house.

10                         AMY BARTLETT:  Uh-huh.

11                         ATTY. INGRAM:  And if it's an

12      important decision, some times I get a piece of

13      paper and I put a line down the middle and of it,

14      and I put positives on one side and negatives on the

15      other.

16                         AMY BARTLETT:  Uh-huh.

17                         ATTY. INGRAM:  And with my house, I

18      need four bedrooms because between my wife and I,

19      we've got four kids.  I need three bathrooms, I have

20      kids in school, a good school system, good

21      neighborhood, my wife likes it, those are all of the

22      positives.

23                         AMY BARTLETT:  Right.

1          ATTY. INGRAM:  On the negative

2    side, it's a 50 year old house, and I am a bit

3    concerned about the structural stability of that

4    house, you know, maybe it needs work.

5          AMY BARTLETT:  Yeah.

6          ATTY. INGRAM:  And there are some

7    plumbing problems, and I don't know about the costs,

8    and I just don't know if I can afford the monthly

9    mortgage payment.  So, when I make important

10   decisions, I try to investigate those negatives.

11         AMY BARTLETT:  Uh-huh.

12         ATTY. INGRAM:  So in my situation

13   here, I call a contractor and say, hey, please, I

14   will give you a couple of hundred bucks, come look

15   at this house, tell me what you think what kind of

16   shape it's in.

17         AMY BARTLETT:  Uh-huh.

18         ATTY. INGRAM:  And he says, Ingram,

19   that house is brick solid, don't worry about it.

20   So, I can scratch that one off, can't I?

21         AMY BARTLETT:  Yep.

22         ATTY. INGRAM:  I call a plumber who

23   says, I can fix this for $200.00, so I can scratch

1    that one off.  But I still have that mortgage

2    payment problem.  So I go to the bank and say,

3    listen, instead of giving me a 15 year loan, will

4    you make it a 20 year loan to extend the payments

5    and cut them down a little.  Nope, it's 15. Well,

6    how about reducing the mortgage rate.  Nope, stays

7    the same.  No matter how much I investigate that

8    mortgage, my ability to pay that mortgage, it

9    remains reasonable, the question remains reasonable

10   in my mind.  Are you with me?

11                  AMY BARTLETT:  Uh-huh.

12                  ATTY. INGRAM:  As long as that one

13   negative is still on that list, I can't say beyond a

14   reasonable doubt that that decision is right for me.

15                  AMY BARTLETT:  Yeah.

16                  ATTY. INGRAM:  Do you see that?

17                  AMY BARTLETT:  Yes.

18                  ATTY. INGRAM:  Do you see that it's

19   the same in this case?

20                  AMY BARTLETT:  Yes.

21                  ATTY. INGRAM:  One single

22   reasonable doubt, and the State of Ohio has not met

23   its burden.  And that is at either phase.  So, at a

1     first phase, a single reasonable doubt as to the

2     Defendant's guilt requires a verdict of not guilty,

3     do you see that?

4                    AMY BARTLETT:  Yes.

5                    ATTY. INGRAM:  At a penalty phase,

6     a single reasonable doubt as to the appropriate

7     penalty requires a life sentence.

8                    AMY BARTLETT:  Right.

9                    ATTY. INGRAM:  Now, I'm closing

10    this notebook because all we've got to talk about is

11    circumstantial evidence.

12                   AMY BARTLETT:  Okay.

13                   ATTY. INGRAM:  You understand what

14    circumstantial evidence is?

15                   AMY BARTLETT:  Yes.

16                   ATTY. INGRAM:  I will give you an

17    example because then I'm going to take advantage of

18    this example.

19                   AMY BARTLETT:  Okay.

20                   ATTY. INGRAM:  If it's the middle

21    of February, and I am at the second floor of my

22    house and I look out at 11:00 at night and I see the

23    grass, and go to sleep and I get up in the morning

1    and there are six inches of snow.  Do I know it

2    snowed?  Of course, I know.  Did I see it snow?  No,

3    I didn't.  That's circumstantial evidence.  Now,

4    it's a Sunday morning, I am waiting for newspaper.

5    So, I've got a cup of coffee in one hand, and I got

6    a cigarette in the other hand, and I am a little

7    impatient now because the paper is late.  So, I look

8    out the window and I see footprints from the house

9    to the right of me, from that house to my front

10   door, and from my front door to the house to the

11   left of me.  What can I assume?

12                   AMY BARTLETT:  They might of taken

13   it.

14                   ATTY. INGRAM:  Or someone walked in

15   the snow, right?

16                   AMY BARTLETT:  Yeah.

17                   ATTY. INGRAM:  Okay.  And you know,

18   I assumed it's my newspaper.

19                   AMY BARTLETT:  Okay.

20                   ATTY. INGRAM:  That it was the

21   paperboy.

22                   AMY BARTLETT:  Uh-huh.

23                   ATTY. INGRAM:  And I go down

1      stairs, and I open the door and behold, Giant Eagle

2      coupons, not my newspaper.  I have piled inferences

3      on inferences there.  Do you see that?

4                          AMY BARTLETT:  Yeah.

5                          ATTY. INGRAM:  You are never

6      required to make an inference.  Whether you make an

7      inference or not, is your decision as a trial juror.

8      Do you understand that?

9                          AMY BARTLETT:  Yeah.

10                         ATTY. INGRAM:  And since an

11     inference is a leap in logic, the first thing you

12     should probably do is test the reasonableness of the

13     inference that you are asked to make.  Will you do

14     that?

15                         AMY BARTLETT:  Yes.

16                         ATTY. INGRAM:  And remember that

17     situation where your brother or sister was accused

18     of throwing the egg?  If you were presented

19     circumstantial evidence and asked to make

20     inferences,  do you think you might look for other

21     inferences that were equally persuasive that pointed

22     in another direction?

23                         AMY BARTLETT:  Yeah.

1           ATTY. INGRAM:  Will you do that

2      here?

3                AMY BARTLETT:   Yeah.

4                ATTY. INGRAM:   Now that we have

5      taken up your entire morning, is there anything that

6      you want to ask of any of us?

7                AMY BARTLETT:  No.

8                ATTY. INGRAM:  We all thank you for

9      your time and attention.

10               AMY BARTLETT:   Thank you.

11               THE COURT:  Pass for cause?

12               ATTY. BECKER:  Yes, we pass for

13     cause.

14               ATTY. INGRAM:  Pass.

15               THE COURT:  Okay, Amy, you will be

16     in the pool from which this jury will be selected.

17     Can't tell her to call back this evening because we

18     won't have anything.  Tuesday or Wednesday evening?

19               ATTY. BECKER:  Monday maybe.

20               THE COURT:  Monday night.  Okay,

21     call Monday night after 4:30.  And, again, you're

22     not to discuss anything, form any opinion, read

23     anything or watch anything on T.V., okay?

1                    AMY BARTLETT:  Okay.

2                    THE COURT:  Thank you.

3

4    (Whereupon, Amy Bartlett, Juror Number #199, was

5    excused until further notice.)

6

7                    THE COURT:  Do you want a little

8    break before we start the next one?

9                    ATTY. BAILEY:  Yes.

10

11

12   (At 11:22 a.m., a recess was taken)

13

14   (Back in Court at 11:45 a.m.)

15

16

17       **VICTOR SABULSKY, JUROR NUMBER 200**

18   **EXAMINATION BY THE COURT:**

19

20                    THE COURT:  Victor, how are you

21   doing this morning?

22                    VICTOR SABULSKY:  Fine, sir, thank

23   you.

1               THE COURT:  Did we keep you waiting

2       a long enough time?

3               VICTOR SABULSKY:  Not too bad.

4               THE COURT:  Did you read that

5       handout that was given to you?

6               VICTOR SABULSKY:  Yes.

7               THE COURT:  The reason that you are

8       here this morning is there are two areas that it's

9       felt necessary that each perspective juror be asked

10      about.  We all have our own opinions about

11      everything.  If the State is able to prove the

12      charges that have been filed against Miss Roberts of

13      aggravated murder with a specification; that means

14      that this case could go to second phase and this

15      jury would have to listen to evidence and recommend

16      one of four possible penalties; that could be the

17      death penalty, life without chance of parole, life

18      without a chance of parole before 30 years, or 25

19      years.

20               Now, the burden is always on the State

21      of Ohio to prove their case.  There is no burden of

22      proof on the Defendant in a criminal case.  The

23      Defendant can sit there and do nothing, her

```
1       attorneys need do nothing if they wish to.  Because

2       it's up to the State as to whether the State wins or

3       loses a case.

4                    Now, every murder under Ohio law does

5       not mean that the person faces a capital penalty.

6       But a person who commits aggravated murder, under

7       certain circumstances we call specifications, then

8       that raises the spector of the death penalty being

9       involved.  An example, if somebody commits

10      aggravated murder and the fellow is a policeman, if

11      that specification that that person was a policeman

12      is attached to the indictment, and that is proven

13      beyond a reasonable doubt to be true, then that

14      Defendant will face the capital punishment penalty.

15                   VICTOR SABULSKY:  Okay.

16                   THE COURT:  The question is raised

17      also, why do we go into this now, because if the

18      State fails to prove their case, the jury returns a

19      verdict of not guilty, and then the death penalty

20      does not even come up.  But the reason we have to go

21      into now, if we didn't question everybody so that

22      these folks knew what each individual's opinion was,

23      we might end up at that second phase, and you might
```

1      have somebody on there that believes strongly that

2      if someone takes a life, they should give their

3      life, eye for an eye.  Well, a person of that nature

4      is entitled to their own thoughts on the matter, but

5      they could not be fair to the Defendant in that

6      case, because if we go into the second phase, it's

7      up to the prosecution to prove again, beyond a

8      reasonable doubt, that the aggravating

9      circumstances, which are reasons given to the jury

10     as to why the death penalty should be imposed,

11     outweigh any mitigating factors.  Mitigating factors

12     meaning things for the jury to consider as to why

13     they should not impose the death penalty.  And a

14     person who is not going to listen to that is going

15     to say, well, we found you guilty of murder,

16     therefore, you should receive the death penalty,

17     cannot be fair to the Defendant.  Can't follow the

18     law.  Likewise, a person on that jury that cannot

19     for religious or moral reasons ever make the

20     decision to put someone to death, then that person

21     couldn't be fair to the State.  The State has the

22     right, if they prove their case beyond a reasonable

23     doubt of aggravated murder with a specification, to

1    ask this jury to consider the death penalty.  The

2    other area that will be inquired to is about

3    pretrial publicity.  This case, as any case of this

4    nature, generated a fair share of publicity from

5    newspapers, T.V., and whatever.  Some people don't

6    partake of the news very much.  Others do on a

7    regular basis.  So, we have people that have been

8    exposed and some that haven't.  And that doesn't

9    make any difference in and of itself.  The question

10   is, anyone who has had prior exposure has to be able

11   to set that aside, because in order for this case to

12   be tried fairly, all 12 people here are going to

13   have to decide the case on the facts presented in

14   this Courtroom.  If somebody says, I remember

15   reading in the paper, and I don't think, you know,

16   this is the way it should be, somebody isn't going

17   to get a fair trial.  It has to be decided on the

18   evidence given in the Courtroom, okay.

19              So, that is what they will be asking you

20   about and whatever your opinions are, are fine.  You

21   are entitled to your opinions.  It's just that you

22   have a right to know where you're coming from, and I

23   am sure that you will find that they respect your

1          opinions, whatever they are, okay?

2                          VICTOR SABULSKY:  Yes.

3                          THE COURT:  Mr. Bailey.

4                          ATTY. BAILEY:  Thank you, Your

5          Honor.

6          **EXAMINATION BY ATTORNEY BAILEY:**

7

8                          ATTY. BAILEY:  Good morning, Mr.

9          Sabulsky.

10                         VICTOR SABULSKY:  Good morning.

11                         ATTY. BAILEY:  My name is Ken

12         Bailey, and I am an assistant prosecutor with the

13         Trumbull County Prosecutor's Office, and as I

14         promised you a little over three weeks ago in the

15         other Courtroom, I am joined by my co-counsel, Chris

16         Becker, another assistant prosecutor in our office,

17         and together we're responsible for prosecuting this

18         case on behalf of the people of Trumbull County, and

19         the people of the State of Ohio.  And as the Judge

20         indicated, we're here today to ask you some

21         questions regarding your prior experiences, your

22         opinions about different things, and to make sure

23         the folks who are selected to serve on this jury can

1    be fair and impartial to both sides, both to the

2    Defendant and to the people of the State of Ohio.

3    Okay, and were asking these questions not because

4    we're snoopy and we like to pry, but rather just to

5    make sure that the folks who are selected can be

6    fair and impartial to both sides.

7                    VICTOR SABULSKY:  Yes.

8                    ATTY. BAILEY:  There aren't any

9    right answers, there aren't any wrong answers to

10   these questions, just open, candid answers, and

11   during this question and answer session today, if

12   you have any questions that come pertaining to what

13   we're doing, feel free to ask because this is the

14   only chance that we get to talk together until this

15   case is all over.  And if this case proceeds to the

16   second phase, we're not allowed to have any contact

17   with you after today until the conclusion of the

18   second phase until the trial is all over.  So, if

19   you want to talk to us, if we run into each other

20   in the hallway or the elevator or a restaurant or

21   something, we're not being anti-social or trying to

22   snub you or anything.  All we're allowed to say is,

23   good morning or good afternoon because under our

1    rules of conduct, attorneys aren't suppose to have

2    any communication with you while the trial is

3    proceeding.  Okay, so from today on, except for in

4    here right now.

5                    VICTOR SABULSKY:  Okay.

6                    ATTY. BAILEY:  So, if you have any

7    questions that come up, you will have to direct them

8    to our bailiff, Laurie Brown, who is not here right

9    now but she will be here for the course of the

10   trial.

11                   VICTOR SABULSKY:  Okay.

12                   ATTY. BAILEY:  Now, the Judge

13   indicated that we will be asking you some questions

14   about pretrial publicity and the death penalty, your

15   views on that and some regular questions.  Let me

16   ask you, we'll start out with, your brother, Steve,

17   is in the Sheriff's Office, are you pretty close

18   with your brother?

19                   VICTOR SABULSKY:  Yes.

20                   ATTY. BAILEY:  How often do you see

21   each other?

22                   VICTOR SABULSKY:  A little bit more

23   in the summer than the rest of the year, maybe a

1    dozen times a year.

2              ATTY. BAILEY:  Okay, does he ever

3    talk about what he does?

4              VICTOR SABULSKY:  Some times, not

5    all the time.

6              ATTY. BAILEY:  Okay, has he ever

7    talked to you about this particular case because you

8    are aware that your brother is on the SWAT team,

9    right?

10             VICTOR SABULSKY:  Yes.

11             ATTY. BAILEY:  And it may well be

12   that he was present at a couple of scenes in this

13   particular case.  Do you have any recollection of

14   him ever saying anything about this particular case

15   to you?

16             VICTOR SABULSKY:  No.

17             ATTY. BAILEY:  So, you would be

18   able to avoid talking to him about this case during

19   the course of the trial?

20             VICTOR SABULSKY:  Oh, yeah.

21             ATTY. BAILEY:  Now, afterward --

22   after we get into the two phases, you will have to

23   wait until the end of the second phase, but after

1     the trial is all over, then you can talk to him

2     about it, but during the course of the trial, you

3     are not allowed to have any communication with him

4     about the case.

5                      VICTOR SABULSKY:  Okay.

6                      ATTY. BAILEY:  You can talk to him

7     but not about the case.

8                      VICTOR SABULSKY:  Okay.

9                      ATTY. BAILEY:  Now, let's talk

10    about this issue of pretrial publicity.  And I

11    understand from looking at your questionnaire that

12    you get the Vindicator and the Tribune, and you look

13    at quite a few papers and you look at those about

14    five times a week?

15                     VICTOR SABULSKY:  At work.  I take

16    them to work with me.  When I'm off, I don't usually

17    buy one.

18                     ATTY. BAILEY:  Okay, and you don't

19    listen to the local T.V. news very often, a couple

20    of times a month.

21                     VICTOR SABULSKY:  Yeah, not very

22    often.  I'm more into sports, ESPN.

23                     ATTY. BAILEY:  Now, the Defendant

1        here is charged with helping plan and aiding and

2        abetting another person of the killing of a fellow

3        by the name of Robert Fingerhut, her ex-husband for

4        insurance money, and there was a trespass, a charge

5        of trespassing to his house or her house by this

6        other fellow, and the theft of the car.  There was a

7        charge of an aggravated burglary and an aggravated

8        robbery as well as the aggravated murder.  Do you

9        recollect having heard or discussed or read anything

10       about this particular case?

11                    VICTOR SABULSKY:  When it first

12       happened, I read it in the paper, but then I

13       actually forgot about it until I was called in on

14       it.

15                    ATTY. BAILEY:  Okay, so initially

16       you read about it in the paper.  Did you ever see

17       any follow up regarding the other person in this

18       particular case?

19                    VICTOR SABULSKY:  No.

20                    ATTY. BAILEY:  Okay, now as you

21       look around the Courtroom today, there is nobody

22       here from the news media, and it may well be as we

23       get into the trial, we will see some reporters

1    coming in from the newspapers and some T.V. crews

2    coming in, and their T.V. stand-up reporters,

3    whatever the word is for that.  They will be here,

4    and they will be here for a couple of minutes.

5    They're not allowed to film the jurors, but they

6    will do a feature probably on the trial, okay, based

7    on the few minutes that they're here.  And you will

8    notice that they will have missed everything that

9    was asked and answered before they got in here and

10   after they leave here.  So their reporting may be

11   somewhat slanted, it may be totally out of context

12   because they missed all of the other stuff that went

13   on, and they don't do it deliberately because it's

14   the nature of the business, they have to rush into

15   print to beat the other stations.  But you

16   understand that it could give you a totally lopsided

17   view of the case if you paid attention to what is in

18   the paper or what's on T.V.

19                    VICTOR SABULSKY:  Uh-huh.

20                    ATTY. BAILEY:  Right?

21                    VICTOR SABULSKY:  Yes.

22                    ATTY. BAILEY:  And because of that,

23   the Judge tells you that you are not suppose to be

1    looking in the newspapers about this case or the

2    T.V. about this case, or discuss it with anybody

3    from the outside, okay, while this case is going on,

4    okay?

5                    VICTOR SABULSKY:  Yes.

6                    ATTY. BAILEY:  It's sort of like

7    going back to school and starting with a blank slate

8    and whatever is going to be written on that slate is

9    going to be written here in this Courtroom from the

10   testimony of the witnesses, the physical exhibits

11   that come in and the instructions of law given to

12   you by the Judge.  And you will be able to do that,

13   right?

14                   VICTOR SABULSKY:  Yes.

15                   ATTY. BAILEY:  And it may well be

16   that as you hear testimony, it might jog a

17   recollection of something that you read before and

18   it may confirm or totally dispel whatever you might

19   of read before, okay?

20                   VICTOR SABULSKY:  Yes.

21                   ATTY. BAILEY:  But you've got to

22   set aside whatever your recollection is from before

23   and decide this case solely on what happens here and

1      the confines of these four walls.  Will you be able

2      to do that?

3                      VICTOR SABULSKY:  Yes.

4                      ATTY. BAILEY:  Okay, so much for

5      the pretrial publicity.  Now, let's talk about the

6      death penalty as a possible punishment.  When did

7      you first learn that this was a possible death

8      penalty case?

9                      VICTOR SABULSKY:  In the courtroom.

10                     ATTY. BAILEY:  Back on --

11                     VICTOR SABULSKY:  About three weeks

12     ago.

13                     ATTY. BAILEY:  And before that,

14     before we had you here, have you ever had occasion

15     to have any discussions or conversations with any

16     family members or friends or people at work

17     regarding your view on the death penalty as a

18     punishment?

19                     VICTOR SABULSKY:  Not really.

20                     ATTY. BAILEY:  Did you ever have

21     any crimes that were reported in the news where you

22     might of said, gosh, certain person, whoever did

23     that, should face a serious punishment?

1               VICTOR SABULSKY:  Bin Laden.

2    That's about it.

3               ATTY. BAILEY:  Okay.  Now, you

4    understand that the State legislature writes the

5    laws in the State of Ohio, and they determine what

6    the penalties are for the different crimes, and then

7    for the crimes, all murders aren't punishable by the

8    death penalty as a possible punishment, okay.

9    Different killings carry different penalties.  And

10   for a person to be eligible for the death penalty,

11   the legislature says that you have to have more than



12   just a killing with prior calculation and design.

13   For example, I could decide to go out on the

14   Courthouse steps at noon today, and say, I am really

15   upset with my co-counsel, Chris Becker, I don't like

16   his shoes, and I am going to kill him tomorrow at

17   noon on the Courthouse steps when he comes walking

18   up those steps and I am going to stand there and

19   blow him away with a .357, and tell the whole world

20   that and I do that.  Okay, and the legislature says

21   that by itself does not -- doesn't make me eligible

22   for the death penalty, okay?

23               VICTOR SABULSKY:  Okay.

```
 1                    ATTY. BAILEY:  The legislature says

 2        that in addition to that, there has to be some extra

 3        special finding of fact.  You have to have a

 4        purposeful killing with prior calculation and design

 5        and could it be during the course of a special

 6        felony, we call it a felony murder like during the

 7        course of an aggravated burglary or aggravated

 8        robbery.  It could be killing for hire, murder for

 9        hire, it could be the victim being the governor or

10        the president, lieutenant governor or a police

11        officer or a young child.  There are a whole lot of

12        factors that would make a person eligible for the

13        death penalty as a punishment, okay, but the

14        legislature has written it in such a way that you

15        don't become eligible unless these special findings

16        of aggravating circumstances were attached to a

17        charge of aggravated murder.  Okay, do you

18        understand that?

19                    VICTOR SABULSKY:  Yes.

20                    ATTY. BAILEY:  Now, if you could --

21        if you had a say in designing the criminal justice

22        system, if you sat on the legislature, would you

23        include the death penalty as a possible penalty for
```

3214

```
 1        any crimes?
 2                         VICTOR SABULSKY:  Not for any
 3        crimes, no.
 4                         ATTY. BAILEY:  Well, I mean are
 5        there any crimes where you would include it as a
 6        possible punishment, would you write the death
 7        penalty into the system somewhere?  Because I
 8        noticed that you had mentioned mass murders, I
 9        believe, and in the killing of children.
10                         VICTOR SABULSKY:  Yeah, I don't
11        like that.
12                         ATTY. BAILEY:  Okay, so your
13        personal belief is you would keep that as a possible
14        punishment, the death penalty --
15                         VICTOR SABULSKY:  Right.
16                         ATTY. BAILEY:  -- for those types
17        of cases?
18                         VICTOR SABULSKY:  Right,
19        definitely.
20                         ATTY. BAILEY:  Well, you understand
21        that the charge here isn't a mass murder, it's not
22        like 911 or the World Trade Center or Oklahoma City.
23                         VICTOR SABULSKY:  Right.
```

```
1                        ATTY. BAILEY:  And it doesn't

2      involve the killing of a young child.

3                        VICTOR SABULSKY:  Uh-huh.

4                        ATTY. BAILEY:  Do you think you

5      would be able to follow the law as the Judge

6      instructs you, and if you -- if we meet our burden

7      of proof in both phases, do you think you would be

8      able to come back with a death penalty verdict if

9      you thought that it was the right punishment under

10     the facts and the law?

11                       ATTY. INGRAM:  I am going to

12     object.  He said -- it's just an unfair question.

13     There's no predicate.  You said, if we meet our

14     burden of proof, can you do it, I think in all

15     fairness he should go into more detail.

16                       ATTY. BAILEY:  I will, I just want

17     to know  --

18                       THE COURT:  What is your thought,

19     do you agree?

20                       ATTY. BAILEY:  Well, I thought the

21     question itself was okay.  I will go into more

22     detail, but I think the question is a fine question.

23                       ATTY. INGRAM:  Well, I think you
```

```
1      should ask the question after you go into more

2      detail.

3                          THE COURT:  Okay, preface that

4      question a little more.

5                          ATTY. BAILEY:  Okay, let me get

6      into a little more detail here on your view on the

7      death penalty as a possible punishment.  I take it

8      you believe that people should be held accountable

9      for their actions?

10                         VICTOR SABULSKY:  Yes.

11                         ATTY. BAILEY:  And, basically, your

12     belief -- you believe that the death penalty should

13     have a place in the criminal justice system?

14                         VICTOR SABULSKY:  Yes.

15                         ATTY. BAILEY:  And if you could

16     write the law, okay, you know that there are

17     different types of killings.  There could be

18     killings of what we used to call premeditated, but

19     we use the term now because they changed the law,

20     it's prior calculation and design.  It requires

21     advance planning and a studied scheme to kill.

22                         VICTOR SABULSKY:  Right.

23                         ATTY. BAILEY:  And there could be
```

1    different reasons, motives that people have for

2    killing somebody.  I mean, it could be a killing of

3    prior calculation and design, maybe somebody wants

4    some financial gain by that, or maybe there is

5    hatred or something or different things.  But in

6    addition to the mass murders that you mentioned and

7    the killing of a young child, would you include the

8    death penalty in the criminal justice, or any other

9    crimes other than those two types of cases?

10            VICTOR SABULSKY:  Possibly.  I am

11   not saying that I would, but I probably would.

12   Certain conditions.

13            ATTY. BAILEY:  Okay, well, like --

14   can you give us a for instance?

15            VICTOR SABULSKY:  Maybe somebody

16   lived in a hostile environment, I wouldn't convict

17   them of murder.

18            ATTY. BAILEY:  Okay, do you

19   understand that all killings are not treated equally

20   in the law.  There are some killings that could be

21   accidental where somebody could be out chopping wood

22   and the head of the ax flies off and somebody gets

23   killed.  You wouldn't punish anybody for that

```
 1        because that was an accident, right?

 2                    VICTOR SABULSKY:  Right.

 3                    ATTY. BAILEY:  And if somebody were

 4        being attacked and defending themselves and somebody

 5        was trying to maybe kill him or something and you

 6        use self-defense and would kill a person in

 7        self-defense, that might not be a crime, right?

 8                    VICTOR SABULSKY:  No.

 9                    ATTY. BAILEY:  Or somebody could

10        get angry, there could be somebody like at a bar and

11        somebody might punch somebody and the victim goes

12        flying back and hits his head on the edge of the bar

13        and dies, that could be some type of manslaughter

14        maybe?

15                    VICTOR SABULSKY:  Right.

16                    ATTY. BAILEY:  And it certainly

17        wouldn't be punished by the death penalty, right?

18                    VICTOR SABULSKY:  Right.

19                    ATTY. BAILEY:  It could maybe be

20        some lesser type of punishment, maybe some type of

21        prison sentence.  But then when you get -- and even

22        the example that I gave you before, the killing with

23        prior calculation and design where I decide to kill
```

1 Chris Becker over there because I didn't like his

2 shoes and announced it to the whole world, that can

3 be punished by some type of life sentence, right?

4      VICTOR SABULSKY:  Right.

5      ATTY. BAILEY:  But you say that

6 there are certain types of things where you could --

7 you can picture maybe including the death penalty as

8 a possible punishment?

9      VICTOR SABULSKY:  Yes.

10      ATTY. BAILEY:  Okay --

11      VICTOR SABULSKY:  But it would go

12 back to like premeditated maybe, or if he planned it

13 and there is an innocent person involved, things

14 like that.

15      ATTY. BAILEY:  Okay.  Now, your

16 view on the death penalty being appropriate in some

17 types of cases, you indicated that your views have

18 changed since 911?

19      VICTOR SABULSKY:  Yeah, I never

20 thought of it before then.

21      ATTY. BAILEY:  Okay, ever?

22      VICTOR SABULSKY:  Not really.

23      ATTY. BAILEY:  Okay, and since 911,

```
 1    I take it that you suddenly became much more in

 2    favor of it?

 3                     VICTOR SABULSKY:  Yes.

 4                     ATTY. BAILEY:  And it's based on

 5    your feeling that the death penalty would be

 6    appropriate in some killings, is that based on a

 7    personal view or a religious view, ethical or moral

 8    view, or some combination of those factors?

 9                     VICTOR SABULSKY:  Morals.

10                     ATTY. BAILEY:  Okay, can you

11    explain that?

12                     VICTOR SABULSKY:  Children, women

13    getting killed for nothing, no reason.

14                     ATTY. BAILEY: Okay.

15                     THE COURT:  Mr. Bailey, this may be

16    a good time to break until this afternoon.

17                     ATTY. BECKER:  Okay, I'll be back.

18    Just like the terminator.

19                     VICTOR SABULSKY:  Yeah.

20                     THE COURT:  All right, come back a

21    little bit around 1:00, 1:05, somewhere in there,

22    okay?

23                     VICTOR SABULSKY:  Okay.
```

3221

```
 1                      THE COURT:  Thank you.

 2

 3      (At 11:55 a.m., a luncheon recess was taken.)

 4

 5      (At 1:10 p.m., back in Court.)

 6

 7                      THE COURT:  Okay, Mr. Bailey, I

 8      think you were examining?

 9                      ATTY. BAILEY:  Yes, Your Honor.

10

11                CONTINUED EXAMINATION OF

12           VICTOR SABULSKY, JUROR NUMBER 200

13      BY ATTORNEY BAILEY:

14

15                      ATTY. BAILEY:  Good afternoon, Mr.

16      Sabulsky.

17                      VICTOR SABULSKY:  Good afternoon.

18                      ATTY. BAILEY:  Did you get a chance

19      to eat lunch?

20                      VICTOR SABULSKY:  Yes, sir.

21                      ATTY. BAILEY:  A good lunch?

22                      VICTOR SABULSKY:  Hot dogs.

23                      ATTY. BAILEY:  Good enough.  Okay,
```

```
 1    we were talking a bit about the death penalty as a

 2    possible punishment before when we left off.  Now,

 3    you understand that the Defendant here is charged

 4    with a number of offenses, a number of crimes, you

 5    read that handout?

 6                VICTOR SABULSKY:  Yes.

 7                ATTY. BAILEY:  And there are two

 8    counts or separate charges of aggravated murder;

 9    there is one person that is killed and two separate

10    theories that we're allowed to pursue, and we

11    elected, because we're allowed to, we elected to

12    pursue both of those theories of the killing, okay,

13    so that the jury can consider both of those

14    particular theories, even though there is only one

15    death.

16                VICTOR SABULSKY:  Okay.

17                ATTY. BAILEY:  Attached to this

18    crime of aggravated murder or crimes of aggravated

19    murder, are specifications.  These special findings

20    of fact that I mentioned that make the Defendant

21    eligible for the death penalty, okay.  Also, there

22    are two other charges, the charge of aggravated

23    burglary and a charge of aggravated robbery, and
```

```
 1        attached to those particular crimes are charges of
 2        firearm specification, that a working gun was used.
 3        Do you understand that the Defendant is charged here
 4        not as the trigger person but rather as a
 5        complictor, a person who solicits or procures
 6        another person to commit a crime or aids and abets
 7        another person, plans with another person in
 8        committing a crime and helps that person or
 9        encourages or strengthens that person.  And under
10        Ohio law, the way the legislature has written the
11        law, the person who is a complictor under certain
12        circumstances can be eligible for the death penalty
13        too, even though that person didn't pull the
14        trigger.
15                      VICTOR SABULSKY:  Yes.
16                      ATTY. BAILEY:  Do you understand
17        that?
18                      VICTOR SABULSKY:  Yes.
19                      ATTY. BAILEY:  Do you have any
20        problems with that?
21                      VICTOR SABULSKY:  No.
22                      ATTY. BAILEY:  Okay, the fact that
23        the Defendant isn't charged as the trigger person
```

1    but, rather, as a complicitor in this particular

2    case.

3                    VICTOR SABULSKY:  Yes.

4                    ATTY. BAILEY:  Now, each of these

5    particular crimes is composed of certain elements,

6    those are like the essential component parts of a

7    crime, sort of like the ingredients in a recipe.

8    Has your wife ever baked a cake?

9                    VICTOR SABULSKY:  Yes.

10                    ATTY. BAILEY:  What is your

11   favorite?

12                    VICTOR SABULSKY:  Chocolate.

13                    ATTY. BAILEY:  Mine too.  Okay,

14   let's take a chocolate cake.  It's got certain key

15   ingredients in that recipe.  She's got to put them

16   all in, the eggs, the flour, the sugar, the baking

17   powder, and a little bit of water, and all of that

18   stuff, she's got to mix it altogether, stir it, put

19   it in the oven at 350 degrees for a certain amount

20   of time maybe, 40 minutes or something.  And if she

21   puts it altogether right, and puts in all of the

22   ingredients, the cake will rise, and you will have

23   yourself a chocolate cake, right?

3225

1              VICTOR SABULSKY:  Yes.

2              ATTY. BAILEY:  Now, if she leaves

3    out one of these key ingredients, like the

4    chocolate, you may get a cake but it's not going to

5    be a chocolate cake, right?

6              VICTOR SABULSKY:  Right.

7              ATTY. BAILEY:  Same thing with

8    these crimes.  Each of these crimes is composed of

9    certain key ingredients, and the burden is on us,

10   the people of the State, to put all of those

11   ingredients in at the trial.

12             VICTOR SABULSKY:  Okay.

13             ATTY. BAILEY:  And if we don't,

14   then you got to find the Defendant not guilty, okay?

15             VICTOR SABULSKY:  Uh-huh.

16             ATTY. BAILEY:  If we put all of

17   those elements in so that you're firmly convinced of

18   the charge to a moral certainty, using your reason

19   and common sense, if we prove it by proof beyond a

20   reasonable doubt, then you can return a conviction,

21   right?

22             VICTOR SABULSKY:  Right.

23             ATTY. BAILEY:  Now, these charges

1    of aggravated murder, there are two different

2    charges there; one of these is the purposeful

3    killing with prior calculation and design.  And the

4    other charge is of a purposeful killing in the

5    course of special felony, we call it felony murder

6    during an aggravated burglary and/or aggravated

7    robbery, okay.  These terms aggravated burglary and

8    aggravated robbery and all of these crimes, are

9    going to be defined for you at the end of the case

10   by the Judge.  All of these legal terms that have

11   special meanings and the Judge will give you the

12   legal definitions at the end, and you're bound to

13   follow his definitions, okay?

14                    VICTOR SABULSKY:  Yes.

15                    ATTY. BAILEY:  That is what the law

16   is.  Now, some times folks who aren't lawyers get

17   confused by the terms of aggravated burglary and

18   aggravated robbery.  Aggravated burglary, quite

19   simply, involves the trespassing of an occupied

20   structure, like a dwelling house, somebody goes into

21   somebody's home and shouldn't be there.  And the

22   perpetrator -- and the perpetrator is there to

23   commit some type of an offense, whether it's an

1    aggravated murder or a theft offense, and the

2    perpetrator can be armed with a deadly weapon, like

3    a gun or a knife, and the perpetrator can cause

4    serious physical harm or death to the person inside

5    of the house, that is, an aggravated burglary.  One

6    type of aggravated burglary.  Then we have

7    aggravated robbery and one type of aggravated

8    robbery involves the perpetrator using force or

9    threat of force against the person to maybe steal

10   something and the perpetrator can be armed with a

11   deadly weapon, like a gun or a knife, and can

12   inflict serious physical harm on the victim, okay.

13   So, the difference is aggravated burglary involves a

14   dwelling house or some type of structure, and the

15   aggravated robbery doesn't involve a structure,

16   okay.

17              VICTOR SABULSKY:  Uh-huh.

18              ATTY. BAILEY:  Now, these elements,

19   let's take a crime -- let me give you a for instance

20   of elements.  Let's take a crime of aggravated

21   murder with prior calculation and design.  We have

22   to prove that it would happen on or about a certain

23   date, let's say December 11, 2001, okay, that would

1    be one element.  The second element would be that it

2    happened here in Trumbull County, Ohio.  We call

3    that venue so that we try the case in this

4    Courthouse rather that in Ashtabula or Tuscaras

5    County.  The third element might be the

6    identification, the person that committed this crime

7    is the same person that is sitting here, and

8    somebody would have to point her out.  The fourth

9    element is that she acted purposely, basically, on

10   purpose.  The Judge will define that term because

11   it's a legal term and it's going to be a detailed

12   definition.  The fifth element is that she caused

13   the death of a living person, in this case, a fellow

14   by the name of Robert  Fingerhut and, sixth, that

15   she acted with prior calculation and design.

16            Okay, we used to have a term in the law

17   called premeditation and they changed that a bit, so

18   now we have prior calculation and design which

19   involves advanced planning and a studied scheme to

20   kill.  So, for example, if I drop my pen and I catch

21   it, that would be by instant or reflex.  On the

22   other hand, if I drop my pen, and I look down and I

23   say, oh, my goodness, I dropped my pen, maybe I

```
 1    better bend down and pick it up, that could be some

 2    advanced planning, right?

 3                    VICTOR SABULSKY:  Uh-huh.

 4                    ATTY. BAILEY:  Okay.  Now, -- and

 5    if yesterday, if I decided, hey, I'm going into

 6    court tomorrow and drop this pen, and then I'm going

 7    to bend down and pick it up as an example, that

 8    might be part of a studied scheme to drop my pen,

 9    right?

10                    VICTOR SABULSKY:  Right.

11                    ATTY. BAILEY:  Some advance

12    planning there.

13                    VICTOR SABULSKY:  Right.

14                    ATTY. BAILEY:  Now, each of these

15    crimes has elements, certain elements, and we've got

16    to put all of those elements in, just like the

17    ingredients in the cake.  And the burden of proof

18    for doing that is on us, the people of the State.

19    The Defendant has no burden of proof.  The burden

20    proving these elements is always on us, it never

21    shifts.  And the defense, they don't have to do

22    anything.  They can sit there, they can sit on their

23    hands during the course of the trial.  I don't
```

1    expect that they will, but under the law, they're

2    allowed to do that.  And that's because of a

3    presumption of innocence.  Under our American system

4    of justice, we have a presumption of innocence, and

5    this Defendant is presumed to be innocent as are all

6    other Defendants tried in this courtroom.  And that

7    presumption of innocence acts as sort of like a

8    cloak shielding her all through the course of this

9    trial.  And that stays with her all the way through

10   all of the testimony and the evidence and the

11   judges' instructions of law.  And unless and until

12   the point where you and the other jurors go back

13   into the jury room to deliberate on your verdict and

14   you find that we have met our burden of proof

15   approving the elements of the crime charged beyond a

16   reasonable doubt, then that presumption of innocence

17   would be gone, right?

18                    VICTOR SABULSKY:  Uh-huh.

19                    ATTY. BAILEY:  And I take it that

20   you can afford her a presumption of innocent, you

21   can follow in that law?

22                    VICTOR SABULSKY:  Yes, right.

23                    ATTY. BAILEY:  Now, we talked about

1    the term reasonable doubt, proof beyond a reasonable

2    doubt, and the Judge will define that term in some

3    detail for you, but there is no mystery about it.

4    It's something that you're used to dealing with in

5    your everyday life.  You use your reason and your

6    common sense everyday, you use it at work, you use

7    it raising kids, you use it when you buy a house or

8    buy a car, or decide to get married, right?

9                    VICTOR SABULSKY:  Yes.

10                   ATTY. BAILEY:  It's something that

11   you use everyday.  And you know when something is

12   right, you balance things out.  You maybe make a

13   list and put the pros on one side and the cons on

14   the other.  And when you're firmly convinced it's

15   the right thing to do, you make your decision,

16   right?

17                   VICTOR SABULSKY:  Right.

18                   ATTY. BAILEY:  Same thing with this

19   proof beyond a reasonable doubt, it's when you are

20   firmly convinced of the truth of the charge to a

21   moral certainty, okay?

22                   ATTY. BAILEY:  And it's not proof

23   beyond all doubt or any doubt or beyond a shadow of

1    a doubt.  Some times folks, they watch movies on

2    T.V. or theatres, read books, and they think, well,

3    you've got to prove it 100 percent.  Well, that's

4    not our burden of proof.  The judge is going to

5    tell you that our burden of proof is going to be

6    proof beyond a reasonable doubt.  Okay, it's sort of

7    like having a box, okay, and you've been a juror in

8    prior cases, in a civil case and a criminal case

9    before?

10               VICTOR SABULSKY:  Yes.

11               ATTY. BAILEY:  Okay, in a civil

12   case, the burden of proof -- well, you were

13   instructed in a civil case it is by a preponderance

14   of the evidence, like a scale and whoever tips it

15   just a little bit is going to win.  If that box were

16   just over half full, that person is going to win in

17   that civil case, right?

18               VICTOR SABULSKY:  Right.

19               ATTY. BAILEY:  We got to fill it

20   with evidence.  And we have got to fill that box

21   with enough evidence so that it's pretty close to

22   the top in a criminal case.  Okay, you received

23   instructions before about proof beyond a reasonable

1    doubt?

2                    VICTOR SABULSKY:  Yes.

3                    ATTY. BAILEY:  And it's not all the

4    way to the top of the box, but pretty darn close to

5    the top of the box, right?

6                    VICTOR SABULSKY:  Right.

7                    ATTY. BAILEY:  It's up to you and

8    the other jurors to decide where you want to draw

9    that line on that box.

10                    VICTOR SABULSKY:  Right.

11                    ATTY. BAILEY:  Okay, so that when

12   you're firmly convinced that we've hit that point,

13   then you can return a conviction, if we meet all of

14   these elements by proof beyond a reasonable doubt.

15              Now, this case can be tried in two

16   different phases.  Unlike the earlier cases you were

17   in, the criminal case, what kind of a trial was

18   that, what was the charge?

19                    VICTOR SABULSKY:  It was in Mercer.

20   I was living in Mercer, Pennsylvania, then, and they

21   stole a van from a Sears parking lot, and there were

22   enclosures and he drove through it and then he

23   stopped the van and a police cruiser came up behind

3234

```
1     him and they slammed in reverse and slammed in a

2     cruiser and they took off in the woods running and

3     they caught them.

4                    ATTY. BAILEY:  He was charged with

5     grand theft of a motor vehicle?

6                    VICTOR SABULSKY:  It's been so long

7     ago, I guess.

8                    ATTY. BAILEY:  Okay.

9                    VICTOR SABULSKY:  He was found

10    guilty.

11                   ATTY. BAILEY:  You were a

12    foreperson on that jury?

13                   VICTOR SABULSKY:  Yes.

14                   ATTY. BAILEY:  Was it an

15    interesting experience?

16                   VICTOR SABULSKY:  Yeah, it was

17    interesting.

18                   ATTY. BAILEY:  This is the third

19    time you've been called for jury duty.

20                   VICTOR SABULSKY:  I know.

21                   ATTY. BAILEY:  Some of us never get

22    called.

23                   VICTOR SABULSKY:  I know.
```

1            ATTY. BAILEY:  So, this case can be

2      tried in two different phases.  The first part is

3      just like any other trial that you would get

4      involved in, okay, because in the first phase the

5      issue is guilty or non-guilty.  Can we establish

6      guilt of the crimes charged beyond a reasonable

7      doubt, okay.  And you don't pay any concern at all

8      to the issue of punishment in the first phase

9      because it's not relevant, just like the other

10     trials.  You didn't decide the punishment, the Judge

11     did, right?

12            VICTOR SABULSKY:  Right.

13            ATTY. BAILEY:  Okay, now, let's say

14     this case goes into the second phase.  Let's  say we

15     meet our burden of proof so that you and the other

16     jurors decide that she is guilty of a crime called

17     aggravated murder and one or more of the

18     specifications of aggravating circumstances, okay.

19     And those aggravating circumstances, quite simply,

20     there are two charges; one is that the aggravated

21     murder occurred with prior calculation and design

22     and during the course of an aggravated burglary.

23     The other aggravating circumstance charges that the

1    aggravated murders was committed with prior

2    calculation and design during the course of an

3    aggravated robbery.  So, let's say you and the other

4    jurors find the Defendant guilty beyond a reasonable

5    doubt of aggravated murder in one or more of these

6    specifications.  We would then move into a second

7    phase, and this second phase is different from what

8    you experienced before.  We still have the burden of

9    proof, the Defendant is presumed innocent, and we've

10   got to establish the elements.  Well, what we have

11   to establish is this balancing test.  You already

12   have the aggravating circumstances you would have

13   found at the end of the first phase.

14                 VICTOR SABULSKY:  Uh-huh.

15                 ATTY. BAILEY:  That goes on one

16   side of the scale.  On the other side of the scale,

17   can be the mitigating factors.  Mitigating factors

18   are, quite simply, things that might work in benefit

19   of the Defendant and again the imposition of the

20   death penalty as a punishment, okay?

21                 VICTOR SABULSKY:  Okay.

22                 ATTY. BAILEY:  Something in the

23   Defendant's favor.  And how much these things weigh

1      is entirely up to you and the other jurors.  You can

2      decide that something weighs maybe a ton, 20 pounds

3      or a ton, or something, and you might decide

4      something else might weigh as much as a feather,

5      right?  So, you do this balancing test and because

6      the issue in the second phase is what is the

7      appropriate punishment for this Defendant for this

8      crime, the punishment would be an issue, and you

9      would start out in that second phase equally

10     considering four possible punishments; the death

11     penalty; life imprisonment without parole; life in

12     prison with parole eligibility after 30 full years;

13     and life in prison with parole eligibility after 25

14     full years.  Those you have to start out with.  For

15     you to sit on this jury, those have to start equally

16     in your mind at the beginning of the second phase

17     because you wouldn't have heard any of the evidence

18     in the beginning of the second phase regarding what

19     was the appropriate punishment, right?

20                  VICTOR SABULSKY:  Right.

21                  ATTY. BAILEY:  So, you've got to

22     hear that and then you make your decision.  Now,

23     when you get to the point after all of this stuff is

```
 1    presented and you hear the Judge's instruction of

 2    law and go back into the jury room with the other

 3    jurors, and you decide beyond a reasonable doubt

 4    that the aggravating circumstance or circumstances

 5    outweigh these mitigating factors, then you must

 6    return a verdict as to the death penalty because

 7    that would be the appropriate punishment, and you

 8    would not go on to consider the other three Life

 9    sentences because we would have met our burden of

10    proof, okay?

11                        VICTOR SABULSKY:  Yeah.

12                        ATTY. BAILEY:  Do you understand

13    that?

14                        VICTOR SABULSKY:  Yes.

15                        ATTY. BAILEY:  Now, if we don't

16    live up to that burden of proof, if we can't

17    convince you beyond a reasonable doubt based on the

18    evidence that the aggravating circumstance or

19    circumstances outweighs the mitigating factors,

20    okay, then you would go on to consider one of the

21    three life sentences and decide which is

22    appropriate, okay?

23                        VICTOR SABULSKY:  Yes.
```

```
 1                    ATTY. BAILEY:  Do you have any

 2      problem with that?

 3                    VICTOR SABULSKY:  No.

 4                    ATTY. BAILEY:  Now, there are

 5      different ways, and you are familiar with probably

 6      from the other trial you have sat in, but there are

 7      different ways that we can establish the elements of

 8      the case.  We can use direct evidence where a

 9      witness comes in and testifies as to what he or she

10      has learned through the use of his or her five

11      senses, like, I heard the gun shot and it was loud

12      and I smelled the smoke and it was acrid, or I

13      touched the body and it was cold.

14                    But there is the other roundabout type

15      of proof that you are familiar with, okay, where you

16      are presented with a fact or series of facts and

17      you're asked to draw a logical deduction to another

18      fact or series of facts.  That is circumstantial

19      evidence.  And you are familiar with those but let

20      me give you a for instance.  Let's say you live in a

21      two story house, and you go to bed at night, and

22      your bedroom is on the second floor, and you look

23      out your bedroom window across the neighborhood and
```

1    it's a really nice night out.  The moon is beaming

2    and the stars are twinkling, there's not a cloud in

3    the sky.  As far as you can see across the

4    neighborhood, it's perfectly dry, okay.  So you draw

5    the blinds and you get into bed, and before you fall

6    asleep, you hear announcer on the radio telling you

7    there is a cold front moving in and there's going to

8    be a storm overnight.  You fall asleep and some time

9    during the night, you're awakened by this booming

10   sound and you look towards the window and you see a

11   bright flash of light from outside, and you can't

12   see what it is because the blinds are drawn, and a

13   couple of seconds later you hear a rolling boom in

14   the sky.  And a half minute goes by and you see

15   another flash of light outside and closer in time

16   another boom up in the sky.  A minute goes by, and

17   there is another really bright flash from outside

18   and right over the house there is big ripping,

19   cracking boom, and a pitter patter on the roof and

20   constant drumming sound on the roof and you fall

21   back asleep.  And you wake up some time later, and

22   you open the window and the blinds and you look out

23   and it's a nice day, the sun shining and there's not

1    a cloud in the sky but, as far as you can see, the

2    whole neighborhood, all of the roof tops are soak

3    and wet, and the streets are running with water and

4    drops of water are dripping off of the leaves of the

5    trees.  And there is no fire hydrant nearby where

6    some car could hit and spurt water all over the

7    place.  And you know what happened during the night,

8    don't you?

9                    VICTOR SABULSKY:  Right.

10                   ATTY. BAILEY:  What happened?

11                   VICTOR SABULSKY:  It stormed.

12                   ATTY. BAILEY:  Right, a

13   thunderstorm.

14                   VICTOR SABULSKY:  Yeah.

15                   ATTY. BAILEY:  And you know that

16   beyond any reasonable doubt, don't you?

17                   VICTOR SABULSKY:  Yeah.

18                   ATTY. BAILEY:  And you know that by

19   using circumstantial evidence.  You couldn't see the

20   thunderstorm with your own eyes but from all of the

21   facts and circumstances that you were presented

22   with, you were able to draw that logical deduction.

23                   VICTOR SABULSKY:  Right.

1           ATTY. BAILEY:  And you did that

2     beyond any reasonable doubt, didn't you?

3           VICTOR SABULSKY:  Right.

4           ATTY. BAILEY:  Now, there are some

5     limitations to circumstantial evidence.  Without

6     more, you can't tell maybe how long it rained or how

7     much water fell unless you were able to measure it,

8     like at the airport or the Weather Bureau.  But you

9     know beyond any reasonable doubt that there was a

10    thunderstorm.  Now, there may be some possible or

11    imaginary doubt.  You can imagine that during the

12    night that Alf and his martian buddies flew by in a

13    flying saucer and put on a sound and light show and

14    sprinkled the ground with some wet stuff.  But that

15    would be a foolish or imaginary doubt, wouldn't it?

16          VICTOR SABULSKY:  Yes.

17          ATTY. BAILEY:  Okay.  Now, the

18    State is allowed to use circumstantial evidence to

19    prove the elements of the crime and some times that

20    becomes very necessary because in serious crimes

21    where people plan serious crimes like aggravated

22    murder, you wouldn't expect them to stand out on the

23    Courthouse steps and announce to the whole world

```
 1        what they were going to do, right?
 2                    VICTOR SABULSKY:  Right.
 3                    ATTY. BAILEY:  Okay, they may do
 4        that in secret, try to hide their tracks.  But if
 5        you had circumstantial evidence of that, maybe
 6        letters or phone calls that might show what's going
 7        on in a person's mind, you would be able to consider
 8        that, wouldn't you?
 9                    VICTOR SABULSKY:  Yes.
10                    ATTY. BAILEY:  And you understand
11        that even though people may plan crimes and go into
12        a lot of detail in the planning, some times they do
13        some really stupid, stupid things and they get
14        caught, right?
15                    VICTOR SABULSKY:  Right.
16                    ATTY. BAILEY:  You've probably
17        heard stories about the bank robber who goes into a
18        bank with a mask and a gun and says, give me all of
19        the money, and the teller gives him the money, and
20        he hands the teller a note, a stick-up note on the
21        back of an envelope, and he runs out taking the
22        money and leaves the note behind and when they turn
23        the envelope over, there is his name and address on
```

1    the other side.

2                    VICTOR SABULSKY:  Right.

3                    ATTY. BAILEY:  Or the burglar that

4    goes in the house and plans to sneak in in the

5    middle of the night and steal stuff, and he does

6    that, but when he goes inside, he drops his wallet

7    and leaves his identification there.

8                    VICTOR SABULSKY:  Right.

9                    ATTY. BAILEY:  Okay, so you

10   understand that criminals aren't always rocket

11   scientist and some times they get tripped up?

12                   VICTOR SABULSKY:  Yes.

13                   ATTY. BAILEY:  Now, as with the

14   other trials, and I take it in Pennsylvania, the

15   Judge didn't let you take notes, right?

16                   VICTOR SABULSKY:  No.

17                   ATTY. BAILEY:  And in -- was it

18   Warren, you didn't take any notes?

19                   VICTOR SABULSKY:  No.

20                   ATTY. BAILEY:  Okay, the same thing

21   here, you can't take notes.  And that is because

22   they want you to look at the witnesses as they

23   testify and watch their demeanor and make your

1     decision as to their truthfulness, okay, just as you

2     did in the other cases.  So, you know, you have to

3     pay close attention and then when you're all done,

4     if this case begins in two weeks, you have got

5     collective recollection of all 12 people on the jury

6     to fall back on.  There aren't going to be any

7     instant transcripts.  Some times folks will ask, can

8     they get the testimony of so and so, and the Judge

9     is going to tell you no.  Our court reporters are

10    very good but we don't have a million dollars worth

11    of transcribing equipment like they had in the O.J.

12    Simpson or the Menendez trial or some high publicity

13    cases where they put a million dollars into

14    recording equipment and transcribing equipment for

15    instant transcripts, okay?

16                    VICTOR SABULSKY:  Right.

17                    ATTY. BAILEY:  So, that's not going

18    to happen.  You are going to have to rely on your

19    recollection.  You are also stuck with the questions

20    that the lawyers ask.  And because we're lawyers and

21    went to law school, we're trained to establish

22    elements or to try to tear down elements.  Okay, so

23    it may be that you have a special interest in

1    something.  Let's see, I think I mentioned before we

2    broke for lunch that I was upset with Chris' shoes

3    or something like that before, so let's use that

4    shoe example.  Let's say you are shoes saleman, and

5    you wondered whether people were wearing Reeboks or

6    wing tips or whatever at the time of the offense.

7    Let's say that has no bearing on establishing the

8    elements.  Okay, that type of question might never

9    get asked or answered.  Okay, you might have some

10   unanswered questions but as long it didn't pertain

11   to establishing the elements and we were able to do

12   that beyond a reasonable doubt, you can return a

13   conviction even though those questions never get

14   answered, right?

15                    VICTOR SABULSKY:  Right.

16                    ATTY. BAILEY:  Okay.  You

17   understand that you can't go out to investigate on

18   your own?

19                    VICTOR SABULSKY:  Oh, yes.

20                    ATTY. BAILEY:  I mean, because that

21   could cause a mistrial.

22                    VICTOR SABULSKY:  Uh-huh.

23                    ATTY. BAILEY:  I think we had that

1   happen in one case and some times they do it in the

2   movies, like on Matlock and Perry Mason might of

3   sent his staff out and L.A. Law and some of those

4   T.V. things, but that is not in real life.

5                    VICTOR SABULSKY:  Right.

6                    ATTY. BAILEY:  Okay, now, what is

7   different in this case too from what you have

8   experienced before is something called

9   sequestration.  At the end of the first phase, a

10  couple of weeks from now, let's say we're done with

11  the testimony and the evidence and the Judge has

12  instructed you and the other jurors on the law and

13  you go back to deliberate.  At that point, you are

14  kept together except that deliberation may take

15  longer and you may be put up in a hotel and meals

16  will be provided for you.  And every jury is

17  different.  In capital cases, we have had juries

18  come back anywhere from a hour and a half to five

19  days, okay.  And you take as long as you need, okay.

20  And you will be kept together and you can't discuss

21  the case unless you are altogether.  You can't have

22  one on one or one on two discussions about it.

23                    VICTOR SABULSKY:  Right.

```
 1                        ATTY. BAILEY:  And let's say you

 2      return a conviction at the end of the first phase

 3      and find her guilty of aggravated murder and one or

 4      more of the specifications.  We then go to the

 5      second phase and there will be a break in between,

 6      probably a couple of days or week.  And then we come

 7      back and you could hear the same testimony or

 8      additional testimony in the second phase, and that

 9      usually will last maybe one to three days, and then

10      the Judge would instruct you on the law and you

11      would again be sequestered as long as it takes.

12      Would that sequestration cause you any undue

13      hardship?

14                        VICTOR SABULSKY:  I don't think so,

15      not at this time.

16                        ATTY. BAILEY:  Okay, now during the

17      course of trial, you are going to be  face to face

18      with the Defendant and perhaps as her chair is

19      turned toward you, you are going to become more

20      acquainted with her.  Now, my question to you is

21      this.  When you go inside your jury room to

22      deliberate on your verdict, can you base your

23      decision on the testimony and evidence that you
```

1        received and the Judges' instructions of law, and

2        lay aside all thoughts of sympathy that you have for

3        this Defendant?

4                         VICTOR SABULSKY:  Yes.

5                         ATTY. BAILEY:  Because I understand

6        that it is normal to feel sympathy for people, but

7        we need to make our decision in this case without

8        any concerns for sympathy.

9                         VICTOR SABULSKY:  Uh-huh.

10                        ATTY. BAILEY:  Now, do you -- I

11       understand that you favor the death penalty but

12       you're Catholic, right?

13                        VICTOR SABULSKY:  Right.

14                        ATTY. BAILEY:  You don't attend

15       Church, I take it?

16                        VICTOR SABULSKY:  Due to my work,

17       not too much now.

18                        ATTY. BAILEY:  And I understand the

19       Church has taken the position against the death

20       penalty, would that cause any problem for you.

21                        VICTOR SABULSKY:  No.

22                        ATTY. BAILEY:  You make your own

23       decisions?

```
 1                      VICTOR SABULSKY:  I make my own

 2       decisions.

 3                      ATTY. BAILEY:  Okay.  Do you have

 4       any questions?

 5                      VICTOR SABULSKY:  No.

 6                      ATTY. BAILEY:  Now, there are

 7       certain obligations, I take it you will agree, that

 8       we have as citizens in this country to make sure our

 9       system works.  One of the obligations is it's

10       election time we have an obligation to sort of bone

11       up on the issues and candidates that cast ballot, if

12       we're able.  That is how you get selected because

13       your name is on the voter registration.

14                      VICTOR SABULSKY:  Right.

15                      ATTY. BAILEY:  And another

16       obligation is if our country is at war, we serve in

17       the military if we're called.  We have young folks

18       over seas now, and I noticed, I believe, you were in

19       the Marines you enlisted.  That was during Vietnam?

20                      VICTOR SABULSKY:  Yes.

21                      ATTY. BAILEY:  Were you over seas?

22                      VICTOR SABULSKY:  No.

23                      ATTY. BAILEY:  Where did you serve?
```

```
 1                      VICTOR SABULSKY:  Quantico,

 2   Virginia, and Camp Pendleton.

 3                      ATTY. BAILEY:  Okay, so you have

 4   done that, you have served your country before.

 5                      VICTOR SABULSKY:  Yes.

 6                      ATTY. BAILEY:  And another

 7   obligation of citizenship is to serve as jurors if

 8   we're summoned, and you have already done that

 9   twice.  Would you be willing to undertake it one

10   more time in the most serious of criminal cases, a

11   capital murder case and serve as a juror in this

12   case to make sure that we get people from all walks

13   of life and throughout the community with all types

14   of experiences to make sure that our system works?

15                      VICTOR SABULSKY:  Yes.

16                      ATTY. BAILEY:  Thank you, very

17   much.

18                      THE COURT:  Mr. Juhasz?

19                      ATTY. JUHASZ:  Thank you, Your

20   Honor.

21

22

23
```

1
2
3
4                        REPORTER'S CERTIFICATE
5
6          This is to certify the foregoing represents a
7      true and correct copy of the proceedings had in the
8      aforementioned cause as reflected by the stenotype
9      notes taken by me on the same.
10
11
12
13
14                                    Maribeth Hoolihan
15      DATE:   January 2, 2004        Maribeth Hoolihan
16                                     Official Court Reporter
17
18
19
20
21
22
23

1               IN THE COURT OF COMMON PLEAS

2                  TRUMBULL COUNTY, OHIO

3

4    STATE OF OHIO,            ) Case No. 01-CR-793
                               )
5              Plaintiff       )
                               )
6    -vs-                      ) Judge John M. Stuard
                               )
7    DONNA M. ROBERTS,         ) **VOLUME XV**
                               )
8              Defendant       )TRANSCRIPT OF PROCEEDINGS

9

10   Voir Dire, commencing April 30, 2003, and

11   May 1 & 2, 2003,

12   BEFORE:     HONORABLE JOHN M. STUARD

13   AT:         Trumbull Co. Court of Common Pleas
                 Courtroom Number 2
14               161 High Street, N.W.
                 Warren, Ohio 44481
15

16   APPEARANCES:

17   On behalf of the State of Ohio:
                 Mr. Kenneth N. Bailey and
18               Mr. Christopher D. Becker
                 Assistant Prosecuting Attorneys
19               Warren, Ohio

20   On behalf of the Defendant:
                 Mr. J. Gerald Ingram and
21               Mr. John B. Juhasz
                 Attorneys at Law
22               Youngstown, Ohio

23   Official Court Reporter:  Maribeth Hoolihan

136

1              **VOLUME XV**

2

3         **VICTOR SABULSKY, JUROR NUMBER 200**

4    **EXAMINATION BY ATTORNEY JUHASZ:**

5                    ATTY. JUHASZ:  How are you doing?

6                    VICTOR SABULSKY:  Good.

7                    ATTY. JUHASZ:  Do you need some

8    water or something?

9                    VICTOR SABULSKY:  No, thanks.

10                   ATTY. JUHASZ:  Okay, but if you do

11   while we're talking, let me know, okay?

12                   VICTOR SABULSKY:  Okay, I'm all

13   right.

14                   ATTY. JUHASZ:  You might remember

15   me from a little over three weeks ago, my name is

16   John Juhasz.

17                   VICTOR SABULSKY:  Yes.

18                   ATTY. JUHASZ:  This is Jerry

19   Ingram.

20                   ATTY. INGRAM:  How are you, sir?

21                   VICTOR SABULSKY:  Fine.

22                   ATTY. JUHASZ:  And Jerry and I are

23   representing Donna Roberts.

1                    VICTOR SABULSKY:  Okay.

2                    ATTY. JUHASZ:  You probably know

3       from your other two juror experiences is that what

4       we're doing here is a little bit different in terms

5       of jury selection that you went through on those

6       cases, correct?

7                    VICTOR SABULSKY:  Yes, a lot

8       different.

9                    ATTY. JUHASZ:  I am assuming that

10      in those other cases, you didn't have a situation

11      where you went in the courtroom and talked one on

12      one with the lawyers, correct?

13                   VICTOR SABULSKY:  No.

14                   ATTY. JUHASZ:  It was all done as a

15      group?

16                   VICTOR SABULSKY:  Correct.

17                   ATTY. JUHASZ:  All right.  There is

18      a reason for that, and the reason is because as Mr.

19      Bailey suggested to you just a couple of moments

20      ago, this is the most serious type of case that we

21      have, obviously.  It is a little bit like -- what

22      we're doing is a little bit like interviewing

23      someone for a job, a short-term job compared to your

1     regular job, but a very important one.  You can

2     appreciate that.

3                         VICTOR SABULSKY:  Yes.

4                         ATTY. JUHASZ:  When you interview

5     someone for a job, you want to ask them questions

6     and find out if they've got the qualifications to

7     serve and, at the same time, you know, if you go

8     into a job interview, you can find out a little bit

9     about your prospective employer, and find out if

10    that is a place where you really want to work.  That

11    is basically what we're doing here, okay?

12                         VICTOR SABULSKY:  Yes.

13                         ATTY. JUHASZ:  If you or somebody

14    that you cared about were sitting over there where

15    Donna is, first of all, I assume that you would want

16    the lawyers who were representing you or that loved

17    one to do what we're doing, which is to find out a

18    little bit about the people who are going to decide

19    the case.  That seems fair to you, correct?

20                         VICTOR SABULSKY:  Yes.

21                         ATTY. JUHASZ:  If I understood what

22    you said, your brother, Steve, have you guys talked

23    about this situation at all?

1              VICTOR SABULSKY:  No.

2              ATTY. JUHASZ:  About this case or

3      anything like that?

4              VICTOR SABULSKY:  I haven't seen

5      him since Christmas.

6              ATTY. JUHASZ:  Okay, all right.

7      But I think you said that you did read something

8      about the case very early on when it first happened,

9      correct?

10             VICTOR SABULSKY:  Yeah, when it

11     first happened, I read just a little part of it.  I

12     usually just scan through it.

13             ATTY. JUHASZ:  Okay.  Three weeks

14     ago, three weeks and a day when we were down in the

15     big Courtroom down the hall in Judge Logan's

16     Courtroom, do you remember now where you were seated

17     or standing in the courtroom?

18             VICTOR SABULSKY:  I was standing in

19     the back by the doors.

20             ATTY. JUHASZ:  Okay.  When you went

21     into that big set of doors, did you go to the right

22     or to the left?

23             VICTOR SABULSKY:  To the left.

1              ATTY. JUHASZ:  And you were

2      standing in the back, were you close to the doors or

3      were you -- some people kind of got pushed down

4      further toward the corner.

5              VICTOR SABULSKY:  I was close to

6      the doors.  I was two people away from the wall.

7              ATTY. JUHASZ:  That day, as the

8      Judge told you, one of the things that we are

9      talking to you about is any information that people

10     may have heard about the case, and that includes not

11     just what you may have heard in the newspaper, but

12     what you may of heard other people discuss about the

13     case, and that is the reason, honestly, that I am

14     asking you these questions.  That day before the

15     Judge came out, did you hear anybody talk about Miss

16     Roberts, or the case or why anybody was there, or

17     anything like that?

18             VICTOR SABULSKY:  I didn't even

19     remember about it until the Judge brought it up.

20             ATTY. JUHASZ:  Okay.

21             VICTOR SABULSKY:  Then, I didn't

22     even know.  When I took my slip into work, the lady

23     at work mentioned it again.

1           ATTY. JUHASZ:  I'm sorry, I didn't

2    hear that last thing that you said.

3           VICTOR SABULSKY:  When I took my

4    paper into work, my slip, the secretary there

5    mentioned it, and that is the second time that I

6    heard about it.

7           ATTY. JUHASZ:  Okay, so other than

8    when you first read about it, when you heard Judge

9    Stuard mention it, and then when you took your paper

10   to work to show them where you have been, that you

11   were summoned for jury duty, and that lady mentioned

12   it.

13          VICTOR SABULSKY:  Correct.

14          ATTY. JUHASZ:  How about anybody

15   who was gathered there to be a prospective juror,

16   did you hear them talk about Donna Roberts or about

17   anything else about why they were there?

18          VICTOR SABULSKY:  No.

19          ATTY. JUHASZ:  Since that day, and

20   I don't know, did you have to come in yesterday and

21   we sent you home and made you come back today, or is

22   today the first day?

23          VICTOR SABULSKY:  No, today is the

1     first day.

2                    ATTY. JUHASZ:  That's good.  We try

3     to work this so that we don't inconvenience you too

4     much.  Since you have been in the Courthouse today,

5     have you heard Donna Roberts or the case or anything

6     like that discussed?

7                    VICTOR SABULSKY:  No.

8                    ATTY. JUHASZ:  From what you have

9     heard, and I understand it's a very little bit, what

10    would you be able to tell us about what this case

11    was about, what would you be able to tell us about

12    it?

13                   VICTOR SABULSKY:  I don't really

14    know anything about it.

15                   ATTY. JUHASZ:  Then, I will tell

16    you a little bit, how's that?

17                   VICTOR SABULSKY:  Okay.

18                   ATTY. JUHASZ:  The basic allegation

19    here by the government is that Donna and a fellow by

20    the name of Nathaniel Jackson, does that name ring a

21    bell with you, Nathaniel and Nate Jackson?

22                   VICTOR SABULSKY:  No.

23                   ATTY. JUHASZ:  The allegation by

1   the government is that, basically, Donna and this

2   Nathaniel Jackson fellow plotted or conspired or

3   made up a plan to kill Robert Fingerhut.  Now,

4   Robert is a person to whom Donna was married and

5   they divorced.  But after they divorced, they

6   continued to live together in Howland, and they

7   continued to work together at the Warren and

8   Youngstown Greyhound Bus Stations.

9                    VICTOR SABULSKY:  Okay.

10                   ATTY. JUHASZ:  Any of that ringing

11  a bell with you now?

12                   VICTOR SABULSKY:  No.

13                   ATTY. JUHASZ:  Some times -- I

14  know some times my wife will tell me that she told

15  me something and I'll claim she won't, and then when

16  I hear something else, it triggers a bell.

17                   VICTOR SABULSKY:  The only thing

18  that I can remember is from the first article is

19  that she had a boyfriend and they plotted to kill

20  her husband.

21                   ATTY. JUHASZ:  Okay.

22                   VICTOR SABULSKY:  And that's about

23  it.

1              ATTY. JUHASZ:  All right.  Because

2      you read that in the paper, do you think it's true?

3              VICTOR SABULSKY:  Not really.

4              ATTY. JUHASZ:  Do you have any

5      impression right now from that little bit, from that

6      article, that she must of been involved or she must

7      be guilty?

8              VICTOR SABULSKY:  No, I don't even

9      know what she's involved with.

10             ATTY. JUHASZ:  Okay.  Some of the

11     evidence that we think the government may  offer

12     against Donna in the effort to persuade the jury

13     that she's guilty, are some letters that Donna wrote

14     and some taped phone conversations.  And the reason

15     that I bring those up is because some of them are

16     sexually explicit.  There are, I suppose, a number

17     of other adjectives that we could apply to that,

18     vivid, but they're sexually explicit some times to

19     the point of being offensive.  Now, here is why I

20     bring that up.  You may see or hear things that

21     cause you to be personally offended about things

22     that Donna said, and what I want to find out from

23     you is, can you assure us that you won't let that

1    substitute for evidence against her?

2                    VICTOR SABULSKY:  No.

3                    ATTY. JUHASZ:  See, they have to

4    prove that she did that, do you agree with that?

5                    VICTOR SABULSKY:  Right.

6                    ATTY. JUHASZ:  Okay.  And even

7    though you might read or hear something and say, I

8    don't approve of that, I don't like what this woman

9    did or what this woman said, but that doesn't

10   substitute or prove that she is actually involved in

11   this case.  Do you see that?

12                   VICTOR SABULSKY:  Yes.

13                   ATTY. JUHASZ:  I mentioned Mr.

14   Jackson's name a little bit ago.

15                   VICTOR SABULSKY:  Yes.

16                   ATTY. JUHASZ:  And I said that it's

17   the government's allegation that they got together

18   and made this plan.  This trial is only about

19   whether Donna helped Mr. Jackson.  Do you understand

20   that?

21                   VICTOR SABULSKY:  Yes.

22                   ATTY. JUHASZ:  You may hear

23   evidence in the course of this case that makes you

1    say, well, you know what, I know that this Juhasz

2    guy told me that this case isn't about Nathaniel

3    Jackson, but from what I am hearing, I conclude that

4    Nathaniel Jackson was involved in Robert Fingerhut's

5    death.  You may do that during the course of the

6    trial, but you appreciate, don't you, that that is a

7    separate issue from whether Donna helped him.  Do

8    you see that?

9                    VICTOR SABULSKY:  Right.

10                   ATTY. JUHASZ:  You mentioned in

11   your questionnaire -- one of the things that you

12   mentioned, is that you don't think that the

13   government should be able to tell you as an American

14   citizen whether you have to wear your seat belt or

15   not, correct?

16                   VICTOR SABULSKY:  Oh, I definitely

17   don't like that.

18                   ATTY. JUHASZ:  Okay.  You probably

19   know from your involvement in other cases that even

20   though you found that person guilty about that

21   offense you talked about over in Mercer, I assume

22   that when you went into case, you went in with

23   presuming the Defendant innocent as you were told to

3264

```
 1    do, correct?

 2                    VICTOR SABULSKY:  Yes.

 3                    ATTY. JUHASZ:  And you didn't think

 4    that just because the government in that case said

 5    this guy did something, that he did it, correct?

 6                    VICTOR SABULSKY: Right.

 7                    ATTY. JUHASZ:  Is that true here

 8    too, just because the government says Donna did it,

 9    you don't think that that is true, correct?

10                    VICTOR SABULSKY:  No.

11                    ATTY. JUHASZ:  Because your brother

12    Steve is on the Sheriff's Department, there may be

13    -- well, there certainly is going to be police

14    officers and maybe deputy sheriffs who testify in

15    this case, okay?

16                    VICTOR SABULSKY:  Yes.

17                    ATTY. JUHASZ:  And one of your jobs

18    as a juror is to decide whether somebody who gets on

19    the witness stand who sits where you are right now

20    is telling you the truth, okay?

21                    VICTOR SABULSKY:  Right.

22                    ATTY. JUHASZ:  And you know that

23    from your other jury experience, correct?
```

1           VICTOR SABULSKY:  Yes.

2           ATTY. JUHASZ:  And you certainly

3  don't strike me as the kind of guy who thinks that

4  just because somebody comes in here and stands in

5  front of the Judge, raises their hand and takes an

6  oath that everything they say to the jury is gospel,

7  right?

8           VICTOR SABULSKY:  No.

9           ATTY. JUHASZ:  All right, is there

10  anything about the fact that your brother Steve

11  works on the Sheriff's Department that if you hear a

12  police officer testify or even a deputy sheriff, who

13  is one of his co-workers might sort of -- kind of

14  give them a leg up and say, you know, well, these

15  guys are cops or these guys are deputy sheriffs so I

16  am inclined to believe them.

17           VICTOR SABULSKY:  I feel that

18  everybody is their own individual person.

19           ATTY. JUHASZ:  Okay.

20           VICTOR SABULSKY:  That's how I

21  feel.

22           ATTY. JUHASZ:  You have known Steve

23  all of your life, obviously.

1                          VICTOR SABULSKY:  That's right.

2                          ATTY. JUHASZ:  You know that the

3     uniform doesn't -- I mean, he's a great guy but the

4     uniform doesn't make him, correct?

5                          VICTOR SABULSKY:  Yes.

6                          ATTY. JUHASZ:  And that would be

7     true of any other person, correct?

8                          VICTOR SABULSKY:  Right.

9                          ATTY. JUHASZ:  Just because they're

10    wearing a police uniform doesn't mean that you

11    believe everything that they have to say.

12                         VICTOR SABULSKY:  Right.

13                         ATTY. JUHASZ:  Let me ask you one

14    more thing about what you may have, the little bit

15    you may have heard, do you have any impression from

16    what you told me about that Donna was probably

17    involved in this case?

18                         VICTOR SABULSKY:  Probably, from

19    what I read in the paper.

20                         ATTY. JUHASZ:  Is that probably to

21    a level that she would, in essence, have to

22    establish for you or present evidence to you that

23    she was not involved in order for you to find her

3267

1    not guilty?  Am I making that question clear?

2                    VICTOR SABULSKY:   Yes.  Probably.

3                    ATTY. JUHASZ:  Okay.

4                    VICTOR SABULSKY:   I don't know

5    enough to say exactly how I feel about that case.

6                    ATTY. JUHASZ:  All right.  Let's do

7    this, we're going to talk and some of this stuff --

8    I appreciate it is stuff that you probably heard

9    before, but I am going to ask you to humor me and I

10   will try not to keep you up here all day and just

11   humor me.  And if I repeat something that you heard

12   before, I apologize.  Have you ever heard the phrase

13   before, taking the fifth?

14                    VICTOR SABULSKY:  Yes.

15                    ATTY. JUHASZ:  A phase that I think

16   some times gets a little bit of a bad rap on the

17   T.V. and the movies because lots of times when you

18   see it there, it's some guy that everybody knows

19   from watching the movie or the T.V. shows, a bad guy

20   who is guilty as hell and he's taking the Fifth

21   because he doesn't want to give some information

22   that is going to put him behind bars.

23                    VICTOR SABULSKY:  Right.

1                    ATTY. JUHASZ:  That is only a part

2    of it, however.  I am assuming that you know that

3    taking the fifth comes from the Fifth Amendment to

4    the Constitution, correct?

5                    VICTOR SABULSKY:  Yes.

6                    ATTY. JUHASZ:  That Fifth

7    Amendment was put in as part of our Bill of Rights

8    way back not so long after the country got started,

9    added to the Constitution just a couple of years

10   after the Constitution was adopted, and it was to

11   make certain that there were certain things that we

12   as American citizens had as protections against the

13   Government, do you see that?

14                   VICTOR SABULSKY:  Yes.

15                   ATTY. JUHASZ:  And the way that

16   works in connection with a criminal case is while

17   you can take the Fifth Amendment like in that movie

18   or T.V. show I was talking about, what it really

19   means is that you as a citizen charged with an

20   offense, don't have to do anything to help the

21   government convict you, do you see that?

22                   VICTOR SABULSKY:  Okay.

23                   ATTY. JUHASZ:  Basically, in our

1      country, as opposed to some other country, which is

2      one of the reasons that they put this protection in

3      the Constitution, in our Country, we say that when

4      the government says that you do something wrong,

5      they have to prove it, you don't have to prove

6      yourself not guilty, they have to prove you guilty,

7      okay.

8                    VICTOR SABULSKY:  Okay.

9                    ATTY. JUHASZ:  Do you think that's

10     a good idea by the way, or do you think it should be

11     the other way around?  If the Government charged you

12     with a crime, you should have to prove that you

13     didn't do it?

14                    VICTOR SABULSKY:   No, I think

15     it's the right way.

16                    ATTY. JUHASZ:  Okay.  Because they

17     have to prove it and because of what I just said a

18     minute ago about since they have to prove it, you as

19     a citizen don't have to do anything to help them

20     prove it.  That is one of the reasons why you have

21     the right to take the Fifth, as they say, by staying

22     silent, do you see that?

23                    VICTOR SABULSKY:  Okay.

1          ATTY. JUHASZ:  And, again, do you

2     think that is a pretty good idea.

3          VICTOR SABULSKY:  Yeah, why would

4     she be helping, she might be innocent.

5          ATTY. JUHASZ:  Right.  And because

6     of that, we have in this Country what is called a

7     presumption of innocence, is that a phase that

8     you've heard before?

9          VICTOR SABULSKY:  Yes.

10          ATTY. JUHASZ:  That means that in

11     every criminal case, Mr. Bailey I think talked about

12     a cloak, a presumption of innocence being a cloak

13     that protects the person, what it means in a case

14     like this, however, is that when you come into a

15     Courtroom like this as a person charged with a

16     crime, every person who sits here to decide whether

17     or not you did it, has to take an oath to say,

18     listen, I have no problem, I am swearing right now,

19     or affirming, that I have no problem believing that

20     that person is guilty of nothing and I will continue

21     to have that honest belief unless and until these

22     guys prove to me by proof beyond any doubt, based on

23     reason and common sense, that she did do something

```
 1    wrong.  Are you okay with all of that?

 2                    VICTOR SABULSKY:  Yes.

 3                    ATTY. JUHASZ:  If you're picked as

 4    a juror in this case, you took an oath a couple of

 5    weeks ago that you would tell us the truth when

 6    you're talking to us now.

 7                    VICTOR SABULSKY:  Uh-huh.

 8                    ATTY. JUHASZ:  And I don't mean to

 9    suggest by that that I think you're not, I am just

10    trying to distinguish it from if you're selected as

11    a juror, you would take another oath and that oath

12    would be to well and truly try this case and part of

13    it would be swearing that you can walk in with that

14    presumption of innocence that I just talked about.

15    Any problem doing that in this case?

16                    VICTOR SABULSKY:  No.

17                    ATTY. JUHASZ:  No problem looking

18    at Donna Roberts right now and saying I believe that

19    you're innocent and I will continue to believe that

20    until they prove to me otherwise?

21                    VICTOR SABULSKY:  Right.

22                    ATTY. JUHASZ:  Everybody has a way

23    that they like to try and talk about these legal
```

```
1    principles to jurors, and the way that I like to do
2    it is to think of an imaginary box.  And I will tell
3    you why I like to talk about it that way.  When
4    you're done with this case, if you're selected as a
5    juror, Judge Stuard is going to read to you -- he's
6    going to tell you what the law is.  He is going to
7    tell you, I am going to give you the law and your
8    job is to decide the facts, and you have to decide
9    whether the facts they presented to you satisfy the
10   law, or did not.  And he is going to say, you have
11   to decide it by proof beyond a reasonable doubt, and
12   he will tell you what that is but what he won't do
13   for you, as you probably know from your other cases,
14   is he won't quantify it, he won't say, look, if they
15   have this much evidence, it's guilty.  If they don't
16   have that much evidence, it's not guilty.  That is
17   why I like to use the box.  You have to think of the
18   box when the trial starts as being empty because
19   right now, have you heard any evidence at all that
20   Donna Roberts did anything?
21                  VICTOR SABULSKY:  No.
22                  ATTY. JUHASZ:  No, you heard
23   allegations, right?
```

1                    VICTOR SABULSKY:  Yes.

2                    ATTY. JUHASZ:  Ever been accused of

3    something that you didn't do?

4                    VICTOR SABULSKY:  Yes.

5                    ATTY. JUHASZ:  Not a fun thing,

6    huh?

7                    VICTOR SABULSKY:  Nope.

8                    ATTY. JUHASZ:  Okay.  And if you

9    had friends or relatives who heard you being accused

10   of that thing you didn't do, you would certainly

11   want them to presume you innocent, right?

12                   VICTOR SABULSKY:  Yes.

13                   ATTY. JUHASZ:  And to continue to

14   believe that unless somebody could back up that

15   allegation they were making, right?

16                   VICTOR SABULSKY:  Right.

17                   ATTY. JUHASZ:  And of course, if

18   you didn't do it, they're not going to be able to

19   back up that allegation, are they?

20                   VICTOR SABULSKY:  Right.

21                   ATTY. JUHASZ:  When you go back

22   into the jury room now, what you have to do is take

23   the evidence that you hear during the course of the

1    trial and sort of pour into this imaginary box,

2    somewhere on that box is going to be a line called

3    reasonable doubt.  It's going to be pretty high up

4    toward the top of the box, and let me tell you why.

5    First of all, because it's the highest standard of

6    proof that we have in cases.  I think -- was one of

7    your cases a civil case?

8               VICTOR SABULSKY:  Yes.

9               ATTY. JUHASZ:  Okay, that case has

10   a much lower burden of proof, what we call

11   preponderance of the evidence, just a little bit

12   more than 50 percent, okay.  In a criminal case,

13   it's a much higher standard of proof called proof

14   beyond a reasonable doubt.  The reason I say that

15   the line is far up on the box and close to the top

16   is, the only thing beyond a reasonable doubt and all

17   doubt that is left are possible doubts or imaginary

18   doubts or foolish doubts.  The government doesn't

19   have to prove its case a hundred percent, it doesn't

20   have to prove it beyond imaginary or foolish doubts,

21   but has to prove it beyond any reasonable doubt.  Do

22   you see that?

23               VICTOR SABULSKY:  Yes.

1                    ATTY. JUHASZ:  Okay.  The reason I

2       like to talk about the box is, see a lot of people

3       think that in a criminal case, if the verdict is

4       guilty, the government wins, and if the verdict is

5       not guilty, the Defendant wins.  That is really not

6       how it works.  Because the Government has the burden

7       of proof, they either win the case or they lose the

8       case, okay.  They win the case by giving the jurors

9       enough evidence to fill up that box beyond the line

10      called reasonable doubt.  They lose the case if they

11      don't give the jurors enough evidence to say that

12      they didn't fill up the box.  Do you see that?

13                    VICTOR SABULSKY:  Uh-huh.

14                    ATTY. JUHASZ:  The Defendant,

15      because of that presumption of innocence that you

16      and I talked about under the Fifth Amendment,

17      doesn't pour anything into the box and doesn't take

18      anything out of the box.  Ingram and I could sit

19      over there and drink Mai ties and play Yahtzee if we

20      want to during this trial.  We probably won't, but

21      we can because her only obligation is to be here,

22      okay.  She got a piece of paper saying, we're

23      charging you with doing something wrong, you got to

1      show up and have a trial.  We don't have to do

2      anything because they either fill up the box, or

3      they don't.  Do you see that?

4                      VICTOR SABULSKY:  Yes.

5                      ATTY. JUHASZ:  Any problem holding

6      them to that burden of proof?

7                      VICTOR SABULSKY:   No.

8                      ATTY. JUHASZ:  If they, during the

9      course of this trial, present to you and the other

10     jurors some evidence, and when go back and look in

11     my silly imaginary box, you look in there and you

12     go, you know what, there is some evidence there,

13     maybe it's even getting pretty far up there, getting

14     close to that line, but that crazy lawyer told me

15     that they have to prove it beyond a reasonable

16     doubt, and they didn't get beyond that line.  In

17     those circumstances, would you have any problems

18     returning a verdict of not guilty?

19                      VICTOR SABULSKY:  No.

20                      ATTY. JUHASZ:  Even though you know

21     somebody is dead here, right?

22                      VICTOR SABULSKY:  Right.

23                      ATTY. JUHASZ:  Okay.  Any problem

1    coming out here and looking these two guys in the

2    eye and saying, you know, you guys are nice guys and

3    you're good lawyers, but you didn't fill up that box

4    beyond the line called reasonable doubt.  Any

5    problem doing that?

6                    VICTOR SABULSKY:  No.

7                    ATTY. JUHASZ:  Now, all of that

8    having been said, let's go back for a second.  I

9    asked you a few minutes ago, and you said that from

10   what you read, probably she's involved, and probably

11   she would have to do something to show you that

12   she's not involved.  In light of what we just talked

13   about where they have the burden of proof --

14                    VICTOR SABULSKY:  Yeah.

15                    ATTY. JUHASZ:  -- what I need to

16   know from you and, look, I am not here to argue with

17   you, I just want to -- I'll take your answer for

18   what it is.  Is what you have heard or read

19   something that is already in that box, or is it

20   something that you can say, you know what, now that

21   you tell me about that, that doesn't belong in that

22   box, and get it the heck out of there.

23                    VICTOR SABULSKY:  Yeah, she

3278

```
 1    shouldn't be in the box or whatever.

 2                    ATTY. JUHASZ:  So, your idea that

 3    she is probably involved, is that something that you

 4    can get rid of or is that something that you -- and

 5    I just need you to be honest with me.  Again, I'll

 6    take your answer, or is it something that you say,

 7    you know what. To be fair about this, from what I

 8    read, even though I don't want to be that way, my

 9    thought that she is probably involved, is something

10    that is in that box that I can't throw out?

11                    VICTOR SABULSKY:  It's just what I

12    read in the papers; that's the only reason I have

13    her involved with this case.

14                    ATTY. JUHASZ:  Okay, okay.  So,

15    maybe you and I are just having a problem -- and

16    this could be my fault, which happens a lot by the

17    way, that we're not communicating on what involved

18    is.  When you say involved, are you talking about

19    involved in the murder, or just involved in this

20    case?

21                    VICTOR SABULSKY:  Involved in the

22    case.

23                    ATTY. JUHASZ:  Okay, all right.
```

1    So, what you've read doesn't constitute anything

2    that is already in that box, or you're saying, well,

3    it was in the paper and these guy's said that she

4    did something, so she's got to be involved.

5              VICTOR SABULSKY:  I don't know what

6    she did.

7              ATTY. JUHASZ:  Okay.  We do, and I

8    am going to apologize in advance, I should have

9    apologized at the very beginning because one of the

10   things that we do in cases like this is, we send you

11   a summons.  Threes times in life you've gotten a

12   summons for jury duty.  We bring you down here and

13   we throw you into a situation full of procedures and

14   rules and laws, that all of us that do this all of

15   the time have studied and gone to school for and

16   learned and practiced, and we come down here and

17   expect you to just like, come on get right in the

18   game here.  Now, I tell you that because if there is

19   something that you don't understand about how

20   procedure works, it is certainly understandable to

21   us because we're giving you a foreign language.  All

22   of that said, do you feel comfortable with having

23   read that handout that Judge Stuard gave you about

1   how a murder, a capital murder trial works in Ohio,

2   or should we spent a couple of minutes with that?

3               VICTOR SABULSKY:  No, I understand

4   it.

5               ATTY. JUHASZ:  Okay.  I like to use

6   an example of -- forget about this case.  You

7   understand that in order to go to a second phase in

8   a death penalty case that the State has to allege

9   and prove not only an aggravated murder, but what we

10   call specification, do you appreciate that?

11               VICTOR SABULSKY:  Yes.

12               ATTY. JUHASZ:  I like to talk about

13   one that is not involved in our case because one of

14   the specifications in Ohio is that the person you

15   killed is the governor, okay.  And the reason I like

16   to talk about that is because there are two separate

17   burdens of proof in the first phase of the death

18   penalty trial.  Let's say that the government

19   charges me, and they say, Juhasz, we say that you

20   planned out a murder and carried it out, you thought

21   about it in advance, and the guy's name was Bob

22   Taft, okay.  If they -- if that's what they charge

23   me with and they prove it, and I am convicted, I can

1   go to jail for a very long time, but I can't get the

2   death penalty.  Do you see that?

3                    VICTOR SABULSKY:  Yes.

4                    ATTY. JUHASZ:  They would have to

5   add something else, something to put me on notice to

6   go, hello, Juhasz, this isn't just an ordinary

7   aggravated murder.  When we said you killed Bob

8   Taft, we're also saying, he was the governor of the

9   State of Ohio when you did it, so if we prove that,

10  you can be eligible for the death penalty.  Do you

11  see that?

12                   VICTOR SABULSKY:  Yes.

13                   ATTY. JUHASZ:  At the trial, they

14  would not only have to prove the murder, but they

15  would have to prove that he was the governor.

16                   VICTOR SABULSKY:  Yes.

17                   ATTY. JUHASZ:  And the reason that

18  I like to use that example is because you can't go

19  back into the jury room and say, every idiot knows

20  Bob Taft is the governor of the State of Ohio.  See,

21  if they don't bring in some kind of evidence to

22  prove that, they haven't met their burden of proof.

23  Do you see that?

```
1                    VICTOR SABULSKY:  Yes.

2                    ATTY. JUHASZ:  Okay.  Any problem

3       holding the government to that type of a burden in

4       this case, making them prove, if they can,

5       aggravated murder and making them prove separately,

6       if they can, one or more of the specifications?

7                    VICTOR SABULSKY:  No.

8                    ATTY. JUHASZ:  Okay.  You

9       understand that if we do get to this second phase,

10      that you then have to do a different weighing

11      process.  You now have to weight the reasons to

12      impose the death penalty against the reasons not to.

13                   VICTOR SABULSKY:  Yes.

14                   ATTY. JUHASZ:  Do you see that?

15                   VICTOR SABULSKY:  Yes.

16                   ATTY. JUHASZ:  Are you comfortable

17      that you understand what the four possible penalties

18      are if we get to that phase?

19                   VICTOR SABULSKY:  Yes.

20                   ATTY. JUHASZ:  You appreciate that

21      if it's in the first phase, you and the other jurors

22      say, you know what, they didn't fill up the box

23      called aggravated murder, we go home.  That and the
```

1   other offenses she's charged with, we go home.  Do

2   you see that?

3                    VICTOR SABULSKY:  Yes.

4                    ATTY. JUHASZ:  If they prove the

5   aggravated murder and those other offenses, but they

6   don't fill up that separate box called a

7   specification, you're also done.  Do you see that?

8                    VICTOR SABULSKY:  Yes.

9                    ATTY. JUHASZ:  It's up to the Judge

10  to decide what penalty a person gets.

11                   VICTOR SABULSKY:  Okay.

12                   ATTY. JUHASZ:  It's only if that

13  specification is proved that the jury is involved in

14  deciding the sentence.  Do you see that?

15                   VICTOR SABULSKY:  Yes.

16                   ATTY. JUHASZ:  You have mentioned

17  in your questionnaire and you have talked to the

18  prosecutor about it, that you think that the death

19  penalty is okay for some offenses, correct?

20                   VICTOR SABULSKY:  Yes, for some.

21                   ATTY. JUHASZ:  And your views have

22  seemed to have changed based upon some of the  more

23  serious events in the world.  I think you mentioned

1      today Bin Laden, right?

2                          VICTOR SABULSKY:  Yes.

3                          ATTY. JUHASZ:  And I think you put

4      in questionnaire 9/11 and did you put the World

5      Trade Center too?

6                          VICTOR SABULSKY:  I missed that

7      one.  It's just an example.

8                          ATTY. JUHASZ:  Yes, understood.  I

9      take it from that and from what you said today, that

10     it's okay for some, that you are not the kind of

11     person who says, if you're guilty of aggravated

12     murder, you are getting the death penalty

13     automatically?

14                          VICTOR SABULSKY:  No.

15                          ATTY. JUHASZ:  All right, is there

16     anything about how you feel about the death penalty

17     that would keep you from going into a second phase

18     if you got there in this case from considering those

19     four penalties as starting out on equal footing?

20     Am I making that clear?

21                          VICTOR SABULSKY:  Yes.

22                          ATTY. JUHASZ:  Is there anything

23     about how you feel about the death penalty that

1    would keep you from doing that?

2                    VICTOR SABULSKY:  No.

3                    ATTY. JUHASZ:  If you found a

4    person guilty of aggravated murder, the death

5    penalty wouldn't sort of have a leg up going into

6    the second phase?

7                    VICTOR SABULSKY:  No.

8                    ATTY. JUHASZ:  You see, don't you,

9    that if we got there, we would start over again with

10   another empty box, but this time instead of proving

11   that the person is guilty of crimes, they now have

12   to prove again by that same standard of proof called

13   beyond a reasonable doubt, that the reasons to

14   impose the death penalty outweigh the reasons not

15   to.  Do you see that?

16                   VICTOR SABULSKY:  Yes.

17                   ATTY. JUHASZ:  And, again, if they

18   don't fill up that box, do you have any problem

19   coming back here and saying, sorry, I'm voting to

20   impose one of the life sentences because you didn't

21   fill up the box?

22                   VICTOR SABULSKY:  No.

23                   ATTY. JUHASZ:  Okay, you may have

```
1    proved to me that she was guilty of murder, but you

2    didn't prove to me beyond a reasonable doubt that

3    death was the appropriate penalty?

4                   VICTOR SABULSKY:   Right.

5                   ATTY. JUHASZ:  You are okay with

6    doing that?

7                   VICTOR SABULSKY:  Yes.

8                   ATTY. JUHASZ:  You would, again, as

9    I mentioned before, if you get selected as a juror,

10   you take a different oath, and we talked about part

11   of that oath being that the presumption -- that you

12   would afford Donna that presumption of innocence,

13   part of that oath would also be that you would say

14   to the Judge, hold up your hand and say, look, if we

15   get to a second phase, I am telling you that all of

16   these penalties are going to start out equally in my

17   mind.

18                  VICTOR SABULSKY:  Yeah.

19                  ATTY. JUHASZ:  You're comfortable

20   taking that oath?

21                  VICTOR SABULSKY:  Yeah.

22                  ATTY. JUHASZ:  I think Mr. Bailey

23   talked to you about sympathy.  I am almost done.  I
```

1    know that I wouldn't have any fun sitting up there.

2    I feel for you.  I think Mr. Bailey talked to you a

3    little about sympathy, correct?

4                    VICTOR SABULSKY:  Yes.

5                    ATTY. JUHASZ:  I am just going to

6    simply leave it at this.  You appreciate, don't you,

7    that sympathy is something that doesn't go in that

8    box?

9                    VICTOR SABULSKY:   Right.

10                   ATTY. JUHASZ:  I may be something

11   -- you  might feel sorry for Mr. Fingerhut and his

12   family if you see these photographs.  You might feel

13   sorry for Donna Roberts because of what's happened

14   to her.  You may feel sorry for a whole bunch of

15   people in this case, but that's not evidence. You

16   appreciate that?

17                   VICTOR SABULSKY:  Right.

18                   ATTY. JUHASZ:  What are your

19   feelings about life imprisonment as sort of an

20   alternative punishment to the death penalty in a

21   case like this?

22                   VICTOR SABULSKY:  What do you mean

23   by that?

1              ATTY. JUHASZ:  Well, you've already

2     told me that you don't think that the death penalty

3     is appropriate for every person who commits a

4     homicide.

5              VICTOR SABULSKY:  Correct.

6              ATTY. JUHASZ:  All right.  One of

7     the things I think you did mention, however, did I

8     hear you mention premeditated murder?

9              VICTOR SABULSKY:  Yes.

10             ATTY. JUHASZ:  And is a person who

11    is found guilty of committing a premeditated murder

12    somebody who, because it's premeditated should get

13    the death penalty every time?

14             VICTOR SABULSKY:  No.

15             ATTY. JUHASZ:  Okay, it's just one

16    of those things where you might be willing to

17    consider the death penalty?

18             VICTOR SABULSKY:  Right.

19             ATTY. JUHASZ:  Okay, so let's take

20    that premeditated murder.  Because you're not saying

21    that person should get the death penalty every time,

22    are you saying that in some of those circumstances

23    life imprisonment would be a substantial enough

1       punishment for somebody found guilty of that?

2                       VICTOR SABULSKY:  Yes.

3                       ATTY. JUHASZ:  Because of that

4       presumption of innocence that you and I have been

5       talking about and my silly empty box, let me talk to

6       you about a couple of other things.  First of all,

7       we talked before, you don't think from this case or

8       from your other jury service that just because the

9       government charges somebody with something, that

10      they did it, right?

11                      VICTOR SABULSKY:  Right.

12                      ATTY. JUHASZ:  You're going to make

13      them prove it, right?

14                      VICTOR SABULSKY:  Right.

15                      ATTY. JUHASZ:  There have to be

16      rules and procedures for everything just to keep

17      order in the world, including our legal system.  And

18      to start a criminal case, when the government makes

19      that allegation, hey, Donna Roberts, we say that

20      you're guilty of aggravated murder, okay.  You know,

21      I some times use silly examples, they don't call a

22      press conference say, Donna Roberts, if you're

23      watching, we, the government, say you're guilty of

1    murder.  They don't get a deputy or a prosecutor and

2    get up on the roof of the courthouse with a bullhorn

3    and say the same thing.  The way they let her know

4    that is to send her a piece of paper called an

5    indictment, okay.  That indictment is simply a piece

6    of paper doing just what I said before, telling her,

7    (A) we say you did something wrong; (B) you don't

8    have to do anything when you get here, but you have

9    to show up for the trial, okay?

10                   VICTOR SABULSKY:  Okay.

11                   ATTY. JUHASZ:  I bring that up

12   because I want to make certain that you understand

13   that just because there is an indictment in this

14   case, that is not something that goes into that box,

15   are you okay with that?

16                   VICTOR SABULSKY:  Yes.

17                   ATTY. JUHASZ:  Even if it's read to

18   you ten times during the course of this case, it

19   never changes its character as anything other than

20   an allegation, do you see that?

21                   VICTOR SABULSKY:  Okay.

22                   ATTY. JUHASZ:  Okay.  Because of

23   the presumption of innocence and the government's

1          burden of proof, Donna doesn't have to do anything,

2          as I have said to you several times.  And that

3          includes, if she doesn't want to, she doesn't have

4          to get up on the witness stand, okay.  Most times

5          when you want to decide things -- you have a couple

6          of kids?

7                          VICTOR SABULSKY:  Yes.

8                          ATTY. JUHASZ:  I would venture to

9          say that during the course of your life, there's

10         been a dispute or two among those children, as

11         everybody's children -- somebody makes an allegation

12         one against the other, or the neighbor kid against

13         one of your kids, correct?

14                          VICTOR SABULSKY:  Oh, yeah.

15                          ATTY. JUHASZ:  Before you decide

16         that, first of all, you want to do it as fairly as

17         possible, right?

18                          VICTOR SABULSKY:  Yes.

19                          ATTY. JUHASZ:  And most of us, I

20         think, want to sort of hear both sides of the story

21         before we make a decision, right?

22                          VICTOR SABULSKY:  Right.

23                          ATTY. JUHASZ:  I mentioned before

1    that if somebody made an allegation against you that

2    wasn't true, you would expect before somebody else

3    decided whether it was true, that at least hear your

4    side of it, right?

5                    VICTOR SABULSKY:  Right.

6                    ATTY. JUHASZ:  Now that we both

7    agree that is the fair way to do things, let me tell

8    you that it doesn't work like that in a criminal

9    case like this, okay.

10                   VICTOR SABULSKY:  Okay.

11                   ATTY. JUHASZ:  Because of that

12   presumption of innocence, the burden of proof, and

13   their obligation to fill up the box, if they can,

14   okay.  Since she doesn't have to do anything, since

15   she doesn't pour anything in or take anything out of

16   the box, she doesn't have to call any witnesses, or

17   she does not have to take the stand.  Now, I bring

18   that up because that is a little bit contra to the

19   way most of us run our lives when we're trying to

20   make fair decisions hearing both sides.  Now that we

21   said all of that, would you have any bad feelings

22   against Donna or think she was trying to hide

23   something if she decides not to take the stand in

1     this case?

2                    VICTOR SABULSKY:  No.

3                    ATTY. JUHASZ:  Do you see that

4     really what she would be doing is saying, hey, those

5     geniuses from 250 years ago who came almost 250

6     years ago that came up with that Fifth Amendment,

7     said I could sit here and look at the jury and fold

8     my arms and say, I'm not doing anything, I don't

9     think they filled up the box.  Okay, that's what she

10    would be doing, do you see that?

11                   VICTOR SABULSKY:  Yes.

12                   ATTY. JUHASZ:  But although she has

13    the right not to take the stand, if she wants to,

14    she can take the stand.  She can say, I know I have

15    the right to, even though I don't think they filled

16    up the box, I think these people should hear what I

17    have to say.  If she does that, she is a witness

18    like any other witness in the case.  Do you see

19    that?

20                   VICTOR SABULSKY:  Yes.

21                   ATTY. JUHASZ:  One of the things I

22    am sure that you know from your other jury service

23    is, when you decide whether somebody is telling the

1    truth or not, you may take into consider whether

2    they have a stake in the outcome of the case,

3    correct?

4                    VICTOR SABULSKY:  Right.

5                    ATTY. JUHASZ:  Clearly she would,

6    right?  I mean, it's a serious charge and she's got

7    an interest in seeing if she's found not guilty,

8    right?

9                    VICTOR SABULSKY:  Right.

10                    ATTY. JUHASZ:  But you don't reject

11   her testimony simply because she's the Defendant,

12   correct?

13                    VICTOR SABULSKY:  Right.

14                    ATTY. JUHASZ:  That's just

15   something that you think about in deciding whether

16   or not she's telling the truth.

17                    VICTOR SABULSKY:  Correct.

18                    ATTY. JUHASZ:  As we eluded to with

19   police officers before, but it certainly can apply

20   to other witnesses, those other witnesses may also

21   have some stake in the outcome of the case, that

22   makes sense to you, right?

23                    VICTOR SABULSKY:  Right.

1          ATTY. JUHASZ:  Something that you

2    would want to think about in deciding whether or not

3    they are telling the truth, correct?

4          VICTOR SABULSKY:  Right.

5          ATTY. JUHASZ:  How in the world do

6    you decide whether the State has filled up this

7    silly little box that I keep talking about.  When

8    you make important decisions in your life, most

9    people whether they do it on a piece of paper in

10   their mind's eye, they kind of make a checklist,

11   pros on one side, cons on the other, correct.  And

12   before you want go forward with that, whether it's

13   -- you wouldn't leave here this afternoon and say,

14   you know what, it's 2:20, let me run down to the

15   Benz dealership and buy a new Mercedes Benz.  That's

16   a serious undertaking.  You have to think about

17   financing and do I need a new car and is my wife

18   going to kill me, whatever the questions are,

19   correct?

20         VICTOR SABULSKY: Right.

21         ATTY. JUHASZ:  It's kind of the

22   same thing here when you're deciding whether they

23   filled up that box.  On one side of the checklist

1     are the reasons why they say they have filled up the

2     box.  And on the other side are reasons why either

3     Ingram and I might say that they didn't fill up the

4     box.  Things you might of thought about by yourself,

5     things other jurors might bring up to you while

6     you're back there deliberating.  They told you

7     before that they don't have to prove their case

8     beyond any doubt or a shadow of a doubt, but they

9     have to prove it beyond any doubt based on reason

10    and common sense.  Do you remember that?

11                    VICTOR SABULSKY:  Yes.

12                    ATTY. JUHASZ:  You look at each one

13    of the doubts that are on that side of the

14    checklist, talk to the other jurors, and maybe you

15    say, you know, -- they show you a piece of evidence,

16    and you go, you know what, I don't know why I had

17    doubt about that, that's not reasonable, and you get

18    rid of it.  You go through each doubt and you

19    analyze just like that.  But some of you may say,

20    you know what, that doubt is based on reason and

21    common sense, it's not foolish, it's not imaginary,

22    there is no evidence that persuades me that that is

23    not a legitimate doubt.  Okay.  If you have at least

1    one, could be more, if you have at least one of

2    those doubts left, they haven't proved the case

3    beyond all doubt based on reason and common sense,

4    they haven't met their burden of proof.  Do you

5    agree?

6              VICTOR SABULSKY:  Yes.

7              ATTY. JUHASZ:  No problem holding

8    them to that?

9              VICTOR SABULSKY:  No.

10              ATTY. JUHASZ:  One last thing and I

11    am finished.  I will desist.  Mr. Bailey suggested

12    to you that the government may be able to prove it's

13    case by circumstantial evidence. Do you recall that?

14              VICTOR SABULSKY:  Yes.

15              ATTY. JUHASZ:  They can, but just

16    because you hear circumstantial evidence, you

17    understand you don't necessarily have to make the

18    leap that the government is asking you to make.  Do

19    you see that?

20              VICTOR SABULSKY:  Yes.

21              ATTY. JUHASZ:  I have a story that

22    I like to tell to give an example of that.  And I

23    want you to pretend for a second that it's a late

1    afternoon 5:00 or 6:00 o'clock in July or August.

2    One of those summer storms are starting, it's sunny

3    but you can see the clouds gathering in the west and

4    the breeze is starting to kick up and you know we're

5    going to get one of those thunder bumpers that we

6    get in this area.  All of a sudden, I hear a crash,

7    so I run from the kitchen into the living room, and

8    as I run in there, my son's cat comes darting out

9    between my legs.  I go in and look and there on my

10   left is my son like this.  There to my right, fallen

11   off of the mantle and onto the hearth and smashed

12   into a million pieces is one of my wife's Norman

13   Rockwell plates, and somewhere over here is one of

14   Mike's nerf balls.  Now, it could be that Mike was

15   throwing a nerf ball in the house like he's been

16   told six hundred thousand times not to do, and the

17   noise scared the cat, and Mike goes, I've been told,

18   you know, the adults were right.  Or it could be

19   that the cat knocked it off and the ball is just

20   laying there because Mike never picks anything up,

21   and the cat was running because it knew that it was

22   trouble.  Or it could be that the breeze from that

23   thunderstorm knocked the plate off and scared the

1    cat and Mike is saying, look at that, I left my nerf

2    ball laying three feet from mom's plate, I got a

3    problem.  Now, from that amount of circumstantial

4    evidence, I suppose you could find that Mike threw

5    the nerf ball, but that wouldn't really be fair,

6    would it?

7                    VICTOR SABULSKY:  Right.

8                    ATTY. JUHASZ:  Because there are

9    other things where the circumstantial evidence poses

10   just as reasonable an explanation, correct?

11                   VICTOR SABULSKY:  Yes.

12                   ATTY. JUHASZ:  Any problem holding

13   the government, if they use circumstantial evidence

14   to making sure that you are convinced beyond a

15   reasonable doubt?

16                   VICTOR SABULSKY:  No.

17                   ATTY. JUHASZ:  Okay.  Anything that

18   has come up in the course of us talking that you

19   think we should talk about or questions that you

20   have?

21                   VICTOR SABULSKY:  Not really.

22                   ATTY. JUHASZ:  All right, I

23   appreciate your time.  Thank you.

1      THE COURT:  Very good.  Pass?

2      ATTY. JUHASZ:  Pass.

3      THE COURT:  Prosecution?

4      ATTY. Bailey:  Pass, Your Honor.

5      THE COURT:  Very good.  Victor, you

6  are going to be in the pool from which this jury

7  will be selected.  Tuesday night is when we told

8  them to call, right?

9      ATTY. JUHASZ:  Monday.

10      THE COURT:  Monday, okay.  If you

11  will call that number Monday evening after 4:30, --

12      VICTOR SABULSKY:  Okay.

13      THE COURT:  -- you will get further

14  instructions.  I would, again, remind you not to

15  discuss anything, read anything about this matter,

16  and if somebody finds out that you may be on this

17  jury, they will maybe try to engage you in

18  conversation about the case and you're not to

19  participate in that.

20      VICTOR SABULSKY:  Okay.

21      THE COURT:  Thank you.

22      VICTOR SABULSKY:  Thank you.

23

1    (Whereupon, Victor Sabulsky, Juror Number 200, was

2    excused until further notice.)

3

4

5                         THE COURT:  All right, let's go on

6    to the next one.

7

8

9         **HELENE MESSERSMITH, JUROR NUMBER 209**

10   **EXAMINATION BY THE COURT:**

11                        THE COURT:  How are you today?

12                        HELENE MESSERSMITH:  Good, how are

13   you?

14                        THE COURT:  Fine, thank you  are

15   you any relation to the Messersmith's in Hartford?

16                        HELENE MESSERSMITH:  Yes, my

17   ex-husband's family.

18                        THE COURT:  Okay, I grew up with a

19   whole pile of Messersmith's.  They were reputed to

20   be the democrats back in the 1840's in the township.

21   I don't know if that's true or not.  That's when

22   everybody else was for the other party.  They were a

23   hardheaded bunch.  I got to tell you too, my

1    favorite person in my life was an older lady, a

2    librarian, and everytime I would stop in, she would

3    hoist off one of the classic classic's on me and she

4    insisted  that I would read it.  And she did me a

5    good turn by doing that, so you have a profound

6    affect on the kids that come in front of you.

7                    HELENE MESSERSMITH:  I agree.

8                    THE COURT:  Well, listen, we're

9    here today -- you've read that handout, right?

10                    HELENE MESSERSMITH:  Yes.

11                    THE COURT:  Okay, and you know why

12   we're here.  I read in the back on your

13   questionnaire that you are in the process of

14   changing from an elementary to a middle school.

15                    HELENE MESSERSMITH:  That's

16   correct.

17                    THE COURT:  Now, this case, we

18   hope, will start next week some time.  We have no

19   idea how long it will take, except it will at a

20   minimum take two weeks, it could go as long as a

21   month, into the first of June some time.  Now, you

22   tell us whether that is creating a difficultly for

23   you that you would rather not be put into?

1          HELENE MESSERSMITH:  Well, we have

2     originally three schools; high school and two

3     elementaries, and we just built new buildings and

4     we're changing now to a high school, a middle

5     school, and one elementary, so my school is going to

6     be the middle school.  So, we have to get books from

7     the high school, and we will be five through eight,

8     so seventh and eighth now is at the high schools, so

9     I have to get books from them, and then I have to

10    take all my K thru 4, take them out of the computer

11    and transfer them to the elementary.  So, it's a lot

12    of work, and I am the only one.

13          THE COURT:  It sounds like a lot of

14    work moving that many books.  What period of time

15    will that tie you up?

16          HELENE MESSERSMITH:  Well, we're

17    closing the libraries on the 16th.

18          THE COURT:  The 16th of April -- or

19    May, I mean?

20          HELENE MESSERSMITH:  Yes, of May.

21    And all three schools are working together to take

22    them out of the computer.

23          THE COURT:  So, the next two or

1    three weeks you will be right in the middle of it?

2                        HELENE MESSERSMITH:  Right.

3                        THE COURT:  Does anyone wish to

4    inquire?

5                        ATTY. BAILEY:  No.  The State has

6    no problem excusing her, Your Honor.

7                        ATTY. INGRAM:  I have no problem

8    excusing her, but I do want to ask the left and

9    right questions.

10                       THE COURT:  Yes, go ahead.

11   **EXAMINATION BY ATTORNEY INGRAM:**

12                       ATTY. INGRAM:  The left and right

13   question will become obvious in a moment.  Hi, how

14   are you doing.  Do you recall about three weeks ago

15   yesterday, --

16                       HELENE MESSERSMITH:  Yes.

17                       ATTY. INGRAM:  We were all gathered

18   in the big Courtroom right at the other end of the

19   hall.  Do you remember that?

20                       HELENE MESSERSMITH:  Yes.

21                       ATTY. INGRAM:  Now, here's the left

22   and the right question:  When you entered the

23   Courtroom, do you remember if you went to the left

1      or to the right?

2                      HELENE MESSERSMITH:  To the right.

3                      ATTY. INGRAM:  Did you then manage

4      to find a seat or did you have to stand.

5                      HELENE MESSERSMITH:  I stood.

6                      ATTY. INGRAM:  While you were

7      there, did any other jurors discuss this case with

8      you?

9                      HELENE MESSERSMITH:  One.

10                     ATTY. INGRAM:  Can you describe

11     that discussion for us, please?

12                     HELENE MESSERSMITH:  What did she

13     say.  She just discussed it in general, things that

14     she had heard on T.V.

15                     ATTY. INGRAM:  What kind of things

16     did she tell you that she had heard on T.V.?

17                     HELENE MESSERSMITH:  Let me see if

18     I can remember.  She just, you know, expressed a

19     little bit of knowledge of what this Donna Roberts

20     was charged with and things that we have all seen on

21     T.V. as far as the trial.

22                     ATTY. INGRAM:  Did she mention

23     letters or tapes?

1          HELENE MESSERSMITH:  Yes, she did

2     mention letters.

3          ATTY. INGRAM:  Did she mention a

4     boyfriend or a male compansion by the name of Nate

5     Jackson?

6          HELENE MESSERSMITH:  No, she didn't

7     really.

8          ATTY. INGRAM:  Did she mention an

9     impression as to whether Donna was involved in the

10     death of Robert Fingerhut?

11          HELENE MESSERSMITH:  I don't know

12     if she actually said, I think she's guilty.  I don't

13     think she said that.  She just said I think --

14     something about, did you see about the letters being

15     admitted or they would have to be in order to be

16     read, they weren't thrown out.  I think that is what

17     she talked about.

18          ATTY. JUHASZ:  She said that the

19     letters were admissible and they were not exclused

20     from evidence, is that it?

21          HELENE MESSERSMITH:  Right.

22          ATTY. INGRAM:  From what this

23     particular person -- it was a female, first of all,

1   right?

2               HELENE MESSERSMITH:  Right.

3               ATTY. INGRAM:  From what she said

4   to you, did you conclude that she had an impression

5   as to whether or not Donna was involved?

6               HELENE MESSERSMITH:  She didn't say

7   that out loud, no.  She just, I think she just heard

8   this recently, like right before we were called that

9   they showed Donna on there and said that the letters

10  were admissible.  She didn't express whether she

11  thought she was guilty, though.

12              ATTY. INGRAM:  You used the words,

13  out loud, do you remember that?  I think you said

14  that she didn't say it out and out.  Did she --

15              HELENE MESSERSMITH:  She didn't

16  say, I think she's guilty, she did it.  She didn't

17  saying anything like that, no.

18              ATTY. JUHASZ:  Did she imply that

19  she thought she was guilty that she had done it?

20              HELENE MESSERSMITH:  I don't think

21  so, no.

22              ATTY. INGRAM:  Was it only you and

23  this other person involved in this conversation or

1     were there more than the two of you?

2                    HELENE MESSERSMITH:  There were

3     people all around us, but she was speaking directly

4     to me, she was kind of standing beside me.

5                    ATTY. INGRAM:  Were you speaking in

6     conversational tones of voice?

7                    HELENE MESSERSMITH:  Yes.

8                    ATTY. INGRAM:  And there were other

9     people within ear shot of the two of you?

10                    HELENE MESSERSMITH:  Yes.

11                    ATTY. INGRAM: Did you hear anyone

12     else discussing the case?

13                    HELENE MESSERSMITH:  No.

14                    ATTY. INGRAM:  Anything else?

15                    HELENE MESSERSMITH:  No.

16                    ATTY. INGRAM:  Thank you, very

17     much.

18                    THE COURT:  Mrs. Messersmith, you

19     can attend to your library, okay.

20                    HELENE MESSERSMITH:  Okay, thank

21     you, I appreciate that.

22                    THE COURT:  Good luck to you, and

23     you are excused from any further responsibilities.

1                    HELENE MESSERSMITH:    Thank you,

2     very much.

3                    THE COURT:   Thank you.

4

5     (Whereupon, Helene Messersmith, Juror Number 209,

6     was excused.)

7

8                    THE COURT:   All right, let's bring

9     in the next one.

10

11         **MARTHA MULDOWNEY, JUROR NUMBER 217**

12     **EXAMINATION BY THE COURT:**

13

14                    THE COURT:   How are you today?

15                    MARTHA MULDOWNEY:   Fine, thank you.

16                    THE COURT:   You've read that

17     handout that was given to you?

18                    MARTHA MULDOWNEY:   Yes, Your Honor,

19     I have read everything.

20                    THE COURT:   Okay.   I will start out

21     here, Martha, and ask you something from your

22     questionnaire that you filled out, you said that you

23     did not recognize anything the day you were in there

1    about this particular case from having prior

2    knowledge about it, is that right?

3              MARTHA MULDOWNEY:  That's right,

4    Your Honor, I will be honest with you.  Way back

5    when this crime came about, I had heard it on T.V.,

6    that was about a year and a half ago.  And I didn't

7    get everything, I had completely forgotten about the

8    case until I was called to the Courtroom that day.

9              THE COURT:  Okay, I notice here

10   that you say that you had forgotten about it and

11   then on the way home you picked up a Warren Tribune

12   and you saw the article.  Did you read that article?

13             MARTHA MULDOWNEY:  I am trying to

14   recall, Judge Stuard, what you said that day I

15   arrived at the Courtroom not to read anything or

16   talk about the case, and when I picked up the Warren

17   Tribune, that's not even the usual paper that I

18   picked up, and in my statements in all of the

19   papers, I had said that I do read or glance at least

20   at the front page and read the headlines.  I

21   couldn't help when I held the paper in my hand that

22   I saw her picture on the bottom and I glanced at it

23   and I read a few sentences.

1               THE COURT:  Okay, well, I

2   appreciate you for your honesty.  You remember I had

3   given the instruction that no one was to read

4   anything.  You are not the first to have done so or

5   to have found out something else afterwards, but --

6   and then you signed that paper that you were not

7   suppose to.  You wish to ask any questions?

8               ATTY. INGRAM:  Well, I have to ask

9   the right and the left questions.

10              THE COURT:  Okay.

11  **EXAMINATION BY ATTORNEY INGRAM:**

12              ATTY. INGRAM:  Hello, how are you?

13              MARTHA MULDOWNEY:  Fine, thank you.

14              ATTY. INGRAM:  Do you recall

15  joining us three weeks ago yesterday down in that

16  big Courtroom at the other end of the hallway?

17              MARTHA MULDOWNEY:  Yes, sir, yes, I

18  do.

19              ATTY. INGRAM:  It'S known as the

20  left and the right question because when you entered

21  the Courtroom, do you remember if you went to the

22  left or to your right?

23              MARTHA MULDOWNEY:  Where I was

1    seated?

2                    ATTY. INGRAM:  Yes, when you walked

3    in the door, did you go to your left or to your

4    right?

5                    MARTHA MULDOWNEY:  Neither.  I was

6    seated in the center.

7                    ATTY. INGRAM:  You're the first

8    one.  While you were there, did anybody else in that

9    room discuss this case with you at all?

10                   MARTHA MULDOWNEY:  No, sir.

11                   ATTY. INGRAM:  Did you overhear

12   anyone discussing the case amongst themselves?

13                   MARTHA MULDOWNEY:  No, sir, I

14   didn't.

15                   ATTY. INGRAM:  Nothing further,

16   Your Honor.

17                   THE COURT:  Okay, any objection to

18   dismissing for cause?

19                   ATTY. BAILEY:  No objection.

20                   ATTY. INGRAM:  No objection.

21                   THE COURT:  I see you worked for

22   Judge Luardi?

23                   MARTHA MULDOWNEY:  Sir, when I got

1    out of high school many years ago, I was 18 years

2    old, that was my actual first job working for

3    Attorney Luardi in Girard.

4                    THE COURT:  Okay, he was a nice

5    fellow.

6                    MARTHA MULDOWNEY:  He became a

7    Judge, also.

8                    THE COURT:  Oh, you're talking

9    about the younger one?

10                   MARTHA MULDOWNEY:  Well, Judge

11   Luardi, I can't recall his first name, he was an

12   attorney in Girard after he became a judge.

13                   THE COURT:  Oh, okay.  There were

14   two of them.  I am thinking about the older fellow.

15   All right, listen, thank you, you are excused.

16

17   (Whereupon, Martha Muldowney, Juror Number 217, was

18   excused.)

19

20   (Court adjourned at 2:45 p.m., til Thursday, May 1,

21   2003, at 1:00 p.m.)

22

23

1          **THURSDAY, MAY 1, 2003, at 1:15 p.m.**

2

3              **JUDITH ELLIOTT, JUROR NUMBER 218**

4       **EXAMINATION BY THE COURT:**

5

6                  THE COURT:  Good afternoon, Miss

7       Elliott or Judith?

8                  JUDITH ELLIOTT:   Judith, yes.

9                  THE COURT:  Okay.  You read that

10      handout that was given to you, I trust?

11                 JUDITH ELLIOTT:  Yes, I did.

12                 THE COURT:  This case involves two

13      counts of aggravated murder with specifications.

14      Under Ohio law, a person who commits murder does not

15      necessarily face the death penalty.  The statute is

16      drawn under which these charges were brought.  To

17      say that under certain circumstances occurring

18      during any murder only then does it become a capital

19      case.  An example is if -- well, that situation down

20      in Youngstown the other night.  A fellow shot a

21      policeman, that becomes a capital case if they

22      include the specification that he's a police

23      officer.  We have to pick a jury here who all 12

```
 1    people are able to follow the law.  Now, that

 2    becomes somewhat difficult at times, depending on

 3    what a person's personal belief is.  We are all

 4    entitled to what our thoughts are on the issue of

 5    capital punishment.  We have somebody that are on

 6    the extreme side of saying that if a life is taken,

 7    that person should forfeit their life; an eye for an

 8    eye.  Such a person cannot be fair to a Defendant

 9    because the law says that if the State is able to

10    maintain its burden of proof and prove the

11    aggravated murder beyond a reasonable doubt with the

12    specification, then the case would go to a second

13    phase.  And at that second phase, the jury has to

14    consider the aggravating circumstances; reasons why

15    the State is saying you should consider and to

16    impose the death penalty.  You weigh those against

17    mitigating factors, which are reasons submitted to

18    the jury as to why you should not in this case

19    impose death.  The burden at all times is on the

20    State of Ohio to prove everything that has to be

21    proven during the trial.  The defense doesn't have

22    to present anything, if they don't care to.

23                    JUDITH ELLIOTT:  Okay.
```

1          THE COURT:  If we don't ask these

2     questions at this time -- the death penalty may

3     never come up, but if the jury would find that the

4     State fails to maintain their burden of proof, then

5     they would properly return a finding of not guilty.

6     But if we find ourselves faced during this trial

7     with the prospect of going forward on the second

8     phase, you would have somebody that, as I said,

9     believed in an eye for an eye or someone who takes

10    the position that they could under no circumstances

11    participate in such a decision, then the State

12    couldn't get a fair trial.  So, these folks have a

13    right to ask each prospective juror what your

14    individual thinking is.  And whatever your thinking

15    is, is fine.  They will respect your thoughts on the

16    matter.  But they have to know that in order to

17    decide whether or not they wish to have any

18    particular person on the jury.

19          JUDITH ELLIOTT:  Okay.

20          THE COURT:  The other issue goes to

21    pretrial publicity.  This case, you know, got a lot

22    of attention, as any case of this nature would, and

23    some of the folks that we have interviewed have read

```
 1   about it or know something about it, and some don't

 2   know anything or very little.

 3                  JUDITH ELLIOTT:  Uh-huh.

 4                  THE COURT:  But they have a right

 5   to make inquiry because for this jury to be fair,

 6   they have to decide this case on the evidence

 7   presented in the courtroom, and to have something

 8   getting back in the jury room where someone says, I

 9   remember reading in the newspaper, that is not the

10   way to do it.  Do you understand?

11                  JUDITH ELLIOTT:  Exactly.

12                  THE COURT:  Okay.  Mr. Prosecutor.

13                  ATTY. BAILEY:  Thank you, Your

14   Honor.
```

**EXAMINATION BY ATTORNEY BAILEY:**

```
16

17                  ATTY. BAILEY:  Good afternoon,

18   Mrs. Elliott, how are you?

19                  JUDITH ELLIOTT:  Fine.  And you?

20                  ATTY. BAILEY:  My name is Ken

21   Bailey, as you are aware.  I was in the other

22   Courtroom about three and a half weeks ago when we

23   talked briefly.
```

1           JUDITH ELLIOTT:  Yes, yes.

2           ATTY. BAILEY:  And I promised you

3    at that time that I would be joined when you came in

4    here by my co-counsel, Chris Becker, who is another

5    assistant prosecutor, and the two of us are

6    responsible for prosecuting this case on behalf of

7    the people in Trumbull County and the State of Ohio.

8           Now, as the Judge indicated, we're going

9    to ask some questions regarding your prior

10   experiences and your opinion on different things.

11          JUDITH ELLIOTT:  Okay.

12          ATTY. BAILEY:  And the reason we do

13   that is to make sure the folks that are selected to

14   serve as jurors in this case can be fair and

15   impartial to both sides, both to the Defendant and

16   to the people of the State of Ohio, and that is why

17   we ask these questions.  It's not because we're

18   snoopy and we like to pry but, rather, just to make

19   sure that the folks can be fair and impartial to

20   both sides.

21          JUDITH ELLIOTT:  Okay.

22          ATTY. BAILEY:  Now, I notice we

23   have the air conditioning on this afternoon.  It

 1     wasn't working this morning and it was really hot in

 2     here this morning, and we have to try to recuperate

 3     from the affects of the heat this morning.  Now,

 4     there aren't any right answers and there aren't any

 5     wrong answers to these particular questions, just

 6     open, candid answers.  And because this is the one

 7     chance that we get to talk together, if you have any

 8     questions about the procedure that we're going

 9     through here, feel free to ask it at this time.

10     Once we get done in Court today, you won't be able

11     to have any communication with us until this trial

12     is over, and if this case goes into two phases, you

13     will have to wait until the end of the second phase

14     before you talk to us.

15                    JUDITH ELLIOTT:  Okay.

16                    ATTY. BAILEY:  Under our rules of

17     conduct, the lawyers aren't allowed to have any

18     communication with you outside the Courtroom here.

19     If we run into each other in the hallway, or the

20     elevator or a restaurant or something, all we can do

21     is say good morning to you or good afternoon.  We're

22     not trying to be antisocial.

23                    JUDITH ELLIOTT:  Right.

1                         ATTY. BAILEY:  And just so you are

2       aware of that.

3                         JUDITH ELLIOTT:  Okay.

4                         ATTY. BAILEY:  Because some times

5       jurors tend to come up to us and try to strike up a

6       conversation.

7                         JUDITH ELLIOTT:  I know.

8                         ATTY. BAILEY:  And that could

9       result in a mistrial.

10                        JUDITH ELLIOTT:  Yes, yes.

11                        ATTY. BAILEY:  And if we did that,

12      it would be improper.  And we don't want to do it

13      over again.

14                        JUDITH ELLIOTT:  Okay.

15                        ATTY. BAILEY:  Let's see, now, as

16      the Judge had indicated, we're going to be talking

17      first about two different areas; first this area of

18      pretrial publicity, and second about the death

19      penalty and then we will get into some regular

20      questions.  Let's start out first with pretrial

21      publicity, looking at your questionnaire, if I

22      understanding correctly, you read the Vindicator a

23      couple of times a week.

1              JUDITH ELLIOTT:  Uh-huh.

2              ATTY. BAILEY:  And you look at Fox

3    local news?

4              JUDITH ELLIOTT:  Mostly.

5              ATTY. BAILEY:  Pretty much?

6              JUDITH ELLIOTT:  That's pretty much

7    my news, that's not even the local.

8              ATTY. BAILEY:  All right, but none

9    of the names that you saw in the questionnaire rang

10   a bell.

11             JUDITH ELLIOTT:  Donna Richards

12   came up a long time ago as just a passing, I heard

13   her name.

14             ATTY. BAILEY:  Donna Richards?

15             JUDITH ELLIOTT:  Yes.

16             ATTY. BAILEY:  Okay, her last name

17   is Roberts.

18             JUDITH ELLIOTT:  I mean, Roberts,

19   I'm sorry.  I will never get names right, so you

20   know that I didn't hear it really good.  So, it was

21   just like in passing like I would hear about

22   something.

23             ATTY. BAILEY:  Now, the reason the

1    Judge admonishes you not to read the paper or to

2    watch or listen to the news on T.V., or discuss it

3    with anybody outside of the Courtroom here is to

4    make sure that you base your decision in this case

5    solely on what you hear here in the Courtroom.  It's

6    like going back to school.  You are a teacher and

7    you go back to school, you start off with a clean

8    slate at the beginning of the semester.  And

9    everything that's going to be written on that

10   chalkboard is going to be written in class, this is

11   the classroom, these four walls, and it's going to

12   be presented to you through the testimony of the

13   witnesses, the physical exhibits that are admitted,

14   and the instructions of law that are given to you by

15   the Judge, okay?

16              JUDITH ELLIOTT:  Okay.

17              ATTY. BAILEY:  So, and it may well

18   be that during the course of these proceedings, you

19   may hear some testimony that may jog your

20   recollection.  You might say, gosh, I remember

21   reading that or hearing that on T.V., and you have

22   to set that aside and base your opinion, your

23   decision on what happens here in Court.

1                    JUDITH ELLIOTT:  Okay.

2                    ATTY. BAILEY:  And the reason for

3      that is fairly simple; as you look around the

4      courtroom there is nobody here from the media.

5                    JUDITH ELLIOTT:  Right.

6                    ATTY. BAILEY:  There are no

7      reporters from the Vindicator or the Tribune, no

8      T.V. personalties setting up their cameras, but I

9      expect as we get into testimony maybe next week, we

10     will start seeing them sitting in the courtroom for

11     a few minutes at a time.  Then, they will listen for

12     a few minutes and then go out and write an article

13     or a feature on the case.

14                   JUDITH ELLIOTT:  Uh-huh.

15                   ATTY. BAILEY:  And you know that

16     because they're here for only a little bit, they

17     will miss everything that was asked and answered

18     before they got in and asked and answered after they

19     left.  So, it's going to be somewhat slanted or

20     distorted.  It will probably be taken out of

21     context.

22                   JUDITH ELLIOTT:  Yes.

23                   ATTY. BAILEY:  SO, if you sat as a

1    juror in this case, you may have somebody save the

2    papers for you and at the end of the trial, you may

3    look at them and say gosh, I sat in Judge Stuard's

4    court for the entire trial, I remember the

5    testimony, and, you know, whoever wrote this article

6    is like they were sitting in a different trial in

7    Judge McKay's Court.

8                    JUDITH ELLIOTT:  Right.

9                    ATTY. BAILEY:  So that is why.  And

10   so much for pre-trial publicity.

11                   JUDITH ELLIOTT:  Okay.

12                   ATTY. BAILEY:  Now, I may as well

13   ask this question.

14                   JUDITH ELLIOTT:  Go ahead.

15                   ATTY. BAILEY:  When you went in

16   there back on April 8th, the other Courtroom that

17   day, did you go to the right or the left?  Silly

18   question, I know.

19                   JUDITH ELLIOTT:  You know what,

20   you're going to find out that I have -- I didn't

21   know this until I started teaching.  I have an

22   orientation problem, so right -- probably I went to

23   the right.  I am going to say the right, but I could

1   be wrong.

2                   ATTY. BAILEY:  Okay, did anybody

3   discuss this case in your presence that day?

4                   JUDITH ELLIOTT:  No, nobody,

5   nobody.

6                   ATTY. BAILEY:  Okay, nobody.

7                   JUDITH ELLIOTT:  No, I didn't.  If

8   they did, they missed me.

9                   ATTY. BAILEY:  Okay, that's good.

10  Now, this issue of the death penalty as a possible

11  punishment.  When was the first time that you

12  learned that this was a potential death penalty

13  case?

14                  JUDITH ELLIOTT:  I think -- I am

15  sure it was on April --

16                  ATTY. BAILEY:  April 8th, when you

17  came here for that orientation over there?

18                  JUDITH ELLIOTT:  I am sure because

19  I didn't know before.

20                  ATTY. BAILEY:  Okay, and before

21  that did you ever have an opportunity to discuss the

22  death penalty or your views on the death penalty as

23  a punishment with any family member or friends or

1      coworkers back at school or in class, or when

2      anything came up, any major criminal cases would

3      come up, or let's ay 9/11 or the Oklahoma City case?

4      When those things came up or Jeffrey Dahmer, did

5      anybody ever raise the issue of the death penalty as

6      a punishment?

7                      JUDITH ELLIOTT:  To tell you the

8      truth, the death penalty has not been mentioned by

9      me.  Just previously it was when my father was

10     living and we would talk about everything, no matter

11     what.  And so, no, it hasn't come up since then.  I

12     haven't talked about it with anybody or nobody has

13     talked about it with me.

14                     ATTY. BAILEY:  When your dad was

15     alive, I take it you discussed the death penalty

16     with him?

17                     JUDITH ELLIOTT:  Yes, I did.

18                     ATTY. BAILEY:  What views did you

19     express?

20                     JUDITH ELLIOTT:  Well, we talked

21     about an eye for an eye, that was one possibility

22     that people talked about.  And then we talked about

23     that is not entirely right because there are other

1    circumstances.  Then, we talked about that you have

2    to really weigh everything into consideration, I

3    mean, just because you see something, later on

4    you're going to be affected by something else.  So,

5    I mean, what you -- if you form a first opinion some

6    times it isn't always right, so you have to weigh

7    everything.

8                    ATTY. BAILEY:  When you discussed

9    it with your dad, did you take the position in favor

10   or against it?

11                   JUDITH ELLIOTT:  He was very

12   adamant about if they find beyond a shadow of a

13   doubt.  He had seen one case where they had the

14   death penalty and the person was not guilty, they

15   found out -- it came out later.  So, he was very

16   adamant that they should prove it beyond a shadow of

17   a shadow of a shadow, in other words, he had to be

18   really certain.  But then he was in favor of it if

19   it was a capital case, like if it was a policeman or

20   something.

21                   ATTY. BAILEY:  And what position

22   did you take?

23                   JUDITH ELLIOTT:  Well, I always

```
 1        sort of always took the opposite of him because I

 2        loved to hear him back   --

 3                      ATTY. BAILEY:  So you were against

 4        the death penalty?

 5                      JUDITH ELLIOTT:  No, I just sort of

 6        said, okay, I agree with you, but I'm not certain,

 7        and I kept saying, well, I'm not certain, but then I

 8        really -- I believe sort of like he did in a way,

 9        and in a way, I am not totally convinced either way.

10        I am just sort of in the middle, I don't know.  I

11        mean, I am sort of leaving it in limbo.  I really

12        don't know, I am not really a strong -- when people

13        talk about the death penalty and then when they talk

14        against, I am -- no, I don't believe either side.

15        In other words, there are other things.

16                      ATTY. BAILEY:  Okay, now, you

17        became aware that this was a death penalty case back

18        on the 8th of April?

19                      JUDITH ELLIOTT:  Right, yes, this

20        is the first time.

21                      ATTY. BAILEY:  And this is May 1st,

22        so you have had a little over three weeks to

23        consider this --
```

```
 1                          JUDITH ELLIOTT:  Right.
 2                          ATTY. BAILEY:  -- and knowing this
 3      is potentially a death penalty case.
 4                          JUDITH ELLIOTT:  Right.
 5                          ATTY. BAILEY:  And Ohio law is sort
 6      of the way you talked about, there are different
 7      things that you have to consider.
 8                          JUDITH ELLIOTT:  Uh-huh.
 9                          ATTY. BAILEY: It's not an automatic
10      death penalty in Ohio if your found guilty beyond a
11      reasonable doubt in the first phase.
12                          JUDITH ELLIOTT:  Right.
13                          ATTY. BAILEY:  Okay, you read that
14      handout that we had downstairs?
15                          JUDITH ELLIOTT:  Yes.
16                          ATTY. BAILEY:  Did that pretty much
17      make sense?
18                          JUDITH ELLIOTT:  It makes a lot of
19      sense.
20                          ATTY. BAILEY:  Okay, so you
21      understand that in Ohio, as in different States, the
22      State legislature passes the laws and they set out
23      what the parameters are for the crimes, what is
```

3330

```
1    prohibited, and what the punishments are going to

2    be?

3                    JUDITH ELLIOTT:  Right.

4                    ATTY. BAILEY:  And do you

5    understand that in an ordinary criminal case, the

6    jury would ordinarily have no concern for punishment

7    at all, they have no say in the process.

8                    JUDITH ELLIOTT:  Right.

9                    ATTY. BAILEY:  Their sole function

10   is to be the finders of fact as to what happened

11   back on or about a certain day, and they determine

12   if it's proven beyond a reasonable doubt, not a

13   shadow of a doubt, but beyond a reasonable doubt is

14   our standard in the law.

15                   JUDITH ELLIOTT:  Okay.

16                   ATTY. BAILEY:  Okay, this term

17   beyond a shadow of doubt --

18                   JUDITH ELLIOTT:  It's pretty

19   misused.

20                   ATTY. BAILEY:  That's in Alfred

21   Hitchcock movies.

22                   JUDITH ELLIOTT:  Well, probably too

23   much T.V.
```

```
 1                    ATTY. BAILEY:  Too much T.V., there

 2    is no such animal in criminal law.

 3                    JUDITH ELLIOTT:  You're right,

 4    you're right.

 5                    ATTY. BAILEY:  And the Judge is

 6    going to defind that term for you.

 7                    JUDITH ELLIOTT:  That's good.

 8                    ATTY. BAILEY:  And do you think

 9    that you will be able to follow the law as the Judge

10    instructs you?

11                    JUDITH ELLIOTT:  Yes, yes, he's

12    very plain and very understandable.

13                    ATTY. BAILEY:  Now, this case can

14    be tried in two different phases, okay, and the

15    first phase is tried just like any other case.  And

16    the sole issue in the first phase is guilt or

17    non-guilty as to the elements of a crime charged.

18    And there are a number of crimes charged and each

19    crime is composed of certain key essential component

20    parts, elements we call them, like the ingredients

21    in a recipe.

22                    JUDITH ELLIOTT:  Okay.

23                    ATTY. BAILEY:  We have to put them
```

1    all in and if we don't, we don't meet our burden by

2    proof beyond a reasonable doubt, okay.

3                    JUDITH ELLIOTT:   True.

4                    ATTY. BAILEY:  Okay, and then you

5    would find the Defendant not guilty.

6                    JUDITH ELLIOTT:  Uh-huh.

7                    ATTY. BAILEY:  But if we meet our

8    burden and you find the Defendant guilty of say,

9    aggravated murder, and one or more of these special

10   findings of fact, we call them specifications of

11   aggravating circumstances, and we will talk about

12   those in a few minutes, but then we go on to a

13   second phase, okay.

14                   JUDITH ELLIOTT:  Okay.

15                   ATTY. BAILEY:  Where you consider

16   the issue of punishment.

17                   JUDITH ELLIOTT:  Okay.

18                   ATTY. BAILEY:  But punishment is

19   not discussed in the first phase.

20                   JUDITH ELLIOTT:  Okay.

21                   ATTY. BAILEY:  Now, if you sat on

22   the legislature and you had a say in designing the

23   criminal justice system here in Ohio, would you

1      include the death penalty as a possible punishment

2      for any crimes, any specific crimes?

3                        JUDITH ELLIOTT:  Possibly like,

4      well, maybe a police officer or where it was

5      terrorists, of course, things like that, I mean

6      really --

7                        ATTY. BAILEY:  Are you talking

8      about killings?

9                        JUDITH ELLIOTT:  Yeah, killings.

10                       ATTY. BAILEY:  Is that just for

11     murders?

12                       JUDITH ELLIOTT:  Yeah, just for

13     murders.  I don't think it would be for other

14     things.

15                       ATTY. BAILEY:  I'm sorry?

16                       JUDITH ELLIOTT:  I wouldn't say

17     that it would be for other things, I think murder is

18     probably the one that would be the most serious.

19                       ATTY. BAILEY:  Okay.

20                       JUDITH ELLIOTT:  And then it would

21     go down from there.

22                       ATTY. BAILEY:  Okay, but --

23                       JUDITH ELLIOTT:  Not that they

3334

```
 1    aren't important, but you just don't weigh them in

 2    the same.

 3                    ATTY. BAILEY:  Well, you

 4    understand that under Ohio law, all killings are not

 5    treated equally under the law.

 6                    JUDITH ELLIOTT:  That's true.

 7                    ATTY. BAILEY:  Okay, if somebody is

 8    chopping wood with an axe and the head flies off and

 9    the axe handle would kill somebody, that's an

10    accident?

11                    JUDITH ELLIOTT:  Exactly.

12                    ATTY. BAILEY:  If somebody is

13    speeding down the street and strikes a pedestrian,

14    it may be some type of manslaughter, but it's not a

15    death penalty offense.

16                    JUDITH ELLIOTT:  Okay, right.

17                    ATTY. BAILEY:  It might be a jail

18    sentence or a prison sentence --

19                    JUDITH ELLIOTT:  Right.

20                    ATTY. BAILEY:  -- depending on all

21    of the circumstances.

22                    JUDITH ELLIOTT:  Right.

23                    ATTY. BAILEY:  And let's say even
```

1    the crime of murder is not always a death penalty.

2    Just plain old murder is not a death penalty offense

3    in Ohio.

4                    JUDITH ELLIOTT:  Right, right.

5                    ATTY. BAILEY:  Okay, if co-counsel

6    and I got in a fight in a bar, and I hit him in the

7    jaw and he goes back and his head hits the bar, the

8    edge of the counter on the bar, and he dies as a

9    result of that, you know, that could be perhaps

10   murder, and it could be punishable by some type of a

11   life sentence, but not the death penalty.

12                   JUDITH ELLIOTT:  Right, okay.

13                   ATTY. BAILEY:  Even what you might

14   consider a premeditated murder, a killing with prior

15   calculation and design would not be a death penalty

16   offense.  For example, if I said, I am upset with my

17   co-counsel, and I don't know like the pictures that

18   he's drawing of me, and I am going to kill him

19   tomorrow on the Courthouse steps, and I announce it

20   to the whole world.  And as he walks up the steps in

21   the morning, I blow him away with a .357, okay, that

22   is premeditated or a killing of prior calculation

23   and design.  But under Ohio law, that alone is not a

 1      death penalty offense, okay.  It's only for the most

 2      serious of crimes where the legislature has written

 3      in certain extra findings of fact for a jury to

 4      consider, as the Judge said, in the killing of a

 5      police officer or a governor, or lieutenant

 6      governor, or the president, or a young child, and

 7      there are a number of felony murders where a special

 8      felony is committed.

 9                      JUDITH ELLIOTT:  Uh-huh.

10                      ATTY. BAILEY:  And you understand

11      that under Ohio law, a person can be eligible for

12      the death penalty even if he or she didn't pull the

13      trigger and they committed that killing with prior

14      calculation and design, if they shared in the

15      planning, okay, and maybe it was during a special

16      felony, okay?

17                      JUDITH ELLIOTT:  Okay.

18                      ATTY. BAILEY:  Now, can you set

19      aside your personal feelings about the death penalty

20      as a punishment, you know, and follow Ohio law?

21                      JUDITH ELLIOTT:  I would really try

22      and I would do it to the best of my ability, yes.

23                      ATTY. BAILEY:  Okay, that's all we

3337

1    can ask.  Now, you have had several weeks to think

2    about this, and I notice your -- you follow a

3    Christian religion and you go to the Missionary

4    Alliance?

5                JUDITH ELLIOTT:  Right, yes.

6                ATTY. BAILEY:  Is there anything in

7    your church or your religion that prohibits the

8    death penalty as a punishment?

9                JUDITH ELLIOTT:  They don't really

10   speak about it.

11              ATTY. BAILEY:  It's an individual

12   thing?

13              JUDITH ELLIOTT:  It's an individual

14   thing, right, it's never brought up.

15              ATTY. BAILEY:  All right, let's say

16   we get -- were in the first phase of this trial and

17   the issue  is guilt or non-guilt of these elements

18   --

19              JUDITH ELLIOTT:  Okay.

20              ATTY. BAILEY:  -- and we convince

21   you and these other jurors beyond a reasonable doubt

22   that the Defendant is guilty of aggravated murder in

23   one or more of these special findings, these special

1   occasions of aggravating circumstances.  Okay, so

2   you know that we proved our case, okay.

3               JUDITH ELLIOTT:  Okay.

4               ATTY. BAILEY:  We met our burden of

5   proof.  Would you be able to return a verdict

6   finding the Defendant guilty of those charges if

7   you're satisfied to a moral certainty of the truth

8   of those charges using your reason and your common

9   sense knowing that it would make the Defendant

10  eligible in the second phase for the death penalty

11  as a punishment?

12              JUDITH ELLIOTT:  It would be a hard

13  experience, but I could do it if it was proved

14  beyond a reasonable doubt.

15              ATTY. BAILEY:  Okay, in the first

16  phase?

17              JUDITH ELLIOTT:  In the first

18  phase.

19              ATTY. BAILEY:  Okay, you think --

20              JUDITH ELLIOTT:  It would be really

21  hard because anything like that is hard, you know,

22  because you really have to --

23              ATTY. BAILEY:  Okay, more

1 importantly, let's say we get to the second phase

2 and in the second phase, the issue is different.

3 You would have already decided this issue of guilt

4 beyond a reasonable doubt and you would have found

5 the Defendant guilty to get to the second phase, you

6 and your other jurors.

7      JUDITH ELLIOTT:  Uh-huh.

8      ATTY. BAILEY:  So, there is no

9 longer any question of guilt, okay?

10      JUDITH ELLIOTT:  Okay.

11      ATTY. BAILEY:  The issue in the

12 second phase is what is the appropriate punishment

13 for this Defendant for this crime?

14      JUDITH ELLIOTT:  Uh-huh.

15      ATTY. BAILEY:  Okay?

16      JUDITH ELLIOTT:  Okay.

17      ATTY. BAILEY:  And in a second

18 phase, you can hear the same evidence that you heard

19 in the first phase, and these aggravating

20 circumstance or aggravating circumstances that you

21 would have found in the first phase, would go on one

22 side of a scale, okay?

23      JUDITH ELLIOTT:  Right.

```
 1                         ATTY. BAILEY:  And these

 2     aggravating circumstances, basically, they're that

 3     the aggravated murder was committed with prior

 4     calculation and design, and during the course of an

 5     aggravated burglary, and the other is -- the

 6     aggravated murder was committed with prior

 7     calculation and design and during the course of an

 8     aggravated robbery.

 9                         JUDITH ELLIOTT:  Okay.

10                         ATTY. BAILEY:  Okay, those are the

11     two aggravating circumstances that could exist here

12     --

13                         JUDITH ELLIOTT:  Okay.

14                         ATTY. BAILEY:  -- on one side of

15     the scale.

16                         JUDITH ELLIOTT:  Okay.

17                         ATTY. BAILEY:  You also could

18     consider or would consider any mitigating factors

19     that are presented.

20                         JUDITH ELLIOTT:  Yes.

21                         ATTY. BAILEY:  Mitigating factors

22     are things that would work in the Defendant's favor

23     and mitigate against the death penalty as a
```

```
 1    punishment.   We don't know what they are at this
 2    point, they're not relevant.
 3                    JUDITH ELLIOTT:  Right.
 4                    ATTY. BAILEY:  But these are things
 5    that could be presented to you in the second phase,
 6    and the Defendant has no burden, no burden of proof.
 7    The burden is totally on us on this balancing test.
 8    Now, let's say we convince you and the other 11
 9    jurors that the aggravating circumstances outweigh
10    the mitigating factors  beyond a reasonable doubt --
11    let me back step here a second.  When you go into
12    that second phase, you have four possible
13    punishments.
14                    JUDITH ELLIOTT:  Okay.
15                    ATTY. BAILEY:  There is the death
16    penalty, there is life imprisonment with no
17    eligibility for parole, there is life imprisonment
18    with parole eligibility after 30 full years, and
19    life imprisonment after 25 full years.
20                    JUDITH ELLIOTT:  Okay.
21                    ATTY. BAILEY:  Those are four
22    possible penalties, and they all have to, for you to
23    sit on this jury, all four of those have to start
```

1    out equally in your mind.

2                      JUDITH ELLIOTT:  Okay.

3                      ATTY. BAILEY:  You have to be able

4    to consider them equally, right?

5                      JUDITH ELLIOTT:  Right.

6                      ATTY. BAILEY:  You wouldn't have

7    any problem doing that?

8                      JUDITH ELLIOTT:  No.

9                      ATTY. BAILEY:  Let's say that we

10   convince you beyond a reasonable doubt that the

11   aggravating circumstance or circumstances outweigh

12   these mitigating factors beyond a reasonable doubt,

13   okay.  In that case, the appropriate penalty, under

14   the law, is the death penalty, and you and the other

15   jurors would have to return a verdict as to the

16   death penalty in that case and you would not go on

17   to consider the other three possible life sentences,

18   okay?

19                      JUDITH ELLIOTT:  Okay.

20                      ATTY. BAILEY:  Now, if we convince

21   you of that, if we convinced you that we met our

22   burden of proof beyond a reasonable doubt so that

23   the death penalty is the appropriate punishment

```
 1      under those circumstances, would you be able to sign

 2      a verdict for the death penalty?  And I know that

 3      this is a hard question, but we have got to ask it

 4      --

 5                      JUDITH ELLIOTT:  Yeah.  I have

 6      never done it, it's hard.

 7                      ATTY. BAILEY:  -- and here's why,

 8      okay.  Remember, it's important to both sides to get

 9      a fair trial --

10                      JUDITH ELLIOTT:  Exactly.

11                      ATTY. BAILEY:  -- and if somebody

12      were to come in and say, you know, I believe in an

13      eye for an eye, and if somebody convinces me beyond

14      a reasonable doubt that the Defendant is guilty as

15      charged of this crime of aggravated murder with

16      these specifications, I am going to automatically

17      vote for the death penalty.  That would not be fair

18      to the Defendant, right?

19                      JUDITH ELLIOTT:  Right.

20                      ATTY. BAILEY:  She wouldn't get a

21      fair trial.

22                      JUDITH ELLIOTT:  That's right.

23                      ATTY. BAILEY:  And by the same
```

3344

```
 1        token, it's important that the people of the State

 2        get a fair trial, so if somebody comes in and says,

 3        you know, I believe in the death penalty as a

 4        punishment, okay, I think I would put it in my

 5        system of criminal justice, and I think it has an

 6        appropriate place, but I don't think that I could

 7        personally partake in that decision.  And if that

 8        person sat on the jury without telling us and went

 9        through the whole trial and we got down to that

10        point where the person had to sign the verdict form

11        for the death penalty and the person, says, you

12        know, gosh, I told the prosecutor that I could it,

13        but, you know, when it comes right down to it, and I

14        don't really believe -- I believe there should be a

15        death penalty, but I don't want to be part of it and

16        I could never sign this form, then the State could

17        never get a fair trial --

18                         JUDITH ELLIOTT:  Right, right.

19                         ATTY. BAILEY:  We wouldn't get a

20        fair shake.  So, that is why we ask you to search

21        your mind and your heart as to whether you can sign

22        that form if we met our burden of proof and you

23        found, you and the other jurors, found that the
```

1    death penalty was the appropriate verdict.

2                    JUDITH ELLIOTT:  I would sign it if

3    it was, like you said, proved, proved beyond a

4    reasonable doubt, and if all of the jury members,

5    you know, we're not going to discuss it among

6    ourselves, of course, but if we each felt this way.

7                    ATTY. BAILEY:  Well, no, you would

8    discuss it among yourselves.

9                    JUDITH ELLIOTT:  Oh, okay, we do.

10                   ATTY. BAILEY:  When all 12 of you

11   are deliberating, you have to discuss it among

12   yourselves.  It's a joint decision.

13                   JUDITH ELLIOTT:  Okay, so if it's a

14   joint decision, I could do it.

15                   ATTY. BAILEY:  And it has to be a

16   unanimous decision, all 12 of you would have to

17   agree.

18                   JUDITH ELLIOTT:  Exactly, not just

19   11 to 1.

20                   ATTY. BAILEY:  Right.

21                   JUDITH ELLIOTT:  Okay, yes, I could

22   if we were all unanimous and it was all proven.

23                   ATTY. BAILEY:  And would you be

3346

```
 1        able to announce that verdict in open Court, if the

 2        Judge asks you, is this your verdict?

 3                    JUDITH ELLIOTT:  Yes, if I signed,

 4        I certainly could announce it.

 5                    ATTY. BAILEY:  Okay and I know it's

 6        a hard thing to think about, but you have had three

 7        weeks now, a little over three weeks to think about

 8        it, which is one of the advantages of having that

 9        time to think about it.

10                    JUDITH ELLIOTT:  Right.

11                    ATTY. BAILEY:  Okay.  Now, do you

12        think anybody might criticize the death penalty

13        verdict if you returned it?

14                    JUDITH ELLIOTT:  I really don't

15        care about whether they criticize it or not.  I

16        mean, I have to know in my heart.  That is what I

17        have to deal with, I have to do self-evaluation, and

18        that is how I have lived my life, and I answer to

19        me.  Of course, I answer to a  bigger system, but if

20        I am not happy with me, then what is the point, so

21        that is all I have to answer to.

22                    ATTY. BAILEY:  Okay, so much for

23        this issue of the death penalty.  Let's get on to
```

3347

```
 1     some regular questions here.

 2                    Now, the Defendant here is charged with

 3     complicity, being a complicitor in this crime,

 4     soliciting or procuring another person or helping or

 5     aiding or abetting another person, planning with

 6     another person by the name of Nate Jackson in the

 7     killing of her ex-husband for insurance money.  And

 8     it's charged that the actual killing was done by

 9     this fellow named Jackson, and that he went -- he

10     trespassed in the victim's house and committed an

11     aggravated burglary and he stole a car, an

12     aggravated robbery, and that he had a loaded working

13     gun, a firearm that he used to commit this offense,

14     okay.  But you understand that the Defendant is

15     charged as a complicitor?

16                    JUDITH ELLIOTT:  Okay.

17                    ATTY. BAILEY:  Not as the trigger

18     person.

19                    JUDITH ELLIOTT:  Okay, yes, I

20     understand that.

21                    ATTY. BAILEY:  Now, there are four

22     different crimes that are charged.  There are two

23     counts of aggravated murder, there's one person that
```

1    was killed, but there are two separate theories that

2    the State is allowed to pursue for the aggravated

3    murder, and we have elected, because we're allowed

4    to do it, we have elected to pursue both of those

5    theories, and the jury could consider both of those

6    theories.  And, basically, the first count of

7    aggravated murder charges the purposeful killing

8    with prior calculation and design, and the second

9    count of aggravated murder, or second charge of

10   aggravated murder, charges a purposeful killing as a

11   felony murder, during the course of a special felony

12   as aggravated robbery or aggravated burglary.

13                    JUDITH ELLIOTT:  Okay.

14                    ATTY. BAILEY:  And attached to

15   these charges of aggravated murder are the

16   specifications of aggravating circumstances, the

17   ones that I mentioned, charging that the aggravated

18   murder was committed with prior calculation and

19   design, and during the course of a special felony,

20   and one count of aggravated burglary, and the other

21   specification, an aggravated robbery.  Okay?

22                    JUDITH ELLIOTT:   Okay.

23                    ATTY. BAILEY:   There are also two

1    separate charges; one for aggravated burglary and

2    one for aggravated robbery, and attached to those

3    is a firearm specification, and that is a finding of

4    fact for a jury to consider that a real working gun

5    was used.

6              JUDITH ELLIOTT:    Okay.

7              ATTY. BAILEY:  Capable of expelling

8    a projectile by means of combustion or explosion.

9    It's like having a gun and pulling the trigger and

10   the bullet comes out.

11             JUDITH ELLIOTT:  Okay.

12             ATTY. BAILEY:  These terms,

13   aggravated burglary and aggravated robbery, if

14   somebody is not well versed in the law, they may

15   confuse those terms.  People sometimes talk about

16   their house getting robbed and what they mean is a

17   burglary in a legal sense.  Aggravated burglary --

18   and the Judge will define all of these terms for you

19   at the end of the case in great detail, and you are

20   bound to follow his instructions.  Let me give you a

21   for instance.  In an aggravated burglary, basically,

22   we're dealing with the trespassing into an occupied

23   structure, like a dwelling house, somebody who gets

1    in somebody else' home and shouldn't be there.  And

2    the person goes in there and commits an offense like

3    an aggravated murder or a theft offense, and the

4    perpetrator has -- the perpetrated is armed with a

5    deadly weapon, like a gun or a knife, and the

6    perpetrator can inflict serious physical harm on the

7    victim or kill the victim.  So, the aggravated

8    burglary deals basically with the structure, trepass

9    in the structure.

10                    JUDITH ELLIOTT:  Uh-huh.

11                    ATTY. BAILEY:  The other crime,

12    aggravated robbery, there is no structure involved.

13    Okay, it's the use of force or threat of force

14    against another person and the perpetrator is

15    committing some type of offense, like theft or

16    something, and the perpetrator who is armed with a

17    deadly weapon like a gun or a knife, and the

18    perpetrator inflicts serious physical harm on the

19    victim or kills the somebody, okay?

20                    JUDITH ELLIOTT:  Okay.

21                    ATTY. BAILEY:  Each of these crimes

22    is composed of elements, like the ingredients in a

23    recipe.  Okay, I am sure that you had an occasion to

```
 1    bake some cakes or something over the years.  What's
 2    your favorite cake?
 3                    JUDITH ELLIOTT:  Chocolate.
 4                    ATTY. BAILEY:  Okay, mine too.
 5    Okay, chocolate cake, you got to put in all of the
 6    ingredients, the eggs, flour, sugar, the water,
 7    baking soda, baking powder, and the chocolate, among
 8    the other things, and you mix it altogether and you
 9    put it in the oven for 40 minute at 350 degrees, and
10    hopefully it rises if nobody jumps up and down.
11                    JUDITH ELLIOTT:  Right.
12                    ATTY. BAILEY:  And if you leave out
13    the chocolate, you don't have a chocolate cake.  You
14    may get a cake, but it's not going to be chocolate,
15    right?
16                    JUDITH ELLIOTT:  Right.
17                    ATTY. BAILEY:  Same thing, as a
18    crime.  We have to put in all of these ingredients
19    in a crime.  And if we leave one out, we haven't put
20    our burden of proof on that crime and you consider
21    each of these crimes separately and each of the
22    specifications separately.
23                    JUDITH ELLIOTT:  Yes.
```

3352

```
 1                    ATTY. BAILEY:  So, we have to bake
 2    a lot of cakes.
 3                    JUDITH ELLIOTT:  Okay.
 4                    ATTY. BAILEY:  And let me -- and
 5    the Judge will define these terms for you and give
 6    you the elements, but let me give you another for
 7    instance.  This crime of aggravated murder with
 8    prior calculation and design, let's say that we have
 9    to prove that it happened on or about a certain
10    date, December 11, 2001.  Second, that it happened
11    here in Trumbull County, Ohio, and so I will be
12    asking that silly question a bunch of times
13    probably, and what kind of a State did this take
14    place.
15                    JUDITH ELLIOTT:  Yes.
16                    ATTY. BAILEY:  That's why we try it
17    in this courthouse rather than up in Ashtabula or
18    down in Tuscaras County.
19                    JUDITH ELLIOTT:  Uh-huh.
20                    ATTY. BAILEY:  The third being the
21    identification, the person who committed this crime
22    is the complicitor, would be the Defendant, somebody
23    would have to point her out during the course of the
```

```
1      trial.  Fourth, that she did it purposely,

2      basically, on purpose, and the Judge will give you a

3      detailed legal definition of that.

4                    JUDITH ELLIOTT:  Okay.

5                    ATTY. BAILEY:   It's always a legal

6      definition.

7                    JUDITH ELLIOTT:  Yes.

8                    ATTY. BAILEY:  Fifth, that she

9      caused the death of a living person, in this case a

10     fellow by the name of Robert Fingerhut.  And sixth,

11     that she acted with prior calculation and design.

12     It used to be, we used to have a crime called

13     premeditated murder, and they changed that so now

14     it's called prior calculation and design.

15                    JUDITH ELLIOTT:  Okay.

16                    ATTY. BAILEY: It requires some

17     advanced planning, a studied scheme to kill.  And,

18     for example, let's say I drop my pen, and I catch

19     it, that could be reflex.  But if I drop my pen and

20     I look down and say, oh, I dropped my pen, maybe I

21     better bend down and pick it up, that would be some

22     prior calculation and design.

23                    ATTY. INGRAM:  Objection.
```

1                    ATTY. BAILEY:  I'm sorry, it would

2       be advanced planning.

3                    JUDITH ELLIOTT:  Advanced planning.

4                    ATTY. BAILEY:  Right.

5                    ATTY. BAILEY:  Now, let's say

6       yesterday --

7                    THE COURT:  Is there an objection?

8                    ATTY.  JUHASZ:  He corrected it.

9                    THE COURT:  Okay.

10                   ATTY. BAILEY:  If I say, gosh, I am

11      going to Court tomorrow and I am going to drop my

12      pen so that I can bend down in front of the jurors

13      and pick it up and give that as an example, and then

14      the next -- like today, I bent down and picked it up

15      just like I planned to do it yesterday, that would

16      be prior calculation and design with advanced

17      planning, okay, right?

18                   JUDITH ELLIOTT:  Right.

19                   ATTY. BAILEY:  Now, I am sure you

20      used examples in your classroom, right?

21                   JUDITH ELLIOTT:  Maybe not legal,

22      but other ways.

23                   ATTY. BAILEY:  You've used other

1   examples, right.  So each crime is composed of

2   certain elements, okay, and now the burden of proof

3   is on us, the people of the State for proving these

4   elements and, basically, that is what we have to

5   prove, is these elements that the Judge is going to

6   tell you about, and only the elements, okay.  And we

7   have to do it by proof beyond a reasonable doubt.

8   Now, you understand that the Defendant has no burden

9   of proof, and that is basically because in our

10  system of justice, in this country, the Defendant is

11  presumed to be innocent, as are all other Defendants

12  tried in this Courtroom.  She is cloaked with this

13  presumption of innocence.  It protects her, it acts

14  as a shield and it protects her all through the

15  course of this trial unless and until all of the

16  testimony in evidence is in, you've heard the

17  Judges' instructions, and you and the other 11

18  jurors retire to the jury room to deliberate, and

19  you find that we have met our burden of proof as to

20  these elements by proof beyond a reasonable doubt,

21  at that point, that presumption of innocence would

22  be gone, right?

23              JUDITH ELLIOTT:  And not until that

1       point?

2                       ATTY. BAILEY:  Not until that

3       point, okay, that stays with her.  And I take it

4       that you would be able to afford her that

5       presumption of innocence?

6                       JUDITH ELLIOTT:  Yes, yes.

7                       ATTY. BAILEY:  Okay, and under our

8       system of justice in this country, there other

9       countries like maybe I think in France or Turkey,

10      other countries where the defendants are presumed to

11      be guilty, and they have to prove their own

12      innocence.  That is not the way our system works.

13      It's only fair that under our system of justice that

14      the State has the burden of proof.  We charged her

15      -- she's charged with the crimes -- the grand jury

16      charges her with this charge or these charges in an

17      indictment, which is just the charging document,

18      okay?

19                      JUDITH ELLIOTT:  Okay.

20                      ATTY. BAILEY:  The Defendant is not

21      present in the grand jury, and neither are her

22      lawyers.  It's only a one-sided presentation, okay?

23                      JUDITH ELLIOTT:  Okay.

```
 1                    ATTY. BAILEY:  It's just the
 2      charging document, it just brings the case here so
 3      we can get to the trial, the point of trial.
 4                    JUDITH ELLIOTT:  Okay.
 5                    ATTY. BAILEY: Okay.
 6                    JUDITH ELLIOTT:  Uh-huh.
 7                    ATTY. BAILEY:  And this is the time
 8      when, basically, the State is in a position where we
 9      have to put up or shut up, basically.
10                    JUDITH ELLIOTT:  Yes.
11                    ATTY. BAILEY:  And that's only fair
12      under our system, right?
13                    JUDITH ELLIOTT:  Right.
14                    ATTY. BAILEY:  Okay.  Now, and
15      because of this presumption of innocence, the
16      Defendant and her attorneys can just sit there
17      during the proceedings, they have no burden, okay?
18                    JUDITH ELLIOTT:  Uh-huh.
19                    ATTY. BAILEY:  Now, they probably
20      will do something because they are very good defense
21      attorneys, they are highly skilled.
22                    ATTY. INGRAM:  Don't flatter us.
23                    ATTY. BAILEY:  You've probably got
```

3358

1     80 to a hundred years in this Courtroom.

2              ATTY. INGRAM:  He's making us far

3     older than we both are.

4              JUDITH ELLIOTT:  Notice that I am

5     just smiling.

6              ATTY. INGRAM:  He's older than I

7     am.

8              ATTY. BAILEY:  Thanks.

9              ATTY. INGRAM:  You're welcome.

10            ATTY. BAILEY:  Now, the standard

11    that we use is proof beyond a reasonable doubt.

12            JUDITH ELLIOTT:  Uh-huh.

13            ATTY. BAILEY:  Okay, and the Judge

14    is going to define that term for you too, but

15    basically, it's something that you're used to

16    dealing with in your everyday life.  It's not a

17    shadow of a doubt --

18            JUDITH ELLIOTT:  No.

19            ATTY. BAILEY:  -- or beyond all

20    doubt, or it's not 100 percent proof.

21            JUDITH ELLIOTT:  Right.

22            ATTY. BAILEY:  You sat as a juror

23    in a civil case before.

1              JUDITH ELLIOTT:  Yes.

2              ATTY. BAILEY:  And in that civil

3      case, the standard was proof by a preponderance of

4      the evidence.

5              JUDITH ELLIOTT:  Yes.

6              ATTY. BAILEY:  So, if you had a

7      scale or tipped a scale a little bit, it would be

8      like 51 percent, just over 50 percent.

9              JUDITH ELLIOTT:  Yeah.

10             ATTY. BAILEY:  Okay, and let's use

11     the example of a box.  Take a box and whoever fills

12     it halfway, just over halfway, is going to win in a

13     civil case.

14             JUDITH ELLIOTT:  Yes.

15             ATTY. BAILEY:  You have to put

16     evidence and testimony in evidence and in a criminal

17     case, it's the highest burden in the law.  The

18     evidence doesn't go all the way to the top of the

19     box.  But it gets pretty darn close to the top of

20     the box.  It's up to you and each of the other

21     jurors to draw your own line up there to where

22     you're firmly convinced of the truth of the charge

23     based on the evidence as to whether we have got

```
 1     enough evidence in the box, okay?

 2                    JUDITH ELLIOTT:  Okay.

 3                    ATTY. BAILEY:  But it doesn't go

 4     all the way to the top, because you could never

 5     prove anything to a hundred percent.

 6                    JUDITH ELLIOTT:  No, that's true.

 7                    ATTY. BAILEY:  You agree with that?

 8                    JUDITH ELLIOTT:  I would agree.

 9                    ATTY. BAILEY:  There is always room

10     there for some possible or hypothetical doubt?

11                    JUDITH ELLIOTT:  Yes.

12                    ATTY. BAILEY:  Now, you would have

13     to use your reason and your common sense that you

14     use everyday, as a teacher, you make decisions if

15     you're going to get married, buy a house, buy a car,

16     and you generally list the pros and cons, and you

17     decide is there reasonable doubt there not to do it.

18                    JUDITH ELLIOTT:  Right.

19                    ATTY. BAILEY:  But at some point,

20     you decide it's the right thing to do for you, okay,

21     and you're going to find the right kind of car

22     eventually, right?

23                    JUDITH ELLIOTT:  Eventually.
```

1                    ATTY. BAILEY:  Okay, or the right

2      house.

3                    JUDITH ELLIOTT:  Right.

4                    ATTY. BAILEY:  You've bought a

5      house before?

6                    JUDITH ELLIOTT:  I live in one

7      that I bought.

8                    ATTY. BAILEY:  Right, and it was

9      the right decision for you, you looked at a lot of

10     factors.

11                    JUDITH ELLIOTT:  Sure.

12                    ATTY. BAILEY:  So, you're used to

13     making that decision, very important decision.  So,

14     you would use your reason and your common sense, and

15     determine if you are firmly convinced of the truth

16     of the charge, the elements, and that is what we're

17     talking about here, is these elements of the crimes

18     charged, the ingredients of the recipes, okay, to a

19     moral certainty.

20                    JUDITH ELLIOTT:  Yes.

21                    ATTY. BAILEY:  And the Judge will

22     give you the detailed definition on that.

23                    JUDITH ELLIOTT:  Yes.

1          ATTY. BAILEY:  Let me give you an

2     example of that, okay.  Well, you understand because

3     you sat as a juror in another civil case, even

4     though the burden of proof was different and the

5     instructions that you are going to get are

6     different.

7          JUDITH ELLIOTT:  It's been a long

8     time ago.

9          ATTY. BAILEY:  It's been a long

10     time ago but, basically, there are different types

11     of proof we can use to establish the elements of the

12     charge.  There is what we call direct evidence where

13     a witness can come in and testify to what he or she

14     has learned through the use of his or her five

15     senses, for example, I heard the gunshot, and it was

16     loud.  I touched the railing and it was hot.  And I

17     smelled the smoke and it was acrid, okay.  But there

18     is another type of evidence that you are used to and

19     that you use in your everyday life, and it's sort of

20     a roundabout-type of evidence, and that is where you

21     are presented with a fact or series of facts, and

22     you are asked to draw a logical deduction from

23     another fact or series of facts, and that is called

1    circumstantial evidence. Some times folks watch

2    T.V. programs like LA Law or the old Perry Mason

3    reruns and they get a distorted view of that term

4    circumstantial evidence. But in real life, it's

5    just as good, it's of equal weight as evidence as

6    direct evidence.

7                    JUDITH ELLIOTT: Uh-huh.

8                    ATTY. BAILEY: Okay, and I will

9    give you a for instance of that. Let's say that you

10   live in a two story house and your bedroom is on the

11   second floor. And when you go to bed at night, you

12   look out the bedroom window and it's a beautiful

13   night, the moon is beaming, the stars are twinkling

14   and there is not a cloud in the sky. And you look

15   across the neighborhood and as far as you can see,

16   it's perfectly dry, right?

17                    JUDITH ELLIOTT: Uh-huh.

18                    ATTY. BAILEY: So, you draw the

19   blinds and you get into bed, and before you fall

20   asleep, you're listening to the radio, and the

21   announcer comes on and says, folks, there is a cold

22   front moving in tonight and there is going to be a

23   storm, and some time after that, you fall asleep.

3364

```
 1    And some time during the night you are awakened and
 2    you look toward the window and there is this bright
 3    flash of light and in the distance in the sky there
 4    is a booming sound, and a couple of minutes go by
 5    and suddenly there is another bright flash of light
 6    outside, and you can't see what's going on because
 7    the blinds are drawn.
 8              JUDITH ELLIOTT:  Uh-huh.
 9              ATTY. BAILEY:  And closer in time,
10    maybe two seconds later, there is a closer booming
11    sound and suddenly there is really a bright flash of
12    light outside and a big cracking, ripping boom above
13    the house and a pitter patter on the roof, and then
14    you hear a steady drumming.  And you fall back
15    asleep.  And some time later, you awaken, go to the
16    window and open the blinds and look out and it's a
17    beautiful day, the sun is shining and there's not a
18    cloud in the sky.  But where it was perfectly dry
19    the night before, you look out and as far as you can
20    see, roof tops are all glistening and soak and wet,
21    water is running in the streets, water is pulling
22    up, and drops of water are dripping off of the
23    leaves of the trees and the trunks, and there is no
```

1     fire hydrant nearby where anybody could have smashed

2     into it and spewed water all over the place, right?

3                     JUDITH ELLIOTT:  Right.

4                     ATTY. BAILEY:  And you know what

5     happened during the night, don't you?

6                     JUDITH ELLIOTT:  Sure.

7                     ATTY. BAILEY:  What happened?

8                     JUDITH ELLIOTT: There was a storm.

9                     ATTY. BAILEY:  A thunderstorm, and

10    you know that happened beyond any reasonable doubt,

11    right?

12                    JUDITH ELLIOTT:  Right.

13                    ATTY. BAILEY:  Now, there's room --

14    and that's circumstantial evidence.  Now, there's

15    room in there for some possible or imaginary doubt,

16    that little space at the top of the box.  And you

17    can imagine that during the night that Alf and his

18    martian buddies flew by in a flying saucer and put

19    on a sound and light show, and sprinkled the ground

20    with some wet stuff.  But that would be a foolish or

21    an imaginary doubt, wouldn't it?

22                    JUDITH ELLIOTT:  Yes.

23                    ATTY. BAILEY:  Now, I think you

```
 1      would agree that when people plan crimes, serious

 2      crimes like aggravated murders, they often would do

 3      so in secret, right, trying to cover their tracks

 4      and not tell the whole world.  I mean, they don't

 5      stand on the Courthouse steps and say, hey, world,

 6      we're going to kill so and so on such and such date

 7      and time, right?

 8                    JUDITH ELLIOTT:  Right.

 9                    ATTY. BAILEY:  And because of that,

10      it's important that we use circumstantial evidence

11      if we have to prove our case because you can't go

12      inside of a person's mind unless you have some other

13      evidence as to what a person was thinking.  For

14      example, if you had letters or phone calls, then you

15      might be able to use those to know what a person was

16      thinking, right?

17                    JUDITH ELLIOTT:  Right.

18                    ATTY. BAILEY:  In advance of the

19      crime.

20                    JUDITH ELLIOTT:  Right.

21                    ATTY. BAILEY:  Now, I take it that

22      you would be able to pile up evidence on evidence

23      and make your own decision as if there is enough to
```

1  follow what the Judge tells you, right?

2  JUDITH ELLIOTT:  Uh-huh.

3  ATTY. BAILEY:  And do you believe

4  that people should be held accountable for their

5  actions?

6  JUDITH ELLIOTT:  Definitely.

7  ATTY. BAILEY:  And as a matter of

8  fact, you would tell that to your students, wouldn't

9  you?

10  JUDITH ELLIOTT:  Absolutely.

11  ATTY. BAILEY:  There would have to

12  be consequences if they do something wrong?

13  JUDITH ELLIOTT:  Always.

14  ATTY. BAILEY:  Now, you understand

15  that even though people may plan crimes in great

16  detail, some times they mess up and do some really,

17  really stupid things and get caught, right?

18  JUDITH ELLIOTT:  Right.

19  ATTY. BAILEY:  For example, you are

20  probably familiar with stories about the bank robber

21  who runs into the bank and he's got a mask on to

22  cover his identity and he's got a gun and hands a

23  stick up note to the clerk, and it says -- it's on

1    the back of an envelope, and it says, give me all of

2    your money, and clerk hands him the money and runs

3    out.  And there is a get away driver waiting outside

4    waiting to take off.  And the clerk turns the

5    envelope that he left behind over, and there is the

6    person's name and address on it, right?

7                    JUDITH ELLIOTT:  Yes.

8                    ATTY. BAILEY:  Or the burglar who

9    would climb in through the window in the middle of

10   the night and drops his wallet with his

11   identification and he gets caught because of that.

12   So, you understand all criminals aren't always

13   rocket scientists?

14                   JUDITH ELLIOTT:  Right.

15                   ATTY. BAILEY:  And despite the

16   precautions that they may take, sometimes they may

17   get caught.

18                   JUDITH ELLIOTT:  Yes.

19                   ATTY. BAILEY:  Now, in your civil

20   case, that was in which court?

21                   JUDITH ELLIOTT:   Here somewhere.

22   It was so long ago, it was a Sears and Roebuck

23   versus a person, so it was like --

1           ATTY. BAILEY:  Was that in this

2   Courthouse here?

3           JUDITH ELLIOTT:  I think it was

4   this Courthouse, I'm not sure.  I won't say for

5   sure.

6           ATTY. BAILEY:  Okay, well,

7   generally in Ohio, Judges don't allow jurors to take

8   notes, and you probably didn't take notes in the

9   other case.

10           JUDITH ELLIOTT:  No, I didn't.

11           ATTY. BAILEY:  When you're in

12   college you take notes.

13           JUDITH ELLIOTT:  Yes. I would like

14   to take notes, but you don't in this.

15           ATTY. BAILEY:  Right, we don't let

16   you do that.  And there is a reason for that.

17           JUDITH ELLIOTT:  Yes.

18           ATTY. BAILEY:  The Judges feel that

19   if you were allowed to take notes it would distract

20   you from looking at the witness and watching the

21   witness' demeanor.  And sometimes some folks take

22   better notes than others and they get into an

23   argument over their notes.

1              JUDITH ELLIOTT:  That's true.

2              ATTY. BAILEY:  And we would rather

3    you rely on your collective recollection.

4              JUDITH ELLIOTT:  Right.

5              ATTY. BAILEY:  And another thing

6    is, our court reporters are excellent, but we don't

7    have a million dollars worth of transcribing

8    equipment or instant transcripts, so you're not

9    going to get into the transcripts of the witnesses

10   testimony, and this trial is going to last a week

11   and a half to two weeks at the most.  And you're

12   going to have to remember that testimony, you and

13   the other 11 jurors that is why there is 12 of you.

14             JUDITH ELLIOTT:  Right.

15             ATTY. BAILEY:  So, all 12 of you

16   should be able to recollect the testimony from the

17   evidence.

18             JUDITH ELLIOTT:  Right, right.

19             ATTY. BAILEY:  Okay, -- and there

20   aren't any instant replays like on T.V.

21             JUDITH ELLIOTT:  I understand.

22             ATTY. BAILEY:  Okay, so you will be

23   able to pay close attention and remember it?

```
1                    JUDITH ELLIOTT:  Yes.

2                    ATTY. BAILEY:  And another thing

3        is, you can't go out and investigate on your own.

4                    JUDITH ELLIOTT:  No.

5                    ATTY. BAILEY:  We had a juror do

6        that once --

7                    JUDITH ELLIOTT:  Really.

8                    ATTY. BAILEY:  They do that some

9        times in the movies, Matlock did it, and Perry Mason

10       sent his staff out on a case once.  That would

11       result in a mistrial.

12                   JUDITH ELLIOTT:  Exactly.

13                   ATTY. BAILEY:  Okay, and you

14       wouldn't do anything like that?

15                   JUDITH ELLIOTT:  I don't think I

16       could anyway.  I mean, why would you, you know, it's

17       a waste of time.

18                   ATTY. BAILEY:  We ask that because

19       it's happened.

20                   JUDITH ELLIOTT:  Yes, it's good to

21       ask.

22                   ATTY. BAILEY:  You understand that

23       you're stuck with the questions that the lawyers
```

1    ask.   Some times on Court T.V. they bring you cases

2    from different State's and different jurisdictions,

3    and some times the jurors are allowed to pass notes

4    to the judge to have the witness asked that

5    question, but that doesn't happen here.

6                    JUDITH ELLIOTT:  Right.

7                    ATTY. BAILEY:  Okay, you're stuck

8    with the lawyers and because we're lawyers and

9    because we go to law school and we're trained the

10   same way, we're trained to prove elements or to tear

11   down elements, okay.  So, you are sort of stuck with

12   what we do or don't do.

13                   JUDITH ELLIOTT:  Yeah.

14                   ATTY. BAILEY:  And it may well be

15   that you have an interest in something that isn't

16   asked about.  For example, let's say you were a

17   chef, and you wondered what people had to eat at

18   dinner that night, okay, because you're really

19   interested in that, that's your line of work, and we

20   never get to -- and we never ask that because it's

21   not relevant to proving the elements.  We can prove

22   the case beyond a reasonable doubt without asking

23   about the food.  Okay, that question would never get

1    asked or never answered, okay, you would still be

2    able to render a verdict in the case if you found

3    that we were able to prove beyond a reasonable doubt

4    the elements of the crime, even though we never

5    asked about the food.  Or maybe even what kind of

6    shoes somebody was wearing, if you sold shoes.

7                JUDITH ELLIOTT:  It wasn't

8    relevant.

9                ATTY. BAILEY:  If it didn't have

10    anything to do with the case.

11                JUDITH ELLIOTT:  Right.

12                ATTY. BAILEY:  Now, at the end of

13    the case, at the end of the first phase when the

14    jury goes out to deliberate on their verdict,

15    they're sequestered, kept together.

16                JUDITH ELLIOTT:  Okay.

17                ATTY. BAILEY:  And every jury is

18    different.  I have had capital juries return

19    verdicts in a hour and a half in the first phase,

20    and I have had juries take up to five days.  Okay,

21    see, it can be any amount of time depending on how

22    much evidence and testimony there is and how the

23    deliberations go, you take whatever time you need.

1              JUDITH ELLIOTT:  Right.

2              ATTY. BAILEY:  But you would be

3    kept together, and if you go into the evening hours,

4    the Judge would have you put up in a hotel and they

5    would provide food and you wouldn't be able to

6    discuss the case when you're not altogether.  You've

7    got to have all 12 of you together to discuss it, no

8    one on one or one on three or whatever.

9              JUDITH ELLIOTT:  All 12, right.

10             ATTY. BAILEY:  And let's say you

11   come back with a guilty verdict of aggravated murder

12   and one or more specifications at the end of the

13   first phase, there would be a little bit of a break

14   in there, it could be a couple of days, it could be

15   a week.  And then you come back with the other

16   jurors for a second phase, and you hear testimony

17   again, and usually that would last one day to three

18   days.

19             JUDITH ELLIOTT:  Uh-huh.

20             ATTY. BAILEY:  And then the Judge

21   would instruct you on the law and then you would be

22   sequestered again, and again have your

23   deliberations.

1                    JUDITH ELLIOTT:  Uh-huh.

2                    ATTY. BAILEY:  That being

3      sequestered, would that cause you any undue

4      hardship?

5                    JUDITH ELLIOTT:  No.

6                    ATTY. BAILEY:  Now, it may well be

7      that during the course of the trial as you come face

8      to face with the Defendant and as her chair is

9      turned toward you, you will become more acquainted

10     with her.  Now, my question to you is this, when you

11     go inside your jury room to deliberate on your

12     verdict, can you set aside all thoughts you might

13     have of sympathy for this Defendant.  I know that

14     it's only natural as a human being to feel sympathy

15     for another human being.

16                    JUDITH ELLIOTT:  Uh-huh.

17                    ATTY. BAILEY:  But you have to make

18     your decision in this case based on the testimony

19     and the evidence and the instructions of law and lay

20     aside all thoughts of sympathy that you have and be

21     conscientious in your deliberations.  Can you do

22     that?

23                    JUDITH ELLIOTT:  Yes.

1              ATTY. BAILEY:  The fact that the

2     Defendant is a woman, does that bother you in any

3     way?

4              JUDITH ELLIOTT:  No.

5              ATTY. BAILEY:  Do you think that if

6     we met our burden of proof in both phases and you

7     found the death penalty was an appropriate

8     punishment in this case, that you would be able to

9     return a death penalty verdict if we met that burden

10    in spite of the fact that she is female?

11             JUDITH ELLIOTT:   In spite of the

12    fact that she's female, yes, she's another human

13    being, so -- she's a human being and that is what I

14    would look at.

15             ATTY. BAILEY:  Okay.

16             JUDITH ELLIOTT:  Not male or

17    female.

18             ATTY. BAILEY:  Okay.  Now, I take

19    it you would agree that as a citizen in this

20    country, we have certain obligations of citizenship,

21    and one of those obligations is if it's election

22    time, we have an obligation to sort of bone up on

23    the issues of the candidates and go out and cast a

1     ballot, right?

2                    JUDITH ELLIOTT:  Yes.

3                    ATTY. BAILEY:  And that's how you

4     get to be here from the voter's list.  And another

5     obligation is if it's war time, our country is at

6     war, then we have an obligation to serve in the

7     military if we're called.  As a matter of fact,

8     we've got young folks over seas in several places

9     right now that are doing their duty, right?

10                    JUDITH ELLIOTT:  Uh-huh.

11                    ATTY. BAILEY:  Another obligation

12    of citizenship that you are familiar with is, if

13    you're summoned in as jurors to serve if we're able

14    to.  And you have done that already on a civil case

15    a number of years ago.

16                    JUDITH ELLIOTT:  Right.

17                    ATTY. BAILEY:  And now you're

18    called again to do that type of service to serve on

19    the most important or the most serious of criminal

20    cases, would you be willing to undertake that

21    obligation again in this case even though it may

22    cause some disruption in your daily life?

23                    JUDITH ELLIOTT:  Yes.

1          ATTY. BAILEY:  Okay.  Do you have

2     any questions?

3          JUDITH ELLIOTT:  No.  I think you

4     have covered a lot of it.  I am trying -- there's a

5     lot to think about, but I think I will be able to

6     digest it.

7          ATTY. BAILEY:  Okay, now defense

8     counsel will have an opportunity to ask you some

9     questions.

10          JUDITH ELLIOTT:  Okay.

11          THE COURT:  Mr. Ingram.

12     **EXAMINATION BY ATTORNEY INGRAM:**

13

14          ATTY. INGRAM:  Good afternoon,

15     ma'am.

16          JUDITH ELLIOTT:  Good afternoon.

17          ATTY. INGRAM:  Are you doing okay

18     up there?

19          JUDITH ELLIOTT:  I am doing fine.

20          ATTY. INGRAM:  Would you like a

21     glass of water?

22          JUDITH ELLIOTT:  Could I have a

23     little bit of water?

```
 1                        ATTY. INGRAM:  Sure.

 2                        JUDITH ELLIOTT:  Thank you.  I am

 3    getting a little bit thirsty.

 4                        ATTY. INGRAM:  My name is Jerry

 5    Ingram and my co-counsel is John Juhasz.

 6                        JUDITH ELLIOTT:  Hi.

 7                        ATTY. INGRAM:  And John and I will

 8    share in the responsibility of representing Donna

 9    here who is on trial for her life.

10                        JUDITH ELLIOTT:  Yes.

11                        ATTY. INGRAM:  And as I am sure

12    you can imagine, John and I take our

13    responsibilities very serious.

14                        JUDITH ELLIOTT:  Yes.

15                        ATTY. INGRAM:  We think that we

16    should take every reasonable precaution in selecting

17    a fair minded jury, the same type of jury, no more,

18    no less, that you or I would want if we were on

19    trial.  Does that sound fair enough to you?

20                        JUDITH ELLIOTT:  Yes.

21                        ATTY. INGRAM:  This is the only

22    opportunity we will have to get to know one another

23    and for you to determine whether you are comfortable
```

 1    sitting in this case.

 2                    JUDITH ELLIOTT:  Okay.

 3                    ATTY. INGRAM:  After this dialogue

 4    conversation ends and the case begins, the lawyers

 5    can certainly talk at you, and that is exactly what

 6    they'll do, but they're not allowed to talk to you.

 7                    JUDITH ELLIOTT:  Right.

 8                    ATTY. INGRAM:  This morning -- or

 9    this afternoon, we're suppose to talk to one

10    another.

11                    JUDITH ELLIOTT:  Okay.

12                    ATTY. INGRAM:  So, if there is

13    anything that you would like to say, any questions

14    that pop into your mind or anything that you would

15    like to discuss, stop me and let me know and we will

16    do our best to address that issue.

17                    JUDITH ELLIOTT:  Okay.

18                    ATTY. INGRAM:  The process that you

19    are going through here is a lot like a job

20    interview.  It's a short term job.

21                    JUDITH ELLIOTT:  Uh-huh.

22                    ATTY. INGRAM:  But it's a lot like

23    a job interview, except when you went to the school

1    to apply for work, you chose what school you were

2    going to go apply to.  And in this case, someone, a

3    courthouse employee somewhere was spinning a jury

4    wheel and reached in and pulled your name out and we

5    asked you to come here.

6                          JUDITH ELLIOTT:  Right.

7                          ATTY. INGRAM:  But we are

8    interviewing you today for one of the most important

9    jobs there is; that is the job of finding the truth

10   and perhaps determining the fate of another person.

11                         JUDITH ELLIOTT:  Yes.

12                         ATTY. INGRAM:  So first question to

13   you is, how do you feel about being asked to assume

14   such a responsibility?

15                         JUDITH ELLIOTT:  I think it's an

16   awesome responsibility.  I certainly -- I'm not

17   taking it very lightly.

18                         ATTY. INGRAM:  I'm sorry, what was

19   your last comment?

20                         JUDITH ELLIOTT:  I am not taking it

21   lightly at all.

22                         ATTY. INGRAM:  You are very soft

23   spoken.

```
 1                    JUDITH ELLIOTT:  Oh, okay, I should
 2       speak up, I'm sorry.
 3                    ATTY. INGRAM:  My wife tells me
 4       that I'm going deaf.
 5                    JUDITH INGRAM:  Well, I am not soft
 6       spoken when I get angry at my husband, but I'm soft
 7       spoken here.
 8                    ATTY. INGRAM:  I hope you don't get
 9       angry with me and that you remain soft spoken.
10                    JUDITH ELLIOTT:  No.  We just got a
11       rental car and he put the emergency brake on, and I
12       know about this rented car and I just was --
13                    ATTY. INGRAM:  Couldn't get it off?
14                    JUDITH ELLIOTT:  No, I couldn't get
15       it off, so I was a little bit angry.
16                    ATTY. INGRAM:  All right.
17                    JUDITH ELLIOTT:  It's not really
18       his fault, I mean, he knows about it, I don't.  I
19       don't know about cars.
20                    ATTY. INGRAM:  In a nutshell, this
21       case boils down to the government's allegation that
22       Donna Roberts plotted or conspired with a male
23       companion by the name of Nate Jackson to cause the
```

1          death of Robert Fingerhut.  Do you understand that

2          this trial is about the guilt or innocence of one

3          person and one person only?

4                         JUDITH ELLIOTT:  One person, yes.

5                         ATTY. INGRAM:  And that is Donna

6          Roberts?

7                         JUDITH ELLIOTT:  Okay.

8                         ATTY. INGRAM:  Throughout these

9          proceedings, you will hear the name Nate Jackson.

10                        JUDITH ELLIOTT:  Yes.

11                        ATTY. INGRAM:  And you may conclude

12         that Nate Jackson did what the State says he did.

13                        JUDITH ELLIOTT:  Uh-huh.

14                        ATTY. INGRAM:  You're here to

15         determine whether Donna helped him do that.  You got

16         me there?

17                        JUDITH ELLIOTT:  Yes, I got you.

18                        ATTY. INGRAM:  And when Mr. Bailey

19         was speaking with you, he used the terms

20         complicitor, aider and abettor.  Do you recall that?

21                        JUDITH ELLIOTT:  Yes.

22                        ATTY. INGRAM:  The State's burden

23         in this case is to prove that Donna Roberts helped

3384

```
 1      Nate Jackson do whatever Nate Jackson did.  Will you

 2      hold them to that burden of proving that?

 3                       JUDITH ELLIOTT:  Yes, sir.

 4                       ATTY. INGRAM:  Now, in support of

 5      its allegation, the State will present during these

 6      proceedings the various letters and tape-recorded

 7      conversations between Donna and Nate.  Some of this

 8      evidence is sexually explicit in nature.

 9                       JUDITH ELLIOTT:  Okay.

10                       ATTY. INGRAM:  And to be honest

11      with you, some of it is down right offensive.

12                       JUDITH ELLIOTT:  Uh-huh.

13                       ATTY. INGRAM:  Do you understand

14      that the allegation here is murder not loose

15      morality?

16                       JUDITH ELLIOTT:  Okay.

17                       ATTY. INGRAM:  And even though you

18      may be offended by the sexual nature of some of this

19      evidence, you are sort of going to have to pull

20      yourself above the offense and test the evidence,

21      and you're up to that?

22                       JUDITH ELLIOTT:  Yes, yes.

23                       ATTY. INGRAM:  Would you have the
```

1      courage to acquit; that is, vote not guilty if you

2      found that a not guilty was warranted by the

3      evidence?

4                          JUDITH ELLIOTT:  Yes, I would.

5                          ATTY. INGRAM:  You may have in

6      passing read something about this case.  Do you

7      recollect what you read at all?

8                          JUDITH ELLIOTT:  Nothing, I am

9      serious, I just bounced whatever it was.

10                         ATTY. INGRAM: Okay, you do

11     understand --

12                         JUDITH ELLIOTT:  Usually my

13     neighbors tell me and we didn't even discuss that,

14     so I'm surprised.

15                         ATTY. INGRAM:  You do understand

16     that your responsibility as a juror is to decide

17     this case on what you see and hear in this

18     Courtroom?

19                         JUDITH ELLIOTT:  Right.

20                         ATTY. INGRAM:  Not on what some

21     reporter may have written somewhere.

22                         JUDITH ELLIOTT:  No.

23                         ATTY. INGRAM:  Not what your

1    neighbor might say.

2                        JUDITH ELLIOTT:  Right.

3                        ATTY. INGRAM:  Not even what your

4    Hubby might say when you are arguing over the car.

5                        JUDITH ELLIOTT:  Right, right,

6    exactly.

7                        ATTY. INGRAM:  And while we're on

8    neighbors and hubbies, they're going to figure out

9    that you're sitting on this case.

10                       JUDITH ELLIOTT:  And I am going to

11   make myself very scarce, you don't know how I can do

12   that.

13                       ATTY. INGRAM:  And it will be

14   because you're involved --

15                       JUDITH ELLIOTT:  Uh-huh.

16                       ATTY. INGRAM:  -- they may follow

17   these proceedings closer than they ordinarily would.

18                       JUDITH ELLIOTT:  Probably would.

19                       ATTY. INGRAM:  And when you get

20   home at night, and it's not that they want to do

21   anything, --

22                       JUDITH ELLIOTT:  Right.

23                       ATTY. INGRAM:  -- but when you get

```
 1          home at night, they're going to have a natural
 2          curiosity and they may say, hey, Judy, what happened
 3          there today, and let me tell you what I think.
 4                         JUDITH ELLIOTT:  Uh-huh.
 5                         ATTY. INGRAM:  You are going to
 6          have to sort of put them off.
 7                         JUDITH ELLIOTT:  I really will.
 8                         ATTY. INGRAM:  Are you up to that?
 9                         JUDITH ELLIOTT:  Oh, yes, I am good
10          at that.
11                         ATTY. INGRAM:  And even the jury is
12          told that they have to keep an open mind until the
13          case is over.
14                         JUDITH ELLIOTT:  Exactly.
15                         ATTY. INGRAM:  Because if you hear
16          a witness early on say one thing, and you let that
17          lead to an opinion in your mind, you may not listen
18          objectively then to other evidence as the case
19          unfolds.
20                         JUDITH ELLIOTT:  Yes.
21                         ATTY. INGRAM:  Will you do your
22          best to keep an open mind until the case is all the
23          way over?
```

1              JUDITH ELLIOTT:  I will.

2              ATTY. INGRAM:  Before I talk to

3   you about penalties, I have to explain a concern

4   that I have.  I am personally a bit bothered that

5   all of us are standing up here talking to you about

6   penalties; the Judge, the prosecutor, myself.  Now,

7   we're asking you about what you might do to someone

8   and you don't even know if anything has been done

9   wrong or not.

10             JUDITH ELLIOTT:  Right.

11             ATTY. INGRAM:  It seems to me a lot

12  like putting the cart before the horse.

13             JUDITH ELLIOTT:  But you have to do

14  it that way.  There's no other way to do it.

15             ATTY. INGRAM:  That's right.  You

16  understand that these questions have nothing to do

17  whatsoever with Donna's guilt or innocence?

18             JUDITH ELLIOTT:  Yes, I understand,

19  that's the justice system.

20             ATTY. INGRAM:  Do you wear your

21  seat belt.

22             JUDITH ELLIOTT:  Most of the time.

23  There's a couple of times that I have been bad.

3389

1      ATTY. INGRAM:  Okay, I am always

2 bad.

3      JUDITH ELLIOTT:  I'm not always bad

4 but --

5      ATTY. INGRAM:  Well, when people

6 buckle their seatbelts, they don't expect to be in

7 an automobile accident, do they?

8      JUDITH ELLIOTT:  No.

9      ATTY. INGRAM:  They buckle just in

10 case.

11      JUDITH ELLIOTT:  Just in case.

12      ATTY. INGRAM:  Well, we're not

13 predicting that we get to a second phase here, we're

14 just asking you these questions just in case, do you

15 understand?

16      JUDITH ELLIOTT:  Uh-huh.

17      ATTY. INGRAM:  As I understand your

18 answers to some of Mr. Bailey's questions, if you

19 were rewriting the laws in the State of Ohio, sort

20 of you're a one woman legislature.

21      JUDITH ELLIOTT:  That would be

22 dangerous.

23      ATTY. INGRAM:  You would be

1    dangerous?

2                    JUDITH ELLIOTT:  I think it would

3    be dangerous.  I think I would need somebody to

4    offset me.  One woman's opinion is not really good.

5                    ATTY. INGRAM:  Okay, but in our

6    one-woman legislature case, I believe you told Mr.

7    Bailey that you would include the death penalty for

8    some aggravated murders?

9                    JUDITH ELLIOTT:  For some, yes.

10                   ATTY. INGRAM:  My question to you

11   is, in those aggravated murders for which you would

12   include the death penalty, would the death penalty

13   be an automatic penalty or would the death penalty

14   be one of a couple of penalties that were optional?

15                   JUDITH ELLIOTT:  It would be one of

16   the options because there are four.  I mean, there

17   is four  --

18                   ATTY. INGRAM:  That is the law.

19                   JUDITH ELLIOTT:  Yes, and I would

20   go by those four.

21                   ATTY. INGRAM:  Okay.

22                   JUDITH ELLIOTT:  Until the other

23   three were cut off, which I don't understand that

```
 1      part.

 2                      ATTY. INGRAM:  Okay, we will talk

 3      about that.

 4                      JUDITH ELLIOTT:  But that's later,

 5      sorry.

 6                      ATTY. INGRAM:  So, actually if you

 7      were rewriting the law, you would sort of keep it

 8      just the way it is.

 9                      JUDITH ELLIOTT:  Yes.

10                      ATTY. INGRAM:  Okay.

11                      JUDITH ELLIOTT:  Until I think of a

12      better way, and I haven't yet.

13                      ATTY. INGRAM:  Okay, and I want to

14      talk about the duties and responsibilities of a

15      second phase juror.

16                      JUDITH ELLIOTT:  Okay.

17                      ATTY. INGRAM:  But I am going to

18      make up a case  --

19                      JUDITH ELLIOTT:  Okay.

20                      ATTY. INGRAM:  -- instead of this

21      case.

22                      JUDITH ELLIOTT:  Okay.

23                      ATTY. INGRAM:  And I am going to
```

1    make up a case which sadly parallels recent events

2    here.

3              JUDITH ELLIOTT:  Okay.

4              ATTY. INGRAM:  You're a second

5    phase juror in an aggravated murder case where the

6    death specification is the Defendant killed a police

7    officer in the line of duty.  That is a capital

8    specification.  Do you understand that even in that

9    scenario, all 4 sentencing options must start out

10   equally in a juror's mind?

11             JUDITH ELLIOTT:  Exactly.

12             ATTY. INGRAM:  Now, let's talk

13   about when the Life offense options are cut off as

14   you say.

15             JUDITH ELLIOTT:  Okay.

16             ATTY. INGRAM:  You know the jury is

17   not called upon to make a sentencing decision in a

18   vacuum.  The law is going to give you some

19   guidelines and the Judge will describe them for you.

20   And, basically, you're told that you have to balance

21   aggravating circumstances and aggravated

22   circumstances are nothing more than the death

23   specifications that get a juror to a second phase.

```
 1        So, in our made up case, the aggravating
 2   circumstance would be a police officer was killed in
 3   the line of duty.
 4                      JUDITH ELLIOTT:  Okay.
 5                      ATTY. INGRAM:  You balance the
 6   aggravating circumstance or circumstances against
 7   the mitigating factors, and those are positive
 8   things that are said about the Defendant that work
 9   against the death penalty.
10                      JUDITH ELLIOTT:  Okay.
11                      ATTY. INGRAM:  If you find beyond a
12   reasonable doubt, and as Mr. Bailey said, that's
13   firmly convinced to a moral certainty.
14                      JUDITH ELLIOTT:  Yes.
15                      ATTY. INGRAM:  If you find beyond a
16   reasonable doubt that the bad things, the
17   aggravating circumstance or circumstances outweigh
18   the mitigating factors beyond a reasonable doubt,
19   and that death is the appropriate penalty --
20                      JUDITH ELLIOTT:  Uh-huh.
21                      ATTY. INGRAM:  -- only then are the
22   life options cut off.
23                      JUDITH ELLIOTT:  Okay.
```

```
1                    ATTY. INGRAM:  Now, when you

2       balance, that means that you will weigh one against

3       the other.  You got me there?

4                    JUDITH ELLIOTT:  Yes.

5                    ATTY. INGRAM:  And as a juror in

6       this case, you are the sole judge of the facts,

7       credibility of the witnesses, and the weight of the

8       evidence.

9                    JUDITH ELLIOTT:  Okay.

10                   ATTY. INGRAM:  So nobody can tell

11      you what weight to give this evidence, that is your

12      personal responsibility; that is a responsibility

13      that you assume by agreeing to be a juror.

14                   JUDITH ELLIOTT:  Okay.

15                   ATTY. INGRAM:  You got that?

16                   JUDITH ELLIOTT:  Uh-huh.

17                   ATTY. INGRAM:  Do you understand

18      that the law will never require you to vote for a

19      sentence that you do not feel is warranted by the

20      evidence?

21                   JUDITH ELLIOTT:  Okay.

22                   ATTY. INGRAM:  And when you were

23      talking with Mr. Bailey and talking about sharing
```

1       your views with the other juror, that is what you

2       should do.

3                       JUDITH ELLIOTT:  When we're all

4       present?

5                       ATTY. INGRAM:  When you're

6       altogether at the end of the case and the Judge

7       tells you are allowed to talk about it.

8                       JUDITH ELLIOTT:  Okay.

9                       ATTY. INGRAM:  You know, during the

10      trial, the only thing that all of you are going to

11      have in common, you are probably not going to know

12      one another --

13                      JUDITH ELLIOTT:  Right.

14                      ATTY. INGRAM:  -- is what you see

15      and hear and what unfolds in this Courtroom.

16                      JUDITH ELLIOTT:  Yes.

17                      ATTY. INGRAM:  And because that is

18      the only thing that you all have in common, it's

19      natural that you are going to want to talk about it

20      and maybe even speculate about it.

21                      JUDITH ELLIOTT:  Okay.

22                      ATTY. INGRAM:  But the Judge is

23      going to tell you again that you are going to have

1    to sort of rise above that natural inclination.  Are

2    you up to that?

3                        JUDITH ELLIOTT:  Yes.

4                        ATTY. INGRAM:  Now, you are back in

5    that room, and I don't care if this is the first

6    phase or the second phase, but you are suppose to

7    share your views with your fellow jurors, do you

8    understand that?

9                        JUDITH ELLIOTT:  Yes, in that room.

10                       ATTY. INGRAM:  And let's say you

11   share your views and you conclude that you're the

12   minority.

13                       JUDITH ELLIOTT:  Uh-huh.

14                       ATTY. INGRAM:  You are suppose to

15   openly listen to them, you understand that?

16                       JUDITH ELLIOTT:  Oh, yes, yes.

17                       ATTY. INGRAM:  And if they honestly

18   convince you that they're right and you're wrong,

19   you should change your mind.

20                       JUDITH ELLIOTT:  Uh-huh.

21                       ATTY. INGRAM:  On the other hand,

22   if they don't honestly convince you that they're

23   right and you're wrong, you are suppose to stick to

1          your guns, do you understand that?

2                          JUDITH ELLIOTT:  Yes, yes.

3                          ATTY. INGRAM:  And do you

4          understand that in our system of justice every

5          single juror has the power to prevent what that

6          juror perceives to be an unjust verdict?

7                          JUDITH ELLIOTT:  Exactly.

8                          ATTY. INGRAM:  Now, you have some

9          civil jury experience?

10                         JUDITH ELLIOTT:  Yes.

11                         ATTY. INGRAM:  When Mr. Bailey was

12         talking to you about proof, did he use a container?

13                         JUDITH ELLIOTT:  Yes.

14                         ATTY. INGRAM:  And he poured a

15         burden of proof in there?

16                         JUDITH ELLIOTT:  Uh-huh.

17                         ATTY. INGRAM:  Well, if that proof

18         is solid like sand or that proof is a liquid like

19         water, in that civil case, the burden of proof is

20         proof by a preponderance of the evidence.

21                         JUDITH ELLIOTT:  Yes.

22                         ATTY. INGRAM:  That is the lowest

23         burden of proof that we have in this country.

1               JUDITH ELLIOTT:  Right.

2               ATTY. INGRAM:  All it is is one

3        drop of water or one grain of sand above half way.

4               JUDITH ELLIOTT:  Uh-huh.

5               ATTY. INGRAM:  It is certainly not

6        firmly convinced to a moral certainty.

7               JUDITH ELLIOTT:  Right.

8               ATTY. INGRAM:  You got me?

9               JUDITH ELLIOTT:  Yes.

10              ATTY. INGRAM:  And that incident

11       back at Christmastime with your house, did someone

12       try to get in and get some presents?

13              JUDITH ELLIOTT:  It was years ago.

14       No, they didn't try to come in and get some

15       presents, they just -- they were probably just

16       fooling around, I don't know, and we were sleeping,

17       mom and I were sleeping, and so it was late at night

18       and so that was --

19              ATTY. INGRAM:  Is there anything

20       about that that has left a sour taste in your mouth

21       about the process at all?

22              JUDITH ELLIOTT: No.  It's just one

23       of those things.

399

```
 1                        ATTY. INGRAM:  I am sure you would
 2    agree with me that this is a court of law and not a
 3    court of sympathy?
 4                        JUDITH ELLIOTT:  Exactly.
 5                        ATTY. INGRAM:  And Mr. Bailey asked
 6    you if you could decide the fate of Donna Roberts
 7    without feeling sympathy for Donna Roberts, and you
 8    should.  That is what you should do, but there is
 9    another side to that coin.  There is a victim here,
10    there is a dead person here.  Robert Fingerhut lost
11    his life.
12                        JUDITH ELLIOTT:  Uh-huh.
13                        ATTY. INGRAM:  And, again, it's
14    only natural to feel sympathy for poor Mr.
15    Fingerhut.
16                        JUDITH ELLIOTT:  Uh-huh.
17                        ATTY. INGRAM:  You understand that
18    sympathy for no one, whether it's the Defendant or
19    the victim, family members, again, you got to rise
20    above the sympathy and decide the case on its fact.
21                        JUDITH ELLIOTT:  Yes, sir.
22                        ATTY. INGRAM:  Are you up to that?
23                        JUDITH ELLIOTT:  Yes, I will try to
```

1      be.

2                     ATTY. INGRAM:  We ask jurors in

3      this country to do a hard thing.

4                     JUDITH ELLIOTT:  Yes.

5                     ATTY. INGRAM:  And we ask you some

6      times put aside your natural feelings because, you

7      know, we're all human and you are going to see some

8      evidence in this case, you will see crime scene --

9      did you ever see CSI?

10                    JUDITH ELLIOTT:  No, I don't watch

11     it.

12                    ATTY. INGRAM:  You will see crime

13     scene photographs, okay, and there will be a body on

14     the ground.  You will see photographs of gunshot

15     wounds, maybe point blank gunshot wounds, coroner's

16     photographs, some of those might even be blown up.

17     Some of this evidence may elicit an emotional

18     response from you.  Sympathy or anger, how could

19     this happen but, again, you got to rise above that

20     emotional response to determine whether that

21     evidence ties Donna to this offense.  Will you do

22     that?

23                    JUDITH ELLIOTT:  Yes.

1                     ATTY. INGRAM:  Forgive me for

2        acting like a civics teacher for a moment.

3                     JUDITH ELLIOTT:  That's okay.

4                     ATTY. INGRAM:  Two hundred and

5        twenty-five years ago, or thereabouts, our

6        forefathers fought for our freedom.

7                     JUDITH ELLIOTT:  Right.

8                     ATTY. INGRAM:  And they wrote our

9        laws either nationwide or for the State of Ohio,

10       after that for the State of Ohio.

11                    JUDITH ELLIOTT:  Yes.

12                    ATTY. INGRAM:  And they included

13       Bill of Rights.  You have the Bill of Rights in the

14       Constitution for the United States and for the State

15       of Ohio.  Many of the principles by which our

16       justice system is based were designed to curb or

17       restrict governmental authority, to protect the

18       individual from the State.  You got me there?

19                    JUDITH ELLIOTT:  Uh-huh.

20                    ATTY. INGRAM:  One of those is the

21       presumption of innocence.

22                    JUDITH ELLIOTT:  Uh-huh.

23                    ATTY. INGRAM:  Do you believe in

3402

1    that principle?

2             JUDITH ELLIOTT:  Yes, I do.

3             ATTY. INGRAM:  The second one is

4    burden of proof.  Mr. Bailey talked to you about

5    France and some other countries.  Well, you know, if

6    you wanted to make things easy for the Government,

7    you would provide the person arrested as, number

8    one, presumed guilty instead of innocent, correct?

9             JUDITH ELLIOTT:  Absolutely.

10            ATTY. INGRAM:  And Number 2, that

11    that person would have the burden of proving himself

12    or herself innocent.

13            JUDITH ELLIOTT:  Yes.

14            ATTY. INGRAM:  That is not the way

15    we do things here.  Are you in favor of the way we

16    do things here?

17            JUDITH ELLIOTT:  Yes.

18            ATTY. INGRAM:  And I ask these

19    questions, I don't want you to think that I am stone

20    cold out of my mind, I have some friends who

21    disapprove of these things and --

22            JUDITH ELLIOTT:  I do too.

23            ATTY. INGRAM:  And we debate them,

```
 1      or I debate them.  And I tell them that their free

 2      to have those opinions --

 3                      JUDITH ELLIOTT:  Uh-huh.

 4                      ATTY. INGRAM:  But if they're

 5      summoned for jury duty, they either have to put them

 6      aside, or they have to say that they can't serve.

 7      Do you agree with that?

 8                      JUDITH ELLIOTT:  I agree with that.

 9                      ATTY. INGRAM:  As Mr. Bailey told

10      you, there are four charges here. Do you think you

11      have a handle on what the four charges are?

12                      JUDITH ELLIOTT:  Yes, there is --

13                      ATTY. INGRAM:  It's not a -- it's

14      two aggravated murders.

15                      JUDITH ELLIOTT:  Two, yeah.

16                      ATTY. INGRAM:  And aggravated

17      burglary and aggravated robbery.

18                      JUDITH ELLIOTT:  I am still not

19      really clear on the burglary and the robbery really.

20      The burglary or the robbery doesn't need -- the

21      burglary like takes place at a certain  --

22                      ATTY. INGRAM:  A house, structure.

23                      JUDITH ELLIOTT:  But the robbery
```

1          doesn't have to have a structure?

2                    ATTY. INGRAM:  Yes.  Let me play

3          act with you for a minute.

4                    JUDITH ELLIOTT:  All right, I'm

5          confused on that one.

6                    ATTY. INGRAM:  You and I are out on

7          the street.  I walk up, hey, ma'am give me your

8          money.  I am committing a theft offense because I am

9          trying to take your money and I am threatening force

10         because I am pretending to have a gun.  That is

11         robbery.

12                   JUDITH ELLIOTT:  All right, I

13         understand.

14                   ATTY. INGRAM:  Burglary is

15         trespassing into a structure, a residence --

16                   JUDITH ELLIOTT:  Okay.

17                   ATTY. INGRAM:  -- to commit some

18         other offense.

19                   JUDITH ELLIOTT:  Okay.

20                   ATTY. INGRAM:  You with me?

21                   JUDITH ELLIOTT:  Now, I am with

22         you.

23                   ATTY. INGRAM:  You understand that

3405

1       the death specifications are merely the aggravated

2       burglary alleged in Count 3, and the aggravated

3       robbery alleged in Count 4?

4                       JUDITH ELLIOTT:  Yes, yes.

5                       ATTY. INGRAM:  Okay.  One of the

6       murders is prior calculation and design.  That is

7       the old premeditated murder.  Do you remember that?

8                       JUDITH ELLIOTT:  That is probably

9       how I will associate it too because I never heard

10      the other one.

11                      ATTY. INGRAM:  But the definition

12      of prior calculation and design differs from the old

13      definition for premeditation.

14                      JUDITH ELLIOTT:  Okay.

15                      ATTY. INGRAM:  The Judge is going

16      to give you the definition of prior calculation and

17      design.

18                      JUDITH ELLIOTT:  Okay.

19                      ATTY. INGRAM:  And he's going to

20      tell you that it means the purpose to cause the

21      death was reached by a definite process of reasoning

22      in advance of the homicide, and it requires more

23      than momentary deliberation.

1                    JUDITH ELLIOTT:  Okay.

2                    ATTY. INGRAM: Dropping a pen, I

3      don't even know if that requires momentary

4      deliberation.  Will you hold the State to prove it's

5      prior calculation and design as defined by the

6      Judge?

7                    JUDITH ELLIOTT:  Yes.

8                    ATTY. INGRAM:  The other murder

9      charge is felony murder.  Do you have a handle on

10     what that means?

11                    JUDITH ELLIOTT:  Yes.

12                    ATTY. INGRAM:  But it also requires

13     purpose, so both aggravated murder charges have an

14     essential element of purpose.

15                    JUDITH ELLIOTT:  Okay.

16                    ATTY. INGRAM:  And I think the

17     Judge will tell you that purpose is the same as

18     intent.  A person acts purposely if it is his

19     specific intent to cause a specific result.

20                    JUDITH ELLIOTT:  Okay.

21                    ATTY. INGRAM:  And would you -- Mr.

22     Bailey talked to you about facts and circumstances

23     surrounding something, shedding light on intent and

1    that certainly does happen, correct?

2                    JUDITH ELLIOTT:  Uh-huh.

3                    ATTY. INGRAM:  And I believe he and

4    you discussed it as if some were intentionally doing

5    something wrong, you would expect them to try and

6    cover their trail instead of leaving a paper trail.

7                    JUDITH ELLIOTT:  Yeah.

8                    ATTY. INGRAM:  Or you might expect

9    them to try and do it in secret, under cover of

10   darkness, rather than openly in light of day.

11                   JUDITH ELLIOTT:  Uh-huh.

12                   ATTY. INGRAM:  Will you hold the

13   State to its burden of proving the essential element

14   of purpose beyond a reasonable doubt.

15                   JUDITH ELLIOTT:  Yes.

16                   ATTY. INGRAM:  I am going to try

17   to go faster.  If I go too fast, stop me.

18                   JUDITH ELLIOTT:  Okay.

19                   ATTY. INGRAM:  You understand that

20   because of the way we do things in this country, the

21   Defendant doesn't have to testify?

22                   JUDITH ELLIOTT:  Right.

23                   ATTY. INGRAM:  She doesn't have to

3408

1 take the witness stand?

2       JUDITH ELLIOTT:  Okay.

3       ATTY. INGRAM:  And if she decides

4 not to, you can't hold it against her.

5       JUDITH ELLIOTT:  Okay.

6       ATTY. INGRAM:  How do you feel

7 about that?

8       JUDITH ELLIOTT:  She has that

9 right.

10       ATTY. INGRAM:  If she does testify,

11 she is a witness just like any other witness.

12       JUDITH ELLIOTT:  Yes.

13       ATTY. INGRAM:  And what I mean by

14 that is, you have to judge her believability,

15 credibility, by the same standards as you judge the

16 other witnesses.

17       JUDITH ELLIOTT:  Okay.

18       ATTY. INGRAM:  And -- but let's be

19 fair about it for a moment.  She is the Defendant

20 here, isn't she?

21       JUDITH ELLIOTT:  Yes.

22       ATTY. INGRAM:  And that gives her

23 an interest or a stake in the outcome.

1                     JUDITH ELLIOTT:  Right.

2                     ATTY. INGRAM:  And that is

3      certainly something that you would want to keep in

4      mind when determining whether to believe her.

5                     JUDITH ELLIOTT:   At first you

6      would, but then you would have to equalize that.

7                     ATTY. INGRAM:  Okay.

8                     JUDITH ELLIOTT:   At first you

9      would.

10                     ATTY. INGRAM:  Well, the Judge is

11     going to give you a list of factors that you can

12     consider, an interest and stake in the outcome is

13     one of those factors.

14                     JUDITH ELLIOTT:  Okay.

15                     ATTY. INGRAM:  But if you consider

16     that factor for her, you have to consider that

17     factor for the other witnesses that testify as well.

18                     JUDITH ELLIOTT:  Okay.

19                     ATTY. INGRAM:  Will you do that?

20                     JUDITH ELLIOTT:  Yes.

21                     ATTY. INGRAM:  This case began by

22     the filing of an indictment, and the indictment is

23     just a piece of paper.  It has a legal purpose and

1   the legal purpose is that it informs the Defendant

2   of the nature of the allegations leveled against

3   them.

4                    JUDITH ELLIOTT:  Okay.

5                    ATTY. INGRAM:  Or in this case her.

6                    JUDITH ELLIOTT:   Okay.

7                    ATTY. INGRAM:  But it's not

8   evidence.

9                    JUDITH ELLIOTT:  Okay.

10                   ATTY. INGRAM:  Let me tell you why.

11  Did you know that the grand jury proceedings were

12  secret?

13                   JUDITH ELLIOTT:  I didn't know

14  that.

15                   ATTY. INGRAM:  Donna didn't know

16  when this case went to the grand jury, she wasn't

17  invited to the grand jury, Juhasz and I, we didn't

18  know, we weren't invited, Judge Stuard didn't know,

19  the only people at the grand jury are the State's

20  witnesses and the State's prosecutors.  So, it's a

21  one-side affair.

22                   JUDITH ELLIOTT:  Uh-huh.

23                   ATTY. INGRAM:  It would be unfair

1        to treat an indictment as evidence in light of the

2        one-sidedness of the process.  Do you agree with

3        that?

4                        JUDITH ELLIOTT:  I agree.

5                        ATTY. INGRAM:  Reasonable doubt is

6        doubt based on reason and common sense.  And we all

7        have reason and common sense.

8                        JUDITH ELLIOTT:  Right.

9                        ATTY. INGRAM:  You are suppose to

10       use it.

11                       JUDITH ELLIOTT:  Yes.

12                       ATTY. INGRAM:  It require, and the

13       Judge will define it for you at the end of the case,

14       and that is his job.  But he's going to tell you

15       that proof beyond a reasonable doubt requires that

16       you be firmly convinced and is proof of such

17       character that you would be willing to rely and act

18       upon it in the most important of your own affairs.

19       Now, do you recall discussing buying a car with Mr.

20       Bailey.  Ever buy a lemon?

21                       JUDITH ELLIOTT:  Once.  I've been

22       fortunate other times, but I did get a lemon.

23                       ATTY. INGRAM:  I'm sorry?

1              JUDITH ELLIOTT:  I have been

2      fortunate other times, but I did get a lemon, yes,

3      sir.

4              ATTY. INGRAM:  When you bought

5      lemon, did you sort of wish that you devoted more

6      thought to the purchase?

7              JUDITH ELLIOTT:  I wished I didn't

8      have that car.  I don't see how you could avoid it,

9      though, some times.

10              ATTY. INGRAM:  One of the important

11      decisions that I have made in my life, or I have

12      tried to make in my life, is whether I could buy a

13      new home.

14              JUDITH ELLIOTT:  Yeah.

15              ATTY. INGRAM:  And when I make that

16      type of decision, I some times make a checklist with

17      a line in the middle of it and write the positives

18      on one side and the negatives on the other side.

19      And in my home situation here, I need four bedrooms,

20      I need three bathrooms, so those are both on the

21      positive side.

22              JUDITH ELLIOTT:  Okay.

23              ATTY. INGRAM:  Those girls take a

1    lot of baths.

2            JUDITH ELLIOTT:  Sure.

3            ATTY. INGRAM:  I need a good school

4    system.  My wife has to like the house.

5            JUDITH ELLIOTT:  Yes.

6            ATTY. INGRAM:  And I have to like

7    the lot and the neighborhood.  So, those are all of

8    my positives.  And I have some negatives though.

9    The house is 50 years old, and I am a little bit

10    worried about the structural stability of the house.

11            JUDITH ELLIOTT:  Right.

12            ATTY. INGRAM:  And there some are

13    some plumbing problems, and I'm worried how much

14    that is going to cost me.  And I have this nagging

15    doubt about my ability once a month to come up with

16    a mortgage payment.

17            JUDITH ELLIOTT:  Okay.

18            ATTY. INGRAM:  So, in the purchase

19    agreement, I write in an exception.

20            JUDITH ELLIOTT:  Uh-huh.

21            ATTY. INGRAM:  I have a contractor

22    who comes and looks at the house and he says,

23    Ingram, this house is brick solid.

1          JUDITH ELLIOTT:  Yes.

2          ATTY. INGRAM:  The plumber says

3  $200.00 to fix the plumbing, it's okay.  I scratch

4  both of those off, and I am now left with the

5  mortgage problem.

6          JUDITH ELLIOTT:  Yes.

7          ATTY. INGRAM:  So, I go to the bank

8  and say, hey, why don't you extend this loan five

9  years, cut down the amount  of money that I have to

10  come up with every month.  Nothing.

11          JUDITH ELLIOTT:  No.

12          ATTY. INGRAM:  Well, how about

13  lowering the interest rate?  No.

14          JUDITH ELLIOTT:  No.

15          ATTY. INGRAM:  I try to get a

16  raise, and since I won't give myself a raise, I have

17  this doubt.  No matter what I do to investigate this

18  mortgage payment doubt, it remains reasonable in my

19  mind, and there is only one on that negative side

20  now, right?

21          JUDITH ELLIOTT:  Okay, uh-huh.

22          ATTY. INGRAM:  And as long as there

23  is one reasonable doubt on that negative side, I

1    cannot say that beyond a reasonable doubt that that

2    decision is the right thing for me.

3                    JUDITH ELLIOTT:  Yes, that's right.

4                    ATTY. INGRAM:  Now, you understand

5    that it's the same in this case?

6                    JUDITH ELLIOTT:  Uh-huh.

7                    ATTY. INGRAM:  If you have one

8    reasonable doubt, the State has not met its burden.

9                    JUDITH ELLIOTT:  Okay.

10                   ATTY. INGRAM:  And that's in the

11   first phase, and if you ever get to a second phase,

12   if you have one reasonable doubt as to the

13   appropriate penalty, the State has not met it's

14   penalty proof.  You got that?

15                   JUDITH ELLIOTT:  Yes.

16                   ATTY. INGRAM:  Circumstantial

17   evidence.  I know you know what it is, so I am not

18   going to discuss what it is with you.  But the

19   example that Mr. Bailey gave you, that example was

20   firmly rooted into the bed rock of truth, isn't it?

21   I mean, you see lightning, you hear thunder, there

22   is a warning, you hear the pitter patter of rain on

23   the roof.  You are secure making that inference or

1    that leap in logic?

2              JUDITH ELLIOTT:  Yes.

3              ATTY. INGRAM:  Will you test every

4    inference that you are asked to make to determine

5    that it is similarly rooted in the bed rock of

6    truth?

7              JUDITH ELLIOTT:  Yes.

8              ATTY. INGRAM:  Am I making sense

9    there?

10             JUDITH ELLIOTT:  Yes, yes.

11             ATTY. INGRAM:  You can only make an

12   inference if it's reasonable, right?

13             JUDITH ELLIOTT:  Right.

14             ATTY. INGRAM:  My example is this.

15   If it's the middle of February and I look out my

16   upstairs window at 11:00 o'clock at night, and I see

17   my grass and there is no snow.  I go to bed and I

18   wake up at 7:00 and there is 6 inches of snow, I

19   have circumstantial evidence that it snowed, right?

20             JUDITH ELLIOTT:  Right.

21             ATTY. INGRAM:  Right.  Let's start

22   piling inferences on here.  Let's change this a

23   little bit.

1              JUDITH ELLIOTT:  Okay.

2              ATTY. INGRAM:  It's a Sunday

3    morning, and I have my cup of coffee in one hand and

4    my cigarette in the other hand, and I want my Sunday

5    paper to go along with those things.  So, I look out

6    my window and I see foot steps from the house on one

7    side to my front door, to the house on the other

8    side, and I can conclude that somebody or infer that

9    somebody walked across the yard because of the

10   footprints.

11             JUDITH ELLIOTT:   Yes.

12             ATTY. INGRAM:  Well, I can make a

13   further assumption or inference, and that is the

14   person that walked across the yard was the paperboy.

15   So I go down stairs and open the door, anxious to

16   grab my paper, and lo and behold, I find my Giant

17   Eagle coupons.

18             JUDITH ELLIOTT:  Okay.

19             ATTY. INGRAM:  When you start

20   getting inferences on inferences, you got to test

21   them.  You have to look for other --

22             JUDITH ELLIOTT:  Yes.

23             ATTY. INGRAM: -- equally persuasive

1    inferences that perhaps lead you in another

2    direction.  Are you open to that and will you do

3    that here?

4                    JUDITH ELLIOTT:  Yes.

5                    ATTY. INGRAM:  Okay, now that we

6    have taken so much of your time and attention, is

7    there anything that you would like to say to any of

8    us, any questions that you have?

9                    JUDITH ELLIOTT:  No.

10                   ATTY. INGRAM:  I thank you for your

11   time and attention.

12                   JUDITH ELLIOTT:    Thank you.

13                   THE COURT:  Mr. Bailey?

14                   ATTY. BAILEY:  Pass for cause, Your

15   Honor.

16                   ATTY. INGRAM:  Pass.

17                   THE COURT:  You will be in the pool

18   from which this jury will be selected.

19                   JUDITH ELLIOTT:  Okay.

20                   THE COURT:  So, call Monday evening

21   after 4:30, to get further instructions.

22                   JUDITH ELLIOTT:  Okay.

23                   THE COURT:  I will, again, remind

1    you not to talk about this with anyone or read any

2    newspaper or watch anything on T.V.

3                        JUDITH ELLIOTT:  I haven't either

4    since April 8th.  I haven't.

5                        THE COURT:  Okay, thank you for

6    coming.

7                        JUDITH ELLIOTT:  Judge, I don't

8    have to call in tomorrow night?

9                        THE COURT:  Til Monday.

10                       JUDITH ELLIOTT:  Okay, thank you.

11

12

13   (Whereupon, Judith Elliott, #218, was excused until

14   further notice.)

15

16                       THE COURT:  Let's take a 10 minute

17   break.

18

19   (At 2:45 p.m., a recess was taken.)

20

21   (Back in Court at 3:00 p.m.)

22

23

1       ### CHRISTINE HAKE, JUROR NUMBER 223

2       **EXAMINATION BY THE COURT:**

3

4                       THE COURT:  Good afternoon.

5                       CHRISTINE HAKE:  Hi.

6                       THE COURT:  Is it Christine?

7                       CHRISTINE HAKE:  Yes.

8                       THE COURT:  Did you read that

9       handout that was given to you?

10                      CHRISTINE HAKE:  Yes.

11                      THE COURT:  Okay, we are here

12      interviewing prospective jurors on certain questions

13      in two areas primarily, and that is questions

14      concerning the death penalty, your views on that,

15      and any pretrial publicity that you may have been

16      exposed to.

17                  In Ohio, just because a person commits a

18      murder, it does not mean that they necessarily face

19      a death penalty.

20                      CHRISTINE HAKE:  Right.

21                      ATTY. INGRAM:  Only when certain

22      things occur in conjunction with the murder, which

23      we call specifications.  In drawing up the

1    indictment, it will be an indictment for aggravated

2    murder with or without specification, so if

3    specifications are attached, that means that the

4    possibility of the jury having to consider the death

5    penalty arises.  An example would be that someone

6    who killed a person is a police officer.  The fact

7    that the person was a police officer there is a

8    specification attached that brings up the

9    possibility of death.

10             Everyone holds there own personal views

11   on questions like the death penalty, we're each

12   entitled to our own views.  The question is whether

13   if a person holds certain views, are they able to

14   sit on a jury of this nature.

15             The State is required to prove each and

16   every element of the aggravated murder with the

17   specification by proof beyond a reasonable doubt.

18   There is no burden on the Defendant to prove

19   anything.  You have the right to remain silent and

20   need do actually nothing if they care not to,

21   because the prosecutor on behalf of the State either

22   wins on loses a case on their own evidence.  If you

23   have a person -- if we wait until we get to that

1    second phase, if we get there, if the State fails to

2    prove their case, then the jury would likely return

3    a verdict of not guilty and never get to a second

4    phase.  But if they do prove their case, then the

5    jury may have to consider the issue of what

6    punishment they will recommend to the Court.

7              So, if we wait until that point without

8    knowing the personal views of everyone, then you may

9    have somebody on that jury that believes in an eye

10   for eye, and that person could not be fair to a

11   defendant, because the Defendant, under the law, if

12   you're into a second phase, they have the right by

13   law to require the State to prove beyond a

14   reasonable doubt that the aggravating circumstances

15   outweigh any mitigating factors.  Aggravating

16   circumstances are reasons to be given by the

17   prosecution as to why the death penalty should be

18   considered and imposed.  And the mitigating factors

19   would be things presented to the jury to convince

20   them that this is not a case where the death penalty

21   should be imposed.  If a person starts out not able

22   to consider anything less than the death penalty,

23   then they couldn't be fair to the Defendant.

1              Likewise, a person who may be on that

2    jury that under no circumstances engage in any

3    activity where they would have to decide the life or

4    death of a person, and that person could not follow

5    the law and, therefore, would be unfair to the

6    prosecution, because the State has the right to ask

7    for the death penalty, if they've proved everything

8    necessary.

9              The jury has to go into that second

10   phase with an open mind, able to determine whether

11   they will recommend a death penalty, life without

12   chance of parole, life without chance of parole

13   before 30 years or 25 years.

14             The other area is on the pretrial

15   publicity, and that is, did any prospective juror

16   have any knowledge about this particular case before

17   coming in here.  The case had enough publicity, as

18   any case of this nature would get, and some of these

19   people we have interviewed have been aware the last

20   couple of years since this happened by reading

21   things in the newspaper.  Others have no

22   recollection of ever having seen anything, and that

23   doesn't necessarily disqualify a person from

1    sitting.  But each potential individual has to be

2    able to set aside anything that they may know about

3    the case, or thing that they know, because if this

4    case is to be decided fairly on both sides, it has

5    to be with a 12 person jury who decides the case on

6    the merits of the evidence presented here in this

7    Courtroom, okay.

8                    CHRISTINE HAKE:  Okay.

9                    THE COURT:  Fair enough.  Mr.

10   Becker.

11                   ATTY. BECKER:  Thank you, Your

12   Honor.

13   **EXAMINATION BY ATTORNEY BECKER:**

14                   ATTY. BECKER:  Good afternoon.  Is

15   it Mrs. Hake?

16                   CHRISTINE HAKE:  Yes.

17                   ATTY. BECKER:  My name is Chris

18   Becker, and I work for the County Prosecutor's

19   Office.  This is Mr. Bailey, and I assume you

20   remember him from about three weeks ago in the big

21   Courtroom down the hall.

22                   CHRISTINE HAKE:  Yes.

23                   ATTY. BECKER:  And I assume you

1     remember Mr. Ingram and Mr. Juhasz and their client,

2     Donna Roberts, who was down there as well.

3                    CHRISTINE HAKE:  Uh-huh.

4                    ATTY. BECKER:  You had an

5     opportunity to, I think, look at this case and

6     probably think about this case since you were here

7     in those three weeks.  And what we're going to

8     discuss with you today is, basically, what the Court

9     indicated to you.  And before we get started and get

10    going on this, you understand that there are no

11    right or wrong answers.

12                    CHRISTINE HAKE:  Okay.

13                    ATTY. BECKER:  Your opinions, I am

14    not going to try and change, and I am sure that Mr.

15    Ingram or Mr. Juhasz are not going to try and change

16    your opinion of what is going on here.  And we have

17    had a number of jurors in the last three weeks who

18    have come in here, as the Judge indicated, one way

19    or the other, that they were either so adamant in

20    their beliefs in the death penalty that they

21    couldn't have been fair to either the State or the

22    Defendant, because they were either going to impose

23    the death penalty no matter what and not consider

1    the other options, or they were not going to

2    consider the death penalty at all, and they could

3    not, as jurors, go back in that jury room and sign a

4    verdict calling for the death penalty.

5              CHRISTINE HAKE:  Right.

6              ATTY. BECKER:  For whatever

7    religious or moral or ethical beliefs that they

8    have.  And there is nothing wrong with that.  They

9    may be called to come and serve on another jury

10   someday, perhaps that doesn't involve the death

11   penalty and they may be perfect jurors for that

12   case.  But because it is a case involving the death

13   penalty, we have to know your feelings and, again, I

14   am going to say this as clearly as I can, whatever

15   answers that you have, there are no right or wrong

16   answers.

17             So with that being said, I want to ask

18   you your feelings on the death penalty and,

19   particularly, your feelings on whether or not you,

20   and take as much time as you need to think about it,

21   if you need more time, I am assuming that you have

22   thought about it the last three weeks, could you, if

23   the State warranted -- the facts warranted and we

1    were able to prove our case beyond a reasonable

2    doubt, if we got to the point where we're at the

3    death penalty phase, and we proved certain things,

4    which are the bad things or what the Court is going

5    to define for you is the aggravating circumstances,

6    could you go back in that jury room and sign a piece

7    of paper calling for the death penalty?  And the

8    reason that I ask that is because you kind of

9    indicated on your questionnaire that even though you

10   were in favor of the death penalty, you didn't want

11   to pass judgement.

12                CHRISTINE HAKE:  I don't want to --

13   I would rather not pass judgment.  I mean, as far as

14   to sign the piece of paper, I mean, it's confusing.

15   I believe in the death penalty --

16                ATTY. BECKER:  Right.

17                CHRISTINE HAKE:  -- because I feel

18   that no matter what crime you commit, the same crime

19   should be committed to you is the way that I feel,

20   but I don't feel that I am a person that should make

21   that decision.

22                ATTY. BECKER:  Okay, well, let's

23   explore that a little bit.

1                     CHRISTINE HAKE:  Okay.

2                     ATTY. BECKER:  Because I have to be

3       clear -- you have to be clear on what you mean by

4       that, and that is one of the reasons why we don't

5       just say, oh, we've got this questionnaire, okay,

6       we'll just read it, and, oh, by the way come back

7       next week.

8                     CHRISTINE HAKE:  Right.

9                     ATTY. BECKER:  You're in favor of

10      the death penalty, I guess, in sort of a

11      non-personal sense that it doesn't concern you.

12      You're in favor of the death penalty if some jury in

13      California does it, and let's say Timothy McVeigh is

14      the case.

15                    CHRISTINE HAKE:  Okay.

16                    ATTY. BECKER:  And he blows up a

17      building and kills 168 people, and some case is

18      going on, and you're in favor of it as a general

19      concept?

20                    CHRISTINE HAKE:  Yes.

21                    ATTY. BECKER:  But personally --

22                    CHRISTINE HAKE:  I think if it was

23      proven in Court that the murder was like not a

1      self-defense thing --

2                  ATTY. BECKER: Okay.

3                  CHRISTINE HAKE: -- if it was

4      deliberate, or for no reason.

5                  ATTY. BECKER: Then you could do

6      it?

7                  CHRISTINE HAKE: I could do it.

8                  ATTY. BECKER: So, you could sign a

9      verdict?

10                 CHRISTINE HAKE: I think that I

11     could, yeah.

12                 ATTY. BECKER: Now, I am going to

13     go back here a little bit here and explain the

14     situation here. First of all, let me follow up on

15     your last response. It's not whether you think you

16     could, can you? I mean, I know that we are putting

17     you in a very difficult situation here, but can you

18     see yourself in your mind with 11 other jurors

19     sitting back there, and we get to this second phase

20     of this murder trial, and they're talking about the

21     penalty, what penalty is appropriate. And if the

22     facts were warranted and the facts permitted it and

23     the law allowed it, and if we met our burden of

1    proof, you could take a pen and sign your name on a

2    piece of paper that is going to say, we, the jury in

3    this case, State of Ohio versus Donna Roberts, feel

4    that the appropriate penalty is the death penalty,

5    and you would write your name Christine Hake on that

6    piece of paper?  Knowing it's going to be there for

7    all people to see, that you signed this death

8    penalty, you were one of the eleven jurors?

9              CHRISTINE HAKE:  I don't know.  I

10    mean, I don't want to say yes and then, but I don't

11    want to say no because --

12              ATTY. BECKER:  And, remember, there

13    is no right or wrong answers, but the reason we're

14    asking you these questions is because if we get to a

15    point two or three weeks down the road, and you are

16    in that jury room and it does come up, you can't say

17    at that point, well, wait a minute  --

18              CHRISTINE HAKE:  Oh, I know.

19              ATTY. BECKER:  -- I can't do this,

20    who am I kidding.

21              CHRISTINE HAKE:  But I would know a

22    lot more about the case.

23              ATTY. BECKER:  Well, I understand

1    that.  I understand that.  Let's let you think about

2    that for a minute.

3                    CHRISTINE HAKE:  This is going to

4    take a long time, I think.

5                    ATTY. BECKER:  Let's go back a

6    little bit here, and what this case is going to

7    happen is, potentially, we may never get to that

8    point where you have to do that, where you would

9    have to go back there and even consider that option,

10   because all death penalty cases are a two-stage

11   process, sort of two phases.  I don't know if you

12   knew that or was that explained on the

13   questionnaire, or you just heard the Court say it?

14                   CHRISTINE HAKE:  Yeah.

15                   ATTY. BECKER:  Okay, so let's say

16   that you're going -- that you're picked for this

17   jury.  Now, we start the first phase of the case,

18   and all the first phase is, is to determine if Donna

19   Roberts committed some crimes, and some of those

20   crimes include crimes that if she were convicted

21   would call for the potential death penalty.

22                   CHRISTINE HAKE:  Okay.

23                   ATTY. BECKER:  Now, you have

1    indicated that you couldn't pass judgment on people.

2    Could you find someone guilty?  You see what I'm

3    saying, that's kind of --

4                    CHRISTINE HAKE: I think I could

5    find someone guilty, yeah.

6                    ATTY. BECKER:  Well, that's not

7    passing judgment on someone?  Because that's what

8    you wrote in your questionnaire.

9                    CHRISTINE HAKE:  Well, yeah, it is,

10   I guess.  See, I'm getting confused.  I'm really

11   nervous.   I --

12                   ATTY. BECKER:  Go ahead and answer.

13                   CHRISTINE HAKE:  I mean, if -- no,

14   I couldn't do it.

15                   ATTY. BECKER:  You could not pass

16   judgment on somebody?

17                   CHRISTINE HAKE:  No.

18                   ATTY. BECKER:   There is nothing

19   wrong with that.  I am not trying to change your

20   answer.

21                   CHRISTINE HAKE:  I just don't --

22                   ATTY. BECKER:  I am just going by

23   what you wrote on your questionnaire.

1              CHRISTINE HAKE:  I mean -- I don't

2     know if I'm suppose to talk?

3              ATTY. BECKER:  I am just going by

4     what you wrote on the questionnaire because you

5     said, is there any reason why you can't serve as a

6     juror, and said that you didn't feel that it should

7     be up to you, really anybody but God to pass

8     judgment on anyone.  But the Judge can decide if you

9     would be a good juror.

10             CHRISTINE HAKE:  Right.

11             ATTY. BECKER:  Well, that's what

12    we're trying to do.  We're trying to decide if --

13    and we're not saying that you're a bad person or a

14    bad juror or a bad person, but if you don't think

15    that you can sign a piece of paper for whatever

16    reason, religious, I think it's your father that is

17    a minister?

18             CHRISTINE HAKE:  Yeah, my dad is a

19    pastor.

20             ATTY. BECKER:  And if it is

21    religious, or ethical, or moral, it doesn't matter

22    if you don't think, I mean, there are many religions

23    and many people that simply can't pass judgment.  I

```
 1      believe Jehovah Witnesses don't serve on juries

 2      because they can't pass judgment.

 3                  CHRISTINE HAKE:  Right, I would not

 4      feel right passing judgment.

 5                  ATTY. BECKER:  All right, so you --

 6                  CHRISTINE HAKE:  I feel there is a

 7      difference between opinion and -- you know, what I

 8      mean?

 9                  ATTY. BECKER:  Right.  So, you

10      don't think that you could sign a piece of paper --

11                  CHRISTINE HAKE:  Sentencing her to

12      death?

13                  ATTY. BECKER: Or even finding her

14      guilty, either way?

15                  CHRISTINE HAKE:  No.

16                  ATTY. BECKER:  You would feel very

17      uncomfortable --

18                  CHRISTINE HAKE: I would feel very

19      uncomfortable.

20                  ATTY. BECKER:  You would renege

21      your duties to maybe even do that?  Shirk your

22      duties, I mean --

23                  CHRISTINE HAKE:   I would feel --
```

1    that would burden me probably for the rest of my

2    life.

3              ATTY. BECKER:  And it would make

4    you so uncomfortable that you might not be able to

5    even perform as a juror in this case?

6              CHRISTINE HAKE:  Yeah, probably

7    not.

8              ATTY. BECKER:  Okay, would you

9    rather be excused in this case?

10             CHRISTINE HAKE:  I think so.

11             ATTY. INGRAM:   No objection.

12             ATTY. BECKER:  We have no

13    objection.

14             CHRISTINE HAKE:  I'm sorry.  I am

15    just really nervous.  If I am nervous doing this, I

16    would be really nervous doing that.

17             ATTY. BECKER:  Yeah, I know, -- I

18    mean, believe me, we're not trying to pass judgment

19    on you.  You seem like a very nice person --

20             CHRISTINE HAKE:  Thank you.

21             ATTY. BECKER:  -- and you're just

22    not qualified to be a juror, that's all.

23             CHRISTINE HAKE:  I'm sorry.

1          ATTY. INGRAM:  We do have the right

2     and left question.

3          THE COURT:  Okay.

4     **EXAMINATION BY ATTORNEY JUHASZ**:

5          ATTY. JUHASZ:  Hi, how are you, I'm

6     Attorney Juhasz.

7          CHRISTINE HAKE:  Hi.

8          ATTY. JUHASZ:  I think you know my

9     brother, but I don't know if we ever met, I don't

10    believe so.

11         CHRISTINE HAKE:  I talked to you on

12    the phone before, but never met you in person.

13         ATTY. JUHASZ: I know you're

14    nervous, but calm down because the hard questions

15    are over.

16         CHRISTINE HAKE:  Okay.

17         ATTY. JUHASZ:  And like Mrs.

18    Becker said, there are no right or wrong answers

19    about any of this stuff, so that is why we do this

20    process to find out who can serve and who can't.  I

21    want to ask you about something that is a little bit

22    different that will take about two minutes.

23         CHRISTINE HAKE:  Okay.

1                    ATTY. JUHASZ:  April 8th, Tuesday,

2       when you first came here with all of the other

3       jurors down at the other end of the hall, do you

4       remember that?

5                    CHRISTINE HAKE:  Yeah.

6                    ATTY. JUHASZ:  When you went into

7       the big set of doors, do you remember where you sat

8       or stood, right, left, center?

9                    CHRISTINE HAKE:  When everybody was

10      in there?

11                   ATTY. JUHASZ: Yeah.

12                   CHRISTINE HAKE:  I stood.

13                   ATTY. JUHASZ:  Where, do you

14      remember?

15                   CHRISTINE HAKE:  In the corner

16      right where the big doors are.

17                   ATTY. JUHASZ:  Okay, so as you go

18      in, you didn't go far from the doors at all, you

19      were pretty much right in the back there.

20                   CHRISTINE HAKE:  Right.

21                   ATTY. JUHASZ:  Do you remember were

22      you in front of the door or off to the right to off

23      to the left?

1                    CHRISTINE HAKE:  The left.

2                    ATTY. JUHASZ:  While you were there

3      waiting for Judge Stuard to come out, did you hear

4      anybody talk about Donna Roberts, anything about

5      this case, or what it was about or why you were

6      there?

7                    CHRISTINE HAKE:  No, they just --

8      well, they said this is the Roberts case, did you

9      read about in the paper, you know, stuff like that.

10                    ATTY. JUHASZ:  Okay.

11                    CHRISTINE HAKE:  Nothing detailed.

12                    ATTY. JUHASZ:  That's okay.  Was

13     this one person, more than one person, I know it

14     seems like I'm pressing you but I wasn't there to

15     hear it, so I need you to  --

16                    CHRISTINE HAKE:  I was talking to

17     Juror Number 222, actually, and that's basically the

18     only person that -- he just happened to by there so

19     instead of just standing there while we were

20     waiting, we just talked.  He was actually talking

21     about ways to get out of it.

22                    ATTY. JUHASZ:  So, is that the

23     person who was saying these things, this is the

1    Roberts case and it's in the paper and that kind of

2    stuff and talking about ways to get out of it?

3                    CHRISTINE HAKE:  Yeah.

4                    ATTY. JUHASZ:  Did that person

5    express an opinion about whether he thought she was

6    guilty or anything else about the case?

7                    CHRISTINE HAKE:  Actually, he never

8    even heard about it.

9                    ATTY. JUHASZ:  Okay.

10                   CHRISTINE HAKE:  He just said,

11   Donna Roberts from the paper that he got, you know,

12   found out about -- when he heard what it was about,

13   I think he heard somebody in the hall say I wonder

14   if this is the murder case or something like that,

15   and then, you know -- but he said he never saw it on

16   T.V. and he never read it in the paper, so he really

17   didn't know that much about it.

18                   ATTY. JUHASZ:  Okay, so -- and

19   don't let me put words in your mouth, I'm just

20   trying to understand what you're telling us here.

21   He's basically repeating something that somebody

22   else told him in the Courthouse that day about what

23   the case is about?

1              CHRISTINE HAKE:  Probably, yes.

2              ATTY. JUHASZ:  Well, because I

3    think you said he didn't even know it was a murder

4    case, correct?

5              CHRISTINE HAKE:  I don't think he

6    did know.

7              ATTY. JUHASZ:  But he is repeating

8    that, so I am drawing a conclusion from what you are

9    telling me that someone else in the Courthouse told

10   him it was a murder case.  I don't want to put words

11   in your mouth.

12             CHRISTINE HAKE:  I don't think it

13   was -- I don't think somebody come out and said,

14   hey, you know, this is a murder case, but they just

15   said Donna Roberts, I believe that is a murder case

16   or something like that, I don't know.  There was not

17   much detail -- there was not much talking about the

18   case, if that is what you're getting to.

19             ATTY. JUHASZ:  All right, you

20   mentioned a newspaper?

21             CHRISTINE HAKE:  Uh-huh.

22             ATTY. BECKER:  What did this person

23   say about the newspaper?

1          CHRISTINE HAKE:  Just that it was

2    -- I don't know, he read a couple of articles about

3    it or something.  I said I had read a couple of

4    articles about it.  He asked me if I knew a lot

5    about it and I said, what I read in the paper, blah,

6    blah, blah, you know.

7          ATTY. JUHASZ:  Did you relate to

8    him what you read in the paper or you just made that

9    comment, no, just what I read in the paper?  Am I

10   making that question clear?

11         CHRISTINE HAKE:  Yeah, you are.

12   You want to know if I told him what the article said

13   in the paper?

14         ATTY. JUHASZ:  Yeah.

15         CHRISTINE HAKE:  I said something

16   about, basically, what the article said, a guy from

17   Howland and a boyfriend that was already convicted

18   and now they're coming after her, or something like

19   that.  That is basically all that I know.

20         ATTY. JUHASZ:  All right, when

21   you're saying that, are there other people around?

22         CHRISTINE HAKE:  Not to what they

23   could hear.

1              ATTY. HAKE:  Okay, so you're having

2     basically a conversation --

3              CHRISTINE HAKE:  Yeah, just between

4     us two and everybody else was, I mean, it was

5     crowded and boring.

6              ATTY. JUHASZ:  Yeah, it sure was.

7     How did you find out he was Juror 222?

8              CHRISTINE HAKE:  He told me.

9              ATTY. JUHASZ:  Okay.  Did you hear

10    anybody else talking about Donna Roberts or about

11    the case or anything else like that that day?

12             CHRISTINE HAKE:  That's basically

13    all I heard.  I mean, there was -- that was what

14    everybody pretty much from what I heard, was saying

15    that talked about it.  Not a lot of people we're

16    talking about it.  A lot of people were complaining,

17    basically.  I mean, you know?

18             ATTY. JUHASZ:  I appreciate.  Jury

19    service is a burden, I know because I take people

20    away from their lives, this is what we do for a

21    living.

22             CHRISTINE HAKE:  Right.

23             ATTY. JUHASZ:  We take people away

1    from their lives, so we understand those complaints.

2             CHRISTINE HAKE:  Well, I think it's

3    interesting but most of the people in there, they

4    just could have cared less, basically.

5             ATTY. JUHASZ:  You gave me an

6    impression a couple of seconds ago from something

7    that you said that other people were talking besides

8    complaining, that they were also saying the same

9    kinds of things that you were.

10             CHRISTINE HAKE:  Well, I was

11   talking to him and the lady standing next to us

12   butted in.

13             ATTY. JUHASZ:  Okay, and she was --

14             CHRISTINE HAKE:  But like I said,

15   the only thing that I said was what I told you, it

16   wasn't as if everybody in the room knew what was

17   going on.

18             ATTY. JUHASZ:  Okay, all right.

19   This lady that butted in, do you know her juror

20   number or her name, or anything that you can tell us

21   about her?

22             CHRISTINE HAKE:  I don't know her

23   juror number but I know that she was dismissed.

3444

1                    ATTY. JUHASZ:  That day or since

2      then?

3                    CHRISTINE HAKE:  That day.

4                    ATTY. JUHASZ:  All right, that's

5      all that I have.  Thank you.

6                    THE COURT:  All right, Ms. Hake, we

7      thank you, very much, for coming, and you're excused

8      from any further responsibilities.

9                    CHRISTINE HAKE:  Thank you.

10

11     (Whereupon, Christine Hake, Juror Number 223, was

12     excused.)

13

14                   THE COURT:  All right, that's all

15     for today.  See you tomorrow.

16

17

18

19     (At 3:30 p.m., Court adjourned til Friday, May 2,

20     2003, at 9:00 a.m.)

21

22

23

1                          **FRIDAY, MAY 2, 2003**

2

3               **SALINE M. SNYDER, JUROR NUMBER 228**

4      **EXAMINATION BY THE COURT:**

5

6                          THE COURT:  Good morning, ma'am,

7      how are you?

8                          SALINA SNYDER:  Good morning.  I'm

9      fine, how are you?

10                         THE COURT:  I'm fine.  Ma'am, you

11     read that handout that was given to you?

12                         SALINA  SNYDER:  Yes.

13                         THE COURT:  That was our attempt to

14     try and bring everybody up to speed.  This all

15     sounds complicated, I suspect, when you first start

16     trying to find out about it, and that is the reason

17     we keep going through the same thing until it makes

18     sense.  We have been dealing with this for a long

19     time, and we realize that you folks probably have

20     never heard a lot of these terms before.

21                         SALINA SNYDER:  Right.

22                         THE COURT:  This is a case where

23     Donna Roberts is charged with two counts of

1     aggravated murders with specifications.  Under the

2     law of Ohio, and in many States, just because a

3     person commits murder, does not mean that that

4     person necessarily faces the death penalty.  It's

5     only under certain circumstances if a murder is

6     committed and certain things are associated with

7     that murder, such as the murder of a police officer

8     or the governor or whatever, then the prosecution

9     has the option of attaching specifications to the

10    murder charge.

11          Now, if the State is able during the

12    trial by presentation of evidence to show beyond a

13    reasonable doubt that the accused is guilty of the

14    aggravated murder with the attached specifications,

15    then and only then does the situation of the jury

16    having to consider the death penalty arise.  If the

17    case is put to the jury and the State fails to prove

18    beyond a reasonable doubt each and every element of

19    what they charged the Defendant with, then the jury

20    would quite properly return a verdict of not guilty

21    and then that would be the end of the trial.

22          If, however, the State is able to

23    maintain and carry their burden of proof, then the

1    trial would go into a second phase upon a finding of

2    guilty of the original charge.

3         So, the question arises, why do we get

4    into all of this at this point.  We don't have any

5    idea what the jury is going to do.  Well, there is a

6    very good reason for it.  If we didn't question

7    everybody beforehand, and we happen to get on this

8    case or any case in the second phase, you may have

9    somebody on that jury that firmly believes that if

10   you take a life you should forfeit your life.  And

11   that person couldn't possibly be fair to the

12   Defendant because the Defendant at that second phase

13   has the right to have the jury listen to evidence

14   that the prosecutor will present called aggravating

15   circumstances, which are reasons that the State

16   would present to convince a jury that they should

17   consider and impose the death penalty.  Because the

18   Defendant has the right to have the jury hear

19   mitigating factors; that is, reasons why the jury

20   should not impose the death penalty.

21        Now, also somebody could be on that jury

22   that under no circumstances could ever consider

23   imposing a death penalty out of religious or moral

```
 1    convictions.  So, the State couldn't get a fair

 2    trial.  And the one thing that everybody is trying

 3    to attempt to achieve here is a fair trial.  So,

 4    it's necessary to have some idea of what each of you

 5    feel about the death penalty, and everybody has an

 6    opinion.  Some more strongly than others.  The

 7    person that is to be seated on this jury should be

 8    somebody, no matter what their personal belief is,

 9    is able to follow the law.

10              SALINA SNYDER:  Right.

11              THE COURT:  And whatever your

12    opinion about the matter is is fine.  These folks

13    will respect that opinion.  You are entitled to your

14    opinion.  It's just that they have a right to know

15    what that opinion is, okay?

16              SALINA SNYDER:  Okay.

17              THE COURT:  The other issue they

18    will go into is the question about pretrial

19    publicity.  This case was in the newspapers and on

20    T.V. for a period of time.  It generated the usual

21    interest of the media in a case of this type.  Some

22    of the prospective jurors read or saw something or

23    heard something about the case at the time, and
```

1    since then, others have not.  And that's neither

2    here nor there, keeping in mind that this jury must

3    decide the matter on the evidence presented in this

4    Courtroom, so if any prospective juror knows or

5    thinks they know something about the case, they have

6    to be able to set that aside because that can't be

7    evidence.  They have to decide this case fairly on

8    the law that is given to them and the evidence that

9    they hear in this Courtroom, okay?

10                  SALINA SNYDER:  Okay, thank you.

11                  THE COURT:  Mr. Bailey.

12                  ATTY. BAILEY:  Thanks, Your Honor.

13    **EXAMINATION BY ATTORNEY BAILEY**:

14                  ATTY. BAILEY:  Good morning, Mrs.

15    Snyder.

16                  SALINA SNYDER:  Good morning.

17                  ATTY. BAILEY:  My name is Ken

18    Bailey, and I'm an assistant prosecutor, and I think

19    you saw me in the other courtroom about three and a

20    half weeks ago.

21                  SALINA SNYDER:  Yes.

22                  ATTY. BAILEY:  And at that time, I

23    promised that I would be joined by the time you got

1    back here by my co-counsel, Chris Becker, who is

2    here today, and the two of us are responsible for

3    prosecuting this case on behalf of the people of

4    Trumbull County and the State of Ohio.  And a couple

5    of things this morning, as the Judge indicated,

6    we're here to make sure that the folks who are

7    selected to serve on this particular jury can be

8    fair and impartial to both sides in this particular

9    lawsuit, both to the Defendant and to the people of

10   the State of Ohio.  And because of that, we're going

11   to be asking you some questions about your prior

12   experiences and your background a little bit, and

13   your opinions on different things to make sure --

14   and it's not because we're snoopy and we like to pry

15   into people's backgrounds, but we have to make sure

16   that the folks who are selected can be fair and

17   impartial to both sides.

18                    SALINA SNYDER:  Right.

19                    ATTY. BAILEY:  There aren't any

20   right answers and there aren't any wrong answers to

21   these questions, there are only open candid answers.

22   And if you have any questions about what we're

23   doing, you stop me and you ask those questions as

```
 1        long as it pertains to what we're doing here.
 2                    SALINA SNYDER:  Okay.
 3                    ATTY. BAILEY:  Also, because we're
 4        attorneys, some times we use some big words, and if
 5        I get too far field on that and you're not quite
 6        sure what I'm asking, you have me slow down and
 7        rephrase the question or have me ask it another way.
 8                    SALINA SNYDER:  Okay.
 9                    ATTY. BAILEY:  Or use some
10        different words.
11                    SALINA SNYDER:  Okay.
12                    ATTY. BAILEY:  And a couple of
13        other things are under our rules of conduct, the
14        lawyers aren't allowed to have any contact with you
15        after we finish today until the whole case is over.
16        If we run into each other out in the hallway, or in
17        the elevator or a restaurant or something like that,
18        we're allowed to say maybe good morning or good
19        afternoon, but we can't really say anything beyond
20        that because it would be improper and it could
21        result in a mistrial.  And if this case goes into
22        two different phases, then we will have to wait
23        until the end of the second phase before you can
```

1    come up to us and ask us.

2                  SALINA SNYDER:  Okay.

3                  ATTY. BAILEY:  And it's not that

4    we're trying to be antisocial or snub you or

5    anything, it's just that under our rules of conduct,

6    it could result in a mistrial, and we would have to

7    do it all over again, and nobody wants to do that,

8    right?

9                  SALINA SNYDER:  Right.

10                ATTY. BAILEY:  Now, I am going to

11    ask you some questions about, as the Judge said,

12    about this area of pretrial publicity and about the

13    death penalty as a punishment, and then I will get

14    to some regular questions.  But let's start out with

15    this pretrial publicity issue.

16             I understand your husband is a district

17    manager at the Tribune?

18                SALINA SNYDER:  Right.

19                ATTY. BAILEY:  Is he in charge of

20    circulation or something, he drives around and makes

21    sure that the papers get delivered to the carriers?

22                SALINA SNYDER:  Right, right.

23    He's over the carriers.  He makes sure that the

1    carriers get the papers out and things like that.

2                    ATTY. BAILEY:   Okay, and because

3    he works for the Tribune, I imagine you get a

4    Tribune every night?

5                    SALINA SNYDER:   Right.

6                    ATTY. BAILEY:   And every weekend?

7                    SALINA SNYDER:   Everyday we get a

8    Tribune.

9                    ATTY. BAILEY:  Everyday, okay.  And

10   I notice that you skim the paper front to back

11   pretty much?

12                   SALINA SNYDER:   Pretty much, I

13   haven't been -- obviously now it has been going

14   right in the garage can, but sometimes I skim it.

15                   ATTY. BAILEY:  Okay, but I take it

16   that you haven't read it since you were here the

17   last time?

18                   SALINA SNYDER:   No, sir.

19                   ATTY. BAILEY:   Okay, you indicated

20   that you really don't -- with the local news on

21   T.V., you don't pay much attention to that?

22                   SALINA SNYDER:   I don't watch it

23   very often, no.

1          ATTY. BAILEY:  Okay, you usually

2    watch --

3          SALINA SNYDER:  If I watch T.V. at

4    all, it's more movies or family shows.

5          ATTY. BAILEY:  Okay, you had also

6    mentioned that you overheard a conversation dealing

7    with this case, I believe?

8          SALINA SNYDER:  Uh-huh.

9          ATTY. BAILEY:  Can you tell us

10   about that?

11         SALINA SNYDER:  Just after I got

12   called for jury duty, people were asking me about

13   what it was about, and I was telling them that I

14   couldn't discuss it and they just wanted to keep

15   going about it and were questioning me on it and

16   calling out different things that they thought it

17   might of been.  And I just tried to get them to stop

18   but they just kept going, and somebody asked me if

19   it was this case, and I said, I'm not allowed to

20   tell you, and then they just mentioned that somebody

21   was murdered, they thought somebody was murdered,

22   and that was really all that I heard.

23         ATTY. BAILEY:  Okay, you had

1    written on there, I think in the questionnaire,

2    murder and the Defendant's boyfriend or husband is

3    a, and didn't fill it out.

4                    SALINA SNYDER:  Oh, I didn't

5    finish.  Somebody was a black person is something

6    else that I heard; that there was a black person

7    involved somewhere.  I really don't know who that

8    is, just somebody had mentioned that.  I'm sorry

9    that I didn't --

10                   ATTY. BAILEY:  Now, the reason --

11   so you really have no real knowledge about this

12   case?

13                   SALINA SNYDER:  No.

14                   ATTY. BAILEY:  Now, the Judge

15   tells all of the jurors that they are not to read

16   the paper pertaining to this case, and if anything

17   comes on the radio or T.V. to shut it off or walk

18   out of the room, and there is a reason for that.  As

19   you look around the courtroom here today, there is

20   no one here from the news media.  But when we start

21   testimony, I expect we will probably see some

22   Tribune reporters and Vindicator reporters and may

23   be T.V. crews from the three T.V. stations setting

1    up.

2                    SALINA SNYDER:  Yes.

3                    ATTY. BAILEY:  And they won't be

4    here very long, they will be here for a couple of

5    minutes most likely, and you'll notice that they

6    will miss everything that was asked and answered

7    before they got here and everything that was asked

8    and answered after they leave here.  So, they're

9    going to rush it to print to do a story, so it's

10   going to be taken out of context, right, because

11   they missed all of this stuff?

12                   SALINA SNYDER:  Right.

13                   ATTY. BAILEY:  They will miss

14   important things and, actually, the testimony may

15   end up being you sitting here as a juror, the whole

16   thrust of the testimony may be just the opposite of

17   what they're reporting.  Okay, so what is in the

18   paper is not intentionally can be very misleading,

19   right?

20                   SALINA SNYDER:  Right.

21                   ATTY. BAILEY:  So, that is why the

22   Judge doesn't want you to get any information from

23   the outside about this case.  You will have to make

1    your decision about this case on totally what

2    happens here in this Courtroom from the testimony

3    and evidence of witnesses and the instructions of

4    law given to you by the Judge.  You will be able to

5    do that, right?

6                    SALINA SNYDER:  Oh, yes.

7                    ATTY. BAILEY:   When you came here

8    that day three and a half weeks ago in the other

9    Courtroom, which way did you turn when you went in,

10   right or left or straight down the middle?

11                   SALINA SNYDER:  I went left.

12                   ATTY. BAILEY:   You went to the

13   left?

14                   SALINA SNYDER:  Uh-huh.

15                   ATTY. BAILEY:  And while you were

16   there, did anybody discuss the case?

17                   SALINA SNYDER:  No, not that I can

18   remember.  I didn't talk to anyone.  People around

19   me were talking, but I don't believe that they were

20   talking about the case.

21                   ATTY. BAILEY:  Okay, you weren't

22   really paying attention to what they were saying?

23                   SALINA SNYDER:  No.

1        ATTY. BAILEY:   Okay, did you read

2  or did you just come in and just sat?

3        SALINA SNYDER:   I just sat.

4        ATTY. BAILEY:   Okay, so much for

5  this pretrial publicity issue.   Let's talk about the

6  death penalty as a possible punishment.   Okay, the

7  first time that you became aware of this was

8  possibly a death penalty case was when?

9        SALINA SNYDER:   When I was in the

10  Courtroom.

11        ATTY. BAILEY:   Three and a half

12  weeks ago?

13        SALINA SNYDER:   Right.

14        ATTY. BAILEY:   And before that,

15  had you ever had an occasion to discuss the death

16  penalty as a punishment with any family members or

17  people at church or some school friends, or any

18  organization, maybe when a major serious crime came

19  up in the news like maybe Oklahoma City, or 911, or

20  Jeffrey Dahmer or any of those types or any?

21        SALINA SNYDER:   The only time I can

22  recall is when I was very young in school, we had a

23  debate about, and we were assigned whether pro or

3459

1   con, and I think that I had -- I was con, you know,

2   I was against it. It wasn't really based on our own

3   opinions, we just had to dig up why it's a law or

4   why it's not or why it's a punishment and why it's

5   not. So, it wasn't really my own opinion.

6            ATTY. BAILEY: Okay, now since then

7   have you had occasion to think about it?

8            SALINA SNYDER: Just since this has

9   come up, you know, since three and a half weeks ago.

10           ATTY. BAILEY: Okay, and that was

11   three and a half weeks ago. So, I imagine you

12   probably gave it quite a bit of thought in the last

13   three and a half weeks.

14           SALINA SNYDER: Yes.

15           ATTY. BAILEY: And what are your

16   views about the death penalty as a punishment?

17           SALINA SNYDER: I am very open --

18   either way, I am very undecided actually. I feel

19   that I am undecided, I really don't know. I think

20   if the person is found guilty without -- undeniably

21   guilty and it was a possibility, then yes, I could

22   probably do it, but I would really have to find the

23   person guilty. But I hate to say that too because

1    of my religious beliefs, I believe that everybody

2    should be forgiven and have chance to --

3                    ATTY. BAILEY: Okay, let's talk

4    about that. You are a born again Christian?

5                    SALINA SNYDER: Yes, sir.

6                    ATTY. BAILEY: You go to the

7    General Assembly Church of God, right?

8                    SALINA SNYDER: Uh-huh.

9                    ATTY. BAILEY: And you've been a

10   member there about how long?

11                   SALINA SNYDER: I have been a

12   member there about a year almost.

13                   ATTY. BAILEY: Okay, and how long

14   have you been born again?

15                   SALINA SNYDER: About three years.

16                   ATTY. BAILEY: Okay, and has your

17   religious conviction gotten stronger over the years?

18                   SALINA SNYDER: Oh, yes.

19                   ATTY. BAILEY: Okay, and your

20   church and your religion, does it have the view

21   regarding capital punishment, the death penalty?

22                   SALINA SNYDER: I really don't

23   believe so, no.

```
1                        ATTY. BAILEY:   There are no sermons

2       or anything against the death penalty as a

3       punishment?

4                        SALINA SNYDER:   Not that I have

5       ever heard, no.

6                        ATTY. BAILEY:   But you indicated in

7       your religious belief that you feel people should be

8       forgiven?

9                        SALINA SNYDER:   Yes, that's my

10      personal belief, right.

11                       ATTY. BAILEY:   Okay, and is that a

12      very strong belief?

13                       SALINA SNYDER:   I'm sorry?

14                       ATTY. BAILEY:   It's a very strong

15      belief?

16                       SALINA SNYDER:   Yes, that's a

17      strong belief.

18                       ATTY. BAILEY:   And the reason that

19      we ask this is because -- well, let me ask you this.

20      You understand that in Ohio for the death penalty --

21      the criminal justice system, the way it works, the

22      State legislature passes the laws, the people we

23      elect to go to Columbus, pass the laws in Ohio, and
```

```
 1        they determine what should be a crime, what people

 2        aren't allowed to do, murder, robbery, rape and

 3        burglary, okay, and then they set out certain

 4        penalties, a range of penalties.  And, ordinarily,

 5        the jury would have no concern about possible

 6        penalty in a criminal case, but in this type of a

 7        case, it's a little bit -- it's a whole lot

 8        different because this case is to be tried in two

 9        different stages.  And the first stage is tried like

10        any other criminal case without any concern for a

11        possible penalty.  It just deals with this issue of

12        guilt or non-guilt.  Did she commit the crime, can

13        we prove that she committed the crime.  The elements

14        of the crime, okay, and if we do and if we convice

15        you beyond a reasonable doubt that she is guilty of

16        aggravated murder and a special finding of fact that

17        the jury has to consider, we call that a

18        specification of an aggravating circumstance, and

19        there are two of those attached to each of the two

20        charges of aggravated murder, then we go into a

21        second stage.  In that second stage, the issue is

22        different.  You've already decided guilt beyond a

23        reasonable doubt, so guilt is no longer an issue
```

3463

1    because you and the other jurors would have decided

2    that.

3                    SALINA SNYDER:  Right.

4                    ATTY. BAILEY:  The issue in the

5    second stage deals with what's the appropriate

6    punishment for this Defendant for this crime, okay.

7                    SALINA SNYDER:  Okay.

8                    ATTY. BAILEY:  And because the

9    issue is punishment in a second stage, you would

10   then hear perhaps the same testimony, you would

11   certainly have the aggravating circumstance or

12   circumstances that you have found in the first phase

13   to put on one side of the scale.  And on the other

14   side of the scale, you could hear additional

15   testimony about what we call mitigating factors.

16   That is a fancy word that just mean things or facts

17   that can work in favor of the Defendant and against

18   the imposition of the death penalty as a punishment,

19   okay?

20                   SALINA SNYDER:  Uh-huh.

21                   ATTY. BAILEY:  And that goes on the

22   other side of the scale, and you and the other

23   jurors determine how much weight to give these

1      things.  The aggravating circumstances and the

2      mitigating factors.  Okay, you can decide if

3      something weighs about as much -- like maybe a ton.

4                      SALINA SNYDER:  Right.

5                      ATTY. BAILEY:  Or it can weigh

6      about as much as a feather, right?

7                      SALINA SNYDER:  Right.

8                      ATTY. BAILEY:  Now, if you were on

9      this -- and this is a system that was set up by the

10     legislature, the people in Columbus.  Now, if you

11     sat on the legislature, say you were voted in by the

12     people in your area to go to Columbus and pass the

13     laws, would you include the death penalty as a

14     possible punishment for certain crimes?

15                     SALINA SNYDER:  Yes.

16                     ATTY. BAILEY:  And for which

17     crimes?

18                     SALINA SNYDER:  That's such a hard

19     question.  Just -- I would only consider it for

20     murders.

21                     ATTY. BAILEY:  Okay.  And you

22     understand that all murders, all killings aren't

23     treated equally in the law.  Okay, some killings

3465

1    could be accidental.  If somebody is out chopping

2    wood and the head flies off of an axe --

3                    SALINA SNYDER:  Right.

4                    ATTY. BAILEY:   -- and somebody

5    gets killed, that could be an accident.  You're not

6    going to punish somebody for that.

7                    SALINA SNYDER:  No, no.

8                    ATTY. BAILEY:  Or if somebody is

9    driving down the street going too fast and they hit

10   a pedestrian and kill them, that could be a type of

11   homicide, maybe a manslaughter charge of some kind,

12   but you certainly wouldn't punish it by the death

13   penalty, right?

14                    SALINA SNYDER:  No.

15                    ATTY. BAILEY:  Okay, and our -- it

16   might be a prison sentence or a jail sentence, but

17   not a death penalty.

18                    SALINA SNYDER:  Right, right.

19                    ATTY. BAILEY:  Okay, and if

20   somebody kills somebody, maybe two fellows get in a

21   fight in a bar and one punches the other and the

22   fellow goes backward and hits his head on the corner

23   of the bar and dies because of that, that could be

1     maybe a manslaughter or a murder charge.  And it

2     could be punishable by something serious in prison

3     but not the death penalty, right?

4                SALINA SNYDER:  Right, right.

5                ATTY. BAILEY:  Even a planned

6     killing like if I decide that I am going to kill my

7     co-counsel here, Chris Becker, okay, because he sent

8     me a nasty note or something, and I tell the whole

9     world, I'm going to kill my co-counsel tomorrow

10    afternoon on the Courthouse steps at high noon.  He

11    comes walking up the steps at high noon and I blow

12    him away with a .357.  Then, that's still not

13    punishable by the death penalty in Ohio, it's not

14    eligible for that.  That's aggravated murder with

15    prior calculation and design, but the legislature

16    says, that's just not enough to make you eligible

17    for the death penalty because there have to be

18    special findings of fact that are attached to them.

19    Those can be things, like the Judge said, like the

20    killing of a police officer, okay, it could be

21    things like the killing of the governor or the

22    president, or lieutenant governor, a young child,

23    certain -- what we call felony murders where certain

3467

```
 1        special crimes like kidnapping, aggravated robbery,
 2        or aggravated burglary.  Okay, but there has to be
 3        more than just that planning to make a person
 4        eligible, okay?
 5                        SALINE SNYDER:  Okay.
 6                        ATTY. BAILEY:  So, you could
 7        include the death penalty then for certain types of
 8        murders?
 9                        SALINA SNYDER:  Certain types of
10        murders.
11                        ATTY. BAILEY:  Okay, what types of
12        murder would you think you would include for the
13        death penalty?
14                        SALINA SNYDER:  I would --
15        something that was planned, like you were saying, I
16        would consider that.  What you were saying about
17        planning it out and pulling through with it.  I
18        would consider that.  You had in your head to kill
19        somebody and then you did, that would be something
20        that I would consider capital punishment for.
21                        ATTY. BAILEY:  Okay, now, we've
22        had people come in here, and you understand that the
23        death penalty isn't an automatic punishment --
```

3468

```
1                    SALINA SNYDER:  Right.

2                    ATTY. BAILEY:   -- who is convicted

3      of aggravated murder with specifications because, in

4      the first phase, you only deal with this issue of

5      guilt or not guilt.  Can we prove the elements of

6      the crime or not.  And you wouldn't of heard

7      anything as to what the appropriate punishment is.

8      So, it's not fair to say that I'm going to

9      automatically come back with a death penalty if you

10     find her guilty in the first phase, right  --

11                    SALINA SNYDER:  Right.

12                    ATTY. BAILEY:   -- beyond a

13     reasonable doubt.  You have to hear the evidence,

14     whatever is presented regarding the aggravating

15     circumstance or circumstances and these mitigating

16     factors.  Because you wouldn't of heard anything

17     about these mitigating factors in the first phase.

18     Things that work for the Defendant's benefit and

19     against the death penalty as a punishment, right?

20                    SALINA SNYDER:   Uh-huh.

21                    ATTY. BAILEY:  And you read that

22     form downstairs?

23                    SALINA SNYDER:  Right.
```

3469

```
1                    ATTY. BAILEY:  Was that pretty
2      clear or do you have questions about that?
3                    SALINA SNYDER:  I had a couple of
4      questions but they have already been answered.
5                    ATTY. BAILEY:  Okay.  And you know
6      that there are four different possible punishments
7      there.
8                    SALINA SNYDER:  Right.
9                    ATTY. BAILEY:  There is the death
10     penalty, there is life in prison with no parole
11     eligibility, there is life in prison with parole
12     eligibility after 30 full years, and life in prison
13     with parole eligibility after 25 full years.  And
14     when you first start out, you got to consider -- to
15     sit on this jury, you have to be able to consider
16     all four of those punishments equally.
17                    SALINA SNYDER:  Right.
18                    ATTY. BAILEY:  You can do that?
19                    SALINA SNYDER:  Yeah.
20                    ATTY. BAILEY:  But in the second
21     phase, if we meet our burden of proof or proof
22     beyond a reasonable doubt that the aggravating
23     circumstance or circumstances outweighs these
```

3470

```
 1      mitigating factors, then the Judge is going to
 2      instruct you on the law.  But then if we meet that
 3      burden of proof, then the appropriate punishment
 4      under law is the death penalty, okay, and you have
 5      to return that type of a verdict and not go on to
 6      the other three life sentences, if we meet our
 7      burden of proof.
 8                      SALINA SNYDER:  Okay.
 9                      ATTY. BAILEY:  Do you understand
10      that?
11                      SALINA SNYDER:  Yes.
12                      ATTY. BAILEY:  And if we don't meet
13      our burden, if we can't prove beyond a reasonable
14      doubt that the aggravating circumstance or
15      circumstances outweigh the mitigating factors, then
16      you go on to consider the other three life sentences
17      and decide which is appropriate in this case, okay?
18                      SALINA SNYDER:  Uh-huh.
19                      ATTY. BAILEY:  Now, some folks have
20      come in and they have told us, you know, I don't
21      care what the Judge says, but if we find her guilty
22      in the first phase of aggravated murder with one or
23      more of these specifications, and I think that the
```

```
 1    right sentence is the death penalty, that is the way

 2    I personally believe, and that is what I am going to

 3    do, then that wouldn't be fair to the Defendant,

 4    would it?

 5                     SALINA SNYDER:  No.

 6                     ATTY. BAILEY:  That would be like

 7    an automatic death penalty for the person.

 8                     SALINA SNYDER:  Right.

 9                     ATTY. BAILEY:  Because they

10    wouldn't listen fairly to the mitigating factors,

11    right?

12                     SALINA SNYDER:  Right.

13                     ATTY. BAILEY:  So, it wouldn't be

14    fair to the Defendant to have somebody like that sit

15    on the jury.  We have other people come in and say,

16    you know, I don't believe in the death penalty as a

17    punishment for personal reasons or religious reasons

18    or moral or ethical reasons, or philosophical

19    reasons, and I could never come back with a death

20    penalty verdict even if the State proves -- even if

21    we find her guilty in the first phase of aggravated

22    murder and one or more of these aggravating

23    circumstances, and if the State meets its burden and
```

3472

1    it shows beyond a reasonable doubt that the

2    aggravating circumstances outweigh the mitigating

3    factors, and the death penalty is a right verdict, I

4    could never return that verdict ever.  I will never

5    even consider it.  That wouldn't be fair to the

6    State to have somebody like that sit on the jury,

7    right?

8                    SALINA SNYDER:  Right.

9                    ATTY. BAILEY:  And we also have

10   people come in and say, I believe in the death

11   penalty as a punishment, I think it ought to be in

12   the system, that's what I personally believe.  But

13   for one reason or another, whether it's religious

14   beliefs or personal beliefs or ethical beliefs, even

15   though I believe it's proper in the system, I can't

16   partake in that decision.  I feel that I can't judge

17   -- I don't have the right to judge somebody else,

18   and it wouldn't be fair to the State to have

19   somebody like that sit on the jury either because we

20   wouldn't get our fair shake in Court, would we?

21                    SALINA SNYDER:  Right.

22                    ATTY. BAILEY:  Okay.  Now, let's

23   say we get all through this trial and get to the

3473

1    first phase and we convince you beyond a reasonable

2    doubt of the truth of the charges, the elements of

3    the crime charged of aggravated murder and one or

4    more of these specifications of aggravating

5    circumstances, these special findings that are

6    attached to this charge of aggravated murder, okay,

7    so that you're firmly convinced of the truth of the

8    charge to a moral certainty using your reason and

9    your common sense. And the Judge will give you a

10   detailed definition at the end of this case about

11   the proof beyond a reasonable doubt. But that is

12   the standard that we have to use, okay.

13                  SALINA SNYDER: Okay.

14                  ATTY. BAILEY: So that you are

15   firmly convinced of the truth of the charge. Would

16   you be able to sign a verdict form finding her

17   guilty in the first phase, knowing that if you did,

18   she could be eligible for the death penalty in the

19   second phase?

20                  SALINA SNYDER: Just eligible,

21   right?

22                  ATTY. BAILEY: Right, at that point

23   she would just be eligible for the death penalty.

1              SALINA SNYDER:  Yeah.

2              ATTY. BAILEY:  Okay.  Now, let's

3    say we meet our burden in the first phase, you and

4    the other 11 jurors found her guilty beyond a

5    reasonable doubt of aggravated murder and one or

6    more of these specifications of aggravating

7    circumstances, and we get into the second phase,

8    Okay, you hear the testimony, whatever there is in

9    the second phase dealing with the mitigating

10   factors, and you've got the aggravating

11   circumstances, and you do the balancing test with

12   the other jurors, and we convince you beyond a

13   reasonable doubt that the aggravating circumstance

14   or circumstances outweigh the mitigating factors

15   beyond a reasonable doubt so that the appropriate

16   penalty is the death penalty, okay?

17             SALINA SNYDER:  Uh-huh.

18             ATTY. BAILEY:  Would you be able to

19   sign a verdict form for the imposition of the death

20   penalty, okay, under those circumstances?  And I

21   know it's a difficult thing, and you've been

22   thinking about it now for three and a half weeks,

23   but I am going to ask you to search your heart and

1 your mind, okay, because you are the only one who

2 knows.  And if we get through the whole trial and we

3 spend a couple of weeks in trial after spending a

4 month picking a jury, and somebody gets in there and

5 says, you know, gosh, I told the prosecutor that I

6 could do it, but when it comes right down to it, for

7 various reasons, my own personal beliefs, I just

8 don't think that I can sign that form and the

9 prosecutor would never know that and we wouldn't get

10 our fair shake in Court, right?

11      SALINA SNYDER:  Right.

12      ATTY. BAILEY:  So, that's why I am

13 asking you to think deeply about it.  And do you

14 think that you would be able, if we met our burden

15 of proof and showed you that the death penalty is

16 the appropriate punishment beyond a reasonable

17 doubt, will you be able to sign a death penalty

18 verdict form?

19      SALINA SNYDER:  Yes.

20      ATTY. BAILEY:  Yes?

21      SALINA SNYDER:  Yes.

22      ATTY. BAILEY:  Okay.  And if you

23 did that, and the Judge asked you in open court, is

 1      this your verdict, would you be able to tell him,

 2      yes, it is?

 3                     SALINA SNYDER:  Yes.

 4                     ATTY. BAILEY:  Okay.  Now, so much

 5      for the death penalty as a punishment.  Let's get to

 6      some regular questions.  And if you have any

 7      questions as we go on, stop me and ask, okay, and

 8      we'll get you an answer.

 9                     SALINA SNYDER:  Okay.

10                     ATTY. BAILEY:  You understand that

11      the Defendant is charged with a number of crimes and

12      she is charged as a complicitor.  Okay, a

13      complicitor is somebody who solicits or procures

14      another person to commit a crime or aids and abets

15      another person, helps, encourages, strengthens,

16      plans with another person to commit a crime.

17                     SALINA SNYDER:  Okay.

18                     ATTY. BAILEY:  Okay, she's not

19      charged as a trigger man.  The charge is that the

20      actual killing was done by a fellow named Nate

21      Jackson.

22                     SALINA SNYDER:  Okay.

23                     ATTY. BAILEY:  Okay.  And that the

1        aggravated burglary and aggravated robbery was

2        actually physically committed by this Nate Jackson

3        and that he had a loaded working gun, okay.

4                          SALINA SNYDER:  Okay.

5                          ATTY. BAILEY:  But she's charged,

6        rather, as an aider and abettor or complicitor.

7        Does that bother you in any way?

8                          SALINA SNYDER:  No.

9                          ATTY. BAILEY:  Do you think it

10       would affect your ability to return a death penalty

11       verdict in this case if we proved beyond a

12       reasonable doubt that it is an appropriate verdict?

13                         SALINA SNYDER:  No.

14                         ATTY. BAILEY:  Okay, now there are

15       two counts here of aggravated murder, okay, but

16       there is only one person who has been killed, but

17       there are two separate counts that are charges of

18       aggravated murder.  And you may say, gosh, how can

19       they do that?  Well, under the law, we're allowed to

20       pursue two different theories of the killing, and

21       because we're allowed to do that, we have elected to

22       that.

23                         SALINE SNYDER:  Okay.

5478

```
1                        ATTY. BAILEY:  There is one type --
2     one charge of aggravated murder, that the killing
3     was done purposely with prior calculation and
4     design.  And there is a second charge that the
5     killing was done purposely in the course of a
6     special felony, felony murders we call them, during
7     an aggravated burglary and/or an aggravated robbery.
8                        SALINA SNYDER:  Okay.
9                        ATTY. BAILEY:  Attached to these
10    charges of aggravated murder are these two
11    specifications, these special findings of fact and
12    these specifications, quite simply, are that the
13    aggravated murder was committed with prior
14    calculation and design and, the first one, during an
15    aggravated burglary.  And the second one, the
16    specification it was done with prior calculation and
17    design and during the course of an aggravated
18    robbery, okay?
19                        SALINA SNYDER:  Okay.
20                        ATTY. BAILEY:  So, these are two
21    special findings that the jury has to consider.
22                        SALINA SNYDER:  Okay.
23                        ATTY. BAILEY:  Now, there are also
```

3479

```
 1    two other charges, there is the charge of aggravated
 2    burglary and a charge of aggravated robbery, and
 3    attached to those charges are firearm
 4    specifications, and there's that fancy word again,
 5    specifications, it just means an extra finding of
 6    fact for a jury to consider.  And firearm,
 7    basically, means a working gun.  A gun where you
 8    pull the trigger a bullet comes out using an
 9    explosive or combustion to propel and project or
10    shoot a bullet.  Fancy words, legal terms.
11                    SALINA SNYDER:  Okay.
12                    ATTY. BAILEY:  These terms
13    aggravated robbery and aggravated burglary, unless
14    you're trained in the law, folks some times use
15    those terms interchangeably.  They may say, my house
16    was robbed, but in the law, they mean their house
17    was burglarized.  And the Judge will define all of
18    these terms for you and you're bound to follow his
19    instructions of the law, okay?
20                    SALINA SNYDER:  Yes.
21                    ATTY. BAILEY:  But let me give you
22    a for instance.  The term aggravated burglary
23    usually refers to a structure, like a dwelling
```

1    house, or your house.

2                      SALINA SNYDER:  Okay.

3                      ATTY. BAILEY:  Your home.  And it

4    involves somebody trespassing into the home or the

5    house with the purpose to commit some type of an

6    offense like an aggravated murder or a theft offense

7    or something, and the perpetrator can be armed with

8    a deadly weapon like a gun or a knife, and the

9    perpetrator can inflict serious physical harm on the

10   victim, serious physical harm or death, okay.

11                     SALINA SNYDER:  Okay.

12                     ATTY. BAILEY:  Physical harm or

13   serious physical harm.  Aggravated robbery, on the

14   other hand, doesn't deal with the house or building

15   or structure, rather, aggravated robbery refers to

16   the use of force or threat of force against another

17   person to commit an offense maybe to steal something

18   and the perpetrator can be armed with a deadly

19   weapon, again, like a gun or a knife, and the

20   perpetrator can also inflict serious physical harm

21   or death on the person, okay.  So, you understand

22   that there is aggravated burglary and aggravated

23   robbery aside from the two separate charges of

```
 1        aggravated murder, and these special findings that
 2        are attached to these charges.
 3                         SALINA SNYDER:  Okay.
 4                         ATTY. BAILEY:  Okay.  Now, there
 5        are what we call elements to each crime.  That's
 6        what we have to prove beyond a reasonable doubt.
 7        Okay, did your mom ever bake a cake?
 8                         SALINA SNYDER:  Uh-huh.
 9                         ATTY. BAILEY:  Okay, what kind of
10        cake was your favorite?
11                         SALINA SNYDER:  Yellow.
12                         ATTY. BAILEY:  Yellow cake.
13                         ATTY. INGRAM:  Well, ask her if she
14        likes chocolate.
15                         ATTY. BAILEY:  Do you like
16        chocolate cake?
17                         SALINA SNYDER:  Oh, yeah.
18                         ATTY. BAILEY:  Let me make this a
19        chocolate cake that we're going to bake because I
20        don't know how to put yellow in the cake.  So, I am
21        not a great baker.  We're going to make a chocolate
22        cake -- your mom is going to make a chocolate cake.
23        Okay, she's got certain ingredients that she's got
```

1          to add to that recipe.  She's got to add her water,

2          sugar, and baking powder and eggs and all of the

3          others, and chocolate, because a chocolate cake

4          you've got to add chocolate.

5                              SALINA SNYDER:  Right.

6                              ATTY. BAILEY:  And it's mixed

7          altogether and you put the pan in the oven for 350

8          degrees for 40 minutes or 45 minutes or something,

9          if nobody jumps up and down, the cake will probably

10         rise, and you've got a chocolate cake.

11                             SALINA SNYDER:  Right.

12                             ATTY. BAILEY:  It's the same thing

13         with a crime.  Each crime has certain key

14         ingredients.

15                             SALINA SNYDER:  Uh-huh.

16                             ATTY. BAILEY:  Like the aggravated

17         murder, and the Judge will give you a detailed

18         definition for each of these crimes at the end of

19         this case.  And the burden of baking these cakes for

20         each of these crimes is on us, the people of the

21         State.  Okay, and we have to do that beyond a

22         reasonable doubt, so that you are firmly convinced

23         of the truth of the charge to a moral certainty

3483

1    using your reason and your common sense.

2                    SALINA SNYDER:  Yes.

3                    ATTY. BAILEY:  If we leave out one

4    of these ingredients, one of these elements or

5    essential component parts of a crime, then you got

6    to find the Defendant not guilty, okay, because we

7    haven't lived up to our burden of proof.  But if we

8    can convince you and the other 11 jurors as to all

9    of the elements of the crime, then you can find the

10   Defendant guilty beyond a reasonable doubt, okay.

11                   SALINA SNYDER:  Uh-huh.

12                   ATTY. BAILEY:  Let me give you a

13   for instance here.  Let's take the crime of

14   aggravated murder with prior calculation and design.

15   For instance, the State would have to prove that it

16   happened on or about a certain date, like December

17   11, 2001.  The second element might be that it

18   happened here in Trumbull County, Ohio.  We've got a

19   fancy word for that, venue.  Venue just means that

20   you can try the case here in this Courthouse, it

21   happened here Trumbull County rather than down in

22   Tuscaras County or up in Ashtabula County.

23                   SALINA SNYDER:  Okay.

3484

```
 1                    ATTY. BAILEY:  And the third
 2      element might be identification, that the person who
 3      committed this offense is the same person who is
 4      sitting there, and somebody may have to come in and
 5      point her out at some point.
 6                    SALINA SNYDER:  Okay.
 7                    ATTY. BAILEY:  The fourth element
 8      would be that she acted purposely, basically, on
 9      purpose.  But the Judge will give you a detailed
10      legal definition as to that term.
11                    SALINA SNYDER:  Okay.
12                    ATTY. BAILEY:  The fifth is that
13      she caused the death of a living person.  In this
14      case, a fellow by the name of Robert Fingerhut.
15                    SALINA SNYDER:  Okay.
16                    ATTY. BAILEY:  And sixth, that she
17      acted with prior calculation and design, and the
18      Judge will define that term in some detail at the
19      end of this case.  What that means is prior
20      calculation and design, it requires a studied scheme
21      to kill, it's an advanced planning and studied
22      scheme to kill.  Let me give you an example of that.
23      Let's say I drop my pen and I catch it, and let's
```

1    say that's a reflex because there's no real planning

2    here.  But if I drop my pen like this and I say,

3    hey, I'm going to bend down and pick it up, that's

4    some advanced planning, right?

5                    SALINA SNYDER:  Right.

6                    ATTY. BAILEY:  Now, let's say

7    yesterday, I decide and I tell my co-counsel.  I

8    say, hey, Chris, I am going to give an example of

9    prior calculation and design, and I am going to go

10   into Court tomorrow and drop my pen so that I can

11   bend over and pick it up.  And that would be some

12   prior calculation and design because I engaged in

13   advanced planning, and I engaged in a studied scheme

14   to do this, right?

15                   SALINA SNYDER:  Right.

16                   ATTY. BAILEY:  So, you got your

17   prior calculation and design.  Okay, so those are

18   like elements of the crime, and each crime has

19   certain ingredients or elements.

20                   SALINA SNYDER:  Right.

21                   ATTY. BAILEY:  And we've got to

22   prove those so that you are satisfied so that your

23   firmly convinced of the truth of the charge.  Now,

1    there are a couple of other things that go along

2    with this.  We have the burden of proving these

3    elements, and the Defendant doesn't have any burden

4    of proof.  Okay, the burden of proof is always on

5    us, the people of this State, and it doesn't shift,

6    okay.  The Defendant and her attorneys, they can

7    just sit there through the whole course of this

8    trial.  They can sit on their hands if they want and

9    play -- work crossword puzzles or something.  I'm

10   sure that they won't, but they're allowed to do that

11   because we, under our system of justice, we have

12   that burden of proof.

13                  SALINA SNYDER:  Okay.

14                  ATTY. BAILEY:  And it's because

15   there is a presumption of innocence.  Under our

16   American system of justice, this is a very important

17   presumption.  This presumption of innocence means

18   that this Defendant is presumed to be innocent as

19   are all other defendants that are tried in this

20   Courtroom, and it sort of acts like a cloak

21   shielding her all through the course of this trial

22   unless and until all the evidence is presented, the

23   Judge has instructed you on the law, and you and the

1     other 11 jurors go back in the jury room to

2     deliberate, and you find that we have established

3     the elements of the crime beyond a reasonable doubt.

4     Okay, and at that point, you understand that

5     presumption of innocence would be gone?

6               SALINA SNYDER:  Okay.

7               ATTY. BAILEY:  Okay.  But that

8     presumption of innocence means that she doesn't have

9     to prove anything, okay, there is no burden on her.

10    And you would be able to afford her that presumption

11    of innocence all through the course of this trial,

12    wouldn't you?

13              SALINA SNYDER:  Right.

14              ATTY. BAILEY:  Because it's the

15    only fair thing to do.

16              SALINA SNYDER:  Right.

17              ATTY. BAILEY:  Okay, the State has

18    come here and the Defendant has been charged by a

19    charging document, an indictment by the grand jury,

20    where the Defendant didn't have any right to be

21    present, her attorneys weren't present, and it's

22    just a piece of paper that tells her what the

23    charges are, okay.

1              SALINA SNYDER:  Okay.

2              ATTY. BAILEY:  And now it's time

3    for the people of the State to basically put up or

4    shut up, right?

5              SALINA SNYDER:  Uh-huh.

6              ATTY. BAILEY:  She's been charged

7    that she's guilty of these crimes and now it's time

8    for the State to come in with evidence to convince a

9    jury as to whether or not she is guilty of these

10   crimes, okay.

11             SALINA SNYDER:  Okay.

12             ATTY. BAILEY:  Now, we talked about

13   the standard of proof beyond a reasonable doubt, and

14   it's a heavy burden of proof.  In a civil case,

15   there is a burden called preponderance of the

16   evidence, and whoever tips the scale a little bit is

17   going to win.  Okay, if we got a box, an imaginary

18   box, and we filled it up with evidence, and we put

19   enough in to go a little over half way, in a civil

20   case, somebody is suing for money damages, whoever

21   fills it more than half way is going to win, okay?

22             SALINA SNYDER:  Uh-huh.

23             ATTY. BAILEY:  But this box, our

1    burden of proof is to fill it pretty close to the

2    top, but since you can't prove anything one hundred

3    percent beyond on all doubt, or beyond any doubt,

4    and some folks say beyond a shadow of a doubt.  But

5    that's an Alfred Hitchcock movie title.  It doesn't

6    exist in criminal law or in real life.  Okay, that's

7    not our burden of proof to fill it all the way to

8    the top.  Okay, we've got to fill it pretty close to

9    the top so that you and the other jurors are firmly

10   convinced that we have established the elements of

11   the crime charged to a moral certainty, okay?

12                   SALINA SNYDER:  Okay.

13                   ATTY. BAILEY:  But -- and it's up

14   to each of you, on your own, to decide where on that

15   box you want to draw that line that convinces you

16   that it's beyond a reasonable doubt.

17                   SALINA SNYDER:   Okay.

18                   ATTY. BAILEY:  And let me give you

19   -- and there are different types of evidence that we

20   can use to put evidence in that box.  There is

21   something called direct evidence; that is where a

22   person comes and testifies as to what he or she has

23   learned through the use of his or her five senses.

1    For example, I saw the rain and it came out of the

2    sky.  Or I heard the jet and thought it was loud.

3                    SALINA SNYDER:  Uh-huh.

4                    ATTY. BAILEY:  Or I smelled the

5    lemon and it smelled yellow.  Well, I had to get

6    that yellow in there somewhere.  There is another

7    type of evidence that is sort of an indirect type of

8    evidence, okay, it's roundabout-type of evidence

9    where you're given a fact or a set of facts, and

10   then you have to draw a logical conclusion to

11   another fact or set of facts, okay.  It's like

12   putting a burger into the microwave at McDonalds,

13   okay, and you put it in for 20 seconds and you take

14   it out and it's not hot enough.  You feel it and

15   it's still cool, and say, ought, oh, it's a little

16   too cold, or draw a logical deduction that maybe I

17   should put it in for another  five or ten seconds in

18   the microwave, right?

19                    SALINA SNYDER:  Right.

20                    ATTY. BAILEY:  Okay.  And let me

21   give you an example of this other type of evidence.

22   We call it circumstantial evidence, and some times

23   folks hear that term on T.V., like in the old reruns

1    of L.A. Law or the old Perry Mason reruns, and they

2    give you a distorted view of that term.  They say

3    it's only circumstantial evidence, which doesn't --

4    it indicates that they don't know what it really

5    means, whoever is writing that show.

6                    SALINE SNYDER:  Uh-huh.

7                    ATTY. BAILEY:  Let's say you live

8    in a house that has two stories, and when you go to

9    bed at night, your bedroom is on the second floor.

10   You go to your window and you look out across the

11   neighborhood, and as far as you can see, it's

12   perfectly dry.  It's a beautiful night out, the moon

13   is beaming, the stars are twinkling and there's not

14   a cloud in the sky.  Okay, so you draw the blinds

15   and get into bed, and before you fall asleep, you

16   got the radio on kind of low and you hear the

17   announcer say, folks, there is a cold front coming

18   in, and I expect we'll get a storm over night, and

19   you fall asleep.  And some time during the night,

20   you are awaken and you hear a distant booming sound,

21   you look toward your window and suddenly there's a

22   bright flash from outside but you can't see what it

23   is because the blinds are drawn.  And a couple of

1    seconds later, there is a distance booming and

2    rolling boom in the sky.  Half a minute goes by and

3    there's another bright flash of light, and maybe two

4    seconds later there is a little closer boom in the

5    sky.  And then a minute later there is suddenly a

6    really bright flash outside and almost

7    instantaneously there is this big cracking, ripping,

8    booming sound above the house and a pitter patter on

9    the roof and a heavy drumming sound, and you fall

10   back asleep.  And you wake up some time later, go to

11   the window, open the blinds and look out, and it's

12   nice day.  The sun is shining, there's not a cloud

13   in the sky, but where it was perfectly dry the night

14   before, as far as you can see now all across the

15   neighborhood, all of the roof tops are soaking wet.

16   There is water running in the streets, it's flooded

17   outside, there are drops of water dripping off of

18   the leaves of the trees -- all of the trees.  Okay,

19   and there is no fire hydrant nearby where somebody

20   could have hit it and knocked water up on the house,

21   right.

22                  SALINA SNYDER:  Right.

23                  ATTY. BAILEY:  Okay, you know what

1      happened during the night, don't you?

2                      SALINA SNYDER:  Yes.

3                      ATTY. BAILEY:  What happened?

4                      SALINA SNYDER:  A rain storm.

5                      ATTY. BAILEY:  Right, there was a

6      thunderstorm, and you know that beyond any

7      reasonable doubt, right?

8                      SALINA SNYDER:  Right.

9                      ATTY. BAILEY:  That's from all of

10     the facts and circumstances that were presented,

11     even though you didn't see it with your own eyes,

12     you didn't see the lightning flash or see the rain,

13     you know that that is what happened, and you know

14     that beyond a reasonable doubt so that you're firmly

15     convinced that is what happened to a moral

16     certainty, right?

17                     SALINA SNYDER:  Right.

18                     ATTY. BAILEY:  Using your reason

19     and your common sense?

20                     SALINA SNYDER:  Yes.

21                     ATTY. BAILEY:  Now, there is some

22     room in there for some possible or imaginary doubt.

23     You can imagine E.T. and his alien buddies flew by

3494

```
 1     in a flying saucer some time during the night and

 2     put on a sound and light show and scattered the

 3     ground with some wet stuff.  But that's probably a

 4     foolish or imaginary doubt, right?

 5                   SALINA SNYDER:  Right.

 6                   ATTY. BAILEY:  You know that it's

 7     just a thunderstorm that occurred by proof beyond a

 8     reasonable doubt.  It's the same thing in a criminal

 9     case, okay, we can use that type of evidence to

10     establish elements of a crime.  And circumstantial

11     evidence is just as good as direct evidence, okay?

12                   SALINA SNYDER:  Okay.

13                   ATTY. BAILEY:  And there is a

14     reason that we're allowed to use that type of

15     evidence.  I imagine that you would think that if

16     somebody were going to plan a serious crime like an

17     aggravated murder, somebody would plan to kill

18     somebody else, they're probably not going to

19     announce it on the Courthouse steps at high noon,

20     are they, to the whole world?

21                   SALINA SNYDER:  Right, yeah.

22                   ATTY. BAILEY:  And it's hard to

23     know what is in somebody's mind unless they express
```

1    it in some other way, right?

2                    SALINA SNYDER:  Right.

3                    ATTY. BAILEY:  So, if you had some

4    circumstantial evidence, maybe some letters or some

5    phone calls of what somebody was planning, you might

6    be able to consider that as circumstantial evidence

7    to show what their purpose was, right?

8                    SALINA SNYDER:  Right.

9                    ATTY. BAILEY:  Or what their plan

10   was.

11                   SALINA SNYDER:  Right.

12                   ATTY. BAILEY:  Now, do you

13   understand -- I take it that you believe that people

14   should be held accountable for their actions, right?

15                   SALINA SNYDER:  Oh, yes, yes.

16                   ATTY. BAILEY:  You teach Sunday

17   school?

18                   SALINA SNYDER:  Yes.

19                   ATTY. BAILEY:  I imagine that you

20   teach that in Sunday school?

21                   SALINA SNYDER:  Uh-huh.

22                   ATTY. BAILEY:  You teach the Ten

23   Commandments?

1                      SALINA SNYDER:  Right.

2                      ATTY. BAILEY:  Thou shall not do

3       certain things.

4                      SALINA SNYDER:  Right.

5                      ATTY. BAILEY:  And if you do

6       certain things, there are going to be consequences,

7       right?

8                      SALINA SNYDER:  Right.

9                      ATTY. BAILEY:  What grades do you

10      teach in Sunday school?

11                     SALINA SNYDER:  I teach ages 10,

12      11, and 12.

13                     ATTY. BAILEY:  Okay.  And you would

14      be able to pile up evidence on evidence and make

15      your own decision as whether there's enough and

16      follow what the Judge is going to tell you, right?

17                     SALINA SNYDER:  Uh-huh.

18                     ATTY. BAILEY:  Now, you understand

19      that you can't take notes.  Some times folks watch

20      Court T.V. and it shows different states, Court in

21      different States.  You will have to rely on your own

22      recollection and collective recollection of the

23      other 11 jurors and remember the testimony.  There

1    aren't going to be any instant replays like on T.V.,

2    or sports programs or different things.

3                SALINA SNYDER:  Right.

4                ATTY. BAILEY:  Okay, and the trial

5    could maybe take a week and a half or two weeks, and

6    during that time you will hear that testimony and

7    you will have to remember it.

8                SALINA SNYDER:  Uh-huh.

9                ATTY. BAILEY:  And there won't be

10    any instant transcripts.  Our court reporters are

11    very good, but we don't have millions of dollars of

12    transcribing equipment like they did in the O.J.

13    Simpson case or the Menendez case or some of these

14    other cases where they had millions of dollars since

15    the County doesn't have anywhere near that kind of

16    money to spend on that type of equipment.

17                SALINA SNYDER:  Right.

18                ATTY. BAILEY:  So, if folks on the

19    jury ask, can we get the testimony of so and so, the

20    answer is going to be, no, you are going to have to

21    rely on your collective recollection.

22                SALINA SNYDER:  Okay.

23                ATTY. BAILEY:  And there will be 12

1    of you in there and you shouldn't have any problem,

2    somebody is going to remember what the testimony

3    was.

4                SALINA SNYDER:  Right.

5                ATTY. BAILEY:  Also, you can't go

6    out on your own to investigate, okay.  So, in some

7    of the movies and T.V. programs, they had people go

8    out and investigate on there own, and that is a no,

9    no.  It would result in a mistrial and cause us to

10    do it all over again, and we don't want that to

11    happen, right?

12                SALINA SNYDER:  No.

13                ATTY. BAILEY:  And you won't do

14    that?

15                SALINA SNYDER:  No.

16                ATTY. BAILEY:  Another thing is

17    that you're stuck with the questions that the

18    lawyers ask.  Because we're lawyers and we go to law

19    school, we're sort of trained to prove these

20    elements of the crime, these ingredients in the

21    recipe, okay.

22                SALINA SNYDER: Uh-huh.

23                ATTY. BAILEY:  And we're trained to

1    either establish them, build them up, or tear them

2    down.

3              SALINA SNYDER:  Okay.

4              ATTY. BAILEY:  And because of that,

5    there may be some side issues that you might have an

6    interest in that might never get asked or answered.

7    For example, if you sold shoes, you might have an

8    interest in what kind of shoes people were wearing.

9    And unless that was real important to the case, like

10   footprints or something, if it had nothing to do

11   with the case, that type of question would never get

12   asked or answered.

13             SALINA SNYDER:  Right.

14             ATTY. BAILEY:  And if we could

15   establish the elements of the crime charged beyond a

16   reasonable doubt, even though there was some

17   unanswered questions about something that didn't

18   relate to it, you would still be able to return a

19   conviction, if we met our burden of proof, right?

20             SALINA SNYDER:  Right.

21             ATTY. BAILEY:  Okay.  Do you

22   understand that not all criminals are rocket

23   scientists; that you don't have to be a rocket

1   scientist to be a criminal.

2                   SALINA SNYDER:  Right.

3                   ATTY. BAILEY:  You can have silly

4   criminals that some times do some really, really

5   stupid things.  People can plan and plan and then

6   they mess up on some detail.

7                   SALINA SNYDER:  Right.

8                   ATTY. BAILEY:  For example, you

9   heard of cases probably where the bank robber goes

10  in with a mask and a gun and hands the teller a note

11  that says, give me all of your money, and it's on

12  the back of the envelope, and the teller gives him

13  the money and he runs out.  Then they turn the

14  envelope over and it's addressed to the robber and

15  his home address with his name.

16                  SALINA SNYDER:  Right.

17                  ATTY. BAILEY:  Or the burglar who

18  climbs into the window and drops his wallet with his

19  identification and gets caught, right?

20                  SALINA SNYDER:  Uh-huh, yes.

21                  ATTY. BAILEY:  Okay, so you

22  understand sometimes that criminals can be really

23  stupid too and do some stupid things?

1
2
3
4                    REPORTER'S CERTIFICATE
5
6        This is to certify the foregoing represents a
7    true and correct copy of the proceedings had in the
8    aforementioned cause as reflected by the stenotype
9    notes taken by me on the same.
10
11
12
13
14
15    DATE:   January 7, 2004      Maribeth Hoolihan
16                                 Official Court Reporter
17
18
19
20
21
22
23

1              IN THE COURT OF COMMON PLEAS

2                 TRUMBULL COUNTY, OHIO

3

4    STATE OF OHIO,              ) Case No. 01-CR-793
                                 )
5              Plaintiff         )
                                 )
6    -vs-                        ) Judge John M. Stuard
                                 )
7    DONNA M. ROBERTS,           )   **VOLUME XVI**
                                 )
8              Defendant         )TRANSCRIPT OF PROCEEDINGS

9

10   Voir Dire, commencing May 2, 2003,

11   BEFORE:      HONORABLE JOHN M. STUARD

12   AT:          Trumbull Co. Court of Common Pleas
                  Courtroom Number 2
13                161 High Street, N.W.
                  Warren, Ohio 44481
14

15   APPEARANCES:

16   On behalf of the State of Ohio:
                  Mr. Kenneth N. Bailey and
17                Mr. Christopher D. Becker
                  Assistant Prosecuting Attorneys
18                Warren, Ohio

19   On behalf of the Defendant:
                  Mr. J. Gerald Ingram and
20                Mr. John B. Juhasz
                  Attorneys at Law
21                Youngstown, Ohio

22

23   Official Court Reporter:  Maribeth Hoolihan

136

## VOLUME XVI

### CONTINUED EXAMINATION OF

### SALINA SNYDER, JUROR NUMBER 228

BY ATTORNEY BAILEY:

SALINA SNYDER:  Yes.

ATTY. BAILEY:  In spite of all of the planning?

SALINA SNYDER:  Uh-huh.

ATTY. BAILEY:  Okay.  At the end of this case, at the end of the first phase, there is something called sequestration.  Okay, after you've heard all of the evidence and the testimony and the Judge has instructed you on the law, then all of the jurors are kept together to deliberate.  And unlike the regular criminal case that takes place where folks go home at night, the jurors can't go home, okay, they're kept together while they're deliberating.  I mean, you get to go to a hotel, they put you up in a hotel and they bring you in meals.  You won't be discussing the case at the hotel, you will be discussing the case here.  There is no one on one or one on three conversations.

```
 1                    SALINA SNYDER:  Right.

 2                    ATTY. BAILEY:  Okay, you all have

 3      to be together to deliberate, but it may take --

 4      every jury is different, I mean, we have had juries

 5      in capital cases in the first phase take from one

 6      and a half hours to five days.

 7                    SALINA SNYDER:  Uh-huh.

 8                    ATTY. BAILEY:  Okay.  And it

 9      depends on, you know, what you decide, and what you

10      have to look at and read in your deliberations, you

11      know, what the evidence is, and every jury is

12      different.  So, you can take as much time as you

13      need, okay, but you're kept together during that

14      time so that nobody has any undue influence on you

15      from the outside.

16                    SALINA SNYDER:  Uh-huh.

17                    ATTY. BAILEY:  And then if you and

18      the other jurors come back with the guilty beyond a

19      reasonable doubt verdict of aggravated murder and

20      one or more of these specifications, aggravating

21      circumstances, we go to a second phase.  And there

22      will probably be a break here for a couple of days

23      or a week, and then you come back and we put on the
```

```
 1      second phase as to mitigation phase, okay,

 2      mitigating factors, and you do that balancing test.

 3      And then after the testimony is in and the Judge

 4      instructs you on the law and you deliberate again,

 5      you would be sequestered again.  And that takes as

 6      long as you need to deliberate.

 7                     SALINA SNYDER:  Okay.

 8                     ATTY. BAILEY:  That sequestration,

 9      being kept together and not being allowed to go

10      home, they will give you advanced notice so you can

11      pack a suit case and bring whatever you need,

12      clothes and a tooth brush and whatever.  But would

13      that cause you any undue hardship?

14                     SALINA SNYDER:  No.

15                     ATTY. BAILEY:  Okay.  I know it's

16      normal as a human being to feel sympathy for another

17      human being.

18                     SALINA SNYDER:  Right.

19                     ATTY. BAILEY:  Okay, even somebody

20      who is charged with a terrible crime.

21                     SALINA SNYDER:  Right.

22                     ATTY. BAILEY:  And it may well be

23      that during the course of the trial, as her chair is
```

1    turned toward you, you may become more acquainted

2    with the Defendant.  But my question to you is this,

3    when you go inside that jury room to deliberate on

4    your verdict, can you lay aside all thoughts of

5    sympathy that you might have for the Defendant and

6    base your decision on the testimony in evidence that

7    you hear and the instructions of law given to you by

8    the Judge and lay aside all thoughts of sympathy?

9                SALINA SNYDER:  Yes.

10              ATTY. BAILEY:  Okay.  Now, do you

11    have any questions?

12              SALINA SNYDER:  No.

13              ATTY. BAILEY:  We have answered

14    pretty much everything?

15              SALINA SNYDER:  Yes.

16              ATTY. BAILEY:  Okay.  Now, we're

17    pretty much at the last thing here, and I think you

18    would agree that we have certain obligations as

19    citizens in this country, okay.  If it's time to

20    vote, if it's election time, we have an obligation

21    to learn whatever we can about the issues and the

22    candidates and cast a ballot.  And that is how you

23    get here basically is you are voter, right?

1           SALINA SNYDER:  I -- actually, no,

2    I was trying to figure that out myself.  I can never

3    remember registering to vote, and so I have never

4    voted.  I might have registered once in high school,

5    but that is all that I can think of.

6           ATTY. BAILEY: Okay.  Or the

7    driver's license, do you drive?

8           SALINA SNYDER:  Yes, I have a

9    driver's license.

10           ATTY. BAILEY:  Okay.  There is

11    another obligation of citizenship, okay.  If it's

12    war time, if our Country is at war, there is an

13    obligation to serve in the military.  And we have

14    young folks overseas in several places right now.

15           SALINA SNYDER:  Uh-huh.

16           ATTY. BAILEY:  And there is another

17    obligation.  If we're summoned in to serve as jurors

18    in a case, it's our obligation to make sure that the

19    system of justice works to get people from all walks

20    of life in the community with different view points

21    to sit on the jury.

22           SALINA SNYDER:  Right.

23           ATTY. BAILEY:  And if we're able

1    to, even though it may cause a hardship to some

2    extent in our personal life, it may disrupt our work

3    schedule or our home schedule, taking care of our

4    husband's or whatever, if we're able to sit on the

5    jury, then we have an obligation to do it to make

6    sure that the system works.  Would you be willing to

7    undertake that obligation of citizenship?

8                    SALINA SNYDER:  Oh, yes, yes.

9                    ATTY. BAILEY:  Thank you, very

10   much.  Now the defense counsel will have an

11   opportunity to ask you some questions.

12                    SALINA SNYDER:  Okay.

13                    THE COURT:  Mr. Ingram.

14                    ATTY. INGRAM:  Thank you, Your

15   Honor.

16   **EXAMINATION BY ATTORNEY INGRAM:**

17                    ATTY. INGRAM:  Good morning, Mrs.

18   Snyder, how are you?

19                    SALINA SNYDER:  Fine.

20                    ATTY. INGRAM:  Do you need water up

21   there or coffee or anything?

22                    SALINA SNYDER:  No, I'm fine, thank

23   you.

```
 1              ATTY. INGRAM:  My name is Jerry

 2    Ingram, and this is John Juhasz.  And John and I

 3    share the responsibility of representing Donna

 4    Roberts who on trial for her life.  And as I am sure

 5    you can understand, John and I take our

 6    responsibilities very seriously and believe we

 7    should take every reasonable precaution in selecting

 8    a fair minded jury, the same type of jury that you

 9    or I would want if we were on trial.  Does that

10    sound fair enough to you?

11              SALINA SNYDER:  That sounds very

12    fair.

13              ATTY. INGRAM:  This is the only

14    opportunity that we have to get to know one another

15    and to determine whether you're comfortable sitting

16    on this jury.  At this stage of the proceedings, we

17    are permitted to talk directly to one another.  I am

18    allowed to ask you questions and say things to you,

19    you are allowed to ask me questions and say things

20    to me.  You know, being a lawyer, I am sort of, I

21    guess by training or by inclination, I tend to

22    monopolize conversations.  I would appreciate it if

23    you would sort of stop me in that respect and
```

1    whenever something pops into your mind that you

2    would like to discuss, please let me know.

3                    SALINA SNYDER:  Okay.

4                    ATTY. INGRAM:  Also, if at any

5    point in time you don't understand one of my

6    questions, that's my fault.  It means that I have

7    failed to make myself clear or that I have failed to

8    translate legal mumbo jumbo into ordinary

9    understandable language.  And that is some times

10   hard to do.  Some times those legal term confuse me.

11                   SALINA SNYDER:  Right.

12                   ATTY. INGRAM:  So, if we get lost

13   at any point in time, sort of say, hey, Ingram, stop

14   right there and let's get back on track, okay?

15                   SALINA SNYDER:  Okay.

16                   ATTY. INGRAM:  The experience that

17   you're going through is a lot like a job interview.

18                   SALINA SNYDER:  Uh-huh.

19                   ATTY. INGRAM:  Except when you go

20   out to seek employment, you choose the employer you

21   are going to apply for, and in this case, somebody

22   spun a wheel and pulled your name out, and we asked

23   you to come here.

```
 1                    SALINA SNYDER:  Right.
 2                    ATTY. INGRAM:  And so that your
 3    curiosity, I guess, is satisfied to some extent,
 4    what I would suspect happened, is that you
 5    registered to vote within the last four years, and I
 6    think that registration remains in effect for four
 7    years, or their paperwork is a little bit behind and
 8    you were still on the list so you got kicked out.
 9                    SALINA SNYDER:  Okay.
10                    ATTY. INGRAM:  Your name.
11                    SALINA SNYDER:  Right.
12                    ATTY. INGRAM:  We're interviewing
13    you today for one of the most important jobs there
14    is.
15                    SALINA SNYDER:  Yes.
16                    ATTY. INGRAM:  The job of finding
17    the truth and perhaps determining the fate of
18    another person.
19                    SALINA SNYDER:  Uh-huh.
20                    ATTY. INGRAM:  So, my first
21    question to you is, how do you feel about being
22    asked to assume that responsibility?
23                    SALINA SNYDER:  A little nervous,
```

5511

```
 1      but also I think it's a big responsibility and

 2      something that I could handle.  That's basically it.

 3                      ATTY. INGRAM:  Okay, and in a

 4      nutshell, this case boils down to the government's

 5      allegation that Donna Roberts plotted or conspired

 6      with a male companion by the name Nate Jackson, --

 7                      SALINA SNYDER:  Uh-huh.

 8                      ATTY. INGRAM:  -- to cause the

 9      death of Robert Fingerhut.  Donna and Robert were

10      divorced but they continued to work with one another

11      at the Greyhound Bus Station in Warren and

12      Youngstown, and to live with one another in Howland

13      Township.

14                      SALINA SNYDER:  Okay.

15                      ATTY. INGRAM:  Throughout the

16      course of these proceedings, you will hear the name

17      Nate Jackson.

18                      SALINA SNYDER:  Uh-huh.

19                      ATTY. INGRAM:  And you very well

20      may conclude that Nate Jackson did what the State

21      says he did.  Do you understand that's not what

22      you're here to determine?

23                      SALINA SNYDER:  Right.
```

1          ATTY. INGRAM:  You are here to

2     determine whether Donna helped him or not?

3          SALINA SNYDER:  Okay.

4          ATTY. INGRAM:  But that is a

5     separate issue, do you see that?

6          SALINA SNYDER:  Yes.

7          ATTY. INGRAM:  And when Mr. Bailey

8     was talking with you, he used the terms complicitor,

9     aider and abettor, that is someone who helps

10    somebody do something wrong.  And they have the

11    burden of proving that beyond a reasonable doubt.

12    And are you going to hold them to that burden?

13         SALINA SNYDER:  Oh, yes.

14         ATTY. INGRAM:  In your

15    questionnaire, you left that sentence, "is a", and

16    then you forgot to finish it, but you were going to

17    add black person?

18         SALINA SNYDER:  Right.

19         ATTY. INGRAM:  That was either

20    Donna's husband or Nate Jackson I assume, or the

21    boyfriend, right?

22         SALINA SNYDER:  I am not real sure.

23         ATTY. INGRAM:  Well, would that

1       trouble you at all that there was a relationship

2       with a black person?

3                       SALINA SNYDER:  No, sir.

4                       ATTY. INGRAM:  You understand that

5       Donna denies that she was involved with the death of

6       Robert by plot, conspiracy, or otherwise.

7                       SALINA SNYDER:  I do now.

8                       ATTY. INGRAM:  In support of its

9       allegation, the State will present during this trial

10      the various letters and tape-recording, and some of

11      that stuff is sexually explicit in nature.

12                      SALINA SNYDER:  Uh-huh.

13                      ATTY. INGRAM:  And to be honest and

14      candid with you, some of it's down right offensive.

15                      SALINA SNYDER:  Okay.

16                      ATTY. INGRAM:  But do you

17      understand that even though you may be offended by

18      the sexual nature of some of this evidence, you have

19      to sort of rise above the offense --

20                      SALINA SNYDER:  Uh-huh.

21                      ATTY. INGRAM:  -- to test the

22      evidence to determine whether it ties Donna to this

23      crime.  Do you think you're up to that?

1              SALINA SNYDER:  Uh-huh, yes.

2              ATTY. INGRAM:  Would you have the

3      courage to acquit, that is one of those legal terms,

4      that is vote not guilty.  Would you have the courage

5      to acquit if you felt that a not guilty verdict was

6      warranted by the evidence?

7              SALINA SNYDER:  Yes.

8              ATTY. INGRAM:  When your hubby --

9      does your hubby bring home the Tribune, is that how

10     you get it, or does he make sure that it's

11     delivered?

12             SALINA SNYDER:  It's delivered.

13             ATTY. INGRAM:  Well, when you scan

14     that paper, these events began back in December of

15     '01, between then and now do you recall, and maybe

16     you should take a few moments to ponder this, do you

17     recall reading or seeing anything about this case at

18     all?

19             SALINA SNYDER:  Just, I remember

20     seeing I think there was a picture of her, and then

21     I remember reading her name, but I did not read the

22     article.  And that is the only time.

23             ATTY. INGRAM:  Between December of

3515

1    '01, and the time you got your invitation by way of

2    a summons to come spend time with us, did anybody

3    talk with you about this case?

4                    SALINA SNYDER:  No.

5                    ATTY. INGRAM:  After you got your

6    summons, then people started to get at you and ask

7    you?

8                    SALINA SNYDER:  Right.

9                    ATTY. INGRAM:  In your

10   questionnaire, you say that you overheard a

11   conversation.  Now, I am a little confused by that.

12                   SALINA SNYDER:  Okay, what happened

13   was, people were -- I didn't tell him correctly.

14   They are asking me and I was telling them that I

15   could not discuss it, I couldn't tell them what it

16   was about, and I ended up leaving the room and they

17   kept yelling and then they started discussing it

18   with each other, and then I ended up you know,

19   leaving the house, actually.  I walked out on the

20   back porch.  And all I heard was that there was a

21   black person involved, and it was murder trial and

22   her name was brought up.  And that's really all that

23   I heard.

```
 1                    ATTY. INGRAM: Okay.  We're going to
 2      come back to that in a minute.
 3                    SALINA SNYDER:  Okay.
 4                    ATTY. INGRAM:  But do you agree
 5      with the American jury system?
 6                    SALINA SNYDER:  The fact that we
 7      have the jury?
 8                    ATTY. INGRAM:  Yes.
 9                    SALINA SNYDER:  Oh, yes.
10                    ATTY. INGRAM:  Would you also agree
11      that it only works when we can find good people who
12      will give of their time and fairly determine the
13      cause before them?
14                    SALINA SNYDER:  Yes.
15                    ATTY. INGRAM:  Would you also agree
16      that they can't really determine the cause, fairly
17      determine the cause before them, if they're going to
18      be influenced by something that they have seen,
19      read, or heard in the past?
20                    SALINA SNYDER:  Right.  I agree.
21                    ATTY. INGRAM:  So, if at any point
22      in time something pops into your mind that I heard
23      this before or I read this before, your oath will
```

1          require you to put it aside.

2                              SALINA SNYDER:  Uh-huh.

3                              ATTY. INGRAM:  Will you do your

4          best to do that?

5                              SALINA SNYDER:  Yes.

6                              ATTY. INGRAM:  Now, because you're

7          here, your friends, your family members are all

8          going to follow these proceedings a lot closer than

9          they ordinarily would because you're involved.

10                             SALINA SNYDER:  Uh-huh.

11                             ATTY. INGRAM:  And you already had

12         this experience but, you know, when you come home,

13         they may say, hey, what happened in that Courtroom

14         today, or I saw the news, let me tell you what I

15         think, and it's not that they want to do anything

16         wrong, it's just that they want to be part of your

17         experience.

18                             SALINA SNYDER:  Right.

19                             ATTY. INGRAM:  Well, you got to

20         stop that.

21                             SALINA SNYDER:  Right.

22                             ATTY. INGRAM:  And you've already

23         had that experience, will you keep that up?

```
1                    SALINA SNYDER:  Oh yes.

2                    ATTY. INGRAM:  Have you sort of

3    read them the riot act about that and say, hey, come

4    on guys, you got to stop trying to do this?

5                    SALINA SNYDER:  Yes.

6                    ATTY. INGRAM:  How did they react?

7                    SALINA SNYDER:  They laughed and

8    just tried to keep going, and, you know, like I

9    said, I got up and left, so every time I visit a

10   family member and they want to discuss what

11   happened, what's going on, and I just tell them that

12   I can't, I can't do it.

13                   ATTY. INGRAM:  Tell them that you

14   will let them know when it's all over with.

15                   SALINA SNYDER:  That's what I did.

16                   ATTY. INGRAM:  When it's all over

17   with you'll have a barbecue.

18                   SALINA SNYDER:  Yes, exactly.

19                   ATTY. INGRAM:  Now, even as a

20   juror, you are told that you have to keep an open

21   mind.

22                   SALINA SNYDER:  Right.

23                   ATTY. INGRAM:  And not decide
```

1    anything about the facts of this case until it's all

2    over.

3                        SALINA SNYDER:  Right.

4                        ATTY. INGRAM:  And let me try to

5    explain why.  If the first witness takes the stand

6    and says that something happened one way --

7                        SALINA SNYDER:  Uh-huh.

8                        ATTY. INGRAM:  -- and you decide in

9    your mind that that sounds pretty good, --

10                       SALINA SNYDER:  Uh-huh.

11                       ATTY. INGRAM:  -- that might

12   prevent you from objectively listening to other

13   testimony that it didn't happen like that.

14                       SALINA SNYDER:  Uh-huh.

15                       ATTY. INGRAM:  So, you have to wait

16   until everything is said and done before you form

17   any impressions about the facts of this case.  Will

18   you do your best to do that?

19                       SALINA SNYDER:  Yes.

20                       ATTY. INGRAM:  Okay, I want to talk

21   to you about penalties too, but before I do, I want

22   to explain a concern that I have.  I'm worried by

23   the mere fact that we're all up here talking to you

1      about penalty, you know, the Judge has talked to you

2      about penalties, preliminary instructions were

3      written about penalties, and Mr. Bailey has talked

4      to you about penalties.  And now I am up here

5      talking to you about penalties.   I am concerned

6      that you might get the impression in your mind that

7      we're all predicting that you might have to decide

8      on a penalty.

9                    SALINA SNYDER:  Right.

10                   ATTY. INGRAM:  You understand that

11     we're lawyers, not fortune-tellers?

12                   SALINA SNYDER:  Right.

13                   ATTY. INGRAM:  And we're not

14     predicting that you will get to a second stage.

15                   SALINA SNYDER:  Right.

16                   ATTY. INGRAM:  And in the

17     preliminary instructions that you read and in the

18     orientation instructions that the Judge gave you at

19     the other end of the hall about three weeks ago, you

20     were told that these questions have to be asked of

21     you now.

22                   SALINA SNYDER:  Uh-huh.

23                   ATTY. INGRAM:  Do you recall that?

```
 1                          SALINA SNYDER:  Yes.

 2                          ATTY. INGRAM:  And that these

 3       questions have nothing to do with Donna Roberts'

 4       guilt or innocence.

 5                          SALINA SNYDER:  Right.

 6                          ATTY. INGRAM:  Do you see that?

 7                          SALINA SNYDER:  Yes.

 8                          ATTY. INGRAM:  Do you wear your

 9       seatbelt?

10                          SALINA SNYDER:  Yes, sir.

11                          ATTY. INGRAM:  And when you fasten

12       that seat belt, do you expect to be involved in an

13       automobile accident?

14                          SALINA SNYDER:  No.

15                          ATTY. INGRAM:  You fasten that

16       seatbelt just in case?

17                          SALINA SNYDER:  Right.

18                          ATTY. INGRAM:  And we're asking you

19       these questions now just in case, do you see that?

20                          SALINA SNYDER:  Uh-huh.

21                          ATTY. INGRAM:  Did you make it

22       through those preliminary instructions?  There's a

23       lot of legal mumbo jumbo in there --
```

```
 1                    SALINA SNYDER:  Yeah.

 2                    ATTY. INGRAM:  -- necessarily so.

 3    But I want you to understand that about half the

 4    lawyers in town, they would read those preliminary

 5    instructions and it would be like Latin to them

 6    because they don't do this kind of stuff.  It's hard

 7    material -- do you have any questions about it?

 8                    SALINA SNYDER:  No, I guess that I

 9    -- everything has been answered.

10                    ATTY. INGRAM:  If questions pop up

11    in your mind while we're talking, let me know.

12                    SALINA SNYDER:  Okay.

13                    ATTY. INGRAM:  When you were

14    talking to Mr. Bailey, he sent you down to Columbus

15    to help write the laws of the State of Ohio.  Do you

16    recall that portion of your dialogue with him?

17                    SALINA SNYDER:  Yes.

18                    ATTY. INGRAM:  And for certain

19    murder cases, if you were writing the laws, you

20    would include the death penalty in the works?

21                    SALINA SNYDER:  Uh-huh.

22                    ATTY. INGRAM:  If you were writing

23    the laws for those murder cases where you would keep
```

1    the death penalty on the books, would the death

2    penalty be the only available penalty, or would

3    there be other options?

4                    SALINA SNYDER:  Other options.

5                    ATTY. INGRAM:   What do you think

6    those other options ought to be?

7                    SALINA SNYDER:  Time in prison.

8                    ATTY. INGRAM:   Life?

9                    SALINA SNYDER:  Life, you know,

10   years.  Like I said, I believe that people should be

11   forgiven and people can change, so, you know, chance

12   of parole.

13                   ATTY. INGRAM:  Do you think you

14   have a handle on the four sentencing options that a

15   capital juror has in a second phase?

16                   SALINA SNYDER:  Yes.

17                   ATTY. INGRAM:  Now, I am going to

18   make up a capital case, it's not this one but it's

19   another one.

20                   SALINA SNYDER:  Okay.

21                   ATTY. INGRAM:  And it is someone

22   who has been convicted of purposely and with prior

23   calculation and design causing the death of another.

1          SALINA SNYDER:  Okay.

2          ATTY. INGRAM:  And in my situation,

3      my situation is going to sadly mirror recent events,

4      and the victim is going to be a police officer.

5          SALINA SNYDER:  Okay.

6          ATTY. INGRAM:  If you are convicted

7      of murdering a police officer in the line of duty,

8      that is a capital specification.

9          SALINA SNYDER:  Uh-huh.

10         ATTY. INGRAM:  So there would be a

11     not guilty verdict on the charge of aggravated

12     murder -- it would be a guilty verdict on the charge

13     of aggravated murder, and a guilty verdict on the

14     death specification.  Do you have me so far?

15         SALINA SNYDER:  Yes.

16         ATTY. INGRAM:  Do you understand

17     that a second phase juror in that case would have to

18     start the second phase with all four sentencing

19     options equal in his or her mind?

20         SALINA SNYDER:  Uh-huh, I

21     understand.

22         ATTY. INGRAM:  And in that kind of

23     a case, would you do that?  Would they start out

1      equal?

2                          SALINA SNYDER:  Right, uh-huh.

3                          ATTY. INGRAM:  Have you ever heard

4      anyone say that they're not in favor of life

5      imprisonment because, we, as taxpayers, shouldn't

6      have to pay?

7                          SALINA SNYDER:  Uh-huh.

8                          ATTY. INGRAM:  Do you have any

9      opinion on that cost issue?

10                         SALINA SNYDER:  Not really, no.

11                         ATTY. INGRAM:  Have you ever

12     donated any time, money, or services to a political

13     campaign or issue?

14                         SALINA SNYDER:  Not really, no.

15                         ATTY. INGRAM:  Do you belong to any

16     group or organization which is active in any

17     political matter?

18                         SALINA SNYDER:  No.

19                         ATTY. INGRAM:  In the last five

20     years or so, have you signed a petition on any

21     public issue?

22                         SALINA SNYDER:  No.

23                         ATTY. INGRAM:  Do you belong to or

1    associate with any group which has crime prevention

2    or law enforcement as a goal?

3                SALINA SNYDER:  No.

4                ATTY. INGRAM:  Mr. Bailey asked you

5    about sympathy, do you recall that?

6                SALINA SNYDER:  Yes.

7                ATTY. INGRAM:  And you and he

8    agreed that that sympathy for Donna Roberts should

9    not affect your evaluation of the evidence in this

10    case?

11                SALINA SNYDER:  Right.

12                ATTY. INGRAM:  And that is true.

13                SALINA SNYDER:  Uh-huh.

14                ATTY. INGRAM:  We don't want

15    sympathy, we want a fair, just adjudication.  You

16    got that?

17                SALINA SNYDER:  Yes.

18                ATTY. INGRAM:  There is another

19    side, however, to that sympathy issue.  Someone

20    lost their life here.

21                SALINA SNYDER:  Right.

22                ATTY. INGRAM:  And it's only

23    natural to feel sympathy for someone whose life was

1        suddenly and unexpectedly taken from him.

2                          SALINA SNYDER:  Uh-huh.

3                          ATTY. INGRAM:  Sympathy for Donna

4        should not affect the way you look at this case.

5        Sympathy for Mr. Fingerhut should not affect the way

6        you look at this case.  Do you agree with that?

7                          SALINA SNYDER:  Yes, I do.

8                          ATTY. INGRAM:  That is one of those

9        things, however, which may be easier said than done.

10                          SALINA SNYDER:  Right.

11                          ATTY. INGRAM:  And by the way, we

12        ask jurors to do a whole lot of things that are

13        easier said than done.

14                          SALINA SNYDER:  Right.

15                          ATTY. INGRAM:  In this case, did

16        you ever see CSI?

17                          SALINA SNYDER:   I think once.

18                          ATTY. INGRAM:  It's a new show.

19                          SALINA SNYDER:  Yeah, I think I

20        seen it once.

21                          ATTY. INGRAM:  Well, you will see

22        crime scene photographs.  You are going to see a

23        body on the kitchen floor, you are going to see

1   photographs of gunshot wounds, maybe point blank to

2   the back of the head.  You will see coroner's

3   photographs.

4                    SALINA SNYDER:  Uh-huh.

5                    ATTY. INGRAM:  And some of these

6   coroner's photographs might actually be blown up.

7                    SALINA SNYDER:  Okay.

8                    ATTY. INGRAM:  It is likely that

9   some of this evidence will evoke an emotional

10  response from you.  Maybe sympathy or maybe anger, I

11  can't believe that somebody did this.

12                   SALINA SNYDER:  Right.

13                   ATTY. INGRAM:  Regardless of the

14  emotional response you, again, have to rise above

15  that emotional response to test the evidence to

16  determine whether it ties Donna to this offense.

17  Are you up to that?

18                   SALINA SNYDER:  Yeah.

19                   ATTY. INGRAM:  You will excuse me

20  while I act like a civics teacher for a second?

21                   SALINA SNYDER:  Okay.

22                   ATTY. INGRAM:  I used to apologize

23  for doing it, but I no longer do because the things

1     that I want to talk to you about are near and dear

2     to my heart.

3                    SALINA SNYDER:  Okay.

4                    ATTY. INGRAM:  About 225 years ago,

5     our forefathers declared independence and fought and

6     died for our freedom.

7                    SALINA SNYDER:  Uh-huh.

8                    ATTY. INGRAM:  And we are a free

9     country.

10                    SALINA SNYDER:  Yes.

11                    ATTY. INGRAM:  And they wrote laws

12    so that we would remain free.  Do you understand

13    that?

14                    SALINA SNYDER:  Yes.

15                    ATTY. INGRAM:  And one of the

16    things that they wrote was the presumption of

17    innocence.

18                    SALINA SNYDER:  Uh-huh.

19                    ATTY. INGRAM:  They wrote our laws

20    to curb or check governmental power.  And, you know,

21    if you want to make things easier for the government

22    to control people, you create a presumption of

23    guilt.  If we arrest you, you are presumed guilty,

1    do you see that?

2                    SALINA SNYDER:  Uh-huh.

3                    ATTY. INGRAM:  And in order to

4    protect us, they wrote the presumption of innocence.

5    How do you personally feel about the rule of law

6    that requires that trial jurors presume a Defendant

7    not guilty?

8                    SALINA SNYDER:  I feel like it's

9    fair, I think that it's --

10                    ATTY. INGRAM:  It's the way things

11   are done?

12                    SALINA SNYDER:  Yeah.  Yeah.

13                    ATTY. INGRAM:  You do understand

14   that your oath will require you to give Donna the

15   full benefit --

16                    SALINA SNYDER:  Right.

17                    ATTY. INGRAM:  -- of that

18   presumption throughout these proceedings until it is

19   removed, if ever, by proof beyond a reasonable

20   doubt.

21                    SALINA SNYDER:  Right, I

22   understand.

23                    ATTY. INGRAM:  But let's see if we

1    can look at this in a more humane or normal terms.

2    If you had a friend or family member, do you have

3    any brothers or sisters?

4                    SALINA SNYDER:  I have a younger

5    sister.

6                    ATTY. INGRAM:  Your sister is

7    accused of some kind of wrongdoing --

8                    SALINA SNYDER:  Uh-huh.

9                    ATTY. INGRAM:  And in your heart,

10   you feel that your sister didn't do whatever someone

11   is saying that she did.

12                   SALINA SNYDER:  Right.

13                   ATTY. INGRAM:  You would require

14   evidence that your sister did it before you would be

15   willing to change your mind, wouldn't you?

16                   SALINA SNYDER:  Yes.

17                   ATTY. INGRAM:  Does that sound to

18   you like you are presuming your sister innocent?

19                   SALINA SNYDER:  Yes.

20                   ATTY. INGRAM:  And if you are

21   presuming your sister innocent and the person who

22   was accusing her came to you and said, okay, here is

23   my evidence, you wouldn't take that evidence at face

1 value, would you, do you think you would look at at

2 with a critical eye to make sure it really amounted

3 to what they say it amounts to?

4     SALINA SNYDER: Yes.

5     ATTY. INGRAM: And will you do that

6 in this case?

7     SALINA SNYDER: Yes.

8     ATTY. INGRAM: And another thing

9 that our forefather's did, is directly related to

10 the presumption of innocence, is the burden of

11 proof?

12     SALINA SNYDER: Uh-huh.

13     ATTY. INGRAM: The State has

14 leveled these accusations and now it's time for the

15 State to put up or shut up. They got to prove them,

16 you understand that?

17     SALINA SNYDER: Yes.

18     ATTY. INGRAM: We have to one

19 degree or another a crime problem under foot in this

20 Country. Do you have any ideas what we, and by "we"

21 I mean society as a whole might be able to do to

22 begin addressing those crime problems?

23     SALINA SNYDER: No.

```
 1                    ATTY. INGRAM:  None?

 2                    SALINA SNYDER:  Not really, no.

 3                    ATTY. INGRAM:  Okay, how about if I

 4      give you some alternatives?

 5                    SALINA SNYDER:  Okay.

 6                    ATTY. INGRAM:  Education.

 7                    SALINA SNYDER:  Uh-huh.

 8                    ATTY. INGRAM:  Work on families,

 9      stiffer punishment, those are just three.  Anything

10      pop into your mind that you think might help us?

11                    SALINA SNYDER:  I think that

12      they're all important.

13                    ATTY. INGRAM:  They're all

14      important?

15                    SALINA SNYDER:  Oh, yes.

16                    ATTY. INGRAM:  So do I.  And you

17      understand that Donna is on trial for murder and not

18      for being a woman of loose moral character?

19                    SALINA SNYDER:  Right.

20                    ATTY. INGRAM:  And while the State

21      may prove that Donna was a loose woman, the State's

22      burden in this case is to prove that Donna

23      intentionally participated in the death of Robert
```

```
1    Fingerhut.  That is what they have to prove.  Will

2    you hold them to their burden of proving that?

3                    SALINA SNYDER:  Yes.

4                    ATTY. INGRAM:  I bet you never knew

5    that a cake could have legal ramifications, huh?

6                    SALINA SNYDER:  No.

7                    ATTY. INGRAM:  Okay, do you have a

8    handle on the four charges here?  Do you have any

9    questions about those?

10                   SALINA SNYDER:  Yeah, I understand

11   them.

12                   ATTY. INGRAM:  There are two

13   aggravated murder charges --

14                   SALINA SNYDER:  Right.

15                   ATTY. INGRAM:  But there is one

16   death.

17                   SALINA SNYDER:  Okay.

18                   ATTY. INGRAM:  Both of those

19   aggravated murder charges have the essential element

20   of purpose, and the Judge will tell you what purpose

21   is, but I believe he's going to tell you that

22   purpose is the same as intent.

23                   SALINA SNYDER:  Okay.
```

1                       ATTY. INGRAM:  And a person acts

2   purposely if it is his specific intent to cause a

3   specific result.  You got that?

4                       SALINA SNYDER:  Uh-huh.

5                       ATTY. INGRAM:  Would you agree with

6   me that the facts and circumstances surrounding an

7   act can shed some light on the actors intent.

8                       SALINA SNYDER:  Oh, yes.

9                       ATTY. INGRAM:  If I was going out

10   on the street to do some intentional wrongdoing of

11   some kind, would you expect me to try to cover my

12   tracks or leave a paper trail?

13                     SALINA SNYDER:  Cover your tracks.

14                     ATTY. INGRAM:  And if I were going

15   out here to do some intentional wrongdoing, would

16   you expect me to try to keep it a secret and maybe

17   do it under cover of darkness or would you expect me

18   to do it openly in broad daylight?

19                     SALINA SNYDER:  Secret.

20                     ATTY. INGRAM:  One of these

21   aggravated murder charges is prior calculation and

22   design aggravated murder, that is why Mr. Bailey was

23   up here playing with his pen.

3536

```
 1                    SALINA SNYDER:  Uh-huh.

 2                    ATTY. INGRAM:  The Judge will

 3    define prior calculation and design for you.

 4                    SALINA SNYDER:  Okay.

 5                    ATTY. INGRAM:  But they have to

 6    prove prior calculation and design, which is the old

 7    premeditation.

 8                    SALINA SNYDER:  Okay, yeah.

 9                    ATTY. INGRAM:  Don't ask me why

10    they changed what we call this, but they do it.

11                    SALINA SNYDER:  Okay.

12                    ATTY. INGRAM:  The aggravated

13    burglary charge and the aggravated robbery charge,

14    Counts 3 and 4, do you understand that those are the

15    death specifications to the aggravated murder

16    charges?

17                    SALINA SNYDER:  Okay.

18                    ATTY. INGRAM:  So there are two

19    death specs to each of the aggravated murder

20    charges.

21                    SALINA SNYDER:  Okay.

22                    ATTY. INGRAM:  And those death

23    specs are that the death was caused during an
```

1       aggravated burglary and an aggravated robbery, and

2       then the aggravated burglary and the aggravated

3       robbery is realleged in Counts 3 and 4.

4                       SALINA SNYDER:  Okay.

5                       ATTY. INGRAM:  Because of the

6       presumption of innocence and the fact that these

7       guys have the burden of proof, Donna, John, and I,

8       we don't have to do anything during the course of

9       this trial.  We can actually sit on our hands

10      because it's up to the State to prove it, or lose

11      it.  You got that?

12                      SALINA SNYDER:  Right, I

13      understand.

14                      ATTY. INGRAM:  Donna doesn't have

15      to testify, and if she elects not to testify, the

16      Judge will tell you that you can't hold it against

17      her.

18                      SALINA SNYDER:  Okay.

19                      ATTY. INGRAM:  You know, in our

20      everyday life, it's only natural to want to hear

21      both sides of any dispute.

22                      SALINA SNYDER:  Right.

23                      ATTY. INGRAM:  And this is one of

1    those hard things that we ask jurors to do.

2                    SALINA SNYDER:  Uh-huh.

3                    ATTY. INGRAM:  You may have to put

4    aside that natural inclination.  How would you feel

5    if she elected not to testify?

6                    SALINA SNYDER:  Probably like

7    you're saying, you want to hear both sides, but I

8    would be okay with it.

9                    ATTY. INGRAM:  Okay.  And let's

10   look at this.  Mr. Bailey used the example of proof

11   with a box or something, remember, and they put a

12   line on there?

13                   SALINA SNYDER:  Right.

14                   ATTY. INGRAM:  Well, because the

15   presumption of innocence, when he starts trying to

16   fill his box, that box is empty, right?

17                   SALINA SNYDER:  Right.

18                   ATTY. INGRAM:  And the fact that

19   Donna elects not to testify, doesn't pour anything

20   into that box.

21                   SALINA SNYDER:  Right.

22                   ATTY. INGRAM:  Now, there is a flip

23   side.  If she does testify, she is a witness like

```
 1    any other witness.  Do you understand that?

 2                    SALINA SNYDER:  Uh-huh.

 3                    ATTY. INGRAM:  And what I mean by

 4    that is, you have to use the same rules for

 5    determining her believability or credibility as you

 6    use for the other witnesses that testified.

 7                    SALINA SNYDER:  Okay.

 8                    ATTY. INGRAM:  But let me be frank

 9    about it.

10                    SALINA SNYDER:  Okay.

11                    ATTY. INGRAM:  So, she has an

12    interest or a stake in the outcome of this case.

13                    SALINA SNYDER:  Right, uh-huh.

14                    ATTY. INGRAM:  And that is

15    something, I would imagine, you would want to keep

16    in mind in determining whether you believe her?

17                    SALINA SNYDER:  Right.

18                    ATTY. INGRAM:  So, if we're going

19    to be fair about it, if you find that other

20    witnesses have an interest or a stake in this case,

21    you have to keep that in mind in determining whether

22    you believe them.

23                    SALINA SNYDER:  Right.
```

1           ATTY. INGRAM:  Would you agree with

2    me that whether somebody has something to gain by

3    their testimony is something that you might want to

4    consider?

5           SALINA SNYDER:  Yes.

6           ATTY. INGRAM:  And the Judge is

7    also going to talk to you about -- he's going to

8    give you a whole list of factors, and that's his job

9    not mine.  I'm not going to go through them -- I'm

10   holding my stomach because I didn't eat breakfast

11   and it's making some noise.  Listen, will you take

12   those factors and apply them to everybody that

13   testifies?

14          SALINA SNYDER:  Uh-huh.

15          ATTY. INGRAM:  And he's also going

16   to tell you about one factor that's called the test

17   of truthfulness that you employ in your daily life.

18   Well, I want to talk about that briefly.  Over the

19   time that you have been on this earth --

20          SALINA SNYDER:  Uh-huh.

21          ATTY. INGRAM:  -- you have had on

22   occasion to determine whether someone is being

23   straight with you or trying to hoodwink you.

3541

1      SALINA SNYDER:  Right.

2      ATTY. INGRAM:  And over the years,

3 I imagine that you have developed a sixth sense or

4 intuitive sense to help you in making that

5 determination?

6      SALINA SNYDER:  Right.

7      ATTY. INGRAM:  Well, the Judge is

8 going to tell you to bring that sixth sense, that

9 intuitive sense in here and apply it to everyone

10 that testifies.  Will you do that?

11      SALINA SNYDER:  Uh-huh.

12      ATTY. INGRAM:  Mr. Bailey told you

13 that the indictment, in essence, is how this case

14 began by the filing of an indictment.  This is not

15 evidence, it's a piece of paper that has one legal

16 purpose; to inform the Defendant of the nature of

17 the allegations leveled by the State.

18      SALINA SNYDER: Okay.

19      ATTY. INGRAM:  It's not evidence

20 because it would not be fair for an indictment to be

21 evidence, and let me explain that.  The grand jury

22 process is a one-sided thing.  The Defendant doesn't

23 know about it, the Defendant's lawyers don't know

1    about it.  There is no Judge there, the only person

2    that is there is the prosecuting attorneys and the

3    prosecuting attorneys' witnesses.

4                    SALINA SNYDER:  Okay.

5                    ATTY. INGRAM:  There is no one

6    there to test what is said.

7                    SALINA SNYDER:  Uh-huh.

8                    ATTY. INGRAM:  It would just be

9    unfair to consider an indictment as evidence.  Do

10   you agree with that?

11                   SALINA SNYDER:  Yes.

12                   ATTY. INGRAM:  But during the

13   course of the trial, the indictment will be read to

14   you, and I don't know whether it's read to you one

15   time, six times or twelve times, nowhere along that

16   line does it magically transform into evidence, you

17   got a handle on that?

18                   SALINA SNYDER:  Yes, I understand.

19                   ATTY. INGRAM:  All it does is

20   explain the legal issues, okay?

21                   SALINA SNYDER:  Okay.

22                   ATTY. INGRAM:  Now, you would agree

23   with me that Alf and green martians and sprinkling

1    fairy dust on yards, none of that stuff has anything

2    to do with what happens in the Courtroom?

3                    SALINA SNYDER:  Right.

4                    ATTY. INGRAM:  Reasonable doubt is

5    a doubt based on reason common sense.

6                    SALINA SNYDER:  Uh-huh.

7                    ATTY. INGRAM:  Have you ever come

8    up to a T-intersection and had someone in the car

9    with you and you looked left, and maybe it was your

10   hubby or maybe it was a friend, and your passenger

11   said, that's okay, just go ahead and pull out, it's

12   clear?

13                   SALINA SNYDER:  Uh-huh.

14                   ATTY. INGRAM:  Did you pull out or

15   did you look?

16                   SALINA SNYDER:  I looked.

17                   ATTY. INGRAM:  Because you had

18   reasonable doubt as to whether you could proceed

19   into the intersection?

20                   SALINA SNYDER:  Right.

21                   ATTY. INGRAM:  Proof beyond a

22   reasonable doubt requires that you be firmly

23   convinced, as Mr. Bailey says, to a moral certainty,

1   and it is proof of such character that you would be

2   willing to rely and act upon it in the most

3   important of your own affairs.  And you've made

4   important decisions, haven't you?

5                    SALINA SNYDER:  Yes.

6                    ATTY. INGRAM:  I am going to use an

7   important decision that I made as an example.

8                    SALINA SNYDER:  Okay.

9                    ATTY. INGRAM:  Let's say I want to

10  buy a house.  Well, that's a big decision for me so

11  some times when I make big decisions, I get a piece

12  of paper and I put a line down the middle of it, and

13  I write the good things on one side and the bad

14  things on the other side.  On the left-hand side are

15  the good things; four bedrooms, I need four

16  bedrooms, so I write that.  Three bathrooms, I need

17  three bathrooms, I write that down.  My wife likes

18  the house, so I write that down.  It's in a good

19  school system, and I write that down.  And it's in a

20  good neighborhood, so I write that down.

21                    On the negative side, it's a 50 year old

22  house, so I am concerned a little bit about the

23  structural stability of the house.  I spy some

3545

1    plumbing problems, so I write that down, and I don't

2    know that I can come up with enough money every

3    month to pay the mortgage payment, so I write that

4    down.  Now, if I can scratch all of these negatives,

5    I become more certain that I am making the right

6    decision, right?

7            SALINA SNYDER:  Right.

8            ATTY. INGRAM:  So, I call a housing

9    contractor to come out and look at this house for

10   me, will you please.  He comes and looks at it and

11   says, Ingram, this house is brick solid, I can

12   strike the structural stability question then.  I

13   call a plumber who says, I can fix this plumbing for

14   $200.00 or $300.00, so I can scratch that.

15           SALINA SNYDER:  Uh-huh.

16           ATTY. INGRAM:  Now, I am left with

17   whether I can pay the mortgage payments.  I go to

18   the bank, I say, hey, how about extending this loan

19   five years.  Instead of 15, make it 20, and instead

20   of 20 make it 25, so the amount of money I got to

21   pay goes down?  No.  How about decreasing the

22   interest rate?  No.  I try to get a raise.  No.  No

23   matter what I do, I still have a reasonable question

1       --

2                       SALINA SNYDER:  Uh-huh.

3                       ATTY. INGRAM:  -- or a reasonable

4       doubt as to whether I can make the monthly mortgage

5       payments.  As long as I have one reasonable doubt

6       left on that right side, I cannot say beyond a

7       reasonable doubt that that decision is the right

8       thing for me.  Do you see that?

9                       SALINA SNYDER:  Yes.

10                      ATTY. INGRAM:  Do you see it's the

11      same thing here.

12                      SALINA SNYDER:  Uh-huh.

13                      ATTY. INGRAM:  And if you have one

14      reasonable doubt as to Defendant's guilt or

15      innocence, the State of Ohio has not met their

16      burden of proof.  Do you see that?

17                      SALINA SNYDER:  Yes.

18                      ATTY. INGRAM:  And a second phase,

19      if we ever get to a second phase, if you have one

20      reasonable doubt as to the appropriate penalty, the

21      State has not met its burden of proof.  Do you see

22      that?

23                      SALINA SNYDER:  Uh-huh.

1           ATTY. INGRAM:  Circumstantial

2    evidence, I'm not going to reexplain it because Mr.

3    Bailey explained it.  But in that scenario he gave

4    you where he asked you to draw the inference that it

5    rained the night before, --

6           SALINA SNYDER:  Uh-huh.

7           ATTY. INGRAM:   -- you've got a lot

8    of solid facts from which to make that inference,

9    don't you?

10          SALINA SNYDER:  Right.

11          ATTY. INGRAM:  You heard the

12   thunder and you see the lightning, there is a guy on

13   the radio telling you that a storm is coming, you

14   hear the rain on your roof.

15          SALINA SNYDER:  Right.

16          ATTY. INGRAM:  Well, when you were

17   asked to make inferences, you have to look for a

18   solid basis in fact, and will you do that?

19          SALINA SNYDER: Yes.

20          ATTY. INGRAM:  Now, let me give you

21   an example and I am going to sit down.  If it's the

22   middle of February, and I look out my bedroom window

23   which is upstairs on the second floor, and it's

3548

1    11:00 o'clock at night I see my grass, I go to sleep

2    and wake up and there is six inches of snow on the

3    ground.  I know it snowed.

4                    SALINA SNYDER:  Right.

5                    ATTY. INGRAM:  If I see footprints

6    from the house to the right of me to my front door,

7    from my front door to the house to the left of me, I

8    can also infer that someone walked in the snow.

9                    SALINA SNYDER:  Right.

10                    ATTY. INGRAM:  I certainly can't

11   infer when they walked in the snow unless I have

12   some training and I go out and start feeling the

13   stuff, but I couldn't do that.

14                    SALINA SNYDER:  Right.

15                    ATTY. INGRAM:  But I start to

16   stretch my inferences or maybe I even pile an

17   inference on an inference, and it's a Sunday

18   morning, and I want my paper, and I see footprints

19   in that snow, and I infer that it was the paperboy

20   that left the footprints.

21                    SALINA SNYDER:  Uh-huh.

22                    ATTY. INGRAM:  Which seems

23   reasonable to me at the time.

1              SALINA SNYDER:  Uh-huh, right.

2              ATTY. INGRAM:  So, go downstairs

3    and go to the front door and I open up the front

4    door expecting to find my paper, and there is my

5    Giant Eagle or Kroger coupons.  So, the farther away

6    from the facts established by direct evidence you

7    get, the more careful you got to be with these

8    inferences, do you see that?

9              SALINA SNYDER:  Right.

10             ATTY. INGRAM:  And would you agree

11   with me that circumstantial evidence is like a

12   chain, and it's only as strong as it's weakest link?

13             SALINA SNYDER:  Right, yeah.

14             ATTY. INGRAM:  Now, that we have

15   all taken up quite enough of your time and

16   attention, is there anything that has popped into

17   your mind that you would like to share with any of

18   us?

19             SALINA SNYDER:  No.

20             ATTY. INGRAM:  I thank you, very

21   much.

22             SALINA SNYDER:  Thank you.

23             THE COURT:  Mr. Bailey?

1          ATTY. BAILEY:  Pass, Your Honor.

2          ATTY. INGRAM:  Pass.

3          THE COURT:  You will be in the pool

4    from which this jury will be selected.  You should

5    call that number given to you Monday evening after

6    4:30.

7          SALINA SNYDER:  Okay.

8          THE COURT:  Again, I would remind

9    you not to read anything in the newspaper, watch

10   anything on T.V., have any discussion.  If anybody

11   approaches you about what is going on, you tell

12   them, I will talk to you after it's over, okay?

13         SALINA SNYDER:  Right.

14         THE COURT:  Thank you, very much.

15         SALINA SNYDER:  Thank you.

16

17   (Whereupon, Salina Snyder, Juror Number 228, was

18   excused until further notice.)

19

20

21   (At 10:50 a.m., a recess was taken.)

22

23   (Back in Court at 11:00 a.m.)

3551

1      **RONALD WYNN, JUROR NUMBER 229**

2  **EXAMINATION BY THE COURT:**

3

4      THE COURT:  Ron, how are you doing

5 this morning?

6      RONALD WYNN:  Good.

7      THE COURT:  Do you wish me to make

8 inquiries about this?

9      ATTY. INGRAM:  Yes, Your Honor.

10     ATTY. BAILEY:  Yes, Your Honor.

11     THE COURT:  Ron, I see from reading

12 the information sheet that you filled out, that you

13 suffer from diabetes.  Do you think that would cause

14 a problem?  We don't -- you know a lot of people

15 have diabetes and there is different degrees of it,

16 do you have problems keeping it regulated?

17     RONALD WYNN:  Not really, I mean,

18 the only problem is now it's just like it's been

19 hard for me, I have been waiting all of that time,

20 and I needed to eat when I got my shot at 10:00

21 o'clock, that's like -- it was like the same thing

22 the first day too.

23     THE COURT:  Is it a situation where

3552

```
 1        you need regular food or something that you can eat

 2        something in between?

 3                        RONALD WYNN:  I need to get my

 4        shots and eat on time.

 5                        THE COURT:  Okay, you have a

 6        problem.

 7                        RONALD WYNN:  Yeah.

 8                        THE COURT:  Well, I will let you

 9        gentlemen inquire.

10                        ATTY. BECKER:  We don't have an

11        objection, particularly, given the fact that he may

12        be sequestered.  I know the time in there could be

13        hours, it could be days in there, and if he's got to

14        regularly eat, we don't have an objection to Mr.

15        Wynn being excused.

16                        ATTY. INGRAM:  Either does the

17        defense.

18                        THE COURT:  Okay, no objection?

19                        ATTY. INGRAM:  No objection.

20                        THE COURT:  Ron, we thank you for

21        coming in.  We're sorry to put you through this.  We

22        have to go through a procedure.  Good luck to you.

23        Thank you.
```

1              RONALD WYNN:  Thank you.

2

3     (Whereupon, Ronald Wynn, Juror Number 229, was

4     excused.)

5

6              THE COURT:  All right, bring in Mr.

7     Hitt.

8

9

10          **THOMAS J. HITT, JUROR NUMBER 227**

11    **EXAMINATION BY THE COURT**:

12

13              THE COURT:  Good morning.

14              THOMAS J. HITT:  Good morning.

15              THE COURT:  How are you doing?

16              THOMAS J. HITT:  Pretty good.

17              THE COURT:  I know you probably

18    take a shower with that hat, but it would be

19    appropriate to take that off, okay?

20              THOMAS J. HITT:   Yep.

21              THE COURT:  We get people in here

22    once in a while that I know they go to bed with

23    their hat on, and I don't get too worked up about

1     that but --

2                          ATTY. INGRAM:  Your Honor, may we

3     approach?

4                          THE COURT:  Yes.

5

6     (Bench conference.)

7

8                          THE COURT:  Mr. Hitt, I noticed on

9     the last thing here that your girlfriend is

10    pregnant, how far along?

11                         THOMAS J. HITT:  I'm not sure yet,

12    her first appointment is June 4th, I think.

13                         THE COURT:  The baby is due June

14    4th?

15                         THOMAS J. HITT:  No, her first

16    doctor appointment is June 4th, we just found out.

17                         THE COURT:  Oh, okay.  Do you have

18    other commitments through another court apparently?

19                         THOMAS J. HITT:  Yeah.

20                         THE COURT:   Would that make it

21    difficult for you to sit on this?

22                         THOMAS J. HITT:  I got to go to

23    that DUI school May 15th through the 18th.

```
 1                         THE COURT:   That's right in the

 2        middle of this trial.

 3                         ATTY. BECKER:   No objection.

 4                         ATTY. INGRAM:   No objection.

 5                         THE COURT:   No objection for

 6        dismissing for cause?

 7                         ATTY. INGRAM:   Right.

 8                         ATTY. BAILEY:   Correct.

 9                         THE COURT:   Listen, we thank you

10        for showing up.   Thank you for your time.

11                         THOMAS J. HITT:   Is that it?

12                         THE COURT:   Yes, that's it.   Good

13        luck.

14

15

16        (Whereupon, Thomas J. Hitt, Juror Number 227, was

17        excused.)

18

19

20                         THE COURT:   All right, Regina

21        Palette.

22

23
```

1        **REGINA C. PALETTE, JUROR NUMBER 233**

2    **EXAMINATION BY THE COURT:**

3

4                    THE COURT: Good morning.

5                    REGINA PALETTE:  Good morning.

6                    THE COURT:  Is that Palette?

7                    REGINA PALETTE:  Yeah.

8                    THE COURT:  You read that handout

9    that was given to you?

10                    REGINA PALETTE:  Yes.

11                    THE COURT:  I see you had two years

12   at Thiel, that's my alma mater.  You can't be all

13   bad, I guess, right.  Regina, if I may call you by

14   your first name.  Did you read that handout  that

15   was given to you?

16                    REGINA PALETTE:  Yes.

17                    THE COURT:  Okay, you know this is

18   a case filed by the State of Ohio against Donna

19   Roberts, the lady seated over there.  And she's been

20   charged with two counts of aggravated murder with

21   specifications.  Under the law of Ohio, a person

22   that is convicted of murder does not necessarily

23   face the death penalty.  It's only aggravated murder

3557

```
1     with specifications.  The specifications come about
2     because of the statute that the legislature adopted
3     that says that if the murder is done under -- with
4     certain accompanying circumstances such as you kill
5     a police officer, kill the governor, or in this
6     case, the acts are committed in conjunction with an
7     aggravated burglary or robbery, and if those are
8     attached to the indictment, they become
9     specifications, meaning that if you're found guilty
10    of aggravated murder with the specification, then
11    the jury is called upon in the second phase of the
12    trial to consider whether or not it would be
13    appropriate from the facts of this case to impose a
14    death penalty, or some lesser sentence of life
15    without chance of parole, or life with chance of
16    parole after 25 or 30 years, okay.
17                    REGINA PALETTE:  Okay.
18                    THE COURT:  Now, it's often the
19    question as to why we even go into this because if
20    the prosecution fails to prove all of the elements
21    necessary to establish their case beyond a
22    reasonable doubt, then this jury will appropriately
23    return a verdict of not guilty, we wouldn't go into
```

3558

1    a second phase.

2              But if the parties, both the State and

3    the Defendant, are not permitted at this point to

4    know something about potential jurors, then we could

5    have a jury seated and if you were to arrive at the

6    second phase, you might have somebody on that jury

7    that believes strongly in an eye for an eye.  And

8    that type of person could not be fair to the

9    Defendant.  Or a person who under no circumstances

10    feel that they could ever make that decision of life

11    or death, that would not be fair to the State.  So

12    these questions are felt necessary in order that

13    both sides are comfortable with who will eventually

14    sit on this jury.  And the criteria that is actually

15    used is are each of these people able to follow the

16    law.  Whether they personally agree or disagree with

17    the law, are they able to follow and impose the law.

18    And that requires at that second phase of the trial

19    that each juror listens to the evidence presented by

20    the prosecution.

21              During a trial, as you know by now, it's

22    only the prosecution that has any burden of proof.

23    The Defendant need do nothing, if they care not to.

1       The State either wins or loses their own case, but

2       the State will present at that second phase

3       aggravating circumstances, which are reasons they're

4       presenting to the jury as to why the jury should

5       consider and impose the death penalty.  The jury has

6       to weigh those against mitigating factors; those are

7       reasons that speak in favor of not imposing the

8       death penalty based on the facts of this case.  And

9       if the State fails to prove beyond a reasonable

10      doubt that those aggravating circumstances outweigh

11      the mitigating factors, then the State is not

12      entitled to a death penalty sentence.

13              The other area that you will be asked

14      about, along with some other things, is primarily in

15      regard to pretrial publicity.  This case generated

16      the usual amount of interest by the media since it

17      has occurred and some of the jurors will have read

18      about it and some of them will of had discussions

19      about it.  Some have no recollection of the matter.

20      But it is important that each juror is able to

21      assure these folks that whether they have any prior

22      knowledge of the case that they're able to set aside

23      that and listen to the evidence presented in this

3560

```
 1    Courtroom.  For this case to be tried fairly, it
 2    will have to be decided on the evidence the
 3    prosecution presents within these four walls, and to
 4    follow the law as given by the Court, okay?
 5                    REGINA PALETTE:  Okay.
 6                    THE COURT:  Mr. Becker.
 7                    ATTY. BECKER:  Thank you, Your
 8    Honor.
 9    EXAMINATION BY ATTORNEY BECKER:
10                    ATTY. BECKER:  Good morning, is it
11    Mrs. Palette, am I pronouncing that correctly?
12                    REGINA PALETTE:  Good morning, yes.
13                    ATTY. BECKER:  My name is Chris
14    Becker, and I work at the County Prosecutor Office,
15    and Mr. Bailey and I are both on this case.  He was
16    here probably a little over three weeks ago when you
17    were in the big courtroom, so I can assume that you
18    remember him.
19                    REGINA PALETTE:  Yeah.
20                    ATTY. BECKER:  Mr. Ingram and Mr.
21    Juhasz were also in the Courtroom with their client
22    Donna Roberts.  What we're going to try to do is
23    sort through a lot of this, but before we do a whole
```

1      lot, I want to go in a different direction very

2      briefly.  You indicate on your questionnaire that

3      this would be a financial burden to you?

4                         REGINA PALETTE:  Yeah.

5                         ATTY. BECKER:  Okay, how so?

6                         REGINA PALETTE:  My employer is not

7      going to pay for anything.

8                         ATTY. BECKER:  Okay, and I assume

9      you have expenses maybe from college?

10                        REGINA PALETTE:  Yeah, yeah.

11                        ATTY. BECKER:  Student loans?

12                        REGINA PALETTE:  Loans, yeah, and

13     bills.

14                        ATTY. BECKER:  Car payment?

15                        REGINA PALETTE:  Yeah.

16                        ATTY. BECKER:  Is this going to be

17     too much of a financial burden or hardship for you

18     to sit as a juror in this case for maybe three or

19     maybe even four weeks to be away from your job from

20     up to a month or three weeks?

21                        REGINA PALETTE:  Yeah, it would.

22                        ATTY. BECKER:  You don't feel that

23     you could give your attention to this case with

1    those financial problems that you have incurred?

2                    REGINA PALETTE:  Yeah, I have a lot

3    of bills from college.

4                    ATTY. BECKER:  All right, and

5    obviously that is probably one of the reasons that

6    you're still living at home.

7                    REGINA PALETTE:  Yeah, yeah.

8                    ATTY. BECKER:  I don't know if we

9    want to --

10                    ATTY. INGRAM:  I want to ask the

11    right and left question.

12                    ATTY. BECKER:  All right, well, I

13    want to thank you, very much, for coming down here

14    today and being part of this jury for I guess about

15    a month now.  But they're going to have some

16    questions for you.

17

18    **EXAMINATION BY ATTORNEY JUHASZ:**

19                    ATTY. JUHASZ:  Good morning.

20                    REGINA PALETTE:  Good morning.

21                    ATTY. JUHASZ:  I am John Juhasz and

22    this is Jerry Ingram, as you probably remember from

23    a couple of weeks ago.  Before we excuse you there

3563

1    are a couple of things that we do want to ask you

2    about.

3                    REGINA PALETTE:  Okay.

4                    ATTY. JUHASZ:  On April 8th when

5    you came here to the big Courtroom, can you tell us

6    when you went into the big set of doors, where you

7    sat or stood, did you go into the right or the left

8    or the middle?

9                    REGINA PALETTE:   To the left.

10                   ATTY. JUHASZ:  To the left?

11                   REGINA PALETTE:  Yes.

12                   ATTY. JUHASZ:  Okay.  And did you

13   end up going up to the front, or were you in the

14   back, or were you standing, or were you seated?

15                   REGINA PALETTE:  I was standing.

16                   ATTY. JUHASZ:   You were standing?

17                   REGINA PALETTE:  Yeah.

18                   ATTY. JUHASZ:  Can you tell me

19   where?

20                   REGINA PALETTE:  Towards the front.

21                   ATTY. JUHASZ:  Did you hear

22   anybody during that morning, any of the other people

23   who were assembled there, discuss Donna Roberts or

3564

```
 1        anything about the case or why you were there?
 2                       REGINA PALETTE:  No.
 3                       ATTY. JUHASZ:  Did you have any
 4        discussions with any people yourself about the case
 5        or why you were there?
 6                       REGINA PALETTE:  No.
 7                       ATTY. JUHASZ:  Okay, so you
 8        overheard nothing about Miss Roberts or the case or
 9        anything like that?
10                       REGINA PALETTE:  No.
11                       ATTY. JUHASZ:  Only what Judge
12        Stuard said once he came out?
13                       SALINA SNYDER:  Yeah.
14                       ATTY. JUHASZ:  Thank you, I
15        appreciate it.
16                       THE COURT:  Miss Palette, we thank
17        you for your attendance and your time.  You are
18        excused, and thank you.
19
20
21        (Whereupon, Regina Palette, Juror Number 233, was
22        excused.)
23
```

```
 1                          ATTY. BAILEY:  That's all we have
 2      until this afternoon.
 3                          THE COURT:  All right, see you this
 4      afternoon.
 5

 6      (At 11:40 a.m., a luncheon recess was taken.)
 7

 8      (Back in Court at 1:20 p.m.)
 9

10

11                  JESSIE CHASE, JUROR NUMBER 238
12      EXAMINATION BY THE COURT:
13                          THE COURT:  Good afternoon, ma'am,
14      are you Miss Chase?
15                          JESSIE CHASE:  Yes, I am.
16                          THE COURT:  Ma'am, did read that
17      handout that was given to you?
18                          JESSIE CHASE:  Yes.
19                          THE COURT:  You have some idea what
20      we're here about then?
21                          JESSIE CHASE:  Yes, sir.
22                          THE COURT:  In this case, the State
23      of Ohio has brought two aggravated murder charges
```

3566

```
 1        with specification against Donna Roberts.  In Ohio,

 2        just because a person is found guilty of murder,

 3        does not mean that they face the death penalty.  A

 4        person has to be charged with aggravated murder with

 5        attached specifications.  The State has to prove

 6        beyond a reasonable doubt the elements of the murder

 7        and the specifications before the possibility of the

 8        death penalty arises.  If you kill a person that is

 9        maybe murder.  If you kill a person that happens to

10        be a policeman, that is attached as a specification

11        and that becomes a capital murder case.  The burden

12        is always on the State to prove each and every

13        element of any crime that is charged against an

14        individual.  The State wins or loses their case.

15        The Defendant need do nothing if they care not to

16        during the course of the trial.  They have the right

17        to remain silent and there is a presumption of

18        innocence.

19             The question arises why do we get into

20        questioning prospective jurors about their thoughts

21        on the death penalty, because that may never arise

22        if the State fails to maintain their burden of proof

23        during the trial, then this jury would properly
```

1       return a verdict of not guilty.  But we don't know

2       what is going to happen because there has been no

3       evidence produced yet.  So, we have to take into

4       account the possibility that if the State does prove

5       their case, this case could go into a second phase.

6       And if we found out at that point in time that we

7       had somebody on the jury that believed in an eye for

8       an eye, then that person could not possibly be fair

9       to the Defendant.  And if you had somebody who under

10      no circumstances could ever participate in any

11      endeavor whereby they had to make a decision whether

12      a person forfeited their life or not, well, a person

13      of that belief could not give the State a fair

14      trial.  The State has the right to ask for the death

15      penalty, if they prove all of those things that we

16      went over.  So, the purpose of the questioning is to

17      find out what your view of the death penalty is, and

18      to see whether you would be comfortable and whether

19      you're able to sit and decide such a matter, if it

20      arises.

21              Everybody who sits on this jury is going

22      to have some view of the death penalty, some more in

23      favor, some less.  But it's whether you have a fixed

3568

1    view that would interfere with your ability to

2    follow the law.  Now, whatever your personal belief

3    is is fine, these folks will respect that.  It's

4    just that they have a right to know what your view

5    is.

6            The other issue will be about pretrial

7    publicity, and many of the people have read or heard

8    something about the case, which is not unusual of a

9    case of this type.  But the issue again is whether

10    or not each prospective -- each juror will be able

11    to decide this matter on the evidence produced in

12    Court.  You can't have a trial by what somebody read

13    in the newspaper.  It has to be the prosecutor

14    presents the evidence here, and that is what the

15    case has to be determined on, okay?

16            JESSIE CHASE:  Yes.

17            THE COURT:  Mr. Becker, are you

18    up?

19            ATTY. BECKER:  Yes, sir.  Thank

20    you, Your Honor.

21    **EXAMINATION BY ATTORNEY BECKER**:

22            ATTY. BECKER:  Good afternoon, Mrs.

23    Chase.

1                        JESSIE CHASE:  Good afternoon.

2                        ATTY. BECKER:  My name is Chris

3       Becker, and I work for the County Prosecutor's

4       Office.  And this is Mr. Bailey, and I believe about

5       three weeks when you were in the Courtroom down the

6       hall, he was in there.

7                        JESSIE CHASE:  I remember.

8                        ATTY. BECKER:  And I was not in

9       that Courtroom at the time.  I don't know -- are our

10      microphones on?  You may want to speak up just so

11      that Mr. Ingram and Mr. Juhasz can hear you.

12                       JESSIE CHASE:  Can you hear now?

13                       ATTY. INGRAM:  Yes.

14                       ATTY. BECKER:  I didn't want them

15      to get sore necks from leaning over and trying to

16      listen to you.  Before I get into some of the issues

17      here, let me ask, I notice on your questionnaire

18      that, first of all, you apparently live in Trumbull

19      County but it's a Windham mailing address?

20                       JESSIE CHASE:  I live in Trumbull

21      County but it's a Windham address and a Windham

22      phone number.

23                       ATTY. BECKER:  All right.

```
 1                     JESSIE CHASE:  But I pay my taxes

 2     here in Trumbull County and I vote in Trumbull

 3     County.

 4                     ATTY. BECKER:  Okay, I was just a

 5     little curious how you got the Windham address and

 6     serve in Trumbull County.  You have some things that

 7     you feel may prohibit you from being a juror in this

 8     case?

 9                     JESSIE CHASE:  I do because some

10     times, as you said, living in Windham, which is

11     about 15 miles from here, and I suffer high blood

12     pressure, and some days I don't really feel like

13     driving.  And there is no one that I know that is

14     serving on the jury that lives out there, at least I

15     heard anyone mentioned?

16                     ATTY. BECKER:  So, it may be

17     difficult for you to get in -- now, did I read this

18     right, that you don't drive or you don't feel safe

19     to drive?

20                     JESSIE CHASE:  I drive, but I don't

21     feel safe to drive some days.

22                     ATTY. BECKER:  All right.  Do you

23     think that if you had to serve on this jury for
```

```
 1        three or four weeks that it would be too much of a

 2        hardship on you or would it create a problem?

 3                         JESSIE CHASE:  I think so.

 4                         ATTY. BECKER:   You don't think

 5        that you could come down here from Windham for three

 6        weeks in a row?

 7                         JESSIE CHASE:  I mean, the sitting

 8        is okay, but I mean driving, getting here.

 9                         ATTY. BECKER:  It's the actual

10        getting here?

11                         JESSIE CHASE:  Uh-huh.

12                         ATTY. BECKER:  And that's because

13        of your health?

14                         JESSIE CHASE:  Yes.

15                         ATTY. BECKER:  And I guess it's due

16        to your blood pressure, and you get dizzy and that

17        makes it difficult for you to drive.

18                         JESSIE CHASE:  Yeah, and I could of

19        brought a statement in from the doctor too.

20                         ATTY. BECKER:   Well, I guess what

21        I am asking you is, because of those health

22        concerns, would you rather not serve in this case?

23                         JESSIE CHASE:  Well, I'd rather
```

1    not.

2                    ATTY. BECKER:   Because you have

3    these health concerns and concerns specifically

4    about your blood pressure being so high --

5                    JESSIE CHASE:  Yes.

6                    ATTY. BECKER:  -- that you may not

7    feel comfortable driving?

8                    JESSIE CHASE:  Uh-huh, and I have

9    no one at my home that could, you know, transfer me

10   back and forth because my daughter she works day.

11                   ATTY. BECKER:   So, you have a

12   transportation problem?

13                   JESSIE CHASE:  Yes.

14                   ATTY. BECKER:  Okay.  Do you want

15   to ask the left and right question?

16                   ATTY. INGRAM:  Yes.

17                   ATTY. BECKER:  They're going to ask

18   you some questions, but I think we're going to

19   excuse you, okay.  But let them ask their questions.

20                   JESSIE CHASE:  Help themselves.

21   **EXAMINATION BY ATTORNEY INGRAM**:

22                   ATTY. INGRAM: Good afternoon,

23   ma'am, how are you doing?

1            JESSIE CHASE:  Good afternoon, all

2     right.

3            ATTY. INGRAM:  Do you remember

4     coming here Tuesday, about three weeks ago, and we

5     were sitting in the other Courtroom -- in the big

6     Courtroom down at the other end of the hall here?

7            JESSIE CHASE:  Was it Tuesday?  On

8     the 8th of April, wasn't it?

9            ATTY. INGRAM:  Yes, ma'am.

10            JESSIE CHASE:  Well, it was the 8th

11     of April, do you remember coming down?

12            JESSIE CHASE:  Yes, I remember

13     coming.

14            ATTY. INGRAM:  When you came into

15     the Courtroom did you manage to find a seat, or did

16     you have to stand up?

17            JESSIE CHASE:  When I first came in

18     it was crowded, and someone moved over a little

19     further and I sat down.

20            ATTY. INGRAM:  Do you remember if

21     you sat down, as you walked in, was it on your left

22     or on your right, or was it straight ahead?

23            JESSIE CHASE:   Do you mean when I

1    came into the room?

2                    ATTY. INGRAM:  Yes, ma'am.

3                    JESSIE CHASE:  It was on my -- when

4    I came into the room and sat down, it was on my

5    right.

6                    ATTY. INGRAM:  While you were in

7    there, did anyone talk to you about this case,

8    discuss this case with you at all?

9                    JESSIE CHASE:  No, because I didn't

10   even know -- of all the people there, I didn't know

11   anyone there.

12                   ATTY. INGRAM:  Okay, did you hear

13   anyone talk about the case?

14                   JESSIE CHASE:  No, I didn't know

15   what the case was going to be until the Judge came

16   in.

17                   ATTY. INGRAM:  And told you what

18   it was about?

19                   JESSIE CHASE:  Yes, when he came

20   in.

21                   ATTY. INGRAM:  Okay, thank you,

22   very much.  You have a good day.

23                   JESSIE CHASE:  You too.

```
 1                         THE COURT:  Did your granddaughter

 2      graduate?

 3                         JESSIE CHASE:  Yes, she did.

 4                         THE COURT:  What did she major in?

 5                         JESSIE CHASE:  In communications.

 6                         THE COURT:  Wonderful, that is a

 7      good university.

 8                         JESSIE CHASE:  Yes, 12,000

 9      graduated.

10                         THE COURT:  Very good.  Listen, you

11      are excused and we thank you for your time.  Have a

12      good day.

13                         JESSIE CHASE:  Thank you, you too.

14

15      (Whereupon, Jessie Chase, Juror Number 238, was

16      excused.)

17

18                         ATTY. BAILEY:  Judge, for the

19      record; I had a question about Juror Number 230,

20      William Danielson.  Apparently, I talked to Connie

21      and Laurie, we needed to excuse him earlier.  He was

22      suppose to call back and there was a problem with

23      work and him getting paid, so we're going to  have
```

1 to do an entry.

2      THE COURT:  Any objection to

3 dismissing for cause?

4      ATTY. INGRAM:  That juror?

5      THE COURT:  This last one for

6 cause, yes, but the one that Ken is talking about.

7      ATTY. JUHASZ:  What I have been

8 trying for the last 20 minutes but he keeps bringing

9 this up, is that we're going to do an entry that is

10 going set forth every juror that we have excused in

11 this case.

12      THE COURT:  That might be wise

13 because we had missed some otherwise, right?

14      ATTY. JUHASZ:  But he has asked to

15 place on the record about this juror and we have no

16 objection.

17      THE COURT:  Kenneth will leave no

18 stone unturned, that's okay.  All right, one more.

19 Bring in Mr. Taylor.

20

21

22

23

### LANCE M. TAYLOR, JUROR NUMBER 240

**EXAMINATION BY THE COURT:**

THE COURT: Good afternoon, Mr. Taylor.

LANCE M. TAYLOR: Good afternoon.

THE COURT: You just read that handout that was given to you?

LANCE M. TAYLOR: Yes, I did.

THE COURT: Do you understand that we are here on an aggravated murder case called State of Ohio against Donna Roberts.

LANCE M. TAYLOR: Yes, sir.

THE COURT: In Ohio, every murder does not necessarily raise the possibility of a jury being called upon to look at the death penalty. It's only when it's an aggravated murder that is proven beyond a reasonable doubt by the State with attached specifications. An example of a specification would be if somebody murdered a policeman, that would be attached as a specification which, therefore, raises the spector of the death penalty.

LANCE M. TAYLOR: Okay.

1              THE COURT:  The State is required

2    to prove all elements of the aggravated murder

3    charge with all of the elements of the specification

4    in order to be able to ask this jury for a finding

5    of guilty.  If they failed to do that then, of

6    course, the jury would return a verdict of not

7    guilty.  That would be the end of the trial.

8              Now, we don't know what this jury is

9    going to do, because we won't know until they heard

10   the evidence and make their decision, but we have to

11   assume that there is a possibility at least that the

12   State may prove their case, which means that the

13   matter could go to a second phase of the trial.  And

14   we cannot wait until that arises to ask people what

15   their personal views are on the death penalty.  If

16   we did it that way, we might find somebody on that

17   jury that believed in an eye for an eye, and if you

18   take a life, you should forfeit your life.  Well,

19   that type of person, although they're entitled to

20   their belief, could not be a fair juror to a

21   Defendant.  And, likewise, a person who, for

22   whatever reasons, religious, moral, ethical, could

23   never make that decision on deciding whether someone

1     lives or dies.  That type of person can never be

2     fair to the State.

3             So, the system is set up that both sides

4     have an opportunity to ask questions of every

5     prospective juror to see whether they're comfortable

6     with any particular person sitting on this jury.

7     The qualification in that regard to a juror has to

8     be that no matter what their personal preference

9     regarding the issue of the death penalty, they have

10    to be able to follow the law, and that is to follow

11    the law as given by the Court no matter what they

12    may think, one way or the other.  Okay?

13             LANCE M. TAYLOR:  Yes, sir.

14             THE COURT:  The second issue, the

15    primary issue, will be whether you have been exposed

16    to any pretrial publicity.  This case, as any case

17    of this nature, generated its fair share of media

18    attention.  Some of the people read about it and

19    some know or knew more about it than others.  Some

20    knew nothing about it that we have interviewed.

21    But, again, that isn't so important if the person is

22    able to assure both sides that even though they may

23    have heard something about the case, it won't

1    influence their ability to sit and fairly decide

2    this matter on the evidence produced in this

3    Courtroom.  If somebody would decide this case on

4    something that they think they have read in the

5    paper rather than on the evidence, then someone

6    isn't going to get a fair trial.  So, that is the

7    primary reason that we go through this individual

8    voir dire in this way.

9              LANCE M. TAYLOR:  Okay.

10             THE COURT:  Very good.  Mr. Bailey.

11             ATTY. BAILEY:  Thank you, Your

12   Honor.

13   **EXAMINATION BY ATTORNEY BAILEY:**

14             ATTY. BAILEY:  Good afternoon, Mr.

15   Taylor.

16             LANCE M. TAYLOR:  Good afternoon.

17             ATTY. BAILEY:  As you know, my name

18   is Ken Bailey, and I am an assistant prosecutor with

19   the Trumbull County Prosecutor's Office.  You saw me

20   three and a half weeks ago in the Courtroom, and I

21   promised you at that time, that I was going to be

22   joined by my co-counsel, Chris Becker, who is here

23   today.  And the two of us are responsible for

1          prosecuting this particular case on behalf of the

2          people of Trumbull County and the people of the

3          State of Ohio.  As the Judge indicated, we're going

4          to ask you some questions this afternoon about your

5          prior experiences, your opinions about certain

6          things, and the reason we do it isn't because we're

7          snoopy and we like to pry into people's backgrounds

8          but, rather, to make sure that the folks who are

9          selected to serve on this jury, can be fair and

10         impartial to both sides; both to the Defendant and

11         to the people of the State of Ohio.  Okay, and that

12         is why we ask these particular questions.

13                   There aren't any right answers, there

14         aren't any wrong answers to these questions, only

15         open, candid answers.  And it's sort of like a job

16         interview in a way.  Everybody is qualified to be a

17         juror, obviously, because you're sitting there, but

18         there are certain types of cases where some folks

19         may not fit on certain cases, and some folks who

20         would fit better on other cases.  And that is why we

21         go through these questions.

22                   LANCE M. TAYLOR:  Okay.

23                   ATTY. BAILEY:  If you have any

1    questions while we go through this question and

2    answer proceeding, please feel free to ask as long

3    as it pertains to what we're doing in this case.

4                    LANCE M. TAYLOR:  Okay.

5                    ATTY. BAILEY:  There was a handout

6    that you got to read downstairs that sort of sets

7    out the parameter of the case.  Another thing is if

8    we run into each other out in the hallway or in the

9    elevator or a restaurant or something during the

10   course of this trial, which could be in two

11   different phases, we're not allowed to have any

12   communication with you except to say good morning or

13   afternoon.  The reason that I mention that is

14   because we don't want you to think that we're

15   snubbing you or being antisocial if we don't come up

16   to you and talk to you.  It would be improper for

17   the attorneys to talk to you during the trial and

18   once we're done here today.  And if we did, it could

19   result in a mistrial, and we don't want to do it all

20   over again.

21                   LANCE M. TAYLOR:  Uh-huh, I

22   understand.

23                   ATTY. BAILEY:  So, you understand

1    that.  Now, of course, once the case is all over, if

2    we get to two phases, when the second phase is over,

3    then feel free to come up to us and ask us what you

4    want.  We're here and we will be glad to answer any

5    questions at that time.

6            Now, this afternoon, I am going to go

7    into two different areas to start out with, pretrial

8    publicity and the death penalty punishment, and then

9    I will get to regular questions.  But before I do

10   that, let me ask you about one thing here.  On your

11   questionnaire that you filled out, you indicated

12   that you take your mom every two weeks or so to a

13   therapist in Boardman?

14           LANCE M. TAYLOR:  Yes.

15           ATTY. BAILEY:  Is it on a specific

16   day?

17           LANCE M. TAYLOR:  Usually it's on a

18   Thursday.

19           ATTY. BAILEY:  About what time?

20           LANCE M. TAYLOR:  Around 2:00 in

21   the afternoon, but it's usually -- its turns out to

22   be an all day thing.  I go into Salem early, I pick

23   her up and take her shopping or whatever she has to

1    do like in the Boardman area or whatever.  And after

2    the therapist, she might want to go out to eat or

3    something, but it's usually on Thursday but it --

4                    ATTY. BAILEY:  Some times it

5    changes?

6                    LANCE M. TAYLOR:  Well, she

7    schedules it.  I tell her to schedule it for a

8    Thursday, you know, that's the day that I usually

9    have free.

10                    ATTY. BAILEY:  Okay, if you were to

11   sit on this jury, okay, if you were selected here,

12   would you be able to maybe have somebody else take

13   her for a couple of weeks, or would you be able to

14   switch it to a Saturday?

15                    LANCE M. TAYLOR:  Well, I work.  I

16   could try.  I don't know for sure.  I have a brother

17   at home, living with my mother, neither of them

18   drive.

19                    ATTY. BAILEY:  Your brother doesn't

20   drive?

21                    LANCE M. TAYLOR:   No, he doesn't.

22                    ATTY. BAILEY:   Is there somebody

23   else, like a neighbor or a friend that might be able

1      to take her for a couple of weeks.

2                    LANCE M. TAYLOR:  Possibly.

3                    ATTY. BAILEY:  Well, it would only

4      be -- once the trial starts, I expect it will take a

5      week and a half, up to the most two weeks.  Then the

6      first phase, and if we go into a second phase, that

7      second phase usually last from one to three days and

8      then there is deliberations, which could take

9      anywhere from a couple hours to a couple of days.

10                    LANCE M. TAYLOR:  Yeah, it's

11     possible.

12                    ATTY. BAILEY:  You would be able to

13     work around it you think?

14                    LANCE M. TAYLOR:  Probably so.

15                    ATTY. BAILEY:  Because it's

16     important that we get jurors from all walks of life

17     in the community here if they're all able to serve.

18                    LANCE M. TAYLOR:  Uh-huh.

19                    ATTY. BAILEY:  So, it will be

20     important for us if you were able to serve.

21                    LANCE M. TAYLOR:  Okay.

22                    ATTY. BAILEY:  Now, let me talk

23     about this issue of pretrial publicity.  I

1     understand that you read the Vindicator, on

2     occasion, a few times a week?

3                    LANCE M. TAYLOR:  Yes.

4                    ATTY. BAILEY:  And you watch the

5     local news on T.V. occasionally when you're home.

6                    LANCE M. TAYLOR:  Right.

7                    ATTY. BAILEY:  What time a day --

8     or when you get a chance?

9                    LANCE M. TAYLOR:  Well, you know,

10    depending on -- usually I miss the 6:00 o'clock

11    news, but yeah, whenever I am home, I love to watch

12    the news, yes, it's informative.  And I usually do

13    watch the evening news.

14                   ATTY. BAILEY:  Okay, and I take it

15    that you indicated you have some knowledge of this

16    case from the papers and maybe from T.V.?

17                   LANCE M. TAYLOR:  Well, from T.V.

18    mostly.

19                   ATTY. BAILEY:  Okay, and you were

20    aware -- when did you become aware watching T.V. or

21    reading from the newspapers?

22                   LANCE M. TAYLOR:   Well, what I

23    remember about the case mostly was from the

1      television accounts, and like I wrote on my

2      questionnaire, the things I remember mostly was when

3      the letters between the two came out and that

4      received a lot of publicity.  I remember that.

5                ATTY. BAILEY:  Okay.  Now, what

6      about -- have you discussed the case with anybody?

7                LANCE M. TAYLOR:  No, not

8      particularly.  I can't remember discussing it while

9      it was going on with anybody, no.

10               ATTY. BAILEY:  And did you become

11     aware of the other fellow that was charged in this

12     case, did you follow that?

13               LANCE M. TAYLOR:  Yes.

14               ATTY. BAILEY:  And did you become

15     aware of what happened in that case?

16               LANCE M. TAYLOR:  I know that

17     there was a conviction.

18               ATTY. BAILEY:  Okay.  Now, as you

19     look around the Courtroom -- well, the Judge tells

20     the jurors after they come in that -- the Judge

21     tells you that you are not to look at the newspapers

22     or T.V. after we get in here, and there is a reason

23     for that.  They're laughing because there is a

1    reporter in here right now, Chris Bobby, a reporter

2    from the Tribune, who is a very good reporter, but

3    you will notice he wasn't here before, and I am sure

4    that he will be in here occasionally during the

5    course of this trial once we get into the testimony.

6    But he probably won't be here for the full day, but

7    he will be here for parts of the trial, okay.  And

8    the other -- the Vindicator  will have their

9    reporter too, Peggy Sinkovich or somebody will come

10   in and cover the trial.  But there may be other

11   trials going on in this County and next door over in

12   Mahoning County, and from time to time, the T.V.

13   crews, the three T.V. stations will set up their

14   cameras, they can't film the jurors, but they will

15   film the other participants in the trial.  And then

16   they will do a feature on it.  They will have missed

17   everything that happened before they got in here,

18   all of the questions that were asked and the answers

19   that were given, and they will miss everything that

20   was asked and answer afterward.  So, if they only

21   hear cross examination, they may have missed all of

22   the direct testimony, and -- or if they heard the

23   direct testimony, they might of missed cross

1    examination.  And just because of the nature of the

2    business, they have to rush into print to beat the

3    other stations.  And to get something in the

4    newspaper, some times what is in the paper may be

5    misrepresentative of what actually occurred in

6    Court.  If you sat here on the jury, you may have

7    somebody save the papers for you, and after it's all

8    over, you look at it and say gosh, I sat in that

9    trial, and I know what happened, I remember what

10   happened here, I remember all of the testimony, and

11   whoever wrote this article, they missed all of the

12   stuff that happened afterward and before it, it was

13   taken out of context, and the whole context was just

14   the reverse.  It's like they were covering a case in

15   Judge McKay's Court rather than in Judge Stuard's

16   Court.  It's not intentional but that's the nature

17   of the beast.  So, that's why we tell you to avoid

18   reading the papers and watching T.V., or discussing

19   the case with anybody else during the trial.  It's

20   like going back to school and starting out with a

21   blank slate.  Whatever is going to be written on

22   that slate, is going to be written here in the

23   Courtroom through the testimony of the witnesses,

1    the physical exhibits that come in and instructions

2    of law given to you by Judge Stuard.

3              Could you set aside anything that you

4    read or heard before and give the Defendant the

5    benefit of the presumption of innocence here and

6    start fresh in this case?

7              LANCE M. TAYLOR:  I believe that I

8    could.

9              ATTY. BAILEY:   I take it that you

10   didn't form any opinion as to her guilt from what

11   you read or heard before?

12             LANCE M. TAYLOR:  Well, to be

13   perfectly honest, yeah, I did.

14             ATTY. BAILEY:  What happened for

15   you to --

16             LANCE M. TAYLOR:  Just I believed

17   that it was like a conspiracy, you know, both were

18   aware.

19             ATTY. BAILEY:   Okay, let's -- from

20   what you heard before.  How close did you follow

21   that case?

22             LANCE M. TAYLOR:   I did not follow

23   it real close.  Like I say, most of my information

1     came from the television.  As far as in the papers,

2     I didn't read them thoroughly, and the last several

3     years, my eye sight has not been the best, I just

4     have a pair of magnifying glasses and when I wear

5     them for any period of time, you know, I get

6     headaches or my eyes get sore, so I don't do the

7     reading that I use to do, so I didn't read the

8     papers thoroughly, I just skimmed through them.

9                    ATTY. BAILEY:  Okay, well, you're

10    the only one who knows what you can do and can't do

11    to serve on this jury, what we ask you to do, what

12    you have to be able to do is to start over again

13    with a blank slate.  You have to be able to afford

14    this Defendant the presumption of innocence.  That's

15    part of our American system of justice.

16                    LANCE M. TAYLOR:  Yes.

17                    ATTY. BAILEY:  Right?

18                    LANCE M. TAYLOR  Right.

19                    ATTY. BAILEY:  You agree with that?

20                    LANCE M. TAYLOR:  Yes.

21                    ATTY. BAILEY:  And would you agree

22    that we have probably have the best justice system

23    in the world, it's not perfect, but we afford people

1     presumptions of innocence.  Other countries may make

2     -- presume somebody to be guilty and they have to

3     prove their own innocence.

4                    LANCE M. TAYLOR:  Yes.

5                    ATTY. BAILEY:   It doesn't happen

6     that way in this county, whether it's here in

7     civilian court or in a military court, right?

8                    LANCE M. TAYLOR:  Yes.

9                    ATTY. BAILEY:  And you understand

10    this Defendant is presumed to be innocent as are all

11    other Defendant's tried in this Courtroom.  It sort

12    of acts like a cloak shielding all through the

13    course of this trial, and that stays with her until

14    and unless we're able to present enough evidence to

15    convince you beyond a reasonable doubt of the

16    elements of the crime charged, okay.  And of course

17    if we get to that point where we do convince you of

18    that beyond a reasonable doubt, then that

19    presumption of innocence would be gone.  But what I

20    am asking you here is, can you perform some mental

21    gymnastics, okay, can you set aside the knowledge

22    you had before, what you believe you had from before

23    that you read in the papers, or saw on T.V.?

1          LANCE M. TAYLOR:  Yeah.

2          ATTY. BAILEY:  And start with a

3    blank slate so that you may recollect having heard

4    things, but you can't consider it in this trial,

5    okay, because the burden of proof is on us, the

6    people of the State.  It's only fair because she's

7    been charged by the State with certain crimes and

8    the burden is on us to prove certain elements or key

9    component parts of these crimes, okay?

10         LANCE M. TAYLOR:  Yes.

11         ATTY. BAILEY:  And if we don't meet

12   our burden, she doesn't have to do anything, there

13   is no burden of proof on her.  The burden is totally

14   on us, so if we don't establish all of these

15   elements, like if we didn't show that it happened

16   here in this County, if we're silly enough not to

17   ask somebody that question, then you would have to

18   find the Defendant not guilty, even though you might

19   of heard on T.V. that it happened here in this

20   County, okay.  Would you be able to do that?

21         LANCE M. TAYLOR:  Yes, I believe

22   that I could.

23         ATTY. BAILEY:  Can you hold us to

1     our burden of proof?

2              LANCE M. TAYLOR:  Yes.

3              ATTY. BAILEY:  And you would be

4     able to set aside whatever you read in the paper,

5     and it may well be during the course of the trial

6     that you hear testimony that may sound like

7     something you saw on T.V. before, or it may confirm

8     what you thought before, but you've got to set aside

9     any opinions that you had before.  Can you do that?

10              LANCE M. TAYLOR:  Yes, I believe

11    so.

12              ATTY. BAILEY:  Okay, so much for

13    pretrial publicity.  Now, let's talk about this

14    issue of the death penalty as a possible punishment.

15    The first that you became aware that this was a

16    possible death penalty case was when?

17              LANCE M. TAYLOR:  That day in

18    Court.

19              ATTY. BAILEY:  Back on April 8th?

20              LANCE M. TAYLOR:  Yes.

21              ATTY. BAILEY:  When you came in

22    here with the other jurors, about three and a half

23    weeks ago?

1                    LANCE M. TAYLOR:  Yes.

2                    ATTY. BAILEY:  And before that, I

3       take it that you had occasion to discuss the death

4       penalty as a possible punishment with some other

5       people, friends or family?

6                    LANCE M. TAYLOR:  The death penalty

7       in general?

8                    ATTY. BAILEY:  Yes.

9                    LANCE M. TAYLOR:  Yes.

10                   ATTY. BAILEY:  And what would bring

11      that up?

12                   LANCE M. TAYLOR:  Well, maybe a

13      certain crime that had been committed that's maybe

14      nationally known and discussions about that.

15                   ATTY. BAILEY:  And I take it that

16      you have been in favor of the death penalty for

17      quite awhile?

18                   LANCE M. TAYLOR:  Yes.

19                   ATTY. BAILEY:  How long -- well,

20      have you always been in favor of the death penalty

21      as a punishment?

22                   LANCE M. TAYLOR:  Yes.

23                   ATTY. BAILEY:  Now, you understand

1    in Ohio, as in most State's, the State legislature

2    is responsible for writing the laws and they

3    determine what the crimes are and what the

4    punishments are going to be and they set up a

5    procedure basically for that, okay, so that you

6    understand that all killings are not punishable by

7    the death penalty.  They're not -- all killings are

8    not equal under the law.  Let me give you a for

9    instance.  Let's say somebody is out chopping wood

10   and the head flies off of the axe and somebody gets

11   killed.  That would be an accident, right?

12              LANCE M. TAYLOR:  Uh-huh.

13              ATTY. BAILEY:  You wouldn't expect

14   there to be any punishment for that?

15              LANCE M. TAYLOR:  No.

16              ATTY. BAILEY:  Somebody is driving

17   down the road and they're going too fast and they

18   hit a pedestrian, okay, you'd expect there might be

19   some type of punishment depending on the

20   circumstances and maybe a jail sentence or prison

21   sentence, depending on everything, but it certainly

22   wouldn't be punishable by the death penalty, right?

23              LANCE M. TAYLOR:  Right.

1                    ATTY. BAILEY:  Or let's say some

2       people -- two people get in a fight in a bar and one

3       fellow hits the other and the victim goes over

4       backwards and hits his head on the edge of the bar

5       and dies as a result of that.  That might be a

6       manslaughter or a murder charge, or it might be

7       punishable by some type of sentence in prison, maybe

8       even some type of life sentence, but it wouldn't be

9       a death penalty offense, would it?

10                   LANCE M. TAYLOR:  Yes, I understand

11      that.

12                   ATTY. BAILEY:  Now, you understand

13      under Ohio law, we used to have a crime called

14      premeditated murder and that's been changed to

15      murder with prior calculation and design, okay.

16      It's a little bit different, it requires advanced

17      planning and a studied scheme to kill, okay?

18                   LANCE M. TAYLOR:  Uh-huh.

19                   ATTY. BAILEY:  But just aggravated

20      murder by itself is not the potential death penalty

21      offense in Ohio.  For example, if I say I don't like

22      my opposing counsel's suit or his boots, and I say

23      that I am going to kill Mr. Ingram tomorrow because

```
 1      I don't like his boots.  When he comes up  --

 2                      ATTY. INGRAM:  You can't wear these

 3      boots.

 4                      ATTY. BAILEY:  -- the steps at 9:00

 5      in the morning, and I do that, and I announce it to

 6      the whole world, you know, on the Courthouse steps

 7      that I am going to kill him tomorrow at 9:00 o'clock

 8      in the morning when he comes up the steps, and I

 9      blow him away with a .357, you understand that may

10      be aggravated murder, but it's not a death penalty

11      offense in Ohio, okay.  The legislature has written

12      the law in such a way that there has to be more.

13      They have written it so that there would have to be

14      special findings of fact for a jury to consider it

15      and find what we call these specifications of

16      aggravating circumstances.  And we get into that a

17      little bit more in a little bit.

18                      LANCE M. TAYLOR:  Okay.

19                      ATTY. BAILEY:  Now, you read that

20      handout from downstairs as prepared by the Judge?

21                      LANCE M. TAYLOR:  Yes.

22                      ATTY. BAILEY:  And did that make

23      sense pretty much?
```

1          LANCE M. TAYLOR:   Yes, it did.

2          ATTY. BAILEY:   Now, the

3     legislature has written the law in such a way that

4     this type of a case, a death penalty, a possible

5     death penalty case, can be tried into two different

6     phases.  The first phase is tried just like any

7     other trial, any other criminal trial that's tried

8     in this Courtroom.  The jury makes the decision in

9     the first phase as to guilt or non-guilt of the

10    elements of the crime, with the burden being on us,

11    the people of the State, to prove these elements by

12    proof beyond a reasonable doubt.  If we do, if we

13    meet that burden, and the only issue there is guilt

14    or non-guilt.  Punishment has no bearing on the

15    first phase because it's just dealing with guilt,

16    right?

17          LANCE M. TAYLOR:  Okay.

18          ATTY. BAILEY:  So, you wouldn't

19    hear anything, you wouldn't expect to hear any

20    testimony about what the appropriate punishment is

21    in the first phase, right?

22          LANCE M. TAYLOR:  Okay.

23          ATTY. BAILEY:  So, let's say that

1    you and the other 11 jurors determine that we've met

2    our burden of proof, we proved the elements of the

3    crime charged beyond a reasonable doubt and we find

4    the Defendant guilty of aggravated murder, and one

5    or more of the specifications of special

6    circumstances, aggravating circumstances.  The way

7    the legislature has written the law, we would then

8    move into a second phase.  In this second phase,

9    there is a totally different issue.  The issue is

10   what is the appropriate punishment for this

11   Defendant for this crime, okay.

12              LANCE M. TAYLOR:  Okay.

13              ATTY. BAILEY:  Now, you already

14   would have decided the issue of guilt, so you are no

15   longer concerned with the issue of guilt.

16              LANCE M. TAYLOR:  Uh-huh.

17              ATTY. BAILEY:  And in the second

18   phase, you would have the aggravating circumstances

19   that you would have found in the first phase on one

20   side of a scale, and on the other side would be what

21   we call mitigating factors.  Mitigating factors are

22   things, certain facts that work in favor of the

23   Defendant and against the imposition of the death

1    penalty as punishment.  We don't know what those are

2    at this point because it's not relevant.  But that

3    would be in issue in the second phase, and that is

4    when you would hear that type of stuff in the second

5    phase.  You can hear the same evidence or maybe new

6    evidence, okay.

7                    LANCE M. TAYLOR:  Okay.

8                    ATTY. BAILEY:  And the defense has

9    the opportunity to present these mitigating factors.

10   And under the law, you have to consider these

11   things.  Okay, to serve on this jury, you've got to

12   be able to consider aggravating circumstances and

13   mitigating factors, things that work to the

14   Defendant's benefit, because you understand that the

15   death penalty sentence is not automatic for somebody

16   found guilty of aggravated murder with one or more

17   specifications because you wouldn't have heard

18   anything about mitigating factors, and to sit as a

19   juror, you have to be able to consider mitigating

20   factors.  There may be something that would bring

21   into balance or tip the scale --

22                    LANCE M. TAYLOR:  Uh-huh.

23                    ATTY. BAILEY:  -- in favor of the

 1    Defendant, okay.  But our burden of proof on the

 2    State is prove that the aggravating circumstance or

 3    circumstances outweigh these mitigating factors by

 4    proof beyond a reasonable doubt.  And in the second

 5    phase, you've got four possible punishments to

 6    consider.  Okay, to sit on this jury, you have to be

 7    able to equally consider all four of those

 8    punishments when you start out.  You got the death

 9    penalty, you got life in prison with no parole

10    eligibility, you got life in prison with parole

11    eligibility after 30 full years, and life in prison

12    with parole eligibility after 25 full years.  Okay,

13    so you would have to be able to consider all of

14    those penalties equally when you start out in the

15    second phase.

16                    LANCE M. TAYLOR:  Yes.

17                    ATTY. BAILEY:  Okay.  Now, if we

18    meet our burden of proof and convince you and the

19    other 11 jurors that aggravating circumstance or

20    circumstances outweigh these mitigating factors

21    beyond a reasonable doubt, then you must return a

22    verdict as to the death penalty because it would be

23    the appropriate punishment, okay?

1                    LANCE M. TAYLOR:  Okay.

2                    ATTY. BAILEY:  If we don't live up

3    to that burden, if we don't convince you and the

4    other 11 jurors that these aggravating circumstances

5    outweigh these mitigating factors beyond a

6    reasonable doubt, then in that case, you don't

7    return a death penalty verdict and you go on to

8    determine which of the three life sentences would be

9    appropriate, okay.

10                    LANCE M. TAYLOR:   Okay.

11                    ATTY. BAILEY:  And can you do that?

12                    LANCE M. TAYLOR:  Yes.

13                    ATTY. BAILEY:  And I notice you --

14    now, the issue of how much these things weigh, that

15    is entirely up to you and the other 11 jurors.

16    You've got to consider these things.  You might

17    decide something might have a whole lot of weight,

18    it might weight 20 pounds or a ton or something.

19    Something on the other hand, you might consider it

20    might not have very much weight and weigh about as

21    much as a feather, right?

22                    LANCE M. TAYLOR:  Yes.

23                    ATTY. BAILEY:   So, that's totally

1    up to you and the other jurors how much weight you

2    give these things that you put on a scale.

3                LANCE M. TAYLOR:  Yes, I

4    understand.

5                ATTY. BAILEY:  But you've got to be

6    able to consider all these things.

7                LANCE M. TAYLOR:  Yeah.

8                ATTY. BAILEY:  Now, let me ask you

9    this, I notice that you're Catholic but you don't go

10    to Church?

11                LANCE M. TAYLOR:  No, I don't.

12                ATTY. BAILEY:  And I know the

13    Catholic Church has taken the position against the

14    death penalty as a punishment, a strong position

15    against it.  Would that affect you in any way?

16                LANCE M. TAYLOR:  No.

17                ATTY. BAILEY:  You're your own

18    person and you make your own decision on that?

19                LANCE M. TAYLOR:  Yes, I was raised

20    up in the Catholic Church, but I don't practice it,

21    so --

22                ATTY. BAILEY:  So, that wouldn't

23    be a problem?

1            LANCE M. TAYLOR:   No, it wouldn't

2       be a problem at all.

3            ATTY. BAILEY:  Okay, you understand

4       that for both sides to get a fair shake, it wouldn't

5       be fair to the State, you know, folks come in with

6       all types of view points.  Some people say, you

7       know, I can't consider the death penalty as a

8       punishment, and I don't care what the Judge says,

9       the law is that I wouldn't be able to follow it

10      because I would never be able to sign the verdict

11      form for the death penalty, okay.  Other folks say,

12      well, I believe in the death penalty as a

13      punishment, and I would always come in with an

14      automatic death penalty, I don't care what the law

15      is about mitigating factors.  And that wouldn't be

16      fair to a Defendant, right?

17            LANCE M. TAYLOR:  Right.

18            ATTY. BAILEY:  And if somebody came

19      in and never signed the death penalty verdict, it

20      wouldn't be fair to the State, right?

21            LANCE M. TAYLOR:  Right.

22            ATTY. BAILEY:  So, it's important

23      that people be able to consider all of these

1    particular things.  If we proved our case beyond a

2    reasonable doubt in the first phase, the Defendant

3    was guilty of aggravated murder with the death

4    penalty specification, you would be able to sign a

5    verdict form in the first phase, right?

6                    LANCE M. TAYLOR:  Yes.

7                    ATTY. BAILEY:  And if we were able

8    to -- if we moved into the second phase and we

9    convince you and the other jurors beyond a

10   reasonable doubt that the aggravating circumstance

11   outweigh the mitigating factors, would you be able

12   to sign a verdict for the imposition of the death

13   penalty?

14                   LANCE M. TAYLOR:  That would

15   probably be the most difficult decision that I would

16   ever be involved in, but I believe that I could do

17   that.

18                   ATTY. BAILEY:  Okay, and it

19   shouldn't be an easy thing, okay, it's only -- it's

20   not usual in criminal law, most murder cases are not

21   death penalty cases.  Okay, it's only in certain

22   cases that don't occur very often where this type of

23   offense is charged and it should be a hard decision.

1     If you were to return a death penalty verdict and

2     sign the verdict form, and the Judge asked after, in

3     open Court, is this your verdict, would you be able

4     to announce that it was your verdict?

5                    LANCE M. TAYLOR:  Yes.

6                    ATTY. BAILEY:  Now, let me get into

7     some other questions, and if you have any questions,

8     feel free to ask them.

9                    LANCE M. TAYLOR:  All right.

10                   ATTY. BAILEY:  You understand that

11    the Defendant here is charged not as the trigger

12    person but rather as a complicitor, somebody who

13    solicited or listened or procured another person to

14    commit the offense or aided and abetted or planned

15    with another person, encouraged, strengthened,

16    helped the other person in the killing of another

17    person.

18                   LANCE M. TAYLOR:  Yes.

19                   ATTY. BAILEY:  Okay.  The fact that

20    she is charged as an aider and abettor or a

21    complicitor rather than the trigger person, do you

22    think that would affect your ability to return a

23    death penalty verdict if it were the proper verdict

1     in this case?

2                    LANCE M. TAYLOR:  No.

3                    ATTY. BAILEY:  No?

4                    LANCE M. TAYLOR:  Yeah.

5                    ATTY. BAILEY:  Okay, now I

6     mentioned that the Defendant is charged with a

7     number of crimes as a complicitor.  She is charged

8     with two counts of aggravated murder and there is

9     only one person who was killed, but there are two

10    separate theories that the State is allowed to

11    pursue.  And because we're allowed to do it, we have

12    chosen and elected to proceed on both theories, and

13    the jury can consider both of these theories of

14    aggravated murder.  Basically, one count of

15    aggravated murder charges the purposeful killing

16    with prior calculation and design.  And the other

17    count of aggravated murder charges a purposeful

18    killing during the course of a special felony like

19    an aggravated burglary or an aggravated robbery.

20    Attached to these two charges of aggravated murder

21    are two specifications; one of those specifications

22    or special findings of fact for a jury to consider

23    is an extra finding, a factual finding for you to

1 consider, is a specification of aggravated burglary,

2 that the aggravated murder occurred with prior

3 calculation and design and it was during the course

4 of an aggravated burglary.

5    The second specification of aggravating

6 circumstance charges that the aggravated murder was

7 committed with prior calculation and design, but

8 during the course of an aggravated robbery as

9 opposed to an aggravated burglary.  So there are two

10 counts of aggravated murder with specifications.

11    Then, there are two other counts or

12 charges.  The charge of aggravated burglary and the

13 charge of aggravated robbery.  And the charge here

14 is that the crimes were that the Defendant planned

15 with another fellow by the name of Nate Jackson to

16 kill her ex-husband for insurance money and that

17 this Nate Jackson fellow is the one who actually

18 went and trespassed in a house to commit an offense

19 and commit an aggravated robbery, stole a car and

20 that he was armed with a deadly weapon, a working

21 gun, a firearm.

22    Now, the difference between -- the Judge

23 is going to define all of these terms for you at the

1    end of the case, and some times folks, unless

2    they're versed in the law, confuse aggravated

3    burglary and aggravated robbery.  They may say,

4    well, my home got robbed and they mean that it got

5    burglarized.  But, basically, an aggravated burglary

6    deals with somebody trespassing in a dwelling house

7    of another person, somebody else's home, with the

8    intent to commit some type of an offense like

9    whether an aggravated murder or a theft offense or

10   something, and the perpetrator can be armed with a

11   deadly weapon like a knife or a gun, and the

12   perpetrator can cause serious physical harm or death

13   to the person inside, the victim.

14                    LANCE M. TAYLOR:  Uh-huh.

15                    ATTY. BAILEY:  Aggravated robbery

16   doesn't deal with a dwelling house, it deals instead

17   with the use of force or threat of force against

18   another person to commit an offense like a theft.

19   And the perpetrator can be armed with a deadly

20   weapon like a gun or a knife, and the perpetrator

21   causes serious physical harm to the victim.  Serious

22   physical harm or death, okay?

23                    LANCE M. TAYLOR:  Okay.

1          ATTY. BAILEY:  Now, I mentioned

2     elements, and we have to prove the elements of the

3     crime charged beyond a reasonable doubt.  And it

4     will be like an ingredient in a recipe.  I take it

5     when you were a kid, your mom baked cakes for you?

6               LANCE M. TAYLOR:   Sure.

7               ATTY. BAILEY:  Chocolate cake?

8               LANCE M. TAYLOR  Sure.

9               ATTY. BAILEY:  That's the only one

10    I know how to bake, well, in Court at least.  Okay,

11    and your mom would whip up certain ingredients, she

12    would take the items of flour and sugar and water,

13    baking powder and chocolate because it's a chocolate

14    cake, and whatsoever, and mix it all together in a

15    pan and put it in the oven at 350 degrees for 40

16    minutes or so, and if nobody jumped up and down on

17    the floor, the cake would rise, and you would get a

18    chocolate cake.  If she were to leave out one of

19    those ingredients like the chocolate, you might get

20    a cake but it's not going to be that chocolate cake,

21    right?

22              LANCE M. TAYLOR:  Right.

23              ATTY. BAILEY:  Same thing with a

1  crime, we're responsible, the people of the State

2  are responsible for baking a number of different

3  cakes on these charges, okay, and we call these

4  ingredients elements.  And I will give you a for

5  instance.  The Judge will define these in great

6  detail and you're bound to follow his instructions,

7  but, for instance, on aggravated murder with prior

8  calculation and design, we would have to prove that

9  first that it happened on or about a certain date,

10  December 11, 2001.  Second, that it happened here in

11  Trumbull County, Ohio.  We call that venue.  It just

12  means that we have to prove that it happened in

13  Trumbull County so that we can try it in this

14  Courthouse rather than up in Cuyahoga County or down

15  in Franklin County.

16              LANCE M. TAYLOR:  Uh-huh.

17              ATTY. BAILEY:  The third might be

18  identification.  Somebody would have to come in and

19  point out that the Defendant is the person who

20  committed this offense.  Fourth, that she acted

21  purposely, basically, on purpose, but the Judge will

22  give you a detailed legal definition defining that.

23  Fifth, that she caused the death of a living person,

1    in this case, a fellow by the name of Robert

2    Fingerhut.  And sixth, that she committed it with

3    prior calculation and design.

4              Now, under the old law, we used to have

5    a term call premeditation, premeditated murder, but

6    that rewrote the law, and now we've got this prior

7    calculation and design, which requires advanced

8    planning and a studied scheme to kill.  And let's

9    say I drop my pen and I catch it, that might be a

10   reflex, right?

11             LANCE M. TAYLOR:  Uh-huh.

12             ATTY. BAILEY:  On the other hand,

13   if I say, I'm going to drop my pen and I pick it up,

14   and I drop it, and then I say, okay, now I am going

15   to pick it up, that could be some advanced planning,

16   right?

17             LANCE M. TAYLOR:  Yes.

18             ATTY. BAILEY:  Now, yesterday, if I

19   told my co-counsel, I say, Chris, I am going to go

20   into Court and use an example for prior calculation

21   and design, and I drop my pen so I can pick it up to

22   demonstrate that, and I do, that would be prior

23   calculation and design because there was some

1     advanced planning and a studied scheme to do that,

2     right?

3                    LANCE M. TAYLOR:  Yes.

4                    ATTY. BAILEY:  Now, we talked about

5     this term proof beyond a reasonable doubt, and we've

6     got to establish these elements by proof beyond a

7     reasonable doubt, and you've got to consider each

8     crime and specifications and these elements

9     separately.  Okay, now, this proof beyond a

10    reasonable doubt, basically, the Judge will define

11    that term for you too, because everything in law has

12    a definition, but its basically when you're firmly

13    convinced of the truth of the charge to a moral

14    certainty using your reason and your common sense,

15    and you're used to doing that, right, you were in

16    the military, and you're a flea marketer, right?

17                    LANCE M. TAYLOR:  Yes.

18                    ATTY. BAILEY:  So, you figure out

19    how much you're going to sell stuff for or buy stuff

20    for so that you can make a profit, right.  You do

21    that everyday, right, you use your reason and common

22    sense.

23                    LANCE M. TAYLOR:  Yes.

1                    ATTY. BAILEY:  And you don't buy

2        something unless you're firmly convinced that it's

3        the right thing to do, and you're not going to sell

4        it so that you lose money, generally, right?

5                    LANCE M. TAYLOR:  Right.

6                    ATTY. BAILEY:  Okay, and you're not

7        going to buy something so that you will lose it, I

8        mean, you have a pretty good idea what things are

9        worth, okay.

10                   LANCE M. TAYLOR:  Right.

11                   ATTY. BAILEY:  So, it's a standard

12       that you're  use to dealing with in your daily life,

13       there is no great mystery about it.  And one example

14       that we use is a box, okay, we've got to fill this

15       box with evidence, and it can be through the

16       testimony of witnesses or the physical exhibits.

17       And in a civil case, where somebody sues for money

18       damages, their burden of proof is just whoever  --

19       if this were a scale, they would just tip the scale

20       just over half way, okay, it would be like filling

21       this box just over half way to win in a civil case

22       for money damages.

23                   LANCE M. TAYLOR:  Right.

```
 1              ATTY. BAILEY:  But in a criminal
 2   case, our burden of proof is different.  It's the
 3   highest burden of proof in the law.  It's proof
 4   beyond a reasonable doubt, and it doesn't go all the
 5   way to the top of the box, but it's pretty darn
 6   close to the top of the box, and it's up to you and
 7   each individual juror over here to draw your own
 8   lines on that box where you're comfortable proving
 9   it to a moral certainty so that you're firmly
10   convinced of the truth of the charges, okay.
11              LANCE M. TAYLOR:  Okay.
12              ATTY. BAILEY:  It's not 100 percent
13   proof or beyond all proof, or beyond any doubt or
14   beyond a shadow of a doubt.  That's a title of an
15   Alfred Hitchcock movie, but there is no such animal
16   in criminal law.  That's fine for T.V. and the
17   movies, but not for real life, okay, because you
18   can't prove anything a hundred percent.  There is
19   always room there for some possible or hypothetical
20   doubt, right?
21              LANCE M. TAYLOR:  I understand.
22              ATTY. BAILEY:  So, what do we fill
23   this box with?  Well, we can use different types of
```

1  evidence, okay.  And one type of evidence is what we

2  call direct evidence where a witness can come in and

3  testify to what he or she has learned through the

4  use of his or her five senses.  For example, a

5  witness comes in and testifies, I heard the gun shot

6  and it was loud; I smelled the smoke and it was

7  acrid; I touched the surface and it was cold, okay.

8  That is direct evidence.

9              LANCE M. TAYLOR:  Uh-huh.

10              ATTY. BAILEY:  There is another

11  type of evidence that we can fill that box with, and

12  it's just as good as the eyewitness evidence, the

13  direct evidence.  And this type of evidence is sort

14  of roundabout evidence.  It's where you're presented

15  with a fact or series of facts and you're asked to

16  draw a logical conclusion to another fact or series

17  of facts.  We call that circumstantial evidence.

18  Okay, you do that in everyday life, right, draw

19  logical deductions to other things.  And let me give

20  you a for instance of that.

21              LANCE M. TAYLOR:  Okay.

22              ATTY. BAILEY:  Let's say you live

23  in a two-story house, and before you go to bed at

```
 1    night, you're up in your bedroom on the second

 2    floor, and you look out your bedroom window and it's

 3    a beautiful night outside.  The moon is beaming, the

 4    stars are twinkling, and there is not a cloud in the

 5    sky.  And as far as you can see across the

 6    neighborhood, it's perfectly dry.  So, you draw the

 7    blinds and you get into bed, and you hear the

 8    announcer on the radio saying, folks, there is a

 9    cold front coming in tonight, and I expect that

10    we're going to have a storm.  Then, you fall asleep.

11    And some time later you are awaken in the middle of

12    the night by a distant booming sound, so you look

13    toward the window but the blinds are drawn and you

14    can't see what's out there.  You see the flash of

15    light and then a couple of seconds later there is a

16    distant booming in the sky, and then another minute

17    goes by and there is another bright flash of light

18    outside, and there is closer in a time boom in the

19    sky.  And suddenly there is really a bright flash of

20    light from outside the window and a big, ripping,

21    cracking boom above the house and a pitter patter on

22    the roof and a steady drumming sound, and you fall

23    back asleep.  Some time later, you awaken and you go
```

```
1     to the window, open the blinds, and look out, and

2     it's a nice day.  The sun is shining, there's not a

3     cloud in the sky but, as far as you can see, it's

4     soak and wet on the roof tops, and water is running

5     in the streets and droplets of water are dripping

6     from the leaves of the trees.  And there is no fire

7     hydrant nearby where any car would hit it and spew

8     water all over your house.  Okay, you know what

9     happened during the night?

10                   LANCE M. TAYLOR:   Yeah, a storm

11    rolled in.

12                   ATTY. BAILEY:  Right, you had a

13    thunderstorm, right?

14                   LANCE M. TAYLOR:  Right.

15                   ATTY. BAILEY:  And you know that

16    beyond any reasonable doubt, right?

17                   LANCE M. TAYLOR:  Uh-huh.

18                   ATTY. BAILEY:  Using your reason

19    and common sense to look at the circumstantial

20    evidence that was presented from all of the facts

21    and circumstances.

22                   LANCE M. TAYLOR:  Right.

23                   ATTY. BAILEY:  Now, there are some
```

1 limitations to that evidence.  You might not be able

2 to determine how long it rained, or you might not be

3 able to determine how much rain fell during the

4 night unless you had some measuring device out

5 there, but you know beyond any reasonable doubt that

6 it all happened because there was a thunderstorm,

7 right?

8        LANCE M. TAYLOR:  Yes.

9        ATTY. BAILEY:  Now, there is room

10 for some possible or imaginary doubt.  You can

11 imagine that E.T. and his alien buddies came by in a

12 flying saucer and sprinkled the ground with some wet

13 stuff and put on a sound and light show.  But that

14 would be an imaginary doubt, right?

15        LANCE M. TAYLOR:  Yes.

16        ATTY. BAILEY:  Okay, well, that is

17 circumstantial evidence, and it's just as good as

18 direct evidence.  And you understand that we can

19 prove our case, the elements of the crime charged,

20 those ingredients of the crimes, beyond a reasonable

21 doubt using that type of evidence, okay.  And some

22 times it may be very necessary, as you would expect,

23 for State to use that type of evidence because when

1    people plan serious crimes like aggravated murders,

2    you wouldn't expect them to stand on the Courthouse

3    steps and tell the whole world what they're planning

4    to do, right?

5                LANCE M. TAYLOR:  Right.

6                ATTY. BAILEY:  And some times you

7    may have to look at other types of evidence to tell

8    what is inside of a person's mind.  For example, if

9    you have letters or phone calls, you would be able

10    to look at those and perhaps to determine what was

11    in another person's mind as far as planning their

12    crime or their purpose, right?

13                LANCE M. TAYLOR:  Right.

14                ATTY. BAILEY:  Now, you would also

15    agree, I take it, that even though people may plan

16    crimes, sometimes they get caught because they do

17    really stupid, stupid, things, right?

18                LANCE M. TAYLOR:  Uh-huh.

19                ATTY. BAILEY:  I am sure you've

20    heard of cases where the bank robber goes into the

21    bank and he has a get-away driver outside waiting

22    for him, he has a mask on, he's got the gun, and he

23    hands a stick-up note to the teller on the back of

1    an envelope.  And it says, give me all of your

2    money.  The teller gives him the money and he runs

3    out and they take off and get away.  And the teller

4    looks at the note there on the envelope and turns it

5    over and there's the guys name and address right on

6    it.

7              LANCE M. TAYLOR:  Right.

8              ATTY. BAILEY:  Or a burglar climbs

9    into the house to steal stuff and drops his wallet

10   and leaves his identification, right?

11             LANCE M. TAYLOR:  Uh-huh.

12             ATTY. BAILEY:  So, you understand

13   that criminals aren't necessarily rocket scientists,

14   right?

15             LANCE M. TAYLOR:  Yes.

16             ATTY. BAILEY:  Sometimes the best

17   laid plans get fouled up and they get caught.  You

18   believe that people should be held accountable for

19   their actions?

20             LANCE M. TAYLOR:  Yes, I do.

21             ATTY. BAILEY:  Now, you understand

22   that you can't take notes in here in our courtrooms.

23   The Judges in Ohio generally don't let jurors take

1   notes of witness' testimony, and have to pay very

2   close attention to the testimony and remember it.

3   And the case may take a week and a half to two week,

4   okay, and you will have a collective recollection of

5   all 12 jurors to rely on.  There are aren't going to

6   be any instant reruns.  It's not like a sports

7   program or something where they do instant replays.

8                    LANCE M. TAYLOR:  Uh-huh.

9                    ATTY. BAILEY:  Also, jurors some

10  times say, well, can we get the testimony of that

11  witness.  But you understand that we don't have a

12  million dollars worth of transcribing equipment that

13  they would have in an O.J. Simpson case where they

14  have millions of dollars poured in through all of

15  the court proceedings and everything.  In Trumbull

16  County, with the budget problems, we can't afford

17  that kind of equipment.  Our court reporters are

18  very good, but they can't get us instant

19  transcripts.  So, you will have to rely on your

20  collective recollection because the Judge isn't

21  going to give you transcripts of the testimony,

22  okay?

23                   LANCE M. TAYLOR:  Okay.

```
 1              ATTY. BAILEY:  Also, you're not

 2     allowed to go out to the scene or anywhere and

 3     investigate on your own.  Sometimes in the movies

 4     and on T.V., like Matlock or Perry Mason, they have

 5     them go out and do their own investigation.  You

 6     can't do that.

 7              LANCE M. TAYLOR:  Uh-huh.

 8              ATTY. BAILEY:  That would cause a

 9     mistrial.  We had a juror do that once and that's

10     why I ask that question.  It may sound somewhat

11     silly, but we don't want to do it over again.

12              LANCE M. TAYLOR:  Okay.

13              ATTY. BAILEY:  Also, you're stuck

14     with the questions that the lawyers ask.  Because

15     we're lawyers and we have gone to law school, we're

16     trained to either establish or build up these

17     elements or tear them down.  So, our questions are

18     generally directed to do that to prove the elements

19     or to try to cast out the elements, okay.  It may

20     well be that you have some special interest, like if

21     you sold shoes, you may be interested in foot wear.

22     What somebody was wearing at the time of an offense,

23     but unless it was footprint evidence, it might have
```

1    no bearing at all in the case and that type of

2    question may never get asked or answered.  You might

3    have some unanswered questions at the end of the

4    case that wouldn't pertain to any of these elements.

5    If we were to convince you beyond a reasonable doubt

6    as to the existence of these elements and you were

7    firmly convinced of the truth of the charge, you

8    will be able to return a conviction even though you

9    might have side questions that didn't pertain to

10   this.

11                    LANCE M. TAYLOR:  Yes.

12                    ATTY. BAILEY:  Now, at the end of

13   case, there's going to come a period of time after

14   the testimony and the evidence is in, and the Judge

15   has instructed you on the law, when you and the

16   other jurors retire to deliberate.  And in an

17   ordinary criminal trial, if you don't decide your

18   case by the end of the day, you go home.  But that

19   doesn't happen in a death penalty case where the

20   death penalty is a possibility.  To make sure that

21   the jurors are kept free from outside contamination,

22   like the newspaper or people just interested and

23   wanting to ask you all kinds of stuff, keep those

```
 1      people away from you and that influence away from

 2      you, you are sequestered and kept together.  And you

 3      can only deliberate when all 12 of you are together.

 4      Okay, you can't talk one on one or one on two.  And

 5      you will be kept in a hotel and meals would be

 6      brought in for you, okay.  And it may take -- I have

 7      had juries come back anywhere from an hour and a

 8      half to five days on the first phase of the capital

 9      case, okay, during that sequestration.  If you and

10      the other jurors find the Defendant guilty of

11      aggravated murder and one or more of these death

12      specifications of aggravating circumstances, we

13      would go to a second phase and there would be a

14      break in there maybe a couple of days or a week.

15      And then you would come back with the other jurors

16      and we put on this second phase, and that could take

17      from one to three days at the most.  Okay, and then

18      you deliberate again and you would be sequestered

19      again.  Would that sequestration cause you any undue

20      hardship?  I mean, because I know the situation with

21      your mom, but those two times that you might be

22      sequestered, would you be able to make arrangements

23      for that?
```

1            LANCE M. TAYLOR:   I believe that I

2    could.  Yeah, I should be able to, I should be able

3    to.

4            ATTY. BAILEY:   Okay.  Now, it's

5    only natural, I expect, for one human being to feel

6    sorry for another human being.  But in this type of

7    a case, you are asked to make your decision without

8    any concern for sympathy based on the facts that are

9    presented, the evidence and the instruction of law.

10   Now, I expect as the Defendant's chair is turned

11   toward you, you are going to become more acquainted

12   with her.  And my question to you is this, when you

13   go inside your jury room to deliberate on your

14   verdict, can you lay aside all thoughts of sympathy

15   that you might have with the Defendant and base your

16   verdict on the testimony and the evidence and the

17   instructions of law given to you by the Court and

18   lay aside all thoughts of sympathy for the

19   Defendant?

20           LANCE M. TAYLOR:   Yes.

21           ATTY. BAILEY:   Now, do you have any

22   questions about what we're doing here?

23           LANCE M. TAYLOR:   No, I don't.

```
 1                    ATTY. BAILEY:   Okay, now I take it
 2     that you would agree that we have certain
 3     obligations as citizens in this country.  For
 4     example, if it's election time, we have an
 5     obligation to find out whatever we can about the
 6     issues and the candidates and cast a ballot, if
 7     we're able to, right?
 8                    LANCE M. TAYLOR:  Right.
 9                    ATTY. BAILEY:  And make sure our
10     system of government works.  And if it's war time,
11     you may be called to serve in the military.  You've
12     already -- you enlisted and served in the military?
13                    LANCE M. TAYLOR:  Yes.
14                    ATTY. BAILEY:  And we have young
15     people overseas in several places that are serving.
16                    LANCE M. TAYLOR:  Yes.
17                    ATTY. BAILEY:  Another obligation
18     of citizenship is if we're summoned in to serve on a
19     jury.  And to make sure that our criminal justice
20     system works, we get people of all walks of life
21     with all kinds of experiences, okay, and if it's at
22     all possible, even though it's inconvenient and we
23     have to make to some adjustments in our daily life
```

1   with our families and stuff, we have other people to

2   take care of, our moms, and different things like

3   that, it's important we're able to serve especially

4   in the most serious of criminal cases like a death

5   penalty case.  Would you be able to undertake that

6   obligation?

7           LANCE M. TAYLOR:  Yes.

8           ATTY. BAILEY:  Okay, thank you,

9   very much for your candid answers, and the defense

10  counsel will have an opportunity to ask you some

11  questions.

12          LANCE M. TAYLOR:  Okay, thank you.

13          THE COURT:  Mr. Juhasz.

14          ATTY. JUHASZ:  Thank you, Your

15  Honor.

16  **EXAMINATION BY ATTORNEY JUHASZ:**

17          ATTY. JUHASZ:  Hi, Mr. Taylor.

18          LANCE M. TAYLOR:  Hello.

19          ATTY. JUHASZ:  How are you doing?

20          LANCE M. TAYLOR:  Okay.

21          ATTY. JUHASZ:  Do you need some

22  water or something?

23          LANCE M. TAYLOR:  No, I'm fine.

1          ATTY. JUHASZ:  If you do, just let

2     me know, all right?

3          LANCE M. TAYLOR:  All right.

4          ATTY. JUHASZ:  I'm John Juhasz.  My

5     friend Jerry Ingram and I are representing Donna

6     Roberts.  Mr. Bailey just mentioned to you when he

7     was talking to you about the obligations that we

8     have as citizens to serving on a jury.  I want to

9     turn that around a little bit and ask you something

10    about that because of something that you have on

11    your questionnaire.  And one of the reasons that we

12    bring so many people into the Courthouse rather than

13    just 12, 14, or 16, is because people may not be

14    able to because of other considerations.

15         One of the things that I noticed is that

16    you are self-employed?

17         LANCE M. TAYLOR:  Yes.

18         ATTY. JUHASZ:  You may remember

19    back on the 8th of April when Judge Stuard was

20    talking, we tried to set up a time table as to when

21    we thought this trial was going to start.  That

22    didn't happen and it's not going to happen.  And my

23    only point of that is, we do our best to predict it,

1       but we just don't know.  Now, that having been said,

2       if this trial, once it starts, goes anywhere from

3       two to four weeks, I am self-employed, so I know

4       what that means, and what I want to find out from

5       you is, is that going to be an economic hardship on

6       you?

7                    LANCE M. TAYLOR:  Sure, that would

8       make things more difficult.

9                    ATTY. JUHASZ:  And look, I'm not

10      trying to push you one way or the other, it's just

11      that while Mr. Bailey is right about people's

12      obligation to serve as jurors, you happen to have

13      your name come up on a wheel in a capital case that

14      takes a lot longer than a regular case.  It's just

15      as likely you might of got a call for another jury

16      where your service only might have been a two or

17      three day trial.

18                    Again, I know from being self-employed,

19      if you say take two or three days off from work for

20      jury duty it's one thing, but take four weeks off

21      for jury duty, that's another thing.  And I only

22      tell you that because I want you to understand that

23      whatever your answer is, I will accept it, I just

1    don't want you to be hesitant in telling us how you

2    feel, fair enough?

3              LANCE M. TAYLOR:  Okay.

4              ATTY. JUHASZ:  I like to tell

5    jurors sometimes when I do this, when I try a case.

6    I don't think about anything else, I barely talk to

7    my wife and my son and my other clients all get

8    upset because I'm in another trial and I'm not

9    paying attention to their case for whatever time I

10   am in this case.  And the reason I like to tell that

11   story is because we sort of ask the same thing of

12   you as jurors.  That is, when you're here, we need

13   you to be thinking about this case to the exclusion

14   of everything else.  That is really the reason why

15   we ask you questions about things like economic

16   hardship, problems that you have with family, health

17   problems, things like that, because we need folks

18   who can give us their full attention.

19              Now, all of that having been said, you

20   know, I would like to tell you that the trial would

21   be two weeks but, who knows, it could be four, and

22   that, I am sensing could make a big difference.  So,

23   what I am asking you to do is sort of think about

1    your own situation and if the trial would run that

2    long, would that be such a hardship that maybe

3    you're going to be sitting here saying, gees, oh

4    man, I don't have any money coming in for four weeks

5    now and these lawyers are still talking?

6              LANCE M. TAYLOR:  I believe that I

7    can set that aside.  It is true that it would make

8    things more difficult for me, but I think I could

9    get by that.

10             ATTY. JUHASZ:  Okay.  So, you don't

11   think that it would pose any sort of an economic

12   hardship?

13             LANCE M. TAYLOR:  Well, it would

14   pose an economic hardship, but not to the point

15   where, you know, that I couldn't get by that.

16             ATTY. JUHASZ:  Okay.  I also want

17   to talk to you briefly, Mr. Bailey has asked you

18   about this already, but this situation with your

19   mom.  And it seems to me, and I'm not sure that I

20   heard everything that you said, but it seems to me

21   that this is a little bit more than just taking her

22   to a medical appointment, you guy's sort of make an

23   day of it?

1                    LANCE M. TAYLOR:  Yes, on those

2   days, yes.

3                    ATTY. JUHASZ:  My mom is 72 and

4   some times when she has medical appointments, if

5   it's me or some times my wife or some times my

6   sister-in-law, that is sort of what we do, go to

7   lunch, go shopping, go to the doctor.  Are you

8   telling me that you can make arrangements for that

9   or is that going to be a problem?

10                   LANCE M. TAYLOR:  I don't know for

11   sure that I can make arrangements, I know there were

12   times where I would be talking to my mother and she

13   would say, if you're not able this week, I can

14   cancel it, but we have never had to do that, so I

15   don't think it would be -- again, I believe that I

16   could find a friend or somebody to fill in, I

17   believe so.

18                   ATTY. JUHASZ:  Since you were here

19   back on April 8th, we sort of gave you some idea

20   about that, have you done anything as far as

21   checking into people or anything like that about

22   making arrangements?

23                   LANCE M. TAYLOR:  No, no.  No, I

1    haven't.

2              ATTY. JUHASZ:  All right, but you

3    think that if you were selected as a juror, you

4    still might be able to handle that situation?

5              LANCE M. TAYLOR:   Yes.

6              ATTY. JUHASZ:  What we're doing

7    here is interviewing folks to see if they're

8    comfortable, and I do emphasize if you're

9    comfortable, because one of the things that I want

10    to make clear to you is, this isn't a situation

11    where I just stand up here and talk at you.  I am

12    asking you questions but I am really more interested

13    in hearing your answers than I am hearing my own

14    voice ask the questions.  So, we're trying to find

15    out if you're comfortable sitting on a job that is a

16    very important job.  You can appreciate that?

17              LANCE M. TAYLOR:  Yes.

18              ATTY. JUHASZ:  It's kind of like a

19    job interview really is that we're asking you

20    questions and, at the same time, just like you would

21    want to find out a little bit about your prospective

22    employer in a job interview and your employer finds

23    out about you, we're doing the same thing here.  We

1       want to find out some things about you, and have you

2       find out some things about how the system works.  Do

3       you appreciate that?

4                       LANCE M. TAYLOR:  Yes.

5                       ATTY. JUHASZ:  Does it seem fair to

6       you that we would want to do that; that we would

7       want to have somebody if you were sitting over there

8       where Donna Roberts is or somebody that you cared

9       about sitting over there, you would want somebody to

10      ask the questions to find out about the people who

11      were going to make the decision?

12                      LANCE M. TAYLOR:  Yes.

13                      ATTY. JUHASZ:  I bring that up

14      because some of the things that I am going to ask

15      you today, I will sort of apologize for in advance.

16      They're hard questions, okay?

17                      LANCE M. TAYLOR:  Okay.

18                      ATTY. JUHASZ:  My friend Jerry is

19      fond of saying that if I handed you this notebook

20      and had you stand up here, and I sat down where

21      you're sitting, and said, here, go ahead and ask me

22      some of these questions, even though I do this all

23      of the time, they are hard questions.  So it may

1   take you some time to look inside yourself, okay?

2              LANCE M. TAYLOR:  Okay.

3              ATTY. JUHASZ:  So that having been

4   said, let's get started with that.  Tell me your

5   thoughts about our American jury system.  What do

6   you think about our American jury system?

7              LANCE M. TAYLOR:  Well, I really

8   don't know a whole lot other than what you see on

9   the T.V. shows, you know, it just seems that -- I

10  believe one of the questions on the questionnaire

11  was, what do you think is the problem --

12             ATTY. JUHASZ:  A problem with our

13  criminal justice system, uh-huh.

14             LANCE M. TAYLOR:  And, you know,

15  there are, as far as -- I'm sorry, I'm getting a

16  little flustered here.

17             ATTY. JUHASZ:  That's okay, take

18  your time.  Take your time.  Do you believe in this

19  system?  Do you believe in our American system?

20             LANCE M. TAYLOR:  Sure, it's the

21  best system going but --

22             ATTY. JUHASZ:  That actually is a

23  good answer to my original question, which is what

```
 1        do you think about our American jury system, it's

 2        the best system that we have going, right?

 3                        LANCE M. TAYLOR:  Absolutely.

 4                        ATTY. JUHASZ:  You know, I'm sure,

 5        from studies when you were in high school that our

 6        forefathers fought for, rebelled against and won,

 7        rebelled against the British government to set up

 8        our own system, correct?

 9                        LANCE M. TAYLOR:  Yes.

10                        ATTY. JUHASZ:  And risked their

11        lives and their fortunes, as the historical saying

12        goes, and set up the jury system we have, correct?

13                        LANCE M. TAYLOR:  Uh-huh.

14                        ATTY. JUHASZ:  Do you think that's

15        an important safeguard that we have to protect

16        people to make sure that if somebody commits a

17        crime, we find out reliably if they did it, and

18        likewise, that if they didn't, that the jury system

19        vindicates them?

20                        LANCE M. TAYLOR:  Yes.

21                        ATTY. JUHASZ:  And you, yourself,

22        in fact, served in the military and really what you

23        did as part of your service was to help defend that
```

3639

1    very constitution and jury system that we're talking

2    about here today, right?

3                    LANCE M. TAYLOR:  Yes.

4                    ATTY. JUHASZ:  And I assume that

5    when you took that oath, that you took it seriously,

6    right?

7                    LANCE M. TAYLOR:  Yes, sir.

8                    ATTY. JUHASZ:  Would you agree

9    with me if I said that that system works only if

10   people who are going to serve, people in this

11   situation that you are, provide honest and

12   straightforward answers about how they feel about

13   things and how they look at the jury system?

14                   LANCE M. TAYLOR:  Yes.

15                   ATTY. JUHASZ:  That's the only way

16   it can work correctly, right?

17                   LANCE M. TAYLOR:  Yes.

18                   ATTY. JUHASZ:  You have not served

19   on a jury before, if I understand?

20                   LANCE M. TAYLOR:  No.

21                   ATTY. JUHASZ:  And if you're like

22   most folks who haven't been on jury duty before or

23   had some other reason to come to the Courthouse,

1    probably this is one of your first trips to the

2    Courthouse?

3              LANCE M. TAYLOR: Yes, it is.

4              ATTY. JUHASZ: I assume that it has

5    left some sort of an impression on you, right? You

6    are just taking in the scene of the courtrooms and

7    the collection of offices and the people who work

8    here, right?

9              LANCE M. TAYLOR: Yes.

10             ATTY. JUHASZ: Everything really

11   that we take in leaves some kind of an impression on

12   us, don't you think?

13             LANCE M. TAYLOR: Sure.

14             ATTY. JUHASZ: Everything we see,

15   if I look outside right now and say, gees, the sun

16   is shining and it looks like a nice day, right?

17             LANCE M. TAYLOR: Yes.

18             ATTY. JUHASZ: When Mr. Bailey was

19   asking you questions, you mentioned that you had

20   read some things in the paper but also heard some

21   things on T.V. about Donna Roberts, and about the

22   other fellow, right?

23             LANCE M. TAYLOR: Yes.

1           ATTY. JUHASZ:   Rather than me

2   standing up here asking you things, did you hear

3   this, did you think that, tell me, if you would

4   please, those things that you read and those things

5   that you heard -- well, first of all, can you kind

6   of summarize them for me?

7           LANCE M. TAYLOR:   Well, basically

8   the things that I remember and, again, most of it

9   was from the T.V., T.V. accounts of Donna Roberts

10  and her boyfriend.

11          ATTY. JUHASZ:   Do you remember his

12  name?

13          LANCE M. TAYLOR:   Yes, Nathaniel

14  Jackson.

15          ATTY. JUHASZ:   Okay.

16          LANCE M. TAYLOR:   And conspiring

17  in the death of -- I didn't know that it was

18  ex-husband, I thought it was husband.

19          ATTY. JUHASZ:   Okay.

20          LANCE M. TAYLOR:   And, again, the

21  thing I remember mostly is the love letters that

22  they came out with.

23          ATTY. JUHASZ:   What do you remember

1      about those?

2                          LANCE M. TAYLOR:    That -- the

3      excerpts that they read.  I can't remember

4      specifically but, at the time, it seemed, you know,

5      like very damning evidence.

6                          ATTY. JUHASZ:  Okay.  Besides those

7      news articles and news stories, have you had

8      discussions about the case at any point in time

9      since it began up until now?

10                         LANCE M. TAYLOR:   Not really.

11                         ATTY. JUHASZ:  Like, hey, did you

12     see that in the paper, that kind of thing?

13                         LANCE M. TAYLOR:  No, no.

14                         ATTY. JUHASZ:  When you came to the

15     Courthouse on the 8th of April, a couple of weeks

16     ago when we first started, do you remember hearing

17     anybody talk about the case then?

18                         LANCE M. TAYLOR:  No.

19                         ATTY. JUHASZ:  Do you remember

20     where you were, by the way, in Judge Logan's big

21     Courtroom, when you went through the big set of

22     doors, did you go to the right or to the left or to

23     the middle?

```
 1                          LANCE M. TAYLOR:  It was to the
 2       left.
 3                          ATTY. JUHASZ:  And did you sit up
 4       in the front or --
 5                          LANCE M. TAYLOR:  It was towards
 6       the front, yes.
 7                          ATTY. JUHASZ:  And if I understand
 8       you, you didn't hear anybody who was gathered there
 9       talk about Miss Roberts or about the case in any
10       fashion?
11                          LANCE M. TAYLOR:  No.
12                          ATTY. JUHASZ:  Did you talk to
13       anybody about the case in any fashion?
14                          LANCE M. TAYLOR:  No.
15                          ATTY. JUHASZ:  So, basically,
16       before April 8th, what you had heard about this case
17       was confined to the things that you and I talked
18       about, which would be those T.V. stories and the
19       newspaper articles, correct?
20                          LANCE M. TAYLOR:  Yes.
21                          ATTY. JUHASZ:  That having been
22       said, tell me, if you would please, what impressions
23       those stories and articles left on of you?
```

1           LANCE M. TAYLOR:  Well, as I stated

2     earlier, I -- after seeing those accounts, I

3     believed that there was a conspiracy.

4           ATTY. JUHASZ:  Okay, and did you

5     believe that Miss Roberts was involved in that

6     conspiracy?

7           LANCE M. TAYLOR:  Yes, I did.

8           ATTY. JUHASZ:  Has anything

9     happened to change that impression since you formed

10    that impression?

11          LANCE M. TAYLOR:  Are you asking me

12    if I believe right this minute that she is --

13          ATTY. JUHASZ:  Yes, I guess I am

14    asking you that same thing just in a different way,

15    yeah.

16          LANCE M. TAYLOR:  I haven't heard

17    anything to, you know, convince me otherwise.

18          ATTY. JUHASZ:  All right.

19          LANCE M. TAYLOR:  I mean, those

20    were my initial impressions and they haven't

21    changed.

22          ATTY. JUHASZ:  That's okay.  And I

23    want you to understand, and I probably should have

1       said this before, there are no right or wrong

2       answers to anything that I am asking you here.  The

3       only wrong answer that you give me is something that

4       you think I want to hear instead of what is really

5       in your mind or in your heart, okay.  One of the

6       reasons that we do this, just -- I hope I am making

7       you feel a little bit more comfortable when I tell

8       you this, one of the reasons that we do this is

9       because when you read this stuff, you didn't know

10      you were going to get a jury summons.

11                    LANCE M. TAYLOR:  No.

12                    ATTY. JUHASZ:  So there is nothing

13      that you have done that is wrong or anything, we

14      just need to talk about what those things are.  So,

15      understand that when I am asking my questions, it's

16      not that I am trying to trick to you.  I'm trying to

17      ask you questions that, again, I am not feeding you

18      the answer, I'm more interested in your thoughts,

19      okay?

20                    LANCE M. TAYLOR:  Okay.

21                    ATTY. JUHASZ:  So, that having been

22      said, it seems to me from what you said, and please

23      correct me if I'm wrong, that those impressions that

1   you formed when you read those articles and heard

2   those stories, was that there was a conspiracy,

3   correct?

4                   LANCE M. TAYLOR:  Yes.

5                   ATTY. JUHASZ:  And that Miss

6   Roberts was involved in that, right?

7                   LANCE M. TAYLOR:  Yes.

8                   ATTY. JUHASZ:  And I think you said

9   that you haven't heard anything that has changed

10  your mind to the contrary, correct?

11                  LANCE M. TAYLOR:  No, that's

12  correct.

13                  ATTY. JUHASZ:  So, it would be fair

14  to say that that is an impression that you still

15  have today, is that right?

16                  LANCE M. TAYLOR:  Yes.

17                  ATTY. JUHASZ:  Is that an

18  impression that you would sort of want somebody to

19  dispel for you.  In other words, you have that

20  impression that there was a conspiracy and that

21  Donna Roberts was involved, so would you expect to

22  hear evidence to sort of convince you otherwise

23  before you would change the impression that you

1    have?  Am I making that question clear to you?

2              LANCE M. TAYLOR:  Yes, I understand

3    the question.  I believe that I could listen to the

4    evidence and, you know, set aside those ideas that I

5    have and just listen to the testimony and the

6    evidence brought forward and make a decision.

7              ATTY. JUHASZ:  Okay.  This is a

8    real hard question, but I hope you appreciate why I

9    am asking.  You have had these impressions for some

10   time now, because it's been some time since you've

11   saw the articles.

12             LANCE M. TAYLOR:  Well, those are

13   the impressions that I had at the time and it's

14   something that I, you know, forgotten, you know, as

15   far as -- I mean, it's nothing that I think about --

16   it's not always on my mind, things like that.

17             ATTY. JUHASZ:  Okay.  Well, let me

18   go back to my earlier question.  Is there something

19   that has happened, whatever it is, that has made you

20   change your mind about those impressions, you still

21   have them, correct?

22             LANCE M. TAYLOR:  Yes, yes.

23             ATTY. JUHASZ:  Is it the Judge's

1    instruction, is it the thought that, well, the

2    lawyers are telling me that this is what I have to

3    do, so I have to set these impressions aside so I am

4    going to do it, or is there something else?  Am I

5    making that clear?

6              LANCE M. TAYLOR:  I'm not

7    understanding you.

8              ATTY. JUHASZ: Okay.  If you can set

9    those impressions aside, it's okay, but if you

10   can't, that also okay.  We're just trying to find

11   out if you can, and if so, what is going on in your

12   head that would make you able to do that?

13             LANCE M. TAYLOR:  Well, I would

14   like to think that I would be able to.

15             ATTY. JUHASZ:  All right.  These

16   questions are some times as hard to ask as they are

17   to answer, believe it or not.  You mentioned that

18   the letters that you heard about, and it was in

19   connection with the other trial, with Mr. Jackson's

20   trial?

21             LANCE M. TAYLOR:  Yes.

22             ATTY. JUHASZ:  I think you told Mr.

23   Bailey that you knew the outcome of that trial,

1          correct?

2                              LANCE M. TAYLOR:  I know that there

3          was a guilty verdict.

4                              ATTY. JUHASZ:  All right.

5                              LANCE M. TAYLOR:  A conviction.

6                              ATTY. JUHASZ:  All right, is there

7          something about that verdict that sort of

8          strengthens or buttresses your earlier impressions

9          that Donna Roberts was involved in this conspiracy?

10         In other words, we have a person that was found

11         guilty --

12                             LANCE M. TAYLOR:  Yes.

13                             ATTY. JUHASZ:  -- does that

14         strengthen your impression to say, well, you know

15         what, I read this stuff, and I had an impression

16         that there was a conspiracy and now this guy is

17         convicted?

18                             LANCE M. TAYLOR:  It did, yes.

19                             ATTY. JUHASZ:  Okay.  And you also

20         mentioned that the letters were, I think you said,

21         damning evidence?

22                             LANCE M. TAYLOR:  Yes.

23                             ATTY. JUHASZ:  Can you to the --

1    whatever way that you're comfortable, elaborate on

2    that for me?  Tell me what you mean by that?

3                    LANCE M. TAYLOR:  I can't remember

4    specifically what were the exact words, but --

5                    ATTY. JUHASZ:  That's okay, that's

6    okay.

7                    LANCE M. TAYLOR:  It just -- in

8    those letters on the T.V. accounts, the words to

9    Miss Roberts were that something was going to be

10   done.  Like I say, I don't remember exactly those

11   words.

12                   ATTY. JUHASZ:  That's okay.

13                   LANCE M. TAYLOR:  But it just said

14   that he was going to do -- take care of something,

15   you know.

16                   ATTY. JUHASZ:  All right, and you

17   heard that during the course of Mr. Jackson's trial,

18   I take it?

19                   LANCE M. TAYLOR:  On the -- yes,

20   yes.

21                   ATTY. JUHASZ:  Now that we've

22   talked about that, let me go back to something that

23   I asked you before and ask you to sort of look

3651

1     inside of your mind again and your heart.  Based

2     upon the impressions that you have right now and,

3     again, I want to interrupt myself, that's all the

4     questions that we ask you, whether it's about this

5     or anything else, nobody is trying to change your

6     mind.  Do you understand that?

7               LANCE M. TAYLOR:  Yes.

8               ATTY. JUHASZ:  I am not trying to

9     change your impressions, I am simply trying to find

10    out what they are, and I think you have pretty much

11    told me that you got an impression that there was a

12    conspiracy, correct?

13              LANCE M. TAYLOR:  Yes.

14              ATTY. JUHASZ:  You got an

15    impression that Donna Roberts was involved in that,

16    correct?

17              LANCE M. TAYLOR:  Yes.

18              ATTY. JUHASZ:  The letters were

19    pretty damning evidence in your mind, correct?

20              LANCE M. TAYLOR:  Yes.

21              ATTY. JUHASZ:  And the fact that

22    Mr. Jackson was convicted sort of strengthens that

23    impression because it kind of confirms the

```
 1    suspicions that you just had, that there was a

 2    conspiracy, correct?

 3                    LANCE M. TAYLOR:  Yes.

 4                    ATTY. JUHASZ:  Did you hear what

 5    penalty, by the way, Mr. Jackson got, or did you not

 6    hear that?

 7                    LANCE M. TAYLOR:  I can't remember

 8    the penalty.

 9                    ATTY. JUHASZ:  All right, all of

10    those impressions, again, are okay because, again,

11    when you read those articles and watched those T.V.

12    stories, you didn't know that you would be called as

13    a juror on this case.  But that having been said,

14    because you have those impressions, would you expect

15    to hear some evidence to sort of change your mind

16    that there was not a conspiracy or that she was not

17    involved?

18                    LANCE M. TAYLOR:  Would I expect --

19    yes, if there is some, I would expect to hear that.

20                    ATTY. JUHASZ:  Okay.  And without

21    that kind of evidence, is it pretty fair to say that

22    you would continue to have that impression that you

23    brought here with you to the Courtroom today?
```

1              LANCE M. TAYLOR:  Yes.

2              ATTY. JUHASZ:  Let me switch gears

3    for a moment and talk to you about your views on the

4    death penalty.  And, again, please understand that I

5    am only interested in what you think, and I am

6    interested in making sure that you know nobody is

7    trying to change your views, just find out what they

8    are so that we can talk about them, fair enough?

9              LANCE M. TAYLOR:  Okay.

10             ATTY. JUHASZ:  You mentioned on

11   your questionnaire, that you had in the past taken a

12   position about the death penalty either in a

13   discussion or debate with another person.  Do you

14   remember that?

15             LANCE M. TAYLOR:  Yes.

16             ATTY. JUHASZ:  Can you tell me

17   about that?  Was it a discussion, was it a debate,

18   has it been on more than one occasion?

19             LANCE M. TAYLOR:  It hasn't been

20   that often but, like I said before, like if there

21   was a national case that people were talking about

22   it at the time and, you know, someone would say, you

23   know, the death penalty would come up and a

5654

1    discussion about that, and do you believe in the

2    death penalty or not, I always -- I believe in the

3    death penalty, yes, sir.

4                  ATTY. JUHASZ:  If you can, sir, can

5    you remember and tell me, Mr. Taylor, some of the

6    arguments that you used sort of to buttress or build

7    up your side of the argument?  Do you know what I'm

8    getting at?

9                  LANCE M. TAYLOR:  Like I wrote

10   there on the questionnaire that, you know, one time

11   I did believe that the death penalty could be a

12   deterrent to crime.  I don't know if that's true --

13   I don't know if that is a fact or not, and as far as

14   I am concerned, whether it is or not, it's not

15   really important.  If it is, then that is great.  If

16   not, I believe that there are some crimes that are

17   punishable by death, should be.

18                  ATTY. JUHASZ:  All right, let me

19   try to help you out a little bit and then we will

20   talk about it.  I think the answer that you're

21   talking about is Question 45, where you said, "I'm

22   in favor of capital punishment.  I used to think

23   that capital punishment was a deterrent to crime,

 1      but I'm no longer sure."

 2                     LANCE M. TAYLOR:  Right.

 3                     ATTY. JUHASZ:  "If it does deter

 4      crime, fine, if not, I believe a victim or survivor

 5      in society in general deserve for want of a better

 6      word, revenge."  Correct?

 7                     LANCE M. TAYLOR:  Yes.

 8                     ATTY. JUHASZ:  All right.  The

 9      only reason that I read that to you is to sort of

10      refresh your recollection about what you said so

11      that I can ask you a couple of questions about it.

12      If I understand that, then you are in favor of the

13      death penalty whether it's a deterrent or not,

14      correct?

15                     LANCE M. TAYLOR:  Yes, yes.

16                     ATTY. JUHASZ:  Even if it's not,

17      you still think an appropriate reason to have the

18      death penalty is for revenge?  Society --

19                     LANCE M. TAYLOR:  That may be a bad

20      choice of a word there, but I believe if a person is

21      found guilty of a crime punishable by death, again,

22      for the victim's family, it provides, as people like

23      to say, closure to a case.

```
 1                    ATTY. JUHASZ:  Okay.  All right,

 2        the only reason that I am asking you about that, is

 3        I asked you before whether you were involved in

 4        debates or arguments or discussions.  Are these

 5        things that you and I have just talked about, are

 6        these some of the arguments that you used in favor

 7        of the death penalty, or were there others, is what

 8        I am trying to find out?

 9                    LANCE M. TAYLOR:  Those are, yes.

10                    ATTY. JUHASZ:  Those are arguments,

11        okay.  I have heard some people argue, and I wonder

12        if you have another reason that we should have the

13        death penalty is because, you know what, it costs so

14        much to warehouse these people.  If you give them a

15        life sentence, we got to pay for them all of these

16        years, and that is another reason to have the death

17        penalty.  Have you ever heard that type of an

18        argument before?

19                    LANCE M. TAYLOR:  Yeah, I've heard

20        that.

21                    ATTY. JUHASZ:  Do you have thoughts

22        about that argument?

23                    LANCE M. TAYLOR:  I don't agree
```

 1    with that.

 2                        ATTY. JUHASZ:  You don't agree with

 3    that?

 4                        LANCE M. TAYLOR:  No.

 5                        ATTY. JUHASZ:  All right.  So, that

 6    in your mind, is not one of the reasons to have the

 7    death penalty?

 8                        LANCE M. TAYLOR:  No.

 9                        ATTY. JUHASZ:  I noticed that, and

10    we had an interesting assortment of answers on this

11    question, but the person you admire was James

12    Cagney, the movie actor, correct?

13                        LANCE M. TAYLOR:  Yes.

14                        ATTY. JUHASZ:  And if I am

15    recalling correctly, you were sort of drawn to his

16    tough guy image when you were a younger fellow,

17    right?

18                        LANCE M. TAYLOR:  Yes, sir.

19                        ATTY. JUHASZ:  And then as you

20    learned more about Mr. Cagney, you learned that

21    James Cagney, the person, as opposed to the

22    characters he played in the movies, was a guy -- an

23    admiral guy who led an admiral life?

3658

```
 1                    LANCE M. TAYLOR:  Yes, sir.

 2                    ATTY. JUHASZ:  Have you learned a

 3      lot about him over time?

 4                    LANCE M. TAYLOR:  Yeah, I have read

 5      a couple of his -- autobiography and his

 6      biographies.

 7                    ATTY. JUHASZ:  Is he a guy from

 8      what you know of pretty strong convictions?

 9                    LANCE M. TAYLOR:  Yes.

10                    ATTY. JUHASZ:  Or was he, I should

11      say.

12                    LANCE M. TAYLOR:  Yes, he was.

13                    ATTY. JUHASZ:  You sort of strike

14      me as the same type of person.  Do you share those

15      characteristics with him?

16                    LANCE M. TAYLOR:  You know, like I

17      say, he's somebody that I have always looked up to.

18      And, you know, he was his own person, he stood up to

19      the movie moguls.

20                    ATTY. JUHASZ:  He wasn't somebody

21      that changes his opinion just because somebody

22      thought that he should?

23                    LANCE M. TAYLOR:   No, absolutely.
```

1          ATTY. JUHASZ:  How about you, do

2    you feel like that too, are you a person who you,

3    you know, you have your convictions and these are my

4    convictions?

5          LANCE M. TAYLOR:  I believe I can

6    be flexible, I don't think that I am bull headed

7    enough to not listen and hear the other point of

8    view.

9          ATTY. JUHASZ:  Okay.  Do you

10   understand that you have -- I'm sorry, before I ask

11   you that.  One of the things that we do, you've

12   never been on jury duty before, but one of the

13   things that we do is send you a piece of paper and

14   tell you to come on down here and be a juror.  If

15   you can do that and, by the way, when you get here,

16   we're going to have all sorts of strange words and

17   rules and procedures that you don't really know

18   about because you're not trained as a lawyer, and

19   some times I think a little bit unfairly we sort of

20   expect you to just kind of fall right into the

21   program.  And when I say you, I don't mean you

22   individually, I mean everybody who is brought in as

23   a juror.  Am I making sense out of that?

660

```
 1              LANCE M. TAYLOR:  Yes, yes.

 2              ATTY. JUHASZ:  There are probably

 3    some things that we're doing, even me standing up

 4    here asking you these silly questions and maybe

 5    you're saying I don't know why these people are

 6    doing this stuff.  And the reason that I bring that

 7    up is, I want to make certain because we've given

 8    you a handout about a very difficult legal subject

 9    which is how a death penalty trial works.  Do you

10    think that you're pretty comfortable with how that

11    works, or do you want to take a few minutes and go

12    over it?  Do you know how the two different phases

13    and all of that, do you want to go over that, or do

14    you feel that you are comfortable that you know

15    that?

16              LANCE M. TAYLOR:  I feel that I am

17    comfortable with it.

18              ATTY. JUHASZ:  You feel that you

19    know that, all right, good enough.  You appreciate

20    that the State of Ohio has a burden in the first

21    phase to try to prove the Defendant guilty beyond a

22    reasonable doubt of aggravated murder and at least

23    one of the special circumstances, specifications, we
```

1    call them.

2                    LANCE M. TAYLOR:  Uh-huh.

3                    ATTY. JUHASZ:   That would make the

4    case eligible for the death penalty, correct?

5                    LANCE M. TAYLOR:  Yes.

6                    ATTY. JUHASZ:  And then you

7    understand that if that happens, then the jury goes

8    into the second phase, correct?

9                    LANCE M. TAYLOR:  Yes.

10                   ATTY. JUHASZ:  And that is where

11   the jury would consider whether or not to impose the

12   death penalty, right?

13                   LANCE M. TAYLOR:  Yes, sir.

14                   ATTY. JUHASZ:  You mentioned when

15   we asked you, again, your views about the death

16   penalty, first of all, of course you will agree,

17   that for the reasons that we've talked about, there

18   are certain crimes that deserve the sentencing

19   death, right?

20                   LANCE M. TAYLOR:  Yes.

21                   ATTY. JUHASZ:  And, specifically,

22   you mentioned the taking of someone's life while

23   committing a crime, or especially a premeditated

```
 1        murder, the actual planning of another person's

 2        murder?

 3                        LANCE M. TAYLOR:  Yes.

 4                        ATTY. JUHASZ:  Those are things for

 5        which you think a person should get the death

 6        penalty, correct?

 7                        LANCE M. TAYLOR:  Yes.

 8                        ATTY. JUHASZ:  Are there others,

 9        or are there not?

10                        LANCE M. TAYLOR:  I can't think of

11        anything specifically, you know, whatever case

12        should be judged individually, I guess.

13                        ATTY. JUHASZ:  Okay.  Do you want

14        some water?

15                        LANCE M. TAYLOR:  No, thanks.

16                        ATTY. JUHASZ:  Let's say that

17        whether it's this case, or well, I'm sorry, let's

18        take these things that we talked about, which are

19        premeditated or planned out murders.  You understood

20        all of Mr. Bailey's questions about prior

21        calculation and design, making a plan for murder,

22        correct?

23                        LANCE M. TAYLOR:  Yes.
```

1            ATTY. JUHASZ:  In a situation where

2    there is a premeditated murder, you think that is a

3    crime for which a person should get the death

4    penalty?

5            LANCE M. TAYLOR:  Yes.

6            ATTY. JUHASZ:  Okay, if you are in

7    a situation, whether it's this case or some other

8    case, well, -- I'm sorry.  Before I do that, there

9    is also another one that you mentioned, which is the

10   commission of a murder in the course of some other

11   felony, right?

12           LANCE M. TAYLOR:  Yes.

13           ATTY. JUHASZ:  And I assume you're

14   talking about something where I walk into a Seven

15   Eleven Store with a gun and pull it out and say

16   empty the cash register, and then apparently for no

17   good reason, I just decide to shoot the clerk and

18   kill him or her after I take the money, is that the

19   kind of thing that you're talking about?

20           LANCE M. TAYLOR:  Yes.

21           ATTY. JUHASZ:  Your views about the

22   death penalty, are these views that you had for a

23   long time?

1                     LANCE M. TAYLOR:  Yes.

2                     ATTY. JUHASZ:  And I take it that

3 they're pretty firmly established in your belief

4 system, correct?

5                     LANCE M. TAYLOR:  Yes.

6                     ATTY. JUHASZ:  I mean, when you

7 discussed the death penalty over the years with

8 folks, you have always taken the position that the

9 death penalty was appropriate for certain crimes,

10 right?

11                     LANCE M. TAYLOR:  Yes.

12                     ATTY. JUHASZ:  Including the two

13 types that we just talked about, correct?

14                     LANCE M. TAYLOR:  Yes.

15                     ATTY. JUHASZ:  Are your feelings

16 about the death penalty then such if you had an

17 offense like that, the death penalty would sort of

18 have a leg up as far as deciding how to impose

19 punishment?

20                     LANCE M. TAYLOR:  Probably so,

21 probably so.

22                     ATTY. JUHASZ:  Okay, all right, and

23 again, there is nothing wrong with that.  It's just

3665

```
 1      that you feel that those certain type of offenses, a

 2      felony murder type situation or a premeditated

 3      murder because of how you feel about the death

 4      penalty, if you were called upon to decide a

 5      sentence, those penalties are sort of going to have

 6      a leg up going into the phase where you decide the

 7      sentence, correct?

 8                      LANCE M. TAYLOR:  Yes.

 9                      ATTY. JUHASZ:  And because of how

10      you feel about the death penalty in those

11      situations, would you sort of expect the Defendant

12      to establish or prove to you reasons why he or she

13      shouldn't get the death penalty if you found them

14      guilty of committing those types of crimes?

15                      LANCE M. TAYLOR:  Yes.

16                      ATTY. JUHASZ:  Are there any

17      situations in your belief system, Mr. Taylor, where

18      you think that life imprisonment is more appropriate

19      than the death penalty?  Am I making that question

20      clear?

21                      LANCE M. TAYLOR:  Yes.  Sure, there

22      are probably situations where that would be a more

23      appropriate sentence.
```

3666

1              ATTY. JUHASZ:  Okay.  But, again,

2     the ones that you and I have talked about, that

3     would not be the case, right, because it's a

4     premeditated murder?

5              LANCE M. TAYLOR:  Yes, that's

6     right.

7              ATTY. JUHASZ:  Are there certain

8     offenses, and are these -- are these them, if the

9     answer is yes, are there certain offenses for which

10    you feel that the death penalty is the only

11    appropriate penalty?  In other words, for the

12    robbery murder of the Seven Eleven that I just told

13    you about, do you feel that the death penalty is the

14    only appropriate penalty for that?

15             LANCE M. TAYLOR:  Yes, I do.

16             ATTY. JUHASZ:  You also mentioned

17    in your questionnaire, especially for premeditated

18    murder, so do you also feel that the death penalty

19    is the only appropriate penalty for that type of

20    thing?

21             LANCE M. TAYLOR:  Yes.

22             ATTY. JUHASZ:  And it's the idea

23    that somebody took the time to plan it out in

1   advance, is that it?

2                   LANCE M. TAYLOR:  Yes, sir.

3                   ATTY. JUHASZ:  You heard Mr. Bailey

4   talk a little bit about the presumption of

5   innocence, correct?

6                   LANCE M. TAYLOR:  Yes.

7                   ATTY. JUHASZ:  Is that something

8   that you were -- and I don't mean to be

9   condescending about this because we have jurors from

10  all over the place.  Some of them say, I know all

11  about the presumption of innocence, and some of them

12  say, I've heard of that, but I don't know what

13  you're talking about.  Is that something that you

14  heard about before?

15                  LANCE M. TAYLOR:  Sure.

16                  ATTY. JUHASZ:  How do you feel

17  about that presumption of innocence?

18                  LANCE M. TAYLOR:  I would want to

19  be presumed innocent if I was in that situation.

20                  ATTY. JUHASZ:  If you were charged

21  with an offense, you would want to be presumed

22  innocent?

23                  LANCE M. TAYLOR:  Absolutely.

1              ATTY. JUHASZ:  Okay.  The State --

2    I think that Mr. Bailey also talked about a box,

3    didn't he?

4              LANCE M. TAYLOR:  Yes.

5              ATTY. JUHASZ:  Okay.  And you

6    understand that the government's obligation is to,

7    if it can at the first phase, fill that box up with

8    enough evidence to get beyond the line called

9    reasonable doubt to prove the Defendant guilty?

10             LANCE M. TAYLOR:  Yes.

11             ATTY. JUHASZ:  As we start this

12   phase, you haven't heard any evidence, correct?

13             LANCE M. TAYLOR:  That's correct.

14             ATTY. JUHASZ:  But you do have some

15   impressions about Miss Roberts because of those

16   things that you seen and heard before, correct?

17             LANCE M. TAYLOR:  Yes, yes.

18             ATTY. JUHASZ:  Are those

19   impressions sort of something that are in that box

20   that constitutes some proof that she is guilty of

21   this conspiracy?

22             LANCE M. TAYLOR:  Probably --

23   probably so up to this point.

1           ATTY. JUHASZ:  Okay, all right.

2    Now, again, let's shift to the second phase for a

3    second.  They have a different box at the second

4    phase, okay?  I apologize because I know this stuff

5    is all new rules, but if the jury finds a person

6    guilty of aggravated murder at the first phase and

7    one or more of those specifications, then you know,

8    of course, we go to the second phase, right?

9           LANCE M. TAYLOR:  Yes.

10          ATTY. JUHASZ:  At the second

11   phase, they have a different box to fill up, and

12   that box is proof, if they can, by proof beyond a

13   reasonable doubt, that the reasons to impose the

14   death penalty outweigh the reasons not to.  Are you

15   comfortable about that from reading your handout?

16          LANCE M. TAYLOR:  Yes.

17          ATTY. JUHASZ:  If it's a situation

18   where it's a premeditated murder or a felony murder,

19   like you and I have been talking about, if I

20   understand your views, the death penalty is the

21   appropriate penalty for those offenses, correct?

22          LANCE M. TAYLOR:  Yes.

23          ATTY. JUHASZ:  And is -- that view,

1    again, sort of something in that box already getting

2    toward the death penalty, is that kind of how you

3    feel about it?

4                    LANCE M. TAYLOR:  Sure, sure.

5                    ATTY. JUHASZ:  And then you would

6    expect a person, whether it's in this case or

7    whether it's Miss Roberts, or somebody in another

8    case, to sort of pull that evidence out of the box

9    and convince you that if it's a premeditated murder

10   or a felony murder, that they should not get the

11   death penalty?

12                   LANCE M. TAYLOR:  Yes.

13                   ATTY. JUHASZ:  I apologize because

14   I know that it's taking up your time and there are

15   lot of hard questions, and I apologize, and I

16   appreciate your answers and your honesty.  Thank

17   you.

18                   LANCE M. TAYLOR:  Thank you.

19                   ATTY. BECKER:  Your Honor, can we

20   approach?

21                   THE COURT:  Yes.

22

23   (Whereupon, counsel approached the bench.)

1     **EXAMINATION BY THE COURT:**

2

3              THE COURT:  Mr. Taylor, if we can

4     go back over a couple of things.  In regard to the

5     death penalty, whether you have any opinions about

6     when it's appropriate or when it isn't, some of your

7     answers seem to tilt one way and some you weren't

8     real clear on some of your answers.  Now, maybe a

9     way to put this is, if you stood charged with

10    aggravated murder with specifications, and you

11    wanted 12 people on that jury to decide this case

12    according to the evidence and the law, would you

13    feel comfortable sitting as a Defendant and having

14    somebody like yourself sitting in judgment on the

15    jury?

16              LANCE M. TAYLOR:  Yes, I would.

17              THE COURT:  You would?

18              LANCE M. TAYLOR:  Yes, sir.

19              THE COURT:  You understand that

20    it's up to the prosecution to prove all of the

21    elements of the aggravated murder with the

22    specification, and in that second phase, each of the

23    jurors have to start out fresh in that second phase

1    with no preconception of what penalty should be

2    involved.  I think you mentioned the Seven Eleven

3    robbery, okay.  Assume it was just a classic case

4    that somebody took a gun and went in there and in

5    the process of robbing the place killed the clerk.

6    When you get to that second phase, ideally you have

7    12 people on that jury who are going to listen to

8    the evidence because both the State and the

9    Defendant have the right, almost have a fresh start,

10   because there might be something in the aggravating

11   circumstances between one case and another that

12   would indicate that the death penalty may or may not

13   be appropriate in that particular fact or situation,

14   or that the mitigating factors may be quite

15   different between one case and another, and the jury

16   has to take each case on the value of the merits of

17   those circumstances versus the factors.  So that

18   means that if you have anybody that has

19   predetermined this type of crime deserves the death

20   penalty and this doesn't, then we can't have a fair

21   trial.  I don't know if that makes sense or not?

22                    LANCE M. TAYLOR:  Yes, I understand

23   that.

1          THE COURT:  Do you feel that you

2     would have any problem at all, no matter what the

3     decision is, with being able to start out in that

4     second phase without any prejudice or bias toward

5     one view or the other?

6          LANCE M. TAYLOR:  Well, again, I

7     would like to think that I would be able to, you

8     know, make a decision as to the evidence that I

9     would hear.

10          THE COURT:  We had several people

11     in their questionnaires bring up the question is

12     asked in there, what do you feel is an appropriate

13     situation for the death penalty.  A lot of people

14     mentioned the death of a child, okay.  I don't think

15     any of us can think of anything more dastardly than

16     killing a child, an innocent little one.  Again,

17     it's understandable why a person would have that

18     view, but if you had a person that felt that way and

19     they were listening to an aggravated murder case

20     with the death penalty as a possibility, a person

21     who held that view, I think, would have a very

22     difficult time if they got to that second phase of

23     putting that out of their mind and starting fresh.

3674

1          Follow me?

2                    LANCE M. TAYLOR:  Yes, sir.

3                    THE COURT:  Do you any reservations

4     in your own mind about that?

5                    LANCE M. TAYLOR:  Well, you know,

6     I think it would be practically impossible to

7     totally, you know, put any ideas that you already

8     have about things like that.

9                    THE COURT:  Well, I agree with you

10    on that.  We ask questions and we ask, are you able

11    to do this and able to do that.  And, of course, we

12    are all who we are to a degree, you couldn't change

13    who we are and no one is trying to do that with any

14    of you.  But the concern is whether you have any

15    reservations in your own mind and I have asked you

16    several times, and you have told me that you do not.

17    It's a question of fairness, I guess, that we try to

18    get 12 people who can be as fair as humanly

19    possible, whatever that may arise to.

20                    Mr. Bailey, why don't you ask a few more

21    questions here.

22                    ATTY. BAILEY:  Thank you, Your

23    Honor.

1    **EXAMINATION BY ATTORNEY BAILEY:**

2           ATTY. BAILEY:  Mr. Taylor, when the

3    defense counsel was asking you some questions, you

4    had some answers that sort of gave an impression

5    that -- well, let me back step a minute.  You

6    understand this concept of the presumption of

7    innocence, right?

8           LANCE M. TAYLOR:  Yes.

9           ATTY. BAILEY:  She's presumed

10   innocent.  Because of that, she doesn't have to do

11   anything, her or her attorneys.

12          LANCE M. TAYLOR:  Right, the burden

13   is on you.

14          ATTY. BAILEY:  Correct, the burden

15   is totally on us.  Because of that, this box, this

16   imaginary box that we have to fill the evidence

17   with, the Defendant doesn't have to take anything

18   out of that box, okay.  You got to be able to tell

19   us that you can set aside whatever you learned from

20   T.V., and the papers, and you start out with a

21   totally blank slate here.  Okay, your own feelings

22   about any impressions as to the co-defendants case,

23   you got to sort of put that somewhere else, okay,

3676

 1    outside of the room, so that we start out with a

 2    fresh blank classroom, so to speak here.  You are

 3    going to get whatever materials are in this course

 4    based on what happens just in this Courtroom, okay.

 5    Do you think that you are able to do that?

 6                    LANCE M. TAYLOR:  I believe that I

 7    am.  I believe, I am.

 8                    ATTY. BAILEY:  Okay, now, let's say

 9    we get to a second phase, in that second phase, you

10    understand that no penalty can have a leg up on

11    another, okay, like the death penalty.  You have to

12    be able to consider all of these penalties equally

13    when you start out.  Okay, the Defendant doesn't

14    have any burden in the second phase.  That total

15    burden of this balancing test is on us, the people

16    of the State, and you can't -- you may have certain

17    personal views as to the appropriateness of the

18    death penalty for certain types of offenses, like

19    for premeditated murders, okay.  You might think

20    that, personally, that you should always impose

21    that, but are you able to set that aside and render

22    a verdict in this case based solely on the evidence

23    here?  I know that it may be a very difficult thing

1     to do because you feel so strongly that the death

2     penalty is the right punishment for that type of a

3     crime because society has a right maybe for

4     retribution or the victims might have that right in

5     your belief system.  But are you able to set aside

6     your own personal belief system and follow the law

7     that the Judge is going to give you?

8               LANCE M. TAYLOR:  I believe so,

9     sir, yes.

10              ATTY. BAILEY:  So there is no

11    penalty that will actually have a leg up on another?

12              LANCE M. TAYLOR:  Yes.

13              ATTY. BAILEY:  Okay, I mean, you

14    are the only person who really knows that.

15              LANCE M. TAYLOR:  Well, you know --

16              ATTY. BAILEY  And it's easy for

17    lawyers.

18              ATTY. INGRAM:  I would suggest that

19    the juror be permitted to answer.  He started to

20    answer Mr. Bailey will not permit him.

21              ATTY. BAILEY:  I'm sorry, I didn't

22    mean to cut you off.  Go ahead and answer.

23              THE COURT:  Go ahead and answer.

3678

```
1                    LANCE M. TAYLOR:  I just was about

2    to say that, you know, it would be practically, you

3    know, impossible to put beliefs aside, but I would

4    do my best to just listen to the evidence and I know

5    every case is, you know, individual and it's a --

6                    ATTY. BAILEY:  Okay, when you say

7    it's practically impossible to put your beliefs

8    aside, are you telling us that your belief in the

9    death penalty being appropriate is going to affect

10   you in that second phase so that you would be

11   inclined to come out with a death penalty verdict,

12   no matter what the evidence was?

13                   LANCE M. TAYLOR:  No, I am not

14   saying that.

15                   ATTY. BAILEY:  Do you think it

16   would give the people of the State an extra boost to

17   start out with there because of your personal

18   beliefs?

19                   LANCE M. TAYLOR:  I don't think so,

20   no.

21                   ATTY. BAILEY:  So, you understand

22   -- let's say we get to a second phase, okay, at that

23   point, we have already proved the Defendant guilty
```

3679

1    beyond a reasonable doubt of aggravated murder with

2    prior calculation and design with specifications, so

3    that it's like -- it fits your belief system, okay,

4    as to whether the death penalty would be

5    appropriate.  Can you put your personal belief

6    system on hold and listen to whatever we present or

7    whatever is presented in the second phase so that

8    you would be able to start out equally considering

9    all of these possible punishments, the life

10   sentences, and the death penalty, and understand

11   that the burden is totally on us.  So, if we don't

12   meet our burden of proof beyond a reasonable doubt

13   that the aggravating circumstances outweigh the

14   mitigating factors, that you would then go on to

15   consider the life sentences and not just come back

16   with a death verdict?

17            LANCE M. TAYLOR:  Yes.  Maybe I was

18   giving a wrong impression.  I don't believe that the

19   death penalty is, even for those cases where I said

20   it was appropriate, that it's automatic.  I don't

21   believe that.

22            ATTY. BAILEY:  So you agree, you

23   follow the law, you would consider fairly the

1    mitigating factors whatever they are, as well as the

2    aggravating circumstances  --

3                    LANCE M. TAYLOR:  Yes.

4                    ATTY. BAILEY:   -- and do this

5    balancing test, this weighing test with the other

6    jurors and consider their opinions too before coming

7    to a decision?

8                    LANCE M. TAYLOR:  Yes.

9                    ATTY. BAILEY:  And your decision

10   would then be based on the facts and the law?

11                   LANCE M. TAYLOR:  Yes.

12                   ATTY. BAILEY:  Okay, thank you.

13                   THE COURT:  Mr. Juhasz.

14   **EXAMINATION BY ATTORNEY JUHASZ:**

15                   ATTY. JUHASZ:  I'm sorry, I know

16   this is tough.  Bear with me.

17                   LANCE M. TAYLOR:  That's quite all

18   right.

19                   ATTY. JUHASZ:  First of all,

20   everything you told me before up here is what you

21   felt when I was asking you questions, yeah?

22                   LANCE M. TAYLOR:  Yeah, I answered

23   to the best of my ability and maybe my answers

1    weren't clear.

2              ATTY. JUHASZ:  Your answers are

3    fine.  That is the point that I have been trying to

4    make with you all afternoon.  Whatever your answers

5    are, as long as that is what you feel, that is fine.

6    And I think one of the things that you said just a

7    minute ago when you were talking to Mr. Bailey and

8    he was asking you some questions, and I think even

9    maybe when Judge Stuard asked you some, it's almost

10   totally impossible to set some of these things

11   aside, correct?

12             LANCE M. TAYLOR:  Yes, that is what

13   I said.

14             ATTY. JUHASZ:  Let's go back for a

15   second.  I am going to promise to try and not take

16   too long with this, but I want to make certain of

17   what you and I talked about before.  Because of what

18   you read and heard, you have an opinion that there

19   was a conspiracy to kill Mr. Fingerhut, right?

20             LANCE M. TAYLOR:  Yes.

21             ATTY. JUHASZ:  And you have an

22   opinion that Donna Roberts was involved in that

23   conspiracy, right?

1                    LANCE M. TAYLOR:  Yes.

2                    ATTY. JUHASZ:  That the letters

3      were pretty damning evidence that sort of buttressed

4      your belief that that conspiracy existed, correct?

5                    LANCE M. TAYLOR:  Yes.

6                    ATTY. JUHASZ:  That Mr. Jackson's

7      conviction in his criminal case also made the

8      existence of that conspiracy more solid in your

9      mind, correct?

10                    LANCE M. TAYLOR:  Yes.

11                    ATTY. BAILEY:  I am going to ask

12     you a hard question, and I will apologize in advance

13     for it.  I want you to sort of -- remember, I said

14     before about you and I flipping places, if you stood

15     up there with my notebook, and I sat there, how the

16     questions would be hard.  I want to do another flip

17     now.  I want you to pretend that you are charged

18     with participating in -- that the government says

19     that you engaged in a conspiracy or a plot to kill

20     somebody else, okay, and one of the people who is

21     going to decide, and you're saying, I didn't do it,

22     okay?

23                    LANCE M. TAYLOR:  Uh-huh.

```
 1                    ATTY. JUHASZ:  And one of the

 2    people who are going to decide whether you did it or

 3    not comes in and says, look, I think that Mr. Taylor

 4    was -- I think there was a conspiracy involving Mr.

 5    Taylor, I think he was involved in it, I've heard

 6    about some evidence that is pretty damning for him,

 7    and the person he is supposed to have done it with

 8    has been convicted already, and so I think that that

 9    just makes the existence of that conspiracy and his

10    participation in it more fixed in my mind.

11                    Now, having said all of that, would you

12    want that person deciding whether or not you were

13    guilty, especially if you were saying that you are

14    not guilty?

15                    LANCE M. TAYLOR:  That would make

16    me feel uncomfortable if a person like that was on

17    the jury.  But, you know, if I was innocent, you

18    know, I would expect the evidence to come out.

19                    ATTY. JUHASZ:  To sort of disprove

20    what that juror thought?

21                    LANCE M. TAYLOR:   Yes.

22                    ATTY. JUHASZ:  I appreciate it.

23    Thanks for being patient with me.
```

```
1              THE COURT:  Approach please.

2

3    (Whereupon, counsel approached the bench.)

4

5              THE COURT:  Mr. Taylor, they have

6    asked you a bunch of questions.  Listen, you have

7    answered and you have done everything that we have

8    asked you to do.  It's always amazing to me how

9    seriously people take the job of being a juror, and

10   you have answered the questions the way you feel

11   rather than what you think they want you to answer.

12   I am going to release you from further

13   responsibility in this matter.  We do thank you for

14   your participation in the process, okay.

15             LANCE M. TAYLOR:  Yes, sir.

16             THE COURT:  Now, I got to tell you

17   that my grandmother was a Taylor.  Do you have any

18   kin in Kentucky?

19             LANCE M. TAYLOR:  No.

20             THE COURT:  Okay, I guess there are

21   a lot of Taylor's around, right?

22             LANCE M. TAYLOR:  Yes, quite a few.

23             THE COURT:  Listen, you have a nice
```

1    day and thank you, very much.

2                    LANCE M. TAYLOR:    Okay, sir,

3    thank you.

4                    ATTY. BAILEY:   Thank you, Mr.

5    Taylor.

6                    ATTY. JUHASZ:   Thank you.

7

8

9    (Whereupon, Lance M. Taylor, Juror Number 240, was

10   excused.)

11

12

13

14

15

16

17

18

19

20

21

22

23

1
2
3                    REPORTER'S CERTIFICATE
4
5        This is to certify the foregoing represents a
6    true and correct copy of the proceedings had in the
7    aforementioned cause as reflected by the stenotype
8    notes taken by me on the same.
9
10
11
12
13
14    DATE:    January 6, 2004        Maribeth Hoolihan
15                                    Official Court Reporter
16
17
18
19
20
21
22
23

1               IN THE COURT OF COMMON PLEAS
                 TRUMBULL COUNTY, OHIO
2

STATE OF OHIO,                    )     Case No. 2001-CR-793
3                                 )
        Plaintiff                 )
4                                 )
-vs-                              )     JUDGE JOHN M. STUARD
5                                 )
DONNA M. ROBERTS,                 )
6                                 )              **PARTIAL**
        Defendant                 )     **TRANSCRIPT OF PROCEEDINGS**
7
                         *VOLUME XVII*
8
                   **JURY TRIAL - VOIR DIRE**
9                       **MAY 5, 2003**

10

11   BEFORE:      HONORABLE JOHN M. STUARD

12   AT:          Trumbull Co. Court of Common Pleas
                  Courtroom Number 2
13                160 High Street, NW
                  Warren, Ohio 44481
14

15   APPEARANCES:

16   On behalf of the Plaintiff:
         MESSRS. KENNETH N. BAILEY
17       and CHRISTOPHER D. BECKER,
         Attorneys at Law
18

19   On behalf of the Defendant:
         MESSRS. J. GERALD INGRAM
20       and JOHN B. JUHASZ,
         Attorneys at Law
21

22

23
     Official Court Reporter:  Kelly J. Wilson

1

*INDEX FOR VOLUME XVII*

2

3    MAY 5, 2003

4                    *INDIVIDUAL VOIR DIRE*

5

PROSPECTIVE JUROR MARGARET FELLOWS................... 3688:4

6

PROSPECTIVE JUROR MARGARET L. KAY.................... 3752:9

7

PROSPECTIVE JUROR EDWARD S. COLUCCI................. 3852:12

8

9

                    *MOTIONS*

10

11   motion made to dismiss for cause.................... 3915:22

12

13

14

15

16

17

18

19

20

21

22

23

1    (MAY 5, 2003)

2                    (Whereupon, the following proceedings

3    commenced in open court.)

4              **PROSPECTIVE JUROR MARGARET FELLOWS**

5                    THE COURT:  How are you today?

6                    MARGARET FELLOWS:  Good.

7                    THE COURT:  Mrs. Kay?

8                    MARGARET FELLOWS:  Beg your pardon?

9                    THE COURT:  Mrs. Kay?

10                   COURT REPORTER:  Mrs. Fellows.

11                   THE COURT:  Margaret Fellows.  I don't

12   have one of the things.  That's okay.  Did you read the

13   handout?

14                   ATTY. INGRAM:  Your Honor, this was on the

15   defense table.  We neglected to give it to you.

16                   THE COURT:  Okay.  Thank you.  There we

17   go, Margaret Fellows.  You read that handout, ma'am, that was

18   given?

19                   MARGARET FELLOWS:  Yes, sir.

20                   THE COURT:  Okay.  The purpose of the

21   question this morning is to primarily discuss with you your

22   views about the death penalty and about any pretrial

23   publicity you may have been subjected to.  As you know, this

1   is a capital murder case, aggravated murder with

2   specifications, and the ideal juror is somebody who is able

3   to follow the law.  Now, that seems like an easy thing to do.

4   We all try to do that.  The difficulty here is that everyone

5   has a personal view of the death penalty and some people have

6   the view that if a person murders another person then they

7   should forfeit their life for that, an eye for an eye.  That

8   is not the law of Ohio.

9        On the other extreme you have people who feel that

10  they could under no circumstances sit in judgment and could

11  not impose a death penalty.  Well, that is not the law of

12  Ohio either.  So the purpose of asking these questions is to

13  find out what your personal views are.

14       Whatever you hold as your belief is fine, these

15  folks will respect that.  It's just that we have to attempt

16  to seat 12 people on this jury who are able to listen to the

17  evidence and the law and follow the law.

18       Now, the State has a right to ask for the death

19  penalty in this particular case if they are able to prove

20  beyond a reasonable doubt the elements that the statute has

21  in it concerning the aggravated murder and if they're also

22  able to prove the specifications.  You will have that

23  explained to you, what we're talking about, as we go on here.

1    Now, if the State fails to do that then this jury would

2    properly return a finding of not guilty and that would be the

3    end of the trial. If the State, however, carries that burden

4    of proof, then this case would go on to a second phase of the

5    trial and at that time the prosecutor would present evidence

6    of the aggravating circumstances. That is reasons why the

7    jury should consider and impose the death penalty. And the

8    jury would also listen at that same time to the mitigating

9    factors, and those are reasons submitted to the jury as to

10   why they should not impose the death penalty.

11          Now, the State has to prove those aggravating

12   circumstances outweigh any mitigating factors before it would

13   be entitled to the imposition of a death penalty. If the

14   State failed to do that, then the jury has three other

15   options: That is life without chance of parole; life with no

16   chance of parole before 25 or 30 years.

17          So if we have somebody on that jury that holds

18   either of the extreme views, if I can use that term, then

19   somebody -- they can't be fair to one side or the other.

20   Someone who believed in an eye for an eye is not going to be

21   fair to the defendant, and someone who would never impose the

22   death penalty can't be fair to the State, so that's the

23   reason that these questions are asked at this time. We may

1  never get to that point, but if we do it's too late then to

2  decide what type of a jury we have in regard to those

3  questions.

4       The other issue that we ask about is pretrial

5  publicity.  Now, this case was given media attention, as any

6  case of this nature would be, and it's gone on for a rather

7  long period of time.  We've had a few people that have not

8  read it or knew anything about it, people that live in the

9  outlying regions.  We've had a few people that live in

10  Howland, the place that this all allegedly happened, that

11  were very familiar with it because it was a topic of

12  discussion not only in the papers but among them themselves.

13       It isn't whether or not you have been subjected to

14  any pretrial publicity, the question is whether you are able

15  to set aside anything that you may have heard and decide this

16  case on the evidence.  In order to have a fair trial here

17  this matter must be decided on the evidence that will be

18  produced in this courtroom.

19       If we had a situation such as we went through the

20  trial and the jury is back in the jury room and someone says,

21  well, the evidence showed this and somebody else says no,

22  wait a minute, I remember reading something in the paper that

23  didn't square with that and I think that's right, well, of

1    course, you couldn't have a fair trial.  So this jury has to

2    be able to decide all issues on the evidence they hear here

3    in this courtroom, not something that they think they've

4    heard before, and they have to apply the law to that in order

5    to come up with a just verdict.  Okay?

6                        MARGARET FELLOWS:  Yes, sir.

7                        THE COURT:  You act a little bit

8    apprehensive.  Please don't be, okay?  These are very fine

9    people here and they won't cause you any problem.

10        Mr. Becker.

11                        ATTY. BECKER:  Thank you, Your Honor.

12    Good morning, Ms. Fellows.

13                        MARGARET FELLOWS:  Good morning.

14                        ATTY. BECKER:  My name is Chris Becker.  I

15    work at the county prosecutor's office.  First of all, let me

16    thank you for the service that you are rendering this county.

17    Probably short of military service, this is probably the most

18    important service you can provide for your community.

19        This is Ken Bailey.  I imagine you remember him

20    from, oh, about a month ago now when you met down in the big

21    courtroom down there.

22                        MARGARET FELLOWS:  Yes.

23                        ATTY. BECKER:  And Mr. Ingram and

1    Mr. Juhasz, they were there as well as Ms. Roberts. We're

2    going to get into a little bit of detail about what the Court

3    just discussed with you, and what we want to try and find out

4    about you is whether you're going to be a good juror in this

5    particular case. That doesn't mean you may not be a good

6    juror in another case, but as the Court indicated to you,

7    we've had a lot of people that have either read things or

8    seen things on TV and have come in and said we can't be fair,

9    or they have such beliefs in the death penalty, either for it

10   or against it, that they couldn't be fair to either side.

11              So, with that in mind, the only rule I guess I'll

12   lay out for you is that you understand there's no right or

13   wrong answers here.

14                   MARGARET FELLOWS:  I understand.

15                   ATTY. BECKER:  This isn't a test.  You're

16   not going to be graded.  We're still going to pay your $12

17   when you leave the courthouse today, or whatever it is we pay

18   you.

19                   COURT REPORTER:  Twenty-five.

20                   ATTY. BECKER:  Twenty-five dollars,

21   they've raised it to $25 dollars so.  Whatever it is, you're

22   going to get your money no matter what.

23              I noticed by looking at your questionnaire that with

1    respect to the death penalty you indicated that you are in

2    favor of the death penalty, although maybe not in every case.

3                    MARGARET FELLOWS:  Yeah, in some cases.

4                    ATTY. BECKER:  But you believe that in

5    some cases the death penalty is warranted?

6                    MARGARET FELLOWS:  Yes.

7                    ATTY. BECKER:  All right.  And you seem

8    like you are fair minded enough and open enough to say well,

9    the death penalty, to impose it you have to know all the

10   facts about the case, correct?

11                   MARGARET FELLOWS:  Yes.

12                   ATTY. BECKER:  And you would need to know

13   as much as you could before you made that determination,

14   right?

15                   MARGARET FELLOWS:  Yes.

16                   ATTY. BECKER:  All right.  The first

17   question I usually ask and I'm going to ask you is if there

18   was a case in your mind that satisfied what you needed to be

19   satisfied?  And remember, the Court is going to tell you what

20   the elements are and what you need to do.  But if the State

21   were to prove its case in accordance with the law as the

22   Court gives it to you, could you go back in that jury room

23   and sign a verdict calling for the death penalty?  You could

1    put your signature on a piece of paper calling for the

2    imposition of the death penalty?

3                    MARGARET FELLOWS:  Yes, I believe I could.

4                    ATTY. BECKER:  All right.  And now I'm

5    going to jump back a little bit here because the way this

6    works is this is sort of like having two trials.  There's

7    really sort of two trials in one trial.  It's sort of one

8    trial with two separate parts.  The first trial or the first

9    part of this trial is going to be the guilt phase and it's

10   Mr. Bailey and I's burden, the State's burden, to prove

11   Ms. Roberts is guilty beyond a reasonable doubt of the crimes

12   that she's charged with.  And specifically to get to that

13   second phase we have to prove her guilty of two counts or at

14   least one count of aggravated murder and then some special

15   circumstances, or what we call aggravating circumstances.

16           The Court is going to tell you that there are four

17   charges in this case; there's aggravated burglary, aggravated

18   robbery, aggravated murder with a specification, and another

19   count of aggravated murder with a specification.  Even though

20   there's only one death, there's two theories charging the one

21   death, do you understand that?

22                    MARGARET FELLOWS:  (Nods head

23   affirmatively.)

1              ATTY. BECKER:  Okay.  And remember you

2    have to speak up because we have a court reporter.

3                  MARGARET FELLOWS:  Yes.

4              ATTY. BECKER:  So there's the possibility

5    that we may never get to the second trial, where again it

6    will be Mr. Bailey and I's obligation to prove that the death

7    penalty is warranted in this case, again by proof beyond a

8    reasonable doubt.  So you understand we're taking this

9    contingency because we may get to that point and we don't

10   want to get 12 jurors in here and we present our case and

11   she's found guilty and then all of a sudden we say okay, now,

12   jurors, you're going to have to hear some testimony and hear

13   some evidence about why the death penalty is appropriate, and

14   someone says, "Wait a minute.  I'm very religious, and

15   pursuant to my religious or ethical or moral thoughts, I

16   can't impose the death penalty."  So we have to sort of ask

17   you in advance and we're being presumptuous doing that.  You

18   don't take that to mean that she's guilty and you have to get

19   to that second phase just because we are talking about the

20   death penalty, do you?

21                  MARGARET FELLOWS:  No.

22              ATTY. BECKER:  All right.  You understand

23   that it's two separate issues and really sort of two separate

1   trials.  First we have to prove her guilty by proof beyond a

2   reasonable doubt, and if we do that, and only if we do that

3   and prove her guilty of the certain charges, then we go and

4   consider the death penalty.  You understand that?

5                   MARGARET FELLOWS:  Yes, I understand that.

6                   ATTY. BECKER:  And you understand that the

7   death penalty is not automatic?

8                   MARGARET FELLOWS:  Yes.

9                   ATTY. BECKER:  Even if you convict her of,

10  you and your fellow jurors were to convict her of the

11  aggravated murder with the aggravating circumstances, you

12  would still have four options in that second trial, right?

13                  MARGARET FELLOWS:  Yes, I understand.

14                  ATTY. BECKER:  And I think you read the

15  handout that they had.

16                  MARGARET FELLOWS:  Yes, I did.

17                  ATTY. BECKER:  So there's life in prison

18  with no parole for 25 years, there's life in prison with no

19  parole until 30 years are served, there's life in prison with

20  no parole, and then the death penalty, right?

21                  MARGARET FELLOWS:  Yes.

22                  ATTY. BECKER:  And if we get to that

23  second phase you have to fairly consider all four of those

 1    options.  Will you be able to do that?

 2                    MARGARET FELLOWS:  Yes, I believe so.

 3                    ATTY. BECKER:  All right.  And you don't

 4    believe so strongly in the death penalty that you're going to

 5    place that, I guess, on a higher position or a higher

 6    pedestal than the other life options, would you?

 7                    MARGARET FELLOWS:  No.

 8                    ATTY. BECKER:  You'll fairly consider all

 9    four of them?

10                    MARGARET FELLOWS:  Yes.

11                    ATTY. BECKER:  And you believe you can

12    listen to the testimony and evidence and make a decision and,

13    if it's proven beyond a reasonable doubt, you can, in fact,

14    sign a death penalty verdict?

15                    MARGARET FELLOWS:  Yes.

16                    ATTY. BECKER:  Okay.  Now, the other thing

17    that we're concerned about here because this is a homicide

18    case and mostly they generate -- they generate the most

19    publicity generally, you have heard of this case, correct?

20                    MARGARET FELLOWS:  Yes.  I remember

21    reading about it when around when it happened.

22                    ATTY. BECKER:  All right.  And you

23    remember hearing the name Nate Jackson I believe?

 1                     MARGARET FELLOWS:  Yes.

 2                     ATTY. BECKER:  Okay.  First of all, with

 3     respect to this case, what is it you remember?

 4                     MARGARET FELLOWS:  I remember he was

 5     arrested and convicted, that's about it.

 6                     ATTY. BECKER:  About Mr. Nate Jackson?

 7                     MARGARET FELLOWS:  Yes.

 8                     ATTY. BECKER:  Do you remember anything

 9     about who he was or how he got caught or --

10                     MARGARET FELLOWS:  No.  No.

11                     ATTY. BECKER:  Or what the sentence was?

12                     MARGARET FELLOWS:  No.

13                     ATTY. BECKER:  All right.  And where did

14     you get your information from?

15                     MARGARET FELLOWS:  From the headlines in

16     the paper.

17                     ATTY. BECKER:  In the Tribune Chronicle I

18     think you said you read?

19                     MARGARET FELLOWS:  The Tribune, yeah.

20     Yes.

21                     ATTY. BECKER:  What do you remember about

22     Donna Roberts?

23                     MARGARET FELLOWS:  I remember when she was

1    arrested and they said she was charged.

2                        ATTY. BECKER:  Okay.  Do you remember

3    where it happened or how it happened?

4                        MARGARET FELLOWS:  Well, I know it was in

5    Howland but that's --

6                        ATTY. BECKER:  Do you know how the victim

7    was killed?

8                        MARGARET FELLOWS:  Not really.  I can't

9    remember.

10                        ATTY. BECKER:  Okay.  Just the names sort

11    of --

12                        MARGARET FELLOWS:  Yes, yes.

13                        ATTY. BECKER:  They mentioned it.  You

14    understand it's real important that you make your decision in

15    this case and you make any decision in this case based only

16    upon what you hear and the testimony and evidence you hear?

17    You can't consider maybe something you've read in the

18    newspaper or seen on television because that's not evidence,

19    right?

20                        MARGARET FELLOWS:  Right.

21                        ATTY. BECKER:  And one of the things that

22    we sometimes worry about is that a witness will sit here and

23    testify and say something and that may jog your memory and

1    say boy, that's not what I remember reading in the Tribune

2    Chronicle, or that's not what I remember seeing on Channel 33

3    or 27 or 21.  You understand that they only get part of the

4    story, right?

5                    MARGARET FELLOWS:  Right.

6                    ATTY. BECKER:  So you wouldn't, you

7    wouldn't allow anything you maybe have read to influence your

8    decision in this case?

9                    MARGARET FELLOWS:  No.

10                   ATTY. BECKER:  Even if there was some

11   witness that testified and reminded you of something that you

12   may have read, you'll say to yourself I've got to put that

13   aside and base this case on what I hear here in the

14   courtroom, correct?

15                   MARGARET FELLOWS:  Yes.

16                   ATTY. BECKER:  All right.  So even if

17   there is a conflict between maybe something you read and

18   something you've heard here in trial, you'll be able to

19   forget about the media coverage?

20                   MARGARET FELLOWS:  Yes.

21                   ATTY. BECKER:  Okay.  All right.  Now, I

22   want to ask you some questions now generally about criminal

23   cases.  And I can't remember, you were called a couple times

1    but you've never served before?

2                    MARGARET FELLOWS:  I was called once but

3    they --

4                    ATTY. BECKER:  Settled it?

5                    MARGARET FELLOWS:  -- got their jury about

6    two numbers before they got to mine so I was never

7    interviewed or anything.

8                    ATTY. BECKER:  Okay.  So they got their

9    jury before they got to you?

10                   MARGARET FELLOWS:  Right.

11                   ATTY. BECKER:  And you didn't get to serve

12   then?

13                   MARGARET FELLOWS:  No.

14                   ATTY. BECKER:  Now, you were a nurse, is

15   that correct?

16                   MARGARET FELLOWS:  Yes.

17                   ATTY. BECKER:  Practical nurse?

18                   MARGARET FELLOWS:  Yes.

19                   ATTY. BECKER:  And you worked at Trumbull?

20                   MARGARET FELLOWS:  No, I worked at Warren

21   General and then I did private duty.

22                   ATTY. BECKER:  All right.  For Dr. --

23                   MARGARET FELLOWS:  No doctor.

1                    ATTY. BECKER:  No doctor?  Oh, okay.  I

2     thought I saw doctor.  We got other questionnaires here.  And

3     your husband, he served in the --

4                    MARGARET FELLOWS:  No.  I was never

5     married.  I served in the military.

6                    ATTY. BECKER:  Oh, you served in the

7     military.  I'm sorry.  I'm sorry, I misread that.  So you

8     actually served in the military.  Now, I have a question on

9     your -- do you remember filling out the single questionnaire?

10                    MARGARET FELLOWS:  Yes.  Yes.

11                    ATTY. BECKER:  The one page.  That's

12    probably been a while ago?

13                    MARGARET FELLOWS:  Yeah.

14                    ATTY. BECKER:  You indicated on that

15    questionnaire that there was a problem.  They asked you do

16    you have any principles or scruples based on religious or

17    ethical teachings or dogma that it would affect your ability

18    to serve as a fair and impartial juror, you crossed off yes.

19                    MARGARET FELLOWS:  Oh.  Well, it was -

20                    ATTY. BECKER:  Was that just a mistake?

21                    MARGARET FELLOWS:  Yes.

22                    ATTY. BECKER:  All right.  That's okay.

23    We have you fill out enough paperwork, you'd think you're

1    getting a federal firearms license or something.  But that

2    was just a mistake then, right?

3                    MARGARET FELLOWS:  Yes.

4                    ATTY. BECKER:  Okay.  You don't have any

5    reason why you don't think you could serve?

6                    MARGARET FELLOWS:  No.

7                    ATTY. BECKER:  Now, when you were in the

8    military what is it that you did?

9                    MARGARET FELLOWS:  I worked in the weather

10   office in the Marine Corps and I worked in radar surveillance

11   in the Air Force.

12                   ATTY. BECKER:  And did you serve overseas?

13                   MARGARET FELLOWS:  No.

14                   ATTY. BECKER:  No.  That was all --

15                   MARGARET FELLOWS:  At the time I was in

16   women didn't go overseas.

17                   ATTY. BECKER:  All right.  And was that --

18   where were you stationed at?

19                   MARGARET FELLOWS:  I was stationed in

20   California, Michigan, Mississippi, quite a few different

21   places.

22                   ATTY. BECKER:  And when you were done I

23   assume you returned home to Warren?

1           MARGARET FELLOWS:  Right, yes.

2           ATTY. BECKER:  And Trumbull County.  Now,

3  you own a rifle, is that correct?

4           MARGARET FELLOWS:  Yes.

5           ATTY. BECKER:  Which I think it was used

6  by your brothers?

7           MARGARET FELLOWS:  Yes, it was one of my

8  brother's.  And when he passed away I had borrowed it and his

9  wife just told me to keep it so I still have it.

10          ATTY. BECKER:  Okay.  Now, also I note on

11 your questionnaire that at one point you were a victim of

12 crime, correct?

13          MARGARET FELLOWS:  Well, it was really my

14 mother's farmhouse down in West Virginia.  It was a summer

15 farm.

16          ATTY. BECKER:  Were you living there at

17 the time?

18          MARGARET FELLOWS:  No.  We just went down

19 in the summer, and it was in the winter time it was broken

20 into, ransacked and all the furniture was stolen.

21          ATTY. BECKER:  And was anyone ever

22 apprehended in that case?

23          MARGARET FELLOWS:  No.

1           ATTY. BECKER:  That wouldn't affect your

2     ability to serve as a juror in this case, would it?

3                 MARGARET FELLOWS:  No.

4           ATTY. BECKER:  All right.  Now, I'm

5     assuming you are familiar with the term that we sometimes

6     hear, you probably read it in novels or newspapers or see it

7     on television sometimes, called the presumption of innocence,

8     correct?

9                 MARGARET FELLOWS:  Yes.

10          ATTY. BECKER:  The presumption of

11    innocence in our system is basically the way that we make

12    things fair for criminal defendants.  Unlike any other

13    country, our defendants are all presumed innocent and it's

14    the State's burden, Mr. Bailey and I's burden, to prove any

15    defendant, including this defendant's, guilt beyond a

16    reasonable doubt.  She does not have to prove anything in

17    these proceedings, do you understand that?

18                MARGARET FELLOWS:  Yes.

19          ATTY. BECKER:  Do you agree with that?

20                MARGARET FELLOWS:  Yes.

21          ATTY. BECKER:  And she and Mr. Juhasz and

22    Mr. Ingram could basically sit over there throughout this

23    trial and read the newspaper or look at their horoscope or do

1    the New York Times crossword puzzle, whatever it is they want

2    to do.   They don't have to prove anything to you.   Do you

3    agree with that?

4                    MARGARET FELLOWS:   Yes.

5                    ATTY. BECKER:   And you don't have a

6    problem with that?

7                    MARGARET FELLOWS:   No.

8                    ATTY. BECKER:   This case got started

9    because a body called the Trumbull County grand jury met

10   downstairs on the second floor and they issued what's called

11   an indictment, and they base that indictment only on evidence

12   that they heard from the prosecution.   There was no defense

13   attorney there.   Mr. Ingram or Mr. Juhasz were not there.

14   Ms. Roberts was not there.   There was no judge there,

15   including this judge.   It was basically nine voting members

16   who got together and they voted that she should be charged

17   with these crimes.   They basically felt that there was enough

18   evidence based on probable cause, was it more likely than

19   not.   You understand that our standard here is much, much

20   different?   We have a much higher standard.   It's called

21   reasonable doubt, correct?

22                    MARGARET FELLOWS:   Yes.

23                    ATTY. BECKER:   All right.   I assume you've

1  heard that term through the media or newspapers or television

2  or whatnot?

3                    MARGARET FELLOWS:  Yes.

4                    ATTY. BECKER:  All right.  You understand

5  that in this case the Court will define for you what

6  reasonable doubt is, right?

7                    MARGARET FELLOWS:  Yes.

8                    ATTY. BECKER:  Now, would you like -- do

9  you want a glass of water or anything?

10                   MARGARET FELLOWS:  No, thank you.

11                   ATTY. BECKER:  All right.  Reasonable

12  doubt sometimes has been described as like a glass of water

13  and the glass is full pretty close to the top.  If you see

14  some of our styrofoam cups over here, they may be up to that

15  little rim where it sticks out there on a coffee cup.  Some

16  people may say it's half an inch from the top, some people

17  may say it's an inch.  We can't quantify it.  We can't give

18  you a number to say all right, if the State presents 10

19  witnesses they win, or if you believe seven out of 10 you win

20  or nine out of 10 you win.  You understand that we can't

21  really quantify it, it's a reasonable doubt based on reason

22  and common sense?

23                   MARGARET FELLOWS:  Yes.

1                       ATTY. BECKER:  Okay.  And you've been

2      around, you've been around the country, you've served in the

3      military, obviously you've lived probably an exciting life in

4      some respects, right?

5                       MARGARET FELLOWS:  In some respects, yes.

6                       ATTY. BECKER:  Okay.  And you've had to

7      make decisions in your life, correct?

8                       MARGARET FELLOWS:  Yes.

9                       ATTY. BECKER:  About where to live, about

10     whether perhaps you're going to reenlist in the military, and

11     you base those things on reason and common sense, correct?

12                      MARGARET FELLOWS:  Yes.

13                      ATTY. BECKER:  So you believe you could

14     serve on this jury using your reason and common sense to

15     determine whether or not Ms. Roberts is guilty as alleged?

16                      MARGARET FELLOWS:  Yes.

17                      ATTY. BECKER:  Okay.  Our job is to put

18     enough water in that glass to make you feel with reason and

19     common sense that we've proved our case beyond a reasonable

20     doubt.  Do you believe you will be up to that task to make

21     that determination?

22                      MARGARET FELLOWS:  Yes.

23                      ATTY. BECKER:  Now, this is where it gets

1   pretty important here.  You understand that Mr. Bailey and I

2   don't have to fill that glass up all the way to the top

3   because that is all doubt?  And the Court will tell you we

4   cannot prove and we're not required to prove this case beyond

5   all doubt because just about everything in life has some

6   doubt to it, right?

7                    MARGARET FELLOWS:  Yes.

8                    ATTY. BECKER:  As I stand here today I've

9   got a wedding ring on, I could probably reach in my wallet

10   and show you some pictures of my children and my wife, and I

11   could probably have my wife come down here today with my kids

12   and you may see them in the back and they'll wave and say,

13   "Hi, daddy."  That's probably reason and common sense that

14   would tell you that I'm married and have children, right?

15                    MARGARET FELLOWS:  Right.

16                    ATTY. BECKER:  But I may not be able to

17   prove to you beyond all doubt.  You may say, well, maybe you

18   just met this woman on the street and those are her kids and

19   they call him daddy and he put the ring on for show and he's

20   got these pictures that, I don't know, he cut out of a

21   magazine or something, right?  You understand what I'm

22   driving at there?

23                    MARGARET FELLOWS:  Yes, I understand.

1               ATTY. BECKER:  Okay.  So we only have to

2     prove to you beyond reason and common sense facts in this

3     case, correct?

4               MARGARET FELLOWS:  Yes.

5               ATTY. BECKER:  All right.  And you'll be

6     able to make a determination and an important determination,

7     because this case is the most serious crime charged in Ohio,

8     it does involve really the ultimate penalty in our criminal

9     justice system, will you be able to make those determinations

10    based on reasonable doubt and not all doubt?

11              MARGARET FELLOWS:  I'd do my best.

12              ATTY. BECKER:  All right.  You wouldn't

13    shy away from either finding her guilty or from imposing the

14    death penalty because you wanted to know beyond all doubt,

15    would you?

16              MARGARET FELLOWS:  No.

17              ATTY. BECKER:  So if we were able to prove

18    it to you by reason and common sense, you could make a

19    determination?

20              MARGARET FELLOWS:  Right.

21              ATTY. BECKER:  All right.  Now, sort of

22    hand in hand with that, you understand that Ms. Roberts,

23    because she has this presumption of innocence, she doesn't

1   have to prove anything to you either in the first phase or

2   the second phase, right?

3                    MARGARET FELLOWS:  Right.

4                    ATTY. BECKER:  It's our obligation,

5   Mr. Bailey and I's, to prove to you beyond a reasonable doubt

6   her guilt and also to prove to you beyond a reasonable doubt

7   that the death penalty is warranted if we were to get to that

8   second phase, right?

9                    MARGARET FELLOWS:  Yes.

10                   ATTY. BECKER:  Now, this case involves the

11  death of one individual and there are two aggravated murder

12  counts.  The fact that there are two aggravated murder

13  counts, does that affect your opinion of this case at all,

14  the fact that you know that?

15                   MARGARET FELLOWS:  No.

16                   ATTY. BECKER:  You understand that there

17  are two different theories of proving the death and the Court

18  will tell you that you can find the defendant guilty of all

19  of the counts, some of the counts or none of the counts,

20  correct?

21                   MARGARET FELLOWS:  Right, yes.

22                   ATTY. BECKER:  You will be told that.  So

23  you don't take it to mean the fact that she has two murder

```
 1   counts and there's only one person dead to mean that

 2   Mr. Bailey and I don't know what the heck they're doing and

 3   they must really not know anything?

 4                   MARGARET FELLOWS:  No.

 5                   ATTY. BECKER:  And on the other side of

 6   that coin, you don't take the fact that there's only one

 7   death and there's two charges of aggravated murder to mean

 8   that she's really bad because boy, there's only one

 9   allegation that she killed one person and yet there's two

10   murder counts?  You don't take it that way either?

11                   MARGARET FELLOWS:  No.

12                   ATTY. BECKER:  You believe that there's

13   just two theories to the case and you may be able to find her

14   guilty of both or you may be able to find her guilty of just

15   one of them or none of them, right?

16                   MARGARET FELLOWS:  Right.

17                   ATTY. BECKER:  And that all depends on the

18   evidence that's going to come from this chair that you're

19   sitting in if you're selected for this jury, right?

20                   MARGARET FELLOWS:  Yes.

21                   ATTY. BECKER:  Now, Mr. Bailey and I will

22   be very up front with you, the allegation in this case is

23   that Ms. Roberts is not the shooter.  She did not shoot the
```

1    victim in this case.  We're not alleging that.  She is

2    alleged to be a helper or what we call an aider and abettor.

3    And, again, the Court will tell you what an aider and abettor

4    is and what a helper is and define those legal terms for you.

5    Would that make your decision any more difficult if we got to

6    a second phase imposing the death penalty?  Would you go back

7    there and say boy, I can't give the death penalty to someone

8    that's not even alleged to have pulled the trigger, or would

9    you listen to the evidence and make your determination and

10   say well, we found that she was guilty of aiding and abetting

11   and now I believe there's enough evidence to find that the

12   death penalty is warranted if we prove our case beyond a

13   reasonable doubt?

14                     MARGARET FELLOWS:  I think so.

15                     ATTY. BECKER:  All right.  You hesitate a

16   little bit.  Does that make a determination for you if she's

17   not the actual shooter?

18                     MARGARET FELLOWS:  No, not really.

19                     ATTY. BECKER:  Okay.

20                     MARGARET FELLOWS:  It's just, you know, we

21   have to have the evidence to prove why, you know, and so on.

22                     ATTY. BECKER:  Yeah.  You have to listen

23   to the evidence.  You seem like you're going to be very

1  open-minded and very fair in this case about what you hear,

2  right?

3              MARGARET FELLOWS:  I try to be.

4              ATTY. BECKER:  Okay.  Is there anything in

5  this case so far or anything you know about it that maybe

6  causes you some concern that you feel you might be biased one

7  way or the other?

8              MARGARET FELLOWS:  No.

9              ATTY. BECKER:  No?  All right.  Now, this

10  case also, like most criminal cases, is going to have some

11  elements of what we call circumstantial evidence.  Just about

12  every criminal case has what we call circumstantial evidence

13  involved, and that's just evidence that you can use to make

14  an inference from evidence you've got.

15              This happens a lot this time of year where maybe you

16  go to bed and you watch the television news and you'll see

17  the weather and there will be a big green blob from, say,

18  Toledo, Ohio all the way down to Indianapolis and then down

19  into Kentucky.  And you may be going to bed watching the

20  10:00 o'clock news or the 11:00 o'clock news and the weather

21  comes on and you say well, I'm going to watch the weather, I

22  want to see what it's going to be like tonight.  And the

23  weatherman comes on and he says, "Okay, folks," he says,

1   "Sometime between 2:00 and 4:00 tonight this line of

2   thunderstorms is going to move through here and give us a lot

3   of rain and tomorrow will be a nice day.  It will be in the

4   60s.  This cold front will move through and there will be a

5   lot of clear skies behind this front and it will be real nice

6   weather."

7           So you go to bed, you turn off the TV, you look

8   outside.  You make sure your windows on your car are up, you

9   make sure nothing is laying out in the yard that maybe would

10  get wet, maybe you left some gardening tools out there, and

11  there's nothing out there, and you go to bed.  And you wake

12  up at 6:30 in the morning the next day and you look out and

13  the sidewalk is wet; the driveway is wet; your car is covered

14  with raindrops.  There's water streaming down the street into

15  the storm sewer and the neighbors' driveways are all wet.

16  The grass is wet, there's little puddles everywhere out in

17  the street and in your driveway, and you can assume that it

18  rained, right?

19                  MARGARET FELLOWS:  Right.

20                  ATTY. BECKER:  You didn't see it rain but

21  you can make that inference.

22                  MARGARET FELLOWS:  Right.

23                  ATTY. BECKER:  That's circumstantial

1     evidence that it rained.  Someone told you in advance and you

2     saw some radar.  You never saw a drop of rain fall from the

3     sky.  In fact, when you woke up at 6:30 the sun was out and

4     the birds were chirping away, right?  And that's happened to

5     you, I'm assuming, in your life?

6                  MARGARET FELLOWS:  Oh, yeah.

7                  ATTY. BECKER:  And you have to be careful

8     sometimes of the inferences you make because sometimes they

9     are not as strong as you think they are.  If you hear the

10    same weather forecast and the guy says, "Well, we're going to

11    have scattered thunderstorms.  Some places might get some

12    rain, some might not," and you go to bed and you wake up the

13    next morning.  You look out and you see your neighbor's

14    driveway and it's all wet and his car is wet, but you look

15    out in your driveway and yours is dry and the street is dry

16    and there's no puddles in the yard.  And then all of a sudden

17    you see your guy, your next-door neighbor, walking out with a

18    bucket with some soap on it and he's got his garden hose out.

19    Well, you can assume that he's washing his car, right?  You

20    can make those kind of inferences?

21                MARGARET FELLOWS:  Yes.

22               ATTY. BECKER:  And will you be able to

23    make, use those kind of inferences where maybe you don't see

1  what happened, because you understand we don't have witnesses

2  and we don't have police at every street corner to see what

3  happens?  Will you be able to make those inferences in

4  determining a case of this magnitude?

5                    MARGARET FELLOWS:  Yes.

6                    ATTY. BECKER:  One of the other things

7  we're always concerned about in criminal cases is we want

8  people to decide the criminal case without sympathy for

9  either party.  Do you believe that you will be unsympathetic

10  to either party and be able to separate any sympathy you may

11  have from making a determination in this case?

12                    MARGARET FELLOWS:  Yes.

13                    ATTY. BECKER:  Because you understand that

14  this case does involve the death of Mr. Fingerhut, correct?

15                    MARGARET FELLOWS:  Yes.

16                    ATTY. BECKER:  And you will see some

17  photographs of him, and I'm assuming it won't disturb you as

18  much as some jurors because you've been trained medically.  I

19  don't know what maybe you ran across in the military, but you

20  may see some photographs of Mr. Fingerhut after he was

21  deceased.  You will definitely hear some testimony from the

22  county coroner's office describing the manner and cause of

23  his death.  That won't disturb you to the point where you

1        won't be able to make a decision, will it?

2                        MARGARET FELLOWS:  No.

3                        ATTY. BECKER:  And if you hear or see that

4        kind of testimony, you won't feel so sympathetic to

5        Mr. Fingerhut that you will find Ms. Roberts guilty even if

6        we don't prove our case to you, will you?

7                        MARGARET FELLOWS: No.

8                        ATTY. BECKER:  And on the other side of

9        that coin, you won't feel sorry for Ms. Finger -- or, I'm

10       sorry, Ms. Roberts if you sit on this jury and you see her

11       for every day for maybe two or three weeks in this trial and

12       then you say boy, the State really proved their case to me

13       but she looks like a nice lady over there, she seems pretty

14       quiet and mild mannered, I can't find her guilty even though

15       they proved their case?  You wouldn't be too sympathetic to

16       her to hinder our case, would you?

17                        MARGARET FELLOWS:  No.

18                        ATTY. BECKER:  And you wouldn't be so

19       sympathetic to us as to hinder their case, would you?

20                        MARGARET FELLOWS:  No.

21                        ATTY. BECKER:  All right.  Ms. Fellows,

22       I'm assuming you've read the newspaper and probably seen in

23       the newspaper, I know a few years ago they used to have a

1   little dumb criminal kind of section in the paper, sometimes

2   just crazy things that criminals do.

3                    MARGARET FELLOWS:  Yes, I've seen it.

4                    ATTY. BECKER:  And sometimes the best laid

5   plans go astray for these guys and these men and women that

6   commit crimes in our country, right?

7                    MARGARET FELLOWS:  Yes.

8                    ATTY. BECKER:  One example that comes to

9   my mind is the guy who is going to rob the bank and he and

10  his buddy get together and they stake out the bank and they

11  figure out what time the Brinks truck comes in and drops off

12  all the money and what time it leaves with all the money and

13  what day it comes.  They figure out that the best time to

14  come and rob this place is, you know, maybe 4:30 or 5:00

15  o'clock on a Thursday because they're going to have all this

16  money to cash everybody's paychecks on Friday, so they figure

17  out that Thursday at 5:00 o'clock right when they're getting

18  ready to close they'll rob the place.

19       And they get their car, their getaway car, they get

20  it tuned up.  They put new tires on it.  They figure out the

21  traffic lights so they know what's the quickest way to get

22  back to their house where they're going to count the money.

23  The guy buys the baseball cap and dark sunglasses and gets

1    the fake beard and puts his coat, his trench coat on, and he

2    goes in on a day like today.  And he goes into the bank, and

3    the getaway driver is out parked in the first spot so they

4    can run right out and get away, and he goes up and he puts a

5    note down on the teller's desk and it says put all the money

6    in the bag, you know, don't put a dye pack in with the money,

7    and he's pointing the gun at her.  She gets all the money in

8    there and he grabs the money and he runs out the store.

9            And then the police are called and they get the note

10   and they turn the note over and the note is a letter that

11   this guy received from someone.  It was addressed to his

12   house.  The police go right to the address and they find them

13   there counting the money, right?  You've heard of crazy

14   criminals that do things like that, right?

15                   MARGARET FELLOWS:  Yes.

16                   ATTY. BECKER:  So even though criminals

17   try and do the best things, they make mistakes sometimes and

18   a lot of times that's how they get caught, right?

19                   MARGARET FELLOWS:  Yes.

20                   ATTY. BECKER:  And you've heard of those

21   types of things?

22                   MARGARET FELLOWS:  Yes.

23                   ATTY. BECKER:  All right.  Now,

 1    Ms. Fellows, we've discussed here for about half an hour here

 2    some of the things about you as a potential juror in this

 3    case.  First and foremost, you'll be able to decide this

 4    case, and if we get to a second phase and if we prove our

 5    case beyond a reasonable doubt you believe that you will be

 6    able to sign a piece of paper calling for the death penalty

 7    if the facts warrant it and the law allows it, correct?

 8                    MARGARET FELLOWS:   Yes.

 9                    ATTY. BECKER:   You'll make your

10    determinations and your decisions without sympathy to either

11    party, correct?

12                    MARGARET FELLOWS:   Yes.

13                    ATTY. BECKER:   You will not hold the State

14    to proof beyond all doubt, correct?

15                    MARGARET FELLOWS:   Yes.

16                    ATTY. BECKER:   You will only hold us to

17    reasonable doubt, and that's reason and common sense,

18    correct?

19                    MARGARET FELLOWS:   Yes.

20                    ATTY. BECKER:   You will allow Ms. Roberts

21    and give her her presumption of innocence which our criminal

22    justice system and our constitution requires throughout these

23    proceedings, correct?

 1              MARGARET FELLOWS:  Yes.

 2              ATTY. BECKER:  And you believe that you

 3    will determine this case without any influence from the media

 4    or anything you've read outside of the courtroom?

 5              MARGARET FELLOWS:  Yes.

 6              ATTY. BECKER:  And you believe you could

 7    be a fair and impartial juror for both sides in this case?

 8              MARGARET FELLOWS:  Yes.

 9              ATTY. BECKER:  All right.  Well, I want to

10    thank you this morning.  Mr. Ingram or Mr. Juhasz will now

11    have some questions for you.  Thank you very much.

12              ATTY. INGRAM:  Good morning, ma'am.  How

13    are you?

14              MARGARET FELLOWS:  Good morning.

15              ATTY. INGRAM:  My name is Jerry Ingram.

16    This young man is John Juhasz.  John and I share the

17    responsibility of representing Donna here who is on trial for

18    her life.  And as I'm sure you can understand, we take our

19    responsibilities to Donna very seriously and believe we

20    should take every reasonable precaution in selecting a

21    fair-minded jury, the same type of jury that you or I would

22    want to decide our cause if we were on trial.  Does that

23    sound fair enough to you?

```
1              MARGARET FELLOWS:  Yes.  Yes, it does.

2              ATTY. INGRAM:  This is the only

3    opportunity we'll have to get to know one another and

4    determine whether you're comfortable sitting on this jury.

5    We can talk right now to one another.  I'm allowed to ask you

6    questions but, more importantly, you're allowed to ask me

7    questions.

8              You know, lawyers I guess by training tend to

9    monopolize conversations, so if you could sort of force me to

10   give up my natural inclinations to monopolize the

11   conversation, I would appreciate that.  If at any point in

12   time there's a question that you would like to ask or there's

13   something that you would like to discuss, would you please

14   let me know and we'll do our best to address that issue?

15              MARGARET FELLOWS:  All right.

16              ATTY. INGRAM:  The process you're going

17   through here is a lot like a job interview except when you go

18   for a job interview you select where you're going to go

19   apply.

20              MARGARET FELLOWS:  Yes.

21              ATTY. INGRAM:  And in this particular

22   situation somebody spun a wheel, reached a hand in, pulled

23   out a number and, lo and behold, it was your number and
```

1    that's what brought you here.  We're interviewing you today

2    for one of the most important jobs there is, the job of

3    finding the truth and perhaps determining the fate of another

4    human being, so my first question to you is how do you feel

5    about being asked to assume such a responsibility?

6                    MARGARET FELLOWS:  It's a heavy

7    responsibility and I'm nervous.

8                    ATTY. INGRAM:  I don't think that we can

9    expect anyone to not be nervous.  Certainly it is a major

10   responsibility, and I think if you're going to do your job

11   right you sort of have to have a little queasy feeling in

12   your stomach.  Do you agree with that?

13                   MARGARET FELLOWS:  Yeah.

14                   ATTY. INGRAM:  In a nutshell this case

15   boils down to the government's allegation that Donna Roberts

16   plotted or conspired with a male companion, Nate Jackson, to

17   cause the death of Robert Fingerhut.  Donna and Robert were

18   divorced but they continued to live with one another in

19   Howland Township and continued to work with one another at

20   the Greyhound bus station in Youngstown and in Warren.  You

21   understand that this trial is about the guilt or innocence of

22   one person and one person only and that's Donna?

23                   MARGARET FELLOWS:  Yes.

1          ATTY. INGRAM:   Throughout the course of

2    these proceedings you will hear the name Nate Jackson and you

3    may conclude that Nate Jackson did what the State says he

4    did.   Do you understand that's not what you are here to

5    determine?

6          MARGARET FELLOWS:   Yes.

7          ATTY. INGRAM:   You're here to determine

8    whether Donna helped him do it, correct?

9          MARGARET FELLOWS:   Yes.

10          ATTY. INGRAM:   And that is the burden that

11    the State has.   The State has to prove to you beyond a

12    reasonable doubt that Donna aided or assisted Nate Jackson in

13    the death of Robert Fingerhut.   Will you hold them to proving

14    that?

15          MARGARET FELLOWS:   Yes.

16          ATTY. INGRAM:   In support of its

17    allegation the State will present during the course of this

18    trial some letters and some recorded telephone conversations

19    between Donna and Nate Jackson.   Some of this evidence is

20    sexually explicit in nature, and to be absolutely candid with

21    you, some of it is downright offensive.   You understand that

22    the allegation here is murder, not loose morality?

23          MARGARET FELLOWS:   Yes.

1        ATTY. INGRAM:  And even though you may be

2    offended by the sexually explicit nature of some of this

3    evidence, you're going to have to sort of try to rise above

4    that offense to test that evidence to determine whether it

5    ties Donna to this offense.  Do you think you're up to that?

6        MARGARET FELLOWS:  Yes.

7        ATTY. INGRAM:  You think you might be

8    bothered by sexually explicit evidence?

9        MARGARET FELLOWS:  No.

10        ATTY. INGRAM:  Donna denies that she

11    participated by conspiracy, plot or otherwise in the death of

12    Robert Fingerhut.  Would you have the courage to acquit, that

13    is vote not guilty, if you thought a not guilty verdict was

14    warranted by the evidence?

15        MARGARET FELLOWS:  If the evidence showed

16    that.

17        ATTY. INGRAM:  We'll come back to that in

18    a second.  Let's talk about publicity a little bit.  You

19    talked with Mr. Becker about what you remembered reading

20    about Nate Jackson.

21        MARGARET FELLOWS:  Yes.

22        ATTY. INGRAM:  As I understand from your

23    answers to the questionnaire, you also read a little bit

1    about Donna at the time she was arrested?

2                    MARGARET FELLOWS:  Yes.  I can remember

3    when they -- yeah, it was in the paper she was arrested.

4                    ATTY. INGRAM:  What all do you remember

5    reading?  And I understand that's a hard question and I'm

6    going to be candid with you, I'm going to ask you some hard

7    questions.  And if you were sitting over there would you

8    expect your lawyers to ask the jurors hard questions?

9                    MARGARET FELLOWS:  Yes, I would.

10                    ATTY. INGRAM:  And when I say hard I don't

11   mean that there's any right or wrong answers.

12                    MARGARET FELLOWS:  Yeah.

13                    ATTY. INGRAM:  I mean hard to the extent

14   that you're probably going to have to think a little bit.  So

15   what do you remember reading, if you remember anything at

16   all, ma'am, about Donna?

17                    MARGARET FELLOWS:  Well, I can remember

18   when she was arrested and I remembered her name because I had

19   knew a girl named Roberts one time and I thought at the time,

20   well, yeah, I wonder if that was any relation to so and so.

21   And -- but then, you know, I don't, I don't really dwell on

22   that part of the newspaper.

23                    ATTY. INGRAM:  You remember reading

1   anything about letters or tape recordings?

2                    MARGARET FELLOWS:  No.

3                    ATTY. INGRAM:  And when Mr. Jackson, all

4   you really remember is that he was arrested, tried and

5   convicted?

6                    MARGARET FELLOWS:  Yes.

7                    ATTY. INGRAM:  You understand that just

8   because Mr. Jackson was convicted, that doesn't mean that

9   Donna was involved with it?

10                   MARGARET FELLOWS:  Yes, I understand that.

11                   ATTY. INGRAM:  Do you believe in the

12  American jury system?

13                   MARGARET FELLOWS:  Yes.

14                   ATTY. INGRAM:  Would you agree with me

15  that the American jury system can only work when we find good

16  people who are willing to give of themselves, come into court

17  and make personal sacrifices and fairly determine the cause

18  before them?

19                   MARGARET FELLOWS:  Yes.

20                   ATTY. INGRAM:  Would you also agree that

21  in order to fairly determine the cause you have to decide the

22  case on what you see and hear in the courtroom, not on any

23  outside influences?

1    MARGARET FELLOWS:  Yes.

2    ATTY. INGRAM:  And you don't have any

3    outside influences or impressions that would affect your

4    evaluation of the evidence in this case?

5    MARGARET FELLOWS:  Not that I know of.  I

6    can't think of any.

7    ATTY. INGRAM:  If you're selected as a

8    juror the judge -- and, as a matter of fact, you've already

9    signed a paper where you promised to try and avoid publicity.

10    Do you recall that?

11    MARGARET FELLOWS:  Yes.

12    ATTY. INGRAM:  And let me try to explain

13    the reason we do that.  I'm going to go back to the O.J.

14    Simpson trial.  I don't like doing that, but every night

15    during that time at about 10:00 o'clock you could turn on the

16    boob tube and there would be a highfalutin ex-prosecuting

17    attorney and a highfalutin defense lawyer and they would put

18    a different spin or interpretation of the evidence that had

19    been presented that day in court.  Did you ever see any of

20    that?

21    MARGARET FELLOWS:  I didn't like the case,

22    I did not watch it.  I didn't, you know.

23    ATTY. INGRAM:  That was probably a wise

1   decision.  But do you see that a juror should not be exposed

2   to that type of news coverage because it might affect your

3   impressions?

4                   MARGARET FELLOWS:  Yes.

5                   ATTY. INGRAM:  And will you do your best

6   to avoid all publicity that you can?

7                   MARGARET FELLOWS:  Yes.

8                   ATTY. INGRAM:  And, you know, that's

9   sometimes easier said than done because they're not going to

10  announce, "Hey, jurors, we're going to have a story here so

11  get ready for it."  You know, you may have to turn off the

12  car radio really quick or you might have to turn the TV off

13  quick or go into another room.  You think you're up to that?

14                  MARGARET FELLOWS:  Yes.

15                  ATTY. INGRAM:  I want to talk to you about

16  capital punishment, but before I do I want to explain a

17  concern that I have, and Mr. Becker already talked with you

18  about it, but, you know, we're standing up here talking to

19  you about punishment and you don't even know if the person

20  that we're talking about has done anything wrong or not.  It

21  seems to me like it's a lot like putting the cart before the

22  horse.  You see what I mean by that?

23                  MARGARET FELLOWS:  Yes.

1             ATTY. INGRAM:  These questions that we're

2    asking you have nothing to do with the innocence or guilt of

3    Donna Roberts.  Do you have a handle on that?

4             MARGARET FELLOWS:  Yes, I do.

5             ATTY. INGRAM:  Do you wear your seatbelt

6    when you drive a car?

7             MARGARET FELLOWS:  Yes, I do.

8             ATTY. INGRAM:  And when you buckle that

9    seatbelt do you expect to be involved in an automobile

10   accident?

11            MARGARET FELLOWS:  No.

12            ATTY. INGRAM:  You buckle up just in case?

13            MARGARET FELLOWS:  Yes.

14            ATTY. INGRAM:  Well, we're asking you

15   these questions now just in case.  We're not predicting that

16   we'll get to a second phase, but we have to ask them now.  Do

17   you understand that?

18            MARGARET FELLOWS:  Yes.

19            ATTY. INGRAM:  You read a preliminary

20   instruction downstairs that the judge wrote.

21            MARGARET FELLOWS:  Yes.

22            ATTY. INGRAM:  That is some hard stuff.

23   That was about what, five or six pages long, and it's not the

1   easiest material in the world to follow.  Was it okay for

2   you?  Did you get a handle on it?

3                    MARGARET FELLOWS:  Yes, I understood it as

4   I read it.  I don't want tested on it but --

5                    ATTY. INGRAM:  No, certainly.  But let me

6   tell you what, we could give half the lawyers in town those

7   six pages, we could ask them to read it and then we could

8   give them a test and half of them would fail the test.  We

9   don't go about our daily lives thinking about these things so

10  it's a little different and it necessarily entails a certain

11  amount of legal mumbo jumbo no matter what you do because

12  they are legal principles.  During my conversation with you

13  I'll do my best to translate the legalese to ordinary

14  English, but if I fail in that respect will you please let me

15  know?

16                   MARGARET FELLOWS:  Okay.

17                   ATTY. INGRAM:  You understand that this is

18  potentially and only potentially a two phase process?

19                   MARGARET FELLOWS:  Yes.

20                   ATTY. INGRAM:  If at the first phase the

21  jury finds Donna Roberts not guilty, what happens?

22                   MARGARET FELLOWS:  It's over.

23                   ATTY. INGRAM:  And we all go home.  Now,

1    when Mr. Becker was talking to you he referred to the first

2    phase as the guilt phase but I may refer to it as the

3    innocence phase, but the issue at the first phase is the

4    guilt or innocence of the accused.  Do you understand that?

5                    MARGARET FELLOWS:  Yes.

6                    ATTY. INGRAM:  In your questionnaire when

7    you were asked how you felt about the death penalty you

8    indicated that you approved of it in some cases.

9                    MARGARET FELLOWS:  Yes.

10                   ATTY. INGRAM:  Can I ask you what kind of

11   cases come to mind?

12                   MARGARET FELLOWS:  Children.  I find the

13   murder of children beyond comprehension.

14                   ATTY. INGRAM:  We recently in this country

15   had some renewed debate regarding capital punishment.  The

16   State of Illinois put a moratorium on executions.  Did you

17   see, read or hear anything about that issue?

18                   MARGARET FELLOWS:  I read a couple

19   articles in the paper about it.

20                   ATTY. INGRAM:  Do you have any opinion on

21   that?

22                   MARGARET FELLOWS:  Well, a lot of them

23   were because of the DNA things that are now cropped up and

1    they can prove more, you know, thoroughly --

2                        ATTY. INGRAM:  Right.

3                        MARGARET FELLOWS:  -- whether someone is

4    innocent or not, or guilty.

5                        ATTY. INGRAM:  The Supreme Court of the

6    United States recently decided a case which prohibits

7    execution of the mentally challenged.  Did you see, read or

8    hear anything about that?

9                        MARGARET FELLOWS:  I've read, yeah, I've

10   read something about it.

11                       ATTY. INGRAM:  Do you have any opinion on

12   that issue?

13                       MARGARET FELLOWS:  I would say it would

14   depend on the mental capacity.

15                       ATTY. INGRAM:  Have you ever considered a

16   political candidate's views on capital punishment in

17   determining whether or not to vote for that candidate?

18                       MARGARET FELLOWS:  No.

19                       ATTY. INGRAM:  Have you ever heard someone

20   say I don't believe in life imprisonment because why should

21   we, the taxpayers, have to pay to house somebody in prison

22   for the rest of their days?

23                       MARGARET FELLOWS:  No.

1           ATTY. INGRAM:  Do you have any opinion on

2      that cost issue one way or the other?

3           MARGARET FELLOWS:  What, whether for life

4      imprisonment?

5           ATTY. INGRAM:  Right.

6           MARGARET FELLOWS:  There are some people I

7      don't think should ever be out of jail.

8           ATTY. INGRAM:  Okay.

9           MARGARET FELLOWS:  I mean, it wouldn't be

10     safe to the rest of the people.

11          ATTY. INGRAM:  For the rest of us.  Do you

12     understand that life imprisonment without parole is indeed

13     life imprisonment without parole?

14          MARGARET FELLOWS:  Yes.

15          ATTY. INGRAM:  You're never eligible, they

16     can't let you out.  It's signed, sealed and delivered.

17          MARGARET FELLOWS:  Yes.

18          ATTY. INGRAM:  And those other two

19     options, life imprisonment with parole eligibility after 25

20     years and the other one with 30 years, they require that you

21     serve day for day 25 or 30 years before you're even eligible

22     for parole.

23          MARGARET FELLOWS:  Yes.

1          ATTY. INGRAM:  Okay.  In the questionnaire

2    you were asked about the greatest problems facing the justice

3    system and I believe you answered funding and overcrowding in

4    prisons?

5          MARGARET FELLOWS:  Yes.

6          ATTY. INGRAM:  Can I press you on the

7    funding?  Funding for what?  Funding for jails, funding for

8    police, funding for education?

9          MARGARET FELLOWS:  Well, like funding for

10   the courts, funding for the police and for the prisons.

11         ATTY. INGRAM:  Okay.

12         MARGARET FELLOWS:  Where you hear where

13   people are released early just because there is no money to

14   keep them in jail even though they should be there.

15         ATTY. INGRAM:  That's disheartening when

16   we hear that, isn't it?

17         MARGARET FELLOWS:  Yes.

18         ATTY. INGRAM:  Would you agree with me

19   that we have a -- and this is another one of these hard

20   questions coming up, by the way.  I'll forewarn you.  Would

21   you agree with me that we have a crime problem underfoot in

22   this country?  Well, we at least have a crime problem to the

23   extent that we have overcrowded prisons, right?

1          MARGARET FELLOWS:  Yes.  Yes.

2          ATTY. INGRAM:  Do you have any idea what

3   we, and by "we" I mean society as a whole, might be able to

4   do to at least begin addressing crime before it starts, so to

5   speak?

6          MARGARET FELLOWS:  No.  I have -- I mean,

7   I just don't feel that I'm qualified to say that.  There's a

8   lot of more educated people than me that are trying.

9          ATTY. INGRAM:  That's true, but we would

10  probably be better off if we just let ordinary people decide

11  these issues because I think they have more common sense.

12  You think if we strengthened family values it would help?

13         MARGARET FELLOWS:  Probably.

14         ATTY. INGRAM:  How about do you think if

15  we tried to improve our education systems it would help?

16         MARGARET FELLOWS:  It sure wouldn't hurt.

17         ATTY. INGRAM:  Have you ever donated any

18  time, money or services to a political campaign or issue?

19         MARGARET FELLOWS:  No.

20         ATTY. INGRAM:  Do you belong to any group

21  or organization which is active in any political matter?

22         MARGARET FELLOWS:  No.

23         ATTY. INGRAM:  In the last five years or

1    so do you recall signing a petition on any public issue?

2                    MARGARET FELLOWS:  I can't remember

3    signing any.  I don't know.

4                    ATTY. INGRAM:  Okay.  Well, if you can't.

5    Well, maybe if somebody came to your house and it wasn't one

6    that you were really concerned with, but if it was one that

7    meant a lot to you you would probably remember.

8                    MARGARET FELLOWS:  Yeah.

9                    ATTY. INGRAM:  Do you belong to or

10   associate with any group which has crime prevention or law

11   enforcement as a goal?

12                   MARGARET FELLOWS:  No.

13                   ATTY. INGRAM:  Mr. Becker talked with you

14   about sympathy and I'm sure you would agree with me that this

15   is a court of law, not a court of sympathy?

16                   MARGARET FELLOWS:  Yes.

17                   ATTY. INGRAM:  Sympathy for Donna Roberts

18   should not affect the way you evaluate the evidence, correct?

19                   MARGARET FELLOWS:  Right.

20                   ATTY. INGRAM:  And the flip side of that

21   is Robert Fingerhut did lose his life and it's natural to

22   feel sympathy for someone that lost his life.  And as

23   Mr. Becker predicted, during the course of this trial you'll

 1    see or hear evidence, crime scene photographs, coroner's

 2    testimony.  Some of this evidence may evoke an emotional

 3    response from you, maybe sympathy because you feel bad or

 4    maybe anger, how could someone do this?  Regardless of the

 5    emotional response, you're still going to have to sort of

 6    again rise above that response to test that evidence to

 7    determine whether it ties Donna to this offense.  Do you

 8    think you're up to that?

 9                    MARGARET FELLOWS:  Yes.

10                    ATTY. INGRAM:  About 225 years ago or

11    thereabouts, my math skills are not real good, our

12    forefathers -- and I'm going to sound like a civics teacher

13    here for a minute and forgive me, but I feel strongly about

14    these things -- our forefathers declared independence, fought

15    and died so that we could be free.  Those that survived wrote

16    laws that have established our system of doing things ever

17    since, and their laws, many of them were designed to curb or

18    restrict governmental power, and one of those things is the

19    presumption of innocence.  How do you personally feel about

20    this rule of law which requires that jurors presume a

21    defendant innocent?

22                    MARGARET FELLOWS:  Well, I believe in it.

23    That's what I would want for me if something happened.



1                    ATTY. INGRAM:  If you had a close friend
2      or a family member who was accused of some type of wrongdoing
3      and you believed in your mind and in your heart that your
4      friend or family member didn't do what they were accused of,
5      you would certainly require evidence before you would be
6      willing to change your mind, wouldn't you?
7                    MARGARET FELLOWS:  Yes.
8                    ATTY. INGRAM:  Does that sound like you
9      are presuming your friend or family member innocent?
10                    MARGARET FELLOWS:  Yes.
11                    ATTY. INGRAM:  And in that situation where
12     someone comes and tries to convince you that your friend or
13     family member did this wrongdoing, you wouldn't willy nilly
14     accept the evidence at face value, would you?  You would look
15     at it with a critical eye, test it to determine that it
16     really is what it's supposed to be?
17                    MARGARET FELLOWS:  Yes.
18                    ATTY. INGRAM:  And will you do that here?
19                    MARGARET FELLOWS:  Yes.
20                    ATTY. INGRAM:  Another thing our
21     forefathers did was they wrote that when the State accuses
22     you the State has to prove it.  Basically it's time for the
23     State of Ohio to put up or shut up.  They leveled these

1   allegations, now it's time for them to prove them if they

2   can.  Do you see that?

3                   MARGARET FELLOWS:  Yes.

4                   ATTY. INGRAM:  Now, we don't have to do

5   anything during the course of this trial.  The burden is

6   solely and exclusively on the government.  Mr. Becker talked

7   to you about proof and he was using a container and I believe

8   the container he used with you was one of these styrofoam

9   coffee cups.  Do you remember that conversation?

10                   MARGARET FELLOWS:  Yes.

11                   ATTY. INGRAM:  Because of the presumption

12  of innocence, as we start this trial the cup is empty,

13  correct?

14                   MARGARET FELLOWS:  Right.

15                   ATTY. INGRAM:  And they have to pour in

16  proof, and they pour it in through witnesses and exhibits, to

17  get all the way up to that line that's beyond a reasonable

18  doubt.  Do you see that?

19                   MARGARET FELLOWS:  Yes.

20                   ATTY. INGRAM:  Donna doesn't have to

21  testify during the course of these proceedings.  It's only

22  natural whenever we're resolved -- asked to resolve a dispute

23  between friends or family members the first thing we say is

1  okay, I want to hear both sides of the story.  Jury duty may

2  require you to put aside that natural inclination.  First of

3  all, if Donna elected not to testify how would you feel about

4  that?

5                    MARGARET FELLOWS:  It's her right.

6                    ATTY. INGRAM:  And if she elects not to

7  testify that's not proof that is poured into that coffee cup.

8  Do you see that?

9                    MARGARET FELLOWS:  Yes.

10                    ATTY. INGRAM:  On the other hand, if she

11  does testify she's a witness just like any other witness and

12  you should use the same standards for determining her

13  believability as you use for determining the believability of

14  the other witnesses.  Do you see me there?

15                    MARGARET FELLOWS:  Yes.

16                    ATTY. INGRAM:  But let's be candid about

17  this.  She's the defendant, right?

18                    MARGARET FELLOWS:  Yes.

19                    ATTY. INGRAM:  So she has an interest or a

20  stake in the outcome of this case, doesn't she?

21                    MARGARET FELLOWS:  Yes.

22                    ATTY. INGRAM:  And that's certainly

23  something you would want to keep in mind in determining

1  whether or not you believe her, right?

2              MARGARET FELLOWS:  Yes.

3              ATTY. INGRAM:  Well, to be fair about it

4  then, if you found that another witness had something to gain

5  by his or her testimony and that that amounted to an interest

6  or a stake in the outcome, you would consider that for the

7  other witnesses as well?

8              MARGARET FELLOWS:  Yes.

9              ATTY. INGRAM:  The judge will give you a

10 whole list of factors at the end of the case that you should

11 consider in determining the credibility or believability of

12 the witnesses.  You should take those factors and apply them

13 to everyone that testifies and that's a big part of your job

14 responsibility as a trial juror.  Will you do that?

15             MARGARET FELLOWS:  Yes.

16             ATTY. INGRAM:  One of the factors the

17 judge will tell you about though is the test of truthfulness

18 which you employ in your daily life.  That's one I think we

19 have to talk about.  Over the years you've frequently been

20 called upon to determine whether someone is trying to be

21 straight with you or hoodwink you, am I right?

22             MARGARET FELLOWS: Yeah.

23             ATTY. INGRAM:  And we develop sort of an

```
 1   intuitive sense or a sixth sense that enables us to make

 2   those determinations.  Do you see what I'm talking about?

 3                    MARGARET FELLOWS:  Yeah.

 4                    ATTY. INGRAM:  That's the test of

 5   truthfulness which you employ in your daily life, and the

 6   judge will tell you to bring that test here with you and

 7   apply it to everybody who testifies.  Will you do that?

 8                    MARGARET FELLOWS:  Yes.

 9                    ATTY. INGRAM:  Now we've talked about, we

10   talked with Mr. Becker about reasonable doubt, and he,

11   Mr. Becker, asked you many times if you were willing to sign

12   the verdict forms.  Do you recall that?

13                    MARGARET FELLOWS:  Yes.

14                    ATTY. INGRAM:  And he asked you if you

15   would be willing to sign a verdict finding Donna guilty and

16   on other occasions he asked you if you would be willing to

17   sign a verdict imposing a sentence of death.  Do you recall

18   that?

19                    MARGARET FELLOWS:  Yes.

20                    ATTY. INGRAM:  I want you to understand

21   Mr. Becker wasn't asking you to prejudge this case when he

22   asked you those questions.

23                    MARGARET FELLOWS:  Oh, I know.
```

1           ATTY. INGRAM:  Okay.  Reasonable doubt is

2     doubt based on reason and common sense.

3           MARGARET FELLOWS:  Yes.

4           ATTY. INGRAM:  And proof beyond a

5     reasonable doubt requires that you be firmly convinced and is

6     proof of such character that you would be willing to rely and

7     act upon it in the most important of your own affairs.  The

8     judge will define it for you more fully at the end of the

9     case, but for now I believe that short definition will suit

10    our purposes.  Do you have a handle on that?

11          MARGARET FELLOWS:  Yes.

12          ATTY. INGRAM:  Did you know that was the

13    highest burden of proof known in a court of law?

14          MARGARET FELLOWS:  No.

15          ATTY. INGRAM:  It is, so you know it now.

16    And you've made important decisions in your life, haven't

17    you?

18          MARGARET FELLOWS:  Yes.

19          ATTY. INGRAM:  And if you are anything

20    like me, sometimes when you're making important decisions you

21    get a piece of paper or maybe you do it in your mind's eye,

22    you put a line down and you write the negative things on one

23    side and the positive things on another side.  Have you ever

1  done that?

2                    MARGARET FELLOWS:  Yeah.

3                    ATTY. INGRAM:  Well, in my decision I'm

4  deciding whether or not I want to buy a house and on the

5  positive side I write down it has four bedrooms; I need four

6  bedrooms.  It has three bathrooms; I need three bathrooms.

7  And my wife has to like it or I can't buy it, and my wife

8  likes it, so that's a plus.  It has a good school system or I

9  can't buy it because my kids have to go to school; that's a

10  plus.

11                 On the negative side, the house is 50 years old and

12  I just have a nagging doubt about the structural stability of

13  that house; there's obviously a few plumbing problems and I

14  don't know what they're going to cost; and I have a doubt as

15  to whether or not I can come up with the mortgage payment

16  every month; so I have three negatives so I investigate the

17  negatives.

18                 I call a contractor.  I have him come in and look at

19  the house and he tells me, "Ingram, it's brick solid," so I

20  can strike that one off there, can't I?

21                    MARGARET FELLOWS:  Yeah.

22                    ATTY. INGRAM:  And I call a plumber and he

23  says it's a $200 plumbing bill, don't worry about it, it's no

1    big thing.  I can strike the plumbing problem.  But I go to

2    the bank, I said, "Hey, can you stretch this mortgage out a

3    couple more years so the amount of money I have to come up

4    with every month goes down?"

5         "Nope, that's as far as we can go."

6         "Will you lower the interest rate a little bit so

7    that the payment will come down?"

8         "No, it won't.  No, we won't."

9         I try to get a raise.  I can't get a raise.  No

10   matter how hard I think about it I have a nagging reasonable

11   doubt as to whether or not I can pay the mortgage every

12   month.  As long as there is one negative on that right-hand

13   side I cannot say beyond a reasonable doubt that that

14   decision was right for me.  Do you see that?

15                    MARGARET FELLOWS:  Yes.

16                    ATTY. INGRAM:  And in this case at the

17   first phase if you have one single solitary reasonable doubt

18   you would be required to return a verdict of not guilty.  Do

19   you understand that?

20                    MARGARET FELLOWS:  Yes.

21                    ATTY. INGRAM:  And if we ever get to a

22   second phase, at a second phase if you had one single

23   solitary reasonable doubt as to the appropriateness of the

1    death penalty you would have to vote for life.  Do you see

2    that?

3                    MARGARET FELLOWS:  Yes.

4                    ATTY. INGRAM:  We'll talk briefly about

5    circumstantial evidence and then I'll sit down.  You know

6    what circumstantial evidence is, right?

7                    MARGARET FELLOWS:  Yes.

8                    ATTY. INGRAM:  Okay.  I want to give you a

9    silly example because it works with the second example I'm

10    going to give you.  If I go to bed one night in the middle of

11    February and I look out my top window and I see my grass and

12    I then go to sleep.  I wake up the next morning and there's

13    six inches of snow on the ground.  I can pretty much conclude

14    that it snowed even though I didn't see it, right?

15                    MARGARET FELLOWS:  Right.

16                    ATTY. INGRAM:  Well, it's a Sunday morning

17    and when I look out and see the snow -- the reason I look out

18    is my paperboy is late and I'm anxious for my newspaper, so

19    when I look out I see the snow and I see footprints from the

20    house to the right of me to my front door, from my front door

21    to the house to the left of me.  Well, I can also conclude

22    not only that it snowed but that somebody walked through the

23    snow, right?

1                    MARGARET FELLOWS:  Yes.

2                    ATTY. INGRAM:  Well, because I'm a bit

3    impatient I sort of pile inferences on inferences here and I

4    conclude that the person who walked through the snow was my

5    paperboy, and that seemed reasonable to me until I go down

6    and I open the front door and, lo and behold, there's no

7    newspaper there but there's my Giant Eagle coupons.  You

8    understand that you have to test every inference that you're

9    asked to make?

10                   MARGARET FELLOWS:  Yes.

11                   ATTY. INGRAM:  And you also understand

12   you're not required to make an inference.  Just because

13   Juhasz might ask you to make an inference or because Bailey

14   or Becker might ask you to make an inference, whether you

15   make an inference is up to you and you alone.  You got that?

16                   MARGARET FELLOWS:  Yes.

17                   ATTY. INGRAM:  And if this inference isn't

18   reasonable, it shouldn't be made.  Do you agree with that?

19                   MARGARET FELLOWS:  Yes.

20                   ATTY. INGRAM:  Now that I've been up here

21   quite long enough, has anything popped into your mind that

22   you would like to talk with any of us about?

23                   MARGARET FELLOWS:  No.

1                    ATTY. INGRAM:  I thank you very much.

2                    THE COURT:  Pass?

3                    ATTY. BECKER:  Pass for cause.

4                    ATTY. INGRAM:  (Nods head affirmatively.)

5                    THE COURT:  Okay.  Both sides pass for

6      cause.  Ma'am, you will be in the pool from which this jury

7      is selected.  Gentlemen, we have to inform these folks when

8      to call in.  Monday night -- well, the other ones are calling

9      in tonight but that isn't going to be workable for this.

10                   ATTY. INGRAM:  I would say Wednesday.

11                   ATTY. BECKER:  Wednesday.

12                   ATTY. JUHASZ:  Yeah, Wednesday.

13                   THE COURT:  Wednesday.  Call in Wednesday

14     evening after 4:30 for a message.  Again remind you and

15     you're going to hear this until you're sick of it, you are

16     not to read anything, you're not to discuss anything about

17     your experience with the case with anyone or watch anything

18     on TV.  No contact with the facts of the case, okay?

19                   MARGARET FELLOWS:  Yes, sir.

20                   THE COURT:  Thank you very much for your

21     time, ma'am.

22                   MARGARET FELLOWS: Thank you.

23                   ATTY. BECKER:  Thank you very much.

1                          ATTY. JUHASZ:  Thank you, ma'am.

2                          ATTY. INGRAM:  Thank you.  Have a nice

3    day.

4                          MARGARET FELLOWS:  You too.

5                          (Whereupon, Ms. Margaret Fellows was added

6    to the pool of prospective jurors and excused for the day,

7    after which a brief recess was taken.)

8                                *   *   *

9                    **PROSPECTIVE JUROR MARGARET L. KAY**

10                         THE COURT:  Good morning, ma'am.

11                         MARGARET L. KAY:  Good morning.

12                         THE COURT:  Have you had an opportunity to

13   read that handout that was given to you?

14                         MARGARET L. KAY:  Yes.

15                         THE COURT:  Okay.  We are here on two

16   counts of aggravated murder with specifications.  Under the

17   law of Ohio the person who commits murder does not

18   necessarily face the death penalty, it's only when an

19   aggravated murder is committed and it has in the indictment

20   specifications attached to it.  Those specifications are

21   circumstances that the legislature has seen fit to include in

22   the statute which says that in an aggravated murder if these

23   circumstances are present then the death penalty arises as a

1    possible sentence.

2         We take this opportunity to ask each potential juror

3    certain questions that may never arise.  The burden is upon

4    the State to present evidence and to prove beyond a

5    reasonable doubt that there was an aggravated murder with

6    specifications.  If the State fails to carry that burden of

7    proof then this jury will not have to consider the death

8    penalty, but we can't wait until the jury makes their

9    decision because if the State proves their case then the

10   question of sentencing arises in the second phase.

11        Now, if we waited until that time you might have a

12   situation where there was someone on the jury who just had a

13   firm belief that if you take a life you should forfeit your

14   life, an eye for an eye, but that isn't the law of Ohio.  And

15   you might have someone else who believes that for religious

16   or moral, based on religious or moral beliefs that they could

17   never participate in deciding on the death penalty.  Well, in

18   those two cases, the one case the defendant could not get a

19   fair trial and in the other the State could not because the

20   State has the right to ask for the death penalty if they

21   prove their case beyond a reasonable doubt.  So it's felt

22   necessary, even though that situation may not arise, we must

23   know up front the views of each individual juror.

1     Now, whatever your views are is fine.  We all have a

2 right to our beliefs.  But both sides here have to be

3 comfortable with the fact that they have seated 12 people who

4 can follow the law.  Everyone on that jury is going to have

5 some personal opinion about these issues.  It's whether or

6 not they hold such firm views that it would interfere with

7 them applying the law as given by the Court.

8     The State at that second phase is required to

9 present evidence showing that there are aggravated

10 circumstances, aggravating circumstances, which are reasons

11 why the jury should consider and impose a death penalty, and

12 the jury would also listen to mitigating factors.  That would

13 be reasons against in this case giving the death penalty.

14 And the State has to prove that those aggravating

15 circumstances outweigh any mitigating factors beyond a

16 reasonable doubt before they would be entitled to have the

17 jury return a death verdict.

18     Now, throughout the trial the burden is entirely

19 upon the State.  The State itself wins or loses a case.  The

20 defense need do nothing.  Any defendant has the right to

21 remain silent so they need not even participate in the trial.

22 That rarely happens but I've had cases where it has, the

23 defendant has done nothing through the whole trial.  The jury

1　　has to decide whether or not the State has proven the case

2　　beyond a reasonable doubt.  Do you have any problem with

3　　that?

4　　　　　　　　　　MARGARET L. KAY:  Not yet.

5　　　　　　　　　　THE COURT:  Okay.  The other issue that

6　　you will be asked about is on the matter of pretrial

7　　publicity.  This case being a murder case generated a fair

8　　share of publicity, as any case of a similar nature would.

9　　And we've had people that know something about the case, some

10　　who know very little, if anything, about the case, and we've

11　　had a few that know quite a bit about the case.

12　　　　　　Now, that knowledge from the media doesn't

13　　necessarily disqualify anybody unless, and we've had a couple

14　　people who quite honestly have stated, you know, I have my

15　　mind made up, I've read so much about this case.  That type

16　　of person could not be fair.  I mean, they've already made

17　　their mind up, and that isn't fair to either side here.  This

18　　case has to be decided on the evidence that this jury will

19　　all hear in this courtroom.  And if we have anyone that read

20　　something before and they would say to themselves, well, I

21　　don't agree with the evidence presented because I read

22　　something in the newspaper that doesn't square with that,

23　　well, we couldn't possibly have a fair trial.  It has to be

 1   decided fairly on the evidence that's presented in this

 2   courtroom and that's what you will be asked about. Okay?

 3                      MARGARET L. KAY:  Okay.

 4                      THE COURT:  Mr. Bailey.

 5                      ATTY. BAILEY:  Your Honor.  Good morning,

 6   Mrs. Kay.  How you doing?

 7                      MARGARET L. KAY:  Fine, thank you.

 8                      ATTY. BAILEY:  I'm Ken Bailey.  You saw me

 9   about three and a half weeks ago, or something like that, in

10   the other courtroom and I promised you at that time I would

11   be joined by my co-counsel, Chris Becker, who is here today.

12                      MARGARET L. KAY:  Okay.

13                      ATTY. BAILEY:  And the two of us are

14   responsible for prosecuting this case on behalf of the people

15   of Trumbull County and the people of the State of Ohio.  As

16   the judge indicated, we're going to be asking you some

17   questions about your opinions about different things and your

18   prior experiences to make sure that the folks who are

19   selected to serve on this particular jury can be fair and

20   impartial to both sides, both to the defendant and to the

21   people of the State of Ohio, and that's why we ask these

22   questions, not because we're snoopy and we like to pry but

23   rather because we want to make sure that the folks are

1   selected and they are fair and impartial to both sides.

2                    MARGARET L. KAY:  Okay.

3                    ATTY. BAILEY:  There aren't any right

4   answers, there aren't any wrong answers to these questions,

5   just open and candid answers.

6            Also, because this is the one chance that we get to

7   have a little give and take here, to talk together until this

8   case is all over, if it goes into two phases, into the second

9   phase, if you have any questions that come up during these

10  proceedings that pertain to what we're doing here, feel free

11  to ask and we'll see if we can get you an answer to your

12  question.

13                   MARGARET L. KAY:  Okay.

14                   ATTY. BAILEY:  And what I'm going to --

15  another thing is we're not allowed to have any other

16  communication with you or contact with you until this case is

17  all over once we're done here today, so if we run into each

18  other out in the hallway, in the elevator, at a restaurant or

19  something, the only thing we are allowed to say maybe is good

20  morning or good afternoon.  I want you to know that we're not

21  trying to be antisocial or snub you, but under our rules of

22  conduct for us lawyers to have any further communication

23  would probably cause a mistrial and we don't want that to

1   happen.

2                       MARGARET L. KAY:  Okay.

3                       ATTY. BAILEY:  Okay.  I'm going to ask

4   you, as the judge indicated, I'm going to ask you about this

5   pretrial publicity issue, which I don't expect to take very

6   long, and about your views on the death penalty, about

7   capital punishment, and then I'm going to get to some regular

8   questions, okay?

9                       MARGARET L. KAY:  Okay.

10                      ATTY. BAILEY:  So let's start out with

11  this pretrial publicity.  I noticed on your questionnaire

12  that you get your news mostly from Channel 27 I believe.

13                      MARGARET L. KAY:  Yeah.

14                      ATTY. BAILEY:  The local news in the

15  morning.

16                      MARGARET L. KAY:  Right.  And this morning

17  they said something about Trumbull County, five weeks, and I

18  went like this.

19                      ATTY. BAILEY:  That's good.

20                      MARGARET L. KAY:  So I didn't hear it.

21  And the only -- and I don't even remember the case, I don't

22  remember that lady's name because I was out of town I think

23  when all this happened.  I don't even know when it happened.

 1  I don't know anything about this thing other than the name I

 2  read this morning again on the paper that I read.

 3                      ATTY. BAILEY:  Okay.

 4                      MARGARET L. KAY:  I know nothing so.

 5                      ATTY. BAILEY:  Well, that's good.  We live

 6  in modern times and usually we want folks to keep up with

 7  what's going on in the community and the world around them,

 8  read the papers and listen to the news on TV, maybe talk to

 9  other people in the community, but then we ask you to come in

10  here and not know anything about what's going on.

11                      MARGARET L. KAY:  Yeah.  Well, this

12  particular thing I went "Tell me when that's over," so.

13                      ATTY. BAILEY:  Well, the important thing

14  is it may well be during the course of this trial that you

15  may hear some testimony that may jog your recollection and

16  you may say gosh, I remember that from TV or maybe you read

17  something or somebody discussed it at work.  But we're going

18  to ask you to set that aside, okay, and start out fresh in

19  this particular case in this courtroom.  And whatever

20  information you decide the case on has to be based solely on

21  what you hear within the confines of these four walls, the

22  testimony and evidence that you receive, the instructions of

23  law given to you by the judge.  And I take it you are able to

1  do that, right?

2              MARGARET L. KAY:  I think so.

3              ATTY. BAILEY:  Okay.  And you notice

4  there's a reason for that.  As you look around the courtroom

5  there's nobody here from the news media, but as we get into

6  the trial with the testimony I expect you're going to see TV

7  cameras set up and some of the TV personality, reporters,

8  come in and they'll be here for maybe five minutes or 10

9  minutes.  They will film not the jurors but they will film

10 the other participants probably, and they will probably try

11 to do a feature on the trial, but they'll miss everything

12 that went on before they got here and everything that goes on

13 after they leave here, and what they put out on the air or in

14 the newspaper may be taken out of context.

15             MARGARET L. KAY:  Right.

16             ATTY. BAILEY:  And it would be distorted.

17 So if you sat in this case you might say gosh, I sat through

18 this whole case and somebody saved the papers for me and now

19 I'm looking at them after the trial is over and whoever that

20 reporter was must have sat in Judge Logan's courtroom and not

21 in Judge Stuard's courtroom because it's totally different

22 from what I remember.

23             MARGARET L. KAY:  Right.

1              ATTY. BAILEY:  Okay.  So much for this

2    pretrial publicity.  Now let's talk about the death penalty

3    as a possible punishment.  The first time you learned this

4    was a potential death penalty case was when?

5              MARGARET L. KAY:  When I came in that day.

6              ATTY. BAILEY:  Okay.  That was --

7              MARGARET L. KAY:  Three or four weeks.

8              ATTY. BAILEY:  -- three and a half weeks

9    ago or something like that?

10             MARGARET L. KAY:  Yeah, yeah.

11             ATTY. BAILEY:  Almost four weeks ago I

12   guess tomorrow.  And before that had you ever had occasion to

13   discuss the death penalty as a possible punishment with any

14   family members or friend or some organization at school?

15             MARGARET L. KAY:  My past.  My brother was

16   murdered.

17             ATTY. BAILEY:  Right, I noticed that.

18             MARGARET L. KAY:  And the death penalty

19   was brought up at that time, but the person testified that he

20   did kill him and I truly feel in my heart that the punishment

21   fit the crime at that point.

22             ATTY. BAILEY:  What was the sentence in

23   that case?

1               MARGARET L. KAY:  Twenty-five years I
2    think.
3               ATTY. BAILEY:  Twenty-five to life?
4               MARGARET L. KAY:  Yeah.
5               ATTY. BAILEY:  Okay.  Was he convicted of
6    aggravated murder?
7               MARGARET L. KAY:  He was convicted of
8    murder.  I don't remember.  It was in '90, it was 1990.
9               ATTY. BAILEY:  Okay.  And the prosecutor
10   that handled that case, was that Dennis Watkins?
11              MARGARET L. KAY:  Yes.
12              ATTY. BAILEY:  Okay.  And were you
13   satisfied with the police investigation?
14              MARGARET L. KAY:  Oh, yeah.  They were
15   wonderful.
16              ATTY. BAILEY:  Okay.  And with the
17   prosecutor's office?
18              MARGARET L. KAY:  Yes.  I -- at the time
19   you're going through it everything is raw and it's a hard
20   thing to go through.  But at the same time, you know, when I
21   look back at it and under the circumstances of how it
22   happened, again I felt the punishment fit the crime.
23          The only thing I really question that really ticks

1   me off, and I put an end to that, was that when these people

2   are prosecuted, when their sentence is put down, then after

3   five years they wanted to let him out on good behavior.

4   Well, five years wasn't enough time.  The sentence is 25

5   years or whatever the sentence is, that's what the sentence

6   should be, you know.

7           And I understand they have to clear the jails or

8   whatever they have to do, but every time they would send the

9   information back to me and I would have to write a letter and

10  send it back to them, at that particular point in time my

11  mother was still alive and it just broke my heart to know

12  that he may get out while she was still alive.  And after my

13  mother died I wrote a letter to them and I said I want him to

14  stay in jail as long as he is sentenced and don't write me

15  any more letters, that I was done with it at that point.

16                  ATTY. BAILEY:  Is he still in?

17                  MARGARET L. KAY:  Oh, yeah.  Yeah, he's

18  still there.  But, again, I felt the punishment fit the

19  crime.  And after my mom died, my mom died in '97, at that

20  point in time in my life that section was over and whatever.

21  God will take care of him with whatever he does, so.  And,

22  again, I felt the punishment fit the crime.

23                  ATTY. BAILEY:  Let me ask you, you said

1       that you felt the punishment fit the crime.  What type of --

2       how was your brother killed?

3                       MARGARET L. KAY:  They were both drunk.

4                       ATTY. BAILEY:  Oh, okay.

5                       MARGARET L. KAY:  His alcohol level was so

6       high, they should have died of an overdose of alcohol, both

7       of them.  And how it particularly happened I don't know, I

8       just know that he was stabbed like 97 times, blah, blah,

9       blah, I had to go and identify him.  And, again, they were

10      both drunk.

11                      ATTY. BAILEY:  Okay.

12                      MARGARET L. KAY:  And that to me --

13                      ATTY. BAILEY:  So you felt that was some

14      type of mitigating factor on behalf of the defendant?

15                      MARGARET L. KAY:  Yeah.  They didn't know

16      what they were doing.

17                      ATTY. BAILEY:  Okay.

18                      MARGARET L. KAY:  I mean, it happened and,

19      grant you, he did it, he said -- he realized he did it.  And,

20      again, I felt the punishment fit the crime.  I mean, the

21      death penalty in my -- my mother wanted the guy with the

22      death penalty, but in my eyes they were both drunk, they

23      didn't know what they were doing.

1          ATTY. BAILEY:  So there was something on

2     behalf, some factor on behalf of the defendant that mitigated

3     against the death penalty somewhat --

4          MARGARET L. KAY:  In my eyes, yeah.

5          ATTY. BAILEY:  -- in your mind?

6          MARGARET L. KAY:  Yeah.

7          ATTY. BAILEY:  Other than that, had you

8     ever taken a view on the death penalty as a punishment when

9     other cases came up that you might have thought were

10    especially egregious?

11         MARGARET L. KAY:  I don't trust the papers

12    or the TV, I mean, and basically that's all you hear is what

13    you hear from TV or from paper.  You don't get what's inside

14    the four walls, and what's inside the four walls is different

15    than what's in the paper and on TV.  Like you said, they come

16    in here for five minutes, you know.  So unless -- I really

17    never thought about it in any other cases, especially since

18    my brother's case.  Prior to that I don't remember.  But

19    since my brother's case, you know, again, what's in the

20    papers isn't always what goes on in four walls.

21         ATTY. BAILEY:  Right.

22         MARGARET L. KAY:  And you have to have all

23    the circumstances and all the --

1           ATTY. BAILEY:  Okay.  Now, you indicated

2    in your questionnaire that you were in favor of the death

3    penalty depending on the crime.  You understand that the laws

4    in Ohio are written by the state legislature, they're passed

5    by the legislature?

6           MARGARET L. KAY:  Yeah.

7           ATTY. BAILEY:  Okay.  And approved by the

8    governor.

9           MARGARET L. KAY:  Right.

10          ATTY. BAILEY:  And they set out the

11   parameters of what would be death penalty offenses or life

12   sentences or whatever for different crimes.

13          MARGARET L. KAY:  Uh-huh.

14          ATTY. BAILEY:  If you were sitting on the

15   state legislature would you include the death penalty as a

16   possible punishment for some types of crimes?

17          MARGARET L. KAY:  Yeah.

18          ATTY. BAILEY:  Okay.  For which types of

19   crimes?  All right.  Let me give you a for instance.

20          MARGARET L. KAY:  Yeah, give me some

21   crimes.

22          ATTY. BAILEY:  Okay.  You understand that

23   all killings are not treated equally under the law?

1          MARGARET L. KAY:  Correct.

2          ATTY. BAILEY:  For example, if somebody

3   were out chopping wood with an ax and the head flew off of

4   the ax and killed somebody, that would be an accident.

5          MARGARET L. KAY:  Right.

6          ATTY. BAILEY:  But you wouldn't expect

7   anybody to get punished for that.

8          MARGARET L. KAY:  Right.

9          ATTY. BAILEY:  Unless the ax was defective

10  in some way, the manufacturer might get sued or something.

11         MARGARET L. KAY:  Yeah, but that's

12  different.

13         ATTY. BAILEY:  Yeah, that wouldn't be a

14  crime.

15         MARGARET L. KAY:  Yeah.

16         ATTY. BAILEY:  And if somebody were

17  driving down the highway too fast and hit a pedestrian and

18  didn't stop at a stop sign, that person might be punished

19  either with jail time or prison times perhaps but not a death

20  penalty offense, right?

21         MARGARET L. KAY:  No.

22         ATTY. BAILEY:  Let's say I got upset with

23  my co-counsel and said, "I'm going to kill Chris tomorrow at

1  noon out in front on the courthouse steps," okay, and I

2  announce it to the whole world, and he comes walking up

3  tomorrow at noon and I blow him away with a .357, okay.  That

4  would be a serious crime, aggravated murder with prior

5  calculation and design.

6             MARGARET L. KAY:  Right.

7             ATTY. BAILEY:  And you would expect at

8  least a life sentence on that but it's not a death penalty

9  offense, right?

10            MARGARET L. KAY:  Not necessarily.

11            ATTY. BAILEY:  Not in Ohio.

12            MARGARET L. KAY:  Right.

13            ATTY. BAILEY:  Because the legislature has

14  written it in such a way that just by itself, a killing with

15  prior calculation and design that's done on purpose, isn't

16  subject to the death penalty unless there's more.

17            MARGARET L. KAY:  Right.

18            ATTY. BAILEY:  Okay.  I think the judge

19  told you that death penalty offenses would be maybe that type

20  of a killing, a killing with prior calculation and design

21  done on purpose of a living person, and there could be extra

22  factors that could make a person eligible for death penalty

23  as a punishment.  For example, if somebody -- if the victim

1    is a police officer or the victim is a young child or if the

2    victim is the governor or president or lieutenant governor or

3    if it's during the course of a special felony, like maybe a

4    kidnapping or a rape or an aggravated burglary or aggravated

5    robbery, there are different types of things that would make

6    a person subject to the death penalty as a punishment in

7    Ohio.  Are any of those -- we used to call prior calculation

8    and design, we used to call it premeditated murder.  But

9    maybe a killing for profit, okay, a murder for hire or

10   something like that, are any of those types of things things

11   that you think that you would include in your system when you

12   designed it?

13                   MARGARET L. KAY:  Depending on all the

14   circumstances.  Again, you have to look at all.  You can't --

15   even if you have a theory, you have to look at all the

16   factors.  I just believe you need to look at the whole thing

17   before you can make a decision that this person deserves  to

18   die.

19                   ATTY. BAILEY:  Okay.  But let's say when

20   you included it, when you include the death penalty in your

21   system if you designed the criminal justice system, would you

22   put it in there as a possible penalty for some crimes?

23                   MARGARET L. KAY:  Yeah, yeah.

```
 1                         ATTY. BAILEY:  Okay.  And in any of those

 2    that I mentioned?

 3                         MARGARET L. KAY:  Yeah, you could do that.

 4                         ATTY. BAILEY:  For which, which of those?

 5                         MARGARET L. KAY:  The rape, the child, the

 6    premeditated for money, that type of thing that they have

 7    calculated, they have planned, you know.

 8                         ATTY. BAILEY:  Okay.  Now -- I'm sorry, I

 9    didn't mean to cut you off.

10                         MARGARET L. KAY:  Yeah, I was trying to

11    think of anything else.  If you've calculated, you've

12    planned, you know, to carry out this, you're going to kill

13    another person, then the death penalty could come into play.

14                         ATTY. BAILEY:  Have you always felt that

15    way or has your view changed over the years?

16                         MARGARET L. KAY:  I think I basically

17    always felt that way.  I really didn't look at it until my

18    brother was killed, I mean, I didn't pay any attention.  It's

19    not something I paid attention to.  You know, sometimes if

20    things don't affect your life you don't pay attention to

21    them.  They're out there --

22                         ATTY. BAILEY:  But in the last 12 or 13

23    years it has affected you?
```

1                    MARGARET L. KAY:  Yeah, yeah.

2                    ATTY. BAILEY:  Has your view gotten

3    stronger, would you say, or weaker?

4                    MARGARET L. KAY:  I think it's gotten

5    stronger.  I do think it's gotten stronger.  And again, to

6    look at all the circumstances, and I still believe you're

7    innocent until proven guilty and you have to look at all the

8    circumstances.  Why did they do this?  How did they do this?

9    Did they think about it ahead of time?  And that would be

10   brought out in a trial.

11                   ATTY. BAILEY:  Okay.  Now, your view on

12   the death penalty, I notice that you're Catholic.

13                   MARGARET L. KAY:  Yes.

14                   ATTY. BAILEY:  And the church -- and you

15   attend church on a weekly basis, right?

16                   MARGARET L. KAY:  At St. Rose, uh-huh.  I

17   have to tell you I'm a converted Catholic.

18                   ATTY. BAILEY:  How do you mean?

19                   MARGARET L. KAY:  I went through the RICA

20   program.  I wasn't Catholic to begin with.

21                   ATTY. BAILEY:  Oh, okay.  Okay.  Now, the

22   church has taken a position I believe against the death

23   penalty as a punishment.

1      MARGARET L. KAY:  Probably.

2      ATTY. BAILEY:  Would that affect your

3 ability to return a death penalty verdict in an appropriate

4 case or would you make your own decision?

5      MARGARET L. KAY:  I would make my own

6 decision and the reason being is I don't care what church you

7 go to, there's man-made laws and there's God's laws.  I think

8 God helped give us the government that we have that is so

9 good and I think it's our duty to reason out with all the

10 circumstances and decide in our heart at that particular time

11 what's right and what's wrong.

12      ATTY. BAILEY:  Okay.

13      MARGARET L. KAY:  But the Catholic church

14 as well as every other denomination has all their man-made

15 laws, you can't do this, you can't do that, da, da, da, da,

16 so.

17      ATTY. BAILEY:  Okay.  So you would follow

18 our laws, society's laws, and God will also take care of

19 whatever afterward?

20      MARGARET L. KAY:  Right.

21      ATTY. BAILEY:  Okay.  Now, I notice you

22 are also, you're an LPN?

23      MARGARET L. KAY:  Yes.

1          ATTY. BAILEY:  And you work in infectious

2     diseases?

3          MARGARET L. KAY:  Yes.

4          ATTY. BAILEY:  So if like SARS would hit

5     the hospital or the ebola virus or something, you would be

6     called in on it, you would be the head of that?

7          MARGARET L. KAY:  I would be helping.  I

8     am a what they call an infectious disease facilitator.  I

9     work with Dr. Blass, I'm like his nurse.  He's the infectious

10    disease specialist at Trumbull Memorial.  The hospital pays

11    me and I help run his office and I help the infection control

12    nurse with whatever she may need help with at the time, so

13    I'm kind of a helper, a go-between.   I help with his clinic

14    and stuff like that, so.

15         ATTY. BAILEY:  And the reason I ask that

16    question is because you're used to working to save lives and

17    here we are asking you in this type of a case to consider

18    possibly the taking of a life, okay?

19         MARGARET L. KAY:  Uh-huh.

20         ATTY. BAILEY:  Which could be some type of

21    a conflict ethically for you or personally.  Would you have

22    any problem with that?

23         MARGARET L. KAY:  No, no, because I truly

```
 1      believe at work with the patients that we have, we do
 2      everything a lot of times to keep them comfortable and let
 3      God have his course.  I mean, we keep medicating them, we do
 4      what we need to do to keep them comfortable, but there comes
 5      a time when you need to let God have his way rather than us
 6      have our way.
 7                      ATTY. BAILEY:  Okay.  Now, there was a
 8      handout downstairs that you read.
 9                      MARGARET L. KAY:  Yes.
10                      ATTY. BAILEY:  Was that pretty clear or
11      did you have some questions about that?
12                      MARGARET L. KAY:  No, that was pretty
13      clear.
14                      ATTY. BAILEY:  So you understand that this
15      case can be tried in two separate phases.  The first phase is
16      tried just as any other criminal case where you make your
17      determination about guilt or non-guilt without any concern
18      for any possible punishment.
19                      MARGARET L. KAY:  Right.
20                      ATTY. BAILEY:  The defendant here is
21      charged with four separate crimes.  She's charged with two
22      counts of aggravated murder with specifications.  And this
23      term specification, that's just a fancy word that means an
```

1  extra finding of fact for the jury to consider. But there's

2  only one person who has been killed but there are two

3  separate theories that we pursued. The law allows us to

4  pursue two separate theories and we've elected to do that, to

5  let the jury consider two theories of the killing. That's

6  why there are two counts or charges of aggravated murder,

7  okay?

8                    MARGARET L. KAY: Okay.

9                    MR. BAILEY: And then there are these

10  specifications of aggravating circumstances, that the

11  aggravated murder was committed with prior calculation, and

12  in the first one, during the course of an aggravated

13  burglary. And the second one, the second specification is

14  that the aggravated murder was committed with prior

15  calculation and design and during the course of an aggravated

16  robbery as opposed to an aggravated burglary. Okay. And

17  there were also two counts, two other counts or charges, a

18  charge of aggravated burglary and aggravated robbery, and

19  attached to those charges there's another specification or

20  special finding; that a firearm, a working gun, was used.

21  Okay?

22          Now, also the defendant is charged here not as a

23  trigger person but rather she's charged as a complicitor,

1    somebody who solicits or procures another to commit a crime.

2    Somebody who aids and abets, helps, encourages, strengthens

3    or plans with another person in the commission of an offense,

4    okay?  And the charge here is that the defendant, Donna

5    Roberts, planned with this fellow by the name of Nate Jackson

6    in the killing of her ex-husband, a fellow by the name of

7    Robert Fingerhut, for insurance money, okay?  And during the

8    course of which this Nate Jackson is charged, it's charged

9    that he's the one that actually went into the dwelling house

10   of the victim where the defendant and the victim had been

11   living and he went in and killed the victim and stole a car

12   with a gun.

13                      MARGARET L. KAY:  Okay.

14                      ATTY. BAILEY:  Using a gun.

15                      MARGARET L. KAY:  That's more than I knew

16   before so.

17                      ATTY. BAILEY:  Pardon?

18                      MARGARET L. KAY:  That's more than I knew

19   before so.

20                      ATTY. BAILEY:  Okay.  So and that's what

21   the charge is, so actually you really don't know anything at

22   this point, you know.  We haven't proved it yet.

23                      MARGARET L. KAY:  Just the charge, right.

1          ATTY. BAILEY:  Okay.  That's just what the

2     charge is.  She's been charged by an indictment, the formal

3     charging document, where the grand jury meets and returns up

4     a charge to bring it up to this point where we go to trial.

5          MARGARET L. KAY:  Right.

6          ATTY. BAILEY:  So now we're at the point

7     where we have to prove it, okay?

8          MARGARET L. KAY:  Okay.

9          ATTY. BAILEY:  Now, the first part of the

10    case deals with this -- each of these crimes and

11    specifications are made up of certain elements or essential

12    component parts of the crimes.  It's like the ingredients in

13    a recipe and we got to bake a cake, a bunch of cakes using

14    different ingredients for these things.

15          MARGARET L. KAY:  Okay.

16          ATTY. BAILEY:  Okay.  And if we prove to

17    you and the other 11 jurors that she's guilty of the elements

18    of these crimes and these specifications, of the crimes of

19    aggravated murder and one or more of these specifications, we

20    would then move to a second phase, okay, and in the second

21    phase the issue is different because you've already

22    determined guilt in the first phase.  You no longer look at

23    guilt because you've decided that beyond a reasonable doubt.

1           MARGARET L. KAY:  Uh-huh.

2               ATTY. BAILEY:  In the second phase the

3    issue is what's the appropriate punishment for this defendant

4    for this crime, okay, and you have to do a balancing test.

5    It's like having a scale and on one side of the scale would

6    be the aggravating circumstances which you would have found

7    in the first phase of the case, okay, that the aggravated

8    murder was committed with prior calculation and design within

9    the course of an aggravated burglary or in the course of an

10   aggravated robbery.  Okay.  Those are the specifications that

11   can be on one side of the scale.

12        On the other side of the scale are what we call

13   mitigating factors, and because they weren't relevant in the

14   first phase of the case these are like the things that you

15   talked about before where you said, you mentioned that the

16   person who killed your brother was drunk.

17           MARGARET L. KAY:  Uh-huh.

18               ATTY. BAILEY:  We don't know what these

19   are at this point but these are factors that can be presented

20   in a second phase of the case and these are things that can

21   work to a defendant's benefit and work against the imposition

22   of the death penalty as a punishment, okay?

23           MARGARET L. KAY:  Okay.

1              ATTY. BAILEY:  And if you and the other

2    jurors find beyond a reasonable doubt that the aggravating

3    circumstance or circumstances outweigh these mitigating

4    factors and it's beyond a reasonable doubt, then you would

5    return a death penalty verdict in the case, okay?

6              MARGARET L. KAY:  Okay.

7              ATTY. BAILEY:  Because that would be the

8    appropriate sentence under the law.

9              MARGARET L. KAY:  Uh-huh.

10             ATTY. BAILEY:  Now, how much these things

11   weigh, the aggravated circumstances and the mitigating

12   factors, that's entirely up to you and the other 11 jurors.

13   You can decide if something weighs about as much as, well,

14   maybe 20 pounds or a ton or something.  On the other hand,

15   you might say something weighs about as much as a feather,

16   right?  That's entirely up to you and the other jurors.

17             Now, to sit on this jury there are four possible

18   punishments in a second phase.  There's the death penalty,

19   there's life in prison with no parole eligibility, there's

20   life in prison with parole eligibility after 30 full years

21   and life in prison with parole eligibility after 25 full

22   years.  And to sit here you have to be able to consider all

23   four of those penalties equally when you first start out,

1    okay?  And I take it you can do that?

2                        MARGARET L. KAY:  I think so.

3                        ATTY. BAILEY:  Okay.  I mean, no penalty

4    would have a leg up over another, would it?

5                        MARGARET L. KAY:  No, huh-uh.

6                        ATTY. BAILEY:  Okay.  Because you would

7    want, you want to know, you know, what are those mitigating

8    factors --

9                        MARGARET L. KAY:  Uh-huh.

10                       ATTY. BAILEY:  -- you know, in this

11   balancing test.  Now, as I said, if you and the other jurors

12   find beyond a reasonable doubt the aggravated circumstance or

13   circumstances outweigh the mitigating factors, then you

14   return a death penalty verdict.

15                       MARGARET L. KAY:  Right.

16                       ATTY. BAILEY:  Because we would have met

17   our burden of proof of proving it beyond a reasonable doubt.

18   If we don't convince you and the other jurors beyond a

19   reasonable doubt that the aggravating circumstance or

20   circumstances outweigh the mitigating factors, then you go on

21   to consider the other three life verdicts and it's up to you

22   and the other jurors to decide which one is appropriate in

23   this case for this defendant, okay?

3781

1              MARGARET L. KAY:  Uh-huh.

2              ATTY. BAILEY:  Okay.  You don't have any

3     problem with that?

4              MARGARET L. KAY:  I don't think so.

5              ATTY. BAILEY:  If we convince you that the

6     defendant is guilty beyond a reasonable doubt of aggravated

7     murder and one or more of the specifications will you be able

8     to return a verdict, sign a verdict form finding her guilty

9     beyond a reasonable doubt knowing it would subject her to a

10    possible death penalty in the second phase?

11             MARGARET L. KAY:  Yeah.

12             ATTY. BAILEY:  Okay.  Let's assume we get

13    to the second phase and we convince you that the death

14    penalty is the appropriate verdict, okay?  Would you be able

15    to sign a verdict form for the death penalty?

16             MARGARET L. KAY:  Yeah.

17             MR. BAILEY:  And if the judge asked you in

18    open court is this your verdict, would you be able to

19    announce yes, it is your verdict?

20             MARGARET L. KAY:  Uh-huh.

21             MR. BAILEY:  Okay.  Now, let me talk for a

22    minute about these elements, okay.  At the end of the case

23    the judge is going to give you instructions as to the law and

1    you are bound to follow those instructions.  And I mentioned

2    elements, okay.  It's like -- did you ever bake a cake?

3                        MARGARET L. KAY:  Not very well but I can

4    bake a cake.  I'm better with cookies.

5                        ATTY. BAILEY:  Okay.  Let's bake --

6                        ATTY. INGRAM:  Chocolate chip.

7                        ATTY. BAILEY:  -- chocolate chip cookies.

8                        MARGARET L. KAY:  Okay.

9                        ATTY. BAILEY:  Those are my favorite.  And

10   you have your ingredients, and I'm not even going to go into

11   it because I use a package now.  I just put them in the oven

12   and it comes out really quick, 12 minutes, a bag of cookies.

13   But you have certain key ingredients in there and if you have

14   to make chocolate chip cookies and you leave out the

15   chocolate chips, you're going to get cookies but they're not

16   going to be chocolate chip cookies, right?

17                        MARGARET L. KAY:  Right.

18                        ATTY. BAILEY:  The same thing with these

19   crimes.  We've got certain key ingredients in these recipes

20   for these different crimes and we have to prove all those

21   elements.  If we leave one out, then we don't have that

22   crime, and you are to consider each crime and each

23   specification separately, okay?

1        MARGARET L. KAY:  Okay.

2        ATTY. BAILEY:  So there may be a number of

3   findings, four separate counts and the specifications that

4   you would have to consider, but if we left one out you might

5   find the defendant not guilty on that one.  But maybe if we

6   prove the others beyond a reasonable doubt so that you're

7   firmly convinced of the truth of the charge to a moral

8   certainty using your reason and your common sense, then you

9   can return a conviction if we meet that burden of proof,

10  okay?

11       MARGARET L. KAY:  Okay.

12       ATTY. BAILEY:  Let me give you a for

13  instance of aggravated murder with prior calculation and

14  design.  Let's say we have to prove that it happened on or

15  about a certain date, December 11th, 2001, okay.  That would

16  be one element.

17       Another element is that it happened in Trumbull

18  County, Ohio, maybe in Howland Township, okay.  And the

19  reason for that, we call that venue, and the reason we have

20  to prove something like that is so that we try the case in

21  this courthouse rather than up in Ashtabula County or down in

22  Tuscawarus County.

23       The third element would be identification, that the

1   person who is sitting over at the defense table is the same

2   person who committed this crime.  Okay.

3         The fourth element is that she acted purposely,

4   okay, basically on purpose, but the judge will give you a

5   detailed legal definition of that term.  Everything has a

6   detailed legal definition pretty much.

7         That she caused the death of a living person, in

8   this case a fellow by the name of Robert Fingerhut, and

9   sixth, that she acted with prior calculation and design,

10  which requires some advanced planning and a studied scheme to

11  kill.  Okay.

12        You heard that old term premeditated murder under

13  the old law.  They changed the law so now it's a bit

14  different.  For example, let's say I drop my pen and --

15  whoops, I didn't catch it, but let me catch it.  I drop it

16  and I catch it; that might be a reflex.  And let's say I try

17  it again and I drop it and I say, "Oh, my goodness, I dropped

18  my pen.  Maybe I better pick it up."  That's some advanced

19  planning, right?

20                    MARGARET L. KAY:  Uh-huh.

21                    ATTY. BAILEY:  Now, let's say yesterday I

22  thought about this and I said I need an example for prior

23  calculation and design so I'm going to come into court and

1    drop my pen and I do that, okay, and then I bend down and

2    pick it up.  That would be prior calculation and design,

3    right, because it's part of a studied scheme, okay?

4                    MARGARET L. KAY:  Uh-huh.

5                    ATTY. BAILEY:  And I engaged in advanced

6    planning and a studied scheme to do this, right?

7                    MARGARET L. KAY:  Uh-huh.

8                    ATTY. BAILEY:  Okay.  Now, we have to

9    prove all of the elements of the crime and the

10   specifications.  I mentioned the terms aggravated burglary

11   and aggravated robbery and people who aren't trained in the

12   law sometimes interchange those terms.  People sometimes say,

13   "Oh, my house got robbed," when they mean their house got

14   burgled.  Generally aggravated burglary will refer to a

15   situation where a perpetrator trespasses in a dwelling house

16   of another person.  They went to your home and they go in

17   with the intent to commit an offense.  It could be an

18   aggravated murder inside, it could be a theft offense.  The

19   perpetrator may be armed with a deadly weapon like a knife or

20   a gun and he may cause serious physical harm to the victim

21   that's inside, or death.  Okay.

22               In an aggravated robbery as opposed to the

23   aggravated burglary there is no structure involved, no

```
 1    dwelling house, it's just the perpetrator using force or
 2    threat of force against another person to commit on offence
 3    like steal something.  And the perpetrator could be armed
 4    with a deadly weapon like a knife or a gun, and the
 5    perpetrator may cause serious physical harm to the victim or
 6    kill the victim.  Okay?
 7                    MARGARET L. KAY:  Uh-huh.
 8                    ATTY. BAILEY:  Okay.  Now, we, the people
 9    of the State, have the burden of proof of proving these
10    particular elements of the crime charged, okay?  We have to
11    do that beyond a reasonable doubt.  But the burden is on us.
12    The defendant has no burden of proof, okay?  They can just
13    sit there during the course of this trial and that's because
14    of the presumption of innocence.  Under our American system
15    of justice this defendant is presumed to be innocent, as are
16    all other defendants tried in this courtroom, okay?  This
17    presumption of innocence acts like a cloak or shield on this
18    defendant all through the course of the trial, unless and
19    until all the evidence is in, the judge has instructed you on
20    the law and you and the other 11 jurors go back into the jury
21    room to deliberate on your verdict.  And if you find that we
22    met our burden by proof beyond a reasonable doubt of proving
23    the elements, then you can find a guilty verdict and then at
```

 1    that point the presumption of innocence would be gone, right?

 2                        MARGARET L. KAY:  Uh-huh.

 3                        ATTY. BAILEY:  Now, and I take it you

 4    agree?  As you said, you believe in the presumption of

 5    innocence.

 6                        MARGARET L. KAY:  I do.  They're innocent

 7    until you prove them guilty.

 8                        ATTY. BAILEY:  Okay.  And because of that

 9    the defense doesn't have to do anything.  They can sit there

10    and work crossword puzzles or play jumbles or whatever in the

11    newspaper.  They won't, I'm sure, but because of that that

12    burden is totally on us.  Okay.

13        Now, we talked about proof beyond a reasonable doubt

14    and the judge is going to give you a detailed legal

15    definition, but it's something that you're familiar with,

16    okay?  It requires that you use your reason and your common

17    sense that you've used before in the course of your life.

18    When you, when you raise your kids you got to use reason and

19    common sense every day, right?  When you get married you make

20    -- you know, important decisions in your lifetime, whether to

21    buy a house, whether to buy a car, whether to change jobs or

22    take a job, right?

23                        MARGARET L. KAY:  Right.

 1                    ATTY. BAILEY:  And you list the pros, you

 2     list the cons and then you make a decision.

 3                    MARGARET L. KAY:  Uh-huh.

 4                    ATTY. BAILEY:  So when you're firmly

 5     convinced it's the right thing to do.

 6                    MARGARET L. KAY:  Uh-huh.

 7                    ATTY. BAILEY:  Okay.  And basically,

 8     basically this is the same thing, we've got to prove these

 9     elements beyond a reasonable doubt so that you're firmly

10     convinced of the truth of the charge.  We say to a moral

11     certainty.

12                    MARGARET L. KAY:  Right.

13                    ATTY. BAILEY:  Okay.  Now, it's not a

14     hundred percent proof, it's not beyond all doubt or beyond

15     any doubt or beyond a shadow of a doubt.  This term shadow of

16     a doubt, that's the title of an Alfred Hitchcock movie.  It

17     makes a good movie title but there's no such thing in

18     criminal law.

19                    MARGARET L. KAY:  Uh-huh.

20                    ATTY. BAILEY:  Okay.  It's sort of like

21     having a box, okay, and we have to fill that box with

22     evidence.  In a civil case somebody has got to fill that box

23     to within just over half the line with evidence.  And in a

1    criminal case the burden is a whole lot higher.  We got to

2    fill that box with evidence pretty close to the top of the

3    box.  I mean, it's up to you and each juror where you want to

4    draw the line on the box.  Some of you may draw it an inch

5    away from the top or half an inch away, but we got to put a

6    lot of evidence in there, enough to firmly convince you of

7    the truth of the charge to a moral certainty using your

8    reason and common sense.

9         The defendant, the defendant doesn't have to add

10   anything or take away anything from that box, okay?  It's up

11   to us, the people of the State, to fill that box with enough

12   evidence because the burden of proof is on us, okay?

13        MARGARET L. KAY:  Uh-huh.

14        ATTY. BAILEY:  Now, whether you -- there

15   are different types of evidence that we can use in filling up

16   that box.  There's what we call direct evidence where a

17   witness could come in and say, can testify to something that

18   he or she has learned through the use of his or her five

19   senses, like I used the electron microscope and saw the virus

20   and it was green, or I smelled the smoke and it was acrid, or

21   I touched the test tube and it was cold.  Okay.

22        There's another type of evidence that you deal with

23   in everyday life, that we all deal with.  It's sort of a

1    roundabout type of evidence where you are presented with a

2    fact or series of facts and you are asked to draw a logical

3    deduction to another fact or series of facts.  It's deductive

4    reasoning.  We call it circumstantial evidence, okay, where

5    you're presented with a fact or series of facts and you're

6    called upon to reason something out.

7            For example, let's say you live in a two-story

8    house, okay, and you go to bed at night.  Your bedroom is on

9    the second floor.  You go to the window, you look out through

10   the bedroom window and it's a beautiful evening.  The moon is

11   beaming, the stars are twinkling, there's not a cloud in the

12   sky.  And you look across the neighborhood and as far as you

13   can see all the rooftops are dry.  Okay.

14           So you draw the blinds, you get into bed.  The radio

15   is on and before you fall asleep you hear the announcer say,

16   "Folks, there's a cold front moving in.  I expect we're going

17   to get a storm before morning," and you fall asleep, and

18   sometime during the night you're awakened by a distant

19   booming sound in the sky.  You look toward the window but the

20   blinds are closed but you see like a flash of light outside

21   and a couple seconds later there's a distant boom.  And then

22   maybe a minute later there's another flash of light and a

23   closer boom up in the sky.  And suddenly there's a great big

1    flash of light outside the window and almost instantaneously

2    right above the house there is a big ripping, cracking,

3    thundering boom, you know, and a pitter-patter on the roof

4    and a steady drumming.

5         Then you fall back asleep and sometime later you

6    awaken.  You go to the window, open the blinds and look out

7    and it's a nice day outside, the sun is shining, not a cloud

8    in the sky, but the streets are flooded with water.  Water is

9    running off the rooftops and drops of water are dripping off

10   the leaves of the trees, and you know what happened during

11   the night, don't you?

12             MARGARET L. KAY:  There was a storm.

13             ATTY. BAILEY:  Right, a thunderstorm.  And

14   you know it from the circumstantial evidence.  Even though

15   you didn't see the lightning or the rain coming down with

16   your own eyes, based on all the circumstances that were

17   presented you know that that's what happened and you know it

18   beyond a reasonable doubt, don't you?

19             MARGARET L. KAY:  Yes.

20             ATTY. BAILEY:  Okay.  Now, there's room

21   there for some possible or imaginary doubt.  You could

22   imagine that ET and some of his alien buddies flew by in a

23   flying saucer and put on a sound and light show and sprinkled



1    the ground with some wet stuff, but that would be a foolish

2    or imaginary doubt, right?

3                    MARGARET L. KAY:  Uh-huh.

4                    ATTY. BAILEY:  Especially if there were no

5    fire hydrants nearby for some car to hit and spew water up

6    all over the neighborhood, right?

7                    MARGARET L. KAY:  Uh-huh.

8                    ATTY. BAILEY:  Now, you understand that we

9    can prove the elements of the crime using circumstantial

10   evidence?

11                   MARGARET L. KAY:  Yes.

12                   ATTY. BAILEY:  Okay.  And if we do, if we

13   convince you beyond a reasonable doubt that those elements

14   are there based on circumstantial evidence, you can return a

15   conviction?

16                   MARGARET L. KAY:  Yes.

17                   ATTY. BECKER:  Okay.  Now, there's a

18   reason that we are allowed to use that type of evidence and

19   it's just as good as direct evidence.  Ofttimes, I take it

20   you'd agree, that when people plan serious crimes like

21   aggravated murders they may not announce to the whole world

22   what their intention is, right?  They may not stand on the

23   courthouse steps and say we're going to kill so and so at

1    such and such a time and in such and such a way, right?

2              MARGARET L. KAY:  Uh-huh.

3              ATTY. BAILEY:  Okay.  So we have to rely

4    on other facts and circumstances if we have them.  For

5    example, if we have like letters or phone calls that would

6    detail what people are planning, those would be things that

7    might show what a person's intent was, right?

8              MARGARET L. KAY:  Uh-huh.

9              ATTY. BAILEY:  Now, and I take it you

10   believe people should be held accountable for their actions?

11             MARGARET L. KAY:  Yes.

12             ATTY. BAILEY:  Okay.  And you would be

13   able to pile up evidence on evidence and make your own

14   decision as to if there's enough and follow what the judge

15   tells you?

16             MARGARET L. KAY:  Yes.

17             ATTY. BAILEY:  Okay.  And a couple things.

18   You understand that you can't take notes, okay?  You may take

19   notes at work when you're talking to people, if you go back

20   for classes or something you take notes in classes, but if

21   you ever watch Court TV or other jurisdictions, sometimes

22   other states may allow some people to take notes, but we

23   don't do that generally in Ohio here.  You have to rely on

1  your recollection and the recollection of the other 11

2  jurors, so you have 12 of you remembering things.

3         There won't be any instant replays.  It's not like

4  TV with sports games or things on there where they run

5  instant replays to see what happened.

6         Another thing is there won't be any transcripts of

7  testimony.  Sometimes jurors ask the question can we get the

8  testimony of so and so, and our court reporters are very

9  good, but the county doesn't have millions of dollars worth

10  of transcription equipment for instant transcripts.  Unlike

11  the OJ Simpson case that was on TV every day and they had

12  major networks covering it and they had all this stuff, we

13  don't have that in this county, okay?

14                    MARGARET L. KAY:  Okay.

15                    ATTY. BAILEY:  So there won't be instant

16  transcripts.  You will be told you have to rely on your

17  collective recollection.

18                    MARGARET L. KAY:  Okay.

19                    ATTY. BAILEY:  Also in some jurisdictions

20  they may allow jurors to submit questions to the judge to ask

21  the witnesses.  That won't happen here.  You're stuck with

22  the questions that the lawyers ask.

23                    MARGARET L. KAY:  Okay.

1          ATTY. BAILEY:  Okay.  And one thing to

2     remember, because we're lawyers and we went to law school,

3     we're trained to focus our questions on building these

4     elements or tearing down these elements, okay?  So it may

5     well be if you had an interest in some special subject, let's

6     say shoes like my wife -- let's say my wife, she might have

7     50 trillion pairs of shoes in the closet and everywhere else.

8          ATTY. INGRAM:  You went from a billion to

9     a trillion.

10         ATTY. BAILEY:  They seem to be

11    multiplying, these shoes.  They're like rabbits, except for

12    the ones the dog eats.  And, you know, if my wife were on the

13    jury she would probably be interested in what footwear

14    somebody was wearing at the time, but if it's not relevant to

15    proving the elements of the crime, then that question may

16    never get asked or answered, right?  And because it wouldn't

17    be relevant, unless there was a case with footprints or

18    something, then that type of question would never get

19    answered.  So you understand if you have questions like that

20    they may never get answered?

21         MARGARET L. KAY:  Okay.

22         ATTY. BAILEY:  Like if somebody were a

23    chef and wondered what people ate, that might not get

1    answered.

2                    MARGARET L. KAY:  Okay.

3                    ATTY. BAILEY:  You would be able to return

4    a verdict if we're able to prove the elements to your

5    satisfaction beyond a reasonable doubt?

6                    MARGARET L. KAY:  I think so.

7                    ATTY. BAILEY:  Okay.  You understand with

8    circumstantial evidence there's some limitations there?  That

9    rainstorm example, you might not be able to tell how long it

10   rained or how much water fell unless you measured it.

11                   MARGARET L. KAY:  Uh-huh.

12                   MR. BAILEY:  But you know beyond any

13   reasonable doubt that there was a thunderstorm, right?

14                   MARGARET L. KAY:  Uh-huh.

15                   ATTY. BAILEY:  Another thing is you can't

16   go out to investigate on your own.

17                   MARGARET L. KAY:  Oh, no.

18                   ATTY. BAILEY:  They do that on TV

19   sometimes or in the movies.  I think in Matlock and Perry

20   Mason.

21                   MARGARET L. KAY:  Yeah.

22                   ATTY. BAILEY:  Some other TV program, I

23   think Hawaii Five-0 in one episode McGarrett had his staff go

1    out, but that would cause a mistrial.  We actually had that

2    happen in one case and we don't want to do it all over again.

3                    MARGARET L. KAY:  No.

4                    ATTY. BAILEY:  Okay.  So you wouldn't do

5    anything like that?

6                    MARGARET L. KAY:  No.

7                    ATTY. BAILEY:  Now, you understand that

8    criminals aren't necessarily rocket scientists.  They may

9    plan and plan and then do something really really stupid and

10   get caught.

11                   MARGARET L. KAY:  And get caught.

12                   MR. BAILEY:  Okay?

13                   MARGARET L. KAY:  Yeah.

14                   ATTY. BAILEY:  For example, you probably

15   heard of cases where the bank robber goes in and he has got a

16   get-away driver, he's wearing a mask, he's got a gun, and he

17   goes in and he hands the teller a stick-up note that says

18   give me all the money.  And he gets the money and runs out

19   and leaves the note, which is written on the back of an

20   envelope.  The teller turns the envelope over and there's the

21   defendant's name and address.  Okay.  Or the burglar who

22   goes through the bedroom window and drops his wallet with his

23   identification in the house and leaves it behind, okay.  So

1    you know that criminals sometimes do some really stupid

2    things?

3                        MARGARET L. KAY:  Uh-huh.

4                        ATTY. BAILEY:  Okay.  In spite of all

5    their planning.

6         Now, at the end of the first phase after all the

7    testimony is in and the evidence and the judge has instructed

8    you on the law, the jury is kept together.  We call that

9    sequestration, okay?

10                       MARGARET L. KAY:  Uh-huh.

11                       ATTY. BAILEY:  And then if you -- and you

12   would have to stay together.  I mean, if the deliberations go

13   into the evening you would be put up in a hotel and the meals

14   would be brought in and stuff.  And you could only deliberate

15   where all 12 of you are together, not one-on-ones or

16   one-on-twos or whatever.

17                       MARGARET L. KAY:  Right.  Right.

18                       ATTY. BAILEY:  But each jury is different,

19   okay?  I've had juries in the first phase that's returned

20   verdicts anywhere from an hour and a half up to five days,

21   okay, and you take whatever time you need to look at evidence

22   and different things.  And then if you and the other jurors

23   return a guilty verdict of aggravated murder and one or more

1    of these specifications we would move into a second phase.

2    And there would be a break probably there of a couple days or

3    maybe a week, and then you'd come back and you might hear

4    more of the same testimony or more testimony relating to the

5    aggravating circumstances and the mitigating factors, and the

6    judge would instruct you on the law again and then again you

7    would be sequestered, okay.  So you could be sequestered

8    twice in this case.  Would that cause you any undue hardship?

9                    MARGARET L. KAY:  No, not at this point.

10                   ATTY. BAILEY:  Okay.  I expect the case

11   itself by the time we start the trial, it's going to take

12   maybe a week and a half or two weeks.

13                   MARGARET L. KAY:  Yeah.

14                   ATTY. BAILEY:  And generally the second

15   phase takes one to three days.

16                   MARGARET L. KAY:  Okay.

17                   ATTY. BAILEY:  Do you have any questions

18   that you want to ask that have come up?

19                   MARGARET L. KAY:  You commented that we

20   would look at the evidence again.  How --

21                   ATTY. BAILEY:  In the second phase?

22                   MARGARET L. KAY:  Yeah.  How would we do

23   that?

 1                    ATTY. BAILEY:  Generally in a second phase

 2     the State makes a statement saying they resubmit things from

 3     the first phase that are relevant to the aggravating

 4     circumstances.

 5                    MARGARET L. KAY:  So again it's all in our

 6     memory?

 7                    ATTY. BAILEY:  Yeah.

 8                    MARGARET L. KAY:  Okay.

 9                    ATTY. BAILEY:  And then, and then the

10     defense has an opportunity to present evidence.

11                    MARGARET L. KAY:  Okay.

12                    ATTY. BAILEY:  They don't have to but they

13     have an opportunity to.

14                    MARGARET L. KAY:  Okay.

15                    ATTY. BAILEY:  Okay.  And then whatever is

16     presented in the second phase you would hear.

17                    MARGARET L. KAY:  Okay.  But again it's

18     all in our memory.  We wouldn't get transcripts or get

19     anything?

20                    ATTY. BAILEY:  There's no transcripts.

21                    MARGARET L. KAY:  At all.

22                    ATTY. BAILEY:  No transcripts.  Yeah,

23     forget transcripts.

 1                         MARGARET L. KAY:  Okay.  Just wanted to

 2     make sure of that.

 3                         ATTY. BAILEY:  Right.  No, you got to

 4     remember it.

 5                         MARGARET L. KAY:  Yeah, okay.

 6                         ATTY. BAILEY:  And it will only be like a

 7     couple days or a week from the end of the first phase.

 8                         MARGARET L. KAY:  Okay.

 9                         ATTY. BAILEY:  Okay.  Would that cause any

10     problem?

11                         MARGARET L. KAY:  No, I don't think so.

12                         ATTY. BAILEY:  Now, I understand that it's

13     normal for people generally to feel sympathy for other

14     people, okay, and perhaps during the course of the trial as

15     you come face to face with the defendant as her chair is

16     turned towards you you're going to become more acquainted

17     with her.  Now, my question to you is this:  When you go

18     inside your jury room to deliberate on your verdict can you

19     set aside any thoughts whatsoever you might have of sympathy

20     for the defendant and base your decision on the testimony and

21     evidence that you hear and the instructions of law given to

22     you by the judge and lay aside sympathy for the defendant?

23                         MARGARET L. KAY:  Yeah.  You have to look,

 1   you have to look at what you've been told.

 2                   ATTY. BAILEY:  Right.

 3                   MARGARET L. KAY:  And you have to make a

 4   decision from the information you have.

 5                   ATTY. BAILEY:  Right.  Okay.  And it's

 6   not necessarily an easy decision to do, okay.  In your field

 7   you may be called upon, the doctor may have to make some hard

 8   decisions.  You're in infectious diseases, right?

 9                   MARGARET L. KAY:  Uh-huh.

10                   ATTY. BAILEY:  Especially if -- it's not

11   an easy thing to do.

12                   MARGARET L. KAY:  No.

13                   ATTY. BAILEY:  And it shouldn't be.

14                   MARGARET L. KAY:  Huh-uh.

15                   ATTY. BAILEY:  Okay.  Now, I take it you

16   agree there are certain obligations that we have as citizens

17   in this country.  One of the obligations is if it's a time

18   for elections we're supposed to find out as much as we can

19   about the issues and the candidates, then go out and cast a

20   ballot.

21                   MARGARET L. KAY:  And pray.

22                   ATTY. BAILEY:  It may be inconvenient,

23   but, if we're able to, we go out and cast a ballot.  If it's

1    war time, if the country is at war with somebody, then we

2    have an obligation to serve in the military.  And we've got

3    young folks overseas right now in different places doing

4    their duty.

5                       MARGARET L. KAY:  I have a daughter that's

6    going to be in the Army.

7                       ATTY. BAILEY:  Okay.  So you're aware of

8    that.

9                       MARGARET L. KAY:  Uh-huh.

10                      ATTY. BAILEY:  And it causes you some

11   concern?

12                      MARGARET L. KAY:  Oh, yeah.

13                      ATTY. BAILEY:  As any parent.  And another

14   obligation of citizenship is if we're summoned in to appear

15   to serve on a jury, if we're able to.  It may be inconvenient

16   for our work and for our home life or our personal lives, but

17   to make sure that the system works, the American system of

18   justice, it's important that we get folks from all areas of

19   the community with different viewpoints to sit on a jury.

20                      MARGARET L. KAY: Uh-huh.

21                      ATTY. BAILEY:  Okay.  And to do their duty

22   to make sure that the system is working.  Would you be

23   willing to undertake that obligation of citizenship?

1          MARGARET L. KAY:  Yeah, because I thought

2     about that when I was first called and I'm thinking okay, we

3     have the instance with my brother that I worried about

4     because I want to make sure if I'm chosen I can make a good

5     decision.  And I thought oh, and I could get out of it

6     because of work, but I don't really think work is an excuse

7     because in order for our system to work people need to do

8     this.

9          ATTY. BAILEY:  Exactly.

10          MARGARET L. KAY:  They need to take a step

11     and do what they need to do.

12          MR. BAILEY:  And the instance with your

13     brother, you would be able to set aside any emotions you

14     might have had from that case and base your decision --

15          MARGARET L. KAY:  Oh, yeah, yeah.

16          ATTY. BAILEY:  -- solely on the facts and

17     testimony?

18          MARGARET L. KAY:  Yeah, because again I

19     felt that I wanted it up front, I wanted everybody to know

20     that that was in my background, because again I felt justice

21     was served, you know, both ways.  I just felt it was so,

22     yeah, but I just wanted to make sure everybody knew about it.

23          ATTY. BAILEY:  Okay.  Well, I'm glad you

```
 1    did that.  Let's see.  I think, I think that's basically --

 2    you hunt, don't you?

 3                    MARGARET L. KAY:  Do I hunt?

 4                    ATTY. BAILEY:  You said you had a shotgun

 5    for rabbits.

 6                    MARGARET L. KAY:  My husband.

 7                    ATTY. BAILEY:  Your husband hunts.

 8                    MARGARET L. KAY:  Not me, my husband.

 9                    ATTY. BAILEY:  Oh, okay.

10                    MARGARET L. KAY:  I've never shot a gun in

11    my life.

12                    ATTY. BAILEY:  Oh, okay.  You don't have

13    any problem with him hunting rabbits?

14                    MARGARET L. KAY:  No.  Keeps him busy.  He

15    doesn't do it as much as he used to.  He golfs now.

16                    ATTY. BAILEY:  Okay.  Okay.  Well, I'm

17    going to quit asking you questions and defense counsel will

18    have an opportunity to address you.

19                    ATTY. JUHASZ:  Thank you, Your Honor.

20    Good morning, Ms. Kay.

21                    MARGARET L. KAY:  Hi.

22                    ATTY. JUHASZ:  I'm John Juhasz.  I think

23    we met a few weeks ago.  If memory serves me, you were one of
```

 1    two ladies who came in the day after we started our initial

 2    procedure.

 3                        MARGARET L. KAY:  Yes.  I was in

 4    Washington D.C. at a convention.

 5                        ATTY. JUHASZ:  You were out of town.

 6    There are some questions about that first day which I won't

 7    ask you.  There are a lot of questions that we do have to ask

 8    you and I want to take a second and tell you why we do that.

 9    You probably have not yet met Jerry Ingram because I don't

10    think Jerry was here the day everyone came up.

11                        MARGARET L. KAY:  No, I don't think so.

12                        ATTY. INGRAM:  Good morning.

13                        MARGARET L. KAY:  Hi.

14                        ATTY. INGRAM:  How are you?

15                        ATTY. JUHASZ:  Jerry and I are

16    representing Donna Roberts who is seated over there.  I don't

17    think Donna was here actually the other day that you and the

18    other lady came in.

19                        MARGARET L. KAY:  No.

20                        ATTY. JUHASZ:  As you know from everything

21    you've heard, Donna is on trial for her life.  They are very

22    serious charges, and Jerry and I take the responsibility of

23    representing her very seriously and so what we're engaged in

1   here, both sides actually, is talking to jurors and finding

2   out if they're comfortable sitting on a jury so that we can

3   get a fair minded jury, the kind that you would want if you

4   were sitting over there or some family member were sitting

5   over there.  Does that seem okay to you?

6                   MARGARET L. KAY:  Uh-huh.

7                   ATTY. JUHASZ:  All right.  And I'm certain

8   if you were sitting over there or some family member were

9   sitting over there where Donna was you would probably want

10  the lawyers representing you or that other family member to

11  ask some questions of the jurors to find out who it is that's

12  going to make this important decision.  Does that also make

13  sense to you?

14                  MARGARET L. KAY:  Right.

15                  ATTY. JUHASZ:  You told Mr. Bailey that

16  the first time that you learned that this was a death penalty

17  case was the day that you and the other lady came up here and

18  the judge told you a little bit what the case was about.

19                  MARGARET L. KAY:  Right.

20                  ATTY. JUHASZ:  Because this process does

21  take so long in these types of cases, you've had a little bit

22  of time to think about it I guess.  And my question is since

23  you came here, between the day that you came here, which I

 1    think was the 9th of April, and today how do you feel about

 2    that responsibility, about being called upon as a juror to

 3    possibly decide not only guilt or innocence but, if we get to

 4    that stage, deciding whether or not someone lives or dies?

 5    How do you feel about that responsibility?

 6                        MARGARET L. KAY:  Well, again, I thought

 7    about it real hard because I thought of all the ways I could

 8    get out of it, but I thought too that, again, in order for

 9    our system to work somebody needs to take the step to be able

10    to do this.  And I just, I still feel that you need to listen

11    to all the circumstances and make a decision at that point,

12    so it doesn't bother me to be here.  I feel that I could

13    probably do as best as anybody else.

14                        ATTY. JUHASZ:  All right.  And that's

15    honestly what we're looking for.  Jerry likes to liken this

16    process to a job interview where the person who may select

17    you for the job gets a chance to ask you some questions and

18    find out about you, but also for you to find out about the

19    place where you might start to work.  This is a little bit

20    different than a job I guess in a couple ways.  One is if

21    you're selected for this job it's a much shorter term job

22    than your normal job.

23                        MARGARET L. KAY:  And you don't get paid

1    as much either.

2              ATTY. JUHASZ:  And you don't get paid as

3    much either, that's also true.  And the other thing is you

4    may have answered an ad or heard a reference or whatever you

5    did to get your present job.  Here we sent you an invitation

6    because somebody pulled your name out of a wheel, so it's a

7    little bit different.

8              My point, though, of all of that is as we're talking

9    here this morning lawyers have the bad habit, first of all, I

10   guess by training that they do a lot of the talking.  I will

11   do that in an effort to keep this going so that you and I

12   don't sit here and look at each other so we can get you out

13   of here, but my point is that if something comes up and you

14   have something you want to say, we are very interested in

15   hearing it.  In fact, we are more interested in hearing what

16   you have to say than what I have to say.  Fair enough?

17              MARGARET L. KAY:  Okay.

18              ATTY. JUHASZ:  This case, as I think

19   Mr. Bailey has suggested to you, is a basic allegation by the

20   government.  We're going to talk about allegations in a

21   little bit, but it's a basic allegation by the government

22   that Donna Roberts and a person by the name of Nathaniel

23   Jackson, which I think you said is a name you have not heard,

1  correct?

2              MARGARET L. KAY:  Yeah.  Well, I read it

3  the first day I was here because it was in that paper.

4              ATTY. JUHASZ:  Okay.

5              MARGARET L. KAY:  But I've seen nothing in

6  the paper, I've seen nothing on TV.  I have learned more here

7  than I've known before.

8              ATTY. JUHASZ:  All right.  The

9  government's claim is that Donna and Nathaniel Jackson

10  planned or conspired or plotted to cause the death of Robert

11  Fingerhut.  Now, Robert Fingerhut and Donna were previously

12  married.  They divorced, but after they divorced they

13  continued to live together in Howland Township and they

14  continued to work together at the Greyhound Bus stations in

15  Youngstown and Warren.

16              Now, you may hear some evidence during the course of

17  this trial that gives you the impression that Mr. Jackson

18  did, in fact, do what the government says, that he caused

19  Mr. Fingerhut's death.  My point in bringing that up is you

20  understand, don't you, that this trial is about Donna Roberts

21  and not Nathaniel Jackson?

22              MARGARET L. KAY:  Uh-huh.

23              ATTY. JUHASZ:  The question here is not

1    whether Mr. Jackson did whatever the government said he did,

2    the question here is whether Donna Roberts did something to

3    help him accomplish that.  Do you see that?

4                  MARGARET L. KAY:  Uh-huh.

5                  ATTY. JUHASZ:  Any problem holding those

6    two ideas distinct in your mind?

7                  MARGARET L. KAY:  Right, no.

8                  ATTY. JUHASZ:  Okay.  And so even though

9    they say, "they" being the government, say that Donna and

10   Nathaniel Jackson did this together, they got together and

11   cooked this up, just because you may find some evidence that

12   Mr. Jackson did it is not evidence that Ms. Roberts did it.

13   You see, they're going to have to prove that to you.

14                MARGARET L. KAY:  Right.

15               ATTY. JUHASZ:  One of the ways that we

16   think that they may try to do that are with some letters

17   which were written by Donna and some phone conversations

18   which were tape recorded.  Have you heard about those before

19   or have you not?

20               MARGARET L. KAY:  (Shaking head

21   negatively.)

22               ATTY. JUHASZ:  Okay.  I will tell you that

23   if you hear or see those things in this case that you will

1   find some of the content of them to be sexually explicit and

2   I think most people would say at some points even offensive,

3   okay?  Now, you're in a job where you sometimes have to

4   separate people's personalities from what it is that you have

5   to do.

6                    MARGARET L. KAY:  Uh-huh.

7                    ATTY. JUHASZ:  You may dislike somebody

8   who has got some horrible disease, but you have to do your

9   best to try to help cure it, correct?

10                    MARGARET L. KAY:  Right, help them.

11                    ATTY. JUHASZ:  If you hear that type of

12  evidence in this case, first of all, you understand that

13  offensive writings or conversations don't substitute for

14  evidence about a plan to kill somebody?  Do you see that?

15                    MARGARET L. KAY:  Uh-huh.

16                    ATTY. JUHASZ:  So even though you may not

17  like or approve of what it is that Ms. Roberts says, that

18  doesn't constitute evidence that she committed this crime.

19  Do you see that?

20                    MARGARET L. KAY:  Right.

21                    ATTY. JUHASZ:  Any problem separating

22  those two?  You may say to yourself at the end of this case

23  you know what, I don't like what she said, it offends me, it

```
 1    disgusts me, but if they don't separately prove that she was

 2    involved with this, you see those are two distinct inquiries?

 3                    MARGARET L. KAY:  Right.

 4                    ATTY. JUHASZ:  You were not here the first

 5    day but let me ask you, we talked to people about publicity

 6    obviously, and I think you can appreciate why, can't you?

 7                    MARGARET L. KAY:  Uh-huh.  Uh-huh.

 8                    ATTY. JUHASZ:  Even though you don't know

 9    anything about this case, if there's a juror who does, we

10    want to make certain that what they heard doesn't substitute

11    for evidence in the case.  Does that make sense to you?

12                    MARGARET L. KAY:  Right.  I had an

13    instance at work when I told the girls, you know, that I was

14    on jury duty and they said, "That trial?"  I said, "Don't say

15    nothing else."

16                    ATTY. JUHASZ:  Okay.

17                    MARGARET L. KAY:  I don't want to hear

18    anything, don't tell me what you've heard in the paper,

19    because, again, you have to know what's in here.

20                    ATTY. JUHASZ:  Okay.

21                    MARGARET L. KAY:  Because the paper and

22    the newspapers, as I said before, have a tendency to just put

23    in what they want.
```

 1                                         ATTY. JUHASZ: I think you used the phrase

 2 when you were talking to Mr. Bailey four walls, correct?

 3                                         MARGARET L. KAY: Uh-huh. Uh-huh.

 4                                         ATTY. JUHASZ: And so you appreciate that

 5 whether they're trying to do an accurate job or not, and we

 6 could probably stand here and render opinions about that all

 7 day, but what's in that newspaper or what's on that TV clip

 8 is not necessarily the same as what happens in this

 9 courtroom. Do you appreciate that?

10                                         MARGARET L. KAY: Right, right, I highly

11 appreciate that. Because, again, with my brother, what was

12 in the paper isn't nowhere near what had happened.

13                                         ATTY. JUHASZ: What had actually happened.

14                                         MARGARET L. KAY: Uh-huh.

15                                         ATTY. JUHASZ: So you had some firsthand

16 experience.

17                                         MARGARET L. KAY: Right. And that was

18 according to the Niles Police and all, you know. That's why

19 I just don't trust papers. You read it and you have to read

20 between the lines.

21                                         ATTY. JUHASZ: That was actually one of my

22 other questions that I was going to get to later, but since

23 you mentioned your brother's case, let's bring that up. That

```
 1    was investigated by Niles Police, is that right?

 2                    MARGARET L. KAY:  Niles, uh-huh.

 3                    ATTY. JUHASZ:  And I think you said you

 4    were pretty happy with the investigation they did?

 5                    MARGARET L. KAY:  Right, yeah.  They had

 6    found the person right away.  And, again, the circumstances,

 7    I felt the punishment fit the crime.

 8                    ATTY. JUHASZ:  It was also prosecuted by

 9    this Trumbull County prosecutor's office, correct?

10                    MARGARET L. KAY:  Yes.

11                    ATTY. JUHASZ:  Now, was Mr. Watkins the

12    county prosecutor at the time or was he an assistant?

13                    MARGARET L. KAY:  It was 1990.  I don't

14    remember.

15                    ATTY. JUHASZ:  Okay.  I actually don't

16    remember when he became the county prosecutor either.

17                    MARGARET L. KAY:  The whole time you're

18    going through that, it happened very quickly.  I mean, there

19    was not no long delays because he pleaded guilty.  And you're

20    still -- I was so wrapped up in the emotional part of it that

21    it just was like, it's like a blur.  I remember bits and

22    pieces.

23                    ATTY. JUHASZ:  That's actually one of my
```

1    other questions because you talk about his case coming up for

2    trial, but he actually did not go to trial?

3                        MARGARET L. KAY:  No, he did not go to

4    trial, right.  And I can't even remember which judge.  I

5    mean, I can go back and look it up, but I don't even remember

6    which judge saw it.

7                        ATTY. JUHASZ:  Was Mr. Watkins the

8    prosecutor who actually handled the case, if you remember?

9                        MARGARET L. KAY:  He was there at the

10   time, that's the name I remember talking to, you know.  And

11   the victims of crime, Miriam Fife was involved.  And we went

12   to a few meetings after that with my mother but my mother,

13   she didn't want to go anymore so we didn't go.  They have a

14   victim of crimes.

15                       ATTY. JUHASZ:  The victims of crime

16   meetings?

17                       MARGARET L. KAY:  Right.  And again, I

18   didn't -- when I -- the circumstances with them both being

19   drunk, it didn't fit any aspect that everybody else there had

20   and it just made it worse for us so we just quit going.

21                       ATTY. JUHASZ:  Okay.  You've said several

22   times that you think justice was done.  I think you even said

23   both ways?

1        MARGARET L. KAY:  Both ways I think, yeah.

2        ATTY. JUHASZ:  All right.

3        MARGARET L. KAY:  I mean, in my eyes, I

4   can't say that for the rest of my family, I can just say it

5   for me, I felt again that the punishment fit the crime.  I

6   just want him to stay there for his 25 years or whatever it

7   was, because I don't even remember now, 15 to 25, something

8   like that, and be done with it.  And I don't even write

9   letters anymore, and I told my brother and sister if they

10  want to write letters they can, I'm done.

11       ATTY. JUHASZ:  Those are letters when the

12  person comes up for parole consideration?

13       MARGARET L. KAY:  Yeah, yeah, because then

14  the whole thing comes back again.  And they didn't have to go

15  through what I did because my brother lives in Texas and my

16  sister lives down there and I have another half sister, but I

17  was the one that had to make the identification and go

18  through all the -- I'm the oldest so, at least the oldest in

19  -- I have a half sister that's older than me, but I was the

20  one that had to make all the arrangements and do everything

21  and I just wanted to be done with it.

22       ATTY. JUHASZ:  So you were sort of a point

23  person because you were here --

1                    MARGARET L. KAY:  I was here.

2                    ATTY. JUHASZ:  -- and you were the oldest

3       and you kind of dealt with your mom --

4                    MARGARET L. KAY:  Yeah.

5                    ATTY. JUHASZ:  -- and got her through that

6       whole thing?

7                    MARGARET L. KAY:  Yeah, yeah.  And, like I

8       said, some of it's a blur.  The court part is like a blur,

9       you know, so.

10                    ATTY. JUHASZ:  But there's nothing about

11      that experience, and I'm going to use this phrase and don't

12      take offense by it, that makes you feel that you somehow got

13      cheated by the system?

14                    MARGARET L. KAY:  No, I don't think so.

15      We've been cheated in other times but not -- I truly felt

16      that the punishment fit the crime.  Had it been different,

17      had he been sober and done this, then probably not at that

18      point, but because they were both drunk.  I mean, they had

19      alcohol levels, they should have both been dead, both him and

20      my brother, so they didn't know what they were doing.

21                    ATTY. JUHASZ:  You mentioned a second ago

22      that there are other situations where you think you got

23      cheated by the system.

1                    MARGARET L. KAY:  Yeah.  My parents --

2                    ATTY. JUHASZ:  Cheated, and I understand

3      that's my word and not yours.

4                    MARGARET L. KAY:  Yeah.  My parents were

5      alcoholics and we were in and out of foster homes when we

6      were younger.  And don't talk to me about child services

7      because they suck.  Sorry, but that's --

8                    ATTY. JUHASZ:  And you're not the first

9      person to say that.

10                    MARGARET L. KAY:  You know, so back when I

11     was younger.  But again, when you're growing up and I look

12     back, it's because of those circumstances that I feel I'm the

13     person I am.  And in some respects it's good and some

14     respects not so good, but, you know, it's that type of thing.

15                    ATTY. JUHASZ:  You mentioned how satisfied

16     you were with the Niles Police Department.  And were you also

17     satisfied with the prosecutor's office?

18                    MARGARET L. KAY:  Yeah, yeah, oh, yeah.

19                    ATTY. JUHASZ:  Now, it's the same

20     prosecutor's office and it's probably obvious why I'm going

21     to ask you this question.

22                    MARGARET L. KAY:  Right.

23                    ATTY. JUHASZ:  Just because you were

 1   satisfied with the prosecutor's office there doesn't sort of

 2   give them a leg up in proving this case, does it?

 3                    MARGARET L. KAY:  No, because the guy said

 4   he was guilty so there was really no case.  I mean, he came

 5   in and said I did it, you know, so they didn't have to prove

 6   anything because he said he did it.

 7                    ATTY. JUHASZ:  All right.  I don't know

 8   this but I'm going to hypothesize for a second.  Let's say

 9   that you're selected on this jury and when the jury comes

10   back at the end of the first phase let's say that the

11   government has not proved to your satisfaction beyond a

12   reasonable doubt that Donna is guilty of anything, okay?

13   These two gentlemen, Mr. Becker and Mr. Bailey, are obviously

14   going to be here, maybe Mr. Watkins will be here if word gets

15   around the courthouse hey, the jury has a verdict.  My

16   question is if you find that the government didn't meet that

17   burden of proof would you have any problem looking at these

18   two fellows or Mr. Watkins, who handled your brother's case,

19   and say sorry, you didn't meet your burden of proof?

20                    MARGARET L. KAY:  No, I'd have no trouble

21   with that because, again, you have to prove the guilt.  You

22   have to prove, you have to prove the point.

23                    ATTY. JUHASZ:  All right.  Our

1    conversation took us away from this and I only want to

2    address it briefly because you weren't here the first day,

3    but since you've been in the courthouse, either that second

4    day or today, have you heard any discussion in the courthouse

5    about Ms. Roberts, about Mr. Jackson, about the case,

6    anything like that?

7                    MARGARET L. KAY:  No.

8                    ATTY. JUHASZ:  One of the things that we

9    do is bring folks in here and Mr. Bailey talked about

10   everybody's duty to do public service and if you get a

11   summons for jury duty, if you can reasonably do it you should

12   do jury duty, and I think that's something you agree with,

13   correct?

14                   MARGARET L. KAY:  Right, right.

15                   ATTY. JUHASZ:  But part of what we do when

16   we bring you down here is we throw a whole bunch of things at

17   you at the same time.  There are procedures you're not used

18   to, there are rules you're not used to.  We gave you a

19   handout with, frankly, some of the most complicated law that

20   there is in Ohio, law that a lot of lawyers in this town

21   don't understand or couldn't pass a test about.

22          Now, having said that, I just want you to understand

23   that, first of all, if you have questions about it as we talk

1  about it please don't feel embarrassed or ashamed to say I

2  don't understand what they're talking about because a lot of

3  people don't.

4                    MARGARET L. KAY:  Uh-huh.

5                    ATTY. JUHASZ:  That said, excuse me, do

6  you feel pretty comfortable with that handout and

7  understanding how an Ohio capital trial works or do you want

8  to spend a minute or two going over that?

9                    MARGARET L. KAY:  No, I think I

10  understand.  First we have to prove they're guilty, and once

11  we prove they're guilty you go into phase two and from phase

12  two you have four options that they have to prove with a

13  reasonable doubt before you go to the death penalty.

14                    ATTY. JUHASZ:  Okay.

15                    MARGARET L. KAY:  It has to be.  And then

16  you have to decide to make the punishment fit the crime.

17                    ATTY. JUHASZ:  Now, let's talk about

18  several -- that's a pretty good summary.  Let's talk about

19  several things about that.  First of all, let's go back to

20  something a little bit different from the death penalty but

21  which ties in.  Have you heard the phrase before presumption

22  of innocence?

23                    MARGARET L. KAY:  Uh-huh.

1               ATTY. JUHASZ:  That comes from the fifth

2      amendment.  And sometimes you see on the movies or the TV

3      people, you know, usually some guilty guy that you know is

4      guilty as all hell who has got all sorts of incriminating

5      information about himself, sitting there saying I'm taking

6      the fifth.  And my point is that sometimes the fifth

7      amendment gets a bad rap like that because people say, well,

8      it allows that guilty guy to not talk.  That's the premise of

9      it, but the idea of the fifth amendment is that in our

10     country when the government says you do something, when they

11     make an allegation they have to prove it rather than the

12     other way around.  Do you see that?

13               MARGARET L. KAY:  (Nods head

14     affirmatively.)

15               ATTY. JUHASZ:  Do you think that's a good

16     idea or not a good idea?

17               MARGARET L. KAY:  It's probably a good

18     idea because you're assumed innocent until proven guilty, so

19     therefore the proof of guilt has to be there without a doubt.

20               ATTY. JUHASZ:  All right.  Mr. Bailey

21     mentioned a box and actually I'm going to catch up with him

22     after the trial because he owes me some royalties because he

23     stole my box example, but we'll hash that out later.  I like

 1    to talk about that box for several reasons.  One is that I

 2    told you that we give you all these crazy rules.  The judge

 3    at the end of the case is going to define for you proof

 4    beyond a reasonable doubt.

 5         Now, that probably gives you some comfort because

 6    you say, well, at least the judge is going to tell me what

 7    this proof beyond a reasonable doubt is.  Before you get too

 8    comfortable let me tell you that there's no way to quantify

 9    it, and I mention that particularly in connection with you

10    because you're in the medical field.  My wife is in the

11    medical field.  She's a medical technologist.  She's a

12    scientist.  You know, when she says you guys are talking

13    about reasonable doubt and a reasonable man and all this

14    stuff, you know, tell me two plus two equals four.

15         So I want you to understand that there is no

16    mathematical formula for reasonable doubt.  You have to have

17    some way, however, to sort of think about this evidence and

18    decide whether or not the government has proved its case and

19    that's why I like to talk about the box.

20         Mr. Bailey mentioned to you that the government has

21    to fill up that box, if it can, beyond a line called

22    reasonable doubt.  You appreciate that?

23                   MARGARET L. KAY:  Uh-huh.

1                    ATTY. JUHASZ:  If they do not do that then

2    you find the defendant not guilty.  Any problem doing that?

3                    MARGARET L. KAY:  No.

4                    ATTY. JUHASZ:  There may be, there may be

5    no evidence in the box when you go back into the jury room.

6    You may say you know what, these guys presented all this

7    stuff to me, but when I pour it into my imaginary box to see

8    if it's evidence that she participated in this crime, I don't

9    see anything.  So, you see, one scenario could be that the

10   box stays empty the whole time.

11           First of all, do you have any problem presuming the

12   box to be empty right now?

13                    MARGARET L. KAY:  It has to be empty right

14   now, I don't know anything.

15                    ATTY. JUHASZ:  That's right, you haven't

16   heard a thing.  Okay.  So you're exactly right, it has to be

17   empty right now.

18           Another reason I like to talk about the box is

19   because a lot of people think, well, you know what, if the

20   verdict is guilty the State wins and if the verdict is not

21   guilty the defendant wins, and that's not exactly correct.

22   And, see, because of this presumption of innocence, which

23   puts the burden of proof on the State in a criminal case,

1    they either win the case or they lose it.  They win the case

2    by convincing you and the other jurors that they filled up

3    that box beyond the line called reasonable doubt.  They lose

4    the case if they fail to convince you of that.  Do you see

5    that?

6                    MARGARET L. KAY:  Right.

7                    ATTY. JUHASZ:  I like to talk about it

8    that way because, as Mr. Bailey said before, Mr. Ingram and I

9    don't have any obligation to do anything in this case.

10   Neither does Donna Roberts, okay.

11            Let's go back then to the death penalty for a second

12   and let's talk about a case that's a little bit different

13   than the one that you have in front of you.  I think Judge

14   Stuard may have mentioned this.  You know, first of all, that

15   not every murder is eligible for punishment by the death

16   penalty, you appreciate that?

17                    MARGARET L. KAY:  Uh-huh.

18                    ATTY. JUHASZ:  There have to be what we

19   call special circumstances, as Mr. Bailey mentioned, or

20   specifications.  One of them that I think is kind of the

21   easiest to talk about for illustration purposes is that the

22   person who is killed is the governor or the lieutenant

23   governor.  So I want you to pretend for a second that I get

 1    indicted for killing a guy by the name of Bob Taft, okay?

 2          Now, if they say Juhasz, we, the government, allege

 3    that you with prior calculation and design, you thought about

 4    it, you planned it out, you killed a guy named Bob Taft,

 5    okay?  If that's all they say in that indictment you see,

 6    don't you, that while I could go to jail if they convict me,

 7    I could not get the death penalty?

 8                        MARGARET L. KAY:  Right.  There's no

 9    specification.

10                        ATTY. JUHASZ:  That's right, there's no

11    specification, and that's why I like to talk about it.  They

12    have to put a separate thing in the indictment.  It's sort of

13    a wake-up call to say hello, Juhasz, besides killing a guy

14    named Bob Taft by prior calculation and design, we're also

15    alleging that Bob Taft was the governor when you killed him,

16    okay?  So now if they can prove that also by proof beyond a

17    reasonable doubt then I may be eligible for consideration of

18    the death penalty.  Do you see that?

19                        MARGARET L. KAY:  Okay.

20                        ATTY. JUHASZ:  All right.  Now, you're

21    hesitating a little.

22                        MARGARET L. KAY:  Uh-huh.

23                        ATTY. JUHASZ:  And that's one of the

```
 1    reasons I like to use the example because you're probably

 2    saying this lawyer --

 3                        MARGARET L. KAY:   Just because he's

 4    governor, what --

 5                        ATTY. JUHASZ:   Pardon me?

 6                        MARGARET L. KAY:   Just because he's

 7    governor, what specification does that make?

 8                        ATTY. JUHASZ:   Well, actually the

 9    legislature, when they said listen, there are certain murders

10    that are more serious that we, the legislature, whether you

11    think we're smart or not, we're sitting in Columbus and

12    you're not so we're writing the laws, and here's what we say

13    are the murders that we think are more serious that deserve

14    the death penalty; if it's the governor or lieutenant

15    governor is one of them.

16                        MARGARET L. KAY:   Okay.

17                        ATTY. JUHASZ:   If you kill a witness is

18    another one; if you kill a police officer or somebody under

19    13, okay.

20                        MARGARET L. KAY:   Okay.

21                        ATTY. JUHASZ:   Now, you and I could

22    probably sit around and debate for a couple days for

23    entertainment purposes whether they made smart decisions, but
```

1    I'm going to ask you to accept for my example the fact that

2    they have chosen to say that's a special killing, okay?

3                    MARGARET L. KAY:  Okay.

4                    ATTY. JUHASZ:  Now, the other reason I

5    like to talk about it is because you may stand here and look

6    at me and go this lawyer has got to be stupid because

7    everybody in Ohio knows Bob Taft is the governor.  But you

8    see, don't you, that if they don't do something independent

9    of proving that I planned to kill and did kill a guy named

10   Bob Taft, they don't get to take me to a second phase for

11   death penalty consideration?  Maybe they bring in some

12   certificate or they bring in the chief justice who swore him

13   in.  However they prove that Bob Taft was the governor is up

14   to them.  But if they don't prove it you can't go back in the

15   jury room and say well, you know, they didn't really prove

16   Bob Taft was the governor, I know it but they didn't prove

17   it.

18                    MARGARET L. KAY:  Okay.

19                    ATTY. JUHASZ:  You see how they have to

20   prove two separate things?

21                    MARGARET L. KAY: Uh-huh.

22                    ATTY. JUHASZ:  You okay with making them

23   do that?

3830

1          MARGARET L. KAY:  Yeah.

2               ATTY. JUHASZ:  All right.  Now, Mr. Bailey

3     asked you a question about if there are certain things where

4     you think the death penalty is an appropriate punishment,

5     correct?  And one of them I think you said is a premeditated

6     murder.

7               MARGARET L. KAY:  Depending on -- I said

8     you have to have the circumstances.

9               ATTY. JUHASZ:  Okay.  And that's my

10    question, is if somebody is found guilty of premeditated

11    murder at the first phase are your feelings about the death

12    penalty such that that person is going to get an automatic

13    death penalty at the second phase because it's like they

14    premeditated it, they planned it?

15              MARGARET L. KAY:  You have to look at the

16    circumstances, the specifications, you have to look at those

17    things.  You have to see, like an example I can use, is this

18    guy could have decided to kill my brother, but because they

19    were both drunk at the time all I know is they were both

20    drunk at the time.

21              ATTY. JUHASZ:  Okay.

22              MARGARET L. KAY:  So you have to look at

23    the whole thing.  And just because they're guilty doesn't

```
 1    mean they get the death penalty.  You have to look at the
 2    circumstances.
 3                        ATTY. JUHASZ:  All right.  And when you
 4    say circumstances are you talking only about the
 5    circumstances under which the killing took place?
 6                        MARGARET L. KAY:  No.
 7                        ATTY. JUHASZ:  Or are you talking about
 8    circumstances about the person?
 9                        MARGARET L. KAY:  In the second part you'd
10    have to look at what they bring in to say because the first
11    part is done with.  From my understanding you're done with
12    the first part, you found them guilty, you're done with that
13    part.  Now it goes to the specifications on what the
14    punishment is going to be.
15                        ATTY. JUHASZ:  Okay.  One of the examples
16    we sometimes use also is let's take what we, what lawyers
17    call a felony murder.  The robbery -- I think Mr. Bailey
18    mentioned like kidnapping and rape if a murder occurs.  That
19    same part of the statute says if it occurs during an
20    aggravated robbery.  So let's say that I walk into a 7/11,
21    pull out a gun and say give me all your money, okay?  And the
22    guy gives me the money, or the woman, whoever is working at
23    the 7/11, and instead of just taking the money and making
```

3832

1    this an aggravated robbery I pull the trigger and kill them,

2    okay?  If a jury finds both of those things at the first

3    phase then, you see, I would be eligible for consideration of

4    the death penalty at the second phase.

5                    MARGARET L. KAY:  Right.

6                    ATTY. JUHASZ:  All right.  Are your views

7    about the death penalty such that in a circumstance like that

8    I would automatically get the death penalty at the second

9    phase?

10                   MARGARET L. KAY:  You have to look at --

11   you have to look at the specifications then.  And the

12   questions that would come up in my mind, were they proven to

13   be drunk, were they proven to be high, were they proven to

14   have underlying circumstances of why they did that?

15                   ATTY. JUHASZ:  Okay.  And let's just say,

16   and I'm not asking you to vote one way or the other on this

17   example, just I want to know whether you will consider this

18   type of evidence.  Let's say that, first of all, at the

19   second phase, and let me try to clear this up.

20                   MARGARET L. KAY:  Okay.  Now, the guy is

21   guilty already?

22                   ATTY. JUHASZ:  The guy is guilty, correct.

23   Let's say that -- and I'm the guy, by the way.  I always like

1    to make myself the bad guy so I'm not ratting on anybody

2    else.  So they prove me guilty of the robbery at the first

3    phase and they prove the specification, that I did the

4    murder, I did the robbery, and I did the robbery -- or, I'm

5    sorry, I did the murder during a robbery, okay.  So that's

6    the specification, that I committed a murder during a certain

7    specified felony, okay?

8                    MARGARET L. KAY:  Uh-huh.

9                    ATTY. JUHASZ:  That specification actually

10   gets a new name at the second phase, and you may have touched

11   on this with Mr. Bailey when he said they stand up and at the

12   second phase they say we resubmit to the jury everything we

13   produced at the first phase relative to the aggravating

14   circumstance, okay.  In essence what happens is the name

15   changes.  The specification at the first phase now becomes

16   what we call an aggravating circumstance or a reason to

17   consider imposing the death penalty at the second phase.  Do

18   you see that?

19                   MARGARET L. KAY:  Uh-huh.

20                   ATTY. JUHASZ:  What you are then asked to

21   weigh against that would be any evidence that in my case I

22   would present to you about why I shouldn't get the death

23   penalty, okay.  And let's just say that I was a little bit

1    drunk because you know what, I went there to steal the money

2    because my son has a deadly disease. I've run out of

3    insurance, I've sold my house, I've sold every worldly

4    possession that I have and he needs this shot in 24 hours or

5    the doctor is telling me he's going to die. And whether it

6    was to screw up my courage or whatever, I have a few pops of

7    Jack Daniels and I get a gun and I go in and do this. And

8    maybe in addition to all that I've got some mental problems

9    myself.

10           Now, again, I'm not asking you to say whether or not

11   you give me life or death in those circumstances, what I want

12   to know is, A, are your feelings about the death penalty such

13   that I'm going to automatically get the death penalty at the

14   second phase?

15                    MARGARET L. KAY:  Not automatically.

16                    ATTY. JUHASZ:  Okay.  B, are your feelings

17   about the death penalty such that the death penalty is going

18   to have a leg up for me at the second phase, that I'm going

19   to have to talk you out of giving me the death penalty?

20                    MARGARET L. KAY:  Depending on the

21   circumstances, maybe.

22                    ATTY. JUHASZ:  All right.  Let's take that

23   one and the premeditated murder because you had some problems

```
 1    with somebody who plans it out.

 2                    MARGARET L. KAY:  Uh-huh.

 3                    ATTY. JUHASZ:  And, again, I want you to

 4    understand that whatever your answers are, that's fine.

 5                    MARGARET L. KAY:  Yeah.

 6                    ATTY. JUHASZ:  Nobody is here to change

 7    your mind or anything like that.  But there are these four

 8    penalties at the second phase, you know that, you've rattled

 9    them off.

10                    MARGARET L. KAY:  (Nods head

11    affirmatively.)

12                    ATTY. JUHASZ:  At the first phase the

13    government has a box to fill up.  Actually two boxes, right?

14    We talked about that.

15                    MARGARET L. KAY:  Uh-huh.

16                    ATTY. JUHASZ:  They have the box called

17    aggravated murder and they have the box called specification.

18    Both of those have to be proved to your satisfaction beyond a

19    reasonable doubt.  Do you see that?

20                    MARGARET L. KAY:   Right, right.

21                    ATTY. JUHASZ:  At the second phase they

22    have another box to fill, again beyond the line called

23    reasonable doubt, and that box is a little bit harder to give
```

1   it a shorthand definition. It is that the reasons to impose

2   the death penalty outweigh the reasons not to by proof beyond

3   a reasonable doubt. Do you see that?

4                   MARGARET L. KAY: Uh-huh.

5                   ATTY. JUHASZ: The reason I'm asking you

6   these questions obviously is because if your feelings about

7   the death penalty are such that somebody who is convicted of

8   a premeditated murder or a murder during the course of a

9   felony like that robbery that you and I talked about, if your

10  feelings are such that the death penalty has a leg up, then

11  you've put some evidence in that box. Do you see that?

12                  MARGARET L. KAY: Uh-huh.

13                  ATTY. JUHASZ: Okay. And in that case it

14  sort of made the government's burden easier because they

15  really don't have to convince you as much. Just like we

16  talked about publicity in the first phase being some evidence

17  in the box, at the second phase if your feelings about the

18  death penalty are such that that's some evidence in the box,

19  that's okay, it's just that I need to know that.

20                  MARGARET L. KAY: Again, I think once the

21  verdict is guilty then you have, in my mind you have to blank

22  that out again. It's almost like starting over. Again

23  they're going to have to prove that that circumstances or

1    that evidence is the truth.  That's -- you have to feel in

2    your heart and your mind that that's going to be the truth,

3    and if you don't feel that that's in your heart and your mind

4    then you have to look at your other three options.  You can't

5    just, like I could never sit here and say that I

6    automatically think that somebody that's killed somebody gets

7    the death penalty because that's not the way it is.

8              ATTY. JUHASZ:  All right.  Regardless of

9    the circumstances of the killing?

10             MARGARET L. KAY:  Right.  But those are

11   what you have to look at, the circumstances and the evidence,

12   and you have to look at that whole picture.  You can't just

13   look that they shot somebody.  Even if somebody saw them

14   shoot somebody, you have to look at the whole circumstances,

15   the evidence that they've brought in that proves that they

16   did that premeditatedly or whatever.

17             ATTY. JUHASZ:  Okay.  All right.

18             MARGARET L. KAY:  I mean, just -- yeah, I

19   just couldn't say that, I could not jump right to the death

20   penalty.  I would have to look at the second phase and all of

21   those things.

22             ATTY. JUHASZ:  All right.  We're almost

23   there.  And you're doing fine.

1                     MARGARET L. KAY:  All right.

2                     ATTY. JUHASZ:  And listen, these are very,

3     very hard questions.

4                     MARGARET L. KAY:  It is, and you have to

5     think about them and you have to, whoever sits in those

6     chairs has to in their heart know that they're doing the

7     right thing.

8                     ATTY. JUHASZ:  Right.  All right.  Now,

9     you've said to me that, and please don't let me put words in

10    your mouth but I want to make sure that I'm paraphrasing you

11    correctly, that regardless of the circumstances of the

12    killing at the first phase, if you find somebody guilty

13    beyond a reasonable doubt you're not automatically going to

14    jump to the death penalty?

15                    MARGARET L. KAY:  No.

16                    ATTY. JUHASZ:  Okay.  My next question is,

17    however, probably a harder question for a lot of people,

18    which is you're not going to automatically jump to the death

19    penalty but is it going to have a preference in your mind?

20                    MARGARET L. KAY:  It's going to be in my

21    mind because I have four options to look at.

22                    ATTY. JUHASZ:  Right.  And it's okay to be

23    in your mind.

```
 1                         MARGARET L. KAY:  Right.  I mean, those

 2    four options, all four of them would be in my mind.

 3                         ATTY. JUHASZ:  Okay.

 4                         MARGARET L. KAY:  And I don't think I

 5    would have one more than another going into the second phase.

 6                         ATTY. JUHASZ:  Okay.

 7                         MARGARET L. KAY:  You know, the evidence

 8    provided at the second phase to fill that box is what's going

 9    to narrow down to whatever decision is made.

10                         ATTY. JUHASZ:  All right.  I had a juror a

11    couple of weeks ago basically say look, when I go into Baskin

12    Robbins chocolate is my favorite flavor, and although I might

13    on occasion get something else, somebody is going to have to

14    talk me out of going chocolate, and that's kind of how she

15    described her views about the death penalty.

16                         MARGARET L. KAY:  Uh-huh.

17                         ATTY. JUHASZ:  I'm sensing from you that

18    you don't have a favorite flavor going into the second phase.

19    Am I right about that?

20                         MARGARET L. KAY:  Right, yeah.  No, no.  I

21    was going to say with ice cream it depends on how I feel that

22    day.  But no, going in you have to look, I would have to look

23    at all four options and look at the evidence because, again,
```

1    the punishment has to fit the crime rather than -- or the

2    crime fit the punishment, maybe you should put it that way.

3                      ATTY. JUHASZ:  You have a couple of

4    relatives who are in law enforcement?

5                      MARGARET L. KAY:  Uh-huh.

6                      ATTY. JUHASZ:  And I think --

7                      MARGARET L. KAY:  My brother --

8                      ATTY. JUHASZ:  Does that say Columbia?

9                      MARGARET L. KAY:  Columbiana.

10                     ATTY. JUHASZ:  Oh, Columbiana.  Okay.

11                     MARGARET L. KAY:  Yeah.  My brother used

12   to do security, I mean, that's as close as law enforcement,

13   but he lives in Texas.  My cousin lives in Columbiana.  We're

14   very close. He's like a brother to me.  He's a deputy sheriff

15   down there.

16                     ATTY. JUHASZ:  All right.  He's a deputy

17   sheriff?

18                     MARGARET L. KAY:  Yeah, something like

19   that.  He was a detective, and you know how the politics are

20   with that stuff, so he's back and forth.

21                     ATTY. JUHASZ:  Yeah, yeah.  You're --

22   well, never mind.  Anything about that relationship that

23   would give you some reluctance to serve on a criminal jury

1    like this?

2                          MARGARET L. KAY:  No, because we haven't

3    even -- I haven't even told, I haven't told -- I think I just

4    told his mom and dad I was picked for jury duty.  We haven't

5    talked.  I haven't talked to him so he has no idea, but no.

6                          ATTY. JUHASZ:  Let's say that again at the

7    end of case you find that the State has not met its burden of

8    proof, okay, and you vote not guilty and then you see him and

9    he goes --

10                         MARGARET L. KAY:  He was guilty as sin.

11                         ATTY. JUHASZ:  Yeah, "What were you

12   thinking?  I mean, this was a capital murder case and you

13   found the person not guilty."  Would you have any trouble

14   doing that?

15                         MARGARET L. KAY:  No, because he wasn't

16   here and he didn't hear the evidence so he can't tell me that

17   I voted wrong because he wasn't here, he doesn't know.  But I

18   truthfully have to tell you that I don't think I could serve

19   on a jury with a policeman like in Youngstown because of

20   that.  I mean, that would just definitely -- there I think

21   I'm a little bit prejudiced in the fact that yes, they still

22   need to prove it and all that stuff, but at that point I

23   think I would be more prejudiced because that could happen to

3842

```
 1    Johnny.  You know, you just never know.
 2                    ATTY. JUHASZ:  Yeah.  I had trouble
 3    reading one of your answers.  I apologize.
 4                    MARGARET L. KAY:  It's my writing.  It's
 5    horrible.
 6                    ATTY. JUHASZ:  The question is in your
 7    opinion what are the most important problems facing the
 8    criminal justice system in this country, and you have
 9    something over something of cases.
10                    MARGARET L. KAY:  I think there's an over
11    burden of cases.  I think that sometimes we put people in
12    jail longer for writing a bad check than we do for killing
13    somebody.  And some things that go to court are stupid, you
14    know, it's just stupid.
15                    ATTY. JUHASZ:  Okay.
16                    MARGARET L. KAY:  And common sense would
17    take care of a lot of it but because of the system everything
18    is just backlogged.
19                    ATTY. JUHASZ:  All right.  You understand
20    that, getting back to the death penalty for a second -- first
21    of all, you've expressed some frustration over this parole
22    process with the fellow who pleaded guilty to killing your
23    brother.
```

1           MARGARET L. KAY:  Uh-huh.  And, again,

2   that's the system, I mean, because the person that does that,

3   you know, also has rights and all that kind of stuff and --

4           ATTY. JUHASZ:  What I want to make certain

5   that you understand in this case is, and I don't know what

6   the particular circumstances were of that case, but whatever

7   sentence he got he was obviously eligible for parole

8   consideration, that's why they sent you those letters.

9           MARGARET L. KAY:  Right.

10           ATTY. JUHASZ:  In this case you know what

11   those four options are.

12           MARGARET L. KAY:  Right.

13           ATTY. JUHASZ:  And I want to make certain

14   that you understand that there are no parole considerations

15   short of exactly what we've told you.

16           MARGARET L. KAY:  Right.

17           ATTY. JUHASZ:  In other words, if it's a

18   life sentence without parole nobody is ever going to get one

19   of those letters because the parole board is never going to

20   think about letting that person out.  You see that?

21           MARGARET L. KAY:  Yeah.  I thought about

22   that right away when I read those things, yeah.

23           ATTY. JUHASZ:  Okay.  With the 30 year

 1   option it's not like, you know, good time and yadda, yadda,

 2   yadda.  It's if you get life with no parole eligibility

 3   consideration for 30 years that person doesn't even get a

 4   hearing, a chance at a hearing for 30 years.  Do you see

 5   that?

 6                    MARGARET L. KAY:  Uh-huh.

 7                    ATTY. JUHASZ:  And ditto for the 25 year

 8   option.

 9                    MARGARET L. KAY:  Right.

10                    ATTY. JUHASZ:  Okay.  And even when they

11   get that hearing, just like you said that this fellow is

12   still in, correct?

13                    MARGARET L. KAY:  Uh-huh, to my knowledge

14   he is, yeah.

15                    ATTY. JUHASZ:  Okay.  Did you ever see the

16   Shawshank Redemption or no?

17                    MARGARET L. KAY:  I did but I don't

18   remember it.  My son thinks it's a great show.

19                    ATTY. JUHASZ:  Oh, yeah, it is a great

20   show.  It is a great show for a lot of reasons.  But Morgan

21   Freeman's character, who actually goes in as a young kid who

22   does a foolish little murder and he turns out to be sort of a

23   lovable guy in the movie, goes in front of the parole board

```
 1    several times and they stamp his thing when he's done.  It

 2    shows them stamping it in red ink "rejected".  And I need you

 3    to understand that even on those 25 and 30 year options

 4    that's just a parole hearing.  You see that?

 5                    MARGARET L. KAY:  Uh-huh.

 6                    ATTY. JUHASZ:  The parole board may say

 7    okay, you had your hearing.  Sorry, rejected, we're not

 8    letting you out.  Okay?

 9                    MARGARET L. KAY:  Right, yeah.

10                    ATTY. JUHASZ:  Anything about your

11    feelings about parole because of the other case that would

12    make you hesitate to vote for one of those options just

13    because there's the possibility of parole?

14                    MARGARET L. KAY:  No, no.

15                    ATTY. JUHASZ:  You also said something

16    about when we were just talking a second ago about stupid

17    cases coming to court and Mr. Bailey talked about stupid

18    criminals a little while ago.  Do you remember that?

19                    MARGARET L. KAY:  Uh-huh.

20                    ATTY. JUHASZ:  And I think he used the

21    example of somebody who hands the bank teller a note, you

22    know, a stickup note, --

23                    MARGARET L. KAY:  With the address on the
```

1    back.

2                    ATTY. JUHASZ:  -- with his address on the

3    back of it.  And I want to talk about that for a second

4    because you may have to think about these types of things if

5    you're called on as a juror in this case.  If I want to do

6    something illegal doesn't it make more sense to you that I

7    would try to do it quietly and surreptitiously rather than

8    openly?

9                    MARGARET L. KAY:  Uh-huh.

10                    ATTY. JUHASZ:  For example, let's just

11   say, I'm going to make up a silly example and say for some

12   reason I'm going to give Mr. Ingram over there a thousand

13   dollar bribe for whatever, okay?  It makes more sense that I

14   would try to do it in that little parking lot behind the

15   Saratoga Restaurant at night handing him an envelope full of

16   cash than by sending him a letter with a check saying, "Dear

17   Jerry:  Enclosed is a check for $1,000 for the bribe I

18   promised you," right?

19                    MARGARET L. KAY:  Uh-huh.

20                    ATTY. JUHASZ:  Mr. Bailey also talked to

21   you about circumstantial evidence.  Do you remember that?

22                    MARGARET L. KAY:  Uh-huh.

23                    ATTY. JUHASZ:  I have a little bit

 1  different way that I like to talk about that, I like to use

 2  actually an example involving my son.  I want you to pretend

 3  for a second that it's a late summer afternoon and it's real

 4  bright outside, it's 85 degrees in July, but the clouds are

 5  getting dark out in the west and the wind is kicking up and

 6  we know we're going to get one of those thunder bumpers that

 7  we get at 6:00 or 7:00 o'clock at night.

 8          I'm out in the kitchen making some iced tea or

 9  whatever and all of a sudden I hear a crash in the living

10  room.  As I go in to see what's going on my son's cat comes

11  tearing out between my legs.  The way you go into my living

12  room you can look both right and left, so I look to my right

13  -- or to my left, excuse me, and there's my son Mike standing

14  there like this with his hands over his face in some obvious

15  consternation, and I look to my right and there is one of my

16  wife's Normal Rockwell plates laying, knocked off the mantle

17  onto the hearth, shattered into a million pieces.

18                  MARGARET L. KAY:  Somebody is dead.

19                  ATTY. JUHASZ:  Somebody is dead, yeah.

20  Now, from what I've told you it could be possible that Mike

21  -- oh, and I'm sorry.  And I mentioned, I failed to mention

22  that there was a little Nerf ball about three feet from the

23  broken plate.

1              Now, from what I've told you it could be that Mike

2    was throwing that Nerf ball like he's been told 65 million

3    times not to do in the house, broke the plate and scared the

4    cat, correct?

5                      MARGARET L. KAY:   (Nods head

6    affirmatively.)

7                      ATTY. JUHASZ:   Could be that the cat

8    knocked the plate off and the Nerf ball was laying where it

9    was because Mike never picks anything up because that's Mike.

10   Or it could be that the wind from that approaching

11   thunderstorm knocked the plate off and both the cat and Mike

12   thought that they were going to be falsely blamed for what

13   happened, right?

14                     MARGARET L. KAY:   Uh-huh.

15                     ATTY. JUHASZ:   Now, while I could make an

16   allegation against Mike for breaking that plate by throwing

17   the Nerf ball, do you see from the circumstantial evidence

18   there are other theories that are just as plausible and

19   reasonable, correct?

20                     MARGARET L. KAY:   Uh-huh.

21                     ATTY. JUHASZ:   And those other theories

22   would constitute reasonable doubt, would they not?

23                     MARGARET L. KAY:   Uh-huh.

 1                    ATTY. JUHASZ:   That would be doubts that

 2    you would have about the reasonableness of the government's

 3    case, correct, or my case against Mike in that situation?   Do

 4    you see that?

 5                    MARGARET L. KAY:   Yep.

 6                    ATTY. JUHASZ:   Any problem holding the

 7    government to that kind of burden of proof when you test

 8    circumstantial evidence?

 9                    MARGARET L. KAY:   No.   They would still

10    have to prove the cat did it or the ball did it and they

11    would have to prove that Mike didn't.

12                    ATTY. JUHASZ:   Okay.   One way of thinking

13    about those kind of things is, or deciding whether that box

14    has been filled up, when you make an important decision don't

15    you sort of either on a piece of paper or in your mind's eye

16    make a checklist with the pros and the cons?

17                    MARGARET L. KAY:   Uh-huh.

18                    ATTY. JUHASZ:   You have to do the same

19    thing here because this is a very important decision.   On the

20    one side would be the reasons why the government tells you

21    that you should find the defendant guilty.   On the other side

22    will be doubts that you have about the case that maybe

23    Mr. Ingram and I have brought to your attention in the course

```
 1    of the case or that other jurors tell you about as you're

 2    back there discussing the case, all 12 of you.  Do you see

 3    that?

 4                    MARGARET L. KAY:  Uh-huh.

 5                    ATTY. JUHASZ:  You have to go through each

 6    one of those doubts.  Maybe the first one you say this is a

 7    doubt I have and somebody says no, look at this piece of

 8    evidence.  And you go you know what, that doubt is no longer

 9    based on reason and common sense, I forgot about that piece

10    of evidence, so you scratch it off.  You have to go through

11    each one of the doubts.  If you have one left, it could be

12    more, like the doubt you would have about Mike's guilt in

13    that case I just gave you, if you have one doubt like that or

14    more, then, you see, the government hasn't proved its case

15    beyond a reasonable doubt?

16                    MARGARET L. KAY:  Right.

17                    ATTY. JUHASZ:  Any problem holding them to

18    that type of burden?

19                    MARGARET L. KAY:  No.

20                    ATTY. JUHASZ:  And if they fail to meet

21    that burden, any problem coming out here and saying they

22    didn't?

23                    MARGARET L. KAY:  Saying not guilty,
```

1    right.

2                      ATTY. JUHASZ:  Okay.  Anything that's come

3    up you think that we should talk about or any questions that

4    you have?

5                      MARGARET L. KAY:  No, I don't think so.

6                      ATTY. JUHASZ:  Thanks for your time.  I

7    appreciate it.

8                      MARGARET L. KAY:  Okay.

9                      THE COURT:  Pass?

10                     ATTY. BAILEY:   Yes, Your Honor.

11                     ATTY. JUHASZ:  (Nods head affirmatively.)

12                     THE COURT:  Okay.  Both pass.  You will be

13   in the final pool from which this jury is selected.

14                     MARGARET L. KAY:  Okay.

15                     THE COURT:  I would ask you to call that

16   number Wednesday evening after 4:30.

17                     MARGARET L. KAY:  Okay.

18                     THE COURT:  I would again remind you, I

19   will continue to remind you throughout this trial you're not

20   to discuss anything about the case, read anything in the

21   newspaper, watch anything on TV, okay?

22                     MARGARET L. KAY:  Cover my ears.  Trumbull

23   County, I'll cover my ears.

```
 1                         THE COURT:  Okay.  Listen, we thank you

 2   very much for your participation.  Call that number.

 3                         MARGARET L. KAY:  Okay.  Thank you.

 4                         THE COURT:  Thanks very much.

 5                         (Whereupon, Ms. Margaret L. Kay was added

 6   to the pool of prospective jurors and excused for the day.)

 7                         THE COURT:  1:15, folks?

 8                         ATTY. BAILEY:  That's fine, judge.

 9                         THE COURT:  Very good.

10                         (Whereupon, a luncheon recess was taken.)

11                                   *   *   *

12              PROSPECTIVE JUROR EDWARD S. COLUCCI

13                         THE COURT:  Mr. Colucci, how are you this

14   afternoon?

15                         EDWARD S. COLUCCI:  Good.  How are you?

16                         THE COURT:  Good.  You read that handout

17   that was given to you?

18                         EDWARD S. COLUCCI:  Yes.

19                         THE COURT:  Okay.  You act a little bit

20   apprehensive here.  Don't be, please.

21                         EDWARD S. COLUCCI:  Okay.

22                         THE COURT:  Okay.  Are you the fellow that

23   collects cars?
```

1           EDWARD S. COLUCCI:  Yes.

2           THE COURT:  What do you have, a street rod

3    or what?

4           EDWARD S. COLUCCI:  Yes, 1941 Ford.

5           THE COURT:  Oh, do you?

6           EDWARD S. COLUCCI:  Two door sedan.

7           THE COURT:  I'll be darn.  I got a son

8    that's got that malady.  You read that handout I asked?

9           EDWARD S. COLUCCI:  (Nods head

10   affirmatively.)

11          THE COURT:  You are aware then that we are

12   here on a case involving two counts of aggravated murder with

13   specifications.  Under the law of Ohio the person who commits

14   murder is not necessarily facing the death penalty.  The

15   legislature have set forth in the statute covering such

16   things a list of circumstances which we refer to as

17   specifications, and if those are included in the indictment

18   and aggravated murder is proven beyond a reasonable doubt to

19   have occurred, and also the same burden is upon the State to

20   prove that the specifications occurred, then that raises the

21   possibility of the jury imposing the death penalty.

22          The reason we go into these questions at this point

23   are pretty simple and that is if we waited until the State

1   presented its case -- now, if the State fails to prove beyond

2   a reasonable doubt each and every element of the aggravated

3   murder and the specifications, then this jury will, quite

4   properly, issue a not guilty finding.  If the State, however,

5   proves its case beyond a reasonable doubt, then this jury

6   would be called upon to consider and weigh the aggravating

7   circumstances against the mitigating factors.

8           The aggravating circumstances are evidence that the

9   State would present that would recommend the imposition of

10  the death penalty to the jury.  The mitigating factors would

11  be factors that would recommend against the jury coming back

12  with a recommendation of the death penalty and to give a

13  lesser sentence of either life without chance of parole or

14  life without chance of parole before 25 or 30 years.

15          Now, if we have somebody on that jury that believes

16  in an eye for an eye, if you kill somebody you should give up

17  your own life, then such a person could not be fair to the

18  defendant if we got into that second phase because the

19  defendant has the right to have that weighing done of the

20  aggravating circumstances against the mitigating factors.

21  Likewise, if you had a juror that under no circumstances

22  would wish to participate in such a decision, then that

23  person could not be fair to the State.  So both sides have an

1    opportunity at this juncture to ask each prospective juror

2    what their own thoughts are on the matter of the death

3    penalty.

4              Whatever your thoughts are is fine, you're entitled

5    to your own beliefs and these folks will respect them.  It's

6    just that they have a duty on both sides to make inquiry to

7    see whether or not each of you are qualified to sit on this

8    jury, and that boils down to a simple question:  Is each

9    individual juror able to follow the law?  And although every

10   person on this jury will have some thought on the death

11   penalty issue, some more in favor, some less, but the issue

12   is can each of them follow the law?

13             The second issue will be about pretrial publicity,

14   what do you know, what did you find out?  Many of the people

15   know something about it.  Some of them seem to know very

16   little about it.  That's not important.  The important thing

17   is is each juror able to give the assurance to these folks

18   that whatever they know or think they know about the case,

19   they're able to set that aside, listen to the evidence in

20   this courtroom and decide the case fairly on the evidence,

21   not on speculation or hearsay that may have occurred before

22   this trial starts.  Okay?

23                      EDWARD S. COLUCCI:  Okay.

```
 1                         THE COURT:  Very good.  Mr. Becker.

 2                         ATTY. BECKER:  Thank you, Your Honor.

 3    Good afternoon, Mr. Colucci.

 4                         EDWARD S. COLUCCI:  Good afternoon.

 5                         ATTY. BECKER:  My name is Chris Becker.  I

 6    work for the county prosecutor's office.  This is Mr. Ken

 7    Bailey.  I assume you remember him from about a month ago

 8    when you were in the big courtroom down there.

 9                         EDWARD S. COLUCCI:  Yes.

10                         ATTY. BECKER:  And I assume you also

11    remember Mr. Ingram and Mr. Juhasz as well as their client,

12    Ms. Roberts.  They were also there that day as well.

13                         EDWARD S. COLUCCI:  (Nods head

14    affirmatively.)

15                         ATTY. BECKER:  One of the things that I'll

16    be forthright with you here is this is the only time we get

17    to speak to you and this is the only time, more importantly,

18    that you get to speak to us.  So if you have any questions or

19    if you have anything that you want to tell us that may not be

20    contained in the questionnaire or anything you feel may be

21    relevant to you serving as a potential juror in this case,

22    please let us know that, both myself and Mr. Bailey as well

23    as Mr. Ingram and Mr. Juhasz, because once this case gets
```

```
 1    started and if you're seated here in the jury box we can't

 2    have that interaction with you.  It's against the code of

 3    ethics for us to speak to jurors, and the Court will, in

 4    fact, tell us that we can't speak to you other than here in

 5    the courtroom.

 6              So if we see you and you're selected on the jury and

 7    we see you at a restaurant or we see you out in the hallway

 8    at the drinking fountain, it's not that we're rude and we

 9    don't like you or we don't want to speak to you or find out

10    more about you, we just can't do that because it would seem

11    to be as if we were influencing your decision in this case.

12    So you understand that?

13                        EDWARD S. COLUCCI:  Yes.

14                        ATTY. BECKER:  Okay.  What I'm going to do

15    is follow along what the Court laid out for you as a

16    framework here.  I am going to ask you some questions about

17    your opinion on the death penalty, any publicity you may have

18    prior to this case, and then finally some general questions

19    about serving as a juror in a criminal trial.

20              First of all, I notice on your questionnaire that

21    you are in favor of the death penalty, is that correct?

22                        EDWARD S. COLUCCI:  Yes.

23                        ATTY. BECKER:  Now, the way this process
```

1    works, and it's a little strange but sometimes you know how

2    the law is.  Sometimes it doesn't make sense and hopefully

3    we'll get it to make a little bit more sense for you.  There

4    is a possibility that we may never have to worry about you

5    considering or having to impose the death penalty or even

6    considering it, and the reason that is is because capital

7    cases in Ohio, and I'm sure that the Court has told you this

8    and you're aware from the questionnaire, are really sort of

9    two trials in one.  We're going to have one trial in this

10   case that's going to deal solely with the criminal charges

11   and whether or not Ms. Roberts is guilty or innocent of the

12   allegations as they are contained in the indictment.

13            There are four counts in the indictment; aggravated

14   burglary, aggravated robbery, and most important for the

15   death penalty consideration portion of this trial, are two

16   counts of aggravated murder, each with a specification or

17   specifications that you have to find her guilty of, you and

18   your fellow jurors would have to find her guilty of to even

19   consider the death penalty.  If you were to acquit her we

20   would all go home and we wouldn't have to worry about this

21   death penalty process.

22            So we're going to be presumptuous here because, like

23   I said earlier, we can't seat you as a juror, have you find

1     her guilty or take that chance that you find her guilty, and

2     then say, "Okay, jurors, guess what?  Come back in about

3     three or four days and we're going to ask you whether you can

4     impose the death penalty."  Because obviously there are some

5     people that, for whatever reasons, cannot impose the death

6     penalty, because of moral or ethical or religious beliefs,

7     and there are some other people who think that if they were

8     to convict someone of aggravated murder they automatically

9     should receive the death penalty, and that's just simply not

10     the process.

11          So you understand, and like I said, if we get to

12     that second phase it's too late then to ask if anybody could

13     impose the death penalty, so that's why we're really going to

14     the end of this trial and asking you if you could do all the

15     things in this trial, including the last portion, if you

16     could do those things.  And it's real important, like I say,

17     that you're very open with us.  And we're not trying to pry

18     into your life, we're not trying to invade your mind or, you

19     know, find out everything we can about you, but we do have to

20     know how you feel about certain issues in this case to know

21     whether you could be a fair and impartial juror.

22          So with that in mind, I'm assuming that if we got to

23     the second phase and Mr. Bailey and I proved the case to you

3860

1    that death was warranted and the facts permitted it and the

2    facts allowed it, you could step back into this jury room and

3    with your fellow jurors you could write on a piece of paper

4    your name and sign your name to a piece of paper calling for

5    the death penalty against Ms. Roberts?

6                    EDWARD S. COLUCCI:  It's possible.

7                    ATTY. BECKER:  Okay.  Well, you seem

8    uncomfortable doing that.  And I know these are really hard

9    questions.  We sort of just say hey, come on in here, we're

10   going to ask you some questions.  These are maybe not as big

11   a question as hey, are you going to get married again or are

12   you going to divorce your wife or are you going to have kids

13   or, you know, are you going to buy this house?  I mean, these

14   are important questions so take your time and, you know, look

15   into your mind and your heart and your soul.  And could you

16   see yourself, if the facts warranted it and the law permitted

17   it, could you sign a piece of paper calling for the

18   imposition of the death penalty?  There's no time rush or

19   anything so go ahead and think about it.

20                   EDWARD S. COLUCCI:  Yeah, I think I could,

21   yes, sir.

22                   ATTY. BECKER:  Okay, you believe you

23   could.  If we get to that second phase, just like in the

1    first phase, Mr. Bailey and I always have the obligation to

2    prove to you and your fellow jurors beyond a reasonable doubt

3    whatever it is that's alleged.  Whether it's the crimes and

4    whether they were committed in the first phase or whether

5    it's the penalty, and that being the death penalty in the

6    second phase, we, Mr. Bailey and I, the State, always have to

7    prove to you and your fellow jurors that it's warranted by

8    proof beyond a reasonable doubt.

9         So let's start out here with, I guess, the first

10   phase.  We'll be in the first phase, and let's assume for

11   argument sake that we prove the aggravated murders or at

12   least one of the aggravated murder counts as well as one of

13   these specifications, one of the bad things that makes her

14   eligible for the death penalty.  And in this case the

15   allegation is going to be that it was what we used to call

16   premeditated but they call it prior calculation and design

17   now, or, on the other hand, it was a felony murder.  You're

18   either going -- to get to this second phase you're going to

19   have to find one or both of those things, either that she

20   planned the murder with prior calculation and design or

21   premeditated and/or, because it could be both, that you found

22   that a person died and she was an aider and abettor in the

23   death of that person through the commission of a felony, in

1    this case either aggravated burglary or aggravated robbery.

2          Now you're in the second phase where we're going to

3    consider what punishment should be imposed and you have to

4    wipe the slate clean and start out fresh.  Now, what

5    Mr. Bailey and I are most likely going to do is say all of

6    the things related to the aggravating circumstance of either

7    the aggravated burglary, the aggravated robbery or prior

8    calculation and design, whichever one of those three, or

9    maybe all three if you found them, we want you to apply in

10   this case as the aggravating circumstances.

11         And basically you're going to take those and put

12   them in -- you've seen the scales of justice.  You're going

13   to put that on one side of the scale and that's going to be

14   the aggravating circumstances.  You have to then determine

15   whether those aggravating circumstances are enough and

16   outweigh by proof beyond a reasonable doubt anything she may

17   put on the other side.  And she may not put anything on the

18   other side, which we call mitigation, which are the good

19   things about her and about this case for her.  But we have to

20   at least get that scale to drop down far enough when we put

21   our aggravating circumstances in that it proves to you and

22   your fellow jurors beyond a reasonable doubt that death is

23   the appropriate penalty.  We may not be able to do that.

1    Does that make sense to you?

2                    EDWARD S. COLUCCI:  Yes.

3                    ATTY. BECKER:  All right.  We may put all

4    the aggravating circumstances in and she may put nothing in

5    in the other side and that may not be enough for you to

6    believe that death is the appropriate penalty, correct?

7                    EDWARD S. COLUCCI:  Yes.

8                    ATTY. BECKER:  She doesn't have to do

9    anything in that second phase, or the first phase for that

10   matter, and that's called the presumption of innocence, and

11   we'll touch upon that a little bit later.  But do you believe

12   that you will be a fair juror and consider all of the options

13   in this case if we get to that second stage fairly and

14   equally?

15                   EDWARD S. COLUCCI:  Yes.

16                   ATTY. BECKER:  And I think you had a piece

17   of paper that described those options to you?

18                   EDWARD S. COLUCCI:  Yes.

19                   ATTY. BECKER:  I think there was life with

20   no parole after 25 years, life with no parole after 30, life

21   with no parole at all, and then the death penalty, right?

22                   EDWARD S. COLUCCI:  Yes.

23                   ATTY. BECKER:  You're not so in favor of

 1    the death penalty that you would automatically impose it?

 2                    EDWARD S. COLUCCI:  No.

 3                    ATTY. BECKER:  Because we've had jurors

 4    like that and obviously we've had to excuse them because

 5    their theory was, basically like the Court said, an eye for

 6    an eye and hey, if you are convicted of aggravated murder I

 7    have to give you the death penalty.  There's nothing wrong

 8    with that, that's their opinion, but you're not of that mind

 9    set, are you?

10                    EDWARD S. COLUCCI:  No.

11                    ATTY. BECKER:  Now, I'm probably making

12    this as clear as mud to you, but do you have a general idea

13    of what we're going to try and do in this trial?

14                    EDWARD S. COLUCCI: Yes, I do.

15                    ATTY. BECKER:  Okay.  Very good.  Now, the

16    other area I want to touch upon is the area of pretrial

17    publicity, and if I remember your questionnaire correctly,

18    you've actually seen some television coverage of this,

19    correct?

20                    EDWARD S. COLUCCI:  Yes, a few minutes.

21                    ATTY. BECKER:  And I believe that was back

22    before the case started or actually before you were selected

23    as a juror, correct?

1               EDWARD S. COLUCCI:  Yes.

2               ATTY. BECKER:  You haven't violated the

3    Court's instructions when you were here on April 8th and read

4    or seen anything or talked about this case since then, right?

5               EDWARD S. COLUCCI:  No.

6               ATTY. BECKER:  And you understand the

7    importance of that is because we want you and your fellow

8    jurors to determine this case, both the guilt and innocence

9    of Ms. Roberts and the appropriate penalty, if we get that

10   far, based upon what's in this courtroom, correct?

11              EDWARD S. COLUCCI:  Yes.

12              ATTY. BECKER:  All right.  You also --

13   well, let me ask you this, what do you remember seeing on

14   television about this case?

15              EDWARD S. COLUCCI:  Really not much.

16              ATTY. BECKER:  Okay.

17              EDWARD S. COLUCCI:  It's been a while ago.

18              ATTY. BECKER:  Right.  That was probably

19   almost a year and a half ago because I think you indicated

20   you saw the television coverage when it happened?

21              EDWARD S. COLUCCI:  And it was, you know,

22   they only show you a few minutes of it, you know, what

23   happened.

```
 1                        ATTY. BECKER:  Sure.  And you probably
 2    weren't paying particular attention to that story anyway,
 3    right?
 4                        EDWARD S. COLUCCI:  No.
 5                        ATTY. BECKER:  Now, is there anything that
 6    you saw on television that would affect your ability to serve
 7    as a juror in this case?
 8                        EDWARD S. COLUCCI:  No.
 9                        ATTY. BECKER:  You're not going to say,
10    "Boy, I saw this on television.  It was so horrendous and
11    horrific, I can't believe it.  You know, if I ever get stuck
12    on that jury I'm going to, you know, find her guilty no
13    matter what?"
14                        EDWARD S. COLUCCI:  No.
15                        ATTY. BECKER:  You're not of that mind
16    set, right?
17                        EDWARD S. COLUCCI:  No.
18                        ATTY. BECKER:  And you also indicated in
19    your questionnaire, I believe, that you had spoken to some
20    coworkers I think about this case?
21                        EDWARD S. COLUCCI:  Yes.
22                        ATTY. BECKER:  And I'm assuming that
23    happened after, you know, or when it was on the news, right
```

```
 1    after?  I'm assuming that happened right around the time that

 2    this was on the news and you probably went into work and

 3    maybe somebody you knew from Howland was there and said,

 4    "Boy, I know where this house is, it's down the street or

 5    across the street from somebody I know," or something like

 6    that?

 7                        EDWARD S. COLUCCI:  Well, when I went back

 8    to work I told them I was selected for --

 9                        ATTY. BECKER:  Okay.  This is after you

10    were selected for jury duty?

11                        EDWARD S. COLUCCI:  Yes.  That I was

12    called to jury duty, for jury duty.

13                        ATTY. BECKER:  And they started speaking

14    to you?

15                        EDWARD S. COLUCCI:  And they knew what the

16    case was before me telling them whatever happened, you know.

17    I mean, they knew before I did and I was here.

18                        ATTY. BECKER:  Okay.  And did you -- I

19    mean, you didn't -- did you say, "Hey, listen, I can't listen

20    to you speak"?  You didn't speak to them about this case, did

21    you?

22                        EDWARD S. COLUCCI:  No.

23                        ATTY. BECKER:  All right.  So you, did you
```

```
 1    tell them --
 2                        EDWARD S. COLUCCI:  Yeah, yeah.  I said
 3    don't talk no more, I don't want to hear, you know, what's
 4    going on.
 5                        ATTY. BECKER:  Because you might be a
 6    juror on this case.
 7                        EDWARD S. COLUCCI:  Right.
 8                        ATTY. BECKER:  And you got the
 9    questionnaire from the judge and you said, "I can't discuss
10    this with you"?
11                        EDWARD S. COLUCCI:  Right, exactly.
12                        ATTY. BECKER:  So that would be your only
13    contact with your coworkers, right?
14                        EDWARD S. COLUCCI:  Yes.
15                        ATTY. BECKER:  You were here on April 8th.
16    They knew you were here obviously because you probably
17    weren't at work.
18                        EDWARD S. COLUCCI:  Right.
19                        ATTY. BECKER:  And they went in and said
20    hey, we saw this or that and something on TV or newspaper and
21    they said this, and you said, "Hey, I can't talk about this,"
22    is that what you did?
23                        EDWARD S. COLUCCI:  Yes, I did.
```

3869

```
 1                            ATTY. BECKER:  All right.  Did you gain

 2    any information from any of these people you work with?

 3    Well, let me ask you, let me ask you that a different way.

 4    That's probably a silly question.  Is there anything that

 5    they said to you that would affect your ability to be a fair

 6    and impartial juror?

 7                            EDWARD S. COLUCCI:  No.

 8                            ATTY. BECKER:  Okay.  And I assume it

 9    wasn't a very long discussion, right?

10                            EDWARD S. COLUCCI:  No.

11                            ATTY. BECKER:  Because as soon as they

12    started to say things that you weren't supposed to hear you

13    told them that you couldn't hear those things.

14                            EDWARD S. COLUCCI:  Right.

15                            ATTY. BECKER:  All right.  Is there

16    anything either from television -- I can't remember, did you

17    read anything from the newspaper?

18                            EDWARD S. COLUCCI:  No.

19                            ATTY. BECKER:  Anything from television or

20    your conversations with your coworkers that you feel would

21    not make you a good juror for this case?

22                            EDWARD S. COLUCCI:  No.

23                            ATTY. BECKER:  And you understand sort of
```

1     the reasons we ask this case or ask you these questions is

2     because this case, like all criminal cases, has to be decided

3     by what you hear in this courtroom, by the evidence and the

4     testimony you hear in this room only, right?

5                     EDWARD S. COLUCCI: Yes.

6                     ATTY. BECKER: And it may be hard for you

7     because I'm assuming you've never been in this situation,

8     probably never want to be, but if you were seated over there

9     where Ms. Roberts was you wouldn't want somebody coming in

10     here and saying, "Oh, yeah, I know about it. I talked to Joe

11     at work and Mike at work and they told me all this about the

12     newspaper. In fact, I remember seeing this on television

13     and, oh, I've got my mind made up, she's guilty." You're not

14     of that kind of mind set right now, are you?

15                     EDWARD S. COLUCCI: No.

16                     ATTY. BECKER: And you understand that the

17     television, they're only in here -- I think earlier we had a

18     camera in here -- but they're only in here maybe two or three

19     or four or five minutes and they go out and they give you 30

20     seconds of sound bite and footage and, you know, they don't

21     know the whole story of what we've even done here today,

22     correct?

23                     EDWARD S. COLUCCI: Right.

3871

```
1                    ATTY. BECKER:  All right.  Now, Mr.

2    Colucci, I want to ask you a little bit about, and again I'm

3    not trying to pry but we do have to know these things, I see

4    you are of the Catholic faith?

5                    EDWARD S. COLUCCI:  Yes.

6                    ATTY. BECKER:  And obviously the Catholic

7    faith is outspoken about the imposition of the death penalty.

8    Is that something that's going to be a problem for you?

9                    EDWARD S. COLUCCI:  No.

10                    ATTY. BECKER:  All right.  Because we've

11   had some people come in and say, you know, I follow the

12   teachings of the Catholic church and I could not impose the

13   death penalty.  And other people have said, well, I'm

14   Catholic and I regularly go to church, but I can separate

15   that religious belief and I could impose the death penalty if

16   I felt it was warranted because that's my personal opinion.

17   So you're of that belief that you could do that despite what

18   your religious upbringing would be?

19                    EDWARD S. COLUCCI:  Yes.

20                    ATTY. BECKER:  Okay.  Now, Mr. Colucci, I

21   want to get into some questions that are really related to

22   criminal cases in general, and all criminal cases in general

23   have recurring themes and one of those recurring themes in
```

1    most criminal cases is what we call the presumption of

2    innocence.  I'm assuming you've watched some television show

3    maybe or read a book or seen it in a magazine somewhere or

4    heard it on the radio or television.  That concept is really

5    one of the basic tenets of our judicial system, at least as

6    it relates to criminals and crimes in this country, is that

7    the defendant is presumed innocent unless and until we can

8    prove her guilt beyond a reasonable doubt.

9              Now, obviously you are familiar with some other

10   countries where, since we just got done with Iraq, where

11   maybe the defendant is presumed guilty and that person has to

12   prove to whatever authorities that they're not guilty of the

13   crime.  Our system obviously doesn't work that way, and for

14   good reason, because our system is basically founded on the

15   principle that it's better to let a guilty person get away

16   with something than to put an innocent person behind bars,

17   correct?

18                        EDWARD S. COLUCCI:  Yes.

19                        ATTY. BECKER:  And you, I assume, believe

20   in that system of justice?

21                        EDWARD S. COLUCCI:  Yes.

22                        ATTY. BECKER:  All right.  So you will be

23   able to give Ms. Roberts the presumption of innocence

1   throughout this trial?

2                   EDWARD S. COLUCCI:  Yes.

3                   ATTY. BECKER:  Despite what you may have

4   read on television -- or, I'm sorry, what you would have seen

5   on television or heard from your coworkers, correct?

6                   EDWARD S. COLUCCI:  Yes.

7                   ATTY. BECKER:  As small as that may have

8   been.

9                   EDWARD S. COLUCCI:  Correct.

10                  ATTY. BECKER:  On the other side of that

11  presumption of innocence -- well, I guess tied into, not on

12  the other side, but tied into that is that throughout this

13  trial, both in the first part and the second part of this

14  trial, Mr. Bailey and I have to prove to you and your fellow

15  jurors beyond a reasonable doubt what Ms. Roberts has done.

16  And if we get, are able to prove that, then we have to prove

17  beyond a reasonable doubt what the appropriate penalty is.

18  She and her attorneys could sit over there and do absolutely

19  nothing throughout this trial and we may present to you 35 or

20  40 witnesses and they may not be enough to prove to you

21  beyond a reasonable doubt her guilt, correct?

22                  EDWARD S. COLUCCI:  Yes.

23                  ATTY. BECKER:  And on the other side we

1    could present maybe one witness and that one witness may be

2    enough to prove her guilt beyond a reasonable doubt if that

3    witness were strong enough and reliable enough, correct?

4                    EDWARD S. COLUCCI:   Yes.

5                    ATTY. BECKER:   It's a little bit like the

6    car accident that happens on say Park Avenue and High Street.

7    If our witness, if our one witness is, say, the local

8    monsignor for the Catholic church here and he walks around

9    the square every day.  He's got 20/20 vision.  He says, "I

10   always walk around courthouse square every day and it's my

11   daily exercise, and I've noticed over the years, I've been

12   doing this for 10 years, that sometimes people run through

13   these intersections and miss the traffic lights so I'm very

14   careful.

15                   "And one day I was standing at the corner of North

16   Park and High Street and I saw a car traveling north on Park

17   and it went through the intersection at Market and it went

18   through the intersection at High Street.  Both of the lights

19   were red and it just plowed into that guy that was driving

20   down High Street."  That one witness -- and he says, "When I

21   was standing there, because I've seen these crazy drivers

22   here in Warren, I don't step out onto the curb until I look

23   both ways.  Even though I have the flashing yellow --" or,

```
 1    I'm sorry, "the flashing white sign that said walk and even

 2    though I knew the light was green in the direction I was

 3    traveling, I didn't step off that curb because I know there's

 4    bad drivers.  I looked to the left, I didn't see anything on

 5    North Park, and I looked to the south and that's when I saw

 6    this guy blow through the red light at Market and Park and he

 7    came right through the intersection of High and I saw the

 8    whole accident."

 9              That would probably be a good enough witness for you

10    to prove beyond a reasonable doubt that the driver had driven

11    through a red light, correct?

12                   EDWARD S. COLUCCI:   Yes.

13                   ATTY. BECKER:   And on the other side we

14    could present to you many other witnesses.  We could probably

15    present to you three or four witnesses who may not be

16    reliable at all.

17              There's a bar down the street called Madigan's on

18    High Street.  Let's assume it's the same set of facts, a car

19    is alleged to have traveled through the intersection at Park

20    and High Street, and these three guys came out of Madigan's.

21    They had been there all day.  It was 12:00 midnight when the

22    accident happened.  They had been drinking since 5:00 o'clock

23    since they got off work.  All three of them got in a fight.
```

3876

1    Two of them wear contacts and their contacts got knocked out

2    and lost during the fight.  The other one wears glasses and

3    his glasses were broke in the fight.

4         They're walking down the street stumbling, not even

5    paying attention.  They're looking at the constellations

6    because it's a clear night and they want to talk about the

7    Sagittarius constellation and the Big Dipper, and all of a

8    sudden they hear this accident and they're going to come in

9    and say the guy who allegedly was going on Park Avenue went

10   through the intersection and, in fact, hit their buddy who

11   was supposed to pick them up at Madigan's after they're done

12   drinking.  He was on his way to get them.  You would have

13   some questions with those jurors, or those witnesses,

14   correct?

15                   EDWARD S. COLUCCI:  Yes.

16                   ATTY. BECKER:  All right.  Serious

17   problems with their credibility.  And that's basically what

18   you are going to be called to do as a juror, to test the

19   credibility of the witnesses, to see who has a motive perhaps

20   to testify a certain way, who is biased, who was in the best

21   position to see something or hear something or do something,

22   and who is most reliable basically.  You feel you could make

23   those kind of determinations in a case of this magnitude?

 1              EDWARD S. COLUCCI:  Yes.

 2              ATTY. BECKER:  Okay.  Now, on the -- hand

 3    in hand with the presumption of innocence is the concept of

 4    reasonable doubt, and again I'm assuming you've heard of that

 5    concept of reasonable doubt, correct?

 6              EDWARD S. COLUCCI:  Yes.

 7              ATTY. BECKER:  I once had a law professor,

 8    his name was Professor Merit, and he was a little bit of a

 9    strange bird but he was my criminal professor, criminal law

10    professor, and he described reasonable doubt as like a glass

11    of water, and the burden of proof.

12              If I put a glass of water here, reasonable doubt is

13    not to the top because that's all doubt and I can't prove to

14    you, nor can Mr. Bailey probably, prove to you anything

15    beyond all doubt.  There's always doubt to some things.

16    There's doubt whether the sun will come up tomorrow.  I mean,

17    a meteor could crash into the sun and we may not know about

18    it, or maybe the earth will quit rotating on its axis.

19    That's possible, right?  It might be even imaginary, but

20    there's some doubt that that may happen, so we only have to

21    prove to you beyond a reasonable doubt, and that's based on

22    reason and common sense, the Court will tell you.

23              And we have to fill that glass up pretty close to

3878

1     the top but we don't have to fill it up so that the next drop

2     of water causes the water to pour out of the glass. Pretty

3     close to the top. And every person is going to have a

4     different idea of what reasonable doubt is. Some may say

5     it's an inch from the top, some may say it's half an inch

6     from the top, but it's reasonable. Is it reasonable to say

7     that this glass is full? And when I bring you a drink where

8     would you say the glass of water is full? That's really what

9     we have to prove.

10          And there's really not a number we can give you.

11    For instance, in my little traffic example the Court is not

12    going to tell you, well, if the State gives you five

13    witnesses and you believe three of them, that's reasonable

14    doubt. Or if they gave you seven witnesses and you believe

15    six of them, they've proved their case. It's something you

16    and your fellow jurors have to discuss and feel comfortable

17    with. Am I making myself fairly clear?

18                    EDWARD S. COLUCCI: Yes.

19                    ATTY. BECKER: Okay. You won't require

20    Mr. Bailey and I to fill the cup up all the way so that it's

21    at the very top, meaning all doubt is gone, would you?

22                    EDWARD S. COLUCCI: No.

23                    ATTY. BECKER: You'll only hold us to what

1    the Court instructs, which is reasonable doubt, correct?

2                    EDWARD S. COLUCCI:  Yes.

3                    ATTY. BECKER:  Now, part of that concept

4    is throughout both of these proceedings Ms. Roberts doesn't

5    have to put anything into our cup of water.  She doesn't have

6    to take anything out, she doesn't have to put anything in

7    because that's her presumption of innocence, correct?

8                    EDWARD S. COLUCCI:  Yes.

9                    ATTY. BECKER:  So if we only fill the

10   glass up half way as to one of these crimes, that's not

11   reasonable doubt for you, is it?  That's leaving too much to

12   chance, isn't it?

13                   EDWARD S. COLUCCI:  Probably, yes.

14                   ATTY. BECKER:  Probably.  And if we fill

15   it up pretty close to the top, say maybe only two-thirds of

16   the way, that might not be reasonable doubt either, right?

17                   EDWARD S. COLUCCI:  Probably not.

18                   ATTY. BECKER:  Okay.  We need to get it

19   pretty close to the top and you'll hold us to that standard?

20                   EDWARD S. COLUCCI:  Yes.

21                   ATTY. BECKER:  And, again, you won't hold

22   us to the standard, the impossible standard of filling that

23   glass up all the way to the top?

```
 1                    EDWARD S. COLUCCI:   No.

 2                    ATTY. BECKER:   Okay.   And I appreciate

 3    that.   Thank you.   Now, this case is, as I told you, involves

 4    four counts; aggravated murder, there are two counts, and a

 5    count of aggravated burglary and aggravated robbery.   In this

 6    case there's only one death.   There are two allegations,

 7    though, of aggravated murder, and basically under Ohio law

 8    there's just many theories and we've decided to approach this

 9    case with two theories.   One of those theories is that the

10    case was committed with prior calculation and design, or like

11    I told you before, premeditated.   The other is that the

12    murder was committed during the course of an aggravated

13    robbery or an aggravated burglary.   That's what we call

14    felony murder.

15                    The Court will instruct you that you can convict

16    Ms. Roberts of both of those charges, one of those charges or

17    none of those charges.   The fact that there are two

18    aggravated murder charges charged in this indictment, does

19    that present any problems to you?   Do you think boy,

20    Mr. Bailey and Mr. Becker must not know what they're doing;

21    there is only one dead guy and they've charged her with two

22    counts of aggravated murder, or do you understand that

23    there's just two different theories?
```

```
 1                         EDWARD S. COLUCCI:  I understand.

 2                         ATTY. BECKER:  And you're not going to

 3      hold that against us because we've charged two different

 4      counts of aggravated murder, correct?

 5                         EDWARD S. COLUCCI:  Right.

 6                         ATTY. BECKER:  And on the other side of

 7      that coin the issue becomes you don't think Ms. Roberts is

 8      really bad and really guilty because, golly gee, there's only

 9      one person killed or alleged to have been killed and she's

10      charged with two murder counts?  You don't hold that against

11      her, do you?

12                         EDWARD S. COLUCCI:  No.

13                         ATTY. BECKER:  All right.  In this case

14      and because it is a very serious offense, in fact, it is the

15      most serious offense that can be charged in the State of

16      Ohio, it carries the ultimate penalty which can be given in a

17      criminal case in Ohio.  And it obviously involves the death

18      of one person, which is Robert Fingerhut, and it involves the

19      potential death of a second person, which is Ms. Roberts.

20      You may find it difficult to decide this case without

21      sympathy, but the Court is going to tell you that we can't be

22      sympathetic to either side.

23                    For instance, you're going to see photographs of
```

```
 1    Mr. Fingerhut.  You're going to hear testimony about his
 2    demise, the cause and manner of his death.  You wouldn't be
 3    of the mind set to say and go back in the jury room and say,
 4    "Boy, you know, Mr. Bailey and Mr. Becker didn't really fill
 5    the cup up high enough for me to prove beyond a reasonable
 6    doubt that she's guilty, but I saw this poor guy with a
 7    bullet wound in his head and I heard the testimony of the
 8    coroner and I just can't get it out of my mind that he must
 9    have been, you know, a decent guy and why did he have to die
10    that way?  I'm going to find her guilty anyway."  You
11    wouldn't do that, would you?

12                    EDWARD S. COLUCCI:  No.

13                    ATTY. BECKER:  And on the other side of
14    that coin is if you're selected for a juror for jury duty in
15    this case you'll be seated in one of these 12 chairs and for
16    two or three weeks you'll be just a few feet from Ms. Roberts
17    throughout this trial.  You won't say two or three weeks into
18    the case and then when you go back to deliberate, "Boy, I
19    know Mr. Bailey and Mr. Becker, they filled that cup up
20    pretty close to the top for me.  I'm reasonable, and based on
21    reason and common sense she's guilty, but boy, I couldn't, I
22    couldn't find her guilty or I couldn't give her the death
23    penalty because she seems like such a sweet old lady over
```

3883

 1     there sitting there being real quite.  Kept to herself and

 2     she smiled at me maybe once or twice.  I couldn't do that to

 3     her.  You know, even though this guy is dead, I just feel so

 4     sorry for her because she's in this predicament."  You

 5     wouldn't do that either, would you?

 6                         EDWARD S. COLUCCI:  No.

 7                         ATTY. BECKER:  Okay.  So you'll be able to

 8     separate any sympathy you may have, because it's only natural

 9     sometimes to feel sympathetic for someone whether they're in

10     both of those situations or one or the other, correct?

11                         EDWARD S. COLUCCI:  Yes.

12                         ATTY. BECKER:  All right.  Now, Mr. Bailey

13     and I are going to be very up front with you in this case.

14     The allegation in this case is not that Ms. Roberts was the

15     shooter.  In fact, I believe the testimony will show she

16     wasn't even at the location where the shooting occurred.

17     She's what we call a helper, or the legal term is aider and

18     abettor.  The Court will explain that a little bit better for

19     you once you get your jury instructions.

20          The fact that Ms. Roberts is not the actual shooter,

21     didn't actually pull the trigger that killed this individual

22     but was only alleged to be a helper, would that cause you

23     concern not to impose the death penalty?

```
 1                         EDWARD S. COLUCCI:   No.

 2                         ATTY. BECKER:   If the Court instructs you

 3   that you can impose the death penalty and the facts warrant

 4   it, you could still sign the death penalty verdict even if

 5   she was just alleged to be a helper or an aider and abettor?

 6   If the facts were warranted --

 7                         EDWARD S. COLUCCI:   Yes.

 8                         ATTY. BECKER: -- and the law permitted,

 9   you could do that?

10                         EDWARD S. COLUCCI:   Yes.

11                         ATTY. BECKER:   And I understand we're

12   really sort of talking in these general concepts here because

13   obviously you haven't heard any evidence, right?

14                         EDWARD S. COLUCCI:   Yes.

15                         ATTY. BECKER:   You may not hear any

16   evidence.  Mr. Bailey and I may say, "Hey, guess what?  Our

17   witness is dead and we can't go on."  I mean, that's not

18   going to happen, but you haven't heard any of the evidence

19   yet, correct?

20                         EDWARD S. COLUCCI:   Right.

21                         ATTY. BECKER:   All right.  This case, like

22   almost all criminal cases, involves some evidence that's

23   called circumstantial evidence, and circumstantial evidence
```

1   is really just pieces of evidence that you can infer other

2   things from.  The Court will tell you that circumstantial

3   evidence and direct evidence -- that means somebody sees

4   something -- have the same value, they have the same weight,

5   and it's for you as a juror to decide if it's reliable and

6   whether you can rely on it.

7           And one of the examples that we always use, it's a

8   very simplistic example but we use it a lot, is you watch --

9   is it Channel 33 that you watch?

10                  EDWARD S. COLUCCI:  Mostly, yeah.

11                  ATTY. BECKER:  Mostly?  Okay.  And I

12  forget who the weather person is on Channel 33.

13                  EDWARD S. COLUCCI:  Stan Boney.

14                  ATTY. BECKER:  Stan Boney, that's right.

15  Let's say you're watching the 11:00 o'clock news and Stan

16  Boney is on there and he's got the big weather map behind him

17  and it's showing the whole State of Ohio and he points out to

18  a line of green blobs that are moving across from Toledo.

19  They're up in Detroit to Toledo, down to maybe Cincinnati and

20  they're moving.  He keeps showing you that radar loop and

21  they keep moving closer and closer and now they're near

22  Columbus and they're running from basically Sandusky down to

23  Columbus all the way down to like Portsmouth.

```
 1        And you're there and he says, "Listen, folks,
 2   sometime between 2:00 to 4:00 tonight we're going to get bad
 3   thunderstorms, there's going to be a lot of rain.  It will
 4   clear out in the morning though.  We're going to have a
 5   beautiful day tomorrow when the high pressure comes in.  It
 6   will be 75, 80 degrees tomorrow."  And you say, well, that's
 7   pretty good because I got some outdoor activity tomorrow.
 8   I'm going to be going fishing or I'm going to go out and take
 9   a walk in the woods, or whatever I'm going to do I need that
10   good weather for tomorrow.
11        So you turn off the TV, you go to bed, and before
12   you go to bed you look out in the driveway and make sure your
13   windows are up in your car, make sure you didn't leave any
14   garden tools around, your wheelbarrow is back because you
15   were putting out mulch this morning, and you want to make
16   sure everything is put away, and you go to bed.  And you wake
17   up at 6:30, 7:00 o'clock, you hear the birds chirping, and
18   you look outside in your driveway and you see all those dead
19   worms there and the driveway is wet and the sidewalk is wet
20   and the street is wet, your neighbor's yard is wet, your
21   neighbor's driveway is wet.  You see water streaming down the
22   curb and into the sewer which is right in front of your
23   house.  You can infer that it rained, right?
```

1                    EDWARD S. COLUCCI:  Yes.

2                    ATTY. BECKER:  You may not have seen a

3    drop of rain fall from the sky, but you know based upon the

4    circumstantial evidence that it's rained.

5                    EDWARD S. COLUCCI:  Yes.

6                    ATTY. BECKER:  And you have to be careful

7    sometimes, you would agree, with circumstantial evidence

8    because let's say the same scenario is presented to you and

9    Stan Boney says, you know, this is going to be hit and miss

10   tonight.  Some places may see just, you know, a downpour and

11   other places may not see a drop of rain.  Those blobs are

12   sort of separated, they're not real -- they're not in that

13   long line like you see with a front moving through.

14              And you go to bed and you do the same thing and you

15   look outside and it's all dry and your windows are up, you

16   didn't leave your garden tools out.  And you get up the next

17   morning and you open up your window and can see your

18   neighbor's driveway or the guy across the street's driveway

19   and it's all wet and his car is wet but you look in your

20   driveway and it's dry and the street is dry and your grass is

21   dry and there's no dead worms in your driveway.  Then you

22   look out again and you see your neighbor and he's coming out

23   with a bucket and he's got a hose and he's washing his car,

1   right?  So you have to be a little bit careful about the

2   inferences you make.  But you believe you'll be able to make

3   inferences and make the inferences in this case if they're

4   presented to you, correct?

5                   EDWARD S. COLUCCI:  Yes.

6                   ATTY. BECKER:  And you'll be able to

7   determine the guilt of Ms. Roberts based upon some

8   circumstantial evidence as well, correct?

9                   EDWARD S. COLUCCI:  Yes.

10                   ATTY. BECKER:  And you'll also be required

11   to make a determination as to whether or not, if we get that

12   far, as to whether the death penalty is appropriate perhaps

13   based on some circumstantial evidence.  You'll be able to do

14   that as well?

15                   EDWARD S. COLUCCI:  Yes.

16                   ATTY. BECKER:  Okay.  You don't have any

17   problems with any of this so far?

18                   EDWARD S. COLUCCI:  No.

19                   ATTY. BECKER:  All right.  Now, the last

20   thing I want to touch upon with you in terms of the criminal

21   aspects of this case is I'm assuming maybe you've seen it on

22   television that you've seen or heard of the really dumb

23   criminal, right?  Somebody has done something and they've

 1    planned it all out, they've done a lot of things to get away

 2    with this crime and they end up getting caught for some

 3    stupid reason, right?

 4              I personally have seen that.  In fact, one of the

 5    first cases that I ever tried, the first case that I ever

 6    tried that was a capital murder trial, the defendant and his

 7    cohort lured someone from Portage County all the way down to

 8    southern Ohio and they ended up planning to take this guy

 9    down there for the purpose of killing him because one of them

10    thought he was dating his girlfriend or his girlfriend's

11    daughter.  And they ended up killing the guy and they

12    basically shot his head off, shot his hands off, took his

13    hands, so they basically left him as a headless handless

14    corpse, and they rolled him into a strip pond.  And when the

15    case was done, or when the body was discovered rather, they

16    pulled this poor headless handless corpse out of the water,

17    let him dry out and, lo and behold, in his breast pocket he

18    had his address and his calendar in it.  They forgot to check

19    his pocket.

20              Well, the police went to Portage County and they

21    found these guys three or four days later and, lo and behold,

22    they still had the knives and the bloody knives and the guns

23    and stuff in their car because they weren't very smart.  Even

1    though they planned it out and they brought him down and they

2    killed him in the middle of the night and left him in this

3    desolate area, they screwed up.

4            You don't think all criminals are rocket scientists,

5    do you?

6                        EDWARD S. COLUCCI:  No, right.

7                        ATTY. BECKER:  And even the best criminals

8    sometimes make a mistake, correct?

9                        EDWARD S. COLUCCI:  Yes.

10                       ATTY. BECKER:  All right.  Even though

11   they wanted to do things in the middle of the night and do

12   them secretly and not let anybody know and travel half way

13   around the state and do it in the dark, they made a mistake,

14   right?

15                       EDWARD S. COLUCCI:  Yes.

16                       ATTY. BECKER:  Okay.  So you could see how

17   things like that can happen to anyone?

18                       EDWARD S. COLUCCI:  Yes.

19                       ATTY. BECKER:  All right.  Is there any

20   questions that you have, Mr. Colucci, about serving as a

21   juror, and specifically serving as a juror on this case

22   because, like I said, it is sort of the mother of all cases

23   in the criminal justice system?  It carries the greatest

```
 1    penalty and involves the potentiality of some day Ms. Roberts

 2    being executed.  Is there anything that you feel that you

 3    need to tell myself or the Court or Mr. Ingram or Juhasz

 4    about your potential service as a juror in this case?

 5                    EDWARD S. COLUCCI:  No.

 6                    ATTY. BECKER:  Nothing has come to mind

 7    that said boy, I just remembered something?  Nothing like

 8    that?

 9                    EDWARD S. COLUCCI:  No.

10                    ATTY. BECKER:  Okay.  Well, I want to

11    appreciate you for -- I'm sorry, thank you, and I appreciate

12    your time here this afternoon.  Mr. Ingram or Mr. Juhasz now

13    are going to ask you some questions.  And, again, thank you

14    very much, sir.

15                    EDWARD S. COLUCCI:  Okay.

16                    THE COURT:  Mr. Ingram.

17                    ATTY. INGRAM:  Good afternoon, Mr.

18    Colucci.  How you doing up there?

19                    EDWARD S. COLUCCI:  Good.  How are you?

20                    ATTY. INGRAM:  You need some water or

21    anything?

22                    EDWARD S. COLUCCI:  No.  I'm fine.

23                    ATTY. INGRAM:  If during our conversation
```

1    you get thirsty, let me know, I'll get you a glass of water.

2                    EDWARD S. COLUCCI:  Okay.  Thank you.

3                    ATTY. INGRAM:  I'm Jerry Ingram, this is

4    John Juhasz, and John and I share the responsibility of

5    representing Donna here who is on trial for her life.  And as

6    I'm sure you can imagine, we feel that it's necessary to take

7    every reasonable precaution in selecting a fair-minded jury,

8    the same type of jury that you or I would want to decide our

9    cause if we were on trial.  Does that sound fair enough to

10   you?

11                   EDWARD S. COLUCCI:  Yes.

12                   ATTY. INGRAM:  This is a lot like a job

13   interview except it's a short-term job, No. 1, and, No. 2,

14   when you go apply for a job you get to choose where you're

15   going to apply.  In this case somebody spun a jury wheel with

16   a bunch of numbers in it, reached a hand in there and, lo and

17   behold, your number came out and we asked you to come here

18   for this interview.

19            When you go for an interview sometimes the applicant

20   learns of the requirements of the job and says you know what,

21   I didn't know that this job required I would be able to do

22   that.  I'm not up to it.  Other times it's the employer, the

23   employer who is doing the interviewing and he makes some type

1    of decisions.  We're interviewing you today for one of the

2    most important jobs there is, the job of finding the truth

3    and perhaps determining the faith of another human being, so

4    my first question to you is how do you feel about being asked

5    to assume such a responsibility?

6                          EDWARD S. COLUCCI:  I understand what's

7    going on, what, you know, could possibly happen.

8                          ATTY. INGRAM:  There are some ground rules

9    in the conversation that you and I are going to have.  First

10   of all, I want you to understand that I'm going to ask you

11   some hard questions, not hard questions in the sense that

12   you're supposed to give a right answer because there are no

13   right or wrong answers.  Hard questions to the extent that

14   you may have to think about how you feel about certain things

15   before you give me your answer.  Does that make sense to you?

16                          EDWARD S. COLUCCI:  Yes.

17                          ATTY. INGRAM:  There are no right or wrong

18   answers.  The only mistake you can make during this dialogue

19   is if instead of telling me how you really feel you tell me

20   or one of the rest of us what you think we want to hear.  Do

21   you understand what I'm saying there?

22                          EDWARD S. COLUCCI:  Yes.

23                          ATTY. INGRAM:  We're all human and because

1    of who we are and what we are we have thoughts, feelings or

2    attitudes about one thing or another.  Do you agree with

3    that?

4                      EDWARD S. COLUCCI:  Yes.

5                      ATTY. INGRAM:  In my case, and I'm talking

6    about me now, you could call me in for jury duty and you

7    could ask me if I'm willing to set aside an impression, a

8    thought, a feeling or an attitude, and depending upon how

9    strongly I feel about that particular issue, I may or may not

10   be able to put aside my personal feelings.  Do you see what I

11   mean?

12                     EDWARD S. COLUCCI:  Yes.

13                     ATTY. INGRAM:  How do you -- do you

14   believe in the American jury system?

15                     EDWARD S. COLUCCI:  Yes.

16                     ATTY. INGRAM:  You understand that this

17   system only works when we find good people who are willing to

18   come into court, give of themselves and fairly determine the

19   cause before them?

20                     EDWARD S. COLUCCI:  Yes.

21                     ATTY. INGRAM:  Do you also understand that

22   the system only works if those good people that come in

23   honestly and forthrightly tell us if they might have a

1    problem giving either side a fair shake?

2              EDWARD S. COLUCCI:  Yes.

3              ATTY. INGRAM:  Because it's important,

4    society as a whole has to have faith and confidence in the

5    outcome of court proceedings.  Do you agree with that?

6              EDWARD S. COLUCCI:  Yes.

7              ATTY. INGRAM:  Now, you while -- when

8    you're on break at work, as I understand it, you read the

9    Vindicator and the Tribune?

10             EDWARD S. COLUCCI:  Yes, usually when I

11   work afternoon turn.

12             ATTY. INGRAM:  And that would be what,

13   once every three weeks or --

14             EDWARD S. COLUCCI:  It's like every other

15   month.

16             ATTY. INGRAM:  Every other month.  And

17   when you read the paper you read the local news first?

18             EDWARD S. COLUCCI:  Most, yes.

19             ATTY. INGRAM:  Do you recall reading

20   anything about this case, a case against Nate Jackson or the

21   name Robert Fingerhut in any newspaper?

22             EDWARD S. COLUCCI:  No.

23             ATTY. INGRAM:  You do recall seeing

1    something about this case on TV, is that correct?

2                          EDWARD S. COLUCCI:  Yes.

3                          ATTY. INGRAM:  Can you give me an idea of

4    when that was?

5                          EDWARD S. COLUCCI:  I think when it

6    happened.

7                          ATTY. INGRAM:  That would have been

8    December of 2001.

9                          EDWARD S. COLUCCI:  Okay.

10                         ATTY. INGRAM:  And you saw something on TV

11   then?

12                         EDWARD S. COLUCCI:  A couple seconds of

13   news.

14                         ATTY. INGRAM:  Are you able to remember

15   what you saw, or not really?

16                         EDWARD S. COLUCCI:  No.

17                         ATTY. INGRAM:  All right.  Then you came

18   here on April 8th, about almost a month ago, and we were at

19   that big courtroom down at the other end of the hall, am I

20   correct?

21                         EDWARD S. COLUCCI:  Yes.

22                         ATTY. INGRAM:  By the way, when you walked

23   in that courtroom as you went in the door did you go to your

1    left or to your right, do you recall?

2                        EDWARD S. COLUCCI:  Left.

3                        ATTY. INGRAM:  Did you find a seat or did

4    you have to stand?

5                        EDWARD S. COLUCCI:  I found a seat.

6                        ATTY. INGRAM:  While you were in that

7    courtroom did anyone else in that courtroom try to engage you

8    in discussion about the case you were being called for?

9                        EDWARD S. COLUCCI:  No.

10                       ATTY. INGRAM:  Did you overhear anyone

11   else talking about the case?

12                       EDWARD S. COLUCCI:  No.

13                       ATTY. INGRAM:  Then you left there and at

14   some point in time you went to work?

15                       EDWARD S. COLUCCI:  Yes.

16                       ATTY. INGRAM:  The day when your coworkers

17   started to talk to you, was that the same day you were here

18   or was that a day or two later, when was that?

19                       EDWARD S. COLUCCI:  Day after.

20                       ATTY. INGRAM:  The day after.  And can you

21   tell me everything you can remember about what happened with

22   that conversation with your coworkers?

23                       EDWARD S. COLUCCI:  They asked -- I told

1   them -- they asked me where I was the day before.  I said I

2   was on, you know, I got called for jury duty, and they just

3   came right out and mentioned Donna Roberts' name just like

4   that, I mean, like they knew where I was already and I hadn't

5   even talked to anybody about it.

6                ATTY. INGRAM:  Well, how many coworkers

7   are we talking about here?

8                EDWARD S. COLUCCI:  Oh, like two or three.

9                ATTY. INGRAM:  Two or three?  In your

10  questionnaire you wrote down that "I heard that she had her

11  boyfriend kill her common-law husband just days after he got

12  out of jail."  Do you recall writing that down?

13               EDWARD S. COLUCCI:  Yes.

14               ATTY. INGRAM:  Is that information that

15  you had obtained from these coworkers at work?

16               EDWARD S. COLUCCI:  Yes.

17               ATTY. INGRAM:  Do you recall what else

18  they may have said to you?

19               EDWARD S. COLUCCI:  That was it.

20               ATTY. INGRAM:  How long did this

21  conversation last?

22               EDWARD S. COLUCCI:  Minute, two minutes at

23  the most.

1          ATTY. INGRAM:  How did it end?  What

2   brought it to a conclusion?

3          EDWARD S. COLUCCI:  I told them I didn't

4   want to hear anymore.

5          ATTY. INGRAM:  What did they say?

6          EDWARD S. COLUCCI:  Okay.  Talk about

7   something else.

8          ATTY. INGRAM:  Now, would you agree with

9   me that virtually everything we see, read or hear leaves some

10  type of an impression on us?

11         EDWARD S. COLUCCI:  Yes.

12         ATTY. INGRAM:  Sometimes we may, we may be

13  able to set aside the impression, sometimes we may not be

14  able to set aside the impression.

15         EDWARD S. COLUCCI:  Yes.

16         ATTY. INGRAM:  But there's probably an

17  impression.  Does that sound fair enough?

18         EDWARD S. COLUCCI:  Yes.

19         ATTY. INGRAM:  Did what you were told by

20  your coworkers leave an impression on you that Donna was

21  probably involved in the death of her common-law husband?

22         EDWARD S. COLUCCI:  No.

23         ATTY. INGRAM:  Is there anything about

1    that conversation that you cannot remove from your mind?

2                    EDWARD S. COLUCCI:  No.

3                    ATTY. INGRAM:  Because you understand that

4    in order to judge this case fairly you have to judge it on

5    what you see here, what you hear in this courtroom?

6                    EDWARD S. COLUCCI:  Yes.

7                    ATTY. INGRAM:  Not on any outside

8    influence.

9                    EDWARD S. COLUCCI:  Right.

10                   ATTY. INGRAM:  If your coworkers try to

11   engage you in discussion in the future, how are you going to

12   handle that situation?

13                   EDWARD S. COLUCCI:  I'm going to tell them

14   I can't talk about it.

15                   ATTY. INGRAM:  And I don't know your

16   coworkers, all right.  Are they strong-minded guys?  Will

17   they listen to you or will they sort of be on your back the

18   entire time?

19                   EDWARD S. COLUCCI:  No, I think they'd

20   listen to me.

21                   ATTY. INGRAM:  Did they bug you after the

22   first conversation where you told them you couldn't discuss

23   it anymore?

1                    EDWARD S. COLUCCI:  No.

2                         ATTY. INGRAM:  Do they know you're here

3       today?

4                         EDWARD S. COLUCCI:  No.

5                         ATTY. INGRAM:  In response to the question

6       about your views on the death penalty you said simply "I am

7       for it," that's what you wrote down in the questionnaire.

8                         EDWARD S. COLUCCI:  Yes.

9                         ATTY. INGRAM:  Could I ask you to expand

10      upon that a little bit, please?  That's one of those hard

11      questions that's going to cause you to make you think a

12      little bit.

13                        EDWARD S. COLUCCI:  Well, I just think

14      that if you prove that someone, you know, planned to murder

15      someone or followed through with it, then, you know, they

16      possibly deserve the death penalty.

17                        ATTY. INGRAM:  Are there any -- have you

18      been exposed to any news coverage about any case that caused

19      you to say in your mind yeah, the death penalty is right for

20      that case, or no, the death penalty is not right for that

21      case?

22                        EDWARD S. COLUCCI:  Not that I can recall.

23                        ATTY. INGRAM:  In your questionnaire you

1    were asked if you thought the death penalty should be

2    required for any offenses and I believe you said, "Yes.

3    Nobody has the right to kill anyone."

4                    EDWARD S. COLUCCI:  Okay.

5                    ATTY. INGRAM:  Do you recall writing that

6    answer?

7                    EDWARD S. COLUCCI:  Yes.

8                    ATTY. INGRAM:  Can I press you and ask you

9    to expand on that answer?

10                   EDWARD S. COLUCCI:  Can you repeat the

11   question again?

12                   ATTY. INGRAM:  Yes.  In the questionnaire

13   there's a question about whether you believe the death

14   penalty should be required for any crimes.  Do you recall

15   that question in there?

16                   EDWARD S. COLUCCI:  Yes.

17                   ATTY. INGRAM:  Here, I think it's 47.

18   Sometimes I'm a little dim-witted.  I apologize for that.

19   I'm not so sure I understand your answer there so I'm asking

20   you if you can sort of explain it to me a little bit?

21                   EDWARD S. COLUCCI:  Okay.

22                   ATTY. INGRAM:  And take your -- you can

23   take time, take a deep breath, if you want a glass of water,

1    but just do your best for me.

2              EDWARD S. COLUCCI:  Okay.  I just think

3    that if you could prove to me that someone killed someone,

4    that they planned it out, and if they've actually done the

5    crime, that maybe the death penalty is for them.

6              ATTY. INGRAM:  Okay.  We're going to send

7    you, and I'm making this up, we're sending you to Columbus.

8    And all those people in Columbus that we pay to write the

9    laws for us, the first thing -- probably the first smart

10   thing we ever did is get rid of all of them, we're going to

11   put you down there as a legislature of one.  Are you

12   following me so far?

13             EDWARD S. COLUCCI:  Okay.

14             ATTY. INGRAM:  You get to write the laws

15   for the State of Ohio.  Based upon the answer you just gave

16   me I gather that you would include the death penalty as a

17   penalty for aggravated murder or premeditated, let's say

18   premeditated murder?

19             EDWARD S. COLUCCI:  Okay.  Yes.

20             ATTY. INGRAM:  Do you understand what I

21   mean by the term premeditated murder?  It's murder with

22   advanced planning.

23             EDWARD S. COLUCCI:  Yes.

1          ATTY. INGRAM:  In your scheme of things in

2     your statutes, it will be Colucci's law, would premeditated

3     murder have only one penalty and that would be the death

4     penalty or would there be alternatives?

5          EDWARD S. COLUCCI:  I believe there would

6     be alternatives.

7          ATTY. INGRAM:  And one of those

8     alternatives -- the alternatives would be life imprisonment?

9          EDWARD S. COLUCCI:  Possibly, yes.

10          ATTY. INGRAM:  Can you think of anything

11     else as an alternative?

12          EDWARD S. COLUCCI:  No.

13          ATTY. INGRAM:  Now, you understand -- did

14     you read the preliminary instructions downstairs?

15          EDWARD S. COLUCCI:  Yes.

16          ATTY. INGRAM:  That's some hard stuff and

17     it's not easy reading.  I want you to know we could give it

18     to half the lawyers in town and they wouldn't understand it.

19     Do you think you got a handle on what was written there?

20          EDWARD S. COLUCCI:  Yes.

21          ATTY. INGRAM:  Do you understand that this

22     is potentially and only potentially a two stage process?

23          EDWARD S. COLUCCI:  Yes.

1          ATTY. INGRAM: If at the first phase Donna

2     is found not guilty, what happens?

3          EDWARD S. COLUCCI: She's free.

4          ATTY. INGRAM: That's right. We all pack

5     up our bags, we go home. There is no -- you're not going to

6     go to a second phase on an innocent person, are you?

7          EDWARD S. COLUCCI: No.

8          ATTY. INGRAM: So I want to talk about a

9     second phase but I'm going to make up a second phase. It's

10    not this case, it's another case. Let's say you're a second

11    phase juror in a case where the defendant has been found

12    guilty of premeditated murder. Let's say, and it sadly

13    reflects recent occurrences in this area, but let's say it is

14    premeditated murder of a police officer in the line of duty,

15    and that's a capital specification. So you have a guilty

16    verdict on a charge of premeditated murder and a guilty

17    verdict on the death spec, which would take you to the second

18    phase. Are you following me so far?

19          EDWARD S. COLUCCI: Yes.

20          ATTY. INGRAM: Do you understand that even

21    in those circumstances you would have to go into the second

22    phase with all four sentencing alternatives starting out

23    equally in your mind?

1                      EDWARD S. COLUCCI:  Yes.

2                      ATTY. INGRAM:  You couldn't, you couldn't

3     favor one over the others.  You got that?

4                      EDWARD S. COLUCCI:  Yes.

5                      ATTY. INGRAM:  I guess what I'm trying to

6     find out from you, and only you can tell me, if you ever got

7     to a second phase in any capital case would your views on the

8     death penalty and aggravated murder cases sort of give the

9     death penalty a leg up going into that second proceeding?

10                      EDWARD S. COLUCCI:  It might.

11                      ATTY. INGRAM:  Well, we're going to have

12     to talk about that.  It might.  You might give the death

13     penalty a leg up because -- can you finish the rest of that?

14                      EDWARD S. COLUCCI:  Well, because maybe, I

15     mean, if it's premeditated they knew what they were going to

16     do.

17                      ATTY. INGRAM:  Okay.  Is it your personal

18     opinion, and I'm talking about how you think in your own

19     mind, is it your personal opinion that in premeditated murder

20     cases where the defendant has been convicted -- you following

21     me so far?

22                      EDWARD S. COLUCCI:  Okay.

23                      ATTY. INGRAM:  Because whenever you get to

1    a second phase you're going to have a conviction.

2                    EDWARD S. COLUCCI:  Okay.

3                    ATTY. INGRAM:  Do you personally feel that

4    in cases of premeditated murder, that is a planned murder,

5    that the death penalty is the appropriate penalty?

6                    EDWARD S. COLUCCI:  No, not necessarily.

7                    ATTY. INGRAM:  Okay.  What do you mean by

8    not necessarily?  I know you are probably thinking to

9    yourself what more can this guy ask me about this?  I'm

10   sorry, but listen, if you were sitting over there wouldn't

11   you expect me to be asking hard questions of the prospective

12   jurors?

13                    EDWARD S. COLUCCI:  Yes.

14                    ATTY. INGRAM:  All right.  Let me try this

15   from another angle, so to speak.  In cases of planned

16   premeditated murder would you expect the defendant to

17   persuade you that the defendant should live rather than die?

18                    EDWARD S. COLUCCI:  Yes.

19                    ATTY. INGRAM:  And is that because -- and

20   don't ever let me put words in your mouth.  If you find that

21   I'm doing that you stop me, tell me to hold up and put me in

22   my place, okay?

23                    EDWARD S. COLUCCI:  All right.

1          ATTY. INGRAM:  Before I digressed with

2     putting words in your mouth I believe that we had just

3     discussed that in cases of planned premeditated murder you

4     might expect the defendant to convince you that life rather

5     than death was the appropriate penalty, right?

6          EDWARD S. COLUCCI:  Yes.

7          ATTY. INGRAM:  And a few moments ago you

8     told me that because of the way you personally feel about the

9     death penalty that if you were going into a second phase you

10    might give the death penalty a leg up?

11         EDWARD S. COLUCCI:  Yes.

12         ATTY. INGRAM:  And both of those were

13    honest forthright answers, correct?

14         EDWARD S. COLUCCI:  Yes.

15         ATTY. INGRAM:  You might expect the

16    defendant to convince you that life rather than death was the

17    appropriate penalty because your personal views in a case

18    where there's been a planned premeditated murder would give

19    the death penalty a leg up going into a second phase; is that

20    a fair statement?

21         EDWARD S. COLUCCI:  Yes.

22         ATTY. INGRAM:  How strongly do you feel

23    about that?  If it's something you feel very strongly about,

1    that's fine.  This is a country where we are all entitled to

2    believe what we choose.  That's what makes this country

3    great.  And I want you to know that if I were being

4    interviewed for jury duty I would be ineligible for nine out

5    of 10 cases.  Do you recall the orientation instruction the

6    judge gave that Tuesday, April 8th?  I believe he said that

7    if any of the potential jurors were excused it would only

8    mean that they had been honest and forthright in their

9    answers, so actually if any juror is excused it's actually an

10    honor.  You see what I mean by that?

11                EDWARD S. COLUCCI:  Okay.

12                ATTY. INGRAM:  Or you think I'm nuts?

13                EDWARD S. COLUCCI:  I don't know.  It

14    sounds --

15                ATTY. INGRAM:  The most we can ask of you

16    is that you be honest with us.  If any juror being honest

17    with us gets that juror excused, that only means that that

18    juror had been honest and forthright and that's something

19    that person should be proud of, that's what I'm saying.  Does

20    that make sense to you?

21                EDWARD S. COLUCCI:  Yes.

22                ATTY. INGRAM:  Which takes me back to how

23    strongly do you feel that the death penalty would have a leg

1    up in a case of planned premeditated murder?

2                        EDWARD S. COLUCCI:  Pretty strongly.

3                        ATTY. INGRAM:  And, by the way, do you

4    know anywhere I can get a '69 -- no, I'm sorry.  You're a

5    past president of a hot rod show or club, right?

6                        EDWARD S. COLUCCI:  Club, yes.

7                        ATTY. INGRAM:  You've worked at Indelux

8    for 25 years.

9                        EDWARD S. COLUCCI:  Yes.

10                        ATTY. INGRAM:  You're married, you have a

11   couple kids.

12                        EDWARD S. COLUCCI:  (Shaking head

13   negatively.)

14                        ATTY. INGRAM:  You're not?

15                        EDWARD S. COLUCCI:  Married.  No kids.

16                        ATTY. INGRAM:  No kids.  I'm sorry.  You

17   seem like you're a fairly strong-willed individual.

18                        EDWARD S. COLUCCI:  Okay.

19                        ATTY. INGRAM:  Is that a fair statement?

20                        EDWARD S. COLUCCI:  Yes.

21                        ATTY. INGRAM:  I also believe that I'm a

22   strong-willed individual.  And you can ask me to set aside

23   something that I feel strongly about and I may, I may be

1    able, I may be willing to tell you that I'll try it, or I may

2    not be willing to tell you that I'll try it depending upon

3    how strongly I feel about the issue.  Does that make sense to

4    you?

5                    EDWARD S. COLUCCI:  Yes.

6                    ATTY. INGRAM:  Are your views that death

7    is -- is your view that death is the appropriate punishment

8    in a case of premeditated murder so strong that it's unfair

9    for us to ask you to set that aside?

10                   EDWARD S. COLUCCI:  No.

11                   ATTY. INGRAM:  You feel you can set it

12   aside?

13                   EDWARD S. COLUCCI:  Yes.

14                   ATTY. INGRAM:  If you are a second phase

15   juror your oath would require you to go into a second stage,

16   whether it's in this case or a made up case, your oath would

17   require you to go into the second stage with no

18   preinclinations or no fixed opinion about punishment.  Do you

19   understand where I'm going?

20                   EDWARD S. COLUCCI:  Yes.

21                   ATTY. INGRAM:  Personally you would go

22   into that second phase favoring the death penalty, is that

23   what I gained from you?

1              EDWARD S. COLUCCI:  Yes.

2              ATTY. INGRAM:  Are you telling her, not

3    the rest of us now, her -- that's Donna by the way -- that

4    you can set aside your own personal feelings regarding the

5    death penalty being the appropriate penalty in a murder case,

6    aggravated murder case, and go into a second phase, if you

7    ever get there, and fairly consider the -- and fairly and

8    equally consider the life options?  Because if you're going

9    to have a problem doing that, now is the time to tell us.

10             EDWARD S. COLUCCI:  No, I don't think I'd

11   have a problem.

12             ATTY. INGRAM:  Can I have a moment, Your

13   Honor?

14             THE COURT:  Yes.

15             ATTY. INGRAM:  In response to the problem

16   in there about the justice system, the question about the

17   justice system, do you remember that question about what's

18   your opinion about the biggest problems facing the justice

19   system?

20             EDWARD S. COLUCCI:  Yeah.  I wrote down

21   not strict enough.

22             ATTY. INGRAM:  Right.  What do you mean by

23   that?

1              EDWARD S. COLUCCI:  I think some of the --

2      in an example of like a drunk driver, how can a drunk driver

3      be caught for the, you know, thirteenth time with a DUI and

4      is still driving a car?

5              ATTY. INGRAM:  That would be a hard

6      question for a lot of judges to answer, wouldn't it?

7              EDWARD S. COLUCCI:  You know, or they're

8      in an accident and they kill someone.  I mean, why are they

9      still driving a car?  I mean, driving is a privilege.  Why

10     are they still driving?

11             ATTY. INGRAM:  Is it your opinion -- let's

12     forget about drunk driving cases for a while.  I think

13     everyone would agree with you there, by the way.  You know,

14     they're changing the limit to .08 in the middle of July.

15             EDWARD S. COLUCCI:  Good.

16             ATTY. INGRAM:  Do you think that the rest

17     of the penalties for -- that's a traffic offense.  Do you

18     think that the criminal penalties also aren't severe enough?

19             EDWARD S. COLUCCI:  Well, not all of them.

20             ATTY. INGRAM:  Do you feel that in a case

21     of planned premeditated murder that life imprisonment is a

22     severe enough penalty?

23             EDWARD S. COLUCCI:  Yes.

1          ATTY. INGRAM:  Have you ever considered a

2     political candidate's views on the death penalty in

3     determining whether to vote for that candidate?

4          EDWARD S. COLUCCI:  No.

5          ATTY. INGRAM:  Did you ever hear anyone

6     say I don't believe in life imprisonment because I don't

7     think we should have to pay to house someone in jail for the

8     rest of their life?  Did you hear my question?  I'm sorry.

9          EDWARD S. COLUCCI:  No.  Say that again.

10         ATTY. INGRAM:  Sure.  I'm sorry.  I'm

11    walking around.  Have you ever heard anyone say I'm not in

12    favor of life imprisonment because I don't think we should

13    pay to house someone in jail for the rest of their life?

14         EDWARD S. COLUCCI:  Yes, I've heard that.

15         ATTY. INGRAM:  Have you ever said that?

16         EDWARD S. COLUCCI:  No.

17         ATTY. INGRAM:  How do you feel about that

18    cost issue?

19         EDWARD S. COLUCCI:  I'm not sure.

20         ATTY. INGRAM:  Okay.  Take a moment and

21    describe for me as best you are able your feelings on that

22    cost issue.

23         EDWARD S. COLUCCI:  I mean, I know it's a

1    cost issue but, you know, maybe life in prison in a

2    six-by-nine cell is punishment, you know.

3                      ATTY. INGRAM:  Well, I would imagine it

4    is.  Is there anything about your views on life imprisonment

5    as an alternative penalty in a premeditated murder case that

6    would prevent you from equally and fairly considering those

7    options if we ever get to a second phase?

8                      EDWARD S. COLUCCI:  No.

9                      ATTY. INGRAM:  Okay.  Thank you very much.

10                     THE COURT:  Approach, please.

11                     (Whereupon, a bench conference was held.)

12                     THE COURT:  Mr. Colucci, could I ask you

13   to step out?  We have to put something on the record here.

14   And then I'll have you come back in, okay?

15                     EDWARD S. COLUCCI:  Okay.

16                     THE COURT:  Thank you.

17                     (Whereupon, Mr. Colucci was excused

18   briefly from the courtroom and the following proceedings

19   commenced outside his presence.)

20                     THE COURT:  Okay.  For the record, the

21   prospective juror, Edward Colucci, is out of the hearing of

22   this presentation.  There has been a motion made to dismiss

23   for cause by the defense.  Would you state the reason for

1     your motion?

2                 ATTY. JUHASZ:  Your Honor, if it please

3     the Court, there are actually two things.  Mr. Ingram only

4     mentioned one up there when we got to that.  First, we

5     believe that his answers in the voir dire indicate a

6     violation of the Court's admonition not to discuss the case

7     or permit the case to be discussed in his presence.  I think

8     it's a fair summary of his answers on voir dire that he

9     didn't really know anything about the case but then he wrote

10    down on his questionnaire that I heard that Mrs. Roberts had

11    her boyfriend kill her husband.  That's information that he

12    says that he got from a coworker.  He says that that

13    conversation was after he went back to work after having been

14    admonished.

15                As Mr. Ingram pointed out at the side bar, this

16    isn't a situation where the juror -- or, I'm sorry, where the

17    coworkers said to him, "Where were you yesterday," and he

18    said, "I was on jury duty," and they said, "Oh, the Donna

19    Roberts case."  And when they started to say, "Well, you

20    know, that's the case --" and he didn't say, "Hold the phone,

21    guys.  Don't talk to me anymore.  I can't talk about this."

22    There's no testimony that he walked away.  In fact, the most

23    damaging things that he's heard about Donna Roberts were the

1    things he heard from those coworkers, and by his own sworn

2    testimony here today he said that that conversation lasted

3    one to two minutes.  That is certainly indicative of the fact

4    that he did not walk away, and so we challenge him for that

5    reason.

6         Secondly I would also challenge him under Morgan

7    against Illinois.  I understand that he said ultimately that

8    "I would consider all of the four penalties equally," but I

9    think it's important to point out that he says that he has,

10   quote, "Pretty strong feelings" and that he is a

11   strong-minded individual; that someone convicted of

12   premeditated murder, he would expect the defendant to

13   persuade him that she should live and that the death penalty

14   would have a leg up in his mind.

15        Morgan makes very clear that the equivalent of what

16   he's given here -- Morgan, the opinion by Justice White in

17   Morgan chastised judges who, after we had the sort of

18   questioning we have here, someone turns to them and says,

19   "Well, but can you follow the law?"  Morgan makes very clear,

20   in fact Justice White says in his opinion, that those jurors

21   may in good conscience believe that they can be fair and

22   impartial when, in fact, their answers make quite clear that

23   they cannot be fair and impartial.  I submit that's exactly

 1  what we have here.

 2        I'm sure that Mr. Colucci believes that he can be

 3  fair and impartial.  I'm sure that he believes because

 4  someone tells him that the penalties all have to start out

 5  equal in his mind that he can do that.  But, in fact, his

 6  answers indicate to the contrary, that in the case of a

 7  premeditated murder, which is, of course, one of the

 8  allegations here, that the death penalty would start with a

 9  leg up and he would permit -- I'm sorry, he would expect the

10  defendant to persuade him that she should get a life

11  sentence.

12                    THE COURT:  Okay.  Thank you.  Mr. Becker.

13                    ATTY. BECKER:  Your Honor, I would

14  strenuously disagree with the characterization of this juror.

15  First of all, he's heard probably less than a number of

16  jurors that have already been selected from this jury.  I

17  certainly believe that in a course -- and, you know, I think

18  it's very unfair to hold this juror to his answer of one

19  minute or two minutes.  In a casual conversation such as this

20  he may have meant 20 seconds or 30 seconds.  He may have

21  said, you know, a minute or two.  How long was Mr. Ingram

22  here?  Oh, five minutes, a minute or two.  I think it's a

23  very unfair characterization to portray this individual that

1    he had a conversation for one or two minutes.

2            I think when he was questioned about the

3    conversation he -- and I certainly think in the matter of a

4    few seconds one of his coworkers could have said, "Oh, yeah,

5    Donna Roberts, she had her boyfriend killed just days after

6    -- or her boyfriend killed her common-law husband just days

7    after he got out of jail." He may have said, "Well, wait a

8    minute, I can't."

9            He's followed the admonitions of the Court. He's

10   testified that he immediately asked the subject be changed

11   and he couldn't talk about it. That little excerpt gives him

12   no more information and, in fact, it gives him quite a bit

13   less information than a number of jurors who are already

14   seated on this Court. He has said that he can set that aside

15   and he makes no determination out about it.

16           Contrary to Mr. Juhasz's statements, I don't believe

17   any court requires a strong-willed individual to be removed

18   from this court. He has given every correct answer, that he

19   could fairly and impartially consider all four options. His

20   personal belief is that the death penalty, that he does

21   believe in it and he's in favor of it, but every juror who

22   can sign a death penalty verdict probably has some feeling or

23   leniency towards it.

1    He has repeatedly said on both direct and -- well,

2    actually on the questioning by the State and the defense,

3    that he could fairly consider all four options in this case

4    and he could set aside his feelings and do that correctly,

5    and that's exactly the type of juror that we're looking for.

6    And it's extremely unfair to the State to have juror after

7    juror come in here who maybe could consider the death penalty

8    but are certainly more in favor of leaning towards the life

9    options.  I mean, if that were the standard, if the standard

10   was if one person gives any of those four options a leg up,

11   we would never get a jury because you're never going to find

12   jurors that are going to come in here and say yes, I've

13   considered all four options throughout my life and I believe

14   I should give death and life.  You're just not going to find

15   a juror like that.

16   He does have obviously a strong view on the death

17   penalty, but he has clearly indicated he would follow the

18   Court's instructions of law, he will fairly consider all four

19   options, and I believe he should be seated as a potential

20   juror in this case.

21   THE COURT:  Okay.  I don't think the

22   question of this episode at work where someone approached him

23   is telling here.  That, I agree with the prosecution that

1    that in and of itself is not enough here because we've got

2    people in the prospective pool here that had much further

3    knowledge and expressed much more information than he's

4    gotten from this.  At some point a good portion of these

5    prospective jurors, you're taking them on faith that they are

6    not going to let anything interfere with the evidence

7    presented in this case.

8           The part that concerns me is it boils down to the

9    one answer and that is whether or not -- because quite

10   clearly he feels the death penalty is appropriate.  As

11   Mr. Becker says, that's one of the things to get on a jury.

12   But, secondly, he in my mind was not perfectly clear about

13   whether or not he would go into that second phase open-minded

14   without any preference for the death penalty and then have to

15   have other proof to get him off that point.

16          So what I'm going to do is have him come back in

17   here.  We're going to have you, give you one more opportunity

18   to ask him questions on that point.

19                      ATTY. BECKER:  Well, I think in the past,

20   and I don't know if we want to, I know there's no written

21   rule, but perhaps the Court should ask that question.

22                      ATTY. INGRAM:  That would be fine.

23                      ATTY. BECKER:  If the Court is satisfied

```
 1    with his answer.  Because we've done that with a few other
 2    jurors.
 3                    THE COURT:  Okay.  I can do that.
 4                    ATTY. INGRAM:  If you want I'll do it.
 5                    ATTY. BECKER:  Yeah, and if there's
 6    something maybe we need to follow up on.
 7                    ATTY. INGRAM:  And we can ask a couple
 8    follow-ups.
 9                    ATTY. BECKER:  Right, right.  If that's --
10    what it is going to boil down to, the issue is I think the
11    Court expressed that you have some questions.  Then perhaps
12    you should ask those questions, and then if there's any room
13    for either the State or the defense to question.
14                    THE COURT:  Well, if there's anything that
15    I -- I thought the guy was, Mr. Colucci, was trying to be up
16    front and answer, but that one answer he kind of hedged on
17    the thing and then he finally came around to "Well, yeah, I
18    can."  But I think that's the only thing that I find --
19                    ATTY. BECKER:  And I note for the record
20    Mr. Bailey and I have not talked to any of these jurors
21    before they've come into the courtroom.
22                    THE COURT:  Something wrong with you or
23    what?  Yeah.  Why don't you have him come in, Gary?
```

1          (Whereupon, Edward Colucci was brought

2     back into the courtroom and the following proceedings

3     commenced.)

4          THE COURT:  Okay.  I have to ask you a

5     couple questions here, if I may?  I'm going to ask, I'm

6     supposed to ask you one but I'm going to ask you another one.

7     You understand, do you not, that if we try this case and we

8     get into a situation where you get back into that jury room

9     and all the jurors agree the evidence presented this, this

10    and this, and somebody says, well, that doesn't square with

11    what I've heard or something I've read in the newspaper, you

12    understand that that would throw the whole thing into a

13    tailspin?  The case has to be decided on the evidence

14    presented in this courtroom.

15         Now, you apparently had very little contact with

16    anything about this case other than this thing where these

17    people or two worker, was it, approached you and you had this

18    brief conversation.  But I have to have your assurance and I

19    can't -- I can only go by what your answer is, because it

20    just wouldn't be fair to have you on this jury if that's

21    going to have any influence, what you may have heard before.

22    You have to decide this case on the evidence.  Now, it may be

23    difficult for you to set that aside.  I don't know the answer

1   to that.

2                   EDWARD S. COLUCCI:  Yeah, I think I can

3   set what I've heard aside.

4                   THE COURT:  I'm sorry?

5                   EDWARD S. COLUCCI:  I believe I could set

6   aside what I've heard.

7                   THE COURT:  Because you realize that isn't

8   evidence.  It may be totally erroneous.  You know, we hear

9   things all the time, we read things in the newspaper that

10  turn out not to be true.  Sometimes they are, sometimes they

11  aren't.  That doesn't matter.  It's what the prosecutor

12  presents to this jury in court is what the jury has to decide

13  the matter on.  Now you tell me, is that going to be a

14  problem?

15                  EDWARD S. COLUCCI:  No.

16                  THE COURT:  It is not?

17                  EDWARD S. COLUCCI:  No.

18                  THE COURT:  Okay.  The other issue that

19  was at some point in the questioning that went on here,

20  you're in favor of the death penalty.  That's fine.  But I

21  kind of had the impression that when you answered the

22  question at first that you kind of hedged a little bit and

23  then you came around and said no, you could accept all four

1    equally as you start out, but that's the important part.

2         If this case would go to that second phase, okay,

3    that means that the jury would have made a finding that

4    Ms. Roberts was guilty of aggravated murder plus a

5    specification, and it has to happen to get a guilty plea.

6    But the law requires, it's kind of a difficult thing in a way

7    to imagine, but the law requires that once the jury has heard

8    all the evidence and they make a decision of that nature,

9    they have to kind of blank all that out and start into that

10   second phase with no predisposition to a life in prison or to

11   the death penalty.  Now, that's asking a lot of people I

12   think, but I think it's a state of mind that you have to

13   visualize or try to imagine yourself being in.

14        Can you give these folks an assurance that if you

15   listen to the evidence and the State proves beyond a

16   reasonable doubt everything necessary to get a finding of

17   guilty -- and you know yourself; I don't.  None of us can

18   look within your mind.  Can you truthfully say to yourself,

19   "I can do what the law requires," and that is start on that

20   second phase with an open mind?  "I could be receptive to the

21   State not being able to prove that the aggravating

22   circumstances outweigh the mitigating factors."

23        Now, I'll tell you the reason that we're so -- this

 1   is my personal opinion of why I think this is so important

 2   and why the law is written this way.  It's unfair to make a

 3   blanket rule that fits all.  Do you agree with that?

 4                    EDWARD S. COLUCCI:  Yes.

 5                    THE COURT:  To make a law in the abstract

 6   sounds very good, but you get any particular fact situation

 7   and maybe you got one out of a thousand cases that the rule

 8   just doesn't fit very well and you're going to have an

 9   injustice.  That's the reason, I think, that the law requires

10   that a person is able to start out fresh in that second

11   phase.  And you've already made the original determination,

12   you've heard evidence on what happened, but you have to be

13   able to sit in that second phase and be fair, and that

14   requires, as the Court requires, that you start with an open

15   mind on that second phase and you're willing to listen and to

16   make your decision on what you hear there, not having made

17   your decision on the second phase from what happened in the

18   first.  Understand?

19                    EDWARD S. COLUCCI:  Yes.

20                    THE COURT:  Now, my question to you is are

21   you able to serve in that capacity?  Some people could and

22   some people couldn't, and we're not going to judge you good

23   or bad by your answer.  It's whether you in good conscience

1   can say to yourself I would be able to do that, or would you

2   be swayed by the finding of guilty?

3                    EDWARD S. COLUCCI:  I don't know.  I think

4   I might be swayed.

5                    THE COURT:  You think you might be swayed.

6   Okay.  You're very candid and you're very honest and we

7   appreciate that.  That's the only way we can get any type of

8   a fair hearing here.  Anyone else have any questions?

9                    ATTY. BECKER:  No.  We'll accept

10  Mr. Colucci's honesty and with much regret say good-bye to

11  him.

12                   THE COURT:  Okay.  You've done everything

13  we've asked you to do and I do appreciate your answers, okay?

14                   EDWARD S. COLUCCI:  Okay.

15                   THE COURT:  Have a good day.  Don't spend

16  all that money on those cars, okay?

17                   EDWARD S. COLUCCI:  I'll try not to.

18                   THE COURT:  You take care.

19                   ATTY. BECKER:  Thank you very much.

20                   ATTY. JUHASZ:  Thank you, sir.  Take care.

21                   ATTY. INGRAM:  Thank you.

22                   (Whereupon, Edward Colucci was dismissed

23  from the pool of prospective jurors.)

```
 1              THE COURT:  For the record, that juror was
 2   dismissed for cause.  Gentlemen, I have a lady I have to talk
 3   to here for about 10 minutes or so, so it's a good time to
 4   take a break.  Okay.
 5              (Whereupon, a brief recess was taken.)
 6                        *   *   *
 7                  SEE VOLUME XVIII
 8
 9
10                  REPORTER'S CERTIFICATE
11
12       This is to certify the foregoing represents a true and
13   correct copy of the proceedings had in the aforementioned
14   cause as reflected by the stenotype notes taken by me on the
15   same.
16
17
18
19
20   _____
21   Kelly J. Wilson
     Official Court Reporter
22
23
```

1           IN THE COURT OF COMMON PLEAS
            TRUMBULL COUNTY, OHIO
2
STATE OF OHIO,              )    Case No. 2001-CR-793
3                           )
        Plaintiff           )
4                           )
-vs-                        )    JUDGE JOHN M. STUARD
5                           )
DONNA M. ROBERTS,           )
6                           )         **PARTIAL**
        Defendant           )  **TRANSCRIPT OF PROCEEDINGS**
7
                    *VOLUME XVIII*
8
            **JURY TRIAL - VOIR DIRE**
9               **MAY 5 and 6, 2003**

10

11  BEFORE:      HONORABLE JOHN M. STUARD

12  AT:          Trumbull Co. Court of Common Pleas
                 Courtroom Number 2
13               160 High Street, NW
                 Warren, Ohio 44481
14

15  APPEARANCES:

16  On behalf of the Plaintiff:
        MESSRS. KENNETH N. BAILEY
17      and CHRISTOPHER D. BECKER,
        Attorneys at Law
18

19  On behalf of the Defendant:
        MESSRS. J. GERALD INGRAM
20      and JOHN B. JUHASZ,
        Attorneys at Law
21

22

23
    Official Court Reporter:  Kelly J. Wilson

136

*INDEX FOR VOLUME XVIII*

MAY 5, 2003 Cont'd

*INDIVIDUAL VOIR DIRE*

PROSPECTIVE JUROR KENNETH ROBERTS.................... 3930:2

MAY 6, 2003


PROSPECTIVE JUROR MICHAEL S. MERRIMAN............... 4001:14

PROSPECTIVE JUROR BRAD MASTERS..................... 4004:11

PROSPECTIVE JUROR RUTH A. BUNKER................... 4011:17

PROSPECTIVE JUROR ANDREW KOTWIS.................... 4015:17

*MOTIONS*

motion of both sides................................ 4001:3

1    (MAY 5, 2003 Cont'd)

2              **PROSPECTIVE JUROR KENNETH ROBERTS**

3                    THE COURT:  How are you this afternoon?

4                    KENNETH ROBERTS:  Fine.

5                    THE COURT:  Let me see if I have Kenneth

6    Roberts.  There we go.  Mr. Roberts, you read that handout

7    that was given to you?

8                    KENNETH ROBERTS:  Yes, sir.

9                    THE COURT:  Okay.  You know that we are

10   here on Donna Roberts, State versus Donna Roberts.  There's

11   two counts of aggravated murder with specifications that

12   she's been charged with.

13        Now, the indictment is merely an allegation.  This

14   jury will be called upon to determine whether or not the

15   State has evidence which will prove each and every element of

16   the original charge of aggravated murder with the

17   specification.  They have to do that beyond a reasonable

18   doubt.  If the State fails to carry that burden of proof,

19   then this jury would quite properly return a verdict of not

20   guilty, but if the State is able to carry that burden of

21   proof, then this case would go into a second phase.  And we

22   can't wait until the trial to see what's going to happen

23   because if we would not ask the questions that are going to

1    be asked now you could get to a situation where if the State

2    got to that second phase you might have somebody on that jury

3    that believes the old testament, an eye for an eye, and that

4    is not the law of Ohio.

5         And a person that felt that, there's nothing wrong

6    if you want to feel that way, we're all entitled to our own

7    beliefs, but a person that had a strong conviction of that

8    could not be fair to the defendant because at the second

9    hearing the jury that has heard and made the determination of

10    guilty would have to more or less start out fresh and listen

11    to what's presented in that second phase to determine what

12    the sentence should be and they have to be willing to listen

13    to all four possibilities; that's the death penalty, which

14    the State will be requesting, or a lesser penalty of life

15    without chance of parole, life without chance of parole after

16    25 or 30 years.  Those are the four options.

17         You might also, if we waited until that point, have

18    somebody on the jury that could not follow the law in that

19    they would never put themselves in a position where they

20    would have to decide on the death penalty.  You know, you

21    have people that have different views.  Now, somewhere in

22    between that are probably the majority of people who will

23    have an opinion on the death penalty, some more in favor than

1   others.  But each of these jurors will have to be of a mind

2   that, no matter what their personal preference is on the

3   question, that they can give the assurance to both the State

4   and the defendant that they will follow the law.

5           And the law says at that second phase they have to

6   listen to the evidence presented by the State on what we call

7   aggravating circumstances, and that is merely reasons the

8   State would put to the jury as to why the jury should

9   consider and impose the death penalty, and the mitigating

10  factors, which would be put to the jury to show why in this

11  particular case the death penalty should not be imposed.

12          Now, again, the State has to prove those aggravating

13  circumstances outweigh the mitigating factors beyond a

14  reasonable doubt.  The burden of proof is always on the State

15  in a criminal trial. A defendant need do nothing.  The State

16  wins or loses their own case.  The defendant need not

17  participate if they wish not to.  Usually the attorneys will

18  do, you know, whatever during the course of a trial, but they

19  need not do anything because it isn't their case to win or

20  lose, it's the State's case.

21          The second issue that you will probably be asked

22  about is whether or not you've had any exposure to pretrial

23  publicity in this case.  This case goes back some time.

```
 1    There have been, like in any murder case, there's an interest
 2    in, you know, the newspapers and the public at large, so it's
 3    not unusual to have people out of the prospective jury pool
 4    that have read something, heard something about the case.
 5    The question becomes are each of these jurors able to set
 6    aside anything they've heard about the matter because in
 7    order for the case to be tried fairly this jury will have to
 8    decide the matters involved solely on the evidence they hear
 9    in this courtroom.  If we had everybody that had read
10    something different or knew something they think about the
11    case, you're not going to have a consensus.  There's nothing
12    that's dependable.  The only dependable way is to listen to
13    the evidence that the prosecution presents and make the
14    judgment on that alone.  Okay?
15                   KENNETH ROBERTS:  Yes.
16                   THE COURT:  Very good.  Mr. Bailey, are
17    you up?
18                   ATTY. BAILEY:  Yes, Your Honor.  Thank
19    you.  Good afternoon, Mr. Roberts.
20                   KENNETH ROBERTS:  Good afternoon.
21                   ATTY. BAILEY:  How you doing?  If you
22    remember, my name is Ken Bailey.  I'm an assistant prosecutor
23    with the Trumbull County prosecutor's office, and I guess
```

1  it's been almost four weeks that we talked in the other

2  court.

3              KENNETH ROBERTS:  Yes.

4              ATTY. BAILEY:  I guess you saw me in

5  there.  I told you at that time I would be joined by my

6  co-counsel, Chris Becker, and together we both represent the

7  people of the State of Ohio and Trumbull County and we're

8  responsible for prosecuting this particular case.  Okay.

9              As the judge indicated, we're going to be asking you

10  some questions regarding your opinions and your prior

11  experiences, and the reason we do that isn't because we're

12  snoopy and we like to pry into people's backgrounds but

13  rather to make sure that the folks who are selected to sit on

14  this particular jury could be fair and impartial to both

15  sides, both to the defendant and the people of the State of

16  Ohio, and that's why we ask these questions.

17              Another thing is because of our rules of conduct

18  this is the one chance we get to talk together.  If you have

19  any questions that come up about what we're doing here

20  pertaining to this case, feel free to ask them at this point.

21  Once we're done here today you can't talk to us and we can't

22  talk to you until the entire case is over.  If it goes into

23  two phases we have to wait until the end of the second phase,

1    okay?  So if we see each other out in the hallway or in the

2    elevator or at a restaurant or something, we're not trying to

3    snub you or be antisocial, it's just that under our rules of

4    conduct if we say more than good morning or good afternoon it

5    could result in a mistrial and we don't want that to happen,

6    right?  Okay.

7            As the judge indicated, there are two areas that

8    we're going to talk about first.  I'm going to ask you

9    questions about pretrial publicity and then I'm going to ask

10   you about your views on the death penalty as a possible

11   punishment.  Then I'll get to some regular questions.

12           Now, I noticed in looking through your questionnaire

13   that you get the local Tribune on a daily basis?

14                   KENNETH ROBERTS:  Yes, sir.

15                   ATTY. BAILEY:  You also read the Cleveland

16   Plain Dealer.  I take it you have ties to Cleveland?

17                   KENNETH ROBERTS:  On occasions.

18                   ATTY. BAILEY:  And you don't watch the

19   local TV news too often?

20                   KENNETH ROBERTS:  No.

21                   ATTY. BAILEY:  Just on occasion.  So most

22   of the information that you obtained was something you read,

23   I take it, in the local paper?

1          KENNETH ROBERTS:  Yes.

2          ATTY. BAILEY:  And you had put down that

3    you had read that Donna Roberts and another person had killed

4    her husband.  And you told us back on the 8th, I believe, you

5    talked to us and said you could set it aside?

6          KENNETH ROBERTS:  Yes.

7          ATTY. BAILEY:  Okay.  Now, the reason we

8    go through these questions, the questions on pretrial

9    publicity, and why the judge tells you that you're not

10   supposed to look at the newspaper or talk to other people

11   about the case is if you look around the courtroom now

12   there's nobody here from the news media but from time to time

13   there will be.  TV folks may set up their cameras.  They

14   can't film the jurors but they may film the other

15   participants here, okay.

16          And the newspaper reporters from the Tribune and the

17   Vindicator, I don't think anybody has come in from the

18   Cleveland papers like the Plain Dealer, but they may be here

19   only for a little bit and then they're going to do a whole

20   feature on the trial and, you know, they're going to be

21   missing everything that was asked and answered before they

22   got in here and everything that was asked and answered after

23   they got out of here, so it's because of that, unintentional

1 distortions, because they take things out of context.

2 If you had somebody save the newspapers for you and

3 you read them after the trial was all over if you sat on the

4 jury, then in that particular case you may say to yourself,

5 "Gosh, I sat in Judge Stuard's court for a week and a half or

6 two weeks of the trial," and then maybe in the second phase,

7 and then, you know, "I remember the testimony, and whoever

8 that reporter was that covered that story and wrote these

9 articles, it was like he was covering another trial in Judge

10 Logan's courtroom," okay? So because of that we ask you not

11 to read the papers anymore and to set aside anything you

12 might remember having read before. And you would be able to

13 do that?

14 KENNETH ROBERTS: Yes.

15 ATTY. BAILEY: Okay. That wouldn't be any

16 problem for you?

17 KENNETH ROBERTS: No.

18 ATTY. BAILEY: Okay. So much for pretrial

19 publicity. Now let's talk about the death penalty as a

20 possible punishment and your views on that. Now, the first

21 time you learned this was potentially a death penalty case

22 was when?

23 KENNETH ROBERTS: On the first day.

```
 1                    ATTY. BAILEY:  About almost four weeks
 2    ago?
 3                    KENNETH ROBERTS:  Yes.
 4                    ATTY. BAILEY:  And before that had you
 5    ever had occasion to discuss the death penalty as a possible
 6    punishment with anybody else, either somebody maybe at work
 7    or in the military or at school or at home?
 8                    KENNETH ROBERTS:  No.
 9                    ATTY. BAILEY:  Family members or friends?
10                    KENNETH ROBERTS:  No.
11                    ATTY. BAILEY:  Okay.  In a criminal matter
12    it never came up for anything that you followed, the issue of
13    punishment?
14                    KENNETH ROBERTS:  No, sir.
15                    ATTY. BAILEY:  Okay.  Now, I noticed you
16    indicated in your questionnaire that the punishment should
17    fit the crime and you believe that the death penalty would be
18    appropriate for killing someone deliberately and
19    cold-bloodedly, right?
20                    KENNETH ROBERTS:  Yes.
21                    ATTY. BAILEY:  All right.  Now, you
22    understand that the State legislature down in Columbus, the
23    folks down there, they write the laws and they set out what
```

1  the crimes are and what the punishment range should be.  And

2  you understand that every killing is not punishable by the

3  death penalty?

4                    KENNETH ROBERTS:  Yes, sir.

5                    ATTY. BAILEY:  So, for example, if

6  somebody is out chopping wood with an ax and the head of the

7  ax flies off and somebody gets hit and dies as a result of

8  that, that would be an accident, right?

9                    KENNETH ROBERTS:  Right.

10                   ATTY. BAILEY:  And you wouldn't expect

11 anybody to get punished for that?

12                   KENNETH ROBERTS:  No, sir.

13                   ATTY. BAILEY:  And if somebody is driving

14 down the street and going too fast and goes through a stop

15 sign and kills a pedestrian, you expect they may go to jail

16 or prison for that but that wouldn't be a death penalty

17 offense?

18                   KENNETH ROBERTS:  No.

19                   ATTY. BAILEY:  And if somebody gets in a

20 fight in a bar and one guy punches another and the victim

21 falls over backwards, hits his head on the edge of the bar

22 and dies from internal hemorrhaging, that might be punishable

23 by some type of manslaughter or maybe a murder charge or

 1    something, but it's certainly not a death penalty offense,

 2    right?

 3                    KENNETH ROBERTS:  No, sir.

 4                    ATTY. BAILEY:  That would be maybe some

 5    type of prison sentence.

 6                    KENNETH ROBERTS:  Yes.

 7                    ATTY. BAILEY:  Now, you understand that in

 8    Ohio if somebody commits a premeditated murder, and today we

 9    call it murder by calculation and design, or somebody kills

10    somebody on purpose, that alone is not a death penalty

11    offense in Ohio the way the legislature has written the law.

12    So, for example, if I said I'm going to kill my co-counsel

13    tomorrow.  I don't like, I don't like the way -- I don't like

14    his shoes, okay, shoes, and I'm sick and tired of those shoes

15    and I'm going to blow him away when he comes up to the

16    courthouse steps at 9:00 o'clock in the morning and I

17    announce that to the whole world from the courthouse steps

18    today and I do that tomorrow.  Chris comes up the steps and

19    boom, he's gone.  That's not a death penalty offense.  That

20    may be a killing with prior calculation and design and I

21    announced it to the whole world in advance, but under Ohio

22    law just that alone isn't enough for me to get the death

23    penalty.  Okay.  Under Ohio law there has to be something

 1      extra, these specifications.  That's a fancy word that just

 2      means extra findings of fact for a jury to consider, okay?

 3              And I think the judge gave you some examples of what

 4      the legislature has set down as certain circumstances that

 5      would make a person eligible for the death penalty.  In

 6      addition to that killing with prior calculation and design,

 7      for example, if he had been the governor or the president or

 8      lieutenant governor or a police officer or young child, or if

 9      the killing is committed during the course of some special

10      felony like a kidnapping or a rape or an aggravated burglary

11      or an aggravated robbery.  And there's some other things, but

12      that -- or if it was a mass murder, okay.  Those things would

13      make me eligible for the death penalty.  Okay.

14              But you understand it's not an automatic death

15      penalty?  If I'm found guilty of those crimes under Ohio law,

16      for you to sit on this jury it's not an automatic death

17      penalty because we have to go into a second phase, okay?

18                        KENNETH ROBERTS:  Yes.

19                        ATTY. BAILEY:  So under Ohio law if a

20      defendant is found guilty of the crime of aggravated murder

21      and one or more of these specifications of aggravating

22      circumstances, these things that make a person eligible for

23      the death penalty, and there are two of those charges here,

1    these aggravating circumstances; that the aggravated murder

2    was committed with prior calculation and design and during

3    the course of an aggravated burglary is one.  And the other

4    is that the aggravated murder was committed with prior

5    calculation and design but in the course of an aggravated

6    robbery as opposed to an aggravated burglary.  Okay, that's

7    the other, okay?

8              So in the first phase of this case, the way the

9    legislature has written the law, the first phase is tried

10   just like any other criminal trial in this State, okay.  That

11   means that you would as a juror, you would listen to the

12   testimony and the evidence and make your decision in the

13   first phase without any concern at all for any possible

14   punishment, okay, because punishment is not an issue.  The

15   only issue is can we prove the elements of the crime charged,

16   the essential key component parts of these crimes?  Okay.

17             Elements are like the ingredients in a recipe if we

18   bake a cake.

19                       KENNETH ROBERTS:  Yes.

20                       ATTY. BAILEY:  Okay.  Each cake -- you got

21   a favorite cake?

22                       KENNETH ROBERTS:  Chocolate.

23                       ATTY. BAILEY:  Okay.  Me too.  So we got a

 1   chocolate cake, okay, and the chocolate cake has certain key

 2   ingredients; the eggs and the flour and the sugar and baking

 3   power, little bit of water and chocolate if we're going to

 4   make a chocolate cake, and I think one or two other things

 5   that we might put in there.  And then we got to put all these

 6   ingredients into each crime because there are a number of

 7   crimes charged here, okay, as well as the specifications.

 8   Those are also composed of elements or essential key

 9   component parts.

10                   KENNETH ROBERTS:  Uh-huh.

11                   ATTY. BAILEY:  Ingredients in a recipe.

12   Okay.  If we prove to your satisfaction, you and the other

13   eleven jurors, that the defendant is guilty of a crime called

14   aggravated murder and one or more of these specifications, we

15   would move on to a second phase, okay?  The first phase deals

16   with the issue of guilt or non-guilt, okay?

17                   KENNETH ROBERTS:  Yes.

18                   ATTY. BAILEY:  Punishment has no bearing

19   on the first phase, okay, doesn't come in until somebody has

20   been found guilty.  So any questions pertaining to punishment

21   either way would not be relevant in the first phase so those

22   questions won't get asked or answered in the first phase,

23   just the issue of guilt, okay?

1                    KENNETH ROBERTS:  Yes.

2                    ATTY. BAILEY:  Now, if you find the

3    defendant guilty of these crimes beyond a reasonable doubt,

4    then we go into a second phase and the issue in the second

5    phase is different.  You already would have decided this

6    issue of guilt in the first phase, guilt beyond a reasonable

7    doubt, okay?  In the second phase the issue becomes one of

8    what's the appropriate punishment for this defendant for this

9    offense, okay, and then you have to do a balancing test.

10   Okay.

11                   On -- it's like having a scale and on one side of

12   the scale are these aggravating circumstances that you found

13   in the first phase, okay, one or two of those; that the

14   aggravated murder was committed in the course of an

15   aggravated burglary and/or an aggravated robbery with prior

16   calculation and design.  Those would go on one side of the

17   scale, okay?  On the other side of the scale would be what we

18   call mitigating factors.  Mitigating factors quite simply are

19   certain facts that can work to the benefit of a defendant and

20   work against the death penalty as a punishment, okay?

21                   And in a second phase you can hear the same evidence

22   as you heard in the first phase or you can also hear other

23   things pertaining to these mitigating factors.  And I don't

1     know what those are at this point, they're not relevant at

2     this point so it's premature to discuss them, but anything

3     that can work to a defendant's advantage. And if you sit on

4     this jury you have to be able to consider the aggravating

5     circumstances and the mitigating factors, okay? You would be

6     able to do that?

7                     KENNETH ROBERTS: Yes, sir.

8                     ATTY. BAILEY: You understand that the

9     death penalty is not an automatic punishment for somebody who

10     is found guilty in the first phase because you wouldn't have

11     heard anything relating to the mitigating factors?

12                     KENNETH ROBERTS: Right.

13                     ATTY. BAILEY: Now, you know, I -- we had

14     a juror today who gave us an example of that. She said both

15     parties were drunk at the time, okay. That could maybe be a

16     mitigating factor, --

17                     KENNETH ROBERTS: Okay.

18                     ATTY. BAILEY: -- okay, in a killing where

19     both parties were drunk. Okay. That would be some fact that

20     could work to a defendant's benefit.

21        Now, this issue of weight, though, on the scale, how

22     much these factors and circumstances weigh, that's entirely

23     up to you and the other 11 jurors. You can decide that

1   something weighs a whole lot.  It can weigh 20 pounds, it can

2   weigh a ton, okay?  It's up to you to decide how much it

3   weighs.  On the other hand, you might decide something weighs

4   about as much as a feather, right?  And then you do this

5   balancing test.

6            Now, when you're in this second phase you have to be

7   able to consider the four different penalties that you read

8   about in that form.

9                    KENNETH ROBERTS:  Yes.

10                   ATTY. BAILEY:  You got to be able to

11  consider those equally when you start out, the death penalty,

12  life in prison with no possibility of parole, life in prison

13  with parole eligibility after 30 full years and life in

14  prison with parole eligibility after 25 full years.  You are

15  able to do that, consider all four of those things, all those

16  four penalties equally when you start out?

17                   KENNETH ROBERTS:  Yes.

18                   ATTY. BAILEY:  Okay.  Until you hear the

19  testimony, right?

20                   KENNETH ROBERTS:  Yes.

21                   ATTY. BAILEY:  And then you go back and

22  deliberate with the other jurors and do this balancing test.

23  Now, if we convince you and the other jurors that the

1    aggravating circumstance or circumstances outweigh these

2    mitigating factors beyond a reasonable doubt so that you're

3    firmly convinced of the truth of the charge to a moral

4    certainty using your reason and your common sense, then you

5    would come back under our law in Ohio, you come back with the

6    death penalty as a punishment, okay, that type of a verdict,

7    because that would be appropriate.  That would be the

8    appropriate punishment under Ohio law.  Okay.

9              If we don't meet that burden of proving that the

10   aggravating circumstance outweighs the mitigating factors

11   beyond a reasonable doubt, then you go past the death penalty

12   as a punishment and you consider the other three life

13   sentences and you determine which is the most appropriate

14   under the facts and circumstances.  Okay.  Do you have any

15   problem with that?

16                    KENNETH ROBERTS:  No, sir.

17                    ATTY. BAILEY:  Okay.  Now, if you had some

18   say, if you were in the legislature, okay, you were able to

19   write the law, would you include the death penalty as a

20   punishment for any particular types of crimes?

21                    KENNETH ROBERTS:  Particular crimes, yes.

22                    ATTY. BAILEY:  Okay.  You understand there

23   could be different types of aggravated murders?

1          KENNETH ROBERTS:  Yes.

2          ATTY. BAILEY:  I mean, there could be

3  murders for hire or murders that are with prior calculation

4  and design that are done maybe for profit, okay.  What types

5  of crimes would you consider where the death penalty might be

6  a possible punishment?

7          KENNETH ROBERTS:  Like a case, you just

8  walk up to somebody and just kill them for no reason.

9          ATTY. BAILEY:  Okay.

10          KENNETH ROBERTS:  Like a gang murder or

11  something like that.

12          ATTY. BAILEY:  A gang murder?

13          KENNETH ROBERTS:  Yes.

14          ATTY. BAILEY:  Okay.  What about like

15  murders for hire or murders for --

16          ATTY. INGRAM:  Excuse me.  Mr. Roberts,

17  we're having a very difficult time hearing you.

18          CAPTAIN BACON:  That mike works if you

19  want to push it closer.

20          KENNETH ROBERTS:  Okay.

21          ATTY. BAILEY:  Let's try that.

22          KENNETH ROBERTS:  Okay.

23          ATTY. BAILEY:  I think that's working now.

1  Is that better?

2                          KENNETH ROBERTS:  Can you hear me now?

3                          ATTY. INGRAM:  Yes.  You're very soft

4  spoken.  We were unable to hear you.  We're sorry.

5                          KENNETH ROBERTS:  Okay.

6                          ATTY. BAILEY:  Okay.  So you think for

7  gang murders or senseless killings the death penalty would be

8  appropriate.  How about some of those other things I named

9  like murders for profit or mass murders where somebody kills

10  a whole lot of people?

11                          KENNETH ROBERTS:  Yes, sir, that would be

12  one, yeah.

13                          ATTY. BAILEY:  Okay.  Anything else?

14  Murder of a young child or during some special felony?

15                          KENNETH ROBERTS:  Like molestation of a

16  child or something like that and they kill them in the

17  process.

18                          ATTY. BAILEY:  Okay.  Now, how long have

19  you felt this way?

20                          KENNETH ROBERTS:  Since I was about 20.

21  About 26, 25 years.

22                          ATTY. BAILEY:  Okay.  And is it based,

23  your view on the death penalty, is it based on some personal

1    or religious or ethical or moral viewpoint or a combination

2    of factors?

3                    KENNETH ROBERTS:  Just personal, yes.

4                    ATTY. BAILEY:  Okay.  Now, you understand

5    your personal views, like the senseless killing of another,

6    may not make -- under Ohio law the legislature didn't write

7    that in to make it a death penalty offense.  Can you set

8    aside your views on the death penalty and follow the law that

9    the judge is going to give you?

10                   KENNETH ROBERTS:  Yes, sir.

11                   ATTY. BAILEY:  Okay.  Now, I notice you

12   enlisted in the military, right?

13                   KENNETH ROBERTS:  Yes, sir.

14                   ATTY. BAILEY:  You served back in '91?

15                   KENNETH ROBERTS:  Yes, sir.

16                   ATTY. BAILEY:  Where did you serve?

17                   KENNETH ROBERTS:  The Navy.

18                   ATTY. BAILEY:  Whereabouts?

19                   KENNETH ROBERTS:  In Florida.

20                   ATTY. BAILEY:  In Florida?

21                   KENNETH ROBERTS:  Yes.

22                   ATTY. BAILEY:  Okay.  And it's sort of

23   like you make your own decisions but it's sort of like

1    following orders in the Navy to a certain extent when the

2    judge gives you the law.  The judge gives you the parameters,

3    okay, and then you have to decide based on the facts and

4    circumstances, you and the other jurors decide what's

5    appropriate in the case.

6                            KENNETH ROBERTS:  Yes.

7                            ATTY. BAILEY:  Okay.  And you would be

8    able to do that?

9                            KENNETH ROBERTS:  Yes, sir.

10                           ATTY. BAILEY:  Now, I noticed you follow

11   the Baptist religion, you go to church occasionally, right?

12                           KENNETH ROBERTS:  Yes.

13                           ATTY. BAILEY:  Two times a week?

14                           KENNETH ROBERTS:  A month.

15                           ATTY. BAILEY:  Oh, a month?

16                           KENNETH ROBERTS:  Yes.

17                           ATTY. BAILEY:  Is there anything in your

18   religion that prohibits the death penalty as a punishment?

19                           KENNETH ROBERTS:  No, sir.

20                           ATTY. BAILEY:  Okay.  Now, you also

21   indicated that you thought there were a couple problems with

22   the criminal justice system.  You said the number of people

23   on death row and how long they stay on death row.  What do

 1  you mean by that, the number of people on death row?

 2                      KENNETH ROBERTS:  I just noticed that a

 3  lot of people on death row, they'd rather, you know, go ahead

 4  with their death penalty than be on death row for the rest of

 5  their lives.

 6                      ATTY. BAILEY:  Okay.  And what do you

 7  think --

 8                      KENNETH ROBERTS:  So I suggest, you know,

 9  if they want to die, let them die.

10                      ATTY. BAILEY:  Okay.  And -- okay.  You

11  indicated the length of time they stay on death row?

12                      KENNETH ROBERTS:  Yes.

13                      ATTY. BAILEY:  It seems like an inordinate

14  amount of time?

15                      KENNETH ROBERTS:  Yes.

16                      ATTY. BAILEY:  Okay.  And a lot of people

17  have that feeling, that it's a long, long time.

18          Now, you understand that the defendant here is

19  charged with four different crimes?  She's charged with two

20  counts of aggravated murder and there's only one person who

21  was killed but there are two different theories of the crime,

22  of the killing that are presented here.  The State is allowed

23  under the law to pursue both of these theories and we've

```
 1    elected to go after both of the theories, to present them

 2    both to a jury for the jury to consider.

 3                        KENNETH ROBERTS:  Okay.

 4                        ATTY. BAILEY:  Okay.  Anything about the

 5    fact that we're pursuing two different theories of the

 6    killing that would bother you?

 7                        KENNETH ROBERTS:  No, sir.

 8                        ATTY. BAILEY:  Okay.  Now, the defendant

 9    here is also charged not as the trigger person, okay, she's

10    not the trigger man that's charged in the crime.  She's

11    charged, rather, with being what we call a complicitor,

12    somebody who solicits another person to commit a crime or

13    aids and abets another person; helps, encourages,

14    strengthens, plans with another person in the commission of

15    the aggravated murder, okay?

16                        KENNETH ROBERTS:  Okay.

17                        ATTY. BAILEY:  And the charge is that

18    Donna Roberts, the defendant, planned with a fellow by the

19    name of Nate Jackson to kill her ex-husband with whom she was

20    living for insurance money, and that there was an aggravated

21    burglary done, a trespass into the victim's dwelling house.

22    And that was actually done by, the charge is it was actually

23    done by Nate Jackson, and that Nate Jackson committed an
```

1 aggravated robbery, that he stole a car and that he shot and

2 killed the victim with a firearm or working gun, okay?

3      KENNETH ROBERTS:  Yeah.

4      ATTY. BAILEY:  But you understand she's

5 not charged as the trigger person but rather as an aider and

6 abettor and complicitor?

7      KENNETH ROBERTS:  Yes, sir.

8      ATTY. BAILEY:  Okay.  Is there anything

9 about that, that she's charged not as the trigger person but

10 rather as a complicitor, that would bother you in any way?

11 Because, you understand, under Ohio law, if we prove all the

12 elements beyond a reasonable doubt of the crimes and

13 specifications charged, she would be eligible for the death

14 penalty under Ohio law?

15      KENNETH ROBERTS:  Yes, sir.

16      ATTY. BAILEY:  That wouldn't bother you?

17      KENNETH ROBERTS:  No, sir.

18      ATTY. BAILEY:  Okay.  The fact that she's

19 a woman, would that give you any concern, as opposed to being

20 a man?

21      KENNETH ROBERTS:  No, sir.

22      ATTY. BAILEY:  Okay.  Now, there are two

23 theories here, two different charges of aggravated murder.

 1    One of these is the purposeful killing with prior calculation

 2    and design, and the other count of aggravated murder charges

 3    a purposeful killing during the course of a special felony,

 4    an aggravated burglary and/or an aggravated robbery.  Okay.

 5    And attached to these charges of aggravated murder are these

 6    specifications I mentioned, special findings of fact that the

 7    aggravated murder was committed with prior calculation and

 8    design and, in one specification, during the course of an

 9    aggravated burglary, and during the other, during the course

10    of an aggravated robbery.

11         There are also two other charges.  There's a charge

12    of aggravated burglary and there's a charge of aggravated

13    robbery, and attached to those two charges are more

14    specifications or special findings of fact.  Those special

15    findings are that a firearm was used, a working gun.  Okay.

16         And sometimes, unless people are well versed in the

17    law, because each -- in the law everything has a special

18    legal definition.

19              KENNETH ROBERTS:  Yes.

20              ATTY. BAILEY:  The terms aggravated

21    burglary and aggravated robbery, a lot of folks use those

22    terms interchangeably and they're not.  Sometimes people will

23    say my home was robbed and they really mean my home was

1     burgled.  Okay.  Let me give you a for instance.

2           Okay.  With an aggravated burglary generally it

3     means that a perpetrator trespasses in somebody else's house,

4     their home, a structure, an occupied structure as we term it

5     in criminal law.  And the person goes in with the intent to

6     commit some type of an offense inside, like an aggravated

7     murder or a theft offense, and the person is armed with a

8     deadly weapon, like a gun or a knife, and the perpetrator

9     inflicts serious physical harm or death on the person inside.

10    Okay.  That's an aggravated burglary because it deals with a

11    trespass in a structure.

12          Aggravated robbery, on the other hand, doesn't deal

13    with any type of house, any building, rather it deals with

14    the use of force or threat of force against another person.

15    And, again, the perpetrator does it with the purpose to

16    commit maybe a theft offense and the perpetrator is armed

17    with a gun or a knife or a deadly weapon and the perpetrator

18    inflicts serious physical harm on the victim, or death.

19    Okay.  So there's the difference between those two terms.

20                          KENNETH ROBERTS:  Okay.

21                          ATTY. BAILEY:  And she's charged as a

22    complicitor with the aggravated burglary and the aggravated

23    robbery, okay, and the firearm specifications, which charges

1    that basically that the gun that Nate Jackson is charged with

2    using, basically it goes back on her, okay, as a complicitor.

3                    KENNETH ROBERTS:  Okay.

4                    ATTY. BAILEY:  Okay.  Now, those, those

5    are basically the charges.  And we have the burden of proof,

6    the people of the State, we've got the burden of proving

7    these elements, the essential ingredients of the crimes

8    charged, by proof beyond a reasonable doubt.  This burden of

9    proof never shifts, okay.  It's only fair since the defendant

10   has been charged with the charging document called an

11   indictment that just sets up what the charges are.

12                   KENNETH ROBERTS:  Yes.

13                   ATTY. BAILEY:  And the defendant, of

14   course, when a grand jury returns that, the defendant is not

15   there, her lawyers aren't there.  It's nine citizens from the

16   community and seven out of nine have to find probable cause,

17   okay, and they return these charges.  Okay.  The prosecutors

18   are there with witnesses.  And now it's time for the State to

19   basically put up or shut up, okay.  We've got her charged

20   with these crimes.  Now is the time for us to be able to

21   prove these things and we've got to put on testimony and

22   evidence that will convince the jury beyond a reasonable

23   doubt as to these elements of the crimes charged, okay?

1                        KENNETH ROBERTS:  Right.

2                        ATTY. BAILEY:  And that burden is on us.

3    They don't have to do anything, okay.  They could sit on

4    their hands during the course of the trial, okay.  They

5    probably won't.  They're very good attorneys and I expect

6    they'll do a lot, but they don't have to do anything under

7    the law.  What has to be done has to be done by the people of

8    the State.  That's the burden of proof, okay?

9                        KENNETH ROBERTS:  Uh-huh.

10                       ATTY. BAILEY:  There's something else

11   under our American system of justice called the presumption

12   of innocence.  You've heard of that?

13                       KENNETH ROBERTS:  Yes, sir.

14                       ATTY. BAILEY:  Okay.  And under our system

15   of justice, in contrast to what they do in other countries

16   like in Turkey or France, there may be a presumption of guilt

17   where the defendant has to prove his or her own innocence

18   over there.  That's not our system of justice.  Under our

19   system of justice this defendant is presumed to be innocent,

20   as are all other defendants tried in this courtroom, and this

21   presumption of innocence sort of acts, it acts like a cloak

22   shielding this defendant all through the course of this trial

23   unless and until the State is able to put on enough evidence,

1    testimony and evidence, to convince you and the other 11

2    jurors when you go back in your jury room to deliberate that

3    she's guilty beyond a reasonable doubt of the crimes charged,

4    okay?

5                         KENNETH ROBERTS:  Yes.

6                         ATTY. BAILEY:  At that point that

7    presumption of innocence would be gone, right?

8                         KENNETH ROBERTS:  Yes.

9                         ATTY. BAILEY:  Okay.  And I take it you

10   would be able to afford her a presumption of innocence?

11                        KENNETH ROBERTS:  Yes.

12                        ATTY. BAILEY:  Okay.  Now, we talked about

13   proof beyond a reasonable doubt.  That's our standard of

14   proof and it's a legal term that the judge is going to define

15   for you in some great detail, but, quite simply, it's

16   something that you're used to dealing with, okay.  All it

17   means is it is a standard of proof where you have to be

18   convinced of the truth of the matter to a moral certainty

19   using your reason and common sense, okay?

20                        KENNETH ROBERTS:  Uh-huh.

21                        ATTY. BAILEY:  Firmly convinced of the

22   matter.  And these are things that you've dealt with before,

23   okay.  You make a decision if you're going to go back to

1    school or enlist in the military, if you're going to buy a

2    car, okay?

3                         KENNETH ROBERTS:  Yes.

4                         ATTY. BAILEY:  Take on another career and,

5    you know, send your kids to school or do something like that,

6    you know.

7                         KENNETH ROBERTS:  Yes.

8                         ATTY. BAILEY:  And you make decisions

9    every day about your kids, right, --

10                        KENNETH ROBERTS:  Yes.

11                        ATTY. BAILEY:  -- when they're younger?

12   And these are things you use using your reason and common

13   sense.  There may be some pros and some cons, but what you do

14   basically is you either write them out or balance them out,

15   right?

16                        KENNETH ROBERTS:  Uh-huh.

17                        ATTY. BAILEY:  And you see if there's good

18   reason for going forward.  If you're firmly convinced it's

19   the right thing to do, then you make that decision, like

20   joining the military, right?

21                        KENNETH ROBERTS:  Yes.

22                        ATTY. BAILEY:  Okay.  And let me give you

23   an example of this.  Let's say we've got an imaginary box.

1    I'm going to steal Mr. Juhasz's imaginary box here.  Okay.

2    In a civil case, which is a suit for money damages, you know,

3    somebody runs into -- a guy in a car runs into another car

4    and they sue for money damages, whoever fills that box over

5    half way with evidence is going to win in that type of a

6    case.

7         In a criminal case the burden is much higher.  Our

8    burden of proof is proof beyond a reasonable doubt and we've

9    got to fill that box pretty close to the top.  It's not a

10   hundred percent proof, it's not proof beyond all doubt or

11   beyond any doubt or beyond a shadow of a doubt.  That term

12   shadow of a doubt, that's an Alfred Hitchcock movie.  There's

13   no such animal in criminal law, okay?  But nothing -- I think

14   you would agree that nothing can be proved a hundred percent.

15   There's always room in there for some possible or imaginary

16   doubt.

17                   KENNETH ROBERTS:  Yeah.

18                   ATTY. BAILEY:  So the standard that the

19   law sets on us is proof beyond a reasonable doubt and you and

20   each of the other jurors can draw your own imaginary line on

21   that box as to when you're personally convinced that we've

22   met that burden of proof, okay?

23        So let's say we put evidence in, and if we fill it

1  up to that point where you're convinced that it proves the

2  elements of the crimes charged beyond a reasonable doubt,

3  then we've met our burden of proof.  If we don't, we don't

4  put in enough evidence, then you got to find the defendant

5  not guilty of that charge, okay?

6                    KENNETH ROBERTS:  Yes.

7                    ATTY. BAILEY:  Now, there are different

8  types of evidence that we can use in putting in that box,

9  putting the evidence into the box, and one type of evidence

10  is what we call direct evidence.  Direct evidence is when a

11  witness comes in and can testify to what he or she has

12  learned through the use of his or her five senses.

13           For example, I heard the telephone wire and it was

14  crackling, okay, or I smelled the smoke and it was acrid or I

15  felt the stove and it was hot.

16                    KENNETH ROBERTS:  Uh-huh.

17                    ATTY. BAILEY:  Okay.  That's direct

18  evidence.  There's another type of evidence, though, that you

19  can use, that we can use to fill that box and it's sort of

20  roundabout evidence but it's evidence that you're used to

21  dealing with pretty much on an everyday basis and we call

22  that circumstantial evidence.  It's where you're given a fact

23  or a set of facts and you're asked to draw a logical

1      deduction to another fact or set of facts, okay?

2              Let me give you a for instance on this.  Let's say

3      you lived in a two-story house, okay, and when you go to bed

4      at night, and your bedroom is up on the second floor, you go

5      to your bedroom window and you look out over the neighborhood

6      and it's a beautiful night.  The moon is beaming, the stars

7      are twinkling, there's not a cloud in the sky.  And as far as

8      you can see across the neighborhood it's dry, it's perfectly

9      dry all across the neighborhood.

10             So you close the blinds, you get into bed, and the

11     announcer on the radio is saying, "Folks, there's a cold

12     front coming in tonight.  There's going to be a storm I

13     expect," and you fall asleep sometime after that.  And

14     sometime during the night you're awakened and you hear a

15     distant booming sound far off in the sky and you look toward

16     the window, and even though the blinds are drawn, you see a

17     flash of light from outside and a couple seconds later a

18     distant boom.

19             Then a minute goes by and there's another flash of

20     light from outside.  You can't see what it is because the

21     blinds are drawn, but there's a closer-in-time boom.  And

22     suddenly there's a great big flash of light outside and a big

23     ripping cracking sound above the house and a pitter-patter on

1   the roof and a heavy drumming sound and you fall back asleep.

2           And then you wake up sometime later, go to the

3   window, open the blinds and you look out and it's a nice day,

4   the sun is shining, there's not a cloud in the sky, but as

5   far as you can see across the neighborhood where it was dry

6   the night before the streets are running with water, the

7   grass is soaked down below, drops of water are dripping from

8   the leaves of the trees.

9                   KENNETH ROBERTS:  Uh-huh.

10                  ATTY. BAILEY:  And there's no fire hydrant

11  nearby for any car to hit and squirt water all over the

12  place.  Okay.  You know what happened during the night, don't

13  you?

14                  KENNETH ROBERTS:  Yes.

15                  ATTY. BAILEY:  What happened?

16                  KENNETH ROBERTS:  It rained.

17                  ATTY. BAILEY:  Right, there was a

18  thunderstorm, and you know that beyond a reasonable doubt.

19  All right.

20          Now, there's limitations to circumstantial evidence.

21  Unless you had some way of measuring it like they do at the

22  airport you might not know how much rain fell during

23  the night.  You might not know how long the rain fell because

1  you were asleep most of that time, but you know beyond any

2  reasonable doubt that all that happened was there was a

3  thunderstorm, right?

4                    KENNETH ROBERTS:  Yeah.

5                    ATTY. BAILEY:  Now, there's room in there

6  for some possible or imaginary doubt.  You can imagine that

7  E.T. and his martian buddies flew by in a flying saucer and

8  sprinkled the ground with some wet stuff and put on a sound

9  and light show, but that would probably be a foolish or

10 imaginary doubt, wouldn't it?

11                   KENNETH ROBERTS:  Yes.

12                   ATTY. BAILEY:  Okay.  So you know based on

13 that type of evidence there was just a thunderstorm.  Even

14 though you didn't see it with your own eyes, you know from

15 all the facts and circumstances what happened.

16                   KENNETH ROBERTS:  Yes.

17                   ATTY. BAILEY:  Okay.  Now, we're allowed

18 to use circumstantial evidence and it's just as good as

19 direct evidence, okay, and there's a reason for it.  I take

20 it you would expect that when somebody plans a serious crime

21 like an aggravated murder they usually don't tell the whole

22 world what they're planning and how they plan to do it,

23 right?

```
 1                    KENNETH ROBERTS:  Right.

 2                    ATTY. BAILEY:  Okay.  So, and how do you

 3   get inside somebody's mind?  Well, you can use circumstantial

 4   evidence to look at their actions.  And if there were things

 5   like letters or phone calls that we had that would show what

 6   somebody was planning, that would be good evidence, wouldn't

 7   it?

 8                    KENNETH ROBERTS:  Yes.

 9                    ATTY. BAILEY:  And I think you would agree

10   that even though criminals may do a lot of planning,

11   sometimes they do some really stupid things, right?

12                    KENNETH ROBERTS:  Yes.

13                    ATTY. BAILEY:  And they get caught.  For

14   example, you probably heard about the bank robber who goes in

15   with the stickup note and gives it to the teller on the back

16   of an envelope.  It says, "Give me all your money," and he

17   gets the money and runs out, and the teller turns the note

18   over that he left behind and it's got his name and address on

19   it, right?

20                    KENNETH ROBERTS:  Yes.

21                    ATTY. BAILEY:  Or I remember one

22   aggravated murder trial where a guy planned to kill a bunch

23   of drug dealers and he got a gang together and they got
```

```
 1    gloves and all kinds of stuff and weapons.  He got

 2    walkie-talkies and he rented the walkie-talkies at Radio

 3    Shack and he used a fake name but he used his grandma's phone

 4    number, okay, which led to him.  Okay.

 5          Now, so you understand even though criminals may

 6    plan, sometimes their plans, they get caught because they do

 7    some stupid things?

 8                    KENNETH ROBERTS:  Yes.

 9                    ATTY. BAILEY:  Okay.  I take it you

10    believe that people should be held accountable for their

11    actions, right?

12                    KENNETH ROBERTS:  Yes, sir.

13                    ATTY. BAILEY:  And you can pile up

14    evidence on evidence and make your own decision as to if

15    there's enough and follow what the judge tells you?

16                    KENNETH ROBERTS:  (Nods head

17    affirmatively.)

18                    ATTY. BAILEY:  Okay.  A couple other

19    things.  You know, when you were back in school when you were

20    taking extra courses you were able to take notes, right?

21                    KENNETH ROBERTS:  Right.

22                    ATTY. BAILEY:  Okay.  In our courts here

23    in Ohio generally the judges do not let you take notes.
```

1    You're going to have to rely on your recollection, you're

2    going to have to pay close attention to the testimony because

3    this trial is probably going to last a week and a half to two

4    weeks.  And you're going to have the collective recollection

5    of you and the other 11 jurors to remember what somebody said

6    or what happened, and you'll have whatever physical exhibits

7    were admitted.

8              There won't be any instant transcripts.  If you

9    watched -- what was it, O.J. Simpson or the Menendez brothers

10   cases on TV?

11                  KENNETH ROBERTS:  Yes.

12                  ATTY. BAILEY:  They have instant

13   transcripts because they have millions of dollars to spend on

14   special recording equipment and transcribing equipment.  And

15   our court reporters are very good, but they can't get us

16   instant transcripts.  Our county doesn't have that kind of

17   money that they had for those national TV trials, okay?

18                  KENNETH ROBERTS:  Yeah.

19                  ATTY. BAILEY:  So you understand if the

20   jury asks for transcripts they're going to be told you're not

21   getting transcripts.  You're going to have to rely on your

22   collective recollection.

23                  KENNETH ROBERTS:  Okay.

1           ATTY. BAILEY:  And there won't be any

2    instant replays like on sports programs on TV.

3           KENNETH ROBERTS:  Yes.

4           ATTY. BAILEY:  Okay.  Also you can't go

5    out to investigate on your own.  We had a juror do that once

6    in a case and sometimes they do it in the TV programs, like

7    on Matlock I think and on the old Perry Mason reruns and I

8    think one of the old Hawaii 5-0 programs, but you can't do

9    that.  In real life if you did it it would cause a mistrial,

10   and we don't want to do it all over again, right?

11          KENNETH ROBERTS:  Right.

12          ATTY. BAILEY:  Another thing is you're

13   stuck with the questions that the lawyers ask.  And because

14   we're lawyers, we go to law school, and we're trained to

15   establish these elements of the crime, the ingredients in a

16   recipe, and either establish them or tear them down, okay?

17   And because of that there may be things that people on the

18   jury may be interested in that we may never get to ask

19   because they don't have any bearing on the elements, like

20   shoes, okay.  We were talking about Chris's shoes before.

21          Let's say somebody sold shoes and had an interest as

22   to what somebody was wearing during the crime.  But let's say

23   footprint evidence didn't have any bearing on the case, the

1    case was proved by other means, then that type of a question

2    would never get asked or answered.

3                    KENNETH ROBERTS:  Okay.

4                    ATTY. BAILEY:  Okay.  And if we were able

5    to convince you, prove to you the elements of the crime

6    charged beyond a reasonable doubt, which is all we have to

7    prove in the case, even though there might be some unanswered

8    questions, like if somebody was a chef and wondered what

9    somebody ate and it didn't have any bearing on the case, that

10   wouldn't bother you, right?

11                   KENNETH ROBERTS:  No, sir.

12                   ATTY. BAILEY:  Okay.  Now, at the end of

13   the case, at the end of the first phase when all the evidence

14   and testimony is in and the judge has instructed you on the

15   law, you and the other jurors would go out and you would

16   deliberate on the evidence and the testimony, okay.  And

17   every criminal case is different and every jury is different.

18   I've had juries in capital cases return a first phase verdict

19   in anywhere from an hour and a half and some have taken up to

20   five days, okay.

21                   KENNETH ROBERTS:  Yeah.

22                   ATTY. BAILEY:  And so it's hard to say how

23   long it's going to take a jury to decide.  Each case is

1    different.  But you will give it whatever time is required,

2    right?

3                    KENNETH ROBERTS:  Yes, sir.

4                    ATTY. BAILEY:  And, in fact, if you can't

5    decide by evening the judge will have you put up in a hotel

6    and they'll bring in meals and stuff like that.  And you

7    can't discuss the case one on one, you got to wait until all

8    12 of you are together there to discuss it.

9                    KENNETH ROBERTS:  Yes.

10                   ATTY. BAILEY:  Okay.  And let's say you

11   and the other jurors find the defendant guilty as charged

12   beyond a reasonable doubt of aggravated murder and one or

13   more specifications and we go to a second phase, there would

14   be a break in there of maybe a couple days or a week.  Then

15   you come back and then you hear maybe the same evidence or

16   more evidence presented pertaining to these aggravating

17   circumstances and mitigating factors.  And then the judge

18   will give you instructions of law and then you'll be

19   sequestered again, okay, and that -- however long that takes

20   it takes.  Okay.  The fact that you could be sequestered

21   twice perhaps, would that cause you any undo hardship?

22                   KENNETH ROBERTS:  No, sir.

23                   ATTY. BAILEY:  Okay.  Now, I think it's

1    only normal for one person to feel some sympathy for another

2    person, but under our system of justice we have to set aside

3    sympathy and base our decisions in criminal cases on the

4    facts in evidence and the instructions of law from the Court.

5    Now I expect, as the defendant's chair is turned towards you,

6    perhaps during the course of the trial you're going to become

7    more acquainted with her, and my question to you is this:

8    When you go back inside your jury room to deliberate on your

9    verdict can you set aside all thoughts of sympathy that you

10   might have for this defendant and base your decision on the

11   testimony and evidence and the instructions of law given to

12   you by the Court and lay aside all thoughts of sympathy for

13   the defendant?

14                   KENNETH ROBERTS:  Yes, sir.

15                   ATTY. BAILEY:  Okay.  You went to school

16   with Stan Elkins, went to high school, and you dated his

17   sister.

18                   KENNETH ROBERTS:  Yes.

19                   ATTY. BAILEY:  Okay.  And Stan Elkins is

20   in our office.  Is there anything about that -- did you stay

21   friends over the years?

22                   KENNETH ROBERTS:  Just like passing by

23   saying hi and stuff like that.

1            ATTY. BAILEY:  Okay.  Can you -- that

2   won't give us a leg up in this trial, will it?

3            KENNETH ROBERTS:  No, sir.

4            ATTY. BAILEY:  Okay.  You're going to make

5   your own decision in this case?

6            KENNETH ROBERTS:  Yes.

7            ATTY. BAILEY:  And the fact that you know

8   Stan Elkins, you would be able to sort of put that aside?

9            KENNETH ROBERTS:  Yes, sir.

10           ATTY. BAILEY:  And try this case on its

11  own merits?

12           KENNETH ROBERTS:  Yes.

13           ATTY. BAILEY:  Okay.  You would give both

14  sides a fair shake, both the defendant and the people of the

15  State?

16           KENNETH ROBERTS:  Yes.

17           ATTY. BAILEY:  Okay.  Now, I take it you

18  would agree with me that there are certain obligations that

19  we have as citizens in this country.  One of these, if it's

20  election time we have an obligation to find out about the

21  issues and the candidates and cast a ballot if we're able,

22  right?

23           KENNETH ROBERTS:  Yes.

1            ATTY. BAILEY:   Another is if we're at war

2     in this country we have an obligation to serve in the

3     military if we're called on, okay, or we may enlist.  As a

4     matter of fact, today we've got young people overseas in

5     several places.  Okay.  And you've already done that, you've

6     served a military obligation.

7            KENNETH ROBERTS:   Yes.

8            ATTY. BAILEY:   You enlisted.

9            KENNETH ROBERTS:   Yes.

10            ATTY. BAILEY:   There's another obligation

11    if we get summoned in to serve as jurors in a case,

12    especially the most serious criminal cases like a capital

13    murder case like this, even though it may cause some

14    disruption in our daily lives, okay, and we have to move

15    things around perhaps that we're used to doing every day.  To

16    make sure that the system works we get people from all walks

17    of life with all kinds of experiences on the jury.

18            KENNETH ROBERTS:   Yes.

19            ATTY. BAILEY:   Would you be able to set

20    aside your personal life a little bit and serve on a jury in

21    this most serious of criminal cases?

22            KENNETH ROBERTS:   Yes, sir.

23            ATTY. BAILEY:   Okay.  Now I'm done and

1     defense counsel are going to have an opportunity to ask you

2     some questions.  Do you have any questions?

3                     KENNETH ROBERTS:  No, sir.

4                     ATTY. BAILEY:  Okay.  Thank you very much.

5                     KENNETH ROBERTS:  All right.  Thank you.

6                     ATTY. JUHASZ:  Hi, Mr. Roberts.

7                     KENNETH ROBERTS:  Hello.

8                     ATTY. JUHASZ:  You've been up here for a

9     little while.  You need some water or something?

10                     KENNETH ROBERTS:  No.  No, sir.  I'm good.

11                     ATTY. JUHASZ:  If you need something, let

12     me know.

13                     KENNETH ROBERTS:  Okay.

14                     ATTY. JUHASZ:  If you need a drink of

15     water or whatever.  I'm John Juhasz.  I don't know -- the

16     judge had us introduce ourselves way back on April the 8th.

17     This fellow over here trying to find a comfortable place to

18     sit is Jerry Ingram, and that's Donna Roberts back there.

19     Jerry and I represent Donna.  Obviously we take that

20     responsibility seriously and it's one of the reasons why

21     we're doing what we're doing here today, which is asking

22     folks lots of questions to try to find a fair and impartial

23     jury, the kind that you or I would want if we were sitting

1    over there charged with something like Donna.  Does that make

2    sense to you?

3                        KENNETH ROBERTS:  Yes.

4                        ATTY. JUHASZ:  You were first here on

5    April the 8th with everybody else down in Judge Logan's

6    courtroom, correct?

7                        KENNETH ROBERTS:  Yes, sir.

8                        ATTY. JUHASZ:  And since that time,

9    because this process has taken so long, you have had a chance

10   to probably think about your jury service.  This is the first

11   time you were called for jury duty, if I'm reading your

12   questionnaire right.

13                       KENNETH ROBERTS:  Yes.

14                       ATTY. JUHASZ:  And you've known since that

15   date that this was a capital case, correct?

16                       KENNETH ROBERTS:  Yes, sir.

17                       ATTY. JUHASZ:  That's a pretty big

18   responsibility, deciding whether somebody is guilty of a

19   serious crime, and if they're guilty of that crime, what's

20   the appropriate punishment.  Would you agree with me?

21                       KENNETH ROBERTS:  Yes.

22                       ATTY. JUHASZ:  What do you think about

23   that?  Have you had thoughts about that since April the 8th,

1    about living up to that responsibility, about whether you're

2    ready for that responsibility?

3                        KENNETH ROBERTS:  Yeah, I've thought about

4    it and I feel I'm ready.

5                        ATTY. JUHASZ:  You thought about it and

6    what?

7                        KENNETH ROBERTS:  I think that I'm ready

8    and I could do it, yes, sir.

9                        ATTY. JUHASZ:  Okay.  The process that

10   we're going through here, the fancy word that we have for it

11   is voir dire, is really a little bit, as Jerry likes to say,

12   like a job interview.  It's a different kind of job, it's a

13   very short-term job, but a very serious job.  But the reason

14   I mention that is it's our opportunity to ask you questions,

15   but just like you would do at a job interview, I mean, you

16   want to find out some things about the place where you're

17   going to work, correct?

18                        KENNETH ROBERTS:  Yes, sir.

19                        ATTY. JUHASZ:  I mean, you wouldn't just

20   sign up and say let me go work here and you sit there and

21   they ask you a bunch of questions and say, well, geez,

22   Mr. Roberts, you seem eminently qualified for this position

23   so we'll hire you, and you find out later that they only pay

1    $2.42 an hour.  That's not going to be a very satisfactory

2    arrangement, is it?

3                      KENNETH ROBERTS:  No, sir.

4                      ATTY. JUHASZ:  I mention that because as

5    we talk here today, although it's probably an occupational

6    hazard of lawyers that they tend to monopolize conversations

7    like this, we're more interested in finding out what you have

8    to say than what I have to say.  So I would like to hear what

9    you have to say and if there's anything that comes up that

10   you have questions about or you don't feel I've appropriately

11   addressed I would like you to stop and ask.  Fair enough?

12                     KENNETH ROBERTS:  Yeah, okay.

13                     ATTY. JUHASZ:  Back on April the 8th when

14   everybody assembled in this big room down at Judge Logan's

15   courtroom down the hall, do you remember where you were

16   seated in the courtroom?

17                     KENNETH ROBERTS:  Yes, sir.

18                     ATTY. JUHASZ:  Can you tell me where,

19   please?

20                     KENNETH ROBERTS:  In the left section in

21   the front.

22                     ATTY. JUHASZ:  Okay.  So as you go in you

23   went off to the left and up to the front.

1                    KENNETH ROBERTS:  Yes, sir.

2                    ATTY. JUHASZ:  And were you seated or were

3     you standing?

4                    KENNETH ROBERTS:  I was standing.

5                    ATTY. JUHASZ:  Standing?

6                    KENNETH ROBERTS: Yes.

7                    ATTY. JUHASZ:  All right.  We had a lot of

8     people packed in there that day.  Can you tell me, did you

9     hear anybody -- well, let's take it one step at a time.  Did

10    anybody discuss with you or attempt to discuss with you

11    either the case or Ms. Roberts or anything about why you were

12    there?

13                   KENNETH ROBERTS:  No, sir.

14                   ATTY. JUHASZ:  Did you -- even if it

15    wasn't somebody trying to talk to you, did you overhear any

16    type of conversation like that?

17                   KENNETH ROBERTS:  No, sir.

18                   ATTY. JUHASZ:  As we said a moment ago,

19    this is your first call to jury duty and it differs from the

20    job interview I guess in one way, which is that most jobs you

21    actively go out and look for the job and in this situation,

22    instead of you going out and looking for this job, somebody

23    pulled your number out of a wheel or a barrel and it was your

1    turn in the barrel, as they say.

2          I'm going to walk out on a limb here, and please

3    tell me if I'm wrong, but I would say that coming down for

4    this jury duty is a new experience for you that's probably

5    left some impressions on you, correct?

6                    KENNETH ROBERTS:  Yes, sir.

7                    ATTY. JUHASZ:  In fact, just about

8    anything that happens to us leaves some sort of an impression

9    on us, right?

10                   KENNETH ROBERTS:  Yes.

11                   ATTY. JUHASZ:  All right.  I notice from

12   your questionnaire that every day you read the Tribune,

13   correct?

14                   KENNETH ROBERTS:  Yes, mostly.

15                   ATTY. JUHASZ:  And I think it put on there

16   what sections do you read and you said front to back?

17                   KENNETH ROBERTS:  Yes.

18                   ATTY. JUHASZ:  Does that mean you pretty

19   much start the paper and you go through the whole thing?

20                   KENNETH ROBERTS:  Yes, sir.

21                   ATTY. JUHASZ:  You're not -- we have some

22   people who, you know, come in and say I only look at the

23   obituaries or I only look at the sports.  You're pretty much

1    a comprehensive person, correct?

2                     KENNETH ROBERTS:  Yes.

3                     ATTY. JUHASZ:  And you read it just about

4    every day, is that right?

5                     KENNETH ROBERTS:  Yes, sir.

6                     ATTY. JUHASZ:  Now, I think you also put

7    on your questionnaire that you had read some things about

8    Ms. Roberts or about this case, correct?

9                     KENNETH ROBERTS:  Yes, sir.

10                    ATTY. JUHASZ:  I want to talk to you about

11   those and I want to -- before I do I want to emphasize a

12   couple of things.  One of them has to do with this particular

13   subject.  The other has to do with just our conversation in

14   general.  First of all, let's talk about our conversation in

15   general.

16        There are no right or wrong answers to anything I'm

17   going to ask you here this afternoon, all right?

18                    KENNETH ROBERTS:  Okay.

19                    ATTY. JUHASZ:  If judge -- I'm sure Judge

20   Stuard indicated this because he has to every juror, nobody

21   is here to change your mind about how you feel about

22   anything.  Nobody is here to chastise you if someone doesn't

23   agree with your opinion.  That's not the process we're going

1   through.  Do you appreciate that?

2                   KENNETH ROBERTS:  Yes.

3                   ATTY. JUHASZ:  The only incorrect answer

4   you could give me is one that you think I want to hear rather

5   than what's actually inside your mind or inside your heart.

6   Fair enough?

7                   KENNETH ROBERTS:  Yes.

8                   ATTY. JUHASZ:  The more specific thing

9   that I want to say before I ask you about the newspaper

10  articles is some jurors seem a little bit uncomfortable with

11  the idea, "Oh, geez.  Well, I've read something about this

12  case."  First of all, we want -- in general the people who

13  are involved in the community, the people who vote, are the

14  folks who end up on jury duty.  That makes sense to you,

15  correct?

16                  KENNETH ROBERTS:  Yes.

17                  ATTY. JUHASZ:  Second of all, when you

18  were reading those articles you didn't understand that months

19  or so hence you were going to get a notice saying come down

20  here to be a prospective juror on this case.  Do you

21  appreciate that?

22                  KENNETH ROBERTS:  Yes.

23                  ATTY. JUHASZ:  So, you know, the fact that

1    you read about this case, there's nothing wrong about that.

2    There is one other thing I should ask you.  I assume -- since

3    April the 8th have you had any conversations with anybody or

4    anybody tried to talk to you about the case?  Have you seen

5    any stories or newspaper articles or TV stories?

6                        KENNETH ROBERTS:  No, sir.

7                        ATTY. JUHASZ:  And no one has tried to

8    talk to you about the case?

9                        KENNETH ROBERTS:  No.

10                       ATTY. JUHASZ:  Tell me, if you would,

11   Mr. Roberts, what you remember from what you read or heard

12   about this case?

13                       KENNETH ROBERTS:  Just that Ms. Roberts

14   and a friend or her boyfriend or something had killed her

15   husband.

16                       ATTY. JUHASZ:  Okay.  Do you remember that

17   other person's name?

18                       KENNETH ROBERTS:  From reading the

19   questionnaire, it was Nate Jackson.

20                       ATTY. JUHASZ:  Okay.  Is that something

21   you got from the questionnaire though, it's not something you

22   remember from the articles?

23                       KENNETH ROBERTS:  No, sir.

1          ATTY. JUHASZ:  How about do you remember

2     the name of the person who it is who was killed?

3          KENNETH ROBERTS:  No, sir.

4          ATTY. JUHASZ:  Have you heard anything

5     else about Ms. Roberts that you can recall from the articles?

6          KENNETH ROBERTS:  No, sir.

7          ATTY. JUHASZ:  How about Mr. Jackson, the

8     fellow who was mentioned in the questionnaire, have you heard

9     anything else about the status of what happened to him?

10          KENNETH ROBERTS:  No.  I know -- I think

11     he was found guilty, that's all I know.  I'm not sure.

12          ATTY. JUHASZ:  You know here today from

13     what Mr. Bailey is saying that the government's claim, the

14     government's allegation in this case is that Ms. Roberts got

15     together and sort of made a plan with Mr. Jackson.

16          KENNETH ROBERTS:  Yes.

17          ATTY. JUHASZ:  Okay.  And you know from

18     the articles that Mr. Jackson was found guilty, right?

19          KENNETH ROBERTS:  Yes, sir.

20          ATTY. JUHASZ:  Do you know, by the way,

21     what happened to him as far as the sentence?  Did you recall

22     reading that or hearing that?

23          KENNETH ROBERTS:  No, sir.

 1                    ATTY. JUHASZ:  From those things -- as we

 2     said before, everything that we take in leaves an impression

 3     with us.  Do you have an impression from the things that you

 4     have been exposed to in this case that Ms. Roberts was

 5     probably involved in what was going on?

 6                    KENNETH ROBERTS:  Yes, I can assume that,

 7     yes.

 8                    ATTY. JUHASZ:  All right.  And if you're

 9     selected as a juror as this trial unfolds is that an

10     impression that you would sort of want Ms. Roberts to present

11     evidence to you to erase in your mind?  Am I making that

12     question clear?

13                    KENNETH ROBERTS:  Pretty clear, yeah.

14     Yeah, I would like to see some evidence that she wasn't

15     involved or just how much involvement.

16                    ATTY. JUHASZ:  Okay.  But barring that,

17     you've got the impression that she was involved?

18                    KENNETH ROBERTS:  Yes.

19                    ATTY. JUHASZ:  Based upon what you've

20     taken in, correct?

21                    KENNETH ROBERTS:  Yes, sir.

22                    ATTY. JUHASZ:  I want to ask you about a

23     couple things in your questionnaire.  I'm pulling it out only

1   so I don't misquote you.

2                        KENNETH ROBERTS:  Okay.

3                        ATTY. JUHASZ:  And if you need to look at

4   it, stop me and I'll let you take a peak at it.  Fair enough?

5                        KENNETH ROBERTS:  Yes, sir.

6                        ATTY. JUHASZ:  Mr. Bailey I think asked

7   you about this and the question was in your opinion the most

8   important problems, what are the most important problems

9   facing the criminal justice system in this country?  And you

10  said the number of people on death row and how long they stay

11  on death row.

12                       KENNETH ROBERTS:  Yes.

13                       ATTY. JUHASZ:  And even with the

14  microphone you're a little bit soft spoken so I think I

15  caught everything you were telling Mr. Bailey.  When you

16  mentioned folks on death row did I hear you say like there

17  are some people who want to be executed?

18                       KENNETH ROBERTS:  Yes.

19                       ATTY. JUHASZ:  But the parlance sometimes,

20  the word sometime attached to them are volunteers.  Have you

21  heard that word before?

22                       KENNETH ROBERTS:  Not as far as death row.

23                       ATTY. JUHASZ:  Okay.  Not as far as that.

1    I'm sure you've heard the word volunteer but not as far as

2    that?

3                         KENNETH ROBERTS:  Yeah.

4                         ATTY. JUHASZ:  All right.  Do you remember

5    a Mr. Berry, the first person who was executed in Ohio a

6    couple of years ago?

7                         KENNETH ROBERTS:  No, sir.

8                         ATTY. JUHASZ:  All right.  But at any

9    rate, is your view about that -- well, what is your view

10   about that?  Those guys want to be executed so -- finish that

11   sentence for me.

12                        KENNETH ROBERTS:  Yes, that's what I feel.

13                        ATTY. JUHASZ:  Okay.  So they should be?

14                        KENNETH ROBERTS:  Yes, sir.

15                        ATTY. JUHASZ:  All right.  And what is it

16   about the criminal justice system that you think is sort of

17   interfering with or holding that up?

18                        KENNETH ROBERTS:  I'm not sure.  I don't

19   know if it's appeals going on or whatever.

20                        ATTY. JUHASZ:  Okay.  Do you have a view

21   that other people on death row who maybe don't want to be

22   executed, who are maybe, you know, clawing and screaming

23   saying, "I'm innocent" or "Even though I'm guilty, I got the

```
 1    death penalty, I don't want them to execute me," do you have

 2    a view that those folks are also on death row too long?

 3                        KENNETH ROBERTS:  No, I don't think so.

 4                        ATTY. JUHASZ:  No?

 5                        KENNETH ROBERTS:  No.

 6                        ATTY. JUHASZ:  Okay.  You also,

 7    Mr. Roberts, we asked you a question in the questionnaire and

 8    -- well, first we said, "State whether you believe certain

 9    crimes should require a sentence of death," and you said yes.

10    And then the next question was, "If your answer to the

11    previous question was yes, please state what crimes and why

12    you feel the death penalty should be required for those

13    crimes."  And then you said, "If you kill someone

14    deliberately and cold-blooded then you should die."

15                        KENNETH ROBERTS:  Yes.

16                        ATTY. JUHASZ:  All right.  Understand that

17    I am not trying to put words in your mouth, I'm only trying

18    to keep this moving along so you get out of here before

19    dinner, okay?

20                        KENNETH ROBERTS:  Okay.  Yes.

21                        ATTY. JUHASZ:  I mention that because if I

22    paraphrase something that I think that you are saying and I'm

23    not saying it right, don't just say oh, yeah, okay, I'll just
```

1    let this lawyer go on and rattle on with his clap trap.  If

2    I'm not saying it right, stop me, okay?

3                    KENNETH ROBERTS:  Okay.

4                    ATTY. JUHASZ:  That sounds to me like if

5    someone intentionally causes somebody's death as opposed to

6    some of the examples Mr. Bailey gave you where, you know,

7    accidentally or something, somebody runs a stop sign or the

8    handle flies off the ax, those types of things.

9                    KENNETH ROBERTS:  Yes.

10                   ATTY. JUHASZ:  If somebody plans to do it

11   and they carry it out cold-bloodedly, then that person in

12   your estimation should get the death penalty?

13                   KENNETH ROBERTS:  Yes, sir.

14                   ATTY. JUHASZ:  All right.  That sounds a

15   little bit to me like an eye for an eye.  Is that the way you

16   believe about those particular types of offenses?

17                   KENNETH ROBERTS:  Yes, sir , yeah.

18                   ATTY. JUHASZ:  Okay.  Just above that,

19   Mr. Roberts, when we asked you about capital punishment, your

20   views about capital punishment, you said that the punishment

21   should fit the crime.

22                   KENNETH ROBERTS:  Yes, sir.

23                   ATTY. JUHASZ:  And I'm taking it from what

1   you've just told me in that answer that I've just given you

2   that if it is a planned out, deliberate, cold-blooded murder

3   that the punishment that fits the crime is, in fact, the

4   death penalty?

5                    KENNETH ROBERTS:  Yes, sir.

6                    ATTY. JUHASZ:  Okay.  As you know -- well,

7   I'm sorry, I shouldn't say as you know because one of the

8   things that I tell jurors sometimes, one of the unfair and

9   maybe arrogant things that we do as lawyers and judges is we

10  bring you down here with an invitation called a petit jury

11  summons, we start telling you all kinds of rules and

12  procedures that you haven't had any exposure to before, and

13  then we expect you to sort of like get right in the game.  It

14  would be sort of like bringing you from another country and

15  saying here's baseball, here's how we do it, and then saying

16  now go out and play right field.

17               I mention that because I want to make certain that

18  before we talk any further, that having read that handout, do

19  you feel comfortable you know how an Ohio capital trial works

20  basically, or should we spend a minute or two kind of

21  reviewing that?

22                    KENNETH ROBERTS:  I pretty well

23  understand, yes.

1          ATTY. JUHASZ:  Okay.  You know that the

2    government has a burden of proof at the first phase that they

3    have to prove at a minimum that someone is guilty beyond a

4    reasonable doubt of aggravated murder, correct?

5          KENNETH ROBERTS:  Yes, sir.

6          ATTY. JUHASZ:  And that they also have to

7    prove, if they can, beyond a reasonable doubt again one or

8    more of those specifications, special circumstances that

9    makes it a death penalty offense.

10          KENNETH ROBERTS:  Yes.

11          ATTY. JUHASZ:  All right.  And you also

12    know from that handout I think, Mr. Roberts, that if that

13    happens, then that's when a capital trial in Ohio goes to a

14    second phase, correct?

15          KENNETH ROBERTS:  Yes.

16          ATTY. JUHASZ:  And you also know then that

17    there are four penalties, correct?

18          KENNETH ROBERTS:  Right.

19          ATTY. JUHASZ:  Having said all that and

20    having talked about what we talked about a few minutes ago,

21    are your views about the death penalty as far as these

22    deliberate and premeditated killings such that if you got to

23    that second phase, if you found a person guilty of that kind

1    of offense at the first phase, that the death penalty would

2    sort of have a leg up in your mind?

3                        KENNETH ROBERTS:   No, not after hearing

4    the rest of the things it wouldn't.   I said not after hearing

5    the rest of the sentences, then it wouldn't be like No. 1 in

6    my mind.

7                        ATTY. JUHASZ:   Okay.   They would -- how

8    would you look at it?   And the only reason I ask you that

9    obviously is because what we've talked about up to this point

10   in time is your own views that if somebody plans out and

11   carries out a cold-blooded murder, that person should get the

12   death penalty.

13                        KENNETH ROBERTS:   Yes.

14                        ATTY. JUHASZ:   Okay.   If you find that

15   type of an offense are you going to expect that person in the

16   second phase to sort of show you why they should get a life

17   sentence?

18                        KENNETH ROBERTS:   Yes, sir.

19                        ATTY. JUHASZ:   Okay.   I'm not talking

20   about taking the life sentences out of the equation

21   altogether.

22                        KENNETH ROBERTS:   Right.

23                        ATTY. JUHASZ:   You're saying that you

1    would consider those, is that correct?

2                KENNETH ROBERTS:  Yes, sir, yes.

3                ATTY. JUHASZ:  But because of how you feel

4    about those -- forgive me, I seem to have some problem with

5    my contact lens here.  But because of how you feel about

6    those deliberate and premeditated types of homicides, that if

7    you found that, the death penalty is going to start out --

8    well, let me interrupt myself and I'll use an example that a

9    juror used with us a couple of weeks ago, and I think

10   basically she said if I go into Baskin Robbins, because of

11   how I feel about chocolate ice cream, chocolate is my

12   preferred choice.  Now, I'm not saying that when I look at

13   the board I won't look at those other choices; I might pick

14   them and I might not.  But given how I feel about chocolate

15   ice cream, I'm pretty much looking at chocolate unless

16   somebody changes my mind.

17               I mentioned that example because I sense that that's

18   kind of how you feel about the death penalty for these types

19   of offenses where it's planned out.  Am I hitting that on the

20   head or am I not?

21               KENNETH ROBERTS:  You're close, yeah.

22               ATTY. JUHASZ:  Okay.  So if at the first

23   phase you find a person guilty of a -- I want to use your

1    words -- deliberate and cold-blooded murder, you find a

2    person guilty of a deliberate and cold-blooded murder, the

3    death penalty is sort of going to be like the chocolate ice

4    cream in the second phase, correct?

5                        KENNETH ROBERTS:  No.  It would depend on

6    the circumstances involved, yes.

7                        ATTY. JUHASZ:  Okay.  What would those

8    circumstances be in your mind that might make you consider

9    something other than the death penalty?

10                       KENNETH ROBERTS:  As far as who pulled the

11   trigger and how much they planned it and how much they

12   carried out the plan and stuff like that.

13                       ATTY. JUHASZ:  Okay.

14                       KENNETH ROBERTS:  Mainly the trigger man,

15   who was the trigger person.

16                       ATTY. JUHASZ:  Who was the trigger person?

17                       KENNETH ROBERTS:  Yes.

18                       ATTY. JUHASZ:  Okay.  I think Mr. Bailey

19   asked you this.  He usually does.  You understand here that

20   the allegation is not that Ms. Roberts is the trigger person?

21                       KENNETH ROBERTS:  Yes, I understand that.

22                       ATTY. JUHASZ:  But I think you told

23   Mr. Bailey that it wouldn't bother you in terms of deciding

1    whether or not to impose the death penalty that she wasn't

2    the trigger person, correct?

3                    KENNETH ROBERTS:  Say that again.

4                    ATTY. JUHASZ:  Yeah.  Well, let me do it

5    this way.  That was so convoluted that when I got done I

6    didn't understand it, and I asked it.  The fact that she is

7    not the trigger person would not stop you from giving the

8    death penalty if you felt it was appropriate?  I thought

9    that's kind of what Mr. Bailey was asking you.  In other

10   words, let me try to do it -- I'm trying to find a good way

11   to ask this question.  I'm not doing very well.  Would you

12   say in your mind, "You know what, I don't know who the

13   trigger person is.  I don't know what happened to him.  I

14   don't even know if they arrested him.  All I know is this

15   person is not the trigger person and so I don't care what she

16   did, I'm not giving the death penalty."  You don't feel like

17   that, or do you?

18                   KENNETH ROBERTS:  Yes, I would.  I don't

19   feel that she should get the death penalty.

20                   ATTY. JUHASZ:  Okay.  So is that a little

21   bit of the reverse of what we were talking about before, that

22   -- let's change it a little bit.  Let's say that they proved

23   to you it's a deliberate and planned out murder, okay?

1              KENNETH ROBERTS:  Okay.

2              ATTY. JUHASZ:  You're convinced of that

3    beyond any reasonable doubt.  You're also convinced beyond

4    any reasonable doubt, however, that the person who you are

5    trying, whether it's Donna Roberts in this case or somebody

6    in another case that we call you for, may have been involved

7    but was not the trigger person, okay?

8              KENNETH ROBERTS:  Yes.

9              ATTY. JUHASZ:  Are you saying that if you

10   found -- but you found her guilty, okay, because the law says

11   if you find that she participated you can find her guilty,

12   okay?

13             KENNETH ROBERTS:  Yes.

14             ATTY. JUHASZ:  Now you go to a second

15   phase.  Is your view such that if you go to that second phase

16   you're going to say, "Look, I don't care how much evidence or

17   what kind of arguments the State presents to me, if she's not

18   the trigger person there is no way I'm voting for death?"

19             KENNETH ROBERTS:  Yes, that's how I feel.

20             ATTY. JUHASZ:  Okay.  And you know what,

21   you need some water yet, or no?

22             KENNETH ROBERTS:  No, I'm cool.  I'm good.

23             ATTY. INGRAM:  I apologize.  These are

1    hard, they're hard questions to ask.  And as long as I've

2    been doing this, asking these questions, I've always said to

3    myself there but for the grace of God go I.

4                        ATTY. INGRAM:  Mr. Juhasz.

5                        ATTY. BECKER:  May we approach, Your

6    Honor?

7                        ATTY. JUHASZ:  Sure.

8                        (Whereupon, a bench conference was held.)

9                        THE COURT:  Okay.  Kenneth.

10                       KENNETH ROBERTS:  Yes, sir.

11                       THE COURT:  You've answered all the

12   questions the way that you were asked to answer them.  We

13   appreciate that.  You didn't give any right or wrong answers.

14   You're doing what we asked you to do and that is answering

15   the question truthfully.

16                       KENNETH ROBERTS:  Yes, sir.

17                       THE COURT:  A couple of your views of

18   things you find -- I don't know that I disagree on the one

19   necessarily -- but probably would make it difficult for you

20   to sit on this case.

21                       KENNETH ROBERTS:  Okay.

22                       THE COURT:  But we do sincerely appreciate

23   your participation.

1                          KENNETH ROBERTS:  Yes.

2                          THE COURT:  Can't -- you know, we've gone

3    through pushing 60 people now and we only have 24 or 25.  So

4    you're excused from any further duties in this case but we

5    thank you for appearing every time we've asked you to do so,

6    okay?

7                          KENNETH ROBERTS:  Yes.

8                          THE COURT:  You have a good day.

9                          KENNETH ROBERTS:  Yes.

10                         THE COURT:  And I see you know Stan

11   Elkins, too.

12                         KENNETH ROBERTS:  Yes.

13                         THE COURT:  You shouldn't tell everybody

14   that.  Take care.

15                         KENNETH ROBERTS:  Thank you.

16                         ATTY. BECKER:  Thank you very much,

17   Mr. Roberts.

18                         ATTY. BAILEY:  Thanks Mr. Roberts.  Take

19   care.

20                         ATTY. JUHASZ:  Thank you, Mr. Roberts.

21   Take care.

22                         ATTY. INGRAM:  You have a good day.  Enjoy

23   yourself.

```
 1                        (Whereupon, Kenneth Roberts was dismissed

 2      from the pool of prospective jurors.)

 3                        THE COURT:  Gentlemen, there is another

 4      issue that has come up and this is the danger of taking so

 5      long.  Juror No. 4,  W. Jean Rowley, plans to leave to North

 6      Carolina first week of June.  Be gone at least one week.  She

 7      didn't mention it before because --

 8                        ATTY. BECKER:  Which one was that?

 9                        ATTY. INGRAM:  No. 4, the first juror.

10                        THE COURT:  No. 4.

11                        ATTY. BECKER:  You're talking about --

12      okay, you're talking about here.  Okay.  No. 1, okay.

13                        THE COURT:  She didn't mention it before

14      because she thought anybody that knew how to try a case would

15      have this over by now.

16                        ATTY. JUHASZ:  I want to see that letter.

17                        THE COURT:  What am I supposed to tell

18      her?  Connie wants to call her back.

19                        ATTY. BECKER:  When?

20                        ATTY. INGRAM:  The first week of June.

21                        ATTY. BECKER:  The first full week or --

22                        THE COURT:  Apparently the first week of

23      June.  I imagine she's probably leaving the end of May and
```

```
 1    have that first week of June, which starts the 2nd of June.

 2                        ATTY. JUHASZ:  I mean, why don't we at

 3    least hold off for a week and see where we're at?

 4                        ATTY. BECKER:  Yeah.  Maybe we could --

 5    who knows, maybe things will go real well tomorrow.

 6                        THE COURT:  I'm sorry?

 7                        ATTY. JUHASZ:  That part wasn't

 8    registering.  I think we both agree, judge, that at least for

 9    now --

10                        THE COURT:  Keep her in the pool.

11                        ATTY. JUHASZ:  Yeah, we'll keep her in the

12    pool.  Who knows, we may get a jury in the next day or two or

13    -- well, I'll just leave that sentence unfinished.

14                        THE COURT:  We only picked up what, two

15    today though?

16                        ATTY. JUHASZ:  We had a good morning and a

17    bad afternoon.

18                        THE COURT:  Yeah.

19                        ATTY. BECKER:  Your Honor, you want to put

20    on the record the side bar before this last juror was

21    excused?

22                        THE COURT:  Yeah.  We had a side bar on

23    Mr. Roberts, the last -- Kenneth Roberts, juror No. 258, and
```

1  both sides agreed to his dismissal for answers that he had

2  given.  It would have been difficult for him to get past

3  either of those, I think, to be a proper juror.  So on motion

4  of both sides, he was removed for cause.

5         I don't know how to -- we just got to see this

6  through the bitter end the way we're going, I guess, but

7  Juhasz -- off the record.

8                     (Whereupon, a discussion was had off the

9  record, after which Court was recessed for the day.)

10                         *   *   *

11  **(MAY 6, 2003)**

12                     (Court was opened and the following

13  proceedings commenced.)

14             **PROSPECTIVE JUROR MICHAEL S. MERRIMAN**

15                 THE COURT:  Please be seated.  Thank you.

16  Good morning to you.

17                 MICHAEL S. MERRIMAN:  Hi.

18                 THE COURT:  You are Mr. Merriman?

19                 MICHAEL S. MERRIMAN:  Yes, I am.

20                 THE COURT:  You had an opportunity to read

21  that handout?

22                 MICHAEL S. MERRIMAN:  Yes.

23                 THE COURT:  I see you've scheduled a

1    vacation May 25th.

2                    MICHAEL S. MERRIMAN:  Yes.  The reason

3    behind that was I just bought a house April 28th, which

4    wasn't expected when I was here the first time through.

5                    THE COURT:  Oh, yeah.  You're planning on

6    moving?

7                    MICHAEL S. MERRIMAN:  Yes.

8                    THE COURT:  Gentlemen?

9                    ATTY. INGRAM:  Well, I have no objection,

10   Your Honor, but before I do I have to ask the right and left

11   questions.

12                    THE COURT:  Yeah.

13                    ATTY. BECKER:  The State has no objection

14   either, Your Honor.

15                    THE COURT:  Okay.  Thank you.

16                    ATTY. INGRAM:  Good morning.  It's sort of

17   a private joke.  We ask all jurors the right and left

18   questions and they go like this.

19                    MICHAEL S. MERRIMAN:  That's fine.

20                    ATTY. INGRAM:  Do you recall, it was four

21   weeks ago today I think, April 8th, when we were in the big

22   courtroom at the other end of the hallway?

23                    MICHAEL S. MERRIMAN:  Yes.

1           ATTY. INGRAM:  When you entered that room

2   did you go to your left or your right, do you recall?

3           MICHAEL S. MERRIMAN:  More or less to my

4   right because I sat on the jury panel.

5           ATTY. INGRAM:  You were sitting in the

6   regular jury box?

7           MICHAEL S. MERRIMAN:  Yes, jury box.

8           ATTY. INGRAM:  While you were in there did

9   anyone attempt to engage you in discussion about this case?

10          MICHAEL S. MERRIMAN:  No.  I didn't talk

11  to anyone.

12          ATTY. INGRAM:  Did you hear anyone else

13  talking about this case?

14          MICHAEL S. MERRIMAN:  No, I didn't.

15          ATTY. INGRAM:  Thank you.  I have no

16  further questions, Your Honor.

17          THE COURT:  Thank you.  Michael, we

18  wouldn't want to ruin your moving plans so.  I was going to

19  tell you well, you can't move, but I thought I better not do

20  that.  Okay.  Listen, we thank you for your participation in

21  the system.  However, --

22          MICHAEL S. MERRIMAN:  I'm sorry about

23  that, because if I would have known I would have never got to

 1 │ this point.

 2 │                     THE COURT:  Everybody has to take care of

 3 │ their own self first so we understand that.  Thank you so

 4 │ much for coming in.

 5 │                     MICHAEL S. MERRIMAN:  Thank you.

 6 │                     ATTY. JUHASZ:  Thank you very much.

 7 │                     ATTY. INGRAM:  Thanks for coming.

 8 │                     (Whereupon, Michael S. Merriman was

 9 │ dismissed from the pool of prospective jurors.)

10 │                           *   *   *

11 │               **PROSPECTIVE JUROR BRAD MASTERS**

12 │                     THE COURT:  Good morning.

13 │                     BRAD MASTERS:  Good morning.

14 │                     THE COURT:  Mr. Masters, you had an

15 │ opportunity to read that handout that was given to you?

16 │                     BRAD MASTERS:  This morning?

17 │                     THE COURT:  Yes.

18 │                     BRAD MASTERS:  Yes.

19 │                     THE COURT:  Okay.  The purpose for today

20 │ is to allow these folks to ask you various questions

21 │ primarily, not solely, but primarily in the areas of your

22 │ views on capital punishment, the death penalty.

23 │            In Ohio just because someone is found guilty of

1    murdering another person does not mean that they

2    automatically forfeit their life.  The legislature in drawing

3    up the statute that covers this has certain circumstances, if

4    certain circumstances occur in conjunction with the murder,

5    and we call those specifications.  If those are attached to

6    the indictment and the State is able to prove the aggravated

7    murder and the specifications beyond a reasonable doubt, then

8    that raises the possibility of the death penalty as one of

9    four possible penalties.

10                      ATTY. INGRAM:  Excuse me, Your Honor.  May

11   we approach, please?

12                      THE COURT:  Sure.

13                      ATTY. INGRAM:  I'm sorry.  I hesitate to

14   interrupt.

15                      (Whereupon, a bench conference was held.)

16                      THE COURT:  Okay.  Counsel informs me --

17                      ATTY. BECKER:  And also economic hardship.

18                      THE COURT:  Oh, okay.  You pretty well

19   have your mind made up you don't wish to sit on this?

20                      BRAD MASTERS:  Yes, I do.

21                      THE COURT:  Okay.  Just for the record,

22   you have some pretty strong feelings about the death sentence

23   over life imprisonment because of the cost factor?

```
 1                         BRAD MASTERS:  (Nods head affirmatively.)

 2                         THE COURT:  You are also the sole provider

 3    for your family and you can't miss a month's work?

 4                         BRAD MASTERS:  (Nods head affirmatively.)

 5                         THE COURT:  You have a medical problem

 6    also?

 7                         BRAD MASTERS:  Yes.

 8                         THE COURT:  And from your questionnaire

 9    here you say you don't feel you're the right person, you

10    could not fairly apply yourself.  You really believe that to

11    be the case?

12                         BRAD MASTERS:  Yes.

13                         THE COURT:  You don't think we could

14    convince you otherwise?

15                         BRAD MASTERS:  No.

16                         THE COURT:  Okay.  Any objections?

17                         ATTY. INGRAM:  No objection, but I have a

18    couple questions.

19                         THE COURT:  Yes.

20                         ATTY. INGRAM:  Good morning, sir.

21                         ATTY. BECKER:  No objection by the State

22    either, for the record.

23                         THE COURT:  Okay.  Pass for cause by both
```

1    sides.

2                        ATTY. INGRAM:  Good morning, Mr. Masters.

3    How are you?

4                        BRAD MASTERS:  Good morning.

5                        ATTY. INGRAM:  Couple questions, then

6    we'll get you out of here.

7                        ATTY. JUHASZ:  Excuse me, Your Honor.

8    Excused for cause.

9                        ATTY. BECKER:  Excused for cause.  You

10   said pass for cause.

11                       ATTY. JUHASZ:  You said pass for cause.

12                       THE COURT:  I'm sorry, excused for cause.

13   Thank you.  It's early.

14                       ATTY. INGRAM:  We've been at this a while.

15   We're all getting a little punchy.  Excuse us.

16                       BRAD MASTERS:  I can see.

17                       ATTY. INGRAM:  You recall coming down for

18   the orientation instruction on April 8th, about four weeks

19   ago today, down in the big courtroom at the other end of this

20   hallway?

21                       BRAD MASTERS:  Yes, sir.

22                       ATTY. INGRAM:  When you entered that door

23   do you remember if you went to your left, your right or

1    straight ahead?

2                          BRAD MASTERS:  You mean as far as where I

3    sat?

4                          ATTY. INGRAM:  Yes, sir.

5                          BRAD MASTERS:  I think I sat in the jury

6    box.

7                          ATTY. INGRAM:  Okay.  While you were in

8    that room did anyone in that room attempt to engage you in

9    discussion about this case at all?

10                         BRAD MASTERS:  No.

11                         ATTY. INGRAM:  Did you hear anyone else

12   discussing this case while you were in that room?

13                         BRAD MASTERS:  No.

14                         ATTY. INGRAM:  In response to question 53,

15   "Is there any reason you cannot or should not serve as a

16   juror in this case," you wrote, "I am not the right person

17   for this case.  I could not fairly apply myself."  Is that

18   because of your exposure to pretrial publicity?

19                         BRAD MASTERS:  No, it's just because I

20   don't really have the interest to sit and, you know, listen.

21                         ATTY. INGRAM:  Okay.

22                         BRAD MASTERS:  I don't -- I'm just not the

23   right person.

1              ATTY. INGRAM:  You're just not the right

2      person.  All right.  Thank you.  No further questions, Your

3      Honor.

4                           THE COURT:  Thank you for your

5      participation.

6                           BRAD MASTERS:  Okay.

7                           ATTY. BECKER:  Thank you.

8                           ATTY. JUHASZ:  Thanks for coming.

9                           (Whereupon, Brad Masters was dismissed

10     from the pool of prospective jurors.)

11                          CAPTAIN BACON:  Connie is calling

12     everybody, judge, to see if she can --

13                          THE COURT:  Yes.

14                          ATTY. INGRAM:  Your Honor, we have tried

15     -- anticipating these problems earlier this morning, Connie

16     is calling -- can I have that list, please?  Connie is

17     calling Juror No. 275, Ruth Bunker.

18                          CAPTAIN BACON:  She's doing that, Your

19     Honor.

20                          ATTY. INGRAM:  We're trying to call, we're

21     trying to get volunteers, we're trying to get bodies, we're

22     trying to get anybody.

23                          THE COURT:  Trying to get these other ones

```
 1    to come in earlier?

 2                    ATTY. INGRAM:  Yeah.  And we even,

 3    Mr. Becker and I agreed that if she had to go out of order to

 4    get people here, that that was fine with us.  Let's just get

 5    somebody here.

 6                    THE COURT:  Okay.

 7                    ATTY. BECKER:  Yeah, we just want to get

 8    moving, so we've asked her to do what Mr. Ingram has

 9    mentioned.  And I guess we're going to take a break now until

10    we get somebody here?

11                    ATTY. INGRAM:  Unless you want to voir

12    dire me.

13                    ATTY. BECKER:  Well, we could dance.

14                    (Whereupon, a brief recess was taken.)

15                    ATTY. INGRAM:  Ruth Bunker, 275, is coming

16    up first.  She apparently has something to tell us about

17    about a plan, plus she has elderly --

18                    ATTY. BAILEY:  Parents.

19                    ATTY. INGRAM:  -- parents.

20                    ATTY. BAILEY:  She's one of the caregivers

21    for them.

22                    THE COURT:  Oh.

23                    ATTY. BAILEY:  So she may not be able to
```

 1 │ spare sequestration.

 2 │                    THE COURT:  Are you telling me it's going

 3 │ to be another dry day or what?

 4 │                    ATTY. INGRAM:  Then we have another one

 5 │ down there who will come up after Ruth.  And the next juror

 6 │ is --

 7 │                    CAPTAIN BACON:  277.

 8 │                    THE COURT:  Well, I'll get on that right

 9 │ off the bat with her.

10 │                    CAPTAIN BACON:  And he's here, too.

11 │                    ATTY. BECKER:  He is out in the hall?

12 │                    CAPTAIN BACON:  He's downstairs.  277 is

13 │ downstairs.

14 │                    ATTY. BECKER:  We want 275 first.

15 │                    CAPTAIN BACON:  Yeah.  The lieutenant is

16 │ out here.

17 │             **PROSPECTIVE JUROR RUTH A. BUNKER**

18 │                    THE COURT:  Good morning.  Ruth, how are

19 │ you doing today?

20 │                    RUTH A. BUNKER:  Good.

21 │                    THE COURT:  Good.  I see from the

22 │ questionnaire that you filled out that you have your parents

23 │ that you care for or see that their needs are met.

```
 1                    RUTH A. BUNKER:  Yes.

 2                    THE COURT:  Is that something that would

 3    interfere with your ability to be here?

 4                    RUTH A. BUNKER:  It's a possibility.  And

 5    also I'm going to be out of town from  tomorrow night until

 6    May 13th.

 7                    THE COURT:  Until when?

 8                    RUTH A. BUNKER:  May 13th, watching my

 9    grandchildren.

10                    THE COURT:  Okay.  You sound like a busy

11    lady.

12                    RUTH A. BUNKER:  And then June 2nd to 5th

13    is a vacation for my husband and myself.

14                    THE COURT:  Okay.  Any questions,

15    Mr. Juhasz or Ingram?

16                    ATTY. INGRAM:  Yeah, I have the left and

17    right questions, Your Honor.

18                    THE COURT:  Yeah.

19                    ATTY. INGRAM:  How are you doing, ma'am?

20                    RUTH A. BUNKER:  Good.

21                    ATTY. INGRAM:  Do you recall when you came

22    in to spend some time with us for the orientation instruction

23    four weeks ago?
```

1           RUTH A. BUNKER:  Yes.

2           ATTY. INGRAM:  We all met down in the

3  other courtroom.

4           RUTH A. BUNKER:  Uh-huh.

5           ATTY. INGRAM:  When you entered that

6  courtroom do you happen to remember if you went to your left,

7  if you went to your right or straight ahead?

8           RUTH A. BUNKER:  I went to the right.

9           ATTY. INGRAM:  Were you able to find a

10  seat or did you have to stand?

11           RUTH A. BUNKER:  No, I was seated.

12           ATTY. INGRAM:  Whereabouts were you

13  seated?  Can you sort of -- toward the front, the back?

14           RUTH A. BUNKER:  Probably in the second

15  row of benches.

16           ATTY. INGRAM:  Towards the front?  So

17  you're in the second row from the front?

18           RUTH A. BUNKER:  Yes.

19           ATTY. INGRAM:  While you were there that

20  day did anyone attempt to engage you in discussion about this

21  case?

22           RUTH A. BUNKER:  No.

23           ATTY. INGRAM:  Did you overhear anyone

```
 1    else talking about this case?

 2                      RUTH A. BUNKER:  The lady next to me, yes.

 3                      ATTY. INGRAM:  Okay.  What did you

 4    overhear the lady next to you saying?

 5                      RUTH A. BUNKER:  Just she knew who the

 6    defendant was.

 7                      ATTY. INGRAM:  Anything else?

 8                      RUTH A. BUNKER:  No.

 9                      ATTY. INGRAM:  Who was she -- was she

10    talking to someone in particular that you could tell?

11                      RUTH A. BUNKER:  Just the ones on each

12    side of her.

13                      ATTY. INGRAM:  All right.  Thank you.

14                      THE COURT:  Any objection to dismissing

15    her?

16                      ATTY. INGRAM:  No objection.

17                      ATTY. BAILEY:  No objection.

18                      ATTY. BECKER:  I have a question.  Was

19    that before or after the judge instructed you not to speak?

20                      RUTH A. BUNKER:  Before.

21                      ATTY. BECKER:  Okay.  Thanks.

22                      THE COURT:  Ma'am, we thank you for your

23    time.  Take care of those grand kids and have a good
```

 1   vacation, okay?

 2                    RUTH A. BUNKER:  Well, thank you.

 3                    THE COURT:  We'll see you.

 4                    ATTY. BECKER:  Thank you very much.

 5                    ATTY. BAILEY:  Thank you.

 6                    ATTY. JUHASZ:  Thank you, ma'am.

 7                    THE COURT:  I compliment you on your

 8   children, too.  Apparently they've done okay.

 9                    (Whereupon, Ruth A. Bunker was dismissed

10   from the pool of prospective jurors.)

11                    CAPTAIN BACON:  Andrew is here.

12                    THE COURT:  What's that?

13                    CAPTAIN BACON:  The next one is Andrew

14   Kotwis.  And she also has, we also have another one which is

15   290, Shelley Myers.

16                    THE COURT:  Oh, okay.

17              **PROSPECTIVE JUROR ANDREW KOTWIS**

18                    THE COURT:  Mr. Kotwis, come on in.  Have

19   a seat right up here, if you will.

20                    ANDREW KOTWIS:  All right.

21                    THE COURT:  How are you doing this

22   morning?

23                    ANDREW KOTWIS:  Fine, judge.  Thanks.

1          THE COURT:   Good.   You read that handout

2    that was given to you?

3                  ANDREW KOTWIS:   Yes.

4                  THE COURT:   Okay.   As you pretty much

5    know, this is a case where there are two counts of aggravated

6    murder with specifications.   In Ohio just because a person is

7    found guilty of murder does not mean that they automatically

8    face the death penalty.   Legislature in drafting the law put

9    in certain circumstances which are identified in the

10   indictment by specifications.   And if a person commits

11   aggravated murder with these specifications, one of them

12   would be if you killed the governor, that's attached that he

13   was the governor, then that raises it to a capital issue.

14         Now, this morning you're going to be asked various

15   questions along two major lines and that is about your views

16   on capital punishment and pretrial publicity.   We all hold

17   some view on capital punishment.   Some people haven't thought

18   about it as much as others, but everybody has kind of an

19   instinctive feel for it.   This case will begin by the

20   prosecution being called upon to prove their case on the

21   aggravated murder and the specification count.   If they are

22   unable to prove the facts beyond a reasonable doubt to the

23   jury's satisfaction, then the jury would properly return a

1     verdict of not guilty.  That would be the end of the trial.

2             If the State carries their burden of proof and this

3     jury would make a finding of guilty, then it would go to a

4     second hearing and at that time the State is called upon to

5     prove beyond a reasonable doubt that the aggravating

6     circumstances outweigh any mitigating factors.  Aggravating

7     circumstances would be those reasons that would be put to the

8     jury to convince them that they should consider and impose

9     the death penalty, and then mitigating factors would be

10    reasons why they should not do that.

11                      ANDREW KOTWIS:  Uh-huh.

12                      THE COURT:  Excuse me.  Now, we have no

13    idea what the jury verdict will be in this case.  Nobody has

14    heard the evidence yet.  So you say why do we get into this

15    question of the death penalty?  Well, if we don't inquire at

16    this point in time you might end up with a jury who have

17    people on there, which has people on there, that someone may

18    feel that the Old Testament, eye for an eye, if you kill

19    somebody you should lose your life automatically.  That is

20    not the law of Ohio.

21                      ANDREW KOTWIS:  Right.

22                      THE COURT:  And you may have people on

23    there who could under no circumstances participate in a death

1    sentence.

2                    ANDREW KOTWIS:  Uh-huh.

3                    THE COURT:  You know, everybody is all

4    over the board on it.  Well, neither of them, of that type

5    person, could be fair to both sides.  So the reason these

6    questions are asked is to try to get people who are

7    comfortable with sitting on a jury of this type, and that

8    means that they're able to follow the law.

9                    Now, everybody is going -- some people will be more

10   geared towards favoring a death penalty and others less.

11   That's fine.  But the State has the right, if they prove

12   their case, to ask the jury for their consideration of the

13   death penalty, and the defendant has the right to have this

14   jury consider any mitigating factors.  And by saying that I

15   would caution that there's no burden on the defendant to do

16   anything during a trial.  It's the State's case.  They either

17   win it or they lose it on the merit of the evidence itself.

18                    ANDREW KOTWIS:  Uh-huh.

19                    THE COURT:  But the defendant, of course,

20   if they wish, can participate in various parts of it.

21                    Now, whatever your views are on the death penalty is

22   fine.  We all have our own view and these folks will respect

23   your belief on it, but they have a right to inquire to see

1  whether they are comfortable with each person on there as to

2  whether they are able to follow the law.

3                    ANDREW KOTWIS:  All right.

4                    THE COURT:  That's the primary thing.  The

5  second part of it is on pretrial publicity.  Some of the

6  people that we've interviewed knew nothing about the case.

7  Others that live more into Warren here, this is alleged to

8  have happened in Howland, are more familiar with it.  But it

9  doesn't matter whether a person knows something about the

10 case or not, it's whether or not each juror is able to assure

11 these folks that what they think they know about the case is

12 not going to be considered as evidence.  For this case to be

13 fairly tried it has to be decided on the merit of the

14 evidence that is presented in this courtroom, and if any of

15 the jurors would bring in any thoughts of things that they

16 had heard before the trial starts, then somebody is going to

17 be denied a fair trial.

18       So those are the primary issues.  They'll ask you

19 other questions, but primarily that's what they're interested

20 in, okay?

21                    ANDREW KOTWIS:  Okay.

22                    THE COURT:  Mr. Becker.

23                    ATTY. BECKER:  Thank you, Your Honor.  I

1    want to make sure I'm pronouncing this right.  Is it Kotwis?

2                    ANDREW KOTWIS:  Kotwis.

3                    ATTY. BECKER:  Okay.  Mr. Kotwis, my name

4    is Chris Becker.  I'm an assistant with the county

5    prosecutor's office.  This is Mr. Ken Bailey, who I believe

6    about a month ago you saw in the courtroom down the hall.

7                    ANDREW KOTWIS:  Yeah.

8                    ATTY. BECKER:  And it's just taken us an

9    inordinate amount of time, longer than we thought, to get to

10   this point.  But the purpose of what we're going to ask you

11   is, of course, as the judge just indicated to you.

12                   ANDREW KOTWIS:  Okay.

13                   ATTY. BECKER:  And the one thing I want to

14   stress to you is there are really no right or wrong answers

15   here.

16                   ANDREW KOTWIS:  I understand.

17                   ATTY. BECKER:  We just want to find out

18   your opinions.  And you may be a juror that ourselves or the

19   defense would like on this case; you may not be.

20                   ANDREW KOTWIS:  Uh-huh.

21                   ATTY. BECKER:  But I want you to keep that

22   in mind because sometimes we recycle jurors and you may be

23   two months from now or six years from now a juror on another

1    case and we may pick you.  So if you get excused don't hold

2    that against either party.

3                   ANDREW KOTWIS:  Fine.  Sure.

4                   ATTY. BECKER:  Mr. Kotwis, I'm going to

5    tell you this is the only time that the attorneys, that we

6    get to speak to you, and more importantly, and probably the

7    most important aspect of this whole procedure is that you get

8    to talk to us.

9                   ANDREW KOTWIS:  Uh-huh.

10                   ATTY. BECKER:  Once this case starts and

11   if you are seated as a juror over here in the jury box our

12   ethics prohibit us from speaking to you during the pendency

13   of the case.

14                   ANDREW KOTWIS:  Okay.

15                   ATTY. BECKER:  So it's very important that

16   if you have any questions or if you have anything you want to

17   add or speak to us about, now is the time to do that.  We

18   have water here if you need a glass of water or anything if

19   you get thirsty, and, with that in mind, let's just get

20   started and we'll cover the areas that the judge indicated to

21   you and then we're going to talk generally about serving as a

22   criminal juror.

23              The first area I want to touch upon is your opinions

1    I guess on the death penalty.  It's my understanding that you

2    are in favor of the death penalty, correct?

3                    ANDREW KOTWIS:  Yes.  I've lived with the

4    death penalty over the years and recognizing that it's, it's

5    a necessary way, it's an accepted way for our law enforcement

6    to provide comfort to the families of the harmed.

7                    ATTY. BECKER:  Okay.  And --

8                    ANDREW KOTWIS:  I don't look at it as a

9    punishment.

10                   ATTY. BECKER:  You've had this opinion for

11   a long time I'm assuming?

12                   ANDREW KOTWIS:  Uh-huh.

13                   ATTY. BECKER:  Now, one of the things

14   that's a little unique about a situation or a case like this

15   is that this capital murder trial, as all capital murder

16   trials are in the State of Ohio, is really two trials in one.

17                   ANDREW KOTWIS:  Uh-huh.

18                   ATTY. BECKER:  The first part of this case

19   it's going to be Mr. Bailey and I's obligation to prove to

20   you and your fellow jurors that Ms. Roberts is guilty of some

21   crimes by proof beyond a reasonable doubt, and I'm assuming

22   you are very familiar with that term.  What we have to do,

23   though, is really have two trials where you're going to hear

1    some things, and we're going to be presumptuous and let's

2    assume that we get to that second phase because there's a

3    possibility we may not be able to prove her guilt beyond a

4    reasonable doubt, correct?

5                    ANDREW KOTWIS:   I understand that, yes.

6                    ATTY. BECKER:   And I'm just going to ask

7    you, what do you think happens if we don't prove her guilty

8    of the crimes that call for the death penalty in the first

9    phase, if you and your fellow jurors decide she's not guilty?

10                   ANDREW KOTWIS:   Well, I think the burden

11   is on you, as it's been reiterated a number of times, --

12                   ATTY. BECKER:   Sure.

13                   ANDREW KOTWIS:   -- to prove beyond a

14   reasonable doubt that she is --

15                   ATTY. BECKER:   Guilty.

16                   ANDREW KOTWIS:   -- guilty.

17                   ATTY. BECKER:   All right.

18                   ANDREW KOTWIS:   But if you don't do that

19   then I see no reason why you would continue beyond that.

20                   ATTY. BECKER:   Okay.  So you understand

21   and, like I said, we're going to get to a point where we

22   can't speak to each other --

23                   ANDREW KOTWIS:   Okay.

```
 1              ATTY. BECKER:  -- if we start this trial,
 2    and therein lies the problem.  We have to ask you in advance
 3    sort of the worst case scenario, particularly for her the
 4    worst case scenario, is if you could impose the death
 5    penalty.  And we can't very well do that if we go through the
 6    first part of this trial and you and your fellow jurors find
 7    her guilty and then we say, "All right, jurors, stick around
 8    for another three or four days because now we're going to
 9    present to you the penalty phase of this trial and one of the
10    possibilities is the death penalty."  And two or three jurors
11    may raise their hand and say, "Wait a minute, no one ever
12    told me we were going to do this.  I can't do that."  So you
13    understand?
14              ANDREW KOTWIS:  Right.  Right.  I think
15    you've made it perfectly clear, sir.
16              ATTY. BECKER:  Okay.  And we don't want to
17    get into a situation here where, you know, we run out of
18    jurors and get to that problem.
19              ANDREW KOTWIS:  Okay.
20              ATTY. BECKER:  So that's why we have to
21    ask you in advance.  And we certainly don't want you to take
22    the fact that we're talking about the ultimate punishment as
23    meaning that she's guilty of anything.
```

```
 1                    ANDREW KOTWIS:  No.  I understand, yeah.

 2                    ATTY. BECKER:  All right.  Now, the death

 3    penalty -- let's assume we get to the second phase.  We prove

 4    her guilty beyond a reasonable doubt and there's two charges

 5    that would enable us to get to that point.  They're both

 6    aggravated murder.  One is essentially that she committed the

 7    crime with prior calculation and design.  We used to call

 8    that premeditated murder.

 9                    ANDREW KOTWIS:  Right.

10                    ATTY. BECKER:  The other would be that she

11    was an aider and abettor, the other allegation is that she

12    was an aider and abettor in the death of an individual who

13    was killed during a felony murder committed during the course

14    of a burglary or robbery.

15                    ANDREW KOTWIS:  Uh-huh.

16                    ATTY. BECKER:  You have to wipe that

17    clean, basically you're going to have to start afresh, and

18    you're going to have to start that second phase when you

19    determine her penalty with a clean mind set and you're going

20    to have to fairly and equally consider all four options;

21    death penalty, life with no parole, life with parole after 30

22    and life with parole after 25, and I think you had a handout

23    that explained some of that to you, correct?
```

1        ANDREW KOTWIS:  Uh-huh, yeah.

2        ATTY. BECKER:  Do you feel that you will

3   be able to wipe that slate clean knowing that in the first

4   phase you may have found her guilty of one or both of the

5   charges of aggravated murder with prior calculation and

6   design, basically premeditated murder, and/or you also found

7   her guilty of aggravated murder during the commission of an

8   aggravated burglary or aggravated robbery?  Because you're

9   going to know that going into that second phase, you're going

10  to know all that about her.

11       ANDREW KOTWIS:  Now, during that three or

12  four day period after your initial --

13       ATTY. BECKER:  Right, when we start the

14  second phase.

15       ANDREW KOTWIS:  After the initial verdict,

16  what is presented, what would be open for the jurors to

17  evaluate this second phase?

18       ATTY. BECKER:  Here's probably what's

19  going to happen.  When we start that second phase, if we get

20  there, Mr. Bailey and I are probably going to say and move

21  into evidence the testimony and evidence that related to the

22  -- there's going to be, on the aggravated murder charge

23  there's going to be a little thing called an aggravating

1    circumstance.  It's a specification.

2                    ANDREW KOTWIS:  Right.

3                    ATTY. BECKER:  And it basically says those

4    things, that it was with prior calculation and design or

5    committed -- well, actually the specifications say it was

6    committed during the course of an aggravated burglary or

7    robbery.

8                    ANDREW KOTWIS:  Right.

9                    ATTY. BECKER:  Or an aggravated robbery.

10   We're going to move into evidence all of those aggravating

11   circumstances, the things that make it eligible for the death

12   penalty, because not all crimes in Ohio, not even all murders

13   are eligible for the death penalty.

14                   ANDREW KOTWIS:  Uh-huh.

15                   ATTY. BECKER:  One of the examples is, and

16   maybe I can explain this a little bit better, let's say

17   there's a guy that I see walk down the sidewalk every day and

18   I don't like him.  I don't like the way he looks at me, I

19   don't like the way he sneers at me, I don't like anything

20   about this guy.  And one day I decide that on Friday I'm

21   going to shoot this guy, I'm going to shoot and kill him.

22   That's premeditated murder.

23                   ANDREW KOTWIS:  Correct.

1        ATTY. BECKER:  I'm thinking about it.  I'm

2    going to go home, I'm going to go out and buy a gun, I'm

3    going to load that gun up, I'm going to carry it with me.  I

4    go out and maybe even do some target practicing so I can hit

5    this guy.  And here he comes down the sidewalk and he's 10

6    feet away from me and I pull out the gun and blow him away,

7    kill him.

8        ANDREW KOTWIS:  Right.

9        ATTY. BECKER:  I thought about it.  I

10   planned it.  I prepared for it.  I killed him.  That in Ohio

11   is not a capital murder offense.

12       ANDREW KOTWIS:  Okay.

13       ATTY. BECKER:  It's premeditated murder,

14   it's prior calculation and design, but it is not an offense

15   that would make me eligible for the death penalty.

16       ANDREW KOTWIS:  Death penalty.

17       ATTY. BECKER:  Now, if I go up to that man

18   and either rob him or steal something from him during the

19   course, either before, during or after this murder, then it

20   becomes a capital murder case because the bad thing that

21   makes it a capital murder is that I've robbed him, I've

22   committed an aggravated robbery.

23       ANDREW KOTWIS:  Uh-huh.

1    ATTY. BECKER:  So now we go into this

2    second phase.  Now you're going to know that I've committed

3    an aggravated robbery.

4    ANDREW KOTWIS:  Right.

5    ATTY. BECKER:  I've killed this man, I

6    planned for it, I practiced for it, and now we're in the

7    second phase, and the only thing that you can consider is the

8    fact that I planned this murder, you know, that I committed

9    this during the course of a robbery, I robbed this guy.

10   ANDREW KOTWIS:  Right.

11   ATTY. BECKER:  There's still, though, when

12   you're on that second phase you have to equally consider

13   life, death and the other life options.

14   ANDREW KOTWIS:  Okay.

15   ATTY. BECKER:  You cannot go into that

16   second phase and be a fair juror and say, you know, "I feel

17   so strong about the death penalty, I already know this guy

18   has done all these things, I'm going to sign the death

19   penalty verdict.  I know these bad things."

20   ANDREW KOTWIS:  Uh-huh.

21   ATTY. BECKER:  Because it's

22   Mr. Bailey and I's burden to prove to you that those bad

23   things outweigh the good things and they don't have to

 1    present anything at either the first phase or the second

 2    phase.

 3                         ANDREW KOTWIS:  I understand.

 4                         ATTY. BECKER:  You may feel, though, that

 5    just the fact that I blew someone away and committed an

 6    aggravated robbery is not enough to warrant the death

 7    penalty.

 8                         ANDREW KOTWIS:  Uh-huh.

 9                         ATTY. BECKER:  And, I mean, I'm not trying

10    to change your opinion --

11                         ANDREW KOTWIS:  No.

12                         ATTY. BECKER:  -- but you can't go into

13    that second phase thinking, "All right, I already know this

14    guy killed somebody during the commission of a robbery.  I'm

15    going to give him the death penalty.  I already know that."

16    You have to weigh that again, you have to weigh that.

17                         ANDREW KOTWIS:  Yes.

18                         ATTY. BECKER:  Now, in reality probably

19    what's going to happen is you're going to know that and

20    Mr. Bailey and I are going to say, for instance, if we're

21    talking about the case where I killed someone and then took

22    his wallet, you're going to know about that and we're going

23    to move that into evidence.  We're going to say, "Okay, our

1   aggravating circumstance is that he killed this person during

2   the commission of this felony.  Your Honor, we just move that

3   the jury recall that testimony and the evidence relating to

4   that testimony."

5                     ANDREW KOTWIS:   Uh-huh.

6                     ATTY. BECKER:   Now, they don't have to do

7   anything in that case.  They don't have to present any

8   evidence.  They don't have to present their client.  They

9   don't have to do anything because you may say, "Well, that's

10  not enough for me to give the death penalty.  I don't think

11  it is."  Now, they may very well do that.  They may put in

12  some things and say, "Listen, our client was really stressed

13  out.  He was going to lose his job.  This guy was his boss,

14  and despite the fact that the defendant had been working

15  there for 25 years, he was going to fire him and lay him off.

16  He had also had his wife just leave him.  He had been

17  foreclosed on his mortgage."  And you may say, "Well, I can

18  understand now," you know, there were some personal

19  relationships here and some things that played in.  Those

20  might be what we call mitigating factors and they may tip the

21  scale back so that you don't find beyond a reasonable doubt

22  that the death penalty is warranted.

23                     ANDREW KOTWIS:   Uh-huh.

1          ATTY. BECKER:  And the only reason I ask

2   you in depth this is because you indicated on your

3   questionnaire that you believe premeditated murder should be

4   given the ultimate punishment if the law allows.  And the law

5   does allow that but you have to weigh --

6          ANDREW KOTWIS:  Weigh the circumstances,

7   sure.

8          ATTY. BECKER:  -- the circumstances.  So

9   my question to you is I guess, if we start this second phase,

10  and the only way to get to this second phase is if you find

11  her guilty of one of two murder charges or both; first, she

12  either planned it, which is a premeditated murder, prior

13  calculation and design.

14          ANDREW KOTWIS:  Uh-huh.

15          ATTY. BECKER:  And that the murder was

16  committed during the course of an aggravated robbery or

17  burglary and/or she committed the aggravated murder during

18  the course of an aggravated burglary or aggravated robbery,

19  and you know that as well.  Are you going to be able to start

20  that second phase and fairly and equally consider all four

21  options?

22          ANDREW KOTWIS:  Well, I think that's my,

23  that would be my responsibility as a juror.

1              ATTY. BECKER:  Okay.  And that's what the

2    Court is going to instruct you.

3              ANDREW KOTWIS:  To evaluate it based upon

4    the circumstances that you're going to present for that

5    second phase.

6              ATTY. BECKER:  Okay.  And you can fairly

7    consider those even though you may not hear any other -

8              ANDREW KOTWIS:  Oh, I think so, sure.

9              ATTY. BECKER:  So even though you feel

10   that the premeditated murder -- and I think the caveat that

11   you put on there said if the law allows.

12              ANDREW KOTWIS:  Yeah.

13              ATTY. BECKER:  You'll follow the law?

14              ANDREW KOTWIS:  Sure.

15              ATTY. BECKER:  Okay.  And as difficult as

16   it may be, and I don't know if it's going to be difficult,

17   you'll be able to separate your personal opinion of what the

18   death penalty is?

19              ANDREW KOTWIS:  Uh-huh.

20              ATTY. BECKER:  And make a fair and

21   accurate I guess verdict on the second phase without any --

22   you're not going to give the death penalty a head start?

23              ANDREW KOTWIS:  No.  I definitely --

1            ATTY. BECKER:   Even though you believe in

2    it?

3            ANDREW KOTWIS:   I definitely, definitely

4    would not do that.

5            ATTY. BECKER:   And you'll be fair and

6    impartial and consider all four of those options?

7            ANDREW KOTWIS:   Absolutely.

8            ATTY. BECKER:   Okay.   And on the flip side

9    of that coin, you could see yourself I guess, or I assume you

10   could see yourself stepping back at some point in a few weeks

11   and going back to that jury room and signing a piece of paper

12   along with 11 other jurors calling for the imposition of the

13   death penalty if the facts warranted it?

14           ANDREW KOTWIS:   Well, that's -- yeah.   It

15   would have to be --

16           ATTY. BECKER:   I mean, if we proved it.

17           ANDREW KOTWIS:   It would have to be set in

18   my mind that the facts warrant the death penalty, you know.

19           ATTY. BECKER:   Okay.   We'd have to prove

20   that to you.

21           ANDREW KOTWIS:   That would be your

22   responsibility.

23           ATTY. BECKER:   And you understand, you

 1  have a pretty good grasp on this.

 2               ANDREW KOTWIS:  Absolutely.

 3               ATTY. BECKER:  You understand that

 4  Mr. Bailey and I in both trials have to prove to you, first,

 5  that she's guilty, and second of all, that the death penalty

 6  is, in fact, warranted?

 7               ANDREW KOTWIS:  That's correct.

 8               ATTY. BECKER:  And we have to prove that

 9  to you by proof beyond a reasonable doubt.

10               ANDREW KOTWIS:  Uh-huh.

11               ATTY. BECKER:  Okay.  Now, the only other

12  question I want to touch with you real briefly is I do see

13  that you are of the Catholic faith and I do see that you also

14  attended St. John's down in Bellaire, which I know is, I

15  believe, a Catholic school.

16               ANDREW KOTWIS:  Right.

17               ATTY. BECKER:  Because I lived in

18  Steubenville for about 10 years.

19               ANDREW KOTWIS:  Oh.  We played you.

20               ATTY. BECKER:  Yeah.  We played Central

21  Catholic every year.

22               ANDREW KOTWIS:  Uh-huh.

23               ATTY. BECKER:  I think they still do.  The

1    fact that you are Catholic and, in fact, educated in the

2    Catholic school system, and obviously the Catholic church has

3    different teachings on the death penalty, is that going to

4    create any kind of problem for you?

5                         ANDREW KOTWIS:  It wouldn't in my mind,

6    no.

7                         ATTY. BECKER:  Okay.  You would be able

8    to --

9                         ANDREW KOTWIS:  I respect the law.  I

10   respect the way that it's set up to handle situations like

11   this.  You know, I don't see that I could be partial to the

12   death penalty if I, or against it, --

13                         ATTY. BECKER:  Right.

14                         ANDREW KOTWIS:  -- based upon any outside

15   circumstances like, for example, religion or race, creed,

16   color.  It wouldn't make any difference.  You know, it's

17   pretty much facts.

18                         ATTY. BECKER:  And that's how you're going

19   to make your determination is what the facts are?

20                         ANDREW KOTWIS:  Yes.

21                         ATTY. BECKER:  And you're going to hold

22   Mr. Bailey and I to our burden to prove that the death

23   penalty is warranted?

1                    ANDREW KOTWIS:  I will do that.

2                    ATTY. BECKER:  Okay.  And we appreciate

3       that.  I see were you had some pretrial publicity I guess and

4       you've been exposed to a little bit of publicity about this

5       case.  How did you come about to find out about this case,

6       hear about this case?

7                    ANDREW KOTWIS:  Well, I live in Warren

8       and, you know, I do read the newspaper.

9                    ATTY. BECKER:  Sure.

10                    ANDREW KOTWIS:  So I'm aware that a crime

11       was committed and it's more from reading the newspaper than

12       anything.

13                    ATTY. BECKER:  All right.  And one of the

14       things we have to -- and I assume you read this maybe a year

15       and a half ago when this allegedly --

16                    ANDREW KOTWIS:  It's been a long time.

17                    ATTY. BECKER:  And I'm assuming since the

18       Court gave its admonition about a month ago not to read

19       anything or watch anything on TV you've abided by that

20       admonition?

21                    ANDREW KOTWIS:  Yes, absolutely.

22                    ATTY. BECKER:  Now, the fact that you read

23       something, obviously --

1          ANDREW KOTWIS:  What I do is I tell my

2    wife, "Here's an article I can't read.  Here, you can read

3    that one but don't tell me anything about it."

4          ATTY. BECKER:  Okay.  Very good.  And

5    that's what you are supposed to do.  And if you're selected

6    for this jury that's what you'll have to do throughout this

7    trial.

8          This case, obviously when it happened you had no

9    idea that you were going to be called for the jury and our

10   law does not say that there's anything wrong with you knowing

11   something about the case.  In fact, you know, we're presumed

12   to want -- we want jurors who know about the community, who

13   care about the community, who vote.  That's obviously why

14   you're selected for jury duty, so we want people who do care

15   about this community and follow it and are interested in

16   what's going on with it to be jurors.  The issue, though, is

17   and the question is can you set aside what you've heard about

18   this case and give Ms. Roberts the presumption of innocence

19   which she's entitled to under our law, as all criminal

20   defendants are, and decide this case only upon what you see

21   and hear in this courtroom?

22          ANDREW KOTWIS:  I can do that because I'm

23   not that familiar with the circumstances of that case.  I'm

1   │ aware that it happened, but the details of it.  In fact,

2   │ you'll notice on that questionnaire you mentioned the

3   │ fellow's name and if you would have asked me on the street do

4   │ I know that guy I would have said no, but the fact that you

5   │ put it in the same context with this crime, then I made the

6   │ association that that must have been the same fellow, so.

7   │                    ATTY. BECKER:  Okay.  Fair enough.  And

8   │ that's really all we can ask you to do and that's all we can

9   │ ask any juror to do because obviously people don't live, you

10  │ know, in a shack underground or in a bunker.

11  │                    ANDREW KOTWIS:  Uh-huh.

12  │                    ATTY. BECKER:  They read the newspaper,

13  │ and particularly when they're voters and they're called to

14  │ come here.  Most voters do read the paper and follow the news

15  │ and want to know what's going on in their communities.

16  │                    ANDREW KOTWIS:  Right.

17  │                    ATTY. BECKER:  So as long as you can

18  │ separate that out and make your determination on the evidence

19  │ and testimony here, you're okay.

20  │                    ANDREW KOTWIS:  Uh-huh.

21  │                    ATTY. BECKER:  And you can do that?

22  │                    ANDREW KOTWIS:  I can do that.

23  │                    ATTY. BECKER:  All right.  Well, thank you

```
 1    very much.  Now I want to ask you some general questions

 2    about the criminal justice system in general.  Obviously

 3    we've touched a little bit upon the presumption of innocence

 4    and that is a concept that's very firmly rooted in our

 5    constitution and our laws in our country and basically one of

 6    the founding principles of our country.

 7                     ANDREW KOTWIS:  Uh-huh.

 8                     ATTY. BECKER:  Throughout these

 9    proceedings Ms. Roberts has the presumption of innocence.

10    The fact that she's indicted by a grand jury and charged,

11    that's merely just an accusation.  I'm assuming you

12    understand that.

13                     ANDREW KOTWIS:  Uh-huh.

14                     ATTY. BECKER:  The indictment that alleges

15    these crimes is just a piece of paper that got this whole

16    ball of wax rolling.  Whether she's guilty or not guilty of

17    any of these charges is for the jurors, which you may be, for

18    them to decide.

19                     ANDREW KOTWIS:  Uh-huh.

20                     ATTY. BECKER:  You don't take the fact

21    that she's here and we're talking about the death penalty and

22    about an indictment and murder charges to mean anything other

23    than the fact she's accused of that?
```

1            ANDREW KOTWIS:  I accept that as a

2    necessary means to the end of the trial.

3            ATTY. BECKER:  And you will give her her

4    presumption of innocence?  Obviously as she sits here today

5    you don't know anything about this case other than the little

6    things you've read.

7            ANDREW KOTWIS:  Right.

8            ATTY. BECKER:  You won't come in here and

9    say, "Boy, Mr. Becker is asking me about the death penalty,

10   he's asking me about any pretrial publicity.  She's got to be

11   guilty of something?"

12           ANDREW KOTWIS:  Uh-huh.

13           ATTY. BECKER:  You don't think that, do

14   you?

15           ANDREW KOTWIS:  No.  I understand that you

16   people have to, meaning you people, lawyers and the courts,

17   have to make sure that the jurors are thinking correctly,

18   that they're open minded, that, you know, everything has to

19   -- you can't have opinionated people involved with a decision

20   of this nature.

21           ATTY. BECKER:  Absolutely, and you're

22   absolutely right on.  Now, this is sort of the flip side of

23   that coin on the presumption of innocence.

1              ANDREW KOTWIS:  Uh-huh.

2              ATTY. BECKER:  Mr. Bailey and I, because

3    it's always our burden, it's always the State's burden to

4    prove to you these things beyond a reasonable doubt, we may

5    present to you 35 witnesses, we may present to you 5,000

6    documents, we may be here for two months, but if we don't

7    prove our case in your mind beyond a reasonable doubt.  She

8    doesn't have to do anything, you understand that?  Her and

9    her attorneys could not utter one word throughout this entire

10   trial.  They could do the crossword puzzle.  They could do

11   the jumble.  They could read horoscopes over there all day.

12   And they may stand up at the end of this trial and at the end

13   of presenting 5,000 exhibits and 35 witnesses and say,

14   "Ladies and gentlemen of the jury, you have a lot of exhibits

15   in front of you, this courtroom is packed with exhibits.

16   You've heard witness after witness come in here.  They didn't

17   prove the case and they didn't prove it beyond a reasonable

18   doubt."  You understand that concept?

19             ANDREW KOTWIS:  Sure.

20             ATTY. BECKER:  And you understand that

21   both in the first phase, the guilt phase, as well as the

22   second phase, which is the phase where you will determine if

23   the ultimate penalty should be given to her, they don't have

1   to prove anything.

2                   ANDREW KOTWIS:  Uh-huh.

3                   ATTY. BECKER:  You're not going to make

4   them prove to you that she's not guilty, are you?

5                   ANDREW KOTWIS:  I -- they're obviously

6   going to try to disprove or present a case in contrast to

7   what your case is.

8                   ATTY. BECKER:  They don't have to.

9                   ANDREW KOTWIS:  All right.

10                  ATTY. BECKER:  You understand that

11  concept?

12                  ANDREW KOTWIS:  Uh-huh.

13                  ATTY. BECKER:  You're not going to make

14  them prove that, are you, or disprove that, are you?

15                  ANDREW KOTWIS:  No.

16                  ATTY. BECKER:  Okay.

17                  ANDREW KOTWIS:  But that's their right to

18  do such if they choose to.

19                  ATTY. BECKER:  Let me give you, let me

20  give you an example, and I'm going to give you an example

21  that the Court mentioned and I think Mr. Juhasz has mentioned

22  a couple times.

23                  ANDREW KOTWIS:  Uh-huh.

 1                    ATTY. BECKER:  In Ohio a person can be

 2    eligible for the death penalty if they kill the president of

 3    the United States.  Now, a few weeks ago I think George W.

 4    Bush was in Canton, Ohio speaking.  I think he might have

 5    been in Cleveland, too.

 6                    ANDREW KOTWIS:  Uh-huh.

 7                    ATTY. BECKER:  Let's assume he also

 8    stopped into Warren and the defendant in this case is charged

 9    with killing George W. Bush when he was in town.  And we

10    prove that he got a gun.  Mr. Bailey and I present to you a

11    guy who worked at a gun shop and a week, two weeks before

12    Bush came to town this guy came in and he wanted the highest

13    powered rifle with the best scope on it and he wanted to know

14    if the bullet, if a single bullet could kill somebody from

15    this.  And the guy said oh, yeah, you can kill deer, you

16    know, anything.  So he gets, let's say it's a .3006, whatever

17    it is.  He gets some big rifle.

18                    ANDREW KOTWIS:  All right.

19                    ATTY. BECKER:  And he gets a big scope on

20    it, the best scope, and then he goes to Canton and he goes to

21    one of the big -- or, I'm sorry, down to Warren here and he

22    goes to one of the buildings downtown where the president is

23    going to speak here at the gazebo outside the courthouse and

1   he asks the guys, "Hey, can I go up on your roof?  I'd like

2   to take some pictures of the courthouse?"  And the guy says,

3   "Yeah, sure.  Here's a key, here's a key to the roof.  You

4   can go up there anytime you want and take pictures of the

5   courthouse," and the guys says thank you.

6           And we present the guy who he bought the gun from,

7   the guy who gave him the key up to the roof so he could take

8   pictures of the courthouse square ostensibly.  We present

9   pictures -- or we present testimony from the guy who got the

10  bullet, he bought the bullets from out at Walmart, and we

11  present testimony from witnesses who say they saw a guy up

12  there right before the president was killed shooting and he

13  had a gun.  We present a ballistics expert from the State of

14  Ohio crime lab that says the bullet recovered from the body

15  of the president matches the rifling characteristics of the

16  gun that this guy used, and we present all of that to you.

17  Now, you would find that he was guilty of aggravated murder,

18  but the special circumstance that makes it a death penalty is

19  that it was the president that he killed.

20          Now, Mr. Bailey and I forget to present to you the

21  fact that it was the president.  We don't -- you know the

22  president is George W. Bush, but we don't present one witness

23  who comes in.  We don't present some congressman who works

1  with him and says, "Yes, I worked with this man and I went to

2  the morgue out at Trumbull Memorial and I looked at it and

3  unfortunately that was our president, George W. Bush, that I

4  saw in the morgue." We don't present to you any certificate

5  from the Federal Election Commission saying that George W.

6  Bush is certified, that he is president and duly elected on

7  whatever date they finally decided all that nonsense between

8  Bush and Gore about who was president. We failed to do that

9  to you.

10        They stand up and say ladies and gentlemen, they've

11  proved their case that the president was killed, or that a

12  man was killed, but they didn't prove the aggravating

13  circumstance that it was the president. They didn't present

14  to you one witness, one piece of evidence. They didn't ask

15  any of our witnesses anything. You have to find him -- well,

16  you have to find him guilty of the aggravated murder but we

17  can't go on to the second phase because we didn't prove to

18  you it was the president, right, even though you know it's

19  the president? Is that a clear enough concept for you?

20                    ANDREW KOTWIS: There's a lot involved in

21  that presentation.

22                    ATTY. BECKER: Well, I understand there's

23  a lot involved in that and there's going to be a lot involved

 1    in this case.

 2                        ANDREW KOTWIS:  Yeah.

 3                        ATTY. BECKER:  But you understand how they

 4    didn't have to prove anything?

 5                        ANDREW KOTWIS:  Right.

 6                        ATTY. BECKER:  They win on the death

 7    penalty issue because we don't even get that far because we

 8    haven't proved that it was the president, right?

 9                        ANDREW KOTWIS:  Uh-huh.

10                        ATTY. BECKER:  And they didn't present one

11    witness, one testimony.  You understand it's always our

12    burden to prove?

13                        ANDREW KOTWIS:  Your burden that you get,

14    yeah.

15                        ATTY. BECKER:  Let me give you a little

16    bit simpler example.  I'm going to give you a little bit

17    easier example.  Let's say today at noon when we're all going

18    out to lunch there's an accident at High Street and Park

19    Avenue right here.

20                        ANDREW KOTWIS:  Uh-huh.

21                        ATTY. BECKER:  And you agree with me that

22    the State could probably prove its case with one witness if

23    the charge is this guy went through a stop sign or the

1    traffic light?

2                    ANDREW KOTWIS:  Right.

3                    ATTY. BECKER:  Let's say we've got

4    Monsignor whomever from here and he's walking around the

5    courthouse square.  He says, "Every day at noon I walk around

6    the six block radius of courthouse square and this particular

7    day I was at the corner of High and Park Avenue and it was a

8    beautiful day.  And I am very careful when I walk around in

9    downtown Warren because there's a lot of crazy people.

10   Sometimes people are mad when they leave the courthouse or

11   they run into the post office and they don't pay attention to

12   the lights."

13                   ANDREW KOTWIS:  Uh-huh.

14                   ATTY. BECKER:  "Well, as I was standing

15   there I saw a guy barreling through Park Avenue.  He goes

16   through the Market Street intersection, it was a red light,

17   and he comes through to High Street, and it's a red light

18   too, and he just crashed into this other car.  And I'm very

19   careful.  I know that even though I had the green light and I

20   saw the walk sign, I don't step out until I look both ways

21   because I'm familiar with these bad drivers in Warren."

22                   ANDREW KOTWIS:  Absolutely.

23                   ATTY. BECKER:  "And just before I started

 1    to step out I saw the walk sign, I saw the green light on

 2    High Street so I had the right-of-way, but I don't step out.

 3    I look down and that's when I saw this guy. He's coming down

 4    in a Chevy Cavalier and he just plowed into this poor guy who

 5    was coming up High Street from the east side of Warren to the

 6    west side and he just got blasted into." This guy says,

 7    "I've got 20/20 vision. I don't know either one of the

 8    parties. I don't know the defendant who went through the red

 9    light, I don't know the victim who was hit. I don't have any

10    personal gain in this." Probably that witness would be good

11    enough to prove the case, right?

12                   ANDREW KOTWIS:   I would think.

13                   ATTY. BECKER:   Okay. And now let's assume

14    here's the other, the flip side of that scenario. Let's

15    assume it's 12:00 midnight and there's a bar down the street,

16    there's an Irish bar called Madigan's. Let's say three guys

17    are drinking in Madigan's. They've been there since 3:00 or

18    4:00 in the afternoon, blasted out of their mind. They just

19    got in a fist fight and they got thrown out of there.

20         Two of them wear glasses and one of them had

21    contacts. The guy who wears contacts got his contacts

22    knocked out, couldn't find them before he got thrown out.

23    The other two guys had the lenses broken out in the fist

 1   fight, they don't have their glasses.  They've each had at

 2   least 18 beers.  And they come down the sidewalk and they

 3   say, "Yeah, we saw this.  We saw the bar owner, the bouncer

 4   that threw us out, come through this intersection and he's

 5   going 40 miles an hour, blew through the red light and, lo

 6   and behold, he hit our friend who was coming down to pick us

 7   up at Madigan's."  You're going to have some trouble with

 8   those witnesses, right?

 9                        ANDREW KOTWIS:  Yes.  They would be

10   questionable.

11                        ATTY. BECKER:  And that's despite the fact

12   that Mr. Juhasz and Mr. Ingram presented anything to you,

13   right?  They don't even have to present any evidence to you.

14                        ANDREW KOTWIS:  Right.

15                        ATTY. BECKER:  We might not win our case

16   even though we had three witnesses in that instance, right?

17                        ANDREW KOTWIS:  Uh-huh.

18                        ATTY. BECKER:  So we're clear on this

19   concept, the presumption of innocence means they don't have

20   to do anything.

21                        ANDREW KOTWIS:  Right.

22                        ATTY. BECKER:  We may be so incompetent

23   over here and our witnesses may be so bad and our evidence

1    may be so weak that they don't have to present anything to

2    you, right?

3                        ANDREW KOTWIS:  That's correct.

4                        ATTY. BECKER:  Okay.  Now do you --

5                        ANDREW KOTWIS:  Now I understand what

6    you're saying, yeah.

7                        ATTY. BECKER:  Okay.  You have a little

8    bit better understanding.  And you will give her that

9    presumption of innocence, you will weigh our evidence and our

10   evidence only?  This is a trial that Mr. Bailey and I, we

11   have to win.  She doesn't have to win it.

12                       ANDREW KOTWIS:  Right.

13                       ATTY. BECKER:  We have to win it.  We have

14   to prove it.  The burden is on us.

15                       ANDREW KOTWIS:  Uh-huh.

16                       ATTY. BECKER:  Okay.  You a little bit

17   clearer on that concept?

18                       ANDREW KOTWIS:  Yes.

19                       ATTY. BECKER:  And you're not going to

20   make them prove anything to you?

21                       ANDREW KOTWIS:  I can't see -- I assume

22   right now that she's as innocent as any person out there.

23                       ATTY. BECKER:  Now I'm going to go back

1   and ask you that previous question. If we give you 35

2   witnesses and 5,000 documents, that still may not be enough

3   for you to find her guilty, right?

4                     ANDREW KOTWIS: Right. That depends upon

5   what the content of the witnesses and the presentation of

6   your case would be.

7                     ATTY. BECKER: Absolutely. And you're not

8   going to make her present anything to you in either phase?

9                     ANDREW KOTWIS: I wouldn't. I wouldn't

10   hold that for her one way or the other. If that's her choice

11   not to present a case of defense, that would be her choice.

12                     ATTY. BECKER: And that's what our law

13   requires, right?

14                     ANDREW KOTWIS: That's it.

15                     ATTY. BECKER: Okay. Because our system,

16   you would agree, is based on a concept that -- I was

17   listening to the radio this morning and this is the only

18   reason this story comes up. I guess it's been 50 some years

19   since Joseph McCarthy started the McCarthy investigations and

20   the red scare and all that. Our system of government doesn't

21   require the defendants to prove anything, it requires the

22   government to prove everything, correct?

23                     ANDREW KOTWIS: Uh-huh.

1              ATTY. BECKER:  We don't live in Iraq or

2    Korea or some of these other countries where they -- North

3    Korea or Iraq or Iran where they make -- you know, if you're

4    the person seated over there you'd want those same rights,

5    correct?

6              ANDREW KOTWIS:  Uh-huh.

7              ATTY. BECKER:  You would want us to prove

8    that you're guilty?

9              ANDREW KOTWIS:  That's right.

10             ATTY. BECKER:  And just because there's an

11   accusation you wouldn't say, "Well, hey, I want to hear what

12   this guy has to say," because you understand under our

13   criminal justice system she doesn't have to tell you

14   anything?  That's her fifth amendment privilege.

15             ANDREW KOTWIS:  Uh-huh.

16             ATTY. BECKER:  She doesn't have to say

17   anything or do anything and her attorneys don't have to ask

18   one question in this case.  Even though you may want to hear

19   the other side, you may never hear it, right?

20             ANDREW KOTWIS:  Yes.

21             ATTY. BECKER:  Okay.  And you won't hold

22   that against her?

23             ANDREW KOTWIS:  I can't say that I would,

1    no.

2                  ATTY. BECKER:  Okay.  Now, on the flip

3    side of the presumption of innocence is the concept of

4    reasonable doubt.  And I had a law professor who once told us

5    that reasonable doubt is sort of like a glass of water.

6    Mr. Bailey and I have to prove these things, we have to prove

7    her guilt and we have to prove, if we get to that second

8    phase, whether the death penalty is appropriate by proof

9    beyond a reasonable doubt.  And that line is probably

10   somewhere maybe where this lip of this cup is here, maybe

11   where this bounds out.  It might be a little bit lower, for

12   some people it might be a little bit higher, but it is not

13   filled to the top of this cup because that is all doubt, that

14   is beyond all doubt.  And, quite frankly, myself and I don't

15   believe Mr. Bailey could prove anything to you beyond all

16   doubt.

17         I'm standing here with a wedding ring.  I've got

18   pictures of my wife and kids in my wallet.  I could probably

19   show you those.  My wife could probably walk in here with my

20   kids, they might say, "Hi, daddy."  That's probably proof

21   beyond a reasonable doubt that I'm married, correct?  But

22   even if I presented you marriage certificates and a wedding

23   photo album and showed you bills in the house, you know, the

1   house is owned by two people, and maybe both of our driver's

2   license, there's still some possible doubt that and imaginary

3   doubt that maybe those things are made up.

4              Maybe he forged them.  Maybe he's got one of these

5   fancy laser computers and printed out a fancy looking

6   document.  Maybe they just got together at a big party and

7   she put on a dress that looks like a wedding dress and acted

8   like they got married and maybe they're not even really

9   married.  That's imaginary doubt.  That's kind of silly,

10  though, isn't it?  And that's why you can't hold us to

11  filling this cup up to the very top.  You can hold us to

12  pretty high up there, but you can't hold us to the top,

13  right?

14                       ANDREW KOTWIS:  Not without the person

15  admitting to the crime.  Then you would know without doubt

16  that that was really what had happened.

17                       ATTY. BECKER:  Well, even sometimes --

18  well, I'm assuming you've heard of people who have given

19  confessions and later on it was found out that the confession

20  was beat out of them or, you know, maybe they were

21  threatened.  I mean, that's happened in other countries,

22  right?

23                       ANDREW KOTWIS:  Uh-huh.

1      ATTY. BECKER:  And, in fact, I think even

2  in our own country there's been some allegations by some

3  police, maybe the Chicago Police Department I think comes to

4  mind, that they actually told some of these people -- they

5  held them for many, many hours and, prior to our Miranda

6  warnings, they didn't tell people they could have an

7  attorney.

8      ANDREW KOTWIS:  Yeah.  You go through

9  life, you make a lot of decisions based upon circumstances

10  that you judge to be correct.

11      ATTY. BECKER:  Exactly.

12      ANDREW KOTWIS:  And, you know, in my life

13  I know I've made a lot of decisions that I feel that I'm

14  pretty certain is accurate.  Some are right, some are wrong,

15  but hopefully we're going to make the right decision more

16  times than we're going to make the wrong decision.

17      ATTY. BECKER:  Absolutely.

18      ANDREW KOTWIS:  So what circumstances that

19  are presented or how you evaluate a situation, you know,

20  based upon your experience, which is what it's going to come

21  down to, based upon your experience you'll know how high up

22  that cup is going to be full or not.

23      ATTY. BECKER:  Absolutely.  Absolutely.

1   And one of the important decisions I'm assuming you've made

2   in your life is you probably bought a house.

3                   ANDREW KOTWIS:  Bought several houses.

4                   ATTY. BECKER:  Bought several houses.

5   Okay.  And when you make a house or when you make -- the time

6   comes for you to buy a house you probably sit down and you

7   make a list of things that you need in the house.  You might

8   need three or four bedrooms, you might need two and a half

9   baths, you might need a good neighborhood for kids and a good

10  school district, you might need close to work, and you have

11  to be able, of course, to afford it, right?

12                  ANDREW KOTWIS:  I raised four children and

13  they brought circumstances to me that I had to evaluate were

14  they right or wrong and, you know, you make a judgment based

15  upon what facts you have available at the time.

16                  ATTY. BECKER:  Sure.  Now, when you bought

17  your house, and you have a house here in Warren, right, on

18  Perkinswood?

19                  ANDREW KOTWIS:  (Nods head affirmatively.)

20                  ATTY. BECKER:  All right.  When you made

21  that evaluation to buy that house you probably went through

22  and said, well, these are the things that my wife and I need.

23  We've got these four kids, we're going to need some bedrooms.

1    We're probably going to need at least two baths.  The schools

2    are good.  We need to make sure they go to good schools.  But

3    you didn't put in that list boy, I wonder if it's on a fault

4    line?  Boy, we might have an earthquake here.  I don't know

5    if I want to buy this house on Perkinswood, there could be an

6    earthquake there.

7           I mean, it's possible that we could have an

8    earthquake in Warren.  It's possible to have an earthquake

9    anywhere, but it's pretty remote.

10                    ANDREW KOTWIS:  Uh-huh.

11                    ATTY. BECKER:  As opposed to moving to

12   San Francisco and buying a house, you know, a mile and a half

13   from the San Andreas fault line.

14                    ANDREW KOTWIS:  Right.

15                    ATTY. BECKER:  That's not going to be a

16   consideration in Warren and that's an imaginary -- or, it's

17   not imaginary but it's a possible doubt, but you didn't

18   really consider that when you bought your house, did you?

19                    ANDREW KOTWIS:  No.

20                    ATTY. BECKER:  And where we used to live

21   at down in Steubenville and Bellaire, I know a lot of times

22   one of the considerations is mine subsidences and sometimes

23   you worry about maybe a house being built --

1          ANDREW KOTWIS:  Floods were always --

2          ATTY. BECKER:  Floods, flooding you might

3   worry about if it's down in one of those hollows and it goes

4   down to the Ohio River.  And you may want to say, "Hey, boy,

5   I remember whatever it was, 1990, when Shadyside flooded and

6   all those poor people.  I don't really want to buy a house

7   down in this little hollow here because that's where this

8   Shadyside flooding happened and all these people got killed,

9   you know, 10, 12 years ago."

10          ANDREW KOTWIS:  Right.

11          ATTY. BECKER:  But you don't consider that

12   when you buy a house on Perkinswood.  That's an imaginary

13   doubt.  I mean, I guess, I guess we could have a flood here

14   in Warren.  I don't know if the Mahoning River has ever

15   flooded that far.

16          ANDREW KOTWIS:  No.

17          ATTY. BECKER:  But that's all doubt, and

18   you're not going to hold -- you didn't make that

19   determination when you bought your house, right?

20          ANDREW KOTWIS:  No.  Well, I did now

21   because I bought a house on Butler and it flooded.

22          ATTY. BECKER:  Well, there you go.

23          ANDREW KOTWIS:  You know, you wouldn't

1    have expected Butler to give you any floods, but anyway.

2                    ATTY. BECKER:  You know what I'm talking

3    about.

4                    ANDREW KOTWIS:  Uh-huh.

5                    ATTY. BECKER:  Okay.  Now, one of the

6    things that you're going to find out about this case -- well,

7    I guess my question is at the end to fill that up, you won't

8    hold Mr. Bailey and I in either phase to filling that up

9    beyond all doubt?  You'll be able to, if we prove our case,

10   you'll be able to sign a verdict of guilty beyond a

11   reasonable doubt, not all doubt?  You may think, well, boy,

12   martians could have came down and committed these crimes.  I

13   mean, that's possible I guess.  Or maybe the death penalty

14   might not be appropriate one way or the other, but you'll

15   evaluate that on a reasonable doubt standard, not on an all

16   doubt standard, correct?

17                   ANDREW KOTWIS:  I think so.

18                   ATTY. BECKER:  Okay.  Now, one of the

19   things that this case is going to involve in, as all homicide

20   cases do, because it is obviously a very, very serious case,

21   there's already one individual dead, you will see photographs

22   of him deceased.  You will see and hear testimony from the

23   very seat that you are at from members of the county

1    coroner's office who will testify as to the manner and the

2    cause of death.  That may invoke some sympathy on the part of

3    some jurors.  You will not consider sympathy, as difficult as

4    it may be, you'll be able to separate out sympathy in making

5    this case, determining this case, correct?

6                ANDREW KOTWIS:  Yes.  This is going to be

7    part of the evaluation process of what you're presenting.

8    And sympathy is certainly, it's a human feeling.

9                ATTY. BECKER:  Exactly.

10             ANDREW KOTWIS:  I'm not going to say there

11    won't be any sympathy because, you know, there's as much

12    feeling for a victim that you don't know as there is -- there

13    certainly wouldn't be as much as if it was a relative of

14    yours, but, you know, you're not that hard hearted that you

15    wouldn't look at this and say that's too bad or, you know,

16    it's unfortunate.  Certainly there's going to be an amount of

17    sympathy involved.

18             ATTY. BECKER:  And I guess my question to

19    you then is, to follow that up, is the fact that you may see

20    some of this and hear this and hear the manner of death --

21    let's say Mr. Bailey and I completely blow this thing and we

22    just don't have the evidence maybe.

23             ANDREW KOTWIS:  Right.

1          ATTY. BECKER:  And we present this thing.

2     You're not going to sit there and say, "Boy, that wasn't much

3     of a case.  They really didn't prove anything.  I don't even

4     know why they charged her, but I really feel bad because this

5     guy Fingerhut, Robert Fingerhut is dead.  He got shot in the

6     head.  And they didn't really prove their case, but you know

7     what?  I feel sorry for that guy and his family and his loved

8     ones and the fact that he lost his life.  I'm going to find

9     her guilty anyway."  You wouldn't do that, would you?

10          ANDREW KOTWIS:  Well, I don't know.  I

11     really don't know.  I don't know how I would react in that

12     case, you know, if you presented a poor case.

13          ATTY. BECKER:  Well, maybe it -- you

14     haven't heard the evidence yet.

15          ANDREW KOTWIS:  I can't presuppose that,

16     right.  I don't know how I'd react.

17          ATTY. BECKER:  But it's theoretical that

18     this case --

19          ANDREW KOTWIS:  I have enough respect as

20     professionals that you are going to do a certain amount of

21     background and make an honest presentation.

22          ATTY. BECKER:  Absolutely.  And that

23     honest presentation, it still may not get to proof beyond a

1    reasonable doubt, right?  And I'm just speaking

2    hypothetically here.

3                    ANDREW KOTWIS:  You know, I'd have to see.

4    I don't -- I can't say yes or no.  You know, like you say,

5    how much of that glass?  You couldn't tell me, your law

6    professor, whether it was up to the lip or all the way

7    further than that.

8                    ATTY. BECKER:  Right.

9                    ANDREW KOTWIS:  So I can't.  I would say

10   probably not, you know.  I can be fair minded in my

11   evaluation of whether or not you've done a good presentation

12   of the case to justify a guilty verdict on anyone.

13                   ATTY. BECKER:  Okay.  And that's what

14   we're asking you basically.

15                   ANDREW KOTWIS:  Yeah.

16                   ATTY. BECKER:  And you seem to be open to

17   that.  The fact and this case involves two counts of

18   aggravated murder even though there's only one death, and

19   that's really just two different theories that the State has,

20   and the Court will tell you you can find the defendant guilty

21   of none of the counts, both -- or, I'm sorry, that's, you

22   know, two, three or four because there's actually four.

23   There's aggravated burglary, aggravated robbery and then two

1     aggravated murders.  One is that it was planned, it was

2     premeditated, prior calculation and design.  The other count

3     is that it was committed during the course of a burglary or

4     robbery.

5                 ANDREW KOTWIS:  Uh-huh.

6                 ATTY. BECKER:  You can convict her of both

7     if we prove the case beyond a reasonable doubt.  You can

8     convict her of one if we prove one or the other by proof

9     beyond a reasonable doubt.  You may acquit her and find her

10     not guilty on both if we don't prove our case beyond a

11     reasonable doubt.

12                 ANDREW KOTWIS:  All right.

13                 ATTY. BECKER:  You don't hold the fact

14     that she's going to be charged or that she is charged with

15     two aggravated murder counts as meaning that we don't know

16     what we're doing over here?  You understand it's just two

17     different theories?

18                 ANDREW KOTWIS:  Pardon me?  The question

19     is that if she is charged and -- go over that question again.

20                 ATTY. BECKER:  There's two aggravated

21     murder counts, two different tracks that are going to lead us

22     to the same point, two different trails that are going to

23     lead us to the same point hopefully.  The fact that she's

1    charged with two different theories of the case, you don't

2    hold that against the State or against her even though

3    there's only one person dead?

4                          ANDREW KOTWIS:  So you're going to, you're

5    saying if you came at it from two different directions?

6                          ATTY. BECKER:  Right.

7                          ANDREW KOTWIS:  And you're going after an

8    aggravated murder?

9                          ATTY. BECKER:  They're both aggravated

10   murder.

11                         ANDREW KOTWIS:  And one with burglary?

12                         ATTY. BECKER:  One alleges that it's

13   aggravated burglary, that the death was caused during an

14   aggravated burglary or an aggravated robbery.  The other

15   aggravated murder charges that it was planned or premeditated

16   or with prior calculation and design.  There's two separate

17   ways.

18                         ANDREW KOTWIS:  Yeah.

19                         ATTY. BECKER:  Because you understand you

20   could come in --

21                         ANDREW KOTWIS:  I think what you're doing

22   there is throwing some feathers in the wind, aren't you, and

23   hoping one of them comes down?

1          ATTY. BECKER:  That's what I'm asking you.

2    Do you think that's what we're doing?  Because -- and let me

3    go back and give you an example.  Let's go back in my example

4    where we were talking about me walking down the street and I

5    see this guy and I don't like him.  Let's say, let's say he

6    is my boss, let's say it's Dennis Watkins and I just don't

7    like him.  He won't give me a pay raise.  I want the corner

8    office; he won't give me the corner office.  I want him to

9    give me a good parking spot; I'm tired of walking from where

10   I have to park.  And you know what?  I asked him for this and

11   he wouldn't give it to me last week so I'm going to get a gun

12   and I'm going to shoot him.  And not only am I going to shoot

13   him, but after I shoot him I'm going to take his wallet

14   because I know he always carries a big wad of money, and I'm

15   going to take his money, too.

16          ANDREW KOTWIS:  Uh-huh.

17          ATTY. BECKER:  It's a premeditated murder,

18   right, with prior calculation and design?  But it's also

19   going to be a robbery, it's going to be an aggravated

20   robbery.  It's going to be both, right?

21          ANDREW KOTWIS:  Uh-huh.

22          ATTY. BECKER:  So crimes can be both,

23   right?  It's not that we're throwing feathers in the wind.

 1                      ANDREW KOTWIS:  Under those circumstances,

 2     yeah, I could understand.  What I was trying to avoid was for

 3     you to present a case and then asking the jury to make a

 4     determination which one, whether it's with burglary, which --

 5     what was the --

 6                      ATTY. BECKER:  With burglary or robbery?

 7                      ANDREW KOTWIS:  With burglary or robbery

 8     or premeditated without burglary and robbery.

 9                      ATTY. BECKER:  Well, that's what we're

10     doing.  We're asking you, we're going to ask you and your

11     fellow jurors to make that determination, and it might be

12     both.  It could be both just like in the scenario I gave you,

13     right?  It could be a planned homicide and it also could be a

14     planned homicide during the course of which the person may

15     have burglarized or robbed someone as well, correct?

16                      ANDREW KOTWIS:  If you had a planned

17     homicide and burglary occurred, I guess I don't understand

18     why you wouldn't -- why there would be a distinction between

19     the two.

20                      ATTY. BECKER:  Well, that's the way the

21     law is written.

22                      ANDREW KOTWIS:  Well, if the law -- I got

23     to think about that one a little bit.  But what you would be

1    asking the jury, you're going to make a presentation and then

2    you're going to ask the jury to make a separation between or

3    include both?

4                    ATTY. BECKER:  They're already separated.

5    You can convict on both or you could convict on one or you

6    could convict on none.  That's what the Court is going to

7    tell you.

8                    ANDREW KOTWIS:  Well, if the Court tells

9    you that that's the direction then.

10                    ATTY. BECKER:  There's nothing wrong with

11    that?

12                    ANDREW KOTWIS:  Yeah.

13                    ATTY. BECKER:  You don't think we're just

14    throwing darts at the board saying boy, we know something has

15    happened, let's just see what sticks?

16                    ANDREW KOTWIS:  Right.

17                    ATTY. BECKER:  You don't think that's what

18    we're doing, do you?

19                    ANDREW KOTWIS:  Well, what I was trying to

20    make sure is that, you know, you weren't leaving the jury in

21    a situation where they would draw conclusions that you didn't

22    present evidence for or that the Court didn't support.

23                    ATTY. BECKER:  Oh, no, we won't do that.

1    We will not do that to you.  We will not ask you to present

2    -- for instance, we're not going to ask you to find, for

3    instance, a rape charge.  We're not going to throw a rape

4    charge in because there's no allegation.  We're not even

5    alleging that.  Yeah, the law, the Court and the law permits

6    us to follow two different theories on a case --

7                    ANDREW KOTWIS:  Okay.

8                    ATTY. BECKER:  -- even though there's one

9    death.

10                   ANDREW KOTWIS:  All right.

11                   ATTY. BECKER:  You're okay with that?

12                   ANDREW KOTWIS:  Yes.

13                   ATTY. BECKER:  All right.  Now I'm going

14   to be very up front with you, Mr. Bailey and I are going to

15   be up front with you right now.  Ms. Roberts is not alleged

16   to be the shooter.  She is not alleged to have actually done

17   this, the actual shooting.  She's alleged to be what we call

18   a helper or the term aider and abettor.  I don't know if

19   you've heard of that term before, but aider and abettor,

20   she's a helper.  And the Court will explain that for you, but

21   that's the allegation.  Do you think that that's going to, if

22   we get to that second phase, do you think that's going to

23   cause you to be a little more less likely to impose the death

 1    penalty or, again, if we prove our case, even though she is

 2    an aider and abettor and a helper, would you be more inclined

 3    one way or the other?  Or are you going to say, "Well, hey,

 4    listen, she's not the one who killed this person.

 5    Mr. Becker and Mr. Bailey told me that.  She didn't even pull

 6    the trigger.  She's only a helper.  I can't give her the

 7    death penalty"?

 8                    ANDREW KOTWIS:  I would have to see some

 9    of the, the amount of involvement, you know, what really

10    transpired.  You're drawing the conclusion that it actually

11    happened that way, or you're presenting it that it actually

12    happened that she did not shoot it.

13                    ATTY. BECKER:  Well, I'm going to tell you

14    there's a dead guy.  You're definitely going to find out

15    there's a dead guy.  Our allegation is that she helped

16    somebody else do it.

17                    ANDREW KOTWIS:  Right.

18                    ATTY. BECKER:  And that's the person that

19    you said when you followed the questionnaire, that Nate

20    Jackson.

21                    ANDREW KOTWIS:  Yeah.

22                    ATTY. BECKER:  We're alleging that she --

23                    ANDREW KOTWIS:  And to what depth was it?

1                    ATTY. BECKER:  And it all depends on the

2    quality of the evidence.

3                    ANDREW KOTWIS:  Did she actually -- to

4    what extent did she go that she enabled that person --

5                    ATTY. BECKER:  Absolutely.  You're

6    absolutely right on.

7                    ANDREW KOTWIS:  -- to get killed?  I don't

8    know.

9                    ATTY. BECKER:  Absolutely.  That's exactly

10   what we're doing.

11                   ANDREW KOTWIS:  I can't say yes or no.

12                   ATTY. BECKER:  Because you haven't heard

13   the evidence.

14                   ANDREW KOTWIS:  No.

15                   ATTY. BECKER:  But if the evidence was

16   strong enough and if it was to that point of beyond a

17   reasonable doubt in that second phase, even though she's not

18   the shooter, if we presented a case to you you could find her

19   eligible for the death penalty, correct?

20                   ANDREW KOTWIS:  Say that again.  It's a

21   presumption.

22                   ATTY. INGRAM:  Or, excuse me.  You said in

23   the second phase and you're asking him to decide guilt or

1    innocence in the first phase.

2                        ATTY. BECKER:  I'm sorry.  That was a bad

3    question.  Let's assume you found her guilty of being an

4    aider and abettor in these two theories of murder, let's say

5    you found both of them.  Now we're in the second phase and

6    you're going to determine --

7                        ANDREW KOTWIS:  If the situation presented

8    itself that her involvement was such that she was closely

9    aligned, very closely aligned to the death of the individual,

10   then I could consider the death penalty.

11                       ATTY. BECKER:  Then you could consider it.

12   You wouldn't give it automatic, though, but you'd consider

13   it?

14                       ANDREW KOTWIS:  No, I'd consider it.

15                       ATTY. BECKER:  And you would have to have

16   these bad things, the aggravating circumstances, outweigh

17   anything in your mind to get you to the point to sign that

18   death verdict, right?

19                       ANDREW KOTWIS:  Uh-huh.

20                       ATTY. BECKER:  Okay.  Now, all cases, just

21   about all cases, civil, criminal, involve some element of

22   circumstantial evidence, and I'm assuming you've heard of

23   circumstantial evidence.  One of the things that they involve

1    and one of the best examples I can give you about

2    circumstantial evidence is you watch the weather, I'm

3    assuming, on the news, correct?

4                    ANDREW KOTWIS:   (Nods head affirmatively.)

5                    ATTY. BECKER:   I don't know what news you

6    watch, but you've probably seen the weather on the

7    television.  And, for instance, you may go to bed at 10:30 or

8    11:30, whatever time it is, and before you go to bed you

9    watch the weather and they show all those green lines of

10   thunderstorms that maybe are coming down from Detroit all the

11   way down through Indianapolis and Cincinnati and down into

12   Kentucky and Tennessee.  And the guy says, "Okay, sometime

13   between 2:00 and 4:00 this morning we're going to get this

14   band of thunderstorms.  They're going to move through

15   tonight.  It's going to be a beautiful day tomorrow, and once

16   these thunderstorms get out of here tonight it will be a

17   great day tomorrow."  And you say, "Oh, that's great because

18   I've got some things outdoor planned tomorrow.  I'm going to

19   be able to do my thing outside tomorrow."

20        You go to bed and before you pull the blinds down in

21   your living room you look out and you see your car out in the

22   driveway and you make sure that the windows are all closed.

23   You say, "Boy, it's going to rain.  I better look out and

1    make sure those windows are up," and they're all up.  You go

2    to bed.

3             You're a sound sleeper.  You don't wake up, don't

4    hear anything, but you wake up the next morning and the

5    ground is wet, the car has got drops of water all over it.

6    The sidewalk is wet.  Your street in front of your house on

7    Perkinswood there is wet.  The water is running down and

8    trickling into the gutter.  You can see everything is wet out

9    there.  You didn't see it rain, did you?

10                      ANDREW KOTWIS:  Huh-uh.

11                      ATTY. BECKER:  But you can presume that it

12   rained, right?

13                      ANDREW KOTWIS:  That happened this

14   morning.

15                      ATTY. BECKER:  It probably did.  That

16   probably happens a lot this time of year.  Now, sometimes you

17   have to be careful with those inferences because let's say

18   you see the same weather forecast but instead of a solid

19   green line of thunderstorms moving down from Detroit and down

20   into Kentucky and Tennessee you see just blotches of them.

21   And the guy says, "Listen, we're going to have some pop-up

22   thunderstorms, maybe hit and miss.  Canfield may get some.

23   Poland may get some.  Howland may get nothing.  Cortland may

1   get a lot.  It's just all going to depend on the way the wind

2   blows."  So you look out again, you see your car.  Well, my

3   windows are up, my gardening tools are in.  I'm not leaving

4   my hoe out there or my rake or anything.  I brought those in.

5   I'm going to go to bed.

6           And you go to bed and you wake up the next morning

7   and you open up your bedroom window and you look out.  Your

8   bedroom happens to face your neighbor's driveway and you see

9   your neighbor's driveway is all wet, his car is wet, and you

10  look out the other window and your driveway is dry.  Then all

11  of a sudden you realize, you hear the neighbor with his hose

12  out there, he's washing his car.  So you sometimes have to be

13  careful and test those inferences, right?  But you'll be able

14  to make a determination based on some circumstantial evidence

15  in this case?  You'll be able to rely on some type of that

16  evidence, do you believe?

17          ANDREW KOTWIS:  See, here again, it's

18  some.  We have a very serious case and you're asking me to

19  make a statement regarding some.

20          ATTY. BECKER:  I understand.

21          ANDREW KOTWIS:  You know, I can't say yes

22  or no.  I really don't know.

23          ATTY. BECKER:  Well, let me ask you this.

1          ANDREW KOTWIS:  You know, on some I'm sure

2     that --

3          ATTY. BECKER:  Well, let's back up.  Let's

4     back pedal a little bit.  Let's go to this question.  If the

5     Court tells you, and the Court is going to tell you that

6     circumstantial evidence has the same weight as direct

7     evidence, that's okay with you, right, if the Court tells you

8     that?

9          ANDREW KOTWIS:  Yeah.

10          ATTY. BECKER:  All right.  And that's all

11     we want to drive at on that.  Now, I'm assuming over the

12     years you've heard of cases where there's been dumb

13     criminals, criminals who have done something dumb and got

14     caught.  Despite their best efforts, they may have planned

15     something, they may have tried to do something and, in fact,

16     they end up doing something stupid, correct?  Have you heard

17     of things like that --

18          ANDREW KOTWIS:  Yep.

19          ATTY. BECKER:  -- or not?  Okay.  And, in

20     fact, and there's nothing in today's paper about this case,

21     but, in fact, I believe just in today's paper there was a

22     story of a guy who did something stupid.  Is it in there?

23     Well, let's strike that.  Let me give you an example.

1          A guy and his partner are going to rob a bank.  They

2      figure out the best bank to rob and they say boy, this bank

3      on the northwest side of town will be the best because the

4      police station is on the southeast side of town.  And we know

5      the police change shifts every day at 4:00 p.m. and all the

6      officers that are on duty, they go back to the police station

7      so they can change and go home, and all the new officers,

8      they're there and they're palling around and having their cup

9      of coffee and they're talking to the guys that are coming off

10     duty, asking them what's going on in town.

11         And we also know that this dumb bank gets the Brinks

12     truck delivered to them every day at 3:00 o'clock on Thursday

13     because the next Friday, the next day, Friday, they have to

14     pay all this money out in paychecks, so there will be a lot

15     of money there because the Brinks will have been there at

16     3:00 o'clock.  All the police will be on the other side of

17     town.  We know where this bank is.  We know the best way to

18     get in and out of there.  We've checked this place out for

19     two weeks now.  We figured out all the traffic.  There's not

20     much traffic.  There's no construction going on.  This is

21     going to be a great bank job.

22         And the two guys the day before they do it, they go

23     to the local auto repair mechanic and say, "Hey, tune this

1    baby up.  Make sure it's running good.  Check all the wheels,

2    rotate the tires.  We want this car to run spectacularly."

3    Now, they don't tell the guy they're going to rob a bank, but

4    they want this car to run like a champ.

5            So they go there and the guy who is going to go in

6    with the gun and with the plastic bag and get all the money,

7    he buys a baseball cap.  It's a sunny day.  He pulls on his

8    sunglasses.  He's got a fake beard that looks real but it's a

9    fake beard.  He bought it at an actor's props place up in

10   Cleveland.  He goes into the place.  He's got his hat on, his

11   glasses, his fake beard, and he puts the note down and it

12   says "Give me all your money and don't put a dye pack in with

13   it or I'll shoot you."  And he shows the girl his gun and

14   he's got the gun there and he points to it.

15           She grabs all the money, and of course they've got

16   lots of money because the Brinks truck just came at 3:00

17   o'clock.  She hits the alarm but it's not going to do a darn

18   bit of good because all the police are on the other side of

19   town changing shifts.  This guy gets all the money, he bolts

20   out the door, and the police catch him because the note he

21   demanded the money on happened to be a letter that was

22   addressed to him.  And the police come and they see this note

23   and they say what's on the other side of this?  And it says,

1    "Oh, Dear John," you know, "How you doing?  It's good to talk
2    to you."
3              They go to his place and he and his buddy are there.
4    They got the glasses and the hat off in the living room.  The
5    money is all out, they're divvying it up.  They made great
6    lengths and gone to great plans to plan this thing, they kept
7    quiet amongst themselves, but they got caught, right?
8                        ANDREW KOTWIS:  Uh-huh.
9                        ATTY. BECKER:  It's sort of the best laid
10   plans go astray, right?
11                       ANDREW KOTWIS:  Right.
12                       ATTY. BECKER:  You've heard that saying?
13                       ANDREW KOTWIS:  Sure.
14                       ATTY. BECKER:  You've heard of cases,
15   maybe not like that but similar cases where, despite the
16   criminal's best intent, it didn't work out, right?
17                       ANDREW KOTWIS:  Uh-huh.
18                       ATTY. BECKER:  That doesn't surprise you?
19                       ANDREW KOTWIS:  It happens frequently.
20                       ATTY. BECKER:  Frequently.  All right.
21   Just to recap very briefly, you'll be able to determine this
22   case and give Ms. Roberts throughout both proceedings her
23   presumption of innocence which she's entitled to, correct?

1                     ANDREW KOTWIS:  Yes.

2                     ATTY. BECKER:  You will not make her prove

3     anything to you, correct?

4                     ANDREW KOTWIS:  Not -- I can't see if it's

5     up to you --

6                     ATTY. BECKER:  It's up to us, right.

7                     ANDREW KOTWIS:  -- to prove that she's

8     guilty.

9                     ATTY. BECKER:  And it's also up to us to

10    prove that the death penalty is warranted if we get that far.

11                    ANDREW KOTWIS:  Right.

12                    ATTY. BECKER:  You won't make her prove

13    that the death penalty is not warranted?  Again, that's

14    Mr. Bailey and I's job to prove that it is, correct?

15                    ANDREW KOTWIS:  That's correct.

16                    ATTY. BECKER:  You will hold us to the

17    reasonable doubt standard.  Wherever that is on that cup for

18    you, you won't make us fill this cup 100 percent to the very

19    top, will you?

20                    ANDREW KOTWIS:  I'll make that evaluation

21    based upon what you present.

22                    ATTY. BECKER:  Thank you.  And you will

23    decide this case without any sympathy, as hard as it may be,

1   for either side, either Ms. Roberts or for the deceased in

2   this case?

3                   ANDREW KOTWIS:  Some sympathy may.  I'm

4   not going to say no sympathy.  I'm sure --

5                   ATTY. BECKER:  But you will try your best

6   to keep sympathy out of this?

7                   ANDREW KOTWIS:  Absolutely.

8                   ATTY. BECKER:  Okay.  And if the facts

9   warrant it and the law allows it and we're able to prove her

10  guilt and her guilt with respect to the death penalty

11  specifications, if we prove beyond a reasonable doubt that

12  the death penalty is warranted, you can go back in that jury

13  room at some point in the next few weeks and sign a verdict

14  form calling for the death penalty, correct?

15                  ANDREW KOTWIS:  Yes.

16                  ATTY. BECKER:  Okay.  I want to thank you

17  very much for your time this morning.  It's been a real

18  pleasure speaking to you.  Mr. Juhasz and Mr. Ingram now, one

19  of the two of them are going to have some questions for you

20  from their standpoint, okay?

21                  ANDREW KOTWIS:  Very good.

22                  ATTY. BECKER:  All right.  Thank you, sir.

23                  **(SEE VOLUME XIX)**

1

2

3

4                    REPORTER'S CERTIFICATE

5

6        This is to certify the foregoing represents a true and

7   correct copy of the proceedings had in the aforementioned

8   cause as reflected by the stenotype notes taken by me on the

9   same.

10

11

12

13

14   _____
     Kelly J. Wilson
15   Official Court Reporter

16

17

18

19

20

21

22

23

1                    IN THE COURT OF COMMON PLEAS
                        TRUMBULL COUNTY, OHIO
2
      STATE OF OHIO,              )      Case No. 2001-CR-793
3                                 )
             Plaintiff            )
4                                 )
      -vs-                        )      JUDGE JOHN M. STUARD
5                                 )
      DONNA M. ROBERTS,           )
6                                 )            **PARTIAL**
             Defendant            )   **TRANSCRIPT OF PROCEEDINGS**
7

8                          *VOLUME XIX*

9
                        **JURY TRIAL - VOIR DIRE**
10                            **MAY 6, 2003**

11

12    BEFORE:        HONORABLE JOHN M. STUARD

13    AT:            Trumbull Co. Court of Common Pleas
                     Courtroom Number 2
14                   160 High Street, NW
                     Warren, Ohio 44481
15

16    APPEARANCES:

17    On behalf of the Plaintiff:
           MESSRS. KENNETH N. BAILEY
18         and CHRISTOPHER D. BECKER,
           Attorneys at Law
19

20    On behalf of the Defendant:
           MESSRS. J. GERALD INGRAM
21         and JOHN B. JUHASZ,
           Attorneys at Law
22

23
      Official Court Reporter:  Kelly J. Wilson

136

1

*INDEX FOR VOLUME XIX*

2

MAY 6, 2003 Cont'd

3

4

*INDIVIDUAL VOIR DIRE*

5

PROSPECTIVE JUROR ANDREW KOTWIS CONTINUED.......... 4084:2

6

PROSPECTIVE JUROR SHELLEY A. MYERS................. 4142:22

7

PROSPECTIVE JUROR MICHELENE MARUCA................. 4223:8

8

9

*OBJECTIONS*

10

ATTY. JUHASZ:  Your Honor, we object................ 4141:9

11

12

13

14

15

16

17

18

19

20

21

22

23

1    (MAY 6, 2003 CONT'D)

2              **PROSPECTIVE JUROR ANDREW KOTWIS CONTINUED**

3                        ATTY. INGRAM:  Thanks, Your Honor.  Good

4    morning, Mr. Kotwis.  How are you?

5                        ANDREW KOTWIS:  Fine, thank you.

6                        ATTY. INGRAM:  Do you need some water up

7    there?

8                        ANDREW KOTWIS:  I would like to have a

9    glass of water, yeah, a cup of water, if there's any

10   available out there.

11                       ATTY. INGRAM:  I'll get it.  My name is

12   Jerry Ingram, this young man right here is John Juhasz, and

13   John and I share the responsibility of representing Donna

14   Roberts, who is on trial for her life.

15                       ANDREW KOTWIS:  Okay.

16                       ATTY. INGRAM:  As I'm sure you can

17   imagine, we take our responsibility very seriously and feel

18   that we should take every reasonable precaution --

19                       ANDREW KOTWIS:  Thank you.

20                       ATTY. INGRAM:  You're welcome -- in

21   selecting a fair minded jury, the same type of jury that you

22   or I would want if we were on trial, no more, no less.  Does

23   that sound fair enough to you?

1          ANDREW KOTWIS:  Absolutely.

2          ATTY. INGRAM:  This is the only

3  opportunity we'll have to get to know one another and

4  determine whether you're comfortable sitting on this case.

5  It's the only time we can talk directly to one another.

6          ANDREW KOTWIS:  Uh-huh.

7          ATTY. INGRAM:  But, you know, I am by

8  training a lawyer and that's sometimes a bad thing, and one

9  of the bad things about being trained as a lawyer is you have

10  a tendency to monopolize conversations.

11          ANDREW KOTWIS:  Uh-huh.

12          ATTY. INGRAM:  That ill serves us here

13  because we're trying to get to know you.

14          ANDREW KOTWIS:  Okay.

15          ATTY. INGRAM:  So whenever there's a

16  question that pops into your mind or whenever there's an

17  issue you would like to discuss would you please stop me, let

18  me know, and we'll address that?

19          ANDREW KOTWIS:  Okay.

20          ATTY. INGRAM:  There's a couple ground

21  rules I want to go over with you.  First and foremost, we

22  have to discuss some legal mumbo jumbo, some legal words.

23  Whenever I'm forced to use legal mumbo jumbo I'll do my best

1    to translate it into plain ordinary English.

2              ANDREW KOTWIS:  All right.

3              ATTY. INGRAM:  But if at any point in time

4    you don't understand one of my questions, that's my fault.

5    That means that I have failed to make myself clear, and that

6    sometimes happens.

7              ANDREW KOTWIS:  Right.

8              ATTY. INGRAM:  If it does, stop me, let me

9    know, and we'll go back and I'll do my best to rephrase the

10   question.

11             ANDREW KOTWIS:  Okay.

12             ATTY. INGRAM:  And listen, this is a lot

13   like a job interview except when you went to the steel

14   company to go apply for the job you chose to go apply and in

15   this case somebody spun the jury wheel, reached a hand in

16   and, lo and behold, your number came out.

17             ANDREW KOTWIS:  Uh-huh.

18             ATTY. INGRAM:  But it's a lot like a job

19   interview.  There are job responsibilities and we want to

20   know -- we want to tell you what those job responsibilities

21   are to determine whether you're comfortable assuming those

22   responsibilities, and I'm candidly going to tell you that at

23   the same time we're all making a determination whether we're

1  comfortable with you assuming those responsibilities.  So do

2  you have a basic understanding of the process you think?

3                    ANDREW KOTWIS:  Sure.

4                    ATTY. INGRAM:  I am going to be frank with

5  you and I'm going to ask you some hard questions.  Now,

6  they're not hard questions in the sense that you have to give

7  me a right answer because there is no right answer.  They are

8  hard questions because they might force you to examine

9  yourself, to look into your heart and your head in order to

10  give me an honest response.  And I'm going to tell you that

11  if we changed roles and you took my notebook and you stood up

12  here and asked me some of the questions that I'm asking you,

13  I would have a very difficult time.  I would have to stop, I

14  would have to ponder my answers.  And I understand that I may

15  be asking you some difficult things, so whenever that happens

16  just take as much time as you need, think about it and give

17  us the best answer that you can.  Is that all right with you?

18                    ANDREW KOTWIS:  I understand.

19                    ATTY. INGRAM:  Now, there's only one

20  mistake you can make here and that is, and I don't think

21  you'll do this, but the mistake, the only mistake you can

22  make is if instead of telling me how you really feel you tell

23  me what you think I want to hear.  Does that make sense to

1  you?

2                    ANDREW KOTWIS:  I won't do that.

3                    ATTY. INGRAM:  And I didn't think you

4  would.  By the way, the steel company, you're the sales

5  manager?

6                    ANDREW KOTWIS:  I was.

7                    ATTY. INGRAM:  You were the sales manager?

8                    ANDREW KOTWIS:  I was.  I was in the steel

9  industry for 38 years and I --

10                    ATTY. INGRAM:  Did you start at Syro?

11                    ANDREW KOTWIS:  I started out with

12  Youngstown Sheet & Tube way back, but there wasn't enough

13  room on that form for me to include every step along the way,

14  but it was Youngstown Sheet & Tube.  I was president of a

15  company, Transrail, that was back in the '70s.  Then I went

16  with Syro Steel and then with J. Allan Steel, which is where

17  I retired from two years ago, or a year ago last December.

18                    ATTY. INGRAM:  Can you briefly describe

19  your duties and responsibilities with J. Allan, please?

20                    ANDREW KOTWIS:  Well, I was in charge of

21  developing sales markets, establishing manufacturer's reps

22  and educating inside sales.  It was a sales management

23  position, which almost all my selling career I've been in

 1 │ management at one form or another.

 2 │                    ATTY. INGRAM:  All told, at J. Allan how

 3 │ many employees did you supervise would you approximate?

 4 │                    ANDREW KOTWIS:  Probably about 15.

 5 │                    ATTY. INGRAM:  How about at Syro, how many

 6 │ did you supervise?

 7 │                    ANDREW KOTWIS:  Probably 60.  Syro got

 8 │ bought out by Trinity and they didn't want to stay in the

 9 │ steel warehouse business so they closed the warehouse

10 │ business and I was moved into roll form sales, which I didn't

11 │ care for, and then that's the reason that I moved over to

12 │ J. Allan.

13 │                    ATTY. INGRAM:  Well, your wife is also in

14 │ steel, huh?

15 │                    ANDREW KOTWIS:  My wife is with WCI.

16 │                    ATTY. INGRAM:  WCI.

17 │                    ANDREW KOTWIS:  She works as a coordinator

18 │ between management and union to establish education programs

19 │ for the workers.

20 │                    ATTY. INGRAM:  Have you met a Sherry

21 │ Senick who works at WCI perchance?

22 │                    ANDREW KOTWIS:  No.  I don't come into

23 │ contact with them that much at WCI.  My wife does, obviously.

1           ATTY. INGRAM:  Have you ever heard her

2    mention that name?

3           ANDREW KOTWIS:  No.

4           ATTY. INGRAM:  The reason I ask that

5    question is she was interviewed to be a juror here and I was

6    just wondering if your wife had brought that up to you.

7           ANDREW KOTWIS:  No.

8           ATTY. INGRAM:  In a nutshell this case

9    boils down to the government's allegation that Donna Roberts

10   plotted or conspired with a male companion by the name of

11   Nate Jackson to cause the death of Robert Fingerhut.  The

12   first thing I want to get straight with you is do you

13   understand that this case is about the guilt or innocence of

14   one person and one person only?

15          ANDREW KOTWIS:  That's correct.

16          ATTY. INGRAM:  And that person is Donna

17   Roberts.

18          ANDREW KOTWIS:  Right.

19          ATTY. INGRAM:  You know, throughout the

20   course of these proceedings you will hear the name Nate

21   Jackson and you may conclude that Mr. Jackson did what the

22   State alleges he did, but that's not what you're here to

23   determine.  You got that?

1              ANDREW KOTWIS:  Yes.

2              ATTY. INGRAM:  And Mr. Becker used the

3     word helper, complicitor, aider and abettor.  They have job

4     responsibilities and their job responsibility here is to

5     prove that she helped, aided, assisted beyond a reasonable

6     doubt.  Do you have that straight in your mind?

7              ANDREW KOTWIS:  That's what I mentioned to

8     him.

9              ATTY. INGRAM:  Okay.  And there are

10    obviously things you would want to consider in making that

11    determination like was she even there at the time or not.

12             ANDREW KOTWIS:  Right.

13             ATTY. INGRAM:  And some other things.  And

14    you wouldn't know all of those things until you hear all the

15    facts, correct?

16             ANDREW KOTWIS:  That's correct.

17             ATTY. INGRAM:  In support of its

18    allegation that Donna aided or abetted this Nate Jackson the

19    State will present during this trial some letters and tape

20    recorded telephone conversations between Donna and Nate

21    Jackson.  Some of this evidence is sexually explicit in

22    nature, and to be candid with you, some of it's downright

23    offensive.  But you understand that the allegation here is

 1 │ murder, not loose morality?

 2 │                    ANDREW KOTWIS:  Uh-huh.

 3 │                    ATTY. INGRAM:  You know, we ask jurors to

 4 │ do hard things in this country, and we're going to talk about

 5 │ sympathy later on, but like we ask jurors to put aside

 6 │ natural feelings of sympathy.  Some of the things that we ask

 7 │ jurors to do are far easier said than done, if that makes

 8 │ sense to you.

 9 │                    ANDREW KOTWIS:  Uh-huh.

10 │                    ATTY. INGRAM:  But in relation to this

11 │ sexually explicit evidence, if you are offended by the nature

12 │ of this evidence, while that offense might be understandable,

13 │ your job responsibility will require you to rise above that

14 │ offense to test the evidence to determine whether it ties

15 │ Donna to this offense or not.  Do you think you're up to that

16 │ responsibility?

17 │                    ANDREW KOTWIS:  I believe so, sure.

18 │                    ATTY. INGRAM:  And Mr. Becker asked you a

19 │ couple times about whether you would be willing to sign

20 │ verdict forms.  He asked you whether you would be willing to

21 │ sign a verdict form of guilty in the first phase and he asked

22 │ you, if you ever got to a second phase, if you would be

23 │ willing to sign a verdict form calling for death.  Do you

```
 1    recall those questions?

 2                    ANDREW KOTWIS:  (Nods head affirmatively.)

 3                    ATTY. INGRAM:  You do understand

 4    Mr. Becker is not asking you to prejudge this case?

 5                    ANDREW KOTWIS:  He was asking -- right, I

 6    understand that.  He was --

 7                    ATTY. INGRAM:  Okay.

 8                    ANDREW KOTWIS:  -- doing several things

 9    and they were on, they were on the form that they asked me to

10    read downstairs, the different penalty phases of the trial.

11                    ATTY. INGRAM:  Well, would you have the

12    courage to acquit, vote not guilty, if you thought a not

13    guilty verdict was warranted by the evidence?

14                    ANDREW KOTWIS:  Absolutely.

15                    ATTY. INGRAM:  I want to talk to you a

16    little bit about pretrial publicity, but before we get there,

17    four weeks ago today I think we all met in Judge Logan's

18    courtroom for the orientation instruction.  When you entered

19    Judge Logan's courtroom do you recall if you went to your

20    left, straight ahead or to your right?

21                    ANDREW KOTWIS:  I sat in the jury box on

22    the right-hand side.

23                    ATTY. INGRAM:  While you were there did
```

 1    anybody engage, try to engage you in discussion about this

 2    case?

 3                        ANDREW KOTWIS:  No.

 4                        ATTY. INGRAM:  Did you overhear anyone

 5    talking about this case?

 6                        ANDREW KOTWIS:  No.

 7                        ATTY. INGRAM:  I want you to think back

 8    and maybe search your mind a little bit and tell me

 9    everything you remember reading about this case.

10                        ANDREW KOTWIS:  It was in the headlines of

11    the Tribune that a fellow in Howland had gotten shot, and it

12    seems like time transpired and the investigation ensued.

13    Then I don't know how the fellow was caught but I know that

14    there were circumstances that were presented for both her and

15    he that indicated that they were involved in the crime.

16    There was some love letters that were presented.  He was

17    involved with the Greyhound bus terminal.

18                        ATTY. INGRAM:  Who, the deceased?

19                        ANDREW KOTWIS:  The deceased.  You know,

20    it was a nice house and then later on the house got sold.  I

21    think it went to auction.  And that's about it.

22                        ATTY. INGRAM:  Okay.  Well, actually that

23    would have spanned a considerable period of time.  The death

1    occurred back in December of '01 and I don't think that the

2    house was sold until much, much later.  You in talking with

3    me said that there were circumstances presented that

4    indicated that both she, and by she you meant Donna, --

5                    ANDREW KOTWIS:  Right.

6                    ATTY. INGRAM:  -- and he, and by he you

7    meant the other fellow, and you now know that's Nate Jackson.

8                    ANDREW KOTWIS:  Right.

9                    ATTY. INGRAM:  That they were involved.

10   Can you remember any of the circumstances that you referred

11   to other than the love letters?  You've already told me about

12   those.

13                   ANDREW KOTWIS:  I know that they had an

14   affair.  The circumstances of the crime I do not recall --

15                   ATTY. INGRAM:  All right.

16                   ANDREW KOTWIS:  -- vividly or with any

17   detail at all.  It's not -- it doesn't come to my mind.

18                   ATTY. INGRAM:  You know, we're all human,

19   and because of the fact that we're all human what we see,

20   read or hear, our life's experiences, leave some type of an

21   impression upon us.  Do you agree with that?

22                   ANDREW KOTWIS:  (Nods head affirmatively.)

23                   ATTY. INGRAM:  As a result of what you

1  read, and when I say read that also includes what you may

2  have heard on TV.

3              ANDREW KOTWIS:  Right.

4              ATTY. INGRAM:  But as a result of what you

5  read about this case did you form an impression that Donna

6  was probably involved in the death of Robert Fingerhut?

7              ANDREW KOTWIS:  No.  But, you know,

8  there's so much crime that comes out in the newspaper it's

9  almost numbing, and you have to really concentrate on a case

10  in order to find out.  I mean, are you really that interested

11  in knowing more about this situation versus tomorrow's new

12  which will bring another one come up, which will bring

13  another one come up?  And, you know, unless you're of that

14  mind that you want to know every detail of something like

15  that, and I'm not that person.  I just, you know, I know that

16  there was a murder with a policeman down in Youngstown but

17  there's not one of those articles that I read in detail to

18  find out whether this fellow that ran away was involved in it

19  or not.  It's just, it just don't interest me unless it

20  involves me.

21              ATTY. INGRAM:  Right.

22              ANDREW KOTWIS:  If it involves me, then

23  I'm interested in it.

1      ATTY. INGRAM:  Well, you know, to use your

2      words, there is so much crime that it's numbing.  Do you have

3      any opinion what we, and by we I mean society as a whole,

4      might be able to do to at least begin addressing that crime

5      problem?

6      ANDREW KOTWIS:  Well, I have a lot of

7      confidence in our court system, that they -- and this is a

8      typical example of what I have the confidence in; that a case

9      is going to be presented, you're going to be the defense,

10     that there's going to be someone there to make a judgment.

11     It just so happens in this case I'm involved in it as a

12     potential juror.  But in solving some of the crime problems I

13     feel, you know, fortunate that it hasn't hit in my household

14     other than a couple of burglaries, you know.

15     ATTY. INGRAM:  And no one was ever caught?

16     ANDREW KOTWIS:  And so I use my own

17     lifestyle as an example.  I hear about the bad families.  I

18     was orphaned when I was six years old.  I was brought up by

19     various foster families.  I ended up in the service, came

20     out, went to college, and then I went and proceeded

21     developing a good career.  So whenever I hear about other

22     people having a hard time I think about it in my context.  I

23     say well, you know, it can be done.  And I think that, you

1   know, there's hard times that we all face.

2                   ATTY. INGRAM:   Well, you know, not only

3   did you develop a career, you got married, you raised four

4   children, and you apparently did a very good job of raising

5   those four children because all four of them are successful.

6                   ANDREW KOTWIS:   Uh-huh.

7                   ATTY. INGRAM:   So if we go from your

8   family to the crime problem we're having in this country, are

9   you saying that if we were to try to strengthen the family

10  that that would help?

11                  ANDREW KOTWIS:   Oh, there's no question

12  about that.  I think that that's a basic issue.  You know,

13  you have to make some sacrifices along the way.  You're not

14  going to have the house you want, you're not going to have

15  the furniture you want.

16                  ATTY. INGRAM:   When you were talking with

17  Mr. Becker you told Mr. Becker that you understood that no

18  outside considerations or outside influences should affect

19  the way you perform your job responsibilities as a trial

20  juror in this case.  Do you recall telling Mr. Becker that?

21                  ANDREW KOTWIS:   Yes.

22                  ATTY. INGRAM:   In light of what you read

23  about this case, would you be satisfied with a juror of your

1    persuasion or your mind set sitting on your case if you were

2    over there as a defendant?

3                    ANDREW KOTWIS:  I would.

4                    ATTY. INGRAM:  Okay.  And no one can ask

5    for any more.

6                    ANDREW KOTWIS:  Yeah.

7                    ATTY. INGRAM:  So you do understand that

8    even if you had a nagging impression in the back of your

9    mind, your job responsibility requires that you put that

10   nagging impression aside and determine this cause on what

11   happens here?

12                   ANDREW KOTWIS:  Right.

13                   ATTY. INGRAM:  Will you do that?

14                   ANDREW KOTWIS:  Absolutely.

15                   ATTY. INGRAM:  Okay.  I'm required to ask

16   you questions about punishments.  Before I do that I want to

17   explain a concern I have.  You know, we're all up here asking

18   you questions about punishment and you don't even know if

19   Donna Roberts did anything wrong or not, do you?

20                   ANDREW KOTWIS:  There's been a tremendous

21   amount of concentration since I've come into the courthouse

22   on punishment.

23                   ATTY. INGRAM:  It seems to me like it's a

1    lot like putting the cart before the horse.  You see what I

2    mean by that old adage?

3                     ANDREW KOTWIS:  Uh-huh.

4                     ATTY. INGRAM:  I don't want you to think

5    that because we're all asking you these questions about

6    punishment that we're predicting we're going to get to a

7    second stage.

8                     ANDREW KOTWIS:  Uh-huh.

9                     ATTY. INGRAM:  You know, the judge told

10   you in the orientation instruction, he told you in those

11   written instructions that you read downstairs that these

12   questions have nothing to do with the guilt or innocence of

13   Donna Roberts.  Do you have that straight?

14                     ANDREW KOTWIS:  Yes.

15                     ATTY. INGRAM:  Do you wear your seatbelt?

16                     ANDREW KOTWIS:  Yes.

17                     ATTY. INGRAM:  When you buckle your

18   seatbelt do you expect to be involved in an automobile

19   accident?

20                     ANDREW KOTWIS:  You know, being in sales

21   for a number of years I've had my share of automobile

22   accidents so I'm a little more cautious than the Sunday

23   driver regarding automobile accident.  So I do -- I don't

1   focus on it but I'm aware that it's a protector.

2                    ATTY. INGRAM:  Okay.  And you buckle your

3   seatbelt just in case, right?

4                    ANDREW KOTWIS:  Uh-huh.

5                    ATTY. INGRAM:  We're asking you these

6   questions now just in case, and the law requires that we ask

7   them of you now.  We're not predicting a second stage.  Are

8   you with me there?

9                    ANDREW KOTWIS:  Right, yeah.

10                   ATTY. INGRAM:  Now, you have, in your own

11  words I believe, lived with the death penalty over a number

12  of years.

13                   ANDREW KOTWIS:  It's been a debatable

14  subject.  You know that certain states are for it, certain

15  states are against it.  You know that presidential positions

16  have been taken regarding their pro and con on death penalty

17  issues.  You know Bush was elected as governor out of Texas

18  and one of the stumbling blocks for him coming out of there

19  was how many people were convicted.  And yeah, you just know.

20  It's not something that you -- it's part of your life.

21                   ATTY. INGRAM:  Have you ever considered a

22  political candidate's views on the death penalty in

23  determining whether or not you were going to vote for that

1    candidate?

2                    ANDREW KOTWIS:  No.

3                    ATTY. INGRAM:  In your questionnaire you

4    indicate that you engaged people in discussion or debate at

5    some point in time about the death penalty.

6                    ANDREW KOTWIS:  We've had discussions on

7    the death penalty.  I think my position has always been that

8    if the circumstances warrant it, you know, I think, providing

9    that the courts allow it, it's a punishment.

10                   ATTY. INGRAM:  Okay.  Well, for purposes

11   of our discussion we're talking about capital punishment, the

12   death penalty, as an option in aggravated murder cases, so

13   those are the four walls of our discussion, so to speak.

14                   ANDREW KOTWIS:  Okay.

15                   ATTY. INGRAM:  We need some boundaries so

16   that we can engage in the discussion.  Are you comfortable

17   with that boundary?

18                   ANDREW KOTWIS:  Uh-huh.

19                   ATTY. INGRAM:  As you know, one of the

20   charges against Donna Roberts is aggravated murder as prior

21   calculation and design aggravated murder.  That's the old

22   premeditated murder.  It's advanced planning.  Do you have

23   that straight in your mind?

1    ANDREW KOTWIS:  (Nods head affirmatively.)

2    ATTY. INGRAM:  Now, I don't know why the

3  legislature changed the name from premeditated to prior

4  calculation and design, but those people in Columbus, who

5  knows why they choose to do the things they do, but they

6  chose to change the name.

7    ANDREW KOTWIS:  Uh-huh.

8    ATTY. INGRAM:  You wrote down here, "And

9  my position is, for as long as I can remember, the punishment

10  should fit the crime.  Obviously circumstances must be

11  considered when the ultimate punishment is meted out."  I

12  want to divide this up.

13    ANDREW KOTWIS:  Uh-huh.

14    ATTY. INGRAM:  The punishment should fit

15  the crime.

16    ANDREW KOTWIS:  Yeah.  And you'll notice

17  there was another question in there, what would you do to

18  change the laws?  And I think that incarceration -- you know,

19  you're talking about capital punishment but you can also talk

20  about just simple jail penalties.  I think that we have too

21  many people going to jail and it's cost, as a taxpayer it's

22  cost us a lot of money and it's presented a lot of financial

23  burden, so, you know, whenever you look at that statement



1     that's what that incorporates.  Not only does that mean that

2     if it's premeditated murder and it's proven that the death

3     penalty is warranted, but it's also if a fellow ends up in

4     jail for four days and it's proven, it's possible that he

5     could have had a punishment that would have been an

6     alternative to incarceration.

7             ATTY. INGRAM:  You're referring to your

8     answer about the question about what are the biggest problems

9     with the criminal justice system?

10             ANDREW KOTWIS:  Right.

11             ATTY. INGRAM:  And I believe your response

12     was giving fair punishment to minor crimes without

13     incarceration.

14             ANDREW KOTWIS:  Right.

15             ATTY. INGRAM:  So I take it that in

16     situations where there are minor offenses --

17             ANDREW KOTWIS:  Right.

18             ATTY. INGRAM:  -- that you're in favor of

19     like monitored house arrest --

20             ANDREW KOTWIS:  Absolutely.

21             ATTY. INGRAM:  -- or some type of an

22     alternative to incarceration because you're concerned with

23     the cost of incarceration?

 1           ANDREW KOTWIS:  And also whether or not it

 2    does any good, you know, and I'm basing that upon personal

 3    experience with a nephew of mine who just spent 30 days in

 4    jail for a DUI that just irritated me to no end.  And, you

 5    know, it just irritates me that the taxpayer footed his bill

 6    for 30 days for something that really wasn't that severe.

 7           ATTY. INGRAM:  Okay.

 8           ANDREW KOTWIS:  And, you know, that's an

 9    example.  That again, you get that out of the experience.

10           ATTY. INGRAM:  Well, I'm tempted to ask

11    you some questions about your nephew's situation but I won't,

12    because that seems harsh to me, but I think we are best

13    leaving that alone.  You've heard the biblical saying an eye

14    for an eye or a tooth for a tooth.  Do you subscribe to that

15    principle?

16           ANDREW KOTWIS:  In fairness.  With

17    fairness being attached to it.  Like I mentioned on several

18    cases there that if it's proven beyond a reasonable doubt in

19    my mind then, you know, I have no problem with the death

20    penalty punishments.  But I don't look at it as an eye for an

21    eye, tooth for a tooth, taking it out of biblical sense.  I

22    look at it more as a court requirement.

23           ATTY. INGRAM:  Can you explain what you

1   mean, I look at it more like a court requirement?

2                   ANDREW KOTWIS:  Well, that it's a

3   punishment that is legislated in the State of Ohio and they

4   say that you're allowed to do this.  Now, if we were in

5   another state that didn't have capital punishment then my

6   feeling would be such that I wouldn't go along with capital

7   punishment, but I don't live in another state, I live in the

8   State of Ohio, and it says that under those circumstances

9   capital punishment is a possibility.

10                  ATTY. INGRAM:  You also answered a

11  question about whether certain crimes should require a

12  sentence of death and you said yes, and then when you were

13  asked to explain that you said premeditated murder should be

14  given the ultimate punishment if the law allows.

15                  ANDREW KOTWIS:  That's right.

16                  ATTY. INGRAM:  And that's what you were

17  just referring to about some states don't do it but some

18  states do do it?

19                  ANDREW KOTWIS:  Right.

20                  ATTY. INGRAM:  Your personal view of just

21  punishment, you understand what I mean by the term just

22  punishment?

23                  ANDREW KOTWIS:  Uh-huh.

1          ATTY. INGRAM:   In a situation where

2    someone without excuse or justification with premeditation

3    and advanced planning takes the death of another, it's your

4    personal view, as I understand what you're saying to me, that

5    the just punishment for that person is death?

6          ANDREW KOTWIS:   If it's proven and if

7    that's the law in the State of Ohio, that death is the

8    ultimate punishment, and it was premeditated and the

9    circumstances are without question, then I would say death.

10         ATTY. INGRAM:   Okay.   When you -- first of

11   all understand this, you can never decide what punishment to

12   impose on someone unless that person has been convicted so

13   we're going to say that you are a second phase juror.

14         ANDREW KOTWIS:   Okay.

15         ATTY. INGRAM:   It doesn't have to be in

16   this case, it's in some imaginary case, but you have already

17   found beyond a reasonable doubt, and let me tell you what

18   that means.   It means that you are firmly convinced, proof

19   beyond a reasonable doubt requires that you be firmly

20   convinced, and is proof of such character that you would be

21   willing to rely and act upon it in the most important of your

22   own affairs.   That's how -- that's part of the definition

23   that the judge will give you.   But whenever you're called

```
 1    upon to determine punishment the defendant must have been

 2    convicted.  You got me there?  So you are firmly convinced

 3    that the defendant has committed an aggravated murder,

 4    premeditated with prior calculation and design.  Are you

 5    following me?

 6                    ANDREW KOTWIS:  Uh-huh.

 7                    ATTY. INGRAM:  Is it your -- and I think

 8    it is but that's only my thought, is it your view that the

 9    just punishment would be death?

10                    ANDREW KOTWIS:  Then again, it would be

11    some of the circumstances that forced the premedition.

12                    ATTY. INGRAM:  Okay.  What do you mean?

13                    ANDREW KOTWIS:  For example, if physical

14    abuse over years would come into play, then that's in my mind

15    a mitigating circumstance, what prompted the premeditation.

16    And, you know, there's more involved than just, okay, the

17    conviction is there, but why is the conviction such?

18                    ATTY. INGRAM:  Are you looking for an

19    excuse?  Maybe I'm a little confused.  With circumstances --

20                    ANDREW KOTWIS:  You said that if that

21    party is proven guilty.

22                    ATTY. INGRAM:  Uh-huh.

23                    ANDREW KOTWIS:  And then you asked what
```

1     the punishment, what in my mind would the punishment be.

2                      ATTY. INGRAM:  The just punishment be.

3                      ANDREW KOTWIS:  And I said that the

4     punishment would be determined by the mitigating

5     circumstances of the reason for the crime.  Now, why would

6     you say that I'm looking for an excuse?

7                      ATTY. INGRAM:  No, no, no, no, no.  An

8     excuse for the offense, for the murder.  Years of abuse you

9     said.

10                     ANDREW KOTWIS:  Well, here again, you

11    would like to know what the -- you know, and I can understand

12    you, the questions that you fellows ask, but, you know,

13    you're asking -- sometimes these questions don't hold a lot

14    of fact to them and it's difficult to make a good judgment on

15    some of them.

16                     THE COURT:  Can I interrupt at this point,

17    because I think this word excuse has come up in the last

18    question that Mr. Ingram asked?  After you've made this

19    determination that there was a premeditated murder with a

20    specification and you've made a finding of guilty, he said

21    are you looking for an excuse.  I think, if I can presume,

22    that he meant are you looking for a reason not to impose the

23    death penalty as opposed to automatically imposing it?

1           ANDREW KOTWIS:  No, I wouldn't be looking

2    for an excuse because I would -- I guess I would evaluate

3    what the circumstances are --

4           THE COURT:  Okay.

5           ANDREW KOTWIS:  -- before I would make a

6    judgment --

7           THE COURT:  So what you're saying is that

8    second phase has --

9           ANDREW KOTWIS:  -- as to what the

10   punishment would be.

11          THE COURT:  That second phase has some

12   meaning for you that you're not done just with the first

13   phase?

14          ANDREW KOTWIS:  I would have to evaluate

15   it.

16          THE COURT:  Okay.  That's what I thought

17   you were saying.

18          ATTY. INGRAM:  Okay.  And listen, I

19   understand these are hard questions and I understand that we

20   like ask you these questions in a vacuum.  Only lawyers could

21   do that.

22          ANDREW KOTWIS:  No problem.

23          ATTY. INGRAM:  I apologize about that, but

1    if I were representing you over there you would want me to

2    ask some hard questions, wouldn't you?

3                    ANDREW KOTWIS:  Do the same thing.  All

4    right.  Yes, sir.

5                    ATTY. INGRAM:  To the extent that I'm able

6    I'll try to provide context because these questions are

7    easier to answer when there's context, but to some extent I'm

8    limited by, number one, my lack of ability, and number two,

9    I'm limited by what I'm permitted to include.  Does that make

10   sense to you?

11                   ANDREW KOTWIS:  Uh-huh.

12                   ATTY. INGRAM:  All right.  Let me be

13   absolutely open, honest and frank with you.

14                   ANDREW KOTWIS:  Sure, yeah.

15                   ATTY. INGRAM:  I have, and I think

16   everybody sitting over there at the defense table has some

17   concern about your ability to be a second phase juror because

18   of what you've told us about your views on the death penalty.

19   And what you have told us has led us to believe that if you

20   ever went to a second phase that you would favor the death

21   penalty.  Now, I'm not saying that we're right in that

22   respect, I'm just telling you that that's where we're coming

23   from.

1              ANDREW KOTWIS:  Sure.

2              ATTY. INGRAM:  Do you see our concern or

3     do you think we're just all wet?

4              ANDREW KOTWIS:  Yeah.  And could you, can

5     you -- and I'm sure that I'm not the first juror you've

6     interviewed on that circumstance.

7              ATTY. INGRAM:  No, you're not.

8              ANDREW KOTWIS:  And to try to get inside

9     of somebody's head without presenting the whole scenario is a

10    difficult thing for you to do, and it's probably difficult

11    for the juror also to come across as one way or the other

12    because it's hypothetical to some extent at this point.

13             ATTY. INGRAM:  Yes, but you are actually

14    an exception.

15             ANDREW KOTWIS:  Right.

16             ATTY. INGRAM:  You are far more eloquent

17    and far stronger willed than most of the jurors that we talk

18    to.  And, as a matter of fact, both Mr. Becker and I are

19    going to end up spending a lot longer with you than we did

20    with any other juror because you engage us, so to speak.

21             ANDREW KOTWIS:  Right.

22             ATTY. INGRAM:  Which is what you are

23    supposed to do.  There's nothing wrong with it.  As a matter

1    of fact, it's exactly what this process is supposed to be.

2                    ANDREW KOTWIS:  Right.

3                    ATTY. INGRAM:  I actually wish every juror

4    I talked to was like you.

5                    ANDREW KOTWIS:  Uh-huh.

6                    ATTY. INGRAM:  We interview some jurors

7    where all you get is uh-huh, uh-huh, uh-huh, huh-uh.

8                    ANDREW KOTWIS:  Yeah.

9                    ATTY. INGRAM:  And, you know, you sit

10   down, you go, "Oh, my God," I'm pulling my hair out.

11                   ANDREW KOTWIS:  You got to draw a

12   conclusion.

13                   ATTY. INGRAM:  I tell you this, you make

14   our job a lot tougher than the average juror, but we need

15   tested.

16                   ANDREW KOTWIS:  Yeah.

17                   ATTY. INGRAM:  You know, we're testing you

18   and you should test us.  Okay.

19           So before I digressed there, we were talking about

20   why those of us over here have some concerns about your

21   ability to be a fair second phase juror if we ever got there.

22   And there was another juror who was strongly in favor of the

23   death penalty.

1                    ANDREW KOTWIS:  Uh-huh.

2                    ATTY. INGRAM:  And I -- was it a she with

3    the chocolate?  It was a she.  She explained her views like

4    this:  "I like chocolate ice cream, and if I go into the ice

5    cream store I'm predisposed to get chocolate.  You could talk

6    me into something else, maybe there's a special on the board

7    or maybe you tell me that the butter pecan is very good, but

8    I'm predisposed to get chocolate.  And if I find a defendant

9    guilty at a first phase of deliberate, premeditated, planned

10   murder, I go into the second phase predisposed towards death.

11   And you may be able to talk me into one of the life options,

12   but I'm predisposed to death."  That was her view.

13                   ANDREW KOTWIS:  Right.

14                   ATTY. INGRAM:  Do you share that view?

15                   ANDREW KOTWIS:  My view would be, as was

16   presented earlier, that you would have to wipe the slate

17   clean whenever you're looking at the trial or the penalty

18   phase of it and make an honest judgment at that point what

19   the penalty would be.

20                   ATTY. INGRAM:  Okay.  So as a second phase

21   juror you would have four options, correct?

22                   ANDREW KOTWIS:  Right.

23                   ATTY. INGRAM:  You have stated that one of

1    the reasons that you are in favor of the death penalty is

2    because it provides comfort, comforts -- comfort.  Excuse me.

3    One of these days I'll learn to speak the English language.

4    Execution provides comfort to the victim's survivors.

5                     ANDREW KOTWIS:  Uh-huh.

6                     ATTY. INGRAM:  And then when you were

7    talking with Mr. Becker you indicated to Mr. Becker that you

8    might have a hard time ferreting out sympathy.  Do you recall

9    that?

10                    ANDREW KOTWIS:  I feel like that it would

11   be a part of any decision certainly, you know, to some

12   extent.  I think you would be very cruel to say that you have

13   no sympathy, zero sympathy.

14                    ATTY. INGRAM:  Yes, you would.  And all we

15   can ask with sympathy is you do your best to set it aside.

16                    ANDREW KOTWIS:  Right.

17                    ATTY. INGRAM:  But I think my question at

18   this moment is a little different.

19                    ANDREW KOTWIS:  Uh-huh.

20                    ATTY. INGRAM:  Again you are a second

21   phase juror.

22                    ANDREW KOTWIS:  Right.

23                    ATTY. INGRAM:  In determining the issue of

1    an appropriate punishment would you be swayed by sympathy for

2    the victim's survivors or a desire to provide comfort for the

3    victim's survivors?

4                    ANDREW KOTWIS:  I think the context that I

5    made that statement on that questionnaire was that the

6    argument for and against the death penalty by various states.

7    And I never feel like, I never felt like it was something

8    that really deters crimes so much as the death penalty

9    provides a feeling of immediate comfort to the victims'

10   families.

11                   ATTY. INGRAM:  Well, not only did you

12   write it in your questionnaire, it's also one of the things

13   you told Mr. Becker when he was up here talking to you before

14   me.  In your mind is that a legitimate factor that you should

15   consider in determining the issue of appropriate punishment?

16                   ANDREW KOTWIS:  It gets back to what the

17   law allows, and the law in the State of Ohio permits that as

18   being a legal form of punishment.

19                   ATTY. INGRAM:  Death?

20                   ANDREW KOTWIS:  Death.

21                   ATTY. INGRAM:  Well, it also --

22                   ANDREW KOTWIS:  If it wasn't included then

23   we probably wouldn't be having this discussion.

1          ATTY. INGRAM:  No, we would not.  Well,

2    we're lawyers, maybe we could still be having this

3    conversation.

4          ANDREW KOTWIS:  Right.

5          ATTY. INGRAM:  The laws in the State of

6    Ohio give you an option for death.  Your personal view is

7    that in a premeditated murder case death is the just

8    punishment.  I am correct in that, am I not?

9          ANDREW KOTWIS:  It is an option.

10          ATTY. INGRAM:  Is that your personal view

11   or is that the law?

12          ANDREW KOTWIS:  No, that's my personal

13   view.

14          ATTY. INGRAM:  Okay.

15          ANDREW KOTWIS:  It's an option.  And, here

16   again, it gets back to the circumstances.

17          ATTY. INGRAM:  Okay.  So I was confused.

18   Thanks.  So your personal view is that in a premeditated

19   murder case -- if you got to write the laws, what punishments

20   would you include for options, as options for aggravated

21   murder?

22          ANDREW KOTWIS:  Well, the maximum would be

23   the debate between the maximum, the death penalty, and life

1    imprisonment, correct?

2                    ATTY. INGRAM:   Right.

3                    ANDREW KOTWIS:   Then I would go with the

4    death penalty.

5                    ATTY. INGRAM:   Okay.  So if you were

6    writing the laws you would only have a penalty of death?

7                    ANDREW KOTWIS:   No.  If I were to write

8    the laws there's four.  Now I'm just giving the maximum.  In

9    other words, the maximum penalty if I were to write the laws

10   would be debatable between life imprisonment or death.  Now,

11   there might be other sections below that, but I think your

12   interest is is if I were to write the law, what would the

13   maximum penalty that I would write.

14                   ATTY. INGRAM:   Well, you would include

15   death, correct?

16                   ANDREW KOTWIS:   I would include death as

17   opposed to life imprisonment, and then there would be other,

18   other lesser penalties included in it as there are in the

19   State of Ohio's.  And you have what, three, four different

20   levels of penalties?

21                   ATTY. INGRAM:   One is life without parole.

22                   ANDREW KOTWIS:   Right, and the other is

23   death.  And then you have the two with parole.

1          ATTY. INGRAM:  After 25 years and after 30

2    years.

3          ANDREW KOTWIS:  And 30 years, right.

4          ATTY. INGRAM:  Okay.  I have to go back to

5    this comfort issue for the victim's family and sympathy.

6    Maybe you've answered it and maybe I'm so dense it just never

7    got through to me.  Is that a factor that you feel should be

8    considered in choosing between death and life?

9          ANDREW KOTWIS:  The reason that I feel

10   that death, the death penalty is so controversial is because

11   of the impact that it has on the victims' families.  I don't

12   believe the death penalty deters crime.

13          ATTY. INGRAM:  You believe it provides

14   comfort and solace to the survivors?

15          ANDREW KOTWIS:  Right.

16          ATTY. INGRAM:  Okay.  I have that

17   straight.  Now what I want to know is if you had to determine

18   punishment would you as part of your consideration balance

19   the need or balance a desire, I guess, to provide comfort and

20   solace to the victim's survivors, or am I not making myself

21   clear?

22          ANDREW KOTWIS:  Yeah.  We're probably

23   talking on two different planes.  On the one hand I'm trying,

1   you know, I'm trying to explain why I feel that the laws

2   justify death in the State of Ohio and you're asking on a

3   different standpoint.  Let's just assume that, or not assume,

4   but let's say, okay, we have death in Ohio.  Now, in my

5   opinion if someone were to be put to death would that be

6   because or provide solace to the family or is that intended

7   to deter crime?

8               ATTY. INGRAM:  Let me -- can I rephrase my

9   question?  You have to decide between death and life.  In

10  making that decision are you going to consider sympathy or

11  comfort for the victim's survivors?

12              ANDREW KOTWIS:  It will be a factor.

13              ATTY. INGRAM:  Now, you have also told me

14  that you disapprove of paying to house people in jail, is

15  that correct?

16              ANDREW KOTWIS:  Uh-huh.  I feel that we've

17  gone overboard on incarceration in this country.

18              ATTY. INGRAM:  Now, have you ever heard

19  someone tell you that -- not tell you.  Have you ever heard

20  someone say, "I'm not in favor of life imprisonment," or "I'm

21  in favor of the death penalty and they should get death

22  because we as taxpayers should not have to pay to house them

23  for the rest of their life?"

1          ANDREW KOTWIS:  I hear that but I

2     recognize that that's a part of our legal function, it's a

3     part of our laws, it's a part of our punishment.  And, you

4     know, I'm willing to say yes, you know, I'm willing to have

5     some of my taxpayer money support prisons so that a person

6     who was convicted and is spending the rest of his time in

7     life imprisonment.

8          ATTY. INGRAM:  Well, do you have an

9     opinion on that cost issue?

10          ANDREW KOTWIS:  On the what?

11          ATTY. INGRAM:  The cost issue.

12          ANDREW KOTWIS:  Well, I recognize it as

13     being a budgetary item that's necessary for us to function as

14     a society certainly.  It's not something that we're going to

15     -- I want to minimize it is what I'm saying.  And I think

16     when I spoke about people going to jail, I think we have too

17     many minor crimes where people are spending time in jail and

18     there are probably better solutions that can be handled in

19     that.

20          ATTY. INGRAM:  Well, in your personal

21     belief system do you feel that the cost of life imprisonment

22     is one of the reasons that you favor the death penalty?

23          ANDREW KOTWIS:  No, because I think the

1  death penalty provides an immediate solution to a problem and

2  the only people that I can see benefitting from it, like I

3  said earlier, it doesn't in my mind deter crime so much as in

4  my mind it provides comfort to the victims' families.

5  Otherwise, why would you see whenever a person is being put

6  to death you got all, you know, the screens there and people

7  are there so that they can see this person die?  You know,

8  they don't televise it.  It's not something anyone else

9  really has that kind of impact on.

10            ATTY. INGRAM:  And the death penalty

11  offers immediacy and life imprisonment does not?

12            ANDREW KOTWIS:  Correct.

13            ATTY. INGRAM:  And is that also something

14  you would consider in choosing between punishments?

15            ANDREW KOTWIS:  I don't think that that

16  would be a factor in it, no, not immediacy.  I wouldn't say

17  that that's going to be.  You know, like I want to get rid of

18  this person right now because they're guilty, that's not part

19  of my play.

20            ATTY. INGRAM:  Well, no.  As I understood

21  what you said -- Your Honor, I'm sorry.

22            THE COURT:  No, go ahead.  Go ahead.

23            ATTY. INGRAM:  And, by the way, if I'm

1    getting on your nerves, I'm sorry.  I certainly do not intend

2    to.

3                        ANDREW KOTWIS:  I'll just get up and punch

4    you.

5                        ATTY. INGRAM:  Please don't.  You're a big

6    guy.  I would get hurt.  You know what?  I don't know that

7    there's anybody in this courtroom that would object.  The

8    immediacy works for the victim's survivors, at least that's

9    what I'm sensing.

10                        ANDREW KOTWIS:  Yeah.

11                        ATTY. INGRAM:  Is that correct?

12                        ANDREW KOTWIS:  That's what I feel that's

13   behind the debate between capital punishment and -- life

14   imprisonment and death penalty.

15                        ATTY. INGRAM:  Okay.

16                        THE COURT:  Jerry, and you can tell me no

17   if you want to just proceed along this line.

18                        ATTY. INGRAM:  No, go ahead.  I'm willing

19   to take any help I can get.

20                        THE COURT:  I'm reading this a little bit

21   different than you are.

22                        ATTY. INGRAM:  All right.  Can I sit right

23   here?

 1 |          THE COURT:  Okay.  From this standpoint,
 2 | and you correct me if I'm wrong because maybe Jerry is right
 3 | and I'm wrong on what he's picking up here, I think that you
 4 | are talking on two levels.  You have apparently given some
 5 | thought to this whole idea of the capital punishment debate
 6 | we have going on and you have rationalized it in your mind
 7 | that the only -- you don't believe that it's a deterrent.
 8 |          ANDREW KOTWIS:  No.
 9 |          THE COURT:  A deterrent factor.  And that
10 | the only rationale you can put on as to why this debate
11 | continues is that it does give comfort to the families of
12 | victims --
13 |          ANDREW KOTWIS:  Uh-huh.
14 |          THE COURT:  -- or the victims of the
15 | crime.  But the point that the defense is trying to get you
16 | to state in a more definite way, you've skirted around it and
17 | I think I know what your answer is but you're not really
18 | giving them a definite answer, and that is this question of
19 | sympathy.  Now, the way you answered it I understood to be
20 | this:  Of course I'm going to have feelings of sympathy
21 | because they're human emotions.  You can't ask people to get
22 | in that jury box and not have feelings of anger or whatever.
23 | We all suffer from our emotions.  But Mr. Ingram is concerned

1    that because of your answer on that philosophical level that

2    you are going to bring that in and apply it in this case as a

3    determining factor in that second phase, that if you feel

4    sorry for the family of the victim, that that may be a

5    deciding part or a big part of any decision that you make.

6                        ANDREW KOTWIS:  Uh-huh.

7                        THE COURT:  And it may be, I don't know.

8                        ANDREW KOTWIS:  I mentioned to him that it

9    would be a factor.

10                        THE COURT:  Okay.

11                        ATTY. BECKER:  I think our question is

12   going to be that the Court is going to instruct him, as all

13   jurors --

14                        THE COURT:  I've avoided saying that to

15   try to get this answer out.

16                        ATTY. BECKER:  Okay.

17                        THE COURT:  The standard instruction that

18   is given, it's given in every case, is to the effect that the

19   law recognizes that each of the jurors are human beings and

20   that they may have sympathy for one side, sometimes for both

21   sides, but that sympathy is not something that is to be used.

22   You're to be more analytical and to apply the facts without

23   applying anger, fear, sympathy, all the emotions we're

1    subject to.

2         Now, it may be that you feel that's an important

3    part of a decision of this nature.  If it is, that's fine,

4    but the law does not permit sympathy to be a determining

5    factor on the evidence.

6                        ANDREW KOTWIS:  Yeah, and I wouldn't.  It

7    wouldn't be a determining factor but it would be, in all

8    honesty, I think it would be a small factor in your

9    consideration.

10                        THE COURT:  Well, that's what I took your

11   answer to be, that of course if I'm going to sit or anybody

12   is going to sit there's going to be human emotions that

13   arise.

14                        ANDREW KOTWIS:  Yeah.

15                        THE COURT:  But it's a question that

16   Mr. Ingram has the right to have the answer to as to whether

17   you can follow the law and not permit sympathy to be a

18   deciding factor on any of these things.

19                        ANDREW KOTWIS:  It won't be a deciding

20   factor.

21                        ATTY. INGRAM:  But it will be a factor?

22                        ANDREW KOTWIS:  It will be a factor.  Just

23   like the glass, whether you have enough evidence all the way

1    up or not, it's going to be, it's going to creep into your

2    psyche some way when you're making your determination.

3                        ATTY. INGRAM:  Okay.  So if we start that

4    second phase --

5                        ANDREW KOTWIS:  I think it will but I've

6    never been in this situation before.  You know, I'm just

7    going from what I think will happen.  Now I don't know.  You

8    know, I can say no, it's not going to be a factor and --

9                        THE COURT:  Let me ask you this.  Do you

10   think it is possible --

11                       ANDREW KOTWIS:  -- be sincere about it,

12   but that would be --

13                       THE COURT:  Do you think it's possible

14   that sympathy may apply to one side or both sides?

15                       ANDREW KOTWIS:  It's not going to be a

16   determining factor, no.  It's going to be -- you know, I'm

17   going to evaluate it based upon the evidence presented.

18                       ATTY. INGRAM:  Okay.  I'm going to

19   apologize in advance.  I have to revisit this issue.  Maybe

20   because, maybe it's just because I'm a stone head.

21                       ANDREW KOTWIS:  Sure.

22                       ATTY. INGRAM:  As I take your -- forget

23   about the people that write these laws.

1        ANDREW KOTWIS:  Okay.

2        ATTY. INGRAM:  As a matter of fact, my

3   father used to say that what we should really do is send

4   these people to Columbus, pay them "X" number of dollars a

5   year and every time they sponsor a bill we take away $5,000.

6        ANDREW KOTWIS:  Sure.

7        ATTY. INGRAM:  You have for a number of

8   years personally believed in the death penalty.  First of

9   all, is that right?

10       ANDREW KOTWIS:  It has been something that

11  I accept.

12       ATTY. INGRAM:  Okay.

13       ANDREW KOTWIS:  You know, I'm not a flag

14  waver, you know, that runs down the street and promotes the

15  death penalty, but I accept the death penalty as a part of

16  our legal system.

17       ATTY. INGRAM:  Okay.  Do you understand

18  that if you ever get to a second phase, and let's say we're

19  in Youngstown, Ohio and you are a second phase juror in that

20  Koliser case where that guy shot a policeman so it's

21  premeditated murder of a law enforcement officer in the line

22  of duty and that's a death spec.  So he's been found guilty

23  of premeditated murder, planned, a police officer in the line

1    of duty, death spec.

2         When you get to a second phase, if you get to the

3    second phase there, even in that case all four sentencing

4    options have to start out equally in your mind.  You cannot

5    be predisposed.  You can't start that second phase saying

6    he's already been found guilty, I think that the appropriate

7    punishment is death; I may give him an opportunity to talk me

8    out of it, but that's what I believe.  Am I making myself

9    clear?

10                        ANDREW KOTWIS:  Uh-huh.

11                        ATTY. INGRAM:  So when you go into a

12   second phase in that made-up case, that glass that the

13   prosecution has to fill beyond a reasonable doubt is empty.

14   I guess my question to you is is this issue of comfort or

15   solace for the victim's family, does it add a little bit of

16   liquid -- you want some more water?  I got you to drink all

17   of it.

18                        ANDREW KOTWIS:  Thank you.  Yes.

19                        ATTY. INGRAM:  Does this comfort or solace

20   for the victim's family add a little bit of liquid to this

21   glass before we ever start that you would then expect the

22   defendant to remove from the glass before you would vote for

23   life?

1              ANDREW KOTWIS:  I would say yes.  Now,

2    your next question, I got to believe, will be to what

3    extent --

4              ATTY. INGRAM:  No.  I don't think --

5              ANDREW KOTWIS:  -- and would it override,

6    would it override the facts?  And this is where I have

7    trouble with that line of questioning.

8              ATTY. INGRAM:  Okay.  But we will agree

9    that before you ever start a second phase that glass already

10   has something in it and that the something in it favors the

11   imposition of death, correct?

12             ANDREW KOTWIS:  Uh-huh.

13             ATTY. INGRAM:  No further questions.

14             ATTY. BECKER:  Your Honor, I would -- I

15   know where we're going with this so I would ask the Court to

16   follow that up perhaps with --

17             THE COURT:  Well, the problem is that --

18             ATTY. BECKER:  He may be too honest, I

19   don't know.

20             THE COURT:  Well, it is a nuance and it's

21   very difficult for somebody to understand.  And that question

22   is I think one that -- you've got a question as Juhasz has,

23   you're going to get an answer pretty standard from each

1   person.

2                    ATTY. INGRAM:  Well, I don't know that

3   there's any standard answer from Mr. Kotwis, Your Honor.  And

4   he -- standard to the extent that it's just he gives

5   heartfelt thoughtful responses.  I'm sure that my suit is

6   pitted out.  I don't know.

7                    THE COURT:  Okay.  Here's the thing, Andy.

8   The last question that was put to you is on that second

9   phase, if we got to that second phase, whether you would be

10  going in with an open mind concerning the four possibilities,

11  and you've answered that no, there would be some water in the

12  glass and it would be up to the defendant to remove it.

13  Well, the defendant doesn't have to do anything throughout

14  the trial and it's the State's case to win or lose.

15        The question as put is one that I think most people

16  are going to answer as you did.  And I didn't really think

17  that you were on that line from all the other questions that

18  have been asked, that you understood that the second phase

19  has to be, in effect, started fresh, although I think that's

20  realistically asking a bit much of a jury who's already

21  listened to all the evidence and made a finding of guilty.

22  But the law requires at that second phase the jurors at least

23  give lip service to the fact that they're able to start out

 1    fresh.  It may not be a popular view, fellows, but that's the
 2    way I see it.
 3                      ATTY. BECKER:  But I think it's the
 4    correct view because I think if he asks that question of any
 5    juror in any potential death penalty case, every juror -- we
 6    would never have a jury because every potential juror is
 7    going to say and give that answer.
 8                      THE COURT:  I understand.  Now let me ask
 9    you this question because this is the whole --
10                      ATTY. INGRAM:  I disagree with that
11    assertion, by the way.
12                      ATTY. BECKER:  Oh, I absolutely disagree
13    with that.
14                      THE COURT:  Well, okay.  That's neither
15    here nor there.
16                      ATTY. BECKER:  Okay.
17                      THE COURT:  The nub of the question is I
18    think you understand this whole process as well as anybody
19    we've had here, and in answering that last question you did
20    not take into account that the defendant does not have to do
21    anything if they choose not to.  They have the right to
22    remain silent throughout the trial.  They have to win or lose
23    their case.  And I think the problem with this all goes back

1    to your attempt and good job of explaining what you perceive

2    as this other issue we've talked about, and that is the

3    philosophical underpinnings of the death penalty itself.

4          The defense at this point is concerned about that

5    sympathy factor and I think we got that pretty well cleared

6    up.  You understand that sympathy cannot be a determining

7    factor.  I understand from your answers that you're going

8    further than most people would in saying I can't tell you I'm

9    not going to have sympathy as we go through this trial, it's

10    a human emotion.

11                    ANDREW KOTWIS:  Uh-huh.

12                    THE COURT:  Well, I suspect that's true.

13    But the question is whether it is going to be a determining

14    factor or not, and you're telling us that it isn't.

15                    ANDREW KOTWIS:  I said no.

16                    THE COURT:  So that leaves the one big

17    issue and that is whether at that second phase, because to

18    get there you have to have gone through the trial and made a

19    determination of guilty, whether you, as every juror has to

20    be able to start that second phase fresh and listen to the

21    aggravating circumstances, most of which you will already

22    have heard.

23                    ANDREW KOTWIS:  Uh-huh.

1          THE COURT:  Okay.  But the important part

2    is to give fair balance to any mitigating factors that are

3    brought up, because if you have a juror that's predisposed to

4    require the defendant to prove that they shouldn't get the

5    death penalty, okay, it's not their job to prove that.  If

6    the defendant sits there and doesn't present any evidence --

7          ANDREW KOTWIS:  Right.

8          THE COURT:  You will have heard also

9    mitigating factors throughout the trial to some degree.  They

10   probably wouldn't be as pointed as those that are usually

11   given by a defendant during that phase, but it isn't up to

12   the defendant to prove anything.  They have an opportunity to

13   give things for the jury's consideration.  But unless each

14   juror is able to start out in that second phase with an open

15   mind, keeping in mind that the State has to prove or lose

16   their own case, then the defendant couldn't get a fair trial.

17        Now, the answer to your last question indicated very

18   clearly that you feel once you've gone through that process

19   and because you believe in the death penalty as opposed to

20   not believing in it, the answer indicated that the defendant

21   would start out at a disadvantage in that you would have a

22   preconception that, well, the death penalty should probably

23   be imposed here.  You follow me?

```
 1                    ANDREW KOTWIS:  (Nods head affirmatively.)

 2                    THE COURT:  Now can you explain yourself

 3      concerning your last answer and what I've just said?

 4                    ANDREW KOTWIS:  Now, the question that --

 5      raise the question again.

 6                    ATTY. INGRAM:  That's one of those things

 7      that is easier said than done, Mr. Kotwis.  Okay.

 8                    THE COURT:  Ready?

 9                    ATTY. INGRAM:  And listen, Mr. Kotwis has

10      to be out of here.  What time do you have to be out of here?

11                    ANDREW KOTWIS:  Well, they're going to

12      pick me up at quarter after 2:00.

13                    ATTY. INGRAM:  How far away?  We'll get

14      you out of here in plenty of time.

15                    ANDREW KOTWIS:  It's Perkinswood.  It's

16      not far.

17                    ATTY. INGRAM:  We were talking sort of

18      about sympathy.

19                    ANDREW KOTWIS:  Yeah, you brought up about

20      the policeman.  That was, that was the --

21                    ATTY. INGRAM:  That was the made-up second

22      phase that we were at.

23                    ANDREW KOTWIS:  That was your hypothesis.
```

4136

1          ATTY. INGRAM:  Well, it doesn't have to be

2     that case, it could be any case, any capital case in which

3     you are at a second phase.

4          ANDREW KOTWIS:  Right.

5          ATTY. INGRAM:  But the charge that brought

6     you to the second phase is planned premeditated murder so

7     we're talking about a planned murder, a premeditated murder,

8     no excuse or justification.  He's guilty, whoever he is.  And

9     I guess that's sort of the stage.  And although I know that

10    you'll never do this, I don't even have to tell you, don't

11    let me put words in your mouth, but I know you won't do that.

12    We have talked off and on, maybe ad nauseam in your opinion,

13    but we have talked repeatedly about your personal belief

14    regarding comfort and solace for the victim's survivors.

15          ANDREW KOTWIS:  Uh-huh.

16          ATTY. INGRAM:  Do you recall all of that?

17          ANDREW KOTWIS:  As -- okay, go ahead.

18    Yes.

19          ATTY. INGRAM:  And I think where we left

20    it was that in our made-up second stage your belief regarding

21    comfort or solace for the victim's survivors would put a

22    little liquid in there before we ever started the second

23    phase, and is that, is that true, No. 1?

1          ANDREW KOTWIS:  When he asked going into

2    the second phase whether I would be able to eliminate the

3    facts that were presented and evaluate the circumstances

4    going into the or in the second phase and I said yes, I would

5    be able to separate the two trials.

6          ATTY. INGRAM:  Okay.

7          ANDREW KOTWIS:  In other words, I would be

8    able to sit through the court hearings in the first phase

9    and, as has been directed and mentioned several times, that

10   it will be necessary to not include the judgment from the

11   first phase into the second phase, and I said that I would be

12   able to, you know.  What you're asking is whether or not

13   sympathy would be a factor in my decisions for the second

14   phase?

15         ATTY. INGRAM:  Well, sympathy in the

16   ordinary use of the word is not what I'm talking about here.

17   I'm talking about, I guess maybe I'm talking about comfort.

18         ANDREW KOTWIS:  It seems like you --

19         ATTY. INGRAM:  I've lived with the death

20   penalty over the years --

21         ANDREW KOTWIS:  It seems like you're

22   getting back to identifying why we have a death penalty and I

23   mentioned that.

1                      ATTY. INGRAM:  I hope he has a suggestion

2    because I'm sort of --

3                      (Whereupon, the defense attorneys

4    conferred off the record.)

5                      ATTY. INGRAM:  Comfort is society's

6    justification for having the death penalty, is that a better

7    way?

8                      ANDREW KOTWIS:  That is my belief.

9                      ATTY. INGRAM:  Okay.  Do you recall

10   probably an hour and a half ago now when you were talking

11   with Mr. Becker and he told you that he and Bailey, maybe we

12   screw up this proceeding and we don't prove it?  Do you

13   remember that?

14                      ANDREW KOTWIS:  Sure.

15                      ATTY. INGRAM:  And do you remember him

16   telling or you telling him I don't know how I would react if

17   you screwed up?

18                      ANDREW KOTWIS:  I think if that was --

19   that was more involved than that.  Did I have enough

20   confidence in their ability to make a good presentation

21   rather than screwing up a capital murder case.

22                      ATTY. INGRAM:  Okay.  Let's back this way

23   up and I'm going to keep this simple and I'm just going to

```
1    simply -- listen, you are obviously a fair and an honest guy
2    so I'm simply going to accept your answers.  All I want you
3    to do is think about it for a second.
4                     ANDREW KOTWIS:  Okay.
5                     ATTY. INGRAM:  If you ever go into a
6    second phase in this case you have to go into that second
7    phase with all four of those sentencing options equal in your
8    mind.  One cannot start with a leg up over the other.  One
9    cannot start with a head start, so to speak.  You with me?
10                    ANDREW KOTWIS:  Uh-huh.
11                    ATTY. INGRAM:  Can you tell her you can do
12   that?
13                    ANDREW KOTWIS:  Absolutely.
14                    ATTY. INGRAM:  Fair enough.  No further
15   questions.
16                    THE COURT:  Pass?
17                    ATTY. BECKER:  Yeah, we pass for cause,
18   Your Honor.
19                    ATTY. JUHASZ:  Can we have a second?
20                    THE COURT:  If you want to approach side
21   bar you're welcome to do that.
22                    ATTY. JUHASZ:  Can we, Your Honor?
23                    (Whereupon, a bench conference was held.)
```

1              THE COURT:  Gentlemen, we can put this on

2    the record when we're done here.

3              ATTY. BECKER:  Okay.

4              ATTY. INGRAM:  Yes.

5              THE COURT:  Mr. Kotwis, you're going to be

6    in the pool from which this jury is selected.

7              ANDREW KOTWIS:  Okay.

8              THE COURT:  I would ask you not to read

9    anything, talk to anybody, all the stuff that I've told you

10   before.  You should call that number given to you after

11   Wednesday evening.

12             ANDREW KOTWIS:  After next Wednesday?

13             THE COURT:  This Wednesday.

14             ANDREW KOTWIS:  After tomorrow?

15             THE COURT:  Tomorrow night, yeah.

16             ANDREW KOTWIS:  Yeah.  I didn't realize.

17             THE COURT:  And we'll give further

18   instructions to you, okay?  Thank you for your time.  Sorry

19   to keep you so long.

20             ANDREW KOTWIS:  Okay.

21             THE COURT:  I can't blame it on either

22   side, they're both guilty.

23                  (Whereupon, Andrew Kotwis was added to the

1    pool of prospective jurors and excused for the day, after

2    which a brief recess was taken.)

3                    ATTY. BECKER:  You want to put this on the

4    record first from before?

5                    THE COURT:  Yeah, we must do that.  That

6    side bar out of the hearing of the potential juror here,

7    there was a pass by the State.  Defense objected -- well, one

8    of you gentlemen put on the record your objection.

9                    ATTY. JUHASZ:  Your Honor, we object based

10   upon the answers that he gave in response to Mr. Ingram's

11   questions where he said that going into the second phase that

12   there would be -- appreciating with due respect the Court's

13   position and the prosecutor's position about those questions,

14   that he said that there would be something in the glass and

15   that he favored the death penalty.  And again under Morgan

16   versus Illinois, even though he said that he could be fair,

17   we think that his answers indicate to the contrary.

18                    THE COURT:  Let me put on the record the

19   Court's view of this at this point.  I have admitted him to

20   the pool on the basis that I think you have a little bit

21   unusual type of person here.  My impression was that he was

22   trying to perhaps draw the line too fine of what the ordinary

23   juror would.  I think that he is the type of juror from all

1   of his answers that once he understands what the law is that

2   he will make every effort to apply the law.  He's thought

3   about the death penalty and has come down on the side that

4   the death penalty as opposed to no death penalty is probably

5   the best way to go.  But he also said that at one point, if

6   you remember, he said something I thought was pretty cogent,

7   if he were going to draw the law as to whether he would draw

8   a law that had life without chance of parole or the death

9   penalty, and then without really answering that he went on to

10  say but the law of Ohio is the death penalty, I would

11  probably go with that.  So I think there's a doubt in his

12  mind as to whether or not he would have the death penalty to

13  begin with, but that's neither here nor there.

14          I think that he in answer to the follow-up questions

15  rehabilitated himself because the only question that was

16  worrisome was the water glass.  But as I've stated to

17  counsel, I think that that was so adroitly put to him that 99

18  out of 100 would answer the same way without thinking, and

19  for that reason I passed him.  If that's the worst problem we

20  have with this case.  See you at 2:00.

21                  (Whereupon, a luncheon recess was taken.)

22              **PROSPECTIVE JUROR SHELLEY A. MYERS**

23                  THE COURT:  How are you today?

```
 1                    SHELLEY A. MYERS:   I'm good.

 2                    THE COURT:   Good.   You had an opportunity

 3      to read that handout that was given to you?

 4                    SHELLEY A. MYERS:   Right.

 5                    THE COURT:   Okay.   You understand a little

 6      about what's going on.   Today is an opportunity for both

 7      sides in this case to ask you questions about several things,

 8      primarily about your view on the issue of capital punishment,

 9      on any pretrial publicity you may have been exposed to.

10           In the State of Ohio just because a person is

11      convicted of murder does not mean that they automatically

12      face the death penalty.   In order for a person to have a jury

13      consider the death penalty it requires an aggravated murder

14      conviction with specifications.   There's a list of

15      specifications in the statute.   One would be if you killed a

16      person who happened to be the governor of Ohio.   If the

17      indictment had the aggravated murder plus the specification

18      that the person was the governor, then that would become a

19      death penalty case.

20           Now, there are specifications attached to the

21      aggravated murder filed against Donna Roberts in this matter,

22      in this case.   The burden is on the State to move forward to

23      prove their case beyond a reasonable doubt.   The burden is on
```

4144

1     the State to prove the case and they either prove it or they

2     don't.  The defendant need do nothing during the course of

3     the trial if they wish not to.  They have the right at all

4     times to remain silent, so the State either proves their case

5     or they don't to the jury.

6          Now, if the State failed to maintain the necessary

7     evidence to prove beyond a reasonable doubt that the

8     aggravated murder was committed by the defendant and that

9     there were specifications attached and they proved those,

10    then this jury would properly make a finding of not guilty

11    and that would be the end of the trial.  If, however, the

12    State carries that burden of proof, then this trial would go

13    to a second phase.

14         Now, we don't have any way of knowing what the

15    decision of this jury will be, but we can't wait until they

16    make their decision because if they came back with a finding

17    of guilty, then it would go to the second phase and these

18    folks would have no idea at that point what the attitude of

19    the jurors is in regard to the death penalty.  It's too late

20    to ask them because you couldn't remove any of them.  We

21    wouldn't be able to go forward.  So they have a right to

22    explore that issue at this juncture even though it may be a

23    waste of time.

1        Now, if they got to that second phase and you found

2   that somebody on the jury believed strongly in an eye for an

3   eye, well, that person could not follow the law and be fair

4   to the defendant because at that second hearing it's

5   necessary again for the prosecutor to go forward and to prove

6   beyond a reasonable doubt that the aggravating circumstances

7   outweigh any mitigating factors.  And the aggravating

8   circumstances are reasons that the prosecutor would present

9   to the jury as to why they should consider and impose the

10  death penalty.  The mitigating factors are factors put to the

11  jury as to why they should not impose the death penalty but

12  impose a lesser sentence of either life without chance of

13  parole or life without chance of parole before 25 or 30

14  years.  And, likewise, if you had a person on the jury that

15  under no circumstances would participate in making that

16  decision of life or death, then the State couldn't get a fair

17  trial.  So both sides have an opportunity now to ask each

18  potential juror what your view is.

19        Whatever your belief is is fine.  These folks will

20  respect that, okay?  It's just that they are entitled to know

21  and you also to make sure you would feel comfortable with

22  sitting on a trial of this nature because if we are to have a

23  fair trial it means that we must have 12 jurors who are able

1     to follow the law.  And the law in Ohio is that every death

2     doesn't receive, every murder doesn't receive the death of

3     the perpetrator.  And the State does have a right to ask for

4     the death penalty but it has to be under aggravated murder

5     with specifications only.

6            The other issue that they may ask about is on

7     pretrial publicity, how much you know about this case, you

8     think you know from having read something or heard something,

9     and whether that's going to interfere with your ability to

10    sit and decide this case on the evidence that you hear in the

11    courtroom.  If any of these jurors decide this matter on what

12    they've heard prior to the presentation of evidence, then

13    somebody is not going to get a fair trial, okay?

14                    SHELLEY A. MYERS:  Okay.

15                    THE COURT:  Very good.  Mr. Bailey.

16                    ATTY. BAILEY:  Your Honor.  Good

17    afternoon, Mrs. Myers.  How are you doing?

18                    SHELLEY A. MYERS:  I'm good.

19                    ATTY. BAILEY:  As you remember, my name is

20    Ken Bailey.  I think it's been about four weeks ago that we

21    were in the other court.

22                    SHELLEY A. MYERS:  Right.

23                    ATTY. BAILEY:  And at that time I promised

1  you that I would have my co-counsel with me the next time we

2  talked.  Okay.  Chris Becker is here and the two of us are

3  assistant prosecutors and responsible for prosecuting this

4  case on behalf of the people of Trumbull County and the State

5  of Ohio.

6                    SHELLEY A. MYERS:  Okay.

7                    ATTY. BAILEY:  Okay.  And because we want

8  to make sure that the folks who are selected to sit on this

9  jury can be fair and impartial to both sides, both to the

10  defendant and to the people of the State of Ohio, we ask

11  questions regarding your prior experiences and your opinion,

12  and not because we're snoopy and we like to pry into people's

13  backgrounds and stuff but just for that sole purpose, to make

14  sure that the folks that are selected can be fair and

15  impartial to both sides.

16         And another thing is there aren't any right answers

17  or wrong answers to these questions, only open and candid

18  answers.  Okay.  And this is one chance we get to talk

19  together until this whole case is through.  If we go into two

20  different phases we can't have any communication with you

21  until after the second phase is over, okay?

22                    SHELLEY A. MYERS:  Okay.

23                    ATTY. BAILEY:  And so if we run into each

1   other in the hallway or the elevator or a restaurant or

2   something, we want you to know that we're not trying to snub

3   you or be antisocial but under our rules of conduct the

4   lawyers aren't allowed to have any communication with you,

5   except to maybe say good morning or good afternoon, because

6   if we engaged in any more conversation then it could result

7   in a mistrial.  And we don't want to do this whole thing over

8   again, right?

9              SHELLEY A. MYERS:  Okay.  Right.

10             ATTY. BAILEY:  Okay.  Also this is the one

11  chance that you get to ask questions as long as it pertains

12  to what we're doing here.  If you have a question about what

13  we're doing and the procedure here, feel free to ask and

14  we'll see if we can get you an answer, okay?

15             SHELLEY A. MYERS:  Okay.

16             ATTY. BAILEY:  Now, let me ask you a

17  couple questions first and then I'm going to ask you about

18  your views on the death penalty and pretrial publicity and

19  then some regular questions.  I noticed on your questionnaire

20  you put down that you have a root canal that has to be

21  finished up this coming Monday the 12th.

22             SHELLEY A. MYERS:  Okay.  It was cancelled

23  so I do have -- I have to go sooner or later.  I had to

1    reschedule that one.  Besides, that was also, that was also

2    from way back when.  I didn't know when this was going to be.

3                    ATTY. BAILEY:  Oh, okay.  I see.

4                    SHELLEY A. MYERS:  But I still do have to

5    have that done, but that's no problem.

6                    ATTY. BAILEY:  Okay.  I mean, don't you

7    have to get it done within a certain amount of time or it

8    might crack?  This is the second time --

9                    SHELLEY A. MYERS:  I know that's bad.  I

10   know.  I've been working 10 hours a day and I've been kind of

11   busy lately.

12                   ATTY. BAILEY:  Okay.  It's not the part

13   where you get the cap on it, it's the part where they finish

14   the root canal?

15                   SHELLEY A. MYERS:  Right.

16                   ATTY. BAILEY:  Okay.

17                   SHELLEY A. MYERS:  And it don't hurt right

18   now.

19                   ATTY. BAILEY:  Okay.  You said there was a

20   second doctor's appointment that could be changed?

21                   SHELLEY A. MYERS:  Yeah.  That was from

22   back.  I didn't know when this was going to be so that

23   actually is nothing either.  The only thing that I did not

 1    know back then is I do have a girl who is on sick leave right

 2    now at work and that's why I'm working 10 hours a day because

 3    I'm also filling in for her, and I'm also the office manager

 4    so.

 5                    ATTY. BAILEY:  So if you're called away

 6    for a couple weeks -- any idea when she's coming back?

 7                    SHELLEY A. MYERS:  Well, let's see.  She's

 8    been gone -- probably another five weeks.

 9                    ATTY. BAILEY:  She's going to be gone

10    another five weeks?

11                    SHELLEY A. MYERS:  Probably.

12                    ATTY. BAILEY:  So if you're pulled away

13    from your work for a couple of weeks, because we expect this

14    case will probably take a week and a half to two weeks to

15    try, but because of the holidays and some interruptions that

16    are going to occur, we won't get done with this case in the

17    first phase, we expect, till the end of this month.  And if

18    it goes into the second phase it's going to take the

19    beginning of next month.  Is that going to cause some undue

20    hardship at work for you?

21                    SHELLEY A. MYERS:  It shouldn't because

22    they kind of know about it, but -- I think I should be okay.

23                    ATTY. BAILEY:  Okay.  Even with somebody

1    off on sick leave?

2              SHELLEY A. MYERS:  Yeah.  They'll probably

3    try to find someone to fill in.  I mean, they know about it

4    so.

5              ATTY. BAILEY:  Okay.  You're not going to

6    have to go back to work at night or anything, right?

7              SHELLEY A. MYERS:  No.

8              ATTY. BAILEY:  Okay.  Now, let me go to

9    this issue of pretrial publicity.  I noticed you read both

10   the Tribune and the Vindicator five or six times a week, you

11   say you read the front page, and you get the local TV news

12   from all of the four stations, but you don't have any

13   recollection of this case, at least when you filled out the

14   questionnaire.  Let me tell you the defendant is charged here

15   with a number of crimes and the charge is that she planned

16   with another fellow by the name of Nate Jackson to kill her

17   ex-husband with whom she was living for insurance money and

18   that this Nate Jackson is the one who actually is charged as

19   the killer and the person who broke, that trespassed in the

20   house where the victim was living and stole a car.

21             SHELLEY A. MYERS:  Okay.

22             ATTY. BAILEY:  Okay.  Now, does that jog

23   any recollection from reading the papers?

1               SHELLEY A. MYERS:  Just that basic, what

2      you told me.

3               ATTY. BAILEY:  Right.

4               SHELLEY A. MYERS:  I mean, you even, you

5      told me even more than that though.

6               ATTY. BAILEY:  Okay.

7               SHELLEY A. MYERS:  So I just know like the

8      little basics, like just exactly what you said, from someone

9      at work said oh, I know it's probably that one, so.

10              ATTY. BAILEY:  Okay.  When did they tell

11     you that?

12              SHELLEY A. MYERS:  Like, oh, last time I

13     was here, like that week.

14              ATTY. BAILEY:  Oh, before you came into

15     court?

16              SHELLEY A. MYERS:  Yeah.

17              ATTY. BAILEY:  Okay.  So when you came

18     into court that day --

19              SHELLEY A. MYERS:  I -- yeah.  I didn't, I

20     really don't know anything really about this case.

21              ATTY. BAILEY:  Okay.  So I take it with

22     the limited knowledge that you have of this case, you will be

23     able to put it aside and start brand new in this courtroom,

 1    right?

 2                    SHELLEY A. MYERS:  Oh, right.

 3                    ATTY. BAILEY:  Okay.  And the reason the

 4    judge tells you you can't read the papers or talk to other

 5    folks about this case while this trial is going on until it's

 6    all over, both phases, is because as you look around the

 7    courtroom we have one reporter here today, okay, but he's

 8    only been here for a couple of seconds right now.

 9                    CHRIS BOBBY:  Oh, yeah.  No, longer than

10    that.

11                    ATTY. BAILEY:  Not much longer than that.

12    And I expect Chris will leave in a little bit --

13                    CHRIS BOBBY:  Right.

14                    ATTY. BAILEY:  -- unless there's nothing

15    else going on in the city here today.  And then generally

16    during the course of the trial you'll see different reporters

17    come in and you'll see the TV cameras set up from the

18    different stations.  They don't film the jurors, they film

19    the other participants.  And then they'll try to do a story,

20    but you'll notice they'll only be here for a little bit.

21    Chris may be here for a while during the course of the trial,

22    but he's not going to be here for the whole thing, I can

23    guarantee that, because he's got other things to cover.  And



1    they'll write a story or do a feature based on the limited

2    time that they're here and they're going to miss everything

3    that happened, that was asked and answered before they got in

4    here and asked and answered after they leave, so sometimes

5    there may be some unintentional distortion in the paper.  It

6    may be taken out of context from what happened.

7              So if you have somebody save the newspapers for you

8    and you read those stories after the trial is all over and

9    you sit on this case you may say gosh, I remember the

10   testimony in this case, I heard it all, and whoever wrote

11   this story must have been sitting in Judge Logan's courtroom

12   covering a separate trial there because it's certainly

13   different from what I recollect, right?

14             So because of that potential for distortion and

15   error, you're instructed not to have any outside knowledge.

16   If the paper is there you got to put it down, or if something

17   comes on TV or radio you got to tune it out, put your hands

18   over your ears, walk out of the room.  If somebody tries to

19   talk to you, you say whoa, I can't talk about this.  Okay.

20   And you'd be able to do that, right?

21                       SHELLEY A. MYERS:  Right.

22                       ATTY. BAILEY:  Okay.  So everything that

23   starts, that happens in this courtroom, you're going to get

1    your knowledge solely from the testimony of the witnesses,

2    the physical exhibits that come in and the instructions of

3    law given to you by the judge, and you'll make your decision

4    based on that, okay?

5                    SHELLEY A. MYERS:   Right.

6                    ATTY. BAILEY:   No problem with that?

7                    SHELLEY A. MYERS:   No.

8                    ATTY. BAILEY:   Okay.   Now let's talk about

9    the death penalty as a possible punishment here.   The first

10   time you learned this was potentially a death penalty case

11   was when?

12                   SHELLEY A. MYERS:   The first time -- I

13   didn't, I didn't hear what you --

14                   ATTY. BAILEY:   The first time you learned

15   this was a possible death penalty case was when?

16                   SHELLEY A. MYERS:   That day.

17                   ATTY. BAILEY:   April 8th I believe it was.

18                   SHELLEY A. MYERS:   Okay, yeah.

19                   ATTY. BAILEY:   When you came into

20   Judge Logan's court across the hall with Judge Stuard?

21                   SHELLEY A. MYERS:   Right.

22                   ATTY. BAILEY:   Okay.   And before that had

23   you ever had occasion to engage in a conversation or

1    discussion with anybody about the death penalty as a possible

2    punishment, either at work or at home or at school?

3                    SHELLEY A. MYERS:  Oh, yeah.

4                    ATTY. BAILEY:  Tell me about it.

5                    SHELLEY A. MYERS:  Everywhere, you know,

6    here and there.  No, it's just, you know, people have their

7    different views on everything.  I would say I'm like 90

8    percent for the death penalty because there's always --

9                    ATTY. BAILEY:  Ninety percent?  Okay.  In

10   the questionnaire you said 98 percent.

11                   SHELLEY A. MYERS:  Well, yeah.  But, you

12   know, like it's just a shame that, you know, they go to jail

13   and then they kind of have it okay there and then they come

14   back out and they do the crime again and it's just, I just

15   didn't believe in that, you know.  I believe, you know, you

16   know they did it, I think they should.

17                   ATTY. BAILEY:  Okay.  So you're a pretty

18   strong believer in the death penalty, right?

19                   SHELLEY A. MYERS:  Yes.

20                   ATTY. BAILEY:  What would bring about this

21   kind of conversation, I mean, some horrible crime in the

22   newspaper or TV or what, where you get into a discussion with

23   somebody about the death penalty as a punishment?

1        SHELLEY A. MYERS:  Oh, maybe if you found

2   -- yeah.  Well, maybe you talk, like somebody raped or killed

3   somebody, you know, then you say, well, then that's how they

4   should go, you know.  You know how you get that conversation

5   going.

6        ATTY. BAILEY:  Okay.  And you've held this

7   view for about how long?

8        SHELLEY A. MYERS:  Oh, probably like 15

9   years, before I even thought about it.

10        ATTY. BAILEY:  Okay.  Before that did you

11   feel the same way or did you have a different view?

12        SHELLEY A. MYERS:  I don't think I really

13   thought about it, you know, like in my teenage years and

14   stuff, but.

15        ATTY. BAILEY:  Okay.  It's after you got

16   out of high school?

17        SHELLEY A. MYERS:  Yeah.

18        ATTY. BAILEY:  And has your view gotten

19   stronger or stayed the same or gotten weaker over the years?

20        SHELLEY A. MYERS:  Well, I think it's

21   gotten stronger because, you know, you listen more.  You see

22   what's out there.  And then you're like he did what or they

23   did what, you know, and it's like that's just horrible and

4158

1    then you think that way, you know.  They just don't -- I

2    don't know.

3                      ATTY. BAILEY:  Okay.  So you believe that

4    people should be held accountable for their actions?

5                      SHELLEY A. MYERS:  Right.

6                      ATTY. BAILEY:  And there should be some

7    type of punishment that would fit the crime?

8                      SHELLEY A. MYERS:  Right.

9                      ATTY. BAILEY:  Okay.  Now, if you could

10   write the laws, and you understand the laws are passed in

11   Ohio by the state legislature.  We elect these people, they

12   go to Columbus and they write the laws and then the laws are

13   approved by the governor generally, right?  And they set down

14   what's a crime and what the possible punishments are for the

15   different crimes.

16            And there are different types of killings that can

17   occur, okay?  I think you'd agree that if somebody is out

18   chopping wood with an ax and the head flies off the ax handle

19   and somebody gets killed as a result of that, that would be

20   what, an accidental killing?

21                      SHELLEY A. MYERS:  Right.

22                      ATTY. BAILEY:  And I guess you would not

23   expect to see anybody punished for that, right?

1            SHELLEY A. MYERS:  Right.

2            ATTY. BAILEY:  And if somebody were

3    driving down the road in a car too fast and they didn't stop

4    at a stop sign and they hit a pedestrian and killed them,

5    okay, you would expect that person to be punished probably,

6    right?

7            SHELLEY A. MYERS:  Right.

8            ATTY. BAILEY:  But probably not the death

9    penalty for that type of an offense, right?  Or tell me.  You

10   think the death penalty would be appropriate?

11           SHELLEY A. MYERS:  It all depends on the

12   situation, okay.  Why is he going fast?  I mean, if he's

13   going to the hospital to take his wife, you know, there's

14   like different scenarios there.

15           ATTY. BAILEY:  Okay.  Those could be

16   mitigating factors, right?

17           SHELLEY A. MYERS:  Right.

18           ATTY. BAILEY:  I mean, something that

19   might work in favor of the defendant against the imposition

20   of the death penalty as punishment.

21           SHELLEY A. MYERS:  Right.

22           ATTY. INGRAM:  You're doing mitigating

23   factors in a vehicular homicide?

1              ATTY. BAILEY:  Well, if she wants the

2     death penalty in a vehicular case.  I take it you wouldn't

3     impose the death penalty as a possible punishment for parking

4     tickets, right?

5              SHELLEY A. MYERS:  Right.

6              ATTY. BAILEY:  Okay.  Now, there are

7     different types of killings that occur in addition to those

8     that we mentioned.  Maybe somebody gets angry with another

9     person in a bar and they start fighting and one fellow

10    punches another and the victim falls over backward, hits his

11    head on the edge of the bar and dies as a result of that,

12    okay.  That could be maybe some type of manslaughter case

13    depending on the circumstances.  Would you -- you think the

14    death penalty --

15             SHELLEY A. MYERS:  Well, I got to hear

16    what that guy did to make that guy do that.

17             ATTY. BAILEY:  Okay.  Again, that might be

18    some type of mitigating factor?

19             SHELLEY A. MYERS:  Yeah.

20             ATTY. BAILEY:  Okay.  Now, then there are

21    other types of killings where, let's say, premeditated murder

22    or murder by prior calculation and design.  Let's say my

23    co-counsel Chris, let's say I don't like his shoes and I'm

 1    sick and tired of those shoes so I announce to the whole

 2    world if he wears those shoes tomorrow I'm going to blow him

 3    away as he comes up the steps of the courthouse at 9:00

 4    o'clock, okay?

 5                    SHELLEY A. MYERS:  Uh-huh.

 6                    ATTY. BAILEY:  And he comes up the steps

 7    of the courthouse wearing those shoes and I shoot him with a

 8    .357 and kill him.  Now, do you think that the death penalty

 9    would be appropriate in that type of a case?

10                    SHELLEY A. MYERS:  Yeah, because that's

11    just wrong, yes.

12                    ATTY. BAILEY:  Okay.  Now, you understand

13    that the legislature in the State of Ohio who has set out

14    what the crimes are and what the possible penalties are

15    doesn't make that a possible death penalty offense --

16                    SHELLEY A. MYERS:  Okay.

17                    ATTY. BAILEY:  -- even though it's a

18    killing with prior calculation and design?

19                    SHELLEY A. MYERS:  But even if someone saw

20    you do it?

21                    ATTY. BAILEY:  Oh, yeah.  You got to prove

22    the person guilty first, right?

23                    SHELLEY A. MYERS:  Right.

1          ATTY. BAILEY:  Okay.  So even if somebody

2     saw him do it, this is not what the law is, it's not what the

3     law is in Ohio.  There's no death penalty for that type of a

4     killing by itself.

5          Now, a person could be eligible for the death

6     penalty if there are some extra aggravating circumstances,

7     special circumstances that the legislature has written into

8     the law to make a person eligible for the death penalty.

9          SHELLEY A. MYERS:  Okay.

10         ATTY. BAILEY:  Okay.  So if I commit a

11    killing with prior calculation and design, and let's say I do

12    it murder for hire, okay, a murder for profit, and let's say

13    that the legislature has set down certain circumstances that

14    make a person eligible for the death penalty.  I think the

15    judge mentioned some.  If a victim is the president of the

16    United States or the governor of the State of Ohio or the

17    lieutenant governor or a police officer or a young child, or

18    if the murder is a mass murder, the killing of two or more

19    people, or if the killing is committed during the course of a

20    special felony like an aggravated robbery or an aggravated

21    burglary or a kidnapping or a rape, okay, a person could be

22    eligible under Ohio law for the death penalty as a

23    punishment.  Okay.

1           Now, let me ask you this:  You may have very strong

2      feelings about the death penalty being appropriate in certain

3      types of cases, right?

4                     SHELLEY A. MYERS:  Right.

5                     ATTY. BAILEY:  Okay.  Can you set aside

6      your personal feelings and, even though they may be very

7      strong, and can you follow what the law is that the judge is

8      going to tell you it is, because your personal feelings may

9      not line up with the law in Ohio?

10                    SHELLEY A. MYERS:  Oh, right.

11                    ATTY. BAILEY:  Okay.  And if Judge Stuard

12     told you this is the law and you got to follow the law, would

13     you be able to do that?

14                    SHELLEY A. MYERS:  Yes.

15                    ATTY. BAILEY:  Okay.  Even though it's

16     different from your personal beliefs?  Okay.  Well, we got to

17     know that.

18                    SHELLEY A. MYERS:  I would because I don't

19     know, I don't know the laws.  I'm just -- I just have my own

20     thought.

21                    ATTY. BAILEY:  It may well be that your

22     personal beliefs may line up with the law, but again, it may

23     not.  It's important, though, that we're a nation of laws and

 1    not men, okay, that we don't go out and enforce our own rules

 2    on people, that we have certain codes of society.  We have to

 3    follow the law or we'd have chaos, right?

 4                    SHELLEY A. MYERS:  Right.

 5                    ATTY. BAILEY:  And anarchy.

 6                    SHELLEY A. MYERS:  Right.

 7                    ATTY. BAILEY:  Okay.  And for the system

 8    to work it's important that people follow the law, they have

 9    to obey the law, right?

10                    SHELLEY A. MYERS:  Yeah.

11                    ATTY. BAILEY:  If you sat on the

12    legislature, if you had a say in designing the system, for

13    what crimes would you make a person eligible for the death

14    penalty?

15                    SHELLEY A. MYERS:  Well, rape, because I

16    wish I would have.

17                    ATTY. BAILEY:  Okay.  Even without a

18    killing?

19                    SHELLEY A. MYERS:  You know, yeah.

20                    ATTY. BAILEY:  Okay.

21                    SHELLEY A. MYERS:  Because for the rest of

22    that person's life --

23                    ATTY. BAILEY:  Okay.  Because of what

1    they've done to the victim?

2                    SHELLEY A. MYERS:  Yeah, because I'm sure,

3    you know, that one person is not the only person that they

4    did.  You know what I mean?

5                    ATTY. BAILEY:  Okay.

6                    SHELLEY A. MYERS:  Because usually,

7    usually those are the type of people who are also doing other

8    things, too.

9                    ATTY. BAILEY:  Okay.

10                   SHELLEY A. MYERS:  Drugs and, you know,

11   usually.

12                   ATTY. BAILEY:  Okay.  But you

13   understand --

14                   SHELLEY A. MYERS:  But, you know, of

15   course murder, of course -- I don't know.  It would have

16   to --

17                   ATTY. BAILEY:  I think you mentioned

18   hurting an animal?

19                   SHELLEY A. MYERS:  I know.  I really

20   cannot stand those stories about animals, you know, abuse and

21   stuff like that.

22                   ATTY. BAILEY:  Do you have any pets like

23   dogs or cats?

1                    SHELLEY A. MYERS:  I have dogs.

2                    ATTY. BAILEY:  What kind?

3                    SHELLEY A. MYERS:  I have a Rottweiler/Lab

4     mix and then a little dog.

5                    ATTY. BAILEY:  Okay.  Do you carry

6     pictures around of your pets?

7                    SHELLEY A. MYERS:  No, I don't.

8                    ATTY. BAILEY:  Because I carry pictures

9     around of my pets.

10                    SHELLEY A. MYERS:  I have them, yeah.

11                    ATTY. BAILEY:  Okay.  But you feel a

12    special attachment for animals?

13                    SHELLEY A. MYERS:  Very much.

14                    ATTY. BAILEY:  So you would punish that by

15    the death penalty?

16                    SHELLEY A. MYERS:  Not death penalty,

17    but they really --

18                    ATTY. BAILEY:  A prison sentence?

19                    SHELLEY A. MYERS:  They don't get -- yeah.

20    They don't get what they deserve.

21                    ATTY. BAILEY:  Okay.  And that's

22    understandable.  I take it you don't like the cases where

23    somebody deliberately goes out and tortures an animal and

1    then maybe gets probation?

2                    SHELLEY A. MYERS:  Right.

3                    ATTY. BAILEY:  Okay.  You think they

4    should serve some time?

5                    SHELLEY A. MYERS:  Right, yes.

6                    ATTY. BAILEY:  Okay.  That person should

7    be held accountable for his actions and not just sort of get

8    off?

9                    SHELLEY A. MYERS:  Exactly, because, you

10   know, he can do it again, just probation.

11                   ATTY. BAILEY:  Now, you had mentioned you

12   thought there were some major problems in the criminal

13   justice system.  You thought there's an over population

14   problem in the jails, right?

15                   SHELLEY A. MYERS:  Right.

16                   ATTY. BAILEY:  And that too much money is

17   being wasted when they keep prolonging the death penalty when

18   obviously the person did the crime.  So you're upset with the

19   lengthy appellate process?

20                   SHELLEY A. MYERS:  I don't know what you

21   mean.

22                   ATTY. BAILEY:  Well, when people are

23   convicted of aggravated murder they have automatic appeals

 1   that may take a number of years, okay?

 2                    SHELLEY A. MYERS:  Oh, okay.

 3                    ATTY. BAILEY:  People aren't executed

 4   right away.

 5                    SHELLEY A. MYERS:  Right.

 6                    ATTY. BAILEY:  Because there's an

 7   automatic appeal in Ohio to the Supreme Court and then there

 8   may be federal issues and other issues that can be, too.

 9   Does that bother you?

10                    SHELLEY A. MYERS:  Is there enough -- is

11   there people out there that you know they did it or is

12   appeal, you know, they're still -- even though they did it

13   and it's obvious, they still can have appeals?

14                    ATTY. BAILEY:  Everybody has the right to

15   an appeal.  If you were convicted of an offense, even, let's

16   say, any criminal offense.

17                    SHELLEY A. MYERS:  Okay.

18                    ATTY. BAILEY:  You would have the right to

19   appeal, okay?

20                    SHELLEY A. MYERS:  Okay.

21                    ATTY. BAILEY:  If you went to a trial.

22   It's a constitutional right basically.

23                    SHELLEY A. MYERS:  Oh, okay.

1            ATTY. BAILEY:  Okay.  It's part of our

2    system of justice.

3            SHELLEY A. MYERS:  Right.  I mean, I know.

4    Okay.

5            ATTY. BAILEY:  Okay.  And I take it what

6    bothers you is that it takes so long, is that right?

7            SHELLEY A. MYERS:  Right, if it's a known.

8            ATTY. BAILEY:  Okay.  You're saying

9    because there's been a guilty finding or guilty verdict then.

10   But the appeals are supposed to catch any errors in the

11   process.

12           SHELLEY A. MYERS:  Okay.

13           ATTY. BAILEY:  Okay.

14           SHELLEY A. MYERS:  That makes sense.

15           ATTY. BAILEY:  Okay.  Now, in Ohio the way

16   the legislature has set up the law in this type of a case,

17   this type of case can be tried in two different phases or two

18   separate trials.  Okay.  You read that handout that we had

19   downstairs?

20           SHELLEY A. MYERS:  Uh-huh.

21           ATTY. BAILEY:  Okay.  Do you have

22   questions about that?  Was it clear or was it --

23           SHELLEY A. MYERS:  It was pretty clear.

1                    ATTY. BAILEY:  Okay.  And as the judge

2      explained to you, you understand that the first part of this,

3      the first trial basically, first phase of the trial is tried

4      just like any other criminal case here in the State of Ohio?

5      The issue is guilt or non-guilt and the people of the State

6      have to prove elements of the crime charged.  Okay.  There

7      are a number of crimes that are charged and we have to prove

8      the elements of those crimes.  Elements are essential

9      component parts of a crime.  In other words, it's sort of

10     like the ingredients in a recipe.  You ever bake a cake?

11                    SHELLEY A. MYERS:  (Nods head

12     affirmatively.)

13                    ATTY. BAILEY:  What's your favorite?

14                    SHELLEY A. MYERS:  Oh, just chocolate.

15                    ATTY. BAILEY:  Chocolate.  Okay.  That's

16     good.  With a chocolate cake you got certain key ingredients.

17     You got to put in your butter and your eggs and your flour

18     and your sugar and your baking powder and chocolate because

19     it's a chocolate cake, right?  And if you leave one of them

20     out, like the chocolate, if you left out the chocolate in the

21     chocolate cake you might get a cake but it's not going to be

22     a chocolate cake, right?

23                    SHELLEY A. MYERS:  Right.

1          ATTY. BAILEY:  Okay.  Same thing with a

2     crime.  Each of these crimes have certain key ingredients and

3     we have to put all those ingredients in or we don't bake that

4     cake that we promised to bake, okay?

5          SHELLEY A. MYERS:  Okay.

6          ATTY. BAILEY:  And I'll give you a for

7     instance of that in a little bit, but in the first phase of

8     the trial we have to bake these different cakes, okay?

9     There's two separate charges of aggravated murder.  Even

10    though there's one person who was killed, under Ohio law

11    we're allowed to pursue two different theories of the killing

12    and the jury is allowed to consider both.  And because we're

13    allowed to do this, we've elected to pursue both different

14    theories of the killing, okay?

15         SHELLEY A. MYERS:  Okay.

16         ATTY. BAILEY:  We'll go into that a little

17    more in a minute, but the issue here is guilt or non-guilt.

18    Do we prove these elements beyond a reasonable doubt or not,

19    okay?

20         SHELLEY A. MYERS:  Okay.

21         ATTY. BAILEY:  And then you make your

22    determination in the first part of this case without any

23    concern at all for any possible punishment, okay, because the

1    issue of punishment isn't relevant to the first part of the

2    case, so you wouldn't hear any testimony about any possible

3    things that would go toward punishment, right?

4                    SHELLEY A. MYERS:  Right.  Okay.

5                    ATTY. BAILEY:  So you wouldn't expect to

6    hear anything as to what's appropriate for punishment in the

7    first phase, you just determine this issue of guilt or

8    non-guilt just like you would in any other regular criminal

9    case because in a regular case the jury never gets involved

10   in this issue of punishment, okay?

11          Now, if you and the other jurors find the defendant

12   guilty of a crime called aggravated murder and one or more of

13   these special findings of fact, we call them specifications

14   of aggravating circumstances, okay, if you find the defendant

15   guilty of that we would then move to a second phase and in

16   this second phase the issue is different.  You've already

17   determined guilt in the first phase, guilt beyond a

18   reasonable doubt, so that's already done, okay?

19                   SHELLEY A. MYERS:  Okay.

20                   ATTY. BAILEY:  You don't consider the

21   issue of guilt again, now you consider what's the appropriate

22   penalty for this defendant for this crime, okay?  And because

23   the issue is different you would expect to hear maybe the

1    same evidence you would have heard in the first phase.  These

2    aggravating circumstances that you would have found would go

3    on one side of an imaginary scale, okay?

4                         SHELLEY A. MYERS:  Okay.

5                         ATTY. BAILEY:  And on the other side of

6    the scale would be what we call mitigating factors.  Because

7    these weren't relevant in the first phase you wouldn't have

8    heard about them in the first phase, so this is the time in

9    the second phase where you hear these mitigating factors,

10   okay?

11                        SHELLEY A. MYERS:  Okay.

12                        ATTY. BAILEY:  Sort of like what you said,

13   why the driver was going down the road that fast or

14   something.

15                        SHELLEY A. MYERS:  Right.  Okay.

16                        ATTY. BAILEY:  And we don't know what

17   those are at this point because they're not relevant now, but

18   the defense has an opportunity to present evidence at that

19   phase.  You may hear additional things in this second phase.

20   And mitigating factors are things that work in favor of the

21   defendant and against the imposition of the death penalty as

22   a punishment.

23                        SHELLEY A. MYERS:  Okay.

1              ATTY. BAILEY:  Okay.  And to sit on this

2    case you got to be able to consider these different things,

3    the aggravating circumstances and the mitigating factors, to

4    determine what the appropriate punishment would be.  Okay.

5    Do you think you would be able to do that?

6              SHELLEY A. MYERS:  I'm open minded.

7              ATTY. BAILEY:  Okay.  You got to be open

8    minded, that's very important here.  And there are four

9    possible punishments that you would have read about in that

10   sheet; there's the death penalty, there's life in prison

11   without any possibility of parole, there's life in prison

12   with parole eligibility after 30 full years and life in

13   prison with parole eligibility after 25 full years.  And to

14   sit on this jury you got to be able to go into that second

15   phase and equally consider all of these four factors when you

16   start out.  Okay.  Even though your personal belief may be in

17   favor of the death penalty if you were writing the law,

18   you've got to be able to start out considering each of those

19   four things equally.

20             SHELLEY A. MYERS:  Right.

21             ATTY. BAILEY:  Do you think you would be

22   able to do that?

23             SHELLEY A. MYERS:  Oh, yes.

1            ATTY. BAILEY:  Okay.  Now, this balancing

2    test, these aggravating circumstances, our burden, the people

3    of the State, we've got to prove that the aggravating

4    circumstances outweigh the mitigating factors beyond a

5    reasonable doubt so that you're firmly convinced of that to a

6    moral certainty using your reason and your common sense.

7    Okay.  If we convince you of that, then in that case the

8    death penalty would be the appropriate punishment and you and

9    the other jurors would return a verdict as to that punishment

10   and you would not go on to consider the other three life

11   sentences under those circumstances, right?

12            SHELLEY A. MYERS:  Okay.

13            ATTY. BAILEY:  If we don't meet our burden

14   of proof and we don't convince you beyond a reasonable doubt

15   that the aggravating circumstance or circumstances outweigh

16   these mitigating factors, then we haven't met our burden of

17   proof.  You ignore the death penalty as a punishment at that

18   point and you go on to consider one of the other three life

19   sentences and determine which is appropriate for this

20   defendant in this case, okay?

21            SHELLEY A. MYERS:  Okay.

22            ATTY. BAILEY:  Keeping an open mind.

23   Okay.  Now, you think you'd be able to do that?

 1                         SHELLEY A. MYERS:  Yes.

 2                         ATTY. BAILEY:  Okay.  If we convince you

 3      that the death penalty is the appropriate penalty in this

 4      case under the facts and the law, would you be able to sign a

 5      death penalty verdict form for the death penalty?

 6                         SHELLEY A. MYERS:  Yes.

 7                         ATTY. BAILEY:  Okay.  And if the judge

 8      asked is that your verdict in open court, would you be able

 9      to announce that, that yes, it is your verdict?

10                         SHELLEY A. MYERS:  Yes.

11                         ATTY. BAILEY:  Okay.  Now, I mentioned

12      that the defendant is charged with a number of crimes and --

13      oh, let me go back to the death penalty for a minute.  You

14      understand that a person who is found guilty in the first

15      phase of aggravated murder and one or more of these

16      specifications of the aggravating circumstances, it's not an

17      automatic death penalty for that person because you wouldn't

18      have heard anything about mitigating factors, right?

19                         SHELLEY A. MYERS:  Right.

20                         ATTY. BAILEY:  Okay.  These things that

21      work in favor of the defendant and against the death penalty.

22      And you have to be able to consider that before you determine

23      anything about punishment, right?

1      SHELLEY A. MYERS:  Right.

2      ATTY. BAILEY:  Okay.  Now, the defendant

3 here is charged not as the trigger person but rather as a

4 complicitor, somebody who solicits or procures another person

5 to commit a crime or aids and abets another person, helps,

6 encourages, plans with another person in the commission of

7 the offense.  Okay.  And as I mentioned before, the defendant

8 is charged with planning with this fellow by the name of Nate

9 Jackson in the killing of her ex-husband, with whom she was

10 living, for insurance money.  And that the actual killing and

11 the trespass into the dwelling house of the victim, his home,

12 was committed by this Nate Jackson and charges that Nate

13 Jackson is the one who committed the aggravated robbery, took

14 the car and used a working gun, a firearm, in the commission

15 of the offense, okay?

16      SHELLEY A. MYERS:  Okay.

17      ATTY. BAILEY:  Now, the fact that the

18 defendant is charged as a complicitor, not the person who

19 pulled the trigger but as a complicitor, would that affect

20 your ability to return a conviction, a verdict for the death

21 penalty in an appropriate case if we proved beyond a

22 reasonable doubt that the aggravating circumstance or

23 circumstances outweighed the mitigating factors?

```
 1                    SHELLEY A. MYERS:  I would still have to
 2    hear the whole story, but --
 3                    ATTY. BAILEY:  Well, absolutely.
 4                    SHELLEY A. MYERS:  Yeah.
 5                    ATTY. BAILEY:  Right, you'd have to hear
 6    the whole thing before you made up your mind.
 7                    SHELLEY A. MYERS:  Right.  I know.
 8                    ATTY. BAILEY:  Okay.  Would that bother --
 9    if under Ohio law, under Ohio law she would be eligible, if
10    we could prove that beyond a reasonable doubt she's eligible
11    for the death penalty, you think that would affect your
12    ability to return a death penalty verdict if we prove to you
13    beyond a reasonable doubt that it was the right punishment,
14    the appropriate punishment in this case?
15                    SHELLEY A. MYERS:  Right, if it's proved,
16    yes.
17                    ATTY. BAILEY:  Okay.  Now, the fact that
18    she's a woman as opposed to a man, does that affect you in
19    any way?
20                    SHELLEY A. MYERS:  No.
21                    ATTY. BAILEY:  Okay.  Now, the defendant
22    is charged with two different counts or charges of aggravated
23    murder.  One of these charges -- and there are two different
```

1    theories.  Like I said, under Ohio law we're allowed to

2    pursue two different theories of the killing.  Even though

3    there's one killing, we can pursue two theories under the

4    law.

5                    SHELLEY A. MYERS:  Oh, okay.

6                    ATTY. BAILEY:  We've chosen to do that,

7    the jury is allowed to consider that, and the first charge of

8    aggravated murder is a charge of a purposeful killing with

9    prior calculation and design and the second charge of

10   aggravated murder, or second theory, is that the purposeful

11   killing was done during the course of this special felony,

12   like an aggravated robbery and/or an aggravated burglary,

13   okay?

14                   SHELLEY A. MYERS:  Okay.

15                   ATTY. BAILEY:  Attached to these charges

16   of aggravated murder are what we call these specifications of

17   aggravating circumstances.  It's fancy words that means a

18   special finding of fact for the jury to consider.  And the

19   first special finding of fact is that the aggravated murder

20   was committed with prior calculation and design and during an

21   aggravated burglary, okay?

22                   SHELLEY A. MYERS:  Okay.

23                   ATTY. BAILEY:  The second specification or

1    special finding of fact is that the aggravated murder was

2    committed with prior calculation and design and during an

3    aggravated robbery as opposed to an aggravated burglary.

4                    SHELLEY A. MYERS:   Okay.

5                    ATTY. BAILEY:   Okay.   There's a difference

6    there.   Sometimes if folks aren't trained in the law they use

7    those terms interchangeably.   Some folks may say, "Well,

8    gosh, my house got robbed," and they really mean "My house

9    got burgled."   Okay.

10            The judge is going to instruct you as to the law and

11   the definitions at the end of this case and you're bound to

12   follow his definitions and his instructions, but basically

13   when we deal with the term aggravated burglary we're talking

14   about a situation where a perpetrator trespasses in somebody

15   else's occupied structure, dwelling house, home, okay?

16                    SHELLEY A. MYERS:   Uh-huh.

17                    ATTY. BAILEY:   Where somebody is living.

18   And the perpetrator goes in with the intent to commit an

19   offense like an aggravated murder or a theft offense, and the

20   perpetrator could be armed with a deadly weapon like a knife

21   or a gun, and the perpetrator could inflict serious physical

22   harm or death on the victim.   Okay.   And an aggravated

23   robbery as opposed to the aggravated burglary, there is no

```
 1    structure involved.  You don't have to have a dwelling house,

 2    okay?  It's the use of force or threat of force against

 3    another person with the purpose to maybe steal something.

 4    And the perpetrator again can be armed with a deadly weapon

 5    like a knife or gun, and the perpetrator can inflict serious

 6    physical harm or death on the victim, okay?

 7                        SHELLEY A. MYERS:  Okay.

 8                        ATTY. BAILEY:  So there's a difference

 9    there between those two types of things, the aggravated

10    burglary and the aggravated robbery, okay?  You understand

11    that?

12                        SHELLEY A. MYERS:  Uh-huh.

13                        ATTY. BAILEY:  Now, there are also two

14    other charges.  There is a charge of, as a complicitor, the

15    defendant is charged with aggravated burglary and aggravated

16    robbery, and attached to those two charges are other

17    specifications of a firearm, a working gun being used, okay?

18                        SHELLEY A. MYERS:  Okay.

19                        ATTY. BAILEY:  And under Ohio law as a

20    complicitor that means this Nate Jackson, his using a gun

21    would go back on the defendant, okay?

22              Now, each of these crimes is composed, as I said, of

23    certain key ingredients.  I'm going to give you a for
```

 1    instance.  The judge is going to define these crimes for you.

 2    It's like baking a bunch of different cakes, right?

 3                    SHELLEY A. MYERS:  Okay.

 4                    ATTY. BAILEY:  Okay.  And let me give you

 5    a for instance as to one of these cakes.  The crime of

 6    aggravated murder with prior calculation and design, we have

 7    to prove beyond a reasonable doubt these elements.  Okay.

 8    First that it happened on a certain date like December 11th,

 9    2001.  The second element that we might have to prove would

10    be that it happened in Trumbull County, Ohio.  We call that,

11    the technical term is venue.  Venue just means it happened in

12    this county here in Ohio so we can try it in this courthouse

13    rather than up in Lorain County or down in Athens County.

14                    SHELLEY A. MYERS:  Okay.

15                    ATTY. BAILEY:  Okay.  The third element

16    might be identification, that the person who committed this

17    crime is sitting over there and somebody would have to point

18    her out.  The fourth element is that she acted purposely,

19    basically on purpose, but the judge is going to give you a

20    detailed, legal explanation of that term.  Fifth, that she

21    caused the death of a living person.  In this case a fellow

22    by the name of Robert Fingerhut.  And, sixth, that she acted

23    with prior calculation and design.

1           Now, it used to be in old law years ago we used to

2    have a term called premeditation.  Okay.  They changed that

3    law, the legislature, and created this new term, prior

4    calculation and design, which really means advanced planning

5    that's part of a studied scheme to kill.  Okay.  So, for

6    example, let's say I take my pen and I drop it and I catch

7    it.  Okay.  That could be a reflex, right?  No planning

8    involved.  But let's say I take my pen and I drop it and I

9    look down and I say, "Uhm, I dropped my pen.  Maybe I better

10   bend down, I'm going to pick it up," and I do that.  That

11   indicates some advanced planning, right?

12                       SHELLEY A. MYERS:  Uh-huh.

13                       ATTY. BAILEY:  Okay.  Now, let's say

14   yesterday I was talking to my co-counsel and I said, "Chris,

15   I need an example of prior calculation and design so I'm

16   going to go into court tomorrow and drop my pen so I can bend

17   down and pick it up," and then I do that, I drop it and I

18   pick it up today.

19                       SHELLEY A. MYERS:  Okay.

20                       ATTY. BAILEY:  Okay.  That would be prior

21   calculation and design because I engaged in a studied scheme

22   to do that and there was also advanced planning, right?

23                       SHELLEY A. MYERS:  Right.  Okay.

```
 1              ATTY. BAILEY:  Okay.  So those are

 2    elements of a crime that are charged, okay, it's an example

 3    of elements, and we have to prove all of those particular

 4    elements of the crime charged to your satisfaction beyond a

 5    reasonable doubt.  Now, you watch, if I recollect, you like

 6    police and detective shows.  What, Law and Order?

 7              SHELLEY A. MYERS:  Well, yeah.  I mean --

 8              ATTY. BAILEY:  You like Crossing Jordan?

 9              SHELLEY A. MYERS:  Yeah.

10              ATTY. BAILEY:  Did she find her mom's

11    killer last night?

12              SHELLEY A. MYERS:  Now that I've been on

13    10 hours I've been missing all my stuff.

14              ATTY. BAILEY:  Okay.  But what do you

15    usually like?  Do you like CSI?

16              SHELLEY A. MYERS:  No.  It's just more or

17    less like Crossing Jordan, and every once in a while -- well,

18    I like ER and I just like those kind of --

19              ATTY. BAILEY:  Those type of shows?

20              SHELLEY A. MYERS:  Yeah, those.

21              ATTY. BAILEY:  Okay.  And you understand

22    sometime those shows are, they do things that don't happen in

23    real life?
```

1                     SHELLEY A. MYERS:   Right.

2                     ATTY. BAILEY:   Okay.   I just wish we had

3 all the technology that they show on CSI.   They show 50

4 million dollars worth of equipment working on every case and

5 that usually doesn't happen.   Okay.

6           Now let's talk about some basic criminal law

7 concepts.   Okay.   The burden of proving the elements of the

8 crime charged is on us, the people of the State.   Okay.   That

9 burden never shifts.   The defendant, the defendant has no

10 burden of proof, okay?   The defense can sit there through the

11 whole trial, they don't have to do anything.   They can sit on

12 their hands or work crossword puzzles.   Okay.   They won't,

13 they're very good attorneys, but they don't have to do

14 anything, you understand that?   The burden of proving these

15 elements is on us, the people of the State.

16                     SHELLEY A. MYERS:   Okay.

17                     ATTY. BAILEY:   And it's sort of different

18 from what you might expect.   Sometimes folks say, well, I

19 like to hear both sides of the story.   Okay.   You understand

20 that that may not happen here because there's no burden on

21 the defense.   The defendant doesn't have to testify, it's a

22 constitutional right, and you can't -- you're not allowed to

23 hold that against her because the burden of proof is on us.

1   We have to prove these elements.  Okay.  You think you can

2   abide by that?

3                   SHELLEY A. MYERS:  Yes.

4                   ATTY. BAILEY:  Okay.  Because that's part

5   of our American system of justice.  There are other countries

6   where, like in France even, or in Turkey, let's say, where

7   the defendant is presumed to be guilty and the person stays

8   in jail until they prove their innocence.  That's not our

9   system of justice.  Under our American system of justice

10   everybody has a presumption of innocence, and this defendant

11   is presumed to be innocent just as all other defendants are

12   in this courtroom.  Okay.  This presumption of innocence

13   under our system of justice acts like a cloak shielding this

14   defendant through the entire course of this trial unless and

15   until we present enough evidence, testimony and evidence,

16   when you and the other jurors are back in the jury room and

17   deliberating and you find that we proved the elements of the

18   crimes charged by proof beyond a reasonable doubt.  Then, of

19   course, you would be able to return a guilty verdict and that

20   presumption of innocence would be gone, right?

21                   SHELLEY A. MYERS:  Right.

22                   ATTY. BAILEY:  So I take it you would be

23   able to afford her that presumption of innocence?

```
 1                    SHELLEY A. MYERS:  Yeah.  Yes.  Oh, yeah.

 2                    ATTY. BAILEY:  Okay.  And they have that

 3    on TV too all the time in all the programs.  If we don't live

 4    up to this burden of proof, if we miss one of the elements,

 5    like let's say I never asked the question what county it

 6    happened in and I leave it out, let's say I'm really dumb and

 7    I don't do that.  That's not going to happen, but let's say I

 8    do that, I leave it out, okay?  Then you have to return a

 9    verdict finding her not guilty because I haven't lived up to

10    my burden of proof.  You understand she doesn't have to do

11    anything?

12                    SHELLEY A. MYERS:  Oh, okay.

13                    ATTY. BAILEY:  Okay.  It's totally on me

14    and on Chris.  Okay.  We've got the burden of proof.

15                    SHELLEY A. MYERS:  Okay.

16                    ATTY. BAILEY:  And she doesn't have to do

17    anything at all, okay?

18                    SHELLEY A. MYERS:  Okay.

19                    ATTY. BAILEY:  We have to convince you

20    beyond a reasonable doubt.  Now, this term reasonable doubt,

21    proof beyond a reasonable doubt, there's nothing mystical

22    about it.  The judge is going to give you a legal definition,

23    but it's something that you're used to dealing with in your
```

1    everyday life.  Okay.  You're a receiving coordinator and

2    you're an office manager, right?

3                    SHELLEY A. MYERS:  Right.

4                    ATTY. BAILEY:  Okay.  So you use reason

5    and common sense in your everyday work, don't you?

6                    SHELLEY A. MYERS:  Right.

7                    ATTY. BAILEY:  And when you raise your son

8    or -- I'm sorry.

9                    SHELLEY A. MYERS:  Corey, yeah.  My son,

10   yeah.

11                   ATTY. BAILEY:  Corey, yeah.  When you

12   raise your son as a parent you use reason and common sense.

13                   SHELLEY A. MYERS:  Right.

14                   ATTY. BAILEY:  Okay.  And the test is

15   basically you've got to be firmly convinced of the truth of

16   the charge, these elements of the crime, to a moral

17   certainty, okay, using your reason and common sense.  And

18   there are decisions that you make in your lifetime, whether

19   you're going to -- if you want to buy a house, right now

20   you're renting, but did you ever buy a house?

21                   SHELLEY A. MYERS:  We're renting to buy

22   so, or renting to own.

23                   ATTY. BAILEY:  You're renting to own.

1  Okay.  A land contract?

2                SHELLEY A. MYERS:  Yeah.

3                ATTY. BAILEY:  Okay.  So when you enter

4  into that type of an arrangement you make the decision as to

5  whether this is the house you really want, right?

6                SHELLEY A. MYERS:  Right.

7                ATTY. BAILEY:  Let's say you want to

8  decide if you're going to get married, that's another major

9  decision, or take a certain job or have children or change

10  jobs, okay, these are things where you may list the pros and

11  the cons, right?

12                SHELLEY A. MYERS:  Right.

13                ATTY. BAILEY:  And you don't make a

14  decision until you're firmly convinced it's the right thing

15  to do using your reason and common sense, right?

16                SHELLEY A. MYERS:  Right.

17                ATTY. BAILEY:  Okay.  So you've done this

18  before.

19                SHELLEY A. MYERS:  Right.

20                ATTY. BAILEY:  This is no mystical weird

21  thing --

22                SHELLEY A. MYERS:  Exactly.

23                ATTY. BAILEY:  -- that we're coming up

1   with, it's something you use in your everyday life, it's a

2   test that you use every day.  Same thing here.

3         Now, proof beyond a reasonable doubt is not proof

4   beyond all doubt or beyond any doubt or beyond an imaginary

5   doubt or beyond a shadow of a doubt.  That term shadow of a

6   doubt, that's a TV movie, that's a Hollywood movie, Alfred

7   Hitchcock I think, that's a title of a movie.

8                     SHELLEY A. MYERS:  Okay.

9                     ATTY. BAILEY:  But there's no such animal

10  in criminal law.  We can't prove anything a hundred percent

11  proof because everything is always open to some possible or

12  imaginary doubt.

13                    SHELLEY A. MYERS:  Okay.

14                    ATTY. BAILEY:  You understand that?

15                    SHELLEY A. MYERS:  I understand that.

16                    ATTY. BAILEY:  Okay.  And we're bound by

17  the same burden of proof in every criminal case.  Whether

18  it's a shoplifting case or a burglary case or a murder case

19  or a possible death penalty case like this one, our burden

20  stays the same, okay?

21                    SHELLEY A. MYERS:  Okay.

22                    ATTY. BAILEY:  It doesn't get any higher,

23  it doesn't get any lower.  It's the same burden of proof,

1    proof beyond a reasonable doubt.  Now, it's sort of like

2    having an imaginary box, okay, and in this box we have to put

3    in evidence.  It's our burden to fill it with evidence,

4    testimony and evidence, --

5                    SHELLEY A. MYERS:  Okay.

6                    ATTY. BAILEY:  -- so that there's enough

7    there to convince you of the truth of the charge, these

8    elements of the crimes.  Now, in a civil case the burden is

9    whoever fills it little over half way.  If somebody gets into

10   a car crash and they're suing for money damages, then whoever

11   fills that just over the middle is going to win.  In a

12   criminal case our burden is a whole lot higher.  You have to

13   fill this box with evidence so it's pretty close to the top

14   of the box, not all the way to the top.  I mean, if you --

15   you and each of the other 11 jurors can draw your own

16   imaginary line on that box.  Some of you might draw it an

17   inch away from the top or half an inch, but it's pretty darn

18   full, right?

19                    SHELLEY A. MYERS:  Right.

20                    ATTY. BAILEY:  So you're firmly convinced

21   of the truth of the charge.

22                    SHELLEY A. MYERS:  Right.  It's a life

23   you're dealing with so you got to.

 1                      ATTY. BAILEY:  Right.  So you want to be

 2    pretty darn sure, right?

 3                      SHELLEY A. MYERS:  Right.

 4                      ATTY. BAILEY:  Okay.  Now, there are

 5    different types of evidence -- and you understand we have

 6    that burden of putting stuff into the box?  The defendant

 7    doesn't have any burden.  It's not up to her to take anything

 8    out of the box or put stuff in.

 9                      SHELLEY A. MYERS:  Okay.

10                      ATTY. BAILEY:  It's entirely on us, the

11    people of the State, to put stuff in the box.

12                      SHELLEY A. MYERS:  Okay.

13                      ATTY. BAILEY:  Right?  She just sits

14    there, okay?

15                      SHELLEY A. MYERS:  Okay.

16                      ATTY. BAILEY:  Now, there are different

17    types of evidence that we can use to put stuff in this box.

18    Okay.  We can use what we call direct evidence.  It's where a

19    witness comes in and testifies to what he or she has learned

20    through the use of his or her five senses like, "I heard the

21    gunshot and it was loud," or "I smelled the smoke and it was

22    acrid" or "I touched the body and it was cold."  Okay.

23    There's another type of proof that we're allowed to use,

1    another type of evidence, and you're used to using this every

2    day.  You may not realize what it is but it's where you are

3    presented with a fact or a series of facts and you're asked

4    to draw a logical deduction from another fact or set of

5    facts.  Okay.  We call that roundabout type of evidence,

6    circumstantial evidence, and it's just as good as direct

7    evidence.

8         Let me give you an example of that.  Let's say you

9    live in a neighborhood where you have a two-story house and

10   your bedroom is on the second floor and you're going to go to

11   bed at night, okay?  And you're in your bedroom, you look out

12   across the neighborhood and it's a beautiful night, through

13   the window in the bedroom, and the moon is beaming, the stars

14   are twinkling, there's not a cloud in the sky.  And as far as

15   you can see across the neighborhood everything is dry, all

16   the rooftops are dry, the streets are dry, so you draw the

17   blinds, you get into bed.

18        You got the radio on kind of low and the announcer

19   says, "Folks, there's a cold front moving in and I expect

20   that we're going to get a storm tonight," and you fall asleep

21   and sometime later you're awakened during the middle of the

22   night by a distant booming sound in the sky.  And you look

23   toward the window and, even though the blinds are drawn, you

1  see suddenly a flash of light outside and two seconds later

2  there's a boom a little further away.  Okay.  And then a

3  minute goes by and another bright flash of light and a second

4  later there's a closer boom.  And suddenly there's a really

5  bright flash of light outside and a big ripping, cracking

6  boom above the house and a pitter-patter on the roof and a

7  steady drumming sound and you fall back asleep.

8              Sometime later you awaken, go to the window, open

9  the blinds, look out across the neighborhood.  It's a

10  beautiful day and the sun is shining and there's not a cloud

11  in the sky, but as far as you can see the streets are running

12  with water, the rooftops are all wet, and drops of water are

13  dripping off the leaves of the trees, and there's no fire

14  hydrant nearby for somebody to hit it and spew water all over

15  the houses, right?  You know what happened during the night,

16  don't you?

17                  SHELLEY A. MYERS:   (Nods head

18  affirmatively.)

19                  ATTY. BAILEY:   What happened?

20                  SHELLEY A. MYERS:   It stormed.

21                  ATTY. BAILEY:   Right, there was a

22  thunderstorm.   And you know that beyond any reasonable doubt,

23  don't you?

```
 1              SHELLEY A. MYERS:  Right.

 2              ATTY. BAILEY:  Okay.  You're firmly

 3    convinced of the truth of that to a moral certainty, --

 4              SHELLEY A. MYERS:  Yeah.

 5              ATTY. BAILEY:  -- okay, based on the

 6    different circumstances, facts and circumstances.  You didn't

 7    see the rain with your own eyes, you didn't see the lightning

 8    with your own eyes, but you heard the thunder, you saw the

 9    flashes of light coming from outside the window.

10              SHELLEY A. MYERS:  Okay.  Yeah.

11              ATTY. BAILEY:  And all the other facts

12    that were involved, the radio announcer and everything.  And

13    you understand that's just as good of evidence as somebody

14    who testifies through the use of their five senses as to what

15    they saw or heard or smelled or whatever?

16              SHELLEY A. MYERS:  Okay.

17              ATTY. BAILEY:  Okay.  And we can prove the

18    elements of the crime through the use of this circumstantial

19    evidence.  And if we convince you so that you're firmly

20    convinced of the truth of the charge beyond a reasonable

21    doubt based on circumstantial evidence alone, you can return

22    a conviction, right?

23              SHELLEY A. MYERS:  Right.
```

1       ATTY. BAILEY: Okay. Now I take it you'd

2   agree that because most serious crimes are planned in secret

3   we may have to use circumstantial evidence to find out what

4   the person's purpose was, okay?

5       SHELLEY A. MYERS: Okay.

6       ATTY. BAILEY: So if we had things like

7   letters or phone calls showing what somebody's intent was

8   before a crime, you could consider something like that?

9       SHELLEY A. MYERS: Right.

10      ATTY. BAILEY: And circumstantial evidence

11  of the elements of the crime, right?

12      SHELLEY A. MYERS: Right.

13      ATTY. BAILEY: Okay. Now, I had mentioned

14  possible or imaginary doubt. There's room in there for some

15  possible or imaginary doubt. You can imagine that maybe E.T.

16  and his martian buddies flew by overhead in a flying saucer

17  during the night and sprinkled the ground with some wet stuff

18  and put on a sound and light show, but that would be a

19  foolish or imaginary doubt, wouldn't it?

20      SHELLEY A. MYERS: Right.

21      ATTY. BAILEY: Okay. And you know based

22  on circumstantial evidence all that really happened was there

23  was a thunderstorm.

1                    SHELLEY A. MYERS:  Right.

2                    ATTY. BAILEY:  Okay.  Can you, can you

3    pile up evidence on evidence and make your own decision as to

4    if there's enough and follow what the judge tells you?

5                    SHELLEY A. MYERS:  Right, yes.

6                    ATTY. BAILEY:  Okay.  A couple of things.

7    You can't take notes, okay?

8                    SHELLEY A. MYERS:  Right.

9                    ATTY. BAILEY:  If you're at work or if

10   you're in school or something you take notes, right?  But in

11   our courts in Ohio our judges don't let people takes notes

12   because they want you to look at the witnesses and observe

13   their demeanor when they testify.

14                   SHELLEY A. MYERS:  Okay.

15                   ATTY. BAILEY:  Okay.  And notes they think

16   are distracting because some people take better notes than

17   others and they may argue about what they wrote down so they

18   want you to pay attention to the testimony and the witness

19   and disregard, you know, don't take notes.

20        On TV sometimes they ask for transcripts of

21   testimony, the jurors, but in Ohio we don't have the

22   facilities here, millions of dollars worth of transcribing

23   equipment, for instance.  And our court reporters are very

```
 1   good but they can't give us instant transcripts.  It's not
 2   like the O.J. Simpson case or the Menendez brothers or one of
 3   those types of cases where they have all the national news
 4   media and all the -- they're paying a million people all this
 5   money to transcribe things instantly.  We don't have that in
 6   this county, okay?
 7                      SHELLEY A. MYERS:  Okay.
 8                      ATTY. BAILEY:  So there won't be any
 9   instant transcripts.  You're going to have to rely on your
10   recollection along with the collective recollection of the
11   other 11 people.
12                      SHELLEY A. MYERS:  Okay.
13                      ATTY. BAILEY:  Okay.  There won't be any
14   instant replays unlike TV where on some of those sports games
15   they have instant replays.
16                      SHELLEY A. MYERS:  Yeah.
17                      ATTY. BAILEY:  Also, you can't go out to
18   investigate on your own.  I mention that because on some of
19   the TV shows like on Matlock or on a Perry Mason rerun or on
20   Hawaii 5-0 on reruns, I saw it when it was original, but
21   McGarrett had his staff go out and investigate.  You can't do
22   that because it would cause a mistrial.
23                      SHELLEY A. MYERS:  Okay.
```

1          ATTY. BAILEY:  Okay.  We don't want to do

2     it all over again, right?

3          SHELLEY A. MYERS:  No, right.

4          ATTY. BAILEY:  Now, another thing is

5     you're stuck with the questions that the lawyers ask, and

6     because we're lawyers we go to law school and we get trained

7     to establish these elements, ask questions establishing the

8     elements or tear them down.  Okay.  And that's what we're

9     looking at basically is elements, these ingredients of the

10    crime.

11          And it may well be that you might have some

12    unanswered questions.  Like if you had an interest in shoes,

13    okay, like my wife, my wife might have a real interest in the

14    shoes.  Like she's got 50 million pairs, unless the dogs eat

15    them.  But if you were wondering what somebody were wearing

16    and it's not, let's say it's not a case where there were

17    prints in the snow or something, and we establish the

18    elements of the crime to your satisfaction beyond a

19    reasonable doubt and nobody ever asks any questions about

20    shoes or nobody answers any because there's none asked, okay,

21    that type of question would not be asked or answered, right?

22    You would never know the answer to something like that.

23          SHELLEY A. MYERS:  Right.

1              ATTY. BAILEY:  Like if somebody was a chef

2    and wondered what people were eating, it might not have any

3    bearing on the case and it would never get asked or answered,

4    right?

5              SHELLEY A. MYERS:  Right.

6              ATTY. BAILEY:  Okay.  So you'd be able to

7    make your decision even though there might be some unanswered

8    questions, right, okay, as long as you were convinced that we

9    proved the elements beyond a reasonable doubt?

10          You understand that criminals may engage in a lot of

11   planning but sometimes they do some really stupid things and

12   they get caught.  For example, you're probably familiar with

13   the situation where the bank robber goes in, he's got a

14   getaway driver outside and he hands the teller a note and it

15   says "Give me all the money."  And the teller gives him the

16   money, he runs out of the bank, but he leaves the note

17   behind.  The teller turns the note over and it's really an

18   envelope and on the back is the defendant's name and address,

19   right?  Or the burglar who climbs in through the window and

20   drops his wallet with his identification at the scene and

21   gets caught because of that.

22             SHELLEY A. MYERS:  Yeah.

23             ATTY. BAILEY:  So you understand sometimes

1   criminals can do some really stupid things and get caught in

2   spite of all their planning.  Okay.

3            At the end of this case the jury is going to be

4   sequestered.  That means after all the testimony and evidence

5   is in and the judge has given you instructions on the law the

6   jury is kept together.  And every jury is different.  In

7   different capital cases, or cases where the death penalty is

8   a possible punishment, we've had juries in the first phase

9   come back in anywhere from an hour and a half up to five

10  days.  Okay.  So you would take as long as you need to

11  deliberate and look at all the evidence, right?

12                    SHELLEY A. MYERS:  Right.

13                    ATTY. BAILEY:  Okay.  And let's say you

14  and the other jurors come back with a guilty verdict of

15  aggravated murder and one or more specifications of

16  aggravating circumstances in the first phase, okay?  You

17  would then move to a second phase and there would be a break

18  in there, maybe a couple of days or a week, and then you come

19  back and you hear maybe the same evidence or different

20  evidence presented.  And the judge will instruct you on the

21  law and then you'd have to go out and deliberate again and

22  you'd be sequestered again, okay?  Those two periods of

23  sequestration, would that cause you any undue hardship

```
 1    because I know you have a young child at home?  Do you think

 2    your husband would be able to handle that?

 3                         SHELLEY A. MYERS:  Well, he's on midnight

 4    turn.

 5                         ATTY. BAILEY:  Okay.

 6                         SHELLEY A. MYERS:  But right now, see, I

 7    do have a baby-sitter right now because of my job.  But

 8    that's like the whole week, seven days?

 9                         ATTY. BAILEY:  Well, it depends.  Each

10    jury is different.  I mean, who knows, it could take a day,

11    it could take several days, I don't know.  It's up to the

12    jury.

13                         SHELLEY A. MYERS:  It should be okay.

14                         ATTY. BAILEY:  Should be okay?  You would

15    be able to get a baby-sitter or something?

16                         SHELLEY A. MYERS:  Yeah.

17                         ATTY. BAILEY:  Okay.  You wouldn't rush

18    your deliberations because of that?

19                         SHELLEY A. MYERS:  No.

20                         ATTY. BAILEY:  Okay.  Okay.  And you would

21    be able to concentrate?  You wouldn't be worried about Corey

22    because you would have somebody watching him?

23                         SHELLEY A. MYERS:  No.
```

1          ATTY. BAILEY:  Okay.  And his dad would be

2     there the rest of the time?

3          SHELLEY A. MYERS:  Right.

4          ATTY. BAILEY:  Do you have any other

5     family like grandmothers around or --

6          SHELLEY A. MYERS:  Yeah, all my family is

7     around here.

8          ATTY. BAILEY:  Okay.  So they would be

9     able to help for a couple of days, right?

10         SHELLEY A. MYERS:  Yes.

11         ATTY. BAILEY:  Okay.  Now, it's normal for

12    folks to feel sympathy, sympathy for the victim perhaps,

13    sympathy for the defendant, because perhaps during the course

14    of the trial as her chair is turned towards you you're going

15    to become more acquainted with her.  My question to you is

16    this:  When you go inside your jury room to deliberate on

17    your verdict can you set aside all thoughts whatsoever you

18    might have of sympathy for the defendant, for the victim, and

19    base your determination on the testimony and the evidence

20    that's received and the instructions of law given to you by

21    the judge?

22         SHELLEY A. MYERS:  I think I can.

23         ATTY. BAILEY:  Okay.  It's very important.

1             SHELLEY A. MYERS:  You know, only because

2    I do have -- I cry easy.  I can't help it.

3             ATTY. BAILEY:  That's understandable.

4             ATTY. INGRAM:  I'm sorry.  What was that?

5             ATTY. BAILEY:  She cries easy.  We've had

6    juries --

7             SHELLEY A. MYERS:  I have -- I don't know.

8             ATTY. BAILEY:  And it's not unusual.  We

9    have juries even in regular cases that aren't death penalty

10   cases where juries return with verdicts and sometimes the

11   folks are crying and there's nothing wrong with that.  But

12   what's important is you have to be able to set aside your

13   personal emotions of sympathy, okay?  You can't decide the

14   case based on sympathy.  And if the judge tells you that you

15   have to set aside all thoughts of sympathy for the victim,

16   for the defendant, would you be able to follow the law and do

17   that?

18             SHELLEY A. MYERS:  I could, yes.

19             ATTY. BAILEY:  Okay.  Okay.  Because it's

20   important that you have to base your decision on the

21   testimony and the evidence and the instructions of law.

22             SHELLEY A. MYERS:  Right.

23             ATTY. BAILEY:  Okay.  Now, would you agree

1    that -- well, do you have any questions as to what we're

2    doing?

3                    SHELLEY A. MYERS:  No.

4                    ATTY. BAILEY:  Okay.  You would agree that

5    we have certain obligations of citizenship in this country.

6    Let's say when it's time, when it's election time we're

7    supposed to go out and find out as much as we can about the

8    issues and the candidates and cast a ballot.

9                    SHELLEY A. MYERS:  Uh-huh.

10                   ATTY. BAILEY:  And we have soldiers

11   overseas fighting to protect our liberty, so we could do

12   that.

13                   SHELLEY A. MYERS:  Right.

14                   ATTY. BAILEY:  And if we're at war we got

15   an obligation to serve in the military.  We got young folks

16   overseas right now in several places handling things in the

17   military.  Okay.  And there's another obligation of

18   citizenship.  If we're summoned in to serve on a jury it may

19   cause inconvenience in our life.  We may have to arrange

20   baby-sitters or we may have to arrange some cover at work or

21   something like that.  And it may take a couple of weeks out

22   of our lives and it may not be the most convenient time, but

23   to make sure that the system works it's important that we get



```
 1    people from all walks of life with all experiences, with

 2    different types of experiences, to sit on a criminal case,

 3    especially one as serious as this.  This is the most serious

 4    of all criminal cases.  Do you think you'd be able to --

 5    would you be willing to undertake that obligation of

 6    citizenship?

 7                        SHELLEY A. MYERS:  Yes.

 8                        ATTY. BAILEY:  Okay.  Thank you very much.

 9    Now I'm done.  Defense counsel will have an opportunity to

10    ask you some questions.

11                        SHELLEY A. MYERS:  Okay.

12                        ATTY. JUHASZ:  Hi, Ms. Myers.  How you

13    doing?

14                        SHELLEY A. MYERS:  Hi.  Good.

15                        ATTY. JUHASZ:  Do you need some water or

16    something?  You've been up here for a while.

17                        SHELLEY A. MYERS:  I'm okay.  Thank you.

18                        ATTY. JUHASZ:  All right.  If you need

19    some, let me know, okay?

20                        SHELLEY A. MYERS:  Okay.

21                        ATTY. JUHASZ:  I'm John Juhasz.  The judge

22    had us introduce ourselves but it's been a long time already.

23    That's Jerry Ingram.
```

```
 1                    ATTY. INGRAM:  Hi.  How are you?

 2                    SHELLEY A. MYERS:  Hi.

 3                    ATTY. JUHASZ:  Jerry and I are

 4    representing Donna Roberts, okay?

 5                    SHELLEY A. MYERS:  Okay.

 6                    ATTY. JUHASZ:  And because of the nature

 7    of the case you might appreciate that we take our

 8    responsibilities pretty seriously, correct?

 9                    SHELLEY A. MYERS:  Right.

10                    ATTY. JUHASZ:  This whole thing that we're

11    doing right now, standing here asking you and everybody else

12    questions for the last month, is one of the not so

13    glamourous, not so exciting things that you never see on TV

14    when you watch lawyer shows.

15                    SHELLEY A. MYERS:  Yeah, right.

16                    ATTY. JUHASZ:  Let me give you a little

17    bit of hint about why we're doing this because if you're

18    sitting in that chair you are probably thinking that all of

19    us are borderline insane.  Kelly, who is our court reporter

20    today, knows from having taken trials before that I've been

21    in that I like to talk about my son Mike and I want to tell

22    you a little story about Mike that I think relates to why

23    we're here doing what we're doing today.
```

1          Mike is a senior now, he's going to graduate this

2     year, but when he was younger and he used to play baseball in

3     some of those younger leagues, I used to coach.  And

4     sometimes we'd have a game scheduled and the umpire just

5     wouldn't show up.  You know, we only paid him 10 bucks to

6     umpire a game and for whatever reason he wouldn't show up, so

7     when that would happen they would say, "You know what?  We

8     only have two coaches and you guys have three.  How about if

9     one of your coaches acts as the umpire, okay?"  And I want

10    you to think for a second and pretend that happens in a

11    situation where I'm the third coach and they say, "Okay,

12    Juhasz, why don't you umpire?  You know, you know a little

13    bit about baseball and, you know, what the heck, you're a

14    fair guy.  You can call the balls and strikes."

15         But let's fast forward to the end of the game now

16    for a second, okay?

17                    SHELLEY A. MYERS:  Uh-huh.

18                    ATTY. JUHASZ:  Let's pretend that it's the

19    bottom of the ninth inning and the score is tied two to two

20    and my son Mike is on second base, okay, and there's two

21    outs, so this is sort of a last chance for the home team.

22    Somebody hits a ball out to right field.  Mike takes off from

23    second base; he rounds third; the coach is waving him home.

1   The ball gets thrown in and there's what in baseball is known

2   as a bang-bang play at the plate, okay?

3                       SHELLEY A. MYERS:   Uh-huh.

4                       ATTY. JUHASZ:   Now here I am, I have to

5   call that play, okay?  It's my team, it's my son.  If I call

6   him safe, we win, we go home.  If I call him out maybe he's

7   going to be angry, maybe the other coaches are going to be

8   angry.

9         Here's the point of my story.  I'm a fair guy and

10  it's probably okay for me to umpire somebody else's baseball

11  game, but what I should have done in that situation is looked

12  ahead and said what if it is tied in the bottom of the ninth

13  inning and what if I have to make that call?  Maybe, even

14  though I'm a fair guy, I should step aside and umpire another

15  game.  Okay.

16        That's really what we do when we ask jurors

17  questions here, okay?  Because of my feelings for my son Mike

18  in particular and the team, as a secondary matter I should

19  not have umpired that game.  I should have just said, "You

20  know what, guys?  Somebody else should do this.  Let's get a

21  parent, let's get somebody who is not related who is just

22  here watching," whatever.

23        We are in essence doing the same thing here when we

1   talk to jurors.  Some of them, because of things going on in

2   their own personal lives, because of how they feel about

3   certain issues involved in this case, maybe should not sit on

4   this jury.  And really what we do, as the judge said a little

5   while ago, is find out if you're comfortable sitting on a

6   case like this and also find out if we're comfortable having

7   you sit on a case like this.  This all making sense to you?

8                   SHELLEY A. MYERS:  Yeah.

9                   ATTY. JUHASZ:  To do that we need to hear

10  what you have to say, so as I stand up here and talk to you

11  this afternoon, first of all, you already know you're more

12  than half way through this now because you've talked to the

13  judge and you've talked to Mr. Bailey.  And if I take as long

14  as Mr. Bailey, Mr. Ingram has instructions to kill me, So

15  you're more than half way.

16                  ATTY. INGRAM:  And I will.

17                  ATTY. JUHASZ:  And he will.  So you're

18  more than half way done.  Nobody has yelled at you, nobody

19  has screamed at you, nobody is going to get you to try to

20  change your opinions, as the judge said before, okay?

21                  SHELLEY A. MYERS:  Okay.

22                  ATTY. JUHASZ:  So as we talk this

23  afternoon I'm interested in hearing what you have to say and

 1    I don't want you to hold back, I want you to tell me what you

 2    think.  There are no right or wrong answers to anything I'm

 3    going to ask you this afternoon.  The only wrong answer you

 4    could give me is telling me something that you think I want

 5    to hear rather than what's really in your head or in your

 6    heart.  Fair enough?

 7                    SHELLEY A. MYERS:  Okay.

 8                    ATTY. JUHASZ:  All right.  So let's talk

 9    about a few things that are pertinent to this case and I want

10    to bring up something that Mr. Bailey brought up with you

11    which has to do with your work and home situation and about

12    sequestration.  There is no way to predict what's going to

13    happen in frankly this case or any other case.  You know, on

14    April the 8th we thought that two weeks ago we'd have a jury

15    seated in this case and we don't have one seated yet.  We've

16    all done this before, okay?  My only point is that these

17    things are unpredictable.

18             Mr. Bailey mentioned I think during his questioning

19    that a jury can be out for an hour and a half; I, like

20    Mr. Bailey, have had juries out on these types of cases for

21    five days deliberating on whether the person was guilty or

22    not.  Now, I only want to try to make you aware of these

23    things so you can look at your own personal situation and

 1    tell us if you're comfortable doing this.

 2              You have an eight-year-old child, correct?

 3                        SHELLEY A. MYERS:  Right.

 4                        ATTY. JUHASZ:  And your son works -- I'm

 5    sorry.  Your son?  Your husband works midnight turn.

 6                        SHELLEY A. MYERS:  Right.

 7                        ATTY. JUHASZ:  So normally you are home at

 8    night while your husband is working with the child, correct?

 9                        SHELLEY A. MYERS:  Except for these eight

10    weeks that that girl has been off.  I've been working 1:00

11    to 11:00.

12                        ATTY. JUHASZ:  Okay.  1:00 in the

13    afternoon until 11:00 at night?

14                        SHELLEY A. MYERS:  At night, yes.  So my

15    son has been going to my mother-in-law's right now anyway.  I

16    don't even see him.  On the weekends.

17                        ATTY. JUHASZ:  That's got to be tough.

18                        SHELLEY A. MYERS:  Yes.

19                        ATTY. JUHASZ:  And you understand that if

20    the jury comes back with certain findings at the first phase,

21    which we don't know how long it's going to take to get there,

22    we don't know how long it's going to take the jury to come up

23    with that verdict, there may be a second phase?  Again, we

1    have an idea but we don't know how long it's going to take,

2    and again the jury would be sequestered, which is, you know,

3    you don't go home at night.  You stay here with -- you bring

4    your jammies and your toothbrush and the whole nine yards.

5    My question is, knowing all that and with what's going on

6    with you at home with your work schedule, with your husband's

7    schedule, is that going to pose a problem for you in this

8    case?

9              SHELLEY A. MYERS:  The home schedule

10   should not be a problem.  The work schedule, I mean, finding

11   somebody to replace me might -- I can't say that because, you

12   know, they're not telling me, you know, because I didn't know

13   what was going on.  You know what I mean?

14             ATTY. JUHASZ:  Okay.  Let's talk a second

15   about that and let me tell you a couple things.  First of

16   all, if you're concerned about that, it's okay and you should

17   tell us and I'll tell you why.  When I try a case, and I

18   suspect this is true of Mr. Ingram, Mr. Becker and

19   Mr. Bailey, I pretty much ignore the rest of the world.  My

20   other clients are mad at me because all I'm thinking about is

21   the case I'm trying.  My wife knows that I'm not going to

22   really talk to her very much.  My son knows I'm not going to

23   talk to him very much because I'm thinking about this case.

1    We ask the same thing of jurors.  We ask you to put

2    everything else that's going on in your life out of your mind

3    and think about this case, if you can do that.  And that's

4    one of the reasons, quite frankly, that we bring in so many

5    people because we have a lot of people who just say, "Look,

6    I'm sorry.  If you would have called me for jury duty in

7    September instead of April I could have helped you out.

8    Thanks."  You know, nobody gets mad at them.  That's why we

9    bring in so many people.

10                    SHELLEY A. MYERS:  Okay.

11                    ATTY. JUHASZ:  And so if you tell me based

12   on what's going on at work that you can't sit on this case,

13   that's okay and we just need to know that because what we

14   don't need is a situation where you're sitting here going,

15   "You know what?  I got this one girl off already.  I'm

16   already working 10 hours a day.  I've changed my schedule

17   from --" what did you say, 1:00 to 11:00?

18                    SHELLEY A. MYERS:  (Nods head

19   affirmatively.)

20                    ATTY. JUHASZ:  Those are horrendous hours.

21   And you're sitting here and it's taking two weeks, and maybe

22   it's taking three weeks because, you know, lawyers always

23   tell the judge, you know, it will take two weeks and it takes

 1  three.   And my concern is or what I want you to think about,

 2  if you would, please, is as you're sitting here we can't have

 3  your mind going, "Oh, my God, this girl is still off.  The

 4  work is piling up.  I'm not seeing my family," you know, and

 5  pretty soon you've missed some stuff.

 6            So all of that having -- and I've got some concerns

 7  because if you're working these hours now just to help fill

 8  in for what's going on with this other girl, I'm kind of

 9  concerned about what's going to be happening, what's going to

10  happen if you're gone as well --

11            SHELLEY A. MYERS:  I know.  That's why I'm

12  concerned.

13            ATTY. JUHASZ:  -- for two or three or four

14  weeks.

15            SHELLEY A. MYERS:  Well, see, here's what

16  my job is.  I'm contract.  I work at General Motors in the

17  truck dock and I am training people who have been on sick

18  leave.  They're people who have been on sick leave for like

19  four years, you know, and they finally come back to work and

20  they don't really want to but, you know.

21            ATTY. JUHASZ:  And you kind of have to get

22  them up to speed?

23            SHELLEY A. MYERS:  Yeah.  And they've been

 1   training since last May but they're still not, you know, they

 2   still need either me or another, you know, girl there that

 3   has the contract that knows the job, you know, for questions

 4   and still, you know, more training here and there, you know,

 5   like little problem areas.

 6                    ATTY. JUHASZ:  Okay.

 7                    SHELLEY A. MYERS:  Because I do a lot of

 8   problem solving at work.

 9                    ATTY. JUHASZ:  All right.

10                    SHELLEY A. MYERS:  Because I'll find their

11   mistakes and, you know, I would fix them.  And that's the

12   thing, I just don't -- I hate to have it pile up.  And then I

13   don't want them to think, "Well, you know what?  They did

14   okay without her and she's only contract."

15                    ATTY. JUHASZ:  And listen, and the last

16   thing that we want, or really two things that are pretty much

17   the same, I don't want you, anybody here doesn't want you

18   sitting here all day listening to evidence and then saying,

19   "You know what?  Okay.  I can't work 1:00 to 11:00 because

20   this judge doesn't let me go until 4:30, but let me go try to

21   do 6:00 to 11:00," and then you come back here at 9:00

22   o'clock the next morning, because in about two or three days

23   you're going to be half dead.

```
 1                    SHELLEY A. MYERS:  Right.

 2                    ATTY. JUHASZ:  We don't want that

 3    happening.

 4                    SHELLEY A. MYERS:  Okay.

 5                    ATTY. JUHASZ:  And we obviously don't want

 6    you sitting there with your wheels spinning going geez oh

 7    man, look at all this stuff that's piling up.  So all of that

 8    having been laid out for you, I'm going to sort of leave it

 9    up to you.  This is a case that involves a bigger time

10    commitment, frankly, than most cases if you had gotten a jury

11    summons.

12                    SHELLEY A. MYERS:  Okay.

13                    ATTY. JUHASZ:  You know, you might have

14    gotten a jury summons at some other time in your life from

15    the Trumbull County jury commissioner and they would have

16    said, "You know what?  Come on in and we have a burglary case

17    that's going to take two or three days," or "We have a

18    personal injury case to be tried down in Judge Kontos's court

19    that's going to take a day and a half or two days."  That's

20    less of a commitment, and so that's one of the reasons why

21    again we bring in so many jurors and why we ask them these

22    questions.

23                    So all of that having been said, you tell us, is
```

1    this a case that you're not comfortable sitting on because of

2    the other things going on with work and all?

3                        SHELLEY A. MYERS:  You see, I wish I could

4    tell you if I had a replacement.  I mean, I don't know

5    because the other girl that does work in my office, she's

6    been filling in for other foremen on a line.  But to know

7    that she's not going to do it then, I mean, that's the only

8    problem.  Work would be a small problem there.

9                        ATTY. JUHASZ:  Okay.  Excuse me one

10   second.

11                       (Whereupon, defense counsel held a brief

12   conference.)

13                       ATTY. JUHASZ:  There are two sides to this

14   issue, okay?

15                       SHELLEY A. MYERS:  Okay.

16                       ATTY. JUHASZ:  The one side is our concern

17   about you.  I mean, really the reason we bring in so many

18   people is we don't know until people get in here what they

19   have going on in their lives.  You know, we have people come

20   in and say, "You know what?  I've been waiting for 40 years

21   to get called for jury service and now I get called and my

22   mother is having surgery tomorrow and I got to take care of

23   her for the next week."  "Okay.  We hope you get called

 1   again."

 2           But the other side of it is, aside from our concern

 3   about the jurors' lives, is we're pretty selfish about what

 4   we have to do here, okay?  And so I guess what I'm asking you

 5   is if you don't know you have a replacement, out of sort of

 6   our selfish concern, should we be comfortable taking a risk

 7   that you can serve?  Am I making that clear to you?

 8                   SHELLEY A. MYERS:  Yes, you're making it

 9   clear.

10                   ATTY. JUHASZ:  You know, we don't want

11   somebody who is going to be --

12                   SHELLEY A. MYERS:  Oh, no, I would have

13   all my all into it, but work would be a problem because I am

14   not a hundred percent sure that I'm going to have a

15   replacement.

16                   ATTY. JUHASZ:  Okay.

17                   SHELLEY A. MYERS:  And being that the one

18   girl -- I mean, it would have been different if both of my

19   girls were on second, but then there would be only one and

20   then --

21                   ATTY. JUHASZ:  Is it so much of a problem

22   that really you think you would be more comfortable sitting

23   on another case at another time, just kind of we caught you

```
 1    at a bad time?
 2                    SHELLEY A. MYERS:  It's a bad time when it
 3    comes to work, yes.
 4                    ATTY. JUHASZ:  Because of that do you
 5    think you would like to be excused in this case and maybe
 6    hope to serve on another case?
 7                    SHELLEY A. MYERS:  Well, if you cannot
 8    find anybody I would be more than happy to do it though.
 9    It's just, you know, I mean, I want to do it.
10                    ATTY. JUHASZ:  Okay.
11                    SHELLEY A. MYERS:  It's just, you know,
12    this happened to come up.  But, like I said, I could probably
13    get a replacement but I just don't know right now, you know
14    what I mean?  I would know like later tonight or tomorrow or
15    something like that.  You know, let me ask around.  I got to
16    talk to my supervisors, got to talk -- you know, they weren't
17    expecting, you know, a big case.
18                    ATTY. JUHASZ:  I see.
19                    SHELLEY A. MYERS:  You know.  I mean, they
20    knew about the jury duty but they didn't know what was going
21    to go on.
22                    ATTY. JUHASZ:  Okay.  When you came in on
23    April the 8th did you and the judge -- now, mind you, we
```

1   missed the mark wildly, and frankly through nobody's fault.

2   It's just the way things worked out.

3                   SHELLEY A. MYERS:   Right.

4                   ATTY. JUHASZ:   But I think the judge

5   probably told you back then we thought we'd have a jury in

6   about two weeks, maybe another two weeks -- excuse me -- for

7   the trial.  Did you talk to them --

8                   SHELLEY A. MYERS:   I told, I just told

9   them I did have jury duty and it might take a little longer

10  but they didn't know like I'd have to stay there all night,

11  you know, and not go back to work or anything like that.

12                  ATTY. JUHASZ:   All right.

13                  SHELLEY A. MYERS:   I didn't know that.

14                  ATTY. JUHASZ:   Okay.  Unfortunately, I

15  hate to do this, but I probably have to throw the ball back

16  into your court.

17                  SHELLEY A. MYERS:   Okay.

18                  ATTY. JUHASZ:   If you say, "This is a bad

19  time for me and I would rather be excused," I'm sure the

20  judge will excuse you.  If you say, "Well, I can work around

21  it," then he's probably going to say then stay.  We don't

22  want to ruin your life, you know.

23                  SHELLEY A. MYERS:   No.  I wouldn't get

1    fired or nothing.  Oh, it probably is a bad time.

2                        ATTY. JUHASZ:  Okay.

3                        ATTY. INGRAM:  She said it's a bad time.

4                        ATTY. BAILEY:  A bad time.

5                        SHELLEY A. MYERS:  With work.

6                        ATTY. BAILEY:  If it's -- it's an undue

7    hardship at work?

8                        SHELLEY A. MYERS:  (Nods head

9    affirmatively.)

10                       ATTY. BAILEY:  Okay.  We don't have any

11   objection.

12                       THE COURT:  You don't object.

13                       ATTY. JUHASZ:  I appreciate it.  Thanks.

14   Don't be nervous, it's okay, honestly.  That's why we ask

15   these questions.

16                       THE COURT:  You're excused from any

17   further participation.  We thank you for your appearance and

18   answering all these questions, okay?

19                       SHELLEY A. MYERS:  Okay.  Thank you.

20                       THE COURT:  Thank you.

21                       ATTY. JUHASZ:  Bye.  Thank you.

22                       ATTY. INGRAM:  Thanks.

23                       ATTY. JUHASZ:  Good luck with everything.

1           ATTY. BAILEY:    Thank you.

2           (Whereupon, Ms. Shelley A. Myers was

3   dismissed from the pool of prospective jurors.)

4           THE COURT:    Do we have one more, Gary?    As

5   they said, that was much ado about nothing, but how do we

6   know.

7           (Whereupon, a brief recess was taken.)

8           **PROSPECTIVE JUROR MICHELENE MARUCA**

9           THE COURT:    You are Miss Myers?

10           MICHELENE MARUCA:    Maruca.

11           ATTY. BAILEY:    Maruca.

12           THE COURT:    It helps to get the right

13   name.    You've read that handout?

14           MICHELENE MARUCA:    Yes, I did.

15           THE COURT:    I notice in your

16   questionnaire, Michelle, that you have trouble concentrating

17   for long periods, work schedules and personal issues.

18           MICHELENE MARUCA:    Right.    I have a job

19   where I do training of tellers and personal bankers.

20           THE COURT:    I'm sorry, I can't hear.

21           MICHELENE MARUCA:    I do training for

22   Second National Bank and right now we have a lot of new

23   people coming in and it's been very, very busy.    And I do

```
 1      have some personal issues with my personal life right now.

 2                      THE COURT:  Does the State wish to ask any

 3      questions?

 4                      ATTY. BAILEY:  If I -- just one or two,

 5      Your Honor.  Ms. Maruca, my name is Ken Bailey.  I'm an

 6      assistant prosecutor and I'm just going to ask you a couple

 7      of quick questions.  You indicate you have a problem paying

 8      attention for a long period of time?

 9                      MICHELENE MARUCA:  Uh-huh.

10                      ATTY. BAILEY:  You tend to lose

11      concentration and daydream?

12                      MICHELENE MARUCA:  Uh-huh.

13                      ATTY. BAILEY:  The reason, are you on

14      medication or anything?

15                      MICHELENE MARUCA:  No, I just, I just get

16      bored, I get bored and then I just start to daydream.  I

17      start thinking about other things.

18                      ATTY. BAILEY:  Okay.  You think that would

19      affect you in this particular case?

20                      MICHELENE MARUCA:  Yeah, I do.  Yeah, I

21      do.

22                      ATTY. BAILEY:  Even though it's an

23      aggravated murder case?
```

1               MICHELENE MARUCA:  Yeah, I do.

2               ATTY. BAILEY:  Okay.  And you think you

3   would lose concentration on the testimony?

4               MICHELENE MARUCA:  (Nods head

5   affirmatively.)

6               ATTY. BAILEY:  Plus whatever personal

7   issues you have --

8               MICHELENE MARUCA:  Uh-huh.

9               ATTY. BAILEY:  -- would affect your

10  ability to concentrate?

11              MICHELENE MARUCA:  Yes.

12              ATTY. BAILEY:  Okay.

13              ATTY. INGRAM:  This is only going to last

14  a couple seconds --

15              MICHELENE MARUCA:  That's fine.

16              ATTY. INGRAM:  -- so you won't have cause

17  to daydream I don't think.  Four weeks ago we all met down at

18  the big courtroom at the other end of the hall.

19              MICHELENE MARUCA:  Uh-huh.

20              ATTY. INGRAM:  When you went into that

21  courtroom do you remember if you went to the left or right or

22  straight ahead?

23              MICHELENE MARUCA:  I walked in straight

1    ahead and I turned to the right.

2                    ATTY. INGRAM:  Did you find a seat or did

3    you have to stand?

4                    MICHELENE MARUCA:  No, I found a seat.

5                    ATTY. INGRAM:  How close to the front?

6                    MICHELENE MARUCA:  I was on the -- it's

7    set up this way, right?  The chairs were all set up this way.

8    I was probably the very first chair on the end next to the

9    wall.

10                   ATTY. INGRAM:  Okay.  So you were in the

11   chair, you were sitting on one of the chairs before the

12   actual bench seats for the spectators?  There were chairs set

13   up in front of --

14                   MICHELENE MARUCA:  I wasn't in those

15   chairs.

16                   ATTY. INGRAM:  Were you on a bench seat or

17   on a chair?

18                   MICHELENE MARUCA:  On a chair, I was

19   sitting in the chair down in front.

20                   ATTY. INGRAM:  Okay.  While you were there

21   did anyone engage you in discussion about this case?

22                   MICHELENE MARUCA:  No.

23                   ATTY. INGRAM:  Did you overhear anyone

1    else talking about the case?

2                        MICHELENE MARUCA:  No.

3                        ATTY. INGRAM:  Okay.  Thank you.

4                        MICHELENE MARUCA:  Not there, no.

5                        ATTY. INGRAM:  Well, did you anywhere

6    else?

7                        MICHELENE MARUCA:  Outside, yes.

8                        ATTY. INGRAM:  Was that before you went in

9    or after you went in?

10                        MICHELENE MARUCA:  After.

11                        ATTY. INGRAM:  So after the judge came and

12   gave the instructions?

13                        MICHELENE MARUCA:  Uh-huh.

14                        ATTY. INGRAM:  Then he left and everybody

15   sort of stood up and left.

16                        MICHELENE MARUCA:  Uh-huh.

17                        ATTY. INGRAM:  And then you heard a

18   conversation at that point in time?

19                        MICHELENE MARUCA:  No, it was afterwards,

20   it was a few days afterwards.  I was out and I heard people

21   discussing about a case and I just assumed, I put two and two

22   together.

23                        ATTY. INGRAM:  Okay.  But they weren't

```
 1   jurors, they were just people that --
 2                      MICHELENE MARUCA:  No, no, no, no, no, no,
 3   no.  This was just people that were out and about.
 4                      ATTY. INGRAM:  Okay.  Thank you very much.
 5                      MICHELENE MARUCA:  You're welcome.
 6                      ATTY. INGRAM:  No objection.
 7                      THE COURT:  Okay.  No objection from
 8   either side?
 9                      ATTY. JUHASZ:  No, sir.
10                      ATTY. BAILEY:  No, Your Honor.
11                      ATTY. BECKER:  No, Your Honor.
12                      THE COURT:  Ma'am, you're excused for
13   cause.  We thank you for your time and your participation.
14                      MICHELENE MARUCA:  Thank you.
15                      ATTY. BAILEY:  Thanks.
16                      ATTY. JUHASZ:  Thank you, ma'am.
17                      MICHELENE MARUCA:  Sorry.
18                      ATTY. JUHASZ:  That's all right.
19                      ATTY. BECKER:  It's all right.
20                      (Whereupon, Michelene Maruca was dismissed
21   from the pool of prospective jurors, after which Court was
22   recessed for the evening.)
23                          SEE VOLUME XX
```

1
2
3
4                        REPORTER'S CERTIFICATE
5
6        This is to certify the foregoing represents a true and
7   correct copy of the proceedings had in the aforementioned
8   cause as reflected by the stenotype notes taken by me on the
9   same.
10
11
12
13
14
                        _____
15                      KELLY J. WILSON
                        Official Court Reporter
16
17
18
19
20
21
22
23

1               IN THE COURT OF COMMON PLEAS
                   TRUMBULL COUNTY, OHIO

2

    STATE OF OHIO,                )     Case No. 2001-CR-793
3                                 )
                                  )
         Plaintiff                )
4                                 )
                                  )
    -vs-                          )     JUDGE JOHN M. STUARD
5                                 )
                                  )
    DONNA M. ROBERTS,             )
6                                 )         PARTIAL
         Defendant                )   TRANSCRIPT OF PROCEEDINGS
7

8                          *VOLUME XX*

9

                      JURY TRIAL - VOIR DIRE
10                         MAY 7, 2003

11

12  BEFORE:        HONORABLE JOHN M. STUARD

13  AT:            Trumbull Co. Court of Common Pleas
                   Courtroom Number 2
14                 160 High Street, NW
                   Warren, Ohio 44481
15

16  APPEARANCES:

17  On behalf of the Plaintiff:
        MESSRS. KENNETH N. BAILEY
18      and CHRISTOPHER D. BECKER,
        Attorneys at Law
19

20  On behalf of the Defendant:
        MESSRS. J. GERALD INGRAM
21      and JOHN B. JUHASZ,
        Attorneys at Law
22

23

    Official Court Reporter:  Kelly J. Wilson

1

*INDEX FOR VOLUME XX*

2

MAY 7, 2003

3

4

*INDIVIDUAL VOIR DIRE*

5

PROSPECTIVE JUROR LARRY P. JORDAN.................. 4235:11

6

PROSPECTIVE JUROR SHERYL E. BRAUN.................. 4298:16

7

PROSPECTIVE JUROR MICHAEL E. BLAKE.................. 4301:17

8

PROSPECTIVE JUROR REBECCA A. PIERCE.................. 4412:5

9

PROSPECTIVE JUROR DAVID P. RATCLIFFE................. 4416:6

10

11

*MOTIONS AND OBJECTIONS*

12

THE COURT:  Your motion............................ 4408:17
ATTY. INGRAM:  I object ........................... 4250:13

13

ATTY. INGRAM:  I object to any assertion that Ohio law is like
New York law...................................... 4337:3

14

ATTY. INGRAM:  Yes, Your Honor.  The defense challenged Mr.
Blake for cause................................... 4408:9

15

16

17

18

19

20

21

22

23

1  (MAY 7, 2003)

2                    (Whereupon, the following proceedings

3  occurred outside the presence of any prospective jurors.)

4                    THE COURT:  Okay.  Jerry had something you

5  wanted to address.

6                    ATTY. INGRAM:  Yes, Your Honor.  I would

7  approach and I would preface my remarks with I am fearful

8  that we have jurors that we have passed for cause just

9  languishing in the community and it's potentially disastrous.

10  Here is an idea that will perhaps jump start this case.

11            We have passed right now 30 jurors for cause.  We

12  have reason to suspect that of those 30 we are perhaps going

13  to lose two for scheduled vacations.  We need 24 jurors to

14  get a panel of 12.  We probably will use all six of our

15  peremptory challenges.  I can't imagine that the State uses

16  all theirs, but even assuming that they use all of theirs, we

17  need 24 jurors to get a panel of 12.  We would then have four

18  extras not counting what we get today.

19            The suggestion is that they are calling, they have

20  been instructed to call in this evening.  I would

21  respectfully suggest that they be told to appear tomorrow at

22  2:00 o'clock.  We then voir dire them; see who has to go, who

23  doesn't have to go; get our panel of 12; give them

1    instructions; see who we have left for alternates; send the

2    panel of 12 on their way after they have been duly

3    instructed.  We then have Friday to fill in the alternates

4    and we then tell them all to come on Monday to begin opening

5    statements and the taking of evidence.

6                        THE COURT:  What if we have some other go

7    by the wayside with challenges for cause that might come up?

8                        ATTY. INGRAM:  Well, then we're going to

9    know it tomorrow.  Listen, right now we're speculating that

10   we may have problems.  If disaster is going to hit us in the

11   eyes, let's find out about it.

12                       THE COURT:  Okay.  What does the State

13   have to say about that?

14                       ATTY. BAILEY:  That's fine with us, Your

15   Honor.  We'll give it a shot and see what happens and see

16   where we stand at this point.  We've got 30 but I kind of

17   suspect we are going to lose at least two of those.  If we

18   can get the basic 12 and then I think we should get at least

19   four alternates.

20                       THE COURT:  I would like to have four.

21                       ATTY. BAILEY:  I mean, I would not like to

22   start this without four because if we lose some I don't want

23   to do it again.

1          THE COURT:  No, right.  Okay, let's do

2     that.  That sounds --

3          ATTY. INGRAM:  Now, there's only one

4     problem with that suggestion and it's a technical problem

5     relating to courthouse employees.  Connie will not be here

6     tomorrow but I assume that there's somebody that undertakes

7     her responsibilities when she's not here.

8          THE COURT:  Right.

9          CAPTAIN BACON:  You want her to come up

10    now so she can do it today?

11         ATTY. INGRAM:  Do we want her up here now?

12         THE COURT:  Yeah.  Thank you, Gary.

13         (Whereupon, a brief recess was taken.)

14         THE COURT:  Connie, we're going to ask you

15    to do something.  Hopefully we're going to pick up a few

16    today.  Have the entire panel report in Thursday at 2:00.

17         JURY COMMISSIONER:  Thursday at 2:00?

18         THE COURT:  Yeah.  And I guess that's all

19    we have to tell her at this point.  What we're going to do is

20    put them in the box as a regular jury, right, and then you'll

21    exercise --

22         ATTY. INGRAM:  Yes.

23         THE COURT:  Yeah.

1          ATTY. INGRAM:  Before we -- go ahead.

2          ATTY. JUHASZ:  I thought before we did

3     that we would bring them in for a 45 or 60-second voir dire

4     to find out if anybody has got a problem.  We don't want to

5     do that as a panel because --

6          THE COURT:  Assuming it's a 60-second voir

7     dire and we aren't stuck into another thing, you know.

8          ATTY. JUHASZ:  Well, and we thought about

9     doing it individually, you know, one right after the other,

10    because if you bring them in and somebody gets off, somebody

11    else could say, "Oh, so that's how you get off," so that's

12    why we thought we'd do it.  Then bring them in as a panel and

13    do the peremptories.

14         THE COURT:  Okay.  That's fine.

15         JURY COMMISSIONER:  Okay.  So basically

16    for me you're going to need me to tell everybody to come in

17    that was told to appear and a list with those that we kept in

18    the pool with their juror number.

19         THE COURT:  Okay.  Thank you, ma'am.

20         JURY COMMISSIONER:  Yep.

21         THE COURT:  Connie, you can get that

22    message made up so if you're not here tomorrow you won't have

23    to worry about Deborah having to --

1                JURY COMMISSIONER:  That will go on

2    tonight.

3                THE COURT:  Okay.  Fine.

4                JURY COMMISSIONER:  And then basically

5    whatever you're going to -- if you guys have a clue what you

6    might, have a general idea what's going to need done.

7                THE COURT:  Right.  Today is Wednesday,

8    isn't it?  Yeah.  Okay.  That will be fine.

9                (Whereupon, prospective juror Larry P.

10   Jordan was seated in the courtroom and voir dire commenced.)

11            **PROSPECTIVE JUROR LARRY P. JORDAN**

12               THE COURT:  Larry, have a seat right up

13   here, if you will.  Good morning, Mr. Jordan.

14              LARRY P. JORDAN:  Good morning, Your

15   Honor.

16              THE COURT:  I just made the comment I see

17   you like Ted Nugent.  I said you can't be all bad.  Okay.

18   You read that handout that was given to you?

19             LARRY P. JORDAN:  The handout, yes.  Yes,

20   Your Honor, I read that.

21             THE COURT:  Okay.  As you know, we are

22   here on a case involving two counts of aggravated murder with

23   specifications.  Under the law of Ohio just because someone

4236

1    commits murder does not mean they face the death penalty

2    automatically.  The legislature in drafting that law said

3    that if you are found guilty of committing aggravated murder

4    under certain circumstances and the prosecutor has attached

5    what we call a specification -- excuse me -- to the

6    indictment, which was done in this case, and if the State is

7    able to prove both the aggravated murder and all the elements

8    of the specification beyond a reasonable doubt, then that

9    means that the person faces the possibility of the jury

10   deciding on the death verdict.

11        An example of a specification is if you kill Bob

12   Taft and the prosecutor doesn't put on there that he's

13   governor, it's not a death penalty.  But if they put the

14   specification that he's a governor on there and prove that,

15   then it becomes a death penalty.

16        These counts on the charges filed against

17   Ms. Roberts, there are specifications, which raises the

18   spector, depending on what the jury decides in this case, of

19   it going to a second phase where the jury would be called

20   upon to decide whether the death penalty should be imposed or

21   life imprisonment without parole, chance of parole, or life

22   without chance of parole before 25 or 30 years.  There's four

23   different options.

1          Now, it seems strange that we would go into all of

2    this before the trial starts because if the State fails to

3    prove their case beyond a reasonable doubt then this jury

4    would properly return a verdict of not guilty.

5                    LARRY P. JORDAN:  Yes.

6                    THE COURT:  And you must keep in mind that

7    the burden is always on the State.  There's no burden on the

8    defendant to prove anything at any time.  The defense has the

9    right to remain silent.  The case is won or lost on the merit

10   of the case presented by the State.  That's a hard thing to

11   keep in mind sometimes because, depending on various

12   questions asked, you think well, yeah.  It's only natural to

13   expect the defendant is going to say something, but they have

14   no right -- they have the right to remain silent.  You can't

15   hold that against the defendant if they should choose to do

16   that because they have a right to say to the jury, "The State

17   didn't prove their case, we're not saying anything."  Okay?

18                    LARRY P. JORDAN:  Yes.

19                    THE COURT:  You have -- if we don't go

20   through the questioning at this point we could get to the

21   situation where no one on the jury has been asked what their

22   view is of the death penalty, and if the State would prove

23   their case then we would be into that second phase.  You

1    might have people on the jury that believe in an eye for an

2    eye, if you kill somebody you should lose your life, and

3    that's not the law.  That type of person couldn't be fair to

4    the defendant.

5                   LARRY P. JORDAN:  I understand that.

6                   THE COURT:  And if you had a person who

7    for religious or moral reasons said to themselves I could

8    never make that decision, I couldn't think of imposing the

9    death penalty, then the State wouldn't get a fair trial

10   because the State has the right to ask for the death penalty

11   if they prove everything that's necessary to get to that

12   point.  So you will be asked questions concerning your view

13   of the death penalty.

14              Now, everyone has some view.  Some haven't thought

15   about it as much as others.  But whatever your beliefs are

16   are fine and they will be respected by these folks, but they

17   have a right to know whether any particular potential juror

18   has the one view or the other to the point where they can't

19   follow the law.  Each juror on this jury, if we have a good

20   jury, is going to be somebody that will have a personal view,

21   either more inclined towards the death penalty or some

22   against it, but the one essential fact is that they can all

23   assure both sides here that they will follow the law.  And

1    most people are able to do that unless you have a very fixed

2    opinion to the extremes, okay?  And there's nothing wrong if

3    you do.  I'm saying that a person in either of those

4    categories could not be fair to one side or the other.

5         The other issue will be in regard to pretrial

6    publicity.  This case, as any case of this nature, generated

7    its fair share of publicity, newspaper and TV and whatever,

8    and it's gone on for a period of time.  Some folks who have

9    come in here were not even aware of the case.  Most of them

10   have lived in outlying districts.  Most of the people around

11   Warren seem to have heard something about it.  The question

12   there is if you have heard anything about the case or read

13   anything about it, do you have anything in your mind so fixed

14   that you're not able to set that aside because in order for

15   both sides to get a fair trial it's absolutely necessary that

16   this jury will decide the case on the merit of the evidence

17   that's produced in this courtroom.

18                      LARRY P. JORDAN:  I understand that.

19                      THE COURT:  Okay.  Anything that appears

20   in the newspaper may be correct but it may be totally

21   erroneous and -- you get the picture, okay?

22                      LARRY P. JORDAN:  Yes.

23                      THE COURT:  Mr. Becker.

1              ATTY. BECKER:  Thank you, Your Honor.

2    Good morning, Mr. Jordan.

3              LARRY P. JORDAN:  Good morning.

4              ATTY. BECKER:  My name is Chris Becker.  I

5    work for the Trumbull County prosecutor's office.  And this

6    is Mr. Bailey who I think you were -- you were one of the

7    jurors who was in the main courtroom about a month ago --

8              LARRY P. JORDAN:  Yes.

9              ATTY. BECKER:  -- down in Judge Logan's

10   courtroom, in that larger courtroom.  I was not there at the

11   time, but I assume you recall Mr. Bailey?

12             LARRY P. JORDAN:  Yes, I do.

13             ATTY. BECKER:  And Mr. Ingram and

14   Mr. Juhasz were also there, I believe, with their client

15   Donna Roberts, correct?

16             LARRY P. JORDAN:  Yes.

17             ATTY. BECKER:  Okay.  One of the things

18   I'm going to start out with and preface this is that we're

19   going to ask you some questions, as the Court indicated to

20   you, about certain subjects and topics and there's no right

21   or wrong answers.  And we've excused probably just as many --

22   probably we've excused more people than we've actually

23   selected for this potential jury for various reasons.  Some

```
 1    people could not impose the death penalty.  Some people would
 2    impose it uniformly or, you know, automatically if someone
 3    was convicted of these crimes.  Some people have heard too
 4    much.  Some people know the attorneys.  Some people know some
 5    of the witnesses.  We had one person who knew one of the
 6    witnesses very, very well and simply said, "I can't testify,"
 7    or rather "I can't be a juror in this case if that witness
 8    testifies."  So there's no really wrong or right answers.
 9    You're not being graded on anything.  And the important thing
10    to keep in mind is this is the only time and the only
11    opportunity we get to have any interaction with you.
12              So with that in mind, I want to bring up some
13    concerns because both sides of this issue have the right to
14    have a fair trial.  And one of the things that sometimes we
15    deal with is knowledge of the attorneys.  And obviously, for
16    instance, if Mr. Juhasz or Mr. Ingram was your current
17    attorney and you were representing them, or they were
18    representing you, rather, say in an automobile accident and
19    you thought they were very good attorneys, that might present
20    some concerns for the State of Ohio.  And I notice on your
21    questionnaire, and I'm not trying to embarrass you or
22    anything like that, but I do note that you were convicted of
23    a felony that was prosecuted by our office.
```

1          LARRY P. JORDAN:  Yes, sir.

2          ATTY. BECKER:  I assume that's going to

3     present some problems to you in terms of, I mean, we're

4     representing the State, you were prosecuted by the State, and

5     I'm assuming that had some consequences.  I don't even know

6     if you went to prison on that offense or if you were given

7     probation or --

8          LARRY P. JORDAN:  I was given probation.

9          ATTY. BECKER:  Okay.  And I'm not trying

10    to bring up anything bad in your past and, like I say,

11    there's really no one in here, no media or anything.  But I'm

12    assuming it would be a little difficult for the people, and I

13    know it wasn't Mr. Bailey and I personally, but I'm assuming

14    it would be difficult for you to hear a case for the people

15    that brought the case against you, to be a juror.  And you

16    might be a better juror in maybe an automobile accident where

17    it's one party versus another, the insurance company versus

18    someone.  Would you tend to agree with that or --

19         LARRY P. JORDAN:  It does bother me but I

20    have no biasing in anything.  I have no --

21         ATTY. BECKER:  Okay.  It bothers you in

22    what sense?

23         LARRY P. JORDAN:  The fact that something

1    did happen and my life has completely been changed around.

2                      ATTY. BECKER:  Well, and that's what I'm

3    sort of driving at.

4                      LARRY P. JORDAN:  Yeah.

5                      ATTY. BECKER:  I mean, I'm assuming

6    because of that prosecution certain things have happened to

7    you and, for instance, I'm probably going to assume, and I'm

8    going to assume this only because I work in the prosecutor's

9    office, that you probably had to come back and at some point

10   have a -- well, no, that wouldn't apply to you.

11        Well, let's put it this way, obviously a felony

12   conviction for any felony offense is not a good thing,

13   correct?

14                      LARRY P. JORDAN:  That is correct.

15                      ATTY. BECKER:  And you've probably had

16   difficulty finding employment and had some problems arise

17   because of that felony conviction?

18                      LARRY P. JORDAN:  Yes, sir.  I've had to

19   make a lot of adjustments in my life but also I used that in

20   a very positive manner to turn my life around.

21                      ATTY. BECKER:  And that's a credit to you.

22   You should be credited with that because oftentimes I tell

23   people, even the ones that I prosecute, I may see them five

1    or six years and they may have gone to prison.  And, you

2    know, our number one goal is that we never see you again, I

3    mean, and I don't say that in the sense that we want you to

4    fall off the face of the earth but we don't want to see you

5    in our office, or anyone who has been involved in any type of

6    alleged criminal activity, you know.  And hopefully, you

7    know, if you do your time or you serve your sentence we will

8    never see you again.  Obviously that's a credit to you.

9    You've gone on and I think you work at Sam's now, is that

10   correct?

11                    LARRY P. JORDAN:  Yes, sir.

12                    ATTY. BECKER:  Okay.  So you've gone out

13   and found productive work and obviously got on with your

14   life.  You didn't revert back to a life of crime and, you

15   know, continue to commit crime after crime after crime.  You

16   got your life turned around, correct?

17                    LARRY P. JORDAN:  That is correct.

18                    ATTY. BECKER:  Okay.  But you understand

19   Mr. Bailey and I's concern is the fact that you were probably

20   prosecuted, I don't know who the prosecutor was but it's

21   Mr. Watkins' office and it was the State of Ohio, and that's

22   who we represent.  And I guess our concern is that you just

23   simply couldn't be fair to the State of Ohio because of this

1    relationship that's really caused you some problems

2    throughout your life, or at least since this happened, and

3    caused some problems to you in the course of your life.

4            And I'm not saying that's right or wrong and I'm not

5    saying, you know, that's just the way it is, I'm assuming

6    that because of that there is going to be some difficulty in

7    you -- you may hold us to a higher standard or you may feel

8    some animosity towards the State of Ohio even though you

9    don't know Mr. Bailey and I personally, because I wasn't even

10   here in Trumbull County in 1986, nor was Mr. Bailey.  But

11   just the fact that we work for the State and the Trumbull

12   County prosecutor's office, I'm assuming that's going to

13   create some problems and maybe some animosity between you and

14   the State?

15           LARRY P. JORDAN:  No.  I don't, I don't, I

16   don't believe that with myself.

17           ATTY. BECKER:  Okay.  Well, I'm having a

18   little bit of difficulty here because, I mean, on one hand

19   you're saying, you're obviously admitting that some bad

20   things have happened to you because of that criminal

21   conviction, right?  I mean, some problems that have arisen

22   from that conviction have come about because of that, right?

23           LARRY P. JORDAN:  That's correct, but I

1    think that a person -- I've been given a second chance at

2    life.

3                    ATTY. BECKER:  Okay.

4                    LARRY P. JORDAN:  And I've turned things

5    around and I've done everything, everything in my life to

6    turn things around and make it a positive.  And I think I

7    feel embarrassed and ashamed for --

8                    ATTY. BECKER:  Of --

9                    LARRY P. JORDAN:  Yeah.

10                    ATTY. BECKER:  Okay.  And --

11                    LARRY P. JORDAN:  I carry a burden of

12   shame.

13                    ATTY. BECKER:  Right.  And you carrying

14   that burden of shame, I don't want that -- and I guess the

15   problem is I assume you still carry that to this day,

16   correct?

17                    LARRY P. JORDAN:  Yes.  Yes, sir, I do.

18                    ATTY. BECKER:  Okay.  And that is a result

19   in some part due to the prosecution which was brought by our

20   office.  Our office prosecuted you.

21                    LARRY P. JORDAN:  Yeah, I understand that.

22                    ATTY. BECKER:  We filed the charges, we

23   brought those charges against you, and even as of this day

1    you feel shame and probably maybe subconsciously.  Maybe

2    you're not going to want to say, "Yeah, I hate the

3    prosecutor's office," but walking around with this burden of

4    shame that you do have, you can see how that might effect

5    your decision in terms of "Hey, those are the same guys that

6    have made we feel the way I feel even to this day.  They may

7    not be the same prosecutors but that's the same office,

8    that's the same, you know, system.  You know, if there's a

9    close call here I'm not going to root for those guys, I'm not

10   going to be on their side or try and find, you know, or help

11   them, I'm going to try and hurt those guys because I walk

12   around with this burden of shame."

13          And I'm not saying there's anything wrong with that

14   or that you would do that, but maybe subconsciously you

15   would do that and that's the problem that Mr. Bailey and I

16   have to address.  Again, I'm not saying you're a bad person.

17   I'm not saying you're a bad juror.  I just have some real

18   concerns that you might not be the right juror for this kind

19   of a case because it is a criminal case.  You've been

20   convicted of a felony.  You still, in your own words, carry

21   this burden of shame.  Would you feel more comfortable if

22   maybe you were called for a civil case and it was maybe a

23   case involving, you know, somebody suing somebody or a land

1  contract dispute or a will contested, a will that's

2  contested?

3                    LARRY P. JORDAN:  Sure, any of those would

4  be a more simpler case.

5                    ATTY. BECKER:  Well, they may be much more

6  complex cases.  I mean, you know, this case, obviously I

7  don't think you've heard much about this case, but this case

8  may just simply involve somebody going up and somebody

9  putting a bullet in their head and there may be three

10  witnesses and that may be the end of the case, because you

11  don't know much about this case, do you?

12                    LARRY P. JORDAN:  No, I don't.

13                    ATTY. BECKER:  Okay.  And I think even on

14  your questionnaire you had indicated that you didn't want

15  your past to interfere with this case, correct?

16                    LARRY P. JORDAN:  Well, yeah, with the

17  media.  I want the best for the courts and the community.

18                    ATTY. BECKER:  Okay.  And I understand

19  that and I really appreciate that.

20                    LARRY P. JORDAN:  Yeah.

21                    ATTY. BECKER:  I can appreciate that.  And

22  I think I guess what I'm asking you is if you could maybe

23  step outside and -- again, I'm not judging you, and, like I

1   say, I think it's fantastic what you've done with your life

2   since that.  It's almost been 20 years now, or 17, 18 years,

3   but you probably would have to agree with me that looking at

4   it, not looking at it through your eyes but someone outside

5   of this, you know, outside of your body, someone else is

6   going to look at it.

7                     LARRY P. JORDAN:  Yes.

8                     ATTY. BECKER:  It would probably be better

9   if someone who has been prosecuted by the State were not to

10  serve as a juror in a case where the State is bringing

11  criminal charges against someone; would you agree with that?

12                    LARRY P. JORDAN:  Yes, sir, I agree with

13  that.

14                    ATTY. BECKER:  Okay.  And would you say

15  that would probably apply to you as well?

16                    LARRY P. JORDAN:  Yes.

17                    ATTY. BECKER:  Okay.  And especially since

18  you carry, and I'm not trying to -- again, I'm not trying to

19  embarrass you or anything, but because of the consequences

20  you suffered and because of this shame that you continually

21  feel today, you might not be the best juror for this

22  particular case because it does involve the same body that

23  prosecuted you and has, I guess, given you those problems

1    throughout your life, correct?  You see what I'm driving at

2    there?

3          And that's not to say that a month from now or a

4    year from now you might not be called.  You might be a great

5    juror for, let's say, a case involving an auto accident or

6    something like that, but we have concerns that obviously I

7    think you've even pointed out and addressed that you may be a

8    little biased against our side of the story.  Even though you

9    don't know us personally, we're the State of Ohio and you've

10   been prosecuted and convicted of a felony, so do you feel it

11   would be better if maybe you were excused from this

12   particular case?

13                    ATTY. INGRAM:  I object to the assertion

14   that Mr. Jordan said he would be biased.  I don't think he's

15   ever said that.

16                    ATTY. BECKER:  Okay.  Well, let me strike

17   that.  Let me --

18                    THE COURT:  Sustained.

19                    ATTY. BECKER:  All right.  That you would,

20   that you would carry this burden of shame that you've had

21   throughout your life and that maybe, maybe it would affect

22   you as a juror in this case?

23                    LARRY P. JORDAN:  I feel I have the

1    capabilities to oversee all of that and that I would help the

2    courts and the prosecution and defense in any way I can.

3                    ATTY. BECKER:  Okay.

4                    THE COURT:  Let me ask one question.

5                    ATTY. BECKER:  Okay.

6                    THE COURT:  Mr. Jordan, you said you

7    turned your life around and that's commendable because in my

8    experience the larger percentage never do that.  They come

9    through here again.

10                    LARRY P. JORDAN:  I understand that.

11                    THE COURT:  And I can see that you have

12   had no problem since.  The whole question boils down here to

13   what your attitude is concerning your original prosecution.

14   Did you hold anybody from the prosecutor's office as

15   responsible for that?

16                    LARRY P. JORDAN:  No, Your Honor.  No,

17   they're not responsible for what I did.

18                    THE COURT:  You're taking this -- you're

19   saying it was your fault, not -- they were just part of the

20   process.

21                    LARRY P. JORDAN:  That's correct.

22                    THE COURT:  That's what I'm getting from

23   you.

```
1              LARRY P. JORDAN:  They were part of the

2     process.

3              ATTY. BECKER:  Okay.  All right.  Well,

4     let me ask you this, and the only reason I ask you this is

5     because I've been doing this 13 years and I know some

6     defendants think this way, and some think completely

7     opposite.  But some people think they get a raw deal from the

8     prosecutor's office, that they were unfairly charged, that

9     they were not treated properly, that they were railroaded.

10    You know, sometimes they say, "Listen, I'm going to plead and

11    I'm probably going to get probation on this, but you know

12    what?  I didn't do it and I'm just going to plead so I can

13    get done with it and move on with my life.  And it's just

14    costing me too much for the attorneys or too much away from

15    work."  Would you fall in that kind of category?

16              LARRY P. JORDAN:  No, sir, I don't.

17              ATTY. BECKER:  Okay.  So you fully take

18    responsibility for what you did, as shameful as obviously it

19    was?

20              LARRY P. JORDAN:  Yes.

21              ATTY. BECKER:  And, again, I'm not trying

22    to open up old wounds here, but you would say that the reason

23    you were in the position you were in was your fault?
```

4253

1          LARRY P. JORDAN:  It was my behavior.

2          ATTY. BECKER:  Okay.  And no one else was

3     responsible?

4          LARRY P. JORDAN:  That's correct.

5          ATTY. BECKER:  You really honestly believe

6     that you will not hold and not be biased against the State of

7     Ohio in this prosecution?

8          LARRY P. JORDAN:  I have no reason to be

9     against the State of Ohio.

10         ATTY. BECKER:  Okay.  All right.  And I

11    appreciate that.  I appreciate your candor here.  And, again,

12    I'm not trying to open up old wounds and I'm not trying to

13    embarrass you or anything, but you can see where I'm coming

14    from, where our concerns are?

15         LARRY P. JORDAN:  Yes, I do.

16         ATTY. BECKER:  Okay.  Well, all right.

17    Well, let's move on here to the real issues of this case in

18    this particular case.  And this case, as the Court has

19    mentioned to you, involves the charges which carry the

20    ultimate penalty in the State of Ohio, and that is the death

21    penalty, and they have the potential for this defendant being

22    put to death at some point.  You, I believe, are in favor of

23    the death penalty, is that correct?

1             LARRY P. JORDAN:  Yes, I am.

2             ATTY. BECKER:  Okay.  And you believe that

3    if the facts warranted it and the law permitted it you could

4    go back into that jury room in a few weeks and sign a piece

5    of paper, if we were able to prove our case beyond a

6    reasonable doubt and if we got to the point where it was

7    required of you to do that, you could go back to that jury

8    room and sign a verdict calling for the death penalty against

9    this defendant?

10            LARRY P. JORDAN:  I would have to -- that

11   would -- I would have to think that over and look at all that

12   evidence and weigh it.

13            ATTY. BECKER:  Right, exactly, and that's

14   what the process is.  And I'm assuming you're familiar at

15   some point -- let me ask you, who was your attorney in that

16   case, if you remember, in '86?

17            LARRY P. JORDAN:  Mr. Petkovich.

18            ATTY. BECKER:  Okay.  Sam Petkovich.

19            LARRY P. JORDAN:  And Mr. Leopardi.

20            ATTY. BECKER:  Okay.  And they were

21   retained or were they court appointed?  Did you pay them?

22            LARRY P. JORDAN:  Retained.

23            ATTY. BECKER:  All right.  And do you

1      remember who prosecuted that case?

2                          LARRY P. JORDAN:  It was a lady.

3                          ATTY. BECKER:  Okay.  Carol Sopkovich

4      maybe?

5                          LARRY P. JORDAN:  Carol or Diane.  Carol?

6      Yeah.

7                          ATTY. BECKER:  I know it's been a long

8      time ago.

9                          LARRY P. JORDAN:  Yeah.

10                         ATTY. BECKER:  I'm not trying to test you

11     on that.  But I'm assuming that in the course they explained

12     some of these processes and procedures and when it came time

13     for you to make a decision as to whether -- there was

14     probably an offer extended to you and whether you should

15     accept that offer or not accept that offer, some of those

16     things were explained to you?

17                         LARRY P. JORDAN:  Yes.

18                         ATTY. BECKER:  About reasonable doubt,

19     about what the jury would hear and what the jury would see.

20     You're obviously going to have to do those things if you are

21     seated as a juror in this case.  You believe you will be able

22     to weigh those, the evidence in this case, and make that

23     determination?



1        LARRY P. JORDAN:  Yes.

2        ATTY. BECKER:  All right.  And if -- and

3    again I'm going to ask you because I'm not really sure if you

4    answered the question, but if we prove it to you, and it's

5    beyond a reasonable doubt, not all doubt, and if the Court

6    instructs you as to what the law is and the law permits it,

7    and I want you to envision yourself and maybe get in your

8    mind a picture of you signing a piece of paper with 11 other

9    jurors in that jury room that will call for the death penalty

10   to be imposed against this defendant, you can do that?

11       LARRY P. JORDAN:  I could do that but I

12   would live with that the rest of my life.

13       ATTY. BECKER:  Okay.  And that's, and

14   that's what we want to ask.

15       LARRY P. JORDAN:  Yeah.

16       ATTY. BECKER:  That's what we want to ask

17   you because here's the problem we have.  This is going to be

18   a two-stage process.  The first stage --

19       ATTY. INGRAM:  Potentially a two-stage

20   process.

21       ATTY. BECKER:  Potentially, correct.  What

22   we're doing here is we're planning for the worst, not so much

23   for the State's side but for their side, and we have to

1    prepare for the whole thing because it is potentially a

2    two-stage process.  The first thing we're going to do is that

3    we have to prove her guilty.  We may not be able to do that.

4    There may not be enough evidence for you and your fellow

5    jurors to convict her.  And not only do you have to convict

6    her, you have to convict her of not only aggravated murder

7    but you have to convict her of these specifications which

8    make her eligible for the death penalty.  You may find she's

9    guilty of the aggravated murder but not these specifications

10   and then we don't get to that second stage.  You may find her

11   not guilty of anything and we don't get to that second stage.

12           But if we do get to that second stage and because

13   the rules of attorneys' conduct, if you're seated in this

14   jury this is the only time we get to talk to you.  We can't

15   speak to you if you're seated in one of these chairs over

16   here and we can't say to you, "You know, Mr. Jordan, what did

17   you think of that last witness, was that a pretty good

18   witness?  Hey, do you think we ought to call this person next

19   or this person?  How much more evidence do you think we ought

20   to --"  We can't do that.  We can't have any conversation

21   with you.  So if we see you out in the hallway at the

22   drinking fountain or we see you at a restaurant when you're

23   out at lunch during the trial or if we see you out in the

1  parking lot when we're parking our cars out there we can't

2  speak to you because that would be unethical of us to speak

3  to a juror while the case is pending, correct?

4             LARRY P. JORDAN:  That is correct.

5             ATTY. BECKER:  And, I mean, after the case

6  we could speak about it and you could say hey, you guys did a

7  great job or you guys didn't do a good job or why didn't you

8  do that, but during the pendency of the case we can't do

9  that.  So the reason we ask you these cases, or these

10  questions, rather, is because if this case does get to that

11  second phase we can't have the jury say okay, the first phase

12  is done, we find that the State has proved its case beyond a

13  reasonable doubt.  She's guilty.  She's guilty of these death

14  specifications, these bad things that make her eligible for

15  the death penalty.  And okay, jurors, by the way, you're also

16  going to have to now determine what the penalty is.  Well,

17  obviously you're familiar, there are probably people you work

18  with or people you know that have religious or moral or

19  ethical beliefs that they don't believe in the death penalty,

20  correct?

21             LARRY P. JORDAN:  If they don't I'd say

22  none of that effects me.

23             ATTY. BECKER:  No, but what I'm saying is

1   there are people that have that, that have those feelings.

2   They can't serve on this jury because --

3                   LARRY P. JORDAN:  Yeah.

4                   ATTY. BECKER:  -- they'll raise their hand

5   and say, "Whoa, wait a minute.  I can't do this.  I'm very

6   religious.  I very closely follow the Catholic teachings of

7   the Catholic church and we are against the death penalty and

8   I cannot impose the death penalty."  Well, then we have to

9   start all over again, right?

10                  LARRY P. JORDAN:  Yeah.

11                  ATTY. BECKER:  Okay.  So that's why we got

12  to ask you and make sure that you and every other juror,

13  because we've asked every juror these hard questions.  And I

14  realize they're hard questions because I can't tell you all

15  the facts of this case in advance, but all I can tell you is

16  that in this general and broad question is if the facts were

17  there and the law allowed it could you see yourself taking a

18  pen out and putting pen to paper and calling -- signing a

19  piece of paper calling for the death penalty against

20  Ms. Roberts?

21                  LARRY P. JORDAN:  I could do that.

22                  ATTY. BECKER:  And I understand you would

23  have to live with that.

1          LARRY P. JORDAN:  It would be very

2    difficult.

3          ATTY. BECKER:  All right.  Would that be

4    so difficult that if it was a close call or, let's say, it's

5    11 to one and you're the one guy that doesn't believe we've

6    convinced you or there's some things that you think need to

7    be done and you say, "Well, I'm going to sign it."  And you

8    sign it but then your fellow jurors talked you into it, that

9    they've proven that we've proven our case, and you sign it

10   and you walk out of there and you think what did I just do?

11   Why did I do that?

12          LARRY P. JORDAN:  Nobody is going to talk

13   me into anything.

14          ATTY. BECKER:  Okay.  Well, you're going

15   to have to discuss this case at both phases with your fellow

16   jurors.  You're all going to have to discuss that.  It's

17   called the deliberation process.  You understand that, right?

18          LARRY P. JORDAN:  Yes.

19          ATTY. BECKER:  I'm not saying anyone is

20   going to talk you into anything because we want you to stick

21   to what your convictions are, both sides do, and they don't

22   want you to give up your convictions easily and give up your

23   thoughts on this case.  We don't want you to be swayed

1    easily.  But you may sit with the jurors back there and you

2    may say, "Boy, I don't think they proved this one element,"

3    or "This one witness didn't say that."  Well, because you

4    can't take notes one of the other jurors may say, "Oh, yes,

5    they did.  They said this, this and this and I think that

6    proves that."  And you may say, "Well, you know what?  You're

7    right.  I think you're right."  So you have to discuss that.

8            Maybe that's not changing your mind, but you're all

9    going to have to discuss this case and make an individual

10   determination.  You will be able to do that, right?

11                   LARRY P. JORDAN:  That's correct.

12                   ATTY. BECKER:  Okay.  So I guess the

13   question is you will be able to sign that verdict form?

14                   LARRY P. JORDAN:  I could sign that.

15                   ATTY. BECKER:  Okay.  All right.  Despite

16   the fact that it may be on your mind for a long time?

17                   LARRY P. JORDAN:  Yes.

18                   ATTY. BECKER:  Okay.  Now, the other thing

19   that we, the other major area that we want to talk to you

20   about and I guess one of the things that I want to talk to

21   you about is what I mentioned earlier.  My understanding is

22   that you are of the Catholic faith, correct?

23                   LARRY P. JORDAN:  Yes, I am.

1              ATTY. BECKER:  Okay.  And obviously the

2    Catholic faith has come out and opposed the death penalty.

3              LARRY P. JORDAN:  I understand that.

4              ATTY. BECKER:  All right.  You'll be able

5    to separate what your religion and what your Catholic faith

6    tells you is proper and what -- maybe not what they tell you

7    is proper but what their position is, you'll be able to

8    separate that out and make a determination?  Because there's

9    nothing wrong -- obviously we've had a number of people come

10   in here and say, "Hey, I can't do it.  I'm a very strict

11   Catholic," or, you know, a moral issue or "I've discussed

12   this issue."  For whatever reason, they can't do it.  You can

13   put aside your --

14             LARRY P. JORDAN:  I'm a strict Catholic

15   but I can separate church and state in my own mind.

16             ATTY. BECKER:  Okay.  And you understand

17   there's nothing wrong with you saying "I can't do it because

18   of my faith," but you believe you would be able to do that?

19             LARRY P. JORDAN:  I would be able to.

20             ATTY. BECKER:  Okay.  All right.  Now, I

21   believe at some point you had indicated that you were -- oh,

22   I guess you were not familiar with this case.  You've heard

23   nothing of this case?

4263

1                    LARRY P. JORDAN:  I saw something come on

2    the news and just never thought much about it because I see

3    it every day.  I see the homicide rate is up in the Mahoning

4    Valley and I don't pay any attention to it.

5                    ATTY. BECKER:  Well, what is it that you

6    saw about this case or heard about this case?

7                    LARRY P. JORDAN:  That some lady had

8    killed her husband.

9                    ATTY. BECKER:  You didn't remember the

10   names?

11                   LARRY P. JORDAN:  No.

12                   ATTY. BECKER:  Did you see it on

13   television or read it in the newspaper?

14                   LARRY P. JORDAN:  It was just a quick

15   glance on television.

16                   ATTY. BECKER:  Do you recall how long ago

17   it was?

18                   LARRY P. JORDAN:  No, I don't, because

19   that's why when I come in here about -- well, we went to the

20   other courtroom, and I was like, I was really floored when I

21   first heard about it because I heard nothing at all on the

22   news.

23                   ATTY. BECKER:  When you went down to that

1   courtroom are you saying people were talking about it?

2                   LARRY P. JORDAN:  No.  No.

3                   ATTY. BECKER:  Oh, okay.

4                   LARRY P. JORDAN:  The judge had brought it

5   up.  When he brought it up.

6                   ATTY. BECKER:  The Court.  Okay.  When you

7   were down there did anybody discuss this issue with you or

8   this case?

9                   LARRY P. JORDAN:  No.

10                   ATTY. BECKER:  And you didn't hear anybody

11  discussing it?

12                   LARRY P. JORDAN:  No.

13                   ATTY. BECKER:  Now, some of the things

14  that we have to ask you about in this particular case are

15  some of the things that probably you are familiar with

16  already.  You understand that every defendant has what we

17  call the presumption of innocence?

18                   LARRY P. JORDAN:  Yes.

19                   ATTY. BECKER:  They are presumed innocent.

20  And I'm assuming you would have no problem giving Ms. Roberts

21  her presumption of innocence throughout this trial?

22                   LARRY P. JORDAN:  Yes.  She's -- yes.

23                   ATTY. BECKER:  You may not hear a word

1    from her.  Basically what that means is Mr. Bailey and I and

2    the State, we have the burden to prove to you beyond a

3    reasonable doubt that she's guilty and her and her attorneys

4    can sit over there and, you know, doodle all day.  They can

5    play hangman on a piece of paper, they can do whatever they

6    want to do over there, but they don't have to present to you

7    one piece of evidence, and if we fail to meet our burden you

8    have to find her not guilty, correct?

9                    LARRY P. JORDAN:  That's correct.

10                   ATTY. BECKER:  And that's for both phases,

11   because what's going to happen is if we get to the second

12   phase you're already going to know some things in the second

13   phase.  You're going to know that she's been convicted of

14   aggravated murder.  You're going to know that she's either

15   committed this crime, or if we get to that second phase

16   you'll know that she's committed this crime because you'll

17   have to find that she committed the crime, with prior

18   calculation, it was premeditated, or that it was committed

19   during the commission of an aggravated burglary or aggravated

20   robbery.  But when we get to that second stage you sort of

21   have to wipe that slate clean and you have to start afresh

22   again because once again, just like in the first part, we're

23   trying to prove her guilty in that second part.  We again

4266

1     have to prove to you that the death penalty is the

2     appropriate penalty.

3           You read the piece of paper, I assume, that gave you

4     the four options?

5           LARRY P. JORDAN:  Yes.

6           ATTY. BECKER:  All right.  Your feelings

7     are if I give you those four options is there one that you

8     would gravitate more towards or one that you feel more

9     comfortable with?

10           LARRY P. JORDAN:  No, because every case

11     is different.

12           ATTY. BECKER:  All right.  So you would

13     feel comfortable and fairly consider all four options, the

14     three life options as well as the death penalty?

15           LARRY P. JORDAN:  That's correct.

16           ATTY. BECKER:  You wouldn't give those

17     life options more of an advantage because you may not want to

18     impose the death penalty, would you?

19           LARRY P. JORDAN:  That's correct.

20           ATTY. BECKER:  You wouldn't do that?

21           LARRY P. JORDAN:  I would look at all of

22     them.

23           ATTY. BECKER:  All right.  And you would

 1 │ fairly consider all four of them, correct?

 2 │                    LARRY P. JORDAN:  Fairly consider it.

 3 │                    ATTY. BECKER:  All right.  Now, this case

 4 │ is going to obviously involve a criminal defendant and it

 5 │ involves a homicide obviously.  In any criminal case there is

 6 │ going to be some feelings of sympathy for either or both

 7 │ parties sometimes.  You are going to hear in this case most

 8 │ likely testimony from the county coroner's office about a

 9 │ death that involved -- you will hear the cause and manner of

10 │ the death of the person involved, Mr. Fingerhut.  You will

11 │ hear and see evidence such as photographs of Mr. Fingerhut.

12 │ Do you believe that you will be sympathetic to Mr. Fingerhut

13 │ being deceased, and his family, and not be able to render a

14 │ decision based upon sympathy?

15 │                    LARRY P. JORDAN:  I understand there will

16 │ be some sympathy but I don't think it will render anything

17 │ or, you know, I don't think it will impair anything.

18 │                    ATTY. BECKER:  It won't affect your

19 │ decision.  And obviously this case involves the potential

20 │ death of this defendant, and do you feel the fact that you

21 │ may sit in one of these chairs for two or three weeks and be

22 │ within 10 or 12 feet from her knowing that at some point, if

23 │ we get to that second phase, you may have to determine what

1    her fate would be, do you feel you would be sympathetic to

2    her to a point where you wouldn't be able to render a

3    decision?

4                        LARRY P. JORDAN:  I feel a small sense of

5    sympathy but I do understand that there are certain things

6    that have to be considered.

7                        ATTY. BECKER:  All right.  Would you let

8    that sympathy affect your ability to render a decision if we

9    were able to prove our case and we were in that second phase?

10                       LARRY P. JORDAN:  No, because I can

11   separate that.

12                       ATTY. BECKER:  Okay.  And that's what we

13   -- I mean, I know it's difficult sometimes to ask that

14   question, but you believe you can do that?

15                       LARRY P. JORDAN:  Yes, sir.

16                       ATTY. BECKER:  Okay.  This case is going

17   to involve and we're going to tell you, be very up front with

18   you here at this point, Ms. Roberts is not alleged to be the

19   trigger person.  We are not going to allege and she is not

20   alleged to be the person what we call the principal offender.

21   She didn't actually pull the trigger on the gun.  Under the

22   law of Ohio she is considered an aider and abettor, which

23   basically boils down to she's a helper, and that's the

1    allegation, that she is an aider and abettor, and we are

2    alleging that she is a helper.  Does that present any

3    problems to you if we prove that that is the case and we're

4    in this second phase where she's alleged to be a helper, are

5    you going to be shying away from the death penalty if we

6    prove our case or are you going to be downplaying the death

7    penalty because, well, you know, she's just not the person

8    who pulled the trigger?

9                    LARRY P. JORDAN:  There is a lot of

10   evidence there that would have to be taken into

11   consideration.

12                   ATTY. BECKER:  All right.  Are you saying

13   we would have to prove a little bit more to you because she's

14   an aider, alleged to be an aider and abettor before you would

15   impose the death penalty?

16                   LARRY P. JORDAN:  That would have to be

17   proven.

18                   ATTY. BECKER:  Okay.  What would have to

19   be proven?

20                   LARRY P. JORDAN:  That the person was an

21   aider or an abettor.

22                   ATTY. BECKER:  Okay.  Well, let's assume

23   we're in this second phase and we prove that.  We have to

1    prove that in the first phase, that she is in fact an aider

2    and abettor because that's the allegation.  Going into the

3    second phase you're going to know she's an aider and abettor

4    if you convict her because you'll find that in the first

5    phase.  You're going to know that she either committed this

6    offense with prior calculation and design, meaning she

7    planned it with someone else, or, and/or she also helped

8    someone commit an aggravated burglary or an aggravated

9    robbery or both that resulted in the death of Mr. Fingerhut.

10        Now you're going to get into this second phase.

11   You're going to know all those things in the second phase if

12   we get there; she's an aider and abettor because you folks

13   would have to sign a verdict saying that; you're going to

14   know that she's a person who planned this or premeditated it

15   with prior calculation and design; and you're also going to

16   know that perhaps some felonies were committed.  Is that

17   going to make things difficult for you in that second phase

18   to be fair to either her or the State of Ohio?

19                    LARRY P. JORDAN:  No.  I would have to

20   look at that and weigh all the facts --

21                    ATTY. BECKER:  Okay.

22                    LARRY P. JORDAN:  -- and make a decision.

23                    ATTY. BECKER:  Okay.  And you will not

1    give any of those four options, if we get to that second

2    phase, a head start or discount one of those, any one of

3    those options, if we get to that second phase?

4                    LARRY P. JORDAN:  That's right.  I would

5    discount nothing at this point.

6                    ATTY. BECKER:  All right.  Now, in every

7    case, just about every case, sometimes civil and criminal,

8    there's usually some elements of what we call circumstantial

9    evidence, and I'm assuming you've heard of circumstantial

10   evidence either through television or the newspaper or maybe

11   a novel you've read or a book you've read.  The Court is

12   going to tell you that circumstantial evidence and direct

13   evidence have the same value.  And one of the things we talk

14   about when we talk about circumstantial evidence is, just one

15   of the silly examples we use that's easy to understand is you

16   watch the television news, is that correct?

17                    LARRY P. JORDAN:  Yes.

18                    ATTY. BECKER:  33, is that what it is?

19                    LARRY P. JORDAN:  21.

20                    ATTY. BECKER:  21.  Okay.  And I can never

21   get my weather people sorted out, but whoever the weatherman

22   is on 21, let's say you go home tonight and you watch the 21

23   news and you're watching the weather and whoever is there

1    says here is the line of thunderstorms.  They're moving down

2    from Sandusky, they're all the way down to Kentucky.  They're

3    moving east, they're going to be here about 2:00 o'clock this

4    morning, but tomorrow those thunderstorms will be out of

5    here.  We'll have a nice clear sunny day tomorrow.  And you

6    say, "That's great.  I got a day off from work, I'm probably

7    going to go fishing," or whatever it is you like to do in

8    your spare time, it's going to be something outside.

9            And you look out your driveway and you make sure

10   your car windows are rolled up so it doesn't get wet in the

11   car and you go to bed, and you wake up the next morning and

12   there's water on your car, water on the driveway, water on

13   the sidewalk, water in your neighbor's driveway, water down

14   the street dripping down, it's trickling down like a little

15   stream down to the sewer.  You didn't see it rain, correct?

16                    LARRY P. JORDAN:  That's correct.

17                    ATTY. BECKER:  But you can infer that it

18   rained, right?

19                    LARRY P. JORDAN:  Yes.

20                    ATTY. BECKER:  Sometimes in criminal cases

21   and civil cases as well in the courtroom we have to make

22   those kind of inferences, correct?

23                    LARRY P. JORDAN:  Yes.

1              ATTY. BECKER:   You'll be able to use those

2     types of inferences to determine, first of all, guilt or

3     innocence of the defendant, correct?

4              LARRY P. JORDAN:   Yes.

5              ATTY. BECKER:   And you'll be able to make

6     those kind of inferences also if we get to that second stage

7     to determine whether the death penalty is appropriate,

8     correct?

9              LARRY P. JORDAN:   That's correct.

10             ATTY. BECKER:   All right.   And we

11    sometimes have to be careful with those inferences because

12    sometimes if we have the same sort of situation and you see

13    those green lines and yellow and red lines that are the radar

14    but they're scattered, they're just pockets of them.   Maybe

15    there's four or five of them.   There's a big storm over

16    Sandusky and Lake Erie and there's another big storm down

17    around Mansfield.   There's another one down around Columbus.

18    And the weather guy on 21 says, "Hey, you know, it's going to

19    be hit and miss tonight."   Niles may get rain but, you know,

20    Kinsman may not get any rain, and Poland may get hit.   It's

21    going to be hit and miss so, you know, be careful out there.

22    Roll up the windows.   Don't take any chances.

23             And you do the same thing, you go to bed, and then

1    you wake up the next morning and you look out your side

2    window, maybe your dining room window.  You look out and you

3    see your neighbor's driveway and it's all wet and his car is

4    wet, but you look in the back and your porch is dry and, you

5    know, your driveway is dry.  And you think, "Boy, what's

6    going on?  I wonder if it rained last night."  It doesn't

7    look like it rained.  There's no water in the street going

8    down the gutter.

9           And then you see your neighbor come out with a

10   bucket and a sponge and he's got his hose there.  Obviously

11   he's washing his car and it didn't rain there.  So you have

12   to be careful sometimes with those inferences, correct?

13                    LARRY P. JORDAN:  Yes, you do.

14                    ATTY. BECKER:  But you'll be able to make

15   the inferences?  If it's solid enough for you, you'll be able

16   to make the inference that it rained if the facts are there

17   and there's enough evidence there for you?

18                    LARRY P. JORDAN:  Yes, sir.

19                    ATTY. BECKER:  Okay.  One of the things

20   that sometimes we hear about our -- I'm not directing this to

21   you.  Well, strike that.  Let me move on.  And I want to go

22   back to your religion here just for a moment.  As a Catholic

23   you believe, because we've had people come in here for

1    whatever religious beliefs, you believe you could pass

2    judgment on another person?

3                    LARRY P. JORDAN:  Yes.

4                    ATTY. BECKER:  And you believe that you

5    could pass judgment not just on another person but this

6    person?

7                    LARRY P. JORDAN:  I could.

8                    ATTY. BECKER:  All right.  And included in

9    that judgment there may be the potential of passing judgment

10   on her to determine whether she should live or die, correct?

11                   LARRY P. JORDAN:  Yes.  It would be

12   extremely difficult but I could do it.

13                   ATTY. BECKER:  All right.  And that's all

14   we're asking, you know, for you to do is -- I mean, I

15   understand this is very difficult and you're not the first

16   person to come in here and struggle with this.  In fact, just

17   about every juror has.

18          I think in closing what I want to ask you is you

19   were held accountable for your actions at one point and I

20   understand you don't blame anyone but probably yourself, and

21   that's really in my estimation, working in the business that

22   I do, that's really a credit to you.  I assume you've not

23   gotten bitter about that with anyone?

1                    LARRY P. JORDAN:   I can't afford that

2   luxury.

3                    ATTY. BECKER:   Okay.   And you're not angry

4   at anyone I assume?

5                    LARRY P. JORDAN:   No.

6                    ATTY. BECKER:   Do you believe, and I'm

7   assuming you believe, do you believe that you can hold

8   someone else, specifically this person, accountable if we

9   prove the allegations?

10                    LARRY P. JORDAN:   Yeah.   Everybody is

11  responsible for their actions.

12                    ATTY. BECKER:   And that's a belief you

13  have not only from your own personal experience but from your

14  upbringing and your beliefs now?

15                    LARRY P. JORDAN:   Yes.

16                    ATTY. BECKER:   Okay.   Mr. Jordan, I want

17  to thank you very much for your honesty and sincerity.   Bless

18  you.   I want to thank you very much.   I want to close by

19  simply saying if there's anything I said to you that you feel

20  is too invasive or too much of opening old wounds or anything

21  like that, I apologize for that, but you understand because

22  this is an extremely serious case and involves, like I said,

23  the death of one individual and the potential death of

1     another, we had to ask you these tough questions.  And I

2     certainly hope that you won't hold anything that I've had to

3     ask you here today against us if you are selected and seated

4     for this jury.  Will you promise not to do that?

5                     LARRY P. JORDAN:  I don't hold -- no.

6     That's okay.

7                     ATTY. BECKER:  Okay.  And I, again, I

8     didn't mean to embarrass you or bring up old wounds or

9     anything like that, but we had to know these questions.

10                    LARRY P. JORDAN:  That's okay.

11                    ATTY. BECKER:  Okay.  I want to thank you

12    very much.  I believe Mr. Ingram or Mr. Juhasz will have some

13    questions for you now as well.  Thank you.

14                    THE COURT:  Mr. Ingram.

15                    ATTY. INGRAM:  Thank you, Your Honor.

16    Good morning, Mr. Jordan.  How are you?  You need some water

17    up there or anything?  You want a glass of water?

18                    LARRY P. JORDAN:  A small one.

19                    ATTY. INGRAM:  Sure.  And my name is Jerry

20    Ingram.  This is John Juhasz.

21                    ATTY. JUHASZ:  Hi.

22                    ATTY. INGRAM:  John is pouring you water.

23    We share the responsibility of representing Donna and feel we

1    should take every reasonable precaution in selecting a fair

2    minded jury, basically the type of jury that you or I would

3    want to decide our cause if we were on trial.  Does that

4    sound fair enough to you?

5                    LARRY P. JORDAN:  Yes, it does.  Thank

6    you, sir.

7                    ATTY. JUHASZ:  Sure.

8                    ATTY. INGRAM:  The other day Mr. Bailey,

9    and this is Mr. Bailey right here, noted that there is a lot

10   of criminal experience in this courtroom with us.  We've been

11   doing this for a long time.  Kelly has been a court reporter

12   for a while.  The judge has been a judge for a while.  We've

13   been lawyers for a while.  And I'm not trying to gild the

14   lilly here, but when we see someone who has taken a negative

15   and turned it around into a positive, that actually makes us

16   feel good and I think we're all proud of you.

17            As I understand your conversation with Mr. Becker,

18   you do not feel that you were unfairly treated by the

19   process, am I correct?

20                    LARRY P. JORDAN:  That's correct.

21                    ATTY. INGRAM:  And you as you sit here

22   feel that you are able to give both sides, Donna Roberts and

23   the State of Ohio, a fair shake in these proceedings?

1        LARRY P. JORDAN:  Yes, sir.

2        ATTY. INGRAM:  I have to tell you a

3    baseball story to make a point.  I have two kids.  They're

4    older now.  The youngest is graduating, the oldest is in

5    college, but they used to play baseball and then I was a

6    coach.  Sometimes you would go and there weren't enough

7    umpires so I would have to umpire first base and I always

8    felt uncomfortable about that because my kid is playing.  And

9    whenever there was a close call, and I don't even know that

10   they were close calls, but whenever there was a close call I

11   went the other way.  Am I making sense?

12       LARRY P. JORDAN:  Yes.

13       ATTY. INGRAM:  I called that for the other

14   team because I didn't want anyone to think I was being

15   unfair.  I want to translate that to you.  You understand

16   that you can't bend over to be fair to the State and do it to

17   an extreme?  Am I making sense to you?

18       LARRY P. JORDAN:  Yes, sir, that's

19   correct.

20       ATTY. INGRAM:  I want to talk to you a

21   little bit about the death penalty, but before I do that I

22   want to explain a concern I have.  The judge has talked to

23   you about penalties, the prosecutor has talked to you about

4280

1    penalties, I've talked to you about penalties, and you don't

2    even know if Donna Roberts has done anything wrong or not.

3                    LARRY P. JORDAN:   That's correct.

4                    ATTY. INGRAM:   To coin an old adage, it

5    seems to me a lot like putting the cart before the horse.

6    You see what I mean by that?

7                    LARRY P. JORDAN:   Yes.

8                    ATTY. INGRAM:   I don't want you to think

9    that because we're up here asking you these questions that

10   we're predicting that we're going to get to a second phase.

11                   LARRY P. JORDAN:   Yes.

12                   ATTY. INGRAM:   As you read in the

13   preliminary instructions, those written instructions

14   downstairs, and as I believe the judge told you four weeks

15   ago, we ask you these questions now because we have to and

16   these questions have nothing to do with the guilt or

17   innocence of Donna.  Do you have that straight in your mind?

18                   LARRY P. JORDAN:   Yes, I do.

19                   ATTY. INGRAM:   Do you wear your seatbelt?

20                   LARRY P. JORDAN:   Yes, I do.

21                   ATTY. INGRAM:   And when you buckle that

22   seatbelt do you expect to be in an accident?

23                   LARRY P. JORDAN:   No, I don't.

1              ATTY. INGRAM:  You wear it just in case,

2     right?

3              LARRY P. JORDAN:  Yes.

4              ATTY. INGRAM:  Well, we're asking you

5     these questions now just in case.  We're not predicting we

6     get to a second stage.  You got me?

7              LARRY P. JORDAN:  Yes.

8              ATTY. INGRAM:  So you do recall as you and

9     I are talking seeing something about this case on TV or

10    reading something about it in the newspaper?

11             LARRY P. JORDAN:  Just, just very brief.

12    I never discussed it or it wasn't never brought up.

13             ATTY. INGRAM:  Okay.

14             LARRY P. JORDAN:  Just a quick glance.

15             ATTY. INGRAM:  And did that quick glance

16    leave any impressions in your mind one way or the other?

17             LARRY P. JORDAN:  No.

18             ATTY. INGRAM:  You understand that

19    fairness requires that you decide this case on what you see

20    in this courtroom, what you hear in the courtroom?

21             LARRY P. JORDAN:  Yes, I understand that.

22             ATTY. INGRAM:  So if at any point in time

23    you find yourself with a nagging impression from what you may

1  have seen, read or heard before, your oath as a juror will

2  require you to put aside that nagging impression.  You think

3  you're up to that?

4                  LARRY P. JORDAN:  Yes, I am.

5                  ATTY. INGRAM:  As I understand your

6  answers about capital punishment, you believe that capital

7  punishment has a place in society.

8                  LARRY P. JORDAN:  Yes, it does.

9                  ATTY. INGRAM:  And in some cases it might

10  be the right thing and in some cases it might be the wrong

11  thing.

12                  LARRY P. JORDAN:  That's correct.

13                  ATTY. INGRAM:  Have you ever considered a

14  political candidate's views on capital punishment in

15  determining whether or not you were going to vote for that

16  candidate?

17                  LARRY P. JORDAN:  No, I haven't.

18                  ATTY. INGRAM:  And when you were talking

19  with Mr. Becker you made note of the homicide problem we're

20  having in the Mahoning Valley.

21                  LARRY P. JORDAN:  Yes.

22                  ATTY. INGRAM:  Well, basically we have a

23  crime problem in the Mahoning Valley.  Do you agree with

1  that?

2                    LARRY P. JORDAN:  Yes.

3                    ATTY. INGRAM:  Have you ever thought about

4  or can you give me any of your ideas about what we, and by

5  "we" I mean society as a whole, might be able to do to at

6  least begin addressing that crime problem?  That's a hard

7  one, isn't it?

8                    LARRY P. JORDAN:  Yes, it is, because

9  we're all part of it.  I think that it starts with youth.

10                   ATTY. INGRAM:  By youth you mean educating

11 our young?

12                   LARRY P. JORDAN:  I think there's been a

13 breakdown in the family.

14                   ATTY. INGRAM:  Okay.

15                   LARRY P. JORDAN:  So the entire society is

16 guilty of it.

17                   ATTY. INGRAM:  Do you need a Kleenex?

18                   LARRY P. JORDAN:  No, sir.

19                   ATTY. INGRAM:  Are you sure?  So one of

20 your ideas would be to sort of take a step back and see what

21 we can do to re-instill family values here, is that right?

22            Your Honor, can we take five, please?

23                   LARRY P. JORDAN:  Well, it's been a long

1    gradual process of everything deteriorating in the family and

2    this has caused this, and I don't think there's any one

3    particular either organization or individual to pin it on.

4    When you pick up the newspaper and you look at the high

5    levels of crime and what's going on, there's not one thing.

6                    ATTY. INGRAM:  Well, to a certain extent

7    all of us are responsible, aren't we?

8                    LARRY P. JORDAN:  Yeah.

9                    ATTY. INGRAM:  Do you want five or do you

10   want to keep going here?  Do you want a five-minute break

11   or --

12                   LARRY P. JORDAN:  No, this is fine.  I'm

13   okay, sir.

14                   ATTY. INGRAM:  In your questionnaire there

15   was a question about whether the death penalty should be

16   required for some, required for some offenses.

17                   LARRY P. JORDAN:  Yes.

18                   ATTY. INGRAM:  And I believe you answered

19   yes and then you put down "Murder with another felony."  Do

20   you recall that answer?

21                   LARRY P. JORDAN:  Yes.

22                   ATTY. INGRAM:  That's felony murder, is

23   that what you mean?  What did you mean by that answer is a

1    better question?

2                    LARRY P. JORDAN:  Aggravated, aggravated

3    murder, and then with accompanied by either a robbery, rape,

4    burglary.

5                    ATTY. INGRAM:  One of the counts, one of

6    the aggravated murder counts in this case is that the death

7    of Robert Fingerhut was caused during the commission of

8    another felony, aggravated burglary or aggravated robbery.

9    Did you know that?

10                   LARRY P. JORDAN:  I didn't know that.

11                   ATTY. INGRAM:  There's two aggravated

12   murder counts.  One is a count of prior calculation and

13   design aggravated murder, and that's the old premeditated

14   murder.  Advanced planning.  Do you have a handle on that?

15                   LARRY P. JORDAN:  I understand that.

16                   ATTY. INGRAM:  The other aggravated murder

17   count is that the death was caused during the commission of

18   an aggravated burglary or an aggravated robbery.

19                   LARRY P. JORDAN:  Yes.

20                   ATTY. INGRAM:  All I want you to

21   understand about that is that even in that scenario the law

22   of Ohio does not say that execution or death is automatic.

23   Do you understand that?

1          LARRY P. JORDAN:  Yes, I understand that.

2          ATTY. INGRAM:  Your oath as a juror would

3   require you to fairly consider all four of the sentencing

4   options if you ever had to decide a sentencing option.

5          LARRY P. JORDAN:  Yes.

6          ATTY. INGRAM:  And, you know, 200 or about

7   225 years ago our forefathers declared independence and

8   fought and died for our freedom and then they wrote some laws

9   that are very important to us and these laws were designed to

10  protect freedom for their posterity.  And I know I sound like

11  a civics teacher and I apologize, but one of the things they

12  wrote was the presumption of innocence.  In this country when

13  someone is accused of wrongdoing they are presumed innocent.

14  I assume you've heard of that.

15         LARRY P. JORDAN:  Yes.

16         ATTY. INGRAM:  How do you feel about that

17  rule?

18         LARRY P. JORDAN:  That's fair.

19         ATTY. INGRAM:  And part and parcel of the

20  presumption of innocence is the burden of proof.

21         LARRY P. JORDAN:  That is also fair.

22         ATTY. INGRAM:  You understand that these

23  guys are the only guys with the burden of proof here?

1          LARRY P. JORDAN:  Yes.

2          ATTY. INGRAM:  And basically the State has

3     leveled these allegations.  Now it's time for them to put up

4     or shut up.

5          LARRY P. JORDAN:  Yes, it is.

6          ATTY. INGRAM:  And this is potentially and

7     only potentially a two stage process.  If at the first stage

8     the State doesn't meet its burden of proof and the jury finds

9     Donna Roberts not guilty, what happens?

10         LARRY P. JORDAN:  Acquitted.

11         ATTY. INGRAM:  We all go home, right?

12         LARRY P. JORDAN:  Yes.

13         ATTY. INGRAM:  If we ever get to a second

14    phase the State once again has the burden of proving to you

15    beyond a reasonable doubt that the reasons for imposing death

16    outweigh the reasons for not imposing death.  Do you have a

17    handle on that?

18         LARRY P. JORDAN:  Yes, I do.

19         ATTY. INGRAM:  Do you understand that the

20    law will never require you to vote for a sentence you do not

21    feel is warranted by the evidence?

22         LARRY P. JORDAN:  Yes.

23         ATTY. INGRAM:  And do you also understand

1    that as a juror you are the sole judge of the weight of the

2    evidence?

3                    LARRY P. JORDAN:  Yes.

4                    ATTY. INGRAM:  And nobody, not even that

5    judge, can tell you how much weight to give the evidence.

6    That's exclusively the province of each individual juror.  Do

7    you understand that?

8                    LARRY P. JORDAN:  I understand that.

9                    ATTY. INGRAM:  Have you ever donated any

10   time, money or services to a political campaign or issue?

11                   LARRY P. JORDAN:  No, I haven't.

12                   ATTY. INGRAM:  Do you belong to any group

13   or organization which is active in any political matter?

14                   LARRY P. JORDAN:  No, I don't.

15                   ATTY. INGRAM:  In the last five years or

16   so have you signed a petition on any public issue?

17                   LARRY P. JORDAN:  No, I haven't.

18                   ATTY. INGRAM:  You would agree with me,

19   would you not, that this is a court of law, not a court of

20   sympathy?

21                   LARRY P. JORDAN:  That is correct.

22                   ATTY. INGRAM:  We ask jurors to do hard

23   things.

1          LARRY P. JORDAN:  I understand that.

2          ATTY. INGRAM:  And frequently we ask

3  jurors to do their best to put aside basic human and natural

4  feelings such as sympathy.  Sympathy for Donna Roberts should

5  not affect the way you look at the evidence.  Will you do

6  your best to do that?

7          LARRY P. JORDAN:  Yes.

8          ATTY. INGRAM:  The flip side of that is,

9  you know, Robert Fingerhut lost his life here.  It's natural

10  to feel sympathy for a victim.  Sympathy for Mr. Fingerhut

11  should not affect your evaluation of the evidence.  Will you

12  do your best to sort of rise above the sympathy?

13          LARRY P. JORDAN:  Yes.

14          ATTY. INGRAM:  You understand that Donna

15  doesn't have to testify in this case?

16          LARRY P. JORDAN:  I understand that.

17          ATTY. INGRAM:  And that rule of law is

18  okay with you?

19          LARRY P. JORDAN:  Yes, it is.

20          ATTY. INGRAM:  There's a flip side of

21  that.  If she does testify she is a witness just like any

22  other witness --

23          LARRY P. JORDAN:  Yes.

1          ATTY. INGRAM:  -- to the extent that you

2    would use the same standards for determining her

3    believability as you use for determining the believability of

4    the other witnesses.

5          LARRY P. JORDAN:  Yes.

6          ATTY. INGRAM:  Mr. Becker talked to you

7    about circumstantial evidence, right?

8          LARRY P. JORDAN:  Yes, he did.

9          ATTY. INGRAM:  All right.  So we're going

10   to back up.  We're going to talk a little bit about

11   reasonable doubt, a little bit about circumstantial evidence,

12   and then I'll sit down.  Reasonable doubt is something that

13   is based on reason and common sense.  You have a handle on

14   that, of course.

15         LARRY P. JORDAN:  Yes.

16         ATTY. INGRAM:  The judge will tell you

17   that proof beyond a reasonable doubt requires that you be

18   firmly convinced and is proof of such character that you

19   would be willing to rely and act upon it in the most

20   important of your own affairs.  He'll give you a more

21   detailed definition, but that's part of it.  And in your life

22   you've made important decisions, haven't you?

23         LARRY P. JORDAN:  Yes, I have.

1          ATTY. INGRAM:  And sometimes either

2    actually on a sheet of paper or in your mind's eye you put a

3    line down the center of the page and you write the positive

4    things in favor of the decision on one side, the negatives on

5    another side.  You ever done that?

6          LARRY P. JORDAN:  Oh, yes.

7          ATTY. INGRAM:  And because you want, you

8    want some degree of certainty that you're making the right

9    decision, I would imagine what you do is you try to strike

10   those negatives.

11         LARRY P. JORDAN:  Yes.

12         ATTY. INGRAM:  And if I'm making a

13   decision to buy a house and I have all kind of positive

14   things; bedrooms, bathrooms, my wife likes it, good school

15   system.  And I have some negatives; it's an old house, I

16   don't know if it's stable, there's some plumbing problems,

17   and I don't know if I can make the mortgage payment.  I can

18   have an inspection and if my contractor tells me it's brick

19   solid, I can strike that, right?

20         LARRY P. JORDAN:  You could.

21         ATTY. INGRAM:  If my plumber tells me the

22   bill is a couple hundred bucks to fix the plumbing, I can

23   strike that.

4292

1          LARRY P. JORDAN:  Yes.

2          ATTY. INGRAM:  But the mortgage payment

3     issue, I go to the bank, they won't extend the loan.  They

4     won't lower the interest rate.  I can't get a raise.  No

5     matter how much I think about that, I have a reasonable

6     question in my mind whether I can come up with the mortgage

7     payment month in, month out.

8          LARRY P. JORDAN:  Yes.

9          ATTY. INGRAM:  As long as there's one

10    reasonable negative that remains on that list I cannot say

11    beyond a reasonable doubt that that decision was the right

12    thing for me.  Do you see that?

13         LARRY P. JORDAN:  Yes.

14         ATTY. INGRAM:  And do you see that it's

15    the same in this case?

16         LARRY P. JORDAN:  Yes, I see your point.

17         ATTY. INGRAM:  Circumstantial evidence,

18    you know what that is, don't you?

19         LARRY P. JORDAN:  Yes.

20         ATTY. INGRAM:  I'm just going to give you

21    one example.  Well, first of all, circumstantial evidence

22    asks as -- oh, my God, I can't speak English.  I'm trying to

23    jump start my brain this morning.  You are asked to make a

1    leap in logic, right?

2              LARRY P. JORDAN:   Okay.

3              ATTY. INGRAM:   So the first thing you got

4    to do is to test that leap to make sure it's reasonable

5    because if it's not reasonable you don't want to make it, do

6    you?

7              LARRY P. JORDAN:   No.

8              ATTY. INGRAM:   And would you agree with me

9    that circumstantial evidence is sort of like a chain and only

10   as strong as its weakest link?

11             LARRY P. JORDAN:   The weakest link.

12             ATTY. INGRAM:   Now that I stand up -- my

13   stomach is growling because I don't eat breakfast when I'm in

14   trial.   Now that I stand up, I've stood up here all this time

15   and asked you all these questions, is there anything that

16   popped into your mind that you would like to talk about with

17   any of us?

18             LARRY P. JORDAN:   The only thing I can say

19   is I'm honored to serve the community and, you know, this

20   community has been my home.

21             ATTY. INGRAM:   Sir, I think you should

22   understand, we're honored to have you here.   And if you're

23   honored to be here, that just makes us prouder of you now

4294

1  than we were before we started this conversation.  I thank

2  you for being you, I thank you for your time and attention,

3  and we'll talk to you later.

4         LARRY P. JORDAN:  Okay.  Thank you.

5         ATTY. BECKER:  Your Honor, may we

6  approach?

7         THE COURT:  Uh-huh.

8         (Whereupon, a bench conference was held.)

9         THE COURT:  We're going to take five or 10

10  minutes.  You can step aside for a minute, Mr. Jordan.  We

11  have to review something.  Step aside.  You probably have

12  time to grab a cup of coffee down there.

13         (Whereupon, the prospective juror was

14  excused from the courtroom, a brief recess was taken, and the

15  following proceedings then occurred outside the presence of

16  the prospective juror Larry P. Jordan.)

17         ATTY. BECKER:  All right.  Your Honor,

18  pursuant to the last juror, we've taken a break and I think

19  both sides have had an opportunity to review Section 2961.01

20  of the Revised Code.  That statute states that a person

21  convicted of a felony under the laws of this or any other

22  state or the United States, unless the conviction is reversed

23  or annulled, is incompetent to be an elector or juror or to

1    hold an office of honor, trust, or profit.  The statute then

2    goes on and says that if a person is granted probation,

3    parole, judicial release, or a conditional pardon or is

4    released under post-release control, the person is competent

5    to be an elector during that period and an elector

6    thereafter.  The specific language of the statute, though,

7    apparently forbids a person convicted of a felony from being

8    a juror unless the conviction is reversed or annulled.

9             So I guess we need the Court to ask Mr. Jordan if

10   his conviction has either been reversed or annulled.  If it

11   has not, then I believe he is probably incompetent and I

12   assume that's what --

13                      THE COURT:  Okay.  And I apologize for

14   being in the same boat the rest of you guys are.  Maybe I

15   should have known that.  I didn't.  But I feel somewhat

16   better that none of us knew.

17                      ATTY. BECKER:  Well, in all fairness to

18   everyone, it did change in 1998.  And I don't know why I

19   thought of it when Mr. Ingram was there, but for whatever

20   reason I decided to pick up the book and read it.

21                      ATTY. INGRAM:  We believe the question

22   asked of the juror should be has your conviction been

23   annulled, expunged, or have you filed a motion for relief

1      from disability?

2                        ATTY. BAILEY:  He's ineligible for

3      expungement as a matter of law because it's a sex offense.

4                        THE COURT:  Yeah.  And the statute doesn't

5      really mention an expungement, --

6                        ATTY. BECKER:  Well, that's true.  Yeah,

7      it is a sex offense.

8                        THE COURT:  -- which is strange I think.

9                        ATTY. BECKER:  I don't know if the Court

10     wants -- it's State versus Madrigal, M-a-d-r-i-g-a-l, and the

11     cite is 87 Ohio St. 3d, 378.  It's a 2000 case.  And

12     unfortunately the real sad part about this decision was that

13     this was the decision that reinstituted the confrontation

14     clause back into Ohio law.  It over reversed State versus

15     Gilliam, which I made a living on for a couple years

16     introducing codefendant statements in the trials of --

17                       THE COURT:  You, of course, think --

18                       ATTY. JUHASZ:  There's that federalism

19     again.  Somebody read the United States Supreme Court

20     decision and said oh, my God, we should be doing this too.

21                       ATTY. INGRAM:  We think that should be the

22     question, if you can read my chicken scratch.

23                       THE COURT:  Has your conviction been

1    annulled, expunged, or have you been taken --

2                        ATTY. INGRAM:  Or have you filed.

3                        THE COURT:  Have you filed?  Your writing

4    is about as bad as mine.  Not quite.

5                        (Whereupon, a discussion was had off the

6    record, after which the prospective juror, Larry P. Jordan,

7    was again seated in the courtroom and the following

8    proceedings commenced.)

9                        THE COURT:  Mr. Jordan, I have to

10   apologize because there is a statute that I should have known

11   about and I didn't.  Let me ask you this, has your conviction

12   been annulled, expunged or have you filed any motion for

13   relief from disability?

14                        LARRY P. JORDAN:  No.

15                        THE COURT:  You haven't.  Okay.  That

16   means that there's a statute that says that a person who is

17   convicted of a felony is not able to sit as a juror or to

18   hold any office, elected office.  You're able to vote because

19   that's a right that's restored to you by either the probation

20   or parole department.  I apologize to take your time up and

21   have you go through all of this.  I have to excuse you for

22   cause.  We thank you very much for appearing and for going

23   through the process, and I wish you well.  Okay?

1          LARRY P. JORDAN:  Okay.

2          THE COURT:  Take care of yourself.

3          LARRY P. JORDAN:  Okay.  That's okay.

4          THE COURT:  Thank you.

5          ATTY. BECKER:  Thank you very much,

6   Mr. Jordan.  I'm sorry that we took your morning.  We'll see

7   you at Sam's Club because we shop there a lot.

8          ATTY. INGRAM:  Young man, you have a good

9   one.  Thank you very much.

10          THE COURT:  Larry, maybe I'll give you a

11   picture of my wife and don't let her in Sam's Club, okay?

12   Take care.

13          (Whereupon, Larry P. Jordan was dismissed

14   for cause from the pool of prospective jurors.)

15                    *   *   *

16          **PROSPECTIVE JUROR SHERYL E. BRAUN**

17          THE COURT:  Have a seat right here.  Don't

18   be nervous.

19          SHERYL E. BRAUN:  I've never done this

20   before.

21          THE COURT:  Okay.

22          ATTY. INGRAM:  Good morning.

23          SHERYL E. BRAUN:  Good morning.

1                    THE COURT:  They just look tough, they're

2     not really tough.  You had some questions, gentlemen?  I'm

3     not aware of what the problem is here.

4                    ATTY. BAILEY:  Just a fast thing.

5                    THE COURT:  Okay.

6                    ATTY. BAILEY:  Good morning, Mrs. Braun.

7     My name is Ken Bailey, I'm an assistant prosecutor, and Chris

8     Becker is my co-counsel.  And before we get into anything

9     else I'm just going to ask you about your trip.  You have a

10    prepaid trip next week where you're going to Washington D.C.

11    with a sixth grade class?

12                    SHERYL E. BRAUN: Right.

13                    ATTY. BAILEY:  Okay.  And I expect we're

14    going to be starting the trial next week and you have to go

15    on that trip, right?

16                    SHERYL E. BRAUN:  Right.  I have

17    everything set up for it.

18                    ATTY. BAILEY:  Okay.  You would like to be

19    excused?

20                    SHERYL E. BRAUN:  If I can.

21                    ATTY. BAILEY:  We have no objection.

22                    THE COURT:  Pass, or excuse for cause?

23                    ATTY. INGRAM:  Well, I have no objection

1  to your request, but I have to ask a couple questions.

2              THE COURT:  Okay.  Absolutely.  I'm sorry.

3              ATTY. INGRAM:  It's not about your trip.

4              SHERYL E. BRAUN:  All right.

5              ATTY. INGRAM:  You joined us about a month

6  ago down in Judge Logan's, the big courtroom at the other end

7  of this hallway?

8              SHERYL E. BRAUN:  Right, right.

9              ATTY. INGRAM:  When you -- I have to ask

10 you what's become known as the left or the right question.

11 When you entered the door do you recall if you went to your

12 left, to your right or sort of straight ahead?

13             SHERYL E. BRAUN:  Left.

14             ATTY. INGRAM:  Did you find a seat or were

15 you one of the unfortunate souls that had to stand?

16             SHERYL E. BRAUN:  I was seated.  I was

17 seated.

18             ATTY. INGRAM:  Towards the back or towards

19 the front?

20             SHERYL E. BRAUN:  Towards the front.

21             ATTY. INGRAM:  Towards the front.  While

22 you were there did anyone engage or attempt to engage you in

23 discussion about this case?

1               SHERYL E. BRAUN:  No.

2               ATTY. INGRAM:  While you were there did

3    you hear anyone else discussing this case?

4               SHERYL E. BRAUN:  No one around me.

5               ATTY. INGRAM:  Did you hear anyone who

6    wasn't around you discussing it?

7               SHERYL E. BRAUN:  Well, no.  I mean, no

8    one that I was sitting around, no.

9               ATTY. INGRAM:  Okay.  Thank you.  We have

10   no objection, Your Honor.

11              THE COURT:  Okay.  You have a nice trip.

12              SHERYL E. BRAUN:  Thank you.

13              THE COURT:  Enjoy yourself.

14              (Whereupon, Sheryl E. Braun was dismissed

15   for cause from the pool of prospective jurors.)

16                        *   *   *

17        **PROSPECTIVE JUROR MICHAEL E. BLAKE**

18              THE COURT:  Mr. Blake.

19              MICHAEL E. BLAKE:  Yes, Your Honor.

20              THE COURT:  Good morning.  You read that

21   handout that was given to you?

22              MICHAEL E. BLAKE:  Yes, I did.

23              THE COURT:  Okay.  You understand we are

1  here on the case of State of Ohio versus Donna Roberts

2  wherein she stands charged by indictment with two counts of

3  aggravated murder with specifications.  Now, in Ohio just

4  because a person is found guilty of having committed murder

5  does not mean that they automatically face the death penalty.

6  The legislature set it up so that only if an aggravated

7  murder is committed and there are certain circumstances

8  attached to that situation, which we call specifications, and

9  those specifications have to be listed in the indictment in

10  order for the matter to be even raised, the issue of the

11  death penalty.

12  So if the State charges a person with aggravated

13  murder with specifications, say the person killed Robert

14  Taft, they have to prove first of all the aggravated murder.

15  Now, if they don't include the fact that he's governor as a

16  specification, it's not a death penalty, but if the

17  indictment would also contain the specification that Robert

18  Taft is a governor and the State was able to prove that

19  beyond a reasonable doubt, aggravated murder done with prior

20  calculation and design and the previous specification that

21  he's governor, then it raises the issue of the death penalty.

22  Now, in the two counts of aggravated murder filed

23  against Donna Roberts there are specifications, and if the

4303

1   State is able to prove beyond a reasonable doubt the murder

2   and the specifications, then this case could well go into a

3   second phase wherein the jury would have to consider the

4   aggravating circumstances and whether they outweigh beyond a

5   reasonable doubt the mitigating factors.  The aggravating

6   circumstances would be reasons why the State would offer to

7   the jury that they should consider and impose the death

8   penalty, and the mitigating factors would be reasons

9   submitted in favor of not granting the death penalty but a

10  lesser sentence of life without chance of parole or life with

11  no chance of parole before 25 or 30 years.

12          Now, the burden is always on the State to proceed in

13  any criminal trial.  A defendant need do nothing.  The

14  defendant can sit and not participate.  The only requirement

15  is that they be here.  Few trials happen to that extreme, but

16  it happens to some degree.  The defense at their option can

17  participate as they see fit.  The reason for that is it's

18  really a one sided show.  The State either proves or does not

19  prove and loses its own case.  The defense doesn't have to

20  prove anything isn't right, the State has to prove that it is

21  correct, what they're saying.

22          Now, that's a little bit different from what we deal

23  with on a daily basis.  If somebody is accused of something

1    we usually expect them to respond to it.  But the law is set

2    up the way it is for a very good purpose and that is that we

3    all have the right to remain silent.  The burden is on the

4    State to prove their case.

5          Now, we don't know what this jury is going to do

6    because there's been no evidence presented.  We don't even

7    have a jury yet.  If the State fails to carry the burden of

8    proof beyond a reasonable doubt, then this jury would

9    properly return a finding of not guilty.  However, if the

10   State is able to carry that burden of proof and prove the

11   aggravated murder and the specification beyond a reasonable

12   doubt, then this case would go into a second phase.  So the

13   question arises why do we talk about the death penalty now?

14         Well, it wouldn't do us much good if we got to that

15   second phase and we discovered that one of the jurors

16   believed in an eye for an eye, if you kill somebody you lose

17   your own life.  That isn't the law of Ohio and that person

18   couldn't be fair to the defendant.  Or, on the other side, if

19   you had somebody that says, "I couldn't under any

20   circumstances ever make such a decision as to whether anyone

21   lives or dies," that person couldn't be fair to the State

22   because the State has the right to ask for that penalty if

23   they prove their case.

1          Now, there's nothing wrong with any of us holding

2     our individual view of the rightness or wrongness of the

3     death penalty.  Whatever your view is is fine.  It will be

4     accepted by everybody here.  It's just that they have to

5     inquire to know what your view is because without having a

6     person on there who can follow the law as it is, whether any

7     of us agree with the law is not important, it is the law and

8     the law has to be followed by everybody.  Most people that

9     will be seated on this jury will have an opinion on the death

10    penalty.  Some will be more in favor of it, some less.  But

11    the question is can you follow the law?

12         And the important thing is at that second phase, if

13    it should get there, is to remember that the burden is

14    entirely on the State.  The defendant doesn't have to prove

15    anything.  They may present something to the jury but they

16    are not required to.

17         The second issue will be in regard to pretrial

18    publicity.  Many of the people that we've interviewed have

19    some knowledge of the case from the newspaper or TV or

20    conversations.  That is not evidence.  If this case is to be

21    tried fairly all 12 people will have to listen to the

22    evidence and decide this case solely on the evidence they

23    hear in this courtroom.  To bring something in that a

1    newspaper said or something a friend told them, that means

2    that somebody isn't going to get a fair trial with them.  So

3    these folks will be seeing if you can give them your

4    assurance that you're not prejudiced in some way by what you

5    heard or think you've heard before.  Okay?

6                        MICHAEL E. BLAKE:  Yes, sir, Your Honor.

7                        THE COURT:  Fair enough.  Mr. Bailey.

8                        ATTY. BAILEY:  Your Honor.  Good morning,

9    Mr. Blake.

10                        MICHAEL E. BLAKE:  Good morning.

11                        ATTY. BAILEY:  My name is Ken Bailey and I

12    think we met about four weeks ago.

13                        MICHAEL E. BLAKE:  Yes.

14                        ATTY. BAILEY:  Going on five, in the other

15    courtroom.  And I told you last time I was going to be joined

16    by my co-counsel, Chris Becker, who is here today.

17                        ATTY. BECKER:  Good morning.

18                        MICHAEL E. BLAKE:  Good morning.

19                        ATTY. BAILEY:  And the two of us are

20    responsible for prosecuting this particular case on behalf of

21    the people of Trumbull County and the people of the State of

22    Ohio.  And, as the judge indicated, we're going to be asking

23    you some questions regarding your prior experiences and your

```
 1    opinions on different things to make sure that the folks who
 2    are selected to serve on this particular jury can be fair and
 3    impartial to both sides, both to the defendant and the people
 4    of the State of Ohio.  And that's why we ask these questions
 5    and not because we're snoopy and we want to pry into people's
 6    backgrounds, but rather just to make sure that folks can be
 7    fair and impartial to both sides.  And there aren't any right
 8    answers and there aren't any wrong answers to these
 9    questions, only open and candid answers.
10          This is the one chance that we get to talk together
11    until this whole case is all over.  If it goes into two
12    phases, you can't talk to us until the end of the second
13    phase.  So if we run into each other in the hallway or in the
14    elevator or at a restaurant or something during the course of
15    these proceedings, we want you to understand that we're not
16    trying to snub you or be antisocial.  All we're allowed to
17    say is maybe good morning or good afternoon and we can't have
18    any other conversation because it would result in a mistrial.
19    But if you have any questions that come up today while we're
20    in here that pertain to these proceedings, if we can answer
21    them for you we'll try and get an answer, okay?  And if I
22    don't make myself clear on something, you stop me and have me
23    rephrase it or ask it a different way.
```

1          Now, we're going to be asking questions to start off

2   with about pretrial publicity and the death penalty and then

3   I'll get to some regular questions.  You had indicated, if I

4   remember back on April 8th, that you had watched the TV news

5   and the newspaper and you had some prior knowledge about this

6   case.

7                    MICHAEL E. BLAKE:  That is correct.

8                    ATTY. BAILEY:  What do you recollect

9   having read or heard about the case?

10                    MICHAEL E. BLAKE:  Well, just basically

11   what was in the newspaper and then whatever, whatever TV I

12   happened to see.  You know, I used to watch the news so.

13                    ATTY. BAILEY:  Okay.  What is that that

14   you heard or read?

15                    MICHAEL E. BLAKE:  Well, that these two

16   people had murdered this guy for his insurance money, you

17   know, dumped his body in a car somewhere.

18                    ATTY. BAILEY:  Okay.

19                    MICHAEL E. BLAKE:  Or whatever, you know.

20   I'm not even sure of what I've read now.

21                    ATTY. BAILEY:  Okay.  And there are a lot

22   of murders in the paper unfortunately.

23                    MICHAEL E. BLAKE:  True.

1              ATTY. BAILEY:  They tend to blend

2    together.  Had you discussed it at all, this particular case,

3    with anybody when it occurred?

4              MICHAEL E. BLAKE:  Maybe with my wife, you

5    know, but nobody else.  You know, our friends don't -- most

6    of our friends aren't interested in what's in the paper or on

7    the news.

8              ATTY. BAILEY:  Oh, okay.

9              MICHAEL E. BLAKE:  So they're just -- got

10   their head in the sand.

11             ATTY. BAILEY:  Okay.  Now, the reason the

12   judge tells you that you can't be reading the paper anymore

13   once this case --

14             MICHAEL E. BLAKE:  Yes.

15             ATTY. BAILEY:  Well, since April 8th I

16   guess.  And you can't discuss it with anyone and you can't --

17   if you're watching TV and something comes on, you got to walk

18   out of the room or turn it off or cover your ears or

19   something like that.  If it's in the paper, you know, you

20   turn the page or something and not read the article.  You can

21   have your wife save the articles for you and read them all

22   after the case is all over, but there's a reason for it.

23             As you look around the courtroom today there's

1    nobody here right now from the news media, but I expect as we

2    get into testimony we'll see a couple of reporters from the

3    Vindicator and the Tribune coming in and some of those

4    reporters from the TV stations with TV cameras.  And they

5    can't film the jurors but they will film maybe the other

6    participants, and then they'll do a feature on it, but you'll

7    notice one thing; they're not there for the whole trial.

8    They're there for maybe a couple of minutes and then they are

9    going to try to do a whole feature and they're going to miss

10   everything that was asked and answered before they came in

11   and asked and answered after they left, okay, because they

12   have to rush into print with it or on the air with it.  It's

13   going to give you perhaps a distorted view of what happens.

14   It's taken out of context, okay, not intentionally, but

15   because of the nature of the beast it just is -- it could be

16   totally different from what happened.

17           So if you're chosen to sit on this particular jury

18   and you hear the testimony and the evidence and then your

19   wife saves the newspapers for you and you look at them after

20   it's all over you may say, "Gosh, I sat in Judge Stuard's

21   courtroom for a couple of weeks and I remember all the

22   testimony and the evidence and whoever covered this story and

23   wrote this feature in the paper, they must have been sitting

4311

1   in Judge Logan's court on another case."  Okay?

2                        MICHAEL E. BLAKE:  (Nods head

3   affirmatively.)

4                        ATTY. BAILEY:  So you would be able to do

5   that, you could set aside anything you might have heard or

6   read before?

7                        MICHAEL E. BLAKE:  Yes.

8                        ATTY. BAILEY:  And start out fresh in this

9   courtroom, right?

10                       MICHAEL E. BLAKE:  Yes.

11                       ATTY. BAILEY:  And get your information

12  just on the testimony and evidence of the witnesses, the

13  physical exhibits that come in and the instructions of law

14  given to you by the judge.

15                       MICHAEL E. BLAKE:  Right.

16                       ATTY. BAILEY:  It may well be that

17  something rings a bell that may jive with what you remember

18  reading before or hearing on TV before, but you understand

19  that wouldn't be evidence.  You're starting with a blank

20  slate and whatever is written on that slate has to be written

21  in this courtroom.

22                       MICHAEL E. BLAKE:  Yes.

23                       ATTY. BAILEY:  Okay.  And you wouldn't

1    have any problem with that?

2                    MICHAEL E. BLAKE:  No.

3                    ATTY. BAILEY:  Okay.  So much for pretrial

4    publicity.  Now let's talk about the death penalty as a

5    possible punishment.  The first time you learned this was a

6    potential death penalty case was when?

7                    MICHAEL E. BLAKE:  I'm not sure.  Whenever

8    it came in the paper I would say, right?

9                    ATTY. BAILEY:  Okay.  In the paper or when

10   you came to court on April 8th?

11                   MICHAEL E. BLAKE:  Well, I don't know.  I

12   don't recall.

13                   ATTY. BAILEY:  Okay.  But at some point

14   you became aware --

15                   MICHAEL E. BLAKE:  Yes.

16                   ATTY. BAILEY:  -- that the death penalty

17   could be a punishment in this case, right?

18                   MICHAEL E. BLAKE:  Right.

19                   ATTY. BAILEY:  Okay.  And before that you

20   had indicated on your questionnaire that you are in favor of

21   the death penalty as a punishment for certain crimes, you

22   said for murder, and it's based basically on a theory of an

23   eye for an eye.

1              MICHAEL E. BLAKE:  Yes.

2              ATTY. BAILEY:  And when -- you said your

3  friends generally don't discuss this type of thing because

4  they don't read the papers or the news.

5              MICHAEL E. BLAKE:  Right.

6              ATTY. BAILEY:  But you discuss it

7  sometimes with your wife.

8              MICHAEL E. BLAKE:  Yes.

9              ATTY. BAILEY:  Okay.  Have you ever had

10  occasion to discuss the issue of the death penalty as a

11  possible punishment when certain cases have come up or other

12  crimes?

13              MICHAEL E. BLAKE:  Not really, no.  We

14  both believe in the death penalty but we don't actually say,

15  you know, they should -- you know, it's not applicable in all

16  cases I still don't think, you know.

17              ATTY. BAILEY:  Okay.  And you understand

18  -- well, this view, that you think it's appropriate in some

19  types of cases.

20              MICHAEL E. BLAKE:  Right.

21              ATTY. BAILEY:  What type of cases?  When

22  you say murder what do you mean?

23              MICHAEL E. BLAKE:  Multiple murders,

4314

1    children.  Murdered children is one of my biggies.  You know,

2    any heinous murders.

3                        ATTY. BAILEY:  Okay.  Now, there are

4    different types of killings that can happen.  For example,

5    let's say somebody is chopping wood, okay?  The law doesn't

6    treat these killings all equally.  If somebody is chopping

7    wood with an ax and the head of the ax flies off and somebody

8    gets killed, that's an accident, right?

9                        MICHAEL E. BLAKE:  Exactly.

10                       ATTY. BECKER:  You wouldn't expect

11   somebody to get punished for that?

12                       MICHAEL E. BLAKE:  No.

13                       ATTY. BAILEY:  If somebody is driving down

14   the road in a car and they blow through a stop sign and hit a

15   pedestrian and kill the pedestrian, you would expect that

16   person to get punished of some sort but not by the death

17   penalty, right?

18                       MICHAEL E. BLAKE:  Right.

19                       ATTY. BAILEY:  It might be a jail sentence

20   or a prison sentence perhaps.

21                       MICHAEL E. BLAKE:  Right.

22                       ATTY. BAILEY:  If somebody, two fellows

23   are in a bar and they're drinking and they get into a fight,

4315

1  one guy punches out the other one and the victim falls back

2  and hits his head against the edge of the bar and dies.  That

3  might be a manslaughter maybe depending on the circumstances,

4  or maybe it could be a murder maybe, but again, the death

5  penalty wouldn't be -- you wouldn't expect that to be the

6  type of punishment in that case, right?

7               MICHAEL E. BLAKE:  Right.

8               ATTY. BAILEY:  There might be some type of

9  prison sentence perhaps.  You understand under our system the

10  legislature writes the laws?

11               MICHAEL E. BLAKE:  Yes.

12               ATTY. BAILEY:  And they set out what's

13  prohibited and what the range of punishments could be.

14               MICHAEL E. BLAKE:  Right.

15               ATTY. BAILEY:  Okay.  So let's say under

16  our law in Ohio there's premeditated murder or murder by

17  prior calculation and design, which requires some advanced

18  planning and maybe a studied scheme to kill.  And I say, and

19  I look at my co-counsel and I say I don't like his shoes.

20  I'm sick and tired of him wearing those shoes.  If he wears

21  those shoes tomorrow I'm going to stand on the courthouse

22  steps and say I'm going to kill Chris tomorrow when he comes

23  into court at 9:00 o'clock in the morning.  I'm going to

1   shoot him if he's wearing those shoes.  And, sure enough, the

2   next day he comes walking up the steps in those shoes and I

3   shoot him and kill him.  Okay.  That could be killing with

4   prior calculation and design.  Under Ohio law the way the

5   legislature has written the law, that alone is not enough to

6   make me eligible for the death penalty, okay?

7                    MICHAEL E. BLAKE:  Okay.

8                    ATTY. BAILEY:  Now, there are other

9   factors that could come in.  There has to be more than just

10  the killing by prior calculation and design, and the

11  legislature has set down certain aggravating circumstances,

12  certain findings of fact that would make a person eligible

13  for the death penalty.  And it could be things like, as the

14  judge said, maybe the killing of the governor or lieutenant

15  governor or the president or a police officer or a young

16  child, or murder for hire or a killing during a special

17  felony, like during an aggravated robbery or during an

18  aggravated burglary or a mass murder.  Okay.  There are

19  different things that make a person eligible for the death

20  penalty in Ohio but it's not an automatic punishment.

21                    MICHAEL E. BLAKE:  Right.

22                    ATTY. BAILEY:  Okay.  You read that

23  handout that we had downstairs?

4317

1                    MICHAEL E. BLAKE:  Yes, I did.

2                    ATTY. BAILEY:  And we could have -- well,

3        would you include any of those crimes in your personal belief

4        system?  Well, let me rephrase that.  If you sat on the

5        legislature and you had a say in designing the criminal

6        justice system, would you make any of those crimes or any

7        other crimes punishable where the death penalty would be an

8        option?

9                    MICHAEL E. BLAKE:  Probably not.

10                   ATTY. BAILEY:  Okay.  Would you include

11       the death penalty in your system, criminal justice system?

12                   MICHAEL E. BLAKE:  Yes.

13                   ATTY. BAILEY:  And if you passed, if you

14       wrote the laws you would keep it for mass murder and for the

15       killing of children?

16                   MICHAEL E. BLAKE:  Yes.

17                   ATTY. BAILEY:  But what about killing for

18       profit?

19                   MICHAEL E. BLAKE:  Probably, yes.

20                   ATTY. BAILEY:  Okay.  Now, when you say

21       probably yes, you just -- okay.

22                   MICHAEL E. BLAKE:  Yeah.

23                   ATTY. BAILEY:  Okay.  Now, do you

1    understand it's fine to have your own personal belief system,

2    but to sit on this jury you have to be able to take your

3    personal belief system and set it aside and be able to follow

4    the law that the legislature has written that the judge is

5    going to later instruct you on?  Okay?

6                         MICHAEL E. BLAKE:  Yes.

7                         ATTY. BAILEY:  You think you would be able

8    to do that?

9                         MICHAEL E. BLAKE:  Oh, yes.  I follow

10   directions very well.

11                        ATTY. BAILEY:  Okay.  I noticed you had

12   enlisted in the Army.

13                        MICHAEL E. BLAKE:  Yes.

14                        ATTY. BAILEY:  Back in the '60s.

15                        MICHAEL E. BLAKE:  Yes.

16                        ATTY. BAILEY:  Did you serve in Vietnam?

17                        MICHAEL E. BLAKE:  No.  I was in Germany.

18                        ATTY. BAILEY:  In Germany.  Okay.  With

19   Kaiserslautern?

20                        MICHAEL E. BLAKE:  Yes, as a matter of

21   fact.

22                        ATTY. BAILEY:  Oh, really.  Okay.  Good

23   guess.  I had been -- well.  Now, talk about a lucky guess.

1              ATTY. INGRAM:  You're easily impressed.

2              ATTY. BAILEY:  Well, there are a lot of

3    cities in Germany and I just happened to pick that base.

4    Now, let me get back on track.  I was asking about --

5              ATTY. INGRAM:  I think it was an um.

6              ATTY. BAILEY:  Go away.  Okay.  Now -- I'm

7    getting there.  There are some days where my age, it's

8    just --

9              THE COURT:  This trial is starting to get

10   to you.

11             ATTY. BAILEY:  It is.  Okay.  So you

12   understand that the legislature passes the laws.  You would

13   set aside your belief system and follow the law given to you

14   by the judge.  And you basically believe in an eye for an

15   eye.  Is that the biblical injunction?

16             MICHAEL E. BLAKE:  Yes.

17             ATTY. BAILEY:  Okay.  You understand that

18   the law in Ohio isn't set up that way?

19             MICHAEL E. BLAKE:  I understand.

20             ATTY. BAILEY:  You may feel, you feel that

21   a person who killed somebody, maybe a young child or a mass

22   murderer, should automatically face the death penalty?

23             MICHAEL E. BLAKE:  Yes.

1           ATTY. BAILEY:  Okay.  You understand to

2     sit on this jury you have to be able to set aside that

3     personal belief system and follow --

4           MICHAEL E. BLAKE:  The rules.

5           ATTY. BAILEY:  -- what is set down here?

6           MICHAEL E. BLAKE:  Yes.

7           ATTY. BAILEY:  Okay.  Now, under our

8     system, our criminal justice system, the way the legislature

9     has written the law this case can be tried in two different

10     phases.  The first phase is tried just like any other

11     criminal case.  The issue here is guilt or non-guilt.  The

12     defendant is charged with a number of crimes, but the thing

13     that makes the defendant eligible for the death penalty is a

14     charge called aggravated murder and one or more of these

15     specifications of aggravating circumstances that we'll talk

16     more about in a little bit.  But these specifications of

17     aggravating circumstances, that's just a fancy word for an

18     extra finding of fact for the jury to consider.

19           Basically the charge of aggravating circumstances,

20     there are two of them.  One of them is that the aggravated

21     murder was committed with prior calculation and design and

22     during the course of an aggravated burglary.  The second

23     specification is that the aggravated murder was committed

1    with prior calculation and design and during the course of an

2    aggravated robbery as opposed to an aggravated burglary.

3    Okay?

4                         MICHAEL E. BLAKE:  Okay.

5                         ATTY. BAILEY:  And these things attached

6    to the aggravated murder charge make a defendant eligible for

7    the death penalty as one of the possible punishments.  Okay?

8                         MICHAEL E. BLAKE:  Okay.

9                         ATTY. BAILEY:  So in the first phase we're

10   just dealing with the issue of guilt and we prove the

11   elements of the crime charged, the essential component parts.

12   It's sort of like the ingredients in a recipe.  We got to

13   bake a cake, a chocolate cake let's say, and we got to put in

14   all the ingredients, including the chocolate.  Otherwise, we

15   don't bake those particular cakes for these different crimes.

16   Okay?

17                        MICHAEL E. BLAKE:  Okay.

18                        ATTY. BAILEY:  If you and the other jurors

19   are convinced beyond a reasonable doubt in the first phase of

20   the defendant's guilt of aggravated murder and one or more of

21   these specifications of aggravating circumstances, we would

22   then move to a second phase and in that second phase the

23   issue would be different.  You've already decided the issue

1    of guilt, okay, and in that first phase there's no evidence

2    necessarily presented as to what the appropriate punishment

3    would be because it's not relevant to the first phase.  Okay?

4    So to sit on this jury in the second phase you've got to be

5    able to consider evidence relating to the appropriate

6    punishment because the death penalty is not an automatic

7    punishment for somebody convicted of aggravated murder with

8    specifications.  Okay?

9                  MICHAEL E. BLAKE:  Okay.

10                 ATTY. BAILEY:  There may be things that

11   work for the defendant's benefit and against the imposition

12   of the death penalty as a punishment, and you would want to

13   know about those things, wouldn't you?

14                 MICHAEL E. BLAKE:  Right.

15                 ATTY. BAILEY:  You would want to consider

16   all the facts and circumstances that are available before you

17   decide what the appropriate punishment is for the crime of

18   aggravated murder with specifications.

19                 MICHAEL E. BLAKE:  Right.

20                 ATTY. BAILEY:  Okay.  In the second phase

21   you can hear maybe the same evidence as presented in the

22   first phase because the specifications that you would have

23   found would be on one side of this imaginary scale in the

1    second phase.  You have to do a balancing test.  On the other

2    side of this scale would be what we call mitigating factors.

3    We don't know what those are, at this point it's premature,

4    but they would be -- they could be presented in a second

5    phase.  The defense has an opportunity to present those and

6    you have to be able to consider those.  Okay?

7                     MICHAEL E. BLAKE:  Right.

8                     ATTY. BAILEY:  And it's up to you though,

9    you and the other jurors, how much weight to give these

10   particular things when you do this balancing test.  You might

11   decide that something has a whole lot of weight, that

12   something might weigh 20 pounds or a ton.  Okay.  You might

13   decide that something else may weigh about as much as a

14   feather.  Okay.  You got to be able to consider it but it's

15   entirely up to you and the other jurors how much weight to

16   give.  Okay?

17                     MICHAEL E. BLAKE:  Okay.

18                     ATTY. BAILEY:  If -- okay.  When you start

19   out in that second phase -- there were four possible

20   penalties that you read about in that sheet, right?

21                     MICHAEL E. BLAKE:  Yes.

22                     ATTY. BAILEY:  There's the death penalty,

23   there's life in prison without parole, there's life in prison

1    with parole eligibility after 30 full years, and life in

2    prison with parole eligibility after 25 full years.  Okay?

3                    MICHAEL E. BLAKE:  Yes.

4                    ATTY. BAILEY:  And to sit as a juror in

5    this case you have to be able to consider those four

6    penalties equally when you first start out.  Okay.  Do you

7    think you could do that?

8                    MICHAEL E. BLAKE:  Yes.

9                    ATTY. BAILEY:  Okay.  I mean, you may

10   favor the death penalty for a certain crime, okay, but you

11   have to be able to put that aside and not give anything a leg

12   up when you start out.  You have to be able to at least

13   consider the evidence and then make a determination.  Okay?

14                   MICHAEL E. BLAKE:  Right.

15                   ATTY. BECKER:  Now, it's sort of like --

16   somebody used the example of chocolate ice cream, going into

17   the store and always ordering chocolate.  Somebody might try

18   to convince you that you might want to try something else,

19   but you might think chocolate might have a leg up as a matter

20   of habit.  But you got to be able to set that aside and

21   consider those four different possible penalties, okay,

22   because you don't know what the evidence is until you get

23   into that second phase, right?

```
 1              MICHAEL E. BLAKE:  Right.

 2              ATTY. BAILEY:  And there may be something,

 3   like somebody used an example where somebody gets in a fight

 4   with somebody and kills somebody, stabs them like -- what did

 5   she say -- 80 some times or something, but it turned out they

 6   were both drunk at the time, and she would have wanted to

 7   know about that because it would have affected her ability to

 8   decide.  If she hadn't known that she wouldn't have known

 9   everything as to what an appropriate punishment would be.

10   Okay.

11          Now, if we, the people of the State, prove beyond a

12   reasonable doubt so that you're firmly convinced to a moral

13   certainty using your reason and common sense that the

14   aggravating circumstance or circumstances outweigh the

15   mitigating factors, then the appropriate penalty would be the

16   death penalty and you and the other jurors would come in with

17   that verdict.  If we don't meet that burden of proof, if we

18   don't convince you and the other 11 jurors that the

19   aggravating circumstance or circumstances outweigh the

20   mitigating factors beyond a reasonable doubt, then you forget

21   about the death penalty and you go on to consider the other

22   three life options and decide which of those would be the

23   most appropriate for this defendant for this crime.  Do you
```

1    think you could do that?

2                    MICHAEL E. BLAKE:  Yes.

3                    ATTY. BAILEY:  Okay.  Now, if you find the

4    death penalty to be an appropriate verdict in this case, if

5    we prove that the aggravating circumstance or circumstances

6    outweigh the mitigating factors beyond a reasonable doubt,

7    will you be able to return a death penalty verdict and sign

8    the form for the death penalty?

9                    MICHAEL E. BLAKE:  Yes.

10                    ATTY. BAILEY:  And if the judge asks you

11    in open court is this your verdict, would you be able to

12    announce yes, it is?

13                    MICHAEL E. BLAKE:  Yes.

14                    ATTY. BAILEY:  Okay.  Now, let me get into

15    something else here, okay?  Now, the defendant here is

16    charged with a number of crimes but basically she's not

17    charged as the trigger person, rather she's charged as a

18    complicitor, somebody who purposely solicits or procures

19    another to commit an offense or aids and abets another person

20    in committing the offense.  Basically she's charged with

21    planning with another person, helping, encouraging,

22    strengthening another person in the commission of the

23    offense.  And the charge is that the killing was actually

 1   done by a fellow by the name of Nate Jackson and that there

 2   was a plan to kill the defendant's ex-husband for insurance

 3   money and that there was a trespass into the victim's home by

 4   this Nate Jackson and that this Nate Jackson is the person

 5   who physically stole the motor vehicle belonging, that was

 6   used by the victim, and that this Nate Jackson used a gun, a

 7   working gun, a firearm.  Okay.  That's basically what the

 8   charge is in this particular case.

 9          The fact that the defendant is charged as a

10   complicitor rather than the trigger person -- well, let me

11   tell you, under Ohio law we're allowed to charge her that way

12   and she would also be eligible for the death penalty if she's

13   convicted of aggravated murder with specifications of

14   aggravating circumstances as a complicitor.  Okay?

15                   MICHAEL E. BLAKE:  Okay.

16                   ATTY. BAILEY:  Does that bother you in

17   such a way that you would not be able to return a death

18   penalty verdict if we prove their case beyond a reasonable

19   doubt?

20                   MICHAEL E. BLAKE:  No, it doesn't bother

21   me.

22                   ATTY. BAILEY:  Okay.  Now, there are a

23   number of charges here.  The defendant is charged with two

4328

1    counts of aggravated murder.  There's only one person that's

2    been killed, but under Ohio law the State is allowed to

3    pursue two different theories of the killing and we can

4    present this to the jury and the jury is allowed to consider

5    two separate theories of the killing.  Okay.  You understand

6    that?

7                    MICHAEL E. BLAKE:  I never heard that but

8    I understand what you're saying.

9                    ATTY. BAILEY:  Okay.  Does that bother you

10   in such a way, that she's charged with two different theories

11   here?

12                   MICHAEL E. BLAKE:  No, no.

13                   ATTY. BAILEY:  The first count of

14   aggravated murder is a charge of the purposeful killing of

15   another with prior calculation and design.  The second theory

16   or charge is the purposeful killing of a living person during

17   the course of a special felony like an aggravated burglary or

18   an aggravated robbery, okay, so there are two separate

19   theories.  And attached to each of these counts or charges of

20   aggravated murder are those two specifications I mentioned,

21   that the aggravated murder was committed with prior

22   calculation and design, and in one of the specifications,

23   during the course of an aggravated burglary and, in the

1    other, during the course of an aggravated robbery.  Okay.

2         There are also two extra charges, a charge of

3    aggravated burglary and a charge of aggravated robbery, and

4    attached to those charges is another specification, a special

5    finding of fact, charging a firearm, okay, a working gun was

6    used to commit the crime.

7         And folks who aren't trained in the law sometimes

8    interchange the terms aggravated burglary and aggravated

9    robbery.  Okay.  Sometimes folks say, "My house got robbed,"

10   and they really mean their house got burgled.  But basically

11   the judge is going to define all these terms for you at the

12   end of the case and you're bound to follow his definitions.

13   But let me give you a for instance here.

14        This term aggravated burglary basically refers to

15   the fact that a perpetrator trespasses in somebody else's

16   home.  An occupied structure is the term we use in the law.

17   And it's a person's dwelling house and the perpetrator would

18   go in with the purpose to commit an offense inside, such as

19   an aggravated murder or a theft offense, and the perpetrator

20   could be armed with a deadly weapon, like a gun or a knife,

21   and the perpetrator could cause or inflict serious physical

22   harm or death on the victim.  Okay.

23        The term aggravated robbery doesn't deal with the

1    structure.  There's no dwelling house needed for an

2    aggravated robbery.  Basically it's where the perpetrator

3    uses force or threat of force against another person to maybe

4    steal something, to commit an offense.  And, again, the

5    perpetrator could be armed with a deadly weapon like a gun or

6    a knife, and the perpetrator could inflict serious physical

7    harm or death on the victim.  Okay?

8                          MICHAEL E. BLAKE:  Okay.

9                          ATTY. BAILEY:  So those are basically the

10   charges.

11        Now, each of these crimes is composed of certain

12   elements.  I referred to the ingredients in a recipe, okay,

13   the essential component parts.  The judge is going to give

14   you detailed definitions of each of these particular crimes

15   and specifications at the end of the case.  It's, like I

16   said, it's like baking a cake, okay, and the burden is on us,

17   the people of the State, to bake these cakes.  We got to put

18   in all the ingredients.

19        If we don't, if we leave out an ingredient, like

20   let's say in the chocolate cake we leave out the chocolate,

21   we wouldn't have met our burden of proof, would we?

22                          MICHAEL E. BLAKE:  Right.

23                          ATTY. BAILEY:  In that case you'd have to

```
 1    find the defendant not guilty of that particular charge,

 2    right?

 3                    MICHAEL E. BLAKE:  Right.

 4                    ATTY. BAILEY:  Okay.  And you would be

 5    able to do that, wouldn't you?

 6                    MICHAEL E. BLAKE:  Yes.

 7                    ATTY. BAILEY:  Even though you may say I

 8    think the defendant did it, but they didn't prove the

 9    elements and it's their burden to prove the elements, I got

10    to find her not guilty, and you would be able to do that

11    under our system of justice?

12                    MICHAEL E. BLAKE:  Yes.

13                    ATTY. BAILEY:  Okay.  Let me give you a

14    for instance on these elements.  Okay.  Let's take the crime

15    of aggravated murder and we have to prove that it happened on

16    or about a certain date like December 11th of 2001.  The

17    second element might be that it occurred here in Trumbull

18    County, Ohio.  There's a fancy legal term for that.  We call

19    it venue, that it happened here in this county in this state.

20    And the reason we have to prove that is so that we can try

21    the case at this courthouse rather than up in Lorain County

22    or down in Athens County.  Okay.

23              The third element would be identification, that the
```

4332

1    person who committed this offense is sitting over there at

2    that table, and somebody is going to have to point her out.

3    Fourth, that she did it purposely, basically on purpose, but

4    the judge is going to give you a detailed legal definition of

5    purpose.  Fifth, that she caused the death of a living

6    person, in this case a fellow by the name of Robert

7    Fingerhut.  And six, that she acted with prior calculation

8    and design.

9         Now, it used to be under the old law we had a term

10   called premeditated murder, premeditation.  They changed that

11   law so now they call it prior calculation and design and it's

12   a little bit different.  It requires some advanced planning

13   and a studied scheme to kill.  Okay?

14        Let me give you a for instance here.  Let's say I

15   drop my pen and I catch it.  That could be a reflex, right?

16   No advanced planning needed.  But let's say I drop my pen and

17   I say, "Gosh, I dropped my pen.  Maybe I better bend over and

18   pick it up," and I do that.  That could be some advanced

19   planning, couldn't it?

20                  MICHAEL E. BLAKE:   (Nods head

21   affirmatively.)

22                  ATTY. BAILEY:  Let's say yesterday I

23   talked to my co-counsel and I said, "Chris, tomorrow I'm

4333

1   going to come into court.  I need an example of prior

2   calculation and design so I'm going to drop my pen so I can

3   pick it up," and I do that, I come in today and I drop it and

4   pick it up.  Okay.  That would be some prior calculation and

5   design, wouldn't it?

6                      MICHAEL E. BLAKE:  Right.

7                      ATTY. BAILEY:  Okay.  Now, the burden of

8   proof for these elements and the crimes charged -- and you

9   consider each of these crimes and their elements separately,

10  okay?  It's like a bunch of cakes that we got to bake.

11                     MICHAEL E. BLAKE:  Right.

12                     ATTY. BAILEY:  The burden of proof is on

13  us, the people of the State.  I mean, it's the State that

14  charged the defendant with these crimes.  There was a grand

15  jury proceeding where the defendant is not present, her

16  attorneys aren't present.  It's only a one-sided proceeding

17  under the law and the only ones there would be the prosecutor

18  and a witness and a recording secretary and the grand jurors,

19  okay, and the grand jury returns this charging document.  All

20  that is is it just brings us to this point so that we could

21  have a trial.  It tells us what the parameters are of the

22  charges, okay, so we know what we're trying and she knows

23  what she's facing.  Okay?

1           MICHAEL E. BLAKE:  Okay.

2           ATTY. BAILEY:  And you understand that the

3   burden for proving the elements is on us, the people of the

4   State?

5           MICHAEL E. BLAKE:  Right.

6           ATTY. BAILEY:  The defendant doesn't have

7   any burden of proof.  Under our system of justice the

8   defendant and her attorneys can sit there.  She doesn't have

9   to testify, she doesn't have to do anything.  They don't have

10  to ask any questions if they don't want to.  It's one of

11  those situations where it's time for us to put up or shut up,

12  so to speak, and we've got to present evidence that will

13  convince you and the other jurors that beyond a reasonable

14  doubt she's guilty of the particular crimes.  Okay.  It's

15  only fair, right?

16          In other countries it's a different situation, and

17  I'll talk about that in a second.  There's a presumption of

18  innocence under our system and you understand this defendant

19  is presumed to be innocent, as are all other defendants tried

20  in this courtroom?  And this presumption of innocence acts

21  like a cloak and shields this defendant all through the

22  course of this trial unless and until we put on enough

23  evidence to convince you and the other jurors when you are

4335

1    back in your jury room deliberating that we've proved the

2    elements beyond a reasonable doubt.  And then if we do you

3    can return a conviction and that presumption of innocence at

4    that point would be gone, right?

5                    MICHAEL E. BLAKE:  Right.

6                    ATTY. BAILEY:  Okay.  Now, our system of

7    justice is different from what they have in different

8    countries overseas.  For example, in France and maybe Turkey

9    and other countries maybe in the Mideast there is no

10   presumption of innocence.  They may be presumed guilty over

11   there and people have to prove their own innocence.  Okay.

12   That's not our system of justice, okay, and under our system

13   of justice there's this presumption of innocence and the

14   burden is totally on us, so the defendant doesn't have to do

15   anything and it's only right, right?

16                   MICHAEL E. BLAKE:  Right.

17                   ATTY. BAILEY:  Okay.  We've probably got

18   the best justice system in the world.  And sometimes there

19   are some stands, but generally it works pretty good and it's

20   because of the different things that we have that the other

21   countries don't have.  Okay.  I'm sure under Saddam Hussein

22   the Iraqis didn't have any presumptions in their favor.

23               Now, the standard of proof for proving these

4336

 1   elements is proof beyond a reasonable doubt.  In a civil case

 2   the burden is different.  If somebody is suing for money

 3   damages somebody has to tip the scale just over half way or

 4   fill a box with evidence just over half way and they are

 5   going to prevail on a civil case.  Okay.  If somebody bashes

 6   a car into another car they get sued for money damages.

 7        But this is a criminal case and in a criminal case

 8   the State has the highest burden of proof in the law.  Our

 9   standard of proof is proof beyond a reasonable doubt.  And

10   it's not proof beyond all doubt, it's not proof beyond any

11   doubt or a hundred percent proof or proof beyond a shadow of

12   a doubt.  As a matter of fact, there is no such thing in our

13   law as proof beyond a shadow of a doubt.  It's an Alfred

14   Hitchcock movie title and it's a good movie title, but

15   there's no such animal in real law.

16        You like cop shows on TV, right?

17                    MICHAEL E. BLAKE:  Right.

18                    ATTY. BAILEY:  Which ones do you watch,

19   Law and Order?

20                    MICHAEL E. BLAKE:  Law and Order.

21                    ATTY. BAILEY:  Okay.  And that one is

22   fairly realistic because they follow New York law over there.

23   We follow Ohio law here, but that's pretty much New York law.

4337

1    But other shows, like you watch CSI?

2                        MICHAEL E. BLAKE:  Yes, I do.

3                        ATTY. INGRAM:  I object to any assertion

4    that Ohio law is like New York law.

5                        ATTY. BAILEY:  No, I said it isn't.  We

6    follow Ohio law here.  That's New York law, which is

7    different.  CSI?

8                        MICHAEL E. BLAKE:  Yes.

9                        ATTY. BAILEY:  Okay.  And I wish we had a

10   million -- we do have good crime labs, but it seems like they

11   use all the resources of their crime lab on every case that

12   they have.  You understand that there are things that they do

13   on that show that can't be done in real life?

14                       MICHAEL E. BLAKE:  Yes.

15                       ATTY. BAILEY:  When they use their

16   computers, we're just not at that stage yet.  Okay.  It makes

17   for great TV.

18                       MICHAEL E. BLAKE:  Yes, it does.

19                       ATTY. BAILEY:  But in real life it just --

20   maybe some day we'll be at that level where we could do all

21   that stuff in every case.  You ever watch the old L.A. Laws?

22                       MICHAEL E. BLAKE:  Yes.

23                       ATTY. BAILEY:  Or the old Perry Mason

4338

1    shows?

2                           MICHAEL E. BLAKE:  Yes.

3                           ATTY. BAILEY:  Okay.  And the old Hawaii

4    5-0's?

5                           MICHAEL E. BLAKE:  Oh, yes.

6                           ATTY. BAILEY:  Okay.  Now, you understand

7    that those shows are different from what happens in real

8    life?

9                           MICHAEL E. BLAKE:  Right.

10                          ATTY. BAILEY:  Okay.  And this standard of

11   proof beyond a reasonable doubt, the judge is going to define

12   that term for you in detail but it's nothing mysterious.

13   You're used to using it in your everyday life.  And on some

14   of those TV shows like L.A. Law or the old Perry Mason shows,

15   they, the writers, weren't well versed in criminal law and

16   they would throw in different terms and give the viewers a

17   misimpression of what the law actually was.  Okay.  And it's

18   sort of like having a box.  Well, basically, all right,

19   you've got everyday life, raising a family, deciding to take

20   on a job or buy a house, you make certain decisions, right?

21                          MICHAEL E. BLAKE:  Right.

22                          ATTY. BAILEY:  And you have pros and cons

23   and what you do, you use your reason and common sense, right?

1          MICHAEL E. BLAKE:  Right.

2          ATTY. BAILEY:  And the standard of proof

3   beyond a reasonable doubt requires the use of reason and

4   common sense to decide whether we proved something so that

5   you're firmly convinced of the truth of the charge to a moral

6   certainty, okay?  A lot of fancy words, but what it basically

7   mean is you look at the pros and cons if you're going to buy

8   a house or not and eventually you find the right house so

9   that you're firmly convinced it's the right thing to do using

10  your reason and common sense, right?

11         MICHAEL E. BLAKE:  Right.

12         ATTY. BAILEY:  And you buy the house.  At

13  some point you're going to find the right house.  Or buying a

14  car.

15         MICHAEL E. BLAKE:  Right.

16         ATTY. BAILEY:  Or retiring or something

17  like that.

18         MICHAEL E. BLAKE:  Yes.

19         ATTY. BAILEY:  You have to consider a lot

20  of factors and then you make your decision, right?

21         MICHAEL E. BLAKE:  Right.

22         ATTY. BAILEY:  And it's not a hundred

23  percent proof.  You can never prove anything a hundred

1    percent, can you?

2                    MICHAEL E. BLAKE:  No.

3                    ATTY. BAILEY:  Okay.  I mean, you were --

4    let's see.  Because everything that deals with human affairs

5    is open to some possible or imaginary doubt, right?

6                    MICHAEL E. BLAKE:  Right.

7                    ATTY. BAILEY:  But you -- it's just like

8    having a box, an imaginary box, and we got to fill that box

9    with evidence.  And in a criminal case to fill it by proof

10   beyond a reasonable doubt we got to come pretty darn close to

11   the top of that box.  I mean, you and the other 11 jurors can

12   draw your own imaginary lines close to the top of that box,

13   maybe half an inch or an inch away from the top of that box.

14   It's not completely full of evidence but there's a whole lot

15   of evidence in there, enough to convince you so that you're

16   firmly convinced of the truth of the charge using your reason

17   and common sense, right?

18                    MICHAEL E. BLAKE:  Right.

19                    ATTY. BAILEY:  Okay.  Now, and you

20   understand because the burden of proof is on us, the people

21   of the State, we have to put that evidence into the box.

22   We're the ones with the burden.  The defendant doesn't have

23   any burden.  She doesn't have to put anything in and she

1   doesn't have to take anything out of that box.  Okay?

2                       MICHAEL E. BLAKE:  Right.

3                       ATTY. BAILEY:  Because of that presumption

4   of innocence.  Okay?

5                       MICHAEL E. BLAKE:  Right.

6                       ATTY. BAILEY:  And because of the burden

7   of proof.  So it's all on us, the people of the State.  We

8   either win or we lose this case by our own actions.

9                       MICHAEL E. BLAKE:  Right.

10                      ATTY. BAILEY:  Okay.  With the type of,

11  you know, from the testimony of the witnesses and the

12  physical exhibits that come in.

13          Now, there are different types of evidence that we

14  can use to fill that box up with evidence, you know, with

15  evidence, and there's what we call direct evidence.  That's

16  where a witness comes in and can testify to something he or

17  she has learned through the use of his or her five senses.

18  For example, I heard a gunshot and it was loud; I touched the

19  surface and it was cold; I smelled the smoke and it was

20  acrid.  Okay?  I tasted the drink and it was bitter.

21          There's another type of evidence that you're used to

22  using.  They might have made short shrift of it in the L.A.

23  Law TV programs, but it's sort of a roundabout type of

 1    evidence and it's where you are presented with a fact or a

 2    series of facts and you're asked to draw a logical deduction

 3    to another fact or set of facts.  Okay.  We call that

 4    circumstantial evidence, okay, and circumstantial evidence is

 5    just as good as direct evidence.

 6         Let me give you a for instance.  Let's say you live

 7    in a two-story house and at nighttime you go up to your

 8    bedroom on the second floor to go to sleep and you look out

 9    the bedroom window, and you look out and it's a beautiful

10    evening.  The moon is beaming, the stars are twinkling,

11    there's not a star -- there's not a cloud in the sky, and as

12    far as you can see across the neighborhood it's perfectly

13    dry.  Okay.  So you draw the blinds, you get into bed.  The

14    radio is on low and you hear the announcer say, "Folks,

15    tomorrow, we're getting a cold front in tonight and I expect

16    we'll have a storm come in by tomorrow," and you fall asleep.

17         Sometime during the night you're awakened by a

18    distant booming sound in the sky.  You look toward the window

19    and, even though the blinds are drawn, you suddenly see a

20    flash of light from outside and then about two seconds later

21    there's a distant boom.  And then a minute goes by, there's

22    another flash of light and maybe a second later there is a

23    closer-in-distance boom in the sky.  But suddenly there's a

4343

1    big ripping flash outside and a big thundering, cracking,

2    ripping boom above the house and a pitter-patter on the roof

3    and a steady drumming, and you fall back asleep.

4           Sometime later you wake up, go to the window, open

5    the blinds and look out and it's a nice day.  The sun is

6    shining, there's not a cloud in the sky, but as far as you

7    can see the streets are running with water, the rooftops are

8    all soaking wet, drops of water are dripping off the leaves

9    of the trees, okay, and there's no fire hydrant nearby where

10   some car can hit it and spew water all over the neighborhood.

11   Okay.  You know what happened during the night, don't you?

12                   MICHAEL E. BLAKE:  Yes.

13                   ATTY. BAILEY:  What happened?

14                   MICHAEL E. BLAKE:  It rained.

15                   ATTY. BAILEY:  Right, there was a

16   thunderstorm.  And you know that beyond any reasonable doubt,

17   right?

18                   MICHAEL E. BLAKE:  Right.

19                   ATTY. BAILEY:  You might not have seen the

20   rain with your own eyes or seen the lightning with your own

21   eyes, but you heard it, and with all the other circumstances

22   that were presented you know that that's all that happened.

23           Now, there may be some limitations to circumstantial

1   evidence.  You might not know how long it rained or, if you

2   didn't have some measuring device like they use at the

3   weather station at the airport, you might not know how much

4   rain fell, but you know if you are interested in what

5   happened that there was a thunderstorm and that's all that

6   happened, right?

7               MICHAEL E. BLAKE:  Right.

8               ATTY. BAILEY:  There's room in there for

9   some possible or imaginary doubt.  You can imagine that ALF

10  and his martian buddies flew by in a flying saucer overnight

11  and put on a sound and light show and sprinkled the ground

12  with some wet stuff, but that would be a foolish or imaginary

13  doubt, wouldn't it?

14              MICHAEL E. BLAKE:  Right.

15              ATTY. BAILEY:  You understand that you can

16  return a conviction based on circumstantial evidence alone if

17  you believe that it proves the elements of the crime beyond a

18  reasonable doubt?

19              MICHAEL E. BLAKE:  Right.

20              ATTY. BAILEY:  Now, there are reasons that

21  we may use circumstantial evidence because I would imagine

22  that you would expect if somebody is planning a very serious

23  crime like an aggravated murder they're probably not going to

1   stand on the courthouse steps announcing to the whole world

2   that they're going to kill a certain person at a certain

3   time, right?

4                   MICHAEL E. BLAKE:  Right.

5                   ATTY. BAILEY:  So to know what their

6   purpose was, to get inside their minds, if you had certain

7   circumstantial evidence like maybe if you had maybe letters

8   or phone calls, you might be able to look at those things and

9   know what somebody had on their mind, right?

10                  MICHAEL E. BLAKE:  Right.

11                  THE COURT:  Mr. Bailey, I didn't realize

12  it was after noon here.  We are going to be longer with this

13  gentleman so why don't we break at this time.

14                  ATTY. BAILEY:  Okay.

15                  THE COURT:  Go grab a bite.  Be back here

16  at a quarter after 1:00, if you would.

17                  MICHAEL E. BLAKE:  Quarter after 1:00?

18                  THE COURT:  Yeah.  Thank you.

19                  ATTY. BAILEY:  Thanks, Your Honor.

20                  (Whereupon, a luncheon recess was taken.)

21                  THE COURT:  Mr. Bailey, I believe you

22  were asking questions.

23                  ATTY. BAILEY:  And I think I just finished

4346

1    talking about ALF and the martians and circumstantial

2    evidence.  And I take it you could pile up evidence on

3    evidence and make your own decision if there's enough to

4    follow what the judge tells you?

5                      MICHAEL E. BLAKE:  Yes.

6                      ATTY. BAILEY:  Now, you understand that

7    criminals may engage in a lot of planning to do something but

8    they may do something really, really stupid and get tripped

9    up or get caught --

10                     MICHAEL E. BLAKE:  Right.

11                     ATTY. BAILEY:  -- as a result of that?

12   I'm sure you've heard examples where on the news reports

13   where the burglar climbed in through the window and drops his

14   wallet and leaves his ID back at the scene and the cops catch

15   him.  Or what's the one I always use?  Oh, right.  Okay.  Or

16   the robber goes into the bank and he's got a getaway driver

17   outside and he goes in and hands the teller the note, the

18   stick-up note, and says give me all your money and he's

19   wearing a mask.  And he gets the money from the teller and

20   runs out of the bank but he leaves the stick-up note behind

21   and it was on the back of an envelope, and when the teller

22   turns it over there's the perpetrator's name and address on

23   the front.  You've heard about those?

1                    MICHAEL E. BLAKE:  Yes.

2                    ATTY. BAILEY:  Okay.  So you understand

3    sometimes criminals do some really stupid things and get

4    caught in spite of all their planning, right?

5                    MICHAEL E. BLAKE:  Right.

6                    ATTY. BAILEY:  Now, a couple of basic

7    things.  On Court TV, I don't know if you watch Court TV.

8                    MICHAEL E. BLAKE:  Some.

9                    ATTY. BAILEY:  Sometimes.  They show cases

10   from different jurisdictions, different states, and the

11   rules, each state has its own rules and procedures.  They're

12   all different.  But in Ohio generally judges do not let you

13   take notes.  You got to rely on your collective recollection,

14   you and the other 11 jurors.  And the basic trial will

15   probably take a week and a half to two weeks I would expect.

16           And there aren't going to be any instant

17   transcripts.  Unlike the O.J. Simpson case or the Menendez

18   brothers where they had all the millions of dollars of

19   transcribing equipment and instantaneous TV coverage, we

20   don't have that in this county, okay?  We can't get you

21   instant transcripts of the testimony.  And if the jury asks

22   for a transcript of the testimony of a witness I would expect

23   the judge's answer is going to be no, you can't have it.  You

1    got to rely on your collective recollection.

2         There aren't any instant replays unlike TV on the

3    sports programs, so you're going to have to pay close

4    attention to the testimony of the witnesses.  Okay.

5                   MICHAEL E. BLAKE:  Right.

6                   ATTY. BAILEY:  And with 12 of you in there

7    I'm sure somebody is going to recollect the testimony.

8    Whatever one person may forget another person is going to

9    remember.

10        Also, you can't go out on your own to investigate.

11   That may sound silly, but we had a case where a juror did

12   that, and they've done that on TV programs like Matlock or --

13   what was it?  Hawaii 5-0, one episode, McGarrett had his

14   staff go out and investigate when he was on a jury.  That

15   would be improper and would result in a mistrial.  You can't

16   do that, okay?

17                  MICHAEL E. BLAKE:  Okay.

18                  ATTY. BAILEY:  Okay.  Also, you're stuck

19   with the questions that the lawyers ask.  And because we're

20   lawyers and we've been to law school, they train us to either

21   build elements or to tear down elements, so our questions are

22   going to be geared toward doing that.  And there may be some

23   side questions that you might have unrelated to proving the

1    elements of the crime charged that may never get asked and

2    may never get answered.

3         For example, let's say you sold shoes.  You might

4    have some interest in what somebody was wearing at the time

5    of a crime, but unless there was footprint evidence, if there

6    was nothing like that in the case, that type of a question

7    might never get asked or answered.

8                   MICHAEL E. BLAKE:  Okay.

9                   ATTY. BAILEY:  So you might have some side

10   questions, but if we can prove the elements of the crime to

11   your satisfaction beyond a reasonable doubt, I take it you

12   would be able to return a conviction even though there were

13   some questions you might have that never got answered?

14                  MICHAEL E. BLAKE:  Yes.

15                  ATTY. BAILEY:  Okay.  There's something

16   called sequestration.  At the end of the first phase of the

17   case when all the testimony is in and the judge has

18   instructed you and the other jurors as to the law and you go

19   back to deliberate, every jury is different.  I've had jurors

20   in capital cases in the first phase return verdicts in

21   anywhere from an hour and a half at the fastest to up to five

22   days at the longest.  Okay.  Every jury is different.  And

23   during that time if you don't return a verdict by the end of

1   the first day that you are deliberating, the judge will keep

2   you all together, put you up in a hotel, bring in meals and

3   stuff.  You can't deliberate one on one, you have to have the

4   whole jury there, all 12 of you.  Okay.

5           And then if you return a conviction on the charge of

6   aggravated murder and one or more of these specifications, we

7   go into a second phase.  And there would be a break in there

8   for maybe a couple of days or a week and then you come back

9   in and maybe hear more testimony and the judge would instruct

10  you on the law again, and that takes one to three days

11  generally.  And you would deliberate again and again you

12  would be sequestered for whatever length of time it takes.

13  That sequestration, would it cause you any undue hardship?

14                  MICHAEL E. BLAKE:  No.

15                  ATTY. BAILEY:  Okay.  A couple of basic

16  questions.  You said you're retired.

17                  MICHAEL E. BLAKE:  Yes.

18                  ATTY. BAILEY:  Are you an electrician?

19                  MICHAEL E. BLAKE:  No.

20                  ATTY. BAILEY:  What do you do, or did you

21  do?

22                  MICHAEL E. BLAKE:  I did service at

23  Packard Electric.

1              ATTY. BAILEY:  Okay.  And what were your

2    duties there?

3              MICHAEL E. BLAKE:  It's kind of hard to

4    define.  I kept the mold area running by supplying with

5    plastic and, you know, just general service.

6              ATTY. BAILEY:  Okay.  The doctor's

7    appointment you told us about, that's all done with.  The

8    next one is going to be in another two months or so, correct?

9              MICHAEL E. BLAKE:  Right.

10             ATTY. BAILEY:  Two and a half months.

11             MICHAEL E. BLAKE:  Three months actually.

12             ATTY. BAILEY:  Three months?

13             MICHAEL E. BLAKE:  Yes.

14             ATTY. BAILEY:  Okay.  No way is this case

15   going to take that long.  If it is somebody is going to have

16   to shoot me.

17        Now, it's normal for one human being to feel

18   sympathy toward another human being, but when you're deciding

19   this case you have to lay aside all thoughts of sympathy.

20   And I expect as the defendant's chair is turned towards you

21   you may become more acquainted with her during the course of

22   this trial, but my question to you is this:  When you go back

23   inside your jury room to deliberate on your verdict can you

 1    lay aside all thoughts of sympathy you might have for the

 2    defendant and be conscientious in your deliberations and base

 3    your verdict on the testimony and evidence that you receive

 4    and the instructions of law given to you by the judge?

 5              MICHAEL E. BLAKE:  Yes.

 6              ATTY. BAILEY:  Okay.  You understand you

 7    have to set aside any thoughts of sympathy you might have for

 8    the victim, too?

 9              MICHAEL E. BLAKE:  Right.

10              ATTY. BAILEY:  Okay.  You have to decide

11    it based on the facts and the law.

12              MICHAEL E. BLAKE:  Right.

13              ATTY. BAILEY:  Okay.  Do you have any

14    questions that have come up during this time?

15              MICHAEL E. BLAKE:  No, none that I can

16    think of.

17              ATTY. BAILEY:  Okay.  Now, I take it you

18    would agree that there's obligations that we have as citizens

19    in this country.  If it's election time it's up to us, the

20    citizens, to go out and learn as much as we can about the

21    issues and the candidates and go out and cast a ballot.

22    Okay.

23              MICHAEL E. BLAKE:  Right.

1           ATTY. BAILEY:  If it's war time then we've

2    got an obligation to serve in the military.  We've got young

3    folks out there in a couple of places today doing their duty.

4    You've done your duty a number of years ago.

5           MICHAEL E. BLAKE:  Right.

6           ATTY. BAILEY:  And there's another

7    obligation of citizenship and it's when we're summonsed in as

8    jurors to serve on a case, especially a criminal case.  It's

9    important that we get folks from all walks of life with

10   different types of experiences to sit on a jury to make sure

11   that the system works.  Okay.

12          MICHAEL E. BLAKE:  Right.

13          ATTY. BAILEY:  And it may be inconvenient

14   at times, we have to set aside what we're doing in our daily

15   life, put some things off or juggle things around, but to

16   make sure the system works it's important that we undertake

17   this obligation.  Would you be willing to undertake this

18   obligation?

19          MICHAEL E. BLAKE:  Yes.

20          ATTY. BAILEY:  Okay.  Thank you very much.

21   Now I'm done with my questions and defense counsel will get a

22   chance to ask you some more questions.

23          MICHAEL E. BLAKE:  Okay.

4354

```
 1                    ATTY. JUHASZ:  Thank you, Your Honor.  Hi,
 2    Mr. Blake.
 3                    MICHAEL E. BLAKE:  Hi.
 4                    ATTY. JUHASZ:  How you doing up there?
 5                    MICHAEL E. BLAKE:  Good.
 6                    ATTY. JUHASZ:  Need some water or
 7    something?
 8                    MICHAEL E. BLAKE:  No thanks.
 9                    ATTY. JUHASZ:  Okay.  If you do while
10    we're up here talking, just let me know, okay?
11                    MICHAEL E. BLAKE:  Okay.
12                    ATTY. JUHASZ:  It's been a while since we
13    were first introduced I think four or five weeks ago.  I'm
14    John Juhasz.
15                    MICHAEL E. BLAKE:  Right.
16                    ATTY. JUHASZ:  This is Jerry Ingram over
17    here.
18                    ATTY. INGRAM:  Hello.
19                    ATTY. JUHASZ:  And Jerry and I are
20    representing Donna who, as you know, is on trial for her
21    life.  That's a pretty serious allegation and it probably
22    makes sense to you that Jerry and I take our responsibility
23    representing Donna seriously.
```

1              MICHAEL E. BLAKE:  Right.

2              ATTY. JUHASZ:  And so the process that

3    we're engaged in is asking some questions in an attempt to

4    find a fair minded jury, the same kind of jury that you would

5    want or I would want if we were sitting over at that table.

6    Make sense to you?

7              MICHAEL E. BLAKE:  Right.  Right.

8              ATTY. JUHASZ:  Okay.  This is kind of like

9    a job interview where we interview you for sort of a

10   short-term job but an important job.  And like any job

11   interview, we ask you questions, but you can also ask us

12   questions because I think, as Mr. Bailey told you, this is

13   the only time we get to have any sort of discussion.

14             MICHAEL E. BLAKE:  Right.

15             ATTY. JUHASZ:  Lawyers by training I think

16   are taught to talk and I will do that in an effort to keep us

17   moving along so that you're not here until 5:00 o'clock this

18   afternoon, but I'm more interested in hearing what you have

19   to say than the words coming out of my own mouth.  So when I

20   ask you things understand that I'm not going to cut you off,

21   I'm more interested in hearing what's inside of you rather

22   than you listen to me rattle on.

23             Let's go back, if we can, to April 8th for a couple

1    of moments and let me ask you a couple things.  First of all,

2    you're not certain, if I understood your answers to

3    Mr. Bailey's questions, whether it was April 8th or maybe

4    before that through reading the newspaper that you learned

5    this was a death penalty case.  Did I hear that right?

6                    MICHAEL E. BLAKE:  Yes.

7                    ATTY. JUHASZ:  Okay.  At any rate, by

8    April 8th you knew that this was State of Ohio versus Donna

9    Roberts, correct?

10                   MICHAEL E. BLAKE:  Right.

11                   ATTY. JUHASZ:  And even if you knew before

12   then that State of Ohio versus Donna Roberts was a death

13   penalty case, as of April 8th you knew you could be a

14   prospective juror on this case.

15                   MICHAEL E. BLAKE:  Right.

16                   ATTY. JUHASZ:  Since then have you had any

17   thoughts about the responsibilities or the task of being a

18   juror on such an important case?

19                   MICHAEL E. BLAKE:  Not really, no.

20                   ATTY. JUHASZ:  Okay.  How do you feel

21   about it as we sit here now?  You know from some of the

22   questions you've been asked basically what's going to be

23   asked of you.  Do you feel that you're up to the



1   responsibility?

2                   MICHAEL E. BLAKE:  Oh, yes.

3                   ATTY. JUHASZ:  Back on April 8th when you

4   went down to that big courtroom, Judge Logan's courtroom down

5   the hall, are you able to remember for us where you sat or

6   stood in the courtroom?  That is, when you went in the big

7   set of doors did you go to the right, to the left or to the

8   middle?

9                   MICHAEL E. BLAKE:  To the left.

10                  ATTY. JUHASZ:  To the left?

11                  MICHAEL E. BLAKE:  Yes.

12                  ATTY. JUHASZ:  And did you sit or were you

13  standing?

14                  MICHAEL E. BLAKE:  I was sitting.

15                  ATTY. JUHASZ:  Do you remember about

16  where?  That is, close to the middle aisle, close to the

17  left?

18                  MICHAEL E. BLAKE:  The second set of

19  benches from the left in the middle.

20                  ATTY. JUHASZ:  All right.  That day on

21  April the 8th did you hear anyone discussing either the case

22  or Donna Roberts or anything about the case or why you were

23  there?

```
 1                    MICHAEL E. BLAKE:  No, I did not.
 2                    ATTY. JUHASZ:  Okay.  No one tried to
 3     engage you in that kind of discussion?
 4                    MICHAEL E. BLAKE:  No.
 5                    ATTY. JUHASZ:  And you overheard no such
 6     discussion?
 7                    MICHAEL E. BLAKE:  Nothing.
 8                    ATTY. JUHASZ:  And you didn't engage in
 9     any such discussions with anybody?
10                    MICHAEL E. BLAKE:  No.
11                    ATTY. JUHASZ:  All right.  Since then,
12     since we brought you back to the courthouse, have you heard
13     anything discussed about the case?
14                    MICHAEL E. BLAKE:  No.
15                    ATTY. JUHASZ:  Okay.  We ask those
16     questions because, as the judge told you and as Mr. Bailey
17     said to you, a couple of things we want to talk about are
18     pretrial publicity.  And while it's common to think about
19     pretrial publicity as just what you see on the TV or hear in
20     the newspaper, the fact of the matter is you can get it from
21     other sources.  So that said, have you had -- you've read
22     some things or heard some things about the case.  Have you
23     also had discussions with friends, relatives, anybody like
```

1    that, about the case?

2                        MICHAEL E. BLAKE:  No, none, nothing, not

3    even my wife.

4                        ATTY. JUHASZ:  All right.  So the

5    impressions that you have about the case are strictly what

6    you got from the news media, am I correct?

7                        MICHAEL E. BLAKE:  Right, and I forgot

8    half of that so.

9                        ATTY. JUHASZ:  Okay.  Is that, is that

10   newspaper, TV, radio, or some of all of the above?

11                       MICHAEL E. BLAKE:  Some of all of the

12   above.

13                       ATTY. JUHASZ:  I know that Mr. Bailey

14   asked you this and I'm particularly interested -- well,

15   before I ask you that, if I read your questionnaire right you

16   were called once for jury duty but were never selected.

17                       MICHAEL E. BLAKE:  Right.

18                       ATTY. JUHASZ:  Now, you said Warren.  Was

19   that this courthouse or was it Warren Municipal Court, do you

20   remember?

21                       MICHAEL E. BLAKE:  I think it was the

22   municipal court.  I'm pretty sure it was.

23                       ATTY. JUHASZ:  All right.  So this is your

1    first time for jury duty in the common pleas court, correct?

2                    MICHAEL E. BLAKE:  Yes.

3                    ATTY. JUHASZ:  All right.  If you're like

4    most folks and you don't have a lot of business with the

5    courts you don't get down to the courthouse too often unless

6    you get a jury summons, right?

7                    MICHAEL E. BLAKE:  Right.

8                    ATTY. JUHASZ:  I imagine just being in

9    these nice courtrooms and in this courthouse has probably

10   left some kind of impression on you about oh, this is how

11   they do this, correct?

12                   MICHAEL E. BLAKE:  Yes.

13                   ATTY. JUHASZ:  Because everything that

14   happens to us leaves some kind of impression on us, right?

15                   MICHAEL E. BLAKE:  Right.

16                   ATTY. JUHASZ:  Okay.  Now, on your

17   questionnaire you mentioned when you were asked what you had

18   read or seen or heard about the case and I think you said

19   only what I -- well, "Only what I read in the Tribune."

20   Yeah, "Only what I read in the Tribune."  And I know you told

21   Mr. Bailey some details about that but I'm going to ask, if

22   you would, again to sort of, since you've had a chance to

23   kind of sit here and think about it and have lawyers throwing

1    questions at you all day, tell me what it is that you

2    remember, that you either -- and I don't want to limit it to

3    the Tribune because you said you also heard things on the TV

4    or the radio.

5                    MICHAEL E. BLAKE:  Right.

6                    ATTY. JUHASZ:  So everything that you can

7    recall that you heard or read.

8                    MICHAEL E. BLAKE:  Right.  Everything?

9                    ATTY. JUHASZ:  As best you can.

10                    MICHAEL E. BLAKE:  Well, you know, it

11   started out they found this guy shot and I don't remember if

12   he was shot in his home or not.  I mean, my memory goes a

13   little bit there when I -- and I don't pay too much

14   attention, you know, to the paper because they never get

15   anything right as far as I'm concerned.  But, anyways, and

16   that the defendant and the other guy were found to be lovers

17   or whatever and that they had murdered this guy for the

18   insurance money.

19                    ATTY. JUHASZ:  Okay.  Anything else that

20   you remember?  Do you remember -- you said the other guy.

21   When you said the defendant you are referring to Donna

22   Roberts, correct?

23                    MICHAEL E. BLAKE:  Yes.

 1                    ATTY. JUHASZ:  All right.  You said the

 2      other guy.  Do you remember anything about him, his name?

 3                    MICHAEL E. BLAKE:  His name was Nate

 4      Jackson.

 5                    ATTY. JUHASZ:  All right.  Anything else

 6      that you remember about the status of Mr. Jackson's case?

 7      Did you hear that he was arrested, for example?

 8                    MICHAEL E. BLAKE:  Yeah.  Yeah.

 9                    ATTY. JUHASZ:  Okay.  And how about do you

10      know what happened with his case?

11                    MICHAEL E. BLAKE:  Yeah.  He was, I think

12      he was sentenced to death.

13                    ATTY. JUHASZ:  Okay.  Anything else that

14      you remember about what it is that the government is sort of

15      claiming happened or have we pretty much -- I don't want to

16      leave -- I want to try to get from you everything that you

17      remember.

18                    MICHAEL E. BLAKE:  What they're -- now

19      repeat that.

20                    ATTY. JUHASZ:  That was a bad question so

21      let me try again.  Setting aside all the stuff you and I have

22      just talked about that you picked up from the media, anything

23      else that you remember that we haven't talked about either

 1    about Donna Roberts or Nate Jackson or their cases?

 2                    MICHAEL E. BLAKE:  I can't think of

 3    anything.

 4                    ATTY. JUHASZ:  All right.  Fair enough.

 5    You -- so your first -- I'm sorry.  Before I ask you that

 6    question I should probably tell you something maybe you

 7    haven't been told which is the judge told you when he was

 8    talking to you earlier nobody is here to try to change your

 9    mind about anything, okay?

10                    MICHAEL E. BLAKE:  Right.

11                    ATTY. JUHASZ:  If you have views about

12    pretrial publicity, nobody is here to change your mind.  If

13    you have views about the death penalty, nobody is here to

14    change your mind.  I want to sort of add to that a little bit

15    by saying that even though you have read these articles I

16    don't want you to feel bad about that because when you were

17    reading the paper and watching TV and listening to the radio

18    you didn't know you were getting a jury summons for this

19    case.

20                    MICHAEL E. BLAKE:  Right.

21                    ATTY. JUHASZ:  And I suppose there is one

22    thing that I forgot to ask you which is, other than all the

23    other things I've asked you, have you heard anything about

```
 1    the case since you were here on April the 8th, either
 2    somebody mentioning something to you --
 3                      MICHAEL E. BLAKE:  No.
 4                      ATTY. JUHASZ:  Okay.  All right.  So we
 5    can scratch all that out.  Now, from your reading of the
 6    paper or watching TV, and correct me if I'm wrong, it seems
 7    to me that you probably first got some notice about this case
 8    right around the time it happened because you remember the
 9    fact that the fellow was shot?
10                      MICHAEL E. BLAKE:  Right.
11                      ATTY. JUHASZ:  All right.  And you and I
12    said a couple of minutes ago that everything that happens to
13    us or that we take in leaves some kind of an impression with
14    us, correct?
15                      MICHAEL E. BLAKE:  Yes.
16                      ATTY. JUHASZ:  From the things that you
17    have read or heard or watched on TV do you have some
18    impression that Donna was probably involved in this whole
19    homicide thing?
20                      MICHAEL E. BLAKE:  Do I have an
21    impression?
22                      ATTY. JUHASZ:  Yes, sir.
23                      MICHAEL E. BLAKE:  I don't really
```

1   understand how to answer that because, I mean, like I said,

2   you only -- what I read, you can't believe all of it, right?

3   I was taught that anyways.

4                           ATTY. JUHASZ:  Yeah.  Does that also apply

5   to your views about the electronic media, the radio and the

6   TV?

7                           MICHAEL E. BLAKE:  Somewhat.

8                           ATTY. JUHASZ:  All right.  And I don't

9   want to, so that we don't spend too long on this, I don't

10  want to try to segregate them.  It would probably be

11  impossible for you to do, say, well, I got this fact from the

12  TV or this fact from the newspaper, correct?

13                          MICHAEL E. BLAKE:  Right.

14                          ATTY. JUHASZ:  But lumping all those

15  together, what sort of an impression did all of those stories

16  leave on you?  In other words, if you take all that publicity

17  and put it together, what impression did you have about Donna

18  Roberts?

19                          MICHAEL E. BLAKE:  Well, they must have

20  had a good reason to arrest her, so.

21                          ATTY. JUHASZ:  Okay.

22                          MICHAEL E. BLAKE:  There must be some

23  truth.  That's what I look at it.

 1                 ATTY. JUHASZ: All right. And did the

 2 fact that Mr. Jackson was convicted, and forgive me, I don't

 3 want to put words in your mouth, did you remember what

 4 happened to him as far as his sentence or not?

 5                 MICHAEL E. BLAKE: I said I thought he got

 6 the death penalty.

 7                 ATTY. JUHASZ: All right. Those things,

 8 did they do anything to sort of add to that impression?

 9 "Well they must have had some good reason, and now look, the

10 other guy, they convicted him and sentenced him to death."

11                 MICHAEL E. BLAKE: I would say no.

12                 ATTY. JUHASZ: No? Okay. But from what

13 you have seen or read or heard you have some impression that

14 they must have had some kind of good evidence against her to

15 arrest her.

16                 MICHAEL E. BLAKE: Right.

17                 ATTY. JUHASZ: And I want to sort of talk

18 about that as an impression. I'm not saying that it's

19 necessarily that you think it's the truth, but you have some

20 impression that she must have been involved in this, is that

21 a fair characterization?

22                 MICHAEL E. BLAKE: Yes.

23                 ATTY. JUHASZ: All right. During the

1 course of taking in all of this publicity did you ever read

2 or see or hear anything that sort of changed that impression,

3 that sort of said, "Oh, geez, you know what, maybe she wasn't

4 involved," or has it all pretty much been, I guess I want to

5 say, one-sided; that is, all sort of leaning to the

6 conclusion or the impression that she was involved?

7          MICHAEL E. BLAKE: Yes.

8          ATTY. JUHASZ: All pretty much one-sided?

9          MICHAEL E. BLAKE: Yeah.

10         ATTY. JUHASZ: Okay. So nothing you've

11 seen or read or heard has really done anything to change your

12 impression that she might have been involved in this?

13         MICHAEL E. BLAKE: Right.

14         ATTY. JUHASZ: Okay. Is that impression

15 something that you would want to hear evidence in this trial

16 if you were selected as a juror to sort of dispel that

17 impression?

18         MICHAEL E. BLAKE: Of course.

19         ATTY. JUHASZ: Okay. And would you

20 anticipate hearing that evidence from Donna Roberts or

21 somebody acting on her behalf?

22         MICHAEL E. BLAKE: Yes.

23         ATTY. JUHASZ: Okay. So you've got an

 1    impression that she's probably involved from what you read,

 2    correct?

 3                     MICHAEL E. BLAKE:  Right.

 4                     ATTY. JUHASZ:  And you would want to hear

 5    some evidence from Donna to sort of dispel that, correct?

 6                     MICHAEL E. BLAKE:  Right.

 7                     ATTY. JUHASZ:  Is it -- another caveat

 8    about us talking.  Sometimes in the interest again of keeping

 9    it moving and because some jurors frankly are more talkative

10    than others, we sometimes try to summarize to make sure we're

11    accurately saying what they're saying.  If I do that this

12    afternoon in an effort to keep this moving, don't let me put

13    words in your mouth, so if I say something that's not

14    accurate, stop me.

15                     MICHAEL E. BLAKE:  Okay.

16                     ATTY. JUHASZ:  Okay.  That impression, it

17    seems to me, is one that you've held for a little while

18    because it's been a while since all this happened.

19                     MICHAEL E. BLAKE:  Right.

20                     ATTY. JUHASZ:  And it seems to me also one

21    that's kind of fixed in your mind, and what I mean by fixed

22    in your mind is that because you haven't heard anything in

23    all this coverage to dispel it the other way.  You know what

1    I am -- am I making that clear?

2                        MICHAEL E. BLAKE:  Right.

3                        ATTY. JUHASZ:  Am I saying that

4    accurately?

5                        MICHAEL E. BLAKE:  Yes.

6                        ATTY. JUHASZ:  Before I forget, you were

7    -- you're retired now but you worked at Delphi?

8                        MICHAEL E. BLAKE:  Packard.

9                        ATTY. INGRAM:  Packard.  Okay.  If you'll

10   indulge me for 30 seconds, I'm going to read you a couple

11   names.  I just want to see -- these are people who work at

12   Packard and I just want to see if you've heard of them.  Fair

13   enough?

14                        MICHAEL E. BLAKE:  Okay.

15                        ATTY. JUHASZ:  Does the name George Dermer

16   ring a bell with you?

17                        MICHAEL E. BLAKE:  Nope.

18                        ATTY. JUHASZ:  How about Karen Tipton?

19                        MICHAEL E. BLAKE:  Nope.

20                        ATTY. JUHASZ:  A fellow whose first name I

21   don't know but his last name is Dicenso?

22                        MICHAEL E. BLAKE:  No.

23                        ATTY. JUHASZ:  Mary Costello?

1                    MICHAEL E. BLAKE:  No.

2                    ATTY. JUHASZ:  And Carol Selak?

3                    MICHAEL E. BLAKE:  Nope.

4                    ATTY. JUHASZ:  Big place, huh?

5                    MICHAEL E. BLAKE:  I'll say.

6                    ATTY. JUHASZ:  As you know, because this

7    is a death penalty case we do have to talk to you about your

8    views about the death penalty.  And, again, out of an

9    abundance of caution, I'm going to repeat the same caveats.

10   Nobody is here to change your mind about how you feel.  Fair

11   enough?

12                   MICHAEL E. BLAKE:  Uh-huh.

13                   ATTY. JUHASZ:  You mentioned on your

14   questionnaire that you favored the death penalty.

15                   MICHAEL E. BLAKE:  Well, I didn't -- that

16   wasn't the way it was worded.

17                   ATTY. JUHASZ:  All right.

18                   MICHAEL E. BLAKE:  I didn't say I favored

19   it, I said I believe in it.

20                   ATTY. JUHASZ:  Okay.  I'm sorry.  You know

21   what, you said that but in a different context.  Where you

22   were asked a question about whether you've ever taken a

23   position in discussing the death penalty, in favor or

1     opposed, and you said, "I favor the death penalty."

2                        MICHAEL E. BLAKE:  Okay.

3                        ATTY. JUHASZ:  All right.

4                        MICHAEL E. BLAKE:  You caught me.

5                        ATTY. JUHASZ:  No, no, no.  Listen, I'm

6     not trying to get you, I'm trying to refresh your

7     recollection.

8                        MICHAEL E. BLAKE:  I know.

9                        ATTY. JUHASZ:  The only reason I

10    questioned myself and looked is because I had written that

11    word, those words down, and I wanted to make sure I was

12    talking about what you had to say accurately.  We bring

13    jurors in here and we sort of make them play by our rules,

14    and as you and I talked a few minutes ago, you've never been

15    on jury duty before so the rules of procedure and all the

16    things we're talking about are new to you.

17                        MICHAEL E. BLAKE:  Right.

18                        ATTY. JUHASZ:  I want you to understand

19    when we talk about the death penalty that, and I don't know

20    how many lawyers there are in Warren, but if I could get them

21    all into one room and we asked them the questions we're

22    asking you, upwards of 50 percent of them would not know what

23    we're talking about because they don't practice that area of

```
 1    the law.  This stuff is a little bit complicated and tricky,

 2    so as we talk about it if you have questions don't feel bad

 3    about that or feel hesitant about it.

 4                    MICHAEL E. BLAKE:  Okay.

 5                    ATTY. INGRAM:  You read the questionnaire

 6    as Judge Stuard asked you.  Do you feel pretty comfortable

 7    that you know basically how a capital trial in Ohio works or

 8    should we spend a minute or two going over that again?

 9                    MICHAEL E. BLAKE:  I think I understood

10    it.

11                    ATTY. JUHASZ:  All right.  Are there

12    certain offenses based upon how you feel where you think that

13    the death penalty would always be appropriate?

14                    MICHAEL E. BLAKE:  Yes.

15                    ATTY. JUHASZ:  Can you tell me what those

16    are, please?

17                    MICHAEL E. BLAKE:  The mass murderers and

18    murders of children.

19                    ATTY. JUHASZ:  Okay.

20                    MICHAEL E. BLAKE:  Them are my two that I

21    hate the worst.

22                    ATTY. JUHASZ:  Yeah, I know.  I heard you

23    before when you were talking about children, and that one
```

1     kind of really, really gets you. And when you talk about

2     mass murders are you talking about like the 9/11 thing or are

3     you talking --

4                         MICHAEL E. BLAKE: Well, I mean, you know,

5     like Bundy and all the --

6                         ATTY. JUHASZ: Like serial killers and

7     stuff like that?

8                         MICHAEL E. BLAKE: Right. Right.

9                         ATTY. JUHASZ: All right. And for those

10     people, if the jury finds them guilty, excuse me, is your

11     view that that person should always get the death penalty?

12     If the jury finds them guilty they should get the death

13     penalty because of the nature of the murder?

14                         MICHAEL E. BLAKE: Yes.

15                         ATTY. JUHASZ: And so a guy like Ted

16     Bundy, no matter what he would say to you at the second phase

17     to say don't give me the death penalty because yadda, yadda,

18     yadda, whatever reasons he and his lawyer lists, your views

19     are hey, sorry, this is a class of offense that if you did it

20     then you automatically get the death penalty?

21                         MICHAEL E. BLAKE: Yes.

22                         ATTY. JUHASZ: All right. Are there -- I

23     don't want to limit you because are there others? You

 1   mentioned mass murder and you mentioned --

 2              MICHAEL E. BLAKE:  Probably.

 3              ATTY. JUHASZ:  Okay.  How about a murder

 4   for profit?

 5              MICHAEL E. BLAKE:  Yes.

 6              ATTY. JUHASZ:  Okay.  And we have a phrase

 7   and I'm going to tell you what it is before I ask you to

 8   answer the question, it's what lawyers call felony murder,

 9   and it's a little bit confusing because every murder is a

10   felony, but what it means is the commission of a murder

11   during the course of a felony, so let me give you a quick

12   example.

13        Let's say that I walk into a 7/11 and I'm determined

14   that I'm going to get some money from this cashier so I pull

15   out a gun and say give me the money and the 7/11 cashier

16   willingly hands over the money, doesn't try any funny stuff,

17   and for whatever reason I pull the trigger and kill him or

18   her.  That's what lawyers would call a felony murder.  So

19   now, having explained that, first of all, you think you

20   understand basically what a felony murder is now?

21              MICHAEL E. BLAKE:  Yes.

22              ATTY. JUHASZ:  All right.  Is a felony

23   murder one for which you think if the person is found guilty

1    of doing that they should always get the death penalty or is

2    it not?

3                        MICHAEL E. BLAKE:  Yes.

4                        ATTY. JUHASZ:  Okay.  Can you tell me how

5    you feel about life without parole as an option to the death

6    penalty?

7                        MICHAEL E. BLAKE:  In my own thinking I

8    would say it would be worse, you know.

9                        ATTY. JUHASZ:  Okay.

10                       MICHAEL E. BLAKE:  Because, I mean, I

11   wouldn't want to live for life in there.

12                       ATTY. JUHASZ:  How about the possibility

13   of parole at all?  Go ahead, I'm sorry.

14                       MICHAEL E. BLAKE:  Well, in the case of

15   what they, the things that they gave us on that piece of

16   paper, it said 25.

17                       ATTY. JUHASZ:  The four sentences?

18                       MICHAEL E. BLAKE:  Yeah.

19                       ATTY. JUHASZ:  Yes.

20                       MICHAEL E. BLAKE:  The 25 before parole.

21   Well, in the defendant's case she would be old or dead so.

22                       ATTY. JUHASZ:  Okay.  But how about in

23   general?  If a person committed -- because, you understand,

1    those sentences apply to any offense in Ohio that's what we

2    call a capital offense whether the defendant is 21 years old

3    or 59 years old?

4                        MICHAEL E. BLAKE:  Right, I understand

5    that.

6                        ATTY. JUHASZ:  Okay.

7                        MICHAEL E. BLAKE:  But -- okay.

8                        ATTY. JUHASZ:  And I appreciate what

9    you're saying about this particular case.  What I'm trying to

10   find out is your views about parole itself.  Do you think

11   that someone --

12                       MICHAEL E. BLAKE:  Well, I think that the

13   25 or 30 before you get paroled is fine, I like that.  Half

14   the time it seems like they get out, you know, they get 25 or

15   30 years and they're out in 10.

16                       ATTY. JUHASZ:  Okay.

17                       MICHAEL E. BLAKE:  But if they get the 25

18   or they get the 30, that would be just almost as good as the

19   death penalty.

20                       ATTY. JUHASZ:  All right.  And again, and

21   please don't think I'm being condescending about this because

22   that's not my intent at all.  It's my intent because things

23   we take as second nature we sometimes assume that other

```
 1    people know as well, which is not fair because we're bringing

 2    you into our system with our rules, so I want to go over

 3    these things to make sure you understand.  The life without

 4    parole option is truly life without parole, you understand

 5    that?

 6                    MICHAEL E. BLAKE:  Okay.

 7                    ATTY. JUHASZ:  There is no -- it's not one

 8    of those like well, okay, yeah, they're telling us it's life

 9    without parole but somewhere down the road she's going to be

10    able to file for some special thing and be considered.  It

11    does not work that way.  When it says life without parole it

12    means life without parole.  You understand that now?

13                    MICHAEL E. BLAKE:  Okay.

14                    ATTY. JUHASZ:  Is that something you did

15    not know before?

16                    MICHAEL E. BLAKE:  Sort of.  I don't think

17    I knew that, I mean.

18                    ATTY. JUHASZ:  All right.

19                    MICHAEL E. BLAKE:  I'm not sure.

20                    ATTY. JUHASZ:  Okay.  And the 25 and 30

21    options that you and I were just talking about, those are

22    eligibility hearings, you understand that?

23                    MICHAEL E. BLAKE:  Okay.
```

| | |
|---|---|
| 1 | ATTY. JUHASZ:  In other words, -- |
| 2 | MICHAEL E. BLAKE:  Yeah, they could -- |
| 3 | ATTY. JUHASZ:  They could get out or they |
| 4 | could not get out, okay?  It is not -- I always like to use |
| 5 | the example from the movie Shawshank Redemption.  Did you |
| 6 | ever see Shawshank Redemption? |
| 7 | MICHAEL E. BLAKE:  Yes. |
| 8 | ATTY. JUHASZ:  I can't remember the |
| 9 | character's name now but the guy that Morgan Freeman plays. |
| 10 | MICHAEL E. BLAKE:  Right. |
| 11 | ATTY. JUHASZ:  You know, during the course |
| 12 | of the movie a couple times he goes in and they say, "Do you |
| 13 | think you've been rehabilitated," and he goes through his |
| 14 | whole speech and at the end they show a big red stamp |
| 15 | "Rejected."  That's how it works here too, it's just that if |
| 16 | you get that life -- those are all life sentences, you |
| 17 | understand that? |
| 18 | MICHAEL E. BLAKE:  Yes. |
| 19 | ATTY. JUHASZ:  And so the one there's no |
| 20 | chance for parole.  The other one you get a chance for a |
| 21 | hearing after 30 years.  It doesn't mean you'll get out.  The |
| 22 | parole board might say sorry, you're not getting out.  And |
| 23 | the same thing with the 25 one, you get a hearing.  You may |

1     get the red rejected stamp like Morgan Freeman's character

2     got, okay?

3                    MICHAEL E. BLAKE:  Okay.

4                    ATTY. JUHASZ:  Now do you feel a little

5     more comfortable you understand those all?

6                    MICHAEL E. BLAKE:  Yes.

7                    ATTY. JUHASZ:  All right.  I was talking

8     to you a few minutes ago about your views about the death

9     penalty as far as we talked about the ones, the mass murder,

10    the children, murder for profit and felony murder.  How about

11    a murder committed for love?

12                   MICHAEL E. BLAKE:  It depends on the

13    circumstances I guess.

14                   ATTY. JUHASZ:  Okay.  You know, there's

15    that classic one you see from some of the Sunday night movies

16    where the guys are like a little half a bubble off and they

17    think their woman is going to leave and so it's like if I

18    can't have you, nobody can.  That type of, that type of

19    killing, is that something that you think somebody would

20    automatically get the death penalty for that?

21                   MICHAEL E. BLAKE:  Not automatically.

22                   ATTY. JUHASZ:  Okay.  Let's -- how about

23    one where it's premeditated?  That's something that jurors

1   bring up sometimes.  I don't want to get into a big

2   discussion with you about what premeditated is.  Let's just

3   for generic purposes call it somebody makes a plan to do

4   something and they do it, okay?

5                    MICHAEL E. BLAKE:  Well, I don't know.  I

6   would have to hear the story, I guess.  I wouldn't, you know,

7   I'm not ready to put anybody to death, you know, just because

8   they killed somebody.

9                    ATTY. JUHASZ:  Okay.

10                   MICHAEL E. BLAKE:  But just in some cases.

11                   ATTY. JUHASZ:  All right.  But there are

12  some cases that you and I have talked about where it is kind

13  of an automatic thing for you.

14                   MICHAEL E. BLAKE:  Right.

15                   ATTY. JUHASZ:  Let's take, let's go back

16  to my 7/11 for a second, okay.  That's one that you have some

17  strong feelings about too, like the mass murder and the child

18  killings.  And let's forget about this case.  Let's do what I

19  typically do when I'm standing up here, which is make myself

20  the bad guy, so let's say that I get charged for that

21  homicide.  It's what we call a felony murder, it's an

22  aggravated murder in the course of committing an aggravated

23  robbery because I did, I robbed somebody with a gun.  Are

1   your views about the death penalty such that in a case like

2   that you are going to go into that second phase with the

3   death penalty sort of having a leg up because of the type of

4   offense you found that it was at the first phase?  Is that a

5   clear question to you?

6                    MICHAEL E. BLAKE:  Not exactly.

7                    ATTY. JUHASZ:  All right.

8                    MICHAEL E. BLAKE:  But I would have to

9   hear the circumstances.  You're throwing out hypothetical

10  stuff that, you know, I can't give you a good answer.

11                   ATTY. JUHASZ:  I know.  And you know what?

12  I apologize.  That's kind of the nature of what we have to

13  do.  I told a juror the other day that it's a little bit

14  unfair because we ask you, I think I used the example of, you

15  know, somebody says to me what would you do if you left the

16  courthouse today and some guy came up to you and stuck a gun

17  in your face and said give me all your money?  And, you know,

18  I would like to think that, well, what I would do is grab my

19  briefcase and slap him and knock the gun out and call Captain

20  Bacon over there to arrest him, but maybe I wouldn't do that

21  because I've never been in that situation.

22                   MICHAEL E. BLAKE:  Right.

23                   ATTY. JUHASZ:  So I'm going to bear with

 1    you understanding you've never been in that situation, and

 2    I'm going to ask you to bear with me a little bit because,

 3    because of the nature of what we're doing, it sort of has to

 4    be hypothetical.  Fair enough?

 5                      MICHAEL E. BLAKE:  Okay.

 6                      ATTY. JUHASZ:  Are there any types of

 7    offenses where because of how you feel about the death

 8    penalty you think the death penalty has a leg up when you go

 9    into a sentencing phase?

10                      MICHAEL E. BLAKE:  No.

11                      ATTY. JUHASZ:  Okay.  Even though you have

12    found that person guilty beyond a reasonable doubt of

13    committing something that you find to be a pet peeve offense?

14                      MICHAEL E. BLAKE:  I'm not sure.

15                      ATTY. JUHASZ:  Okay.  Is there anything

16    about how you feel about the death penalty -- well, let me

17    back up.  Mr. Bailey has talked to you about the government's

18    burden of proving the case.  You remember all that?

19                      MICHAEL E. BLAKE:  Right.

20                      ATTY. JUHASZ:  You know at the first phase

21    the government has to -- and he talked about a box I think,

22    right?

23                      MICHAEL E. BLAKE:  Right.

1               ATTY. JUHASZ:  At the first phase of any

2     capital case, this one or any other one, the State has two

3     burdens in essence, at least two boxes to fill up.  One is

4     called aggravated murder and the other one is a special

5     circumstance or what we call a specification, some reason to

6     make that case eligible to be considered for the death

7     penalty.  You okay with that?

8               MICHAEL E. BLAKE:  Yes.

9               ATTY. JUHASZ:  All right.  Any time you

10    would get to a second phase in a capital murder trial in Ohio

11    you have already found the defendant guilty of aggravated

12    murder beyond any reasonable doubt and you've already found

13    the defendant guilty of one or more of those special

14    circumstances beyond any reasonable doubt.  So presumably in

15    your mind by the time you go to the second phase you are

16    comfortable saying to yourself and to everybody else in the

17    world I'm convinced beyond any reasonable doubt this person

18    did these bad things.  Are you with me on that?

19               MICHAEL E. BLAKE:  Yes.

20               ATTY. JUHASZ:  Having done that, having

21    found the person guilty of that, are there any types of

22    offenses that going into the second phase you're going to

23    say, "Look, I already found the government filled up that

1    box, I found them guilty of doing this bad thing, so because

2    of how I feel about the death penalty for certain offenses

3    that person is going to have to talk me into giving them a

4    life sentence?"

5                    MICHAEL E. BLAKE:  No.

6                    ATTY. JUHASZ:  Okay.  You would -- well,

7    do you understand that at the second phase there is another

8    box that the government has to fill up?

9                    MICHAEL E. BLAKE:  Yes.

10                   ATTY. JUHASZ:  And that box has to start

11   out empty at the second phase.

12                   MICHAEL E. BLAKE:  Right.

13                   ATTY. JUHASZ:  So what you're saying to us

14   is that if you're picked as a juror on this case, no matter

15   what happens at that first phase, no matter what you find,

16   that box that the government has to fill up at the second

17   phase will start out empty in your mind?

18                   MICHAEL E. BLAKE:  Right.

19                   ATTY. JUHASZ:  If you're -- we gave you an

20   oath back on April the 8th.  Do you remember that?

21                   MICHAEL E. BLAKE:  Right.

22                   ATTY. JUHASZ:  And that oath has to do

23   with you talking to us and answering us truthfully about

1    these questions.  If you're picked as a juror you take

2    another oath.

3                    MICHAEL E. BLAKE:  Right.

4                    ATTY. JUHASZ:  And part of that oath would

5    be that if you ever got to that second phase that you would

6    promise everybody that all four of those penalties would

7    start out equally in your mind.

8                    MICHAEL E. BLAKE:  Right.

9                    ATTY. JUHASZ:  Do you have any problem

10   taking that kind of an oath?

11                   MICHAEL E. BLAKE:  No.

12                   ATTY. JUHASZ:  Okay.  And so no matter --

13   well, I'm sorry, there's something else that I'm assuming you

14   know and that's tremendously unfair.  The thing at the first

15   phase we call a specification, at the second phase it gets a

16   different name, okay, and that different name is called an

17   aggravating circumstance, okay?

18                   MICHAEL E. BLAKE:  Okay.

19                   ATTY. JUHASZ:  It is -- you remember

20   Mr. Bailey telling you at the second phase that the decision

21   you have to make, the box that you have to fill up, or the

22   government has to fill up, excuse me, is if the reasons to

23   impose the death penalty outweigh the reasons not to by proof

1    beyond any reasonable doubt, okay?

2                    MICHAEL E. BLAKE:  Right.

3                    ATTY. JUHASZ:  That specification at the

4    first phase gets a name change, that's all that happens to

5    it, it gets a name change and it now becomes the aggravating

6    circumstance or the reason to consider imposing the death

7    penalty in the second phase.  Do you see how that works?

8                    MICHAEL E. BLAKE:  Yes.

9                    ATTY. JUHASZ:  I think Judge Stuard

10   mentioned earlier talking about killing a guy named Bob Taft

11   who is the governor.

12                   MICHAEL E. BLAKE:  Right.

13                   ATTY. JUHASZ:  And you understand that in

14   a case like that if the government charged me with that,

15   proving that I killed Bob Taft doesn't get me the death

16   penalty?

17                   MICHAEL E. BLAKE:  Right.

18                   ATTY. JUHASZ:  They also have to prove

19   that Bob Taft was the governor when I killed him.

20                   MICHAEL E. BLAKE:  Right.

21                   ATTY. JUHASZ:  And that would be the

22   second box.  You're okay with all that?

23                   MICHAEL E. BLAKE:  Yes.

```
 1                    ATTY. JUHASZ:  That second box in this

 2    trial where I'm accused of killing Bob Taft and at the second

 3    phase becomes the aggravating circumstance, in essence it's

 4    the reason the prosecutor is going to stand up and say to the

 5    jury, "Listen, you guys should give Juhasz the death penalty

 6    because Bob Taft was the governor," that's the aggravating

 7    circumstance, okay?

 8                    MICHAEL E. BLAKE:  Okay.

 9                    ATTY. JUHASZ:  On the other side of the

10    scale you will be asked to consider things about the

11    defendant or things about the particular crime.  Maybe I had

12    some, you know, mental problem that the doctor said well,

13    he's not insane but he's got this thing about anybody named

14    Taft and he goes kind of berserk.  That may or may not

15    persuade you, but the question is going into the second phase

16    can you fairly weigh all of those factors?

17                    MICHAEL E. BLAKE:  Yes.

18                    ATTY. JUHASZ:  One against the other?

19                    MICHAEL E. BLAKE:  Yes.

20                    ATTY. JUHASZ:  Reasons to impose the death

21    penalty against reasons not to?

22                    MICHAEL E. BLAKE:  Yes.

23                    ATTY. JUHASZ:  And even though you think
```

4388

1     that for some offenses it should be an eye for an eye, you're

2     saying that that's not really how you would proceed in a case

3     like this?

4                    MICHAEL E. BLAKE:   No.   Every case would

5     be different.

6                    ATTY. JUHASZ:   All right.   Have you heard

7     the phrase before taking the fifth?

8                    MICHAEL E. BLAKE:   Yes.

9                    ATTY. JUHASZ:   All right.   That I think

10    sometimes gets a bad play in TV and movies because typically

11    when they do it they've got some, you know, hard core

12    criminal who everybody knows from watching the movie or the

13    TV show is just guilty as all get out and he's sitting there

14    calmly in some interrogation room smoking cigarettes, staring

15    into the corner saying, "I'm taking the fifth."

16         Mr. Bailey talked to you earlier about the

17    presumption of innocence.   That comes from the fifth

18    amendment, and let me kind of give you an overview about how

19    that works so we can see if you're comfortable with it in

20    this case.   The fifth amendment says that a citizen in our

21    country doesn't have to do anything to help the government

22    convict them of a crime.

23                    MICHAEL E. BLAKE:   Right.

1           ATTY. JUHASZ:  Okay.  That's, as we call

2     it, the privilege against self-incrimination.  You've heard

3     of that before?

4           MICHAEL E. BLAKE:  Right.

5           ATTY. JUHASZ:  That's different from a lot

6     of countries.  Did you know that?

7           MICHAEL E. BLAKE:  Yes.

8           ATTY. JUHASZ:  What do you think about

9     that?  Do you think that our system is better than their

10     system or do you think --

11           MICHAEL E. BLAKE:  It's the best in the

12     world.

13           ATTY. JUHASZ:  Okay.  There are some

14     ramifications of that then because since the person who is

15     accused doesn't have to do anything to help the government

16     convict them, then, you see, that puts the burden on the

17     government.  If you and I were saying okay, here's a new game

18     we made up and I tell you that there's this game and I say

19     you go first, and you say no, you go first, we would never

20     get anywhere.  Do you see that?

21           MICHAEL E. BLAKE:  Right.

22           ATTY. JUHASZ:  Well, it's kind of the same

23     thing.  Because of the privilege against self-incrimination

1    it means that the government has to sort of carry the ball.

2                         MICHAEL E. BLAKE:  Right.

3                         ATTY. JUHASZ:  And you think that's a good

4    idea?

5                         MICHAEL E. BLAKE:  I can't think of a

6    better one.

7                         ATTY. JUHASZ:  Okay.  Many people think of

8    a criminal trial like this, as a situation where, and I think

9    Judge Stuard alluded to this a little bit, as a situation

10   where, well, if the verdict is guilty then the State wins and

11   if the verdict is not guilty then the defendant wins, and it

12   actually doesn't work like that.  You see that because of

13   this privilege against self-incrimination?

14                        MICHAEL E. BLAKE:  Right.

15                        ATTY. JUHASZ:  If we take the box that

16   Mr. Bailey was talking about, first of all, as you start this

17   case now is that box empty for you?

18                        MICHAEL E. BLAKE:  Yes.

19                        ATTY. JUHASZ:  The State has to fill that

20   box up, if it can, beyond the line called reasonable doubt.

21                        MICHAEL E. BLAKE:  Yes.

22                        ATTY. JUHASZ:  If it does that then the

23   verdict is guilty and the State wins.  If it doesn't do that

1    it's not that the defendant wins, it's that the State lost.

2    That's what Judge Stuard was saying to you earlier.  Do you

3    remember that?

4                    MICHAEL E. BLAKE:  Yes.

5                    ATTY. JUHASZ:  Any problem holding the

6    State to that kind of a burden?

7                    MICHAEL E. BLAKE:  No.

8                    ATTY. JUHASZ:  Okay.  And because that box

9    has to start out empty there is what we call the presumption

10   of innocence.  You've heard that phrase before?

11                   MICHAEL E. BLAKE:  Yes.

12                   ATTY. JUHASZ:  The other feature of this

13   fifth amendment is that because of that privilege against

14   self-incrimination the defendant does not have to take the

15   witness stand, as I think Mr. Bailey alluded to, and doesn't

16   have to offer any evidence.  Do you see that?

17                   MICHAEL E. BLAKE:  Yes.

18                   ATTY. JUHASZ:  Now, she may elect to take

19   the witness stand, okay?

20                   MICHAEL E. BLAKE:  Okay.

21                   ATTY. JUHASZ:  She may elect to have her

22   lawyers ask questions on cross examination even though we're

23   not required to do that.  And I have a little bit of a story

1    about that.  Let's assume that I'm accused of killing

2    somebody out here at this corner at 4:00 o'clock in the

3    afternoon on April the 1st, okay?

4                    MICHAEL E. BLAKE:  Okay.

5                    ATTY. JUHASZ:  And now it comes time for

6    the trial and the State brings in a witness that says, "Yeah,

7    that guy sitting over there at that table, that Juhasz guy, I

8    don't know his name but that's the guy I saw, I saw him right

9    out at that corner at 4:00 o'clock on April 1st.  I saw him

10   pull out a gun and shoot this guy whose picture you're

11   showing me of this dead body, that's the guy he shot."  I'm

12   not looking too good.  I mean, it's only one witness but it's

13   not looking too good for me, is it, because we got somebody

14   who has pointed me out and said I was there and I shot the

15   person, right?

16                   MICHAEL E. BLAKE:  Right.

17                   ATTY. JUHASZ:  But let's assume that I

18   hired Ben Matlock, okay, and I always use Ben Matlock because

19   he's always pulling stuff out of his pocket, which is not

20   really what lawyers do with evidence.  But Matlock gets up

21   and he goes in that little southern drawl and says, "Now,

22   Mr. Witness, 4:00 o'clock on April 1st, is that what you're

23   saying?"

1         "Yes, sir, Mr. Matlock."

2         "Well, weren't you at Kaufmann's at the Southern

3    Park Mall at 4:00 o'clock on April the 1st?"

4         And now the guy goes and he kind of slinks down in

5    the chair because Matlock has a receipt.  I don't know how

6    the heck he ever finds this stuff, but, okay, he does, and

7    he's got this receipt where this witness was down buying a

8    suit at Kaufmann's at the Southern Park Mall at the very time

9    he says that he saw me shoot the person.  Now, do you see by

10   that cross examination how that has sort of detracted from

11   the government filling up the box?

12                  MICHAEL E. BLAKE:  Yes.

13                  ATTY. JUHASZ:  Another way that can happen

14   is let's say the witness says, "No, sir, Mr. Matlock, that

15   wasn't me.  You must have made a mistake," okay?  Now the

16   government gets done, they say "We're done presenting

17   evidence.  We think we filled up the box."

18        So now the defendant, Matlock, might say well, my

19   witness is Joe Jones, and he gets Joe up there and Joe says,

20   "I work at the Southern Park Mall at Kaufmann's," and he

21   shows him this receipt and he shows them a picture of the

22   witness who said that he saw me shooting him and the guy

23   says, "That's the guy I sold the suit to on this day."  You

```
 1      see in that case that the presentation of evidence, although

 2      she doesn't have any burden of proof, the presentation of

 3      evidence may cause you to have a reasonable doubt about the

 4      government's case.

 5                          MICHAEL E. BLAKE:  Yes.

 6                          ATTY. JUHASZ:  Excuse me just one second.

 7      You need water?  I'm sorry.

 8                          MICHAEL E. BLAKE:  No.

 9                          ATTY. JUHASZ:  You're still okay?

10                          MICHAEL E. BLAKE:  Fine.

11                          ATTY. JUHASZ:  All right.  We've talked

12      about all this stuff.  You feel pretty comfortable with it

13      or are you --

14                          MICHAEL E. BLAKE:  Yes.

15                          ATTY. JUHASZ:  Okay.  Let's go back to a

16      little bit of a concern that I have about something you said

17      before, which is that based upon the impressions that you

18      have, and again, it's okay that you have them because you

19      didn't know you were going to be a juror, but based on the

20      impressions that you have that she's probably involved in

21      this and that you're going to want to hear her present some

22      evidence, --

23                          MICHAEL E. BLAKE:  Well, I said I figured
```

1    that she must have something to do with it because they

2    arrested her, not saying she's guilty.

3                    ATTY. JUHASZ:  Okay.  Does the fact that

4    she's arrested in some way lead you to an inference that

5    she's guilty or does it not?

6                    MICHAEL E. BLAKE:  No.

7                    ATTY. JUHASZ:  Okay.  One thing we haven't

8    talked about yet is another legal concept.  You ever hear the

9    old adage where there's smoke there's fire?

10                   MICHAEL E. BLAKE:  Yes.

11                   ATTY. JUHASZ:  Okay.  And I'm sensing a

12   little bit of that from what you're saying about the fact

13   that they arrested her, they must have had some good reason.

14                   MICHAEL E. BLAKE:  True.

15                   ATTY. JUHASZ:  Okay.  She has been

16   indicted.  Are you aware of that?

17                   MICHAEL E. BLAKE:  I think so.

18                   ATTY. JUHASZ:  Okay.  An indictment is a

19   piece of paper that tells somebody in a serious case in Ohio,

20   what we call a felony case, a serious case in Ohio, that the

21   government says that you did something wrong.

22                   MICHAEL E. BLAKE:  Yes.

23                   ATTY. JUHASZ:  Okay.  That's what brings

1  us to this courtroom.

2              MICHAEL E. BLAKE:  Right.

3              ATTY. JUHASZ:  All right.  Do you have

4  some perception based upon that as well as what you have read

5  and heard before that she must be somehow involved in this?

6              MICHAEL E. BLAKE:  I don't know how to

7  answer that.

8              ATTY. JUHASZ:  All right.  Well, I would

9  actually prefer that you tell me your words.  Tell me what

10  your impression is as you sit here right now.

11              MICHAEL E. BLAKE:  Well, I would have to

12  listen to all the evidence before I can make up my mind one

13  way or the other.

14              ATTY. JUHASZ:  Okay.

15              MICHAEL E. BLAKE:  That's what it's all

16  about, right?

17              ATTY. JUHASZ:  All right.  Yes.  Yes.  But

18  as you sit here now knowing or -- sorry.  Knowing is a bad

19  word.  Having heard and having read what you have read are

20  you able to look at Donna Roberts and say look, okay, I've

21  read and heard all this stuff but I presume you innocent, or,

22  in candor, would you have to look at her and say look, I've

23  read and heard all this stuff, I've got some inkling you were

1   involved in this and you're going to have to do something to

2   show me that I'm wrong about that?

3                    MICHAEL E. BLAKE:  No.

4                    ATTY. JUHASZ:  I'm not sure which answer

5   you mean no to so I'm going to ask you, tell me what your

6   impression is right now about Donna Roberts.

7                    MICHAEL E. BLAKE:  No, I wouldn't -- I

8   don't presume anybody guilty.

9                    ATTY. JUHASZ:  Okay.  One of the things

10  that we also don't do is we don't give you a hard and fast

11  numerical definition of what proof beyond a reasonable doubt

12  is.  Nobody is going to say listen, if the government brings

13  in 12 pounds of exhibits it's guilty and if they only bring

14  in 10 pounds of exhibits it's not guilty, or if they bring in

15  100 witnesses it's guilty, if they only bring in five it's

16  not guilty.  It doesn't work numerically, do you see that?

17                   MICHAEL E. BLAKE:  Right.

18                   ATTY. JUHASZ:  All right.  So the judge is

19  going to give you a definition of reasonable doubt and he's

20  going to say that it's a doubt based on reason and common

21  sense.  You have to somehow figure out if they have filled up

22  that box we keep talking about, okay?

23                   MICHAEL E. BLAKE:  Right.

```
 1                    ATTY. JUHASZ:  And, by the way, are you
 2   comfortable -- let's say that at the end of this case you go
 3   back into the jury room and you look in that imaginary box
 4   and you go you know what, there's some evidence in there and
 5   I don't like what I'm seeing, but they haven't filled that
 6   box up in my estimation beyond the line called reasonable
 7   doubt.  Are you comfortable coming back under those
 8   circumstances and saying not guilty?
 9                    MICHAEL E. BLAKE:  Yes.
10                    ATTY. JUHASZ:  And no problem looking at
11   these guys and saying sorry guys, you seem like nice guys,
12   but you didn't prove the case?
13                    MICHAEL E. BLAKE:  Right.
14                    ATTY. JUHASZ:  Even though you know you
15   have a dead body in this case?
16                    MICHAEL E. BLAKE:  Right.
17                    ATTY. JUHASZ:  So when you decide if
18   you're filling that box up you have to sort of, when you make
19   an important decision like that, make a checklist.  Some
20   people do it in their mind's eye, some people do it on a
21   piece of paper, but when you make an important decision don't
22   you sort of put the pros on one side and the cons on the
23   other side?
```

```
 1              MICHAEL E. BLAKE:  Yes.

 2              ATTY. JUHASZ:  In this case on the pro

 3    side, so to speak, are going to be all the reasons why the

 4    government is going to tell you that you should find the

 5    defendant guilty, all right?

 6              MICHAEL E. BLAKE:  Right.

 7              ATTY. JUHASZ:  On the other side are going

 8    to be doubts that you might have about the evidence or that

 9    Mr. Ingram and I might point out through something that we do

10    or that other jurors tell you about when you're back there,

11    all 12 of you, deliberating.  Does that make sense to you?

12              MICHAEL E. BLAKE:  Yep.

13              ATTY. JUHASZ:  Mr. Bailey talked about ALF

14    and his martian buddies and all that stuff in connection with

15    the storm.  Do you remember that?

16              MICHAEL E. BLAKE:  Yes.

17              ATTY. JUHASZ:  And I think everybody

18    agrees that's a pretty foolish or imaginary doubt about

19    whether it stormed last night, right?

20              MICHAEL E. BLAKE:  Right.

21              ATTY. JUHASZ:  Okay.  You may have doubts

22    about the government's proof in this case, you or the other

23    jurors, that don't rise to the level of being that foolish.
```

1    They might be doubts based on reason and common sense.  Does

2    that make sense to you?

3                    MICHAEL E. BLAKE:  Yes.

4                    ATTY. JUHASZ:  You need to sort of take

5    the doubts on the one hand, one side of that checklist, and

6    look at each one of them and analyze them and say to yourself

7    is this a doubt that I have that's based on reason and common

8    sense?  And maybe you say to the other jurors hey, I've got

9    this doubt and you tell them what it is and they go oh, look

10   at this.  Here is an exhibit and you go boy, I forgot about

11   that, okay?  You know what, I'm scratching that one off my

12   list, okay?  You have to do that for every doubt that you

13   have.  Do you see that?

14                   MICHAEL E. BLAKE:  Yes.

15                   ATTY. JUHASZ:  If you are left with one,

16   could be more than one, but if you're left with at least one

17   doubt, and no matter how much you talk to the other jurors,

18   no matter how much you think about it, no matter how much you

19   look at the exhibits and think back in your mind about what

20   the testimony was, you say to yourself no, there is simply no

21   way for me to account for this doubt other than to say that

22   it's reasonable, it's based on reason and common sense, in

23   that case they have not proved their case.  Do you see that?

1               MICHAEL E. BLAKE:  Yes.

2               ATTY. JUHASZ:  No problem holding them to

3       that kind of burden of proof?

4               MICHAEL E. BLAKE:  No.

5               ATTY. JUHASZ:  Okay.  Let's talk for a

6       second about circumstantial evidence.  I think Mr. Bailey

7       talked to you about that.

8               MICHAEL E. BLAKE:  Yes.

9               ATTY. JUHASZ:  I have a little bit

10      different story that I like to tell about that and I'll try

11      to keep it brief so you can get the heck out of here.  I want

12      you to pretend for a second that you're at my house late in

13      August, maybe 5:00, 6:00 o'clock at night, and the sun is

14      shining, it's about 85 degrees, but it's getting dark out in

15      the west and the breeze is kicking up and you know that in 45

16      minutes or so we're going to get one of those thunder bumpers

17      that we get in this area late in the afternoons and early

18      evenings in the summertime.  We're out in the kitchen, I'm

19      making you a glass of iced tea, and all of a sudden we hear a

20      big crash in the living room.  I go rushing in to see what

21      the heck is going on and my son Mike's cat comes darting out

22      between my legs.  When I go into the living room and look

23      there's Mike standing off to my left with his hands over his

 1    face and he's in some obvious distress, and over to the right

 2    is one of my wife's Norman Rockwell plates knocked off of the

 3    mantle down onto the hearth, broken into a zillion pieces,

 4    and a couple feet away from that is one of Mike's Nerf balls.

 5    Okay?

 6          Now, it could be from those facts that I've given

 7    you -- I didn't see what happened to the plate, correct?

 8                    MICHAEL E. BLAKE:  Right.

 9                    ATTY. JUHASZ:  And so that's why we call

10    it circumstantial evidence.  We have to try to decide, if we

11    can, what happened from the evidence we know, okay?

12                    MICHAEL E. BLAKE:  Right.

13                    ATTY. JUHASZ:  It could be from what I've

14    told you that Mike was throwing the Nerf ball like he's been

15    told 650, 700,000 times not to do in the house.

16                    MICHAEL E. BLAKE:  Right.

17                    ATTY. JUHASZ:  Knocked the plate off, the

18    noise scared the cat.  It could be that the cat was climbing

19    up on the mantle like it's been told not to do 650 or 700,000

20    times, knocked the plate off, and Mike's going "Oh, boy, I'm

21    going to get blamed for this."  And the Nerf ball is there

22    because, you know, Mike is 18 now but he still hasn't picked

23    up anything in his life including that Nerf ball.  Or it

 1    could be that the breeze from that approaching storm came in

 2    and knocked the plate off and Mike and the cat are both

 3    thinking they're going to get blamed for something they

 4    didn't do.  All those kind of make sense from the facts I

 5    gave you, correct?

 6                    MICHAEL E. BLAKE:  Right.

 7                    ATTY. JUHASZ:  And so although I could

 8    accuse Mike of throwing that Nerf ball and breaking that

 9    plate, there really would be no way for me to prove it from

10    that evidence beyond a reasonable doubt, would there?

11                    MICHAEL E. BLAKE:  No.

12                    ATTY. JUHASZ:  It wouldn't be fair, would

13    it?

14                    MICHAEL E. BLAKE:  No.

15                    ATTY. JUHASZ:  And so if you have

16    circumstantial evidence in this case will you hold the

17    government to that same kind of testing of the evidence to

18    see are there other theories based on reason and common sense

19    that explain this evidence?

20                    MICHAEL E. BLAKE:  Right.

21                    ATTY. JUHASZ:  Okay.  Anything that has

22    come up while you and I have been talking, questions that you

23    have or reasons why you think you cannot or should not serve

1  as a juror on this case?

2              MICHAEL E. BLAKE:  No.

3              ATTY. JUHASZ:  Okay.  I want you to

4  appreciate the fact, I'll apologize if I asked you questions

5  that sort of pushed, you know, were hard questions, but as I

6  said when we stood up here, those are the kind of questions I

7  assume you would want a lawyer asking on your behalf if you

8  were sitting over there talking to somebody who might sit on

9  a jury like this.

10              MICHAEL E. BLAKE:  Right.

11              ATTY. JUHASZ:  Does that make sense to

12  you?

13              MICHAEL E. BLAKE:  Right.

14              ATTY. JUHASZ:  I appreciate your time.

15  Thank you.

16              MICHAEL E. BLAKE:  Okay.

17              ATTY. INGRAM:  May we approach?

18              (Whereupon, a bench conference was held.)

19              THE COURT:  Okay.  I have a couple

20  questions for you.

21              MICHAEL E. BLAKE:  Yes, Your Honor.

22              THE COURT:  You seemed to indicate at one

23  point early on in the questioning that from what you had

1    heard about the case before that you had some pretty fixed

2    opinions about what happened.  You read the articles in the

3    paper and you were asked some question along the line "Would

4    that have to be proven not to be true?"  And the question

5    that I have to have you answer goes back to what I said at

6    the very beginning of this and that is that this matter has

7    to be determined on the evidence in this case.  I can't look

8    within your heart and mind.  You have to answer this to your

9    satisfaction as well as these folks, and that is if you have

10   any thought or reservation at all that you would not be able

11   to set aside anything that you have heard before and give a

12   fair judgment on the value of the evidence you hear in this

13   courtroom, then you should state that and that's fine.

14        I think we all have such situations in our life

15   where something happens and we might find out later on that

16   our initial impression was not true, but we always have some

17   reservation about maybe it was true, you know, my first

18   impression may have been correct.  Even though I have all

19   this other evidence that disproves that, you still have that

20   doubt in your mind.  Now, you're the only one that can answer

21   that for us.  And do you feel that from what you already know

22   at this point about this trial that there's going to be any

23   tendency on your part to somehow require something from the

1    defense side or something even from the prosecution's side to

2    disprove what you believe is true?

3                    MICHAEL E. BLAKE:  I'm going to set aside

4    everything I've read or heard.  I'm just going to listen to

5    the facts that are presented and I'll have to make up my mind

6    that way.  I mean, I'm not -- just because I read about it I

7    don't think I feel like she's guilty.

8                    THE COURT:  You don't -- you feel

9    comfortable, and I don't know if you've been asked this or

10   not, but I think the best way to do it is to picture yourself

11   a defendant in a similar situation or some grievous situation

12   where you had a potential juror that had read something in

13   the paper or talked to somebody about it and whether you

14   would be comfortable with that person being able to set that

15   aside and judge the evidence that's presented.

16                    MICHAEL E. BLAKE:  What was that question?

17                    THE COURT:  Okay.  Just assuming you were

18   a defendant in a case and you had a prospective juror up here

19   that says yeah, I read about it, and this, that and another,

20   but I can set that aside, would you feel comfortable knowing

21   what you know about what you know about this case?

22                    MICHAEL E. BLAKE:  Well, I don't think

23   what I know about this case would have that same effect.  And

1     if I was a defendant, naturally I think the ideal for a

2     defendant would be to have nobody know anything about it,

3     that would be the ideal situation, but it's not going to

4     happen, I don't believe.

5                THE COURT: Well, you're very, very wise

6     in that. That's just the world we live in. At one time the

7     jury system was based on people that knew all about the case

8     before they could be on the jury, but that's all changed. We

9     try and get people that have no knowledge at all and that's

10     not practical in modern life, but that's the ideal is to get

11     someone of that nature or someone like yourself who feels in

12     their heart that they're not going into the case with any

13     type of a preconception of what the facts are. Are you

14     comfortable with that?

15                MICHAEL E. BLAKE: Yes.

16                THE COURT: Okay. Before we proceed,

17     Kelly, I'm going to have to ask you to come into the jury

18     room or into the chambers. I hate to have you do that.

19     Well, let's do this, do you mind going out in the hall for a

20     minute?

21                MICHAEL E. BLAKE: No.

22                THE COURT: And I'll have you come back in

23     here in just a second.

1          (Whereupon, the prospective juror was

2     briefly excused from the courtroom and the following

3     proceedings commenced.)

4          THE COURT:  Okay.  Before my last

5     questions put to this prospective juror counsel and I had

6     gone into chambers and there was a concern expressed on

7     behalf of the defendant's attorneys.  Would you please state

8     on the record what that was?

9          ATTY. INGRAM:  Yes, Your Honor.  The

10    defense challenged Mr. Blake for cause on the basis that he

11    had stated he had impression that Donna was probably

12    involved, that it was a fixed impression.  He further stated

13    that he felt that as a result of what he read there was a

14    good reason for her arrest and he would want to hear evidence

15    to dispel his impressions.  And I have nothing further to

16    add.

17         THE COURT:  Your motion, your challenge

18    for cause is based on that, right?

19         ATTY. JUHASZ:  Yes, sir.

20         ATTY. INGRAM:  Yes.

21         ATTY. BAILEY:  And, Your Honor, may it

22    please the Court, counsel for the defense, the prospective

23    juror has indicated he can set that aside and make his

1    decision based on the facts, the testimony and the evidence

2    presented and the law given to him by the Court, and anything

3    he read he could set aside.  And there was one more thing.

4    Excuse me one second.  Right, and the juror, the prospective

5    juror indicated that he could set aside anything that he

6    read, he wouldn't take it as an indication of her guilt.  I

7    think he understands the distinction as to the burden of

8    proof, that it's on the State, the defendant has no burden of

9    proof and that she's presumed innocent, so I think that any

10   argument there would be of no merit.

11               THE COURT:  Okay.  The Court is going to

12   overrule the motion for challenge for cause for the following

13   reasons:  Part of this whole process is the analysis of both

14   sides plus the analysis of the Court.  He made that

15   statement, which on its face if left alone would be more than

16   enough to remove him for cause.  But from the follow-up

17   answers that he gave as the questioning proceeded and from

18   the answer that he has given to the Court once that I

19   attempted to frame it in the manner in which I did, the Court

20   is satisfied that the man understands what he has to do and I

21   think that the challenge is not enough to remove him from

22   this pool.

23               You want to have him come back in here, please?  I'm

1    just adding up in my head for the State, for the --

2                          (Whereupon, the prospective juror was

3    again seated in the courtroom.)

4                          THE COURT:  Okay.  Sir, you will be in the

5    pool from which this jury is to be drawn.

6                          MICHAEL E. BLAKE:  Okay.

7                          THE COURT:  Stop back down and see Connie.

8    I think she will tell you that you are to report here

9    tomorrow at 2:00 o'clock.  We're going to make an attempt to

10   seat this jury, although we're going to be very shy of the

11   numbers involved because it's taking so long to get people

12   that are qualified, but check with her before you leave.

13   You're not to read anything about the case, watch anything on

14   TV, discuss anything with anybody about your experience about

15   the case, okay?

16                          MICHAEL E. BLAKE:  Okay.

17                          THE COURT:  Thank you very much.

18                          MICHAEL E. BLAKE:  Thank you.

19                          ATTY. BAILEY:  Thanks.

20                          ATTY. BECKER:  Thank you very much.

21                          ATTY. JUHASZ:  Thank you, Mr. Blake.

22                          ATTY. INGRAM:  Appreciate it, Mr. Blake.

23   Have a good one.

1           (Whereupon, Michael Blake was added to the

2     pool of prospective jurors and excused for the day, after

3     which a brief recess was taken.)

4               ATTY. INGRAM:  All right, Your Honor.  It

5     was brought to the attention of defense counsel and the

6     prosecuting attorney by the jury commissioner that Juror

7     No. 305, James Martin, who in the ordinary rotation would

8     have been here at 10:30 this morning, is in fact in Las

9     Vegas.  He will not return until Saturday.  Accordingly, the

10    defense and prosecution suggested to the jury commissioner

11    that the jury commissioner simply have Mr. Martin call on

12    Monday.  The record should reflect that the defense has no

13    objection to skipping Mr. Martin in the ordinary rotation,

14    and if we don't need him, we don't need him.

15              ATTY. BAILEY:  And we'll go along with

16    that.

17              THE COURT:  Okay.  Fine.  That will be by

18    stipulation then.

19              (Whereupon, a discussion was had off the

20    record.)

21              ATTY. INGRAM:  The defense is satisfied

22    without Ms. Pierce coming up, but I will leave it to the

23    prosecution.  Are you satisfied?

1                    ATTY. BAILEY:  She doesn't have to come

2       up.

3                    ATTY. BECKER:  She's here anyway.  She's

4       out there.

5              **PROSPECTIVE JUROR REBECCA A. PIERCE**

6                    THE COURT:  How are you today?

7                    REBECCA A. PIERCE:  Fine, thank you.  How

8       are you?

9                    THE COURT:  Good.  In reading through your

10      questionnaire it appears that you mentioned in here that

11      you've read everything --

12                    REBECCA A. PIERCE:  Yes, I have.

13                    THE COURT:  -- you could about the case.

14      And you have medical problems?

15                    REBECCA A. PIERCE: Yes, I do.

16                    THE COURT:  Something with your arm?

17                    REBECCA A. PIERCE:  Yes.  Since I was here

18      the last time I've been diagnosed with a pinched nerve in my

19      arm that's going to require some surgery.

20                    THE COURT:  It makes it difficult for you

21      to sit for a long period of time?

22                    REBECCA A. PIERCE:  Yes, because I'm

23      supposed to keep my arm in a certain way and to sit you

```
 1    normally would fold your arm up and I'm supposed to keep it
 2    straight and it makes it extremely numb and very painful.
 3                    THE COURT:  Can you hear back there?
 4                    ATTY. BECKER:  Your Honor, I believe she
 5    also has some financial considerations if you were to miss
 6    work, is that correct?
 7                    REBECCA A. PIERCE:  Right.
 8                    ATTY. BECKER:  And you would rather be
 9    excused from this jury?
10                    REBECCA A. PIERCE:  Yes.
11                    ATTY. BECKER:  I believe both --
12                    ATTY. BAILEY:  And her daughter.
13                    ATTY. BECKER:  And you have some things
14    with your daughter that you have to do as well?
15                    REBECCA A. PIERCE:  Right.
16                    ATTY. BECKER:  Your Honor, the State has no
17    objection to her being excused.
18                    THE COURT:  Do you have any questions?
19                    ATTY. JUHASZ:  Just the standard.  I just
20    have a couple quick questions for you, if I can?  Back on
21    April the 8th, the first date you were here.
22                    REBECCA A. PIERCE:  Right.
23                    ATTY. JUHASZ:  Down in the big courtroom
```

1    down the hall.

2                          REBECCA A. PIERCE:  Uh-huh.

3                          ATTY. JUHASZ:  Do you remember when you

4    went into the big set of doors where you were seated or where

5    you stood?

6                          REBECCA A. PIERCE:  When we initially went

7    in?

8                          ATTY. JUHASZ:  Yes.

9                          REBECCA A. PIERCE:  I was in the back row.

10                         ATTY. JUHASZ:  Okay.  On the right?

11                         REBECCA A. PIERCE:  On the left.

12                         ATTY. JUHASZ:  On the left?  Okay. While

13   you were there that day did you -- well, I'm going to ask you

14   several questions all sort of related.  Did you have any

15   discussions with anyone seated there or standing there about

16   Donna Roberts, about the case, about why everybody was

17   gathered there that day?

18                         REBECCA A. PIERCE:  I don't believe so, no.

19                         ATTY. JUHASZ:  Did you hear any -- did

20   anybody else try to have that type of a discussion with you?

21                         REBECCA A. PIERCE:  No.

22                         ATTY. JUHASZ:  And did you overhear anybody

23   within your earshot having any of those types of discussions?

1                    REBECCA A. PIERCE:  No.

2                    ATTY. JUHASZ:  Since you've been to -- how

3      about later on that day after the judge got up and talked and

4      told everybody what the case was about and the time

5      parameters?

6                    REBECCA A. PIERCE:  No.

7                    ATTY. JUHASZ:  No discussions?

8                    REBECCA A. PIERCE:  Uh-huh.

9                    ATTY. JUHASZ:  And since you've been in the

10     courthouse today or any other days you have been called down

11     here?  I think today is the only day.

12                   REBECCA A. PIERCE:  Right.

13                   ATTY. JUHASZ:  Okay.  Any discussions you

14     heard about the case?

15                   REBECCA A. PIERCE:  No.

16                   ATTY. JUHASZ:  That's all I have.  Thank

17     you.  No objection.

18                   THE COURT:  Okay.  The prospective juror

19     then would be dismissed for cause.  Good luck to you.

20                   REBECCA A. PIERCE:  Thank you.

21                   THE COURT:  Thank you for coming in.

22                   ATTY. BECKER:  Thank you.

23                   ATTY. BAILEY:  Thank you.

1       ATTY. JUHASZ:  Thank you, ma'am.

2               (Whereupon, Rebecca A. Pierce was dismissed

3    for cause from the pool of prospective jurors and a brief

4    recess was taken.)

5                           *   *   *

6              **PROSPECTIVE JUROR DAVID P. RATCLIFFE**

7               THE COURT:  Good afternoon.

8               DAVID P. RATCLIFFE:  Good afternoon.

9               THE COURT:  You had an occasion to read

10   that handout sheet?

11              DAVID P. RATCLIFFE:  Yes.

12              THE COURT:  Okay.  As you know, this is a

13   case that has been brought by the State of Ohio against Donna

14   Roberts wherein there are two counts of aggravated murder with

15   specifications.  Under Ohio law just because a person commits

16   murder does not mean that they necessarily face the death

17   penalty.  The legislature in drafting the law that covers such

18   things said that if you commit aggravated murder under certain

19   circumstances which are called specifications and they are

20   attached to the count in the indictment, if the State through

21   the prosecution is able to prove beyond a reasonable doubt

22   that the aggravated murder was committed by a certain person

23   and that the specifications applied, then that raises the

1    spector of the jury having to consider the death penalty.

2         Now, in this case there are specifications attached

3    so it's conceivable, depending on whether the State is able to

4    prove their case beyond a reasonable doubt.  If they were able

5    to do so then this case would go to a second phase.  Should

6    the State fail to be able to prove beyond a reasonable doubt

7    both the aggravated murder and/or the specification, then this

8    jury would properly make a finding of not guilty, that they

9    didn't prove their case.

10        Now, it seems premature to talk about the death

11   penalty when we don't know what the jury is going to do yet,

12   but there's a good reason for that.  If we waited until that

13   second phase, if we get there, it's too late to inquire of the

14   jury what their thoughts are on the matter.  You can't have

15   another jury come in, this same jury has to make that

16   decision, so we have to cover this subject knowing the

17   possibility is there that the trial could go to the second

18   phase.  Because if we got to that second phase and you had

19   somebody on the jury that under no circumstances could ever

20   sit in judgment of another human being concerning the death

21   penalty, pretty serious business you would agree, then the

22   State cannot have a fair trial because the State under our law

23   has the right to make that request of the jury, to consider

1    it.  And if they prove that the aggravating circumstances

2    outweigh the mitigating factors, they have a right to ask the

3    jury to make a recommendation of the death penalty.  And,

4    likewise, if you had a juror that truly believed in an eye for

5    an eye, if you kill somebody you forfeit your life, then the

6    defendant could never get a fair trial because both of those

7    extreme positions are not the law of Ohio.

8            The law of Ohio says that each juror must be willing

9    and able to listen to the law, to follow the law, and if the

10   State proves its burden of proof beyond a reasonable doubt,

11   then the possibility is there that each juror may have to

12   consider the death penalty along with life in prison without

13   chance of parole or life in prison without chance of parole

14   before 25 or 30 years.  There's four options.  But if you have

15   somebody that up front knows in their mind they're not going

16   to give the death penalty, that person shouldn't be on the

17   jury.  And, likewise, if you have someone who feels that hey,

18   if this jury convicts Donna Roberts then I'm going to vote for

19   the death penalty, that's someone not doing what they have to

20   do, and that is merely follow the law.  Okay?

21                    DAVID P. RATCLIFFE:  (Nods head

22   affirmatively.)

23                    THE COURT:  The second issue that will be

1    of primary importance is about the question of pretrial

2    publicity.  We had some folks that don't know much, if

3    anything, about the case.  We've had others who know quite a

4    bit about it.  It's not unusual that many of the jurors will,

5    prospective jurors will know something about the case because

6    it was a murder case, it happened allegedly in Howland, Ohio

7    here, and it generated its own share of publicity, as any case

8    of that nature would, so many people read or saw something on

9    TV about it or whatever.

10          And, there again, none of us can look within the mind

11    of anyone else.  These folks have an opportunity to have some

12    assurance from each prospective juror, however, that if they

13    did read anything or see anything or hear anything about the

14    matter that they would be able to set that aside, because in

15    order for both sides to have a fair trial here this case has

16    to be decided on evidence presented in this courtroom.  The

17    burden is on the State to prove their case beyond a reasonable

18    doubt.  The State of Ohio will win or lose their own case on

19    the value of their evidence.  The defendant need do nothing

20    during the entire trial.  She has the right to remain silent,

21    as any defendant does.  There's no burden on the defense to

22    prove anything.  The State either proves the necessary

23    elements of the charges brought or they fail to do that, in

1    which case the jury would make a finding of not guilty.  So

2    you have to in your own mind determine whether or not on both

3    those issues you would make a fair juror.

4          Whatever your feelings are are fine.  We're all

5    entitled to our own feelings.  And whatever your feelings are

6    will be respected.  I've seen answers all across the board

7    here and these folks just want you to express what you believe

8    openly, that's all.  Okay?  Mr. Becker.

9          ATTY. BECKER:  Thank you, Your Honor.  Good

10   afternoon, Mr. Ratcliffe.

11          DAVID P. RATCLIFFE:  Good afternoon.

12          ATTY. BECKER:  And, first of all, let me

13   apologize because I know we've kept you here a long time today

14   and sometimes that happens and there's just nothing that we

15   can do about that.  We certainly didn't think we would be here

16   still talking to jurors back when we started on April 8th and

17   we've gotten bogged down quite a bit, so I apologize for you

18   having to wait and any inconvenience for you.

19          First of all, let me thank you for prospectively

20   sitting on this jury.  I think you'll probably find that this

21   is one of the most important civic duties you can perform

22   probably, short of serving your country in the military since

23   we now have a voluntary military.  It is a very important

1    function to both the State and the people of Ohio as well as

2    to the defendant and, of course, the entire community.

3         Before we get started I want to point out and

4    reiterate something that the Court mentioned to you.  This is

5    a very important discussion that we have here with you today,

6    both between myself and you and the discussion you have with

7    defense counsel when they get their opportunity to speak to

8    you, because it really is the only opportunity in this trial

9    that we have a chance to talk to you about your views on the

10   death penalty, your views on the publicity you may have seen

11   or heard about this case, and, in general, criminal concepts

12   of criminal court.  We can't speak to you in detail

13   unfortunately.  We can't say, "Okay, listen here, this is what

14   the facts are going to be.  What do you think you're going to

15   do?"  But we can talk to you in broad general terms, so that

16   makes it a little frustrating sometimes, and we're going to

17   ask you some hard questions.  And as the Court indicated to

18   you, all we really want from you is your answers and your

19   opinions.  There's nothing wrong with the answers or opinions

20   you give us.  They're yours and you should hold them, and you

21   certainly have them based on your value system.  And we're not

22   trying to change your opinions or your values but we have to

23   know what they are to know if we have the juror that we would

1    like to have in this case.  And the same thing for the

2    defense, if they have a juror that they feel would be a good

3    juror.  So throughout this proceeding, by all means, it's most

4    important that you do the talking.  I'll probably end up doing

5    most of it because I have a big mouth.

6                    DAVID P. RATCLIFFE:  Okay.

7                    ATTY. BECKER:  But it's very important that

8    we hear from you and you open up to us and tell us because

9    this is really the only opportunity.  So with that said, I

10   want to get started and really ask you about your opinions on

11   the death penalty, and I note from your questionnaire that

12   obviously you are in favor of the death penalty.

13                   DAVID P. RATCLIFFE:  Yes.

14                   ATTY. BECKER:  All right.  Well, --

15                   DAVID P. RATCLIFFE:  Yes.

16                   ATTY. BECKER:  And if I'm misconstruing

17   that, --

18                   DAVID P. RATCLIFFE:  No.

19                   ATTY. BECKER:  -- you know, do not, you

20   know, don't be afraid to say, "What the heck are you reading,"

21   or "You're wrong."  Your belief, I guess, is that it does not

22   deter crime but it is a punishment that we should have in this

23   country?

1          DAVID P. RATCLIFFE:  That's what I believe.

2          ATTY. BECKER:  All right.  And the real

3    question and the real reason we're here is because this case

4    at some point may, it's not required to, but it may end up

5    being a case where you and 11 other jurors may have to sign a

6    piece of paper calling, a verdict form calling for the

7    imposition of the death penalty.  And I guess in a broad

8    general sense, because you're not hearing any facts of

9    anything yet, if the facts were to permit it or warrant it and

10   the law permitted it could you, Mr. Ratcliffe, sign a verdict

11   calling for the imposition of the death penalty?

12         DAVID P. RATCLIFFE:  Yes.

13         ATTY. BECKER:  Okay.  Now, we're going to

14   backtrack a little bit here.  One of the problems in doing

15   this is, as the Court explained, this is a two part trial.

16   All capital murder cases in Ohio are tried in really two

17   separate trials.  It's almost like we're having a trial A and

18   a trial B.  The first part of the trial it will be you and

19   your fellow jurors' duty to determine whether or not

20   Ms. Roberts is guilty of any crimes, and there are basically

21   four crimes that are charged.  Two of them are burglary, or

22   one is burglary, one is robbery.  The other two are aggravated

23   murder and each of the aggravated murder counts has what we

1    call a death specification, and it's just basically an

2    additional thing that Mr. Bailey and I will have to prove to

3    you and your fellow jurors.

4         If we're able to prove conviction on either one of or

5    both of the aggravated murder charges and either of the

6    specifications on those aggravated murder counts, then we go

7    to a second trial. And when we start that second trial you're

8    going to have to wipe the slate clean because, once again,

9    then it's going to be trial B. And in trial B again Mr.

10   Bailey and I have the burden of proof and we have to prove to

11   you and your fellow jurors that Ms. Roberts is deserving of

12   the death penalty. And what we have to find is a pool of 12

13   jurors who will start that second phase and fairly, if we get

14   to that phase, that will fairly and equally consider all four

15   of the options that I think you had on that piece of paper.

16                    DAVID P. RATCLIFFE:  Yes.

17                    ATTY. BECKER:  Do you believe that you will

18   be one of those people who will be able to consider fairly all

19   four options?

20                    DAVID P. RATCLIFFE:  Yes.

21                    ATTY. BECKER:  Okay. And sort of the way

22   to break it down is, in the abstract I guess, is if we get to

23   that second phase, and we may not get there because you and

1    your fellow jurors may find her not guilty of either

2    aggravated murder or you may find her guilty of the aggravated

3    murder counts but not guilty of the special things, the

4    aggravating circumstances that would make her eligible for the

5    death penalty. But if we do get to that second trial, that

6    "B" part, we have to have jurors that are going to say, "Okay,

7    I will consider equally 25 percent from the very get-go death,

8    life with no parole, life with no parole after 30 years, and

9    life with no parole after 25." We can't have jurors going

10    into that second phase that are going to say, "Boy, you know

11    what? I really believe in the death penalty and I found some

12    certain things in that first trial and I'm going to say, boy,

13    it's like 75 percent I'm leaning to the death penalty." It's

14    got to be equal to all four. You understand that, correct?

15                 DAVID P. RATCLIFFE: Yes.

16                 ATTY. BECKER: All right. So you believe

17    that, first of all, that you could be a fair juror and impose

18    the death penalty if the facts warrant it and the law allows

19    it and we were in that trial B, and you also believe that if

20    we get to that phase B that you will fairly consider all four

21    options?

22                 DAVID P. RATCLIFFE: Yes.

23                 ATTY. BECKER: Okay. Now, the other thing

 1    I wanted to ask you about is what you heard or perhaps read

 2    about this case through the media.  I think you indicated that

 3    you don't know anything about this case?

 4                        DAVID P. RATCLIFFE:  That's right.

 5                        ATTY. BECKER:  And is there anything that

 6    maybe since you were here on April 8th that's caused you, when

 7    the judge started to talk about this when you were down in the

 8    big jury room down there?

 9                        DAVID P. RATCLIFFE:  No.

10                        ATTY. BECKER:  Okay.  So you don't know any

11    of the facts, any of the players, you just know obviously what

12    the Court has told you?

13                        DAVID P. RATCLIFFE:  That's right.

14                        ATTY. BECKER:  All right.  So you

15    absolutely have no preconceived notions about Ms. Roberts'

16    guilt or innocence coming into this case.

17                        DAVID P. RATCLIFFE:  That's right.

18                        ATTY. BECKER:  Now let's talk a little bit

19    about what this criminal case is going to entail.  And I'm

20    assuming you've read books or seen movies or read in the

21    newspaper or watched television programs where they discuss or

22    the term presumption of innocence has come up, correct?

23                        DAVID P. RATCLIFFE:  (Nods head

1    affirmatively.)

2                    ATTY. BECKER:  And in every criminal case,

3    not just in Ohio but throughout this country, every defendant

4    is presumed innocent unless and until they are proven guilty

5    by proof beyond a reasonable doubt, correct?

6                    DAVID P. RATCLIFFE:  Yes.

7                    ATTY. BECKER:  And sort of intertwined with

8    that we have what's called the fifth amendment privilege, the

9    fifth amendment right.  And obviously the reason for that is,

10   as opposed to a number of other countries on this planet, our

11   jury system operates under the theory that it's better to let

12   a guilty person go than to convict an innocent person and we

13   don't make the defendant prove anything.  Do you believe in

14   that theory?

15                   DAVID P. RATCLIFFE:  Yes.

16                   ATTY. BECKER:  All right.  And one of the

17   problems, sometimes we run into jurors that -- it's our job,

18   Mr. Bailey and I's, it's our job to prove this case.  We have

19   to prove to you and your fellow jurors beyond a reasonable

20   doubt that she is guilty of those four crimes.  She doesn't

21   have to prove anything to you.  In fact, she doesn't have to

22   take the witness stand, she doesn't have to present one

23   witness in her favor, she doesn't have to have her attorneys

 1   even ask one question.  Now, that's in theory.  I suspect in

 2   this case that there will be, at the very least, questioning

 3   by her attorneys, and there may be witnesses and there may be

 4   an instance where she may want to take the witness stand, but

 5   theoretically they don't have to do anything.  They just have

 6   to be here.  And we could present, Mr. Bailey and I, 35 or 40

 7   witnesses and still not present to you a case that's proven

 8   beyond a reasonable doubt.  Do you believe that would be

 9   possible?

10                    DAVID P. RATCLIFFE:  I'm sure.

11                    ATTY. BECKER:  All right.  And on the flip

12   side of that coin, we could probably present one witness if

13   the case were the right type of case and the witness was the

14   right type of witness and we may be able to prove, we may be

15   able to prove to you beyond a reasonable doubt that she is

16   guilty beyond a reasonable doubt, correct?

17                    DAVID P. RATCLIFFE:  Yes.

18                    ATTY. BECKER:  And one of the examples I

19   give is, and it's kind of a silly example, but it's a rainy

20   day today and let's say there's a traffic accident at 12:00

21   noon.  There was an accident at Park Avenue and High Street at

22   12:00 noon and a guy was coming up Park Avenue and he blew the

23   stop light or the traffic light at Market and he continued

1   through and he hit a car that was traveling east and west on

2   High Street.

3         He went through the red light here at Park Avenue and

4   High, clearly he's at fault, and Mr. Bailey and I present to

5   you one witness that charges the defendant has run a red light

6   here in the City of Warren.  And the one witness we present to

7   you is, let's say, a minister from the local Christian Church

8   here who every day, his testimony would be, that he walks

9   around the six or seven block radius around courthouse square,

10  and he's been doing it for 10 years.  He's got 20/20 vision.

11  He's done this so off that he's very familiar with the drivers

12  here in the City of Warren and he knows a lot of times people

13  aren't paying attention in downtown traffic, they might be

14  window shopping or maybe they're mad because they had to pay a

15  ticket down at municipal court or they're mad because they are

16  getting their divorce papers here at the common pleas

17  courthouse, or whatever it is, so sometimes they don't pay

18  attention.

19        And his testimony is, "On the day in question I was

20  out.  It was about 12:00 noon and I was standing at the corner

21  and there was a red light on High Street, and all of a sudden

22  the light turned green and I saw the flashing light come on

23  and it went -- it said 'walk', in white letters it said

1    'walk'.  But I know because I've been downtown Warren for 10

2    years that sometimes people blow these traffic lights, they're

3    not paying attention, so I looked to my left, to the north on

4    Park Avenue.  Didn't see anything coming.  I looked to the

5    right and I see this guy barrel through the intersection at

6    Park and Market and he came right through the red light at

7    Park and High.  He hit this poor guy that was traveling from

8    the east and going west on High Street."  That one witness is

9    probably credible enough for you to prove our case that the

10   defendant ran a red light, correct?

11                    DAVID P. RATCLIFFE:  Probably.

12                    ATTY. BECKER:  All right.  Now let's look

13   at it a different way.  Let's assume we have the same set of

14   facts but it's now 12:00 midnight.  The power is out because a

15   thunderstorm has run through Warren.  No, let's not use that.

16        It's 12:00 midnight, it's raining very heavily,

17   visibility is very low, and we have three guys that were

18   drinking at Madigan's bar, which is down at the other end of

19   High Street, and they've been there since 5:00 o'clock in the

20   afternoon.  They got off of work, they immediately went down,

21   they all got their paychecks.  They've blown their whole

22   paychecks at Madigan's.  They got thrown out because they

23   wouldn't get credit from the bartender.  They got in a fight

1    as they were going out and the bouncer, the bouncer popped all

2    three of them in the face.  The one guy had glasses; they were

3    broken.  He didn't even have them.  The other guy had

4    contacts; they had fallen out.  And the third guy, he didn't

5    even bring his glasses because he just likes to drink, so as

6    long as he can reach his beer.  He can't see more than five

7    feet in front of him.  They're down here at this intersection.

8            They've all been drinking 12 to 15 beers.  They've

9    all been in a fist fight.  The one guy's eye is swollen shut

10    from the fight.  The other two have lost their glasses and

11    contacts.  And now they say, "Listen, we see this guy barrel

12    through this intersection."  And it just so happens that he's

13    the bouncer's brother and the guy that got hit, the victim in

14    the case, is a guy that's their cousin who was coming down to

15    pick them up from the bar from drinking all night.  You would

16    probably have some questions about their testimony and we

17    would probably have a hard time proving our case to you,

18    right?

19                   DAVID P. RATCLIFFE:  Yes.

20                   ATTY. BECKER:  All right.  Those are the

21    type of things that you will have to do as a juror.  You will

22    have to evaluate evidence, you will have to test the

23    credibility of witnesses, you'll have to see who has bias and

1   motive and interest in the case, if any.  And you believe that

2   you will be able to do those types of things if you're

3   selected as a juror in this case, correct?

4                    DAVID P. RATCLIFFE:  Yes.

5                    ATTY. BECKER:  All right.  Now, in both

6   phases of this case and sort of hand in hand with that is what

7   we call the concept of reasonable doubt.  And I don't know,

8   again I'm assuming that's a concept you've heard on television

9   or perhaps read in the newspaper or in a novel or seen in a

10  movie or something like that.  I'm assuming you've heard that

11  term?

12                   DAVID P. RATCLIFFE:  Yes.

13                   ATTY. BECKER:  And the Court is going to

14  instruct you what reasonable doubt is at the end of this case

15  and you will get your instructions at the end of this case as

16  to what the law is and how you are to apply that law to the

17  facts of this case that you will be hearing over the next few

18  weeks, but the Court is not going to tell you that reasonable

19  doubt is 70, 80, 90 percent; if you believe 90 percent of the

20  State's case you can find her guilty.  The Court is going to

21  tell you that reasonable doubt is a doubt based on reason and

22  common sense.

23                   Now, reason and common sense and reasonable doubt was

 1   explained to me one time by a law professor sort of like a
 2   glass of water, and if you take a glass of water, maybe a
 3   coffee mug, and you fill it up pretty close to the top, maybe
 4   an inch, quarter of an inch from the top, that's probably
 5   reasonable doubt.  But because reasonable doubt can't be
 6   quantified we have to rely on what each individual juror
 7   determines reasonable doubt is because everybody has different
 8   standards of reason and common sense.  Some people may say,
 9   "Hey, it's not very reasonable to wear shorts when it's 70
10   degrees."  Somebody else may say, "Hey, I think it's very
11   reasonable.  If it hits 70 degrees I'm wearing shorts."

12            I know you have some children and you've probably
13   seen some children or kids, maybe some parents say, "Hey,
14   listen, when my kid turns eight years old I'm not going to let
15   him wear a helmet anymore, he doesn't have to wear a helmet
16   when he rides a bike."  Other parents may want their kids to
17   go to 10 or 11 and wear a helmet.  Some may say it's a good
18   idea to wear one even as an adult.  So everybody has different
19   standards.

20            My question to you is, and the only reason I ask this
21   is because in your questionnaire you mention the term when you
22   were talking about the death penalty, you actually mentioned--
23                    ATTY. INGRAM:  Indisputable.

1          ATTY. BECKER:  Indisputable evidence.

2   Thank you.  Sometimes I'm losing my mind I think.  You

3   understand that there's no such concept and there will be no

4   such concept in this court as indisputable?  That's sort of

5   like all doubt.  Mr. Bailey and I probably can't prove

6   anything to you beyond all doubt.

7          I'm standing before you here with a wedding ring on.

8   I could probably produce pictures of my wife and my kids.  My

9   wife could probably come down here in a matter of 20 minutes

10  or so, however long it takes to get from Cortland to here, and

11  get the kids down here, and I could say, "Hi, dear," and, you

12  know, my kids could wave at me and say, "Hi, daddy," and that

13  would probably be proof beyond a reasonable doubt that I'm

14  married, right?

15          DAVID P. RATCLIFFE:  Probably.

16          ATTY. BECKER:  But I could present to you,

17  maybe I could keep going and present to you a marriage

18  certificate and maybe have her bring our wedding photo album

19  down here.  And maybe even bring the title of the house that

20  shows it in both of our names, and you'll see a ring or her

21  finger.  But there might be some possible or imaginary doubt

22  that boy, maybe he's just putting on a show here.  Maybe they

23  had some big party years ago and she just put on a wedding

```
 1    dress, it might have been a costume party, and maybe those

 2    kids aren't even his.  So you see what I'm saying?  I can't

 3    prove anything to you probably beyond all doubt.

 4                  DAVID P. RATCLIFFE:  I understand that.

 5                  ATTY. BECKER:  All right.  You will not

 6    hold Mr. Bailey and I to a standard of indisputable doubt or

 7    all doubt, will you?

 8                  DAVID P. RATCLIFFE:  No.

 9                  ATTY. BECKER:  All right.  And that goes

10    for both phases because the first trial, trial A, we have to

11    prove her guilt only beyond a reasonable doubt.  And, of

12    course, the second phase, it does involve the potential of the

13    ultimate penalty in the criminal justice system.  Again, it is

14    only reasonable doubt, not indisputable or all or possible or

15    imaginary doubt, correct?

16                  DAVID P. RATCLIFFE:  I understand.

17                  ATTY. BECKER:  All right.  And I guess

18    another way to look at it is you've purchased a home, I'm

19    assuming?

20                  DAVID P. RATCLIFFE:  Yes.

21                  ATTY. BECKER:  Probably one or two or maybe

22    more.  When you purchased a home, I don't know if you

23    necessarily wrote down a list of items that you wanted in the
```

 1    home or needed in the home, but you probably -- I think you

 2    have four children, is that correct?

 3                    DAVID P. RATCLIFFE:   Yes.

 4                    ATTY. BECKER:   You probably needed at least

 5    three or four bedrooms, probably at least two bathrooms, if I

 6    know children or families like that.  You probably wanted

 7    maybe an attached garage.  Maybe you wanted a fireplace,

 8    whether it be gas or wood burning.  You probably wanted good

 9    schools for your children.  You probably wanted an area that

10    was close to work for you or convenient.  And those are the

11    kind of things you went through on the list, correct?  And if

12    you got those things that was probably a good house for you

13    and you probably ended up making your decision and purchasing

14    it, correct?

15                    DAVID P. RATCLIFFE:   Sure.

16                    ATTY. BECKER:   Now, some of the things that

17    may not be on that list but maybe should have been considered

18    were, well, maybe a hurricane will strike the home.  Well, in

19    Ohio that's kind of a silly doubt, isn't it?  Maybe the home

20    is not earthquake proof.  Maybe it needs to be shored up a

21    little bit because, boy, if we get an earthquake here this

22    house is going to collapse.  But that's kind of an imaginary

23    doubt in Ohio, especially in this part of Ohio, correct?  You

1   didn't worry about those types of things I wouldn't think.

2                   DAVID P. RATCLIFFE:  I didn't.

3                   ATTY. BECKER:  All right.  So those are

4   imaginary doubts or possible doubts but they weren't

5   reasonable doubts.  Now, maybe if you lived in California that

6   would be a little bit different consideration, or Seattle.  So

7   you have to separate out what's reasonable and what's not

8   reasonable in every situation, and you'll be able to do that,

9   correct?

10                  DAVID P. RATCLIFFE:  Yes.

11                  ATTY. BECKER:  All right.  Now, this case,

12  because it does involve and it is the most important and

13  serious case that's available under Ohio criminal law, it

14  obviously involves the death of one person because it is a

15  homicide charge.  It also involves the potential death of a

16  second individual because the State, of course, that

17  Mr. Bailey and I represent is asking and going to be asking,

18  if we get to that second phase, for the imposition of the

19  death penalty.  As difficult as it may be, you and your fellow

20  jurors cannot consider sympathy for either side, and let me

21  get into that a little bit further.

22          Robert Fingerhut is the deceased in this case.  You

23  will see some photographs of Mr. Fingerhut that are not

1　　pleasant to look at but they are necessary for you to see and

2　　for us to prove our case.  You will also hear testimony from

3　　the Trumbull County coroner's office detailing injuries that

4　　he suffered and basically the cause and manner of his death.

5　　You may feel sympathetic for him, correct?  He's a fellow

6　　human being --

7　　　　　　　　　　DAVID P. RATCLIFFE:  Sure.

8　　　　　　　　　　ATTY. BECKER:  And his life has ended

9　　tragically --

10　　　　　　　　　　DAVID P. RATCLIFFE:  Sure.

11　　　　　　　　　　ATTY. BECKER:  -- and obviously before his

12　　time.  You wouldn't be the type of juror who would sit in here

13　　and see those kind of photographs and hear that kind of

14　　testimony and then go back to the jury room and say, "Boy, you

15　　know, Mr. Bailey and Mr. Becker proved some things but they

16　　didn't prove to me beyond a reasonable doubt that this

17　　Fingerhut guy was killed.  And they certainly didn't prove to

18　　me beyond a reasonable doubt that Mrs. Roberts had anything to

19　　do with it.  But, boy, I saw this terrible tragedy.  I got to

20　　find her guilty even though they didn't prove her case because

21　　I feel so bad for the guy."  You wouldn't do that, would you?

22　　　　　　　　　　DAVID P. RATCLIFFE:  No.

23　　　　　　　　　　ATTY. BECKER:  And on the other side of the

1    coin, if you're selected as a juror you will be seated in this

2    courtroom 10, 15 feet away from Ms. Roberts for three or four

3    weeks.  You may see her, you may glance at her, you may become

4    familiar with her during the course of this proceeding, and I

5    don't mean in a verbal sense but in seeing her.  If the case

6    were the other way around and Mr. Bailey and I had proved our

7    case beyond a reasonable doubt and had proved that, if we get

8    to that second phase, the death penalty was warranted, you

9    wouldn't shirk from that responsibility because you would say,

10   "Boy, she seems like such a nice lady seated over there.

11   She's been pretty quiet.  I know she interacts with her

12   attorney pretty well.  She doesn't -- she seems pretty

13   harmless to me.  I really feel sorry for her that she's in all

14   this trouble.  And even though they proved some terrible

15   things against her, I just can't find her guilty or I just

16   can't give her the death penalty if we got to that stage"?

17   You wouldn't do that either, would you?

18                    DAVID P. RATCLIFFE:  No, sir.

19                    ATTY. BECKER:  And I know it might be

20   difficult because we get to know people and we get to be

21   familiar with people over time and we're going to be here for

22   maybe two or three weeks.

23                    All right.  This case involves an allegation that

1    Mrs. Roberts is the helper, and the legal term for that is

2    aider and abettor.  And the Court again will explain to you

3    what an aider and abettor is, but Mr. Bailey and I are going

4    to be very up front with you, she is not the shooter in this

5    case.  She is not alleged to be the shooter and the allegation

6    is that she was a helper.  So my question to you is, if we get

7    to that second stage and you find out that she is not the

8    shooter, which we're telling you right now, are you going to

9    discount the option of the death penalty just because she's

10   not the shooter?  Are you going to say, "Well, I know I've got

11   the death penalty as an option, but I just can't give her the

12   death penalty, she wasn't the shooter"?  Even if we proved our

13   case to you beyond a reasonable doubt that the death penalty

14   was warranted, would you say, "Well, I know they proved some

15   reasons why she should get the death penalty, but she's not

16   the shooter, I can't do it"?

17                         DAVID P. RATCLIFFE:  It would still be an

18   option.

19                         ATTY. BECKER:  All right.  And it would

20   still be a fair and equal option on equal footing with all

21   those other life options, correct?

22                         DAVID P. RATCLIFFE:  Yes.

23                         ATTY. BECKER:  Almost all criminal cases,

```
 1    and all civil cases, for that matter -- and speaking of

 2    criminal cases, I believe you -- did you serve on a civil jury

 3    at one point?

 4                      DAVID P. RATCLIFFE:  Yes.

 5                      ATTY. BECKER:  All right.  That was at this

 6    courthouse, correct?

 7                      DAVID P. RATCLIFFE:  Yes.

 8                      ATTY. BECKER:  Do you recall the nature of

 9    the case?

10                      DAVID P. RATCLIFFE:  It was a traffic

11    accident.

12                      ATTY. BECKER:  And a party was injured and

13    they were basically asking for money?

14                      DAVID P. RATCLIFFE:  Yes.

15                      ATTY. BECKER:  Do you remember which judge

16    it was?

17                      DAVID P. RATCLIFFE:  It was Wyatt --

18                      ATTY. BECKER:  McKay?

19                      DAVID P. RATCLIFFE:  -- McKay.

20                      ATTY. BECKER:  Right downstairs?

21                      DAVID P. RATCLIFFE:  Yes.

22                      ATTY. BECKER:  You're probably familiar

23    with Kelly then.
```

```
 1                          DAVID P. RATCLIFFE:  It was a few years
 2     ago.
 3                          COURT REPORTER:  I've been here 10 years.
 4     You look familiar to me.
 5                          DAVID P. RATCLIFFE:  I don't remember.
 6                          COURT REPORTER:  That's all right.
 7                          ATTY. BECKER:  That's all right.
 8                          COURT REPORTER:  We're not that memorable.
 9                          ATTY. BECKER:  Kelly is.  The rest of us
10     sort of blend in like the flags.
11                          COURT REPORTER:  We try to.
12                          ATTY. BECKER:  We try to, right.  What --
13     were you the foreman of that jury?
14                          DAVID P. RATCLIFFE:  Yes, I was.
15                          ATTY. BECKER:  Okay.  I had a feeling you
16     probably were.  You ended up finding in favor of the
17     plaintiff, is that correct?
18                          DAVID P. RATCLIFFE:  Yes.
19                          ATTY. BECKER:  All right.  And you gave
20     them some amount of money?
21                          DAVID P. RATCLIFFE:  That's right.
22                          ATTY. BECKER:  So you're pretty familiar
23     with a lot of I guess general jury duty obligations.  You
```

1   can't speak about the case.  I'm assuming that they tell you

2   in the civil case you can't make up your minds about the case

3   until you go back to begin your deliberations, right?

4                   DAVID P. RATCLIFFE:  Right.

5                   ATTY. BECKER:  So if you hear some terrible

6   things right off the bat about Mrs. Roberts you have to say

7   "Well, okay, there may be more and I have to listen."

8           Now, in that civil case did the defendant, the person

9   you found against, did they present any evidence or testimony,

10  if you recall?

11                  DAVID P. RATCLIFFE:  Yes, I think they did,

12  a few photographs of the vehicle.

13                  ATTY. BECKER:  And you understand in this

14  case, and I want to reiterate again that Ms. Roberts has no

15  such obligation to present to you anything in this case?  The

16  ball is really and it's going to stay in Mr. Bailey and I's

17  court in both these trials, the A portion and the B portion.

18                  DAVID P. RATCLIFFE:  Uh-huh.

19                  ATTY. BECKER:  And so despite the fact

20  you've had some prior jury service, you understand that was a

21  little bit different setting because it was a civil rather

22  than criminal proceeding?

23                  DAVID P. RATCLIFFE:  Yes.

```
 1                    ATTY. BECKER:  All right.  In that case,

 2   and I'm assuming in that case and I know in this case, you had

 3   some circumstantial evidence.  Maybe somebody didn't see

 4   something or actually hear it but there was an inference that

 5   you could make that something had happened.  Does that ring a

 6   bell or not?

 7                    DAVID P. RATCLIFFE:  Yes, there was.

 8                    ATTY. BECKER:  Okay.  And you have no

 9   problem making determinations based upon circumstantial

10   evidence, do you, because obviously you've done that before?

11                    DAVID P. RATCLIFFE:  Right.

12                    ATTY. BECKER:  One of the basic examples

13   that we use because we have to speak to you in terms of just

14   basic and generalities here, one of the basic concepts that we

15   throw out there is let's say you go home tonight and you turn

16   on the television news and you want to know what the weather

17   is going to be because maybe you're going to be off work

18   tomorrow or you got a day planned with the kids or you're

19   going to go fishing or whatever you're going to do, so you go

20   to bed and you want to know what the weather is going to be

21   tomorrow.  And the weatherman comes on whatever channel you

22   watch, 21, 27, 33, the Weather Channel, whatever it is, and

23   they show you a big green line that basically runs from the
```

4445

1   north side of Lake Erie down through Detroit, just on the

2   other side of Toledo, all the way down to Tennessee.

3       And the guy says, "Listen, this line of thunderstorms

4   is moving about 30 miles an hour.  It will be here sometime

5   around 3:00 a.m. tonight.  You know, batten down the hatches

6   because it will be kind of strong, but tomorrow is going to be

7   a real beautiful day.  Once this storm clears through here it

8   will be 70 degrees and sunny."  And you say, "Well, that's

9   pretty good.  It's going to rain tonight, but that will be

10  fine for what I'm going to do tomorrow.  It won't bother me."

11      You turn off the TV before you head down to the

12  bedroom or upstairs to the bedroom, whatever your house is.

13  You look out, make sure your car and your wife's car, the

14  windows are up so if it does rain you're not going to get wet,

15  and you go upstairs.  You're a sound sleeper, you finally get

16  a good night's sleep.  You put in eight hours.  You get up at

17  7:00 o'clock in the morning, you look outside.  The ground is

18  covered with water, the sidewalks are wet, your neighbor's

19  driveway is wet, your street is wet, and there's a little

20  stream of water trickling down the curb there going into the

21  sewer.  You can assume it rained, right?

22                  DAVID P. RATCLIFFE:  Yes.

23                  ATTY. BECKER:  And those are the kind of



```
 1    things that I think maybe you had to do in that civil case,

 2    correct?

 3                         DAVID P. RATCLIFFE:   Yes.

 4                         ATTY. BECKER:   Maybe not the entire case

 5    was built on circumstantial evidence, but some circumstantial

 6    evidence is used in just about anything, correct?

 7                         DAVID P. RATCLIFFE:   (Nods head

 8    affirmatively.)

 9                         ATTY. BECKER:   And you have to be careful

10    sometimes, you would agree, with those inferences.  Let's go

11    back to the same scenario but rather than a solid green line

12    running three or 400 miles from Detroit to Tennessee it's

13    splotches, little blotches of green, and it's hit or miss kind

14    of thunderstorms.  And the guy comes on and says, "Hey, you

15    know, we're going to get hit and miss weather tonight.  Mercer

16    County may get a lot of rain.  Youngstown may get nothing.

17    Niles may get hammered.  It's just all going to depend on

18    which way the wind blows so don't take any chances."

19         You go to bed, turn it off, and you say, "Well, at

20    least it's going to happen tonight, it's not going to

21    interfere with my fishing."  And you get up the next morning

22    at 8:00 o'clock and you look out and your neighbor's driveway

23    is all wet, but you look out in your driveway and your
```

1    driveway is dry, the street is dry, the grass is dry, your car

2    is dry.  And then you look back over to your neighbor's

3    driveway and you see your neighbor coming out with a bucket

4    and there's a sponge in the bucket and he's got his garden

5    hose with him and obviously he's cleaning his car.  So you

6    sometimes have to be careful with those inferences, right?

7                    DAVID P. RATCLIFFE:  Yes.

8                    ATTY. BECKER:  But you'll be able to make

9    those inferences and feel comfortable enough making them,

10    first of all, using some inferences to infer the guilt beyond

11    a reasonable doubt, correct?

12                    DAVID P. RATCLIFFE:  Yes.

13                    ATTY. BECKER:  And you'll be able to make

14    inferences in determining whether or not the death penalty is

15    appropriate, if we get to that stage, correct?

16                    DAVID P. RATCLIFFE:  Yes.

17                    ATTY. BECKER:  Now I want to ask you a

18    question that Mr. Bailey and I sort of ask some of the

19    witnesses here.

20                    ATTY. INGRAM:  Not witnesses.

21                    ATTY. BECKER:  Not witnesses, jurors.

22    We've been here five weeks.  I apologize.

23                    DAVID P. RATCLIFFE:  I appreciate that.

1           ATTY. BECKER:  And we've asked these

2   questions about 30 -- 300 times, 100 times.  You read the

3   newspaper I noticed.  You generally read the sports and

4   something else you read.

5           DAVID P. RATCLIFFE:  Well, the weather, I

6   said the weather, and just general.

7           ATTY. BECKER:  General stuff.  All right.

8   I'm assuming you've heard crazy stories of criminals that,

9   despite their best laid intentions, they foul things up by

10  doing something stupid.  They've gotten caught basically.

11          DAVID P. RATCLIFFE:  Sure.

12          ATTY. BECKER:  I mean, it happens.  We just

13  had a case in the Tribune yesterday I think.  It was a little

14  blurb about the guy who apparently was taking pictures of his

15  children in the nude or something, and of course he takes them

16  to Kmart to get them developed.  You know, he probably went to

17  all the precautions to lock the doors and, you know, make sure

18  his neighbors don't know he's doing this.  And, you know, he

19  certainly didn't want his wife to know or didn't want his

20  neighbors to know or his parents, and he makes sure his wife

21  is gone for the day and he says, "Well, I'll take some

22  sexually explicit pictures of myself."  And I don't know if

23  it's his kids or what it is, but then the dummy goes and takes

 1    those pictures to Kmart like no one is going to see them

 2    there.

 3            Well, then, of course, the guy who develops them at

 4    Kmart says what's this idiot doing?  He calls the police and

 5    now the guy gets caught.  So you agree sometimes or you've

 6    heard the story about sometimes the best laid plans can go

 7    astray?

 8                     DAVID P. RATCLIFFE:  Yes.

 9                     ATTY. BECKER:  And you certainly believe

10    that even if someone plans something out and puts some thought

11    into it, they can make a misstep or a miscalculation on the

12    way and sometimes that's how people end up getting caught,

13    correct?

14                     DAVID P. RATCLIFFE:  Yes.

15                     ATTY. BECKER:  That wouldn't surprise you

16    if that happened in any case?

17                     DAVID P. RATCLIFFE:  It would not.

18                     ATTY. BECKER:  All right.  Is there

19    anything that I've asked you that has raised some concern for

20    you about serving as a potential juror in this case?

21                     DAVID P. RATCLIFFE:  Nothing you've asked.

22                     ATTY. BECKER:  Is there any questions that

23    you have that you want to ask now about your potential service

```
 1    as a juror on this case?

 2                         DAVID P. RATCLIFFE:  Not that I can think

 3    of.

 4                         ATTY. BECKER:  You've been through the

 5    block once before, although it was not --

 6                         DAVID P. RATCLIFFE:  It was different.

 7                         ATTY. BECKER:  Different case, but you

 8    served as a juror before.

 9                         DAVID P. RATCLIFFE:  Yes.

10                         ATTY. BECKER:  You believe that you'll be

11    able to give Ms. Roberts her presumption of innocence

12    throughout this case, correct?

13                         DAVID P. RATCLIFFE:  Yes.

14                         ATTY. BECKER:  And that's at both phases of

15    this trial?

16                         DAVID P. RATCLIFFE:  Yes.

17                         ATTY. BECKER:  You will hold the State to a

18    proof beyond a reasonable doubt but not all doubt, correct?

19                         DAVID P. RATCLIFFE:  Yes.

20                         ATTY. BECKER:  You'll make us fill that cup

21    of coffee up not to the very rim where the next drop spills

22    over the top but to a high enough point where you're

23    comfortable making a decision, correct?
```

1                         DAVID P. RATCLIFFE:  Yes.

2                      ATTY. BECKER:  I believe in the criminal,

3    or the civil case you were in they used a preponderance of the

4    evidence standard, which is just who had more evidence.

5    That's sort of 50 percent plus one more drop.  We have a

6    little bit higher standard.  In fact, we have a lot more

7    higher standard than that, but it's not all the way to the

8    top, correct?

9                         DAVID P. RATCLIFFE:  That's right.

10                     ATTY. BECKER:  You believe that if the

11   facts -- if we get to that second stage and if we're able to

12   prove the case beyond a reasonable doubt at the guilt phase,

13   if we prove to you again beyond a reasonable doubt that the

14   death penalty is warranted, you will fairly consider all four

15   options and you believe that you could sign a verdict calling

16   for the death penalty against Ms. Roberts if the facts

17   warranted it and the law permitted it, correct?

18                        DAVID P. RATCLIFFE:  Yes, sir.

19                     ATTY. BECKER:  All right.  And you don't

20   believe there's any reason why you could not serve as a fair

21   and impartial juror in this case?

22                        DAVID P. RATCLIFFE:  There is not.

23                     ATTY. BECKER:  All right.  Mr. Ratcliffe, I

1   want to thank you very much for this time this afternoon.

2   And, again, I apologize for keeping you here a little bit

3   longer.  Mr. Ingram or Mr. Juhasz will now ask you some

4   questions.  Thank you.

5                    ATTY. INGRAM:  Afternoon, Mr. Ratcliffe.

6   How are you doing up there?

7                    DAVID P. RATCLIFFE:  I'm all right.

8                    ATTY. INGRAM:  Do you require -- do you

9   want a glass of water or anything?

10                   DAVID P. RATCLIFFE:  I'm fine, thank you.

11                   ATTY. INGRAM:  My name is Jerry Ingram,

12  this is John Juhasz, and John and I share the responsibility

13  of representing Donna Roberts, and obviously we take our

14  responsibility here quite seriously.

15                   DAVID P. RATCLIFFE:  Yes.

16                   ATTY. INGRAM:  We feel we should take every

17  reasonable precaution in selecting a fair-minded jury, the

18  same type of jury that you or I would want to determine our

19  cause if we were on trial.  Does that sound fair enough to

20  you?

21                   DAVID P. RATCLIFFE:  It does.

22                   ATTY. INGRAM:  This is the only opportunity

23  we'll have to get to know one another and for you to determine

1  whether you're comfortable sitting on this case.  I am

2  unfortunately by vocation and training a lawyer, which means I

3  have a tendency to monopolize the conversation.  That ill

4  serves this particular dialogue because we're trying to get to

5  know you, so I'm actually going to try to motivate you to talk

6  as often and as much as I can.

7              DAVID P. RATCLIFFE:  Okay.

8              ATTY. INGRAM:  So if there's anything that

9  pops into your mind, there's a question, you want to stop me,

10  you are in control.

11             DAVID P. RATCLIFFE:  Okay.

12             ATTY. INGRAM:  So "Hey, Ingram, stop.  I

13  want to talk about that.  I want to discuss that."

14         This is a lot like a job interview except when you

15  went to the what, equipment company?

16             DAVID P. RATCLIFFE:  Stock Equipment

17  Company.

18             ATTY. INGRAM:  Stock Equipment Company to

19  apply for that job you chose the job you were applying for.

20  Here somebody spun a jury wheel, they reached a hand in,

21  pulled out a number and, lo and behold, we asked you to come

22  here for this interview.  We are interviewing you, however,

23  for one of the most important jobs there is, the job of

1    determining the truth and perhaps deciding the fate of another

2    human being, so my first question to you is how do you feel

3    about being asked to assume that responsibility?

4                    DAVID P. RATCLIFFE:  I think it's a very

5    important responsibility and I don't have any problem with

6    that, while I've never been faced with that before.

7                    ATTY. INGRAM:  Okay.  And I'm going to

8    predict while I'm standing up here asking you questions that

9    I'm going to ask you some hard questions.  And when I say hard

10   questions I don't mean that it's difficult to arrive at the

11   correct response because there, in fact, is no correct

12   response.  When I mean hard questions I'm talking about

13   questions that might ask you to search your mind and your

14   heart a little bit in order to answer.  But I would like you

15   to know that if we changed roles and you took my notebook and

16   asked me some of the same questions I'm going to ask you that

17   I would have a hard time answering these questions, and we all

18   understand that, so if you have to take some time, you have to

19   think, you have to ponder, please feel free to do that.

20                   In a nutshell -- excuse me.  And, by the way, the

21   engine that runs this clunker of a body that I reside in is

22   having a hard time getting started today.  I don't know if

23   it's the weather or whether we've been here so long.  So if I

1    get a little tongue-tied, excuse me, and if at any point in

2    time you don't understand one of my questions, what that means

3    is that I have failed to make myself clear, it's my fault, so

4    stop me and let me know.

5                    DAVID P. RATCLIFFE:  Okay.

6                    ATTY. INGRAM:  In a nutshell this case

7    boils down to the government's allegation that Donna Roberts

8    plotted or conspired with a male companion by the name of Nate

9    Jackson to cause the death of Robert Fingerhut.  Donna and

10   Mr. Fingerhut were divorced but they continued to work with

11   one another at the Greyhound bus stations in Youngstown and

12   Warren and to live with one another in Howland Township.

13   Throughout the course of these proceedings you'll hear the

14   name Nate Jackson and you may very well conclude that

15   Mr. Jackson did what the State says he did.

16                    DAVID P. RATCLIFFE:  Okay.

17                    ATTY. INGRAM:  Donna is charged with being

18   a helper, an accomplice.  You understand that this trial is

19   about the guilt or innocence of one person and one person

20   only?

21                    DAVID P. RATCLIFFE:  Yes.

22                    ATTY. INGRAM:  And that's Donna Roberts.

23                    DAVID P. RATCLIFFE:  Yes.

1    ATTY. INGRAM:  The State alleges that she's

2    an aider and abettor, a helper.  Now it's time for them to

3    prove that and that's what you're here to determine.  Do you

4    see that?

5    DAVID P. RATCLIFFE:  Yes.

6    ATTY. INGRAM:  In support of its allegation

7    that Donna participated in the death of Mr. Fingerhut the

8    State will present to you various letters and tape recorded

9    conversations between Donna and Nate Jackson.  Some of this

10   evidence is sexually explicit in nature, and to be downright

11   candid with you, some of it is offensive.  Even though it's

12   offensive, your job responsibility as a trial juror will

13   require that you sort of rise above that offense and test that

14   evidence to determine whether it ties Donna to this offense.

15   Do you think you're up to that?

16   DAVID P. RATCLIFFE:  Yes, sir.

17   ATTY. INGRAM:  You understand that the

18   allegation here is murder, not loose morality?

19   DAVID P. RATCLIFFE:  That's right.

20   ATTY. INGRAM:  And you and I do not have to

21   discuss publicity at all, am I correct?

22   DAVID P. RATCLIFFE:  That's right.  The

23   only, the only thing, while I said I read the newspaper every

 1    day, the facts are my wife and I work at the same place and we

 2    drive to work every day and she reads the newspaper to me.

 3    And she admits that she read all those articles and never read

 4    it, you know, read it out loud, so.  I do all the driving and

 5    that's the only --

 6                    ATTY. INGRAM:  Okay.  Well, --

 7                    DAVID P. RATCLIFFE:  I'm sorry about this.

 8                    ATTY. INGRAM:  No.  Don't tell my wife that

 9    story because she'd be on me.  My wife is always accusing me

10    of not listening to her.

11                    DAVID P. RATCLIFFE:  Well, that may be part

12    of it as well, but --

13                    ATTY. INGRAM:  All right.  Well, let's talk

14    about your wife for a second.

15                    DAVID P. RATCLIFFE:  Okay.

16                    ATTY. INGRAM:  All of our family members

17    are inquisitive.

18                    DAVID P. RATCLIFFE:  Yes.

19                    ATTY. INGRAM:  They're curious.  They want

20    to share our experiences.  And it's only natural because

21    you're involved in these proceedings that your wife, your

22    kids, your friends will follow these proceedings a little

23    closer than they ordinarily would.

1           DAVID P. RATCLIFFE:  (Nods head

2     affirmatively.)

3           ATTY. INGRAM:  And they may want to share

4     their thoughts with you or they may want to learn your

5     thoughts.  Like when you come home they may want to know what

6     it was like that day, what happened, or when you walk in the

7     door somebody may, "Oh, man, let me tell you what I think."

8     While that's natural, it can't happen, you understand that?

9           DAVID P. RATCLIFFE:  Yes, I do.

10          ATTY. INGRAM:  You're going to have to do

11    your best to stop and say, "Whoa, everybody, hold up.  I'm a

12    juror here.  I'm not allowed to discuss this with you."  And

13    while that may be a little hard on occasion, I'm sure you're

14    up to that.

15          DAVID P. RATCLIFFE:  Yes.  After our first

16    get-together we had a long talk.

17          ATTY. INGRAM:  One of those husband/wife

18    talks?

19          DAVID P. RATCLIFFE:  Well, it was a family

20    chat so.

21          ATTY. INGRAM:  Okay.  And even you as a

22    juror will be told to keep an open mind until the case is

23    over, and the reason for that is early on -- let's say you're

1    testing a sales protocol and early on in the testing process

2    you sort of made up your mind half way.  That might cause you

3    to reject or not pay close attention to the rest of the

4    testing protocol which might lead you in another direction.

5    Do you see what I mean?

6                      DAVID P. RATCLIFFE:  Yes, I do.

7                      ATTY. INGRAM:  So you have to keep an open

8    mind until this case is absolutely completely over.  And

9    again, that may be a little bit hard, but will you do your

10   best to do that?

11                     DAVID P. RATCLIFFE:  Yes, I will.

12                     ATTY. INGRAM:  Now I have to talk to you

13   about penalty, this penalty issue, but before I do I want to

14   explain to you a concern I have.  You know, we're all up here

15   talking to you about punishments.  The judge talked to you

16   about punishments, the prosecutor talked to you about

17   punishments and I'm now doing the same, and you don't even

18   know if Donna has done anything wrong or not.  To use an old

19   adage, it seems to me a whole heck of a lot like putting the

20   cart before the horse.  You see what I mean by that?

21                     DAVID P. RATCLIFFE:  Yes, I do.

22                     ATTY. INGRAM:  If you think back to the

23   orientation instruction four weeks ago and to the preliminary

1    instructions which you just would have read maybe what, this

2    morning?

3                              DAVID P. RATCLIFFE:  This morning.

4                              ATTY. INGRAM:  Yeah.  Sorry about that.

5    The judge told you these questions are asked of you now and

6    they have nothing to do with Donna's guilt or innocence.

7                              DAVID P. RATCLIFFE:  That's right.

8                              ATTY. INGRAM:  You have a handle on that?

9                              DAVID P. RATCLIFFE:  Yes, I do.

10                             ATTY. INGRAM:  You -- do you wear your

11   seatbelt?

12                             DAVID P. RATCLIFFE:  Yes, I do.

13                             ATTY. INGRAM:  When you buckle that

14   seatbelt do you expect to be involved in an automobile

15   accident?

16                             DAVID P. RATCLIFFE:  No.

17                             ATTY. INGRAM:  You buckle it up just in

18   case, right?

19                             DAVID P. RATCLIFFE:  Yes.

20                             ATTY. INGRAM:  We're asking you these

21   questions just in case, we're not predicting you are going to

22   have to decide this issue.  You see that?

23                             DAVID P. RATCLIFFE:  Right.

1          ATTY. INGRAM:  Your views on capital

2    punishment, you believe in the death penalty but you do not

3    believe that it is a deterrent.

4          DAVID P. RATCLIFFE:  I would say it is not.

5          ATTY. INGRAM:  And let me explain.  I'm not

6    going -- in asking you these questions I am not challenging

7    and I do not intend to criticize your opinions, I simply want

8    to learn what your opinions are.  Can you elaborate on your

9    views on the death penalty a little bit?  And I understand

10   that's a hard thing to do, but give me your best stab at it.

11         DAVID P. RATCLIFFE:  Well, keep in mind I

12   would in general say that the media certainly has shaped some

13   of my opinions, but -- like I could only perceive it, for

14   instance, that there is a war on drugs.  I have no idea

15   firsthand, you know.

16         ATTY. INGRAM:  Right.

17         DAVID P. RATCLIFFE:  I, I live it through

18   them.  Well, anyhow, I would -- ask the question again, if you

19   would?

20         ATTY. INGRAM:  I was sort of asking you if

21   you could elaborate on your views on capital punishment, but

22   let me try, let me see if I can come up with a clearer way of

23   doing it.  We recently in this country have had some renewed

1    debate about whether or not we should have the death penalty.

2    The State of Illinois put a moratorium on executions.  Were

3    you exposed to any of that discussion or debate?

4                    DAVID P. RATCLIFFE:  No.

5                    ATTY. INGRAM:  The Supreme Court of the

6    United States recently decided a case which prohibits the

7    execution of the mentally challenged.  Were you exposed to any

8    of the publicity regarding that opinion?

9                    DAVID P. RATCLIFFE:  No.

10                   ATTY. INGRAM:  Have you ever discussed the

11   death penalty with your wife in relation to any particular

12   case or circumstance?

13                   DAVID P. RATCLIFFE:  Not -- no, not in as

14   far as any specifics, only in general.

15                   ATTY. INGRAM:  Okay.  And when you engage

16   in the general discussion with your wife about the death

17   penalty is she taking one view and you're taking the other

18   view?

19                   DAVID P. RATCLIFFE:  Yes.

20                   ATTY. INGRAM:  Are you for and she's

21   against --

22                   DAVID P. RATCLIFFE:  No.

23                   ATTY. INGRAM:  -- or is it the other way

1   around?

2              DAVID P. RATCLIFFE:  No, we are both for.

3   She is very cut and dried.  She would have answered many

4   questions on the survey much different than I did.

5              ATTY. INGRAM:  And I'm going to make one of

6   these inferences, these leaps in logic, and if I'm absolutely

7   wrong tell me.  I'm trying to save us some time here.  When

8   you say she's cut and dried do you mean she's far more in

9   favor of it?

10             DAVID P. RATCLIFFE:  Well, yes.  For

11  instance, the question regarding should any one crime --

12             ATTY. INGRAM:  Require.

13             DAVID P. RATCLIFFE:  -- require, and I

14  assume that means make the death penalty mandatory.

15             ATTY. INGRAM:  Yes.  Yes, sir.

16             DAVID P. RATCLIFFE:  And she would have

17  answered right off, you know, she answers quickly.

18             ATTY. INGRAM:  And she would have answered

19  yes?

20             DAVID P. RATCLIFFE:  She would have

21  answered yes.

22             ATTY. INGRAM:  Okay.  I'm playing the role

23  of your wife, or you're Phil Henry and you're playing both the

1    role of your wife and yourself.  She has just said that it

2    should be mandatory for, let's say, what crime would she say

3    it should be mandatory?

4                DAVID P. RATCLIFFE:  Well, say murder.

5                 ATTY. INGRAM:  Say murder.

6                 DAVID P. RATCLIFFE:  Yes.

7                 ATTY. INGRAM:  What would your response to

8    your wife be?

9                 DAVID P. RATCLIFFE:  There's no way,

10    there's no way.  It just, it's a -- you know, trying to be --

11    keeping in mind we weren't speaking of any specific case, just

12    in general, I could think of countless reasons why I would not

13    be in favor of the death penalty in those, in those imaginary

14    case instances.

15                 ATTY. INGRAM:  The preliminary instructions

16    that you read downstairs, they were about five or six pages

17    long.

18                 DAVID P. RATCLIFFE:  Yes.

19                 ATTY. INGRAM:  It's actually hard,

20    difficult material, so did you get through it okay?  Do you

21    think you have a handle on the procedure that was outlined in

22    those instructions?

23                 DAVID P. RATCLIFFE:  Yes, I do, yes.

```
 1                          ATTY. INGRAM:  I would like to go to a very

 2    intriguing answer.  It has nothing to do with the death

 3    penalty.

 4                          DAVID P. RATCLIFFE:  Okay.

 5                          ATTY. INGRAM:  You were asked your views

 6    about the most important problems facing the criminal justice

 7    system and, first of all, you set forth that the news media

 8    has shaped your opinion in large part.

 9                          DAVID P. RATCLIFFE:  (Nods head

10    affirmatively.)

11                          ATTY. INGRAM:  Well, listen, they have

12    shaped all of our opinions in large part, haven't they?

13                          DAVID P. RATCLIFFE:  I suspect they have.

14                          ATTY. INGRAM:  You believe that too many

15    guilty criminals get off on technicalities.  Can I ask you

16    what you mean by that?

17                          DAVID P. RATCLIFFE:  Well, my only, my -- I

18    would say a person who, for instance, if evidence that proved

19    the guilt was found by unlawful means, I appreciate that, I

20    appreciate that it was unlawfully, you know, --

21                          ATTY. INGRAM:  Obtained?

22                          DAVID P. RATCLIFFE:  -- obtained.  But, on

23    the other hand, I guess it seems like you're in a quandary
```

1    obviously, and I appreciate that the law probably helps you

2    out with that quandary, but if the person obviously was guilty

3    but was let go because of that, then that's my only instance

4    that comes to mind.

5                        ATTY. INGRAM:    Well, I should probably

6    share with you the fact that the Supreme Court of the United

7    States of America has been in the very same quandary since it

8    decided Mapp versus Ohio what, in the '50s?

9                        ATTY. JUHASZ:    '61.

10                       ATTY. INGRAM:    '61.   And basically they

11   sort of come full circle.   And that's far afield of our

12   discussion, but even the Supreme Court of the United States

13   shares your dilemma with that particular issue and it's

14   something we grapple with every day.

15         I'm going to pour you some just in case you need it.

16   And to be equal, I took a cup from the defense table, the

17   water from the prosecution table, and you're getting them

18   both.

19                       DAVID P. RATCLIFFE:    Thank you.

20                       ATTY. INGRAM:   You're welcome.   "Money is

21   too much of an issue.   As a nation we spend an obscene amount

22   of money on the war against drugs."

23                       DAVID P. RATCLIFFE:    Those were two

```
 1    different thoughts.

 2                    ATTY. INGRAM:  Okay.

 3                    DAVID P. RATCLIFFE:  But --

 4                    ATTY. INGRAM:  Good, I'm glad they are

 5    because I want to focus on the money is too much of an issue

 6    aspect of it.

 7                    DAVID P. RATCLIFFE:  The only thing that

 8    makes me -- like the, I would say, the O.J. Simpson trial,

 9    which I can't say that I paid much attention to, but it just

10    seemed like I would have said I had the feeling that money was

11    a -- it influenced the trial in more than a few ways.  And I

12    don't know that I have those ways, I just feel that that

13    probably was a problem for everyone.

14                    ATTY. INGRAM:  As an aside, do you ever

15    watch A & E?

16                    DAVID P. RATCLIFFE:  Yes.

17                    ATTY. INGRAM:  They have a special

18    sometimes they run on famous trials.  There's a two-hour

19    special they have on the O.J. Simpson trial.  If you ever have

20    the opportunity to watch that take the time and effort to

21    watch it.  In two hours you'll learn more about what happened

22    in that case, how it happened, when it happened than thousands

23    of hours in mass media.
```

1              DAVID P. RATCLIFFE:  Uh-huh.

2              ATTY. INGRAM:  So basically the rich

3    sometimes get better justice than those that can't afford high

4    priced lawyers?

5              DAVID P. RATCLIFFE:  I'm not sure that the

6    lawyer is the only point maybe, but I, that's --

7              ATTY. INGRAM:  Investigators, forensic

8    people?

9              DAVID P. RATCLIFFE:  Yes, yes, yes, yes.

10             ATTY. INGRAM:  And "Jails do little to

11   rehabilitate."  Well, wait.  No, no, that's a good answer.

12   Would you change jails so that we emphasize, encourage

13   rehabilitation?

14             DAVID P. RATCLIFFE:  I think that -- I

15   don't know how you could do that.  You can barely teach good

16   kids in school so I suspect it's a -- obviously it's a

17   problem.

18             ATTY. INGRAM:  Well, the Japanese have a

19   theory and I'm going to tell you what I understand their

20   theory to be and then you tell me if you agree with it.  When

21   you go to prison in Japan you go for "X" amount of time.  I

22   don't know what the amount of time is but you go for "X"

23   number of years.  If you get a high school diploma while

1    you're there you get so much time off.  If you get college

2    credits you get so much time off.  You learn a trade you get

3    so much time off.  They encourage education while you are

4    incarcerated.  Is that one of the things you think would be a

5    good idea?

6                        DAVID P. RATCLIFFE:  Sure.  I would think

7    that is a positive thing.

8                        ATTY. INGRAM:  We have a crime problem

9    underfoot in this country.  People have different opinions on

10   how severe it is, but do you have any idea what we, and by

11   "we" I mean society as a whole, might be able to do to at

12   least begin addressing that crime problem?

13                       DAVID P. RATCLIFFE:  I guess I would have a

14   few opinions but they're mostly related to like the economy

15   and if the person had a chance for a good job as --

16                       ATTY. INGRAM:  Keep coming with that.

17                       DAVID P. RATCLIFFE:  Well, I think that

18   it's a lot of -- I would -- I have never lived in a crime

19   area, I've never almost been associated with any crimes, and

20   so I would believe that, probably again from the media, that a

21   lot of people were not, they either got off to a bad start or

22   they never were -- you know, you look through the want ads now

23   and you have to feel for good young people let alone bad

1  young, you know, people who haven't had a good upbringing.  I

2  don't mean bad, I mean that they just haven't had perhaps the

3  opportunities the other kids have had.  I mean, some kids

4  have, I would unfortunately believe, that -- I grew up in

5  Solon and the kids from Solon have a greater chance of success

6  than kids who grew up in Cleveland.  I just -- and I -- it's a

7  very complex thing, I'm positive of that, but the

8  opportunities for the kids from Solon are also.  Maybe it's

9  not right but it is, that's how it is.

10                 ATTY. INGRAM:  Well, isn't that also

11  another way of saying education because part --

12                 DAVID P. RATCLIFFE:  Sure, for sure.

13                 ATTY. INGRAM:  Part, you get opportunities

14  because of economic development, but another part of it is if

15  you don't get educated you don't have the opportunities.

16                 DAVID P. RATCLIFFE:  That's right.

17                 ATTY. INGRAM:  Have you ever donated any

18  time, money or services to a political campaign or issue?

19                 DAVID P. RATCLIFFE:  Minimal.  I mean, I do

20  it on my tax returns but that's --

21                 ATTY. INGRAM:  To the democratic or

22  republican party, whatever?

23                 DAVID P. RATCLIFFE:  Yeah, yes.

1                    ATTY. INGRAM:  Okay.  And listen, I'm going

2      to try to go fast here.

3                    DAVID P. RATCLIFFE:  Okay.

4                    ATTY. INGRAM:  If I go too fast, stop me.

5      Do you belong to any group or organization which is active in

6      any political matter?

7                    DAVID P. RATCLIFFE:  No.

8                    ATTY. INGRAM:  In the last five years or so

9      have you signed a petition on any public issue?

10                    DAVID P. RATCLIFFE:  No.

11                    ATTY. INGRAM:  Do you belong or associate

12      with any group which has crime prevention or law enforcement

13      as a goal?

14                    DAVID P. RATCLIFFE:  No.

15                    ATTY. INGRAM:  You talked with Mr. Becker

16      about sympathy.  I think we can take care of sympathy in about

17      30 seconds.  This is a court of law, not a court of sympathy.

18                    DAVID P. RATCLIFFE:  That's right.

19                    ATTY. INGRAM:  We don't want you to let

20      sympathy for Donna effect your evaluation of the evidence, and

21      that sounds fair, doesn't it?

22                    DAVID P. RATCLIFFE:  Yes, it does.

23                    ATTY. INGRAM:  There's a flip side.

1    There's a victim.  It's only natural to feel sympathy for

2    Mr. Fingerhut.  Sympathy for Mr. Fingerhut also should not

3    affect your evaluation of the evidence.  Does that sound fair?

4                     DAVID P. RATCLIFFE:  That sounds fair.

5                     ATTY. INGRAM:  Some of these things,

6    however, are easier said than done.  You're going to see some

7    of that evidence which Mr. Becker described for you, crime

8    scene photographs, coroner's photographs, coroner testimony.

9    Some of this evidence may elicit an emotional response from

10   you, maybe sympathy or maybe anger, how could someone do that?

11   Again, you have to rise above the emotional reaction to test

12   the evidence.  Are you up to that?

13                     DAVID P. RATCLIFFE:  Yes.

14                     ATTY. INGRAM:  Mr. Becker spoke with you

15   about the presumption of innocence and I want to approach that

16   a little differently.  About 225 years ago our forefathers,

17   and I know I sound like a civics teacher here and for that I

18   -- well, I would apologize except for the fact that I feel

19   very strongly about what I'm talking about, so no, I'm not

20   going to apologize.  Our forefathers declared independence and

21   fought and died so that we could be free.  They then wrote

22   laws not only to protect their freedoms but to protect freedom

23   for their posterity.  They wrote laws that curbed or

1    restricted governmental power, and if you want to curb

2    governmental power you create a presumption of innocence.  If

3    you want to promote governmental authority or if you want to

4    have an Iatola dictatorship you create a presumption of guilt.

5                    DAVID P. RATCLIFFE:  Okay.

6                    ATTY. INGRAM:  Does that make sense to you?

7                    DAVID P. RATCLIFFE:  Yes, it does.

8                    ATTY. INGRAM:  How do you personally feel

9    about the rule of law that requires a trial juror presume the

10   defendant not guilty?

11                   DAVID P. RATCLIFFE:  I think that sounds

12   fair to me.

13                   ATTY. INGRAM:  When your kids were young,

14   if one of them were accused by the neighbor of some type of

15   wrongdoing, let's say throwing an egg or a roll of toilet

16   paper, and you felt in your mind and your heart that your kid

17   didn't do it, you would require evidence from the neighbor

18   that the child did it before you would be willing to change

19   your mind, wouldn't you?

20                   DAVID P. RATCLIFFE:  Yes.  I would probably

21   inquire with my child as well.

22                   ATTY. INGRAM:  And we'll come to that.

23                   DAVID P. RATCLIFFE:  Okay.

1          ATTY. INGRAM:  But you would require

2    evidence that they did it before you would be willing to

3    change your mind?

4                    DAVID P. RATCLIFFE:  Yes.

5                    ATTY. INGRAM:  And when the neighbor came

6    over and gave you evidence you probably just wouldn't accept

7    it willy-nilly, at face value, you would look at it with a

8    critical eye to make sure it really tied the kid to what he

9    was supposed to have done wrong.

10                   DAVID P. RATCLIFFE:  Yes.

11                   ATTY. INGRAM:  Will you do that in this

12   case?

13                   DAVID P. RATCLIFFE:  Yes.

14                   ATTY. INGRAM:  Now, the State has leveled

15   these accusations and basically it's time for them to put up

16   or shut up.  They've got the only burden of proof.  And,

17   again, going back to our forefathers, if you want to promote

18   governmental authority you would what?  You would make the

19   defendant prove that he was innocent.  That's not the way we

20   do things.

21                   DAVID P. RATCLIFFE:  That's right.

22                   ATTY. INGRAM:  And that's okay with you?

23                   DAVID P. RATCLIFFE:  That's right.

```
 1                         ATTY. INGRAM:  And you understand that

 2     Donna is on trial for murder?

 3                         DAVID P. RATCLIFFE:  I think that --

 4                         ATTY. INGRAM:  Yeah, it was a poor

 5     question, wasn't it?  Go ahead.  I'm sorry.

 6                         DAVID P. RATCLIFFE:  Well, you have to make

 7     them prove that they're guilty.  I'm not sure how you -- it

 8     sounded, something sounded weird, but --

 9                         ATTY. INGRAM:  The burden is on the State.

10                         DAVID P. RATCLIFFE:  Yes.

11                         ATTY. INGRAM:  To prove beyond a reasonable

12     doubt the defendant's guilt.

13                         DAVID P. RATCLIFFE:  Yes.

14                         ATTY. INGRAM:  And you'll hold them to that

15     burden?

16                         DAVID P. RATCLIFFE:  Yes.

17                         ATTY. INGRAM:  And you understand that's

18     the burden of proving that Donna was involved in a murder, not

19     a burden of proving that she's a woman of loose moral

20     character?

21                         DAVID P. RATCLIFFE:  That's right.

22                         ATTY. INGRAM:  Because of all of that, the

23     presumption of innocence, the burden of proof, Donna doesn't
```

1    have to testify, and if she elects not to testify the judge is
2    going to tell you you can't hold it against her.  Now, here --
3    I promised you we would go back to your kids.  Here is where
4    we go back.  When those kids were in some type of a jam or
5    when there was a dispute between two of them your normal
6    customary reaction is sit down and let me get both sides of
7    the story.  Your oath as a juror may require you to put aside
8    that natural inclination.

9                      DAVID P. RATCLIFFE:  Okay.

10                     ATTY. INGRAM:  You think you can do that?

11                     DAVID P. RATCLIFFE:  Yes.

12                     ATTY. INGRAM:  The other side of that coin
13   is if Donna does testify she's a witness just like any other
14   witness, and what I mean by that is the judge will tell you
15   you have to use the same standards for determining her
16   believability as you use in determining the believability of
17   the other witnesses.  And let me give you an example.  She's
18   the defendant here, right?  That obviously gives her an
19   interest or a stake in the outcome of these proceedings, and
20   certainly that's something that you would want to keep in
21   mind, isn't it?

22                     DAVID P. RATCLIFFE:  Sure.

23                     ATTY. INGRAM:  Because she would have

1  something to gain.

2                    DAVID P. RATCLIFFE:   Sure.

3                    ATTY. INGRAM:   If you found that another

4  witness had something to gain, to be fair about it you would

5  have to consider that with the other witness as well.  Do you

6  see what I mean?

7                    DAVID P. RATCLIFFE:   Yes, I do.

8                    ATTY. INGRAM:   The judge is going to give

9  you a whole list of factors that you can, that you should

10  apply to every witness that testifies.  It's a long list.

11  It's his job.  I don't want to step on his job

12  responsibilities, but you should take all of those factors and

13  apply them to everyone that testifies.

14        He's going to give you one factor, though, that we do

15  have to talk about.  It's called the test of truthfulness that

16  you employ in your daily life.  And over the years, whether

17  you are on a sales call, in a sales meeting, you frequently

18  have to determine at some point in time whether someone is

19  being straight with you or trying to hoodwink you, and over

20  the years you've developed an almost intuitive or a sixth

21  sense that helps you make those determinations.  It's

22  different for all of us.  I don't know what yours is, but do

23  you see what I'm getting at?

1          DAVID P. RATCLIFFE:  Yes.

2          ATTY. INGRAM:  The judge is going to tell

3   you you should bring that sixth sense or that intuitive sense

4   into the courtroom with you and apply it to everybody that

5   testifies.  Will you do that?

6          DAVID P. RATCLIFFE:  Yes.

7          ATTY. INGRAM:  Mr. Becker talked to you

8   about proof beyond a reasonable doubt and he used a glass.  We

9   can agree that reasonable doubt would obviously be based on

10  reason and common sense.  The judge will give you a definition

11  and he'll tell you that proof beyond a reasonable doubt

12  requires that you be firmly convinced and is proof of such

13  character that you would be willing to rely and act upon it in

14  the most important of your own affairs.  And when you were

15  talking with Mr. Becker you and he discussed buying a house?

16          DAVID P. RATCLIFFE:  (Nods head

17  affirmatively.)

18          ATTY. INGRAM:  And you had all of the

19  positives on the left-hand side of the page, the bedrooms, the

20  bathrooms, et cetera, et cetera, et cetera.  And, by the way,

21  we did have an earthquake in Ohio about two or three years

22  ago.

23          DAVID P. RATCLIFFE:  Uh-huh.

4479

1           ATTY. INGRAM:   I'm buying a house and I got

2    all those positives, but the house I want to buy is 50 years

3    old and it has a plumbing problem and it costs a little more

4    money on a monthly basis than I think I can afford, so I got

5    three negatives.  And if I'm going to investigate making the

6    right decision I'm going to try to eliminate those negatives,

7    aren't I?

8                     DAVID P. RATCLIFFE:   Yes.

9           ATTY. INGRAM:   And I can, I can investigate

10   those.  I call a contractor and I write in my purchase

11   agreement I want an inspection, so I get an inspection and my

12   contractor says that house is brick solid, go ahead and buy

13   it.  I can strike that.  I call a plumber.  "Jerry, I see what

14   you mean about these plumbing problems, but it's a couple

15   hundred dollars, I can fix it."  I can strike that.  So now

16   I'm down to whether or not I can afford the mortgage payment.

17          I go to the bank, I say, "Please, instead of 15 years

18   make this a 20 year loan so I don't have to come up with this

19   much money every month."  "No, we'll only give it to you for

20   15."

21          "Well, will you reduce the interest rate so I don't

22   have to come up with this much every month?"  "No."

23          I try to get a raise.  I can't get a raise.  No

1    matter how hard I think about it I still don't know in my mind
2    whether I can come up with that amount of money month in,
3    month out, every month, so I still have one reasonable
4    negative.  Are you with me?
5                      DAVID P. RATCLIFFE:  Yes.
6                      ATTY. INGRAM:  As long as there's one
7    reasonable negative on the right-hand side of that column I
8    cannot say beyond a reasonable doubt that that decision is the
9    right thing for me.  Do you see that?
10                     DAVID P. RATCLIFFE:  Sure.  Yeah, it's a --
11                     ATTY. INGRAM:  Well, let --
12                     DAVID P. RATCLIFFE:  Well, you're -- the
13   point that's deciding it for you is can you afford it or not.
14                     ATTY. INGRAM:  Right.
15                     DAVID P. RATCLIFFE:  And so it's a -- if it
16   was something else I would -- I mean, you're talking about
17   something that says you can't even make the payments.
18                     ATTY. INGRAM:  Okay.  Well, I can -- let's
19   say that I go to my boss and my boss gives me a raise and I
20   can afford that payment, but my contractor instead of telling
21   me that that house is brick solid tells me that I might have
22   foundation problems down the lot and my concern about the
23   stability of the house remains reasonable in my mind.  As long

4481

1   as there's one doubt on the right-hand side of that column

2   that is reasonable in my mind I cannot say beyond a reasonable

3   doubt that that decision is the right decision for me.

4                   DAVID P. RATCLIFFE:  I understand that.

5                   ATTY. INGRAM:  Now, I can use other

6   standards, but if I'm using a reasonable doubt standard for

7   making that decision, if there's one reasonable doubt I cannot

8   say that the decision is the right thing for me.  So let's

9   translate that to this case.  Do you see that if you have a

10  single solitary doubt as to the defendant's guilt, one

11  reasonable doubt, the State has not met its burden?

12                  DAVID P. RATCLIFFE:  No.

13                  ATTY. INGRAM:  You don't agree with that?

14                  DAVID P. RATCLIFFE:  No.

15                  ATTY. INGRAM:  Okay.  The State has the

16  burden of proof here beyond a reasonable doubt.

17                  DAVID P. RATCLIFFE:  Yes.

18                  ATTY. INGRAM:  If after carefully

19  considering and weighing the evidence you find that you have

20  -- you can find that you have reasonable doubts, but if you

21  find that you have one reasonable doubt, they have not met

22  their burden of proof.

23                  DAVID P. RATCLIFFE:  I'm not sure what you

1    just said.

2                    ATTY. INGRAM:  Okay.  The State has to

3    convince you, firmly convince you beyond a reasonable doubt.

4                    DAVID P. RATCLIFFE:  Yes.

5                    ATTY. INGRAM:  If after the case is all

6    done you in your mind carefully weigh and examine all of the

7    evidence and you are left with, we're going to narrow it down

8    to one, one doubt that is based on reason and common sense, in

9    that case the State of Ohio has not met its burden of proof.

10                    DAVID P. RATCLIFFE:  I don't know that I --

11   the way -- if the glass is not full I could be, have, be

12   beyond a reasonable doubt and yet still have a doubt.

13                    ATTY. INGRAM:  No.  Maybe I'm confusing you

14   and I probably am.  Let's go back to the glass.  You were a

15   juror in a civil case where the burden of proof was by a

16   preponderance of the evidence.

17                    DAVID P. RATCLIFFE:  Yes.

18                    ATTY. INGRAM:  And that's simply the

19   greater weight.  That's one drop of liquid or one grain of

20   sand over half.

21                    DAVID P. RATCLIFFE:  Okay.

22                    ATTY. INGRAM:  That's the lowest burden of

23   proof that we have in the court of law.  Did you know that?

1                             DAVID P. RATCLIFFE:  I didn't know that.

2                             ATTY. INGRAM:  That's the lowest we have.

3                             DAVID P. RATCLIFFE:  Makes sense.

4                             ATTY. INGRAM:  There's another burden

5      called clear and convincing which is higher.

6                             DAVID P. RATCLIFFE:  Okay.

7                             ATTY. INGRAM:  And then the highest burden

8      of proof we have in this country is beyond a reasonable doubt.

9      It requires that you be firmly convinced and that you would

10     rely and act upon it in the most important of your own

11     affairs.  It's close to the top of that glass, but where you

12     would draw that line is up to you.

13                            DAVID P. RATCLIFFE:  Yes.

14                            ATTY. INGRAM:  But that line has to be

15     above all reasonable doubt.

16                            DAVID P. RATCLIFFE:  Yes.

17                            ATTY. INGRAM:  If after considering and

18     examining the evidence you have a reasonable doubt, it's not

19     up to that line wherever you have drawn the line.

20                            DAVID P. RATCLIFFE:  Okay.

21                            ATTY. INGRAM:  You got me?

22                            DAVID P. RATCLIFFE:  Yes.

23                            ATTY. INGRAM:  And will you hold the State

 1    to that burden in this case?

 2                      DAVID P. RATCLIFFE:  Yes.

 3                      ATTY. INGRAM:  And you understand that if

 4    we ever get to a second phase the State has the burden of

 5    proving the appropriate penalty beyond a reasonable doubt?

 6                      DAVID P. RATCLIFFE:  Yes.

 7                      ATTY. INGRAM:  And you certainly know what

 8    circumstantial evidence is?

 9                      DAVID P. RATCLIFFE:  (Nods head

10    affirmatively.)

11                      ATTY. INGRAM:  And Mr. Becker asked you if

12    you'll make an inference here or an inference there.  Do you

13    recall that?

14                      DAVID P. RATCLIFFE:  Yes.

15                      ATTY. INGRAM:  Whether you make an

16    inference, he can ask you, we can ask you; no one, including

17    the judge, can tell you to make an inference because that's

18    your job and your job alone.  Do you understand that?

19                      DAVID P. RATCLIFFE:  Yes.

20                      ATTY. INGRAM:  And you certainly wouldn't

21    make an inference that is not reasonable, would you?

22                      DAVID P. RATCLIFFE:  No.

23                      ATTY. INGRAM:  And would you agree with me

```
 1    that circumstantial evidence is like a chain and it's only

 2    going to be as strong as its weakest link?

 3                          DAVID P. RATCLIFFE:  Sure.

 4                          ATTY. INGRAM:  I'm done.  We've been up

 5    here quite a long time.  Has anything popped into your mind

 6    that you would like to discuss with any of us?

 7                          DAVID P. RATCLIFFE:  Nothing that I can

 8    think of.

 9                          ATTY. INGRAM:  I thank you for your time

10    and attention.

11                          DAVID P. RATCLIFFE:  Thank you.

12                          ATTY. INGRAM:  Your Honor, can I ask the

13    left and right question?  I forgot.  Hey, when we were here on

14    April 8th.

15                          DAVID P. RATCLIFFE:  Yes.

16                          ATTY. INGRAM:  We were down at the other

17    end of the hall.

18                          DAVID P. RATCLIFFE:  Yes.

19                          ATTY. INGRAM:  When you went in that

20    courtroom did you go to your left or to your right?

21                          DAVID P. RATCLIFFE:  I went to my left.

22                          ATTY. INGRAM:  Were you seated, did you

23    find a seat, or did you have to stand?
```

```
 1                        DAVID P. RATCLIFFE:  I stood.

 2                        ATTY. INGRAM:  Did anybody try to engage

 3   you in conversation that day about this case?

 4                        DAVID P. RATCLIFFE:  No.

 5                        ATTY. INGRAM:  Did you hear anyone else

 6   talking about the case?

 7                        DAVID P. RATCLIFFE:  No.

 8                        ATTY. INGRAM:  Okay.  Thanks a lot.  Have a

 9   nice night.

10                        THE COURT:  Side bar?

11                        ATTY. INGRAM:  No.

12                        ATTY. BAILEY:  I don't think we need one.

13   The State would pass for cause.

14                        THE COURT:  Okay, fine.  Thank you.  For

15   the record, both sides have passed.  You will be in this pool

16   from which the jury will be seated.

17                        DAVID P. RATCLIFFE:  Okay.

18                        THE COURT:  And it's our intention to have

19   everyone come in tomorrow at 2:00 o'clock --

20                        DAVID P. RATCLIFFE:  Okay.

21                        THE COURT:  -- to see if we have enough to

22   pick the jury.

23                        DAVID P. RATCLIFFE:  Okay.
```

```
 1                      THE COURT:  Hopefully we will.  Stop and
 2    see Connie on the way down there before you leave.
 3                      DAVID P. RATCLIFFE:  Connie is?
 4                      COURT REPORTER:  Down at the jury
 5    commissioner's office.
 6                      THE COURT:  Downstairs, yeah.  Okay.  Thank
 7    you for your time.  You're not to discuss anything or talk to
 8    anyone, you understand?
 9                      DAVID P. RATCLIFFE:  Yes.
10                      THE COURT:  Or read anything.
11                      DAVID P. RATCLIFFE:  Yes.
12                      THE COURT:  Okay.  Thank you.
13                      (Whereupon, David P. Ratcliffe was added to
14    the pool of prospective jurors and excused for the day, after
15    which Court was recessed for the evening.)
16                               *   *   *
17                          SEE VOLUME XXI
18
19
20
21
22
23
```

1
2
3
4
5                         REPORTER'S CERTIFICATE
6
7        This is to certify the foregoing represents a true and
8    correct copy of the proceedings had in the aforementioned
9    cause as reflected by the stenotype notes taken by me on the
10   same.
11
12
13
14
15   _____
16   KELLY J. WILSON
     Official Court Reporter
17
18
19
20
21
22
23