IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,              )     Case No. 2001-CR-793
                        )
       Plaintiff      )
                        )
-vs-                 )     JUDGE JOHN M. STUARD
                        )
DONNA M. ROBERTS,      )
                        )      **PARTIAL**
       Defendant      ) **TRANSCRIPT OF PROCEEDINGS**

***VOLUME XXI***

**JURY TRIAL - VOIR DIRE**
**MAY 8, 2003**

BEFORE:         HONORABLE JOHN M. STUARD

AT:              Trumbull Co. Court of Common Pleas
                  Courtroom Number 2
                  160 High Street, NW
                  Warren, Ohio 44481

APPEARANCES:

On behalf of the Plaintiff:
    MESSRS. KENNETH N. BAILEY
    and CHRISTOPHER D. BECKER,
    Attorneys at Law

On behalf of the Defendant:
    MESSRS. J. GERALD INGRAM
    and JOHN B. JUHASZ,
    Attorneys at Law

Official Court Reporter:  Kelly J. Wilson

1

*INDEX FOR VOLUME XXI*

MAY 8, 2003

2

*INDIVIDUAL VOIR DIRE*

PROSPECTIVE JUROR MICHAEL ARCURI..................... 4490:7

3

PROSPECTIVE JUROR W. JEAN ROWLEY..................... 4496:3

PROSPECTIVE JUROR TILGHMAN GRAY...................... 4499:1

4

PROSPECTIVE JUROR RICHARD CARAWAY................... 4501:11

PROSPECTIVE JUROR MAXINE HOWARD..................... 4503:3

5

PROSPECTIVE JUROR GEORGE DERMER..................... 4504:6

PROSPECTIVE JUROR KAREN TIPTON...................... 4505:8

6

PROSPECTIVE JUROR BRAD SEELBACK.................... 4506:14

PROSPECTIVE JUROR THOMAS CARMICHAEL................ 4507:17

7

PROSPECTIVE JUROR LINDA BLACK....................... 4511:8

PROSPECTIVE JUROR PANDA HEATHERLY-LANTZ............ 4513:14

8

PROSPECTIVE JUROR JOHN D. LANAM, SR................ 4514:23

PROSPECTIVE JUROR KEVIN B. PATTERSON................ 4516:2

9

PROSPECTIVE JUROR MARSHA J. DANADIC............... 4517:15

PROSPECTIVE JUROR MOSELLE DICENSO................... 4519:5

10

PROSPECTIVE JUROR THELMA L. RANKIN................ 4524:16

PROSPECTIVE JUROR KASEY S. KELLY.................... 4526:4

11

PROSPECTIVE JUROR MARY J. COSTELLO................. 4527:3

PROSPECTIVE JUROR ROBIN SCHLAEGEL................. 4528:21

12

PROSPECTIVE JUROR GARY S. PHILLIPS................. 4531:2

PROSPECTIVE JUROR NATHAN CROCKER................... 4532:7

13

PROSPECTIVE JUROR CAROL K. SELAK.................. 4533:19

PROSPECTIVE JUROR AMY BARLETT....................... 4535:3

14

PROSPECTIVE JUROR VICTOR V. SABULSKY.............. 4536:12

PROSPECTIVE JUROR JUDITH M. ELLIOTT............... 4537:18

15

PROSPECTIVE JUROR SALINA M. SNYDER................. 4539:4

PROSPECTIVE JUROR MARGARET E. FELLOWS............. 4540:13

16

PROSPECTIVE JUROR MARGARET L. KAY................. 4541:19

PROSPECTIVE JUROR ANDREW KOTWIS.................... 4543:2

17

PROSPECTIVE JUROR MICHAEL E. BLAKE................. 4544:9

PROSPECTIVE JUROR DAVID R. RATCLIFFE.............. 4545:15

18

PROSPECTIVE JUROR TODD DAVIDSON................... 4547:16

PROSPECTIVE JUROR THOMAS A. CARMICHAEL............ 4555:19

19

PROSPECTIVE JUROR LINDA J. BLACK................... 4560:3

PROSPECTIVE JUROR KEVIN B. PATTERSON................ 4563:9

20

PROSPECTIVE JUROR MOSELLE DICENSO................. 4571:22

PROSPECTIVE JUROR ROBIN SCHLAEGEL.................. 4576:7

21

*OBJECTIONS AND MOTIONS*

22

motion for change of venue.......................... 4589:16

23

the State objects................................... 4587:1

your objection is noted............................. 4591:20

1    (MAY 8, 2003)

2                        THE COURT:  We're going to handle

3    Mr. Arcuri first.  Bring him in.

4                        ATTY. INGRAM:  Yes, Your Honor.  And, you

5    know, these are not necessarily for Mr. Arcuri.

6                        THE COURT:  Yeah, I understand.

7              **PROSPECTIVE JUROR MICHAEL ARCURI**

8                        THE COURT:  Michael, have a seat right up

9    here, if you will.  How are you this afternoon?

10                        MICHAEL ARCURI:  I'm not feeling real

11   well.  I don't know, like I've got a lot of stress going on

12   with selling the house and thinking of this and my wife

13   leaving.  I like had a couple minor seizures the last few

14   days and today I'm not feeling real well, like my left side.

15   I sort of get disoriented.

16                        THE COURT:  Okay.  Your medical problems

17   you explained earlier are getting worse?

18                        MICHAEL ARCURI:  Yeah.  I didn't think it

19   would cause me a problem, but I'm afraid that if I do it and

20   then we're here in the middle of it and the stress doesn't

21   subside and then I end up seizing and have to be hospitalized

22   or something.

23                        THE COURT:  So you're not comfortable with

 1  continuing on the --

 2              MICHAEL ARCURI:  Not really.

 3              THE COURT:  -- on this prospective jury?

 4  Does the State have any questions you wish to ask?

 5              ATTY. BAILEY:  No, Your Honor.

 6              ATTY. INGRAM:  No, Your Honor.  No

 7  objection from the defense.

 8              THE COURT:  May I excuse for cause then?

 9              ATTY. INGRAM:  No objection.

10              THE COURT:  You're excused.  We thank you

11  for your time and I wish you well.

12              MICHAEL ARCURI:  I'm sorry about that.

13              THE COURT:  That's okay.  You got to take

14  the situation as it is.  Thank you.

15              MICHAEL ARCURI:  Okay.

16              (Whereupon, Michael Arcuri was dismissed

17  from the pool of prospective jurors for cause.)

18              (Whereupon, a discussion was had off the

19  record.)

20              ATTY. BAILEY:  We're going to lose that

21  first one, Juror No. 4, Rowley.  She's going on vacation June

22  1st and that will be right at the end of the first --

23              ATTY. INGRAM:  She's going to be the first

1    person we talk to.

2                        ATTY. BECKER:  Yeah, but, I mean, we're

3    going to --

4                        ATTY. INGRAM:  Yeah, I know.

5                        THE COURT:  Well, we got to bring her up

6    and put it on the record.  Ask her to send up Ms. --

7                        THE BAILIFF:  You're just doing them one

8    at a time again?

9                        THE COURT:  Well, just for three questions

10   I'm going to ask.

11                       ATTY. INGRAM:  You know what?  You don't

12   want Rowley to tell the rest of them how to kick themselves

13   off the case.  It's only three questions.

14                       THE BAILIFF:  All right.

15                       ATTY. INGRAM:  And only the judge is going

16   to ask the questions.

17                       THE BAILIFF:  All right.  I can stand it

18   for that long.

19                       (Whereupon, a brief recess was taken.)

20                       THE COURT:  Hello.

21                       ASSISTANT JURY COMMISSIONER:  Hi.  This

22   Kasey, she didn't call in, that's why, so she's on her way.

23   And the other man, Michael?

```
 1                        COURT REPORTER:  Todd.
 2                        ASSISTANT JURY COMMISSIONER:  Todd.  He
 3    said he told everybody that he was going to be in domestic
 4    court today.
 5                        ATTY. JUHASZ:  Oh, she's right.
 6                        ATTY. INGRAM:  Okay.
 7                        ATTY. BECKER:  He's getting divorced.
 8                        ATTY. INGRAM:  Yeah, he did.  He did.
 9                        ATTY. JUHASZ:  Today is May 8th.
10                        ASSISTANT JURY COMMISSIONER:  He thinks he
11    is only going to be there a half an hour.
12                        ATTY. BECKER:  We can bring him in, we can
13    bring him in --
14                        ASSISTANT JURY COMMISSIONER:  I said to
15    come down after he was done.
16                        ATTY. INGRAM:  Okay.
17                        ASSISTANT JURY COMMISSIONER:  But I didn't
18    know if you wanted to do that.
19                        ATTY. INGRAM:  That's fine.
20                        THE COURT:  Everybody will agree to take
21    him out of order then?
22                        ATTY. INGRAM:  Is that okay with you guys?
23                        ATTY. BECKER:  That's fine with us.
```

4494

```
 1                    ASSISTANT JURY COMMISSIONER:  He's at the

 2    end, I mean, he's down towards the end.  It's a custody case.

 3                    ATTY. JUHASZ:  No, it's a pretrial.

 4                    THE BAILIFF:  He may not be in a great

 5    mood.

 6                    THE COURT:  He's not here yet, right?

 7                    ASSISTANT JURY COMMISSIONER:  No, he's not

 8    here.

 9                    THE COURT:  Why don't you send up the

10    first one on the list that is here?

11                    ASSISTANT JURY COMMISSIONER:  You know

12    what I'm going to do, have one come in and then have a couple

13    out in the hall; is that all right?

14                    ATTY. INGRAM:  Yeah.

15                    THE COURT:  Yeah.  You want Rowley first,

16    right?

17                    ATTY. INGRAM:  Yes, Your Honor.

18                    ATTY. BECKER:  Right.

19                    ATTY. INGRAM:  Just go down the list and

20    if they're here we'll just go down the list.

21                    ASSISTANT JURY COMMISSIONER:  And they are

22    except for that one lady.

23                    COURT REPORTER:  Send Rowley in and tell
```

1    the next two or three to wait out in the hall.

2                    ASSISTANT JURY COMMISSIONER:  All right.

3                    COURT REPORTER:  Thanks, Deb.

4                    (Whereupon, a brief recess was taken.)

5                    ATTY. INGRAM:  Gentlemen, if Acuri's

6    hearing is at 3:00.

7                    ATTY. JUHASZ:  Davidson.

8                    ATTY. BECKER:  Davidson.

9                    ATTY. INGRAM:  Why don't we ask him if he

10   can stop here before going there?

11                   ATTY. BECKER:  I thought that's what she

12   was doing?  She's not bringing him down?

13                   ATTY. INGRAM:  No, after.

14                   ATTY. BECKER:  Oh.  Okay.

15                   ATTY. BAILEY:  We're going to get to him,

16   I would expect, when we start exercising peremptories because

17   he's 20.

18                   CAPTAIN BACON:  He's already down there,

19   isn't he?

20                   COURT REPORTER:  No.

21                   ATTY. INGRAM:  He's a block away, I mean.

22                   THE BAILIFF:  Just what he needs, to come

23   here before he goes to a custody hearing.

```
 1                            ATTY. INGRAM:  That's true.  All right.

 2                            (Whereupon, a brief recess was taken.)

 3                  PROSPECTIVE JUROR W. JEAN ROWLEY

 4                            THE COURT:  Ma'am, have a seat up here, if

 5       you will.  Good afternoon, Ms. Rowley.

 6                            W. JEAN ROWLEY:  Hello.

 7                            THE COURT:  I understand that you have

 8       some vacation plans?

 9                            W. JEAN ROWLEY:  (Nods head

10       affirmatively.)

11                            THE COURT:  Will you explain to us what

12       those are?

13                            W. JEAN ROWLEY:  Yes.  Our oldest

14       granddaughter is finishing her medical residency in

15       Greenville, North Carolina, the 1st of June.

16                            THE COURT:  And you are going to baby-sit

17       after that, is that the one?

18                            W. JEAN ROWLEY:  What?

19                            THE COURT:  You were to baby-sit after

20       that?

21                            W. JEAN ROWLEY:  No.

22                            THE COURT:  I must be mistaken.  Okay.

23                            W. JEAN ROWLEY:  I'm not baby-sitting.
```

1    I'm not baby-sitting, but we were going over for the hospital

2    reception and then a family celebration.

3                      THE COURT:  Okay.  And when are you

4    planning on leaving?

5                      W. JEAN ROWLEY:  We have to be over there

6    the 2nd and we'll come back the next Sunday, the 8th I think

7    it is.

8                      THE COURT:  Okay.  Questions by the State?

9                      ATTY. BAILEY:  Yeah.  Ma'am, you told us

10   you were leaving for vacation the first time, right?

11                     W. JEAN ROWLEY:  No, I didn't, I called in

12   Monday morning, because when this started I thought it would

13   all be over by now and I had no plans until June.  I didn't

14   understand how the system works and so I did not say anything

15   to start out with.  But I called in Monday morning because I

16   got concerned when I saw how long things were taking.

17                     ATTY. BAILEY:  So if I understand, you do

18   want to go to North Carolina?

19                     W. JEAN ROWLEY:  I sure do.

20                     ATTY. BAILEY:  And that's when?

21                     W. JEAN ROWLEY:  The 3rd of June.

22                     ATTY. BAILEY:  June 3rd.  Well, do you

23   have any problem or --

1                    ATTY. INGRAM:  No questions.

2                    ATTY. BAILEY:  Okay.  We don't have a

3     problem excusing her so she can go.

4                    THE COURT:  No objection to dismissing for

5     cause?

6                    ATTY. JUHASZ:  No, sir.

7                    THE COURT:  Enjoy yourself, ma'am.

8                    W. JEAN ROWLEY:  I certainly appreciate

9     it.  I did not anticipate this --

10                    THE COURT:  Well, it's not your fault by

11    any means.  Thank you for your attendance and your

12    cooperation.

13                    ATTY. BAILEY:  Have a good day.

14                    ATTY. Becker:  Thank you very much.

15                    ATTY. INGRAM:  Thanks, ma'am.

16                    W. JEAN ROWLEY:  You're welcome.  I held

17    her when she cried, when things didn't go right, so I have to

18    be there to celebrate.

19                    ATTY. BECKER:  Oh, yeah.

20                    ATTY. JUHASZ:  Thanks, ma'am.

21                    (Whereupon, W. Jean Rowley was dismissed

22    from the pool of prospective jurors for cause, after which a

23    discussion was held off the record.)

1            **PROSPECTIVE JUROR TILGHMAN GRAY**

2                        THE COURT:  Good afternoon.

3                        TILGHMAN GRAY:  Hi.

4                        THE COURT:  I'll ask you three questions

5     here.  Has anything occurred since we last spoke which might

6     affect your ability to serve as a fair-minded juror in this

7     case?

8                        TILGHMAN GRAY:  No.

9                        THE COURT:  When you were last here many

10    questions were put to you by both sides.  Do you presently

11    have any reason to change or amend any response that you gave

12    to any of those questions put to you?

13                       TILGHMAN GRAY:  No, I don't.

14                       THE COURT:  Is there any reason why you

15    are unable to continue your service in this most important

16    cause which may last up until the first week of June?

17                       TILGHMAN GRAY:  No.  I'm going away over

18    Memorial weekend but I'll only be gone Saturday, Sunday

19    Monday.

20                       THE COURT:  You'll just be gone on the

21    days that the rest of us will have off?

22                       TILGHMAN GRAY:  Right.

23                       THE COURT:  Okay.  Fine.  Very good.

1                          ATTY. BECKER:  Your Honor.

2                          ATTY. JUHASZ:  May we?

3                          THE COURT:  Yeah, that's a possibility.

4                          ATTY. JUHASZ:  Uh-huh.

5                          (Whereupon, a bench conference was held.)

6                          THE COURT:  Okay.  Folks, I would suggest

7     that we send each of these potential jurors back down with an

8     instruction not to discuss anything, okay?

9                          ATTY. BECKER:  You're going to let them

10    go?

11                         ATTY. INGRAM:  No.

12                         ATTY. JUHASZ:  No, no.

13                         THE COURT:  We're all kind of flying by

14    the seat of our pants because these things are always, you

15    know, jumbled like this and no one can figure a better way to

16    do it.  Please go back down, have a seat there.  I would ask

17    you not to discuss with any of the other jurors that haven't

18    been up, or with anybody, anything about what questions were

19    asked or anything that happened up here, okay?

20                         TILGHMAN GRAY:  Okay.

21                         THE COURT:  We'll see you in a little bit.

22    Thank you.

23                         TILGHMAN GRAY:  All righty.

1            THE COURT:  You have another one out there

2  waiting for us?

3            CAPTAIN BACON:  Yeah.

4            THE COURT:  What you should do is each one

5  that goes down, send up one more to sit out here.

6            TILGHMAN GRAY:  Send one more up?

7            THE COURT:  Yeah.

8            (Whereupon, Tilghman Gray was excused from

9  the courtroom and the proceedings commenced with the next

10  prospective juror as follows.)

11          **PROSPECTIVE JUROR RICHARD CARAWAY**

12            THE COURT:  Good afternoon, sir.

13            RICHARD CARAWAY:  Good afternoon.

14            THE COURT:  All right.  Three questions to

15  ask.  Has anything occurred since we last spoke which might

16  affect your ability to serve as a fair-minded juror in this

17  case?

18            RICHARD CARAWAY:  No.

19            THE COURT:  Okay.  When you were last here

20  there were many questions put to you by both sides.  Do you

21  presently have any reason to change or amend any response

22  given to those questions?

23            RICHARD CARAWAY: No.

```
 1                        THE COURT:  Is there any reason why you

 2   are unable to continue your service in this important case

 3   which may last until the first week of June?

 4                        RICHARD CARAWAY:  No.

 5                        THE COURT:  Okay.  Very good.  Please have

 6   a seat back down there and don't discuss with anybody the

 7   reason or the questions asked up here, okay?

 8                        RICHARD CARAWAY:  Okay.

 9                        THE COURT:  And we'll have you back up

10   later.

11                        RICHARD CARAWAY:  Okay.

12                        THE COURT:  When you go down send up

13   another juror, if you would.

14                        RICHARD CARAWAY:  Okay.

15                        THE COURT:  Okay.  Thank you.

16                        (Whereupon, Richard Caraway was excused

17   from the courtroom.)

18                        THE COURT:  I think, gentlemen, that's "a"

19   rather than "e" on the word effect; affect.

20                        ATTY. BECKER:  Oh, that would be my fault.

21                        ATTY. INGRAM:  I had it typed with an "a"

22   and the prosecutor unilaterally without authorization tried

23   to change my language.
```

1          THE COURT:  Well, I'm not casting any

2    aspersion.

3              **PROSPECTIVE JUROR MAXINE HOWARD**

4          THE COURT:  Good afternoon.  How are you?

5          MAXINE HOWARD:  Fine, thank you.  How are

6    you?

7          THE COURT:  I have three short questions

8    for you.  Has anything occurred since we last spoke which

9    might affect your ability to serve as a fair-minded juror in

10   this case?

11         MAXINE HOWARD:  No, sir.

12         THE COURT:  When you were here last many

13   questions were put to you by both sides.  Do you presently

14   have any reason to change or amend your responses to any of

15   those questions?

16         MAXINE HOWARD:  No.

17         THE COURT:  Is there any reason you are

18   unable to continue your service in this most important case

19   which might last until the first week of June?

20         MAXINE HOWARD:  No, sir.

21         THE COURT:  Okay.  Very good.  Please

22   don't discuss these questions or why you were brought up

23   here.  Go back down and have seat and we'll have you all up

```
 1    later.  Send up the next juror, if you would.  Tell Connie.
 2                    MAXINE HOWARD:  Yes, sir.
 3                    (Whereupon, Maxine Howard was excused from
 4    the courtroom and the proceedings commenced with the next
 5    prospective juror as follows.)
 6                 PROSPECTIVE JUROR GEORGE DERMER
 7                    THE COURT:  Have a seat right up here, if
 8    you will.  Mr. Dermer, I have three questions for you.  Has
 9    anything occurred since we last spoke which might affect your
10    ability to serve as a fair-minded juror in this case?
11                    GEORGE DERMER:  No.
12                    THE COURT:  When you were here last there
13    were many questions put to you by both sides.  Do you
14    presently have any reason to change or amend your responses
15    to any of those questions?
16                    GEORGE DERMER:  No.
17                    THE COURT:  Is there any reason why you
18    are unable to continue your service in this most important
19    case which may last until the first week of June?
20                    GEORGE DERMER:  No.
21                    THE COURT:  No problem?  Very good.
22    Please go down, back down.  We're going to have you all up
23    together a little bit later.  Don't discuss anything about
```

1    what you've done up here.

2                    ATTY. BECKER:  Thank you, Mr. Dermer.

3                    ATTY. INGRAM:  Thank you.

4                    ATTY. JUHASZ:  Thank you, sir.

5                    (Whereupon, George Dermer was excused from

6    the courtroom and the proceedings commenced with the next

7    prospective juror as follows.)

8                **PROSPECTIVE JUROR KAREN TIPTON**

9                    THE COURT:  Ma'am, have a seat right up

10   here, if you will.  Good afternoon, Karen.

11                   KAREN TIPTON:  Hi.

12                   THE COURT:  Three short questions for you.

13   Has anything occurred since we last spoke which might affect

14   your ability to serve as a fair-minded juror in this case?

15                   KAREN TIPTON:  No.

16                   THE COURT:  When you were here last there

17   were many questions put to you.  Do you presently have any

18   reason to change or amend your response to any question given

19   to you at that time?

20                   KAREN TIPTON:  No.

21                   THE COURT:  Is there any reason why you

22   are unable to continue your service in this most important

23   case which may last until the first week of June?

1                         KAREN TIPTON:  No.

2                         THE COURT:  No?  Okay.  Very good.  Please

3    have a seat back down there.  We'll have you all up here

4    together later.  And don't discuss anything about why you

5    came up at this point.

6                         KAREN TIPTON:  Okay.

7                         THE COURT:  Thank you, ma'am.

8                         ATTY. BECKER:  Thank you.

9                         ATTY. JUHASZ:  Thank you.

10                        ATTY. INGRAM:  Thank you, ma'am.

11                        (Whereupon, Karen Tipton was excused from

12   the courtroom and the proceedings commenced with the next

13   prospective juror as follows.)

14                  **PROSPECTIVE JUROR BRAD SEELBACK**

15                        THE COURT:  Brad, have a seat up here, if

16   you will.  Good afternoon.

17                        BRAD SEELBACK:  Good afternoon.

18                        THE COURT:  Three questions for you.

19                        BRAD SEELBACK:  Yes, sir.

20                        THE COURT:  Has anything occurred since we

21   last spoke which might affect your ability to serve as a

22   fair-minded juror in this matter?

23                        BRAD SEELBACK:  No, sir.

```
 1                      THE COURT:  When you were here last many
 2   questions were put to you by both sides.  Do you presently
 3   have any reason to change or amend your responses to any
 4   questions put to you?
 5                      BRAD SEELBACK:  No, sir.
 6                      THE COURT:  Is there any reason you are
 7   unable to continue your service in this most important case
 8   which may last until the first week of June?
 9                      BRAD SEELBACK:  No, sir.
10                      THE COURT:  Okay, fine.  Thank you.
11   Please wait down there.  We'll have you all up together
12   later.  Don't discuss why you were brought up with anybody.
13                      BRAD SEELBACK:  Okay.
14                      (Whereupon, Brad Seelback was excused from
15   the courtroom and the proceedings commenced with the next
16   prospective juror as follows.)
17             PROSPECTIVE JUROR THOMAS CARMICHAEL
18                      THE COURT:  Have a seat up here, Tom.
19   Good afternoon, Tom.
20                      THOMAS CARMICHAEL:  How you doing?
21                      THE COURT:  Good.  Three questions for
22   you.  Has anything occurred since we last spoke which might
23   affect your ability to serve as a fair-minded juror in this
```

1  case?

2                        THOMAS CARMICHAEL:  Well, I got things to

3  do now.  I mean, my family is coming into town.  I have a

4  cousin in the Air Force that's coming.

5                        THE COURT:  Okay.  Explain that to us.

6                        THOMAS CARMICHAEL:  I have a cousin in the

7  Air Force.  He lives down in Texas, stationed down in Texas.

8  He's going to be here for two weeks.  I would like to, you

9  know, be with him.

10                       THE COURT:  When is that?  When is he

11  coming in?

12                       THOMAS CARMICHAEL:  About 10 days.

13                       THE COURT:  Is that over Labor Day or

14  what?

15                       THOMAS CARMICHAEL:  Yeah, it's over Labor

16  Day weekend.

17                       THE COURT:  Well, this Court, of course,

18  will be taking off over Labor Day, that Saturday, Sunday and

19  Monday.  Is that sufficient time?

20                       THOMAS CARMICHAEL:  Maybe.  Maybe.

21                       THE BAILIFF:  Memorial Day.

22                       THE COURT:  I'm sorry, Memorial Day.  What

23  did I say, Labor Day?

```
 1                    ATTY. BECKER:  The Court may want to also,
 2    due to some scheduling problems, we're not going to be in
 3    court Friday the 16th or Monday the 19th as well, so we'll
 4    have a four-day weekend next week.
 5                    THE COURT:  That's right.  That's right.
 6    That's not Memorial Day weekend then, though?
 7                    ATTY. BAILEY:  The week before.
 8                    ATTY. BECKER:  The week before, yeah,
 9    that's the week before.
10                    THE COURT:  And we will have four days
11    off, the 16th through to that following Tuesday.
12                    THOMAS CARMICHAEL:  Uh-huh.
13                    THE COURT:  And then Memorial Day, three
14    days of Memorial Day the following week.
15                    THOMAS CARMICHAEL:  Okay.
16                    THE COURT:  Does that cause you any
17    problem?
18                    THOMAS CARMICHAEL:  No.  I also have a
19    company picnic coming up.  I think it's on the 21st of June.
20    The 21st of June.
21                    THE COURT:  A what?
22                    THOMAS CARMICHAEL:  The 21st of June, a
23    company picnic up at Six Flags.  I want to take my girlfriend
```

```
 1    there.  I would like to have that week off, too, I mean.

 2                      ATTY. BAILEY:  Judge, we should be done

 3    long before that day.  We should be done the first week of

 4    June if it goes into two phases.

 5                      THOMAS CARMICHAEL:  Okay.

 6                      THE COURT:  Approach the bench, please.

 7                      (Whereupon, a bench conference was held.)

 8                      THE COURT:  Okay.  A couple other

 9    questions for you here.

10                      THOMAS CARMICHAEL:  Okay.

11                      THE COURT:  When you were last here many

12    questions were put to you by both sides.  Do you presently

13    have any reason to change or amend your response to any

14    question put to you?

15                      THOMAS CARMICHAEL:  No.

16                      THE COURT:  Is there any reason you are

17    unable to continue your service in this most important case

18    which may last until the first week of June, outside of the

19    things that you already told us?

20                      THOMAS CARMICHAEL:  Not that I'm aware of.

21                      THE COURT:  Okay, fine.  Would you please

22    go back down, have a seat down there, and don't discuss with

23    anybody the questions that were put to you, okay?
```

1          THOMAS CARMICHAEL:  Okay.

2          THE COURT:  We're going to have you all

3   back up here together in a little bit.  Thank you.

4          ATTY. BECKER:  Thank you.

5          (Whereupon, Thomas Carmichael was excused

6   from the courtroom and the proceedings commenced with the

7   next prospective juror as follows.)

8          **PROSPECTIVE JUROR LINDA BLACK**

9          THE COURT:  Good afternoon.  How are you?

10         LINDA BLACK:  Good afternoon.  Good.

11         THE COURT:  Good.  Three questions for

12  you.  Has anything occurred since we last spoke which might

13  affect your ability to serve as a fair-minded juror in this

14  case?

15         LINDA BLACK:  No.

16         ATTY. INGRAM:  When you were last here

17  there were many questions put to you by both sides.  Do you

18  presently have any reason to change or amend your responses

19  to those questions?

20         LINDA BLACK:  No.

21         THE COURT:  Is there any reason you are

22  unable to continue your service in this most important case

23  which may last until the first week of June?

1          LINDA BLACK:  The only reason it would be

2     a problem is if we were sequestered.  I do have dogs, I would

3     have to board them.

4               THE COURT:  I didn't hear the last part.

5          LINDA BLACK:  I have dogs, I would have to

6     board them.  I live by myself.

7               THE COURT:  Oh, you'd have to board them

8     for -- if you were sequestered?

9          LINDA BLACK:  Sequestered, yes.

10              THE COURT:  Okay.  That is something you

11    can take care of because we don't know how long it's going to

12    take a jury, but historically around here three days is

13    unusual.  It's usually a night.  I had one, I think I had one

14    that had two nights.

15         LINDA BLACK:  Okay.

16              THE COURT:  But that would be something

17    you can live with?

18         LINDA BLACK:  That's my only concern is

19    that.

20              THE COURT:  Okay.  You go on vacation, you

21    have to board them too probably?

22         LINDA BLACK:  Yes.

23              THE COURT:  Okay.  Listen, if you would be

1    kind enough to wait back downstairs we'll have you all up

2    here in a little bit.  Don't discuss what you were asked

3    while you were up here, okay?

4                    LINDA BLACK:  No.

5                    THE COURT:  Thank you.

6                    LINDA BLACK:  Thank you.

7                    (Whereupon, Linda Black was excused from

8    the courtroom.)

9                    THE COURT:  Wait before you send the next

10   one in here.

11                   ATTY. INGRAM:  Off the record.

12                   (Whereupon, a discussion was had off the

13   record.)

14        **PROSPECTIVE JUROR PANDA HEATHERLY-LANTZ**

15                   THE COURT:  How are you today?

16                   PANDA HEATHERLY-LANTZ:  I'm fine.  You?

17                   THE COURT:  Good.  Three questions for

18   you.  Has anything occurred since we last spoke which might

19   affect your ability to serve as a fair-minded juror in this

20   case?

21                   PANDA HEATHERLY-LANTZ:  No.

22                   THE COURT:  When you were here last there

23   were many questions put to you by both sides.  Do you

1     presently have any reason to change or amend your response to

2     any of those questions?

3                PANDA HEATHERLY-LANTZ:   No.

4                THE COURT:   Is there any reason you are

5     unable to continue your service in this most important case

6     which may last until the first week of June?

7                PANDA HEATHERLY-LANTZ:   No.

8                THE COURT:   Okay.   Thank you.

9                PANDA HEATHERLY-LANTZ:   You're welcome.

10               THE COURT:   Please wait downstairs.   We'll

11    have you all up here as a group later.   And please don't

12    discuss anything about why you came up with the other ones.

13               PANDA HEATHERLY-LANTZ:   Not a problem.

14    That's why I brought a book.

15               THE COURT:   Okay.   Thank you.

16               ATTY. INGRAM:   Thank you.

17               ATTY. BECKER:   Thank you.

18               ATTY. BAILEY:   Thanks.

19               PANDA HEATHERLY-LANTZ:   You're welcome.

20               (Whereupon, Panda Heatherly-Lantz was

21    excused from the courtroom and the proceedings commenced with

22    the next prospective juror as follows.)

23          **PROSPECTIVE JUROR JOHN D. LANAM, SR.**

1                    THE COURT:  Good afternoon, John.

2                    JOHN D. LANAM, SR.:  How you doing?

3                    THE COURT:  Good.  Three questions for

4       you.  Has anything occurred since we last spoke which might

5       affect your ability to serve as a fair-minded juror in this

6       case?

7                    JOHN D. LANAM, SR.:  No.

8                    THE COURT:  When you were here last many

9       questions were put to you by both sides.  Do you presently

10      have any reason to change or amend your response to any of

11      those questions?

12                   JOHN D. LANAM, SR.:  No.

13                   THE COURT:  Is there any reason why you

14      are unable to continue your service in this most important

15      case which may last until the first week of June?

16                   JOHN D. LANAM, SR.:  No.

17                   THE COURT:  Okay.  Very good.  Please have

18      a seat back downstairs and don't discuss anything with

19      anybody in the meantime.  We'll have you all back up here as

20      a group shortly.

21                   JOHN D. LANAM, SR.:  All right.

22                   (Whereupon, John D. Lanam, Sr. was excused

23      from the courtroom and the proceedings commenced with the

1    next prospective juror as follows.)

2                    **PROSPECTIVE JUROR KEVIN B. PATTERSON**

3                    THE COURT:  Mr. Patterson, have a seat up

4    here.  How are you doing today?

5                    KEVIN B. PATTERSON:  Good.

6                    THE COURT:  Good.  Three questions for

7    you.  Has anything occurred since we last spoke which might

8    affect your ability to serve as a fair-minded juror in this

9    case?

10                   KEVIN B. PATTERSON:  My agency makeup has

11   changed some.  My director was put on administrative leave

12   and is under investigation so they made one of my

13   counterparts the acting director and there's four of us doing

14   the work that six of us did before.  However, I mean, it's

15   going to be there one way or another.

16                   THE COURT:  Yeah.  Sounds like the company

17   is going to get behind one way or the other, right?

18                   KEVIN B. PATTERSON:  Probably would, yeah.

19   Other than that, no.

20                   THE COURT:  Okay.  When you were here last

21   many questions were put to you by both sides.  Do you

22   presently have any reason to change or amend your response to

23   any of those questions?

```
 1                        KEVIN B. PATTERSON:  No, I do not, no.

 2                        THE COURT:  Is there any reason you are

 3    unable to continue your service in this most important case

 4    which may last until the first week of June?

 5                        KEVIN B. PATTERSON:  No.

 6                        THE COURT:  Okay.  Very good.  Have a seat

 7    back down there.  We'll have you all up together in a few

 8    moments here, or a few minutes.  And not to discuss anything

 9    in the meantime about why you came up here, okay?

10                        KEVIN B. PATTERSON:  Okay.

11                        THE COURT:  Thank you.

12                        (Whereupon, Kevin B. Patterson was excused

13    from the courtroom and the proceedings commenced with the

14    next prospective juror as follows.)

15              PROSPECTIVE JUROR MARSHA J. DANADIC

16                        THE COURT:  Good afternoon, Marsha.

17                        MARSHA J. DANADIC:  Hi.

18                        THE COURT:  Three questions for you.

19                        MARSHA J. DANADIC:  Okay.

20                        THE COURT:  Has anything occurred since we

21    last spoke which might affect your ability to serve as a

22    fair-minded juror in this case?

23                        MARSHA J. DANADIC:  No.
```

1     THE COURT:  When you were last here many
2  questions were put to you by both sides.  Do you presently
3  have any reason to change or amend your response to any
4  question put?
5     MARSHA J. DANADIC:  No.
6     THE COURT:  Is there any reason you are
7  unable to continue your service in this most important case
8  which may last until the first week of June?
9     MARSHA J. DANADIC:  (Shaking head
10  negatively.)
11     THE COURT:  No problem?
12     MARSHA J. DANADIC:  No.
13     THE COURT:  Okay.  Thank you.  Have a seat
14  down there.  We'll have you all back up shortly, and not to
15  talk with anybody about why you came up, okay?
16     MARSHA J. DANADIC:  Okay.  Downstairs
17  again you mean?
18     THE COURT:  I'm sorry?
19     MARSHA J. DANADIC:  I go back downstairs?
20     THE COURT:  Yeah.
21     ATTY. BAILEY:  Thank you.
22     ATTY. BECKER:  Thanks.
23     ATTY. JUHASZ:  Thank you.

1          ATTY. INGRAM:  Thanks.

2          (Whereupon, Marsha J. Danadic was excused

3     from the courtroom and the proceedings commenced with the

4     next prospective juror as follows.)

5          **PROSPECTIVE JUROR MOSELLE DICENSO**

6          THE COURT:  Good afternoon.

7          MOSELLE DICENSO:  Good afternoon.

8          THE COURT:  Three questions here.  Has

9     anything occurred since we last spoke which might affect your

10    ability to serve as a fair-minded juror in this matter?

11         MOSELLE DICENSO:  Not that, but I do have

12    a conflict.  On the 28th of May my daughter is having surgery

13    which I didn't know the last time I was here.

14         THE COURT:  What, what is this about?

15         MOSELLE DICENSO:  I'm sorry?

16         THE COURT:  What is your conflict.

17         MOSELLE DICENSO:  My daughter is having

18    surgery on the 28th of May.

19         THE COURT:  Oh, she's having surgery.  The

20    28th of May?

21         MOSELLE DICENSO:  (Nods head

22    affirmatively.)

23         THE COURT:  Okay.  Let me ask you these

1   other questions.

2                   MOSELLE DICENSO:  Okay.

3                   THE COURT:  We'll take care of that.  When

4   you were last here many questions were put to you by both

5   sides.  Do you presently have any reason to change or amend

6   your responses given at that time?

7                   MOSELLE DICENSO:  No.

8                   THE COURT:  Is there any reason you are

9   unable to continue your service in this most important case

10  which may last until the first week of June, other than --

11                  MOSELLE DICENSO:  No, not other than that.

12                  THE COURT:  No other reason?

13                  MOSELLE DICENSO:  No.

14                  THE COURT:  Okay.  Fine.  Would you please

15  have a seat down there.  We'll have you all up here shortly.

16                  MOSELLE DICENSO:  Okay.

17                  THE COURT:  And not to discuss anything

18  about why you came up.

19                  MOSELLE DICENSO:  Okay.

20                  ATTY. BAILEY:  Judge, perhaps we should

21  inquire first.

22                  THE COURT:  Yeah.

23                  ATTY. BECKER:  Yeah, have a seat.

1                    THE COURT:  Have a seat for a moment.

2    Come on up.

3                    (Whereupon, a bench conference was held.)

4                    THE COURT:  Let me ask you a couple more

5    questions.

6                    MOSELLE DICENSO:  Okay.

7                    THE COURT:  You have two daughters.  One

8    is in Columbus, I believe, and the other one is local here.

9    Which daughter is it?

10                   MOSELLE DICENSO:  The one in Columbus.

11                   THE COURT:  Okay.  And I'm not trying to

12   pry into your personal affairs.  This is a very important

13   thing that we're trying to do here, as you know by now.  Is

14   it major surgery?

15                   MOSELLE DICENSO:  No.

16                   THE COURT:  It's minor surgery?

17                   MOSELLE DICENSO:  It's foot surgery.

18                   THE COURT:  Okay.  Can you see that there

19   would be more than one day's absence on your part, or do you

20   have other obligations besides, you know?

21                   MOSELLE DICENSO:  We're going to leave

22   here on Tuesday night and she has the surgery on Wednesday

23   and then we're going to bring her back here on Thursday.

1            THE COURT:  Well, so it would be two days

2    at a minimum you would be gone?

3            MOSELLE DICENSO:  Two days would be what,

4    unless something would go wrong, which I am not thinking but.

5            THE COURT:  Do you wish side bar?

6            ATTY. BAILEY:  Yes, Your Honor.

7            (Whereupon, a bench conference was held.)

8            THE COURT:  Would you please go back

9    downstairs and we're going to have everybody up in the group,

10   okay?

11           MOSELLE DICENSO:  Okay.

12           THE COURT:  You're not to discuss anything

13   while you're down there.

14           MOSELLE DICENSO: Okay.

15           (Whereupon, Moselle Dicenso was excused

16   from the courtroom.)

17           ATTY. BECKER:  Your Honor, I don't know

18   what the procedure is here that we're -- I mean, I understand

19   the function that we're doing and I just want to make sure

20   that we're just going to call these people now.  Unless

21   there's some really extenuating circumstance like they're

22   having surgery on themselves, we're not going to let them go.

23           ATTY. INGRAM:  Right.

1              ATTY. BECKER:  So unless they've got some

2    kind of, you know, emergency footology operation or, you

3    know, whatever, like ear lowering surgery or something, we're

4    not going to let them go unless they tell us they've got a

5    real serious problem with them themselves?

6              ATTY. INGRAM:  That's my sentiment.

7              ATTY. BECKER:  Okay.

8              ATTY. BAILEY:  But I don't understand.

9    She says that she's got plans already to leave town for her

10   daughter's surgery, which is on the 28th, so she's leaving.

11   She's going to be in Columbus on the 27th.

12             THE COURT:  Right.

13             ATTY. BAILEY:  And then she's going to be

14   gone on the 28th for the surgery.  If there's problems there,

15   she won't be back, and she's not planning on coming back

16   until the next day if everything goes right on the 29th.  So

17   does that mean --

18             ATTY. INGRAM:  I would suggest her husband

19   could pick her daughter up.

20             THE COURT:  I think she was leaving it

21   open-ended as to what was going to happen as a result of the

22   surgery.  She was going to bring her daughter back unless she

23   said she was able to walk or something, then I don't know

1    what she's going to do.

2            Now, the thing is with this amount of time you're

3    going to have half these people that are going to have

4    something that's come up.  You're going to have to make some

5    hard and fast criteria of either telling them you can't, you

6    got to be here, which means you're going to have some

7    disgruntled people on the jury.

8            ATTY. INGRAM:  I tell you what, may I

9    approach, Your Honor?

10           ATTY. BAILEY:  Because I think we left her

11   with the idea that she would be able to go to the surgery,

12   and that's going to be close to the end of the case.

13           (Whereupon, a discussion was had off the

14   record.)

15           THE COURT:  Have the next one come in.

16           **PROSPECTIVE JUROR THELMA L. RANKIN**

17           THE COURT:  How are you this afternoon?

18           THELMA L. RANKIN:  I'm good.  How are you?

19           THE COURT:  Good.  Three questions.  Has

20   anything occurred since we spoke last which might affect your

21   ability to serve as a fair-minded juror in this matter?

22           THELMA L. RANKIN:  No.

23           THE COURT:  When you were here last there

1    were many questions put to you by both sides.  Do you

2    presently have any reason to change or amend any of those

3    answers?

4                    THELMA L. RANKIN:  No.

5                    THE COURT:  Is there any reason you are

6    unable to continue your service in this most important case

7    which may last up until the first week of June?

8                    THELMA L. RANKIN:  No, I don't have any

9    reason to change anything.  I don't have anything that's

10   going to stop me from serving.

11                   THE COURT:  Okay.  We appreciate that very

12   much.

13                   THELMA L. RANKIN:  Okay.

14                   THE COURT:  Please wait back downstairs.

15   We're going to have you all up here together shortly.

16                   THELMA L. RANKIN:  Okay.  Thank you.

17                   THE COURT:  Thank you.  You're not to

18   discuss anything with anybody as to why you were up here.

19                   THELMA L. RANKIN:  Okay.

20                   ATTY. BECKER:  Thank you, Ms. Rankin.

21                   ATTY. BAILEY:  Thank you.

22                   ATTY. JUHASZ:  Thank you.

23                   ATTY. INGRAM:  Thanks, ma'am.

1              (Whereupon, Thelma L. Rankin was excused

2      from the courtroom and the proceedings commenced with the

3      next prospective juror as follows.)

4                    **PROSPECTIVE JUROR KASEY S. KELLY**

5              THE COURT:  You are familiar with that

6      chair.  Have a seat.  Three questions for you, ma'am.  Has

7      anything occurred since we last spoke which might affect your

8      ability to serve as a fair-minded juror in this matter?

9              KASEY S. KELLY:  No.

10             THE COURT:  When you were here last many

11     questions were put to you by both sides.  Do you presently

12     have any reason to change or amend any of your answers?

13             KASEY S. KELLY:  No.

14             THE COURT:  Is there any reason why you

15     are unable to continue your service in this most important

16     case which may last until the first week of June?

17             KASEY S. KELLY:  No.

18             THE COURT:  Okay.  Very good.  Please wait

19     back downstairs.  We'll have you all up here shortly.  Not to

20     discuss anything about why you came up.

21             KASEY S. KELLY:  Okay.

22             THE COURT:  Okay.  Thank you.

23             (Whereupon, Kasey S. Kelly was excused

1    from the courtroom and the proceedings commenced with the

2    next prospective juror as follows.)

3                  **PROSPECTIVE JUROR MARY J. COSTELLO**

4                         THE COURT:  How are you today?

5                         MARY J. COSTELLO:  I'm good.

6                         THE COURT:  Good.  Three questions for

7    you.  Has anything occurred since we last spoke which might

8    affect your ability to serve as a fair-minded juror?

9                         MARY J. COSTELLO:  No.

10                         THE COURT:  When you were last here many

11   questions were put to you by both sides.  Do you presently

12   have any reason to change or amend your responses to any of

13   those questions?

14                         MARY J. COSTELLO:  No.

15                         THE COURT:  Is there any reason you are

16   unable to continue your service in this most important case

17   which may last until the first week of June?

18                         MARY J. COSTELLO:  I am going away the

19   last weekend of May.  May 30th I have plans on going to

20   Chicago.

21                         THE COURT:  For what period of time?

22                         MARY J. COSTELLO:  For the weekend.

23                         THE COURT:  For the week?

4528

1              MARY J. COSTELLO:  Yeah.  For the weekend,

2    yeah.

3              THE COURT:  For the weekend?

4              MARY J. COSTELLO:  Yes.

5              THE COURT:  Give me your itinerary.  When

6    are you leaving, on Friday?

7              MARY J. COSTELLO:  I'm leaving Friday at

8    1:00 o'clock and returning home Sunday evening at 7:00.

9              THE COURT:  Okay.  Very good.  Please go

10   back downstairs and we will have you all up here shortly.

11             MARY J. COSTELLO:  Okay.

12             THE COURT:  And you're not to discuss

13   anything about why you came up in the meantime, okay?

14             MARY J. COSTELLO:  Okay.

15             THE COURT:  Thank you.

16             ATTY. JUHASZ:  Thank you.

17             ATTY. BECKER:  Thank you.

18             (Whereupon, Mary J. Costello was excused

19   from the courtroom and the proceedings commenced with the

20   next prospective juror as follows.)

21            **PROSPECTIVE JUROR ROBIN SCHLAEGEL**

22             THE COURT:  Good afternoon, ma'am.

23             ROBIN SCHLAEGEL:  Hi.

```
1                    THE COURT:  Three questions for you.  Has

2    anything occurred since we last spoke which might affect your

3    ability to serve as a fair-minded juror in this matter?

4                    ROBIN SCHLAEGEL:  Since I was here the

5    last time my mother was in a severe car accident.  Her

6    husband is blind and so I have been having to kind of go back

7    and forth between my home and her home to make sure that

8    everything is well.  And she is starting now to be able to

9    drive but she's kind of fearful because it was a really bad

10   accident, so I don't know if I'm going to be needed.  I don't

11   know how soon this is, like if it's at like -- I don't know

12   if I'm going to be needed to take her back and forth to

13   doctors or --

14                   THE COURT:  Well, we're hoping that this

15   may be starting Monday or Tuesday of next week.

16                   ROBIN SCHLAEGEL:  Uh-huh.  That's the only

17   thing that has come --

18                   THE COURT:  Is there anyone else that's

19   able to help you cover that problem?

20                   ROBIN SCHLAEGEL:  There -- of my family

21   there's only my sister who lives in Toledo, so she's not

22   around here.  And he does have some family around that may be

23   able to help with that.
```

1                    THE COURT:  Okay.  Let me ask you these

2        other two questions.  When you were last here many questions

3        were put to you by both sides.  Do you presently have any

4        reason to change or amend your responses to those questions?

5                    ROBIN SCHLAEGEL:  No.

6                    THE COURT:  Is there any reason you are

7        unable to continue your service in this most important cause

8        which may last until the first week of June, other than what

9        you've just said?

10                    ROBIN SCHLAEGEL:  No, not really.

11                    THE COURT:  Okay.  Fine.  Please go back

12        downstairs.  We're going to have you all back up here

13        shortly.

14                    ROBIN SCHLAEGEL:  Okay.

15                    THE COURT:  You're not to discuss anything

16        about what you were asked.

17                    ROBIN SCHLAEGEL:  Okay.

18                    ATTY. BECKER:  Thank you.

19                    ATTY. JUHASZ:  Thank you.

20                    ATTY. INGRAM:  Thanks.

21                    ROBIN SCHLAEGEL:  You're welcome.

22                    (Whereupon, Robin Schlaegel was excused

23        from the courtroom and the proceedings commenced with the

1  next prospective juror as follows.)

2  **PROSPECTIVE JUROR GARY S. PHILLIPS**

3  THE COURT:  Good afternoon, Gary.

4  GARY S. PHILLIPS:  Hi.

5  THE COURT:  Three questions.

6  GARY S. PHILLIPS:  Okay.

7  THE COURT:  Has anything occurred since we

8  last spoke which might affect your ability to serve as a

9  fair-minded juror in this matter?

10  GARY S. PHILLIPS:  No, sir.

11  THE COURT:  When you were last here many

12  questions were put to you by both sides.  Do you presently

13  have any reason to change or amend any response that was

14  given?

15  GARY S. PHILLIPS:  No, sir.

16  THE COURT:  Is there any reason you are

17  unable to continue your service in this most important case

18  which may last until the first week of June?

19  GARY. S. PHILLIPS:  No, sir.

20  THE COURT:  Okay.  Very good.  Please wait

21  back downstairs.  We'll have you all up shortly here.  Not to

22  discuss anything about why you were brought up.

23  GARY S. PHILLIPS:  Okay.

1                    THE COURT:   Thank you.

2                    GARY S. PHILLIPS:   You're welcome.

3                    ATTY. JUHASZ:   Thanks.

4                    (Whereupon, Gary S. Phillips was excused

5        from the courtroom and the proceedings commenced with the

6        next prospective juror as follows.)

7                   **PROSPECTIVE JUROR NATHAN CROCKER**

8                    THE COURT:   Good afternoon.

9                    NATHAN CROCKER:   Good afternoon.

10                   THE COURT:   Three questions for you.

11                   NATHAN CROCKER:   Okay.

12                   THE COURT:   Has anything occurred since we

13       last spoke which might affect your ability to serve as a

14       fair-minded juror in this case?

15                   NATHAN CROCKER:   No.

16                   THE COURT:   When you were last here many

17       questions were put to you by both sides.   Do you presently

18       have any reason to change or amend any of those responses?

19                   NATHAN CROCKER:   No.

20                   THE COURT:   Is there any reason you are

21       unable to continue your service in this most important case

22       which may last until the first week of June?

23                   NATHAN CROCKER:   It may last until the

```
 1    first week of June?

 2                         THE COURT:  Yeah.

 3                         NATHAN CROCKER:  No, no problem.

 4                         THE COURT:  Very good.

 5                         NATHAN CROCKER:  Are things likely to be

 6    over by June 12th or 13th?

 7                         THE COURT:  If I have anything to do with

 8    it.  Okay.  Please go back downstairs and wait and don't

 9    discuss anything about why you were brought up here, okay?

10                         NATHAN CROCKER:  Okay.

11                         THE COURT:  Thank you.

12                         ATTY. BECKER:  Thank you very much.

13                         ATTY. BAILEY:  Thanks.

14                         ATTY. JUHASZ:  Thanks.

15                         ATTY. INGRAM:  Thank you.

16                         (Whereupon, Nathan Crocker was excused

17    from the courtroom and the proceedings commenced with the

18    next prospective juror as follows.)

19                    PROSPECTIVE JUROR CAROL K. SELAK

20                         THE COURT:  Ma'am, please have a seat up

21    here.  Three questions for you, ma'am.

22                         CAROL K. SELAK:  Okay.

23                         THE COURT:  Has anything occurred since we
```

4534

1    last spoke which might affect your ability to serve as a

2    fair-minded juror in this case?

3                    CAROL K. SELAK:  No.

4                    THE COURT:  When you were last here many

5    questions were put to you by both sides.  Do you presently

6    have any reason to change or amend your responses?

7                    CAROL K. SELAK:  No.

8                    THE COURT:  Is there any reason you are

9    unable to continue your service in this most important case

10   which may last until the first week of June?

11                   CAROL K. SELAK:  No.

12                   THE COURT:  Okay.  Very good.  Please have

13   a seat back down there.  We're going to have you all back up

14   shortly.

15                   CAROL K. SELAK:  Okay.

16                   THE COURT:  And not to discuss why you

17   were brought up, okay?

18                   CAROL K. SELAK:  Okay.  Thank you.

19                   ATTY. BECKER:  Thank you.

20                   ATTY. BAILEY:  Thanks.

21                   ATTY. JUHASZ:  Thanks.

22                   ATTY. INGRAM:  Thank you.

23                   (Whereupon, Carol K. Selak was excused

1     from the courtroom and the proceedings commenced with the

2     next prospective juror as follows.)

3                    **PROSPECTIVE JUROR AMY BARLETT**

4                    THE COURT:  Amy, how are you?  Three

5     questions for you.

6                    AMY BARLETT:  Okay.

7                    THE COURT:  Has anything occurred since we

8     last spoke which might affect your ability to serve as a

9     fair-minded juror?

10                    AMY BARLETT:  No.

11                    THE COURT:  When you were last here many

12     questions were put to you by both sides.  Do you presently

13     have any reason to change or amend any of those responses?

14                    AMY BARLETT:  Nope.

15                    THE COURT:  Is there any reason you are

16     unable to continue your service in this most important case

17     which may last until the first week of June?

18                    AMY BARLETT:  No.

19                    THE COURT:  None?  Okay.  Very good.

20     Please have a seat back down there.  We'll have you all up

21     later.

22                    AMY BARLETT:  Okay.

23                    THE COURT:  And not to discuss why you

1  were brought up.

2              AMY BARLETT:  Okay.

3              THE COURT:  Thank you.

4              AMY BARLETT:  Thank you.

5              ATTY. BAILEY:  Thanks.

6              ATTY. BECKER:  Thank you.

7              ATTY. JUHASZ:  Thanks.

8              ATTY. INGRAM:  Thank you.

9              (Whereupon, Amy Barlett was excused from

10  the courtroom and the proceedings commenced with the next

11  prospective juror as follows.)

12              **PROSPECTIVE JUROR VICTOR V. SABULSKY**

13              THE COURT:  Good afternoon.  Have a seat.

14  How are you today?

15              VICTOR V. SABULSKY:  Fine, thank you.

16              THE COURT:  Good.  Three questions for

17  you.  Has anything occurred since we last spoke which might

18  affect your ability to serve as a fair-minded juror in this

19  matter?

20              VICTOR V. SABULSKY:  No.

21              THE COURT:  When you were here last many

22  questions were put to you by both sides.  Do you presently

23  have any reason to change or amend your responses given?

1          VICTOR V. SABULSKY:  No.

2               THE COURT:  Is there any reason you are

3     unable to continue your service in this most important case

4     which may last until the first week of June?

5          VICTOR V. SABULSKY:  No.

6               THE COURT:  Okay.  Very good.  Please go

7     back downstairs and wait, we'll have you all up here shortly,

8     and not to discuss any reason why you were brought up here,

9     okay?

10          VICTOR V. SABULSKY:  Okay.

11               THE COURT:  Thank you.

12               ATTY. BECKER:  Thank you.

13               ATTY. JUHASZ:  Thanks.

14               ATTY. INGRAM:  Thank you, sir.

15               (Whereupon, Victor V. Sabulsky was excused

16     from the courtroom and the proceedings commenced with the

17     next prospective juror as follows.)

18               **PROSPECTIVE JUROR JUDITH M. ELLIOTT**

19               THE COURT:  Go ahead, have a seat right up

20     here, please.  How are you doing today?

21          JUDITH M. ELLIOTT:  Okay.

22               THE COURT:  Good.  Three questions for

23     you.

1              JUDITH M. ELLIOTT:  Okay.

2              THE COURT:  Has anything occurred since we

3    last spoke which might affect your ability to serve as a

4    fair-minded juror in this matter?

5              JUDITH M. ELLIOTT:  Not that I can think

6    of.

7              THE COURT:  When you were last here there

8    were many questions put to you by both sides.  Do you

9    presently have any reason to change or amend your answers?

10              JUDITH M. ELLIOTT:  No.

11              THE COURT:  Is there any reason you are

12    unable to continue your service in this most important case

13    which may last until the first week of June?

14              JUDITH M. ELLIOTT:  Not that I can see.

15              THE COURT:  Very good.  Please wait back

16    downstairs.  We'll have you all up here shortly.

17              JUDITH M. ELLIOTT:  Okay.

18              THE COURT:  Not to discuss anything about

19    why you were brought up here.

20              JUDITH M. ELLIOTT:  Right.  Thank you.

21              THE COURT:  Thank you.

22              ATTY. BAILEY:  Thank you.

23              ATTY. JUHASZ:  Thanks.

```
 1                         (Whereupon, Judith M. Elliott was excused

 2       from the courtroom and the proceedings commenced with the

 3       next prospective juror as follows.)

 4                    PROSPECTIVE JUROR SALINA M. SNYDER

 5                         THE COURT:  Good afternoon to you.

 6                         SALINA M. SNYDER:  Good afternoon.

 7                         THE COURT:  Three questions for you.

 8                         SALINA M. SNYDER:  Yes.

 9                         THE COURT:  Has anything occurred since we

10       last spoke which might affect your ability to serve as a

11       fair-minded juror in this matter?

12                         SALINA M. SNYDER:  No.

13                         THE COURT:  When you were last here many

14       questions were put to you by both sides.  Do you presently

15       have any reason to change or amend your answers given at that

16       time?

17                         SALINA M. SNYDER:  No.

18                         THE COURT:  Is there any reason you are

19       unable to continue your service in this most important case

20       which may last until the first week of June?

21                         SALINA M. SNYDER:  No.

22                         THE COURT:  Okay.  Very good.  Thank you.

23                         SALINA M. SNYDER:  Thank you.
```

1           THE COURT:  Please wait back downstairs

2   and not to discuss anything --

3           SALINA M. SNYDER:  Okay.

4           THE COURT:  -- as to why you were up here.

5           SALINA M. SNYDER:  Okay.

6           THE COURT:  Thank you.

7           ATTY. INGRAM:  Thank you.

8           ATTY. JUHASZ:  Thank you.

9           ATTY. BECKER:  Thank you.

10          (Whereupon, Salina M. Snyder was excused

11  from the courtroom and the proceedings commenced with the

12  next prospective juror as follows.)

13              **PROSPECTIVE JUROR MARGARET E. FELLOWS**

14          THE COURT:  How are you this afternoon?

15          MARGARET E. FELLOWS:  Fine, thank you.

16          THE COURT:  Very good.  Three questions

17  for you.  Has anything occurred since we last spoke which

18  might affect your ability to be or to serve as a fair-minded

19  juror?

20          MARGARET E. FELLOWS:  No.

21          THE COURT:  When you were last here many

22  questions were put to you by both sides.  Do you presently

23  have any reason to change or amend your responses to any

```
 1    questions put to you?

 2                    MARGARET E. FELLOWS:  No.

 3                    THE COURT:  Is there any reason you are

 4    unable to continue your service in this most important case

 5    which may last until the first week of June?

 6                    MARGARET E. FELLOWS:  No.

 7                    THE COURT:  Okay.  Very good.  Thank you.

 8    Please have a seat back downstairs, we'll bring you up later,

 9    and not to discuss why you were brought up.  Thank you.

10                    MARGARET E. FELLOWS:  (Nods head

11    affirmatively.)

12                    ATTY. BECKER:  Thank you.

13                    ATTY. BAILEY:  Thanks.

14                    ATTY. JUHASZ:  Thanks.

15                    ATTY. INGRAM:  Thank you, ma'am.

16                    (Whereupon, Margaret E. Fellows was

17    excused from the courtroom and the proceedings commenced with

18    the next prospective juror as follows.)

19              PROSPECTIVE JUROR MARGARET L. KAY

20                    THE COURT:  How are you today, Margaret?

21                    MARGARET L. KAY:  Fine, thank you.

22                    THE COURT:  Three questions.  Has anything

23    occurred since we last spoke which might affect your ability
```

```
 1   to serve as a fair-minded juror in this case?

 2                   MARGARET L. KAY:  No.

 3                   THE COURT:  When you were last here there

 4   were many questions put to you by both sides.  Do you

 5   presently have any reason to change or amend any response

 6   given at that time?

 7                   MARGARET L. KAY:  No.

 8                   THE COURT:  Is there any reason you are

 9   unable to continue your service in this most important case

10   which may last until the first week of June?

11                   MARGARET L. KAY:  No.

12                   THE COURT:  Okay.  Very good.  Thank you.

13   Please go back downstairs.  We'll have you all up here

14   shortly.  You are not to discuss anything about why you came

15   up, okay?

16                   MARGARET L. KAY:  Okay.

17                   THE COURT:  Thank you.

18                   ATTY. BECKER:  Thank you.

19                   ATTY. BAILEY:  Thanks.

20                   ATTY. INGRAM:  Thanks.

21                   ATTY. JUHASZ:  Thank you.

22                   (Whereupon, Margaret L. Kay was excused

23   from the courtroom and the proceedings commenced with the
```

1    next prospective juror as follows.)

2                    **PROSPECTIVE JUROR ANDREW KOTWIS**

3                    THE COURT:  Andy, have a seat up here,

4    please.

5                    ATTY. INGRAM:  How was your blood

6    pressure?

7                    ANDREW KOTWIS:  It was low.

8                    THE COURT:  Andy, I have three questions

9    for you here.  Has anything occurred since we last spoke

10   which might affect your ability to serve as a fair-minded

11   juror in this matter?

12                   ANDREW KOTWIS:  No, sir.

13                   THE COURT:  When you were last here many

14   questions were put to you by both sides.  Do you presently

15   have any reason to change or amend your response to any

16   question put to you?

17                   ANDREW KOTWIS:  No, sir.

18                   THE COURT:  Is there any reason you are

19   unable to continue your service in this most important case

20   which may last until the first week of June?

21                   ANDREW KOTWIS:  No, sir.

22                   THE COURT:  Okay.  Very good.  Please go

23   back downstairs.  We'll have you all up here shortly.  Not to

```
 1   tell anybody why you were brought up here.

 2                   ANDREW KOTWIS:  Okay.

 3                   ATTY. BAILEY:  Thanks.

 4                   ATTY. BECKER:  Thank you.

 5                   ATTY. INGRAM:  Thank you.

 6                   (Whereupon, Andrew Kotwis was excused from

 7   the courtroom and the proceedings commenced with the next

 8   prospective juror as follows.)

 9            PROSPECTIVE JUROR MICHAEL E. BLAKE

10                   THE COURT:  Good afternoon.

11                   MICHAEL E. BLAKE:  Good afternoon, Your

12   Honor.

13                   THE COURT:  Three questions.  Has anything

14   occurred since we last spoke which might affect your ability

15   to serve as a fair-minded juror in this case?

16                   MICHAEL E. BLAKE:  No.

17                   THE COURT:  When you were last here many

18   questions were put to you by both sides.  Do you presently

19   have any reason to change or amend your response to any

20   question put to you?

21                   MICHAEL E. BLAKE:  No, Your Honor.

22                   THE COURT:  Is there any reason you are

23   unable to continue your service in this most important case
```

```
 1    which may last until the first week of June?

 2                     MICHAEL E. BLAKE:  No, Your Honor.

 3                     THE COURT:  Okay.  Very good.  Please have

 4    a seat downstairs.  We'll have you all up here shortly.

 5                     MICHAEL E. BLAKE:  Okay.

 6                     THE COURT:  Not to mention to anybody why

 7    you came up.

 8                     ATTY. BAILEY:  Thanks.

 9                     ATTY. BECKER:  Thank you.

10                     ATTY. JUHASZ:  Thank you.

11                     ATTY. INGRAM:  Thank you.

12                     (Whereupon, Michael E. Blake was excused

13    from the courtroom and the proceedings commenced with the

14    next prospective juror as follows.)

15              PROSPECTIVE JUROR DAVID R. RATCLIFFE

16                     THE COURT:  Good afternoon to you.

17                     DAVID R. RATCLIFFE:  Good afternoon.

18                     THE COURT:  Three questions.  Has anything

19    occurred since we last spoke which might affect your ability

20    to serve as a fair-minded juror in this case?

21                     DAVID P. RATCLIFFE:  No.

22                     THE COURT:  When you were here last many

23    questions were put to you by both sides.  Do you presently
```

1      have any reason to change or amend your responses to any

2      question put to you?

3                  DAVID P. RATCLIFFE:  No.

4                   THE COURT:  Is there any reason you are

5      unable to continue your service in this most important case

6      which may last until the first week of June?

7                   DAVID P. RATCLIFFE:  No.

8                   THE COURT:  Okay.  Very good.  Please

9      return downstairs.  We are going to have you all back up here

10      shortly.

11                   DAVID P. RATCLIFFE:  Okay.

12                   THE COURT:  Thank you.

13                   DAVID P. RATCLIFFE:  Thank you.

14                   ATTY. BECKER:  Thank you.

15                   ATTY. BAILEY:  Thanks.

16                   ATTY. JUHASZ:  Thanks.

17                   ATTY. INGRAM:  Thank you.

18                   (Whereupon, David P. Ratcliffe was excused

19      from the courtroom.)

20                   THE COURT:  Is there one that was missed?

21                   THE BAILIFF:  He's at domestic court until

22      3:00 o'clock.

23                   ATTY. BAILEY:  Yeah, he's in domestic

1    court.

2                THE COURT:  Which one?  Oh, that's the

3    one.  What's his name?

4                THE BAILIFF:  Davidson.  Davidson, judge.

5                THE COURT:  Davidson.

6                ATTY. BECKER:  Do you want to take a break

7    until Davidson gets here?

8                ATTY. INGRAM:  Well, let's take a break.

9    I have an idea that I need to discuss with Mr. Juhasz, and

10    after I discuss it with Mr. Juhasz I have to discuss it with

11    these gentlemen, and after I discuss it with them maybe we'll

12    discuss it with you.

13                THE COURT:  Then you'll let me in on it.

14    Okay.  Have at it.

15                (Whereupon, a brief recess was taken.)

16            **PROSPECTIVE JUROR TODD DAVIDSON**

17                THE COURT:  You've been a busy man today.

18                TODD DAVIDSON:  Oh.

19                THE COURT:  Three questions for you.  Has

20    anything occurred since we last spoke which might affect your

21    ability to serve as a fair-minded juror in this case?

22                TODD DAVIDSON:  No.

23                THE COURT:  Okay.  When you were last here

1    many questions were put to you by both sides.  Do you

2    presently have any reason to change or amend your response to

3    any question?

4                          TODD DAVIDSON:  No, not really.

5                          THE COURT:  Okay.  Is there any reason you

6    are unable to continue your service -- I'm sorry.  Any reason

7    you are unable to continue your service in this most

8    important case which may last until the first week of June?

9                          TODD DAVIDSON:  No.

10                         THE COURT:  None?

11                         TODD DAVIDSON:  (Shaking head negatively.)

12                         THE COURT:  Okay.  Very good.  If you'll

13   go back downstairs we're going to have you all back up here

14   shortly.

15                         TODD DAVIDSON:  Okay.

16                         THE COURT:  Thank you.

17                         TODD DAVIDSON:  Thank you.

18                         ATTY. BECKER:  Thank you.

19                         ATTY. BAILEY:  Thanks.

20                         ATTY. BECKER:  Hope everything went well

21   for you down there.

22                         TODD DAVIDSON:  Oh, yeah.

23                         ATTY. INGRAM:  Thanks.

1          ATTY. JUHASZ:   Thank you.

2          ATTY. INGRAM:   It's our fault.   You told

3    us about it.

4          (Whereupon, Todd Davidson was excused from

5    the courtroom and a brief recess was taken.)

6          THE COURT:   Do you want to put something

7    on the record at this point in time?

8          ATTY. BECKER:   Yeah, why don't we put

9    something on the record, pick the regulars.

10          ATTY. BAILEY:   The regular 12 jurors.

11          THE COURT:   Mr. Juhasz actually has a

12    different perspective than I think of rest of under the

13    circumstances.

14          ATTY. JUHASZ:   What a surprise.

15          ATTY. INGRAM:   Go ahead, explain yourself.

16          ATTY. JUHASZ:   Well, my concern is I heard

17    several of these jurors say this afternoon that they've got

18    things going on in their personal lives that have come up and

19    we've said, "Okay.   Thanks a lot.   Go back down to the jury

20    room."   We got a lady who is going to be gone for two days

21    with her daughter having surgery, a lady who has got plans to

22    leave and go to Chicago for the weekend, a fellow who has got

23    problems at work.

1    I understand that we're all trying to get a jury and

2    we're probably all frustrated because it's taken us five

3    weeks to do it, but the bottom line is we may be cutting off

4    our nose to spite our face.  These are questions where we'd

5    ask jurors in any other case and any other situation and say

6    are you not comfortable sitting on this jury because of

7    what's come up?

8    And I can envision a situation, and maybe nobody

9    else in the room agrees with me, that happens to me a lot,

10   but I can envision a situation where if we don't ask these

11   people and we just force them onto this jury and nobody

12   knocks them off with a peremptory challenge that, and I'm

13   just going to take her as an example, poor Mrs. Dicenso, as

14   it gets closer and closer to her daughter's surgery and her

15   maternal instincts get stronger and stronger, she's going to

16   say, "You know what?  I'm sorry, I just can't serve on this

17   jury."  And we have enough people here that with four

18   alternates that could potentially become a problem for a

19   mistrial.

20   THE COURT:  Well, John, only you and I can

21   understand the feelings of a mother, but I agree with you.  I

22   do not think it's a good idea to have anybody -- now, there

23   are some things that are inconvenient for people.  The thing

4551

1    with the mother, that's pretty basic I think.  And to force

2    her to stay on the jury, you have at best a bad juror no

3    matter how nice a lady she is, and she's going to be

4    concerned about her daughter.

5         The guy with the work, I think that's something that

6    Jerry brings up a point.  He should be asked more questions

7    about that.  Maybe he's going to say it doesn't make any

8    difference, we still have a mess.  But what are you proposing

9    then?

10        ATTY. JUHASZ:  Well, from our notes,

11   judge, there are five of them.  I can't imagine that's going

12   to take another 10 minutes or so.  Let's just call them in

13   and ask them those kind of questions that we normally ask

14   those jurors.  You know, maybe it's a problem and maybe it's

15   not.  The fellow with the cousin coming in, you know, maybe

16   that's not a problem because of these days off.  I don't

17   think we really left that fully answered with him.

18        THE COURT:  Okay.  Here's the only thing,

19   we reach 4:00 o'clock.  I think that that's advisable that we

20   do that, we're going to nail down the ones that may be

21   potential problems.  I would also suggest that maybe we

22   should take tomorrow and get more in the pool and then Monday

23   get everybody in here hell or high water, Monday morning at

1    10:00, and start this with our jury selection.

2        Now, the caveat is, the way we've been going, we

3    might spend all day tomorrow and get one or maybe two more,

4    but at least it's more of a cushion than we are going to have

5    otherwise.

6        ATTY. JUHASZ:  I agree with that.  And can

7    I just, and I haven't even thought this through, I'm just

8    sort of reacting to what you're saying.  I don't think it

9    would take that long to do the peremptories today as we had

10   planned once we talk to these five people.  And the only

11   reason I'm thinking about that, judge, is because I don't

12   know what they're going to do and we don't know what we're

13   going to do depending upon what they do as far as

14   peremptories.  My point is if some get waived we may not be

15   in as dire straits at the end of the day as maybe we're

16   thinking right now.

17       THE COURT:  Well, I'm not that good a

18   prognosticator and all I can say is you have to have a

19   certain -- you got certain numbers here we have to work with

20   and we're just pushing it awful close to the line.  And --

21       ATTY. JUHASZ:  No.  I'm sorry, I don't

22   mean to interrupt you.  I agree with that.  But here's what

23   I'm saying is if everybody uses six we need 24 jurors to get

```
 1    a panel of 12, and we need, we need eight more to get our
 2    four alternates.  But if they don't use all their
 3    peremptories and we don't use all our peremptories, we may
 4    have a bigger pool of potentials for peremptories.
 5                    THE COURT:  But if we do it that way and
 6    we run out of people, then we've got potentially a jury,
 7    maybe you've gotten the jury seated but you don't have the --
 8                    ATTY. JUHASZ:  Okay.
 9                    THE COURT:  And you've got to send the
10    jury home and then we have to monkey around.  I'd rather get
11    it all done first.  I think that makes more sense.  Now you
12    tell me.
13                    ATTY. BAILEY:  Judge, if I understand,
14    you're saying we should get the jury today?
15                    ATTY. JUHASZ:  No, that's not what he's
16    saying.
17                    ATTY. BAILEY:  What were you saying?
18                    ATTY. JUHASZ:  He's saying we could go
19    through, if I understand what he's saying, --
20                    THE COURT:  I'm saying we take the other
21    time we have today and bring these ones up that are potential
22    problems, question them, make a decision on each one, what
23    we're going to do.  Spend tomorrow, have seven or eight more
```

 1    come in and go through this procedure and get more numbers in

 2    the pot.

 3                      ATTY. BAILEY:  I was kind of hoping of

 4    getting the basic jury of 12 today and then tomorrow we'll

 5    get some more and then we would exercise the peremptories on

 6    the alternates.  That way at least we have a jury for sure

 7    today and then we pick up whatever we need for the alternates

 8    tomorrow.  I think if we get two tomorrow --

 9                      THE COURT:  Well, we're going to have to

10    keep the jury here past 4:30 because it's going to take at

11    least a half hour to go through these six people, five or six

12    people, at least.

13                      ATTY. BAILEY:  It shouldn't take that

14    long.

15                      THE COURT:  Okay.  Let's try it that way.

16    Get the first one up, if you will, Gary.

17                      CAPTAIN BACON:  What's the name?

18                      THE COURT:  What's the name?

19                      ATTY. INGRAM:  The first one is

20    Carmichael.

21                      ATTY. JUHASZ:  The first one is

22    Carmichael.

23                      THE COURT:  Carmichael.  This is not going

 1 │ to take very long with him.

 2 │                    ATTY. INGRAM:  Who are the other ones?

 3 │                    ATTY. BECKER:  We're just doing the five?

 4 │                    ATTY. INGRAM:  Carmichael, Black,

 5 │ Patterson, Dicenso, Schlaegel.  Those are the five.

 6 │                    THE COURT:  Yeah, just have them all come

 7 │ up and wait out there.

 8 │                    CAPTAIN BACON:  Dicenso?  I've got three

 9 │ so far.  Who else?

10 │                    ATTY. INGRAM:  Fifty-nine, Thomas

11 │ Carmichael.

12 │                    ATTY. JUHASZ:  Do you have Schlaegel,

13 │ Robin Schlaegel?

14 │                    CAPTAIN BACON:  No.

15 │                    ATTY. JUHASZ:  There's four.

16 │                    CAPTAIN BACON:  Five.  Carmichael,

17 │ Dicenso.  Kel, she won't answer the phone.

18 │                    (Whereupon, a brief recess was taken.)

19 │          **PROSPECTIVE JUROR THOMAS A. CARMICHAEL**

20 │                    THE COURT:  Mr. Carmichael.

21 │                    THOMAS A. CARMICHAEL:  Yeah.

22 │                    THE COURT:  You expressed some concern

23 │ about -- I think on two different planes you had potential

```
 1   problems.

 2                     THOMAS A. CARMICHAEL:  Right.

 3                     THE COURT:  With your cousin, as I

 4   remember, and the second one was what?

 5                     THOMAS A. CARMICHAEL:  A company picnic.

 6                     THE BAILIFF:  No, that's not a problem.

 7   That's not until June 21st.

 8                     THE COURT:  Oh, okay.  What is your view?

 9   Would you rather not be on this jury or are you willing to

10   serve on the jury and take whatever inconvenience that may be

11   concerning the problem with or the fact your cousin is

12   coming?  I'm assuming your cousin is going to have other

13   things to do besides just be with you.  You tell me how

14   critical a thing this is.

15                     THOMAS A. CARMICHAEL:  Well, I don't get

16   to see him that often.  I would like to spend as much time as

17   I can with him so I would, I would prefer not to be on the

18   jury.

19                     THE COURT:  Does the State have any brief

20   questions you wish to put or not?

21                     ATTY. BAILEY:  Mr. Carmichael, we expect

22   over the next three weeks we're going to be going for three

23   and a half days during each of those three weeks, I mean,
```

1    until the jury gets to the point where they're sequestered.

2    Your cousin is coming in on what day?

3                    THOMAS A. CARMICHAEL:   The 20th.

4                    ATTY. BAILEY:   The 20th, May 20th.   Okay.

5    And today is the 8th.   That's Memorial Day weekend or --

6                    THOMAS A. CARMICHAEL:   No.   He'll be

7    here --

8                    ATTY. INGRAM:   That's before that.

9                    THE COURT:   Yeah.

10                   CAPTAIN BACON:   Here.

11                   ATTY. BAILEY:   Thanks.   Okay.   Today is --

12   if we start this trial about the 12th we would go for three

13   and a half days, and then the following week we would start

14   on a Tuesday.   And he's coming in on Tuesday?

15                   ATTY. BECKER:   That Tuesday.

16                   ATTY. BAILEY:   That Tuesday, the 20th.

17   Okay.   You'd be home in the evenings because court generally

18   goes from about 9:00 o'clock until about 4:30 or 5:00.   And

19   we would -- there would be half a day Thursday that's off,

20   which is the court's regular day, and we would go through

21   Friday of that week.   And then the following then you would

22   have off Saturday the 24th through the 26th, which is

23   Memorial Day, and then we would be back on the 27th.

1                    THOMAS A. CARMICHAEL:  I understand, but I
2    would still rather not be on it.
3                    ATTY. BAILEY:  Okay.  Is there something
4    other than the fact that your cousin is coming in?
5                    THOMAS A. CARMICHAEL:  I just, I don't
6    think I'd be comfortable sitting here.  I mean, I don't think
7    I would be comfortable sitting there, you know, watching
8    this.
9                    THE COURT:  You have second thoughts about
10   even being on the jury is what you're saying?
11                   THOMAS A. CARMICHAEL:  Yes.
12                   ATTY. BAILEY:  Would it affect one side or
13   the other?
14                   THOMAS A. CARMICHAEL:  I'm not sure.  I
15   just, I don't think I would be paying attention to anything
16   that goes on in the court.
17                   ATTY. BAILEY:  Is there a reason for it?
18                   THOMAS A. CARMICHAEL:  I just, I -- if I'm
19   not moving around I just get sleepy.  If I'm going to sit
20   here I'm going to get tired.  I was down there napping
21   already because, you know, I just can't sit down for a while.
22                   THE COURT:  Do you have any questions?
23                   ATTY. INGRAM:  Yeah, I do.  Your request

1   or your preference that you not be here and that you spend

2   time with your cousin, I'm sensing from you that that's a

3   pretty strong preference.

4                       THOMAS A. CARMICHAEL:   That is a

5   preference.

6                       ATTY. INGRAM:   And it's so strong of a

7   preference that if we say nay that you're going to be a

8   little miffed with us, is that it?

9                       THOMAS A. CARMICHAEL:   Yes.

10                      ATTY. INGRAM:   Okay.   I thought so.   I

11  have no further questions.

12                      THE COURT:   Any objection to dismissing

13  for cause?

14                      ATTY. BAILEY:   No objection, Your Honor.

15                      ATTY. INGRAM:   No.

16                      THE COURT:   Okay.   You're excused,

17  Mr. Carmichael.   Thank you very much.

18                      (Whereupon, Thomas A. Carmichael was

19  dismissed from the pool of prospective jurors for cause.)

20                      THE COURT:   There's an example of

21  something that has changed.   That's an excuse, not the reason

22  he doesn't want to sit on that jury.

23                      ATTY. INGRAM:   Off the record.

 1                    (Whereupon, a discussion was had off the

 2    record.)

 3                **PROSPECTIVE JUROR LINDA J. BLACK**

 4                    THE COURT:  We meet again.

 5                    LINDA J. BLACK:  Hi.

 6                    THE COURT:  Linda, in asking you those few

 7    questions before there was no other problem except your

 8    animals, right, your dogs?

 9                    LINDA J. BLACK:  Yes.

10                    THE COURT:  Now, we have to know whether

11    that's going to be something that is going to cause you a

12    problem to sit here.  If you are able to -- you know, it's

13    important to both sides that we try to eliminate as many

14    potential things that might bother jurors because they have

15    to give their full attention to this, and none of us, I

16    believe, are really sure about where you stand in regard to

17    your dogs.  Remember we talked about it before?

18                    LINDA J. BLACK:  Uh-huh.

19                    THE COURT:  And my impression was that it

20    was a concern for you and a bother but it wasn't any real

21    problem.

22                    LINDA J. BLACK:  The only concern would be

23    is when you're subpoenaed.  I've been subpoenaed before on

 1   the first trial I was on.  They don't give you time to go

 2   home.  I can board them but -- that's not a problem -- but to

 3   get them there.  I just have two.

 4                  THE COURT:  Well, I mean, like if you have

 5   to be kept together overnight.

 6                  LINDA J. BLACK:  Uh-huh.

 7                  THE COURT:  Here's the way this has always

 8   worked, every case I've seen.  We all have an idea this is

 9   the day that the jury is going to be kept together until they

10   get a decision.  We always tell people the night before bring

11   your personal effects with you, you know, because --

12                  LINDA J. BLACK:  In case.

13                  THE COURT:  Now, sometimes it doesn't

14   happen on that day, it might occur the following day, but at

15   least we're pretty close on that part.  Now, with that in

16   mind, you know, you have 24 hours advanced notice.

17                  LINDA J. BLACK:  That's not a problem.  I

18   have someone who will keep them.

19                  THE COURT:  You do?  Okay.  So that would

20   not be a problem then for you to sit on this jury?

21                  LINDA J. BLACK:  No.

22                  THE COURT:  Okay.  You're clear in your

23   mind on that then?

```
 1                         LINDA J. BLACK:  Yes.

 2                         THE COURT:  And there's no other reason

 3    that you would not feel comfortable in sitting then?

 4                         LINDA J. BLACK:  No.

 5                         THE COURT:  Okay.  Very good.  Do you have

 6    any questions or not?

 7                         ATTY. BAILEY:  I just want to mention one

 8    thing.  If you have to board your dogs if you don't have

 9    somebody available at that time, you could notify the kennel

10    like this week and say, "I'm going to be on a jury and I have

11    dogs and they need to be boarded, I don't know the exact

12    day," but they can make arrangements to keep it sort of

13    open-ended.

14                         LINDA J. BLACK:  Ahead of time.

15                         ATTY. BAILEY:  Because I have dogs and as

16    long as it's not the height of summer vacation or something

17    when everybody is traveling, generally they can generally get

18    them in, especially if you give them advance notice.

19                         LINDA J. BLACK:  Okay.  I understand that.

20                         THE COURT:  Make prior arrangements,

21    that's a good idea.

22                         LINDA J. BLACK:  I understand that.

23                         ATTY. BAILEY:  And tell them you may have
```

1    to board them twice, okay?

2                    LINDA J. BLACK:  Okay.

3                    THE COURT:  Okay.  Done?

4                    ATTY. INGRAM:  No questions.

5                    THE COURT:  Okay.  Thank you.

6                    (Whereupon, Linda J. Black was excused

7    from the courtroom and the proceedings commenced with the

8    next prospective juror as follows.)

9              **PROSPECTIVE JUROR KEVIN B. PATTERSON**

10                   THE COURT:  One thing that is of a concern

11   to us because we think there's a possible concern on your

12   part -- you know, the whole thing is to have as much as

13   possible people that don't have extraneous things that are

14   bothering them or worrying them.

15                   KEVIN B. PATTERSON:  Certainly.

16                   THE COURT:  And you mentioned your job.

17                   KEVIN B. PATTERSON:  Right.

18                   THE COURT:  I perceived your answer a

19   little bit differently than a couple of the other people

20   here.  My impression -- well, you tell me.  What -- if you

21   are required to be on this case is your job situation

22   something that you feel is going to cause you harm in some

23   way or some kind of harm to your employer that you would like

```
 1    to avoid?  You tell us, is that something that is --

 2                         KEVIN B. PATTERSON:  The concern would be

 3    that I would just get further and further behind and my

 4    employer would get further behind.  The work, the work is

 5    going to keep coming whether I'm here or whether I'm there.

 6                         THE COURT:  What type of work, I forget?

 7                         KEVIN B. PATTERSON:  I do case work plus I

 8    do evaluations --

 9                         THE COURT:  Oh, yeah.  Okay.

10                         KEVIN B. PATTERSON:  -- which I go out.

11    We cover all of Ohio so there's --

12                         THE COURT:  You work for the federal

13    government?

14                         KEVIN B. PATTERSON:  Yes.  There's usually

15    six of us.  There's four of us doing it now and --

16                         THE COURT:  They're not going to pick up

17    or transfer any other employee to take up the slack?

18                         KEVIN B. PATTERSON:  No, sir, there's no

19    chance of that.  They have not been sending me stuff because

20    I'm on jury duty so they've, they've tried to do that.

21                         THE COURT:  Well, will that continue as

22    long as you're not there or does it pile up on you?  Does it

23    pile up or will they send it --
```

1         KEVIN B. PATTERSON:  It's going to pile up

2    no matter what, correct, it's going to pile up.  They'll

3    continue to do it, I mean, we don't have a choice.

4         THE COURT:  Well, then I have to leave

5    this up to you.  We all appreciate that, you know, your job

6    is your livelihood and this, that and the other.  You tell

7    us, do you wish to serve on this jury with that in mind or

8    would you rather not serve on this jury because of that?

9         KEVIN B. PATTERSON:  Now, with that in

10   mind I would rather not serve.  And that didn't happen --

11   what happened happened after I was up here.

12        THE COURT:  And it would have happened in

13   any event while you -- if we had started the jury sooner you

14   would still have that on your mind?

15        KEVIN B. PATTERSON:  Yes, sir.  Yes, sir.

16        THE COURT:  Well, any questions by the

17   State?

18        ATTY. BAILEY:  One or two.  Mr. Patterson,

19   I understand it's inconvenient, but if you were sick for

20   maybe three or four weeks because -- well, let me point out,

21   over the next three weeks we're only going to be in court for

22   three and a half days until you get into sequestration and

23   deliberations in the first phase.

```
 1                        KEVIN B. PATTERSON:  Uh-huh.

 2                        ATTY. BAILEY:  Okay.  Because we've got

 3    holidays and we've got other things that are scheduled.

 4                        KEVIN B. PATTERSON:  Right.

 5                        ATTY. BAILEY:  During that time you could

 6    probably go to work on the days that you're not here, okay,

 7    as long as you avoid any contact about talking about this

 8    case.

 9                        KEVIN B. PATTERSON:  Okay.

10                        ATTY. BAILEY:  Okay.  So we would be going

11    next week.  If we start on Monday we're going to go Monday,

12    Tuesday, Wednesday and half a day Thursday.  Then we're going

13    to be off Friday, we're going to be off the following Monday,

14    and we'll go, the week of the 18th we're going to go Tuesday

15    the 20th, 21st, half a day on Thursday, and Friday the 23rd.

16    Okay.

17                   Then you got Memorial Day weekend.  We're going to

18    be off the 26th.  Then we're going to have three and a half

19    days the next week.  Okay.  At that point you could be in

20    deliberations, somewhere around there.  Will you be able to

21    pick up on some of the case work during those days?

22                   And if it went to a second phase generally that

23    testimony, the proceedings last for generally one day.  It
```

```
 1    could last as many as three days, but generally it's one or

 2    two.

 3                    KEVIN B. PATTERSON:  Yeah, I would be able

 4    to do that.  I could go to work when I wasn't here, sure.

 5                    ATTY. BAILEY:  Will you be able to work

 6    around this schedule so that you would be able to sit on this

 7    case?  I understand that things may back up, but we all run

 8    into that, and there are times when we may have to put some

 9    extra work in.  Will you still be able to concentrate on this

10    case and give it your full attention during that time and

11    then pick up some of your case load, you know, at work so you

12    would be able to serve in this case?

13                    KEVIN B. PATTERSON:  I think I could do

14    that if I had to, uh-huh.

15                    ATTY. BAILEY:  Okay.  And it wouldn't

16    unduly affect you so that you would lose concentration here?

17                    KEVIN B. PATTERSON:  No.

18                    ATTY. BAILEY:  Okay.  So you would be able

19    to serve?

20                    THE COURT:  You're comfortable with that?

21                    KEVIN B. PATTERSON:  Yeah.  Yes, sir.

22                    THE COURT:  Okay.  Any questions?

23                    ATTY. INGRAM:  Yes.  I will adopt
```

1    Mr. Bailey's rules here, Your Honor.  Mr. Carmichael, as I

2    understand your answer -- Mr. Patterson.  I'm sorry.

3    Presently at your employment there are four employees doing

4    the work of six?

5                        KEVIN B. PATTERSON:   That's correct.

6                        ATTY. INGRAM:   And the duty assignments

7    are piling up because you're two short now, two employees

8    short, correct?

9                        KEVIN B. PATTERSON:   That's right.

10                       ATTY. INGRAM:   We take you away.   That

11   means there's three employees doing the work of six.

12                       KEVIN B. PATTERSON:   That would be

13   correct.

14                       ATTY. INGRAM:   And your duty assignments,

15   they're not assignments where you just go into the office,

16   there's a sheet of paper on the desk and everybody can come

17   to you and you can get everything done in the office, you got

18   to get in the car and you got to drive, sometimes you have to

19   stay, and it takes some time, am I correct?

20                       KEVIN B. PATTERSON:   Yeah.   I'm an

21   out-stationed employee, right.

22                       ATTY. INGRAM:   Which means that scheduling

23   pot luck is sort of a problem for you?

1        KEVIN B. PATTERSON:  I have an area from

2   Painesville to Mansfield to Marietta and everything in

3   between in the State, so when things happen in that area I

4   handle them.

5        ATTY. INGRAM:  And if you have to go down

6   to Marietta and you can spend time down there you can

7   schedule things in a block, whereas if you're only in the

8   office for one day --

9        KEVIN B. PATTERSON:  That's true.

10        ATTY. INGRAM:  -- your scheduling is far

11   more of a problem.

12        KEVIN B. PATTERSON:  That's true, correct.

13   Right.

14        ATTY. INGRAM:  In light of all of that, if

15   you feel that it's a hardship upon you and your employer,

16   just let us know.

17        KEVIN B. PATTERSON:  I think it is

18   probably a hardship to a certain extent, yes.

19        ATTY. INGRAM:  And it is something that no

20   matter how hard you try not to worry about it, in the back of

21   your mind you might be a bit concerned about the work piling

22   up at the office?

23        KEVIN B. PATTERSON:  I guess that might

1 happen.  Yeah, I would try not to think about it, but it

2 could happen, sure.

3        ATTY. INGRAM:  All right.  I have no

4 further questions, and I have no objection to Mr. Patterson

5 being excused.

6        THE COURT:  Okay.  I will ask you this,

7 Mr. Patterson.  In light of the two styles of questioning

8 here, the one sympathetic more so than the other.

9        KEVIN B. PATTERSON:  Right.

10        THE COURT:  What do you wish to do?  And

11 we will be comfortable with whatever your decision is.  We

12 would like to have you sit on this jury, but you're the guy

13 that has to answer that.

14        KEVIN B. PATTERSON:  Yeah, I would rather

15 be dismissed honestly to do the work, to do my work.

16        THE COURT:  You would like to stay?  I'm

17 sorry?

18        COURT REPORTER:  To be dismissed, judge.

19        THE COURT:  To be dismissed?

20        KEVIN B. PATTERSON:  To do the work.

21        THE COURT:  Well, the federal government

22 should pay you more than you're getting paid, I'll tell you

23 that.

```
 1                         KEVIN B. PATTERSON:  Well, they do, but --

 2                         THE COURT:  Well, any objection to

 3    dismissing for cause?

 4                         ATTY. INGRAM:  None from the defense.  I

 5    can't speak for Mr. Bailey.

 6                         THE COURT:  The State?

 7                         ATTY. BAILEY:  We reluctantly will let him

 8    go.

 9                         THE COURT:  Okay.  Thank you very much.

10    Good luck to you.

11                         KEVIN B. PATTERSON:  Thank you, and I

12    apologize.

13                         THE COURT:  That's no problem.  Things

14    come up, we understand.  Thanks for participating, though.

15                         ATTY. BAILEY:  Thanks.

16                         ATTY. INGRAM:  Thank you.

17                         ATTY. JUHASZ:  Good luck.

18                         (Whereupon, Kevin B. Patterson was

19    dismissed from the pool of prospective jurors for cause and

20    the proceedings continued with the next prospective juror as

21    follows.)

22                 PROSPECTIVE JUROR MOSELLE DICENSO

23                         THE COURT:  What would your reaction be if
```

1  I tell you you have to stay?

2                    MOSELLE DICENSO:  I wouldn't be happy.

3                    THE COURT:  Wouldn't be happy.

4                    MOSELLE DICENSO:  She's never had anything

5  like this before.

6                    THE COURT:  Well, we've talked about this,

7  and none of us happen to be mothers but we all have mothers

8  and we know how mothers worry about things.  If I understood

9  correctly, you have two days for sure that you're going to be

10 gone?

11                    MOSELLE DICENSO:  Right.

12                    THE COURT:  And it could be more than

13 that?

14                    MOSELLE DICENSO:  I don't think so.

15                    THE COURT:  You don't think so.

16                    MOSELLE DICENSO:  I mean, we could come

17 back on Wednesday, she's coming home with us, but I just

18 don't know if the doctor would want her to leave the hospital

19 and get in the car.

20                    THE COURT:  Right.  I understand.

21 Mr. Bailey, do you have any questions you wish to ask?

22                    ATTY. BAILEY:  If I understand, you're

23 leaving May 27th?

1                          MOSELLE DICENSO:  Yes.

2                          ATTY. BAILEY:  Okay.  That's right after

3      Memorial Day.

4                          MOSELLE DICENSO:  In the evening though.

5                          ATTY. BAILEY:  And we expect we're going

6      to be concluding this trial that week.  So you would be

7      leaving what time in the evening?

8                          MOSELLE DICENSO:  6:00 o'clock after my

9      husband gets home from work.

10                         ATTY. BAILEY:  So if this case --

11                         MOSELLE DICENSO:  I have to be there by

12     7:00 in the morning.

13                         ATTY. BAILEY:  By 7:00 in the morning on

14     the 28th.  And what time would you be back on the 29th?

15                         THE COURT:  In the evening sometime?

16                         MOSELLE DICENSO:  We'll probably get up --

17     no.  We'll probably get up and come home on the, let's see,

18     29th, yeah.

19                         ATTY. BAILEY:  You're coming back from

20     Columbus so you wouldn't get here until the afternoon

21     sometime?

22                         MOSELLE DICENSO:  Probably, yeah.

23                         ATTY. BAILEY:  Okay.  So you'd be missing

```
 1    two days and that would be probably at the end of our trial,

 2    maybe the beginning of sequestration.  If you couldn't go

 3    down there, if you were to sit on this jury and we told you

 4    you couldn't go down there, how would you feel?

 5                    MOSELLE DICENSO:  I want to go.

 6                    ATTY. BAILEY:  Well, let me ask you, do

 7    you think that knowing your daughter was undergoing some

 8    surgery and hoping everything came out right, but you never

 9    can tell about complications, would that distract your

10    ability to concentrate on the evidence here, especially if

11    you got sequestered and you wouldn't be able to have any

12    contact with anybody else?

13                    MOSELLE DICENSO:  I would imagine it

14    would.  I mean, I've never --

15                    ATTY. BAILEY:  You think it would.  And

16    it's difficult to ask but that's a possibility.  I mean, you

17    could be in sequestration at that point, deliberations.

18                    MOSELLE DICENSO:  So if it --

19                    ATTY. BAILEY:  You're the only one who

20    knows yourself, I mean, if that's going to cause you an undo

21    hardship, knowing that your daughter is undergoing surgery.

22    You made plans to be there with her and she's expecting you

23    to be there and your husband is expecting you to be there?
```

 1                    MOSELLE DICENSO:   (Nods head

 2   affirmatively.)

 3                    ATTY. BAILEY:   Okay.   Are you telling us

 4   you would rather not serve on this particular jury because of

 5   that?

 6                    MOSELLE DICENSO:   I would rather be with

 7   her.

 8                    ATTY. BAILEY:   Okay.

 9                    THE COURT:   Quite clearly this lady would

10   not be comfortable with staying on the jury in light of your

11   daughter, you know, going through the operation.   Any

12   objection to me dismissing for cause?

13                    ATTY. JUHASZ:   None from us.

14                    ATTY. BAILEY:   Not from the State, Your

15   Honor.

16                    THE COURT:   Thank you.

17                    MOSELLE DICENSO:   Okay.   Thank you.

18                    THE COURT:   Good luck.   Hope everything

19   works out for your daughter okay.

20                    ATTY. BECKER:   Take care.   Thank you.

21                    ATTY. BAILEY:   Thanks.

22                    ATTY. JUHASZ:   Thank you.   Good luck with

23   everything.

```
 1                        (Whereupon, Moselle Dicenso was dismissed
 2     from the pool of prospective jurors for cause.)
 3                        ATTY. JUHASZ:  I apologize when I said
 4     this would only take 10 minutes.
 5                        THE COURT:  Are there more?
 6                        ATTY. BECKER:  Yes.
 7                PROSPECTIVE JUROR ROBIN SCHLAEGEL
 8                        THE COURT:  Okay.  I have to admit I
 9     forgot what the problem was with you, what you had.
10                        ROBIN SCHLAEGEL:  My mother, she had been
11     in an accident.
12                        THE COURT:  Oh, yeah, yeah, yeah.  Your
13     stepfather.  Here again, we don't wish to impose on anybody
14     to effect, you know -- and whoever sits on this jury should
15     be as free as possible from any outside worries.  You
16     mentioned that there were other members of the family.
17                        ROBIN SCHLAEGEL:  Uh-huh.
18                        THE COURT:  You have to tell us whether
19     that's workable for you or whether that's going to be
20     something on your mind, whether if you have a choice you
21     would opt to not be on the trial or whether you could deal
22     with all those situations and feel comfortable in sitting
23     here.
```

```
 1                    ROBIN SCHLAEGEL:  Uh-huh.

 2                    THE COURT:  So you tell us what your

 3    thoughts are on the matter.

 4                    ROBIN SCHLAEGEL:  There are other people

 5    that could help.  I guess just because they're mainly his

 6    family I feel more of a responsibility because it's my mom

 7    and this is her second marriage; it's not, you know, the

 8    first one, so.  She has come a long way.  She is starting to

 9    drive again.  She may go back to work next week.  You know,

10    it was just more or less one of those things that --

11                    THE COURT:  Is she -- she's able to care

12    for your stepfather most of the time?

13                    ROBIN SCHLAEGEL:  Right.

14                    THE COURT:  But not like she could before?

15                    ROBIN SCHLAEGEL:  Correct.

16                    THE COURT:  But is there someone else that

17    you would feel comfortable with being able to help both of

18    them?

19                    ROBIN SCHLAEGEL:  Yeah.  He has, he has

20    brothers and sisters.  He has like eight or nine.

21                    THE COURT:  Are they pretty good with

22    responding?

23                    ROBIN SCHLAEGEL:  Yes.  Uh-huh.
```

1                    THE COURT:  Well, the decision really at

2    this point I'm going to leave up to you, whether you're

3    willing to serve on the jury, keeping everything in mind, or

4    whether you would ask to be excused or not.

5                    ROBIN SCHLAEGEL:  Okay.  At this point,

6    just because I'm unsure of how she would be, you know, I

7    think I probably should not be just because I need to, I need

8    to be available.

9                    THE COURT:  Okay.  Mr. Bailey, do you have

10   any questions?  Or Mr. Becker?  I keep calling on Mr. Bailey

11   but --

12                   ATTY. BAILEY:  Mrs. Schlaegel.

13                   ROBIN SCHLAEGEL:  Yes.

14                   ATTY. BAILEY:  Let me put it this way,

15   okay?  We're going to be here, we expect, over the next three

16   weeks in the first phase, okay, but we're going to start,

17   assuming we start next Monday, we're only going to go three

18   and a half days a week.  Okay.  Next week we're going to go

19   Monday the 12th, the 13th, the 14th, and half the day on

20   Thursday the 15th.  Okay.  We're off Friday the 16th and off

21   the 19th, which is the following Monday.

22        Then we pick up for three and a half days, Tuesday,

23   Wednesday, half a day Thursday, and Friday the 23rd.  Then

```
 1   we're off again and it's Memorial Day weekend and we're off

 2   that Monday, and then we would go Tuesday and Wednesday and

 3   half a day Thursday.  At that point I expect we're probably

 4   going to be towards the very end of the case, I would expect,

 5   and in deliberations sometime toward the end of that week.

 6   During the time that you're not in court in this trial until

 7   the point where you are sequestered you can --

 8                      ROBIN SCHLAEGEL:  Right.

 9                      ATTY. BAILEY:  Your mom is where, she's

10   nearby or --

11                      ROBIN SCHLAEGEL:  Yeah.  She just lives in

12   Champion.

13                      ATTY. BAILEY:  Okay.  So you would be able

14   to visit your mom every night during that time?

15                      ROBIN SCHLAEGEL:  Yeah.

16                      ATTY. BAILEY:  And you will be able to see

17   her, you'll be able to be with her all those times here that

18   we're not in court?

19                      ROBIN SCHLAEGEL:  Correct.

20                      ATTY. BAILEY:  As long as you don't talk

21   about this case.

22                      ROBIN SCHLAEGEL:  Sure.

23                      ATTY. BAILEY:  Okay.  Or read the paper
```

```
 1    about the case or anything.  The only time you wouldn't be

 2    able to do anything is if you're sequestered.

 3                    ROBIN SCHLAEGEL:  Right.

 4                    ATTY. BAILEY:  And that could be --

 5                    ROBIN SCHLAEGEL:  Right.  That's a ways

 6    away.

 7                    ATTY. BAILEY:  We don't know, it could be

 8    a day, it could be a couple days or something.

 9                    ROBIN SCHLAEGEL:  Okay.

10                    ATTY. BAILEY:  And then the second phase

11    generally would be a couple days or a week later and that

12    generally is like one day, maybe at most three days.

13                    ROBIN SCHLAEGEL:  Uh-huh.

14                    ATTY. BAILEY:  Generally maybe two days.

15    And then deliberations with sequestration.  Do you think you

16    can work around that?

17                    ROBIN SCHLAEGEL:  Yes.  I didn't realize

18    that it would only be -- I was thinking it would be like all

19    week long.  So if there were days -- if I knew the schedule

20    ahead of time and that she had doctor's appointments, I could

21    work around that, so yes, that would be okay.

22                    ATTY. BAILEY:  So knowing the schedule you

23    think you would be much more comfortable?
```

```
 1                         ROBIN SCHLAEGEL:  Yes.

 2                         ATTY. BAILEY:  And you would still be able

 3    to concentrate on the evidence?

 4                         ROBIN SCHLAEGEL:  Yes, right.

 5                         ATTY. BAILEY:  And still be able to sit as

 6    a juror in this case?

 7                         ROBIN SCHLAEGEL:  Yes, since I know that

 8    now.

 9                         THE COURT:  Would it cause you any concern

10    now because when you're sequestered you can't phone your mom

11    or anything?

12                         ROBIN SCHLAEGEL:  No.  That would be fine.

13                         THE COURT:  That would be okay?

14                         ROBIN SCHLAEGEL:  Uh-huh.

15                         ATTY. JUHASZ:  Hi.

16                         ROBIN SCHLAEGEL:  Hi.

17                         ATTY. JUHASZ:  We want to make sure you're

18    comfortable serving on this jury.

19                         ROBIN SCHLAEGEL:  Uh-huh.

20                         ATTY. JUHASZ:  If I remember, Mr. Ingram

21    is the one who I think asked you questions before when you

22    were in here, but if I remember, you are kind of busy at work

23    too, right?
```

1           ROBIN SCHLAEGEL:   Correct.

2           ATTY. JUHASZ:   Okay.   Now you got this

3    thing with your mom.

4           ROBIN SCHLAEGEL:   Uh-huh.

5           ATTY. JUHASZ:   And now you got not just

6    some case but you've got a death penalty case.

7           ROBIN SCHLAEGEL:   Uh-huh.

8           ATTY. JUHASZ:   All right.   That's a lot

9    going on.   I'm not trying to talk you out of serving, but

10   understand that we want people who can give their full

11   attention.

12          ROBIN SCHLAEGEL:   Uh-huh.

13          ATTY. JUHASZ:   Okay.   And honestly, if you

14   were sitting over there or somebody you cared about were

15   sitting over there, you wouldn't want jurors who are thinking

16   about other things.   That seems fair, right?

17          ROBIN SCHLAEGEL:   Correct.

18          ATTY. JUHASZ:   Okay.   I can't suggest to

19   you that you are or you're not, it's just that over the

20   course of hearing you today and the other day when you were

21   in here it seems to me you have a lot going on, and earlier

22   you told the judge that you wouldn't be comfortable because

23   of these other things going on.

```
 1                      ROBIN SCHLAEGEL:   Correct.

 2                      ATTY. JUHASZ:   Sometimes I think that

 3    people, especially people like you, and I remember some of

 4    your answers from before, you are taken with and impressed

 5    with the civic responsibility of serving as a juror.

 6                      ROBIN SCHLAEGEL:   Uh-huh.

 7                      ATTY. JUHASZ:   And we appreciate that.

 8    But I need you to understand that we call in lots of people

 9    because we don't make everybody who comes in here serve on

10    jury duty.   That's why we ask folks these questions because,

11    you know, a lot of times we put it to them in terms of would

12    you be comfortable serving on another jury at another time

13    because of things going on in your life?

14                      ROBIN SCHLAEGEL:   Uh-huh.

15                      ATTY. JUHASZ:   And really that's kind of

16    what this boils down to and that's a question only you can

17    answer.   Nobody is going to yell at you if you say "I'm not

18    comfortable serving on this jury because of things going on

19    in my life."   We'll get somebody else.   And I'm not trying to

20    give you short shrift on that.

21                      ROBIN SCHLAEGEL:   Right.

22                      ATTY. JUHASZ:   But you understand where

23    I'm coming from?
```

```
 1                    ROBIN SCHLAEGEL:  Uh-huh.

 2                    ATTY. JUHASZ:  Okay.  You struck me

 3   earlier when you were talking about your mom as it was a

 4   serious accident and you're kind of worried about her.

 5                    ROBIN SCHLAEGEL:  Uh-huh.

 6                    ATTY. JUHASZ:  That's also understandable.

 7   So now taking all those things together, you tell us.  We'll

 8   take whatever your answer is.  Is this something that you

 9   think you can do or are you just doing that out of this

10   driving sense of civic responsibility when really you're

11   saying, "Geez, oh, man, things are crazy at work.  Now this

12   stuff with my mom, and on top of that they're going to pile

13   onto me the pressure of deciding a capital murder case."  Are

14   you more comfortable serving on this jury or are you more

15   comfortable saying, "You know what?  I hope you call me for

16   jury duty some other time when I don't have these things

17   going on in my life"?

18                    ROBIN SCHLAEGEL:  The only real difficulty

19   as far as work goes, that is something that my daughter can

20   either give to me in the evening, or now that I know too that

21   I wouldn't be here every day, those are things that I can do

22   aside from that.  And then too, as I said, my mom is doing

23   better, but I didn't know, you know, you don't know.
```

1                      ATTY. JUHASZ:  Sure.

2                      ROBIN SCHLAEGEL:  So --

3                      ATTY. JUHASZ:  And there's some

4      uncertainty there?

5                      ROBIN SCHLAEGEL:  Right, there is that

6      uncertainty, so.

7                      ATTY. JUHASZ:  And I guess what causes me

8      some concern is if we start hearing evidence next week, okay?

9                      ROBIN SCHLAEGEL:  Uh-huh.

10                      ATTY. JUHASZ:  Next week there's still

11     some uncertainty with your mom?

12                      ROBIN SCHLAEGEL:  She's planning on going

13     back to work on Monday.

14                      ATTY. JUHASZ:  Okay.  All right.  Then let

15     me just kind of boil it down to what I said before.  You tell

16     us, is this a situation where you say, "I'm just not

17     comfortable serving on this jury because of everything going

18     on in my life," or is it a situation where you say, "I can do

19     this"?

20                      ROBIN SCHLAEGEL:  I think, umm, I think to

21     be fair for everybody it probably would be better that I am

22     not.

23                      ATTY. JUHASZ:  Okay.

1           ROBIN SCHLAEGEL:  Just, just so that my

2    mind would be where it needs to be.

3           ATTY. JUHASZ:  Okay.  I appreciate that.

4    Thank you.

5           THE COURT:  Any objection for dismissing

6    for cause?

7           ATTY. BECKER:  Yeah, Your Honor.  I mean,

8    with all -- can we approach side bar?

9           (Whereupon, a bench conference was held.)

10          THE COURT:  We'll put side bar here when

11   we're done.

12          Ma'am, you're excused.  We thank you for

13   participating, okay?

14          ROBIN SCHLAEGEL:  Okay.

15          THE COURT:  Good luck to you.

16          ROBIN SCHLAEGEL:  Thank you.

17          ATTY. BAILEY:  Thanks.

18          ATTY. BECKER:  Thank you.

19          ATTY. JUHASZ:  Good luck.

20          ATTY. INGRAM:  Thank you.

21          (Whereupon, Robin Schlaegel was dismissed

22   from the pool of prospective jurors for cause.)

23          THE COURT:  For the record, the side bar

1    was a discussion.  The State objects to the Court's decision

2    of dismissing for cause.  The Court is not comfortable with

3    that lady sitting.  No one can foresee the future.  True, we

4    have alternates, but there may be other things come up with a

5    trial of this length where alternates may be necessary.  This

6    woman, if her mother became ill or something, we're just

7    asking for problems that can be avoided by not having her on

8    the thing, so I've overruled the Court -- or the State's

9    objection.

10            Now, we're going to get them up and you're going to,

11   without any further ado, exercise your challenges, is that

12   correct?

13                    ATTY. BAILEY:  I believe so, Your Honor.

14                    ATTY. INGRAM:  Can you give us like five,

15   10 minutes to get a seating chart together?

16                    ATTY. BAILEY:  We have to do our seating

17   chart.

18                    THE COURT:  Now, once we have the jury I

19   will give them the admonition, Laurie will swear them in, and

20   we'll leave them go today.  Now, what about tomorrow?  What

21   are we proposing for tomorrow?

22                    ATTY. INGRAM:  I thought we were going to

23   draw voir dire alternates if we need to and then we're going

1    to start the trial on Monday, so you will tell the 12 to --

2                         THE COURT:  Well, that's assuming that we

3    have 12 on the jury and we usually get four for alternates.

4    That's where I think you're going to run shy on this.

5                         ATTY. INGRAM:  Why don't we have them call

6    tomorrow afternoon?

7                         COURT REPORTER:  There's like eight people

8    coming tomorrow morning, or tomorrow during the day.  Have

9    this group tonight that actually gets picked call tomorrow

10   night.

11                        ATTY. INGRAM:  Right.  And then we'll give

12   them the weekend because tomorrow is Friday, right.  That

13   gives them the weekend to get ready for Monday, or Tuesday at

14   the latest, but hopefully Monday.

15                        THE COURT:  Yeah.  But the thing is, if we

16   get, if we go through more individuals tomorrow, right, we're

17   going to run into similar problems here.  There's a time

18   element here that I'm saying, that to tell them Friday night

19   to be back here Monday -- well, maybe we just have to see

20   where we're at.

21                        COURT REPORTER:  Yeah, I think we need to

22   see.

23                        THE COURT:  Let's get the jury, get them

1   up, exercise your peremptories, and I have to read them a few

2   things here before we start this.

3                       ATTY. BAILEY:  We've lost six.

4                       THE COURT:  Huh?

5                       ATTY. BAILEY:  We've lost six.  We're back

6   down to 26 people on the panel.

7                       THE COURT:  Twenty-six.

8                       ATTY. BAILEY:  Well, we need 24 for the

9   jury, but for the alternates we're going to need probably

10  another --

11                      THE COURT:  That's assuming you all

12  exercise your six preempts.

13                      (Whereupon, a discussion was had off the

14  record.)

15                      THE COURT:  Now, there's another thing

16  that I don't want to forget about here.  This motion for

17  change of venue is still hanging out there in the bushes

18  somewhere.

19                      ATTY. BECKER:  It won't go anywhere.

20                      ATTY. JUHASZ:  You're not asking me to

21  withdraw it, are you?

22                      THE COURT:  I think -- let me ask, is

23  there any -- because I don't want to swear this jury in until

```
 1 ║ that is ruled on.
 2 ║               ATTY. BAILEY:  Okay.
 3 ║               THE COURT:  And I'm asking if you're going
 4 ║ to require argument before I rule on that matter?
 5 ║               ATTY. JUHASZ:  No.
 6 ║               ATTY. INGRAM:  No.
 7 ║               THE COURT:  You are not?
 8 ║               ATTY. INGRAM:  No.
 9 ║               THE COURT:  You'll let the record speak
10 ║ for itself?
11 ║               ATTY. JUHASZ:  Yes, sir.
12 ║               THE COURT:  Okay.  Let me address that at
13 ║ this point in time then.  We've gone through a long, some may
14 ║ say a belabored process here of picking a jury.  The question
15 ║ up front was because of the fact that there was another trial
16 ║ on the same facts and the publication that was generated due
17 ║ to the set of facts in this case on the prior case and this
18 ║ case, whether or not a change of venue was appropriate.
19 ║ I've taken that matter under advisement until we reached this
20 ║ point.
21 ║      It's my conclusion that there are many people on
22 ║ this jury that I was convinced did not know anything about
23 ║ the trial.  There are some who knew something about the trial
```

 1    and some who knew quite a bit about the trial.  I think those

 2    who knew an inordinate amount or a lot about the trial have

 3    been dismissed up to this point.  Those who have had some

 4    smattering of knowledge or some knowledge about the case have

 5    been passed up to this point.  And I think that counsel has

 6    been very assiduous in their questioning on this issue.

 7         The defense has also tried to find out if there was

 8    a lot of gabbing going on that first day before I talked to

 9    this prospective bunch of jurors about discussions of

10    pretrial publicity, and the only thing that came out of any

11    of that was apparently there were two people that mentioned

12    something about they were aware of what this case probably

13    was about.  That the person that gave that information I

14    think was ultimately not chosen here.  In any event,

15    whichever way that was, she was not prejudiced by it

16    according to her testimony, so the Court feels very

17    comfortable that this case can be fairly tried in this county

18    and that a change of venue is not proper.

19         Now, anything that anybody wishes to place on the

20    record?  Your objection is noted from the defense as

21    continuing.  Okay?

22                   ATTY. JUHASZ:  Very well.  Thank you.

23                   ATTY. BAILEY:  Thanks, Your Honor.

```
 1              THE COURT:  I need a judgment entry on

 2   that, too.  I need those other judgment entries.

 3              ATTY. BECKER:  Oh, you know what?  You

 4   mentioned that and I will get those.  I will work on those,

 5   finish those up tonight hopefully, probably.

 6              THE COURT:  Okay.  Because technically

 7   those should be filed before the trial starts.

 8              ATTY. BECKER:  Yes, and I will work on

 9   those tonight, Your Honor.

10              THE COURT:  Okay.  Get these folks up here

11   and let's see what we've got.

12              (Whereupon, a discussion was had off the

13   record.)

14              THE COURT:  Does everybody agree on that,

15   there's no special oath anymore to be given to the jury on a

16   capital case, just the standard oath?

17              ATTY. BECKER:  Yes, standard.

18              ATTY. JUHASZ:  Yes.

19              THE COURT:  Motion overruled on change of

20   venue.

21              (Whereupon, all members of the prospective

22   jury pool were seated in the courtroom and the following

23   proceedings commenced.)
```

1          THE COURT:  Okay, everybody, be seated.

2    Thank you.  Okay.  Members of the jury, you are the chosen

3    few that we've arrived at after a very arduous four or five,

4    going into the fifth week here.  This type of case because of

5    its seriousness, we have to go through all of these different

6    things that you participated in and what everybody else in

7    the prospective pool has participated in.  Some of you went

8    through very extensive questioning, some of you not so much,

9    but it's the way the whole system is set up, and we

10   appreciate your patience and your attitude throughout this.

11         I'm sorry to keep you late this afternoon, but this

12   is the time to try to get our jury seated.  We've narrowed it

13   down.  The more time that goes on the more of you may have

14   things come up which would make it difficult or impossible

15   for you to sit.  That happens in every case when you have a

16   long period of time.  That's one of the reasons we will have

17   alternates during this case.

18         Now, you've all gone through this process and

19   there's just a couple things that I want to review with you

20   before we actually start selecting the jury.  This concept of

21   beyond a reasonable doubt is something that you will hear

22   repeated throughout the trial.  I will give you a closing

23   instruction at the end.  I bring this up because some of you

1   have sat on civil trials. Many times attorneys in trying to

2   explain this to the jury use the example if you look up on

3   our courthouse when you come in in the morning there are four

4   beautiful ladies depicted up there and they're each holding a

5   balance of justice. Now, the symbol of that balance means,

6   and it's very important, the concept that evidence is always

7   weighed in every case. Whether it's a civil or a criminal

8   case, you have to weigh the evidence.

9           In a civil case the Court will instruct that the

10  jury in starting out has to visualize that balance as being

11  an equal pose. It's perfectly balanced. There are no

12  presumptions either way. And for a civil plaintiff to win

13  they have to put enough weight on there merely to tip it in

14  their favor.

15          But the criminal law requires a burden of proof

16  known as beyond a reasonable doubt and that means that you

17  have to visualize that scale of justice as being at the

18  beginning of the trial very much out of balance because we

19  have the presumption of innocence, the right to remain

20  silent, and we have the burden of proof known as beyond a

21  reasonable doubt. So during the course of the trial the

22  State has to put enough evidence on their side not just to

23  get above like they do in a preponderance of a civil case,

1    and not by clear and convincing evidence, which is another

2    standard in civil law, but beyond a reasonable doubt.  And,

3    as all of you were informed, that's not beyond all doubt but

4    beyond a reasonable doubt, and each of you have to set

5    exactly where that mark is.

6            I think you've all been examined on that, but it's

7    most important that you understand that that is the burden of

8    proof that will be applied in this case.

9            Another fact is, I mentioned to you this at the

10   beginning and it's important, the fact that a defendant is in

11   court on trial where the charges have been made against her

12   is no evidence whatsoever of that person's guilt.  The jurors

13   are to consider only evidence properly received in this

14   courtroom in determining the question of guilt or innocence

15   of the defendant.

16           This defendant has been arraigned on the indictment,

17   has entered a plea of not guilty, which is a complete denial

18   of all charges, making it necessary for the prosecution

19   acting through these gentlemen to my left to prove beyond a

20   reasonable doubt the case that they allege against the

21   defendant.  Until and unless that is done by the State, the

22   presumption of innocence covers that table.

23           Okay.  I am going to ask all prospective jurors to

 1    please stand -- no, wait a minute.  That's not necessary.

 2    You've already been sworn.  I apologize.  We will now start

 3    the selection of the jury.

 4         Now, ordinarily, ladies and gentlemen, we'll bring a

 5    prospective jury in, we'll put 12 people in the box, we go

 6    through a bunch of questions.  That has all been done

 7    individually in this case.  These folks have had every

 8    opportunity to ask you every question they wanted to ask you

 9    and they're comfortable with you sitting on this jury up to

10    this point.  They have an opportunity at this point to

11    exercise on each side what we call peremptory challenges.

12    Those are -- there are two types of challenges.  Challenge

13    for cause, we've exercised a lot of those.  We've gone

14    through 60 some people or more.  Many of them were excused

15    for cause.  That means there was something that would not

16    enable them to sit and be a fair and impartial juror.  They

17    still have the right to challenge for cause, but I don't

18    think there's any of those left because they know too much

19    about you at this point where any of those would be valid.

20    Something might come up.  But they have the right to exercise

21    a peremptory challenge.

22         Now, for challenge for cause they have to give a

23    reason, but for a peremptory challenge they need give no

 1    reason and it wouldn't be proper for me to ask them why.

 2    It's just a right that both sides have.  They have six each.

 3         If any of you should be excused, and some of you

 4    undoubtedly will be, you should not ask yourself why, did I

 5    answer something wrong?  No.  Because, quite simply, you've

 6    probably done everything the way we asked you to do it, and

 7    that was to be truthful about your answers.  Just because you

 8    may not be picked on this jury has nothing to do with your

 9    ability to sit on any other jury.

10         Would the bailiff please seat by order the first 12?

11                   THE BAILIFF:  Okay.  We seat you first

12    row, first juror will sit in the first seat in the first row,

13    okay?  Terry Tilghman -- or Terry Gray.

14                   THE COURT:  Ma'am, have a seat right up

15    here in the front row in the first seat.  Thank you.

16                   THE BAILIFF:  Richard Caraway.  Maxine

17    Howard.  George Dermer.  Karen Tipton.  Brad Seelback.  Linda

18    Black.  Panda Heatherly-Lantz.  John Lanam.  Marsha Danadic.

19    Kasey Kelly.  Thelma Rankin.

20                   THE COURT:  Okay.  Very good.  Does the

21    State have any challenge for cause of any of the 12 jurors

22    seated?  I'm talking about for cause now.

23                   ATTY. BECKER:  For cause?

1           THE COURT:  Yeah, I'm asking for cause.

2   Do you have any further challenge for cause?

3           ATTY. BAILEY:  No challenges for cause,

4   Your Honor.  We pass.

5           THE COURT:  Defense?

6           ATTY. JUHASZ:  We have no challenges for

7   cause, Your Honor.

8           THE COURT:  Okay.  Peremptory to the

9   State.

10           ATTY. BAILEY:  The State would like to

11   thank and excuse Mr. Caraway.

12           RICHARD P. CARAWAY:  Okay.

13           THE COURT:  Sir, we thank you for all your

14   time and trouble being here.

15           RICHARD P. CARAWAY:  Okay.

16           THE COURT:  But thank you for

17   participating.  Appreciate it.

18           RICHARD P. CARAWAY:  You're welcome.

19           THE COURT:  Yes, you're free to go.  Thank

20   you very much.

21           ATTY. BECKER:  Thank you, Mr. Caraway.

22           ATTY. BAILEY:  Thanks, Mr. Caraway.

23           ATTY. INGRAM:  Thank you, Mr. Caraway.

1                        ATTY. JUHASZ:  Thank you.

2                        (Whereupon, Richard P. Caraway was

3      dismissed from the jury.)

4                        THE COURT:  Peremptory to the defense.

5                        THE BAILIFF:  Aren't you going to put the

6      next one in?

7                        THE COURT:  Huh?  Oh, yeah, put the next

8      in.  I'm sorry.

9                        THE BAILIFF:  Mary Costello.

10                        THE COURT:  You folks don't know how

11     miserable my life would be without my bailiff, I'll tell you.

12     Peremptory to the defense.

13                        ATTY. INGRAM:  The defense would thank and

14     excuse Mr. Seelback, Your Honor.

15                        THE COURT:  Sir, we thank you very much

16     for your time and trouble.

17                        BRAD SEELBACK:  Thank you.

18                        ATTY. JUHASZ:  Thank you, sir.

19                        (Whereupon, Brad Seelback was dismissed

20     from the jury.)

21                        THE BAILIFF:  Gary Phillips.

22                        THE COURT:  Peremptory to the State.

23                        ATTY. BAILEY:  The State would like to

1    thank and excuse Mrs. Costello.

2                         MARY J. COSTELLO:  Okay.

3                         THE COURT:  Ma'am, thank you very much for

4    your time and trouble.

5                         MARY J. COSTELLO:  Thank you.

6                         (Whereupon, Mary J. Costello was dismissed

7    from the jury.)

8                         THE BAILIFF:  Todd Davidson.

9                         THE COURT:  Peremptory to the defense.

10                        ATTY. INGRAM:  Your Honor, the defense

11   would thank and excuse Mr. Dermer.

12                        THE COURT:  Sir, we thank you so much.

13                        GEORGE E. DERMER:  You're welcome.

14                        (Whereupon, George E. Dermer was dismissed

15   from the jury.)

16                        THE BAILIFF:  Nathan Crocker.

17                        THE COURT:  Peremptory to the State.

18                        ATTY. BAILEY:  The State would like to

19   thank and excuse Miss Howard.

20                        THE COURT:  Ma'am, thank you so much.

21                        MAXINE HOWARD:  Thank you.

22                        ATTY. JUHASZ:  Thank you, ma'am.

23                        ATTY. BECKER:  Thank you.

```
 1                         (Whereupon, Maxine Howard was dismissed

 2      from the jury.)

 3                         THE COURT:  Next.

 4                         THE BAILIFF:  Carol Selak.

 5                         THE COURT:  Peremptory to the defendant.

 6                         ATTY. INGRAM:  The defense would thank and

 7      excuse Mrs. Black.

 8                         THE COURT:  Mrs. Black, thank you so much.

 9      Your dogs can be happy now.

10                         ATTY. JUHASZ:  Thank you.

11                         ATTY. BECKER:  Thank you, Mrs. Black.

12                         ATTY. BAILEY:  Thank you.

13                         (Whereupon, Linda J. Black was dismissed

14      from the jury.)

15                         THE BAILIFF:  Amy Barlett.

16                         THE COURT:  Peremptory to the State.

17                         ATTY. BAILEY:  The State would like to

18      thank and excuse Mr. Crocker.

19                         THE COURT:  Sir, thank you so much.

20                         ATTY. JUHASZ:  Thanks, Mr. Crocker.

21                         ATTY. INGRAM:  Thanks, Mr. Crocker.  Have

22      a good day.

23                         ATTY. BECKER:  Thank you, Mr. Crocker.
```

```
 1                    (Whereupon, Nathan Crocker was dismissed
 2    from the jury.)
 3                         THE BAILIFF:  Victor Sabulsky.
 4                         THE COURT:  Peremptory to the defense.
 5                         ATTY. INGRAM:  The defense would thank and
 6    excuse Mr. Lanam, Your Honor.
 7                         THE COURT:  Sir, thank you.
 8                         ATTY. JUHASZ:  Thank you, Mr. Lanam.
 9                         ATTY. INGRAM:  Thank you.
10                         ATTY. BECKER:  Thank you.
11                         ATTY. BAILEY:  Thanks.
12                    (Whereupon, John D. Lanam was dismissed
13    from the jury.)
14                         THE COURT:  Next.
15                         THE BAILIFF:  Judith Elliott.
16                         THE COURT:  Peremptory to the State.
17                         ATTY. BAILEY:  Yeah.  The State would like
18    to thank and excuse Miss Elliott.
19                         THE COURT:  Miss Elliott, thank you,
20    ma'am.
21                         JUDITH M. ELLIOTT:  Thank you.
22                         ATTY. JUHASZ:  Thank you, ma'am.
23                         JUDITH M. ELLIOTT:  Thank you.
```

4603

1               ATTY. BECKER:  Thank you.

2               (Whereupon, Judith M. Elliott was

3   dismissed from the jury.)

4               THE BAILIFF:  Salina Snyder.

5               THE COURT:  Peremptory to the defense.

6               ATTY. INGRAM:  We would thank and excuse

7   Karen Tipton, Your Honor.

8               THE COURT:  Thank you so much.

9               ATTY. JUHASZ:  Thank you, ma'am.

10              (Whereupon, Karen S. Tipton was dismissed

11  from the jury.)

12              THE BAILIFF:  Margaret Fellows.

13              THE COURT:  Last peremptory to the State.

14              ATTY. BAILEY:  If I might have a moment,

15  Your Honor?  The State would like to thank and excuse

16  Miss Snyder.

17              THE COURT:  Ma'am, thank you.

18              SALINA M. SNYDER:  Thanks.

19              (Whereupon, Salina M. Snyder was dismissed

20  from the jury.)

21              THE COURT:  Next.

22              THE BAILIFF:  Margaret Kay.

23              THE COURT:  Sixth and final peremptory to

1    the defendant.

2                      ATTY. JUHASZ:  Can we have just one

3    moment, Your Honor?

4                      ATTY. INGRAM:  The defense is satisfied

5    with the jury as presently constituted.

6                      THE COURT:  Okay.  Pass.  We have a jury

7    seated.  Would counsel approach, please, for a moment?

8                      (Whereupon, a bench conference was held.)

9                      ATTY. BECKER:  Thank you, Your Honor.

10                     THE COURT:  Ladies and gentlemen, this is

11   like trying to plan a battle campaign.  You organize this,

12   you organize that, this, that goes wrong, that goes wrong.

13   What we're trying to do is save all of you as much time from

14   sitting around as possible.  And, as you can see, our best

15   efforts are not all that good, but it's the best we're able

16   to do, so we do appreciate your patience.

17                     Okay.  You three gentlemen in the back, I'm going to

18   ask you to come in tomorrow -- Monday at 11:00 o'clock.  The

19   three of you will be with hopefully four or five others from

20   which we will pick our alternates.  We would like very much

21   to have four alternates, if possible.  If we only get three

22   then we're going to have to live with that, but we're going

23   to shoot for four.

 1          Let me read something here to all of you over the

 2     weekend.  You folks will report at 1:00 o'clock Monday.  1:00

 3     o'clock Monday afternoon this trial will begin.  It is

 4     important that all of you be fair and attentive throughout

 5     the trial.  You are not to discuss this case among yourselves

 6     or with anyone else.  Do not permit anyone to discuss it with

 7     you or in your presence.

 8          If you should find during any break that we have

 9     during the next several weeks that -- it's not uncommon for

10     this to happen -- you're out in the hallway and one of the

11     attorneys may call a witness they're going to put on and they

12     start discussing the case with them and what the testimony is

13     going to be, remove yourself from that conversation.  You are

14     not to permit anyone to discuss anything about this case with

15     you or in your presence, and you are not to form or express

16     any opinion on this case until it is finally submitted to

17     you.

18          We had a case here some years ago where several of

19     the jurors -- it was a long, it was a murder case, in fact.

20     They went down, they were having lunch together, people who

21     had met on the jury, and someone at one of the other tables

22     heard a discussion about the case.  Well, that just won't

23     fly.  You know, it means we have to start all over again,

1    declare a mistrial.  And I know how natural it is.  If you

2    sit here, particularly over the course of a couple weeks, and

3    you hear things about the case, it's only natural to want to

4    talk to somebody about it.  Please, you can't do that.  We've

5    got a lot, we've got five weeks tied up already, and it just

6    is not possible for somebody to get a trial under the rules

7    we have to apply if people don't observe that.

8         Now, it's difficult probably to understand why you

9    can't discuss this case among yourselves or with friends or

10   relatives, but it's very simple why that isn't permitted.

11   When you talk to somebody, say your spouse or a friend or

12   something, if you were to engage in a conversation you're not

13   going to stand up there and give a monologue.  It's always a

14   dialogue, they're saying something, you're saying something

15   back, and they well can say something that may cause a light

16   bulb you think to go on in your head and say I never thought

17   of that.  That's what the other jurors are for when you get

18   back in the jury room at the proper time, to discuss the

19   evidence you've heard.  Anyone you talk to outside on this

20   matter, they haven't sat through the evidence.

21        Another thing is you will get the opening

22   statements, you'll get the evidence, you'll get the closing

23   arguments, and then you'll get the instruction of law.  Like

1    Mr. Bailey's famous chocolate cake, you can't make a good

2    chocolate cake until you have everything, all the right

3    ingredients.  That takes all of that.  Once you have that and

4    you're back in the jury room, then you're ready to start

5    thinking through what the proper answer is here.  You can't

6    do it until you have everything in your mind.

7         Now, you're called upon to explain this rule -- I'm

8    addressing you gentlemen back there also -- to your friends

9    and family.  It's only natural if somebody finds you are on

10   any type of a jury case -- most people never get an

11   opportunity to serve on a jury and people are interested.

12   They see things on TV and it looks like a glamourous thing to

13   do.  Well, it's a lot of hard work, it's a lot of boredom,

14   it's a lot of down time, but any trial has its points of real

15   drama also.  But it's such a very important thing that you've

16   agreed to do, I'm telling you the proper way that you have to

17   maintain your activities during the trial so that everyone

18   has a fair trial.

19        Now, when the trial is over I will release you from

20   this instruction and at that time, depending on your

21   preference, you can talk with whomever after the trial is

22   completely over or you can keep your own counsel.  Many times

23   jurors decide they don't want to discuss it.  Others, they

1  talk with whomever.  But until the end of that trial comes

2  and I formally release you, please keep these instructions in

3  mind both here and at home.

4          Now, likewise, you're not permitted to talk with the

5  attorneys, the parties or witnesses during the trial.

6  Likewise, the participants in the trial, whether it be the

7  attorneys, the witnesses, are under a similar instruction not

8  to approach or talk to the jury.  A conversation can be most

9  innocent but it has the appearance too many times of

10  impropriety.  You folks have a very important job here of

11  determining the facts in this case and you must do that on

12  the evidence and the law.

13          If the attorneys at times pass you up, say when

14  we're all coming in here in the morning, and the attorneys

15  act like they're being rude, like they don't know you exist,

16  do not think that they're being rude because they're merely

17  following this instruction to the letter.  It is not uncommon

18  for people to nod or to say good morning or something like

19  that, and I'd probably find nothing wrong with that, but

20  there should be no even amenities passed between the jury and

21  anyone else.  You folks have a very serious job here and that

22  should not be interfered with in any way so that it even

23  looks like it's an improper action.

1    Now, should anyone attempt to discuss this case with

2    you you're called upon under your oath that you will take

3    Monday to report that incident immediately to this Court.

4    There was a very good movie many years ago with Lee J. Cobb

5    and Henry Fonda called *12 Angry Men* where in a murder case

6    there was one holdout, I don't remember which way it was, but

7    that person went out during the course of an evening and

8    found a piece of evidence he brought back into the jury room

9    and turned the jury around.  That would be an improper

10   decision.  It is important, it is necessary, it is mandatory

11   that no one attempt to find out anything about this case.

12   You've been instructed from the very beginning not to do

13   that.  That must also maintain throughout the balance of the

14   trial.  You will be given everything that is necessary within

15   this courtroom to make an informed decision.  That will come

16   from the prosecutor's office.  As I said, the prosecutor will

17   maintain their burden of proof or they will not and you will

18   make your decision on that basis.

19   Now, any violation, excuse me, of these orders may

20   cause a new trial to be required or may require a penalty for

21   disobedience, and sadly we've had cases that have had

22   mistrials declared and we start all over again.  And it

23   always goes back to somebody not thinking.  I don't think I

1    remember a case where somebody intentionally did something

2    wrong, but they just didn't keep in mind you can't talk about

3    it, okay?

4            Now, during the course of the trial we usually go an

5    hour and a half.  Our reporter gets quite tired.  This is a

6    demanding job.  It doesn't look -- they make it look simple,

7    but they all end up with carpal tunnel eventually and it's a

8    very demanding job so they have to take a break.  But many

9    times during the course of a trial some of us may not be

10   feeling well or whatever.  If anybody experiences any

11   personal problem, hold your hand up.  The judge is always

12   ready to take a break, okay?  Keep that in mind.  But we

13   usually try not to go more than an hour and a half at a time

14   because everybody needs a break after that.  You should just

15   talk to the reporter.  Now, we'll have different reporters.

16   Kelly is on this week and there's a couple others that will

17   be here, but give them the eye, tell them you need a break,

18   and that's no problem.

19           Now, I'm called upon to repeat this instruction,

20   this admonition, every time you're allowed out of the jury

21   box.  It will be in a very abbreviated form and it will be

22   "Remember you're not to discuss anything or form any

23   opinion."  If I should overlook doing so and Laurie doesn't

 1   remind me, then you must remember that it applies throughout
 2   the trial.

 3          If during the trial you find that you cannot hear
 4   something or understand something that's happening, and many
 5   times the attorneys will be walking or showing things and
 6   whatever, you may not be able to see or hear. The acoustics
 7   are 1895 circa and not real good for anybody that has any
 8   type of hearing problem, and at times people with perfectly
 9   good hearing don't catch things in here. Hold your hand up.
10   Don't be embarrassed to do that. You folks must keep in mind
11   you are the people that are going to have to decide this
12   case. You want to know everything about it so when you get
13   back there when somebody is talking about some point you're
14   up to speed, you know what's going on, you don't have to take
15   somebody else's word for it, you've heard it or you've seen
16   it, so don't be cautious about doing that.

17          The last point is on the question of note taking.
18   That was mentioned to some of you. There's actually nothing
19   in Ohio that says that a Court can instruct you to take notes
20   or not to take notes. Remember the O.J. trial they gave
21   everybody copious amounts of tablets and they were all
22   scribbling on them and all this stuff. One of them even
23   published it afterwards I think. I ask you not to take notes

1    and let me tell you why.

2            Unless you happen to be very expert in shorthand or

3    something, you're not going to get everything.  You're going

4    to write bits and pieces down.  When you're writing something

5    down you're going to miss something else, there's a big

6    danger of that.  Even our reporters, all of whom are very

7    skilled, have to at times during a trial with testimony say,

8    "Wait a minute."  Some of them do it with a little bit more

9    vigor than others, but they'll say, "Wait a minute.  I can't

10   take four people talking at one time."  You're not going to

11   get everything.

12           My life experience has been, excuse me, that

13   whenever -- no, thanks.  I got coffee.  I just am losing my

14   voice.  Whenever we write something down and later on, if

15   memory fails, you try to remember something, whatever you've

16   written down, it may be right or wrong, but you're going to

17   tend to trust what you wrote down.  It takes on kind of a

18   life and validity of its own because it's in writing.  Many

19   times it's not entitled to that.  So I think that incomplete

20   or partial notes can cause a lot of problems because you have

21   11 people who get back there and say, "Well, I remember it,

22   this is what was said," and somebody says, "No, no.  I got it

23   written down right here.  You're all wrong."  The best of you

1  are going to say well, they wrote it down, that might be

2  right.  It causes nothing but problems.  So I would ask you

3  please not to take notes.  That's the reason I tell you to

4  listen and watch.  If you don't see or hear something, hold

5  your hand up.  And I trust that when you get back there the

6  12 of you will not have missed a thing.  You will have

7  everything by way of evidence that you need.

8         We will attempt to have the instruction of law

9  printed up to go back with you.  That's usually where most of

10  the questions come up from the jury and what did you say

11  about this question of law?  The age of the computer, it's

12  often available for us to have the written instruction with

13  you, and that will aid you, but you must trust your memories

14  and whatever exhibits you may have that have been admitted in

15  making your decision.

16         Okay.  When we return Monday at 2:00, by that time

17  we're going to make every effort to have these gentlemen

18  sorted out so we know whose the alternates.  You will all be

19  sworn in as a jury in this matter in the order in which you

20  have been picked and we will go into some preliminary

21  instructions I must read to you.  We may well then during

22  Monday afternoon listen to most, if not all, of the opening

23  statements.  That's an opportunity for you to know at that

1    point in time particularly what the State alleges to be the

2    facts of this case.  And we will go day from day then when we

3    get into evidence on what witnesses are available.  Sometimes

4    we have to juggle them around because there will be quite a

5    few witnesses, I understand.

6         But please keep in mind whenever you're sitting

7    wondering what all those lawyers and judges are doing that

8    there's one thing they have not forgot about and that is your

9    comfort and that we're taking your valuable time up.  I know

10   it will be easy at times for you to think that we've

11   forgotten about you, but believe me, we haven't, and I tell

12   you quite frankly why we haven't.  We've all at various times

13   in our careers been involved with juries that have gone sour,

14   they get mad, and usually it goes back to somebody not

15   keeping them up to speed on what's happening.  They think

16   that their time is being wasted.  I will make every effort to

17   see that you don't feel that way.  If we have a long period

18   of time I will at least send somebody or come to you myself

19   and tell you here's what's happening, we're tied up, we're

20   going to be this much longer.  Don't ever hold me to how much

21   longer I tell you though, okay?  Very good.

22        Gentlemen, 11:00 o'clock Monday.  The rest of you at

23   1:00 o'clock Monday.  Keep my instructions in mind.  You got

1   a blank mind until you come back here, okay?  Enjoy

2   yourselves over the weekend.  Thank you.

3                   (Whereupon, Court was recessed for the

4   day.)

5                       *   *   *

6                   **SEE VOLUME XXII**

7

8

9                   REPORTER'S CERTIFICATE

10

11      This is to certify the foregoing represents a true and

12   correct copy of the proceedings had in the aforementioned

13   cause as reflected by the stenotype notes taken by me on the

14   same.

15

16

17

18

19   _____

20   KELLY J. WILSON
     Official Court Reporter

21

22

23

1          IN THE COURT OF COMMON PLEAS
              TRUMBULL COUNTY, OHIO
2

STATE OF OHIO,              )    Case No. 2001-CR-793
3                           )
      Plaintiff             )
4                           )
-vs-                        )    JUDGE JOHN M. STUARD
5                           )
DONNA M. ROBERTS,           )
6                           )         **PARTIAL**
      Defendant             )  **TRANSCRIPT OF PROCEEDINGS**
7
              *VOLUME XXII*
8

9          **JURY TRIAL - VOIR DIRE**
                 **MAY 9, 2003**
10

11

BEFORE:       HONORABLE JOHN M. STUARD
12

AT:           Trumbull Co. Court of Common Pleas
13            Courtroom Number 2
              160 High Street, NW
14            Warren, Ohio 44481

15

APPEARANCES:
16

On behalf of the Plaintiff:
17     MESSRS. KENNETH N. BAILEY
       and CHRISTOPHER D. BECKER,
18     Attorneys at Law

19

On behalf of the Defendant:
20     MESSRS. J. GERALD INGRAM
       and JOHN B. JUHASZ,
21     Attorneys at Law

22

23

Official Court Reporter:  Kelly J. Wilson

1

*INDEX FOR VOLUME XXII*

2

MAY 9, 2003

3

*INDIVIDUAL VOIR DIRE*

4

5

PROSPECTIVE JUROR JOSEPH CHETSKO.................... 4617:2

6

PROSPECTIVE JUROR BRAD PETAK....................... 4682:17

7

PROSPECTIVE JUROR MARY JANE O'HARA................. 4687:16

8

PROSPECTIVE JUROR ROBERT D. MORGAN................. 4785:21

9

PROSPECTIVE JUROR JOHN M. BRDEK, JR................ 4788:2

10

PROSPECTIVE JUROR TROY KAHLER...................... 4796:13

11

*OBJECTIONS*

12

ATTY. INGRAM:  Objection........................... 4627:18

13

14

15

16

17

18

19

20

21

22

23

1    (MAY 9, 2003)

2                    PROSPECTIVE JUROR JOSEPH CHETSKO

3                    THE COURT:  Good morning, Mr. Chetsko.

4                    JOSEPH CHETSKO:  Good morning.

5                    THE COURT:  I understand you're a little

6    bit out of sorts about sitting around and, believe me, I

7    don't blame you a bit.

8                    JOSEPH CHETSKO:  Well, two days in a row,

9    I mean, it makes you wonder.

10                   THE COURT:  Well, let me explain to you

11   something.  We have to go through this long drawn out

12   procedure talking to each of you, and no matter how well we

13   try to plan it, some of them take longer than others.  We've

14   had times here where we haven't had anybody to talk to

15   because we've gone through them real quickly, and at other

16   times, in trying to keep a backlog down there so that we

17   don't have down time, we end up that we've had several people

18   like yourself who have sat down there much too long.  But

19   please know that we're not taking your time lightly, we're

20   just trying to get through this thing, okay?

21            Did you have an opportunity to read that

22   questionnaire that was handed out to you?

23                   JOSEPH CHETSKO:  Yes, I did.

1          THE COURT:  Okay.  You understand that

2    this is an aggravated murder.  There are two counts of

3    aggravated murder filed against Donna Roberts with

4    specifications.  Under Ohio law just because a person is

5    found guilty of murder does not mean that they automatically

6    face the death penalty.  In this particular case there are

7    specifications attached to the charges of aggravated murder,

8    which means that this jury, if they find that the State has

9    proven beyond a reasonable doubt all the necessary elements

10   to prove the aggravated murder with the specifications, that

11   the jury may have to go into a second phase to consider the

12   possibility of imposing the death penalty or a lesser penalty

13   of life without chance of parole or life imprisonment with no

14   chance of parole before 25 or 30 years.

15          Now, we don't know what this jury is going to do,

16   because there's been no evidence presented, until they make

17   their decision.  It may well be that if the State fails to

18   carry the burden of proof then this jury would make a finding

19   of not guilty.  That would be the end of the trial.  But we

20   can't wait until the jury makes their decision because if

21   they should find the State has proven their case, then they

22   have to then consider the second phase.

23          You may have people on there that firmly believe in

```
 1    an eye for an eye, if you kill somebody you forfeit your
 2    life.  Well, that isn't the law of Ohio so that wouldn't be
 3    fair to a defendant because a defendant has the right in that
 4    second phase to have the jury consider the aggravating
 5    circumstances which the prosecution will present, and that
 6    will be reasons given to the jury in favor of imposing the
 7    death penalty, and they have to weigh those factors against
 8    mitigating factors, which are reasons put to the jury as to
 9    why in this particular case they should not impose the death
10    penalty.
11           Likewise, if we didn't know up front, and that's
12    what's taken all this time is to find out primarily each
13    individual possible juror's view on the death penalty.  If
14    you had somebody on there, and there are people who for
15    religious or moral reasons could never make that decision of
16    whether a person receives the death penalty or not, then that
17    type of person cannot be fair to the State because under the
18    law the State has the right to ask the jury to consider and
19    impose the death penalty if the facts warrant it.  The State
20    has proven beyond a reasonable doubt that there is reasons to
21    impose the death penalty that outweigh any factors speaking
22    against it, so we have to go through this.
23           And the person that makes the correct type of juror
```

```
 1    in a death penalty case is someone who has their own opinion.

 2    We all have our opinion about the death penalty.  Some are

 3    more in favor, some less.  But it has to be people who are

 4    able to follow the law, that they don't have such an

 5    entrenched view of the death penalty wherein they wouldn't be

 6    able to be fair to one side or the other, so that's what you

 7    are going to be asked concerning that issue.  The other issue

 8    is on pretrial publicity.  Where do you live at, sir?  I

 9    don't have your --

10                    JOSEPH CHETSKO:  I live in Kinsman.

11                    THE COURT:  Kinsman.  That's a good area.

12    I live down in Hartford.  What papers do you take?

13                    JOSEPH CHETSKO:  I don't take any papers.

14                    THE COURT:  Oh, okay.

15                    JOSEPH CHETSKO:  If you look at my

16    questionnaire I read, everything is true in there.

17                    THE COURT:  Okay.  I didn't have the

18    benefit of one of these questionnaires.  In any event, they

19    will ask you whether or not you have read or heard, seen

20    anything on TV about this case that would make it difficult

21    or impossible for you to set that aside.  This case in order

22    to be fairly tried has to be based on the evidence presented

23    only in this courtroom.  Anything that someone may have read
```

1    some other time may be true or may not be true.  So they will

2    make inquiry as to what you know or don't know about the

3    case.  Fair enough?

4                    JOSEPH CHETSKO:  Oh, I'll give you an

5    honest answer, that's all I can do.

6                    THE COURT:  Okay.  Mr. Becker.

7                    ATTY. BECKER:  Thank you, Your Honor.

8    Mr. Chetsko, correct, is that how you pronounce it?

9                    JOSEPH CHETSKO:  That's it.

10                    ATTY. BECKER:  All right.  My name is

11    Chris Becker.  I'm with the county prosecutor's office.  This

12    is Mr. Ken Bailey.  I assume you remember about a month ago

13    when you were in the large courtroom down the hall.

14                    JOSEPH CHETSKO:  (Nods head

15    affirmatively.)

16                    ATTY. BECKER:  As the Court indicated to

17    you, we're going to ask you some questions touching upon your

18    ability to serve as a fair and impartial juror in this case.

19    Some of the questions may seem a little personal, some of

20    them may be somewhat intrusive, but it's important for not

21    only the State but the defendant in this case to know what

22    your answers are.

23                    I realize, and we've all read over your

```
 1    questionnaire, and obviously sometimes those questions and
 2    those answers lead to more questions, and that's really the
 3    purpose of this procedure.  Before I get started, though, I'm
 4    going to ask you a very up front question, and I guess my
 5    question is, and there's no right or wrong answers here and
 6    there's no question that's going to upset us because, like
 7    the Court had indicated, we've had a number of people excused
 8    for many, many different reasons, would you rather not be
 9    here and not be serving on this case?
10                        JOSEPH CHETSKO:  I'm going to tell you
11    something, if I wanted not to be on the case or to serve I
12    would have said the first day.
13                        ATTY. BECKER:  Okay.  Well, the only
14    reason I ask that is because there's been some hint that --
15                        JOSEPH CHETSKO:  Am I happy?
16                        ATTY. BECKER:  -- you may not have come
17    back here.
18                        JOSEPH CHETSKO:  I am not happy.
19                        ATTY. BECKER:  Okay.  And I --
20                        JOSEPH CHETSKO:  Let me tell you one
21    thing, you asked me in that questionnaire what can I do to
22    make the justice system work better.
23                        ATTY. BECKER:  Uh-huh.
```

1          JOSEPH CHETSKO:  And I think I put down

2     you do the best you can.

3          ATTY. BECKER:  Well, you had three or four

4     answers, as I recall, to this question.

5          JOSEPH CHETSKO:  Well, I went down, I had

6     an appointment at 1:30 to be here.  I was here.  I waited

7     three hours and I get told to come back Friday.  I come back

8     Friday at 9:00 o'clock and I'm told right away that it's

9     10:00 o'clock.  Now, if I were running a business like this

10    court runs I would be broke, so that's my answer.

11         ATTY. BECKER:  All right.  Well, let me

12    ask you something, you're obviously a little upset at the

13    court system here, and particularly this case and this system

14    of choosing jurors.  Would you feel uncomfortable sitting as

15    a juror or feel that you would maybe let your anger --

16         JOSEPH CHETSKO:  No.  I told you, if I

17    wanted to get out of this I would have stated that when he

18    said who doesn't want to be there.

19         ATTY. BECKER:  Okay.  So you feel you

20    could sit as a fair and impartial juror in this case?

21         JOSEPH CHETSKO:  I would hope so.

22         ATTY. BECKER:  All right.  Now, I'm going

23    to tell you something very up front right now.  You are not

1    going to be a regular juror in this case, you're going to be

2    what we call an alternate juror, and what that means is you

3    may sit in this courtroom for three or four weeks and hear

4    testimony and you are only here in case one of these regular

5    jurors that we've already chosen to sit, and at some point

6    the Court may say to you -- well, because it's a capital case

7    they're going to tell you that you have to sit in there

8    during the deliberations during the first phase and then

9    you're going to possibly come back.  If the jury comes back

10   for a second phase, you may have to come in there.  But you

11   may sit three or four weeks in this case and never get to

12   participate and never get to vote.  Is that going to cause

13   you some problems?

14                   JOSEPH CHETSKO:  It won't cause me no

15   problems at all.

16                   ATTY. BECKER:  Okay.  All right.

17                   ATTY. INGRAM:  Chris.

18                   (Whereupon, a discussion was had among the

19   attorneys.)

20                   ATTY. BECKER:  Come here.  And I

21   apologize, Mr. Chetsko.

22                   (Whereupon, further discussion was had

23   among the attorneys.)

1           ATTY. BECKER:  All right.  Mr. Chetsko,

2    I'm going to follow that last question up that I had for you.

3    I can't promise you that this case is going to run like

4    clockwork and I understand you're upset about wasting your

5    time which, believe me, I appreciate that it's valuable.  My

6    time is valuable.  Yours is just as valuable, if not more

7    valuable.  If you sit on this jury we're going to have a

8    number of delays in this case, I can tell you right now.

9    First of all, this Court by its very nature has to not have

10   court every Thursday morning because it has to tend to other

11   criminal matters.  There are days where we may not even be in

12   this courtroom because we --

13           JOSEPH CHETSKO:  Excuse me.  All I need to

14   know is a day ahead of time what you're going to do, or at

15   the end of the day what you're going to do.

16           ATTY. BECKER:  Okay.  Well, we should be

17   able to give you that.  But you understand that we're dealing

18   -- I can't tell you what's going to happen in this trial, but

19   in many trials that we've been involved with, for instance, a

20   witness may come up here and may say something or do

21   something or testify to something that we may take a break

22   and go into chambers for half an hour, we may have to --

23           JOSEPH CHETSKO:  I have no problem with

```
 1    that.
 2                         ATTY. BECKER:  Okay.
 3                         JOSEPH CHETSKO:  It's the idea that you
 4    show up and nothing happens.
 5                         ATTY. BECKER:  Well, what I'm telling you
 6    is that that may happen many times in this case.
 7                         JOSEPH CHETSKO:  But if you know, if you
 8    come out and say for the day it's over or whatever, you can
 9    go, I have no problem with that.
10                         ATTY. BECKER:  Okay.
11                         JOSEPH CHETSKO:  It's the idea of waiting
12    down there, watching TV.
13                         ATTY. BECKER:  Well, what I'm telling you
14    is that that potentially could happen.  There may be --
15                         JOSEPH CHETSKO:  I have no problem with
16    that.
17                         ATTY. BECKER:  Okay.  All right.
18                         THE COURT:  I think this gentleman feels
19    like we all do when we go to a doctor's office.  They tell
20    you to be there at 2:00 and you sit there and you get in at
21    5:00, and I understand that.  There is no way that I can
22    convey to you -- this is, this type of trial is totally
23    different from any other type of trial because of this
```

```
 1    individual voir dire.  There's no way we can predict how long
 2    it's going to take and that means we inconvenience people.
 3    It's built right into it.
 4                         JOSEPH CHETSKO:  I understand that and
 5    that's not the problem.
 6                         THE COURT:  I feel that you do understand,
 7    so let's go on from there.
 8                         JOSEPH CHETSKO:  Yeah.
 9                         ATTY. BECKER:  All right.  Well, let's
10    move forward then.  I notice on your questionnaire that you
11    do believe in the death penalty.
12                         JOSEPH CHETSKO:  Yes, I do.
13                         ATTY. BECKER:  All right.  And that is one
14    of the first and primary concerns of both parties in this
15    case because you understand obviously the State is seeking
16    the death penalty in this case and we need jurors that are
17    able to impose the death penalty.  I want you to --
18                         ATTY. INGRAM:  Objection.
19                         ATTY. BECKER:  If we prove our case.
20                         THE COURT:  Objection?
21                         ATTY. INGRAM:  Yes.  The statement was we
22    need jurors who are --
23                         ATTY. BECKER:  The State needs jurors that
```

1    can be fair and can fairly consider the death penalty if

2    we're able to prove our case.

3                        ATTY. INGRAM:  That's fine.

4                        THE COURT:  Okay.

5                        ATTY. BECKER:  All right.  Can you

6    imagine, and I assume you have and that's why you answered

7    the way you did, if the State were to prove its case beyond a

8    reasonable doubt you can foresee yourself signing a piece of

9    paper, putting your signature on a piece of paper calling for

10   the imposition of the death penalty?

11                       JOSEPH CHETSKO:  Yes, I can.

12                       ATTY. BECKER:  All right.  Now, I don't

13   know how much you know about the capital, capital cases in

14   Ohio and the way they're tried so I'm going to explain to

15   you.  And let me ask you, do you know anything about how

16   capital cases are tried here?

17                       JOSEPH CHETSKO:  Not officially at this --

18   really nothing.

19                       ATTY. BECKER:  All right.  This case, as

20   all capital cases are in Ohio, is a two-step process.

21   There's going to be a first phase of this trial.  That first

22   phase is just like any other criminal case.  Mr. Bailey and I

23   have to prove to you and the fellow jurors that are on this

1    jury that this defendant, Donna Roberts, is guilty beyond a

2    reasonable doubt.  There are four counts in the indictment;

3    aggravated burglary, aggravated robbery, and two counts, even

4    though there's only one death, two counts of aggravated

5    murder.  Both of those counts of aggravated murder have

6    specifications or attachments or special things that make her

7    eligible for the death penalty.

8         Now, you and your fellow jurors may acquit her, you

9    may find her not guilty of everything, and we all go home

10   after the end of that first phase, that first trial.  You may

11   find her guilty of aggravated murder but not of the special

12   things that make it a death penalty eligible case, and at

13   that point we all go home again.  Excuse me.  Or you may find

14   her guilty of the aggravated murder count and those

15   specifications, or those special things that get us to the

16   death penalty phase.

17        Then and only then do we begin a second phase, and

18   in that second phase you and your fellow jurors have to wipe

19   the slate clean.  You have to start with a blank piece of

20   paper like there in the corner.  You're going to know,

21   though, if we get to that second phase because the only way

22   we get to that second phase is if you and your fellow jurors

23   convict her of aggravated murder and that she committed that

 1  aggravated murder either with prior calculation and design,

 2  which is what we call premeditated murder -- it used to be

 3  the premeditated murder statute, meaning she planned it, or,

 4  and/or she also committed this offense while helping another

 5  person or aiding and abetting another person during the

 6  commission of a felony, that being the aggravated burglary

 7  and the aggravated robbery.  Now, I probably haven't made

 8  that as clear as I probably can, but that's as clear as I can

 9  probably make it in terms of simplicity.

10       So knowing that you would perhaps be in this second

11  phase if you were to find her guilty, you're going to know

12  that she's involved in a premeditated murder and/or a murder

13  that was committed during the course of a felony, that being

14  aggravated burglary or aggravated robbery, do you believe you

15  can start fair again and again put the burden solely on

16  Mr. Bailey and I to prove that those things, those bad

17  things, specifically the aggravated burglary and aggravated

18  robbery specifications, that they outweigh the mitigating

19  factors?

20            JOSEPH CHETSKO:  Yes, I can, because, like

21  I answered in the questionnaire, I said that you'd have to

22  prove it.

23            ATTY. BECKER:  Okay.  And that's fair

1    enough.  And when you get to that second phase, if we get

2    there, you're going to have four options, and I assume you

3    remember that from the handout you read.

4                    JOSEPH CHETSKO:   (Nods head

5    affirmatively.)

6                    ATTY. BECKER:  You're going to have death

7    obviously, life with no parole, life with no parole after 30

8    years, and life with no parole after 25 years.  And you will

9    be able to consider all four of those fairly and equally,

10   correct?

11                   JOSEPH CHETSKO:  Yes.

12                   ATTY. BECKER:  All right.  And just so you

13   understand, that's been a lot of the problem and a lot of the

14   reason for the delay.  Some people we have spent 20 minutes,

15   30 minutes, 40 minutes on that very issue because they say I

16   can't consider all four of those options.  Some of them say I

17   can't consider the death penalty, some of them say I will

18   only consider the death penalty.  So just so you understand

19   why we're in this predicament and why we run so slow, some

20   people are not as clear and concise as you are.  Some people

21   say well, I don't know, maybe, I guess.  They're not as firm

22   in their beliefs.  So just so you understand, that's why

23   we're where we're at.

1               You understand that in both phases, the guilty phase

2       where we have to prove these things, that she's done

3       something, and if we get to a second phase, the penalty

4       stage, we have to prove to you and it's Mr. Bailey and the

5       State's burden to prove beyond a reasonable doubt that crimes

6       were committed and that the penalty is warranted, correct?

7               JOSEPH CHETSKO:  Yes, that's the answer I

8       want.

9               ATTY. BECKER:  Okay.  And you will be fair

10      and consider all four options at that second level if we get

11      to that second stage?

12              JOSEPH CHETSKO:  Yes.

13              ATTY. BECKER:  All right.  Now, looking at

14      your questionnaire, Mr. Chetsko, it's my understanding that

15      you have not heard any pretrial publicity connected with this

16      case.

17              JOSEPH CHETSKO:  No.  I don't listen to

18      the radio and I don't read the paper because -- I don't get

19      the paper because when we order the paper the paper doesn't

20      come all the time so I'm paying for a paper I don't get.

21              ATTY. BECKER:  And I also notice that I

22      think you had some problems in the paper about -- was it you

23      that was quoted at some point, misquoted in the paper?

```
 1                          JOSEPH CHETSKO:  I don't think so.

 2                          ATTY. BECKER:  Okay.  That was the next

 3      one.  Okay.  I'm getting my people mixed up here.  I'm sorry.

 4      You basically read the Wall Street Journal I think?

 5                          JOSEPH CHETSKO:  Yes.

 6                          ATTY. BECKER:  All right.  And I assume

 7      since you live in Kinsman, which is almost in Ashtabula

 8      County and up on the PA line, you don't really keep track of

 9      what goes on in Howland or that part of the county?

10                          JOSEPH CHETSKO:  No.

11                          ATTY. BECKER:  All right.  Have you heard

12      anything from anybody, whether it be from the media or people

13      you work with, people in the community?

14                          JOSEPH CHETSKO:  If I heard anything it

15      just passed through the ears because I don't recognize --

16                          ATTY. BECKER:  You don't really care.

17                          JOSEPH CHETSKO:  I don't recognize any of

18      them.

19                          ATTY. BECKER:  And anything you may have

20      heard would not affect your ability to sit as a fair and

21      impartial juror in this case?

22                          JOSEPH CHETSKO:  I don't believe so.

23                          ATTY. BECKER:  Okay.  Now I'm going to ask
```

1    you some general questions about generally jury service, and

2    every criminal case involves certain issues I guess and

3    certain, certain -- well, issues and, and, and -- what's the

4    word I'm looking for?  I'm a little bit brain dead this

5    morning.

6                         ATTY. JUHASZ:  Concepts.

7                         ATTY. BECKER:  Concepts.  Thank you.  In

8    this case, as in every criminal case, the defendant is

9    presumed innocent.  I'm assuming you've heard of that term

10   either through something you've read or television or a novel

11   you may have read or something.  That concept basically means

12   that she does not have to prove anything to you during these

13   proceedings.  Do you agree with that concept?

14                         JOSEPH CHETSKO:  Yes, I do.

15                         ATTY. BECKER:  Okay.  And do you believe

16   that it would be possible for Mr. Bailey and I to present to

17   you numerous witnesses, numerous exhibits and still not meet

18   our burden of proof beyond a reasonable doubt?

19                         JOSEPH CHETSKO:  I doubt it.

20                         ATTY. BECKER:  Well, it's conceivable

21   though, right?

22                         JOSEPH CHETSKO:  If you did your job I

23   feel it would be pretty hard not to see that.

1            ATTY. BECKER:  Well, you understand our

2     job is only as good as the investigation that was done,

3     correct?

4            JOSEPH CHETSKO:  Well, then that's the way

5     it would go.

6            ATTY. BECKER:  Okay.  And I'm going to use

7     a very simplistic example to point something out to you and I

8     just want to see if you agree with this example.  We could

9     probably be here -- let's assume we're not here on this death

10    penalty case but we're here on a traffic accident and the

11    traffic accident occurred at Park Avenue and High Street at

12    12:00 noon, beautiful sunny day, and we only had one witness.

13         Mr. Bailey and I presented to you one witness for

14    the charge that this driver went through a red light at Park

15    Avenue and High Street and our one witness is the local

16    bishop for the Catholic Dioceses here in the

17    Youngstown/Warren area.  And he says, "I always walk around

18    the courthouse square every day at 12:00 noon, I've been

19    doing it for 10 or 12 years, and before I cross the streets

20    down here I always look both ways because I know there's a

21    lot of wild drivers in the Warren area.  Sometimes people are

22    ticked off from leaving the courthouse or muni court downtown

23    here.  Whatever reason, I know they're speeding around

1    everywhere.  They might be on their lunch break trying to run

2    errands.

3            "So on this particular day at 12:00 noon I'm

4    standing at the corner, I'm going east on High Street.  I see

5    the green light on High Street.  I see the flashing yellow

6    light or, I'm sorry, the flashing light that says 'walk', but

7    before I step out into the road I look both ways because I've

8    almost been hit many, many times and I know these drivers are

9    nuts.

10           "I look to the left, which is north on Park Avenue.

11   Don't see anything.  I look to the right and here comes a guy

12   in a blue Chevy pickup truck just barreling down the road,

13   blows through the intersection and T-bones this guy right in

14   the intersection.  I saw the whole thing.  I have perfect

15   vision, 20/20.  In fact, I had just been at the eye doctor

16   the other day, gave me 20/20 vision.  I don't drink, I don't

17   smoke.  I was only paying attention, I wasn't carrying on a

18   conversation with anybody."

19           If the charge was did somebody run through a red

20   light, you could basically find that guy guilty on just that

21   one witness, right?  Would that be enough for you?

22                   JOSEPH CHETSKO:  Well, I know how I would

23   look at it, but no, I don't think I could.  I would have --

1                    ATTY. BECKER:  And why not?

2                    JOSEPH CHETSKO:  I think you have to

3     question both people in that.

4                    ATTY. BECKER:  What do you mean question

5     both people?

6                    JOSEPH CHETSKO:  Well, the guy that went

7     through the red light, he might have a different story than

8     the guy who saw it.  Most people don't realize what they see

9     at what time they see it.

10                   ATTY. BECKER:  Well, let me ask you this

11    though, you just told me a few minutes ago that you believe

12    in our presumption of innocence, correct?

13                   JOSEPH CHETSKO:  Right.

14                   ATTY. BECKER:  That driver of that car may

15    decide maybe he doesn't want to take the witness stand for

16    whatever reason.  He's not required to.  You don't have to

17    hear anything.  You may never hear his side of the story.  Do

18    you believe that we could prove our case with just that one

19    witness even if you didn't hear from the driver?  That's all

20    the evidence you've had is just this one witness.

21                   JOSEPH CHETSKO:  Well, I guess you could.

22                   ATTY. BECKER:  Okay.  So, I mean, and I

23    know that's a very simplistic example and we're trying to

1   speed this process up as much as we can for you, but you

2   believe we probably could?

3                    JOSEPH CHETSKO:  If, if the witness, if

4   you questioned the witness long enough and --

5                    ATTY. BECKER:  Right, and got enough

6   detail from him?

7                    JOSEPH CHETSKO:  Yes, and his story didn't

8   waver, I would say the one witness would be sufficient.

9                    ATTY. BECKER:  All right.  And that's

10  generally what we're looking for.  You wouldn't make the

11  driver in that car, you wouldn't sit here if you were a juror

12  on that case and say, "Boy, I wonder what the driver has got

13  to say about this?  Boy, you know, I'm not going to find him

14  guilty," or "I am going to find him guilty because he didn't

15  get up and say what I wanted him to say.  He didn't say

16  anything."  You understand that's what the presumption of

17  innocence is all about?  He doesn't have to, that driver in

18  that accident never has to take the witness stand, never has

19  to tell you his side of the story, right?

20                   JOSEPH CHETSKO:  He has the option to,

21  though.

22                   ATTY. BECKER:  But you can't, but the

23  Court is going to tell you you can't hold that against him,

1    the fact that he doesn't --

2                    JOSEPH CHETSKO:  I didn't say that.  I

3    said the driver --

4                    ATTY. BECKER:  Sure.  Sure, he has the

5    option.

6                    JOSEPH CHETSKO:  He has the option.  If he

7    feels he's innocent he has the option to testify.

8                    ATTY. BECKER:  Well, and he also has the

9    option to stand up and have his attorney say in closing

10    arguments hey -- and let me give you another example.  Let

11    me, let me, let me show you, illustrate by a very simplistic

12    example the other side of that coin.

13        Let's assume now instead of 12:00 noon it's 12:00

14    midnight.  It's a rainy evening.  There's an Irish bar down

15    the street here called Madigan's.  Let's assume there are

16    three guys in Madigan's.  Two of them wear glasses, the other

17    one wears contacts.  They get in a big fight down there.  The

18    bouncer throws them out.  Sometime during being thrown out

19    and getting in this fight they break their glasses, the one

20    guy loses his contacts.  They're drunk.  They've been there

21    for seven or eight hours drinking two or three beers an hour.

22        They come stumbling down the street and it just so

23    happens they see a car, pickup truck, Chevy pickup truck,

1    coming through the intersection at High and Park Avenue and

2    it hits a car.  And let's assume that the car the driver hits

3    is their cousin who was coming to pick them up at Madigan's

4    because they called right before the fight to get a ride.

5    And now they find out that the guy who has allegedly ran

6    through the red light is the brother of the bouncer that

7    threw them out of the bar.

8              Now, let's assume the brother who is driving through

9    the intersection, the defendant in that case, never takes the

10   witness stand.  You're going to have a hard time finding the

11   guy guilty based on those three witnesses, the three drunks

12   who had their glasses broken and are protecting their cousin

13   ostensibly who is going through the intersection as well,

14   right?  There's a lot of motive for why they testified that

15   the bouncer's brother was the one at fault, right?

16             JOSEPH CHETSKO:  Theoretically speaking

17   you're right, but if you question them long enough the story

18   will come out probably, what happened.

19             ATTY. BECKER:  If we ask them the right

20   questions.  That's what our job is essentially.  But you

21   would have some concerns about their testimony, wouldn't you?

22             JOSEPH CHETSKO:  Most likely you would.

23             ATTY. BECKER:  All right.  And in that

```
 1    scenario you wouldn't require the driver of the pickup truck
 2    to testify, would you?  You wouldn't sit here as a juror and
 3    say, "Well, the driver of that pickup truck, he should have
 4    testified, because if he doesn't testify I'm going to find
 5    him guilty?"  You wouldn't be of that mind set, would you?
 6                   JOSEPH CHETSKO:  No, because --
 7                   ATTY. BECKER:  Because he's got a
 8    presumption of innocence, right?
 9                   JOSEPH CHETSKO:  Right.
10                   ATTY. BECKER:  And he's got his fifth
11    amendment, and she does as well, correct?
12                   JOSEPH CHETSKO:  Yes, yes.
13                   ATTY. BECKER:  So you may not hear from
14    her.  As much as you may want to hear two sides of the story,
15    you may not hear two sides of the story, correct?
16                   JOSEPH CHETSKO:  That's true.
17                   ATTY. BECKER:  You will not hold that
18    against her if she does not take the witness stand?
19                   JOSEPH CHETSKO:  No.
20                   ATTY. BECKER:  And you will not consider
21    it for whether she's guilty or not guilty?
22                   JOSEPH CHETSKO:  No.
23                   ATTY. BECKER:  All right.  And that's what
```



1    that presumption of innocence means, you understand that?

2                    JOSEPH CHETSKO:  Oh, yes, I understand.

3                    ATTY. BECKER:  All right.  Now, the next

4    concept we have to deal with is the concept called reasonable

5    doubt, and when I was in law school one of my professors my

6    first year of law school referred to reasonable doubt and all

7    standards of proof really as like a cup of water.  Reasonable

8    doubt is reason, reason and common sense.  It's based on

9    reason and common sense.  It is not all doubt.  All doubt is

10   the top of this cup so that if I put another drop of water in

11   there it spills out.  Mr. Bailey and I cannot prove anything

12   to you beyond all doubt.

13        I'm standing here today with a wedding ring on.  I

14   can probably reach into my wallet and put down pictures of my

15   wife and kids.  I can probably call my wife today and have

16   her come down and meet me for lunch and have my four children

17   brought down here and bring them into this courtroom, but --

18   and that's probably reasonable doubt that I'm married, right?

19   I've got the ring.  I've got pictures of them.  They came

20   down here.  My kids may wave and say, "Hi, daddy."  That's

21   probably going to prove to you that I'm married and have

22   kids, right?

23                    JOSEPH CHETSKO:  Yes.

```
 1                    ATTY. BECKER:  Now, some people may want
 2    me to produce a marriage certificate, so maybe I'll have my
 3    wife bring down the marriage certificate, right?
 4                    JOSEPH CHETSKO:  I suppose you would.
 5                    ATTY. BECKER:  Okay.  And there may be
 6    other jurors who may want to see our wedding pictures so I
 7    may have to have her bring down the wedding pictures, the
 8    license, and maybe even the pronouncement from the Methodist
 9    church that we were married in the church to prove all of
10    that.  But even with all of that there may be a little bit of
11    doubt as to whether any of that stuff is real, right?  I
12    mean, you could always imagine, well, maybe they're just
13    trying to pull a big con game on me.  Maybe Becker went down
14    to the pawn shop, bought a ring today, stole some pictures of
15    his neighbors' kids, had his neighbor's wife come down with
16    her kids, brought in some photographs of him and this woman
17    when they were at some costume dinner and they were, you
18    know, acting like bride and groom, and maybe they forged
19    these documents and printed them out on one of these fancy
20    laser printer.  I mean, there's always room for some doubt,
21    right?
22                    JOSEPH CHETSKO:  Yes.  That would be great
23    lengths though.
```

1               ATTY. BECKER:  Right, and it would be.  So

2    you're not going to hold the State -- reasonable doubt is

3    basically going to be some point near the top but not to the

4    top, you understand that simple concept?

5               JOSEPH CHETSKO:  Yes.

6               ATTY. BECKER:  You'll be able to find this

7    defendant guilty beyond reasonable doubt, which is somewhere

8    near the lip of this cup, and not make us prove our case

9    beyond all possible doubt because I don't think we can prove

10   anything to you beyond all possible doubt?  Would you agree

11   with that?

12              JOSEPH CHETSKO:  Yes.

13              ATTY. BECKER:  And by the same token, if

14   we get to that second phase, which is the penalty phase where

15   you would determine whether the death penalty was

16   appropriate, you would only hold the State to the standard of

17   reasonable doubt as to whether or not the death penalty was

18   warranted, you would not hold us to all possible doubt as to

19   whether that was warranted?

20              JOSEPH CHETSKO:  Yes.

21              ATTY. BECKER:  All right.  Now, I noticed

22   that you are a member of the Catholic faith and obviously the

23   Catholic church has pronounced that they are opposed to the

1    death penalty.  Do you follow those views or do you -- are

2    you able to separate those views?

3                    JOSEPH CHETSKO:  Yes.

4                    ATTY. BECKER:  Okay.  This case involves

5    two counts of aggravated murder even though only one person

6    is deceased.  The reason that that is charged that way is

7    there are two theories of the case and the Court is going to

8    tell you you can find her guilty of none of them, some of

9    them or all of them.  So in reality you could find her not

10   guilty of aggravated murder, you could find her guilty of one

11   or the other, or you could find her guilty of both counts if

12   you think that both theories fit the case.  Do you have any

13   problem with that?

14                   JOSEPH CHETSKO:  No.

15                   ATTY. BECKER:  This case, of course, is a

16   very serious case because it involves the death of one

17   individual, we know that, because there's a charge of murder,

18   and it involves the potential death of this defendant because

19   if we get to that second phase and if we're able to prove our

20   case, obviously the death penalty is an option.  And now that

21   Ohio has begun to actually exercise that it may be a real

22   reality for her some day.  Do you feel that you would be the

23   type of person that would be sympathetic either to Mr. Robert

1    Fingerhut, who is the deceased person in this case, and his

2    family or to the defendant because death has occurred in this

3    case or death may occur in this case?

4                        JOSEPH CHETSKO:  I think I'm partial to

5    the crime.

6                        ATTY. BECKER:  You're partial to what?

7                        JOSEPH CHETSKO:  To the crime committed.

8                        ATTY. BECKER:  I'm not sure if I

9    understand your answer.

10                       JOSEPH CHETSKO:  Well, if you can prove

11   that there was a murder, like the murder.

12                       ATTY. BECKER:  Right.

13                       JOSEPH CHETSKO:  And you're calling for

14   the death penalty, I could go with that.

15                       ATTY. BECKER:  But you would still --

16   well, --

17                       JOSEPH CHETSKO:  I would not be partial to

18   either side is what you want to know.

19                       ATTY. BECKER:  Okay.  All right.  You

20   would follow the law and the facts I guess is what you're

21   saying?

22                       JOSEPH CHETSKO:  (Nods head

23   affirmatively.)

1      ATTY. BECKER:  All right.  This case

2  involves a situation and Mr. Bailey and I are going to be

3  very honest with you, the allegation in this case is that she

4  is an aider and abettor or a helper.  She is not alleged to

5  be the trigger person.  Does that change anything for you in

6  terms of whether or not you feel she should be subject to the

7  death penalty if we're able to prove that case the first

8  time?

9      JOSEPH CHETSKO:  No.

10      ATTY. BECKER:  So even you believe if she

11  was an aider and abettor and it was proven that she was an

12  aider and abetter and a helper, if the law warranted it and

13  the facts permitted it, you would be able to sign a verdict

14  calling for the death penalty?

15      JOSEPH CHETSKO:  Yes.

16      ATTY. BECKER:  All right.  Every case

17  involves, every criminal case, just about every civil case as

18  well, has some element of what we call circumstantial

19  evidence.  I'm not going to be presumptuous, but I'm assuming

20  you've heard of that term before, correct?

21      JOSEPH CHETSKO:  Yeah.

22      ATTY. BECKER:  The Court will tell you

23  that circumstantial evidence is the same as direct evidence

1  and direct evidence is basically if I'm sitting here in the

2  courthouse and I see some guy rob somebody out here in

3  courthouse square. I know who he is, I see him pull out a

4  gun, I see him point it at the guy's head, I see the guy give

5  him his wallet, I see the guy run away. That's direct

6  evidence. I could come into the courtroom and say on May 9th

7  at approximately 10:30, 10:45 a.m. I was voir diring a

8  witness and I happened to look out the window and I saw this

9  horrible crime; that's direct evidence you would agree,

10 correct?

11                    JOSEPH CHETSKO:  Yes.

12                    ATTY. BECKER:  Circumstantial evidence are

13 things such as fingerprints, DNA, perhaps things that lead

14 you to a conclusion. If I witnessed this same -- well, let's

15 say I don't witness this. I'm standing here and I look out

16 and I see a guy going like this, his wallet is on the ground,

17 the police are there, the police show up, and the guy gives

18 him his explanation and they take the wallet and they

19 fingerprint it and they find the defendant's fingerprints. I

20 never saw the guy's wallet being taken out. The guy who does

21 the fingerprinting examination never saw it. He just dusted

22 the thing for fingerprints and found fingerprints. That's

23 circumstantial evidence. You can assume, I'm guessing, that

1    the person who reached in and touched that wallet who is now

2    alleged to be the defendant actually touched it, right, his

3    fingerprints were found on it?

4                          JOSEPH CHETSKO:  (Nods head

5    affirmatively.)

6                          ATTY. BECKER:  Often times in rape cases

7    women are raped, they go, they report it, they may not know

8    who the assailant is.  They extract DNA or they run a DNA

9    test and they put it in a database and they may be able to

10   match that DNA to another defendant or to a person, a known

11   suspect.  Even though the woman doesn't know who committed

12   the crime, that DNA evidence, that circumstantial evidence,

13   links him to the crime, correct?

14                          JOSEPH CHETSKO:  Yes.

15                          ATTY. BECKER:  All right.  You don't have

16   a problem determining guilt or innocence or, if we get to

17   that second phase, whether the death penalty is appropriate

18   based upon circumstantial evidence such as DNA, fingerprints

19   or anything like that?

20                          JOSEPH CHETSKO:  If there's enough of it.

21                          ATTY. BECKER:  All right.  So you could

22   find first guilt and then secondly that the death penalty

23   would be warranted?

1           JOSEPH CHETSKO:  Yes.

2           ATTY. BECKER:  All right.  Mr. Chetsko, I

3   just have one last area I want to finish up with you on.  I'm

4   assuming throughout your life you've heard stories of

5   criminals that have done dumb things, they've done things

6   that are ridiculous.  They've made plans to commit a crime

7   and then they end up getting caught doing it for some stupid

8   reason, correct?

9           JOSEPH CHETSKO:  I suppose.

10          ATTY. BECKER:  All right.  Well, just the

11  other day in the newspaper we had an individual who

12  apparently decided to take some photographs of himself with a

13  small child in a closed house.  The door was closed, the

14  bedroom was closed, or the bathroom, wherever they were

15  taken, and he took some lewd photographs of himself.  He

16  probably made sure his wife was gone, nobody was around.  He

17  had this small child there, he took some photographs in a

18  very criminal way and a very sexually explicit way of these

19  small children and himself.  He went to all this planning to

20  make sure his wife was gone, the neighbors were gone.  He

21  pulled the blinds down and he locked the door to the house.

22  He closed the bathroom door.  He made sure that there was no

23  one around and he took these photographs, and then like a big

```
 1    dummy he went to Kmart and had them developed.  You've heard,

 2    you know, the saying the best laid plans can go astray?

 3                        JOSEPH CHETSKO:  I heard the phrase, yes.

 4                        ATTY. BECKER:  Okay.  You agree that that

 5    could happen in a case even involving a possible homicide?

 6                        JOSEPH CHETSKO:  Yes.

 7                        ATTY. BECKER:  People can make dumb

 8    mistakes like that?

 9                        JOSEPH CHETSKO:  Yes.

10                        ATTY. BECKER:  Okay.  Mr. Chetsko, I want

11    to thank you very much for your time here this morning.  I

12    also want to thank you and apologize for keeping you here

13    yesterday, and I do apologize and I think all of us here

14    apologize for keeping you here and wasting your time because

15    it was very difficult, I'm sure, for you to be here not

16    knowing why, what was going on and what the delay was.  This

17    case may involve delays.  It may involve you being here some

18    day and maybe only hearing two or three hours of testimony

19    rather than six or seven hours of testimony.  Sometimes those

20    things happen.

21                        JOSEPH CHETSKO:  I have no problem with

22    that.  It's just if --

23                        ATTY. BECKER:  Okay.
```

1              JOSEPH CHETSKO:  I have no problem with

2    that.

3              ATTY. BECKER:  Okay.  You believe and you

4    don't think there's any other reason why you could not serve

5    as a juror in this case?

6              JOSEPH CHETSKO:  Not at the moment.  I

7    don't know what the future will bring.  I can't -- you know,

8    I don't know.

9              ATTY. BECKER:  Well, do you have anything

10   pressing at home?

11             JOSEPH CHETSKO:  No.

12             ATTY. BECKER:  Any issues that may cause

13   you to have to leave?

14             JOSEPH CHETSKO:  Nothing that I can't work

15   around.  I have no problem with that.

16             ATTY. BECKER:  All right.  And you'd be

17   glad to serve as an alternate juror in this case?

18             JOSEPH CHETSKO:  I have no problem, yes.

19             ATTY. BECKER:  Okay.  I want to thank you

20   very much.  Mr. Ingram or Mr. Juhasz now are going to ask you

21   some questions.  Again, thank you, sir.

22             THE COURT:  I do want to ask one thing.

23   You own a farm?

1                        JOSEPH CHETSKO:  Pardon?

2                        THE COURT:  Do you farm?

3                        JOSEPH CHETSKO:  Yes.

4                        THE COURT:  You do?  You have your crops

5     all in?

6                        JOSEPH CHETSKO:  Well, I'm ready to go as

7     soon as the ground dries up.  I mean, I don't have that much

8     land.  I can do what I got to do in eight hours.

9                        THE COURT:  This won't interfere with you

10    doing that?

11                       JOSEPH CHETSKO:  No.

12                       THE COURT:  Okay.  Go ahead.

13                       ATTY. INGRAM:  Good morning, sir.  How are

14    you?

15                       JOSEPH CHETSKO:  Well, I hope I'm fine.

16                       ATTY. INGRAM:  You need a glass of water?

17                       JOSEPH CHETSKO:  No, I don't.  I'm fine.

18                       ATTY. INGRAM:  If you want coffee I think

19    I can --

20                       JOSEPH CHETSKO:  I don't drink coffee,

21    sir.

22                       ATTY. INGRAM:  You don't drink coffee?

23                       JOSEPH CHETSKO:  No.

1              ATTY. INGRAM:  How do you get your

2    caffeine?

3              JOSEPH CHETSKO:  I don't.

4              ATTY. INGRAM:  I wouldn't be able to live

5    without caffeine.  My name is Jerry Ingram, this is John

6    Juhasz, and we share the responsibility of representing Donna

7    Roberts who is on trial for her life.  As I'm sure you can

8    imagine, we take our responsibility to Donna very seriously

9    and feel we should take every reasonable precaution in

10   selecting a fair-minded jury, basically the same type of jury

11   that you or I would want if we were on trial.  No more, no

12   less.

13             JOSEPH CHETSKO:  That's right.

14             ATTY. INGRAM:  Does that sound fair enough

15   to you?

16             JOSEPH CHETSKO:  Fair enough to me.

17             ATTY. INGRAM:  This is the only

18   opportunity that we'll ever have to get to talk to one

19   another and determine whether you're comfortable sitting on

20   this panel.  I'm allowed to talk to you but, more

21   importantly, you're allowed to talk to me.  And actually

22   you're the one who is supposed to be doing most of the

23   talking, but lawyers by training or whatever have a tendency

1    to monopolize the conversation.  So whenever there's

2    something you would like to discuss or something you would

3    like to volunteer, why don't you do that and it will minimize

4    my tendency to monopolize the conversation.

5              JOSEPH CHETSKO:  Just ask the questions

6    and I'll give you the answers.

7              ATTY. INGRAM:  Okay.  We're interviewing

8    you today for the job of being a trial juror, except when you

9    go apply for a job job you pick.  When you went to Delphi you

10   chose to go apply for that job.  Here we spun the jury wheel

11   and we called you down here, you had no choice.  We're

12   interviewing you today for one of the most important jobs

13   there is, finding the truth and perhaps determining the fate

14   of another human being.  How do you feel about being asked to

15   assume that responsibility?

16             JOSEPH CHETSKO:  I consider it quite a

17   responsibility.  I mean, it's a civic duty I guess.  You

18   know, when you get called you go.

19             ATTY. INGRAM:  Okay.  There are no right

20   or wrong answers in this exchange, and if at any point in

21   time my question doesn't make sense to you, and that might

22   happen, that's my fault.  That means I failed to make myself

23   clear, so if that happens will you let me know?

```
 1                        JOSEPH CHETSKO:  Sure will.

 2                        ATTY. INGRAM:  In a nutshell this case

 3    boils down to the government's allegation that Donna Roberts

 4    plotted or conspired with a male companion, Nate Jackson, to

 5    cause the death of Robert Fingerhut.  Donna and Robert were

 6    divorced but they continued to live together in Howland

 7    Township and work together at the Greyhound bus stations in

 8    Warren and Youngstown.  You understand that this trial is

 9    about the guilt or innocence of one person and one person

10    only?

11                        JOSEPH CHETSKO:  Yes.

12                        ATTY. INGRAM:  And that's Donna Roberts.

13                        JOSEPH CHETSKO:  (Nods head

14    affirmatively.)

15                        ATTY. INGRAM:  Throughout the course of

16    these proceedings you'll hear the name Nate Jackson and you

17    may conclude that Mr. Jackson did what the State claims he

18    did.  That's not what you are here to determine.  You're here

19    to determine whether Donna helped him do it.  You got a

20    handle on that?

21                        JOSEPH CHETSKO:  Yes.

22                        ATTY. INGRAM:  And the State has the

23    burden of proving that she was a helper, and the legal term
```

1   for helper is accomplice, aider and abettor, but we'll use

2   the word helper.  They have to prove that Donna was a helper

3   beyond a reasonable doubt.  Will you hold them to that

4   burden?

5                    JOSEPH CHETSKO:  Yes.

6                    ATTY. INGRAM:  Now, in support of its

7   allegation that Donna participated in the death of Robert

8   Fingerhut the State will present during this trial some

9   letters and tape recorded telephone conversations between

10  Donna and Nate Jackson.  Some of this evidence is sexually

11  explicit in nature, and to be downright candid with you, some

12  of it's offensive.  Even though you may be offended by the

13  sexually explicit nature of some of this evidence, you're

14  sort of going to have to rise above that offense because your

15  job responsibility will require you to test the evidence to

16  determine whether it ties Donna to this offense.  Do you

17  think you're up to that?

18                    JOSEPH CHETSKO:  Yes.

19                    ATTY. INGRAM:  Do you have any feelings

20  about interracial relationships?

21                    JOSEPH CHETSKO:  No, I don't.

22                    ATTY. INGRAM:  And if you found in this

23  case that there was an interracial relationship would that

1   bother you at all?

2                    JOSEPH CHETSKO:  No.

3                    ATTY. INGRAM:  Donna denies that she

4   participated by conspiracy, plot or otherwise in the death of

5   Robert Fingerhut.  Would you have the courage to acquit, that

6   is vote not guilty, if you thought a not guilty verdict was

7   warranted by the evidence?

8                    JOSEPH CHETSKO:  Yes.

9                    ATTY. INGRAM:  Many times Mr. Becker asked

10  you if you were willing to sign verdict forms.  Sometimes he

11  asked you about verdict forms relating to guilt or innocence

12  and on other occasions he asked you about verdict forms

13  relating to punishment.  Do you recall those questions?

14                   JOSEPH CHETSKO:  Yes.

15                   ATTY. INGRAM:  You understand no one is

16  asking you to prejudge this case?

17                   JOSEPH CHETSKO:  Right.

18                   ATTY. INGRAM:  We got to talk about

19  punishments.  Before we do that there's a concern I have I

20  want to explain to you.  All of us have stood up here and

21  asked you your views about the death penalty, the judge, the

22  prosecutor, and myself, and I'm a little bit concerned that

23  we're asking you about punishment when you don't even know if

1    the person we're talking about has done anything wrong or

2    not.   To me it seems a lot like putting the cart before the

3    horse.   Do you see what I mean by that old adage?

4                    JOSEPH CHETSKO:   Well, if you want me to

5    tell you, I'm telling you that the prosecutor unequivocally,

6    the evidence says the person is guilty, I have no problem

7    with the death penalty.

8                    ATTY. INGRAM:   Okay.   You know that this

9    is an aggravated murder case?

10                   JOSEPH CHETSKO:   Aggravated, yes.

11                   ATTY. INGRAM:   And we're going to talk

12   about one of the counts.   One of the counts is prior

13   calculation and design aggravated murder.   It's premeditated

14   murder, advanced planning.   Is it your view that if they

15   prove her guilty that you go right to the death penalty?

16                   JOSEPH CHETSKO:   It has to -- no, I would

17   not go right to the death penalty.   It has to be proven that

18   is exactly the way it is that they're saying it is for the

19   death penalty.

20                   ATTY. INGRAM:   Okay.   Did you read the

21   preliminary instruction, the five or six pages downstairs?

22                   JOSEPH CHETSKO:   Right.

23                   ATTY. INGRAM:   That's some pretty hard

1    stuff, and if we asked half the lawyers in town to read it,

2    half the lawyers wouldn't be able to understand it because

3    they don't do that kind of stuff, they're not familiar with

4    that kind of stuff.  Did it make sense to you, those

5    preliminary instructions?

6                      JOSEPH CHETSKO:  Yes.

7                      ATTY. INGRAM:  You think you have a handle

8    on the procedure?

9                      JOSEPH CHETSKO:  Yeah.

10                     ATTY. INGRAM:  Okay.  How do you feel

11   about the death penalty as a sentence that we use in this

12   country?

13                     JOSEPH CHETSKO:  I feel it's being used as

14   a deterrent.  I don't know if it's doing its job, but that's

15   what it's supposed to be doing.

16                     ATTY. INGRAM:  Okay.  We've recently had

17   some renewed debate in this country about whether we should

18   even have the death penalty or not, and like the State of

19   Illinois, Illinois put a moratorium on executions.  Did you

20   hear anything about that debate?

21                     JOSEPH CHETSKO:  No.  I just know the

22   governor, before he went out of office he put a moratorium

23   on.

1        ATTY. INGRAM:  Did you have cause to think

2   about what that governor did before he went out of office?

3   Did you think that it was a wise thing, a crazy thing or --

4        JOSEPH CHETSKO:  I felt that he thought it

5   was moral, that there was some discretion there, and that he

6   put his political life on the line.

7        ATTY. INGRAM:  And it takes a lot for a

8   politician to put his political life on the line.  Also there

9   was a supreme court decision recently that prohibited the

10  execution of the mentally challenged.  Did you read or hear

11  anything about that decision?

12        JOSEPH CHETSKO:  No.

13        ATTY. INGRAM:  Did you ever hear anyone

14  say that they are not in favor of life imprisonment because

15  they don't believe that we, the taxpayers, should have to pay

16  to house someone for the rest of their life?

17        JOSEPH CHETSKO:  Yeah, I heard a lot of

18  people say that.

19        ATTY. INGRAM:  Have you ever said it?

20        JOSEPH CHETSKO:  No.

21        ATTY. INGRAM:  Do you have any feelings

22  about this cost issue?

23        JOSEPH CHETSKO:  Cost?

1          ATTY. INGRAM:  Yes.

2          JOSEPH CHETSKO:  No.

3          ATTY. INGRAM:  In murder cases how do you

4   feel about life imprisonment as an alternative to the death

5   penalty, and I understand that's a hard question?

6          JOSEPH CHETSKO:  Well, I feel that maybe

7   sometimes it's probably worse than the death if they get no

8   parole.

9          ATTY. INGRAM:  In those preliminary

10  instructions downstairs there were four sentencing options

11  that were described in there.  Do you have a handle on those?

12         JOSEPH CHETSKO:  Yeah.

13         ATTY. INGRAM:  You understand that life

14  without parole is indeed life without parole?

15         JOSEPH CHETSKO:  I would assume.  That's

16  what it says.  I assume that that's what it's going to be.

17         ATTY. INGRAM:  That's what it is.  You go

18  in, you get out in a box.  And there are two others, the one

19  with the 30 and the 25.  You're not even eligible to go to

20  the parole board until 30 or 25 years.

21         JOSEPH CHETSKO:  Right.

22         ATTY. INGRAM:  And even then you may or

23  may not get out.  You got that?

1                    JOSEPH CHETSKO:  Right.

2                    ATTY. INGRAM:  When you were talking with

3     Mr. Becker he asked you a question and you responded, and I

4     don't even remember what the question was, I'm sorry, but

5     your response was "I'm partial to the crime.  If you can

6     prove it, then I can go for the death penalty."  Do you

7     recall giving that answer?

8                    JOSEPH CHETSKO:  Yeah.

9                    ATTY. INGRAM:  Do you remember what the

10    question was that elicited that answer because I don't?

11                   JOSEPH CHETSKO:  He wanted to know if they

12    committed a murder if I could commit the death penalty.  If

13    the murder -- if the crime fit the sentence I guess is what

14    he wanted to know.

15                   ATTY. INGRAM:  Okay.

16                   JOSEPH CHETSKO:  If they could prove that

17    the crime was committed in order for the death penalty, I

18    could go along with it.

19                   ATTY. INGRAM:  What did you mean by the

20    words "I'm partial to the crime"?

21                   JOSEPH CHETSKO:  Well, what I meant to

22    say, if they make the case I can go to the death penalty.

23                   ATTY. INGRAM:  Okay.  And let's talk about

4664

1    that. You understand that this is potentially and

2    potentially only a two stage process?

3                        JOSEPH CHETSKO: Right.

4                        ATTY. INGRAM: Because at the first stage

5    the issue is Donna's guilt or innocence, correct?

6                        JOSEPH CHETSKO: Right.

7                        ATTY. INGRAM: And if you and the rest of

8    the jurors find her not guilty, what happens?

9                        JOSEPH CHETSKO: Nothing. It's over.

10                       ATTY. INGRAM: It's over. We go home,

11   don't we? If you get to a second phase, if we ever get

12   there, at that point the State also has the burden of proof.

13   The burden of proof at the second phase is to convince you

14   that certain aggravating circumstances, and the judge will

15   describe those for you, outweigh any mitigating factors

16   beyond a reasonable doubt and that death is the appropriate

17   penalty. You understand me there?

18                       JOSEPH CHETSKO: Yes.

19                       ATTY. INGRAM: So at the second phase

20   basically it's the State's burden, if we ever get to a second

21   phase, to firmly convince you beyond a reasonable doubt that

22   death is the appropriate penalty.

23                       JOSEPH CHETSKO: Yes.

1            ATTY. INGRAM:  Is that what you meant when

2    you were talking about --

3            JOSEPH CHETSKO:  Yes.

4            ATTY. INGRAM:  I'm going to make up

5    another case, not this case, because we're going to go

6    directly to a second phase, and I think I'm going to use some

7    sad events in Youngstown to frame my made-up case.  There's

8    someone who has been convicted of premeditated murder of a

9    policeman in the line of duty.  Aggravated murder of a

10   policeman in the line of duty is a capital offense so there

11   would be a verdict of guilty of aggravated murder and a

12   verdict of guilty of a specification that there was a police

13   officer in the line of duty, so a second phase juror would

14   then have to determine appropriate punishment.  Are you with

15   me?

16           JOSEPH CHETSKO:  Yeah.

17           ATTY. INGRAM:  In that case, as I read

18   your answers in the questionnaire, you would favor the death

19   penalty because a policeman was killed in the line of duty?

20           JOSEPH CHETSKO:  Right.

21           ATTY. INGRAM:  And you would also, as I

22   read your answers in the questionnaire, would in a second

23   phase favor the death penalty if a child was killed?

```
 1                         JOSEPH CHETSKO:  Yes.

 2                         ATTY. INGRAM:  Are there any other cases

 3    where you would go into a second phase favoring the death

 4    penalty?

 5                         JOSEPH CHETSKO:  I think it would be some

 6    kind of heinous crime, some kind of terrible crime.

 7                         ATTY. INGRAM:  Terrible crime.

 8                         JOSEPH CHETSKO:  Against society.

 9                         ATTY. INGRAM:  If I pressed you on whether

10    you could think about a heinous or a terrible crime --

11                         JOSEPH CHETSKO:  Pardon me.  Could you

12    repeat that?

13                         ATTY. INGRAM:  If I pressed you for an

14    example of a heinous or a terrible crime could you take some

15    time and think about it and try to see if you can give me any

16    examples?

17                         JOSEPH CHETSKO:  Well, it's like we got

18    this terrorist group, you know, bombing our buildings and our

19    citizens and innocent people.  They just want to live their

20    life and this guy wants to destroy it, right?

21                         ATTY. INGRAM:  Yes.

22                         JOSEPH CHETSKO:  Well, to me he took, you

23    know, he's doing the worst thing in the world, he's depriving
```

1   me of my freedom.

2                           ATTY. INGRAM:  Okay.  Let's go back.

3           You all right?   We have to take care of the court

4   reporter.

5           Even in a case with a policeman and a child a second

6   phase juror would have to go into that second phase with all

7   four sentences equal in his or her mind.  You could not go in

8   there favoring one or another.  Do you understand that?

9                           JOSEPH CHETSKO:  Yes.

10                          ATTY. INGRAM:  Okay.  If we ever get to a

11  second phase in this case you would have to start with all

12  four sentences equal in your mind.

13                          JOSEPH CHETSKO:  Correct.

14                          ATTY. INGRAM:  Would you have any problem

15  doing that?

16                          JOSEPH CHETSKO:  No, if -- no.

17                          ATTY. INGRAM:  Fair enough.  Have you ever

18  donated any time, money or services to a political campaign

19  or issue?

20                          JOSEPH CHETSKO:  No.

21                          ATTY. INGRAM:  Well, you'll laugh at a

22  couple of these then.  Do you belong to any group or

23  organization which is active in any political matter?

 1                    JOSEPH CHETSKO:  No.

 2                    ATTY. INGRAM:  In the last five years or

 3    so do you recall signing a petition on any public issue?

 4                    JOSEPH CHETSKO:  No.

 5                    ATTY. INGRAM:  You were in the Reserves

 6    for 15 years?

 7                    JOSEPH CHETSKO:  Correct.

 8                    ATTY. INGRAM:  What did you do in the

 9    Reserves?

10                    JOSEPH CHETSKO:  A variety of things.

11    First I was a combat engineer.  From there I went to supply,

12    supply outfit, and then last was a medical outfit.

13                    ATTY. INGRAM:  To one degree or another we

14    have a crime problem underfoot in this country.  Do you have

15    any ideas what we, and by we I mean society as a whole, can

16    do to at least begin addressing that problem?

17                    JOSEPH CHETSKO:  Society as a whole.

18    Yeah, we could create some jobs.

19                    ATTY. INGRAM:  Okay.  You talked with

20    Mr. Becker about sympathy, and I actually think that, now

21    that I'm giving myself a frame of reference, I think it was

22    when you were talking about sympathy that that answer came

23    out about "I'm", what was it, "partial to the crime" or

1    something?  You would agree with me that it is a court of

2    law, not a court of sympathy?

3                        JOSEPH CHETSKO:  Right.

4                        ATTY. INGRAM:  So sympathy for no one

5    should affect your evaluation of the evidence.

6                        JOSEPH CHETSKO:  Right.  The evidence will

7    speak for itself.

8                        ATTY. INGRAM:  So you can't feel sorry for

9    her.

10                       JOSEPH CHETSKO:  No.

11                       ATTY. INGRAM:  And there is a dead person

12   here.  You can't feel sorry for the dead person either.  You

13   got that?

14                       JOSEPH CHETSKO:  Right.

15                       ATTY. INGRAM:  But you're going to see

16   evidence; crime scene photographs, coroner's photographs,

17   you'll hear coroner testimony.  And some of this evidence may

18   evoke a natural emotional response from you, maybe sympathy

19   because you might feel bad, or maybe anger, how could someone

20   do this?  But whether this evidence evokes an emotional

21   response or not, you have to rise above that emotional

22   response to test the evidence to determine whether it ties

23   Donna to this offense.  Do you see what I mean, No. 1?

1                    JOSEPH CHETSKO:  Yes.

2                    ATTY. INGRAM:  Do you think you're up to

3      that?

4                    JOSEPH CHETSKO:  Yeah.

5                    ATTY. INGRAM:  That's one of those things

6      that may be easier said than done.

7                    JOSEPH CHETSKO:  I don't doubt it.

8                    ATTY. INGRAM:  About 220 -- and I'm going

9      to sound like a civics teacher here for a while.  I apologize

10     about that, but these things mean a lot to me and I think we

11     have to talk about this.  About 225 years ago our forefathers

12     declared independence, fought and died so that we -- so that

13     they could be free and we could be free.  After the

14     revolution they wrote laws that were designed to restrict or

15     curb the power of government.  One of those laws was the

16     presumption of innocence.  If you want to give a government

17     broader or more authority would you create a presumption of

18     innocence or a presumption of guilt?

19                    JOSEPH CHETSKO:  Guilt.

20                    ATTY. INGRAM:  And our forefathers in

21     addition to the presumption of innocence and -- well,

22     actually as part and parcel to it, said that okay, if the

23     government charges someone with a crime not only is that

1    person presumed innocent, the government bears the burden of

2    proving it.  Do you have any problem with either of those

3    concepts?

4                    JOSEPH CHETSKO:  No.

5                    ATTY. INGRAM:  Let me tell you why I ask

6    that question.  Some people do have problems with those

7    concepts.  I have some friends who are no longer concerned

8    about restricting or curbing governmental authority, they're

9    concerned about the crime problem, and one of the ways they

10   would deal with the crime problem is to replace the

11   presumption of innocence with a presumption of guilt.  And

12   it's okay that they feel that way, but if they truly feel

13   that way and could not set aside those feelings they would

14   not make good trial jurors.  Do you see what I mean?

15                   JOSEPH CHETSKO:  Yeah, sure.  It becomes a

16   police state.

17                   ATTY. INGRAM:  That's right.  Now, because

18   the sole burden of proof is on these guys, basically it's

19   time for them to put up or shut up.  The State levels these

20   allegations, now we're here to see if they can prove them.

21   You got that?

22                   JOSEPH CHETSKO:  Yeah.

23                   ATTY. INGRAM:  Donna doesn't have to

```
 1    testify and the judge will tell you that if she elects not to
 2    testify that you can't hold that against her or consider it
 3    for any purpose.  Let's go back to our police state.  If you
 4    really want to give government a lot of authority you enable
 5    them to force people to testify.  You see what I mean?
 6                       JOSEPH CHETSKO:  Yeah.
 7                       ATTY. INGRAM:  But I sense, and maybe I'm
 8    wrong, and when I'm wrong you're supposed to tell me, I sense
 9    you have a bit of a problem with the fact that maybe a
10    defendant doesn't testify.
11                       JOSEPH CHETSKO:  No, I have no problem.
12    That's their right.
13                       ATTY. INGRAM:  You recall Mr. Becker
14    discussing proof with you and using a glass?
15                       JOSEPH CHETSKO:  Yeah.
16                       ATTY. INGRAM:  If Donna doesn't testify
17    that isn't anything that goes into that container.  You see
18    what I mean?
19                       JOSEPH CHETSKO:  Well, I'll go back to my
20    original answer, they have -- if you want -- they have to
21    prove without a reasonable doubt that she's guilty.
22                       ATTY. INGRAM:  Okay.  Now, if --
23                       JOSEPH CHETSKO:  And I guess I should say
```

1     you have to prove, counterprove that she's not guilty.

2                      ATTY. INGRAM:   No, I don't.  I don't have

3     to prove that she's not guilty.

4                      JOSEPH CHETSKO:   Oh, okay.  I take that

5     back.  Let's say if they have witnesses, you should question

6     the witnesses in a manner to prove that they are wrong.

7                      ATTY. INGRAM:   That's a good way of

8     looking at it.  And if we go back to that glass that

9     Mr. Becker used, when a witness testifies maybe you pour

10    something into that glass when the prosecutor, when the

11    prosecution is asking that witness questions.  Then when the

12    defense lawyers come up and ask questions maybe you take some

13    of what you put in the glass out of the glass.  You see what

14    I mean?

15                     JOSEPH CHETSKO:   Correct.

16                     ATTY. INGRAM:   Is that what you meant?

17                     JOSEPH CHETSKO:   Yeah.

18                     ATTY. INGRAM:   If Donna does testify she's

19    a witness just like any other witness so you would have to

20    use the same rules for determining whether you believe her as

21    you apply to other witnesses.

22                     JOSEPH CHETSKO:   (Nods head

23    affirmatively.)

 1          ATTY. INGRAM:  She's the defendant, she

 2    obviously has an interest or a stake in the outcome of the

 3    case.

 4          JOSEPH CHETSKO:  Oh, yeah.

 5          ATTY. INGRAM:  And the judge will tell you

 6    that that's one of the things you can consider in determining

 7    whether or not you believe a witness, is whether the witness

 8    has an interest or a stake in the outcome of the case.  But

 9    to be fair about it then, if you consider that with her you

10    should consider that with any other witness you find has an

11    interest or a stake in the outcome of the case.

12          JOSEPH CHETSKO:  Correct.

13          ATTY. INGRAM:  You see what I'm getting

14    at?

15          JOSEPH CHETSKO:  Oh, yeah.

16          ATTY. INGRAM:  And if you found another

17    witness had something to gain -- the judge at the end of the

18    case will give you a whole set of rules that you should, or

19    standards that you should apply to everyone who testifies.

20    That's his job.  I don't want to step on his toes.  One of

21    the things he's going to tell you about though is, and only

22    lawyers or legislators could say things like this, the tests

23    of truthfulness that you apply in your daily lives.  Over the

1    years whether it's in the Reserves, whether it's at Delphi or

2    whether it's at home, you've had occasion or occasions to

3    determine whether someone is being straight with you or

4    trying to hoodwink you?

5                        JOSEPH CHETSKO:  Oh, yeah, every day.

6                        ATTY. INGRAM:  And over the years you've

7    developed an intuitive sense, a sixth sense that helps you in

8    making that determination.  I don't know what yours is.  I

9    don't even know that I know what mine is.  I know I have one,

10   but we all have one.  You understand?

11                       JOSEPH CHETSKO:  Yes.

12                       ATTY. INGRAM:  You're supposed to bring

13   that sixth sense, that intuitive sense in here and apply it

14   to everybody that testifies.  Will you do that?

15                       JOSEPH CHETSKO:  Yes.

16                       ATTY. INGRAM:  And you have -- I don't

17   know what I did with my notes.  You know -- Bill Bailey is

18   a --

19                       JOSEPH CHETSKO:  Cousin.

20                       ATTY. INGRAM:  Cousin.  And I know he's

21   with the YPD.

22                       JOSEPH CHETSKO:  Yeah.

23                       ATTY. INGRAM:  You will have some

```
 1      policemen testify and policemen are human beings.

 2                       JOSEPH CHETSKO:  Right.

 3                       ATTY. INGRAM:  You're going to have to

 4      judge the credibility of police officers just as you would

 5      anyone else.

 6           You ever said to yourself I want to give, I'm going

 7      to give a coworker or a friend or maybe even Leanna the

 8      benefit of the doubt in regard to anything?

 9                       JOSEPH CHETSKO:  Yes.

10                       ATTY. INGRAM:  Well, when you said that to

11      yourself was the doubts you were giving someone the benefit

12      of a reasonable or an unreasonable doubt?

13                       JOSEPH CHETSKO:  Probably reasonable.

14                       ATTY. INGRAM:  What?

15                       JOSEPH CHETSKO:  Reasonable.

16                       ATTY. INGRAM:  Because we intuitively know

17      what's reasonable and what's unreasonable, don't we?

18                       JOSEPH CHETSKO:  Yeah.

19                       ATTY. INGRAM:  Proof beyond a reasonable

20      doubt is based on reason and common sense.  And the judge

21      will tell you and he'll give you a more detailed definition

22      that proof beyond a reasonable doubt requires that you be

23      firmly convinced and is proof of such character that you
```

1   would be willing to rely and act upon it in the most

2   important of your own affairs.

3                   JOSEPH CHETSKO:  Right.

4                   ATTY. INGRAM:  You've made some important

5   decisions in your life, probably a lot of them.  Do you ever

6   make a checklist with a line down the middle with the good

7   things on one side, the bad things on the other, the

8   positives, the negatives?

9                   JOSEPH CHETSKO:  No.

10                  ATTY. INGRAM:  Well, when you make an

11  important decision you balance those factors that are in

12  favor of the decision and those factors that are against the

13  decision, don't you?

14                  JOSEPH CHETSKO:  Risk, yes.

15                  ATTY. INGRAM:  And only when you're firmly

16  convinced that the decision is the right thing for you do you

17  go ahead and make important decisions, correct?

18                  JOSEPH CHETSKO:  Not all the time.

19                  ATTY. INGRAM:  Not all the time.  That's

20  the standard in this case, firmly convinced.  Will you hold

21  the State to firmly convincing you?

22                  JOSEPH CHETSKO:  Yes.

23                  ATTY. INGRAM:  And Mr. Bailey says it's

1    firmly convincing you to a moral certainty, and only you can

2    answer the question of where that line is on that cup that

3    Mr. Becker was talking to you about, but did you know that

4    proof beyond a reasonable doubt was the highest burden known

5    in a court of law?

6                         JOSEPH CHETSKO:  No.

7                         ATTY. INGRAM:  It is.  And wherever that

8    line is for you, it is necessarily way up near the top of the

9    cup.  You got me?

10                        JOSEPH CHETSKO:  (Nods head

11   affirmatively.)

12                        ATTY. INGRAM:  And you know what

13   circumstantial evidence is, don't you?

14                        JOSEPH CHETSKO:  Oh, yeah.

15                        ATTY. INGRAM:  And if you were asked to

16   make an inference the first thing you're going to want to

17   consider, I would imagine, is whether the inference is

18   reasonable.

19                        JOSEPH CHETSKO:  Right.

20                        ATTY. INGRAM:  And would you agree with me

21   that circumstantial evidence is like a chain and only as

22   strong as its weakest link?

23                        JOSEPH CHETSKO:  Yes.

1           ATTY. INGRAM:  And will you, will you look

2    for weak links whenever you're asked to make inferences?

3           JOSEPH CHETSKO:  Yes.

4           ATTY. INGRAM:  I briefly want to give you

5    an example of a situation where you sort of pile inferences

6    on inference and then I'm going to sit down.  But if it's a

7    Saturday night in the middle of February about 11:00 o'clock

8    and I'm getting ready to go to bed and I'm in the upstairs of

9    my house and I look out and I see the grass and I go to bed

10   and I wake up in the morning and there's six inches of snow

11   on the ground, I didn't see it snow but I know it snowed,

12   right?

13          JOSEPH CHETSKO:  I hope so.

14          ATTY. INGRAM:  I also want my newspaper

15   and sometimes they don't deliver it, you're exceedingly

16   right, and it's late and I'm getting anxious.  And I'm

17   standing up there, I got a cup of coffee in one hand, a

18   cigarette in the other hand, and I look and there's

19   footprints in the snow from the house to the right of me to

20   my front door, from my front door to the house to the left of

21   me.  I can also assume that someone walked in the snow,

22   right?

23          JOSEPH CHETSKO:  Yes.

```
 1                          ATTY. INGRAM:  And I make a further
 2    inference or a further assumption.  I assume it's my
 3    paperboy, and it seemed reasonable to me when I made it.  I
 4    went downstairs, opened the front door expecting to find my
 5    paper and, lo and behold, there's some coupons for Giant
 6    Eagle, Kmart and all over the place.  You have to test these
 7    inferences, especially when you come close to piling an
 8    inference on an inference.  You see what I mean?
 9                          JOSEPH CHETSKO:  Yes.
10                          ATTY. INGRAM:  And will you do that?
11                          JOSEPH CHETSKO:  Yes.
12                          ATTY. INGRAM:  Now that we've taken so
13    much of your time and your attention, is there anything you
14    want to raise or discuss with any of us?
15                          JOSEPH CHETSKO:  No.  I mean no, I have
16    nothing to say.
17                          ATTY. INGRAM:  Okay.  Thank you, sir.
18                          JOSEPH CHETSKO:  You make your evaluation
19    or whatever, that's fine.
20                          THE COURT:  Just one minute, sir.  Side
21    bar.
22                          (Whereupon, a bench conference was held.)
23                          THE COURT:  Mr. Chetsko, you will be in
```

1    the pool from which we are going to select the alternates to

2    this case.  That will happen Monday at 11:00 o'clock.  We

3    have, we've already seated a jury and we're going to try to

4    have eight because both sides have two called peremptory

5    challenges which they can exercise without giving any reason.

6    I would like to have four alternates on this.  We may have to

7    go with three, but every time we have a case of the length

8    that this will take there's always something that comes up

9    and you can't ever predict and we have to, many times the

10   alternates have to take over.  This is the type of case, we

11   put five weeks in to this point, and if we run out of jurors

12   and we have to grant a mistrial and start the whole thing

13   over again and this is costing the county a lot of money.  So

14   if you'd be back here at 11:00 o'clock Monday, it won't take

15   very long to go through that process.

16          I would again advise you not to read anything about

17   the matter, watch anything on TV, if there should be

18   anything, don't discuss anything about the case until you

19   return.  Okay?

20                  JOSEPH CHETSKO:  You want me to come back

21   11:00 o'clock Monday?

22                  THE COURT:  11:00 o'clock Monday.

23                  JOSEPH CHETSKO:  All right.

```
 1                        THE COURT:  That's it.  Thank you.

 2                        JOSEPH CHETSKO:  Okay.

 3                        ATTY. BECKER:  Thank you.

 4                        ATTY. BAILEY:  Thank you.

 5                        ATTY. JUHASZ:  Thank you, Mr. Chetsko.

 6                        ATTY. INGRAM:  We'll see you.  Have a good

 7      weekend.

 8                        (Whereupon, Joseph Chetsko was added to

 9      the pool of prospective alternate jurors and excused for the

10      day.)

11                        ATTY. BAILEY:  Take a five-minute break?

12                        THE COURT:  Huh?

13                        ATTY. BAILEY:  Take a break?

14                        THE COURT:  Yeah.  Kelly is starting to

15      get weak here, so.

16                        (Whereupon, a brief recess was taken.)

17                     PROSPECTIVE JUROR BRAD PETAK

18                        THE COURT:  Good morning.

19                        BRAD PETAK:  Good morning.

20                        THE COURT:  You're Brad?

21                        BRAD PETAK:  Uh-huh.

22                        THE COURT:  Bradley, did you read that

23      outline?
```

1             BRAD PETAK:  Yes, I did.

2             THE COURT:  You want me to go right to the

3     last question?

4             ATTY. INGRAM:  Yes, Your Honor.

5             ATTY. JUHASZ:  Yes, please.

6             ATTY. INGRAM:  Well, the last page at

7     least.

8             THE COURT:  Brad, you've answered on the

9     questionnaire that you felt you could not sit in a case that

10    involved capital punishment, is that correct?

11            BRAD PETAK:  Uh-huh, that's right.

12            THE COURT:  Is that a strongly held belief

13    that you have or -- the reason I ask that, whatever your

14    belief is is fine.  Everybody here will respect it.  To sit

15    on this jury we need 12 people, all of whom are going to have

16    some view on the death penalty.

17            BRAD PETAK:  Uh-huh.

18            THE COURT:  Some more in favor, some less.

19    Now, if you're the type that you just couldn't even consider

20    it, then you should not serve on the jury.  But the State has

21    the right to ask for the death penalty, the defendant has the

22    right to require that the jury consider the death penalty but

23    other factors also.

1                    BRAD PETAK:  Uh-huh.

2                    THE COURT:  Okay?

3                    BRAD PETAK:  (Nods head affirmatively.)

4                    THE COURT:  You tell me where you're

5      coming from.

6                    BRAD PETAK:  I don't know.

7                    THE COURT:  Is this something based on a

8      religious view or --

9                    BRAD PETAK:  Yeah.

10                    THE COURT:  It is?

11                    BRAD PETAK:  Uh-huh.

12                    THE COURT:  Do you feel that you could

13     under no circumstances even consider the death penalty?

14                    BRAD PETAK:  No.

15                    THE COURT:  You couldn't?

16                    BRAD PETAK:  Huh-uh.

17                    THE COURT:  Mr. Bailey or Mr. Becker, do

18     you wish to ask any questions?

19                    ATTY. BAILEY:  Just one or two.  Well,

20     just a couple, and I will be short.  Brad, my name is Ken

21     Bailey.

22                    BRAD PETAK:  Uh-huh.

23                    ATTY. BAILEY:  I'm an assistant

1    prosecutor.  I'm just going to ask you a couple questions

2    about this.

3                          BRAD PETAK:  Okay.

4                          ATTY. BAILEY:  There are several reasons

5    that you don't want to serve here, is that right?

6                          BRAD PETAK:  My work and --

7                          ATTY. BAILEY:  Your work, you can't take

8    the time away from your work.  You're a baker, right?

9                          BRAD PETAK:  Uh-huh.

10                          ATTY. BAILEY:  You get migraine headaches?

11                          BRAD PETAK:  Yeah.

12                          ATTY. BAILEY:  Your nerves are bothering

13   you?

14                          BRAD PETAK: Yeah.

15                          ATTY. BAILEY:  And for this type of case

16   it's going to cause, you're afraid it could cause some

17   serious problems?

18                          BRAD PETAK:  Uh-huh.

19                          ATTY. BAILEY:  And with the death penalty,

20   you're Roman Catholic?

21                          BRAD PETAK:  Uh-huh.

22                          ATTY. BAILEY:  You go to church a couple

23   times a month?

1              BRAD PETAK:  Yeah.

2              ATTY. BAILEY:  And the church has taken

3  the position against the death penalty?

4              BRAD PETAK:  Not really, no.

5              ATTY. BAILEY:  Well, you believe in the

6  commandment thou shalt not kill, right?

7              BRAD PETAK:  Uh-huh.

8              ATTY. BAILEY:  And you think that's going

9  to effect your ability to come back with any -- you could

10  never come back with a judgment against the death penalty,

11  could you?

12              BRAD PETAK:  No.

13              ATTY. BAILEY:  You would never be able to

14  sign a death penalty verdict form even if we proved our case

15  beyond a reasonable doubt and even though under the facts and

16  the law it might be the appropriate or right verdict for the

17  case, you still could never take part in that, could you?

18              BRAD PETAK:  No.

19              ATTY. BAILEY:  Okay.  Thank you very much.

20              ATTY. JUHASZ:  We have no questions.

21              THE COURT:  Okay.  Any objection to me

22  dismissing for cause?

23              ATTY. INGRAM:  Well, now that Mr. Bailey

 1    has unnecessarily nailed down an unopposed challenge for

 2    cause, no, there is none.  I'm making fun of him, it has

 3    nothing to do with you.

 4                        BRAD PETAK:  Okay.

 5                        THE COURT:  You're excused from any

 6    further participation.  We thank you for your time.

 7                        BRAD PETAK:  Okay.  Thank you.

 8                        THE COURT:  Thank you now.

 9                        ATTY. BECKER:  Thank you.

10                        ATTY. BAILEY:  Thanks.

11                        ATTY. JUHASZ:  Thank you.

12                        ATTY. INGRAM:  Have a good one.

13                        BRAD PETAK:  You, too.

14                        (Whereupon, Brad Petak was dismissed from

15    the pool of prospective alternate jurors.)

16              **PROSPECTIVE JUROR MARY JANE O'HARA**

17                        THE COURT:  I have to ask you, does your

18    husband have any relatives from Sharon?

19                        MARY JANE O'HARA:  No, he doesn't.

20                        THE COURT:  Oh.  I grew up with a family

21    over there, two boys, were good friends of mine.

22              You read that outline that was given to you?

23                        MARY JANE O'HARA:  Yes.

 1              THE COURT:  Okay.  You understand that

 2    this is an aggravated murder case with specifications.  Under

 3    the law of Ohio just because a person commits murder does not

 4    necessarily mean that they face the death penalty.  The

 5    legislature drafted the law so that if a person is convicted

 6    of aggravated murder and the prosecution has attached a

 7    specification, which -- specifications, which is from things

 8    in the statute that says if you commit aggravated murder and

 9    these additional circumstances apply and the State proves

10    that beyond a reasonable doubt, then the issue of capital

11    punishment becomes part of the case.

12              We won't have any idea what this jury is going to do

13    until they've heard all the evidence.  At the initial stage

14    the State is called upon to prove all the elements that are

15    necessary to ask the jury for a guilty verdict beyond a

16    reasonable doubt.  Now, if they fail to do that then this

17    jury would properly return a verdict of not guilty.  That's

18    the end of the trial.  If the State is able to carry their

19    burden of proof then this matter would go into a second

20    phase, and since we have no idea whether we will be into that

21    second phase or not we have to assume that it is a

22    possibility.

23              MARY JANE O'HARA:  Yes.

1        THE COURT:  Therefore, we have to -- these
2   folks have to have some idea of what the beliefs and thoughts
3   of each of these jurors is in regard to the issue of capital
4   punishment.  The reason for that is if you had a juror that
5   firmly believed in an eye for an eye, then the defendant
6   could not possibly get a fair trial because the law says that
7   in that second phase the burden is again and always on the
8   prosecution to prove the aggravating circumstances about the
9   murder -- those are reasons why the death penalty should be
10  considered and imposed -- outweigh any mitigating factors.
11  And the mitigating factors are reasons put to the jury's
12  consideration as to why in this particular case the death
13  penalty should not be imposed.

14       Well, likewise, if you had somebody on the jury that
15  under no circumstances could ever see themselves
16  participating in deciding whether a person lives or dies,
17  then that person could not be fair as far as the State was
18  concerned because the State under the law has the right to
19  ask for the death penalty if they prove everything necessary
20  to get to that point.  So it is felt necessary up front to
21  have some idea about the thoughts of each potential juror.
22  And whatever your thoughts are are fine, you're entitled to
23  those.  It's just that these folks have a right to determine

 1    whether or not they will be comfortable with any particular

 2    person sitting on this jury.  As I said, they are all going

 3    to have their own view of capital punishment, some for, some

 4    against more than another, but the question is are they able

 5    to follow the law?  That's the bottom line.

 6           Another issue is the question of pretrial publicity.

 7    Some of the people we've interviewed knew something about the

 8    case.  Some knew more, some knew quite a bit.  But the case

 9    to be tried fairly has to have a decision made on the

10    evidence which will be presented in this courtroom.  Anything

11    that happened before this trial starts is not evidence and it

12    would be unfair to have a situation where 12 jurors get back

13    into the jury room and they agree that the evidence showed

14    that this, that or another thing happened and then somebody

15    says, "Well, wait a minute.  I read about that in the paper

16    and I don't agree with that."  You can't have that.  It has

17    to be legitimate evidence produced here.  So those are the

18    questions that will be put to you primarily, okay?

19                   MARY JANE O'HARA:  That's fine.

20                   THE COURT:  Another thing, you will be an

21    alternate if chosen.  We've already seated a jury.  Over the

22    years I've had a few people that felt that was a waste of

23    their time, but it's a very important thing that we have

```
 1    alternates, particularly when you have a trial that takes

 2    more than a couple days, because you have 12 people.  Many

 3    things can happen in their lives and someone may be called

 4    away, so we have to have that pool to be able to put somebody

 5    in there that's already listened to everything as if they

 6    were on the jury.  Do you have any problem with serving in

 7    that capacity?

 8                        MARY JANE O'HARA:  No, I don't.

 9                        THE COURT:  Okay.  I thank you for that.

10    Gentlemen.

11                        ATTY. BECKER:  Can we approach, Your

12    Honor?

13                        THE COURT:  Yeah.

14                        (Whereupon, a bench conference was held.)

15                        THE COURT:  We're going to break for

16    lunch.  I'm sorry to inconvenience you any further but

17    there's a couple things here that these folks have to do over

18    the lunch period, so.  I didn't realize that it was that

19    late.  But you are all primed now to start answering

20    questions, so if you would be back here at 1:00 o'clock.

21                        MARY JANE O'HARA:  Okay.

22                        THE COURT:  Okay.  Thank you very much.

23                        ATTY. BECKER:  Thank you.
```

1            ATTY. BAILEY:  Thank you.

2            (Whereupon, a luncheon recess was taken.)

3            THE COURT:  Okay.  These gentlemen are

4    going to ask you some questions now along the line that I've

5    mentioned.

6            MARY JANE O'HARA:  Okay.

7            ATTY. BAILEY:  Good afternoon,

8    Mrs. O'hara.

9            MARY JANE O'HARA:  Hello.

10            ATTY. BAILEY:  Hi.  My name is Ken Bailey.

11    I'm an assistant prosecutor and I think you saw me, I think

12    it's been close to a month ago, in the other courtroom.  And

13    I promised at that time that I would be joined by my

14    co-counsel, Chris Becker, and the two of us as assistant

15    prosecutors are responsible for prosecuting this case on

16    behalf of the people of Trumbull County and the State of

17    Ohio.  And because of that, because we want to make sure that

18    the folks who are selected to serve on this particular jury

19    can be fair and impartial to both sides, both to the

20    defendant and to the people of the State, we're going to ask

21    some questions regarding your prior experiences and your

22    opinions.  And that's why we're asking it, not because we're

23    snoopy and we like to pry into people's backgrounds, but just

1    to make sure they can be fair and impartial to both sides.

2              Now, there aren't any right or wrong answers to

3    these questions, there's just open and candid answers.  And

4    this is the one chance that we get to talk together during

5    these proceedings until this case, and it may be in two

6    separate phases, until the entire case is over.  If you have

7    any questions that come up about our procedure or what we're

8    doing here and if we can get an answer for you, feel free to

9    ask.  If there's anything you're not clear about, stop me and

10   have me clarify it.

11              MARY JANE O'HARA:  Certainly.

12              ATTY. BAILEY:  Okay.  The only reason I

13   mention that is because when we're done here today until this

14   case is all over we're not allowed to have any communication

15   with you under our rules of conduct, so if we run into each

16   other in the hallway, in the elevator, at a restaurant, we're

17   not allowed to say anything more than good morning or good

18   afternoon.  It would be improper and it could result in a

19   mistrial.  And it's not that we're trying to be antisocial

20   and snub you, it's just because we're not allowed to talk to

21   you.

22              MARY JANE O'HARA:  I understand.

23              ATTY. BAILEY:  If there are questions you

 1    have to direct them to the bailiff.  Laurie Brown, she's not

 2    here now, but she will be when the trial begins, I believe,

 3    and so if anything like that comes up, you know, address the

 4    questions to her or to the Court.

 5         Now, we're going to ask you some questions this

 6    afternoon.  I'm going to ask you about pretrial publicity and

 7    the death penalty as a punishment and then I'm going to ask

 8    you some regular questions.

 9                     MARY JANE O'HARA:  Certainly.

10                     ATTY. BAILEY:  Okay.  So let's start out

11    with this pretrial publicity.  I notice that you get the

12    Vindicator every day and you watch the 21 News at night and

13    you had some recollections from the TV and the newspapers

14    about some of the facts or the issues in the case.  Now, what

15    do you recollect?  Well, had you ever discussed this with

16    anybody, any family or friends or --

17                     MARY JANE O'HARA:  No.  I was doing quite

18    a bit of traveling.  I'm not sure of the dates, but -- and at

19    first, because I didn't have a lot of information about when

20    they were selecting jury, exactly what the case was, and I

21    hadn't remembered the name, I think I wrote that I thought

22    maybe it had to do with a --

23                     ATTY. BAILEY:  I think you wrote down

1    somebody was killed in a home robbery.

2                        MARY JANE O'HARA:  Right.

3                        ATTY. BAILEY:  And something about prison

4    accomplice and letters.

5                        MARY JANE O'HARA:  And something about

6    letters, right, and that was it.

7                        ATTY. BAILEY:  And you filled it out about

8    a month ago.

9                        MARY JANE O'HARA:  You're exactly right.

10                       ATTY. BAILEY:  Now, since then --

11                       MARY JANE O'HARA:  Okay.  I only had, I

12   only had --

13                       ATTY. BAILEY:  -- have you had a chance to

14   think about it and has anything jogged any further

15   recollection in your mind?

16                       MARY JANE O'HARA:  Not really.  When I

17   tell people that I'm going on the jury I immediately say, you

18   know, I can't talk about it.  And I had a party last night

19   and I said I have to go to court in the morning and I said I

20   can't talk about it, I'll leave, talk among yourselves type

21   thing.  But I only had one problem and that was my aunt is 88

22   and I mentioned and she says, "Oh, I bet I know what case it

23   is," and I go, "Stop, stop.  I can't talk."  And she

 1    mentioned a man who had already had his trial and I again

 2    told her stop, but that's it, because I've been so careful

 3    not to.

 4              ATTY. BAILEY:  Okay.  And there's a reason

 5    for that.  The judge admonishes the jurors that they're not

 6    to talk to anybody else about the case or if anything comes

 7    on TV or radio to either walk out or shut it off or put your

 8    hands over your ears.

 9              MARY JANE O'HARA:  Sure, and I've tried to

10    do that.

11              ATTY. BAILEY:  Or if there's an article in

12    the paper, you see a headline or something, just put it aside

13    until later, until the trial is all over.  And as you look

14    around the courtroom there is nobody here right now from the

15    news media.  There was a reporter earlier from the Tribune

16    who stopped in, Chris Bobby, and I'm sure Peggy Sinkovich

17    will be here from the Vindicator and probably the TV channels

18    will send their on-air people to come in and do a feature on

19    the trial as the trial begins, but you'll notice one thing,

20    they're not going to be here for the whole trial, they're

21    going to be here for just a couple of minutes.

22              And Chris Bobby may stay for a good part of the

23    trial, but then he's going to get up and leave because there

1    are other stories going on, other trials and other things

2    going on in the county, so they're going to be missing

3    everything that was asked and answered before they got in and

4    everything that was asked and answered after they leave.  And

5    because they have to rush into print and do their stories and

6    features, their stories may be taken out of context.

7              As a matter of fact, if you sit here for this whole

8    trial as an alternate then you would perhaps say somebody

9    save the papers for you and you read them later, you might

10   say gosh, I sat in Judge Stuard's court for that whole trial

11   and whoever wrote this story must have been sitting in Judge

12   Logan's court covering a different trial because the whole

13   gist of the testimony that day was just the opposite.

14             MARY JANE O'HARA:  I understand.

15             ATTY. BAILEY:  That's not unusual, okay,

16   not intentionally but because of the nature of the beast.

17             MARY JANE O'HARA:  Out of context, sure.

18             ATTY. BAILEY:  Okay.  So what we ask you

19   to do is to perform mental gymnastics sort of, to start off

20   fresh.  It's like going into a class at school and starting

21   out with a clean slate and whatever is going to be written on

22   that slate has to be written here in this courtroom through

23   the testimony of the witnesses and the evidence that's

1    received and the instructions of law given to you by the

2    judge, okay?  And anything else that you might recollect

3    about the case or what maybe somebody had told you something

4    before, you have to mentally set that aside and make your

5    determination here solely on what happens in this courtroom

6    within these four walls.  You are able to do that?

7                     MARY JANE O'HARA:  Yes.

8                     ATTY. BAILEY:  Okay.  You wouldn't have

9    any problem doing that?

10                    MARY JANE O'HARA:  No.

11                    ATTY. BAILEY:  Okay.  Now, so much for

12   pretrial publicity.  Let's talk about this issue where the

13   death penalty is a possible punishment.  Now, the first time

14   you learned that this was potentially a death penalty case

15   was when?

16                    MARY JANE O'HARA:  I believe when we went

17   into the courtroom when all the jurors, the prospective

18   jurors were all brought in together.

19                    ATTY. BAILEY:  Back on April 8th, about a

20   month and a day ago?

21                    MARY JANE O'HARA:  Yes.

22                    ATTY. BAILEY:  Okay.  And before that you

23   had indicated that you are, if I understand your

1     questionnaire, you believe in the death penalty as a possible

2     punishment?

3                    MARY JANE O'HARA:  Yes.

4                    ATTY. BAILEY:  Okay.  Under our system

5     here in Ohio the state legislature writes the laws, they

6     write down what the crimes are and what the penalty ranges

7     are, okay, and they've included the death penalty as a

8     possible punishment in our system for certain crimes.  Now,

9     if you had some -- say if you were on the legislature and you

10    could write the laws in the State of Ohio, would you include

11    the death penalty as a punishment?

12                  MARY JANE O'HARA:  I don't think I would

13    because I would want truth in sentencing.  I would want --

14    when I hear somebody is sentenced to 10 years in prison and

15    they're given one year --

16                  ATTY. BAILEY:  Okay.  You're talking about

17    good time credit.  Okay.

18                  MARY JANE O'HARA:  Yes.

19                  ATTY. BAILEY:  Okay.  Now, you understand

20    they changed the law back in 1996?

21                  MARY JANE O'HARA:  Maybe I didn't know

22    that.

23                  ATTY. BAILEY:  They did, they changed it.

1    It used to be you would get about a third of your sentence

2    off for good time credit.

3                    MARY JANE O'HARA:  Exactly.

4                    ATTY. BECKER:  Well, they did away with

5    that and now you can build up, I think it's one day a month

6    good time.  They use different words.  When they passed that

7    law they basically did away with good time credits, so now

8    you do have your basic truth in sentencing.

9                    MARY JANE O'HARA:  I think at one point I

10   believed that if somebody was sentenced to the death penalty

11   and it was a very, very serious crime that this would assure

12   that they stayed in prison because I always felt that if they

13   were given life they would get 20 years is my general

14   beliefs, but if you said this has been changed.

15                    ATTY. BAILEY:  Well, the death penalty,

16   the legislature did include the death penalty as a possible

17   punishment.

18                    MARY JANE O'HARA:  Okay.

19                    ATTY. BAILEY:  And you understand it's a

20   real penalty because we've had a number of people who have

21   been executed in Ohio over the last couple of years.  I mean,

22   for a long time nobody was executed.

23                    MARY JANE O'HARA:  Right.

1            ATTY. BAILEY:  But -- from 1963 until a

2    few years ago.  But there were a couple of cases over the

3    last few years where people have been executed in Ohio.

4            MARY JANE O'HARA:  I would take it so very

5    seriously.  Yes, I would consider it, but I would take it

6    very, very seriously.

7            ATTY. BAILEY:  What I'm asking is if you

8    wrote the laws --

9            MARY JANE O'HARA:  Yes.

10           ATTY. BAILEY:  -- would you include the

11   death penalty for certain crimes as a possible punishment?

12           MARY JANE O'HARA:  Yes, very -- I mean,

13   it, it would have to be very, very serious, yes.  Yes.

14           ATTY. BAILEY:  Right.  And that's the way

15   the legislature looks at it.  They only include it for what

16   they consider to be serious, very serious offenses.  You

17   understand that not all killings are treated equally in the

18   law?

19           MARY JANE O'HARA:  I understand.  I was

20   reading today the paper we were given and --

21           ATTY. BAILEY:  Okay.  Let me give you an

22   example.  If somebody is out chopping wood with an ax and the

23   head of the ax flies off the handle and killed somebody, that

```
 1    would be an accident, right?

 2                    MARY JANE O'HARA:  Yes.

 3                    ATTY. BAILEY:  You wouldn't expect anybody

 4    to get punished for that.

 5                    MARY JANE O'HARA:  Correct.

 6                    ATTY. BAILEY:  If somebody is driving a

 7    car down the road and going too fast for the conditions and

 8    goes through a stop sign and kills a pedestrian, you would

 9    expect they'd face some type of punishment, maybe jail or

10    prison time, right?

11                    MARY JANE O'HARA:  Correct.

12                    ATTY. BAILEY:  But not the death penalty,

13    right?

14                    MARY JANE O'HARA:  Correct.

15                    ATTY. BAILEY:  If somebody commits a

16    killing, two guys are in a bar, they're drinking, the one

17    fellow punches the other and the other guy hits him back, and

18    during this one of the fighters hits the other person and the

19    victim goes backwards, hits his head on the edge of the bar

20    and dies as a result of internal bleeding, that would be

21    perhaps punishable with maybe a prison sentence of some kind,

22    maybe a manslaughter or something, but not the death penalty,

23    right?
```

1          MARY JANE O'HARA:  Correct.

2          ATTY. BAILEY:  Okay.  Let's say under the

3   law in Ohio as it's written by our legislature -- let's say I

4   decide I'm upset with my co-counsel, I don't like his shoes,

5   okay, and I say quit wearing those shoes and he won't.  And

6   so I get out on the courthouse steps and I tell the whole

7   world I'm upset with Chris's shoes, "If he's wearing those

8   shoes tomorrow when he comes in here at 9:00 o'clock in the

9   morning I'm going to take a .357 and blow him away," and sure

10  enough, he comes up the steps wearing those shoes tomorrow

11  and I blow him away with a .357.  Okay.  That's aggravated

12  murder, okay, killing -- the purposeful killing of another

13  with prior calculation and design, but under Ohio law that's

14  not punishable by the death penalty.  It's punishable by a

15  prison sentence, some type of life sentence, but it's not a

16  death penalty offense under Ohio law because under Ohio law

17  the legislature says there has to be more.  There has to be a

18  specification of aggravating circumstances, which is a bunch

19  of fancy words for an extra finding of fact made by a jury,

20  okay, and these would be things like the extra facts that

21  would have to attach to the crime of aggravated murder.  It

22  would be like the killing of a police officer.  It could be a

23  serial killer, mass murder.  It could be killing during a

1    special felony like kidnapping or rape or an aggravated

2    robbery or aggravated burglary. It could be a murder for

3    hire. And then there are other things that the -- or the

4    killing of a governor or lieutenant governor or the

5    president. Okay. There are certain things that the

6    legislature has written into the law that would make a person

7    eligible for the death penalty. Okay. I mean, would you

8    include any of those types of things in your personal system

9    if you could design the system?

10                MARY JANE O'HARA: I indicated on my

11    questionnaire a serial killer or very, very, very serious

12    crimes. And also in reading --

13                ATTY. BAILEY: Well, when you say very

14    serious crimes are you talking about maybe a premeditated

15    murder for profit or something?

16                MARY JANE O'HARA: Right. But I think

17    you've clarified a lot of things in the paper that we read

18    about aggravated circumstances and -- what's the other one?

19                ATTY. BAILEY: Mitigating factors?

20                MARY JANE O'HARA: Yes, mitigating

21    factors.

22                ATTY. BAILEY: Okay. We're going to talk

23    about mitigating factors.

1              MARY JANE O'HARA:  Okay.  Sorry I jumped

2      ahead.

3              ATTY. BAILEY:  Okay.  You found that paper

4      helpful?

5              MARY JANE O'HARA:  Very much so.  It was

6      very informative.  And that's the law and that's what we're

7      supposed to follow.

8              ATTY. BAILEY:  Right.  Okay.  And you

9      wouldn't have any problem setting aside your personal belief

10     system and following the law as the judge would instruct you,

11     right?

12             MARY JANE O'HARA:  Absolutely.  That's

13     what we're to do.

14             ATTY. BAILEY:  Now, your view on the death

15     penalty, has your view gotten stronger over the years or has

16     it stayed the same?  Has it changed over the years?

17             MARY JANE O'HARA:  I don't think it's

18     changed at all except for what I indicated to you, that if I

19     was concerned that the law was that somebody that did a very,

20     very serious crime and I'd say, well, you know, that they'd

21     be out in 20 years, which I guess --

22             ATTY. BAILEY:  Okay.  Now, your belief in

23     the death penalty as being appropriate for some types of

1   crimes, for very serious crimes, what's it based on?  Is it

2   based on a personal, religious, moral, ethical belief, or

3   some combination?

4                   MARY JANE O'HARA:  I would say moral and,

5   of course, you know, probably just acquired knowledge and

6   feelings over the years.  You know, I'm getting up there and

7   you keep adding knowledge and experience, but nothing, no

8   personal experience but, you know, just from things you read

9   and maybe other people's stories.

10                  ATTY. BAILEY:  Okay.  Now, under our,

11  under our system this type of case can be tried in two

12  different phases.  Okay.  The first phase is tried just as

13  any other trial in Ohio, any other criminal trial where the

14  jury makes a determination as to guilt or non-guilt.  The

15  State has the burden of proving beyond a reasonable doubt the

16  elements of the crimes charged.  Elements are like the

17  essential ingredients like the ingredients in a cake, maybe

18  chocolate cake -- we'll pick chocolate because it's my

19  favorite -- and we got to put all those ingredients in.  And

20  if we -- the eggs, the flour, the water, the baking powder,

21  the sugar, all that stuff, including the chocolate.  Okay.

22  And if we leave one out we don't have that cake.  If we leave

23  the chocolate out we might have a cake, but it's not going to

1   be a chocolate cake, right?

2                    MARY JANE O'HARA:  (Nods head

3   affirmatively.)

4                    ATTY. BAILEY:  We have to bake a bunch of

5   different cakes here for these crimes.

6                    MARY JANE O'HARA:  Okay.

7                    ATTY. BAILEY:  Okay.  For the crimes and

8   the specifications.  And you got to consider each one

9   separately because you might decide hey, they proved all

10  these cakes, they baked all these cakes beyond a reasonable

11  doubt, but I got a question on one of them.  Okay.  So you

12  try -- each one will be considered separately.

13          Now, in the first phase the issue is guilt or

14  non-guilt, has the State established the elements of the

15  crime charged beyond a reasonable doubt?  And punishment is

16  not an issue in the first phase so you wouldn't expect to

17  hear any testimony as to what the appropriate punishment

18  would be in the first phase, right?

19                    MARY JANE O'HARA:  Correct.

20                    ATTY. BAILEY:  Okay.  So let's say that

21  you and the other jurors find the defendant guilty beyond a

22  reasonable doubt of the crime called aggravated murder and

23  one or more of these specifications, these special findings

1    of fact, of aggravating circumstances.  We would then move

2    into a second phase and in a second phase the issue is

3    different.  It's not guilt anymore because you've already

4    determined guilt beyond a reasonable doubt.  Okay.  The issue

5    in the second phase is what's the appropriate punishment for

6    this defendant for this offense, okay?  And when you go into

7    a second phase you have to be able to consider equally four

8    different possible punishments.  There's the punishment of

9    the death penalty, there's life in prison without any parole

10   eligibility, there's life in prison with parole eligibility

11   after 30 full years, and life in prison with parole

12   eligibility after 25 full years.  To sit on this jury you

13   have to start out considering those things equally in your

14   mind.  Would you be able to do that?

15                    MARY JANE O'HARA:  Yes.

16                    ATTY. BAILEY:  Okay.  Now, in the second

17   phase you're asked to do an imaginary balancing test.  It's

18   like having a scale and on one side of the scale there are

19   going to be the aggravating circumstances that you would have

20   found, the specification of aggravating circumstances from

21   the first phase, and basically there are two of those that

22   could be found.  And the specifications basically are that,

23   the first one is the aggravated murder was committed with

1    prior calculation and design during the course of an

2    aggravated burglary, and the second specification is that the

3    aggravated murder was committed with prior calculation and

4    design and during the course of an aggravated robbery as

5    opposed to the aggravated burglary, so that can be on one

6    side of the scale, like these bad facts, these findings.

7    Okay.

8              On the other side of the scale could be what we call

9    the mitigating factors, and mitigating factors, fancy words

10   for just good facts that could be in favor of the defendant

11   and that would work against the imposition of the death

12   penalty as a punishment.  Okay?

13                     MARY JANE O'HARA:  Sure.

14                     ATTY. BAILEY:  And the place where you may

15   hear about these could be in a second phase.  In a second

16   phase you may hear the same testimony over again.  Okay.

17   Generally the State says something like we move to admit all

18   the relevant facts in evidence from the first phase relating

19   to these aggravating circumstances into the second phase.

20   And then in the second phase you might hear evidence

21   pertaining to these mitigating factors, and we don't know

22   what they are because they're not relevant, but it could be

23   like that example about the two guys who were drinking in the

4710

```
 1    bar and got in the fight.  You might consider that maybe a
 2    mitigating factor or something.
 3                    MARY JANE O'HARA:  Sure.
 4                    ATTY. BAILEY:  Okay.  And then on this
 5    weighing, it's up to you.  You have to be able to consider
 6    these things.  To sit on this jury you got to be able to
 7    consider the aggravating circumstances and you got to be able
 8    to consider whatever mitigating factors are presented.
 9           Now, it's totally up to you and the other 11 jurors
10    as to how much weight you want to assign to these different
11    things.  You might decide that something weighs a whole lot,
12    like maybe 20 pounds or a ton, and you might decide that
13    something else may weigh about as much as a feather, right?
14    It's got to have some weight but it's totally up to you how
15    much weight to give.
16           If the State proves beyond a reasonable doubt so
17    that you're firmly convinced to a moral certainty using your
18    reason and common sense that the aggravating circumstance or
19    circumstances outweigh the mitigating factors beyond a
20    reasonable doubt, then you would have to come in with the
21    death penalty as a verdict because that would be the
22    appropriate punishment under the law if the State meets its
23    burden of proof.
```

1           If we don't convince you beyond a reasonable doubt

2    that the aggravating circumstance or circumstances outweigh

3    the mitigating factors, then you forget about the death

4    penalty and you go to the three life sentences and then you

5    make a determination based upon all the facts and evidence

6    and the instructions of law as to what the most appropriate

7    penalty is on the life sentence.  Okay?

8                    MARY JANE O'HARA:  Uh-huh.

9                    ATTY. BAILEY:  And you wouldn't have any

10   idea until you heard the evidence in the second phase, right?

11                   MARY JANE O'HARA:  Absolutely.

12                   ATTY. BAILEY:  Because that would be when

13   it could be presented.  Okay.

14        Now, if we convince you that the death penalty --

15   well, let's say in the first phase we convince you beyond a

16   reasonable doubt that the defendant is guilty of aggravated

17   murder and one or more of these specifications.  Would you be

18   able to sign a verdict form for guilty knowing that if you

19   did so the defendant would then be eligible for the death

20   penalty as a possible punishment in the second phase?

21                   MARY JANE O'HARA:  Yes.

22                   ATTY. BAILEY:  Okay.  And let's say we go

23   to a second phase and we convince you and the other 11 jurors

1    beyond a reasonable doubt that the death penalty is the

2    appropriate punishment, okay?  Would you be able to sign a

3    verdict form for the death penalty as a punishment?

4                      MARY JANE O'HARA:  Yes.

5                      ATTY. BAILEY:  Okay.  And would you be

6    able to announce in open court if the judge asked you is this

7    your verdict, would you be able to say yes, it is my verdict?

8                      MARY JANE O'HARA:  Yes.

9                      ATTY. BAILEY:  Okay.  Now, you understand

10   that if you and the other jurors find the defendant guilty

11   beyond a reasonable doubt of aggravated murder and one or

12   more of these specifications the death penalty is not an

13   automatic punishment, right?

14                     MARY JANE O'HARA:  I understand.

15                     ATTY. BAILEY:  And the reason for that is

16   you wouldn't have heard anything in the first phase about

17   mitigating factors, right?

18                     MARY JANE O'HARA:  The second phase,

19   correct.

20                     ATTY. BAILEY:  Okay.  Let me -- so much

21   for the death penalty as a possible punishment.  Let's get to

22   some regular questions.  Okay.  The defendant here is charged

23   with a number of crimes but the defendant is not charged as a

1   trigger person. She's charged, rather, as a complicitor.

2   Okay. A complicitor is someone who purposely solicits or

3   procures another person to commit a crime, or aids and abets

4   another person, helps, encourages, strengthens or plans with

5   another person in the commission of an offense. Okay. And

6   the charge here is that the defendant planned with a guy by

7   the name of Nate Jackson to kill the defendant's ex-husband

8   with whom she was living for insurance money and that the

9   aggravated burglary, the trespass into the victim's home, was

10   actually done by this Nate Jackson and that a car was stolen

11   by this Nate Jackson that was used by the victim and that

12   this Nate Jackson used a working gun, a firearm, in the

13   commission of these offenses. Okay. But you understand the

14   defendant is not charged as the trigger person?

15                   MARY JANE O'HARA: I understand.

16                   ATTY. BAILEY: Under Ohio law the State is

17   allowed to charge a defendant this way and the defendant

18   under Ohio law could be eligible for the death penalty as a

19   possible punishment even though she's not the trigger person

20   if we prove all the elements of the crime and the

21   specifications beyond a reasonable doubt. Do you have any

22   problem with that?

23                   MARY JANE O'HARA: I would take it very

1    serious but I would have to hear all of the information and I

2    would go by Judge Stuard's instructions.

3                    ATTY. BAILEY:  Okay.  So the fact that

4    she's charged as a complicitor, you would be able to consider

5    -- you would hold us to our burden of proof and if we met our

6    burden of proof --

7                    MARY JANE O'HARA:  Correct.

8                    ATTY. BAILEY:  -- under the law, proof

9    beyond a reasonable doubt, you would be able to return a

10   conviction even though she's not the trigger person?

11                    MARY JANE O'HARA:  If this was our

12   instructions, yes.

13                    ATTY. BAILEY:  Okay.  The fact that she's

14   a woman and not a man, does that bother you in any way in

15   returning an appropriate verdict under the law and on the

16   facts in this case?

17                    MARY JANE O'HARA:  Not -- if the facts are

18   as presented, I would -- no, there wouldn't be any change in

19   how I would perceive it.

20                    ATTY. BAILEY:  Okay.  Now, as a

21   complicitor the defendant is charged with two counts of

22   aggravated murder.  Now, there's only one person that's been

23   killed, but under Ohio law the State has the right to pursue

1   two separate theories of the killing and have the jury

2   consider both theories of the killing and there's nothing

3   wrong with our doing that.  We're allowed to do that under

4   the law, we've elected to do so, and that's what we've done.

5   And attached to these charges of aggravated murder are these

6   two specifications that I mentioned.  Okay.  There's also two

7   other charges, a charge of aggravated burglary and aggravated

8   robbery, and attached to those charges are specifications, or

9   special findings, of a firearm, that a working gun was used

10   in the commission of these offenses.  Okay.

11        Now, each crime is composed of certain elements.  I

12   mentioned elements were like the ingredients of a cake,

13   right?

14               MARY JANE O'HARA:  Correct.

15               ATTY. BAILEY:  And the judge is going to

16   give the instructions of law in detail at the end of this

17   case about the law and the elements and definitions and

18   you're bound to follow those instructions, but I'm going to

19   give you a for instance.  Let's -- these two counts of

20   aggravated murder, okay, the first aggravated murder is

21   charged with prior calculation and design and the second

22   aggravated murder is charged as the purposeful killing of

23   another in the course of a special felony like the aggravated

1    burglary and/or aggravated robbery.  Okay.

2            Examples of the elements.  Okay.  Let's take the

3    crime of aggravated murder with prior calculation and design.

4    The State would have to prove beyond a reasonable doubt that

5    it happened first on or about a certain day like December

6    11th, 2001.  Second we would have to prove that it happened

7    here in Trumbull County, Ohio.  We call that venue, okay, and

8    that term just means that we have to prove it, and you'll

9    hear that question asked, in what county and state did this

10   occur, so that we can try the case in this courthouse and not

11   up in Ashtabula or down in Columbiana.

12           MARY JANE O'HARA:  Okay.

13           ATTY. BAILEY:  The third element might be

14   identification.  Somebody is going to have to come in and

15   point out the defendant, okay, as the person who did this.

16   Fourth is that she acted purposely, basically on purpose, but

17   the judge will give you a detailed legal definition.

18   Everything has got a detailed legal definition.  Okay.  And

19   you're probably familiar as a reference, prior reference

20   librarian with definitions --

21           MARY JANE O'HARA:  Definitely.

22           ATTY. BAILEY: -- and all kind of things

23   like that with books.  Fifth, that she caused the death of a

1   living person, in this case a fellow by the name of Robert

2   Fingerhut.  And six, that she acted with prior calculation

3   and design.  Okay.  Let me give you -- and prior calculation

4   and design requires some advanced planning and a studied

5   scheme to kill.

6          Let me give you a for instance.  For instance, let's

7   say I drop my pen and I catch it.  That could be a reflex,

8   right?  No planning needed.  But let's say I drop my pen and

9   I look down and say, "Oh, my goodness, I dropped my pen.

10  Maybe I better bend down and pick it up," and I do that.

11  That's some advanced planning, right?  Okay.

12         Well, let's say yesterday I told my co-counsel, I

13  said, "Chris, I need an example of prior calculation and

14  design.  I'm going to go into court tomorrow and drop my pen

15  so I can bend over and pick it up and demonstrate prior

16  calculation and design," and that would be prior calculation

17  and design.  There's the advanced planning and the studied

18  scheme to do this, right?

19                  MARY JANE O'HARA:  Yes, sir.

20                  ATTY. BAILEY:  Now, I already mentioned

21  those two specifications attached of these aggravating

22  circumstances, that the aggravated murder was committed

23  during an aggravated burglary with prior calculation and

1     design, and the other is that it was committed during an

2     aggravated robbery with prior calculation and design, and

3     then we've got those terms or crimes, aggravated burglary and

4     aggravated robbery. And sometimes folks who aren't versed in

5     the law will interchange those terms and people may say gosh,

6     my home got robbed, and they really mean my home got burgled.

7                  MARY JANE O'HARA: Right.

8                  ATTY. BAILEY: Basically when we talk

9     about aggravated burglary we're talking about somebody

10     trespassing in an occupied structure of another person, a

11     dwelling house, somebody's home.

12                  MARY JANE O'HARA: Okay.

13                  ATTY. BAILEY: And the victim is present

14     and the perpetrator goes in to commit an offense, like an

15     aggravated murder or a theft offense or something, and he's

16     armed with a deadly weapon, like a gun or a knife, and he

17     causes serious physical harm or death to the victim. The

18     aggravated robbery, on the other hand, doesn't involve a

19     structure. The aggravated robbery is where the perpetrator

20     uses force or threat of force against another person --

21                  MARY JANE O'HARA: I see.

22                  ATTY. BAILEY: -- to commit maybe a theft

23     offense. And, again, he could be armed with a gun or a

1    knife, a deadly weapon, and cause serious physical harm or

2    death to the victim.  Okay.

3                    MARY JANE O'HARA:  I didn't understand

4    those.  I'm glad you clarified it.  I was going to ask but I

5    figured you'd come around with it.

6                    ATTY. BAILEY:  Okay.  And that's why I

7    ask.  I figure folks usually, unless they're lawyers, they're

8    not used to having those terms used in specific ways like

9    that.

10                    MARY JANE O'HARA:  Sure.

11                    ATTY. BAILEY:  And this specification of a

12   firearm, that just means it's a working gun.

13                    MARY JANE O'HARA:  I see.

14                    ATTY. BAILEY:  Pull the trigger and a

15   projectile comes out through the use of combustion or

16   explosion, and the judge will give you a detailed definition

17   as to that.  It will have more elements in it, okay, and we

18   got to prove those things beyond a reasonable doubt.

19            Now, let's talk about this burden of proof, okay?

20   The State has the burden of proving the elements of the crime

21   charged beyond a reasonable doubt, and if we don't live up to

22   this burden and if we miss one of those elements, like let's

23   say I never asked the question about what county and state

1    did this occur, I never prove venue, you got to find the

2    defendant not guilty.  You may feel well, gosh, they proved

3    everything else, I really ought to find her guilty, but you

4    can't, right?  You understand that?

5                    MARY JANE O'HARA:  Yes.

6                    ATTY. BAILEY:  The burden is totally on

7    us.  That burden never shifts.  The defendant has no burden,

8    okay?  The defendant and her attorneys, they can just sit

9    there during the course of the trial and work crosswords or

10   jumbles or something, but they're not going to do that.  They

11   are excellent attorneys and they're not going to do that, but

12   they don't have any burden, okay, no burden of proof.  The

13   burden is totally on us, the people of the State.  It's the

14   State that charged the defendant through a charging document

15   called an indictment.  The State went to the grand jury, it

16   presented witnesses, and the only ones there were the

17   prosecutor, a recording secretary, a witness and the grand

18   jurors.  Okay.  The defendant doesn't have any right to be in

19   the grand jury and her attorneys aren't there, okay?  All

20   that happens in a grand jury is they come out with a charging

21   document.  Basically it sets out the parameters of what we're

22   here for, tells her what she's charged with and tells us what

23   we got to prove.

1                        MARY JANE O'HARA:  I see.

2                        ATTY. BAILEY:  And now it's time for the

3      State basically to put up or shut up, okay?  We made the

4      charges and now we got to prove it.

5           Now, under our, under our American system of justice

6      we have a presumption called the presumption of innocence,

7      okay, and this defendant is presumed to be innocent, as are

8      all other defendants tried in this courtroom.  And that

9      presumption of innocence acts like a cloak shielding this

10     defendant all through the course of this trial.  And that

11     stays with her, that presumption of innocence, unless and

12     until the State is able to put on enough evidence so that

13     when you and the other jurors go back in the jury room to

14     deliberate based on the testimony and the evidence and the

15     judge's instructions, you find that we proved the elements of

16     the crime charged beyond a reasonable doubt.  And if we do,

17     then you can return a guilty verdict and that presumption of

18     innocence at that point would be gone, right?

19                        MARY JANE O'HARA:  Yes.

20                        ATTY. BAILEY:  Okay.  Now, other countries

21     may not have the presumption of innocence.  If you're in

22     France or if you're in Turkey there may be a presumption of

23     guilt, but that's not our system.  The defendant in that type

1    of case would have to prove his or her own innocence, but

2    that's not our system because we have the burden of proof,

3    and because of the presumption of innocence the defendant

4    doesn't have to do anything.  It's not right under our system

5    for the defendant to have to do anything.  It's totally on

6    us.  The State has to win or lose the case all on its own,

7    okay?

8                         MARY JANE O'HARA:  I understand.

9                         ATTY. BAILEY:  You'd be able -- you agree

10   with that presumption of innocence?

11                        MARY JANE O'HARA:  Yes, I do.

12                        ATTY. BAILEY:  And with the burden of

13   proof?

14                        MARY JANE O'HARA:  Yes.  Judge Stuard

15   spoke about that.

16                        ATTY. BAILEY:  Right.

17                        MARY JANE O'HARA:  You know, the cloak of

18   innocence.

19                        ATTY. INGRAM:  He did a much better job.

20                        ATTY. BAILEY:  I'm sure he did a much

21   better job.  I'm just bumbling along here.

22           Now, we talk about the standard of proof, proof

23   beyond a reasonable doubt, and in a civil case it's

1    different. It's where somebody sues for money damages, maybe
2    for a car crash, okay?
3                        MARY JANE O'HARA: Okay.
4                        ATTY. BAILEY: Their burden of proof is
5    only by a preponderance of the evidence. If you have a
6    scale, whoever tips that scale just a little bit is going to
7    win. Instead of a scale let's use an imaginary box. I'm
8    going to steal John Juhasz's box.
9                        MARY JANE O'HARA: Okay.
10                       ATTY. BAILEY: I like that box.
11                       ATTY. JUHASZ: The royalties will be
12   coming in.
13                       ATTY. BAILEY: You'll get the royalties
14   when Napster gives them to you.
15         And we've got this imaginary box and we got to fill
16   it with evidence because the burden of proof is on us. You
17   understand the defendant doesn't have to put anything into
18   that box, she doesn't have to take anything out of that box?
19                       MARY JANE O'HARA: I understand.
20                       ATTY. BAILEY: We have to put stuff into
21   the box. Okay. And in a civil case whoever fills that box
22   over just half way with evidence is going to win, okay, but
23   in a criminal case the burden is on us, the people of the

```
 1    State.  We got to fill that box almost all the way to the
 2    top, maybe an inch away or half an inch away.  It's up to you
 3    and each individual juror to decide where you want to draw
 4    the line on that box, but it's up to the point where you are
 5    firmly convinced of the truth of the charge, the elements,
 6    okay, to a moral certainty using your reason and your common
 7    sense.  And that's something that you're used to doing in
 8    everyday life, right?  I mean, when you raise your children
 9    and when you get married, when you get a job or decide to
10    change jobs or decide to retire or buy a house, you use your
11    reason and common sense, don't you?
12                    MARY JANE O'HARA:  Absolutely.
13                    ATTY. BAILEY:  Okay.  There are pros,
14    there are cons.  You may reject several houses that you
15    looked at, maybe a whole lot of houses.  When you go out to
16    buy a house you want to know, you know, is there water
17    problems, is the roof okay, foundation problems or whatever,
18    but eventually you get to the point where you find a house
19    that looks right and the pros outweigh any cons and you're
20    firmly convinced that it's the right thing to do, right, --
21                    MARY JANE O'HARA:  Yes.
22                    ATTY. BAILEY:  -- okay, to a moral
23    certainty?
```

1                    MARY JANE O'HARA:  Yes.

2                    ATTY. BAILEY:  Okay.  So it's not a

3    magical standard that we ask you to look at, it's something

4    you're used to doing every day.

5           Now, there are different types -- oh, you understand

6    when we talk about proof beyond a reasonable doubt it's not

7    proof beyond all doubt or beyond a shadow of a doubt or

8    beyond any doubt?  It's not a hundred percent proof, okay,

9    because you can't prove anything a hundred percent.  There's

10   always some possible or imaginary doubt in there.  That's why

11   the box isn't full completely to the top, okay?

12                   MARY JANE O'HARA:  Okay.

13                   ATTY. BAILEY:  The judge says we have to

14   prove our case beyond a reasonable doubt.  He doesn't use the

15   term beyond all doubt or beyond any doubt.  Okay.  Shadow of

16   a doubt, that's an Alfred Hitchcock movie title.  It makes

17   for a good movie title, but there's no such animal in

18   criminal law in real life.

19          And it's the same burden of proof that we have to

20   meet in every criminal case whether it's a shoplifting case

21   or a burglary case or a robbery or a rape or a murder or a

22   possible capital murder case like this one where the death

23   penalty is an option.  Okay.  That burden doesn't change,

1    it's still the same burden on us, the people of the State.

2    Do you agree with that?

3                      MARY JANE O'HARA:  Yes, I do.

4                      ATTY. BAILEY:  Now, there are different

5    types of evidence that we can use to put evidence into this

6    box to fill it up with evidence and there's something called

7    direct evidence where a witness comes in and testifies to

8    what he or she has learned through the use of his or her five

9    senses.  For example, "I saw the sky and it was blue" or "I

10   smelled the lemon and it was citrony," or/and "I touched the

11   surface and it was vibrating."  That's a word.  It's a new

12   example.

13           And there's another type of evidence that we can

14   use.  It's sort of a roundabout type of evidence that you're

15   used to using in your everyday life.  It's where you're

16   presented with a fact or series of facts and you have to draw

17   a logical deduction to another fact or set of facts.  Okay.

18   We'll call that circumstantial evidence.  If you watch the

19   old TV reruns sometimes people don't know what those terms

20   mean, like on LA Law or on the old black and white Perry

21   Masons, they misuse the term, but let me give you an example

22   of that.

23           Let's say you live in a two-story house and you go

1    to bed and your bedroom is on the second floor.  It's

2    nighttime and you look out through your bedroom window across

3    the neighborhood and it's a nice night.  The moon is beaming,

4    the stars are twinkling, there's not a cloud in the sky, and

5    as far as you can see across the neighborhood it's perfectly

6    dry.

7            You close the blinds, get into bed.  The radio is on

8    low and you hear the announcer say, "Folks, there's a cold

9    front coming in tonight and I expect we're going to get a

10   storm before morning," and you turn off the radio and you

11   fall asleep.  But sometime during the night you're awakened

12   by a distant booming sound up in the sky and you look toward

13   the window, and even though the blinds are drawn, you can see

14   a flash of light and a couple seconds later there's a distant

15   boom.  And then a minute later there's another flash of light

16   outside and closer in time, maybe a second away, there's

17   another boom up in the sky.  And then suddenly there's this

18   great big flash of light outside.  You can't see what it is

19   because the blinds are drawn, but instantaneously there's a

20   big cracking, ripping, booming sound above the house and a

21   pitter-patter on the roof and a heavy drumming sound, and you

22   fall back asleep and sometime later you awaken.  You go back

23   to the window.  You open up the blinds and you look out and

1    it's a nice day.  The sun is shining, there's not a cloud in

2    the sky, but as far as you can see across the neighborhood

3    the streets are running with water, the rooftops are all wet,

4    there are drops of water dripping down the leaves of the

5    trees, and there's no fire plug nearby for some car to hit it

6    and spew water all over the neighborhood, right?  You know

7    what happened during the night, don't you?

8                    MARY JANE O'HARA:  (Nods head

9    affirmatively.)

10                   ATTY. BAILEY:  What happened?

11                   MARY JANE O'HARA:  Right, a thunderstorm.

12                   ATTY. BAILEY:  Right, a thunderstorm.  And

13   you know that beyond any reasonable doubt, don't you?

14                   MARY JANE O'HARA:  Yes.

15                   ATTY. BAILEY:  Okay.  Based on all the

16   facts and circumstances.  You didn't see the rain with your

17   own eye and you didn't see the lightening with your own eye,

18   but from all the facts and circumstances that were presented

19   you know that that was all that happened.

20                   MARY JANE O'HARA:  (Nods head

21   affirmatively.)

22                   ATTY. BAILEY:  Now, there may be some

23   limitations to circumstantial evidence.  You may not know how

1    long the rain fell or how much water came down unless you had

2    a measuring device like they have at the airport, but you

3    know beyond any reasonable doubt there was a thunderstorm,

4    right?

5                      MARY JANE O'HARA:  (Nods head

6    affirmatively.)

7                      ATTY. BAILEY:  There's room there for some

8    possible or imaginary doubt.  You could imagine that ALF and

9    his martian buddies flew by in a flying saucer during the

10   night and put on a sound and light show and sprinkled the

11   ground with some wet stuff, but that would be a foolish or

12   imaginary doubt, wouldn't it?

13                     MARY JANE O'HARA:  Correct.

14                     ATTY. BAILEY:  Okay.  Now, that's

15   circumstantial evidence.  Now, we can fill that box with

16   circumstantial evidence and it's just as good as direct

17   evidence.  Okay.  And if we convince you beyond a reasonable

18   doubt of the circumstantial elements -- the evidence of the

19   elements of the crime charged, you can return a conviction

20   based on that, couldn't you?

21                     MARY JANE O'HARA:  Yes.

22                     ATTY. BAILEY:  Now, there is a reason that

23   we have to use circumstantial evidence sometimes because you

1    can imagine that when people plan very serious crimes, like

2    aggravated murders, they usually don't stand out at the

3    courthouse steps at noon and announce to the whole world what

4    they're planning to do, right?

5                              MARY JANE O'HARA:    (Nods head

6    affirmatively.)

7                              ATTY. BAILEY:    They may do that in secret.

8    And to get inside a person's mind to know what a person's

9    purpose was we may have to rely on things, if we got them,

10   like letters or phone calls to see, you know, if a person

11   says in the letters or phone calls what they were planning.

12   You could look at that as circumstantial evidence, couldn't

13   you?

14                              MARY JANE O'HARA:    Yes.

15                              ATTY. BAILEY:    Now, you understand, and I

16   take it you could pile up evidence on evidence and make your

17   own decision as to if there's enough and follow what the

18   judge tells you?

19                              MARY JANE O'HARA:    (Nods head

20   affirmatively.)

21                              ATTY. BAILEY:    Okay.    You believe people

22   should be held accountable for their actions?

23                              MARY JANE O'HARA:    Yes.

 1              ATTY. BAILEY:  Now, you understand that

 2     people can plan and plan in great detail how they're going to

 3     commit a crime but sometimes, you would agree, that criminals

 4     do some really, really stupid things and get caught, right?

 5     You've probably heard the stories about the robber who goes

 6     into the bank.  He's got a mask on, a getaway driver outside,

 7     and he's got a gun and he's got a stick-up note and he hands

 8     it to the teller.  It's on the back of an envelope and it

 9     says, "Give me all your money," and the teller gives him the

10     money.  He runs out and takes off and he leaves the note

11     behind.  When the teller turns the note over there's the

12     perpetrator's name and address, right?  Or the burglar who

13     climbs in through the window and drops his wallet with his

14     identification and leaves it at the scene.

15          Okay.  So in spite of all the planning that's done

16     sometimes, because of the stupid things criminals do, they

17     get caught, right?

18              MARY JANE O'HARA:  (Nods head

19     affirmatively.)

20              ATTY. BAILEY:  Okay.  You understand --

21     you watch -- where is it?  Oh, well.  You ever see Court TV?

22              MARY JANE O'HARA:  Yes.

23              ATTY. BAILEY:  Okay.  On Court TV they

1    have cases from different parts of the country.

2                    MARY JANE O'HARA:  Yes.

3                    ATTY. BAILEY:  You understand that what

4    they do on Court TV because it's from different parts of the

5    country, the states have different rules, each state is

6    allowed to set up their own systems basically.

7                    MARY JANE O'HARA:  Yes.

8                    ATTY. BAILEY:  So the courts don't always

9    run the same, the trials don't work the same way in different

10   parts of the country.

11                   MARY JANE O'HARA:  Yes.

12                   ATTY. BAILEY:  And in Ohio our judges

13   don't let you take notes.  Okay, back in school you could

14   take notes.

15                   MARY JANE O'HARA:  I was wondering about

16   that.

17                   ATTY. BAILEY:  Right.  No, you can't.

18                   MARY JANE O'HARA:  That was one of the

19   questions.  I'm glad you covered that, too.

20                   ATTY. BAILEY:  And there's a reason for

21   that, okay, because the judges want you to pay close

22   attention to the witnesses and watch their demeanor as they

23   testify.  And if everybody took notes, some people take

1    better notes than others.  Remember back in college you might

2    have borrowed somebody's notes or somebody wanted to borrow

3    your notes, okay, because you were a better note taker.  And

4    if everybody took notes they may argue -- they may miss the

5    next piece of testimony because they're writing something

6    down and they may argue over their notes, who had the better

7    notes, and if they didn't write it down the same, they

8    misheard it, they would be arguing over notes.

9                    MARY JANE O'HARA:  Yes.

10                   ATTY. BAILEY:  And so they want you to

11   ignore note taking and concentrate on the witnesses, watch

12   them, listen to them.  And because there are 12 of you, you

13   should be able to collectively remember the testimony over a

14   week and a half.  Well, maybe three weeks in this case

15   because we're only going to go probably three and a half days

16   each week because of different scheduling problems, okay, for

17   the next three weeks I would expect in the first phase.  And

18   you're going to have to rely on your recollection and there

19   aren't going to be any instant replays.  It's not like sports

20   programs on TV where they have instant replays.  Okay.  You'd

21   be able to do that, I take it, right?

22                   MARY JANE O'HARA:  Yes.

23                   ATTY. BAILEY:  Okay.  And you can't go out

1    to investigate on your own.  We had a juror do that in one

2    case and it caused a mistrial.  Now, they do it on TV

3    sometimes.  I think, what is it, a Hawaii 5-0 episode?

4                    MARY JANE O'HARA:  I missed that one.

5                    ATTY. BAILEY:  And a Matlock episode.

6                    MARY JANE O'HARA:  Missed that one, too.

7                    ATTY. BAILEY:  Okay.  And there was a

8    movie I think.  But that's a no-no, you just can't do that,

9    and because we don't want to do it all over again.  We've

10   been going for five weeks now on jury selection alone.  Not

11   going, not going to do that, right?

12                   MARY JANE O'HARA:  (Nods head

13   affirmatively.)

14                   ATTY. BAILEY:  And you understand that

15   you're stuck with the questions that the lawyers ask.  In

16   some jurisdictions on Court TV they allow the jurors to

17   submit questions to the judge and the judge may ask the

18   witness the question.  That's not going to happen here, okay?

19   And because we're lawyers, we go to law school, we are

20   trained to establish with questions the elements or tear down

21   the elements generally, okay, so our questions are going to

22   be geared toward those elements of the crime.

23                   There may be some questions you have.  If you've got

1     some special interest in cooking, let's say if you were a

2     chef, you may wonder what people were eating.  Or shoes, if

3     you sold shoes you may wonder what people are wearing.  But

4     unless it's relevant to the case -- if it's not a case where

5     there were footprints in the snow or something, that type of

6     question would never get asked and answered.  So you might

7     have some unanswered questions that will never get answered,

8     right?

9                          MARY JANE O'HARA:  Okay.

10                         ATTY. BAILEY:  And if we were able to

11    establish the element of the crime or crimes to your

12    satisfaction beyond a reasonable doubt, you would still be

13    able to return a conviction even though you might have had

14    some unanswered questions, right?

15                         MARY JANE O'HARA:  Right.

16                         ATTY. BAILEY:  Okay.

17                         MARY JANE O'HARA:  I have a question.

18                         ATTY. BAILEY:  Sure.

19                         MARY JANE O'HARA:  In deliberation, not

20    new questions but part of the testimony, in Ohio is that --

21    if you say I think I remember this part, can you ask for

22    that?

23                         ATTY. BAILEY:  I was just going to get to

1    that.

2                        MARY JANE O'HARA:  I'm just going to let

3    you talk.  I won't ask questions.

4                        ATTY. BAILEY:  Jurors sometimes ask the

5    question can we have the testimony of so and so?  The answer

6    to that generally is going to be no.

7                        MARY JANE O'HARA:  Okay.

8                        ATTY. BAILEY:  I would expect the judge is

9    going to tell you that you're not going to be able to get a

10   transcript.  You're going to have to rely on the collective

11   recollection of all 12 of you.

12                       MARY JANE O'HARA:  Okay.

13                       ATTY. BAILEY:  Okay.  And there's a reason

14   for that.  Unlike O.J. Simpson or the Menendez brothers or

15   other high publicity Court TV cases, we don't have the

16   millions of dollars that it took to get those transcribing

17   systems.  Our court reporters are excellent, but they don't

18   have that ability to get out instant transcripts.

19                       MARY JANE O'HARA:  I understand.

20                       ATTY. BAILEY:  And we can't wait a week

21   for them to prepare a transcript for each -- every time the

22   jury has a question.

23                       MARY JANE O'HARA:  Okay.

```
 1                    ATTY. BAILEY:  So that's why the jurors
 2    are told they have to rely on their collective recollection.
 3    You understand --
 4                    MARY JANE O'HARA:  I understand.
 5                    ATTY. BECKER:  -- that you won't be
 6    getting instant transcripts?
 7                    MARY JANE O'HARA:  Okay.
 8                    ATTY. BAILEY:  Okay.  Now, the judge also
 9    mentioned you're going to be an alternate, you're being
10    considered for an alternate juror's position.  And I expect
11    if you're selected here as an alternate juror you understand
12    folks sometimes feel gosh, I feel like a fifth wheel here.
13    I'm sitting, I may be second or third alternate or something
14    like that.  But we're highly experienced attorneys.  We've
15    handled quite a few of these cases over the years.  We've had
16    cases where we've run out of all of our alternates.
17    Hopefully nothing happens to anybody on the jury, but because
18    of the fact that people get sick.
19                    MARY JANE O'HARA:  Sure.
20                    ATTY. BAILEY:  They may have family
21    emergencies that come up, who knows what can happen, but
22    there have been times when we've used all the alternates, so
23    it's important that you pay just as close attention as if you
```

1    were sitting in one of those 12 seats, okay, because you

2    never know when you're going to get moved into one of those

3    seats.

4                    MARY JANE O'HARA:  Yes.

5                    ATTY. BAILEY:  Okay.  You wouldn't have

6    any problem with that?

7                    MARY JANE O'HARA:  No.

8                    ATTY. BAILEY:  Okay.  Now, at the end of

9    this case, at the end of the first phase after the testimony

10   is in and the judge instructs you on the law and you and the

11   other jurors go out to deliberate on your verdict, you're

12   going to be sequestered.  You'll get notice the day before

13   that most likely, and you'll be told to pack your belongings

14   and stuff that you need to stay for maybe a couple of nights.

15   And each jury is different, okay.  We've had juries on

16   capital cases in the first phase come back anywhere from an

17   hour and a half up to five days.

18                    MARY JANE O'HARA:  Uh-huh.

19                    ATTY. BAILEY:  We don't know how long your

20   jury will take, whatever amount of time is necessary for you

21   to consider everything and render your verdict.  And let's

22   say you and the other jurors come back with a guilty beyond a

23   reasonable doubt verdict of aggravated murder and one or more

1    specifications, we go into a second phase.  And there would

2    be a break there maybe for a couple days or a week and we

3    would come back.  And generally a second phase takes anywhere

4    from one to three days and again you'd be sequestered when

5    you deliberate.  Those sequestrations, would they cause you

6    any undue hardship?

7                         MARY JANE O'HARA:  No.

8                         ATTY. BAILEY:  Okay.  I mean, they put you

9    up in a hotel and feed you.

10                        MARY JANE O'HARA:  Correct.

11                        ATTY. BAILEY:  And when you deliberate

12   there's no one-on-one, you have to wait to deliberate until

13   all 12 of you are together.

14                        MARY JANE O'HARA:  I understand.

15                        ATTY. BAILEY:  Now, another thing,

16   sympathy, it's normal for one human being to feel sympathy

17   for another human being, but you understand that sympathy --

18   when you go in to deliberate you have to be able to set aside

19   feelings of sympathy that you might have for the defendant

20   and base your verdict solely on the testimony and evidence

21   that you hear and the instructions of law given to you by the

22   Court.

23                        MARY JANE O'HARA:  (Nods head

1    affirmatively.)

2                    ATTY. BAILEY:  Okay.  So when you get

3    inside your jury room can you set aside, be conscientious in

4    your deliberations and base your verdict solely on the

5    testimony and the evidence and the instructions of law given

6    to you by the judge and set aside all thoughts whatsoever of

7    sympathy that you might have for this defendant?

8                    MARY JANE O'HARA:  Yes.

9                    ATTY. BAILEY:  Now, do you have any

10   questions that have come up during this time?

11                   MARY JANE O'HARA:  No.  I think I jumped

12   right in when I needed to.

13                   ATTY. BAILEY:  Okay.  Now, I think you'd

14   agree that we have certain obligations of citizenship as

15   citizens in this country.  One obligation is when it's

16   election time that we learn what we can about the candidates

17   and the issues and go out and cast a ballot and make sure our

18   system of democracy works.

19                   MARY JANE O'HARA:  Yes.

20                   ATTY. BAILEY:  Another obligation is if

21   it's war time we may have an obligation to serve in the

22   military if we're called.  We've got young folks that are

23   overseas now in several places, okay, and that's an important

1    obligation of citizenship, to make sure the country stands

2    strong.  Okay.

3            There's another obligation of citizenship, when

4    we're summonsed in to serve as jurors in cases.  To make sure

5    our system of justice works it's important that we get folks

6    from all walks of life with different viewpoints and

7    experiences to sit on those juries, and especially in this

8    most serious of criminal cases, a capital murder case.  Okay.

9    Would you be willing, and even though it may cause us some

10   hardships in our personal lives, we may have to jockey some

11   things around, change our daily schedules for a while, would

12   you be able to do that and undertake this obligation of

13   citizenship?

14           MARY JANE O'HARA:  Yes.  I think it's very

15   important if I was chosen, yes.

16           ATTY. BAILEY:  Okay.  Now I'm done with my

17   questions and defense counsel will have an opportunity to

18   address you.  Thank you.

19           MARY JANE O'HARA:  Okay.

20           THE COURT:  Mr. Juhasz.

21           ATTY. JUHASZ:  Thank you.  Ms. O'hara,

22   good afternoon.

23           MARY JANE O'HARA:  Hello.

1          ATTY. JUHASZ:  You've been up there for a

2     little while.  You doing okay?  You need some water or

3     anything?

4               MARY JANE O'HARA:  No, I'm okay.

5          ATTY. JUHASZ:  All right.  If you do while

6     we're talking, then please let me know and we'll make sure

7     you get some.  Fair enough?

8               MARY JANE O'HARA:  Thank you.

9          ATTY. JUHASZ:  My name is John Juhasz.  My

10    friend Jerry Ingram and I over there are representing Donna

11    Roberts who, as you know from everything you've heard, is on

12    trial for her life.  We take that responsibility of

13    representing Donna very seriously, and this lengthy and

14    laborious process that we're involved in is an effort to get

15    a fair and impartial jury, the same kind of jury that you

16    would probably want if you were sitting over there charged

17    with an offense or somebody you cared about, a family member

18    or a loved one.  You would want that same kind of impartial

19    jury, I take it?

20               MARY JANE O'HARA:  Absolutely.

21          ATTY. JUHASZ:  Okay.  I tell you that so

22    that you know why we're asking some of these questions that

23    probably seem just a little bit inane to you and ask you to

1    sort of humor us as we go along doing that.  I will try not

2    to repeat.  I may elaborate slightly on something Mr. Bailey

3    said, but I'm going to try not to go over the exact same

4    things that Mr. Bailey went over with you.

5         Probably the most important thing that I can tell

6    you as we're standing here is Jerry likes to say that this is

7    sort of like a job interview.  It's a pretty short-term job

8    but it's an important job, and the thing about a job

9    interview is we're interviewing you to see if you're

10   comfortable taking this job and if we're comfortable having

11   you take this job.  Like any job interview you would go for,

12   you would also want to find out some things about the job

13   you're about to take on.

14              MARY JANE O'HARA:  Absolutely.

15              ATTY. JUHASZ:  So we're trying to find out

16   how you feel about certain things and also sort of give you

17   an idea to the best that we're able of some of the things

18   that you might expect.  It's a little bit different from the

19   normal job interview, however, since you didn't apply for

20   this job, you got sent a little piece of paper asking you to

21   come down here.

22              You have known, from what you told Mr. Bailey, since

23   April the 8th that this was a potential death penalty case,

1    correct?

2              MARY JANE O'HARA:  Correct.

3              ATTY. JUHASZ:  And because this process

4    has taken so long you've had some time to think about that.

5    Tell me your thoughts about the responsibility of, your

6    thoughts about acting as a juror and taking on the

7    responsibility of that in a case this important.  What do you

8    think about that?

9              MARY JANE O'HARA:  I feel it's a very

10   serious obligation and I feel that Judge Stuard's

11   instructions and guidance would be the most valuable part of

12   the job so that I could follow, as I would want someone else

13   to follow, that I could follow to according to the law and do

14   the best job.

15             ATTY. JUHASZ:  All right.

16             MARY JANE O'HARA:  I'm wet behind the ears

17   so excuse me when I don't get it just right.

18             ATTY. JUHASZ:  That's okay.  In fact, one

19   of the things that I usually tell folks when I'm up here

20   talking to them is that, and actually sometimes I even use

21   the word arrogant, that we're a little bit arrogant to the

22   extent that we study this stuff, we go to law school, we

23   practice it, and we sort of yank you out of your life and

1   come in here, give you a whole bunch of rules that we're used

2   to dealing with like second nature.  It would be -- you used

3   to be an x-ray tech, correct?

4                    MARY JANE O'HARA:  Correct.

5                    ATTY. JUHASZ:  All right.  It would be

6   like you saying Juhasz, quit practicing law for a couple

7   days, come on in here and help me do X-rays, and, you know, I

8   don't know anything about that stuff.

9                    MARY JANE O'HARA:  Exactly.

10                   ATTY. JUHASZ:  So if you have questions,

11  please let us know.  I mentioned a minute ago that it's kind

12  of like a job interview and I am interested in hearing what

13  you have to say.  So understand I'm not trying to put you on

14  the spot if I ask you a question, it is that I'm more

15  interested in hearing what you have to say than listening to

16  the rambling of my own voice.  That's one of the reasons why

17  we're doing this.

18            The only answers that you can give me that would be

19  wrong are answers that you think I want to hear rather than

20  what you really think.  We are not here to change anybody's

21  views about anything, all right?

22            You know from what Judge Stuard told you that a

23  couple things we want to talk about this afternoon are

1   pretrial publicity and folks' views on the death penalty, and

2   I want to talk to you first about pretrial publicity.  I want

3   you to understand that, and I mention this because sometimes

4   jurors seem nervous about this, when you were watching TV or

5   reading the newspaper and picking up snippets of information

6   about this case and you had no idea you were going to get a

7   summons to be a potential juror on this case, so I want you

8   to understand and relax a little bit, that there's nothing

9   wrong with the fact that you heard things about this case.

10  But because you have, it makes sense to you that you would --

11  we would want to ask you questions about that.  That makes

12  sense, doesn't it?

13                    MARY JANE O'HARA:  Yes, it does.

14                    ATTY. JUHASZ:  I went out to a school last

15  week in Boardman to speak to some students and told them that

16  we were in the middle of this process and I sort of gave them

17  an example.  And I pointed to one student and said, "Now

18  let's assume that he accuses you of doing something," and

19  let's assume that a couple of other students say, "Well, you

20  know, I heard Mary, she's a snob and she's not really nice to

21  people and she cheats on tests," and Mary is looking at me

22  like none of that stuff is true.  And I said you understand

23  one of the reasons -- you wouldn't want those people deciding

1   your case, would you?  She said no, because they have bad

2   impressions about me that aren't true.  So we need to talk

3   about that and find out what your impressions are.

4           You have written down on the questionnaire some of

5   the things that you remember picking up along the way and you

6   also mentioned some things to Mr. Bailey.  Your aunt, as I

7   understand it, tried to tell you some stuff and you're --

8                   MARY JANE O'HARA:  Yes.

9                   ATTY. JUHASZ:  -- waving her off?

10                  MARY JANE O'HARA:   Absolutely not.  Can I

11  say one thing?

12                  ATTY. JUHASZ:  Yeah, sure.

13                  MARY JANE O'HARA:  When Mr. Bailey was

14  first asking me what I'd heard and I was kind of stumbling,

15  the reason is when I came for the first, when I was summonsed

16  originally and Judge Stuard says you don't want to know

17  anything, that night I filled out the questionnaire and I

18  have tried my darndest to keep a blank mind.  So when he

19  asked me what I know, I've done everything in my power to be

20  totally -- to wipe the slate clean as we were instructed.

21                  ATTY. JUHASZ:  All right.  We appreciate

22  that.  It's sometimes a tough thing to do.

23                  MARY JANE O'HARA:  That's why I stumbled

1    when you said, and thank goodness you had what I wrote down,

2    but I really try very hard.  I worked for a physician and he

3    wrote in a resume for me, or a whatever you call it, that I

4    have a mind like a steel trap.  But in this case, and I

5    unfortunately remember details, you know, you like to -- but

6    in this case that is why I have tried since that day to keep

7    a very clean slate.

8                    ATTY. JUHASZ:  Okay.  And we appreciate

9    that and we appreciate your honesty in telling us like your

10   aunt tried to talk and you're waving her off.  Let me ask you

11   though, us having talked about all that, do you have an

12   impression about Donna now from the things that you have read

13   or heard in the paper or on TV?

14                   MARY JANE O'HARA:  I think that I wrote

15   that everything was so vague and I really don't know if I had

16   the right case.  I read the paper all the time but -- wait a

17   minute.  These are my travel dates.  I read the paper.  I was

18   in Chicago, I was in --

19                   ATTY. JUHASZ:  The days you have marked

20   down.

21                   MARY JANE O'HARA:  -- Florida, I was in

22   California.  And at that point -- I have a new grandchild in

23   Chicago so I spent quite a bit of time there.

```
 1                    ATTY. JUHASZ:  That's No. 4 then?

 2                    MARY JANE O'HARA:  That's No. 4 grandson,

 3      yes.

 4                    ATTY. JUHASZ:  The recent arrival?

 5                    MARY JANE O'HARA:  Yes.

 6                    ATTY. JUHASZ:  Congratulations.

 7                    MARY JANE O'HARA:  Thank you.  So I have

 8      been out of the loop for quite a bit, so to speak.

 9                    ATTY. JUHASZ:  All right.  It's a curious

10      combination, you're out of the loop but you have a mind like

11      a steel trap so you did pick up some things?

12                    MARY JANE O'HARA:  Yes.

13                    ATTY. JUHASZ:  And do you have an

14      impression from those things you picked up that she's

15      probably involved in this case?

16                    MARY JANE O'HARA:  I don't think so.  I've

17      read, the little bit I read I got the impression that it was

18      possibly a husband and possibly -- I don't know.  It was so

19      vague, and not really.

20            Another thing that affected me quite badly as far as

21      trying to come with a full slate is media can very harshly

22      convict on the news and in the paper.  And I was very

23      affected by Dr. Dickstein because I felt the media just --
```

1    let's not even go there.  It was very devastating to me, the

2    outcome, because he was prosecuted and convicted in the press

3    as far as I'm concerned.

4                    ATTY. JUHASZ:  Uh-huh.

5                    MARY JANE O'HARA:  I hope I'm not yakking

6    too much.

7                    ATTY. JUHASZ:  Not at all.  In fact, I was

8    going to ask you, if I remember -- yes.  And since Mr. Bobby

9    is not here from the Tribune -- well, even if he were here I

10   would do this, quite frankly, but since he's not here let's

11   take off on the news media a little bit because you put in

12   one of your questions how the media can switch things around.

13                    MARY JANE O'HARA:  Oh, definitely.

14                    ATTY. JUHASZ:  You were involved in a

15   situation that had to do something with a quarry?

16                    MARY JANE O'HARA:  Yes.  Our home is built

17   in a rock quarry and 1500 feet from my property they are

18   blasting for rock.

19                    ATTY. JUHASZ:  That's pretty close.

20                    MARY JANE O'HARA:  And it's beautiful

21   there and I don't want it destroyed.  And I did contact the

22   State and they found them in gross violation, but mining has

23   -- well, lobbyists and whatever, and it's very difficult to

 1    get into.  Yeah, they say, you know, we can't prove anything

 2    and yes, they were in gross violation, but they said they

 3    aren't going to do it anymore, so.

 4         But the news, what the TV did, they come and

 5    interview you for 45 minutes and there's a 30 second clip on

 6    TV, so I definitely understand.  And plus the paper, too, as

 7    the reporter writes things down they aren't always going to

 8    get the right facts.

 9              ATTY. JUHASZ:  And I'm guessing from that

10    45 minute interview probably not the 30 seconds that you

11    would have picked if they said, "Look, we appreciate all this

12    information but we have to pick out 30 seconds.  Do you want

13    to pick it out?"

14              MARY JANE O'HARA:  Exactly.

15              ATTY. JUHASZ:  It's probably not the same

16    30 seconds you would have picked out?

17              MARY JANE O'HARA:  Sure.

18              ATTY. JUHASZ:  Okay.  So you do have some

19    experience, not only from the case that we've talked about,

20    in your personal situation, that the media can put a twist on

21    things and it may not be accurate, correct?

22              MARY JANE O'HARA:  Sure.

23              ATTY. JUHASZ:  All right.  So you had all

```
 1   this information but I take it you're not necessarily putting

 2   a lot of stock in even the things that you do remember

 3   because of how the media --

 4                    MARY JANE O'HARA:  Absolutely.

 5                    ATTY. JUHASZ:  -- twists things?  All

 6   right.  Mr. Bailey, as he told you, stole my box example

 7   that I've been using actually for a number of years because

 8   I'm getting old, and I want to talk about it for a second

 9   right now in connection with pretrial publicity.  You

10   understand that using my silly little box that the State of

11   Ohio has to fill up that box with evidence, if they can,

12   beyond the line called reasonable doubt.  You appreciate

13   that?

14                    MARY JANE O'HARA:  Yes.

15                    ATTY. JUHASZ:  You have heard in this case

16   how much evidence as of right now?

17                    MARY JANE O'HARA:  None.

18                    ATTY. JUHASZ:  None, exactly right.  And

19   as a result of that, because you've heard no evidence, that

20   box has to be empty right now.  Do you see that?

21                    MARY JANE O'HARA:  Correct.

22                    ATTY. JUHASZ:  Do you have any problem

23   because of the things that you have heard or read or seen
```

 1    about Donna Roberts and about Mr. Jackson and the thing your

 2    aunt said the other day, do you have any problem saying to

 3    me, to Mr. Ingram, to Donna Roberts and to the judge, "Look,

 4    that box is empty.  Those things I've heard are not in

 5    there"?

 6              MARY JANE O'HARA:  Absolutely no problem.

 7              ATTY. JUHASZ:  All right.  If you are

 8    selected as a juror you may hear things during the course of

 9    the trial that you go you know what, I didn't even remember

10    this stuff when I was talking to the judge and Bailey and

11    Juhasz, but now that I hear somebody testify about this, I

12    read something about that in the paper.  That's okay.  Here's

13    the reason I bring it up, however.  One of your jobs as a

14    juror is to test what we call the credibility, the

15    believability of every witness who gets on the stand.  You

16    appreciate that?

17              MARY JANE O'HARA:  Yes.

18              ATTY. JUHASZ:  If what that witness says

19    squares with something that you realize later that you read

20    in the paper or heard on TV 21 or whatever, you can't say to

21    yourself well, you know what, that must be true because I

22    read that in the paper.  Do you see that?

23              MARY JANE O'HARA:  Right, absolutely.

1              ATTY. JUHASZ:  Okay.  No problem with

2      that?

3              MARY JANE O'HARA:  No.

4              ATTY. JUHASZ:  Very good.  You, I think,

5      know now what the government's basic allegations are, that

6      they're saying that Donna conspired, plotted with, got

7      together and made a plan with Mr. Jackson to kill

8      Mr. Fingerhut.  You might throughout the course of the trial

9      if you're selected as a juror hear evidence that makes you

10     say well, you know what, I think that Mr. Jackson was

11     involved in this and Mr. Jackson did what the government says

12     that he did.  My point in bringing that up is you understand,

13     don't you, that this trial is not about Nathaniel Jackson,

14     it's about Donna Roberts?

15             MARY JANE O'HARA:  Absolutely.

16             ATTY. JUHASZ:  And even if Nathaniel

17     Jackson is guilty as all sin, the question in this trial is

18     whether Donna Roberts did anything to plan that with him or

19     help him with that plan.  Do you see that?

20             MARY JANE O'HARA:  Yes.

21             ATTY. JUHASZ:  No problem separating the

22     two?

23             MARY JANE O'HARA:  No.

1            ATTY. JUHASZ:  Okay.  You have heard some

2    things about letters as well?

3            MARY JANE O'HARA:  Yes.

4            ATTY. JUHASZ:  Okay.

5            MARY JANE O'HARA:  The only thing I heard,

6    and I think it was right before we were called in, is letters

7    were put into evidence.  That's the only, that's the whole

8    extent of it.

9            ATTY. JUHASZ:  All right.  Part of what

10   the State may try to use as evidence in this case may be

11   letters written by Donna and telephone conversations,

12   recorded telephone conversations between Donna and Nathaniel

13   Jackson.  I will tell you now that some of those, if you read

14   them or hear them, are sexually explicit, and I'm going to

15   even go a step further and tell you some of them are

16   offensive.  Now, you may be offended when you hear those

17   things, but I bring it up because you understand that even if

18   you don't approve of things that are said or written as far

19   as being sexually explicit or offensive, that does not

20   substitute for evidence about whether she planned with him to

21   carry out a crime and they did something about it?  Do you

22   see that?

23            MARY JANE O'HARA:  Absolutely.  Everybody

1       is different in how they express themselves or whatever.

2                       ATTY. JUHASZ:  All right.  And so even

3       though at the end of the trial you may be saying, you know,

4       she's a little over the top for me in her personal

5       preferences, that's no reason to convict somebody, you agree

6       with that?

7                       MARY JANE O'HARA:  Absolutely.

8                       ATTY. JUHASZ:  And so even though there's

9       been all this media hype and coverage of the case and all

10      this discussion we're having today about letters and tapes,

11      if at the end of the case you find that the State of Ohio has

12      not filled up that imaginary box that we've referred to

13      beyond the line called reasonable doubt, would you have any

14      hesitation whatsoever in voting not guilty?

15                      MARY JANE O'HARA:  No.  I would definitely

16      want to use the instructions of Judge Stuard.  And, as I

17      said, this is all so new to me, but this is foremost in my

18      mind, that he is running the ship here and to follow his

19      directives.

20                      ATTY. JUHASZ:  He is -- I'm going to

21      modify what you said just a little bit.

22                      MARY JANE O'HARA:  Okay.

23                      ATTY. JUHASZ:  Okay.  That's okay.  He's

1     running the ship in that he's going to serve as the umpire if

2     the lawyers have disagreements about evidence or procedure,

3     but one of the things that he'll tell you -- and he runs the

4     ship because he gives you instructions about how to do your

5     job.

6                     MARY JANE O'HARA:  That's what I meant,

7     exactly.

8                     ATTY. JUHASZ:  But you understand that

9     when it comes to deciding what factually occurred in this

10    case, that's your job, not his?

11                    MARY JANE O'HARA:  Yes, I do.

12                    ATTY. JUHASZ:  You're clear on that?

13                    MARY JANE O'HARA:  Oh, definitely.

14                    ATTY. JUHASZ:  He will give you the

15    instructions.

16                    MARY JANE O'HARA:  It's the instructions

17    from him how to interpret.

18                    ATTY. JUHASZ:  Okay.  Let's talk a little

19    bit, if we can, about your views on the death penalty.  And

20    again, understand nobody is here to change your mind.  I'm

21    interested in hearing what you think and how you feel.

22          One of the things that you mentioned I think maybe

23    in your questionnaire but certainly when you were talking

1    with Mr. Bailey is that the death penalty is appropriate

2    punishment for some cruel crimes.  Do you remember using that

3    word?

4                    MARY JANE O'HARA:  Yes.

5                    ATTY. JUHASZ:  And I'm not sure that you

6    had an opportunity to sort of tell us what you mean by that.

7    Would you give me some idea what you mean by that?

8                    MARY JANE O'HARA:  Just done with such

9    malice; cruelty, malice.  I guess, you know, as you were

10   talking about, or was it Attorney Bailey that mentioned

11   about, yes, the pencil.

12                   ATTY. JUHASZ:  Dropping the pen?

13                   MARY JANE O'HARA:  Yes.  Planning this and

14   maybe causing such cruelty to the person is what I meant by

15   cruelty.

16                   ATTY. JUHASZ:  Okay.

17                   MARY JANE O'HARA:  Malice, such cruelty

18   and malice and planning and not just, you know, as he again

19   used examples of an accident.  If it was -- when testimony

20   would mean that there's just such malice, that's what I meant

21   by a crime of cruelty.

22                   ATTY. JUHASZ:  All right.  Let's follow up

23   on that for a couple of minutes.  First of all, you talked to

1    Mr. Bailey about different types of homicide offenses and I

2    think you agreed with him, as you just said to me now, some

3    of them don't deserve the death penalty, correct?

4                    MARY JANE O'HARA:  Correct.

5                    ATTY. JUHASZ:  There are some that clearly

6    do in your mind.  And are there other offenses other than

7    homicide offenses for which you think the death penalty might

8    be appropriate?

9                    MARY JANE O'HARA:  I've never given it any

10   thought.

11                   ATTY. JUHASZ:  Okay.

12                   MARY JANE O'HARA:  I'm sorry.  I would

13   have to really consider it.

14                   ATTY. JUHASZ:  That's all right.  And

15   there's something else that I should have told you when I was

16   sort of telling you the ground rules for our discussion.

17   These questions are hard questions.  As Mr. Bailey said, this

18   is not his first death penalty case.  It's not my first death

19   penalty case.  It's nobody in this room's first death penalty

20   case, so we've had some time to think about this.

21                   MARY JANE O'HARA:  Right.

22                   ATTY. JUHASZ:  You have not.

23                   MARY JANE O'HARA:  Right.

1              ATTY. JUHASZ:  So that's fine.

2              MARY JANE O'HARA:  I'm just trying to be

3     honest.

4              ATTY. JUHASZ:  I appreciate that.  I did

5     see that you mentioned that you had, I thought you said

6     something about "I've never had a deep, soul-searching debate

7     but I have discussed my position for capital punishment for

8     extremely serious crimes."  I'm interested if you can tell me

9     a little bit more about that.  Was it a discussion, a series

10    of discussions, different discussions over the years?

11             MARY JANE O'HARA:  Well, working as a

12    reference librarian, of course, many assignments are capital

13    punishment and all the other issues, and I've researched them

14    for people.  But I guess what I meant by that is I never

15    actually knew someone close enough that I would be -- say a

16    family member and I, and another family member was killed, I

17    think that's what I meant.  It would be a soul searching

18    where you are going to the depth of the discussion.

19             ATTY. JUHASZ:  Okay.

20             MARY JANE O'HARA:  What I meant is you

21    see something on TV and you lightly say, but you aren't

22    taking it to that degree.

23             ATTY. JUHASZ:  Yeah, I understand, because

1    you're not that closely involved in it.

2                    MARY JANE O'HARA:  Exactly.

3                    ATTY. JUHASZ:  And I suspect you've

4    probably had more thoughts about it now because, even though

5    it's not a family member or something like that, the

6    potential of you being a juror on a case like that.

7                    MARY JANE O'HARA:  Oh, exactly.

8                    ATTY. JUHASZ:  Have you had discussions in

9    the past about the death penalty where you've taken a certain

10   position or used certain arguments to justify whatever

11   position you took?

12                   MARY JANE O'HARA:  Probably if you're just

13   talking about a case or a situation that you'd heard of and

14   you might say -- well, or like in a serial killing case and

15   you would say there are all these people suffering and, you

16   know, then you would say well, yes, I would consider it.

17                   ATTY. JUHASZ:  Okay.  You mentioned a few

18   minutes ago when we were talking about cruel crimes that if

19   something is planned out.  You talked about Mr. Bailey and

20   the pen.  Are those offenses for you that if you find beyond

21   a reasonable doubt that the person did that, and let's just,

22   let's just take plans so we're talking about one sort of

23   offense, so you find beyond a reasonable doubt that somebody

1    planned something out and they did it and they carried

2    through the plan and they killed somebody, now tell me what

3    your thoughts are about the death penalty for that person.

4    Is that a person who because of that cruelty the death

5    penalty sort of has a leg up in your mind and they would have

6    to talk you out of it, or is it just the type of -- well, I'm

7    trying to -- I'm more interested in hearing what you have to

8    say than what I have to say.

9                    MARY JANE O'HARA:  Okay.  The paper we had

10   to read today was really helpful because according to, from

11   my understanding, Ohio law tells you that you have to

12   consider the mitigating and -- I'm sorry, what's the other

13   one?

14                   ATTY. JUHASZ:  You're right, the

15   mitigating circumstances against the aggravating factors,

16   that's right.

17                   MARY JANE O'HARA:  Right, exactly.  What's

18   wrong?  What's wrong, guys?  Okay.  Never mind.

19                   ATTY. JUHASZ:  Oh, I said -- I'm sorry.

20                   ATTY. INGRAM:  Mr. Juhasz reversed them.

21                   ATTY. JUHASZ:  I reversed them I guess.

22   I'm sorry.

23                   MARY JANE O'HARA:  Oh.

1              ATTY. JUHASZ:  It's aggravating

2    circumstances and mitigating factors.

3              MARY JANE O'HARA:  There you go.  Okay.

4    Okay.  I thought I did something wrong.

5              ATTY. JUHASZ:  No, I did, and nobody threw

6    anything at me.  Yeah, it's called the aggravating

7    circumstances, which are the reasons to consider imposing the

8    death penalty.

9              MARY JANE O'HARA:  Exactly.

10             ATTY. JUHASZ:  Against the mitigating

11   factors, which are the reasons not to.

12             MARY JANE O'HARA:  Right.  So it just

13   wouldn't be automatic because after I read that and

14   understand what the law is, that you have to weigh those

15   things out.

16             ATTY. JUHASZ:  Okay.  So even if it's one

17   of these things that's a cruel thing for which you feel the

18   death penalty is appropriate, you can go into the second

19   phase with all four of though equal in your mind?

20             MARY JANE O'HARA:  (Nods head

21   affirmatively.)

22             ATTY. JUHASZ:  Okay.  You  mentioned also

23   when Mr. Bailey was asking you questions "truth in

```
 1    sentencing," and I got some of what you were saying but I
 2    think he may have gone on with other questions and I'm sort
 3    of interested in hearing some more what you have to say about
 4    that.  Can you tell me what you mean by truth in sentencing
 5    as it relates to the death penalty, first of all?
 6                      MARY JANE O'HARA:  Okay.  I might have a
 7    misconception and the laws may have changed, but at one
 8    point, and I guess until I was enlightened today that some of
 9    the laws have changed, I felt that if you were given life in
10    prison automatically this could be plea bargained down or
11    something could happen to make it less.  If a family member
12    of mine was killed, what I was saying is I would have a hard
13    time with the death penalty but I would have an easier time
14    if I knew that life in prison did mean life in prison.  Am I
15    making myself clear?
16                      ATTY. JUHASZ:  I think so, and I'm going
17    to try to do it again, and if I get it wrong don't let me put
18    words in your mouth.
19                      MARY JANE O'HARA:  Okay.
20                      ATTY. JUHASZ:  Your concern was that life
21    imprisonment didn't really mean life imprisonment?
22                      MARY JANE O'HARA:  Exactly.
23                      ATTY. JUHASZ:  Just like when you used to
```

1  hear, as Mr. Bailey mentioned about good time, when somebody

2  got 10 years in jail they didn't really get 10 years in jail.

3  And so if I'm reading you right, you would have been more

4  inclined to give the death penalty because it was something

5  very serious and a life sentence that wasn't truly a life

6  sentence would somehow demean the seriousness of that crime.

7  Am I saying that right?

8              MARY JANE O'HARA:  Yes.  Okay, say Joe

9  Smith killed five people.

10             ATTY. JUHASZ:  Uh-huh.

11             MARY JANE O'HARA:  And maybe I knew some

12  of those people.  If I felt that he had any chance of getting

13  out because life in prison did not mean life in prison; is

14  that clear?

15             ATTY. JUHASZ:  Yes, yes.  All right.  So

16  at least when you thought that's the way the law worked, the

17  death penalty might have had more of a leg up because you

18  wanted to make sure that person was truly going to be

19  punished for those horrendous crimes?

20             MARY JANE O'HARA:  That's exactly what I

21  was trying to say and kind of went around the barn with it.

22             ATTY. JUHASZ:  That's okay.  Now, let's go

23  to -- you think you have clear in your mind what those four

4766

1   sentences are under Ohio law?

2                   MARY JANE O'HARA:  Yes.

3                   ATTY. JUHASZ:  Okay.  Let me first tell

4   you that life imprisonment without parole, what lawyers call

5   L-WOP for short, really does mean that.  There are no trick,

6   you know, things; well, yeah, it means life without parole

7   unless the guy, you know, engages in prison industries for 30

8   years and then they'll let him out.

9                   MARY JANE O'HARA:  Right.

10                  ATTY. JUHASZ:  Life imprisonment without

11  parole means just that, okay?

12                  MARY JANE O'HARA:  Okay.

13                  ATTY. JUHASZ:  Okay.  So if that

14  becomes --

15                  MARY JANE O'HARA:  That was a

16  misconception on my part.

17                  ATTY. JUHASZ:  Okay.  If that becomes a

18  vote of a jury, a verdict of a jury in a case, in a capital

19  case, that person goes to jail for the rest of their life and

20  they don't come out until they come out in a box, okay?

21                  MARY JANE O'HARA:  (Nods head

22  affirmatively.)

23                  ATTY. JUHASZ:  Now, there are two other

4767

1   ones though and I want to talk about those for a second.  One

2   is life imprisonment, and again life imprisonment means life

3   imprisonment, but with a qualifier; you have an opportunity

4   for parole after you serve 30 full years, and full years

5   means full years, okay?

6                    MARY JANE O'HARA:  Okay.

7                    ATTY. JUHASZ:  Not -- no good time, none

8   of that stuff.

9                    MARY JANE O'HARA:  Okay.

10                    ATTY. JUHASZ:  I always like to talk about

11   the movie *Shawshank Redemption*.  Have you ever seen that

12   movie?

13                    MARY JANE O'HARA:  Yes, yes.

14                    ATTY. JUHASZ:  I can never remember the

15   character's name, but the guy that Morgan Freeman plays in

16   that movie, in the course of the movie he goes in front of a

17   parole board a couple of times and, you know, at the end they

18   show it, "rejected".  He went in front of the parole board

19   and they rejected him.  Now, I bring that up because if a

20   jury in a case like this says we're giving you life

21   imprisonment with no chance for parole for 30 years, what

22   that means is after 30 full years in prison they go in front

23   of the parole board, it does not mean they will get out.

4768

1     They could get the rejected stamp like Morgan Freeman's

2     character, okay?

3                    MARY JANE O'HARA:  I understand.

4                    ATTY. JUHASZ:  And it also works the same

5     way with the other sentence except the hearing is in 25 years

6     instead of 30.  So it's entirely possible that somebody who

7     gets one of those, let's call them lesser of the four

8     sentences, --

9                    MARY JANE O'HARA:  Could still serve.

10                   ATTY. JUHASZ:  -- could still serve their

11    entire life in prison.

12                   MARY JANE O'HARA:  I understand.

13                   ATTY. JUHASZ:  Now, because of how you

14    feel, would you hesitate to consider those options just

15    because the person may get out, not "will" but "may"?

16                   MARY JANE O'HARA:  It would depend on the

17    circumstances, in weighing the circumstances that we are to

18    weigh and the instructions according to the law.

19                   ATTY. JUHASZ:  No.  Understand, I'm not

20    asking you how you would vote in a particular case.

21                   MARY JANE O'HARA:  Okay.

22                   ATTY. JUHASZ:  All I'm asking --

23                   MARY JANE O'HARA:  Would I consider them?

4769

1          ATTY. JUHASZ:  Yes.

2          MARY JANE O'HARA:  Yes.

3          ATTY. JUHASZ:  Because you understand that

4    all four have to be equal in your mind going in.

5          MARY JANE O'HARA:  I understand.

6          ATTY. JUHASZ:  And what I want to make

7    certain is that if you got to a second phase in a case like

8    this that you wouldn't say, "Well, you know, what?  I'll

9    consider the death penalty, not lightly, but I'll consider

10   the death penalty.  I'll consider life without parole because

11   Juhasz assured me life without parole is life without parole.

12   But, you know, these other two, they might have a chance of

13   getting out and that's just not acceptable to me so I'm not

14   even going to consider them."  I'm not talking about how you

15   would ultimately vote, but would you consider them is what I

16   need to know?

17          MARY JANE O'HARA:  Yes.  This is so

18   hypothetical.

19          ATTY. JUHASZ:  Yeah, I know.

20          MARY JANE O'HARA:  It makes it difficult

21   for me.

22          ATTY. JUHASZ:  I know.  But you would at

23   least consider them?

1                    MARY JANE O'HARA:  Yes, yes.

2                    ATTY. JUHASZ:  I want to talk a little bit

3     about some other things that come up in criminal law cases,

4     and before we do that, I noticed on your questionnaire, and

5     we asked everybody, "In your opinion, what are the problems

6     with the criminal justice system," and you said, "Court case

7     backlog."  And I assume you mean -- well, tell me what you

8     mean.

9                    MARY JANE O'HARA:  That the courts are

10    bogged down with cases and I think it makes it difficult for

11    everybody.  And then, of course, with short staff, you know.

12    The ideal system -- well, that even goes to all levels that

13    have to do, you know, going out from the court to the social

14    services to the law enforcement.  I just meant the whole

15    system.

16                    ATTY. JUHASZ:  Okay.

17                    MARY JANE O'HARA:  That if there was more

18    money, more staff and you would have it less bogged down.

19                    ATTY. JUHASZ:  All right.  And I assume

20    your budget cut answer sort of dovetails into that?

21                    MARY JANE O'HARA:  Oh, exactly.

22                    ATTY. JUHASZ:  And how about the media?

23                    MARY JANE O'HARA:  Well, I think we

1    covered the media pretty much.

2                    ATTY. JUHASZ:  Okay.  All right.  Fair

3    enough.  Have you heard the phrase before "taking the fifth"?

4                    MARY JANE O'HARA:  Yes.

5                    ATTY. JUHASZ:  All right.  And I think

6    sometimes it gets a little bit of a bad rap in the TV and the

7    movies because it's usually some guy whose done lots of bad

8    things and we know that because we've seen the TV show, and

9    he sits in some interview room calmly smoking cigarettes,

10   staring in the corner saying "I'm taking the fifth," and "You

11   know you're hiding something, you guilty SOB."  But actually

12   we need to talk about some other aspects of that fifth

13   amendment.

14             We started out this country after the revolution and

15   after a brief failed attempt with something called the

16   Articles of Confederation with the constitution that we've

17   had for a couple of hundred years now, and attached to that

18   constitution is a Bill of Rights.  The fifth amendment in

19   those Bill of Rights says that you as a citizen accused of a

20   crime do not have to do anything to help the government

21   convict you, okay?  In countries where the government is more

22   authoritative, has more power or people have fewer liberties,

23   it's a different system.  The system is if the government

4772

1    accuses you of something, you're presumed to be guilty and

2    you have to prove yourself to be innocent.  We have just the

3    opposite.  Do appreciate that?

4                    MARY JANE O'HARA:  Absolutely.

5                    ATTY. JUHASZ:  What do you think about

6    that, is that a good idea?  Do we have the right idea or do

7    they have the right idea?

8                    MARY JANE O'HARA:  I think that our

9    country is doing the absolute best they can in considering

10   rights, human rights.

11                   ATTY. JUHASZ:  Okay.

12                   MARY JANE O'HARA:  I think in taking the

13   fifth -- you know, maybe I should let you ask certain

14   questions.

15                   ATTY. JUHASZ:  No.  Go ahead.

16                   MARY JANE O'HARA:  But in taking the fifth

17   not everybody comes off the way they'd like to or the way you

18   want people to perceive you.  Sometimes I get too hyper and I

19   think oh, how am I appearing?  Well, this can be true of

20   everybody.  And if somebody chooses not to testify it may not

21   be for any other reason that they don't know how they're

22   going to be perceived.

23                   ATTY. JUHASZ:  You strike me, as most

4773

1    jurors do who come up here, as somebody that if you get

2    selected for this job, you want to do the best you can and,

3    doggone it, you want to be fair.

4                    MARY JANE O'HARA:  That's right.

5                    ATTY. JUHASZ:  And you've got three

6    children and four grandchildren and somewhere along the line

7    I imagine you've had to mediate a dispute or two along the

8    years, during the years, correct?

9                    MARY JANE O'HARA:  I think so.

10                   ATTY. JUHASZ:  Most times -- pardon me?

11                   MARY JANE O'HARA:  I think so.

12                   ATTY. JUHASZ:  Most of the time when you

13   do that, when any of us do that --

14                   MARY JANE O'HARA:  Yes.

15                   ATTY. JUHASZ:  Excuse me.  When any of us

16   do that it's sort of a natural inclination that before we

17   make a decision, before you decide whether somebody, whether

18   one of your children did something wrong --

19                   MARY JANE O'HARA:  Thank you.

20                   ATTY. JUHASZ:  Sure -- you'll want to hear

21   both sides of the story.  That's kind of how we've learned to

22   do things fairly.  Now, there's a little bit of a tension

23   here, though, and it's because of the fifth amendment.  You

4774

1    want to do things fairly in this case, but unlike that normal

2    situation where, you know, one son accuses the other one of

3    doing something wrong and you have to decide whether he did

4    it, in this case because of the fifth amendment it's a little

5    different situation and you may not hear both sides of the

6    story.  Do you appreciate that?

7                     MARY JANE O'HARA:  (Nods head

8    affirmatively.)

9                     ATTY. JUHASZ:  I like to tell people when

10   we talk about that box that most people think that if the

11   verdict in a criminal case is guilty, the government wins,

12   and if the verdict in the criminal case is not guilty, the

13   defendant wins.  That's not actually true.  If the verdict in

14   a criminal case is guilty the government wins because it

15   carried its burden of proof.  If the verdict is not guilty

16   the government lost its case because it brought the

17   allegations, it sort of represented we have enough proof to

18   convince you folks beyond a reasonable doubt, but they didn't

19   and so they didn't fill up the box.  Do you see that?

20                     MARY JANE O'HARA:  Yes.

21                     ATTY. JUHASZ:  I like to use that box for

22   that reason because the box has to be filled up by the

23   government.  The defendant doesn't put anything into the box

1    and she doesn't take anything out of the box.  Do you see

2    that?

3                    MARY JANE O'HARA:  I understand.  And

4    Attorney Bailey mentioned about the venue and different

5    things like that, that it is the government's duty to prove

6    the situation.

7                    ATTY. JUHASZ:  Right.  Some jurors have a

8    problem.  We had one juror I can recall since we've been

9    working on this case who when Mr. Bailey stood up and said

10   that and they said, "So you mean if you forget to prove that

11   it happened in Trumbull County that we would have to say not

12   guilty," and your oath as a juror would require you to do

13   that.  Some people would regard that as a technicality, but

14   do you have a problem with that or do you not?

15                   MARY JANE O'HARA:  It's hard to hear just

16   like when you read about cases that if rights or searches or

17   whatever aren't done correctly, but that's our laws, and I

18   think the laws are trying to be as fair as they can.

19                   ATTY. JUHASZ:  Okay.  So you have no

20   problem yourself?  You understand that the way our system --

21                   MARY JANE O'HARA:  I might be frustrated

22   but I would follow the directives.

23                   ATTY. JUHASZ:  Okay.  Because of that

1    fifth amendment it's basically when the government says you

2    do something they've got to prove that you did it, if they

3    can prove it.  And if they can, the verdict is guilty.  If

4    they can't prove it, it's not guilty.  You see that?  No

5    problem holding them to that burden of proof?

6                    MARY JANE O'HARA:  No problem.

7                    ATTY. JUHASZ:  All right.  And let's just

8    say, let's just take that little venue example for a second.

9    Mr. Bailey was very complimentary to Mr. Ingram and I.  I'll

10   return the compliment.  He and Mr. Becker are very good

11   prosecutors, but let's just hypothetically say that for

12   whatever reason they forget to prove in this case or some

13   other case that the crime happened in Trumbull County, what

14   lawyers call venue.  Now, you understand from what we've just

15   talked about that the jurors sitting on that case would under

16   their oaths have to say, "Sorry, not guilty.  You didn't

17   prove all the elements.  Even though we think the person you

18   charged is guilty as hell, you didn't prove everything."  Any

19   problem if something like that should happen in this case

20   returning a not guilty verdict?

21                   MARY JANE O'HARA:  Play by the rules.

22                   ATTY. JUHASZ:  All right.  And that's

23   exactly the answer, that is the only way.  And Judge Stuard

4777

1    says this a lot, the only way that we can assure that these

2    trials are fair is that everybody plays by the same set of

3    rules.

4            You've mentioned a couple times that you're going to

5    take some comfort in the fact that Judge Stuard is going to

6    give you the instructions that you need.

7                      MARY JANE O'HARA:  Yes.

8                      ATTY. JUHASZ:  And indeed he will.  I may

9    make you slightly uncomfortable when I tell you that although

10   he'll give you definitions of things, he will not quantify

11   things for you.  I know because my wife is a medical

12   technologist so she's a scientist, you know, she doesn't

13   understand how people like me talk about reasonable doubt and

14   what a reasonable person would do.  It's like, you know, give

15   me black and white.  You will not have that.  You won't get

16   an instruction that says if "X" number of evidence is

17   produced the verdict is guilty beyond a reasonable doubt;

18   otherwise, not.  If "X" number of witnesses are produced the

19   guilty is verdict -- or the verdict is guilty beyond a

20   reasonable doubt; otherwise, not.  He will give you a

21   definition of reasonable doubt but he won't quantify it.  Am

22   I making that clear?

23                      MARY JANE O'HARA:  I think so.  I think

4778

1    that you're saying that I can't rely on him to help me in my

2    job except by giving instructions, and it would be just like

3    me standing there telling you to take the X-rays.  I'm not

4    going to take them for you but I can tell you how to do it.

5                    ATTY. JUHASZ:  Right, exactly.

6                    MARY JANE O'HARA:  Is that --

7                    ATTY. JUHASZ:  Exactly.

8                    MARY JANE O'HARA:  Okay.

9                    ATTY. JUHASZ:  Now, you have to decide

10   whether that silly little box is filled up beyond the line

11   called reasonable doubt and that means that, as Mr. Bailey

12   said, the case doesn't have to be proved beyond a shadow of a

13   doubt or beyond imaginary or foolish doubt, but it's got to

14   be proved beyond any doubt that's based on reason and common

15   sense.  That means if you have one doubt left at the end of

16   considering the government's evidence and that doubt is based

17   on reason and common sense, then they have not met their

18   burden of proof.

19                    MARY JANE O'HARA:  I understand.

20                    ATTY. JUHASZ:  Any problem with that?

21                    MARY JANE O'HARA:  No.

22                    ATTY. JUHASZ:  A lot of people when they

23   make decisions, they sort of put the pros and the cons on two

1    sides of the checklist, whether they do it on paper or in

2    their mind's eye.  You know what I'm talking about?

3                          MARY JANE O'HARA:  (Nods head

4    affirmatively.)

5                          ATTY. JUHASZ:  You have to do the same

6    thing in a case like this.  On the one side would be the

7    reasons why the government says you should convict.  On the

8    other side would be the reasons, doubts that you may have

9    that you've thought about yourself, that the lawyers have

10   brought to your attention or that other jurors have brought

11   to your attention.  If when you're done talking with the

12   other jurors, if you have at least one doubt based on reason

13   and common sense, there's no other way to account for it,

14   then they haven't proved their case.  You see that?

15                         MARY JANE O'HARA:  (Nods head

16   affirmatively.)

17                         ATTY. JUHASZ:  No problem holding them to

18   that type of burden of proof?

19                         MARY JANE O'HARA:  No.

20                         ATTY. JUHASZ:  Okay.  They may ask you to

21   consider and I think Mr. Bailey mentioned circumstantial

22   evidence.  Let me tell you a quick story that I like to tell

23   about that and then I'm going to sit down and not otherwise

4780

1    sully this beautiful afternoon for you .  Let's pretend that

2    it's a little later in the year, say July or August.  It's

3    maybe 5:00 or 6:00 o'clock at night.  It's a bright sunny

4    day, 80 degrees, humid, but the clouds are getting dark in

5    the west and a breeze is starting to kick up and you know

6    pretty soon we're going to get one of those late afternoon,

7    early evening thunderstorms that we get.

8            I'm out in the kitchen making you a glass of iced

9    tea or lemonade and all of a sudden there's a big crash in

10   the living room.  As I go running in to investigate my son

11   Mike's cat is running out between my legs.  I look to my

12   left, there's my son Mike with his hands over his face in

13   obvious distress.  I look to my right and one of my wife Mary

14   Pat's Norman Rockwell plates is off of the mantel shattered

15   in a million pieces on the hearth, and two or three feet away

16   is one of Mike's Nerf balls.  Now, based on that type of

17   circumstantial evidence, and it's circumstantial because I

18   did not see how the plate got broken, you agree?

19                   MARY JANE O'HARA:  (Nods head

20   affirmatively.)

21                   ATTY. JUHASZ:  I suppose that I could say

22   that my son Mike was throwing the Nerf ball like he's been

23   told 600,000 times not to do in the house, broke the plate,

4781

1    scared the cat.  But it also could be that the cat was

2    prancing along along the mantel like she's been told not to

3    and knocked the plate off and Mike says, "I'm going to get

4    blamed for it and I never picked up my Nerf balls and there's

5    one and it's pretty bad evidence for me."  Or it could be

6    that the breeze from the approaching thunderstorm got the

7    best of the plate, the noise scared the cat, and Mike thinks

8    he's going to get blamed for it anyway.

9              Here's my point with all that; when the government

10   asks you to make inferences from circumstantial evidence they

11   have to be reasonable inferences, number one, you see that?

12   And No. 2, if there's some other reasonable inference based

13   on the same evidence, then you would have a reasonable doubt

14   about the inference the government asked you to make.  Would

15   you agree?

16                   MARY JANE O'HARA:  (Nods head

17   affirmatively.)

18                   ATTY. JUHASZ:  If I would -- it would be

19   unfair of me to convict my son Mike beyond a reasonable doubt

20   from that circumstantial evidence I gave you, right?

21                   MARY JANE O'HARA:  (Nods head

22   affirmatively.)

23                   ATTY. JUHASZ:  Any problem holding the

1   government to that kind of burden of proof in this case?

2                     MARY JANE O'HARA:  No.  I have a wonderful

3   example with the blasting.  They blast at noon or 1:00 and

4   all the working people had no idea that the blasting was

5   going on, so you have a cat in the house and things fall off

6   the wall or off the shelf, so I hear you.

7                     ATTY. JUHASZ:  Okay.

8                     MARY JANE O'HARA:  And I have no problem.

9                     ATTY. JUHASZ:  All right.  Any reason why

10  you think you could not serve as a juror on this case?

11                     MARY JANE O'HARA:  No.

12                     ATTY. JUHASZ:  All right.  I appreciate

13  your time and your answers.  Thank you.

14                     MARY JANE O'HARA:  Thank you.

15                     THE COURT:  Does either side wish side

16  bar?

17                     ATTY. BAILEY:  No, Your Honor.  Pass.

18                     THE COURT:  Pass?

19                     ATTY. JUHASZ:  Pass.

20                     THE COURT:  Ma'am, I would ask you -- you

21  will be in the pool from which the alternates are selected

22  here.

23                     MARY JANE O'HARA:  Okay.

4783

1          THE COURT:  I would ask you to be here

2     Monday at 11:00 o'clock.

3          MARY JANE O'HARA:  Monday at 11:00.

4          THE COURT:  I again remind you not to

5     discuss anything about the case, watch anything on TV, read

6     anything in the newspaper until you return, okay?  Thank you

7     so much.

8          MARY JANE O'HARA:  Thank you.

9          THE COURT:  You're excused.  Have a good

10    afternoon, what's left of it here, okay?

11         MARY JANE O'HARA:  Thank you.  You too.

12         (Whereupon, Mary Jane O'hara was added to

13    the pool of prospective alternate jurors and excused for the

14    day.)

15         THE COURT:  I have a note here, folks.

16    There are four people waiting, one more coming in, and Connie

17    has to know what we're going to do for Monday, what kind of

18    message to be put on.  We've told the three or four that we

19    had to be here Monday and told each one of these to be here

20    Monday, so I don't -- I'm assuming we don't have to, unless

21    you want to put it on as a backup, tell the ones to come in

22    at 11:00 o'clock Monday.  I guess it won't hurt to put it on

23    if they call.  The other ones were notified to be here at

4784

1    1:00 o'clock on Monday.  What else do we need by way of a

2    message?

3                    ATTY. INGRAM:  I don't know.  I'm

4    confused.  I don't think anything.

5                    ATTY. JUHASZ:  The alternates are being

6    told to report at 11:00 and the regular jurors at 1:00.

7                    THE COURT:  Right.  So we should have all

8    the bases covered on that.

9                    ATTY. INGRAM:  Right.

10                   ATTY. JUHASZ:  I think so.

11                   THE COURT:  So we don't need a message

12   then for this jury on Monday.  Now, what about the four or

13   five we have downstairs?

14                   ATTY. INGRAM:  I would suggest that you

15   ask 329, Mr. Morgan, to come up and 334, Mr. --

16                   COURT REPORTER:  Brdek.

17                   ATTY. INGRAM:  Brdek.

18                   ATTY. BAILEY:  What about Kahler?  We have

19   two sitting out in the hall.

20                   ATTY. INGRAM:  Well, Ken, if you would let

21   me conclude my thought you would get an answer.  And while

22   I'm on Mr. Bailey, if he spends an hour with one more

23   alternate juror I'm going to have to slit my throat.

1        Both 329 and 334, Mr. Morgan has a receipt for his

2   vacation.  He's clearly gone.  Mr. Brdek indicates, and I've

3   done this so I know what it would be like, he coaches two

4   baseball teams and one soccer team.  We're in the height of

5   his season and it might be a problem.

6                  THE COURT:  That leaves what, three more

7   down there then?

8                  CAPTAIN BACON:  Two more.  Oh, yeah,

9   three.

10                  THE COURT:  Well, let's bring those two

11  up, and if you don't mind taking them out of order and get --

12  see if they're going to be excused or not.

13       I never heard this, L-WOP.

14                  ATTY. BAILEY:  I never heard it either.

15                  ATTY. JUHASZ:  You never heard L-WOP?

16                  ATTY. BECKER:  You never heard of that?

17                  ATTY. INGRAM:  Unlike Mr. Bailey, however,

18  when you heard it in the context -- off the record.

19                  (Whereupon, a discussion was had off the

20  record.)

21              **PROSPECTIVE JUROR ROBERT D. MORGAN**

22                  THE COURT:  Good afternoon.

23                  ROBERT D. MORGAN:  Good afternoon, sir.

1    How are you today?

2                        THE COURT:  Oh, I'm doing fine, thank you.

3                        ATTY. INGRAM:  Here you go, Your Honor.

4                        ATTY. JUHASZ:  You need a copy, judge?

5                        THE COURT:  I got it right here.  I'm

6    having more trouble keeping track of these things.

7    Mr. Morgan, did you have something that came up after you

8    filled this out that was going to cause you a problem?

9                        ROBERT D. MORGAN:  No, this had been --

10                       THE COURT:  I'm sorry?

11                       ROBERT D. MORGAN:  This had been in the

12   plans for quite some time.

13                       THE COURT:  Okay.  You have plans to go,

14   when is that?

15                       ROBERT D. MORGAN:  Leaving here May 22nd.

16                       THE COURT:  May 22nd.

17                       ROBERT D. MORGAN:  May 22nd.

18                       THE COURT:  Okay.  You would rather go to

19   that than sit on this trial?

20                       ROBERT D. MORGAN:  I think so.

21                       THE COURT:  Okay.

22                       ATTY. INGRAM:  No objection.

23                       ATTY. BAILEY:  No objection, Your Honor.

4787

1              ATTY. BECKER:  No objection from the

2   State, particularly since he has fantastic airfare.  Two

3   hundred and some bucks to Seattle, that's pretty good

4   airfare.

5              THE COURT:  Okay.  Listen, we appreciate

6   your time and your participation in this whole process.  It's

7   -- I know many of your number feel that we've taken some of

8   your time unduly and that, let me assure you, is not the

9   case.  We've tried to keep this moving along as expeditiously

10  as possible.  We do thank you for your time.  You're excused.

11  Good luck to you.

12              ROBERT D. MORGAN:  Thank you, sir.

13              THE COURT:  The record will show pass for

14  cause.

15              ATTY. BAILEY:  You have a good trip.

16              ROBERT D. MORGAN:  Thank you.

17              ATTY. JUHASZ:  Have a good trip.  Excused

18  for cause you mean, judge?  Excused for cause?

19              THE COURT:  I'm sorry?

20              ATTY. JUHASZ:  It's excused for cause?

21              THE COURT:  Excused for cause, yeah.  I

22  see you folks are filling in for my bailiff.  That's fine.

23              (Whereupon, Robert D. Morgan was dismissed

4788

1    from the pool of prospective alternate jurors for cause.)

2                  **PROSPECTIVE JUROR JOHN M. BRDEK, JR.**

3                        THE COURT:  Good afternoon.

4                        JOHN M. BRDEK, JR.:  Hello.

5                        THE COURT:  Are you tired of waiting

6    around for us yet?

7                        JOHN M. BRDEK, JR.:  No.  It wasn't too

8    bad.

9                        THE COURT:  Well, okay.  We thank you for

10   that.  We've tried to keep it moving, believe me.  You had

11   something that's come up?

12                       ATTY. INGRAM:  Here you go.

13                       THE COURT:  Oh, yes.  You're the busy

14   fellow.  One of these gentleman says that he appreciates what

15   you're doing because he's done the same thing.  This is your

16   busy season?

17                       JOHN M. BRDEK, JR.:  It happens to be,

18   yes.  Primarily I help.  I'm not managing baseball right now,

19   I'm helping the coach, but I do manage a soccer team, too.

20                       THE COURT:  Oh, okay.

21                       JOHN M. BRDEK, JR.:  And it's fun with the

22   kids.

23                       THE COURT:  Yeah.

1           JOHN M. BRDEK, JR.:  That's where my spare

2    evening time goes.

3           THE COURT:  Rather intense during this

4    period of the year.  That undoubtedly would interfere in a

5    lot of different considerations, a lot of plans that you've

6    already made to do that, and if you were required to be here

7    that would be disconcerting, would it not?

8           JOHN M. BRDEK, JR.:  Possibly.  Generally

9    our games aren't until 6:00 in the evening, which, you know,

10   I would usually need about a half an hour or 45 minutes to be

11   available for that.  Practice sessions will be over in about

12   the next week or two and then our games will begin.

13          THE COURT:  You've got the situation of

14   possible sequestration where you're kept together.  We don't

15   know how long that would be.  Well, you know, it's up to you.

16   Both sides here have drawn this to my attention and it's

17   really your call.  We would not wish to have you seated here

18   and then have something else on your mind.  We usually get

19   out of here by 4:30, but there are times, depending if we

20   have a witness from out of town or something, we might go

21   later than that.  And I can see where that would put an undue

22   pressure on you if you had to be out of here and make your

23   arrangements to be home by that time, but you tell us.  If

1    you wish to serve, that's fine.  If you wish not to, say

2    that.

3                    JOHN M. BRDEK, JR.:  I was hoping that you

4    people would make that call for me.  I understand that it's

5    my obligation and duty to do this.  However, I am flexible as

6    far as time restraints.  I tend to juggle work and children

7    and grandchildren accordingly.  I really can't answer that

8    question because I do stay quite busy and I do try to keep a

9    schedule going.

10                   THE COURT:  But let me ask you this, if --

11   what part of the season are you in right now, you just

12   started?

13                   JOHN M. BRDEK, JR.:  Just beginning, yes.

14   Basically games and both baseball and soccer would be over

15   about the second week of July, so it's about a six to an

16   eight week season.

17                   THE COURT:  Yeah.  Well, let me ask you

18   this, assume that you agree to stay or you're selected to

19   stay and you find that due to the time elements involved here

20   that maybe you miss a game or two.  Is that going to be

21   something that's going to be that much concern to you or is

22   there somebody else that can cover?

23                   JOHN M. BRDEK, JR.:  Somebody else can

 1   cover.  I do have an assistant coach for soccer.  And, like I

 2   say, I'm not managing baseball this season, I'm assisting the

 3   coach.  As far as time restraints, missing my daughter versus

 4   my son, that's already inevitable because there are times

 5   when they both have a game.  My wife and I have to split up

 6   in different directions.

 7                    THE COURT:  Try and make them all but you

 8   can't.

 9                    JOHN M. BRDEK, JR.:  Oh, sure.  There was

10   a time when that bothered me.  When I elected to work

11   overtime and my son scored his first soccer goal, I was

12   devastated and that bothered me, but I'm past that now.  That

13   was six years ago.

14                    ATTY. INGRAM:  That would still bother me.

15                    JOHN M. BRDEK, JR.:  Well, it does.

16                    ATTY. INGRAM:  You missed the first one.

17                    JOHN M. BRDEK, JR.:  But since then they

18   play year-round, they play indoor, they have scored goals.  I

19   love to watch them, but there's also times I don't like to

20   watch them.

21                    THE COURT:  It's the dad that never shows

22   up, it's the dad that never shows up that sticks out.

23   Approach for a moment.

4792

1                    (Whereupon, a bench conference was held.)

2                    ATTY. INGRAM:  My kids, by the way, are

3      both done with soccer.  My youngest, it was his senior season

4      so I no longer have to go to all of those games, although I

5      am going to miss it.  Here's all we need to know, if we

6      sequester you and take you away from the sporting

7      responsibilities for two separate periods of time, maybe up

8      to five days each, I can't tell you that, but let's just

9      assume five days each, is that something that would pose such

10     a problem for you that you feel it would be a hardship and we

11     should let you go?  We're going -- we're letting you make

12     this decision.

13                    JOHN M. BRDEK, JR.:  I'm going to have to

14     think for a second here.

15                    ATTY. INGRAM:  Take your time.

16                    JOHN M. BRDEK, JR.:  Would I still be

17     allowed to see my children once a day?

18                    ATTY. INGRAM:  Not during sequestration,

19     no.

20                    JOHN M. BRDEK, JR.:  Not at all.  That's

21     something I've never done, not seeing them, not even walking

22     into the bedroom if I work overtime.

23                    ATTY. INGRAM:  Well, you don't get to go

4793

1    home.

2                    JOHN M. BRDEK, JR.:  Okay.  Can you give

3    me a time line when this may be, if it were after sports or

4    during, because, like I say, most everything would be over in

5    about six to eight weeks?

6                    ATTY. INGRAM:  Yeah, both of these will be

7    right within that six to eight week period, if there are two.

8    The first time will probably be around the end of May, the

9    beginning of June, and if there is a second sequestration it

10   would probably be a week later.

11                   JOHN M. BRDEK, JR.:  I can't say that I

12   wouldn't do that, but would it bother me slightly?  Probably.

13   Would I do it?  Certainly.  For instance, I don't care to go

14   to work at the mill every day, but I do it.  It's what I have

15   to do.

16                   ATTY. INGRAM:  What I think, I don't know

17   that any of us are making ourselves clear.  We're actually

18   offering you a pass.  If you want the pass, say yes.  If you

19   don't, say nay and we'll just carry on.

20                   JOHN M. BRDEK, JR.:  Okay.  Again, it's a

21   decision I didn't think I would have to make.  It's

22   interesting to serve but it's also kind of, if I could speak

23   freely, kind of a pain.

4794

1              ATTY. INGRAM:  Yeah.

2              JOHN M. BRDEK, JR.:  Because --

3              ATTY. BECKER:  You're the first person

4    that's ever said that.

5              JOHN M. BRDEK, JR.:  Well, just being a

6    human being, I mean, you know, we're used to our own routine.

7    You know, sometimes a different routine is kind of

8    interesting and sometimes it can get old.  Granted, you know,

9    I've worked 30 years at WCI, it's very old, you know, so

10   looking at this beautiful building and being around different

11   people is kind of interesting.  Breaking my evening routines

12   with the children, that would perhaps bother me a little bit,

13   but, you know, life goes on.  I tend to work overtime also

14   and I'm away from the kids and I do miss some practices and

15   games.

16             THE COURT:  May I suggest this, if there's

17   no objection, to have this gentleman come back Monday if he

18   wishes to participate and give him the weekend to think about

19   it?

20             ATTY. BECKER:  Excellent idea.

21             ATTY. JUHASZ:  That's fine.

22             THE COURT:  And if you don't wish to come

23   in we know that you decided against coming in.

4795

1              JOHN M. BRDEK, JR.:  Well, what shall I

2      do, come at a certain time or call to come in?

3              THE COURT:  That would help if you call,

4      but if you're willing to participate then come in Monday at

5      9:00, okay?

6              JOHN M. BRDEK, JR.:  Okay.

7              THE COURT:  Because we have a few more

8      that we're going to question at that time.  That will give

9      you time to discuss what you're doing with your kids, your

10     wife, and I know you have mixed feelings at this point in

11     time.

12             JOHN M. BRDEK, JR.:  Certainly.

13             THE COURT:  So be back here at 9:00

14     o'clock in the morning or call in and talk to Connie

15     downstairs and tell her that you've decided that you would

16     accept the ability to be removed for cause, okay?

17             JOHN M. BRDEK, JR.:  Okay, judge.  Thank

18     you.

19             THE COURT:  Fair enough?

20             JOHN M. BRDEK, JR.:  Yes.  I'm just

21     shocked that our time would be at the same time when playoffs

22     would be and, you know, we don't know how long this trial is

23     going to take.

4796

1              THE COURT:  No, that's too much to ask to

2    have any idea there.  And, you know, we can't, none of us can

3    do very much about the timing of this whole thing, or any

4    case really.  Okay.

5              JOHN M. BRDEK, JR.:  Okay.  Am I done?

6              THE COURT:  You're done.

7              JOHN M. BRDEK, JR.:  Okay.  Thank you.

8              THE COURT:  Thank you very much.  Thank

9    you, now.

10             (Whereupon, John M. Brdek, Jr. was

11   dismissed from the pool of prospective jurors and excused for

12   the day, after which a discussion was had off the record.)

13             **PROSPECTIVE JUROR TROY KAHLER**

14             THE COURT:  Good afternoon.  Have a seat

15   there.

16             TROY KAHLER:  Good afternoon.

17             THE COURT:  You're Troy?

18             TROY KAHLER:  Yes.

19             THE COURT:  You read that handout that was

20   given to you?

21             TROY KAHLER:  Yes.

22             THE COURT:  You have a pretty good idea of

23   why we're here.  This case is State of Ohio versus Donna

4797

1    Roberts.  She's charged with two counts of aggravated murder

2    with specifications.  Under the law of Ohio just because a

3    person is involved or commits a murder does not mean that

4    they automatically face the death penalty.  The scheme

5    arrived at by the legislature in drafting the law says that

6    aggravated murders committed under certain circumstances, and

7    if those circumstances are attached to the indictment as

8    specifications, then that raises the possibility of the jury

9    having to consider the death penalty.

10        The burden is upon the State to prove each and every

11   element of the crimes of aggravated murder with the

12   specifications.  We do that beyond a reasonable doubt, and if

13   the State is unable to do that, then this jury would properly

14   make a finding of not guilty of the charges.  If the State,

15   however, is able to carry that burden of proof and this jury

16   would return a finding of guilty, then the matter would go to

17   a second hearing, and only then.

18        And one thing to keep in mind is that the State wins

19   or loses the case.  The defendant need not participate or do

20   anything if they care not to.

21        We have no way of foreseeing what this jury will do.

22   There's been no evidence produced yet.  It may not get to a

23   second phase, but if we do it's too late at that time to make

4798

1    inquiry about each individual juror's thoughts or beliefs on

2    the death penalty, and we could run into a situation where

3    you have someone who firmly believes in an eye for an eye, if

4    you  kill someone you should lose your life.  That person

5    could not be fair to any defendant.

6          The defendant has the right to require at that

7    second phase that the prosecution prove beyond a reasonable

8    doubt that the aggravating circumstances outweigh the

9    mitigating factors.  And the purpose for that second hearing

10   is for the State to produce evidence showing reasons why the

11   jury should consider and impose a death penalty due to the

12   aggravating circumstances.  And the jury would be presented

13   with mitigating factors or could consider mitigating factors

14   that would speak in favor of why they should not impose the

15   death penalty, and again the State has to carry the burden of

16   proof of beyond a reasonable doubt.

17         Likewise, if we waited to that point and had a

18   person or persons who through religious or moral convictions

19   could never participate in making such a decision, then the

20   State would not be able to get a fair trial.  The State under

21   the law is entitled, if they prove their case beyond a

22   reasonable doubt, to request of this jury, if we get to the

23   second phase, for the consideration, and if the facts warrant

```
 1    it, to a recommendation of the death penalty, so the only

 2    practical thing we can do is question everybody up front.

 3              Now, it doesn't matter what your personal views are

 4    on this.  You're entitled to your opinion.  Everyone here

 5    will give due reference -- or deference to that.  It is

 6    important, however, that they have the assurance of each of

 7    these people to be seated that they're able to follow the

 8    law, and that means that whether they agree or disagree to

 9    some degree with the law, they have to follow it.  Everybody

10    has to be able to do that or somebody isn't going to receive

11    a fair trial.

12              The other thing that you will be asked about is

13    pretrial publicity, whether you've been exposed to such and

14    whether it is so fixed in your mind that you're not able to

15    set it aside.  In order for this case again to be tried

16    fairly each one of these jurors will have to depend on

17    evidence that is presented in this courtroom, and that alone,

18    in making a determination here.  Okay?

19                        TROY KAHLER:  Uh-huh.

20                        THE COURT:  Fair enough.

21                        TROY KAHLER:  Yes, sir.

22                        ATTY. BECKER:  Thank you, Your Honor.

23                        ATTY. BECKER:  I want to make sure, is it
```

4800

1    Mr. Kahler?

2                        TROY KAHLER:  Yes, Kahler.

3                        ATTY. BECKER:  Okay.  Mr. Kahler, my name

4    is Chris Becker.  I'm with the Trumbull County prosecutor's

5    office.  You've already met Mr. Bailey about a month ago --

6                        TROY KAHLER:  Yes.

7                        ATTY. BECKER:  -- down in the large

8    courtroom here.  We're going to try and move as quickly as we

9    can and ask you these questions.  I apologize for keeping you

10   here today, a nice Friday afternoon after the storms have

11   sort of cleared out.  I want to stress, though, before we

12   begin that, just to reiterate what the Court said, there are

13   no right or wrong answers in this case.

14                       TROY KAHLER:  Uh-huh.

15                       ATTY. BECKER:  No one is here to try and

16   change your views or your opinions.  We've had probably more

17   people excused from this case than we've kept as jurors

18   because of various reasons; they could not impose the death

19   penalty for whatever reasons, they would automatically impose

20   the death penalty for whatever reasons.  We've had people

21   that have known some of the witnesses, some members of the

22   Howland Police Department, and we've had people who knew the

23   defendant or her family or the victim and their family, so

1     it's a variety of reasons why jurors sometimes can't serve.

2     Even in a larger county like Trumbull County, it's

3     interesting to see how many people are intertwined with each

4     other and know each other.

5                With that said, I'm going to touch upon the two

6     areas that the Court mentioned, the publicity as well as the

7     death penalty, and then we're going to talk generally about

8     criminal law concepts.

9                I notice in your questionnaire, and the only reason

10    I want to start out here is because it was a little confusing

11    to me.  There was a question that said, "State whether you

12    believe that certain crimes should require a sentence of

13    death," and you said no.  Do you recall that?  You wrote yes

14    and then you scratched it out.

15                         TROY KAHLER:  Right.

16                         ATTY. BECKER:  Okay.  Is that because you

17    do not believe in the death penalty?

18                         TROY KAHLER:  Certain -- okay, certain

19    crimes requiring the death penalty?

20                         ATTY. BECKER:  Yeah, and maybe I'll just

21    show it to you.  It may be easier.

22                         TROY KAHLER:  I'm sorry.  It's been a

23    while since I've did this.

4802

1                    ATTY. BECKER:  There's no test on this.

2                    TROY KAHLER:  It's been a while since I

3       did this.

4                    ATTY. BECKER:  I understand.

5                    TROY KAHLER:  Oh, I had yes on there.  I

6       didn't realize that there was require, "State whether you

7       believe that certain crimes should require a sentence of

8       death," all of them, and my answer was no.

9                    ATTY. BECKER:  All right.  And is that

10      still your answer?

11                   TROY KAHLER:  Yes.

12                   ATTY. BECKER:  Okay.  So you don't believe

13      that there should be any crimes that require a sentence of

14      death?

15                   TROY KAHLER:  I interpreted that to state

16      that all crimes of this nature should.

17                   ATTY. BECKER:  Okay.  So it was a

18      misunderstanding?

19                   TROY KAHLER:  Yeah.

20                   ATTY. BECKER:  Okay.  You then do believe

21      that some crimes should?

22                   TROY KAHLER:  Some crimes should.  I'm

23      stating that not all should automatically.

4803

 1              ATTY. BECKER:  Okay.  And that's probably,

 2    I mean, that's a very good interpretation of what our law is.

 3    Of course not every crime requires the death penalty.  Thefts

 4    and robberies and burglaries don't.

 5              TROY KAHLER:  Right.

 6              ATTY. BECKER:  And we have had some people

 7    come in here and say look, if you rape a child you should get

 8    the death penalty.  Well, that's not the law in Ohio.  Well,

 9    with that said then, I assume that you've had this opinion

10    for a while, that some crimes, not all crimes, but some

11    crimes should be punishable by the death penalty?

12              TROY KAHLER:  I would say yes.

13              ATTY. BECKER:  All right.  And you

14    understand that if you were selected for this jury you may,

15    if we get to that point, be asked to impose a verdict

16    yourself with your fellow jurors calling for the death

17    penalty?

18              TROY KAHLER:  (Nods head affirmatively.)

19              ATTY. BECKER:  Do you believe that you

20    could do that if you were called upon?

21              TROY KAHLER:  Oh, given the information

22    that Judge Stuard said, if need necessary, yes.

23              ATTY. BECKER:  So if the State were to

4804

1    prove its case and prove to you beyond a reasonable doubt

2    that the death penalty is warranted and the facts permitted

3    it, you could envision yourself going back into this jury

4    room in this courtroom and signing a piece of paper with 11

5    other jurors calling for the imposition of the death penalty?

6              TROY KAHLER:  If so warranted.

7              ATTY. BECKER:  And it may not be warranted

8    either.

9              TROY KAHLER:  Correct.

10             ATTY. BECKER:  We have to have jurors that

11   are going to fairly consider all four of the options that you

12   were given on that piece of paper down there.  Do you believe

13   that you are the type of juror who could fairly consider all

14   four of those options?

15             TROY KAHLER:  Definitely.

16             ATTY. BECKER:  All right.

17             TROY KAHLER:  I am really, because of the

18   business that I work in in the industry, I have very eclectic

19   interests and I review varied genres seriously and I feel

20   that I would have the ability to consider all the evidence

21   and, again, if necessary.

22             ATTY. BECKER:  All right.  And that would

23   be the kind of person we're looking for here actually.  We're

```
 1    looking for someone who is not going to come in -- let me

 2    back up a little bit.  This is going to be a case that

 3    involves two trials really.  It's really two trials and it's

 4    the only case in the criminal jurisdiction that really

 5    requires two trials.  The first it going to be whether she's

 6    guilty or innocent --

 7                    TROY KAHLER:  Correct.

 8                    ATTY. BECKER:  -- and whether or not

 9    Mr. Bailey and I can prove that to you.  We may not be able

10    to prove to you that she's guilty beyond a reasonable doubt.

11                    TROY KAHLER:  Uh-huh.

12                    ATTY. BECKER:  And in that case we

13    wouldn't even have to worry about this death penalty.  As the

14    Court explained, we're doing this as a precautionary measure

15    and we're being presumptuous because if we get to that second

16    phase Mr. Bailey and I and the other attorneys in this case,

17    we can't come and say, "Okay, we found her guilty.  Now,

18    jurors, we're going to ask you to see if you can impose the

19    death penalty," because obviously those people that could not

20    would raise their hands and say, "Hey, I'm out of here.  I

21    can't do that," and that's not fair to the State.  And it

22    also wouldn't be fair to the defendant if the people that

23    were so in favor of the death penalty said, "Oh, yeah, this
```

1    is what we've been waiting for."  So, you see, we have to get

2    a fair and even keel of jurors.

3                    TROY KAHLER:  Uh-huh.

4                    ATTY. BECKER:  So if we get to the second

5    phase you're not of the mind set that any one of those four

6    penalties would have a head start on the other ones?

7                    TROY KAHLER:  No.

8                    ATTY. BECKER:  You would consider them

9    basically 25 percent?  You would basically have, you know,

10   four options, 25 percent each you would give them

11   consideration?

12                   TROY KAHLER:  Correct.

13                   ATTY. BECKER:  All right.

14                   TROY KAHLER:  And, again, part of it is my

15   profession.  I daily have to take data from sources all over

16   the world and sort of varied information and then make

17   decisions so.

18                   ATTY. BECKER:  Okay.  So this is a little

19   bit, I suppose serving on jury service is a little bit

20   similar to what you do on a daily basis in your work.

21                   TROY KAHLER:  Uh-huh.

22                   ATTY. BECKER:  With that said, I want to

23   ask you a little bit about any publicity you may have heard

1    about this case.  And, if I'm familiar, you don't know -- or

2    if I'm correct, you don't recall any of the testimony or --

3    I'm sorry, any of the coverage of this case?

4                    TROY KAHLER:  Gentlemen and ladies, I

5    travel frequently for Borders.  We have 10 stores in

6    northeastern Ohio and I spend about a thousand miles a month

7    on the road.

8                    ATTY. BECKER:  Okay.

9                    TROY KAHLER:  I have to be honest and tell

10   you I have no idea what this case is about.

11                   ATTY. BECKER:  And that's --

12                   TROY KAHLER:  I didn't even know that

13   Howland was involved until you mentioned Howland, so I don't

14   know when it was, I don't know where it took place.  I'm

15   realizing that it's Trumbull County because we're all here

16   today.  And if I had a life because of my commitments for

17   employment, I would probably know something about this

18   otherwise.

19                   ATTY. BECKER:  Absolutely.  And in all

20   honesty, sometimes that's a better type of juror to have, is

21   someone who doesn't know anything about this, because

22   obviously people that watch the news or television, and I'm

23   assuming you're familiar with Lacey Peterson in California or

1    something?

2                         TROY KAHLER:  (Shaking head negatively.)

3                         ATTY. BECKER:  Or O.J. Simpson?

4                         TROY KAHLER:  No, actually I met Johnny

5    Cochran this past fall.

6                         ATTY. BECKER:  Oh, okay.

7                         TROY KAHLER:  And one of the reasons why

8    I'm here, Johnny Cochran was very -- I spent an evening with

9    him -- was very adamant that if you were ever called for,

10   selected for jury duty service that it was imperative that

11   you, you know, participate to the fullest extent, so.

12                         ATTY. BECKER:  And that's good advice and

13   we appreciate that.  We get a lot of people up here that just

14   want to shake their head and nod their head and say yeah, you

15   know, or I don't know.  And this is really the only point in

16   this case where anybody is going to get to speak to you and

17   you're going to get to speak to us because if you're seated

18   on this jury, not that we want to be rude, but we can't speak

19   to you, we can't talk to.

20                         TROY KAHLER:  Oh, yeah, I'm aware of that.

21                         ATTY. BECKER:  Well, let me get into some

22   general criminal concepts then, and I'm sure you've run

23   across these phrases and these terms.  First of all, I'm

1      assuming you've run across the presumption of innocence?

2                        TROY KAHLER:  Uh-huh.

3                        ATTY. BECKER:  And you're familiar with

4      that term that under the American judicial system and our

5      criminal justice system every defendant, not just this

6      defendant, has what's called the presumption of innocence and

7      that presumption stays with them unless and until the State,

8      which in this case is Mr. Bailey and I, can prove her guilty

9      beyond a reasonable doubt.  You'll be willing to give

10     Mrs. Roberts her presumption of innocence throughout these

11     proceedings, correct?

12                        TROY KAHLER:  Correct.

13                        ATTY. BECKER:  Under that presumption of

14     innocence and because of that it is our burden and our burden

15     only to prove something to you in this case, you and your

16     fellow jurors.  Miss Roberts does not have to present

17     anything to you.  She doesn't have to present one witness.

18     She doesn't have to cross examine anyone.  She doesn't have

19     to have her attorneys do anything.  It's entirely incumbent

20     upon us in both of these parts of this trial, the guilty

21     phase as well as the second phase, to prove first that she's

22     guilty of the crimes charged, and second, that the death

23     penalty is warranted, if we get to that phase.  You will not

1   make her prove anything to you, is that correct?

2                    TROY KAHLER:  I understand.

3                    ATTY. BECKER:  You just have to answer

4   verbally.

5                    TROY KAHLER:  I understand, sir.

6                    ATTY. BECKER:  Now, hand in hand with the

7   presumption of innocence is the concept of reasonable doubt,

8   and again I'm assuming you've heard of that concept?

9                    TROY KAHLER:  Yes.

10                   ATTY. BECKER:  And maybe read novels or

11  listened to radio programs or television shows, movies,

12  whatever.  That concept was once explained to me by basically

13  taking a glass of water.  There are basically three standards

14  of proof in American jurisprudence.  There's the

15  preponderance of the evidence, which is the type of evidence

16  that's needed when you sue somebody.  Someone rear ends you

17  while you're traveling taking care of those 10 stores,

18  Borders stores, and you're not at fault, the other guy is at

19  fault.  You get one of these guys from TV that's going to,

20  you know, get you a million dollars and fight the insurance

21  companies and you come to court.  That's the preponderance of

22  the evidence.  Basically it's a glass of water that's half

23  full with one more drop of water poured into it.  You win the

1    case if you can prove it by a preponderance of the evidence.

2    If you can fill that glass up to half way and put a drop of

3    water in, you win, you get your money, you get your new car,

4    your injuries for your back or your neck or whatever.

5           There's another concept called clear and convincing

6    evidence, and the professor I had basically defined that as

7    75 percent full.  If you fill that cup up three-quarters of

8    the way, that is proving something by clear and convincing.

9           Neither of those two standards are going to be

10   relevant to this particular case.  What's relevant to this

11   case, of course, is the highest standard of proof, which is

12   proof beyond a reasonable doubt.  Proof beyond a reasonable

13   doubt is getting pretty close to the top of that cup.  And if

14   I were to fill that cup up and carry it over to you, it's

15   probably not so full that I would have to take little tiny

16   baby steps because it's so full that I wouldn't want any

17   water to spill out of it, but I also couldn't just, you know,

18   kind of walk over and saunter over.  It's somewhere between

19   maybe an inch or a half an inch from the top of that glass,

20   because if you require us to fill it to the top, that's all

21   doubt, if you look at it that way.  Filling that cup up to

22   the very top is all doubt.  We will never win our case.  We

23   probably wouldn't win any case because there are very few

1  things in life that Mr. Bailey or I or any other prosecutor

2  can prove to you beyond all doubt, and I'm going to give you

3  a very simple illustration of that.

4       I'm standing here and I've got a wedding ring on my

5  left finger.  I've got pictures of my wife and kids in my

6  wallet.  I could probably call my wife up and she could

7  probably be down here from Cortland in probably about half an

8  hour and have her bring all four of my kids, assuming my

9  youngest isn't taking his nap.  She might not be happy about

10  it, but I could ask her to do that.

11       They could probably sit in this front row on the

12  bench here and my kids would probably wave at me and say,

13  "Hi, daddy," and my girls may want to come up here and give

14  me a hug or something, and that's probably proof beyond a

15  reasonable doubt that I'm married.  I got a wife here, I got

16  kids.

17       But even if you requested more, even if I said,

18  "Hey, bring down the wedding photo album when we got married

19  12 years ago," and she brings down the photo album and it's

20  got pictures of us at a big party and she's dressed in a

21  wedding gown and we're cutting the cake and she's jamming it

22  in the my face like they do, that would probably be proof

23  beyond a reasonable doubt because you're going to use your

1    reason and common sense and say, "Well, listen, the guy's got

2    a ring on; he's going to show me pictures; he brought these

3    kids down here; he's got a photo album of this wedding. He's

4    probably married."

5    But there's some people that are going to want us to

6    prove that beyond all doubt, and even if I presented a

7    marriage certificate and the records from the church somebody

8    may say, "Well, you know, boy, those kids, they could be

9    anybody. And maybe he just dressed up and posed for these

10   pictures that are in this photo album and maybe these

11   documents were created on some high, you know, fancy laser

12   jet printer and they're not even authentic. You know, I need

13   something more to prove to me." Well, that's sort of proving

14   it beyond all doubt, and I can't prove anything to you, even

15   the fact that I'm married and have four kids, to you beyond

16   all doubt. I suppose maybe if I showed you all my bills

17   maybe that would --

18                    TROY KAHLER: Yeah, that's what I was

19   thinking about.

20                    ATTY. BECKER: But some people would hold

21   us to the unattainable standard of proof beyond all doubt and

22   require us to fill that glass of water to the very top. I'm

23   assuming you would not require the State to prove to you

1    beyond all doubt anything in this case, just reasonable

2    doubt?

3                    TROY KAHLER:  I would have to take all of

4    the data and review it and then make my decision.

5                    ATTY. BECKER:  Okay.  And if it was

6    reason, if it was based on reason and common sense, and

7    that's one of the dangers sometimes of dealing with people

8    that are a little bit more -- I'm assuming you're a little

9    bit more number oriented, analytical or more number oriented?

10                   TROY KAHLER:  (Nods head affirmatively.)

11                   ATTY. BECKER:  And sometimes, especially

12   in the court, we can't quantify anything for you.  We can't

13   say listen, the State -- the instruction is not going to be

14   if the State presents to you "X" amount of witnesses and you

15   believe 90 or 95 percent of them, that's reasonable doubt, or

16   95 percent of what they say.  It's going to be a reason based

17   on, it's going to be a reason -- let me start again.  It's

18   going to be, reasonable doubt is going to be a reasonable

19   doubt based on reason and common sense, and we really can't

20   quantify it because every person is going to have a different

21   idea of that.  But you will do that and you will not hold us

22   to proof beyond all doubt of anything in this case, will you?

23                   TROY KAHLER:  I would again be willing to

 1   review the documentation and make a decision.

 2                    ATTY. BECKER:  As well as the testimony

 3   and recall the testimony, whatever documents and physical

 4   evidence we would present to you?

 5                    TROY KAHLER:  Correct.

 6                    ATTY. BECKER:  You feel comfortable that

 7   you can make those kind of determinations?

 8                    TROY KAHLER:  I hope so.

 9                    ATTY. BECKER:  Do you feel comfortable you

10   can make those kind of determinations, first of all, in a

11   case that's involving the death of another individual, a

12   homicide case?

13                    TROY KAHLER:  Yes.

14                    ATTY. BECKER:  And do you feel comfortable

15   that if we were able to prove our case again beyond

16   reasonable doubt that you would be able to impose the death

17   penalty if we got to that second phase and were able to show

18   beyond a reasonable doubt that the death penalty was

19   warranted, that these aggravating circumstances outweighed

20   the mitigating factors, which are the bad things?  Those are

21   the terms we're going to use when we get there.

22                    TROY KAHLER:  Again, if the information

23   warranted it, yes, I would consider.

1          ATTY. BECKER:  And you would consider it

2    equally with those other four options?

3          TROY KAHLER:  Correct.

4          ATTY. BECKER:  Now, every criminal case

5    involves a little bit of, particularly this kind of case, may

6    involve a little bit of sympathy.  You are going to hear and

7    see testimony and exhibits, because this is a case involving

8    the death of a human being, you're going to see photographs

9    of this individual, you're going to hear testimony about the

10   cause and manner of death.  Would that cause you any concern

11   in terms of the type of person you are, because we don't know

12   you, to think, "Boy, this is a very serious case.  This

13   individual is dead.  I know Mr. Bailey and Mr. Becker didn't

14   really present to me a case beyond reasonable doubt, but I

15   can't let this woman go out of here.  They didn't really

16   prove the case but I'm going to find her guilty because of

17   just the fact that someone's dead"?  I guess what I'm saying

18   is you wouldn't be so sympathetic to the victim and his

19   family that you felt you had to come back with a verdict of

20   guilty?

21          TROY KAHLER:  I feel that I would be able

22   to weigh again the information at hand.

23          ATTY. BECKER:  You would be able to

1   separate any feelings you would have of sympathy?

2                    TROY KAHLER:  Correct.  Correct.

3                    ATTY. BECKER:  And, additionally, you may

4   sit in this courtroom for three or maybe even four weeks as a

5   juror and you may become familiar just through seeing her,

6   Ms. Roberts, and you may say to yourself, "Boy, Mr. Bailey

7   and Mr. Becker really proved to me a lot of things.  I

8   believe she's guilty beyond a reasonable doubt, but I don't

9   want to find her guilty because I've seen her, she seems like

10  a nice older lady, and I really don't want to find her guilty

11  because, boy, I just feel so bad for her.  She sits over

12  there, she talks to her attorneys.  I've seen her smile a few

13  times.  I would hate to find her guilty."  You wouldn't do

14  that either, would you?

15                   TROY KAHLER:  I feel confident that I

16  could review the information and make an educated decision.

17                   ATTY. BECKER:  Okay.  All right.  In this

18  case there are four charges; there's aggravated burglary,

19  aggravated robbery, and two counts of aggravated murder.  The

20  judge is going to tell you you can find the defendant guilty

21  of all of those charges, some of those charges, none of those

22  charges.  The aggravated murder counts are what the

23  allegation is that would get us to this second phase.  And

1    it's not just the aggravated murder counts because you could

2    find her guilty of aggravated murder and still not get to

3    that second phase, but you have to find her guilty of

4    aggravated murder plus some what we call aggravating

5    circumstances.  They're special things that make this case

6    eligible for the death penalty.

7            And one of the easiest ways to explain that is there

8    are many, many different types of homicide under Ohio law.

9    There are probably seven or eight different types of

10   homicides.  There's the guy who gets in his car, puts in the

11   keys, he's being drinking for 12, 13 hours.  He gets behind

12   the wheel and as he's driving down the road he goes left of

13   center and kills somebody.  That case will never be eligible

14   for the death penalty.  That's an aggravated vehicular

15   homicide, it's probably a manslaughter charge, but neither

16   one of those is going to make him eligible for the death

17   penalty.

18           We have murder, which is the purposeful killing of

19   another person.  That's basically if I walk in there and say,

20   "Boy, I hate sailboats.  I don't like those sailboats," and I

21   pull out a gun and I shoot you because you're wearing a

22   sailboat shirt.  That's murder, but it's not a death penalty

23   eligible offense that I have for punishment.

1      There is what we call aggravated murder and that is

2   purposely planning and plotting the death of another.  That

3   would be an instance where, for instance, if I saw Mr. Bailey

4   walking across the street every day and we've been over here,

5   you know, five weeks picking a jury and I finally say to

6   myself, "You know, I've had enough of him.  I'm tired of him

7   sitting there.  I'm tired of him telling me what to do just

8   because he's more experienced than I am and, you know, I want

9   to run the show.  I'm going to be in charge now, not him.

10   I'm not going to let him call the shots."

11      And I come in here Monday and I know he goes to his

12   office first thing and he gets his cup of coffee and then he

13   sits down and he looks over, you know, what the case is we

14   had for the morning, and while he's doing that, sitting there

15   with his cup of coffee, I'm going to go in there and shoot

16   him.  So I plan it, I go out and buy a gun this weekend, I

17   target practice a little bit, and when he comes into his

18   office and he's sitting down with his cup of coffee, I walk

19   in and I shoot and kill him.  That's aggravated murder and it

20   carries a higher degree penalty than murder, but it's still

21   not a capital offense.

22      Now let's say I do the same thing, I plot and plan

23   Mr. Bailey's murder, but I'm also going to do something else.

1    I'm going to do what's called a felony murder, I'm going to

2    take his wallet as well because I know he's loaded.  He's got

3    lots of money.  He scrimps and saves and he's probably always

4    got a thousand bucks in his wallet.  I'm going to not only

5    kill him but I'm going to take that thousand bucks because I

6    could really use it to feed my four kids.  Now I've committed

7    the aggravated murder; I've planned it, I've plotted it, I've

8    worked all weekend target shooting, I know what his routine

9    is, and now I shoot him, and in addition to that I commit the

10   further offense of stealing his wallet.  I've committed this

11   aggravated robbery, I had a firearm on me, and I took his --

12   well, I took his wallet.  That now makes me eligible for the

13   death penalty.  But even under that crime, even though I'm

14   eligible for it, it's not automatic.  So we have these

15   varying levels of crimes and we have these varying levels of

16   homicides.

17           In this particular case there are two different

18   theories.  Even though there's only one death, the State is

19   going to present to you two different theories.  The Court

20   again will tell you that you can find her guilty of all of

21   the charges or none of the charges.  If we prove beyond a

22   reasonable doubt the elements of both theories, you can find

23   her guilty of both theories of aggravated murder.  Do you

1    necessarily have a problem with that?

2                        TROY KAHLER:  No.

3                        ATTY. BECKER:  The fact that there's only

4    one death.  Okay.  You understand you can find her guilty of

5    both of them, some of them or none of them?

6                        TROY KAHLER:  Correct.

7                        ATTY. BECKER:  All right.  And you don't

8    take that to mean that Mr. Bailey and I don't know what the

9    heck we're doing because why would they have two -- there's

10   only one guy dead; why would they have two murder charges?

11   You don't take that to mean we don't know what we're doing,

12   right?

13                        TROY KAHLER:  Correct.

14                        ATTY. BECKER:  Just two different

15   theories, right?

16                        TROY KAHLER:  Correct, theories.

17                        ATTY. BECKER:  And on the other side of

18   that coin, you don't interpret the fact that there are two

19   aggravated murder charges and only one dead person to mean

20   that Ms. Roberts is really a bad person because, boy, there's

21   only one person dead and they've got two allegations here

22   that she did it?  You don't take it that way either?

23                        TROY KAHLER:  I have to be honest again,

1    I'm totally unaware of all of the elements of this case.

2              ATTY. BECKER:  And you're going to -- and

3    yeah, I apologize for having to speak in generalities, but I

4    can't really --

5              TROY KAHLER:  Oh, I understand, but I'm

6    being sincere.  So to respond, I guess I look at things

7    extremely intellectually at times and then without --

8              ATTY. BECKER:  Okay.  And that's fine,

9    that's fine.  One of the things that I'm going to tell you is

10   that the allegation in this case is that Mrs. Roberts was

11   what we call an aider and abettor under the law.  She was a

12   helper basically.

13             TROY KAHLER:  Uh-huh.

14             ATTY. BECKER:  Does that fact -- or

15   assuming we went to trial and we found her guilty at the

16   guilt phase, would the fact that she is not the shooter, not

17   the principal offender but rather an aider and abettor, would

18   that cause some concern for you or would that make your job a

19   little less likely to impose the death penalty?

20             TROY KAHLER:  Again, I still feel I would

21   be able to review the evidence and make a decision.

22             ATTY. BECKER:  And follow the law as the

23   Court would give it to you?

1          TROY KAHLER:  Uh-huh.

2          ATTY. BECKER:  All right.  Just about

3    every criminal case involves, and civil cases for that matter

4    too, involve elements of what we call circumstantial

5    evidence, and I'm assuming that's another term that you've

6    become familiar with through the years either in novels or

7    books or anything else you may have read or seen or heard.

8          The most simplistic example that we can give you of

9    circumstantial evidence is, and because it's sort of the

10   rainy season around here, is let's say you go home tonight,

11   you got some things planned tomorrow morning.  You want to

12   mow the yard or take the kids fishing or whatever it is you'd

13   like to do tomorrow.  And you go to bed tonight at 11:00

14   o'clock and you turn on the 11:00 o'clock news and they show

15   those green lines of thunderstorms on the radar and the

16   weather and they're stretching from Toledo, north of Detroit,

17   all the way down to Cincinnati, and they're moving 30, 40

18   miles an hour to the east and they're heading our way.  And

19   the weather guy comes on and says, "Hey, these storms are

20   going to hit sometime between 3:00 and 5:00 this morning.

21   They're going to be pretty heavy at times but they're going

22   to clear out of here by 6:00 or 7:00 in the morning and

23   everything should be clear in the morning and, you know, it

1    will be a beautiful day tomorrow, 75."

2              So you turn off the TV, head down the hall, look out

3    in the driveway, and you see your car there.  And you say,

4    "Well, I better roll up the windows," so you go out, get in

5    the car, roll up the windows because you left them down.  You

6    go to bed.  Sound sleeper, make it through the night.  7:00

7    o'clock in the morning you wake up.  Your car is wet, the

8    driveway is wet, the sidewalk is wet, there's water streaming

9    down the street.  It's trickling down into the gutter, you

10   see that stream of water.  You didn't see it rain, correct?

11             TROY KAHLER:  Correct.

12             ATTY. BECKER:  You can infer that it

13   rained though, right?

14             TROY KAHLER:  Correct.

15             ATTY. BECKER:  Sometimes, though, we have

16   to be careful about those inferences.  Let's say there's

17   patches of those greens splotches when you go to bed and the

18   guy says hey, they're going to be hit and miss.  Some of them

19   may hit Niles.  Some of them may hit Kinsman.  Cortland and

20   Bazetta may see nothing.  Canfield may get rain.  It's all

21   going to be hit and miss, we don't know where it's going to

22   go, but there's possibilities.

23             You do the same thing, you go out and roll up the

1    windows in the car, hop in bed, sleep all night.  You wake up

2    the next morning and you look out your side bedroom window

3    and you see your neighbor's driveway.  The car is wet, the

4    driveway is wet, but you look out to your driveway and the

5    street is dry and you don't see anything.  And then you look

6    back and you see your neighbor coming out of his garage and

7    he's got a hose and he's got a bucket of water with soap on

8    it.  The inference is that he's washing his car and it didn't

9    rain last night, or, if it did, it didn't last very long

10   because you don't see any rain on the ground, right?

11                    TROY KAHLER:  Correct.

12                    ATTY. BECKER:  Would you feel comfortable

13   if there were elements of circumstantial evidence in making

14   this determination, or I guess the proper question is will

15   you feel comfortable making a decision or will you be able to

16   make a decision based in part on circumstantial evidence?

17                    TROY KAHLER:  I would interpret the

18   information and then make a decision.

19                    ATTY. BECKER:  Pretty much the same answer

20   you gave before?

21                    TROY KAHLER:  Yeah.

22                    ATTY. BECKER:  And part of your job is

23   going to be doing those kind of things, doing exactly those

1   kind of things, weighing witnesses, weighing testimony.  For

2   instance, if there's a car wreck and you've got one witness

3   to the case, we could probably prove the case to you if that

4   one witness was solid enough, was accurate enough in the

5   details of his testimony, had a background that wouldn't lead

6   you to believe that he was lying or untruthful, and let's say

7   his vision was 20/20 and he happened to be only 15 feet from

8   where this accident occurred.  Those are the kind of things

9   you're going to look for to make your decision, right?

10                   TROY KAHLER:  Correct.

11                   ATTY. BECKER:  And if we have a witness

12  who is maybe intoxicated or has something to gain out of the

13  thing, maybe monetary or some other, those are things that

14  you're going to look at and say, "Boy, I know this guy said

15  he saw some things, but boy, he's got a lot of motive and

16  bias and interest in testifying the way he did," correct?

17                   TROY KAHLER:  Correct.

18                   ATTY. BECKER:  And you'll be able to make

19  those kind of determinations?

20                   TROY KAHLER:  I feel comfortable doing

21  that.

22                   ATTY. BECKER:  All right.  Is there any

23  reason that you feel that you could not serve as a fair and

1    impartial juror in this case?

2                    TROY KAHLER:   None whatsoever.

3                    ATTY. BECKER:   Nothing pressing at work,

4    because we may be here for three or four weeks?

5                    TROY KAHLER:   Well, with my employer I

6    have a leave of absence situation that's available, so.

7                    ATTY. BECKER:   So that should be no

8    problem?

9                    TROY KAHLER:   Yeah.  And I've already

10   spoken to my boss about it.

11                   ATTY. BECKER:   Okay.  And he's aware that

12   you may be seated on this jury?

13                   TROY KAHLER:   Yeah.  And it's part of our

14   employee handbook situation so it's all very --

15                   ATTY. BECKER:   Sure.  Okay.  Fair enough.

16   One last thing.  I'm assuming you've probably heard through

17   the years of cases where criminals do something stupid and

18   they get caught when they do something ridiculous.  You've

19   heard of the phrase, I guess, the best laid plans can go

20   astray?

21                   TROY KAHLER:   (Nods head affirmatively.)

22                   ATTY. BECKER:   The guy who goes in to rob

23   a bank and he and his cohort plan it for weeks and weeks and

1    they get the car tuned up, they get the tires rotated, make

2    sure there's enough air pressure in the tires.  They scope

3    out the way to and from the bank to their hideout.  They make

4    sure they know when the cops change shifts so they know the

5    cops will all be down at the station because the cops that

6    were on duty are down at the police station and the new ones

7    that are coming in, they're probably down there having a cup

8    of coffee and finding out what happened during the day shift

9    or the morning shift.

10            And these guys figure out when the Brinks truck

11   comes in and they figure out that Thursday at 4:00 o'clock

12   would be a great day to rob this bank because at 4:00 o'clock

13   the police are changing shifts and the Brinks truck comes in

14   at 3:00 o'clock to give the bank all the money for all the

15   people on Friday who get paid.  And they plan this thing; the

16   guy gets a hat, he gets sunglasses, he gets a fake beard.

17   They go down to the bank, the guy rushes in with the gun.  He

18   puts the gun to the teller's face.  He's got sunglasses, a

19   ball cap on, a beard.  He gives her a note that says "Put all

20   the money in this," you know, "Walmart bag.  Don't give me

21   any dye packs or I'll shoot you," and he shows her the gun

22   and she puts all the money in.

23            He runs out and when the police get there they check

1    out the note and, lo and behold, on the other side of the

2    note is the guy's letter addressed to him from somebody and

3    they end up catching him counting the money.

4                    TROY KAHLER:  Uh-huh.

5                    ATTY. BECKER:  You've heard of things like

6    that?  I don't know if you've heard of a case particularly

7    like that, but you're familiar that sometimes even criminals,

8    no matter how much they plot and plan, they end up getting

9    caught for sometimes a simple or stupid reason, right?

10                    TROY KAHLER:  Correct.

11                    ATTY. BECKER:  It wouldn't surprise you

12   if something like that happened in any case, would it?

13                    TROY KAHLER:  No.

14                    ATTY. BECKER:  All right.  Even if it was

15   a homicide case?

16                    TROY KAHLER:  Any case.

17                    ATTY. BECKER:  Okay.  It could happen.  So

18   just to reiterate very briefly, you feel comfortable trying

19   this case; you will fairly and accurately and evenly weigh

20   all four options if we get to that second phase, correct?

21                    TROY KAHLER:  Correct.

22                    ATTY. BECKER:  You have no pressing

23   matters at home or work that would cause you to have any

1    problems serving as a juror, correct?

2                      TROY KAHLER:  Correct.

3                      ATTY. BECKER:  You believe you can fairly

4    weigh the evidence and you will weigh the evidence and hold

5    the State to its standard of reasonable doubt and not all

6    doubt, correct?

7                      TROY KAHLER:  Correct.

8                      ATTY. BECKER:  And throughout these

9    proceedings you will give Ms. Roberts her presumption of

10   innocence that she's entitled to under the law and not make

11   her have to prove anything to you, correct?

12                     TROY KAHLER:  Correct.

13                     ATTY. BECKER:  And if we get to that

14   second phase and if the facts warranted it and the law

15   permitted it, you could go back in that jury room and

16   actually sign a piece of paper that would call for the

17   imposition of the death penalty?

18                     TROY KAHLER:  If necessary.

19                     ATTY. BECKER:  Okay.  Well, I want to

20   thank you very much, Mr. Kahler, for your time.  Again, I

21   apologize for keeping you here a little bit today.

22                     TROY KAHLER:  That's fine.

23                     ATTY. BECKER:  Mr. Ingram or Mr. Juhasz,

1    one of those two, will now ask you some questions.

2                        TROY KAHLER:  Okay.

3                        ATTY. BECKER:  Okay.  Thank you, sir.

4                        ATTY. INGRAM:  Good afternoon, Mr. Kahler.

5                        TROY KAHLER:  Hi.

6                        ATTY. INGRAM:  Are you all right up there?

7    You need some water?

8                        TROY KAHLER:  If you don't mind, I would

9    like some.

10                       ATTY. INGRAM:  Sure.  Be happy to get you

11   a glass.  One of these guys will pour it and I'll get it up

12   there.  My name is Jerry Ingram.  John Juhasz and I share the

13   responsibility of representing Donna Roberts.  As I'm sure

14   you can imagine, we feel it's necessary to take every

15   reasonable precaution in selecting a fair-minded jury, the

16   same type of jury you or I would want to determine our cause

17   if we were on trial.  Does that sound fair enough to you?

18                       TROY KAHLER:  Yes, it does.

19                       ATTY. INGRAM:  This is the only, this is

20   the only opportunity we'll have to get to know you and for

21   you to determine whether you're comfortable sitting on this

22   panel.  Since the purpose of this discussion is for us to get

23   to know you, it really does help if you do most of the

1    talking.  But we're lawyers and I guess we're trained, I

2    don't know what the process is, but eventually we tend to

3    monopolize the conversations.  So why don't you try to cut

4    off my monopolistic tendencies every now and then and

5    whenever there's something that pops into your mind or

6    something that you would like to say, let me know and we'll

7    discuss those issues.  Okay?

8                    TROY KAHLER:  Okay.  Fine.

9                    ATTY. INGRAM:  This is a lot like a job

10   interview except when you went to Borders for that job

11   interview you chose to go there.

12                    TROY KAHLER:  Actually they contacted me.

13                    ATTY. INGRAM:  Well, then it's the same

14   because here we contacted you.  What were you doing in life

15   when Borders contacted you for the job up there?

16                    TROY KAHLER:  I was in the process, I was

17   -- I had spent about four and a half years as an independent

18   scholar.  I was commissioned by George Washington's Mount

19   Vernon to research some badges that were created at the time

20   of George Washington's death.

21                    ATTY. INGRAM:  Were those badges of honor

22   or --

23                    TROY KAHLER:  They were.  I actually

1    brought one, a sample.  People always ask me about it.  This

2    was the work that I worked on.

3                        ATTY. INGRAM:  May I see it, please?

4                        TROY KAHLER:  Yeah, sure.  I spent four

5    and a half years researching the material, culture and

6    aspects of that and the aspects then of how we could actually

7    recreate the piece today, and so that's what I was doing

8    prior to going to Borders.

9                        ATTY. INGRAM:  I'm going to hand that

10   around, okay?

11                       TROY KAHLER:  That's fine, that's fine.

12                       ATTY. INGRAM:  Did you get a grant for

13   that independent scholarship study or did you finance it

14   yourself?

15                       TROY KAHLER:  No.  Mount Vernon funded the

16   majority of the project.

17                       ATTY. INGRAM:  Okay.  And you went to Ohio

18   State University, and since they have a good landscape

19   architecture school there, is that where you studied

20   landscaping?

21                       TROY KAHLER:  Initially.

22                       ATTY. INGRAM:  And then you also have

23   what, a BS, bachelor of science in education?

1               TROY KAHLER:  Science in education.

2               ATTY. INGRAM:  You got that from YSU?

3               TROY KAHLER:  Youngstown State.  And I

4   also have additional studies which I didn't put on there from

5   Case Western and Kent State also.

6               ATTY. INGRAM:  What did you study at Case?

7               TROY KAHLER:  I worked with their arts

8   department in partnership with the Cleveland symphony

9   orchestra.  And then in Kent I took a course in law and also

10  -- boy, it's been a long time.  Oh, cripe.  I'm sorry, I

11  can't remember what the second class was.

12              ATTY. INGRAM:  What was the course in law

13  at Kent?

14              TROY KAHLER:  It was for real estate.

15              ATTY. INGRAM:  Borders, you're the

16  marketing manager for seven stores.

17              TROY KAHLER:  I do marketing management

18  for seven stores at Borders.  I have five stores here in Ohio

19  and two stores in New York.

20              ATTY. INGRAM:  Do you supervise any other

21  employees?

22              TROY KAHLER:  Yes.  I'm a multi-unit

23  manager so we have on the average of probably 40 to 60 people

 1    working at each one of these stores.  And if it's something

 2    that effects my marketing, then I'm involved with management

 3    of staff.

 4                    ATTY. INGRAM:  Okay.  In a nutshell this

 5    case boils down to the government's allegation that Donna

 6    Roberts plotted or conspired with a male companion by the

 7    name of Nate Jackson to cause the death of Robert Fingerhut.

 8    You understand that there's one defendant in this case and

 9    this case involves the guilt or innocence of one person and

10    one person only?

11                    TROY KAHLER:  Correct, I understand that.

12                    ATTY. INGRAM:  Throughout these

13    proceedings you will hear the name Nate Jackson and you may

14    conclude that Mr. Jackson did what the State says he did.  Do

15    you understand that that's not what you are here to

16    determine, Mr. Jackson's guilt or innocence?

17                    TROY KAHLER:  No, but I'm sure there will

18    be references to him if he's involved in this case.

19                    ATTY. INGRAM:  Yes, there will be

20    references to him, but the State's burden of proof is to

21    prove that Donna Roberts actively assisted or participated in

22    these events.  Do you see that?

23                    TROY KAHLER:  Oh, yes, I understand.  I

1     understand that.

2                ATTY. INGRAM:  In support of its

3     allegation that Donna aided or participated in the death of

4     Robert Fingerhut the State will present various letters and

5     tape recorded telephone conversations.  Some of this evidence

6     may be sexually explicit in nature.  Some of it might be

7     downright offensive.  Even though you may be offended by the

8     sexual nature of some of this evidence, your job

9     responsibility will require that you sort of rise above that

10     offense to test the evidence and to determine whether it ties

11     Donna to these events.  Do you see that?

12                TROY KAHLER:  I understand, sir.

13                ATTY. INGRAM:  Now, Mr. Becker when he was

14     talking with you asked you on a couple of occasions about

15     your willingness to sign verdicts.  Do you recall those

16     questions?

17                TROY KAHLER:  Yes, sir.

18                ATTY. INGRAM:  Whether you would be

19     willing to sign a guilt verdict, whether you'd be willing to

20     sign a death verdict.  I'm not going to ask you about your

21     willingness to sign verdicts, but do you understand no one is

22     asking you to prejudge this case?

23                TROY KAHLER:  Oh, definitely, sir.

1          ATTY. INGRAM: Would you have the courage

2    to acquit, that is vote not guilty, if you thought a not

3    guilty verdict was warranted by the evidence?

4          TROY KAHLER: Definitely.

5          ATTY. INGRAM: I have to talk to you about

6    punishments. Before we get to that issue, though, I want to

7    explain to you a concern I have. We're all talking to you

8    about punishment, the judge, the prosecutor, myself, and you

9    don't even know if the person that you're here to determine

10   or talk about has done anything wrong or not. It seems to me

11   a whole heck of a lot like putting the cart before the horse,

12   to coin an old adage. Do you see what I mean by that?

13         TROY KAHLER: I'm sure part of it is the

14   case itself and the penalties that could be imposed and they

15   want to make sure that people have a complete understanding

16   of that.

17         ATTY. INGRAM: That's right. And we have

18   to ask these questions now. These questions have nothing to

19   do with Donna's guilt or innocence, do you understand that?

20         TROY KAHLER: I understand that

21   completely, sir.

22         ATTY. INGRAM: When I read the

23   questionnaire I thought I understood your views on the death

1    penalty.  After your conversation with Mr. Becker I'm not so

2    sure.  So pretend that I'm one of these motivational people

3    that come to Borders and give a little seminar and my seminar

4    is on communications and I'm going to talk to people there

5    about how to communicate, how to express how you feel, and

6    I'm going to use you as my first person when I'm there.  I'm

7    going to give you a minute or two and I want you to tell the

8    rest of us your feelings regarding the death penalty.

9                    TROY KAHLER:  I view that it is something

10   that is currently used or available in our society as a means

11   to -- what am I looking for?  As a means to -- the term is

12   not coming to my mind.  To impose justice for crimes that may

13   or may not have been committed and people have been found

14   guilty.  I don't view the death penalty as something, as I

15   stated earlier, I believe that should be automatically

16   imposed in every single instance.  Again, we're talking about

17   four different elements of possible sentencing, am I correct?

18                    ATTY. INGRAM:  Okay.  Four -- for the time

19   being here we're going to forget about the law and we're

20   going to forget about the preliminary instructions you read

21   downstairs and for the time being we're just going to talk

22   about your personal view.  Then we'll return to the law and

23   the preliminary instructions.  Does that sound fair to you?

1      TROY KAHLER:  Outside of the case then?

2    Outside of the case I'm not opposed to the death penalty in

3    certain cases if it's necessary.

4      ATTY. INGRAM:  Okay.  In your personal

5    view are there situations where you think that the death

6    penalty should be automatic or required upon a conviction?

7      TROY KAHLER:  No.

8      ATTY. INGRAM:  We've recently had some

9    renewed debate in this country about whether or not we should

10   even have the death penalty, and part of that debate evolved

11   around the State of Illinois where there was a moratorium put

12   on executions.  Were you exposed to any of that debate?

13     TROY KAHLER:  No.  The only thing that

14   I've really reviewed with the death penalty I think was the,

15   oh, probably from the 1890s at the point in time that the

16   electric chair became a means of the death penalty and some

17   of the problems that they had with that.  But other than

18   that, I haven't reviewed any.

19     ATTY. INGRAM:  Well, how did you have

20   occasion to review that data about the electric chair?

21     TROY KAHLER:  I ran across a book that we

22   had at the store.

23     ATTY. INGRAM:  Since I might be

1    interested, what was the name of the book, do you remember?

2                        TROY KAHLER:  *Perfect Endings* I think was

3    the title of it.

4                        ATTY. INGRAM:  Did you ever read the --

5    what was that book by Stephen King, *The Long Mile*?

6                        ATTY. JUHASZ:  *The Green Mile*.

7                        ATTY. INGRAM:  *The Green Mile*.  Did you

8    ever read *The Green Mile*?

9                        TROY KAHLER:  No.  But if you ever want to

10   meet Stephen King he's always at our Borders store in Maine

11   on Christmas Eve, he signs.  He'll just show up some time

12   during the day and sign.

13                        ATTY. INGRAM:  Well, I may have to go up

14   there some Christmas Eve.  And, by the way, you met Johnny

15   Cochran, is that right?

16                        TROY KAHLER:  Correct.

17                        ATTY. INGRAM:  Who impressed upon you the

18   importance of jury service --

19                        TROY KAHLER:  Correct.

20                        ATTY. INGRAM:  -- as a civic

21   responsibility.  Well, you're not going to hold any of the

22   lawyers in this room to the persona of Mr. Cochran, are you?

23   You know, none of us here make a million dollars a case.

1              TROY KAHLER:  Well, actually you're all

2     taller than he is, and I'm a little bit smaller than his

3     bodyguard, so.

4              ATTY. INGRAM:  You ever hear someone say

5     I'm not in favor of life imprisonment as an alternative to

6     the death penalty because I don't believe that we, the

7     taxpayer, should have to pay?

8              TROY KAHLER:  In the past I've heard

9     people make comments of that nature.

10             ATTY. INGRAM:  Do you have any opinion on

11    that cost issue?

12             TROY KAHLER:  On the cost issue itself?

13             ATTY. INGRAM:  Yes.

14             TROY KAHLER:  No.

15             ATTY. INGRAM:  How do you feel about life

16    imprisonment as an alternative to the death penalty?

17             TROY KAHLER:  Again, if it's something

18    that has to be considered based on the individual case, then

19    so be it.

20             ATTY. INGRAM:  You ever considered a

21    political candidate's views on the death penalty in

22    determining whether to vote for that candidate?

23             TROY KAHLER:  No, sir.

1           ATTY. INGRAM:  You ever seen a movie

2     called *True Crimes* starring Clint Eastwood?

3           TROY KAHLER:  No, sir.  Typically what I

4     do is, if I have anyone coming in, I review their work prior

5     to their coming to the Cleveland market so that I can best,

6     you know, suit the event around them.  I don't have time to

7     watch television or review particular movies.  I think the

8     last movie I went to see was the *Titanic*.

9           ATTY. INGRAM:  Well, at least it was a

10    good one.  We're going to stay outside of this case.  We'll

11    make up a second stage in some other capital case.

12          TROY KAHLER:  Okay.

13          ATTY. INGRAM:  When a capital juror gets

14    to a second phase, and let's say it's a case like in

15    Youngstown where there's someone convicted of the aggravated

16    murder of, the aggravated murder of a policeman in the line

17    of duty.

18          TROY KAHLER:  Okay.

19          ATTY. INGRAM:  That would be a capital

20    conviction because there would be an aggravated murder and

21    there would be a death spec, the fact that the policeman was

22    in the line of duty.  First off, is that a situation where

23    you feel that the death penalty should be automatic or just

4843

1    one where it should be an option?

2                    TROY KAHLER:  Again, minimal amount of

3    conversation about this, I guess it shouldn't be an automatic

4    option.  Again, you know, all of this is a hypothetical

5    situation --

6                    ATTY. INGRAM:  Right, uh-huh.

7                    TROY KAHLER:  -- and unless I've actually

8    reviewed the documentation.  Again, I deal with things like

9    this all day for a living and I'm very conscious about

10   commenting until I'm familiar with the parameters of what I'm

11   dealing with.

12                   ATTY. INGRAM:  Okay.  But in our

13   hypothetical scenario I think we know the parameters.  There

14   is a conviction of aggravated murder of a policeman in the

15   line of duty.  Even in that case your oath would require you

16   to equally consider all four sentencing options.  Do you

17   understand that?

18                   TROY KAHLER:  Oh, yes, I understand.

19                   ATTY. INGRAM:  Is there anything in your

20   personal belief structure which would interfere with your

21   ability to equally consider any of the sentencing options?

22                   TROY KAHLER:  No.

23                   ATTY. INGRAM:  Do you understand that if

1    you ever got to a second phase your oath would require you

2    to equally and fairly consider all four options?

3                         TROY KAHLER:  Yes.

4                         ATTY. INGRAM:  And if you ever got to a

5    second phase, it would be the State's burden to prove to you

6    beyond a reasonable doubt that the death penalty was the

7    appropriate penalty.

8                         TROY KAHLER:  Yes, I understand that.

9                         ATTY. INGRAM:  And certainly you would

10   hold them to that burden?

11                        TROY KAHLER:  Yes.

12                        ATTY. INGRAM:  Have you ever, have you

13   ever donated any time, money or services to a political

14   campaign or issue?

15                        TROY KAHLER:  No.

16                        ATTY. INGRAM:  Do you belong to any group

17   or organization which is active in any political matter?

18                        TROY KAHLER:  I used to belong to the

19   Warren Chamber of Commerce and I believe at that point in

20   time they were starting to think about addressing various

21   political issues, but to my knowledge I don't know if they

22   have or not.

23                        ATTY. INGRAM:  You were on the board?

1      Were you on the board of --

2                          TROY KAHLER:  I was never on the board, I

3      was just a member.  I thought you had inquired if I had

4      belonged to any organizations.

5                          ATTY. INGRAM:  Well, I was actually going

6      to another question.  I'm sorry.  In the last five years or

7      so have you signed a petition on any public issue?

8                          TROY KAHLER:  The only petitions that I've

9      signed in the past five years were for people running for

10     office here locally.

11                         ATTY. INGRAM:  Did you circulate any of

12     those petitions or did you just sign it when someone knocked

13     at the door?

14                         TROY KAHLER:  Just signed it, yeah.  It

15     was for a person running for Board of Education.

16                         ATTY. INGRAM:  Do you belong to or

17     associate with any group which has crime prevention or law

18     enforcement as a goal?

19                         TROY KAHLER:  No, I don't.

20                         ATTY. INGRAM:  You talked briefly with

21     Mr. Becker about sympathy.  I'm sure you would agree with me

22     this is a court of law, not a court of sympathy?

23                         TROY KAHLER:  Correct.

 1                       ATTY. INGRAM: The judge will tell you

 2   you should not permit feelings of sympathy to effect your

 3   evaluation of the evidence. But in this country we leave the

 4   tough jobs to the jury, and stopping sympathy from effecting

 5   how you look at things is probably one of those things that

 6   is easier said than done, but you'll have to do your best.

 7   Are you up to that, do you think?

 8                       TROY KAHLER: Sir, believe me, I'm

 9   bombarded with so many decisions each day that, again, I'm

10   very adept with reviewing information at hand.

11                       ATTY. INGRAM: Well, in this case you're

12   going to see some evidence in the form of maybe crime scene

13   photographs, you'll see a dead person on the ground, and

14   coroner's photographs, coroner's testimony. Some of this

15   stuff may evoke an emotional response from you. It may be

16   sympathy or may be anger, "How could somebody do this?" But

17   even though there is an emotional response, you're still

18   going to have to test this evidence to determine whether it

19   ties Donna to these occurrences. Are you up to that?

20                       TROY KAHLER: I've seen forensic medicine

21   publications and things that we carry at the store, so yes.

22                       ATTY. INGRAM: Those are hard to get. Do

23   you guys carry them?

1          TROY KAHLER:  We order them for people

2     from time to time for various concerns.

3          ATTY. INGRAM:  Now, I probably shouldn't

4     go where I'm going but I'm diving right in.  I tell most

5     jurors when I get to this point that I'm going to sound like

6     a civics teacher, but, you know, 225 years ago or thereabouts

7     our forefathers declared independence, fought and died so

8     that we could be free, and they passed some laws.  They

9     included the Bill of Rights to the Constitution because they

10    couldn't get the Constitution passed or ratified without the

11    Bill of Rights.  Many of the laws they wrote were designed to

12    curb or restrict the power of the government, and one of the

13    things they provided to restrict the power of government was

14    the presumption of innocence.

15          If you want to increase the power of a governmental

16    agency you create a presumption of guilt and people they

17    arrest are presumed guilty.  How do you personally feel about

18    the rule of law which requires that a trial juror presume the

19    defendant innocent?

20          TROY KAHLER:  In my finding I have no

21    problem with that, for assuming people are innocent until

22    they're tried and possibly found guilty.

23          ATTY. INGRAM:  A lot of people think that

1   to one degree or another we have a crime problem underfoot in

2   this country.  Do you have any ideas what we, and by "we" I

3   mean society as a whole, might do to at least begin

4   addressing that crime problem?

5          TROY KAHLER:  Actually I spent a half a

6   day with Rudy Giuliani in November and Rudy said that the

7   first thing he did every morning when he went to work in New

8   York City was to review the percentages of crime in the city,

9   what sort of crimes they had been, had they been murders,

10  rapes, what have you.  And as soon as he saw a one percent

11  increase in any given part of the city they immediately sent

12  more forces into that given area, and he felt that it was, of

13  course, very successful for New York City.  And I guess if I

14  had to say to any community, you know, how would you go about

15  addressing crime, Rudy really had a decent approach to

16  helping a city with millions of people, so.

17         He said that one of the main problems is that cities

18  will wait until the percentages start to reach 10, 15, 20

19  percent, and then he said at that time it becomes extremely

20  difficult to try to suppress the crime rate increasing.

21         ATTY. INGRAM:  I have some friends who are

22  concerned about the crime problem and they have in their

23  minds a solution which they actually advocate, and one of

1    their solutions is replacing the presumption of innocence

2    with a presumption of guilt.  And in this country they are

3    certainly free to feel that way.  Do you think they would

4    make good jurors if they truly believe that way?

5                        TROY KAHLER:  I've never even considered

6    it.

7                        ATTY. INGRAM:  Okay.

8                        TROY KAHLER:  I think it's kind of absurd.

9                        ATTY. INGRAM:  The same thing with the

10   burden of proof.  You know, these guys have leveled this

11   allegation.  Now it's time for them to put up or shut up.

12   They got to prove it.

13                        TROY KAHLER:  Correct.

14                        ATTY. INGRAM:  You understand that Donna

15   is on trial for murder, not for being a woman of loose moral

16   character?

17                        TROY KAHLER:  Again, I'm not familiar with

18   the case so I can't assume.

19                        ATTY. INGRAM:  Okay.  But she is on trial

20   for murder, right?

21                        TROY KAHLER:  Correct.

22                        ATTY. INGRAM:  And they may prove she's a

23   woman of loose moral character, but they have to prove that

1    she aided a murder.  Do you have that in mind?

2                        TROY KAHLER:  Oh, yes, I understand that,

3    sir.

4                        ATTY. INGRAM:  Now, she doesn't have to

5    testify, and if she elects not to testify you can't hold it

6    against her.  Do you have any problem or qualm with that

7    rule?

8                        TROY KAHLER:  If it's permissible within a

9    court of law, no.

10                       ATTY. INGRAM:  Well, it is permissible.

11   Did you know that?

12                       TROY KAHLER:  No, I have no idea.  Again,

13   I have never been involved in this sort of situation.

14                       ATTY. INGRAM:  At work if you're ever

15   called upon to resolve a dispute between two co-employees or

16   two people that you supervise, the natural inclination is to

17   sit them both down and ask, okay, both of you tell me your

18   side of the story.  Does that sound reasonable to you?

19                       TROY KAHLER:  It could in some

20   circumstances.  Usually I turn it over to our HR person and

21   let them take care of it.

22                       ATTY. INGRAM:  Well, this is where the HR

23   person is on vacation and you can't duck the responsibility,

1   or are you going to duck it with someone else?

2                   TROY KAHLER:  I'd still have to because of

3   our employee hand -- my job description won't permit me to

4   get involved in this sort of thing, so.

5                   ATTY. INGRAM:  Well, you do see, don't

6   you, that usually in our everyday life when we're called upon

7   to resolve a dispute the first thing we say is I want to hear

8   both sides of this dilemma?

9                   TROY KAHLER:  (Nods head affirmatively.)

10                  ATTY. INGRAM:  In this case your oath as a

11  juror may require you to put aside that natural inclination.

12  Do you think you're up to that?

13                  TROY KAHLER:  I feel so, sir.

14                  ATTY. INGRAM:  If Donna does testify she's

15  a witness just like any other witness.  You would use the

16  same rules or standards for determining her believability as

17  you use for determining the believability of other witnesses.

18                  TROY KAHLER:  Correct.

19                  ATTY. INGRAM:  But she's the defendant

20  here, right?

21                  TROY KAHLER:  Uh-huh.

22                  ATTY. INGRAM:  So she has an interest or a

23  stake in the outcome of this case, doesn't she?

1           TROY KAHLER:  Correct.

2                    ATTY. INGRAM:  And the judge will give you

3      or tell you when he gives you the instruction on credibility

4      that that's one of the things you may consider in determining

5      whether to believe a witness, whether the witness has an

6      interest or a stake in the outcome of this case.  If you

7      consider that factor for her, to be fair then you should also

8      consider it for every other witness who testifies if you

9      find that any other witness has something to gain.  Do you

10     see what I mean?

11                   TROY KAHLER:  (Nods head affirmatively.)

12                   ATTY. INGRAM:  The judge is also going to

13     tell you that you should apply to every witness that

14     testifies something he'll call the test of truthfulness that

15     you employ in your daily life.  Now, over the years you have

16     to decide whether someone is being straight with you or

17     trying to hoodwink you.  That has happened to you, hasn't it?

18                   TROY KAHLER:  Uh-huh, yes.

19                   ATTY. INGRAM:  And you've developed an

20     almost intuitive sense or a sixth sense that assists you in

21     making that determination?

22                   TROY KAHLER:  (Nods head affirmatively.)

23                   ATTY. INGRAM:  He is going to tell you

1    that you should bring that intuitive sense in here and apply

2    it to every person who testifies.  Will you do that?

3                        TROY KAHLER:  Yes.

4                        ATTY. INGRAM:  Reasonable doubt, as the

5    term implies, is based on reason and common sense.  And when

6    the judge defines it for you he's going to tell you that

7    reasonable doubt requires that you be firmly convinced and is

8    proof of such character that you would be willing to rely and

9    act upon it in the most important of your own affairs.  When

10   you have to make some important marketing decision -- you

11   need more or are you all right there?

12                        TROY KAHLER:  No, I'm fine.

13                        ATTY. INGRAM:  When you have to make an

14   important marketing decision at Borders sometimes those

15   decisions will have positive factors and sometimes negative

16   factors, right?

17                        TROY KAHLER:  Usually it's positive.

18                        ATTY. INGRAM:  Okay.  There's no negatives

19   ever?

20                        TROY KAHLER:  I'm kind of an abnormal

21   situation at Borders.  They can't quite figure out what to do

22   with me, but more often than not we have initiatives and my

23   boss will go "How?"

1              ATTY. INGRAM:  How, how'd you do it?

2              TROY KAHLER:  Yeah, because we tend to

3    exceed the company's expectations frequently.

4              ATTY. INGRAM:  Well, maybe I should hire

5    you for something.  Well, let's take this decision out of

6    Borders and make it a decision in your personal life.  You

7    know what, I'm going to take you out of the equation and I'm

8    going to make the decision.

9         I want to buy a house, and because I'm a lot less

10   decisive than you I sometimes have to make a list either on a

11   sheet of paper or in my mind's eye.  I put the positives on

12   one side, the negatives on the other.  And if it's a house, I

13   need four bedrooms, that's a good thing; three bathrooms,

14   that's a good thing; good school system; that's a good thing.

15   Most important, my wife likes it.  That should be No. 1

16   actually because if she doesn't like it I can't buy it.

17        Then I got a couple negatives though.  This house is

18   50 years old and I'm concerned with the structural stability,

19   there's some plumbing problems and I'm concerned about the

20   cost of repairs, and I'm concerned with my ability to make

21   the mortgage payment month in and month out.  You following

22   me?

23             TROY KAHLER:  Uh-huh.

1          ATTY. INGRAM:  Well, I'm going to balance,

2     I'm going to investigate those negatives to see if I can

3     strike them off the right-hand side because, if I can, then

4     it's more probable that I'm making the right decision,

5     correct?

6          TROY KAHLER:  Uh-huh.

7          ATTY. INGRAM:  So I write in an

8     inspection.  I get a contractor who says, "Hey, Ingram, this

9     house is brick solid, baby."  I strike that one then, don't

10    I?

11         TROY KAHLER:  (Nods head affirmatively.)

12         ATTY. INGRAM:  I call a plumber.  "I can

13    fix this plumbing, it's 200 bucks."  I strike that.  But I go

14    to the bank, I say, "Can you extend this loan so that my

15    monthly mortgage payment is reduced?"  No.  "Can you maybe

16    reduce the interest rate so my monthly payment is reduced?"

17    No.  I try to get a raise, I try to rebalance my spending

18    habits, but no matter how much I investigate it, no matter

19    how much I question it, my doubt as to my ability to make

20    that mortgage payment every month remains reasonable in my

21    mind.  There's now one reasonable negative on the right-hand

22    side, correct?

23         TROY KAHLER:  I guess, yes.

1              ATTY. INGRAM:  Well, assuming that there's

2    one reasonable negative on the right-hand side, I cannot say

3    beyond a reasonable doubt that that decision is the right

4    thing for me.  Do you see that?

5              TROY KAHLER:  Yes.  But again, to play the

6    devil's advocate here, you virtually can get a loan for

7    anything now so you just would have to look for another loan

8    officer or a different company to go with.

9              ATTY. INGRAM:  Yeah, you can go get a

10   loan, but who is paying it back for me?

11             TROY KAHLER:  Well, believe me, it can be

12   done.

13             ATTY. INGRAM:  Not on, not with my money.

14             TROY KAHLER:  They're making all of these

15   improvements so.

16             ATTY. INGRAM:  Okay.  Do you enjoy this?

17             TROY KAHLER:  I find it intriguing.

18             ATTY. INGRAM:  Mr. Bailey and I have a

19   long professional relationship.

20             TROY KAHLER:  It has nothing to do with

21   the case, but we have attorneys on either side of us, my wife

22   and I, so we are constantly harassing them.

23             ATTY. INGRAM:  Who are they?

1          TROY KAHLER:  Oh, we have Cal Woodward on

2     one side and Gary Rich on the other.

3          ATTY. INGRAM:  That's an odd pair.

4          TROY KAHLER:  Yeah, it's very odd.

5          ATTY. INGRAM:  Which one do you pick on

6     more?

7          TROY KAHLER:  Neither.  We pick on both of

8     them.

9          ATTY. INGRAM:  Equally?

10          TROY KAHLER:  Yeah, so.

11          ATTY. INGRAM:  You talked to these guys

12     about circumstantial evidence, and I'm sure you know what

13     circumstantial evidence is.

14          TROY KAHLER:  (Nods head affirmatively.)

15          ATTY. INGRAM:  You understand that

16     everybody here can ask you to make an inference, but whether

17     you make that inference is solely and exclusively up to you?

18          TROY KAHLER:  I understand, sir.

19          ATTY. INGRAM:  And whether you make an

20     inference or not is going to depend in large part upon

21     whether the inference seems reasonable to you, correct?

22          TROY KAHLER:  Correct.

23          ATTY. INGRAM:  And you might imagine that

1    it tends to get a little tricky if you start to pile an

2    inference upon an inference.  For instance, if it's a Sunday

3    morning and I'm looking out my window and I see footprints in

4    the snow from the house to the right of me, which in your

5    case would be Gary Rich's house, to my front door, and then

6    from my front door to Cal Woodward's front door, I can infer

7    that somebody walked in the snow.

8                    TROY KAHLER:  Correct.

9                    ATTY. INGRAM:  If I infer who that person

10   is I'm piling an inference on an inference.  Do you see that?

11                   TROY KAHLER:  Uh-huh.

12                   ATTY. INGRAM:  But, you know, I like to do

13   those things so I assume that my Sunday paper is down there

14   because it was the paperboy, until I opened the door and I

15   see my Giant Eagle coupons.  Will you test every inference

16   that you're asked to make in this case?

17                   TROY KAHLER:  I feel more than capable to,

18   sir.

19                   ATTY. INGRAM:  Okay.  Thank you.  That's

20   nice work, by the way.

21                   THE COURT:  Do you wish side bar?

22                   ATTY. INGRAM:  No.

23                   ATTY. BECKER:  No.

```
 1                    THE COURT:  Pass?

 2                    ATTY. BAILEY:  Pass.

 3                    ATTY. BECKER:  Pass.

 4                    THE COURT:  Okay.  I have one question for

 5       you.  You work for Borders?

 6                    TROY KAHLER:  Yes.  Actually, sir, I work

 7       for Borders Group which owns Borders stores.

 8                    THE COURT:  How do we all get 60 percent

 9       discounts?

10                    TROY KAHLER:  Actually we're thinking

11       about having a legal profession discount.

12                    THE COURT:  Okay.  Listen, you will be in

13       the pool from which we are going to make our last selection

14       on Monday.  You should be here at 11:00 o'clock.

15                    TROY KAHLER:  On Monday at 11:00?

16                    THE COURT:  On Monday morning.  And I

17       would again remind you not to discuss anything or form any

18       opinion about anything.

19                    TROY KAHLER:  No, no.

20                    THE COURT:  You know that.  You will get

21       sick of me saying that, but I have to say that to you all the

22       time.  But I liked one of your comments in here about the

23       courts being overworked and understaffed.  I thought that was
```

1      very cogent.

2                          TROY KAHLER:  Well, sir, I'm well aware of

3      it.

4                          THE COURT:  Thank you very much.

5                          TROY KAHLER:  Thank you.  I appreciate it.

6                          THE COURT:  Okay.

7                          ATTY. BECKER:  Thank you.

8      (Whereupon, Troy Kahler was added to the pool of prospective

9      alternate jurors and excused for the day, after which, Court

10     was recessed for the evening.)

11                               *   *   *

12                          **SEE VOLUME XXIII**

13

14

15

16

17

18

19

20

21

22

23

1

2

3

4

5                    REPORTER'S CERTIFICATE

6

7        This is to certify the foregoing represents a true and

8    correct copy of the proceedings had in the aforementioned

9    cause as reflected by the stenotype notes taken by me on the

10   same.

11

12

13

14

15                                    _____

16                                    KELLY J. WILSON
                                      Official Court Reporter

17

18

19

20

21

22

23

1                IN THE COURT OF COMMON PLEAS

2                  TRUMBULL COUNTY, OHIO

3  STATE OF OHIO,          ) Case No. 01-CR-793
      Plaintiff        ) Appeal No. 03-T-56

4                     )
  -vs-                ) Judge John M. Stuard

5                     )
  DONNA M. ROBERTS,      ) **TRANSCRIPT OF PROCEEDINGS**

6      Defendant        ) **VOLUME XXIII**

7

8  Jury Trial proceedings on Monday, May 12, 2003 and Tuesday,

9  May 13, 2003

10  BEFORE:     HONORABLE JOHN M. STUARD

11  AT:         Trumbull County Court of Common Pleas
              Courtroom Number 2

12             161 High Street, NW
              Warren, Ohio 44481

13

14  APPEARANCES:

15  On behalf of the State of Ohio:

16      Messrs. Ken Bailey & Christopher Becker
      Assistant Prosecuting Attorneys

17      Warren, Ohio

18  On behalf of the Defendant:

19      Messrs. John Juhasz & Gerald Ingram
      Attorneys at Law

20      Youngstown, Ohio

21

22

23  Official Court Reporter:  Lori J. Rittwage

1                           I N D E X - VOLUME XXIII

2

3                              MONDAY, MAY 12, 2003

4

5        INDIVIDUAL VOIR DIRE:

6

7        KRISTINA M. HOLMES.................................... 4862

8        LISA R. MASSARY...................................... 4873

9        JOANNE M. BATES...................................... 4958

10

11       GENERAL VOIR DIRE.................................... 5030

12       MOTION FOR MISTRIAL.................................. 5042

13

14                             TUESDAY, MAY 13, 2003

15

16       MOTIONS............................................. 5044

17

18       OPENING STATEMENT ON BEHALF OF THE STATE OF OHIO....... 5065

19       OPENING STATEMENT BY THE DEFENDANT.................... 5095

20

21

22

23

1          **MONDAY, MAY 12, 2003**

2     (Whereupon, the following individual voir dire occurred in

3     open court at 9:25 a.m.)

4                    PROSPECTIVE JUROR KRISTINA M. HOLMES,

5     **EXAMINATION BY THE COURT:**

6     Q          Good morning.

7     A          Hi.

8     Q          Miss Holmes, you read that handout that was given to

9     you?

10    A          Yes.

11    Q          Okay.  You understand why we're here.  There are two

12    counts of aggravated murder with the specifications that have

13    been filed against Donna Roberts by the State of Ohio.

14             In Ohio, just because someone commits a murder does

15    not mean that they automatically face the death penalty.  The

16    legislature, in drafting the statute that applies to murders,

17    aggravated murder, has ordained that if an aggravated murder

18    is committed with certain attending circumstances which we

19    call or which are put in the indictment as specifications,

20    then any of those things in the statute that qualifies as a

21    specification means that the possibility of the jury having

22    to consider the death penalty arises.

23             An example is if somebody murdered Robert Taft and

1    was found guilty of aggravated murder, if the State had

2    failed to put on the specification that he is the governor of

3    Ohio then it would not be a death penalty case.  But if they

4    attach the specification that Bob Taft was murdered with

5    aggravating circumstances and that he was the governor, then

6    that would mean that the jury would have to consider and

7    possibly impose the death penalty.

8         Now we have no idea what this jury is going to do

9    because the evidence has not been presented yet.  If the

10   State fails to prove beyond a reasonable doubt each and every

11   element necessary to prove aggravated murder or to -- then

12   this jury would make a finding of not guilty.  That would be

13   the end of the trial.

14        If, however, the State proves the elements of

15   aggravated murder and the specifications attached, then they

16   are going to have to consider imposing the death penalty

17   along with three other considerations, and that is life

18   imprisonment without chance of parole or life imprisonment

19   with no chance of parole before 25 or 30 years.  There are

20   four options.

21        Now, we can't very well wait until the jury makes

22   the decision as to guilt or not guilt, not guilty, because if

23   they do find that Miss Roberts is guilty, they have to go to

1  that second phase and it's too late then to question them

2  concerning their views on the death penalty.  If we waited

3  until that point, we may have somebody on that jury who

4  believes in an eye for an eye, if you kill somebody, you

5  should lose your life.  That isn't the law in Ohio so that

6  person couldn't be fair to the defendant.

7       The defendant has the right to have the jury, if we

8  get to that stage, of weighing the aggravated circumstances

9  against any mitigating factors.  Mitigating factors would be

10 reasons put before the jury as to why they should not, in

11 this particular case, impose the death penalty.  And the

12 aggravating circumstances would be reasons the State would

13 submit to the jury that they should consider and impose the

14 death penalty.

15      Now, the burden is on the State at all times to

16 prove beyond a reasonable doubt all elements of the

17 aggravated murder and the specifications.  There's no duty on

18 the defendant to do anything.  That's difficult in one way

19 for some people to understand because we always expect that

20 people are going to come forth and say something to exonerate

21 themselves.  But under the law, and that's a very important

22 part of the law, the defendant need not say anything.  They

23 have the absolute right to remain silent.  The reason for

1    that is it's the State's case to win or lose.  The evidence

2    has to come from the State as to whether they have proven

3    their charges or not.  If they fail to prove that, then the

4    jury must return a verdict of not guilty.

5         Likewise, if we had a juror who could, under no

6    circumstances, even consider imposing the death penalty, some

7    people, for ethical or moral reasons, could not visualize

8    themselves making that decision.  Well, a person of that mind

9    could not be fair to the State of Ohio.  The State has the

10   right to ask for the death penalty if they prove their case.

11        So it's necessary to get some understanding of what

12   each potential juror's view is.  Now, whatever your view on

13   the issue of capital punishment is is fine.  We all hold some

14   view on the matter.  Whatever your view is will be respected

15   by these folks who will be asking the questions.  But it's

16   important that they know what you truly feel about the

17   subject.  I can't think of anything worse than to have

18   somebody on that jury getting to that point where they have a

19   duty to follow the law and they would be unable to do so

20   because of some strong belief one way or the other.  Okay?

21        The second issue will be about any pretrial

22   publicity that you may have been exposed to.  Some people

23   that we've interviewed have heard something about the case,

1    some have heard nothing, some have heard a great deal. But

2    the important point there is whether or not each of these

3    jurors will be able to set aside anything that they heard or

4    think they know about the case, because in order for the

5    matter to be tried fairly, for both sides to get a fair

6    trial, this jury has to decide this matter on the evidence

7    they hear in this courtroom. Anything that happened outside

8    this courtroom is not evidence. It has to be presented here.

9    Okay? Fair enough.

10            Are you a little bit apprehensive or what?

11   A       I don't know. I don't like being here.

12   Q       Okay. That's, that's the reason that we're going

13   through this questioning.

14           Mr. Bailey, in lieu of nobody else there, I'll call

15   upon you.

16                   MR. BAILEY:   Thanks, Your Honor.

17   **EXAMINATION BY MR. BAILEY:**

18   Q       Miss Holmes, hi.

19   A       Hi.

20   Q       My name is Ken Bailey. You probably saw me in the

21   other courtroom. I guess it's been over, what, five weeks

22   now?

23   A       Uh-huh.

1    Q        And I promised you last time that Chris Becker, my

2    co-counsel, will be here this time.  He is here, but he'll be

3    back in a minute; okay?

4    A        Okay.

5    Q        But the two of us are responsible for prosecuting

6    this case on behalf of the people of the State of Ohio and

7    the people of Trumbull County.  Okay.

8             We're going to ask you some questions or I'm gonna

9    ask you some questions and then defense counsel is going to

10   ask you some questions.  The reason we ask these questions,

11   it's gonna deal with your opinions on different things and

12   your prior experiences.  And it's not because we're snoopy

13   and we like to pry into peoples' backgrounds, but rather to

14   make sure that the folks that we've selected to serve on this

15   particular jury can be fair and impartial to both sides, both

16   to the defendant and to the people of the State of Ohio.  And

17   that's why we ask these particular questions.  There aren't

18   any right answers.  There aren't any wrong answers.  Just

19   open and candid answers.  Okay?  If you have any questions

20   that come up pertaining to what we're doing here, feel free

21   to ask them at this time.  Because after we're done here

22   today, we can't have any communication with you until this

23   case is entirely over.  If it goes into two different phases,

1    you have to wait until the end of the second phase until you

2    can talk to us.  If we run into each other out in the hallway

3    or in the elevator or in a restaurant, we're not allowed to

4    have any communication except maybe to say good morning or

5    good afternoon because if we do, it would be improper and it

6    could result in a mistrial and we don't want to do this all

7    over again; okay?

8    A      Okay.

9    Q      And just so you know, we're not trying to snub you

10    or be antisocial; okay?

11    A      Uh-huh.

12    Q      Are you relaxing a little bit up there?

13    A      Yeah.  A little.

14    Q      Okay.  That's good.  I'm gonna ask you some

15    questions.  I'm gonna ask you a couple of, one or two

16    questions about some other things first and then I'm going to

17    get into this issue of death penalty as a punishment and I

18    expect pretrial publicity and then some regular questions.

19            You had mentioned on your questionnaire that you

20    filled out that you have an impending wedding?

21    A      Uh-huh.

22    Q      Okay.  And you've been quite busy with that?

23    A      Yeah.

1    Q        Do you think, when are you getting married?

2    A        In August.

3    Q        Okay.  And this is May already.  Getting close to

4    the middle of May.  So are you, and with your work and

5    everything, does it give you a lot of time for wedding

6    preparations or are you kind of rushed?

7    A        I work two jobs.  I only have one day off a week

8    from both jobs.

9    Q        Okay.  So do you need, you get, I imagine, with your

10   positions -- this trial is gonna take probably three weeks.

11   We're going three and a half days a week for this week, the

12   next week and the week after and I expect we might finish the

13   first phase by the end of three weeks.  And then if we go

14   into a second phase, there would probably be a break of a

15   couple days or a week and then we'd go into the second phase,

16   which could take one to three days and then whatever time it

17   takes to deliberate where you would be sequestered and you

18   wouldn't be able to leave.  So it could take maybe four weeks

19   of your time or up to five weeks of your time.  Would you be

20   able to spare it with your wedding?

21   A        I mean, yeah, I could, but --

22   Q        Let me ask you about your jobs.  Do you get paid if

23   you're here on jury duty?

1    A        No.

2    Q        So would that be an economic hardship on you?

3    A        Yeah.  Because I have a lot of things that I'm

4    trying to get done before.

5    Q        Okay.  I take it you couldn't afford to lose your

6    income from two different jobs for the next month or so;

7    right?

8    A        Huh-uh.

9    Q        Okay.  And that would create a real hardship on you

10   with your wedding coming up and everything?

11   A        Yeah.

12   Q        Okay.  And I know you live with your parents?

13   A        Yeah.

14   Q        You also indicated your uncle has a problem with

15   depression?

16   A        Uh-huh.

17   Q        And do you think that would affect, do you spend a

18   lot of time with him?

19   A        Yeah.  He's over our house like every day so

20   whenever I'm like getting ready in-between jobs, I see him

21   and stuff.

22   Q        Do you think that would cause additional stress on

23   you having to sit here in this most serious of criminal cases

1    so it would affect your ability to concentrate while you're

2    here?

3    A        Well, from the things that he's been saying, yeah.

4    I mean we don't know what's gonna happen with him.

5    Q        Also, as far as the death penalty, the death penalty

6    is a possibility in this case; okay?  If the defendant gets

7    convicted of aggravated murder with one or more of the

8    specifications of aggravating circumstances, you read about

9    it in this handout downstairs?

10   A        Uh-huh.

11   Q        Did that make sense, or do you have some questions

12   about it?

13   A        No.  It made sense.

14   Q        Okay.  Well, if she's convicted beyond a reasonable

15   doubt of aggravated murder and one or more of these

16   specifications, she would become eligible for the death

17   penalty as a punishment and we'd then move into the second

18   phase.  And in that second phase, the jury could return the

19   death penalty verdict.  Now we've had folks come up here with

20   different types of views on the death penalty as a

21   punishment.  Some people --

22                    THE COURT:  Mr. Bailey, would you

23   approach, please?

1    (Whereupon, a conference was held at the bench.)

2                    THE COURT:  For the record, no objection

3    to dismissing for cause?

4                    MR. BAILEY:  I have no objection for

5    dismissing for cause, Your Honor.  Economic hardship.

6                    THE COURT:  No objections by either side?

7                    MR. JUHASZ:  We have none either, Your

8    Honor.

9                    THE COURT:  This is a bad time for us to

10   ask you to be here.  It's a happy time for you, and we don't

11   want to ruin that; okay?  You're excused.  Wish you the best.

12   Okay?

13                   KRISTINA M. HOLMES:  All right.  Thanks.

14                   THE COURT:  Thank you very much for

15   participating.

16                   KRISTINA M. HOLMES:  Thank you.

17                   MR. BAILEY:   Take care.  Thanks very

18   much.

19                   THE COURT:  I received a phone call from

20   John M. Brdek, Jr., Juror Number 334.  Pursuant to what

21   appears on the record, he advised that he will not be

22   participating in the trial and he's dismissed for cause.

23                            * * *

1          **PROSPECTIVE JUROR LISA R. MASSARY**,

2    **BY THE COURT:**

3    Q          Good morning, ma'am.

4    A          Hi.

5    Q          Do you still have your appointment for May 22d?

6    A          Yes.

7    Q          At 4.  Okay.  You read the handout that was given to

8    you?

9    A          Uh-huh.

10   Q          You have a pretty good idea of what's going on, but

11   we'll go into a little bit more detail.

12              This case basically deals with two aggravated murder

13   counts against Donna Roberts with specifications.  Under the

14   law of Ohio, just because a person commits murder does not

15   mean that they automatically face the death penalty.  The

16   death penalty arises when there are specifications, those are

17   things contained in the statute that covers aggravated

18   murder, if those are attached.  Now, what the specifications

19   do is say that there were aggravating circumstances and

20   should raise it to the level of the death penalty.  Just

21   because a person kills someone in Ohio does not mean, as I

22   said, that the death penalty arises.  But when there is a, an

23   indictment that has, for aggravated murder that has

1    specifications attached, that means that if the State is able

2    to carry the burden of proof of showing each and every

3    element of the aggravated murder and the accompanying

4    specifications, then the jury is called upon to consider

5    imposing the death penalty or one of three alternatives.  And

6    that is life without chance of parole, life without any

7    chance of parole before 25 or 30 years.

8         Now, we have no way of knowing what the decision of

9    this jury is going to be, of course.  They won't, we won't

10   know that until the evidence has been presented, they've

11   heard the instruction of law and they make their decision.

12   If the State of Ohio fails to carry their burden of proof,

13   then this jury would properly return a verdict of not guilty.

14   If, however, the State proves everything necessary beyond a

15   reasonable doubt, then this jury may be called upon to

16   consider and perhaps to impose the death penalty or some

17   lesser sentence.  We can't very well wait until we get to

18   that second phase if that does arise because we may have

19   somebody on that jury that believes that if somebody takes a

20   life, they should forfeit their life, an eye for an eye.

21   That isn't the law in Ohio.  Such person could not be fair to

22   the defendant.

23         Likewise, a person who could, under no

 1    circumstances, put themselves in a position of having to make

 2    that decision, then that person could not be fair to the

 3    State of Ohio because the State has the right to ask for the

 4    death penalty if they prove their case.

 5          The defendant has a right in that second phase for

 6    every member of this jury to weigh the aggravating

 7    circumstances against the mitigating factors.  Aggravating

 8    circumstances are reasons the State would put before the jury

 9    as to why they should impose the death penalty.  The

10    mitigating factors would be reasons put to the jury to show

11    them that in this particular case why they should not impose

12    the death penalty.  And again, the State has to prove that

13    beyond a reasonable doubt.  The burden is always upon the

14    State.  They -- the State alone wins or loses its case.  The

15    defendant may participate, the defendant may offer witnesses

16    or whatever, but there's no need to.  And if the defendant

17    chooses the option of doing nothing throughout the trial, the

18    jury can't look upon that with any eye of suspicion because

19    it isn't the defendant's job here or duty to present

20    anything.  It's the State's job to do that.

21          The other issue will be regarding pretrial

22    publicity.  Have you read or do you think you know something

23    about the case that might cause you difficulty in listening

```
 1    to the evidence and following what the evidence proves.  For

 2    the case to be fairly tried, this jury will have to set aside

 3    anything that they may have heard about the case and decide

 4    the matter strictly on the evidence that they hear in this

 5    courtroom.  Okay?

 6    A       Yes.

 7                    THE COURT:  Very good.  Gentlemen.

 8    EXAMINATION BY MR. BAILEY:

 9    Q       Morning, Mrs. -- is it Massary?

10    A       Uh-huh.

11    Q       My name is Ken Bailey.  You saw me about I guess

12    it's been five weeks over in the other courtroom and I

13    promised you at that time that next time you saw me I would

14    be joined by my co-counsel, Chris Becker, and there he is.

15    A       Hi.

16    Q       And the two of us are assistant prosecutors with the

17    Trumbull County Prosecutor's Office and we're responsible for

18    prosecuting this case on behalf of the people of Trumbull

19    County and the State of Ohio.  And as the Judge indicated,

20    we're going to be asking you some questions about some

21    different things this morning.  And the reason we ask these

22    questions about your opinions on different things and your

23    prior experiences isn't because we're snoopy and we like to
```

1   pry into peoples' backgrounds, but rather to make sure that

2   the folks who are selected to sit on this particular jury can

3   be fair and impartial to both sides, both to the defendant

4   and to the people of the State of Ohio; okay?

5   A       Okay.

6   Q       And there aren't any right answers, there aren't any

7   wrong answers to these questions.  Only open and candid

8   answers.  If you have any questions that come up during the

9   course of these proceedings, then feel free to ask them at

10  this point and we'll see if we can get you an answer.  We're,

11  we are not allowed to have any communication with you after

12  we're done today in court, okay, until this entire case is

13  over.  If it goes into two phases, we have to wait until the

14  end of the second phase before we're allowed to talk to you.

15  If we run into each other in the hallway, in the elevator, at

16  a restaurant, we're only allowed to say maybe good morning or

17  good afternoon.  If we said anymore, it could result in a

18  mistrial.  We don't want to do it all over again.  Okay?  And

19  we just want you to know what our rules of conduct are so

20  that you don't think we're snubbing you or trying to be

21  antisocial or anything like that in case we do run into each

22  other.

23  A       Okay.

```
 1    Q        Okay?  Now, this morning, I am going to be asking

 2    you some questions.  I'm gonna ask you about pretrial

 3    publicity, I'm going to ask you about the death penalty as a

 4    punishment as it pertains to the case and your views on it

 5    and then I am going to ask you some regular questions.

 6             Let me -- before I do that, let me ask you about

 7    your doctor's appointment.  You said you had one scheduled

 8    May 22d at about 4:00?

 9    A        That's correct.

10    Q        Okay.  This is the 12th so that would be next

11    Thursday I believe; right?

12    A        (Nods head.)

13    Q        Any chance you can get that moved?

14    A        I can try.  Like moved to?

15    Q        Do they do it on a Saturday or?

16    A        I don't think his office is open on a Saturday, but

17    I got it at 4:00.

18    Q        Well, we can, I'm sure that if you're selected to

19    serve here, we'd be able to let you out.

20    A        Yeah.  I think one day they're open to 7 so I could

21    also try to get it moved.

22    Q        Oh, okay.  That would work out.

23    A        Okay.
```

1    Q        But we'd probably be able to work around that.

2    A        Okay.

3    Q        Let's talk about this pretrial publicity.  The first

4    time, let's see, looking at your questionnaire, I understand

5    you get the Tribune occasionally on Sundays and you watch the

6    local news a couple of times a week on channel 27; right?

7    And in your questionnaire, you indicated you had no knowledge

8    of this particular case when you filled it out?

9    A        That's correct.

10   Q        Okay.  Have you heard, do you recollect having heard

11   anything about this case?

12   A        No.

13   Q        Okay.  Now, let me tell you, the defendant has been

14   charged with a couple counts of aggravated murder with

15   specifications and aggravated burglary and aggravated robbery

16   and firearm specifications.  And the charge is that she

17   planned with another person by the name of Nate Jackson to

18   kill her ex-husband with whom she was living for insurance

19   money and that the actual killing and the trespass into the

20   victim's house and the theft of the car was done by this Nate

21   Jackson.  Okay.  Does that ring a bell in any way?

22   A        No.

23   Q        Okay.  The reason the Judge admonishes the jurors

1    not to read the paper or listen to the news is because as you

2    look around the courtroom now, there is nobody here from the

3    news media; okay?  But it may well be that as the trial

4    progresses, as we get into testimony, you'll see reporters

5    come in and sit down for a few minutes, maybe for half an

6    hour or so.  You'll see the TV folks come in and set up their

7    cameras.  They can't film the jury, but they can film the

8    other participants and then they'll do a feature on the

9    trial.  But the thing is, they'll have missed all the

10   questions that were asked and answered before they got in

11   here and everything that was asked and answered once they

12   leave here.  Okay?  So their coverage is going to be taken

13   out of context from the course of the trial.  And in fact,

14   what might be in the paper or on TV might actually be the

15   reverse of the total impact of the testimony.  Okay?  And

16   they don't deliberately mislead people as to what happened.

17   It's just because of the nature of the beast.  They have to

18   rush in to print and they miss everything else that happens.

19   So if you sat on this jury, you might say, have somebody save

20   the papers for you and then read them when the trial is all

21   over.  You might say to yourself, "Gosh, I sat in Judge

22   Stuard's court for the entire case and whoever wrote this

23   article must have been sitting in Judge Logan's court on a

1    different case."

2              Okay?  So it's because of that potential or error

3    and distortion that you're asked not to read the papers or

4    ignore the TV programs or coverage of the case and not

5    discuss it with anybody.  You wouldn't have any problem doing

6    that?

7    A        No.

8    Q        Okay.  So much for pretrial publicity.

9              Now let's talk about the death penalty as a

10   punishment here and your views on that.  The first time you

11   learned this was a potential death penalty case was when?

12   A        When I was here.

13   Q        Back on April 8th?

14   A        The 8th, yeah.

15   Q        Okay.  And before that, have you ever had occasion

16   to discuss or have conversations with any family members or

17   friends or some organization concerning your view on the

18   death penalty, maybe back in school, you know, when cases

19   came up in the news or at work?

20   A        I would imagine, yes.

21   Q        Okay.  And do you remember what position you would

22   have taken?

23   A        Yeah.  I probably would say that it would just

1     depend on the evidence and what happened during the course

2     of, you know, the trial to get 'em to that point I guess.

3     Q        Okay.  Looking at your questionnaire, it seems like

4     you favor the death penalty for murder cases?

5     A        Yes.

6     Q        And you believe it has a deterrent affect on other

7     people from committing murders?

8     A        Yes.

9     Q        Okay.  You understand that in Ohio -- well, let me

10    ask you.  Your ex-husband is a, is he still a corrections

11    officer with the Sheriff's Office?

12    A        Yes.

13    Q        What's his name?

14    A        Dominic Massary.

15    Q        Okay.  Did you ever have a chance to talk to him

16    over the years about the death penalty as a punishment?

17    A        No.

18    Q        Did it ever come up?

19    A        No.

20    Q        The law in Ohio, the criminal law is written by the

21    state legislature.  We elect the folks down in Columbus and

22    they pass the laws and they write out what's prohibited and

23    what the range of punishments would be.  And every killing in

1    the law isn't treated equally; okay?  The way the law is

2    written, I imagine that if somebody were out chopping wood

3    and the head of the ax or the ax head flew off the handle and

4    killed somebody, that would be an accident, wouldn't it?

5    A        Yes.

6    Q        You wouldn't expect anybody to be punished for

7    something like that?

8    A        No.

9    Q        And if somebody were driving down the road too fast

10    and went through a stop sign and killed a pedestrian, you'd

11    expect there would be some type of punishment of jail or

12    prison sentence, but not the death penalty; right?

13    A        Right.

14    Q        Okay.  If two fellows were drunk and they were

15    fighting in a bar and one fellow hit the other and the victim

16    flew backwards, hit the back of his head on the edge of the

17    bar and died as a result of that, that might be some type of

18    manslaughter case perhaps.  You would expect maybe a prison

19    sentence, but not the death penalty; right?

20    A        Right.

21    Q        And if somebody, there are different types of cases

22    where somebody could kill somebody with prior calculation and

23    design.  In the old days, we used to talk about premeditated

1    murder, but they changed the law a number of years ago and

2    now we have a law dealing with prior calculation and design.

3    It's where basically somebody plans a killing in advance.

4    And it may be for different reasons.  It could be a murder

5    for profit, a murder for hire, it could be, there a lot of

6    different things it could be under the law.  But let's say

7    somebody plans to kill another person.  Let's say I'm upset

8    with my co-counsel's shoes.  I say, "I hate those shoes.

9    Chris, if you wear those shoes tomorrow, I'm gonna blow you

10   away when you come up the courthouse steps."

11         And I stand out in front of the courthouse and tell

12   everybody, I announce to the whole world, "If my co-counsel

13   wears those shoes tomorrow, the same shoes, I'm gonna blow

14   him away with a .357."

15         And he walks up the steps tomorrow morning wearing

16   those shoes and I blow him away with a .357, okay, that would

17   be a killing with prior calculation and design.  But under

18   Ohio law, that's not punishable by the potential penalty of

19   the death penalty.  It's not a potential punishment just for

20   that the way the legislature has written the law.  Okay.

21         To make a person eligible for the death penalty,

22   there has to be something else.  Like the Judge mentioned,

23   there has to be a specification of an aggravating

1     circumstance.  And the legislature has written the law in

2     such a way that that can include maybe killing a specified

3     person like a police officer or the governor or lieutenant

4     governor or the president of the United States or it could be

5     the killing of a young child or certain type of felony murder

6     where it's committed during the course of an aggravated

7     burglary or kidnapping or a rape or an aggravated robbery or

8     a mass murder which involves the killing or attempted killing

9     of two or more people.  Okay?  And there are a number of

10    other things that are in there too.  And that would make a

11    person eligible for the death penalty as punishment.

12          Let me ask you -- that's the way the legislature has

13    written the law now.  If you had some say in designing the

14    criminal justice system, if you sat as a legislator down in

15    Columbus, would you include the death penalty for certain

16    killings?

17    A       Yes.

18    Q       What type?

19    A       Well, I would say the types that were premeditated,

20    but they had, like you said, an aggravating circumstance to

21    that.  You know.  If they raped them or robbed them in the

22    process or whatever.  I would say that would be.

23    Q       Okay.  In your belief in the death penalty being

4886

1    appropriate for some types of cases, would you include it for

2    anything other than murder?

3    A        No.

4    Q        Okay.  Your belief that the death penalty might be

5    appropriate for certain types of killings, is it based on

6    personal, moral, ethical or religious belief or some

7    combination of factors?

8    A        Just probably personal and moral and a little bit,

9    I'd say, religious belief.

10   Q        How is it?  Can you explain that?

11   A        Well --

12   Q        You -- because I understand you're a Pentecostal

13   Christian?

14   A        That's correct.

15   Q        Anything in your religion, I mean does it talk about

16   certain beliefs in the death penalty?

17   A        No.  Just in the bible, it states the eye for an eye

18   thing, but I think you have to take that a little farther

19   with what the circumstances are.

20   Q        Okay.  Can you explain that?

21   A        What do you mean?

22   Q        How you mean that.

23   A        Well, in the bible it's, you know, God says that if

1    you kill somebody then you should be judged in the same

2    manner.  But I think that if that would hold true, that would

3    mean that somebody that hit somebody with a car would also

4    have to be put to death, which I don't think is right.  So I

5    think it would have to depend on the circumstances

6    surrounding the case.

7    Q        Okay.  And that's what they've done in Ohio law,

8    because you understand for somebody convicted of aggravated

9    murder with specifications, it's not an automatic death

10   penalty because in the first phase of the trial, you know,

11   the first phase is tried just like any other criminal trial

12   in Ohio.  You got to make your decision as to whether the

13   defendant is guilty beyond a reasonable doubt of the crime of

14   aggravated murder and one or more of these specifications of

15   special circumstances before you go into a second phase.  And

16   in that first phase, punishment isn't relevant.  So nothing,

17   you'd probably hear nothing about this issue of what the

18   appropriate punishment is; right?

19   A        Correct.

20   Q        So the first phase just deals with guilt or

21   non-guilt.

22            Now, if you find that we meet the burden of proving

23   the elements of the crimes, the essential component parts of

1    the crimes, beyond a reasonable doubt, then we go into a

2    second phase.  And in the second phase, the issue is

3    different from the first phase.  You've already decided guilt

4    so guilt is no longer an issue.  Okay?  Because you've been

5    convinced beyond a reasonable doubt that the defendant is

6    guilty of aggravated murder and one of more of these

7    specifications.

8            In the second phase here, the issue is what's the

9    appropriate punishment for this defendant for this crime.

10   And the way that the Ohio law is written, you got to do a

11   balancing test.  In a second phase, you can hear the same

12   evidence over again.  The State generally says something to

13   the effect that, "We move to admit all the testimony and

14   evidence that's relevant to the aggravating circumstances

15   from the first phase into the second phase," or something

16   like that.  Okay?  And then you could hear new evidence.

17           The defense has an opportunity to present what we

18   call mitigating factors.  Mitigating factors, basically it's

19   a fancy word that means something that's in favor of a

20   defendant and works against the imposition of the death

21   penalty as a punishment.  Okay?  We don't know what they are

22   at this time because it's not relevant now.  But it could be

23   like the two guys fightin' in a bar.  They're both drunk or

1    something.  But who knows.  Okay?  And you have to be able to

2    consider those things.  You got to be able to consider the

3    aggravating circumstances and the mitigating factors to sit

4    on this case.

5         Now, how much these things weigh when you put 'em on

6    a scale, that's entirely up to you and the other jurors.  You

7    might decide something weighs a whole lot.  It may weigh like

8    20 pounds or a ton.  And something else, on the other hand,

9    may weigh maybe like about as much as a feather; right?  But

10   you got to be able to consider it and determine how much

11   weight to give it to sit on this jury because the death

12   penalty is not an automatic punishment.

13        Now, in the second phase, the State's burden of

14   proof is to prove beyond a reasonable doubt that the

15   aggravating circumstance or circumstances, which you would

16   have found from the first phase of the trial on one side of

17   the scale, we have to show that that outweighs beyond a

18   reasonable doubt whatever these mitigating factors are.  And

19   you have to be able to consider four possible punishments to

20   sit on this jury.  You got to consider them equally when you

21   start out.  There's the death penalty, there's life in prison

22   without possibility of parole, there's life in prison with

23   parole eligibility after 30 full years and life imprisonment

1    with parole eligibility after 25 full years.  And under our

2    system, you got to be able to consider those at the beginning

3    equally.  Okay?

4         If we meet our burden of proof of proving that the

5    aggravating circumstance or circumstances outweigh these

6    mitigating factors beyond a reasonable doubt, then the

7    appropriate penalty is the death penalty.  And at that point,

8    you stop your deliberations if we meet that burden and you

9    return that verdict.  Okay?

10        If we don't meet our burden of proof, if you and the

11   other eleven jurors say, "Hey, the prosecutor didn't prove

12   that the aggravating circumstance or circumstances outweigh

13   the mitigating factors beyond a reasonable doubt," then you

14   forget the death penalty and you go down to the other three

15   life sentences and consider which of those is the most

16   appropriate for this defendant for this case.  Okay?

17        Do you think you would be able to do that?

18   A    Yes.

19   Q    Okay.  If we meet our burden of proof in the first

20   phase and we establish to your satisfaction that the

21   defendant's guilty of the elements of the crime charged for

22   aggravated murder and one or more of these specifications

23   beyond a reasonable doubt, can you sign the verdict form for

1    guilty knowing that if you do she'd become eligible for the

2    death penalty in the second phase?

3    A       Yes.

4    Q       Okay.  Now let's say we get to the second phase and

5    we convince you and the other eleven jurors beyond a

6    reasonable doubt that the aggravating circumstance or

7    circumstances outweigh the mitigating factors beyond a

8    reasonable doubt.  Would you be able to sign a verdict form

9    for the imposition of the death penalty?

10   A       Yes.

11   Q       And if you did that and the Judge asked you in open

12   court, "Is this your verdict," would you be able to say,

13   "Yes, it's my verdict"?

14   A       Yes.

15   Q       Okay.  Now your view on the death penalty being

16   appropriate, you've held that view for about how long?

17   A       Oh, I don't know.  Twenty years.

18   Q       Okay.  And has the, your strength in that belief,

19   has it stayed about the same or has it increased or

20   decreased?

21   A       I'd say the same.

22   Q       Okay.  So much for the death penalty as a possible

23   punishment.

1          Now let's get into some regular questions here.

2     Now, the defendant here is charged with planning with another

3     person, this Nate Jackson, and she's not charged as the

4     trigger person, but rather as a complicitor, a complicitor

5     being someone who solicits or procures or aides and abets

6     another person, encourages, strengthens, helps or plans with

7     another person in the commission of the offense.  And under

8     Ohio law, she can become eligible for the death penalty if we

9     prove that she planned or she was a complicitor in these

10    crimes if we establish all the elements beyond a reasonable

11    doubt.  Okay?  She'd become eligible for the death penalty.

12          Is there anything about the fact that she's not

13    charged as the trigger person, but rather as somebody who

14    planned with prior calculation and design the killing of

15    another person that would affect your ability to return a

16    verdict?

17    A          No.

18    Q          Okay.  Now, there are two charges here of aggravated

19    murder.  There's only one person that's been killed, but

20    there are two separate charges because under Ohio law, the

21    State is allowed to pursue two separate theories and have

22    both of these theories go to the jury for their

23    consideration.  And the way these are charged, there's a

1    charge of aggravated murder with prior calculation and design

2    and there's a second charge of aggravated murder that the

3    purposeful killing of another person was done in the course

4    of a special felony, during the course of an aggravated

5    burglary and/or an aggravated robbery.  Okay?

6          And there are these specifications that we

7    mentioned.  And basically specifications attached to both

8    counts of aggravated murder.  The specifications, there are

9    two of those, and the first one is a specification of an

10   aggravated burglary, that the aggravated murder occurred

11   during an aggravated burglary and that the defendant

12   committed the aggravated murder with prior calculation and

13   design.

14         And the second specification is that the aggravated

15   murder was committed during an aggravated robbery, as opposed

16   to an aggravated burglary, and that the defendant committed

17   the aggravated murder with prior calculation and design.

18   Okay?

19         Each of these crimes is composed of certain

20   elements.  Oh, there are two more crimes.  There's a charge

21   of aggravated burglary and aggravated robbery.  The defendant

22   is charged as a complicitor in these.  And let me give you

23   the distinction here.  Most folks, unless they're trained in

1    the law, interchange those terms, robbery and burglary.  And

2    people sometimes say, "Gosh, my house got robbed," and they

3    really mean it got burglared.

4            Basically when we talk about an aggravated burglary,

5    we're talking about somebody trespassing in an occupied

6    structure, in somebody else's home, and the person goes in

7    with the intent to commit some type of offense.  It could be

8    an aggravated murder or a theft offense inside that residence

9    and somebody is there and the perpetrator is armed with a

10   deadly weapon like a knife or a gun and the perpetrator

11   inflicts serious physical harm or death on the victim inside.

12   Okay?

13           On the other hand, there's a charge of aggravated

14   robbery.  Aggravated robbery doesn't involve any type of

15   structure.  No dwelling, house.  It's basically when the

16   perpetrator uses force or the threat of force against another

17   person to commit the offense, like to steal something, and

18   the perpetrator could be armed with a deadly weapon like a

19   knife or gun and the perpetrator inflicts serious physical

20   harm or death upon the victim; okay?

21           And attached to those particular charges are firearm

22   specifications.  Just an extra finding of fact.  The term

23   specification is just an extra, it's a fancy word that just

1    means an additional finding of fact for a jury to consider.

2    And there's a charge there that a working, loaded gun was

3    used where you pull the trigger and a bullet comes out

4    through the use of combustion or expulsion.  There's a fancy,

5    well, there's a technical legal definition that the Judge

6    will give you, but basically it means a working gun.  Okay?

7            And the Judge is gonna define all these terms for

8    you.  Everything has got a definition pretty much and he'll

9    give you the legal definition of all these particular terms

10   at the end of the case and you're bound to follow that

11   instruction.  Okay.

12           Now, this concept of elements, each crime is

13   composed of certain elements.  It's like, did your mom ever

14   bake a cake?

15   A       Yeah.

16   Q       Chocolate cake?  Do you like chocolate cake?

17   A       Uh-huh.

18   Q       Okay.  Me too.  And when your mom baked a chocolate

19   cake, she used certain key ingredients and she had to put all

20   those ingredients in for each, each cake she made had

21   different ingredients; right?  If it's a chocolate cake,

22   she's got to have the chocolate.  If she leaves it out, you

23   might end up with a cake, but it's not gonna be a chocolate

1    cake; right?

2    A        Right.

3    Q        Same thing with these crimes.  We got to bake a

4    whole lot of cakes; okay?  And you got to consider each cake

5    or crime separately.  We put in different ingredients.  If we

6    leave out an ingredient, you got to find the defendant not

7    guilty of that particular crime.  We have to establish these

8    ingredients or elements by proof beyond a reasonable doubt

9    basically so that you're firmly convinced of the truth of the

10   charge to a moral certainty using your reason and your common

11   sense.  It's a test you use every day.  If you raise a child,

12   you use a lot of reason and common sense and you want to make

13   sure that it's the right thing to do; right?

14   A        Right.

15   Q        Now, I'm gonna give you a for instance of these

16   elements.  Now, let's take the crime of aggravated murder

17   with prior calculation and design.  And the Judge, you're

18   bound by the Judge's instructions, but let's say that we have

19   to establish first the crime happened on or about a certain

20   date.  Let's say December 11 of 2001.

21            Second, that it happened here in Trumbull County,

22   Ohio.  The legal term for that is venue.  And quite simply,

23   we have to ask that question, what county and state did this

1   occur so we can try this case in this courthouse rather than

2   up in Ashtabula or down in Tuscarawas County.

3           Third is identification.  Somebody is gonna have to

4   come in and point out the defendant as the person involved

5   here.

6           Fourth, that she acted purposely.  Basically on

7   purpose, but the Judge will give you a detailed definition of

8   purpose.

9           Fifth, did she cause the death of a living person?

10  In this case, a fellow by the name of Robert Fingerhut.

11          And sixth, that she acted with prior calculation and

12  design.  Now this term, prior calculation and design,

13  requires some advanced planning and a studied scheme to kill.

14          And let me give you a for instance of that.  Let's

15  say I take my pen and I drop it and I catch it.  That might

16  be a reflex, no planning involved.

17          But let's say I drop my pen and I say, "Oh my

18  goodness.  I dropped my pen.  Maybe I better bend down and

19  pick it up."

20          Okay?  That's some advanced planning; right?

21          Now, let's say yesterday I'm talking to Chris, who's

22  not here now, he keeps disappearing on me now.

23                       MR. INGRAM:  He went to retrieve a

1    document.

2    A       He's scared of you.

3             MR. BAILEY:  That's good.

4    Q       (By Mr. Bailey)  And let's say I told Chris

5    yesterday, I said, "I need an example of prior calculation

6    and design.  So I'm gonna come to court and I'm gonna drop my

7    pen so I can use that as an example."

8             When I pick it up and I planned it in advance, that

9    would be prior calculation and design.  Okay?

10   A       (Nods head.)

11   Q       Because it was a studied scheme to drop my pen so I

12   could pick it up and I use it as an example.  Okay?

13            Now, the burden of proving these particular elements

14   is on us, the people of the State, and we've got to do that

15   beyond a reasonable doubt.  And if we don't meet this burden,

16   then you have to find the defendant not guilty of that

17   charge.  Okay?  You may say, "Gosh, they put on a whole lot

18   of evidence and I suspect the defendant did it, but they left

19   out venue.  The prosecutor never asked what county or state

20   it occurred in."

21            Okay?  So even though you may say, "I think the

22   defendant did it, this prosecutor didn't meet his burden of

23   proof," so you got to find the defendant not guilty.  Okay?

1    You'd be able to do that?

2    A        Yes.

3    Q        Okay.  You understand that the burden of proof is on

4    us, the people of the State?

5    A        Uh-huh.

6    Q        It never shifts.  The defendant has no burden of

7    proof.  The defense team there, they can sit on their hands

8    during this trial.  They don't have to ask any questions

9    under the law because we've got this burden of proof.

10   They're not gonna do that.  They're excellent attorneys.

11   They're highly skilled, but they could sit there and work

12   word jumbles or something like that.  Okay?  Because the

13   burden is entirely on us.  The defendant doesn't have to do

14   anything in the course of the case.

15            And there's a reason for that.  There's a

16   presumption of innocence under our American system of

17   justice.  Other countries don't have this presumption of

18   innocence.  Not all countries.  If you lived in France or you

19   lived in Turkey, there's a presumption of guilt basically.

20   And -- but that's not our system.  Okay?  And this

21   presumption of innocence, this defendant is presumed to be

22   innocent, as are all other defendants tried in this

23   courtroom.  And the presumption of innocence acts like a

1    cloak shielding this defendant all through the course of the

2    trial unless and until the State's able to put on enough

3    testimony and evidence to convince you of the truth of the

4    elements of the crime charged beyond a reasonable doubt.

5    Okay?  That stays with her all the way through the course of

6    the trial until you're back in the jury room deliberating

7    with the other jurors.  And if you find that we've proved

8    these elements of the crime beyond a reasonable doubt, at

9    that point, you'd be able to return a guilty verdict and that

10   presumption of innocence would be gone.  Okay?  And you

11   believe in the presumption of innocence; right?

12   A        Yes.

13   Q        It's important in our system of justice?

14   A        Uh-huh.

15   Q        Now, we use this term proof beyond a reasonable

16   doubt.  And the Judge is gonna give you a detailed definition

17   of that term.  But like I said, it's a common sense term

18   basically.  It's based on use of your reason and common sense

19   in determining if you're firmly convinced of the truth of the

20   charge, in this case the elements of the crime, to a moral

21   certainty.  Okay?

22            That fancy language, it's just stuff you've dealt

23   with every day.  You've bought a house before?

```
 1    A        Actually, I am in the process of buying a house.

 2    Q        Oh, good.  And you've taken on a job; right?

 3    A        (Nods head.)

 4    Q        You decided to get married, you decided to get

 5    divorced; right?

 6    A        Uh-huh.

 7    Q        You decided to have a child?

 8    A        Uh-huh.

 9    Q        Okay.  And these, if your kid is sick while you're

10    raising them, you decide whether or not to take 'em to the

11    doctor; right?  You use your reason and common sense?

12    A        Uh-huh.

13    Q        You list the pros, you list the cons.  Just like

14    buying the house.  Okay.  You want to make sure that it's the

15    right house for you.  Some houses might be too expensive,

16    there may be structural problems, water damage.  There are

17    all kinds of things you look at in the house.  Is it in the

18    right neighborhood, the location, is it close to the school,

19    are there sidewalks nearby or is there a septic system versus

20    city water.  A lot of things to consider; right?

21    A        Uh-huh.

22    Q        So you list your pros and your cons.  You look at

23    the interest rates, see if you can get a decent rate, and
```



1    this is a good time to buy, and at some point you're probably

2    going to make a decision, aren't you?

3    A       Uh-huh.

4    Q       I know when I went out, we looked at a lot of

5    houses, saw everything where we live in that area and knew

6    what was on the market and everything, what the rates were.

7    But if you have questions, reasonable doubt, you don't buy

8    it.  But if you've satisfied every reasonable doubt and

9    you're firmly convinced it's the right thing to do, then you

10   go ahead and make your decision and you buy it; right?

11   A       Correct.

12   Q       Okay.  That's the same test you use here.  It's one

13   of the most important decisions you're gonna make in your

14   lifetime.  Major investment, whether you by a house or not;

15   right?

16   A       Uh-huh.

17   Q       And it's that same reason and common sense that you

18   apply to this particular case that you use in your daily

19   life.  And it's sort of like, I'm gonna steal John Juhasz's

20   box, his imaginary box, that he uses as an example.  I like

21   this box.  And in a civil case where somebody sues for money

22   damages, like in a car accident or something, whoever fills

23   that box over half way with evidence is gonna prevail in that

1    case.  Okay?  And it's like a scale.  So whoever tips the

2    scale just a little bit is gonna win.

3           But in a criminal case, our burden is a whole lot

4    bigger, it's a lot higher.  We got to fill that box pretty

5    close to the top.  Not all the way to the top because under

6    our system of justice, nothing could ever be proved a hundred

7    percent.  There's always some room in there for some possible

8    or imaginary doubt; right?  So the law puts the burden on us,

9    the people of the State, to fill the box with evidence beyond

10   a reasonable doubt, which is fairly close to the top.  You

11   and each of the other eleven jurors can draw your own

12   imaginary line on that box.  It might be an inch away from

13   the top or a half an inch or something, wherever you're

14   comfortable with it.  Okay.  And we have to fill that box

15   with evidence to convince you of the elements of the crimes

16   charged.  And if we do, then we've met our burden of proving

17   the case beyond a reasonable doubt.

18          Now you understand the defendant doesn't have any

19   burden.  Okay?  She doesn't have to put anything into the box

20   or take anything out of the box because of the presumption of

21   innocence and the burden of proof.  We're the only ones who

22   have to do anything, the people of the State, but you

23   wouldn't force the defendant to do anything, would you?

4904

```
 1    A        No.

 2    Q        Okay.  Now, the standard of proof beyond a

 3    reasonable doubt, sometimes folks watch TV programs like,

 4    what were the old ones, L.A. Law and Perry Mason, and they

 5    used, and there was an Alfred Hitchcock movie, Shadow of a

 6    Doubt, and folks, they use terms like, oh, we have to prove

 7    it beyond all doubt or beyond any doubt or beyond the shadow

 8    of a doubt.  Well, that's not the law.  You understand it's

 9    just proof beyond a reasonable doubt?  That shadow of a

10    doubt, there's no such animal in real life.  It makes for a

11    good Alfred Hitchcock movie title, but that's all it is.

12    It's a movie title.  Okay.  You wouldn't force us to a higher

13    burden of proof than what the Judge instructs; right?

14    A        No.

15    Q        And you understand this burden of proof is the same

16    in all criminal cases, whether it's a shoplifting case or a

17    burglary or a robbery or an aggravated murder case like this?

18    A        Uh-huh.

19    Q        Okay.  Now, there are different types of evidence

20    that we can use to fill this box.  We can use direct evidence

21    where a witness comes in and testifies to the, what he or she

22    has used through the use of his or her five senses.  Like "I

23    heard the gunshot and it was loud, I smelled the smoke and it
```

1   was acrid, I touched the surface and it was warm."

2          Okay?  But there's another type of evidence that

3   you're used to using.  It's roundabout evidence.  It's where

4   you're presented with a fact or series of facts and you're

5   asked to draw a logical deduction to another fact or series

6   of facts.  That's called circumstantial evidence.  In those

7   TV programs, sometimes they misuse that term, but let me give

8   you a for instance.

9          Let's say you live in a two-story house and your

10  bedroom is on the second floor and before you go to bed at

11  night, you look out of your bedroom window across the

12  neighborhood and it's a beautiful night.  The moon is

13  beaming, the stars are twinkling and there's just not a cloud

14  in the sky.  And as far as you can see across the

15  neighborhood, it's perfectly dry.  Okay?  So you draw the

16  blinds, you get into bed, the radio is on low and you hear

17  the announcer say, "Folks, there's a cold front coming in

18  tonight and I expect we're gonna get a storm before morning."

19         So you turn off the radio and you fall asleep.  And

20  sometime during the night, you're awakened by a distant

21  booming sound up in the sky.  And you look toward the window,

22  but the blinds are drawn and you see like a flash of light

23  outside.  And about three seconds later, there's a distant

1    boom.  And a minute goes by and suddenly there's another

2    bright flash of light outside and about a second later

3    there's a closer boom up in the sky.  Suddenly, there's this

4    really bright flash outside and right over the house there's

5    a ripping and cracking boom sound and a pitter patter on the

6    roof and a steady drumming sound and you fall back asleep.

7    Sometime later, you awaken, go to the window, open the blinds

8    and look out.  The sun is shining, there's not a cloud in the

9    sky.  Looks like a nice day, but as far as you can see across

10   the neighborhood, the streets are now running with water, the

11   rooftops are soaking wet, there are drops of water dripping

12   off the leaves of the trees.  Okay?  And you know, there is

13   no fire hydrant nearby where any car could hit it and spew

14   water all over the place.  So you know what happened during

15   the night?

16   A        We had a storm.

17   Q        Right.  There was a thunderstorm.  And you know that

18   beyond any reasonable doubt using circumstantial evidence,

19   don't you?

20   A        Uh-huh.

21   Q        Now, there is some room in there for some possible

22   or imaginary doubt.  You can imagine that E.T. and his alien

23   buddies flew by on a flying saucer during the night and put

 1    on a sound and light show and sprinkled the ground with some

 2    wet stuff, but that would be a foolish or imaginary doubt,

 3    wouldn't it?

 4    A        Uh-huh.

 5    Q        You know all that happened is there was a

 6    thunderstorm.

 7             Now, there are some limitations to circumstantial

 8    evidence.  If you wanted to know how much water fell during

 9    the night or for how long it fell, you'd probably have to go

10    to the weather station out at the airport or something to

11    look at their measuring devices.  But you would know, to

12    determine what happened during the night, you'd know that

13    beyond any reasonable doubt; right?

14    A        Right.

15    Q        Now there's a reason that the State is allowed to

16    use circumstantial evidence as well as direct evidence, and

17    you understand circumstantial evidence is just as good as

18    direct evidence?  Okay?  Are you able to pile up evidence on

19    evidence and make your own decision and follow what the Judge

20    tells you?

21    A        Yes.

22    Q        Now, there's a reason for it because sometimes,

23    unless somebody tells you what they're planning to do, you

1    have to look at all the circumstances and facts to determine

2    what was in a person's mind as to what the person's purpose

3    was at the time of the crime.  And if you had things like

4    maybe letters or phone calls where a person expressed his

5    purpose, you'd be able to consider those types of things as

6    circumstantial evidence to know what the intent was; right?

7    A        Uh-huh.

8    Q        You believe that people should be held accountable

9    for their actions?

10   A        Yes.

11   Q        Now, criminals can engage in a lot of planning in

12   committing a crime, but you're aware that there are times

13   where criminals get caught because they do some really,

14   really stupid things, in spite of all their planning; right?

15   A        Uh-huh.

16   Q        For example, you're aware of the cases where the

17   bank robber goes in and he's got a getaway driver or he's

18   wearing a mask and he's got a gun and he goes up to the

19   teller and he hands a note on the back of an envelope to the

20   teller that says, "Give me all your money," and the teller

21   hands over the money and the guy takes the money and runs

22   leaving the note behind.  And when the teller turns the note

23   over, there is the perpetrator's name and address on the

4909

```
 1   front; right?
 2           Or the case where the burglar climbs into the house
 3   through a window and drops his wallet with all his
 4   identification and leaves it behind at the scene and gets
 5   caught because the cops go to the house and catch him with
 6   all the loot and everything; right?
 7           So you understand that in spite of all the, all the
 8   detailed planning some criminals do, sometimes they slip up
 9   because they do some stupid things?
10   A       Uh-huh.
11   Q       And they get caught.
12           Couple other things.  You can't take notes while
13   you're in court.  Okay?  You ever watch Court TV?
14   A       Sometimes.
15   Q       Okay.  Well, they have cases from different parts of
16   the country and each state has different rules and
17   procedures.  And sometimes in the other jurisdictions, some
18   of the judges let some of the jurors take notes.  We don't do
19   that here in Ohio.  Generally our judges feel it would
20   distract the jurors' attention from observing the witness's
21   demeanor.  They want you to hear what's being said and how
22   it's being said.  And some folks take better notes than
23   others.  It's like being back in college.  And then people
```

```
 1    may argue over their notes.  So they want you to rely on your
 2    collective recollections without taking notes.  You'd be able
 3    to do that?
 4    A       Uh-huh.
 5    Q       You don't -- you're gonna have to remember the
 6    testimony.  We're probably gonna go for three weeks with
 7    three and a half days a week because of the Court's schedule.
 8    And there aren't going to be any instant replays of the
 9    testimony.  That's why you're gonna have, it's not like with
10    the sports things on TV where they have the instant replays.
11            Also, there won't be any instant transcripts of the
12    testimony of the witnesses.  Sometimes folks ask for
13    transcripts of the testimony of the witnesses.  That's not
14    gonna happen.  Our court reporter are excellent, but they
15    can't, we don't have the million dollars worth of recording
16    and transcribing equipment that they do in the O.J. Simpson
17    case and the Menendez brothers cases and some of the other
18    big cases where the TV people are there and they got 50
19    million transcribing devices and stuff.  So you're not gonna
20    have instant transcripts; okay?
21    A       Okay.
22    Q       You've got to rely on your collective recollection,
23    all twelve of you.
```

```
 1    A        Okay.

 2    Q        You can't go out to investigate on your own.  We had

 3    a juror do that once and they do that sometimes on TV

 4    programs, I think one of the Hawaii 5-0 episodes and one of

 5    the Matlock episodes.  That's a no no.  That would cause a

 6    mistrial, and we don't want do it over again.  You're not

 7    gonna do that; right?

 8    A        No.

 9    Q        You're being selected for the position of an

10    alternate.  Sometimes folks say, "Well, I'm an alternate.

11    It's sort of like being a fifth wheel."

12             Well, that's not true because we've tried quite a

13    few capital cases over the years and we try to get four

14    alternates and say, well, gosh, that's a lot of people to be

15    alternates, but we've had a number of cases where because of

16    family emergencies or illnesses, sometimes you hit flu season

17    or something happens, hopefully nothing happens, but we've

18    had cases where all four alternates have been installed to

19    replace regular jurors; okay?  And so it's very important

20    that you pay very close attention just as if you were sitting

21    in one of those twelve seats; okay?

22    A        (Nods head.)

23    Q        That wouldn't bother you; right?
```

```
1    A        No.

2    Q        The fact that the defendant is a woman rather than a

3    man charged with a capital offense, does that bother you?

4    A        No.

5    Q        Another thing is you're stuck with the questions

6    that the lawyers ask.  On Court TV, sometimes they have cases

7    from different jurisdictions where they, the jurors can

8    submit questions to the judge to ask the witnesses questions.

9    You can't do that here.  And because we're lawyers and

10   because we've been trained in law schools, we're geared

11   toward proving the elements or tearing down the elements.

12   Okay?  That's what we tend to focus on.  And there may be

13   some unanswered questions.

14            Shoes.  If you had an interest in shoes.  Let's say

15   you sold shoes.  Like my wife, who has 50 pairs of shoes.

16   Okay?  She might be interested in shoes if she were a juror.

17   But let's say unless it was a case with footprints in the

18   snow or something like that and they were making casts of

19   them, that might not be relevant to this particular case.

20   And if we can establish those elements beyond a reasonable

21   doubt without ever getting into the area of footwear, then

22   you'd be able to return a conviction even though we never

23   asked any questions about shoes; right?
```

4913

```
 1              It's like being a chef.  If you wondered what people

 2     ate during the crime or something like that, that might never

 3     get asked and answered; right?

 4     A        Yeah.

 5     Q        Right?  There might be some questions that might

 6     never get asked or answered.

 7              Sequestration.  At the end of the first phase, and

 8     again, when all the testimony is in and the evidence and the

 9     Judge instructs you on the law, you and the other jurors go

10     back out to the jury room to deliberate and you're all kept

11     together and you're not allowed to deliberate unless all

12     twelve of you are there.  No one on ones or one on threes or

13     whatever.  And you're not allowed to go home at night.

14     You're given advance notice so you can bring your stiff in

15     and they put you up at a local hotel.  And each jury is

16     different.  We've had jurors come back in the first phase in

17     anywhere from an hour and a half with a verdict up to five

18     days.  Okay?  So who knows how long it's going to take for

19     each jury to make a decision.  But you'd be sequestered.

20              And then if you return a conviction in the first

21     phase of aggravated murder and one or more of these

22     specifications, then you'd be maybe recessed for a week or a

23     couple of days and we'd come back in and then we'd have a
```

1   second phase which would last from one to three days usually.

2   And then the Judge would again instruct you on the law and

3   you'd get sequestered again.

4           Okay. Would the sequestration bother you in any way?

5   Would it be a hardship?

6   A       No.

7   Q       Okay.  They put you up at a hotel and they provide

8   you with meals.

9           Do you have any questions that have come up during

10  the course of these proceedings?

11  A       No.

12  Q       Now, sympathy, I think it's normal for one human

13  being to feel some sympathy for another human being, but you

14  understand you have to make your decision in this case based

15  on the testimony and the evidence and the instructions of law

16  without any sympathy for the defendant; can you do that?

17  A       I understand.  Yeah.

18  Q       And there are certain obligations that we have as

19  citizens in this country.  One of those obligations would be

20  that when it's election time, we've got an obligation to bone

21  up on what the issues are and the candidates and then go out

22  and cast a ballot to make sure our system of democracy works.

23          If it's wartime, then we've got an obligation to

1915

 1  maybe serve in the military.  In fact, we have got young

 2  folks overseas in a number of places today doing their duty.

 3          There's another obligation of citizenship, that when

 4  we're summonsed in as jurors in different cases to make our

 5  system of justice work, it's important that we get people

 6  from all walks of life with different experiences sitting on

 7  these juries.  Okay?  Would you be willing to undertake that

 8  obligation of citizenship, even though it may be difficult

 9  to, it sets aside your work schedule for a bit or things that

10  are going on in your personal life, you have to jockey things

11  around.  Again, could you sit on this most serious and

12  important of criminal cases to make sure the system works?

13  A       Yes.

14                      MR. BAILEY:  Thank you very much.

15                      THE WITNESS:  Uh-huh.

16                      MR. BAILEY:  Now, I'm done with my

17  questions and defense counsel will have an opportunity to ask

18  you some.

19                      THE WITNESS:  Okay.  Thank you.

20                      MR. BAILEY:  Thank you.

21                      THE COURT:  Mr. Juhasz.

22                      MR. JUHASZ:  Thank you, Your Honor.

23                              *  *  *

4916

1 **EXAMINATION BY MR. JUHASZ:**

2 Q Good morning.

3 A Good morning.

4 Q How you doing up there?

5 A Good.

6 Q I see you have coffee.  You need some water or

7 something?

8 A No.  I'm good.  Thank you.

9 Q Okay.  I'm John Juhasz.  The Judge had us introduced

10 ourselves a long time ago, back on April the 8th.  My buddy,

11 Gerry Ingram, who's had to go back in the jury room to look

12 at something, and I are representing Donna Roberts.

13  Donna's on trial, as you know, for her life.  And

14 I'm sure it makes sense to you under those circumstances that

15 we would want to ask questions of the people who might be

16 jurors on this case so that we can try to get a fair jury,

17 the same kind of jury you would want or I would want if we

18 were sitting over there charged with an offense such as

19 Donna.  Make sense to you?

20 A Uh-huh.

21 Q Okay.  Some of the questions that we have to talk

22 about because this is a death penalty case are very hard

23 questions.  And by hard questions, ones that you may not have

1    thought about a lot because people just don't always think

2    about the things that we're dealing with here in this

3    courtroom. So if you need some time as I'm asking you these

4    questions, don't worry about it. That's fine. The only

5    thing that I ask you is, be straight forward. And by that, I

6    don't mean to suggest that you're gonna lie or anything. I

7    guess probably a better way to say it is that the only wrong

8    answer you can give me is something that you think I want to

9    hear rather than what you really think about something; fair

10   enough?

11   A        Uh-huh.

12   Q        The Judge told you that nobody is here to change

13   your mind about anything. We are not here to change your

14   opinions about if you were exposed to publicity or to change

15   your views about the death penalty, but I'm sure it makes

16   sense to you, again, that because it's the kind of case where

17   the jurors may end up voting on the death penalty that we

18   have to find out those views. That okay?

19   A        (Nods head.)

20   Q        Gerry, when he's standing up here taking his turn

21   doing this, often likens this to kind of a job interview,

22   except it's a little bit different because usually you go

23   apply for a job and, here, we kind of sent you an invitation.

1   It's a short-term job, but it's an important job.  The reason
2   I like to use Jerry's example of that is in a job interview,
3   not only does the prospective employer find out some things
4   about you to see if he or she is comfortable having you work
5   on that job, but you also find out some things about the
6   place to find out if you want to work there.  So the reason I
7   tell you that is if, as we talk here today, something comes
8   up that makes you feel that maybe you're not comfortable
9   sitting on this kind of case, it's okay to tell us that.  In
10  fact, you should tell us that.
11          And the other thing I want to say is that although
12  lawyers, by either training, experience, or both, sort of
13  take control of and monopolize conversations, I am more
14  interested in what you have to say than what I have to say.
15  So as we get into this, I won't be asking you so many of what
16  lawyers call leading questions which sort of feed you the
17  answer.  I'm more interested in hearing your opinions; all
18  right?
19          You've had a little while now to think about, over a
20  month actually, since you learned this was a pretty serious
21  case and to think about the fact that you might be a juror on
22  this case or maybe you thought this sort of passed you by
23  because it took us so long to get a jury, I don't know, but

1    I'm interested, have you had any thoughts since back then on

2    April the 8th about if you were selected as a juror about

3    taking on that kind of responsibility of deciding --

4    A        Yeah.

5    Q        -- an issue like this?

6    A        Kind of overwhelming actually.

7    Q        Has -- I know that people don't sit around and think

8    about the death penalty, but when you learned it was a death

9    penalty case, did that make you sort of re-examine your views

10   on the death penalty?  Re-examine is the wrong word.  Think

11   about maybe the death penalty when maybe you hadn't thought

12   about it for awhile?

13   A        Yes.

14   Q        Yeah?  Okay.  How do you feel about taking on the

15   responsibility if you're picked to be as a juror?

16   A        Well, I think it's a duty that we have to do so I

17   would be comfortable with that.

18   Q        One of the things that I also like to tell jurors

19   because virtually everybody feels as you do, which is you

20   kind of hope you never get that jury summons.  And once you

21   get it, you kind of go, "Oh," but then you say, "Well, but

22   this is my civic responsibility."

23            And it is.  And Mr. Bailey just talked about that.

1    But at the same time, I want to emphasize to you that even

2    though it's your civic responsibility, we call a lot more

3    people than we're ever gonna need.  You know.  We've talked

4    to more than twelve people plus four potential alternates in

5    this case.  And the reason I tell you that is if there's

6    anything going on in your personal life that's a problem, you

7    know, you should let us know that as well.  Is there, I don't

8    see from your questionnaire that there is, other than your

9    medical appointment?

10   A       No.

11   Q       There's nothing about work or your child or anything

12   like that?

13   A       No.

14   Q       Okay.  You mentioned on your questionnaire and you

15   told Mr. Bailey again today that you really have not heard

16   anything about this case; correct?

17   A       Correct.

18   Q       All right.  And when we say heard, we usually assume

19   that to be from the newspapers or the media.  Have you heard

20   any discussions about Donna Roberts or the case either in the

21   courthouse when you've been hanging around here or from

22   people at work or friends or anything like that?

23   A       No.

4921

1    Q        As Mr. Bailey told you, the basic claim by the

2    government here is that Donna and a fellow by the name of

3    Nathaniel Jackson -- is that a name that you've heard before

4    or not?

5    A        No.

6    Q        Donna and a fellow by the name of Nathaniel Jackson

7    plotted or planned or conspired to kill Robert Fingerhut.

8    Now, Robert and Donna had been married at one time.  They had

9    divorced, but after they divorced, they continued to live

10   together over in Howland and they continued to work together

11   at the Greyhound bus stations in Youngstown and in Warren.

12   Any of that ringing a bell for you?

13   A        Huh-uh.

14   Q        Okay.  During the course of this case, you may hear

15   some evidence, see some evidence, hear some testimony,

16   whatever the circumstances may be, that may well convince you

17   that this Nathaniel Jackson, who I've just mentioned was, in

18   fact, involved in Mr. Fingerhut's death.  That's okay.  The

19   point I want to make clear to you here is you understand,

20   don't you, that this case is not about Nathaniel Jackson, but

21   about Donna Roberts.

22   A        Yes.

23   Q        And specifically it's about whether or not Donna

1    Roberts helped Nathaniel Jackson because I think Mr. Bailey

2    told you, he's been telling most of the jurors, that they're

3    not claiming in this case that Donna is what the law calls a

4    principal offender; do you remember him telling you about

5    that?

6    A        Trigger man or something?

7    Q        Exactly.  Exactly.  And I mention that because it's

8    actually two separate cases; do you see that?  He could be as

9    guilty as sin, but the question in this case is whether the

10   government has any evidence that Donna helped him in any

11   fashion; do you see that?

12   A        Yes.

13   Q        So if you become convinced that Mr. Jackson was, in

14   fact, involved in this and to use my phrase from a second

15   ago, is guilty as sin, that doesn't necessarily mean that

16   Donna is guilty and that doesn't constitute any evidence that

17   she's guilty; do you agree with that?

18   A        Yes.

19   Q        Okay.  In the State's efforts to convince you that

20   Donna is involved, we expect that they will introduce some

21   letters written by Donna and some tape-recorded telephone

22   conversations between Donna and this Mr. Jackson whom I've

23   mentioned.  I'll tell you right now that those letters and

1    those tapes have sexually explicit material in them and many

2    people, I think, would just be downright offended at some of

3    the things they hear.

4         That said, you appreciate the fact that even if you

5    are offended at things that she writes or says, that also

6    does not constitute evidence that she is guilty; do you see

7    that?

8    A       Yeah.

9    Q       Okay.  So you may find yourself in the position of

10   saying, well, you know what, first of all, I think this

11   Jackson guy, from everything I've heard in this trial, is

12   guilty as sin and it may well be that even though you think

13   that, they haven't proved to you that Donna Roberts was

14   involved in helping him; do you see that?

15   A       Uh-huh.

16   Q       It may also be that you say, you know what, she's

17   not a person that I would like to know because what she says

18   and what she writes I find to be offensive, but that doesn't

19   mean that she was involved here and they didn't prove it.  So

20   even though you're offended at what she said or did, you

21   could still find her not guilty; would you have a problem

22   doing that?

23   A       No.

1   Q        All right.  And even though you don't know about it,

2   there has been some hoopla about this case, some media

3   publicity, and that actually brings me to another question,

4   which is that this trial, we anticipate, will get some

5   continued coverage in the media.  My question is if you are

6   not convinced that the State has proved beyond a reasonable

7   doubt that Donna was involved in helping this Mr. Jackson,

8   even though there's all this media hoopla about it, would you

9   have any problem or any hesitation voting not guilty if they

10  didn't prove their case?

11  A        Just because of the media?

12  Q        Yes.

13  A        No.

14  Q        Okay.  You know, we bring that up because you know

15  how sometimes, oh, well, the poor fellow has passed away now,

16  but there was a talk show legend in Youngstown named Dan Ryan

17  and sometimes people would get on Dan Ryan or Ron Verb or one

18  of these other talk shows and they would sort of second guess

19  the jury.  You know.  Like how could those jurors do that?

20  What in the world were they thinking?  And so when we talk to

21  jurors, we want to make certain that we have people who have,

22  for want of a better phrase, the guts to say, "Hey, if they

23  didn't prove it, I'm gonna vote not guilty.  If they proved

1    it, I'm gonna vote guilty.  I don't care what Dan Ryan and

2    Ron Verb and all the people who call them say."

3            And from the expression on your face, you strike me

4    as a person who doesn't care?

5    A       I don't care.

6    Q       All right.  Good enough.

7            Before I ask you a little bit about your views on

8    the death penalty, I want to talk to you for one second, and

9    you strike me as the sort of person who appreciates this, but

10   I want to make certain.  Here we are, we've given you a

11   handout, the Judge has talked to you a little bit about the

12   death penalty, the prosecutor has talked to you about the

13   death penalty, and now one of Donna's lawyers is gonna talk

14   to you about the death penalty and you haven't heard one

15   piece of evidence yet that she's even done anything wrong;

16   correct?

17   A       Correct.

18   Q       So as Donna's lawyer, you might see my concern that

19   here we are, everybody in the world is talking to you about

20   punishing her and you haven't even heard any evidence that

21   she is guilty; do you see that?

22   A       Uh-huh.

23   Q       Do you have any thought that because we're doing all

4926

1   of this that she must be guilty, that we're gonna get to that

2   second phase that you read about?

3   A        No.

4   Q        Okay.  You appreciate, don't you, that we have to

5   have rules for everything we do.  Otherwise, Mr. Bailey and I

6   would probably be elbowing each other for who gets to talk

7   first and go first and all that other stuff.  And one of

8   those rules is that we have to talk about everything that

9   could potentially happen in a case at the beginning of the

10  case; does that make sense to you?

11  A        Uh-huh.

12  Q        All right.  So you don't have any thought that Donna

13  is probably guilty right now?

14  A        No.

15  Q        Okay.  How about the fact that the grand jury has

16  returned what's called an indictment?  Does that, your soon

17  to be ex-husband, it's soon to be; correct?

18  A        Correct.

19  Q        Okay.  That's what was on the questionnaire and I

20  didn't know if it was finalized yet.  He's a corrections

21  officer.  Is an indictment a phrase you've heard before or

22  no?

23  A        Not really.

1   Q       Okay.  You don't have any view, then, that just

2   because the State has charged her with doing these things

3   that I've mentioned that she must be guilty or they wouldn't

4   have charged her?

5   A       No.

6   Q       Okay.  Now, if we can, I'd like to take a couple of

7   minutes and talk to you about your views about the death

8   penalty.  And you mentioned the biblical principle or precept

9   of an eye for an eye.  But if I understood you, you didn't

10  completely agree with that because I think, as you told

11  Mr. Bailey, the person who runs the stop sign and kills

12  somebody would be responsible; is that correct?

13  A       Correct.

14  Q       Can you tell me a little bit more about when you

15  think the death penalty is appropriate?

16  A       Well, I think it would just depend on a certain case

17  and what facts you heard and what evidence was presented if,

18  you know, if it was cold, calculated and, you know, they did

19  it on purpose and it was, you know, I'd think, yeah, then

20  they should get the death penalty.  But if they just, you

21  know, if it's an accident or, you know, they didn't really

22  plan it, then -- I think it would just depend on the certain

23  case.

4928

1    Q        All right.  One other ground rule that comes up that

2    I want to make certain that you're aware of which is, in my

3    efforts to try to summarize what I think you have said, don't

4    let me put words in your mouth.  I want to make sure that I

5    understand you, but I don't want to tell you what you think.

6    A        Okay.

7    Q        I don't want to say it incorrectly.  So if I say

8    something wrong, stop me.

9    A        Okay.

10   Q        I'm getting the impression that you have kind of a

11   thermometer or a barometer that the more serious the type of

12   homicide and the more cold-blooded and premeditated, the more

13   likely it is that the person should get the death penalty.

14   A        Yes.

15   Q        Is that a fair reading of how you feel?

16   A        Yes.

17   Q        Now, that said, are there certain offenses in your

18   mind for which the death penalty should be automatic which

19   is -- in other words, is there something so bad that if a

20   jury finds beyond a reasonable doubt in the first phase this

21   is what the person did, we don't have any doubt, based on

22   reason and common sense, this is what they did, that's so bad

23   they got to get the death penalty, no excuses, no

1    explanations, no answers?

2    A        I don't think I understand the question.

3    Q        All right.  Okay.  I think when you were talking to

4    Mr. Bailey you mentioned premeditated murders and murders

5    where something else was happening.  I think you said --

6    A        Rape.

7    Q        Yeah.  Rape or robbed in the process.  Okay?  So

8    let's take this one, what lawyers call a felony murder and

9    let's make me the bad guy.  Let's pretend that I decide that

10   I need some money and I'm gonna go to the 7-Eleven and get,

11   I'm gonna rob the 7-Eleven.  I go in there, I take the gun,

12   pull it out, demand the money.  And the clerk, whether it's a

13   he or she, doesn't give me my trouble, doesn't pull out any

14   guns, just says, "Here, it's not worth it, take the money and

15   go, please.  Just don't hurt me."

16            Well, I'm a jerk and even though he or she says,

17   "Don't hurt me," I shoot 'em.  Okay?

18            Again, what we typically call a felony murder and

19   one of the reasons to consider imposing the death penalty in

20   Ohio.  My question is, from what I heard you tell Mr. Bailey,

21   that would be a murder where something else happened in the

22   process.  In that case, a robbery rather than a rape.  Are

23   your feelings about the death penalty such that if a jury

```
 1    finds me guilty of doing exactly what I've just laid out for
 2    you that I should get the death penalty no matter what?
 3    A       Yes.
 4    Q       Okay.  And you mentioned premeditated to Mr. Bailey
 5    and I think cold-blooded or calculated when we were talking
 6    this morning.  Are there murders in your mind that you feel
 7    the same way about this one that we have just talked about
 8    which is, well, I'm trying to think of one real quick.  Let's
 9    just say that, you know, I've been in this courtroom now for
10    five weeks with Gerry Ingram.  Five weeks.  All right?  I
11    just can't take it anymore.  The guy is driving me nuts.  And
12    besides, he got that Suburban and I really like that
13    Suburban.  I'm gonna kill him and I'm gonna steal his
14    Suburban after I kill him.  And I don't just come up with
15    this on the spur of the moment.  Every day as we leave court,
16    I'm thinking more and more.  I just can't do this.  I just
17    can't take it anymore.  And I plan it out and, you know, I'm
18    not gonna do it openly.  You know.  I mean I come up with a
19    plan that makes it look like it's gonna be, you know, some
20    kind of a drive-by shooting and nobody will ever suspect me.
21    It takes me weeks to plan this out.  Okay?  And I do it in
22    such a fashion that I think we'd probably all call it
23    cold-blooded, which is, you know, I try to do it in a
```

1    neighborhood where it looks like it's going to be some random

2    act of violence and maybe I'd even set Gerry up to go to that

3    neighborhood.  I tell him, "There's a real important witness.

4    You got to go to this bad drug house though."

5           And when he gets there, I reach in the window and,

6    boom, put a gun to his head and kill him.  So I've made a

7    plan and that's a pretty cold-blooded killing.  Is a

8    premeditated murder like that, in your view, something that

9    if the jury, again, finds me guilty beyond any reasonable

10   doubt I should get the death penalty for that?

11   A       Yes.

12   Q       Okay.  And again, no questions asked on that?

13   A       No.

14   Q       Correct?

15   A       Uh-huh.

16   Q       All right.  There are, as I understand it, the way

17   you feel about the death penalty, some offenses for which I

18   could be guilty of murder that even though you think I should

19   go to jail for a very long time, I should not get the death

20   penalty; correct?

21   A       Correct.

22   Q       And I'm, did you ever take art in high school?

23   A       Uh-huh.

1    Q        Okay.  Do you remember what, I just thought of this,

2    do you remember what a chromatic scale where you sort of, you

3    know, you go from, I remember the first one we had to do was

4    from white to black and we just had to, you know, the art

5    teacher was teaching us to do different shades of gray.  You

6    sort of have a chromatic scale for these types of homicide;

7    is that it?

8    A        Yes.

9    Q        And the ones that are, let's call 'em the black ones

10   are the 7-Eleven thing I just told you about and this thing

11   that I just planned out and cold-bloodedly killed Gerry;

12   correct?

13   A        Uh-huh.

14   Q        And those ones in that black zone, if you find that

15   person guilty of that, if I understand it, that person is

16   automatically gonna get the death penalty in your mind?

17   A        Well, I don't know if I could say that for sure.

18   Q        Okay.

19   A        Because you'd have to think of all the facts and all

20   the evidence and everything that was presented in front of

21   you before because there's other sentences you could give

22   too.

23   Q        Okay.  And that's exactly what I'm trying to get at.

1    A        Uh-huh.

2    Q        And you know from your reading of the thing, forgive

3    me, we bring people in here and we give 'em all sorts of

4    rules and we expect them to understand and play by our rules.

5    Are you comfortable with, having read that handout, with how

6    a death penalty works in Ohio or do you want to take a minute

7    and go over that?

8    A        I think I understand.

9    Q        All right.  So you know, as you just said, that

10   there are, there's more than one penalty to consider?

11   A        Yes.

12   Q        Okay.  I had a juror -- Mr. Bailey stole my box a

13   little while ago, my box example, I'm gonna steal what this

14   juror said a few weeks ago because it's probably the best way

15   I can think of or have heard to explain it.

16            She was talking about her views on the death penalty

17   and she said, well, for a certain type of offense, the death

18   penalty is sort of like, you know, chocolate is my favorite

19   ice cream.  And so if I go to Baskin Robbins, I might think

20   about or consider other options, but unless somebody

21   convinces me otherwise, I'm gonna go with chocolate.  Okay?

22   And she was likening her views about the death penalty for

23   certain offenses to that chocolate.  I'm sensing that with

1   you.  But, again, I'm not trying to put words in your mouth.

2   It sounds to me like for at least the two types of things we

3   have talked about this morning that the death penalty is sort

4   of your chocolate ice cream, that unless somebody talks you

5   out of that, that's what you're gonna impose if you find that

6   person guilty; is that accurate or is that not accurate?

7   A      I'd say yes.

8   Q      Okay.  You, you're not saying that you would rule

9   out the other sentences?

10  A      No.

11  Q      But for those type of offenses, the death penalty

12  has a leg up; correct?

13  A      Yes.

14  Q      And let's make me the bad guy in those two examples,

15  as I did.  If you find me guilty at the first phase beyond a

16  reasonable doubt, the death penalty sort of has a leg up;

17  correct?

18  A      Uh-huh.

19  Q      And I have to talk you out of imposing it; correct?

20  A      Yes.

21  Q      Okay.  And again, it's okay if you feel this way.

22  We just need to know that.  At the second -- you know how

23  Mr. Bailey talked about the box?

1    A        Uh-huh.

2    Q        The State has to prove its case at the first phase.

3    They also have a box to fill at the second phase.  And that

4    box is that the reasons to impose the death penalty outweigh

5    the reasons not to by proof beyond a reasonable doubt.  Do

6    you remember reading something about that?

7    A        Uh-huh.

8    Q        And him talking about that?  Okay.  I'm sensing from

9    you and, please, again, I'm just trying to keep this moving.

10   I'm interested in really hearing what you have to say, that

11   for those couple types of offenses that we've talked about,

12   because the death penalty has a leg up, at least for those

13   offenses, not for every offense that you might ever be called

14   upon to decide, but for those type of offenses, that box

15   doesn't start out empty because you have a predisposition to

16   vote for death?

17   A        No.

18   Q        Okay.

19   A        No.  I think it would start out empty.

20   Q        Okay.

21   A        It would just, especially if we went through the

22   first phase though, I would already, we would already have

23   known whether she's guilty or not.

1    Q       Right.

2    A       So then the second phase, you have to determine what

3    the punishment would be.

4    Q       Correct.

5    A       Right.

6    Q       Exactly.  And here's my concern and I kind of need

7    you to explain it for me.  You told me that for a couple of

8    these types of offenses that you have a predisposition for

9    the death penalty going into the second phase?

10   A       But I don't think that that would be the first thing

11   that I thought of, you know, that automatically, you know,

12   the death penalty.  No.

13   Q       Okay.

14   A       I would have to think about it.  You know what I

15   mean?

16   Q       Sure.

17   A       I wouldn't be able to just say death penalty.

18   Q       Sure.  I think we got away from automatically.

19   A       Yeah.

20   Q       Because I think you told me it wouldn't be automatic

21   for you.  What I'm interested in finding out, though, is if

22   it has a leg up.  See, then, my concern is that they, at

23   least for those kind of offenses, and I'm not saying for

1    everything you might ever be called to hear in a case, but

2    for those kind of offenses that we talked about, that because

3    it's got a leg up you're not considering all four of them

4    equally.  Am I making sense about that?

5    A       Yeah, but I think I would be able to consider all

6    four of them equally.

7    Q       Okay.  You see, because we want to make sure that we

8    have folks who will start out --

9    A       I mean I would rather not have to have the death

10   penalty.  You know what I mean?

11   Q       Well, I think I do, but I'd like you to explain that

12   for me.

13   A       That's a harder decision to make, to take somebody's

14   life.

15   Q       Okay.

16   A       So that would, I would hope that, you know, even

17   though it's in front of you, it would be something that I

18   would rather not have to do, but I would if that's what the

19   evidence and the facts had you do.

20   Q       Fair enough.  And let's talk about that for a couple

21   minutes more because I think I know where you're coming from

22   here, but I want to make certain.  We've interviewed a lot of

23   folks and I'll let you in on another secret, this isn't the

4938

1    first time I've done a death penalty case.  So I've

2    interviewed folks in other cases.  And what we sometimes find

3    out is that people have views about the death penalty.  And

4    it's one thing to be out there on the street and to say,

5    "Well, you know what, if that SOB did that, he should get the

6    death penalty."

7          But then it's another thing to come into a courtroom

8    and say, "Well, you know what, it's easy to say out there,

9    but now I'm the one who may actually have to do it."

10         Is some of that going through your mind here?

11   A     Yes.

12   Q     Okay.  Now, what I want to satisfy myself as to

13   obviously, and I apologize for these questions, but I'm sure

14   you can appreciate why I have to ask these questions.

15   A     Uh-huh.

16   Q     You have those views about the death penalty that we

17   talked about, for the robbery, murder, the planned-out thing

18   we talked about.  Is the fact that you are sort of sitting

19   here in the courtroom rather than out on the street saying,

20   "That SOB should get the death penalty for that," is that

21   something that sort of tempers against or diminishes that

22   thought that the person, that the death penalty has a leg up?

23   Am I asking that clearly or am I not?

1    A       You're not.

2    Q       All right.  My concern, honestly, is that for the

3    two types of offenses that we talked about that the death

4    penalty has a leg up?

5    A       Uh-huh.

6    Q       Okay.  Now, that leg up usually, frankly, translates

7    in my mind to, well, the box isn't starting empty for her

8    because she found this person did this, she doesn't like this

9    kind of offense, she thinks the death penalty is appropriate,

10   and my concern is that she is not gonna start out with that

11   box being empty, that the death penalty has a leg up, which

12   means there's something already in that box helping the

13   government convince her that the death penalty should be

14   given; am I making that part clear?

15   A       Uh-huh.

16   Q       Okay.  First of all, do you feel that way or do you

17   not?

18   A       I don't think I do.

19   Q       Okay.  And then my second question is, and I hope I

20   make this clear now, is that even though you have those

21   feelings about the death penalty we have talked about, is the

22   fact that you would actually be sitting here doing it sort of

23   helping make sure that you don't put something in that box

1    before they present evidence to you?

2    A       Yes.

3    Q       Okay.  Can you tell me what your feelings are about

4    life imprisonment as an alternative to the death penalty?

5    You know that there are three life sentencing options?

6    A       Right.

7    Q       Do you have thoughts about that, when life

8    imprisonment is more appropriate as a punishment than the

9    death penalty?

10   A       (No response.)

11   Q       Hard question.

12   A       Yeah.

13   Q       I know.

14   A       Well, it is taking your whole life and it's just

15   going down the drain so.

16   Q       All right.  Okay.  So you do not consider it an

17   insignificant punishment as compared to the death penalty?

18   A       No, no.  Not at all.

19   Q       We ask that question because some jurors feel that

20   way.  It's like, hey, you took a life, you give a life and

21   anything less is not really a punishment.

22   A       No.

23   Q       Some people think that, you know, prisons are like

1     country clubs and so if you give somebody a life sentence

2     it's like going to the mall every day or something; do you

3     feel like that or do you not?

4     A       No.

5     Q       Have you ever heard the argument about the death

6     penalty that, you know what, we have to pay, as tax payers,

7     to house these people and I'd rather just execute them

8     instead of paying all my hard-earned tax dollars to keep

9     these people in prison; have you heard that argument?

10    A       Yes.

11    Q       Is that an argument with which you agree?

12    A       No.  Because I think it would be worse to stay in

13    prison for life than --

14    Q       Okay.  I'm gonna ask you a couple more questions

15    about the death penalty and I promise you we're done with it.

16    A       Okay.

17    Q       You do understand that the life sentencing option of

18    those four you were given of life without parole does mean

19    life without parole?

20    A       Yes.

21    Q       It's not like one of these things where, well, yeah,

22    they're all telling me that and they're winking at me, but

23    really this person gets good time and gets a chance to get

1    out in X number of years.  You understand it does not work

2    that way?

3    A        I understand that.

4    Q        Have you seen the movie Shawshank Redemption?

5    A        Yes.

6    Q        And, you know, I use this example all the time and I

7    can never remember the character that Morgan Freeman plays,

8    but you remember in the movie a couple times he goes in front

9    of the parole board and he says, "Well, yes, I'm

10   rehabilitated.  I've learned my lesson.  I came in as a young

11   boy and now I'm a man."

12            And he comes out and they stamp his file rejected.

13   I use that example because even with the two sentencing

14   options where there is a possibility of parole, you

15   understand that's not a guarantee that that person would get

16   out?

17   A        Yes.

18   Q        Okay. That just means they get a chance at a parole

19   hearing after 30 full years, no good time, or 25 full years,

20   no good time; you understand that?

21   A        Uh-huh.

22   Q        So you wouldn't hesitate to look at one of those

23   options in the sentencing phase because you think it's kind

1 | of a slap on the wrist in exchange for a death?

2 | A       No.

3 | Q       Okay.  Have you heard the phrase before taking the

4 | fifth?

5 | A       Yes.

6 | Q       It sometimes, I think, gets a little bit of a bad

7 | rap in the media or in the movies and TV because a lot of

8 | times it's the cold, hard criminal and we all know from

9 | watching the TV show or the movie up to this point that he is

10 | a cold, hard criminal sitting in the room, smoking a

11 | cigarette, staring blankly at the ceiling saying, "I'm taking

12 | the fifth," and we all know you're guilty.

13 |       That's only a very small part of the fifth

14 | amendment.  The fifth amendment says that anybody who is

15 | accused by the government of committing a crime doesn't have

16 | to do anything to help the government convict them of that

17 | crime.  Okay?  What is sometimes called the privilege against

18 | self-incrimination.  Have you heard that phrase before?

19 | A       Huh-uh.

20 | Q       Okay.  That's sort of the fancier name for "I'm

21 | taking the fifth."

22 | A       Okay.

23 | Q       Is that you invoke your privilege against

1    self-incrimination.  There are a lot of things that come

2    about as a result of that privilege against

3    self-incrimination and it sort of leads to why I like to use

4    the box that Mr. Bailey stole from me.

5            First of all, if you and I are playing a game, and

6    you know what, it could be Monopoly, okay, if neither one of

7    us rolls the dice first, I go, "You roll the dice first," and

8    you go, "No, you roll the dice first."

9            Well, the game never gets going; do you see that?

10   A       Uh-huh.

11   Q       So somebody has to make the game go.  And in the

12   case where it's a person charged with a crime because of the

13   privilege against self-incrimination, they don't have to do

14   anything so that necessarily makes this side roll the dice

15   first; does that make sense to you?

16   A       Yeah.

17   Q       Many people think of -- well, I'm sorry.  Before I

18   ask you that, because they have to show you if they can that

19   the person committed the crime and because the person sitting

20   at that table doesn't have to do anything, the law has said

21   that the privilege against self-incrimination, one of the

22   affects of it is that we have a presumption of  innocence.

23   Now, is that a phrase you've heard before?

1    A       Yes.

2    Q       Okay.  So you know that everybody in a criminal case

3    in this country who is accused of a crime by the government

4    is presumed not to be, not to be guilty, to be innocent?

5    A       Yes.

6    Q       That's not the way it is in a lot of countries quite

7    frankly.  Actually, quite frankly, a lot of countries have a

8    presumption of guilt.  And if the government charges you with

9    something, you have to prove you didn't do it.  What do you

10   think about our presumption of innocence, as opposed to the

11   presumption of guilt?  Good idea, not a good idea?

12   A       I think it's a good idea.

13   Q       Any problem looking at Donna Roberts now?  You don't

14   know anything about this case except what the lawyers have

15   told you.  So you have no problem looking at her saying, "I

16   can presume you to be innocent"?

17   A       Yes.

18   Q       "And they are gonna have to show me otherwise if

19   they can"?

20   A       Uh-huh.

21   Q       It's probably popular to think of because everything

22   we do in this country is some kind of a contest or another,

23   that it's probably popular to think that if a verdict in a

1    criminal case is guilty, the State wins, the government wins.

2    If the verdict is not guilty, the defendant wins.  It doesn't

3    really work like that.  And let me tell you why.  Let's go

4    back to this presumption of innocence.  Because she's

5    presumed innocent, that's where I get my box, see, they have

6    to produce enough evidence to convince you, if they can, and

7    you sort of pour the evidence into a box in your mind's eye,

8    this imaginary box.  If they fill up the box beyond the line

9    called reasonable doubt, because you know from what you've

10   heard that it's beyond a reasonable doubt; correct?

11   A          (Nods head.)

12   Q          Then they have proved their case.  And in that case,

13   they win.

14             If, however, they can't produce enough evidence to

15   fill up that box in your mind's eye beyond that line called

16   beyond a reasonable doubt, then they have lost.  It isn't

17   that she wins, it's that they lost because they said by

18   charging her, they sort of implied we're gonna prove this to

19   you beyond a reasonable doubt; okay?

20   A          (Nods head.)

21   Q          Now, that makes it a little bit more of a one-sided

22   proceeding than we're usually used to because when you decide

23   things in life, you know, if I accused Lori here, our court

1    reporter, of doing something bad, okay, before you -- and

2    let's say you were the person put in charge of deciding did

3    she do it or didn't she, you would probably want to hear what

4    Lori had to say about that allegation; correct?

5    A        Uh-huh.

6    Q        Before you made up your mind.

7    A        Uh-huh.

8    Q        It's a little bit different, most of us operate that

9    way because we want to be fair and jurors want to be fair,

10   but it's a little bit different with the presumption of

11   innocence because they either convince you or they don't

12   convince you.  She doesn't have to do anything; do you see

13   that?

14   A        Uh-huh.

15   Q        Any problem with that?

16   A        No.

17   Q        It sort of changes our usual thing because you want

18   to be fair and hear both sides, but you appreciate you may

19   not.  That's why I like to use the box because they have to

20   fill up the box if they can, but she doesn't put anything

21   into the box and she doesn't take anything out of the box; do

22   you see that?

23   A        Uh-huh.

1    Q        So -- and again, let's talk about the possibilities

2    both ways because we have to do it now.  If she decides not

3    to testify or as Mr. Bailey said, you know, Ingram and I can

4    sit over there doing the jumble or drinking Mai Tais or

5    playing Yahtzee or whatever we want to do.  If she decides

6    not to take the witness stand, you understand it doesn't

7    necessarily mean that she's trying to hide something from you

8    like in that example I gave you at the beginning about taking

9    the fifth; do you see that?

10   A        Yes.

11   Q        It just may be a statement to you, not a verbal

12   statement, but a statement through her actions of saying,

13   "You know what, they have to fill up the box.  I don't think

14   they filled up the box.  There's nothing for me to do here."

15            Do you see that?

16   A        Uh-huh.

17   Q        Okay.  Let's do the other side of that.  Let's say

18   that she does decide that she wants to testify.  One of your

19   jobs as a juror is to decide whether every person who gets on

20   the witness stand where you're sitting right now is telling

21   you the complete truth, none of the truth or some of it's

22   true and some of it's not; do you see that?

23   A        Uh-huh.

1    Q        Okay.  What lawyers call credibility or

2    believability.

3            The Judge will give you a whole bunch of tests for

4    deciding that, but what you'll find out is that they're

5    pretty much the kind of things that you would use in your

6    daily life anyway deciding whether somebody is telling you

7    the truth.

8            One of the things you might want to consider if

9    Donna does testify is that she has a stake in the outcome of

10   the case; would you agree?

11   A        Uh-huh.

12   Q        You could say to yourself, "Well, she's got a reason

13   for telling me this.  She's charged with capital murder for

14   God's sake."

15           That doesn't mean, however, does it, that she just,

16   you just reject her testimony out of hand saying, "Well,

17   she's the defendant.  She's automatically gonna lie to me;

18   correct?

19   A        No.

20   Q        You have to do that with every witness; do you think

21   you could you do that?

22   A        Yes.

23   Q        You see there might be other witnesses who get on

1    the witness stand besides Donna, maybe even witnesses from

2    the State's side of the case who might also have some stake

3    in the outcome; do you see that?

4    A        Uh-huh.

5    Q        Okay.  You, well, I guess still are, I was gonna say

6    you were, but I guess you still are until it's final, married

7    to a corrections officer.  Do you, is there anything about

8    that marriage and the fact that it was a corrections officer

9    that would cause you that if a law enforcement officer came

10   in here that you would sort of give up the job of testing his

11   credibility because you would say, "Well, he's a cop.

12   They're always gonna tell the truth"?

13   A        No.

14   Q        Okay.  You see, don't you, you have to judge their

15   credibility just like anybody else?

16   A        Yeah.

17   Q        And you think you can do that?

18   A        Uh-huh.

19   Q        Okay.  Mr. Bailey talked to you about some important

20   decisions.  And as I've been talking about this silly box,

21   you have to use that to decide whether the State's produced

22   enough evidence to convince you beyond the existence of any

23   reasonable doubt about her guilt; do you see that?

1    A        (Nods head.)

2    Q        There may be a situation, you know how we talked

3    earlier where I said you might, after you read those letters

4    and hear those phone calls, you might be offended at some of

5    the things she said, but that's not necessarily evidence that

6    she's guilty; do you remember that?

7    A        Uh-huh.

8    Q        Okay.  There could be a situation where maybe they

9    put some evidence into that box I keep talking about, but

10   they don't fill it up beyond the line called beyond a

11   reasonable doubt.  So you may look in there and say, "Well,

12   okay, Juhasz got me into this box thing now so let me look in

13   the box and, yeah, there's some evidence in here and, boy, I

14   don't like it, but you know what, how do I figure out whether

15   they've filled it beyond that line called reasonable doubt?"

16          Well, let me suggest this to you.  Mr. Bailey talked

17   to you about making important decisions.  And when you make

18   them, whether you do it on a piece of paper or sort of in

19   your mind's eye, don't you sort of weigh out the pros and the

20   cons?

21   A        Uh-huh.

22   Q        Because if there are some cons that are pretty

23   substantial, it's not a good idea; correct?

1    A        Correct.

2    Q        I've used the example with a couple of jurors like

3    if you get done here today and say, "You know what, it's ten

4    after 11, I think I'll bop down to the Mercedes dealership

5    and buy a new Benz," you wouldn't just do that willy-nilly;

6    correct?

7    A        No.

8    Q        Okay.   There are things to think about; correct?   I

9    mean the pros are obvious.   It's the cons you have to worry

10   about.

11   A        Yeah.

12   Q        Well, it's kind of the same thing in deciding

13   whether they have filled up the box.   On one side of this

14   check list will be all the reasons why they tell you the

15   defendant is guilty.   On the other side would be doubts that

16   you have thought about as you've listened to the evidence,

17   doubts maybe that Donna's lawyers have brought up or doubts

18   that other jurors have brought up as you're talking about the

19   evidence; do you see that?

20   A        (Nods head.)

21   Q        What you have to do with those, talking with the

22   other jurors, is to analyze each one.   So you take the first

23   one.   You go, "You know what guys, I have a doubt about

1    this."

2            And somebody goes, "Well, here's a piece of

3    evidence.  That proves that your doubt is not based on reason

4    and common sense."

5            And you look at it and say, "You know what, you're

6    right.  I forgot about that piece of evidence."

7            So you scratch that one off.  You have to go through

8    each doubt that you have like that.  If, when you're done,

9    you have one left, could be more than one, but if you have at

10   least one doubt left on that side of the check list and no

11   matter how you think about it, it's based on reason and

12   common sense, then they haven't proved their case; do you see

13   that?

14   A        Uh-huh.

15   Q        No problem if that happened coming out and saying,

16   "You know what, you guys seem like nice guys and you're good

17   prosecutors, but you just didn't have enough evidence here;"

18   no problem doing that?

19   A        No.

20   Q        The State may ask you to rely upon what lawyers call

21   circumstantial evidence.  Have you heard that word before?

22   A        Uh-huh.

23   Q        Other than when Mr. Bailey was talking about it?

1      A       Uh-huh.

2      Q       He's right when he says that juries can rely upon

3      circumstantial evidence to find guilt.  But when you do that,

4      you have to sort of remember that thing I just talked about

5      about reasonable doubt.  And you have to make sure that if

6      they ask you to make an inference, to jump from A to B with

7      some circumstantial evidence, that there's no other

8      reasonable explanation or doubt about that.

9              Here's a little story I like to tell about how I

10     think that works.  I want you to pretend for a second that

11     you are at my house late in August.  It's about 5 or 6:00 in

12     the afternoon, about 85 degrees, humid as all get out and the

13     wind is starting to kick up because we're gonna get one of

14     those late afternoon thunderstorms.  You know.  It's getting

15     all dark out in the west, even though the sun is still out.

16     I'm out making you something cold to drink in the kitchen and

17     all of a sudden we hear a big crash in the living room.  And

18     when I run in to see what's going on, my son Mike's cat goes

19     charging out between my legs.  I go into the living room and

20     look.  And to my left, there's my son, Mike, like this

21     (indicating) with his hands over his face.  I look to my

22     right, there's one of my wife's Norman Rockwell plates

23     knocked off of the mantle onto the hearth splattered.  Couple

1    feet away, one of Mike's Nerf balls.  Okay?

2          Could be, from what I told you, okay, that's

3    circumstantial evidence, and it's circumstantial because I

4    didn't see who broke the plate; right?

5    A       Uh-huh.

6    Q       I know it's broken, but I didn't see who broke it;

7    correct?

8          Could be that Mike was throwing the Nerf ball like

9    he's been told 655,241 times not to do in the house and the

10   noise scared the cat.

11         Could be that the cat walked up on the mantel like

12   she's been told not to do 655,241 times and Mike is going,

13   "Oh, boy, this is gonna be a problem.  And by the way, since

14   I never pick anything up, there's my Nerf ball over by the

15   plate.  I may get blamed for this."

16         It could be that the wind from that approaching

17   thunderstorm knocked it off, the noise scared the cat and

18   Mike's thinking he's toast just because he's at the scene of

19   the crime as it were.

20         Now, there's circumstantial evidence there where I

21   suppose I could ask you to make an inference that Mike broke

22   the plate by throwing the Nerf ball, but it wouldn't really

23   be fair, would it, because there'd be other explanations that

 1   made just as much sense?

 2   A       Uh-huh.

 3   Q       Any problem holding the State to that kind of

 4   analysis and that kind of burden when you test their

 5   circumstantial evidence?

 6   A       No.

 7   Q       Any reason you can think of, any questions you have

 8   that have come up or any reason you can think of why you

 9   cannot serve on this jury?

10   A       No.

11   Q       Mr. Bailey mentioned you would be an alternate if

12   you're selected.  That sometimes conjures up the phrase,

13   "Always the bridesmaid and never a bride."

14           He is correct, however, there are an unbelievable

15   number of cases where we do need the alternates.  So you

16   appreciate that even if you're selected as an alternate, it's

17   important to pay attention just as if you're one of the

18   regular twelve?

19   A       Yes.

20   Q       You may well be called upon; do you see that?

21   A       Yes.

22   Q       Okay.  Any other questions that you have?

23   A       Nope.

1              MR. JUHASZ:  Appreciate your patience with

2     me.  Thanks.

3          Thank you, Your Honor.

4              LISA MASSARY:  Thank you.

5              MR. BAILEY:  Pass for cause.

6              MR. JUHASZ:  Pass, Your Honor.

7              THE COURT:  Okay.  You will be in the pool

8     from which this jury will be seated.  I would ask you to go

9     back downstairs and have a seat until we have everybody back

10    up here.

11         I will continue to remind you until you're sick of

12    hearing me not to discuss anything or read anything about the

13    case in the meantime.

14             LISA MASSARY:  Okay.

15             THE COURT:  Okay?  Thank you.

16         Gentlemen, do you want to approach?

17             MR. JUHASZ:  May I get Mr. Ingram, Your

18    Honor?

19             THE COURT:  Yes.

20             MR. JUHASZ:  Thank you.

21    (Whereupon, a conference was held at the bench.)

22    (Whereupon, a recess was had commencing at 11:35 a.m. and

23    concluding at 11:43 a.m.)

1              **PROSPECTIVE JUROR JOANNE M. BATES,**

2      **EXAMINATION BY THE COURT:**

3      Q        You are Joanne; right?

4      A        Yeah.

5      Q        Okay.  Is that your married name, Bates?

6      A        Yes, it is.

7      Q        The Bates' were one of the first families in

8      Hartford Township way back at the very beginning of the

9      township.  Still quite a few of them living in Hartford.

10             You read that handout that was given to you; right?

11     A        Uh-huh.

12     Q        As you know, this is a case involving primarily two

13     aggravated murder charges with specifications that have been

14     filed against Donna Roberts by the State of Ohio.

15             In Ohio, just because a person commits a murder does

16     not mean that they necessarily face the death penalty.  The

17     legislature, in drawing the statute up, has it so that if a

18     person is found guilty of aggravated murder with a

19     specification and if the State proves beyond a reasonable

20     doubt both those factors, then that means that the death

21     penalty becomes a possible recommendation, option, by the

22     jury, along with life without parole, life without parole

23     before 25 or 30 years.

1          At this point, we have no idea what this jury is

2     going to find.  If the State fails to prove their case beyond

3     a reasonable doubt about the murder and the specifications,

4     then this jury would properly return a verdict of not guilty.

5     It would be the end of the trial.

6          If, however, the State maintains that burden of

7     proof, then the trial would go on to a second phase if they

8     make a finding of guilty.

9          Now it seems, it makes some sense if you don't think

10    it through, I think, that, well, why not wait until that

11    second phase to ask the questions about whether people agree

12    or disagree with the death penalty.  That isn't workable

13    because we can't eliminate anybody at that point.  We have to

14    have the same jury.  So we have to cover this up front.

15         Now, a person on this jury that believed if you take

16    a life, you forfeit your life, an eye for an eye, that person

17    couldn't possibly be fair to the defendant because the

18    defendant has a right, if the jury makes a finding of guilty,

19    to require the State to prove that the aggravating

20    circumstances, that is reasons why the jury should consider

21    and impose the death penalty, are outweighed by the

22    mitigating factors.  Mitigating factors are reasons for the

23    jury to consider why, in this particular case, the death

1    penalty should not be imposed.  The State has to do that

2    beyond a reasonable doubt.  The burden is always upon the

3    State to prove the case or not prove the case.  Defendant has

4    no duty to do anything.  The defendant can choose to sit and

5    not talk during the whole trial.  Her attorneys have the

6    right to sit there and do nothing because it's up to the

7    State to convince the jury or not to convince the jury of the

8    truth of the charge.

9          Likewise, if you had a person on the jury that could

10   not, under any circumstances, make a decision on the death

11   penalty, there are some people that couldn't picture

12   themselves making that decision, a person of that mind could

13   not be fair to the State.  And the State does have the right

14   to request this jury's consideration and imposition of the

15   death penalty if they prove all factors necessary.

16         So that's the reason we go into these questions at

17   this point in time.  Whatever your particular beliefs are

18   concerning the death penalty, that's fine.  These folks will

19   respect your opinion, but they have a right to know if you

20   can follow the law.  That's the bottom line.

21         The other issue will be primarily about pretrial

22   publicity, whether you've been exposed to things in the

23   newspaper that you are unable to lay aside.  This case, to be

1   tried fairly, has to be decided on the evidence presented in

2   this courtroom.  Okay?  Very good.

3           Mr. Bailey.

4                   MR. BAILEY:   Your Honor.

5   **EXAMINATION BY MR. BAILEY**:

6   Q       Morning, Mrs. Bates.

7   A       Hi.

8   Q       I'm Ken Bailey.  I'm an assistant prosecutor.  I

9   think you saw me about five weeks ago in the other courtroom.

10  I told you at that time I'd be joined by Chris Becker, who

11  was here, but he had to run out and get something.  And the

12  two of us are responsible, as assistant prosecutors, for

13  prosecuting this particular case on behalf of the people of

14  Trumbull County and the people of the State of Ohio.

15          And as the Judge said, we are here today to make

16  sure that the folks who are selected to serve on this

17  particular jury can be fair and impartial to both sides, both

18  to the defendant and to the people of the State of Ohio.  And

19  for that reason, we're going to be asking you some questions

20  regarding your prior experiences and your opinions on

21  different things.  Not because we're snoopy and we like to

22  pry into folks' backgrounds, but to make sure that the people

23  who are selected here can be fair and impartial.

```
 1              There aren't any right answers.  There aren't any
 2     wrong answers to these questions.  There are only open and
 3     candid answers.  If you have any questions that come up
 4     during this proceeding pertaining to what we're doing here
 5     regarding to the procedure or other things, feel free to ask
 6     me because this is the one chance that we get to have a
 7     little give and take.  Okay?  And it's important that if you
 8     have questions they get cleared up at this point.
 9     A      All right.
10     Q      We can't have any contact with you after we're done
11     today until the case is over.  If it goes into two phases,
12     we've got to wait until the end of the second phase until you
13     talk to us because sometimes jurors want to talk to the
14     lawyer afterward.  But we want you to know that if we run
15     into each other out in the hallway or in an elevator or in a
16     restaurant or something like that and we don't talk to you,
17     it's not because we're trying to snub you or to be
18     antisocial.  It's just that under our rules of conduct, all
19     we're allowed to do maybe is say good morning or good
20     afternoon.  If we engage in anymore conversation, we could be
21     subject to discipline and it could be result in a mistrial,
22     and we don't want to do this over again.  Okay?  So that's
23     why I let everybody know about that.
```

4963

```
 1    A         I understand.

 2    Q         Now, as the Judge indicated, we're going to ask you

 3    some questions about pretrial publicity and the death penalty

 4    as a punishment and then some general questions.  And if I

 5    don't make myself clear on anything, you stop me and have me

 6    rephrase it; okay?

 7    A         Okay.

 8    Q         Now let's talk about this pretrial publicity for a

 9    second.  I noted in your questionnaire, you indicate that you

10    look at the Tribune on a daily basis?

11    A         Yeah.

12    Q         As well as the PD.  And you also, and you rarely

13    look at the TV news locally; right?

14    A         Well, actually, we watch Cleveland stations.

15    Q         Okay.

16    A         For the most part.

17    Q         Because you're up in Mesopotamia?

18    A         Right.  So we're kind of half way between.

19    Q         Okay.  So it would be like 3, 5 and 8 that you get?

20    A         Pretty much, yeah.

21    Q         Okay.  So, and at this point, you don't recollect

22    anything at all about this case; right?

23    A         We had the local news on, my husband had it on one
```

```
 1   day last week and it started to come on and I left the room.

 2   Q       Okay.

 3   A       My family has been very understanding that way.

 4   Q       Okay.  And there's a reason that the Judge tells

 5   you --

 6   A       Right.

 7   Q       -- that you have to continue doing that.

 8   A       Right.

 9   Q       Because as you look around the courtroom, there's

10   nobody here from the news media.  But from time to time, when

11   we start the testimony tomorrow, you're gonna be seeing

12   reporters come in from the Tribune and from the Vindicator

13   and there will probably be TV station people setting up their

14   cameras.  They can't film the jurors, but they film the other

15   participants.  And they'll only be here generally for a

16   little bit.  I mean Chris Bobby might be here from the

17   Tribune for half a day or something or Peggy Sinkovich from

18   the Vindicator for the better part of the day, but then

19   they're gonna be gone because there are other stories going

20   on throughout the county.

21   A       Right.

22   Q       And they'll stop in from time to time.  But then

23   they're gonna do a story based on what they heard.  And
```

4965

```
 1    they're gonna miss everything that had happened, that was
 2    asked and answered before they got in here and after they
 3    leave.  So it may well be that they take something out of
 4    context.  Unintentionally, but that's the nature of the
 5    beast.  They got to run in and print.
 6    A       Yes.
 7    Q       And what they report on may give you a convoluted
 8    view of what happened that day.  It may be totally out of
 9    context and be just the opposite --
10    A       Right.
11    Q       -- of the whole gist of the testimony.
12            Okay.  And that won't be deliberately, but it
13    happens.
14            So it may be that if you have your husband save the
15    papers for you that you read it after the whole trial is
16    over, after both phases are done and you may say, "Gosh, I
17    sat through that whole trial in Judge Stuard's court and
18    whoever reported on that case must have been sitting in Judge
19    Logan's court covering a different case."
20            Okay?
21    A       I understand.
22    Q       So you'll be able to do that?  Just continue
23    avoiding any, hearing anything or discussing it with anybody.
```

4966

```
 1    A        Right.

 2    Q        So much for pretrial publicity.

 3    A        Yeah.

 4    Q        Now let's talk about this issue with the death

 5    penalty as a possible punishment.  Looking at your

 6    questionnaire -- well, you had indicated -- the first time

 7    you learned this was a potential death penalty case was when?

 8    A        Oh, when I came into court April 8th.

 9    Q        Back on April 8th?

10    A        Yeah.

11    Q        Okay.  About five weeks ago or so?

12    A        Yeah.

13    Q        And I noticed before that, you indicated you had

14    discussed the death penalty before that where you said it was

15    necessary sometimes, but rarely.  Okay.  You've taken a

16    position.  When would it come up?  I mean when cases came up

17    in the news, would you discuss it with family or friends or

18    people at work?

19    A        Probably more just a general thing.  You know.

20    Just --

21    Q        Okay.  Did you ever, back in school, did you ever

22    have to argue the death penalty?

23    A        I don't think so.
```

1   Q       Okay.

2   A       That was a long time ago.

3   Q       Okay.  I mean when you say it came up as a general

4   thing, how do you mean?

5   A       I don't know.  Just not particular cases.  Just a

6   general discussion of what people think.  You know.

7   Q       Okay.  I mean did you follow along with --

8   A       But as far as a particular case?

9   Q       Okay.  Or generally.  It doesn't make any

10  difference.  I mean whenever it came up.

11  A       Just kind of general conversation.  Not a heated

12  debate or anything like that.  Just, you know, exchange of

13  thoughts.

14  Q       Okay.  How about when things happened like Oklahoma

15  City or 9-11?

16  A       Not really.

17  Q       Okay.  You indicated that you're in favor of the

18  death penalty for premeditated murder and cases of extreme

19  brutality; right?

20  A       That's, okay, that would be more like a, I guess I

21  always thought it was more of a case-by-case kind of thing.

22  Q       Oh, okay.

23  A       Not necessarily everybody, but -- and that's why

1    it's hard to talk about a particular case because you don't

2    know.

3    Q        Okay.  So if I understand what you're saying --

4    A        That's just a general idea.

5    Q        Right.

6    A        And I really think it has to be something that you

7    decide case by case when you know all the details in the

8    case.  So it's hard like what you said about the newspapers.

9    Q        And that's the way Ohio law is written.

10   A        Pretty much.  Yeah.  The way he stated it, I can

11   understand.

12   Q        Because there's two separate hearings the way the

13   legislature writes the law.

14   A        Yes.

15   Q        In Ohio, we elect these folks, they go down to

16   Columbus and they pass the laws telling us what are crimes

17   and what the punishment range would be for each.

18   A        Right.

19   Q        And all killings aren't treated equally under the

20   law; okay?  And there's a reason for it.  For example, if

21   somebody was out chopping wood and the head of an ax flew off

22   and killed somebody, that would be an accident; right?  And

23   you wouldn't expect anybody to be facing any type of

```
 1    punishment; right?

 2    A       Yeah.

 3    Q       Most likely.  No prison sentence or death penalty?

 4    A       Yeah.

 5    Q       And if somebody were driving down the road too fast

 6    and went through a stop sign and killed a pedestrian, you'd

 7    expect maybe a jail or a prison sentence for that person, but

 8    not the death penalty; right?

 9    A       Right.

10    Q       Okay.  Or parking tickets?  You wouldn't expect

11    death penalty for parking tickets?

12    A       No.

13    Q       Okay. And if two fellows were drinking in a bar and

14    they got in a fight and one fellow punched the other one and

15    the victim fell backwards and hit his head on the edge of the

16    bar and died as a result of that, that might be some type of

17    manslaughter case and you might expect maybe a jail or prison

18    sentence, but not a death penalty offense; right?

19    A       Probably not.

20    Q       Now, you understand the way the legislature has

21    written the law in Ohio, that if I go out and I premeditate a

22    murder, if I use prior calculation and design, let's say I

23    don't like my co-counsel's shoes.  I say, "I'm sick and tired
```

1    of those shoes.  If he wears them one more day, I'm gonna" --

2    and I go out to the courthouse steps at noon and I say, "If

3    Chris comes in tomorrow at 9:00 in the morning and he's

4    wearing those same shoes, I'm gonna blow him away with a

5    357."

6         And sure enough, he comes up those steps at 9 with

7    the same shoes, I shoot him with a .357.  That would be a

8    killing with prior calculation and design.  But you

9    understand in Ohio, the way the legislature has written the

10   law, just that by itself does not make him eligible, does not

11   make me eligible for the death penalty; okay?

12        The legislature says there has to be more.

13   A       I understand.

14   Q       There are these specifications of aggravating

15   circumstances, some extra bad facts that we have to prove.

16   A       Right.  I understand that.

17   Q       Okay.  And the legislature has set down a number of

18   factors or circumstances that could make a person eligible

19   for the death penalty.  For example, I think the Judge

20   mentioned the killing of the president or the governor of the

21   state or the lieutenant governor or a police officer as a

22   victim or a young child or a mass murder where somebody kills

23   or attempts to kill two or more people, he could be eligible

```
 1    for the death penalty, or when somebody engages in a special

 2    felony, killings with prior calculation and design and

 3    engages in an aggravated burglary or an aggravated robbery or

 4    rape or kidnapping, certain types of crimes, a person could

 5    become eligible for the death penalty too.  And there are

 6    other things too.  Murder for hire.  And on those types of

 7    cases, it's not an automatic death penalty.

 8    A       Right.

 9    Q       Okay.  Now, in Ohio, the cases tried in, that type

10    of case is tried in two different phases.  The first phase is

11    a trial, just like any other criminal case, where the jury

12    makes its determination without any concern for any type of

13    punishment.  Okay?  And we'd have, we have the burden of

14    proving the elements of the crime charged, the essential

15    component parts of the crime, like the ingredients of a

16    recipe.  Like if you're baking a chocolate cake, you've got

17    to put in all the ingredients, including the chocolate.

18    Okay?  And we've got to bake a number of cakes here.  But

19    let's say we got to prove the elements of the crime charged

20    beyond a reasonable doubt of aggravated murder and one or

21    more of these specifications of aggravated circumstances.

22            There are two of those circumstances.

23    A       Uh-huh.
```

 1   Q        One is that the aggravated murder was committed with

 2   prior calculation and design and during the course of an

 3   aggravated burglary, and the other is a specification that

 4   the aggravated murder was committed with prior calculation

 5   and design during the course of an aggravated robbery, as

 6   opposed to an aggravated burglary.

 7            Okay?  So if we prove the aggravated murder and one

 8   or both of those specifications, we would then move on to a

 9   second phase.

10            Now in the first phase, the issue of punishment,

11   what's appropriate punishment, would not be appropriate to

12   the first stage; right?

13   A        Right.

14   Q        It's not relevant so you wouldn't expect to hear

15   anything like that in the first phase; right?

16   A        (Nods head.)

17   Q        So let's say we've met our burden in the first

18   phase.  We go into a second phase.

19            Now, in the second phase, you've already determined

20   guilt beyond a reasonable doubt.

21   A        Uh-huh.

22   Q        So that's all over and done with.  Okay?  In this

23   second phase, the issue is what's the appropriate punishment

1    for this defendant for this crime?  And you'd have to do a

2    balancing test.  And to sit on this jury, there are number of

3    things you'd have to do.  First, you have to be able to

4    consider the issue of appropriate punishment.  And there's

5    the aggravating circumstances that you would have found from

6    the first phase in the case that could be placed on one side

7    of an imaginary scale.  On the other side of this imaginary

8    scale would be mitigating factors.  Now, you wouldn't have

9    had the opportunity to hear about these most likely in the

10   first phase.  The proper place for these is in the second

11   phase where the defense has an opportunity to present

12   evidence of mitigating factors.

13   A        Uh-huh.

14   Q        And a mitigating factor is a fancy word.  It just

15   means certain facts that are favorable to a defendant and

16   would work against the death penalty as a punishment.  And we

17   don't know what they are at this point because it's not

18   relevant, but it would be like the two guys drinking in a bar

19   and they were both drunk or something like that.

20   A        I understand.

21   Q        It could be different things that you would

22   consider.  And you have to be able to consider these things

23   to sit on this jury.  Now, how much these things weigh that

4974

```
 1    you're gonna put on the scale, that's entirely up to you and

 2    the other eleven jurors.  You might decide that something has

 3    a whole lot of weight, that it weighs maybe 20 pounds or

 4    maybe a ton.  And on the other hand, something else, you may

 5    decide, may weigh about as much as a feather.  Okay?

 6          Now, to sit in the second phase, you have to be able

 7    to start out considering the four possible punishments here

 8    equally.  Okay?  The death penalty, life in prison without

 9    any parole eligibility, life in prison with parole

10    eligibility after 30 full years and life in prison with

11    parole eligibility after 25 full years.  Okay?  They all

12    start out equally in your mind.

13    A     Uh-huh.

14    Q     Okay?  You may have personal preferences, personal

15    feelings for certain types of crimes, but you have to be able

16    to set those personal feelings aside and follow the law that

17    the Judge is gonna give you.  You'd be able to do that?

18    A     Yeah.  I believe I would.

19    Q     Okay.  Now, if we, the people of the State, prove to

20    your satisfaction beyond a reasonable doubt so that you're

21    firmly convinced of the truth of the charges to a moral

22    certainty using your reason and your common sense, tests that

23    you use in your every day life, okay, then if we prove that
```

4975

1    the aggravated circumstance or circumstances outweigh the

2    mitigating factors beyond a reasonable doubt, then you would

3    return a verdict as to the death penalty because it would be

4    the appropriate punishment under Ohio law; okay?

5         If we don't meet this burden of proof and we don't

6    convince you and the other jurors beyond a reasonable doubt

7    that the aggravating circumstance or circumstances outweigh

8    the mitigating factors, then you ignore the death penalty and

9    you go on to consider the other three life punishments, okay,

10   and decide which one is the most appropriate for this

11   defendant.

12        Okay?  You don't have any problem with that?

13   A    No.

14   Q    Okay.  Now, if we convince you beyond a reasonable

15   doubt that the defendant is guilty in the first phase of

16   aggravated murder and one or more of the specifications,

17   would you be able to sign that verdict form finding her

18   guilty, knowing that it would then make her eligible for the

19   death penalty in the second phase?

20   A    Yes.

21   Q    Okay.  And let's say we get to the second phase and

22   we can convince you beyond a reasonable doubt that the

23   aggravating circumstances outweigh the mitigating factors so

```
1    that the death penalty is the appropriate verdict.  Would you

2    be able to sign a verdict form for the death penalty?

3    A       Yes.

4    Q       Okay.  And if you returned a death penalty verdict

5    and the Judge asked you in open court, "Is this your

6    verdict," would you be able to say yes?

7    A       Yes.

8    Q       Okay.  Now --

9                      THE COURT:  Mr. Bailey.

10                     MR. BAILEY:  Your Honor.

11                     THE COURT:  It's noon.

12                     MR. BAILEY:  You want to break for lunch?

13                     THE COURT:  Yeah.  We probably should

14   because the deputy has to take the defendant over for lunch

15   and all we're doing is postponing the thing.

16                     MR. BAILEY:  Okay.

17                     THE COURT:  So if you don't mind, let's do

18   that; okay?

19                     JOANNE M. BATES:  Okay.

20                     THE COURT:  You may want to go get a bite

21   too.

22                     MR. BAILEY:  See you in an hour.

23                     THE COURT:  Be back here at 1:00.
```

```
 1    (Whereupon, a recess was had commencing at 12:03 p.m. and

 2    concluding at 1:05 p.m.)

 3                    THE COURT:  Hello again.

 4                    JOANNE M. BATES:  Hi.

 5                    THE COURT:  Okay.  Mr. Bailey was engaged

 6    in the questions.

 7                    MR. BAILEY:  Okay.

 8    Q        (By Mr. Bailey) Where was I?  We were talking about

 9    the death penalty.  And you understand the death penalty is

10    not an automatic punishment?

11    A        Yes, I do.

12    Q        If she's found guilty in the first phase, you've got

13    to be able to consider that stuff in the second phase.

14             Now, you had, I believe you indicated your friend

15    had been the victim of a crime?

16    A        Yeah.

17    Q        Okay.  That wouldn't, the facts here --

18    A        No.

19    Q        -- are totally different?

20    A        No.  It's a totally different case.

21    Q        You'd be able to set that aside and make your

22    decision based on whatever the facts and testimony and

23    evidence that are in this case?
```

```
 1    A         (Nods head.)

 2    Q         You're Protestant.  Does your church have any

 3    holdings for or against the death penalty?

 4    A         I don't actually know.

 5    Q         Okay.  So that wouldn't affect you in any way?

 6    A         I don't think so.

 7    Q         Okay.  You had mentioned on your questionnaire,

 8    there was a question about what are the major problems facing

 9    the criminal justice system today and you wrote down that

10    people don't think for themselves when they're on a jury.

11    What did you mean by that?

12    A         What did I mean?  I think sometimes we're swayed by

13    what we hear on the news a lot, I think they have

14    preconceived ideas, and I don't think people think enough for

15    themselves period I guess.

16    Q         Okay.  Okay.  Let me get to some regular, regular

17    questions here.  Well, I had mentioned that the defendant was

18    charged here, maybe I didn't mention it, but the defendant is

19    charged with a number of charges.  Okay.  But she's charged

20    not as the trigger person, but rather as a complicitor.

21    A         Okay.

22    Q         A complicitor basically is somebody who solicits or

23    procures another person to commit a crime or aids and abets
```

```
 1    another person to commit a crime.  In other words, the

 2    defendant is charged with planning with another person or

 3    strengthening, encouraging, helping in some way, a fellow by

 4    the name of Nate Jackson in the killing of the defendant's

 5    ex-husband with whom she lived for insurance money.

 6              And the charge is that this Nate Jackson, who

 7    actually committed the aggravated murder, that he trespassed

 8    into the victim's house and that he stole a vehicle that

 9    belonged to the victim, that the victim used, and that the,

10    that this Nate Jackson used a firearm, a working gun; okay?

11    A       Okay.

12    Q       But the defendant is charged as a complicitor, not

13    the trigger person.

14    A       Okay.

15    Q       Under Ohio law, she, if we can prove that beyond a

16    reasonable doubt, she becomes eligible for the death penalty

17    if we can prove the aggravated murder with specifications.

18    The fact that she's charged as a complicitor rather than the

19    principle or the trigger person, does that bother you in any

20    way so that you wouldn't be able to return a verdict --

21    A       No.

22    Q       -- as to the death penalty or of guilty in the first

23    phase if we prove our case beyond a reasonable doubt?
```

1    A        Does that bother me?  No.

2    Q        Okay.  The fact that she's a woman rather than a

3    man, does that bother you in any way?

4    A        No.

5    Q        Okay.  Now, these crimes, the defendant is charged

6    with two counts of aggravated murder with these

7    specifications, these special findings of fact of aggravating

8    circumstances and with a count of aggravated burglary,

9    aggravated robbery and attached to those two counts are

10   firearm specifications, special findings of fact that a

11   working gun was used.

12           Each of these crimes and each of these

13   specifications is composed of certain elements, like the

14   ingredients in a cake.  And we got to bake all of those

15   particular cakes and you've got to consider each of those

16   cakes or crimes separately.  Okay?  If we don't meet our

17   burden of proving all the elements and each charge beyond a

18   reasonable doubt, consider each one separately and return a

19   not guilty; right?

20   A        I understand.

21   Q        If we do meet that burden, you return a guilty.

22           These elements, the Judge is going to instruct you

23   as to these elements in great detail at the end of this case,

1    and you're bound by his instructions and the definitions that

2    he's gonna give you, but I'm gonna give you a for instance,

3    okay, an example --

4    A        Uh-huh.

5    Q        -- of what the elements are.

6             Let's take the crime of aggravated murder with prior

7    calculation and design.  And I should explain.  The defendant

8    is charged with two counts of aggravated murder.  There's

9    only one person who was killed, but there are two counts, two

10   separate theories that under Ohio law the State is allowed to

11   pursue and have the jury consider, okay, and we've elected to

12   do that because we're allowed to do that.  There's one count

13   of aggravated murder with prior calculation and design and

14   one count of aggravated murder charging it occurred in the

15   course of another special felony like aggravated burglary

16   and/or aggravated robbery.

17            Now, let's take the crime of aggravated murder with

18   the prior calculation and design.  One of the elements might

19   be that we have to prove that it happened on or about a

20   certain date, on December 11th, 2001.

21            The second element would be that it happened here in

22   Trumbull County, Ohio.  We call that venue.  And the reason

23   we have to prove this venue, that it happened here in the

1        county, is so we can try the case in this courthouse rather

2        than up in Tuscarawas -- or down in Tuscarawas or up in

3        Ashtabula or some other place.

4            The third element might be identification.  That the

5        person who committed the crime is the same person who is

6        sitting there, and somebody would have to point her out.

7            The fourth element would be that she acted

8        purposely.  The Judge will define that term, but it basically

9        means on purpose.

10           Fifth, she caused the death of a living person as a

11       complicitor.  In this case, a fellow by the name of Robert

12       Fingerhut.

13           And sixth, that she acted with prior calculation and

14       design.  Now this term, prior calculation and design, has a

15       specific meaning that the Judge will define for you, but

16       basically it's, it requires advanced planning and a studied

17       scheme to cause the death of another.

18           It used to be, we used to have a term called

19       premeditated murder in Ohio law.  They changed that to this

20       prior calculation and design.

21           Let me give you an example.  Let's say I take my pen

22       and I drop it and I catch it, just barely, but I catch it.

23       Okay.  That might be a reflex.

1          Let's say I drop my pen and I say, "Oh, my goodness.

2     I've got to bend down and pick it up," and I do that.  That

3     would be some advanced planning; right?

4          Now, this prior calculation and design, this studied

5     scheme to kill, let's say I tell my co-counsel, Chris Becker,

6     yesterday, "Chris, I need an example to demonstrate this

7     term, prior calculation and design and the studied scheme, so

8     I'm gonna take my pen tomorrow when I get into court and drop

9     it so I can pick it up."

10         Okay?  And I do that.  Well, I planned it in advance

11    and it was part of a studied scheme to pick up my pen.  So

12    that would be prior calculation and design; right?

13         So those are basically elements.  Those six things

14    are the ingredients of the cake that we got to bake.

15         Now, it may well be that you have some questions

16    that never get asked or answered.  Let's say you have a

17    special interest in, I picked shoes on him before.  Let's say

18    you sold shoes and you wondered what people wore when they

19    did different things because that was your special interest.

20    Like people who are chefs may wonder what people ate at

21    different times during the course of the proceedings, but if

22    it's not relevant to proving the elements of the crimes

23    charged, that type of question might never get asked or

1    answered.  Okay?  And if we can convince you beyond a

2    reasonable doubt of these elements of the crimes charged,

3    you'd be able to return a conviction, in spite of the fact

4    there may be some unanswered questions like, you know, that

5    wouldn't pertain to the elements; right?

6    A        (Nods head.)

7    Q        Okay.  Now, the term aggravated burglary and

8    aggravated robbery, sometimes people who are not trained in

9    the law interchange those terms.  People might say, "Well,

10   gosh, my house just got robbed," when they really mean that

11   it really got burglared.

12          This term, aggravated burglary, refers to a

13   situation generally where a perpetrator trespasses in another

14   person's house, an occupied structure we call it in the law,

15   the dwelling house of another.  And they go in with the

16   purpose to commit some type of offense, whether it's an

17   aggravated murder or a theft offense or something, and the

18   perpetrator could be armed with a deadly weapon, like a gun

19   or a knife, and the perpetrator can cause serious physical

20   harm or death to the victim inside.  Okay.  That might be

21   aggravated burglary.

22          There's another crime called aggravated robbery

23   which does not require the structure.  There's no occupied

1    structure involved.  No dwelling house.  And basically that

2    involves the perpetrator who uses force or threat of force

3    against another person to commit an offense, they steal

4    something, and the perpetrator could be armed with a deadly

5    weapon like a knife or gun and the perpetrator can cause

6    death or serious physical harm to the victim.  Okay.

7    A        Yeah.

8    Q        So there are these two crimes.  And the term firearm

9    basically means a working gun.  It's a complex legal

10   definition that talks about the use of combustion or

11   explosive to propel a projectile.  It means pulling the

12   trigger and a bullet comes out; right?

13   A        Right.

14   Q        Okay.  Now, and if I remember, you're familiar with

15   firearms because you've got a handgun and a shotgun that you

16   use to hunt and maybe for target practice; right?

17   A        (Nods head.)

18   Q        Okay.  So nothing magical about that?

19   A        No.

20   Q        Okay.  Now, let's talk about some regular stuff.

21   The burden of proof is always on us, the people of the State.

22   And the burden is to prove these elements of the crimes

23   charged.  If we don't meet it, then you find the defendant

1    not guilty.  If we do meet our burden of proof beyond a

2    reasonable doubt, then you find the defendant guilty.

3         Now, you understand the defendant has no burden of

4    proof?  That burden never shifts.  The burden is entirely on

5    us, the people of the State.  The defendant and the defense

6    team there can sit on their hands for the course of the

7    trial.  They're not gonna do that because they're very

8    experienced.  They're gonna ask questions, but you understand

9    they don't have to do anything under our system of justice?

10   The burden is totally on us.  And that's  because there is a

11   presumption of innocence in our American system of justice,

12   unlike some other countries, like France or Turkey.

13   A       Uh-huh.

14   Q       The presumption goes the other way.  There's a

15   presumption of guilt maybe in those countries, okay, where

16   the defendant would have to get up and do something, but

17   that's not our system of justice.  You understand that under

18   our system, the defendant is presumed to be innocent, as are

19   all other defendants tried in this courtroom, and that

20   presumption of innocence acts like a cloak shielding her all

21   through the course of this trial unless and until we put on

22   all the testimony and evidence, the Judge has instructed you

23   under the law and you and the other eleven jurors go back

1    into the jury room to deliberate.  And at that point, if you

2    find we proved the elements of the crime charged beyond a

3    reasonable doubt, if you find the defendant guilty, at that

4    point, that presumption of innocence would be gone; right?

5    A        Right.

6    Q        And you agree with this presumption of innocence;

7    right?

8    A        Right.

9    Q        I mean it's important as American citizens --

10   A        Absolutely.

11   Q        -- that we have this presumption?

12   A        I understand.

13   Q        Now, we have to prove our case, the elements of the

14   crimes, by proof beyond a reasonable doubt.  And the Judge

15   will give you a detailed definition of that term, everything

16   has got a definition under the law, but basically, I think I

17   mentioned before, that it's when we convince you, firmly

18   convince you of the truth of the charge to a moral certainty

19   using your reason and your common sense.  It's like we talked

20   about buying a house?

21   A        No.

22   Q        We didn't talk about buying a house yet?

23   A        I don't think so.

1    Q        Okay.  You make decisions in your daily life.  You

2    make a decision to get married, you make a decision to buy a

3    house.  You guys, you own your own home?

4    A        Uh-huh.

5    Q        You make a decision whether to take a job or leave a

6    job or have children; right?

7    A        (Nods head.)

8    Q        These are all major decisions in your lifetime, to

9    buy a car, and what you do is you list the pros and cons

10   basically and then you use the tests that you use in your

11   every day lives using your reason and common sense.  You may

12   have some questions about some things, but you determine

13   whether they're reasonable doubts or not.

14        Like buying a house.  There may be some problems

15   with the foundation.  You look at a bunch of houses; right?

16   I know when my wife and I went out to buy a house, we

17   probably knew everything that was in the neighborhood, the

18   whole area, of what all the prices were and what the interest

19   rates were, which houses had water problems, which didn't

20   look structurally sound, we had the house inspected, all

21   these types of things.  You look at the roof.  Is the living

22   space, is the layout right, is it close to the school system,

23   is it going to gain any value hopefully?  All these types of

1   things.  And then on your checklist, when you get rid of all

2   the reasonable doubts, if they're all gone and there's

3   nothing left that's reasonable, you may have some doubt, but

4   if they're not reasonable doubts --

5   A       Right.

6   Q       -- then they don't count; right?

7           And then if you're firmly convinced using your

8   reason and common sense it's the right thing to do, you go

9   ahead and decide; right?

10  A       Right.

11  Q       At some point, you did, you bought a house; right?

12  A       Right.

13  Q       Okay.  And it's the same thing here.  It's just,

14  this is sort of like buying a house.

15          You understand that, well, let me give you an

16  example.  It's like an imaginary box.  Juhasz uses the

17  imaginary box so I'm going to steal his imaginary box for a

18  bit here.  It's a box that we have to fill up with evidence;

19  okay?  And because we have the burden of proof, we've got to

20  put evidence in.  And if it were a civil case for money

21  damages, whoever fills that box just over half way is gonna

22  prevail on a civil case.  In a criminal case, it's different.

23  We have the highest burden in the law.  We don't have to fill

1    the box up all the way to the top.  We got to come pretty

2    darn close to the top, though.  Maybe within an inch or half

3    an inch of the top so that you are personally satisfied.  You

4    and each of the other jurors can draw an imaginary line on

5    that box to where you feel we meet the test.  It's not proof

6    beyond all doubt or beyond any doubt or beyond the shadow of

7    a doubt because nothing that is subject to human affairs can

8    be proven beyond all possible or imaginary doubt.  Okay?  So

9    the law doesn't require us to prove it all the way, a hundred

10   percent, just to the point where it's beyond a reasonable

11   doubt.  Okay?

12           Now, do you understand because of the burden of

13   proof here and because of the presumption of innocence, the

14   defendant doesn't have to put anything into the box or take

15   anything out of that box?  The burden is totally on us, the

16   people of the State, to fill that box; okay?

17   A        (Nods head.)

18   Q        And there are different types of evidence that we

19   can put into the box.  There's direct evidence where a

20   witnesses comes in and testifies to what he or she has

21   learned through the use of his or her five senses.  For

22   example, "I heard the gunshot and it was loud.  I smelled the

23   smoke and it was acrid.  I touched the calendar and it was

1    smooth."

2         Okay?  And that's one type of evidence.

3         There's another type of evidence that is just as

4    good.  It's sort of roundabout evidence that you're used to.

5    And that's where you're presented with a fact or series of

6    facts and you're asked to draw a logical deduction to another

7    fact or series of facts.  That deductive reasoning we call

8    circumstantial evidence.  Okay.  I'll give you a for instance

9    to this.  Let's say you live in the two-story house and your

10   bedroom is on the second floor and when you go to bed at

11   night, you look out your bedroom window.  And you look across

12   your neighborhood and it's a beautiful night.  The moon is

13   shining, the stars are twinkling, there's not a cloud in the

14   sky.  As far as you can see across the neighborhood, it's

15   perfectly dry.  Okay?  So you draw the blinds, you get into

16   bed and just before you fall asleep, you have the radio on

17   low, you hear the announcer say, "Folks, there's a cold front

18   moving in.  I expect we're gonna have a storm before

19   morning."

20        And you shut the radio off and you fall asleep.  And

21   sometime during the night, you're awakened by a distant

22   booming sound in the sky and you look toward the window and

23   even though the blinds are drawn, you see like a flash of

 1    light outside.  And three or four seconds later, there's a

 2    distant rolling boom in the sky.  And maybe a minute goes by

 3    and suddenly there's another flash of light outside.  And a

 4    second later, there's another closer boom in the sky.  And

 5    suddenly there's a big flash of light outside and right over

 6    the house is a big ripping, cracking boom and a pitter patter

 7    on the roof and then a steady drumming sound and you fall

 8    back asleep.  And then sometime later, you wake up, you go to

 9    the window, you open the blinds, you look out, the sun is

10    shining, there's not a cloud in the sky, but where it was

11    perfectly dry the night before, the streets are running with

12    water, the rooftops are all wet as far as you can see, there

13    are drops of water dripping off the leaves of the tree and

14    there's no fireplug nearby for some car to hit it and spew

15    water up all over all the houses; right?  So you know what

16    happened during the night.  What happened?

17    A       It rained.

18    Q       Right.  There was a thunderstorm, and you know that

19    based on the circumstantial evidence, even though you didn't

20    see that with your own eyes because the blinds were closed,

21    but based on everything you heard and could see, you know

22    there was a thunderstorm.

23            Now, there's room in there for some possible or

1  imaginary doubt.  You can emergency that E.T. and his alien

2  buddies flew by in a flying saucer and sprinkled the ground

3  with some wet stuff and put on a sound and light show, but

4  that would be a foolish or imaginary doubt, wouldn't it?

5  A         (Nods head.)

6  Q         And there's a limitation to circumstantial evidence.

7  You might not know how long it rained because you were

8  sleeping.  You might not know how much water fell during the

9  night and unless you went out to the airport and measured it

10  with their devices out there and they tell you how much fell

11  or how long it fell.  But you know beyond any reasonable

12  doubt that there was just a thunderstorm as to what happened;

13  right?  It's the same thing.

14         You understand that circumstantial evidence is just

15  as good as direct evidence?  We can prove the elements of the

16  crimes charged using circumstantial evidence.  Okay.  You

17  don't have any problem with that?

18  A         Right.  I understand what you mean.

19  Q         Okay.  Now, you understand that there's a reason

20  that we use circumstantial evidence.  We may have to use it

21  because oft times when people plan really serious crimes like

22  aggravated murders, they may not stand on the courthouse

23  steps at noon and tell the whole world what their intentions

```
 1    are; right?

 2    A         (Nods head.)

 3    Q         Okay.  So we have to look at all the facts and

 4    circumstances.  And if we have things like maybe letters or

 5    phone calls where people are planning things to know what was

 6    inside a person's mind to show their purpose, we would be

 7    able to use things like that; right?

 8    A         Right.

 9    Q         Okay.  Now, in spite of, and I take it you could

10    pile up evidence on evidence and make your own decision as to

11    if there's enough and follow what the Judge tells you?

12    A         (Nods head.)

13    Q         Okay.  And you believe people should be held

14    accountable for their actions?

15    A         Yes.

16    Q         Now, you understand that in spite of all the

17    planning that criminals may do, they may engage in detailed

18    plans, sometimes criminals do some really stupid things so

19    they get caught; right?  For example, you probably heard

20    about the cases where the robber goes into the bank and he's

21    got a holdup note and he hands it to the clerk on the back of

22    an envelope and it says, "Give me all your money," and the

23    clerk hands him the money, he runs out and the clerk turns
```

1    over the envelope, there's the guy's name and address.  Okay?

2    And they catch him.

3          Or the burglar who climbs in through the bedroom

4    window and sneaks around and steals stuff, but he drops his

5    wallet and it's got all his identification and they find him

6    with the proceeds right after; right?

7    A        Uh-huh.

8    Q        So you understand that in spite of all the planning,

9    sometimes criminals do some stupid things and get caught.

10   Now, you can't take, you can't take -- do you ever watch

11   Court TV?

12   A        A little bit.

13   Q        A little bit?  Well, they have cases from across the

14   country, different jurisdictions.  And each state is

15   different in their procedures.  And in some states, they let

16   jurors take notes, but in Ohio, generally our judges don't

17   let the jurors take any notes of the testimony of the

18   witnesses.  And there's a reason for it.  Our judges feel

19   that they want the jurors to pay close attention, to listen

20   to what's being testified to and to observe the witness's

21   demeanor.  Okay?  And people sometimes, when they take notes,

22   some people take better notes than others and somebody writes

23   one thing down and somebody writes another and they argue

1    about their notes and it would distract them from what the

2    testimony was.  Okay?  So generally judges do not let you

3    take notes.

4         Also, there aren't any instant replays on the

5    testimony like the sports games on TV.  You've got to pay

6    close attention.  The trial may last over a couple weeks

7    because we're only going like three and a half days a week

8    for three weeks.  But you'll be, because there are twelve of

9    you on there, I'm sure you'll be able to recollect the

10   testimony if you pay close attention.  There aren't going to

11   be any instant transcripts either.  Unlike those

12   high-publicity trials like O.J. Simpson or the Menendez

13   brothers.  We don't have the millions of dollars for the

14   instant transcribing devices in this county.  We're hurting

15   financially in the county so we just don't have those.  Our

16   court reporters are very good, but they can't do instant

17   transcripts.  So if you ask for, you know, the testimony of

18   so and so, the answer is going to be no, you have to rely on

19   your collective recollection.  You don't have any problems

20   with that?

21   A       No.

22   Q       Okay.  Also, you can't go out to investigate on your

23   own.  That sounds silly, but sometimes in TV programs like I

1    think it was a Matlock episode and there was a Hawaii 5-0

2    episode where they went out and there was a movie where the

3    juror went out and investigated the crime scene.  We had that

4    happen in real life here once and it caused a mistrial and we

5    had to do it all over again.

6    A       Yeah.

7    Q       You don't want to do anything like that; right?

8    A       No.

9    Q       Because we don't want to do this over again; right?

10   A       No.

11   Q       Okay.  Also, you're being picked as an alternate.

12   And sometimes folks say, "Gosh, I'm an alternate.  It's sort

13   of like being the fifth wheel on a car."

14           Not true.  We've tried numerous capital murder cases

15   over the years and there have been a number of times, more

16   than I care to think, where we've used all the alternates

17   because of family emergencies during the course of the trial

18   or people got sick during the course of the trial.  So it's

19   very important you pay just as close attention to the

20   testimony as if you were sitting in that chair because you

21   might end up sitting in that chair.  Hopefully nothing

22   happens to any of the jurors, but if it does, you know, you

23   may see alternates moving up as the trial progresses.

1    A         Okay.

2    Q         Another thing is, you're stuck with the questions

3    that the lawyers ask.  On Court TV, sometimes it shows jurors

4    submitting questions to the judge to ask the witnesses.  That

5    doesn't happen here in Ohio.  Okay?  And because we're

6    lawyers, we go to law school, we're trained to establish

7    elements of the crime or tear them down.  Okay?  And it may

8    well be that you have some questions, but you're stuck with

9    our questions.  Okay?  That's not gonna bother you?

10   A         I don't think so.

11   Q         As long as we prove the elements of the crime to

12   your satisfaction beyond a reasonable doubt?

13   A         Right.

14   Q         Sequestration.  At the end of the first phase, after

15   all the testimony and evidence is in and the Judge has

16   instructed you on the law, you and the other jurors go back

17   in the jury room to deliberate.  And at that point, you're

18   kept together.  You're sequestered.  If you don't reach a

19   decision by the end of the first evening, you're taken to a

20   motel or hotel and put up and they provide meals and all that

21   stuff.  And you get advanced notice so you know to pack

22   stuff.  Each jury is different.  And I don't know how long

23   it's going to take.  Nobody can predict that.  I've had

1    juries in capital murder cases return first-day verdicts

2    within an hour and a half and some juries take up to five

3    days.  Because each case is different, there are different

4    numbers of exhibits to look at.  So you take however long it

5    takes.

6            If you and the other jurors return a verdict of

7    guilty of aggravated murder beyond a reasonable doubt with

8    the specifications, we move to a second phase.  And there

9    will probably be a break in-between, maybe a couple of days

10   or maybe a week.  The second phase generally takes one to

11   three days and then you are instructed on the law and you are

12   sequestered again.  Okay.  And again, that depends on, each

13   jury is different.

14           The two sequestrations, is that going to cause you

15   any undue hardship?

16   A       No.

17   Q       Okay.  Do you have any questions that have come up

18   during the course of these proceedings?

19   A       Not really, no.

20   Q       Okay.  Now, sympathy, I know it's normal for one

21   human being to feel sympathy for another human being, but can

22   you set aside any sympathy you might feel for the defendant

23   and base your verdict on the testimony and evidence that you

1    hear and the instructions of law given to you by the judge

2    and set aside any sympathy that you might have for the

3    defendant?

4    A        Yes.

5    Q        Okay.  Thank you.

6             Now, I think you'd agree that there are certain

7    obligations that we have as citizens in this country.  One of

8    those is, if it's election time, we've got an obligation to

9    bone up on the issues and candidates and cast a ballot, and

10   that's how most folks get here is because they're voters.

11   A        Yeah.

12   Q        And there's another obligation.  If it's wartime,

13   we've got an obligation to serve in the military if we're

14   called.  As a matter of fact, we've got young people overseas

15   now in different countries doing their duty.

16             There's another obligation of citizenship.  When

17   you're summonsed in to appear to serve as a juror on a case,

18   you never know what case it's going to be, but to make sure

19   our American system of justice works, it's important we get

20   folks from all walks of life with all kinds of experiences

21   and especially in a case like this, a criminal case, the most

22   serious of criminal cases, it's important that we get folks

23   who can serve on this jury.  Would you be willing to

```
 1   undertake that obligation of citizenship, even though you got

 2   to jockey things around in your daily life?

 3   A        Yes.

 4   Q        Okay.  That's all we can ask.  You have no questions

 5   of me?

 6   A        No.

 7                    MR. BAILEY:  Okay.  Now I'm done.  Defense

 8   counsel is gonna have an opportunity to address you.

 9                    JOANNE M. BATES:  Okay.

10                    THE COURT:  Gentlemen.

11                    MR. JUHASZ:  Thank you, Your Honor.

12   EXAMINATION BY MR. JUHASZ:

13   Q        Miss Bates, how you doing?

14   A        Okay.

15   Q        Do you need some water or something?

16   A        No.  I'm good.

17   Q        Tell you what I'm gonna do before I start talking to

18   you.  I remembered at lunch that I turned on my cell phone

19   and if I don't turn it off, it's going to go off at some

20   point during court today.  That's the kind of luck I have

21   with cell phones.

22            My name is John Juhasz.  My friend, Gerry Ingram,

23   and I are representing Donna Roberts who, as you know, is on
```

1   trial for her life.  We take the responsibility of

2   representing her seriously, as I imagine you would think that

3   we would.  And because of that, that's why we engage in this

4   process of, this lengthy process of asking you questions to

5   try and get a fair and impartial jury.

6   A       Right.

7   Q       The same kind of jury you would probably want if you

8   were sitting over there or a family member?

9   A       Right.

10  Q       Make sense to you?

11  A       Uh-huh.

12  Q       You've had a lot of time to think about it since you

13  were first called in on April the 8th and learned that this

14  was a capital case.  And I'm curious if you have any thoughts

15  about taking on the responsibility of potentially being a

16  juror in this case.  Have you thought about that?

17  A       Yeah.

18  Q       Can you tell me what you've been thinking?

19  A       What have I been thinking?  That somebody has to do

20  it and that it actually comes at a time when I'm, don't have

21  a lot of things that would interfere.  And I think I can be

22  impartial.  Let's see.  What else?  I would try to be the

23  kind of juror that I would want if I was there.

1    Q        Okay.  You think you can be the kind of juror that

2    you would want if you were sitting over there?

3    A        Yeah.

4    Q        As we talk this afternoon, lawyers have a tendency,

5    either by training, experience or some combination of the

6    two, to monopolize conversations.  And I will certainly try

7    to keep this moving so we can finish this process and get you

8    out of here.  But I want you to understand that I am

9    interested in what you have to say more than what I have to

10   say.  Gerry likens this process to a job interview.  And as

11   you know, at a job interview, first of all, there's a

12   difference which is that you didn't apply for the job, you

13   got a notice to come here.  But there's a similarity in that

14   in the job interview, the prospective employer is looking at

15   you to see if he or she is comfortable hiring you and you're

16   also looking at the place that you're gonna work.  So, you

17   know, we're interested in talking to you and finding out your

18   views, but we're also interested that if you have views that

19   you maybe discover at some point you are not comfortable

20   sitting on this case.  And I don't want you to be reluctant

21   about saying that if that's how you feel.

22            You, as I understand it, did not know anything about

23   this case?

```
 1    A         No.

 2    Q         Okay.  Aside from, you read the Tribune every day,

 3    right, and then you get your TV news from Cleveland because

 4    of where you live?

 5    A         (Nods head.)

 6    Q         Did you hear the case, when you were down either on

 7    the 8th of April or since you've been here today, have you

 8    heard any discussions about Donna Roberts or the case or

 9    anything like that?

10    A         No, I really haven't.

11    Q         All right.  You know, I'm sure from what the Judge

12    has told you and what Mr. Bailey has told you that the basic

13    allegations against Donna by the government are that she and

14    a fellow by the name of Nate Jackson, is that a name that you

15    knew or did not know?

16    A         No, I didn't.

17    Q         That Donna and a fellow by the name of Nate Jackson

18    planned or plotted or conspired or whatever word you want to

19    attach to that to kill Robert Fingerhut.  Robert and Donna

20    had been married at one time.  They divorced, but after they

21    divorced, they continued to live together in Howland Township

22    and to work together at the Youngstown Greyhound bus stations

23    -- I didn't say that right.  The Youngstown and Warren
```

1    Greyhound bus stations.  Forgive me.  Any of that ringing a

2    bell with you?

3    A       It's not, really.

4    Q       All right.  You may hear during the course of this

5    trial some things that make you believe that Mr. Jackson was,

6    in fact, involved in Mr. Fingerhut's death.  But you

7    understand that this case is about one person and one person

8    only, and that's Donna Roberts; do you appreciate that?

9    A       Right.

10   Q       So even if you are convinced that he is guilty as

11   sin, he being Mr. Jackson, of whatever you hear in this case,

12   that's not necessarily proof that she was involved; do you

13   see that?

14   A       Yes.

15   Q       The government is going to have to prove to you, if

16   they can, by proof beyond a reasonable doubt that she did

17   something to help Mr. Jackson.  And are you comfortable

18   holding them to that burden?

19   A       Yes.

20   Q       In their efforts to do that, to convince you that

21   Donna was somehow involved in helping Mr. Jackson, they will

22   likely produce for you letters she has written and recorded

23   telephone conversations between Donna and Mr. Jackson.  I

```
 1    will tell you that some of those letters and telephone

 2    conversations are sexually explicit and many people,

 3    honestly, would find them to be offensive in places.  Now, I

 4    bring that up for this reason.  You may find, as a result of

 5    evidence you hear in this case, that you don't like very much

 6    what she has said in these letters or these tapes, but you

 7    appreciate, don't you, that that doesn't substitute for

 8    evidence about whether she helped Mr. Jackson?

 9    A       Yes.

10    Q       Do you see that?

11    A       Yes, I see that.

12    Q       You could very easily walk out of this case saying

13    to yourself, "You know what, I know this trial wasn't about

14    Nate Jackson, but I'm convinced he was involved in

15    Mr. Fingerhut's death."

16            You may also say to yourself, "She's not somebody

17    I'd like to meet or talk to outside of this room because of

18    things she has written or said, but nevertheless, they didn't

19    connect them by proof beyond a reasonable doubt."

20            Do you see how that could happen?

21    A       Yes.

22    Q       And those are three separate and distinct inquiries.

23    And you can keep them separate?
```

```
 1    A        (Nods head.)

 2    Q        Even though you don't know about it, there has been

 3    some publicity about this case.  And sometimes jurors look at

 4    me a little funny when I ask this question, but I'll tell you

 5    in a second why I ask it.  Given the fact that there's been

 6    some publicity, if you find that the State doesn't meet its

 7    burden of proof and doesn't prove Donna's participation in

 8    this homicide by proof beyond a reasonable doubt, would you

 9    have any reluctance to vote not guilty?

10    A        No.

11    Q        Okay.  I ask that because sometimes on radio talk

12    shows and things like that, the people who call in, sometimes

13    the hosts like to sort of second guess what juries do.  And

14    you appreciate, of course, they're not here.  You're here.

15    A        Right.

16    Q        But we do want to make sure that jurors aren't

17    worried more about what Ron Verb thinks than what's the right

18    thing to do.

19    A        Right.

20    Q        You're not one of those people; correct?

21    A        I don't think so.

22    Q        All right.  The Judge mentioned to you quite

23    correctly that we are going to talk to you about your views
```

1    about the death penalty.  And in doing that, it's not our

2    purpose to change your views about the death penalty, simply

3    to find out what they are and to see if those can or cannot

4    be squared with sitting on a case like that; does that make

5    sense to you?

6    A        I understand.

7    Q        All right.  Before we talk about that, though, you

8    have been given a handout, Judge Stuard has talked to you a

9    little bit, Mr. Bailey has talked to you at some length and

10   I'm up here talking to you now.  All of us are talking to you

11   about the potential of the death penalty and yet you have not

12   heard one piece of evidence that Donna is even involved;

13   right?

14   A        Right.

15   Q        I bring that up because obviously as one of Donna's

16   lawyers I have a concern that jurors might think, they're

17   talking about the death penalty right and left here, she must

18   be guilty; do you have any thoughts like that?

19   A        No.

20   Q        All right.  You appreciate, don't you, that we have

21   to talk about everything that could potentially come up in a

22   case like this at the beginning?

23   A        I understand.

1    Q        All right.  You are very soft spoken.

2    A        I'm sorry.

3    Q        And so even though I was straining to hear your

4    answer, there's something I want to ask you about before we

5    talk about the death penalty, and that's the answer that you

6    gave about the criminal justice system.  People don't think

7    for themselves when they are on a jury.  And I tried very

8    hard to hear what you said and I couldn't.  I apologize.

9    A        Oh, I think that they let the news media sway them

10   and I just think people listen to other people too much

11   instead of making up their own mind in general.

12   Q        Okay.  One of the things that sometimes we ask

13   jurors is that, maybe no one has even told you this, so let's

14   take a second and talk about it.  In this case, a jury of

15   twelve would have to decide something by a unanimous vote.

16   Did you know that or did you not know that?

17   A        I didn't know it for sure.

18   Q        All right.  That means that if the jury finds

19   somebody guilty, all twelve of them have to agree.  And if

20   they find somebody not guilty, all twelve of them have to

21   agree.  And similarly, if you get to a second phase, if they

22   are going to vote to impose the death penalty, all twelve of

23   them have to agree to do that.  Now, here's my point about

5010

1    that in connection with what you said.  You never know what's

2    gonna happen in this world, as I'm sure you know.

3    A        Right.

4    Q        You may find yourself in a situation back in the

5    jury room where even though all twelve of you sat and heard

6    the same evidence, when you get back there and start talking

7    about it when it's time to deliberate, you're going, "I don't

8    know where these other people are coming from, but I didn't

9    see it like that at all."

10            And you could end up being a, in essence, a one vote

11   with eleven on the other side of you.  And it doesn't matter

12   for present purposes whether you're voting guilty and they're

13   all voting not guilty or vice versa.

14            I've never been on a jury, but I've talked to plenty

15   of jurors, and that's an uncomfortable experience.  You

16   strike me from the, from the follow-up that you've given me

17   to that answer that if you find yourself in that position you

18   will not honestly surrender your convictions just to get the

19   world's work done and get on with this case.

20   A        No, I wouldn't.

21   Q        Okay.  And I'm gonna read into your answer and if

22   I'm, if I say something that's not accurate, please tell me,

23   that if whatever verdict the jurors are contemplating coming

5011

```
 1    up with, somebody says, "We can't do that, we'll get

 2    crucified in the media," that you're a person who is gonna

 3    sort of say, "What's wrong with you people?"

 4    A       Pretty much.

 5    Q       "We have to judge this based upon the evidence."

 6    A       Yes.

 7    Q       Is that right?

 8    A       Yes.

 9    Q       Okay.  Like many people we talk to, your views seem

10    to be that the death penalty is appropriate for some offenses

11    and inappropriate for others; is that a fair statement?

12    A       Yeah.

13    Q       This is one of those points where I'm more

14    interested in what you have to say than what I have to say.

15    Can you elaborate a little bit for me, and I appreciate you

16    told Mr. Bailey.

17    A       Uh-huh.

18    Q       And I'm not gonna try to pin you down to, well, if I

19    gave you these facts, would you vote for the death penalty or

20    not the death penalty.  I understand you can't do that.  I'm

21    more interested in your general thoughts about the death

22    penalty.  Well, let's start with that and then I'll ask you

23    some other questions.
```

5012

1    A        Okay.  I'm not opposed to it.  I just think it

2    should be rare.

3    Q        It should be rare?

4    A        Yeah.  I think it would, yeah, it takes a lot to

5    come back with the death penalty.

6    Q        Okay.

7    A        The exact circumstances, I don't know.  That would

8    be on a case by case.

9    Q        Understood.  One of the things, of course, as I

10   think you know from the handout and maybe from some of the

11   things Mr. Bailey has said and Judge Stuard has said, if you

12   get to a second phase, whether it's this case or any other

13   capital case in Ohio, the government has a separate burden of

14   proof?

15   A        Right.

16   Q        Completely different than what they had at the first

17   phase; do you understand that?

18   A        I understand that.

19   Q        Mr. Bailey stole my box.  He was talking to you

20   before about my box.  He stole my box.  He's been doing that

21   for five weeks and I'll get even.  But for present purposes,

22   what I want to find out is the government has a box to fill

23   at the second phase of a capital case if you ever get there

5013

1    and they have to fill it with proof beyond a reasonable doubt

2    that the reason or reasons to impose the death penalty

3    outweigh all the reasons not to impose the death penalty; you

4    know you know that, right?

5    A        Yeah.

6    Q        I'm judging from your answers because of what you

7    said about it's something that should be rarely and carefully

8    done, that that box is gonna start out empty for you at the

9    second phase?  There's nothing about how you feel about the

10   death penalty that sort of puts something into that box, or

11   is there?

12   A        No.

13   Q        Does it matter to you what the offense is?  And let

14   me, let me narrow that down a little bit.  Does it matter to

15   you what type of murder it is?  In other words, some people

16   have said to us, "Well, if it's a child.  Well, if it's

17   premeditated.  Well, if it's cold-blooded."

18           Do any of those things make you change what you've

19   just said about carefully considering the death penalty at

20   the second phase?

21   A        Okay.  You'd still have to start from scratch.

22   Q        Yes.  But -- and here's why I ask you, and I'm

23   trying to walk the line here between not feeding you answers

1    to find out how you feel.

2    A       Okay.

3    Q       But also I'm trying not to give you any trick

4    questions.

5    A       Okay.

6    Q       Some people, because of how they feel about the

7    death penalty, if it's a certain type of offense, if sort of

8    has a leg up going into the second phase.  Okay?  You know

9    how the Judge and I think Mr. Bailey both told you that if

10   you get to a second phase, all four of those sentencing

11   options have to start out equally in your mind?

12   A       Right.

13   Q       And will they do that for you?

14   A       Yes.

15   Q       Okay.  My question is, and again, I'm not trying to

16   trick you, but I'm also trying not to feed you the answers

17   because I want to hear what you have to say, is some jurors

18   have told us that, well, if it's a child murder, the death

19   penalty has a leg up for me and so they don't really start

20   out equally for me.  The defendant has to talk me out of

21   giving the death penalty in a situation like that.  And I'm

22   interested in finding out if you feel like that about any

23   type of homicide.  Is that a clearer question?  I know it's

```
 1    hard because --
 2    A         Yeah.  Because it doesn't really apply.  I think
 3    it's such a serious thing to give someone the death penalty,
 4    I think you have to prove that it's necessary.
 5    Q         Okay.  So I guess the answer to my question would
 6    be --
 7    A         Would be that, no, I don't think I would lean
 8    towards ever favoring it.
 9    Q         Okay.  That -- and if I didn't make myself clear,
10    what I'm trying to suggest to you is some people have said,
11    for example, "If I found somebody guilty of murdering a child
12    at the first phase, the death penalty -- and I went to the
13    second phase, the death penalty would have a leg up."
14              The four options wouldn't start out equally.  And
15    instead of the State filling up the box, the defendant would
16    have to take stuff out of the box?
17    A         Right.
18    Q         Okay?
19    A         I understand what you're saying.
20    Q         All right.
21    A         I don't feel I would be that way.
22    Q         That's what I want to make certain of.  Thank you.
23              Couple more hard questions about the death penalty
```

5016

```
 1    and then we'll be done with it.  Can you tell me how you feel

 2    about life imprisonment as an alternative, as a sentence

 3    alternative to the death penalty?

 4    A         (No response.)

 5    Q         Hard question.  I know.

 6    A         Yeah.  I'm not sure exactly what you mean.

 7    Q         All right.  Is there anything about life

 8    imprisonment, some people think that if you kill somebody,

 9    well, some people think an eye for an eye.

10    A         No.

11    Q         Some people have a modified version of an eye for an

12    eye and they think that if you killed somebody and you

13    planned it or whatever the circumstances are, that life

14    imprisonment really isn't much of a punishment.

15    A         Oh, okay.

16    Q         You know.  They got weights down there and they can

17    exercise and they have TV.  It's not really much of a

18    punishment.

19    A         No.  I don't feel that way.  I feel life in prison

20    is a viable punishment for --

21    Q         All right.  I want to make certain that you

22    understand, I think you do, but I want to make certain that

23    you understand, because many jurors don't, you do understand
```

```
 1    that life imprisonment without parole means just that?

 2    A        Yeah.

 3    Q        There are no tricky lawyer things, well, yeah, I

 4    know we told the jury that, but there's good time and they

 5    get a super special chance at parole.  You go in, you come

 6    out in a box; you appreciate that?

 7    A        Right.  I understand that.

 8    Q        Did you ever see the movie Shawshank Redemption?

 9    A        Yeah.

10    Q        Morgan Freeman's character, whatever his name is, I

11    can't remember, goes in for a couple parole hearings during

12    that and he gets stamped rejected; do you remember that?

13    A        Uh-huh.

14    Q        I bring that up because the two life sentence

15    options out of the four that you would have available to you

16    if you got to a second phase involve a possibility of parole

17    after 25 years or 30 years, but you understand that does not

18    necessarily mean --

19    A        Right.

20    Q        -- that the person will get parole?

21    A        Right.

22    Q        Okay.  So even a jury who votes for one of those

23    sentences may well be sentencing the person to life in prison
```

1    because the parole board may not let them out; do you see

2    that?

3    A        I understand.

4    Q        And so there's nothing about that, some people are

5    nervous, quite frankly, about the prospect that somebody

6    would get parole and so I said a little while ago about some

7    people have a view about the death penalty, that it would

8    have a leg up going in a second phase.  For want of a better

9    phrase, and this is not a good one, those options would have

10   a leg down.  They would sort of start out in a hole because

11   the jurors would stay away from them thinking that, "Hey, I'm

12   not even gonna consider those because this person might get

13   parole somewhere down the road."

14   A        Okay.

15   Q        Do you feel that way?

16   A        No, I don't feel that way.

17   Q        Okay.  We bring you folks in here and give you all

18   sorts of rules that we went to school for and that we use all

19   the time and I'm sensitive to the fact that, you know, this

20   isn't what you do all the time.

21   A        No.

22   Q        You and everybody else who has sat there.

23   A        Yeah.

5019

1    Q        You get some help because the Judge will give you

2    jury instructions.  He'll define reasonable doubt for you.

3    He'll define what the crimes are for you.  If you get to a

4    penalty phase, he will talk to you again about the definition

5    of reasonable doubt and he'll talk to you about weighing the

6    reasons to impose the death penalty against the reasons not

7    to.  But as Mr. Bailey suggested to you, the Judge, the

8    lawyers, nobody can tell you as an individual juror how much

9    weight to attach to a particular circumstance or factor; do

10   you see that?

11   A        Uh-huh.

12   Q        And so the upshot of that is that even if you get to

13   a second phase in a death penalty case, nobody can ever tell

14   you that you have to vote for a sentence that you don't

15   personally feel is supported by the evidence.

16   A        Right.

17   Q        You okay with that?

18   A        Yes.

19   Q        Have you heard the phrase before takin' the fifth?

20   A        Yeah.

21   Q        "I'm takin' the fifth."

22            It, most people hear it from TV or the movies and it

23   gets a little bit of a bad rap because it's some guy that we

1    know from watching the TV show or the movie that he's clearly

2    guilty and he's sitting there, you know, calmly smoking

3    cigarettes, staring up into the corner saying, "I'm takin'

4    the fifth."

5          That's one negative aspect of it.  It actually comes

6    from our fifth amendment and it's based on an idea started by

7    our founding fathers after the revolution that, really, is

8    different from any other country in the world.  If the

9    government accuses you of something, you are presumed not to

10    have done it and you need do nothing to help the government;

11    do you appreciate that?

12    A      Right.

13    Q      What are your thoughts about that?  And let me

14    narrow that down a little bit.  You think it's better the way

15    we do it, we're sort of in the minority, or do you think it's

16    better the way they do it in other countries?

17    A      It's better the way we do it.

18    Q      Okay.  There are some kind of difficult to

19    understand or deal with consequences of that.  I'm sure

20    you've had to mediate a dispute between children from time to

21    time in your life.  One accuses the other one of doing

22    something.  Before you make a decision, you want to hear both

23    sides of the story; correct?

```
 1    A        Yeah.

 2    Q        And that's the fair way.  Whether it's kids or

 3    whether it's me accusing Lori here of doing something wrong,

 4    you'd want to hear what Lori had to say before you decided;

 5    correct?

 6    A        Right.

 7    Q        Jurors, of course, want to be fair and so there's a

 8    natural inclination to want to hear both sides of the story?

 9    A        Uh-huh.

10    Q        But because of the presumption of innocence, that's

11    where this little box that I talk about that Bailey keeps

12    stealing from me comes in.  The State, a lot of people think

13    that if the verdict in a criminal case is guilty, the State

14    won and if the verdict in a criminal case is not guilty, the

15    defendant won.  That's really not the case.

16    A        Right.

17    Q        If it's guilty, they won.  If it's not guilty, they

18    lost.

19    A        Right.

20    Q        Because when they bring the allegations, they're

21    sort of representing that they're going to prove to you

22    beyond a reasonable doubt that the person committed the

23    crime; do you see that?
```

```
 1    A         Yes.

 2    Q         The reason I like to use the box is for several

 3    reasons.  One is that, as we've already mentioned, sitting

 4    here right now, having heard no evidence against Donna, that

 5    box is empty; correct?

 6    A         Yeah.

 7    Q         And it is for you, isn't it?  You have no problem

 8    looking at Donna saying, "I have no problem affording to you

 9    the presumption of innocence, I am going to make them prove

10    everything;" right?

11    A         Right.  Yeah.

12    Q         All right.  The other reason I like to talk about

13    the box that way is because Donna or anybody who sits at that

14    table doesn't have to pour anything in that box and she

15    doesn't have to reach in and pull anything out; do you see

16    that?

17    A         Yes.

18    Q         The case is either proved or not proved based upon

19    what they put in the box.

20    A         Right.

21    Q         As Mr. Bailey said, Ingram and I probably won't sit

22    on our hands the whole time.  That's not pulling evidence out

23    of the box.  That is simply offering questions, asking
```

1    witnesses questions that may make the jurors say, you know

2    what, they didn't put as much in the box as I originally

3    thought when I heard the witness testify; do you see how that

4    would work?

5    A       Yes.

6    Q       And that's one of the reasons, by the way, why we

7    tell jurors not to make up their minds until they hear

8    everything; do you think you can do that?

9    A       Yes.

10   Q       Now that I've given you this little lecture on the

11   fifth amendment and my silly little box, does it make a

12   little more sense to you now why a defendant does not have to

13   testify in a criminal case?

14   A       Oh, yeah.

15   Q       And let's do both sides of this issue.  If Donna

16   does not testify in this case, are you gonna hold it against

17   her and sort of saying, well, you know what, she must have

18   been hiding something like that guy in the movies who's

19   smoking a cigarette staring up at the corner?

20   A       No.

21   Q       Okay.  If she does testify, she's a witness like any

22   other witness in the case; do you agree?

23   A       Uh-huh.

5024

1    Q        Now, let's be fair about this, she may have, not

2    may, she does have a stake in the outcome of this case,

3    doesn't she?

4    A        Right.

5    Q        And that's something, in fairness, you ought to

6    consider; right?

7    A        (Nods head.)

8    Q        Does it mean you reject her testimony out of hand

9    because she's the defendant?

10   A        No.

11   Q        Okay.  It just means it's something to consider;

12   correct?

13   A        Right.

14   Q        You may also find the situation where witnesses

15   produced by the State may also have some interest in the

16   outcome of the case.  That makes sense to you as well,

17   doesn't it?

18   A        Uh-huh.

19   Q        And you can test their creditability the same way by

20   taking into account that they may have a reason to shade

21   their testimony; right?

22   A        Okay.

23   Q        It would be nice for jurors, I think, if when the

1    Judge gave you the definition of reasonable doubt it was

2    something a little more precise than it is, but we are

3    dealing with human affairs here, not science.

4    A        Right.

5    Q        So it has to be imprecise, and you seem to

6    appreciate that.  One of the ways that we like to think about

7    whether or not the State has filled up that box, Mr. Bailey

8    talked to you about some dots and things like that I think

9    when he was talking about reasonable doubt.  I like to think

10   of it in terms of a checklist.  If you make an important

11   decision, well, actually the one I like to use is if you got

12   done right now with this little discussion that we're having

13   and said, "Hey, you know what?  The Mercedes dealership

14   doesn't close till 5.  Let me pop down there and buy a new

15   Mercedes," you wouldn't do that, would you?

16   A        Probably not.

17   Q        Probably not.  There are, the pros are obvious in

18   that decision, but there are some cons, aren't there?

19   A        (Nods head.)

20   Q        For one thing, driving it home and explaining it to

21   your husband might be one.  Whatever those cons are, whenever

22   we make an important decision, we sort of weigh those pros

23   and cons, do we not?

5026

1     A       Uh-huh.

2     Q       Same thing here.  When you're deciding whether that

3     box is filled up, you look at all the cons, all the doubts

4     you have about the case.  If you can account for some of 'em,

5     somebody shows you a piece of evidence you forgot about or

6     whatever and you go, "You know what, that was silly.  I

7     shouldn't have written that down."

8             But if you have one or more than one left that's

9     based on reason and common sense, the State has not proved

10    its case; do you see that?

11    A       Yes.

12    Q       Any problem holding them to that burden?

13    A       No.

14    Q       They're a couple of nice guys.  They're a couple of

15    good prosecutors.  But if the evidence isn't there --

16    A       Right.

17    Q       -- you don't have any problem coming out and saying,

18    "You're nice guys and good prosecutors, but you didn't fill

19    up the box;" no problem doing that?

20    A       No.

21    Q       One of the ways they may try to fill up that box is

22    to ask you to make inferences, leaps in logic, about what we

23    call circumstantial evidence; is that a phrase you've heard

5027

1    before or no?

2    A        (Nods head.)

3    Q        If the inference they ask you to make makes sense,

4    is based on reason and common sense, and if there are no

5    inferences based on reason and common sense that can't also

6    be explained by the same evidence, then that might be a fair

7    thing to do.  But what I want to talk to you about for a

8    second is if there are other reasonable inferences.  I like

9    to do that by telling a little story.  And I'll tell you the

10   truth.  I made this story up a long time ago when my son was

11   about this big (indicating).  Now he's about 6'5", but the

12   story still is okay.

13           I want you to pretend that he's still little and

14   that it's about the middle of August, it's about 85 degrees,

15   about the same temperature as this courtroom and just about

16   as humid.  It's late in the day and the clouds are starting

17   to darken and the breeze is kickin' up a little and we know

18   we're gonna get one of those late afternoon thunder bumpers

19   that we're used to getting in this area.  You and I are out

20   in the kitchen and I'm making you some iced tea or lemonade

21   or whatever and we hear a big crash in the living room.  When

22   I run in to investigate, my son Mike's cat is darting out

23   between my legs.  I get in there into the living room and I

5028

```
 1    look to my left and there's my son, Mike, with his hands over

 2    his face like this (indicating).  Over to the right is my

 3    wife's Norman Rockwell plate knocked off the mantle,

 4    shattered on the hearth.  Couple feet from that, a Nerf ball.

 5    Now, it could be that Mike was throwing the Nerf ball like

 6    he's been told 631,000 times not to do and the noise scared

 7    the cat.

 8         Could be that the cat was walking on the mantle like

 9    she's been told 631,000 times not to do and Mike is going,

10    "Oh, boy.  Mom's gonna be mad.  And on top of it all, since I

11    never pick anything up, my Nerf ball is over there.  That

12    doesn't look good for me."

13         It could be that the breeze from that approaching

14    thunderstorm got the best of the plate, the noise scares the

15    cat, Mike sees the Nerf ball and thinks he's gonna get blamed

16    for it.

17         Here's the point of my story.  From that

18    circumstantial evidence, although I could accuse Mike of

19    breaking that plate, I certainly couldn't prove it beyond a

20    reasonable doubt, could I?

21    A    Right.

22    Q    Wouldn't be fair, would it?

23    A    No.
```

```
 1    Q        Any problem holding the State to that type of burden
 2    when you look at their circumstantial evidence?
 3    A        Yes -- oh, not a problem, no.
 4    Q        Any questions you have or anything that you have
 5    thought of since we've been up here?
 6    A        No.
 7    Q        Okay.  As Mr. Bailey said, you would be an
 8    alternate.  And he's quite right that many times we have put
 9    alternates into service.  It's what I call the always a
10    bridesmaid and never a bride question, which you appreciate,
11    don't you, that it's important to pay attention if you're an
12    alternate because you never know.
13    A        Right.
14    Q        Somebody else, one time, used the analogy of a pinch
15    hitter in baseball.  You know.  You're sitting on the bench
16    day dreaming or whatever and all of the sudden, the coach
17    says, "Get in there," and you got to be game ready.
18    A        I've been a pinch hitter.
19                       MR. JUHASZ:  I appreciate your time.
20    Thank you.
21                       JOANNE M. BATES:  Okay.
22                       MR. JUHASZ:  Thank you, Judge.
23                       MR. BAILEY:  Pass for cause, Your Honor.
```

5030

```
 1                      MR. JUHASZ:  Pass.

 2                      THE COURT:  Ma'am, you will be in the pool

 3      from which the alternates will be chosen and we're going to

 4      do that shortly.  If you'll please go back downstairs and

 5      then we'll bring you all up together.  Okay?

 6                      JOANNE M. BATES:  Okay.

 7                      THE COURT:  Thank you.  You're not to

 8      discuss anything of course.

 9                      JOANNE M. BATES:  Right.

10      (Whereupon, Joanne M. Bates was excused.)

11                      THE COURT:  We have enough now to proceed

12      with the selection of the alternates; is that correct?  Speak

13      up.  Anybody have anything?

14                      MR. JUHASZ:  I believe we do.  Yes, sir.

15      I'm sorry.  I thought it was a statement and not a question.

16                      THE COURT:  Oh, well, it probably sounded

17      like a statement.  Do you want a couple of minutes and we'll

18      get the prospective jurors up here and then we'll finish this

19      off.

20      (Whereupon, a discussion was had off the record.)

21      (At 2:20 p.m., the prospective alternate jurors returned to

22      the courtroom.)

23                      THE COURT:  Folks, we're gonna play a
```

5031

```
 1    little musical chairs here if you don't mind.

 2            Mr. Kotwis, will you please sit in the first seat

 3    here; next will be Michael Blake in chair number two; next is

 4    David Ratcliffe; Mr. Chetsko, number four; then Mary Ohara,

 5    number five; Mr. Kahler; and then over here we have

 6    Mrs. Massary and Miss Bates.  That's in your numerical order.

 7            To the State and the defense, I ask, are there any

 8    further challenges for cause?  I think they've been passed.

 9    You've passed on challenges for cause?

10                        MR. BAILEY:  Pass for cause, Your Honor.

11                        MR. INGRAM:  Pass for cause, Your Honor.

12                        THE COURT:  Very good.

13        Does the State wish to exercise a peremptory?

14                        MR. BAILEY:  Yes, Your Honor.  The State

15    would like to thank and excuse Mr. Ratcliffe.

16                        THE COURT:  Mr. Ratcliffe, we thank you,

17    sir, for your time and your patience.

18                        DAVID P. RATCLIFFE:  Okay.

19                        THE COURT:  Okay?  Thank you very much.

20        Peremptory to the defense.

21                        MR. INGRAM:  The defense would thank and

22    excuse Mr. Blake.

23                        THE COURT:  Sir, thank you very much for
```

```
1     your time and your patience.

2                         MICHAEL E. BLAKE:  You're welcome.

3                         MR. JUHASZ:  Thank you, Mr. Blake.

4                         THE COURT:  Peremptory to the State.

5                         MR. BAILEY:  The State would like to thank

6     and excuse Mr. Kahler.

7                         THE COURT:  Mr. Kahler, thank you, sir.

8                         TROY D. KAHLER:  You're welcome.

9                         THE COURT:  You have a good day.

10                        MR. BECKER:  Thank you.

11                        MR. JUHASZ:  Thank you, Mr. Kahler.

12                        THE COURT:  Peremptory to the defense.

13                        MR. INGRAM:  We would thank and excuse

14    Mr. Kotwis, Your Honor.

15                        THE COURT:  Sir, we thank you so much.

16                        ANDREW KOTWIS:  Thank you.

17                        MR. BECKER:  Thank you, Mr. Kotwis.

18                        MR. JUHASZ:  Thank you, Mr. Kotwis.

19                        THE COURT:  Okay.  The peremptories being

20    exhausted, the remaining four persons will be the alternates

21    in this matter.  Now we've got two chairs over here.  We're

22    gonna have to get two more chairs.  We'll get some in for

23    Tuesday, tomorrow, in case you folks need them.  I don't know
```

```
 1    if you will or not.
 2                    MR. BECKER:  Well, we're gonna need one
 3    for Detective Sergeant Monroe.
 4                    THE COURT:  Can I presume upon you to put
 5    two up there now?
 6                    MR. BECKER:  Sure.
 7                    MR. BAILEY:  Can we approach for one
 8    second?
 9                    THE COURT:  Sure.
10                    MR. BAILEY:  I've got a question.
11    (Whereupon, a conference was held at the bench.)
12                    THE COURT:  Okay.  If you folks will be
13    seated.  Mr. Chetsko, you're in chair number one here.  Yeah.
14    Right over there.  Miss Ohara, yes, number two.  Miss
15    Massary.  And Miss Bates, number four.
16         Okay. Just a couple remarks here to the alternates.
17    You might call down.  Will you call down for the other
18    twelve?
19         You folks know by now, part of the trial requires me
20    to repeat things that I know you have to get sick of hearing,
21    but you have to, of course, pay attention.  That doesn't
22    presume you're not going to pay attention, but at times
23    people who are alternates think, "Well, the way this trial is
```

1   going, there's not much of a chance of me sitting on the

2   jury."

3           That is not true.  We're going to be probably at

4   least three weeks on this.  And the problem for that is we

5   only have three and a half days each week because of other

6   things that the Court must do.  You get tired at times.  I

7   suspect you get bored at times.  We'll get into certain

8   presentations of evidence that, to be kind, it's boring.  But

9   it's absolutely essential that you try to maintain your

10  observation because many times when you get back in the jury

11  room, if you get back there, it is very important to be able

12  to have recall.  Part of the system, now you've got twelve

13  people, but it's nice if you're back there yourself that you

14  have the recall, you don't have to depend on somebody else's

15  memory over this period of time of three weeks.  We've

16  already had, in the time period from the beginning of this

17  trial, several people who have had things come up that were

18  originally slated to possibly be on the trial found it was

19  impossible.  Things come up.  And I don't know that I've ever

20  had a capital case that we didn't have at least one of the

21  alternates that ended up in the jury itself.  So with that

22  being said, we're going to get the jury up here and swear all

23  you folks in.

 1    (Whereupon, the following proceedings occurred in open court

 2    with the jury and four alternates at 2:30 p.m.)

 3                    THE COURT:  For the record, we have a jury

 4    of twelve persons seated with four alternates to begin this

 5    trial.  Would all of you folks, the jury and the alternates,

 6    please stand and raise your right hand to be sworn.

 7    (Whereupon, a jury of twelve and four alternates was sworn by

 8    the bailiff, Laurie Brown.)

 9                    THE COURT:  Okay.  Fine.  Please be

10    seated.

11                Because of the time, I'm going to give you some

12    preliminary instructions I have to give before we start and

13    then we will begin at 9:00 in the morning.  We will go right

14    into the opening statements of counsel.  That is an

15    opportunity that, one of the few times that counsel, during

16    the course of the trial, have an opportunity to speak

17    directly to the jury.  The opening statements will be from

18    the State an outline of the case as they see it that they are

19    required to prove beyond a reasonable doubt.  The defense may

20    or may not address the remarks of the State.  If the defense

21    does, then it is important that you listen primarily to the

22    State because the State has the burden of proving all the

23    allegations contained in the indictment and specifications.

1    Many times during the course of a trial, I get the impression

2    that the opening statements are kind of treated as

3    preliminary and it isn't that important.  I think it's very

4    important because it gives you landmarks, so to speak, to try

5    to find as the evidence that's produced.  The opening

6    statements are very important.

7         Now the attorneys for these parties will, of course,

8    have active roles during the trial.  They will be called upon

9    to make opening statements.  Once we begin presentation of

10   evidence, they will question witnesses and make objections.

11   And after the evidence is presented, they will be called upon

12   to give a final argument as to their view of what the

13   evidence does show.  What it ultimately shows, of course, is

14   what you determine from the evidence the facts to be.

15        Now you must remember, and this is most important,

16   that the attorneys are not witnesses.  And since it is your

17   duty to decide this case solely on the evidence which you see

18   or hear in this courtroom on this case, you must not consider

19   as evidence any statement of any attorney made during the

20   trial.

21        Now, there is one exception to that.  And if the

22   exception occurs, the Court will draw that to your attention

23   specifically.  If the attorneys agree to any particular fact,

1    we call this a stipulation of fact or an agreement of fact,

2    then it will be your duty to accept that fact as having been

3    conclusively proven and you will not require any further

4    proof on that point.  That's if both sides agree to any fact.

5    Otherwise, every other fact is in dispute between the parties

6    and requires the burden of proof.

7          Now, if during the questioning of a witness a

8    question is asked and an objection is made to that question,

9    a question by itself without an answer to provide meaning has

10   no meaning.  And many times, a question almost seems to beg

11   an answer.  You cannot give in to that temptation.  If a

12   question is not answered, you must disregard the question.

13   It's not part of this case.

14         Sometimes as the questions are put to a witness,

15   there will be a question put, an answer given and then a

16   motion to strike.  Now if the Court, in passing a ruling on

17   that motion to strike, grants the motion to strike, that

18   means that it is not proper evidence and should not have come

19   in.  Sometimes the answer comes out so quickly that the other

20   side doesn't have time to object or whatever.  Now that's a

21   little bit more difficult than if you've heard a question

22   that you think, well, I might know the answer to that, but I

23   can't, you have to say to yourself, I have to put it out of



```
 1   mind.  But here you have a question and an answer that's

 2   already been given.  So this creates a little bit more will

 3   on your part.  I can tell you that you have to forget it.

 4   Well, that's meaningless.  But we are rational beings.  And

 5   if the Court instructs you that the question and the answer

 6   is not evidence, then you have to be able to take and set

 7   that aside out of your mind knowing that you cannot use it in

 8   any final determination.  It's quite possible to do this.  It

 9   sounds, at first blush, like an impossibility.  It is not.

10   You have to keep in mind the proper evidence is what you have

11   to determine this matter on.

12           Now, as jurors, you also have the sole and exclusive

13   duty to decide the credibility of witnesses who will testify.

14   And you're going to have numerous witnesses in this case.

15   That simply means that it's up to each of you individually as

16   to decide what testimony you find worthy of belief or what

17   testimony you do not.  In determining these questions, you

18   will apply the tests of truthfulness which you apply every

19   day in your lives.  These tests include the appearance of

20   each witness on the stand; that person's manner of

21   testifying; and of course the reasonableness of the

22   testimony; the opportunity the witness had to see, hear or

23   know about that to which they're testifying; their accuracy
```

1    of memory; their frankness or lack of it; their intelligence;

2    their interest and bias, if any, but together with all the

3    facts and circumstances surrounding the testimony.  In

4    applying these tests, you will assign to the testimony of

5    each witness such weight as you deem proper.

6          Now you're not required to believe the testimony of

7    any witness simply because it was given under oath.  No one

8    is able to testify in a court in Ohio without being placed

9    under either oath or affirmation.  But that is merely one of

10   the tests that you apply in judging the testimony of any

11   particular person, that it is being given under oath or

12   affirmation.

13         Now in applying these tests, you will assign to the

14   testimony of each witness such weight as you deem proper and

15   you are not required to believe -- I already said that.  You

16   may believe or disbelieve all or any part of the testimony of

17   each witness.  You should not decide any issue of fact merely

18   on the basis of the number of witnesses who testify to one

19   side or the other.

20         The final test in judging evidence should be the

21   force and the weight of the evidence itself, regardless of

22   the number of people testifying to that fact.  The testimony

23   of one witness believed by you is sufficient to prove any

5040

1    given fact.  Also, discrepancies in a witness's testimony or

2    between that person's testimony and that of others, if that

3    should occur, does not mean that you should disbelieve the

4    witness, as people commonly forget facts or recollect them

5    erroneously after the passage of time.  You're certainly all

6    aware of the fact that two or more people who witness an

7    event at a later time often recall the event differently.

8    Sometimes there's a marked difference.  You wonder if they

9    witnessed the same event.  But that's the challenge to you

10   folks is to listen to each witness, to compare that witness's

11   testimony with the testimony of others and to come up with a

12   rational understanding of what you believe the facts to have

13   been.

14          When someone testifies that, you know, it was a

15   black cat and somebody else said, no, it was a calico cat,

16   that's not an important disparity.  It's the question about

17   how was the cat involved in the case.

18          Now if you conclude that a witness has wilfully lied

19   to you during their testimony, you would have the right to

20   reject all of that person's testimony unless, by taking all

21   the testimony of all the witnesses and all the evidence, you

22   find that there is some particular point or part of that

23   person who lied to you's testimony that is valid.  You have

 1   to sift through it all.

 2          There, of course, this being criminal, they have

 3   these in the instructions, there's no interrogatories or

 4   depositions or anything?  Very good.  Okay.

 5          This concludes my preliminary instructions to you.

 6   I hope it will be of some assistance as we begin the trial

 7   tomorrow morning.  I may be called upon to give you

 8   instructions of law as we proceed through the case.  I am

 9   called upon to give you a rather detailed instruction of law

10   at the conclusion of the case.  And as I mentioned to the

11   jury, I don't believe, well, maybe you were all here, we will

12   make every effort to give you a written copy of those

13   instructions.  There are times that we change things at the

14   last minute and that isn't possible, but there will be enough

15   work go into this beforehand that you'll probably have a copy

16   with you.

17          Okay.  I will release you for the evening.  Be back

18   here at 9.  You should remember, and I will constantly remind

19   you, you're not to discuss anything about the case with

20   anyone, you're not to read anything in the newspaper, you're

21   not to watch anything on TV.  If you get a visitor from outer

22   space during the nighttime, you are to disregard that.  You

23   are to keep your own counsel until the time arrives when you

5042

 1  get back in the jury room at the proper time.  That's when

 2  you start talking about the case and you will reach a

 3  resolution.  In the meantime, you will hear bits and parts of

 4  the case as we proceed.  As I said at the opening, until you

 5  have all that is necessary to make an informed decision,

 6  there's no point in trying to do so.

 7       I'm the only judge in the court that has this rule,

 8  but all of you ladies are to instruct your significant other

 9  that when you get home each evening they have supper ready

10  for you.  Okay?  Very good.

11       We thank you folks for your patience.  You have been

12  extremely patient, considering the extreme length this has

13  taken to pick a jury, and we'll try to keep the thing moving

14  as swiftly as we can from this point up.

15       Have a nice evening.  Thank you.

16  (Whereupon, the jury was excused at 2:43 p.m. and the

17  following proceedings occurred in open court at 2:46 p.m.)

18                 MR. INGRAM:  The defense notes an

19  objection to the judge's preliminary instructions to the

20  jury.  The Court noted that the defendant may or may not

21  address the remarks of the State and the Court then stated,

22  and I believe this is a quote, "If the defense does, it is

23  important that you listen primarily to the State because the

5043

1    State has the burden of proving the allegations."  We object

2    to that instruction and we would move for a mistrial.

3                    THE COURT:  Okay.  That motion will be --

4    do you wish to address?

5                    MR. BAILEY:  Well, I think you just have

6    to move that adverb or that adjective or whatever primarily

7    is and correct that and explain what you meant tomorrow

8    morning.

9                    THE COURT:  That was, I agree, it might

10   politely be called a judicial faux pas.  I will correct that

11   before we start with the jury in the morning.

12   (At 2:48 p.m., court was adjourned to Tuesday, May 13, 2003.)

13                            *  *  *

14

15

16

17

18

19

20

21

22

23

1              **TUESDAY, MAY 13, 2003 at 9:20 A.M.**

2                        THE COURT:  The Court has before it

3      defendant's motion in limine raising the issues of the

4      government introducing statements of the alleged

5      co-conspirator, Nathaniel Jackson, whether being oral or

6      recorded or in writing.  The State is objecting at this

7      point.

8                        MR. BECKER:  Well, I'm objecting for a

9      number of reasons.  First of all, these two motions were not

10     filed until yesterday at I believe 2:27 p.m.  I think that's

11     extremely late in the course of this matter.  Discovery has

12     been provided and available for months.  And in fact the

13     State has filed and permitted open discovery in this case and

14     defense has, has and continues to be available to have,

15     anything the State has in this matter.

16                   The basis of one of the motions is that the State

17     not be permitted to introduce any statements of

18     co-conspirator Nathaniel Jackson who's been convicted and is

19     currently on death row for his part in these crimes unless

20     and until the conspiracy can be established.  The State is

21     going to present the testimony, or I'm sorry, the taped

22     statements of this defendant, her own words, which are by

23     definition not hearsay because they're going to be introduced

5045

 1    and used against her.  Intertwined with those are the

 2    statements of Nate Jackson.  And I think the first time she

 3    makes a statement on those tapes regarding the death of

 4    Robert Fingerhut or taking care of the package or whatever

 5    else they refer to it, the State has met its burden.  It's

 6    not required to show that, I mean there's really no

 7    quantitative measurement of what the conspiracy consists of.

 8    So once her statement is introduced that there is a

 9    conspiracy, I think the State is free to introduce Mr.

10    Jackson's statements in both recorded form and in written

11    form.

12            Second of all, and I would point out to the Court

13    that if this is going to be, if we really want to have more

14    testimony than that as to the conspiracy, because the State

15    has already subpoenaed witnesses, we'll have to give our

16    opening statements this morning, hold off and I'm gonna have

17    to readjust witnesses because we've got, Mr. Bailey and I

18    have witnesses coming.  We've got one witness here from

19    Lorain Correctional Institution already, but we will need at

20    least maybe a day off to readjust witnesses.  I've made phone

21    calls, I've contacted witnesses.  We've got people coming in

22    missing jobs and work.  And obviously they're gonna be upset,

23    but I'll have to put on and start with a different witness to

 1   show the conspiracy to begin with.  And if the Court wants to

 2   do that --

 3                    THE COURT:  Well, the alternative is to

 4   just allow you to proceed as you wish to do and then perhaps

 5   have this case come back on, from appeal.

 6                    MR. BECKER:  But I don't think --

 7                    THE COURT:  You know, I don't wish to keep

 8   this jury waiting any longer than we have to and I would just

 9   as soon make this as short and sweet as possible, but there's

10   been a motion raised.  They have raised a legitimate point

11   that before a conspiracy, there's no other way that, it's

12   hearsay without the fact of the --

13                    MR. BECKER:  Now, wait a minute.  Not her

14   statement.

15                    THE COURT:  I understand, but you're

16   proposing to introduce her statements along with Nathaniel

17   Jackson's.

18        Now you're saying that it's a self-qualifying point,

19   I guess, that by her statements, that alone is enough to

20   establish that there's a conspiracy.

21                    MR. BECKER:  And I believe her statement

22   is the independent proof of the conspiracy that's required

23   under 801(D)(2)(e).  Once she makes a statement that she's

1    part of the conspiracy, anything Nate Jackson says in

2    furtherance of that conspiracy is clearly admissible.  And I

3    think that's, there's no quantitative amount in the rule.

4               THE COURT:  Oh, I agree with that.

5               MR. BECKER:  Okay.

6               THE COURT:  Well, there's this argument

7    about whether prima facie or preponderance and all that

8    stuff.

9               MR. BECKER:  Well, I think once you hear

10    the conversation, I think the rule, and if the Court would

11    read the rule through the, the committee notes to the rule,

12    the rule is to prohibit the  State from bringing in people

13    that have made deals with the State and exchange testimony

14    for favorable plea bargains, put them on the witness stand

15    and introduce their acts and say, "Well, we engaged in a

16    conspiracy with this defendant."

17        That's not the case at all in this case.  What the

18    State is gonna present is a conversation that involves the

19    co-conspirator with this conspirator, with this defendant,

20    her own words, which are not hearsay.  I don't think we're

21    violating the rule in any sense.

22               THE COURT:  Here's the point that I made,

23    Mr. Becker.

1              MR. BECKER:  Okay.

2              THE COURT:  Are you not simplifying the

3    fact that two people who say we're going to enter into a

4    conspiracy does not a conspiracy make as far as the point

5    we're talking about?  There has to be some showing of some

6    attempt or carrying on a conspiracy over and above just

7    talking about it.

8              MR. BECKER:  I disagree because I don't

9    think that's what the rule -- the rule requires proof upon,

10   independent proof of the conspiracy.  It does not require, it

11   only requires a prima facie showing of the existence of the

12   conspiracy.  And I think once the prima facie evidence is,

13   when she says, "Let's do it," and he says, "Yeah, put me in

14   the house," or, "All I got to do is be in the house," that's

15   the independent proof and that's all that's required is prima

16   facie.

17             THE COURT:  Let me ask you this.  If you

18   and I go out some night and were to get blistered and I say

19   to you, "Hey, let's rob a bank."

20             MR. BECKER:  Uh-huh.

21             THE COURT:  And you say, "Okay," can we be

22   charged with a conspiracy?

23             MR. BECKER:  Well, I got to know what the

1    acts are.  I got to know what the further acts were.

2                        THE COURT:  My point.  My point.  Isn't

3    there something more than just --

4                        MR. BECKER:  That's fine.  That's fine.

5    You know what?  To accommodate all the parties, we'll give

6    our opening statements.  I would respectfully request and I

7    think I'm entitled to, I'd ask for a two-day continuance in

8    this matter, actually put us and we won't start the testimony

9    until next Wednesday because I've got to readjust these

10   witnesses, I've got about 15 phone calls I've got to make.

11                        MR. BAILEY:  Tuesday.

12                        MR. BECKER:  Tuesday.  That's right.  I'm

13   sorry.  Next Tuesday.  Let's continue the case until next

14   Tuesday after we give our opening statements.  I'll have to

15   readjust these witnesses and I'll have to, you know, get

16   these witnesses all readjusted.  That's fine.  I have no

17   problem doing it.  I mean we'll try the thing until Labor Day

18   if that's what they want.

19                        THE COURT:  Well, I have no problem with

20   going forward today, but --

21                        MR. BECKER:  Wait a minute.

22                        THE COURT:  I don't want to deal with this

23   case twice.

 1              MR. BECKER:  That's fine.  I have no

 2   problem if the thing lasts until September.  I really don't

 3   care if we go till Christmas.  I mean if we want to not risk

 4   that, then that's fine.  Let's give our openings and come

 5   back on Wednesday or Tuesday.  That's fine with me.

 6              THE COURT:  Gentlemen.

 7              MR. JUHASZ:  Your Honor, I don't intend to

 8   belabor the motion or regurgitate the motion.  I simply want

 9   to make several points based upon what Mr. Becker has said.

10         First of all, I would have to agree that the State

11   has been more than generous in providing us open-file

12   discovery.  I'm not certain how that's material to what is at

13   issue here because I think that we're getting the situation

14   turned around.  The defense is being berated for filing a

15   motion in limine a day before the testimony begins as if it's

16   a big surprise there, everybody, that this is the

17   well-established law in Ohio.  The fact of the matter is if

18   the State had chosen to proceed as it apparently wants to, we

19   could have simply stood up at that time and made a timely

20   objection as I believe we did in the Santine case.  We're

21   simply doing this to bring it to somebody's attention that we

22   do intend to require the government to follow the law.  It

23   isn't that we made up the law for this motion in limine

 1    yesterday afternoon.  This is the law that exists in Ohio

 2    that everybody should be expected to abide by.  So I think

 3    it's unfair to turn it around as if the defense is attempting

 4    to be obstructionists.  These rules exist so that the

 5    government knows how it has to proceed to prove its case when

 6    it wants to use statements that it claims are made during the

 7    course of a conspiracy.

 8            Secondly, I would have to say that I am inclined to

 9    agree with the Court and disagree respectfully with the

10    prosecutor about the concept of independent proof and the

11    existence of a conspiracy because the rule doesn't state an

12    overt act when talking about when the statements of

13    coconspirators are admissible doesn't somehow change the

14    common law of Ohio.  And I set forth in the memorandum, as

15    the Court has pointed out, the existence of a conspiracy

16    requires not only an agreement, but an overt act, and that

17    must be shown as well.

18            Thirdly, I think it's important to point out because

19    there is a difference, in my estimation, between Ohio law and

20    federal law.  The Ohio rule specifically requires independent

21    proof of the conspiracy.  I cited to the Court the Bourjaily

22    case from the United States Supreme Court that came out of

23    the Sixth Circuit.  The federal rule seems to be, although

1   Justice Stevens had some problems with his concurrence in it,

2   the federal rule seems to be that you may, in essence,

3   bootstrap the existence of a conspiracy by using statements.

4   That is not the rule in Ohio it's our position.

5           And finally, as regards to going forward today,

6   although the State may not be able to put on a slide show and

7   an audio show, I don't think there's anything that prohibits

8   the State from calling these witnesses in and laying the

9   foundation so that when they later, if they do as they claim

10  they'll be able to do, establish the existence of a

11  conspiracy, then those items have the foundation having been

12  previously laid would be properly admissible into evidence.

13          THE COURT:  Well, Mr. Bailey and yourself

14  and I went through this whole thing on the Santine, and that

15  was my understanding at the time, that the mere talking about

16  something does not make a conspiracy without additional

17  substantiation that there's been some attempt to put that

18  conspiracy into the workings.  And that's the point I've

19  attempted to make with Mr. Becker.

20          Mr. Becker, your view is that the mere statement

21  alone is enough to establish that there is a conspiracy; is

22  that correct?

23          MR. BECKER:  Your Honor, I think the Court

1    is misinterpreting the rule and I think defense counsel, with

2    all due respect, is completely --

3                      THE COURT:  No.  I know what the rule

4    says, but I also know what the case law says and that you

5    have to look at the case law, as well as the rule.  And

6    they're saying that --

7                      MR. BECKER:  The rule says -- and let's

8    let me quote the rule.  The rule specifically states, 801(D)

9    states, "Statements which are not hearsay."

10        801(D)(2), subsection e, says that a statement by a

11   co-conspirator of a party is admissible as substantive

12   evidence if the co-conspirator's statement is offered against

13   that party and the statement was made during the course of

14   and in furtherance of the conspiracy upon independent proof

15   of the conspiracy.

16        We're not introducing statements of the

17   co-conspirator.  We're introducing her statements, the

18   conspirator's statements.  This is not where, according to

19   what Mr. Bailey is telling me, I have no idea who Santine is

20   or what happened, but it's my understanding in the Santine

21   case that the State attempted to introduce statements of the

22   coconspirators with nothing more.  Well, that's not the case

23   in this instance.  We're introducing her statements which

1    happen to contain, and they're completely meaningless unless

2    they're in the context of the conversation, which happen to

3    be the co-conspirator.

4               THE COURT:  And that's the very thing that

5    the motion is raised about is the statements of the

6    co-conspirator.

7          You're saying, in effect, as I get it, that under

8    the rule that she's going to make these statements in the

9    context of a conversation?

10              MR. BECKER:  Exactly.

11              THE COURT:  Therefore, you establish that

12   there is a conspiracy?

13              MR. BECKER:  Yes.

14              THE COURT:  And that's what I'm saying is

15   there has to be something more than just the talk.

16              MR. BECKER:  And what case cites that?  I

17   want to know what case, what case says that her statement,

18   the conspirator's statement, is not admissible?

19              THE COURT:  Mr. Juhasz or Mr. Ingram?

20              MR. JUHASZ:  I'm sorry.  Do you want a

21   case citing or do you want to know if we have anything else

22   to say?

23              THE COURT:  Yeah.  His point is do you

1    have specific cases that say this?  You know.  It's my

2    understanding from being through this one time before that

3    there has to be some showing of --

4                    MR. BECKER:  Your Honor, I'm gonna direct

5    the Court, with all due respect, to State of Ohio versus

6    Carter.  It's an Ohio Supreme Court case, 72 Ohio State 3d

7    545, 651 Northeast 2d 965.  It's a 1995 case.  That Supreme

8    Court case found that at the time, Horton -- Horton was a

9    co-conspirator, or I'm sorry, Horton was someone who

10   overheard a conversation between the co-conspirator and the

11   defendant.  The State elicited testimony from Horton.

12           "The requisite foundational prima facie showing of

13   the existence of a conspiracy between Carter and Hill,"

14   Carter being the defendant, Hill being the co-conspirator,

15   "by independent proof had not been made as required by" --

16   even though there was independent proof of this, it was

17   subsequently provided by the State through the introduction

18   into evidence of the defendant's tape-recorded statement.

19           That, and then I would also cite State versus Milo.

20   It's 6 Ohio App. 3d 19 at 22 and 23.  It's a 1992 case.  This

21   is from the Ohio Supreme Court which basically is saying that

22   independent proof of the conspiracy was provided by the State

23   through the introduction of the defendant's taped statement.

1   That's what that case says.  It's from the Ohio Supreme

2   Court.  And I have a copy of it and I'll provide it to the

3   Court and defense counsel.

4                THE COURT:  Well, again, I have no problem

5   with you introducing any, anything that the defendant says at

6   this point --

7                MR. BECKER:  Okay.

8                THE COURT:  -- that she is engaged in a

9   conspiracy.  That's fine.  The objection is not to her

10  statement.  It's to the codefendant's or the co-conspirator

11  or alleged coconspirator's statement.

12               MR. BECKER:  Well, then we're gonna move

13  for a continuance until next Tuesday so I can, because -- and

14  with all due respect to defense counsel, my understanding of

15  the law was that I could introduce her statements and I was

16  prohibited from introducing the coconspirator's statements

17  until the -- and let me rephrase that.

18          My understanding of the law is and I believe the

19  correct interpretation of the law is the State is permitted

20  to introduce the coconspirator's statements if they introduce

21  the defendant's statements because the defendant's statements

22  are independent proof as required under the evidence rule of

23  the conspiracy.  That's my understanding of the rule, I think

1     that's what these Ohio Supreme Court cases say, and we were

2     prepared to present this case with her statements first. And

3     we're gonna ask for a motion to continue this case.

4                THE COURT: I don't know that we have a

5     disagreement on where you're going. I think it's just on how

6     you get there. I am familiar with the facts of this case

7     from the prior and I might state that there are other things

8     that were done, according to the State's theory of this case,

9     to put this conspiracy into execution. It would seem to me

10    at a minimum that if something of that nature is presented,

11    then that raises, with any statements made by the defendant,

12    the issue as to whether or not there is a conspiracy. But

13    I'm saying that mere talk alone under Ohio law as I

14    understand it, and I'm, I may be wrong on this, but I don't

15    think that I am, mere talk alone of a conspiracy is not

16    sufficient. There has to be something over and above that to

17    show that there was an attempt at least to put it into

18    effect. I know what the rule says.

19               MR. BECKER: I'm telling you what the Ohio

20    Supreme Court says in State of Ohio versus Carter. It's a

21    1995 case. And that case says that independent proof of the

22    conspiracy was provided by the State through the introduction

23    into evidence of the defendant's taped statement.

```
 1              And I think -- I respectfully disagree with the

 2       Court, but I'll abide by the Court's ruling.

 3                      THE COURT:  Listen to me.

 4                      MR. BECKER:  I'm listening.

 5                      THE COURT:  That wasn't, that case did not

 6       contain a dialogue between the conspirators.  It was a

 7       statement made by the defendant.  I have no objection to you

 8       introducing that at this point.

 9                      MR. BECKER:  Well, the problem is her

10       statement in this case is self-serving.

11                      THE COURT:  I understand that.  I

12       understand that.  It doesn't make any sense out of the

13       context of the other person talking.

14                      MR. BECKER:  Well, we're gonna need some

15       time.  I'm respectfully requesting the Court because my

16       interpretation apparently is wrong of this rule, I'm gonna

17       ask the Court to, well, I suppose we can present Mr. Monyak;

18       right?  We can probably present Monyak; correct?

19       (Whereupon, a discussion was held off the record.)

20                      THE COURT:  Will counsel approach?

21                      MR. BECKER:  Well, you know what?  I think

22       we'll be all right then.  We're gonna need some time, Your

23       Honor.  That's all I'm telling the Court.  We will be able to
```

1  present one witness today.

2  THE COURT:  Will counsel approach for a

3  moment, please?

4  (Whereupon, a conference was held at the bench.)

5  THE COURT:  Counsel has asked for a few

6  minutes.  They've had it.  Mr. Becker, do you have anything?

7  MR. BECKER:  Yes, Your Honor.  The State

8  is going to move at this time for the admission of State's

9  Exhibit 271-D-139.  It's a letter dated Monday,

10  November 26th at 1 p.m.  It is ostensibly signed by Donna

11  Roberts.  It is a letter that is one, two, six pages in

12  length.  It has already been stipulated to, in fact, that it

13  was Miss Roberts' letter.  There is a stipulation that all

14  the letters were written by Miss Roberts as well as all the,

15  well, all the exhibits from 271-D-1 through 139 inclusive

16  were written by Miss Roberts, and I don't have the exact

17  numbers for Mr. Jackson, but the numbers and the exhibits

18  that bear his writing were his as well.  And just very

19  briefly, I'll read into the record the relevant portion of

20  the letter.

21  "Now for the other thing.  I only worry about losing

22  you or losing me to incarceration.  You know I will be the

23  first one to face questioning.  I don't want to have to get

1    an attorney and defend myself.  Oh, and I have had some info

2    to add to our plan.  You know there are phone records and CCA

3    pass records.  Well, everyone thinks he is gay.  Did you know

4    that?  It's been whispered a lot in Youngstown and the good

5    part is that he is the one --"  I'm sorry.  Am I going to

6    fast?

7              "The good part is that he is the one who wrote and

8    paid the checks on the phone bills.  His writing.  So he knew

9    about you (not really), but the whole phone thing could be

10   good because it shows you were a friend to both of us and

11   maybe you were a real good friend of his.  Anyway, your hair

12   and prints could be anywhere since you drove the car and were

13   here and all.  But I think it's all gonna come down to me

14   when I get that call and I can handle that because it means

15   everything to us both.  I am not even worried about it any

16   longer because I've thought about it a lot and am prepared.

17   Instead of laughing and cheering, I will concentrate on

18   losing someone that I would really go nuts over and react

19   accordingly.  Just tell me how you're gonna be here for weeks

20   without anyone knowing.  That will be the real trick, huh?

21   And after it's over, I can get a place for you or even here

22   in Warren for a couple weeks because who is to tell me not

23   to.  Oh, I have been all over looking for a ski mask.  I only

1    see those knitted caps.  Any suggestion on who might have

2    them?  And I'm still looking for gloves because I don't think

3    the thick ones I'm seeing are good to work with as would be

4    thinner leather ones.  Know what I mean?"

5         And then -- I mean there's a lot more.

6              THE COURT:  Okay.  I think that's

7    sufficient.

8              MR. BECKER:  Okay.

9              THE COURT:  That will become --

10             MR. BECKER:  And the State will present

11   testimony later on detailing where these letters were found,

12   how they came into the possession of the police.

13             THE COURT:  Mr. Juhasz or Mr. Ingram, do

14   you have any --

15             MR. JUHASZ:  Your Honor, I have to agree

16   that we stipulated to the fact that the letters written by

17   Miss Roberts were, in fact, written by her.  And as an

18   officer of the Court, I have to agree that I have seen case

19   law saying that the mailing of a letter does constitute an

20   overt act.  So therefore, if the Court is going to allow the

21   State to proceed, I really don't have much to say about it.

22             THE COURT:  Okay.  Fine.  Thank you.

23             MR. JUHASZ:  Thank you.

1          THE COURT:  Okay.  Let's get this jury up

2     here.

3     (At 9:54 a.m., the following proceedings occurred in open

4     court with the court and jury present.)

5          THE COURT:  Good morning to all of you.

6     I asked you to be here at 9 and you were.  I hope this isn't

7     a precursor of things to come.  We're getting started at 10.

8     The point is that we had a couple motions that were filed

9     this morning, properly so, and we had to deal with the

10    motions on the record, and that's what took the hour up.  I

11    explained to you that there will be times like this during

12    the course of the trial when things come up.  There are many

13    motions that can't be handled beforehand.  They arise once

14    something else has already happened or during the course of

15    the trial.  There are many things that it is not proper to

16    hold in front of the jury.  You remember the rules we keep

17    mentioning.  There are a lot of things that happen during the

18    trial that is not something for the jury to participate in.

19    You participate in finding, from the evidence presented, the

20    facts of the case.  But any issues of law, you have no part

21    in the, in the decision on that.  That's the Court's function

22    after argument by counsel.  So whenever we have a sidebar,

23    which means that we'll be whispering and you're not hearing

1    what we're talking about, we're doing that because we're

2    following the rules or attempting to do so.

3         Okay.  I have to correct one thing I said to you

4    yesterday that was, if not incorrect, perhaps misleading and

5    it was properly raised.  I mentioned to you about the opening

6    statements which you're about to hear.  I made some mention

7    that if the defendant participates in that opening statement

8    that you should primarily I think is the word I used listen

9    to what the State is saying and analyze that.  That is

10   misleading at best.  As you know or as you will repeatedly

11   hear throughout this trial, this isn't the defendant's case

12   to win or lose.  It's the State's case to win or lose.  They

13   will win on their evidence or they will lose on their

14   evidence.  The defendant need say nothing throughout the

15   trial.  If the defense chooses to do nothing throughout the

16   trial, that's not to be taken as meaning anything.  You have

17   to analyze the evidence that is presented by the State and

18   whether they prove their case beyond a reasonable doubt.

19   What I was attempting to say was that if the defendant does

20   participate in the opening statement, that will be along the

21   lines of suggesting alternatives in the State's case perhaps.

22   But whatever the defendant says or doesn't say, you have to

23   analyze the evidence on whether the State proves their case

1    or not, not what the defendant does or doesn't do.  Okay?

2    Very good.

3         Mr. Bailey, are you ready to proceed with your -- or

4    I'm sorry.  Mr. Becker.

5                   MR. BECKER:  Yes, Your Honor.

6                   THE COURT:  I always give deference to age

7    is what it is; right?

8                   MR. BAILEY:  Judge, may we approach for a

9    second?

10                   THE COURT:  Yeah.  Sure.

11   (Whereupon, a conference was held at the bench.)

12                   THE COURT:  I mentioned yesterday, both

13   sides wanted me to emphasize this, that the opening

14   statements are not evidence.  Remember, I told you, nothing

15   the attorneys say throughout the trial is evidence.  The

16   evidence will proceed and start right after the opening

17   statements.  And the simplest way to cover the opening

18   statements is you should give equal attention to both sides,

19   whatever they say.  Okay?

20        Mr. Becker.

21                   MR. BECKER:  Thank you, Your Honor.

22

23                          *  *  *

1           **OPENING STATEMENT ON BEHALF OF THE STATE OF OHIO**

2                 MR. BECKER: May it please the Court,

3 Mr. Juhasz, Mr. Ingram, Miss Roberts, the defendant in this

4 case, and most importantly, you, Ladies and Gentlemen of this

5 jury. First of all, I want to thank you, each and every one

6 of you, for this important civic duty that you are about to

7 undertake. I think, as we mentioned in the voir dire, I

8 believe probably short of serving your country in the

9 military this is the most important civic duty that you can

10 perform for this country and for your community.

11        In every criminal trial, as an attorney, you look

12 for a theme or you look for maybe a catch phrase to present

13 to the jury. Maybe you try and interwove it or interweave it

14 with some themes from a television show or a news headline or

15 historical context. And I sat long and hard trying to think

16 about what I should present to you as a theme for this case.

17 And after awhile, it became apparent. I don't have to

18 present a theme for you for this case because this defendant

19 spoke the theme, wrote the theme and did the theme.

20        This case is going to be about a relationship.

21 Actually, two relationships. The first relationship is

22 between Donna Roberts and Robert Fingerhut, and that

23 relationship started over 20 years ago when they got married.

1    They lived in the Miami, Florida region.  They lived there

2    for a number of years.  Eventually, they returned to

3    northeast Ohio.  Miss Roberts is from Austintown.  They moved

4    to Howland to 254 Fonderlac Drive.  They operated the two

5    Greyhound bus stations in this area, the one in Youngstown

6    and one in Warren.  At one point during their relationship

7    they opened a restaurant at the Youngstown bus station.  And

8    at one point during the operation of those Greyhound bus

9    stations, this defendant met an individual by the name of

10   Nathaniel Jackson.  Now you're gonna hear a lot of things

11   about Nathaniel Jackson.  You're gonna hear his voice.

12   You're probably gonna read letters he wrote.  You will hear

13   testimony about him.

14          Early on in this case, and I think when you were

15   voir dired, defense counsel repeatedly asked you not to find

16   her guilty because of some things that she said that were

17   sexually explicit.  And to be quite honest with you, the

18   State is not going to ask you to find her guilty of anything

19   she or Mr. Jackson discussed that may be sexually explicit.

20   She's not charged with that.  And what she does in her sexual

21   affairs, that's her own business.  And we have no objection

22   to that.  But that evidence is gonna be offered to you to

23   show the depth of her emotion and her love for Nathaniel

1    Jackson, a young, 29, 28-year-old black male from the

2    Youngstown area who she fell in love with.  And it was in the

3    course of that love that, really, she wrote the theme for

4    this case.  And it involves the three most basic human

5    emotions.  Love, hatred and greed.  And from her own words,

6    from her own writings, and from her own actions, you will see

7    how she acted upon those three emotions.

8           And what you'll find in this case essentially is

9    that she and Mr. Jackson thought about it, they talked about

10   it, they wrote about it, and they did it.  And the evidence

11   in this case is basically going to show that sometime in

12   September of 2001 Nathaniel Jackson was sent back to the Ohio

13   state penitentiary system.  This was very depressing to

14   Mrs. Roberts.  And you'll read about it in her letters.

15   You'll read about how she missed him, how she cared about him

16   and, yeah, there's some things in there about the sexually

17   explicit stuff.  It really has no importance in terms of the

18   actual deeds that they did, but it does have importance to

19   show you the depth and the connection that those two had with

20   each other and, really, the love that they had for each

21   other.

22          You'll discover that they were intimate, that in

23   fact they were lovers.  They hid their relationship from

1   Mr. Fingerhut.  They snuck around.

2          And the testimony will clearly show that while

3   Mr. Jackson was incarcerated in the Lorain Correctional

4   Center, which is on the west side of Cleveland, they

5   formulated a plan to eliminate Robert Fingerhut, to kill him.

6   The motive for this killing was pure greed, $550,000 in life

7   insurance policies.  You will be introduced and the evidence

8   will show that there were two insurance policies.  They will

9   show and she will discuss in her conversations and letters

10  the thing with all of the zeros and how she talked to her

11  accountant about the things with all the zeros to make sure

12  that it was paid up until the end of the year.

13         You'll hear testimony and you'll see exhibits from

14  Mr. Jackson talking about what he'll do with those proceeds,

15  how he would like a new Cadillac Deville, and you'll hear and

16  read her words which promise to get him a Cadillac Deville.

17  In fact, she'll tell you in her letters about how they should

18  get a personalized license plate for Mr. Nate Jackson on his

19  new Cadillac Deville.

20         Now, the first part of this case will be devoted to

21  hearing it.  You will hear 19 phone calls from the Ohio state

22  penitentiary system.  We will introduce witnesses who will

23  tell you that when an inmate is incarcerated at the Lorain

1    Correctional Institution, they are given a pin number.  It's

2    sort of like a bank code number.  And when you make a call

3    from the institution, which you're permitted to do or

4    Mr. Jackson was permitted to do every Thursday and Saturday,

5    you have to enter that pin number.  That is recorded.  And

6    you will hear on the conversations that they are being

7    recorded.  You'll hear a prerecorded voice at the first part

8    of those conversations and in the middle of those

9    conversations advising that this call is made from the Lorain

10   Correctional Institute and may be recorded or monitored.

11   Mr. Jackson and Miss Roberts, at their peril, disregarded

12   those warnings.

13        And the evidence will show and those phone calls

14   will show that initially Mr. Jackson was to be incarcerated

15   until April of 2002.  And again, you'll hear words and

16   letters from this defendant that that saddened her because

17   she was in love with Mr. Jackson and she needed Mr. Jackson

18   there.  However, on October 25th, 2001, the evidence will

19   show Nate Jackson found out that he was getting out of prison

20   on December 9th, 2001.  He was given credit for time served

21   that he spent at a place called CCA, which is in Youngstown,

22   which is a place he was incarcerated at before he went to

23   Lorain Correctional Center.

1          And on October 25th, 2001, in addition to writing

2     letters to this defendant advising her that he was getting

3     out, he called this defendant.  And he called her collect

4     because that's the only way you can call someone from the

5     Ohio state penitentiary is collect.  She accepted the calls.

6     And you will hear Nate Jackson describe how -- well, he will

7     ask her what does she want for Christmas.  And her reply is,

8     "You."  She wants Nate Jackson for Christmas.

9          And Nate Jackson will tell her in that phone call

10    he's getting out December 9th, that she's gonna have him for

11    Christmas.  And she will squeal like a little teenager with

12    delight that Nate Jackson is getting out.

13         And in that same conversation, you will hear

14    Mr. Jackson say he's going to do it the next day.  He's gonna

15    go ahead and do it the next day, referring to the murder of

16    Robert Fingerhut.

17         And this Defendant's reply is, "Oh, no.  Don't do

18    that," or, "What are you talking about?"

19         Her reply is, "Oh, I just wrote to you that I didn't

20    think you meant it."

21         And you'll read that in the letters, the numerous

22    letters of which there are almost 300 in this case.

23         You'll see during these phone calls and these

1    letters that she sends him money.  She sends him things that

2    he needs so he can buy things from the commissary.  She even

3    goes so far as to get him a subscription to the Youngstown

4    Vindicator because, my goodness, he's in prison.  He doesn't

5    know what's going on in Youngstown.  He needs to know the

6    news.

7          The next phone call you'll hear will be on November

8    8th, 2001.  And you will find that this defendant had written

9    a letter dated November 11th, 2001 and you will hear the next

10   part of this case which is her hatred for Robert Fingerhut.

11   And you will hear, quote, you will read her words, quote, in

12   the letter of November 11th, 2001, "I would really love for

13   him to see me sucking that dick of yours just before he

14   leaves planet Earth.  I wouldn't have to yell or swear or say

15   a word.  That would be more than a sufficient send-off."

16         And during the phone call of November 8th, 2001,

17   Nate Jackson will comment about reading that letter of

18   November, that November 8th letter.  And Nate Jackson will

19   say, "I was reading a letter where you wrote you would like

20   him to see you suck my dick before it goes away.  I love

21   that."  I asked if you -- "I asked you if we could do it like

22   that in my letter."

23         And on the phone you'll hear this defendant say,

```
 1    "Mmm, of course."

 2              She wants him dead and she wants him dead now.

 3              During the course of those telephone calls, they do

 4    decide to get a little bit smarter and they will eventually

 5    refer and debate -- degrade Mr. Fingerhut's life to a

 6    package.  They will refer to Mr. Fingerhut as "the package"

 7    and the death of Mr. Fingerhut and the murder of

 8    Mr. Fingerhut will be referred to as the delivery of the

 9    package.

10              On November 22d, 2001, there's a phone call.  Mind

11    you, this is less than three weeks before Mr. Fingerhut was

12    ultimately murdered on November 11th, or I'm sorry,

13    December 11, 2001.  Nate Jackson has to take care of

14    something else before he kills Mr. Fingerhut and that is he

15    has to have sex with this defendant.  And Mr. Jackson says

16    that he was talking to some friends in prison and there's a

17    place called the Wagon Wheel Room in Boardman, Ohio.  And he

18    tells this defendant to go put a deposit on the room because

19    it's quite a popular place for lovers in the area, seeing as

20    how it has a jacuzzi filled tub or a large, rather, walk-up

21    jacuzzi and it's sort of a lovers' rendezvous, a lovers' nest

22    in the area.  He needs her to go there and make a deposit and

23    get the room for them.
```

1          The State will present to you evidence from credit

2     cards and receipts that, in fact, she went to the Wagon Wheel

3     and she got the room.

4          And Mr. Jackson requests for their little love

5     rendezvous that she wear some red panties because he wants to

6     see her in a red thong panties and that would be so romantic.

7     Well, you'll hear testimony from the people who rented that

8     room to this defendant, people who saw this defendant with

9     Mr. Jackson there, and they will also tell you that after

10    they checked out, low and behold they found some red thong

11    panties in the room which was rented, by the way, for

12    December 9th, Mr. Jackson's first day out of prison.

13         The evidence will show that she checked out that

14    room, she put the deposit on it, see left a pair of red thong

15    panties.  You'll hear testimony from the credit card receipt

16    or about the credit card receipt and you'll hear testimony

17    about finding those red thong panties that she left there.

18         Now, back to the phone call of November 22d of 2001.

19    Nate Jackson reiterates on that phone call that he is going

20    to kill Robert Fingerhut the next day.  And he says -- or she

21    says, rather, "I'm afraid, Nate."

22         And Nate Jackson asked her on that phone call what

23    she's afraid of.  She doesn't say she's afraid of losing

 1    Robert Fingerhut, the man she's lived with for twenty some

 2    years.  No.  She's afraid of one thing, of losing Nate

 3    Jackson.  And she says, "I can't afford to lose you again."

 4         She doesn't want Nate Jackson to go back to prison

 5    again because it's tearing her up.  And you'll read through

 6    the course of these letters how much it pains her that Nate

 7    Jackson is in prison.

 8         Nate Jackson goes on to explain that he knows, in

 9    fact, what he's doing in this case.  And this defendant will

10    tell you on that phone call or tell Nate Jackson in that

11    phone call and you'll hear more evidence of their plan or the

12    delivery of the package.  And this defendant says, "But what

13    was the story with the trunk and the handcuffs?  That's too

14    involved.  You're going to leave hair.  You're going to leave

15    prints."

16         She's concerned about what evidence they may leave

17    if they commit this crime the way Mr. Jackson has discussed.

18         On November 24th, 2001, once again, Mr. Jackson

19    makes a collect call that's accepted by this defendant.  And

20    you'll hear that telephone call.  And Nate Jackson assures

21    her that he knows the laws in the State of Ohio.  They won't

22    have his DNA so they don't have to worry about DNA.

23         She also goes on to discuss a number of cars that

1    she would like to buy for him, maybe a Lincoln, maybe a

2    Cadillac, and they talk about what he has to do the next day

3    after he gets out of prison.  They both agree, as they do on

4    a number of occasions, that they'll talk about it later when

5    he gets out because they do know that the phone calls are

6    being recorded.  Because each and every phone call, there is

7    a warning telling them that the phone calls are recorded.

8            Now we get to the most intriguing of the phone calls

9    you'll hear.  December 8th, 2001.  One day before Nate

10   Jackson gets out, three days before Robert Fingerhut is

11   murdered in his home in Howland Township.  And he tells her

12   that it's better to be an older woman's heart than a younger

13   woman's fool.  And she makes arrangements to spend the night.

14   They've already got it planned out.  If you read the letters

15   and hear the phone calls, she's gonna tell Mr. Fingerhut, the

16   excuse she's going to give him is apparently she has a niece

17   that lives in the Cleveland area.  And she's going to tell

18   Mr. Fingerhut that Saturday night, December 7th -- or I'm

19   sorry, December 8th -- she's gonna drive up to Cleveland and

20   spend the night with her niece and go to church the next

21   morning when, in fact, you'll read from the letters and the

22   phone calls that Mr. Jackson gets out of prison on Sunday,

23   December 8th, 2001, and he's released at 8:00 in the morning.

1    She's gonna pick him up and bring him back to the Wagon Wheel

2    and have their rendezvous.  So she lies to Mr. Fingerhut

3    about where she's going.

4         She makes the arrangements.  And on the December 8th

5    phone call, Mr. Jackson makes sure that they're going to

6    spend the night together.  And she promises him that they

7    will.

8         And during that December 8th, 2001 phone call, in

9    the middle of the conversation, in fact, quite humorously,

10   although sadly for Mr. Fingerhut, Nate Jackson makes one

11   request of Donna Roberts for when he is going to kill

12   Mr. Fingerhut.  And his quote is, "There's only one thing I

13   need.  I need to be in the house."

14        And she says, "No, not in the house."  She doesn't

15   want him killed in the house.

16        And finally, this defendant says, "Well, we'll talk

17   about it later," knowing full well she's going to see him the

18   next day.

19        You will hear the testimony and see the exhibits of

20   their first night together at the Wagon Wheel.  Jose Flores

21   will identify the defendant as getting that room.  He will

22   identify Mr. Jackson.  You will also hear the testimony about

23   how she got that room and about the red thong panties.  You

1    will hear their thoughts.  They will express them to you.

2    They will talk about doing it.

3         The next piece of evidence, and the biggest portion

4    of evidence, you will have a box about the size of that

5    bankers box filled with letters.  And those letters are the

6    next step of their hatred of Mr. Fingerhut, their love for

7    each other and their greed.  And in those letters, she writes

8    with her own words and her own handwriting.  First you'll

9    hear of her own hatred for Mr. Robert Fingerhut.  You'll have

10   all these letters and you'll have all the time you need once

11   you deliberate to read these, this evidence.  But I want to

12   give you a glimpse and a taste of the hatred that this

13   defendant had for Robert Fingerhut.

14        Quote, "Last night he said he wished he was dead.

15   That is one wish I hope comes true for him.  I can't even

16   stand to look at him anymore.  I hate it when he talks to me

17   too.  I hate to look at him.  I can't stand to even handle or

18   do his laundry anymore.  I hate his face, hair, nose, eyes,

19   body.  Everything about him makes me nauseous."

20        Her words.  Her handwriting.

21        Then she says, "And, yes, sneaking to see you a

22   couple of hours doesn't do it.  It leaves us both with no

23   real life together.  And when you go your way, you have to

1  fend for yourself and eat alone and sleep alone and be out

2  with the wolves," because Nate Jackson is a street person

3  from the streets of Youngstown.

4          "And me, I exist in hell on earth.  Like last night,

5  I got so sick of just looking at him and hearing the same

6  shit over and over and smelling his breath and every other

7  little thing.  It's all bad.  And seeing his skin and

8  watching him walk or breathe.  I can't hold in my disgust and

9  contempt for him well at all."

10          Once again, her words.  Her writing.

11          "So there's one extra time in my life I had to look

12  at him.  Help me.  That's one too many times for me.  I have

13  never lived like this with so much animosity and hatred."

14          That's her telling you how much animosity and hatred

15  she has.

16          "And it's really hard since he has been controlling

17  the money for the last year or so."

18          We'll get to the greed in a minute.

19          On October 24th, 2001, she writes to Nate Jackson in

20  prison.  "It is his birthday.  He is 56."  That's true.

21  Mr. Fingerhut did turn 56 on October 24th, 2001, the last

22  birthday he was alive.

23          She says, "He's 56.  I can't stand to say his name

1    anymore.  He is so totally crude now.  My only birthday wish

2    for him is that this should be his last birthday."

3          And that's that.  And, in fact, it was Robert

4    Fingerhut's last birthday.

5          Quote, "It's enough I have to go through with this

6    schmuck now, Robert.  Sometimes I almost feel sorry for him.

7    Not.  It's a good thing all the 38s were in the car because

8    when he slapped me real hard, I would have lost it and

9    emptied that all into his mouth."

10          Once again, these are her words.  At one point,

11    she's referring to cleaning in a letter she writes to

12    Mr. Jackson.  "My heart just isn't in it, especially because

13    he keeps saying it looks like a N blank blank blank blank

14    blank R house just because of some dust and stuff.  Well, let

15    it look that way I say because soon it will be just that if I

16    have anything to say about it.  Soon the door is going to

17    open and the wrong man is going to enter.  I hope some day I

18    can just roll over and say good night to you," referring to

19    Mr. Jackson.

20          "He gets me so sick now I can barely stand it

21    anymore.  I've been living with a moron for the last 20

22    years."

23          Once again, the testimony and the evidence will show

1    that they reduced Mr. Fingerhut's life to nothing more than a

2    delivery of a package.  It was gonna be like a UPS delivery.

3    Knock on the door, be done with it, delivery's done.

4         These are her words again.  "Ok.  I'll only say

5    this.  Go ahead and take care of business.  I'm sorry about

6    the worry over the package.  It's just such a major move and

7    with very serious consequences and severe.  I can't stand

8    even to think about losing you again," referring to

9    Mr. Jackson.

10        "Do whatever you decide is best.  If our prayers are

11   answered, we will be together next Thanksgiving."

12        She talks about enjoying the first snow of the year

13   together with Mr. Jackson.  She talks about waking up

14   Christmas morning next to each other with Mr. Jackson.

15        "I've been thinking a lot about the delivery of that

16   package and I get real scared.  All I worry about, though, is

17   losing you forever to prison.  And the more complicated the

18   plan, the more that can go wrong.  A fingerprint, a hair, an

19   article of clothing, a witness, the weapon.  I will be in the

20   line of fire, too, and could end up you know where.  We have

21   to make certain that all of this is as fool proof as it can

22   be.  I guess we'll get it down when you get home.  I'm so

23   worried about the delivery.  I don't want to see you in

1    orange again, Nate.  Do you really have the nerve and the

2    guts to deliver this package?  What do you think about when

3    you think of doing it?  Will you tell me everything about it?

4    It's a real shame that they have such advanced DNA testing or

5    I'd tell you to spit on the package while you were delivering

6    it.  That's a mean thing to say and it's really not my

7    character to say such things, but this package just begs for

8    it, don't you think?"

9          Now, in addition to the hatred of Mr. Fingerhut, she

10   also has to feign grief because Mr. Fingerhut will die.  How

11   is she going to feign this grief?  She tells you how she's

12   going to feign this grief.  She writes it in her letters.

13         "Once again, I worry about my reaction and any

14   authority's reaction to my reaction.  I mean how do you

15   appear to be sad when you feel like throwing a party, but I

16   know I can do whatever I must for all to be well.  I'm so

17   worried to think how I will be able to even act sorrowful.

18   There will be a lot of interrogations and perhaps a lot of

19   suspicion.  Can we handle that?"

20         And quote, "It's all gonna come down to when I get

21   that call.  And I can handle that because it means everything

22   to both of us," referring to Mr. Jackson.

23         "I am not even worried about it any longer because

1    I've thought about it a lot and I'm prepared.  Instead of

2    laughing and cheering, I will concentrate on losing someone

3    that I would go nuts over and react accordingly."

4            That's how she's gonna react when she finds out

5    Mr. Fingerhut's dead.

6            Now the State is not required to show motive.  But

7    in this case, she wrote the motive, she spoke the motive.

8    And that motive is on one of those three emotions, one of

9    those strong human emotions.  And that emotion is greed.  The

10   State will introduce evidence that will show there were two

11   life insurance policies out on Mr. Fingerhut's life, $550,000

12   in life insurance on Mr. Fingerhut.

13           You will also hear testimony about the financial

14   condition, through her words, of the Greyhound bus terminals.

15   And I want you to keep this case in the context of

16   September 11, 2001.  All of us remember that tragic day.

17   Probably each and every one of you remembers where you were

18   at.  But the evidence in this case will show and the facts of

19   this case will show and you'll recall travel was way down.

20   People weren't going anyplace.  People weren't flying.  They

21   weren't even taking the buses.  And she'll write in her

22   letters about how business is down, how they're not making

23   much money at the bus station.  You'll hear testimony that

1    she really doesn't know much about the business.  In fact,

2    the reason she doesn't work in the Youngstown terminal is

3    because she doesn't know how to use the computers.  So what

4    better way to get out from this financial debt and to get out

5    from this bad business than to collect $550,000 in insurance

6    money?

7              You will hear testimony about how her and

8    Mr. Fingerhut, it's in her own letters, had 52 credit cards.

9    You'll hear testimony about she refers to Mr. Fingerhut as

10   the Grinch, about how he controls her spending.  She only

11   gets so much a month, a week, and she's used to having money

12   whenever she wants.  But times are bad in late December and

13   November and October of 2001.  People aren't traveling.

14   People aren't taking the Greyhound bus.  You'll hear how the

15   business is down 30, 40, 50 percent.  Through her own words

16   she'll tell you that.  She's used to having money whenever

17   she wants.  She's hoping that those days will return again

18   soon.  And she tells Mr. Jackson that and her problems with

19   money and how she hopes that those days when she can spend

20   money again will return soon.

21             And she says, "Do whatever you want to him ASAP.

22   Amen.  Yes, you can do whatever you want to accomplish our

23   goal."

1    She writes in the one of the letters, "I found out

2    that those things with the zeros are paid up to the end of

3    the year as per our accountant's suggestion.  Yes, I didn't

4    want you to worry about that," writing to Mr. Jackson.

5    Why would Nate worry?  Because you're gonna find out

6    he's gonna get a Cadillac out of this deal.  He talks about

7    dreaming of a Cadillac Deville.  And she talks about getting

8    him personalized plates.  Nate Dog or Nathaniel or whatever

9    else might pop into their minds.  In fact, I think in one of

10   the letters she refers to a personalized plate that says D

11   loves N.  They'd like to get a little license plate to

12   express their love to the world.  And she'll talk about that

13   and talk about how she'd like to express their love to the

14   world.  What will people think when they see Mr. Jackson and

15   I walking down the street together, walking together, walking

16   through the malls?  An older white woman like myself with a

17   young black man.  We'll have to hold hands a lot so people

18   will know our, show the world our love.

19   Now, eventually this defendant looks into getting

20   Mr. Jackson the Cadillac that he so desires.  She writes in

21   one of her letters, though, there's going to be some problems

22   because her and Mr. Fingerhut are leasing two Chrysler

23   300 Ms.  Pretty nice cars.  You'll hear testimony from

```
 1    witnesses who will tell you that those cars were in

 2    Mrs. Roberts' name.  And what you're gonna hear basically is

 3    at one point in their relationship, and she'll tell you, that

 4    Mr. Fingerhut requested that all of the assets that Miss

 5    Roberts and he had be placed in her name.  And the first

 6    thing they did was they got an official divorce.

 7    Mr. Fingerhut was worried about being sued through the

 8    terminals and losing everything.  So they got this divorce of

 9    convenience basically or really for financial reasons.  They

10    still lived together.  They transferred the house to her

11    name.  She signed all the leases to the two vehicles they

12    owned.  Even the Greyhound terminal, the Greyhound bus

13    business, was in her name.  So she had everything.  But don't

14    be mistaken.  Mr. Fingerhut still drove the cars.  He took

15    care of them.  In fact, we will present testimony from Barry

16    Ricker and Carmen Olivia from Preston Auto Group out on the

17    strip out in Niles who will tell you that Mr. Fingerhut did

18    all the negotiating for the contracts and the leases, that

19    Mr. Fingerhut brought the vehicles in for service.  That

20    Preston has a deal where if you buy a car, they'll wash it

21    every week or every month and detail it.  And Mr. Fingerhut

22    predominantly was the one who brought those vehicles in.  So

23    don't be fooled by who owns what because Mr. Fingerhut still
```



1    lives in that house and he still drives those cars.

2          But what you're gonna hear this defendant tell Nate

3    Jackson in one of those phone calls is that she can't really

4    get out of the lease after they kill Mr. Fingerhut so they'll

5    have to slum around in these 2000 and 2001 Chrysler 300 Ms.

6          Now Mr. Bailey and I were very forthright with you

7    when we started this case, each and every one of you when you

8    sat in that chair and were voir dired in this case.  We told

9    you right from the beginning she's not the shooter.  She's an

10   aider and abetter.  And the Court will define that term for

11   you, but we usually use that term to mean help.

12         She talks at one point about someone else doing it.

13   And you'll read in the letters that she talks about getting a

14   professional delivery service.  But Mr. Jackson is confident

15   that he can pull this off himself.  And at one point she

16   says, "I really do believe you intend on taking care of

17   business.  Here's how I feel about it.  What size gloves do

18   you wear?  Ok?"

19         Because Mr. Jackson is going to need some things to

20   commit this crime.  He's going to need some gloves, he's

21   going to need the firearm, he's going to need to be in the

22   house, and he's going to need a ski mask.  You will hear and

23   read her words.  She looked all over.  In fact, in one of her

1    letters, she said she had to look for four stores for that

2    ski mask.  But you know what?  She found it.  She was real

3    proud of herself, proud that she got it for Mr. Jackson.  And

4    she got the gloves.  No, not the thick ones.  She got thin

5    ones because they're easier to work with.

6           You'll hear testimony and you'll see exhibits that

7    she had guns.  Now unfortunately, we never recovered the gun

8    that killed Robert Fingerhut.  But, quite conveniently, about

9    two or three weeks before Mr. Fingerhut's murder, she reports

10    a gun stolen and to be stolen by a guy named Santiago Mason.

11    Boy, she writes these letters what a terrible guy he is.  He

12    did all these terrible things.  We are gonna hear from Mr.

13    Santiago Mason.  Mr. Santiago Mason is gonna get on that

14    witness stand and he's gonna tell you, "I went to her house

15    one time.  She wanted to have sex with me,"

16    Mr. Santiago Mason being the persuasion that she prefers, a

17    large black man.  And Mr. Mason is gonna tell you, "I didn't

18    steal anything from her.  She tried to set me up for murder."

19           And Mr. Mason will sit there and tell you how angry

20    she was when he rebuffed her sexual advances.  And quite

21    coincidentally, a few days later, she goes to the Warren

22    Police Department to report a firearm stolen by Mr. Santiago

23    Mason.  And she writes in her letters, "Oh, he said he's

1    gonna do bad things with it."  Why not create a third party

2    to make it look as if the murder was committed not by Nate

3    Jackson and Donna Roberts, but by this bad Santiago Mason?

4         Now she goes on in her letters to aid and abet

5    Mr. Jackson.  And she says, "I will have the gloves and the

6    rest waiting for your arrival.  But why the handcuffs?  I

7    would feel better if I knew this was gonna be quick and

8    painless."

9         In the same letter she says, "I would really love

10   for him to see me sucking that dick of yours just before he

11   leaves plant Earth.  I wouldn't have to yell and scream or

12   say a word.  That would be more than a sufficient send-off."

13        She also asks when she can't find a ski mask at one

14   point, she asks Mr. Jackson, "I can't find a ski mask because

15   the places I'm shopping at only have the knit caps.  Any

16   suggestions?"

17        Finally she found that.  She was so proud of

18   herself.

19        And the last thing that Nate Jackson needed and

20   you'll hear on that phone call December 8th, the one request

21   he made was that he needed to be in that house.

22        And the evidence and the testimony from the Howland

23   Police Department will be that at about midnight on

5089

1    December 11th, 2001, they received a phone call from 254

2    Fonderlac.  Miss Roberts had put herself into the mind set

3    that she needed to be like she talked about in the letters.

4    She wasn't gonna be happy and cheery.  She had to think about

5    losing someone that she really cared about.  And she cried

6    and cried.  And the police will tell you she was so upset

7    they could hardly understand her.  But they'll also tell you

8    that when they asked her to go to the bedroom in the house

9    that as they discussed the scene and what they had discovered

10   and Mr. Fingerhut with three bullet wounds, one through his

11   hand that entered the shoulder, one coming through the back

12   of his shoulder and then finally a fatal shot to the head,

13   they'll tell you that when they started to discuss things

14   that all of a sudden the sobbing and the crying stopped and

15   it was as if she was listening at the door.  And they'd go

16   back and check on her and she'd start crying again.  "How

17   terrible.  My poor Robert."

18          Of course the police didn't know that there were all

19   these phone calls and letters at that time.  They had no

20   reason to suspect Miss Roberts.

21          And the police will also tell you that they searched

22   that house.  They walked around it.  They looked at the

23   windows.  They looked at the doors.  There was no forced

5090

1    entry.  Someone had stealthily snuck in there or perhaps was

2    waiting for Mr. Fingerhut when he got home.

3           And the evidence and the testimony will show that

4    this defendant then gave statements to the Howland Police

5    Department.  And she told them what she did.  "Well, I went

6    out shopping and I went to Wal-Mart.  In fact, here's my

7    receipt.  Oh, I did have dinner at Red Lobster that night.  I

8    went out and had dinner with Red Lobster.  And Mr. Fingerhut,

9    well, he works the late shift at the Youngstown bus station

10    and he doesn't get to leave until the last bus comes in about

11    9:00."

12           And the State will present testimony to you showing

13    you that Mr. Fingerhut left the Youngstown terminal at about

14    9:30.  In fact, you'll have the video tape from the security.

15    Now, the times are a little bit off on the tape, but you'll

16    hear testimony from one of the security guards that, in fact,

17    Mr. Fingerhut left about 9:30, his usual time.  He was really

18    a creature of habit.

19           You will see phone calls between Miss Roberts and

20    Mr. Jackson because Mr. Jackson had this defendant's cell

21    phone.  You'll have the records and the times.  And when Miss

22    Roberts is questioned about this Nathaniel Jackson, she says,

23    "Oh, I haven't seen him since Sunday.  I picked him up from

5091

1 prison, but I haven't seen him since then."

2    Well, guess what?  The State will present to you

3 evidence that she was with Mr. Jackson all day on

4 December 11th.  The State will present testimony to you from

5 Kris Ellington who owns a hairstyling place right beside the

6 Warren bus terminal.  Miss Ellington will tell you that this

7 defendant came in with an individual, Nate Jackson.

8    A bus driver who works for the Greyhound who stops

9 in at the 5:00 stop, he's the last stop at the Warren

10 station, he will tell you that when he came to, into the

11 station, he saw this defendant with Nate Jackson.  Funny how

12 Miss Roberts neglects to tell the Howland Police that she was

13 with Mr. Jackson all day the day of the murder.

14    Then you will hear the testimony from Jill Kenyon.

15 She is a waitress at the Red Lobster out by the Eastwood

16 Mall.  And Miss Kenyon will tell you, "Yeah, I waited on a

17 woman," who she identifies.  And she'll also identify that

18 she was with Nate Jackson.  She kind of forgot to tell the

19 police she was with Nate Jackson all day.  She lied.  And

20 that's what the evidence will show.

21    They had it all planned out.  The gloves, being in

22 the home when Mr. Fingerhut arrives, the gun, reporting the

23 gun mysteriously missing a few weeks before.  It's all

5092

1    planned out.  The handcuffs.  But there was one thing they

2    didn't count on, one part of their plan that the evidence

3    will show didn't go the way they wanted it to.  Mr. Fingerhut

4    was not gonna leave his house.  When he walked into that

5    house and saw this black male there with a gun, he fought and

6    he struggled.  And that's what the injuries will show you,

7    the hand up, the bullet through the webbing of the hand, the

8    bullet into the chest, the grazing wound on his shoulder as

9    he was trying to fight with his assailant.

10        And contrary to what Mr. Jackson's concerns and

11   knowledge of Ohio law and the DNA was, he was wrong.  And she

12   was wrong.  Because the evidence is going to show that Mr.

13   Jackson did leave DNA.  He left DNA everywhere and

14   fingerprints everywhere.  And the worst part about this case

15   is not what happened before.  It's what happened afterwards.

16   Because Miss Roberts will tell you how grieving she was, how

17   terrible it was and you'll hear the police say, "Oh, she was

18   crying December 11th around midnight when we got there."

19        But she forgot to tell the Howland Police Department

20   one other piece of evidence that you'll have.  She checked

21   Nate Jackson into a Days Inn Motel in Boardman between 10 and

22   12 on December 11 because Mr. Jackson had shot his finger

23   during the struggle and he had shot his index finger on his

1    left hand.  He was injured.  And she took him down to

2    Boardman, paid for it with her own credit card.  Kind of

3    forgot to tell the Howland Police about that part.

4         When questioned by the Howland Police about

5    Mr. Jackson, "Oh, Nate would never do such a thing."

6         And the evidence will show that they made one other

7    mistake.  It was a pretty big one.  In addition to talking on

8    the phone, despite these repeated warnings, and they were

9    pretty careful on the phone, albeit, I'll admit that, they

10   didn't get rid of the letters.  He kept all of hers and she

11   kept all of his.  And in fact you'll see letters that she

12   wrote.  In her letters, "Maybe we should get rid of these.

13   We should destroy all these parts or at least the pages where

14   we talk about Robert."

15        But she couldn't give 'em up.  She couldn't get rid

16   of 'em because there was so much love for Nate Jackson in

17   those letters.  And she'll tell you that.  It's in her

18   letters.  She couldn't destroy them because of the love that

19   she felt from Nate in those letters.  And fortunately for the

20   Howland Police and you and the State of Ohio and for Robert

21   Fingerhut, we have those letters.  And you will see those

22   letters.  They are the evidence in this case.

23        You will hear a lot of testimony from forensics

5094

```
 1    people.  The room that she got down in Boardman, the Days
 2    Inn, Paul Monroe and this detective, Sergeant Dillon, went
 3    down there.  Paul Monroe got in a dumpster, he pulled out the
 4    trash and he found gauze, tape, bandages from where Nate
 5    Jackson had taped up his finger.  And of course it's Nate
 6    Jackson's DNA.  BCI experts came in.  They found Nate
 7    Jackson's fingerprints in that room that was rented by her
 8    for a week.  Just like their plan.  Just like the discussions
 9    in the letter.  He needed to get a place to stay to sort of
10    stay low until they could move in together before Christmas.
11    I guess apparently two weeks is all you need.

12            But the evidence in this case will show beyond all
13    doubt what I started out this morning telling you.  They
14    thought about it, they talked about it, they wrote about it,
15    and they did it.  And at the end of this case, it will be
16    Mr. Bailey and I's sworn duty to ask you to return verdicts
17    of guilty to all four counts, aggravated robbery, aggravated
18    burglary, aggravated murder with a death specification and
19    another count of aggravated murder.  They planned it.  They
20    set it up.  Even though it was her house, it was
21    Mr. Fingerhut's home as well.  It was his home that was
22    burglarized.  It was his home that Mr. Fingerhut came home to
23    where he found Mr. Jackson stealthily planted in there in
```

5095

1     preparation of this plan.  It was his car that he drove.  He

2     may not have owned it.  They may not have been in his name,

3     but the evidence will show they were his just as much as they

4     were hers.  At the close of this case, we will ask you to

5     return verdicts of guilty to each and every count and each

6     and every specification.

7                    I want to thank you very much for your attention.

8                    THE COURT:  Thank you, Mr. Becker.

9              Does the defense wish to address the jurors?

10                   MR. INGRAM:  Yes, Your Honor.  Donna

11    Roberts, pursuant to statute, will give the defense opening

12    statement.

13         **OPENING STATEMENT ON BEHALF OF THE DEFENDANT**

14                   THE DEFENDANT:  Good morning.  Will the

15    real Donna Roberts please stand up?  Ladies and Gentlemen,

16    the real Donna Roberts stands before you.  The testimony and

17    evidence will establish that I played no part in Robert'S

18    death.  The Donna Roberts you'll hear portrayed in the

19    letters and on those tapes is not the real Donna Roberts.

20         My attorneys will test the State's evidence and ask

21    important questions in cross examination.  Please, please

22    listen carefully for those questions.

23         Perhaps I'll have more to say later.  Regardless, I

```
 1    am not guilty.  I am not guilty.  And you'll know that when

 2    this case is over.

 3              Thank you.

 4                   THE COURT:  Okay.  Ladies and Gentlemen,

 5    that concludes the opening statements.

 6              Will counsel approach for a moment?

 7    (Whereupon, a conference was held at the bench.)

 8                   THE COURT:  Ladies and Gentlemen, you can

 9    have about ten minutes to step aside if you wish.  We're

10    going to start with the first witness then.  The next phase

11    of the trial now will be the evidence.  This will be the bulk

12    of what we do during the next couple weeks here.  You're not

13    to discuss anything, form any opinion until you get back.

14    Okay?  Let's make it about five after.  Be back in the box,

15    please.

16    (Whereupon, a recess was had commencing at 10:53 a.m. and

17    concluding at 11:06 a.m.)

18                   THE COURT:  Is the State ready to begin

19    your case?

20                   MR. BAILEY:  Yes, Your Honor.  The State

21    calls Christopher Monyak.

22    (Note:  For further proceedings in this matter, please refer

23    to Volume XXIV.)
```

1

2                      REPORTER'S CERTIFICATE

3

4

5        This is to certify the foregoing represents a true and

6 correct copy of the proceedings had in the aforementioned

7 cause as reflected by the stenotype notes taken by me on the

8 same.

9

10

11

12

13    1-7-04

                             Lori J. Rittwage, RPR
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

1              IN THE COURT OF COMMON PLEAS

2                  TRUMBULL COUNTY, OHIO

3    STATE OF OHIO,              ) Case No. 01-CR-793
          Plaintiff             ) Appeal No. 03-T-56
4                                )
     -vs-                        ) Judge John M. Stuard
5                                )
     DONNA M. ROBERTS,           ) **TRANSCRIPT OF PROCEEDINGS**
6         Defendant              )    **VOLUME XXIV**

7

8    Jury Trial proceedings on Tuesday, May 13, 2003 and

9    Wednesday, May 14, 2003

10   BEFORE:      HONORABLE JOHN M. STUARD

11   AT:          Trumbull County Court of Common Pleas
                  Courtroom Number 2
12                161 High Street, NW
                  Warren, Ohio 44481
13

14   APPEARANCES:

15   On behalf of the State of Ohio:

16        Messrs. Ken Bailey & Christopher Becker
          Assistant Prosecuting Attorneys
17        Warren, Ohio

18   On behalf of the Defendant:

19        Messrs. John Juhasz & Gerald Ingram
          Attorneys at Law
20        Youngstown, Ohio

21

22

23   Official Court Reporter:  Lori J. Rittwage

1          I N D E X - VOLUME XXIV

2          TUESDAY, MAY 13, 2003

3    WITNESSES:

4    CHRISTOPHER MONYAK

5    DIRECT EXAMINATION BY MR. BAILEY........................5098

6    CROSS EXAMINATION BY MR. INGRAM........................5119

7

8    FRANK REYNOLDS

9    DIRECT EXAMINATION BY MR. BAILEY........................ 5125

10   CROSS EXAMINATION BY MR. INGRAM........................5136

11

12   GERALD FUNELLI

13   DIRECT EXAMINATION BY MR. BECKER........................5143

14

15   ALBERT RAY

16   DIRECT EXAMINATION BY MR. BAILEY........................ 5155

17   CROSS EXAMINATION BY MR. INGRAM........................ 5162

18   REDIRECT EXAMINATION BY MR. BAILEY..................... 5166

19    RECROSS EXAMINATION BY MR. INGRAM..................... 5167

20          WEDNESDAY, MAY 14, 2003

21   JILL KENYON

22   DIRECT EXAMINATION BY MR. BAILEY....................... 5169

23   CROSS EXAMINATION BY MR. INGRAM........................5179

**WITNESSES (CONTINUED):**

**PAULA CARSON**

DIRECT EXAMINATION BY MR. BAILEY........................5181

CROSS EXAMINATION BY MR. INGRAM........................5188


**BRIDGET PAUL**

DIRECT EXAMINATION BY MR. BAILEY........................5190

CROSS EXAMINATION BY MR. INGRAM........................ 5199


**JAMES DANIELS**

DIRECT EXAMINATION BY MR. BECKER.......................5203

CROSS EXAMINATION BY MR. INGRAM........................5220

REDIRECT EXAMINATION BY MR. BECKER.....................5226

RECROSS EXAMINATION BY MR. INGRAM......................5228

FURTHER REDIRECT EXAMINATION BY MR. BECKER.............5229


**JOSE SANCHEZ**

DIRECT EXAMINATION BY MR. BAILEY....................... 5231

CROSS EXAMINATION BY MR. INGRAM........................ 5250

REDIRECT EXAMINATION BY MR. BAILEY..................... 5260

**WITNESSES (CONTINUED):**

**KATHRYN THOMAS**

DIRECT EXAMINATION BY MR. BAILEY....................... 5267

CROSS EXAMINATION BY MR. INGRAM........................5280


**KRIS ELLINGTON**

DIRECT EXAMINATION BY MR. BECKER.......................5291

CROSS EXAMINATION BY MR. INGRAM....................... 5296


**BARRY RICKER**

DIRECT EXAMINATION BY MR. BECKER....................... 5298

CROSS EXAMINATION BY MR. JUHASZ....................... 5308


**CARMEN OLIVIA**

DIRECT EXAMINATION BY MR. BECKER....................... 5311

CROSS EXAMINATION BY MR. JUHASZ....................... 5319


**JOSE FLORES**

DIRECT EXAMINATION BY MR. BAILEY....................... 5325


**EXHIBITS:**

State's Exhibit Number 403 marked for identification.... 5178

**REPORTER'S CERTIFICATE**................................5341

5098

1              **TUESDAY, MAY 13, 2003**

2    WHEREUPON,

3                   **CHRISTOPHER MONYAK,**

4    having been first duly sworn, according to law, was examined

5    and testified as follows:

6                   **DIRECT EXAMINATION**

7    **BY MR. BAILEY:**

8    Q        Good morning, Mr. Monyak.  You want to tell the

9    Court and jury your full name?

10   A        Christopher Monyak.

11   Q        And tell us your place of employment and position?

12   A        I'm the investigator at Lorain Correctional

13   Institution.

14   Q        And how long have you been so employed?

15   A        Approximately six years.

16   Q        And your duties and responsibilities?

17   A        Administrative investigations inside the institution

18   and assisting the state patrol in criminal investigations.

19   Q        Okay.  Now Lorain Correctional Institution, where is

20   that located?

21   A        In Lorain County just southwest of Cleveland.

22   Q        And approximately how many inmates and employees do

23   you have there?

```
 1    A         Approximately 2,000 inmates and a little over 500

 2    employees.

 3    Q         Now, did there come a point in time when you were

 4    called to assist in an investigation regarding an individual

 5    by the name of Nathaniel Jackson?

 6    A         Yes, I was.

 7    Q         And who's Trooper Funelli?

 8    A         Trooper Funelli is a state patrol investigator.  I

 9    first knew him a couple years ago when he was the

10    investigator at Trumbull Correctional.

11    Q         Now, were you able to determine whether or not

12    Nathaniel Jackson was incarcerated at Lorain Correctional

13    Institution?

14    A         Yes, I was.

15    Q         And how did you determine who Mr. Jackson was?  Did

16    you need any identification data?

17    A         Yeah.  Trooper Funelli gave me some information,

18    name, social security number, date of birth, and I was able

19    to go back and search our records and determine that he was

20    incarcerated at Lorain.

21    Q         Okay.  And is each inmate given an inmate number?

22    A         Yes, they are.  When they enter the institution or

23    the department, they are given an inmate number that stays
```

5100

```
 1    with them through their incarceration.
 2    Q       Is that a unique number, unique to each individual
 3    inmate?
 4    A       Yes, it is.
 5    Q       Now, when an inmate enters Lorain Correctional
 6    Facility, are they processed in to the facility?
 7    A       Yes.  Lorain is a reception center for all the
 8    northern Ohio counties and they go through an orientation
 9    process at Lorain and then they are shipped out to their
10    parent institutions.
11    Q       And are inmates permitted to make telephone calls?
12    A       Yes, they are.
13    Q       Okay.  Tell us about the telephone system and the
14    telephone process dealing with inmates at Lorain Correctional
15    Institution.
16    A       When the inmates come in, they're issued their
17    inmate number, which is a six-digit number.  They're allowed
18    to make phone calls while they're incarcerated.  And part of
19    the process when they make a phone call is they have to enter
20    their unique pin number into the system.  And once it
21    recognizes that pin number, it will authorize them to make a
22    phone call.
23    Q       Okay.  How many phones are there approximately
```

1    throughout the institution and throughout the different

2    housing units?

3    A        There's approximately 57 phones.  The way our

4    institution is divided up, there's normally four phones in

5    each of the housing units.  We have about 12 or 13 housing

6    units.

7    Q        Okay.  And do you have time designations for inmates

8    to make phone calls?

9    A        The phone system is on from 6:00 in the morning

10   until 11:00 at night.  And of course during counts when

11   they're locked in their cells, they're not permitted to make

12   phone calls.  And depending on which unit they're on, there

13   are certain designated times specific to that unit when they

14   can make phone calls.

15   Q        Now when an inmate initiates a phone call, what do

16   they physically do?

17   A        The first time that they actually make a phone call,

18   they enter in their pin number.  It's an eleven-digit number

19   all together.  The first digit indicates that they're a male

20   inmate; the next six digits is their inmate number, which is

21   a six-digit number; and then that's followed by a four-digit

22   date of birth, the month and then the day.

23            In that first phone call, they're prompted to record

their name, which is kept on the system. And then every subsequent phone call after that, it calls up that recording so the called party can know who's calling them.

Q Okay. Now, when those calls are made, is that information recorded anyplace?

A Both the actual recorded phone call and the call records are electronically recorded.

Q Okay. What about the entry of the pin number? Is that logged also?

A Yeah. The date, time, the phone that's actually, the phone number that's being called, the phone that the inmate is actually making the call from. All that information is recorded.

Q Okay. So if you looked at the pin number, you could determine an inmate's institution number, along with his date of birth from that information?

A Correct.

Q Okay. And those records that record the phone calls electronically, are those records made at or near the time that the call is being made?

A They're made, immediately after the phone call is when all those records are saved to a computer.

Q Okay. And are those records maintained at the

5103

1    facility?

2    A        Yes, they are.

3    Q        And how, how long are they maintained there?

4    A        The actual electronic recording is on, stored for

5    approximately six months.  The call record, which is the pin

6    number that was actually used and the number that was called,

7    is kept indefinitely.

8    Q        Okay.  And are those records kept in the regular

9    course of your doing business as an institution as a prison?

10   A        Yes, they are.

11   Q        And I take it the original records are kept at the

12   institution?

13   A        Yes.

14   Q        Now, can you tell us a little bit about the digital

15   recording system, this electronic system that you use?  How

16   accurate is it and that type of information, security

17   features.

18   A        Yeah.  It's a computer-based program.  And what it

19   does is at the conclusion of the call, it saves the recorded

20   conversation in electronic form to a hard drive.  It's a

21   special type of recording.  It's not a normal computer-type

22   recording.  You need a special player that's provided by the

23   company that supplies the equipment to be able to play that

5104

1   recording back.

2   Q       Are there safety measures that prevent the recording

3   from being tampered with?

4   A       Yeah.  There's no way to access the call and to

5   change it in any way.

6   Q       Okay.  Now, to be able to listen to one of those

7   calls, what do you have to do when it's recorded on the hard

8   drive?

9   A       Through the computer in my office, you're able to

10  call up those recordings.  If I need to use the recordings in

11  court or outside the institution, I can copy them to a CD

12  along with the program that's used to open and listen to the

13  recordings.

14  Q       Okay.  Now is that part of your duties as an

15  investigator, as well as working the phone systems?

16  A       Yes, it is.

17  Q       Okay.  And who's in charge of the phone system?

18  A       The system is the same in all the institutions and

19  it falls on the investigator to oversee the process.

20  Q       Okay.  Who is your phone provider, phone service

21  provider?

22  A       The equipment and the service is provided by MCI.

23  Q       And what kind of training have you had with respect

5105

1    to that phone system?

2    A        We actually had a new system installed in '99 and it

3    was basically an upgrade to the old system that we had had,

4    and MCI came to the institutions and provided training on the

5    new system.

6    Q        Okay.  How about on the old system?  Did you also

7    have training on that?

8    A        Yes, we did.

9    Q        Okay.  And in your job as an investigator, are you

10   able to extract the phone calls from the system?

11   A        Yes, we can.

12   Q        And how do you do that?

13   A        Through search reports, you can call up different

14   criteria such as I can enter an inmate's pin number and call

15   up all the recordings or conversations that were recorded

16   using that pin number.  I can call them up by the destination

17   number, meaning the number that was called.  You can call

18   them up just about, all the different search criteria I can

19   use to call it up.

20   Q        Okay.  And the phone calls are tracked under each of

21   those different scenarios?

22   A        Correct.

23   Q        Are they tracked by the phone call to, you said

1   destination, that's to where it's made?

2   A       Yes.  That is one of the criteria that's recorded.

3   Q       Okay.  And you can tell the, can you tell the

4   duration of the phone call?

5   A       Yes.  That's another factor that's recorded.

6   Q       Okay.  Did there come a point in time that you

7   compiled information with respect to an inmate by the name of

8   Nathaniel E. Jackson?

9   A       Yes, I did.

10  Q       Now I'm going to hand you what's been marked for

11  identification -- I'm gonna hand you what's been marked for

12  identification as State's Exhibit 360 and ask if you can

13  identify that.  That's a plastic sleeve containing I believe

14  three pages?

15  A       Yes.

16  Q       Have you seen that before?

17  A       Yes, I have.

18  Q       Okay.  And what is that?

19  A       This is a search report generated by myself upon

20  Trooper Funelli contacting me and requesting that

21  information.

22  Q       And what information was being requested?

23  A       Basically he had identified inmate Jackson and he

1    wanted to know not only his phone calls or not only if he was

2    at the institution, but any phone calls and records that were

3    made while he was incarcerated.

4    Q        Okay.  Now, can you identify from that

5    Mr. Jackson's inmate number?  Are you able to do that from

6    that document?

7    A        Yes.

8    Q        Okay.  What is his inmate number?

9    A        It is 399469.

10   Q        And can you explain to the Ladies and Gentlemen of

11   the Jury where that information is located?

12   A        There is approximately twelve columns of

13   information.  Right in the middle of the report is a pin

14   number column and it's recorded, the inmate number along with

15   his date of birth.

16   Q        Okay.  And what was his date of birth?

17   A        02-13, which is February 13th.

18   Q        Okay.  So you use a four-digit date of birth code?

19   A        Correct.

20   Q        Okay.  Now, when you generated this report, were you

21   able to determine how many phone calls were made?

22   A        Yes.

23   Q        How many?

5108

```
1    A        When I ran this report, I did it by Mr. Jackson's
2    inmate number and there were 72 phone call attempts that were
3    placed.
4    Q        Okay.  Using that pin number?
5    A        Correct.
6    Q        And how many, can you determine from that how many
7    had actually been recorded?
8    A        Yes.  There were 18 conversations or phone calls
9    that were accepted and recorded by the system.
10   Q        Okay.  This process that you have, it records the
11   phone calls that are being called?
12   A        Pardon me?
13   Q        It records the phone call that's being made on the
14   system?
15   A        Correct.
16   Q        Okay.  You indicated, I believe, you could search by
17   the phone number that was called or the pin number?
18   A        That's correct.
19   Q        Okay.  Are there any safeguards built into the
20   system with respect to three-way phone calls?
21   A        The system has the capability of detecting and
22   terminating three-way phone calls.
23   Q        Okay.  What's a three-way phone call?
```

1    A        Basically, the inmate can only make collect phone

2    calls.  If he would call an individual and that person had

3    three-way calling, that person would be able to call an

4    additional number so the inmate could speak to people without

5    making an actual collect call to that person.

6    Q        Okay.  And your system that was installed at the

7    institution while Nate Jackson was there, does it prevent

8    that from happening?

9    A        In a way, it does.

10   Q        Can you explain?

11   A        Yeah.  What the system does is it will detect tones

12   or a ringing sound on the line.  When an inmate calls, if the

13   person clicks off to dial that third number and clicks back

14   on and you're able to hear the ringing in the background, the

15   system will detect that and automatically terminate the call.

16   The inmates were, soon after this was implemented, the

17   inmates kind of found a way around it.  They were able to

18   tell their, tell the people that they were calling, "Just

19   don't click over until that person answers," and that way the

20   system will never hear the ringing tone and that way it won't

21   detect the three-way call.

22   Q        Okay.  So there were 72 different phone calls

23   attempted; right?

5110

```
 1    A        Correct.

 2    Q        And you indicated how many were accepted?

 3    A        Eighteen.

 4    Q        Of the 18 that went through, how many different

 5    telephone numbers were called?

 6    A        Of the 18 calls that actually were accepted, they

 7    were all to the same number.

 8    Q        And what is that phone number?

 9    A        Area code 330-609-7812.

10    Q        Now is it possible that another inmate can use one

11    inmate's number to make phone calls?

12    A        It is possible, yes.

13    Q        Okay.  In this particular case, was that issue

14    presented to you?

15    A        Yes, it was.

16    Q        And what, if anything, were you able to do?

17    A        One of the things that I did after this report was

18    generated, I ran a search report specifically on that number,

19    the 330 area code number, and I was able to determine that

20    there were different pin numbers that were used to call that

21    number.  Actually, there was only one other attempt using a

22    different pin number.

23    Q        One other attempt using the pin number?
```

5111

```
 1    A         Right.

 2    Q         Okay.  Which -- now, the time frame of the 18

 3    accepted phone calls, when did that occur?  Between what

 4    dates?

 5    A         The first one was accepted October 25th, 2001 and

 6    the last one was accepted December 8th, 2001.

 7    Q         Now, during that time frame, were you able to track

 8    Mr. Jackson's locations in the institution?

 9    A         Yes.  Yes, we were.

10    Q         And how many different locations was he in during

11    that time frame?

12    A         He was in three different locations.

13    Q         All in Lorain Correctional Facility?

14    A         From October to December, yes.

15    Q         Okay.  So he was in, what, three separate housing

16    units?

17    A         Three separate units, correct.

18    Q         Had he moved back and forth between housing units at

19    any time or did he stay in one housing unit before he moved

20    to the second and stay there and move to a third?  I mean

21    what did you find?

22    A         Right.  His initial placement was in our orientation

23    unit, which is 4B.  Approximately a week later, he was moved
```

112

```
1    to a unit we call 4C.  And then a couple of days later, he

2    was moved to his last unit, which was 8B.

3    Q       Okay.  And the pin numbers, did they correspond with

4    his move in the institution as well?

5    A       Yes, they did.

6    Q       Did there come a point in time when you were able to

7    track a nineteenth phone call that was accepted?

8    A       Yes, I did.

9    Q       Can you explain that?

10   A       As I stated earlier, initially, after running this

11   report, I ran a second report just on the 330 area code

12   number and I was able to determine that there was an

13   additional call placed using a different pin number.  And

14   basically what happened, when Mr. Jackson first arrived at

15   the institution, he attempted to use his pin number, but it

16   was not in the computer yet.  After a couple of attempts, he

17   used another inmate's pin number and was able to get through,

18   but all subsequent calls after that were using his pin

19   number.

20   Q       Okay.  So you were able to connect that phone call

21   as well?

22   A       Right.  And that was made from the unit that he was

23   initially placed in.
```

1    Q        Okay.  Now I'm gonna hand you what's been marked as

2    State's Exhibit Number 361.  Can you identify that?

3    A        Yes, I can.

4    Q        How are you able to identify it?

5    A        It has my handwriting on it, and it's a CD

6    containing the 19 phone calls that were placed by inmate

7    Jackson.

8    Q        Okay.  And does it list -- okay.  And does it have,

9    what name and number is on that?

10   A        It has N Jackson 399469, which is his inmate number.

11   Q        And are there dates that are listed on there?

12   A        Yes.  It states 19 calls to Donna Roberts between

13   October 5th, 2001 to December 8th, 2001.

14   Q        Okay.  What actually, what is that CD?  I mean what

15   do you --

16   A        There's --

17   Q        How do you create that?

18   A        There's a CD burner which is common today.  It's on

19   the phone computer.  And basically what I do is I put the

20   computer files which contain the recordings into a file

21   that's copied onto this CD.  So actually, there are 20 files

22   on this CD, 19 of which are phone calls and the twentieth is

23   the actual player which is used to play back the recording.

5114

```
 1    Q        Okay.  And the original, the original recording of
 2    that, that's kept on the computer at the institution?
 3    A        That's correct.
 4    Q        And is this a true and accurate copy of those phone
 5    calls?
 6    A        Yes, it is.
 7    Q        And you made that CD?
 8    A        I made the CD.
 9    Q        Okay.
10    A        Yes.
11    Q        Okay.  I'm gonna hand you what's been previously
12    marked for identification as State's Exhibit 276-C containing
13    four pieces of paper that are marked 276-C-1, 276-C-2,
14    276-C-3 and 276-C-4.  Okay?  I'm gonna ask you if you can
15    identify that envelope.
16    A        The envelope has what we call a property control
17    form for the State Patrol, which any time that they handle
18    evidence, it basically tracks the chain of custody for the
19    evidence.
20    Q        Okay.  And is there an inmate number on that?
21    A        Yes, there is.
22    Q        And what is that?
23    A        399469.
```

1    Q        Okay.  And can you look at the four documents

2    inside?

3    A        (Witness complies.)

4    Q        Okay.  Do those contain inmate numbers?

5    A        Yes, they do.

6    Q        And what numbers are those?

7    A        Again, 399469.

8    Q        That's on all four forms that are inside that

9    envelope?

10   A        Yes.

11   Q        Okay.  And is that the same inmate number that you

12   had previously given us with respect to Nathaniel Jackson?

13   A        Yes, it is.

14   Q        Now, were you asked to collect these particular

15   documents at some point?

16   A        Yes.  My initial contact with Trooper Funelli was

17   dealing with the phone calls and then subsequent

18   conversations dealt with these forms.

19   Q        Okay.  And what are those forms basically?

20   A        Basically, as I stated earlier, we're a reception

21   center for northern Ohio.  When they first come into the

22   system, a lot of information is collected about them.  One of

23   the forms that we have here, which is C-1, deals with their

1   employment history.  C2 deals with their religious

2   preference.  It's just one of the many documents that we

3   generate when they first come into the system.

4   Q       Okay.  And the other two forms?

5   A       The other two forms are, one is a clothing box list

6   and the other one is a food box list.  And basically what

7   these are are a list of items that were sent to him at his

8   prior institution, which was Belmont Correctional

9   Institution.

10  Q       Okay.  Those original documents, were those kept by

11  Lorain Correctional Institution originally?

12  A       Yes.

13  Q       And were they done -- were they prepared at or near

14  the time that they're filled out?

15  A       The two forms, C-1 and C-2, would have been prepared

16  his first week at the institution.  The other ones, the food

17  box list and the clothing box list, were actually written by

18  someone else, attached to the box that was sent in.  And then

19  after the box was sent in, the items were issued to

20  Mr. Jackson, he signed for 'em and then the record, the list

21  was kept on the record.

22  Q       Okay.  And those are all kept as part of doing

23  business as a correctional institution?

117

```
 1    A        Correct.

 2    Q        Now, and I take it your previous warden was Linda

 3    Thomas?

 4    A        That's correct.

 5    Q        And she would have had care, custody and control of

 6    those initially?

 7    A        Correct.

 8    Q        She's no longer with your institution?

 9    A        Correct.

10    Q        And I take it, you testified that you had collected

11    those documents for her; right?

12    A        Yes, I had.

13    Q        Okay.  And to whom were they turned over?

14    A        Turned over to Trooper Funelli on April 14th, or I'm

15    sorry, April 17th, 2002.

16    Q        And that was by, you recognize the writing on there?

17    A        By Linda Thomas.

18    Q        Your warden?

19    A        Correct.

20    Q        Okay.  Were you there?

21    A        On that particular day, I was not at the

22    institution.

23    Q        Okay.  You recognize your writing though?  You're
```

1118

```
 1   familiar with it?

 2   A        Yes.  Yes, I do.

 3   Q        Okay.  And I take it, are you familiar with Trooper

 4   Funelli's writing?

 5   A        Yes.

 6   Q        Okay.  Is that his writing?

 7   A        Yes.

 8   Q        Now, these phone calls that are on the CD, State's

 9   Exhibit Number 361, could you determine approximately how

10   long the phone calls were, each of the phone calls that

11   Mr. Jackson made?

12   A        Yeah.  One of the criteria that the report records

13   is the duration of the phone call.  The system is set up to

14   limit the phone calls to ten minutes, and the vast majority

15   of the phone calls that he made were the full ten minutes.

16   Q        What happens at the end of ten minutes?

17   A        Approximately one minute prior to the ten minutes

18   being up, it'll give a notice that there's 60 seconds left.

19   And then at ten minutes, it will just cut off.

20   Q        Approximately how many phone calls are attempted out

21   of the institution on a daily basis?

22   A        We have 2,000 inmates.  We probably average 2,000 to

23   3,000 phone call attempts every day.
```

119

1    Q      Okay.  Now, because these calls are recorded, is

2    there any type of warning that comes on when you're on, using

3    the telephone, a collect call from the institution?

4    A      Yeah.  Initially, when you first make a collect

5    call, the person that's receiving the phone call will hear a

6    recording indicating that the call originates from a

7    correctional institution and it will not only identify the

8    inmate with that recording that he makes during his first

9    phone call, but it'll also tell you which institution the

10   call is coming from.

11         And then once you accept the phone call,

12   periodically throughout that phone call, there will be a,

13   it's called a voice layover, which basically states that the

14   call originates from, in this case, Lorain Correctional

15   Institution and that it may be monitored and/or recorded.

16                MR. BAILEY:  Okay.  Excuse me one moment.

17         Thank you, Mr. Monyak.  Defense counsel will have an

18   opportunity to address you.

19                MR. INGRAM:  Thank you, Your Honor.

20                 **CROSS EXAMINATION**

21   **BY MR. INGRAM:**

22    Q      Morning, Mr. Monyak.  How are you?

23    A      Good morning.

5120

1    Q       My name is Gerry Ingram.  John and I represent

2    Donna, and we just have a couple questions.

3    A       Okay.

4    Q       You're in charge of internal, internal

5    investigations within the Lorain Correctional Institution and

6    you assist the Ohio State Patrol in other investigations; am

7    I correct?

8    A       That's correct.

9    Q       So when a call is made out, it has to be made

10   collect?

11   A       All phone calls are collect, correct.

12   Q       And the first thing that the person receiving that

13   call hears is the name of the person placing the call, that

14   it's coming from a particular institution and that the call

15   may be recorded or monitored; am I correct?

16   A       Well, the initial item that the person that's

17   receiving the call will hear is a computer-generated voice

18   basically identifying the call as a collect phone call, it

19   will indicate what institution it's from and then the name of

20   the person is actually in the voice of the person placing the

21   phone call or the pin number that's being used to place that

22   phone call.

23   Q       Okay.  But the mechanical voice at the beginning of

5121

```
 1      the call informs the person receiving the call that the call

 2      may be recorded or monitored; correct?

 3      A       Correct.

 4      Q       And then periodically throughout the call, there is

 5      this mechanical voice again that speaks up and says,

 6      "Warning, this call is from an institution and may be

 7      recorded or monitored"?

 8      A       Not in those words, but, yeah, it does state that.

 9      Q       How often is that recorded or monitored warning --

10      A       It's basically, it's programmed at a random time.

11      Therefore, the inmates don't know that it's, when it's gonna

12      come up.  But during a ten-minute phone conversation, it

13      comes up at least twice.

14      Q       And as part of your job responsibilities, do you

15      have the capability to listen to outgoing telephone calls in

16      real time?

17      A       Yes, we do.

18      Q       So if you wanted to, you could actually listen to a

19      telephone call as an inmate was making it?

20      A       That's correct.

21      Q       Is there an orientation or some type of proceeding

22      where when people get to Lorain they are somehow informed of

23      the rules and regulations of the institution?
```

5122

```
1    A       Yes, there is.

2    Q       And in that orientation, for lack of a better term,

3    are the inmates told that the telephone calls are recorded

4    and subject to real-time monitoring?

5    A       Not only are they told in the inmate handbook,

6    there's a sign posted above each phone indicating that all

7    calls are recorded and/or monitored and then, of course, you

8    have the voice overlay during the phone call which both the

9    inmate and the called party can hear.

10   Q       Okay.  So there's at least three warnings?  The

11   first one you get in orientation?

12   A       Right.

13   Q       And then you have 57 phones and they're divided up

14   into banks of four in each housing unit and there'd be a sign

15   up that says, "Hey, these phones are recorded and monitored,"

16   and then you have the mechanical voice within the call

17   itself?

18   A       Correct.

19   Q       Are they told the purpose of their unique pin

20   number?

21   A       Well, basically they're informed that to be able to

22   make a phone call, they have to use their pin number.

23   Q       Are they informed that that pin number is unique to
```

5123

 1    them?

 2    A        Yes.

 3    Q        And when you first got a request from Trooper

 4    Funelli, you ran your search based on Mr. Jackson's unique

 5    pin number?

 6    A        That's correct.

 7    Q        Later, you ran a second search and you, you ran that

 8    search on Donna Roberts' telephone number; am I correct?

 9    A        On the number that the phone calls went through.  I

10    ran it on that number, yes.

11    Q        And that second search indicated one extra call,

12    which made a total of 19?

13    A        Correct.

14    Q        That nineteenth call would have been the first in

15    point of time?

16    A        That's correct.

17    Q        It wouldn't be all that hard to disguise or use

18    somebody else's pin number, would it?

19    A        No, it wouldn't be.

20    Q        All you got to do is get someone to cooperate with

21    you, tell you what their inmate is, what their date of birth

22    is and you can then use somebody else's number; correct?

23    A        Correct.

```
 1    Q       With the 18 calls that you discovered in your first

 2    search, was any effort made by Mr. Jackson to disguise his

 3    individual pin number or use somebody else's pin number?

 4    A       Not that I could see, no.

 5                    MR. INGRAM:  May I have one moment, Your

 6    Honor.

 7              Thank you very much, sir.  No further questions.

 8                        THE COURT:  Any redirect?

 9                        MR. BAILEY:  No redirect, Your Honor.

10                        THE COURT:  Sir, we thank you.  You are

11    excused.

12                        THE WITNESS:  Okay.  Thank you.

13                        MR. BAILEY:  We're seeing if we have

14    another witness here.  Frank Reynolds.

15                        THE COURT:  Mr. Bailey, is this a rather

16    short witness?

17                        MR. BAILEY:  I would expect we should be

18    able to get it done by noon.

19                                  *  *  *

20

21

22

23
```

1   **WHEREUPON,**

2                       **FRANK REYNOLDS,**

3   having been first duly sworn, according to law, was examined

4   and testified as follows:

5                       **DIRECT EXAMINATION**

6   **BY MR. BAILEY:**

7   Q        Good morning, Mr. Reynolds.

8   A        Good morning.

9   Q        Do you want to tell the Court and jury your full

10  name and let me move this just a little bit closer.  Okay.

11  A        My name is Frank Edward Reynolds.

12  Q        Okay.  And, sir, how old are you?

13  A        Age 28.

14  Q        And where do you live?

15  A        Youngstown.

16  Q        Okay.  Whereabouts in Youngstown?

17  A        1724 Oakland Avenue.

18  Q        Okay.  And are you presently employed?

19  A        No.

20  Q        Okay.  Now I'm gonna direct your attention back a

21  bit to December of 2001, okay, about 17, 17 months ago.

22  Where were you working at that time?

23  A        I was working for Greyhound.

```
 1   Q        Okay.  And who did you work for?

 2   A        I worked for James Daniels and Bob Fingerhut.

 3   Q        Okay.  And Bob Fingerhut, how long did you know him?

 4   A        About eight or nine years.

 5   Q        Okay.  And how did you, you met him, how did you

 6   first meet him?

 7   A        When he opened the restaurant in the terminal there.

 8   Q        In Youngstown?

 9   A        Yes.

10   Q        Okay.  And did you share any interest in any,

11   anything that he collected?

12   A        I got a jersey shirt and that from the Steelers and

13   that.

14   Q        He collected sports memorabilia?

15   A        Yeah.

16   Q        Okay.  Now -- and did you become friends?

17   A        Yes.

18   Q        Okay.  And how did, and did he give you a job at the

19   Greyhound terminal there?

20   A        Yeah.  Part time.

21   Q        Okay.  What kind of part-time job did you have there

22   at Greyhound?

23   A        Loading the buses, unloading.
```

5127

```
 1    Q       Okay.  And how long did you work there?

 2    A       I worked there from around, around Thanksgiving.

 3    Q       Of 2001?

 4    A       Yes.  To July 9th of 2002.

 5    Q       Okay.  And did you, what happened at that time?

 6    A       I just quit.

 7    Q       Okay.  Now, would you go there before the time you

 8    started working there to the Greyhound bus station?

 9    A       Yes.

10    Q       And did you also go to the restaurant?

11    A       Yes.

12    Q       And how long were you going to the Greyhound

13    terminal and the restaurant?

14    A       I've been going there for five or six years.

15    Q       Okay.  And where did you eat?

16    A       I eat at the restaurant there.

17    Q       At the Greyhound station?

18    A       Yes, sir.

19    Q       And did you do, did you do that throughout the

20    summer of 2001?

21    A       Yes.

22    Q       And you were, so you did the baggage there; right?

23    A       Yes, sir.
```

5128

```
 1    Q        You mentioned this other fellow, James Daniels, was

 2    it?

 3    A        Yes.

 4    Q        Okay.  What did he do there?

 5    A        He was the ticket agent and he was my supervisor.

 6    Q        Okay.  Now, and was there another fellow that worked

 7    with you?

 8    A        Yes.  Melvin Williams.

 9    Q        Okay.  And what hours would you work?

10    A        I worked from 7 to 9 that night.

11    Q        Okay.  And how did Robert Fingerhut treat you?  How

12    did you get along with him?

13    A        We got along real good.

14    Q        Okay.  And you would help him doing the baggage on

15    the buses?

16    A        Yes, sir.

17    Q        And whatever he'd tell you to do?

18    A        Yes.

19    Q        Now, did you get to know Donna Roberts?

20    A        I met her when I went in to the restaurant.

21    Q        Okay.  And do you see her today in this courtroom?

22    A        Yes.

23    Q        Can you point her out?
```

5129

1    A        She's right over there.

2                    MR. INGRAM:  We'd stipulate.

3    Q        Is this the person to whom you're referring?

4    A        Yes.

5                    MR. BAILEY:  May the record reflect that

6    the witness identified the defendant?

7                    THE COURT:  The record will so reflect.

8    Q        (By Mr. Bailey) Now, did there come a time where you

9    saw the defendant with somebody by the name of Nate?

10   A        Yeah.

11   Q        And did you see the defendant and this Nate

12   together?

13   A        Yes.

14   Q        Okay.  When would that have been?

15   A        Between mid summer.

16   Q        Of 2001?

17   A        Yes.

18   Q        Okay.  Did you ever see -- well, let me go back for

19   a sec.

20            At that time, how did the defendant look?  Did her

21   hair color look the same?

22   A        She had dark red hair.

23   Q        Dark red hair at that time?

5130

```
 1    A        Yeah.

 2    Q        Okay.  And did you ever see the defendant, Donna

 3    Roberts, and this Nate fellow and Robert Fingerhut all

 4    together at the same time?

 5    A        No.

 6    Q        Did you ever see this Nate fellow with Robert

 7    Fingerhut?

 8    A        No.

 9    Q        Now, I want to direct your attention to Monday,

10    December 10th, 2001.  Did you work that day?

11    A        Yes.

12    Q        Okay.  And that particular day, do you remember when

13    you were there that day, on December 10th?

14    A        I was there in the morning.

15    Q        In the morning?

16    A        From morning until, until the evening.

17    Q        Until when?

18    A        Until the evening, at 9:00.

19    Q        Until the evening.  Until the evening.  Okay.  Now,

20    did you see Robert Fingerhut that day?

21    A        He came in at 2:45.

22    Q        Okay.  2:45 in the afternoon that day?

23    A        Yes.
```

1    Q        Okay.  And did you -- okay.  Did you see that day

2    the defendant and Nate Jackson?  Or I mean Nate.  This

3    fellow, Nate.

4    A        Between the hours of 10 and 10:45 a.m.

5    Q        Okay.  And where did you see them?

6    A        In-between the double doors.

7    Q        Okay.  Where are the double doors located?

8    A        Outside -- in-between the main entrance of the

9    terminal.

10   Q        Okay.  Now, let's go to that December 10th at about

11   2:45 in the afternoon when you saw Robert Fingerhut.  Did the

12   defendant come in to the terminal that day?

13   A        Yes.

14   Q        And what happened?

15   A        We were sitting in the ticket agent's office and we

16   heard a knock at the door and Mr. Fingerhut opened the door.

17   Q        Okay.  You were with Robert Fingerhut?

18   A        Yes.

19   Q        Okay.  And who was at the door?

20   A        Miss Donna.

21   Q        Donna Roberts?

22   A        Yes.

23   Q        Okay.  And what happened?

1   A       She, she came in, shut the door and she, she looked

2   like she was nervous.

3   Q       Okay.  What made you think she was nervous?

4   A       Cause the way she was shaking.

5   Q       She was shaking?

6   A       Yes.

7   Q       Okay.  And did she say anything?

8   A       She asked Bob for $3,000.

9   Q       She asked Robert Fingerhut for $3,000?

10  A       Yes.

11  Q       And what did he tell her?

12  A       He said he wasn't giving her no money.

13  Q       Okay.  And what did, what was her reaction to that?

14  A       She gave him the dirtiest look like --

15  Q       Okay.  A dirty look?

16  A       Yeah.

17  Q       Now, is that the first time you ever saw any

18  hostility between Donna Roberts --

19               MR. INGRAM:  Objection.

20  A       Yes.

21               THE COURT:  Objection sustained.

22  Rephrase.

23  Q       (By Mr. Bailey)  Okay.  Had you ever seen her do

5133

1   that before?

2   A       No.

3   Q       Okay.  Now on Tuesday, December 11th, 2001 around 10

4   in the morning to 10:45 in the morning, you were at the

5   Youngstown Greyhound bus station?

6   A       Yes.

7   Q       Okay.  And at that time, do you see the defendant

8   and this Nate together?

9   A       Yes.

10  Q       Okay.  What's this Nate look like?

11  A       Tall, skinny black guy.

12  Q       Okay.  This is when you said you saw them between

13  the two sets of doors?

14  A       Yes, sir.

15  Q       What was this defendant doing with Nate?

16  A       Hugging him, kissing, talking to him.

17  Q       Okay.  Now, I'm gonna direct your attention to about

18  8:45 to 8:55 that evening, okay, on December 11th of 2001.

19  Were you at, did you end up at the Greyhound bus station

20  there in Youngstown?

21  A       Yes.

22  Q       And why did you go there?

23  A       To pick up my paycheck.

```
 1    Q        Okay.  And at that time, did you come into contact
 2    with or see Robert Fingerhut?
 3    A        I see Bob Fingerhut because he's the one gave me my
 4    paycheck.
 5    Q        Okay.  Where was he?
 6    A        Behind the ticket agent.
 7    Q        Okay.  Behind the ticket agent.  That's at the
 8    ticket counter?
 9    A        Yeah.
10    Q        Okay.  Now, do you remember what kind of car Bob
11    Fingerhut drove?
12    A        It was a gold car.
13    Q        It was a what?
14    A        A goldish tannish car like.
15    Q        Okay.  Did you ever see him drive a silver 2001
16    Chrysler?
17    A        That's the one.
18    Q        Okay.  Okay.  And that particular car, how often did
19    you see him drive that?
20    A        Mostly every day.
21    Q        Okay.  Did you ever see the defendant, Donna
22    Roberts, driving that car?
23    A        No.
```

1    Q        Okay.  Did you ever see her drive it once maybe?

2    A        No.

3    Q        Now, did you ever see Robert Fingerhut again after

4    that night?

5    A        No, sir.

6    Q        Do you know what kind of car or what color car Donna

7    Roberts drove back then?

8    A        All I know, it was a red car.

9    Q        The defendant drove a red car?

10   A        Yes, sir.

11            MR. BAILEY:  Okay.  Thank you.  Defense

12   counsel will have an opportunity to ask you some questions.

13            MR. INGRAM:  Your Honor, I'd actually

14   request a luncheon recess at this point.  I would request a

15   luncheon recess at this point.

16            THE COURT:  Oh, okay.  You're able to

17   return after lunch?

18            THE WITNESS:  Yeah.

19            THE COURT:  Okay.  We thank you.

20       Ladies and Gentlemen, be back here at 1:00.  You are

21   not to discuss anything in the interim about this case or

22   form any opinions.  The evidence has just started.  You all

23   have a nice lunch.  Thanks.

1    (Whereupon, a recess was had commencing at 11:55 a.m. and

2    concluding at 1:06 p.m.)

3                    THE COURT:  I think you were told

4    previously, but the media is not allowed to photograph the

5    jury if you're concerned about that.

6               Mr. Ingram, where is our witness?

7                    MR. INGRAM:  I believe he's on the bench

8    in the hallway, Your Honor.

9                    THE COURT:  For the record, this is the

10   cross examination of the witness from this morning,

11   Mr. Reynolds.  Please continue.

12                    **CROSS EXAMINATION**

13   **BY MR. INGRAM:**

14   Q       Mr. Reynolds, how are you this afternoon?

15   A       Pretty good.

16   Q       I just have a couple questions for you if I may.

17   How long did you say you knew Robert Fingerhut?

18   A       For eight to nine years.

19   Q       Eight or nine years.  How did you come to know him?

20   A       When I always go into the bus station to see my

21   friends.

22   Q       So you met him at the Greyhound bus station in

23   Warren?

5137

1    A       No.

2    Q       In Youngstown?

3    A       In Youngstown.

4    Q       You do not know him outside of the Greyhound bus

5    station in Youngstown; am I correct?

6    A       Exactly.

7    Q       You would go to the Greyhound bus station in

8    Youngstown to socialize with your friends and, as I

9    understand your testimony, also to eat on occasion?

10   A       Yes.

11   Q       And there was a restaurant there and the name of

12   that restaurant was Just the Ticket?

13   A       Exactly.

14   Q       Did Donna help run the restaurant called Just the

15   Ticket?

16   A       Yes, she did.

17   Q       And back when you would go to the Greyhound bus

18   station to the restaurant, were you receiving disability

19   benefits?

20   A       Yes.

21   Q       When you worked for Mr. Fingerhut, were you

22   receiving disability benefits?

23   A       Yes.

5138

```
1    Q        And how were you paid by Mr. Fingerhut?

2    A        Cash.

3    Q        And I assume that that cash was not reported to any

4    governmental agency?

5    A        Exactly.

6    Q        Now during the nine years that you would go to the

7    bus station and socialize and eat, would you on occasion see

8    Robert and Donna together at the bus station?

9    A        Sometimes.

10   Q        And the only time you ever saw the two, either of

11   them or the two of them have a disagreement was the

12   disagreement you told us about on the afternoon of December

13   11th; correct?

14   A        Exactly.

15   Q        When you would go to the restaurant, would you call

16   Donna Roberts Miss Donna?

17   A        Yes.

18   Q        Would you on occasion at the end of the month run

19   out of money?

20   A        No.

21   Q        No?  She ever give you free food at that restaurant?

22   A        No.

23   Q        Now on the afternoon of Tuesday, December 11th,
```

```
 1    right around 2:45 or 3:00 in the afternoon, you are in the

 2    Greyhound office talking with Mr. Fingerhut; am I correct?

 3    A       Yes.

 4    Q       And that's when Donna knocks at the door?

 5    A       Yes.

 6    Q       Does she open the door or do you or Mr. Fingerhut

 7    have to open the door?

 8    A       Mr. Fingerhut.

 9    Q       So Mr. Fingerhut opens the door and Donna enters the

10    room?

11    A       Yes.

12    Q       When she enters the room, does she ask you to leave?

13    A       No.

14    Q       And it's at that time that she asks Mr. Fingerhut

15    for $3,000?

16    A       Yes.

17    Q       Now earlier that day, I believe you said at about

18    10:45 in the morning, you saw Donna Roberts and Nate Jackson

19    at the Greyhound bus terminal in Youngstown; is that right?

20    A       Yes.

21    Q       And they were standing in-between the double doors?

22    A       Yes.

23    Q       And those doors, are those wooden doors or are those
```

5140

```
 1   glass doors?

 2   A        Glass doors.

 3   Q        So you can see through these glass doors?

 4   A        Yes.

 5   Q        From either side; correct?

 6   A        Yes.

 7   Q        As a matter of fact, you can see, we're gonna call

 8   the area between the doors the vestibule; okay?

 9   A        (Witness nods head.)

10   Q        You can actually see the vestibule from all four

11   sides; correct?

12   A        Yes.

13   Q        And it's your testimony that at around 10:45 or

14   11:00 in the morning Donna Roberts and Nate Jackson are

15   standing in that vestibule kissing and hugging?

16   A        Exactly.

17   Q        For you and all the world to see; correct?

18   A        Yes.

19   Q        Now after that incident, does Donna come up to you

20   and say, "Hey, Frank, please don't tell Robert"?

21   A        She didn't come up to me.

22   Q        She didn't ask you to forget what you had seen?

23   A        Nope.
```

1    Q        Do you tell Robert what you had seen?

2    A        I didn't tell Robert what I seen.

3    Q        And there were other employees there that morning,

4    were there not?

5    A        Just James Daniels.

6    Q        Well, he is another employee; correct?

7    A        Yes.

8    Q        Now how about Melvin?  Melvin was not there?

9    A        Melvin Williams works on the weekends.

10   Q        Were there customers about, do you know?

11   A        There was customers for WRTA local buses and for

12   Greyhound.

13   Q        I guess we should back up and establish that.  The

14   Greyhound terminal is also the bus station for the Youngstown

15   buses known as WRTA; correct?

16   A        Yes, sir.

17   Q        So the vestibule where you say Donna and Nate were

18   standing and kissing, there would be customers walking in and

19   out of those two sets of doors; correct?

20   A        Yes.

21                    MR. INGRAM:  No further questions.

22                    THE COURT:  Any redirect?

23                    MR. BAILEY:  No questions.

```
 1                    THE COURT:  Mr. Reynolds, you're excused.
 2   We thank you, sir.
 3                    MR. BECKER:  Your Honor, I hate to take a
 4   break so soon, but I need a few moments to set something up
 5   here.  Maybe just five or ten minutes.
 6                    THE COURT:  How long?
 7                    MR. BECKER:  Ten minutes.
 8                    THE COURT:  Ten minutes.  That's fine.
 9   The jury, you may be comfortable where you are and wish to
10   continue sitting there.  He has to take a few minutes to set
11   up a video display apparently.  You're welcome to get out of
12   the box if you wish, stretch your legs.
13            You're not to discuss anything or form any opinion
14   until you return.
15                              *  *  *
16
17
18
19
20
21
22
23
```

1    **WHEREUPON,**

2                              **GERALD FUNELLI,**

3    having been first duly sworn, according to law, was examined

4    and testified as follows:

5                          **DIRECT EXAMINATION**

6    **BY MR. BECKER:**

7    Q        Would you introduce yourself to this jury, please?

8    A        My name is Gerald Funelli.  I am employed with the

9    Ohio State Highway Patrol.

10   Q        And just for the record, could you spell your last

11   name for our court reporter?

12   A        F-u-n-e-l-l-i.

13   Q        And what are your, what is your current position at

14   the State Highway Patrol?

15   A        I'm assigned to the district four office of

16   investigative services.  That district takes care of

17   northeastern Ohio from Ashtabula down to East Liverpool.

18   Q        And what are your current job duties?

19   A        My current job duty is identity theft and crimes

20   that occur inside state institutions.  I investigate those.

21   Q        That would include state penal institutions?

22   A        Yes, sir.

23   Q        And what state penal institutions are located in

1    your area or in your district?

2    A        We have three state correctional facilities that are

3    inside district four, which is Warren District headquarters;

4    Lake Erie Correctional, which is up in Conneaut, Ohio;

5    Trumbull Correctional, which is located on the west side of

6    Warren; and the Ohio State Penetentiary, which is located on

7    the east side of Youngstown.

8    Q        Pursuant to that job description, have you ever been

9    called upon in your current duties to assist other law

10   enforcement agencies?

11   A        Yes, sir.

12   Q        And have you ever been called to assist other law

13   enforcement agencies with investigations or things they may

14   need from other penal institutions that are not located in

15   this district?

16   A        Yes.  Usually the way I get the information or to

17   assist if the case is within our district or from outside our

18   district, one of the district investigators from where that

19   crime occurred will contact me because there's an inmate

20   incarcerated in one of our three penal institutions to assist

21   them in that.

22   Q        What types of crimes have you investigated over the

23   years where you've given assistance to other law enforcement

1    agencies?

2    A       Homicides, auto theft rings, identity theft, drugs

3    being transported inside the institutions, credit card fraud.

4    Q       A number of them?

5    A       Yes.

6    Q       I want to direct your attention to I believe it was

7    December of 2001, and I believe your department or your

8    services were requested by the Howland Police Department; is

9    that correct?

10   A       Yes.

11   Q       Do you recall the nature of why your services were

12   required by the Howland Police Department?

13   A       Yes.  On Friday morning, December 14th of 2001,

14   Detective Frank Dillon contacted me at my office in Warren,

15   well, in Southington, but at the Warren district

16   headquarters, and he basically briefed me that they're

17   investigating a homicide that occurred in their township and

18   they, one of the suspects was incarcerated in the state penal

19   institutions in Lorain and they asked if I could assist them

20   in obtaining some information from that facility to assist

21   them in the investigation of the homicide.

22   Q       And to be clear, then, Lorain is not one of the

23   institutions that you would normally handle in this district

1    where you work; is that correct, sir?

2    A       No, sir.

3    Q       But because you do that for this district, you had

4    the contacts and the wherewithal to contact the individuals

5    that needed to be contacted at the Lorain Correctional

6    Institution?

7    A       Yes, sir.

8    Q       All right.  And that's what you did in this case?

9    A       Yes.  I contacted our district three investigator,

10   Trooper Weber, who handles Lorain Correctional.  He, in turn,

11   turned me over to the institutional investigator, Chris

12   Monyak, who takes care of Lorain for the Department of

13   Corrections.  I contacted him with the information that I was

14   provided to obtain on Nathaniel Jackson.

15   Q       And you were given the name from Detective Dillon of

16   Nathaniel Jackson; is that correct?

17   A       Yes.

18   Q       What other information, identifying information

19   relating to Nathaniel Jackson, were you given?

20   A       His social security number.  There is a list of

21   telephone numbers that they wanted searched through the

22   institutional database, recordings that they have to see if

23   phone calls were made by him to these numbers.

1    Q        And in fact the information that you had requested

2    was actually given to you at some point; is that correct?

3    A        Yes, sir.

4    Q        And explain in what form and how this information

5    came to be in your possession.

6    A        On Tuesday, the following Tuesday, which would be

7    December 18th if I'm correct, I contacted Investigator Monyak

8    at Lorain Correctional and he advised me that he ran inmate

9    Jackson's information through the phone system and obtained a

10   total of 18 phone calls that were made through his pin

11   number.  Through the course of this, we found out that there

12   was one other phone call that was made prior to those 18 that

13   was made on someone else's pin number to one of the numbers

14   that was supplied to me and we were able to identify that

15   caller as Nathaniel Jackson.

16   Q        Based upon that information, then, did you actually

17   physically retrieve an exhibit from Investigator Monyak at

18   the Lorain Correctional Institution?

19   A        Yes.  On Tuesday, the 18th of December, I drove up

20   to Lorain.  Investigator Monyak supplied me with a CD rom

21   which contained the phone calls.

22   Q        All right.  Now I'm gonna hand you what's been

23   marked previously as State's Exhibit 361 and ask if you

1    recognize State's Exhibit 361?

2    A        Yes.  This is the CD rom that I obtained from

3    Investigator Monyak.

4    Q        All right.  Is that CD in the same or substantially

5    the same condition as when you retrieved it in December of

6    2001?

7    A        Yes, sir.

8    Q        What did you do with State's Exhibit 361 after you

9    obtained it?

10   A        I brought it back and I turned it over to the

11   prosecutor's office to --

12   Q        Howland Police Officer?

13   A        Howland Police Officer Monroe, Paul Monroe.

14   Q        Now the chief, was Detective Sergeant?

15   A        Yes.

16   Q        At the time, he was a sergeant?  Or you maybe don't

17   know that.

18   A        I think that's what he was.

19   Q        All right.  Did you obtain any other information

20   from Investigator Monyak?

21   A        Yes.  To identify the phone calls and the date and

22   time, he supplied me with a printed copy of the phone calls

23   that list the length of time, the numbers that were called,

1    which phone station they were called from.

2    Q        Okay.

3    A        And I think some information regarding visitation

4    lists.

5    Q        All right.  I'm gonna hand you a three-page document

6    that's been marked as State's Exhibit 360 and also some

7    paperwork listed as 276 C-1, 2, 3 and 4.  There are actually

8    four pages.  And I am going to ask if you recognize these

9    items?

10   A        Exhibit, State's Exhibit 360 is the call detail

11   report that I obtained from Investigator Monyak.

12   Q        And is that in the same or substantially the same

13   condition as when you first obtained that from Investigator

14   Monyak?

15   A        Yes, sir, it is.

16   Q        Okay.  And do you recall or are you familiar with

17   the other exhibit there that I believe is 267?  Or I'm sorry.

18   It's 276-C-1, C-2, C-3 and C-4?

19   A        Yes.  State's Exhibit 276-C-3 is an inmate packing

20   list.  It's a list of the items that were in his possession

21   and --

22   Q        Upon his release or upon his entry?

23   A        Let me see what this was.  It was dated 4-18-01.

1   Q       Okay.

2   A       And State's Exhibit 276-C-4 is a standard food

3   packing list, and that is dated 4-16-01.

4           And State's Exhibit 276-C-1 is the inmate's

5   employment history and special services that we conducted

6   while he was in the institution.

7           And State's Exhibit 276-C-2, this is intake service

8   form.  It lists his religious services that he requests.

9   Q       Are all those items in the same or substantially the

10  same condition as when you first obtained them?

11  A       Yes, sir.

12  Q       Okay.  What did you do with State's Exhibits 360 and

13  State's Exhibits 276-C-1, 2, 3 and 4 after you obtained them

14  from Investigator Monyak?

15  A       I hand-delivered them to I think it's Frank Dillon,

16  his unit number is 412, on 4-17 at 2:52 p.m.

17  Q       All right.  And that's noted on the jacket of that

18  manila envelope you're holding?

19  A       Yes, sir.

20  Q       And that's basically the envelope that you

21  transported them from Lorain to the Howland Police Department

22  in?

23  A       Yes, it is.

1    Q        Okay.  Now, Officer, go ahead and put those back in

2    that envelope.

3    A        (Witness complies.)

4    Q        I want to ask you, at some point, were you asked to

5    listen to the 19 phone calls and were they actually put on an

6    audio tape at some point?

7    A        I listened to them on CD rom and then I also had the

8    transcripts and compared them that way and then the tapes, I

9    also listened to and compared them to the transcripts.

10   Q        All right.  I'm going to hand you what's been marked

11   for purposes of identification as State's Exhibits 362

12   through and including 378 and ask if you recognize what those

13   exhibits are?  Or actually, I'm sorry.  It's 362 through 381.

14   I'm sorry.  They may not be in order.

15   A        No, they're not, but, yes, these are the tapes that

16   I listened to.

17   Q        And how do you recognize that those are the tapes

18   that you listened to?

19   A        On the top right-hand corner, I put a check mark on

20   each one of the tapes.

21   Q        And you did so after you listened to each and every

22   one of those tapes?

23   A        Yes.  And I compared them to the transcripts that I

1    received.

2    Q        Now I'm gonna hand you State's Exhibits 362-A

3    through 381-A and ask if you recognize those.  Again, they

4    may not be in order.

5    A        These are the transcripts that I compared the tapes

6    to.

7    Q        And were you able to determine, listening to those

8    audio tapes and comparing those to the transcripts, were

9    there any substantial corrections that were required?

10   A        No, sir.

11   Q        All right.  And I believe you also listened -- well,

12   I'm sorry.  Strike that.

13           I believe there was also a transcription made of a

14   composite, I guess, of those phone calls that were put on a

15   tape that was marked as, that was marked as State's Exhibit

16   397 and a transcript marked as 397-A that was basically a

17   boiled-down version of those transcripts and those phone

18   calls; is that correct?

19   A        Yes.

20   Q        And you were able to listen to that composite tape?

21   A        Yes, sir.

22   Q        And the composite tape, as well as the

23   transcription, were there any substantial corrections to be

```
1    made in that transcript?

2    A       No, sir.

3                    MR. BECKER:  Okay.  Your Honor, at this

4    time, I'd like to dim the lights at this time and play

5    State's Exhibit 397 for this witness.

6                    THE COURT:  Very well.

7    (Whereupon, State's Exhibit Number 397 was played for the

8    jury commencing at 1:35 p.m. and concluding at 2:10 p.m.)

9    Q       (By Mr. Becker)  Officer Funelli, we've just heard

10   State's Exhibit 397 and you, I believe, reviewed and

11   testified previously that you reviewed the transcript of that

12   phone call marked as 397-A.  Is that a fair and accurate

13   composite of some of those phone calls that you listened to?

14   A       Yes, sir.

15   Q       All right.  And does the transcript identified in

16   397-A have any substantial corrections to it based upon those

17   tapes that, or the tape that was recorded and marked as

18   State's Exhibit 397?

19   A       No, sir.

20                   MR. BECKER:  All right.  Your Honor, I

21   have nothing further of this witness.

22                   THE COURT:  Cross?

23                   MR. INGRAM:  No questions.
```

```
 1                    THE COURT:  Trooper, thank you very much.

 2                    THE WITNESS:  Thank you, Your Honor.

 3                    MR. BECKER:  Your Honor, we have the next

 4       witness.  And perhaps we should take this down.  Should we

 5       take our break a little early before the next witness?

 6                    THE COURT:  Yeah.  Maybe you should get a

 7       breath of fresh air.  Let's take ten minutes.  You are not to

 8       discuss anything or form any opinion until you return.

 9       (Whereupon, a recess was had commencing at 2:11 p.m. and

10       concluding at 2:24 p.m.)

11                    THE COURT:  Mr. Bailey, you may call your

12       next witness.

13                    MR. BAILEY:  Your Honor, the State calls

14       Patrolman Albert Ray from Howland Township PD.

15                                 *  *  *
```

1    **WHEREUPON,**

2                            **ALBERT RAY,**

3    having been first duly sworn, according to law, was examined

4    and testified as follows:

5                        **DIRECT EXAMINATION**

6    **BY MR. BAILEY:**

7    Q        Officer, do you want to tell the Court and jury your

8    full name, place of employment and position?

9    A        Officer Albert Ray with the Howland Township Police

10   Department.

11   Q        And how long have you been so employed?

12   A        Twenty-six years.

13   Q        And your duties and responsibilities?

14   A        General patrol.

15   Q        Okay.  Now I'm gonna direct your attention to

16   December 12th, 2001 at approximately one minute after

17   midnight.  Were you on duty on that date and time?

18   A        Yes, sir, I was.

19   Q        And at that time, did you have occasion to be

20   dispatched somewhere?

21   A        Yes.

22   Q        Okay.  And what occurred?

23   A        We received a call from the 9-1-1 Center of a

 1    hysterical caller on the line with the 9-1-1 Center from

 2    Avalon Drive.  Myself and Officer Pollcino were dispatched to

 3    the scene.

 4    Q        Was that at 254 Fonderlac, Southeast?

 5    A        Yes, sir, it was.

 6    Q        And in what township, county and state?

 7    A        It was in Howland Township, Trumbull County, State

 8    of Ohio.

 9    Q        Which township?

10    A        Howland Township.

11    Q        Okay.  And how long did it take you to get there?

12    A        Approximately two to three minutes.

13    Q        When you arrived there, what did you observe?

14    A        Upon initial arrival, myself and Officer Pollcino

15    parked on the roadway in front of the residence.  And when we

16    looked at the residence, we observed a white female standing

17    in the front entrance of the residence with the front door

18    open and yelling hysterically and kind of screaming and

19    hollering and trying to attract our attention as we exited

20    our vehicles.

21    Q        Okay.  What did you do?

22    A        We both walked up to who was later identified as

23    Donna Roberts.  We met her about half way in the yard.  She

1   was yelling and screaming about her husband who was lying in

2   the kitchen.  She, we weren't able to make out exactly what

3   she was saying due to her hysterical nature.

4   Q        Okay.  This person you identified as Donna Roberts,

5   do you see her in the courtroom today?

6   A        Yes, sir, I do.

7   Q        Can you point her out?

8   A        Sitting at the defense table in the dark.

9                    MR. BAILEY:  Let the record reflect that

10  the witness identified the defendant.

11                   THE COURT:  The record will so show.

12  Q        (By Mr. Bailey) What happened then?

13  A        At that time, my partner, Officer Pollcino, consoled

14  Miss Roberts as I entered the residence.  As I entered the

15  front door, I looked around and saw a living room to my right

16  and a dining room leading into a kitchen area on my left.  I

17  proceeded into the kitchen area and, at that time, observed

18  what appeared to be a white male laying on the floor at the

19  entrance to a door leading into the garage.

20  Q        Okay.  Did you observe any signs of life with this

21  white male?

22  A        No, sir, I did not.

23  Q        What did you do then?

1    A        Proceeded to look around the immediate area of the

2    kitchen and garage area which, at that time, I observed what

3    appeared to be a nickel, or correction, a blue steel revolver

4    on the one step leading down to the garage which was

5    approximately two steps lower in elevation than the kitchen

6    floor.

7    Q        What, if anything, did you observe in the garage?

8    A        In the garage, I observed a vehicle, I don't recall

9    the exact, it was a Chrysler product, but it was in the

10   right-hand side of the garage.

11   Q        Do you remember the color of this vehicle?

12   A        I believe it was a goldish color, bronze color.

13   Q        Did you mark --

14   A        It wasn't well lit in the garage when I was in

15   there.

16   Q        Afterwards, were you able to determine the color?

17   A        I don't recall at this time, no.

18   Q        Okay.  Do you note it in your report?

19   A        Yes, sir, I do believe I did.

20   Q        Do you need to look at your report?

21   A        Yes, sir, I would.

22                    MR. INGRAM:  Go ahead.

23                    THE WITNESS:  Yes, sir.  It was a red in

1    color Chrysler 300.

2    Q        (By Mr. Bailey)  Okay.  Now, what -- what, if

3    anything, do you notice about the main garage door?

4    A        The garage door, at that time, was down, in a closed

5    position.

6    Q        Okay.  What did you do next?

7    A        I proceeded to look around the residence.  Not

8    knowing whether this was how this victim succumbed to his

9    death, immediately proceeded to establish a crime scene just

10   in case.

11           At that time, I went back and found my partner who

12   was in the living room with Miss Roberts and spoke to him,

13   indicated what I had found and asked him to console her until

14   the paramedics would arrive shortly afterwards.

15   Q        Okay.  Did the paramedics arrive eventually?

16   A        Yes, sir.  Within the next five to ten minutes, they

17   were on the scene.

18   Q        Okay.  Now before the paramedics got there, what did

19   you do?

20   A        I took an initial search around the house looking

21   for any signs of possible damage to the exterior or the

22   perimeter of the house and could find no signs of a break-in

23   or any signs of damage to any of the entrances or exits.

5160

```
 1    Q       Did you locate -- during the search of the

 2    residence, did you find any signs of any forced entry?

 3    A       None whatsoever.

 4    Q       Now, what happened then?

 5    A       In approximately five to ten minutes, as I

 6    indicated, the paramedics arrived and were talking to Miss

 7    Roberts.

 8            At that time, I instructed Officer Pollcino to check

 9    the exterior of the residence for any signs of evidence or,

10    and/or suspects of any type.  And he came, reported back to

11    me shortly afterwards and indicated no, there were no signs

12    of the exterior of the house being forced.

13    Q       Okay.  Now, what did you do after that?

14    A       At that time, I also initiated phone calls to our

15    investigators and also our chief of police at that time and

16    notified them of the, what the, what we had at that time.

17    Q       Who were the detectives that you notified?

18    A       The investigators at that time were Sergeant Frank

19    Dillon and Sergeant Paul Monroe.

20    Q       Okay.  And since then, Officer Monroe has changed

21    positions?

22    A       He has been promoted to the chief of police.

23    Q       Now, what happened next?
```

```
 1    A        Basically, we secured the residence.  Upon the

 2    initial arrival of the EMS personnel, the paramedics, one of

 3    them walked over to the deceased and checked him for any

 4    signs of life, at which time they indicated to me that there

 5    were no signs of life, and we secured the scene until the

 6    investigators arrived.

 7    Q        Now, did both of the detectives get there?

 8    A        Yes, sir.

 9    Q        And what happened then?

10    A        They conducted a crime scene search of the area and

11    notified the coroner, who arrived afterwards, during which

12    time Miss Roberts was in the, at one point, she was in the

13    bedroom of the residence, her bedroom, and I was in there

14    talking to her at the time and Sergeant Monroe came in to the

15    bedroom, explained to Miss Roberts that the house is a crime

16    scene and that we would need to process the crime scene and

17    search for any suspects and/or evidence at that time.

18             Miss Roberts' reply was, "Do whatever you have to do

19    to catch the bastard."

20    Q        Now, while you were at that house, did you observe

21    the defendant, Donna Roberts?

22    A        Yes, sir, I did.

23    Q        And how did she appear during the time that you
```

1    observed her?

2    A        In the approximately one to two hours that I was in

3    contact with her, she had emotional highs and lows during

4    which when she would appear to be sobbing, there was a lack

5    of tears.  There was the emotional part of it, but I didn't

6    notice any tears coming from her eyes.

7                    MR. BAILEY:  Okay.  I'm done asking

8    questions now.  Defense counsel will have an opportunity to

9    ask you some.

10                    THE COURT:  Cross?

11                    **CROSS EXAMINATION**

12    **BY MR. INGRAM:**

13    Q        Good morning or good afternoon.  How are you?  You

14    talked to Donna at one point in time in her bedroom?

15    A        Yes, sir.

16    Q        Was she in her bedroom at points in time alone?

17    A        I don't recall.

18    Q        Do you recall if family relatives, relatives of

19    Donna, were asked to come to the Fonderlac address and help

20    console her and maybe take her to their home?

21    A        Yes, sir.  I believe there was a call made to

22    relatives in Austintown.

23    Q        And were you there when that occurred, when they

1    arrived?

2    A        I do believe I was in the residence.  I don't

3    remember seeing them come in the door though.

4    Q        Were you there when they departed?

5    A        I believe so.  I don't recall at this time.

6    Q        Was she restricted in what she could take from the

7    residence?

8    A        I don't know.  It --

9    Q        Do you know if her movements in the residence were

10   monitored by any police officer?

11   A        Only when she was in my presence did I monitor what

12   I observed.

13   Q        I take it that neither of the detectives that

14   arrived, and that would be Detective Dillon and Detective

15   Monroe, who's now the chief, neither of them asked you to

16   monitor Donna's movements while she was in the house?

17   A        I don't recall that.

18   Q        You indicated that there was a paramedic.  Would

19   that be a Howland Fire Department paramedic by the name of

20   George Beck?

21   A        Yes, sir.

22   Q        You, at some point in time, entered the kitchen; am

23   I correct?

5164

```
 1    A        That is correct.

 2    Q        And Mr. Fingerhut is lying on the ground?

 3    A        On the floor of the kitchen, yes.

 4    Q        And there was blood on the ground?

 5    A        There was puddles of blood.

 6    Q        Did you notice what appeared to be any footprint

 7    impressions in the puddles of blood on the kitchen floor?

 8    A        I don't recall at this time.

 9    Q        You do, do you still have your report or did

10    Mr. Bailey take it back?

11    A        I believe Mr. Bailey has it.

12    Q        Just let me know when you're done.

13    A        Yes, sir.

14    Q        All right.  So my question is does your report make

15    any mention of footprint-type impressions in the puddles of

16    blood on the kitchen floor?

17    A        It appears not.

18    Q        It appears not.  So your answer is no?

19    A        That's correct.

20    Q        Well, it's a two-page report, is it not?

21    A        It's approximately a page and a half.

22    Q        And you've had adequate opportunity to read that one

23    page and a half?
```

```
 1    A          (No response.)

 2    Q          Have you had an adequate opportunity to read that

 3    document?

 4    A          Yes, sir.

 5    Q          There is no mention in that document of footprint

 6    impressions in the pools of blood in the kitchen floor;

 7    correct?

 8    A          That is correct.

 9    Q          When you noticed the gun, the gun is actually on a

10    step in the garage; am I correct?

11    A          That is correct.

12    Q          I think we should back up and describe this.  If

13    you're in the garage, there's one step into the kitchen?

14    A          It's -- that's correct.  One step up into the

15    kitchen.

16    Q          And the gun that you have told the jury you found

17    was on that step from the garage into the kitchen?

18    A          That is correct.

19    Q          It was not in Mr. Fingerhut's hand?

20    A          No, sir.

21    Q          It was not next to Mr. Fingerhut's body?

22    A          It was in close proximity, within a foot or two, of

23    his head which was laying towards the open door.
```

1    Q        But his head was inside the kitchen; correct?

2    A        That is correct.

3    Q        After you found the gun, was your attention then

4    drawn to that particular step?

5    A        Yes, sir.

6    Q        Did you notice any type of footprint impression on

7    that step?

8    A        Not as I recall.

9                        MR. INGRAM:  May I have one moment?

10                       THE COURT:  Yes.

11                       MR. INGRAM:  No further questions.

12                       THE COURT:  Any redirect?

13                       MR. BAILEY:  Just one question.

14                    **REDIRECT EXAMINATION**

15   **BY MR. BAILEY:**

16   Q        Officer, as the first responding officer to that

17   scene, are you responsible for collecting the evidence or

18   crime scene processing?

19   A        Basically just securing the crime scene until the

20   investigators arrive.

21   Q        Okay.  And then it's up to other officers to handle

22   the processing?

23   A        Yes, sir.

1   Q        And taking photographs and collecting evidence?

2   A        Yes, sir.

3                    MR. BAILEY:  Okay.

4                    THE COURT:  Any recross?

5                    MR. INGRAM:  Yes.

6                    **RECROSS EXAMINATION**

7   **BY MR. INGRAM:**

8   Q        You're the first police officer on the scene, you

9   and Officer Pollcino?

10  A        That's correct.

11  Q        You're the first police officer inside the kitchen?

12  A        Yes, sir.

13  Q        And before Detectives Monroe and Dillon arrive, you

14  tell the medical personnel that they can go into the kitchen?

15  A        That's correct.

16  Q        How many of them entered the kitchen?  Do you know?

17  A        To the best of my knowledge, just paramedic George

18  Beck.

19  Q        Do you recall if he was wearing tennis shoes?

20  A        I do not recall at this time.

21                   MR. INGRAM:  No further questions.

22                   THE COURT:  Anything further at this time?

23                   MR. BAILEY:  No further questions.

```
 1                      THE COURT:   Thank you, Officer.   You may
 2       step down.
 3             I understand that exhausts the State's witnesses for
 4       the day?
 5                      MR. BECKER:   Yes, sir.   We had some
 6       unfortunate consequences with some of the witnesses.
 7                      THE COURT:   Yeah.   I understand.   That's
 8       fine.
 9             Ladies and Gentlemen, we're going to adjourn for the
10       day.   Couple people that were supposed to be here to testify
11       had matters come up that was, they were unable to be here.
12       We're going to have a full day of testimony tomorrow.
13             I would again remind you not to watch anything on
14       TV, read anything in the newspaper or have any discussion
15       with anybody about the case.   You all have a nice evening.
16       We'll see you back here tomorrow.   We'll try and get started
17       at 9 if possible.   Okay?   Thank you very much.
18       (At 2:40 p.m., court was adjourned to Wednesday, May 14,
19       2003.)
20                              *  *  *
21
22
23
```

1          **WEDNESDAY, MAY 14, 2003 AT 9:12 A.M.**

2                    THE COURT:  Good morning, folks.

3          State ready to proceed with your evidence?

4                    MR. BAILEY:  Yes, Your Honor.  The State

5     calls Jill Kenyon.

6     **WHEREUPON,**

7                         **JILL KENYON,**

8     having been first duly sworn, according to law, was examined

9     and testified as follows:

10                    **DIRECT EXAMINATION**

11    **BY MR. BAILEY:**

12    Q        Good morning.  Miss Kenyon, do you want to tell the

13    grand jurors and the Court your full name and where you live?

14    A        Jill Kenyon, Warren.

15    Q        Okay.  And where do you work?

16    A        Red Lobster in Niles.

17    Q        And your position there?

18    A        Server.

19    Q        And how long have you been employed at the Red

20    Lobster in Niles?

21    A        Five years.

22    Q        Okay.  Now, where is that in Niles?

23    A        It's on the strip right in front of the mall.

1    Q        Okay.  And about how far is that from downtown

2    Warren here?

3    A        About five, ten minutes.

4    Q        Okay.  And how long -- and have you always been a

5    server or a waitress?

6    A        Yeah.

7    Q        Okay.  What shift do you typically work?

8    A        It varies.  Sometimes lunch, sometimes dinner.

9    Q        Okay.  Now, was there a point in time when some

10   police officers came and talked with you about some customers

11   that came to the Red Lobster?

12   A        Yes.

13   Q        And do you remember what department those officers

14   were from?

15   A        Howland.

16   Q        Now, I'm gonna direct your attention back to

17   December 11th of 2001; do you remember that date?

18   A        Uh-huh.

19   Q        And do you remember in particular some customers

20   coming in that you described to the police officers?

21   A        Yes.

22   Q        Okay.  What do you recollect about those particular

23   customers?

 1    A         She was an older white female.  He was a younger

 2    black male.

 3    Q         Okay.  And do you remember what color hair she had?

 4    A         Red.

 5    Q         And when you say she was older, what do you mean?

 6    A         Mid-fifties.

 7    Q         And how about the male?

 8    A         He was young, about 30.

 9    Q         Okay.  Now, as part of your duties of being a

10    waitress, did you take orders from these people?

11    A         Yes.

12    Q         And what's the system at Red Lobster?  How do you

13    process those orders?

14    A         When I ring it in, they keep track of everything.

15    Like they can keep track of exactly what time everything was

16    rang in.  Like if the drinks were ordered first, you can keep

17    track of what time the drinks were rang in.  And then

18    whenever the order was rang in, it'll keep track of what time

19    that was done too.

20    Q         Okay.  Let me move that microphone just a little bit

21    closer.

22    A         Okay.

23    Q         Let's try that now.  And how, how do you keep track

1    of it?  I mean is there some type of system you use?

2    A        Yeah.  It's a computer system.  Yeah.

3    Q        And do you remember what this couple ordered?

4    A        Yeah.  King crab legs and crab-stuffed flounder.

5    There was a vodka martini and a Long Island Iced Tea.

6    Q        Now do you remember who had what?

7    A        I think he had the king crab legs and she had the

8    crab-stuffed flounder.

9    Q        Okay.  Now, the order sheet, does it show every time

10   you take an order?

11   A        Yes.

12   Q        And sometimes if you get a drink order, you might

13   have appetizers and dinner and dessert.  Does all that

14   reflect on your order?

15   A        Yes.

16   Q        Now I'm gonna hand you what's been marked, I'm gonna

17   hand you what's been marked for identification as State's

18   Exhibit 314.  It's a cellophane envelope and inside of it are

19   some exhibits, 314-A, 314-B, 314-C and 314-D.  I'm gonna ask

20   you to look at those and see if you can identify those.

21   A        Yes.  This first one here is the time that, it's the

22   drinks, it's what the drinks were and what time the drinks

23   were rang in.

```
 1   Q        Is that 314-A?

 2   A        Yes.

 3   Q        Okay.  And what's 314-B?  Oh, let me go back to

 4   314-A.  Does it show the date and time?

 5   A        Yes.  Where's it at?  It says 12-11.  This is the

 6   day it was printed though I do believe.

 7   Q        Okay.  December 11th?

 8   A        Yes.

 9   Q        And does it show your name on there?

10   A        Yes.

11   Q        As being the waitress?

12   A        Uh-huh.

13   Q        And does it reflect the time in military time?

14   A        Yes.  I'm sorry.  Yeah.  1754.

15   Q        Is that 314-A?

16   A        Yeah.

17   Q        Okay.  And that shows the drink order?

18   A        Uh-huh.

19   Q        Okay.  That's at, what, the bottom of this?  1754.

20   Does it show -

21                    MR. INGRAM:  Your Honor, we would

22   stipulate that 314-A shows the drinks that were ordered at

23   1754 military time, which is 5:54 regular time.
```

5174

```
 1                    THE COURT:  Very Good.  So stipulated.
 2    Q        (By Mr. Bailey)  Okay.  Now, do you remember --
 3    okay.  What's 314-B?
 4    A        This is what time the food was rang in.
 5    Q        And what time was that?
 6    A        1800.
 7    Q        So 6:00 --
 8    A        Yeah.
 9    Q        -- in real life?
10    A        Uh-huh.
11    Q        Non-military time.  Okay.  And 314-C?
12    A        Okay.  There was a soft drink that was rang in at
13    the end.  I'm sorry.  That was 1820, which would be 5:20.
14    Q        18 -- 6 something?  Twelve from eighteen is six?
15    A        Okay.
16    Q        6:20?
17    A        Uh-huh.
18    Q        In the evening?
19    A        Yeah.
20    Q        Okay.  And Exhibit 314-D, what's that reflect?
21    A        I think it's just another, is it another copy of the
22    order?  Or there was a coffee.  There was another coffee that
23    was rang in.
```

1    Q        Okay.  Okay.  So -- and 314-E?

2    A        And that is what time they cashed out.

3    Q        And what time was that?

4    A        1843.

5    Q        6:43.  So they were there from 5:47 until 6:43?

6    A        Yes.

7    Q        Okay.  Now --

8    (Whereupon, a discussion was had off the record with

9    counsel.)

10   Q        (By Mr. Bailey)  Let me go back to 314-A; okay?  The

11   time that's on the top there, that 17:47:16, what is that?

12   A        This was the time the drinks were first rang in.

13   Q        Okay.  So -- and you had mentioned, I believe, 1754.

14   What was that?

15   A        That was what time the drinks were rang in.

16   Q        Okay.  But what's at the top of the order?  That's

17   another order?

18   A        Yeah.  That's another order.  That's not me.

19   Q        Okay.  So their order was which one, the 5:54?

20   A        Yeah.  Yeah.

21   Q        Okay.  Not the 5:47 order?

22   A        No.

23   Q        Okay.  So they were there from 5:54 ordering until

5176

```
 1    they cashed out at 6 -- what is that?

 2    A        6:43.

 3    Q        6:43.  Okay.  Now, I'm gonna hand you -- oh, when

 4    they got done with the food order and being served and

 5    eating, you present them with some kind of a bill?

 6    A        Yeah.  It's the final guest check.

 7    Q        I'm sorry.  The final?

 8    A        Guest check.

 9    Q        Guest check.

10             Now, I'm gonna hand you what's been marked for

11    identification as State's Exhibit 315, okay, and I'm gonna

12    ask you to turn that over and see if you can identify that.

13    A        Yeah.  That's the final guest check.  That's the one

14    they were given in the end.

15    Q        Okay.  And does it list a date?

16    A        December 11th.

17    Q        Of 2001?

18    A        Uh-huh.

19    Q        And does it list the time?

20    A        Yeah.  6:43.

21    Q        And does it list a server?

22    A        Yes.  It's me.

23    Q        Okay.  And it reflects their order?
```

1    A        Okay.  Uh-huh.

2    Q        Okay.  What was the amount of that?

3    A        51.77.

4    Q        $51.77?

5    A        Yes.

6    Q        Now when the police came to you after that -- I take

7    it the police came to you after, sometime after that?

8    A        Yeah.

9    Q        And did they ask if you were able to identify the

10   people who, whom you had served?

11   A        Yes.

12   Q        Okay.  And did they show you anything?

13   A        Yeah.  Actually, what they showed me was this

14   paperwork here and then they showed me my final guest check.

15   Q        Okay.  And then after that, did the police -- well,

16   I'm gonna show you what's been marked for identification as

17   316.  Let me hand you what's been marked for identification

18   as 316.  Okay.  Can you identify that?

19   A        Yes.  It was the lineup they originally showed me.

20   Q        Okay.  A photographic lineup?

21   A        Uh-huh.

22   Q        Okay.  And were you able to recognize anybody in

23   that series of photos?

```
 1    A        Yes.

 2    Q        And whom did you recognize?

 3    A        Number six.

 4    Q        And who was that?

 5    A        Nathaniel Jackson.

 6    Q        Okay.  And did you, and was he one of the people you

 7  served that night?

 8    A        Yes.

 9    Q        And did you sign that form?

10    A        Yes.

11                   MR. BAILEY:  Can I have this marked as

12  State's Exhibit 403?

13  (Whereupon, State's Exhibit Number 403 was marked for

14  identification.)

15    Q        I'm gonna show you what's been marked for

16  identification as State's Exhibit 403.  Do you recognize

17  that?

18    A        Yes.

19    Q        And what is that?

20    A        That's the woman I waited on that evening.

21    Q        Okay.  And did you initial that?

22    A        Yes.

23    Q        When did you do that?
```

```
 1    A         The 19th of December.

 2    Q         Okay.  Now, that woman that you waited on that

 3    night, do you see her here in the courtroom today?

 4    A         Yes.

 5    Q         Can you point her out?

 6    A         Yeah.  She's sitting over there.

 7    Q         Over here?

 8    A         Uh-huh.

 9                    MR. BAILEY:  May the record reflect that

10    the witness identified the defendant?

11    Q         (By Mr. Bailey) Does she look any different today

12    from when you saw her?

13                    THE COURT:  The record will so reflect.

14                    MR. BAILEY:  Thanks, Your Honor.

15    A         Different hair color.

16    Q         Different hair color?  Okay.

17                    MR. BAILEY:  Okay.  I'm done with my

18    questions.  Defense counsel are gonna be able to ask you some

19    questions.

20                    THE WITNESS:  Okay.

21                         CROSS EXAMINATION

22    BY MR. INGRAM:

23    Q         Good morning.  How are you?
```

3180

```
 1     A        Good morning.

 2     Q        The Red Lobster is a fairly busy restaurant, is it

 3     not?

 4     A        Yes.

 5     Q        And these two present themselves at the Red Lobster

 6     shortly before 6 p.m?

 7     A        Yes.

 8     Q        And that would be smack dab in the middle of the

 9     dinner hour?

10     A        Yes.

11     Q        And that would be the busiest time of day at the Red

12     Lobster?

13     A        Yeah.

14     Q        Do they ask for a table in a dark corner secluded

15     from the rest of the customers?

16     A        No.

17     Q        They sit there openly in front of everyone?

18     A        Yes.

19                           MR. INGRAM:  No further questions.

20                           THE COURT:  Any redirect?

21                           MR. BAILEY:  No.  No redirect.

22                           THE COURT:  Ma'am, thank you very much.

23     You're excused.
```

```
 1                        THE WITNESS:  Thank you.

 2                        THE COURT:  Next witness.

 3                        MR. BAILEY:  State calls Paula Carson.

 4    WHEREUPON,

 5                           PAULA CARSON,

 6    having been first duly sworn, according to law, was examined

 7    and testified as follows:

 8                        DIRECT EXAMINATION

 9    BY MR. BAILEY:

10    Q        Morning, Miss Carson.

11    A        Morning.

12    Q        Do you want to tell the Court and jury your full

13    name?

14    A        Paula Jo Carson.

15    Q        And where do you live?

16    A        I live in McDonald.

17    Q        I'm sorry?

18    A        I live in McDonald.

19    Q        McDonald.  Okay.  And where do you work?

20    A        I work at Trumbull County 9-1-1.

21    Q        And your position there?

22    A        I'm a dispatcher.

23    Q        And how long have you been so employed?
```

1    A        I have been there since August of '98.

2    Q        Okay.  Now, what do you do there?  What are your

3    duties and responsibilities at the 9-1-1 Center?

4    A        We take 9-1-1 calls.  We take seven-digit calls,

5    which is like non-emergency calls, and we handle, as far as

6    the police departments, when they go on traffic stops, when

7    they go on calls, anything they call out, we also handle that

8    at the same time.

9    Q        Okay.  And can you tell us what shift you typically

10   work at the 9-1-1 Center?

11   A        I'm on midnight turns.  I work --

12   Q        And how long have you been doing that?

13   A        I've been on steady midnight turns for probably

14   close to a year now.  But before then, it was a float shift.

15   Q        Okay.  And midnight turn, what time does that

16   commence?

17   A        It starts at 11 at night, 11 p.m., which is 2300

18   hours, we go by military time, until 7 a.m.

19   Q        Okay.  And did you work last night?

20   A        Yes, I did.

21   Q        Okay.  And can you tell me when you're at the 9-1-1

22   Center, when calls come into your center, are those telephone

23   calls recorded?

1    A        Everything is recorded.  Radio traffic, 9-1-1 calls,

2    the seven-digit lines.  Everything is recorded.

3    Q        And are those phone calls and recordings kept as

4    part of doing business as the 9-1-1 Center?

5    A        Correct.  Everything is kept.  Everything can be

6    taped.  Everything's taped.  You can get a copy of anything.

7    Q        Okay.  And are those tapes made at the time that the

8    calls come in?

9    A        They're recorded at the time the calls come in.

10   When someone requests a tape, they go in and they make it,

11   the supervisor will make it for them, depending upon which

12   call, what traffic they want.  Everything's made.

13   Q        Okay.  Now, I want to direct your attention back I

14   believe it's about 17 months ago, to December 11th and

15   beginning of December 12th of 2001.  Did you work that

16   evening?

17   A        Yes, I did.

18   Q        And what time did you start?

19   A        I started at 11 that night, 2300 hours.

20   Q        Okay.  And did you have occasion to receive a 9-1-1

21   call from Fonderlac Drive?

22   A        Yes, I did.

23   Q        And what happened?

1    A        I answered a 9-1-1 call and there was a female

2    screaming.  And it was hard to get information from her at

3    first because she was so hysterical.  I wasn't sure whether

4    it was a squad call.  I wasn't sure whether it was a suicide.

5    When someone's screaming like that, it's kind of hard to

6    understand them.  You try to get as much information as you

7    can from them for the officers.  As far as medical, whether

8    they need to go out and get a squad out there started.  She

9    was pretty much upset.  I pretty much got the address, I got

10   her name out of her.  And when the officers got there, then

11   they took over as far as the rest of the information from

12   her.

13   Q        Okay.  Now, when the call comes up, when you first

14   get the call, you have like a computer screen?

15   A        Yes.  It's called a KML.  When you get a call from a

16   home, from a residence, it'll bring up the address, the phone

17   number, who the phone is registered to, which township it

18   comes back to.

19   Q        Okay.  So when the phone call comes in, the address

20   is translated from the phone number?

21   A        Correct.

22   Q        And is there a written log or a computerized log

23   that's also kept in connection with those phone calls?

1    A       With the phone calls and the calls, there's, it's

2    written.  It's called a CAD sheet.  It's a computer-generated

3    sheet.

4    Q       What's CAD stand for?

5    A       It's computer automated I think it's data.  It has

6    to do with everything that you put into the call, anything

7    you take, as far as the address, the residence, everything on

8    the 9-1-1 screen will pop up on the CAD sheet.  Any

9    information you put on as far as units on the call, any

10   information that you're given that's put into narrative comes

11   up on the CAD sheet.

12   Q       I'm gonna show you what's been marked for

13   identification as State's Exhibit 1-A.  It's a folder

14   containing some sheets.  And now I'm gonna ask you if you can

15   identify that.

16   A       This is the, the CAD sheet from that night when I

17   took the call.  It gives from the beginning time until the

18   time the call was actually cleared.  It gives the units that

19   was on it, everything as far as what happened that was

20   reported to us is on here.

21   Q       Okay.  Now, what time did that call come in exactly?

22   A       This come in exactly one minute after midnight.

23   Q       One minute after midnight?

```
1    A        Correct.

2    Q        Okay.  And to what phone number was it registered

3    to?

4    A        It was registered to -- you want the actual phone

5    number or the address?

6    Q        Yeah.  The phone number.

7    A        It's 609-7812.

8    Q        Is there, is there a three digit?

9    A        330 is the area code.

10   Q        Okay.  Our area code?

11   A        Area code 330-609-7812.

12   Q        And to whom is that, does the caller's name come up

13   on the screen?

14   A        Correct.  It comes back to a Donna M. Roberts.

15   Q        And an address?

16   A        It comes back to 254 Fonderlac Drive, Southeast, in

17   Howland.

18   Q        Here in Trumbull County?

19   A        Correct.

20   Q        Okay.  And --

21                     MR. INGRAM:  We'll stipulate that's the

22   tape.

23   Q        (By Mr. Bailey)  I'm just gonna show you State's
```

 1    Exhibit 1.  Have you seen this before?

 2    A        Yes.  It's the tape of the call, of the call that I

 3    had took.

 4    Q        Okay.  And have you listened to it before?

 5    A        Yes, I have.

 6    Q        Okay.  And is it a true and accurate representation

 7    of the call that you received that night?

 8    A        Yes, it is.

 9    Q        And is that your initial on the tape?

10    A        Yes.

11              MR. BAILEY:  I'm gonna ask permission to

12    play this tape.

13              THE COURT:  I guess I shouldn't nod my

14    head.  It's yes.

15              MR. BAILEY:  Okay.  Thank you, Your Honor.

16         Oh, the Court wanted me to remind it of something

17    yesterday.

18              MR. BECKER:  Yeah.  We'll do that on the

19    break.

20    (Whereupon, State's Exhibit Number 1 was played for the jury

21    commencing at 8:37 a.m. and concluding at 8:41 a.m.)

22    Q        (By Mr. Bailey)  Now did that truly, is that the

23    call that you received?

```
 1    A        Yes.

 2    Q        Now, as a result of that call, what did you

 3    dispatch?

 4    A        I dispatched that there was the problem, it was hard

 5    to understand her, but that there's a problem with her

 6    husband.  I didn't know whether it was, we didn't know as far

 7    as medical, whether it was suicide, whether, heart attack,

 8    whether, we didn't know exactly what was wrong with him.  She

 9    was very hysterical, hard to understand.

10    Q        So who did you dispatch then?

11    A        We dispatched Howland Police Department and we also

12    dispatched the fire department for Howland.

13    Q        Okay.  The fire department would be the paramedics?

14    A        Correct.

15                  MR. BAILEY:  Okay.  I'm done with my

16    questions.  Defense counsel will have an opportunity to

17    address you.
```

<div align="center"><strong>CROSS EXAMINATION</strong></div>

**BY MR. INGRAM:**

```
20    Q        Morning, Miss Carson.  How are you?  That CAD sheet,

21    what is that, Exhibit 1-A, State's Exhibit 1-A, does that

22    indicate that the call we just listened to came in at 12:01?

23    A        It indicates that it come at 1 after and 20 seconds.
```

1    Q        I'm sorry?

2    A        It come one after and 20 seconds, the exact time

3    that it was received --

4    Q        Okay.

5    A        -- was one minute after and 20 seconds.

6    Q        I'm sorry.  I'm confused.  What time did the call

7    come in?

8    A        It come in one minute after midnight and 20 seconds.

9    Q        One minute and 20 seconds after midnight?

10   A        Correct.

11   Q        Is that -- 12:01 is close enough for my purposes.

12   Is 12:01 about right?

13   A        Correct.

14   Q        Does it also indicate that the Howland Police

15   Department was en route at about 12:03?

16   A        The police department was en route at, correct,

17   three minutes after.

18   Q        Does it indicate that the police department arrived

19   at the Fonderlac residence at 12:05?

20   A        Correct.

21                    MR. INGRAM:  No further questions.

22                    THE COURT:  Any redirect?

23                    MR. BAILEY:  No redirect.

```
 1                      THE COURT:  Thank you, ma'am.  You're

 2      excused.

 3                      MR. BAILEY:  Bridget Paul.

 4      WHEREUPON,

 5                          BRIDGET PAUL,

 6      having been first duly sworn, according to law, was examined

 7      and testified as follows:

 8                        DIRECT EXAMINATION

 9      BY MR. BAILEY:

10      Q       Good morning.

11      A       Morning.

12      Q       Do you want to tell the Court and the jury your full

13      name?

14      A       Bridget Paul.

15      Q       Okay.  And let me just move this up a little bit

16      closer maybe so you don't have to lean forward.  Okay.  And

17      where do you live, ma'am?

18      A       203 Avalon Drive.

19      Q       Okay.  And what township is that located in?

20      A       Trumbull.  Trumbull County.

21      Q       Trumbull County, but I mean are you in Howland?

22      A       Howland.  Howland.

23      Q       Okay.  And where is that in relation to Fonderlac
```

1    Drive?

2    A        It's a street over.

3    Q        And do you work anywhere outside the home?

4    A        No.

5    Q        Okay.  Now, did you become familiar with a woman by

6    the name of Donna Roberts?

7    A        I never met her personally, but she's in the

8    neighborhood and you kind of get to know the neighborhood

9    people.  So I did know her through passing.

10   Q        Okay.  And as part of somebody in the neighborhood,

11   did you become familiar with the kind of car that Donna

12   Roberts drove?

13   A        Yes, I did.

14   Q        Okay.  And what kind of car, can you describe the

15   type of vehicle that she drove?  Let me go back to about 17

16   months ago or so, okay, which would be in December, November

17   and December of 2001.  I think that's about 17 months ago.

18   Can you describe the vehicle?

19   A        Burgundy.  A very nice car.  It was kept clean.  I'm

20   not good at brands, but to see it, I would recognize it.

21   Q        Okay.  Now, I'm gonna hand you what's been marked

22   for identification as State's Exhibits 146, 147 and 148 and

23   149, okay, four photographs, have you seen those before?

```
 1    A        Yes.

 2    Q        Okay.  And do you recognize the vehicle that's in

 3    those photographs?

 4    A        Yes.

 5    Q        Okay.  What is that vehicle?

 6    A        Donna --

 7    Q        Donna Roberts?

 8    A        -- Roberts' car, yes.

 9    Q        Okay.  And those pictures show different angles of

10    that vehicle?

11    A        Yes, it does.

12    Q        Okay.  And whereabouts would you see her in the

13    neighborhood?

14    A        We live on a corner and I would see her.  She would

15    always pause, a long pause at our stop sign and kind of sit

16    there for a few moments.  And we kind of observed her that

17    way.  And whenever she would go through the Avalon Estates,

18    we would kind of watch her.

19    Q        Oh, okay.  Is there a Giant Eagle nearby?

20    A        Yes, there is.

21    Q        And did you ever see her there?

22    A        One time I saw her in the store, but most of the

23    time it was in the allotment or maybe through town I might
```

1    see her once in a while driving.

2    Q        Okay.  And is there anything particular about that

3    vehicle that you see in the pictures that you recognize?

4    A        What comes to my attention last time I saw the car

5    was the back bumper because I was behind her for a long time

6    and just how the reflectors were on both sides of the

7    driver's, the license plate on both sides of the bumper.

8    Q        And one of those photos --

9    A        It --

10   Q        What's the number on the back of the photo that

11   shows that?

12   A        14 --

13   Q        Is that 148?

14   A        Yes.

15   Q        State's Exhibit 148.  Okay.

16            Now I'm gonna direct your attention to about 17

17   months ago, to December 11th of 2001.  Did you see that car

18   that evening?

19   A        Yes, I did.

20   Q        And why do you remember that date in particular?

21   A        I was returning some tapes to Giant Eagle about 9:30

22   that night.

23   Q        Okay.  Tapes, like VHS tapes?

```
 1    A         I believe it was that.

 2    Q         Movies?

 3    A         Movies, yes, for the kids.

 4    Q         Okay.  And did you get some information the next day

 5    that made you remember that evening in particular?

 6    A         Yes.

 7    Q         Okay.  What, what did you find out about?

 8    A         One of my neighbors called and --

 9    Q         As a result -- well, let me phrase it this way.

10              THE COURT:  Just a minute.  Is there an

11    objection?

12              MR. INGRAM:  Not yet.

13    Q         (By Mr. Bailey) Did you learn of any occurrence that

14    had occurred in Howland?

15    A         No, not at this time, until I got a phone call from

16    my neighbor and, a friend of mine, and she said that there

17    was a homicide that was here in Avalon and --

18    Q         Okay.  And so you remember that night?

19    A         Yes.

20    Q         Okay.  Now as a result of that, did you then contact

21    the police department?

22    A         I did eventually.  I --

23    Q         Okay.  And when did you remember first seeing that
```

195

```
 1    car on Tuesday, December 11th?  About what time?

 2    A        It was about, between 9:30 and 10.

 3    Q        In the evening?

 4    A        Yes.

 5    Q        And where did you see it?

 6    A        On old 82.

 7    Q        And where is that in relation to your house?

 8    A        About a block north of where I live.  And I was

 9    going west towards Giant Eagle.

10    Q        Okay.  And which direction was this car that, Donna

11    Roberts' car going?

12    A        Same way I was going, west, towards Warren.

13    Q        Towards Warren?  Okay.  It was on old 82?

14    A        Yes.

15    Q        How many lanes are on that road?

16    A        It's two lanes until it gets to Howland Corners and

17    then it turns into four lanes.

18    Q        Okay.  And Howland Corners, that's what, 46?

19    A        Yes, 46 and old 82.

20    Q        Okay.  And 46 takes you down, if you go south,

21    towards Eastwood Mall?

22    A        Yes, it would.

23    Q        Okay.  And that's the back way into the mall?
```

1    A        Yes.

2    Q        What's right there at the corner of 46 and 82?

3    A        You'd have two gas stations, a doctor's office and

4    Andrews Shop.  And more so, behind the gas station is Giant

5    Eagle.

6    Q        Okay.  Like a plaza; right?

7    A        A plaza, yes.

8    Q        Okay.  How do you get into the Giant Eagle parking

9    lot?

10    A        There's a few ways you can get in, but it's on your

11    left as you go down old 82.  And I would always cut in before

12    the light that was right in front of Giant Eagle and the

13    Howland School.

14    Q        Okay.  Now, was there anything, anything

15    characteristic about Donna Roberts, the driver, that would

16    catch your attention?

17    A        Whenever she would drive her car, she would always

18    have her window down and she would always be smoking her

19    cigarette.  And just the mannerism that she would hold her

20    cigarette to the side.

21    Q        How did she do that?

22    A        Just by flicking her cigarette.

23    Q        Okay.  Any particular style that you refer to it as?

5197

```
 1    A       Well, as I said before, the kids told me it's like a

 2    Hollywood style.

 3    Q       Okay.  So you followed the, about how far did you

 4    follow her car?

 5    A       Pretty much, I would say about a mile.

 6    Q       Okay.  And you were directly behind the car?

 7    A       Yes, I was.  All the way.

 8    Q       And did you have to stop at the light at 46?

 9    A       I paused there.  We were going pretty slow.  I

10    believe by the time I got to the light, it turned and we went

11    through.  But I don't think it was an actual red light.  It

12    was the light before we actually stopped off, stopped

13    completely, which would be Howland-Wilson.

14    Q       Okay.  And then you proceeded down to 46?

15    A       Yes, I did.

16    Q       Do you know what the speed limit is out there?

17    A       I think it's 40 miles.

18    Q       And were you doing the speed limit?

19    A       No.  We were going much slower.

20    Q       Was there any traffic in front of her?

21    A       No.  We were the only --

22    Q       And did that appear unusual to you?

23    A       It was because normally when someone is on the road,
```

5198

1    they'll kind of scoot along if there's no traffic and she was

2    going pretty slow, but I just stayed behind her.  I wanted, I

3    just stayed behind her.

4    Q       Okay.  You were able to observe her license plate?

5    A       Yes, I did.

6    Q       And did it sort of make you agitated?

7    A       It did, but sometimes I just wanted to see what she

8    was up to.

9    Q       Okay.  Once you got to Howland Corners, what

10   happened then?

11   A       We got to Howland Corners, we went through the light

12   at 46 and we continued to the next light, which was right in

13   front of Giant Eagle.  She started to stop, and that's when I

14   veered off into the store parking lot and I continued going

15   up to the tape, to drop the tape off then.

16   Q       How, and what was she doing while you were doing

17   this?

18   A       She was sitting at the light for a pretty long time

19   and I believe it turned green and I kept looking over and I

20   saw her toss her cigarette at the time and I was kind of --

21   I'm against smoking for one thing.  And someone littering, it

22   just kind of got me upset that she would do that.  So I went

23   on and kind of kept looking over because it was taking her so

1   long to move through the lights.

2   Q        Okay.  And do you get to return your videotapes?

3   A        Yes, I did.

4   Q        And did you look back at the defendant in her

5   vehicle?

6   A        I did.  I dropped the tape off and then I glanced

7   back and she seemed like she was moving forward.  But when I

8   moved, when I circled around, the car was gone.  And I

9   thought that was kind of unusual because --

10                    MR. INGRAM:  Objection.

11                    THE COURT:  Yeah.  Objection sustained as

12   to what the witness thought.

13   Q        (By Mr. Bailey) Okay.  Well, what time was this

14   approximately?

15   A        Between 9:30 and 10.

16                    MR. BAILEY:  Thank you very much.  Defense

17   counsel will have an opportunity to ask you some questions.

18                    THE COURT:  Cross?

19                         **CROSS EXAMINATION**

20   **BY MR. INGRAM:**

21   Q        Good morning, ma'am.  How are you?

22   A        I'm sorry?

23   Q        I said good morning.  How are you?

```
 1    A       I'm fine.

 2    Q       You're a bit of a curious person, aren't you?

 3    A       I am?

 4    Q       Yeah.  You chose to follow this car for awhile when

 5    you could have passed it; correct?

 6    A       Yes.

 7    Q       And you are against smoking?

 8    A       Well --

 9    Q       Isn't that what I heard you tell Mr. Bailey?

10    A       Yes.  I mean anyone who litters.  I just, you know,

11    if you're gonna smoke, you can smoke, but just don't throw

12    your butts.  That's all.

13    Q       Okay.  And so you're also against littering?  Is

14    that an accurate statement?

15    A       Yes.

16    Q       Okay.  That car and those exhibits, 146-A through

17    what, D, do you know Robert Fingerhut?

18    A       No.  I never met him, never.

19    Q       Did you ever see --

20    A       I saw him from a distance, but I couldn't --

21    Q       Did you ever see a male drive that car?

22    A       No.

23    Q       Did you ever see Donna drive a car that's similar,
```

5201

```
 1    probably the same make, but silver in color rather than red?

 2    A        No.  It was always the burgundy.

 3    Q        Where is this Giant Eagle?  I'm not familiar with

 4    Warren.  Where is the Giant Eagle?

 5    A        On old 82.

 6    Q        How close to Howland-Wilson Road?

 7    A        Howland-Wilson Road?  Maybe a half a mile.

 8    Q        It's a fact, isn't it, that you didn't realize that

 9    this was Donna's car until you got to Howland-Wilson Road?

10    A        Actually, before I even got to Howland-Wilson.  We

11    started approaching it and there were more lights in that

12    area and I noticed by her arm going out.

13    Q        Okay.  I'm gonna hand you a document and ask you to

14    read that page right there to yourself.

15    A        (Witness complies.)

16    Q        Isn't it a fact that you previously testified under

17    oath that you didn't realize it was Donna's car until you got

18    to Howland-Wilson Road?

19    A        From about here to as we were approaching.  So by

20    the time, yes, I knew that when we made the stop at

21    Howland-Wilson, yes.

22    Q        Did you previously -- my question right now is did

23    you previously testify under oath that you did not realize it
```

3202

```
 1   was Donna's --

 2   A       I guess --

 3   Q       -- car until you got to Howland-Wilson Road?

 4   A       I guess I did.

 5   Q       Is that a hard question to understand?

 6   A       No.

 7   Q       And is that what the written word says?

 8   A       As I -- yes.

 9   Q       And as a matter of fact, Donna always drove slow,

10   didn't she?

11   A       She did.

12                   MR. INGRAM:  No further questions.

13                   THE COURT:  Redirect?

14                   MR. BAILEY:  No further questions.

15                   THE COURT:  Ma'am, thank you so much.

16   You're excused.

17                   THE WITNESS:  Thank you.

18                   MR. BECKER:  Your Honor, State would call

19   James Daniels.

20                   THE COURT:  Okay.  Please proceed.

21                           * * *

22

23
```

1   **WHEREUPON,**

2                           **JAMES DANIELS**,

3   having been first duly affirmed, according to law, was

4   examined and testified as follows:

5                           **DIRECT EXAMINATION**

6   BY MR. BECKER:

7   Q       Sir, would you introduce yourself to this jury,

8   please?

9   A       My name is James Daniels.

10  Q       And Mr. Daniels, where do you live at?

11  A       905 Lanterman Avenue.

12  Q       And how long have you lived there?

13  A       Oh, I lived there about four or five years.

14  Q       Do you work someplace?

15  A       Yes.  I work at the Greyhound bus terminal.

16  Q       And where is that Greyhound bus terminal located at?

17  A       Youngstown, Ohio.

18  Q       Do you happen to know what the address is there?

19  A       340 Federal Plaza West.

20  Q       Okay.  And Mr. Daniels, how long have you worked at

21  the Greyhound bus terminal in Youngstown?

22  A       Oh, about 18 years.

23  Q       What do you do there at the Greyhound bus terminal?

```
 1    A         Terminal manager.

 2    Q         And how long have you been the terminal manager?

 3    A         The terminal manager, well, up until now, about six

 4    years now.

 5    Q         And can you tell this jury what it is that the

 6    terminal manager does at the Greyhound bus station in

 7    Youngstown, Ohio?

 8    A         One of the main things that is done is make sure

 9    that the scheduling is done right and the tickets are, all

10    the employees are doing their job right, the loading of the

11    buses and make sure the customers are satisfied.

12    Q         Okay.  You know what, before we go any further, I

13    see a couple of jurors leaning back.  You might want to get

14    this a little closer to you and maybe move the seat up so you

15    can get into the microphone a little better.

16    A         (Witness complies.)

17    Q         Thank you, Mr. Daniels.

18    A         Okay.

19    Q         All right.  Now Mr. Daniels, were you the terminal

20    manager of the Greyhound bus station in Youngstown in

21    December of 2001?

22    A         Yes.

23    Q         Okay.  Now, do you know if there are any other
```

5205

1    businesses located in that terminal?

2    A        Plaza Donuts, WRTA.

3    Q        And what is the WRTA?

4    A        WRTA is the local transportation service for

5    Youngstown.

6    Q        Now, I want to take you back, Mr. Daniels, to

7    December of 2001.  Who ran the Greyhound bus terminals?  Who

8    did you report to in December of 2001?

9    A        Mr. Robert Fingerhut.

10   Q        And how long had Mr. Robert Fingerhut been your boss

11   in December of 2001?

12   A        In December?

13   Q        In that year, in that month of December of 2001, how

14   long had you been working for Mr. Fingerhut prior to that?

15   A        He got there about in '88 so about two years I

16   think.

17   Q        '88 or '98?

18   A        '98.  I'm sorry.

19   Q        Okay.  So about two, almost three years?

20   A        Yes.

21   Q        And do you know how he came to acquire the Greyhound

22   bus terminal or how he came to run the station?

23   A        There was an opening.  The predecessor resigned from

5206

```
 1    the position so they had a, they were looking for somebody to
 2    occupy that same position.
 3    Q        Okay.  And was your relationship with Mr. Fingerhut
 4    on just a professional level, a working level?
 5    A        Well, we came, we talked a lot.  You know.  Just
 6    friendly.
 7    Q        A lot of down time between when buses would come
 8    that you would have occasion to speak to him?
 9    A        Yes.
10    Q        Okay.  And how would you describe your relationship
11    with Mr. Fingerhut?  Was it a good relationship, a bad
12    relationship?
13    A        It was a good relationship.
14    Q        All right.  Now did you ever know Mr. Fingerhut to
15    have a significant other in his life, either a wife or a
16    girlfriend or someone that he held out as his wife?
17    A        The only one I know is Miss Roberts.  That's the
18    only one I know of.
19    Q        Do you know what Miss Roberts' first name was?
20    A        Donna.
21    Q        Now, Mr. Fingerhut -- well, first of all, let me go
22    back and ask you.  What shift did you generally work when you
23    worked for Mr. Fingerhut?
```

1    A        Morning shift.

2    Q        Okay.

3    A        From 7 to 3:30.

4    Q        And when would Mr. Fingerhut arrive at the Greyhound

5    bus station?

6    A        Most of the time, he worked in the afternoons.  He'd

7    usually be there at around 3 or a little bit before 3.

8    Q        And was there a reason that you were there in the

9    morning and he sort of came in in the afternoon?

10   A        No particular reason.  Most of the time he wanted to

11   be in Warren in the morning sometimes but, you know, that's

12   the shift I always had, the morning shift.

13   Q        Now, what was the significance of him having to be

14   in Warren?  What was in Warren?

15   A        Well, he was also the owner of Warren bus station

16   also.

17   Q        So he had actually two different locations for this

18   Greyhound bus terminal; is that right?

19   A        Right.  Correct.

20   Q        Now, in December of 2001 -- well, let me strike

21   that.

22            What kind of work did Robert Fingerhut do when he

23   was at the Youngstown bus terminal?  What was he in charge of

5208

1    doing?

2    A        His main, when he was at work, the main thing, he

3    sold tickets, answered the phone, gave information.  Sometime

4    he would do some paperwork every now and then.

5    Q        Okay.  Now, Mr. Daniels, I've never been to the

6    Greyhound bus terminal in Youngstown.  Do you think you could

7    describe the layout of where the terminal is in that building

8    and maybe, is it just a large room or there's an office or

9    what is in there?

10   A        The terminal has a large lobby area which is located

11   at the rear of the building.  The ticket counter and the WRTA

12   is located at the right, if you're coming in, the right rear

13   side.  The WRTA is on the far right and Greyhound is on the

14   left.  We share the same ticket window or information window.

15   Q        All right.  Would you describe that as larger or

16   smaller than this room, this courtroom?

17   A        It's larger.

18   Q        Much larger?

19   A        Yes.

20   Q        All right.  Now, I assume that station can get busy

21   when buses come in?

22   A        Yes.

23   Q        In addition to the Greyhound bus terminal there,

5209

 1    when, how often would the WRTA buses come in?

 2    A        They come in at the top of the hour and the bottom

 3    of the hour.

 4    Q        So every half hour, there's a WRTA bus.  And that is

 5    the local Warren, I'm sorry, the Western Reserve Transit

 6    Authority buses?

 7    A        Yes.

 8    Q        So there would generally be quite a bit of people

 9    milling about there?

10    A        Correct.

11    Q        Now, at one point, I believe there was a restaurant

12    located in the terminal; is that correct?

13    A        That is correct.

14    Q        Do you recall what the name of that restaurant was?

15    A        Just the Ticket.

16    Q        And do you recall who ran that restaurant?

17    A        Mr. Fingerhut and Donna Roberts.

18    Q        Was Miss Roberts there more often when the

19    restaurant was open or was she there about the same amount of

20    time or was she there less time when the restaurant was open?

21    A        When the restaurant was open, she was there mostly

22    all the time.

23    Q        When the restaurant was open?

1    A       Yes.

2    Q       Do you know what she did at the restaurant?

3    A       Well, she was always over there doing -- I'm not

4    always over there so.

5    Q       You're busy doing your thing with the Greyhound bus

6    terminal?

7    A       Yeah.  I know something was going on over there.

8    Q       What do you mean, you know something was going on?

9    A       Well, you know, they were waiting on customers and

10   so on and so forth.

11   Q       Right.  Okay.  So they were busy too?

12   A       Yeah.

13   Q       At some point, did that Greyhound, or I'm sorry, did

14   that restaurant have to close or did Mr. Fingerhut close that

15   restaurant?

16   A       Yes.  A little bit before that, they had closed the

17   restaurant.  I don't remember the exact reason why.

18   Q       Little bit before December of 2001?

19   A       Yeah.  I don't remember how long.  About, it was a

20   little while before that.  I can't remember when it was.

21   Q       Could have been six months, could have been maybe

22   less than a year, more than a year?

23   A       About six months, yes, sir.

5211

```
 1    Q        So maybe summer, mid-summer, early summer of 2001

 2    the restaurant closed?

 3    A        Something like that.

 4    Q        Now when the restaurant closed, did you see Miss

 5    Roberts around as much?

 6    A        No.

 7    Q        How often would you see Miss Roberts at the

 8    Greyhound bus terminal?

 9    A        You would, very seldom.  She'd come every now and

10    then.

11    Q        Okay.  Would she call the Greyhound bus terminal

12    after the restaurant closed?

13    A        Yes, sometime, looking for Mr. Fingerhut.

14    Q        How often would she call the Greyhound bus terminal

15    looking for Mr. Fingerhut?

16    A        Maybe, oh, if I'm there, about maybe about two or

17    three times.  It depends.  You know.

18    Q        Now, the Donna Roberts that you're familiar with, do

19    you see her in the courtroom today?

20    A        Yes.

21    Q        Could you please point to her?

22    A        She is over there (indicating.)

23                    MR. BECKER:  All right.  I'm gonna ask the
```

 1    Court to allow the record to reflect that he has, in fact,

 2    identified the defendant.

 3                    THE COURT:  The record will reflect.

 4                    MR. BECKER:  Thank you, Your Honor.

 5    Q       (By Mr. Becker) Now, when you were working at the

 6    Greyhound bus terminal, who generally paid the bills and sent

 7    out the payroll and did the paperwork?

 8    A       Basically Miss Roberts and Mr. Fingerhut I believe.

 9    At one time.  And then they turned it over to a payroll

10    agency.

11    Q       All right.  So essentially they just turned it over

12    to some agency that would make the payroll?

13    A       Right.

14    Q       Now, I want to direct your attention to some

15    security there.  Was there some cameras in that business,

16    Greyhound bus terminal?

17    A       Yes.

18    Q       Do you know how many there were?

19    A       Nine.

20    Q       And do you know where they were focused at, what

21    types of, where they were focused at in the actual terminal

22    itself?

23    A       They had one camera focused on the parking lot, one

5213

1    camera focused on the, where the Greyhound buses would come

2    in, the other camera would be focused in the baggage area,

3    the other camera was located near the rest rooms, the other

4    one was, one was focused down the hallway to the front

5    entrance.  Let's see here.  There was one focused towards the

6    donut shop at the entrance.

7    Q        Now were those cameras that you could get access to

8    as an employee of Greyhound, you could get the tapes out?

9    A        No.

10   Q        Who had the tapes to those?

11   A        The security.

12   Q        The security people?

13   A        And Mr. Diaz from WRTA.

14   Q        Miguel Diaz?

15   A        Yes.

16   Q        And did Miguel Diaz have some people that worked

17   security for him?

18   A        Yes.

19   Q        And were those officers of the Mahoning County

20   Sheriff's Department generally?

21   A        That is correct.

22   Q        Was one of those individuals a fellow by of name of

23   Joe or Jose Sanchez?

5214

```
 1    A         That is correct.

 2    Q         All right.  Now, I want to direct your attention

 3    back to December of 2001.  In December of 2001, did you know

 4    what kind of vehicle Mr. Fingerhut drove?

 5    A         A grey Chrysler 3000.

 6    Q         And do you know what type of vehicle Mrs. Roberts

 7    drove?

 8    A         It was a maroon, but same car, Chrysler 3000.

 9    Q         And specifically on December 11, 2001, during your

10    work shift, I'm assuming you'd recall that Tuesday?

11    A         Yes.

12    Q         You showed up at your regular time at work?

13    A         Correct.

14    Q         You left at your general time of work, about 3,

15    3:30?

16    A         Yes.

17    Q         I think you just said?

18    A         Yes.

19    Q         Did you receive any phone calls from Donna Roberts

20    that day?

21    A         Yes.  About three of them.

22    Q         And do you know what the nature of her calls were?

23    What did she want?
```

```
 1    A        She wanted to know if Robert was there and he
 2    hadn't, had he got there yet.
 3    Q        Was there anything unusual about those calls that
 4    struck you as odd?
 5    A        Because it was, it was just frequent.  You know.
 6    That's the only thing.  It was frequent.  Wanted to know has
 7    he got there yet or something.
 8    Q        Were those calls in the morning or afternoon?
 9    A        It was around 1:30, 2:00.
10    Q        And you received at least three phone calls from
11    her?
12    A        Yeah.
13    Q        Can you describe the tone of her voice?
14    A        Like she really wanted to, you know, wanted to see
15    him.
16    Q        To speak to him you mean?
17    A        Speak to him, yeah.
18    Q        Now, at some point, you left at 3:30 at your regular
19    time on December 11th; is that correct?
20    A        Yes.
21    Q        Did you say good-bye or did you leave any
22    instructions with Mr. Fingerhut?
23    A        I only just said the same thing as I'd usually say
```

1    to him, what was going on that day, and he was always telling

2    me jokingly, "Jimmy D, don't leave me here to rot."

3    Q        Okay.

4    A        That's the last thing he told me.

5    Q        And he didn't mean that literally?  It was sort of a

6    joke you're saying?

7    A        Yes.  He always told me that.

8    Q        He always told you that?

9    A        Yeah.

10   Q        Okay.  And would that have been the last time you

11   saw Mr. Fingerhut alive?

12   A        Yes.

13   Q        Now, do you recall coming in to work -- well, strike

14   that.

15            Do you recall what he was wearing when you left work

16   that day?

17   A        Some sort of baseball jersey.

18   Q        Was that unusual for him?

19   A        He wore it all the time, all kinds of different

20   jerseys and things.

21   Q        And when you left the office that day, did you find

22   out anything the next morning when you came to work December

23   12th or did you hear anything that had happened to

1    Mr. Fingerhut?

2    A        When I came in, the deputies pulled me over and

3    said, "There's something going on with Mr. Fingerhut."

4             He wouldn't tell me exactly what it was.  They said

5    they think he got killed or something.

6    Q        Now, directing your attention to that next day,

7    which was Wednesday, December 12th.

8    A        Right.

9    Q        This would have been the first time you walked into

10   the terminal that you were advised by someone that

11   Mr. Fingerhut had been killed?

12   A        Correct.

13   Q        Did you speak to Donna Roberts on December 12th?

14   A        Yes.

15   Q        What did you speak to Donna Roberts about?

16   A        Concerning the payroll.

17   Q        And why was that important to speak to her on that

18   particular day, that Wednesday?

19   A        That was, it was talking about how we're gonna get

20   paid.  We just wanted to know how we were gonna, the staff

21   was gonna get paid.

22   Q        Now that Mr. Fingerhut had passed on?

23   A        Yes.

```
 1    Q        Did she come into the station or was this a

 2    telephone call?

 3    A        This was a telephone call.

 4    Q        And did she say anything about Mr. Fingerhut to you?

 5    A        Yes.

 6    Q        What did she tell you?

 7    A        She said that Robert was gone.

 8    Q        And did she cry?

 9    A        Yes.

10    Q        Did it sound to you anything unusual about her

11    crying?

12                        MR. INGRAM:  Objection.

13                        MR. JUHASZ:  Objection.

14                        THE COURT:  Yes.  What's your objection?

15                        MR. INGRAM:  Calls for absolute

16    speculation on the part of the witness.

17                        THE COURT:  That's what I thought.  Yeah.

18    I'd sustain the objection.

19                        MR. BECKER:  All right.

20    Q        (By Mr. Becker) When you went -- well, let me ask

21    you this.  Did you go to Mr. Fingerhut's funeral?

22    A        Yes.

23    Q        Did you see Miss Roberts there?
```

```
 1    A        Yes.

 2    Q        Can you describe how she acted at the funeral?

 3    A        It wasn't, it was, it was, it was not usual.  It

 4    just, I hadn't never seen anyone act like that at a funeral.

 5    Q        You had been to funerals before this; correct?

 6    A        Yes.

 7    Q        How was she acting?

 8    A        Well, a little odd to me.  To me.  I know she was

 9    sad, but it was just not of the norm to me.

10    Q        Did you make a comment to your wife about her

11    behavior?

12    A        Yes.

13    Q        And what was that comment?

14    A        "This don't seem right to me."

15    Q        Now, did you notice a change in the relationship

16    between Donna Roberts and Robert Fingerhut after the closure

17    of that restaurant called Just the Ticket?

18    A        Well, like said, I don't usually see her that much

19    but, you know, they would usually talk sometime, you know, on

20    the phone.

21    Q        Okay.  You didn't notice anything unusual, though,

22    after the closing in either one of their behavior?

23    A        Well, Miss Roberts was a little different.
```

```
 1    Q          Different in what sense?

 2    A          Well, she --

 3                     MR. INGRAM:  I object to the question.

 4    May we approach?

 5                     MR. BECKER:  I'll withdraw it.  I'll

 6    withdraw it.

 7          Thank you very much, Mr. Daniels.  I believe these

 8    gentlemen will have some questions for you.

 9                        CROSS EXAMINATION

10    BY MR. INGRAM:

11    Q          Hi, Mr. Daniels.  How are you?

12    A          Yes, sir.

13    Q          Are you a trained psychologist by any chance?

14    A          Trained psychologist?

15    Q          Uh-huh.

16    A          No, I'm not, sir.

17    Q          Do you have any psychological training at all?

18    A          No.

19    Q          Do you still work for Greyhound?

20    A          Yes.

21    Q          So Greyhound did not go bankrupt after 9-11?

22    A          No, they didn't.

23    Q          Is there an owner/operator of the Youngstown
```

1    Greyhound terminal today?

2    A        Correct.

3    Q        Who is that?

4    A        Deanna Baum.

5    Q        Who?

6    A        Deanna Baum.

7    Q        So after Mr. Fingerhut passed away, the current

8    owner/operator purchased the business from Greyhound?

9    A        Correct.

10   Q        And as I recall your testimony, Mr. Fingerhut bought

11   or Donna and Mr. Fingerhut bought the rights to the Greyhound

12   terminal about three years before Mr. Fingerhut's death in

13   1998?

14   A        Correct.

15   Q        So it was not nine years before his death?

16   A        No.

17   Q        Did Donna work the restaurant Just the Ticket?

18   A        Yes.

19   Q        And would she come to work every day?

20   A        I'd see her mostly every day at the restaurant.

21   Q        And Mr. Fingerhut, while Donna was working the

22   restaurant, Mr. Fingerhut would work the bus section?

23   A        Sometimes he'd be at the restaurant also.  Most of

1    the time, I'd see him over -- he's back and forth.

2    Q         And that restaurant closed on or about December 20th

3    of 1999?  Does that sound about right?

4    A         Yeah.  Somewhere in that area, yes, sir.

5    Q         And after that restaurant closed, there was no

6    longer the need for Donna to be at the Youngstown terminal as

7    often as she had been when the restaurant was open; am I

8    right?

9    A         Correct.

10   Q         Did I hear you say that it was not uncommon for

11   Donna to call Mr. Fingerhut two, three, four times a day?

12   A         Sometimes.  Yes.

13   Q         Can we talk about cars for a second?

14   A         All right.

15   Q         There were two Chryslers; am I right?

16   A         Yes.

17   Q         And one was newer than the other one?

18   A         Well --

19   Q         Do you know that to be true or not?

20   A         I don't know how new they were.  They looked about

21   the same.

22   Q         Did they trade cars off and on or would one

23   consistently drive one car and the other one consistently

1    drive the other car?

2    A       As I can remember it, Mr. Fingerhut always drove the

3    gray car.

4    Q       Now were you --

5                    MR. INGRAM:  May I have one second, Your

6    Honor?

7            Thank you.

8    Q       (By Mr. Ingram) Were you at work -- you were at work

9    on December 11th?

10   A       Right.

11   Q       And your duty shift is from 7 in the morning until 3

12   in the afternoon and I believe you told Mr. Becker that you

13   left on the 11th at 3:30?

14   A       Yes.

15   Q       Mr. Fingerhut would have been, would have arrived

16   shortly before 3?

17   A       Well, on that day, he arrived about 3:05 or

18   something like that.

19   Q       And Frank Reynolds was also working that day?

20   A       In the morning time.  He wasn't there at that time.

21   Q       He wasn't there at 3:05?

22   A       No, he wasn't.

23   Q       What time do you think Mr. Reynolds left?

1    A       He's in and out of the place.  He's not like what
2    you call a regular person that stays on.  Only when the bus
3    came.  So he was in and out.  So the last time I remember
4    seeing him was like around 9 or so.
5    Q       Nine in the morning?
6    A       Yes.
7    Q       There is an, is there a little office for the
8    Greyhound portion of the terminal?
9    A       An office?
10   Q       Uh-huh.
11   A       Yeah.  Well, it's separated, the Greyhound side and
12   WRTA side.
13   Q       Well, Mr. Fingerhut would sell tickets and take
14   money?
15   A       Correct.
16   Q       Or you would sell tickets and take money?
17   A       Right.
18   Q       When you sold tickets and took money, were you in an
19   enclosed space that had a door that you would have to open so
20   the people could come in?
21   A       The people, as customers you say?
22   Q       No.  Say if you were selling tickets and Robert had
23   to get to where you were, did you have to let him in?

1    A       Yeah.  Well, he had his own key.

2    Q       Okay.  You either had to have a key or somebody had

3    to let you in?

4    A       Yes.

5    Q       And describe this space for me.  Would you call it

6    an office?  Would you call it a ticket booth?  What would you

7    call it?

8    A       Well, it could be an office/ticket booth because you

9    have a desk and a certain section of that area is for ticket

10   transactions.

11   Q       If you're standing outside of the office/ticket

12   booth, can you see inside of it?

13   A       Yes.

14   Q       Did you see Frank Reynolds and Robert Fingerhut in

15   that office/ticket booth anytime between 2:30 and 3:30 on

16   December 11th, 2001?

17   A       No.  He wasn't there.  I can't remember.

18   Q       He was not there?

19   A       No.  I don't remember seeing him.

20   Q       Did you see Donna Roberts in this office/ticket

21   booth anytime between 2:30 and 3:30 on Tuesday, December

22   11th?

23   A       No.  She wasn't there.

3226

1    Q       She was not there.  As a matter of fact, you told us

2    she's on the phone talking to you at about that time; right?

3    A       Right.

4               MR. INGRAM:  No further questions.

5                   **REDIRECT EXAMINATION**

6    **BY MR. BECKER:**

7    Q       Mr. Daniels, could Mr. Reynolds have been there that

8    day in that office?

9    A       He probably could.

10    Q       With Mr. Fingerhut?

11    A       It's possible.  He's, like I said, he could be in

12    and out.

13    Q       You just don't recall seeing him there?

14    A       I don't recall seeing him there.

15    Q       And do you recall whether or not Miss Roberts was in

16    that day if you recall?

17    A       No.  She wasn't, I can't remember her being there,

18    no.

19    Q       But, again, she could have been, maybe while you

20    were doing something else?

21    A       It's always a possibility.

22    Q       People are in and out of there and sometimes you may

23    not know who's in that office?

1    A        Correct.

2    Q        So it's conceivable that on December 11th, without

3    you knowing, Mrs. Roberts --

4                         MR. INGRAM:  Objection to it's

5    conceivable.  I have been very liberal as it is.

6                         THE COURT:  Just a minute.

7                         MR. BECKER:  Let me withdraw the question.

8                         THE COURT:  Rephrase your question.

9                         MR. BECKER:  Let me rephrase my question.

10   Q        (By Mr. Becker)  Are you aware of every person that

11   was in the office on December 11th, 2001?

12   A        Not all the time because sometime I have to go

13   outside.

14   Q        Okay.  And -- well, strike that.  Would

15   Mr. Reynolds, during the course of your employment, ever have

16   been in that office?

17   A        Yes.  He had his own key to get in and out.

18   Q        Mr. Reynolds did?

19   A        Uh-huh.

20   Q        And would Miss Roberts sometimes be in the office of

21   the Greyhound bus terminal?

22   A        Well, like I said, I never hardly ever see her,

23   but --

5228

```
 1    Q        Did you ever see her in the office?

 2    A        Well, one time she came one day just to say hello.

 3    That was like about two or three, about three or four days or

 4    a week before.  Just told me that she wanted to say hello to

 5    me and left.

 6                      MR. BECKER:  All right.  I have nothing

 7    further.

 8                      MR. INGRAM:  I do.

 9                      RECROSS EXAMINATION

10    BY MR. INGRAM:

11    Q        You were inside the Greyhound terminal or about

12    there at about 10:30, 11:30 in the morning?

13    A        Yeah.

14    Q        And in order to get in, you have to walk through two

15    glass doors and there would be a vestibule or a space

16    in-between?

17    A        Yes.

18    Q        Did you see Donna Roberts hugging and kissing a

19    black man in-between those two doors between 10:30 and 11:30

20    in the morning on December 11th, 2001?

21    A        No, I didn't.

22                      MR. INGRAM:  No further questions.

23                      THE COURT:  Any redirect?
```

1        MR. BECKER:  Yeah.

2                **FURTHER REDIRECT EXAMINATION**

3    **BY MR. BECKER:**

4    Q        How many sets of double doors are in the Greyhound

5    bus terminal?

6    A        There's one section toward the street that has a

7    vestibule area.  That's near where the restaurant was.

8    Another door is toward the rear of the terminal.  That's

9    where most of the people come in and out, that area.  There's

10   a vestibule area there also.

11   Q        So how many total?

12   A        Two.  Two separate areas there.

13   Q        Were part of your job duties in December of 2001 to

14   watch these areas?

15   A        No.  I just, it's just where I'm at.

16   Q        Doing your paperwork and the things you had to do?

17   A        Correct.

18                        MR. BECKER:  I have no further questions.

19                        THE COURT:  Anything further on cross?

20                        MR. INGRAM:  Nothing further.

21                        MR. BECKER:  Your Honor, may we approach?

22                        THE COURT:  Yes.

23                        MR. BECKER:  Oh, I'm sorry.  Mr. Daniels

 1   may be excused.

 2                     THE COURT:  Thank you.

 3   (Whereupon, a conference was held at the bench.)

 4                     THE COURT:  We're gonna take a 15-minute

 5   break, folks.  Not to discuss anything or form any opinion

 6   until you return.

 7   (Whereupon, a recess was had commencing at 10:28 a.m. and

 8   concluding at 10:45 a.m.)

 9                     THE COURT:  You may call your next

10   witness.

11                     MR. BAILEY:  The State's gonna call Deputy

12   Jose Sanchez from Mahoning County Sheriff's Office.

13                              *  *  *

14

15

16

17

18

19

20

21

22

23

1    WHEREUPON,

2                            JOSE SANCHEZ,

3    having been first duly sworn, according to law, was examined

4    and testified as follows:

5                        DIRECT EXAMINATION

6    BY MR. BAILEY:

7    Q        Good morning.

8    A        Good morning.

9    Q        Deputy Sanchez, do you want to tell the Court and

10   jury your full name and your place of employment and

11   position?

12   A        Yes, sir.  Jose Sanchez, Mahoning County Sheriff's

13   Office.

14   Q        Okay.  And what's your position with the Sheriff's

15   Office?

16   A        I'm a deputy sheriff.

17   Q        And how long have you been so employed?

18   A        Three years.

19   Q        And your duties and responsibilities as a deputy?

20   A        Provide security services for the jail, the

21   courthouse and odd jobs.

22   Q        Okay.  Now, is there a time when you took an extra

23   job as an employee of WRTA?

1    A        Correct.

2    Q        What is WRTA?

3    A        That's the transportation services for Mahoning, as

4    well as Trumbull.

5    Q        Okay.  And when was that?

6    A        That would be July of '99.

7    Q        And that was a part-time job?

8    A        Yes.

9    Q        And where did you work as part of that part-time

10   employment?

11   A        Federal station, downtown Youngstown, 340 Federal

12   Plaza West.

13   Q        Okay.  And what amount of time would you work and

14   what were your hours there approximately?

15   A        About 32 hours a week.

16   Q        Are you still working there?

17   A        No.

18   Q        Okay.  When did you discontinue your employment?

19   A        That would have been April of 2002.

20   Q        Okay.  Now, when you were employed in 1999, who was

21   the owner and operator of the Greyhound bus part of that

22   business?

23   A        Robert Fingerhut.

5233

```
 1    Q         And did you know Mr. Fingerhut?

 2    A         Yes.

 3    Q         And did you get along well with him?

 4    A         Yes, I did.

 5    Q         What kind of person was he?

 6    A         Pretty much a business person.

 7    Q         Okay.  And how often would you work with him during

 8    the week in 1999?

 9    A         He would come in in the evenings and work the

10    station as a ticket agent and I work a lot of evenings also

11    so.

12    Q         Okay.  Now, let's go back in time to about 17 months

13    ago to December 11th of 2001.  Do you remember that

14    particular evening?

15    A         Yes.

16    Q         Okay.  And did you work at the Greyhound bus

17    station, WRTA, that particular evening?

18    A         Yes.

19    Q         What time did you work there?

20    A         I worked from 6:00 until 10.

21    Q         And who was working for the Greyhound bus company

22    when you came to work?

23    A         Mr. Fingerhut.
```

5234

```
 1    Q        Was he by himself?

 2    A        Yes.

 3    Q        Do you know Donna Roberts?

 4    A        Yes.

 5    Q        And how would you describe their relationship, Donna

 6    Roberts and Mr. Fingerhut?

 7    A        From what I understood, they were married.

 8    Q        Okay.  Would you see her in Youngstown at times?

 9    A        Yes.

10    Q        And did she work there very often?

11    A        Yeah.  She would come in sometimes and work with

12    him.

13    Q        Okay.  And where would she work there?

14    A        They used to have a restaurant inside the station,

15    inside federal station.  There used to be a little restaurant

16    called Just the Ticket.

17    Q        Just the Ticket?

18    A        Yeah.  And she pretty much was in charge of that.

19    Q        Okay.  And did that business stop running as a

20    business at sometime?

21    A        Yeah.

22    Q        When did that restaurant close up if you remember?

23    A        I can't recall the time, but it was -- prior to that
```

1    incident, it was I'd say at least six to eight months at

2    least.

3                        MR. INGRAM:  We're willing to stipulate

4    that business closed in December of 1999.

5                        THE COURT:  Okay.  That's stipulated to.

6    The jury can accept that as true.

7    Q        (By Mr. Bailey)  Okay.  Now, were you familiar with

8    the type of vehicle that Mr. Fingerhut drove?

9    A        Yes.

10   Q        What kind of car was that?

11   A        Chrysler 300M.

12   Q        And do you know what type of vehicle Donna Roberts

13   drove?

14   A        I believe it was the same.  They used to alternate

15   cars.  They had a silver one and a red one.

16   Q        Okay.  Now, did you know a fellow by the name of

17   Nathaniel Jackson?

18   A        Yes.

19   Q        Did you ever see him at the Greyhound bus terminal?

20   A        Yeah.

21   Q        And how'd you get along with Donna Roberts?

22   A        Good.

23   Q        Okay.  Were you aware of any problems between Donna

```
 1    Roberts and Robert Fingerhut while you were working there?

 2    A        No.

 3    Q        Okay.  Now on December 11th of 2001, that evening

 4    between 6 and 10, was Mr. Fingerhut, while you were there and

 5    Mr. Fingerhut was there, was anybody working with him?

 6    A        No.

 7    Q        And who were the other employees that would have

 8    been working at that point in time for Mr. Fingerhut?

 9    A        The supervisor was Mr. Daniels and there was a

10    Melvin Williams and a Frank Reynolds.

11    Q        Okay.  And Frank Reynolds worked there part time for

12    Mr. Fingerhut?

13    A        Yes.

14    Q        Okay.  What did he do there if you remember?

15    A        Load and unload the luggage from the Greyhound

16    buses.

17    Q        Okay.  Are there cameras in that facility?  Were

18    there cameras at that time in the facility, the bus station?

19    A        Yes.

20    Q        Do you remember how many?

21    A        There were at least nine that I can recall.

22    Q        Okay.  You know there were cameras, though; right?

23    A        Yes.
```

1    Q       Did the cameras have recording devices?  I mean did

2    they work?

3    A       Yes.

4    Q       And you were there, what was your job there at the

5    WRTA and the Greyhound bus station?

6    A       Provide security services for, for the staff, the

7    bus drivers and the people in general at Greyhound.

8    Q       Okay.  Now, do you remember what Mr. Fingerhut was

9    wearing on December 11th?

10   A       Blue jeans and I believe he had a sweat shirt on and

11   he used to wear a Cincinnati Reds jacket.

12   Q       Did he have a sweater?

13   A       Like a sweat shirt.  He used to wear a lot of

14   sports, like hockey shirts.

15   Q       Okay.  Now, when Mr. Fingerhut worked there, what

16   would he be doing?  I mean what's his job there?

17   A       Basically to sell tickets, Greyhound tickets.

18   Q       Okay.  Did he ever help load and unload buses?

19   A       That particular night, yeah, he did.  He didn't have

20   nobody else working with him.  So he had to do, load and

21   unload buses.

22   Q       Would you spend much, did you spend much time that

23   December 11th watching him or being with him at that shift

1   that you worked that night?

2   A          Yeah.  I mean it's a small place so, you know,

3   everybody's always, you know, there.

4   Q          How many offices are in that building?

5   A          There's the WRTA office and right next to it there's

6   the ticket office for Greyhound.

7   Q          Okay.  So, and where the ticket agents are, is there

8   a window there?

9   A          Yeah.

10  Q          And how far away would you be from him when he'd be

11  in his office or ticket window?

12  A          A lot of times I would stand like, like the offices

13  are divided by a cubicle kind of thing, little wall, so where

14  the front window is, there's an opening.  So a lot of times

15  he'll be leaning over and I'll be on the other side and we'd

16  be talking.

17  Q          Okay.  And you talked to him on December 11th?

18  A          Yes.

19  Q          And how did he appear as far as his mood that night?

20  A          Same as always.  You know.

21  Q          Did he joke a lot?

22  A          Yeah.

23  Q          Okay.  Notice anything unusual about him?

```
 1   A        No.

 2   Q        Now, how many buses came to the Greyhound station

 3   that evening while you worked?

 4   A        Two.

 5   Q        Do you remember the times that they came in?

 6   A        Yeah.   There's one that came in around 7 and the

 7   last one for the evening, that one comes at 9.

 8   Q        Was it 7 or 7:55?

 9   A        I believe it was around 7.

10   Q        Okay.   But there were two that came in; right?

11   A        Yes.

12   Q        And did the two leave?

13   A        Yeah.

14   Q        And Mr. Fingerhut, he'd what, load 'em and unload

15   'em?

16   A        Yes.

17   Q        Okay.   Now, were you with him -- when he'd load and

18   unload the buses, did you, you were able to watch him?

19   A        Yeah.

20   Q        And did you notice the time -- you know what he was

21   driving that night?

22   A        No.

23   Q        Okay.   But he, the cars that he would drive would be
```

1    which ones?

2    A        The red one, a red 300M.  That's what he normally

3    would drive.

4    Q        What was the other car?  You said there was a second

5    car?

6    A        It was silver, but it was the same make and model.

7    Q        And who would drive that?

8    A        A lot of times, Miss Roberts.

9    Q        You said they alternated cars?

10   A        Yeah.

11   Q        Okay.  So now did there come a time when

12   Mr. Fingerhut left the bus terminal that night?

13   A        Yes.

14   Q        Okay.  And did you see, did you notice the time that

15   Mr. Fingerhut left?

16   A        About 9:00.

17   Q        Okay.  9:00 that night on December 11th of 2001; is

18   that right?

19   A        Yes.

20   Q        Okay.  And did he make any statements to you when he

21   left?

22   A        I told him, "You're leaving early tonight."

23            And he'd say, "Yeah."

1          You know.  He said he was getting out of there early

2     and that was pretty much it.  That 9:00 bus usually don't

3     leave there until about, you know, usually it's late or 9:30

4     or something and somebody's got to stay there.  And that

5     night, he was leaving early.

6     Q          Okay.  So you joked about the fact that he was

7     leaving early?

8     A          Uh-huh.

9     Q          Okay.  Was he smiling?

10    A          Yeah.

11    Q          Did he carry anything with him that you noticed when

12    he left work?

13    A          His regular like a briefcase kind of bag to carry

14    his paperwork.

15    Q          Okay.  He'd usually carry a briefcase --

16    A          Yes.

17    Q          -- with paperwork?

18    A          Yeah.

19    Q          Now, you indicated that there were video cameras

20    that would record the various areas of the Greyhound bus

21    terminal?

22    A          Correct.

23    Q          Okay.  And that, those, those cameras, they would

5242

```
 1   show the, what people were doing that particular night?

 2   A       Correct.

 3   Q       I'm gonna show you a videotape, okay, and ask if the

 4   places that are on this tape, if you can recognize the

 5   different places that are on this tape.

 6                   MR. INGRAM:  Your Honor, may I relocate

 7   over to the far side?

 8                   THE COURT:  Surely.

 9                   MR. BAILEY:  For the record, I'm playing a

10   tape that's marked, a VHS tape that's State's Exhibit 319.

11   Q       (By Mr. Bailey)  Can you see that?

12   A       Yes.

13   Q       Do you recognize that area?

14   A       Yes, I do.

15   Q       And what is that area?

16   A       That's, that was the entrance to Plaza Donuts.

17   Q       Is this the Greyhound bus station and the WRTA

18   station -- .

19   A       Right.

20   Q       -- that you were talking about?

21   A       That right there is the back entrance to the luggage

22   room.

23   Q       Back entrance to the luggage room.  And is this a
```

1    luggage cart?

2    A       Yes.  There's Mr. Fingerhut.

3    Q       I'm sorry?

4    A       That was Mr. Fingerhut.

5    Q       That was Mr. Fingerhut?

6    A       Yes.

7    Q       And it showed one of those, that shirt that you were

8    describing?

9    A       Right.

10   Q       And this is, what's this?

11   A       That's the Greyhound bus I believe.

12   Q       What part of the station is that bus at?

13   A       That would be, I don't know how to explain it, it's

14   right on the side.  That's right on the other side.  That

15   door open right there, that's the luggage door.

16   Q       This is where the luggage door comes out?

17   A       Yes.

18   Q       And who is that?

19   A       That's Mr. Fingerhut.

20   Q       Now while this is showing different frames out

21   there --

22                   MR. INGRAM:  I'm going to object to

23   showing the video if he's not going to ask questions about it

5244

1    or he's going to ask questions while it's being shown.  It's

2    one or the other.

3                    MR. BAILEY:  I'm gonna pause it for a

4    second.  Oh, well, let me go, I'll go all the way to the end

5    and then I'll ask the questions.

6    Q        I'm gonna ask you to tell us when you see

7    Mr. Fingerhut on any of the frames here.

8    A        That's Mr. Fingerhut right there walking towards the

9    door.

10   Q        Right here?

11   A        Yes.  That's the other side of the door.

12   Q        The same door that we saw on the bottom; right?

13   A        The back luggage door.

14   Q        I'm gonna pause this for a second here.  Okay.  Now,

15   are you familiar with that, the camera system, the security

16   system?

17   A        Yes.

18   Q        Okay.  There were, there were two sets of numbers on

19   this --

20   A        Uh-huh.

21   Q        -- film?  When I, the number at the top sort of

22   jumped up out of the frame, but what do those numbers

23   represent?

1    A        The times, the date.

2    Q        Okay.  And if I unpause it, okay, okay, you can see

3    it says like 1635 and the other says 1734 with seconds after

4    it or part of the second.  Well, what area is this now?

5    A        That's the lobby at Federal Station.  That's

6    Mr. Fingerhut.

7    Q        Okay.  And where are the offices, the ticket

8    window -- well, okay.  This is back to that same area where

9    the bus was before?

10   A        Yes.

11                     MR. INGRAM:  You better go back to that

12   top time.

13                     MR. BAILEY:  Okay.  Let me pause it.

14   Okay.  I'm gonna pause this for a second.

15   Q        (By Mr. Bailey) There are two sets of time on here

16   and the date.  It shows December 11th?

17   A        Correct.

18   Q        Which is the correct time?

19   A        That would be that one right there on the bottom.

20                     MR. INGRAM:  Your Honor, I believe the

21   defense would be willing to stipulate that the accurate time

22   is the time on the top.

23                     MR. BAILEY:  I agree.  We stipulate that

5246

1    the accurate --

2    Q        Actually, the accurate time is the top time?

3    A        Well, see, that's in military time.

4    Q        Right.

5    A        All right?  There was an hour difference in them

6    times due to the fact that the time on the, on our recording

7    machine was never changed because the main people from WRTA

8    take care of that, changing the time, and it was still on, it

9    was still on springtime.  Instead of being an hour behind, it

10   was an hour ahead for the clocks.

11   Q        Okay.  So the VCR numbers or whatever are faster

12   than the actual time?

13   A        Right.

14   Q        So the actual time would be the 1956 and this would

15   be the factory time, right, the 2055?

16   A        Yeah.

17                  MR. INGRAM:  You're going to succeed in

18   confusing me.  The top time is accurate and the bottom time

19   is an hour off.

20                  MR. BAILEY:  Right.  And we'd stipulate

21   that the top time is the correct time.  The bottom time is an

22   hour, almost an hour different.

23                  THE WITNESS:  Correct.

1    Q       (By Mr. Bailey) Where are the ticket windows in

2    relation to this lobby area?

3    A       They would have been right up front.

4    Q       This way?

5    A       Yes.

6    Q       Off to the right of the screen here?

7    A       Yes.

8    Q       Okay.

9    A       There's Mr. Fingerhut.

10   Q       That's Mr. Fingerhut?

11   A       He already went by.

12   Q       Okay.  Okay.  I'm gonna pause it for a second.  Who

13   is that?

14   A       That was Mr. Fingerhut.

15   Q       Okay.  That was Mr. Fingerhut?

16   A       Yes.

17   Q       Okay.  Okay.  I'm gonna pause it for a second.  Who

18   is that?

19   A       Mr. Fingerhut.  He's leaving.  He's leaving the

20   building at this point.  He's exiting through the luggage,

21   through the back room, the luggage room.

22   Q       And this is real close, in real time, it's close to

23   9:00 in the evening, this being an hour off?

5248

1    A        Right.

2    Q        Okay.

3    A        There's the bus pulling away.  According to the

4    schedule, that bus is not supposed to leave until 9:05.  And

5    as you can tell, it's well before.

6    Q        He's leaving early?

7    A        Yeah.  Leaving before 9:00.

8    Q        Now I'm pausing it again.

9    A        That's Mr. Fingerhut.

10   Q        And just about 9:00?

11   A        Yes.

12   Q        Okay.  And he's leaving?

13   A        Yes.

14   Q        What's back in this area where he's going?

15   A        That's just, that's just the walkway.  At that time,

16   there was construction being done on the parking lot of WRTA.

17   So that day, he was parked behind the misdemeanor jail which

18   is across the street.  So right there he's walking towards

19   the misdemeanor jail.

20   Q        Okay.  And this top part of it shows it's just 9:01.

21   A        Right.  Yes.

22   Q        Officer, I'm gonna show you, that, what you

23   observed, that looked to be true and accurate as to what you

1    saw, well, having seen Mr. Fingerhut that night?

2    A        Uh-huh.

3    Q        Appear to be what he was wearing?

4    A        Yes.

5    Q        Now, I'm gonna show you some pictures I believe

6    you've seen before.  I'm gonna show you what's been marked

7    for identification as 320-I.  Okay.  Does that appear to be a

8    frame from that video that we just saw?

9    A        Correct.

10   Q        And that has the time that's an hour off on it?

11   A        Yes.

12   Q        And I'm gonna show you what's been marked for

13   identification as State's Exhibit 320-D.  Okay.  Can you

14   identify that picture?

15   A        Yes.

16   Q        What is that?

17   A        It shows Mr. Fingerhut exiting the building through

18   the luggage door.

19   Q        Okay.  And is that, that's, that little one, the

20   picture, D, that I showed you, that's in color?

21   A        Yes.

22   Q        And does that depict what he was wearing that night?

23   A        Yes.

3250

```
 1    Q        Okay.  Now, that has both of the times on it; right?
 2    The actual time up on top and the little numbers which aren't
 3    reflected in the first photograph, State's Exhibit 320-I, but
 4    320-D has both sets of numbers?
 5    A        Correct.
 6    Q        And the time, and it shows the time that he was
 7    actually leaving?
 8    A        Yes.
 9    Q        Which was about 9:00 that night?
10    A        Yes.
11    Q        Okay.  Did you ever see him again after that?
12    A        No, sir.
13                       MR. BAILEY:  Thank you very much.  Now
14    defense counsel will have an opportunity to ask you some
15    questions.
16                       THE COURT:  Cross?
17                       MR. INGRAM:  Yes, Your Honor.
18                     CROSS EXAMINATION
19    BY MR. INGRAM:
20    Q        Morning, Deputy Sanchez.  How are you?
21    A        Pretty good.
22    Q        You're a Mahoning County Deputy Sheriff; am I
23    correct?
```

5251

```
 1    A        Correct.

 2    Q        And in addition to your duties and responsibilities

 3    with the Mahoning County Sheriff's Department, you also work

 4    part time providing security services for the Greyhound

 5    station in Youngstown?

 6    A        Correct.

 7    Q        But you're actually employed by the WRTA, which is

 8    the Western Reserve Transit Authority?

 9    A        Yes.

10    Q        That's the Youngstown bus system for lack of a

11    better term?

12    A        Yes.

13    Q        All of the jurors here are from Warren and that bus

14    station is in Youngstown.  That bus station is actually on

15    what's called the west end of Federal Plaza; am I correct?

16    A        Correct.

17    Q        And what would be the street, Federal, Federal

18    Street would run east and west?

19    A        Uh-huh.

20    Q        What would be the street running north and south?

21    It's right at the corner there.  Do you know?

22    A        Fifth.

23    Q        Fifth?  And the west end of Federal Plaza, in terms
```

5252

```
1    of business activity, is almost like a war zone, is it not,

2    boarded-up buildings, no business left, one bank?

3    A        Correct.

4    Q        And it's actually a bad area, isn't it?

5    A        I guess.  I mean whatever you want to call it.

6    Q        Well, there's a need for security; am I right?

7    A        Right.

8    Q        And that bus station is open how many hours a day?

9    A        From 6 a.m. to 11 p.m.

10   Q        Is there security the entire time it's open?  Is

11   there a deputy sheriff there the entire time it's open?

12   A        At that time, yes, there was.

13   Q        So in December of 2001, there was a deputy at the

14   Greyhound terminal or the WRTA terminal?  And for purposes of

15   our discussion, we can use either term; okay?

16   A        Correct.

17   Q        There was a deputy there from the time it opened

18   until the time it closed?

19   A        Correct.

20   Q        Do you know who would have worked the morning shift

21   on December 11th of 2001 in terms of security?  There was a

22   deputy there.  Who was that person?

23   A        I cannot recall that.
```

5253

1    Q        How about the, would there be one deputy before you

2    got there or is there two shifts before you would have gotten

3    there because you got there at 6; right?

4    A        Yes.  I got there at 6 and I relieved, that would

5    have been Deputy Mays.

6    Q        Deputy Mays?

7    A        Yes.

8    Q        Do you know what time Deputy Mays would have

9    started?

10   A        He would have started at 2:00.

11   Q        And you know Donna from when she used to work at the

12   Just the Ticket restaurant; am I correct in that?

13   A        Correct.

14   Q        How long was she involved in the operation of Just

15   the Ticket restaurant?

16   A        When I got there in July of '99, the place was

17   already, you know, they were already open.

18   Q        So from July of '99 to December of '99, you'd see

19   her at the restaurant?

20   A        Correct.

21   Q        On almost a daily basis?

22   A        Yes.

23   Q        And the camera system which you so aptly described

1    for Mr. Bailey, there are nine of those cameras?

2    A       Correct.

3    Q       And they're not hidden cameras, are they?  I mean if

4    you look, you can see them?

5    A       If you know where they are.  Some of them are inside

6    a bubble.

7    Q       Some are inside a bubble?

8    A       Yes.  There's like a --

9    Q       And the people that work there know of these

10   cameras, do they not?

11   A       Yes.

12   Q       And basically, it's common knowledge of people who

13   work for the WRTA or the Greyhound or Just the Ticket

14   restaurant that there's nine security cameras or that there

15   are security cameras?

16   A       There are security cameras.

17   Q       Those cameras are part of the overall security

18   apparatus of the building; am I right?

19   A       Correct.

20   Q       You're part of the security apparatus, the cameras

21   are another part of the security apparatus, and there may be

22   other parts that we don't know about?  But for sure, you and

23   the cameras are part of the security apparatus?

5255

```
 1    A        Correct.

 2    Q        For the general public, how many ways are there in

 3    and out of this building?

 4    A        That building, there's a front entrance, there's one

 5    entrance on the west side right in front of Federal and then

 6    you can come in also through the Plaza Donuts, which is also

 7    the front.  It's on Federal Street.  So I would say there's

 8    three entrances to that building.  And the luggage, but

 9    that's just for personnel.

10    Q        Now, if I were in charge of a security system and I

11    was placing cameras, I'd want to place cameras that looked at

12    the entrance so that if I ever needed to see documentation of

13    who came in and who came out, I could have that

14    documentation.  Do you know, is there a camera that is

15    focused on each of these entrances?

16    A        Yes.

17    Q        There is?

18    A        Yes.

19    Q        And in the video which Mr. Bailey so challenging

20    played for you, did you see Donna Roberts and some black guy

21    in the middle of some doorways kissing and hugging?

22    A        No.

23    Q        Did you see Donna Roberts at all?
```

5256

 1    A       Not that day.

 2    Q       On that video that he played for you, did you

 3    see them?

 4    A       No.

 5    Q       So my first question is, you did not see her in the

 6    video?

 7    A       No.

 8    Q       My second question is, you did not see her that day?

 9    A       No.

10    Q       Handing you what has been marked as State's Exhibit

11    320-D, that's a photograph of Mr. Fingerhut leaving the

12    Greyhound terminal at approximately 9:00 on December 11th?

13    A       Correct.

14    Q       Of 2001?

15    A       Correct.

16    Q       And is he going out the door that would be facing

17    Federal Street or would he be going out the door facing

18    Commerce Street?

19    A       That door is actually facing Fifth.

20    Q       That door is facing Fifth?

21    A       It's on the side.  Yeah.  It's on the side of the

22    building.

23    Q       Okay.

1    A        He's walking towards Commerce.  That's where the

2    misdemeanor jail is at.

3    Q        That's where what?

4    A        That's where the misdemeanor jail is, the corner of

5    Fifth and Commerce.

6    Q        The misdemeanor jail is at the corner of Fifth and

7    Commerce?

8    A        Yes.

9    Q        He's walking out the Fifth Avenue exit, which means

10   that he walks out going in a westerly direction, he leaves

11   the building, he turns right and then he heads north towards

12   Commerce Street?

13   A        Correct.

14   Q        And he actually has to cross Commerce Street

15   because, as I heard your testimony, he was parked behind the

16   misdemeanor jail?

17   A        Correct.

18   Q        How far of a distance do you think that is from the

19   entrance to, the exit from the, the exit from the bus

20   terminal to the parking lot behind the misdemeanor jail?

21   A        I couldn't tell you.

22   Q        Four or five football fields?

23   A        No.

5258

```
 1   Q        Two or three football fields?

 2   A        I'd say maybe one and a half.

 3   Q        Okay.  When Mr. Fingerhut leaves, is he escorted by

 4   anyone?

 5   A        No.

 6   Q        Was it his practice, was it the practice of the

 7   security personnel to escort Mr. Fingerhut when he left?

 8   A        No.

 9   Q        And there was construction in that parking lot at

10   the time?

11   A        Correct.

12   Q        If it had not been for the construction, was it

13   Mr. Fingerhut's practice to park in the parking lot of the

14   Greyhound terminal itself?

15   A        Correct.

16   Q        And it was the construction that caused him to

17   deviate from that practice and park behind the misdemeanor

18   jail?

19   A        Correct.

20   Q        You didn't see what car he got into that night, did

21   you?

22   A        No, I didn't.

23   Q        And I believe you told Mr. Bailey that Donna Roberts
```

1    and Mr. Fingerhut had two Chryslers, 300Ms?

2    A        Yes.

3    Q        You don't know what years those were, do you?

4    A        No.

5    Q        You just know that one was red and one was silver?

6    A        Correct.

7    Q        One was red or maroon; is that right?

8    A        Yeah.

9    Q        And the other one was silver.  Do I have those

10   colors right or am I wrong?

11   A        No.  That's pretty accurate.

12   Q        That's about right?

13   A        Yes.

14   Q        Who generally drove the silver one?

15   A        Miss Roberts.

16   Q        Do you know if that was the newer of the two?

17   A        Yeah.  That was newer.

18   Q        Do you know if she drove the silver one because it

19   had four air bags?

20   A        (No response.)

21   Q        You don't know.  So if Donna generally drove the

22   silver one, then Mr. Fingerhut, I take it, would generally

23   drive the red one?

5260

```
1    A        Correct.

2                        MR. INGRAM:  No more questions, Your

3    Honor.

4                        THE COURT:  Redirect?

5                   REDIRECT EXAMINATION

6    BY MR. BAILEY:

7    Q        Deputy Sanchez, this security system with the tapes,

8    it doesn't, it jumps around, doesn't it?

9    A        Correct.

10   Q        And it may not go back to one area for a number of

11   minutes?

12   A        I'd say seconds.  Within seconds, it goes back.  It

13   goes in frames.

14   Q        Okay.  I mean we watched this tape for, what, about

15   ten or fifteen minutes?

16   A        Yes.

17   Q        And it covered about four hours, I believe, in

18   there?

19                        MR. INGRAM:  Objection.  That tape is

20   edited.  We have not established, I was kind and did not

21   require that they establish the method of the editing, and

22   this is absolutely unfair.

23                        THE COURT:  The tape has been edited so
```

5261

```
 1    unless you have another line that you wish to go down to
 2    establish how long the original tape was, I am going to
 3    sustain the objection.
 4                        MR. BAILEY:  Okay.
 5    Q        (By Mr. Bailey) Just to make sure, no question,
 6    Robert Fingerhut left around 9:00 that night; right?
 7    A        That's correct.
 8                        MR. BAILEY:  Okay.  No further questions.
 9                        MR. INGRAM:  No questions, Your Honor.
10                        THE COURT:  Deputy, thank you very much
11    for your time.  You're excused.
12                        THE WITNESS:  Thank you.
13                        THE COURT:  State wish to call your next
14    witness?
15                        MR. BAILEY:  Yes.  The State calls Kathryn
16    Thomas.
17                        MR. INGRAM:  May we approach sidebar while
18    she's coming in?
19                        THE COURT:  Surely.
20    (Whereupon, a conference was held at the bench.)
21                        THE COURT:  We're gonna save you until
22    after lunch, okay, because we're just gonna get started and
23    some of the attorneys have to review a couple items before we
```

1    can proceed with your testimony.  So I apologize for that.

2         Ladies and Gentlemen, if you'd be back here at a

3    quarter to 1.  That will give you an hour for lunch.  You are

4    not to discuss anything about the case or form any opinion

5    until you return; okay?  Thank you.

6    (At 11:43 a.m., the jury was excused for lunch and the

7    following proceedings occurred in open court.)

8              THE COURT:  You had two motions in the

9    morning.  I think that it was clear to everybody here, but I

10   don't know that it was specifically stated on the record that

11   I denied both those motions in light of what appears on the

12   record.

13             MR. INGRAM:  Both of 'em or just one?

14             MR. JUHASZ:  We didn't argue the second

15   one.

16             MR. INGRAM:  We didn't argue the second

17   one.  I don't think the second one is ripe for adjudication

18   yet.  But clearly, the first one, Mr. Becker proffered a

19   State's Exhibit.  You ruled that provided an independent

20   basis for a determination of the existence of a conspiracy

21   and overruled the motion.

22             THE COURT:  And the second one was in

23   reference, it's going to come up when you get to the letters.

5263

```
 1                    MR. JUHASZ:  Correct.

 2                    THE COURT:  Yeah.  Yeah.  You're correct.

 3    That was -- I was taking the fact that both of those were

 4    pretty much on the same thing.  They aren't the objection and

 5    the --

 6                    MR. INGRAM:  The motion is different.

 7                    THE COURT:  Yeah.  The second motion went

 8    to the fact of gratuitously giving all this, all the sexual

 9    matters, the pillow talk between the two of 'em and the

10    letters that aren't relevant, they're objecting to that.

11              In that other case, they were admitted.

12                    MR. INGRAM:  I don't know that they were

13    objected to.  And I refuse to, I refuse to be bound by the

14    evidentiary rules of that case.

15                    THE COURT:  That's correct. They weren't.

16    No, no.  I'm not saying because they were admitted in the

17    other one because they weren't objected to on this basis.

18    They were objected to, but it was on some superficial reason.

19                    MR. BAILEY:  I'm sure defense counsel made

20    a good effort, did what they thought was proper.

21                    THE COURT:  Yeah.  I don't mean to -- what

22    I meant is that it was not clarified as to the objection.

23    The objection, as given before, was not adequate to keep the
```

1     letters out of that case.  That was not the proper --

2                      MR. BECKER:  Well, if we're gonna address

3     that, I simply would point out that this is a conspiracy and

4     the relationship is extremely important.  And I think all of

5     the letters document the extent of that relationship, the

6     intensity of that relationship.  And because the State is

7     bound by the highest burden of proof under the law, I think

8     it's very important and very relevant that all of the letters

9     are admitted because they are, quite frankly, every time I've

10    read 'em, and I've read them beginning to end probably three

11    times, every one of those letters, and every time I seem to

12    glean a little bit more that maybe I gloss over.  So to say

13    that some are relevant and some are not relevant, I think

14    they're all relevant because they all were statements made

15    during and in furtherance of the conspiracy.  And the

16    conspiracy was fueled by this, by this love for each other,

17    the hatred --

18                      THE COURT:  Well, I think that theory is

19    not incorrect.  I will leave it at this for the time being.

20    I have not seen these so I have no idea what's in them.  I

21    will throw this back to the defense, that if there are

22    letters that have nothing to do with the furtherance of this

23    conspiracy, you know, a short letter, I love you, okay, that

5265

 1   has nothing to do with the conspiracy.  But otherwise, I

 2   think the assumption that I will proceed upon here is that

 3   all of these letters are in furtherance of the conspiracy and

 4   will be admitted, but it's quite possible some of these

 5   letters do not delve into what, you know, this background

 6   conspiracy involves.  You're going to have to go through

 7   those and point them out.

 8                   MR. INGRAM:  Your Honor, if I may,

 9   although I should probably defer to Mr. Juhasz, but I'm a big

10   mouth so I'll just stumble right ahead.  Why don't you give

11   us an opportunity as we go along here to show you what

12   specific letters we're talking about because obviously we're

13   not talking about all of them.

14                   THE COURT:  That's what I'm saying.  It's

15   up to you folks.

16                   MR. INGRAM:  And we'll address it later.

17   And probably the right time to address it is when the State

18   rests.  Go ahead.

19                   MR. JUHASZ:  I was gonna say two things.

20   One is that I did not know exactly how the State was gonna

21   proceed.  These motions in limine, in particular the second

22   one having to do with the letters and any conversations in

23   the tapes that were purely just sexual and having nothing to

1 do with any conspiracy, I didn't know if they were gonna

2 attempt to put those in front of the jury before the Court in

3 some media fashion by putting them up on the overhead or

4 whatever.  That's what the motion in limine was directed to.

5 It was not to supplant the normal arguments that take place

6 at the close of the State's case when we talk about exhibits.

7     I am, I have to tell you, however, troubled by what

8 I perceive as the Court's ruling and, in essence, reversing

9 the burden of proof because I think Rule 401 still requires

10 them to prove that each of those letters are relevant and I

11 think I just heard the Court say he'll assume they are

12 relevant.

13     THE COURT:  No, no.  You misunderstood

14 what I said.  I asked you to point out, if you will, those

15 that you object to.  They still have the burden of proving

16 that they're admissible.  But as I say, in the last case, we

17 touched on this area, but I don't even remember what the

18 objection was based on before.  It may well have been based

19 on the same thing, but we didn't, there was never any

20 analysis of each and every individual one.  You've raised

21 that by your motion.  I say that as a matter of convenience

22 because, otherwise, we'd have to go through every letter.

23 They would have to present them.  It's merely a time-saving

1    device.

2                    MR. JUHASZ:  Understood.

3                    MR. BECKER:  Thank you, Your Honor.

4                    MR. BAILEY:  Thanks, Your Honor.

5    (Whereupon, a recess was had commencing at 11:48 a.m. and

6    concluding at 12:57 p.m.)

7                    THE COURT:  Okay.  We're all here.

8                    MR. BAILEY:  State calls Kathy Thomas.

9    **WHEREUPON,**

10                    **KATHRYN THOMAS,**

11   having been first duly sworn, according to law, was examined

12   and testified as follows:

13                    **DIRECT EXAMINATION**

14   **BY MR. BAILEY:**

15   Q       Ma'am, do you want to tell the Court and jury your

16   full name?

17   A       Kathryn Lynn Thomas.

18   Q       And where do you live?

19   A       4962 Mahoning Avenue.

20   Q       In what city?

21   A       In Youngstown -- well, Austintown.

22   Q       Austintown?

23   A       Yeah.

5268

1    Q       Okay.  And where are you employed?

2    A       State Farm Insurance.

3    Q       And your position there?

4    A       I own the agency there.

5    Q       Okay.  And the name of the agency?

6    A       And I'm an agent, also an agent.

7    Q       I'm sorry?

8    A       I'm also an agent.

9    Q       You're an agent?

10   A       Yes.

11   Q       And you're the owner of the agency?

12   A       Yes.

13   Q       Okay.  And how long have you been so employed?

14   A       Since April 1 of 1988.

15   Q       Okay.  Do you have any other employees in the

16   office?

17   A       Yes, I do.

18   Q       What do you have?

19   A       At the current time, I have three other full-time

20   employees.

21   Q       Okay.  Do you have any, what education and training

22   and experience do you have to hold your present position?

23   A       I have a license in property and casualty with the

1    State of Ohio, also a license in life and health and a

2    Series-VI license.

3    Q        And what is a Series VI license?

4    A        That is a license that's required to sell mutual

5    funds and variable products.

6    Q        And how long have you been licensed as an insurance

7    agent?

8    A        Since 1988.

9    Q        Okay.  And let's see.  Now, as an insurance agent

10   and the owner of your agency, are you familiar with different

11   insurance policies?

12   A        Yes.

13   Q        And have you been trained in interpreting different

14   insurance policies?

15   A        Yes.

16   Q        And have you had a client by the name of Robert

17   Fingerhut?

18   A        Yes.

19   Q        Do you recall approximately when Robert Fingerhut

20   became a client of yours?

21   A        Approximately, I think it was around 1998

22   approximately.  I'm not exactly sure because he was a State

23   Farm client before he was insured with me.

5270

```
 1    Q         Okay.  And during the time that he became a client,

 2    you said he was a client with State Farm prior to your

 3    insuring him?

 4    A         Yes.  In Florida.

 5    Q         In Florida.  And then did he return to this area?

 6    A         Yes.

 7    Q         And he came to you to get back with State Farm?

 8    A         Yes.

 9    Q         Okay.  Who contacted -- how did you come into

10    contact with him?  Did he contact you or did you contact him?

11    A         He contacted me.

12    Q         And do you recall what types of insurance

13    Mr. Fingerhut had with State Farm?

14    A         We had several lines of insurance.  We had his home,

15    his autos, business insurance, rental properties and life

16    insurance.

17    Q         Okay.  Did you know the defendant in this case,

18    Donna Roberts?

19    A         Yes.

20    Q         Okay.  How did you meet her?

21    A         Through Mr. Fingerhut.

22    Q         Okay.  Now, the vehicles that Mr. Fingerhut had

23    insured, do you remember what types of vehicles he had
```

1   insured?

2   A        He had a 2000 and a 2001 Chrysler.  They were both

3   the same type.  He had, I believe, a Pontiac.  I have to go

4   through my notes.  He had several vehicles.  Let me just make

5   sure of the makes.  1985 Ford Contour and a '85 Pontiac Grand

6   Prix.

7   Q        Okay.  And part of your job as an agent, are you

8   required to determine who the owner of the vehicle is?

9   A        In this situation -- well, normally we just go with

10  whom they tell us.  We don't require actual proof.

11  Q        You don't need the certificate of title?

12  A        Not necessarily.

13  Q        Okay.  Okay.  And these auto policies, in whose

14  names, whose name or names were these policies listed?

15  A        In Donna Roberts'.

16  Q        Who came in to actually fill out the policy and

17  provide you the information?

18  A        The majority of the time, I talked with

19  Mr. Fingerhut.

20  Q        Okay.  And who paid the premiums on the insurance?

21  A        To my knowledge, Mr. Fingerhut.

22                   MR. INGRAM:  Objection, unless there's a

23  foundation there.

```
 1                          THE COURT:  Sustained.

 2                          MR. INGRAM:  I would move that the answer

 3     be stricken.

 4                          THE COURT:  The answer will be stricken.

 5     The jury will disregard.

 6            You may wish to lay a foundation for that,

 7     Mr. Bailey.

 8     Q      (By Mr. Bailey)  Okay.  Do you know, over the course

 9     of dealing with Mr. Fingerhut and his different insurance

10     policies, how would the policies be paid for?

11     A      Usually by check.  There have been occasions when it

12     was a personal check.  I believe there were times when the

13     business check was written to pay for the policies.

14     Q      Okay.  And did Mr. Fingerhut ever bring in these

15     checks?

16     A      Normally, they were mailed in or a couple occasions,

17     I personally picked up checks that were written by

18     Mrs. Roberts.

19     Q      Okay.  And with the, is there something that's known

20     as an additional driver or covered driver on an insurance, in

21     insurance parlance?

22     A      Yes.

23     Q      What is that?  Can you explain that?
```

```
 1    A        Well, with State Farm, we will insure any licensed
 2    driver that's driving with the permission of the owner.
 3    However, anyone who resides in a household that we have cars
 4    insured in that household, we underwrite that person
 5    regardless if they are a relative or not because they have
 6    access to drive the cars on a regular basis.  So they would
 7    be underwritten and they would be a listed driver in that
 8    household on that policy.
 9    Q        Okay.  So with these vehicles, who were the drivers
10    that would have been covered?
11    A        Mr. Fingerhut and Donna Roberts.
12    Q        Now, you had mentioned that there was, I believe,
13    life insurance?
14    A        Yes.
15    Q        And oh, with the vehicles, the coverage on the
16    vehicles, that would include both those Chryslers, the 2000
17    and 2001 Chryslers?
18    A        Yes.
19    Q        Was the house insured?
20    A        Yes.
21    Q        And do you remember the address of the house?
22    A        254 Fonderlac in Warren.
23    Q        And as part of the policy on that house, did that
```

 1    also include insurance on the contents of the house?

 2    A        Yes, it did.

 3    Q        Now, what about the businesses?  You mentioned there

 4    were businesses that were insured.  What were those?

 5    A        We insured two Greyhound bus ticket offices, one in

 6    Warren and one in Youngstown.

 7    Q        Okay.  And who, based upon the insurance policy, who

 8    was the owner of those businesses?

 9    A        Donna Roberts.

10    Q        And did you maintain an insurance policy on

11    Mr. Fingerhut's life?

12    A        Yes.

13    Q        Okay.  I'm gonna hand you what's been marked for

14    identification as State's Exhibit Number 323, which is in a

15    plastic envelope, and ask if you can identify that document?

16    A        Yes.  This is the life insurance policy that was

17    issued for Mr. Robert Fingerhut by State Farm Insurance.

18    Q        Okay.  And in, in that policy, the second page of

19    that policy, that lists the name of the insured?

20    A        Yes.

21    Q        And that person was?

22    A        Robert B. Fingerhut.

23    Q        Was there a date that policy was issued?

1    A        August 12th of 1999.

2    Q        Okay.  And did that replace another policy?

3    A        Yes, it did.  It was a re-issue.

4    Q        Of an earlier policy?

5    A        Right.  Previously to that, I had a $250,000 policy

6    and we rewrote that to increase it to 300,000.

7    Q        Okay.  And that was back in '99?

8    A        August 12th of '99 is when we increased it.  The

9    original policy was back in '98.

10   Q        Okay.

11   A        The 250.

12   Q        Okay.  Now, a couple of pages before the end of the

13   policy, you have, what, an application page?

14   A        Yes.

15   Q        And we -- oh, were you involved in preparing this

16   particular document?

17   A        Yes.

18   Q        And who was the agent that sold that policy?

19   A        I was.

20   Q        And to whom did you sell that policy?

21   A        Mr. Fingerhut.

22   Q        And does that life insurance policy carry a

23   designation as a beneficiary?

5276

```
1    A         Yes, it does.
2    Q         Okay.  What is a beneficiary?
3    A         A beneficiary is, on the, upon the death of the
4    insured, the proceeds go to that first-named beneficiary, the
5    primary.
6    Q         And does that policy, does the policy typically make
7    a designation of a beneficiary?
8    A         Yes.
9    Q         Is there any requirement that the beneficiary have
10   any relationship to the insured?
11   A         No.
12   Q         Is there any requirement that such a policy go to a
13   spouse?
14   A         No.
15   Q         Now, are you familiar with beneficiary payments in
16   the State of Ohio and how benefits are paid out under a life
17   insurance policy?
18   A         Yes.
19   Q         Okay.  And how does that work?
20   A         Well, a life insurance policy is a contract between
21   the insurance company and the named insured.  And whoever
22   they designate as their beneficiary, that's who the proceeds
23   would go to upon their death.
```

5277

```
 1    Q       Now, when this application was filled out, who did
 2  it list as, did it list a beneficiary?
 3    A       Yes.
 4    Q       And who did it list?
 5    A       It listed Donna Roberts.
 6    Q       Okay.  What name was listed -- well, was this
 7  application signed by Mr. Fingerhut?
 8    A       Yes, it was.
 9    Q       And what date did he sign it?
10    A       August the 12th of 1999.
11    Q       And did you witness it?
12    A       Yes.
13    Q       Okay.  What name did he use for, was listed on that
14  as the primary beneficiary?
15    A       Donna Roberts.
16    Q       Can you --
17    A       Oh, I'm sorry.  Fingerhut.
18    Q       Okay.  I'm sorry.  I didn't hear that.
19    A       Donna Fingerhut.
20    Q       Donna Fingerhut?
21    A       Uh-huh.
22    Q       Okay.  And did it list her age at the time?
23    A       Fifty-five.
```

5278

```
 1    Q        And her relationship to him?

 2    A        Wife.

 3    Q        Now, after, after that time, in November of 2001,

 4    did you have occasion to talk to Mr. Fingerhut again

 5    regarding life insurance?

 6    A        He did call me and stated he wanted to take out more

 7    life insurance.

 8    Q        More life insurance?

 9    A        Right.

10    Q        Naming who as beneficiary?

11    A        Well, we didn't discuss that.  He just said he

12    needed more life insurance.  And due to his schedule, him

13    being so busy, as a matter of fact, I even called him back to

14    remind him we have to get together to do it.  And we just

15    weren't able to get our schedules together at the time to.

16    Q        Okay.  Now, I'm gonna hand you what's been marked

17    for identification as State's Exhibit 322, a certified copy

18    of a life insurance policy from Zurich Life.  Have you seen

19    this document?

20    A        Yes.

21    Q        Have you seen this before?

22    A        (Witness nods head.)

23    Q        Okay.  What is that document?
```

5279

```
 1    A        This is a life insurance policy from Zurich Life
 2    Insurance Company for, insured is Robert S. Fingerhut, and
 3    the face amount is $250,000.
 4    Q        $250,000?
 5    A        Yes.
 6    Q        And when was that taken out?
 7    A        August 19th of 1998.
 8    Q        And towards the back part of that policy, is there
 9    an application page?
10    A        Yes, it is.
11    Q        And does that designate a beneficiary?
12    A        Yes.
13    Q        And who does it designate as beneficiary?
14    A        Donna M. Roberts.
15    Q        And does it list her relationship to him?
16    A        Fiancee.
17    Q        And does it indicate how much of the policy,
18    proceeds, would go to her?
19    A        A hundred percent.
20    Q        A hundred percent?
21    A        Would go to her, yes.
22                  MR. BAILEY:  Okay.  Thank you very much.
23    I'm done with my questions and defense counsel will have an
```

5280

 1   opportunity to address you.

 2                   THE COURT:  Mr. Ingram.

 3                   MR. INGRAM:  Thank you, Your Honor.

 4                   **CROSS EXAMINATION**

 5   **BY MR. INGRAM:**

 6   Q       Afternoon, ma'am.  Normally, the owner of a life

 7   insurance policy names as beneficiary someone the owner loves

 8   and cares for; correct?

 9   A       Yes.

10   Q       The owner of a life insurance policy is the person

11   that controls the policy; am I correct?

12   A       That's correct.

13   Q       And ordinarily, the owner is not the beneficiary?

14   A       Correct.

15   Q       For the State Farm policy, and that's State's

16   Exhibit 323, the owner is Mr. Fingerhut?

17   A       Yes.

18   Q       And the beneficiary was named as Donna Roberts

19   Fingerhut; am I correct?

20   A       On the application, it does say Donna Fingerhut.

21   Q       Can I see that?  I just, I thought it said Donna

22   Roberts Fingerhut.

23   A       (Witness complies.)

1    Q        Okay.  The owner of the policy controls the policy,

2    not the beneficiary; am I correct?

3    A        They do control the beneficiary also because they

4    could change it.

5    Q        They can change the beneficiary?

6    A        Right.

7    Q        They can cancel the policy?

8    A        Yes.

9    Q        They could give the policy, if I own an insurance

10   policy --

11   A        Uh-huh.

12   Q        -- and I have Ken Bailey as my beneficiary, but he

13   has aggravated me in these proceedings so I choose to make

14   Mr. Becker beneficiary, I could just change it; right?

15   A        Right.

16   Q        And if I really want to get Ken's gun, instead of

17   changing the beneficiary, I'm gonna give Mr. Becker my policy

18   and I'll just transfer the policy to him and tell him he can

19   name his wife beneficiary or whoever he wants?

20   A        Once he becomes the owner of that policy, he can

21   change the beneficiary.  He has all rights to do whatever he

22   wants.

23   Q        So I could give away my life insurance policy?

```
 1    A       Right.

 2    Q       And Mr. Fingerhut could have given away his life

 3    insurance policy?

 4    A       Yes.

 5    Q       And he could have changed the beneficiary?

 6    A       He could have changed it, yes.

 7    Q       Before he gave -- he never gave it away?

 8    A       Right.

 9    Q       Since he never gave it away or transferred it, he

10    could have changed the beneficiary at any time?

11    A       Correct.

12    Q       Now you say in November of '01 Mr. Fingerhut --

13    well, let me back up.  I'm sorry.

14            State's Exhibit 323, the $300,000 State Farm policy,

15    that replaced a previous State Farm policy?

16    A       Yes.

17    Q       And the face value of that policy, did I hear you

18    say 250?

19    A       It was $250,000.

20    Q       And then Mr. Fingerhut called you in November; is

21    that right?

22    A       Yes.

23    Q       Do you remember if it was the first of the month,
```

1    the last of the month?

2    A         I would say more towards, I can't be exact about the

3    date, but I would say it was more toward the beginning of the

4    month because I know we went back and forth about a month

5    trying to get our schedules together so I could get him to do

6    the additional policy he requested.

7    Q         So as I understand what you just told me, he calls

8    you about increasing the face value of the policy?  That's

9    what it would be worth if he passed away?

10   A         Right.  He wanted more life insurance.

11   Q         Okay.  And you and he then played phone tag for a

12   month trying to hook up so that he could do that and you and

13   he just never get together?

14   A         Correct.

15   Q         Do you recall the last time you contacted him trying

16   to get together?

17   A         I would, like I said, I know it was approximately a

18   month after he originally contacted me to say, you know, "We

19   haven't done this, we got to get together."

20             And he said, "I know.  You know.  I've been so

21   busy."

22             You know.  He was a very busy person.

23   Q         So that would put you and Mr. Fingerhut somewhere in

5284

1    the beginning of December 2001?

2    A        Right.

3    Q        And the only thing that stopped Mr. Fingerhut from

4    increasing the policy was the fact that he was too busy to

5    get together with you?

6    A        Right.  We just didn't get together.

7    Q        Well, he never told you, "I changed my mind and I

8    don't want to increase the amount of the policy"?

9    A        No.

10   Q        He never told you, "I changed my mind and I want to

11   make somebody else beneficiary"?

12   A        No.

13   Q        You would actually collect the payment, or payment

14   would be mailed to you?  Did you receive the checks in

15   payment?

16   A        We, I believe we set up an automatic draft from the

17   checking account to make the payment.

18   Q        How about on the car insurance?  How would you

19   receive payment for those?

20   A        That was on a monthly billing also.  I can't recall

21   right off the bat if that was automatically deducted.

22   Q        Did I hear you tell Mr. Bailey that Mr. Fingerhut

23   gave you checks?

```
 1    A         Yes.  Well, you know, like when we initially took

 2    out policies, you'd have to have the, a premium to send in

 3    with the initial application.

 4    Q         When he took out the car insurance, isn't it a fact

 5    that Mr. Fingerhut told you to get the checks from Donna?

 6    A         Yes.

 7    Q         Did she deliver them to you or did you pick them up

 8    from her?

 9    A         She either mailed them -- the majority of the time,

10    they were mailed.  I talked to her personally, we discussed

11    the price, and she would mail the check to me.

12    Q         Whose signature was on those checks?

13    A         I --

14    Q         Do you know?

15    A         I'm not sure.

16    Q         Well, did you tell Mr. Bailey Mr. Fingerhut's

17    signature was on any check?

18    A         I don't recall making that statement.

19    Q         Do you know for a fact whose signature was on any of

20    the checks in payment of the auto insurance, the life

21    insurance, the business insurance or the house insurance?

22    A         On the, I believe the life insurance policy, he

23    instructed Donna to write the check.  So she signed it.  Now,
```

5286

```
 1    if she signed her name or his name, I can't tell you without
 2    looking at the check.  But she wrote the majority of the
 3    checks.
 4    Q      She wrote the check?
 5    A      Yes.
 6    Q      Well, ordinarily when you sign a check, you sign
 7    your own name, don't you?
 8    A      Usually.
 9    Q      For the cars -- let's just talk about the cars.
10    A      Okay.
11    Q      Did you ever see a check in payment of car insurance
12    that Mr. Fingerhut signed?
13    A      No.  If I, I would have to say the majority of the
14    time, I can't recall him actually writing the check.  He
15    always told me to have Donna write it.
16    Q      And again, if you write a check, you usually sign
17    your own name to the check?
18    A      Yes.
19    Q      Now I have to ask you some questions about car
20    insurance, but, you know, I fear to tread there.  All I know
21    about life insurance is it costs me so, or car insurance, it
22    costs me so much I have to pay it four times a year.
23           I have five drivers.  Three of them are teenagers.
```

1    Our company makes us assign a car, even though I'm the owner

2    of all five vehicles, I have to assign a car to myself, my

3    wife, and each one of the teenagers.

4    A        Correct.

5    Q        Is there a primary driver designated in this

6    automobile insurance on these two Chryslers?

7    A        Yes.  We always assign a primary driver.

8    Q        Okay.  So who is the primary driver on the 2001

9    Chrysler?

10   A        That, I would have to check our company records to

11   see actually who was listed as the primary driver on each

12   car.

13   Q        The State didn't ask you to do that?

14   A        No.

15   Q        You have nothing in your file that would indicate

16   that?

17   A        No.  It doesn't say in those files, but I could get

18   those records for you.

19   Q        All right.

20   A        Because we do, every vehicle is designated as to who

21   the primary driver is of that vehicle.

22   Q        So you'll --

23   A        However, everyone in the household is allowed to

1    drive it.

2    Q        Sure.  So I can drive my kid's car and my kid can

3    drive my car?

4    A        Correct.

5    Q        Mr. Fingerhut could drive the car that Donna was the

6    primary driver on or Donna could drive the car that

7    Mr. Fingerhut was the primary driver on?

8    A        Right.

9    Q        But you designate a primary driver for the person

10   that primarily drives that car?

11   A        Drives that car.  Exactly.

12   Q        Will you please obtain that information and send it

13   to either Mr. Bailey or I?

14   A        I certainly will.

15   Q        Thank you.

16            Now I heard you say something about rental property

17   insurance.  No, I did not hear you say something about --

18   A        Yes.  We had a rental dwelling policy.

19   Q        Well, who was the named insured in the rental

20   dwellings property?

21   A        Donna Roberts.

22   Q        How many rental dwelling policies were there?

23   A        We had two insured at the time.

 1   Q        And can you tell me the face amount of those

 2   policies?

 3   A        One, I believe I only have one in here.  One was at

 4   253255 Washington Street, and we had 60,000 on that one.

 5            I don't believe -- I don't have -- oh, yes.  It's

 6   494 Olive Avenue, and there was $30,000, I'm sorry, 53,700 on

 7   that building, on that property.

 8   Q        And the named insured is Donna Roberts?

 9   A        Uh-huh.

10   Q        Which means she was the titled owner?

11   A        Yes.

12   Q        So if something happened to either one of those

13   rental properties, she got the money?

14   A        Her, and if there's a mortgage company involved,

15   their interest would be paid off first and she would get the

16   remainder.

17   Q        So if they burn down, you pay off the mortgage and

18   then --

19   A        She would get the rest.

20   Q        -- she would get the rest?

21   A        Correct.

22   Q        And who was the named insured in the business

23   policies?

5290

```
1    A        Same.  Donna Roberts.

2    Q        So if something happened with those businesses, she

3    would get the insurance proceeds?

4    A        Correct.

5    Q        And the same with the home owners?

6    A        Yes.

7                        MR. INGRAM:  May I have a moment, Your

8    Honor.

9                        THE COURT:  Yes.

10                       MR. INGRAM:  Thanks, ma'am.  No further

11   questions.

12                       THE COURT:  Redirect?

13                       MR. BAILEY:  No questions.  Thank you very

14   much.

15                       THE COURT:  Thank you, ma'am.

16                       THE WITNESS:  Thank you.

17                       MR. BECKER:  Your Honor, the State would

18   call Kris Ellington.

19                              *  *  *

20

21

22

23
```

1     **WHEREUPON,**

2                             **KRIS ELLINGTON,**

3     having been first duly sworn, according to law, was examined

4     and testified as follows:

5                      **DIRECT EXAMINATION**

6     **BY MR. BECKER:**

7     Q          Miss Ellington, I am going to ask you to scoot your

8     chair maybe a little bit closer to the microphone.

9                            THE COURT:   Do you mind being

10    photographed?

11                           THE WITNESS:   Yes.

12                           THE COURT:   You do?   Okay.   She does not

13    wish to the photographed.

14    Q          (By Mr. Becker) Would you state your name for the

15    jury?

16    A          Kris Ellington.

17    Q          And Miss Ellington, do you own a business here in

18    Warren, Ohio?

19    A          Yes, I do.

20    Q          What business do you own?

21    A          It's called the Final Cut.

22    Q          And what kind of a business is it?

23    A          It's a barber shop.

1    Q        And where is that business located at?

2    A        402 East Market.

3    Q        How long have you owned that business?  Or how long

4    have you owned it at that location?

5    A        It's about a year and a half, November of 2001.

6    Q        So prior to December of 2001 is when you opened your

7    business?

8    A        Yes.

9    Q        And when you began that business in December of

10   2001, can you tell this jury what the hours were that you

11   were open, what days of the week and what hours you were

12   open?

13   A        We're open from, Tuesday through Saturday -- Tuesday

14   through Friday, 9 to 5 and Saturday, 7 to 4.

15   Q        And so the days of the week you'd be closed on would

16   be?

17   A        Monday -- Sunday and Monday.

18   Q        Okay.  Thank you.  Now, are you familiar with any

19   other businesses that are in the same building as your

20   business?

21   A        Yes.

22   Q        What businesses are located in the same building and

23   next to your business?

1  A        The Greyhound bus station.

2  Q        All right.  Now, was that business, the Greyhound

3  bus business, in operation in December and November of 2001?

4  A        Yes.

5  Q        Now when you first began your business in November

6  of 2001, did you become acquainted with or familiar with the

7  two people who ran the Greyhound bus station?

8  A        Just the female.

9  Q        All right.  And did you come to find out who that

10  female was?

11  A        I never, I never knew her name.  I just saw her.

12  Q        And can you describe this individual for this jury,

13  the female?

14  A        She was Caucasian, kind of short, like a reddish

15  brown hair.

16  Q        Do you know how old she was?

17  A        In her fifties maybe.

18  Q        All right.  Now, you did occasionally see the man or

19  not?

20  A        In passing, yes.

21  Q        Did you happen to catch what type of cars they drove

22  or operated?

23  A        I believe they were Chryslers.  One was red and one

```
1    was silver.

2    Q        Do you recall which one the woman would drive and

3    which one the man would drive or were they interchangeable?

4    A        Interchangeable.

5    Q        All right.  Now, at some point, you found out that

6    something happened to the man?

7    A        Yes.

8    Q        In December of 2001; is that correct?

9    A        Yes.

10   Q        And eventually, I believe, the police department

11   came to speak to you; is that correct?

12   A        Yes.

13   Q        Now, do you recall telling them about something that

14   happened in your business on Tuesday, December 11th, 2001?

15   A        Yes.

16   Q        All right.  Tell this jury what you told the police

17   happened at your business on December 11th, which was a

18   Tuesday, of 2001?

19   A        Just that the lady from the bus station brought

20   someone in to get their hair cut.

21   Q        And can you describe the person that she brought in

22   to get the haircut on Tuesday, December 11, 2001?

23   A        Black male, afro.
```

1    Q        And did you take care of his services or?

2    A        Yes.  I cut his hair.

3    Q        All right.  And do you recall anything unusual about

4    his hands?

5    A        No.

6    Q        No bandages or anything on his hands?

7    A        No.

8    Q        No injuries?

9    A        No, not that I noticed.

10   Q        And do you recall who paid for this man's haircut?

11   A        He did.

12   Q        And do you recall how he was introduced or anything

13   that was said to you by the woman?  Was there anything, any

14   introduction or anything said?

15   A        No.  She just brought him in, showed him where to

16   come and she left.

17   Q        Okay.  Do you see the woman that brought him in

18   there in this courtroom today?

19   A        Yes.

20   Q        Okay.  Can you please identify her?

21   A        She's sitting at the table with the flowered shirt

22   on.

23                       MR. BECKER:  Okay.  And Your Honor, let

1    the record reflect the witness has identified the defendant

2    in this matter.

3                        THE COURT:  The record will show that.

4                        MR. BECKER:  I have nothing further.

5                        THE COURT:  Are you done?

6                        MR. BECKER:  Yeah.

7                        **CROSS EXAMINATION**

8    **BY MR. INGRAM:**

9    Q       Hello.  How are you?

10   A       Good.  How are you?

11   Q       Your barber shop is closed on Mondays so you know

12   this was on Tuesday, December 11th; am I right?

13   A       Yes.

14   Q       In the morning or the afternoon?

15   A       That, I don't know.

16   Q       Can you pinpoint it at any time during the day?

17   A       I don't recall what time of day it was, no.

18   Q       Okay.  Well, what time did you open?

19   A       We open at 9.

20   Q       What time do you close?

21   A       Five.

22   Q       So it's somewhere between 9 and 5?

23   A       Yes.

```
1    Q         Did this guy that came in, he ask you to dye his
2    hair?
3    A         No.
4    Q         He ask you to do anything to try to change his
5    appearance?
6    A         No.
7    Q         Just wanted a haircut?
8    A         Yes.
9                        MR. INGRAM:  No further questions.
10                       THE COURT:  Any redirect?
11                       MR. BECKER:  No, sir, Your Honor.
12                       THE COURT:  Ma'am, thank you very much.
13                       THE WITNESS:  Thanks.
14                       MR. BECKER:  Your Honor, the State would
15   call Barry Ricker.
16                             *  *  *
17
18
19
20
21
22
23
```

1    **WHEREUPON,**

2                              **BARRY RICKER,**

3    having been first duly sworn, according to law, was examined

4    and testified as follows:

5                         **DIRECT EXAMINATION**

6    **BY MR. BECKER:**

7    Q        Would you please introduce yourself to this jury,

8    please?

9    A        Yes.  My name is Barry Ricker.  I am a service

10   advisor.  I work down at Preston Auto Mall down in Warren,

11   Ohio.

12   Q        And can you tell us how long you've worked at

13   Preston Auto Mall?

14   A        At Preston Auto Mall, about five and a half.  In

15   October, it'll be six years.

16   Q        And what do you do at Preston Auto Mall?

17   A        I am a service advisor, service consultant is what

18   they call it.

19   Q        Now, during the course of your employment at Preston

20   Auto Mall, did you become familiar with an individual by the

21   name of Robert either Roberts or Fingerhut?

22   A        Yes.  I knew Bob as Mr. Roberts.  I called him that

23   from day one, but I was familiar with Bob Roberts or

1   Mr. Fingerhut, yes.

2   Q        All right.  And could you tell us and tell this jury

3   under what circumstances you would see Mr. Roberts or

4   Fingerhut?

5   A        He would bring in, there were two automobiles that

6   he would bring in for service, both of 'em Chrysler

7   automobiles, one silver and one red.  He would bring the

8   vehicles in in the morning and drop them off for either

9   maintenance or mechanical repairs and we would make

10  arrangements on getting him transportation back to work and

11  things like that.

12  Q        And what sort of arrangements would that include?

13  Did that include, perhaps, you driving him back to work?

14  A        I never had the occasion to drive him back to work.

15  We would either have one of our dispatch people as far as a

16  driver take him in one of our automobiles or one of the sales

17  department would run him back down to work.

18  Q        And do you, are you familiar with who would have

19  dealt with Mr. Fingerhut in the sales of those vehicles?

20  A        I know that one of the salesmen, Carmen Olivia, was

21  his salesman.  He usually dealt with Carmen on a full-time

22  basis.

23  Q        Okay.  And apparently Preston has some I guess

1    customer perks, for lack of a better term, that they offer

2    some of their customers in terms of taking care of their

3    vehicles?

4    A        Sure.  When you purchase a vehicle from Preston Auto

5    Mall, you're entitled to car washes for, say for instance,

6    the life of, as long as you own the vehicle.  So anytime,

7    you're permitted to drive on down and you can turn your keys

8    in to anyone at the service department or anyone down in the

9    sales department and they would get the car washed for free.

10   Things like that.

11   Q        Did Mr. Fingerhut or Mr. Roberts ever take advantage

12   of that service?

13   A        I would see him come down.  Whenever I saw him come

14   for service, I would primarily deal with Bob as far as his

15   automobiles are concerned.  When he came down for, to talk to

16   either someone in sales or to come down to get the car

17   washed, I would see him and acknowledge him.  A lot of times

18   he would never come, even come back to service because there

19   would be no reason for him to come back.  He would just be

20   there just to get a car washed.

21   Q        And he'd say hi to you?

22   A        Sure.

23   Q        And would he be in one or both of these vehicles or?

1    A        He brought down either car.

2    Q        Right.  And did you ever become familiar with a

3    Mrs. Roberts?

4    A        I dealt with Bob primarily probably 99 percent of

5    the time.  In the history of having the two cars there, I

6    dealt with Mrs. Roberts I think one time.  I had called Bob

7    to let him know his car was done and he had mentioned to me

8    the fact that he would not be picking the vehicle up, that

9    Donna would be coming down to pick the vehicle up.  And

10   that's when, the one occasion I dealt with Donna.

11   Q        That you recall seeing her?

12   A        Correct.

13   Q        Now, when he would bring these cars on and service

14   was performed on them, I'm not talking about the car wash,

15   were there documentations and things that had to be signed

16   for that?

17   A        Definitely.  Any time that a car comes in for any

18   kind of service work on the vehicle, a repair order is

19   initiated.  We do the repair work that's stated on the repair

20   order and then when the customer comes to pick the vehicle

21   up, we review it with them and they sign the repair order.

22   Q        All right.  I'm gonna show you a series of exhibits

23   that have previously been marked as State's Exhibit 398 and

1    399.

2           First, I'm gonna show you what has been marked for

3    purposes of identification as State's Exhibits 398-A, as in

4    apple, through and including P.  I'm going to ask if you

5    recognize what those various documents are.  And just tell us

6    with respect to each letter and refer to the number and

7    letter what those documents are.

8    A        Uh-huh.  398-A, for instance, was an occasion in

9    August of 2001 where the vehicle was dropped off here for

10   some service work.

11          Same thing with basically all of the copies of the

12   repair orders here.  Basically, these are copies of the

13   accounting copies of the repair work that was done at, while

14   the vehicle was here for service.

15   Q        And would Mr. Roberts or Mr. Fingerhut, as you knew

16   him, have to sign off on any of those documents?

17   A        Correct.  We do not permit the vehicle to leave the

18   premises unless the customer signs, unless there's a special

19   case where we deliver the automobile to the customer.  That

20   would be the only time.

21   Q        And would Mr. Fingerhut have signed those documents

22   in your presence?

23   A        Correct.  We escort the customers over to our

1   cashier's counter and explain to them any of the charges and

2   any of the repairs that were done and then we ask them to

3   sign at that particular time.

4   Q        Now I notice that those documents, I believe, all

5   carry the name of Donna Roberts on the, I guess that would be

6   the account information?

7   A        Correct.

8   Q        All right.  What did you know or did you know of any

9   relationship between Mrs. Roberts and Bob?

10  A        I had, from the start when the vehicle came in for

11  service work, Bob identified himself as bringing the vehicles

12  in for repairs.  What we do as service advisors, then, is we

13  pull the vehicle around into position as far as to get it

14  ready for service, we take the information from the car, as

15  in the vehicle identification number and the miles and enter

16  it into our computer.  When we enter this information into

17  the computer, then the name, address, phone numbers, all the

18  information for the car comes up, and that's when it shows as

19  Donna Roberts.  I had dealt with Bob on a first-name basis

20  for the entire time that he had his vehicle there.  Whenever

21  we ran the vehicle information through and the repair order

22  was written up and then I contacted Bob, I assumed that it

23  was Bob Roberts.

1    Q        Okay.

2    A        I didn't realize that there was the difference in

3    the last names.  So I always identified myself, called him

4    Bob.  On the rare occasions when he wasn't at the phone, I

5    would ask for Mr. Roberts.  There would be a little bit of,

6    uh, and then they would realize who I was asking for.

7    Q        Okay.

8    A        So.

9    Q        Now, all of those documents that are 398-A through I

10   believe P I think is the last one on there, those are all

11   various documents for service provided at Preston?

12   A        Correct.  There are service records here.  There are

13   also information here as far as the service contract that was

14   purchased on the automobiles here.  There's also shipping

15   orders and delivery receipts here also for those two cars.

16   Q        And I believe your name is also on those forms?

17   A        Yes.

18   Q        And additionally, it indicates with respect to the

19   398 Exhibits A through P, they indicate the model of the car,

20   as well as the color?

21   A        Correct.

22   Q        All right.  And what is the year, the model and the

23   color of the exhibits contained in 398?

1    A        398-A shows this as a 2000 Chrysler 300M, and it's

2    red in color.  They actually call it inferno red, but it's

3    known as red.

4    Q        All right.  And are all of those fair and accurate

5    copies of the originals, which I believe you still have at

6    Preston Auto?

7    A        Correct.

8    Q        Okay.  Now I'm gonna ask you to look at State's

9    Exhibits 399-A through and including, they're out of order

10   here, 399-A through K, and ask if you recognize what those

11   exhibits are?

12   A        Correct.  Again, these are copies of the accounting

13   copies of the repair orders that, for the Chrysler 300M that

14   was silver in color that Bob would bring in for repairs.

15   Q        All right.  And are those, again, the same type of

16   documents and executed in the same manner as you previously

17   testified?

18   A        Correct.  All the same format, same information,

19   same spot for the customer signature, things like that.

20   Q        And again, when you put this into your computer,

21   whose name would come up as I guess the person who bought

22   that vehicle?

23   A        As the vehicle, it tells us that the vehicle is

1    titled to Donna Roberts, yeah.

2    Q        And would your name also appear on those documents?

3    A        Correct.

4    Q        And those items, 399-A through, did I say G?

5    A        K.

6    Q        K.  I'm sorry.  Were those items, are those items

7    fair and accurate copies of the originals that are at

8    Preston?

9    A        Yes, sir.

10   Q        Now, do you recall when Mr. Robert Fingerhut or

11   Roberts would come to Preston, do you recall how he would

12   often be dressed?

13   A        Very casual dresser.  The thing I liked about Bob is

14   when we, he would drop his vehicles off, there'd always be a

15   little conversation --

16                    MR. INGRAM:  Objection.  Non-responsive to

17   the question.

18                    THE COURT:  Yeah.

19   Q        (By Mr. Becker)  Okay.  Just do you recall how he

20   would be dressed?

21   A        Casual dresser.  He would wear blue jeans.  Most of

22   the time, he would wear sports jackets.  Things like that.

23   Team jackets.

1    Q        Now, do you recall the last day you saw Mr. Roberts

2    or Mr. Fingerhut?

3    A        Would have been approximately December the 10th I do

4    believe it was.  He had dropped the vehicle off for service.

5    We had done some service work and we had to order a part for

6    the car.  So I had contacted him at that time and told him

7    that the vehicle was done, but I had to order a part.  It was

8    ready for pick up and he could stop and get it anytime.

9    Q        And were you there when he stopped to pick it up?

10   A        December the 10th, I can't really remember if I was

11   there.  We're a volume dealership, in that we usually deal

12   with 25 to 30 people a day.  5 to 6:00 in the afternoon is

13   the busiest time of the day.  And a lot of times, we're so

14   busy at that particular time that Bob knew that if he came to

15   the counter and I was busy, he went right over to the cashier

16   to pick his car up.

17   Q        All right.  And when you saw him earlier on the 10th

18   of what you believed, did he appear to be concerned about

19   anything or did he appear to be normal?

20   A        Just a regular day.

21                   MR. INGRAM:  Objection.

22                   THE COURT:  What is your objection?

23                   MR. INGRAM:  It calls for absolute

1    speculation.

2                    MR. BECKER:  Well, let's put it this way.

3                    THE COURT:  I will sustain the objection

4    if you wish to rephrase it at some point.

5    Q        (By Mr. Becker) Did his actions or tone of voice

6    give you any indication that it was different for him that

7    day than any other day?

8    A        Not at all.

9                    MR. BECKER:  Thank you very much.  I have

10   nothing further.

11                   THE WITNESS:  Yes, sir.

12                   MR. BECKER:  Oh, wait, wait.

13           I have nothing further, Your Honor.

14                   THE COURT:  Do you wish to cross?

15                   MR. INGRAM:  Mr. Juhasz.

16                   MR. JUHASZ:  Just briefly.

17                        **CROSS EXAMINATION**

18   **BY MR. JUHASZ:**

19   Q        Mr. Ricker, good afternoon.  For these vehicles that

20   you've been talking about, is it possible for someone to buy

21   a service plan, a service contract, for them?

22   A        At the time of sale, our salesmen are instructed to

23   inform potential customers, our customers, that there is,

1    there are service contracts available where your oil changes

2    and tire rotations are paid for in advance.  There's also

3    service contracts available for mechanical repairs.

4    Q        Any of these documents Mr. Becker has put in front

5    of you this afternoon, do they indicate whether or not there

6    was such a service contract?

7    A        Yes.  I happened to glance through.  I'd have to

8    look through the other one very closely, but I happened to

9    glance on the silver 300M that there is a, I do believe, it

10   may be, there, it's actually on the red automobile.  There's

11   a copy of the contract, what they call the care-free car

12   protection, which is a mechanical repair service contract.

13   Q        And who was the purchaser of that contract?

14   A        It is titled under the name of Donna Roberts.

15   Q        Okay.  As were both of the cars, if I understood

16   your testimony; is that right?

17   A        Correct.  Yes, sir.

18   Q        Now, you indicated that had Mr. Fingerhut, or

19   Mr. Roberts as you knew him, would mostly, you'd deal mostly

20   with him; correct?

21   A        Yes, sir.

22   Q        Incidentally, when you called him Mr. Roberts, did

23   he ever correct you?

```
 1    A       Not one time, no.

 2    Q       All right.  It is not unusual in your business, is

 3    it, for somebody who's not the owner to bring in a vehicle

 4    for service?

 5    A       Correct.

 6    Q       You do a lot of high end vehicles like BMWs and

 7    things like that; correct?

 8    A       That is correct.  I have, on occasions, I've been

 9    there with BMWs for almost six years and there are still

10    customers I've never met.

11    Q       Okay.  So you've never met the owner cause somebody

12    else always brings them in; is that what you're saying?

13    A       Correct.  Yes.

14                    MR. JUHASZ:  Thank you very much.

15                    THE COURT:  Redirect?

16                    MR. BECKER:  I have nothing further, Your

17    Honor.

18                    THE COURT:  Mr. Ricker, thank you very

19    much.

20                    THE WITNESS:  That's it?  Sure.

21                    MR. BECKER:  Carmen Olivia.

22                           *  *  *

23
```

1    **WHEREUPON,**

2                      **CARMEN OLIVIA,**

3    having been first duly sworn, according to law, was examined

4    and testified as follows:

5                      **DIRECT EXAMINATION**

6    **BY MR. BECKER:**

7    Q        I'm gonna ask you to maybe try and speak as closely

8    as you can to the microphone there.

9    A        Okay.

10   Q        So everyone in the courtroom can hear you.

11   A        Sure.

12   Q        Just for the record and for this jury, will you

13   introduce yourself?

14   A        Carmen Olivia.

15   Q        And Mr. Olivia, where do you work at?

16   A        Preston Chrysler/Jeep/BMW.

17   Q        And where is that located at?

18   A        That's 3843 Youngstown Road, Warren, Ohio.

19   Q        And what is it that you do at the Preston Auto Mall?

20   A        Sales rep.

21   Q        And how long have you been with Preston Auto Mall?

22   A        Be nine years.

23   Q        All right.  Now, during the course of your

1    employment at Preston Auto Mall, did you become familiar with

2    an individual by the name of Robert either Fingerhut or

3    Roberts?

4    A        Mr. Roberts.

5    Q        And can you tell this jury, was it through the --

6    can you tell this jury whether it was through the sale of

7    more than one car or multiple cars?

8    A        It was more than, it was '98, '99, 2000, 2001.  Four

9    cars.

10   Q        And do you recall the makes and models of those

11   cars?

12   A        Yes.  '98 Sebring, '99 300M, 2000 300M, 2001

13   Chrysler 300M was the last one.

14   Q        Now eventually, did you become aware that this

15   individual's name was not Mr. Roberts, but actually

16   Mr. Fingerhut?

17   A        Well, I knew his last name was Fingerhut.  We called

18   him, we just all called him Mr. Roberts.

19   Q        Was there a reason for that?

20   A        That's what he said call him.  Call him Mr. Roberts.

21   Q        Okay.  And were those cars that he got from Preston,

22   do you know whether they were purchased or leased?

23   A        They were leased.

1    Q        And in addition to purchasing or leasing those, do

2    you know whether he would purchase or, I don't know if you'd

3    call it a purchase when you lease it, but would he obtain a

4    service contract?

5    A        Sure.

6    Q        That's like an added and above insurance sort of, I

7    guess, above what the warranty, the manufacturer's warranty

8    covers?

9    A        Right.  Uh-huh.

10   Q        And he would be interested in those?

11   A        On the extended insurance?

12   Q        Yeah.  Is that what they refer that to?

13   A        Well, when there's a lease, it's standard.  You have

14   to have, the only extra insurance is gap insurance.

15   Q        All right.

16   A        That's mandatory.

17   Q        Would he be interested in that?

18   A        It's not a matter of being interested.  He wasn't

19   involved in that end anyway.

20   Q        All right.  And when he would come in to lease these

21   cars, I assume all of them were leased?

22   A        Yes.

23   Q        The ones you described?

1    A        Yes.

2    Q        Would he generally negotiate with you I guess?

3    A        Yeah.  He picked every car and negotiated it with

4    me.

5    Q        And during this time where you would negotiate and

6    lease these, was a female present with him?

7    A        No, sir.

8    Q        But eventually, you did come to know that there was

9    a female that he was, I don't know to refer to as wife, but

10   as a significant other?

11   A        Sure.

12   Q        And whose name were those cars that he would lease

13   from you, whose name were they placed in?

14   A        Donna Roberts, his wife.

15   Q        Did you come to know who Donna Roberts was?

16   A        Yes.

17   Q        And who did you find out Donna Roberts was through

18   your business relationship with Mr. Fingerhut?

19   A        I knew that was his wife.

20   Q        And what is it that Donna Roberts did regarding the

21   negotiation of the lease of those vehicle?

22   A        She just came in to sign on the lease contracts and

23   take --

1   Q        Basically just sign some paperwork?

2   A        Right.  Excuse me.  And take delivery of the

3   vehicle.

4   Q        All right.  Now, does Preston have any services that

5   I guess they give to customers that are like maybe a perk?

6   A        Yeah.  Feature and benefits, Monday through

7   Saturday, anytime, come in for a free car wash, free rental,

8   free loaner on an overnight stay.  We had a good relationship

9   with Mr. Roberts.  We would go to the bus terminal, pick up

10  the car, bring it over for service, bring it back anytime he

11  needed that.

12  Q        And he, how often would you see Mr. Roberts or

13  Mr. Fingerhut?

14  A        Oh, I'd see Mr. Roberts probably at least once a

15  week.  He was particular with the cars, keeping 'em clean.

16  Q        And that was because, yeah, he wanted to keep them

17  clean?

18  A        Cleaned and serviced.

19  Q        And how often would you see this Donna Roberts?

20  A        I seen Donna probably four or five times, on time of

21  signing on deals and me going over the vehicle with her to

22  take delivery of it.

23  Q        Would those be about the only times you would see

```
 1    her?

 2    A         Yeah.  I didn't see Donna much, other than signing

 3    and taking delivery.

 4    Q         All right.  Now, do you recall the last two vehicles

 5    that Mr. Fingerhut leased from Preston?

 6    A         Sure.

 7    Q         And what vehicles were those?

 8    A         2000 300M, 2001 300M.

 9    Q         Do you recall the colors of those vehicles?

10    A         Inferno red was the 2000.  Silver mist metallic was

11    the 2001.

12    Q         And would Mr. Roberts or Mr. Fingerhut bring both of

13    those in for the service and this perk for the car wash?

14    A         Absolutely, yeah.  Or we would go to him if it

15    was --

16    Q         And pick 'em up?

17    A         If he was too busy, we would go to him.

18    Q         Now, do you recall the types of keys for those

19    automobiles that Mr. Fingerhut had?

20    A         Sure.  I don't even need to see 'em.

21    Q         Well, I'm gonna show 'em to you anyway.  Go ahead

22    and describe them if you'd like.

23    A         Just had a lot of keys.  There was a baseball on it
```

1    usually, a little thing of a gym bag, a key ring, had a

2    little ring on there.  Had a lot of keys.

3    Q       You would have seen those or how would you have come

4    into contact with those keys?

5    A       I would take the car back to get it washed, cleaned.

6    I would bring it to Barry for service.

7    Q       You're referring to Barry Ricker?

8    A       Yeah.

9    Q       I'm gonna show you what's been marked for purposes

10   of identification as State's Exhibit 269 and ask if you

11   recognize what State's Exhibit 269 is?

12   A       That's them.

13   Q       You weren't kidding when you said a lot of keys,

14   were you?

15   A       No.  I took care of 'em, you know, five years

16   almost.

17   Q       And throughout your relationship, that basically was

18   the keys that he would give you to the vehicle?

19   A       Yeah.  Yes, sir.

20   Q       I assume he had his car in for a lot of repairs to

21   the ignition?

22   A       Yeah.  Right.

23   Q       Do you know, through any conversation, whether

5318

1    Mr. Fingerhut or Mr. Roberts was any type of sports

2    enthusiast or collector?

3    A        Yeah.  He was a collector.  He wore jerseys every

4    time he would come in.

5    Q        All right.

6    A        NFL jerseys, any professional activity.  He actually

7    personally gave one to my son, Anthony.  We were Dolphin

8    fans, and he brought one in and he said, "Give this to your

9    son from me."

10   Q        And do you recall the last time you saw

11   Mr. Fingerhut alive?

12   A        Yeah.  It was probably a week before he came in for

13   his last visit to see Barry, which would have been on the

14   10th, I believe, of December.

15   Q        All right.  Did you get a chance to --

16   A        Because we ordered a part for him.

17   Q        All right.  Did you get a chance to speak to him

18   that day?

19   A        Just "Hello.  How are you?  Is everything okay?"

20            He said Barry ordered a part for him.

21   Q        Okay.  And was there anything in his mannerisms or

22   tone that indicated to you that something was not right?

23   A        No.  He was always a very polite man.  Everybody

1    liked him.

2    Q       The individual that you came to know as Donna

3    Roberts, do you see her in this courtroom today?

4    A       Sure.

5    Q       Could you please identify her?

6    A       Excuse me?

7    Q       Could you please point to her, describe what she's

8    wearing?

9    A       Yeah.  Right here to my right (indicating.)

10                   MR. BECKER:  Please allow the record to

11   reflect that he has identified the defendant in this case,

12   Donna Roberts.

13                   THE COURT:  Yeah.  The record will

14   reflect.

15                   MR. BECKER:  Your Honor, I have no further

16   questions of this witness.

17                   THE COURT:  Cross.

18                   **CROSS EXAMINATION**

19   **BY MR. JUHASZ:**

20   Q       Mr. Olivia, good afternoon.

21   A       Good afternoon.  How are you?

22   Q       I'm fine.  How are you?

23   A       Good, sir.

1  Q       I'm just gonna take a couple minutes and ask you a

2  couple questions based on some of the things that

3  Mr. Becker asked you about.

4  A       Okay.

5  Q       If I understand you, you were involved in dealing

6  with Mr. Fingerhut, or Mr. Roberts as you knew him, in four

7  different vehicles; is that right?

8  A       Yes, sir.

9  Q       Okay.  Each one of those were leases; correct?

10  A       Yes.

11  Q       Do you also sell vehicles there at Preston?

12  A       Sure.  Sell, lease.

13  Q       But these all happened to just be leases?

14  A       Yes.  Uh-huh.

15  Q       Before the, the silver is the newest of the two

16  cars?

17  A       That would have been the latest one.

18  Q       Okay.  Was there a trade-in of a previous leased

19  vehicle for that silver one?

20  A       Yeah.  But the 2000 would have been the trade-in, of

21  course, on the '01.

22  Q       Okay.  When you say the 2000, are you talking about

23  the inferno red one?

1    A        The inferno red, yeah.

2    Q        Okay.  Before the red, was there another car, a

3    burgundy car?

4    A        There was.  It was called cranberry.  It was a '99.

5    Q        Cranberry?

6    A        It was a '99.  We call it cranberry.  That's the

7    factory name, cranberry.

8    Q        And that was a, did you say a '99?

9    A        Yes, sir.  Uh-huh.

10   Q        If you remember, then, there would have been a point

11   in time when the two cars that were leased were the cranberry

12   and the inferno red; am I right?

13   A        Right.

14   Q        And then the cranberry lease would have been expired

15   or whatever happened with it, and the silver mist one that

16   you talked about --

17   A        They weren't expired.  They, from me remembering,

18   there were, it was a trade-in.

19   Q        Okay.

20   A        That cranberry was a trade-in where we pay off the

21   balance and --

22   Q        All right.  So the lease was still in existence?

23   A        Sure.  Uh-huh.  We'd just pay it off.

5322

```
 1    Q        Just decided to upgrade to the silver mist car?

 2    A        That's right.

 3    Q        All right.  All of the cars that you dealt with with

 4    Mr. Roberts or Mr. Fingerhut, whose name was on all of the

 5    leases?

 6    A        His wife did all the signing.

 7    Q        Donna Roberts?

 8    A        Donna, yes.

 9    Q        Okay.  You mentioned, when Mr. Becker was asking you

10    some questions, about seeing her when she would come in to I

11    think you said take delivery of the vehicle?

12    A        After signing and sitting with our business manager.

13    Q        Okay.

14    A        Of course I'd wait for her and take care of her on

15    making sure she knew everything about the car before she

16    drove off in it.

17    Q        All right.  That's what I'm interested in finding

18    out.  Is it, is something required, is it your business

19    practice that when somebody leases a vehicle, the person who

20    leases it to 'em, your phrase is take delivery, you sort of

21    go over the car with them, make sure they understand --

22    A        They know every button on that car.  Sure.  Yeah.

23    Q        Okay.  Because that person who signs the lease is
```

```
 1   the person who's legally responsible, for example, if they
 2   return the car damaged at the end of the lease; is that
 3   right?
 4   A        That person on the lease contract.
 5   Q        Who's on the lease, correct?
 6   A        Absolutely.  Sure.
 7   Q        Now, I assume when somebody applies for a lease,
 8   there is also a process of checking credit to make sure that
 9   you're gonna go through with the lease?
10   A        Their credibility is there and approved, sure.
11   Q        All right.  And the credit that would be checked in
12   the case of all these leases that we're talking about would
13   be Donna Roberts; correct?
14   A        That's correct.
15   Q        Not Mr. Fingerhut?
16   A        Donna Roberts, yeah.
17   Q        The 2001 silver mist, if you recall, is that a car
18   that has four air bags?
19   A        No.  Dual air.  Just front dual air bags.
20   Q        Okay.
21   A        It didn't have the side air bags.
22   Q        On the silver one?
23   A        Right.
```

5324

```
 1    Q        Okay.  Do any of the cars have the side air bags

 2   that you can recall, any of the four that we're talking

 3   about?

 4   A        No.

 5                         MR. JUHASZ:  Thank you.

 6                         THE COURT:  Redirect?

 7                         MR. BECKER:  Nothing, Your Honor.

 8                         THE COURT:  Sir, we thank you.

 9                         MR. BECKER:  Thank you very much.

10                         THE WITNESS:  Okay.

11                         MR. BAILEY:  State calls Jose Flores.

12                              *  *  *

13

14

15

16

17

18

19

20

21

22

23
```

1    WHEREUPON,

2                              JOSE FLORES,

3    having been first duly sworn, according to law, was examined

4    and testified as follows:

5                          DIRECT EXAMINATION

6    BY MR. BAILEY:

7    Q        Good afternoon, Mr. Flores.  Do you want to tell the

8    Court and the jury your full name and where you live?

9    A        My name is Jose Torres Flores.  I live in Mansfield,

10   Ohio.

11   Q        Okay.  And how long have you lived down there?

12   A        I've lived in Mansfield for --

13   Q        Approximately.

14   A        -- about seven months.

15   Q        Okay.  And before that, where were you living?

16   A        I lived at the Wagon Wheel.

17   Q        I'm sorry?

18   A        Wagon Wheel.

19   Q        The Wagon Wheel.  And what is the Wagon Wheel?

20   A        The Wagon Wheel is a motel.

21   Q        And where is it located?

22   A        7015 Market Street, Boardman, Ohio.

23   Q        Okay.  And how old are you now?

```
 1    A        I'm 24.  I'll be 25 tomorrow.

 2    Q        Okay.  And how old were you back in December of

 3    2001?

 4    A        I should have been 23.

 5    Q        About 17 months ago.  Okay.  Now, I'm gonna direct

 6    your attention back to December of 2001.  Can you tell us

 7    what you were doing at that time?

 8    A        Say the date again.

 9    Q        December of 2001.

10    A        December?

11    Q        December.  Right.  The month of December in 2001.

12    You were living at the Wagon Wheel?

13    A        (Witness nods head.)

14    Q        Okay.  You've got to answer for our court reporter.

15    A        Yes, I was living at the Wagon Wheel.

16    Q        Okay.  And what was your employment at that time?

17    A        I was the general manager.

18    Q        Of the Wagon Wheel?

19    A        That's correct.

20    Q        Okay.  How did you become manager of or when did you

21    become manager of the Wagon Wheel?

22    A        In August.

23    Q        Of 2001?
```

1    A        Of that year.

2    Q        And can you describe this motel, the size of this

3    motel?

4    A        It's got, I can't remember now, but it's got about

5    21 rooms, two jacuzzi suites.  And that's all.  It's not very

6    big.

7    Q        Okay.  I'm gonna move this closer a little bit to

8    you; okay?  Let's see if it picks up your voice a little.

9    A        Okay.

10   Q        Can you tell us again?

11   A        It's got about 21 rooms that I can remember, two

12   jacuzzi suites.

13   Q        Okay.  And you were the general manager?

14   A        Yes.

15   Q        How many levels on this hotel?

16   A        It's just a single-level motel.

17   Q        Okay.  And where would it be located in regards to

18   the Southern Park Mall down in Boardman?

19   A        I'd say it's about two blocks off of 224.

20   Q        Going towards Youngstown?

21   A        Going toward Youngstown.

22   Q        Okay.  What is that, Route 7 over there, Market

23   Street?

1    A        Yeah.  Market Street.

2    Q        Okay.  Now, I'm gonna direct your attention to

3    December 6th of 2001.  At that time, do you recall seeing a

4    woman that paid cash for a room about which you were

5    contacted by the police later?

6    A        Yes.

7    Q        Okay.  And can you tell us about how that

8    transaction occurred and about this woman who came in?

9    A        First when she came in, she wanted to see the room.

10   Q        Okay.

11   A        After she saw the room, she asked if she could hold

12   it.  And I don't really remember too much, but I remember

13   that she said she would come by and check it out again.

14   Q        Okay.  This room that she checked out, what kind of

15   room was it?

16   A        It was our jacuzzi suite, room 101.

17   Q        Okay.  And how much did that room cost?

18   A        That room was 95, plus tax.

19   Q        Okay.  With tax, it would have been?

20   A        106.40.

21   Q        $106.40

22   A        Yep.

23   Q        Okay.  And room 101, when you say it's a jacuzzi

```
 1    suite, what's that mean?

 2    A         It's got a king size bed.  It has, it has the

 3    jacuzzi in it.  It also has a, like a small shower/sauna

 4    thing where it steams up.  It's like a bridal suite.  It's

 5    bigger than all the other rooms.  It's got steps where you

 6    step up to get to the jacuzzi level in room 101.

 7    Q         Okay.  Does it have any reflecting surfaces like

 8    mirrors?

 9    A         Yes.  It has reflecting --

10    Q         Can you move up a little bit because apparently the

11    jurors are having trouble hearing.

12    A         Okay.

13                    MR. BAILEY:  Were you able to hear any of

14    that?

15                    JUROR NO. 12:  Yeah.

16    Q         (By Mr. Bailey) Okay.  Tell us about the, this room

17    had mirrors?

18    A         Yes.  The room has mirrors.  On the jacuzzi, it has

19    mirrors on both sides, okay, because the rest of the jacuzzi

20    goes to the room and it's open.  But by the jacuzzi, it goes

21    on the corner.  Where the walls are, there's mirrors there.

22    There's also mirrors on the king size bed.  Where the

23    headboard would be, there's mirrors.  And you can dim the
```

1    lights.  And then above the bed, there's a mirror also.

2    Q        Mirrors on the ceiling?

3    A        Uh-huh.  Ceiling mirrors.

4    Q        Okay.  This is one of your larger rooms?

5    A        Yes.

6    Q        How many of these jacuzzi suites do you have at the

7    Wagon Wheel?

8    A        We only have two.

9    Q        Okay.  Now, I'm gonna direct your attention to

10   December 9th, 2001.  Were you working on that day?

11   A        Yes.

12   Q        I'm gonna show you what's been marked for

13   identification as State's Exhibit 312.  You know what?  Let

14   me move this other stuff off of here for a second.  Okay.

15   I'm gonna show you what's been marked for identification as

16   State's Exhibit 312.  It's an envelope that came out of an

17   envelope that contains a piece of paper.  And I'm gonna cut

18   this envelope open.  Okay.  312 contains a little index card.

19   Okay.  Have you seen that before?

20   A        Yes.

21   Q        And what is that?

22   A        This is the, these are receipt cards that we fill

23   out for each customer that comes into the hotel.  We identify

1  the car and the person.

2  Q       Okay.  And do you recognize the writing on that

3  card?

4  A       I know which writing is mine, and I know which

5  writing isn't.

6  Q       Okay.  So you were involved in, this is a guest

7  register receipt?

8  A       Right.  Normally, the guest fills it out.  Sometimes

9  they just give you ID and you can fill it out, the manager

10  fills it out.

11  Q       Okay.  And this particular day, December 9th of

12  2001, what happened that particular day when this receipt got

13  filled out?

14  A       I can't remember much about the day except for key

15  things that -- the key things that I remember are things that

16  I have to go over.  The only thing I remember about that day

17  is Nathaniel Jackson and Donna Roberts coming in.  I don't

18  remember much else about that day.

19  Q       You're saying you don't remember the rest of the

20  day.  You remember them coming in?

21  A       Yeah.  Of course I remember.

22  Q       Okay.

23  A       I've been, I have to remember.

1    Q      Okay.

2    A      Nothing else about the day is important.

3    Q      Okay.  Well, tell us about them coming in.

4    A      I remember I was in the office.  They drove into the

5    parking lot, turned the car toward the office facing Market

6    Street.  Nathaniel Jackson came in.  He paid.  I don't

7    remember if he paid in full or for the rest of what the

8    deposit was left.

9    Q      Well, let me stop you for a second.  You say

10   Nathaniel Jackson and Donna Roberts came in or they were

11   there.  They were in a car?

12   A      They were in the vehicle.

13   Q      Okay.  What kind of car was this?

14   A      It was a Chrysler.

15   Q      Do you remember what color it was?

16   A      It was like a burgundy color, red.  I don't know how

17   you say that.

18   Q      Okay.  Do you remember what model it was?

19   A      The model was a 300M.

20   Q      300M Chrysler?

21   A      Yes.

22   Q      Do you remember the year?

23   A      No.

5333

```
 1    Q       Okay.  And the woman, okay, the woman that came with

 2    him that day, was this the same woman that had been there a

 3    couple days before?

 4    A       Yes.

 5    Q       Okay.  And you received payment for the room I take

 6    it?

 7    A       Yes.

 8    Q       And how much was that room?

 9    A       The total was 106.40, including tax.

10    Q       Okay.  And you said the man came inside?

11    A       The man came inside the office.

12    Q       And where was the woman?

13    A       She was in the vehicle.

14    Q       Okay.  And when the man came in, what information

15    did you mark, was marked down on the receipt?

16    A       His, he filled out what's on this card.  His name.

17    Q       What was the name?

18    A       Nathaniel Jackson.  An address.

19    Q       What was the address he listed?

20    A       309 South Pearl, Youngstown, Ohio.  And he also

21    filled out the vehicle, and it says 300M Chrysler 2000, and

22    then the other thing filled out is the number in party and

23    there's the number two written there.
```

```
 1    Q        So there were two people in that party?

 2    A        Yes.

 3    Q        And this is for what room?

 4    A        This was for room 101, the jacuzzi suite.

 5    Q        Okay.  And this woman, can you describe her?

 6    A        I don't remember much about her.  She had red hair.

 7    She was light-complected.  She seemed to me she was somewhere

 8    in her forties.  That's about all I can remember.  She was

 9    really small -- she was smaller.

10    Q        Okay.  What was her race?

11    A        She was Caucasian.

12    Q        And the male?

13    A        He was African American.

14    Q        Okay.  And about how tall was this woman?

15    A        I don't know.  I'd have to say around 5'2."  I'm not

16    sure.

17    Q        Okay.  Now, did you work that week then?

18    A        I work every day.

19    Q        Okay.  Now, this room, was this ready for their

20    occupancy right away?

21    A        No.

22    Q        Why not?

23    A        I had customers that left late that day.  They had a
```

5335

1    late check-out.

2    Q       Okay.  So what happened?

3    A       I needed to finish doing a few things to the room so

4    it could be prepared.  There was some cleaning that needed to

5    be done.

6    Q       And was that done?

7    A       That was done before they entered the room.

8    Q       Okay.  Now, what did they do during this time that

9    they couldn't enter the room?

10   A       They were sittin' in the vehicle, which they had

11   pulled up into the spot which was empty which was reserved

12   for room two, but since room two and room 101 are next to

13   each other, you know, it doesn't matter who takes the spot.

14   Q       Okay.

15   A       And that's the spot they were sittin' in.

16   Q       And what were they doing?

17   A       They looked like they were talking and they had

18   music playing cause I could hear it.

19   Q       You could hear it?

20   A       Yes.

21   Q       What kind of music?

22   A       It was like hip-hop.

23   Q       Okay.  And about how long did it take you to get the

```
 1    room in order?

 2    A        I can't remember.

 3    Q        Okay.  Now, eventually, they did occupy that room?

 4    A        Yes.

 5    Q        How many days did they occupy that room?

 6    A        They stayed overnight.

 7    Q        And during that time, that evening, did you get any

 8    phone calls from them about the room?

 9    A        Yes, I did.

10    Q        And what was it about?

11    A        I had complaints about the heat.

12    Q        Was there anything wrong with the heat?

13    A        There was nothing wrong with the heat.  Also had a

14    complaint about the jacuzzi itself.  There was nothing wrong

15    with it.

16    Q        Okay.  Could you hear any noise going on in the room

17    when they called?

18    A        Well, Nathaniel Jackson was the one on the phone,

19    and I can hear a female's voice in the background giggling

20    and stuff.

21    Q        Okay.  Now, what about check-out?  What's normal

22    check-out?

23    A        Check-out is 11 in the morning.
```

```
 1    Q        And did this party check out at the normal time?

 2    A        No, they didn't.

 3    Q        What happened?

 4    A        I do believe they had to stay over just a little.

 5    They asked me on the phone that morning if it would be all

 6    right.  I said -- I can't remember much more.  I don't

 7    remember if I asked 'em if they could pay to stay extra an

 8    hour or not.  I don't remember.

 9    Q        Okay.  Now after, did there come a time when they

10    left the room?

11    A        Yes, they did.

12    Q        And after they left, did you have occasion to go

13    back inside that room to clean up?

14    A        That's correct.

15    Q        And was anything left behind?

16    A        Yes.

17    Q        What was left behind?

18    A        What was left behind was a pair of thong underwear,

19    they were red in color.

20    Q        Red thong underwear?

21    A        Yes.

22    Q        And this pair of red thong underwear, had it been in

23    the room before they occupied it?
```

```
 1    A        No.

 2    Q        Who had cleaned that room before they occupied it?

 3    A        That would be me.

 4    Q        Okay.  Now, did there come a time when the Howland

 5    Township Police Department talked to you about the case?

 6    A        Yes, they did.

 7    Q        Okay.  Did they show you any photographs?

 8    A        They showed me, the only pictures I was showed were

 9    to identify the male.

10    Q        The man?

11    A        Uh-huh.

12    Q        I'm gonna hand you what's been marked for

13    identification as State's Exhibit 313 and ask if you can

14    recognize that photographic array.

15    A        Yes.  I recognize it.

16    Q        Okay.  How do you recognize it?

17    A        He's the same, he was like what I described.  He's

18    thinner, he's dark, and there was a feature on his face that,

19    like a mole or I don't know what it was.

20    Q        But you, oh, you picked -- well, did you sign that

21    array?

22    A        That's my signature, yes.

23    Q        Okay.  And did you identify anybody in that
```

1    photographic array?

2    A        Yes, I did.  I identified picture number six.

3    Q        Okay.  And who was that person?

4    A        They never told me if I got it right or not.  It's

5    supposed to be Nathaniel Jackson.

6    Q        Well, is that the person who rented the room, one of

7    the two people?

8    A        That is the male that rented the room.

9    Q        Okay.  Let me ask you this.  The woman who was with

10   this man that rented the room, the woman who had come in a

11   couple days before to check out the room, do you, would you

12   recognize her if you saw her again?

13   A        I don't know if I would recognize her.  I haven't

14   seen her face since then.

15   Q        Okay.  Well, can you look around the courtroom today

16   and tell me if you see her here?

17   A        I, like I said, I wouldn't, I haven't seen her face

18   since then.

19   Q        Okay.  But at that time, this woman, you said, had

20   red hair, reddish brown hair?

21   A        She had red hair at the time.

22   Q        Red hair?  And she was short?

23   A        And she was short.

1    Q        And she was a white female?

2    A        She was white.

3    Q        Okay.  And do you remember what her build was at

4    that time?

5    A        At the time?

6    Q        Right.  At that time.  About 17 months ago.

7    A        At the time, she, like I said, she was short,

8    shorter than me, I'm six foot tall, which 5'2" is pretty

9    average of the females I've met in my life.  My sister is the

10   same height.  So she seems about that height.  She seems

11   thinner than my sister, who weighs 135.

12   Q        So, at that time, this woman seemed thinner than

13   your sister, who is 135 pounds?

14   A        Yes.

15   Q        At that time?

16   A        Yes.

17   Q        Seventeen months ago?

18   A        Yes.

19            MR. BAILEY:  Okay.  Thank you very much.

20   I'm done with my questions.  Now defense counsel will get an

21   opportunity to ask you some.

22            THE COURT:  Care to cross?

23            MR. INGRAM:  Thank you, Your Honor.

1  (Note:  For further proceedings in this matter, please refer

2  to Volume XXV.)

3

4  **REPORTER'S CERTIFICATE**

5

6  This is to certify the foregoing represents a true and

7  correct copy of the proceedings had in the aforementioned

8  cause as reflected by the stenotype notes taken by me on the

9  same.

10

11  _____

1-7-04  Lori J. Rittwage, RPR

12  Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

1              IN THE COURT OF COMMON PLEAS

2                  TRUMBULL COUNTY, OHIO

3    STATE OF OHIO,            ) Case No. 01-CR-793
          Plaintiff           ) Appeal No. 03-T-56
4                             )
     -vs-                      ) Judge John M. Stuard
5                             )
     DONNA M. ROBERTS,         ) **TRANSCRIPT OF PROCEEDINGS**
6         Defendant           )    **VOLUME XXV**

7

8    Jury Trial proceedings on Wednesday, May 14, 2003 and

9    Thursday, May 15, 2003

10   BEFORE:      HONORABLE JOHN M. STUARD

11   AT:          Trumbull County Court of Common Pleas
                  Courtroom Number 2
12                161 High Street, NW
                  Warren, Ohio 44481
13

14   APPEARANCES:

15   On behalf of the State of Ohio:

16        Messrs. Ken Bailey & Christopher Becker
          Assistant Prosecuting Attorneys
17        Warren, Ohio

18   On behalf of the Defendant:

19        Messrs. John Juhasz & Gerald Ingram
          Attorneys at Law
20        Youngstown, Ohio

21

22

23   Official Court Reporter:  Lori J. Rittwage

1                          I N D E X - VOLUME XXV

2

3                    WEDNESDAY, MAY 14, 2003 (CONTINUED)

4    WITNESSES:

5    JOSE FLORES

6    CROSS EXAMINATION BY MR. INGRAM......................... 5342

7    REDIRECT EXAMINATION BY MR. BAILEY......................5350

8

9    CHRISTOPHER GEAR

10   DIRECT EXAMINATION BY MR. BECKER........................5357

11

12                       THURSDAY, MAY 15, 2003

13   JEFF DIAMANTES

14   DIRECT EXAMINATION BY MR. BECKER........................5375

15   CROSS EXAMINATION BY MR. INGRAM .......................5385

16

17   JENNIFER ROBINSON

18   DIRECT EXAMINATION BY MR. BECKER........................5387

19   CROSS EXAMINATION BY MR. INGRAM........................5393

20

21   MIKE YANNUCCI

22   DIRECT EXAMINATION BY MR. BECKER........................5396

23   CROSS EXAMINATION BY MR. INGRAM........................5405

1    **WITNESSES (CONTINUED):**

2    **ANTHONY LESHNACK**

3    DIRECT EXAMINATION BY MR. BAILEY.........................5409

4    CROSS EXAMINATION BY MR. JUHASZ.........................5426

5

6    **SANTIAGO MASON**

7    DIRECT EXAMINATION BY MR. BECKER........................5436

8    CROSS EXAMINATION BY MR. INGRAM.........................5449

9    REDIRECT EXAMINATION BY MR. BECKER...................... 5472

10   RECROSS EXAMINATION BY MR. INGRAM....................... 5472

11   FURTHER REDIRECT EXAMINATION BY MR. BECKER............. 5475

12   FURTHER RECROSS EXAMINATION BY MR. INGRAM............. 5476

13

14   **FRANK DILLON**

15   CROSS EXAMINATION BY MR. INGRAM.........................5479

16   DIRECT EXAMINATION BY MR. BECKER........................5480

17   RECROSS EXAMINATION BY MR. INGRAM.......................5481

18

19   **REPORTER'S CERTIFICATE**..................................5487

20

21

22

23

3342

1               **WEDNESDAY, MAY 14, 2003 (CONTINUED)**

2               **CROSS EXAMINATION OF JOSE FLORES**

3   **BY MR. INGRAM:**

4   Q      Good afternoon, Mr. Flores.

5   A      Good afternoon.

6   Q      I'm gonna ask you some questions, but when I ask you

7   some questions, I'm gonna stand back there so that you have

8   to talk to me and I have to hear your answers; okay?

9   A      Okay.

10   Q      But before I go back there, I have to see 312.  Can

11   I borrow this?

12   A      Go ahead.

13   Q      I'm gonna give this back to you and then I'm gonna

14   go back there.  When I ask you to look at 312, this is what

15   I'm talking about; fair enough?

16   A      Fair.

17   Q      Okay.  I have to be able to hear you all the way

18   back here.

19   A      Okay.

20   Q      When you were talking with Mr. Bailey, he asked you

21   what you remembered about December 9th.  Do you recall that

22   question?

23   A      Yes.

5343

1    Q        And you told him that all you, you told him that all

2    you remembered were the names Nate Jackson and Donna Roberts?

3    A        I remember what I had to about the two individuals.

4    Q        Well, when you told Mr. Bailey that you remembered

5    Nate Jackson and Donna Roberts, where did those names come

6    from?

7    A        The Nathaniel Jackson name came from the card.

8    Q        That's State's Exhibit 312, that little card in

9    front of you; is that right?

10   A        That's correct.  The name --

11   Q        Where did the name Donna Roberts come from?

12   A        The name Donna came from me from her first visit.

13   The name Roberts, I didn't have no clue.

14   Q        Well, you said the name Donna Roberts when you were

15   talking to Mr. Bailey.  You couldn't say the name Roberts if

16   you had no clue.  Where, pray tell, did the clue come from?

17   A        The clue came from the police.

18   Q        The clue came from the police?

19   A        Yeah.  They gave me the names of the individuals.

20   Q        So you talked to the police on December 18th?

21   A        (No response.)

22                      MR. INGRAM:  May I approach?

23   Q        (By Mr. Ingram)  You want to look at that document,

1    please?

2    A       (Witness complies.)  I read over the highlighted

3    part.

4    Q       Well, why don't you read the whole thing?

5    A       "While working at the desk at the Wagon Wheel

6    Motel."

7    Q       No.  Read it to yourself, please.

8    A       Okay.

9    Q       You know what?  I'll withdraw that.  Do you see at

10   the bottom of that document there's a date?

11   A       Yes.

12   Q       Is the date December 18th of 2001?

13   A       Yes.

14   Q       And is that the date that the police clued you in on

15   the name Roberts?

16   A       I don't believe that's the day they told me the

17   names of any individuals except, other than Nathaniel

18   Jackson.

19   Q       Well, when would they have clued you in on the name

20   Roberts?

21   A       I believe I asked the name during a phone

22   conversation.

23   Q       With who?

 1    A        Sergeant Dillon.

 2    Q        That would have been back in December of 2001, that

 3    phone conversation?

 4    A        That would have to be in December, after the 18th.

 5    Q        After the 18th, but in, it was back in December of

 6    2001?

 7    A        Yes.

 8    Q        And you're telling us today that you remembered

 9    Roberts all the way back from December of 2001?

10    A        The last name Roberts?

11    Q        Yeah.

12    A        Attached to the name Donna?

13    Q        Yes.

14    A        Yes.

15    Q        Did you tell Mr. Bailey that Donna Roberts came in

16    to the Wagon Wheel on the 6th --

17    A        She came --

18    Q        -- to reserve a room?

19    A        That's what I said.

20    Q        How do you reserve a room, sir?

21    A        To reserve a room, you need to put down a deposit.

22    Q        All right.  You got to reach in your pocket, and I

23    don't have much money, but you got to reach in your pocket

1    and you got to put money down on the desk?

2    A        That's correct.  And I have to take it, just a

3    deposit.

4    Q        Did you take any money on the 6th?

5    A        That, I can't remember.

6    Q        Well, why don't you look at State's Exhibit 312 and

7    see if that's for the full amount of the room?  No, no, no.

8    The little cards.  Your receipt.  State's Exhibit 312.

9    A        Oh, okay.  312.  What was your question?

10   Q        This is the receipt that you gave Nate Jackson for

11   the room on December 9th?

12   A        That's the receipt I had him fill out.

13   Q        And is that the time that the room was paid for?

14   A        Yes.

15   Q        So the room was not reserved on the 6th, was it,

16   because there's no deposit put down on the 6th?

17   A        There's no deposit on there.

18   Q        So you took no money from a Donna on December 6th;

19   correct?

20   A        I believe I took money for the room.  I don't take

21   money in the full amount in most cases.

22   Q        Well, what is the date on State's Exhibit 312?

23   A        It was filled out, it's dated 12-9, but there's a

5347

1    signature and a date of 12-6.  That's a signature of my

2    employer.  She signs it when she takes the money.

3    Q        Well, how much money did you take on the 9th?

4    A        Usually, if I don't take a full amount, I'll take

5    half of the amount as a deposit.

6    Q        Well, does that show that you took the full amount

7    on the 9th?

8    A        On the 9th would be the date I take the full amount.

9    Q        The person who came in on the 9th, did he have

10   identification?

11   A        He had no form of ID on him.

12   Q        But he gave you his name as Nate Jackson?

13   A        He didn't give me his name.  He wrote it down on the

14   card.  He wrote the --

15   Q        He wrote his name on the card; is that what you're

16   saying?

17   A        He had to have.

18   Q        Okay.  He wrote the name --

19   A        I don't remember.

20   Q        Does the card bear the name Nate Jackson?

21   A        Yes.

22   Q        He wrote that name on the card or you wrote that

23   name on the card, but one of you did; correct?

1   A        It's not my handwriting, sir.  I did not write that.

2   Q        Was there a third person when Nate Jackson was

3   there?

4   A        I'm starting to remember some things.  The room, it

5   said the date, 12-9.  Was it him that filled out the card or

6   was it her that filled out the card?  Which one was it?

7   Q        Mr. Flores --

8   A        It was Nathaniel Jackson that filled out the card.

9   I was trying not to get them confused with another couple

10  where the lady filled in her husband's name.

11  Q        Nathaniel Jackson filled out the card and gave you

12  the name Nathaniel Jackson?

13  A        Correct.

14  Q        In your statement to the police, are you now saying

15  that maybe on December 6th, someone else took money from this

16  Donna woman?

17  A        There's no way.

18  Q        There's nobody; right?

19  A        I'm the only person at the desk.

20  Q        Well, in your statement to the police on December

21  18th, you don't say anything in there about the woman giving

22  you money on December 6th, do you?

23  A        No, I did not put that down.  I did not say anything

1    about it.

2    Q      Well, didn't you say, "She asked me if the room

3    would be available and I told her unless she put down a

4    deposit, she'd have to come early."

5    A      Or else the room might not be there.  That's

6    correct.

7    Q      Okay.  So you didn't get a deposit on the 6th;

8    correct?

9    A      (No response.)

10   Q      Oh, forget it.  It doesn't matter.  But the room is

11   not ready; correct?

12   A      The room wasn't ready.

13   Q      So they, these people wait outside in the parking

14   lot?

15   A      That's right.  They waited outside in the parking

16   lot.

17   Q      And they sit in the car?

18   A      They sat in the car.

19   Q      And they listened to music?

20   A      That's correct.

21   Q      They're not sitting in this car kissing and hugging

22   each other, acting inappropriately?  They're just sitting

23   there listening to music?

1    A        I've told you as far as I can remember.

2    Q        As far as you can remember, they were sitting there

3    listening to music; isn't that right?

4    A        That's correct.

5                        MR. INGRAM:  Thank you.

6                        THE COURT:  Any redirect?

7                        MR. BAILEY:  Oh, yes.  Are you done?

8                        MR. INGRAM:  I'm done.

9                        MR. BAILEY:  Okay.  Thanks.

10                       **REDIRECT EXAMINATION**

11   **BY MR. BAILEY:**

12   Q        Mr. Flores, State's Exhibit Number, what is this,

13   312, this guest registration card, on the bottom right, there

14   is some initials and the date; right?

15   A        Correct.

16   Q        Okay.  Who's Mazi Rahman?

17   A        Mazi Rahman is the owner of the motel.

18   Q        Okay.  And who is, are you familiar with the

19   initials that are at the bottom right of that card?

20   A        Yes.

21   Q        Whose initials are those?  Well, whose signature is

22   that?

23   A        That signature is Mazi Rahman.

1    Q        You familiar with his writing?

2    A        Yes.

3    Q        Okay.  And that date, that's also written with the

4    same ink, thick ink?

5    A        Yes.  That's the same pen.

6    Q        Okay.  And Mazi Rahman, he would be your boss?

7    A        That's correct.

8    Q        And when, when does he sign the bottom of the guest

9    register?

10                         MR. JUHASZ:  Objection.

11                         THE COURT:  Objection?

12                         MR. JUHASZ:  Uh-huh.

13                         THE COURT:  What's your objection?

14                         MR. JUHASZ:  There's no foundation that he

15   would know.  How would he know?

16                         THE COURT:  I don't know that I

17   understand.  No foundation for what?

18                         MR. JUHASZ:  That the witness saw when the

19   other fellow signed it.

20                         THE COURT:  Oh, oh, oh.  Yeah.  Okay.

21   That's sustained.

22   Q        (By Mr. Bailey) Are you familiar with when, the

23   procedure in your business when your boss would sign the

1   bottom right corner?

2   A        You have to sign it in front of me.

3   Q        Okay.  And if you were there at the time, what does

4   that mean?

5   A        Of the signature?

6   Q        Right.

7   A        That means he filled it out.  He cannot change any

8   of the dates.  He cannot change how much money was given.

9   Q        Okay.  But does it --

10  A        It means he can't short my drawer.

11  Q        Your boss?

12  A        That's right.

13  Q        Okay.  And that, do you know, were you present when

14  your boss signed and dated that guest register?

15  A        Yes, I was present when he was there.  He also took

16  the money for it.

17  Q        Okay.  And what date would that money have been

18  paid?

19  A        The full amount would have been paid at a later

20  date.  This only shows that he took the money on that date.

21  Q        Okay.  What money were you referring to?

22  A        It must have been the money for the deposit.

23  There's no other way he would fill it out at a earlier date.

1    Q       Okay.  So on December 6th, at that time, how much

2    did you require for a deposit?

3    A       I believe it would be $50 like I did with most other

4    people who didn't have the full amount for a deposit.

5    Q       Okay.  And this room, then, would have, the deposit

6    would have been paid by -- how many people came in to check

7    on this room back on December 6th?

8    A       Nobody else came to check up on this room, 101.  It

9    was open for that day.

10   Q       Okay.  But on December 6th when Mazi Rahman would

11   have taken, when the deposit would have come in, who would

12   have paid that deposit?

13   A       The only person that came in, that would have to be

14   the name they gave me, Donna Roberts.

15   Q       Well, let me put it this way.

16   A       The female.

17   Q       You didn't know her name at that time, did you?

18   A       No, I didn't.  The female with red hair.

19   Q       Okay. The female with the red hair?

20   A       And I'm not gonna forget a female with red hair

21   since red hair is my favorite hair color.  My fiancee has got

22   red hair herself.

23   Q       Okay.  And did she give you any name at all that you

1    remember?

2    A        I, for some reason, I'm remembering what took place

3    on the 6th.  Before, I could not remember.  And every day I

4    would think is there anything I can remember, and until this

5    card was shown to me again because I haven't seen it for

6    awhile, something is coming back.  And I had a little

7    conversation because we went and I showed her the room.  And

8    as people do, people talk.  And I do believe I asked for her

9    name.  She said Donna.  I said that, I said, you know, there

10   was a Donna that used to work here before I did.  I remember

11   that conversation now.

12   Q        Okay.  So you can remember the name?  She gave you

13   the name Donna, right, but you don't remember, this name

14   Roberts, you don't know anything about Roberts; right?

15   A        No.

16   Q        You believe that sometime after you gave a statement

17   to the police, if I understand your response to Mr. Ingram,

18   the name Roberts came up from a police officer; right?

19   A        Correct.  I remember no name of Roberts.

20   Q        Okay.  But the name of this lady, all you know, the

21   only name she gave you was Donna?

22   A        Donna.

23   Q        Okay.  You know before they occupied that room, you

1    got the full amount of the money in, whether part of it was a

2    deposit a couple days before, but the rest of it was

3    certainly paid before they were able to occupy the room?

4    A        That's correct.

5    Q        Okay.  And no question, these two people occupied

6    the room; correct?

7    A        Yes.  They both walked into the room.

8    Q        Okay.  And they stayed there overnight?

9    A        That's correct.

10   Q        And you know that because they called you up to

11   complain about a couple of things?

12   A        They called me during the, their stay, and their

13   vehicle was in the lot at late night.

14   Q        Okay.  This red or burgundy car?

15   A        Right.  And I'm there 24/7.

16   Q        Okay.  When somebody puts down the deposit, do they

17   have to, they just pay the balance of what's due on the room?

18   They don't have to put more money down and then get a deposit

19   back; right?

20   A        No.

21   Q        No.  They just pay the balance of what's due on the

22   room?

23   A        Right.

1    Q        Okay.  Okay.  And then they stayed a little bit

2    late?

3    A        That's correct.

4    Q        Okay.  And then sometime after that, the cops

5    contacted you, you picked out this guy's picture whose name

6    you --

7                        MR. INGRAM:  That's beyond the scope of

8    redirect, Your Honor.

9                        MR. BAILEY:  Okay.  No further questions,

10   Your Honor.

11                       THE COURT:  Any recross?

12                       MR. INGRAM:  None.

13                       THE COURT:  You're excused, sir.  Thank

14   you very much.

15                       THE WITNESS:  Thank you.

16                       MR. BECKER:  Can we approach?  Well,

17   should we take our afternoon break is what I should ask?

18                       THE COURT:  We're going to take a

19   15-minute break, folks.  You are not to discuss anything or

20   form any opinion until you return.

21                       MR. BECKER:  Thank you, Your Honor.

22   (Whereupon, a recess was had commencing at 2:59 p.m. and

23   concluding at 3:15 p.m.)

1    **WHEREUPON,**

2                          **CHRISTOPHER GEAR,**

3    having been first duly sworn, according to law, was examined

4    and testified as follows:

5                          **DIRECT EXAMINATION**

6    **BY MR. BECKER:**

7    Q       Would you please introduce yourself to the jury

8    here?

9    A       My name is Christopher Gear.  I live on the north

10   side of Youngstown.

11   Q       And can you tell this Jury exactly what your address

12   is?

13   A       116 Victoria Street.

14   Q       And how long have you lived there?

15   A       About eleven years now.

16   Q       Okay.  And are you familiar with a street in

17   Youngstown called Wirt Street?

18   A       Yes, sir.

19   Q       How close to your home is Wirt Street?

20   A       About three blocks.

21   Q       I guess it's Wirt.

22   A       Wirt.  About three blocks.

23   Q       All right.  Mr. Gear, I want to direct your

1    attention to any particular habits you may have before you go

2    to bed at night.  Do you have a routine that you engage in

3    before you go to bed at night?

4    A      Yeah.  Usually, I look out my front window out of my

5    sun room and check my vehicles, check the cars around to make

6    sure everything is all right.

7    Q      And I want to specifically direct your attention to

8    Tuesday night, December 11th of 2001.  When you went to bed

9    that night, did you notice anything unusual in your

10    neighborhood?

11    A      Yeah.  There was a car parked on Pershing in front

12    of an empty lot that, and usually there isn't any cars parked

13    out there.

14    Q      Do you recall what color or what type of car it was?

15    A      It was a Chrysler, a silver Chrysler.

16    Q      And this vehicle that you saw out there, did you do

17    anything at that time on Tuesday, December 11th, before you

18    went to bed?

19    A      No, sir, I didn't.

20    Q      Do you recall approximately what time you went to

21    bed that evening?

22    A      It was around midnight.  It was after the 11:00

23    news.  So somewhere around midnight.

1    Q        Now, when you got up the next morning, which would

2    have been Wednesday, December 12th, 2001, did you observe

3    that vehicle?

4    A        Yes.  It was still there.

5    Q        And then you went to work?

6    A        Yes, sir.

7    Q        Where do you work at?

8    A        I work construction.  So I was, it could have been

9    anywhere.  I don't remember exactly where I was working that

10   day.

11   Q        Nevertheless, while you were at work on that day,

12   did you hear somehow that there had been a homicide here in

13   Howland here in Trumbull County?

14   A        Actually, sir, it was that evening.  We heard it on

15   the news when I came home from work.

16   Q        Okay.  Now when you came home on Wednesday, December

17   12th, 2001, was that vehicle still on Pershing?

18   A        Yes, sir.

19   Q        And what's the relationship from your home to

20   Pershing, even though I understand you live on Victoria?

21   A        Victoria Street T's into Pershing right there.  I

22   live about two houses up from the corner so I can see it

23   clearly.

1    Q        Now, when you came home and saw the news on

2    December 12th, 2001, or I'm sorry, on Wednesday, December

3    12th, 2001, and you heard there had been a homicide in

4    Trumbull County, Ohio, was there any type of vehicle that

5    they were on the lookout for?

6    A        They just said they hadn't found the vehicle yet and

7    I thought it was kind of strange so my wife called the police

8    department and they came out to check it.

9    Q        And at some point either before or after the police

10   were called, did you check and look at the license plate on

11   that vehicle?

12   A        I did, sir.  I checked to see what county it was

13   from.  It was from Trumbull County.

14   Q        And, in fact, did the police come and tow that

15   vehicle?

16   A        Yes, sir, they did.  About 20 minutes later, half

17   hour later.

18   Q        And that was basically your involvement in this

19   case; correct?

20   A        Yes, sir.  That's all.

21                   MR. BECKER:  Okay.  I have nothing

22   further, Your Honor.

23                   THE COURT:  Cross?

1          MR. INGRAM:  No questions.

2          THE COURT:  Sir, thank you very much.

3          THE WITNESS:  Thank you.

4          MR. BECKER:  Your Honor, at this time,

5    we've gone through eleven witnesses today and they went a

6    little quicker than we thought.  And because it's such a

7    wonderful day, both sides have agreed to give the jury the

8    afternoon off and we'll see them here at 1:00 tomorrow since

9    the Court has criminal morning tomorrow if that's agreeable

10   with the Court.

11         THE COURT:  Yes.  That's fine.  You have

12   no further witnesses for the day then?

13         MR. BECKER:  We have nothing further

14   scheduled for today.

15         THE COURT:  Okay.  We have the criminal

16   morning starting at 9 tomorrow.  We're usually done by noon

17   so we should be ready to proceed at 1:00.  Mr. Bailey is the

18   prosecutor assigned to this court so if we aren't able to

19   start at 1:00, we can all blame him; okay?

20         MR. BAILEY:  I'll get done fast, Your

21   Honor.

22         THE COURT:  Okay.  You're not to discuss

23   anything or form any opinion until you return.  You've only

1   started to hear the evidence in this matter.  You all have a

2   nice evening.  Thank you very much.

3                   MR. BECKER:  Thank you.

4                   MR. BAILEY:  Thanks, Your Honor.

5   (At 3:05 p.m., the jury was excused and the following

6   proceedings occurred in open at 4:04 p.m. with the Court and

7   counsel present.)

8                   THE COURT:  On the record here.  We are

9   back in the courtroom.  The jury has left for the day, but

10  Juror Number Nine and Juror Number One have stayed and asked

11  to speak to the Court about a concern of theirs.  I have

12  assembled counsel from both sides.  The defendant has

13  already --

14                  MR. INGRAM:  We waive the presence of the

15  defendant.

16                  THE COURT:  Waive the presence of the

17  defendant.

18          Ladies, would you tell me on the record what your

19  problem is?

20                  JUROR NO. 9:  Our concern is going back to

21  work.  We don't want to jeopardize anything we've done.  We

22  both work at two different hospitals.  Because of the

23  reporters and TV and all that stuff, people in that hospital

1   know what's going on.  When I happened to go to the hospital

2   yesterday and started getting comments, I shut my door

3   because I don't want to hear the comments.  I need to make my

4   own decision.  How do we handle that?  What do we do?

5                    THE COURT:  Let me ask one question.  Are

6   you working during, you are talking about the days we are not

7   having court?

8                    JUROR NO. 9:  Correct.  Like Friday and

9   Monday.

10                   THE COURT:  You are not working in the

11  evenings or anything?

12                   JUROR NO. 1:  I work midnights.

13                   THE COURT:  Even though you're here?

14                   JUROR NO. 1:  I don't work before I come

15  in here.

16                   THE COURT:  I understand.  Let me ask you

17  this.  Be very candid.  If I ordered you to not go to work,

18  will you be paid by your employer if you had time missed?

19                   JUROR NO. 1:  I get paid for the days I'm

20  here so I would assume.

21                   JUROR NO. 9:  And for me, it doesn't

22  matter.  I could take leave days at work.  I just wanted an

23  okay that I shouldn't go to work and do that.

1          THE COURT:  What we're talking about here

2     is a day and a half during the term of this trial and, quite

3     frankly, I don't want to order that if it's going to be a

4     financial burden on you.

5          JUROR NO. 1:  Oh, I am not worried about

6     that.

7          JUROR NO. 9:  No.

8          THE COURT:  It would not be --

9          JUROR NO. 9:  Uh-huh.

10          THE COURT:  Let me, this apparently is

11     very much of a concern to both of you or you wouldn't have

12     come back.

13          JUROR NO. 1:  It is, because two of the

14     people that were in the jury pool were nurses on my floor.

15          THE COURT:  Okay.

16          JUROR NO. 1:  And they both got dismissed

17     so they know what's going on and it has spread throughout the

18     hospital.  So everywhere you go, you get the same remarks and

19     questions and --

20          THE COURT:  Yeah.  Probably some of it is

21     people trying to be what they think is cute and it isn't.

22          JUROR NO. 9:  Right.  Right.

23          JUROR NO. 1:  Yeah.

1          THE COURT:  Okay.  Then for the record, I

2     am ordering both of you that you are not to go to work

3     because of the contact that is being forced upon you.

4          Off the record.

5     (Whereupon, a discussion was had off the record.)

6          MR. INGRAM:  I think we are obligated to

7     ask a few questions.

8          MR. BECKER:  I think we are obligated to

9     ask a few questions for the record.  Mr. Ingram, go ahead and

10    ask them.

11         MR. INGRAM:  Ladies, thank you very much

12    first off.  Miss Gray, I'll start with you.

13         JUROR NO. 1:  Okay.

14         MR. INGRAM:  My memory is not what it used

15    to be.  Who were the two nurses that are no longer involved?

16         JUROR NO. 1:  Diane Park is an LPN on

17    midnights on my floor and Gina Day, Regina Day, is an LPN on

18    day shift.

19         MR. INGRAM:  Has any, has either of them

20    or anyone else at work said anything to you about this case?

21         JUROR NO. 1:  Well, whenever I see any of

22    'em, it's immediately, you know, "How's it going?  What's

23    happening?"

1          And I just have to back away and say, you know, "I

2    can't talk about it."

3                    MR. INGRAM:  So they ask you questions

4    about what's going on here.  Do they tell you about what they

5    read in the newspaper or about what they hear?

6                    JUROR NO. 1:  I have not had that yet.

7                    MR. INGRAM:  Okay.

8                    JUROR NO. 1:  But I get remarks like, you

9    know, I can't even think of what the remarks were, but

10    everybody, people make remarks about being in court, being on

11    a jury, you know, "What are you doing there?  Oh, you poor

12    thing."

13          Well, I don't particularly see it that way.

14                    MR. INGRAM:  Either do any of us.  And

15    those remarks are all generic, sort of, to the extent that

16    they would apply to jury service in any case.

17                    JUROR NO. 1:  Uh-huh.

18                    MR. INGRAM:  Has anyone at work made

19    case-specific remarks to you?

20                    JUROR NO. 1:  Not yet.

21                    MR. INGRAM:  Not yet.

22          Mrs. Kay, what's happening with you at work?

23                    JUROR NO. 9:  It's the same thing.  I

1    went in yesterday and I went in this morning and I have four

2    employees there that were making those same generic comments.

3    You know.  "How is the jury going?"

4          And I told them, "I don't want to talk about this,"

5    and I can go in and shut the door.  That's what I did.  We

6    didn't have that problem.

7          Today, I went back this morning to do some office

8    work and they didn't mention it because I point blank made

9    that distinct point that I don't want to talk about it at

10   all.  My problem being is that if I go back to work, I go

11   from floor to floor and I can't shut them out.

12                    MR. INGRAM:  Okay.  I want the record to

13   be clear.  So with you as well, people are asking you about

14   your experiences here.  They're not giving you information --

15                    JUROR NO. 9:  Right.

16                    MR. INGRAM:  -- that they've read in the

17   newspaper?

18                    JUROR NO. 9:  I have heard nothing about

19   the paper, the TV, nothing.

20                    MR. INGRAM:  This last question is to both

21   of you.  Has anything occurred that you think would hinder, I

22   know the answer to this question, but it's for the record,

23   has anything occurred that you believe would hinder or affect

1    your ability to give each side a fair shake here?

2                    JUROR NO. 9:  No.  That's what I want to

3    make sure and clear that doesn't happen.  That's why we

4    brought this concern up.

5                    THE COURT:  Ladies, we all thank you very

6    much.

7                    MR. BECKER:  Thank you very much.

8    (At 4:11 p.m., court was adjourned to Thursday, May 15,

9    2003.)

10                                   *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

1                    **THURSDAY, MAY 15, 2003 AT 1:05 P.M.**

2                              MR. JUHASZ:  We had discussed yesterday

3      after court about the admonition.  Both Mr. Becker and I have

4      brought an admonition.  They're virtually the same.  They're

5      out of O.J.I. so we'll offer those to the Court and ask the

6      Court to -- Mr. Becker has highlighted the portions.

7                              THE COURT:  May I see those, please?

8                              MR. BECKER:  You can have them.

9                              THE COURT:  Thank you.

10                             MR. BECKER:  I don't know if you want to

11     reiterate the first portion there again because of the

12     discussions we had in chambers off the record yesterday and

13     then just from here on out use the abbreviated --

14                             MR. JUHASZ:  The short form.

15                             MR. BECKER:  The abbreviated short form

16     admonition.

17                             THE COURT:  Well, this one says it's

18     important to be fair and attentive.  Of course I've told

19     them, what I usually tell them is, "You are not to discuss

20     this case among yourselves or with anyone else or form any

21     opinion."

22                     I don't know which one of these you submitted,

23     but --

1              MR. BECKER:  Well, I don't know if you

2    want to read, because of the concerns that defense counsel

3    raise, and I think it was off the record yesterday in

4    chambers after the proceedings, I highlighted the first, the

5    one that basically says don't form an opinion one first and I

6    don't know if you want to just reiterate that one time for

7    them at the break today and then go back to just using the

8    second admonition, the short form from here on out.

9              THE COURT:  Okay.  Just remind you of the

10   admonition.

11             MR. JUHASZ:  Yeah.  That's fine with us.

12             THE COURT:  Fair enough.  No problem.

13             MR. JUHASZ:  The second thing, Your Honor,

14   is if the Court will recall yesterday when the State Farm

15   insurance agent, Kathy Thomas, testified, she was asked some

16   questions by Mr. Ingram on cross examination about who was

17   listed as the principle driver on the two vehicles leased by

18   the Fingerhuts.  Mr. Ingram asked her if she'd be kind enough

19   to call and provide that information.  While we were still in

20   court yesterday, Laurie came in and handed me the slip that

21   she had called back.  And in my usual fashion, I forget to

22   tell everybody, including my own co-counsel, until last

23   night, I brought it to the attention of the prosecutors this

1    morning and we are all agreed and have signed a stipulation

2    that Donna Roberts was the primary driver listed on the

3    silver mist Chrysler, the 2001 model, and Robert Fingerhut on

4    the 2000 inferno red Chrysler 300M.

5              THE COURT:  Well, it would be appropriate

6    for one side or the other to state that to the jury.

7              MR. BAILEY:  We have no problem with

8    Mr. Juhasz stating that, reading that in, the stipulation.

9              THE COURT:  Okay.  We'll do that right up

10   front then.

11             MR. JUHASZ:  That will be fine.

12             MR. BAILEY:  And then there's a third

13   issue with a juror.

14             MR. INGRAM:  I don't know of an issue with

15   a juror.

16             MR. BAILEY:  I thought you had something

17   yesterday that was brought to our attention that --

18             MR. BECKER:  Didn't one of you just

19   mention something about one of the jurors?

20             MR. JUHASZ:  Did you not mention

21   yesterday, at the end of court yesterday something about one

22   of the jurors having difficulty with getting paid?

23             THE COURT:  Yeah.  Juror Number 11.

```
 1                      MR. JUHASZ:  I don't know if you want to
 2    look into that.
 3                      THE COURT:  Well, we should voir dire her
 4    individually.
 5                      MR. JUHASZ:  I suggest we just leave it
 6    alone.
 7                      THE COURT:  Well, I'll take a consensus of
 8    opinion on this because she has raised it with only Connie.
 9    She's not said, "I'd like the Judge to know about it," or
10    whatever.
11          I take from that that she does not think that it's
12    all that big a deal, but one side or the other may find that
13    if that's something that's going to be quite bothersome for
14    her that you might wish to inquire into it.  I don't know.  I
15    kind of agree with Gerry.  But on the other side of the coin,
16    you folks have to decide what you want to do on that.  I take
17    no position at this point.
18                      MR. BAILEY:  Well, our feeling is we
19    probably don't really care, except for the fact that the
20    defense might have a concern that she may be rushing her
21    deliberations if she's not getting paid.  So they may, I
22    don't know, it might behoove --
23                      MR. INGRAM:  May I have a moment with
```

1    Mr. Juhasz, please?

2    (Whereupon, a discussion was had off the record.)

3                    MR. BECKER:  I'm just going to put on for

4    the record that Connie is the jury commissioner.

5                    THE COURT:  I would point out that that's

6    only one out of twelve.  I think that any tendency could be,

7    would blocked by the others.  You know.

8                    MR. JUHASZ:  Your Honor, for the record,

9    the position of the defense mirrors what you've just said,

10   which is that she hasn't, it's obviously not such a concern

11   to her that she's asked to have it brought to the attention

12   of the Court.

13                   THE COURT:  Right.

14                   MR. JUHASZ:  Also, I think that the trial

15   may conclude a little quicker than maybe we originally

16   thought so it may not end up being as big of a problem as we

17   original thought.

18                   THE COURT:  Okay.

19                   MR. JUHASZ:  Obviously, if she brings it

20   to somebody's attention, it's a bigger issue.  But for now, I

21   think we should leave it alone.

22                   THE COURT:  Would the State agree with

23   that or not?

1          MR. BAILEY:  Yeah.  That's fine with us,

2     Judge.

3          THE COURT:  Okay.  For the time being.  If

4     she should officially bring it to my attention, I will notify

5     you.

6          MR. INGRAM:  I only have one other thing,

7     and it's only to clarify the record so that later on we don't

8     get confused.  There has been an agreement between the

9     parties that the parties would separate their witnesses, and

10    the witnesses have been separated, but that agreement was not

11    previously stated on the record.

12         THE COURT:  Yeah.  It was not.  Okay.

13    Both sides are instructed, then, that you're responsible for

14    any witness who is going to testify, and once they've

15    testified, if you have any expectation of calling them back,

16    make sure they leave the room.  Okay?

17         Your motion is of exclusion, not separation, because

18    separation technically is to keep any possible witnesses

19    separated, but to exclude them from the courtroom during the

20    testimony?

21         MR. INGRAM:  Yes.

22         THE COURT:  Okay.

23    (Whereupon, the jury was escorted into the courtroom at 1:18

1    p.m. and the following proceedings occurred in open court.)

2                        THE COURT:  Good afternoon, folks.  We are

3    going to continue with the evidence presented by the State at

4    this time.  Is the State ready to call your next witness?

5                        MR. BECKER:  Yes, sir, Your Honor.

6              Your Honor, the State would call Jeff Diamantes.

7    WHEREUPON,

8                        **JEFF DIAMANTES**,

9    having been first duly sworn, according to law, was examined

10   and testified as follows:

11                        **DIRECT EXAMINATION**

12   **BY MR. BECKER:**

13   Q        Would you please introduce yourself to this jury?

14   A        Jeffrey Paul Diamantes.

15   Q        And Mr. Diamantes, where is it that you work at

16   currently?

17   A        Gorant Candies.

18   Q        Now, I want to direct your attention to about 18

19   months ago, December of 2001.  Where did you work in December

20   of 2001?

21   A        At a Days Inn.

22   Q        And where was that Days Inn located at?

23   A        On Market Street in Boardman.

1   Q        Do you recall how long you were working or had been

2   working there in December of 2001?

3   A        I worked there and the Super 8, it was the same

4   owners, about maybe a year.

5   Q        Now, I want to ask you about some specific things

6   that happened in December of 2001.

7            First of all, what were your job duties with the

8   Days Inn there?

9   A        I was a night auditor/desk clerk.

10  Q        And what does the night auditor/desk clerk do?

11  A        We check in, check out people, answer the phone and

12  do the night audit on the computer.

13  Q        Now, I want to direct your specific attention to

14  December 11, 2001, which was a Tuesday I believe.  Do you

15  recall renting a room to a person for one week?

16  A        Yes.

17  Q        Why would the period of one week stand out in your

18  mind?

19  A        Mainly because construction workers mainly did,

20  they'd come in to get their room for like a week if they're

21  doing work in the area.

22  Q        So it would be unusual, unless it was a construction

23  worker, that someone would rent a room that long?

5377

```
 1    A        Correct.

 2    Q        Do you recall whether this person who rented the

 3    room was a man or a woman?

 4    A        A woman.

 5    Q        Can you describe, as best you recall, the physical

 6    appearance of this woman?

 7    A        Short, medium build, dark hair, forties.

 8    Q        And when you say short, how short do you mean?

 9    A        5'2".

10    Q        Okay.  Now, I want you to tell us in your own words

11    what happened when this woman got the room.

12             Well, first of all, was she by herself?

13    A        Yes.

14    Q        Do you recall what type of vehicle that she was in?

15    A        Yes.

16    Q        Did she, do you recall how, the method that she used

17    to pay for the room?

18    A        Credit card.

19    Q        Okay.  And when someone rents a room or was rented a

20    room at the Days Inn in Boardman then, how would they go

21    about or how would you go about conducting business with that

22    credit card?

23    A        First, you got to give 'em a folio, they have to
```

1    fill it out with their name and you check their license to

2    make sure that the name matched up the credit card.

3    Q       All right.  And did you do all of that with this

4    woman?

5    A       Yes.

6    Q       And you did, in fact, check this woman's

7    identification; is that correct?

8    A       Yes.

9    Q       And approximately how long did it take you to set

10   this woman up with the room?

11   A       Maybe, no longer than ten minutes.

12   Q       Do you recall what this woman was doing when you

13   were checking her in to the room at the Days Inn?

14   A       Just pacing around the lobby.

15   Q       Now, I want to ask you, do you recall approximately

16   what time this woman came in to rent this room?  Was it

17   morning, afternoon, evening, night?

18   A       It was between, I think, 9 p.m. and 12 p.m.

19   Q       All right.  So it was late in the evening?

20   A       Yes.

21   Q       Now, I want to show you some items that have been

22   marked for purpose of identification here as State's Exhibits

23   311-A and B.  First, I'm gonna hand you these.  I want you to

```
 1    look at them.  Don't say anything, but just look at those.

 2    A         (Witness complies.)

 3    Q         Have you had a chance to look at those?

 4    A         Yes.

 5    Q         All right.  Now, I'm gonna hand you this device.  Do

 6    you see that?

 7    A         Yeah.

 8    Q         I'm gonna put up on the screen State's Exhibit 311

 9    and ask if you recognize what exhibit, what Exhibit 311 is?

10    A         That is a folio that the customer fills out when

11    they rent a room.

12    Q         And I'm sorry.  What did you refer to that as?

13    A         A folio.

14    Q         All right.  And is this like a carbon copy?  Is that

15    another way of saying it?

16    A         Yes.

17    Q         All right.  The original that someone writes on goes

18    through and leaves the impressions on here?

19    A         Yes.

20    Q         Is that correct?  All right.

21              And at the very top, it says name.  Did you write

22    that down or did the person renting the room?

23    A         The person renting the room.
```

5380

```
 1    Q        And the next line, it says address, and it says 254

 2    Fonderlac.  Who would have filled that information out?

 3    A        The person that rented the room.

 4    Q        All right.  Is anywhere on that document the

 5    signature of you or anything that you would have written?

 6    A        Just on the right, the right side.

 7    Q        Okay.  And that would have been the rate and the

 8    date and the date out, is that correct, that information?

 9    A        Correct.

10    Q        If you're having trouble seeing, by all means, you

11    can step down off the witness stand.

12    A        That's okay.

13    Q        Okay.  You can see that okay?

14    A        Yeah.

15    Q        All right.  And then there are the days occupied,

16    and that's checked out.  Who would have checked that out?

17    A        Me.

18    Q        And are, there's also some listing of the amount,

19    the tax, the county tax, the sales tax, and then the total

20    amount for the room is that information.  Would you have

21    filled that out?

22    A        Yes.

23    Q        So on that line that's about say a quarter of the
```

5381

1    way over on the right, all of that information from that

2    vertical line was filled out by yourself?

3    A        Correct.

4    Q        And all the information on the left-hand side was

5    filled out by yourself?

6    A        On the right-hand side?

7    Q        I'm sorry.  The left-hand side was filled out by the

8    person that rented that room?

9    A        Correct.

10   Q        All right.  Is that a fair and accurate copy of the,

11   and I forget, what did you refer to that as?

12   A        Folio.

13   Q        Folio.  Is that a fair and accurate copy or would

14   that be the carbon copy that was made at the time that room

15   was rented?

16   A        Is that the yellow one or the white one?

17   Q        It's the yellow one.

18   A        That would be the carbon copy.

19   Q        And that's the one you just saw up there?

20   A        Yes.

21   Q        Okay.  And the number of persons in that room, do

22   you see how many that was?

23   A        One.

1    Q       And that also indicates credit card and there's a

2    signature there at the signature line; correct?

3    A       Correct.

4    Q       Now, I'm gonna show you State's Exhibit 311-B, as in

5    boy, and I don't know if you can see that.  Okay.  All right.

6    What is State's Exhibit 311-B, which is one of the pieces of

7    paper I just handed you a few moments ago?

8    A       That is a credit card receipt.

9    Q       And how do you go about getting the credit card

10   receipt?

11   A       You just swipe the credit card through the machine

12   and it prints out the receipt.

13   Q       And the original, which is I guess the white copy,

14   is that given to the customer?

15   A       Yes.

16   Q       And they sign that?

17   A       Yes.

18   Q       And you guys keep that for your records?

19   A       We keep one, yes.

20   Q       And this is the one you keep?

21   A       Yes.

22   Q       Does that look like a fair and accurate or is that

23   the, rather, the copy that was kept by you?

1    A     Yes.

2    Q     Now, do you recognize the woman who filled out the

3    forms there and came and got that room on Tuesday,

4    December 11th, 2001 here in the courtroom?

5    A     Yes.

6    Q     Could you please identify her?

7    A     She's right there with the turquoise shirt.

8              MR. BECKER:  All right.  Please allow the

9    record to reflect that the witness has identified the

10    defendant, Donna Roberts.

11              THE COURT:  The record will so reflect.

12    Q     (By Mr. Becker) Now, I'm going to come back up here

13    only because we're having a little bit of trouble there.

14         What time is indicated on State's Exhibit 311-B, the

15    receipt there?

16    A     11:33 p.m.

17    Q     All right.  Now you wouldn't know anything about

18    whether that clocking device or that timing device was off or

19    correct, would you?

20    A     I was told it was off by one of the guys that worked

21    there.  I'm not sure by how much though.

22              MR. INGRAM:  Objection.

23              THE COURT:  What's your objection?

384

```
 1                          MR. INGRAM:  Hearsay.  "I was told by."

 2                          MR. BECKER:  Without telling us --

 3                          THE COURT:  I sustain the objection.

 4                          MR. BECKER:  Yeah.

 5      Q       (By Mr. Becker)  Without telling us if anyone told

 6      you, were you -- strike that.

 7              Well, we'll get into that later on.  All right.

 8              Do you remember what room was rented to this woman?

 9      A       129.

10      Q       All right.  And the room was for approximately how

11      long?

12      A       A week.

13      Q       Okay.  Without telling us how you, without telling

14      us if someone else told you, mentioning someone else, were

15      you aware that the clock was off on that credit card machine?

16      A       No.

17      Q       All right.  Later on, did you discover that it was?

18      A       Yes.

19                          MR. INGRAM:  Oh, I move to strike.  This

20      is an improper question.  He should know better.

21                          THE COURT:  Okay.

22                          MR. INGRAM:  That was Mr. Bailey's idea.

23                          THE COURT:  Just approach for a minute
```

 1   here.

 2                        MR. BECKER:  Your Honor, I'll --

 3                        THE COURT:  Well, you're able to do it,

 4   ask the question, if you lay the foundation.

 5                        MR. BECKER:  Well, let me do this.  Let me

 6   withdraw that question and we'll present, later on, testimony

 7   on that.

 8                        THE COURT:  Okay.

 9                        MR. BECKER:  I have no further questions

10   of this witness.

11                        THE COURT:  Very good.  Cross.

12                        **CROSS EXAMINATION**

13   **BY MR. INGRAM.**

14   Q        Afternoon, sir.  This room is rented for a week,

15   Monday through Tuesday or Tuesday through Monday?

16   A        It was rented on Monday through I believe Sunday or

17   was it Tuesday through Monday?

18   Q        Well, why don't you look at the right-hand column of

19   311-B.  Isn't that the document that shows?

20   A        Correct.

21   Q        What is it, Tuesday through Monday?

22   A        Tuesday through Monday.

23   Q        And when the woman who rented the room presented

5386

```
 1    herself, did she offer you cash if you, as an incentive not
 2    to require identification?
 3    A       No.
 4    Q       When you asked for identification, was she hesitant?
 5    A       No.
 6    Q       You did check identification; correct?
 7    A       Yes.
 8    Q       And then you checked if the driver's license matched
 9    with the credit card?
10    A       Correct.
11    Q       I live in Boardman down the street.  And if my
12    brothers were to visit me over the 4th of July weekend and I
13    had a graduation party and they wanted a room for a week,
14    would you rent them a room for a week?
15    A       Of course.
16                    MR. INGRAM:  Thank you.  No further
17    questions.
18                    MR. BECKER:  We have nothing further, Your
19    Honor.
20                    THE COURT:  Thank you, sir.  You're
21    excused.
22                    MR. BECKER:  The State would call Jennifer
23    Robinson.
```

1    **WHEREUPON,**

2    <u>**JENNIFER ROBINSON,**</u>

3    having been first duly sworn, according to law, was examined

4    and testified as follows:

5    <u>**DIRECT EXAMINATION**</u>

6    <u>**BY MR. BECKER:**</u>

7    Q    Would you please introduce yourself to this jury,

8    please?

9    A    My name is Jennifer Robinson.

10    Q    All right.  And Miss Robinson, where do you work at?

11    A    The Days Inn Motel.

12    Q    And where is that Days Inn Motel located at?

13    A    On Market Street.

14    Q    Market Street where?

15    A    South of the mall.

16    Q    Of which mall?

17    A    Southern Park.

18    Q    That's down near Youngstown or Boardman?

19    A    Boardman.

20    Q    All right.  Now, Miss Robinson, what do you do for

21    the Days Inn at Boardman?

22    A    I'm a housekeeper.

23    Q    And how long have you been employed there?

1    A        About eight years.

2    Q        Can you just tell this jury what your general duties

3    are regarding the housekeeping at the Days Inn in Boardman?

4    A        Go out to the rooms and clean 'em, strip out all the

5    beds, empty all the trash, check all the drawers and

6    everything.

7    Q        And is that done after a person checks out or when

8    is that done?

9    A        It's done after they check out.

10   Q        What type of cleaning regimen do you engage in if

11   the person is staying over for an additional day or two or

12   three?

13   A        Pretty much the same thing.  Just we don't go in the

14   drawers and stuff and we avoid their personal items that's

15   left in the room.

16   Q        All right.  I want to direct your attention to about

17   a year and a half ago.  I believe some detectives from the

18   Howland Police Department came to speak to you?

19   A        Yes.

20   Q        And do you remember why they came to speak to you?

21   A        Yes.  They were asking about people that stayed in

22   one of our rooms.

23   Q        Do you remember what room number they were asking

```
 1   about?

 2   A         129.

 3   Q         Now, were you able to tell them about cleaning

 4   during the week of December 11th?  Actually, it would have

 5   been December 10th, it would have been that Monday, but

 6   Tuesday, December 11th; Wednesday, December 12th; the 13th;

 7   14th; 15th; did you recall the routine or what was going on

 8   with room 129 and your cleaning of that room?

 9   A         For Thursday and Friday and Saturday, yes.

10   Q         All right.  Why not Wednesday?

11   A         I was off Wednesday.

12   Q         Is that your normal day off?

13   A         Yes.

14   Q         All right.  What did you tell 'em regarding your

15   cleaning that room on Thursday, December, what would have

16   been the 13th; Friday, December 14th; and Saturday, December

17   15th?

18   A         I didn't clean their room.

19   Q         And why didn't you clean the room?

20   A         It had a do not disturb sign on the door.

21   Q         Now we got to Saturday.  I believe that would have

22   been December 16th.  And you did clean the room on that

23   Saturday; is that correct?
```

1    A        Yes.

2    Q        Can you tell this jury how you cleaned the room and

3    where you cleaned the room, what parts of the room you

4    cleaned?

5    A        When I got there, the do not disturb sign was off

6    the door.  I knocked.  Nobody answered.  I went in and it was

7    pretty much empty.  There was no personal items.  So I

8    checked at the front desk to see if they were still a

9    stay-over.  She said no and told me to clean the room like a

10   regular checkout.  So I did.  I stripped out the beds, all

11   the linen and everything out the bathroom, and took all the

12   garbage, put it in a bag and proceeded to spray down the room

13   and clean it.

14   Q        Now, the trash, do you recall some items, specific

15   items that were in the trash from room 129?

16   A        Yeah.

17   Q        What items do you recall?

18   A        I found some gauze, like a bandage where you wrap up

19   when you get a sore or something, an almost empty bottle of

20   peroxide and some band-aids.

21   Q        Do you recall if any of those items were bloody?

22   A        I believe a couple of 'em had blood stains on 'em,

23   yeah.

1    Q        And did you find the room key in the room?

2    A        Yeah.  It was laying on the dresser.

3    Q        And the room key was, is it like the metal key or is

4    it like a card?

5    A        It's a card.

6    Q        Okay.  And what did you do with those items once you

7    picked them up from the room?

8    A        I put them inside a little trash bag, tied it up and

9    then put it on a larger trash bag on my cart.

10   Q        And at the end of the day, what did you do with the

11   trash bag that was in your cart?

12   A        I take it out to the dumpster that's in the back of

13   the hotel.

14   Q        And when these officers from the Howland Police

15   Department came, did you show them where you put the larger

16   trash bag that was in your cart?

17   A        Yes, I did.

18   Q        And where did you direct them to?

19   A        I directed them to the back of the hotel where we

20   keep the dumpster.

21   Q        And do you recall what those officers did when you

22   told them that?

23   A        Yeah.  They got in the dumpster and dug through the

```
 1   trash.

 2   Q        Okay.  Now, I'm gonna show you what's been marked

 3   for purposes of identification some photographs here.  And

 4   I'm gonna show you State's Exhibits 194, 195, 197 and 201 and

 5   226.  And I'm just gonna start with State's Exhibit 226 and

 6   ask you if you recognize what State's Exhibit 226 is.  Do you

 7   recognize State's Exhibit 226?

 8   A        That look like the outside of the hotel.

 9   Q        Excuse me?

10   A        Look like the outside of the hotel.

11   Q        Okay.  I'm gonna show you now State's Exhibit 201

12   and ask if you recognize State's Exhibit 201?

13   A        That's the inside of the room.

14   Q        All right.  One of the rooms at the Days Inn there?

15   A        Yeah.

16   Q        They all pretty much look the same?

17   A        Yeah.  Pretty much.

18   Q        I'm gonna show you, I'm sorry, I'm not gonna show

19   you 194 and 195.  Those are different.

20            I'm gonna show you State's Exhibit 197 and ask if

21   you recognize State's Exhibit 197?  Maybe it would help if I

22   showed it to you a little bit closer.

23   A        Yeah.
```

1    Q        I'm gonna show you 197.

2    A        This look like the stuff that I found in the room.

3    Q        All right.  And the stuff that the deputies or the

4    detectives later got out of the trash?

5    A        Yes.

6                         MR. BECKER:  Okay.  Your Honor, at this

7    time, I have no further questions of this witness.

8                         THE COURT:  Cross?

9                         MR. INGRAM:  Just a couple if I may.

10                        **CROSS EXAMINATION**

11   **BY MR. INGRAM:**

12   Q        Hi, how are you?

13   A        Okay.

14   Q        It's not unusual to have a stay-over room; right?

15   A        No.  It's not unusual.

16   Q        And a stay-over room is where the person is not

17   gonna check out and stay for some period of time like maybe a

18   week?

19   A        Yeah.

20   Q        And you clean a stay-over room differently than you

21   clean a room where the person is checking out that morning?

22   A        Yes.

23   Q        You were off on Wednesday.  You worked on Thursday.

```
 1    Did you see anybody around this room on Thursday?

 2    A       No.

 3    Q       Did you see any vehicles around the room on

 4    Thursday?

 5    A       Not that I can really recall.

 6    Q       On Friday, did you see anybody around the room?

 7    A       No, not that I recall.

 8    Q       And on Friday, you didn't see any vehicles around

 9    the room; right?

10    A       I don't think so, no.

11    Q       On Saturday, the do not disturb sign is off the

12    door?

13    A       Yes.

14    Q       You go ahead in?

15    A       Uh-huh.

16    Q       And as I understand your testimony, you were

17    uncertain whether the occupant of that room had checked out

18    or not; is that correct?

19    A       Yes.

20    Q       So you called the front desk?

21    A       Yes.

22    Q       And the front desk told you that the room was still

23    paid for a couple days?
```

1    A        I'm not exactly sure what she said, but she told me

2    to go ahead and clean it as a checkout.

3    Q        Her name would be Rita?

4    A        Yes.

5    Q        And you talked to the police back on December 18th?

6    A        I believe it was.

7    Q        You think if you looked at your statement it might

8    refresh your recollection as to what Rita told you?

9    A        It might.

10   Q        Why don't you just look at the first couple lines of

11   that paragraph right there?

12   A        (Witness complies.)

13   Q        You done?

14   A        Yes.

15   Q        Does that refresh your recollection a little bit?

16   A        Yeah.

17   Q        And did Rita tell you that the room was, in fact,

18   rented for another couple of days?

19   A        Yes, she did.

20   Q        But she did tell you that you could go ahead and

21   clean it?

22   A        Yeah.  She told me to go ahead and clean it like a

23   checkout.

 1                    MR. INGRAM:  Okay.  Thank you.  I have no

 2   further questions, Your Honor.

 3                    THE WITNESS:  Uh-huh.

 4                    THE COURT:  Any redirect?

 5                    MR. BECKER:  Your Honor, I have no

 6   redirect of this witness.

 7                    THE COURT:  Ma'am, I thank you very much.

 8   You're excused.

 9                    THE WITNESS:  Thank you.

10   WHEREUPON,

11                    **MIKE YANNUCCI**,

12   having been first duly sworn, according to law, was examined

13   and testified as follows:

14                    **DIRECT EXAMINATION**

15   **BY MR. BECKER:**

16   Q        Would you please introduce yourself to this jury,

17   please?

18   A        Detective Mike Yannucci with the Trumbull County

19   Sheriff's Department.

20   Q        And how long have you been with the Trumbull County

21   Sheriff's Department?

22   A        Over seven years.

23   Q        Mike, I want to ask you what your current duties are

1    with the Trumbull County Sheriff's Department?

2    A        Currently assigned to the narcotics unit.

3    Q        All right.  In addition to the narcotics unit duties

4    that you have, I believe you're also part of some, for lack

5    of a better term, special unit with the Sheriff's Department?

6    A        Yes.  I'm also an active member of the SWAT team.

7    Q        All right.  And I know for some budgetary reasons, I

8    think our SWAT team is inactive at this time?

9    A        That's correct.

10   Q        However, in December of 2001, the Trumbull County

11   SWAT team was in operation; is that correct?

12   A        That's correct.

13   Q        All right.  Can you briefly tell this jury what it

14   is the Trumbull County SWAT team does?

15   A        Well, the SWAT team will handle any type of

16   high-risk incident, whether it be a raid on a drug house,

17   hostage situation, high-risk warrant arrest, anything like

18   that.

19   Q        All right.  And is there any special training that

20   you had that prepared you for the SWAT team?

21   A        Yes.  I've gone to several schools, including the

22   FBI SWAT school.

23   Q        Now, are you familiar with the Youngstown Violent

5398

```
 1    Crimes Task Force?

 2    A        Yes, sir.

 3    Q        And what is your knowledge of what the Youngstown

 4    Violent Crimes Task Force is?

 5    A        They're made up of guys from different police

 6    departments in the Mahoning County and it's kind of like a

 7    county-wide SWAT team, but they're from different

 8    departments.

 9    Q        And is it unusual for the Trumbull or was it unusual

10    for the Trumbull County SWAT team to work with other law

11    enforcement agencies, including the Youngstown Violent Crimes

12    Task Force?

13    A        No.  That's not uncommon.

14    Q        Now, I want to ask you or direct your attention to

15    specifically December 21st of 2001.  Were you called out to

16    assist another law enforcement agency on that date as a

17    member of the SWAT team?

18    A        Yes.

19    Q        All right.  What other agency were you called out to

20    assist with?

21    A        Howland Township.

22    Q        And you went to a location, I believe, in Howland;

23    is that correct?
```

1    A        That's correct.

2    Q        After going to that location in Howland, did you go

3    to a second location outside of Trumbull County?

4    A        Yes, we did.

5    Q        All right.  Can you tell this jury what location you

6    went to outside of Trumbull County?

7    A        It was 791 Wirt Street.

8    Q        And do you know which city that was located in?

9    A        Youngstown.

10   Q        Now, who would have been with you from the Trumbull

11   County SWAT team as best you can recall?  Were you the only

12   one or were there other members?

13   A        No.  I believe there was five from Trumbull County.

14   I believe it was Major Phillips, Captain Bacon, Lieutenant

15   McBride, Detective Tackett and myself.

16   Q        Were you met with any other members of any other law

17   enforcement SWAT teams?

18   A        Yes.  We staged with the Violent Crimes Task Force

19   once we got to Youngstown.

20   Q        Okay.  And can you tell this jury what it means to

21   stage?

22   A        Basically what you're doing is you're making a plan

23   for the house that you're gonna execute the search on.

5400

1    Q        And the location that you were looking for at 791

2    was it Wirt Street?

3    A        Wirt, w-i-r-t, yes.

4    Q        All right.  That location, did you have a, do you

5    know what your reason was at the staging?  Did you know what

6    the reason was for going in there?

7    A        There was a suspect there involved in a homicide

8    supposedly inside that residence.

9    Q        And what was your job to go into this location to

10   do?

11   A        To extract him.

12   Q        Now, after you went and you staged at the location,

13   you actually went to this 791 Wirt Street --

14   A        That's correct.

15   Q        -- location?  And, in fact, was an individual

16   arrested out of that location?

17   A        Yes, he was.

18   Q        And do you know what his name was?

19   A        Nate Jackson.

20   Q        Now, I'm gonna show you some photographs that have

21   previously been marked for identification as State's Exhibits

22   229, 227, 228, 229, 231, 232, 234.  I'm gonna ask you to take

23   a look at these photographs, Officer Yannucci.  I'm gonna let

1    you look at these.

2    A        (Witness complies.)  Okay.

3    Q        Do you recognize all of those photographs?

4    A        Yes, sir.

5    Q        All right.  Let me put them on the screen so the

6    jury can see them as well.  I'm going to put on the screen

7    State's Exhibit Number, this is going to be a poor

8    photograph, but I want you to see State's Exhibit 229.  It

9    looks like it was taken at night?

10   A        Yes.  That's a photo of the front of 791 Wirt

11   Street.

12   Q        I assume that was taken or do you know when that

13   photograph was taken?

14   A        About the time we were there, yeah.  About 1, 2 in

15   the morning I would think.

16   Q        I'm gonna show you State's Exhibit 228.

17   A        That's the front door of the same residence.

18   Q        I'm gonna show you State's Exhibit 231.  Do you

19   recognize what State's Exhibit 231 is?

20   A        That's the closet where the gloves were located.

21   Q        And what type of gloves did you locate at that Wirt

22   Street address?

23   A        Black leather gloves.

1    Q        Would you characterize those, how would you

2    characterize the thickness of those gloves?

3    A        They weren't very thick.  They had a little bit of

4    lining, but not very much.

5    Q        Can you maybe use that laser pointer that's in front

6    of you there?  It should be right in front of you.  It looks

7    like a remote control.  Right on the desk there.  There

8    should be a button that says laser.  Can you point for the

9    jury where those gloves were found?

10   A        Right back in that far left-hand corner.

11   Q        Okay.  I'm going to show you State's Exhibit 233.

12   Again, what is State's Exhibit 233?

13   A        Right there (indicating.)

14   Q        And State's Exhibit 234?

15   A        Right there (indicating.)

16   Q        Okay.  I'm also gonna show you State's Exhibit 227.

17   What is State's Exhibit 227?

18   A        That's a door off a dining room that goes into a

19   bedroom and down there (indicating) was where a pair of

20   tennis shoes that the suspect was wearing.

21   Q        All right.  And 232 is right here.

22   A        That's just the door, going through there is that

23   hallway where the gloves were located.

1    Q        All right.  Now, all of those photographs clearly

2    and accurately depict the scene as you observed it on

3    December 21st, 2001?

4    A        Yes, sir.

5    Q        All right.  Beside you, I believe there are some

6    rubber gloves in a box there if you wouldn't mind standing up

7    and grabbing those.

8    A        (Witness complies.)

9    Q        I'm gonna hand you a paper bag that's been marked

10   for purpose of identification as State's Exhibit 317 and ask

11   if you recognize State's Exhibit 317?

12   A        Yes, I do.  This is the paper bag that I put the

13   gloves into.

14   Q        All right.  And how do you know that's the paper bag

15   that you put those gloves into?

16   A        That's my handwriting.

17   Q        And can you please show us the items that are in

18   State's Exhibit 317?

19   A        (Witness complies.)

20   Q        Anything unusual about those gloves?

21   A        Yes, sir.  The left index finger on the glove

22   appears to be torn.

23   Q        And does there appear to be anything on it?

 1    A        At this point, I'm having a hard time seeing it, but

 2    when I found it, there was a red substance.

 3    Q        And do those pair of gloves, are they the same pair

 4    of gloves that you found on December 21st, 2001 --

 5    A        Yes, sir.

 6    Q        -- at Wirt Street in Youngstown?

 7    A        Yes.

 8    Q        Are they in the same or substantially the same

 9    condition as when you found them?

10    A        Yes.  Minus the red substance.  It was more visible

11    on the fingertip.

12    Q        What did you do with State's Exhibit 317 after you

13    retrieved them from the Wirt or Wirt Street address in

14    Youngstown, Ohio?

15    A        I bagged the evidence and turned it over to

16    Lieutenant McBride who was on scene in charge at the time.

17    Q        Okay.  Go ahead and put those away, please.

18    A        (Witness complies.)

19                  MR. BECKER:  Your Honor, I have nothing

20    further of this witness -- or hold on.

21    Q        The bag that you indicated there, did you sign that

22    bag?

23    A        Yes, sir.

1    Q        And your signature appears thereon?

2    A        Yes, sir.

3    Q        And you dated it I believe?

4    A        Yes, sir.

5    Q        And the date contained on that bag is?

6    A        12-21 of '01.

7    Q        Yeah.  And it was eventually sealed by you?

8    A        Oh, absolutely.  Yes.

9    Q        And that was, and then it was turned over to

10   Lieutenant McBride?

11   A        That's correct.

12                   MR. BECKER:  All right.  I have nothing

13   further.

14                   THE COURT:  Cross?

15                   **CROSS EXAMINATION**

16   **BY MR. INGRAM:**

17   Q        You're a member of a SWAT team?

18   A        Yes, sir.

19   Q        And as I understand what you just said, you have

20   specialized training to deal with high-risk incidents?

21   A        That's correct, sir.

22   Q        And before you went to 791 Wirt, did you go to 254

23   Fonderlac?

1    A        Yes, sir.

2    Q        You had a staging at Wirt.  Did you have a staging

3    at Fonderlac?

4    A        Yes, sir.

5    Q        Did you kick the kitchen door in?

6    A        I myself or the team?

7    Q        Did somebody, a member of the SWAT team, kick the

8    kitchen door in?

9    A        Yes.

10   Q        Did other members rush in through the front door

11   when Donna opened the door?

12   A        I can't speak for that.  I was in a different part

13   of the house at the time.

14   Q        All right.  But she's arrested by this

15   high-incident, specialized training SWAT team on December

16   21st?

17   A        That's correct.

18   Q        And from there, you fellows meet up with some guys

19   from Youngstown and go to Wirt?

20   A        That's correct.

21                    MR. INGRAM:  Would you put 231 back up on

22   the screen for me, please?

23                    MR. BECKER:  Sure.

5407

```
 1    Q        (By Mr. Ingram)  You're not gonna need to take
 2    anything out of that bag.  If you find gloves uncomfortable,
 3    you can take them off.
 4    A        Thank you.
 5                      MR. BECKER:  231?
 6                      MR. INGRAM:  231.  Isn't that a picture of
 7    the closet?
 8                      MR. BECKER:  Yeah.
 9    Q        (By Mr. Ingram)  That's one of several pictures of
10    the closet in which you found the gloves that are located in
11    a brown paper bag; correct?
12    A        Correct.
13    Q        Were there other belongings in that closet?
14    A        Yes.  It was filled with other items of clothing,
15    stuff like that.
16    Q        Were they male?  Was it male clothing?
17    A        I don't recall the other type.  There was a bunch of
18    junk basically in the bottom of that.
19    Q        Any papers containing the name Nate Jackson?
20    A        No.
21    Q        Did anyone direct your attention to that closet or
22    did you find those gloves on your own?
23    A        I found 'em on my own.
```

```
 1                        MR. INGRAM:  Thank you, Mr. Becker.

 2      Q        (By Mr. Ingram) Did you find any of Donna Roberts'

 3      personal belongings at 791 Wirt?

 4      A        No.

 5                        MR. INGRAM:  No further questions, Your

 6      Honor.

 7                        THE COURT:  Any redirect?

 8                        MR. INGRAM:  Oh, I do have one question.

 9      I'm sorry.

10      Q        (By Mr. Ingram) You're not from Youngstown.  Do you

11      have, if you don't know the answer to this, fair enough.  Do

12      you have any idea how far 791 Wirt is from the intersection

13      of Pershing and Victoria?

14      A        Not a clue, sir.

15                        MR. INGRAM:  Thank you.

16                        THE COURT:  Redirect?

17                        MR. BECKER:  I have nothing further, Your

18      Honor.

19                        THE COURT:  Thank you.

20                        THE WITNESS:  Thank you, sir.

21                              *  *  *

22

23
```

1    **WHEREUPON,**

2                          **ANTHONY LESHNACK,**

3    having been first duly sworn, according to law, was examined

4    and testified as follows:

5                          **DIRECT EXAMINATION**

6    **BY MR. BAILEY:**

7    Q        Sergeant, do you want to tell the Court and jury

8    your full name, place of employment and position?

9    A        Yes.  My name is Anthony Leshnack.  I'm employed

10   with the Trumbull County Sheriff's Office as a sergeant.

11   Q        And how long have you been so employed?

12   A        Over eight years.

13   Q        And your duties and responsibilities with the

14   Sheriff's Office?

15   A        Yes, I do.

16   Q        Oh, what are they?

17   A        What are my responsibilities?

18   Q        Right.

19   A        Right now or at the time of this incident?

20   Q        Well, what are your duties now and then what were

21   your duties back at the time of the incident?

22   A        Right now, I'm a sergeant in the civil division

23   transporting and --

```
 1    Q        Tony, can you move that mike a little closer?

 2    A        (Witness complies.)

 3    Q        Okay.

 4    A        Okay.  I'm sergeant in the civil division.  I

 5    transport prisoners and deliver civil process.

 6    Q        Okay.  And back then, back in December 11th and 12th

 7    of 2001, what were your duties?

 8    A        I was a detective in the Investigations ID Bureau.

 9    I, part of my responsibilities were of processing crime

10    scenes.  I was also a member of the Trumbull County Homicide

11    Task Force.

12    Q        Okay.  Now I'm gonna direct your attention to

13    December 12th of 2001.  Did you have occasion to get called

14    out in the early morning hours just after midnight?

15    A        Yes, I did.

16    Q        And where, to where did you respond?

17    A        I don't know the exact address.  It was Fonderlac

18    Drive, I believe, in Howland Township.

19    Q        Was it the scene of a homicide?

20    A        Yes, it was.

21    Q        And in what county and state is that located?

22    A        Trumbull County, Ohio.

23    Q        Okay.  Now, why were you called?
```

```
 1   A          Detective Sergeant Monroe called me as a member of

 2   the homicide task force to assist in photographing and

 3   processing the crime scene at that location.

 4   Q          Okay.  Now, who was the senior officer at the

 5   Sheriff's Office involved with that process?

 6   A          Detective Sergeant Pizzulo.

 7   Q          And did you work with him in that time period doing

 8   that?

 9   A          At that particular scene?

10   Q          At that particular time.  No, not at that scene, but

11   at that time?

12   A          At that time, we were working together.

13   Q          Okay.  Was he able to go that night?

14   A          No.  He was not available for work.

15   Q          Okay.  Now how, approximately, if you got called

16   about, what, about 12:12 in the morning?

17   A          That's correct.

18   Q          How long, approximately, did it take you to arrive

19   at the scene?

20   A          I'm sure I was there within 45 minutes.

21   Q          Okay.  Now, when you got there, what was the weather

22   like?

23   A          It was a cool evening I believe.  Not cold, but
```

1    cool.

2    Q        And do you remember what kind of clothing you had

3    on?

4    A        I believe I was wearing a light sweat shirt.

5    Q        Okay.  Did you have to wear any gloves, winter

6    gloves or anything like that?

7    A        No.  No winter gloves.

8    Q        Okay.  Now once you got to that scene, can you tell

9    the jury what you did when you got there?

10   A        I spoke to Detective Sergeant Monroe.  He advised --

11   Q        Is that Chief Monroe now?

12   A        He is Chief Monroe.

13   Q        But back then, Paul Monroe was Detective Sergeant?

14   A        That's correct.

15   Q        Okay.  And what, you spoke with him and then what

16   happened?

17   A        After I spoke with him, he advised me of the

18   situation, took me around the scene, asked me to take

19   photographs and assist in processing the scene.

20   Q        Okay.  And did you photograph the scene?

21   A        Yes, I did.

22   Q        Now where, what areas did you photograph?

23   A        All areas outside and inside of the house.

```
 1    Q         Okay.  And when you took the photographs, who was

 2    there at the time?

 3    A         Detective Sergeant Monroe was with me.

 4    Q         Okay.  So he was there when you made the

 5    photographs?

 6    A         To my recollection, he was there for most of the

 7    photographs.  I can't say every one.

 8    Q         Okay.  And do you take more than one roll of film?

 9    A         Yes, I did.

10    Q         And that night, did you take more than one, use up

11    more than one roll of film?

12    A         Yes, I did.  I believe I used 13 rolls of film.

13    Q         Thirteen rolls of film?  Okay.

14              And when you got done, where, did you turn those

15    photographs over to the Howland Township Police Department?

16    A         Yes, I did.

17    Q         Now, how many photos are on a roll?

18    A         They average, I believe at the time I was using 24

19    exposures.  There may have been some 36 exposures in there

20    and some 12 exposures also.  I couldn't be for sure.

21    Q         Okay.  And 13 rolls of both 36 and 24 exposures?

22    A         On the average, there would be 24 exposures.

23    Q         Okay.  Did you do anything else at the crime scene?
```

1    A        Yes, I did.

2    Q        What did you do?

3    A        After taking photographs, I was requested to help

4    process it for fingerprints, which I did, and I also

5    volunteered to sketch the crime scene for 'em.

6    Q        Okay.  Were you also requested to lift blood

7    samples?

8    A        Yes, I was.

9    Q        Now, you mentioned fingerprints.  What, when you

10   look for fingerprints, what area were you looking at?

11   A        I looked at the entrance and exits of the house, the

12   kitchen, the countertop areas, cups and glasses around the

13   immediate scene.

14   Q        And were you able to lift anything of significance?

15   A        Nothing of significance.

16   Q        Okay.  Now, on TV programs like CSI, they always

17   find prints.  Okay.  In real life -- well, what education and

18   training and experience do you have in lifting prints?

19                      MR. INGRAM:  Did the first part of that

20   question have anything to do with the second part?

21                      MR. BAILEY:  Yeah.  I'm gonna get to it.

22   I'm sorry.  What was my question?  Can I have that last

23   question --

```
 1                    MR. INGRAM:  Have you had --

 2                    MR. BAILEY:  Oh, yeah.

 3     Q       (By Mr. Bailey)  What education and training and

 4     experience have you had with regards to fingerprints?

 5     A       I went through the basic academy and did limited

 6     fingerprint lifts there and other training.  I've been to

 7     numerous seminars with the Ohio Identification Officers

 8     Association, numerous fingerprint schools, maybe two or three

 9     specifically for lifting fingerprints.

10     Q       Okay.  And have you lifted prints before this?

11     A       Yes, I have.

12     Q       Or dusted scenes for prints?

13     A       Yes, I have.

14     Q       Okay.  A lot of scenes?

15     A       Yes.

16     Q       Okay.  Now, at this particular scene -- what's

17     significant ridge detail?

18     A       Significant ridge detail is the points on your

19     finger that would protrude that would actually leave a mark

20     after being dusted.  You'd be able to see the lines in it.

21     And from there, with the ridge detail, you have to find

22     minutia points to determine where, to determine who the

23     fingerprint came from if you had a suspect or you can enter
```

1    it into our AFIS system.

2    Q        What's AFIS?

3    A        AFIS is the automated fingerprint identification

4    system.

5    Q        Okay.  Now, the area that you locked at, what

6    equipment did you use to dust for prints?

7    A        I used a brush, black powder, and flouresent powder

8    on some of the darker surfaces.

9    Q        And were you able to -- now in the TV programs, they

10   always find prints.  In real life, at all the scenes that

11   you've dusted, have you always been able to find prints with

12   significant ridge detail for comparison?

13   A        No, not for comparison.  Most of the scenes, you're

14   gonna find smudges.  You're not gonna get a perfect print

15   like you see on the TV shows.  The ones at that scene, I did

16   get some smudges, but nothing that I could identify.

17   Q        Okay.  Now, you mentioned blood.  How do you do

18   that?

19   A        Blood samples are taken with a sterile swab in

20   distilled water and packaged in a manila envelope.

21   Q        Okay.  And did you, were you able to lift, were you

22   able to swab blood stains?

23   A        Yes.

1     Q        Okay.  And what do you do with those?

2     A        After swabbing them and packaging them, marking the

3     evidence tape to seal them, I turned everything over to

4     Howland Police Department for, to turn in to a lab for

5     analysis.

6     Q        Okay.  Now you mentioned, was there any evidence

7     that you took with you personally?

8     A        No, there wasn't.

9     Q        Okay.  Now this was a Howland Township homicide?

10    A        That's correct.

11    Q        Okay.  And this scene that you were at, in what

12    township, county and state was it located?

13    A        Trumbull County, Howland Township, Ohio.

14    Q        Okay.  Now, you said you did a diagram; is that

15    right?

16    A        That's correct.

17    Q        Sergeant, I'm gonna ask you to come down here.  I'm

18    gonna ask you to stand off to the side so that all the jurors

19    can see.  Okay.  And that State's Exhibit 3 on that easel,

20    can you identify that?

21    A        I couldn't hear you, sir.

22    Q        Pardon?

23    A        I couldn't hear your question.  I didn't hear

```
 1    whatever you said.

 2    Q        Can you identify State's Exhibit 3, that diagram on

 3    the easel?

 4    A        Yes, I can.

 5    Q        Okay.  What is it?

 6    A        This is a blown-up version of the diagram that I

 7    drew, the sketch of this crime scene on Fonderlac.

 8    Q        Okay.  And is that a true and accurate sketch of

 9    the, is it a true and accurate blowup of the diagram that you

10    prepared?

11    A        Yes, it is.

12    Q        And does that list the address of the scene?

13    A        Yes, it does.

14    Q        What was the address that you were at?

15    A        254 Fonderlac in Howland Township.

16    Q        And on the original, what size was the original?

17    A        Regular I believe it's nine and a half by eleven is

18    a regular size sheet of paper.

19    Q        Okay.  Now, how did you prepare that?  The original.

20    A        The original was done in pencil using rulers and

21    other, other tools for sketching.

22    Q        Okay.  And do you do the entire outline of the

23    house?
```

5419

1    A        Yes, I did.

2    Q        Okay.  And are there various points that are on that

3    diagram?

4    A        Yes, there are.

5    Q        What is, can you briefly go through the various

6    points as you've noted them on the left-hand side to describe

7    what you, what you wrote down there?  And tell us, tell the

8    jury and the Court what that diagram depicts.  You can use

9    the pointer so that they can see.

10   A        Okay.  This is an overall diagram of the house in

11   each room of the house concentrating on where the victim was

12   found.  I have certain points marked here.

13   Q        You're pointing to the bottom left now for a key?

14   A        Correct.  That's my key.  I have point A and point B

15   marked, which are starting points; point A and point B, which

16   is a door jam facing the victim.  I also have two other

17   starting points I used to triangulate my measurements, point

18   A1 and point B1, which is the actual, the other side of the

19   door jam facing into the garage.

20            From point A to point B, the measurements are

21   triangulated to certain objects or a piece of evidence.

22            The first one I have is the left hand of the victim,

23   which from point A to point B was zero.  I'm sorry.  Yeah.

1    Point A, yeah, would be zero inches, which was the starting
2    point.
3            The right hand from point A was 25 inches to 38
4    inches away from point B.
5            The left shoe was located 72 inches from point A and
6    74 inches from point B.
7            The right shoe was located 63 inches from point A
8    and 67 inches from point B.
9            The opposite side of the door jam was used to locate
10   items in the garage area.  Point A1, the gun, was found at
11   ten inches.
12           These are all to center by the way.
13   Q       Okay.  You mentioned a gun?
14   A       Yes.  There was a gun found.
15   Q       And you have that marked with a spot on the diagram?
16   A       Correct.
17   Q       What's that marked?
18   A       It's marked right here on the diagram, and it's
19   located ten inches from point A1 and 29 inches from point B1.
20   That was found on the step leading into the garage.
21           The next piece that may have been of some
22   significance was a white stub that was found here, 34 inches
23   from point A1 and I believe four feet five inches, I'm sorry,

1    that's not 34 inches, that's three feet four inches from

2    point A1 and four feet five inches from point B1.

3              There's also glasses.

4    Q        When you say glasses, you mean eyeglasses?

5    A        They were eyeglasses with the left lens missing,

6    which they were located five feet five inches from point A1

7    and six foot five inches from point B1.

8              Also, the right lens of the pair of glasses were

9    found nine feet four inches from point A1 and ten feet eleven

10   inches from point B1.

11             There was a bracket with a screw found nine feet two

12   inches from point A1 and ten feet seven inches from point B1.

13             There was also another bracket found twelve feet

14   five inches from point A1 and fourteen foot two inches from

15   point B1.

16   Q        Okay.

17   A        Those are the only measurements I have depicting

18   evidence or body parts so that the body could be repositioned

19   at a later time if needed.

20   Q        Okay.  And you marked down the layout of the rest of

21   the house?

22   A        Yes, I did.

23   Q        What do you note on there on your diagram as to the

1    layout of the house?

2    A        I noted north.

3    Q        Can you show that on the diagram, the big diagram,

4    so the jury can see?

5    A        This would be facing north.  I also want to note

6    that the measurements here are not to scale.  I am not an

7    architect, although I was involved in construction, it's

8    close to scale, but it's not exactly to scale.

9             Also depicted the driveway, the garage door, the car

10   in the garage, various rooms, the countertop in the kitchen,

11   the kitchen area, table, chairs, the table in the dining room

12   area, the chairs around it, a red spot which was actually a

13   red drop.

14   Q        Okay.  That red spot was, what did you do with that?

15   A        That was, that was collected and turned over to the

16   Howland Police Department.

17   Q        How did you collect that?

18   A        I collected it with a sterile swab in distilled

19   water and packaged it in a manila envelope and sealed it and

20   initialed it and dated it.

21   Q        And who did you give it to?

22   A        Detective Sergeant Monroe.

23   Q        Okay.  Now, you have a stairwell with a bullet hole

1    that's marked in there?

2    A        Yes.  The stairwell going down with a bullet hole

3    that was found in the ceiling going down the step.

4    Q        Okay.  What did you do when you noted that?  Did you

5    search that area for anything?

6    A        Yes.  We searched the area.

7    Q        Did you find anything?

8    A        Yes.  We cut out the drywall and found a lead bullet

9    in the I believe the two by four.

10   Q        Okay.  You included that in your diagram?

11   A        Yes.  Would you like me to continue?

12   Q        Sure.  Go ahead.

13   A        Also master bedroom, I marked master bedroom, the

14   bed, the bathroom, a dead space in the wall, a secondary

15   bedroom, the bed, the bathroom, the tub and the laundry

16   facilities, another family room, a couch, a piano, the TV and

17   second or third, second or third family room and an office

18   area.

19   Q        Okay.  And that's what you personally observed

20   somewhere around 1:00 in the morning or soon thereafter on

21   December 12th at 254 Fonderlac?

22   A        That's correct.

23   Q        If you can resume the stand, please.

5424

```
 1    A         (Witness resumes witness stand.)

 2    Q         Now, did you assist the medical examiner that night

 3    with the photography?

 4    A         Yes.

 5    Q         Dr. Germaniuk?

 6    A         That's correct.

 7    Q         Okay.  And on December 12th about 2:00 in the

 8    afternoon, did you return to that scene?

 9    A         Yes, I did.

10    Q         Okay.  What was the purpose of doing that?

11    A         I wanted to bring Detective Sergeant Pizzulo back to

12    the scene and review what we did the night he couldn't make

13    it.

14    Q         Okay.  Did you additionally, process additional

15    areas for prints?

16    A         Not for prints at that time.  I believe we pulled

17    some blood samples up at that time.

18    Q         Okay.  And what did you do with those?

19    A         We packaged them and turned them over to Howland

20    Township Police.

21    Q         Okay.  And then the next day, on December 13th, did

22    you take some additional photographs?

23    A         I believe we did.
```

1    Q        And additional blood stains from the garage floor?

2    A        Correct.  That was the -- I'm sorry.  I have the

3    days mixed up.  It was that day, the 13th.

4    Q        On the 13th?

5    A        Right.

6    Q        Okay.  But going back to the 12th, you went back to

7    the scene in the afternoon; right?  I mean because you were

8    there in the early morning hours around, right after

9    midnight?

10   A        Right.  We were there for a long time.  We needed to

11   get some rest and come back.

12   Q        Okay.  So when you went back to the scene, you did

13   additional print processing?

14   A        Correct.

15   Q        And additional blood stain processing?

16   A        I'm not sure if we did anymore blood stain

17   processing at that time or not.

18   Q        Do you have your report of December 12th?

19   A        I have to check it.

20   Q        Do you need to look at that to refresh your

21   recollection?

22   A        Yes.

23   Q        Okay.  Now, did you get a chance to read the second

5426

1    and third paragraphs?

2    A        Yes.

3    Q        So you went to that scene twice on December 12th and

4    once on the 13th?

5    A        That's correct.

6    Q        And during those occasions, you did blood processing

7    and print processing; is that right?

8    A        That's correct.

9    Q        Okay.  And everything you found, you turned over to

10   Detective Sergeant Monroe?

11   A        That's correct.

12                    MR. BAILEY:  Okay.  Thank you.

13                    THE COURT:  Cross.

14                    **CROSS EXAMINATION**

15   **BY MR. JUHASZ:**

16   Q        Sergeant Leshnack, good afternoon.  Do you still

17   have the, yeah, do you have the diagram there that has the

18   measurements on it?

19   A        Yes.

20   Q        Let's use that one just so it's easier for you to

21   read; okay?

22   A        Okay.

23   Q        If I understand what you did with this diagram,

3427

 1    State's Exhibit 3, you took two starting points, A and B, so

 2    that you could triangulate the measurements; correct?

 3    A        That's correct.

 4    Q        So that there would be, for every significant item

 5    recorded on the diagram, there would be not one, but two,

 6    measurements so that if somebody ever wanted to go back and

 7    look at the house and see where the person's hand was, there

 8    would be a way to triangulate it and make it precise;

 9    correct?

10    A        That's correct.

11    Q        All right.  You also have two other starting points,

12    don't you, called A1 and B1; correct?

13    A        That's correct.

14    Q        Now, if I'm reading your diagram correctly, it seems

15    to me that A and B are starting points inside the door jam

16    and A1 and B1 are starting points outside the door jam; is

17    that right?

18    A        That's correct.

19    Q        Okay.  And then you began to measure various items

20    that you regarded as significant to this homicide; correct?

21    A        That's correct.

22    Q        Now, speaking of the word homicide, did you regard

23    it as a homicide at the time?  By the time you were there,

5428

1    it's pretty much regarded as a homicide?

2    A        When we first got to the scene, it was a shooting

3    death that we didn't know whether it was self-inflicted or a

4    homicide.

5    Q        Okay.  But in any event, the purpose of all of the

6    photographs that you've told Mr. Bailey and the jury that you

7    took and the diagram is to record everything that might be a

8    significant event so that later, if you needed to testify

9    about it or show somebody what it looked like, you were able

10   to do that; correct?

11   A        That is correct.

12   Q        Because as we've just seen, since it's been 17 or 18

13   months, you had to look at your report, you can't remember

14   everything; correct?

15   A        That's correct.

16   Q        That's why you write down things, so that you're

17   able to look at them later; correct?

18   A        Correct.

19   Q        Now, you started out with the location of

20   Mr. Fingerhut's left hand; right?

21   A        Correct.

22   Q        I should say correct, not right, since I'm talking

23   about the left and right hand.  You started out with his left

9429

```
 1    hand; am I correct?

 2    A        Correct.

 3    Q        And you mentioned that it was zero inches from point

 4    A because you, in fact, used that as the starting point;

 5    correct?

 6    A        Correct.

 7    Q        You also have it as zero inches from point B, which

 8    is over here on the other side of the man door; correct?

 9    A        That's what I wrote down.

10    Q        That's what you wrote down?

11    A        That's correct.

12    Q        And that's not correct, is it?

13    A        That is not correct.

14    Q        Okay.  I assume that you took photographs, you have

15    marked in your diagram a red spot; correct?

16    A        That is correct.

17    Q        And you mentioned to Mr. Bailey that you used a

18    sterile swab and some distilled water and picked that swab up

19    and turned it over to Howland; correct?

20    A        Correct.

21    Q        I assume you took a photograph of that; is that

22    right?

23    A        Yes, I did.
```

```
1    Q        You also mentioned to Mr. Bailey that there was a

2    hole in the stairwell, that you guys cut out the drywall; you

3    recall that?

4    A        Yes.

5    Q        And you have that marked on your diagram, don't you?

6    A        I have it marked, correct.

7    Q        And I assume you took photographs of that as well?

8    A        Correct.

9    Q        You took or attempted to lift a number of

10   fingerprints; right?

11   A        Correct.

12   Q        Now, there's a difference, isn't there, between

13   having the skills to lift a print and having the skills to

14   compare prints; correct?

15   A        Absolutely.

16   Q        Are you trained in both of those or are you trained

17   only in lifting?

18   A        I'm trained in lifting and comparing.

19   Q        All right.  Mr. Bailey was talking about some of the

20   crime scene shows, how they always get fingerprints and

21   that's wonderful evidence, but the reason that you don't get

22   it is because when we do things, like I'm touching this bench

23   right here, I'm liable to slide my hand when I pull it away
```

1   like I just did there and that's gonna smear the print;

2   correct?

3   A       That's correct.

4   Q       As opposed to, you're also trained in how to

5   fingerprint people when you book them when you arrest 'em;

6   right?

7   A       Correct.

8   Q       And so we've seen that, how you very carefully lay

9   and roll it out so that you get a good print for comparison

10  purposes; correct?

11  A       That's correct.

12  Q       All right.  And if I understand the upshot of your

13  testimony about all of the dusting that you did, while you

14  may have found some ridges or something that you could say,

15  well, that's somebody's fingerprint, you're not able to have

16  enough to compare it with a known print to say whose

17  fingerprint that is?

18  A       That's correct.

19  Q       Okay.  And that's true throughout the entire or

20  whatever printing you did at the residence; correct?

21  A       Correct.

22  Q       You didn't print every square inch of the place, did

23  you?

5432

```
 1    A         No.  Not feasible.

 2    Q         Right.  You try to look for places that you think

 3    might be significant; correct?

 4    A         That is correct.

 5    Q         And if I understood, you basically went to the

 6    entrance ways and things like that where people would be

 7    using doors, etcetera?

 8    A         Correct.

 9    Q         Okay.  And again, found nothing that was liftable or

10    comparable?

11    A         That's correct.

12    Q         All right.  Now, these items that we have talked

13    about, the red spot and the bullet hole and the various

14    locations of Mr. Fingerhut, you went to the trouble to

15    measure those and triangulate them and record them; correct?

16    A         Which areas?

17    Q         I'm sorry.  The, you did not triangulate the red

18    spot?

19    A         I did not triangulate those.

20    Q         Forgive me.  But the various areas where

21    Mr. Fingerhut is found, where his hands are, things like

22    that, you went to the trouble to triangulate all of that?

23    A         Correct.
```

5433

1    Q        You also did that with the gun?

2    A        Correct.

3    Q        And with the glasses, correct, in the garage?

4    A        Correct.

5    Q        And with the bracket in the garage?

6    A        Yes.

7    Q        Okay.  And again, your effort is to try to record

8    everything that might be significant to whatever has happened

9    in that house that you come upon; correct?

10   A        That's correct.

11   Q        All right.  You and I can agree that nowhere in here

12   do you record anything about any footprints in blood;

13   correct?

14   A        That's correct.  I did not.

15   Q        All right.  That would be true both for the step;

16   correct?

17   A        Correct.

18   Q        And for the kitchen?

19   A        Correct.

20   Q        The gun that was on the step, you triangulated that

21   and measured it; correct?

22   A        Yes.

23   Q        Did you photograph it as well?

5434

1    A        Yes, I did.

2    Q        And were you responsible, as part of processing the

3    crime scene, to turn that gun over to Howland or was somebody

4    else involved in that?

5    A        That was turned over to Howland also.

6    Q        Okay.  Did you actually pick the gun up off the step

7    and bag it and turn it over to them?

8    A        Myself and Dr. Germaniuk looked at the gun,

9    photographed it.  I actually opened the gun up to see what

10   was in the cylinder.

11   Q        Okay.  And before you did that, did you dust the gun

12   for prints?

13   A        No, I did not.

14   Q        When you're doing all of this, particularly the

15   prints, are you wearing gloves, something like the latex

16   gloves that are there in front of you on the bench?

17   A        Yes, I am.

18   Q        Okay.  And do you wear those gloves when you pick up

19   that gun and handle it?

20   A        Yes, I do.

21   Q        And that's to protect the integrity of it, even

22   though you didn't dust it for prints?

23   A        That's correct.

```
 1    Q        Okay.  And after you turn it over to Howland you, of

 2    course, have no idea what happens to the gun?

 3    A        It was turned over to be tested at a lab.

 4    Q        Well, do you know that from your personal knowledge

 5    or is that something somebody told you?

 6    A        That's from Detective Sergeant Monroe.

 7    Q        Okay.  So that's not something you know about it?

 8    A        That's correct.

 9                   MR. JUHASZ:  Okay.  That's all I have.

10    Thank you very much.

11                   MR. BAILEY:  No questions.

12                   THE COURT:  Redirect?

13                   MR. BAILEY:  No.  No other questions, Your

14    Honor.

15                   THE COURT:  Thank you.

16                   THE WITNESS:  Thank you.

17                   MR. BECKER:  Your Honor, I believe it's

18    2:30 and we'd like to take the usual 15-minute break.

19                   THE COURT:  That's fine.  We'll take a

20    15-minute break.

21         Ladies and Gentlemen, you are not to discuss this

22    case among yourselves or with anyone else.  Do not permit

23    anyone to discuss it with you or in your presence.  Thank
```

 1    you.

 2    (Whereupon, a recess was had commencing at 2:30 p.m. and

 3    concluding at 2:47 p.m.)

 4                    THE COURT:  Okay.  I believe we're ready

 5    to proceed.  Call your next witness.

 6                    MR. BECKER:  Your Honor, the State would

 7    call Santiago Mason.

 8    **WHEREUPON,**

 9                         **SANTIAGO MASON,**

10    having been first duly sworn, according to law, was examined

11    and testified as follows:

12                         **DIRECT EXAMINATION**

13    **BY MR. BECKER:**

14    Q        All right.  Would you please introduce yourself to

15    this jury?

16    A        My name is Santiago Mason.

17    Q        All right.  And Mr. Mason, you still may want to

18    maybe scoot a little bit closer.

19    A        Santiago Mason.

20    Q        Okay.  Very good.  Mr. Mason, where do you live at?

21    A        Right now, I live at 407 Southern Boulevard,

22    apartment 215.

23    Q        And Mr. Mason, what is your date of birth?

1    A        11-13-68.

2    Q        Mr. Mason, I want to direct your attention to

3    October, November, December of 2001.  Actually, I guess just

4    the fall, September, October, November of 2001.  Were you

5    going to the Warren bus station at certain intervals at that

6    time?

7    A        Yes.

8    Q        What was your reason in going to the Warren bus

9    terminal?

10   A        I have family live in Cleveland.  I'm from Cleveland

11   myself.

12   Q        Okay.  And is that the transportation method you

13   would use to go visit that family?

14   A        Yes.  Yes.

15   Q        While you were going to -- well, how often would you

16   use the Greyhound station here in Warren?

17   A        Like on a, right now I don't use it, but back then,

18   I was using it like every other weekend.

19   Q        All right.  And when you would go to the Warren bus

20   station, did you become familiar with any of the employees

21   there or any of the people that were there?

22   A        Yes.

23   Q        Do you recall who you became familiar with?

5438

```
 1    A        Yes.

 2    Q        Do you recall the name?

 3    A        Donna Roberts.

 4    Q        All right.  And just in your own words, tell us how

 5    you got to know Donna Roberts.

 6    A        Well, I was going to Cleveland and she was writing

 7    her boyfriend, Mr. Jackson, at the time and there was a

 8    picture and I was incarcerated myself in Belmont Institution

 9    myself so I remembered the background.  I was like just

10    passing conversation since I was sitting there.  And I was

11    like, "That picture like he in Belmont."

12             And she's like, "He is.  Do you know him?"

13             I'm like, "No, I don't know him, but I know the

14    background of the picture because I was, I took pictures in

15    that room before."

16             And we just started talking and everything.

17    Q        So you became familiar with Miss Roberts through

18    some previous incarceration that you had been in trouble for?

19    A        Yes.

20    Q        And can you tell this jury what you were

21    incarcerated for?

22    A        Oh, I was incarcerated for not watching my parole

23    officer.  They put it for escape.  Up under the new law, it's
```

5439

 1    escape right now.

 2    Q        All right.  And were you on parole at the time?

 3    A        Yes, I was on parole at the time.

 4    Q        All right.  Now, at some point, I believe in

 5    November of 2001, did Miss Roberts offer to do something with

 6    you?

 7    A        Oh, she just told me to stop back at the bus stop

 8    when I get back from Cleveland.  And we just started talking

 9    and that's kind of what, we started getting better with each

10    other and we, I sat there until she got off work and we got

11    in her car or whatever.

12    Q        Now do you recall approximately what date of the,

13    what date in November?

14    A        It was a little after my birthday.

15    Q        So sometime after November 13th?

16    A        My birthday is the 13th of November so it was like a

17    couple days after my birthday.

18    Q        And, in fact, you took her up on her offer to meet

19    her after work?

20    A        Yes.

21    Q        And can you tell this jury in your own words what

22    you did that particular day?

23    A        Well, after she got off, she locked up the building

```
 1      and everything.  We got in the car, she had a red Chrysler,

 2      and I thought she was pulling out a pack of cigarettes and

 3      she pull out a big old pack of fat joints.  And I'm like, I'm

 4      thinkin' she's gonna smoke a cigarette so I rolled my window

 5      down because I don't smoke cigarettes at all.  So we ridin'

 6      and I smell, I'm like, "What you smokin'?  You smokin' weed?"

 7              And she like, "Yeah."

 8              I'm like, "Oh, man, you a live old lady."

 9              You know what I'm saying?  So she throw on her

10      little CD player and started playing thug music and stuff.

11      I'm like --

12      Q       What kind of music was it?

13      A       Thug music.

14      Q       Okay.  What is thug music?

15      A       Like Trick Daddy, I'm A Thug, whatever.

16      Q       Okay.  Is it what we call rap music?

17      A       Yes.  Rap music.

18      Q       Okay.

19      A       Yeah.  And I asked her, I'm like, "What is you doin'

20      listening to this type of music, you know what I'm saying, at

21      your age"?

22              She like, "My boyfriend hook me onto this kind of

23      music," or whatever.
```

3441

1    Q        And at that time, you knew her boyfriend to be?

2    A        Her boyfriend was Nathaniel Jackson at that time.

3    Q        And that's the same person --

4    A        That's the same guy I seen she was writin' and the

5    picture that was on the desk and everything.

6    Q        And what did you do after she drove you around?

7    Where did you go?

8    A        Well, we went into her house out there.

9    Q        And do you know where her house was?

10   A        In Howland.

11   Q        All right.  I'm gonna show you what's been marked

12   for purposes of identification as State's Exhibit 126 -- 126,

13   104, 249 and 124.  I'm gonna show you up here on this screen

14   what's been marked for purposes of identification as State's

15   Exhibit 126.  Do you recognize what State's Exhibit 126 is?

16   A        I recognize the house.

17   Q        That you went to in November of 2001?

18   A        Yes.

19   Q        All right.  And when you were in that house, did you

20   observe anything or what did you do in the house I guess?

21   A        Well, we went in the house.  I sat down and

22   observed.  There was a leather couch.  The house was nice.

23   You know what I'm saying?  The house was really nice.

3442

1   Q        What kind of couch was it?

2   A        Leather black couch.

3   Q        All right.  I'm going to show you State's Exhibit

4   124 and ask if you recognize State's Exhibit 124?

5   A        That's the couch.

6   Q        And what did you do on that couch?

7   A        She gave me a blow job on that couch.

8   Q        All right.  And I'm gonna show you now State's

9   Exhibit 104 and ask if you recognize State's Exhibit 104?

10  A        We took it to the room, that room right there, and

11  she wanted me to have sex with her and I told her no.

12  Q        All right.  Why did you tell her you didn't want to

13  have -- she wanted to have vaginal sex with you?

14  A        Intercourse.  She wanted me to stick it in.

15  Q        Was this before or after she had given you oral sex?

16  A        This was out there on the couch, she gave me oral

17  sex and then we worked our way back to the room.

18  Q        What did you distinctly remember about the room?

19  A        All them jerseys.

20  Q        Why did that catch your eyes?

21  A        Because I love jerseys myself.  You know what I'm

22  saying?

23  Q        And did you ask her anything?

5443

```
 1   A        Yeah.  I asked her could I get one.  They was all

 2   too small for me because they was all mediums and smalls and

 3   large.  I wear like a 3X so they was all too small for me.

 4   And she told me --

 5   Q        You're a rather large individual?

 6   A        Yeah.

 7   Q        What's your height and weight?

 8   A        6'1", 240.

 9   Q        Is that about the same height and weight you were --

10   A        Back then, I was weighin' a little bit more then.  I

11   was weighin' like 250 then.  I lost a little weight.

12   Q        And I'm gonna show you State's Exhibit 249 and ask

13   if you recognize State's Exhibit 249?

14   A        Yes.  I remember that.

15   Q        What is State's Exhibit 249?

16   A        The plants, the background of brass and the glass

17   back there in the background.

18   Q        And was that in that residence?

19   A        Yes.  That's at that residence.

20   Q        And do you recognize the individual there?

21   A        Yes.

22   Q        And who is it?

23   A        Donna Roberts.
```

1    Q        Now, Mr. Mason, do those photographs fairly and

2    accurately depict Donna Roberts in the residence at 254

3    Fonderlac?

4    A        That's what I seen in the house when I was there,

5    yes.

6    Q        Now, after you refused to have intercourse with her,

7    what happened?

8    A        She got attitude.

9    Q        What do you mean when you say she got attitude?

10   A        For one thing, she come up to my job.  First, she

11   called.

12   Q        Well, right, right that day.  What happened?

13   A        That day, she got mad and she wanted me to walk

14   home, but she gave me a ride back to Greyhound.

15   Q        Did she say anything to you about you refusing to

16   have intercourse with her?

17   A        She just balled her face up, got attitude and, "Come

18   on, I'm taking you back where you came from," or whatever and

19   dropped me off.

20   Q        Where did she take you?

21   A        She dropped me right back off at Greyhound.

22   Q        Here in Warren?

23   A        Yeah.  Here in Warren.

```
 1   Q        Now, a few days later, did you have a chance to see
 2   Donna Roberts again?
 3   A        Yes.  We talked.
 4   Q        And tell this jury how you came to see Donna Roberts
 5   again.
 6   A        She had called up to my job.
 7   Q        And where were you working?
 8   A        I was workin' at Vista Windows at this time up on
 9   Elm.
10   Q        Up on Elm Road?
11   A        Elm Road, yes.  It's right behind Perkins.
12   Q        And what did she do when she came to see you?
13   A        Well, I thought she was coming up there to take me
14   out to lunch.  Then I pulled up from Wendy's.  She's standing
15   outside with her cell phone callin' me all kind of black MFs
16   and, "Mother Fucker, you took my gun.  Why in the fuck you
17   take my money?"  And this and that and all this.
18            And I'm looking at her like she crazy.  Like what
19   the hell is you talkin' about?  I said, "You must deal with
20   too many black guys.  You can't point the finger at me
21   because you deal with too many of 'em."
22            And she was like, "I know you done it.  I'm gonna
23   have the police come up here and arrest you for stealing my
```

1   gun and stealing my money," and some kind of phone calls and

2   crap.  Trying to just claim all kind of craps on me.  So

3   after that, she left.

4           Before she left, my boss came outside and told her,

5   asked her what she was waiting on.  And she said, "I'm

6   waiting on Howland Police," and he said, "Good.  Because they

7   can come and take you to jail, too, for being on private

8   property."

9           So that's when she left.  The next day, I go to

10  work, Howland Police come up there again and ask me to come

11  up to the police station for questioning.

12  Q       Right.

13  A       So I go up there, they put me in the room and record

14  me or whatever, ask me questions about the last time I seen

15  her and did I know anything about a gun and all this and

16  that.  I'm telling 'em no.  So next thing I know, they tell

17  me I have a warrant out for my arrest.  I'm like, "For what?"

18          "For a stolen gun."

19          I'm like, "How could you put a warrant out for

20  somebody's arrest and I ain't done anything?"

21          They say, "Well, this is the law," or whatever.

22  "You going to jail.  You going down to the county."

23          So they took me down to the county.  I was down



5447

```
 1    there for like two or three days.  I lost my job behind that.

 2    Q         You lost your job because you were incarcerated for

 3    those two or three days?

 4    A         Yes.  Because, first, my boss was gonna get me out,

 5    but they couldn't get me out because I had a speeding ticket

 6    too.  See what I'm sayin'?  So they were holding me down for

 7    that.  So that's another reason they probably hold me a

 8    couple of days, too, because I had a speeding ticket.

 9             But other than that, they hold me in there and I

10    finally got out.  I think it was on a Tuesday I got out of

11    jail.  And as soon as I done that, I got me an attorney.  But

12    at the time, I was still talking to Detective Hoolihan and

13    another detective.  I forgot his name.  I just seen the

14    fellow here.  He was here today.

15    Q         So eventually what happened with this accusation

16    that you stole Miss Roberts' gun?

17    A         Yeah.  She said I pulled her gun.  I went to work.

18    Then at the time, I remember right before I got fired from my

19    job, I went to work, they was like detectives came back up

20    there again and told me that I had to come up there and take

21    care of, go to the police station and talk to some more

22    police officers and everything.

23    Q         Were you ever convicted of that crime, of stealing
```

5448

1    her gun?

2    A        No, I was not convicted.

3    Q        Now, Mr. Mason, the individual that you've described

4    as Donna Roberts, is she here in this courtroom?

5    A        Yes, she is.

6    Q        Can you please identify or point to her?

7    A        She right there (indicating.)

8                    MR. BECKER:  Please allow the record to

9    reflect that the witness has identified Donna Roberts.

10                   THE COURT:  The record will so reflect.

11                   MR. BECKER:  Give me one moment, Your

12   Honor.

13                   THE COURT:  Sir, do you mind being

14   photographed while you're on the stand?  You have the right

15   not to be photographed.  If you don't mind, then that's okay.

16                   THE WITNESS:  I don't want to be

17   photographed.  I don't want to be in the newspaper, anything.

18                   THE COURT:  I'm sorry?

19                   THE WITNESS:  I do not want to be

20   photographed because I don't want to be in the newspaper, my

21   picture.

22                   THE COURT:  You do not wish to?

23                   THE WITNESS:  Huh?  Excuse me?

```
 1                      MR. INGRAM:  He does not.

 2                      MR. BECKER:  I have nothing further, Your

 3    Honor.

 4                      CROSS EXAMINATION

 5    BY MR. INGRAM:

 6    Q        Afternoon, Mr. Mason.  How are you?

 7    A        How's it going?

 8    Q        You first meet Donna Roberts back in the fall of

 9    2001 at the Greyhound bus station?

10    A        It was like in November, yes.

11    Q        And you're using public transportation at that time;

12    am I correct?

13    A        Yes, sir.

14    Q        And that's because your license was suspended?

15    A        Yes, sir.

16    Q        Was your license suspended as a result of a failure

17    to pay a fine?

18    A        Yes, sir.  I wasn't working at that time.  I was on

19    my way payin' that fine and I thought because I was

20    incarcerated that it would be gettin' tooken care of, but it

21    didn't.

22    Q        Okay.  But your license was suspended because you

23    had not paid a fine?
```

```
 1    A         Yes.

 2    Q         And you go to the Greyhound bus station to purchase

 3    a ticket to go to Cleveland?

 4    A         Yes.

 5    Q         To see your family?

 6    A         Yes.

 7    Q         And she strikes up a conversation with you?

 8    A         No.  I strikes up a conversation with her.

 9    Q         Well --

10    A         Because I noticed the picture.  And she was writing.

11    I noticed the picture and I said, "Oh, he must be in

12    Belmont."

13              She didn't strike it with me.  I struck it up with

14    her.

15    Q         Okay.  Well, at some point that day, did she tell

16    you that you were so cute?

17    A         No.  She -- yeah.  She said that.  I wouldn't --

18    Q         Did she tell you that you were so cute?

19    A         Yeah.  She said I was cute, yeah.

20    Q         And that's about the same time you see this

21    photograph?

22    A         No.  She says I was cute afterwards, before -- after

23    all that.
```

```
1    Q        Okay.  Well, when you look at this photograph, you

2    recognize the background of the photograph as the Belmont

3    Correctional Facility?

4    A        Yeah.

5    Q        Well, Belmont, were you in the Belmont Correctional

6    Facility?

7    A        Yes, I was.

8    Q        And Belmont only takes felons; am I correct?

9    A        Yes, they do.

10   Q        So how many felonies you been convicted of in the

11   last ten years?

12   A        Oh, in the last ten years of my life, I've been

13   locked up three times.  I have three numbers.

14   Q        Okay.  What felonies have you pled to or been

15   convicted of?

16   A        Well, I've been convicted of when I seen my parole

17   officer back in '99.

18   Q        Is that the escape charge?

19   A        Yes.

20   Q        You were on parole for another felony?

21   A        No.

22   Q        You were on parole for a misdemeanor?

23   A        That's not a misdemeanor.  That's a felony because
```

5452

```
1    I --

2    Q        Escape?

3    A        Escape.  That's a felony.

4    Q        I you thought you got charged with escape for

5    failure to report to your parole officer?

6    A        That's the same thing, sir.

7    Q        So you have two escapes?

8    A        One escape.

9    Q        What got you put on parole the first time?

10   A        Back in the day, I was living in Cleveland.  I was

11   hangin' around the wrong crowd.  I was selling drugs.

12   Q        You were selling drugs?

13   A        Yes, I was.

14   Q        What kind of drugs were you selling?

15   A        I was selling crack cocaine.

16   Q        And is that what got you sent to Belmont the first

17   time?

18   A        No.  The first time I got locked up was in Grafton.

19   It was in Grafton, Lorain.  I was real young.

20   Q        And what got you, you had to be 18 or you don't go

21   to Grafton; right?

22   A        Yeah.  I was like 25, 24.

23   Q        What got you sent to Grafton that time?
```

453

```
 1    A        My very first time, I was selling drugs.  That was
 2    my first time.
 3    Q        The second time was selling drugs?
 4    A        The second time was aggravated assault.
 5    Q        And then the third time?
 6    A        The third time was failing to see my parole officer.
 7    Q        So while you and Donna are in the Greyhound bus
 8    station, she's writing a letter to Nate; is that right?
 9    A        I guess so.  That's what she was writin'.  She had
10    his picture beside the letter.
11    Q        So at the same time she's writing the letter to
12    Nate, she's fixin' up a date with you for 5:00 that day when
13    work is over?
14    A        Yes, sir.  Not that day because I was going to
15    Cleveland that day.  When I got back from Cleveland, we set
16    up that thing.  When I got back, we set up an appointment
17    where we were gonna hook up.  When I got back, she was there,
18    and that's when we started hookin' up with each other.
19    Q        Was that the same day or a different day?
20    A        A different day.
21    Q        How many days later?
22    A        About two days.
23    Q        And is that the occasion that she takes you to her
```

1   home?

2   A        Yeah, she do.  We rode around for a minute before

3   she took me there because she smoked a fat joint, a couple of

4   fat joints, and then she rode to her house.

5   Q        And while you are with her, she tells you that her

6   boyfriend is Nate Jackson; right?

7   A        She asked me did I know him because I was in

8   Belmont.  I told her no.  I asked her his name.  She told me

9   his name.  I told her I didn't know him.

10  Q        She told you his name?

11  A        She asked -- yeah.  She told me his name because she

12  asked me did I know him.  I told her I didn't know him.

13  Because I was down there.  I wasn't trying to associate with

14  a lot of people down there.

15  Q        Did she indicate to you that that was her boyfriend?

16  A        Yes, she did.  She said that was her little lover on

17  the side.  And I asked her was she married.  And she's like,

18  "Yeah."

19           I said, "What you doing with a boyfriend on the

20  side?"  Flat out.  Like that.

21           She's like, "Well, my husband don't take, don't

22  satisfy my needs."

23  Q        Did she tell you she was separated?

```
1    A        Yeah.  Something like that.

2    Q        That her and her husband had separate bedrooms?

3    A        Yeah.

4    Q        So while she's telling you that she had separate

5    bedrooms with her husband and she loves Nate Jackson, she's

6    performing fellatio on you on the couch?

7    A        I guess I remind her of Nate.  That's what it was.

8    You know what I'm saying?  I think we favored or whatever in

9    certain ways and that's why, that's what made her really like

10   me because I guess I reminded her of him a little bit.

11   Q        Well, would you agree that regardless of her

12   feelings about Nate, whatever those feelings were, they

13   weren't strong enough to stop her from throwing herself right

14   at your feet?

15   A        True.

16   Q        Isn't that what you're telling us?  She wanted to

17   have sex with you?

18   A        Exactly.  As soon as I came back, she wanted me.

19   Q        Now, you owed a fine at this time; right?

20   A        Yeah.  I owed a fine.

21   Q        Of $238 or thereabouts?

22   A        No.  It was $280 to be exact.  It was in east

23   Cleveland.
```

5456

```
 1    Q        $280?

 2    A        Yes.

 3    Q        Did you have to pay that $280 in order to get your

 4    license reinstated?

 5    A        I paid, I went down to east Cleveland and made a

 6    payment plan with them and they dropped the charges because

 7    they found out I was in Belmont so they dropped the charges.

 8    Q        Did you borrow the money from Donna to pay that

 9    fine?

10    A        I didn't get no money from Donna.

11    Q        Did you borrow $238 from Donna?

12    A        I didn't borrow no money from Donna.

13    Q        Do you recall talking, giving a tape-recorded

14    statement to Detective Hoolihan from the Warren Police

15    Department and Detective Dillon, this gentleman right here?

16    A        Uh-huh.

17    Q        On December 13th of 2001?

18    A        Yes.  I remember talking to them guys.

19    Q        And you're telling us under oath that you never told

20    them you borrowed $238 from Donna Roberts?

21    A        She wanted to give me some money for having some sex

22    with her.  That was all it was about.  It wasn't about me

23    borrowing no money.  She really told me, "If you need any
```

1    money, I will help you out."

2              That's what this lady told me.

3    Q        So your position is it wasn't a loan, it was payment

4    for services rendered?

5    A        Yeah.  She didn't tell me it was no loan because I

6    didn't ask her for nothing.  She told me, "I will help you

7    out," because I was talking about my fines.  That's why I was

8    taking Greyhound.

9    Q        You were telling her about your fines?  Did she give

10   you money?

11   A        She offered to give me some money.  It wasn't no --

12   Q        Did you tell them that she, in fact, gave you $238?

13   A        She gave me a hundred and like 80 bucks.

14   Q        Do you want me to play the tape where you talk about

15   238?

16   A        You can play the tape.  It might refresh my memory.

17              MR. INGRAM:  Did you guys bring that tape

18   with you?

19              MR. BECKER:  Yeah.  It's right here.

20              MR. INGRAM:  Get it out.  I want to use

21   it.

22              MR. BECKER:  You have a copy of it, right,

23   or do you want the tape?  Oh, we got it.  We got it.

```
 1    Q         (By Mr. Ingram) Did you use that money to pay your
 2    fine?
 3    A         Yes, I did.  Like I say, I went down there to get me
 4    a payment plan.
 5    Q         She ask you to do anything in return for that money?
 6    A         She wanted me to have sex with her flat out and I
 7    wouldn't have sex.  She had oral sex on me and she got mad
 8    because I wouldn't have sex with her.
 9    Q         Well, she never asked to you kill her husband, did
10    she?
11    A         No way.
12    Q         As a matter of fact, she never said anything to you
13    bad about her husband at all, did she?
14    A         No way.
15    Q         She told you when she gave you the money that money
16    meant nothing to her, didn't she?
17    A         She said that money ain't nothin' to her.  She had
18    plenty of money.  That's what she said.  Money don't mean
19    nothin' to her.
20    Q         She also told you all the property was in her name?
21    A         Yes, she did.
22    Q         She ever take you for a haircut?
23    A         No, she didn't.  The haircut place is right next
```

5459

1    door to the Greyhound.  I just go there and get my hair cut

2    at Final Cut.  I still go there to this day.

3    Q       Now, you have, as you and I are talking, you filed a

4    lawsuit against Donna for money damages, haven't you?

5    A       Yes.  I lost my job behind that.  I was up under

6    stress because I thought I was gonna get accused for

7    something I didn't do because people do get locked up for

8    something they didn't do lots of time.

9    Q       Let's talk for a second because there are actually

10   some ground rules here.  If you can answer, fairly and

11   reasonably answer my questions yes or no, you should.  The

12   question was have you filed a lawsuit for money damages?

13   A       Yes.

14   Q       And is that gentleman sitting back there in the blue

15   shirt your lawyer?

16   A       Yes, he is.

17   Q       That's Mr. Bluedorn.  And that lawsuit asks for

18   money damages for some amount in excess of $25,000?

19   A       Yes.

20   Q       And how much money do you hope to get?

21   A       I don't know how much money I hope to get.  I'm

22   letting my lawyer take care of that.

23   Q       But you're just hoping it's some sum over $25,000?

1    A        This procedure made me lose my job.  I lost my job

2    behind it.  It put me in a bad character.

3    Q        It's a fact, is it not, that your lawsuit is based

4    on a theory that Donna tried to frame you, that Donna Roberts

5    instigated, instituted and perpetuated the criminal

6    proceedings against you in order to frame you for the murder

7    of Robert Fingerhut?

8    A        True.

9    Q        Did you come up with that theory on your own or did

10   the police help?

11   A        No.  I came up with that.  After the police told me

12   what was going on, after Detective Dillon and Hoolihan told

13   me what was going on, that she was trying to say I stole her

14   gun and point the finger at me so her and Nate, Mr. Jackson,

15   go in the clear, that's what made me come up with that

16   theory.

17   Q        Okay.  They gave you the facts and then you put them

18   together to come up with that theory; is that right?

19   A        That's all I can think of.

20   Q        When were you arrested on this complaint?

21   A        Excuse me?

22   Q        You were arrested on the complaint Donna filed

23   against you?

```
 1    A         Yeah.  She put a warrant out for my arrest.

 2    Q         You were arrested on December 3d?

 3    A         Yes.

 4    Q         And as I understand your answers to Mr. Becker, you

 5    were unable to make bail so you spent two or three days in

 6    jail?

 7    A         Yes, I did.

 8    Q         Money's tight; right?

 9    A         Yeah.

10    Q         Hard to come up with money?

11    A         Yeah, when you ain't working at the time.  I had

12    that money from my mother-in-law.  She had got me out the

13    third day.

14    Q         You weren't working when you were arrested?

15    A         Yes, I was working.

16    Q         Okay.  So even though you were working, money was

17    tight?

18    A         Because that wasn't my pay week.

19    Q         Oh.  Well, I guess Donna is lucky that you posted

20    bail, isn't she?

21    A         Why you say that?

22    Q         Well, you're telling us she tried to set you up as a

23    patsy; right?
```

```
 1    A         That's how I feel.

 2    Q         If you hadn't posted bail, you would have been in

 3    jail on December 11th; am I right?

 4    A         If I hadn't posted bail, I probably would have sat

 5    there until I went to court again.

 6    Q         You were arrested on December 3d; correct?

 7    A         I don't know practically what time I was arrested,

 8    but --

 9    Q         Well, here.  Take a gander at your lawsuit, young

10    man, and you tell me if you allege that you were arrested on

11    December 3d.  I'm sorry.  I have a copy of that for the

12    prosecuting attorney.  Excuse me one minute.

13    A         Excuse me.  My lawyer have all the copies and

14    everything what day I was arrested and everything.  I don't

15    remember everything.

16    Q         Here's certified records from Youngstown Municipal

17    Court.  You're arrested on December 3d.  You want to argue

18    about that date or do you want to concede that date?

19    A         I don't want to argue about no date because I know I

20    was arrested.  I don't know what exact day I was arrested,

21    but like I said, my lawyer have copies and everything when I

22    was arrested and everything.

23    Q         I don't care what your lawyer has copies of.  You're
```

1    telling this jury she tried to set you up for a patsy when,

2    in fact, she had you arrested on December 3d; correct?

3    A        Yeah.  She did try to set me up for it.

4    Q        And she knows you don't have money, doesn't she,

5    because you couldn't pay your fine to get your license

6    reinstated?

7    A        No, I could have paid my fines, but I was working at

8    the time.  I have other bills.  I'm a family man.

9    Q        You couldn't pay your fine.  Why didn't you pay?

10   A        Because I have bills down here.  I have a family

11   down here.

12   Q        So if you can't come up with money after you're

13   arrested, you stay in jail; correct?

14   A        I guess so, but I came up, my mother-in-law got me

15   out.

16   Q        Well, is she telepathic?  Is she gonna know your

17   mother-in-law is gonna get you out?

18   A        I don't know what she know, but I know I called my

19   peoples and they got me out.

20   Q        Now when you were questioned by the police on

21   December 13th of 2001, that's Detective Dillon and Detective

22   Hoolihan, you actually go, where, to the Howland Police

23   Department; right?

```
 1    A         Excuse me?  Say that again.

 2    Q         Did you go to the Howland Police Department and they

 3    questioned you?

 4    A         Yes, I did.

 5    Q         And they question you about your whereabouts on

 6    December 11th; correct?

 7    A         Yes, they did.

 8    Q         And you're married?

 9    A         Yes, I am.

10    Q         And you have kids?

11    A         I have kids.  I have one son in Cleveland and I have

12    a daughter down here in Warren.

13    Q         Does the girl you have down here in Warren, does she

14    live with you and your wife?

15    A         Yes.

16    Q         And back at this time, you were working Monday

17    through Friday from about 9 to 2?

18    A         9 to 3.

19    Q         9 to 3?

20    A         Yes.

21    Q         And when they were talking with you, they asked you

22    about your whereabouts on December 11th; do you recall that?

23    A         I told 'em I was at the Fiesta.  I like to shoot
```

1     pool a lot.

2     Q       What?

3     A       I like to shoot pool a lot so I was at the Fiesta

4     shootin' pool.

5     Q       Up until about 10:00; right?

6     A       About 10:30, 10:00.  Go to the house, go to bed,

7     ready to go to work the next day.

8     Q       Okay.  So when the police asked you where you were

9     at midnight on Tuesday, December 11th, you say that, "I was

10    at home and in bed with my wife"?

11    A       Oh, yeah.  At that time, I was in bed at the time.

12    Q       And as a matter of fact, if I asked you where you

13    were on any given Tuesday when you were working, your answer,

14    at midnight, your answer would be, "At home in bed with my

15    wife;" correct?

16    A       Yeah.  Because I had to go to work in the morning,

17    true.

18    Q       Right.  How many Tuesdays would we have to go back

19    in time before your answer would be different?

20    A       I don't know how many Tuesdays.  I do something

21    different almost every day.

22    Q       But you go to work every morning; right?

23    A       Exactly.

```
 1    Q         So you go to bed at a reasonable hour?

 2    A         I go to bed no later than 10:30, 11:00.

 3                   MR. INGRAM:  Can I have a moment, Your

 4    Honor?

 5                   THE COURT:  Yes.

 6    Q         (By Mr. Ingram)  When Donna presented herself at

 7    your place of employment, that didn't make you a happy

 8    camper, did it?

 9    A         No, it didn't.  At first, I was happy to see her

10    until she started sticking me with her phone like she wanted

11    to shoot me like, "Mother fucker, you took my gun," and all

12    this and that.

13                   I'm like, "What is you talkin' about?"

14    Q         And eventually you learned that she had sworn out a

15    warrant for your arrest?

16    A         Yeah.  Later on that, later on that, later on the

17    next day when the detectives come up there.

18    Q         And right around that same time, you placed a

19    telephone call to Robert Fingerhut, did you not?

20    A         Oh, yeah.  I called her husband at the Greyhound

21    station and told him that she was threatenin' me and talking

22    about some gun or whatever and talkin' about I took some

23    money or whatever.  Yes, I did call her husband, but I didn't
```

1    get --

2    Q        And you also told her husband that, "Donna is

3    cheating on you"?

4    A        Oh, I didn't tell her husband nothing like that.

5                        MR. INGRAM:  Okay.  Your Honor, could we

6    have a recess so I can get this tape set up?

7                        THE COURT:  Yes.  How much time do you

8    need?

9                        MR. INGRAM:  Probably five, ten minutes.

10                       THE COURT:  Let's take ten minutes.  You

11   are not to discuss anything about the case until you return.

12   You are not to form an opinion.

13   (Whereupon, a recess was had commencing at 3:17 p.m. and

14   concluding at 3:35 p.m.)

15                       THE COURT:  Mr. Ingram.

16                       MR. INGRAM:  Thank you, Your Honor.

17   Q        (By Mr. Ingram)  Mr. Mason, do you recall having a

18   conversation with Detective Hoolihan and Detective Dillon

19   back on December 13th, 2001 at approximately 2:35 in the

20   afternoon?

21   A        Yes.

22   Q        I'm gonna play for you and hopefully the microphone

23   will pick it up so that the jury can hear a portion of your

1    conversation with those detectives on that date.

2    (Whereupon, counsel played a portion of an audio tape for the

3    witness.)

4    Q        (By Mr. Ingram)  I asked you previously if you had

5    told Mr. Fingerhut that Donna was cheating on him and you

6    said no.

7    A        Well, that would have been around --

8    Q        Sir, sir, answer my question, please.  Did that tape

9    refresh your recollection?

10   A        Yes.  Yes, it does.

11   Q        Did you tell Mr. Fingerhut that Donna was cheating

12   on him?

13   A        Yeah.  It was on the recording.  I must have said

14   something.  I was mad at the time.

15   Q        So when you said no, that was an incorrect answer

16   under oath?

17   A        I didn't remember all that.  You know what I'm

18   sayin'?

19   Q        You didn't remember all that?

20   A        I was so mad that day.

21   Q        You didn't say you didn't remember what you said to

22   Mr. Fingerhut, did you?  You said you had not told him that

23   Donna was cheating on him?

5469

1    A        Like I said, I told him, I talked to him on the

2    phone.  I don't remember the conversation I said because I

3    was mad at the time because she came into my job and kept on

4    harassing me.

5    Q        Okay.  So now -- let's be clear about this.  Now you

6    remember calling him and telling him that Donna was cheating

7    on him?

8    A        Yeah.

9    Q        And you told the police that you made that telephone

10   call to Mr. Fingerhut about a month before the interview.  So

11   the interview was on December 13th.  And if it's a month

12   before, that's about the middle of November; is that right?

13   A        I guess so.  I don't remember.  I can't remember

14   that far back.  That's like a year ago.

15   Q        You remembered far back when you were talking to the

16   gentlemen from the prosecution here.

17   A        I remember the discussions I had with the

18   detectives, but I don't know the exact words I was saying

19   then because I was mad at the time when I was talking to them

20   telling them about the situations that happened at my job.

21   Q        Do you have a selective recollection?

22   A        What?

23   Q        Do you have, can you only remember what you want to

1    remember?

2    A        Ain't about what I want to remember.  I just knew I

3    was pissed off at the time and I was just, just telling the

4    detectives what was on my mind right when I had done.

5    Q        Okay.  You were pissed off so you called

6    Mr. Fingerhut to tell Mr. Fingerhut that Donna was cheating

7    on him?

8    A        True.  It was on the recorder.  Yeah.  I must have

9    started that.

10   Q        Well, if we had never got this recording, would you

11   have ever told us the truth?

12   A        It ain't about me telling the truth.

13   Q        It's not about you telling the truth?  Did you take

14   an oath?

15   A        Excuse me?

16   Q        Did you take an oath to tell the truth?

17   A        Yes, I did, but I couldn't remember.

18   Q        Let me tell you something, sir.  While you are here,

19   everything is about you telling the truth.

20   A        I am telling the truth about everything, but I

21   couldn't remember everything.

22   Q        And when you said you had not called Mr. Fingerhut,

23   that simply was not the truth?

```
 1    A       I said I called Mr. Fingerhut, but I couldn't recall

 2    all the words, all the conversations that we had though.  I

 3    did say I called him.

 4    Q       You said you called him, but you said you had not

 5    said anything about Donna cheating.  That was not the truth,

 6    was it?

 7    A       It's the truth.  It's on the recorder.  The tape is

 8    the truth.

 9    Q       We now know it's the truth.  The question is, your

10    previous testimony under oath was not the truth?

11    A       Well, it's the truth.  I know I didn't steal no gun.

12    I didn't murder nobody.

13    Q       I agree with that.  You want to go back and talk

14    about the $220?

15    A       You can record, we can go rewind that and go back

16    and talk about it.

17    Q       Well, do we have to?

18    A       You don't have to.

19    Q       She gave you $220, didn't she?

20    A       She gave me some money.

21    Q       About $220?

22    A       I would say about $180.  It was about $180.

23                         MR. INGRAM:  I have no further questions.
```

1          THE COURT:  Any redirect?

2                    **REDIRECT EXAMINATION**

3     **BY MR. BECKER:**

4     Q        Mr. Mason, who took Donna Roberts' gun?

5     A        I don't know.

6     Q        Did you take Donna Roberts' gun?

7     A        I didn't take no gun.

8     Q        And when were you accused of taking Donna Roberts'

9     gun?  When were you accused of doing it?  Approximately.

10    A        (No response.)

11    Q        Well, let me withdraw that question.

12             Let me ask you this.  How long after you rebuffed

13    her sexual advances to you were you accused of taking her

14    gun?

15    A        I can't remember.  I think it was about three to

16    four days afterwards.  Somethin' like that.

17    Q        And who was responsible for you being charged for

18    taking a firearm in December of 2001?

19    A        She was responsible for saying I took her gun.

20                    MR. BECKER:  I have nothing further.

21                    **RECROSS EXAMINATION**

22    **BY MR. INGRAM:**

23    Q        Donna Roberts is responsible for getting you thrown

5473

```
 1    in jail on December 3d, 2001?

 2    A         Yes, because she put a warrant out for my arrest

 3    that I stole a gun from her.

 4    Q         I'm gonna ask you this question again.  Try to

 5    answer my question.  She's responsible for getting you thrown

 6    in jail on December 3d, 2001.  Yes or no?

 7    A         The day I went to jail, she's responsible.  Yes, she

 8    is responsible for that.

 9    Q         And you went to jail before December 11th, 2001,

10    didn't you?

11    A         Yeah, I went to jail before -- you say the 11th?

12    Like I say, I can't remember the exact day or whatever

13    because it's been almost a year ago, but --

14    Q         Well, you wouldn't file a false or frivolous

15    lawsuit, would you?

16    A         Yes, I filed a lawsuit.

17    Q         Yes, you would?

18    A         Yes, I filed a lawsuit.

19    Q         I didn't ask you if you filed one.  I said you

20    wouldn't file a false and frivolous one.  That's a false one.

21    A         No, I didn't file no false --

22    Q         Read to the jury paragraph five.

23    A         Which one?
```

1    Q        Paragraph five.

2    A        "On or about December 3d, 2001, the Warren Police

3    arrested plaintiff, Santiago Mason, pursuant to warrant

4    issued upon defense.  The plaintiff was taken to and confined

5    in the Trumbull County Jail for two days before release on

6    bond answering to the charges before Warren Municipal Court."

7    Q        The truth is, you're arrested on December 3d;

8    correct?

9    A        The truth is, I don't know exactly what day I was

10   arrested, but I know I was put in jail.

11   Q        If your lawyer said it was December 3d, are you

12   gonna tell him he's wrong?

13   A        If my lawyer got the paper that show me the day I

14   was in jail, it's right.  If it's on this paper, it's right

15   then.

16   Q        Okay.  It says December 3d.  So it's right?

17   A        Yeah.

18   Q        And that's before December 11th, isn't it?

19   A        Exactly.

20                    MR. INGRAM:  No further questions.

21                    THE COURT:  Redirect?

22                             *  *  *

23

1      **FURTHER REDIRECT EXAMINATION**

2      BY MR. BECKER:

3      Q      Mr. Mason, have you ever heard of a typographical

4      error?

5      A      No.

6      Q      All right.  Do you think that sometimes people put

7      the wrong dates in documents?

8      A      Mistakes can happens.

9      Q      Okay.  Could you have been arrested on December 13th

10     rather than December 3d?

11     A      Like I said, I don't know what day I got arrested on

12     because I don't remember.

13     Q      So we need to check the Trumbull County records --

14     A      Yes.

15     Q      -- to see when exactly you were arrested in

16     December?

17     A      Yes.

18     Q      Whether it was before December 11th or after

19     December 11th?

20     A      Yes.

21     Q      Correct?

22     A      Because I don't know exactly what day.  I know I was

23     in jail.  That's all I know.  I went to jail for something I

```
 1    didn't do.

 2    Q        And you don't know the exact date, even regardless

 3    of what it says in that lawsuit?

 4    A        Exactly.

 5    Q        That may be, someone may have forgot to put the one

 6    in before the three?

 7    A        I don't know.

 8                     MR. BECKER:  I have nothing further.

 9                     MR. INGRAM:  Chris, where is that, those

10    certified records?

11                     MR. BECKER:  Right there.
```

**FURTHER RECROSS EXAMINATION**

**BY MR. INGRAM:**

```
14    Q        Regardless of whether your lawyer made a

15    typographical error, she comes to your place of employment

16    with the cell phone and calls the police well before December

17    11th; correct?

18    A        I don't know the exact date it was, but I know she

19    came to my job.

20    Q        Well, it was the same day that you told the police

21    you called Mr. Fingerhut; is that correct?

22    A        Like I said, I don't know the exact date that I

23    called and what exact date that I went to jail, but I know I
```

1    was jail and I know I called her husband.  I'm not

2    remembering, I don't remember dates.  I know it was cold

3    outside.

4    Q       When Dillon here and Hoolihan came to talk to you,

5    were you home or were you in jail?

6    A       I was at work when they came and talked to me.

7    Q       Did they come to talk to you on December 13th, 2001?

8    A       I don't recall.  I can't remember what date it was,

9    sir.

10   Q       Okay.

11   A       I just know that they came up to my job and told me

12   to come up to Howland Police station.

13                   MR. INGRAM:  Your Honor, I know I'm gonna

14   aggravate, sorry Ladies and Gentlemen, I'm gonna try the

15   jury's patience.  I have to rewind this for a second.

16                   MR. BECKER:  I'm sorry?

17                   MR. INGRAM:  I'm rewinding.

18                   THE COURT:  Is there a transcript of that

19   tape?

20                   MR. INGRAM:  I don't have one.

21                   MR. BECKER:  No.  There is no transcript

22   of that tape.

23                   MR. INGRAM:  I guess it would be real

```
 1    simple if Detective Dillon could tell us what day the

 2    interview took place.

 3                      MR. BECKER:  Do you want to call him for

 4    limited purposes?

 5                      MR. INGRAM:  Yes.

 6                      DETECTIVE FRANK DILLON:  The 13th.

 7                      MR. BECKER:  Okay.  Are you done with

 8    Mr. Mason?

 9                      MR. INGRAM:  Yes.

10                      THE WITNESS:  You done with me?

11                      THE COURT:  You're excused then.  Thank

12    you very much.

13                      DEPUTY GARY BACON:  Is he excused or just

14    temporarily?

15                      MR. INGRAM:  Temporarily.  I may have more

16    questions.

17                      MR. BECKER:  Just wait in the hallway.

18                      THE WITNESS:  All right.

19                      MR. BECKER:  Your Honor, I guess that the

20    defense has requested that Detective Sergeant Dillon be

21    called for the limited purpose, and we have no objection to

22    him being taken out of order, for the limited purpose of --

23                      MR. INGRAM:  Establishing the date of the
```

1    interview.

2                         MR. BECKER:  -- the day that Mr. Mason was

3    arrested.

4                         THE COURT:  This should be pretty easy to

5    clear up as to whether it was the 3d or the 13th.

6    **WHEREUPON,**

7                         **FRANK DILLON,**

8    having been first duly sworn, according to law, was examined

9    and testified as follows:

10                        **CROSS EXAMINATION**

11   **BY MR. INGRAM:**

12   Q        When did the Mason interview take place?

13                       THE COURT:  Okay.  Let me stop you just

14   one minute.  This is for purposes of cross examination at

15   this point.

16                       MR. BECKER:  I don't -- yeah.

17                       MR. INGRAM:  It doesn't matter.

18                       MR. BECKER:  We have no objection to

19   Mr. Ingram leading off the questioning of this witness at

20   this time.

21                       THE COURT:  Okay.  Fair enough.  Go ahead.

22   A        According to my report --

23                       MR. INGRAM:  I'll withdraw that.

1    Q        (By Mr. Ingram)  State your name first.  I'm sorry.

2    A        Sergeant Frank Dillon.

3    Q        When did the interview take place?

4    A        According to my report, December 13th, 2001.

5    Q        Where did you get Mr. Mason from?  Where did you

6    find him?

7    A        He was at work, Vista Windows.

8    Q        Did you come to learn of a complaint filed against

9    Mr. Mason for theft of a gun?

10   A        Yes, sir.

11   Q        And was that complaint filed on November 28th, 2001?

12   A        I believe so.

13                    MR. INGRAM:  I have no further questions.

14                    MR. BECKER:  May I ask a few questions?

15                    THE COURT:  Yes.

16                    **DIRECT EXAMINATION**

17   **BY MR. BECKER:**

18   Q        Detective Sergeant Dillon, can you tell this jury

19   why on December 13th -- well, first of all, Mr. Fingerhut was

20   murdered on what date?

21   A        December 11th.

22   Q        December 13th, 2001, can you tell this jury why

23   Santiago Mason was questioned while you were in the middle of

1   a homicide investigation?

2   A        I believe Donna Roberts told us of an incident

3   involving the subject stealing a weapon from her when we were

4   trying to account for her guns.

5   Q        And would that weapon have been or do you recall the

6   caliber or type of weapon that she had allegedly had stolen?

7   A        I want to say a Taurus .38.  I may be wrong.

8   Q        Okay.  Would it have been Smith & Wesson perhaps?

9               MR. INGRAM:  Stipulated.

10  A        Perhaps.

11  Q        It's been stipulated that it was a Smith & Wesson

12  .38 that was alleged to have been stolen?

13  A        Yes, sir.

14  Q        Was there an allegation that perhaps he may be a

15  suspect in Mr. Fingerhut's homicide?  Is that why you spoke

16  to him?

17  A        Yes, sir.  And to track, to try and track the gun

18  down as possibly being involved in the incident.

19               MR. BECKER:  I have nothing further.

20                    **RECROSS EXAMINATION**

21  **BY MR. INGRAM:**

22  Q        The complaint is filed on November 28th and the

23  warrant for Mr. Mason's arrest is issued November 28th of

5482

1    2001; correct?

2    A        I don't believe I ever saw the warrant.

3                   MR. BECKER:  We'll stipulate to that if

4    you want.

5                   MR. INGRAM:  Okay.

6                   MR. BECKER:  Do you want to make it a

7    joint exhibit because that's the --

8                   THE COURT:  What is the stipulation?

9                   MR. INGRAM:  The stipulation is that

10   the --

11                  MR. BECKER:  I don't know how many pages

12   that is.

13                  MR. INGRAM:  Three.

14                  MR. BECKER:  Do you want to make it a

15   joint exhibit?

16                  MR. INGRAM:  We'll stipulate that the

17   complaint charging Mr. Mason with theft of a Smith & Wesson

18   .38 was filed by Donna Roberts on November 28th of 2001 and

19   on that date a warrant was issued for Mr. Mason's arrest.

20                  THE COURT:  Okay.  That's agreed by both

21   sides.

22                  MR. BECKER:  And I don't know if you want

23   to make it, as in terms of the date, the actual date of the

1    arrest.

2                         MR. INGRAM:  I want some clarification on

3    that.

4                         MR. BECKER:  Okay.  Okay.  I have nothing

5    further of Officer Dillon.

6                         MR. INGRAM:  I have nothing further.

7                         THE COURT:  Okay.  Fine.  Thank you, sir.

8                         MR. BECKER:  Do you want Mr. Mason back

9    in?

10                        MR. INGRAM:  No.

11                        THE COURT:  Are you done?

12                        MR. INGRAM:  He's released.

13                        THE COURT:  Okay. Fair enough.  You may

14   advise him of that.

15                        MR. BECKER:  Your Honor, at this time, we

16   have no further witnesses for the day.  It's my understanding

17   that we are going to break.  Due to some problems, we're not

18   going to be back until Tuesday so it's my understanding that

19   -- well, wait.  Oh, we do have one, we do have two things

20   that we would like to read into the record in the presence of

21   the jury.

22        Your Honor, there are two stipulations that the

23   parties have agreed to formally.  The first is that the

1    parties agree with reference to Kathryn Thomas's testimony

2    yesterday that her business records which are kept in the

3    regular course of business would establish that Donna M.

4    Roberts, the defendant, and Robert Fingerhut reported to

5    State Farm Insurance that the primary driver of the 2001

6    silver mist Chrysler 300M was Donna M. Roberts and the

7    principle driver of the 2000 inferno red Chrysler 300M was

8    Robert Fingerhut.

9         Additionally, there is a stipulation that was

10   previously filed that the parties would stipulate that

11   Exhibits 271-D-1 through 271-D-139 inclusive are authentic

12   and were written by the defendant, Donna Roberts.

13        The parties further stipulate that Exhibits 272-N,

14   as in Norman, 1 through 273-N, as in Norman, 143 are

15   authentic and were written by Nathaniel Jackson.

16        We have those two stipulations.

17             THE COURT:  Okay.  That's stipulated by

18   both sides.  The jury will accept what he has just read as

19   proven facts then.

20        Ladies and Gentlemen, because of conflicts in

21   schedules, we will not be here tomorrow, nor Monday.  So you

22   are to return Tuesday morning.  We will continue with the

23   State's case at that time.

1          I would again remind you that over the weekend, you

2     are not to discuss with anyone or allow anyone one to talk

3     with you about this case or any detail of it.  You are not to

4     read anything in the newspaper, watch anything on TV and you

5     should remember the admonition that I read at the very

6     beginning of this as to what that covers, which is keep your

7     own counsel until you return.  This case should not affect

8     your lives in any way between now and then as far as any

9     other information that you might come in contact with.

10    You're duty-bound to make sure that that doesn't happen.

11         I will note to you that the newspapers have been

12    following this case, as well as the TV stations.  That's not

13    unusual.  It happens in every case of this type.  But all the

14    more reason that you should be cautious when you're watching

15    TV or whatever.

16         There's always a lot of talk among lawyers about how

17    seriously the jurors take the admonition to do your job the

18    way we ask you to do it.  And there's a great diversity.

19    Some are quite cynical about it.  My personal belief is that

20    I think that jurors really try because jurors, in my

21    experience, take their duties most seriously.  And our system

22    will not work for very long if that isn't the case.  So I am

23    confident that this jury, as other juries, will follow the

1    instruction that I've given you.

2            Enough said about that.  May you all have a very

3    nice and enjoyable weekend.  Let's hope we get some sunshine.

4            Yes, ma'am?

5                    JUROR 11:  You said 9:00 in the morning on

6    Tuesday?

7                    THE COURT:  9:00 in the morning on

8    Tuesday.  Right.  Thank you now.

9    (At 3:53 p.m., the jury was excused and the following

10   proceedings occurred in open court with counsel and the

11   defendant present.)

12                   THE COURT:  The question that was put to

13   me by Juror 11 with agreement of counsel was does a

14   stipulation mean that we have to accept it as being true?

15   And I told her yes, that's true.  A stipulation, there's no

16   question of fact because both parties admit to it.  Okay?

17                   MR. BECKER:  (Nods head.)

18                   MR. BAILEY:  I think the Court had already

19   listed that in the preliminary instructions.

20                   THE COURT:  I did.  I went over that in

21   some detail I thought.

22   (At 3:55 p.m., court was adjourned to Tuesday, May 20, 2003.)

23   (Note: For all further proceedings in this matter, please

1    refer to the transcripts prepared by Mary Ann Mills.)

2                              *  *  *

3

4                      REPORTER'S CERTIFICATE

5

6         This is to certify the foregoing represents a true and

7    correct copy of the proceedings had in the aforementioned

8    cause as reflected by the stenotype notes taken by me on the

9    same.

10

11

12

13

14   1-7-04                    _____
                               Lori J. Rittwage, RPR
15                             Official Court Reporter

16

17

18

19

20

21

22

23

5488

```
 1              IN THE COURT OF COMMON PLEAS
                  TRUMBULL COUNTY, OHIO
 2            TRIAL COURT CASE NO. 01-CR-793
            SUPREME COURT OF OHIO CASE NO. 03-1441

 3

 4   STATE OF OHIO        )
                          )              VOLUME XXVI
 5           Plaintiff    )
                          )            STATE'S WITNESSES
 6   -vs-                 )
                          )
 7   DONNA M. ROBERTS     )
                          )
 8           Defendant    )

 9

10            BE IT REMEMBERED, that on Tuesday, May 20,

11   2003, these proceedings came on to be heard before

12   one of the Judges of this Court, John M. Stuard,

13   in Courtroom No. 2, on High Street, Warren, Ohio,

     before the case heretofore filed herein.
14

15

16

17

18

19

20   Mary Ann Mills, RPR
     Official Court Reporter
21   Trumbull County, Ohio

22
```

5489

1                    A P P E A R A N C E S

2

3

On Behalf of the State of Ohio:
4      Dennis Watkins, Prosecuting Attorney
       Charles L. Morrow, Ass't. Prosecuting Attorney
5      Christopher D. Becker, Ass't. Prosecuting Attorney
       Kenneth N. Bailey, Ass't. Prosecuting Attorney
6      160 High Street, N.W.
       Warren, OH 44481
7

On Behalf of the Defendant, Nathaniel Jackson:
8      Anthony V. Consoldane, Attorney at Law
       James F. Lewis, Attorney at Law
9      State of Ohio Public Defendant's Office
       328 Mahoning Avenue, N.W.
10     Warren, OH 44481

11  On Behalf of the Defendant, Donna M. Roberts:
       John B. Juhasz, Attorney at Law
12     J. Gerald Ingram, Attorney at Law
       7330 Market Street
13     Youngstown, OH 44512

14  On Behalf of The Vindicator Printing Co.
       Ann Millette, Attorney at Law
15     3200 National City Center
       1900 East Ninth Street
16     Cleveland, OH 44114

17  On Behalf of WFMJ Television, Inc.:
       Stephen T. Bolton, Attorney at Law
18     201 E. Commerce Street, Atrium Level Two
       Youngstown, Oh 44503
19

20

21

22

1

<u>I N D E X</u>

2

3  <u>VOLUME XXVI</u>:
(Tuesday, May 20, 2003 & Wednesday, May 21,
4  2003)

5  <u>STATE'S WITNESSES</u>:
   <u>Jim McCoy</u>
6   Direct Examination by Mr. Bailey     5500
   Cross Examination by Mr. Ingram     5510
7

   <u>James Campbell</u>
8   Direct Examination by Mr. Bailey     5514
   Cross Examination by Mr. Ingram     5522
9   Redirect Examination by Mr. Bailey   5525

   <u>Agent Ed Lulla</u>
10   Direct Examination by Mr. Bailey     5526
   Cross Examination by Mr. Juhasz     5556
11

   <u>Dr. Humphrey Germaniuk</u>
12   Direct Examination by Mr. Becker    5572
   Cross Examination by Mr. Juhasz     5603
13   Redirect Examination by Mr. Becker   5603
   Recross Examination by Mr. Juhasz   5604
14

   <u>Sgt. Frank Dillon</u>
15   Direct Examination by Mr. Becker    5605
   Cross Examination by Mr. Juhasz     5672
16

   <u>Dale Laux</u>
17   Direct Examination by Mr. Becker    5715
   Cross Examination by Mr. Juhasz     5742
18

19

20

21

22

5490

1   <u>Tuesday, May 20, 2003; In Open Court at 9:25 a.m.</u>:

2   (Juror No. 109, Casey Kelly, entered the Courtroom.)

3                  THE COURT:   What is your name?

4                  MS. KELLY:  Casey Kelly.

5                  THE COURT:   I understand from the

6   note from your doctor, James C. Haun, M.D., of

7   Warren, Ohio, that you are having trouble, being

8   treated for your back, is that correct?

9                  MS. KELLY:   Right.

10                  THE COURT:   He's recommending that

11  you be removed from Jury duty.  I assume that you

12  have been to see him for treatment and relayed to

13  him that you are having problems sitting here, is

14  that correct?

15                  MS. KELLY:   The main problem is he

16  told me that I have a pinched nerve in my back and

17  I can't not take my pain medicine.  I don't feel

18  like I should be making this kind of important

19  decision while I am under the influence of a

20  narcotic.  I think it is too important a decision

21  to make, and the fact that I can't sit for very

22  long because it is very painful.

5491

1          THE COURT:  You are taking pretty

2   strong pain medication, is that it?

3          MS. KELLY:  Yes.

4          THE COURT:  The State have any

5   questions?

6          MR. BAILEY:  No questions.

7          THE COURT:  Defense?

8          MR. INGRAM:  No.  I would like the

9   record to reflect that as we're talking with Miss

10  Kelly, she's obviously in physical distress.  You

11  can look at her and tell that her back is hurting

12  and that it is necessary for her to take

13  medication.  We have no objection to her excusal.

14          MR. BAILEY:  We have no objection.

15          THE COURT:  You will be removed for

16  cause then.  Thank you for your participation.

17  Good luck to you.

18          MR. BECKER:  There's one other

19  matter that we would like to discuss.  Apparently

20  on Friday, Mr. Juhasz had filed a motion in

21  limine -- I'm sorry, filed a Dauber motion on

22  Friday.  I think that motion was directed at most

5492

1    of the State's experts from BCI, but particularly a

2    doctor Humphrey Germaniuk regarding some testimony

3    that he had given in the previous trial, in Nate

4    Jackson's trial, case number 01-CR-793.  And that

5    testimony was basically speculative in terms of the

6    position of where Mr. Fingerhut was at when he was

7    shot.  We spoke briefly on the phone yesterday.  I

8    have agreed that I'll not ask him on direct

9    examination any of these hypotheticals.  I'm

10   assuming Mr. Juhasz won't and I won't have to worry

11   about redirecting him on anything.  I think that

12   will cover the main problem with the motion,

13   because that was previous testimony.

14               THE COURT:  Is that the testimony

15   where he said he had his hands up?

16               MR. BECKER:  Yes, Sir.

17               MR. JUHASZ:  Then on cross

18   examination, it was just as likely that two or

19   three other hypotheticals were just as likely.  The

20   thrust of the motion is that he can not say more

21   likely than not or whatever the Supreme Court is

22   requiring these days.  Mr. Becker and I have agreed

5493

1   that we'll simply stay away from that testimony,

2   and with that --

3                   MR. BECKER:   I personally spoke to

4   Dr. Germaniuk yesterday and advised him that he's

5   not to answer or he's not to speculate as to the

6   position of the deceased in this case.  He's here,

7   I don't know if you want to bring him in and put it

8   on the record.  Do you want me to call him?

9                   THE COURT:   I think if you --

10  (OFF THE RECORD)

11                  MR. BECKER:   Just for the record, I

12  want to note this, because the only reason I note

13  this, I don't think it will happen, but it happened

14  to me one time and it caused a mistrial and I was

15  99 percent done with the trial.  The motion to

16  suppress, which we stipulated to which was the

17  video taped statement of Miss Roberts on either

18  December 20th or 21st, we have by agreement decided

19  not to use that.  She had retained Mr. Ingram and

20  Mr. Juhasz at that point and indicated, I think in

21  the first few moments of the video tape that she

22  did not want to speak to the officers without their

5494

1  presence or words to that effect.  I have handed a

2  letter to Mr. Dillon and Chief Monroe, we're not

3  going to call Captain Bacon on that, because he was

4  involved in that statement, but they have been

5  advised and admonished to stay clear of that

6  statement and to not even mention that statement,

7  both by letter that I personally delivered to them

8  and that is pursuant to the stipulation.  I bring

9  that up because I was in a Jury trial one time and

10  the former Mr. Philamena -- and when this

11  individual said something she was not supposed to

12  say, I was told I purposely did it because

13  Mr. Philamena was a great attorney.  I just wanted

14  to place on the record that I did admonish them

15  both verbally and I gave them a written letter

16  yesterday advising them that they are not to

17  mention that statement that was video taped for

18  which there was a motion to suppress and a

19  stipulation.

20              THE COURT:  I just got your motion

21  here, so I haven't had a chance to go through the

22  whole thing, but there's no other arguments -- you

5495

1 have quite a few experts that testify.  Is there

2 any other problem?

3 　　　　　　MR. JUHASZ:  In other trials, I

4 might be more concerned.  In this particular trial,

5 because of the Defense strategy, I'm not concerned

6 with those.  I'm satisfied with the agreement that

7 that fully disposes of the motion in limine.

8 　　　　　There are two other things.  One is that

9 Mr. Bailey and I had a conversation this morning,

10 and he's going to with Ed Lulla from BCI and James

11 Campbell from the Howland Police Department --

12 Mr. Bailey is going to show a number of photographs

13 on the overhead.  Although those photographs have

14 not been admitted and I have told him that it is my

15 position that he does not need to move for

16 admission at this point in time.  None of those

17 photographs are objectionable by us or offensive to

18 us --

19 　　　　　　MR. BAILEY:  There's one that I'm

20 not going to display to the Jury.  It is a chest

21 wound.  I am having him identify it, but not

22 display it.

5496

1            THE COURT:  I assume the State is

2   not going to enter a series of repetitions.  We

3   have already gone through that in that other trial.

4            MR. BECKER:  For the record, I

5   believe we have -- the State plans on presenting

6   essentially the same photographs that were

7   introduced in Jackson's trial.  I don't believe any

8   of them are repetitive.  I would consider only one

9   of them -- well, there's just a few of the wounds

10  and injuries to Mr. Fingerhut.  But those are

11  available to Defense counsel.  These are the same

12  Exhibits that were used before.  I don't know if

13  you want to take a look at those before

14  Dr. Germaniuk testifies.

15            MR. BAILEY:  I'm going to show him

16  the same photos he saw before with Mr. Lulla.  It

17  should go fairly rapidly.  I'll show him the whole

18  packet first, that they are accurate and he took

19  them.  I'll go through each number, which somebody

20  else didn't do before, looking at the transcript.

21  I imagine that will go fairly fast and when we

22  actually get to what we're going to move to admit,

5497

1   we may be more selective at that point.

2              MR. BECKER:  The photographs that I

3   have Dr. Germaniuk testifying to, I am assuming

4   there's probably going to be objections to them,

5   but they are very, very few that look like they are

6   actually -- basically looks to me like five or half

7   a dozen showing injuries on his body, and I would

8   say two of them --

9              THE COURT:  The point is, we usually

10  review them before they are actually presented.

11  You can't show them and say, "Well, I'm not going

12  to let those in."

13             MR. BECKER:  I'm not going to show

14  these on the overhead.  I'm going to show these to

15  Dr. Germaniuk.  As opposed to some other trials, we

16  don't have 50 gruesome photographs and we're going

17  to withdraw 49 of them.  We have five or six that

18  are required to show the injuries and cause of

19  death.  I think they are all acceptable.  They were

20  all admitted within the last trial.  I think there

21  were some withdrawn in the previous trial.  Rather

22  than --

5498

1              THE COURT:  These will not be shown
2     on the screen?
3              MR. BECKER:  No.  Just with
4     Dr. Germaniuk.
5              THE COURT:  Mr. Ingram?
6              MR. INGRAM:  The issue that I am
7     about to address, I'm not so sure that it is even a
8     problem, but I am compelled to note it at this
9     point in time.  As Mr. Becker stated, we filed a
10    motion to suppress the video taped statement and he
11    has notified his witnesses not to reference that
12    video taped statement.  After the video taped
13    statement, there was an agreement to make a
14    telephone call, where Donna would make a telephone
15    call.
16             MR. BECKER:  I'll not get into that.
17    For the record, I think basically what I advised
18    them, anything that happened after her arrest on
19    the 21st, December 21, 2001 is not to be discussed.
20    In terms of anything she may have said, because she
21    was represented by counsel and she did state on the
22    video portion that she did not want to speak

5499

1   without counsel present. There was a phone call

2   made. We'll not get into that, because I don't

3   think we can.

4           MR. INGRAM: My understanding of the

5   law on this issue is that when a motion to suppress

6   is granted, the State is precluded from admitting

7   evidence. If the Defense then chooses to admit

8   that evidence, the Defense is free to do it. I'm

9   just being open here. We actually may elicit

10  testimony that we made the telephone call, but only

11  the telephone call.

12  (OFF THE RECORD)

13  (Jury brought into Courtroom at 9:35 a.m.)

14          THE COURT: The Jury has lost one of

15  its members. Juror number 11 has been excused for

16  cause. So alternate number one, you are a member

17  of the Jury. Would you please take the chair up

18  there? This seems to invariably happen when you

19  have a case of this duration. You folks don't have

20  to move your chairs now, but you will still remain

21  in the same order. We have a period of a little

22  bit longer than a week in here. We'll be going

5500

1    today, tomorrow, half a day Thursday and Friday,

2    then we'll be off next Monday, being Memorial Day.

3    Is the State ready to proceed?

4                    MR. BAILEY:  The State calls Jim

5    McCoy.

6                         JIM McCOY

7    being duly sworn according to law, on his oath,

8    testified as follows:

9    DIRECT EXAMINATION BY MR. BAILEY:

10   Q.   Good morning.  Would you tell the Court and

11            Jury your full name?

12   A.   Jimmie McCoy.

13   Q.   Where do you live?

14   A.   Cleveland, Ohio.

15   Q.   And can you tell us what you do for a living?

16   A.   I am a Greyhound bus driver.

17   Q.   And how long have you been so employed?

18   A.   This past April is 24 years.

19   Q.   Your duties and responsibilities as a

20            Greyhound bus driver?

21   A.   I drive from Cleveland to New York City and

22            Cleveland to Washington D.C. and I also

5501

1              train drivers.

2    Q.   And did you just get back from a training

3              trip?

4    A.   Yes, I did.

5    Q.   Back in December of 2001, what was your run at

6              that time, what schedule did you work?

7    A.   I ran from Cleveland to Pittsburgh, Pittsburgh

8              to Erie, PA.

9    Q.   And did you have occasion during that time to

10             make stops at the Greyhound Youngstown

11             and Warren bus terminals?

12   A.   Yes.

13   Q.   I'm going to direct your attention back to

14             December 11, 2001, a Tuesday, about 4:30

15             in the afternoon.  Do you know where you

16             were about that time?

17   A.   About 4:30, at the Youngstown bus station.

18   Q.   Were you on a pretty tight schedule at that

19             time?

20   A.   Yes.

21   Q.   What was your schedule?

22   A.   I am due in Youngstown at 4:35 and out of

5502

1              Youngstown at 4:45.

2    Q.   And where do you go from there?

3    A.   To Warren station.

4    Q.   And how long does it take you to get to the

5         Warren station?

6    A.   Approximately 30 minutes.

7    Q.   Now I'm going to direct your attention to 4:30

8         that afternoon, you said you were working

9         that day?

10   A.   Yes.

11   Q.   And you got to the Youngstown terminal?

12   A.   Yes.

13   Q.   When you got there, did you know a fellow by

14        the name of Robert Fingerhut?

15   A.   Yes.

16   Q.   How did you know him?

17   A.   He ran the Youngstown station and the Warren

18        station.

19   Q.   Now at that time, were you aware of any

20        construction that was being done at the

21        Youngstown station?

22   A.   Yes.   The city bus and Greyhound bus pull in.

5503

1          They were resurfacing that area right

2          there.

3    Q.    The parking lot?

4    A.    Yes.

5    Q.    And how many buses were there when you got

6          there?

7    A.    When I arrived there, there weren't any buses

8          there.  I was the first bus to get there

9          and I pull up in front of the bus

10         station.

11   Q.    Did another bus arrive?

12   A.    Yes, one came in from Cleveland.

13   Q.    And what would Mr. -- well, was somebody

14         responsible for loading and unloading the

15         buses?

16   A.    Normally, they would have a ticket agent

17         present that sold tickets and a guy that

18         worked in the back that would come out

19         and load and unload buses.

20   Q.    Now that particular day, who handled the bus?

21   A.    Mr. Fingerhut.  He was the only one there.

22   Q.    And what about your own bus?

5504

```
 1   A.   I did my own, because I parked out front and I
 2             dropped my passengers off out front and
 3             the other bus came in and he pulled in
 4             the back and I walked around and I asked
 5             him why he was he around there and Mr.
 6             Fingerhut came out and told me that I
 7             could pull my bus around also if I wanted
 8             to, but I told him I had unloaded my bus
 9             already.
10   Q.   Now, at that time, did you know a person by
11             the name of Donna Roberts?
12   A.   Yes.
13   Q.   And how did you know Donna Roberts?
14   A.   She worked at the Warren station and from what
15             I know, they were husband and wife.
16   Q.   Mr. Fingerhut and Donna Roberts?
17   A.   Yes.
18   Q.   Do you see her -- well, can you describe her
19             at that time, what size was she?
20   A.   She was a short lady.  I would say about five
21             foot one, five foot two.  Reddish hair.
22             I would say she was in her fifties.
```

5505

1   Q.   And when you got done at the Youngstown

2        station, where did you go?

3   A.   I went to the Warren station.

4   Q.   And you said it usually took you about 30

5        minutes?

6   A.   About 30 minutes, yes.

7   Q.   The same thing that day?

8   A.   Yes.

9   Q.   And so you got to the Warren terminal about

10       what time?

11  A.   About 5:15.

12  Q.   And what did you do when you got there?

13  A.   When I got there, I unloaded my passengers,

14       because we have to pull up on the side of

15       the street there, the bus station.  We

16       can't park around in front of it, so we

17       have to park on the side and unload and

18       pick up passengers there, and you had to

19       walk around into the terminal and check

20       to see was anybody in there, any luggage

21       or anything.

22  Q.   And you did that?

5506

1   A.   Yes.

2   Q.   And where did you go then?

3   A.   I went into the bus station and I asked did

4        they have any passengers or any luggage.

5   Q.   Who was there?

6   A.   Donna Roberts.

7   Q.   Do you see her here today?

8   A.   Yes.

9   Q.   Can you point her out?

10  A.   Yes, right there.  (Indicating)

11            MR. BAILEY:  May the record reflect

12  that the witness identified the Defendant?

13            THE COURT:  The record will reflect

14  that.

15  Q.   And where was she?

16  A.   She was behind the counter.

17  Q.   Can you describe this counter area?

18  A.   This counter area is -- it has a, like a glass

19        partition in front of it, something like

20        glass, plexiglass or whatever, something

21        like that.

22  Q.   Are the customers allowed behind there?

5507

1   A.   No.

2   Q.   That is basically for employees only?

3   A.   Yes.

4   Q.   And what was she doing?

5   A.   She was on the computer when I walked in.

6   Q.   What did you say to her?

7   A.   When I walked in and I spoke to her and I

8        asked did they have any luggage, or any

9        passengers and she said no.  She said she

10       was in the computer, and trying to shut

11       it down.  That is when I said -- she was

12       on the computer and she was trying to get

13       it shut down, and so I said, "Are you in

14       the chat room?"

15  Q.   In the chat room?

16  A.   Yes.

17  Q.   Where people talk to each other?

18  A.   Yes.  And she said, "No."  I said, "Are you

19       sure you're not in there talking to some

20       of the guys?"  I said, "You can tell me

21       who they are like that."  She said,

22       "There's no guy like that."  I said,

5508

1          "Come on, tell me," and she said, "His

2          name is Nate."

3   Q.   She said Nate?

4   A.   That is what she said.

5   Q.   At that point, what happened?

6   A.   This gentleman walked from around in the back,

7          back behind her.

8   Q.   In the employees' part?

9   A.   Yes.

10  Q.   Part of the ticket area?

11  A.   Yes.

12  Q.   Can you describe this man?

13  A.   Thin black guy.  I would say in his thirties,

14         I would guess.

15  Q.   About how tall?

16  A.   About five-nine, five-ten, somewhere along

17         there.

18  Q.   How was he dressed, if you remember?

19  A.   He had on a green jogging suit, warm-up suit.

20  Q.   Green jogging suit.  Anything unusual about

21         it?

22  A.   It looked to be new.

5509

1  Q.  Brand new?

2  A.  Yes.

3  Q.  And did you ask him anything?

4  A.  I asked him was his name Nate?  I said, "Are

5      you Nate?"  And he said, "Yes."

6  Q.  And then what did you say?

7  A.  I asked him were they trying to leave and get

8      out of there and he said, "Yes, we're

9      trying to get out of here."

10 Q.  You are directing that at both him and Donna

11     Roberts?

12 A.  Yes.  I said, "I won't hold you up, I'll go

13     ahead and leave.  I'll get out of your

14     way."

15 Q.  Did you then leave?

16 A.  I did, yes.

17 Q.  How did they seem?

18 A.  Just normal.

19         MR. INGRAM:  Objection.

20 Q.  Did they appear to be in a hurry?

21 A.  Not really --

22         THE COURT:  Did you object?

5510

1              MR. INGRAM:  No.

2    A.    Just that she was trying to shut down the

3              computer and he was standing over next to

4              the wall.

5    Q.    And about a month and a half later, did you,

6              back on February 1 of 2002, did you talk

7              to the Howland detectives, Sergeant

8              Dillon and Sergeant Monroe?

9    A.    Yes.

10   Q.    And I take it you gave them a statement?

11   A.    Yes.

12              MR. BAILEY:  Thank you.

13   CROSS EXAMINATION BY MR. INGRAM:

14   Q.    Good morning, Mr. McCoy.  How are you?

15   A.    Good morning.

16   Q.    I just have a couple of questions for you.

17              Back on February 1st of 2002 you talked

18              to some detectives from Howland?

19   A.    Yes.

20   Q.    And that would be Detective Dillon and

21              Detective Monroe?

22   A.    Yes.

5511

```
 1   Q.   Did they ask you to sign a statement?

 2   A.   I'm not sure whether I was asked to sign one.

 3        I think I did, I'm not positive.

 4   Q.   I'm going to hand you a document dated

 5        February 1, 2002; is that a copy of your

 6        statement?

 7   A.   Yes.

 8   Q.   And it is a written statement, is it not?

 9   A.   Yes.

10   Q.   And does it bear your signature?

11   A.   Yes.

12   Q.   You arrive at the Warren bus station there at

13        approximately 5:15, am I correct?

14   A.   Yes.

15   Q.   And when you enter, Donna is on the computer

16        in the office portion of the Warren

17        terminal?

18   A.   Yes.

19   Q.   And that is separated from the rest of the

20        terminal by a glass partition?

21   A.   Yes, like a half wall and some glass there,

22        and also some wire.  I'm not totally
```

5512

1              exact of everything that is there.  There
2              was a partition, yes.
3    Q.   When you initially approached the partition
4              and talked with Donna, do you realize
5              that this gentleman by the name of Nate
6              is there?
7    A.   No, there's no one there but her.
8    Q.   You then talk to Donna, she mentions the name
9              to you, Nate?
10   A.   Yes.
11   Q.   And at some point in time after she mentions
12             the name Nate, a black fellow walks out
13             from somewhere, am I correct?
14   A.   Yes, from back where she's at.
15   Q.   So this fellow that walked forward made no
16             effort to hide himself from you, did he?
17   A.   No.
18   Q.   He simply walked right up to you, and said
19             that indeed he was Nate?
20   A.   He didn't walk up to me.  What he did, he just
21             walked out, and when he walked out, I
22             asked him was he Nate.

5513

1   Q.   And he said yes?

2   A.   Yes.

3   Q.   He didn't tell you, "Forget I was here, forget

4        you ever met me," or anything like that?

5   A.   No.

6   Q.   Before you went to the Warren station, you had

7        been at the Youngstown station?

8   A.   Yes.

9   Q.   And you arrived at the Youngstown station at

10       about 4:30?

11  A.   Yes.

12  Q.   And Mr. Fingerhut was the only employee

13       present at that time?

14  A.   Yes.

15  Q.   You know Frank Reynolds that works there at

16       Youngstown terminal?

17  A.   Maybe by face.  By name, no.

18  Q.   But while you were there on December 11, 2001,

19       there was no one there to help Mr.

20       Fingerhut.  He was working by himself?

21  A.   Correct.

22            MR. INGRAM:  No further questions.

5514

1                    MR. BAILEY:  No redirect.

2                    THE COURT:  Sir, we thank you very

3     much.  You are excused.

4                    OFFICER JAMES CAMPBELL

5     being duly sworn according to law, on his oath,

6     testified as follows:

7     DIRECT EXAMINATION BY MR. BAILEY:

8     Q.   Good morning.  Would you tell the Court and

9               Jury your full name, place of employment

10              and position?

11    A.   My name is Jim Campbell.  I'm an officer with

12              the Howland Police Department.

13    Q.   And how long have you been so employed?

14    A.   Since 1988.

15    Q.   And your duties and responsibilities?

16    A.   That of patrolman with the patrol division.

17    Q.   Now, before that, where were you employed?

18    A.   Trumbull County Sheriff's department.

19    Q.   And how many years of police work do you have?

20    A.   Approximately 26 years.

21    Q.   Now, I'm going to direct your attention back

22              to December 12, 2001.  At that time, with

5515

```
 1              the Howland Police Department what duties

 2              did you have back then?

 3    A.   I was assigned to the patrol division, but I

 4              was requested by the investigative

 5              section to attend an autopsy at Trumbull

 6              Memorial Hospital.

 7    Q.   Do you know whose autopsy that was?

 8    A.   Robert Fingerhut.

 9    Q.   Did you take a camera with you?

10    A.   Yes, I did.

11    Q.   Who was present at that autopsy?

12    A.   Myself and the coroner.

13    Q.   Was that doctor -- was that autopsy performed

14              by Dr. Germaniuk?

15    A.   Yes, it was.

16    Q.   Now, I'm going to hand you a series, a set of

17              photographs, State's Exhibits 61, 62, 63,

18              64, 65, 66, 67 and 68.  Without showing

19              them to the Jury at this time, I'll ask

20              you to look at these pictures to yourself

21              and see if you can recognize all of those

22              photos.  Is there some writing on the
```

5516

1                  back that you can identify?

2      A.    Yes, on the back is the date and my initials.

3      Q.    And did you take all of those pictures?

4      A.    Yes.

5      Q.    And do they all truly and accurately depict

6                  what you observed at the time that you

7                  took each picture?

8      A.    Yes.

9      Q.    Now, I'm going to show you some of these

10                 pictures.  I'm going to show you what has

11                 been marked for identification as Exhibit

12                 No. 1.  Can you identify that?

13     A.    That was the jersey that was worn by the

14                 victim, Robert Fingerhut.

15     Q.    I'm sorry, I'll show you what has been marked

16                 for identification as State's Exhibit 61.

17                 What does that depict?

18     A.    That depicts the jersey that was worn by

19                 Robert Fingerhut.

20     Q.    Next I'm going to show you what has been

21                 marked for identification as State's

22                 Exhibit 62.  Can you identify that?

5517

1    A.   Again, that is a piece of apparel that was

2           worn by Robert Fingerhut that was removed

3           down at the coroner's office.

4    Q.   Now the next picture I'm going to show you, I

5           want you to just look at it yourself

6           without showing it to the Jury at this

7           time.  State's Exhibit 63.  What does

8           that depict?

9    A.   That is a photograph of Robert Fingerhut

10          showing a chest wound to the right side

11          of his chest.

12    Q.   I'm going to show you State's Exhibit 64.  Can

13          you identify that?

14    A.   That is a projectile that was removed from

15          Robert Fingerhut.

16    Q.   What area of his body?

17    A.   It was taken from the brain.

18    Q.   You said projectile?

19    A.   A bullet, correct.

20    Q.   I'm going to show you what has been marked for

21          identification as State's Exhibit 65.

22          Can you identify that?

5518

1    A.    That is the close-up of the same projectile.

2    Q.    State's Exhibit 66?

3    A.    Those are additional articles of clothing that

4          were removed from the deceased by the

5          coroner.

6    Q.    State's Exhibit 67?

7    A.    It is the photograph of an X-ray of the

8          deceased, with the position of the

9          bullet.

10   Q.    In what part of his body?

11   A.    In the brain.

12   Q.    Do you have a laser?  This button is laser, if

13         you point it at that.  Can you point that

14         out?

15   A.    This area right here, this is the projectile

16         that was located in the brain.

17   Q.    Exhibit No. 68.

18   A.    That was the jacket that was worn by the

19         victim, Robert Fingerhut.

20   Q.    Where was this autopsy performed?

21   A.    It was at the coroner's office at Trumbull

22         Memorial Hospital, Forum Health.

5519

```
 1   Q.   Now, do you know approximately how many hours
 2        you were there for this autopsy?
 3   A.   Three, four, I can't be sure.  Three or four
 4        hours, somewhere in that vicinity.
 5   Q.   This projectile that was removed from Mr.
 6        Fingerhut's brain, did you take custody
 7        of that from the doctor?
 8   A.   Yes, I did, down there at the coroner's
 9        office.
10   Q.   Officer, I'm going to hand you what has been
11        marked for identification as State's
12        Exhibit 266.  Can you look at that and
13        see if you can identify that?  It is a
14        little package.
15   A.   This is the sealed packet that holds the
16        projectile from Mr. Fingerhut.
17   Q.   When you receive that, what, do you mark that
18        in any way?
19   A.   It is marked with my indication of what I
20        number it, along with Sergeant Monroe and
21        his initials and it is taken and placed
22        in the evidence room.
```

5520

1  Q.  And I take it, it was in a sealed condition

2          when you did that?

3  A.  It was.

4  Q.  And you gave it to Detective Monroe?

5  A.  At a later point, yes.

6  Q.  Now, was that at the Howland Police

7          Department?

8  A.  That is correct, secured in our evidence room.

9  Q.  Now, did you also -- I'm going to hand you

10         what has been marked for identification

11         as State's Exhibit 265.  An envelope

12         containing a packet inside.  Did you have

13         occasion to receive a vial of blood from

14         the victim, Robert Fingerhut?

15 A.  Yes, I did.

16 Q.  You can take it out of the plastic sleeve, if

17         you want.

18 A.  Okay.

19 Q.  Did you receive that from a registered nurse

20         there at Trumbull Memorial Hospital?

21 A.  Yes.

22 Q.  That was at the time of the autopsy?

```
                                                          5521
 1    A.    Yes, it was.

 2    Q.    And was that marked on that vial by the

 3          hospital?

 4    A.    Yes.

 5    Q.    And did you also mark that and take it over to

 6          the Howland Police Department evidence

 7          room?

 8    A.    All of it was tagged and returned to the

 9          evidence room.

10    Q.    And then subsequently turned over to Detective

11          Monroe?

12    A.    Correct.

13    Q.    I'm going to show you State's Exhibit 66.  You

14          indicated the victim's clothing, that you

15          took a picture of that.  Did the victim

16          also have any jewelry on his person?

17    A.    Yes, which is displayed also in this

18          photograph.

19    Q.    Do you remember what the jewelry was?

20    A.    There was a watch, some rings, necklace, might

21          have been a bracelet.  I have to look a

22          the inventory sheet.  There were several
```

5522

1          articles of jewelry.

2    Q.   Do you remember what they were made of?

3    A.   They appeared to be 14 karat gold.

4              MR. BAILEY:  Thank you.

5    CROSS EXAMINATION BY MR. INGRAM:

6    Q.   Good morning.  The jewelry, the watch, the
7              rings, the necklace, all of that was 14
8              karat gold or appeared to be?

9    A.   I'm not a jeweler.  I can't tell you.  It
10             appeared to be good jewelry.

11   Q.   You just told Mr. Bailey it appeared to be 14
12             karat gold?

13   A.   It appeared to be.

14   Q.   It is your understanding that those items were
15             removed from Mr. Fingerhut?

16   A.   Correct.

17   Q.   Do you have training in reading X-rays?

18   A.   No, I don't.

19   Q.   That X-ray that Mr. Bailey showed you, did you
20             obtain the answer from Dr. Germaniuk, is
21             that how you knew how to answer those
22             questions?

5523

1    A.    It was something that we looked at together as

2          an X-ray from the X-ray technician that

3          brought it back down from the X-ray

4          department indicating that it was in fact

5          the bullet that was in the brain.

6    Q.    You couldn't make that determination by

7          yourself, could you?

8    A.    No, I could not.

9    Q.    The duties and responsibilities of a patrolman

10         differ from the duties and

11         responsibilities of a detective and

12         investigator or a crime scene technician,

13         do they not?

14   A.    Yes, they do.

15   Q.    And in many respects, patrolmen, to use I

16         guess a frequent phrase, after 911 are

17         first responders?

18   A.    Yes.

19   Q.    Frequently, the patrol officer is the first

20         person on the scene, usually the first

21         person on the scene, correct?

22   A.    That is correct.

5524

| | | |
|---|---|---|
| 1 | Q. | And as a result, you guys all have training on |
| 2 | | how to treat and preserve the integrity |
| 3 | | of crime scenes, do you not? |
| 4 | A. | Yes. |
| 5 | Q. | And you also have training on report writing? |
| 6 | A. | Yes. |
| 7 | Q. | Basically, you are trained that your reports |
| 8 | | should be as complete and thorough as you |
| 9 | | can reasonably make them? |
| 10 | A. | Correct. |
| 11 | Q. | And in terms of protecting the integrity of |
| 12 | | evidence at a crime scene, if you are a |
| 13 | | patrol person, you try to keep |
| 14 | | unnecessary people away from the scene of |
| 15 | | an offense, am I correct? |
| 16 | A. | That is correct. |
| 17 | Q. | And if you are a patrol person and you see or |
| 18 | | notice evidence at a scene, you are |
| 19 | | supposed to make a reasonable effort to |
| 20 | | note the existence of that evidence in |
| 21 | | your report, am I correct? |
| 22 | A. | Correct. |

5525

1          MR. INGRAM:  No further questions.

2     REDIRECT EXAMINATION BY MR. BAILEY:

3     Q.   You weren't the scene officer at the scene of

4          the homicide -- scene officer in this

5          case, were you?

6     A.   No.

7     Q.   You were assigned to go to the autopsy and

8          take some photos?

9     A.   Correct.

10    Q.   And collect some evidence?

11    A.   That is correct.

12    Q.   And what was your job at the Sheriff's office

13         before going to Howland Township Police

14         Department?

15    A.   I had several functions.  I was a detective in

16         the investigative section for years and I

17         worked undercover narcotics for years,

18         and I was also a patrol deputy.

19    Q.   And I take it as detective and the evidence

20         officer, you got to take photographs?

21    A.   Correct.

22    Q.   Mr. Ingram asked you about the X-ray, were you

```
                                                          5526

 1                 present when the projectile was removed

 2                 from the victim's brain?

 3    A.   Yes, I was.

 4    Q.   And that was the same area that looked like in

 5                 the X-ray?

 6    A.   It appeared to be.

 7                      MR. BAILEY:   Thank you.

 8                      THE COURT:   Any other questions?

 9                      MR. INGRAM:   No.

10                      THE COURT:   Officer, you are

11    excused.

12                      EDWARD LULLA

13    being duly sworn according to law, on his oath,

14    testified as follows:

15    DIRECT EXAMINATION BY MR. BAILEY:

16    Q.   Good morning.   Would you tell the Court and

17                 Jury your full name, place of employment

18                 and position?

19    A.   My name is Edward Lulla, special agent with

20                 the Ohio Attorney General's Bureau of

21                 Identification out of the Boardman

22                 office.
```

1    Q.   What education, training and experience do you

2              have to hold your present position?

3    A.   I have a Bachelor's degree in criminal

4              justice.  I have approximately 18 years

5              as a police officer, five of those as

6              being a special agent.  During my 13

7              years as a police officer, I was a police

8              detective for five of those years in

9              Steubenville which is in Jefferson

10             County, Ohio.

11   Q.   And you have been with the crime scene unit

12             for how long?

13   A.   Just over five years.

14   Q.   Where is your crime scene unit office located?

15   A.   Our headquarters is in London, Ohio, which is

16             outside of Columbus, but I'm assigned to

17             the satellite office which is in

18             Boardman, Ohio.

19   Q.   And as a member of the crime scene unit, what

20             do you do, what are your duties?

21   A.   We assist smaller agencies throughout the

22             State of Ohio, in processing crime

5528

1              scenes, processing evidence.

2    Q.    I'm going to direct your attention to December

3              18, 2001, did you have occasion to

4              receive a call to assist in a homicide

5              investigation into the death of Robert

6              Fingerhut?

7    A.    Yes, Sir, I did.

8    Q.    And did you meet someone at a particular

9              location from the Howland Police

10             Department?

11   A.    Yes, I met Detective Dillon.

12   Q.    And when did you meet him?

13   A.    It was approximately 12:30 in the afternoon.

14   Q.    On December 18th of 2001?

15   A.    Yes, Sir, that is correct.

16   Q.    What was your purpose of meeting him?

17   A.    I was requested to examine a hotel room for

18             possible blood evidence, fingerprints,

19             hairs.

20   Q.    And do you know the name of the hotel or

21             motel?

22   A.    I believe it was the Days Inn.

5529

1  Q.  On Market Street?

2  A.  That is correct.

3  Q.  And did you go to the Days Inn?

4  A.  Yes, Sir, I did.

5  Q.  With whom?

6  A.  Detective Dillon, and we were met there by

7      Lieutenant Heaver from the Boardman

8      Police Department.

9  Q.  Jeff Heaver from Boardman PD?

10  A.  Yes, Sir, that is correct.

11  Q.  And did you gain access to a particular room?

12  A.  Yes, Sir, we gained access to room 129.

13  Q.  That is the Days Inn Motel?

14  A.  That is correct.

15  Q.  Now, did you get an address on Market Street?

16  A.  I got several.  I believe the final one we

17      assumed it was 8390 Market Street.  The

18      phone book had a different address.  That

19      is what I believe the correct address

20      was.

21  Q.  Within two digits of each other?

22  A.  Yes, Sir.

5530

1  Q.  And can you describe how large a facility this

2      is?

3  A.  Just a regular hotel.  I believe it was only

4      one floor hotel.  When you walk into the

5      room, bed, dresser, T.V., further on back

6      is a bathroom.

7  Q.  What kind of evidence were you looking for?

8  A.  Blood, fingerprints and any kind of maybe

9      trace evidence, hairs or fibers.

10 Q.  And what did you do?

11 A.  Upon walking in the room, I first just

12     visually examined the room, tried to see

13     if I could see anything with my naked

14     eye.

15 Q.  Can you describe this room?

16 A.  I'm not sure of the dimensions.  I walked in,

17     there was a bed, window, air-conditioning

18     unit to the left; dresser, T.V. on my

19     right, and as you walked further back in

20     the room, there was a door where the

21     bathroom was located.

22 Q.  And did you notice anything in regards to your

5531

1              trace evidence when you walked into the

2              room that was observable to the naked

3              eye?

4    A.   Yes, Sir, I did.

5    Q.   What was that?

6    A.   I located some suspect stains on the comforter

7              on the bed.  I noticed a suspect stain,

8              as you walk in the door on your left hand

9              side, between the front door and the

10             air-conditioning or heating unit.  I

11             located suspect stain on the bathroom

12             floor and I also located a suspect stain

13             in the bottom of a plastic garbage can

14             container, wastepaper basket.

15   Q.   The suspect stain on the comforter on the bed,

16             what did you do with that?

17   A.   They appeared to be blood to me.  We have a

18             presumptive test we use.  If we go to a

19             crime scene, there could be a thousand

20             stains.  This presumptive test tries to

21             narrow it down to make sure that the

22             possibilities are that it is blood.  It

5532

```
 1              is called phenolphthalein.  I tested each

 2              suspect stain.  Each stain tested

 3              positive.

 4   Q.   How do you do this, when you use this

 5              phenolphthalein?

 6   A.   Take a regular cotton swab like a large Q-tip,

 7              we moisten it with some distilled water.

 8              We absorb some of the stain.  We place

 9              some of the phenolphthalein on it and we

10              place a little hydrogen peroxide.  If the

11              tip of the cotton swab turns pink, that

12              is presumptive positive that that stain

13              is blood.

14   Q.   And what did you do if it turns pink?

15   A.   We can do one of two things.  If it is a large

16              object, we can either just use another

17              sterile cotton swab and dampen it with

18              distilled water and absorb some of the

19              stain.  If it is an object we take with

20              is, like in this case, the comforter, I

21              package up the comforter in a large brown

22              paper bag and take it with me.
```

5533

1   Q.   When you entered that room, was it cleaned or

2        unoccupied?

3   A.   Yes, Sir, it was unoccupied.

4   Q.   What else did you observe then?

5   A.   I also found two, like a hand towel and a

6        washcloth underneath the bathroom sink.

7        One had a yellowish stain on it and

8        another one had another stain which

9        appeared to be blood.  I also checked

10       that stain and it was presumptive

11       positive for blood.  I also found several

12       pubic hairs on and around the rim of the

13       toilet seat and around the rim of the

14       toilet seat and I collected those, also.

15  Q.   Now, did you do any other testing while you

16       were in there?

17  A.   No, I believe I then fingerprinted the room

18       for fingerprints.

19  Q.   What about, was there a trash bucket?

20  A.   Yes, Sir.  There was a stain on the bottom of

21       the trash bucket.

22  Q.   What did you do with that?

5534

1    A.    I checked that with the swabs.  I absorbed it

2          with the sterile cotton swab and took the

3          stain instead of taking the whole bucket.

4    Q.    What about the fingerprintings?  How do you do

5          that?

6    A.    There's several methods.  In this instance, I

7          had a bottle of fingerprint powder and a

8          brush, and I placed the fingerprint

9          powder on the surfaces that are conducive

10         for fingerprints.  A lot of surfaces

11         aren't conducive like carpet or older

12         wood.  Most smooth surfaces you can

13         obtain a fingerprint from.

14   Q.    I take it all surfaces don't collect

15         fingerprints?

16   A.    That is correct.

17   Q.    Now, so what did you fingerprint?

18   A.    The smooth surfaces, I believe it was the

19         bathroom walls were like a tile, they

20         were very smooth.  The telephone, the

21         door, maybe the T.V.  Those were most of

22         the surfaces.  The other surfaces were

5535

1  like textured wallpaper and the wood on

2  the dressers and stuff aren't conducive

3  for fingerprints.  I attempted but there

4  were no fingerprints on them.

5  Q.  Now, did you take any photographs that day?

6  A.  Yes, Sir, I did.

7  Q.  And what did you photograph?

8  A.  The outside of the room, the interior of the

9  room, the stains prior to lifting.

10  Q.  I'm going to hand you a series of photographs,

11  199 through 226.  I'm going to show you a

12  series of photographs that range from 199

13  to 226, less 202 and 204.  I'm going to

14  ask you just to look at these.  I believe

15  you have seen them before.  And can you

16  identify those as to who took all of

17  those pictures that are in that stack and

18  if there's any writing on the back?

19  A.  These appear to be the photographs I took.  On

20  the back is the date I obtained them, my

21  initials, and my unit number which is

22  117.

5536

1   Q.   Now, I'm going to -- all of these pictures,

2        you took all of those pictures that are

3        in the packet?

4   A.   Yes, Sir, I did.

5   Q.   And do they all appear to truly and accurately

6        reflect what you observed that day?

7   A.   Yes, Sir, they do.

8   Q.   Now, I'm going to show you what has been

9        marked for identification as State's

10       Exhibit 199.  Can you identify that?

11  A.   That is the exterior door of room 129.

12  Q.   Next I'm going to show you what has been

13       marked for identification as State's

14       Exhibit 200.  What does that show?

15  A.   That is the bed inside of room 129.  The

16       yellow placards indicate the location of

17       a stain.

18  Q.   Exhibit No. 201?

19  A.   If you are inside room 129 and you were

20       looking out towards the front door, that

21       is the front door as it is shut.

22  Q.   State's Exhibit 203.  What does this show?

5537

1    A.    If you are standing beside the bed, that is

2          facing the dresser, the open door is the

3          bathroom.

4    Q.    State's Exhibit 205.

5    A.    That is the bed inside room 129; to the left

6          is the air-conditioning heating unit and

7          the window.

8    Q.    State's Exhibit 206.

9    A.    Another view of the interior of the room, the

10         bathroom door opened.

11   Q.    State's Exhibit 207.

12   A.    A photograph of the open bathroom door.

13   Q.    State's Exhibit 208.

14   A.    That is a photograph of the stain on the

15         comforter.

16   Q.    Which area -- where is it with the laser

17         pointer?  Can you point that out?

18   A.    Right here and right there.  (Indicating)

19   Q.    This is the area that you tested?

20   A.    That is correct.

21   Q.    Exhibit No. 209.

22   A.    As you come to the door, on the left hand

5538

1          side, between the door and the

2          air-conditioning heating unit, here's my

3          placard and right around here is the

4          stain.  (Indicating)

5    Q.   State's Exhibit 210.

6    A.   That is a close-up of the previous photograph.

7          I believe the stain is right here.

8          (Indicating)

9    Q.   You often bring placards to the scene?

10   A.   Yes, Sir.

11   Q.   With placard numbers?

12   A.   Yes, Sir.

13   Q.   State's Exhibit 211.

14   A.   That is the stain of the previous two

15         photographs.  It is an up close

16         photograph.  Stain is right here.

17   Q.   To the right of the placard?

18   A.   Yes, Sir.

19   Q.   State's Exhibit 212.

20   A.   These are small suspect stains on the bathroom

21         floor.

22   Q.   Whereabouts?

5539

```
 1   A.   Each little purple arrow points it a suspect
 2          stain.
 3   Q.   State's Exhibit 213.
 4   A.   It is just a photograph of a previous scene,
 5          just a little further back.
 6   Q.   State's Exhibit 214.
 7   A.   Another photograph, just a little further away
 8          showing where the stain is in relation to
 9          the tub and the door.
10   Q.   State's Exhibit 215.
11   A.   These are the hand towels and the washcloth
12          that I located underneath the sink in the
13          bathroom.
14   Q.   Which is which?
15   A.   Indicated by No. 4.
16   Q.   State's Exhibit 216.
17   A.   This is the larger hand towel that I found,
18          some type of crusty yellow staining and
19          this is the smaller washcloth that I
20          found, the suspect what appeared to be
21          blood stain.
22   Q.   State's Exhibit 217.
```

5540

1   A.   This is the plastic trash can, wastepaper
2        basket I located in the bedroom.
3   Q.   Is this the one where you noted a stain?
4   A.   The stain is in the bottom of the trash
5        container.
6   Q.   State's Exhibit 218.
7   A.   This is a photograph looking down into the
8        trash container.  I believe the stain is
9        here.  (Indicating)
10  Q.   State's Exhibit 219.  This is a close-up of
11       that?
12  A.   That is correct.  This is the suspect stain
13       right here, which tested positive for
14       blood.
15  Q.   State's Exhibit 220.
16  A.   This is the toilet in the bathroom.
17  Q.   Those little purple arrows on the floor in
18       front of it?
19  A.   I believe those are pubic hairs or suspect,
20       small little black hairs.
21  Q.   And these little purple things, how do you do
22       that?

5541

| | | |
|---|---|---|
| 1 | A. | They are like little stickers I put on there, |
| 2 | | so it will draw your attention to what |
| 3 | | I'm trying to show you in the photograph. |
| 4 | Q. | State's Exhibit 221.  Is this a close-up of |
| 5 | | that area? |
| 6 | A. | That is correct. |
| 7 | Q. | And where the arrow is, that is what you |
| 8 | | wanted to point out? |
| 9 | A. | A little hair here, a little here and a little |
| 10 | | hair up there. |
| 11 | Q. | State's Exhibit 222.  What does that show? |
| 12 | A. | This is the side of the toilet bowel.  Also |
| 13 | | suspect hairs are located.  That is what |
| 14 | | these small purple arrows are indicating. |
| 15 | Q. | And State's Exhibit 223.  Is this a close-up |
| 16 | | of that area? |
| 17 | A. | Yes, Sir, it is. |
| 18 | Q. | Did you do anything -- did you have occasion |
| 19 | | to go outside that building to the rear |
| 20 | | of the building? |
| 21 | A. | Yes, Sir, I did. |
| 22 | Q. | What did you do there? |

5542

1   A.   Just photographed the exterior, photographed

2        the dumpster.

3   Q.   Exhibit No. 224.  What does that show?

4   A.   That is the BFI dumpster located at the rear

5        of the hotel.

6   Q.   And Exhibit No. 225.

7   A.   That is a photograph indicating the location

8        of the dumpster as compared to the hotel

9        itself.

10  Q.   The hotel is on the left side?

11  A.   Yes, Sir.

12  Q.   And Exhibit No. 226.

13  A.   Just exterior photograph of room 129 with the

14       door open.

15  Q.   How many presumptive tests did you make in

16       that particular room, room 129?

17  A.   For every stain that I located, I did a

18       presumptive test.  There were no stains

19       that I located that did not indicate the

20       presence of blood with the presumptive

21       test.

22  Q.   They all indicated presumptively the presence

5543

```
 1              of blood?
 2    A.    That is correct.
 3    Q.    Were there five of those?
 4    A.    Yes, Sir.
 5    Q.    And you also lifted -- did you do prints,
 6              lifts on the prints?
 7    A.    Yes, Sir.
 8    Q.    How do you do fingerprint lifts?
 9    A.    Once we process a surface for fingerprints,
10              then the fingerprints are developed, you
11              can actually see them with your eye.
12              We'll take fingerprinted tape and place
13              them over the developed fingerprint and
14              you just slowly lift off the fingerprint.
15              Now, the print is on the tape.  We then
16              take that tape and put a piece of plastic
17              sheeting, sort of like putting it on an
18              overhead projector.  We now place the
19              fingerprint that is on the tape on this
20              piece of plastic.
21    Q.    When you collect all of this evidence, do you
22              tag it and bag it and package it?
```

5544

1   A.   Yes, Sir, I do.

2   Q.   Do you seal it then?

3   A.   Yes, Sir, I do.

4   Q.   And where do you take it?

5   A.   I take it to my office in the Boardman, Ohio

6        BCI office.

7   Q.   What happens to it then?  What is your

8        standard procedure?

9   A.   It is locked in an evidence locker until the

10       intake officer, who is our secretary, is

11       available.  I then submit that evidence

12       to her and twice a week she takes all of

13       the evidence that the office has

14       collected to the lab which is in

15       Richfield, Ohio.

16  Q.   Is that all taken in a sealed condition?

17  A.   Yes, Sir.

18  Q.   It is kept in Richfield at their evidence

19       area?

20  A.   Correct.

21  Q.   Until the lab tech requests -- the lab tech

22       comes and takes it and breaks the seal

5545

1      and analyzes what is inside?

2   A.   That is correct.

3   Q.   Now, is there some special sheet that you have

4        to fill out when you collect evidence?

5   A.   No, Sir, there's not.

6   Q.   When evidence is taken to BCI in Richfield, is

7        there some sheet that is prepared that

8        would list what is being taken?

9   A.   Yes, there's an evidence submission sheet and

10       that is assigned a lab number so all of

11       the items from that investigation are

12       listed underneath that lab number.

13  Q.   And that is a unique case number from BCI?

14  A.   Just for that case itself.

15  Q.   And subsequent submissions would -- would they

16       get an additional letter next to a

17       number?

18  A.   Yes, Sir.  The second submission would be an

19       A, the second a B.

20  Q.   Attached to the unique case number in that

21       case?

22  A.   That is correct.

5546

1    Q.    I'm going to hand you what has been marked for

2           identification as State's Exhibit 279.

3           I'll ask if you can identify that?

4    A.    Yes, I can.

5    Q.    What is that?

6    A.    This is an Ohio BCI lab number evidence

7           submission sheet.  The lab number is

8           01-35755-B.

9    Q.    Is that the evidence sheet that was prepared

10         in this particular case for your

11         investigation at that hotel room?

12   A.    Yes, it was.

13   Q.    And what is listed, what do you list on that

14         sheet?

15   A.    I listed B-1, one paper bag containing one

16         comforter from bed with suspect stain.

17         B-2, one box containing suspect stain

18         from wall, photo ID No. 2.  That

19         indicates the little placards that were

20         on the wall.  B-3, one box containing

21         suspect stain from bathroom floor, photo

22         ID number three.  B-4, one bag containing

5547

1        one washcloth with suspect stain from

2        bottom of bathroom sink, photo ID No. 4.

3        B-5, one bag containing one hand towel

4        with suspect stain from bottom of

5        bathroom sink, photo ID No. 4.  B-6, one

6        box containing a suspect stain from

7        bottom of trash can, photo ID number

8        five.  B-7, one envelope containing tape

9        lifts containing hair from toilet area.

10        B-8, one envelope containing latent

11        lifts.  Those would be the fingerprints

12        that were developed and lifted with the

13        tape.  B-9, one envelope containing the

14        acetate sheet containing elimination and

15        palm prints from Jennifer Robinson, Days

16        Inn housekeeping staff.

17   Q.   Who was Jennifer Robinson?

18   A.   Part of securing from the hotel, we were able

19        to locate Mrs. Robinson.  She was the

20        housekeeping personnel that had cleaned

21        the room.  Knowing she had touched the

22        areas in the room, I requested a copy of

5548

```
 1              her fingerprints and she complied.
 2   Q.   How did you do that?
 3   A.   I have a little kit that I carry with us,
 4              amongst our equipment that we fingerprint
 5              powder her hands and place them on a
 6              piece of sticky paper and it is when
 7              someone is arrested, their initialed
 8              prints are taken.  It works the same way,
 9              but it is a lot less dirty, because I
10              don't have stuff in the van that cleans
11              the ink off.  We use this method instead.
12   Q.   So those are her prints that were submitted as
13              B-9 for Richfield?
14   A.   That is correct.
15   Q.   And what date do you have as the submission
16              date?
17   A.   I submitted this December 19, 2001, at 9:25
18              a.m.
19   Q.   The day after you were at the motel?
20   A.   That is correct.
21   Q.   Now I'm going to show you -- I'm going to show
22              you some Exhibits that are pre-marked as
```

5549

1          Exhibit No. 287 containing three little

2          white boxes that are labeled 276-A, 287-B

3          and a 287-C.  I'll ask if you can

4          identify those?

5   A.   Yes, I can.

6   Q.   What is that?

7   A.   287-A is a suspect stain on a cotton swab

8          containing the suspect stain that I

9          removed from the bottom of the trash can.

10          It has the date, my name, and the

11          biohazard stickers are to inform the lab

12          technician that this is possibly blood,

13          and once we put them on, we initial them

14          and date them.  It is my initial and the

15          date I placed them in there.

16   Q.   When you mark something "biohazard," does it

17          indicate you have to treat it any special

18          way?

19   A.   To let the lab people be advised this is

20          probably blood.

21   Q.   What else is in there?

22   A.   287-C is the white box which contains the

5550

```
 1              cotton swab of the stain that I removed
 2              from the wall, placard No. 2.  It also
 3              has the biohazard sticker and my name and
 4              my initials.  287-A.
 5    Q.   Well, 287-B.  One of them is marked with a B
 6              on it, on the side.
 7    A.   Both of these have A.
 8    Q.   If you look at the identify of one of the A's,
 9              there's a B?
10    A.   287-B is a white box that contains a cotton
11              swab that has the suspect stain from the
12              bathroom floor.  It also has a biohazard
13              sticker and the sticker with my initials
14              and the date.
15    Q.   And you collected those items?
16    A.   Yes, Sir, I did.
17    Q.   Just for the record, one of the little white
18              boxes in there, it is marked 287-B on the
19              side.  And it has got our case number on
20              it, which is 01-CR-793.  But on the other
21              end of it, it had a 287-A and we marked
22              it with a B to reflect the difference
```

5551

1        between the other one that was marked

2        287-A.  Exhibit No. 288.  I'm going to

3        hand you back what's been marked 288.

4        Can you identify that?

5   A.   This is the washcloth that I found underneath

6        the sink.  Photo ID with placard No. 4.

7   Q.   And you marked that bag and tag it and seal

8        it?

9   A.   Yes, Sir.  On bags, we usually use BCI

10       evidence tape.  It has my initials and

11       the date that it was placed inside this

12       bag and secured.

13  Q.   What is the purpose of doing all of that?

14  A.   Just to guarantee that it is secure that no

15       one has entered the bag since I packaged

16       it.

17  Q.   Exhibit No. 289.  Can you identify that?

18  A.   It has my handwriting on it.  It is the hand

19       towel that I found underneath the

20       bathroom sink with placard number four.

21       It has the evidence tape still secured

22       with my initials and the date it was

5552

1            placed inside of here.

2   Q.   Exhibit No. 290.

3   A.   This should contain the acetate sheet which

4            has the tape lifts which is taking a

5            piece of tape and I lift up the small

6            little hairs that I found around the

7            toilet bowl.  Put the biohazard sticker

8            in case there's some type of disease.

9            Without the evidence tape, we put regular

10           tape on this.  My initials and the date

11           it was placed inside.

12  Q.   And Exhibit No. 291.

13  A.   These are the elimination prints or the

14           fingerprints I taped from Jennifer

15           Robinson, the housekeeping staff at the

16           hotel.  It's been sealed with tape, my

17           initials and the date it has been placed

18           inside.

19  Q.   Were there some other items that are not in

20           that collection?

21  A.   Yes, probably the latent fingerprint lifts,

22           the actual lifts.  I believe those remain

5553

1              with the lab at all times.

2  Q.   Which would be B-8?

3  A.   I believe.  Yes, that's correct.

4  Q.   Now how long did you spend at the motel?

5  A.   Approximately four and a half hours, give or

6         take.

7  Q.   Did you go to another motel after leaving the

8         Days Inn?

9  A.   Yes, Sir, we did.

10  Q.   And where did you go?

11  A.   We went to the Wagon Wheel Motel.  It is

12         located on Market Street, right down the

13         street from the Boardman Mall.

14  Q.   Is that at 7015 Market Street in Boardman?

15  A.   I believe that is the correct address.

16  Q.   Who was with you?

17  A.   Myself and Detective Dillon.

18  Q.   Approximately how far is one motel from the

19         other?

20  A.   I'm just guessing.  Maybe two miles, three

21         miles, not that far.

22  Q.   About what time did you arrive at the Wagon

5554

1      Wheel?

2    A.   We got there about 5:00 in the evening.

3    Q.   And did you, was your attention directed to a

4         specific room at the Wagon Wheel?

5    A.   The room 101.

6    Q.   And while there, what did you do?

7    A.   I photographed the exterior of the building.

8         I photographed the interior of room 101.

9    Q.   I'm going to hand you a packet of photos, 192,

10        193, 194, 195 and 196.  These Exhibits

11        are pre-marked for identification.  I'm

12        going to ask you to look at these and see

13        if you can identify these particular

14        photographs by the front and by any

15        writing on the back.

16   A.   These are the photographs I took at the Wagon

17        Wheel on the 18th of December, 2001.  On

18        the back is the date I obtained them,

19        which is 12-18-01, my initials and my

20        unit number which is 117.

21   Q.   Now, I'll show you Exhibit No. 192.  Can you

22        identify that?

5555

1    A.    This is the Wagon Wheel Motel.   101, room 101

2          is located down this corridor.   Because

3          it was very dimly lit, it was hard to get

4          the actual 101 number from above the

5          door.   This is where room 101 is located.

6    Q.    Exhibit No. 193.   What does this depict?

7    A.    It is the office area of the Wagon Wheel

8          Motel.

9    Q.    Who took all of these pictures?

10   A.    I took these photographs.

11   Q.    Do they all truly and accurately depict what

12         you observed?

13   A.    Yes, Sir, they do.

14   Q.    Exhibit No. 194.   What does this show?

15   A.    That shows the interior of room 101.

16   Q.    What can you see in there?

17   A.    This is the bed area.

18   Q.    You have that laser pointer.

19   A.    This is the bed.   This is a glass wall, T.V.

20         stand here.

21   Q.    Exhibit No. 195.   What does this show?

22   A.    I believe this is the Jacuzzi area of the

5556

1          room.  This is the shower.

2    Q.   And Exhibit No. 196.

3    A.   That is an outside photograph of the marquee

4          of the Wagon Wheel Motel.

5    Q.   That room have mirrors in it?

6    A.   Yes, Sir, I believe it did.

7              MR. BAILEY:  Thank you very much.

8              THE COURT:  We'll take a recess at

9    this point.  Remember my previous admonition about

10   any discussion in the case.  Let's take ten

11   minutes.  Be back at 11:05.  Make it 15 minutes.

12   (Court in Recess at 10:55 a.m.)

13   CROSS EXAMINATION BY MR. JUHASZ:

14   Q.   Mr. Lulla, good morning.

15   A.   Good morning.

16   Q.   You mentioned to the Jury when Mr. Bailey was

17          asking you questions, that you are

18          located -- your primary base of

19          operations is the Boardman office,

20          correct?

21   A.   That is correct.

22   Q.   And if I understand it, you get called out to

5557

```
 1              help different small -- like Howland
 2              Police Department in assisting in these
 3              type of investigations?
 4   A.   That is correct.
 5   Q.   Did anybody call you to come out to the
 6              Fonderlac address in Howland Township?
 7   A.   No, I'm not familiar with that address, no.
 8   Q.   I put back in front of you, State's Exhibit
 9              279 which is the BCI submission sheet
10              that Mr. Bailey talked to you about.  So
11              that we're clear for the Jury, every time
12              a case is opened in which the BCI lab is
13              going to be involved, it is given a
14              specific case number, correct?
15   A.   If there's evidence that is going to be
16              submitted, each case has a BCI lab number
17              just for that case itself, yes.
18   Q.   And that number is assigned, as I understand
19              it, the first time evidence is submitted
20              to the laboratory, correct?
21   A.   That is correct.
22   Q.   And then every time something else is
```

5558

1              submitted to the laboratory, the same

2              number is used, but then followed by a

3              letter, correct?

4    A.   That is correct.

5    Q.   So the original submission would have whatever

6              the original number was, right?

7    A.   Correct.

8    Q.   And then if somebody came in later and said,

9              "We also want this tested," it would have

10             a number plus an A, B, C and so on?

11   A.   Correct.

12   Q.   Your submission is the B submission, is that

13             correct?

14   A.   That is correct.

15   Q.   The evidence submission sheet is a way to log

16             the things that are actually delivered to

17             the laboratory for possible analysis,

18             correct?

19   A.   That is correct.

20   Q.   The form itself indicates several types of

21             tests which can be requested, is that

22             right?

5559

1    A.    That is correct.

2    Q.    And my understanding, and please correct me if

3          I am wrong, is that the person who

4          submits whatever the evidence is to BCI

5          can say, "Here's what I am giving you and

6          I would like you to do this test or these

7          tests"?

8    A.    Yes.

9    Q.    And are you one of the people who has

10         authority to do that?  In other words,

11         when you submit evidence, can you say, "I

12         would like this tested for DNA," or "I

13         would like this tested for fingerprints"?

14   A.    Well, the fingerprints, that goes without

15         saying, but as far as like blood

16         evidence, we'll indicate DNA, but usually

17         they -- it is usually discussed between

18         the requesting agency and the lab.  They

19         decide which evidence is best to have

20         processed.

21   Q.    You said the fingerprints are sort of self

22         evident and there's a box on there to

5560

1          check for latent prints, correct?

2   A.   That is correct.

3   Q.   It is not checked on this particular

4          submission sheet, is it?

5   A.   No, it is not.

6   Q.   Is that because you are regarding the

7          submission of the latent prints as just a

8          given that somebody will look at those

9          prints?

10  A.   No.  It is probably just a typo by the

11          secretary.

12  Q.   In this particular case, did you instruct --

13          I'm sorry, before we get there.  Is this

14          submission sheet prepared in Boardman

15          before the evidence is taken to the lab

16          in Richfield, or is that sheet prepared

17          at the laboratory once the evidence is

18          received?

19  A.   This was prepared by initials on the bottom

20          which is BS.  Barbara Sofranc.  She's the

21          evidence intake personnel in the Boardman

22          office.  This is prepared by the Boardman

```
                                                          5561
 1              office.

 2   Q.   Did you have input into what types of tests

 3              would be requested?

 4   A.   Yes and no.  The DNA is just for the blood.

 5              The blood always goes to DNA.  The hair

 6              would have went to trace and she did not

 7              indicate latent, but those are where

 8              latent always go, to latent fingerprint

 9              analysis.

10   Q.   Tell us when you say the hair was submitted

11              for trace, what do you mean by trace?

12   A.   They would look at the hair under the

13              microscope to see species, possibly

14              gender, race, things of that nature.

15   Q.   In this particular case, are you aware of any

16              other samples that were submitted for

17              trace comparison, that is, some other

18              hair samples other than what you found in

19              the hotel room and the motel room?

20   A.   I don't have that knowledge, no.

21   Q.   So any trace test that would be conducted here

22              would be simply comparing the different
```

5562

1          hairs that you found in the bathroom to

2          see if they were consistent with each

3          other?

4    A.   Possibly.

5    Q.   Was there another possibility?

6    A.   It could be, we'll send this to trace and as

7          the investigation possibly identifies the

8          suspect -- suspect or standard would be

9          obtained from that suspect and then they

10         could compare the two.

11   Q.   And that latter one is what you would call a

12         standard, is that correct?

13   A.   That is correct.

14   Q.   And from your own personal knowledge, you are

15         not aware of whether any standard was

16         submitted in this case; am I

17         understanding you correctly?

18   A.   That is correct.

19   Q.   You also have DNA checked there?

20   A.   Yes, Sir.

21   Q.   And if I understood what you said to me a

22         couple of minutes ago, that would be to

5563

1             check the blood samples that you took?

2   A.   That is correct.

3   Q.   Is it possible also to check the hair for DNA?

4   A.   Possible, it is a lot harder, but it is

5             possible.

6   Q.   Would you have to specifically request that on

7             this form if you wanted the hair checked

8             for DNA?

9   A.   Not really, no.

10   Q.   That would be up to somebody at Richfield?

11   A.   I can't speak for everybody, but usually the

12             lab would contact the requesting agency

13             and they would see how the case is

14             progressing, what evidence would need to

15             be processed at that time.

16   Q.   Your job as I understand with BCI is basically

17             to go out and to collect evidence and to

18             document whatever evidence is that you

19             find, correct?

20   A.   Correct.

21   Q.   And in this case, Mr. Bailey and you explained

22             to the Jury a number of photographs where

5564

```
 1          you put little markers and everything to

 2          highlight where that evidence was found,

 3          correct?

 4   A.   That is correct.

 5   Q.   So, and you were careful to use prospective

 6          pictures, that is, you showed us the

 7          stain on the wall for example with the

 8          marker, correct?

 9   A.   Correct.

10   Q.   And then some other photographs to show us

11          where that specific stain was in the

12          room?

13   A.   That is correct.

14   Q.   Is that an equally important part of your job,

15          that is, documenting not only what you

16          found, but where you found it at the

17          scene?

18   A.   I believe so, yes.

19   Q.   Now, besides rooms like this, part of your job

20          is also to do the same type of things at

21          crime scenes, am I correct?

22   A.   Yes, Sir.
```

5565

1   Q.   And part and parcel of that would be likewise
2        to document not only what you found, but
3        where you found it, correct?
4   A.   Yes, Sir.
5   Q.   Let us say for example that at a crime scene
6        you found a footprint that appeared to be
7        in blood.  Would that be something
8        significant that you would want to record
9        in some fashion?
10  A.   I believe so, yes.
11  Q.   And it might be reasonable for you to
12       photograph that first of all, correct?
13  A.   That is correct.
14  Q.   And take some of those, what I called earlier
15       prospective pictures to show not only the
16       close-up of the footprint but other
17       things in relation to the crime scene?
18  A.   That is correct.
19  Q.   Would you also take measurements, a point of
20       reference, this little wooden wall here
21       if it were found 18 inches from there,
22       would you also show where it was found?

5566

1   A.   Each case is different, but probably more than

2        likely, I would have.

3   Q.   Do you sometimes use a photograph with a ruler

4        in it to show the measurements of

5        something?  Would that be something you

6        would do?

7   A.   Yes, Sir.

8   Q.   Now you have also got training and experience

9        in lifting latent prints or fingerprints

10       and palm prints?

11  A.   Yes, Sir.

12  Q.   Are you are also trained in analyzing and

13       comparing prints, or are you not?

14  A.   No, Sir, I'm not.

15  Q.   You simply know what is required as far as

16       lifting them and keeping them preserved

17       so someone else can compare them, is that

18       correct?

19  A.   That is correct.

20  Q.   And if I understood your testimony, when

21       Mr. Bailey was asking you questions, you

22       basically look for surfaces that are

5567

1              smooth surfaces because it is more likely

2              that we're going to leave prints on those

3              surfaces, correct?

4    A.   That is correct.

5    Q.   Even though you are not trained in comparing

6              fingerprints to each other, are you

7              familiar with the phrase insufficient

8              ridge detail?

9    A.   Yes, Sir, I am.

10   Q.   And that would be a situation where if I put

11             my thumb on this lectern here and you

12             lifted that print, there may be something

13             showing there that it is a fingerprint

14             but you may not have enough detail to

15             show a known print from me?

16   A.   That is correct.

17   Q.   If I were, after I put my finger or my thumb

18             on here, if I were to take this

19             handkerchief and wipe this clean, would

20             you expect to find smudges or expect to

21             find nothing?

22   A.   I would expect to find nothing.

5568

1   Q.   You took what, item B-9 on that sheet which is

2            what you called the elimination prints of

3            Jennifer Robinson, the lady who cleaned

4            the room?

5   A.   That is what I was told, yes, Sir.

6   Q.   And obviously, when you are taking these

7            latent lifts, you don't know who these

8            lifts belong to?

9   A.   That is correct.

10  Q.   You took those because someone told you she

11           might have been in the room, is that

12           right?

13  A.   That is right.

14  Q.   Whoever it is at BCI Richfield starts

15           comparing them.  If they find her prints,

16           they can say, "We know that is the

17           cleaning lady"?

18  A.   That is correct.

19  Q.   That is the reason for taking those?

20  A.   Yes, Sir, it was.

21  Q.   Were you asked in the course of this case to

22           take elimination prints from any other

5569

|    |    |                                                    |
|----|----|----------------------------------------------------|
| 1  |    | individual?                                        |
| 2  | A. | No, Sir, I was not.                                |
| 3  | Q. | You also told Mr. Bailey that all of the           |
| 4  |    | stains that you found in the room tested           |
| 5  |    | positive or presumptive for blood, is              |
| 6  |    | that right?                                         |
| 7  | A. | That is correct.                                   |
| 8  | Q. | That would not include, however, the yellow        |
| 9  |    | stain that you found on that hand towel,           |
| 10 |    | correct?                                           |
| 11 | A. | Correct.                                           |
| 12 | Q. | Did you do any presumptive test on that?           |
| 13 | A. | No, Sir, I did not.                                |
| 14 | Q. | Now are you able to tell us how many hairs you     |
| 15 |    | removed from the room or are you not?              |
| 16 | A. | No, I cannot.                                      |
| 17 | Q. | How about the number of latent lifts, how many     |
| 18 |    | lifts did you find?                                |
| 19 | A. | I would just be guessing.  I would have to         |
| 20 |    | actually see the submission sheet itself           |
| 21 |    | and count them.  We don't list how many            |
| 22 |    | exactly fingerprints we lift.                      |

5570

```
 1   Q.   So if you would look, please, at State's
 2        Exhibit 279 for a second, item B-8 says
 3        one envelope containing latent lifts?
 4   A.   That is correct.
 5   Q.   What you are saying is you would actually have
 6        to count those to see how many lifts you
 7        took?
 8   A.   We might tape a surface and lift up that
 9        surface and then that piece of tape there
10        could be ten fingerprints, but we
11        consider that lift one lift.  So we would
12        actually have somebody come in and say,
13        "I count five or six on that piece of
14        tape itself."
15   Q.   You mentioned also that you were there for
16        about four, four and a half hours; is
17        that right?
18   A.   I believe that is correct.
19   Q.   And there's no time limit on how long you can
20        spend there, is there?
21   A.   No, Sir, there's not.
22   Q.   You just go there and try to get as many
```

5571

1    things as you can?

2 A. Yes, Sir.

3 Q. Are you comfortable that you pretty much

4    scoured the room for latent lifts or did

5    you just go to some significant areas?

6 A. I went to the areas that I believed would be

7    conducive for fingerprints.

8 Q. The towel that you submitted with the yellow

9    stain, did you ask specifically for any

10    test to be done on that towel?

11 A. Not specifically, no, I did not.

12 Q. You just checked the general box at the top,

13    where you can ask for different types of

14    tests, DNA?

15 A. Yes.

16 Q. And then you sort of leave it to the

17    discretion of the laboratory personnel as

18    to what they are going to test and what

19    they are not going to test?

20 A. Yes, Sir.

21    MR. JUHASZ:  That is all I have.

22 Thank you very much.

```
                                                         5572
 1                    MR. BAILEY:  No further questions.

 2                    THE COURT:  Thank you very much.

 3    Mr. Becker, since this next witness will take a

 4    considerable amount of time, you keep an eye on the

 5    clock.

 6                    DR. HUMPHREY GERMANIUK

 7    being duly sworn according to law, on his oath,

 8    testified as follows:

 9    DIRECT EXAMINATION BY MR. BECKER:

10    Q.    Would you please introduce yourself to this

11          Jury?

12    A.    My name is Humphrey Don Germaniuk, and I'm the

13          forensic pathologist for Trumbull County.

14    Q.    And can you tell us what it is you do at your

15          office here in Trumbull County?

16    A.    As the forensic pathologist, we're the

17          coroner's office in Trumbull County.  We

18          basically determine a cause of death, a

19          manner of death and we investigate the

20          circumstances surrounding any death which

21          is unusual, unexplained, of a violent

22          nature, or of anyone who is in apparent
```

5573

```
 1              good health and suddenly dies.
 2     Q.    Could you please tell this Jury, first of all,
 3              give them your -- how you became
 4              interested in the medical field and your
 5              training and education up to this point
 6              in your career?
 7     A.    My training and education and experience began
 8              nearly 30 years ago, when I was 19 years
 9              old.  I volunteered at the Manhattan
10              Medical Examiners Office in New York in
11              1973 and from 1973 to 1975, I assisted in
12              nearly a thousand autopsies.  And after
13              the time spent there, it was love at
14              first sight, because I knew exactly what
15              I wanted to do for the rest of my life.
16              I graduated from Wagner College on
17              Stanton Island in New York in 1975.  At
18              that time, I was a biology major, a
19              nursing major and chemistry minor.  From
20              there I went to the University of Turin
21              in Perugia, Italy, where I took various
22              courses in liberal arts, philosophy,
```

5574

1    architecture and literature, and I was

2    there from 1976 until 1977.  I began my

3    medical training at the University of

4    Turin in Italy in 1977 and was there

5    until 1981 when I was transferred to the

6    University of Rome, Italy.  I graduated

7    there in 1984 with an M.D. degree.  From

8    there I went to Columbus, Ohio and the

9    Ohio State University Hospitals, where I

10   began my specialty training in pathology.

11   I was there from 1984 until 1988.  After

12   that, I went to Miami, Florida in Dade

13   County where I began my sub-specialty

14   training in forensic pathology and I was

15   there from 1988 until 1989 as Assistant

16   Medical Examiner.  From there I went to

17   Syracuse, New York where I was Associate

18   Medical Examiner from 1989 until 1994.

19   From there I proceeded to Washington,

20   D.C., where from 1994, I was the Deputy

21   Chief Medical Examiner of our nation's

22   Capitol.  I held that position up until

5575

1              1996, when I became the acting Chief

2              Medical Examiner for Washington, D.C.,

3              and then in July of 1997, I was appointed

4              the Chief Medical Examiner for

5              Washington, D.C.  I was there until 1998,

6              where on January 1st of 1998, I became

7              Forensic Pathologist for the Trumbull

8              County Coroner's Office and hold that

9              position still.

10   Q.   Thank you.  Now Doctor, can you tell this Jury

11             what jurisdiction you were licensed to

12             practice medicine in?

13   A.   I am licensed to practice medicine in the

14             State of New York, the State of Ohio, and

15             the District of Columbia.

16   Q.   How long have you been licensed in the State

17             of Ohio?

18   A.   In the State of Ohio since 1987.

19   Q.   Now, Doctor, I want to ask you some questions

20             about different areas of pathology.  You

21             mentioned you were, I think you referred

22             to it as a specialty in forensic

5576

1           pathology, is that correct?

2    A.    It is a sub-specialty of pathology.

3    Q.    And can you tell this Jury, what exactly first

4           of all, pathology is?

5    A.    When you go to medical school, you will learn

6           how the body is put together.  That is

7           called anatomy.  The structure, the study

8           of normal structure, both grossly and

9           microscopically, the study of abnormal or

10          diseased structure, both grossly and

11          microscopically is called anatomic

12          pathology.  When you go to medical

13          school, they teach you how the body

14          functions.  That is called physiology.

15          The study of abnormal function is called

16          clinical pathology.  So, the two major

17          areas of pathology, anatomic pathology,

18          the study of abnormal structure and

19          clinical pathology, is the study of

20          abnormal function.

21   Q.    And Doctor, is it possible for a doctor to

22          become what we call Board certified?

5577

```
 1   A.   Yes.

 2   Q.   What does Board certified mean?

 3   A.   Basically, several agencies order or offer

 4             Board certification, some are vanity

 5             agencies.  But the Board certification

 6             that really is the one that you want or

 7             the one that is respected is what is

 8             known by the Board of Pathology, various

 9             medical sub-specialties or other

10             specialties.  Surgery, pediatrics,

11             internal medicine pathology, will have a

12             group or a commission of scholarly

13             individuals in that field.  And they

14             pretty much determine what the bare

15             minimum is for you to know before you go

16             out and practice medicine.  And

17             basically, when you apply for

18             certification by the American Board of

19             Pathology, they want to know where you

20             trained, who trained you, letters of

21             recommendation, what was your course of

22             study.  Once they review all of that,
```

5578

 1            then you are either allowed to sit for

 2            certification or you are denied.  So

 3            basically, it is a three day grueling

 4            examination which I don't want to ever

 5            take again.  Once you pass that exam, you

 6            are certified in anatomic pathology.

 7            Once you are certified in that area, then

 8            you are eligible to take the

 9            sub-specialty examination, such as

10            forensic pathology or hematology or

11            pediatric pathology.  And I chose the

12            course of study in forensic pathology,

13            where once again you have a group of

14            scholarly individuals that pretty much

15            decides this is the bare minimum you have

16            to know to go out and practice forensic

17            pathology.  Or the sub-specialty in

18            response to your question, I am certified

19            in anatomic pathology and forensic

20            pathology by the American Board of

21            Pathology, which is a regulatory agency.

22    Q.    And now, can you tell this Jury what an

5579

1              autopsy is?

2  A.    An autopsy is nothing more than a laboratory

3              test that is never conducted in a vacuum.

4              Prior to approaching the patient, you try

5              to get as much information as possible.

6              You try to go to the scene if at all

7              possible.  You try to find out what the

8              turn of events are, you try to get some

9              medical history.  You try to find out

10              what the police report says.  Once you

11              have gotten as much of that information

12              as possible, only then do you approach

13              the particular patient in question.  The

14              technical aspects of the autopsy resolve

15              around three axis.  The first axis is

16              what is known as the gross examination,

17              where the body is viewed externally and

18              internally for any signs of trauma,

19              disease process, birth defects that may

20              or may not have contributed to their

21              cause of death.

22                  The second axis of the autopsy is

5580

1            what is known as microscopy.  Fragments

2            of tissue are submitted to the

3            Laboratory, are processed and then

4            returned to us in the form of glass

5            slides that we look at, under the

6            microscope for the presence or absence of

7            disease or other factors, which might be

8            relevant to the case.

9                 The third axis is what is known as

10           toxicology, where bodily fluids and

11           sometimes bodily tissues are submitted to

12           the laboratory and analyzed for the

13           presence or absence of alcohol or drugs

14           or poisons.  Usually, when you have gone

15           through those three steps, you can,

16           within reasonable medical certainty,

17           arrive as to a cause of death, and a

18           manner of death.

19    Q.    Now, can you explain the difference to this

20           Jury, what the difference is between

21           cause of death and manner of death?

22    A.    Cause of death simply put, is but for -- but

5581

1        for this particular reason, but for that

2        particular reason, the individual would

3        still be alive.  But for the massive

4        heart attack, the person would still be

5        alive.  But for the Oxycontin overdose,

6        the person would still be alive.  But for

7        the multiple blunt traumatic injuries,

8        this person would still be alive.  A

9        cause of death simply put is but for this

10       particular reason, or that particular

11       reason, the individual would still be

12       alive.

13            A manner of death on the other hand

14       are the circumstances in which the cause

15       of death took place.  You can have the

16       same cause of death, but depending on the

17       circumstances, the manner of death might

18       vary, and there are only five manners of

19       death.  Natural, accident, homicide,

20       suicide and undetermined.  So we

21       determine a cause of death, and a manner

22       of death.

5582

1                Let's take a look at the gunshot

2             wound to the head.  A contact gunshot

3             wound to the head, we know the cause of

4             death, but depending on the

5             circumstances, that could be a homicide,

6             a suicide or an accident.  So again, we

7             determine a cause of death and a manner

8             of death.

9   Q.   Now, Doctor, I believe you briefly mentioned

10            what the role is of the Trumbull County

11            Coroner's Office.  And that role is to

12            what?

13  A.   The Trumbull County Coroner's Office gets

14            involved in any death in Trumbull County,

15            where the circumstances are uncertain,

16            where there's an index of suspicion that

17            you might be dealing with an unnatural

18            death, and any time any form of violence

19            is suggested, or thought that might have

20            occurred to the individual's death and

21            any death where an individual in

22            apparently good health, with no medical

5583

1          history, suddenly and unexpectedly dies.

2          We're called as referees of death.  We go

3          in there, we examine the scene, we

4          perform the post-mortem examination.  We

5          have no interest in the case one way or

6          the other, and we make our determination.

7          We make our diagnosis regarding cause of

8          death and manner of death.

9     Q.   Now, Doctor, I know in your career you have

10         made and been involved in a number of

11         autopsies.  Can you approximate for this

12         Jury the number of all the autopsies you

13         have personally performed?

14    A.   Yes.  Right now, it's a little over 4,000

15         medical, legal post mortem examinations

16         or autopsies that I have done.

17    Q.   And Doctor, you have previously testified as

18         an expert witness in other jurisdictions,

19         is that correct?

20    A.   Yes.

21    Q.   In the State of Ohio?

22    A.   Yes.

5584

1   Q.   Can you basically give us a run down off the

2        top of your head the jurisdictions you

3        have been qualified?

4   A.   The jurisdictions that I have been qualified

5        as an expert witness are Florida, New

6        York State, Virginia, Maryland, and the

7        District of Columbia as well as the State

8        of Ohio.

9   Q.   Now, can you please tell this Jury and explain

10       to this Jury -- I want to direct your

11       attention to approximately -- well, not

12       sure what time you arrived, but December

13       12, 2001.  Did you happen to go to a

14       location here in Trumbull County, Ohio,

15       in reference to your duties and your

16       employment with Trumbull County Coroner's

17       Office?

18  A.   May I refer to my notes?

19  Q.   Yes.  I believe you are referring to --

20  A.   I am referring to our case file which is case

21       number 01200.  In answer to your

22       question, after midnight somewhere around

5585

1          between 12:15 and 12:30 a.m., on the 12th

2          of December, 2001, I received a call from

3          our investigator about an apparent

4          suicide at 254 Fonderlac Street in

5          Howland.

6    Q.    Now, Doctor, when you first arrived at the

7          scene, can you tell this Jury, not only

8          in this case but what is the first thing

9          that you will do when you get to the

10         scene and examine the body?

11   A.    Well, the first thing you want to do is try to

12         get as much information as possible.  You

13         try to talk to the EMS people that were

14         there, you try to talk to the responding

15         officers and try to get some background

16         to see what we have got and so when I

17         talked with the patrolman and

18         investigators that were there, I said

19         what have we got and basically, they told

20         me that according to police, the

21         individual's wife returned home shortly

22         before midnight, and that she was

5586

1        somewhat startled because when she pushed

2        the garage door opener, instead of the

3        garage door opening, the garage door

4        closed, and the light went on.  Again,

5        according to the investigators, she

6        pulled into the garage and found her

7        husband unresponsive in the kitchen.

8        There's a little island that connects the

9        kitchen with the garage door and she

10       found him unresponsive, that there was

11       some blood and that she subsequently

12       called 911.

13   Q.  And Doctor, after you gathered the preliminary

14       information from the people that are

15       there at the scene, what is the next

16       thing you did?

17   A.  Well, the next thing we do or did is

18       essentially, without touching anything,

19       you try to document and photograph as

20       much as you possibly can.  And so, after

21       photographically documenting, I also drew

22       up a little scene sketch, and you begin

5587

1    the examination of the body.  And we

2    began to examine the body, the body was

3    not in rigor mortis, the body was still

4    somewhat warm to the touch, which tells

5    me he hasn't been dead for that long.  In

6    addition, you also want to take a look at

7    the nature of the injuries, because most

8    of the time law enforcement will ask you,

9    "What are we looking for?  Is it a knife?

10   Is it a gun?  Is it a baseball bat?"  And

11   so again, we examined the body and we

12   determined that there were multiple

13   gunshot wounds.  We also photographed the

14   scene and again in the hallway, there's

15   one step that leads into the garage.

16   There was a revolver, a silver colored

17   revolver there.  We examined that, and

18   none of the cartridges had any firing pin

19   impressions.  None of the projectiles

20   were discharged, so apparently it did not

21   appear that this firearm was fired.  And

22   based on the preliminary examination of

5588

1           the body, we came up with a speculative

2           cause of death which was multiple gunshot

3           wounds and a speculative manner of death,

4           which was homicide.

5    Q.   And that was while you were at the scene?

6    A.   Yes.

7    Q.   Now, did you do anything else at the scene?

8    A.   Basically, when we began to examine the body

9           after it was photographed, once everyone

10          got their photographs, we rolled the body

11          over, and in between his skin and black

12          T-shirt there was a projectile that was

13          in that area, so I removed that

14          projectile, photographed it, and turned

15          it over to law enforcement at the scene.

16          And essentially that was about it.

17   Q.   Now, Doctor, later on, I believe on December

18          12th, the body was removed, and it was

19          examined by yourself at the Trumbull

20          County, Trumbull Memorial Hospital at the

21          morgue there, is that correct?

22   A.   Right.   That is where we do our post-mortem

1           examinations at Trumbull Memorial.

2    Q.    Can you tell this Jury, first of all, what a

3           post-mortem examination is?

4    A.    Well, like I said earlier, an autopsy is

5           nothing more than a laboratory test that

6           is never conducted in a vacuum.  You

7           would remove the clothing and try to

8           determine what is important for

9           evidentiary purposes, what is not.  You

10          remove the jewelry, you would go through

11          some of the personal effects and sort of

12          make a decision what law enforcement

13          might need to test further, or what might

14          not be important.  And then what you

15          begin to do, again there are basically

16          five steps that you follow in the

17          post-mortem examination.

18               The first step is the external

19          examination.  What does this person look

20          like without any evidence of medical

21          therapy, without any evidence of injury?

22          What are the scars, what are the tattoos,

5590

1        how tall, how heavy are they?

2           The second part of the post-mortem

3        examination is what is known as evidence

4        of medical therapy.  Where you

5        specifically hone in on what medical

6        procedures have been done.  Did he have

7        an IV line, are there electrocardiogram

8        pads on the chest?  Was the patient

9        undergoing surgery?

10           The third part is what is known as

11        the evidence of injury.  Where you

12        specifically concentrate on what injuries

13        this individual received.

14           The fourth part is what is known as

15        the internal examination, where you

16        examine all of the organs internally; and

17        fifth part is what is known as the

18        autopsy findings where in a word, or a

19        sentence, or a phrase, your major

20        findings are listed almost like the

21        contents of a book, like chapters.

22  Q.   Can you please tell this Jury, the results of

5591

1    not only your findings, but the

2    examination including the external, the

3    evidence of medical therapy and all of

4    those things you just talked about, with

5    reference to this particular individual

6    that you examined?

7  A.    When I completed the examination, there were

8        nine major autopsy findings; number one

9        was multiple gunshot wounds.  Number two

10       was multiple lacerations or tears.

11       Number three was multiple abrasions, or

12       scrapes.  Number four was multiple

13       contusions or bruises.  Number five was

14       cardiomegaly, which simply means he had

15       an enlarged heart.  Number six was

16       arteriosclerosis, coronary artery

17       disease.  The seventh major finding was

18       he had a light yellow brown and soft

19       liver.  Final number eight was

20       nephrolithiasis, which means he had a

21       kidney stone.  And the ninth major

22       finding was diverticular disease in his

5592

1          large intestine.  And those were the

2          major findings at the autopsy.

3    Q.    I am going to hand you some photographs that

4          have been marked for purposes of

5          identification as State's Exhibits 4

6          through 21, 24, 25, 26, 27, 28, 31, 37,

7          38, 39, 40, 43, 44, 47, 48, 49, and 51

8          through 60 and ask if you recognize these

9          particular photographs.  Doctor, if you

10         would, I just ask that you simply not

11         publish those to the Jury at this time.

12   A.    The packets of photographs handed to me by the

13         Prosecution, I'm not going to go through

14         the numbers, basically are true and

15         accurate copies of the original

16         photographs that are in the case file.

17   Q.    And do those photographs fairly and accurately

18         represent the scenes of December 12th,

19         both at the house at 254 Fonderlac as

20         well as the autopsy that was conducted by

21         yourself also on December 12?

22   A.    Yes, they do.

5593

1    Q.    Now, Doctor, can you describe for us, first of
2          all, with a reasonable degree of medical
3          certainty, were there any non-lethal
4          injuries on this individual -- could you
5          describe those?
6    A.    Yes.  Basically, the non-lethal injuries
7          consisted of lacerations or tears,
8          abrasions or scrapes, and contusions or
9          bruises.
10   Q.    And where were those injuries located at on
11         the body?
12   A.    The laceration or tear was in the webbing in
13         between the left thumb and the left index
14         finger.  The upper outer right forehead
15         had two lacerations, one was linear and
16         that measured three-quarters of an inch
17         by less than one-sixteenth of an inch.
18         And the third laceration was on the lower
19         part of the right forehead, and there was
20         a laceration or tear, which measured one
21         quarter of an inch by less than
22         one-sixteenth of an inch.  The areas of

5594

1          scrapes involved the outside bridge, the

2          left part of the nose, where there was an

3          upside down V-shape scrape or abrasion.

4          And the back part of the right hand, also

5          had just below the index finger, a

6          three-eighths of an inch by one eighth of

7          an inch abrasion.  Areas of contusion or

8          bruising on his left forehead, there was

9          an one and one-half inch by

10          three-quarters of an inch faint purple

11          contusion or bruise.

12  Q.   Now, Doctor, were there -- were you able to

13          determine within a reasonable degree of

14          medical certainty, as to the cause and

15          manner of death of this individual based

16          upon your examination both at the scene

17          and your conducting of the autopsy?

18  A.   Yes.

19  Q.   And can you please tell this Jury based upon a

20          reasonable degree of medical certainty,

21          what your opinion is regarding the cause

22          and manner of death of this individual?

5595

1   A.   My opinion regarding the cause of death of

2        this individual is multiple gunshot

3        wounds.  And my opinion regarding the

4        manner of death of this individual is

5        homicide.

6   Q.   And Doctor, did you place your report -- or

7        I'm sorry, did you place your findings in

8        a report entitled the autopsy report?

9   A.   Yes.

10  Q.   Doctor, I'm going to hand to you State's

11       Exhibits 262, which is an 11 page

12       document, and ask if you recognize what

13       that 11 page document is?

14  A.   Exhibit No. 262 consists of an 11 page

15       document which is a true and accurate

16       copy of the autopsy report, the original

17       of which is in the case file.

18  Q.   And that contains your signature on that

19       document?

20  A.   Yes.

21  Q.   Those would be your findings then, correct?

22  A.   Yes.

5596

1    Q.    Now, after an autopsy is conducted, a death

2          certificate is issued and coroner's

3          verdict, is that correct?

4    A.    Yes.

5    Q.    Those are generally signed by whom?

6    A.    Those are signed by Dr. Soboslay, who is the

7          Trumbull County Coroner.

8    Q.    And it is my understanding, just for the

9          record, that Dr. Soboslay has been in

10         some ill health here recently, is that

11         correct?

12   A.    Yes.

13   Q.    I'm going to hand you what has been marked for

14         purposes of identification as State's

15         Exhibits 260 and 261.  I'm going to ask

16         if you recognize what State's Exhibits

17         260 and 261 are.

18   A.    State's Exhibit 260 is a true and accurate

19         copy of the death certificate which is in

20         the original case file.  State's Exhibit

21         261 is a true and accurate copy of the

22         coroner's verdict, which is again a copy

5597

1          of the original.  I'm sorry, a copy of

2          the copy in the case file.

3     Q.   And those have both been signed by

4          Dr. Soboslay?

5     A.   Yes.

6     Q.   Now, Doctor, I am also going to hand you three

7          one page Exhibits, numbers 263, 264 and

8          264-A and ask if you recognize what those

9          documents are?

10    A.   State's Exhibit 263 is a copy of the original

11         microscopic examination which is in the

12         case file.  State's Exhibit 264 is a copy

13         of the toxicology report, a true and

14         accurate copy of the original which is in

15         the case file.  State's Exhibit 264-A is

16         a true and accurate copy of the original

17         X-ray report that is in the case file.

18    Q.   Doctor, I'm going to also show you now State's

19         Exhibits 61, 62, 63, 64, 65, '66, 67 and

20         68 and ask if you recognize what those

21         photographs are?  Again I would ask that

22         you not publish those for the Jury.

5598

| | | |
|---|---|---|
| 1 | A. | The Exhibits handed to me are copies of some |
| 2 | | of the photographs in my original case |
| 3 | | file and some that are not in the |
| 4 | | original case file. |
| 5 | Q. | And do those fairly and accurately depict the |
| 6 | | scene and the autopsy and the clothing |
| 7 | | removed from the victim that night? |
| 8 | A. | Well, like I said, some of these photographs I |
| 9 | | did not take, and so therefore, I cannot |
| 10 | | vouch for some of these.  Again, when we |
| 11 | | performed a post-mortem examination, I |
| 12 | | take photographs, local law enforcement |
| 13 | | also takes photographs, but there are at |
| 14 | | least -- |
| 15 | Q. | Which ones are you not familiar with or did |
| 16 | | you not take? |
| 17 | A. | State's Exhibit 66.  Probably State's Exhibit |
| 18 | | 63.  State's Exhibit 64, State's Exhibit |
| 19 | | 65, State's Exhibit 67, and that would be |
| 20 | | the extent of it.  The others are |
| 21 | | photographs that are in the original case |
| 22 | | file. |

5599

1   Q.   And those three that -- State's Exhibits 62,

2        61 and 68, they have the Trumbull County

3        Coroner's placard with the case number?

4   A.   Our identification number.  Every case gets a

5        number to identify it.

6   Q.   Now was in fact an X-ray taken of this suspect

7        that evening or that day on the 12th?

8   A.   Suspect --

9   Q.   Not the suspect -- the deceased?

10  A.   An X-ray was taken of the individual, in fact,

11       four X-rays were taken.

12  Q.   And the photograph that is depicted in State's

13       Exhibit 67, does that look similar to the

14       Exhibit or the X-ray that was taken of

15       the deceased?

16  A.   It has an identifier in it that says Robert

17       Fingerhut, and again I would assume that

18       this would be a police photograph of the

19       X-ray that was taken.

20  Q.   And where in fact did you remove a projectile

21       from Mr. Fingerhut?

22  A.   From his brain, inside of his head.

5600

1    Q.    Now, I'm going to hand you -- well, let me ask

2          you this.  The projectile that you

3          removed from Mr. Fingerhut, did you turn

4          that over to anyone?

5    A.    Yes.

6    Q.    Who did you turn that over to?

7    A.    I believe that was Patrolman Campbell.

8                MR. INGRAM:  Stipulate it was

9    Patrolman Campbell.

10               THE COURT:  So stipulated.

11               MR. BECKER:  Is there a stipulation

12   also that you turned over blood?

13               MR. INGRAM:  So stipulated.

14               MR. BECKER:  It is my understanding

15   that Defense counsel will stipulate to the

16   photographs, but may have other matters to address

17   with the Court at a later time.

18   Q.    Doctor, based on your autopsy of December 12,

19         2001 and within the bounds of reasonable

20         medical certainty, do you have an opinion

21         regarding the approximate time of death

22         of Mr. Robert Fingerhut?

5601

1   A.   Well, the approximate time of death is just

2        that, an approximation, unless it is a

3        witnessed event, there's a whole number

4        of variables.  You can't look at a watch.

5             MR. INGRAM:  His answer is nowhere

6   responsive to the question.  The question is does

7   he have an opinion or not.

8             THE COURT:  The answer would be yes

9   or no.  You are trying to explain your answer and

10  that is the next question.

11  Q.   The next question is going to be, can you

12       explain --

13            THE COURT:  Do you have an opinion?

14  A.   Yes.

15  Q.   Can you tell this Jury what that opinion is

16       and why that is your opinion?

17  A.   Probably under six hours, and the reason for

18       that is as I said before, there was a

19       wide number of variables when someone

20       dies, and so the time of death becomes a

21       range, from when the person was last seen

22       alive, until they were found.  So

5602

1          examining the body, the body was still

2          warm to the touch.  He was going into

3          rigor mortis.  He wasn't in full rigor

4          mortis.  And so, based on those two

5          findings, I would probably put his death

6          as under six hours from when I examined

7          him, probably somewhere in the range of

8          four hours, plus or minus an hour or two.

9          MR. BECKER:  I have no further

10   questions for Dr. Germaniuk.  I do see it is around

11   the lunch hour.  I do believe that Defense counsel

12   would need some time to review some items before we

13   return, so should we return at 1:30?

14          MR. INGRAM:  I have to say we're

15   probably going to have very few questions, but

16   before we make that determination, we must review

17   the good Doctor's case file.  So 1:30 would sound

18   like a good time.

19          THE COURT:  Very good.  If you folks

20   would be kind enough to be back here by 1:30.  I

21   would again remind you of the Court's admonition

22   not to discuss anything about the case in the

5603

1    meantime.  Thank you.

2    (Court in recess at 12:10 p.m.)

3    (Resumed in Open Court at 1:30 p.m.)

4    CROSS EXAMINATION BY MR. JUHASZ:

5    Q.    Doctor, I want to thank you for taking the

6          time to meet with Mr. Ingram and I over

7          the lunch hour.  There's only one thing I

8          want to ask you.  You mentioned to

9          Mr. Becker just before the lunch break,

10         that you set the cause of death at four

11         hours, plus or minus one to two hours

12         from when you first examined the body.

13   A.    It is an approximation.  It can go out as far

14         as six, somewhere in the range of four,

15         plus or minus a few hours.

16   Q.    Would you be kind enough to tell the Jury what

17         time you began to examine the body?

18   A.    I began to examine the body about 1:00 in the

19         morning.

20              MR. JUHASZ:  That is all I have.

21   Thank you.

22   REDIRECT EXAMINATION BY MR. BECKER:

5604

1   Q.   That time is an approximation?

2   A.   Yes.

3   Q.   Could it have been outside of six, four to six

4         hours?

5   A.   Yes.

6   Q.   Could it be two to four hours?

7   A.   Yes.

8   Q.   Could it have been six to eight hours?

9   A.   Less likely eight, bringing it closer into the

10        six hour range.

11  Q.   And the difficulty again in determining the

12        exact cause of death is based upon many,

13        many variables?

14  A.   Yes.

15  Q.   And your function is not really necessarily to

16        determine the time of death, but the

17        cause and manner, correct?

18  A.   Yes.

19           MR. BECKER:  Nothing further.

20  RECROSS EXAMINATION BY MR. JUHASZ:

21  Q.   I meant to say time of death and I would think

22        I said cause of death.  You understand

5605

1          what we're talking about is the time of

2          death?

3   A.    Right.

4              MR. JUHASZ:  Thank you.

5              MR. BECKER:  Nothing further.

6              THE COURT:  You are excused.  Thank

7   you very much.

8              MR. BECKER:  The State would call

9   Frank Dillon.

10              <u>SGT. FRANK DILLON</u>

11   being duly sworn according to law, on his oath,

12   testified as follows:

13   <u>DIRECT EXAMINATION BY MR. BECKER:</u>

14   Q.    Good afternoon.  Would you introduce yourself

15          to this Jury, please?

16   A.    Sergeant Frank Dillon.

17   Q.    And Sergeant, where are you employed at?

18   A.    Howland Township Police Department.

19   Q.    And how long have you been employed there?

20   A.    Sixteen years.

21   Q.    Can you briefly tell this Jury the training

22          and background that you have had that has

5606

1              prepared you for that position?

2    A.    I went to the basic State of Ohio police

3           academy and have had extensive training

4           beyond that involving all elements of

5           police work in general.

6    Q.    And can you please tell this Jury how long you

7           have been employed with the Howland

8           Township Police Department?

9    A.    Sixteen years.

10   Q.    Now, what are your current duties with the

11          Howland Township Police Department?

12   A.    Currently a Detective Sergeant in the

13          investigations division.

14   Q.    And how long have you been in that division?

15   A.    Since August of 2001.

16   Q.    Now I want to direct your attention

17          specifically to the early morning hours

18          of December 12, 2001, probably just after

19          midnight.  Were you called out or were

20          you on duty at that time?

21   A.    I was called out.

22   Q.    And do you recall what you were called out in

5607

1          reference to?

2    A.   In reference to a body at a crime scene.

3    Q.   And do you recall the address of that crime

4          scene?

5    A.   254 Fonderlac Drive, Southeast.

6    Q.   And is that located in Trumbull County?

7    A.   Yes, Sir.

8    Q.   Now, when you got to the scene, would you

9          please tell this Jury what other officers

10         were present when you got to the scene?

11   A.   Patrolman Ray and Patrolman Pollcino.

12   Q.   Were there any EMS people there?

13   A.   I believe so.  I believe two were outside and

14         one was still near the door, the entrance

15         to the house.

16   Q.   And was there anyone else there in the

17         residence?

18   A.   A female.

19   Q.   Do you know who that was?

20   A.   She was later introduced to me as Donna

21         Roberts, the victim's wife.

22   Q.   And she's the same wife, Donna Roberts, in

```
                                                        5608
 1              this case?

 2    A.   Yes, Sir.

 3    Q.   Now, when you got to the scene, what is the

 4              first thing that you did when you

 5              arrived?

 6    A.   Spoke with the officers that called me there

 7              to ascertain what information they got,

 8              what they had done so far.

 9    Q.   And what did you find out they had done?

10    A.   I found out that they checked the house for

11              signs of forced entry, and they checked

12              the inside to make sure no one else was

13              in the residence.

14    Q.   And was there anyone else in the residence?

15    A.   No, Sir.

16    Q.   Now, initially, when you arrived did you come

17              in the front door or the side door or

18              where did you come in at?

19    A.   The front door.

20    Q.   Which would have not been through the garage?

21    A.   Yes, Sir, the garage was closed.

22    Q.   The garage door was down?
```

5609

1   A.   Yes.

2   Q.   Now, when you got to the residence, can you

3        please describe for this Jury where the

4        victim was and how he was positioned?

5   A.   The victim was on the floor in the kitchen

6        near the man door, at least from the

7        garage into the kitchen.  He was, if you

8        are looking from the living room or the

9        dining room area into the kitchen area,

10       he was on the left side, which would have

11       been the east side of the man door on the

12       floor in the corner by an island that was

13       part of the counter top of the residence.

14  Q.   I'm going to show you what has been marked for

15       identification purposes as State's

16       Exhibit 126.  I'm going to show you what

17       has been marked for purposes of

18       identification as State's Exhibit 126.  I

19       want you to take a look at this and I

20       believe you still have the laser pointer

21       there.  Please indicate to us what we're

22       going to see here, and then I want you to

5610

1          note in that photograph anything unusual

2          that may be in that photograph.  You see

3          that photograph?

4  A.   Yes, Sir.

5  Q.   And what is State's Exhibit 126?

6  A.   That is 254 Fonderlac Drive, Southeast.

7  Q.   And that vehicle that is parked, do you know

8          whose vehicle that is?

9  A.   At the time, Detective Sergeant Monroe's

10         vehicle.

11 Q.   And the garage door was closed on the left, as

12         you indicated?

13 A.   Yes, Sir.

14 Q.   And we can't see it on the screen, but I'm

15         going to hand you this Exhibit and I want

16         you to take a look at it and in the lower

17         left hand corner, was there something

18         that was later observed in that

19         photograph?

20 A.   Yes, Sir.

21 Q.   What is in the lower left hand corner of that

22         photograph?

5611

1   A.   There were marks in the grass where it

2           appeared a vehicle had driven across the

3           lawn.

4   Q.   Now, I am also going to show you a photograph

5           that has previously been marked as

6           State's Exhibit 69.  I'm going to ask you

7           if you recognize State's Exhibit 69?

8   A.   Yes, Sir.

9   Q.   And what is State's Exhibit 69?

10   A.   It is a photo of those marks from the driveway

11          onto the lawn, the corner of the lawn

12          adjacent to the driveway.

13   Q.   Were you able to -- State's Exhibit 69 was

14          taken in the daylight, is that correct?

15   A.   Yes, Sir.

16   Q.   Now, I also want you to look, and without

17          showing the Jury, I would like you to

18          take a look at these photographs that are

19          up here, these larger photographs, and

20          just walk us through each photograph,

21          describing the number on them and what

22          each photographing depicts.

5612

1   A.   Exhibit No. 4 is a tin serving tray that was

2            on the dining room table that contained

3            marijuana and drug paraphernalia.

4   Q.   Was that marijuana tested or is that based on

5            some knowledge that you had?

6                MR. INGRAM:   Stipulated it was

7   marijuana.

8   Q.   Is that all that is depicted in State's

9            Exhibit 4?

10  A.   Yes, Sir.  The same with State's Exhibit 5.

11  Q.   State's Exhibit 6?

12  A.   What is depicted in State's Exhibit 6?

13           Partial photograph of Mr. Fingerhut and

14           where he was laying on the floor in the

15           residence.

16  Q.   Just continue on those photographs, just

17           detailing each one and telling us what

18           the Exhibit numbers are.

19  A.   Exhibit No. 7 shows roughly the same

20           photograph, but from, as viewed from the

21           garage as you enter the house.  State's

22           Exhibit 8 is a photo from the kitchen

5613

1           area partially showing Mr. Fingerhut's

2           body and blood that is on the floor

3           around his body including what I believe

4           the photo was trying to depict was a

5           partial footprint.

6    Q.   Let me ask you about that footprint.  Was that

7           footprint there upon your arrival, that

8           blood footprint?

9    A.   Yes.

10   Q.   And were any of the other officers believed to

11          have left that impression?

12   A.   We checked everyone's shoes just to make sure.

13   Q.   And that would include the EMS personnel?

14   A.   Yes, Sir.

15   Q.   And Miss Roberts?

16   A.   Yes.

17   Q.   And were any of them found to have blood on

18          their shoes?

19   A.   No, Sir.

20   Q.   Continue.

21   A.   Exhibit No. 9 is a photo from the garage area

22          on the step, a picture of the step as you

5614

```
 1              walk up from the garage floor.  There's
 2              one step before you enter the house that
 3              shows that step; again another, what
 4              appears to be a partial footprint in the
 5              blood and a weapon that is laying on the
 6              step, the handgun.
 7     Q.   I want to ask you about that weapon.  Did you
 8              happen to speak to Miss Roberts that
 9              night about that weapon?
10     A.   I believe myself or Sergeant Monroe did.
11     Q.   That weapon initially when the officers
12              responded there, was there some concern
13              about maybe that weapon being used?
14     A.   Possibly, yes.
15     Q.   Was it handled in an appropriate manner?
16     A.   Yes, Sir, it was.
17     Q.   Initially, it was picked up, I believe by
18              Dr. Germaniuk?
19     A.   Initially, I believe by Detective Leshnack.
20     Q.   And would he have been wearing any protective
21              clothing when he picked that up?
22     A.   He had latex gloves on his hands at the time.
```

5615

1    Q.   What is the purpose of that?

2    A.   To prevent any contamination of the weapon as

3         far as fingerprints are concerned.

4    Q.   Upon Officer Leshnack opening that weapon,

5         what was discovered inside of the weapon?

6    A.   Five unfired rounds, which is a full chamber

7         for that particular weapon.

8    Q.   That weapon is what type, semi-automatic?

9    A.   It is a revolver.

10   Q.   It has five chambers?

11   A.   Yes, Sir.

12   Q.   And all five were full?

13   A.   Yes, Sir.

14   Q.   And I believe you have a photograph depicting

15        that?

16   A.   Yes, Sir.

17   Q.   What Exhibit is that?

18   A.   Exhibit No. 10 shows the open cylinder of the

19        handgun and the unfired rounds.

20   Q.   Now, that weapon was then retrieved and kept

21        as evidence?

22   A.   Yes, Sir, it was.

5616

| | | |
|---|---|---|
| 1 | Q. | I'm going to hand you what has been marked for |
| 2 | | purposes of identification as State's |
| 3 | | Exhibit 251 and ask if you recognize what |
| 4 | | State's Exhibit 251 is? |
| 5 | A. | It is the weapon in the photograph. |
| 6 | Q. | Let's do this. We are going to show you -- |
| 7 | | I'm just going to briefly go back and |
| 8 | | show you these photographs. This is |
| 9 | | State's Exhibit 4, is that correct? |
| 10 | A. | Yes, Sir. |
| 11 | Q. | What is State's Exhibit 4 again? |
| 12 | A. | The metal tray containing what appears to be |
| 13 | | marijuana and drug paraphernalia. |
| 14 | Q. | And now I'm going to go through these rather |
| 15 | | quickly here. This is State's Exhibit 5, |
| 16 | | it is just another view of the marijuana? |
| 17 | A. | Yes, Sir. |
| 18 | Q. | And this was in the dining room? |
| 19 | A. | Yes, Sir, on the table, glass top table. |
| 20 | Q. | The other day we had Tony Leshnack come in |
| 21 | | here and he displayed a diagram. |
| 22 | A. | Yes, Sir. |

5617

1  Q.  The dining room is where in relation to where

2      Mr. Fingerhut was found?

3  A.  The dining room is adjacent to the kitchen.

4      Mr. Fingerhut was found in the kitchen at

5      the other end, opposite the dining room.

6  Q.  I'll show you what has been marked as State's

7      Exhibit 6 and ask if you recognize what

8      State's Exhibit 6 is?

9  A.  Again that is a photograph of Mr. Fingerhut as

10     he was seen when we arrived.

11 Q.  Did you note any injuries to him other than

12     his head?

13 A.  The webbing of his left hand.

14 Q.  Could you use the laser pointer?

15 A.  Right there.  (Indicating)

16 Q.  That was visible to you?

17 A.  Yes, Sir.

18 Q.  I'll show you what has been marked for

19     purposes of identification as Exhibit No.

20     7 and ask if you recognize what State's

21     Exhibit 7 is?

22 A.  Again that is a photo taken from the garage

5618

1          into the kitchen and in the same position

2          as you saw in the previous photograph.

3    Q.    The jacket that he was wearing -- well, I'll

4          get to that.  Strike that.  Exhibit No.

5          8.  Do you recognize that?

6    A.    Yes, that is the photograph partially of Mr.

7          Fingerhut's body and the blood stains on

8          the floor, blood on the floor and to the

9          top right of the photo which is kind of

10         not in the picture at this time is

11         where -- when appeared, what we believed

12         at the time may have been a partial

13         footprint in the blood.

14   Q.    Again you checked all of the people who were

15         in the house for any blood on their

16         shoes?

17   A.    The officers for sure.  Sergeant Monroe also

18         participated in that, so we weren't

19         together the whole time, but yes,

20         everyone.

21   Q.    I'll show you Exhibit No. 9.  Do you recognize

22         State's Exhibit 9?

5619

| | | |
|---|---|---|
| 1 | A. | That is again the picture from inside the |
| 2 | | garage showing the weapon that was lying |
| 3 | | on the step, another partial footprint |
| 4 | | there. |
| 5 | Q. | Could you show us the other partial footprint? |
| 6 | A. | Right there.  (Indicating) |
| 7 | Q. | I'm going to show you State's Exhibit 10, do |
| 8 | | you recognize State's Exhibit 10? |
| 9 | A. | That is the weapon that was laying on the step |
| 10 | | in the previous photo with the cylinder |
| 11 | | open. |
| 12 | Q. | Exhibit No. 11. |
| 13 | A. | Another shot similar to the first one showing |
| 14 | | Mr. Fingerhut. |
| 15 | Q. | I'll show you State's Exhibit 12.  Do you |
| 16 | | recognize what State's Exhibit 12 is? |
| 17 | A. | That is a picture of the door that is standing |
| 18 | | open, but the door from the garage into |
| 19 | | the house, into the kitchen. |
| 20 | Q. | Exhibit No. 13. |
| 21 | A. | A cup that was on the floor between Mr. |
| 22 | | Fingerhut's body and the counter top. |

5620

| | | |
|---|---|---|
| 1 | Q. | I think there were some diagrams mentioned by |
| 2 | | Detective Leshnack of this Pepsi |
| 3 | | container? |
| 4 | A. | That is correct. |
| 5 | Q. | That is in his diagram? |
| 6 | A. | Yes, Sir. |
| 7 | Q. | State's Exhibit 14. |
| 8 | A. | That is a photo of the same area where Mr. |
| 9 | | Fingerhut had been lying, only farther |
| 10 | | back in the kitchen taken from a farther |
| 11 | | back view. |
| 12 | Q. | Exhibit No. 15. |
| 13 | A. | A photo of what was lying at Mr. Fingerhut's |
| 14 | | feet on the floor. |
| 15 | Q. | Now you were present when Dr. Germaniuk |
| 16 | | arrived? |
| 17 | A. | Yes, Sir. |
| 18 | Q. | And can you tell this Jury just very briefly |
| 19 | | what you observed Dr. Germaniuk do when |
| 20 | | he arrived at the scene? |
| 21 | A. | Dr. Germaniuk talked with the officers at the |
| 22 | | scene to find out what information we |

5621

1                        gathered so far, what the circumstances

2                        were surrounding the incident that we

3                        knew to that point.  Then he began his

4                        investigation.

5    Q.    And what did he do with the body of Mr.

6                        Fingerhut?

7    A.    Initially, he took photographs of the crime

8                        scene and all of the areas around the

9                        body and the body itself and then he

10                       began to examine the body.

11   Q.    And did he do anything with the clothing of

12                       Mr. Fingerhut?

13   A.    He went through it to look for evidence that

14                       was still on the body.

15   Q.    Can you tell this Jury how Mr. Fingerhut was

16                       dressed?

17   A.    He had blue jeans on, white tennis shoes, high

18                       top tennis shoes, white socks.  He had on

19                       a black long sleeve T-shirt undershirt

20                       and over that, he had I believe a white,

21                       with red stripes, Cincinnati Reds

22                       baseball jersey, and over that, his

5622

1      Cincinnati Reds coat.

2   Q.   Now, you were present when Dr. Germaniuk

3        undressed him?

4   A.   Yes.

5   Q.   Did anything -- was anything found when

6        Dr. Germaniuk undressed him?

7   A.   He found a bullet between the layers of the

8        clothing.

9   Q.   I'm going to put up Exhibit No. 16.  Do you

10       recognize what State's Exhibit 16 is?

11  A.   It's a bullet.

12  Q.   Is that the bullet that was recovered from his

13       clothing?

14  A.   I can't say exactly yes.

15  Q.   If I hand you the full picture, it is hard to

16       get on the screen.

17  A.   Yes, Sir, it is.

18  Q.   That is the bullet that was recovered from his

19       clothing?

20  A.   Yes, Sir.

21  Q.   I'm going to show you State's Exhibit 17.  If

22       you could tell us what State's Exhibit 17

5623

1   is?

2   A.   It is a close-up of the injury to the webbing

3        of Mr. Fingerhut's left hand.

4   Q.   I'm going to show you Exhibit No. 19.

5   A.   That is the stair well that leads into the

6        basement which is basically directly, if

7        you stand in the garage and look through

8        the door and look straight, that is what

9        you see ahead of you on the opposite side

10       of the kitchen.

11  Q.   What is the significance of that photograph,

12       State's Exhibit 19?

13  A.   We located a bullet hole in the wall.

14  Q.   Can you please direct the Jury where that

15       bullet hole is?

16  A.   I'm going to say it is right there.

17       (Indicating)

18  Q.   Now, I'm going to show you State's Exhibit 18

19       and see if you recognize what this view

20       is?

21  A.   I believe it is a photograph taken from

22       standing on the steps, leading to the

5624

1          basement looking back towards Mr.

2          Fingerhut's body and the doorway from the

3          garage into the kitchen.

4   Q.   And way in the back, we see some red directly

5          in the background?

6   A.   I believe that is Mr. Fingerhut's body.

7   Q.   I am talking about beyond that, higher above

8          that.

9   A.   That would be the car parked in the garage.

10  Q.   I'm going to show you State's Exhibit 20 now.

11         Do you recognize what State's Exhibit 20

12         is?

13  A.   That is the hole in the wall we located in the

14         stair well.

15  Q.   Now eventually that was something -- was

16         something done to that wall?

17  A.   Yes, we cut a hole in the wall, in the dry

18         wall to see what was behind it.

19  Q.   I'm going to show you Exhibit No. 97 and 141.

20         This is State's Exhibit 97.  Do you

21         recognize what that is?

22  A.   Yes, that is a close-up photo of the hole in

5625

1           the wall.

2    Q.    And I'm going to show you State's Exhibit 141.

3           Do you recognize what that is?

4    A.    That is a distant photo, right there would be

5           where the hole was found.  I believe they

6           taped a ruler underneath it for that

7           photo.

8    Q.    Was a projectile ever recovered from that

9           wall?

10   A.    Yes, Sir, it was.

11   Q.    I'm going to hand you what has been marked for

12          purposes -- strike that.  When you got to

13          the scene, you also determined some other

14          things such as medications that may be in

15          the residence?

16   A.    Yes, Sir.  Usually Dr. Germaniuk likes to know

17          what medications may be at the residence

18          so that when he does his toxicology

19          reports for his investigation, he can

20          compare those to what is in the

21          residence.

22   Q.    And if I can have you speak a little bit

5626

```
 1              closer to the microphone.  Now, when you
 2              got to the residence, were there any
 3              animals in the house?
 4    A.   Yes, two dogs.
 5    Q.   Where were those two dogs at when you arrived?
 6    A.   When I arrived, they were in the bedroom.
 7    Q.   What were they doing in the bedroom?
 8    A.   Laying underneath the bed, near the edge where
 9              you could see them.
10    Q.   Now eventually Dr. Germaniuk moved this body,
11              is that correct?
12    A.   Yes, Sir.
13    Q.   And was there anything discovered in addition
14              to the projectile after he moved the
15              body, underneath the victim?
16    A.   Not that I can recall.
17    Q.   Before he undressed him and he rolled him
18              over, was anything discovered on the
19              floor beneath him?
20    A.   I believe there might have been some keys.
21    Q.   If I show a photograph, would that maybe
22              refresh your memory?
```

5627

1          MR. INGRAM:  You can lead him, go

2     ahead.

3     Q.   I'm going to show you a photograph and we'll

4          mark this --

5          MR. INGRAM:  Why don't you mark this

6     as a Joint Exhibit?

7          MR. BECKER:  We'll mark this as

8     Joint Exhibit 404.  I'm sorry, mark it as Joint

9     Exhibit 1.

10    Q.   I'll show you what has been marked for

11         identification as Joint Exhibit 1 and ask

12         if you recognize that item?

13    A.   Can I see it up close?

14    Q.   It is the bottom picture.

15    A.   Okay.

16    Q.   Do you recognize that now?

17    A.   Yes, it is a key.

18    Q.   Were you able to determine where that key fit?

19    A.   I can't answer that question.

20    Q.   It was retrieved as evidence?

21    A.   Yes.

22    Q.   Also depicted after Dr. Germaniuk removed the

5628

```
 1              clothing were some items or was an injury

 2              to Mr. Fingerhut after you removed his

 3              clothes?

 4    A.   Yes, Sir.

 5    Q.   And what is that depicting?

 6    A.   That is a graze wound that was on his right

 7              shoulder.

 8    Q.   That is Joint Exhibit 1.  Both of them are

 9              Joint Exhibit 1.  There are two

10              photographs on one page that is marked

11              Joint Exhibit 1.  And in addition to the

12              clothing that was removed from the

13              victim, was there some valuables that

14              were on his person?

15    A.   I believe jewelry, and a lot of gold jewelry

16              on his person.

17    Q.   I'm going to hand you what I'm going to mark

18              as State's Exhibits 404 and 405.  I'll

19              hand you State's Exhibit 404 and State's

20              Exhibit 405 and ask you what those

21              Exhibits are?

22    A.   Yes, Sir.
```

5629

1 Q. What is State's Exhibits 404 and 405?

2 A. Mr. Fingerhut's wallets.

3 Q. And can you tell this Jury where they were

4   discovered at?

5 A. They were discovered on his person; one in his

6   left rear pocket of his pants and the

7   other in the right rear pocket of his

8   pants.

9 Q. And can you tell this Jury if there was any

10   U.S. currency in any of those wallets?

11 A. Yes, Sir.

12 Q. How much currency was in those wallets?

13 A. Off the top of my head, I believe it was

14   somewhere in the area of $231.

15 Q. And those -- strike that.  Did you personally

16   look for any signs of forced entry into

17   that residence?

18 A. Yes, Sir, I did.

19 Q. Did you discover any signs of forced entry?

20 A. No, Sir, I did not.

21 Q. When you arrive at the scene, is it normal for

22   you to prepare, I guess what we call, it

5630

1            is a type of form that you fill out?

2   A.   Yes, Sir.

3   Q.   As part of your investigation?

4   A.   Yes, Sir.  We have a death investigation

5            report that we fill out.

6   Q.   And it has standardized questions?

7   A.   Yes, Sir.

8   Q.   And you conducted one of those?

9   A.   Yes, Sir.

10  Q.   Involved in this case?

11  A.   Yes, Sir.

12  Q.   Now, after you do your preliminary

13           investigation and you talk to the

14           officers and talk to the EMS, do you then

15           finally get an opportunity to speak to

16           Miss Donna Roberts?

17  A.   Yes, Sir, initially, I talked to her.

18  Q.   And in your initial conversations with her,

19           did she tell you what -- can you relate

20           to this Jury what she told you happened

21           that night when she came home at

22           approximately 12:00 p.m. on December 12?

5631

1    A.    She said that she had come down the street and
2          hit the door opener for the overhead
3          garage door and noticed that the light
4          came on and the door was going down, and
5          that I believe her husband's car was not
6          in the garage.  So she hit the button
7          again to open the door and pull in the
8          garage on the right hand side where she
9          usually parks her car.
10   Q.    And did she tell you a reason why or did she
11         tell you anything that she felt unusual
12         about the garage door going down instead
13         of up?
14   A.    I believe she said that she's used to it going
15         up and didn't realize it was going down
16         until she started to pull into the
17         driveway.  She thought that was unusual.
18   Q.    What did she tell you when she pulled into the
19         garage that she did?
20   A.    She got out of the car, walked around the back
21         of the car and as she walked in to the
22         doorway, she noticed that the door was

5632

1          opened from the garage into the kitchen

2          and then she noticed her husband on the

3          floor.

4  Q.   Did she indicate to you that she had seen any

5          weapons?

6  A.   No, Sir, she did not.

7  Q.   Now when you got to the scene and spoke to

8          Miss Roberts, how was her condition or

9          emotional state when you spoke to her?

10  A.   She was hysterical, excited.  She would get

11         wound up and then calm down and back and

12         forth.

13  Q.   Where did she tell you that she had been when

14         she had come home?

15  A.   She told me that when she walked into the

16         house and saw her husband, she grabbed a

17         portable phone off the kitchen counter

18         and ran to the bedroom and called 911 and

19         then she told me that she realized at

20         that time that someone may still be in

21         the house, so she ran out the front door

22         and the police arrived.

5633

1    Q.   Did she describe for you or give you any

2              indication as to what was missing from

3              the residence?

4    A.   Eventually she told us that her husband's car

5              was not there.

6    Q.   Was she able to give a description of that

7              vehicle?

8    A.   Yes, Sir, she did.

9    Q.   And how did she describe it?

10   A.   She described it as a silver Chrysler 300-M.

11   Q.   Now, did she describe for you any of Mr.

12             Fingerhut's routines in terms of what he

13             would do when he came home?

14   A.   Yes.  At one point she told us that Mr.

15             Fingerhut is a routine person.  He

16             usually comes home around 9:30, walks in

17             the house, puts his green mug on the

18             table.  I believe she said he takes his

19             two wallets out and sets those also on

20             the table and then he reviews the daily

21             mail, which she says that she opens every

22             day and lays out for him.

5634

1  Q.  Did she tell you whether or not that man door
2          that you described, whether -- how that
3          door is kept locked or secured?
4  A.  She told me -- I asked her if it is locked or
5          unlocked routinely and she said they
6          leave it unlocked, because they felt
7          secure in the automatic garage door
8          system that they had.
9  Q.  Now did she reveal to you that Mr. Fingerhut
10         in fact carried two wallets?
11 A.  Yes, she told us that he puts them both on the
12         table.
13 Q.  Now I suppose at some point, then you were
14         joined by another officer from the
15         Howland Police Department at the scene?
16 A.  Yes, Sir, Detective Sergeant Monroe arrived
17         shortly after.
18 Q.  And he's now the Chief of Police in Howland?
19 A.  Yes, Sir.
20 Q.  At some point then, you began to speak to, you
21         and Detective Monroe jointly talked to
22         Miss Roberts?

5635

1  A.   Off and on we both did, yes.

2  Q.   And did you get to a point in time where you

3       asked her about her activity prior to

4       coming home that evening?

5  A.   I believe so.

6  Q.   Were you present in that conversation?

7  A.   Yes.

8  Q.   And did she tell you what she had done earlier

9       that evening?

10  A.   She said she had gone to Wal-Mart and Super

11       K-Mart and Giant Eagle.

12  Q.   Did she tell you why she had gone to K-Mart,

13       Wal-Mart and Giant Eagle?

14  A.   She said she had spoken to her husband on the

15       phone and he told her he would be a

16       little late, that she should go out

17       shopping.  So she went out and shopped.

18  Q.   Did she indicate when she left her residence

19       to go on this shopping spree?

20  A.   I believe she said he called around nine, so

21       it would have been shortly after that.

22  Q.   Did she indicate what she purchased at any of

5636

1              these stores?

2   A.   The only thing we knew for sure that she

3              purchased was at the Wal-Mart store.

4   Q.   And how did you know that?

5   A.   Because she had offered to us that the bag was

6              on the kitchen table, which we found the

7              receipt in it.  I believe some make-up

8              and some cigarette lighters.

9   Q.   I'm going to hand you what has been marked as

10              State's Exhibit 396 and ask if you know

11              what 396 is?

12   A.   That is the Wal-Mart receipt.

13   Q.   Can you tell this Jury what the date and time

14              is on that receipt?

15   A.   12-11-01 and the time is 2137, which is 9:37

16              p.m.

17   Q.   Now, tell this Jury what Miss Roberts told

18              you -- well, let me ask you this.  Was

19              she asked if those were the only places

20              she had been?

21   A.   I believe so.

22   Q.   What was her response, if you recall?

5637

1           MR. INGRAM:  I'll object unless we

2    can have a more definite response to the previous

3    question.

4    Q.   Do you recall her being asked if she had been

5             to any other locations?

6    A.   I only recall Wal-Mart, Giant Eagle and Super

7             K-Mart.

8    Q.   Did you ask her where she had eaten dinner

9             that night?

10   A.   I believe Sergeant Monroe may have.

11   Q.   Now, tell this Jury what Miss Roberts told

12            you -- strike that.  Eventually the car

13            that Miss Roberts returned in, that red

14            Chrysler was moved from the garage, is

15            that correct?

16   A.   Yes, Sir.

17   Q.   Were you present when that was done?

18   A.   Yes, Sir.

19   Q.   Was there anything found underneath where that

20            Chrysler, the red Chrysler was parked at?

21   A.   A pair of glasses, the frame and a lens.

22   Q.   I'm going to hand you what has been marked for

5638

```
 1              purposes of identification as State's

 2              Exhibits 263 and 259 and ask if you can

 3              recognize those?  Would you please open

 4              those?  Please refer to the numbers that

 5              you are looking at.

 6    A.   Exhibit No. 259 is the glass frames with the

 7              missing lens.

 8    Q.   I'm sorry, that is 254.  That is Exhibit 254

 9              not 259.

10    A.   State's Exhibit 253 is the lens that was on

11              the floor and fits in these frames.

12    Q.   And those items are the same or substantially

13              the same condition as when you first

14              found them?

15    A.   Yes, Sir.

16    Q.   Eventually a video tape was made of that

17              scene?

18    A.   Yes, Sir.

19    Q.   Who would have made the video tape of the

20              scene at that location?

21    A.   I took some of it and Chief Monroe took some

22              of it, also.
```

5639

1   Q.   254 should be the lens and the other one

2           should be the actual glass.  254 is the

3           eye glasses and 253 is the lens.  Now,

4           during the time you were investigating

5           and at the scene, you and your fellow

6           officers were searching for evidence and

7           doing the things that you would normally

8           do in an investigation?

9   A.   Yes, Sir.

10  Q.   Where was Miss Roberts at when this was going

11          on?

12  A.   In the master bedroom.

13  Q.   Can you tell this Jury what Miss Roberts was

14          doing in the master bedroom while you and

15          your fellow officers were investigating

16          this crime scene?

17  A.   We wanted her to relax and compose herself.

18          We could hear repeated shouting of what

19          she had seen and her distraughtness over

20          that, and then she would get quiet for

21          awhile and then we would hear it some

22          more.

5640

1    Q.    Do you recall any of the words that she used

2          or any of the things that she said?

3    A.    "Oh, my poor Robert.  I can't believe somebody

4          stabbed him in the face.  All of that

5          blood."  Things of that nature.

6    Q.    And what would happen when you and your fellow

7          investigators would speak about this

8          case, and I say what would happen, what

9          would she do when you and your fellow

10         officers would discuss the investigation

11         in the other rooms?

12   A.    At one point, I happened to notice that when

13         we would begin to talk pretty

14         extensively, we would no longer hear her

15         shouting.

16   Q.    And did there come a time when you actually

17         went back to the bedroom yourself?

18   A.    Yes, Sir, I went back to the bedroom to check

19         on her at a period where we didn't hear

20         her making any noise and I found her

21         standing, leaning against the door, the

22         edge of the doorway there, the door frame

5641

1          and she appeared to be listening.

2                    MR. INGRAM:  Objection.

3                    THE COURT:  Sustained.  The Jury is

4      to disregard.

5      Q.   What did she do when she saw you?

6      A.   I startled her and then she began to shout

7           again.

8      Q.   Now, eventually Miss Roberts left the

9           residence, is that correct?

10     A.   Yes, Sir.

11     Q.   Do you recall how it is that she came to leave

12          that residence?

13     A.   Chief Monroe had asked her if there were any

14          family members that could come and get

15          her and be with her at her time of grief

16          and she gave Chief Monroe the information

17          in reference to her brother in

18          Austintown.

19     Q.   And in fact, did someone show up to get her?

20     A.   Yes, her brother, Ralph eventually showed up

21          at the scene.

22     Q.   Was anyone else present with Ralph?

5642

1   A.   His wife, Rita.

2   Q.   And do you recall approximately what time they

3        left the residence?

4   A.   I want to say around 1:50, 1:45.  I don't know

5        exactly.  I would have to refer to my

6        notes.

7   Q.   Now, do you recall anything she may have said

8        when she left and was directed to you and

9        your fellow officers about searching that

10       residence?

11  A.   Yes.  Chief Monroe explained to her that the

12       house was a crime scene and we were going

13       to need to finish procession and it may

14       take a long time and that we were going

15       to have to search the house and

16       everything in it, including the garage

17       and the cars.

18  Q.   And do you recall what her response was?

19  A.   Miss Roberts stated, "Do whatever you have to

20       do.  I just want you to get this person

21       or get this guy."

22  Q.   Now, at some point, some other evidence was

5643

1          found that included some letters?

2    A.   Yes, Sir.

3    Q.   Were you present when those letters were

4         found?

5    A.   No, Sir, I was in a different room.

6    Q.   And eventually Anthony Leshnack, who is a

7         Sergeant with the Trumbull County

8         Sheriff's Department arrived?

9    A.   Yes, Sir.

10   Q.   Were you present when he arrived?

11   A.   Yes, Sir.

12   Q.   Do you know the reason he was called to the

13        scene?

14   A.   I believe Chief Monroe called him to the scene

15        to assist in processing.

16   Q.   And we have already heard from Officer

17        Leshnack as to what he did?

18   A.   Yes, Sir.

19   Q.   Eventually, you left the scene of the

20        residence?

21   A.   Yes, Sir.

22   Q.   And when you left the scene approximately what

5644

1          time was it?

2   A.    It was around 6:30 in the morning on the 12th

3          of December.

4   Q.    I want to direct your attention to December

5          12th of 2001 at approximately 1:00 p.m.,

6          I believe you again had a chance to meet

7          with Donna Roberts?

8   A.    Yes, Sir.

9   Q.    And can you explain to this Jury how that came

10         about and where that happened at?

11  A.    I believe Chief Monroe had spoken to Donna and

12         arranged a meeting for us to sit down and

13         talk with her to further our

14         investigation at the Howland Police

15         Department.  She came there, I believe

16         with her brother, Ralph, and another

17         brother.

18  Q.    And when she arrived there on December 12,

19         2001, had you had a chance to review any

20         other evidence in this case?

21  A.    I don't know that I reviewed it.  I know what

22         was there at the time.

5645

| | | |
|---|---|---|
| 1 | Q. | Are you referring to the letters? |
| 2 | A. | In reference to the letters, I had not |
| 3 | | reviewed those. |
| 4 | Q. | So, when she arrives on December 12th, which |
| 5 | | is 1:00 p.m., it is about 12 hours when |
| 6 | | you had last seen her, maybe 11, she's |
| 7 | | there at the Howland Police Department, |
| 8 | | and do you recall discussing with her |
| 9 | | basically her background and relationship |
| 10 | | with Mr. Fingerhut? |
| 11 | A. | Yes, Sir, when they met, how they met.  How |
| 12 | | long they had been together. |
| 13 | Q. | Can you tell this Jury basically the story she |
| 14 | | reiterated to you, when they met? |
| 15 | A. | I believe she told us that they met in Florida |
| 16 | | in 1983 and were married somewhere around |
| 17 | | that time for several years, and then |
| 18 | | they gotten a divorce, which she said was |
| 19 | | Mr. Fingerhut's idea to protect their |
| 20 | | assets. |
| 21 | Q. | And did she indicate to you what she did when |
| 22 | | she was living in Florida? |

5646

1   A.   She said she worked for a plastic surgeon

2        there.  She was his only office person.

3        She assisted in doing the office work and

4        at times participated in treating the

5        patients, whatever assistance he needed

6        in that respect.

7   Q.   Did she indicate to you any type of travel she

8        may have done with the doctor?

9   A.   She told us that she had gone to Israel, I

10       believe at least once, to treat soldiers

11       there who were wounded in the war that

12       was going on there at the time.

13  Q.   Did she tell you what type of injuries she

14       helped treat?

15  A.   I believe it was gunshot wounds and skin graph

16       type injuries.

17  Q.   Now did she tell you what type of relationship

18       that she and Mr. Fingerhut had together

19       in December of 2001?

20  A.   She said they got along fine.  They were happy

21       together.

22  Q.   Now I want you to tell this Jury, during the

5647

1               time that you discussed Mr. Fingerhut's

2               relationship, what type of affection did

3               she express for Mr. Fingerhut?

4  A.   She said he was a good man, that he did

5               everything for her.  He took care of her,

6               told her -- gave her an allowance, told

7               her how to spend money as far as when she

8               would make purchases, and they had

9               numerous credit cards.  She would consult

10              him as to which credit card to use, so

11              that they kept them going or whatever

12              reason that may have been.

13  Q.   Did she express to you any financial problems

14              they were experiencing?

15  A.   None.  She didn't say anything about that.

16  Q.   In terms of their relationship, did she

17              describe it as a loving relationship or

18              one filled with hate and animosity?

19  A.   It was a loving relationship.

20  Q.   And did she relate to you any type of physical

21              abuse that may have been occurring?

22  A.   Not that I recall.

5648

1    Q.   Did you discuss the ownership of any firearms

2         that Miss Roberts may have had?

3    A.   Yes, I believe we did.

4    Q.   And did you discuss any firearms that Mr.

5         Fingerhut owned?

6    A.   Yes.

7    Q.   And what did she tell you about the firearms?

8    A.   From what I remember, I believe there were

9         three that she described.  A Walther PPKS

10        380 caliber handgun which she had given

11        to the Doctor in Florida as a gift.  A

12        Smith and Wesson .38 revolver, a Taurus

13        revolver.  And then she described another

14        gun which she didn't know the make of,

15        that as she eventually described it, we

16        assumed it was a hammerless revolver.

17   Q.   Did she advise whether she had in her

18        possession all of these firearms?

19   A.   The Walther, she told us she had given that to

20        the doctor in Florida, and she had

21        reported a .38 Smith and Wesson stolen

22        out of her vehicle in Warren.

5649

1   Q.   Did you discuss with her then again, go over

2        again the events of December 11th in the

3        evening up until finding her husband

4        deceased?

5   A.   I believe at that time, again, she spoke of

6        leaving work around five 5:15 or 5:30,

7        stopping at Giant Eagle to get chicken

8        for her dogs.  She fed them rotisserie

9        chicken that they make at Giant Eagle.  I

10       don't know if at that time for sure or

11       not she spoke of going to Red Lobster and

12       having dinner.

13  Q.   Only tell us what you know, what you recall.

14  A.   Okay.

15  Q.   Was she able to describe to you the last time

16       she saw Robert Fingerhut alive?

17  A.   Yes, Sir.  She said that 8:00 on the morning

18       of the 11th, she saw him as he was

19       getting ready for work.  She remained in

20       bed and laid around, I believe she told

21       us until 10:00, at which time she got up

22       and washed her hair and put her make up

5650

1          on and took care of the dogs.  She told

2          us she had gone to work around 12:30 at

3          the Warren Greyhound bus station and was

4          there until 5:15 or 5:30.

5     Q.   And when the Defendant would refer to her

6          dogs, did she have a name that she

7          referred to them or call them something

8          else?

9     A.   Her girls.

10    Q.   And when this Defendant told you she was at

11         work, did she then tell you where she

12         went to after work on December 11th?  I

13         am talking about your speaking to her on

14         December 12, 2001, did she tell you where

15         she went after work?

16    A.   Without referring to any notes, I get

17         confused.

18    Q.   Would you like to refer to your notes?

19              MR. INGRAM:  No problem.

20    Q.   I am referring to the events of December 12,

21         2001 at approximately 1:00 p.m. at the

22         Howland Police Department.

5651

1   A.   Okay.

2   Q.   You created a report relating the conversation

3        you had with her that day?

4   A.   Chief Monroe did.

5   Q.   Did you not write a report that day?

6   A.   No, I just see his.

7   Q.   Having seen his report, does that refresh your

8        memory?

9   A.   Yes.

10  Q.   On December 12, 2001 at 1:00 p.m., do you

11       recall seeing her -- or I'm sorry, having

12       her tell you where she went to after she

13       left the Greyhound bus station on

14       December 11?

15  A.   Yes, Sir.

16  Q.   Where did she tell you she went?

17  A.   Went to Giant Eagle and purchased a roast

18       chicken for her dogs.

19  Q.   Do you have an independent recollection now

20       having read it?

21  A.   I stayed with her while she answered these

22       questions.

5652

1  Q.    After she went to get the chicken at Giant

2         Eagle, did she indicate where she went

3         after that?

4              THE COURT:  Approach for a minute,

5  please.

6  (SIDE BAR DISCUSSION OFF THE RECORD AND OUT OF

7  HEARING)

8  Q.    I won't ask you about anything she told you.

9         Let's close that up.  Detective, during

10        the conversation of December 12, 2001,

11        did she indicate that she was present

12        with anyone on December 11th?

13 A.    I don't recall.

14 Q.    Let's back up here.

15             MR. INGRAM:  You said we're not

16 going to go to the book, now we're going to the

17 book.  May we approach?

18 (SIDE BAR DISCUSSION, OFF THE RECORD AND

19 OUT OF HEARING)

20             THE COURT:  For the record, counsel

21 has agreed that at the appropriate time, we'll put

22 the present conversation on the record of what was

5653

1    conducted at Side Bar, is that correct?

2              MR. INGRAM:  Yes, Sir.

3              MR. BECKER:  Yes, Sir.

4    Q.   I want to go back and I want to direct your

5         attention to some things that you did in

6         the evening of December 12, 2001.  I

7         believe at that point, you were called in

8         the evening of December 12, 2001 to go to

9         a location in the City of Youngstown?

10   A.   Yes.

11   Q.   And what were you called to go to the City of

12        Youngstown for?  What had been found in

13        the City of Youngstown?

14   A.   They had located the silver Chrysler 300-M

15        that belonged to Mr. Fingerhut.

16   Q.   And can you tell the Jury where that vehicle

17        was found?

18   A.   On Pershing Avenue and Victoria.

19   Q.   Can you describe the condition of that

20        vehicle?

21   A.   It was in normal condition other than the

22        interior had blood on it -- the exterior

5654

1         had some blood on it.

2   Q.  And do you know the location where that

3         vehicle was found?  How close that is to

4         Wirt Street?

5   A.  It is approximately three blocks.

6   Q.  And do you know, can you tell this Jury who

7         was arrested on December 21, 2001 in a

8         house on Wirt Street?

9   A.  Nate Jackson.

10  Q.  I'm going to show you some photographs

11        relating to that motor vehicle.  I'm

12        going to show you State's Exhibit 178 and

13        ask if you recognize what Exhibit No. 178

14        is?

15  A.  Yes.  Those are the keys in the ignition of

16        the vehicle as it was found.

17  Q.  They were found like that?

18  A.  Yes, Sir.

19  Q.  Now, I want to have you take a look at State's

20        Exhibit 269 and ask if you recognize what

21        State's Exhibit 269 is?

22  A.  The keys that were in the vehicle.

5655

| | | |
|---|---|---|
| 1 | Q. | Which vehicle? |
| 2 | A. | The silver Chrysler 300-M. |
| 3 | Q. | And were they obtained by you that night in |
| 4 | | Youngstown? |
| 5 | A. | Yes, Sir, by myself and Chief Monroe. |
| 6 | Q. | Now, I want to direct your attention to the |
| 7 | | next day, which was December 13, 2001. |
| 8 | | Do you know where Vista Windows is? |
| 9 | A. | Yes, Sir. |
| 10 | Q. | Did you go to Vista Windows? |
| 11 | A. | Yes, Sir. |
| 12 | Q. | Where is that located? |
| 13 | A. | Elm Road, Bazetta Township. |
| 14 | Q. | What was your purpose in going to Vista |
| 15 | | Windows on December 13, 2001? |
| 16 | A. | To speak to an employee there. |
| 17 | Q. | Who? |
| 18 | A. | Santiago Mason. |
| 19 | Q. | Why did you need to speak to Santiago Mason? |
| 20 | A. | Mrs. Roberts had told us that she had a weapon |
| 21 | | stolen in the City of Warren and reported |
| 22 | | it stolen and that is the person she said |

5656

```
 1              stole the weapon from her vehicle.
 2  Q.   And you spoke to Mr. Mason that day?
 3  A.   Yes, Sir.
 4  Q.   What did you tell him that you wanted to do
 5              with him?  What did you tell him you
 6              wanted to do that day?
 7  A.   We asked him to meet us at the Howland Police
 8              Department when he got off work to speak
 9              to him about that incident.
10  Q.   Did you do that?
11  A.   Yes, Sir.
12  Q.   Was Santiago Mason on December 13, 2001 a
13              suspect in your investigation?
14  A.   No, Sir.
15  Q.   He was not a suspect in the Fingerhut murder?
16  A.   Not to my knowledge.
17  Q.   Did you want to speak to him regarding the
18              firearm?
19  A.   Yes, Sir.
20  Q.   And how did you have him come to the police
21              station?
22  A.   He couldn't drive, his boss was going to drive
```

5657

1            him there.

2   Q.   And were there any, I guess, precautions that

3            you took that he would arrive there at

4            the station?

5   A.   Yes, Sir, we had our marked patrol cars along

6            the way parked and unmarked cars to

7            guarantee that he would stop at the

8            station, because we wanted to speak to

9            him, just in case he decided he didn't

10           want to come there.

11  Q.   He did come and speak to you?

12  A.   Yes, Sir, he did.

13  Q.   And eventually he was arrested on that date?

14  A.   Yes, Sir, he was.

15  Q.   And arrested for what?

16  A.   Warrant that Donna Roberts had filed for his

17           arrest in reference to the theft of the

18           gun.

19  Q.   And you again, the date that he was arrested

20           was what date?

21  A.   December 13, 2001, I believe.

22  Q.   Now, on December 14, 2001, I believe you had

5658

1          an occasion to go to Youngstown again, to

2          the Greyhound bus terminal in Youngstown?

3  A.    Yes, Sir.

4  Q.    What was your purpose in going to the

5          Greyhound bus terminal on December 14th?

6  A.    To interview employees there with reference to

7          any knowledge they may have had in

8          reference to Mr. Fingerhut's activities

9          on the day he died.

10  Q.    And while you were there, were you able to

11          obtain some video tapes?

12  A.    Yes, Sir, I did.

13  Q.    And what were those video tapes of?

14  A.    They were video tapes from the bus terminals

15          in-house surveillance closed circuit T.V.

16          system.

17  Q.    And we saw the other day, an Exhibit that was

18          marked as an edited version of those

19          things.  Do you know who would have

20          edited those tapes?

21  A.    I did.

22  Q.    I am going to show -- who gathered those

5659

1          tapes?

2    A.    I did.

3    Q.    I'm going to show you what has been marked --

4          I'm going to show you State's Exhibit

5          406.  I'm going to hand you State's

6          Exhibit 406 and ask if you recognize what

7          State's Exhibit 406 is?

8    A.    Yes, Sir, they are the video tapes that I took

9          on the 14th.

10   Q.    And who did you retrieve those from?

11   A.    From the deputy, Jose Sanchez, actually

12         through the head of security at the time,

13         who was Michael Diaz.

14   Q.    And those video tapes, you then took and I

15         guess made, for lack of a better term,

16         the composite that we saw the other day?

17   A.    Yes, Sir.

18   Q.    And that was just for the record, State's

19         Exhibit 319?

20   A.    Yes, Sir.

21   Q.    On December 15, 2001, did you again see the

22         Defendant in this case, Donna Roberts?

5660

1    A.    Yes, Sir.

2    Q.    And can you tell this Jury how it came about

3          that you saw the Defendant, Donna Roberts

4          on Saturday, December 15, 2001?

5    A.    She agreed to come to the police department

6          again to speak with us concerning the

7          investigation.

8    Q.    And who did she come to the police station

9          with this time?

10   A.    Her attorney.

11   Q.    Do you remember what his name was?

12   A.    Stephen Chuparkoff.

13   Q.    Now was this conversation recorded?

14   A.    Yes, Sir, it was.

15   Q.    And do you recall who was present with you

16         besides the Defendant and her attorney?

17   A.    Chief Monroe.

18   Q.    Now eventually then, after you took a

19         statement from her, did you go to another

20         location with her?

21   A.    Yes, Sir.

22   Q.    Where did you go to?

5661

1    A.    Her residence.

2    Q.    And who else went to the residence with you

3          and Miss Roberts?

4    A.    Her attorney and Chief Monroe and I believe

5          her son.

6    Q.    And what was the purpose of going to her

7          residence on December 16, 2001?

8    A.    We were going to make some phone calls.

9                MR. INGRAM:  I'm sorry, that is

10   December 15th.

11   Q.    And those phone calls were made?

12   A.    Yes, Sir.

13   Q.    And I believe Detective Sergeant Monroe --

14         well, strike that.  What did Detective

15         Sergeant Monroe bring with him?

16   A.    A tape recorder to record the phone calls.

17   Q.    Who would have listened in on the phone calls

18         that she made?

19   A.    I believe I did.

20   Q.    Was it you or Detective Monroe?

21   A.    I'm not sure if we both did or just me.

22   Q.    Those calls were recorded, is that correct?

5662

1    A.    Yes, Sir.

2    Q.    While were you at the house, did she further

3          describe her relationship with Robert

4          Fingerhut?

5    A.    Yes, Sir.

6    Q.    And when she was there, did she start to

7          discuss the religious aspects of their

8          relationship?

9    A.    Yes, Sir, she did.

10   Q.    What religion did she indicate they were?

11   A.    Jewish.

12   Q.    What did she indicate was there marital status

13         in the Jewish religion?

14   A.    They were still married.

15   Q.    And did she present to you some documentation

16         or something?

17   A.    She opened a scroll type of thing that

18         looked -- well, she told us it was

19         written in Hebrew.  It was their marriage

20         doctrine or something of that nature.

21   Q.    Now the next day, December 16, 2001, while you

22         were at the residence -- I'm sorry,

5663

```
 1              strike that.  The next day, December 16,

 2              2001, did you go anywhere else on that

 3              day or go back to her residence?

 4    A.   I believe we went to Youngstown.

 5    Q.   And where did you go in Youngstown on that

 6              date?

 7    A.   To the Days Inn Motel.

 8    Q.   What was your purpose in going to the Days Inn

 9              Motel?

10    A.   To check on records on Nate Jackson staying

11              there.

12    Q.   I'm going to hand you what has been marked

13              previously as identification as State's

14              Exhibits 311-A and B.  When you got to

15              the Days Inn -- well, I'm going to hand

16              you State's Exhibits 311-C, D and E.  I'm

17              sorry, just 311-E -- and 311-D, and ask

18              if you recognize what 311-D and E are?

19              When you refer to these, please refer to

20              the numbers on the back.  State's Exhibit

21              311-D and E.

22    A.   State's Exhibit 311-E is a receipt for the
```

5664

1             phone calls that were made while the room

2             was being used.  It is dated December 16,

3             2001 at 7:31 a.m.  And State's Exhibit

4             311-D is a computer printout of the phone

5             numbers that I believe were called from

6             the room and the total number of charges

7             for those phone calls.

8 Q.  What room number were those?  Did they

9             indicate where they were called from?

10 A.  Number 129.

11 Q.  At the Days Inn in Boardman?

12 A.  Yes.

13 Q.  You obtained those personally?

14 A.  Myself and Chief Monroe, yes.

15 Q.  There was later a time when you had to go back

16             to that Days Inn, is that correct?

17 A.  Yes, Sir.

18 Q.  And I believe that date was December 18th?

19 A.  I believe so.

20 Q.  Who were you present with on December 18th of

21             2001?

22 A.  Originally, Lieutenant Heaver from the

5665

| | | |
|---|---|---|
| 1 | | Boardman Police Department, Special Agent |
| 2 | | Ed Lulla from the Ohio State Bureau of |
| 3 | | Criminal Identification and |
| 4 | | Investigation. |
| 5 | Q. | And when you were there on December 18, 2001, |
| 6 | | did you have them run a -- I guess a |
| 7 | | credit card scan or some type of scan |
| 8 | | through a machine? |
| 9 | A. | Yes, Sir. |
| 10 | Q. | What was the purpose of that? |
| 11 | A. | To try to determine if the printout, the time |
| 12 | | stamp on the credit card receipt printout |
| 13 | | was accurate or not. |
| 14 | Q. | And I believe that originally, you also |
| 15 | | obtained a receipt that was marked as |
| 16 | | State's Exhibit 311-A, or I'm sorry, |
| 17 | | 311-B which was the credit card receipt? |
| 18 | A. | Yes, Sir. |
| 19 | Q. | And that was actually received from |
| 20 | | Mr. Diamantes? |
| 21 | A. | I believe so, yes. |
| 22 | Q. | And you went back on the 18th to confirm the |

5666

1        time on the receipt that you got from

2        Officer -- or from Mr. Diamantes?

3   A.   Yes, Sir.

4   Q.   Were you present when the credit card scan was

5        run again?

6   A.   Yes, Sir, I was.

7   Q.   And was there a problem with the time on that

8        credit card receipt?

9   A.   It was off.  It was not accurate.

10  Q.   Do you recall how much it was off by?

11  A.   I know the time roughly was 46 minutes off.  I

12       believe it was 46 minutes fast.

13  Q.   What is your unit number?

14  A.   412.

15  Q.   Now, I'm going to hand you State's Exhibit

16       311-C.  I'll ask if you recognize what

17       State's Exhibit 311-C is?

18  A.   Yes, Sir.

19  Q.   What is State's Exhibit 311-C?

20  A.   It is the receipt that we printed while I was

21       there to try to determine if the machine,

22       the time on the machine, the time stamp

5667

1           on the machine was accurate or not.

2  Q.   And what is the time on the receipt, the

3           printed time?

4  A.   The time printed on the receipt is 12:40.

5  Q.   What was the actual time when that receipt was

6           printed?

7  A.   11:54 a.m.  It was 12:40 p.m., the actual time

8           was 11:54 a.m.

9  Q.   So the machine was fast or slow?

10  A.   Fast.

11  Q.   Now, Detective, I want to ask you about -- I

12           want to ask you about the firearm that

13           you previously testified to.  That item

14           was eventually submitted to the Bureau of

15           Criminal Identification and

16           Investigation?

17  A.   Yes, Sir.

18  Q.   Exhibit No. 251?

19  A.   The one that was at the scene?

20  Q.   Yes.

21  A.   Yes, Sir.

22  Q.   And all of those items would have been

5668

1    transported including the firearm by

2    Detective Paul Monroe, is that correct?

3  A.   Yes, Sir.

4  Q.   If we could -- could we take a small break so

5    I can set up the television again for

6    Detective Monroe?

7    THE COURT:  Folks, let's take a ten

8  minute break.  Remember the admonition.  No

9  discussion in the meantime.

10 (Court in Recess at 2:50 p.m.)

11 (Resumed in Open Court at 3:10 p.m.)

12    THE COURT:  Mr. Becker, please

13 explain what you are doing here.

14 Q.   (By Mr. Becker)  Detective, I'm going to hand

15    you what has been marked for purposes of

16    identification as Exhibit No. 2, and ask

17    if you recognize what Exhibit No. 2 is?

18 A.   Yes, Sir.  It is a video of the crime scene at

19    254 Fonderlac.

20 Q.   I'm going to play for the Jury and you,

21    Exhibit No. 2, and if you could narrate

22    as we go along, what it is we're

5669

1      watching.  Detective, I believe we have

2      no sound.

3  A.   Yes, Sir.

4  Q.   Just narrate as we go along, what we're

5      viewing?

6  A.   This is a view of the kitchen and the area

7      where Mr. Fingerhut's body was laying.

8      You can also see the car in the garage in

9      that picture, the burgundy 300-M

10     Chrysler.  The wound to Mr. Fingerhut's

11     hand.  Blood spatter on the wall above

12     his head.  That is looking from the stair

13     well area.

14 Q.   Which stair well?

15 A.   The basement stair well area back farther into

16     the kitchen.  The kitchen itself.  This

17     is looking from the corner of the kitchen

18     to Mr. Fingerhut's body towards the rest

19     of the house.  That is the hallway that

20     leads to the bedrooms and the floor

21     there, that spot, that spot right there

22     is the drop of blood that was later

5670

1    taken.  That is looking from the garage

2    into the kitchen area.  The weapon where

3    it was laying.  That is showing the

4    damage to the garage door that we found

5    and the pieces of it that are on the

6    floor.  The car that is parked in the

7    garage there, parts of the garage door.

8    Close-up damage there where the rail was

9    lifted away from the door.  That is

10   showing the stair well and eventually the

11   close-up will be of the hole in the wall

12   where the bullet was retrieved.  That is

13   looking down the hall from the hallway

14   that runs to the bedroom at the area

15   where Mr. Fingerhut's body lay and into

16   the garage.  That is a view from the

17   garage back into the house and where the

18   bullet is from the doorway to where the

19   bullet is in the stair well.  That is

20   after Dr. Germaniuk had begun to undress

21   Mr. Fingerhut.  He's been moved by

22   Dr. Germaniuk.  It shows a bullet wound.

5671

1    The area where he had been laying and

2    blood spattering on the wall and the

3    cabinet there.  The area where his body

4    was laying again.  There's blood on the

5    cabinet that we were trying to show.  It

6    doesn't pick it up well because of the

7    color.  That is the area where the bullet

8    was retrieved at.  It had been cut.  That

9    is a close-up of the floor and Mr.

10   Fingerhut.  That is the area outside the

11   door where there's a bloody footprint.

12   The gun had been removed already and

13   logged into evidence.  It is the counter

14   top of the island area.  I believe there

15   was some blood on the envelope box.  That

16   is why the close-up was taken.  Those are

17   the glasses on the floor after the car

18   had been moved.  There's the lens from

19   the glasses as it lay after the car had

20   been moved.  Damage to the door.  Now the

21   door is up.  It is the front of

22   Mrs. Roberts' car and the license plate

5672

1      number.  That particular -- those

2      particular things were on the inside of

3      the door, the back side of the door and

4      there was blood on those, also.

5  Q.  Which door are you referring to?

6  A.  The door that leads from the garage into the

7      house.

8  Q.  That concludes the video tape?

9  A.  Yes, Sir.

10  Q.  Is that video tape, State's Exhibit 2, a fair

11      and accurate reproduction of the scene as

12      you observed it on December 12, 2001?

13  A.  Yes, Sir.

14      MR. BECKER:  I have no further

15  questions of this witness.

16  CROSS EXAMINATION BY MR. INGRAM:

17  Q.  Good afternoon, Detective Dillon.  I have a

18      couple of questions for you.  I don't

19      think I'll be too long.  Please try to

20      bear with me.  You were not the first

21      person on the scene, am I correct?

22  A.  No, Sir.

5673

1    Q.    When you arrived on the scene, Patrolman Ray,

2          Patrolman Pollcino were already present?

3    A.    Yes, Sir.

4    Q.    And some emergency medical personnel are

5          present?

6    A.    Yes, Sir.

7    Q.    Does the name George Beck, a paramedic for the

8          Howland Fire Department sound familiar to

9          you?

10   A.    Yes, Sir.

11   Q.    Was he there?

12   A.    Yes, Sir.

13   Q.    And one of the things you do when you get

14         there is you talk to the guys that were

15         there before you to see what they have

16         done?

17   A.    Yes, Sir.

18   Q.    Do you learn that Patrolman Ray and paramedic

19         George Beck, at some point in time

20         entered the kitchen and roll Mr.

21         Fingerhut over, and then turn him back?

22   A.    Yes, Sir.

5674

```
 1    Q.    You arrived before Detective Monroe, am I
 2          correct?
 3    A.    A couple of minutes, yes, Sir.
 4    Q.    Do you have State's Exhibits 4 and 5?
 5    A.    Yes.
 6    Q.    Have those been published?
 7                MR. BECKER:  Yes, they have.
 8    Q.    Would you hold both of those up and show them
 9          to the Jury, please?  Is that some kind
10          of decorated Tai dish or something like
11          that?
12    A.    To me -- it seemed to me to be a serving tray
13          to put cups on to serve.
14    Q.    On that serving tray is some drug
15          paraphernalia?
16    A.    Yes, Sir.
17    Q.    Marijuana and hemostats and tweezers?
18    A.    Rolling papers.  That is a cigarette rolling
19          device.
20    Q.    All of this drug paraphernalia and all of this
21          marijuana.  Did you guys have to search
22          to find this stuff?
```

5675

1   A.   No, Sir, it was in plain view.

2   Q.   Where was it in plain view?

3   A.   On the dining room table.

4   Q.   So when a police officer walks in the dining

5        room, those drugs, that drug

6        paraphernalia, that is right there for

7        all of the world to see?

8   A.   Yes, Sir.

9   Q.   Was the house ransacked?

10  A.   No, Sir.

11  Q.   To the unfamiliar eye, did anything appear to

12       be missing from the Fingerhut residence?

13  A.   No, Sir.

14  Q.   Sometimes you go to a scene and it is obvious

15       that there's a T.V. that was in a place,

16       there was a VCR in a place, there's

17       drawers that are upside down.  None of

18       that was here, correct?

19  A.   No, Sir.

20  Q.   The gun that is shown on the step in State's

21       Exhibits 9 and 10.  First of all, can you

22       help me identify by make and model this

5676

| | | |
|---|---|---|
| 1 | | gun? |
| 2 | A. | It is a Taurus .38 special revolver. |
| 3 | Q. | Now that is not the gun that we talked about |
| 4 | | when we refer to Santiago Mason, the .38 |
| 5 | | Smith and Wesson? |
| 6 | A. | No, Sir. |
| 7 | Q. | That's a different gun? |
| 8 | A. | Yes, Sir. |
| 9 | Q. | Was that gun submitted for fingerprint |
| 10 | | analysis, do you know? |
| 11 | A. | I don't know. |
| 12 | Q. | Was that gun handled carefully while you were |
| 13 | | on the scene to preserve the integrity of |
| 14 | | any fingerprints which may have been on |
| 15 | | that gun? |
| 16 | A. | Yes, Sir. |
| 17 | Q. | Did you at some point in time notice that |
| 18 | | Donna Roberts had on a T-shirt and there |
| 19 | | was some blood on her T-shirt? |
| 20 | A. | What appeared to be blood, yes, Sir. |
| 21 | Q. | And as a result of the fact that her T-shirt |
| 22 | | contained what appeared to be blood, did |

5677

1       you or Detective Monroe ask her to change

2       T-shirts?

3   A.  Yes, Sir.

4   Q.  Did you ask her to give you her T-shirt?

5   A.  Yes, Sir.

6   Q.  Was she cooperative in doing that?

7   A.  Yes, Sir.

8   Q.  Did she resist your request?

9   A.  No, Sir.

10  Q.  Was that shirt submitted to the laboratory for

11      scientific analysis?

12  A.  Yes, Sir.

13  Q.  Do you have a report back regarding that

14      shirt, do you know?

15  A.  I don't know firsthand.

16  Q.  If I wanted to ask that question of someone

17      who would have firsthand knowledge, would

18      that person be Chief Monroe?

19  A.  Yes, Sir.

20  Q.  And Donna was also asked, I believe, to submit

21      to a swab of her hands to determine

22      whether there was gunshot residue on her

5678

1              or about her hands?

2    A.    Yes, Sir.

3    Q.    And did she resist that request?

4    A.    No, Sir.

5    Q.    Did she comply?

6    A.    Yes, Sir.

7    Q.    She was cooperative throughout the night,

8              wasn't she?

9    A.    Yes, Sir.

10   Q.    And at one point in time before she leaves

11             with Ralph and Rita Roberts, then

12             Detective Monroe, now Chief Monroe

13             basically tells her that the entire house

14             is a crime scene, and every nook and

15             cranny of the house has to be searched?

16   A.    Yes, Sir.

17   Q.    And she indicated that that was fine with her,

18             she just wanted you guys to do what you

19             had to do to find the person responsible?

20   A.    Yes, Sir.

21   Q.    Now the key that was found under Mr.

22             Fingerhut.  I believe that is in Joint

5679

1     Exhibit 1.  What efforts were made to

2     determine what door or what object that

3     key was designed to open?

4 A. I don't know.

5 Q. Who would?

6 A. Chief Monroe.

7 Q. Where is that key today?

8 A. It has been entered into evidence.

9 Q. That means it is at the Howland Police

10     Department?

11 A. I don't know.

12 Q. In one of Mr. Fingerhut's wallets, and he had

13     two wallets in his back pockets, am I

14     correct?

15 A. Yes, Sir.

16 Q. In one of his wallets, he had approximately --

17     not approximately, $231?

18 A. Yes, Sir.

19 Q. In his front pocket, he had $130?

20 A. Yes, Sir.

21 Q. And that was not in the other wallet, that was

22     just in his pocket like I keep my money?

5680

1   A.   Yes, Sir.

2   Q.   And in addition to the money, if you look at

3         Joint Exhibit 1, you see a gold chain

4         here?

5   A.   Yes, Sir.

6   Q.   And there was other jewelry, was there not?

7   A.   Yes, Sir.

8   Q.   And that is expensive jewelry, wasn't it?

9   A.   Yes, Sir.

10   Q.   And that jewelry remained on his person when

11         you arrived at the scene?

12   A.   Yes, Sir.

13   Q.   Whose idea was it to call Ralph and Rita

14         Roberts?

15   A.   I don't know.

16   Q.   But the idea in calling Ralph and Rita Roberts

17         is to get some family members there to

18         help with Donna and may be see if they

19         could take her to their home?

20   A.   Yes, Sir.

21   Q.   And while Donna was in her residence that

22         night, before she left with Ralph and

5681

1    Rita, she was not in any respect a

2    suspect, was she?

3    A.    No, Sir.

4    Q.    She was free to move about the house as she

5    chose?

6    A.    Yes, Sir.

7    Q.    Although you asked her not to interfere with

8    what you guys were doing, it was her

9    house, and she could go where she wanted

10    and do what she wanted?

11    A.    Yes, Sir.

12    Q.    Can you ballpark when Ralph and Rita arrived?

13    A.    For some reason, the time 1:50 a.m. sticks in

14    my mind.

15    Q.    That sounds like a fair estimate.  That is

16    about two hours, a little short of two

17    hours after you get there?

18    A.    Yes, Sir.

19    Q.    And most of the time during that two hours, am

20    I correct that Donna is in the master

21    bedroom, that is her bedroom?

22    A.    Yes, Sir.

5682

1   Q.   And am I also correct that most of the time

2           she's in that bedroom, she's by herself?

3   A.   Yes, Sir.

4   Q.   Nobody is in there like watching what she's

5           doing, making sure she doesn't do

6           anything?  She's just in there alone?

7   A.   Yes, Sir.  Back and forth, between the group

8           of us, we would have walked in the

9           bedroom to check on her and walk out as I

10          said I had done.

11   Q.   Periodically?

12   A.   Yes.

13   Q.   But most of the time she was actually in there

14          alone?

15   A.   Yes, Sir.

16   Q.   And when Ralph and Rita arrive and Donna

17          agrees to go to their home, first off,

18          whose decision was it that Donna would

19          leave?

20   A.   I can't answer that question.

21   Q.   You couldn't make her leave, could you?

22   A.   No.

5683

1  Q.   When she left, she gathered belongings to

2          leave, did she not?

3  A.   Yes, Sir.

4  Q.   And she perhaps, with the assistance of Ralph

5          and Rita -- but she gathered her

6          belongings to take with her?

7  A.   Yes, Sir.

8  Q.   And again, there was no restriction put on

9          whatever belongings she wanted to take

10         with her?

11 A.   No, Sir.

12 Q.   Did she ask to take her car?

13 A.   I don't know.

14 Q.   If she had asked to take her car, could you

15         have stopped her?

16         MR. BECKER:  Objection.

17 Q.   Did you have the legal authority --

18         THE COURT:  Objection sustained.

19 Q.   Did you have the legal authority to stop her

20         from taking her car, if she wanted to

21         take it?

22         MR. BECKER:  Objection.

5684

1             THE COURT:  That is a perfectly

2   legitimate question.

3   A.   At that point, no.

4   Q.   There was a video that was made by Deputy

5          Leshnack that was just played?

6   A.   No, by myself and Chief Monroe.

7   Q.   I'm sorry.  You are correct.  That video was

8          made by yourself and Chief Monroe.  At

9          the end of the video, we see a map of the

10         United States in the last 30 seconds or

11         so; do you recall seeing that?

12  A.   Yes, Sir.

13  Q.   I'm going to hand you what has been marked for

14        identification purposes as Defendant's

15        Exhibits 1, 2 and 3.  I would ask you to

16        take a gander at those and when you are

17        done, look up so that I know you are

18        ready.

19  A.   Okay.

20  Q.   Defendant's Exhibits 1, 2 and 3, do they also

21        show that map of the United States?

22  A.   Yes.

5685

1  Q.   From the garage into the kitchen, there's a

2        door -- there's a doorway, correct?

3  A.   Yes, Sir.

4  Q.   And that doorway has a storm door and a

5        regular door?

6  A.   Yes, Sir.

7  Q.   Is the regular door solid wood, do you recall?

8  A.   I believe it is a wood frame and it is hollow

9        in the middle, but it is wood.

10 Q.   There's no glass in there?

11 A.   No, Sir.

12 Q.   And the door opens inward into the kitchen?

13 A.   Yes, Sir.

14 Q.   So if this is the garage -- the garage, this

15        is the kitchen, this would be the door,

16        right?

17 A.   Yes, Sir.

18 Q.   And if I wanted to see that map, I would have

19        to close this door and the map would be

20        on the kitchen side of the door for in

21        our example, the Courtroom side of the

22        door?

5686

1   A.   Yes, Sir.

2   Q.   Did I hear you say that that map had blood on

3        it?

4   A.   Yes, Sir.

5   Q.   Can I borrow those for a second?  To the right

6        of the map, there's a calendar with two

7        dogs on it?

8   A.   Yes, Sir.

9   Q.   Does that map also or does that calendar have

10       blood on it?

11  A.   I don't know.

12  Q.   Below the calendar is something.  Take a look

13       at Defendant's Exhibit 3.  Are you able

14       to tell me what that is?

15  A.   On it or what it is?

16  Q.   First of all, what is it?

17  A.   Some kind of chart.

18  Q.   Do you have any recollection of seeing that

19       chart on December 11, 2001 when you were

20       in the Fingerhut residence?

21  A.   No.

22  Q.   Does there appear to be blood on that chart?

5687

1    A.    Yes, Sir.

2    Q.    Does blood on the map -- there's blood on the

3          calendar, there's blood on the chart, am

4          I correct?

5    A.    The chart and the map I can say yes -- I can't

6          see the picture well enough of the

7          calendar.

8    Q.    I'm going to hand you what has been marked for

9          identification purposes as Defendant's

10         Exhibit 4.  Have you seen that before?

11   A.    The picture, yes.

12   Q.    Is that a drawer in the -- is that a

13         photograph of the drawer inside 254

14         Fonderlac?

15   A.    I can't answer that question.

16   Q.    Where have you seen that photograph before?

17   A.    In the photographs from the scene.

18   Q.    Does that photograph -- is it a photograph of

19         a drawer?

20   A.    It appears to be, yes, Sir.

21   Q.    And are there, for lack of a better term, sex

22         toys in that photograph?

5688

| | | |
|---|---|---|
| 1 | A. | Yes, Sir. |
| 2 | Q. | And among the sex toys depicted in that |
| 3 | | photograph, is there a set of handcuffs? |
| 4 | A. | Yes, Sir. |
| 5 | Q. | And then there's other things, right? |
| 6 | A. | Yes, Sir. |
| 7 | Q. | I'll try to avoid mentioning, but there are |
| 8 | | other things.  Were those handcuffs |
| 9 | | seized and taken by the Howland Police |
| 10 | | Department as evidence? |
| 11 | A. | I can't answer that question. |
| 12 | Q. | Yes, you can.  When you seize evidence, you do |
| 13 | | an inventory and receipt, do you not? |
| 14 | A. | Yes, Sir. |
| 15 | Q. | You guys left Fonderlac at 6:30 in the morning |
| 16 | | on December 12th.  Did you leave an |
| 17 | | inventory or did you create an inventory? |
| 18 | A. | Yes, Sir. |
| 19 | Q. | Would you take a gander at the inventory and |
| 20 | | see if those handcuffs are delineated |
| 21 | | anywhere in that document? |
| 22 | A. | I don't see it in there. |

5689

1  Q.   The inventory of the items removed on the 12th

2       are approximately six, seven pages, eight

3       pages?

4  A.   Yes, Sir.

5  Q.   53 items, eight pages long?

6  A.   Yes, Sir.

7  Q.   No mention of handcuffs?

8  A.   No, Sir.

9  Q.   So, do you know if they were removed or not?

10  A.   Yes, Sir.

11  Q.   What is the answer?

12  A.   No.

13  Q.   They were not removed?

14  A.   No, according to that.

15  Q.   There were two photographs of suspected bloody

16       footprints?

17  A.   Yes, Sir.

18  Q.   One is on the step in the garage, and one you

19       said was up in the kitchen?

20  A.   Yes, Sir.

21  Q.   Any effort made to measure those to assist in

22       determining perhaps what size shoe might

5690

1           have made those impressions?

2    A.    I can't answer that question.

3    Q.    I have a ruler here.  If I had something on

4           the ground and I wanted to may be have an

5           idea of what size it was, I might just

6           put a ruler down there and take a picture

7           of it?

8    A.    Yes, Sir.

9    Q.    Have you seen any picture like that?

10   A.    No, Sir.

11   Q.    Of either of these supposed footprints?

12   A.    No, Sir.

13   Q.    We don't even know if they are the same size,

14          do we?

15   A.    No, Sir.

16   Q.    On December 13th, you went to Vista Windows to

17          talk to Santiago Mason.  When you went

18          there, did you know there was a warrant

19          for his arrest?

20   A.    Yes, Sir.

21   Q.    When there's a warrant for someone's arrest,

22          that means that any time that person

5691

1          comes in contact with a law enforcement

2          officer, the law enforcement officer is

3          supposed to take that person into

4          custody?

5  A.   Yes, Sir.

6  Q.   And you heard a stipulation that this warrant

7          for Santiago Mason was taken out by Donna

8          Roberts on November 28th?

9  A.   Yes, Sir.

10  Q.   So, Mr. Mason could have been arrested on that

11          warrant November 28th?

12  A.   Yes, Sir.

13  Q.   November 29th?

14  A.   Yes, Sir.

15  Q.   December 1st?

16  A.   Yes, Sir.

17  Q.   December 2nd?

18  A.   Yes, Sir.

19  Q.   December 3rd?

20  A.   Yes, Sir.

21  Q.   Let's go to December 11th. If he had the

22          misfortune of running into a policeman on

5692

1          December 11th, his butt would be in jail,

2          correct?

3  A.   Yes, Sir.

4  Q.   Now, you heard Mr. Mason testify that -- I'll

5          withdraw that question.  The Smith and

6          Wesson .38, that was reported stolen?

7  A.   Yes, Sir.

8  Q.   Where in 254 Fonderlac is that gun recovered?

9  A.   Never was.

10  Q.   It was never recovered?

11  A.   No, Sir.

12  Q.   It is not in the house?

13  A.   No, Sir.

14  Q.   On December 14th, you and Detective -- well,

15          what should we call him?  He's not here,

16          so let's call him Detective Monroe and

17          when he comes, we'll call him Chief,

18          okay?

19  A.   Yes, Sir.

20  Q.   You and he go to the Youngstown terminal on

21          December 14th?

22  A.   Yes, Sir.

5693

1   Q.   And that is the date that you actually take

2        possession of two of the WRTA video

3        security cassettes?

4   A.   Yes, Sir.

5   Q.   And so that everybody is clear on this, WRTA

6        controls that facility and their security

7        system is both for themselves and for

8        Greyhound?

9   A.   Yes, Sir.

10  Q.   And isn't it a fact that you asked for those

11       two video tapes as a direct result of

12       Frank Reynolds telling you that Donna

13       Roberts was kissing and hugging Nate

14       Jackson in the vestibule at approximately

15       10:45 a.m. on Tuesday, December 11th?

16  A.   Yes, Sir.

17  Q.   So, you told the Prosecution that you spent a

18       lot of time and I think it is about eight

19       hours?

20  A.   I believe so.

21  Q.   Looking at that video to see if you could find

22       Mr. Fingerhut, remember?

5694

1    A.    Yes, Sir.

2    Q.    You didn't tell us anything about looking in

3            that video to see if you could find Donna

4            Roberts and Nate Jackson kissing and

5            hugging in the vestibule?

6    A.    No, Sir.

7    Q.    That is why you asked for the video in the

8            first place, right?

9    A.    Yes, Sir.

10    Q.    So you did look for that, didn't you?

11    A.    Yes, Sir.

12    Q.    And you didn't find it, did you?

13    A.    No, Sir.

14    Q.    But you didn't tell us anything about it until

15            now?

16    A.    No, Sir.

17    Q.    That takes us, I believe, to December 16th,

18            when you go to the Days Inn?

19    A.    Yes, Sir.

20    Q.    And Detective Monroe does not accompany you on

21            that date, you are met by Mr. Lulla from

22            BCI and Detective Heaver from Boardman?

5695

1    A.    Yes, Sir.

2    Q.    Can I see whether it is there or there, I

3          don't know, that computer printout of

4          phone calls.  I think it is 311-D.  Who

5          gave you 311-D?

6    A.    Rita Morrison.

7    Q.    That room was rented for a week, is that

8          correct?

9    A.    Yes, Sir.

10   Q.    What are the dates of the telephone calls in

11         311-D?

12   A.    December 12th -- or I'm sorry, December 13th

13         and December 14th of 2001.

14   Q.    No other dates?

15   A.    No, Sir.

16   Q.    And did I hear right that 311-E is a credit

17         card receipt for those phone calls?

18   A.    It appears to be.

19   Q.    Could I see that?  This is dated December

20         16th.  Were you present when this was

21         generated?

22   A.    Yes, Sir.

5696

1   Q.   Was Donna Roberts there?

2   A.   No, Sir.

3   Q.   Is her signature on there?

4   A.   No, Sir.

5   Q.   That is the same date you conducted the time

6        audit and so everybody knows what I am

7        talking about, the time audit is when you

8        and Mr. Pascarella ran a credit card

9        transaction to determine the time.

10  A.   That was on the 18th.

11  Q.   When you do this on the 16th, is there any

12       effort on the 16th made to determine

13       whether that time is accurate, which is

14       7:31 a.m.?

15  A.   No, Sir.

16  Q.   Did you get up that early?

17  A.   No, Sir.

18  Q.   I didn't think so.  When did you do the time

19       audit?

20  A.   On the 18th.  December 18th of 2001.

21  Q.   So you go there on December 18th.  You run a

22       credit card transaction through, and you

5697

1              run it through at 11:54 a.m.

2    A.    Yes, Sir.

3    Q.    And the machine, the receipt generated by the

4              machine was 12:40 p.m.?

5    A.    Yes, Sir.

6    Q.    So, you're right, it is 46 minutes fast,

7              right?

8    A.    Yes, Sir.

9    Q.    What I need to know about that, did you make

10             an effort to determine if there was a

11             standard like -- did you run that

12             transaction and then run a second

13             transaction and a third transaction to

14             see if those transactions were also 46

15             minutes fast?

16   A.    No, Sir.

17   Q.    Did you on any other date run a credit card

18             transaction to determine whether those

19             transactions were 46 minutes fast?

20   A.    No, Sir.

21   Q.    So for all you know, this particular

22             transaction that you ran on December

```
                                                        5698
 1              18th, was just an abhorrent mechanical

 2              error on that machine on that occasion?

 3    A.    Technically, yes, Sir.

 4    Q.    Because you never ran a second or third test

 5              to determine whether your results were

 6              accurate or not?

 7    A.    No, Sir.

 8              MR. INGRAM:   Thank you.   No further

 9    questions.

10              MR. BECKER:   I have nothing further

11    of this witness.

12              THE COURT:   Thank you.

13              MR. BECKER:   At this time, we have

14    no further witnesses for the day.

15              THE COURT:   We'll begin at 9:00 in

16    the morning.   You are not to discuss anything or

17    watch anything or read anything in the newspapers,

18    watch anything on T.V.   The usual admonition.   See

19    you back here at 9:00 in the morning.   Have a good

20    evening.

21    (Jurors excused at 3:55 p.m.

22    (In-chambers at 4:00 p.m. Defendant present.)
```

5699

1          MR. INGRAM:  The first Side Bar,

2    according to my recollection, merely related to

3    Detective Dillon testifying from his report.  When

4    he had previously testified that his recollection

5    had been refreshed from looking at the report,

6    there was an objection at Side Bar.  The

7    Prosecuting Attorney indicated that he was going to

8    move along to a different area of examination, so

9    no further proceedings were necessary, nor was a

10   ruling necessary on an objection.

11          THE COURT:  That was the one thing

12   we talked about.

13          MR. BECKER:  That is correct.

14          THE COURT:  That you were going to

15   try to get the information you needed in through

16   another witness.

17          MR. BECKER:  Yes.

18          THE COURT:  What is the second

19   thing?

20          MR. INGRAM:  The second thing,

21   Mr. Juhasz and I have learned that Miss Roberts had

22   a scheduled appointment with her mental health

5700

1  provider, who I believe is a psychiatrist, who

2  upped her medication, changed her medication and

3  also, I believe increased her dosage, and I am

4  simply -- I think Mr. Juhasz and I shared this

5  concern, that the change in medication has impacted

6  her ability to follow these proceedings and

7  reasonably assist us in these proceedings.  We have

8  made an effort to call the psychiatrist, and from

9  here, I am merely going to throw the ball to

10  Mr. Juhasz and let him go from here.  He's much

11  more adept at these issues than I am.

12          THE COURT:  I understand.

13          MR. JUHASZ:  Judge, Jerry is right,

14  our concern all day has been the change in Donna's

15  appearance and demeanor.  I don't know that we're

16  certainly at a point where we wanted to say, stop

17  the trial and have any sort of competency

18  proceedings.  I think the most reasonable thing to

19  do, I should interrupt myself and say I had some

20  conversations with Captain Bacon who was kind

21  enough to give me some information about the

22  procedures and how they handle matters at the jail.

5701

1  And Gary, if I am talking out of school here,

2  please correct me, but I think that the procedure

3  is that the jail is going to administer whatever

4  medication the doctor prescribes, unless and until

5  the doctor says otherwise.  So what Mr. Ingram and

6  I are going to try to do is to get in touch with

7  this doctor and ask that that medication be

8  adjusted.  I understand that it is a stressful

9  situation for Donna and I can understand given her

10  mental health history, why she would think that she

11  would need some medicine, but obviously whether it

12  is for a day, an hour or the entire trial, she's

13  got to be competent to stand trial in the sense

14  that she can meaningfully participate in her

15  defense.  We're not trying to delay the proceedings

16  in any fashion and hopefully we can have this

17  situation corrected by tomorrow.  But we did want

18  to alert everybody that we have those concerns.  I

19  don't think, if she shows up in this condition

20  tomorrow, I think that I would probably move to ask

21  that the proceedings be recessed until we can get

22  it changed.

5702

1          THE COURT:  You have left word with

2     the doctor's office?

3          MR. JUHASZ:  We tried to call on the

4     last break of the afternoon and I did not get

5     through.  I left word.  I'll try to call again.

6          GARY BACON:  John had talked to me

7     about that and I don't think -- if John or Jerry

8     was to talk to them and say we don't want her to do

9     this, they would have to hear something from the

10    doctor.  On the other hand, she has the right to

11    refuse medication, which we did not discuss.

12         MR. JUHASZ:  We did not.

13         GARY BACON:  She has the right to

14    refuse medication if she so desires.

15         THE COURT:  Does your client or does

16    she remember what dosage she was on?

17         MR. INGRAM:  She was on a different

18    medication.  The medication has changed, two of

19    them, and Mr. Juhasz and I are not medical doctors,

20    and I'm not going to say don't give her her

21    medicine, because low and behold if something bad

22    happens, I'm not assuming the responsibility.  That

5703

1   is why we have doctors.

2            THE COURT:   If it is a different

3   medication then I think I would.   If it was the

4   same medication --

5            GARY BACON:   I was at the doctor's

6   appointment and it is aa different medication.   He

7   changed it.   It has been changed.

8            MR. BAILEY:   Do you want to bring

9   the doctor in and inquire of the doctor?

10            THE COURT:   I don't want to go

11   through all of that, if we can get him to address

12   the problem.   If he doesn't, I may have to do that.

13            MR. BAILEY:   My concern is does

14   Defense Counsel feel -- I assume this is just

15   today?

16            MR. INGRAM:   Yes.

17            MR. JUHASZ:   Just so it is clear for

18   appellate purposes, so we make a clear record.   We

19   were not in session, as you know, on Friday the

20   16th of May, and yesterday, Monday the 19th of May.

21   This appointment was on Friday the 16th, so this is

22   the first Court day since the change in the

5704

 1 | medication.

 2 | MR. BECKER: I want to add for the

 3 | record, but I think -- I think Mr. Juhasz and

 4 | Mr. Ingram are aware that she had the appointment

 5 | on Friday, but were unaware until today of the

 6 | change of medication.

 7 | MR. INGRAM: That's correct.

 8 | GARY BACON: There was an

 9 | appointment scheduled and I didn't know what John

10 | and Jerry wanted to do. I called Chris and said

11 | she has an appointment with Psych Care. I said,

12 | "What should I do? Should I take her?" Chris told

13 | me to get ahold of John and Jerry and I called John

14 | and had a phone conversation with John. He said to

15 | go ahead and take her. At that point, there was no

16 | indication there was any medicine change.

17 | MR. JUHASZ: Correct.

18 | MR. BECKER: My only concern here

19 | is, because I have heard the statement made that --

20 | it is now the end of the day, there's no further

21 | testimony. We have been here since 9:00. It is

22 | now 4:00 p.m. We presented four or five

5705

1    witnesses -- three, four witnesses, five witnesses

2    there, and I would think the statement was made

3    that she has not been of assistance today.  She's

4    not been of assistance today.  I don't know if you

5    are moving for a mistrial?

6              MR. INGRAM:  No.  We're not.  What I

7    believe I said was that we had cause to believe it

8    impacted her ability to follow these proceedings.

9              MR. BAILEY:  It may behoove us to

10    have some type of -- I don't want to do this all

11    over again.

12              THE COURT:  I believe the only

13    witness that was really a fact witness, the only

14    problem would be some situation where Donna was

15    present, but there's a rendition of fact.  The rest

16    of it, none of us need be here.  Just put it on the

17    record to the Jury, but a lot of that was just the

18    presentation of evidence, which Donna had no direct

19    participation in.  I would proffer this to the

20    Defense, that if you feel uncomfortable about

21    anything that happened with Mr. Dillon, Mr. Dillon

22    was there and testified to things that Donna was

5706

1   present at, then I would reserve your right to call

2   him back or require the State to go through all of

3   that again.  That is up to you folks.

4                   MR. INGRAM:  We're not uncomfortable

5   with the examination of Detective Dillon.

6                   MR. JUHASZ:  Candidly, neither of us

7   are shrinking violets when it comes to making

8   objections.  If we felt it was appropriate to stop,

9   we would have asked to do so.

10                   MR. BECKER:  We're leaving it as you

11  are going to get ahold of the doctor or attempt to.

12  If we cannot get ahold of him by 9:00 tomorrow, do

13  we want to --

14                   THE COURT:  We'll address it.

15                   MR. BAILEY:  Do you want the Court

16  to call to have the facility page him?

17                   MR. INGRAM:  It may help, if you

18  call and reasonably suggest that this good doctor

19  make an effort to return our call.

20  (End of in-chamber discussion at 4:10 p.m.)

21

22

5707

1  <u>Wednesday, May 21, 2003; In Open Court at 9:40 a.m.:</u>

2  (Jury is not present.)

3              THE COURT:  The Court will make

4  inquiry of the status of your client.

5              MR. JUHASZ:  Your Honor, I have had

6  some conversations with Donna this morning.  I

7  suppose to make the record complete and also

8  apprise the Court of everything that happened.

9  Well, let me go back to after our chambers

10  conference yesterday.  The Court was kind enough to

11  call Valley Counseling and try to use the influence

12  of the Court to make sure that somebody came to see

13  Miss Roberts.  After that, Mr. Ingram and I went

14  over to the jail.  We spoke with the jail medical

15  staff, advised her of the problem, and she

16  concurred about Donna's appearance.  She indicated

17  that she would be able to talk to the jail doctor,

18  who was Dr. Malvasi, and even if Donna's doctor did

19  not modify the medicine that Dr. Malvasi would

20  probably be able to.  My understanding is that they

21  have done that, and I have had some conversations

22  with Donna this morning.  I won't tell you that

1   she's as alert as she normally is, but I'll tell

2   you that I believe she's much more alert than

3   yesterday, and having had some conversations with

4   her this morning about a number of items, including

5   things related to her case, Mr. Ingram and I do

6   feel that she's able to proceed.

7                   THE COURT:  Fine.  She did have

8   contact with medical assistance?

9                   MR. JUHASZ:  Somebody came from

10  Valley Counseling.  She does not know the name.  My

11  conversation with Valley Counseling, I'm sorry,

12  after the Court called, they then called me back on

13  my cell phone.  There was some original discussion

14  about having Donna conveyed there for an

15  appointment.  When she called me back on the cell

16  phone, she told me that that was not going to

17  happen, because the doctor was too busy, but they

18  were going to send somebody to the jail from Valley

19  Counseling.  We made the nursing staff aware that

20  they did in fact come to see Donna and her

21  medication has been modified for today.

22                  MR. BAILEY:  I think the Court

5709

1    should also make inquiry of the Defendant to make

2    sure that she's able to proceed today.

3                    MR. INGRAM:   I'm not sure that we'll

4    permit that.

5                    THE COURT:   May I ask your client

6    one question?   Is she comfortable with proceeding?

7                    MR. INGRAM:   Yes, you may.

8                    THE COURT:   Donna, are you

9    comfortable with proceeding today?   You understand

10   what is going on, the medication is not affecting

11   you as it did yesterday?

12                   THE DEFENDANT:   Yes.

13                   THE COURT:   Connie, it has been

14   brought to my attention that there was some

15   conversation between you and one of the jurors,

16   that a juror approached you --

17                   JURY COMMISSIONER:   Yes, it was

18   Juror Terry Gray.   One of the ones that you guys

19   gave the order for not having to go to work.   When

20   she was signing in, just like a comment in passing,

21   she goes, "I cannot believe that they already

22   published in the paper that two of them didn't have

5710

1    to go to work anymore," which I hadn't read the

2    paper.  My first question to her was, "You read the

3    paper?"  She goes, "No, no."  I didn't want to get

4    into a whole conversation because the other jurors

5    were sitting in there, but she had made the comment

6    that she -- somebody had talked to one of the other

7    ones, I'm assuming Peggy, but I don't know, that

8    made the statement to the other person that it was

9    in the paper that they don't have to go to work.

10   Peggy is the other one that you gave the order to,

11   Margaret Kay.

12                THE COURT:  There's a situation, do

13   you wish the Court to make inquiry of either or

14   both?

15                MR. BECKER:  I think you better.

16                THE COURT:  Send both of them up.

17   (Juror Terry Gray entered the Courtroom.)

18                THE COURT:  Good morning.  Let me

19   ask you a question here.  We have to go through

20   this because we have to be so careful that there's

21   no taint of the Jury.  You asked or made some

22   comment to Connie about a newspaper.  Explain the

5711

1    context of that.

2            TERRY GRAY:  I asked Connie how it

3    got into the paper so fast, that Peggy and I had

4    come to talk to you, and I got it from Marsha.

5    Yesterday Marsha said to me that somebody had read

6    the paper and had read in the paper that she didn't

7    have to go to work anymore, while she was on the

8    Jury, and I said -- she said, "Do you know anything

9    about that?"  I said, "What are you talking about?"

10   And she said her mother had read it in the paper

11   and she didn't know anything about it and the Judge

12   hasn't said anything to her that she didn't have to

13   go to work, so she was going to work.

14           THE COURT:  Did you make any comment

15   to her about your situation?

16           TERRY GRAY:  I just said to her that

17   Peggy and I had concerns about going to work and

18   being put in a position of having to listen and

19   talk to people.

20           THE COURT:  You just explained that

21   you and Peggy's situation is --

22           TERRY GRAY:  I said that is probably

5712

1   what it was.

2               THE COURT:  Fair enough.  Do you

3   have any questions?

4               MR. BAILEY:  No questions.

5               THE COURT:  Defense?

6               MR. INGRAM:  No questions, but I'll

7   tell you what I'll do.  When Chris Bobbey comes in

8   this afternoon, we'll beat him up for you.  The

9   answer to your question is, he's responsible for

10  that.

11              TERRY GRAY:  It was after Court and

12  I just couldn't understand how it had gotten in the

13  paper so fast.

14              THE COURT:  If you find out, let me

15  know.

16              MR. BAILEY:  It was a slow news day.

17              MR. JUHASZ:  I think I know the

18  answer to this, but the only contact you have had

19  with the newspaper is from what Marsha told you

20  from what her mother told her?

21              TERRY GRAY:  I have not seen a

22  newspaper, watched the television, nothing.

5713

1    Isolated at home.

2    (Terry Gray excused from the Courtroom.)

3    (Marsha Danadic, Juror No. 10, entered the Courtroom.)

4              THE COURT:  The lady that was just

5    here had some conversation with you about something

6    in the newspaper.  Explain that to us for the

7    record.

8              MARSHA DANADIC:  I had asked -- my

9    mother-in-law wanted to know was I still going to

10   work.  She said she read in the paper that we

11   didn't have to go to work anymore.  She knows I

12   work every other weekend, so not necessarily -- you

13   guys are off the weekend, but I wouldn't be.  I

14   guess she was trying to help me out.

15             THE COURT:  Sounded like a good idea

16   to you?

17             MARSHA DANADIC:  Yes.

18             THE COURT:  You were wondering if

19   there had been some order that the Court had put

20   on?

21             MARSHA DANADIC:  I told her the

22   Judge didn't say anything to us about it, so that

5714

1    was all.

2                    THE COURT:  And the answer given to

3    you by the other lady that was in here, Terry Gray,

4    I think -- did that satisfy you as to what the

5    situation was?

6                    MARSHA DANADIC:  Yes.

7                    THE COURT:  You did not read a

8    newspaper yourself?

9                    MARSHA DANADIC:  No.

10                    THE COURT:  Any questions,

11   Mr. Bailey?

12                    MR. BAILEY:  No questions.

13                    MR. INGRAM:  Just a couple of

14   questions.  Good morning.  How are you?  It was

15   your mother-in-law that spoke with you?

16                    MARSHA DANADIC:  Yes.

17                    MR. INGRAM:  Did she tell you

18   anything else about the article that she had read

19   other than the fact that there was someone who

20   didn't have to go to work anymore?

21                    MARSHA DANADIC:  No.

22                    MR. INGRAM:  That is all I wanted to

5715

1    know.

2                    THE COURT:   Thank you.

3    (Juror Marsha Danadic excused from the Courtroom.)

4    (Jurors entered the Courtroom at 9:55 A.M.)

5                    MR. BECKER:   The State would call

6    Dale Laux.

7                    <u>DALE LAUX</u>

8    being duly sworn according to law, on his oath,

9    testified as follows:

10   <u>DIRECT EXAMINATION BY MR. BECKER:</u>

11   Q.   Good morning.  Would you introduce yourself to

12        this Jury, please?

13   A.   My name is Dale Laux, L A U X.

14   Q.   And Mr. Laux, where are you employed at?

15   A.   I work for the Ohio Bureau of Criminal

16        Identification and Investigation in

17        Richfield, Ohio.

18   Q.   And what is it you do there?

19   A.   I am a forensic biologist.

20   Q.   Can you relate to this Jury what exactly a

21        forensic biologist does at BCI?

22   A.   Yes.   We examine evidence that is brought into

5716

```
 1           the laboratory from police departments
 2           and Sheriff's offices in regards to
 3           criminal activity.  I primarily examine
 4           clothing, weapons, many different types
 5           of objects for stains of body fluids, for
 6           example, blood, semen, saliva, things of
 7           this nature.
 8   Q.   And can you briefly relate to this Jury the
 9           education and training that you received
10           that prepared you for that position?
11   A.   Yes.  I have a Bachelor's of Science degree in
12           Biology from Heidelberg College.  I have
13           a Master's of Science degree from Ohio
14           State University, and I have worked with
15           the Bureau for over 23 years.  And during
16           that time, I have attended many schools
17           and workshops and meetings in the area of
18           forensic science.  Some of these schools
19           were at Quantico, Virginia at the FBI
20           Academy.  A couple of these schools
21           involved the analysis and examination of
22           blood stains and semen stains and DNA
```

5717

1          analysis.  And I have also had training

2          in forensic serology from a laboratory in

3          Chicago, Illinois.  The lab is run by

4          Walter McCrone.

5     Q.   And you have testified, I'm assuming, many

6          times in the State of Ohio?

7     A.   Yes.

8     Q.   And you have been qualified as an expert

9          witness many times?

10    A.   Yes.

11    Q.   Can you just name a few of the counties that

12         you have been qualified as an expert in?

13    A.   I believe I have testified in about half of

14         the counties.  There's 88 counties in

15         Ohio, and roughly half of those, mostly

16         the northeast, southeast, and northwest

17         areas.

18    Q.   And that would include Trumbull County?

19    A.   Yes.

20    Q.   Now, Mr. Laux, I would like to ask you some

21         questions about specific work you do.

22         First of all, there's a test called

5718

1          presumptive blood test, is that correct?

2   A.   Yes.

3   Q.   And can you relate to this Jury what exactly a

4          presumptive blood test is and how you

5          perform it?

6   A.   Well, there are different types of presumptive

7          blood tests that are used throughout the

8          country in examining blood stains.  It

9          depends on the lab and the analyst as to

10          what they want to use, but all of them

11          have one thing in common.  They will

12          react with the heme portion of

13          hemoglobin, and that is a component that

14          is in our blood.  And they will, the heme

15          acts as the catalyst, which speeds up a

16          chemical reaction.  And we can utilize

17          this phenomenon by adding a chemical to a

18          stain and seeing if it turns a color.  It

19          acts as a catalyst and speeds up the

20          oxidation of a chemical, and it is very

21          simple process.  It turns a colorless

22          liquid into a colored compound and that

5719

1              indicates to us then that the sample may

2              be blood.  It is a presumptive test,

3              because there are other things that will

4              react like that and give you a positive

5              reaction, but there aren't any substances

6              that I'm aware of that look like blood

7              and give a positive reaction.

8    Q.   And do you on occasion at the lab do a

9              presumptive test even if there's been a

10             presumptive test out in the field by say

11             an agent or law enforcement officer?

12   A.   Are you asking if I would repeat it?

13   Q.   Yes.

14   A.   Yes, I would.

15   Q.   Why would you do that?

16   A.   Well, just to satisfy myself that I am getting

17             a positive reaction and that whatever was

18             collected is still there and giving a

19             positive reaction.

20   Q.   And let's talk specifically about when

21             materials and say may be specifically

22             clothing comes to you or articles of

5720

1           clothing or material come to you.  What

2           is it that you do when you first receive

3           an item that potentially you need to

4           examine or that you are required to

5           examine?

6    A.   First thing I would do is lay out a clean

7           sheet of brown paper that we have and

8           place the item on that.  For example,

9           let's say a shirt, and under very good

10          lighting, take a look at the shirt,

11          describe it in my notes, and look for any

12          apparent stains that may be blood.  And

13          I'm sure everyone knows what blood stains

14          look like.  When they are dry on

15          clothing, they tend to turn a little

16          browner in color than red.  I'll check

17          those stains visually, and if anything

18          appears to be blood, then I'll run this

19          presumptive test.  And the way we do

20          this, we don't contaminate the sample

21          with the chemical I mentioned.  We'll

22          take a clean cotton tip swab, moisten it

5721

```
 1                    and then dab the stain, and in doing

 2                    that, we're removing some of the stain

 3                    out of the swab and we don't need very

 4                    much.  And then we'll add our chemicals

 5                    to the swab and see if it turns color.

 6    Q.    Now, how is it that you work -- I know years

 7                    ago, you were in, I think you were in

 8                    serology, is that correct?

 9    A.    Yes.

10    Q.    For lack of a better term -- or let me strike

11                    that.  Over the years serology has sort

12                    of fallen by the wayside; is that a fair

13                    statement?

14    A.    Yes.

15    Q.    And serology has been replaced by what testing

16                    procedure?

17    A.    Well, serology is defined as the typing of

18                    blood and semen stains, and years ago, we

19                    used to do the ABO blood grouping method,

20                    and a lot of you are familiar with what

21                    your ABO blood type is, but it wasn't as

22                    discriminating as other methods.  For
```

5722

1      example, half the population are type O,

2      so it doesn't help you very much in

3      determining who could be the source of a

4      blood stain.  And then we moved into

5      protein markers and that helped

6      distinguish the potential donor of a

7      blood stain.  And then now finally, I

8      think most people have heard of DNA and

9      that is a method where a stain is

10     extracted and typed and given what is

11     called a profile, and we can, if we get

12     enough markers to come up on a stain,

13     state with certainty that an item

14     originated from a person to the exclusion

15     of all other people, because the numbers

16     are so tremendously large; so that has

17     changed.  The basic analysis and

18     examination of items for blood and semen

19     and the presumptive test has not changed,

20     but the actual typing of the material

21     has.

22  Q.   And I assume we talked a little bit about

5723

```
 1              materials and examining say clothing.  I

 2              assume you use pretty much the same

 3              procedure or can you tell this Jury what

 4              the procedure is when you get say a fluid

 5              sample from a known suspect and they are

 6              asking you to compare that to an unknown

 7              suspect or unknown material?

 8   A.   When we have an unknown material, a stain on a

 9              pair of pants or shirt for example, and

10              now we want to determine could a person

11              be the source of that material or can

12              that person be excluded as being a source

13              of that blood.  What we need is a

14              standard.  And we can either obtain a

15              blood sample from a person or what we're

16              doing more often now is collecting, they

17              are called buccal swabs, which is just a

18              swabbing of the inside of the person's

19              cheek, and the cells that line the inside

20              of the mouth will come off onto the swab.

21              It is not painful.  It gives us enough

22              sample to determine the person's DNA
```

5724

```
 1                profile from that and then we can compare
 2                it to the unknown material.
 3    Q.    And can you explain to this Jury now here in
 4                2003 and maybe in the last two or three
 5                years, what your role is specifically as
 6                it works as evidence comes in to you?
 7                How do you work in this process of
 8                analyzing material for DNA analysis?
 9    A.    Well, I still examine the clothing, the items
10                that are brought in.  For example, in
11                this case an automobile was brought in,
12                so I would go into the garage and examine
13                the item for blood, semen stains, make a
14                determination if sperm is present or
15                blood, and then retain those items and
16                those are frozen and then we have several
17                people who do the DNA analysis.  They
18                will go to a freezer, obtain those items
19                and then run the DNA type.
20    Q.    Now, I want to direct your attention
21                specifically to sometime, I believe in
22                December of 2001 -- did you become
```

5725

1         involved in a case that the Howland

2         Police Department here in Trumbull County

3         made you aware of?

4 A.   Yes, Sir, I did.

5 Q.   And I want to specifically direct your

6         attention to a report that you generated.

7         Did you generate a report when your work

8         was done in that case?

9 A.   Yes, Sir.

10 Q.   Now, we have had some testimony already about

11         when evidence comes into the BCI crime

12         lab. It is put on, I guess what we call

13         a submission sheet?

14 A.   Yes.

15 Q.   And you are familiar with those?

16 A.   Yes.

17 Q.   I want to show you what has been marked for

18         purposes of identification as State's

19         Exhibits 280 and 284. First of all, do

20         you recognize State's Exhibit 280?

21 A.   Yes, Sir, I do.

22 Q.   And what is State's Exhibit 280?

5726

1    A.    This is a submission sheet in regards to a

2          homicide that was submitted by Howland

3          Police Department, and in particular this

4          is a C submission.  So there was an

5          original and then the way our lab

6          designates additional submissions is by a

7          letter after the original number, so we

8          would have gone through A and B and this

9          would have been the fourth submission.

10   Q.    So you had a regular number, A, B and then

11         this one, C?

12   A.    Yes.

13   Q.    I'm going to hand you what has been marked for

14         purposes of identification as State's

15         Exhibit 284.  That is a two page

16         document.  Can you tell us what that is?

17   A.    This is a copy of the report that I sent to

18         Howland Police Department in regards to

19         my findings.

20   Q.    And is that a fair and accurate representation

21         of your report, is that correct?

22   A.    Yes, Sir.

5727

1  Q.  Now, during the course of this investigation,

2      you had some items that you looked at to

3      make these determinations that you were

4      talking about, these presumptive blood

5      tests, is that correct?

6  A.  Yes.

7  Q.  I'm going to show you State's Exhibit 255.

8      I'm going to hand you State's Exhibit

9      255.  And can you tell us what State's

10     Exhibit 255 is?

11 A.  This is a manila envelope that was marked with

12     our case number 14, and it is labeled one

13     cotton swab of possible blood stain from

14     floor found in front door hallway.

15 Q.  And what did you do with that when you got it

16     at the lab?

17 A.  I opened the sealed envelope, pulled out the

18     swab, ran the presumptive test that I

19     mentioned with stain, and then I broke

20     the end of the swab off and retained that

21     in a manila envelope and froze that.  The

22     test were positive for indicating the

5728

1          presence of blood.

2   Q.  And did that then go on to another location in

3          BCI?

4   A.  The end of the cotton tip swab that I

5          retained, yes, it did.

6   Q.  Where did that go to?

7   A.  Brenda Gerardi, who is a DNA analyst, examined

8          that material.

9   Q.  Now you also had a chance to examine some

10         other items, is that correct?

11  A.  Yes.

12  Q.  And can you briefly relate to this Jury the

13         other items that you examined at the lab

14         there pursuant to your report?

15  A.  We had an automobile that was brought in.  It

16         was designated item number 28 and that

17         was examined for any possible blood

18         stains, and I examined the outside and

19         interior of the vehicle, and found some

20         presumptive positive reactions and I

21         swabbed those areas and retained those.

22  Q.  Do you recall what areas specifically you

5729

1       swabbed?

2   A.  Yes.   There was a stain visible on the

3       passenger side, the exterior of the door

4       handle and under the door handle.  Also

5       inside the vehicle near the console and

6       then also on the driver's side visor.

7   Q.  I'm going to show you -- do you happen to

8       recall what the license number is to that

9       vehicle or the VIN number?

10  A.  The license plate number was CPA 8225.

11  Q.  I'm going to show you a series of photographs.

12      They have been marked as State's Exhibits

13      157, 159, 160, 162, 164, 165, 166, 168,

14      169, 170, 171, 172, 174, 178, 181, 182,

15      184 and 191.  I'm going to hand you these

16      first and ask you to look at them before

17      I put them on the overhead.

18  A.  Okay.

19  Q.  Have you had a chance to review all of those?

20  A.  Yes.

21  Q.  Do you recognize those?

22  A.  I recognize them.

5730

1   Q.   What are those Exhibits?

2   A.   These are photographs of the vehicle that we

3        examined in the garage that I mentioned

4        the license number already, and they are

5        pictures of the exterior of the vehicle

6        and then various shots of the interior.

7   Q.   Mr. Laux, I'm going to show you some of these

8        on the overhead here, and specifically,

9        you said you actually found some

10       presumptive test on those?

11  A.   Yes.

12  Q.   What were the locations again?

13  A.   The outside door handle underneath.  There was

14       a stain on the outside passenger door

15       handle and then underneath that handle.

16  Q.   Before you begin, I'm going to show you

17       State's Exhibit 169 and ask you if you

18       recognize State's Exhibit 169?

19  A.   Yes.

20  Q.   What is State's Exhibit 169?

21  A.   The door handle on the passenger side of the

22       vehicle.

5731

1    Q.   And I'll show you State's Exhibit 170.  Do you
2         recognize 170?
3    A.   Yes.  It is the door handle again.
4    Q.   You have in front of you a laser pointer.  It
5         looks like a little remote control.
6    A.   There's a stain right there on the handle.
7    Q.   And that is something that you would have
8         tested?
9    A.   Yes.
10   Q.   And you indicated you had found blood
11        somewhere else on that vehicle?
12   A.   There was a stain inside the passenger door
13        handle that was swabbed and the item was
14        retained.  It is a plastic vinyl inside
15        handle.
16   Q.   I'm going to show you State's Exhibit 182.
17        Can you see number 182?
18   A.   Yes.  There was a stain, you can't see it, but
19        it was on this handle.
20   Q.   Now there were other stains in that vehicle,
21        is that correct?
22   A.   Yes, there was one labeled seven that I

5732

1           labeled, item number seven, and that was

2           on a front panel below the light switch.

3    Q.    I'm going to show you State's Exhibit 191.

4    A.    There's a stained area right there I circled

5           with a yellow marker.

6    Q.    This stain, was it tested?

7    A.    Yes.

8    Q.    Was every stain that you thought was blood on

9           this vehicle tested?

10   A.    Yes.

11   Q.    Now, I'm going to show you State's Exhibit

12          162.   Is that the vehicle?

13   A.    Yes, Sir.

14   Q.    And depicting the license plate you previously

15          read?

16   A.    Yes.

17   Q.    Where is this garage or location at?

18   A.    This garage is attached to our lab.

19   Q.    And where is that physically located?

20   A.    Richfield, Ohio.

21   Q.    I'm going to show you State's Exhibit 164 and

22          ask if you recognize what State's Exhibit

5733

1           164 is?  I'll show you State's Exhibits

2           164, 165, 168 and 171 before I put them

3           up on the screen.  Do you recognize those

4           items?

5    A.   Yes.

6    Q.   I'm going to put up first of all number 164.

7           This is State's Exhibit 164.  Can you

8           tell us what we're looking at?

9    A.   It is the driver's side sun visor and it is in

10          the up position, and there are some

11          buttons here, that there's a button

12          labeled "off" and I believe "on" and that

13          would be the roof area.  And then there's

14          a hangar mechanism that is attached to

15          the car and the visor is right here.  You

16          can see the warning label on it.

17   Q.   And those items were tested for presence of

18          blood?

19   A.   Yes.  The visor was, you see some stains here

20          and then also the mechanism that held the

21          visor onto the car.

22   Q.   What were the results of that?

5734

1    A.    Positive.

2    Q.    I am going to show you State's Exhibit 165 and

3          ask you what 165 is?

4    A.    That is a different view of the same size.

5          Here you can see the controls that are on

6          the roof of the car.  This is the roof or

7          headliner and this is the visor right

8          here that is pulled away from the

9          mechanism that holds it on.  You can see

10         that attached right there.

11   Q.    And what was done with the visor and that

12         mechanism, that clip?

13   A.    Those were removed from the car.

14   Q.    And you were present when they were removed?

15   A.    Yes.

16   Q.    I'll show you State's Exhibit 168 and ask if

17         you recognize State's Exhibit 168?

18   A.    Yes, Sir.  That is the visor that has been

19         removed now and it is laying on top of a

20         desk.

21   Q.    And State's Exhibit 171?

22   A.    That is a mechanism that holds the visor in

5735

1          place, and you can see a stained area

2          right there.

3    Q.    Those items that were removed, were they given

4          to someone else after you were done with

5          them?

6    A.    Yes.

7    Q.    Who were they given to?

8    A.    Brenda Gerardi.

9    Q.    I'll hand you State's Exhibits 268 and 267.

10         I'm going to ask you if you recognize

11         those items?

12   A.    Yes, I recognize State's Exhibit 267.  It is

13         the package that we used to hold the

14         visor that was removed.  It has our case

15         number and this is a small paper bag.

16         Again it has our case number and item

17         number and this contains the mechanism

18         that held the visor in place.

19   Q.    Now, I am also going to present to you State's

20         Exhibits 385, 386, 387, 388, 389, and

21         390.  I'll ask if you recognize what

22         those items are?

5736

1   A.   Yes, Sir, I recognize these items.

2   Q.   Can you tell this Jury and refer to please,

3          our Exhibit numbers, what those items

4          are?

5   A.   State's Exhibit 385 is a swabbing from the

6          visor, the driver's side visor that you

7          saw on the screen.  I took a swabbing of

8          the stained area and retained that.

9          State's Exhibit 386 is a stain, it is a

10         swabbing of a stain that was visible on

11         the trunk release that is inside the

12         vehicle on the driver's side.  State's

13         Exhibit 387 is a swab with a stain and

14         that was collected from our number 14

15         and we discussed that earlier.  Counsel

16         showed me an envelope that was labeled

17         item 14 and I told you that I retained

18         the cotton swab portion that was

19         exhibited and this is that.  State's

20         Exhibit 388 is a blood standard from

21         Robert Fingerhut.

22   Q.   Did you do anything with that?

5737

| | | |
|---|---|---|
| 1 | A. | It came in a liquid state and I dried the |
| 2 | | sample down and then retained it item |
| 3 | | 389, a brown paper packaging that I |
| 4 | | prepared.  It contains gauze that was |
| 5 | | found, I believe, in a dumpster. |
| 6 | Q. | That is 390? |
| 7 | A. | That is State's Exhibit 389. |
| 8 | Q. | You're right. |
| 9 | A. | And State's Exhibit 390 is a swabbing from the |
| 10 | | jacket, our item number eight. |
| 11 | Q. | You actually saw a jacket at your lab at some |
| 12 | | point? |
| 13 | A. | This is an item that Brenda Gerardi collected. |
| 14 | Q. | Okay.  That is 390 from the jacket.  All of |
| 15 | | those items with the exception of 390, |
| 16 | | they were then later turned over to |
| 17 | | Brenda Gerardi? |
| 18 | A. | Yes. |
| 19 | Q. | For her further testing? |
| 20 | A. | Yes. |
| 21 | Q. | Is that the extent of your involvement in this |
| 22 | | case in terms of the presumptive test for |

5738

1             finding blood on those items?

2  A.   Yes.

3  Q.   Now Mr. Laux, I have a few additional

4            questions for you. All of those items

5            are in the same or substantially the same

6            condition as when you examined them?

7  A.   Yes.

8  Q.   Your report is a fair and accurate report of

9            your findings in this case?

10  A.   Yes, Sir.

11  Q.   Now, I have a question for you, a couple of

12            questions I want to follow up. How many

13            cases a year do you handle in your

14            department, approximately?

15  A.   I would say probably 12 hundred to 15 hundred.

16  Q.   And how long or how much work is involved to

17            say do what you did in this case, can you

18            give us an approximation of how many

19            hours you spend?

20  A.   I believe examination of the car took an

21            entire day and then some of the other

22            items that were submitted, so a day and a

5739

1               half perhaps.

2   Q.   And is it possible for BCI to examine every

3               piece of evidence that is given to it by

4               a law enforcement agency?

5   A.   Well --

6   Q.   That is a bad question.   Let me rephrase that.

7               Does BCI have a policy for examining

8               certain items?

9   A.   Yes.

10  Q.   Tell this Jury what that policy is in terms of

11              evaluating items that are submitted to it

12              by law enforcement agencies?

13  A.   We do exactly what you just stated.   We

14              evaluate the items.   We discuss what

15              happened in a case, what police and

16              Prosecutors believe happened, and then

17              we'll examine items that they would like

18              examined and that we agree to that will

19              either help substantiate what they

20              believed happened or refute that

21              situation.   And then those officers can

22              go on other leads, but primarily, we want

5740

1              to examine items that we think are

2              relevant and will shed light on what

3              happened.

4     Q.   So, if an agency would bring in to you 300

5              items and ask you to examine all of them,

6              what would the response from BCI be to

7              that?

8     A.   We would not do that.  We would talk to the

9              authorities and say, "Please can you tell

10             us some items that you would like us to

11             look at, and if it turns out that this

12             aids you, perhaps we can stop," and

13             certainly -- I'm working on one case that

14             is years and years old and so far nothing

15             has been fruitful, so we'll continue to

16             work on a case until we can gather some

17             information that, as I said, sheds light

18             on perhaps what happened.

19    Q.   And in essence then what you ask the agencies

20             are to give you the best of what they

21             need?

22    A.   Yes.  You have to understand that when an

5741

1              officer is at the crime scene, they are

2              perhaps collecting items that they think

3              may be relevant, they are not sure, and I

4              have been in that situation myself.  So

5              you are going to collect a lot of items

6              and now, because you have one time to do

7              that, and then later, you go through

8              those items and ask yourself, is this

9              helpful or is this relevant or do I not

10             have to look at this item.

11    Q.    And even though some things may add to the

12             case, there's a time constraint that you

13             have at your agency?

14    A.    Yes.  We're under time constraints certainly.

15             We have cases that are going to Court.

16             We try to at all times meet Court dates,

17             so that is a priority, and everyone wants

18             their case done immediately, so we do

19             have a time problem in that regard.

20    Q.    Mr. Laux, I want to thank you very much for

21             your time.  Just so counsel knows, I'm

22             going to keep all of these somewhat

5742

1             organized in the back on the bench here,

2             if you want any of these Exhibits other

3             than his report.  Thank you very much,

4             Mr. Laux.

5 CROSS EXAMINATION BY MR. JUHASZ:

6 Q.    Mr. Laux, good morning.

7 A.    Good morning.

8 Q.    I just have a few questions for you and let me

9             start with a couple of things that

10             Mr. Becker gave you.  One of the things

11             he gave you was the C submission sheet;

12             do you have that in front of you?

13 A.    Yes, Sir.

14 Q.    Would you be kind enough again, for the

15             record, to identify what State's Exhibit

16             that is?

17 A.    State's Exhibit 280.

18 Q.    Now, 280, State's Exhibit 280 is the C

19             submission, which I think you said is the

20             fourth submission, correct?

21 A.    Yes.

22 Q.    Now you also have in front of you, your

5743

1           report, correct?

2  A.    Yes, Sir.

3  Q.    Would you take just a second and look at that

4           and then tell me after you have looked at

5           it, whether you were asked to analyze

6           anything on the C submission?

7  A.    Yes, I don't have to look on the report.  I

8           can see on the C submission that I was

9           asked to look at items.  It is written

10          right on the State's Exhibit 280.

11  Q.    Let me ask you to take a look at your report

12          and again, would you be kind enough for

13          the record to identify what that is, as a

14          State's Exhibit, what number?

15  A.    State's Exhibit 284.

16  Q.    On the first page of that report, I see some

17          items that were submitted, beginning with

18          two and ending with 28?

19  A.    Yes.

20  Q.    Those would be just for the clarification for

21          the Jury, those would be because there's

22          no letter in front of them or after them

5744

1              from the original submission, correct?

2    A.   Correct.

3    Q.   And then at the bottom of the page, I see some

4              things actually running over into the

5              next page, starting with A-1 and ending

6              with A-25, correct?

7    A.   Correct.

8    Q.   So those would be from the A submission,

9              correct?

10   A.   Yes.

11   Q.   Now I don't see anything with any C numbers on

12             there.  Does your report mention anything

13             that you analyzed from the C submission?

14   A.   No.

15   Q.   So, to go back to my original question, you

16             may have been asked to do that, but you

17             did not analyze anything from the C

18             submission, correct?

19   A.   Correct.

20   Q.   Now, can you and I agree that item C-6 on the

21             C submission is a pair of red and black

22             Nike tennis shoes?

5745

1  A.  Yes.

2  Q.  Now you don't know where those shoes came from

3      or who they belonged to or anything like

4      that, correct?

5  A.  Correct.

6  Q.  All you know is that a pair of red and black

7      Nike tennis shoes were delivered to BCI?

8  A.  Yes.

9  Q.  On the C submission?

10 A.  Correct.

11 Q.  And you never examined them for a presumptive

12     blood test or anything else, we can agree

13     on that?

14 A.  That is correct.

15 Q.  Now, Mr. Becker asked you some questions about

16     the time constraints and the fact that

17     there are Court dates and all of those

18     kinds of things?

19 A.  Yes.

20 Q.  Here we're sitting May of 2003 in Court,

21     correct?

22 A.  Yes.

5746

| | | |
|---|---|---|
| 1 | Q. | These items were submitted back in December of |
| 2 | | 2001, is that right? |
| 3 | A. | Yes. |
| 4 | Q. | Now, since December of 2001, has anybody |
| 5 | | called you and said, "You know, I know |
| 6 | | you were kind of busy when we sent you |
| 7 | | all of this stuff originally, but there's |
| 8 | | a couple of other things we would like |
| 9 | | you to look at."  You haven't gotten a |
| 10 | | call like that, have you? |
| 11 | A. | No. |
| 12 | Q. | Or a letter or anything like that? |
| 13 | A. | No. |
| 14 | Q. | I don't believe you have the original |
| 15 | | submission sheet in front of you, do you? |
| 16 | | You know what I am talking about, the |
| 17 | | original BCI, the original submission, do |
| 18 | | you have that? |
| 19 | A. | Yes, I have a copy in my file. |
| 20 | Q. | Rather than marking another Exhibit, let's |
| 21 | | just use that one.  Let's use that one, |
| 22 | | fair enough? |

5747

1    A.    Yes.

2    Q.    Can you look on there, please, and tell me,

3          item No. 2, that was submitted with the

4          original submission, is a shirt, is it

5          not?

6    A.    Yes.

7    Q.    Does it indicate or do you have any knowledge

8          of where that shirt came from or who it

9          belonged to?

10   A.    Yes.  From Mr. Fingerhut's wife.

11   Q.    Now, Mr. Laux, do you have any present

12         recollection about ever looking at that

13         shirt?

14   A.    No, I did not.

15   Q.    You did not?

16   A.    Right.

17   Q.    Did you have any discussion with the law

18         enforcement authorities about whether you

19         should look at that shirt?

20   A.    I can't recall having a discussion.  I may

21         have.

22   Q.    And again, for the Jury, would you be kind

5748

```
 1                enough to tell us what date that shirt

 2                was submitted to BCI?

 3    A.    On December 14, 2001.

 4    Q.    And as of today, May 21, 2003, it has not been

 5                looked at or tested, we can agree on

 6                that?

 7    A.    Yes.

 8    Q.    In the BCI submission sheet, sometimes they

 9                ask you by putting after it or in

10                parentheses what they want you to look at

11                for a particular item, correct?

12    A.    Yes.

13    Q.    And just I know that you and I know what we're

14                talking about, so we're clear for the

15                Jury, if it says item one, a box, it may

16                say after it, latent prints, correct?

17    A.    Correct.

18    Q.    May even say firearms if they want to see if

19                there's gun powder residue?

20    A.    Yes.

21    Q.    Or it may say serology, they want you to check

22                and see if there's also a blood stain on
```

5749

1          that box?

2    A.    Yes.

3    Q.    Is there any such listing for the item we have

4          listed, the shirt?

5    A.    Serology, human blood.

6    Q.    So when Howland Police Department gave that

7          shirt to BCI, they wanted BCI to look at

8          it, to check it for the presence of human

9          blood, correct?

10   A.    Yes.

11              MR. JUHASZ:  That is all I have.

12   Thank you very much.

13              MR. BECKER:  No redirect.

14              THE COURT:  Let's take a ten minute

15   break.  Remember the admonition given.

16   (Court in recess at 10:40 a.m.)

17

18

19

20

21

22

5750

1

2          REPORTER'S   CERTIFICATE

3

4          I do hereby certify that the above and

5     foregoing is a true and correct transcript

6     of the proceedings had in the within hearing

7     as shown by stenotype notes written by me in the

8     presence of the witnesses at the time of the

9     hearing.

10

11                    _____
                      MARY ANN MILLS, R.P.R.
12                    Official Court Reporter
                      Trumbull County, Ohio
13

14

15

16

17

18

19

20

21

22

5751

1               IN THE COURT OF COMMON PLEAS
                   TRUMBULL COUNTY, OHIO
2              TRIAL COURT CASE NO. 01-CR-793
             SUPREME COURT OF OHIO CASE NO. 03-1441
3

4    STATE OF OHIO          )
                            )        VOLUME XXVII
5             Plaintiff     )
                            )
6    -vs-                   )
                            )
7    DONNA M. ROBERTS       )
                            )
8             Defendant     )

9

            BE IT REMEMBERED, that on Wednesday, May 21,
10
     2003, and Thursday, May 22, 2003, these proceedings
11
     came on to be heard before one of the Judges of this
12
     Court, John M. Stuard, in Courtroom No. 2, on High
13
     Street, Warren, Ohio, before the case heretofore
14   filed herein.

15

16

17

18   Mary Ann Mills, RPR
     Official Court Reporter
19   Trumbull County, Ohio

20

21

22

```
                                                              5752

1

2                       A P P E A R A N C E S

3

4    On Behalf of the State of Ohio:
          Dennis Watkins, Prosecuting Attorney
5         Charles L. Morrow, Ass't. Prosecuting Attorney
          Christopher D. Becker, Ass't. Prosecuting Attorney
6         Kenneth N. Bailey, Ass't. Prosecuting Attorney
          160 High Street, N.W.
7         Warren, OH 44481

8    On Behalf of the Defendant, Nathaniel Jackson:
          Anthony V. Consoldane, Attorney at Law
9         James F. Lewis, Attorney at Law
          State of Ohio Public Defendant's Office
10        328 Mahoning Avenue, N.W.
          Warren, OH 44481
11
     On Behalf of the Defendant, Donna M. Roberts:
12        John B. Juhasz, Attorney at Law
          J. Gerald Ingram, Attorney at Law
13        7330 Market Street
          Youngstown, OH 44512
14
     On Behalf of The Vindicator Printing Co.
15        Ann Millette, Attorney at Law
          3200 National City Center
16        1900 East Ninth Street
          Cleveland, OH 44114
17
     On Behalf of WFMJ Television, Inc.:
18        Stephen T. Bolton, Attorney at Law
          201 E. Commerce Street, Atrium Level Two
19        Youngstown, Oh 44503

20

21

22
```

1
                              I N D E X

2

3       VOLUME XXVII:
        (Wednesday, May 21, 2003 & Thursday, May 22,
4       2003)

5       STATE'S WITNESSES:   (May 21, 2003)

6        Brenda Gerardi
         Direct Examination by Mr. Becker           5753
7        Cross Examination by Mr. Juhasz            5776

8        Michael Roberts
         Direct Examination by Mr. Becker           5788
9        Cross Examination by Mr. Juhasz            5814

10       Cynthia Mayle
         Direct Examination by Mr. Becker           5826
11       Cross Examination by Mr. Juhasz            5843
         Redirect Examination by Mr. Becker         5852
12       Recross Examination by Mr. Juhasz          5855

13       Chief Paul Monroe
         Direct Examination by Mr. Becker           5856
14

15

        (Thursday, May 22, 2003)
16
         Continuing Direct Examination by Mr.
17       Becker of Chief Paul Monroe                5951
         Cross Examination by Mr. Ingram            5960
18       Redirect Examination by Mr. Becker         6042
         Recross Examination by Mr. Ingram          6050
19

20

21

22

5753

1

2  Wednesday, May 21, 2003:

3  (Resumed in Open Court at 10:55 a.m.)

4                    BRENDA GERARDI

5  being duly sworn according to law, on her oath,

6  testified as follows:

7  DIRECT EXAMINATION BY MR. BECKER:

8  Q.    Would you introduce yourself to this Jury?

9  A.    Brenda Gerardi, G E R A R D I.

10 Q.    Where are you employed at?

11 A.    I am employed with the Ohio Bureau of Criminal

12              Identification and Investigation,

13              commonly referred to as BCI.

14 Q.    And what do you do at BCI?

15 A.    Forensic scientist in the serology, DNA

16              section.

17 Q.    And how long have you been employed at BCI?

18 A.    March of 1997.

19 Q.    And can you tell this Jury what your primary

20              duties are at BCI?

21 A.    I analyze physical evidence for the

22              identification of physiological fluids

5754

```
1              such as blood, urine, feces, semen, urine
2              and saliva, and the subsequent DNA
3              analysis of those samples.
4   Q.   Can you tell this Jury what education you
5              received to prepare you for that
6              position?
7   A.   I have an Associate of Science degree and a
8              Bachelor's of Science degree in biology
9              from Kent State University.  I have
10             completed continuing education in
11             myecular biology, genetics and
12             bio-chemistry.  I have completed an
13             in-house training, approximately two
14             years of training, in DNA analysis and
15             interpretation.  I have also completed a
16             course conducted by the FBI Academy in
17             Quantico, Virginia on DNA analysis and
18             interpretation.
19  Q.   Do you make DNA analysis part of your duties,
20             that is a part of your duties at BCI?
21  A.   Yes.
22  Q.   Can you tell this Jury approximately how many
```

5755

```
 1              DNA analyses you have performed?
 2     A.   I have worked over 120 cases in DNA.  So I
 3              have made several comparisons for each
 4              case.
 5     Q.   Now are either you or the BCI lab that you
 6              work for, are they members of a
 7              professional organization?
 8     A.   I am a member of the Midwestern Association of
 9              Forensic Scientists, and I am also a
10              member of the Ohio Identification
11              Officers Association.
12     Q.   And do you know whether the BCI lab here in
13              Ohio where you work at is accredited or
14              has any certifications?
15     A.   We're accredited by ASCLD, which is the
16              American Society of Crime Lab Directors.
17     Q.   And what does that mean to be accredited?
18     A.   Accreditation is the crime lab directors have
19              come up with manuals, set standards that
20              you must follow, to insure the
21              reliability in your testing.
22     Q.   Have you previously been qualified as an
```

5756

1          expert witness in any Courts in Ohio?

2    A.   Yes, I have.

3    Q.   And that would include Trumbull County Court?

4    A.   Yes.

5    Q.   And I think presumably this Courtroom itself?

6    A.   That is correct.

7    Q.   Now, can you tell this Jury what exactly DNA

8          is?

9    A.   DNA stands for deoxyribonucleic acid.  It's a

10         long string like molecule that contains

11         the genetic code or blueprint for life.

12         It is found in all living cells, with the

13         exception of red blood cells, and it is

14         unique to each individual.  Except

15         identical twins.

16   Q.   And what makes -- and maybe just briefly,

17         could you explain why identical twins,

18         you cannot differentiate?

19   A.   Identical twins, identical, the DNA will be

20         the same.  During conception, the egg

21         splits and the same exact DNA type is

22         transferred.

5757

1    Q.    Now, what makes DNA useful for comparison?

2          How are we able to make these

3          comparisons?

4    A.    DNA is useful -- well, 99 percent of your DNA

5          is the same from the person to person.

6          But there's the one percent of your DNA

7          that is unique and that makes you

8          different and we can tell you apart, just

9          by that area.  So we do look at target

10         location in that one percent that is

11         unique to each individual.  It is also

12         unique for forensic because the same DNA

13         in your skin cells, is the same DNA found

14         say in your blood cells.  So you can

15         compare one to the other.  So, if you

16         have left a cigarette butt at a crime

17         scene, I can compare the cells or from

18         the lip cells to a blood standard, known

19         reference standard to include or exclude

20         someone as being the source of the DNA on

21         the cigarette butt.

22   Q.    And you mentioned forensic that DNA is used

5758

```
 1              for, but there are other uses outside of

 2              forensic that DNA is used for?

 3   A.   DNA can be used for medical technology,

 4              genetic engineering, things like that.

 5   Q.   Can you explain to this Jury, how you make a

 6              DNA comparison?  What do you do when you

 7              make a DNA comparison?

 8   A.   There's a four step procedure that we follow,

 9              and I'll break it down into those four

10              areas.  First we do an extraction, which

11              is just the removal of the DNA from the

12              cellular material or stain.  And then I

13              would quantify, which just allows me to

14              know how much DNA I have extracted from

15              the stain.  We have an amplication step

16              which is a chemical Xeroxing of the

17              target area that I explained, area --

18              that those rare sites of DNA, and then we

19              have the actual DNA analysis, which gives

20              me the data that I can use to do the

21              comparisons from the known, to the

22              forensic sample.
```

5759

1   Q.   Now, how do you know that the results, what

2        you get, are going to be valid results or

3        they are reliable?

4   A.   I can tell that our results are reliable

5        because we do controls through every step

6        of our procedure to ensure that our tests

7        are working properly.  To ensure that our

8        tests are working properly and also, we

9        have a technical review, once my case is

10       finished, another peer or another DNA

11       qualified analyst will review all of my

12       work and then make sure that they have

13       come to the same conclusions that I have

14       come to.  It is also administratively

15       reviewed by a supervisor.  We also take

16       qualifying exams and proficiency tests

17       twice a year, and are graded by an

18       outside agency to ensure that I am doing

19       my tests properly and interpreting

20       reliably.

21  Q.   And is that also part of that certification

22       process you talked about?

5760

1    A.   Yes, that is correct.

2    Q.   Now, over the years, I think there's been

3         different types of DNA analysis used,

4         different procedures, I guess.  What type

5         of DNA analysis is currently being used

6         by BCI?

7    A.   We have an STR PCR procedure.  STR stands for

8         short tandem repeat and that is the most

9         advanced DNA we're trained in.  The PCR

10        is just the type of amplication step that

11        I told you earlier.  That is the

12        procedure that we use.

13   Q.   Now, sometimes during a DNA analysis, you will

14        find what we call two contributors to a

15        stain.  How are you able to sort through

16        and find out that there's two different

17        contributors, that same process?

18   A.   During our comparison -- well, let me explain.

19        When you -- when you are conceived, you

20        get your DNA half from your parents, so

21        one-half from your mother and half from

22        your father.  So at a particular

5761

1        location, you have two pieces.  Those two

2        pieces you have two at each location, so

3        if I have four pieces at a location, then

4        I can be assured that I have a mixture,

5        and that is how I can tell whether or not

6        there's a mixture.  There's also

7        mathematical formulations that we use to

8        determine percentages on how much DNA

9        from a major contributor versus the minor

10       contributor.  I can also separate the

11       two, and in most cases, you aren't going

12       to have an equal proportion of the two

13       contributors.  For example, if you have

14       skin cells that don't have a lot of DNA

15       and are sporadic on a clothing item, it

16       is not going to give a lot of DNA

17       reaction as much as a blood stain, that

18       you are going to have a lot of DNA

19       concentrated.  If I have a stain that I

20       cut out and there's a mixture, the blood

21       is more than likely the major

22       contributor.

5762

1   Q.   And the skin would be a minor contributor?

2   A.   That is correct.

3   Q.   Now, when you make your analysis, you talk

4        about the location or what we call loci?

5   A.   Yes.

6   Q.   Just briefly explain what that is?

7   A.   When we talk about a location, that is just a

8        location on the gene and I described that

9        there's a ton of information, a lot of

10       genetic material.  And we're looking at a

11       very small minute portion of the

12       chromosomes and chromosomes are just part

13       of a term that houses the DNA.  And so

14       when we have the location, we're just

15       pointing it out specific.  We have 13

16       locations that we look at on the DNA

17       strand.

18  Q.   And you look at those same 13 locations on all

19       of the DNA that you get?

20  A.   That is correct.

21  Q.   So, if there's 50 people that you are looking

22       at, you are looking at the same location,

5763

1          the same 13 locations on all 50 of those

2          people?

3    A.    That is correct.

4    Q.    Now, you mentioned something about statistics.

5          Are you familiar with population

6          frequencies?

7    A.    Generally, in forensics.

8    Q.    And how they apply to your line of work?

9    A.    That's correct.

10   Q.    And you have been trained in how to apply

11         those statistics to your line of work?

12   A.    That is correct.

13   Q.    You have attended seminars and been trained in

14         that?

15   A.    Yes.

16   Q.    Now, I want you to tell this Jury, and direct

17         your attention to a case that was

18         involving a Robert Fingerhut and Nate

19         Jackson.  Do you recall doing some

20         analysis in that case a little over a

21         year ago?

22   A.    Yes.

5764

1   Q.   Now, you are familiar with that case, and I'm

2        going to present to you some Exhibits

3        that I have back here.  The first thing I

4        want to present to you are State's

5        Exhibits 286-A, C and D.  At the

6        conclusion of your examination, did you

7        prepare some reports?

8   A.   Yes, I did.

9   Q.   I'm going to hand you State's Exhibits 286-A,

10       C and D and ask if you recognize those

11       Exhibits?

12  A.   Yes, I can recognize all three Exhibits by my

13       signature.

14  Q.   And those are fair and accurate copies of the

15       original that I believe you have retained

16       somewhere?

17  A.   That is correct.

18  Q.   Now, when you were assigned to this case, I

19       believe you made some comparisons.  I'm

20       going to hand you what has been marked

21       for purposes of identification as State's

22       Exhibits 265 and ask if you recognize

5765

```
 1           what State's Exhibit 265 is?
 2    A.   State's Exhibit 265, I can recognize this by
 3           our BCI case number.
 4    Q.   And what exactly is that?
 5    A.   This is the blood standard of Robert
 6           Fingerhut.
 7    Q.   And that is 265, correct?
 8    A.   That is correct.
 9    Q.   Now, you were also given some other items,
10           which I believe you have up there.
11           Specifically they are State's Exhibit
12           385, 386, 387, 388, 389, 390.  Those
13           items that are there in front of you, do
14           those items also represent items that you
15           analyzed?
16    A.   Yes.
17    Q.   So those were samples, and I guess just tell
18           us what those items are if you just
19           relate each one, what it is and what you
20           know it to be?
21    A.   State's Exhibit 385 is a stain from the visor
22           inside the car.  State's Exhibit 386 is a
```

5766

```
 1              stain above the trunk release inside the
 2              car.  State's Exhibit 387 is a swab with
 3              stain.  State's Exhibit 388 is the blood
 4              standard of Robert Fingerhut.  State's
 5              Exhibit 389 is the gauze, and State's
 6              Exhibit 390 is a stain from the jacket.
 7    Q.   Now, in addition, on your report, I believe
 8              you also had a DNA sample.  I guess we
 9              call it buccal swab of Nate Jackson, is
10              that correct?
11    A.   That is correct.
12    Q.   You made some comparisons between a number of
13              items that were submitted to you, and
14              they would have been swabbings that
15              either an officer in the field had taken
16              or Dale Laux had taken?
17    A.   That is correct.
18    Q.   And they were presented to you with two, what
19              we call known standards, is that correct;
20              or two people who knew that DNA was
21              present?
22    A.   I had received two known standards.
```

5767

1    Q.   And the one standard was from Nate Jackson and

2         the other was from Robert Fingerhut?

3    A.   That is correct.

4    Q.   Can you please tell us from your report, what

5         items contained DNA evidence of Nate

6         Jackson and what items contained evidence

7         of Robert Fingerhut based on your report?

8    A.   I have three reports, but I'll give you the

9         information.

10   Q.   Refer to the number.

11   A.   State's Exhibit 286-A.  The swab from the

12        house, the crime scene, would be

13        consistent with Robert Fingerhut.  The

14        cutting from the visor was a mixture

15        of -- which is consistent with Robert

16        Fingerhut and Nate Jackson.

17   Q.   Was there a major or minor contributor to

18        either one of those?

19   A.   Not on the visor.  It was a mixture.  On the

20        gauze from -- I believe it was submitted

21        to me as found behind the dumpster, was

22        consistent with Nate Jackson.  A cutting

5768

1          from the jacket was consistent with

2          Robert Fingerhut.  And the swab from the

3          trunk release of the car was a mixture of

4          Nate Jack -- I'm sorry, Nate Jackson and

5          Robert Fingerhut, which I did separate

6          into major and minor.  The major was Nate

7          Jackson.  The minor was Robert Fingerhut.

8    Q.    And can you, when you give -- and that is

9          State's Exhibit 286, correct?  286-A that

10         you were reading from?

11   A.    I read from all three.

12   Q.    You were able to determine using those

13         population frequencies, those don't

14         actually tell us that the person that you

15         have is, I guess the person who was to

16         leave the DNA, it tells us that you can

17         exclude that person; is that a correct

18         statement?

19   A.    Whether we can include or exclude.  The

20         statistics gives power to an inclusion or

21         actually the inclusion.

22   Q.    And what were the numbers relating to those

5769

1            findings, the probabilities?

2    A.    For the gauze -- would you like it in all

3          three populations?

4    Q.    Yes.  Well, no.  With the gauze, with the

5          African-American population?

6    A.    I'm going to read from the report.  Based on a

7          national data base provided by the

8          Federal Bureau of Investigation, the

9          approximate frequencies of occurrence of

10         the DNA profile identified on the gauze,

11         are as follows.  In the Caucasian

12         population, you would expect to find a

13         profile that was found on the gauze one

14         in 45 quintillion 170 quadrillion people.

15         In the African-American population, you

16         would expect to find this profile one in

17         29 quadrillion, 860 trillion people.

18         Again, in the Hispanic population, you

19         would expect to find the profile found on

20         the gauze, one in 22 quintillion, 400

21         quadrillion.

22   Q.    And that was State's Exhibit 389, was the

5770

1          gauze.  Now the other items, the other

2          areas -- go ahead and give all three

3          populations.

4    A.    On the visor, again I'll read from my report.

5          Based on national data base provided by

6          the Federal Bureau of Investigation,

7          proportion of the population, which

8          cannot be excluded as contributors to the

9          mixture of the DNA profiles on the visor

10         are as follows.  In the Caucasian

11         population, you would expect someone that

12         would contribute to that mixture one in

13         16 million, 10,000.  In the

14         African-American population, you would

15         expect to find someone to contribute to

16         the mixture one in five million, 491

17         thousand.  In the Hispanic population,

18         one in six million, 835 thousand.

19   Q.    And that was, the visor was previously marked

20         as State's Exhibit 385?

21   A.    Yes.

22   Q.    Go ahead.  I know it is a little difficult

5771

```
 1            because your numbers don't match up to

 2            our Exhibit numbers.

 3    A.    State's Exhibit 386 would be the trunk

 4            release.  Based on national data base

 5            provided by the Federal Bureau of

 6            Investigation, the approximate

 7            frequencies of occurrence of the major

 8            DNA profile from the stain above the

 9            trunk release in the car are as follows.

10            In the Caucasian population, you would

11            expect to find the major contributor, one

12            in 45 quintillion, 170 quadrillion

13            people.  In the African-American

14            population, you would expect to find that

15            profile one in 29 quadrillion, 860

16            trillion people.  In the Hispanic

17            population, one in 22 quintillion, 400

18            quadrillion people.

19    Q.    And we're referring to the major contributor

20            there as which standard?

21    A.    Nate Jackson.

22    Q.    And did you do statistics for the trunk
```

5772

```
 1              release relating to the minor

 2              contributor?

 3    A.   No, I did not.

 4    Q.   The next one would have been -- well, what is

 5              in your report?

 6    A.   I believe that is all.

 7    Q.   Now, how do you determine at BCI what items to

 8              test?

 9    A.   Generally, as items are submitted, we do get a

10              lot of items in and we narrow it down to

11              what we believe by looking at the

12              synopsis and our forensic background,

13              what would be the best evidence, and we

14              do have a policy that allows us to do so.

15              I also contacted the department and get

16              their ideas, so I may not miss something

17              that is very important to the case.  I

18              also contact, if necessary, the

19              Prosecuting Attorney to find out what is

20              necessary, maybe did I overlook

21              something, and also, they can contact me

22              directly.
```

5773

1    Q.    And sometimes based on your policy of the

2          things that don't get tested, there are

3          things that don't get tested?

4    A.    Yes.

5    Q.    And the factors that you have determined, you

6          speak to the police, the Prosecution?

7    A.    Yes.

8    Q.    And you make a determination yourself, but is

9          it fair to say that sometimes items don't

10         get tested that may be the police or

11         Prosecution want tested?

12   A.    A lot of times that happens.  A lot of

13         evidence is submitted and we do narrow it

14         down.

15   Q.    And you have to do that for what purpose?

16   A.    Well, we have a five month backlog, even with

17         doing it the way we do it.  So, there's a

18         lot of reasons involved.  A lot of times

19         it is unnecessary evidence that was

20         submitted that is not going to be needed,

21         so there's a lot of reasons involved,

22         time.

5774

```
 1   Q.    And can you tell this Jury how long from the
 2             time you get a case to the time you are,
 3             your report is completed, it takes to go
 4             through this process?
 5   A.    Well, the way it is set up, is that I wouldn't
 6             just run one sample or even just one
 7             case.  I can run 48 samples at a time, so
 8             I would have other cases, also.  But the
 9             general time frame is around two weeks,
10             start to finish.  For me to get my
11             samples prepared, the extraction, the
12             quantification, amplication and DNA
13             analysis, and also that gives me time for
14             the interpretation, writing the report,
15             and those peer reviews that I had
16             mentioned also.  It takes some time.
17   Q.    And that is the reason for the policy?
18   A.    Yes.
19   Q.    Or one of the reasons?
20   A.    Yes.
21   Q.    Now you have talked about these population
22             frequencies and the statistics you gave.
```

5775

1              Do you have an idea of approximately how

2              many people live on planet earth today?

3                        MR. JUHASZ:  Objection.

4                        THE COURT:  What is your objection

5      based on?

6                        MR. JUHASZ:  Where would she get

7      that knowledge except from hearsay?

8                        MR. BECKER:  Part of her training.

9                        THE COURT:  That is an interesting

10     question because there's a general figure that most

11     people would probably give.  The question is, for

12     purposes of the scientific opinion, may have to

13     narrow it down a little bit more.  I assume that

14     the witness probably has some -- she may or may

15     not, a basis for taking that into consideration in

16     the overall analysis.

17                       MR. BECKER:  I'll rephrase the

18     question.

19     Q.   Based on your training and experience for your

20          job, do you have an idea of how many

21          people live on this planet?

22                       MR. JUHASZ:  Same objection.

5776

1          THE COURT:  I think that question

2    may be one that gets into the realm of how fast was

3    the car going.  There's a general figure that

4    everybody banters about whether it is true or not.

5    I don't know.  I'm going to overrule the objection.

6    I'll let her answer the question if she can, based

7    on her scientific background.

8    A.    The figure that I have read -- articles,

9          scientific journals, is approximately 6.1

10         billion people.

11   Q.    And the numbers you gave are substantially

12         larger than 6.1 billion?

13   A.    Yes, millions times the world population.

14         MR. BECKER:  I have nothing further.

15   CROSS EXAMINATION BY MR. JUHASZ:

16   Q.    Miss Gerardi, good morning.

17   A.    Good morning.

18   Q.    Even with all of that, you still don't put in

19         your report, that it is Nate Jackson's

20         blood, right?

21   A.    No, it is a statistic.

22   Q.    So, you use the word in your report, and here

5777

1          today "consistent", correct?

2   A.   We say consistent and then we also say that it

3          cannot be excluded.

4   Q.   Let's go back and make sure that I understand,

5          hopefully so the Jury understands what it

6          is that you do.  And I'll confess to you

7          in advance that I was a Liberal Arts

8          major, not a science major.  If I blow

9          this, I'm sure you will help me out, but

10         I remember back from high school Biology,

11         that old double helix thing that they

12         showed us from the DNA molecule, that is

13         what you're talking about?

14  A.   Yes.

15  Q.   It was sort of a twisted ladder thing with

16         rungs on it, correct?

17  A.   Yes.

18  Q.   My understanding is that each of those rungs

19         is what you call a loci, correct?

20  A.   No.  The location that we're talking about

21         could entail several rungs.

22  Q.   So it could be several rungs.  But there are a

5778

| | | |
|---|---|---|
| 1 | | number of those rungs and I think you |
| 2 | | gave the number 13 that you look at, |
| 3 | | correct? |
| 4 | A. | We look at 13 locations, that is correct, and |
| 5 | | plus a gender site to determine male or |
| 6 | | female. |
| 7 | Q. | How many of those locations are there in a DNA |
| 8 | | molecule? |
| 9 | A. | I couldn't tell you that. |
| 10 | Q. | I have heard the number 66,000, does that |
| 11 | | sound right to you or does it not? |
| 12 | A. | Locations are different to us than what may be |
| 13 | | you are thinking of sequencing. |
| 14 | Q. | Here's what I'm trying to get at.  You told us |
| 15 | | that 99 percent of our DNA is all the |
| 16 | | same, correct? |
| 17 | A. | That is correct. |
| 18 | Q. | And that is the DNA that says you have two |
| 19 | | eyes and I have two eyes, correct? |
| 20 | A. | That is correct. |
| 21 | Q. | You have one nose with two holes and so do I, |
| 22 | | etc.? |

5779

1   A.   That is correct.

2   Q.   And then the one percent are the obvious

3        differences between us?

4   A.   That is correct.

5   Q.   And everybody else?

6   A.   Right.

7   Q.   And do the 13 that you examined constitute the

8        entire one percent or do they not?

9   A.   No.   They do not.

10  Q.   What percent then of the one percent do the 13

11       constitute?

12  A.   I could not tell you.

13  Q.   Basically, what you do then, if I understand

14       it, is you take these 13 locations,

15       correct?

16  A.   That is correct.

17  Q.   And you compare that against a data base that

18       in this case was provided to you by the

19       FBI, is that right?

20  A.   That is right.

21  Q.   You basically statistically project it out and

22       say, the chances of this being somebody

5780

```
 1              else are one in 45 million or whatever
 2              that number is you gave here today?
 3    A.   That is correct.
 4    Q.   And do you yourself have any idea how many
 5              people are in the data base that was
 6              given to you by the FBI?
 7    A.   No, I do not do the FBI.  It is a data base
 8              that is provided by an FBI computer that
 9              we use.
10    Q.   You told Mr. Becker and the Jury that you were
11              given standards for Nate Jackson and
12              Robert Fingerhut, am I correct?
13    A.   That is correct.
14    Q.   Were you supplied standards from anybody else?
15    A.   I personally was not supplied that, but they
16              were submitted, yes.
17    Q.   So standards for other people were submitted
18              to BCI, correct?
19    A.   That is correct.
20    Q.   But you did not test any blood or any other
21              DNA against some standard other than
22              Robert Fingerhut and Nate Jackson, am I
```

5781

1                right?

2    A.    That is correct.

3    Q.    Assuming that these reports are going to be in

4          evidence, let's go over them for a

5          second.   There are three different

6          reports that you submitted in the case,

7          correct?

8    A.    That is correct.

9    Q.    Would you be kind enough to tell the Jury what

10         the difference is between those three

11         reports?

12   A.    The initial report had the visor, a standard

13         from the subject, the standard from

14         Robert Fingerhut and Nate Jackson.   A

15         swab from the house and the gauze from

16         the dumpster.

17   Q.    I'm still unclear as to what is the difference

18         between the three reports.

19   A.    And the second report, there was a request for

20         me to do statistics on the visor, which I

21         did not do on the original report, so the

22         second report is just a statistic for one

5782

```
 1              of the items that I tested on the
 2              original report.  The third report is
 3              additional testing.  It was a request to
 4              go back and do more samples.
 5    Q.   All right.  So let me see if I have this
 6              clear.  In the first report, you do some
 7              tests of the visor and you say that that
 8              visor constitutes a mixture of the DNA,
 9              and I'm going to throw the word
10              "consistent" out, so we can get the
11              world's work done here.  The DNA of
12              Robert Fingerhut and Nate Jackson, is
13              that right?
14    A.   That is right.
15    Q.   In the second report, you are asked to load
16              that into your statistics program and
17              tell them what the chances are that it is
18              somebody else?
19    A.   Someone else can be a contributor to the
20              mixture.
21    Q.   And then the third report, you are asked to go
22              back and do additional testing; is that
```

5783

1          right?

2   A.    More samples, yes.

3   Q.    And would you tell us, please, from the third

4          report, what additional items you tested?

5   A.    That would be the jacket and the trunk release

6          from the car.

7   Q.    So, and do you have information there that

8          tells you from whom that jacket was taken

9          or do you not?

10  A.    No, I don't have knowledge of the jacket.

11  Q.    Do you remember anything about the jacket?

12  A.    I believe the jacket was that of Robert

13         Fingerhut and I can refer to my notes.

14  Q.    That would be fine.

15  A.    The jacket was being tested by our firearms

16         section, and then the request came in to

17         do a sample from the jacket, so I was

18         called to firearms to look at the jacket

19         and to collect my samples.

20  Q.    Do you remember was the jacket a baseball type

21         jacket?

22  A.    I do not have a description of the jacket.  It

5784

1          was -- I was called to collect my sample

2          before they did their testing that may

3          change my sample.

4    Q.   And the guy in firearms, is that Mike Roberts?

5    A.   That is correct.

6    Q.   So basically, Mike Roberts has a jacket,

7          correct?

8    A.   That is correct.

9    Q.   And somebody calls you and says, "Hey Brenda,

10         come test this before we do our stuff,

11         because we want you to check the DNA,"

12         correct?

13   A.   That is correct.

14   Q.   Now, if you can tell us, is that additional

15         testing that is reflected in your third

16         report done as a result of an additional

17         request from the police authorities, or

18         is it as a result of the initial

19         submission?  Am I making that clear?

20   A.   Yes.  As I stated earlier, all items are

21         submitted, and then we narrow the items

22         down.  That was not one of the items that

5785

```
 1              we initially decided to test, and then I
 2              believe I spoke to Prosecutor Dennis
 3              Watkins on what items to be tested after
 4              we got our initial results and the jacket
 5              was one of them.
 6    Q.   If this is convenient for you and if it is
 7              not, please tell me.  Are you able to
 8              tell us the submission number of that
 9              jacket?  Do you know what I mean, the BCI
10              submission number?
11    A.   Yes, I can find it.  It would be the original
12              submission, item number eight -- our item
13              number eight.
14    Q.   So the jacket, just to make it clear, is one
15              of the initial items submitted to BCI,
16              correct?
17    A.   That is correct.
18    Q.   It is not addition -- I'm sorry, it is not
19              initially tested by you, it is in
20              firearms, correct?
21    A.   That is correct.
22    Q.   And then you have some recollection that you
```

5786

```
 1              had a conversation with Mr. Watkins, the
 2              County Prosecutor, and as a result, you
 3              went over there and pulled a sample to
 4              test it?
 5    A.   That is correct.
 6    Q.   Are you ever asked to test or analyze for DNA
 7              a pair of black and red Nike tennis
 8              shoes?
 9    A.   I didn't do the serology.  I did the DNA,
10              which would be the second step.  The
11              initial items that come into our
12              laboratory would go to our serology
13              section first and you have already heard
14              the testimony of Dale Laux, so he would
15              be in contact with all of the items
16              coming in.  The case had already been
17              turned over to me once the jacket came
18              into play, so that is why I collected the
19              sample, but any shoes or what you are
20              asking for, would have gone through Dale.
21    Q.   You are sometimes aware, however, where the
22              samples come from?
```

5787

1   A.   Correct.

2   Q.   For example, you testified here today that one

3        of the swabs you were given was taken

4        from the hallway of the residence,

5        correct?

6   A.   That is correct.

7   Q.   And you testified that that sample is

8        consistent with the DNA of Robert

9        Fingerhut?

10  A.   That is correct.

11  Q.   Do you have any recollection of anybody giving

12       you a swab from a pair of black and red

13       Nike tennis shoes?

14  A.   No.

15  Q.   Do you have any recollection of anybody giving

16       you a swab from a T-shirt taken from

17       Donna Roberts?

18  A.   No.

19  Q.   And you didn't have any conversation with

20       Mr. Watkins about going back and testing

21       that shirt when you were testing the

22       jacket, correct?

5788

1   A.   No.

2                    MR. JUHASZ:  Thank you.

3                    MR. BECKER:  I have nothing further.

4                    THE COURT:  Thank you.

5                    MR. BECKER:  We have no further

6   witnesses until 1:00 p.m.

7                    THE COURT:  The Jury is excused then

8   until 1:00 p.m.  Remember the admonition.  Have a

9   nice lunch.

10  (Court in recess at 11:30 A.M.)

11  (Resumed in Open Court at 1:05 p.m.)

12                   MICHAEL ROBERTS

13  being duly sworn according to law, on his oath,

14  testified as follows:

15  DIRECT EXAMINATION BY MR. BECKER:

16  Q.   Would you please introduce yourself to the

17            Jury, please?

18  A.   My name is Michael Roberts.  I am a forensic

19            scientist assigned to the firearms

20            department, the Bureau of Criminal

21            Identification and Investigation, or as

22            more commonly referred to by a short

5789

```
 1              acronym of BCI, which is essentially the

 2              States' crime lab division, and it is a

 3              division office of the State Attorney

 4              General's Office.

 5   Q.   How long have you been at BCI?

 6   A.   Next month will be 11 years.

 7   Q.   Can you tell this Jury what your duties are?

 8   A.   I analyze nearly all evidence pertaining to

 9              firearms, excluding the gunshot residue

10              kits that are obtained from hands, but I

11              analyze mostly the firearms.  Fire

12              projectiles and fire component of

13              ammunition to attempt to match back to a

14              particular firearm or to exclude a

15              firearm.  We also do what is called

16              muzzle to garment approximations.

17              Basically, to see how far away a person

18              was shot at the time of discharge or how

19              far away the person was at the time of

20              discharging of the firearm.  Also, we

21              attempt to raise obliterated or gouged

22              out serial numbers on various metal
```

5790

```
 1                      objects.  Most commonly what we come

 2                      across is firearms that have the serial

 3                      numbers gouged out.  We also do tool mark

 4                      comparisons to attempt to match back

 5                      marks left at the crime scene to a

 6                      particular suspect tool.

 7     Q.     Now, can you tell this Jury the education that

 8                      you had that has prepared you for that

 9                      position?

10     A.     I have a Bachelor of Arts degree that I

11                      obtained from Berea College, located in

12                      Berea, Kentucky.  I have also completed a

13                      six month probationary on-the-job

14                      training under two experts in the field,

15                      who since retired.  Also I have attended

16                      several armourous courses.  Armourous

17                      courses are put on by a manufacturer of

18                      firearms such as Beretta or Smith and

19                      Wesson.  It varies in lengths depending

20                      on the manufacturer and it just educates

21                      each student about the internal mechanism

22                      of each firearm.  Also attended and
```

5791

```
 1              completed the McCrome McCrosopy classes,

 2              a class dealing with microscopic

 3              analysis.

 4   Q.   And are you a member of any professional

 5              organizations?

 6   A.   Just the Ohio Association of Criminalists.

 7   Q.   Have you previously testified as an expert in

 8              the State of Ohio?

 9   A.   Yes, Sir, I have.

10   Q.   Numerous counties?

11   A.   Very many.

12   Q.   Including this county, Trumbull County?

13   A.   This county as well as this Courtroom.

14   Q.   Now, I want you to tell this Jury what exactly

15              firearms identification is and what makes

16              firearms identification possible?

17   A.   The basis is the firearms identification is

18              identifying or matching back the fired

19              projectiles or bullets, back to a

20              particular weapon.  As well as other fire

21              components such as the cartridge case.

22              Now I'll go into more detail explaining
```

5792

1    what a cartridge casing and bullet are.

2    Basically, we're attempting to match back

3    components left at the crime scene to a

4    particular weapon or exclude it.  The way

5    we can do this is have the suspect weapon

6    and fire the suspect weapon, and we have

7    a water tank and we cover the bullets and

8    cartridge cases, all of the fired

9    components and what we're looking for is

10   unique markings that are put on the

11   bullet as it travels down the barrel.  It

12   picks up the unique markings that are in

13   place on the internal part of the barrel,

14   that are then scratched onto the bullet

15   as it passes through the barrel.  Then it

16   leaves the firearm, it is going to have

17   that unique pattern onto the bullet.  It

18   is going to be impressed onto the bullet

19   as it leaves the barrel.  Same principle

20   with the cartridge cases.  There's unique

21   markings that are impressed upon the

22   cartridge case.  That is going to be

5793

1          unique from one firearm to another, so

2          what we do is we just take knowns or test

3          fires from a weapon that we have

4          submitted into our lab, compare the known

5          or the test fires to the unknowns or the

6          bullets or other components that are left

7          at the crime scenes.

8     Q.   And how physically do you do that type of

9          work?

10    A.   We have what is called a comparison

11         microscope.  It is a comparison

12         microscope that has two stages.  It is

13         actually two microscopes in one.  That is

14         combined with an optical bridge that

15         allows us to look at two objects with a

16         split screen, not an overlapping screen,

17         but a split screen so you take for

18         example, bullets will take two test shots

19         and put the bullets, one on each stage,

20         and then we'll look for that unique

21         pattern.  And once we identify that

22         unique pattern on our test shots, then we

5794

1              move one of the test shots and put the

2              unknown that is recovered from the scene

3              on there and look for that unique

4              pattern.  Quite often, there's times

5              where the bullet is damaged to the point

6              where you can't identify, there's not

7              enough markings on it or it is mutilated.

8              For example, if it hits a wall or it hits

9              bone, it has a chance of disfiguring and

10             marring of the bullet where there isn't

11             enough detail to identify or match back

12             to a particular weapon.

13    Q.    Now, in the course of your employment, have

14             you been able to examine firearms that

15             were manufactured by the same

16             manufacturer for this type of purpose?

17    A.    Yes, we have.

18    Q.    And in fact, have you had a chance to examine

19             a firearm that was produced one right

20             after the other, consecutive firearms

21             that were produced by the same

22             manufacturer?

5795

1   A.   We have actually analyzed fired bullets that

2        have been fired consecutively made

3        barrels.  That is important to know that

4        there's a difference from firearm to

5        firearm.  That is what makes firearms

6        identification possible.  If I can, I can

7        educate the Jury about the manufacturing

8        of a barrel.

9   Q.   Please tell us the manufacturer of the barrel

10       and how this assists you in that job.

11  A.   In three basic steps, what happens is that the

12       manufacturer starts with a solid rod and

13       then they will remount the internal

14       portion to a particular diameter, or

15       caliber.  And then they will group or

16       they will cut grooves into one end to the

17       other in either a right hand or left hand

18       twist, so inside the barrel, you have

19       raised portions and then you have

20       grooves, so it alternates raised portion

21       and then a groove, raised portion and a

22       groove, and that is in either a right

5796

 1          handed or left handed twist.  This is so

 2          when the bullet goes through the barrel,

 3          it picks up the raised portions, and then

 4          starts twisting to either the right hand

 5          or left handed twist.  That is so when

 6          the bullet leaves the barrel, it is in a

 7          spinning motion, so that the velocity

 8          will be maintained for a longer period of

 9          time and the accuracy will be greater

10          than if it was just a smooth bore or

11          there wasn't any grooves, the bullet

12          would go straight out the barrel and go

13          end over end and wouldn't be as accurate.

14          Same theory as when the quarterback

15          throws a spiral.  He throws a spiral so

16          he can get further distance and more

17          accuracy.  Sometimes, I throw these where

18          the ball doesn't spin, and it goes end

19          over end.  People call this a lame duck.

20          Same principle.  You want to throw a

21          spiral, so that the pass would be more

22          accurate and go further.

5797

1    Q.    And when you conduct your examinations, you

2          look for those impressions that are left

3          first on the bullet, correct?

4    A.    That is correct, yes, Sir.

5    Q.    And also on the cartridge casing?

6    A.    Yes, Sir.

7    Q.    And that is sometimes from either where the

8          firing pin actually hits the cartridge

9          casing or maybe if it is a semi automatic

10         where it may be extracted from a weapon,

11         correct?

12   A.    Exactly, yes, Sir.

13   Q.    Now, you also mentioned that -- well, strike

14         that.  I want to direct your attention to

15         a case that you were asked to handle that

16         was presented to you by the Howland

17         Police Department here in Trumbull

18         County, Ohio.  This would have been back

19         about a little over a year, year and a

20         half ago.  Do you recall being called to

21         assist the Howland Police Department?

22   A.    Yes, Sir.

5798

1    Q.    Now, I want to direct your attention to some

2          State's Exhibits that I have back here.

3          I'm going to ask you to first take a look

4          at State's Exhibit 251.  I'll give you

5          State's Exhibit 251, 252 and 252-A.  I'm

6          going to hand you these Exhibits and ask

7          if you have seen them before.  If you

8          have seen them, how do you know you have

9          seen them?

10   A.    First of all, I can recognize the evidence

11         envelope by my initials, with the BCI

12         evidence tape.  Also the date that I

13         started my analysis, followed by my

14         initials, and the date I finished my

15         analysis.  Also inside is an unloaded

16         weapon that has my initials on the frame.

17         With State's Exhibit 252, I can recognize

18         the envelope by once again the initials

19         over the BCI evidence tape and the date

20         that I started my analysis, followed by

21         my initials, BCI and the date I finished

22         my analysis.  Inside is three unfired

5799

1               cartridges with my initials on the

2               cartridge case wall.

3    Q.   Now, I am going to hand you what has been

4               marked for purposes of identification as

5               State's Exhibit 266.  I'll ask if you

6               recognize what 266 is.

7    A.   This would be a fired bullet that I examined.

8    Q.   And again would your initials be on there?

9    A.   Yes.  It is on the base of the bullet as well

10              it is on the envelope.  The same

11              principle, initials, BCI, the date I

12              started and finished my analysis.

13   Q.   You were also given, or I'm going to hand you

14              State's Exhibits 259 and 257.  I'm going

15              to ask if you recognize State's Exhibits

16              257 and 259.

17   A.   Yes, I recognize the packaging of 257 by the

18              same markings.  The dates that I started

19              and finished my analysis and my initials.

20              It would be a fired bullet as well.

21   Q.   The other one is 259?

22   A.   259, same markings, the dates I started and

5800

1          finished my analysis and my initials and

2          it is a fired bullet.

3   Q.   Now, I also want to show you two, the last two

4          Exhibits I have here, number 318 and --

5          that is number 317.  And I'm going to

6          hand you State's Exhibit 258.  I'll ask

7          if you have seen these items before?

8   A.   Yes, this is the jacket that I analyzed, part

9          of the jacket that I cut off as well.

10  Q.   And you recognize both of those items?

11  A.   Yes, Sir, I do.

12  Q.   And --

13  A.   It is 258.

14  Q.   And then State's Exhibit 317 was a smaller

15          envelope.  State's Exhibit 317.  That

16          larger bag there.

17  A.   I recognize the packaging by the same dates,

18          start and finish and my initials and the

19          evidence tape.  I recognize the gloves.

20          They have my initials with the BCI

21          evidence tape on both of those.

22  Q.   Is one of those gloves, is there a problem

5801

1               with one of those gloves?

2    A.    There's a defect in the left index finger.

3    Q.    When you were done with your examinations, did

4          you prepare some written reports

5          regarding your findings?

6    A.    Yes, Sir, I did.

7    Q.    I'm going to hand you State's Exhibits 282-A,

8          282-B and 282-C.  I'm going to ask you,

9          disregard the State's Exhibit numbers in

10         terms of chronological order.  I believe

11         you created those reports, or can you

12         look at those and tell me if you created

13         those?

14   A.    Yes, Sir, I did.

15   Q.    282-B was the initial report that you

16         generated?

17   A.    That is correct.

18   Q.    282-A was a corrected version of 282-B?

19   A.    Yes.

20   Q.    282-C is a supplemental report?

21   A.    Yes, Sir, it is.

22   Q.    I want you to relay to this Jury your findings

5802

1       with respect to the firearm that is up

2       there, and the bullets that you test

3       fired as well as the bullets that were

4       submitted to you that had been fired.

5       Were you able to make any determinations

6       about that gun related to those bullets?

7   A.   Sure.  I did my examination with the weapon

8       that was submitted, State's Exhibit 251

9       to the submitted fired bullets and I was

10      able to determine through my analysis

11      that the fired bullets were not fired

12      from State's Exhibit 251.  Now, without

13      trying to muddy the water, the fired

14      bullets, what we did is -- let me

15      backtrack.  The weapon itself has the

16      same number of lands and grooves in the

17      barrel as the fired bullets, however,

18      that pattern that was explained earlier

19      was different than the pattern on the

20      fired bullets, so I was able to eliminate

21      that weapon from firing the submitted

22      bullets, because through my examination,

5803

1              no alteration of the barrel itself, even

2              though they had the same number of lands

3              and grooves or raised portion of the

4              grooves and the direction of the twist,

5              there was no alteration to that firearm,

6              and therefore, that firearm did not fire

7              the submitted bullets.

8   Q.   Now, with respect to that testing, you were

9              able to determine -- I just want to be

10             clear as to what we're talking about

11             here.  You took five live rounds that

12             were in 252 that were State's Exhibit

13             252, is that correct?

14  A.   That is correct.

15  Q.   And you fired two of those rounds out of

16             State's Exhibit 251?

17  A.   Yes, Sir, I did.

18  Q.   And then you took -- then what did you do with

19             the fired rounds that you fired out of

20             State's Exhibit 251, which is that 38?

21  A.   First of all, what I did with the submitted

22             bullets is I looked for those pattern,

5804

1          that unique pattern that is going to be

2          different from firearm to firearm.  It is

3          unique in this case, I found the three

4          that were submitted, were all fired from

5          the same firearm and I detected that

6          unique pattern with sufficient detail

7          there to identify or match all three

8          bullets to each other.

9     Q.   You are referring to State's Exhibits 259, 257

10         and 266?

11    A.   That is correct.  Three submitted fired

12         bullets were the bullets that were

13         recovered either from the body or the

14         crime scene.  Then what I did is I took

15         two unfired cartridges that were

16         submitted to our laboratory and I put it

17         inside the submitted weapon, and I took

18         two test fires to show A, that the gun

19         was operable and B, to recover the fired

20         bullets.  So I could recover the fired

21         bullets and then put the two fired

22         bullets that were test fired from that

5805

```
 1                 weapon, we'll call them the known
 2                 bullets, and look for the pattern that is
 3                 unique to that firearm.  I detected the
 4                 pattern there and then compared that
 5                 pattern to the submitted fired bullets
 6                 recovered from the body or the scene,
 7                 and I was able to determine that patterns
 8                 did not match and, therefore, that the
 9                 three bullets that were submitted to our
10                 laboratory that were recovered from the
11                 body or the scene were not fired from the
12                 submitted weapon.
13     Q.    Now the three recovered and that is within a
14                 reasonable degree of scientific
15                 certainty?
16     A.    Yes.
17     Q.    Now with a reasonable degree of scientific
18                 certainty, were you able to determine
19                 whether State's Exhibit 266, 257 and 259,
20                 were they fired from the same weapon?
21     A.    Yes, they were.
22     Q.    With a reasonable degree of scientific
```

5806

1    certainty, you were able to determine

2    that?

3 A. Yes, Sir.

4 Q. And one of those had actually been recovered

5    from the body of the victim, correct?

6 A. Yes, Sir.

7 Q. And the damage that sometimes can occur when a

8    bullet strikes bone was not -- was not so

9    great as to make your determination

10    difficult?

11 A. That is correct.  I was able to identify the

12    bullet.

13 Q. Now, you also did some testing, I believe, on

14    some clothing, is that correct, the

15    jacket, as well as the gloves, is that

16    correct?

17 A. Yes, Sir.

18 Q. What kind of testing did you do on the jacket

19    and the gloves?

20 A. We do a visual examination and then a chemical

21    examination for the presence of gunshot

22    residue.

5807

1    Q.    And what, can you tell this Jury what gunshot

2          residue is and what causes gunshot

3          residue?

4    A.    In an unfired cartridge, inside the cartridge

5          case, which is this brassy colored area

6          here is powder, when the firearm strikes

7          the metal prong called the firing pin,

8          strikes the primer, it causes that little

9          internal spark and then that causes the

10         powder to start burning.  And the

11         pressure is built up so great that the

12         bullet has to escape in the path of least

13         resistance which is down the barrel, so

14         as the bullet goes through the barrel and

15         leaves the barrel, the powder then is

16         spewed out the end of the muzzle or the

17         end of the barrel and in a cone shaped

18         pattern, so the further away the object

19         is when it is hit, the more disperse the

20         pattern is going to be.  The closer the

21         person is to the gun when it is

22         discharged, the more concentrated the

5808

1        pattern would be.  It will go out to a

2        flashlight or beam pattern.  It will be

3        consistent from shot to shot at two feet.

4        If you fire the gun at a distance of two

5        feet, recovered the residue pattern, it

6        is going to be the same if you fired it

7        again at two feet and recovered the

8        residue pattern.  It will be the same at

9        six feet.  What we look for is two

10       components of gunshot residue.  We

11       concentrate on nitrites, then we also

12       look for lead residue.  The reason we

13       concentrate on nitrites is because

14       nitrites is a component of the burning of

15       gun powder.  Now lead is a component of

16       gunshot residue.  It could be from the

17       primer, it could be from the bullet.  It

18       could be from the base of the bullet, if

19       the base is exposed because if, the core

20       of the bullets are generally lead alloy,

21       sometimes the lead could flake off, that

22       is why we concentrate on the nitrites,

5809

1 because the nitrites are what is going to

2 be out in the cone shaped pattern.  The

3 lead just helps verify that the gunshot

4 residue was present.  So, what we do is a

5 visual examination of the clothing for

6 partially burned or unburned gun powder

7 particles around the suspected bullet

8 hole.  We also look for a characteristic

9 of contact.  What this means is when a

10 gun is discharged pressed against an

11 article of clothing, hot gases, as I

12 explained, are going to be released, or

13 when the gun, the bullet goes through the

14 clothing, the clothing is going to rip

15 and it is going to rip at 90 degree

16 angles and also since it is very hot gas

17 being escaped out the end of the barrel,

18 depending on the type of materials, it is

19 either going to burn or it is going to

20 melt.  So we look -- those are

21 characteristics of contact, discharge,

22 the end of the gun is touching the

5810

1    clothing.  We look for contact

2    characteristics and also we look for gun

3    powder particles.  That is an indication

4    of very close range.  What is going to

5    happen, the further away you get from the

6    firearm as it is discharged, like I said,

7    the pattern is going to be more disperse,

8    where you get to an area such as six

9    feet, approximately six feet, then the

10   gunshot residue pattern is going to start

11   dropping off, then you may have a bullet

12   hole, but you may not have gunshot

13   residue.  And that can be explained by

14   being at greater distances or other

15   variables.  But like I said, the gunshot

16   residue is going to go out in a cone

17   shaped pattern about six feet or so and

18   then it will start dropping off.  What we

19   look for is the contact characteristics,

20   microscopically, the gun powder

21   particles, and when you try to chemically

22   raise out the nitrites and the lead

5811

1              patterns.

2    Q.   Did you do that with reference to that jacket,

3              which is State's Exhibit 258 and the

4              gloves, which is State's Exhibit 317?

5              Did you do those kinds of things?

6    A.   Yes.

7    Q.   And did you have any findings or make any

8              discoveries that, with respect to those

9              two Exhibits?

10   A.   Well, in regards to the jacket, I was able to

11             detect a chemical reaction of four points

12             of nitrites, meaning there's four spots

13             of nitrites, not being a pattern in

14             itself, I couldn't establish the

15             distance.  There could be a number of

16             reasons why you have four specks on

17             there, but since there's not identifiable

18             pattern, I cannot determine at what

19             distance the firearm was discharged at

20             the time.  The gun itself -- or excuse

21             me, the glove had a vaporous lead on the

22             area around the defected finger, the left

5812

1          index finger.  That is an indication of

2          being very close to a firearm at the time

3          of discharge.  The vaporous lead is an

4          indication of being from the primer, and

5          the vaporous lead is only confined in a

6          short distance.

7   Q.   Now, with a reasonable degree of scientific

8          certainty, then, can you say whether that

9          glove was damaged or that defect was part

10         of a firearm shot?

11  A.   Well, it is consistent with being at close

12         range of a firearm.  Since there's no

13         nitrites or there's not a distinct bullet

14         hole or what we consider a bullet wipe.

15         It is basically you have a hole and then

16         you have a lead ring around it.  That is

17         a bullet wipe.

18  Q.   Did you discover any bullet holes on the

19         jacket?

20  A.   Yes, I did.  There were four defect holes.

21  Q.   And you have testified to those?

22  A.   Yes.  Excuse me, there's three.

5813

1    Q.    And you printed -- or I'm sorry, you created

2              your reports, which are the three reports

3              that I previously asked you about, your

4              findings are contained in those reports?

5    A.    Yes, Sir.

6    Q.    And those are fair and accurate copies of the

7              original reports, right?

8    A.    Yes, Sir.

9    Q.    Now with respect to -- with respect to State's

10             Exhibits 257, 259 and 266 -- which 266 is

11             the projectile recovered from the brain

12             of the victim. 257 was recovered from

13             the clothing -- I'm sorry, 257 was

14             recovered from the wall, and 259 was

15             recovered from the clothing of the

16             victim. Were you able to determine --

17             first of all, you were able to determine

18             that they were all fired from the same

19             firearm, correct?

20    A.    Yes, Sir.

21    Q.    Were you able to determine what caliber those

22             bullets were fired from with a reasonable

5814

```
1              degree of scientific certainty?
2    A.    Yes, they exhibited .38 special or .357
3              magnum.  Really, I should say and/or.  A
4              .357 magnum and .38 special, you can fire
5              the same bullets.  The only difference is
6              that the .357 magnum cartridge case, this
7              portion here is approximately one-tenth
8              of an inch longer, so it has more power,
9              more powder.
10             MR. BECKER:  I have no further
11   questions of this witness.
12   CROSS EXAMINATION BY MR. JUHASZ:
13   Q.    Hi, Mr. Roberts.
14   A.    Hi, Mr. Juhasz.
15   Q.    Let's go back to the last thing that you were
16             talking with Mr. Becker about if we can.
17             You said a .38 or .357?
18   A.    .38 special, .357 magnum.
19   Q.    Difference is the bullets in the .357 is
20             longer?
21   A.    The cartridge case length.  The bullets are
22             the same.
```

5815

1    Q.   You could fire a .38 from a .357, a .38

2         bullet?

3    A.   Yes, you can fire a .38 special in a .357.

4    Q.   How many sorts of weapons like that are there

5         in the world, .38 specials?

6    A.   Many.

7    Q.   How many .357?

8    A.   Many.

9    Q.   So if we wanted to get a list of the possible

10        weapons that fired these bullets, it

11        would be a long list?

12   A.   I have a list of possible sources, possible

13        weapons based on the number of lands and

14        grooves and the direction and twist, but

15        there's many of those types.  There's

16        many, for example, Taurus, there would be

17        many guns made of that particular model.

18   Q.   The gloves that you were asked to examine.

19        First of all, you look for two things if

20        I understand it, vaporous lead, correct?

21   A.   We found that, yes.

22   Q.   But I am talking about what you are looking

5816

```
 1              for initially.  You look for two things.
 2              Vaporous lead, correct?
 3   A.   Yes.
 4   Q.   And nitrites?
 5   A.   Yes, we look for lead and nitrites, yes, Sir.
 6   Q.   Can the bullet itself carry any specks of the
 7              nitrites?
 8   A.   Yes, Sir.
 9   Q.   When you shoot the gun, the bullet comes out,
10              right?
11   A.   Yes.
12   Q.   The gases come out, correct?
13   A.   Yes.
14   Q.   And that is the cone shape that you talk about
15              as carrying some of these nitrites with
16              it?
17   A.   I could see that, yes, Sir.
18   Q.   It stands to reason that some nitrites could
19              get on the bullet itself?
20   A.   Yes.
21   Q.   On the jacket, you found four tiny little
22              specks of nitrites?
```

5817

1   A.   Yes, four point reactions, yes, Sir.

2   Q.   You have indicated that the best you can say

3           is that it is something further than

4           contact, right?

5   A.   That is correct, yes.

6   Q.   All you can say is that the gun wasn't right

7           next to the jacket when it was fired,

8           right?

9   A.   That's correct.

10   Q.   And beyond that, you really can't say whether

11           it is two feet, six feet or 20 feet?

12   A.   That is correct.

13   Q.   On the glove, you found vaporous lead, is that

14           right?

15   A.   That is correct.

16   Q.   Is that something that a bullet can carry,

17           also?

18   A.   No.  I wouldn't think so.  Vaporous lead is

19           from the primer.  It doesn't actually

20           touch the bullet itself.

21   Q.   So there's no way it can get on the bullet as

22           it is traveling through the chamber?

5818

1   A.   I wouldn't think so because the primer is back

2        here at the base of the cartridge case

3        and the bullet is at the very end, so

4        when the bullet is discharged, you are

5        still going to have the powder in

6        between, so the vaporous lead is going to

7        stick around the weapon, it is not as

8        heavy as the nitrites.

9   Q.   Now when you say stick around the weapon

10       though, I can have vaporous lead, for

11       example if I held a gun right here, is

12       that six, eight in inches from my left

13       arm and shot, I could get vaporous lead?

14  A.   Depending on the weapon, I have to do some

15       tests, but I would say within six inches

16       would be common.

17  Q.   My point is, it doesn't have to be direct

18       contact?

19  A.   It doesn't have to be contact.

20  Q.   So then, when the gases are coming out, then

21       the bullet is coming out, the vaporous

22       lead is also coming out?

5819

1    A.   Yes.

2    Q.   But you are saying that even though it is all

3         coming out, there's no way the vaporous

4         lead can actually get stuck on the

5         bullet?

6    A.   I wouldn't think so.  I find that hard to

7         believe.

8    Q.   In this case, you have got vaporous lead on

9         this glove, right?

10   A.   Yes.

11   Q.   But no nitrites?

12   A.   That is correct, yes, Sir.

13   Q.   And you mentioned something about that the

14        patterns would always be the same.  If I

15        took the same weapon and shot it at this

16        podium from three feet three different

17        times, I would have the same pattern,

18        right?

19   A.   Yes.

20   Q.   How about environment, can that affect that at

21        all?

22   A.   Yes.

5820

1    Q.    A 40 knot cross wind would change that, right?

2    A.    Yes.

3    Q.    When you were talking to Mr. Becker, I thought

4          I heard you use the phrase concerning the

5          Taurus, about there's no alteration of

6          the gun?

7    A.    Of the internal barrel, yes.  For example,

8          scratches that were put on by a foreign

9          object, that would change the

10         characteristics of the pattern.

11   Q.    So you are not talking about a weapon that has

12         never been fired?

13   A.    No.

14   Q.    You are talking about something that may have

15         happened for example, when cleaning the

16         gun or something like that?

17   A.    Yes, depending on what you use to clean the

18         gun, if it is a heavy metal that you are

19         using as a wire brush, that would be an

20         indication that would show alteration or

21         at least mar up the pattern to make that

22         identification.  It would be detected.

5821

1    Q.   You were telling the Jury about the comparison

2              microscope that you use.  Is that a

3              microscope where you have the ability to

4              take photographs of what is compared?

5    A.   We don't have cameras put onto the comparison

6              microscopes.

7    Q.   That wasn't my question.  Capability.  Can you

8              hook a camera up to that?

9    A.   Yes.

10   Q.   If you guys wanted to, you could hook a camera

11             up and bring us a picture of what you

12             compared?

13   A.   Actually, we have a purchase order in for one.

14   Q.   Up to this point, BCI has chosen not to hook

15             cameras up to these microscopes?

16   A.   Yes, Sir.

17   Q.   We don't have the ability to see a picture of

18             what you compared in the laboratory?

19   A.   That is correct.

20   Q.   Were you ever given a .38 Smith and Wesson to

21             test in this case?

22   A.   I don't believe so, no, Sir.

5822

1   Q.   Just the Taurus that you have in front of you?

2   A.   Yes, Sir.

3   Q.   Now, if I understood what you said before,

4        Mr. Becker was asking you questions about

5        sequentially manufactured weapons?

6   A.   Yes.

7   Q.   What you are saying is if you and I went to

8        the Smith and Wesson outlet store,

9        wherever it is, right outside the Smith

10       and Wesson factory and you bought gun

11       1000, and I bought a gun 1001, that were

12       exactly the same make and model, there

13       would be different firing characteristics

14       that you would be able to see under the

15       microscope.

16  A.   When you have the serial number 1000, 1001, it

17       doesn't necessarily mean that the two

18       barrels were sequentially made.  It just

19       means that the frames were sequentially

20       made, so what I was explaining is that

21       consecutively made barrels, where we have

22       actually were tested, the comparison of

5823

1          consecutively made barrels, and each

2          barrel had different patterns, because

3          what we're looking for is the tooling or

4          the manufacturing of the barrel.  It is

5          constantly changing as the barrel is

6          being made.

7    Q.    Okay.  So we're not talking about consecutive

8          made guns, but consecutively made

9          barrels?

10   A.    That is correct.

11   Q.    You are saying that there's a difference in

12         the markings that each would produce?

13   A.    Yes, Sir.

14   Q.    And so to have a comparison that you can come

15         into Court and say, "This gun fired these

16         bullets," you would have to have to have

17         the actual gun?

18   A.    Yes.  You would have to have something to

19         compare it to, yes, Sir.

20   Q.    Not just something to compare it to, because

21         two Smith and Wesson .38's wouldn't do

22         you any good, you would have to have the

5824

1          Smith and Wesson .38 that fired the

2          actual bullets?

3  A.   Yes, to identify it to match back to the

4          weapon.

5  Q.   You are telling me that each one makes unique

6          markings?

7  A.   Yes.

8  Q.   It would be like you put a finger on here and

9          I put a finger on here, you need to have

10         the exact one to match the prints?

11  A.   Yes.

12  Q.   So, if I want to make you a Patsy for my

13         murder, a murder that I'm going to

14         commit, I would actually have to leave

15         the weapon that would be attributed to

16         you, right?

17  A.   Explain that again.  It took me off guard.

18  Q.   If I commit a murder under circumstances where

19         I wanted to pin the murder on you, Mike

20         Roberts.  Maybe I knock you out and after

21         I knock you out, I shoot Jerry over

22         there.  It doesn't do any good for me to

5825

```
 1              take the gun, because then they are not
 2              going to match up the bullets if I took
 3              the gun.  If I want to pin it on you,
 4              I'll leave the gun by you, the actual gun
 5              that fired the bullets?
 6    A.   I don't know about pinning it, but the bullets
 7              that would be fired by that gun would be
 8              identified back to that gun, yes.
 9    Q.   Let's forget about all of the Exhibit numbers
10              for a second, just to make sure that the
11              Jury understands what happened here.  You
12              get three fired bullets submitted to you,
13              correct?
14    A.   That is correct, yes.
15    Q.   One from Mr. Fingerhut's brain, correct?
16    A.   Correct.
17    Q.   One found on Mr. Fingerhut's clothing,
18              correct?
19    A.   That is correct.
20    Q.   One found in the dry wall?
21    A.   Correct.
22    Q.   You get submitted to you only one gun, right?
```

5826

1   A.   Correct.

2   Q.   The Taurus .38?

3   A.   Correct.

4   Q.   All three of those bullets that were submitted

5        to you were fired from the same gun,

6        correct?

7   A.   Correct.

8   Q.   And it was not the Taurus .38?

9   A.   Correct.

10  Q.   And the gun that fired them has never been

11       submitted to you?

12  A.   That is correct.

13            MR. JUHASZ:  That is all I have.

14  Thank you.

15            MR. BECKER:  I have nothing further.

16  Cynthia Mayle.

17                 CYNTHIA MAYLE

18  being duly sworn according to law, on her oath,

19  testified as follows:

20  DIRECT EXAMINATION BY MR. BECKER:

21  Q.   Could you please introduce yourself to the

22       Jury?

5827

1   A.   Good afternoon.  I am Cynthia Mayle, from

2        Attorney General Jim Petro's Office, the

3        Bureau of Criminal Identification and

4        Investigation.

5   Q.   And what do you do for the Attorney General's

6        Office Bureau of Criminal Identification

7        and Investigation?

8   A.   I am currently a latent print examiner,

9        forensic scientist and the forensic

10       science coordinator for the State of Ohio

11       for the discipline of latent prints.

12  Q.   Can you briefly describe for this Jury the

13       training and education you had that

14       prepared you for that position?

15  A.   Certainly.  Briefly, I have a Bachelor's

16       degree from Cleveland State University.

17       After approximately one year in

18       Philadelphia Police Department as a

19       fingerprint examiner, and also ten years

20       at the Cleveland Police Department as a

21       fingerprint examiner, I was employed by

22       the Attorney General's Office,

5828

1           approximately eight years ago.  So, all

2           totaling, I'm in excess of 18 years in

3           latent prints examination.  I have

4           attended over a thousand hours of

5           continuing education.  I also am an

6           educator myself for international

7           conferences of forensic scientists in the

8           discipline of latent prints and crime

9           scene investigation.  I am also a trainer

10          for our specific field for the Attorney

11          General's Office for the State of Ohio.

12     Q.   And can you describe for this Jury, the

13          process of fingerprint analysis, what

14          makes it possible?

15     A.   I'm not quite sure I understand.

16     Q.   What is -- tell us what you do at the lab.

17     A.   What you are asking about is the basic factors

18          of fingerprints.  The basic factors are

19          that no two fingerprints from two

20          individuals have been shown to be alike.

21          That is, the fingerprints are permanent

22          and individually unique.  They are

5829

1          permanent in that they form in the womb

2          approximately the 12th week after

3          conception and they remain permanent

4          throughout your lifetime until

5          decomposition after death.  This has been

6          proven within the forensic science field

7          and has been recognized for over 100

8          years in the modern Courts today.

9    Q.   And what do you look for when you make an

10         examination of a fingerprint?  Is there

11         certain characteristics that you look

12         for, and if there are, what are they

13         called?

14   A.   Back to some basic principles.  Present on the

15         palms of your hands and the soles of your

16         feet, is skin which is far different from

17         other areas of your body.  Unlike other

18         areas of your body, this skin has roughed

19         raised portions, which we call ridges.

20         Those ridges don't flow from one of the

21         hand or finger to the other in a nice

22         continuous flow, rather they move and

5830

```
 1              they form patterns.  Those patterns have
 2              been identified, and we use those
 3              patterns to make comparisons, from an
 4              inked impression which would be
 5              fingerprint card, perhaps taken for
 6              identification purposes to a latent
 7              print, which would be a print that we
 8              have developed or made visible, from a
 9              piece of evidence, or from a crime scene.
10              When we conduct examinations, we're not
11              simply looking at that particular pattern
12              as an identifying characteristic, it is
13              one characteristic, but we actually look
14              at the details within the ridge flow,
15              what we call ridgology.  Those minute
16              details within the actual fingerprint
17              pattern itself, such as a ridge ending,
18              or minute as pores, and the structure of
19              pores help us to determine if one person
20              has made that print that had been left
21              behind on an object or we have developed
22              in the laboratory.
```

5831

1    Q.   Now, in your experience as an analyst for BCI,

2          have you been qualified and testified in

3          Courtrooms?

4    A.   Yes, I have testified in the Courtrooms of

5          Ohio, and Federal Courts in excess of 100

6          times.

7    Q.   And you have been qualified as an expert in

8          those Courts?

9    A.   Yes, I have.

10   Q.   Including the Courtrooms here in Trumbull

11         County, Ohio?

12   A.   Yes, I have.

13   Q.   And I think including this very Courtroom?

14   A.   Yes.

15   Q.   Now I want to direct your attention to

16         analysis that you performed, I believe

17         sometime in February of 2002 to assist

18         the Howland Police Department here in

19         Trumbull County, Ohio.  Would you have

20         created a report in reference to your

21         findings?

22   A.   Yes, I did.

5832

1  Q.  I'm going to hand you what has been marked for

2      purposes of identification as State's

3      Exhibit 283.  It is a two page

4      document -- and ask if you recognize

5      State's Exhibit 283?

6  A.  Yes, I do.  This is a report, a copy of a

7      report which I have signed that I

8      produced on 2-13-2002.

9  Q.  And would that report also indicate the items

10     that were submitted to you for your

11     examination?

12 A.  For my examination and within the latent print

13     section, yes.

14 Q.  Your personal examination?

15 A.  Yes.

16 Q.  Can you just tell this Jury what it is that

17     you examined in reference to this case

18     for latent fingerprints?

19 A.  Certainly.  Item three submitted -- let me

20     correct and start this over -- submitted

21     on 12-14-01, by Detective Sergeant

22     Monroe, to the laboratory for the latent

5833

1    print section examination, under Case

2    number 0135755.  I have received and

3    examined item three, a Taurus .38 caliber

4    revolver, serial number JH14188.  Item

5    number four, live rounds.  Item number

6    24, a plastic placemat.  Item number 25,

7    a plastic tray.  Item number 26,

8    post-mortem fingerprints of Robert

9    Fingerhut.  Item number 27, copies of

10   fingerprint cards of Nathaniel E.

11   Jackson.  And item 28, a Chrysler 300-M

12   vehicle, license plate number CPA 8225.

13   Submitted on 12-18-2001, by Detective

14   Sergeant Pizzullo for latent print

15   section specifically, under case number

16   0135755-A were items A-5, a gauze with

17   stain and a piece of tape.  A-10 a

18   plastic bottle, A-11, bandage container.

19   A-12 an empty paper tape package.  A-13,

20   empty bandage container.  A-14, an empty

21   sponge container.  A-15, empty sponge

22   container.  A-16 an empty sponge

5834

1          container.  A-17 an empty sponge

2          container.  Also included was item A-18,

3          an empty envelope.  A-19 is also an empty

4          envelope.  A-20, keys.  A-21, cell phone.

5          A-22, garage door opener.  A-23, a CD.

6          Submitted on 12-19-2001, by special agent

7          Lulla for the latent prints section

8          examination, under case number 0135755-B

9          was item B-8 latent lifts; item B-9 inked

10         fingerprint and palm print cards of

11         Jennifer Robinson.

12   Q.    Were you given any fingerprints or palm prints

13         at some point of Nate Jackson?

14   A.    Yes, I was.

15   Q.    Now, I want to ask you with respect to those

16         items that you have just read, were you

17         able to find any fingerprints on any of

18         those items?

19   A.    Yes.  May I refer to my notes?

20   Q.    Yes.

21   A.    As I did identify eight partial latent

22         fingerprints.

5835

1   Q.   And can you recall where those eight latent

2        partial fingerprints were located at, on

3        what Exhibits or what items?

4   A.   Item A-18 is an empty envelope and that had

5        three partial latent fingerprints and

6        item B-8 was an envelope containing

7        latent lifts and that had five partial

8        latent fingerprints and one partial

9        latent palm print.

10  Q.   Those were submitted to you by Ed Lulla?

11  A.   Yes.

12  Q.   And were you able to make a comparison of any

13       known fingerprints that were submitted to

14       you and make a match?

15  A.   Yes, I did.  I compared the eight partial

16       latent fingerprints that were developed

17       in this case, and compared those to the

18       fingerprints of Robert Fingerhut, Nate E.

19       Jackson, and Jennifer Robinson.

20  Q.   And with a reasonable degree of scientific

21       certainty, were you able to make a

22       determination as to who the latent

5836

1               print -- first of all, the latent lifts

2               that Ed Lulla gave you from the Days Inn,

3               whose fingerprints did those match?

4   A.   I did identify the latent fingerprints

5               submitted by special agent Lulla.  I

6               identified the left index finger, the

7               right middle finger, the right ring

8               finger, the right index -- excuse me.  I

9               need to start this over.  I identified

10              the right index finger, right middle

11              finger, right ring finger, and two right

12              little fingers; a total of five

13              identifications to Nate Jackson.

14  Q.   And can you tell this Jury how you made that

15              comparison,  how you visually did that or

16              how you scientifically did that?

17  A.   Sure.  Each latent is taken individually and

18              examined for the minute details of

19              identification which we call points of

20              identification.  Those identification

21              points are compared to the individual's

22              fingerprint cards submitted.  In other

5837

1          words, the fingerprint cards of Robert

2          Fingerhut, Nate E. Jackson, and Jennifer

3          Robinson.  During those examinations,

4          each fingerprint, each latent print is

5          compared to the fingerprint card for

6          possible identification.  We look at

7          again, the minute ridge detail that I

8          mentioned previously in my testimony for

9          identifying characteristics in each of

10         the cards and that I have identified five

11         from those latent lifts submitted from Ed

12         Lulla.

13    Q.   Now, were there some items that you were not

14         able to -- strike that.  Is there such a

15         thing as insufficient ridge detail?  Do

16         you speak in that type of item or

17         finding?

18    A.   There's a number of definitions we do use and

19         one is insufficient ridge detail.  And in

20         examining evidence, there are a number of

21         factors why we would not develop a

22         sufficient ridge detail.  In other words,

5838

1          enough quantity of ridge detail with

2          points of identification in order for me

3          to make a comparison against that.  There

4          are a number of factors, basically we

5          refer to four primary factors as to why

6          we may not leave a fingerprint behind,

7          and those four are, surface, sweat,

8          contact and environment.  The first thing

9          is surface.  If I touch an item and the

10         item is perhaps bumpy or textured like a

11         lot of items are today, such as a

12         refrigerator or dashboard, the ridge

13         detail I leave behind is not going to

14         have a lot of continuity because that

15         texture is, the surface is so bumpy, so

16         is the surface itself.  Sweat,

17         perspiration, is exuded from the minute

18         portion on the surface of our hands, and

19         so if you exude profusely, perspire, then

20         you will perhaps smudge or smear that

21         print because your hands are so wet, so

22         we might not get a clear impression that

5839

1      way.  Contact is how I actually handle an

2      item.  If you think of a rubber stamp and

3      if I have two much ink on that stamp and

4      I put it down on something, it is going

5      to press down and smear around.  How you

6      actually handle an item is what might

7      cause you to not leave a latent print or

8      value behind, and if I handle a pair of

9      scissors and I use that motion in

10      handling that item, causes a lot of

11      smearing of the fingerprint.  The

12      environment is simply that the outside

13      environment does have an effect on latent

14      prints left behind on items, specifically

15      like rain or inclement weather would

16      likely wash away any latent print residue

17      left behind.

18  Q.   Did you take any photographs in connection

19      with this case during your examination?

20  A.   Yes, I did.

21  Q.   What did you take photographs of?

22  A.   I took photographs of item A-18, which was an

5840

```
 1              empty envelope.  On that envelope, I

 2              developed three fingerprints and I

 3              photographed those three fingerprints for

 4              identification purposes.

 5    Q.   And were you able to determine or make to a

 6              reasonable degree of scientific certainty

 7              a match on those fingerprints?

 8    A.   Yes, I did.  The three fingerprints developed

 9              on that envelope were identified as the

10              right thumb, the right middle finger and

11              the right ring finger of Nate Jackson.

12    Q.   And I'm going to hand you what has been marked

13              as State's Exhibit 309 and 309-A and ask

14              if you recognize what is 309 and 309-A

15              are?

16    A.   Yes.  309 is an envelope submitted to the

17              laboratory as item number A-18.  I

18              recognize it from my initials, when I

19              opened the case on 2-7-2002 and when I

20              finished examination of this item on

21              2-13-02.

22    Q.   And that is the envelope that you were
```

5841

1           referring to?

2    A.    No, that is simply the bag that contained the

3           envelope.  309-A is what was contained in

4           this paper bag as it was submitted to the

5           laboratory and that is an envelope which

6           is identified by my initials, the case

7           number and the date, 2-7-02, my initial

8           examination date of this item.

9    Q.    And now I'm going to show you what has been

10          marked for purposes of identification as

11          State's Exhibits 395-A, B -- well, I

12          guess it is just A and B.  395-A and B

13          and ask if you recognize 395-A and B?

14   A.    395 is a latent lift -- excuse me, lifts

15          submitted to the laboratory for

16          examination.  Identified by the case

17          number, my initials and the date of

18          examination, 12-13-02.  395-B is also

19          latent prints submitted to the

20          laboratory, identified by the case

21          number, my initials and the examination

22          date of 2-12-2002.

5842

1    Q.   And you were able to determine who those

2         fingerprints belonged to within a

3         reasonable degree of scientific

4         certainty?

5    A.   The fingerprints on these three piece of

6         evidence, 309-A, 395-A and 395-B have all

7         been identified to Nate E. Jackson.  That

8         is 309-A, 395-B.

9    Q.   I'm going to show you 391 and 391-A.  I'm

10        sorry, there's four prints in there.

11        I'll ask if you recognize 391-A.

12   A.   391 is the envelope containing 391-A, which

13        are copies of the fingerprint cards

14        identified as Nate Edward Jackson,

15        identifiable by myself by the case

16        number, my initials and the examination

17        date on them.

18   Q.   Those are the prints that you use to make

19        those comparisons to those latent lifts

20        that you referred to?

21   A.   Yes, those are the actual fingerprint cards I

22        use to compare against the latent lifts

```
                                                        5843
 1            developed.
 2    Q.   Now, your report that has been previously
 3            marked as State's Exhibit 283.
 4    A.   State's Exhibit 283.
 5    Q.   That is a fair and accurate copy of your
 6            report and your findings in this case?
 7    A.   Yes, it is.
 8    Q.   And it bears your signatures?
 9    A.   Yes, it does.
10    Q.   And it reflects the fact that Nate Jackson's
11            fingerprints were found or matched the
12            lifts within a reasonable degree of
13            scientific certainty from the Days Inn
14            lifts that Ed Lulla submitted to you,
15            including the room card, that envelope?
16    A.   That is correct.
17            MR. BECKER:  I have nothing further.
18    CROSS EXAMINATION BY MR. JUHASZ:
19    Q.   Good afternoon.  The Chrysler automobile that
20            you examined, I think it was item 28.
21            When was that submitted to you, item 28?
22    A.   Lab number 0135755 was submitted as item 28 on
```

5844

1           12-14-2001.

2   Q.    And you went over that car yourself?

3   A.    I was part of a group of people that examined

4           the vehicle, yes.

5   Q.    And that car was silver in color, I believe?

6   A.    I don't know.  I didn't write down the vehicle

7           color as an identifiable characteristic.

8   Q.    A Taurus gun was submitted to you for

9           fingerprints as well, correct?

10  A.    Yes.

11  Q.    You found some ridge detail, but not enough to

12          compare them to anybody's prints,

13          correct?

14  A.    That is correct.

15  Q.    You found the ridge detail on the gun near the

16          logo, is that right?

17  A.    Yes, I did.

18  Q.    The standards that were submitted to you, and

19          by the way, when we say standards, what

20          we're talking about is when Mr. Becker

21          just showed you those fingerprint cards

22          of Nate Jackson; those are standards,

5845

1                    right?

2    A.    Yes.

3    Q.    You know these are so and so prints, so you

4                    can compare your latent prints to them,

5                    correct?

6    A.    They are submitted to the laboratory with

7                    names on them.  I couldn't testify that

8                    those were those particular people's

9                    fingerprints, because I did not take

10                   those fingerprints.  We refer to those as

11                   standards.  They are labeled, usually

12                   typed in the front is the name of the

13                   person and signed by the person, so we do

14                   make the assumption that they are that

15                   person.

16   Q.    On the car, you find no prints that you can

17                   compare, is that right?

18   A.    That is correct.

19   Q.    So we have some prints on the gun, but you

20                   can't compare them, right?

21   A.    Correct.

22   Q.    Some prints on the car, but you can't compare

5846

```
 1              them, correct?

 2    A.   That is correct.

 3    Q.   We mentioned a second ago standards, the

 4              standards submitted to you in this case

 5              were from Robert Fingerhut, correct?

 6    A.   Yes.

 7    Q.   Nate Jackson, right?

 8    A.   Yes.

 9    Q.   Jennifer Robinson, correct?

10    A.   Correct.

11    Q.   And no one else?

12    A.   No.

13    Q.   You don't find Jennifer Robinson's prints

14              anywhere in the hotel room, is that

15              right, from the lifts taken from the

16              hotel room?

17    A.   That is correct.

18    Q.   You don't find Donna Roberts' prints on

19              anything submitted to you because no one

20              gives you the standard for her prints for

21              to you compare them to, is that also

22              correct?
```

5847

```
 1   A.   That is correct.  There were no fingerprint
 2             cards submitted of Donna Roberts.  There
 3             were eight fingerprints developed as
 4             identified in this case and they were all
 5             identified to Nate Jackson.
 6   Q.   But even if you wanted to find out if Donna
 7             Roberts' prints were on something, you
 8             wouldn't be able to do it, because no one
 9             sent a card to say, "These are Donna
10             Roberts' prints?
11   A.   I believe the reason why they did not submit
12             her prints is because all of the
13             fingerprints available had been
14             identified.  There were only eight found
15             in all of the evidence and all eight of
16             those fingerprints were found to be Nate
17             Jackson's.
18   Q.   When were the prints submitted to you?
19   A.   The fingerprints of Nate Jackson were
20             submitted on 12-14-2001, as well as the
21             fingerprint cards of -- post-mortem
22             prints of the victim.
```

5848

1   Q.   On 12-14-01?

2   A.   That is correct.

3   Q.   You have Jackson's and Fingerhut's on

4        12-14-01?

5   A.   That is correct.

6   Q.   When do you get Jennifer Robinson's?  That is

7        on the B submission, I believe.

8   A.   Yes.  Jennifer Robinson's fingerprints were

9        submitted on 12-19-01.

10  Q.   So by 12-19-01, you have all of the three

11       standards that were given to you in this

12       case, is that right?

13  A.   That is right.

14  Q.   You have some notes there, don't you, from

15       when you were testifying as to when you

16       actually did your fingerprint analysis,

17       correct?

18  A.   Yes, I do.

19  Q.   Tell us please when you did those.

20  A.   I started my examination on 12-14-01.

21       12-14-01 and I completed my examination

22       on 2-13-02.

5849

1    Q.    What is it that you do on 12-14 as far as

2          fingerprint analysis?

3    A.    On 12-14 --

4    Q.    Before you answer that, I want to make clear.

5          You did say you started your analysis on

6          12-14, correct?

7    A.    12-14-01, yes.

8    Q.    Tell us please what you did on 12-14.

9    A.    On 12-14-01, I can't say exactly what I would

10         have done, but I would probably have

11         started the examination by pulling the

12         evidence from the evidence room submitted

13         to me.  The next date, I would work other

14         cases involved as well as this case.  I

15         don't work just one case at a time.  So,

16         I don't exact dates.  The car I examined

17         on 12-18.  Started examination on 12-18.

18   Q.    Let me ask you.  Do we know what day you

19         concluded that the eight prints you have

20         testified here to belonged to Nate

21         Jackson?

22   A.    I don't have the exact date that I actually

5850

1   made the identification, no.  I will only

2   be able to say that it had to be during

3   the 12-14 to the completion date of 2-13.

4  Q.   And when please, did you write your report

5   indicating what your results were?

6  A.   My report, I write up a rough draft of my

7   report on the final day of examination.

8   That would have been 2-13-02.  My report

9   itself was typed on 3-15-02.

10 Q.   And tell us please, who that report is

11   addressed to?

12 A.   The report is addressed to Howland Police

13   Department, Detective Sergeant Monroe.

14 Q.   So, you don't actually tell Howland Police

15   Department until about four months after

16   the homicide, the middle of March of '02

17   what your results are, right?

18 A.   That would have been the date the report had

19   been probably sent to the agency.  I

20   can't say for sure whether I would have

21   had a phone conversation and informed him

22   of the identification to that or not.

5851

```
 1                   Most often we do make a phone call to let
 2                   them know.  At this period of time, there
 3                   was a significant backlog from the time
 4                   we would complete our report and typists
 5                   were backlogged until the time the report
 6                   would be typed.  We were notifying
 7                   agencies.  I often did that, but I do not
 8                   have a record of doing that.
 9     Q.   Did I hear you say that you finished the
10                   analysis in mid February, February 12th?
11     A.   February, February 13th.
12     Q.   So on 2-13, you finish your analysis?
13     A.   Correct.
14     Q.   You just said there was a backlog and so the
15                   report doesn't get typed until March?
16     A.   Until 3-15-02.
17     Q.   You may have had some conversation with
18                   Howland police authorities, but you can't
19                   remember?
20     A.   Yes, that is correct.
21     Q.   Any conversation would have been between 2-13
22                   when you completed your analysis and 3 --
```

5852

1              whatever when you sent your report out?

2     A.    That's correct.

3     Q.    But yet, the standards are submitted to you

4              back in December, correct?

5     A.    Didn't you say 12-14 and 12-19?  12-19 was

6              Jennifer Robinson.  And 12-14 was Mr.

7              Fingerhut and Mr. Jackson.

8     Q.    So earlier when you said, "Well, they didn't

9              submit Donna Roberts' samples, known

10             samples back then, because I identified

11             all of the prints," you didn't do that

12             until February, did you?

13    A.    The examination was not completed.

14             MR. JUHASZ:  Thank you.  I

15    appreciate it.

16    REDIRECT EXAMINATION BY MR. BECKER:

17    Q.    If you had 25 different people's fingerprints,

18             would it have made any difference in your

19             analysis?  Would you have found that, if

20             I gave you, if the Howland Police would

21             have given you 25 different people's

22             fingerprints cards, like Mr. Jackson's,

5853

1           would that have changed your analysis?

2   A.   No, it would not.  All eight latent prints

3           developed would still be the latent

4           fingerprints and identified to Nate E.

5           Jackson.

6   Q.   So you find eight prints that you can use in

7           your analysis?

8   A.   Eight fingerprints, correct.

9   Q.   One, two, three, four, five, six, seven,

10          eight, and you match all eight of those

11          to who?

12  A.   Nate E. Jackson.

13  Q.   And you had Jennifer Robinson's, did you match

14          hers to anybody?

15  A.   No.

16  Q.   Did you find any that were unknown?

17  A.   Yes.

18  Q.   Where were those found at?

19  A.   There was one palm print on B-8 from the

20          latent lifts submitted by Ed Lulla.

21  Q.   What is that?

22  A.   They are latent lifts submitted from Ed Lulla.

5854

1  Q.   And it was found on the latent lifts he had?

2  A.   Yes.

3  Q.   So one person, one print palm print, you can't

4       identify because you couldn't match it to

5       any of those two?

6  A.   I don't have palm prints -- I only had palm

7       prints of the victim and they are not the

8       victim's prints.

9  Q.   Did you have palm prints of Nate Jackson?

10 A.   No.

11 Q.   Do you recall whether you told Howland Police,

12      "I found a palm print," or was that just

13      in your report?  Do you recall ever

14      calling them?

15 A.   It is in the report to submit ink cards, but I

16      probably would have notified them that

17      there was one remaining unidentified palm

18      print.

19 Q.   You weren't given any other palm prints?

20 A.   I received no other inked palm prints to

21      compare.

22 Q.   Eight prints that you did find all matched one

5855

1          person?

2   A.    Yes.

3                MR. BECKER:  Thank you.

4   RECROSS EXAMINATION BY MR. JUHASZ:

5   Q.    Anybody send any prints to you since all of

6          this, since your report?

7   A.    No.

8   Q.    So basically, you told them, "I got a palm

9          print here, but I can't identify it,

10         guys," right?

11  A.    That is in my report.

12  Q.    And I'm going to hang on to it in case you

13         want to send me something.

14  A.    It is retained.

15  Q.    At least in sending you something, the Howland

16         Police Department did zilch.  As far as

17         sending you something else after sending

18         you that report, they did zilch?

19  A.    I have received no further standards for

20         examination.

21               MR. BECKER:  Nothing further.

22               THE COURT:  Ma'am, thank you very

5856

1   much.

2   (SIDE BAR DISCUSSION, OFF THE RECORD AND

3   OUT OF HEARING)

4               THE COURT:  The Side Bar for the

5   record was just on housekeeping schedule.  Let's

6   take a five minute break, folks.  The next witness

7   will take a considerable amount of time.  It may go

8   into tomorrow.  Remember the admonition given.

9   (Court in recess at 2:25 p.m.)

10   (Resumed in Open Court at 2:45 p.m.)

11                    CHIEF PAUL MONROE

12   being duly sworn according to law, on his oath,

13   testified as follows:

14   DIRECT EXAMINATION BY MR. BECKER:

15   Q.   Would you tell this Jury your name, please?

16   A.   Paul Monroe.

17   Q.   Where are you employed at?

18   A.   Howland Township Police Department.

19   Q.   What is your current title there?

20   A.   Chief of Police.

21   Q.   I want to direct your attention to December

22           2001.  What was your title in December of

5857

1           2001?

2    A.   Detective Sergeant.

3    Q.   Now, how long have you been employed with the

4         Howland Police Department?

5    A.   17 years.

6    Q.   And can you briefly tell us what education and

7         training you have had to prepare you for

8         that position as of December of 2001?

9    A.   I graduated from Kent State University with a

10        Bachelor of Science degree.  I attended

11        the required police academy.  Numerous

12        investigative courses and patrol courses

13        that I have dealt with, burglary

14        investigations, homicide investigations.

15        Sex investigations, robberies.  Gambling

16        investigations, narcotics investigations.

17   Q.   Now I want to direct your attention to

18        December of 2001 again, and as a

19        Detective Sergeant back then, what would

20        your duties have been?

21   A.   On any major crimes that would occur in the

22        Township, either myself or Detective

5858

1              Dillon would be called out to process the

2              scene and investigate the crimes.

3   Q.   Now, specifically on December 12, 2001, were

4              you called to a location in Howland

5              Township in reference to a crime?

6   A.   Yes.

7   Q.   Where was that location at?

8   A.   254 Fonderlac Drive in Howland Township,

9              Warren, Ohio, Trumbull County.

10  Q.   Now, I want you to tell this Jury when you

11             first got to that residence, who was

12             present in the residence?

13  A.   Patrolman Albert Ray, Patrolman Pollcino.

14             Detective Dillon, Donna Roberts.

15  Q.   Were there any emergency management people

16             there or emergency medical personnel

17             there?

18  A.   Yes.

19  Q.   Do you recall who they would have been?

20  A.   Captain Swindler, Paramedic Beck, and I

21             believe there was one other fire

22             personnel there, but I'm not sure who

5859

1            that was.

2    Q.    Now, when you get to the scene, where do you

3            go to get into that house?

4    A.    The front door.

5    Q.    Who were you met by?

6    A.    Patrolman Ray.

7    Q.    And what did he advise you of?

8    A.    Patrolman Ray came outside and spoke with me

9            on the front lawn of the residence, right

10           by the steps.  Told me that they had a

11           white male subject, appeared to have been

12           shot in the head.  There was a small

13           handgun laying on the step of the garage.

14           Blood around the victim, that the

15           victim's wife, Donna Roberts, was inside

16           the home in the master bedroom and that

17           she had contacted the Trumbull County 911

18           center, and found, actually was the

19           person that found the body.

20   Q.    Now, did you have a chance then to go see this

21           Donna Roberts?

22   A.    Yes, I did.

5860

1   Q.   Where did you first see Donna Roberts at on

2        December 12, 2001?

3   A.   She was in the master bedroom of the

4        residence.

5   Q.   And what was she doing back there?

6   A.   She was standing in the door jamb of the

7        bedroom.

8   Q.   Can you describe what her emotional state

9        appeared to you to be?

10  A.   When I first saw her, she appeared to have

11       been crying.  She wasn't crying when I

12       walked into the room.  But you could tell

13       her eyes were puffy.  She seemed curious

14       and anxious to find out what was going

15       on.  She was asking a lot of questions,

16       and then throughout the conversations I

17       had with her, she would become emotional

18       and start crying and screaming and then

19       she would calm back down.

20  Q.   Now, how long did you initially speak to her?

21  A.   Just a couple of moments.

22  Q.   What did you get from her?

5861

| | | |
|---|---|---|
| 1 | A. | Basically went over the information that |
| 2 | | Patrolman Ray had told me, asked her if |
| 3 | | she could tell me what happened. When |
| 4 | | she came in, if anything was missing from |
| 5 | | the house that was noticeable to her. I |
| 6 | | didn't know how well she had traveled |
| 7 | | through the house from the time that she |
| 8 | | arrived. Tried to see if she noticed if |
| 9 | | there was anything stolen, if anything |
| 10 | | unusual appeared to be out of place in |
| 11 | | her opinion, since it was her home. |
| 12 | Q. | Now, did you eventually go to a location where |
| 13 | | the victim was? |
| 14 | A. | Yes, I did. |
| 15 | Q. | And can you describe what you saw to this Jury |
| 16 | | when you first saw the victim? |
| 17 | A. | The victim was laying on his left side. The |
| 18 | | left side partially on his chest. He |
| 19 | | wasn't fully laying face down with his |
| 20 | | right arm extended. There was blood |
| 21 | | pooling around the victim's torso and |
| 22 | | head. There was a laceration or some |

5862

```
 1              type of cut in the webbing of his hand,

 2              his right hand, I believe, not certain if

 3              it was the right or left hand, but

 4              basically right through here where this

 5              muscle and skin was, this was torn, cut

 6              open.  (Indicating)

 7   Q.   And did you observe the firearm that you were

 8              advised about?

 9   A.   Yes, I did.

10   Q.   And where was that firearm located at?

11   A.   The firearm was actually laying in the garage

12              on the first step.  There's one step from

13              the garage floor into the residence and

14              it was laying on the floor -- or I'm

15              sorry, on the step.

16   Q.   And did you have a first impression of maybe

17              what had happened that night when you

18              first saw that?

19   A.   Originally there was talk of this being

20              suicide.  Someone there had indicated

21              initially that they thought they had a

22              suicide.  The closer we looked, we
```

5863

1          realized that this was not a suicide.

2    Q.    What types of things when you looked closer

3          indicated that perhaps it was not a

4          suicide?

5    A.    The victim had been shot more than once.  The

6          firearm that was recovered next to the

7          body was fully loaded.  It was a Taurus

8          revolver, five shot revolver, and there

9          were five live rounds in it.  None of

10         those cartridges had been fired.

11   Q.    And was there something missing from the

12         residence?

13   A.    Yes.

14   Q.    What was missing from the residence?

15   A.    The victim's keys and his silver Chrysler.

16   Q.    Now, when you first got into that

17         investigation, did you ever determine if

18         the victim had any valuables on his

19         person?

20   A.    Yes.

21   Q.    And did he?

22   A.    Yes.

5864

1   Q.   And if he did, what were they?

2   A.   He had two wallets in his back pocket with

3        quite a few credit cards.  He had cash in

4        his wallets, had gold jewelry on, around

5        his neck, he had rings, watch on.

6   Q.   Now, eventually, after you surveyed the scene

7        and discussed this with your other

8        officers, you went back and had a more

9        detailed conversation on December 12th in

10       the early morning hours with Donna

11       Roberts?

12  A.   Yes.

13  Q.   I want to talk to you about the conversations

14       you had with Miss Roberts on December 12,

15       2001, after your arrival sometime in the

16       early morning hours, the early a.m.

17  A.   Yes.

18  Q.   Was Miss Roberts able to tell you anything

19       about the car that was missing?

20  A.   She told me that it was Robert's car, her

21       husband's, who she refers to as her

22       husband, said that Robert's car is

5865

1          missing.  Somebody stole it.  Said it was

2          identical car to her car, which is a year

3          older, but it is also a red Chrysler

4          300-M.

5   Q.   Was that red Chrysler 300-M at the location?

6   A.   Yes, it was.

7   Q.   Eventually was that moved for some reason?

8   A.   Yes.

9   Q.   Was any evidence found under that Chrysler

10         300-M?

11  A.   Yes.

12  Q.   What evidence was found under the Chrysler

13         300-M?

14  A.   A pair of broken glasses.  The glasses frame,

15         the eye glass frames were underneath the

16         car.  There was a lens missing.  It was

17         laying underneath the car as well as

18         blood drops on the floor.

19  Q.   Was there any damage inside the interior of

20         the garage?

21  A.   Yes.

22  Q.   Can you describe that damage?

5866

1  A.  On the garage door -- this was a garage door

2        that the sections were about 24 inches

3        tall, and the full width, a double wide

4        garage, and as you opened the garage

5        door, each of those sections folds, and

6        on the lower section, there's a metal bar

7        that kind of supports and keeps the door

8        rigid.  There's some carriage bolts that

9        had been knocked out of the garage door,

10       and the metal frame was bent.

11 Q.  And I believe those were video taped?

12 A.  Yes, they were.

13 Q.  As well as the rest of the crime scene?

14 A.  Yes.

15 Q.  Now, did you get a chance, to ask Miss Roberts

16       about any routines that Mr. Roberts had

17       when he came home?

18 A.  Yes.

19 Q.  And can you tell this Jury what she told you

20       on December 12, 2001, Mr. Fingerhut's

21       routine was when he came home?

22 A.  During that conversation, the routine was just

5867

```
 1              to get off work around nine, shortly
 2              after nine, and he would come home and
 3              park on the left hand side of the garage.
 4    Q.   And that garage, when he came in to the actual
 5              garage itself, how much room was there to
 6              maneuver with both of those vehicles in
 7              there or if both of those vehicles would
 8              be in there?
 9    A.   It was very tight.
10    Q.   Did she tell you how he would have to get out
11              of his car to get into the house?
12    A.   No.
13    Q.   When she told you he came home, what did she
14              tell you he would normally do when he
15              came into the house?
16    A.   On the 12th?
17    Q.   On the 12th, I am still talking about December
18              12, 2001, what did she tell you he did?
19    A.   You are talking about the first interview on
20              the 12th?
21    Q.   Yes.  The very first interview.  Did you get
22              into that discussion at that point?
```

```
                                                        5868
 1    A.    At that point she just said he came home and
 2                parked in the garage on the left hand
 3                side.
 4    Q.    Now, did you discuss with her on the 12th, and
 5                this is the early morning hours, what she
 6                had done that evening?
 7    A.    Yes, I did.
 8    Q.    What did she tell you that she had done, I
 9                guess it would be the evening of December
10                11th?  What did she tell you she had done
11                and where did she tell you she had gone?
12    A.    She had worked at the Warren Greyhound
13                terminal until 5:30, and after work she
14                went to the Red Lobster Restaurant and
15                had a quiet dinner alone, then proceeded
16                home roughly 5:45, 6:00.  And during that
17                time, Robert Fingerhut had called her a
18                couple of times, inquired as to what they
19                were going to have for dinner.  Told her
20                that things had been slow at the bus
21                terminal in Youngstown throughout the
22                evening, and he would be a little bit
```

5869

1            late on December 11th and that she should

2            go shopping.  Donna told me that he told

3            her to go shopping at the mall and buy

4            herself something nice, because she

5            deserved it.  She said that she decided

6            that she didn't want to go to the mall,

7            she was going to go to Wal-Mart instead.

8            She said on her way to Wal-Mart, she left

9            her development, went down East Market

10           Street and stopped at Giant Eagle in

11           Howland, pulled in, made a left hand turn

12           into Giant Eagle from the traffic light,

13           went in, tried to buy rotisserie chicken

14           for the dogs.  They didn't have any.  She

15           said she parked in the first handicapped

16           space in front of the doors.

17   Q.   Did she give you an idea of what time she left

18           her house?

19   A.   Yes.

20   Q.   What time did she tell you?

21   A.   9:00.

22   Q.   And did she tell you -- I didn't mean to

5870

1     interrupt.  After she was at Giant

2     Eagle -- what did she do at Giant Eagle

3     when she's trying to get this rotisserie

4     chicken?

5 A. She parked in the first handicapped space,

6     went in and looked for the chicken,

7     didn't have any.

8 Q. And then where did she tell you on December

9     12th, just a few hours after you had been

10     called there, where did she tell you she

11     went then?

12 A. Wal-Mart.

13 Q. And what did she tell you she did at Wal-Mart?

14 A. She said she shopped for a short period of

15     time, about ten minutes, and that she had

16     bought cigarette lighters and make-up.

17 Q. Did she tell you how long she was at Wal-Mart?

18 A. About ten minutes.

19 Q. Now, how long does it take to get from Avalon

20     Estates where she lives there on

21     Fonderlac to Giant Eagle?

22 A. Three minutes.

5871

1    Q.    How long then does it take to get from Giant

2          Eagle to the Elm Road Wal-Mart?

3    A.    Seven minutes.

4    Q.    And she told you she was at Wal-Mart for just

5          five, ten minutes?

6    A.    She said about ten minutes.

7    Q.    And did she tell you where she went after she

8          left Wal-Mart?

9    A.    Yes.

10   Q.    Where did she say she went?

11   A.    She said she went to Super K-Mart.

12   Q.    So we're still before 9:30 at this time, is

13         that correct, using her time table?

14   A.    Yes.

15   Q.    And how long -- or I take that back.  How long

16         does it take to get from the Elm Road

17         Wal-Mart to Super K-Mart in Howland

18         Township?

19   A.    15 minutes tops, probably ten minutes.

20   Q.    And that super K-Mart is over by the mall?

21   A.    Yes, it is on State Route 46, Niles-Cortland

22         Road.

5872

1   Q.   Now, what did she tell you she did, and I am

2          still referring to the December 12th

3          statement in the early a.m. hours.  What

4          did she tell you she did at Super K-Mart?

5   A.   She said often she just goes to Super K-Mart

6          and walks around and looks at things.  On

7          that particular evening, she said she

8          didn't buy anything.  She just walked

9          around.  I asked her if she spoke with

10         anybody or ran into anybody she knew

11         while she was at Super K-Mart.  She said

12         she had not, but she did stop and speak

13         to a lady with a cute child.  Shortly

14         before midnight she went home.

15  Q.   And did she tell you exactly or approximately

16         what time before midnight she went home?

17  A.   Just said shortly before midnight.

18  Q.   This is on December 12th in the early morning

19         hours?

20  A.   This occurred on December 11th.  She's telling

21         me this the early morning hours of the

22         12th.

5873

1    Q.    She's telling you this on December 12th, just

2          hours before, hours before what had

3          happened?

4    A.    Yes.

5    Q.    Did you find anything on December 12th?  Now,

6          was there anything there that confirmed

7          what she was telling you?

8    A.    Yes.

9    Q.    What was in the house on December 12th in the

10         early morning hours that confirmed what

11         she had told you?

12   A.    On the kitchen table, it was just past the

13         victim's feet.  There was a white

14         shopping bag, plastic shopping bag that

15         had make-up, cigarette lighters and a

16         receipt from Wal-Mart.

17   Q.    And I'm going to hand you State's Exhibit 396

18         and ask if you recognize what State's

19         Exhibit 396 is?

20   A.    State's Exhibit 396 is the Wal-Mart receipt,

21         which I just testified that we found on

22         the kitchen table at 254 Fonderlac.  It

5874

1           is dated December 11, 2001 with the time

2           2137 hours and 18 seconds as the checkout

3           time, and 2137 in military time is

4           actually 9:37 p.m.

5    Q.   And that was found in her residence?

6    A.   Yes.

7    Q.   Now, did you later find some food, I guess,

8           that confirmed another part of her story?

9    A.   Well, there was a carcass from a rotisserie

10          chicken laying on the counter.

11   Q.   How new or old did that appear to be?

12   A.   Don't know.

13   Q.   Was there take home containers of food in that

14          residence -- or I'm sorry, in the car?

15   A.   Yes.

16   Q.   What was in the take out container of the car?

17   A.   There were crab legs in a clear plastic tin on

18          the passenger floorboard of the red

19          Chrysler 300-M.

20   Q.   Could you tell what -- where the location was

21          that that food had been purchased at?

22   A.   No.

5875

1    Q.    Did you ever find out where that food had been

2          purchased at?

3    A.    Yes.

4    Q.    How did you find that out?

5    A.    I asked Donna Roberts.

6    Q.    And what did she say?

7    A.    She told me that she had eaten at Red Lobster.

8    Q.    And that was on December 11th, that previous

9          evening?

10   A.    Yes.

11   Q.    Did she say who she had eaten on December 11th

12         with?

13   A.    Yes.

14   Q.    Who did she say who she had eaten with?

15   A.    She said she was alone.

16   Q.    Now, eventually, I think you asked her about

17         when she initially came home to the

18         residence on December 11th?

19   A.    Yes.

20   Q.    And this is now you are still talking to her

21         in the early morning hours of December

22         12th at her residence.  What does she

5876

1        tell you about coming home on December

2        12th?

3   A.   On December 11th, she told me as she

4        approached the house, she pushed the

5        garage door opener, the remote control

6        button that was on the visor.  After she

7        pushed it, she realized the garage lights

8        came on, and the garage door was actually

9        coming down, so she pushed it again and

10       sent the door back up.  Noticed that

11       there were no vehicles in the garage.

12       Pulled into the garage on the right hand

13       side, got out of the car, walked around

14       the back, and went into the house through

15       an open man door.  She said the door

16       leading from the garage into the house

17       was standing open, and that Robert

18       Fingerhut was laying there bleeding from

19       the face.

20  Q.   And where did she tell you she went after she

21       saw that?  What did she tell you she did?

22  A.   She said she didn't touch anything, she just

5877

1          ran into the house, grabbed the portable

2          phone and called 911.

3  Q.   Did she report that she saw any weapons when

4          she came into her house?

5  A.   No.

6  Q.   Now while she was in the house calling 911,

7          did she tell you where she went next?

8  A.   She said she stood in the house and then

9          thought maybe there was an intruder in

10         the house, so she went and left the house

11         through the front door, and stood out in

12         the front yard and waited there until the

13         police arrived.

14  Q.   And was she asked if she saw anyone near the

15         house?

16  A.   Yes.

17  Q.   And what was her reply?

18  A.   No.

19  Q.   And was she asked where the Defendant's -- or

20         I'm sorry, strike that.  Eventually

21         Dr. Germaniuk came to the residence, is

22         that correct?

5878

```
 1    A.    Yes.

 2    Q.    And were you present when Dr. Germaniuk was

 3          there?

 4    A.    Yes.

 5    Q.    While you were there with Dr. Germaniuk, what

 6          did he do to the body of Robert

 7          Fingerhut?

 8    A.    Dr. Germaniuk took a photograph of the body.

 9          Checked the wounds before the body was

10          moved.  Then slowly removed the contents

11          of the victim's pocket.  Took swabbings

12          from the inside of the victim's pocket,

13          then slowly removed the victim's

14          clothing.

15    Q.    Now during the course of Dr. Germaniuk

16          removing the clothing of Mr. Fingerhut,

17          it is State's Exhibit 268, I believe --

18          I'm sorry, 258.  If you could look at

19          State's Exhibit 258, which is this

20          tattered bag.  Do you recognize what

21          State's Exhibit 258 is?

22    A.    Yes.
```

5879

1    Q.    And what is State's Exhibit 258?

2    A.    State's Exhibit 258 is a Cincinnati Reds

3              baseball jacket.

4    Q.    And do you know where that was recovered from?

5    A.    Yes, I do.

6    Q.    Where was it recovered from?

7    A.    This was recovered from Robert Fingerhut's

8              body in the residence of 254 Fonderlac.

9              MR. INGRAM:  I object.  Four

10   witnesses have testified that that is where this

11   jacket came from already.  This is cumulative and I

12   respectfully submit a waste of our time.

13              THE COURT:  The detective has

14   identified it and it has been proven where it was

15   found.

16   Q.    Now, Detective, can you describe for this Jury

17              the injuries that you observed on Mr.

18              Fingerhut at the scene?

19   A.    A bullet wound to the top of his skull.  A

20              bullet wound to his chest.  Another

21              bullet wound to his back.  I was going to

22              show you, to give you the proximity of

5880

1    where the bullet came out, it hit up kind

2    of high, and then we see this little

3    fray.  It is an exit wound for the

4    bullet.

5    MR. INGRAM:  I object.  He's not

6    qualified to say what is an exit wound in that

7    jacket.

8    THE COURT:  I think he's qualified

9    to say that it appears --

10    MR. INGRAM:  To be a hole.

11    Q.   I'll --

12    THE COURT:  Let me inform the Jury

13    as to the angle of the bullet where it came in,

14    went out, that is something that an expert would

15    have to testify to.  The Detective has given you

16    what he thinks appears to be the entrance and exit

17    wound of the bullet.

18    Q.   I'm going to hand you State's Exhibit 259.  Do

19    you recognize what State's Exhibit 259

20    is?

21    A.   State's Exhibit 259 is a spent bullet, which

22    was found trapped between the layers of

5881

```
 1              clothing in the front of Robert
 2              Fingerhut.
 3    Q.   And did you gather up that Exhibit?
 4    A.   Yes.
 5    Q.   And you put it in that container?
 6    A.   Yes.
 7    Q.   And it is in the same condition as when you
 8              first got it there at the scene?
 9    A.   Yes.
10    Q.   During the course of your investigation, did
11              you find any bullet holes in the
12              residence?
13    A.   Yes.
14    Q.   Can you describe for this Jury where the
15              bullet holes were located at?
16    A.   When you walk into the kitchen from the
17              garage, if you would just continue to
18              walk straight through the house, there's
19              a set of basement steps that go down, and
20              in the dry wall ceiling, that is at an
21              angle going down the steps, towards the
22              bottom portion of that dry wall close to
```

5882

1              the basement ceiling, there was an oblong

2              hole in the drywall.  We removed part of

3              the drywall and found a bullet, spent

4              bullet behind that.

5    Q.   Now, I'm going to hand you State's Exhibit 257

6              and ask if you recognize number 257?

7    A.   Yes.

8    Q.   And what is 257?

9    A.   State's Exhibit 257 is a partially damaged

10             spent bullet.  There's some white

11             substance on the bullet.  This is the

12             bullet that I described that we found

13             behind the drywall where the oblong hole

14             in the wall was.

15   Q.   And go ahead and take those gloves off.  As

16             you and your fellow officers were

17             conducting your examination, finding

18             these bullets, getting the clothing,

19             gathering evidence, what was this

20             Defendant doing?

21   A.   She was still in the bedroom of the residence.

22   Q.   And could you hear what she was doing?

5883

1    A.    At times, the victim was crying, screaming,

2          "Oh, my Robert, my Robert," very loudly.

3          Other times, she was very quiet.

4    Q.    Go ahead.

5    A.    Sometimes while we were processing different

6          parts of the crime scene, it would become

7          quiet and there wasn't much conversation

8          between the other policemen.  It seemed

9          like during those periods of times that

10         we would hear Donna Roberts in the

11         bedroom screaming and crying.  When we

12         would begin talking, Detective Dillon

13         noticed that --

14              MR. INGRAM:  Objection to what

15    Detective Dillon noticed.

16              THE COURT:  Sustained.

17    Q.    What did you notice?

18    A.    I noticed that when we were discussing some of

19         the findings and things that we had seen

20         within the home, Donna Roberts had become

21         quiet and we didn't hear her any longer

22         as long as we were talking.

5884

1   Q.   Now, eventually -- well, let me ask you this.

2          Were there any animals in that house?

3   A.   Yes.

4   Q.   Where were they at?

5   A.   They were underneath the bed in the master

6          bedroom.

7   Q.   Is that where they remained throughout the

8          evening?

9   A.   Yes, they did.

10   Q.   At some point, a decision was made to have

11         Miss Roberts leave the residence?

12   A.   Yes.

13   Q.   And how did that come about?

14   A.   We realized we were going to be inside this

15         home for a substantial number of hours

16         collecting evidence.  And that it would

17         probably be best for Donna Roberts to

18         have somebody come sit with her or leave

19         the residence, a neighbor or family

20         member.  I spoke to Donna Roberts and

21         asked if there was someone we could call

22         to have come over with her or that she

5885

1          could go to their residence.  She gave me

2          the phone number of her brother.

3    Q.   And in fact, did she leave the residence with

4          her brother?

5    A.   Yes.

6    Q.   And approximately what time was that, if you

7          recall?

8    A.   I don't know.

9    Q.   But she did leave?

10   A.   Yes.

11   Q.   And your investigation was not completed yet?

12   A.   No, it was not.

13   Q.   After she left, or as she left, did she say

14          anything to you about what needed to be

15          done?

16   A.   She told me to do whatever had to be done,

17          search the entire house if we had to,

18          just find whoever did this.

19   Q.   Now she leaves the residence, correct?

20   A.   Yes.

21   Q.   And at some point during your search, did you

22          search her vehicle?

5886

1    A.    Yes.

2    Q.    What did you find in her vehicle?

3    A.    In the trunk of the vehicle, found a brown

4          paper shopping bag that contained

5          clothing and the name Nate Jackson upon

6          it and 145 letters that were written by

7          Donna Roberts to Nate Jackson.

8    Q.    I'm going to show you State's Exhibit 270 and

9          ask if you recognize that, what State's

10         Exhibit 270 is?

11   A.    The brown shopping bag that I described that

12         says Nate Jackson, this is the bag that

13         we found inside the trunk of Donna

14         Roberts' vehicle.

15   Q.    And did you say there was something else in

16         that bag?

17   A.    Yes, there were some paperwork from the

18         prison, release papers, some socks.

19         There were 145 handwritten letters from

20         Donna Roberts to Nate Jackson.

21   Q.    I'm going to hand you State's Exhibits 271-D

22         one through -- State's Exhibit 271-D 139

5887

1          and D-139-A, and ask if you recognize

2          what those are?

3               MR. INGRAM:  I'll stipulate that

4     those are the letters that were in the bag.

5               MR. BECKER:  Thank you.

6  Q.   Those letters, they were in this bag, is that

7          correct?

8  A.   Yes, the letters were actually folded in each

9          of these envelopes, each one had an

10          envelope.

11  Q.   And on December 12, 2001, did you have a

12          chance to read those letters?

13  A.   Not all of them.

14  Q.   Did you read any of them?

15  A.   Yes.

16  Q.   How many would you proximate?

17  A.   About five.

18  Q.   Now, while you are there at the residence, you

19          conduct your search, you gather the

20          evidence you need, and you leave.  Do you

21          remember what time you left?

22  A.   Approximately 6:30 a.m.

5888

1   Q.   And while you were there doing your job, doing

2        your work, doing whatever it is to catch

3        this person as she asked you, did someone

4        call the residence?

5   A.   Yes.

6   Q.   And tell this Jury about the phone call you

7        got.

8   A.   3:38 a.m., I was sitting in the dining room

9        writing down an inventory, filling out an

10       inventory form of items that were to be

11       removed.  I answered the phone, said

12       hello.  There was a pause, a quiet.

13       Nobody said anything and they hung the

14       phone up.  So I hit the button, star 57

15       on the phone, which causes the phone

16       company to automatically do a trace on

17       the incoming call.  I received a recorded

18       message that indicated the successful

19       trace had been conducted on the last

20       call.  I hung the phone up, then I hit

21       star 69, which indicated the number that

22       that call had just came from.

5889

1   Q.   Do you recall the number that you got?

2   A.   It was area code 330/056-0371, but I would

3        have to refer to my notes to be exact.

4   Q.   If you want to refer to your notes, do you

5        have them with you here?

6   A.   Yes.

7   Q.   Are they in the binder that Detective Dillon

8        has?

9   A.   Yes.

10  Q.   Would that help you refresh your memory of

11       what that phone number was?

12  A.   Yes.  The phone number was 330/506-0373.

13  Q.   And now you go home after you finish your

14       search at 6:30 in the morning.  You go

15       home, and what do you do at home, you

16       probably sleep?

17  A.   I slept for about three hours.

18  Q.   Did you ever see Donna Roberts again on that

19       same date, December 12th?

20  A.   Yes.

21  Q.   How did that come about?

22  A.   Around 10:00 in the morning, I went back to

5890

```
 1              where Donna Roberts was staying in

 2              Austintown.  Spoke with her there, and

 3              she gave us a written consent to continue

 4              searching the residence.

 5   Q.   And did you make arrangements to meet with her

 6              and speak with her again?

 7   A.   Yes.

 8   Q.   And where were you to meet with her and speak

 9              with her again?

10   A.   At the Howland Police Department at 1:00 in

11              the afternoon.

12   Q.   Did you go back to the house between 10:00 and

13              1:00?

14   A.   No.

15   Q.   When you got to the house at 1:00 p.m. -- I'm

16              sorry, when you got to your office at

17              1:00 p.m., did she show up?

18   A.   Yes.

19   Q.   And this is at the Howland Police Department,

20              is that correct?

21   A.   Yes.

22   Q.   So, now you are at the Howland Police
```

5891

1              Department, and you question this

2              Defendant again about her relationship

3              with Mr. Robert Fingerhut, is that

4              correct?

5    A.   Yes.

6    Q.   Did she tell you how she met Robert Fingerhut?

7    A.   I don't recall.

8    Q.   Did she tell you how long they had been

9              married?

10   A.   They were married for three years.

11   Q.   And did she tell you how long she had been

12             with him?

13   A.   Since 1983.

14   Q.   Did she tell you where they had met at?

15   A.   I don't know.

16   Q.   And did she tell you a lot of details about

17             what she did when she met Mr. Fingerhut?

18   A.   Yes.

19   Q.   What kind of work did she tell you she did

20             when she met Mr. Fingerhut?

21   A.   She worked for a plastic surgeon in North

22             Miami Beach, Florida.

5892

1  Q.  Did she tell you what she did with this

2      particular doctor?

3  A.  Yes.

4  Q.  Did she tell you his name?

5  A.  Yes.

6  Q.  What did she tell you she had done with this

7      doctor, what type of work she had done?

8  A.  She worked for Dr. Mort Freeman.  He's a

9      plastic surgeon and she was his only

10      employee.  Said she did his medical

11      records, his billing, filed medical

12      reports, insurance forms.  She assisted

13      him in surgical proceedings, assisted him

14      with skin grafts and just basic

15      proceedings that he had done.

16  Q.  Did she tell you that she had ever traveled

17      with this doctor?

18  A.  Yes.

19  Q.  Where did she tell you she had traveled with

20      this doctor to?

21  A.  Israel.

22  Q.  What did she do in Israel with this doctor?

5893

1   A.   Dr. Freeman would do, would handle repair work
2        to gunshot wounds and skin grafts, and
3        she indicated to me that she had actually
4        performed skin grafts on persons who had,
5        who were in need of these because the
6        services were so limited in Israel, and
7        she also assisted in dressing fresh
8        gunshot wounds from battle.  She referred
9        to them as battle wounds.
10  Q.   On December 12th at 1:00 p.m. when you are
11       meeting with her, what did she tell you
12       her marital status was with Robert
13       Fingerhut?
14  A.   She said she was married.
15  Q.   Does she tell you anything about divorcing Mr.
16       Fingerhut?
17  A.   She said in the eyes of the law, she was
18       divorced from Robert Fingerhut, that she
19       was divorced from him because of
20       financial reasons, and business reasons
21       that her husband Robert wanted to be
22       divorced in case there would be a lawsuit

5894

1           at the bus terminal or the collapse of

2           the business, it wouldn't affect the

3           finances.  But in her mind, because they

4           were a devout Jewish family, that in the

5           eyes of their religion, they were not

6           divorced and the only way they could

7           become divorced would be to get a GET,

8           which you would need to get that from a

9           higher ranking official in the Jewish

10          church.

11   Q.    Now how did she describe on December 12, 2001,

12          her relationship at 1:00 in the

13          afternoon, her relationship with Mr.

14          Fingerhut?

15   A.    Said they got along great and had no real

16          problems.

17   Q.    Did she report to you any physical abuse?

18   A.    No.

19   Q.    Did she report to you any problems they were

20          having?

21   A.    No.  She said the only problems they ever had

22          was over who was going to put water in

5895

1           the dog's bowl.

2    Q.    Did she tell you about some firearms that she

3           owned and Mr. Fingerhut owned?

4    A.    Yes.

5    Q.    And eventually, not on the 12th, but later on,

6           did you conduct anything, get some serial

7           numbers or do anything with those serial

8           numbers?

9    A.    Yes.

10   Q.    What did you do when you got the serial

11          numbers for those guns?

12   A.    I contacted ATF and submitted a request for a

13          weapons trace with ATF.

14   Q.    And what weapons did she tell you she had on

15          December 12, 2001 or how many?

16   A.    There was a long rifle with a bayonet on it,

17          and two hand guns.

18   Q.    Now, I'm going to show you what is marked for

19          purposes of identification as State's

20          Exhibit 327-A, 327-B and 327-C.  I'm

21          going to hand you State's Exhibits 327,

22          A, B and C and ask if you recognize

5896

1            those?

2    A.    Yes.

3    Q.    What are those?

4    A.    327-A is a certification letter from the

5          Department of Treasury, Bureau of

6          Alcohol, Tobacco and Firearms, which

7          directly addresses State's Exhibit 327-B

8          and State's Exhibit 327-C, which are

9          actually firearms traces, which were

10         conducted by the Department of the

11         Treasury, Bureau of Alcohol, Tobacco and

12         Firearms to determine ownership of two

13         firearms.

14   Q.    Both of those firearms, what make and model

15         were they?

16   A.    327-B is a Taurus model 85, .38 caliber,

17         serial number IL-46854.  Indicates the

18         owner of this firearm is Donna Roberts,

19         and she purchased it March 26, 1990.  The

20         second is a Taurus, doesn't list a model

21         number, .38 caliber revolver, serial

22         number JH-14188.  Purchased October 24,

5897

```
 1              1990 by Robert Steven Fingerhut.

 2    Q.   Now, those firearms, were they will both

 3              recovered in connection with this case?

 4    A.   No, they were not.

 5    Q.   One of those was missing?

 6    A.   Yes.

 7    Q.   And has it ever been recovered as of this

 8              date?

 9    A.   No.

10    Q.   Now, I want to go back and I hate to do this

11              to you, and I'm going to go back to when

12              you were at the house on the 11th.  Did

13              you find some other letters in the

14              residence?

15    A.   Yes.

16    Q.   And who were those letters addressed from and

17              who were they addressed to?

18    A.   They were addressed from Nate Jackson and they

19              were addressed to Donna Roberts.

20    Q.   And I'm going to assume that State's Exhibits

21              273-N one and 273-N 143 would be

22              stipulated to as the previous ones were.
```

5898

1          MR. INGRAM:  Yes.

2          THE COURT:  So stipulated.

3  Q.    There's also an additional letter that was

4         found in the master bedroom inside an

5         armoire marked as 275-A.

6          MR. INGRAM:  Can I see that?

7          MR. BECKER:  Is that stipulated to

8  that that is Mr. Jackson's letter?

9          MR. INGRAM:  Yes.

10  Q.    Going back to the house, when you were in the

11        residence, did you search the bedroom?

12  A.    Yes.

13  Q.    In the bedroom, did you find some paperwork?

14  A.    Yes.

15  Q.    Where did you find this paperwork and what

16        kind of paperwork was it?

17  A.    Besides the letters?

18  Q.    Yes, besides the letters.

19  A.    In the headboard of the bed, the master

20        bedroom, a little cabinet and you opened

21        it up and there was a stack of papers in

22        there.  On the very top were two life

5899

1          insurance policies.

2  Q.   I'm going to hand you State's Exhibits 322 and

3          323 and ask if these are the insurance

4          policies that you found in the bedroom?

5               MR. INGRAM:   Stipulated.

6               MR. BECKER:   Those are stipulated

7  to.

8  Q.   Where were they in relationship to all of the

9          other stacks of things in that room?

10 A.   They were on the top.

11 Q.   Now, I want to go back to December 12th at

12         1:00 p.m. at your office.   Did the

13         Defendant give you a version of the

14         events of December 11th starting from

15         when she got up that morning?

16 A.   Yes.

17 Q.   What did she tell you was the last time she

18         saw Robert Fingerhut on December 11th?

19 A.   While she was laying in bed.

20 Q.   And what did she tell you that she -- well,

21         what did she tell you that Robert went to

22         in the morning -- where did she tell you

```
                                                    5900
 1           he went?

 2    A.   He would go to the Warren Greyhound terminal.

 3    Q.   And then where would she go in the day?

 4    A.   The daytime, she said she woke up around 8:00,

 5           Robert Fingerhut was leaving for work.

 6           They exchanged greetings and he went on

 7           his way.  Said she laid in bed until 9:30

 8           or 10:00, got up, washed her hair, fixed

 9           her make-up, fed her dogs, and at 12:30

10           she went to work at Warren Greyhound

11           station and worked there alone until

12           5:30.

13    Q.   What did she tell you on this date that you

14           are now talking to her at 1:00 p.m. on

15           December 12th, what did she tell you

16           about going -- or I'm sorry, what did she

17           tell you about why she didn't go to the

18           Youngstown terminal?

19    A.   The Youngstown terminal is computerized and

20           she doesn't know how to use the equipment

21           there, that is why she doesn't work in

22           the Youngstown terminal.
```

5901

1    Q.    When the Defendant was telling you she went to

2          the Warren bus station, what did she tell

3          you about Nate Jackson?

4    A.    She didn't tell me anything about Nate

5          Jackson.

6    Q.    And she continued to tell you what she did

7          when she left work on December 11th from

8          the Warren terminal?

9    A.    Yes.

10   Q.    What did she tell you she did when she left

11         work at the Warren terminal about 5:15?

12   A.    She said she worked there until 5:15, she

13         called out to the Youngstown terminal,

14         talked to Robert.  She went to Giant

15         Eagle and purchased a rotisserie chicken.

16         That is what she typically feeds her

17         dogs.

18   Q.    This was the same type of rotisserie chicken

19         that she told you the night before or

20         earlier in the morning she had gone out

21         at 9:00 for?

22   A.    Yes.

5902

1    Q.    Now she's saying it was what time when she

2          went to buy the rotisserie chicken after

3          work?

4    A.    About 5:30.

5    Q.    Now, did she tell you where she had dinner

6          that night?

7                MR. INGRAM:  May we please approach

8    Side Bar?

9                THE COURT:  Yes.

10   (SIDE BAR DISCUSSION, OFF THE RECORD AND

11   OUT OF HEARING)

12   Q.    Detective, may I have the -- Detective, I want

13         to direct your attention to December 12th

14         again, and you are speaking to her at the

15         Howland Police Department.  On December

16         12th, she tells you that she went to get

17         this rotisserie chicken from Giant Eagle.

18         Where did she tell you she went to dinner

19         that night?

20   A.    She said she got the chicken at the Giant

21         Eagle.  She said that she had dinner at

22         the Red Lobster.

5903

1    Q.   And what did she tell you about having dinner

2         with Nate Jackson on December 12th?

3    A.   She did not.

4    Q.   And when she went home then, she then told you

5         again the more detailed version of the

6         events that led up to her going to

7         Wal-Mart and all of these other stores.

8         Did she tell you the same story or what?

9    A.   Yes.

10   Q.   Now, again, when she tells you this story, was

11        she a little bit more accurate of what

12        time she left Super K-Mart which was the

13        last place she went to in that version of

14        events, correct?

15   A.   On that occasion, she said 10:30 she arrived

16        at Super K-Mart.

17   Q.   Did she tell you how long she was at Super

18        K-Mart?

19   A.   She said about an hour.

20   Q.   Now, on either of these dates, December

21        12th -- well, actually it is the same

22        date, but once in the early morning

5904

```
 1              hours, in the morning at the house and

 2              again at Howland Township at the police

 3              department on December 12th, did she tell

 4              you why she went to the Days Inn in

 5              Boardman?

 6   A.   She didn't tell me that.

 7   Q.   Neither one of those times you spoke to her on

 8              December 12th?

 9   A.   She never mentioned the Days Inn on December

10              12th.

11   Q.   On December 12th, did she tell you about the

12              people she was married to in the past?

13   A.   Yes.

14   Q.   What did she tell you about the people she was

15              married to in the past?

16   A.   She told me the names of both of her previous

17              husbands prior to Robert.

18   Q.   Did she tell you how long she had been married

19              to them?

20   A.   Yes.

21   Q.   Did she tell you about Robert and the kind of

22              work he did in Florida?
```

5905

1    A.    Yes.

2    Q.    And what did she tell you about Robert having

3          a gun when he was in Florida?

4    A.    She said he had a private investigator's

5          license and permit to carry a firearm.

6    Q.    What did she tell you about moving back to

7          Ohio?

8    A.    She told me when they moved back and where

9          they moved to.

10   Q.    What did she tell you about some type of

11         lawsuit she was involved in?

12   A.    She named an officer, she wasn't sure whether

13         it was with Youngstown Police Department

14         or Mahoning County Sheriff's Department,

15         other than he wore a black uniform and

16         she believed his name was Bettencough.

17   Q.    What did she tell you about that lawsuit?

18   A.    Told me she filed a lawsuit against him and

19         that it had been dismissed and it was

20         currently under appeal and her attorney

21         was Steve Chuparkoff.

22   Q.    And did she start to talk to you about some

5906

1              potential suspects?

2    A.    Yes.

3    Q.    Do you recall who some of those suspects were?

4    A.    She said that a lot of these crazy people come

5              into the bus terminal especially in

6              Youngstown.  People come in and would

7              make threats towards Robert.

8    Q.    What names did she have for you?

9    A.    As far as the crazy people and the persons

10             that come in and made the threats, she

11             didn't have any actual names.

12   Q.    Now, what did she indicate to you about

13             Robert?

14   A.    She told me that there's something you don't

15             know about Robert, that he goes both ways

16             and he has a friend named Bobby.

17   Q.    And what did she tell you about Bobby?

18   A.    She said that Robert met him at the Avalon Inn

19             in Howland, but she really doesn't know

20             who Bobby is and she's never met Bobby.

21   Q.    Would Bobby call her residence, if you

22             remember?

5907

1  A.  Donna said that they would call Bobby and

2       Robert would talk on the phone.

3  Q.  And what did she tell you about Robert

4       Fingerhut's behavior prior to his death?

5  A.  She said a week, week and a half prior to his

6       death that Robert was acting kind of

7       nutty and that she thought it was because

8       of his relationship with this Bobby.

9  Q.  What did she tell you about a Hispanic man

10      named Carlos?

11 A.  She said that she had been having a

12      relationship with Carlos for sexual

13      purposes only.  They weren't in love.

14      She was just having sex with him.  This

15      relationship lasted six months.

16 Q.  And what did she tell you about a guy named

17      Santiago?

18 A.  That he was her, kind of a friend, and she was

19      trying to help him out and that he had

20      stolen some money and a gun from her.

21 Q.  One of those guns that was in the ATF report?

22 A.  No.

5908

1    Q.   A different gun?

2    A.   A different gun.

3    Q.   And how did she describe to you the sexual

4              things that she had or these boyfriends

5              while she was in this relationship with

6              Mr. Roberts?  How did she explain that

7              relationship and his knowledge of those?

8    A.   She said that her and Robert were just kind of

9              a cool couple and that Robert did his

10             thing, she did hers, and that it is kind

11             of a game, and as long as they didn't say

12             "I love you" to the other person,

13             everything was okay.  And out of respect

14             for Robert, she wouldn't bring people to

15             the house, and Robert wouldn't bring his

16             friends to the house, either.

17   Q.   Now on December 12, 2001, you have all of

18             these letters, you have Mr. Fingerhut

19             dead, she's giving you all of these

20             names.  Tell this Jury how the name Nate

21             Jackson comes up in the conversation with

22             this Defendant.

5909

1    A.    I asked Donna if she had relationships with

2          anybody else that she could recall.  She

3          said, "No, there's nobody else.  I told

4          you everybody."  I said, "What about a

5          guy by the name of Nate Jackson?"  She

6          says, "Yes, I forgot about him."  I said,

7          "Well, who is Nate Jackson?"  She said,

8          "I have been dating him for about two

9          years.  He calls me from prison and he

10         writes me quite often and I write him."

11   Q.    And did she tell you when the last time she

12         saw Nate Jackson was?

13   A.    She said she actually saw Nate Jackson on

14         December 9th.

15   Q.    Which would have been Sunday?

16   A.    Yes.

17   Q.    And did she tell you under what circumstances

18         she came to see Nate Jackson on December

19         9th?

20   A.    She said she saw Nate Jackson as a friend and

21         as a favor to him, she went to the Lorain

22         Correctional Institution, picked him up

5910

1           and gave him a ride back to Youngstown

2           where she dropped him off at a house on

3           Wirt Street occupied by the persons known

4           to her only as Oscar and Sheila.

5    Q.   And did she say she had spoken to Mr. Nate

6           Jackson at all since December 9th?

7    A.   Yes.

8    Q.   And what did she tell you about speaking to

9           Mr. Nate Jackson?

10   A.   She said she spoke to him last on the

11          telephone, not in person, on December

12          11th in the morning hours.  He called her

13          from a pay phone.

14   Q.   And did she tell you what that conversation

15          was about?

16   A.   (No response.)

17   Q.   Did you also ask her about Mr. Fingerhut's

18          knowledge of her relationship with

19          Mr. Jackson?

20   A.   Yes.

21   Q.   And what was her response to that?

22   A.   That Nate Jackson and Robert Fingerhut were

5911

1          friends.

2   Q.   And did she tell you if Robert Fingerhut was

3          jealous of Nate or vice versa?

4   A.   She said they both got along and there were no

5          problems between the two of them.

6   Q.   Now, on December 12, 2001, did you have a

7          chance to discuss with Miss Roberts this

8          phone call that came to you while you

9          were at the residence at 3:30 in the

10         morning?

11  A.   Yes.

12  Q.   I want to ask you did you ask her anything

13         about a cell phone?

14  A.   Yes.

15  Q.   And tell this Jury what you asked Miss Roberts

16         about the cell phone or where it was?

17  A.   I asked her if she had a portable cell phone

18         and she said she did.  I asked her where

19         it was at, and she said it was in her

20         purse.  I said, "May I look at it?"  She

21         said, "Certainly."  The purse was on the

22         floor, she reached down and fumbled

5912

1            through her purse a little bit and said,

2            "I left it at home.  It's on the kitchen

3            counter."  I said, "Okay."  And I said,

4            "It's funny that on the night that we

5            were at your house at 3:38 in the

6            morning, that cell phone called back to

7            the crime scene and I answered the phone

8            and I talked to a black male gentleman on

9            the phone briefly."  I said -- I asked

10           her who that was, if she knew anything

11           about it.  She said, "Nate must have had

12           the phone.  He's always borrowing it."

13  Q.   Now, on that date, did she tell you -- I am

14           talking about December 12th, this 1:00

15           p.m. conversation you are having, did she

16           tell you where her and Mr. Jackson were,

17           what was going on with their

18           relationship?

19  A.   Said there was no relationship any longer,

20           they were just friends.

21  Q.   And why was there no longer a relationship

22           according to her?

5913

1    A.    Said she didn't want it.  She just wanted to

2          be friends with him and that was it.

3    Q.    Now, what did she tell you about spending the

4          night at the Wagon Wheel?  I am referring

5          to December 12th -- at the Wagon Wheel in

6          Boardman on December 9th with

7          Mr. Jackson?

8    A.    She didn't tell me that.

9    Q.    You asked her about some telephone numbers

10         that she had, is that correct?

11   A.    Yes.

12   Q.    You asked her for the phone numbers for the

13         cellular phones, but they are actually

14         mounted in the cars, is that correct?

15   A.    In each of the Chryslers, there were fixed

16         mounted telephones in the cars.

17   Q.    She gave you those numbers?

18   A.    Yes.

19   Q.    And she also gave you her cell phone number?

20   A.    Yes.

21   Q.    Now on December 12, 2001, at about 1:00 p.m.,

22         do you recall how that conversation with

5914

1         this Defendant ended?

2   A.    We started talking about the cell phone and

3         why this unknown black male called the

4         house at 3:00 in the morning or about

5         3:38 in the morning and she told me that

6         it must be Nate Jackson.  She put her

7         head down on the table and folded her

8         arms and said she was too tired to

9         continue talking, and we ceased the

10        interview at that point.

11  Q.    And she went home?

12  A.    Yes.

13  Q.    Now, on December 13th, there was a vehicle

14        recovered, is that correct?

15  A.    No.

16  Q.    I'm sorry, that was on December 12th.  On

17        December 12th.  Where was that vehicle

18        recovered at?

19  A.    The corner of Pershing and Victoria in

20        Youngstown, Ohio.

21  Q.    What vehicle did that ultimately be?

22  A.    The silver 300-M that Donna Roberts told us

5915

1          was Robert Fingerhut's car.

2    Q.   What did you observe in that vehicle, in the

3          interior of that vehicle?

4    A.   Keys were in the ignition, there was blood on

5          the -- those large key chains in the

6          ignition, had an assortment of keys and

7          little gym bags and multiple key chains

8          upon it.  There was blood all over that.

9          There was blood on the door rest on the

10         passenger side, the driver's side of the

11         car, underneath the dash, on the visors,

12         above the fold down visors for the sun.

13   Q.   Now, I want to direct your attention back to

14         the conversations you had on the 12th

15         with Miss Roberts at 1:00 p.m. when you

16         were at Howland.  How much life

17         insurance -- how much life insurance did

18         she tell you will she had between her and

19         Mr. Fingerhut?

20   A.   $300,000.

21   Q.   Eventually, then you continue your

22         investigation and there were a number of

5916

```
 1              people that were contacted in the next
 2              few days, is that correct?
 3   A.   Yes.
 4   Q.   Evidence was obtained and taken to BCI?
 5   A.   Yes.
 6   Q.   A lot of that would have been done by you?
 7   A.   Yes.
 8   Q.   I am assuming you don't have any objection to
 9              the chain of custody or any of those
10              issues, so we won't cover those, correct?
11              MR. INGRAM:  I don't think so.
12   Q.   Now on December 14th, I'm sorry, December 15th
13              of 2001, which I believe was a Saturday,
14              you had a chance to meet with Miss
15              Roberts again, is that correct?
16   A.   Yes.
17   Q.   Explain to this Jury how you met with her on
18              December 15, 2001?
19   A.   I received a page in the afternoon to call our
20              911 center.  I called in and they said
21              that Attorney Steve Chuparkoff has been
22              trying to get ahold of me and would like
```

5917

1          me to call him back at his office in

2          Canfield. And there's a Donna Roberts in

3          his office that would like to speak with

4          me. I called him back, Mr. Chuparkoff

5          said his client would like to talk to me

6          and made arrangements for him to meet me

7          at the Howland Police Department.

8    Q.   And in fact did she come and meet with you?

9    A.   Yes.

10   Q.   Now, on December 15, 2001, you had a chance to

11         read more of those letters?

12   A.   Yes.

13   Q.   Had you had a chance to receive any phone

14         calls that had been made by Miss Roberts?

15   A.   It was the following week.

16   Q.   And having read some of those letters, you

17         have actually taken notes from those

18         letters, is that correct?

19   A.   Yes, I have.

20   Q.   You have created quite an extensive bit of

21         notes?

22   A.   Yes.

5918

1  Q.    From you personally reading those letters?

2  A.    Yes.

3  Q.    When she came in with her attorney on December

4              15, 2001, what was the conversation like

5              on that day?  And I want to start out

6              with specifically, what did she offer to

7              you -- strike that.  What did she tell

8              you in terms of her relationship now with

9              Mr. Jackson?

10 A.    At this point --

11              MR. INGRAM:  I object.  May we

12 approach Side Bar, please?

13 (SIDE BAR DISCUSSION, OFF THE RECORD AND

14 OUT OF HEARING)

15 Q.    I want to direct your attention to December

16             15, 2001.  There was a tape recorded

17             conversation between you and

18             Mrs. Roberts, the Defendant in this case

19             on that date, with her attorney present,

20             correct?

21 A.    Correct.

22 Q.    Now, during that conversation, and in fact,

5919

1           with all of your conversations with her,

2           the two on the 12th and now on the 15th,

3           tell this Jury how forthcoming she was

4           with information.

5    A.  She was not.

6    Q.  How would you describe her giving you

7           information?

8    A.  Uncooperative.

9    Q.  How would she give you information when you

10          confronted her with additional

11          information?

12   A.  She would give us partial information, to dig

13          a little bit, say for example, the

14          conversation in the afternoon on the 12th

15          with Donna Roberts, he asked her if she

16          had relationships with any other men

17          other than the one she already told me,

18          and she said no.  And I bring up Nate

19          Jackson and then all of a sudden, she

20          remembers Nate Jackson.  With a little

21          prodding, she started telling me more,

22          but without digging into it, she wasn't

5920

1              going to tell me anything.

2    Q.    On December 15th when you had spoken to her,

3              you had a chance to read some of those

4              letters and I think you have testified

5              to, correct?

6    A.    Yes.

7    Q.    And on December 15th, how would you

8              characterize Nate Jackson in terms of

9              your investigation?

10   A.    He was our prime suspect.

11   Q.    When you spoke to Miss Roberts on December 15,

12             2001, did you discuss with the Defendant

13             perhaps trying to get in contact with

14             Nate Jackson?

15   A.    Yes.

16   Q.    And what did you do in preparation for doing

17             that?

18   A.    Prepared a list of questions for her.

19   Q.    And then where did you go for her to make

20             contact with Mr. Jackson?

21   A.    Donna Roberts agreed that she wanted to

22             cooperate and help the police catch

5921

1         whoever had done this.  I discussed with

2         her my beliefs that it was probably Nate

3         Jackson, that I wanted her to make a

4         telephone -- have a telephone

5         conversation with him.  And to call him,

6         we would record the conversation.  We

7         went to 254 Fonderlac in case they would

8         have caller I.D. that probably wouldn't

9         look too good if she's calling from the

10         police station and asking a lot of

11         questions about her husband.

12 Q.  And did in fact she attempt to make a call to

13         Mr. Nate Jackson that night?

14 A.  Yes, she did.

15 Q.  And was she successful?

16 A.  No.

17 Q.  Now the next day which was Sunday, December

18         16th, did you attempt to do the same

19         thing?

20 A.  Yes.

21 Q.  And was she present with her attorney again?

22 A.  Yes.

5922

```
 1   Q.   And you were making these calls again from her
 2            residence?
 3   A.   Yes.
 4   Q.   And can you tell -- and she had the same list
 5            of questions for her to ask?
 6   A.   Yes.
 7   Q.   Did she make contact with Nate Jackson or did
 8            he make contact with her that night?
 9   A.   She made contact with Nate Jackson's sister,
10            Tausha Corrigan in Youngstown.  Tausha
11            told her to -- asked her what number she
12            was at and said she could see if she
13            could get ahold of Nate Jackson.  A short
14            time later, the phone rang at the
15            residence and she spoke to Nate Jackson
16            on the phone.
17   Q.   And was this call being recorded?
18   A.   Yes, it was.
19   Q.   By who?
20   A.   By me.
21   Q.   And how well of a job did she do asking the
22            questions that you had prepared for her?
```

5923

1   A.   She did not.

2   Q.   What did you do when she wasn't asking the

3        questions that you had asked her to ask

4        Mr. Jackson?

5   A.   The questions were written down and they were

6        large enough for her to read and I would

7        get right next to her and I would point

8        to this question and she would roll her

9        eyes and kind of smirk at me and

10       continued the conversation and never did

11       ask the questions that we asked her to

12       ask.

13  Q.   Now, did she ever tell you during these

14       conversations on December 12th at the

15       residence, December 12th at the Howland

16       Police Department, and December 15th and

17       December 16th, either at the Howland

18       Police or her house, about letters and

19       the contents of those letters that she

20       had written between her and Mr. Jackson?

21  A.   On December 12th?

22  Q.   Yes, on the 12th.

5924

1    A.    No.

2    Q.    Now on the 15th?

3    A.    Yes.

4    Q.    And that is when she knew you had the letters?

5    A.    Yes.

6    Q.    And how did she characterize those letters,

7          the contents of those letters?

8    A.    Said it was just prison talk and she was

9          telling Nate Jackson what he wanted to

10         hear.

11   Q.    Eventually this investigation led you to the

12         Days Inn in Boardman Ohio, is that

13         correct?

14   A.    Yes.

15   Q.    And you went to that residence -- I'm sorry,

16         you went to that location and obtained

17         some physical evidence, is that correct?

18   A.    Yes.

19   Q.    Tell this Jury what evidence you have got and

20         how you got it.

21   A.    Myself and Detective Dillon went to the Days

22         Inn.  It was a Sunday, in the afternoon,

5925

1      about 3:00.  We spoke with the desk clerk

2      there who indicated that in fact there

3      was a Nate Jackson that -- I'm sorry,

4      room 129 at the Days Inn was rented out

5      to Donna Roberts.  And we were able to

6      obtain receipts from the Days Inn with

7      Donna Roberts' name upon it.

8  Q.  And did you then go to the room that had been

9      rented in her name?

10 A.  Yes.

11 Q.  And did you find any physical evidence either

12     in the room or at that location?

13 A.  Yes.

14 Q.  Where did you find the physical evidence?

15 A.  In the dumpster behind the motel there was

16     five or six bags of trash in the back in

17     the dumpster and we opened the bags and

18     went through them.

19 Q.  Now, Detective or Chief, there came a time

20     when Nate Jackson was arrested?

21 A.  Yes.

22 Q.  And when he was arrested, did he have an

5926

1           injury to his person?

2     A.    Yes, he did.

3     Q.    Where was that injury at?

4     A.    His left index finger to the top knuckle.

5     Q.    I'm going to show you State's Exhibits 239,

6           241 and 245, and ask if you recognize

7           what those Exhibits are?

8     A.    Yes.

9     Q.    What are those, and please refer to the

10          numbers.

11    A.    State's Exhibit 239 is a photograph that was

12          taken on December 21, 2002 by Detective

13          Daniel Mason at the Trumbull County jail.

14          I was present when the photograph was

15          taken.  It is a picture of Nate Jackson

16          with his arms spread out and a white

17          gauze bandage upon his left index finger.

18    Q.    Okay.

19    A.    Photograph 241 are photographs taken by

20          Detective Dan Mason at the police

21          department on December 21, 2001.  They

22          exhibit a left and right hand shot

5927

1    without bandage on Mr. Jackson's left

2    index finger, showing a wound to the top

3    knuckle. State's Exhibit 254 is a

4    photograph taken on December 21st, which

5    I have taken. This photograph depicts

6    only the left hand, and it shows an

7    injury to the same knuckle on the left

8    index finger.

9  Q.  Now, on the date of his arrest, which I

10    believe was either December 20th or

11    December 21st, some articles of clothing

12    were given to you by officers?

13  A.  Yes, it was on the 21st.

14  Q.  I'm going to hand you State's Exhibit 318.

15         MR. INGRAM: Chief Monroe displayed

16  State's Exhibits 239, 241 and 245 to the Jury.

17  They have not been admitted, however, the Defense

18  has no objection to the display of those Exhibits.

19         THE COURT: You have no objection?

20         MR. INGRAM: No objection.

21  Q.  I'm going to hand you State's Exhibit 318 and

22    State's Exhibit 317. I'll ask if you

5928

1          recognize what those Exhibits are?

2    A.   State's Exhibit 317 I recognize.  These are

3          black fleece lined gloves that were

4          recovered at 791 Wirt Street in

5          Youngstown, Ohio by Detective Yannucci of

6          the Trumbull County Sheriff's Department.

7          The left index finger of the one glove is

8          damaged.  There's some dark staining and

9          there's also a hole.

10   Q.   Which glove is that, which hand?

11   A.   This is the left hand and the left index

12        finger, State's Exhibit 318.  These are

13        red and black Nike tennis shoes that were

14        recovered on Nate Jackson on the evening

15        he was arrested.

16   Q.   Now, Detective, at the scene when you were

17        there on December 12, 2001, did you

18        observe, when were you at the scene, on

19        that step where the body was and that gun

20        was, and in that entrance way to the

21        kitchen, were there some footprints in

22        blood?

5929

1   A.   Yes.

2   Q.   Can you tell this Jury first of all why --

3            well, let me ask you this.  Were those

4            tennis shoes submitted for comparison

5            with any footprints?

6   A.   No.

7   Q.   Can you tell this Jury why not?

8   A.   We didn't have these tennis shoes originally

9            when the items were submitted.  At the

10           point that we probably could have

11           submitted them, we didn't feel we needed

12           to submit them.

13  Q.   And that was in light of the other evidence?

14  A.   Yes.

15                MR. INGRAM:  Objection.

16                THE COURT:  What is your objection

17  based on?

18                MR. INGRAM:  I'll withdraw it.

19                THE COURT:  That is an assumption on

20  his part.  It may be a reason in his mind, the Jury

21  can accept it.  Overruled.

22  Q.   Now, in every case that you have investigated,

5930

1          do you do -- have you done every possible

2          test in this case?

3   A.   No.

4   Q.   Have you ever had the case where you have done

5          every possible test?

6   A.   No, it is impossible.

7   Q.   Now, in addition to those items, and I'll ask

8          you to put those shoes and gloves away

9          while you still have your gloves on.  In

10          addition to those records, did you also

11          obtain by subpoena some telephone

12          records?

13  A.   Yes.

14  Q.   I'm going to hand you State's Exhibit 321 and

15          ask if you -- I'm going to hand you

16          State's Exhibit 321 and ask if you

17          recognize State's Exhibit 321.

18  A.   Yes.

19  Q.   What is that State's Exhibit 321?

20  A.   State's Exhibit 321 are -- is a call report

21          from Bob Dobson Communication, which

22          indicates account numbers for cellular

5931

```
 1              telephone service for specific telephone
 2              numbers.
 3    Q.   And would those be the telephone numbers of --
 4              that was in the cellular phone in the
 5              silver Chrysler?
 6    A.   Yes.  Well, you have got the silver Chrysler,
 7              there's a hand held portable.
 8    Q.   That is the number you previously testified to
 9              as 506-0373?
10    A.   Yes.  That telephone, the silver Chrysler and
11              the red Chrysler.
12    Q.   And those were obtained by subpoena by you and
13              they are certified copies?
14    A.   Yes.
15    Q.   There's a certificate on the front of that?
16    A.   Yes.
17    Q.   Now, when you got those telephone calls, you
18              were able to discover phone calls or were
19              you able to determine that there were
20              phone calls made from the cellular phone
21              call to the phone in any of the cars?
22    A.   Yes.
```

5932

1    Q.    On the night of December 11th?

2    A.    Yes.

3    Q.    And were you able to determine whether the

4          calls were made the other way?

5    A.    Yes.

6    Q.    And do you know what hours during December 11,

7          2001 those calls were made?

8    A.    Yes.

9    Q.    And they were made, and those records reflect

10         that?

11   A.    If you look on this report on page two, it

12         specifically addresses the telephone

13         number 506-0373 and it indicates the

14         calls that were made from that phone to

15         another phone; and then on page ten, it

16         addresses calls which were made from the

17         telephone number 509-0271 which is the

18         red Chrysler, and the calls that were

19         made from that phone and to what phone

20         they were made to.  If there was say an

21         incoming call, it also indicates the same

22         number.

5933

1   Q.   And does it list the time of those calls on

2        there?

3   A.   Yes, it does.

4   Q.   And does it list the date?

5   A.   Yes.

6   Q.   And can you read -- what page are you looking

7        at right now?

8   A.   I'm going to go between, on page two and page

9        ten.

10  Q.   And all of those calls are listed to and from

11       those telephones?

12  A.   Right.  For example, at 2145 hours on December

13       11th, a call was made, it shows from

14       509-0271, which was the red Chrysler, and

15       then where it says number called, it

16       shows the same number, but beside it, it

17       says incoming, so if you go back to page

18       two and look up the time which would

19       correspond with that, it shows that at

20       the same exact time, telephone 506-0337

21       called 507-0271, which is the red

22       Chrysler.  So at that time, Donna

5934

1           Roberts' portable phone is calling her

2           fixed mounted mobile phone in the red

3           Chrysler.

4    Q.   And you had a chance to go through those phone

5           records prior to coming to Court today,

6           right?

7    A.   Correct.

8    Q.   And there were a number of those instances, is

9           that correct?

10   A.   Yes.

11   Q.   During the hours of approximately 9:00 p.m. to

12          12 midnight on December 11, 2001?

13   A.   Yes.

14   Q.   Calls going from both phones?

15   A.   Yes.

16   Q.   To the other phone?

17   A.   Yes.

18   Q.   Is the phone call that you received from

19          330/506-0373 at approximately 3:38 a.m.

20          at the Roberts' residence, is that phone

21          call in those records?

22   A.   Yes, it is.

5935

1   Q.   And it depicts the cellular phone call calling
2        the residence while you were there and
3        answering it at 3:30 in the morning on
4        December 12th?
5   A.   Yes, it does.
6   Q.   Eventually you went to the Red Lobster, is
7        that correct?
8   A.   Yes.
9   Q.   And you obtain a statement from someone there?
10  A.   Yes.
11  Q.   Was an identification made of any individual
12       or individuals that ate there on December
13       11, 2001?
14  A.   Yes.
15  Q.   Who made that identification?
16  A.   Jill Kenyon.
17  Q.   And you obtained a statement from her -- or
18       I'm sorry, a statement from her as well
19       as a written photographic line-up?
20  A.   Yes.
21  Q.   And she initialed the same?
22  A.   Yes.

5936

1   Q.    You also obtained some other evidence from

2           her?

3   A.    Yes, receipts.

4               MR. BECKER:  At this time, we have

5   no further questions of this witness.

6               THE COURT:  This is an opportune

7   time to break.  We have criminal in the morning, so

8   we'll start at 1:00 in the afternoon.  You are done

9   with the witness on direct or just stopping for

10  today?

11              MR. BECKER:  Could we break for

12  today?  There's one piece of evidence that I don't

13  have that I would like to introduce with him.  I

14  can't find it here.

15              THE COURT:  I'll permit that with

16  the instruction.  There's to be no talking with the

17  witness.

18              MR. BECKER:  I have one Exhibit that

19  I would like to present to him, and I'll give my

20  word that I'll not speak to this witness about this

21  case, but I do want to discuss something with

22  Mr. Bailey.

5937

1           THE COURT:  I didn't understand --

2           MR. BECKER:  It is close to 4:30 and

3   I would like to break today if we could, because I

4   would like to get one more Exhibit and I would like

5   to discuss something with Mr. Bailey.

6           THE COURT:  The Court will permit

7   that with no conversation ensuing between the

8   witness and yourself.

9           MR. INGRAM:  We have no doubt that

10  Mr. Becker will abide by the rule.  We simply

11  object to him having any conversation with

12  Mr. Bailey.

13          THE COURT:  Folks, you are done for

14  another day.  You will be back here at 1:00

15  tomorrow afternoon.  I trust you all have a nice

16  evening.  I would again remind you not to read

17  anything in any newspaper, watch anything on T.V.,

18  have any conversation with anyone else during the

19  course of the evening break.  You all have a nice

20  evening.  Thank you.

21  (Court in Recess at 4:20 p.m.)

22          THE COURT:  We had two Side Bars.

5938

1    The one was in reference to an objection by the

2    State to Mr. Monroe.  They thought he was reading

3    his notes.  The notes were taken away by Mr. Becker

4    and he continued on with his testimony, is that

5    correct?

6                MR. INGRAM:  That is correct.

7                THE COURT:  The second issue was in

8    regard to the tape recording and I think Mr. Becker

9    got off that subject.

10               MR. INGRAM:  He did.

11               THE COURT:  And that should be no

12   problem either, is that correct?

13               MR. JUHASZ:  Yes, Sir.

14               THE COURT:  See you tomorrow.

15   (Court adjourned at 4:22 p.m.)

16

17

18   Thursday, May 22, 2003; In Open Court at 1:20 p.m.:

19               MR. BECKER:  I wanted to put on the

20   record a few things outside of the presence of the

21   Jury.  There were two letters that were introduced

22   through this trial, and I believe they were

5939

1   stipulated to, and as the other letters there,

2   they are 275-A and 275-B, is that correct?

3                MR. INGRAM:  That is correct.

4                MR. BECKER:  Now the one area that I

5   do want to address very briefly is, I have got a

6   few more questions for Detective Monroe or Chief

7   Monroe, and I want to put, because we had this on

8   the Side Bar yesterday and I believe it was out of

9   the hearing or was not on the record.  The State

10  wanted to question Officer Monroe about a statement

11  the Defendant gave on December 15, 2001, which was

12  tape recorded.  There was an objection to that line

13  of questioning because the State could put on the

14  tape, I guess.

15               MR. INGRAM:  That is correct.

16               MR. BECKER:  While we take exception

17  with that ruling, we'll live with that ruling and

18  the State was then not permitted to question

19  Officer Monroe about that statement at all.  So, I

20  want to make it clear that Defense is not going to

21  try to elicit any responses regarding that tape or

22  try to introduce that tape.

5940

1           THE COURT:  My understanding is a
2     little bit different than what you both agreed to
3     here.  My understanding is that there was a tape
4     and I believe Mr. Ingram had said that he was told
5     at one point or one of the witnesses stated there
6     was no such tape.  Am I in error on that?  Were you
7     provided the tape?
8           MR.  INGRAM:  We were provided the
9     tape.
10           THE COURT:  I took the objection to
11     be that you were trying -- or his objection was to
12     you attempting to get the substance of the tape in
13     through the testimony rather than the tape itself.
14     I told you at Side Bar, you were able to hit
15     highlights of it, but you couldn't get the whole
16     tape in.  If you wanted to get the substance in,
17     you had to bring the tape into the case.
18           MR. BECKER:  Then I am confused on
19     that ruling.  I'll be able to ask questions -- I'll
20     be able to ask questions about that conversation or
21     not?  Are they going to have the same objection?
22           THE COURT:  That is with the caveat

5941

1  that you can't use his testimony in lieu of the

2  tape, if there's some salient point in there to

3  prove some other point.  But once you delve into

4  that realm, I think the tape should be brought into

5  testimony.  Do I make that clear at all?

6          MR. INGRAM:  Yes.  If you plan on

7  asking a couple of limited questions about that

8  conversation, I don't object, but if you are going

9  to ask an hour's worth of questions, then I do

10  object.  I'm not sure I am making any sense.

11          MR. BECKER:  I don't think we're

12  going to introduce that tape, but I want to make it

13  perfectly clear that because the -- I thought the

14  ruling was because the tape is quote unquote the

15  best evidence.  Although I have disagreed with that

16  ruling, I respectfully disagree with that, but I'll

17  live with that ruling, that it is the best evidence

18  that I cannot ask Officer Monroe 20 minutes or so

19  of questions about that conversation and that is

20  fine, that it is the Court's ruling.  But I don't

21  want to be barred from introducing and questioning

22  him about that tape and have Defense Counsel

5942

1    question him about her cooperation.

2              THE COURT:  I agree with that.

3              MR. BECKER:  They cannot pursuant to

4    the evidence rules, because it is a hearsay

5    statement, they can't even introduce the tape.

6              THE COURT:  Just so it is clear, my

7    ruling did not stop you from asking pertinent

8    questions about something in that tape, but to get

9    the substance of the tape before the Jury, I think

10   the best evidence is the tape.

11             MR. BECKER:  Okay.  I'm not going to

12   introduce the tape and I'm not going to ask him any

13   questions.  We have not asked him any questions, at

14   least that he's answered before the objection.

15             THE COURT:  The Defense will be

16   denied the opportunity to delve into that.

17             MR. INGRAM:  I planned on asking

18   three questions about that tape.  I was not going

19   to ask about the words that were used by the

20   Defendant, but I was going to ask three questions

21   about whether or not three subjects or issues were

22   discussed.

5943

1           THE COURT:  Not what the discussion

2    was, but whether they were discussed?

3           MR. INGRAM:  For instance, that on

4    December 15th in that conversation, she told you

5    about seeing Nate on Monday and Tuesday, including

6    a haircut and dinner at the Red Lobster.

7           THE COURT:  I have no objection to

8    that, but I think it opens the door to them on

9    redirect examination to explain anything.

10          MR. INGRAM:  I understand.

11          THE COURT:  Is that agreed?

12          MR. BECKER:  We're going to object

13   to those questions, since we were not permitted to

14   ask about the substance of the tapes.  I think that

15   is what he's doing is he's asking about substance

16   of the tape, the conversation.

17          THE COURT:  He's not in a

18   position -- well, I guess he could introduce the

19   tape on his motion.

20          MR. BECKER:  It's hearsay.  It is an

21   out of Court statement.  It is not offered against

22   the party opponent.  It is hearsay and there's no

5944

1    exception to it.

2              THE COURT:  That is the reason then.

3              MR. BECKER:  That he can not

4    introduce it.

5              THE COURT:  But he can ask questions

6    and that opens the door for you to follow up.

7              MR. BAILEY:  The questions that he's

8    asking are questions that deal with the substance

9    about it.

10             THE COURT:  I understand that opens

11   the door for the substance on your end of it.

12             MR. BECKER:  Our objection is going

13   to be that he's eliciting hearsay and there's no

14   exception to the rule.  He can't introduce her

15   statement because it is hearsay.  It is definition

16   hearsay.  It is not offered against her as a party

17   opponent.  It is offered to either support her

18   position or it's hearsay.  It is her statement.  It

19   is her out of Court statement.

20             MR. JUHASZ:  I don't disagree that

21   the statement is definitely hearsay.  I also don't

22   disagree that -- well, I'm sorry.  If they want to

5945

1   use it, it is not definitely hearsay, it is an

2   admission which is not an exception to the hearsay.

3   It is defined as non-hearsay, but the recorded

4   statement itself is a statement.  It falls within

5   the best evidence rule, and it would be like if I

6   have a lease and I stand up and say, "Well, okay,

7   the lease says that your rent is this and your

8   lease says you have do this and the lease says you

9   have do that."  The best evidence rule I think does

10  govern that, and so, what they have done and I

11  think what they are intending to do is in essence

12  by asking questions, introduce the contents of a

13  recording which falls within the best evidence

14  rule.

15         Now, the other thing that I have to say

16  about that is they have done that to a limited

17  extent already, and in essence, presented only

18  portions of what is in that statement.  I think

19  that on cross examination in the interest of

20  showing bias, because if I ask you only the

21  questions that I want to ask you and have not

22  represented the entire contents of the statement, I

5946

1   think you are allowed to go into that under cross

2   examination to show, well, you have a little bit of

3   a bias here, because you are only bringing out the

4   parts that you want to bring out, and I don't think

5   it is hearsay for those purposes, because you are

6   not offering to prove the matters of the proof

7   asserted.  You are offering it to show the bias.

8                   THE COURT:  The problem is my

9   recollection is that they were pretty well

10  precluded from getting into the tape.

11                  MR. BECKER:  We did not present any

12  substance of the conversation because the objection

13  was sustained and that was a Side Bar, which I

14  wanted to put on the record.  We didn't get into

15  any conversation of the December 15, 2001 statement

16  and we have been barred.  If we don't get into it,

17  then Mr. Juhasz' argument is out the window.

18                  THE COURT:  John, I would buy your

19  argument on better terms if they had presented

20  something that would be unfair to not allow you to

21  delve into it further.  My recollection is they

22  never got into the substance.

5947

1          MR. JUHASZ:  I am inclined to agree

2    with that, however, I am looking at my trial notes

3    from yesterday, and I think that what I just said

4    as far as bias does apply to the extent of the

5    general questions Jerry wants to ask, because I

6    have got notes here that Detective Monroe said that

7    she wasn't forthcoming and she was uncooperative.

8    He's allowed to ask questions to show that that is

9    not a correct statement, I think.

10          THE COURT:  Now do you do that with

11    didn't she say this and didn't she say that?

12          MR. JUHASZ:  He's not planning to

13    say that.  He's planning on asking, "Didn't you

14    guys talk about this?"  The difference is to

15    clarify what I'm trying to say if I want to come

16    into Court and say that I had a conversation with

17    Gary Bacon who saw the accident and Gary Bacon

18    said, "The car ran the red light."  That is

19    obviously hearsay.  It is not hearsay to say, "Well

20    Gary Bacon and I talked about the accident."

21          THE COURT:  I agree.

22          MR. BECKER:  Mr. Ingram and I think

5948

 1  we have resolved this issue.

 2          THE COURT:  My inclination is to

 3  allow them to proceed as long as you don't get into

 4  bringing out what was said.  If he wants to inquire

 5  about the mode of the conversation, that is

 6  apparently where you are going.  I think that is

 7  proper to delve into.  What is your agreement?

 8          MR. BECKER:  Mr. Juhasz is going to

 9  ask essentially about the prison talk aspect of

10  that question, which was the question --

11          MR. INGRAM:  I do plan on going into

12  the rights recitation.  Before he talked to her on

13  the 15th, he gave her her rights and she agreed to

14  talk to him.

15          MR. BECKER:  We'll have the same

16  objection to that.

17          THE COURT:  I didn't hear the

18  question.

19          MR. INGRAM:  That before the

20  conversation on the 15th, Chief Monroe informed her

21  of her rights.  She waived those rights and freely

22  agreed to engage him in discussion.  I don't then

5949

1  plan on going into the discussion.

2              THE COURT:  I'll permit that.

3              MR. BECKER:  And my objection is

4  going to be that that is also hearsay.  And I'm

5  going to cite the Court to a number of cases,

6  particularly State vs. Gatewood, 1984, 15 Ohio

7  Appellate 3rd at 14; a party may not introduce his

8  own statement under evidence rule --

9              THE COURT:  He's not introducing the

10  statement.

11              MR. BECKER:  He's introducing the

12  statements that he cooperated.

13              THE COURT:  That question is in

14  response to the testimony that she was

15  uncooperative.  That is the only purpose that he's

16  bringing that question into it.

17              MR. BAILEY:  In this one case, State

18  vs. Davis, it is found at 1996 West Law 465, 254,

19  the Court held, it was the Franklin County

20  Appellate from the Franklin County Court of Common

21  Pleas, it would have the Tenth Appellate District,

22  1996 case, where the Prosecutor argued that the

5950

1   waiver form and the statement constituted

2   inadmissible hearsay and the Court agreed.  It went

3   to both the waiver and the statement.  We have got

4   that case if the Court wants to see it.

5                     MR. INGRAM:  I would like to see it.

6                     THE COURT:  I can see where that

7   case is correct, but I distinguish that from the

8   present situation where we're at because the

9   question was asked, she was uncooperative.  His

10  only way to rebut that, didn't she sign the waiver?

11                    MR. BECKER:  I would tend to agree

12  with the Court on that issue.

13                    THE COURT:  You fellows can object

14  if you attempt to go further.

15                    MR. BECKER:  That is where we're

16  going to be at.  Thank you.

17                    MR. INGRAM:  I do want the record to

18  reflect that the case Mr. Bailey cited doesn't say

19  what he cited.  I take that back.

20  (Jury brought into the Courtroom at 1:35 p.m.)

21                    THE COURT:  Good afternoon.  After

22  you leave and we excuse you for the day, there's

5951

1   always things that we have to put on the record,

2   and some of the matters that we didn't cover fully

3   yesterday, which we thought we had, came up again

4   this afternoon, so that is the reason there's a

5   delay of you sitting down there.

6   CONTINUING DIRECT EXAMINATION BY MR. BECKER:

7   Q.   Detective Monroe, yesterday we had talked

8        about some things and I want to just be

9        very brief here this afternoon.  While

10       you were at the scene on December 11,

11       2001, did you discover anything under the

12       body of Robert Fingerhut?

13   A.   Yes.

14   Q.   I'm going to hand you what has been marked for

15       purposes of identification as State's

16       Exhibits 407 and 408 and I believe by

17       agreement of Defense Counsel, there's no

18       need to open those, but I believe -- can

19       you identify those?

20   A.   State's Exhibit 408 is marked as evidence item

21       number 21.  It is a paper tag with a

22       metal ring around it, and it had the

5952

1           writing 498 Olive Street written on the

2           paper tag.  Exhibit 407 is a key found on

3           the floor under the victim.

4   Q.   And those keys were then bagged by yourself

5           and marked?

6   A.   Yes.

7   Q.   And your signature is on those?

8   A.   Yes.

9   Q.   Those keys were for -- I'm sorry, key, single

10          key, or were you able to determine where

11          those keys were for, what they were for?

12  A.   State's Exhibit 407 fits a lock at 494 Olive

13          Street.

14  Q.   And do you know who owns 494 Olive Street or

15          who owned that property in December of

16          2001?

17  A.   Donna Roberts.

18  Q.   And do you know what kind of property that was

19          in December of 2001?

20  A.   It was a rental property.

21  Q.   Now, Detective, I want to ask you about your

22          investigation in firearms that were

5953

```
1              missing in this investigation.  How many
2              firearms were missing from the Roberts,
3              Fingerhut residence?
4    A.   One firearm.
5    Q.   And how many firearms total were missing from
6              either businesses, automobiles, and
7              locations in total?
8    A.   Two.
9    Q.   Do you know the makes of those two firearms
10             that were missing?
11   A.   Yes.
12   Q.   What were the makes of those two firearms and
13             caliber?
14   A.   One was a Smith and Wesson .38 caliber
15             revolver, and the other was a Taurus .38
16             caliber revolver.
17   Q.   And which one was the one that Santiago Mason
18             was accused of taking?
19   A.   The Smith and Wesson .38 revolver.
20   Q.   And as of today's date, May 22, 2003, have
21             either one of those firearms been
22             recovered?
```

5954

1    A.    No.

2    Q.    With respect to a number of individuals that

3          she gave you their names on December

4          12th, did you ever determine or find out

5          the sexual orientation of Mr. Fingerhut?

6    A.    Yes.

7    Q.    And what did you discover?

8                   MR. INGRAM:  Objection.

9                   THE COURT:  Approach please.

10                  MR. BECKER:  I'll ask this.  I'll

11   withdraw that question and ask this.

12   Q.    Did you ever find Bobby?

13   A.    No.

14   Q.    Did you ever find Carlos?

15   A.    No.

16   Q.    You did find Santiago Mason?

17   A.    Yes.

18   Q.    You did find Nate Jackson?

19   A.    Yes.

20   Q.    Now we talked yesterday and you were looking

21         at State's Exhibit 321.  I want to ask

22         you some questions about State's Exhibit

5955

1              321 which were the copies, certified

2              copies of the phone calls for December

3              11, 2001; is that correct?

4    A.    Yes.

5    Q.    According to the Defendant, when you talked to

6              her in the afternoon of December 12,

7              2001, who had her cell phone?

8    A.    Nate Jackson had her portable cell phone that

9              had the phone number 330/506-0373.

10   Q.    Now, this may be a little cumbersome, but can

11             you tell us, if there, specifically

12             looking at December 11, 2001 at 9:45

13             p.m., what number was called at

14             approximately 9:45 p.m. by that number

15             506-0373?

16             MR. INGRAM:  I do object.  This

17   question has been asked and answered.  It was asked

18   and answered yesterday.

19             THE COURT:  I thought that it had

20   been asked and answered also yesterday.  Am I

21   incorrect on that?

22             MR. BECKER:  I think I asked him

5956

1    generally and he discussed one phone call.  I would

2    like to ask him about each and every specific phone

3    call at this point.

4                    THE COURT:  I'll overrule the

5    objection.  Approach for a moment, please.

6    (SIDE BAR DISCUSSION, OFF THE RECORD AND

7    OUT OF HEARING)

8    (Proffer into the record.)

9                    MR. INGRAM:  The Defense objects to

10   the following question and will put the nature of

11   the objection on the record later.

12                   THE COURT:  The Court will rectify

13   the record at the appropriate time.

14   Q.    On December 12, 2001 at 9:45 p.m., can you

15               tell us based on those phone records,

16               what number was called?  Either what

17               number was called or what number was

18               called to from 330/506-0373?

19   A.    You mean on December 11th?

20   Q.    Yes.

21   A.    Yes.

22   Q.    What number was called?

```
                                                        5957
 1    A.    330/509-0271.

 2    Q.    And that was the phone in which Chrysler?

 3    A.    In the red Chrysler 300-M.

 4    Q.    That was driven by whom on December 11, 2001?

 5    A.    Donna Roberts.

 6    Q.    At 9:47 p.m., on December 11, 2001, can you

 7          tell us what number was called by that

 8          cellular phone, 506-0373?

 9    A.    The same number 509-0271.

10    Q.    Can you tell us what number was called at 9:54

11          by 506-0373 the portable phone?

12    A.    The same number 509-0271.

13    Q.    Can you tell us what number, the portable

14          phone of that Mr. Jackson had was called

15          at 9:55?

16    A.    509-0271.

17    Q.    Can you tell us what number was called by the

18          phone that Mr. Jackson had at 9:59 p.m.?

19    A.    509-0271.

20    Q.    Can you tell us what phone number was called

21          at 10:00 from that portable phone that

22          Mr. Jackson had in his possession?
```

5958

1   A.   The same number.

2   Q.   Can you tell us what number was called at

3            10:03:03 p.m. by that -- strike that.

4            Can you tell us what number was called at

5            10:03 p.m. by Donna's cellular phone in

6            her car, 509-0271 number?

7   A.   Yes.  At 10:03, the 509-0271, which is in the

8            red Chrysler called 506-0373.

9   Q.   Which was the portable that Nate Jackson had?

10  A.   Yes.

11  Q.   The one that she forgot that he had taken?

12  A.   Yes.

13  Q.   Now, can you tell us at 11:01 p.m., what

14           number that phone call, the one from the

15           car, what phone number it called?

16  A.   At 11:01 on December 11th, the portable cell

17           phone called 509 --

18           MR. INGRAM:  Objection.  It is not

19  responsive to the question.

20           MR. BECKER:  I asked him.

21           MR. INGRAM:  You asked about the

22  other phone.

5959

```
 1   Q.   I'm sorry.  What did I say?  Let me rephrase
 2        that.
 3             THE COURT:  Sustained.
 4   Q.   At 11:01, what number did the portable phone
 5        call?
 6   A.   At 11:01 on December 11th, the portable phone
 7        called 509-0271, which is in the red
 8        Chrysler.
 9   Q.   And again, at 11:44 p.m. on December 11, 2001,
10        20 minutes before the phone call to 911
11        by Miss Roberts, what number did this
12        portable phone call?
13             MR. INGRAM:  I object to the
14   suggestions that Mr. Becker wants to testify, that
15   maybe he should take the witness stand.
16             MR. BECKER:  I have asked who, what
17   where and when.
18             THE COURT:  Overruled.  I think it
19   is a proper question.
20   A.   11:44 hours, portable cell phone called
21        509-0271.
22   Q.   And again that is whose vehicle?
```

5960

1    A.    Donna Roberts.

2              MR. BECKER:   I have no further

3    questions of this of this witness at this time.

4    CROSS EXAMINATION BY MR. INGRAM:

5    Q.    Before I ask you some questions, let's

6              establish a ground rule.  If at any point

7              in time during our conversation you want

8              to look at any of your notes or your

9              investigative reports, feel free to do

10             so.

11   A.    Okay.

12   Q.    You then read the report, and if it refreshes

13             your recollection, then you can answer

14             the question.  What you can't do is take

15             the report and then read the report.

16             That is why the notebook was taken away,

17             but you are certainly free to ask for it,

18             review it, and we can deal with those

19             requests.  That is perfectly fine.  Is

20             that fair enough to you?

21   A.    Yes, Sir.

22   Q.    You arrived at 254 Fonderlac at approximately

5961

1           12:35 a.m., am I correct?

2    A.   Yes.

3    Q.   And you are actually the fourth police officer

4           on the scene?

5    A.   Yes.

6    Q.   There's Patrolman Ray, Patrolman Pullcino,

7           Detective Dillon, correct?

8    A.   Yes.

9    Q.   And then there are some fire department

10          personnel?

11   A.   Yes.

12   Q.   And how many fire Captains were there?

13   A.   One.

14   Q.   You told us yesterday that that fire Captain

15          was Captain Swindler?

16   A.   No.

17   Q.   Isn't that what you said yesterday?

18   A.   I don't believe I did.

19   Q.   If you said Captain Swindler yesterday, that

20          would have been a mistake?

21   A.   Yes, Sir.

22   Q.   It was?

5962

1   A.   It was Captain Phillips.

2   Q.   There was an EMT there by the name of George

3        Beck and another EMT that you could not

4        identify?

5   A.   I think the other fireman that was there, he

6        wasn't an EMT but there was another fire

7        person there.

8   Q.   Do you know his name?

9   A.   I'm not certain.  I believe it was Hank

10       Wingard.

11  Q.   The first thing you want to do is obtain

12       information from the patrolman who

13       arrived first to see what was going on,

14       am I right?

15  A.   Yes, Sir.

16  Q.   And you and Officer Ray go out to like the

17       front porch or the front yard and have a

18       brief conversation in the front yard?

19  A.   Yes.

20  Q.   And while that conversation is going on, Donna

21       Roberts is in the master bedroom?

22  A.   She's in the house.  She could be in the

5963

1              bedroom.

2    Q.    When you saw her, where was she?

3    A.    She was in the bedroom.

4    Q.    Did you ask Patrolman Ray where he and officer

5              Pollcino had sort of stashed Donna while

6              they were going about their professional

7              obligations?

8    A.    No.

9    Q.    When you see Donna in the bedroom, is she in

10             the bedroom alone or in there with

11             someone else?

12   A.    She was alone.

13   Q.    Do you know how long she had been alone in

14             that bedroom?

15   A.    No, I don't.

16   Q.    And you then engage her in a brief

17             conversation, am I correct?

18   A.    Yes.

19   Q.    And the purpose of that conversation was to

20             obtain information from her?

21   A.    Yes.

22   Q.    But you wanted to know if the house had been

5964

1          burglarized?

2   A.    Yes.

3   Q.    And burglarized, whether someone took

4          something?

5   A.    If there's anything obvious that is missing or

6          out of place.

7   Q.    And before you talked to her, you had already

8          done a quick sweep to see if you, with an

9          unfamiliar eye, could determine whether

10          anything was missing?

11  A.    I don't know that I had done a quick walk

12          through the house to see if I could

13          notice anything.  Sometimes when you walk

14          into a burglary scene, walk in the living

15          room and there's an entertainment center

16          and it is empty except for a television,

17          it would be a clue that something is

18          missing.  But I don't believe that I had

19          done that before I talked to Donna

20          Roberts.

21  Q.    Do you recall testifying in a preliminary

22          proceeding in this matter on February 26,

5965

1                    2003?

2    A.   Yes.

3    Q.   Page 89.  Does that talk about a walk through?

4    A.   Yes.

5    Q.   Is that walk through before you talked to

6              Donna?

7    A.   I'm going to have to read back at least

8              another page.

9    Q.   Go ahead, feel free.

10   A.   I don't believe that is what this says, Sir.

11   Q.   The part about the walk through on page 89,

12             the sentence right before that says, "I

13             asked her if she knew of anything that

14             was missing," right before you describe

15             the walk through, correct?

16   A.   Yes, but if you go up a few lines, it also

17             discusses where I have talked to her and

18             I asked her if there's a neighbor we

19             could have come and sit with her, which

20             would indicate to me this is a later

21             conversation.  The thing that I want you

22             to understand is that when I would walk

5966

1              back and talk with Donna Roberts,

2              sometimes she would start crying and

3              would become emotional and the

4              conversations weren't productive.  So, to

5              say I went in there on December 12th, at

6              12:30 p.m. and I talked to her for 15

7              minutes straight, and then I didn't talk

8              to her again, that wouldn't be correct.

9              I would talk to her, and then she would

10             get upset and I would leave the room and

11             let her kind of gather herself and come

12             back and talk to her again.

13    Q.   My question simply is this.  Before you talked

14             to her the first time, do you recall if

15             you had done a quick walk through --

16             through the house to see if anything was

17             missing?

18    A.   I don't think so.

19    Q.   You did do a walk through at some point in

20             time?

21    A.   Yes, I did.

22    Q.   And nothing was missing to the unfamiliar eye,

5967

1           is that correct?

2    A.    Yes.

3    Q.    The house was not ransacked?

4    A.    No.

5    Q.    Drawers were not overturned?

6    A.    No.

7    Q.    As a matter of fact, although Donna was

8           emotional and would sometimes break into

9           tears, when you needed information back

10          on December 11th, you found her to be

11          cooperative in providing you information,

12          did you not?

13   A.    No.

14   Q.    You did not find her cooperative in providing

15          you information?

16   A.    In the context of the investigation on the

17          surface, you may think that she was

18          cooperative, but she was the only person

19          that was in the home that could have

20          provided us some crucial information that

21          wouldn't have wasted our time

22          immediately.  On face value it appeared

```
                                                                5968
 1              that she was very cooperative.
 2    Q.   And on February 26, 2003, if you go to page
 3              119, you say you know when I needed
 4              information from Donna Roberts, she was
 5              cooperative.  That would be lines nine
 6              and ten.
 7    A.   Like I said --
 8    Q.   Check and see if that is your sworn testimony
 9              on your own first --
10    A.   Okay.  Which lines?
11    Q.   Lines nine and ten on page 119.
12    A.   Okay.
13    Q.   Are those your words?  Why don't you read
14              those words?
15    A.   "The question is did you purposely try to have
16              somebody within earshot of that first
17              conversation?"  Answer.  "You know when I
18              need information from Donna Roberts, she
19              was cooperative.  I would try to get
20              someone" --
21    Q.   Those are your words?
22    A.   Yes.
```

5969

1    Q.    That was sworn testimony under oath?

2    A.    Yes, it was.

3    Q.    That was the truth?

4    A.    Yes, it is.

5    Q.    And that testimony was given on February 26,

6          2003?

7    A.    Yes, Sir.

8    Q.    Well after Donna Roberts' arrest?

9    A.    Yes, Sir.

10   Q.    Did you ask her for a swab of her hand, the

11         gunshot residue swab?

12   A.    Yes, Sir.

13   Q.    Did she resist that request?

14   A.    No, Sir.

15   Q.    She didn't tell you no, she told you, "Go

16         ahead and swab my hands," correct?

17   A.    Yes, she did.

18   Q.    Did you want her to provide you with her

19         shirt --

20              MR. INGRAM:  Gentlemen, you are a

21   little loud.  Please.

22   Q.    Did you want her to give you her shirt?

5970

1    A.    Yes, I did.

2    Q.    Did she resist that request?

3    A.    No, she did not.

4    Q.    She didn't tell you no?

5    A.    No, she did not.

6    Q.    She simply went and changed her shirt and gave

7          it to you, so you could do whatever you

8          wanted with it?

9    A.    Yes, she did.

10   Q.    By the way, did you submit that shirt to BCI?

11   A.    Yes.

12   Q.    Was it tested?

13   A.    No.

14   Q.    Did you tell them not to test that shirt?

15   A.    No.

16   Q.    Do you recall testifying yesterday when you

17         were talking with Mr. Becker about some

18         ATF documents and ATF is Alcohol, Tobacco

19         and Firearms, correct?

20   A.    Yes, it is.

21   Q.    And you and he discussed State's Exhibits 327

22         A, B and C?

5971

1    A.   Yes.

2    Q.   And those were reports that you had received

3         back from ATF about some guns?

4    A.   Yes.

5    Q.   Isn't it a fact that you were able to request

6         that information because Donna Roberts

7         gave you the serial number for those

8         guns?

9    A.   Yes.

10   Q.   By the way, was the gunshot residue swab taken

11        of Mr. Fingerhut's hand?

12   A.   No.

13   Q.   Now you have already told us that on occasion

14        Donna would break down in tears.   When

15        you first saw her, her eyes were actually

16        puffy and it was obvious that she had

17        been crying, correct?

18   A.   Yes.

19   Q.   And the entire time you dealt with her on

20        December 11th, she portrayed herself as

21        the grieving spouse?

22   A.   Yes, Sir.

5972

1   Q.   And she was not a suspect while she was in

2          that house on December 11, 2001, was she?

3   A.   No, she was not.

4   Q.   And she was there for hours before Ralph and

5          Rita Roberts came to pick her up, was she

6          not?

7   A.   I think she was there about two hours, two and

8          a half hours.

9   Q.   And during those two and a half hours, within

10         reason, she was free to move about as she

11         desired, correct?

12   A.   Yes.

13   Q.   No one was assigned to monitor her movements?

14   A.   We requested that she stay in the back of the

15         house and she did.

16   Q.   My question was, was anyone assigned to

17         monitor her movements?

18   A.   Nobody was assigned to monitor Donna Roberts.

19   Q.   When you say that you requested that she stay

20         in the back of the house, number one,

21         that is so she didn't get in your way?

22   A.   Yes.

5973

1    Q.   And number two, the master bedroom is in the

2          back of the house, right?

3    A.   Yes, from the crime scene without going in the

4          basement, one of the furthest points

5          away.

6    Q.   During this two and a half hours, she

7          primarily stayed in the master bedroom,

8          did she not?

9    A.   Yes.

10   Q.   And during this two and a half hours, she's in

11         the master bedroom alone, is she not?

12   A.   Yes.

13   Q.   That was your idea as I understand it, to call

14         Ralph and Rita Roberts to see if they

15         would come to 254 Fonderlac?

16   A.   Yes.

17   Q.   And that was because Donna Roberts had told

18         you that you could do whatever you wanted

19         to her house, you could search the entire

20         place.  She just wanted you to find the

21         person that did this?

22   A.   Is that why I requested?

5974

1   Q.   You knew you were going to be there a long
2        time, correct?
3   A.   Yes.
4   Q.   And you knew you were going to be there a long
5        time because she told you you could
6        search the entire house, do whatever you
7        wanted, find who did it?
8   A.   I don't understand what your question is.
9   Q.   Did you need her consent to search that house?
10  A.   Yes.
11  Q.   Did she give you consent?
12  A.   Yes, she did.
13  Q.   And before she gave you consent, did you tell
14       her, "There was a bad person here, we
15       don't know where he may have gone, we
16       don't know what he may have done, we have
17       to search the whole house.  It may take a
18       long time"?
19  A.   Yes, I told her that.
20  Q.   So you called Ralph and Rita Roberts, because
21       it was going to take a long time to
22       search the house.  That's not a difficult

5975

```
 1              question.
 2   A.    No, that is not why I called Ralph and Rita.
 3              I called them because I felt that her
 4              husband had just been murdered and that
 5              somebody probably ought to come and sit
 6              with this woman out of compassion.
 7   Q.    You also wanted to see if they would take her
 8              to their home, correct?
 9   A.    Yes.
10   Q.    Because you were going to be there for a long
11              time processing the scene?
12   A.    I felt that in the best interest of Donna
13              Roberts, it would be better if she left
14              and went with a neighbor or family
15              member.
16   Q.    And before she left, she gave you carte
17              blanche authority to search anything in
18              that house, wherever it was located,
19              whatever you desired?
20   A.    Yes, she did.
21   Q.    And before she leaves, she has to gather some
22              personal belongings to take with her,
```

```
                                                              5976
 1              doesn't she?
 2   A.    Yes, Sir.
 3   Q.    And she does gather personal belongings?
 4   A.    Yes.
 5   Q.    And she also gathers up the dogs and takes
 6              them with her?
 7   A.    Yes, she did.
 8   Q.    And in the process of gathering up the dogs
 9              and gathering up the personal belongings,
10              she is sort of moving from room to room a
11              little bit, correct?
12   A.    As I recall, primarily she stayed in the --
13              whatever belongings she took with her
14              came from the master bedroom.
15   Q.    Take a look at page 121 there.
16   A.    Okay.
17   Q.    Lines nine through 11.
18   A.    "She went from the bedroom to the formal
19              living room which is right next to it as
20              you go out the front door.  That is where
21              her family was standing."
22   Q.    She kept going back and forth from those two
```

5977

1        rooms?

2   A.   Yes.

3   Q.   Did she have to get dog food?

4   A.   Yes.

5   Q.   Was the dog food in the bedroom or the living

6        room?

7   A.   I don't know.

8   Q.   While she was gathering up her belongings, no

9        one was assigned to monitor what she was

10       packing up to take with her, correct?

11  A.   Not that I know of.

12  Q.   And when she left, she took some belongings in

13       a bag or something?

14  A.   She took some belongings.  I don't know what

15       she took with her.

16  Q.   No one inspected what she took with her,

17       correct?

18  A.   That is correct.

19  Q.   Handing you what has been marked for

20       identification purposes as Defendant's

21       Exhibit 4.  Is that a photograph of the

22       drawer within 254 Fonderlac?

5978

1  A.  Yes, it is.

2  Q.  Taken by you or one of your fellow police

3       officers on December 11th?

4  A.  Yes.

5  Q.  And that is a drawer which contains for lack

6       of a better term, some sex toys?

7  A.  Yes.

8  Q.  And amongst those sex toys is a pair of

9       handcuffs?

10 A.  Yes.

11 Q.  Were those handcuffs removed or seized on

12      December 11th?

13 A.  No, they were not.

14 Q.  Handing you State's Exhibits 4 and 5.  Can you

15      tell us what those are, please?

16 A.  State's Exhibit 4 and 5 are two different

17      photographs from different angles of a

18      plastic serving tray that has some drug

19      paraphernalia, small amount of marijuana,

20      and what is referred to, as I think,

21      there's a couple of roaches, which are

22      burnt stubs of marijuana cigarettes.

5979

```
 1    Q.    Did you ask Donna Roberts whose marijuana that
 2          was?
 3    A.    Yes.
 4    Q.    Did she tell you it was her's?
 5    A.    Yes.
 6    Q.    She also tell you Robert never touched the
 7          stuff?
 8    A.    Yes.
 9    Q.    And was that marijuana hidden away?  Was it
10          concealed?  Where was that plate?
11              MR. BECKER:  I'm going to object to
12    this line of questioning.  She's not charged with
13    possession of marijuana.
14              THE COURT:  What is the purpose?
15              MR. INGRAM:  To establish that it
16    was in plain view.
17              MR. BECKER:  There's no relevancy.
18              MR. INGRAM:  It has already been
19    testified to.
20              THE COURT:  I wondered why it was
21    relevant to begin with, but there was no objection
22    to that.  It has been something submitted by the
```

5980

```
1    State.  So I think he has a right to question on
2    it.
3    Q.   Was that in plain view on the dining room
4         table?
5    A.   Yes, it was.  This is the -- you can see the
6         glass table here, this is the formal
7         dining room.  They had two kitchen
8         tables.  This is the formal dining room.
9    Q.   Handing you Defendant's Exhibits 1, 2 and 3,
10        as well as State's Exhibits 91, 93 and
11        94.  Do both sets of Exhibits -- do
12        Defendant's Exhibits and State's Exhibits
13        show the same things?
14   A.   Yes.
15   Q.   What is depicted in those two sets of
16        Exhibits?
17   A.   In State's Exhibit 94 and Defendant's Exhibit
18        No. 2, both the same photograph.  They
19        show a place mat with a map of the United
20        States and it is attached to the man door
21        that leads from the kitchen to the
22        garage, and the door is in the closed
```

5981

1           position, and --

2    Q.    The door is in the closed position?

3    A.    Yes.  That man door is closed.

4    Q.    At the time those pictures were taken?

5    A.    Yes.

6    Q.    That place mat in State's Exhibit 94 and
7          Defendant's Exhibit 2, that is on the
8          interior or the kitchen side of the man
9          door, from the garage into the kitchen?

10   A.    Yes.

11   Q.    I think I'll use this door back here for an
12         example.  If this is the kitchen and the
13         Jury room is the garage, are you with me?

14   A.    Yes, Sir.

15   Q.    When that picture was taken, State's Exhibit
16         94 and Defendant's Exhibit 2, the man
17         door is closed like this?

18   A.    Yes.

19   Q.    And if the man door was opened like this, you
20         could not take those pictures, correct?

21   A.    That is correct.

22   Q.    The rest of those Exhibits also show other

5982

1              items on the interior side, the kitchen

2              side of the man door from the garage, do

3              they not?

4     A.   Yes.  It is a different depth and shows more

5              of the door.

6     Q.   And those pictures were taken because there

7              was suspected blood on those items,

8              correct?

9     A.   Yes.

10    Q.   And those items were in fact or some of those

11             items, the place mat for instance were

12             submitted to BCI for analysis?

13    A.   Yes.

14    Q.   Handing you number 110, 132, 139 of State's

15             Exhibits.  Would you tell us what those

16             are, please?

17    A.   State's Exhibit 110 is a photograph taken on

18             December 12, 2001, by Anthony Leshnack,

19             and it shows a -- this picture is taken

20             from a vantage point immediately away

21             from the door, more towards the basement

22             steps towards the man door.  To the left

5983

1          side of the photograph, it shows the

2          peninsula here in the kitchen, the

3          victim, and I doubt that you can see it

4          from here, but the door we just spoke of

5          is in the open position and you can make

6          out the door knob here.

7  Q.   Keep that one.  Maybe we only need that one.

8          Does that fairly and realistically show

9          the location of Mr. Fingerhut's body when

10         you saw the location?

11  A.   Yes.

12  Q.   Can that door be shut with Mr. Fingerhut lying

13         like that?

14  A.   No.

15  Q.   So in order to shut the door, somebody had to

16         move Mr. Fingerhut?

17  A.   Yes.

18  Q.   Just put those aside, we'll get back to them.

19         Handing you State's Exhibits 76 and 92,

20         would you tell us what they depict,

21         please?

22  A.   State's Exhibit 92 is a photograph of the

5984

1          Fingerhut residence taken on December 12,

2          2001 by Deputy Anthony Leshnack.  This

3          photograph is taken from within the

4          garage of the residence, looking into

5          that man door.  You can see into the

6          kitchen where that man door we talked

7          about is standing open.  Obviously, Donna

8          Roberts' car has been moved.  The body

9          has been moved.

10    Q.   Is there a door opened in the garage?

11    A.   Yes, there's a screen door that is standing

12         open.

13    Q.   That's a screen door?

14    A.   Yes.

15    Q.   Why don't you pick up that other exhibit?

16    A.   State's Exhibit 76.

17    Q.   Is that a close-up of the screen door that

18         we're talking about?

19    A.   Yes, it is.

20    Q.   Is there a hole in that screen door?

21    A.   Yes, there is.

22    Q.   Is there a circular hole?

5985

1   A.   It is kind of an oblong hole.

2   Q.   Would you take a look at what has been marked

3        for identification purposes as

4        Defendant's Exhibit 6?  Is that a Consent

5        to Search form?

6   A.   Yes, it is.

7   Q.   Does your name appear on that document?

8   A.   Yes, it does.

9   Q.   Is that document dated December 17, 2001?

10  A.   Yes, it is.

11  Q.   So, on the date that document is signed, you

12       have already talked to Donna Roberts on

13       December 12th, you already talked to

14       Donna Roberts on December 15th, correct?

15  A.   Yes.

16  Q.   I take it from that document that you went to

17       the house on December 17th and asked her

18       permission to remove the screen door that

19       we have just talked about?

20  A.   Yes, this form is incomplete though.

21  Q.   How is it incomplete?

22  A.   There should be more information on the back

5986

1           of it.

2    Q.    What kind of information?

3    A.    There's some acknowledgment, stuff on the

4           back, a spot for inventory.  If I could

5           review my notes, I can produce the

6           original.

7    Q.    Can I see the back, please?  There's a whole

8           bunch of space here on the back, right?

9    A.    Yes.

10   Q.    Like details leading to search, law

11          enforcement action, quantity, item, make,

12          model, color, witness, officer, date and

13          time began, date and time ended.  Is that

14          right?

15   A.    Yes.

16   Q.    Is there one bit of writing on the back of

17          that page that you said was incomplete?

18   A.    There's no writing on the back.

19   Q.    There's no writing at all?

20   A.    No.

21   Q.    For all intents and purposes, Defendant's

22          Exhibit 6 is in fact complete?

5987

```
 1   A.   The front of it, yes.

 2   Q.   Well, there's no writing on the back.  Did you

 3        write one word on the back of the Consent

 4        to Search form that you got on December

 5        17, 2001?

 6   A.   No, Sir.

 7   Q.   But even though you didn't bother to write one

 8        word, you still want us to believe that

 9        it is incomplete?

10   A.   Well, you asked me if this was an accurate

11        copy of the form and I told you, no, it

12        was not, because it is not a complete and

13        accurate copy of the form.

14   Q.   Okay.  Did you ask her for her consent to take

15        the door?

16   A.   Yes, I did.

17   Q.   Did you tell us yesterday that she was

18        uncooperative with you, by the way?

19   A.   Yesterday.

20   Q.   When you testified and talked to Mr. Becker

21        yesterday, did you tell us that she was

22        uncooperative?
```

5988

1    A.    Yes.

2    Q.    In her uncooperative fashion, did she tell you

3          to, "Go pound salt, you are not getting

4          my storm door"?

5    A.    No, she did not.

6    Q.    She gave you her storm door?

7    A.    Yes.

8    Q.    Is that uncooperative to you?

9    A.    That line, no.

10   Q.    What did you do with that storm door?

11   A.    We examined the door.

12   Q.    Who is "we"?

13   A.    Myself, other detectives took a closer look at

14         it.

15   Q.    Send it to BCI?

16   A.    No.

17   Q.    Who were the other detectives?

18   A.    Detective Dillon, Detective Compton.

19   Q.    Did Dillon -- this guy that has been sitting

20         here throughout this trial and testified

21         a little bit ago -- he helped you look

22         and examine that door?

5989

1  A.  Yes.

2  Q.  I didn't say helped you remove it.  Did he

3         help you examine it?

4  A.  I believe that he did.

5  Q.  Do you remember or not?

6  A.  Am I certain?  No.

7  Q.  From now on, please don't tell us anything

8         you're uncertain of.

9  A.  Okay.

10  Q.  You told us yesterday that in the headboard of

11         the master bedroom, you found some

12         personal documents belonging to Donna and

13         Mr. Fingerhut.  Do you recall that?

14  A.  Yes.

15  Q.  And I believe you said that on top were two

16         life insurance policies?

17  A.  Yes.

18  Q.  You would agree with me, wouldn't you, that

19         something has to be on top?

20  A.  Yes.

21  Q.  Did you learn that Mr. Fingerhut was

22         contemplating increasing the amount of

5990

1           his life insurance?

2  A.   Yes.

3  Q.   Do you know who last handled those documents,

4           Mr. Fingerhut or Donna Roberts?

5  A.   No.

6  Q.   Did you submit them for fingerprint analysis

7           to perhaps assist you in making that

8           determination?

9  A.   No.

10  Q.   I'm going to hand you what has been marked as

11           State's Exhibits 8, 9, 110, 132 and 139.

12           Just sort of look at them collectively.

13           Are there supposed to be footprint type

14           impressions in blood in those Exhibits?

15  A.   Are they supposed to or are there?

16  Q.   Are there?

17  A.   Yes.

18  Q.   Which ones?

19  A.   State's Exhibit 139, State's Exhibit 9,

20           State's Exhibit 8, State's Exhibit 132

21           and State's Exhibit 110.

22  Q.   Are we talking about one footprint, one

5991

1          impression or more than one impression?

2  A.   More than one.

3  Q.   Is there in your opinion, is there a footprint

4          impression shown in State's Exhibit 8?

5  A.   Yes.

6  Q.   And would that be right here?  (Indicating)

7  A.   It looks like there's part of an impression

8          here and down in here and over here.  To

9          say it is one full shoe, I couldn't say.

10 Q.   These are, quoting you, impressions inside of

11         the kitchen?

12 A.   Yes.

13 Q.   And that is Exhibit 8.  Do you know of any

14         other photographs other than State's

15         Exhibit 8 that show impressions inside of

16         the kitchen?

17 A.   I can look through them.

18 Q.   Maybe when we get to a break, I'll give you

19         that opportunity.  Now, State's Exhibits

20         132, 110, 139 and 9, do they in your

21         opinion show an impression?

22 A.   Yes.

5992

1    Q.    That impression is not inside of the kitchen,

2          correct?

3    A.    Actually both.  There is on the step and if

4          you look up here, there's a difference

5          between the blood drops, these droplets,

6          and if you look closely here on this tile

7          here.

8    Q.    So 139 shows impressions both on the step

9          coming in from the garage, correct?

10    A.    Yes.

11    Q.    And inside of the kitchen?

12    A.    Yes.

13    Q.    That would be the same for State's Exhibit 9?

14    A.    No.  You can't see the step.

15    Q.    Nine only shows the impression on the step?

16    A.    Yes.

17    Q.    What is State's Exhibit 125?

18    A.    State's Exhibit 125 is a photograph taken

19          December 12, 2001 by Deputy Anthony

20          Leshnack in the Fingerhut home.  It

21          depicts an oblong hole just above -- you

22          see some spot down here at the bottom.

5993

1          It is actually a Cleveland Indians flag.

2    Q.   What is to the right of that hole?

3    A.   It is a photographic rule.

4    Q.   Like a ruler?

5    A.   Yes.

6    Q.   This kind of ruler?

7    A.   It is similar to that, yes.

8    Q.   A ruler is a ruler is a ruler, isn't it?

9    A.   Yes.

10   Q.   And with State's Exhibit 125, you wanted to
11        show the size of something, so you put a
12        ruler next to it and you took a picture
13        of it?

14   A.   Yes.

15   Q.   Are there any photographs with a ruler next to
16        these footprint impressions?

17   A.   No.

18   Q.   Were they measured by anyone?

19   A.   Not that I know of.

20   Q.   Did you instruct anyone to measure them?

21   A.   No, I did not.

22   Q.   Did you personally measure them?

5994

1    A.    No, I did not.

2    Q.    And you are the Detective in charge here,

3          weren't you?

4    A.    Yes, Sir.

5    Q.    And if someone measured them and made note of

6          those measurements, they would bring

7          those measurements to your attention,

8          would they not?

9    A.    Should have been turned in to me, Sir.

10   Q.    And nothing like that has ever happened?

11   A.    No.

12   Q.    As far as you know, no one ever measured?

13   A.    Correct.

14   Q.    When you went back on the 17th to get the

15         storm door, was all of the blood cleaned

16         up?

17   A.    Yes.

18   Q.    Are you certain of that?

19   A.    Yes.

20   Q.    Mr. Fingerhut had two wallets and in one of

21         those wallets he had $231, correct?

22   A.    Sounds about right, but I would have to lock

5995

1              at the inventory form.  I can give you an

2              exact number.  Yes, that is correct.

3              $231, left rear pocket, black wallet.

4    Q.  And he had a 130 some -- if you turn the page

5              over, 130 some in his front pocket?

6    A.  $130 in his front right pocket.

7    Q.  And in addition to money, Mr. Fingerhut had

8              gold jewelry on or about his person, did

9              he not?

10   A.  Yes, he did.

11   Q.  Appeared to be expensive jewelry, 14 carat

12             gold?

13   A.  I'm not up on jewelry, but he had a lot of

14             jewelry on.

15   Q.  When Donna Roberts left 254 Fonderlac, she was

16             not a suspect, correct?

17   A.  No, she was not.

18   Q.  And you had no reason to believe that that red

19             Chrysler in the garage was in any way

20             tied or linked to this offense, correct?

21   A.  Correct.

22   Q.  But once she left, she didn't tell you she

5996

1              wanted to take that car with her, did

2              she?

3   A.   No, she did not.

4   Q.   She didn't tell you she needed transportation?

5   A.   No, she did not.

6   Q.   Did you have legal authority to stop her from

7              taking that car if she wanted to take it?

8   A.   Without thinking it was part of the crime, no.

9   Q.   That is right?

10  A.   No.

11  Q.   If she wanted to take that car, that car would

12             have went with her, correct?

13  A.   Probably.

14  Q.   And that is the same car you told us you found

15             these letters in the trunk?

16  A.   Yes.

17  Q.   And then you told us you found letters in the

18             drawer in the master bedroom?

19  A.   In an armoire.

20  Q.   What does that mean?

21  A.   It is a cabinet.  It has some shelves in it,

22             also some drawers.

5997

1    Q.    Was it in a drawer within this armoire?

2    A.    It was in the cabinet, yes.

3    Q.    Was it a secret cabinet?

4    A.    No, it is not a secret cabinet.  It is a piece

5          of furniture.

6    Q.    It is not a hidden cabinet?

7    A.    No.

8    Q.    When you open it, this stuff stares you in the

9          face?

10   A.    No.

11   Q.    Was it with underwear?

12   A.    Yes.

13   Q.    It is in an underwear drawer?

14   A.    It is laying on a shelf.  All kind of packed

15         in there.

16   Q.    In an underwear shelf?

17   A.    I guess that is what you would call it.

18   Q.    When you go visiting, you take underwear with

19         you, you go visiting?

20   A.    Yes.

21   Q.    When she left, do you know if she went in

22         there to take underwear with her?

5998

1   A.   I don't know what she took with her.

2   Q.   And if she had taken these letters, you

3        wouldn't have known that, would you?

4   A.   No.

5   Q.   Did you and I discuss previously that she left

6        there at an approximate time, a ballpark

7        time, and I'm not trying to pin you down

8        here, I'm not trying to be tricky, around

9        2:00?

10  A.   2:00, 2:30, somewhere in that area.

11  Q.   And you left at 6:30?

12  A.   Yes.

13  Q.   And you managed to get a couple of hours

14       sleep?

15  A.   Yes.

16  Q.   Then at about 10:00 the next morning, you and

17       a fellow officer, Captain Compton -- is

18       it Captain?

19  A.   Yes.

20  Q.   I have got to get these ranks right.  At 10:00

21       in the morning, you and Compton drive to

22       Donna Roberts' house?

```
                                                            5999
 1    A.    Yes.

 2    Q.    And the purpose of that trip is to get a

 3          written Consent to Search signed?

 4    A.    Yes.

 5    Q.    She had already given you carte blanche

 6          authority to search before?

 7    A.    Yes.

 8    Q.    But this time you wanted to get it in writing?

 9    A.    Yes.

10    Q.    Did you have any difficulty locating her at

11          10:00 in the morning?

12    A.    No, Sir.

13    Q.    She didn't pull a Mr. Koliser on you and get

14          in the car and drive to Florida now, did

15          she?

16    A.    No, she did not.

17    Q.    She told you she would be at her brother's,

18          you called her at her brother's and she

19          told you to come on up?

20    A.    Yes.

21    Q.    When you arrived, she was on the couch?

22    A.    Yes.
```

6000

1   Q.   She appeared tired to you?

2   A.   Yes.

3   Q.   And you explained to her that you wanted to

4        continue searching the house and the

5        vehicles?

6   A.   Yes.

7   Q.   But you didn't have both vehicles at this

8        time, correct?

9   A.   No, I did not.

10  Q.   Sort of a contingency plan, if we find the

11       silver one, we want to search it, too?

12  A.   We were going to search it, yes.

13  Q.   So, you are going to ask her for a written

14       consent to continue searching 254

15       Fonderlac, correct?

16  A.   Yes.

17  Q.   Written consent to continue searching the red

18       Chrysler, correct?

19  A.   Yes.

20  Q.   And written consent to search the silver

21       Chrysler when and if you find the silver

22       Chrysler?

6001

1    A.    Yes.

2    Q.    And again, even though you found her

3              uncooperative, she didn't tell you to go

4              pound salt, get out of here?

5    A.    No, she did not.

6              MR. BECKER:  I'm going to object.

7    He covered this.  You are talking about the

8    consent?

9              MR. INGRAM:  This is the different

10   consent.  This is 12-12, the other one is 12-17.

11             THE COURT:  Which one are you

12   talking about?

13             MR. INGRAM:  The one on December

14   12th.

15             THE COURT:  He's already asked the

16   question once about whether there was a written

17   consent, true.

18             MR. BECKER:  I'll withdraw.

19   Q.    And is Defendant's Exhibit 5 the written

20             consent that Donna Roberts gave you on

21             December 12th?

22   A.    Yes, it is a copy of that.

6002

1    Q.    And while you were talking with her on

2          December 12th at Ralph and Rita Roberts'

3          house, you found her very cooperative,

4          did you not?

5    A.    In regards to this consent, yes.

6                MR. INGRAM:  This would be a

7    convenient time for a break, if we could.  I would

8    like the Detective to look and see if he can find

9    pictures that better show the impressions, plus it

10   is quarter to three.

11               THE COURT:  Okay.  Let's take a 15

12   minute break.  Remember my admonition about talking

13   about the case in the meantime.

14   (Court in Recess at 2:45 p.m.)

15   (Resumed in Open Court at 3:05 p.m.)

16   Q.    One final question about the December 12, 2001

17         Consent to Search that is signed by Donna

18         Roberts at about 10:30 that morning.

19   A.    Yes, Sir.

20   Q.    I take it that after Defendant's Exhibit 5,

21         the Consent to Search is executed, and

22         you asked Donna to come to the Howland

6003

1              Police Department at 1:00?

2    A.    Yes.

3    Q.    When you and Captain Compton proceeded to the

4              Roberts' residence, did you leave from

5              the Howland Police Department to go

6              there?  I'll withdraw the question.  Do

7              you have any idea or can you proximate

8              for us please, how long it takes to drive

9              from the Howland Police Department to the

10             Roberts' residence?

11   A.    Two minutes.

12   Q.    They live in Austintown?

13   A.    I thought you meant Donna Roberts.

14   Q.    When Defendant's Exhibit 5, the Consent to

15             Search was signed, Donna is at Ralph and

16             Rita's house in Austintown, correct?

17   A.    Yes.

18   Q.    That is about a half hour drive?

19   A.    Yes.

20   Q.    And she was tired when you were at Ralph and

21             Rita's to have the document signed?

22   A.    Yes, she was.

6004

```
 1   Q.   So you asked her to come to the police
 2             department at 1:00 and that certainly
 3             doesn't leave much time for rest in
 4             between, does it?
 5   A.   No, it doesn't.
 6   Q.   And again, even though she was uncooperative,
 7             she showed up at the Howland Police
 8             Department at 1:00, didn't she?
 9   A.   Yes.
10   Q.   Didn't have to, did she?
11   A.   No.
12   Q.   Who was present at the Howland Police
13             Department for that interview with Donna
14             Roberts on December 12, 2001, at 1:00
15             p.m.?
16   A.   Donna Roberts, myself, Detective Dillon,
17             Captain Compton.
18   Q.   All three of you are there?
19   A.   In the interview room?
20   Q.   Yes.
21   A.   It was a conference room, yes.
22   Q.   All three of you were in the conference room?
```

6005

1    A.   Yes.

2    Q.   Did only one of you ask questions or did all

3         three of you ask questions?

4    A.   I asked the majority of the questions.

5    Q.   If you asked the majority, that necessarily

6         implies that someone else asked the

7         minority?

8    A.   Yes, Sir.

9    Q.   Both Captain Compton and Detective Dillon?

10   A.   Captain Compton asked a few questions.

11        Detective Dillon asked more than Compton.

12        I asked the majority of the questions.

13   Q.   All told, how long did this interview take

14        would you guess?

15   A.   Could I look at my notes?

16   Q.   Feel free.

17   A.   The report doesn't indicate what time she

18        concluded or we concluded the interview,

19        but I would say roughly about an hour,

20        hour and a half.

21   Q.   And you told us yesterday that at the end of

22        the interview, Donna put her head down

6006

```
 1              and said that she's too tired to

 2              continue.  Do you recall telling us that?

 3   A.   Yes, Sir.

 4   Q.   When she did that, that wasn't a permanent

 5              termination, "I am never talking to you

 6              again," correct?

 7   A.   Correct.

 8   Q.   What she said is, "I am too tired and I'll

 9              make myself available after I have had an

10              opportunity to get some rest"?

11   A.   Yes.

12   Q.   And in fact, during that hour or hour and a

13              half interview, she appeared to be very

14              tired to you, did she not?

15   A.   Yes.

16   Q.   Throughout the entire interview?

17   A.   Yes.

18   Q.   Was that interview tape recorded?

19   A.   No.

20   Q.   Did you ask Donna for permission to tape the

21              interview?

22   A.   This one?
```

6007

1  Q.  The one on 12-12-01 at 1:00 p.m.

2  A.  No, Sir.

3  Q.  You do have tape recorders at the Howland

4      Police Department, do you not?

5  A.  Yes, we do.

6  Q.  And she had never said "no" to any request you

7      had made previously, correct?

8  A.  Correct.

9  Q.  But you didn't ask her to tape record that

10     conversation?

11 A.  No, I did not.

12 Q.  And you and/or Detective Dillon took written

13     statements from a whole slew of witnesses

14     in this case, did you not?

15 A.  Yes, we did.

16 Q.  On December 12, 2001, did you ask Donna

17     Roberts for a written statement?

18 A.  No.

19 Q.  Did one of the three, either you, Detective

20     Dillon or Captain Compton act as

21     recording secretary, so to speak, during

22     this interview?  By that I mean was it

6008

1          someone's responsibility to take notes?

2   A.   I took notes and Detective Dillon took notes,

3          but as far as saying, "Attorney Ingram,

4          it is your job, you are taking notes,"

5          no.

6   Q.   So you and Detective Dillon took some

7          handwritten notes?

8   A.   Yes, Sir.

9   Q.   And are those handwritten notes in that

10          notebook?

11  A.   No, they are not.

12  Q.   Where are those handwritten notes today?

13  A.   They were destroyed.

14  Q.   When were they destroyed?

15  A.   Upon completion of this report, they are

16          destroyed.

17  Q.   Later that day, the silver Chrysler is

18          recovered?

19  A.   Yes.

20  Q.   Not from 79 Wirt Street, correct?

21  A.   791 Wirt.

22  Q.   Excuse me.  How far?

6009

1   A.   About three blocks.

2   Q.   Who lives at that Wirt Street address?

3   A.   Sheila Fields and Oscar.  Without going

4        through some records, I'm not sure what

5        Oscar's last name is.

6   Q.   That is good enough.  That is in fact where

7        Nate Jackson was assessed on December

8        20th, 21st, when he was arrested?

9   A.   Yes.

10  Q.   And that is the same address where the gloves

11       you talked about with Mr. Becker were

12       found?

13  A.   Yes.

14  Q.   And that is the same address where the tennis

15       shoes you talked with Mr. Becker were

16       found?

17  A.   Yes.

18  Q.   So after that car is found, what becomes of

19       it?

20  A.   After the car was found, we called a tow

21       company, had it towed.  We had Majors

22       Towing come to the scene at the corner of

6010

1            Victoria and Pershing in Youngstown.  We

2            followed the tow truck directly back to

3            Howland Police Department.  We put it in

4            our garage there.  Disconnected the power

5            to the overhead door, put evidence seals

6            upon the doors to get into the garage, to

7            keep anybody from entering the garage.

8    Q.    Do you do anything with that car while it is

9            in the garage?

10   A.    That night?  No.

11   Q.    How about ever?

12   A.    Yes.

13   Q.    What?

14   A.    We made arrangements with the Bureau of

15           Criminal Identification and Investigation

16           in Richfield to have them process the

17           vehicle for evidence.  Prior to having it

18           transported there on a flat bed truck,

19           there was a chemical which was applied to

20           that exterior of the vehicle in case

21           there would be fingerprints on the car.

22           It was raining and I don't know what the

1    chemical is called.

2  Q.   You protected it so that any fingerprint

3       evidence on the exterior of the vehicle

4       would not be ruined?

5  A.   Yes.  It hardens the prints that may be found,

6       if found, if you are out in a moisture

7       environment.

8  Q.   Who inventories the contents of this vehicle?

9  A.   Myself, Detective Leshnack, Cindy Mayle.

10      There was another BCI technician there, I

11      don't know what his name was at the lab.

12 Q.   She testified here yesterday, she's a

13      fingerprint person?

14 A.   Yes, Sir.

15 Q.   And there was -- was there another BCI person

16      present?

17 A.   Dale Laux was there, also.

18 Q.   What does he do?

19 A.   He works in serology.

20 Q.   He's a blood guy?

21 A.   Yes, Sir.

22 Q.   So there's a bunch of you from the local

6012

1          police agency is here?

2    A.   Yes.

3    Q.   And then there's a fingerprint person and a

4          blood person from BCI?

5    A.   Yes.

6    Q.   Anyone else?

7    A.   I don't think there was anybody else in the

8          garage.

9    Q.   And is that when the contents of the car are

10         removed and inventoried?

11   A.   Yes.

12   Q.   Do you recall when that car was sent to BCI?

13         Let me give you the BCI submissions.  I

14         believe it is the second page.

15   A.   On December 14, 2001.

16   Q.   Everything is taken out of the car and

17         itemized.  That is one task, correct?

18   A.   Yes.

19   Q.   Cindy Mayle then does her thing with checking,

20         I would imagine both the interior, the

21         exterior of the vehicle, for

22         fingerprints?

6013

1  A.  Yes.  I didn't participate in that.

2  Q.  You were not there?

3  A.  Not when she did that stuff.

4  Q.  What was done to this car when you were there?

5  A.  The loose contents in the vehicle, clothing

6     items, anything that would be laying in

7     the car were removed.  Things that were

8     easy to take out.  That is what was done

9     while I was there.  As far as them

10    actually lifting fingerprints from the

11    car or taking blood samples from the car

12    or collecting any kind of trace evidence

13    or such, I didn't participate in that

14    collection.

15 Q.  Does that mean you weren't there when it

16    occurred?

17 A.  Yes.

18 Q.  Was that car measured when you were there?

19 A.  Yes.

20 Q.  By whom?

21 A.  I don't know.

22 Q.  What was measured?

6014

1    A.   I think they were measuring damage on the rear

2           bumper of the car.

3    Q.   Do you have a report that shows that anywhere?

4    A.   There's a photograph.  I don't have a report

5           that I wrote as far as measurements.

6    Q.   There's a photograph of somebody measuring the

7           car?

8    A.   The photographs with measurements that were

9           being taken.

10   Q.   Do you know where that photo would be?

11   A.   I know where my photos are.  Without going

12          through their stuff, no.

13   Q.   These guys are going to look -- we'll come

14          back to that.  You have no written report

15          about these measurements?

16   A.   No, Sir.

17   Q.   Let's go back to December 11th, between the

18          time you got to 254 Fonderlac and the

19          time you left.  Were any measurements

20          taken of anything except for this bullet

21          hole in the stairwell going down to the

22          basement?

6015

1   A.   Yes.

2   Q.   What?

3   A.   Detective Leshnack took measurements.  He took

4        measurements to make a drawing of the

5        residence.

6   Q.   Okay.  And we have seen that drawing?

7   A.   Okay.

8   Q.   Are there any photographs showing any items of

9        evidence being measured, other than that

10       bullet hole in the stairwell?

11  A.   I don't know.

12  Q.   BCI took measurements of the car, but never

13       sent you a written document setting forth

14       what those measurements are?

15  A.   No.

16  Q.   Were any measurements taken on December 11,

17       2001 inside the garage?

18  A.   I didn't participate.  I would have to assume,

19       and I am guessing, I wouldn't say

20       guessing --

21  Q.   You shouldn't guess.  You don't know if there

22       were any measurements taken inside that

6016

```
 1            garage or not?
 2   A.   No.  You would have to ask Detective Leshnack.
 3   Q.   While you were at 254 Fonderlac, do you recall
 4            anybody taking a yard stick and holding
 5            it up to the garage door to measure the
 6            damage on the garage door from the
 7            ground?
 8   A.   No.
 9   Q.   That was not done, correct?
10   A.   I didn't say it wasn't done.  I don't recall
11            anybody doing it.
12   Q.   You are the Detective in charge?
13   A.   Yes, Sir.
14   Q.   You got two big notebooks.  You got an Army of
15            police officers to help?
16   A.   No.
17   Q.   Do you have a report that shows that anybody
18            measured that door?
19   A.   I don't think so.
20   Q.   You don't think so.  Do you want to take some
21            time to look through the books?
22   A.   I would like to look through Detective
```

6017

1              Leshnack's report and see what is there.

2    Q.   Go ahead.

3    A.   To answer your question, it appears from

4              looking at this drawing, that there were

5              measurements taken.  I'm not certain --

6              it shows bracket, measuring the bracket

7              here and the different dimension.

8    Q.   Can you interpret those measurements or would

9              we need Deputy Leshnack to do that?  Can

10             you tell me when he's measuring where the

11             bracket is on the floor or the height of

12             where the bracket is supposed to be on

13             the door?

14   A.   It appears that the broken bracket on the

15             floor, he's triangulating from point A

16             one and point B one to determine position

17             on the floor.

18   Q.   He's trying to show you where, if this pen is

19             the broken bracket, I really hate that I

20             dropped that pen, it reminds me of

21             Mr. Bailey, if this pen is the bracket on

22             the floor, his measurements are designed

6018

1         to show you where on the floor that

2         bracket is located?

3    A.   Yes.

4    Q.   That's not what I am talking about.

5    A.   Okay.

6    Q.   I am talking about measurements from the floor

7         up to show where on the door there's

8         damage.  There's no measurements like

9         that, are there?

10   A.   I don't see that, no.

11   Q.   When was the last time you inspected the

12        damage to that door?

13   A.   December 12th.

14   Q.   Before you left at 6:30?

15   A.   I would say when we came back.

16   Q.   When did you go back to the house on December

17        12th?  At 10:00, you are at Ralph and

18        Rita Roberts.  At 1:00 you are at the

19        Howland Police Department.  You are

20        recovering the silver Chrysler later on.

21        Do you go back to the house on December

22        12th?

6019

1  A.  It was a busy day.

2  Q.  I understand that, Sir.

3  A.  Yes, I did.

4  Q.  What time?

5  A.  1400 hours.

6  Q.  That is 2:00.  I thought you were talking to

7      her?

8  A.  That is what it says.

9  Q.  Something is not kosher.  Would you agree with

10     that?

11  A.  Well, Detective Leshnack says --

12  Q.  You can't use Detective Leshnack's notes to

13     refresh your own recollection.  You are

14     free to tell us -- go ahead, do it.  Use

15     it all you want.  Does Leshnack say you

16     went to the house with him?

17  A.  He doesn't mention my name.

18  Q.  He went there on the 12th.  Do you remember

19     whether you were with him?

20  A.  I remember being with him.

21  Q.  Do you remember taking measurements on the

22     12th?

6020

1   A.   No, I do not.

2   Q.   Isn't that what he did on the 12th?

3   A.   He collected additional blood stain evidence,

4        fingerprint evidence.  Measurements were

5        taken while we were there.  He collected

6        a place mat that we discussed that was on

7        the back of the door.

8   Q.   I am sort of lost here.  While he's there on

9        the 12th, are you with him or not?

10  A.   Yes, I must have been with him.

11  Q.   You must have been with him?

12  A.   Yes, Sir.

13  Q.   Do you have a recollection of being with him

14       or are you assuming that you were there?

15  A.   I was with Leshnack when we went back there.

16  Q.   How many times did Leshnack go back there, do

17       you know?

18  A.   Twice.

19  Q.   Were you with him both times or one time?

20  A.   Both times.

21  Q.   So if he measured the damage to this door from

22       the ground up, you would have been there

6021

```
 1              when he did it unless he went there three
 2              times?
 3   A.   No, I was there at the residence.  Actually he
 4              was there three times and I went there
 5              with him every time he went back there.
 6              To say I was personally standing by his
 7              side, no.
 8   Q.   But you have no recollection of any such
 9              measurements ever being taken?
10   A.   No, Sir.
11   Q.   Let me tell you the reason why I'm asking all
12              of these questions.  You previously
13              testified that the damage to the rear
14              bumper of the silver Chrysler --
15              MR. BECKER:  I'm going to object to
16   him telling something.  If he's got a question, I
17   think he can ask it.
18              THE COURT:  Sustain the objection.
19   Rephrase your question.
20   Q.   Did you ever make an effort to match the
21              bumper or damage to the bumper with the
22              damage to the door?
```

6022

1   A.   Did I take the car back and put it next to the
2        damage on the door?  No, I did not.
3   Q.   Did you ever make any effort whatsoever to
4        match the damage on the silver Chrysler
5        to the damage on the garage door at 254
6        Fonderlac?
7   A.   I looked at them.  Yes, we took photographs
8        and measurements of the bumper damage.
9   Q.   Is it your opinion that they match?
10  A.   Yes, it is.
11  Q.   You matched them from photographs?
12  A.   I think if you look at the photographs of the
13       damage and the photographs of the damage
14       to the car, it appears that it is
15       consistent with the damage to the garage
16       door.
17  Q.   Consistent?
18  A.   Yes.
19  Q.   Consistent wouldn't be an identical match now
20       would it?
21  A.   No.
22  Q.   Did you testify under oath previously that it

6023

1                was an identical match?

2   A.   If I can look at my testimony.

3   Q.   You sure can.  Do you recall testifying in

4              another proceeding on October 21, 2002?

5   A.   Yes, was that in a trial?

6   Q.   Yes.

7   A.   Whose trial?

8   Q.   Mr. Jackson's trial.

9   A.   Yes.

10   Q.   You were sworn to tell the truth?

11   A.   Yes.

12   Q.   Take a gander at page 164, lines ten through

13              15.

14   A.   Do you want me to read this to you?

15   Q.   Do you say there that it is an identical

16              match?

17   A.   Yes.

18   Q.   That was sworn testimony under oath, correct?

19   A.   Yes.

20   Q.   And today you are telling us that that is not

21              accurate testimony?  Answer my question.

22   A.   Yes, show me the photographs of the car and

6024

```
 1              that, and I'll compare it and I'll tell
 2              you it is identical.
 3   Q.   Didn't you just tell it was consistent but not
 4              identical?  Do you want to change your
 5              testimony here, too?
 6   A.   You are not showing me anything to look at
 7              here, Sir.
 8   Q.   I'm showing you your written testimony.  And
 9              by the way, comparing something from a
10              photograph to a photograph, what
11              scientific methodology is that?  Do you
12              know what tool mark analysis is?
13   A.   Yes.
14   Q.   Did you ask anyone from BCI to do a tool mark
15              analysis?
16   A.   No.
17   Q.   Tell the Jury what tool mark analysis is.
18   A.   Tool mark analysis is when you look at
19              impressions that may be left from say a
20              screwdriver sliding across a piece of
21              metal, which may leave unique marks
22              specific to that tool, and if you were
```

6025

1    able, if there was a useful purpose for

2    doing it, you may want to look at that

3    screwdriver under a stereo scope and if

4    possible, if you could lift the

5    battleship into the lab or take a look

6    where they scraped the metal and you

7    could see that screwdriver caused that

8    scratch.

9 Q. Do you have training in tool mark analysis?

10 A. No, I do not.

11 Q. Did you ask BCI to do tool mark analysis?

12 A. No.

13 Q. From your understanding, can you do tool mark

14    analysis from one photograph to another

15    photograph?

16 A. I would say if you had a good enough

17    photograph, you could do that.

18 Q. You can determine scrapes from a photograph?

19    Okay.  By the way, are you as certain of

20    the rest of your testimony as you are

21    about this testimony regarding the bumper

22    and the door?

6026

```
1    A.    Yes.  It would be helpful if you would show me

2              the evidence.

3    Q.    There's the box.  Come down and take all of

4              the time you want and find as many

5              photographs as you want.  I'll take a

6              seat.

7    A.    Could I see your photographs?

8    Q.    I don't have photographs.

9              MR. BECKER:  I want to say for the

10   record, they have all of the photographs that the

11   State has.  Some of these photographs are contained

12   in a compact disk.  Now I want to point out for the

13   record, that not all of the printed photographs are

14   here in the Courtroom today.  If we want to break

15   for the day and go get those from the Howland

16   Police Department, we can do that.

17              THE COURT:  Let me ask you this.

18              MR. INGRAM:  We don't have to do

19   that.  I'll withdraw.

20              MR. BECKER:  I don't want it implied

21   that the State is hiding something.

22              MR. INGRAM:  If Mr. Becker or anyone
```

6027

1    else interpreted anything that I said as the fact

2    that the State has hidden photographs, they have

3    not.  We have these photographs.

4                    MR. BECKER:  They are on a media

5    that is on compact disk.

6                    MR. INGRAM:  I am computer

7    illiterate, and that is neither here nor there.

8    Q.    But you testified in one trial they are an

9          identical match, right?

10   A.    Yes.

11   Q.    You testified in this trial, they are

12         consistent?

13   A.    Yes, they are.

14   Q.    That testimony is not the same, is it?

15   A.    You are mixing and matching words.

16   Q.    You again talked to Donna Roberts on December

17         15, 2001?

18   A.    Yes.

19   Q.    And this time she actually requests a

20         conference, doesn't she?

21   A.    Yes.

22   Q.    And before this particular interview, you

6028

1              inform her of her rights?

2    A.   Yes.

3    Q.   So you told her she didn't have to talk to

4              you, correct?

5    A.   Correct.

6    Q.   She indicated she's happy to talk to you and

7              matter of fact, she wanted to talk to

8              you, that is why she requested the

9              interview?

10   A.   Yes.

11   Q.   You told her she could stop answering

12             questions at any time?

13   A.   Yes.

14   Q.   And she never did that, she answered each and

15             every question that you put to her,

16             didn't she?

17   A.   Are you asking my opinion?

18   Q.   Did she answer your questions?  Did she ever

19             refuse to answer a question?

20   A.   No.

21   Q.   Now all told on December 12th and December

22             15th, you spent more than six hours

6029

1           talking to Donna Roberts, correct?

2     A.    I'm not certain.

3     Q.    How much time do you think you spent talking

4           to her?

5     A.    As you set these rules up, we started the

6           trial, you asked me to be specific and

7           exact, you testified or told me that I

8           spent six hours, I would say that is

9           probably close.  But to say I spent

10          exactly six hours, I'm not going to say

11          that based on the rules you wanted to set

12          up, Sir.

13    Q.    I set up rules that you had to be exact?

14    A.    You said --

15    Q.    Don't speculate, you're right.  Did you talk

16          to her about six hours?

17    A.    Yes.

18    Q.    And in the six hours of conversation she had

19          with you, she never refused to answer any

20          question you put to her, did she?

21    A.    No.

22    Q.    And the conversation you had with her on the

6030

1    15th, that is in and of itself lasted

2    about two and a half hours, doesn't it?

3  A.   Yes.

4  Q.   And after that two and a half hour

5    conversation is over, you ask her to go

6    back to Fonderlac, so that you can put

7    recording equipment on the phone and ask

8    her to call Nate Jackson?

9  A.   Yes.

10  Q.   And even though she's uncooperative, she

11    agrees to do that?

12  A.   Yes.

13  Q.   And she places the call to Tausha on the 15th?

14  A.   Yes, she did.

15  Q.   And that call is monitored by the police, by

16    you or someone else, correct?

17  A.   Yes, it was.

18  Q.   And Nate was not there?

19  A.   No.  Well, we were told he wasn't there.

20  Q.   So, does Donna agree to try again the next

21    day?

22  A.   Yes.

6031

1  Q.  And does she go back the next day?

2  A.  Yes.

3  Q.  Again, even though she's being uncooperative

4       with you, she's voluntarily doing these

5       things.  You can't make her make these

6       telephone calls, can you?

7  A.  No, I can't.

8  Q.  Now, I believe you testified yesterday that in

9       making the call, she didn't follow the

10      script?

11 A.  That is right.

12 Q.  She was able to get Nate Jackson on the phone,

13      was she not?

14 A.  Yes.

15 Q.  And have you ever tried to carry on an

16      important telephone conversation while

17      someone in the same room with you is in

18      your ear trying to tell you what to say?

19      That ever happen to you?

20 A.  All the time.

21 Q.  It is not an easy thing, is it?

22 A.  Not that hard.

6032

1   Q.   Not for you perhaps.  And when you are

2          pointing at this script?

3            MR. BECKER:  I'm going to object to

4  the comments.

5            THE COURT:  The Jury will disregard.

6            MR. INGRAM:  I'll withdraw it.

7   Q.   When you are pointing at the script, is she

8          holding the script like this?

9          (Indicating)

10  A.   No, Sir.

11  Q.   Would you know if she's farsighted or

12         nearsighted?

13  A.   No, Sir.

14  Q.   Earlier that day on the 16th did you accompany

15         Detective Dillon to the Days Inn?  If you

16         need a report, I can find it.

17  A.   Was that Sunday?

18  Q.   December 16.

19  A.   Yes, I did.

20  Q.   You have it there?

21  A.   I don't have a report in front of me, but I

22         remember going to the Days Inn.

6033

1   Q.   You already have it, that is the report?

2   A.   Yes.

3   Q.   And is that when you are given the documents

4          that have been marked State's Exhibit

5          311?

6   A.   Yes.

7   Q.   What is number 311-E?

8   A.   311-E is a carbon copy of a receipt dated

9          December 16, 2001, 7:31 and 29 seconds.

10   Q.   Is that a.m.?

11   A.   It is a.m.

12   Q.   It is in the amount of eight dollars and no

13          cents?

14   A.   Yes.

15   Q.   That generated while you guys were there to

16          take these telephone calls delineated in

17          311-D?

18   A.   These were given to us on that date.

19          Detective Dillon collected them.

20   Q.   Okay.  We'll rely upon Detective Dillon's

21          testimony in that respect.  However

22          311-E --

6034

1   A.   Okay.

2   Q.   At 7:30 in the morning?

3   A.   Yes.

4   Q.   What time were you guys there?

5   A.   3:10 in the afternoon.

6   Q.   Will you put all of those back in there?  The

7        next day is the 17th, that is the day you

8        go and remove the storm door?

9   A.   Yes.

10  Q.   Do you enter the house on December 17th?

11  A.   I don't know.

12  Q.   You go back to the house on the 18th, don't

13       you?

14  A.   Yes, I did.

15  Q.   And at this time you go with Major Phillips?

16  A.   Yes.

17  Q.   And I have been waiting to do this.  You go

18       with this good looking guy over here,

19       Gary Bacon.  I promised him I would call

20       him "good looking".

21  A.   Yes, Sir.

22  Q.   And you guys go there to gather evidence, to

6035

1          process the scene or what do you go there

2          for?

3    A.    We go there to get a confession.

4    Q.    Does Donna invite you in?

5    A.    Yes.

6    Q.    Didn't have to let you in, did she?

7    A.    No.

8    Q.    She then leaves?

9    A.    Yes.

10   Q.    When she leaves, did you cause Captain Bacon

11         to stop her car and search her car

12         looking for Nate Jackson?

13   A.    No.

14   Q.    Do you know if that happened?

15   A.    Yes.

16   Q.    Her car was stopped?

17   A.    Yes.

18   Q.    For some offense?

19   A.    I wasn't there when that happened.

20   Q.    Was the car searched?  They are looking for

21         Nate Jackson?

22   A.    I don't know if they searched it or not.

6036

1   Q.   You do know that Nate Jackson was not in the

2        car?

3   A.   Yes.

4   Q.   Now Donna is arrested on the 20th?

5   A.   Yes.

6   Q.   And even after she's arrested, she agrees to

7        go back to 254 Fonderlac and try to get

8        Nate Jackson on the telephone, correct?

9   A.   Yes.

10  Q.   She's actually transported --

11               MR. BECKER:  Can I have one second?

12               MR. INGRAM:  Sure.

13               MR. BECKER:  May we approach?

14  (SIDE BAR DISCUSSION, OFF THE RECORD AND

15  OUT OF HEARING)

16               MR. BECKER:  We'll withdraw the

17  objection.

18  Q.   She once again agreed to call Nate Jackson?

19  A.   Yes.

20  Q.   She gets him on the phone?

21  A.   Yes.

22  Q.   This time he's at 791 Wirt, Sheila and

6037

1          Oscar's?

2   A.   Yes.

3   Q.   When she's on the phone with him, the police

4          go to the house and arrest him?

5   A.   Yes.

6   Q.   On December 21st of 2001, Detective Tackett

7          turns over to Detective Dillon, at least

8          he signs or he writes the report, that on

9          December 21st, some gloves and some

10         tennis shoes correct?

11  A.   Yes.

12  Q.   You want to go to the report?  You seemed

13         hesitant.

14  A.   The reason I'm hesitant, if you want me to be

15         precise without looking, it sounds like

16         what we would have done.  Detective

17         Yannucci collected the gloves.  Detective

18         Tackett collected the shoes.  The

19         officer -- did Officer Tackett give it to

20         Dillon?  Did I know that for sure?  Yes,

21         we did get that item of evidence.

22  Q.   Can you tell me for sure you got the gloves

6038

1          and the tennis shoes on December 21st?

2 A.   Yes.

3 Q.   Now you testified yesterday that the shoes,

4          State's Exhibit 318, that those were not

5          sent to BCI at all?

6 A.   No, they were sent to BCI.

7 Q.   My question to you is this.  Yesterday did you

8          testify they were not sent?

9 A.   I can look at the lab sheet and I can tell you

10          if they were sent or not.  I'm pretty

11          sure they were sent to the lab.  Yes,

12          they were sent to BCI.

13 Q.   If you testified yesterday that they were not

14          sent to BCI, that was a mistake?

15 A.   If I testified to that, it was a mistake, but

16          they were definitely sent to BCI.

17 Q.   They were not tested?

18 A.   No.

19 Q.   When were they sent?

20 A.   December 24th.

21 Q.   Three days after you got them or about?

22 A.   Yes.

6039

1   Q.   In the three days that those shoes were in the

2           possession of the Howland Police

3           Department, before they were sent to BCI,

4           what did you do with those shoes?

5   A.   Sat in the sealed bag.  We didn't do anything

6           to them.

7   Q.   Did you examine them for blood?

8   A.   No, I did not.

9   Q.   Did you ever look at the bottom of those shoes

10          to see if there was as red substance on

11          the bottom of those shoes?

12   A.   Between December 21st and the 24th?

13   Q.   Ever?

14   A.   Yes.

15   Q.   When?

16   A.   After they came back from the lab, we took a

17          closer look at the shoes.

18   Q.   You took a closer look at the shoes after they

19          came back from the lab?

20   A.   Yes.

21   Q.   When you sent those shoes to the lab, did you

22          request that the lab do blood testing on

6040

1           them?

2   A.   Yes.

3   Q.   Did you tell them not to do that testing?

4   A.   No.

5   Q.   Besides taking a closer look at the shoes and

6            seeing red stuff on the bottom, what did

7            you do, if anything?

8   A.   I looked at the tread and compared it with the

9            photographs that we had.

10  Q.   Let me see if I got this right.  You looked at

11           this tread, right?

12  A.   Yes.

13  Q.   And then you looked at these photographs?

14  A.   Yes.

15  Q.   Which ones?

16  A.   These are enlargements.

17  Q.   Do you have the enlargements to look at?

18  A.   No.

19  Q.   Okay.

20  A.   There are more photographs.

21  Q.   Pick out the best one right here.

22  A.   You have only given me three and two of them

6041

1           are distance shots and there's better

2           shots of this.

3                   MR. INGRAM:  I respectfully request

4    a recess.  I want the best pictures you have of

5    this impression.

6    A.    Certainly.

7                   MR. INGRAM:  I'm sorry.  I have no

8    choice.

9                   THE COURT:  Approach the bench

10   please.

11   (SIDE BAR DISCUSSION, OFF THE RECORD AND

12   OUT OF HEARING)

13                  MR. INGRAM:  Can I see those photos?

14   Let's just finish.

15                  THE COURT:  Mr. Ingram?

16                  MR. INGRAM:  I wish to try to

17   finish.

18                  THE COURT:  Fine.

19   Q.    You made your comparison with the shoes and

20           photographs similar to in quality to

21           State's Exhibit 8?

22   A.    Yes.

6042

1              MR. INGRAM:  I request to publish

2    State's Exhibit 8 to the Jury.

3              THE COURT:  Any objection?

4              MR. BECKER:  I have no objection.

5    Q.   From a photograph although smaller in size,

6              but similar in quality to State's Exhibit

7              8, you compared the dots and swirls on

8              the bottom of those tennis shoes to that

9              photograph?

10   A.   Yes.

11   Q.   And you are as certain of the rest of your

12             testimony as you are of the results of

13             that comparison?

14   A.   You are asking me --

15   Q.   Are you as certain of your --

16   A.   I'm certain.  You are asking me an opinion

17             oriented question.

18             MR. INGRAM:  No further questions.

19   REDIRECT EXAMINATION BY MR. BECKER:

20   Q.   Is that photograph the one that you used to

21             make your comparison?

22   A.   This exact one, no.

6043

1  Q.   Can you tell this Jury how cooperative this
2            Defendant was in terms of her
3            relationship with Nate Jackson?
4  A.   She was not.
5  Q.   How cooperative was this Defendant about
6            telling you about this murder plan that
7            she wrote 280 some letters between
8            October and December with Nate Jackson?
9  A.   She was not.
10 Q.   How cooperative was this Defendant in telling
11           you that she accepted 19 collect phone
12           calls from prison from Nate Jackson?
13 A.   She was not.
14 Q.   What did this Defendant tell you about the
15           murder plan to kill Robert Fingerhut?
16           MR. INGRAM:  Objection.
17           THE COURT:  What is your objection?
18           MR. INGRAM:  He's assuming that, it
19 assumes facts that he can't assume.
20           MR. BECKER:  I'll withdraw the
21 question.
22           THE COURT:  The objection is

6044

1   sustained as to the form of the question.

2   Q.    What did this Defendant tell you about writing

3         letters and discussing the murder of

4         Robert Fingerhut?

5   A.    Said it was just prison talk and she was

6         telling Nate Jackson what he wanted to

7         hear.

8   Q.    What did this Defendant tell you on December

9         12, 2001 either at the house or at the

10        Howland Police Department, about taking

11        Nate Jackson to a hotel in Boardman,

12        Ohio?

13  A.    Nothing.  She never told me that.

14  Q.    What did this Defendant tell you about the

15        nine telephone calls she had between 9:45

16        p.m. and 11:45 p.m. that she had with

17        Nate Jackson?

18              MR. INGRAM:  Objection.  He's

19  assuming that those calls are received.

20              THE COURT:  It shows phone calls are

21  made.  It doesn't show who made them.  Sustained.

22  Q.    I'll rephrase the question.  What did she tell

6045

1        you about the nine telephone calls she

2        received from her cell phone that she

3        received from 9:45 to 11:45 p.m. on

4        December 11, 2001?

5                MR. INGRAM:  Objection.

6                THE COURT:  What is your objection?

7                MR. INGRAM:  Same objection.  She

8    received.  All you know is that --

9                THE COURT:  Is there testimony that

10   she actually received the phone calls?

11               MR. BECKER:  I'll rephrase the

12   question again.

13               THE COURT:  Sustained.

14   Q.   What did she tell you about the nine phone

15        calls that were received in her red

16        Chrysler 300-M, the phone call that --

17        the telephone that was in that car, which

18        by the way she said she was driving

19        around -- what did she tell you about

20        those nine phone calls?

21               MR. INGRAM:  Go ahead.

22   A.   Told me she received one phone call from Nate

6046

1          Jackson.

2   Q.   And when did she tell you she received that

3          phone call?

4   A.   About quarter to ten.

5   Q.   P.M.?

6   A.   Yes, Sir.

7   Q.   What did she tell you on December 12th, about

8          her written letters and her plan to wake

9          up on Christmas morning by Nate Jackson?

10  A.   Nothing.

11  Q.   What did she tell you about her letters and

12         her plan in the letters to marry Nate

13         Jackson?

14  A.   Nothing.

15  Q.   What did she tell you about her plans to get

16         Nate Jackson a red Cadillac Deville with

17         personal license plates?

18  A.   Nothing.

19  Q.   Now, on December 12, 2001, when you were in

20         that house, and Mr. Ingram showed you a

21         photograph with some handcuffs, what did

22         you know at that time about any

6047

1          discussion, any letters between Miss

2          Roberts and the Defendant, Nate Jackson

3          or Mr. Nate Jackson about the use of

4          handcuffs?

5  A.  Didn't know anything about the handcuffs.

6  Q.  So what did you know about the evidentiary

7          value on December 12, 2001 of any

8          handcuffs involved in this case?

9  A.  Didn't know that.

10  Q.  What was the importance of marijuana to this

11          murder?

12  A.  Nothing.

13  Q.  You testified that she was cooperative -- or

14          tell this Jury how cooperative she was to

15          prove to you that she didn't shoot a

16          weapon?

17  A.  She held her hands out and I took some

18          swabbings from her hands.

19  Q.  And how cooperative was she to give you the

20          shirt off her back that night?

21  A.  She did when I asked her if she would

22          cooperate.

6048

1   Q.   What did she tell you on December 12th about

2           any person she may have had knowledge of

3           wanting to kill her husband?

4   A.   She gave me the names, the name of one person.

5           She didn't say he wanted to kill him,

6           this Bobby fellow, and some crazy people

7           that would come into the bus terminal,

8           but no names of anybody.

9   Q.   What about Nate Jackson?

10  A.   She didn't tell me about Nate Jackson.

11  Q.   When she was there making those phone calls on

12          December 16th, to Nate Jackson, you gave

13          a list of questions to her, correct?

14  A.   Yes.

15  Q.   Please tell this Jury how she was going to ask

16          these questions?  How long prior to that

17          had you discussed asking these questions?

18  A.   We discussed those questions.  They were

19          formulated with Attorney Chuparkoff and

20          Donna Roberts at the Howland police

21          station and discussed it was important

22          that she ask all of the questions.

6049

1    Q.    Well, go ahead.

2    A.    We had gone over them and discussed the

3          importance of discussing these questions

4          with Nate Jackson to see if he would talk

5          about the injury to his finger and how he

6          received the injury to his finger and

7          where he was at.  Prior to even going to

8          the house on the 15th and then went over

9          them again in the house on the 16th.

10   Q.    Now, were they just given to her in writing

11         the moment she tried to make that phone

12         call?

13   A.    No.  We talked about them before we even wrote

14         them down.  We discussed what the

15         questions were going to be and then we

16         wrote them down for her.  Her Attorney

17         looked at them and talked to her about

18         them and went over them, talked to her

19         about the question.  "How did Nate

20         Jackson injure his finger?  Is he getting

21         treatment for the finger?"  Just general

22         questions to open a discussion up and how

6050

1           important it was.

2    Q.   And when she was making the phone calls with

3           these questions in front of her, what

4           efforts did she do to even look at the

5           questions?

6    A.   She did not.

7    Q.   Who did she tell you she had dinner with on

8           the night of December 11, 2001?

9    A.   She had dinner by herself at the Red Lobster.

10   Q.   And who did she tell you she had taken to

11          Youngstown, Ohio on December 12th -- or

12          I'm sorry, on December 12, 2001, who did

13          she tell you she had taken to Youngstown,

14          Ohio on December 11th?

15   A.   She didn't say she had taken anyone to

16          Youngstown.

17          MR. BECKER:   I have nothing further.

18   RECROSS EXAMINATION BY MR. INGRAM:

19   Q.   When you call 911, that usually means the

20          police are coming to your house, right?

21   A.   Yes.

22   Q.   And on December 12th, Donna did tell you she

6051

1          had dinner at the Red Lobster, right?

2    A.   Yes.

3    Q.   She didn't say Cafe Capri, she didn't say the

4          Saratoga, she didn't say Bob Evans -- Red

5          Lobster?

6    A.   Yes.

7    Q.   And on December 12th, she told you that Nate

8          Jackson called her from prison?

9    A.   Yes.

10   Q.   And on December 12th, she told you that she

11        had one phone call from Nate Jackson at

12        9:45?

13   A.   Yes.

14   Q.   And the rest of those phone calls, you don't

15        know if the phone is busy, if there's no

16        answer or if there's voice mail, do you?

17   A.   No.

18              MR. INGRAM:  No further questions.

19              THE COURT:  Any other questions?

20              MR. BECKER:  No, Sir.

21              THE COURT:  Chief Monroe, you may

22   step down.

6052

1  (SIDE BAR DISCUSSION, OFF THE RECORD AND

2  OUT OF HEARING)

3              THE COURT:  Ladies and gentlemen,

4  that will conclude the testimony for today.  I'm

5  going to ask you to come back tomorrow at 1:00.  We

6  have an entire morning of things that we need to do

7  on this case on the record, outside the presence of

8  the Jury.  We'll go from 1:00 until 4:30 tomorrow.

9  Monday, we're off.  So what we don't conclude

10  tomorrow, we'll come back and attempt to do so on

11  Tuesday or Wednesday, however long it takes.

12              I would again remind you folks that you

13  are not to read anything in the newspaper, watch

14  anything on T.V., not to have any discussion with

15  any other person about the facts or about this

16  case, and I trust you all have a nice evening.

17  We'll see you back here tomorrow at 1:00.

18  (Court in Recess at 4:20 p.m.)

19

20

21

22

6053

1

2                    REPORTER'S  CERTIFICATE

3

4          I do hereby certify that the above and

5    foregoing is a true and correct transcript

6    of the proceedings had in the within hearing

7    as shown by stenotype notes written by me in the

8    presence of the witnesses at the time of the

9    hearing.

10

11                              _Mary Ann Mills_____
                                MARY ANN MILLS,  R.P.R.
12                              Official Court Reporter
                                Trumbull County, Ohio
13

14

15

16

17

18

19

20

21

22

6054

1              IN THE COURT OF COMMON PLEAS
                  TRUMBULL COUNTY, OHIO
2            TRIAL COURT CASE NO. 01-CR-793
             SUPREME COURT OF OHIO CASE NO. 03-1441
3

4    STATE OF OHIO          )
                            )      VOLUME XXVIII
5              Plaintiff    )
                            )
6    -vs-                   )
                            )
7    DONNA M. ROBERTS       )
                            )
8              Defendant    )

9

10            BE IT REMEMBERED, that on Friday, May 23,

     2003, Tuesday, May 27, 2003, Wednesday, May 28, 2003,
11
     Tuesday, June 3, 2003, Wednesday, June 4, 2003, and
12
     Friday, June 20, 2003, these proceedings came on to
13
     be heard before one of the Judges of this Court,
14
     John M. Stuard, in Courtroom No. 2, on High Street,
15
     Warren, Ohio, before the case heretofore filed herein.
16

17

18
     Mary Ann Mills, RPR
19   Official Court Reporter
     Trumbull County, Ohio
20

21

22

```
                                                                    6055

 1

 2
                        A P P E A R A N C E S
 3

 4

     On Behalf of the State of Ohio:
 5       Dennis Watkins, Prosecuting Attorney
         Charles L. Morrow, Ass't. Prosecuting Attorney
 6       Christopher D. Becker, Ass't. Prosecuting Attorney
         Kenneth N. Bailey, Ass't. Prosecuting Attorney
 7       160 High Street, N.W.
         Warren, OH 44481
 8
     On Behalf of the Defendant, Nathaniel Jackson:
 9       Anthony V. Consoldane, Attorney at Law
         James F. Lewis, Attorney at Law
10       State of Ohio Public Defendant's Office
         328 Mahoning Avenue, N.W.
11       Warren, OH 44481

12   On Behalf of the Defendant, Donna M. Roberts:
         John B. Juhasz, Attorney at Law
13       J. Gerald Ingram, Attorney at Law
         7330 Market Street
14       Youngstown, OH 44512

15   On Behalf of The Vindicator Printing Co.
         Ann Millette, Attorney at Law
16       3200 National City Center
         1900 East Ninth Street
17       Cleveland, OH 44114

18   On Behalf of WFMJ Television, Inc.:
         Stephen T. Bolton, Attorney at Law
19       201 E. Commerce Street, Atrium Level Two
         Youngstown, Oh 44503
20

21

22
```

1

## I N D E X

2

3    <u>VOLUME XXVIII</u>:

4    (Friday, May 23, 2003, Tuesday, May 27, 2003
     Wednesday, May 28, 2003, Tuesday, June 2,
5    2003, Wednesday, June 4, 2003 & Friday,
     June 20, 2003)

6

7    Exhibits Proffered (May 23, 2003)           6056
     Rule 29 Motion (May 27, 2003)               6101
     Closing Argument by Mr. Bailey              6117
8      (May 27, 2003)
     Closing Argument Waived by Mr. Ingram       6146
9      (May 27, 2003)
     Jury Charge                                 6147
10     (May 27, 2003)
     Verdict  (May 28, 2003)                     6210
11   In-Chamber Hearing with Dr. Eberle          6220
       (June 3, 2003)
12   In-Chamber re Jury Instructions             6239
       (June 4, 2003)

13

14   <u>Mitigation Hearing</u> - (June 4, 2003)

     Opening Statement Waived by Mr. Ingram      6252
15   Opening Statement Waived by Mr. Bailey      6252
     Defendant's Unsworn Statement               6253
16   Closing Argument by Mr. Becker              6301
     Closing Argument Waived by Mr. Ingram       6309
17   Jury Charge                                 6310
     Verdict                                     6329
18   Sentencing Hearing (June 20, 2003)          6336

19

20

21

22

6056

1

2  Friday, May 23, 2003; In Open Court at 2:00 p.m.:

3  (Jury is not present.)

4              THE COURT:  The Prosecution and the

5  Defense have taken most of the morning reviewing

6  the evidence to find which items they agreed should

7  be submitted, and I assume they have probably found

8  some they disagree on.  Is that correct?

9              MR. BECKER:  I think the only ones

10  that there's going to be any argument over are

11  dealing with the letters.

12              MR. INGRAM:  No argument.

13              MR. BECKER:  I don't know if it

14  would be better if I run through the numbers and

15  what they are.  For the record, I'll do that.

16              THE COURT:  Let me ask you this up

17  front.  Are there items that there's a disagreement

18  on that have been proffered that should not be

19  submitted to the Jury?

20  (Off the record)

21              THE COURT:  Review each of the

22  proffered Exhibits and then if there's any that are

6057

1  objected to or any comment, please make it at that

2  time.

3              MR. BAILEY:  With the photos, I

4  think we're going to agree, but the Court is going

5  to have to make the finding on the photographs that

6  the photographs are relevant and of probative value

7  in assisting the trier of fact to determine the

8  issues, and/or are illustrative of testimony and

9  other evidence and that the danger of material

10 prejudice to the Defendant is outweighed by their

11 probative value and they are not repetitive or

12 cumulative in number.  Is that right?

13             MR. BECKER:  Let me get started

14 here, because this may take a little bit of time.

15 The State at this time is going to move for

16 admission of State's Exhibit No. 1, which is the

17 911 telephone call.  It is the tape of the 911

18 call.

19             MR. INGRAM:  No objection.

20             MR. BECKER:  State's Exhibit No. 1-A

21 is the CAD sheet from the 911 call that has the

22 times and locations.

6058

1              MR. JUHASZ:  We don't object.

2              THE COURT:  For the record, if

3    there's no objection made, when a number is

4    mentioned, I'll assume by the Court that there's no

5    objection and that will be admitted.

6              MR. BECKER:  Thank you.  State's

7    Exhibit 2 is the video tape of the Fonderlac crime

8    scene.

9              MR. JUHASZ:  No objection.

10             MR. BECKER:  Now we have got some

11   photographs, that these will be objected to.  I'm

12   sorry, No. 3 is the crime scene diagram.

13             MR. JUHASZ:  No objection.

14             MR. BECKER:  State's Exhibit 4,

15   these next Exhibits until number 60 are 8-1/2 by 11

16   photographs.  State's Exhibit 4?

17             MR. INGRAM:  No objection.

18             MR. BECKER:  State's Exhibit 5.

19             MR. INGRAM:  No objection.

20             MR. BECKER:  No. 6.

21             MR. INGRAM:  No objection.

22             MR. BECKER:  No. 7.

6059

1              MR. INGRAM:  No objection.

2              MR. BECKER:  No. 8.

3              MR. INGRAM:  No objection.

4              MR. BECKER:  No. 9.

5              MR. INGRAM:  No objection.

6              MR. BECKER:  No. 10.

7              MR. INGRAM:  No objection.

8              MR. BECKER:  No. 11.

9              MR. INGRAM:  No objection.

10             MR. BECKER:  No. 12.

11             MR. INGRAM:  No objection.

12             MR. BECKER:  No. 13.

13             MR. INGRAM:  No objection.  Actually

14   we have no objection through number 20.

15             MR. BECKER:  14, 15, 16, 17, 18, 19

16   including 20.

17             MR. JUHASZ:  Including 20.

18             MR. BECKER:  There's no objection to

19   those.  21, is there an objection to?

20             MR. INGRAM:  Yes.

21             THE COURT:  Set that aside for now.

22             MR. BECKER:  21, 24, 25, 26, 27, 28,

6060

1   31, those are basically the autopsy photographs.

2   Do you want to do the objections now?

3                    MR. JUHASZ:  Your Honor, so the

4   record is clear, State's Exhibit 21 is a photograph

5   of the decedent Mr. Fingerhut on the coroner's

6   morgue table.  I think what I'll do with the

7   Court's permission, is identify what they all are,

8   because the objection is basically the same with

9   all of them.  State's Exhibit 24 is a photograph of

10  Mr. Fingerhut on the coroner's table showing the

11  chest torso area between basically the neck and the

12  waist line.  It shows the, what I think

13  Dr. Germaniuk identified as the exit wound in the

14  right shoulder area.  State's Exhibit 25 is a

15  photograph of Mr. Fingerhut on the table showing

16  the feet and chin area from the bottom of the feet

17  up to the knees.  State's Exhibit 26 is Mr.

18  Fingerhut on the coroner's table.  This is a view

19  of the back.  The body is laying on what appears to

20  be the right side and it shows the back of the head

21  and the decedent's upper and middle back.  State's

22  Exhibit 27 is a photograph of Mr. Fingerhut on the

6061

1    coroner's table showing the bullet wound marked A

2    on the left side of the head with the hair shaved

3    away to show it very clearly.  That is also true of

4    State's Exhibit 28 which is actually a closer shot

5    of 27.  And State's Exhibit 31 is a photo of the

6    skull showing the head wound with at least to my

7    untrained eye, the scalp removed and showing the

8    fractures of the skull.  Mr. Bailey has set forth

9    the case that sets forth the standard, the Morales

10   case and the question obviously is, is there

11   prejudice to the Defendant versus what do these

12   photographs prove.  This case is, as I understand

13   it, from everything the State has said and

14   everything the State has proved, is a case where

15   this Defendant is charged with complicity to

16   aggravated murder.  There's certainly been ample

17   testimony that the decedent died from a gunshot

18   wound from Dr. Germaniuk.  These photographs, we

19   believe, there's nothing about the way Mr.

20   Fingerhut died save and except that it was from

21   gunshot wounds, that is probative to the State's

22   case versus the obvious prejudice.  The reason for

6062

1   the decision in <u>Morales</u> in the first place which is

2   that photographs like these tend to get people of

3   ordinary sensibilities quite worked up.  Therefore,

4   we feel that the prejudice does outweigh the

5   probative value in this case.  If this was a case

6   where Mr. Jackson was on trial, claiming seelf

7   defense, something about the angle and the nature

8   of the injuries were pertinent, it might be a

9   different situation here.  Simply the fact that

10   he's dead is sufficient.  The question in this case

11   is, as we have been telling jurors all through Voir

12   Dire, did Donna Roberts help him.  And so that's

13   the basis for the objection.

14          THE COURT:  What is the State's

15   response?  You didn't address Exhibits 4 and 5.

16          MR. BECKER:  There's no objection to

17   those.

18          MR. JUHASZ:  There's no objection to

19   those.

20          MR. BAILEY:  May it please the

21   Court, counsel for the Defense, these photographs

22   depict the victim's body and it indicates the

6063

1   coroner's examination and the wounds on the victim.

2   It illustrates the testimony of the State's

3   witnesses concerning the murder, the cause of

4   death, the Defendant's liability therefor.  It also

5   indicates basically because the Defendant is

6   charged with complicity in this killing, and in

7   conjunction with the other evidence in this case

8   with the phone calls that were taped, with the

9   letters that were sent between the Defendant and

10  the co-defendant, these photographs of the victim's

11  injuries are probative, with regard to showing her

12  intent and her deliberation in the instant case.

13          Further, even if somewhat gruesome, the

14  photographs were properly authenticated.  They are

15  relevant, and of probative value in assisting the

16  Jury in determining the issues in this case and

17  they are illustrative of the testimony and the

18  other evidence in this case.  And we submit to the

19  Court that the danger of material prejudice to the

20  Defendant is outweighed by the probative value and

21  there's certainly not repetitive or cumulative in

22  number which was a concern of the Supreme Court and

6064

1   in the <u>Morales</u> case which was <u>State vs. Morales</u>, 32_

2   Ohio State_3rd, 252, a 1987 case, where the Supreme

3   Court indicated they were concerned about the

4   overwhelming number of photographs that were being

5   admitted in capital cases. This case, because

6   there's the heightened test where the probative

7   value of the photographs is not substantially

8   outweighed by their prejudicial effect, if any, we

9   certainly would meet that Supreme Court test in

10   this particular case, and none of these photographs

11   should be excluded.

12           THE COURT: In regard to Exhibit No.

13   21, that is a picture of the neck and face of the

14   deceased. The question of -- it doesn't show any

15   wound. It shows what might appear to be some blood

16   on the left side of the deceased, but that doesn't

17   show much of anything. The question of identity is

18   not in contention here. So that will be withdrawn

19   from the Jury.

20           MR. BECKER: Just very briefly, I

21   would tell the Court, if you recall -- that is

22   fine. Never mind.

6065

1           THE COURT:  Number 21 is not

2  admitted as part of the evidence.  Number 24 shows

3  what appears to be a bullet entrance wound on the

4  right upper chest.  Number 25 shows merely a

5  picture of the lower leg and feet.  Number 26

6  merely shows the back view with a lot of blood in

7  the hair.  Number 27 and 28 show the same thing

8  from a different angle of the entrance wound of the

9  projectile into the head.  The Court is going to

10  allow that at the State's election, either 27 or

11  28.  The others will not become part of the

12  evidence, but will become part of the record.  The

13  bullet wound on the chest, I remember that the

14  testimony was the death was caused, the immediate

15  death by the bullet wound to the head.  It is true

16  that the Doctor testified to that, but I think that

17  this is part of the State's right to have one

18  photograph showing that.  The Exhibit 31, I think,

19  would be inflammatory.  It doesn't add anything to

20  the picture portrayed in 27 or 28, other than it is

21  more gruesome.  So number 31 will not be admitted,

22  either.

6066

1            MR. BECKER:  I have a question.  I
2    wanted to make sure I understand.  You are saying
3    that 24, 25, 26, are out?

4            THE COURT:  21, 24, 25, 26 and 31
5    are not admitted.  Either 27 or 28 is out at your
6    election.

7            MR. BECKER:  The State is going to
8    elect that State's Exhibit 27 remain in evidence.
9    Well, at our election the Court gave us, we'll
10   withdraw 28.  I'll take State's Exhibits 21, 24,
11   26, 31 and 28.  I'm going to put them in the box
12   back here that we have the Exhibits that are out.
13   These three boxes will remain.  I'll put these
14   photographs back in the box.  We're withdrawing
15   pursuant to the Court's order, we're withdrawing
16   number 28.  You want it to remain part of the
17   record?

18           THE COURT:  I think it is more
19   proper that everything remains part of the record
20   that has been proffered.  You have the right to
21   withdraw it if you wish.

22           MR. BECKER:  Nos. 24, 25, 26, 28, 31

6067

1  and 21 were all offered, but denied by the Court

2  admission.  I'm going to leave those with the Court

3  Reporter here.

4            THE COURT:  27 will become part of

5  the submission to the Jury.

6            MR. BECKER:  That leaves us with

7  State's Exhibit 33 which is the bullet that was

8  recovered.

9            MR. JUHASZ:  No objection.

10           MR. BECKER:  State's Exhibit 37 is a

11  close up of the entry wound in the chest.  State's

12  Exhibit 38 is another view of the chest.  State's

13  Exhibit 39 is an entry wound in the back.  It is a

14  further distance than State's Exhibit 37.  State's

15  Exhibit 40 is a picture of the graze wound on the

16  back.  State's Exhibit 43 is a picture of the

17  webbing of the left hand.  State's Exhibit 44 is a

18  different angle of the webbing of the left hand.

19           MR. JUHASZ:  In light of Mr. Becker

20  has already identified what these photographs are

21  for the record, so I won't go through that again.

22  In light of what the Court has already held, I

6068

1  would think that all of these photographs would be

2  excluded, because they don't show the wound that

3  caused the death.  The rest of them have been

4  described by Dr. Germaniuk.  I don't think there's

5  any reason to put them in front of the Jury.  Again

6  incorporated by reference everything I said before

7  about this being a complicity case.

8          MR. BECKER:  I would argue that

9  either 43 or 44 is obviously a defensive wound into

10  the webbing of his left hand.

11          THE COURT:  There was testimony in

12  the other trial to get opinion evidence given by

13  the good Doctor that where he surmised that the

14  hand was probably put up when the weapon was fired.

15  I don't recall any of that testimony in this trial.

16          MR. INGRAM:  It was not elicited.

17          MR. BECKER:  It was not elicited in

18  this trial.

19          THE COURT:  Again, I don't see the

20  relevancy.  There was testimony that he was shot

21  three times, but that doesn't add anything to the

22  fact that the bullet wound in the head was what the

6069

1    Doctor testified was the murder blow.  These other

2    pictures, I think with good foundation on the

3    Defendant's part makes it arguable, but they don't

4    add anything, but they may tend to inflame the

5    Jury.

6              MR. BAILEY:  The State's position is

7    that this particular photograph indicates that

8    something went wrong with the plan that was set out

9    in the letters and the phone calls.  The plan was

10   to basically kidnap the victim and have the killing

11   happen outside of the house, and obviously

12   something went wrong and the Jury can draw a

13   logical inference from all of the facts, that there

14   was some type of a scuffle or resistance by the

15   victim and that is why there are these numerous

16   injuries to the victim and it is important.  It

17   goes to what happened, and as to what went wrong

18   with the plan.  It shows the Defendant's intent to

19   cause the death and certainly the co-defendant's

20   actions at the scene and the victim's actions.  It

21   illustrates that point for the Jury.

22             THE COURT:  How does the Defense

6070

1   contend or rebut that contention?

2                   MR. JUHASZ:  I haven't heard

3   anything in any of the State's evidence that --

4   actually goes to anything Mr. Bailey said.  Whether

5   that plan went wrong or not, this trial is about

6   whether or not she assisted Mr. Jackson.  Whether

7   the plan was to kill him there or whether the plan

8   was to kidnap him away and the plan went wrong,

9   that doesn't have to do with the central question

10  this Jury has to decide.

11                  THE COURT:  That was not part of the

12  evidence in this case that I recall.  I'm going to

13  stand with my prior ruling that this is irrelevant.

14  As I see it, the question that the State has to

15  convince the Jury of is that there was a plan, that

16  it was executed resulting in the death.  That is

17  done by the testimony, if the Jury accepts it.  And

18  that photograph is in line with that testimony

19  given by the Doctor.  These other photographs don't

20  add anything to that, other than to accentuate the

21  manner in which it was done.  There's nothing in

22  this trial that got into the manner in which it was

6071

1  | done or that it wasn't according to the plan.  It

2  | is just that the plan to murder, there was a murder

3  | and the death.  So I think these would not be

4  | proper to go to the Jury.  That is 37, 38, 39, 40,

5  | 43, 44 on the Defendant's objection will not be

6  | part of the evidence that the Jury sees, but will

7  | become part of the permanent record.

8  | MR. BECKER:  Number 47, 48, show the

9  | Cincinnati Reds baseball jacket which confirms the

10 | fact that he was the individual who left the

11 | Greyhound bus station.

12 | MR. JUHASZ:  No objection.

13 | MR. BECKER:  Number 49 is the

14 | Cincinnati Reds baseball shirt with the blood on

15 | it, which was testified to by some of the witnesses

16 | that he was wearing that day.

17 | MR. JUHASZ:  No objection.

18 | MR. BECKER:  51, 52, 53, 54, 55, 56

19 | are all photos of the shirts he was wearing, the

20 | red and black shirts, which was testified to by the

21 | officers at the scene.  Dr. Germaniuk as he

22 | undressed him that one of the --

6072

1          MR. JUHASZ:  No objection.

2          MR. BECKER:  Finally, that leaves us

3   with 57, 58, 59 and 60.  Those photographs are

4   close ups of the face of Mr. Fingerhut.  They show

5   an abrasion, actually two abrasions above the right

6   eyebrow in number 57.  Number 58 shows an abrasion

7   on the bridge of the nose.  It's a close-up

8   photograph.  Number 59 shows an abrasion on the

9   right hand, the back of the right hand, and 60

10  shows the complete face with abrasions above the

11  right eyebrow and the bridge of the nose.  And I

12  think there was ample testimony by Dr. Germaniuk

13  that they were non-lethal wounds.  And again it is

14  the State's contention that the plan was for him to

15  be removed.  And quite honestly, the letters which

16  we have not gotten to yet, clearly depict a plan

17  that there was a plan to move him at gun point in

18  handcuffs.  It is going to be our argument to the

19  Jury that the reason the letters were found in the

20  house, because the plan was not to kill him in the

21  house.  In fact there's conversation on the last

22  tape of December 8th by Mr. Jackson with this

6073

1   Defendant that it was not to be done in the house.

2   They discussed that on December 8th.  The State's

3   contention is that the plan went awry when Mr.

4   Fingerhut would not comply with their wishes to

5   leave the house or Mr. Nate Jackson's request to

6   leave the house at gun point.  He fought for his

7   life and that led not only to his death, but to

8   these injuries.

9           MR. JUHASZ:  Argument is basically

10  the same as before.  I appreciate Mr. Becker's

11  point and what the argument that the State is going

12  to make to the Jury.  Again, whether the plan went

13  wrong or didn't go wrong, the question in this case

14  is whether Donna Roberts helped Mr. Jackson.  Those

15  photographs, even to those of us who are, I suppose

16  over the years desensitized since they are not head

17  shots with somebody's brains hanging out, but they

18  are still photographs that are likely to shock the

19  average jurors who are not accustomed to seeing

20  some of the things we unfortunately see in this

21  business.  Because of that fact and the fact that

22  they don't prove the issue in this case, we object.

6074

```
 1              MR. BECKER:  If I may interject,
 2   part of the defense in this case has been that Miss
 3   Roberts was cooperative and certainly she knew
 4   nothing was going on, because these letters were
 5   found in her house and in her vehicle.  The State's
 6   contention is that the reason those were found
 7   there is because the plan went awry, the plan that
 8   is discussed over and over in the letters.  The
 9   plan that is discussed over and over in the phone
10   calls, and the fact that it went awry was for one
11   reason or one reason only because Mr. Fingerhut
12   would not comply with the wishes to leave the
13   house.  He was shot, beat, and eventually killed in
14   the house when he refused to leave the house.  And
15   I think those photographs clearly depict injuries
16   to his face, that would be recent abrasions that
17   were testified to, and I think they are very
18   important to overcome this defense of how
19   cooperative she was and how willing she was to
20   assist the Howland police in this investigation.
21   And to be quite frank, we have the highest burden
22   of proof under the law, and I respectfully request
```

6075

1    that those photographs are really not gruesome at

2    all and I don't think they fall under the standard

3    of the gruesome photographs, because they don't

4    depict any open bullet wounds.  They don't depict

5    any body parts.  They are injuries that probably

6    would be no worse than if someone took a line drive

7    in the nose.

8                THE COURT:  Again, I hate to keep

9    referring back to the Jackson case, but part of

10   that was on the reasoning put forth by the State at

11   the time of the introduction of these particular

12   photos, was that there's a possibility that some

13   sort of a self defense argument is going to be

14   raised by Jackson that he had no plan on shooting

15   him, and that they got into a fight and that is

16   what killed him.  It didn't turn out that way and

17   that is part of the argument and what was accepted

18   by the Court.  In this case, I think it is proper

19   argument to the Jury.  You have the testimony of

20   the doctor that there were ancillary -- whatever

21   the proper word is, other injuries.  I think for

22   that purpose, I would allow State's Exhibit 57 in

6076

1   which clearly shows other marks.  The others show

2   marks that add nothing to the fact.  This is in

3   conjunction with the doctor's testimony and I think

4   that is relevant to it.  58, 59, and 60 will not be

5   admitted.  57 will be.  57 will be admitted.

6               MR. BECKER:  There are a series of

7   photographs, a number of photographs now that I'll

8   go through.  I don't believe any of them are from

9   the autopsy at this time.  One is the shirt again.

10  It is 61.

11              MR. JUHASZ:  No objection.

12              MR. BECKER:  62 is the shirt, it is

13  the black shirt.  63 I am assuming there's going to

14  be an objection on.  It is a picture of Mr.

15  Fingerhut on the gurney with the chest wound to the

16  upper right.  I'm going to assume that the Court is

17  going to exclude it.

18              THE COURT:  I am always willing to

19  listen to argument, but I think that is pretty

20  consistent with what I said, with the facts that

21  have to be proven by the State.  Anything that goes

22  beyond that, you run the risk of this case coming

6077

1   back.

2               MR. BECKER:  I'm going to then put

3   State's Exhibit 63 with the pile that are to remain

4   part of the record with the Court Reporter.  Number

5   64 and 65 are photographs of the bullet removed

6   from Mr. Fingerhut's brain.

7               MR. JUHASZ:  No objection to 64 and

8   65.

9               MR. BECKER:  66 is his clothing that

10  was removed from him at the morgue showing nothing

11  more than the clothing.

12              MR. JUHASZ:  No objection.

13              MR. BECKER:  67 is the photograph of

14  the X-ray, with the actual bullet in the brain.

15  That is 67.

16              MR. JUHASZ:  No objection.

17              MR. BECKER:  68 is another

18  photograph of the jacket.  It is the back of the

19  jacket showing the hole in it.

20              MR. JUHASZ:  No objection.

21              MR. BECKER:  69 is a photograph

22  taken in the day of 254 Fonderlac, the apron of the

6078

1   driveway going out to the road and showing tire

2   marks as if traffic had traveled in the grass.

3                   MR. JUHASZ:  No objection.

4                   MR. BECKER:  State's Exhibits 227,

5   228, 229, 230, 231, 232, 233, 234 are all

6   photographs of Wirt Street in Youngstown.

7                   MR. JUHASZ:  No objection.

8                   MR. BECKER:  State's Exhibits 239,

9   241 and 245 are pictures of Mr. Nate Jackson's left

10  index finger.

11                  MR. JUHASZ:  No objection.

12                  MR. BECKER:  State's Exhibit 76 is a

13  photograph of the screen door from the man door.  I

14  believe it was actually introduced by Defense

15  counsel.

16                  MR. JUHASZ:  No objection.

17                  MR. BECKER:  State's Exhibits 91,

18  92, 93 and 94 are photographs of the kitchen.

19                  MR. INGRAM:  They were used by the

20  Defense.  We have no objection.

21                  MR. BECKER:  We have no objection to

22  them being admitted, either.  State's Exhibit 99,

6079

1    100, and 101 are photographs of Mr. Fingerhut at

2    the scene laying down, and specifically State's

3    Exhibit 100 shows the graze wound on his right

4    shoulder.  It also shows the jewelry that was

5    around his neck.

6                    MR. JUHASZ:  We have no objection to

7    99, 100 and 101.

8                    MR. BECKER:  State's Exhibit 104 is

9    a photograph of the bedroom and the sports jersey

10   that was testified to by Santiago Mason.

11                   MR. JUHASZ:  No objection.

12                   MR. BECKER:  State's Exhibit 109 is

13   the bullet hole above the Cleveland Indians banner

14   in the basement steps or doorway.

15                   MR. JUHASZ:  No objection.

16                   MR. BECKER:  110 is a photograph of

17   the deceased laying on the kitchen floor.

18                   MR. JUHASZ:  No objection.

19                   MR. BECKER:  State's Exhibit 124 is

20   the leather couch that Mr. Mason testified to.

21                   MR. JUHASZ:  No objection.

22                   MR. BECKER:  State's Exhibit 125 is

6080

1   a bullet hole with a ruler above the Cleveland

2   Indians banner that was testified to.

3              MR. JUHASZ:  No objection.

4              MR. BECKER:  126 is the outside of

5   the house.

6              MR. JUHASZ:  No objection.

7              MR. BECKER:  Also showing the lower

8   left corner the tire tracks.  State's Exhibit 132

9   is the deceased looking in from the garage.

10             MR. JUHASZ:  No objection.

11             MR. BECKER:  Number 138 is

12   Dr. Germaniuk holding the firearm open and

13   displaying that it was fully loaded, the one that

14   was recovered at the step in the garage.

15             MR. JUHASZ:  No objection.

16             MR. BECKER:  Number 139 shows the

17   gun in relation to Mr. Fingerhut.

18             MR. JUHASZ:  No objection.

19             MR. BECKER:  Number 141 is a distant

20   shot of where the Cleveland Indians banner was and

21   where the bullet was removed.

22             MR. JUHASZ:  No objection.

6081

1          MR. BECKER: Number 196, 197, 198

2   and 199 are all photographs of the red Chrysler

3   300-M.

4          MR. JUHASZ: No objection.

5          MR. BECKER: State's Exhibits 157,

6   159, 160, 162, 164, 165, 166, 168, 169, 170, 171,

7   172, 174, 178, 181, 182, 184, and 191 are all

8   photos of the silver Chrysler, various inside

9   portions, the metal clip, the sun visor, the door

10  handle.

11          MR. JUHASZ: No objection to any of

12  those.

13          MR. BECKER: State's Exhibits 192,

14  193, 194, 195 are photographs of the Wagon Wheel

15  Hotel room.

16          MR. JUHASZ: No objection.

17          MR. BECKER: State's Exhibit 197 is

18  the items that were found in the dumpster at the

19  Days Inn.

20          MR. JUHASZ: No objection.

21          MR. BECKER: State's Exhibits 199,

22  200, 201, 203, 205, 206, 207, 208, 209, 210, 211,

6082

1    212, 213, 214, 215, 216, 217, 218, 219, 220, 221,

2    222, 223, 224, 225 and 226 show just about

3    everything at the Days Inn.

4                    MR. JUHASZ:  No objection.

5                    MR. BECKER:  I think that takes care

6    of the majority of the photographs for this case.

7                    MR. BAILEY:  With those photographs,

8    how many do we have that were admitted over

9    objection so far of the victim?  Do we have two or

10   three?

11                   MR. BECKER:  Three or four, I think.

12                   MR. BAILEY:  With those three or

13   four, I take it the Court is making that finding

14   that those particular photographs that were

15   admitted are relevant and of probative value in

16   assisting the trier of fact to determine the issues

17   and are illustrative of the testimony and other

18   evidence, and that the danger of material

19   prejudices to the Defendant is outweighed by their

20   probative value and they are certainly not

21   repetitive or cumulative in number.

22                   THE COURT:  You have such a nice way

6083

1    of putting things.

2              MR. INGRAM:  He speaks very well for

3    you, doesn't he?

4              MR. BECKER:  I want to put this on

5    the record, because it is very important.  There's

6    one person in our office, who immensely appreciates

7    the work Mr. Bailey does and that is LuWayne Annos.

8    I have heard her say that many times.  State's

9    Exhibits 257 and 259; one is the bullet removed

10   from the wall and one is the bullet removed from

11   the clothing.  259 is the clothing, 257 is the

12   wall.

13             MR. JUHASZ:  No objection.

14             THE COURT:  By the way, did anyone

15   hear if Connie was able to contact everybody?

16             MR. JUHASZ:  She was.

17             MR. INGRAM:  She caught 13 out of

18   the 15 and the other two did not show up that she

19   contacted.

20             MR. BECKER:  251 is the .38 caliber

21   recovered at the Fonderlac address.

22             MR. JUHASZ:  No objection.

6084

1           MR. BECKER:  252 and 252-A.  252 are

2   the live rounds recovered from that weapon.  252-A

3   are the two cartridges used to test fire the .38

4   caliber.

5           MR. JUHASZ:  No objection.

6           MR. BECKER:  254 is the eye glasses.

7           MR. JUHASZ:  No objection.

8           MR. BECKER:  253 is the lens from

9   the eye glass recovered in the garage.

10          MR. JUHASZ:  No objection.

11          MR. BECKER:  255 is a cotton swab of

12  the blood stain that was later identified by Brenda

13  Gerardi of Mr. Fingerhut's in the front wall.  It

14  is State's Exhibit 255.

15          MR. JUHASZ:  No objection.

16          MR. BECKER:  Number 260, 261, 262,

17  263, 264, 264-A, those are -- 260 is the death

18  certificate.  261 is the coroner's verdict.  262 is

19  the 11 page autopsy report.  263 is the microscopic

20  examination.  264 and 264-A are the toxicology and

21  radiology imaging that Dr. Germaniuk testified to.

22          MR. JUHASZ:  No objection.

6085

1          MR. BECKER:  265 is Mr. Fingerhut's

2   blood drawn from the hospital.

3          MR. JUHASZ:  No objection.

4          MR. BECKER:  266 is the bullet

5   removed from his brain.

6          MR. JUHASZ:  No objection.

7          MR. BECKER:  267 is the visor.

8          MR. JUHASZ:  No objection.

9          MR. BECKER:  268 is a driver's side

10  clamp from the silver Chrysler.

11          MR. JUHASZ:  No objection.

12          MR. BECKER:  269 is the car keys

13  recovered from the silver Chrysler.

14          MR. JUHASZ:  No objection.

15          MR. BECKER:  270 is the bag, the

16  shopping bag marked Nate Jackson.

17          MR. JUHASZ:  No objection.

18          MR. BECKER:  276-C is the records of

19  Mr. Nate Jackson from Lorain Correctional

20  Institution.

21          MR. JUHASZ:  I think we'll object on

22  relevance grounds.

6086

1            MR. INGRAM:  Actually they were

2   provided in the other trial to provide handwriting

3   samples.

4            MR. BECKER:  This shows the fact

5   that he was in Belmont Institution, which is where

6   Mr. Mason said that he saw the photograph that he

7   was in and it confirmed that he was in Belmont

8   Correctional Institution.

9            THE COURT:  It also confirms the

10  date that he got out.

11           MR. BECKER:  It confirms his release

12  date of December 9th.

13           MR. JUHASZ:  The objection is

14  withdrawn.  We have no objection.

15           MR. BECKER:  279, I'm going to

16  withdraw that.  It is a -- or 279, do you want to

17  withdraw the submission sheet or do you care?  All

18  right, 279 is a submission sheet.  We would ask for

19  admission of that.

20           MR. INGRAM:  We object.

21           MR. BECKER:  It is the submission

22  sheet from Ed Lulla from the Days Inn to BCI.  He

6087

1  testified to it.

2              THE COURT:  You have his testimony

3  on that.  Number 279 is not admitted as a piece of

4  evidence to the Jury.

5              MR. BECKER:  282-A is the March 22nd

6  report from Mike Roberts.  282-C is his

7  supplemental report that was dated 3-22-02.

8              THE COURT:  That is on ballistics?

9              MR. BECKER:  Right.

10              MR. JUHASZ:  No objection.

11              MR. BECKER:  283 is the February

12  13th report of Cindy Mayle.

13              MR. JUHASZ:  No objection.

14              MR. BECKER:  284 is the serology

15  report of Dale Laux dated February 15, 2002.

16              MR. JUHASZ:  No objection.

17              MR. BECKER:  286-A is dated 3-5-02.

18  286-C is dated 3-28-02 and 286-D is dated 3-17-02.

19  Those are the three reports from Brenda Gerardi

20  regarding the DNA.

21              MR. JUHASZ:  No objection.

22  (OFF THE RECORD)

6088

1          MR. BECKER:  State's Exhibits 287-A,

2   B and C, and I do want to point out for the record

3   that one of these Exhibits, 276-B has been marked

4   in this case with a 01-CR-793 which is the case

5   number, because in Mr. Jackson's trial, they had

6   two 287-A's.  We put our own sticker on there and

7   we put on there, 01-CR-793.  Those are the swabs

8   that Mr. Lulla got from the wall, trash can and

9   bathroom floor at the Days Inn.

10          MR. JUHASZ:  No objection.

11          MR. BECKER:  288 is the washcloth

12   found from Days Inn.

13          MR. JUHASZ:  No objection.

14          MR. BECKER:  289 is the hand towel

15   found under the sink at the Days Inn.

16          MR. JUHASZ:  No objection.

17          MR. BECKER:  State's Exhibit 290 is

18   the hair lifts from the Days Inn.

19          MR. JUHASZ:  No objection.

20          MR. BECKER:  291 is the elimination

21   prints for Jennifer Robinson.

22          MR. JUHASZ:  No objection.

6089

1            MR. BECKER:  294 is the piece of

2    stained dressing that was pulled from the dumpster

3    that I believe Miss Gerardi testified to.

4            MR. JUHASZ:  No objection.

5            MR. BECKER:  309 is the empty Days

6    Inn room key.  It is in that envelope.

7            MR. JUHASZ:  No objection.

8            MR. BECKER:  309-A is part of that.

9    They are two pieces to that envelope.

10           MR. JUHASZ:  No objection to either.

11           MR. BECKER:  311, there's actually

12   311-A, B, C, D and E are the documents from the

13   Days Inn in Boardman.

14           MR. JUHASZ:  No objection.

15           MR. BECKER:  312 is the Wagon Wheel

16   receipt from Wagon Wheel.

17           MR. JUHASZ:  No objection.

18           MR. BECKER:  313 is the photographic

19   line-up shown to Jose Flores of the Wagon Wheel.

20           MR. JUHASZ:  No objection.

21           MR. BECKER:  314 and 314-A, B, C, D,

22   and E, are the receipts, and the Red Lobster

6090

1    documents.

2              MR. JUHASZ:  No objection.

3              MR. BECKER:  315 is the actual

4    receipt from Red Lobster.

5              MR. JUHASZ:  No objection.

6              MR. BECKER:  316 is the photographic

7    line-up used by Jill Kenyon.

8              MR. JUHASZ:  No objection.

9              MR. BECKER:  317 are the leather

10   gloves.

11             MR. JUHASZ:  No objection.

12             MR. BECKER:  318 are the shoes.

13             MR. JUHASZ:  No objection.

14             MR. BECKER:  319 is a copy of the

15   composite copy of the video tapes testified to by

16   Detective Dillon.  I'm sorry, the WRTA composite

17   security tape.

18             MR. JUHASZ:  No objection.

19             MR. BECKER:  320, I think it is

20   actually -- it is 320-D and 320-I are two

21   photographs from the video of the Greyhound bus

22   terminal.

6091

1          MR. JUHASZ:  No objection.

2          MR. BECKER:  321 are the certified

3    copies of the phone records.

4          MR. JUHASZ:  No objection.

5          MR. BECKER:  322 and 323 are the

6    insurance policies.

7          MR. JUHASZ:  No objection.

8          MR. BECKER:  327-A, 327-B and 327-C

9    are the -- A is the certification, and B and C are

10   the documents from the firearms trace on the two

11   firearms.

12         MR. JUHASZ:  No objection.

13         MR. BECKER:  351 is the swabbing of

14   Nate Jackson for DNA.

15         MR. JUHASZ:  No objection.

16         MR. BECKER:  360 is the log of the

17   calls from the Lorain Correctional center.

18         MR. JUHASZ:  No objection.

19         MR. BECKER:  361 is the composite --

20   is the compact disk of 19 telephone calls from

21   October 5th to December 8, 2001 between Nate

22   Jackson and Donna Roberts.

6092

1          MR. JUHASZ:  I'm going to probably

2    object to this one.  Chris is going to introduce

3    the tapes, the audio tapes.  This is on CD format.

4    It is cumulatiave and unless someone has a

5    computer, it is of no utility any way, so it is not

6    going to help the Jury.

7          MR. BECKER:  The only reason I would

8    be concerned about keeping 361 in, the Jury can

9    request the median to play it on.  We have a lap

10   top.  The other items are on tape and I would hate

11   to have one of those tapes break and then them not

12   being able to hear any of the tapes, or if

13   something would happen to any of the tapes.  The

14   CD is a more secure median for them to listen to

15   those.  I do recognize that they are cumulative,

16   but I think in a case of that magnitude it might be

17   a good idea.

18          THE COURT:  I doubt that the Jury

19   will listen to that.  It is part of the evidence,

20   Mr. Juhasz, and over your objection, I'll permit

21   number 361 to be admitted.

22          MR. BECKER:  They may very well

6093

1    listen to the tapes.  If something were to happen

2    to the tapes, which can happen, then we're stuck

3    with missing some tapes or the tapes are broken.

4    362 inclusive to 381 are the audio tapes.  Those

5    are all of the tapes, the 19 tapes.

6                THE COURT:  Any objection to the

7    tapes?

8                MR. JUHASZ:  No objection.

9                MR. BECKER:  I think there's going

10   to be an objection to 362-A through 381-A.  Those

11   are the transcripts.

12               MR. JUHASZ:  We do object to those.

13   Those are cumulative.  The Jury has been given the

14   tapes and the CD's.

15               THE COURT:  There's no disputing

16   that they are cumulative.  The question is --

17               MR. BECKER:  They would assist the

18   Jury if they need to find something on the tapes

19   that they -- it would certainly make their job

20   easier.

21               MR. INGRAM:  May I say something?  I

22   think that the rule of law is that the tapes and

6094

1  not the transcripts are evidence.  The transcripts

2  are given to the Jury during the evidence phase of

3  the proceeding as a guide, but they are only a

4  guide, and I believe it is improper for the

5  transcripts to go to the Jury room.

6          THE COURT:  Well, we run into the

7  situation --

8          MR. BECKER:  I don't have a problem

9  if the Court wants to instruct them that way and

10 because I think the actual rule of law is that the

11 tapes are the authentic evidence and not the

12 transcript.

13         THE COURT:  If the tapes should

14 break, we could make a request.

15         MR. INGRAM:  We'll withdraw the

16 objection.  Mr. Becker has persuaded us.

17         MR. BECKER:  There's no objection to

18 the transcripts then?

19         MR. JUHASZ:  Correct.

20         MR. BECKER:  State's Exhibit 385

21 through 390 inclusive are various blood stains.

22 385 is from the visor of the car.  386 is from the

6095

1    trunk release, 387 is the swab stain, 388 is from

2    the blood standard from Mr. Fingerhut.  389 is,

3    well I don't have what that is.  They are all from

4    the silver car, except for the standard from him

5    and the jacket.

6                    MR. JUHASZ:  We do not object.

7                    MR. BECKER:  391 is the fingerprint

8    cards for Mr. Nate Jackson.

9                    MR. JUHASZ:  No objection.

10                   MR. BECKER:  395 is the latent lifts

11   from the Days Inn.

12                   MR. JUHASZ:  No objection.

13                   MR. BECKER:  396 is the receipt from

14   Wal-Mart.

15                   MR. JUHASZ:  No objection.

16                   MR. BECKER:  397 is the composite

17   and 397-A is the transcript.  We're going to

18   withdraw those per previous discussions with

19   counsel.

20                   MR. JUHASZ:  If they are withdrawn,

21   they are not part of the record.

22                   THE COURT:  I don't totally

6096

1   disagree, but here's the thing that always concerns

2   me about that.  Assume upon appeal they say, "Well,

3   something happened during the trial, they don't

4   have anything to testify."  I don't have no problem

5   if you want to withdraw it.

6                MR. BECKER:  We'll withdraw and

7   leave it here, because it was admitted or denied or

8   something and part of Nate Jackson's trial.  398

9   and 399 are the service records, 398 is for the red

10  Chrysler.  399 is for the silver Chrysler.

11               MR. JUHASZ:  No objection.

12               MR. BECKER:  Number 403 is Jill

13  Kenyon's identification of this Defendant.

14               MR. JUHASZ:  No objection.

15               MR. BECKER:  404 and 405 are Mr.

16  Fingerhut's wallets.

17               MR. JUHASZ:  No objection.

18               MR. BECKER:  406 is the Greyhound,

19  is the entire Greyhound bus video.  We'll withdraw

20  406.  They are the two tapes from the Greyhound bus

21  video.  There's already a composite.  Number 407

22  and 408, 407 is the key found under the victim.

6097

1    408 is the tag that was found under the victim.

2                   MR. JUHASZ:  No objection.

3                   MR. BECKER:  We have one Joint

4    Exhibit that we would like to admit.  Joint Exhibit

5    1 that Mr. Ingram probably lost.

6                   MR. JUHASZ:  For the record, Joint

7    Exhibit 1 consists of two photographs, which I

8    think have previously been admitted into evidence.

9                   MR. BECKER:  The one on the bottom

10   was not.

11                  THE COURT:  There was a stipulation,

12   was there not on the one?

13                  MR. BECKER:  Joint Exhibit 1 is

14   mutually agreed to and I don't think we have any

15   objection to their Exhibits.

16                  MR. JUHASZ:  Defendant's 1 and

17   Defendant's 2 are photographs of the closed man

18   door at the Fonderlac residence as is Defendant's

19   Exhibit 3.  Defendant's Exhibit 4 is a photograph

20   of a drawer in the Fonderlac residence.

21   Defendant's 5 is a consent to search dated

22   12-12-01.  Defendant's 6 is a consent to search

6098

1    dated 12-17-01.

2              MR. BECKER:  No objection.

3              THE COURT:  A little bit premature

4    on Defendant's Exhibits coming in.  For the record,

5    there will be no objection when they properly move

6    to submit.

7              MR. BECKER:  You're right.

8              THE COURT:  Now, if I'm not

9    mistaken, some numbers that were not utilized in

10   the sequence from one to 408.

11             MR. JUHASZ:  Correct.

12             THE COURT:  Those were not

13   proffered, is that correct?

14             MR. BAILEY:  That is correct,

15   because we use the same numbering system that they

16   had in State versus Nate Jackson and there was a

17   motion to extend the time to file the appeal in the

18   Nate Jackson case, so because of that, we have the

19   Exhibits here, because we needed the same Exhibits

20   in both trials, so all of the Exhibits that were

21   relevant in the Nate Jackson case are not relevant

22   in this case, so we didn't proffer all of the

6099

1    numbers.

2                    THE COURT:  Just so we have all of

3    the sequence, so all of the numbers have been gone

4    over in this recent afternoon.  What is the State's

5    wish at this point?

6                    MR. BECKER:  The State would now,

7    subject to the admission of the Exhibits we

8    discussed, and I don't think there's any objections

9    other than what we have discussed, we would like to

10   rest in front of the Jury on Tuesday morning.

11                   Your Honor, I apologize, there are --

12   well, we're still waiting to see what Mr. Ingram

13   wants do with the letters.  Those Exhibits are 276,

14   271.  Wait a minute.  271-N-1 through and including

15   273-N-143 and 271-D-1 including, and through

16   271-D-139.  Those are the letters that were

17   recovered in connection with this case and we would

18   move for the admission of all of those Exhibits.

19   We're also withdrawing for the record, we're going

20   to withdraw State's Exhibits 253 and 254.  They

21   were photographs of the eye glasses that were found

22   in the garage.  The glasses themselves are already

6100

1  admitted with the lens.  Also, there's been a

2  stipulated entry on State's Exhibits 275-A and B,

3  those are two letters that were found outside the

4  area where the others were found.  I know there's

5  going to be some objections.  I don't know.  We

6  want to move for the admission of those letters.

7                    MR. JUHASZ:  No objection.

8                    MR. BECKER:  With that --

9                    THE COURT:  All of those letters are

10  admitted then.

11                    MR. BECKER:  With that, we would

12  like to come back Tuesday and rest in the presence

13  of the Jury, and I believe you had the Jury

14  instructions.

15                    MR. JUHASZ:  I do.

16  (OFF THE RECORD)

17  (End of Hearing at 3:20 p.m.)

18

19

20

21  Tuesday, May 27, 2003; In Open Court at 10:20 a.m.:

22  (Jury is not present.)

6101

1           THE COURT:  I believe before we
2   proceed, you wish to have, the State is formally
3   resting.  They will do so in front of the Jury.
4   You wish to take up your Rule 29 motion at this
5   point?
6           MR. JUHASZ:  Yes, Sir.  If it please
7   the Court.  Judge, we filed a written motion this
8   morning for judgment of acquittal pursuant to Rule
9   29.  I'm not going to regurgitate the entire
10  motion.  I do want to point out, however, several
11  highlights that I think are material for the
12  Court's consideration in ruling on the Rule 29
13  motion.
14           As I set forth in our motion, last year
15  we filed a motion asking the Court to require the
16  Government to establish the existence of probable
17  cause if this was a capital case, before we engaged
18  in the process of death qualification, a lengthy
19  process that we did in fact engage in in this case.
20  And what we said in that motion essentially was you
21  shouldn't engage in death qualification, if this
22  truly is not a capital case, because of the

6102

1    recognition of the fact, primarily that death

2    qualification results in Juries which are more

3    conviction prone.

4         The Court overruled that motion, and we

5    engaged in the process of death qualification and

6    now we have heard all of the evidence that the

7    Government intends to offer as to both the charges

8    and the specifications.  I want to turn first to

9    the specifications under 2929.04(A)(7) as we have

10   discussed in going over the Jury instructions this

11   morning, off the record, that statutory

12   specification is constructed in the alternative.

13   The State has in their proposed instructions, taken

14   out the language to say that the Defendant is the

15   principal offender, appropriately so because all

16   along the State has said that she's not the trigger

17   person.  She's a complicitor.  I don't think that's

18   the end of the inquiry, however, because the second

19   portion of that specification says that if not the

20   principal offender, that the offender committed the

21   aggravated murder with prior calculation and

22   design.

6103

1    I don't think it is accidental that the

2  General Assembly adopted that statutory language,

3  and the Taylor case, which we cited in our

4  Memorandum is a case that directly addresses that

5  issue.  In that case, the Supreme Court made it

6  very clear that even though you are guilty, that

7  you can charge somebody with murder under either

8  the A or the B subsection of the aggravated murder

9  statute, and that if enough evidence is presented,

10  that certainly is enough for a guilty finding.  But

11  there's a different inquiry, one commanded by the

12  Eighth Amendment as set forth in Zant vs. Stevens

13  that says that murderers, the class of murderers

14  has to be sufficiently narrowed, so that we're

15  choosing only the worst of the murderers for

16  consideration of capital punishment.

17    I also cited a dissent from Justice

18  Pfifer in the Simco case where I think he makes

19  that point very clear, and in essence what he's

20  saying, if you don't do that, you are not being

21  proportional in the way that you impose the death

22  penalty.

6104

1      In this case, there's no evidence and

2   there's not really even an allegation by the

3   Government, their proposed Jury instructions in

4   fact say that they use the words complicity.  I

5   don't think the statute allows for that.  It is a

6   death penalty case and the statute has to be

7   strictly construed, and so while the State has in

8   essence taken out the principal offender part, I

9   think that at least as to the A-7 specification,

10   this is not as we have claimed all along, truly a

11   capital case.

12      I think it is error to instruct the Jury,

13   it is a clear violation of the statute to instruct

14   the Jury that if you find that Nate Jackson, while

15   doing all of this stuff, committed the homicide,

16   and it was done with prior calculation and design,

17   that that brings this Defendant as a complicitor

18   into the statute.

19      Now, there are several cases that we

20   discuss in the Memorandum, the Taylor case, which I

21   mentioned earlier from the Ohio Supreme Court.  In

22   that case, Taylor was present with the other fellow

6105

1  Turnage.  And they, of course, charged him as a

2  complicitor.  The evidence was pretty clear that

3  Turnage is the person who whacked the guy over the

4  head and caused his death.  And so when the case

5  got to the Ohio Supreme Court, they said if you

6  want to charge Taylor as a complicitor, you

7  certainly can do that.  But when it comes to

8  establishing that he's a principal offender, that's

9  a separate question.  The other case that we cited

10  is the Mapes case, 1985, from the Ohio Supreme

11  Court, the Ballew case from the Ohio Supreme Court

12  from 1997, and also the Guyton case and Appellate

13  case before Issue One, a 1984 case.  What all of

14  those cases have in common is one feature that this

15  case does not have, and that is that there's no

16  evidence or allegation that the Defendant was there

17  actually participating.  If the Jury believes the

18  State's evidence about the tapes and the letters

19  and the plan and all of that, that is certainly

20  complicity to aggravated murder.  That is a wholly

21  separate question, however, from whether the

22  specification should be submitted to the Jury.

6106

1       We set forth what the test is for any
2   Rule 29 motion, and we submit that this
3   specification doesn't meet that test.  The latest
4   of those cases incidentally was a 2002 case from
5   the Seventh District called State vs. Twyford where
6   they again go over the Penex and Taylor standard,
7   and they say that for (A)(7) the aggravated murder
8   has to be either committed while the Defendant was
9   committing one of the five listed felonies or the
10  aggravated murder has to be committed while the
11  Defendant was committing one of the offenses, and
12  the Defendant committed the aggravated murder with
13  prior calculation and design.

14      All of those cases have something in
15  common that we don't have here, which is an
16  allegation or evidence that the Defendant was
17  directly involved in causing Mr. Fingerhut's death.

18      As to the aggravated murder counts
19  themselves, we submit that a Rule 29 motion is
20  proper because as we have discussed in preparing
21  the Jury instructions, if you assist a principal
22  after the offense and what we used to call an

6107

1    accessory after the fact, that is not sufficient

2    for complicity.  We think that that is what the

3    evidence reasonably shows in this case, and

4    therefore, submission of the case on complicity to

5    aggravated murder is also inappropriate and

6    judgment of acquittal should be entered as to the

7    aggravated burglary.  I point out in the Memorandum

8    that this is not the Jackson case.  We don't have

9    the benefit of some of the evidence here.  The

10   Court has to rule on this motion based upon what is

11   presented in this case.  While there's

12   circumstantial evidence presented in this case

13   that Jackson was there, there's no circumstantial

14   evidence that he entered by force, stealth or

15   deception, that he committed a trespass, or that he

16   was there without privilege or authority.  In fact,

17   if the State's argument is correct, that Donna

18   Roberts was involved, then I guess he did have

19   authority.

20            So, under those standards, we submit that

21   the submission of the aggravated burglary charge

22   would be inappropriate and finally as to the

6108

1    aggravated robbery charge, we also think that a

2    Rule 29 motion should be granted, because part of

3    the -- part of the elements of the offense of

4    aggravated robbery are that there be a theft

5    offense and part of the elements of that T-R that

6    the person exerted control over property or

7    services with a purpose to deprive the owner of

8    those property or services.  And if you look at

9    OJI, which the State so fondly clings to in its

10   Jury instruction.  Deprive means to withhold the

11   property of another permanently or for a period

12   that appropriates a substantial portion of its

13   value or use or to dispose of the property such as

14   to make it unlikely that the owner will recover it.

15   There's been no evidence produced of that here.

16   The best case scenario for the State is that the

17   car was taken and found within 24 hours.  That

18   there was no -- nothing about those circumstances

19   that indicated a permanent intent to deprive the

20   owner of the property.  So, for all of those

21   reasons which have been elaborated upon in the

22   written motion, we ask the Court to enter Judgment

6109

1   of Acquittal as to all counts and specifications.

2               THE COURT:  Thank you, Mr. Juhasz.

3   The State?

4               MR. BECKER:  I will address the last

5   few points that Mr. Juhasz made first.  First of

6   all, with respect to the aggravated burglary and

7   aggravated robbery, ample case law exists that it

8   is the possessory interest, is not just the owner,

9   but the possessory interest.  I think the State has

10  proven well beyond a reasonable doubt, that Mr.

11  Fingerhut had a possessory interest, not only in

12  the home, but also in the silver Chrysler 300-M, as

13  evidenced by the car keys, the lengthy testimony

14  from the individuals who repaired and took care of

15  those automobiles, and recognized his particular

16  set of keys, which were found in the ignition.  So,

17  I think it is clear that Mr. Fingerhut had a

18  possessory interest not only in the home but also

19  in the automobile that was taken from him by

20  Mr. Jackson.

21              Second of all, with respect to the

22  residence and the burglary, even if assuming

6110

1    arguendo that Miss Roberts had given consent to

2    Mr. Jackson to be in the house, there's ample case

3    law, State vs. Steffan, 1987, Ohio State 3rd, 111,

4    also State vs. Lilley, 1999, 87 Ohio 3rd, State,

5    97, that a spouse may be criminally libel for a

6    trespass and/or burglary in the dwelling of the

7    other spouse, who is exercising custody or control

8    over the dwelling.  Obviously, Mr. Fingerhut, that

9    was his home, that was his residence.  He exercised

10   control and custody over that dwelling even though

11   the actual title and the legal title was not in his

12   name.___

13          Second of all, pursuant to State vs.

14   Steffan, whenever a Defendant lawfully enters a

15   residential premise, the privilege to be in or upon

16   those premises can infer, can be inferred to have

17   been revoked, where the Defendant in this case,

18   Mr. Jackson, the codefendant, committed a violent

19   felony directed against another person in the

20   premises.  You simply don't have a right to permit

21   someone to come into any location to commit a

22   felony, so it is a nullity that she gave him

6111

1    permission to be in the house for the purpose of

2    killing Mr. Fingerhut.

3            So, with those two issues addressed, we

4    would respectfully ask the Court to overrule that

5    aspect of the motion.  Second of all, I think the

6    language of 2929.04(A)(7) makes it very clear, in

7    fact the definition of (A)(7) makes it clear, and I

8    believe that there are probably dozens of people on

9    Ohio death row, who are in fact aiders and

10   abettors.  That is why the entire extinction exists

11   there and that is why the term is narrowed down to

12   principal offender, and disjunctively or with prior

13   calculation and design.

14           If you commit the offense with prior

15   calculation and design, obviously, you can be an

16   aider and abetter.  That is the exact language.

17   The State not even attempting to argue, we have

18   been very straight forward with this Jury from the

19   Voir Dire process and the Jury instructions that

20   the Court has before it clearly indicate and the

21   State's position is that Miss Roberts absolutely,

22   positively was not the principal offender.

6112

1    However, she does fall under the (A)(7) in that she

2    is an offender, any person who conspires with, and

3    commits complicity is an offender.

4         She's an offender and she has committed

5    this offense with probably more prior calculation

6    and design than this Court will ever see as long as

7    it sits on the bench.

8         With that said, we would respectfully

9    request that the motion be overruled in its

10   entirety and that the charges as indicted be

11   submitted to the Jury for their consideration.

12   Thank you.

13        THE COURT:  You have last word, if

14   you wish, Mr. Juhasz.

15        MR. JUHASZ:  Only two things.  The

16   case as cited by Mr. Becker concerning the spousal

17   burglaries, I would quite agree that is what those

18   hold, but those have to do with situations where

19   spouses have, by Court order, been excluded by

20   civil protection order or some sort of restraining

21   order in a domestic action to deprive them of the

22   ability to go into that house.  And their argument

6113

1    is, of course, "Well, it is my house."  That is a

2    wholly different situation from what presents

3    itself here.  Finally, as far as the

4    specifications, the Taylor case talks about how you

5    should not boot strap cases and make them death

6    penalty cases.  If you take the State's argument,

7    and six or seven of us sit around and plan a

8    homicide, but, among those 6 or 7 is Jerry Ingram,

9    and he's the guy who goes in and does it and

10   actually does the homicide, not (A)(3), not murder

11   for hire, and (A)(7), during the course of a

12   burglary or whatever, he goes in and does it.

13   Under the State's theory, then all six or seven of

14   us who sat around and planned that would get the

15   death penalty.

16          That is not what the death penalty was

17   intended for.  That is not how the death penalty

18   has been implied.  Even in Ohio, where the Supreme

19   Court has been less than strict sometimes in its

20   construction of the Statutes in order to affirm

21   capital convictions.  But in that case, there would

22   be seven death penalties and not one.  I have to

6114

1   respectfully disagree with Mr. Becker when he says
2   that the statutory language permits this case, the
3   specification to go to the Jury. The statutory
4   language is very clear that it is the offender,
5   meaning the person who did it, and Taylor makes it
6   clear that using complicity to boot strap a
7   complicitor into quote the offender for (A)(7)
8   purposes is not permissible. Thank you.

9               THE COURT: Thank you. I am not
10   going to touch on each of these issues but just
11   briefly on the taking of the automobile. I think
12   the intent is found by the mere act, an old
13   asportation we were taught in law school. I don't
14   think the amount of time has any relevancy. The
15   person can enter into a premises with permission,
16   and become a trespasser by carrying out any
17   activity which would be considered in violation of
18   the permission that was granted. The Defense
19   raises a very interesting issue on this question of
20   principal offender, and the complicitor. The cases
21   cited, I think are distinguished. I'm not going to
22   get into that. The principle that you state,

6115

1   Mr. Juhasz, is valid to a degree, but I think in

2   the particular facts here the State has presented,

3   whether the Jury accepts the facts or not as

4   presented, but that there was a participation prior

5   to arguably during, although there's no evidence

6   that the Defendant was present at the time this

7   incident occurred, there's other evidence that they

8   have presented that the Jury could reasonably find

9   that she was participating to some degree, and that

10  she participated afterwards.  The question of boot

11  strapping, I don't feel applies here as delineated

12  in the Taylor case, but that is a question for

13  another day.

14          My ruling will be that the Rule 29 motion

15  is denied.  We have a Jury waiting.  Is there any

16  other business now at this juncture before we

17  proceed with closing arguments?  Nothing further?

18                  MR. BECKER:  I don't believe so.

19                  MR. JUHASZ:  The only thing I can

20  think is, so that we don't delay and I don't think

21  you guys have any objections to the Defense

22  Exhibits.

6116

1          MR. BECKER:  There was no objection.
2   There was one Joint Exhibit.
3          THE COURT:  Also for the record, any
4   motions that the Court has not formally ruled on
5   that have been submitted are hereby denied.
6   (Jury brought into the Courtroom at 10:40 a.m.)
7          THE COURT:  It is my understanding
8   that the State is formally resting your case at
9   this point.
10         MR. BAILEY:  Yes, Your Honor.  The
11  State rests.
12         THE COURT:  And the Defense?
13         MR. INGRAM:  The Defense would move
14  for the admission of Defendant's Exhibits 1 through
15  6 and with that the Defense would rest.
16         THE COURT:  I believe those Exhibits
17  are not objected to by the State, so they will be
18  admitted, and go back with the Jury.
19         Ladies and gentlemen, the evidence in
20  this matter is before you.  That will not be
21  supplemented.  You have heard all of the evidence
22  that will be presented.  Is the State ready to

6117

1    begin your closing argument?

2              MR. BAILEY:  Yes, Your Honor.

3    CLOSING ARGUMENT BY MR. BAILEY:

4              MR. BAILEY:  May it please the

5    Court, counsel for the Defense, ladies and

6    gentlemen, will the real Donna Roberts stand up?

7    State's Exhibit 403 shows the real Donna Roberts,

8    the person in the photograph, the Defendant with

9    the heavy makeup and dyed hair.  This is not a case

10   about murder for love.  This is a murder for greed,

11   for over a half million dollars of insurance money.

12             The evidence has shown the real Donna

13   Roberts, the manipulative, lying, duplicitous,

14   scheming, greedy, evil, corrupt and depraved

15   murderess, the woman who uses people.  An actress,

16   pretending to cry when it suits her, who feigns

17   grief and hysteria.  A schemer who uses people to

18   satisfy her sexual desires, and in furtherance of

19   her plot to kill for money.

20             Love.  Was she being faithful to her boy

21   toy convict, Nate Jackson, whom she sucked into her

22   plan of murder when she performed oral sex on

6118

1   Santiago Mason, another ex-con?  Or was she keeping

2   her tongue polished as she said in her tape

3   recorded telephone conversation with Nate Jackson?

4   Or was she setting up Santiago Mason as a fall guy

5   for the theft of a .38 caliber firearm, which was

6   consistent with the about to be missing murder

7   weapon?

8        Now, because this is closing argument,

9   because the State bears the burden of proving the

10  elements of the crimes charged by proof beyond a

11  reasonable doubt, we get to both open and to

12  conclude closing argument, and in between Defense

13  counsel will have the opportunity to address you.

14        I would like to just take a brief moment

15  here, on behalf of the people of the State of Ohio

16  and Trumbull County, and thank all of you for the

17  patience and the attention that you have shown.  I

18  understand that at times, the case may move slowly.

19  There are times where there may be recesses where

20  the lawyers and the Court have to engage in legal

21  matters.  But I'm going to ask you to bear with us

22  just a little while longer, because later this

6119

1   afternoon this case is going to be in your hands

2   for deliberation and decision.

3        When we started this trial a few weeks

4   ago, we promised that the evidence would show the

5   following by proof beyond a reasonable doubt.  That

6   before the Fall of 2001, the Defendant and Nate

7   Jackson began discussing a plan to kill Robert

8   Fingerhut for insurance money.  The thing with all

9   of the zeros.  Over 500 thousand dollars in

10  insurance policies.  The evidence has shown that

11  the victim was totally unsuspecting of this plot.

12  He provided for the Defendant and you heard

13  Catherine Thomas, the lady from State Farm

14  Insurance tell you that he even planned to take out

15  additional insurance with the Defendant as a

16  beneficiary.  You heard testimony that he even, and

17  it is mentioned in the letters -- you will have

18  these letters, prison letters, between the

19  Defendant and Nate Jackson.  And you will have

20  phone calls, the tape recorded phone calls from the

21  prison.  And all of the statements that she made to

22  the police afterward.  But in all of those

6120

1   statements and all of those letters and phone calls

2   and statements, it indicates that the victim even

3   bought the Defendant's parents a new car for their

4   anniversary.  The Defendant wrote Nate Jackson that

5   she couldn't believe that she was such a good sneak

6   and liar.

7         The plan developed into a proposed

8   kidnapping and murder of Robert Fingerhut, using

9   handcuffs and a .38 caliber firearm.  And the

10   Defendant was so vicious that she wanted to make

11   the victim watch while she performed oral sex on

12   Nate Jackson prior to killing Robert Fingerhut.

13   The Defendant planned to have sex at the Wagon

14   Wheel Motel with Nate Jackson when he got out of

15   prison.  She planned to pick him up from prison and

16   take him to the Wagon Wheel Motel to a room with a

17   Jacuzzi and mirrors on the walls and the ceiling

18   above the bed, and she was to bring her thong

19   underwear with the rear portion of the -- the butt

20   end cut out.

21         And the Defendant, according to this

22   plan, was to get Nate Jackson a motel room for him

6121

1    to lay low after the killing.  And then, the joy of

2    joys, they would be able to wake up together on

3    Christmas morning back in 2001.  And in fact, the

4    evidence has shown that the Defendant did in fact

5    pick up Nate Jackson at the prison on December 9,

6    2001, and she got him a room at the Wagon Wheel.

7           Remember the testimony of Jose Flores at

8    the Wagon Wheel and the Defendant, Nate Jackson

9    complained about the Jacuzzi and the heat, and they

10   asked to stay an hour later instead of checking out

11   at the normal time.  And on December 10th of 2001,

12   the day before the killing, you remember the

13   testimony of Frank Reynolds, the part-time

14   Greyhound employee, whom Robert Fingerhut had given

15   a job, the Defendant had come in and asked Robert

16   Fingerhut for $3,000 and he had refused to give it

17   to her.  And the next day on December 11th of 2001,

18   the Defendant took Nate Jackson to the Greyhound

19   station in the morning, and that day, she took Nate

20   Jackson for a hair cut.  She was seen there by

21   Chris Ellington at the Final Cut.  And then out to

22   dinner at the Red Lobster that evening.

6122

1          You remember the testimony of Jill

2     Kenyon, the waitress at the Red Lobster and the

3     receipts?  And Jimmie McCoy, the bus driver from

4     Greyhound, also saw the Defendant and the

5     codefendant together at the Greyhound station that

6     day.  In room -- in a room, the codefendant was

7     behind the counter, they are trying to get out of

8     there, and the Defendant was having a hard time

9     getting off the computer, and that is when he met

10    this Nate.  You can infer from the evidence from

11    all of the facts and the evidence from the

12    Defendant's own letters, that she gave Nate Jackson

13    the gun, the .38 that she talks about in the

14    letters, and that she let him into Robert

15    Fingerhut's house.  The house that she shared with

16    Robert Fingerhut on Fonderlac here in Trumbull

17    County, Ohio, Howland Township.

18          And that day -- remember the testimony of

19    James Daniels over at the Greyhound station?  The

20    Defendant even called the Greyhound station several

21    times, to make sure that the victim was going to be

22    on his way home, so that he would be there for Nate

6123

1    Jackson to kill him.

2         And while Nate Jackson waited -- you can

3    infer that while Nate Jackson waited inside that

4    house for the victim, the house that the police

5    would later show no signs of forced entry, the

6    Defendant went out in the red Chrysler to set up an

7    alibi.  And in fact, around the time of the murder,

8    she was seen driving slow by Bridget Paul, the lady

9    who noticed the way she held her hand out the

10   window while she drove with the cigarette, noticed

11   her going slow and not going to Giant Eagle as she

12   later told the police.  And the Defendant went to

13   Wal-Mart on Elm Road, but not to Super K-Mart.  She

14   didn't have time to go to Super K-Mart because she

15   was going to be taking Nate Jackson down to the

16   Days Inn to wash him up.

17        When the victim came home, he ended up

18   fighting for his life.  You can determine that from

19   all of the testimony of Dr. Germaniuk and the

20   observations that were noted in his testimony and

21   the photographs, and the coroner's autopsy report.

22   The victim had a bullet wound in the shoulder

6124

1   blade, one wound in the webbing of his hand, and a

2   fatal wound in the head.  And the coroner noted, or

3   the pathology noted scrapes and abrasions and cuts

4   on his face and hands.  But during this fight, the

5   struggle that the victim fought for his life, Nate

6   Jackson also ended up getting shot in the left

7   index finger through the gloves that he wore.  You

8   remember the testimony of Detective Sergeant, now

9   Chief Paul Monroe of the Howland Township Police

10  Department, where the Defendant admitted that she

11  had given Nate Jackson her cell phone and the

12  evidence has shown that Nate Jackson stole the

13  victim's silver Chrysler, the car that he was

14  driving that night, because the Defendant at that

15  time had been driving the red car, the red

16  Chrysler.  And Nate Jackson took that silver

17  Chrysler along with the victim's set of keys, and

18  he dumped the car only a few blocks from where he

19  was later arrested.  And the Defendant left in that

20  car, the victim's keys, and he left his own and

21  Robert Fingerhut's DNA in blood on the car visor

22  and on the trunk release.  Remember the testimony

6125

1    of Brenda Gerardi from BCI.

2              And then there was a series of telephone

3    calls that ensued between the Defendant's cell

4    phone in Nate Jackson's possession and the

5    Defendant's car phone and the red Chrysler.  And

6    the Defendant ended up picking up the wounded Nate

7    Jackson and taking him over to the Days Inn in

8    Boardman.

9              Remember the testimony of Jeff Diamantes

10   at the Days Inn where the Defendant used the charge

11   card to rent Nate Jackson a room for a week.

12   Remember the testimony that the Defendant had had

13   training in treating gunshot wounds for a plastic

14   surgeon in Miami and in Israel and the evidence

15   indicates that she brought medical supplies.

16              MR. INGRAM:  Objection.  There's no

17   evidence of that.

18              MR. BAILEY:  Statement to Detective

19   Paul Monroe.

20              THE COURT:  Well, you can testify as

21   to the facts as brought up.  It can be inferred,

22   but there's no testimony directly that she brought

6126

1  medical supplies.  The Jury will disregard the last

2  statement.

3           MR. BAILEY:  Remember the testimony

4  of the police?  The Defendant told them that she

5  had training in treating gunshot wounds for a

6  plastic surgeon in Miami and Israel, and you can

7  infer that she brought medical supplies and

8  bandaged up her wounded boy toy.

9           Remember the testimony of Jennifer

10  Robinson, the maid who cleaned the Days Inn room

11  and found the bloody bandages, put them in the

12  dumpster where they were recovered by the police

13  and taken to BCI and the DNA was consistent with

14  the codefendant, Nate Jackson.  And then the

15  evidence indicates that the Defendant rushed back

16  to Trumbull County to act out her feigned grief

17  that she talked about in her letters for months.

18  The Defendant discovered the body of Robert

19  Fingerhut, the same Robert Fingerhut whom just

20  weeks before the Defendant had wished death for his

21  birthday gift in her letters, the same Robert

22  Fingerhut to whom she referred to as the Grinch,

6127

1  who doled out the money.  The same person for whom

2  she expressed so much hatred and animosity.  The

3  same person whose hair, nose and breath she

4  couldn't stand.

5          The Defendant telephoned 911 and she was

6  so shocked and grief stricken that she couldn't

7  respond coherently to the operator, Paula Carson,

8  the 911 operator on that call.  And paramedics and

9  Howland Township police officers responded to that

10  scene, and remember the officers, one of the

11  officers told you that the Defendant said, "Who

12  stabbed him in the face?"  The testimony indicates

13  that when the officers began to discuss the case,

14  the Defendant would become silent, she would quit

15  her hysterical sobbing and screaming, and

16  apparently eavesdropped on them.  You can infer

17  that she was interested in what the investigation

18  was developing.  When the officers questioned her,

19  she failed to mention that she corresponded with a

20  convict, Nate Jackson, and she neglected to mention

21  that she engaged in a plan to kill Robert Fingerhut

22  for months for money.

6128

1      Remember the testimony of Detective

2   Sergeant, now Chief Paul Monroe of the Howland

3   Township Police Department.  When the officers

4   asked the Defendant for permission to search the

5   house and the car, the Defendant told them to do

6   whatever they had to do to catch the killer.  And

7   the Defendant was taken to her brother's house that

8   night and the police collected all of the letters

9   that they discovered from the Defendant and from

10   Nate Jackson.  And during the police search, Nate

11   Jackson used the Defendant's cell phone to call the

12   house and hung up when Detective Sergeant Paul

13   Monroe answered.  The police were unaware at that

14   time of the incriminating documents that they had

15   seized for several days, until they were finally

16   able to sit down and read the letters.

17      Meanwhile, later that day, about 1:00 in

18   the afternoon, the Defendant began to throw out red

19   herrings and attempted to send the police on a

20   number of wild goose chases in several directions

21   in regards to the case.  The Defendant had

22   previously filed a report alleging that Santiago

6129

1  Mason -- you remember his testimony, an ex-con with
2  whom she had oral sex, but Mr. Mason had declined
3  the Defendant's further sexual advances, and she
4  claimed that he had stolen her .38 caliber firearm,
5  and she later attempted to smear the victim's
6  reputation, Roberts Fingerhut's reputation by
7  telling the police that he swung both ways and that
8  he had been threatened by crazies at the bus
9  station, and that she came up with the names Carlos
10  and Bobby.  And the police, of course, found no
11  success in investigating those two names.
12          And finally, the police officers got a
13  chance to read some of the letters and that led to
14  the arrest of Nate Jackson and to the Defendant.
15          Now, let's take a look at the law.  The
16  Defendant is charged here with a number of counts,
17  separate charges in an indictment.  There are two
18  counts of aggravated murder with specifications,
19  special findings of fact of aggravating
20  circumstances.  That the aggravated murder was
21  committed with prior calculation and design, and
22  during the course of an aggravated burglary, and

6130

1    during the course of an aggravated robbery.

2         There are also two charges.  There's a

3    charge of aggravated burglary with a firearms

4    specification and a charge of aggravated robbery

5    with a firearms specification, and the Defendant is

6    charged as a complicitor.

7         A complicitor.  Someone who solicits or

8    procures or aids and abets another person in the

9    commission of the offense.  And what do we have to

10   prove by proof beyond a reasonable doubt?  We have

11   to prove certain elements that the crime happened

12   on or about Tuesday, December 11, 2001, and that is

13   the testimony in this case that it happened in

14   Trumbull County, Ohio.  It happened in a house on

15   Fonderlac in Howland Township, here in Trumbull

16   County, Ohio.  And that is the testimony.

17        We have to prove third, that it was the

18   Defendant who did this, the same person who is

19   sitting there.  And you have got her letters.  You

20   have got her taped phone calls from prison and all

21   of the other testimony and evidence.

22        We have to show that she acted purposely,

6131

1    on purpose, and the Judge will give a detailed
2    instruction.  And this is one of those rare cases.
3    usually, you have got to look at the person's acts,
4    because you can't go inside of their mind, but this
5    is one of those rare cases where you can go inside
6    a person's mind because you have got the letters
7    that she wrote showing her plan for months.  It
8    shows her intent, her purpose.  Her purpose to kill
9    with prior calculation and design, the scheme, this
10   detailed scheme that she developed.

11             And you will have a lot of letters.
12   There are a couple hundred, and I suggest that you
13   request a pair of latex gloves to read those
14   letters, because when you go through those letters,
15   you are going to find that there may be some bodily
16   substances on those letters from the Defendant and
17   from the codefendant.  There may be vaginal
18   secretions and there may be semen.  So I would
19   suggest you use a pair of gloves.  That the
20   Defendant purposely aided and abetted and/or
21   solicited or procured Nate Jackson to commit the
22   aggravated murder of Robert Fingerhut with prior

6132

1   calculation and design, and/or during an aggravated

2   burglary, and/or aggravated robbery and with a

3   working firearm as charged in the indictment.

4          These terms solicitor, procure -- the

5   Judge is going to instruct you on the law, but

6   basically we have got to show that she, this person

7   solicits or procures, they seek, ask, influence,

8   invite, attempt, lead on, bring pressure to bear,

9   get, obtain, induce, bring about or motivate

10  another person.

11         Aid and abet means that a person

12  supported, assisted, encouraged, cooperated with,

13  advised or incited another person to commit the

14  act.

15         The Judge is going to instruct you on

16  these elements of complicity.  Basically, these are

17  the things that we have to show.  Now, what about

18  the crime of aggravated burglary?  Let's take a

19  look at aggravated burglary.  We have to show again

20  it happened on or about a certain date, on December

21  11, 2001, in Trumbull County, Ohio, and that the

22  Defendant was the person who did this.  And as a

6133

1   complicitor, which means she solicited or procured

2   or aided and abetted Nate Jackson in doing this,

3   that there was an entry made by force, stealth or

4   deception.  It was a trespass into an occupied

5   structure.  In this case, 254 Fonderlac in Howland

6   Township in Trumbull County, Ohio, when Robert

7   Fingerhut was present, with purpose to commit any

8   criminal offense in the structure.  In this case,

9   the criminal offense that structure would be the

10  aggravated murder of Robert Fingerhut.  And that

11  the Defendant inflicted physical harm on Robert

12  Fingerhut, no question about physical harm.  It

13  includes death, the victim was killed.  He was shot

14  to death.  And that they had a deadly weapon on or

15  about their person or under their control, a

16  working firearm.  And that that particular firearm

17  was displayed, brandished, that they indicated they

18  possessed the firearm or used it to facilitate the

19  offense.  No question that a working gun was used

20  to facilitate the offense of the aggravated murder

21  and the aggravated burglary.

22           Now, trespass.  One of the elements is

6134

1    that there be a trespass, and it doesn't matter if

2    the Defendant let in Nate Jackson with her

3    permission, because that house, they both jointly

4    lived there, both the Defendant and Robert

5    Fingerhut.  And I expect the Judge is going to tell

6    you that where a Defendant lawfully enters a

7    residential premises with privilege to be in or on

8    this premise can be inferred to be revoked, where

9    the Defendant thereafter commits a violent felony

10   directed against another person in the premises,

11   who had the ability and authority to revoke the

12   privilege, when one enters the property of another

13   as an invitee or licensee, that person loses his

14   status as an invitee or licensee and becomes a

15   trespasser when it becomes evident that the purpose

16   of such entry is to commit a criminal offense

17   against another.  So, if the codefendant went in,

18   doesn't matter if this Defendant let him in or the

19   victim let him in.  She goes in there with the

20   intent to kill the victim and he does that.  Then

21   that he's trespassing.  And an occupied structure

22   means any house which is maintained as a permanent

6135

1   or temporary dwelling, regardless of who owns it.

2   It doesn't matter if the Defendant is the legal

3   owner of the deed, it is also Robert Fingerhut's

4   house, because he was living there.  So it was his

5   house, too.

6         Now, let's look at this term aggravated

7   robbery.  There's some things taken.  There was a

8   car, also a set of keys.  For an aggravated

9   robbery, we have to show that it happened again on

10   or about December 11, 2001, in Trumbull County,

11   Ohio, that the Defendant as a complicitor, in

12   committing that theft offense, which would be the

13   theft of Robert Fingerhut's car.  At that time, he

14   was using the silver car, because the Defendant was

15   using the red car.  That the codefendant, Nate

16   Jackson had a deadly weapon, firearm on or about

17   his person or under his control, and he displayed,

18   brandished or indicated he possessed it or used it,

19   and inflicted serious physical harm on Robert

20   Fingerhut.

21         Now, for a theft offense, basically a

22   theft offense occurs and I expect the Court is

6136

1    going to tell you that a theft occurs which a
2    person with purpose to deprive the owner of
3    property, knowingly obtains or exerts control over
4    the property without the consent of the owner.  In
5    Ohio, ownership is possessory, you don't have to
6    have the legal title.  In Ohio, even if you stole
7    from a thief, and even though the Defendant,
8    according to the evidence, held the certificates of
9    titles to the vehicles, what does the evidence
10   indicate?  The evidence indicates from the two
11   fellows you heard from the vehicle purchase place,
12   that it was Robert Fingerhut who came in and
13   purchased the cars.  He made an arrangement to take
14   care and maintain those cars and he drove those
15   cars.  And that particular day, the evidence
16   indicates the Defendant was driving the red car, so
17   you can infer that the victim drove home from the
18   Greyhound station in the silver car.  Because at
19   the time of the killing, according to all of the
20   evidence, Bridget Paul was seeing the Defendant out
21   and about driving real slow, right about that time,
22   setting up an alibi.

6137

1          I expect the Court is going to tell you

2     that an owner means any person other than the actor

3     who is the owner of or has possession or control

4     of, or an interest in property, even if such

5     ownership, possession, control or interest is

6     unlawful.

7          Now, let's look at the charge, the

8     charges of aggravated murder.  What do we have to

9     prove the Defendant as a complicitor?  There are

10    two different charges here, two different theories

11    that the State is pursuing.  First charge is

12    aggravated murder with prior calculation and

13    design.  We have to prove, we have reasonable doubt

14    that it happened on or about Tuesday, December 11,

15    2001.  Somewhere in the night.  That it happened in

16    Trumbull County, Ohio.  No question that the victim

17    according to the photographs that you are going to

18    see, Exhibit No. 7.  State's Exhibit 57 and State's

19    Exhibit 27, show the injury or injuries, some of

20    the injuries to the victim, and indicate there was

21    a struggle and indicates that it happened there at

22    that house on Fonderlac in Howland Township,

6138

1    Trumbull County, Ohio.

2          Again, we have to show that the

3    Defendant, the same person who is sitting at that

4    table, acted as a complicitor, and she acted

5    purposely.  Again she did it on purpose, that she

6    caused the death of Robert S. Fingerhut, and she

7    did so with prior calculation and design.

8          And what does this mean?  Prior

9    calculation and design.  I expect the Judge is

10    going to tell you that prior calculation and design

11    means that the purpose to cause death was reached

12    by a definite process of reasoning in advance of

13    the homicide, when the process of reasoning must

14    have included a mental plan involving studied

15    consideration of the method and the means, with

16    which to cause the death of another.  And as you

17    read those letters and you listen to those taped

18    calls, you will see this plan developing or the

19    plan, the process of reason, that shows studied

20    consideration of the method and the means, the .38

21    caliber firearm.  Remember the testimony from BCI

22    that the bullets that were recovered, the fatal

6139

1    bullet is consistent with a  .38, .357 magnum, and

2    that a .38, where the Defendant had a couple of

3    .38's, and she accused Santiago Mason of taking the

4    .38, and in the letters, she said she's going to

5    get Nate Jackson a .38 to use.

6        To be prior calculation, there must have

7    been sufficient time and opportunity for the

8    planning of an act of homicide.  Here this plan

9    developed over several months and the circumstances

10   surrounding the homicide would show a scheme

11   designed to carry out the calculated design to

12   cause the death.  She doesn't get the insurance

13   money if he's not dead.  No definite period of time

14   must elapse and no particular amount of

15   consideration must be given, but acting on the spur

16   of the moment, or after momentary consideration of

17   the purpose to cause the death is not sufficient.

18   It is not dropping the pen and catching it.  It is

19   setting up a plan to drop the pen and pick it up.

20       Now there are two specifications.  Well,

21   let me jump to the second count of aggravated

22   murder.  Second theory of aggravated murder that

6140

1  you can consider.  It happened on Tuesday.  This is

2  a felony murder.  Tuesday, December 11, 2001, in

3  Trumbull County, Ohio, again, the Defendant as a

4  complicitor, that she acted purposely on purpose,

5  and the Judge will give you the detailed definition

6  of purposely, cause the death of Robert S.

7  Fingerhut during an aggravated burglary and/or

8  aggravated robbery, by having her codefendant

9  trespass in that residence to kill Robert

10  Fingerhut.

11        We don't have to show motive.  But we

12  did.  It was motive for greed, for money, for over

13  a half million dollars in insurance money,

14  $550,000.  Because everything else was in the

15  Defendant's name.  She owned, she had title to the

16  house.  She had the businesses, she had the cars.

17  It was greed, pure and simple.  That is why she

18  wanted the victim dead.  She wanted the extra

19  money.

20        The specifications.  You have got two

21  specifications attached to each of these counts of

22  aggravated murder.  Specifications are that the

6141

1    aggravated -- we have to prove these beyond a
2    reasonable doubt, that the aggravated murder was
3    committed during -- in one specification an
4    aggravated burglary, and the other during an
5    aggravated robbery, and that the Defendant as a
6    complicitor, committed the aggravated murder with
7    prior calculation and design.  Basically, those are
8    the things that we have to prove.

9              Now, let me list some points of evidence.
10   Points of evidence.  Now there's certain points of
11   evidence that have been presented in the course of
12   this case that you can consider that indicate the
13   Defendant is guilty, which goes to show the
14   elements of the crimes charged and the
15   specifications.  There are the insurance policies.
16   You have got State's Exhibit 323, the State Farm
17   Insurance Company policy for $300,000.  And State's
18   Exhibit 322, this is the certificate life policy
19   for 250 thousand dollars.  And where do the police
20   find these?  These are in the bedroom by the
21   Defendant's bed.

22             You had the fatal bullet, actually you

6142

1   have got a number of bullets that are consistent

2   with a .38.  Remember they were put in the BCI .38,

3   .357.  And that is consistent with the Defendant's

4   plan, when you read the letters.  And when you read

5   those letters, I suggest you read them in a

6   chronological fashion by date so that you see how

7   the plan develops, the letters and correspondence

8   between the Defendant and her codefendant.  You

9   have got the photographs of the victim of Robert

10  Fingerhut that show the injuries.  The body on the

11  floor in the house, the injuries on his head and

12  injuries, the fatal wound.

13          You will have the coroner's autopsy

14  report.  Remember the cause of death.  You have got

15  a glove of Nate Jackson that was recovered when he

16  got arrested.  That gloves is important because it

17  indicates that Nate Jackson got shot at the scene,

18  because you have got that blood that was found in

19  the vehicle, the victim's car, after the killing.

20  The killer, Nate Jackson took something away from

21  that scene with him.  He took the victim's blood,

22  that is where they got the DNA.  They got it on

6143

1    that trunk latch and the visor of the car along

2    with Nate Jackson's blood and DNA.  So we have got

3    the DNA of Nate Jackson.  You have got the DNA of

4    Robert Fingerhut.

5            Most important, one of the most important

6    things is you have got the letters from the

7    Defendant and you have got letters from Nate

8    Jackson.  You go inside their minds, what is the

9    Defendant thinking?  You have got phone calls from

10    prison.  And you remember those interruptions,

11    "This call is being recorded by Lorain Correctional

12    Facility.  Your call is being recorded."  They

13    didn't care, they used their magic words to show,

14    deliver the package, the thing with all of the

15    zeros, they are cohorts.  They were so devious in

16    their planning, so smart.

17            Remember criminals don't have to be

18    rocket scientists.  You have got the Wagon Wheel

19    Motel.  The Wagon Wheel, the classy motel with the

20    Jacuzzi that he was staying in and the mirrored

21    walls and ceiling above the bed, where she was

22    going to take her partner in crime and, she took

6144

1    him there beforehand, to celebrate.  You have got

2    the red thong panties that were discovered when

3    that room was cleaned, found by -- you heard Jose

4    Flores' testimony that those things were left

5    behind in that particular room.  And remember the

6    telephone call from prison where Nate Jackson said,

7    "Hey baby, bring those panties, the ones with the

8    butt cut out," and he wanted specifically something

9    there and she was going to meet him because this

10   was part of her plan to kill Robert Fingerhut.

11           You have got the Defendant's cell phone.

12   Remember she told Paul Monroe that she loaned it to

13   Nate Jackson.  She had forgot that she had done

14   that.  But this is at the time that the murder is

15   going to go down.  He's got the cell phone.  She's

16   got her other phone in the red car that she's

17   driving, and she's out and about to set up the

18   alibi.  You have got, yes, the red Chrysler that

19   the Defendant took to set up an alibi at the time

20   of the killing.  You have got the 911 call where

21   the Defendant got a chance to play actress and

22   feign grief when she comes back and discovers

6145

1   Robert Fingerhut's body.  She couldn't even catch

2   her breath because she was in such shock in finding

3   poor Robert Fingerhut.  You have got, according to

4   the testimony, the Defendant's lies.  What did she

5   lie about?  Little things like Giant Eagle, when

6   she told the cops she went to Giant Eagle.  She

7   never did because what did Bridget Paul say?  She

8   was driving real slow over there, but she never

9   turned in there.  Red Lobster.  She told the police

10  that she was dining alone.  But low and hold the

11  lady at Red Lobster told you, no, she was there

12  with Nate Jackson.

13          She lied about Super K-Mart.  She never

14  went there.  She was taking the codefendant, Nate

15  Jackson to Days Inn to bandage him up.  You can

16  infer from the evidence.  She lied about Nate

17  Jackson because when the police asked her what she

18  knew, she omitted originally telling them anything

19  about Nate Jackson.  Then when they asked her about

20  Nate Jackson, yes, Nate Jackson, and what did she

21  tell the police?  She hadn't seen Nate Jackson the

22  day of the murder.  She lied about her relationship

6146

1   with Robert Fingerhut.  What did she tell the

2   police?  She told the police that they had a loving

3   relationship and the letters to Nate Jackson, it

4   was a hate relationship and she wanted him dead.

5   What did she tell the police about the insurance

6   policy?  She even lied about that.  She told them

7   that they had $300,000 in insurance, but in fact

8   there was $550,000 in insurance.  These are

9   policies that were by her bed.  She lied about the

10  Days Inn.  She didn't tell the police that she went

11  to get a room for Nate Jackson to take care of his

12  injury.

13          Now, because we bear the burden of

14  proving the elements of the crimes and the

15  specifications charged by proof beyond a reasonable

16  doubt, we get the opportunity to do both opening

17  and closing argument, and now Defense counsel will

18  have an opportunity to address you.

19          MR. INGRAM:  Your Honor, the Defense

20  waives argument and requests that the Jury be

21  immediately instructed.

22          THE COURT:  I'm sorry?

6147

1    MR. INGRAM:  Waive argument and

2    request that the Jury be immediately instructed.

3    THE COURT:  Okay.  Gentlemen,

4    approach, please.

5    (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

6    OF HEARING)

7    THE COURT:  Ladies and gentlemen,

8    the next step is for me to read you the

9    instructions.  These will take a half hour, 45

10   minutes, so let's take a ten minute break.  You

11   step aside and come back, and once I have given you

12   the instructions, then you will be sequestered, and

13   I'll explain to you at the appropriate time what

14   all that entails.  I think you have a pretty good

15   idea right now.  Let's take ten minutes.  Be back

16   at 20 till, and we'll conclude this trial.  You are

17   not to discuss anything.  Remember the admonition

18   given.

19   (Court in Recess at 11:25 a.m.)

20   JURY CHARGE:

21   THE COURT:  Members of the Jury, you

22   heard the evidence and the arguments of counsel in

6148

1    this case.  The Court and the Jury have separate

2    functions.  You decide the disputed facts and the

3    Court provides the instructions of law.  Now it is

4    your sworn duty to accept these instructions and to

5    apply the law as it is given to you.  You are not

6    permitted to change the law, nor to apply your own

7    conception of what you think the law should be.

8    Likewise, the Court may not interfere in any way

9    with your function as a juror.

10           Now a criminal case begins with the

11   filing of an indictment.  The indictment informs

12   the Defendant that she has been charged with an

13   offense.  The fact that it was filed may not be

14   considered by you for any purpose.  The plea of not

15   guilty that was entered is a denial of the charges.

16   And specifications.  And puts in issue all of the

17   essential elements of each charge and

18   specification.

19           The Defendant is presumed innocent unless

20   her guilt is established beyond a reasonable doubt.

21   The Defendant must be acquitted of an offense

22   unless the State produces evidence which convinces

6149

1    you beyond a reasonable doubt of every essential

2    element of that offense, and specifications charged

3    in the indictment.

4          Now reasonable doubt is present when,

5    after you have carefully considered and compared

6    all of the evidence, you cannot say that you are

7    firmly convinced of the truth of the charge.

8          Reasonable doubt is doubt based on reason

9    and common sense.  Reasonable doubt is not mere

10   possible doubt, because everything relating to

11   human affairs or depending on moral evidence is

12   open to some possible or imaginary doubt.

13         Now proof beyond a reasonable doubt is

14   proof of such character that an ordinary person

15   would be willing to rely and act upon it in the

16   most important of his or her own affairs.  Now you

17   must determine the issues in this case from the

18   evidence.  And the evidence is all the testimony

19   received from the witnesses, the Exhibits admitted

20   during the trial, and any facts that were agreed

21   upon by counsel, stipulations of fact.

22         Evidence itself may be either direct or

6150

1  circumstantial or both.  Now direct evidence is the

2  testimony given by a witness who has seen or heard

3  the facts to which he or she has testified.  And

4  direct evidence also includes Exhibits admitted

5  during trial.

6      Circumstantial evidence is the proof of

7  fact or circumstance by direct evidence from which

8  you may reasonably infer other related or connected

9  facts, which naturally and logically follow

10  according to the common experience of mankind.

11      Now to infer or to make an inference, is

12  to reach a reasonable conclusion or deduction of

13  fact which you may, but are not required to make

14  from other facts, which you find have been

15  established by direct evidence.  Now whether an

16  inference is made or not rests entirely with you.

17      Direct and circumstantial evidence are of

18  equal weight and probative value.  Now the evidence

19  does not include the indictment or the opening

20  statements or closing arguments of counsel.  The

21  opening statements and closing arguments of counsel

22  are designed to assist you, but they are not

6151

1   evidence.  A number of Exhibits and testimony

2   related to them have been introduced.  You may

3   consider whether the Exhibits are the same objects

4   and in the same condition as originally taken by

5   the law enforcement officers during their

6   investigation.  You will determine what weight, if

7   any, the Exhibits should receive in the light of

8   all of the evidence.  Video tape and audio tape

9   recordings and testimony relating to them have been

10  introduced into evidence.  You shall consider

11  whether the video tape and/or the audio tape is a

12  true record of what transpired at the time it was

13  taken.  If you find that it is, you will then

14  determine what weight, if any, the video tape

15  and/or audio tape should receive in light of all of

16  the evidence.

17          Now statements or answers that were

18  stricken by the Court, or which you were instructed

19  to disregard are not evidence.  And you must treat

20  them as though you never heard them.  And you must

21  not speculate as to why the Court sustained the

22  objection to any question, or what the answer to

6152

1   that question might have been.  And you must not

2   draw any inference or speculate upon the truth of

3   any suggestions included in any question that was

4   not answered.

5          You are the sole judge of the facts of

6   this case, the credibility of the witnesses and the

7   weight of the evidence.  To weigh the evidence, you

8   must consider of course the credibility of the

9   witnesses.  These tests that you apply every day in

10  your lives include the appearance of each witness

11  upon the stand, his or her manner of testifying,

12  the reasonableness of their testimony, the

13  opportunity that person had to see, hear or know

14  about that to which they have testified, their

15  accuracy of memory, or lack thereof, their

16  frankness, intelligence, interest and bias if any,

17  but together with all of the circumstances and

18  facts surrounding the testimony.  In applying these

19  tests, you will assign to the test of each witness

20  such weight as you deem proper.

21         You are not required to believe the

22  testimony of any witness simply because it was

6153

1    given under oath.  You may believe or disbelieve

2    all or any part of the testimony of any witness.

3    It is within your province to determine what

4    testimony is worthy of belief, and what testimony

5    is not worthy of belief.

6            Now generally a witness may not express

7    an opinion from the stand, however, one who follows

8    a profession or special line of work, may express

9    his or her opinion because of that person's

10   education, knowledge and or experience.  Such

11   testimony is admitted for whatever assistance it

12   may provide to help you in arriving at a just

13   verdict.  As with other witnesses, upon you alone

14   rests the duty to decide what weight is to be given

15   to the testimony of the experts.  In determining

16   its weight, you may take into consideration that

17   expert's skill, experience, knowledge, veracity,

18   familiarity with the facts of this case, and the

19   usual rules for testing credibility and determining

20   the weight to be given to that testimony.

21           Now it is not necessary that the

22   Defendant take the witness stand in her own

6154

1    defense.  Miss Roberts has a Constitutional right

2    not to testify.  The fact that the Defendant did

3    not testify may not be considered by you for any

4    purpose.  The right of this Court to try the

5    Defendant depends on proof that the offense was

6    committed in Trumbull County, Ohio.  This is called

7    venue.  And venue is an essential element of the

8    offenses charged in the indictment.  And as with

9    other elements, must be proven by the State beyond

10    a reasonable doubt.

11           Now getting to the indictment itself, the

12    Defendant is charged with a total of four counts

13    and six specifications, as follows.  Count One,

14    complicity to aggravated murder, with two

15    specifications.  Count Two, complicity to

16    aggravated murder with two specifications.  Count

17    Three, complicity to aggravated burglary, with one

18    specification.  Count Four, complicity to

19    aggravated robbery, with one specification.

20    Although the Counts are numbered in chronological

21    order, I feel it would make more sense to instruct

22    you on the complicity to aggravated burglary, and

6155

1   the complicity to aggravated robbery counts before

2   I instruct you on the complicity to aggravated

3   murder counts, as some of the terms that I'm going

4   to define for you relative to those charges, will

5   also be used in the complicity to aggravated murder

6   instructions.

7           Now in Count Three of the indictment, the

8   Defendant has been charged with complicity to

9   aggravated burglary. Before you can find the

10  Defendant guilty, you must find beyond a reasonable

11  doubt that on or about the 11th day of December,

12  2001, and in Trumbull County, Ohio, the Defendant

13  purposely solicited, procured, aided and/or abetted

14  Nathaniel Jackson to commit the offense of

15  aggravated burglary. Aggravated burglary is the

16  trespass by force, stealth or deception in an

17  occupied structure, or in a separately secured or

18  separately occupied portion of an occupied

19  structure when another person, other than an

20  accomplice of the Defendant was present in that

21  structure, or separately secured or separately

22  occupied portion of the occupied structure and with

6156

1   purpose to commit any criminal offense.  And at

2   that time, the accomplice did inflict, or attempt

3   or threaten to inflict serious physical harm on

4   another, and/or the accomplice had a deadly weapon

5   on or about his person or under his control,

6   specifically in this case, a firearm.

7          I'll now define some terms for you.  The

8   Defendant is charged with complicity to commit all

9   of the indicted offenses.  Complicity means acting

10  with the kind of culpability required for the

11  commission of the offense.  Soliciting or procuring

12  another to commit the offense, or aiding or

13  abetting another in committing the offense.  Mere

14  association with the person or persons who

15  committed an offense are not enough to convict the

16  Defendant of complicity.  To be a complicitor, one

17  must solicit, procure, aid and/or abet another in

18  accomplishing a common goal or purpose.  To be a

19  complicitor, one must both be aware of and must

20  consent to that common goal or purpose.  Before you

21  can convict the Defendant as a complicitor, it must

22  be proven beyond the existence of any reasonable

6157

1    doubt that she sought, asked, influenced, invited,

2    attempted, led on, brought pressure to bear, got,

3    obtained, induced, brought about, motivated,

4    supported, assisted, encouraged, cooperated with,

5    advised, or incited Nathaniel Jackson to commit the

6    offenses charged in this indictment.  Even approval

7    or acquiescence without either the expression of

8    agreement or doing some act, which in some way

9    contributes to the commission of the crime, is not

10   aiding and abetting.  The Defendant must take some

11   role before the offense to cause the commission of

12   the offense.

13        Now the State may demonstrate that the

14   Defendant is guilty of complicity by direct or

15   circumstantial evidence or both.  Although criminal

16   intent may be inferred from presence, companionship

17   and conduct before and after an offense is

18   committed, you may not infer that the Defendant is

19   guilty of complicity of an offense merely from the

20   fact that you find she was an accessory after the

21   fact.  A complicitor to aggravated murder must

22   assist the principal before the offense, with the

6158

1    purpose of causing death, and must intend to aid,

2    solicit, procure, or cause the principal to commit

3    the offense.   In other words, an attempt to kill is

4    insufficient.   There must also be an intent to

5    assist the principal offender to kill.   Thus before

6    you can convict the Defendant, Donna M. Roberts, of

7    the offense of complicity to commit an offense, you

8    must find beyond a reasonable doubt that she in

9    some way solicited, procured, aided or abetted

10   Nathaniel Jackson by taking some role in causing

11   the commission of the offenses of aggravated

12   murder, aggravated burglary and aggravated robbery.

13        It is not a defense to a charge of

14   complicity that Nathaniel E. Jackson either has or

15   has not been convicted as the principal offender.

16   If you find that the State proved beyond a

17   reasonable doubt all of the essential elements of

18   the offense of complicity to commit aggravated

19   murder, then your verdict must be guilty.   If you

20   find that the State failed to prove beyond a

21   reasonable doubt, any one of the essential elements

22   of the offense of complicity to commit aggravated

6159

 1 | murder, then your verdict must be not guilty.
 2 | Solicit means to seek, to ask, to influence, to
 3 | invite, to attempt, to lead on, to bring pressure,
 4 | to bear.  Procure means to get, obtain, induce,
 5 | bring about, motivate.  Aided or abetted means
 6 | supported, assisted, encouraged, cooperated with,
 7 | advised or incited.  Force means any violence,
 8 | compulsion or constraint used by any means upon or
 9 | against a person or thing to gain entrance.
10 | Stealth means a secret, sly, or clandestine act to
11 | gain entrance.  Deception means knowingly deceiving
12 | or cause another to be deceived by any false or
13 | misleading misrepresentation or by any other
14 | conduct, act or omission which creates, confirms or
15 | perpetuates a false impression in another to gain
16 | entrance.  Trespass means knowingly entering the
17 | land or premises of another without privilege to do
18 | so.  Any entrance or remaining in -- any entrance
19 | or remaining in knowingly made in a structure of
20 | another, that is unlawful if it is without the
21 | authority, consent or privilege to do so, is
22 | unlawful.  If it is without authority, consent or

6160

1  privilege.  Where a Defendant lawfully entered a
2  residential premises, the privilege to be in or
3  upon this premises can be inferred to have been
4  revoked, where the Defendant thereafter commits a
5  violent felony directed against another person in
6  the premises, who had the ability and authority to
7  revoke the privilege.  Where one enters upon the
8  property of another as an invitee or licensee, that
9  person loses his status as an invitee or licensee,
10  and becomes a trespasser, when it becomes evident
11  that the purpose of such entry is to commit a
12  criminal offense against another.

13          Occupied structure means any house,
14  building or other structure which is maintained as
15  a permanent or temporary dwelling regardless of who
16  owns it.  A person acts purposely when it is his
17  specific intention to cause a certain result.  It
18  must be established in this case, that at all times
19  in question, there was present in the mind of the
20  Defendant, a specific intention to cause a certain
21  result.

22          Purpose is a decision of the mind to do

6161

1   an act with the conscious objective of producing a

2   specific result.  To do an act purposely is to do

3   it intentionally and not accidentally.  Purpose and

4   intent mean the same thing.  Now the purpose with

5   which a person does an act is known only to that

6   person unless he or she expresses it to others or

7   indicates it by his or her conduct.  The purpose

8   with which a person does an act is determined from

9   the manner in which it is done.  The means and

10  weapons used, and all of the other facts and

11  circumstances in evidence.  Proof of motive is not

12  required.  The presence or absence of motive is one

13  of the circumstances bearing upon the purpose.

14          For the purposes of this case, complicity

15  to aggravated murder and complicity to aggravated

16  robbery, which are defined below are criminal

17  offenses.  Physical harm to persons means any

18  injury, illness, or other physiological impairment

19  regardless of its gravity or duration.  Deadly

20  weapon means any instrument, device or thing

21  capable of inflicting death and designed or

22  specifically adapted for use as a weapon or

6162

1   possessed, carried or used as a weapon.

2          Now if you find that the State proved

3   beyond a reasonable doubt all of the essential

4   elements of the offense of complicity to aggravated

5   burglary, your verdict must be guilty of complicity

6   to aggravated burglary.  If you find that the State

7   failed to prove any one of the essential elements

8   of the offense of complicity to aggravated

9   burglary, your verdict must be not guilty.  If you

10  find the Defendant guilty of Count 3 of complicity

11  to aggravated burglary, it is your duty to

12  deliberate further and to decide one specification

13  attached to Count 3.  You will proceed to consider

14  whether the specification has been again proven

15  beyond a reasonable doubt, if and only if, you

16  determine that the Defendant is guilty of

17  complicity to aggravated burglary.  If your verdict

18  is not guilty, then you would not consider the

19  specification.  If your verdict is guilty, the

20  Defendant may be found guilty or not guilty of the

21  specification.

22          The specification is that codefendant

6163

1    Nathaniel E. Jackson did at the time of the

2    commission of the offense have a firearm on or

3    about his person or under his control, and he

4    displayed the firearm, brandished the firearm, or

5    used it to facilitate the offense.

6              Firearm means any deadly weapon capable

7    of expelling or propelling one or more projectiles

8    by the action of an explosive or combustible

9    propellant.  Firearm includes an unloaded firearm,

10   and any firearm which is inoperable, but which can

11   be readily rendered operable.  When deciding

12   whether a firearm is capable of expelling or

13   propelling one or more projectiles by the action of

14   an explosive or combustible propellant, you may

15   rely on circumstantial evidence, including, but not

16   limted to, the statements and actions of the

17   individual exercising control over the firearm.

18             On or about the Defendant, the

19   Defendant's or accomplice's person or under the

20   Defendant's or accomplice's control means that the

21   firearm was on the Defendant's or the accomplice's

22   person, or so near the Defendant, or accomplice, as

6164

1   to be conveniently accessible, and within the

2   Defendant's or accomplice's immediate physical

3   reach.  Thus, if as to this specification, you find

4   that the State proved beyond a reasonable doubt all

5   of the essential elements of the specification,

6   your verdict must be guilty of that specification.

7   If as to this specification, you find that the

8   State failed to prove beyond a reasonable doubt any

9   one of the essential elements of the specification,

10  then you must find the Defendant not guilty on that

11  specification.

12          In Count 4 of the indictment, the

13  Defendant is charged with complicity to aggravated

14  robbery.  Before you can find the Defendant guilty

15  of complicity to aggravated robbery, you must find

16  beyond a reasonable doubt that on or about the 11th

17  day of December, 2001, at Trumbull County, Ohio,

18  the Defendant purposely solicited, procured, aided

19  or abetted Nathaniel Jackson to commit the offense

20  of aggravated robbery.

21          Aggravated robbery is attempting or

22  committing a theft offense and having a deadly

6165

1   weapon on or about your person or under that

2   person's control and either brandished it or used

3   it or that the Defendant inflicted serious physical

4   harm on others.

5            I have defined previously for you

6   solicited, as well as procured, aided, abetted, and

7   purposely.  Attempt is when one purposely does

8   anything which is an act constituting a substantial

9   step in a course of conduct planned, to culminate

10   in his commission of the crime.  To constitute a

11   substantial step, the conduct must be strongly

12   corroborative of the actor's criminal purpose.

13            While committing or attempting to commit

14   means that the theft must occur as part of acts

15   leading up to or occurring during or immediately

16   subsequent to the offense set out in this charge.

17   And that the theft was directly associated with the

18   offense set out in this charge.

19            A theft offense occurs when a person with

20   purpose to deprive the owner of property knowingly

21   obtains or exerts control over that property

22   without the consent of the owner.  A person acts

6166

1   knowingly regardless of his purpose when he's aware
2   that his conduct will probably cause a certain
3   result, or that he's aware that his conduct will
4   probably be of a certain nature. A person has
5   knowledge of circumstances when he's aware that
6   such circumstances probably exist.

7               Now again, since you cannot look into the
8   mind of another person, knowledge is determined
9   from all of the facts and circumstances in
10  evidence. You will determine from these facts and
11  circumstances, whether there existed at the time in
12  the mind of the Defendant, the intent to obtain or
13  exert control over the property. Owner means any
14  person whether -- owner means any person, other
15  than the actor who is the owner of or who has
16  possession or control of or any license or interest
17  in property or services even if such ownership,
18  possession, control, license or interest is
19  unlawful.

20              I have defined deadly weapon previously
21  for you.

22              Serious physical harm to persons means

6167

1   any of the following.  Any mental illness or
2   condition of such gravity as would normally require
3   hospitalization or prolonged psychiatric treatment.
4   Two, any physical harm that carries a substantial
5   risk of death; three, any physical harm that
6   involves some permanent incapacity or the partial
7   or total or that involves some temporary
8   substantial incapacity.  Four, any physical harm
9   that involves some permanent disfigurement or that
10  involves some temporary serious disfigurement.
11  Five, any physical harm that involves acute pain of
12  such duration as to result in substantial
13  suffering, or that involves any degree of prolonged
14  or intractable pain; and six, death.

15          If you find that the State proved beyond
16  a reasonable doubt all of the essential elements of
17  complicity to aggravated robbery, your verdict must
18  be guilty to complicity to aggravated robbery.  If
19  you find that the State failed to prove any one of
20  the essential elements of the offense of aggravated
21  robbery, it is your duty to deliberate further and
22  decide -- I'm sorry, I misread that.  If you find

6168

1    the Defendant guilty of Count 4 of complicity to

2    aggravated robbery, it is then your duty to

3    deliberate further and decide one specification

4    attached to Count 4.

5          You will proceed to consider whether the

6    specification has been proven beyond a reasonable

7    doubt, if and only if, you determine that the

8    Defendant is guilty of complicity to aggravated

9    robbery.  If your verdict is not guilty, then you

10   would not consider the specification.  If your

11   verdict is guilty, the Defendant may be guilty or

12   not guilty of the specification.

13         The specification is that codefendant,

14   Nathaniel Jackson, did at the time of the

15   commission of the offense, have a firearm on or

16   about his person or under his control, and

17   displayed the firearm, brandished the firearm, or

18   used it to facilitate the offense.  All relevant

19   terms have been previously defined for you.  Thus,

20   if as to this specification, you find that the

21   State proved beyond a reasonable doubt all of the

22   essential elements of the specification, your

6169

1   verdict must be guilty of the specification.

2            If, as to this specification, you find

3   that the State failed to prove beyond a reasonable

4   doubt any one of the essential elements of this

5   specification, then you must find the Defendant not

6   guilty of that specification.

7            In Count 1 of the indictment, the

8   Defendant is charged with complicity to aggravated

9   murder.  With respect to this Count, complicity to

10  aggravated murder, complicity to aggravated murder

11  is purposely soliciting, procuring, aiding and/or

12  abetting another to cause the death of another

13  person with prior calculation and design.  Before

14  you can find the Defendant guilty of complicity to

15  aggravated murder in this Count 1, you must find

16  beyond a reasonable doubt that on or about the 11th

17  day of December, 2001, and in Trumbull County, the

18  Defendant purposely solicited, procured, aided and

19  or abetted another, to cause the death of Robert S.

20  Fingerhut, with prior calculation and design.

21           I have previously defined solicited,

22  procured, aided, abetted and purpose for you.  In

6170

1    addition, if a wound is inflicted upon a person

2    with a deadly weapon in a manner calculated to

3    destroy life, or inflict great bodily harm, the

4    purpose to cause death, may be inferred from the

5    use of the weapon.  No person shall be convicted of

6    aggravated murder unless she's convicted

7    especially -- let me start that over.  No person

8    shall be convicted of aggravated murder unless

9    she's specifically found to have intended to cause

10   the death of another.

11          Prior calculation and design means that

12   the purpose to cause death was reached by a

13   definite process of reasoning in advance of the

14   homicide, which process of reasoning must have

15   included a mental plan involving studied

16   consideration of the method and the means by which

17   to cause the death of another.

18          To be prior calculation, there must have

19   been sufficient time and opportunity for the

20   planning of an act of homicide and the

21   circumstances surrounding the homicide must show a

22   scheme designed to carry out the calculated

6171

1  decision to cause the death.

2        Now, no definite period of time must

3  elapse and no particular amount of consideration

4  must be given.  But acting on the spur of the

5  moment, or after momentary consideration of the

6  purpose to cause death is not sufficient.

7        Now the State charges that the act of the

8  Defendant caused the death of Robert S. Fingerhut.

9  Cause is an essential element of the offense.

10  Cause is an act or failure to act, which in a

11  natural and continuous sequence produces the death,

12  and without which it would not have occurred.  If

13  you find that the State proved beyond a reasonable

14  doubt, all of the essential elements of the offense

15  of complicity to aggravated murder as charged in

16  this Count, your verdict must be guilty as to that

17  Count.  If you find that the State failed to prove

18  beyond a reasonable doubt any of the essential

19  elements of the offense of complicity to aggravated

20  murder as charged in Count 1, your verdict must be

21  not guilty as to that offense.

22        If you find the Defendant not guilty of

6172

1   complicity to aggravated murder as charged in this
2   Count, you will not consider any specification
3   relative to this Count.  If you find the Defendant
4   guilty of complicity to aggravated murder as
5   charged in Count 1, it is your duty to deliberate
6   further and to decide additional factual questions,
7   which we call specifications relative to this
8   Count.

9                Now Count 1 sets forth two
10  specifications.  You will proceed to consider
11  whether each specification to this Count, has been
12  proven beyond a reasonable doubt, if and only if,
13  you determine that the Defendant is guilty of this
14  Count.  If your verdict is not guilty, as I said,
15  you are not to consider the specification.  If your
16  verdict is guilty as to this Count, the Defendant
17  may be found guilty or not guilty of any one or all
18  of the specifications in that Count.

19               Specification One to Count 1, charges
20  that the Defendant committed the aggravated murder,
21  as a complicitor and that the aggravated murder was
22  committed while the accomplice was committing,

6173

1    attempting to commit, or fleeing immediately after

2    committing aggravated burglary.  And that the

3    Defendant solicited, procured, aided or abetted the

4    accomplice to the aggravated murder with prior

5    calculation and design.

6         All of those relevant terms have been

7    previously defined for you.  Before you can find

8    the Defendant guilty of Specification One to Count

9    1, you must find that the State has proven beyond a

10   reasonable doubt that the Defendant committed the

11   aggravated murder as a complicitor, and that the

12   aggravated murder was committed while the

13   accomplice was committing, attempting to commit or

14   fleeing immediately after committing aggravated

15   burglary.  And that the Defendant solicited,

16   procured, aided or abetted the accomplice to the

17   aggravated murder with prior calculation and

18   design.

19        If you find the State proved beyond a

20   reasonable doubt all of the essential elements of

21   this specification, then your verdict must be

22   guilty as to that specification.  If you find that

6174

1  the State failed to prove beyond a reasonable doubt

2  any one of the essential elements of this

3  specification, your verdict must be not guilty as

4  to that specification.

5      Specification Two to Count 1 charges that

6  the Defendant committed the aggravated murder as a

7  complicitor and that the aggravated murder was

8  committed while the accomplice was committing,

9  attempting to commit, or fleeing immediately after

10  committing aggravated robbery.  And that the

11  Defendant solicited, procured, aided or abetted the

12  accomplice to the aggravated murder, with prior

13  calculation and design.

14      Again, I have defined the necessary terms

15  previously.  Before you can find the Defendant

16  guilty of Specification Two to Count 1, you must

17  find that the State has proven beyond a reasonable

18  doubt that the Defendant committed the aggravated

19  murder as a complicitor, and that the aggravated

20  murder was committed while the accomplice was

21  committing, attempting to commit, or fleeing

22  immediately after committing aggravated robbery.

6175

1   And that the Defendant solicited, procured, aided

2   or abetted the accomplice to the aggravated murder

3   with prior calculation and design.

4          If you find that the State proved beyond

5   a reasonable doubt all of the essential elements of

6   this specification, then your verdict must be

7   guilty as to that specification.  If you find that

8   the State failed to prove beyond a reasonable doubt

9   any one of the essential elements of the

10  specification, your verdict must be not guilty as

11  to that specification.

12         In Count 2 of the indictment, the

13  Defendant is charged with complicity to aggravated

14  murder.  With respect to this Count, aggravated

15  murder is purposely soliciting, procuring, aiding

16  and/or abetting an accomplice in causing the death

17  of another, while the accomplice was committing,

18  attempting to commit, or fleeing immediately after

19  committing aggravated robbery and or aggravated

20  burglary.

21         Before you can find the Defendant guilty

22  of complicity to aggravated murder on Count 2, you

6176

1   must find beyond a reasonable doubt that on or

2   about the 11th day of December, 2001, and in

3   Trumbull County, Ohio, the Defendant purposely

4   solicited, procured, aided and/or abetted another,

5   causing the death of Robert S. Fingerhut, while the

6   accomplice was committing, attempting to commit, or

7   fleeing immediately after committing, or attempting

8   to commit aggravated robbery, and/or aggravated

9   burglary.

10          Now I have previously defined all

11  relevant terms.  If you find that the State proved

12  beyond a reasonable doubt, all of the essential

13  elements of the offense of complicity to aggravated

14  murder as charged in Count 2 of the indictment,

15  your verdict must be guilty as to that Count.  If

16  you find the Defendant not guilty of complicity to

17  aggravated murder as charged in this Count, or you

18  are unable to reach a verdict as to this Count, you

19  will not consider any specification relative to

20  Count 2.  Now there's attached to Count 2 on the

21  first specification, charges that the Defendant

22  committed the aggravated murder as a complicitor,

6177

1 | and that the aggravated murder was committed while
2 | the accomplice was committing, attempting to commit
3 | or fleeing immediately after committing aggravated
4 | burglary and that the Defendant solicited,
5 | procured, aided or abetted the accomplice to the
6 | aggravated murder with prior calculation and
7 | design.
8 | Again, I have given you all of the
9 | necessary meanings of those words. Before you can
10 | find the Defendant guilty of Specification One to
11 | Count 2, you must find that the State has proven
12 | beyond a reasonable doubt that the Defendant
13 | committed the aggravated murder as a complicitor
14 | and that the aggravated murder was committed while
15 | the accomplice was committing, attempting to
16 | commit, or fleeing immediately after committing
17 | aggravated burglary. And that the Defendant
18 | solicited, procured, aided and/or abetted the
19 | accomplice to the aggravated murder, with prior
20 | calculation and design.
21 | All terms have been previously defined.
22 | Specification Two to Count 2 charges that the

6178

1   Defendant committed the aggravated murder while
2   committing, attempting to commit, or fleeing
3   immediately after committing aggravated robbery,
4   and that the Defendant was either the principal
5   offender in the commission of the aggravated
6   murder, or if not the principal offender, that she
7   committed the aggravated murder with -- I'm sorry,
8   that he committed the aggravated murder with prior
9   calculation and design.

10          All of the relevant terms, again, I have
11  previously defined for you.  Before you can find
12  the Defendant guilty of Specification Two on Count
13  2, you must find that the State has proven beyond a
14  reasonable doubt that the Defendant committed the
15  aggravated murder as a complicitor, and that the
16  aggravated murder was committed while the
17  accomplice was committing, attempting to commit or
18  fleeing immediately after committing aggravated
19  robbery, and that the Defendant solicited,
20  procured, aided or abetted the accomplice to the
21  aggravated murder with prior calculation and
22  design.

6179

1        If you find that the State proved beyond

2   a reasonable doubt all of the essential elements of

3   this specification, then your verdict must be

4   guilty as to that specification.  If you find that

5   the State failed to prove beyond a reasonable doubt

6   any one of the essential elements of the

7   specification, your verdict must be not guilty as

8   to that specification.

9        Now the specification set forth in the

10  indictments each constitute a separate and distinct

11  matter.  You must consider each Count and each

12  Specification and the evidence applicable to each

13  Count and each Specification separately, and you

14  must state your finding as to each Count and each

15  Specification uninfluenced by your verdict as to

16  the other Counts or Specifications.  Except that

17  should you find the Defendant not guilty of a

18  particular Count, you will not consider the

19  Specification or Specifications attached to that

20  Count.  The Defendant may be found guilty or not

21  guilty of any of the offenses, or any of the

22  specifications.

6180

1          Now we have three remaining alternate

2     jurors that were selected to serve on this Jury

3     panel.  It will be necessary for all of the

4     alternate jurors to remain until this Jury has

5     returned its verdict in Open Court.  You will be

6     conducted to the office of the Jury Commissioner or

7     some other suitable location and will remain under

8     the direction of the bailiff until this Jury has

9     reached its verdict.

10          You are reminded not to discuss this case

11    with anyone or with each other, or to tell anyone

12    how you would have voted until after this Jury has

13    returned its verdict.  You may not discuss -- well,

14    I'll explain to the alternates in at a more

15    appropriate time a few other items.  It is not

16    necessary that I do that at this point in time.

17          To the Jury, you may not discuss or

18    consider the subject of punishment during your

19    deliberations.  Your duty is confined to the

20    determination of whether the Defendant is guilty or

21    not guilty of the counts and the Specifications.

22          You must not be influenced by any

6181

1   consideration of sympathy or prejudice.  It is your
2   duty to carefully weigh the evidence, to decide all
3   disputed questions of fact, to apply the
4   instructions of the Court to your findings and to
5   render your verdict accordingly.  And fulfilling
6   your duty, your efforts must be to arrive at a just
7   verdict.

8           Consider all of the evidence.  And make
9   your findings with intelligence, and impartiality,
10  without bias, sympathy or prejudice, so that both
11  the State of Ohio and the Defendant, Donna Marie
12  Roberts, will feel that their case was fairly and
13  impartially tried.

14          And once again, if during the course of
15  this trial, the Court has said or done anything
16  that the Jury has misinterpreted as the Court's
17  view on the evidence, please disregard that.
18  Disregard that because it would be most improper
19  for a Judge to take any position on the evidence.
20  That is not my function.  That is your function.
21  My job is dealing with the law.  So, any indication
22  that you may have perceived that I had any opinion

6182

1   at all on the evidence, you are to set that aside

2   because that was not my intention.

3          Now, it may be difficult to remember all

4   of the instructions that I have given to you.  They

5   seem repetitious, like I'm going over the same

6   thing, but if you read over them, they each cover a

7   specific point.  To assist you, you will have a

8   copy of these instructions with you in the Jury

9   room.  If during your deliberations you have a

10  question, it should be discussed in privacy of your

11  Jury room, and any question submitted to the Court

12  should not reflect the status of your deliberation,

13  it should be reduced to writing so that there will

14  be no misunderstanding as to what the question is

15  as to what you request.  It should be signed by the

16  foreperson, with the date also.  And it should then

17  be delivered to the bailiff who will submit it to

18  the Court.

19         Now the bailiff, throughout the course of

20  your deliberations will have contact with you

21  merely for your comfort.  She's not able to answer

22  any questions, none should be put to her.  If

6183

1 | anyone should forget that, do not think she's rude

2 | by ignoring the question.

3 | Now your initial conduct upon entering

4 | the Jury room is a matter of importance.  It is not

5 | wise to immediately express a determination or to

6 | insist upon a certain verdict, because if you do

7 | so, and your sense of pride is aroused, you may

8 | hesitate to change your position if you later

9 | decide you were initially wrong.  You should

10 | consult with one another, consider each other's

11 | views, and deliberate with the objective of

12 | reaching an agreement, if you can do so, without

13 | disturbing your individual judgment.

14 | Each of you must decide this case first

15 | of all, by yourself, in your own mind.  But you

16 | should do so only after a discussion and the

17 | consideration of the case, by discussing it with

18 | your fellow jurors.

19 | You should not hesitate to change an

20 | opinion if you become convinced that you are wrong.

21 | But just as important, you should not surrender

22 | honest convictions just to be congenial or to just

6184

1   go along with the other people's view on a verdict.

2          You will have with you in the Jury room

3   ten verdict forms.  I am now going to briefly read

4   over those for you.  Each of these forms I think

5   are self-explanatory, but it is customary to go

6   over them.

7          You have the caption of the case, which

8   identifies it for our records.  You have Jury

9   Verdict, this first one reads, "Count 1, complicity

10  to aggravated murder, prior calculation and design.

11  We the Jury, having been duly empaneled, to well

12  and truly try the above cause and true deliverance

13  make, do find the Defendant, Donna M. Roberts," you

14  find a blank with an asterisk, and the asterisk

15  says, "insert in ink either Not Guilty or Guilty

16  Beyond a Reasonable Doubt," whatever your verdict

17  is.  And it continues, "on Count 1, complicity to

18  commit aggravated murder, in the manner and form

19  she stands charged in the indictment."

20          Now you will note that there are 12

21  verdict lines, one for each juror.  This being a

22  criminal case, of course, you must have a unanimous

6185

1   verdict of all 12 to arrive at any conclusion.  On

2   any of the verdict forms that there are all 12

3   signatures written, if that occurs, it should also

4   be dated.  If you do not have all 12 members

5   concur, then you have not arrived at a verdict.

6           These all read the same.  They have all

7   the information with the asterisk and they cover

8   each of the counts, and all of the specifications.

9   Specifications are set forth on a different verdict

10  form.

11          Laurie, do you want to stand up and be

12  sworn?  Miss Brown, please raise your right hand.

13  Do you solely swear that you will, to the best of

14  your ability, keep the persons sworn as jurors on

15  this trial from separating from each other, and

16  that you will not suffer any communications to be

17  made to them, or any of them, orally or otherwise,

18  except by the order of this Court, or to ask them

19  if they have agreed on their verdict, and that you

20  will not, before they render their verdict,

21  communicate to any person the state of their

22  deliberations or the verdict they have agreed upon,

6186

1    so help you God?

2                    LAURIE BROWN:   I will.

3                    THE COURT:   To the 12 members of the

4    Jury and to the alternates.   From this time on, you

5    will be in the charge of our Bailiff, Laurie Brown.

6    You will follow her instructions in every regard.

7    If you desire to communicate with the Court, you

8    should do so in writing, and only after careful

9    consideration of the language used so that the same

10   does not unnecessarily disclose the status of your

11   deliberations.   And making sure that any inquiry is

12   clear and unambiguous.   These requests should be

13   submitted in writing and signed by the foreperson.

14                   Now during all of the breaks in your

15   deliberations, you will follow the instructions of

16   the Bailiff, but do not discuss the case with her,

17   or even among yourselves during the breaks.   Any

18   discussion that you have on this case, should only

19   occur when all 12 of you are back in the Jury room.

20   If some of you should be out for some reason on a

21   break, few remaining there cannot talk about the

22   case.   You have to all 12 be together to talk about

6187

1   anything.

2           Now the Court will place in your

3   possession the Exhibits and the verdict forms.  You

4   will also have with you in the Jury room a VCR, a

5   T.V. and a cassette player.  The foreperson will

6   retain possession of these records, including the

7   verdicts and return them to the Court.  As a

8   practical matter, the foreperson selected can't

9   carry everything back in here, but just hang on to

10  the verdict forms.  We'll see that the evidence is

11  handled in due course.  The foreperson is called

12  upon to see that your discussions are orderly, and

13  that each juror has an opportunity to discuss the

14  case and to cast his or her vote.  Otherwise the

15  authority of the foreperson is the same as any

16  other jurors.  Some of us are more reluctant to

17  express our opinions, some of us you can't shut up.

18  The foreperson should make sure that everybody

19  participates.  You are going to have some people,

20  we always do, that don't like to force their

21  opinion on people or even discuss it.  The

22  foreperson should have everybody engage in your

6188

1   discussions. That is the value of the Jury is

2   having 12 minds in there. And likewise, if

3   somebody speaks too often, a friendly reminder

4   might be available. So until your verdict is

5   announced in Open Court, you are not to disclose to

6   anyone else the status of your deliberations or the

7   nature of your verdict.

8           After you retire, select a foreperson and

9   whenever all 12, and I repeat all 12 agree upon

10  your verdicts, you will sign the verdicts in ink,

11  date them, and advise the Bailiff. You will then

12  be brought back into the Jury room, and your

13  verdict will be read in Open Court.

14          Ladies and gentlemen of the Jury, are all

15  of you able to begin your deliberations?

16  (All nodded affirmatively)

17              THE COURT: I see everyone nodding

18  their head. Very good.

19          Gentlemen, approach the bench, please.

20  (SIDE BAR DISCUSSION, OFF THE RECORD AND

21  OUT OF HEARING)

22  (In-chambers at 12:50 p.m.)

6189

1          THE COURT:  We're in-chambers, out

2     of the presence of the Jury.  All counsel and the

3     Defendant are present.

4          MR. JUHASZ:  Your Honor, if it

5     please the Court, with regard to the aggravated

6     robbery count that was read to the Jury, the phrase

7     "deprive" was not defined.  It is set forth in OJI

8     and was set forth in our submitted instructions.

9          THE COURT:  Do you want me to give

10    that?

11         MR. JUHASZ:  It should come as part

12    of theft offense.  On page 12 the Court defines

13    theft offense and says it occurs when a person with

14    purpose to deprive the owner.  I think that should

15    be of property.  Knowingly obtains or exerts

16    control over the property without the consent of

17    the owner.  OJI then has a separate subsection

18    which defines deprive.  I mentioned that this

19    morning in my Rule 29 motion.  So we would request

20    that that be included.

21         Secondly, my hearing of the Court's

22    reading of the aggravated robbery instruction is

6190

1   that on page 13, you did read the paragraph that

2   says, "If you find the State failed to prove" --

3   I'm sorry, "If you find the State."  On page 13.  I

4   think the Court did read the paragraph that begins

5   "If you find that the State proved beyond a

6   reasonable doubt all of the essential elements of

7   the offense of complicity to aggravated robbery,

8   your verdict must be guilty".  The next paragraph I

9   think because you began to jump ahead to the

10  specification, you neglected to read that

11  paragraph, which says, "If you find that the State

12  failed to prove any one of the essential elements,

13  then your verdict must be not guilty."

14          THE COURT:  Do you wish me to add

15  that at this point?

16          MR. JUHASZ:  Yes, Sir.

17          MR. BECKER:  Do you want to read a

18  general statement, "If you find the State proved

19  beyond a reasonable doubt all of the essential

20  elements of any of the offenses your verdict must

21  be guilty and if you find that the State failed to

22  prove any of the essential elements of any of the

6191

1    offenses" --

2                    MR. JUHASZ:   That is fine.

3                    MR. BECKER:   In a generic sense?

4                    MR. JUHASZ:   Yes.

5                    THE COURT:   Do you have that

6    contained in the instructions or what?

7                    MR. BECKER:   It is in the

8    instructions.  Rather than specifically point to

9    each, I don't care.

10                    MR. INGRAM:   I agree.

11                    MR. BECKER:   Just reiterate, "If you

12   find that the State proved beyond a reasonable

13   doubt, all of the essential elements of any

14   offense, your verdict must be guilty.  If you find

15   the State failed to prove any one of the essential

16   elements, your verdict must be not guilty of any of

17   the offenses."  Rather than specifically

18   delineating each charge.

19                    MR. BAILEY:   On page 13, the first

20   two paragraphs.

21                    THE COURT:   I need a definition of

22   deprive.

6192

1    (OFF THE RECORD)

2                THE COURT:  For the record then, the

3    Court will give the definition of deprive and give

4    a generic on specification.

5                MR.  INGRAM:  Not on specification,

6    on counts.

7                THE COURT:  Yes.  All the Counts and

8    Specifications.

9                MR.  JUHASZ:  Also on page 14, when

10   the Court gave a definition of purpose in

11   connection with the infliction of a wound, we cited

12   in our proposed Jury instructions that while that

13   is a correct statement of the law, that State vs.

14   Coleman requires the Court to also instruct the

15   Jury that that inference is not conclusive.

16               THE COURT:  There was something I

17   read to that very affect in here.

18               MR.  BECKER:  He's saying there

19   should be an additional phrase that you can infer

20   if the wound was inflicted in a deadly manner that

21   would calculate to destroy life.  You can infer.

22   It is not binding.

6193

1          MR. JUHASZ:  Correct.

2          THE COURT:  The Jury has to think,

3     after about ten minutes of those instructions, what

4     the hell is he going over all of the same stuff

5     for.

6          MR. JUHASZ:  Never mind.  We

7     withdraw that objection.  The last objection we

8     had, of course, we're going to renew our objection

9     to the specifications, I'm not going to reiterate

10    all of the language, it was painfully obvious to me

11    as I listened to the Court read them that these

12    instructions are far outside of what I think the

13    statute permits, the cases that we cited this

14    morning and also and I didn't cite these cases this

15    morning, but the Enmund vs. Florida from the United

16    States Supreme Court even as it was modified

17    against Tison against Arizona, would not permit

18    these instructions.  That is all I have to say

19    about that.

20         MR. BECKER:  You are talking about

21    the (A)(7) instruction.  The (A)(7) is pretty

22    clear, I think, based upon the language of what

6194

1    principal offender is.  Our law in Ohio defines

2    principal offender as the actual shooter.  It

3    leaves open the possibility, I think clearly by

4    definition, that someone could be an aider and

5    abetter, provided they have prior calculation and

6    design they are still an offender to commit the

7    offense.  The specification clearly delineates

8    between principal offender, which is very narrowly

9    defined as the actual killer.  Well, the converse

10   of that, and the obvious flip side of that is that

11   a person can be the aider and abetter with prior

12   calculation and design and we think this is the

13   perfect case for that and it narrows down --

14                  THE COURT:  I agree with the

15   Prosecution, but the Defense raises a most

16   interesting argument on the Legislative intent.  I

17   keep coming back to the State's position for this

18   reason.  Assume that there were five people that

19   planned the Oklahoma bombing.  Only Timothy McVey

20   drove the truck up and committed the thing.  I

21   don't think for a minute that in light of that, now

22   that may be because of the emotionalism of the

6195

1    thing rather than the logic, but in that case,

2    anyone who had anything to do with it is going to

3    go down as a principal offender, aider or abetter.

4    The argument that the Legislature intended only the

5    shooter or the perpetrator of the act receive the

6    death penalty, had a certain appeal, but I don't

7    know that the law that is presently drafted means

8    that.  You are arguing that it does?

9                MR. JUHASZ:  I'm not.  I'm not.

10   First of all, I am inclined to agree with you on

11   the first thing that you said that I think it is

12   more than emotionalism in the argument as far as

13   the Oklahoma bombing; and second of all, the

14   principal offender is the actual killer.  What I'm

15   saying is that if you are not the principal

16   offender and if it is by prior calculation and

17   design, that is sufficient under the (A)(7)

18   specification to warrant consideration of the death

19   penalty, but that Defendant has to be participating

20   actively in the acts that lead up to the homicide.

21   And in this case, there's no evidence that Donna

22   Roberts is even at the house when this happens.

6196

1   That is why I cited those cases, because even the

2   cases that I cited, in some of those cases, they

3   said you can get the death penalty, but it is

4   because for example, in <u>Ballew</u>, they can't

5   determine whether it was <u>Ballew</u> or the other guy

6   who shot the person.  Clearly they are both there.

7   She's not even here is my point.

8                THE COURT:  For purposes of the

9   evidence, what the Jury accepts is another

10  question, but I feel quite clearly that the State

11  did put evidence before the Jury, that they could

12  conclude that she did participate to some degree.

13  It is an issue of fact rather than an issue of law

14  that you are arguing.  Law based on fact.

15               MR. JUHASZ:  I am done.

16               MR. BECKER:  If you find the State

17  proved beyond a reasonable doubt all of the

18  essential elements of any offense or specification,

19  your verdict must be guilty of that offense or

20  specification.  If you find that the State failed

21  to prove any one of the essential elements of any

22  of the offenses or specifications, your verdict

6197

1   must be not guilty to that offense or specification

2   or to those offense or specifications.

3                   MR. JUHASZ:  That is fine.

4                   MR. BECKER:  We have changed the

5   language with Specification Two to Count 2 should

6   not have that principal language, offender.  Do you

7   want him to read that again?

8                   MR. INGRAM:  I would put it in the

9   instructions.

10                  MR. BECKER:  We'll put it in the

11  instructions.  I'll put that in the instructions.

12  We'll just have the Court read.  You are going to

13  read the definition of deprive?

14  (OFF THE RECORD)

15  (End of In-chamber discussion)

16                  THE COURT:  No matter how hard we

17  try, we always seem to leave something out.  I

18  failed to define for you what deprive means.

19  Deprive means to withhold property of another

20  permanently or for a period that appropriates a

21  substantial portion of its value or use, or to

22  dispose of property, so as to make it unlikely that

6198

1     the owner will recover it.  If you find that the

2     State proved beyond a reasonable doubt all of the

3     essential elements of any offense or specification,

4     your verdict must be guilty of that offense or

5     specification.  If you find that the State failed

6     to prove any one of the essential elements of any

7     of the offenses or specifications, your verdict

8     must be not guilty to those offenses or

9     specifications.  Gentlemen, does that satisfy?

10                  MR. JUHASZ:  Yes, Sir.

11                  MR. BECKER:  Yes, Sir.

12                  THE COURT:  Ladies and gentlemen,

13     you are now in the care and custody of Laurie

14     Brown.  You will remain so until you have, at the

15     appropriate time returned your verdict in this

16     matter.  If at any time you wish to take a break

17     back there, let Laurie know, but it is very

18     important that all of you remain on this floor

19     during any break.  You can't go off by yourself.

20     You more or less have to stay in the vicinity that

21     you are in Miss Brown's care and custody.  The

22     three of you must stay together and stay away from

6199

1    anybody else.  We'll try to accommodate you in a

2    place where there's no one around.  Sometimes there

3    are other people around.  Just read your books or

4    whatever you do.  The Jury can please go with

5    Laurie.  The alternates remain where you are at.

6    (Jurors began deliberations at 1:15 p.m.)

7              THE COURT:  Raise your right hand.

8    The deputies present are Gary Bacon, Pete Pizzulo,

9    and Valarie Bayless.  Do you solely swear that you

10   will, to the best of your ability keep the persons

11   sworn as jurors on this trial from separating from

12   each other, that you will not suffer any

13   communication to be made to them, or any of them

14   orally or otherwise, that you will not communicate

15   with them, or any of them, orally or otherwise,

16   except by the order of this Court, or to ask them

17   if they have agreed on their verdict, until they

18   have been discharged and that you will not orally

19   before they render their verdict, communicate to

20   any person, the state of their deliberations or the

21   verdict they have agreed upon, so help you God?

22              GARY BACON:  I do.

6200

1                PETE PIZZULO:  I do.

2                VALARIE BAYLESS:  I do.

3                MR. JUHASZ:  Only because of the bad

4 experience that I had in another Jury trial, I

5 would ask the Court to ask the Bailiff to see if

6 any jurors have cell phones and ask them to take

7 the cell phones from them.

8                MR. BECKER:  I want to put on the

9 record, happy birthday to Jerry Ingram.

10 (At Jury room door with Judge at 6:50 p.m.)

11                THE COURT:  It is quarter to seven

12 and I understand the Jury wishes to go to supper,

13 is that right?  Or dinner, whatever is your

14 preference.  I would ask you again to please

15 remember the admonition, stay together and we'll

16 see you back there after you have had time to get a

17 bite to eat.

18 (Court in recess at 6:50 p.m.)

19 (Jurors resumed deliberations at 8:15 p.m.)

20 (In-chambers at 9:50 p.m.)

21                THE COURT:  We're in-chambers, about

22 15 minutes ago the Jury sent out one of the verdict

6201

1  forms which is Count 1, Verdict on Specification

2  One, and asked a question as to the wording because

3  the way it has been submitted is it reads in

4  pertinent "Donna M. Robert is or is not guilty of

5  committing the offense of aggravated murder while

6  she was committing or attempting to commit."  The

7  Court's instructions, I believe, pointed out that

8  she was a complicitor.  That has been the theory of

9  the State's case throughout.  She was not the

10  principal committing the offenses, but I agree that

11  the wording should be corrected to show her state

12  of complicity, rather than being principal

13  offender.  These Jury forms have been changed to

14  show that the proper term of complicitor is

15  involved rather than principal.  I'm going to

16  deliver the amended verdict forms and it has been

17  suggested that I read the following to them, which

18  I'm going to do.

19                 MR. INGRAM:  Submit in writing.

20                 THE COURT:  This will go back in

21  writing in response to your question.  "Some of the

22  verdict forms have been changed.  I trust that the

6202

1    changes have answered your question."

2                    MR. INGRAM:  We have an objection

3    that Mr. Juhasz will put on the record, then I have

4    a request.

5                    MR. JUHASZ:  We object.  The reasons

6    we have stated before based upon everything from

7    Enmund to Tison to Taylor to Guyton to Mapes to

8    Twyford.  I think the Jury question just highlights

9    the point that we have tried to make, and now the

10   language that the Court is going to submit in the

11   amended Jury forms I guess in the language of

12   Taylor even boot straps more complicity into making

13   someone who is otherwise not eligible for the death

14   penalty, eligible for the death penalty.  We think

15   that is in violation of the Eighth Amendment and

16   2929.04 (A)(7) and for those reasons, we object to

17   any modification of the Jury verdict forms.

18                   MR. BECKER:  I would just add for

19   the State, we feel that this is a true relfection

20   of what the charge was, and what the law provides

21   for, which is that an accomplice with prior

22   calculation and design, who is not the principal

6203

1   offender is death eligible.

2               THE COURT:  The objection is noted

3   for the record.  You have a request, Mr. Ingram?

4               MR. INGRAM:  I would request that

5   the Jury question and the verdict form to which it

6   was specifically attached, which is the form

7   entitled Jury Verdict Count 1, Verdict on

8   Specification One, along with the nine other

9   verdict forms all be marked Court's Exhibit 1 and

10  preserved for the record.

11              THE COURT:  That will be granted.

12  (OFF THE RECORD)

13              MR. INGRAM:  I previously requested

14  that the Jury question and the verdict form

15  entitled Jury Verdict Count 1, Verdict on

16  Specification One along with the nine other verdict

17  forms be marked Court's Exhibit 1 for Appellate

18  purposes.  I amend that request and I only request

19  that the specific verdict form we're talking about,

20  which is Count 1, Verdict on Specification One,

21  along with the question be marked Court's Exhibit

22  1, but I would note for the record that there are

6204

1   four verdict forms regarding specifications, and

2   that all four of those verdict forms have been

3   amended, and the Defense objects to the amendment

4   of each and every one of them.

5              THE COURT:  That request for the

6   record is granted as I said.

7   (End of In-chamber Discussion)

8   (Typed answer submitted to the Jury.)

9   (Judge at Jury room door at 10:30 p.m.)

10             THE COURT:  Laurie is going to take

11  you over to your rooms.  She's made arrangements.

12  You get up in the morning, you are going to have

13  breakfast at eight.  Have an enjoyable breakfast.

14  When we get over here -- we'll get you all over

15  here and get you started again.  Remember the

16  admonition.  You three alternates will be kept

17  separate still from the Jury and in the morning,

18  make arrangements for you to get back here.

19

20  (Jurors excused for the night at 10:31 p.m.)

21

22

6205

1

2    Wednesday, May 28, 2003:

3    (Jurors resumed deliberations at 9:20 a.m.)

4    (Jury question at 9:30 a.m.)

5    (In-chambers at 10:00 a.m.)

6              THE COURT:  You waive presence of

7    the Defendant?

8              MR. INGRAM:  The Defendant is not

9    present and we waive the presence of the Defendant.

10   We're here for the purposes of answering a Jury

11   question and it is our collective opinion that her

12   presence is not required, but we do waive it.

13             THE COURT:  The question was sent

14   out that will appear on the record as the jurors'

15   question.

16             MR. INGRAM:  Let's mark it Court's

17   Exhibit 2.

18             THE COURT:  The question was, "Does

19   this mean Donna was actually there while Nate

20   Jackson pulled the trigger?"  And another question,

21   "The phrase while the accomplice was committing is

22   in question, (page 19) of instructions?"  That was

6206

1    signed by the foreman and then below that is

2    another question.  "What constitutes a felony

3    murder?"  Again signed by the foreman.  The last

4    question is not specifically answered because there

5    was nothing in the instructions concerning felony

6    murder.  The answer here given to the Jury reads as

7    follows.  "The answer to your question is no.  The

8    charges set forth in the indictment and described

9    in your Jury instructions are merely allegations."

10   Second paragraph, "In response to your question as

11   to what constitutes felony murder, I can only

12   direct your attention to the Jury instructions

13   presently in your possession.  See instruction to

14   Count Two, pages 17 and 18."  The felony murder

15   instruction is no longer called a felony murder,

16   but it is contained in the statute as contained in

17   the instructions.  That answer is with agreement of

18   both sides, is that correct?

19              MR.  INGRAM:  The Defense has an

20   objection.

21              THE COURT:  You have your continuing

22   objection?

6207

1              MR. JUHASZ:  Correct.

2              THE COURT:  As to the form of the

3    question?

4              MR. JUHASZ:  Yes.

5              MR. BECKER:  The form of the answer.

6    Their objection is the continuing of the

7    complicitor problem.

8              MR. INGRAM:  I take it you will mark

9    the Court's response as Court's Exhibit 2-A.

10   (OFF THE RECORD)

11             MR. INGRAM:  Joint Exhibit 1 was

12   admitted by agreement of the parties?

13             MR. BECKER:  Yes, just for the

14   record, Joint Exhibit 1 was admitted.

15             THE COURT:  Correct.

16   (End of In-chamber discussion)

17   (Jury question and Jury answer at 11:00 a.m.)

18   (In-chambers at 11:10 a.m.)

19             THE COURT:  There's a question and

20   an answer.  This we have designated as 3 and the

21   answer is 3-A.  The question is, "The instruction

22   on page 10 on or about person.  We are confused to

6208

1    the words, his/her.  On the firearms specification
2    it says Donna Roberts.  Please clarify both of
3    these specifications."  The answer given to the
4    Jury marked 3-A, "I am unable to offer any further
5    guidance as to the instructions relating to the
6    firearm specifications contained on page 10 of your
7    Jury instructions.  If you have a more specific
8    question, please reduce that question to writing
9    and I will try to offer assistance."  Signed by
10   myself.
11                MR. INGRAM:  No objection from the
12   Defense to your answer.
13                MR. BAILEY:  No objection from the
14   State.
15   (End of In-chamber discussion)
16   (Jury question.  Jury answer at 12:20 p.m.)
17   (In-chambers at 12:30 p.m.)
18                THE COURT:  The question has been
19   sent out from the Jury, which is designated as
20   Court's Exhibit 4, which reads, "On Count 4,
21   firearm charge, (robbery), does the Defendant have
22   to be physically present in the room at the time of

6209

1  discharge to be considered under her control, or

2  could you possibly put above stated in layman

3  terms." Signed by the foreman. Question five

4  submitted is, "Count 3 and Count 4, firearm

5  specification, can the word complicity be put in?

6  And if not why?" Signed by the foreman. After

7  consultation with both the State and the

8  Defendant's counsel, the answer to the Jury on

9  question four. "No, if you find the Defendant is a

10 complicitor, she need not be physically present in

11 the room at the time the firearm is discharged to

12 be considered under her control; however, to find

13 the Defendant guilty of a firearm specification

14 under such circumstances, you must find beyond a

15 reasonable doubt that Donna Roberts had knowledge

16 that Nathaniel Jackson had a firearm in his

17 possession." That is marked as Court's Exhibit

18 4-A. We have chosen not to answer question five

19 because the answer is contained in the instructions

20 if they read it. Agreed?

21                 MR. JUHASZ: Agreed.

22                 MR. BAILEY: Agreed.

6210

1  (End of In-chamber discussion.)

2  (Verdict at 2:50 p.m.)

3            THE COURT:  Ladies and gentlemen,

4  have you arrived at a verdict in this matter?

5  (All nodded affirmatively.)

6            THE COURT:  Would the foreperson

7  please deliver that to the Bailiff?  The verdict as

8  delivered to me by this Jury reads as follows.

9  "Count One, Complicity to Aggravated Murder, Prior

10  Calculation and Design.  We the Jury, having been

11  duly empaneled to well and truly try the above

12  cause and true deliverance make, do find the

13  Defendant, Donna M. Roberts, is guilty beyond a

14  reasonable doubt on Count 1, Complicity to Commit

15  Aggravated Murder, in the manner and form she

16  stands charged in the indictment."  That has been

17  signed by all 12 members of the Jury and dated this

18  date.

19            "Count One, Verdict on Specification One.

20  We, the Jury, having been duly empaneled to well

21  and truly try the above cause and true deliverance

22  make, do find the Defendant, Donna M. Roberts, is

6211

1   guilty beyond a reasonable doubt of complicity in
2   committing the offense of aggravated murder while
3   she was a complicitor in committing or attempting
4   to commit, or in fleeing immediately after
5   committing or attempting to commit aggravated
6   burglary and that the Defendant committed the
7   aggravated murder with prior calculation and design
8   in the manner and form she stands charged in the
9   indictment." Also signed by all 12 members of the
10  Jury, and dated this date.

11          Specification Two to Count One. "We, the
12  Jury, having been duly empaneled to well and truly
13  try the above cause and true deliverance make, do
14  find the Defendant, Donna M. Roberts, is guilty
15  beyond a reasonable doubt of complicity in
16  committing the offense of aggravated murder, while
17  she was an complicitor in committing or attempting
18  to commit, or in fleeing immediately after
19  committing or attempting to commit aggravated
20  robbery and that the Defendant committed the
21  aggravated murder with prior calculation and
22  design, in the manner and form she stands charged

6212

1   in the indictment."  That has been signed by all 12

2   members of the Jury with today's date.

3           "Count Two, Complicity to Aggravated

4   Murder.  We, the Jury, having been duly empaneled

5   to well and truly try the above cause, and true

6   deliverance make, do find the Defendant, Donna M.

7   Roberts, is guilty beyond a reasonable doubt on

8   Count Two, Complicity to Commit Aggravated Murder,

9   in the manner and form she stands charged in the

10  indictment."  That is signed by all 12 members of

11  the Jury, with this date.

12          Specification One to Count Two.  "We the

13  Jury, having been duly empaneled to well and truly

14  try the above case and true deliverance make, do

15  find the Defendant, Donna M. Roberts, is guilty

16  beyond a reasonable doubt of complicity in

17  committing the offense of aggravated murder while

18  she was a complicitor in committing or attempting

19  to commit, or in fleeing immediately after

20  committing or attempting to commit aggravated

21  burglary, and that the Defendant committed the

22  aggravated murder with prior calculation and design

6213

1  in the manner and form she stands charged in the

2  indictment." That is signed by all 12 members of

3  the Jury and dated today.

4  On Specification Two to Count Two. "We

5  the Jury, having been duly empaneled to well and

6  truly try the above cause and true deliverance

7  make, do find the Defendant, Donna M. Roberts, is

8  guilty beyond a reasonable doubt of complicity in

9  committing the offense of aggravated murder while

10 she was a complicitor in committing or attempting

11 to commit or in fleeing immediately after

12 committing or attempting to commit aggravated

13 robbery and that the Defendant committed the

14 aggravated murder with prior calculation and design

15 in the manner and form she stands charged in the

16 indictment." Signed by all 12 members of the Jury

17 and dated today.

18 On Count Three, Complicity to Aggravated

19 Burglary. "We, the Jury, having been duly

20 empaneled to well and truly try the above cause and

21 true deliverance make, do find the Defendant, Donna

22 M. Roberts, is guilty beyond a reasonable doubt on

6214

1    Count Three, Complicity to Commit Aggravated

2    Burglary, in the manner and form she stands charged

3    in the indictment."  Signed by all 12 members of

4    the Jury and dated today.

5            On Count Three, the Firearms

6    Specification.  "We, the Jury, having been duly

7    empaneled to well and truly try the above cause and

8    true deliverance make, do find by proof beyond a

9    reasonable doubt that the Defendant, Donna M.

10   Roberts did have a firearm on or about her person

11   or under her control while committing aggravated

12   burglary in the manner and form she stands charged

13   in the indictment."  Signed again by all 12 members

14   of the Jury and dated today.

15           Count Four, Complicity to Aggravated

16   Robbery.  "We, the Jury, having been duly empaneled

17   to well and truly try the above cause and true

18   deliverance make, do find the Defendant, Donna M.

19   Roberts, is guilty beyond a reasonable doubt on

20   Count Four, Complicity to Commit Aggravated

21   Robbery, in the manner and form she stands charged

22   in the indictment."  Signed by all 12 members of

6215

1　the Jury, and dated this date.

2　　　　　The Firearm Specification to Count Four,

3　"We, the Jury, having been duly empaneled to well

4　and truly try the above cause and true deliverance

5　make, do find by proof beyond a reasonable doubt

6　that the Defendant, Donna M. Roberts, did have a

7　firearm on or about her person or under her control

8　while committing aggravated robbery in the manner

9　and form she stands charged in the indictment."

10　Signed again by all 12 members of the Jury, with

11　this date.

12　　　　　Ladies and gentlemen, have I properly

13　read the verdict rendered by you?

14　(All nodded affirmatively.)

15　　　　　THE COURT:  Does the State wish to

16　poll the Jury?

17　　　　　MR. BAILEY:  No, Your Honor.

18　　　　　THE COURT:  Does the Defense?

19　　　　　MR. INGRAM:  Respectfully, yes, Your

20　Honor.

21　　　　　THE COURT:  Thank you.  Because of

22　your finding that means that this case -- I

6216

1    apologize.  I'll refer to you then by name -- by

2    number.  You merely answer yes or no.  Ladies and

3    gentlemen, Juror No. one, have I properly read the

4    Verdict rendered by you?

5                    JUROR NO. 1:  Yes.

6                    THE COURT:  Number two?

7                    JUROR NO. 2:  Yes.

8                    THE COURT:  Number three?

9                    JUROR NO. 3:  Yes.

10                    THE COURT:  Number four?

11                    JUROR NO. 4:  Yes.

12                    THE COURT:  Number five?

13                    JUROR NO. 5:  Yes.

14                    THE COURT:  Number six?

15                    JUROR NO. 6:  Yes.

16                    THE COURT:  Number seven?

17                    JUROR NO. 7:  Yes.

18                    THE COURT:  Number eight?

19                    JUROR NO. 8:  Yes.

20                    THE COURT:  Number nine?

21                    JUROR NO. 9:  Yes.

22                    THE COURT:  Number 10?

6217

1               JUROR NO. 10:  Yes.

2               THE COURT:  Number 11?

3               JUROR NO. 11:  Yes.

4               THE COURT:  Number 12?

5               JUROR NO. 12:  Yes.

6               THE COURT:  Thank you.  Because of

7    the verdict that you have rendered, this case will

8    go into a second phase.  I have had a conference

9    with the Attorneys, trying to anticipate all

10   possible results here.  I would ask you all to be

11   back here next Wednesday at 9:00 in the morning.

12               Now, our experience is from prior cases

13   that the three days, Wednesday, Thursday and

14   Friday, should be sufficient time.  Of course, that

15   depends on how long it takes you on your verdict,

16   but we'll expect that on Wednesday, most of the

17   proceeding will be put before you.  It might go

18   into Thursday, but your time will be up to you

19   after the matter of course, is presented to you.

20               I'm going to direct that you not return

21   to work.  This is a very important part of this

22   case, as the entire case is.  From past experience,

6218

1   we have had situations where we had a week or

2   longer and it is difficult to keep people from

3   going to work, but I can tell you what will happen

4   if you do if you were to go back to work, and that

5   is that everybody in the world you work with is

6   going to pester you to death and you don't need

7   that, and I think that would not be fair to either

8   side here.  You have only half completed your job

9   at this point.  You have to make one further

10  determination.  If you are not exposed to

11  everything that we have tried to keep you from

12  being exposed to, that is going to be better for

13  the system.

14          So, we were reviewing each of your

15  situations, and it was my recollection that only

16  potentially two of you had any real problem with

17  your employment, and I hope we have covered that.

18  So the rest of you, I would direct that you not

19  return to work until we complete this entire case.

20  We thank you for your time and your patience and

21  your diligence.  See you back here at 9:00 next

22  Wednesday.

6219

1   (SIDE BAR DISCUSSION, OFF THE RECORD AND

2   OUT OF HEARING)

3            THE COURT:  They have reminded me of

4   one thing.  You should bring your overnight bags

5   again Wednesday.  I started to say to the ladies

6   serving as alternates here, you should be back,

7   also.  I would again remind all of you as I have

8   done throughout this trial, you are not to watch

9   anything on T.V., you are not to read any

10  newspapers.  You are not to permit anyone to

11  discuss the case with you or in your presence.  You

12  are to keep your own counsel.  We have had no

13  problem that I'm aware of with this Jury, and that

14  seems to be as time goes on more difficult to keep

15  jurors into the framework of what you have to do,

16  and that is to isolate yourself from any media or

17  any contact with anybody about the case.  I thank

18  you for that.  So, until Wednesday, please remember

19  the admonition and follow it as closely absolutely

20  as you can.  And you will get this case through, so

21  we have all done our job in a proper manner.

22            I thank you, you are excused.  I'm going

6220

1  to ask everybody in the Courtroom to remain until

2  the jurors have left down to the second floor.

3  Thank you very much.

4  (Court in Recess at 3:00 p.m.)

5              MR. INGRAM:  I believe that there

6  are motions that you now have to rule on that were

7  previously filed and held in abeyance.

8              THE COURT:  There are several.

9              MR. INGRAM:  I'm not telling you

10  what those are, but we'll certainly draw your

11  attention to those motions.

12              THE COURT:  Let's pick a time for

13  Monday, Tuesday.  You all agree on that, and let me

14  know.  The rest of you folks that have joined us

15  this afternoon, you are free to leave and we thank

16  you for your patience.

17  (Court adjourned.)

18

19

20

21  Tuesday, June 3, 2003; In-chambers at 11:50 a.m.:

22              THE COURT:  All parties, attorneys

6221

1    and Miss Roberts are present.  Dr. Thomas Eberle is

2    also present.  There's been a request made by the

3    Defense that this hearing be held in-camera and the

4    Court has no objection to that.  I assume the State

5    does not.

6                    MR. BAILEY:  We have no objection.

7                    THE COURT:  Donna, you have been

8    found guilty by the Jury of the charges that were

9    filed against you and you are entitled, the law

10   requires that this second phase be gone through,

11   and I'm sure that you are aware by this time as to

12   the function of the mitigation phase.  I'll state

13   to you that my opinion is that your attorneys have,

14   and this is just my opinion, done an excellent job

15   up to this point.  Saving their ammunition, so to

16   speak for this phase of the trial.  The facts of

17   this case as you were aware from the beginning are

18   pretty foreboding as to the evidence that the State

19   had available.  And at the mitigation phase, your

20   attorneys would have an opportunity to put before

21   the Jury things in your favor, whereby this Jury

22   would determine that there would be no purpose or

6222

1   reason in a larger sense to impose the death

2   penalty upon you.  I am informed by them that you

3   have instructed them that you do not wish to

4   present any evidence.

5              THE DEFENDANT:  That is correct.

6              MR. INGRAM:  Save and except an

7   unsworn statement.

8              THE COURT:  Okay.  You have the

9   right to do that, if you do so voluntarily and

10  knowingly.  I have to say that I think that it is

11  unusual.  Most people would take advantage of that

12  situation because it allows the Jury an opportunity

13  to know something about Donna Roberts that was not

14  brought out during the trial.

15             THE DEFENDANT:  May I interrupt?  If

16  we let them know the real me, they will think they

17  are in the wrong place, so let's not get them more

18  mixed up than they are.

19             THE COURT:  That is the whole

20  purpose for the mitigation phase.

21             THE DEFENDANT:  I know.

22             THE COURT:  Because many things

6223

1    cannot be brought out during the course of the

2    trial because of the rules of evidence and that.

3                    THE DEFENDANT:  I'm aware.

4                    THE COURT:  Your attorneys will miss

5    an opportunity to be able to present evidence that

6    goes behind what they already know to make you into

7    a real person, rather than the person that they

8    have heard about.  I have no idea what that

9    evidence would be.  Your attorneys would be quite

10   capable, I'm sure, of presenting such evidence.

11   The whole purpose of that is for the Jury to take

12   the person that they know from what they have heard

13   already, and be faced with comparing that person

14   with the person your attorneys could present by the

15   background and whatever.  By ordering your

16   attorneys not to do that, then this Jury knows you

17   by what they have already heard.

18                    THE DEFENDANT:  That is what I am

19   hoping for.

20                    THE COURT:  You understand that?

21                    THE DEFENDANT:  I do.

22                    THE COURT:  You have thought this

6224

1  through?

2                    THE DEFENDANT:  Very much so.

3                    THE COURT:  You have talked with

4  your attorneys about what you are doing?

5                    THE DEFENDANT:  I talked to them, my

6  parents, my son, my sister, people in five states

7  that love me, a couple of countries, and yes, I

8  know what I am doing.  I explained to everyone that

9  cares why I am doing it.

10                   MR. INGRAM:  May I at this time

11  interject something for the record or would you

12  prefer I wait?

13                   THE COURT:  Go ahead.

14                   MR. INGRAM:  The conversations

15  between Donna on the one hand and Mr. Juhasz and I

16  on the other hand relating to the presentation of

17  mitigating evidence during the sentencing phase of

18  these proceedings occurred over at least a five day

19  time span.  We have explained to Donna the exact

20  nature of the mitigating evidence that we propose

21  to introduce.  We have obtained hospital records

22  relating to a six day psychiatric stay in the year

6225

1   2000.  There was a hospitalization in April of --

2   two hospitalizations of April of 1999 relating to a

3   traffic accident.  We have obtained counseling

4   records from Valley Counseling.  We made

5   arrangements for basically family members to come

6   and testify during the sentencing phase.  Those

7   witnesses were canceled.  Donna has instructed us

8   not to present mitigating evidence.  And while I

9   professionally and personally may disagree with

10   that decision, I'll state on the record that it is

11   my personal and professional opinion that Donna's

12   decision making process was rational and that she's

13   competent to make the decision.  I believe

14   Mr. Juhasz should explain his own feelings on that

15   matter, but those are my opinions.  My own

16   perspective is that this is a rational, competent

17   decision on her part.  It is not one that I would

18   make, it is not one that I professionally approve

19   of, but it is her decision, not mine.

20               THE COURT:  Right.  Mr. Juhasz?

21               MR. JUHASZ:  Briefly.  I echo

22   everything Mr. Ingram said.  I suppose I would say

6226

1    in addition it is obviously difficult as a lawyer,

2    because what is being proposed here runs contrary

3    to our training, particularly our training for

4    certification for capital cases and it runs contra

5    to my experience in other capital cases in which I

6    have been involved, but this Court and all of the

7    lawyers in this room are fairly well acquainted

8    with me and I'm probably not making too much of an

9    exaggeration to say that nobody complains about

10   what I regard as an over exercise of governmental

11   power more than I do.  And that said, there is, I

12   guess, a certain amount of big brother in what we

13   do in these mitigation phases because we in essence

14   tell a Defendant that this is what they have to do.

15        My reading of the case law, however, is

16   actually fairly consistent with my own view of what

17   the Constitution requires and that is if a person

18   has a liberty under the United States or Ohio

19   Constitutions and they knowingly and voluntarily

20   and intelligently decide to forego or give up that

21   liberty, then that is something that all of us are

22   duty bound to honor.  She has that type of liberty

6227

1  under the Eighth Amendment of the United States

2  Constitution and Article One, Section IX of the

3  Ohio Constitution and having met with Donna, and

4  Mr. Ingram and conferred with Dr. Eberle, I am

5  comfortable that what Donna is doing is in indeed,

6  knowing and voluntary and intelligent.

7          MR. INGRAM:  Dr. Eberle is with us.

8  I do think it would be appropriate for the Court to

9  inquire of him.

10         THE COURT:  I would like to make one

11  observation.  I had an opportunity to see Miss

12  Roberts during the entire trial and I notice, or I

13  perceive a totally different person today as far as

14  being, appearing to be less emotional, less up

15  tight, for want of better words, and a more relaxed

16  person.

17         THE DEFENDANT:  Every CO said that

18  since I went back there Wednesday.  Every

19  correction officer said that.

20         THE COURT:  Dr. Eberle.

21             DR. THOMAS EBERLE

22  being duly sworn according to law, on his oath,

6228

1  testified as follows:

2  　　　　　THE COURT:  If I may inquire.

3  　　　　　MR. JUHASZ:  Absolutely.

4  <u>EXAMINATION BY THE COURT OF DR. EBERLE</u>:

5  Q.  How long have you -- how long has it been

6  　　　　since you first met Miss Roberts?

7  A.  My first contact with Miss Roberts was toward

8  　　　　the end of March, 2003.

9  Q.  You had a period of time then to speak with

10  　　　　her to know things concerning her?

11  A.  Yes.

12  Q.  And will you agree that she was of a different

13  　　　　attitude and mental state when you first

14  　　　　saw her than from what she is now?

15  A.  Yes, I would agree.

16  Q.  You have had an opportunity today and recently

17  　　　　to speak with her?

18  A.  Yes, I spent a couple of hours with her this

19  　　　　morning.

20  Q.  I assume that you did various testing and

21  　　　　whatever?

22  A.  I evaluated her, yes.  We didn't do any formal

6229

1          psychological testing.

2  Q.    Based on that personal contact and testing and

3          with your -- I should ask this question.

4          There's no objection by the State that

5          Dr. Eberle is qualified?

6              MR. BECKER:  He may want to state

7  his name, who he is and what his experience is.  I

8  don't have an objection.  I think he's qualified.

9  A.    Thomas Eberle.  I have a Ph.D. in clinical

10         psychology which I received from the

11         University of Pittsburgh in 1974 and

12         board certified in forensic psychology by

13         the American Board of Professional

14         Psychology since 1980, licensed to

15         practice in Pennsylvania where I reside.

16         I have been practicing in this area,

17         forensic psychology before I was board

18         certified, probably for about 25 years

19         and full time private practice primarily

20         in and around the Pittsburgh area.  On

21         the staff of a number of VA Hospitals,

22         West Penn Hospital.  University of

6230

1              Pittsburgh Medical Center.

2                   MR. BECKER:  You have been qualified

3    as an expert in the State of Ohio?

4    A.    I have testified in Ohio before and in fact in

5              this County.

6                   THE COURT:  The Court will accept

7    the doctor's testimony as an expert witness in the

8    field of psychology.  Hearing no objections, I'll

9    proceed.

10   Q.    Doctor, based on your training, your

11             opportunity to discuss this matter fully

12             with Miss Roberts and from your personal

13             observations, do you have a professional

14             opinion beyond a reasonable degree of

15             medical certainty concerning her

16             competency?

17   A.    I do.  Donna and I discussed this extensively

18             today, rather than previously because

19             when I had seen her before, it was prior

20             to the trial.  And it is my opinion,

21             based on my training and experience and

22             my contact with Donna that she's now

6231

```
 1              mentally and rationally making this
 2              decision for reasons that are not
 3              unintelligent.  And again, I would echo
 4              what Mr. Ingram said.  It is not
 5              necessarily what I would personally do,
 6              but it is really her right to make that
 7              decision, and I find no psychiatric or
 8              psychological abnormality that would
 9              prevent her from having the faculties
10              needed to make that decision in a
11              rational way.
12     Q.    Based upon your conversations with her,
13              without getting into what those are and
14              your entire knowledge of this situation,
15              you feel that it is a rational decision
16              on her part?
17     A.    Yes, I do.
18     Q.    You have discussed that fully with her?
19     A.    Specifically and fully, yes, Your Honor.
20                   THE COURT:  I would allow either
21     side an opportunity, if you have any further
22     questions of the doctor.
```

6232

1      MR. INGRAM:  I have nothing further

2   from the Defense.

3      MR. BECKER:  I think the Court has

4   complied with the dictates of State vs. Ashworth.

5   Other than the fact that the Court wants to

6   address --

7      THE COURT:  Donna, you have heard

8   what these other folks have had to say.  I think

9   both your attorneys and the doctor here have

10  expressed something to the effect that they don't

11  know that they necessarily agree with your

12  decision.  They accept the fact, as Mr. Juhasz put

13  it, but you of course have the right to take the

14  approach that you are, but I must be entirely

15  convinced that this is your wish, and that you

16  understand all aspects of it, that you understand

17  that by waiving the presentation of mitigating

18  evidence, this Jury has little to go upon in coming

19  up with something other than the death penalty.

20     THE DEFENDANT:  That is what I hope

21  for.

22     THE COURT:  Do you have any other

6233

1  questions about what you are doing or any questions

2  about anything that I or these other folks may

3  answer for you?

4              THE DEFENDANT:  No, Sir.  I know

5  what I am doing and I know why.  Thank you for

6  asking.

7              THE COURT:  Gentlemen, do you have

8  anything further?

9              MR. JUHASZ:  Yes, Sir.  Donna, do

10  you understand that this decision once made is what

11  lawyers call irrevocable?  You can't take it back.

12  You can't later --

13              THE DEFENDANT:  Yes, John.

14              THE COURT:  That is a good point,

15  because Miss Roberts, in this one case that they

16  are referring to, this <u>Ashworth</u> case, that is one

17  of the basis that it was appealed upon, was that

18  the Defendant at a later time, after all of the

19  smoke had cleared, came to the decision that, "I

20  made a big mistake in waiving that mitigation," and

21  tried to get the Court to allow him a second

22  chance.  And there's no second chance.  This is

6234

1   irrevocable as he says.  You have any hesitation at
2   all?  Do you need more time?
3                   THE DEFENDANT:  Absolutely not.
4                   THE COURT:  The Court is satisfied
5   from the conversation that has occurred this
6   morning, from observing Miss Roberts in speaking
7   with her, that this is her voluntary decision.  She
8   appears to have no reluctance at all in making the
9   decision.  The Court will note that she appears to
10  me to be relieved in having made the decision.  I
11  do not understand why that is, nor is it necessary
12  that I do.  She's expressed several times that she
13  has come to some resolution in her own mind, that
14  this is what she wants to do.  And I guess again as
15  Mr. Juhasz says, it is not my function here to
16  impose what I would do or what I would think is
17  proper, that is strictly Miss Roberts say on the
18  matter and she's had her say.  Do you wish to stick
19  by that, is that correct?
20                  THE DEFENDANT:  Yes, Sir.
21                  THE COURT:  Fair enough.
22                  MR. INGRAM:  I take it from what you

6235

1    have just stated for the record, that you also find

2    that Donna's decision is a rational and competent

3    decision.

4              MR. BECKER:  Ashworth speaks of

5    freely and knowingly and voluntarily and

6    intelligently.

7              THE COURT:  Freely, knowingly and

8    voluntarily, intelligently.  It is done in a

9    rational basis, which is predicated on the

10   testimony of the doctor that she's competent to

11   make that decision.

12             THE DEFENDANT:  Just as long as I

13   get to make a statement tomorrow.  I do get to make

14   a statement tomorrow?

15             THE COURT:  Yes, you surely do if

16   you wish to do so, yes.

17             MR. JUHASZ:  I have one other thing

18   if it please the Court, and that is that we also

19   had a conference with Donna this morning.  The

20   Defense filed several motions this morning which we

21   had discussed with the Prosecutor yesterday and

22   faxed to them late in the day.  And with the

6236

1    exception of one, Donna has instructed us to

2    withdraw those.  We filed a motion to prohibit

3    reference to the nature and circumstances of the

4    offenses at certain times, because the Supreme

5    Court, after a long time has finally figured out

6    that that is indeed a mitigating circumstance and

7    not to be discussed unless raised by the Defense.

8    I don't know whether Donna intends to raise it or

9    not in her own unsworn statement, but she has

10   instructed us to withdraw that motion.

11                MR. BECKER:  Even speaking to that,

12   even if she does mention it in her unsworn

13   statement, we're prohibited from commenting on it

14   anyway.  The only thing we can say about the

15   unsworn statement is that it is an unsworn

16   statement.  Not subject to cross examination.  That

17   is the gist of what we can say about the unsworn

18   statement.

19                MR. JUHASZ:  Without that there, had

20   she not raised it in mitigation, had we gone

21   forward with mitigation, the Prosecutor would not

22   be allowed to argue about it in final argument.

6237

1            MR. BECKER:  I agree.

2            MR. JUHASZ:  That is also being

3   withdrawn.  We filed a motion to prohibit

4   readmission of certain Exhibits from the first

5   phase.  Basically, in a nutshell the argument was

6   that the only Exhibits that should be admitted in

7   the second phase would be those pertinent to the

8   aggravating circumstance.  She has instructed us to

9   withdraw that motion and to not object to the

10  admission of any Exhibits into the second phase, is

11  that right?

12            THE DEFENDANT:  Yes.

13            MR. JUHASZ:  And also we filed a

14  motion to merge the capital specifications under

15  2929.04 (A)(7) because they were in essence for

16  sentencing purposes, duplicative.  At least that

17  was the Defense argument and she has instructed us

18  to withdraw that motion as well, correct?

19            THE DEFENDANT:  Yes.

20            THE COURT:  That last is by virtue

21  of law.

22            MR. JUHASZ:  Yes, Sir.  The only

6238

1   other one that we did file this morning that she

2   did not instruct us to withdraw is the motion to --

3   Defendant's motion to prohibit improper comment by

4   the Prosecutor on the Defendant's unsworn

5   statement, and --

6                   THE COURT:  That motion will be

7   granted.

8                   MR. JUHASZ:  That one she has

9   instructed us not to withdraw.

10                  MR. BECKER:  For the record, we do

11  want to dismiss, I believe it is Count Two.

12                  MR. BAILEY:  We want to retain the

13  prior calculation and design, Aggravated Murder,

14  Count One, and dismiss the second count of

15  aggravated murder, which is the felony murder.

16                  THE COURT:  That motion will be

17  granted.

18                  MR. BAILEY:  Then when we move to

19  admit all of the relevant evidence, the evidence

20  that is relevant to the second phase from the first

21  phase, as to the testimony and evidence, we're not

22  offering everything, are we?  No, we'll cut that

6239

1  down.

2              THE COURT:  Donna, it is your wish

3  to withdraw the motions as specified?

4              THE DEFENDANT:  Yes, Sir.

5              THE COURT:  Those motions are

6  withdrawn.

7              THE DEFENDANT:  There's one other

8  thing.  I am wearing regular underwear today.

9  (End of In-chamber discussion at 12:20 p.m.)

10

11

12

13  Wednesday, June 4, 2003; In-chamber at 9:30 a.m.:

14              THE COURT:  We're assembled.  Do you

15  waive presence of the Defendant?

16              MR. INGRAM:  We do.

17              MR. JUHASZ:  So the record is

18  completely clear about that, we're in-chambers for

19  the purposes of discussing Jury instructions.  Miss

20  Roberts and I have had a conversation wherein I

21  advised her that I see a distinct difference

22  between a waiver of mitigation and counsel's

1  obligation to see to it that the Jury is properly

2  instructed on the applicable law relating to the

3  facts and evidence put before the Jury.  All of

4  that having been said, we have a bit of a

5  disagreement about that, but her presence is

6  waived.

7          THE COURT:  Because she does not

8  care to participate?

9          MR. JUHASZ:  Yes, Sir.

10          THE COURT:  Okay.  You have had an

11  opportunity to review this charge.

12          MR. JUHASZ:  Yes, Sir.  Mr. Becker

13  was kind enough to fax this to us yesterday

14  afternoon.  Mr. Ingram and I have gone over it.  Do

15  you want me to start in and tell you the

16  difficulties?

17          THE COURT:  Yes.

18          MR. JUHASZ:  Some of these are minor

19  changes, but they are, I think, necessary to comply

20  with what we believe is going to transpire.  On the

21  first full paragraph of page two where it says, "In

22  this phase of the proceedings, the Defense has," we

6241

1     just propose to change that to, "The Defendant has

2     presented an unsworn statement." Leave out the

3     rest of that sentence.

4            MR. BECKER: The first paragraph is

5     going to read, "In this phase of the proceedings,

6     the Defendant has presented an unsworn statement."

7     (OFF THE RECORD)

8            THE COURT: For the record, we have

9     gone over the charge. They have been retyped.

10    There are some objections, however, I believe from

11    the Defense.

12           MR. JUHASZ: If it please the Court,

13    the Court has in its possession now a set of Jury

14    instructions which contain the changes upon which

15    the parties have agreed. The Defendant, however,

16    still has the following objections. Several places

17    throughout the instructions, the word "recommend"

18    is used. We believe that that is and there was a

19    pre-trial motion on this and argument on this

20    before, however nonetheless, we object to the use

21    of the word "recommend" anyplace in the penalty

22    phase instructions. We believe that violates the

6242

1   Eighth Amendment and _Caldwell_ against _Mississippi_.

2   The second instruction we have has to do with

3   the -- I'm sorry, the second objection has to do

4   with the instructions concerning the specifications

5   themselves.  I think the record is fairly complete

6   as to what our objections are as to the language in

7   the specifications submitted to the trial jurors at

8   the end of the first phase, because the proposed

9   instructions, basically regurgitate that language

10  as far as providing the Jury the aggravating

11  circumstances in the second phase, we object to

12  that.

13          MR. BECKER:  The Defendant has

14  requested on page six that the third mitigating

15  factor that they are to consider would be that --

16  now this strictly out of the statute, although I

17  changed the pronoun.  "The offender was a

18  participant in the offense but not the principal

19  offender, the degree of her participation in the

20  offense and the degree of the offender's

21  participation in the acts that led to the death of

22  the victim."  That is verbatim from 2929.04 (B)(6).

6243

1          MR. JUHASZ:  That is the record.

2  The record should reflect that is an instruction

3  that was added at the request of the Defendant.

4  The basis for that is even if Miss Roberts does not

5  bring that up in, what we anticipate to be her

6  unsworn statement presented here in the mitigation

7  phase, the trial Jury is allowed to consider

8  Exhibits and testimony from the first phase as they

9  are relevant to both the aggravating circumstances

10  and the mitigating factors, and it seems to us that

11  that is an appropriate mitigating factor based upon

12  the evidence presented at the first phase.

13          MR. BECKER:  There was an additional

14  request by the Defense that the language indicating

15  that her unsworn statement was not evidence be

16  removed.  So that language has been removed simply

17  stating that it now says, "The Defendant gave an

18  unsworn statement in this matter and therefore

19  cross examination was not permitted.  It is her

20  right under Ohio law to do so, and this statement

21  may be considered by you for whatever purpose you

22  may assign."  The language in there that was not

6244

1    evidence has been taken out.

2                    THE COURT:  Okay.

3    (OFF THE RECORD)

4                    MR. BAILEY:  The Defendant -- do you

5    want to address the question about the Defendant

6    wearing jail clothes?

7                    MR. INGRAM:  The Defendant is

8    presently attired in blue coveralls.  She's attired

9    in blue coveralls as a result of her free and

10   voluntary choice.  She was given an opportunity to

11   change into civilian clothes.  Captain Bacon

12   actually encouraged and recommended that she change

13   into civilian clothes.  She declined that

14   opportunity, and she's wearing the coveralls

15   because she chooses to wear the coveralls.

16   Personally, I don't fault that decision.

17                   MR. BECKER:  We're going to move for

18   the admission of some State's Exhibits in relevance

19   to this phase.  Specifically, number 266, the

20   bullet from the brain.  257, the bullet removed

21   from the clothing.  259, the bullet removed from

22   the wall.  Photographs 191, 184, 182, 181, 178,

6245

1  174, 172, all of those are of the silver Chrysler

2  300-M.  State's Exhibits 7, 13, 27 and 57 which are

3  photographs of Mr. Fingerhut.  State's Exhibit 360

4  which is the log from the Lorain Correctional

5  Center.  State's Exhibits 362-A through and

6  including 381-A, those are the transcripts of the

7  telephone calls between Miss Roberts and

8  Mr. Jackson.  322, which is the certified phone

9  records of the phone calls before the homicide.

10  The actual taped conversations which are State's

11  Exhibits 360 is the CD and then 361 through 381

12  which are the audio tapes and then finally all of

13  the letters which are State's Exhibits 273, 271,

14  and then there's also a 275-A and 275-B, which are

15  also letters that were found.  It is all of the

16  letters, all of the phone calls and that would be

17  what we're going to move for admission for in this

18  phase.

19          MR. BAILEY:  I have to do that on

20  the record then, don't I, when we start out?  I'll

21  just move for admission.

22          MR. INGRAM:  We object to the CD.

6246

1          MR. BECKER:  The only reason I would

2  ask for the CD to be thrown in there in the event

3  the tapes would break.  If they want to, we can get

4  them a computer to play the CD on.  These tapes

5  have been listened to by the Jury.

6          THE COURT:  What is your objection

7  based on?

8          MR. INGRAM:  You are introducing,

9  the State is introducing the same evidence in three

10  different formats.  One is a CD rom.  I think that

11  is actually an edited CD Rom.  The other is the

12  original tapes themselves, and then the

13  transcripts.  I think it is unfair for them to

14  introduce the same evidence in three separate

15  mediums.

16          THE COURT:  I think it is the same

17  evidence, but you are saying that this isn't the

18  same evidence because it has been edited?

19          MR. INGRAM:  The CD, I believe, is

20  edited.

21          THE COURT:  From the tapes?

22          MR. INGRAM:  From the tapes.  They

6247

1    have introduced the tapes.

2              THE COURT:  The tapes are the best

3    evidence, I'll agree with that.  If something would

4    happen, which is very unlikely that the tapes would

5    not be usable by then, then I can always introduce

6    it.

7              MR. INGRAM:  We can always make new

8    copies of the tapes.  They have a tape player back

9    there.  They do not have a computer to play the CD.

10             THE COURT:  Do you have the tapes as

11   part of your submission?

12             MR. BAILEY:  Yes.

13             THE COURT:  That is good enough.

14   State's Exhibit 361 will be kept out.

15   (End of In-chamber discussion)

16   (In Open Court with Jury present at 10:30 a.m.)

17             THE COURT:  Good morning to the

18   Jury.  Ladies and gentlemen, we're now ready to

19   proceed with the second phase of this trial.  You

20   will be required to make a decision on the sentence

21   that you are to recommend to this Court.  Before we

22   proceed, I am required to ask all of you, have you

6248

1   been subjected to any information about this trial

2   during the past several days since you returned

3   your verdict in regard to anything about the trial

4   of any nature, be that through the media, the

5   newspapers, T.V.?  Has anyone approached you and

6   talked with you about the trial where you were

7   unable to avoid them?

8   (All nodded negatively.)

9              THE COURT:  Have all of you been

10  able to follow the admonition given previously to

11  the letter?  I see you all shaking your heads yes.

12  Are there any of you that are unable to proceed

13  with this second phase?  I see no signs to the

14  contrary.

15             Now the Defendant is given an opportunity

16  to present evidence in mitigation of the imposition

17  of the sentence of death.  Mitigating factors are

18  factors that while they do not justify or excuse a

19  crime, nevertheless, may be considered by you, the

20  Jury, in fairness and mercy, as extenuating or

21  reducing the degree of the Defendant's punishment.

22  The Defendant has a right to proceed first, with an

6249

1   opening statement and the presentation of evidence.
2   The State of Ohio may offer evidence in rebuttal of
3   any mitigating evidence presented by the Defendant,
4   though you have already found the Defendant, Donna
5   Roberts guilty of the aggravating circumstances in
6   this matter.

7           But at the first phase of the trial, you
8   decided that the Defendant was guilty of two counts
9   of aggravated murder, as well as two specifications
10  of aggravating circumstances that were attached to
11  the first count and two specifications that were
12  attached to the second count.  Because the acts for
13  which the Defendant stands convicted as to Counts
14  One and Two constitute only one event, she can only
15  be punished for one offense of Aggravated Murder of
16  the person of Robert S. Fingerhut.  As a result,
17  the State of Ohio has elected to dismiss the second
18  count of the indictment at this second phase of the
19  trial.

20          This means that the Defendant stands
21  convicted for penalty purposes of Count One of the
22  indictment together with the two specifications

6250

1    attached to Count One.  Now the State of Ohio bears

2    the burden of proving to you that these aggravating

3    circumstances outweigh any mitigating factors which

4    may be presented to you in this hearing before you

5    can return a sentence recommending death beyond a

6    reasonable doubt.

7              At the conclusion of the evidence, the

8    State of Ohio will have the opportunity to open and

9    close the final arguments, that is, of course,

10   because they bear the burden of proof.  Thereafter,

11   I'll be called upon to give you instructions of law

12   further defining your duties in regard to the

13   burden of proof and how you are to indicate your

14   decision to us.

15             You will remain under the admonition I

16   gave you at the very outset of this case.  You may

17   not form or express any opinion concerning this

18   case until all of the evidence and arguments are

19   presented to you and you are back in the Jury room.

20   You may not have any contact with the parties,

21   witnesses or lawyers for any reason, or in any way

22   attempt to investigate the subject matter of this

6251

1   case on your own.  You may not discuss this case

2   among yourselves or with anyone else or let anyone

3   discuss it with you or in your presence until I

4   tell you, you may do so.  You may not read about

5   this case in the newspaper, listen to it on the

6   radio or television, or let anyone read to you or

7   comment to you about it.

8           Now the function of the alternate jurors

9   remains the same.  You should pay close attention

10  to the evidence, the arguments of counsel, and

11  instructions of law, in case you are called upon to

12  replace one of the 12 jurors before they start

13  their deliberations.  Once you have begun your

14  deliberations, you will be sequestered.  This means

15  that if your deliberations go into an evening this

16  week, you will be sequestered together overnight.

17  Are counsel ready to proceed with the second phase

18  of this trial?

19                  MR. BAILEY:  Yes.

20                  MR. INGRAM:  Yes.

21                  MR. BAILEY:  The State moves to

22  introduce any and all evidence raised at trial that

6252

1   is relevant to the aggravating circumstances the

2   offender was found guilty of committing.

3                    THE COURT:  For the record, we have

4   gone over in-camera and placed on the record those

5   specific Exhibits which the State is going, which

6   the State has proffered and the Court has accepted

7   as evidence for the purpose of the second phase.

8   The Defense has made objections and the Court has

9   ruled on those objections on the record.  Is that

10  agreed?

11                   MR. INGRAM:  That is agreed on the

12  Exhibits.

13                   MR. BAILEY:  Yes, Your Honor.

14                   THE COURT:  You may proceed.

15                   MR. INGRAM:  Pursuant to Donna's

16  instructions, the Defense will waive opening

17  statement.

18                   THE COURT:  Thank you.

19  Mr. Prosecutor, I should ask further, does the

20  State have any opening statement you wish to make?

21                   MR. BAILEY:  We're going to waive

22  our opening statement.

6253

1        THE COURT:  Does the Defense have

2   anything that you wish to present at this time?

3        MR. INGRAM:  Donna would like to

4   make an unsworn statement from the podium if she

5   may.

6        THE COURT:  Very well.

7        THE DEFENDANT:  Hi.  I wear my jail

8   clothes that I have been wearing for a year and a

9   half.  I didn't think I had to dress today.  How

10  many wrong turns does a person have to make to get

11  to where I am today?  Just one.

12       THE COURT:  Is the Jury able to hear

13  the Defendant?

14       JUROR:  No.

15       THE COURT:  You are welcome to take

16  the stand here.

17       THE DEFENDANT:  We're not presenting

18  any mitigating circumstances today, which means

19  there are no doctors testifying, my family is not

20  testifying.  Even though my son is nice enough to

21  come for today.  We're not getting any kind of

22  evidence, nothing.  We're giving you no mitigating

6254

1    circumstances whatsoever.

2         The reason I'm up here is because I have

3    to get things out of me that have been in me for a

4    year and a half.  It is not going to make any

5    difference.  It cannot make any difference in your

6    decision today.  You made your decision that I'm

7    guilty.  The aggravating circumstances, mitigating.

8    There are none.  You don't have much of a choice.

9    I'm going to read this.  Well, like I said, we're

10   not calling anyone else, so I'm going to take 45 or

11   50 minutes, but I'll try to go fast.  Try to keep

12   up.

13        Some good has to come out of this

14   nightmare and I know that Robert would have wanted

15   that to be like that.  I'm not taking an oath today

16   because when you take an oath it is a very serious

17   thing according to my religion, which you know what

18   that is now because the Prosecutor told you.  If

19   you take an oath and say one wrong word, one in 50

20   pages, you have taken God's name in vain, and I'll

21   not take the chance of doing that like many of

22   these witnesses did.  It is a sin.  I have

6255

1    committed other sins, but that is not one of them.

2         Now I'm not standing here to beg you to

3    spare my life.  That is not my intention.  If it

4    was I would have allowed everybody to speak like I

5    told you.  I refused.  I refused to let them make

6    any kind of statements.  What I'll say is in no way

7    to be conceived as mitigating like I told you.  I

8    offer none.  There are two reasons that I want to

9    speak; one is to expose people who have taken an

10   oath to God to tell the truth, the whole truth, and

11   then sat in that witness box and lied and cheated,

12   abused authority, used their power to destroy

13   lives, and do so in the most serious place in the

14   most serious of circumstances, a Courtroom and a

15   murder trial, with a possible death penalty, times

16   two.

17         This is the second one.  The second

18   reason is to demand racial equality in a Courtroom.

19   All men are created equal -- don't laugh.  It's

20   funny, isn't it?  We say that.  Who means it?

21   Nobody.  Unless your skin is black, you grew up on

22   the streets because you had no other choice, you

6256

1   are not equal.  Because you are poor and you must

2   place your life in the hands of incompetent Public

3   Defenders, you are not equal.  What does our

4   Government do, our State do, our community do, or

5   one of you do to help insure proper education,

6   housing, or a safe environment for our less

7   fortunate, helpless children who never have a

8   chance from the moment they are born get a chance?

9   How many of you can say  you have done anything?

10       Well, I have taken action or lack of it

11  today to make certain that this little old white

12  lady you have been hearing about, receives equal

13  consideration and judgment as the laws of the land

14  demands.  I'm not going to apologize for keeping

15  you here or thank you for listening.  The attorneys

16  and the Judge have done enough of that.  It is your

17  job and you have to be here, however long it takes.

18       I have a right to speak today.  It is the

19  law.  I only apologize to those two gentlemen right

20  there, John and Jerry.  For a year and a half they

21  put up with me.  I'm sure one of them wanted to gag

22  me and walk out of that door and never come back.

6257

1    I don't care if you like me or hate me.  It makes

2    no difference to me.  I'll tell you this, you don't

3    even know me.  You have been shown what amounts to

4    about five percent of my life.  That five percent

5    included being with Nathaniel Jackson eight times

6    in the 14 months prior to this horrible incident.

7    That is all provable with prison records, Halfway

8    House records.  The other 95 percent of my life was

9    dedicated to my husband, my son, my family and

10   business, and doing charity for unfortunate to

11   share the good fortune that God bestowed upon me

12   and my loved ones.

13          Why is it that a middle aged man can have

14   an affair with a 25 year old woman, tell her he

15   loves her, hates his wife, she doesn't understand

16   him, he wants to be with her, the next day he's at

17   a piano recital for his daughter with his wife.

18   There you go.  Where is the equality there?

19   There's none.

20          The key players in this room are one,

21   two, three, four.  Four attorneys.  All white.

22   Judge Stuard, with all due respect, you are white.

6258

1 The man who is guarding me back and forth for two
2 months, he's white.  The reporter over there, he's
3 white.  The other reporter, she's white.  You see a
4 black camera man?  No.  They take the pictures they
5 want.  They show the pictures they want.  They
6 publish the pictures they want.  That man over
7 there prints what he wants.
8         Do you remember that day, the barber
9 lady, she was here.  One attorney said, "Who paid
10 you for Nate's hair cut?"  She said, "Nate did."
11 Everybody heard it.  You know what was in the paper
12 the next day, tell them.  The barber said Donna
13 paid her.  I know she was speaking English.
14 Everybody else heard it.  That is why Judge Stuard
15 said don't read the papers.  That is why in that
16 Jury questionnaire you filled out on your interview
17 they said, "Do you believe everything you read in
18 the paper or hear on the news?"  If you would have
19 written "Yes," you wouldn't be here today.  Trust
20 me.
21         Another thing about the press I didn't
22 want to forget.  They never gave my attorneys fair

6259

1   credit when they tore their witnesses up and showed

2   you they were lying and they had conflicting

3   testimony.  You never saw that in the newspaper.

4   Sometimes it was printed exactly the opposite of

5   what the witnesses said, and always in the

6   Prosecution's favor.  Mr. Bobbey referred to my

7   husband for a year and a half as a Howland

8   businessman.  Do you know what he called me?  A

9   live-in companion.  A live-in lover, an employee,

10  an ex-employee, a common law wife, and a few other

11  things.  I have been a business woman for about 40

12  years.  You know, I worked for a plastic surgeon

13  for about 25 of those.  It was just me and him.  I

14  did a lot.  When we moved up here, we had the Avis

15  franchise at the airport, then we had the

16  Greyhounds.  I also ran a business in Youngstown, a

17  restaurant, which in that case he referred to me as

18  a restaurant worker.

19          After being in the public and attaining

20  the age of 59, I think I'm a pretty good judge of

21  character.  In fact, after reading your Jury

22  questionnaires and looking at each of you for a

6260

1   couple of weeks, I see some of you who I wouldn't

2   even care to know personally, really.  And I

3   certainly wouldn't want you on my Jury judging me

4   or my life if I had a choice.  I do not consider

5   you a Jury of my peers by any means.

6          I have lived here in the sixties, in

7   Miami for 27 years.  It is an entirely different

8   type of society.  I have traveled around the world

9   a couple of times.  I have been exposed to other

10  nationalities in their own environment, their life

11  styles, different races, beliefs.  And education

12  results in acceptance and understanding.  Education

13  of other people results in acceptance and

14  understanding.

15         Some of you qualified to sit on my Jury

16  because you said you had no preconceived ideas with

17  regard to this case.  Among the reasons you put to

18  justify that was because you didn't watch the news

19  and you didn't read the papers.  That is scary,

20  folks.  But you sit and you judged me.  Do you know

21  what is happening in the world?  How do you live

22  without reading the paper and watching the news?  I

6261

 1   don't know.  My husband and I at night from 10:30
 2   to midnight, that was our time with our two little
 3   girls, Fluffy and Blossom.  We talked about
 4   everything in the paper, everything on the news,
 5   everything we knew that was happening, everything
 6   people said, everybody's opinions.
 7            I have had some experiences in my life
 8   that none of you will ever have.  I believe two of
 9   you are 36 years old, one of you is 30 years old,
10   and Amy, you are 20 years old.  I just cannot
11   believe that such young inexperienced people have
12   knowledge, insight or the wisdom to sit in judgment
13   of me, or anyone else, and certainly not in such a
14   serious case, and be able to make even a fair or
15   near proper appraisal of my life, my lifestyle, the
16   evidence, what it means, and how it applies to me.
17            For half of this case, the Prosecution
18   rehashed the Nathaniel Jackson case.  They didn't
19   mention about self-defense.  Mr. Becker said
20   Nathaniel Jackson shot himself.  That would be
21   impossible.  They said he ambushed.  He would have
22   had to have been holding the gun, which he didn't

6262

1    have, in his left hand.  He's left handed.  He got

2    shot first, we know that.  My husband's wounds were

3    fatal.  They talked about red and black sneakers

4    three, four, five times, that with so many other

5    things I turned to John because he was closest to

6    me and I said, "What the hell does that have to do

7    with me?"  And you know what John said, "Nothing."

8    Speaking of red.  What does red thong underwear

9    have to do with a murder case?  Can anybody tell

10   me?  Mr. Bailey kept harping and harping on a red

11   thong.  So what?  If they would have found me not

12   guilty, I would have gone out and bought his wife a

13   pair.

14        To be serious about the Prosecution for a

15   moment.  I have to point out two grievous offenses

16   committed by Mr. Becker.  They may not sound like

17   much, but they are the seeds of evil, racism, and

18   intolerance and AntiSemitism.  Mr. Becker, in his

19   opening statement, mentioned something about a

20   black man, he looked at me, and pointed me out, and

21   said that that is her preference.  How can he say

22   that?  I was married to my husband, he's white, for

6263

1   20 years.  My son's father is white.  I knew

2   Nathaniel Jackson two years, I saw him eight times

3   in 14 months.

4         There was one other thing Mr. Becker did

5   that I think is really unforgivable.  Paul Monroe

6   was up here, the man who wanted to be Chief of

7   Police really bad, and he asked him about my

8   marital status and Paul Monroe said, "Yes, it is

9   true."  I said that I was divorced from my husband

10  since 1985, but that we honored our religious vows.

11  Now, well unless you get married in the Courthouse,

12  takes religious vows, you know what those are, but

13  he had to go one step further.  He had to say what

14  religion, because he knew the answer and you know

15  the answer and I know none of you forgot it.

16  "She's Jewish."  Who do people hate more than black

17  people?  Jews.  You went in that room, thinking,

18  black and Jews.  I know it.  You know it.  We all

19  know it, because that is the way it is in this

20  world today.  Black and Jewish.

21        I guess it is obvious to you by now, I'm

22  not trying to make friends and influence people

6264

1  here.  My admission is to expose to you one thing

2  there has been too little of in this Courtroom and

3  that is the truth, the whole truth.  You know when

4  you say a half truth, it sounds like something else

5  all together.  Jerry told you during Jury selection

6  that your job was to find the truth.  You may think

7  you found the truth.  You had sexy, nasty prison

8  letters to read.  The kind every inmate begs for.

9  You had phone calls from a thug to listen to.  That

10  you accepted all as the truth.  No question.

11  Because you didn't understand.

12          I refused to allow a forensic

13  psychiatrist or any psychiatrist to come here and

14  testify about me today.  I didn't want anybody to

15  influence you.  I didn't want any mitigating

16  factors and I'll tell you why later.  You already

17  had your mind set already on what you would believe

18  and what everyone had testified about.  But now I

19  already said that, I didn't want any mitigating

20  factors.  The truth is the opposite of falsehoods.

21  We know that.  Magic, smoke screens, illusions,

22  they are not the truth.  If they were but they were

6265

1    put before you over and over again.  I wonder how

2    many of you were able to see through any of them,

3    some of them, maybe all of them, I doubt it.

4         None of what I reveal to you can be used

5    as evidence today.  It is all over.  I am making an

6    unsworn statement.  It doesn't count.  Whatever I

7    tell you doesn't count.  Whatever I say, am I

8    correct, cannot be used as mitigating circumstances

9    whatsoever.  I just want to get it out of me,

10   before I go away to a place where I'm going to come

11   out in a box.

12        First I'm going to give you a few things

13   that have been bothering me, then I'm going to go

14   into the magic tricks.  You will be amazed.  Do you

15   remember Kathy Thomas, my State Farm Insurance

16   agent?  House, cars, life, businesses.  Paul Monroe

17   said that he asked me how much life insurance did

18   we have all together.  I told him $300,000.  I did

19   tell him that.  That was the truth as I knew it.

20   My husband changed three policies that he had for

21   like 25 years into one, $250,000 one.  I had no

22   knowledge.  He raised it to three, so he had 250, I

6266

1    had 50, that is three.

2          She also told you for the whole month of

3    November, they played phone tag, because my husband

4    wanted to get a million dollars in coverage.  He

5    knew without him, that I would be helpless.  He was

6    right.  So, I thought we had all of our insurance

7    through State Farm and you know what, I am

8    surprised really that Robert went anywhere else,

9    but he did, probably because it was a little

10   cheaper.  And not until I was in jail, arrested and

11   in jail, my son came to take care of my, whatever

12   it had to be taken care of in one of the checking

13   accounts, I believe there was seven or eight.  He

14   said, "Mom, there's an account here that ends with

15   617, my birthday, what is that?"  I said, "I don't

16   know."  He says, "It has just the ticket on it."  I

17   said, "That is the restaurant account.  It should

18   have been closed in December of 1999."  Well, it

19   wasn't.  We found out that my husband had been

20   making deposits for every month for 100 dollars.

21   $87 of which in change, went to pay this Zurick

22   thing.  I had no knowledge of that.  It was an

6267

1  automatic deduction.

2         Now, Mr. Bailey calls me greedy.  He

3  doesn't know me.  He doesn't know who I helped.  He

4  doesn't know about my financial reports.  We had

5  the Youngstown Greyhound, the Warren Greyhound, a

6  restaurant, apartment buildings, other interest

7  income, I was drawing $1300 a month myself from my

8  retirement fund.  We earned over $200,000 a year.

9  Did you know that?  I know that sounds like a lot

10  to most people.  It used to sound like a lot to me,

11  but how can you think that $250,000 in life

12  insurance means anything when you are making

13  $200,000 a year?  How could you believe a person

14  could murder a person for that?  What would I do

15  after the second year?  Why would I do that at all?

16         The Prosecutor, Mr. Watkins, I remember

17  in Mr. Jackson's case said about me, I don't know

18  why, it was his case, his trial.  "She had

19  everything," he yelled and pounded the table.  He's

20  right.  I had everything.  I had more than

21  everything.  I spoiled my husband as much as I

22  could.  We went walking at the mall.  Whatever he

6268

1    saw, I got for him.  I made him get it.  He had a

2    extensive sports collection, hundreds of thousands

3    of dollars worth.  The whole downstairs was like

4    another house.  It was full of the stuff.  I had

5    everything.  Now I have nothing.  But the most

6    important thing I don't have is Robert, and my two

7    little girls.  I want you to look at them.  This is

8    Fluffy and Blossom.  Pass it down.  Get to know me

9    more.  This is my husband with the little brown

10    dog.  Whenever you saw him, you saw her.  She slept

11    on his pillows, sat at his feet.  Let him carry her

12    around and we all talked about will the real Donna

13    Roberts please stand up.  You stole that.  That was

14    my line.  This was before I came to jail.  I really

15    did dye my hair and I really did wear makeup, and

16    Mr. Bailey thinks because of that, I'm an evil

17    person.  I don't think there's one woman in here

18    that doesn't care how she looks, that doesn't fix

19    her hair and doesn't wear makeup.  The matriarchs

20    in the Bible, they all wore makeup from berries and

21    plants to look nice for their husbands.  Today

22    we're the same.

6269

```
 1            I don't know if I should tell you this,
 2    but as far as those policies were concerned, my
 3    husband had a very bad relationship with his two
 4    sons in a previous marriage.  Every couple of
 5    years, I would try to get them to be friends again,
 6    but it never worked, because they agitated him to
 7    be sick.  He made me swear to him once a month,
 8    because he knew if I raised my hand, it was to be
 9    the truth, that I would never -- he said, "You are
10    so sweet, you are so nice, you are going to give
11    them something.  If you do, swear you won't, I
12    don't want them to have anything."  He wrote a Will
13    up, and in that Will, he wrote, "I want," you have
14    to mention your kids by the way, if you don't
15    mention them, then they can sue and they probably
16    get everything anyway.  He did mention them to
17    avoid that problem, and he said, "I want each of my
18    sons, Alan and Michael, to receive a half penny
19    each."  A total of one penny for the two of them.
20    Before I knew, before this even started, I thought
21    the verdict was going to be not guilty.  If you
22    feel not guilty, you are going to figure it is
```

6270

1  going to come out like that, but even though I

2  never had an idea what it would be, I signed those

3  policies and I broke my word over to his estate.  I

4  didn't get a penny.  I didn't want a penny.  I

5  didn't care about the money.  I'm not a greedy

6  person, believe me, far from it.

7          I have to spend a little extra time on

8  this one.  Maybe I shouldn't even bother.  I was

9  going to talk about that Santiago Mason that has

10  absolutely nothing to do with this case, but they

11  brought him in, because he was another black man

12  and yes, he's suing me because he said I tried to

13  frame him.  Let's see, how do you frame somebody?

14  You know a crime is going to take place, I didn't.

15  You have to have the weapon he's going to use and

16  leave it at the scene.  You have to know where he

17  is preferably with you to frame him, or he's going

18  to have an alibi.  After I pressed charges against

19  him, which I took the time out of my busy day.  It

20  cost me $75.  I didn't hear from him or see him for

21  three weeks.  I didn't no where he was, what he was

22  doing.  The man who called me every day, after

6271

1   that, he didn't.  He could have been at a
2   policeman's ball in New York, dancing a laptop
3   dance for all I know.  How do you frame a person?
4   That is just -- I'm going to skip these whole two
5   pages here, about how he stole from me three times,
6   but I still gave him a break because I don't want
7   to honor him or speak about him.

8           And you know what bothered me?  He said
9   when he was in my house that he didn't want
10  anything of my husband's collection because they
11  were all size small.  Let me tell you about my
12  husband and his collection.  They took rows and
13  rows and rows of closets, downstairs, upstairs.  He
14  was a fanatic about it.  He loved it.  I started
15  him on it.  I bought him half the stuff he had.  He
16  had every Jersey, they were this clothes, five, 600
17  of them, by team, home and away, by number.  If you
18  touched the sleeve of the sleeve hanging out, that
19  man would know it, that you were in that closet.
20  Trust me, believe that.  If it wasn't true, I
21  wouldn't think to say it.

22          This man says he didn't want them -- my

6272

1   husband's were no smaller than three X's.  I
2   wouldn't touch them.  I certainly wouldn't give
3   them to a man like that and if I did offer him a
4   Jersey, he would have probably taken it to sell it
5   for half price to buy more crack.  We know he was
6   in prison a couple of times for doing that, buying
7   and selling it, using it.  Then they show you a
8   picture of a sofa in my house to insult me even
9   more, a little green leather sofa on a parquet
10  floor with an area rug.  You know I looked at that
11  picture but I was so stunned by listening to this
12  guy lying, lying, that it just didn't hit me until
13  when I was back in the jail in my little cell.  I
14  am thinking something is wrong.  He was in the
15  family room, with the fireplace and the big screen
16  T.V.  This sofa that Paul Monroe took a picture of
17  and showed you, was in my computer room back by the
18  library.  I never went in there.  My husband did to
19  use the computer, to look for Jerseys to buy.  My
20  family room has an L-shaped light turquoise sofa,
21  big, high backed, a big coffee table and wall to
22  wall carpeting.  How low can you go?  Did you see

6273

1   my picture there?  He says that I accused him of

2   stealing my gun and money because he wouldn't have

3   sex with me.  But that I performed oral sex on him

4   on that green sofa in a room where I never go in in

5   the back of the house.  You see why I have to get

6   this all out?  I'm not telling you any lies.  You

7   can look at the pictures.  I wish the house was

8   still as it was, but I lost my home right after I

9   lost my husband.  Because then you can see for

10  yourself, it was a whole big lie again.  But you

11  know what, each time they tell you another fact

12  about something it makes it seem so much more real.

13  This, this, and this and that.  It is such an

14  involved story, how could it not be true?  How

15  could it be a lie?  Trust me.  It can be.  It was

16  and it can be and it was.  That is enough for him.

17          We're going to skip two pages of him.

18  Now we'll get into the magic part.  Smoke screens,

19  illusions and magic.  Those are only there to hide

20  the truth.  Number one.  My neighbor, remember that

21  lady, she picked me up at a certain point out from

22  our complex, not even in our neighborhood, out on

6274

```
 1    the street, on Market going west, away from my
 2    house to Giant Eagle between 9:30 and 10:00 on
 3    December 11, 2001.  Was she absolutely sure?  Yes,
 4    9:30 to 10:00 p.m.  He caught her in a lie, he
 5    didn't publish it, of course.  He showed her
 6    testimony from way back when.  She said something
 7    else at that time.  Now she changed it.  Now, this
 8    lady, I am telling you, she better get a hobby or a
 9    pet or a boyfriend or a job, something, something,
10    because something is wrong with somebody like that.
11    How does she know me?  If she was standing right
12    here, if she was sitting where Mr. Bailey is with
13    Mohammad Ali along her, a black man, my preference,
14    I wouldn't know who she was, honest.  I never saw
15    her.  I don't know where she lives.  Our community
16    wasn't that big across from the Avalon Inn on the
17    golf course there, there's like four or five
18    streets.  Where did she come from?  Who is she?  It
19    was like funny.  I am in front of her, I'm going
20    suspiciously slow.  How does she usually drive?
21    Slow.  Okay.  West, away from my home, 9:30 to
22    10:00 p.m.
```

1          Mr. Bailey even had that in his closing
2    statement against me.  But you know what else they
3    said?  They said I purposely planned an alibi.
4    What did I do?  Well, I called my husband according
5    to my home phone and it is long distance from
6    Howland to Youngstown.  It is on the record there
7    at about 9:04, 9:04.  I left my house, I went to
8    Wal-Mart.  I had to get there at about 9:17.
9    Mr. Monroe will say ten minutes.  I drive
10   suspiciously slow, so it takes me a couple of extra
11   minutes.  I was there about 9:17, shopped around,
12   got what I wanted.  They had me on a surveillance
13   camera as an alibi at 9:37 p.m.  They have a
14   receipt for what I bought, it matched what was in
15   the bag.  Checked out at 9:37 p.m.
16          Now, I am at Wal-Mart on Elm Road.  I am
17   coming east toward my house, not even 9:37, because
18   I take my sweet time.  I, the evil woman, I wear
19   makeup, so I look in the mirror and put some
20   lipstick on.  Put a CD in.  By the time I get out
21   of that parking lot, it has to be 9:40.  By the
22   time I get to Giant Eagle, which is still a couple

6276

1   of minutes from my house, it is 9:50.  They told

2   you all of that.  And in their closing statement,

3   they told you that my neighbor swore under oath

4   that I'm going the other way, at the same time

5   suspiciously slow in front of her.  The girl wonder

6   here.  I defy all of the laws of physics.  Not only

7   am I in two different places at once, but I'm going

8   in two different directions.  How do you like that?

9   That is part one.  I'm cutting out the second page

10  of her, because that is enough on her.

11          Frank Reynolds.  My husband and I had two

12  Greyhound stations.  You are not allowed to have

13  two in one name.  His name was in Youngstown.  My

14  name was in Warren.  We had no other employees in

15  Warren.  If he was there in the morning, I was

16  there in the afternoon.  On December 11th, they

17  showed you pictures of Robert getting to the

18  Youngstown Greyhound at 2:35 in the afternoon.

19  That means I had to be in Warren between 12 and

20  5:30 which I was, because they gave you a witness,

21  a barber who said during that time I took Nate over

22  for a haircut.  And another witness of theirs says

6277

1    that Nate was there, because the bus driver also

2    came in and she introduced him to the bus driver,

3    too.  Mr. Daniels, our real employee, our daytime

4    manager, he told you that I had been calling from

5    Warren, and I believe he called me about a bus

6    coming my way.  Would it be on time or not.  So he

7    knew I was in Warren.  He knew we didn't have any

8    other employees.  Robert is there.  Mr. Daniels is

9    there until 3:30.  "Mr. Daniels, did you see Frank

10   Reynolds there at all that day?  No.  In the

11   morning?  No.  In the afternoon?  No."  And he

12   knows he's the boss.  Mr. Reynolds says that I went

13   to Youngstown, Ohio, all the way from Warren to

14   argue with my husband that I wanted $3,000 and he

15   wouldn't give it to me, and Mr. Reynolds said, "She

16   gave him the dirtiest look I ever saw."  You see

17   what I mean about all of these details?  It makes

18   it sound really real, doesn't it?  I am sitting

19   there thinking, "You know, I'm starting to doubt

20   myself here.  Yes, I think I really was in Warren.

21   Yes, I was."  The man is on SSI.  He's mentally

22   challenged.  And he's standing there telling you

6278

1  something that is very important in my case, that I

2  was arguing with my husband about money.

3         On the news the next day on the

4  television, the girls call me out, "Look at this."

5  I never look at the paper anymore, and I don't want

6  to hear the news. I close my door and I go like

7  this. I am on the news. It said, "She was in

8  Youngstown arguing with her husband for $3,000 and

9  later that night, he was dead." If I wanted

10  $3,000, all I had to do was write a check. I have

11  my own income.

12         Number three, the bloody washcloth and

13  the bloody towel at the Days Inn. Criminals aren't

14  the brightest people. Criminals are not exactly

15  rocket scientists. You remember saying that? You

16  did. He did. Guess what? The police aren't,

17  either. They had a lady in here, the housekeeper,

18  a sweet little girl. She was away a couple of

19  days, she came back. She had to check with her

20  supervisor. She said, "Should I do just a routine

21  clean up? Are they staying?" Which is what, like

22  you wipe the tubs, the sink, puts new towels, fix

6279

1    the bed, not change it?  "Or should I do an
2    intensive overall for the next guest?"  Her
3    supervisor, she said, "Do a complete one," because
4    Paul Monroe and Frank Dillon, they had been in and
5    out of there.  All right, so now they are going to
6    go back in with this lady, because they need a
7    witness.  They can't be each other's witness.  So
8    they walk in with this poor sweet little girl and
9    what do they find?  A bloody washcloth and a bloody
10   towel by the sink.  Did you ever walk into a room
11   at a motel, a hotel, and there's a bloody washcloth
12   and a bloody towel near the bloody sink?  I don't
13   think so.  How would she miss that?  She goes in,
14   she changes the sheets, she does the bed.  She
15   takes the dirty towels, she puts clean ones.  They
16   do a towel count.  It is on credit card.  They will
17   charge you.  Wait a minute.  We forgot one other
18   thing.  Three black pubic hairs on the toilet.
19   Black pubic.  How do you know?  Did they look like
20   a black person's curly hair?  And if they did,
21   guess what, that is what the hair on their head
22   looks like, too.  Why were there three pubic black

6280

1  hairs on the toilet?  The girl had at least go like

2  this to put that little paper thing on the toilet.

3  You go like this, a hair is gone.  But there were

4  three black pubic hairs and two bloody towels.

5  Then outside in the dumpster that was almost empty,

6  Frank jumps in and finds bloody bandages from over

7  a week ago.  It is a motel.  They have a lot of

8  garbage.  How is it almost empty?  How could he

9  jump in?  Don't they empty the garbage?  What is

10  that blood on the towels and those bandages?  Is it

11  road kill?  Where did they get that?  Because it

12  wasn't from Mr. Jackson.  In fact, were you paying

13  attention when the BCI lady was up there?  You

14  never heard the bloody towels were never blood

15  typed, no DNA.  Neither was what they found in the

16  garbage dumpster, but there you go again.  Make the

17  story complicated.  Make it sound real.  There's

18  the smoke screen.  Wrong.

19          Number four.  It's getting boring, huh?

20  Because now you already know how the magician does

21  his tricks.  He cheats, it's no fun.  Handcuffs.  I

22  can assure you, there were no handcuffs.  They said

6281

1   it was a drawer.  It was the back shelf, the

2   headboard of my bed.  Jerry showed me a picture one

3   day.  He said, "What is this a picture of?"  I

4   said, "Handcuffs."  And he said, "And what about

5   the sex toys?"  I said, "I hate those.  Robert is

6   always getting those things and he wants to see me

7   playing with them and I go in the second bedroom

8   and hide them in the dresser in there with more of

9   his Jerseys, underneath the pile in the top left

10  hand drawer."  That is where Paul Monroe found

11  them.  But here we have a picture now of handcuffs

12  and two sex toys.  I was in that bedroom for months

13  and months and I never saw either one of those two

14  things, honestly.  And I am thinking, why?  Why do

15  they want that?  The sex toys, of course, was to

16  make me look like even a dirty little old lady,

17  more dirty than you thought I was.  Why were the

18  handcuffs there?  Because Nathaniel Jackson had

19  mentioned them.

20          Jerry got up and asked him because Jerry

21  already knew the answer.  Jerry was just letting

22  him bury himself.  Dig your hole a little deeper.

6282

1    Come on, Paul Monroe, what do you do when you

2    search a place?  How would you go about it?  What

3    is the procedure?  Well, to begin with, it was an

4    illegal search and seizure.  Paul Monroe said to

5    me, "I must treat this as a crime scene."  I said,

6    "Do whatever you have to do."  Then he comes to

7    Court and says, "I told her I had to search," and

8    all of his buddies backed him up.  The guy who

9    wanted to be chief and all of his four lackies,

10   they all said what he said he said.  "What do you

11   do, Paul?"  Well, we searched every nook and cranny

12   and took everything that might be important or

13   relevant to this case.  Some of the stuff was never

14   presented, because it was so irrelevant.  But you

15   think handcuffs should be -- especially if

16   Nathaniel Jackson mentioned them, so how did he do

17   this?  How do you do it?  You go through the house,

18   you search every nook and cranny, you wear gloves

19   or something, you don't want to destroy

20   fingerprints or bodily fluids that might be on it

21   for identification purposes.  You tag it.  You bag

22   it.  You give it a number on an inventory sheet and

6283

1  you write the description out.

2       Now we have all of this stuff he

3  collected all during the night and Jerry sees the

4  list and says, "Show me the handcuffs."  They were

5  not on the list.  They set that up, I can assure

6  you on my shelf behind my headboard, handcuffs and

7  sex toys, a crime and a dirty old lady.  Why?  You

8  know why.  They wanted you to think I'm a dirty old

9  lady and an accessory to murder.  We're on number

10 five and there's only seven.

11      Number five.  The marijuana.  You know,

12 if there would have been marijuana in that tray

13 that night, I can assure you, I wouldn't be here

14 today and neither would you.  My husband and I

15 would be somewhere.  What is today?  Wednesday.  He

16 works, tomorrow night is Thursday.  We planned to

17 have dinner somewhere really special and bring our

18 two little girls something home as a treat.  Get up

19 on the bed and talk and hand feed them the treats.

20 If I had any marijuana in that tray and they said,

21 there was leaf marijuana and there were roaches,

22 maybe some of you don't know what those are.  Those

6284

1   are like to smoke a joint, and there's a little bit

2   left and anybody with half a brain knows when you

3   smoke the joint and the smoke goes through, that is

4   really strong then, it is good.  So we unwrap it

5   and that is what those little rolling machines are

6   for, those cigarette machines and the paper.  You

7   put the rest of it, you put the paper in and you

8   roll it and smoke it.  I was doing that for years.

9   I was in three major car accidents, had three major

10  concussions.  I have a bone floating in my neck and

11  a problem with my lower back.  I don't want you to

12  think that is the only reason I took it was for

13  medicinal purposes like people say, because that is

14  BS.  I also took it because I am a hyper person.  I

15  want to relax.  My husband got it for me sometimes.

16  He approved of it.  And we were both happy.  I have

17  never got addicted to any kind of pain killers.  I

18  refused to take them.  I saw how it ruined other

19  people's lives.  There it was.  Marijuana loose,

20  and roaches in that tray.  Wait a minute.  That was

21  the night of the crime, too.  The police are

22  coming.  I'm going to leave some marijuana on the

6285

1   dining room table just to show them I do other

2   things wrong.

3           Next to the last.  The tapes and the

4   letters.  I had the opportunity along with you to

5   read a lot of those letters and listen to those

6   tapes.  I had a real good memory when it comes to

7   what people say, believe me.  Nobody knew until I

8   was in the fourth grade that I was blind.  I can

9   see right here.  Nothing past six inches.  I used

10  to memorize what the teacher was saying.  I was on

11  the Honor roll my whole life and the Dean's list in

12  college, because I memorized stuff.

13          Remember when they played those tapes for

14  you real loud and they made you read those words on

15  that big giant screen?  At the end of some of those

16  phone calls, and at the end of some of the

17  transcripts I read, there weren't any endings.

18  They cut out the endings.  Some of them were just

19  before Nathaniel got out of prison.  They were

20  pretty damn important too, folks.  Really

21  important.  Things he said to me and things I said

22  to him, things I told him he had to do.  Things I

6286

1  told him that might help him to get a job.  Things

2  I told him that might help him to get a reality

3  check.  And the letters.  Did you get a list of the

4  letters or just the letters?  I got a list of the

5  letters from Jerry and on there it had the dates.

6  And then there were some with -- there were

7  envelopes with no letters in them.  In their rush

8  to go through them, they messed up because not only

9  are criminals nitwits, not rocket scientists and

10  not the brightest people, but neither are the

11  police, who want -- what did one of their snitches

12  say he wanted to do?  Cross every T and dot every

13  I.  There were too many loose endings for Paul

14  Monroe.  He wanted to be the Chief of Police.  He

15  wanted to solve this murder case, a murder case in

16  Howland of a white businessman, with a 30 year old

17  black man out of prison involved with his wife.  So

18  anything they couldn't explain, they made up.  They

19  planted.  Trust me.  This is the one I have been

20  waiting for.  I'll leave the rest of that go.

21          I should read this so I don't miss a

22  word.  Saved you three pages.  I don't want

6287

1    anything for it, not even a thank you.  This is all
2    about the man who would be chief.  And his lackies
3    who knew they better stay in his good graces, Paul
4    Monroe.  Now, you know I admire anybody who is
5    doing their job.  I said good morning to these
6    gentlemen every day.  I appreciate when people do a
7    good job.  I try to do that my entire life.
8    Sometimes people's lives depend on it.  A lot of
9    times, in fact.  I appreciate my attorneys.  You.
10   They did motions and motions, and motions.  They
11   had six more for today that I said just forget
12   about it, cancel them.  I don't want anything.
13   Nothing.  As you recall, Paul Monroe conducted a
14   warrantless, illegal search of what used to be my
15   house, from 1:50 in the morning when I left with my
16   brother for five hours or more.  He read the
17   letters, he said that.  They were right in the
18   bedroom, they were not hidden.  My letters to
19   Nathaniel from Sunday, Monday, Tuesday, three days
20   were in the trunk of my car, which I left there in
21   a big brown bag that said, "Nathaniel Jackson," and
22   his prison number.  You can't make any mistake

6288

1    about it.  His letters to me, my letters to him.

2    So, we have him reading these letters.  He now

3    knows that my husband is gone, and I was consorting

4    with a black man who was in prison.  By the way, he

5    was in prison for receiving stolen property, and in

6    jail for petty theft, stealing a shirt.  Remember I

7    said if you want a shirt that you like, I'll buy it

8    for you.  I don't want you to go back to jail.  He

9    likes to borrow them.  He takes them to one place

10    to another without anybody's permission.  Saves cab

11    fare.  He likes cars.  Now we have a young black

12    man.  We know -- how did Paul Monroe know he was

13    black from those letters?  You know how he knew?

14    Almost every letter Nate is bragging about black

15    things that are in a man's boxers.  That is how he

16    knew.  Every policeman you saw up here in this

17    case, was on the force for 20 or more years.  Some

18    26, some 28.  Now they know about a crime scene,

19    and they know if there's an expired victim of a

20    gunshot wound, and if a weapon is found next to

21    them, the person that is charged with the crime, a

22    lot of times will plead self-defense.  In murder

6289

1    cases, once they figured out how to make a capital

2    case with the victims, what did you charge me with,

3    stealing my car and trespassing in my house.

4    There's many different facets in the importance of

5    a gun.  Where it is found, if it was the weapon

6    used, who is the owner, which sometimes is

7    important.  But Robert and I were in Miami where we

8    got these guns.  We used to go to the range

9    together with our police officer friends who

10   properly taught us how to use them in defense of

11   ourselves, because it was a dangerous place to

12   live.  Whoever took out their wallet, their credit

13   card and their identification, signed the thing,

14   and that is whose name it was in.  This wasn't

15   necessary who was using it.  That little one that

16   was at the house, actually I had been using it, but

17   I put it in the bedroom.  Actually, I forgot to

18   tell you one thing about Mr. Mason, if he hadn't

19   stolen my gun, Robert wouldn't be carrying that gun

20   and he would be alive today.  Because that man

21   stole my gun, I ran home and told Robert.  I said,

22   "This SOB stole my gun, I can't believe it."  I

6290

1   even went and begged him, "Keep the money, keep the
2   calling cards, give me back the gun." My husband
3   said, "You know what, you would be lucky if this
4   guy doesn't come back, rob you, rape you and kill
5   you." Rob you, rape you and kill you. He was
6   right on two counts. He didn't kill me. Okay.

7          Now. I'm going to read something very
8   important to you. This is nothing I am making up
9   now. This is from what is called an affidavit for
10  an arrest warrant. This has to be sworn to,
11  included in the thing before they can come and
12  arrest you. This is the bottom first page, the
13  bottom first half of the report, the first report,
14  the initial report made by the coroner. You
15  remember that little guy with the gray hair, been
16  everything, heard everything, knows everything. I
17  bet you were impressed with that. I was in the
18  medical field. Let me tell you, I wasn't a bit
19  impressed. If he was that great, believe me, he
20  wouldn't have been banished to Warren, Ohio.
21  Here's what they said. Three different sentences.
22  A revolver was found in close proximity to the

6291

1    body.  My husband has become a body.  The weapon

2    was less than two feet from the body.

3    Dr. Germaniuk, upon inspecting the area of the

4    body, discovered that the .38 revolver next to the

5    victim was fully loaded.  I'm not making this up.

6    You can see it on the black and white.  You can see

7    it signed.  It is an affidavit.  That night, my

8    husband's life ended and to me it was precious and

9    to him, of course, it was precious.  When I arrived

10   at home that night, and I went around my car, and I

11   was heading toward that kitchen door, there was

12   nothing on that step to impede my progress, stepped

13   up, there's a nightmare of my life.  There's the

14   end of my life.  There's my husband dead on the

15   cold floor alone.  Not how we planned to go,

16   because we planned to be in each other's arms

17   comforting each other, believe me.  And I didn't

18   even have to veer around.  It didn't take me a

19   second to run and grab that phone.  I didn't have

20   to veer around that revolver, it was close enough

21   to him.

22              Let's see.  Now you got to keep in mind,

6292

1    this is the second capital murder case that
2    involved this gun, this victim.  And all of those
3    police officers' sworn statements.  You know, even
4    if I know every word I was going to say here was
5    exactly right and, it's a disgrace really, to have
6    people in power like that of your lives, too.  I
7    hope you never run into them, lie under oath, in
8    such an important thing.  Okay.

9            A homicide, a weapon, a gun, nothing is
10   more important.  Well, some people say that the
11   most important thing in the world is becoming the
12   Chief of Police.  But, and how better to do that
13   than to solve a homicide?  You got to get it all
14   wrapped up tight, Paul.  You have got to cross
15   those T's and dot the I's.  Advance to the murder
16   trial of Nathaniel Jackson now, which was just
17   seven months ago.  He pleads self-defense, there
18   was a struggle.  It is obviously a struggle.
19   Nathaniel Jackson actually got shot first, in his
20   dominant hand.  There's a picture now, that the
21   Prosecution presents to this Jury, and guess what
22   it is a picture of?  It is a picture of that

6293

1    revolver that was -- wait a minute, in close

2    proximity, less than two feet and next to the

3    victim.  Guess where it is now?  In this trial.  It

4    is all the way out in the garage, and it is on the

5    step.  It is out in the garage and on the step.

6    Don't tell me somebody accidentally kicked it when

7    they went in to take the car.  They don't do that

8    at the murder scene with a gun and a victim.  No.

9    Out in the garage on a step.  You know why?

10   Because if it would have been next to my husband,

11   it just might have looked like self-defense.  Maybe

12   he was about to shoot somebody.  Maybe that person

13   defended themselves.  Do you know how serious that

14   is or what?  Is it me?  Do you know?  I know you

15   know.  Because I have been watching you.  You look

16   like a very interesting and intelligent woman and I

17   like the way you take care of yourself, too.  He

18   didn't.  So, we have Sgt. Leshnack and Officer No.

19   2, Frank Dillon, and the man who would be Chief,

20   Paul Monroe.  The gun is out in the garage.

21              THE COURT:  We'll take a ten minute

22   break.  You can finish.  The Jury is admonished to

6294

1   remember the instruction.

2   (Court in Recess at 11:40 a.m.)

3   (Resumed in Open Court at 11:55 a.m.)

4           THE COURT:  Miss Roberts, you may

5   continue.

6           THE DEFENDANT:  I just wanted to say

7   one more thing about Paul Monroe and his friends

8   under him, that I think when you move a gun at a

9   murder scene, it could involve tampering with

10  evidence, obstruction of justice, and of course,

11  perjury, lying under oath.  Because he did say that

12  is where the gun was when he was on that stand.

13          This is the end.  You remember that

14  before I began I told you that I didn't get up here

15  to beg you to spare my life.  I meant that.  All I

16  wanted was a chance to speak the truth clearly and

17  plainly, so that it would finally be heard.  After

18  so many lies, I'm going to take the pressure off of

19  you and off of Judge Stuard, and any guilt you

20  might feel in the future.  You shouldn't ever feel

21  anything, because you did your job with what you

22  were presented with.  I'm asking for justice,

6295

1   though.   I'll beg you for justice and I'll demand

2   justice, so now in the name of justice, I ask you

3   to sentence me properly, like you swore to do as a

4   juror.   There's only one sentence you can bring

5   back with all 12 signatures.   You have all of the

6   aggravating -- remember the Judge told you like

7   this, here's the aggravating, if the mitigating

8   just comes a little bit more, you can't give me the

9   death penalty.   We haven't given you one piece of

10  mitigating evidence.   You are bound by law to give

11  me one sentence, the death penalty.   You have no

12  other choice.   That is what I'm asking you to do,

13  because that is the right thing to do.   That is the

14  only thing to do.   Mr. Nathaniel Jackson was

15  charged with the same crimes, he was tried, he was

16  found guilty, he was sentenced to death.   If you

17  pick any other one, there's going to be a lot of

18  people upset, and they are going to want to know

19  why.   They told you that you couldn't consider that

20  I wasn't the triggerman.   You agreed you would not,

21  that you could still get the death penalty if I

22  wasn't or you wouldn't be here.   Also, he said --

6296

1    well, Mr. Becker said, "You are going to look at
2    Miss Roberts, you think it, look at that nice
3    little old lady with her attorneys."  That is
4    exactly what he said, "old lady."  He kept saying
5    that.  Why did you have to keep saying "old"?  But
6    that can't influence you, just because she's a nice
7    little lady.  You have to go by the law and you
8    said okay.

9         If the aggravating circumstances outweigh
10   the mitigating factors, yes, I would give her the
11   death penalty.  You all signed your names that I'm
12   guilty of aggravated murder, and you haven't been
13   presented any other evidence to change anything.
14   Here's what I am looking for.  I don't want to say
15   it wrong.  There's only one difference between me
16   and Nathaniel Jackson.  I'm white.  He's black.
17   That is it.

18        In this Court, it doesn't matter if you
19   are a male or female, young or old, rich or poor, I
20   had good attorneys.  I didn't use one penny of my
21   husband's money by the way to pay them.  I used my
22   retirement fund of my own.  I just want you to know

6297

1   that. I have the benefit of two wonderful,

2   brilliant men. Mr. Nathaniel Jackson had -- what

3   does a poor black man have? An incompetent Public

4   Defender. I won't tell you his name, but trust me

5   that is exactly what he is, what he was and what he

6   always will be. So, those people, they always feel

7   so helpless and hopeless. I guess it is always

8   been like that, you know. They will just make God

9   cry another tear, because there's never going to be

10   equality. Never.

11           It is going to be like hundreds of years

12   ago. The same charges, same verdict. There can be

13   only one sentence, you better do the right thing.

14   You don't want to backtrack in any progress we

15   might have made that saying, all men are created

16   equal. Yes, right. We talked about that at the

17   beginning. All men are not created equal. You

18   know that and I know. As my son said, you know it,

19   I know it, and the American people know it.

20           There's one more thing. Let this be

21   perfectly clear especially to the news media. This

22   is in no way an admission of guilt, and should not

6298

1   be misconstrued as such.  There's none.  Not on my
2   part, and not on that of Nathaniel Jackson's.  But
3   since you found us guilty, I wanted to make some
4   good of it, at least maybe somebody will,
5   something, some little thing, maybe just a reporter
6   writing things right.  Maybe a reporter not having
7   to slant on it to make it a sensationalist thing,
8   so somebody will buy another paper.  Look, every
9   single time he wrote that story, a Howland
10  businessman, they plotted a murder, it was clear
11  and plain.  It was a plan, a plot, plainly in those
12  letters.  I read those letters.  I don't see any
13  plan or plot.  I see he came to work with me.  I
14  was teaching him the computer, went back to
15  Youngstown.  He was going to come the next day.  I
16  didn't see a plot or a plan.
17          I loved my husband very much.  My husband
18  loved me.  I don't want any of you leaving here,
19  thinking that I didn't.  I don't want you to leave
20  thinking that my husband died not being loved.  I
21  said a lot of things that weren't true to
22  Nathaniel.  My husband never touched me.  He never

6299

1  laid a hand on me.  He gave me everything I wanted,

2  the same as I did to him.  He spoiled me, I spoiled

3  him.  He was a wonderful man.  He was a wonderful

4  man to my son from another gentleman, wasn't he?

5  Really.

6           Robert's birthday was October 24th.  That

7  time before December 11th, Michael flew all the way

8  from New Hampshire so we could all go out for our

9  birthday dinner especially.  We had beautiful

10 pictures of all of us hugging and kissing and

11 smiling.  That is the way it really was.  I just

12 wanted you to know that.

13          I wanted to fill a wish that if I had any

14 wishes, I wish I would have stayed home that night.

15 Or that anything that happened bad would have

16 happened to me.  My husband's life is over.  But so

17 is his suffering.  And the minute his life was

18 over, all of my suffering began.  I don't want to

19 do this, because Mr. Bailey will say, "You are

20 doing it on purpose," and I'm not.

21          So, I am taking my saying back, I am

22 using it for the last time.  You can't have any

6300

1   more.  I know what you are thinking, here it comes.

2   Will the real Donna Roberts please sit down and I

3   will.  You do what is right.

4            THE COURT:  Does the Defense wish to

5   offer anything further?

6            MR. INGRAM:  No, Your Honor.  The

7   Defense is instructed to rest.

8            THE COURT:  Okay.  Ladies and

9   gentlemen, we have reached the noon hour.  I'm

10  going to discharge you for one hour to get lunch.

11  When you come back, the State will present whatever

12  evidence they wish to present.  We'll go right into

13  the closing instructions and then the case will be

14  given to the Jury.  You are to remember the

15  admonition that you have been given repeatedly

16  throughout the trial.  You have all followed that

17  very well.  Please do so over the next hour and

18  we'll see you back here.  Have a nice lunch.

19  (Court in recess at 12:05 p.m.)

20  (Resumed in Open Court at 1:30 p.m.)

21            THE COURT:  Gentlemen of the

22  Prosecution, I believe that the Defense has nothing

6301

1   further to present.  Do you have anything further

2   to put on the record?

3                    MR. BAILEY:  No further testimony.

4                    THE COURT:  The Exhibits then have

5   been admitted and will be part of the information

6   that goes back to the Jury.  Ladies and gentlemen,

7   first of all, on behalf of all concerned, I want to

8   again thank you for giving of your time to this

9   very important obligation and duty to our system.

10                   MR. BAILEY:  Can we approach?

11  (SIDE BAR DISCUSSION, OFF THE RECORD AND

12  OUT OF HEARING)

13                   THE COURT:  I have misinterpreted

14  what I have been told.  I apologize to counsel.

15  You wish to give closing argument?

16                   MR. BECKER:  Yes.

17                   THE COURT:  The State may proceed.

18  CLOSING ARGUMENT BY MR. BECKER:

19                   MR. BECKER:  Ladies and gentlemen, I

20  want to thank each and every one of you

21  individually and collectively for the service that

22  you have provided to this community.  I think you

6302

1  have a very important duty, a very important

2  function in this community.  And to this point, you

3  have done an excellent job of evaluating this case.

4       As we mentioned to you a long time ago,

5  this is probably the most important civic duty

6  short of serving in the military that any of you

7  ever will undertake.  We're to the point now where

8  it is your job to fulfill your oath, and your oath,

9  if you recall, was to uphold the law and truly try

10  this case.  Your decision is not to change the law

11  if you don't like it, but to impose the law as the

12  Court is going to give it to you here in a few

13  moments.

14       The only issue in this phase of these

15  proceedings is to the aggravating circumstances

16  that you have already found this Defendant guilty

17  of, outweigh beyond a reasonable doubt any and all,

18  if there are any, mitigating factors.

19       What are the aggravating circumstances in

20  this case?  They are the death of Robert Fingerhut

21  during the aggravated burglary with prior

22  calculation and design and the death of Robert

6303

1 Fingerhut during the aggravated robbery with prior

2 calculation and design. What are you going to have

3 in terms of prior calculation and design? You are

4 going to have all of the letters, all of the phone

5 calls, the transcripts from those telephone calls,

6 as the prior calculation and design.

7          Now, at this point in the case, I am

8 going to tell you I am prohibited by law from

9 saying anything about Miss Roberts' unsworn

10 statement except to remind you that it was unsworn,

11 it was not under oath or affirmation and not

12 subject to cross examination. That is all I'm

13 permitted to tell you about that statement.

14          This case is one of those cases that

15 speaks volumes from the evidence though and the

16 evidence in this case clearly shows that the prior

17 calculation and design in this case was

18 overwhelming. You could probably sit on 100 Jury

19 trials and never have as much prior calculation and

20 design as you have in this case. Nathaniel Jackson

21 was picked up from prison. Nathaniel Jackson went

22 to the Wagon Wheel Inn for his first night of

6304

1  lovemaking after he was released from prison.  He

2  was gotten gloves, not thick ones, but the thin

3  kind that would be good for the job.  Gun, a

4  haircut, a last meal at the Red Lobster before he

5  went off to do his duty.  The ski mask that had to

6  be searched for in four different stores by this

7  Defendant.  The escape vehicle, the bullets to

8  cause the death of Robert Fingerhut, the hideout

9  after the murder as previously discussed in the

10  phone calls.  That would be the Boardman Motel,

11  checking up with the accountant to make sure that

12  the thing with all of the zeros was paid for.  The

13  only thing that Nate Jackson provided to this case

14  was this.  His index finger.  This Defendant

15  provided everything else to Nate Jackson, the car,

16  the mask, the leather gloves, the place to hide out

17  afterwards; the bullets, the entry into the home.

18           With respect to the aggravated burglary,

19  I submit to you that you can have no worse form of

20  aggravated burglary than what you had in this case.

21  This aggravated burglary was not committed to steal

22  valuables, to rape someone, to kidnap someone.  It

6305

1   was committed to murder someone with prior

2   calculation and design.  That is the worst form of

3   aggravated burglary you could possibly have.

4           This Defendant left Nate Jackson in that

5   home for one purpose, to ambush Robert S. Fingerhut

6   when he came home.  You will recall relating to the

7   aggravated robbery, that Nate Jackson's DNA was

8   found in that motor vehicle.  Nate Jackson dumped

9   that vehicle with the keys in it just blocks from

10  where he was arrested in Youngstown, Ohio.  And

11  that aggravated robbery was not committed to steal

12  a wallet.  It was not committed to steal the

13  jewelry.  It was not committed to steal credit

14  cards or valuables.  Wasn't even taken to take the

15  car to a chop shop to sell.  That aggravated

16  robbery was committed to escape the aggravated

17  murder that had been planned with prior calculation

18  and design, and I submit to you that that

19  aggravated robbery that was committed, was the

20  worst form of aggravated robbery you can have.

21          Listen very closely to the very simple

22  instruction the Court is going to give you in this

6306

1    case.  You are going to take the aggravating

2    circumstances and put them in one side of that

3    scale.  On the other side, you are going to put

4    any, if there are any, mitigating factors on the

5    other side.  I submit to you that there probably

6    aren't any mitigating factors.  You are free, as

7    jurors, to find any, and even if you find some,

8    there's no way that they tipped the scales back.

9    Because the aggravating circumstances in this case,

10   are clearly beyond a reasonable doubt and clearly

11   outweighed beyond a reasonable doubt, if there is

12   any mitigating factors.

13          What you are going to do is a very simple

14   test.  You are going to take some mitigating

15   factors and I think the Court will tell you that

16   there probably are three things you can consider as

17   mitigating factors.  The unsworn statement of the

18   Defendant, which again I remind you I cannot

19   comment upon by law other than to say it was given

20   not under oath and not subject to cross

21   examination.

22          Any other factors, anything that you can

6307

1    think of, that would provide mitigation for Miss

2    Roberts.  And finally, whether or not she's a

3    participant in the offense and not the principal

4    offender, but her level and degree of

5    participation.  And I submit to you, that without

6    Donna Roberts participation in this crime, it

7    doesn't happen.  The only thing she didn't provide

8    was the finger that pulled the trigger.

9            So, you are going to take those

10   mitigating factors and you are going to put them in

11   that scale and you are going to assign, each and

12   every one of you, whatever weight you want to

13   assign to those mitigating factors.  And on the

14   other side of that scale, you are going to take the

15   aggravating circumstances, the letters, the phone

16   calls, the tapes, the bullets, the bullet that was

17   removed from Mr. Fingerhut's brain, and you are

18   going to put them on the other side of that scale.

19   You think those aggravating circumstances outweigh

20   beyond a reasonable doubt any mitigation you have

21   heard?

22           Each and every one of you is in this Jury

6308

1    box because you sat at that chair in April or May

2    and each and every one of you told us under oath,

3    that if the facts warranted it and the law

4    permitted it, you could go back to that Jury room

5    and sign a piece of paper calling for the

6    imposition of the death penalty.  I submit to you,

7    that that time and place is now and here.  The time

8    has come for each and every one of you to live up

9    to what your oath was, to uphold the law.

10          Our system of justice is not a perfect

11   system of justice.  But it is a good system of

12   justice, and it is only as good as the people that

13   are dispensing that justice, in this case, that is

14   you.

15          There's two tragedies in cases like this.

16   The first is that a person who does not deserve the

17   death penalty gets the death penalty.  The other

18   tragedy is someone who deserves the death penalty

19   doesn't get the death penalty.  The time has come

20   for each and every one of you to do what you said

21   you could do.  The time has come for each and every

22   one of you to make sure that our system of justice

6309

1   works.

2          This case started out with a statement,

3   "Will the real Donna Roberts please stand up."  I

4   submit to each and every one of you, the only

5   people that can make the real Donna Roberts stand

6   up and take responsibility for her actions of

7   December 11, 2001 are each and every one of you

8   jurors.  And each and every one of you have taken

9   an oath that you would do that.  There's no

10  mitigation.  The aggravating circumstances outweigh

11  just about all doubt, any mitigating factors, if

12  there are any in this case.

13         Your duty is now clear.  You must follow

14  the Court's law.  Thank you.

15              THE COURT:  Thank you, Mr. Becker.

16  Gentlemen?

17              MR. INGRAM:  I am instructed to

18  waive argument and have no choice but to abide by

19  that instruction.

20              THE COURT:  Very well.  The State

21  have anything further?

22              MR. BAILEY:  No, Your Honor.

6310

1    THE COURT:  As I prematurely started

2    to say, we thank you for your participation.  We

3    have all been impressed by the attention that each

4    of you have given to everything that has gone on in

5    the Courtroom and the manner in which you followed

6    the instructions of the Court and we thank you for

7    that.

8    Now at the first phase of this trial, you

9    decided that the Defendant, Donna Roberts, was

10   guilty of two counts of Aggravated Murder, as well

11   as two specifications of aggravating circumstances

12   that were attached to the first count and two

13   specifications that were attached to the second

14   count.  Because the acts for which the Defendant

15   stands convicted as to Counts One and Two

16   constitute only one event, she can only be punished

17   for one offense of Aggravated Murder of Robert S.

18   Fingerhut.  As I informed you at the opening, as a

19   result, the State of Ohio has elected to dismiss

20   the second count of the indictment at this second

21   phase of the trial.

22   This means that the Defendant stands

6311

1  convicted for penalty purposes of Count One of the

2  indictment, together with the two specifications,

3  attached to Count One.  You are instructed to

4  disregard the second count of Aggravated Murder and

5  its specifications and not consider them for any

6  purpose.

7          In this phase of the proceedings, the

8  Defendant has presented an unsworn statement.  The

9  State has offered arguments that the evidence of

10 the aggravating circumstances outweighs, by proof

11 beyond a reasonable doubt, the mitigating factors,

12 and the State seeks the death penalty rather than

13 one of the life sentences.  Your duty now is to

14 determine if the aggravating circumstances outweigh

15 by proof beyond a reasonable doubt, any mitigating

16 factors you have found, and based upon your

17 findings, you must make a determination on the

18 sentence to be imposed for the Aggravated Murder

19 conviction.

20         It is now my duty to instruct you on the

21 law which applies to these proceedings.  Again, the

22 Court and the Jury have separate functions.  You

6312

1    decide the disputed facts and the Court provides

2    the instruction of law.  And it is your sworn duty

3    to accept these instructions and to apply the law

4    as it is given to you.  It is your sworn duty to

5    accept these instructions.  You are not permitted

6    to change the law, nor to apply your own conception

7    of what you think the law is or should be and you

8    are not to disregard the law.

9         Now the State of Ohio has the burden of

10   proving by proof beyond a reasonable doubt, that

11   any one or all of the aggravating circumstances in

12   the first count of the indictment, which the

13   Defendant has been found guilty of committing,

14   outweigh any or all of the factors in mitigation.

15        The Defendant has no such burden of

16   proof, however, the Defendant does have the burden

17   to go forward with the evidence on mitigating

18   factors.  As noted, the State has already proven in

19   the first phase of this case that aggravating

20   circumstances exist in this case.  In reaching your

21   verdict, you are instructed that you will consider

22   all of the evidence and Exhibits which the Court

6313

1    has admitted as relevant to the aggravating

2    circumstances in this phase of the trial along with

3    all of the additional evidence and Exhibits, which

4    the Court has admitted as relevant to the

5    mitigating factors.

6         You have heard the term "outweigh" quite

7    a bit during this proceeding.  To outweigh means to

8    weigh more than, to be more important than.  In

9    that regard, it is the quality of the evidence that

10   must be given consideration by you, and the quality

11   of the evidence may or may not be commensurate with

12   the quantity of the evidence, that is, the number

13   of witnesses or Exhibits presented.

14        Remember that reasonable doubt is present

15   when after you have carefully considered and

16   compared all of the evidence, you cannot say you

17   are firmly convinced that the aggravating

18   circumstances outweigh the factors in mitigation.

19        Reasonable doubt is based on reason and

20   common sense.  Reasonable doubt is not mere

21   possible doubt because everything relating to human

22   affairs and depending on moral evidence is open to

6314

1   some possible or imaginary doubt.  Proof beyond a

2   reasonable doubt is proof of such a character, that

3   an ordinary person would be willing to rely and act

4   upon it in the most important of his or her own

5   affairs.

6           If you are convinced that the aggravating

7   circumstances which the Defendant was found guilty

8   of committing as set forth in Count One outweigh,

9   by proof beyond a reasonable doubt, the factors in

10  mitigation, then the State has met its burden of

11  proof and the Jury shall recommend to the Court

12  that the sentence of death should be imposed on the

13  Defendant.

14          If you find the aggravating circumstances

15  and the mitigating factors to be of equal weight,

16  then you must choose one of the life sentences.

17          You shall sentence the Defendant to death

18  only if you unanimously find by proof beyond a

19  reasonable doubt, that the aggravating

20  circumstances outweigh the mitigating factors.

21          If you do not so find, you shall consider

22  either a recommendation that the Defendant be

6315

1   sentenced to life without parole eligibility or a

2   life sentence with parole eligibility after serving

3   thirty (30) full years of imprisonment, or a

4   sentence of life with parole eligibility after

5   serving twenty-five (25) full years of

6   imprisonment.

7          Now what is and what is not evidence in

8   this proceeding? Again the indictment is not

9   evidence. It simply informed the Defendant that

10   she was charged with Aggravated Murder with

11   specifications of aggravating circumstances and the

12   indictment was the vehicle for bringing this matter

13   to Court. Also, the closing arguments which you

14   have just heard, are not evidence. Closing

15   arguments by counsel are designed to assist you,

16   but they are not evidence.

17          Then, what is the evidence in this

18   proceeding? It is any testimony you heard in the

19   first phase of this trial and any of the Exhibits

20   admitted into evidence in the first phase, which

21   this Court has determined to be relevant to proving

22   any of the aggravating circumstances or mitigating

6316

1  factors and which you had the opportunity to

2  examine and which you will have with you again when

3  you deliberate in this proceeding.

4       And once again, you are the sole judge of

5  fact, also the credibility of witnesses and the

6  weight of that evidence.  Again, to weigh the

7  evidence, you must consider the credibility of the

8  witnesses and to do this, you will apply the tests

9  of truthfulness, which you apply in your daily

10 lives.

11      These tests again include the appearance

12 of each witness upon the stand, the manner of

13 testifying, the reasonableness of the testimony,

14 the opportunity the witness had to see, hear, and

15 know about that to which they have testified; their

16 accuracy of memory, their frankness or lack of it,

17 their intelligence, interest or bias, if any,

18 together with all of the facts and circumstances

19 surrounding the testimony.

20      Applying these tests, you will assign to

21 the testimony of each witness such weight as you

22 deem proper.  You are not required to believe the

6317

1 | testimony of any witness simply because he or she

2 | was under oath. You may believe or disbelieve all

3 | or any part of the testimony of any witness. It is

4 | within your province to determine what testimony is

5 | worthy of belief and what testimony is not.

6 | The Defendant gave an unsworn statement

7 | in this matter, and therefore cross examination by

8 | the State was not permitted. It is her right under

9 | Ohio law to do so and this statement may be

10 | considered by you for whatever purpose you may

11 | assign.

12 | What are aggravating circumstances? In

13 | this particular case, the aggravating circumstances

14 | are precisely set out in the specifications

15 | contained in the verdict forms on these

16 | specifications. There are two (2) aggravating

17 | circumstances relating to Count One.

18 | Let me read those over: (1) That the

19 | Defendant was a complicitor to aggravated murder

20 | and that the aggravated murder was committed while

21 | the accomplice was committing, attempting to

22 | commit, or fleeing immediately after committing

6318

1  aggravated burglary, and that the Defendant
2  solicited, procured, aided or abetted the
3  accomplice to the aggravated murder, with prior
4  calculation and design.  (2)  That the Defendant
5  was a complicitor to aggravated murder and that the
6  aggravated murder was committed while the
7  accomplice was committing, attempting to commit, or
8  fleeing immediately after committing aggravated
9  robbery and that the Defendant solicited, procured,
10  aided or abetted the accomplice to the aggravated
11  murder with prior calculation and design.

12        The Aggravated Murder itself is not to be
13  considered as aggravating circumstances or to
14  determine penalty herein, except as it relates to
15  Specification One to Count One, alleging that the
16  Aggravated Murder of Robert S. Fingerhut, was the
17  criminal offense for which the accomplice
18  trespassed in the commission of the Aggravated
19  Burglary.

20        Counsel approach the bench, please.
21  (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT OF
22  HEARING)

1          THE COURT:  Now what are mitigating

2    factors?  Mitigating factors are factors that,

3    while they do not justify the crime of Aggravated

4    Murder, nevertheless, if you find they exist, shall

5    be considered by you as extenuating, lessening,

6    weakening, the degree of the sentence.

7          Gentlemen, we struck that one.  We took

8    that out.  I'll read this over again.  I apologize.

9          Mitigating factors are factors that while

10   they do not justify the crime of Aggravated Murder,

11   nevertheless, if you find they exist, shall be

12   considered by you as extenuating, lessening,

13   weakening, to some extent, or reducing the degree

14   of the sentence.  Mitigating factors are not

15   related to Donna Marie Roberts' culpability, but

16   rather, are those factors which are relevant to the

17   issue of whether Donna Marie Roberts should be

18   sentenced to death.

19          You are to weigh as mitigating factors,

20   such things including, but not limited to:  (1) The

21   unsworn statement of the Defendant.  (2)  Any other

22   factors in mitigation that are relevant to the

6320

1   issue of whether Donna Marie Roberts should be

2   sentenced to death.  (3)  The offender was a

3   participant in the offense, but not the principal

4   offender, the degree of her participation in the

5   offense, and the degree of the offender's

6   participation in the acts that led to the death of

7   the victim.

8           Now, ladies and gentlemen, when you

9   retire to commence these deliberations, remember,

10  your initial conduct upon entering the Jury room is

11  a matter of importance.  It is not wise immediately

12  to express a determination or to insist upon a

13  certain verdict because if your sense of pride is

14  aroused, you may hesitate to change your position

15  even if you decide you are wrong.

16          I would suggest that you consult with one

17  another and consider each other's views and

18  deliberate with the objective of reaching an

19  agreement.  Again, each of you must decide this

20  matter for yourself, but you should do so only

21  after a discussion and consideration with your

22  fellow jurors along with all of the evidence and

6321

1   the Exhibits which this Court has determined to be

2   relevant in this phase.

3         Do not hesitate to change an opinion if

4   convinced that it is wrong. But just as

5   importantly you should not surrender honest

6   convictions in order to be congenial or to reach a

7   verdict solely because of the opinion of the other

8   jurors.

9         In reaching a verdict in this proceeding,

10   you must consider all of the evidence applicable to

11   the statutory aggravating circumstances and the

12   mitigating factors admitted at both phases of the

13   trial, and the arguments of counsel in this phase

14   of the trial. You must then determine whether the

15   aggravating circumstances which the Defendant,

16   Donna Marie Roberts, was found guilty of committing

17   in the aggravated murder of Robert S. Fingerhut,

18   are sufficient by proof beyond a reasonable doubt

19   to outweigh the mitigating factors present in this

20   case.

21         All twelve (12) members of the Jury must

22   agree on a recommendation of a death sentence. If

6322

1  all twelve (12) jurors find that the aggravating

2  circumstances which the Defendant, Donna Marie

3  Roberts, was found guilty of committing in the

4  death of Robert S. Fingerhut, outweigh by proof

5  beyond a reasonable doubt, the mitigating factors,

6  then you shall return such a finding to the Court,

7  and as a matter of law, make a recommendation that

8  the sentence of death be ordered.

9          On the other hand, if any one of you

10  finds that the State has not proved beyond a

11  reasonable doubt that the aggravating circumstances

12  which the Defendant, Donna Marie Roberts, was found

13  guilty of committing in the death of Robert S.

14  Fingerhut, outweigh the mitigating factors, or if

15  you are unable to reach a unanimous verdict

16  recommending the death penalty, then in either of

17  these events, and as a matter of law, you must

18  determine which of three (3) possible life

19  imprisonment sentences to impose.

20          Again, those three (3) life imprisonment

21  sentences are as follows:  (1)  That the Defendant

22  be sentenced to life imprisonment without parole

6323

1   eligibility.   (2)   That the Defendant be sentenced

2   to life imprisonment with parole eligibility after

3   thirty (30) full years of imprisonment.  Or (3)

4   That the Defendant be sentenced to life

5   imprisonment with parole eligibility after

6   twenty-five (25) full years of imprisonment.

7           Now, you will have with you back in the

8   Jury room the following verdict forms.  I'll read

9   them briefly to you.  They are very similar to the

10  ones you had in the first phase.

11          The one reads Count One, Specification

12  One, Aggravated Burglary.  Under that is Jury

13  finding and recommendation of death sentence.

14          "We, the Jury, being duly empaneled and

15  sworn or affirmed, do hereby find that the

16  aggravating circumstances that the Defendant, Donna

17  Marie Roberts, was found guilty of committing with

18  reference to the death of Robert S. Fingerhut,

19  outweigh, by proof beyond a reasonable doubt, the

20  mitigating factors presented in this case.  We,

21  therefore, find and recommend that the sentence of

22  death be imposed upon the Defendant, Donna Marie

6324

1  Roberts."  There's a place for the foreperson to

2  enter the date, and again, twelve signature lines.

3          Another choice that you have, "We, the

4  Jury, being duly empaneled and sworn or affirmed,

5  do hereby find that the State has not proved that

6  the aggravated circumstances that the Defendant,

7  Donna Marie Roberts, was found guilty of committing

8  with reference to the death of Robert S. Fingerhut,

9  outweigh by proof beyond a reasonable doubt, the

10  mitigating factors presented in this case, or that

11  the Jury is unable to reach a unanimous verdict

12  recommending the sentence of death.  We, therefore,

13  find and recommend that the following sentence be

14  imposed upon the Defendant, Donna Marie Roberts."

15  And there's an instruction, place an "X" in the

16  appropriate space, and listed below are the three

17  other possibilities you have for life sentences.

18  Date, signature.

19          Another form.  "We, the Jury, being duly

20  empaneled and sworn or affirmed do hereby find that

21  the aggravating circumstances that the Defendant

22  Donna Marie Roberts, was found guilty of committing

6325

1    with reference to the death of Robert S. Fingerhut,

2    outweigh by proof beyond a reasonable doubt, the

3    mitigating factors presented in this case, we,

4    therefore, find and recommend that the sentence of

5    death be imposed upon the Defendant, Donna Marie

6    Roberts."

7         Another form that you have.  "We, the

8    Jury, being duly empaneled and sworn or affirmed,

9    do hereby find that the State has not proved that

10   the aggravating circumstances that the Defendant,

11   Donna Marie Roberts, was found guilty of committing

12   in reference to the death of Robert S. Fingerhut,

13   outweigh by proof beyond a reasonable doubt, the

14   mitigating factors presented in this case, or that

15   the Jury is unable to reach a unanimous verdict,

16   recommending the death sentence.  We, therefore,

17   find and recommend the following sentence be

18   imposed upon the Defendant, Donna Marie Roberts."

19   Again, you have three possible life sentences,

20   twelve signature lines and the date.

21        We have the four verdict forms.

22             MR. BECKER:  Is one for the

6326

1    aggravated burglary spec and one is for the

2    aggravated robbery spec?

3    (SIDE BAR DISCUSSION, OFF THE RECORD AND

4    OUT OF HEARING)

5              THE COURT:  You will have those four

6    forms with you and you will use those that you find

7    appropriate according to your decision.

8              Now, as I have stated, this being a

9    criminal case, it will take of course, all twelve

10   (12) of you to reach a decision on any verdict that

11   you return.

12             When you have reached your verdict in

13   this matter, you will complete the verdict form

14   which corresponds to your decision, signing the

15   respective verdict form in ink.

16             It is your duty to carefully weigh the

17   evidence, decide all disputed questions of fact,

18   apply the instructions of the Court to your

19   findings, and render your verdict accordingly.

20             In fulfilling your duty, your efforts

21   must be to arrive at a just verdict.  Remember you

22   must not be influenced in your deliberations by any

1   consideration of bias, sympathy or prejudice. You

2   are to consider all of the evidence and make your

3   findings with intelligence and impartiality, so

4   that the State of Ohio and the Defendant will feel

5   that this proceeding was fairly and impartially

6   tried.

7            Once more, if during the course of this

8   proceeding, the Court has said or done anything

9   that you consider an indication of the Court's view

10  on the issues of sentencing, you are instructed to

11  disregard that.  It has not been my intention, it

12  would be most improper for any Judge to attempt to

13  do that.

14           Now the Court is going to place in your

15  possession the Exhibits which have been admitted

16  into evidence during this phase of the trial and

17  the verdict forms which I have just read to you.

18  The person you select as foreperson will retain the

19  verdict forms and make sure that the Exhibits are

20  delivered to the Bailiff once you have concluded

21  your finding.  And the foreperson will bring the

22  verdict forms back into the Jury box once you have

6328

1    reached a verdict.  Until your verdict is announced

2    in Open Court, you are not to disclose to anyone

3    else the status of your deliberations or the nature

4    of your verdict.  Whenever all twelve (12), and I

5    repeat, all twelve (12) of you agree on your

6    verdict, you will notify the Bailiff that you are

7    ready to return to the Courtroom.

8              You will have with you the Exhibits and

9    verdict forms and the copy of these instructions

10   which I have just read and a copy of the verdicts

11   in the first phase of the trial.

12             Before we put the Jury into

13   deliberations, is there any objection to the Court

14   at this point dismissing the alternates?

15                  MR. BAILEY:  No.

16                  MR. INGRAM:  Not from the Defense.

17                  THE COURT:  Let me ask the Jury.

18   Are you ready and able to begin deliberations?

19   (All nodded affirmatively.)

20                  THE COURT:  You three ladies, you

21   have been just as attentive as the Jury itself, and

22   we thank you for your time and your attention.  I'm

6329

1    discharging you from any further responsibilities

2    at this time.  I would make one request and that is

3    that you not discuss your opinion on anything or

4    any of the evidence that you have heard until this

5    Jury has returned a verdict on this second phase.

6    We thank you very much.  You may keep your seat for

7    the time being.

8            Our Bailiff, Miss Brown, you have

9    previously been sworn in this matter, so I need not

10    do that again.  I am placing this Jury into your

11    care and custody, you will see that their comforts

12    are provided for until they have arrived at a

13    verdict and see that no one disturbs them.

14            Ladies and gentlemen, do you want ten

15    minutes before you start on your deliberations or

16    are you ready to go right in?  Take ten minutes and

17    meet outside the Jury room and Laurie will put you

18    all back together.  Remember the admonition, not to

19    talk to anybody.

20    (Court in Recess at 2:10 p.m.)

21    (Jurors commenced deliberations at 2:25 p.m.)

22    (Jury returned to Courtroom with verdict at 4:15 p.m.)

6330

1          THE COURT:  Ladies and gentlemen,

2  have you arrived at a verdict in this matter?

3          FORELADY:  Yes.

4          THE COURT:  The verdict delivered to

5  me by this Jury reads as follows.  "We, the Jury,

6  being duly empaneled and sworn or affirmed do

7  hereby find that the aggravated circumstances that

8  the Defendant, Donna Marie Roberts, was found

9  guilty of committing with reference to the death of

10  Robert S. Fingerhut outweigh by proof beyond a

11  reasonable doubt the mitigating factors presented

12  in this case.  We, therefore, find and recommend

13  that the sentence of death be imposed upon

14  Defendant, Donna Marie Roberts."  Dated June 4,

15  this year.  Signed by all 12 members of the Jury.

16          Second verdict reads, "We, the Jury,

17  being duly empaneled and sworn or affirmed do

18  hereby find that the aggravating circumstances,

19  that the Defendant, Donna Marie Roberts, was found

20  guilty of committing with reference to the death of

21  Robert S. Fingerhut, outweigh by proof beyond a

22  reasonable doubt the mitigating factors presented

6331

1   in this case.  We, therefore, find and recommend

2   that the sentence of death be imposed upon the

3   Defendant, Donna Marie Roberts."  Dated June 4,

4   2003, and again signed by all 12 members of the

5   Jury.  And the other two verdict forms are blank.

6          Ladies and gentlemen, have I properly

7   read the verdict rendered by you?

8   (All nodded affirmatively.)

9          THE COURT:  Does the State wish to

10  poll the Jury?

11         MR. BAILEY:  No.

12         THE COURT:  Does the Defense?

13         MR. INGRAM:  Yes.

14         THE COURT:  I'll refer to you by

15  number rather than name.  Juror No. one, have I

16  properly read your verdict?

17         JUROR NO. 1:  Yes.

18         THE COURT:  Number two?

19         JUROR NO. 2:  Yes.

20         THE COURT:  Number three?

21         JUROR NO. 3:  Yes.

22         THE COURT:  Number four?

6332

1                    JUROR NO. 4:  Yes.

2                    THE COURT:  Number five?

3                    JUROR NO. 5:  Yes.

4                    THE COURT:  Number six?

5                    JUROR NO. 6:  Yes.

6                    THE COURT:  Number seven?

7                    JUROR NO. 7:  Yes.

8                    THE COURT:  Number 8?

9                    JUROR NO. 8:  Yes.

10                   THE COURT:  Number 9?

11                   JUROR NO. 9:  Yes.

12                   THE COURT:  Number 10?

13                   JUROR NO. 10:  Yes.

14                   THE COURT:  Number 11?

15                   JUROR NO. 11:  Yes.

16                   THE COURT:  Number 12?

17                   JUROR NO. 12:  Yes.

18                   THE COURT:  Folks, you have been

19      asked to take a good deal of your time from your

20      daily pursuits and this is, I'm sure, not a

21      pleasant duty for anyone to engage in, but I

22      commend you for participating.  So many people will

6333

1   not participate in any Jury trial, let alone a

2   trial of this nature.  You folks have been very

3   attentive.  Each of you have paid attention as far

4   as I can observe to everything that occurred.  That

5   doesn't always happen.  There are many times

6   there's boredom during the trial and you have all

7   kept your interest alive, and that is, you are to

8   be congratulated for that.

9         You have participated in a very, I'm sure

10  in some ways disheartening proceeding here.  We all

11  have misgivings about many things, but you have

12  done everything according to the law, as much as

13  you could possibly do so.  We thank you.  That is

14  the most that I can say for the County, the State,

15  and that is thank you for your time and efforts.

16        I'm going to ask that everyone remain in

17  the Courtroom until this Jury has had an

18  opportunity to gather their belongings and leave

19  the Courtroom.  You are released from any prior

20  instruction I gave you of silence concerning the

21  matter.  If you care to discuss your experience

22  with anyone, you may do so from this point on.  If

6334

1  you care to keep your own counsel and not talk with

2  anyone, you of course have the right to do that.

3  Thank you again.  You are excused.

4  (Jurors excused at 4:20 p.m.)

5              THE COURT:  Everyone be seated,

6  please.  Gentlemen, I'm going to request a PSI in

7  this matter.  That has not been done, right?

8              MR. JUHASZ:  Correct.

9              THE COURT:  The Court, of course,

10  has to review the entire record and to

11  independently approve or disapprove.  That will

12  take -- the last one took some time.  I'll make

13  every effort to do that as soon as possible, it's

14  just a laborious task as you all know, and it was

15  an unusually long time to pick the Jury is going to

16  add to my time, because that portion of the trial

17  is not important.

18              The fact is, we picked a Jury and it is

19  the content of the trial itself that I need to

20  review.  There's always a problem of getting some

21  portions typed.  These girls can only work so many

22  hours a day, and it is easy to tell the reporter,

6335

1   we need this typed and we have got to have it by

2   next Tuesday.  That isn't always a very practical

3   order to give, because they have lives, too, and if

4   you work them more than 16 hours, they complain.

5   I'll make every effort to facilitate the thing as

6   much as possible.

7           I'll ask the Probation Department to

8   either come over and visit Miss Roberts in jail or

9   make arrangements for the sheriff to bring her

10  over, whatever is the wishes of the Probation

11  Department.

12          I wish to commend both sides by way of

13  counsel here.  I have not had more than my share of

14  this type of case, but I have had enough to know

15  that they can be very difficult from a Judge's

16  perspective.  And it makes it much easier when you

17  are dealing with attorneys on both sides who are

18  truly professional.  I have had the opportunity to

19  have attorneys from both the State and the Defense,

20  who know the law very well, and I have to admit in

21  some areas, perhaps better than I do.  You have

22  kept me working, too.  It makes the entire process

6336

1    easier to get through, and I suspect it makes for a

2    more just result, also.

3           Everybody has had their say and I hope

4    have been afforded a fair trial.  This will be

5    reset for sentencing once the Court has reviewed

6    the matter.  I thank you all very much.

7    (Court adjourned at 4:25 p.m.)

8

9

10

11   Friday, June 20, 2003; In Open Court at 1:50 p.m.:

12   Sentencing Hearing before Judge Stuard:

13           THE COURT:  On May 28, 2003, a

14   Trumbull County Petit Jury returned a unanimous

15   verdict finding the Defendant, Donna Marie Roberts,

16   guilty of two counts of complicity to commit

17   aggravated murder, arising from the death of Robert

18   S. Fingerhut.  Each count contained two

19   specifications of aggravating circumstances, listed

20   in division A of section 2929.04 of the Revised

21   Code.

22           Since Counts One and Two of the

6337

1    indictment merge for sentencing purposes, the State

2    elected to dismiss Count Two and the specifications

3    thereto prior to the commencement of the mitigation

4    phase.   Therefore, for purposes of this opinion,

5    the Defendant was convicted of the first count of

6    the indictment or purposely and with prior

7    calculation and design, causing the death of Robert

8    S. Fingerhut.

9              On June 4, 2003, the mitigation or second

10   phase of the trial began.  The Jury in that phase,

11   unanimously found that the State had proven beyond

12   a reasonable doubt, that the aggravating

13   circumstances, to-wit, Specification One to Count

14   One, that the Defendant was a complicitor in

15   committing or attempting to commit or in fleeing

16   immediately after committing, or attempting to

17   commit aggravated burglary, and that the Defendant

18   committed the aggravated murder with prior

19   calculation and design.  And Specification Two to

20   Count One, that the Defendant was a complicitor in

21   committing or attempting to commit or in fleeing

22   immediately after committing or attempting to

6338

1   commit aggravated robbery.  And that the Defendant
2   committed the Aggravated Murder with prior
3   calculation and design outweighed the mitigating
4   factors, and returned two verdicts recommending the
5   death sentence.
6           Pursuant to Revised Code, Section
7   2929.04(F), the Court is now obligated to file a
8   separate written opinion independently weighing the
9   aggravating circumstances of each specification
10  against the mitigating factors.  The weighing
11  process reflected in this opinion is based upon
12  evidence heard by the Jury, but is done
13  independently and without regard to the findings of
14  the Jury.
15          Factually, the evidence at trial revealed
16  that the Defendant planned the murder of her
17  ex-husband and housemate, Robert S. Fingerhut, for
18  $550,000 in insurance proceeds.  The Defendant
19  plotted the murder for at least three months prior
20  to December 11, 2001.  The Defendant corresponded
21  with her convict lover and codefendant, Nathaniel
22  Jackson while he was in prison at the Lorain

6339

1    Correctional Institution.

2            She also accepted 19 collect telephone

3    calls from Jackson while he was incarcerated,

4    wherein they planned the details of the murder.

5    The telephone calls were recorded, and the letters

6    and phone calls were seized by police during the

7    course of the murder investigation.

8            The murder plot included a plan whereby

9    the Defendant would pick up Jackson from prison on

10   December 9, 2001, and take him to the Wagon Wheel

11   Motel in Boardman, Ohio, and rent a room with a

12   mirrored ceiling and Jacuzzi tub where they would

13   have sexual relations.  The Defendant would obtain

14   handcuffs, a firearm, ski mask, leather gloves to

15   conceal fingerprints and would ensure Jackson

16   access to the Defendant's residence so that Jackson

17   could abduct the victim and take him out of the

18   house and kill him.  The conspirators discussed

19   forcing the victim to watch the Defendant perform

20   oral sex on Jackson before executing the victim.

21           The Defendant planned to set up an alibi

22   at the time of the murder by driving around and

6340

1  going to various retail outlets and shopping, where

2  she would be filmed by the store's video security

3  cameras, and the Defendant made several telephone

4  calls to Fingerhut's place of employment, the

5  Greyhound bus station in Youngstown, Ohio, to

6  ensure that Fingerhut timely left work at

7  approximately 9:00 p.m. on December 11, 2001.

8       The Defendant also provided Jackson with

9  a cellular phone to keep in contact with her while

10  she was driving a red Chrysler 300-M, which

11  contained its own cellular phone.

12       The Defendant had previously checked on

13  the insurance policies, to ensure that they were in

14  effect, and that the premiums were paid until the

15  end of 2001.  The Defendant also discussed in the

16  letters and phone calls, obtaining a motel room for

17  Jackson after the killing, so Jackson could hide

18  out after the murder.

19       However, the plan began to go bad when

20  Jackson, who was in Fingerhut's residence,

21  sustained a gunshot wound to his left index finger

22  during a struggle with the victim.  Jackson shot

6341

1   Fingerhut three times including one fatal shot to

2   the head.  Jackson left the victim's body in the

3   residence, took Fingerhut's car keys, and

4   Fingerhut's silver Chrysler 300-M from the garage

5   of the residence.  Jackson drove Fingerhut's car to

6   Youngstown, Ohio, where he abandoned it

7   approximately three blocks from where he was

8   ultimately arrested on December 20, 2001.

9       A series of telephone calls occurred

10  between the Defendant's telephone and her red

11  Chrysler and her cellular telephone, which was in

12  the possession of Jackson during the time frame of

13  approximately 9:30 p.m. and 12 midnight, on

14  December 11, 2001.  Between 9:30 p.m. and 10:30

15  p.m., the Defendant drove Jackson to the Days Inn,

16  in Boardman, Ohio, and rented him a room for one

17  week.  Jackson's wound was treated and bandaged in

18  the room.

19      The Defendant returned to the residence

20  in Howland Township, Trumbull County, Ohio and

21  discovered her ex-husband's body just inside the

22  main door leading from the garage.  The Defendant

6342

1  called 911, and feigned hysteria.  The Defendant in

2  her letters to Jackson, had discussed how she would

3  fake grief upon discovering that her ex-husband had

4  been killed.

5          Howland Township police officers

6  responded to the 911 call, and were met by the

7  Defendant.  The police did not find any signs of

8  forced entry, and the only thing missing from the

9  residence were the victim's car keys and the

10 victim's automobile.  Two wallets containing a

11 large sum of cash and credit cards as well as other

12 valuables were undisturbed inside the residence.

13         The Defendant told the officers that her

14 husband's car was missing, and granted them

15 permission to search the residence, and her vehicle

16 for evidence that might lead to the killer.  And

17 during this search, police found approximately 140

18 letters from Jackson to the Defendant in her

19 dresser.  And approximately 140 letters from the

20 Defendant to Jackson, in the trunk of the

21 Defendant's red car, in a paper bag bearing

22 Jackson's name, prison number.

6343

1          As the investigation progressed, the law

2     enforcement officers were able to obtain the 19

3     recorded telephone conversations between the

4     Defendant and Jackson while Jackson was

5     incarcerated in the Lorain Correctional

6     Institution.  These tapes constituted approximately

7     three hours of conversation.  These telephone calls

8     along with letters which spanned the time frame of

9     approximately three months, revealed a continuing

10    and evolving plan to kill Fingerhut within days

11    after Jackson's release from prison.

12          Jackson was soon arrested at a house on

13    Wirt Street in Youngstown, Ohio, a few blocks from

14    where Fingerhut's vehicle was recovered.  And a

15    pair of black leather gloves with fleece lining

16    were recovered from that house at the time of his

17    arrest.

18          In a letter written to Jackson, the

19    Defendant acknowledged that she had found thin,

20    fleece lined leather gloves.  The recovered gloves

21    had gunshot residue, and a hole in the left index

22    finger along with the reddish substance, which

6344

1 | appeared to be blood in that area. This damaged

2 | area matched the injury that Jackson had sustained

3 | to his finger.

4 | The evidence also revealed that the

5 | Defendant, near the approximate time of the murder,

6 | was seen driving her automobile in a very slow

7 | manner away from the vicinity of the home where

8 | Fingerhut lived. Furthermore, within two hours

9 | from the last time Fingerhut was seen alive, the

10 | Defendant rented a motel room at the Days Inn in

11 | Boardman, Ohio for Jackson. In this room, bloody

12 | bandages and other medical supplies were found by

13 | hotel cleaning personnel and were subsequently

14 | collected by the police.

15 | Fingerhut's silver Chrysler, which had

16 | been stolen by Jackson from the residence was

17 | recovered in Youngstown, Ohio. Blood stains in and

18 | on the vehicle were collected by law enforcement

19 | officers. DNA analysis of the blood stains

20 | collected on the trunk latch and the interior sun

21 | visor, revealed that the blood matched the DNA

22 | profiles of Nate Jackson, and the victim. Blood

6345

1   stains collected from the Days Inn also matched the

2   DNA profile of Nathaniel Jackson.

3            The State also introduced evidence from

4   the letters that the Defendant and Jackson

5   discussed purchasing a new Lincoln or a Cadillac

6   Deville for Jackson.  The Defendant and Jackson

7   repeatedly discussed waking up together on

8   Christmas morning.  And the Defendant repeatedly

9   stated how much she hated Fingerhut.

10           Additionally, Fingerhut had two life

11  insurance policies with a combined benefit of

12  $550,000.  On December 12, 2001, shortly after

13  calling 911, Howland police officers noted the

14  Defendant's behavior, which included feigned crying

15  and listening in on conversations of investigators.

16  On December 12, 2001, shortly after calling 911,

17  the Defendant told investigators that she had been

18  out shopping at Wal-Mart, Super K-Mart, and Giant

19  Eagle.  Police could only confirm that the

20  Defendant was at Wal-Mart at approximately 9:30

21  p.m.  The Defendant never stated to police that she

22  had taken Jackson to the Days Inn in Boardman,

6346

1   Ohio.

2          Later in the afternoon of December 12,

3   2001, the Defendant provided police with a list of

4   suspects who may have wanted to kill Fingerhut,

5   including an alleged homosexual lover of the

6   victim.  A half Hispanic, half black man that the

7   Defendant had dated, a man named Santiago Mason.

8   And a number of people from the Greyhound bus

9   station.  When investigators asked the Defendant

10  about Nathaniel Jackson and the Defendant stated,

11  "Oh, I almost forgot about him."  And proceeded to

12  tell the officers that she had last seen Jackson on

13  Monday, December 10, 2001, and had last spoken to

14  him in the morning of Tuesday, December 11, 2001.

15          The investigation revealed that the

16  Defendant and Jackson worked together throughout

17  the afternoon and evening of December 11, 2001.

18  And the State presented evidence and testimony that

19  the Defendant took Jackson to get a haircut, ate

20  dinner with him at Red Lobster and was with him at

21  the Warren Greyhound bus terminal in Warren, Ohio,

22  which was the Defendant's place of employment.

6347

1      One witness, Frank Reynolds, testified

2    that after Jackson's release from prison and prior

3    to the murder, he was present at the Youngstown bus

4    terminal when the Defendant asked Fingerhut for

5    $3,000.  When Fingerhut refused to give her the

6    money, she gave him a dirty look.  The Defendant

7    had stated in her letters that she was tired of the

8    grinch doling out the money.  And was referring to

9    Fingerhut providing her with a set amount of cash

10   to spend each week.  The Defendant planned to

11   obtain a firearm for Jackson and to use it in order

12   to kill Fingerhut.

13      While the Defendant was supposedly in a

14   torrid love relationship with Jackson, she invited

15   the ex-con, Santiago Mason, into her residence

16   where she performed oral sex on him.  When he

17   refused her further sexual advances to engage in

18   intercourse, Mason was accused by the Defendant of

19   stealing a .38 caliber firearm.  Forensic evidence

20   revealed that the weapon used to kill Fingerhut was

21   consistent with the .38 caliber firearm.  The

22   investigation revealed that Roberts was missing two

6348

1    .38 caliber firearms at the time of Fingerhut's

2    murder.

3              In this case, the Jury found the

4    existence beyond a reasonable doubt, of two

5    aggravating circumstances, pursuant to Section

6    2929.04 (A)(7) of the Revised Code, to-wit,

7    Specification One to Count One, that the Defendant

8    was a complicitor in committing or attempting to

9    commit or in fleeing immediately after committing

10   or attempting to commit aggravated burglary, and

11   that the Defendant committed the aggravated murder

12   with prior calculation and design.  And

13   Specification Two to Count One, that the Defendant

14   was a complicitor in committing or attempting to

15   commit, or in fleeing immediately after committing

16   or attempting to commit aggravated robbery, and

17   that the Defendant committed the Aggravated Murder

18   with prior calculation and design.

19             With respect to the aggravating

20   circumstances relating to the aggravated burglary,

21   the evidence presented at trial proved that the

22   Defendant allowed Jackson to trespass in

6349

1   Fingerhut's residence, located at 254 Fonderlac

2   Drive, Howland Township, Trumbull County, Ohio,

3   with the specific purpose of killing Fingerhut with

4   prior calculation and design.

5            Jackson was wearing leather gloves and

6   armed with a firearm, which he used to shoot the

7   victim three times causing his death.  The gloves

8   and the ski mask, firearm and access to the house

9   were all provided by the Defendant with prior

10  calculation and design, as evidenced by the

11  telephone calls and letters introduced by the

12  State.  The Defendant assured the victim's arrival,

13  by checking at his place of employment, and

14  determining when he left work by calling him on the

15  telephone while he was on his way home.

16           The Defendant also checked on the status

17  of the life insurance policies and determined that

18  the premiums paid were up to the end of 2001, and

19  advised Jackson of the same.  Pursuant to her plan

20  to kill Fingerhut, the Defendant took Jackson to a

21  motel room in Boardman, Ohio, and rented the room

22  for one week which was consistent with the plans

6350

1  discussed in the letters and phone calls prior to

2  the murder.

3        Upon discovering Fingerhut's body, the

4  Defendant feigned grief exactly as discussed in her

5  letters with Jackson.  During the course of the

6  investigation, the Defendant continually threw out

7  red herrings to the Howland Police by mentioning a

8  number of possible suspects, including alleged

9  homosexual lovers of the victim, her ex-boyfriends,

10  crazy people from the bus terminal in Youngstown,

11  and Santiago Mason.  The Defendant only mentioned

12  Jackson, the convict she had corresponded with by

13  letters for three months, spoken to on the

14  telephone 19 times, picked up from prison and

15  engaged in sexual relations with just two days

16  prior, taken to get a haircut and ate dinner with

17  just hours previously and the person whom she had

18  driven to Boardman, Ohio on the night of the

19  murder, and who had an injured index finger, only

20  after the investigators confronted her with his

21  name.

22        From the aforementioned evidence, the

6351

1    Court concludes that the Defendant committed the

2    aggravated murder as a complicitor, while

3    committing or attempting to commit or in fleeing

4    immediately after committing or attempting to

5    commit aggravated burglary.  And that the Defendant

6    committed the aggravated murder with prior

7    calculation and design.  With respect to the

8    aggravating circumstance related to the aggravated

9    robbery, after Jackson had murdered the victim, he

10   took the victim's set of keys and the silver

11   Chrysler, 300-M.  Although the planned crime

12   involved Jackson stealing Fingerhut's car in order

13   to kidnap Fingerhut, it is clear that Jackson was

14   to take the victim's car to flee the residence.

15        The fact that Fingerhut struggled with

16   Jackson in the residence and was killed in the

17   residence, in no way, negates the Defendant's plan

18   that Jackson should steal the victim's car to

19   facilitate Jackson's own flight from the residence.

20   Ample DNA evidence was presented indicating that

21   Jackson was in the silver Chrysler 300-M following

22   the murder of Fingerhut.  Additionally, phone

6352

1   records were introduced showing that Jackson and

2   the Defendant called each other after the murder to

3   check on the status of the plan.

4          Finally, the vehicle was recovered a few

5   blocks from the location where Jackson was

6   arrested.  The Defendant, in accordance with the

7   plan to kill Fingerhut, paid for a hotel room for

8   Jackson following the murder.  The fact that the

9   silver Chrysler 300-M was found abandoned with the

10  victim's keys in the ignition, coupled with the

11  fact that the victim's wallet, money, credit cards

12  and other valuables were not stolen, clearly shows

13  that the plan to steal the victim's car with a

14  means of escape following the kidnapping and murder

15  of the victim was carried out in accordance with

16  the prior calculation and design, as set out by the

17  Defendant and Jackson.

18         From the aforementioned evidence, this

19  Court concludes that the Defendant committed the

20  Aggravated Murder, as a complicitor, while

21  committing or attempting to commit or in fleeing

22  immediately after committing or attempting to

6353

1   commit aggravated robbery, and that the Defendant

2   committed the aggravated murder with prior

3   calculation and design.

4       Now, to be weighed against the

5   aggravating circumstances, the Court must weigh any

6   mitigating factors.  On Tuesday, June 3, 2003, the

7   Defendant appeared in-chambers and on the record

8   with her retained attorneys, J. Gerald Ingram and

9   John B. Juhasz, and her retained psychologist,

10  Thomas Eberle.  The State was present and

11  represented by Assistant prosecutor Kenneth N.

12  Bailey and Christopher D. Becker.

13      At that time, the Defense indicated to

14  the Court that the Defendant had been evaluated by

15  Dr. Eberle for her competency to waive mitigating

16  evidence.  And that in the doctor's opinion, she

17  was competent to do same.

18      This Court personally addressed the

19  Defendant and inquired of her as to the importance

20  of presenting mitigating evidence, the use of such

21  evidence to offset the aggravating circumstances,

22  and the effect of failing to present such evidence.

6354

1   The Court was assured at that time by the

2   Defendant, that she understood these concepts by

3   both Defense counsel and Dr. Eberle.  This Court

4   personally inquired whether the Defendant desired

5   to waive the right to present mitigating evidence.

6   The Court having found no evidence to contradict

7   Dr. Eberle's findings on the Defendant's

8   statements, and her express desire to waive the

9   presentation of mitigating evidence, then found

10  that the Defendant was competent to waive her

11  presentation of mitigating evidence, and had done

12  so knowingly, voluntarily and intelligently, and

13  the Defendant indicated to the Court, that she only

14  desired to make an unsworn statement to the Jury,

15  which she was advised she was permitted to do and

16  would be permitted to make on June 4, 2003, which

17  was the date previously scheduled for the

18  mitigation or second phase.

19          On Wednesday, June 4, 2003, the Defendant

20  made an unsworn statement during which she stated

21  to the Jury that there were no mitigating factors,

22  and during which she requested the Jury to impose

6355

1   the death sentence.  This statement was articulate,

2   coherent and well organized.  The statement lasted

3   approximately one hour, during which the Defendant

4   showed no difficulty or fear in addressing a large

5   group of individuals, including the Jury, and a

6   large number of Courtroom observers.  The Defendant

7   spoke freely and although she had with her prepared

8   notes, she often extemporized.

9            Despite the preceding that I have

10  outlined, the Court is still bound to make an

11  independent weighing of any and all mitigating

12  factors that it feels may exist in this case

13  against the aggravating circumstances.  The

14  Defendant in this case was not the principal

15  offender.  Pursuant to section 2929.04 (B)(6), the

16  Court considers this factor, but gives it very

17  little weight.

18           The Defendant committed the Aggravated

19  Murder during the course of the commission of both

20  an aggravated burglary and aggravated robbery.  The

21  record is replete with instances where the

22  Defendant actively planned this Aggravated Murder

6356

1   with prior calculation and design in order to

2   collect $550,000 in life insurance proceeds.  The

3   Defendant's plan included buying her codefendant a

4   new Cadillac or Lincoln in exchange for killing her

5   ex-husband, promises of trips, a nice home in a

6   wealthy neighborhood, an overall 180 degree change

7   in life style for Nathaniel Jackson, her

8   codefendant.

9          The record is overwhelming that, but for

10   the Defendant's planning and actions, the victim

11   would be alive today.  The Defendant discussed and

12   planned for months with the principal offender, how

13   they would kill the victim.  The Defendant checked

14   on the status of the insurance policies in order to

15   ensure that she would be able to collect the

16   proceeds, and advised the principal offender of the

17   status of the policies.  The Defendant then

18   transported the principal offender in the

19   Aggravated Murder from prison to a predetermined

20   location, in order to engage in love making before

21   the murder.

22          The Defendant fed the principal offender

6357

1   prior to the crime.  The Defendant provided the

2   principal offender with gloves, a ski mask, murder

3   weapon and hideout after the Aggravated Murder, all

4   as planned and discussed prior to the Aggravated

5   Murder.

6           The Defendant gave the principal offender

7   entry into the residence of the victim for the sole

8   and exclusive purpose of killing the victim.  This

9   plan was clearly discussed in both the letters, and

10  recorded telephone conversations, including the

11  last telephone call on December 8, 2001, the day

12  before the principal offender was released from

13  prison.  The Defendant failed to advise police of

14  her relationship with the principal offender until

15  she was confronted with the evidence of the

16  relationship by the police.  And prior to being

17  confronted by the existence of this relationship,

18  the Defendant gave the police a number of red

19  herrings implicating a number of potential

20  suspects, but never mentioned the relationship with

21  the principal offender, and her discussions with

22  him regarding the Aggravated Murder of Robert

6358

1  Fingerhut.

2          The Court gives very slight weight to the

3  fact that the Defendant indicates in her letters

4  that the victim may have been physically abusive to

5  her.  This factor is pursuant to section 2929.04

6  (B)(1)(2).  However, the existence of this factor

7  is given very slight weight due to the fact that it

8  is unsubstantiated, and even if it were true, would

9  not warrant the Defendant's action in this case.

10          The Court gives very little weight to the

11 Defendant's unsworn statement.  During the course

12 of her unsworn statement the Defendant apologized

13 to her Defense team and thanked them for the hard

14 work.  The few positive things gleaned from this

15 statement were overshadowed by the Defendant's

16 personal attacks, and statements that were clearly

17 contrary to the evidence.  The Defendant denied

18 guilt and personally attacked the jurors by

19 claiming they were not a judge of her peers, not a

20 Jury of her peers.

21          The Defendant accused the lead

22 investigator as being motivated solely by career

6359

1   advancement and accusing him of obstruction of

2   justice and perjury.  The Defendant referred to the

3   other investigators as lackeys and claimed that one

4   member of the Prosecution team was anti-Semetic and

5   racist.

6            The Defendant also chastised jurors for

7   being uninformed about current events.  The

8   Defendant also stated to the Jury that she and the

9   victim had a loving relationship, and planned to

10  live happily ever after.

11           These statements are in direct

12  contravention of her statements in the letters and

13  the phone calls expressing her desire and wishes

14  that the victim meet an untimely death, and her

15  desire to marry and live with Nathaniel Jackson.

16           The Defendant also appeared to brag to

17  the Jury that she and the deceased have earned over

18  $200,000 per year and that the $550,000 in life

19  insurance proceeds was of little value to her,

20  because of that sum would only sustain her for a

21  few years.  It is difficult for this Court or any

22  finder of fact to give any weight to such a

6360

1   statement.

2         Pursuant to section 2929.04 (A)(7), the

3   Court will give very slight weight to the

4   Defendant's behavior during the course of this

5   trial.  The Defendant was courteous, pleasant and

6   properly addressed the Court at all times.  The

7   Defendant appeared intelligent and interested in

8   the proceedings, and appeared to assist in her

9   defense at all times.  The Defendant presented no

10  security problems to this Court and those who

11  transported her to Court each day.

12        Now the Court has carefully and

13  independently weighed the accumulation of all of

14  the mitigating factors against each aggravating

15  circumstance separately, as to each of the two

16  specifications.  In other words, the Court has

17  weighed the evidence twice, first the Court weighed

18  all of the mitigating factors against the

19  aggravating circumstances surrounding the

20  aggravated burglary, and then the Court engaged in

21  second weighing, whereby the Court again weighed

22  all of the mitigating factors against the

6361

1    aggravating circumstances surround the aggravating

2    robbery.

3              With respect to the first weighing of the

4    aggravating circumstances relating to the

5    aggravated burglary against all of the mitigating

6    factors, this Court finds that the aggravating

7    circumstances not only outweigh the mitigating

8    factors by proof beyond a reasonable doubt, but in

9    fact, they almost completely overshadow them.

10             The legislature of the State of Ohio, has

11   recognized that under certain circumstances, the

12   death penalty is an appropriate sanction to a

13   Defendant who commits an Aggravated Murder during

14   the commission of certain felonies.  In the case at

15   bar, the underlying felonies were aggravated

16   burglary and aggravated robbery.  In this

17   particular case, the Court accords substantial

18   weight to the aggravated burglary specification and

19   the weighing process.

20             In order to prove an aggravated burglary,

21   the State is required to prove that a Defendant

22   trespassed in an occupied structure, for the

6362

1    purpose of committing a criminal offense.  In this

2    particular case, the Defendant purposely had her

3    codefendant trespass in the occupied structure of

4    Robert S. Fingerhut, with the specific purpose of

5    committing an Aggravated Murder, which had been

6    meticulously planned over a number of months with

7    prior calculation and design.

8           Under the facts of this case, this Court

9    cannot see any other form of aggravated burglary

10    where the weight of this particular aggravating

11    circumstance could ever be greater.  The evidence

12    reveals that the aggravated burglary was committed

13    for the sole purpose of killing Robert S.

14    Fingerhut, pursuant to a planned and methodical

15    execution scheme designed by the Defendant and her

16    codefendant and whereby the Defendant would collect

17    $550,000 in insurance proceeds.  This is a most

18    heinous form of aggravated burglary and is entitled

19    to unsurpassed weight.

20           In this Court's view, this aggravating

21    circumstance standing alone, outweighs all of the

22    mitigating evidence in this case.  Therefore, with

6363

1  respect to Specification One to Count One, this

2  Court concurs with the Jury's recommendation, and

3  finds that the death sentence is an appropriate

4  penalty.

5         With respect to the aggravating

6  circumstances of the aggravated robbery, the Court

7  concedes that this offense is not quite heinous as

8  the circumstances surrounding those concerned with

9  the aggravated burglary; however, the aggravated

10  robbery was clearly committed to facilitate the

11  escape from the Aggravated Murder, and is extremely

12  close to being the worst form of aggravated

13  robbery.  This statement is galvanized by the fact

14  that the aggravated robbery was planned by the

15  Defendant to be part of a kidnapping, whereby the

16  victim was to be removed, taken to a different

17  location where the Defendant would then engage in

18  oral sex with her codefendant, while the Defendant

19  was forced to watch prior to his execution.  This

20  plot is clearly spelled out in the letters between

21  the Defendant and codefendant.  The plan clearly

22  went awry when the victim engaged the codefendant

6364

1    in the struggle at the residence.  Again this

2    scheme was hatched for the purpose of the Defendant

3    collecting the $550,000 in insurance proceeds.

4            Therefore, the aggravating circumstance

5    specification relating to the aggravated robbery,

6    when weighed against all of the mitigating factors

7    in this case, clearly and undeniably outweighs by

8    proof beyond a reasonable doubt, all of the

9    mitigating evidence in this case.

10            Therefore, with respect to Specification

11   Two to Count One, the Court concurs with the Jury's

12   recommendation and finds that the death sentence is

13   the appropriate penalty.  The Court recognizes that

14   the death sentence recommendation by the Jury must

15   be merged and the Court does hereby merge the death

16   sentences for purposes of sentencing.

17            For the reasons set forth herein, and

18   after independently and separately weighing the

19   aggravating circumstances against all of the

20   mitigating factors, it is the judgment of this

21   Court that the Jury's recommendation is accepted,

22   and the Court does find that the sentence of death

6365

1    is the appropriate penalty in this case.

2            Counsel approach the bench, please.

3    (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT OF

4    HEARING)

5            THE COURT:  The Court has asked at

6    side bar if counsel for either side wish to place

7    anything on the record before this Court proceeds

8    with sentencing.  Mr. Ingram, I believe you wish to

9    address something.

10           MR.  INGRAM:  Your Honor, the record

11   should reflect that in pronouncing sentence, you

12   have apparently read from a written decision that

13   you have prepared in advance.  I guess I would ask

14   if I am correct in that assumption?

15           THE COURT:  That is correct.

16           MR.  INGRAM:  As you read that

17   decision, Mr. Bailey sat at the Prosecution table

18   and reviewed a document as if he was reading along.

19   Every time you turned the page, Mr. Bailey turned

20   the page.  I would now ask on the record, that

21   Mr. Bailey be required to identify the documents

22   which are sitting in front of him.

6366

1              THE COURT:   Mr. Bailey is referring

2     to a document that I have had prepared.  I have

3     outlined the sum and substance of it to the

4     Prosecution.   They have a computer over there which

5     you are aware of, Mr. Ingram, we have used

6     throughout the trial, which makes it convenient to

7     correct, delete from a master copy and to come up

8     with a form that is present, which I presently

9     used.

10             MR. INGRAM:   Well, the record should

11    reflect the vehement Defense objection to the

12    State's participation in the drafting of the

13    Court's sentencing decision in ex parte proceeding.

14    We did not know this, we did not know of this.

15    That is prohibited.  I would ask that those

16    documents be sealed and become part of the

17    Appellate record in this case.

18             THE COURT:   That will be done.

19             MR. INGRAM:   I would ask that they

20    be given to the Court Reporter at this point.

21             THE COURT:   Mr. Bailey, please

22    deliver that copy.

6367

1          MR. INGRAM:  May I see it?  May I

2   ask Your Honor, when at what point in time, the

3   exchanges between you and Mr. Bailey occurred?

4          THE COURT:  I don't recall.  That

5   was probably about Wednesday.

6          MR. INGRAM:  Was there one such

7   exchange or more than one exchange?

8          THE COURT:  I believe that there was

9   one exchange.

10          MR. INGRAM:  We would also note an

11   objection to the Court's depriving the Defendant of

12   the right of allocution.  We object to the Court

13   depriving the Defendant of her right of allocution.

14          THE COURT:  Your objection is noted.

15          MR. BAILEY:  We haven't reached a

16   point of allocution yet.  We're just getting to

17   that point.  The Court had to do the independent

18   weighing and now we're at the point where the Court

19   has to advise the Defendant of her Appellate rights

20   and of allocution.

21          THE COURT:  I have to advise of Rule

22   32 now.

6368

1          MR. JUHASZ:  The objection is

2    because the Court has already determined sentence

3    without having heard from the Defendant.  Normally

4    in sentencing proceedings, the Court hears from the

5    Defendant before making a determination of the

6    appropriate sentence.  That is the basis for the

7    objection.

8          THE COURT:  Okay.  Could I see

9    counsel?

10   (In-chambers at 2:30 p.m.)

11   (OFF THE RECORD)

12         THE COURT:  We're in-chambers in

13   conference.  Are you waiving presence of the

14   Defendant?

15         MR. INGRAM:  Yes.

16         THE COURT:  Mr. Ingram, you have

17   another question?

18         MR. INGRAM:  Based upon our exchange

19   a few moments ago in the Courtroom, it is my

20   understanding that a draft or some document

21   relating to the Court's pronouncement of sentence

22   was provided to the Prosecuting Attorney on

6369

1    Wednesday.

2              THE COURT:  I believe it was

3    Wednesday.  I asked them to type this up and get a

4    copy back, so that we would all have it when I was

5    reading through it.  You weren't given a copy of

6    it, and I apologize for that.

7              MR. INGRAM:  We should probably ask

8    that that document that was provided to the

9    Prosecuting Attorney on Wednesday also be marked

10   and sealed as part of the Court's Exhibit in this

11   matter.

12             THE COURT:  Okay.

13             MR. BAILEY:  The only thing left is

14   the final one.  All prior ones were thrown out.

15   There were six or seven of them.

16             MR. INGRAM:  There's six or seven

17   drafts?

18             MR. BAILEY:  Not six or seven

19   drafts, there's one draft and there's corrections

20   and all of the corrections with the draft were

21   pitched.

22             MR. INGRAM:  Who made the

6370

1    corrections?

2              MR. BAILEY:  We made or the Court.

3    We kept finding typo's.

4              THE COURT:  Whatever you have, if

5    you have something, bring it over.

6              MR. BECKER:  Let me explain

7    something here.  This is my understanding of what

8    we were supposed to do.  We were to take that and

9    put it on the computer and print out the hard copy

10   of the sentencing order, which is what we did.  As

11   Ken and I would proofread it for typographical

12   errors, it was changed and just saved on the hard

13   drive of the computer.  It was never printed out

14   and kept as draft after draft after draft.  I would

15   type over the hard drive, and prepare it.

16   Eventually a final copy was provided to the Court

17   and I think the Court had some typographical errors

18   and maybe some changes.

19             THE COURT:  I made one phone call

20   back to you.

21             MR. BECKER:  And the Court had

22   indicated some changes.  I just simply changed

6371

1    that.   Essentially what I did, because I typed the

2    whole thing was I was the Court's typewriter, the

3    Court's secretary.

4              THE COURT:  We used that -- we don't

5    have the equipment here or the know-how to do

6    things expeditiously.  That is the way we were able

7    to get the final instructions.

8              MR. BECKER:  That is the way Jury

9    instructions are done.  Now I think --

10              THE COURT:  We have had this come

11   up.  Tony Consoldane always raises this issue about

12   the Prosecutor typing stuff as if the Prosecutor

13   is -- and it may be a legitimate point, I don't

14   know.  It is the system that is used here because

15   it is the most practical.

16              MR. INGRAM:  Does anybody have the

17   first draft?  They do not.  Do you?

18              THE COURT:  No.  I don't have

19   anything, no.

20              MR. INGRAM:  Who wrote the first

21   draft?

22              THE COURT:  I gave notes saying this

6372

```
 1   is what I want.  This, this and this, and they sent

 2   it back.  I read it over, made some corrections,

 3   went back from there.

 4              MR. INGRAM:  The record should

 5   simply reflect that in this process, Defense

 6   counsel was never involved, nor consulted.  Other

 7   than that, I have nothing further.

 8              MR. BECKER:  I just want to address

 9   something on record here.  Rule 32 states that

10   sentence shall be imposed without unnecessary

11   delay.  Sentence shall be imposed without

12   unnecessary delay.  Pending sentence, the Court may

13   commit the Defendant or continue or alter the bail.

14   At the time of imposing sentence, and it doesn't

15   necessarily say before sentence is imposed, it says

16   at the time of imposing sentence, the Court shall

17   do all of the following:  Afford counsel an

18   opportunity to speak on behalf of the Defendant and

19   address the Defendant personally and ask if he or

20   she wishes to make a statement in his or her own

21   behalf; afford the Prosecution to make an

22   opportunity to speak; afford the victims the right
```

6373

1  provided by law; and then notify and then after --

2  it is very specific, the rule says after imposing

3  sentence in a serious offense, the Court shall

4  advise the Defendant has the right to appeal.  I

5  think what is important is Rule 32 does not say

6  before imposing sentence, Defendant or counsel

7  should be afforded an opportunity, it says at the

8  time of imposing sentence.  We haven't had the

9  sentence.  I don't think the actual sentence has

10  been handed down.  That is an important

11  distinction.  The Court by law had to make an

12  independent weighing and circumstances.

13           THE COURT:  Well, the record is

14  clear as to what has happened.  If you have a point

15  on appeal, you have got a point on appeal.

16           MR. INGRAM:  Thank you.

17  (End of in-chamber discussion)

18  (Back in Open Court)

19           THE COURT:  Gentlemen, would you

20  have your client come forward, please?  Does the

21  Defendant wish to address anything prior to

22  sentencing?

6374

1          THE DEFENDANT:  Yes, I think I

2    would.  I would like to have one of those notes

3    back.  Short and sweet this time.  You probably

4    wonder why I did what I did about asking for the

5    death penalty.  Because I think one small voice for

6    justice is going to count.  Maybe if it is for only

7    one person some day.  I didn't want to take the

8    stand on race equality and the criminal justice

9    system.  Criminal justice, an oxymoron, and two, to

10   expose and ask corrupt police officials who use a

11   badge to destroy rather than protect lives for

12   their own gain by committing perjury, planting and

13   transferring evidence, tampering, and using race

14   and religion to condemn.  Thank you.

15          Thank you for your decision.  I was a

16   little worried you might try to find something not

17   to do that.  I appreciate what you did.  Thank you.

18          MR. INGRAM:  The record should

19   reflect my migraine has returned.  We have nothing.

20          THE COURT:  Counsel have nothing

21   further?

22          MR. INGRAM:  No.

6375

1      THE COURT:  Miss Roberts, you have a

2   right to appeal the conviction filed in this case.

3   I would ask you, it is my duty to appoint counsel

4   to perfect that appeal for you.  I have had some

5   indication from someone that you may wish to hire

6   your own counsel or do you wish the Court to

7   appoint someone to represent you?

8      MR. INGRAM:  May I answer this

9   question?

10      THE COURT:  Yes.

11      MR. INGRAM:  The appeal in this

12   matter would be due in 45 days.  Donna, along with

13   Mr. Juhasz and I will make Appellate decisions in

14   due course, and at this time, there's no request

15   for Court appointed Appellate counsel.

16      THE COURT:  There's no request?

17      MR. INGRAM:  No request not at this

18   juncture.

19      THE COURT:  I would ask you to

20   apprise me, because the Supreme Court insists that

21   within a certain time period, within two weeks, I

22   have to either appoint Appellate counsel or they

6376

```
 1   are not completely happy with me.

 2                 MR. INGRAM:  Okay.

 3                 THE COURT:  As I said, you have an

 4   absolute right to file an appeal in this case, it

 5   would be the Supreme Court to review the actions of

 6   this Court and this Jury.  If you are unable to pay

 7   the cost of that appeal, the appeal will be

 8   perfected with no cost to yourself and counsel will

 9   be appointed with no cost to you.  Any papers,

10   other expenses you are unable to pay for will be

11   provided by this Court.  You have the right to have

12   a notice of timely appeal filed on your behalf.  If

13   you fail to do that, this Court will see that that

14   is done.  Do you have any other questions about any

15   of that at this time?

16                 THE DEFENDANT:  No.  Jerry says no.

17                 THE COURT:  Anything that the

18   Defense or the Prosecution wish to place on the

19   record at this time before the Court enters

20   sentence?

21                 MR. INGRAM:  Only that you take this

22   and mark it as a Court's Exhibit for sentencing
```

6377

1 | purposes.

2 | THE DEFENDANT:  I just request that

3 | that fairy tale you told, not be told to children

4 | at night.  Thank you.

5 | THE COURT:  The Court has considered

6 | the record and oral statements made as well as the

7 | principles and purposes of sentencing under Ohio

8 | Revised Code 2929.11, and has balanced the

9 | seriousness and recidivism factors of O.R.C.

10 | Section 2929.12.  Pursuant to law, the Trial Court,

11 | this day, June 20, 2003, having determined in a

12 | separate opinion of specific findings that the

13 | aggravating circumstances as to the count of

14 | Aggravated Murder, outweigh the mitigating factors

15 | by proof beyond a reasonable doubt, then made

16 | inquiry as to whether the Defendant had anything to

17 | say, why judgment should not be pronounced against

18 | her.  And the Defendant in answer showed no good

19 | cause or sufficient reason why sentence should not

20 | be pronounced.  Are you wondering what I am reading

21 | from?

22 | MR. INGRAM:  I am wondering what

6378

1   Mr. Bailey is reading from.  Mr. Bailey is reading

2   from a sentence.

3            MR. BAILEY:  This is Nathaniel

4   Jackson's.

5            THE COURT:  This is a copy of

6   Nathaniel Jackson's, which I have altered.  The

7   Court has considered the factors under Ohio Revised

8   Code 2929.14 and makes the following findings.  The

9   shortest prison term will demean the seriousness of

10  the Defendant's conduct; two, the longest prison

11  term is appropriate because the Defendant committed

12  the worst form of the offense; number three,

13  multiple prison terms are necessary to protect the

14  public from future crime and to punish the

15  offender; number four, consecutive prison sentences

16  are not disproportionate to the seriousness of the

17  Defendant's conduct and to the danger the

18  Defendant, the offender, opposes to the public.

19  Five, the harm caused by the multiple offenses was

20  so great that no single prison term for any of the

21  offenses committed as part of a single course of

22  conduct adequately reflects the seriousness of the

6379

1   Defendant's conduct.

2              It is therefore Ordered and Adjudged and

3   Decreed that the Defendant, Donna M. Roberts, be

4   taken from the Courtroom to the Trumbull County

5   jail, and from thence to the correction reception

6   center at Lorain -- I'm sorry, at Marysville, Ohio.

7              Counsel approach for a moment, please.

8   (SIDE BAR DISCUSSION, OFF THE RECORD AND

9   OUT OF HEARING)

10             THE COURT:  I'll read this over

11  again.  It is therefore Ordered and Adjudged and

12  Decreed that Defendant, Donna M. Roberts, be taken

13  from the Courtroom to the Trumbull County jail,

14  from thence to the correction reception center at

15  Marysville, Ohio, and thereafter be sentenced to

16  death on January 11, 2004 on Count One.  And

17  imprisoned therein for the stated prison term of

18  ten years on Count Three, plus a mandatory term of

19  three years on the firearms specification, to be

20  served prior to and consecutive to the sentence

21  imposed in Count Three.  Ten years on Count Four,

22  plus a mandatory term of three years on the

6380

1   firearms specification, to be served prior to and

2   consecutive to the sentence imposed in Count Four.

3   Sentence in Count Four to be served consecutively

4   to the sentence imposed on Count Three.  The

5   firearms specification in Counts Three and Four

6   shall merge as one sentence in Count Three as

7   matter of law.

8           The Defendant is ordered to pay the cost

9   of prosecution, once that is determined, for which

10  execution is awarded.  That is the judgment of this

11  Court.

12          Miss Roberts, I can't think of a more

13  unpleasant thing that anybody is called upon to do

14  than to sit here and review a record like this.

15                  THE DEFENDANT:  I know.

16                  THE COURT:  My heart goes out to

17  everyone that was involved in this thing.  I think

18  as most people who look at it, think that you used,

19  you appear from all of the contact I have had with

20  you, to be a normal person, which makes it more

21  difficult to explain the actions that the State has

22  been able to put forth.  And it almost appears to

6381

1  me that it was an abandoned, where there was no

2  thought of what was going to happen tomorrow or the

3  next day or down the road, almost some sort of a

4  fantasy world that you were living in.  But all of

5  our actions have consequences, and sadly, yours

6  have brought you to this point.  I do say this,

7  with heartfelt sincerity though, I wish you well.

8              THE DEFENDANT:  Thank you, Sir.

9              MR. INGRAM:  Thank you.

10  (End of Sentencing Hearing at 3:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

6382

1

2 REPORTER'S CERTIFICATE

3

4 I do hereby certify that the above and

5 foregoing is a true and correct transcript

6 of the proceedings had in the within hearing

7 as shown by stenotype notes written by me in the

8 presence of the witnesses at the time of the

9 hearing.

10

11 _____

MARY ANN MILLS, R.P.R.

12 Official Court Reporter

Trumbull County, Ohio

13

14

15

16

17

18

19

20

21

22