```
 1                    IN THE COURT OF COMMON PLEAS

 2                       TRUMBULL COUNTY, OHIO

 3                 TRIAL COURT CASE NO. 01-CR-793

 4                 SUPREME COURT CASE NO. 03-1441 07-2288

 5    STATE OF OHIO,            )

 6         Plaintiff           )

 7    vs.                      )

 8    DONNA M. ROBERTS,        )

 9         Defendant           )

10

11         BE IT REMEMBERED that this matter came on for

12    hearing on December 6, 2006, January 17, 2007,

13    September 20, 2007, October 22, 2007, and

14    October 29, 2007, before the Honorable Judge

15    John M. Stuard of the Trumbull County Common Pleas

16    Court at the Trumbull County Court House, 160 High

17    Street, Warren, OH  44481

18

19

20

21    Mary Ann Mills, R.P.R.

22    Official Court Reporter

23    Trumbull County, OH
```

2 ll

```
 1                        APPEARANCES
 2
 3    On Behalf of the State of Ohio:
 4         Assistant Prosecutor Kenneth N. Bailey
 5         Assistant Prosecutor Christopher D. Becker
 6         160 High Street
 7         Warren, OH  44481
 8
 9
10    On Behalf of the Defendant, Donna Roberts:
11         Atty. David L. Doughten
12         Atty. Robert A. Dixon
13         4403 St. Clair Avenue
14         Cleveland, OH  44103
15
16
17
18
19
20
21
22
23
```

1                          I N D E X

2

3    Hearing on December 6, 2006..............page   4

4

5    Hearing on January 17, 2007..............page   8

6

7    Hearing on September 20, 2007............page 12

8

9    Motions Hearing on October 22, 2007.......page 14

10          WITNESS

11          DR. THOMAS GAZLEY

12          Direct Examination by Atty. Becker...page 17

13          Cross Examination by Atty. Doughten..page 24

14          Redirect Examination by Atty. Bailey.page 37

15

16   Resentencing on October 29, 2007.........page 68

17

18

19

20

21

22

23

```
 1    WEDNESDAY, DECEMBER 6, 2006
 2     (In-chambers with Judge Stuard at 9:50 a.m.)
 3                     THE COURT:  This is set this
 4    morning for hearing on the Donna Roberts case.
 5                     ATTY. BECKER:  I think for the
 6    record, it is just a status conference.  We don't
 7    have the Defendant here.
 8                     ATTY. DOUGHTEN:  I should put
 9    on the record that Miss Roberts specifically
10    requested that she not be brought back, so I would
11    waive her presence if it is necessary for a
12    status.  She had specifically written me and
13    requested that she not be brought back.
14                     ATTY. BECKER:  I guess we are
15    actually here on a couple of things.  There's
16    actually been three motions filed by Mr. Doughten.
17    One for the appointment of co-counsel, that would
18    be Robert A. Dixon.  We don't have an objection to
19    that.  Pursuant to the rules, we probably do need
20    an appointment.
21                     THE COURT:  I'll grant that.
22    Prepare an entry.
23                     ATTY. BECKER:  There is a
```

```
 1    motion for appropriation of funds for expert
 2    assistance.  We are going to oppose that and a
 3    motion for release of records.  I think optimally
 4    what we would like to do is Mr. Doughten has
 5    indicated that her time to file an appeal to the
 6    U.S. Supreme Court is not yet tolled at this
 7    point.  There is also an unrelated matter
 8    involving both myself, Mr. Bailey and the Court
 9    that is pending in the disciplinary counsel, which
10    I think would perhaps be best if we waited until
11    resolution occurred in that matter, and I think
12    basically, what we would like to do is just come
13    back in January at some point for another status
14    conference to see where these various issues are
15    at.  I suppose we don't have an objection to the
16    release of records.
17                    ATTY. BAILEY:  No.
18                    ATTY. DOUGHTEN:  I think there
19    is a journal entry.  Just so the record is clear,
20    there may be an issue as to competency, I told the
21    Court off the record, I was told about a year or
22    so ago, that there had been a problem with her
23    mental health.  I believe she's on the right
```

```
 1    medication and in my view doing fine right now.  I
 2    believe she's competent, but there is that in the
 3    past that I want to look into.  I have had done a
 4    signed paper release, and there were some
 5    incidents that her son had just told me a month
 6    ago that I was unaware of and Chris was unaware of
 7    that there had been some serious auto accident
 8    with head injuries, I don't know if that is true
 9    or not.  I said we are trying to find out if that
10    is the case or if that has any connection
11    whatsoever to the problem she had.  I'm trying to
12    get those records, so I can let the Court know
13    with some assurance, whether there is or isn't an
14    issue.
15                    ATTY. BECKER:  I suppose we
16    don't have an objection as long as we are provided
17    the records as well.
18                    ATTY. DOUGHTEN:  I have no
19    problem with that.
20                    ATTY. BECKER:  I think there is
21    an attached order to that motion.  I think we'll
22    let the motion for appropriation of expert funds
23    be held in abeyance.  We'll come back on
```

```
 1    January 17, 2007 at 3:00 p.m. for another status
 2    hearing.
 3
 4         (END OF HEARING ON DECEMBER 6, 2006)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

1  WEDNESDAY, JANUARY 17, 2007

2    (In-chambers)

3                    THE COURT:  There was a hearing

4  set it was on this motion for release of records

5  and motion for appropriation of funds for an

6  expert of a psychological nature, psychiatric

7  nature.  The Court has had conference with all

8  parties and I have no problem with approving these

9  matters, but I do question at this point my

10  jurisdiction to grant the motion as stated for the

11  reason that this case has been sent back from the

12  Supreme Court with one narrow issue involved and

13  that is for me to do another independent review of

14  the mitigating aggravating factors and to type my

15  findings to resubmit into the case.  There is no

16  instruction from the Supreme Court as to anything

17  other than that that I read.

18                    ATTY. BECKER:  Except for the

19  allocution.

20                    THE COURT:  Well the

21  allocution, you guys never had a bad day like I

22  had a bad day that day.  How often do you miss the

23  allocution, although there is a lot of law that

```
 1    says you have to do it.  In any event, in the
 2    interest of justice, it seems to me with the facts
 3    as they stand presently, all parties from what I
 4    observe, including the Court, are really on unsure
 5    ground here as to what is the proper thing, but
 6    there has been a request by recently appointed
 7    counsel representing Miss Roberts, that they wish
 8    to obtain her medical and particularly psychiatric
 9    or psychological records to see if there is
10    something that they would be called upon to do
11    with that information and I have no reason at all
12    not to wish them well in obtaining that
13    information.  It is been suggested that the
14    easiest way is for her signature, which they have
15    brought up to me and that is fine.  If she does
16    not cooperate, then this Court has no objection to
17    aiding in any way that it is determined to be
18    proper, with the thought of my jurisdiction in
19    mind, to help you get that information.  I also
20    have an order directing evaluation of Defendant's
21    competency to stand trial.
22                    ATTY. BECKER:  Not to stand
23    trial.  Competency to be resentenced.
```

```
 1                    THE COURT:  Yes.  We have
 2   already had the trial.  That was done at the
 3   inception.  We also had another evaluation.
 4                    ATTY. BECKER:  Evaluation
 5   regarding the waiver of mitigation.
 6                    THE COURT:  And those all
 7   showed that she was competent of course and that
 8   psychologically she had no defect or any reason
 9   why that the matter could not proceed.
10                    ATTY. BECKER:  Note for the
11   record that that is a proposed entry that was
12   prepared by the State.  Mr. Doughten has an
13   opportunity to review that and I believe approves
14   of the same, we are trying to avoid the problem
15   that got us here in the first place.
16                    THE COURT:  You do not object
17   to them having prepared this entry?
18                    ATTY. DOUGHTEN:  That is
19   correct.  I was provided it before it was
20   presented to the Court.
21                    THE COURT:  I am signing this
22   with the reservation that I'm not totally sure of
23   my jurisdiction to do so, but I see no reason why
```

1    anyone would object to my jurisdiction.

2                    ATTY. BECKER:  We have to

3    determine that she's competent before we can

4    sentence her.  I don't think there is any question

5    on that.  They are going to argue for additional

6    evidence to be presented at the sentencing

7    hearing, including mitigation type evidence.  Our

8    position, I think, I know is going to be that that

9    is not what we were here for when we ultimately

10   get to that point.  That is for a different day.

11                   THE COURT:  I don't disagree,

12   but I could question on the basis of what the

13   manner in which the previous Roberts case was sent

14   back to this Court, that I can legitimately say

15   there are no more competency evaluations that are

16   going to be done.  I'm going to do what the

17   Supreme Court ordered me to do.

18                   ATTY. BECKER:  For the record,

19   we are going to come back February 14, 2007 at

20   3:30 p.m. for another status hearing.

21

22           (END OF HEARING ON JANUARY 17, 2007)

23

1 THURSDAY, SEPTEMBER 20, 2007

2   IN OPEN COURT AT 3:00 p.m.

3                  THE COURT:  This matter was set

4 today.  I understand there is a problem with going

5 forward.

6                  ATTY. BECKER:  I'll address the

7 Court.  We were here today to determine the

8 competency of Miss Roberts to stand trial -- I'm

9 sorry to stand for sentencing as remanded by the

10 Ohio Supreme Court.  It is our understanding that

11 the report from the Forensic Diagnostic Center has

12 been prepared, and the Court as well as counsel,

13 have received copies of that.  It is our

14 understanding, and just briefly discussing this

15 issue, that Mrs. Roberts and her attorneys will

16 not be stipulating to that report.  That has

17 necessitated the requirement that we bring

18 Dr. Gazley from the Forensic Diagnostic Center

19 here before the Court and put him on the stand.

20 We have checked with every one's schedule.  I

21 believe we mutually agreed that October 22nd at

22 1:00 p.m. would be a mutually convenient time to

23 do that.  So we'll return on the 22nd to, I

```
 1    believe, to determine whether or not she's
 2    competent.  I know there are some outstanding
 3    issues and motions by the defense.  I believe they
 4    will make arguments at that point.  We as well
 5    will make arguments, and the Court will make a
 6    ruling from that point, and depending on how the
 7    Court rules, we'll come back on October 29th or
 8    later at 1:00 p.m.
 9               I think Mr. Doughten may want to add
10    something to the record, but I tried to summarize
11    that.
12                         THE COURT:  There are also
13    three or four motions pending.  I have had
14    discussion with both sides and I guess it would be
15    appropriate for me to probably make rulings on
16    those and send copies to all of you before that
17    next hearing.  I think the latest one was filed
18    today.  I'll do that, and see you back here on the
19    22nd of October, and we'll proceed from that point
20    on.
21
22               (END OF HEARING ON SEPTEMBER 20, 2007)
23
```

1    MONDAY, OCTOBER 22, 2007

2    HEARING ON MOTIONS

3    IN OPEN COURT AT 1:25 p.m.

4              THE COURT:  Good afternoon.

5    This matter is before the Court on remand from the

6    Supreme Court in State vs. Roberts.  2006, 110

7    Ohio State 3d, 71.

8              ATTY. BECKER:  Our case number

9    is 01-CR-793.

10             THE COURT:  The Court found no

11   prejudicial error in regard to Defendant Roberts

12   conviction, and the conviction and judgment of the

13   Court was affirmed.

14        The Court then remanded the case for the

15   second phase on the basis that they felt there was

16   input from the Prosecutor's office.  The Court

17   has -- well, that is not important at this point.

18        The purpose of today is to handle the

19   remand and the narrow focus in which the Supreme

20   Court sent the matter back here.  We have some

21   motions, which must be put on the record in the

22   meantime.  I have had conversations with both

23   sides in regard to these motions over the last

1    couple of weeks, but we have not formally

2    journalized them.

3          I have first a motion for Appropriation

4    of Funds for Expert Assistance.  That has been

5    briefed by the defense.  I don't know that the

6    State has presented anything other than the

7    discussion that we had.  What is the State's

8    position?

9                    ATTY. BECKER:  We would oppose

10   that motion at this point.  We believe in the

11   dictates of the opinion, the Forensic Center

12   has -- and we have testimony here today and a

13   report of Dr. Gazley detailing the Defendant's

14   competency for these proceedings.  The opinion of

15   Dr. Gazley is that she is competent.  I understand

16   the Court has to accept that and we'll present

17   some testimony on that, but we'll oppose the

18   second violation.

19                    THE COURT:  Do you have

20   anything else to add?

21                    ATTY. DOUGHTEN:  Nothing.

22                    THE COURT:  I have advised

23   counsel for both sides, the Court is taking a

1   narrow approach here as to what is appropriate.

2   The primary thing that, and the only thing that I

3   felt was relevant, was the present competency of

4   the Defendant, Miss Roberts.  I had appointed a

5   forensic expert in that regard.  I have that

6   report back, which I have accepted.  It finds that

7   she's presently competent.

8                   ATTY. BECKER:  Your Honor, I

9   don't think they are stipulating to that report.

10  I know you have the report, but I think we need to

11  put some testimony on from Dr. Gazley.  That's why

12  we have subpoenaed him here.  They are not going

13  to stipulate to the report.

14                  ATTY. DOUGHTEN:  No, we are

15  not.

16                  ATTY. BECKER:  We are going to

17  ask, or we are going to call Dr. Gazley to the

18  witness stand, he's here.  Dr. Thomas Gazley

19  prepared the report.

20

21                  DR. THOMAS GAZLEY

22  being first duly sworn, according to law,

23  testified as follows:

```
 1    DIRECT EXAMINATION BY ATTY. BECKER:
 2    Q        Would you state your name for the record?
 3    A        Thomas Gazley.
 4    Q        Dr. Gazley, where are you employed?
 5    A        Forensic Psychiatric Center of Northeast
 6    Ohio.
 7    Q        What is your occupation there?
 8    A        Psychologist.
 9                   ATTY. BECKER:  It is my
10    understanding that the defense will stipulate to
11    his credentials.
12                   THE COURT:  I misunderstood.  I
13    apologize for that.
14                   ATTY. DOUGHTEN:  That's
15    correct, Your Honor.
16    Q     You have a Ph.D., you're a psychologist
17    and you work for the Forensic Diagnostic Center,
18    is that correct?
19    A        That is correct.
20    Q        Do you make routine, as part of your
21    work, evaluations to determine competency of
22    criminal Defendants?
23    A        That is true.
```

1    Q        You also make a part of your work,

2    determining not guilty by reason of insanity pleas

3    and making opinions with respect to those pleas,

4    is that correct?

5    A        That is correct.

6    Q        How long have you been employed with the

7    Forensic Center?

8    A        One year.

9    Q        I want to direct your attention and

10   specifically to a report that was prepared

11   involving a woman by the name of Donna Roberts.

12   Are you familiar with that report?

13   A        Yes, I am.

14   Q        I have it to be ten pages in length, and

15   we have marked a copy of it as State's Exhibit

16   No. 1 and I have put today's date of October 22,

17   2007, on it.  Do you have a copy of that report in

18   front of you?

19   A        Yes, I do.

20   Q        You probably have the original?

21   A        Correct.

22                    ATTY. BECKER:  I believe

23   counsel for the defense has a copy of this ten

```
1    page document.
2                      ATTY. DOUGHTEN:  We do.
3    Q        I am going to provide that to Dr. Gazley
4    and ask if that is a fair and accurate copy of the
5    original which you have prepared.
6    A        It seems to be, yes.
7    Q        Does your signature appear on the last
8    page?
9    A        Yes, it does.
10   Q        The original would be either in your
11   files at the Forensic Diagnostic Center or in your
12   files that you brought here today?
13   A        Correct.
14   Q        Which is it?
15   A        It is at the Diagnostic Center.  This is
16   a copy.
17   Q        Dr. Gazley, you were asked to evaluate
18   Miss Roberts to determine whether she was
19   competent to be sentenced in these matters and to
20   proceed, is that correct?
21   A        I believe the actual wording in the Court
22   order was competence to be resentenced.
23   Q        And in efforts to find out whether she
```

```
 1   was, what steps did you undertake to make that
 2   determination?
 3   A        I interviewed Miss Roberts at Marysville.
 4   I was able to review her mental health records in
 5   the mental health department at Marysville, and I
 6   reviewed the available information in the court
 7   file regarding some of the background information
 8   in the case.
 9   Q        And how long did you actually interview
10   Mrs. Roberts?
11   A        It was close to two and a half hours, one
12   way or the other.
13   Q        And you physically went to Marysville
14   Correctional Institution and did that?
15   A        Yes, I did.
16   Q        How much time did you spend going over
17   the records that you received and inspected?
18   A        There were the records from the police
19   reports.  There were records available in the
20   mental health file at Marysville.  So I would say
21   in the neighborhood of an hour, hour and a half.
22   Q        And you reviewed those and reviewed your
23   interview with her and you said there were some
```

```
 1    other documents you had?
 2    A        There were, there was the order for the
 3    evaluation.  There was some police reports.  I had
 4    a conversation, in person conversation with the
 5    director of the psychology department at
 6    Marysville.  I also had, I believe, a phone
 7    conversation with defense counsel.
 8    Q        Mr. Doughten or Mr. Dixon?
 9    A        Correct.
10    Q        Or both of them?
11    A        To the best of my recollection, it was a
12    speaker phone call.  I'm not certain exactly.
13    Q        After you gathered all of that
14    information and reviewed it, I assume you took
15    notes at the interview with Miss Roberts.
16    A        That is correct.
17    Q        Did you then come to an opinion as to
18    whether or not she was competent to be
19    resentenced?
20    A        I phrased the opinion, not so much in
21    terms of competency, given that that's a question
22    for the Court to decide, but I do have an opinion
23    in terms of her ability to understand the
```

```
 1    sentencing process and the ability to understand
 2    what the alternatives available are to her as well
 3    as her ability to provide her counsel with any
 4    mitigating circumstances, should she desire to do
 5    so.
 6    Q       And what was your determination?
 7    A       That she would be able to do those things
 8    I just listed.
 9    Q       And you have put that opinion in your
10    report, is that correct?
11    A       Yes, I did.
12    Q       And the person that you met with in
13    Marysville, she's the Defendant in this case, Miss
14    Donna Roberts?
15    A       That is correct.
16    Q       So it's your opinion with a reasonable
17    degree of psychological certainty that Miss
18    Roberts is aware of what she could do, not whether
19    she's going to do it, but what she could do to
20    present to this Court to spare her from being
21    given the death penalty?
22    A       That is correct.
23    Q       She's aware that she can give evidence to
```

```
 1    the Court and to her attorneys to mitigate the
 2    sentence?
 3    A        Yes, and she has the ability to do that.
 4    Q        And it is your opinion, based upon your
 5    evaluation of her, that these proceedings could
 6    continue with her being sentenced and being able
 7    to present I guess allocution or make a statement
 8    to the Court?
 9    A        Yes.
10    Q        The item you have in front of you,
11    State's Exhibit No. 1 with a date of today,
12    10/22/07, that is a fair and accurate copy of the
13    original?
14    A        It appears to be, yes.
15                      ATTY. BECKER I have no further
16    questions for Dr. Gazley, but I would move that
17    his report, the ten page report be made a part of
18    the record and I know Mr. Doughten may want to
19    wait.
20                      THE COURT:  You can proffer it
21    at this time.
22
23
```

1    CROSS EXAMINATION BY ATTY. DOUGHTEN:

2    Q        I want to ask you this afternoon a little

3    bit about references that you made in your report

4    and were in the prison records as to the auto

5    accident, the head injuries, the sex abuse, those

6    sort of things.  I'll go through them one by one.

7    Did you become aware that Miss Roberts had been

8    involved in a number of auto accidents?

9    A        Yes.

10   Q        In a serious one in the year 2000?

11   A        The degree to which it was serious, I

12   don't know.  It did result in some injury I am

13   aware of.

14   Q        That is what I wanted to ask you about.

15   Is it important to know the effect that a head

16   injury might have on one's ability to be

17   competent?

18   A        I think the, certainly in a typical

19   competency proceeding, it is my understanding that

20   the criteria that the Court uses to make a

21   determination about competency are pretty spelled

22   out in terms of what the Court has to weigh.

23   Under these circumstances, I don't know if there

1    is such a thing as a competency to be resentenced

2    criteria.  It is difficult for me to say, yes, a

3    head injury in 2000 would in fact influence

4    competency to be resentenced in the year 2007

5    without knowing specifically what the injury might

6    have been.

7    Q        That is my question.  What is a

8    neuropsychologist?

9    A        A neuropsychologist is a psychologist who

10   is specialized in evaluating, assessing and

11   sometimes treating disorders of the brain that

12   have to do with often times neurological

13   impairment, whether the result of disease, whether

14   the result of some sort of injury or illness of

15   the brain.

16   Q        And do you sometimes refer cases out to a

17   neuropsychologist?

18   A        I personally have not as of this date,

19   but I am aware of neuropsychologists.  I have

20   colleagues who are neuropsychologists.  I know

21   what they do, where they are employed, what type

22   work they do.

23   Q        With your educational background, explain

1    -- what is organic brain damage?

2    A        Organic brain damage?

3    Q        Is there such a thing?

4    A        Well there used to be.

5    Q        If you could explain that for us.

6    A        Organic simply means it refers to

7    something that has to do with damage to that

8    particular organ of the brain.  Years ago in some

9    of the old nomenclature, organic brain damage was

10   in fact a diagnosis.  It is no longer a diagnosis.

11   Q        What is the proper diagnosis if you would

12   determine, and this is hypothetical, if you would

13   determine that perhaps a brain injury caused

14   significant change in a person's ability to

15   process thought?

16   A        I think it is a diagnostic question.  If

17   the question is specifically that it changes a

18   person's ability to process thought, that is a

19   different diagnostic question, than if it changes

20   a person's personality and their ability to

21   function.

22   Q        Explain the differences.

23   A        Processing thought is a cognitive,

1      intellectual, it is a processing type of thing.

2      It has to deal with the use of language.  It has

3      to deal with the use of memory.  It has to deal

4      with the ability to take in information, do

5      something with it, feed it back, if that is the

6      task.  The personality part of it, is the person's

7      ways of relating to others, relating to

8      situations, acting in a characteristic manner,

9      personality meaning it has some sort of stability

10     across different situations.

11     Q      Might a sudden mood change or personality

12     change, might that effect one's ability to

13     interact with defense counsel say?

14     A      It could.

15     Q      Did you find that to be so in this case?

16     A      I had no direct observation of her

17     ability to interact with defense counsel, but

18     based on her ability to interact with me and

19     provide me information, provide a coherent account

20     of her own perceptions about the situation, I came

21     to the conclusion that she would be able to do so

22     with her defense counsel as well.

23     Q      Did you talk to any of her family

1    members, son, sisters, in regard to her situation

2    before and after the auto accident?

3    A        No, did I not.

4    Q        In reviewing the Marysville records, did

5    you come across some allegations of sexual abuse

6    that she had suffered as a child?

7    A        I don't remember if it was actually in

8    the record at Marysville or something that Miss

9    Roberts told me directly.

10   Q        Let me ask you this, did you see

11   anything, I saw, I see the post-traumatic stress

12   syndrome is not a diagnosis of yours today, is

13   that correct?

14   A        That is correct.

15   Q        Did you see anything in the mental health

16   records at Marysville referring to post-traumatic

17   stress syndrome?

18   A        Not that I recall.

19   Q        Is that sometimes an effect of childhood

20   sex abuse?

21   A        Yes.

22   Q        Were you aware, from discussing with the

23   mental health experts at Marysville, whether Miss

```
 1    Roberts had gone through periods of
 2    hallucinations?
 3    A         I don't recall them saying she had gone
 4    through periods of hallucinations specifically.
 5    She was going through periods of significant
 6    depression while at Marysville.
 7    Q         You don't remember any specific incidents
 8    of imagining things in herself, that wasn't made
 9    available to you?
10    A         Not that I recall right offhand.
11    Q         Do you remember what drugs she was taking
12    at Marysville?
13    A         Yes, I do.
14    Q         Do you remember if they were giving her
15    any psychotropic drugs at Marysville?
16    A         Yes, she was getting psychotropic
17    medication.
18    Q         What is a psychotropic drug, and then
19    what is it usually prescribed for?
20    A         Qualifying my answer with that I'm not a
21    medical doctor.  I'm talking about this based on
22    my experience in behavioral medicine, not being a
23    physician, but being a psychologist and being
```

1  familiar with types of medications, not being able
2  to prescribe.
3  Q        You know a whole lot more than we do I'm
4  sure.  Anything you can help us with.
5  A        She was prescribed medication called
6  Trazodone, a medication called Lithium and a
7  medication called Wellbutrin.  The Lithium is a
8  mood stabilizing medication often used to treat
9  the symptoms of bipolar disorder.  The Wellbutrin
10 is a anti-depressant medication often used to
11 treat the symptoms of depression and the Trazodone
12 is a medication that is often used to treat
13 depression or often used as a sleeping aid as
14 well.  And I believe those are the three
15 medications she had been prescribed.
16 Q        This may be out of the your field, if it
17 is an unfair question, let me know.  Aren't
18 psychotropic drugs often used for people suffering
19 from hallucinations?  Isn't that one of the
20 reasons they are sometimes prescribed?
21 A        Hallucinations are a symptom of a
22 psychiatric disorder, known as schizophrenia.
23 Sometimes a bipolar disorder with psychotic

1    features, a person may experience symptoms of

2    hallucinations as well.  Psychotropic medication

3    is a general name for any kind of medication that

4    is used to treat psychiatric illness.

5    Q       What I was going to ask you, you have

6    diagnosed her with bipolar disorder, but not with

7    schizophrenic features, is that correct?

8    A       That is correct.

9    Q       Did you see in the Marysville records or

10   speak to a health official in Marysville about any

11   type of schizophrenia being present in Miss

12   Roberts?

13   A       No.

14   Q       You didn't see that?

15   A       Not that I recall.

16   Q       You mentioned in your report, and that

17   Miss Roberts had a pretty consistent suicide

18   ideation, is that the right term?

19   A       Yes.

20   Q       And what did you base that on?

21   A       Her report.  She told me she had thought

22   about suicide in the past.

23   Q       Did you speak to any mental health

1    officials at Marysville or in reviewing the mental

2    health records, did you see any specific instances

3    of suicide attempts or suicidal thoughts while she

4    was in Marysville?

5    A        I believe early on in her stay there, she

6    was diagnosed with a level of depression that was

7    significantly more severe than the depression that

8    she experienced at the time that I saw her.

9    Q        And if you can early on, if you can time

10   frame, are you talking, well if you can, can you

11   give us a year approximately?

12   A        I believe in reviewing the mental health

13   record at Marysville, in July of 2003, they had

14   indicated that she was experiencing moderate to

15   severe depressive mood.

16   Q        Is that consistent with your bipolar

17   diagnosis?  If it is, can you explain to us how

18   that works?

19   A        Are you asking me, is depressed mood

20   consistent with the bipolar diagnosis?

21   Q        It is a convoluted question.  Let me back

22   up and straighten it out for you.  Did you come to

23   an opinion, an opinion as to what was the basis

1    for her conscience thinking of suicide?

2    A       My assumption was, it was due to symptoms

3    of depression.  Depression causing the suicide

4    thoughts.

5    Q       Do you know from your reviewing of her

6    mental health records, did this pre-exist the

7    charges here?

8    A       That I don't know.  The mental health

9    records that I reviewed were mental health records

10   from Marysville institution.

11   Q       You are unaware if this was chronic, and

12   what I mean by that, say for 20 years preceding

13   the homicides or if this was just post, when she

14   got to Marysville?

15   A       I know there was a previous psychiatric

16   history, I do not know what the diagnosis was.

17   There was no record available to me in terms of

18   what her previous psychiatric illness might have

19   been or how it was treated or what it was treated

20   with.

21   Q       Speaking of records, for the Court's --

22   in all fairness to the doctor, we just received

23   this last Friday, which was the 19th.  I think I

1    showed it to you for five minutes.

2    A        You did.

3    Q        Identifying Defense Exhibit A, these are

4    the Social Security records SSI, and the reason I

5    wanted to ask you, were you aware at the time you

6    did the diagnosis, if Miss Roberts was receiving

7    any type of benefits for mental disorder, mental

8    handicap from Social Security administration?

9    A        I was not aware of that.

10   Q        You just saw this for the first time

11   today, is that correct?

12   A        I saw about two pages of that, yes.

13   Q        If you were aware, if you became aware

14   that someone had been diagnosing, was receiving

15   benefits from the Government for a mental

16   disability, could that have any affect on your

17   opinion, do you think?

18   A        I don't think it would have an affect on

19   my opinion that addressed the legal question

20   before the Court at this time.

21   Q        And could you explain why that is?

22   A        There are often situations where people

23   are been diagnosed with psychiatric illnesses

1    either of acute or of a chronic nature.  And they
2    have been accused of an offense, and that they,
3    the Court remains concerned either about their
4    competency to participate in proceedings or about
5    their sanity at the time of the offense.  The
6    diagnosis, simply because a person has a
7    psychiatric or mental health diagnosis does not
8    influence one way or the other whether a person is
9    ultimately found to be competent to stand trial.
10   The diagnosis is part of how, what you would have
11   to investigate to make that determination, but it
12   doesn't impact, simply because a person has a
13   diagnosis doesn't necessarily mean they are
14   automatically competent or not competent.  A
15   person who is psychotic, a person who has paranoid
16   schizophrenia, a person who has a bipolar
17   disorder, a person who has a major depressive
18   disorder, can be and often is found competent to
19   stand trial.
20   Q        I just have one more area.  I just want
21   to clean up one thing.  I want to get back to the
22   head injury aspect of your diagnosis.  Is this
23   something that a person, a psychologist who is not

1    a neuropsychologist, can you make a determination

2    of how severe the injury is?

3    A        No.

4    Q        So that is something that in order to

5    understand the affect that the injury may have

6    had, you would have to have a neuropsychologist

7    give an evaluation, which in turn you would have

8    to review in incorporating your opinion, is that

9    correct?

10   A        The way you phrase the question, I don't

11   believe it is correct.

12   Q        Go ahead and phrase it properly.

13   A        I think, I base my opinion that I provide

14   the Court on the information that I receive from

15   the subject at the time I do the interview.

16   Whether or not that person has a severe or

17   disabling mental illness or whether or not that

18   person may have a neurological impairment, or a

19   brain injury, I think is maybe related, but is not

20   the crux of how I make the decision about my

21   opinion.  I make my decision about the opinion

22   based on the responses the person provides me to

23   the questions I asked that I believe are related

```
 1    to the questions the Court needs to address,
 2    rather than the diagnosis.  The diagnosis may
 3    provide some helpful information in terms of what
 4    might be expected, but in terms of the person's
 5    ability to actually provide a coherent, relevant
 6    reasonable, intelligent response to what the Court
 7    needs to know, it is not necessary.
 8                     ATTY. DOUGHTEN:  Thank you very
 9    much.
10                     THE COURT:  Any other
11    questions?
12                     ATTY. BAILEY:  Just for
13    purposes of the record, I'm replacing Mr. Becker
14    because he got called down to trial in Judge
15    McKay's Court.
16
17    REDIRECT EXAMINATION BY ATTY. BAILEY:
18    Q        Dr. Gazley, with the additional
19    information that defense counsel just presented to
20    you, and the questions that he asked, did that
21    change your opinion in any way as to the
22    Defendant's ability to be competent to be
23    resentenced?
```

```
 1   A        No, it did not.

 2                   ATTY. BAILEY:  Thank you.

 3                   THE COURT:  I have a couple of

 4   questions.  If I understand what you are saying,

 5   and I think the main thrust of counsel's question

 6   was, if a person has had some psychiatric problem,

 7   whatever it maybe, bipolar, schizophrenia,

 8   whatever, unless the person is to the point where

 9   they don't understand what is going on at the

10   time, you are looking at a slot of time to

11   determine, is this person competent to understand

12   what is going on now, is that correct?

13                   WITNESS:  That is correct.

14                   THE COURT:  That is the purpose

15   of the competency hearing?

16                   WITNESS:  Correct.

17                   THE COURT:  You may have

18   somebody that hears voices or whatever, but they

19   still have the ability to understand and

20   communicate and understand what their attorney is

21   saying, whatever, that may qualify as being

22   competent, even though they may be pretty much not

23   normal, is my understanding correct?
```

```
 1                    WITNESS:  Yes.
 2                    THE COURT:  Is it possible for
 3     somebody to have these other problems and still be
 4     determined competent at any certain time?
 5                    WITNESS:  Are you asking is it
 6     possible for a person to have a psychiatric
 7     diagnosis such as --
 8                    THE COURT:  The thing that
 9     concerns me here is, they brought up this fact
10     that she has been, while in prison, been given
11     Lithium, which I think most of us realize is for
12     bipolar disorder, and other drugs that may be for
13     some other reason.  My question is, are you
14     comfortable with your determination of competency,
15     taking that all into account, as to whether or not
16     she's competent at the present time to understand
17     the proceedings against her?
18                    WITNESS:  I think, especially
19     in reviewing the information available to me at
20     Marysville, there is a definite improvement in her
21     overall psychiatric and psychological well-being
22     from the time she was admitted, up until the time
23     I saw her, and you can see in the rating scales
```

1    that they used, the way they described the
2    improvement and the progression of her illness, to
3    the point where, back in 2003, I believe I
4    mentioned to defense counsel, that she was
5    moderately to severely depressed, and then the
6    descriptors lessened as time went on and she was
7    treated both psychiatrically and psychologically
8    there, to the point where the final diagnostic
9    considerations by the mental health people at
10   Marysville were that her symptoms were in fact in
11   remission at the time that I saw her.  She was
12   progressively getting better, and when I saw her
13   earlier this year, she was very coherent, her
14   comments and responses to my questions were very
15   relevant and I thought to the point.
16                    THE COURT:  The State have any
17   further questions of the witness?
18                    ATTY. BAILEY:  No, Your Honor.
19                    THE COURT:  Defense?
20                    ATTY. DOUGHTEN:  No, Your
21   Honor.  Thank you.
22                    THE COURT:  You may step down.
23   Thank you.

```
 1                          ATTY. BAILEY:  Just ask for the
 2    introduction of State's Exhibit No. 1.
 3                          THE COURT:  Any objection to
 4    that?
 5                          ATTY. DOUGHTEN:  No.
 6                          THE COURT:  No objection, it
 7    will be admitted.
 8                          ATTY. DOUGHTEN:  We move just
 9    for the admission of Defendant's Exhibit A.
10                          ATTY. BAILEY:  No objection.
11                          THE COURT:  That gets to
12    another motion.  Let me take care of that right
13    now.  I believe there are two motions to proffer
14    evidence.  One rather extensive, the other not so.
15    One is the prison records and another proffer.
16    That will be admitted for purposes of the record
17    only at this point.
18          There is a motion for the trial judge to
19    recuse himself.  I am overruling that motion
20    because I have an order from the upper court to
21    review this and to send it back up again.  I think
22    if the motion to recuse were proper, they would
23    have taken that into consideration.  They did not
```

1    feel that it was necessary.

2        There is a motion for appointment of

3    independent expert and for continuance.  The Court

4    has denied that request.  That was where you

5    wanted to get into the mental health of your

6    client in regard to this possible accident and

7    what effect if any it had.  The Court's reason for

8    overruling that is that, that is for another court

9    and another day.  That is the reason I am allowing

10   you to supplement the record with that.

11       The question before this Court is only

12   the competency presently of the Defendant to

13   understand this resentencing.

14       I think I had granted a motion for

15   continuance for this resentencing hearing on at

16   least one occasion, maybe two.  I believe that

17   covers all of the outstanding motions, is that not

18   correct?

19                      ATTY. DOUGHTEN:  It is.  We

20   were going to file today, I this it's moot now, a

21   third proffer, which would be the records, but

22   since it came in as an Exhibit at this hearing, I

23   think it is moot.  We may file it, just frankly to

1    make sure the record is clear, but it is already

2    part of this, so I don't think it matters.

3                    THE COURT:  Anything that is at

4    all relevant, you may submit as a proffer for the

5    record.  Defendant's Exhibit A is admitted.

6            Now in regard to the submission by the

7    State of the competency report, which the doctor

8    has just testified, I read that over, and I am

9    accepting his testimony.  That's the reason I

10   asked the questions because of what you raised on

11   this thing.  And again, you are attempting to get

12   way beyond the purview of what this is about.

13   What it is about is her present competency.  She

14   may have all kinds of mental problems.  As long as

15   they do not affect her ability to understand what

16   is going on for purposes of the sentencing within

17   that narrow view of what the Court has ordered me

18   to do.  I see no reason, in fact I see very

19   potential problems with attempting to get into a

20   whole side issue, which in my opinion, should have

21   been brought up during the trial itself, and I

22   think there was some good reasons why those items

23   were not brought up.  That is for some reviewing

1    Court.  It is not for this Court to determine or
2    to get into that.
3            Are there any other motions before the
4    Court before we proceed with allocution?
5                        ATTY. DOUGHTEN:  Have you ruled
6    on the competency issue?
7                        THE COURT:  I am accepting the
8    competency report and finding that the Defendant
9    is competent.
10                       ATTY. DOUGHTEN:  We had
11   a motion for the appointment of a
12   neuropsychiatrist.  I understand the Court said
13   "no."  For the record, we are going to renew our
14   motion and ask for a continuance if that
15   neuropsychiatrist were granted for obvious
16   reasons.  We want to make that clear.
17                       THE COURT:  I think that is not
18   relevant to the reason for this hearing.  That is
19   something that -- I don't know how defense counsel
20   can use such testimony, but it has nothing to do
21   here.  The only thing I am concerned with or
22   should be concerned with is the present
23   competency.  These other arguments are something

1    on appeal for whether she had a proper trial to

2    begin with because there were problems that

3    weren't gone into.  Her attorneys quite clearly

4    tried to get her to allow them to pursue such

5    things and my understanding at the time was that

6    she gave orders not to get into anything of that

7    nature.  So those are Appellate questions, they

8    are not before this Court, nor relevant to the

9    issue at hand in my mind.

10          Please submit anything of that nature

11    that you wish to put into the record.  That will

12    go up with the case.

13    (SIDE BAR DISCUSSION.  OFF THE RECORD AND OUT OF

14    HEARING.)

15          THE COURT:  Would you please

16    bring your client forward? Good afternoon.  This

17    is an opportunity for you to address the Court.

18    I'm sure your attorneys have told you.

19          A jury has returned a finding of guilty,

20    and they have recommended to this Court the death

21    penalty.  You may address the Court as to anything

22    that you feel is relevant to your situation.

23          DEFENDANT:  First of all, I

```
 1    think there's been a big misrepresentation about
 2    me, my character, my personality, and my life, and
 3    I just want you to know me a little better.
 4           I was born in 1944 on the east side of
 5    Youngstown Ohio.
 6                 ATTY. DOUGHTEN:  Speak like you
 7    are angry.  The Judge needs to hear you.
 8                 DEFENDANT:  And when I was
 9    about five years old, my Dad moved us out to the
10    country because he thought it would be a lot
11    healthier for us and I lived on a farm in
12    Austintown when there was no Austintown.  We were
13    Roman Catholic and my Dad helped build the first
14    church there, Immaculate Heart of Mary, and I
15    attended school there for many years.  When I was
16    real young, I was sexually abused, I was raped by
17    an older cousin and he hurt me and he ruined a lot
18    of me inside.  And to get away from that pain and
19    everything, and I was able to, I looked sideways
20    and I'd picture a little girl in a green and white
21    ruffled little dress with a little straw hat and
22    straw basket with flowers in it and that is how I
23    got through that.
```

1           And a lot of times after that, I did the
2    same thing.  I just went somewhere else to endure.
3    I lived in a very very abusive household.  That is
4    why we had my father leave.  He beat my mother.
5    He verbally abused her every which way you can.
6    It was horrible, and I spent a lot of time under
7    my bed, especially when guns came out.
8           Somehow one of my aunts, not the aunt who
9    was the mother of this person, told my Mom
10   something was happening because she noticed how I
11   was and wasn't acting, and my Mom took me to an
12   older male doctor and he took me in a room, all
13   alone and my Mom didn't come with me, and when we
14   came out, he said to my Mom, she's a bad girl.
15   And that is what I thought my whole life really.
16           I tried to be happy and positive and
17   everybody around me just loved to be with me, but
18   then when I was alone, my face was long and I was
19   very sad and I always felt empty because nobody
20   had ever paid attention to me or hugged me or
21   anything, just wasn't time.  There were five of us
22   kids.
23           I'm sorry to be hesitating and taking up

1    your time.  My Dad made us know that we had to get
2    good grades and throughout my entire schooling, I
3    always got certificates that I was on the honor
4    roll, and I went to Youngstown University, it
5    wasn't state then, I was on the dean's list.
6              I married my high school sweetheart, I
7    guess you could say, and after one year, we moved
8    to Miami, Florida, and I had a lot of trouble
9    getting pregnant because of what had happened to
10   me, but I finally did, and in 1969 I had the most
11   wonderful son any mother could want, mannerly,
12   respectful of everyone, intelligent and in 1987,
13   when he graduated from high school, he told me he
14   wasn't going to go to college, he wanted to go in
15   the Army and I had a breakdown.  And I was like 87
16   pounds shortly thereafter, and he went out of the
17   country to Germany, and he was in JAG for ten
18   years.  After that, he went to New Hampshire to
19   work for the attorney general.
20             And here his mother is in prison.  I know
21   I am forgetting a lot of things, but David wants
22   me to tell you about my injuries.
23             In 1963 I was going to college and I was

```
 1    working in South and North Side hospitals in the
 2    lab getting training.  And I used to always work
 3    like day and night call for the technologist and
 4    once I worked day night day and when I was going
 5    home, I fell asleep and the car went through big
 6    giant trees, hitting something, I don't know what
 7    at the end, but I was there on the passenger side
 8    on the front floor, filled with glass and I could
 9    feel my head going up.  It felt like it was going
10    up that much, and I don't remember the ambulance
11    or anything, but I know I went to the hospital,
12    and I know they spent a long time picking glass
13    out of me, and I was like spacey for awhile.
14         And then in 1983, Robert was driving the
15    car and somebody was speeding right through the
16    red light and he caught her in the corner of his
17    eye, turned just enough to get hit like right here
18    and I flew through the windshield and then again,
19    went my head and this time my legs and hands were
20    numb and I was real afraid.  I was in the hospital
21    and they put me in traction and then after that
22    for a long time, many many many months, I had to
23    go to the neurosurgeon that was taking care of me,
```

```
 1    and he put these big needles in my neck for some
 2    kind of shots.
 3            The next one was 1999, April, and that
 4    was the one.  Again I fell asleep.  I worked too
 5    hard and I worked too long at home and at the
 6    businesses, and I fell asleep and again, every
 7    case, everybody looked at the cars and they
 8    couldn't believe anybody could survive.  The same
 9    with that car, it was a brand new car, and State
10    Farm rendered it totally demolished, and I think I
11    was kind of demolished.  My head, I don't remember
12    anything, I don't remember falling asleep.  I
13    remember about, I remember when I was in the
14    hospital, I heard the doctor saying to Robert, she
15    has to stay.  I just came out and heard that and
16    went back, and I don't remember anything for a
17    long time, a long time.  If I had to say what I
18    did in March, April, May, June, July, August, I
19    don't even remember.
20            And Robert was calling me spacey and
21    goofy, and he was really worried about me, and he
22    told me I should get some kind of help, but I
23    didn't want any help.  I had so much pain in my
```

```
 1    life and I think I must have ignored depression, I
 2    was always so low and so empty and I got my little
 3    dog Blossom, she was my little girl and nobody
 4    could ever love her like me or take care of her,
 5    know everything she wanted and went out to the
 6    garage and I put her on the passenger seat, I sat
 7    down, and then I turned the key on, and I looked
 8    at Blossom and I gave her a little kiss, and all
 9    of a sudden, my body was always so tense, it just
10    was relaxed, and I felt like I was in a cloud and
11    then Blossom was going like this on me with her
12    little paw, and she licked me and she started
13    whimpering, and I looked at her and I thought, Oh
14    my God, what am I doing to my little girl.  I
15    didn't even care about me.  So somehow, I dialed
16    some number on the car phone, it was like that and
17    I dialed something and I think it was a lady, she
18    said, turn your car off and open the garage door,
19    and I thought, Oh know, here I am back to earth
20    again.  Pain, depression, and some man came.  I
21    know some man came in a car, and he put Blossom in
22    the house, and he took me in the house and told me
23    to get some personal things I needed, and then I
```

1    remember getting in his car and that was it.

2           A week later, I realized I was in a

3    psychiatric ward, and I walked up and down the

4    hall and after I'd been there some days, Robert

5    came to see me.  We always took care of each

6    other.  We really loved each other.  I don't know

7    how all of this happened, but they gave me a lot

8    of medications, and they gave me, I remember the

9    name of only one, I think I had three or four and

10   they gave me Risperdal and that was for voices, to

11   stop the voices.  And it worked, but when I got to

12   Marysville, I asked Dr. Naluri that I wanted to

13   stop taking it, because everybody knows

14   everybody's business and I didn't want them making

15   fun of me, but I had some terrible experiences.

16          One day I was seeing these giant anthills

17   like that, all over the floor in my room and I

18   remember telling the warden who came, we were good

19   friends.  She came to visit me every week.  We had

20   nice talks and she came and I said, my Mom told me

21   if you put coffee around these aunts, they will go

22   away and the major came and everybody came and

23   they were looking at me like I was out of my mind.

1    I guess I was, but then I started falling all over

2    the place and hitting my head again and again, and

3    I fell and hit the corner of the desk once and got

4    two cuts on the bottom of my eyes, and I ended up

5    in the hospital.

6         I don't know how I got there or how long

7    I was there or anything.  And it is just like ever

8    since that accident, even right afterwards, I

9    would get up and think its Tuesday but it would be

10    Wednesday, and I just tried so hard to remember

11    Tuesday, but I couldn't, and it was kind of scary.

12    It was really Wednesday, and I couldn't believe

13    it.  And I looked at the paper for the date and I

14    asked everybody, and then, there were periods

15    where I just wasn't there.  I didn't know what was

16    going on or anything.

17         And after I think seven months after

18    that, after I got out of the hospital, Robert made

19    me go to Social Security and they made me go to a

20    psychiatrist, that was in 2000.  And they said, I

21    was, whatever how you say it, and they put me on

22    Social Security and Medicare and Medicaid.  And I

23    still was not all there.  I can't even remember

1    what I did in the year 2000.

2            I do remember one thing after the

3    accident and before the hospital, I went in my

4    restaurant, locked it up, and walked out and never

5    went back.  I left refrigerators full, freezers

6    full, I just couldn't do it anymore.  I couldn't

7    take it anymore.  It was just too much.

8            And I was working in the Warren office

9    too and juggling.  I had a part time man here,

10   part-time girl here, and I would like you to know,

11   sir, that while I had that restaurant, I loved it

12   more than almost 23 years in that plastic

13   surgeon's office.  That was a high class thing.  I

14   had beautiful clothes.  When we went to surgery,

15   people respected us.  We helped a lot of people.

16   I had people that were completely scarred and made

17   them want to live again.  If it took a year or two

18   years to do reconstructive surgery, I was with

19   them the whole time.  And think I saved maybe two

20   lives for sure, one woman was so bad that I

21   helped, that her husband actually shot himself to

22   death.  He couldn't stand it anymore looking at

23   her because she had been so beautiful.  She showed

1    us pictures.  She was a Cuban girl.  She was

2    gorgeous.

3         When I was in the restaurant, at the end

4    of the month, people didn't have anymore money,

5    and I learned they got checks like at the

6    beginning of the month, and they would come and we

7    would have a wonderful time.  All but three people

8    of all of the customers, there were a lot of them,

9    they were all black, but those three older white

10   people who came, everybody came almost everyday,

11   every afternoon.  But at the end of the month,

12   when there was no more money to give the children

13   milk or food, they all came to Donna, Miss Donna,

14   they called me, they got food, they got milk.  I

15   had bowls of candy for the children.

16        I gave them the best.  We only had the

17   best of everything, and I gave them everything.

18   And some of them needed money to keep their

19   electricity on for their kids, to keep the phone

20   on, in case there was an accident.  A phone isn't

21   a luxury anymore, and I helped them, and I never

22   wanted anything back.

23        There came a time in 1980 that I felt

```
 1    very strongly about God, and one God, and I
 2    converted to Judaism.  The first thing I was able
 3    to do was join the Chevre Kadisha, and that is the
 4    burial society.  You have to be in a state of
 5    grace to work for them and we get called out in
 6    the middle of the night, very strict about burial,
 7    you can't wait, and we would wash them, wash the
 8    bodies, and we would talk to them in case they
 9    were still around, and we would tell them not to
10    be embarrassed and that God loved them and they
11    were about to go meet God, and then we dressed
12    them in a shroud and it had to be all cotton, no
13    clips, no buttons, and we would actually have to
14    put them in a wooded casket and it had to be
15    wooden, no metal, only wooden, so it would
16    disintegrate into the earth.  Then we call Shomar,
17    that means to watch.  Usually a little old man,
18    because we never leave a body alone, because you
19    never know what horrendous things people will do.
20         Then the next thing I did, was campaign
21    to save one Falasha Jew, that would be a black Jew
22    in Ethiopia.  They were just murdering them,
23    slaughtering them and we had people there that
```

1    could get them, but it cost thousands and
2    thousands of dollars to get them out of there, and
3    so, I got from the Jewish Society, I got slides
4    and all of that information, materials, and I went
5    from Temple to Temple, and I showed them.  And I
6    collected enough money to save one life.  They got
7    him, they got him out of the back country and out
8    where he could take a plane and they flew him to
9    Israel to freedom.  I am very proud of that.  I
10   saved a life.
11           A while later, there was a war, there's
12   always a war in Israel, and I volunteered to work
13   for a month with the plastic surgeons.  We had to
14   go into the morgue in the morning and we got, we
15   used a Dermatone, it's a special machine plastic
16   surgeons use.  It cuts the right amount of skin
17   off the body.  My job was to hold up the leg while
18   the doctor did that and as I did that, I was
19   looking at all of those dead that their mother's
20   raised.
21           So in the afternoon, we would do skin
22   grafts and reconstruction.  We even worked on one
23   of our enemies, and we gave him the best care.  He

1    was really afraid because those people when they

2    get a Jewish soldier, they slaughter them, they

3    take their penis off, they put it down their

4    throat.  That is a regular thing with them.  Then

5    they tie them to a car and drag them through the

6    streets.  So he was really scared, but we took

7    good care of him, and everybody stayed far away

8    from him.  When I went over to him one day and he

9    didn't speak English, but I patted him and I

10   rubbed his arm, and I told him, don't worry its

11   okay, and somehow he understood me and he smiled.

12          No one knows what that can mean unless it

13   is you and you are there.

14          I wanted to get to something that the

15   Ohio Supreme Court typed up.  Now I don't know

16   where they got this information, but it hurts me

17   so bad, that I have laid in my bed for I don't

18   know how long, and just talked to you.  I talk to

19   you, Your Honor.  I said everything I wanted to

20   say to you, and I prayed some day I'd get the

21   chance to say it.  This first page, I don't know

22   who did it, it had to be the Prosecution and Paul

23   Monroe, the Detective, who tainted evidence, moved

```
 1    it, put it in, lied under oath.  He sat in that
 2    chair and raised his hand to God, he swore to tell
 3    the truth, and then, I learned what it all means.
 4    I swear to tell the truth.  People's ears shut off
 5    at that, but then I realized.  The whole truth and
 6    nothing but the truth, because that man took
 7    truths that I told him, and he put all of these
 8    lies in like that.  He didn't tell the truth.  He
 9    didn't tell the whole truth and he didn't tell
10    nothing but the truth.  He lied and lied and lied.
11    So I imagine it was him and the Prosecution, that
12    created this.  How would the Supreme Court know?
13         It says Donna Roberts and Robert
14    Fingerhut, next line, Fingerhut bought two
15    Greyhound bus terminals.  You don't buy Greyhound
16    bus terminals.  They are not for sale.
17         I had 23 years of running an office.  I
18    did everything for the doctor.  It was me and him,
19    except sometimes I'd bring in my sister to give
20    her a job to do or whatever.  You have to be an
21    entrepreneur, and then they give it to you, if you
22    have the money to pay all of the workmen's comp
23    and insurances and everything they say.  So it was
```

```
 1    mine.  That was mine.  I wasn't a hanger on.  I
 2    wasn't a money grubber.  It was exactly the
 3    opposite.  I handed the money out to whoever
 4    needed it.  Then they say that we were divorced to
 5    protect his assets and against being sued.  We
 6    were married in 1983.  I was scheduled to close on
 7    my dream house I had built on June 14.  We got
 8    divorced on May 29 to protect my assets.  Robert
 9    had no assets.  He just been through the second
10    horrible divorce of his life.  I took $75,000 out
11    of my tax free Franklin mutual fund as a down
12    payment on that house, and I was making enough
13    money that I paid it, and Robert was working
14    occasional sales jobs here and here and here.
15            I invested in stocks, bonds, mutual
16    funds.  I bought real estate and sold it, in fact,
17    I bought Robert's house so he could finally settle
18    his divorce thing.  And I sold it like 60 days
19    later and I did make a great profit.
20            So, the way they portray me, Your Honor,
21    its sinful.  It is sinful, and you sat here and
22    you heard this and you read these things.
23            Now there is another thing, I have to say
```

1     and it doesn't have anything to do with
2     mitigation, but I have to get this out, please
3     give me a minute.  It says, there was a Frank
4     Reynolds who worked for us.  He testified here.
5     He was on mental disability.  The man said he was
6     at our Youngstown terminal at 3:30 that afternoon
7     and heard me beg Robert for $3,000, and when he
8     wouldn't give it to me, I made a mean face.  That
9     was his testimony.  The man was never there that
10    day sir.  Our manager sat there and said, no, he
11    wasn't there.  The police officer, Jose Sanchez,
12    sat there and said, no, he wasn't there.  He
13    himself said he got a ticket and went off to
14    another city to visit his sister.  This is what I
15    had to live with these fake things here.  I didn't
16    have to ask Robert for $3,000.
17              The accounts were mine.  The house was
18    mine.  The only way we had three cars is on my
19    credit.  Three because I bought my parents one.
20    They never had a new car, the same as the year
21    because of us little brats having to be raised and
22    educated, so in 1998, I went and right off the
23    showroom, a silver Ford and brought it to their

1   house with one of those big red bows.

2          My son needed extra money for his

3   townhouse in New Hampshire, I wired $10,000 to

4   him, the same minute I hung up the phone from

5   talking to him.  My sister needed money for

6   college, first the IRS, college, $5,000, here's a

7   check.  I wrote them right in front of Robert.  I

8   didn't have to ask him.  Then my sister needed

9   money for college, another $5,000.  I helped that

10  girl.  You might say I helped save her life.  My

11  parents were in their late 50's when she was

12  fifteen.  She's fifteen years younger than me and

13  she was getting in all kinds of trouble, and I

14  won't be specific, and they sent her to live with

15  me.  So I had the burden of raising a fifteen year

16  old girl that was in big trouble and I did raise

17  her.  I loved her.  I made my husbands love her.

18  If they didn't, we helped her, everywhere we went,

19  we took her, and then my little sister became a

20  CPA.  After going through hell, drugs and other

21  things, and I am proud of that too.

22          Now I have to say more about Paul Monroe.

23  He said I was uncooperative, but in the first

```
 1    things before the trial, I don't know what you
 2    call that, he said I was very cooperative.  In
 3    fact, he came to my house almost everyday.  My
 4    attorneys were not present.  He asked me
 5    questions, he asked me to go to the police
 6    station.  He put a little tape recorder in front
 7    of me, and he said, the time, date, my name, his
 8    name and Frank Dillon's name, and I spoke to them
 9    for an hour and a half, I told them everything.  I
10    told them about Nate.  I told them all about the
11    whole day, what I did, where I did it, everything
12    before they wanted to know, after, and when he
13    came to court, he said he did not make a tape
14    recording, but he admitted that he and Frank
15    Dillon took copious notes, and you know what --
16                THE COURT:  Let me interrupt
17    you, if I may, we can go over all of the facts of
18    the case that were presented to the jury, that is
19    really not the purpose of this hearing.  The
20    hearing is to state whether you have anything that
21    you feel you wish to tell the Court that may alter
22    my decision one way or the other that I have to do
23    in regard to either accepting the recommendation
```

1    or denying the recommendation of the jury as to

2    the death penalty.  You have been going over, I

3    listened to the part, which is very correct of

4    your history and that, but you are going through

5    the case now piece meal and that is not part of

6    this hearing.  It is what, if anything, you wish

7    to say to the Court as to why the recommendation

8    of the jury should not be upheld.

9                    ATTY. DOUGHTEN:  Could we have

10   one second?

11   (Off the record)

12                    DEFENDANT:   I wanted to say

13   that I was a very good writer in high school and

14   in college and I wrote stories because I had a

15   great imagination.  I won prizes, medals,

16   certificates, trophies, and I was always as maybe

17   you can surmise that I had a creative mind, and in

18   those letters and conversations with Nate, that is

19   all they were, stories.  I never initiated any

20   talk of hurting anyone in the tapes or the

21   letters.  But it was my imagination, and I

22   answered and I wrote what he told me to write, and

23   I'm not a bad person, Your Honor.

```
 1                        THE COURT:  I never thought for
 2      a moment that you are a bad person.
 3                        DEFENDANT:  I never intended
 4      for anything like that to happen, and I couldn't
 5      believe it, and I still can't believe it.  We
 6      loved each other and we had a good life.
 7                        THE COURT:  Anything else that
 8      counsel wishes to submit?
 9                        ATTY. DOUGHTEN:  We really have
10      nothing to add.  I think what she said speaks for
11      itself.
12                        THE COURT:  I have heard some
13      things that I have not heard before.  This is set
14      for next Monday, I have to get that all resolved
15      in my mind by then.
16                        ATTY. DOUGHTEN:  Can I make one
17      thing clear for the record?  When I had said we
18      had nothing say in her behalf.  Our position is,
19      we have proffered what we think we need to make --
20      I understand the Court is under order from the
21      Supreme Court.  I urge you to listen to what she
22      said, which I believe the Court has done.
23                        ATTY. DIXON:  Can we have a
```

1   moment, Your Honor?

2   (Off the Record)

3                      ATTY. DOUGHTEN:  Nothing

4   further, Your Honor.

5                      THE COURT:  Thank you gentlemen

6   for your professionalism.  Mr. Bailey, do you have

7   anything further?

8                      ATTY. BAILEY:  No, Your Honor.

9                      THE COURT:  This will reconvene

10  next Monday at 1:00 on the 29th.

11                     ATTY. DOUGHTEN:  Your Honor, we

12  have the family here, and I think in Court.  I

13  indicated to the Court, the Court is under the

14  restrictions from the Supreme Court we understand,

15  but we wanted to proffer what the family would

16  have said, if they were permitted, can I just give

17  that to the Court or would you rather it was

18  filed?

19                     THE COURT:  You may do that.

20  You are going to do that in writing?

21                     ATTY. DOUGHTEN:  Yes.

22                     THE COURT:  Let me see it

23  first.

```
 1                        ATTY. BAILEY:  The State has
 2   never seen that proffer, the Defendant's family
 3   statement, I believe that is what it is.  Could
 4   you have the court reporter make a copy for the
 5   State?
 6                        THE COURT:  Yes, since it is a
 7   proffer for the record, I think they should have
 8   an opportunity to see it also.  Those are letters
 9   from the sister and brother.  This matter will be
10   re-set for Monday.  Thank you.
11
12                    (END OF HEARING AT 2:50 p.m.)
13
14
15
16
17
18
19
20
21
22
23
```

```
 1    MONDAY, OCTOBER 29, 2007
 2      RESENTENCING HEARING
 3      IN OPEN COURT AT 1:25 p.m.
 4                    THE COURT:  We're here today --
 5    would you come forward with your client please?
 6              We're here today for resentencing,
 7    allocution having occurred last week.  I would
 8    again ask if there is anything further that
 9    counsel or the Defendant wishes to place on the
10    record.
11                    ATTY. DOUGHTEN:  Just briefly.
12    Part of the frustration with doing this kind of
13    work is that the statute is designed so that the
14    worst of the worst are the ones that receive the
15    death penalty.  It is our strong belief that
16    because of Donna's mental instability for lack of
17    a better term, that this isn't happening in this
18    case.  I think her behavior and her decisions at
19    the first trial were dictated by injuries and
20    other perhaps post-traumatic stress, a number of
21    mental disabilities, organic damage, if you will,
22    so that her decisions not to put on mitigation,
23    her decisions on whether to have counsel argue
```

```
 1    were really dictated by that, and those originally

 2    doing the competency hearing, the doctor at that

 3    time, did not have all of this information.

 4         What we believe, and I understand you are

 5    restricted by the Ohio Supreme Court, but it is

 6    our belief that Donna is not one of the worst of

 7    the worst, that she had no prior record, that if

 8    not for the aberration caused by all of these

 9    mental disabilities, this would never have

10    happened and she wouldn't be here, and it is our

11    request that the Court consider as much as it is

12    allowed to by the dictates of the Supreme Court,

13    why Donna said what she did, why she did what she

14    did.  Thank you very much.

15                   THE COURT:  Do you have

16    anything further to say Donna?

17                   DEFENDANT:  No.

18                   THE COURT:  I'm sorry to hear

19    about the passing of your mother.

20                   DEFENDANT:  Thank you.

21                   THE COURT:  The Court has

22    prepared and will file a judgment entry in this

23    case of my review, that will be filed this
```

1    afternoon.  I have taken into account the

2    additional information which you have proffered on

3    behalf of your client, which will become a part of

4    this record for any further appeal.  Some of what

5    you have presented may in some way be an

6    explanation of how the entire case went before,

7    but I do not feel I have the luxury of taking that

8    into account at this point because as I have told

9    you many times and you are well aware, I have

10   approached this within the directions given to me

11   by the Supreme Court when this was sent back on

12   the very narrow portion of the case.

13       Had the information that you have

14   presented presently been presented at the other

15   trial, I have no opinion on whether that would

16   have made a difference or not, but it is something

17   that you will have an opportunity to work with.

18       Now the Court has considered the record,

19   the oral statements, as well as the principles and

20   purposes of sentencing under Ohio Revised Code

21   Section 2929.11.  I have reviewed the other

22   material.  I feel that it is relevant and should

23   be admitted, has been admitted for appeal

1    purposes.

2           Pursuant to law, this Court having

3    determined in a separate opinion of specific

4    findings that the aggravating circumstances as to

5    the count of aggravated murder outweigh the

6    mitigating factors by proof beyond a reasonable

7    doubt, that Jury's recommendation is accepted.

8           I have made inquiry as to whether there

9    is any other reason why sentence should not be

10   pronounced at this point.

11          ATTY. DOUGHTEN:  We are ready

12   to go forward at this time.

13          THE COURT:  It is therefore

14   Ordered, Adjudged and Decreed that the Defendant,

15   Donna M. Roberts, be taken from this Courtroom to

16   the Trumbull County jail and from there to the

17   Correction Reception Center at Marysville, Ohio,

18   and is sentenced to death on October 28, 2008,

19   on Count One.  And she shall be imprisoned therein

20   for the stated prison term of ten years on Count

21   Three, plus a mandatory term of three years on the

22   Firearms Specification, to be served prior to and

23   consecutive to the sentence imposed in Count

1    Three.   Further, ten years incarceration on Count

2    Four, plus a mandatory term of three years on the

3    Firearms Specification; that to be served prior to

4    and consecutive to the sentence imposed in Count

5    Four.   That sentence in Count Four to be served

6    consecutively to the sentence imposed on Count

7    Three.   And the Firearms Specification in Counts

8    Three and Four shall merge as one sentence in

9    Count Three as a matter of law.   The Defendant is

10   ordered to pay costs.   And once that is

11   determined, execution is awarded.   That is the

12   judgment of this Court.

13            Does anyone have anything further to say

14   at this point?

15                    ATTY. DOUGHTEN:  No, Your

16   Honor.

17                    THE COURT:  Donna, I have a

18   duty to advise you --

19                    ATTY. DOUGHTEN:  Could I have

20   one second?

21                    THE COURT:  Yes.

22                    ATTY. DOUGHTEN:  We are ready.

23   Thank you.

1                THE COURT:  You have a right to

2    file an appeal in this matter.  If you are unable

3    to pay the cost of the appeal or the money to hire

4    an attorney to represent you, that appeal will be

5    filed on your behalf and you will be provided

6    counsel at no cost to yourself.  The same as if

7    you are not able to afford the cost of the

8    paperwork and documentation necessary for the

9    appeal, that will be paid on your behalf by the

10   State of Ohio.  Now you have a right to have that

11   notice of appeal timely filed on your behalf.  And

12   upon your request, this Court shall appoint

13   counsel for that appeal.

14           Counsel, do you have any requests at this

15   time concerning the Appellate rights of your

16   client?

17                ATTY. DOUGHTEN:  Yes, Miss

18   Roberts would like to have counsel appointed.  She

19   is indigent.  We'll have an indigency affidavit

20   filled out today and provided to the Court.

21                THE COURT:  Will you gentlemen

22   be handling that?

23                ATTY. DOUGHTEN:  We would

```
1    prefer to.  I don't think there would be a
2    conflict.  We were not the trial attorneys.  We
3    are for this very limited purpose.
4                    THE COURT:  That is a decision
5    you have to make and I would probably agree with
6    you at this point.  There would appear to be no
7    conflict.  I would ask you to file a formal motion
8    to that effect for my signature and we'll make
9    arrangements about any costs that are concerned.
10                    ATTY. DOUGHTEN:  Thank you.
11                    THE COURT:  Anything further
12   from the prosecution?
13                    ATTY. BECKER:  No, sir, Your
14   Honor.
15                    ATTY. DOUGHTEN:  Nothing
16   further.
17                    THE COURT:  I have to prepare a
18   sentencing journal, and again these are usually
19   done as a matter of course by the prosecution.
20   Because I have already dictated what my judgment
21   on this matter is, if there isn't some reason that
22   you care to disagree with that, I would ask you to
23   submit a journal entry and the Prosecutor to
```

1    submit a journal entry.

2              ATTY. DOUGHTEN:  Just so we are

3    clear, you are talking about the sentencing entry,

4    not the Opinion.

5              THE COURT:  No.

6              ATTY. DOUGHTEN:  I don't see

7    any problem with the sentencing journal.  We do

8    not object.  We do not object to the Prosecutor if

9    he just does the sentencing entry, and we waive

10   any right we have to file our own.

11             THE COURT:  They will send you

12   a copy for your approval in any event.

13             ATTY. DOUGHTEN:  We are fine

14   with that.

15             ATTY. BECKER:  Just to be

16   certain here, there is no objection to the State

17   preparing the sentencing entry.

18             THE COURT:  I have given the

19   entry, I have given the contents of the entry and

20   as we have usually done here and done in most of

21   the counties that I am aware of, the Prosecutor

22   will prepare that according to the Judge's

23   instruction.  That is always done with approval of

```
 1    counsel.  Counsel has the right to submit your own
 2    entry.
 3                      ATTY. DOUGHTEN:  Just so the
 4    record is clear.  That is a separate entry as
 5    opposed to the 03(f) entry that the Court is
 6    required to do.
 7                      THE COURT:  Right.  That will
 8    be prepared here shortly and you can have a copy
 9    of that.
10                      ATTY. BECKER:  So the Court is
11    ordering the State to prepare the sentencing
12    entry.
13                      THE COURT:  According to the
14    sentence that I have rendered.
15                      ATTY. BECKER:  And there is no
16    objection, although we'll provide counsel for the
17    defense a copy.
18                      THE COURT:  They have stated on
19    the record that they do not object to that.
20                      ATTY. DOUGHTEN:  That is
21    correct.
22                      ATTY. BECKER:  We'll prepare
23    that and title it as a proposed sentencing entry.
```

1    I'll make sure they will get a copy.  I will save

2    a copy or put a copy out on the shared I drive

3    that we share or I'm sorry G drive that we share

4    with the Courts and then if the Court needs to

5    make any changes or feels any changes are needed,

6    the Court can make those.

7                        THE COURT:  Or if there's any

8    objection.

9                        ATTY. BECKER:  Yes, or if

10   there's any objections.

11                       THE COURT:  Donna, I suspect

12   this is not the last time I'll see you, but take

13   care.

14                       ATTY. DOUGHTEN:  Thank you.

15

16       (END OF RESENTENCING AT 1:35 p.m.)

17

18

19

20

21

22

23

1
2
3
4                    REPORTER'S CERTIFICATE
5          I HEREBY CERTIFY that the foregoing is a
6    true and correct transcript of the hearings held
7    as shown by the stenographic notes taken by me at
8    the time of said hearings.
9
10   ___11/7/2007___              Mary Ann Mills
11        DATE                    MARY ANN MILLS, R.P.R.
12
13
14
15
16
17
18
19
20
21
22
23

IN THE COURT OF COMMON PLEAS

TRUMBULL COUNTY, OHIO

TRIAL COURT CASE NO. 01-CR-793

SUPREME COURT CASE NO. 07-2288


STATE OF OHIO vs. DONNA M. ROBERTS


LIST OF EXHIBITS


Defendant's Exhibit A

Defendant Robert's Appendix to Third Motion to Proffer
Evidence (binder)


Defendant's Exhibit B

Letters to Judge John M. Stuard


State's Exhibit No. 1

Forensic Psychiatric Center's Competency Evaluation


Submitted by:

*Mary Ann Mills* 12/18/2007

Mary Ann Mills, Official Court Reporter

IN THE COURT OF COMMON PLEAS

TRUMBULL COUNTY, OHIO

TRIAL COURT CASE NO. 01-CR-793

SUPREME COURT OF OHIO CASE NO. 03-1441  old No.

2014-989 New No.

STATE OF OHIO vs. DONNA M. ROBERTS

LIST OF TRIAL EXHIBITS

AND MITIGATION HEARING EXHIBITS

EXHIBIT LIST
TRUMBULL COUNTY
CLERK OF COURTS

STATE OF OHIO

VS

DONNA ROBERTS; 01CR793(SUPREME COURT 03-1441)

NOTE: THE MAJORITY OF EXHIBITS FROM THIS CASE ARE
SHARED WITH CASE 01CR794.(STATE OF OHIO VS NATHANIAL
JACKSON). THE JACKSON CASE IS PRESENTLY BEING HEARD AT
THE SUPREME COURT(03-137) AND THEREFORE THE EXHIBITS
TRANSMITTED FOR THE JACKSON CASE ARE UNAVAILABLE TO
TRANSMIT FOR THE ROBERTS CASE. SEE BELOW FOR
BREAKDOWN OF EXHIBITS FOR ROBERTS AND THOSE SHARED
WITH JACKSON.

PG 2-EXHIBITS FROM SUPPRESSION HEARING(ROBERTS)

PG 3 THRU 16-EXHIBITS SHARED WITH NATHANIAL JACKSON
CASE

PG17 STATES EXHIBITS 378, 378A, 309A, SHARED WITH
NATHANIAL JACKSON CASE.
STATES EXHIBITS 403 THRU 408 FOR DONNA ROBERTS CASE.

PG 18-DEFENDANTS EXHIBITS, JOINT EXHIBIT 1, COURTS
EXHIBITS, SENTENCING EXHIBIT "A"(SEALED).(ROBERTS)

THE COURT REPORTER HAS LISTED EXHIBIT 309A ON COURTS
EXHIBIT LIST FILED 1/20/04.(#136A ON INDEX) THE CLERKS
OFFICE CAN LOCATE NO SUCH EXHIBIT WITH THE EVIDENCE
FILED. ALSO, EXHIBIT 309A IS NOT LISTED ON THE LIST OF
EXHIBITS AS IT APPEARS IN THE NATHANIAL JACKSON
TRANSCRIPTS.

1

EXHIBITS FROM MOTION TO SUPPRESS HEARING

STATE'S EXHIBITS:

    1.  Consent to search form by D. Roberts · Admitted

DEFENDANT'S EXHIBITS:

    A.  Property receipt        Admitted

    B.  List of medications    Admitted

| Exhibit No. | Description | Admitted |
|---|---|---|
| 1 | 911 Tape | No objection |
| 1A | 911 Paper work | No Objection |
| 2 | Crime Scene Video | No objection |
| 3 | Crime Scene Diagram | No objection |
| 4 | Photo | No Objection |
| 5 | Photo | No Objection |
| 6 | Photo | No Objection |
| 7 | Photo | No Objection |
| 8 | Photo | No Objection |
| 9 | Photo | No Objection |
| 10 | Photo | No Objection |
| 11 | Photo | No Objection |
| 12 | Photo | No Objection |
| 13 | Photo | No Objection |
| 14 | Photo | No Objection |
| 15 | Photo | No Objection |
| 16 | Photo | No Objection |
| 17 | Photo | No Objection |
| 18 | Photo | No Objection |
| 19 | Photo | No Objection |
| 20 | Photo | No Objection |
| 21 | Photo | Obj  sustained |
| ~~22~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~23~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 24 | Photo | Obj sustained |
| 25 | Photo | Obj sustained |
| 26 | Photo | Obj sustained |
| 27 | Photo | Adm. over obj |
| 28 | Photo | withdrawn |
| ~~29~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~30~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 31 | Photo | Obj sustained |
| ~~32~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 33 | Photo | |
| ~~34~~ | ~~Photo~~ | ~~No Objection~~ |
| ~~35~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~36~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 37 | Photo | Obj sustained |
| 38 | Photo | Obj sustained |
| 39 | Photo | Obj sustained |
| 40 | Photo | No Objection |
| ~~41~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~42~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 43 | Photo | Obj sustained |
| 44 | Photo | Obj sustained |
| ~~45~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~46~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 47 | Photo | No Objection |
| 48 | Photo | No Objection |
| 49 | Photo | No Objection |
| ~~50~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 51 | Photo | No Objection |
| 52 | Photo | No Objection |
| 53 | Photo | No Objection |
| 54 | Photo | No Objection |
| 55 | Photo | No Objection |
| 56 | Photo | No Objection |
| 57 | Photo | Adm over obj |
| 58 | Photo | Obj sustained |
| 59 | Photo | Obj sustained |
| 60 | Photo | Obj sustained |

| | | |
|---|---|---|
| 61 | Photo Shirt | No Objection |
| 62 | Photo Shirt | Obj sustained |
| 63 | Photo - Victim | Obj sustained |
| 64 | Bullet Recovered from Brain of Victim | No Objection |
| 65 | Bullet Recovered from Brain of Victim | No Objection |
| 66 | Clothes and Jewerly | No Objection |
| 67 | Photo X-Ray | No Objection |
| 68 | Photo Reds Jacket | No Objection |
| 69 | Tire Marks in Grass | No Objection |
| ~~70~~ | ~~N. Side Exterior of House~~ | ~~No Objection~~ |
| ~~71~~ | ~~Front Exterior of House~~ | ~~No Objection~~ |
| ~~72~~ | ~~Rear Exterior of House~~ | ~~No Objection~~ |
| ~~73~~ | ~~S. Side Exterior of House~~ | ~~No Objection~~ |
| ~~74~~ | ~~Main Bathroom~~ | ~~No Objection~~ |
| ~~75~~ | ~~View of man door screen from house~~ | ~~No Objection~~ |
| 76 | View of man door screen from garage | No Objection |
| ~~77~~ | ~~Spare Bedroom~~ | ~~No Objection~~ |
| ~~78~~ | ~~Clothing Spare Bedroom~~ | ~~No Objection~~ |
| ~~79~~ | ~~Blood spatter - peninsula~~ | ~~With drawn~~ |
| ~~80~~ | ~~Blood Spatters on wall by door~~ | ~~With drawn~~ |
| ~~81~~ | ~~Blood Spatters and smear~~ | ~~With drawn~~ |
| ~~82~~ | ~~Blood Spatters~~ | ~~With drawn~~ |
| ~~83~~ | ~~Inside Garage looking into residence~~ | ~~No Objection~~ |
| ~~84~~ | ~~Blood drops - garage~~ | ~~No Objection~~ |
| ~~85~~ | ~~Garage~~ | ~~With drawn~~ |
| ~~86~~ | ~~Blood Spatters - garage~~ | ~~No Objection~~ |
| ~~87~~ | ~~Overview garage~~ | ~~No Objection~~ |
| ~~88~~ | ~~Peninsula & Wall - blood splatters~~ | ~~With drawn~~ |
| ~~89~~ | ~~Different view as in 88~~ | ~~With drawn~~ |
| ~~90~~ | ~~Blood Drops in garage~~ | ~~No Objection~~ |
| 91 | Kitchen door closed | No Objection |
| 92 | Overview garage | No Objection |
| 93 | Back of man door w/ blood | No Objection |
| 94 | Interior side of man door | No Objection |
| ~~95~~ | ~~Eye glasses and broken lag bolt garage~~ | ~~No Objection~~ |
| ~~96~~ | ~~Eye glasses garage~~ | ~~No Objection~~ |
| ~~97~~ | ~~Stairwell ceiling~~ | ~~No Objection~~ |
| ~~98~~ | ~~receipt dated 8-26-01~~ | ~~No Objection~~ |
| 99 | Victim | No objection |
| 100 | Victim -back close up | No objection |
| 101 | Small key found under victim | No Objection |
| ~~102~~ | ~~overview bedroom~~ | ~~No Objection~~ |
| ~~103~~ | ~~bedroom master~~ | ~~No Objection~~ |
| 104 | bedroom closet | No Objection |
| ~~105~~ | ~~Photo~~ | ~~No Objection~~ |
| ~~106A~~ | ~~Photo~~ | ~~No Objection~~ |
| ~~106~~ | ~~Photo~~ | ~~No Objection~~ |
| ~~106A~~ | ~~Photo~~ | ~~No Objection~~ |
| ~~107~~ | ~~Photo~~ | ~~No Objection~~ |
| ~~107A~~ | ~~photo~~ | ~~With drawn~~ |
| ~~108~~ | ~~Victim~~ | ~~No Objection~~ |
| ~~108A~~ | ~~Victim Face down~~ | ~~With drawn~~ |
| 109 | Dry Wall Hole | No objection |
| ~~109A~~ | ~~Victim face down~~ | ~~With drawn~~ |
| 110 | Victim in Kitchen | No Objection |
| ~~111~~ | ~~Victim lower torso~~ | ~~With drawn~~ |
| ~~112~~ | ~~Victim - Footprints in small dots~~ | ~~With drawn~~ |
| ~~113~~ | ~~Stairay~~ | ~~No Objection~~ |
| ~~114~~ | ~~Stairay~~ | ~~No Objection~~ |
| ~~114½~~ | ~~Living Room~~ | ~~No Objection~~ |
| ~~115~~ | ~~Living Room~~ | ~~No Objection~~ |
| ~~117~~ | ~~Living Room~~ | ~~No Objection~~ |

| | | |
|---|---|---|
| 124 | Office Area w/ ball cap | No Objection |
| 125 | Dry Wall Hole | No Objection |
| 126 | Front View of Car | No Objection |
| 132 | Garage w/ view of Gun | No Objection |
| 138 | Stainless Steel Revolover | No Objection |
| 139 | Close - up Footprint & Garage | No Objection |
| 141 | Stairwell & Basement | No Objection |
| 157 | Rear view of Car | No Objection |
| 159 | Rt Side View of Car | No Objection |
| 160 | Front View of Car - Left Corner | No Objection |
| 162 | Front View of Car | No Objection |
| 164 | Visor Area | No Objection |
| 165 | Interior area above head w/ blood | No Objection |
| 166 | Exterior | No Objection |
| 168 | Visor Area - Removed | No Objection |
| 169 | Door Handle | No Objection |
| 170 | Door Handle w/ blood | No Objection |
| 171 | Diryer side visor clamp | No Objection |
| 172 | Front Passenger Seat - Cell Phone | No Objection |
| 174 | Interior -Left Console | No Objection |
| 178 | Keys in Ignition | No Objection |

| | | |
|---|---|---|
| 180 | Driver Side Console | No Objection |
| 181 | Passenger Side Dashboard | No Objection |
| 182 | Passenger side door - interior | No Objection |
| 183 | Driver side view - shows the garage door opener | No Objection |
| 184 | Left side of car w/ dashboard | No Objection |
| 185 | Rt side back seat | No Objection |
| 186 | Front driver compartment | No Objection |
| 187 | Exterior thru rear left door | No Objection |
| 188 | Keys | Withdrawn |
| 189 | Cell Phone | Withdrawn |
| 190 | Keys - Blue Matt | Withdrawn |
| 191 | Driver side - release button | No Objection |
| 192 | Wagon Wheel Photo | No objection |
| 193 | Wagon Wheel Photo | No objection |
| 194 | Wagon Wheel Photo | No objection |
| 195 | Wagon Wheel Photo | No objection |
| 196 | Wagon Wheel Photo | No objection |
| 197 | Photograph Items Recovered Days Inn | No objection |
| 198 | Photo of Chrysler | No objection |
| 199 | Days Inn Photographs | No objection |
| 200 | Days Inn Photographs | No objection |
| 201 | Days Inn Photographs | No objection |
| 202 | Days Inn Photographs | Objection Sustained |
| 203 | Days Inn Photographs | No objection |
| 204 | Days Inn Photographs | Objection Sustained |
| 205 | Days Inn Photographs | No objection |
| 206 | Days Inn Photographs | No objection |
| 207 | Days Inn Photographs | No objection |
| 208 | Days Inn Photographs | No objection |
| 209 | Days Inn Photographs | No objection |
| 210 | Days Inn Photographs | No objection |
| 211 | Days Inn Photographs | No objection |
| 212 | Days Inn Photographs | No objection |
| 213 | Days Inn Photographs | No objection |
| 214 | Days Inn Photographs | No objection |
| 215 | Days Inn Photographs | No objection |
| 216 | Days Inn Photographs | No objection |
| 217 | Days Inn Photographs | No objection |
| 218 | Days Inn Photographs | No objection |
| 219 | Days Inn Photographs | No objection |
| 220 | Days Inn Photographs | No objection |
| 221 | Days Inn Photographs | No objection |
| 222 | Days Inn Photographs | No objection |
| 223 | Days Inn Photographs | No objection |
| 224 | Days Inn Photographs | No objection |
| 225 | Days Inn Photographs | No objection |
| 226 | Days Inn Photographs | No objection |
| 227 | Photographs of Wirt Street | No objection |
| 228 | Photographs of Wirt Street | No objection |
| 229 | Photographs of Wirt Street | No objection |
| 230 | Photographs of Wirt Street | No objection |
| 231 | Photographs of Wirt Street | No objection |
| 232 | Photographs of Wirt Street | No objection |
| 233 | Wirt Street Photographs | No objection |
| 234 | Wirt Street Photographs | No objection |
| 235 | Front view - Nate Jackson | No Objection |
| 236 | Rear view Nate Jackson | No Objection |
| 237 | Full body shot | No Objection |
| 238 | Rt arm and Hand | No Objection |
| 239 | Front view - Nate Jackson | No Objection |
| 240 | Left & Rt knee | No Objection |
| 241 | View of Hands & Wound | No Objection |

| 271D | Letters From Donna to Nate | | |
|------|---------------------------|----------|----------|
| 271D1 | | 12/03/01 | Admitted |
| 271D2 | | 11/29/01 | Admitted |
| 271D3 | | 11/29/01 | Admitted |
| 271D4 | | 11/28/01 | Admitted |
| 271D5 | | 11/28/01 | Admitted |
| 271D6 | | 11/27/01 | Admitted |
| 271D7 | | 11/27/01 | Admitted |
| 271D8 | | 11/26/01 | Admitted |
| 271D9 | | 11/26/01 | Admitted |
| 271D10 | | 11/24/01 | Admitted |
| 271D11 | | 11/23/01 | Admitted |
| 271D12 | | 11/23/01 | Admitted |
| 271D13 | | 11/22/01 | Admitted |
| 271D14 | | 11/22/01 | Admitted |
| 271D15 | | 11/22/01 | Admitted |
| 271D16 | | 11/22/01 | Admitted |
| 271D17 | | 11/21/01 | Admitted |
| 271D18 | | 11/21/01 | Admitted |
| 271D19 | | 11/20/01 | Admitted |
| 271D20 | | 11/20/01 | Admitted |
| 271D21 | | 11/20/01 | Admitted |
| 271D22 | | 11/20/01 | Admitted |
| 271D23 | | 11/19/01 | Admitted |
| 271D24 | | 11/19/01 | Admitted |
| 271D25 | | 11/19/01 | Admitted |
| 271D26 | Empty | | Admitted |
| 271D27 | | 11/16/01 | Admitted |
| 271D28 | | 11/16/01 | Admitted |
| 271D29 | | 11/15/01 | Admitted |
| 271D30 | Empty | | Admitted |
| 271D31 | | 11/12/01 | Admitted |
| 271D32 | | 11/10/01 | Admitted |
| 271D33 | | 11/10/01 | Admitted |
| 271D34 | | 11/10/01 | Admitted |
| 271D35 | | 11/10/01 | Admitted |
| 271D36 | | 11/09/01 | Admitted |
| 271D37 | | 11/09/01 | Admitted |
| 271D38 | | 11/09/01 | Admitted |
| 271D39 | | 11/09/01 | Admitted |
| 271D40 | | 11/08/01 | Admitted |
| 271D41 | | 11/08/01 | Admitted |
| 271D42 | | 11/08/01 | Admitted |
| 271D43 | | 11/07/01 | Admitted |
| 271D44 | | 11/07/01 | Admitted |
| 271D45 | | 11/07/01 | Admitted |
| 271D46 | | 11/07/01 | Admitted |
| 271D47 | Empty | | Admitted |
| 271D48 | | 11/06/01 | Admitted |
| 271D49 | | 11/06/01 | Admitted |
| 271D50 | Empty | | Admitted |
| 271D51 | | 11/05/01 | Admitted |
| 271D52 | | 11/05/01 | Admitted |
| 271D53 | | 11/03/01 | Admitted |
| 271D54 | | 11/03/01 | Admitted |
| 271D55 | | 11/02/01 | Admitted |
| 271D56 | | 11/02/01 | Admitted |
| 271D57 | | 11/02/01 | Admitted |
| 271D58 | | 11/01/01 | Admitted |
| 271D59 | | 11/01/01 | Admitted |
| 271D60 | Halloween card | | Admitted |
| 271D61 | | 10/31/01 | Admitted |

| 271D62 | | 10/30/01 | Admitted |
|--------|--|----------|----------|
| 271D63 | | 10/29/01 | Admitted |
| 271D64 | | 10/29/01 | Admitted |
| 271D65 | | 10/28/01 | Admitted |
| 271D66 | | 10/27/01 | Admitted |
| 271D67 | | 10/26/01 | Admitted |
| 271D68 | | 10/26/01 | Admitted |
| 271D69 | | 10/26/01 | Admitted |
| 271D70 | | 10/25/01 | Admitted |
| 271D71 | | 10/25/01 | Admitted |
| 271D72 | | 10/24/01 | Admitted |
| 271D73 | | 10/24/01 | Admitted |
| 271D74 | | 10/23/01 | Admitted |
| 271D75 | | 10/23/01 | Admitted |
| 271D76 | | 10/23/01 | Admitted |
| 271D77 | | 10/23/01 | Admitted |
| 271D78 | | 10/22/01 | Admitted |
| 271D79 | Empty | | Admitted |
| 271D80 | | 10/21/01 | Admitted |
| 271D81 | | 10/20/01 | Admitted |
| 271D82 | | 10/20/01 | Admitted |
| 271D83 | | 10/20/01 | Admitted |
| 271D84 | | 10/20/01 | Admitted |
| 271D85 | | 10/19/01 | Admitted |
| 271D86 | | 10/19/01 | Admitted |
| 271D87 | | 10/19/01 | Admitted |
| 271D88 | | 10/19/01 | Admitted |
| 271D89 | | 10/18/01 | Admitted |
| 271D90 | Empty | | Admitted |
| 271D91 | | 10/18/01 | Admitted |
| 271D92 | | 10/17/01 | Admitted |
| 271D93 | | 10/16/01 | Admitted |
| 271D94 | | 10/16/01 | Admitted |
| 271D95 | | 10/15/01 | Admitted |
| 271D96 | | 10/15/01 | Admitted |
| 271D97 | | 10/15/01 | Admitted |
| 271D98 | | 10/13/01 | Admitted |
| 271D99 | | 10/13/01 | Admitted |
| 271D100 | | 10/13/01 | Admitted |
| 271D101 | | 10/12/01 | Admitted |
| 271D102 | | 10/12/01 | Admitted |
| 271D103 | | 10/12/01 | Admitted |
| 271D104 | Empty | | Admitted |
| 271D105 | | 10/12/01 | Admitted |
| 271D106 | | 10/12/01 | Admitted |
| 271D107 | | 10/11/01 | Admitted |
| 271D108 | | 10/11/01 | Admitted |
| 271D109 | | 10/11/01 | Admitted |
| 271D110 | | 10/10/01 | Admitted |
| 271D111 | | 10/10/01 | Admitted |
| 271D112 | | 10/10/01 | Admitted |
| 271D113 | | 10/08/01 | Admitted |
| 271D114 | | 10/08/01 | Admitted |
| 271D115 | | 10/06/01 | Admitted |
| 271D116 | | 10/06/01 | Admitted |
| 271D117 | | 10/06/01 | Admitted |
| 271D118 | | 10/05/01 | Admitted |
| 271D119 | | 10/05/01 | Admitted |
| 271D120 | | 10/05/01 | Admitted |
| 271D121 | | 10/05/01 | Admitted |
| 271D122 | | 10/05/01 | Admitted |
| 271D123 | | 10/05/01 | Admitted |

| 271D124 |         | 10/05/01 | Admitted |
| 271D125 |         | 10/04/01 | Admitted |
| 271D126 |         | 10/04/01 | Admitted |
| 271D127 |         | 10/02/01 | Admitted |
| 271D128 |         | 10/02/01 | Admitted |
| 271D129 |         | 10/02/01 | Admitted |
| 271D130 | Unknown |          | Admitted |
| 271D131 | Unknown |          | Admitted |
| 271D132 | Unknown |          | Admitted |
| 271D133 | Unknown |          | Admitted |
| 271D134 | Unknown |          | Admitted |
| 271D135 | Unknown |          | Admitted |
| 271D136 | Unknown |          | Admitted |
| 271D137 | Unknown |          | Admitted |
| 271D138 | Unknown |          | Admitted |
| 271D139 |         | 11/26/01 | Admitted |

| 273N | Letters from Nate to Donna | | Admitted |
|---|---|---|---|
| 273N1 | | 12/01/01 | Admitted |
| 273N2 | | 11/30/01 | Admitted |
| 273N3 | | 11/29/01 | Admitted |
| 273N4 | | 11/28/01 | Admitted |
| 273N5 | | 11/27/01 | Admitted |
| 273N6 | | 11/26/01 | Admitted |
| 273N7 | | 11/25/01 | Admitted |
| 273N8 | | 11/23/01 | Admitted |
| 273N9 | | 11/22/01 | Admitted |
| 273N10 | | 11/20/01 | Admitted |
| 273N11 | | 11/19/01 | Admitted |
| 273N12 | | 11/17/01 | Admitted |
| 273N13 | | 11/16/01 | Admitted |
| 273N14 | | 11/14/01 | Admitted |
| 273N15 | | 11/14/01 | Admitted |
| 273N16 | | 11/13/01 | Admitted |
| 273N17 | | 11/12/01 | Admitted |
| 273N18 | | 11/12/01 | Admitted |
| 273N19 | | 11/10/01 | Admitted |
| 273N20 | | 11/09/01 | Admitted |
| 273N21 | | 11/07/01 | Admitted |
| 273N22 | | 11/06/01 | Admitted |
| 273N23 | | 11/08/01 | Admitted |
| 273N24 | | 11/05/01 | Admitted |
| 273N25 | | 11/03/01 | Admitted |
| 273N26 | | 11/01/01 | Admitted |
| 273N27 | | 11/01/01 | Admitted |
| 273N28 | | 10/31/01 | Admitted |
| 273N29 | | 10/30/01 | Admitted |
| 273N30 | | | Admitted |
| 273N31 | | 10/28/01 | Admitted |
| 273N32 | | 10/27/01 | Admitted |
| 273N33 | | | Admitted |
| 273N34 | | 10/25/01 | Admitted |
| 273N35 | | 10/25/01 | Admitted |
| 273N36 | | 10/25/01 | Admitted |
| 273N37 | | 10/24/01 | Admitted |
| 273N38 | | 10/23/01 | Admitted |
| 273N39 | | 10/22/01 | Admitted |
| 273N40 | | 10/21/01 | Admitted |
| 273N41 | | 10/21/01 | Admitted |
| 273N42 | | 10/20/01 | Admitted |
| 273N43 | | 10/19/01 | Admitted |
| 273N44 | | 10/18/01 | Admitted |
| 273N45 | | 10/17/01 | Admitted |
| 273N46 | | 10/16/01 | Admitted |
| 273N47 | | 10/16/01 | Admitted |
| 273N48 | | 10/15/01 | Admitted |
| 273N49 | | 10/14/01 | Admitted |
| 273N50 | | 10/12/01 | Admitted |
| 273N51 | | 10/10/01 | Admitted |
| 273N52 | | 10/10/01 | Admitted |
| 273N53 | | 10/08/01 | Admitted |
| 273N54 | | 10/05/01 | Admitted |
| 273N55 | | 10/07/01 | Admitted |
| 273N56 | | 10/04/01 | Admitted |
| 273N57 | | 10/04/01 | Admitted |
| 273N58 | | 10/02/01 | Admitted |
| 273N59 | | 10/01/01 | Admitted |
| 273N60 | | 10/01/01 | Admitted |
| 273N61 | | 09/30/01 | Admitted |

| | | | |
|---|---|---|---|
| 273N62 | | 09/27/01 | Admitted |
| 273N63 | | 09/27/01 | Admitted |
| 273N64 | | 07/12/01 | Admitted |
| 273N65 | | 06/28/01 | Admitted |
| 273N66 | | 06/09/01 | Admitted |
| 273N67 | | 05/18/01 | Admitted |
| 273N68 | | 05/15/01 | Admitted |
| 273N69 | | 05/12/01 | Admitted |
| 273N70 | | 05/10/01 | Admitted |
| 273N71 | | 05/09/01 | Admitted |
| 273N72 | | 05/06/01 | Admitted |
| 273N73 | | 05/04/01 | Admitted |
| 273N74 | | 05/03/01 | Admitted |
| 273N75 | | 04/28/01 | Admitted |
| 273N76 | | 02/24/01 | Admitted |
| 273N77 | | 04/23/01 | Admitted |
| 273N78 | | 04/22/01 | Admitted |
| 273N79 | | 04/19/01 | Admitted |
| 273N80 | | 04/16/01 | Admitted |
| 273N81 | | 04/16/01 | Admitted |
| 273N82 | | 04/15/01 | Admitted |
| 273N83 | | 04/11/02 | Admitted |
| 273N84 | | 04/10/01 | Admitted |
| 273N85 | | 04/10/01 | Admitted |
| 273N86 | | 04/09/01 | Admitted |
| 273N87 | | 04/08/01 | Admitted |
| 273N88 | | 04/04/01 | Admitted |
| 273N89 | | 04/02/01 | Admitted |
| 273N90 | Unknown | | Admitted |
| 273N91 | | 03/31/01 | Admitted |
| 273N92 | | 03/29/01 | Admitted |
| 273N93 | | 03/26/01 | Admitted |
| 273N94 | | 03/25/01 | Admitted |
| 273N95 | | 03/23/01 | Admitted |
| 273N96 | | 03/22/01 | Admitted |
| 273N97 | | 03/20/01 | Admitted |
| 273N98 | | 03/20/01 | Admitted |
| 273N99 | | 03/20/01 | Admitted |
| 273N100 | | 03/19/01 | Admitted |
| 273N101 | | 03/19/01 | Admitted |
| 273N102 | | 03/19/01 | Admitted |
| 273N103 | | 03/19/01 | Admitted |
| 273N104 | | 03/15/01 | Admitted |
| 273N105 | | 03/13/01 | Admitted |
| 273N106 | | 03/12/01 | Admitted |
| 273N107 | | 03/11/01 | Admitted |
| 273N108 | | 03/09/01 | Admitted |
| 273N109 | | 03/06/01 | Admitted |
| 273N110 | | 03/04/01 | Admitted |
| 273N111 | | 03/03/01 | Admitted |
| 273N112 | | 03/02/01 | Admitted |
| 273N113 | | 02/27/01 | Admitted |
| 273N114 | | 02/25/01 | Admitted |
| 273N115 | | 02/20/01 | Admitted |
| 273N116 | | 02/23/01 | Admitted |
| 273N117 | | 02/22/01 | Admitted |
| 273N118 | | 02/19/01 | Admitted |
| 273N119 | | 02/16/01 | Admitted |
| 273N120 | | 02/15/01 | Admitted |
| 273N121 | Unknown | | Admitted |
| 273N122 | | 02/13/01 | Admitted |
| 273N123 | | 02/12/01 | Admitted |

| | | | |
|---|---|---|---|
| 273N124 | | 02/09/01 | Admitted |
| 273N125 | | 02/07/01 | Admitted |
| 273N126 | | 02/04/01 | Admitted |
| 273N127 | | 02/01/01 | Admitted |
| 273N128 | | 02/01/01 | Admitted |
| 273N129 | | 01/26/01 | Admitted |
| 273N130 | | 01/19/01 | Admitted |
| 273N131 | | 01/17/01 | Admitted |
| 273N132 | | 01/21/01 | Admitted |
| 273N133 | | 01/16/01 | Admitted |
| 273N134 | | 01/12/01 | Admitted |
| 273N135 | | 01/05/01 | Admitted |
| 273N136 | | 01/01/01 | Admitted |
| 273N137 | | 12/27/00 | Admitted |
| 273N138 | | 12/27/00 | Admitted |
| 273N139 | Unknown | | Admitted |
| 273N140 | | 12/11/00 | Admitted |
| 273N141 | Unknown | | Admitted |
| 273N142 | Unknown | | Admitted |
| 273N143 | | 05/01/01 | Admitted |

| No. | Description | Disposition |
|---|---|---|
| 242 | Left Hand - Wound | No Objection |
| 243 | Front view w/ bandage | No Objection |
| 244 | Side view Finger | No Objection |
| 245 | Left Hand - wrist to finger tip | No Objection |
| 246 | Left Hand Palm up | No Objection |
| 247 | Back side of Hand | No Objection |
| 248 | Both Hands | No Objection |
| 249 | Head and Shoulders | Admitted over Obj |
| 250 | Full body shot | Objection Sustained |
| 251 | Handgun - .38 Taurus | No Objection |
| 252 | Five (5) Live Rounds from Taurus | No Objection |
| 252A | Envelope Containing Test Fire Rounds | No Objection |
| 253 | Right Eye glass Lens | No Objection |
| 254 | Eye glasses Missing Right Lens | No Objection |
| 255 | Cotton Swab - Front Door Hallway | No Objection |
| 256 | Dry Wall Cut out w/ Bullet Hole | No Objection |
| 257 | Bullet Recovered from Dry Wall | No Objection |
| 258 | Cincinnatti Red's Jacket - From Victim | No Objection |
| 259 | Bullet Recovered from Clothing of Victim | No Objection |
| 260 | Death Certificate | No Objection |
| 261 | Coroner's Verdict | No Objection |
| 262 | Autopsy Protocol - 11 pages | No Objection |
| 263 | Microscopic Examination | No Objection |
| 264 | Toxicology - 1 page Front and Back | No Objection |
| 264A | Radiology Report | No Objection |
| 265 | Blood - Drawn from Robert Fingerhut | No Objection |
| 266 | Bullet Recovered from Brain of Victim | No Objection |
| 267 | Driver's Side Visor | No Objection |
| 268 | Visor Clamp | No Objection |
| 269 | Keys Recovered from Ignition | No Objection |
| 270 | Bag Containing Letters | No Objection |
| 271 | Letters from Donna to Nate (See attached) | No Objection |
| 272 | No Exhibit | |
| 273 | Letters from Nate to Donna (See Attached) | No Objection |
| 274 | No Exhibit | |
| 275A | Hand Writing Analysis | No objection |
| 275B | Hand Writing Analysis | No objection |
| 275C-1 | Hand Writing Standard | No Objection |
| 275C-2 | Hand Writing Standard | No Objection |
| 275D-1 | OCA Records | No Objection |
| 275D-2 | OCA Records | No Objection |
| 275D-3 | OCA Records | No Objection |
| 275D-4 | OCA Records | No Objection |
| 275D-5 | OCA Records | No Objection |
| 275D-6 | OCA Records | No Objection |
| 275D-7 | OCA Records | No Objection |
| 276C | Hand Writing Standard | No Objection |
| 276C-1 | Prison Records | No Objection |
| 276C-2 | Prison Records | No Objection |
| 276C-3 | Prison Records | No Objection |
| 276C-4 | Prison Records | No Objection |
| 277 | 01-35755 - Two (2) pages | No Objection |
| 278 | 01-35755-A | No Objection |
| 279 | 01-35755-B | Obj sustained |
| 280 | 01-35755-C | |
| 281 | 01-35755-D | Admitted over Obj |
| 282A | 01-35755 - Mike Roberts (2) Pages | No Objection |
| 282B | | Not Introduced |
| 282C | 01-35755 - Mike Roberts Supplemental | No Objection |
| 283 | 01-35755 - Cindy Maylee (2) Pages | No Objection |
| 284 | Dale Laux - (2) Pages | No Objection |

| 323 | $300,000 - State Farm Insurance Policy 17 pages | No objection |
| 324 | Constitutional Rights Waiver | No Objection |
| 325 | Video Tape Confession | No Objection |
| 326 | Transcript of Video Tape Confession 38 Pages | No Objection |
| 327A | Certification - ATF - 1page | No objection |
| 327B | Taurus IL46854 - 2 pages | No objection |
| 327C | Taurus JH14188 - 1 page | No objection |
| 360 | Cd containing 19 Telephone Conversations | No Objection |
| 361 | Telephone Log Record 3 pages | Adm. over obj |
| 362 | Audio Tape of 10-05-01 Recording | No Objection |
| 362A | Transcript of 10-05-01 Recording | No Objection |
| 363 | Audio Tape of 10-25-01 Recording | No Objection |
| 363A | Transcript of 10-25-01 Recording | No Objection |
| 364 | Audio Tape of 10-27-01 Recording | No Objection |
| 364A | Transcript of 10-27-01 Recording | No Objection |
| 365 | Audio Tape of 11-03-01 Recording | No Objection |
| 365A | Transcript of 11-03-01 Recording | No Objection |
| 366 | Audio Tape of 11-08-01 Recording | No Objection |
| 366A | Transcript of 11-08-01 Recording | No Objection |
| 367 | Audio Tape of 11-10-01 Recording | No Objection |
| 367A | Transcript of 11-10-01 Recording | No Objection |
| 368 | Audio Tape of 11-11-01 Recording | No Objection |
| 368A | Transcript of 11-11-01 Recording | No Objection |
| 369 | Audio Tape of 11-15-01 Recording | No Objection |
| 369A | Transcript of 11-15-01 Recording | No Objection |
| 370 | Audio Tape of 11-17-01 Recording | No Objection |
| 370A | Transcript of 11-17-01 Recording | No Objection |
| 371 | Audio Tape of 11-22-01 Recording | No Objection |
| 371A | Transcript of 11-22-01 Recording | No Objection |
| 372 | Audio Tape of 11-24-01Recording | No Objection |
| 372A | Transcript of 11-24-01 Recording | No Objection |
| 373 | Audio Tape of 11-24-01Recording | No Objection |
| 373A | Transcript of 11-24-01 Recording | No Objection |
| 374 | Audio Tape of 11-25-01 Recording | No Objection |
| 374A | Transcript of 11-25-01 Recording | No Objection |
| 375 | Audio Tape of 11-29-01Recording | No Objection |
| 375A | Transcript of 11-29-01 Recording | No Objection |
| 376 | Audio Tape of 12-01-01Recording | No Objection |
| 376A | Transcript of 12-01-01 Recording | No Objection |
| 377 | Audio Tape of 12-02-01Recording | No Objection |
| 377A | Transcript of 12-02-01 Recording | No Objection |
| 379 | Audio Tape of 12-06-01Recording | No Objection |
| 379A | Transcript of 12-06-01 Recording | No Objection |
| 380 | Audio Tape of 12-08-01Recording | No Objection |
| 380A | Transcript of 12-08-01 Recording | No Objection |
| 381 | Audio Tape of 12-08-01Recording | No Objection |
| 381A | Transcript of 12-08-01 Recording | No Objection |
| 349 | Photographic Line-Up - Frank Reynolds | Not Introduced |
| 350 | Consent to Search - Wirt Street - Shelia Fields | No Objection |
| 351 | (2) two cotton tipped swabs | No Objection |
| 352 | Search Warrant for Oral Swabs and Photographs | Withdrawn |
| 385 | Swabs | No Objection |
| 386 | Swabs | No Objection |
| 387 | Swabs | No Objection |
| 388 | Swabs | No Objection |
| 389 | Swabs | No Objection |
| 390 | Gerardi - Cutting | No Objection |
| 391 | Envelope Containing Jackson Prints | No Objection |
| 391A | Jackson Prints | No Objection |
| 392 | Photograph - Lifts | No Objection |
| 393 | Photograph - Lifts | No Objection |
| 394 | Envelope Containing 2 Photos | No Objection |

| | | |
|---|---|---|
| 395 | Envelope Containing Lift Sheets | No Objection |
| 395A | Lift Sheets | No Objection |
| 395B | Lift Sheets | No Objection |
| 396 | Walmart Receipt | No objection |
| 397 | Audio Tape of Excerpts | withdrawn |
| 397A | Transcript of Audio Tape Excerpts | withdrawn |
| 398 | Preston Automobile Service Records Red Chrysler | No objection |
| 398 A-P | Preston Automobile Service Records Red Chrysler | No objection |
| 399 | Preston Automobile Service Records Silver Chrysler | No objection |
| 399 A-J | Preston Automobile Service Records Silver Chrysler | No objection |
| 400 | Trumbull County Recorder 184 Olive Street | Admitted over Obj |
| 400 A-G | Trumbull County Recorder 184 Olive Street | Admitted over Obj |
| 401 | Trumbull County Recorder Washington Street | Admitted over Obj |
| 401 A-B | Trumbull County Recorder Washington Street | Admitted over Obj |
| 402 | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| 402 A-F | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| 403A 403B | Defendant's school records | No Objection |

**Defendant's Exhibits**

| | | |
|---|---|---|
| Deft A | Dreft's Criminal History | No Objection |
| Deft B | Contains 8 subparts of Blood Swabs | No Objection |
| Deft F | Credit Application | No Objection |
| Deft G | BMV Registration Card | No Objection |
| Deft H | Sales Agreement | No Objection |
| Deft I | Lease Agreement | No Objection |
| Deft J | Car Registration | No Objection |
| Deft K | Credit Application | No Objection |
| Deft L | BMV Registration Card | No Objection |
| Deft M | Real Estate Records | No Objection |
| Deft N | Real Estate Records | No Objection |
| Deft O | Real Estate Records | No Objection |
| Deft P | Psychological Report | No Objection |
| Deft T | Fingerlat Jewelry | No Objection |

| | | |
|---|---|---|
| Court Exhibit 1 | Orientation Instructions | |
| Court Exhibit 2 | Exhibit List | |
| Court Exhibit 3 | Brief in Opposition to Acquittal | |
| Court Exhibit 4 | Jury Charge | |
| Court Exhibit 5 | Corrected Instruction | |
| Court Exhibit 6 | Jury Question | |
| Court Exhibit 7 | Penalty Instruction | |

DEFENDANT'S EXHIBITS

   1.   Photo                        No objection

   2.   Photo                        No objection

   3.   Photo                        No objection

   4.   Photo                        No objection

   5.   Consent to Search form   No objection

   6.   Consent to Search form   No objection

   A.   Yellow shirt


JOINT EXHIBIT NO. 1     Photos


COURT'S EXHIBITS:

   1.  Jury verdict form

  1A. Court's answer to jury question

   2.  Jury questions

  2A. Court's answer to jury question

   3.  Jury question

  3A. Court's answer to jury question

   4.  Jury question

  4A. Court's answer to jury question

   5.  Jury question


SENTENCING EXHIBIT "A" (sealed by the Court)

1

FILED
COURT OF COMMON PLEAS

SEP 1 5 2014

TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

1       IN THE COURT OF COMMON PLEAS
                TRUMBULL COUNTY, OHIO

2

3   STATE OF OHIO,            ) Case No. 2001-CR-793
         Plaintiff            )
4                             )
    -vs-                      ) Judge Ronald J. Rice
5                             )
    DONNA M. ROBERTS,         )
6        Defendant            ) **TRANSCRIPT OF PROCEEDINGS**

7

8   Resentencing Hearing held on April 30, 2014

9   BEFORE:        HONORABLE RONALD J. RICE

10
    AT:            Trumbull Co. Court of Common Pleas
11                 161 High Street, NW
                   Warren, Ohio 44481
12

13  APPEARANCES:

14

15  On behalf of the Plaintiff:

16      Mr. Christopher D. Becker and Ms. Luwayne Annos
        Attorneys at Law

17

18  On behalf of the Defendant:

19      Messrs. David L. Doughten and Robert A. Dixon,
        Attorneys at Law
20

21

22

23  Official Court Reporter:  Richelle J. Guerrieri

1          THE COURT:  Good morning, Ladies and

2  Gentlemen.  We're here on, this is Case No. 2001-CR-793, State

3  of Ohio versus Donna Marie Roberts.

4          Counsel, would you identify yourselves for

5  the record, please?

6          MS. ANNOS:  On behalf of the State of Ohio,

7  Luwyane Annos.

8          MR. BECKER:  Chris Becker for the State of

9  Ohio, Your Honor.

10          MR. DOUGHTEN:  On behalf of Donna Roberts,

11  David Doughten.

12          MR. DIXON:  On behalf of Donna Roberts,

13  Robert Dixon.

14          THE COURT:  Thank you.  We're here this

15  morning on a -- there was a motion filed by the defense

16  contesting the Court's holding the hearing.  We also, like I

17  said, have another matter.  We had a request for continuance

18  filed which I guess --

19          MR. DOUGHTEN:  Yes, Your Honor.  I can

20  address the continuance.  I received a call from Donna's case

21  manager, I believe it was last Thursday, indicating that they

22  thought that would be -- she was having medical difficulties

23  and treatment.  I did send something down, releases were

1    granted.  I did hear from the institution.  A Melissa Hall had

2    faxed me back and indicated to me that in fact she was stable

3    enough that she could be transferred at this time.  And it was

4    at that point I called the Court and indicated that I had

5    received confirmation that she was medically able to come and

6    we would withdraw our Motion to Continue.

7                    THE COURT:   Thank you.  We did receive a

8    letter directly from Miss Roberts requesting not to be here.

9    She is present, so I guess that request is moot at this time.

10   But I think we have a copy of that which we will provide to

11   you.

12                    Well, counselor, as to your motion, do you

13   wish to address the Court on the motion that you filed?

14                    MR. DOUGHTEN:   Yes, Your Honor.  I

15   understand that whatever which way this Court decides it's

16   going to be decided by the Supreme Court.  But this is a

17   unique scenario.  We'll rest on the briefing except to say

18   that the difficulty of this case is they're, they're putting

19   you in an impossible task.  They're asking you to weigh not

20   only the mitigation, but also the aggravation, and you weren't

21   privy.  And I know the Court has reviewed all the record, but

22   it's, it's different than actually hearing the intonation,

23   seeing the facial expressions, the pauses, et cetera, et

1   cetera.

2               And our position is that the Ohio statute

3   does not allow for the proceeding as ordered by the Supreme

4   Court.  Now obviously it's the Supreme Court's order, but

5   we're going to ask them to take a look at that.  Thank you,

6   Your Honor.

7               THE COURT:  State wish to address the

8   motion?

9               MS. ANNOS:  Your Honor, the opinion from

10  the Ohio Supreme Court makes it clear that this Court is only

11  to engage in a sentencing exercise today, that no further

12  testimony is to be taken, no further evidence is to be taken.

13              And while the situation is one in which

14  another Judge did in fact hear the case and was able, as

15  Mr. Doughten said, to see the witnesses or Miss Roberts in

16  person, the fact is, there is an extensive record in this case

17  that is available for review, which the Supreme Court was well

18  aware of when they ruled as they did in this matter.  So we

19  ask that this motion be denied.

20              THE COURT:  Thank you.  The Court will -- I

21  have read the motion.  I'm going to read that again.  I have

22  started an entry.  I'll prepare an entry, address that first

23  thing at 2:00 o'clock and proceed straight to sentencing at

1    2:00.  Anything else?

2                        MR. DOUGHTEN:  Nothing else at this time,

3    Your Honor.

4                        THE COURT:  Counsel, you can stay with your

5    client as long as you need to.  We'll see you back here at

6    2:00 o'clock.

7                        MR. BECKER:  Thank you, Your Honor.

8                        MR. DOUGHTEN:  Thank you, Your Honor.

9                        THE COURT:  One other thing.  We've got

10   some directions from the Court as to -- there's not a whole

11   lot of participation in the process, but it is a sentencing,

12   so I do intend to give both sides an opportunity to speak as

13   far as counsel, ask if the hearing can go forward, anything

14   Miss Roberts would like to say.  I know it's not supposed to

15   be another allocution but it is a sentencing.

16                        And I'm assuming we still have to give

17   post-release control notifications, court costs and everything

18   else at a normal sentencing.  They didn't address that but I'm

19   assuming we have to do that; correct?  As silly as I

20   personally feel about post-release control, we still have to

21   go through all those other notifications; correct?

22                        MS. ANNOS:  Yes.  That was not in the entry

23   for 2007.  I would agree with Your Honor.

1               THE COURT: I guess on the side of caution

2   we'll go through it anyway, no matter how futile it is, but

3   we'll go through it anyway.

4               MR. DOUGHTEN: I would agree. In fact, one

5   of the points that we are going to address is her indigent

6   status and costs. The last time she was brought up here they

7   gave her a bill for $250. We're going to ask to address that.

8   So I guess I would state, I'd rather there be an abundance of

9   caution.

10               THE COURT: Fair enough. See you at 2:00

11   o'clock.

12               (Whereupon, recess was taken.)

13               THE COURT: We're back on the record in

14   Case No. 2001-CR-793, State of Ohio versus Donna Marie

15   Roberts. Counsel, first I'm going to address the motion

16   filed, Motion to Preclude a Sentence of Death or, in the

17   Alternative, Order a Full Penalty Phase Hearing, filed by the

18   Defendant, Donna Marie Roberts. The Court has reviewed the

19   motion, memoranda, pleadings. In addition, the Court heard

20   some brief arguments this morning on the motion.

21               This matter is before the Court on remand

22   from the Supreme Court of Ohio with specific instructions to

23   consider all the mitigating evidence reflected in the record,

1   including Roberts's allocution, weigh the aggravating
2   circumstances against the mitigating factors, and file a
3   sentencing opinion that reflects that it has complied with
4   these instructions.  In doing so, the trial court must make an
5   independent determination of whether a death sentence is
6   appropriate and may not give deference to the sentences
7   previously entered.

8                       Roberts claims the failure to conduct a
9   completely new sentencing hearing, including the empaneling of
10  a new jury for the mitigation penalty phase, violates the
11  Fifth, Sixth, Eighth and Fourteenth Amendments of the United
12  States Constitution.  Although the Court recognizes the unique
13  position of this Court as a sentencing authority without
14  first-hand knowledge of the events in the original mitigation,
15  penalty phase and the remand following *Roberts I*, the Court
16  must also be cognizant of its position in relation to the
17  directive issued by the Supreme Court of Ohio in *Roberts II*.
18  In addition, the Court has fully complied with the upper
19  Court's directive and has conducted a thorough review of the
20  records, including but not limited to transcripts of all
21  proceedings, the pleadings, judgment entries and exhibits.
22                       Further, *Roberts II* already considered and
23  rejected the arguments set forth by Roberts in the pending

1   motion.  In a case in which the Defendant was not deprived of
2   any constitutional rights, including her Eighth Amendment
3   right to present mitigation at the time of her mitigation
4   hearing, there seems to be no basis for requiring the trial
5   court to reopen or supplement that evidence in a later
6   proceeding.  To hold, as *Coyle* does, that a new mitigation
7   hearing must be held, even though no constitutional error
8   infected the original one, would transform the right to
9   present relevant mitigation into a right to update one's
10  mitigation.  Such a right has no clear basis in *Lockett* or its
11  progeny as set forth in *Roberts II*.

12          The Court finds *Roberts II* considered and
13  rejected Roberts's arguments regarding the presentation of any
14  additional evidence at this phase of the proceedings.  As
15  stated in *Roberts II*, the correct procedure is to proceed on
16  remand from the point at which the error occurred.  Therefore,
17  the Court finds Roberts's Motion to Preclude a Sentence of
18  Death, or in the Alternative, Order a Full Penalty Phase
19  Hearing, is hereby denied.  I will provide you, counsel, with
20  a copy of that.

21          MR. DOUGHTEN:  Thank you.
22          THE COURT:  Are the parties ready to
23  proceed with the sentencing?

1          MR. BECKER: Yes, Your Honor.

2          MS. ANNOS: Yes, Your Honor.

3          MR. DOUGHTEN: Yes, Your Honor.

4          THE COURT: This is kind of a unique

5   situation. At a sentencing hearing, both sides are given an

6   opportunity to present some evidence and make statements.

7   Pursuant to Supreme Court guidelines, there won't be any

8   additional evidence permitted or any statements to be made.

9          Miss Roberts, I understand you have some

10  health issues. Would you like to stay seated through the

11  sentencing hearing?

12          THE DEFENDANT: Yes. Thank you.

13          THE COURT: Counsel, I have a notice of

14  post-release control, if you will take a minute and review

15  that with your client.

16          Miss Roberts, the Court is notifying you,

17  pursuant to Ohio Revised Code Sections 2929.19, 2943.032 and

18  2967.28 as to Count 1 on your previous conviction of

19  Complicity to Commit Aggravated Murder, should you ever be

20  released from prison you will be subject to a life time of

21  parole supervision. If you violate any of the conditions of

22  your parole, then you would be forced to serve the balance of

23  any suspended life sentence.

1               As to Count 3, Complicity to Commit

2   Aggravated Burglary, and Count 4, Complicity to Commit

3   Aggravated Robbery, you will be subject to a mandatory period

4   of five years of post-release control upon your being released

5   from prison.

6               If you were to violate any of the

7   conditions of a post-release control sanction imposed upon you

8   by the parole board upon the completion of any stated prison

9   term, the parole board may impose upon you as the offender a

10  residential sanction that includes a new prison term of up to

11  nine months for each violation of the rules, not to exceed

12  one-half of your stated prison term.

13             If while on post-release control you are

14  convicted of a new felony offense, in addition to being

15  punished for the underlying conduct, the new offense, an

16  additional prison term of one year or what time remains on

17  your post-release control term may be added as an additional

18  or consecutive penalty.

19             You will not be allowed to ingest or be

20  injected with any drug of abuse, subject to random screening

21  while on post-release control.

22             Ma'am, I have before me a Notice of

23  Post-Release Control.  There's a signature above your name; is

1  that your signature?

2                    THE DEFENDANT:  Yes, sir.

3                    THE COURT:  Thank you.  You may be entitled

4  to earn one or five days of credit for each completed month

5  during which you productively participate in an education

6  program, vocational training, employment in prison industries,

7  treatment for substance abuse or any other constructive

8  program developed by the Ohio Department of Corrections.

9  However, those credits are not automatically awarded but must

10  be earned.

11                    Pursuant to the Ohio Revised Code, the cost

12  of the prosecution as well as jury fees must be assessed to

13  you.  If you fail to pay those costs or fail to make timely

14  payments toward those costs under a schedule approved by the

15  Court, you could be ordered to perform community service work

16  until such time as the costs are paid in full or until you are

17  in compliance with an approved schedule approved by the Court.

18  You will receive credit against any judgment for costs at the

19  hourly minimum-wage rate for the services performed.

20                    Counsel, it's my understanding in chambers

21  you had a question as to cost?

22                    MR. DOUGHTEN:  Yes, Your Honor.

23  Miss Roberts has been on death row for well over a decade.

1  She has no source of income.  We ask the Court to waive costs.

2              THE COURT:  All right.  Any objection from

3  the State?

4              MR. DOUGHTEN:  If I could add, when she was

5  brought back for sentencing here the last time, not part of

6  the trial, the resentencing, she was -- additional costs were

7  put on at that time.  And if they're not waived at this point,

8  even though she did not want to be here, as the Court is

9  aware, but she was obligated to be, again, costs would be

10  assessed to her which makes it more difficult, a difficult

11  situation she's in even more difficult.

12              MR. BECKER:  Can we approach briefly?

13              THE COURT:  Sure.

14              (Whereupon, a discussion was held off the

15  record.)

16              THE COURT:  No objection by the State?

17              MR. BECKER:  That's correct, Your Honor.

18              THE COURT:  Counsel, I'm not sure whether

19  there is an appropriate Affidavit of Indigency.  I thought I

20  did see one but I might be mistaken.  So the Court will waive

21  those upon the filing of an appropriate affidavit.

22              MR. DOUGHTEN:  Thank you very much, Your

23  Honor.

1       THE COURT:   This matter was remanded by the

2    Supreme Court of Ohio with the following instruction.   "On

3    remand, the trial court must consider all the mitigating

4    evidence reflected in the record, including Roberts's

5    allocution, weigh the aggravating circumstances against the

6    mitigating factors, and file a sentencing opinion that

7    reflects that it has complied with these instructions.   In

8    doing so, the trial court must make an independent

9    determination of whether a death sentence is appropriate and

10   may not give deference to the sentences previously entered."

11       Pursuant to the remand of this matter from

12   the Supreme Court of Ohio, the Court has carefully read,

13   reviewed, examined and/or inspected the entire court record,

14   all of the transcripts from the pre-trial and post-trial,

15   exhibits, pleadings, including but not limited to the

16   following items:   The indictment of the Trumbull County Grand

17   Jury; all of the docket entries filed in this matter; all of

18   the notes entered by the staff as to scheduling matters; the

19   prior court scheduling of 29 events, including status

20   hearings, hearings, pre-trials; motions to suppress; the jury

21   trial, sentencing and re-sentencing hearings; all the

22   pleadings as filed by the State of Ohio and various counsel

23   for the Defendant; the transcript of the Motion to Suppress

held on February 3rd, 2002; Transcripts of Proceedings, Volumes 1 through 23 of individual and group voir dire questioning and juror selection; all of the exhibits admitted at the trial as listed and attached to this entry on a document titled List of Trial Exhibits And Mitigation Hearing Exhibits; the entire trial and sentencing record; the entire record following the remand from *Roberts 1*.

In accordance with *Roberts II*, the Court did not permit Roberts to update her mitigation at the hearing following the recent remand. Establishing a right to update mitigation, as stated earlier, could result in arbitrary distinctions between similarly situated capital defendants. Roberts expressly and validly waived her right to present mitigating evidence during the original sentencing phase.

The Court notes this matter is now before a different judge, as Judge John M. Stuard has since retired from the bench and shortly thereafter passed away. As instructed, the Court has not given any deference to the prior decisions of Judge Stuard in this matter. However, the Court notes, the Court notes the acknowledgement as recognized in *Roberts II* that the trial court then stated it had considered the record and the oral statements. Beyond this, however, the opinion does not discuss Roberts's allocution. The Court

1    notes with confidence and respect for Judge Stuard, he would

2    not have acknowledged consideration of the oral statements,

3    including the allocution, had he not, in fact, considered the

4    same. Such was his nature of fairness. Nevertheless, as

5    previously indicated, the Court has given no deference to the

6    prior decisions of Judge Stuard and has complied with the

7    remand instructions as directed.

8              Despite the fact that Roberts expressly

9    waived mitigation, Roberts took advantage of her opportunity

10    for allocution at the original sentencing and again following

11    the *Roberts I* remand. Roberts explained in her original

12    allocution she had no intention of offering mitigating factors

13    for consideration. Rather, she advised she chose allocution

14    because it was against her religion to take an oath.

15              Roberts's allocution centered on two

16    salient points. First, she pointed out inconsistencies in the

17    evidence and testimony as she perceived. Second, she drew

18    attention to the differences between her trial and the trial

19    of Nathaniel Jackson, claiming racial inequities.

20              Roberts accurately characterized in her

21    allocution that the jury had been exposed to five percent of

22    her life. That five percent included her relationship with

23    Jackson. As she stated, "The other 95 percent of my life was

1   dedicated to my husband, my son, my family and business, and

2   doing charity for the unfortunate to share the good fortune

3   that God bestowed upon me and my loved ones." This Court

4   finds this is the most truthful and yet, unfortunate,

5   statement in the Defendant's entire allocution. Five percent

6   comprised of bad decisions has such a profound effect on a

7   lifetime.

8   Roberts brought attention to the fact that

9   the personnel in the courtroom were white. She likewise

10   opined on inaccurate portrayals in the newspaper regarding the

11   facts of this case.

12   Roberts explained she did not consider the

13   jury to be a jury of her peers. She provided some details

14   regarding her life. She worked for a plastic surgeon for

15   25 years. She lived in Miami for 27 years. She traveled the

16   world. Roberts expressed concern that some of the jurors

17   indicated that they did not read any newspapers or watch the

18   news. She also expressed concern regarding the young age of a

19   few of the jurors, citing their lack of life experiences as a

20   hindrance to their ability to judge the case.

21   Next, Roberts recounted certain aspects

22   regarding the prosecution against Nathaniel Jackson. Roberts

23   pointed out her perceived inconsistencies in the Jackson trial

1  compared to the prosecution by the State in her case.  She

2  also alleged racial bias on behalf of the prosecution.

3  Roberts relayed her opinion on Howland

4  Chief of Police Paul Monroe and his role in this matter prior

5  to holding that position.  She claimed Monroe intentionally

6  informed the jury she was Jewish in an effort to sway the

7  jurors against her even more.  Roberts used her opportunity at

8  the allocution to chastise the jurors for becoming too

9  involved in the operatic drama of the prison letters and

10  communications than the truth.

11  Roberts reviewed the testimony regarding

12  the life insurance policies.  She claimed she had no knowledge

13  the victim -- she had no knowledge the victim had increased

14  the value his life insurance policies.  She also reviewed her

15  financial history and business investments.  Roberts pointed

16  out she was earning $200,000 annually and the insurance policy

17  of $250,000 was not enough to seduce her to murder

18  Mr. Fingerhut.

19  Roberts added personal details about her

20  life with the victim by describing their daily rituals with

21  their beloved pets.  She discussed the victim's family life

22  and relationships with his sons from a previous relationship.

23  She insisted she did not want any more money from Mr.

1    Fingerhut and relayed the fact that she signed over any life

2    insurance policies to his children.

3                    Next, Roberts spoke regarding Santiago

4    Mason.  She explained that Mason sued her for framing him.

5    She protested his characterization and explained why that was

6    not true.  She described the victim's sports memorabilia

7    collection.  She also attacked Mason's character.

8                    Roberts disputed certain elements of the

9    State's case.  Namely, she challenged the eye witness from her

10   neighborhood who saw her driving in the area.  She questioned

11   the time frame against the witness's statement and her own

12   activities during the relevant period of time on the night of

13   the murder.  She also challenged the testimony of Frank

14   Reynolds.  She pointed out inconsistencies in Reynolds'

15   testimony with the facts of her life.  She contradicted the

16   testimony of Reynolds regarding her argument over money with

17   the victim.  She was incensed that Reynolds would advise the

18   jury she was upset with Mr. Fingerhut because he would not

19   give her money.  She was adamant she did not need any money

20   from Mr. Fingerhut.

21                   Roberts also challenged the physical

22   evidence of the prosecution.  She discussed the bloody

23   washcloth found at the Days Inn.  She claimed the washcloth

1　and towel were purposefully placed there by the police.  She

2　also attacked the validity of other evidence recovered from

3　the hotel and the surrounding area.

4　　　　　　　　Roberts questioned the introduction of

5　certain sexual information about her by the State as

6　inappropriate.  She claimed it was only meant to influence the

7　jury into forming a low opinion of her.  She also challenged

8　the search of the residence as improper.

9　　　　　　　　In addition, Roberts claimed the marijuana

10　found at the residence did not belong to her.  She maintained

11　it was also fabricated by the police.  However, she admitted

12　to smoking marijuana on a regular basis.

13　　　　　　　　Roberts discussed the letters between her

14　and Jackson as well as the taped telephone conversations while

15　Jackson was incarcerated.  She alleged the State manipulated

16　those conversations to fit their case by not admitting the

17　entire transcript of the conversations, only limited portions.

18　　　　　　　　With gratitude, she acknowledged her

19　attorneys.  She described when and where she acquired the

20　weapons found at the home.  She explained the events when

21　Mason allegedly stole her gun.  Roberts also reviewed the

22　coroner's report.

23　　　　　　　　Roberts described her reaction to finding

1   the victim on the night in question. She then relayed her

2   version of the Jackson case running parallel to her

3   prosecution. She challenged the veracity of the location of

4   the murder weapon in the reports. According to the Defendant,

5   the police moved the gun.

6   Finally, Roberts closed her allocution by

7   advising the jury they are required to recommend a death

8   sentence since she presented no mitigating evidence. She

9   pleaded for equal treatment and a sentence equal to that of

10   Jackson's. However, Roberts reiterated this was not an

11   admission of guilt. Rather, she claimed her plea was one of

12   social justice and equality. She pledged her love for the

13   victim and ended her allocution with the instruction for the

14   jury to do what is right.

15   At the resentencing hearing following

16   *Roberts I*, Roberts again offered allocution to the Court. On

17   October 22nd, 2007, Roberts indicated the record had been "a

18   big misrepresentation about me, my character, my personality

19   and my life." Roberts proceeded to provide additional

20   information relative to her personal history.

21   Roberts explained she grew up on a farm in

22   Austintown, Ohio. She attended a Roman Catholic elementary

23   school. She recounted that she was sexually abused by an

older cousin when she was very young.  She described her
household as very, very abusive.

Roberts recalled her father abused her
mother physically and verbally.  Roberts stated she "spent a
lot of time under my bed, especially when the guns came out."
When Roberts was taken to a doctor, she described being taken
into a room alone with a male doctor and afterward he advised
her mother she was a bad girl.  According to Roberts, she was
always sad and "felt empty because nobody had ever paid
attention to me or hugged me or anything."

Despite this sadness, Roberts achieved good
grades and rewards in school.  She was on the honor roll and
dean's list later in college.  She received accolades as a
writer.  She married her high-school sweetheart and moved to
Miami, Florida.  She described having her son and acknowledged
his many accomplishments.

Roberts was involved in a car accident in
1963.  She "fell asleep and the car went through big giant
trees, hitting something."  She recalled she was filled with
glass from the debris.  Roberts described herself as spacey
for awhile after the accident.

In 1983, Roberts was again involved in a
car accident.  She flew through the windshield and experienced

numbness in her extremities after the accident.  Roberts was
treated by a neurosurgeon for some time after this.

In 1999, Roberts again fell asleep behind
the wheel and was involved in a car accident.  Roberts
recalled months after this event where she has no memory.
Roberts stated, "Robert was calling me spacey and goofy, and
he was really worried about me, and he told me I should get
some kind of help, but I didn't want any help."  Roberts
acknowledged she ignored the depression.

Roberts recounted a suicide attempt wherein
she started her car in the garage with her dog, Blossom.  She
stated Blossom alerted her by pawing at her arm and she called
for help.  Roberts was hospitalized after this event in a
psychiatric ward.  Following this hospitalization, Roberts
sought Social Security disability.

Roberts explained she was prescribed three
or four medications at that time.  One medication was to stop
the voices.  Roberts experienced some hallucinations while
incarcerated.  She described seeing giant anthills on her
floor.  Roberts also described falling and hitting her head on
multiple occasions after this event.  Roberts described
periods of time when she could not identify the day of the
week.

1                   Roberts explained she walked away from the

2   restaurant she owned one day because she became overwhelmed.

3   She left the refrigerator and freezers full and never

4   returned.

5                   Roberts described her life working with a

6   plastic surgeon.  She described helping people with

7   reconstructive surgery.  Roberts remembered how she used to

8   help people pay their checks at the restaurant when they

9   didn't have enough money.

10                 Roberts converted to Judaism in 1980.  She

11   explained her involvement in a Jewish burial society and the

12   customs therewith.  She proudly expressed her involvement in a

13   campaign to rescue a Jewish man from persecution in Ethiopia.

14   She also volunteered in Israel with the plastic surgeons

15   performing skin grafts.

16                  In contrast, Roberts explained the

17   inaccuracies in the record describing Mr. Fingerhut as the

18   entrepreneur.  Roberts claimed she was the businesswoman.

19   They divorced to protect her assets; not his.  She took out

20   $75,000 from her mutual fund for a down payment on her dream

21   house.  She described herself as the breadwinner.

22   Mr. Fingerhut only worked occasionally, according to Roberts.

23   Roberts espoused her talents in trading on the stock market

1   and investing in real estate.

2           Roberts was fixated on ensuring the Court

3   was aware of her affluence.  She was proud of the fact that

4   she had money and wore expensive clothes.  She again chastised

5   Frank Reynolds for his testimony that she and Mr. Fingerhut

6   had an argument because he wouldn't give her $3,000.  Roberts

7   stated, "The accounts were mine.  The house was mine.  The

8   only way we had three cars is on my credit."  She spoke

9   regarding her gifts of money to her son and her sister.

10          Roberts closed her allocution with the

11  following words:  "I never intended for anything like that to

12  happen, and I couldn't believe it, and I still can't believe

13  it.  We loved each other and we had a good life."

14          Revised Code 2929.04(A) sets forth the

15  applicable aggravating circumstance enabling a consideration

16  of the death penalty to be specified in the indictment and

17  proven beyond a reasonable doubt in this case.  In Section 7,

18  "the offense was committed while the offender was committing,

19  attempting to commit, or fleeing immediately after committing

20  or attempting to commit kidnapping, rape, aggravated arson,

21  aggravated robbery or aggravated burglary, and either the

22  offender was the principal offender in the commission of the

23  aggravated murder or, if not the principal offender, committed

1    the aggravated murder with prior calculation and design."

2                    On May 28th, 2003, Roberts was found guilty

3    following a trial before a petit jury and after due

4    deliberation by said jury of the following:  Count One:

5    Complicity to Commit Aggravated Murder in violation of Revised

6    Code Section 2923.03(A)(2), 2903.01(A) and 2941.14(C) of

7    Robert S. Fingerhut, with two separate Specifications of

8    Aggravating Circumstances; to wit, Specification Number one:

9    Aggravated Burglary in violation of Revised Code Section

10   2929.04(A)(7) and Specification Number Two:  Aggravated

11   Robbery in violation of R.C. Section 2929.04(A)(7); Count Two:

12   Complicity to Commit Aggravated Murder in violation of Revised

13   Code 2923.03(A)(2), 2903.01(B) and 2941.14(C) of Robert S.

14   Fingerhut, with two separate Specifications of Aggravating

15   Circumstances, to wit:  Specification Number One. Aggravated

16   Burglary in violation of Ohio Revised Code 2929.04(A)(7) and

17   Specification Number Two:  Aggravated Robbery in violation

18   Ohio Revised Code 2929.04(A)(7); Count Three:  Complicity to

19   Commit Aggravated Burglary with a Firearm Specification in

20   violation of Revised Code Section 2923.03(A)(2),

21   2911.11(A)(1)(2) and 2941.145; and Count Four:  Complicity to

22   Commit Aggravated Robbery with a Firearm Specification in

23   violation of Ohio Revised Code Section 2923.03(A)(2),

1    2911.01(A)(1)(3) and 2941.145. Count Two was removed from the

2    Jury pursuant to a Motion to Dismiss by the State.

3                  The Court finds the aggravating

4    circumstances were set forth in the indictment of Roberts.

5    The Court further finds these elements of the aggravating

6    circumstances were proven beyond a reasonable doubt in the

7    trial of this matter. The Court finds Roberts acted with

8    prior calculation and design in the aggravated murder of the

9    victim, Mr. Fingerhut.

10                  The Court finds Roberts acted with prior

11    calculation and design in the aggravated murder of Fingerhut

12    while committing or attempting to commit aggravated burglary.

13    It was proved beyond a reasonable doubt at trial that Roberts

14    provided access to Jackson to trespass in Fingerhut's

15    residence at 254 Fonderlac Drive, Howland Township, Trumbull

16    County, Ohio with the specific purpose of killing Fingerhut

17    with prior calculation and design. It was further proven

18    beyond a reasonable doubt that the tools used to carry out

19    this plot were provided by Roberts: the gloves, ski mask,

20    firearm, as well as the access to the residence. Countless

21    recorded telephone calls and written letters outlined this

22    plan to murder Mr. Fingerhut in this manner leaving no

23    reasonable doubt whatsoever.

1      The Court finds Roberts acted with prior
2  calculation and design in the aggravated murder of Fingerhut
3  while committing or attempting to commit aggravated robbery.
4  It was proven beyond a reasonable doubt at trial that Roberts
5  acted with prior calculation and design.  Roberts intended for
6  Jackson to steal Mr. Fingerhut's vehicle, originally to use
7  the car as a means for kidnapping Fingerhut away from the
8  residence to kill him off site.  The police recovered Mr.
9  Fingerhut's vehicle a few blocks from where Jackson was
10  arrested.  The keys were still in the ignition.

11      The Court finds beyond a reasonable doubt
12  Roberts acted with complicity to commit aggravated murder
13  while committing or attempting to commit or in fleeing
14  immediately after committing or attempting to commit
15  aggravated burglary.  The Court finds beyond a reasonable
16  doubt Roberts acted with complicity to commit aggravated
17  murder while committing or attempting to commit or in fleeing
18  immediately after committing or attempting to commit
19  aggravated robbery.  The Court further finds beyond a
20  reasonable doubt Roberts acted with complicity to commit
21  aggravated murder with prior calculation and design.

22      Having found the aggravating circumstances
23  proven beyond a reasonable doubt, the Court must now weigh

1  against the aggravating circumstances proved beyond a

2  reasonable doubt, the nature and circumstances of the offense,

3  the history, character, and background of the offender along

4  with the additional statutory factors set forth in the Revised

5  Code Section 2929.04(B) as mitigating factors.

6  Pursuant to Revised Code 2929.03(F), the

7  Court makes the following findings regarding the factors

8  listed in Revised Code Section 2929.04(B): "One, whether the

9  victim of the offense induced or facilitated it."

10  The Court finds Mr. Fingerhut, the victim

11  in this matter, did nothing to facilitate or induce his own

12  death.  The Court gives no weight to the allegations made by

13  Roberts in her letters to Jackson regarding the physical abuse

14  she suffered at the hand of Mr. Fingerhut.  Even if the Court

15  were to accept those claims as true, there is no evidence of

16  any imminent threat to Roberts.  Likewise, there is no

17  evidence Roberts was prevented from evading the abusive

18  situation by alternate means such as leaving the residence or

19  filing a complaint with the police department.

20  "Whether it was -- it is unlikely that the

21  offense would have been committed, but for the fact that the

22  offender was under duress, coercion or strong provocation,"

23  the Court finds there is no evidence before the Court that

1  Roberts was under any duress, coercion or strong provocation
2  to commit the crime.

3               "Three.  Whether, at the time of committing
4  the offense, the offender, because of a mental disease or
5  defect, lacked substantial capacity to appreciate the
6  criminality of the offender's conduct or to conform the
7  offender's conduct to the requirement of the law."

8               The Court finds there is no evidence to
9  suggest Roberts lacked substantial capacity to appreciate the
10 criminality of her conduct or to conform her conduct to the
11 rules of law.  Although Roberts testified in her allocution
12 regarding the status of her mental health, the Court does not
13 find that statement contained any evidence to suggest or
14 support Roberts did not understand the criminality of her
15 conduct.  The Court finds the incidents described by Roberts
16 in her allocution were either isolated events following
17 physical traumas associated with her motor vehicle accidents
18 or they occurred after the death of Mr. Fingerhut.  There is
19 no evidence to suggest Roberts lacked mental capacity at the
20 time of the events in question.

21               "Four.  The youth of the offender."  The
22 Court finds the age of Roberts is not a factor for
23 consideration.

1       "Five.  The offender's lack of a

2   significant history of prior criminal convictions and

3   delinquency adjudications."  The Court finds Roberts does not

4   have a significant history of prior criminal convictions.

5   This factor does weigh in her favor.

6       "Six.  If the offender was a participant in

7   the offense but not the principal offender, the degree of the

8   offender's participation in the offense and the degree of the

9   offender's participation in the acts that led to the death of

10  the victim."

11      The Court finds although Roberts was not

12  the triggerman, the evidence clearly demonstrated she

13  orchestrated the entire plot.  The record reveals the

14  intentional acts of Roberts in planning the aggravated murder

15  of Mr. Fingerhut in exchange for his life insurance proceeds.

16  Roberts induced Jackson to be her accomplice with promises of

17  payment in the form of a Cadillac or Lincoln, a wealthy

18  lifestyle, vacations and a home in a desirable neighborhood.

19  Roberts premeditated for months.  She checked the balance of

20  her life insurance proceeds.  She arranged for Jackson's

21  transportation from prison to a hotel room where she fulfilled

22  his sexual needs, fed him food for sustenance, and provided

23  the necessary tools to carry out the murder.  The Court finds

1    that Roberts was the primary mastermind behind Mr. Fingerhut's

2    murder.  But for her premeditated calculations, Mr. Fingerhut

3    would not have been murdered by Jackson on that day.

4                    "Seven.  Any other factors that are

5    relevant to the issue of whether the offender should be

6    sentenced to death."

7                    The Court finds there were several

8    mitigating elements presented in Roberts's allocution.

9    Certain elements of Roberts's allocution at the original

10   sentencing and again upon the earlier remand are worthy of

11   some discussion.

12                   First, Roberts allegedly grew up in an

13   abusive household.  She claimed she was witness to physical

14   confrontations between her mother and her father to the point

15   where she would hide under the bed when the guns came out.

16   This history, coupled with the alleged physical abuse between

17   Roberts and Fingerhut does weigh slightly in favor of Roberts.

18   Perhaps Roberts was still shouldering those childhood burdens

19   into adult life.

20                   However, there is absolutely no evidence

21   before the Court to support the veracity of the physical abuse

22   allegations made by Roberts against Fingerhut.  Therefore, the

23   Court is left to ponder whether those allegations were part of

her scheme to induce Jackson to act as her accomplice.
Roberts failed to alert the Court to any physical violence
between her and Fingerhut during her allocution.  Instead,
Roberts professed her love for the man whom she contracted to
have killed.  Therefore, the Court finds these facts weigh
only slightly in favor of Roberts.

Likewise, the Court gives little weight to
Roberts's allocution claims regarding the rape by her cousin
when she was very young.  The Court finds this is entitled to
little weight as there is no direct connection to the
underlying crime.  Even if Roberts were carrying the
psychological scars of this trauma, there is little or no
evidence to suggest any connection to the underlying crime.

The Court finds the charitable history of
Roberts is entitled to some mitigation weight in her favor.
Apparently, Roberts was quite generous with both her time and
funds.  She assisted plastic surgeons performing
reconstructive surgery in Israel.  She helped rescue a man
from persecution in Ethiopia.  On a more day-to-day basis,
Roberts would help others in her family as well as strangers
who were struggling financially.  However, the Court finds
this generosity must also be reviewed in totality with
Roberts's self-promotion.  Roberts frequently referred to her

1   wealth in her allocution. She wanted the Court to know she

2   was the breadwinner, not Mr. Fingerhut. She berated the man

3   who testified she was angry with Mr. Fingerhut when he refused

4   to give her $3,000. It seems these mischaracterizations of

5   her social status were more upsetting to Roberts than the

6   guilty verdict against her for complicity to commit murder.

7   The Court finds these two polar self-portraits are not

8   compatible with one another. Therefore, the Court affords no

9   weight to the self-reported acts of generosity and charity of

10  Roberts as mitigation.

11              The Court finds the reports of mental

12  instability and physical traumas following several car

13  accidents could be mitigating factors in Roberts's favor.

14  Roberts was involved in two motor vehicle accidents which

15  occurred after Roberts fell asleep behind the wheel. The mere

16  fact that one has not only a singular incident of this

17  magnitude, but two, leads the Court to question whether there

18  are other biological or physiological factors at play. In

19  addition, the mental status post-accidents and the lack of

20  memory for an extended period of time is likewise a mitigating

21  factor that weighs in favor of Roberts.

22              However, the Court finds the self-promotion

23  by Roberts as to her financial prowess, educational accolades

1 and charitable works is contradictory to her assertion that
2 she has suffered mental deficiencies as a result of the motor
3 vehicle accidents described above. The two are juxtaposed;
4 either Roberts is a powerful entrepreneur capable of earning a
5 magnitude of wealth and respect or she is one suffering from
6 mental trauma. The Court gives little to no weight to any
7 evidence of the latter. In addition, the Court finds Roberts
8 was fairly well-spoken in the delivery of her allocution.
9 Plus, Roberts expressly made a valid waiver of her right to
10 present mitigation evidence. There was no mental deficiency
11 at play in that decision.

12 There is no question Roberts suffered from
13 physical and mental traumas as a result of these accidents.
14 Roberts even attempted to commit suicide in her garage.
15 However, the Court finds these incidents are isolated and
16 occurred in a time frame so far removed from the murder of Mr.
17 Fingerhut that their relevance for mitigation is
18 significantly, significantly decreased. In addition, pursuant
19 to Revised Code 2929.04(B), the Court must also consider and
20 weigh the nature and circumstances of the offense, the
21 history, character and background of the offender. The Court
22 finds the history, character and background of Roberts have
23 been sufficiently addressed in the discussion specified in

1    Revised Code 2929.04(B)(1 through 7) already stated above.

2                 Roberts planned and plotted for the murder

3    of Fingerhut over a period of at least three months.  She

4    conspired with Jackson, her imprisoned lover, to murder

5    Fingerhut for his life insurance proceeds.  The murder plan

6    was well documented through telephone calls recorded from

7    Jackson's residence; the Lorain Correctional Institute,

8    detailed letters were exchanged between the couple outlining

9    their plans.  These plans included the acquisition of

10    supplies, the procurement of a hotel room, and the promise of

11    a new vehicle for Jackson -- all provided by Roberts.

12    Ultimately, Roberts provided access to the residence in order

13    for Jackson to carry out the murder as planned.

14                 Despite these intricate details, Roberts

15    forgot to include Jackson as one of her named lovers to the

16    police during interviews.  In addition, Roberts attempted to

17    thwart the investigation into the Fingerhut murder by

18    implicating other individuals; not Jackson.  In addition,

19    Roberts's feigned emotional outbursts over Fingerhut's death

20    do not correlate to the insidious behavior relative to the

21    same.

22                 Therefore, the Court has granted little to

23    no weight to any of the mitigating factors outlined by Roberts

1   in her allocution.  In addition, the Court finds Roberts's

2   request for equal treatment to Jackson is inconsistent with

3   the primary body of her allocution and has not given any

4   weight to that request.

5                The presence of mitigating factors does not

6   preclude the imposition of a death sentence.  Rather, those

7   mitigating factors are to then be weighed against the

8   aggravating circumstances of the crime.  In conducting this

9   comparison, the Court overwhelmingly finds the aggravating

10   circumstances outweigh the mitigating factors.

11                The mitigating factors given little weight

12   by this Court do not even approach an imbalance of the

13   aggravating circumstances present in this matter.  Roberts's

14   traumatic childhood, her allegations of physical abuse at the

15   hands of Fingerhut, the physical injuries sustained in

16   multiple motor vehicle accidents, the mental disability, the

17   lack of a prior criminal record and Roberts's charitable

18   tendencies do not even draw the Court's attention away from

19   the aggravating circumstances.

20                The Court has made a careful and

21   independent review of the entire record, including Roberts's

22   first and second allocutions.  Upon this review, the Court

23   finds the aggravating circumstances outweigh the mitigating

1    factors by proof beyond a reasonable doubt.

2              Therefore, the Court hereby finds the

3    sentence of death is an appropriate penalty for the Defendant,

4    Donna Marie Roberts, in this matter.

5              The Defendant, Donna Marie Roberts, having

6    been indicted by the September 8th, 2001 term of the Grand

7    Jury of Trumbull County, Ohio for Count One: Aggravated Murder

8    in violation of Revised Code Section 2903.01(A) and 2941.14(C)

9    of Robert S. Fingerhut, with two separate Specifications of

10   Aggravating Circumstances to wit:  Specification Number 1:

11   Aggravating Burglary in violation of Revised Code

12   2929.04(A)(7) and Specification Number 2:  Aggravated Robbery

13   in violation of Revised Code 2929.04(A)(7); Count Two:

14   Aggravated Murder in violation of Revised Code 2903.01(B) and

15   2941.14(C) of Robert S. Fingerhut, with two separate

16   Specifications of Aggravating Circumstances, to wit:

17   Specification Number 1:  Aggravated Burglary in violation of

18   Revised Code 2929.04(A)(7, and Specification Number 2:

19   Aggravated Robbery in violation of Revised Code 2929.04(A)(7);

20   Count Three:  Aggravated Burglary with Firearm Specification

21   in violation of Revised Code 2911.11(A)(1)(2) and 2941.145;

22   and Count Four:  Aggravated Robbery with Firearm Specification

23   in violation of Revised Code 2911.01(A)(1)(3) and 2941.145,

1    and on the 8th day of April, 2003, having been brought into
2    court for trial before a petit jury, being represented by
3    counsel, Attorney J. Gerald Ingram and Attorney John B.
4    Juhasz, and the jury having been empaneled and after due
5    deliberation on May 28, 2003, was found guilty of Count One:
6    Complicity to Commit Aggravated Murder in violation of Revised
7    Code 2923.03(A)(2), 2903.01(A) and 2941.14(C) of Robert S.
8    Fingerhut, with two separate Specifications of Aggravating
9    Circumstances, to wit: Specification Number 1: Aggravating
10   Burglary, in violation of Revised Code 2929.04(A)(7) and
11   Specification Number 2: Aggravated Robbery in violation of
12   Revised Code 2929.04(A)(7); Count Two, Complicity to Commit
13   Aggravated Murder in violation of Revised Code 2923.03(A)(2),
14   2903.01(B) and 2941.14(C) of Robert S. Fingerhut, with two
15   separate Specifications of Aggravating Circumstances, to wit:
16   Specification Number 1: Aggravated Burglary in violation of
17   Revised Code 2929.04(A)(7), and Specification Number 2:
18   Aggravated Robbery in violation of Revised Code 2929.04(A)(7);
19   and on Count Three, Complicity to Commit Aggravated Burglary
20   with a Firearm Specification in violation of Revised Code
21   2923.03(A)(2), 2911.11(A)(1)(2) and 2941.145.   And Count
22   Four, Complicity to Commit Aggravated Robbery with a Firearm
23   Specification in violation of Revised Code 2923.03(A)(2),

1    2911.01(A)(1)(3) and 2941.145.  Thereafter, Count Two was

2    removed from the Jury pursuant to a Motion to Dismiss by the

3    State.

4              On June 4, 2003, the Defendant, having been

5    brought into this Court to give evidence in mitigation on

6    Count One of the Indictment, and after arguments of counsel

7    and instructions of law, and after due deliberation, it was

8    the finding and recommendation of the Jury on June 4, 2003,

9    that the sentence of death be imposed on the Defendant.

10             On April 30th of this year, pursuant to a

11   remand from the Supreme Court of Ohio, the Defendant's

12   sentencing hearing was held pursuant to Revised Code 2929.19.

13   Attorney David L. Doughten and Attorney Robert A. Dixon were

14   present on behalf of -- as counsel for the Defendant, and

15   Assistant Prosecutor Christopher Becker was present for the

16   State.  The Defendant was also present in Court and was

17   previously afforded all rights pursuant to remand from the

18   Supreme Court.  The court has considered the record and oral

19   statements, as well as the principles and purposes of felony

20   sentencing under Revised Code 2929.11, and has balanced the

21   seriousness and recidivism factors of the Revised Code Section

22   2929.12.

23             Pursuant to law, the Court this day, April

1  30, 2014, having determined in a separate opinion of specific

2  findings that the aggravating circumstances as to the count of

3  Aggravated Murder outweigh the mitigating factors by proof

4  beyond a reasonable doubt, then made inquiry as to whether the

5  Defendant in answer -- any reason why we can't go forward with

6  the judgment today?

7            THE DEFENDANT:  No.

8            THE COURT:  The Court has considered the

9  factors under Revised Code 2929.14, and makes the following

10  findings:  The shortest prison term would demean the

11  seriousness of the Defendant's conduct; the longest prison

12  term is appropriate because the Defendant committed the worst

13  form of the offense; multiple prison terms are necessary to

14  protect the public from future crime and to punish the

15  offender; consecutive prison sentences are not

16  disproportionate to the seriousness of the Defendant's conduct

17  and to the danger the offender poses to the public; and the

18  harm caused by multiple offenses was so great that no single

19  prison term for any of the offenses committed as part of a

20  single course of conduct adequately reflects the seriousness

21  of the Defendant's conduct.

22            It is therefore ORDERED, ADJUDGED and

23  DECREED that the Defendant, Donna Marie Roberts, shall be

1    sentenced to death on Count One; shall serve an imprisonment

2    term of ten years on Count Three, plus a mandatory term of

3    three years on the Firearm Specification to be served prior to

4    and consecutive to the sentence imposed in Count Three.  Shall

5    serve an imprisonment term of ten years on Count Four, plus a

6    mandatory term of three years on the Firearm Specification to

7    be served prior to and consecutive to the sentence imposed in

8    Count Four.  Sentence in Count Four is to be served

9    consecutively to the sentence imposed on Count Three.  The

10   Firearm Specifications in Counts Three and Four shall merge as

11   one sentence in Count Three as a matter of law.  The Defendant

12   shall submit to DNA testing.  Costs have been waived by

13   previous ruling of the Court.

14                    The Court has previously notified the

15   Defendant of her post-release control notification.  The Court

16   disapproves of any placement in any programs provided by the

17   Ohio Department of Corrections.

18                    Miss Roberts, you have an absolute right to

19   appeal in this matter.  I assume, counsel, you would be

20   willing to take an appointment for the appeal?

21                    MR. DOUGHTEN:  That is correct, Your Honor.

22                    THE COURT:  If you could get the

23   appropriate paper filed with the Court, I'll approve the

1    appointment of both of you to handle the appeal in this

2    matter.

3                        MR. DOUGHTEN:  Thank you, Your Honor.  This

4    may be paranoia on our part, previously in the prior agreement

5    we had proffered a number of materials that the Supreme Court

6    did refer to, paragraphs 18 through 21.  We just want to make

7    sure we request that those proffered materials remain

8    proffered.  I think it's already part of the record but I'm

9    not sure, because this is an unusual proceeding, whether we

10   need to again state for the record we intend to --

11                       THE COURT:  Certainly noted for the record.

12   And also note that the Court reviewed them in making this

13   decision.

14                       MR. DOUGHTEN:  Thank you very much.

15                       THE COURT:  Anything further?

16                       MS. ANNOS:  Could we approach for just one

17   moment, Your Honor?

18                       THE COURT:  Sure.

19                       (Whereupon, a discussion was held off the

20   record.)

21                       THE COURT:  Counsel for the State has

22   pointed out, I believe in my Findings of Fact I made reference

23   to a previous original allocution which was an unsworn

1    statement on *Roberts I*, came back on *Roberts II*.  It was an

2    actual allocution, so to clarify that for the record.

3                    MR. DOUGHTEN:  No objection, if that's

4    accurate.

5                    THE COURT:  Anything further?

6                    MR. DOUGHTEN:  No.  Thank you very much.

7                    MR. BECKER:  Thank you, Your Honor.

8                    THE COURT:  Court will be in recess.

9                              * * *

10

11

12                    REPORTER'S CERTIFICATE

13

14        This is to certify the foregoing represents a true and

15    correct transcript of the proceedings had in the

16    aforementioned cause as reflected by the stenotype notes taken

17    by me on the same.

18

19

20

21

22    Richelle J. Guerrieri
      Official Court Reporter

23