10/20/21, 11:18 AM                                    Case Details - CourtView Justice Solutions

## 2001 CR 00793 STATE OF OHIO -VS- ROBERTS, DONNA MARIE JMS

- Case Type:
  CR - Criminal
- Case Status:
  CLOSED
- File Date:
  12/21/2001
- DCM Track:
-
- Action:
  AGGRAVATED MURDER (prior calculation/design)
- Status Date:
  12/20/2001
- Case Judge:
  STUARD, JOHN M
- Next Event:
-

| All Information | Party | Charge | Ticket/Citation # | Event | Docket | Financial | Checks | Receipt | Disposition |

### Docket Information

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 12/20/2001 | FILING FEE FOR EACH CAUSE OF ACTION AND EACH UNDERTAKING<br>Amount Owed: $27.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $27.00 | |
| 12/20/2001 | PRISONER FEES<br>Amount Owed: $11.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $11.00 | |
| 12/20/2001 | GENERAL REVENUE FUND<br>Amount Owed: $11.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $11.00 | |
| 12/20/2001 | VICTIMS OF CRIME<br>Amount Owed: $30.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $30.00 | |
| 12/20/2001 | SPECIAL PROJECTS JUDGES<br>Amount Owed: $50.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $50.00 | |
| 12/21/2001 | WARRANT ON COMPLAINT AND RETURN OF SERVICE FILED. | $0.00 | |
| 12/21/2001 | COMPLAINT AND AFFIDAVIT FILED UNDER SEAL BY ORDER OF THE COURT | $0.00 | |
| 12/21/2001 | DEFT APPEARED WITH COUNSEL. NO PLEA ENTERED. NO BOND SET. | $0.00 | |
| 12/26/2001 | MOTION TO INTERVENE WITH SERVICE FILED BY ATTY STEPHEN BOLTON. | $0.00 | |
| 12/28/2001 | PRELIMINARY HEARING 12/31/2001  11:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 12/28/2001 | DIRECT PRESENTMENT FOR<br>CT 1: AGG MURDER (F) W/SPECS OF AGG CIRCUMSTANCES<br>CT 2: AGG MURDER (F) W/SPECS OF AGG CIRCUMSTANCES<br>CT 3: AGG BURGLARY (F1) W/FIREARM SPEC<br>CT 4: AGG ROBBERY (F1) W/FIREARM SPEC | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 12/28/2001 | INDICTMENT AND SUMMONS FILED BY PROSECUTOR'S OFFICE AND COPIES OF SAME ISSUED TO SHERIFF.<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $2.00 | |
| 12/28/2001 | MOTION OF THE VINDICATOR PRINTING CO IN OPPOSITION TO DEFT DONNA M ROBERTS MOTION TO SEAL COURT RECORDS WITH SERVICE FILED BY ATTY DAVID MARBURGER. | $0.00 | |
| 12/28/2001 | NOTICE OF APPEARANCE AS CO-COUNSEL WITH SERVICE FILED BY ATTY JOHN JUHASZ | $0.00 | |
| 12/28/2001 | DEFTS MOTION AND MEMORANDUM TO HOLD AFFIDAVIT AND EXHIBITS UNDER SEAL WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 12/31/2001 | NOT GUILTY PLEA TO ARRAIGNMENT ON INDICTMENT & SUMMONS NO BOND SET | $0.00 | |
| 12/31/2001 | SUMMONS ON INDICTMENT RETURNED BY SHERIFF ON DONNA MARIE ROBERTS SHERIFF ALTIERE<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $2.00 | |
| 12/31/2001 | CAPIAS RETURNED AND ENDORSED BY SHERIFF ON DONNA MARIE ROBERTS SHERIFF ALTIERE | $0.00 | |
| 01/03/2002 | PRE TRIAL 01/30/2002  09:00 AM<br>JUDGE:HON. JOHN M. STUARD LOC:COURT 2<br>(N1-3-02) | $0.00 | |
| 01/04/2002 | CERTIFIED MAILER NUMBER 0891 801 SENT TO: THE SUPREME COURT OF OHIO<br>Amount Owed: $5.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.00 | |
| 01/07/2002 | VICTIM'S RIGHTS NOTIFICATION FILED. | $0.00 | |
| 01/07/2002 | DEFENDANT'S NOTICE OF REQUEST FOR DISCOVERY FILED BY DEFENDANT'S ATTORNEY JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 01/07/2002 | DEFENDANT'S MOTION FOR NOTICE OF INTENTION TO USE EVIDENCE FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 01/14/2002 | CERTIFIED MAIL NUMBER 891801 RETURNED ENDORSED FROM THE SUPREME COURT OF OHIO ON 1/9/02 BY ? | $0.00 | |
| 02/01/2002 | HEARING ON PENDING MOTIONS 05/23/2002  01:00 PM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/01/2002 | JURY TRIAL 11/18/2002  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/01/2002 | 963/427 WAIVER OF SPEEDY TRIAL FOR 300 DAYS UNTIL 11/18/02<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 02/11/2002 | DEFENDANT'S MOTION FOR AN ORDER ENLARGING THE TIME FOR FILING PRETRIAL MOTIONS FILED FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 02/11/2002 | DEFENDANT'S MOTION FPR DISCOVERY FILED  BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 02/20/2002 | MOTION TO DETERMINE PROPER STANDARD TO EXCUSE JURORS FOR CAUSE FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ. | $0.00 | |
| 02/26/2002 | DEFENDANT'S MOTION FOR COMPREHENSIVE VOIR DIRE EXAMINATION FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM | $0.00 | |
| 03/13/2002 | NOTICE TO SUPREME COURT (COPY) CC02008 | $0.00 | |
| 03/15/2002 | STATE'S REQUEST FOR RECIPROCAL DISCOVERY FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/15/2002 | STATE'S RESPONSE TO DEFENDANT'S REQUEST FOR DISCOVERY FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/15/2002 | STATE'S RESPONSE TO DEFENDANT'S REQUEST BILL OF PARTICULARS FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/20/2002 | MOTION OF INTEREST PARTY FILED BY ATTORNEY ROSEMARY MILBY ATTORNEY FORD MOTOR CREDIT COMPANY FILED | $0.00 | |
| 04/16/2002 | STATES SECOND SUPPLEMENTAL RESPONSE TO DEFTS REQUEST FOR DISCOVERY WITH SERVICE FILED BY PROSECUTOR | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 04/18/2002 | STATES THIRD SUPPLEMENTAL RESPONSE TO DEFTS REQUEST FOR DISCOVERY WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 05/20/2002 | HEARING ON PENDING MOTIONS 07/18/2002  01:00 PM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 06/18/2002 | DEFENDANT'S MOTION FOR COMPEHENSIVE VOIR DIRE EXAMINATION FILED BY THE DEFENDANT'S ATTORNEY J. GERALD INGRAM AND JOHN B JUHASZ | $0.00 | |
| 06/18/2002 | DEFENDANT'S MOTION TO PROHIBIT DEATH QUALIFICATION OF JURORS UNLESS AND UNTIL THE GOVERNMENT HAS ESTABLISHED PROBABLE CAUSE THAT THE CASE WILL PROCEED TO A SECOND PHASE EVIDENTIARY HEARING REQUESTED FILED BY THE DEFENDANT'S ATTORNEY J. GERALD INGRAM AND JOHN J JUHASZ | $0.00 | |
| 07/09/2002 | DEFENDANT'S MOTION TO SUPPRESS EVIDENCE REQUEST FOR EVIDENTIARY HEARING FILED BY THE DEFENDANT'S ATTORNEY J. GERALD INGRAM AND JOHN B JUHASZ | $0.00 | |
| 07/15/2002 | DEFENDANT'S MOTION FOR ALTERNATING VOIR EXAMINATION FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM | $0.00 | |
| 07/15/2002 | DEFENDANT'S MOTION TO HAVE REASONS FOR OBJECTIONS AND REASONS FOR OVERRULING OBJECTIONS PLACED ON THE<br>RECORD FILED BY THE DEFENANT'S ATTORNEY JERRY INGRAM | $0.00 | |
| 07/18/2002 | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO PROHIBIT DEATH QUALIFICATIONS UNTIL PROSECUTION HAS SHOWN PROBABLE CAUSE THAT THE CASE WILL PROCEED TO A SECOND PHASE FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 07/18/2002 | STATE'S MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION TO DETERMINE PROPER STANDARD TO EXCUSE JURORS FOR CAUSE FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 07/18/2002 | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPREHENSIVE VOIR DIRE FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 07/18/2002 | DEFENDANT'S MOTION TO DISMISS INDICTMENT OR IN THE ALTERNATIVE TO DISMISS DEATH SPECIFICATIONS BECAUSE DEATH PENALTY IN OHIO IS UNCONSTITUTIONAL REQUEST FOR ORAL HEARING FILED BY THE DEFENDANT'S ATTORNEY'S JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 07/19/2002 | 976/309 ENTRY OF STIPULATION REGARDING DEFTS JULY 9, 2002 MOTION TO SUPPRESS. SEE J/E. 7/19/02  COPIES SENT TO: J INGRAM, J JUHASZ, S BOLTON, D MARBURGER, A MILLETTE & PROSECUTOR<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $4.00 | |
| 07/19/2002 | POSTAGE<br>Amount Owed: $2.22<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.22 | |
| 07/23/2002 | HEARING ON PENDING MOTIONS 09/20/2002  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 08/26/2002 | DEFTS MOTION TO SUPPRESS REFERENCES TO THE JURY THAT A VERDICT OF DEATH IS ONLY A RECOMMENDATION WITH SERVICE FILED BY ATTY JOHN JUHASZ | $0.00 | |
| 09/11/2002 | 981/507 DEFTS MOTION TO SUPPRESS REFERENCES TO THE JURY THAT THE DEATH PENALTY IS BEING SOUGHT IS DENIED. SEE J/E. 9/11/02 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ<br>Amount Owed: $6.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $6.00 | |
| 09/11/2002 | POSTAGE<br>Amount Owed: $1.11<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.11 | |
| 09/12/2002 | DEFTS MOTION TO DISMISS DEATH SPECIFICATIONS DUE TO INADEQUATE APPELLATE REVIEW REQUEST FOR HEARING WITH SERVICE FILED BY ATTY JOHN JUHASZ | $0.00 | |
| 09/13/2002 | DEFTS MOTION TO PROHIBIT THE GOVERNMENT FROM USING PEREMPTORY CHALLENGES TO EXCLUDE VENIREMEN WHO EXPRESS CONCERN ABOUT IMPOSING CAPITAL PUNISHMENT WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 09/16/2002 | DEFTS MOTION TO HAVE REASONS FOR OBJECTIONS AND REASONS FOR OVERRULLING OBJECTIONS PLACED ON THE RECORD WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 09/16/2002 | DEFTS MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS BECAUSE METHOD OF EXECUTION IS UNCONSTITUTIONAL WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 09/20/2002 | HEARING ON PENDING MOTIONS 10/10/2002  01:00 PM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 10/04/2002 | MOTION TO SUPPRESS WITH SERVICE FILED BY ATTY GERALD INGRAM | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS DUE TO INADEQUATE APPELLATE REVIEW WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS BECAUSE METHOD OF EXECUTION IS UNCONSTITUTIONAL WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM CONTRA TO DEFTS MOTION TO DISMISS INDICTMENT: OR IN ALTERNATIVE TO DISMISS DEATH SPECIFICATIONS BECAUSE DEATH PENALTY IN OHIO IS UNCONSTITUTIONAL WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO HAVE REASONS FOR DEFENSE OBJECTIONS AND REASONS FOR OVERRULING DEFTS OBJECTIONS PLACED ON RECORD WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO PROHIBIT THE USE OF PEREMPTORY CHALLENGES TO EXCLUDE VERIREMEN WHO EXPRESS CONCERNS ABOUT IMPOSING CAPITAL PUNISHMENT WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION FOR ALTERNATING VOIR DIRE WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MOTION FOR DEFT TO SUBMIT TO HANDWRITING EXEMPLARS WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | STATES FOURTH SUPPLEMENTAL RESPONSE TO DEFTS REQUEST FOR DISCOVERY WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | 983/808 MOTIONS HEARING SCHEDULED FOR 9/20/02 AT 9:00 AM IS RESCHEDULED TO 10/10/02 AT 1:00 PM. 10/10/02 COPIES SENT TO: C BECKER, K BAILEY, TR CO PROSECUTOR, J INGRAM AND J JUHASZ<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $2.00 | |
| 10/15/2002 | HRG ON MOTION TO SUPPRESS 11/08/2002  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 10/21/2002 | STATUS CONFERENCE 10/24/2002  11:30 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 10/25/2002 | 985/232 WAIVER OF SPEEDY TRIAL FOR 210 DAYS UNTIL 4/7/03<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 10/29/2002 | JURY TRIAL 04/07/2003  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 11/01/2002 | PRE TRIAL 12/19/2002  08:45 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 12/03/2002 | DEFTS MOTION TO DISMISS DEATH SPECIFICATIONS AND TO DECLARE INVALID OHIO CONST ART IV, 2 AND 3 AND ORC ANN 2929.05 AND 2953.02 AND REQUEST FOR HEARING WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 12/20/2002 | PRE TRIAL 01/02/2003  08:45 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 01/03/2003 | SUPPRESSION HEARING 02/26/2003  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/28/2003 | FINAL PRE TRIAL 03/26/2003  01:00 PM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/28/2003 | JURY TRIAL 04/08/2003  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/28/2003 | 995/415 WAIVER OF SPEEDY TRIAL FOR ADDITIONAL 45 DAYS; TRIAL DATE APRIL 8, 2003.<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 03/03/2003 | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/17/2003 | NOTICE OF OPEN FILE DISCOVERY FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/18/2003 | DEFENDANT'S MOTION FOR ORDER GRANTING EXPERT ACCESS TO DEFENDANT IN COUNTY JAIL FILED BY THE DEFENDANT'S ATTORNEY JOHN JUHASZ | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 03/18/2003 | 996/977 JUDGMENT ENTRY GRANTING EXPERT ACESS. 3/18/03 CC SENT TO: C BECKER, K BAILEY, J G INGRAM, J JUHASZ, DR T EBERLE & T ALTIERE<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 123746 Date: 04/29/2008 | $2.00 | |
| 03/18/2003 | POSTAGE<br>Amount Owed: $2.22<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.22 | |
| 03/21/2003 | DEFENDANT'S POST SUPPRESSION HEARING MEMORANDUM FILED BY THE DEFENDANT'S ATTORNEY GERALD INGRAM AND JOHN JUHASZ | $0.00 | |
| 04/04/2003 | 998/433 DEFTS MOTION TO SUPPRESS IS DENIED. 4/4/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ<br>Amount Owed: $6.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $6.00 | |
| 04/04/2003 | POSTAGE<br>Amount Owed: $1.11<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 123746 Date: 04/29/2008 | $1.11 | |
| 04/07/2003 | PROPOSED ORIENTATION INSTRUCTIONS AS TO PROCEDURE IN A CAPITAL CASE FILED BY THE DEFENDANT'S ATTORNEY J GERALD INGRAM | $0.00 | |
| 04/07/2003 | HEARING ON MOTION TO SUPPRESS EVIDENCE FILED BY THE DEFENDANT'S ATTONREY J GERALD INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 04/07/2003 | NOTICE OF APPEAL TO THE 11TH APPELLATE COURT FILED BY ATTY J JUHASZ | $0.00 | |
| 04/07/2003 | DEFENDANTS MOTION TO CHANGE VENUE REQUEST FOR CLOSED ORAL HEARING FILED BY ATTY INGRAM AND JUHASZ | $0.00 | |
| 04/08/2003 | 998/713 MANDATE FROM COURT OF APPEALS. THE INSTANT APPEAL IS DISMISSED FOR LACK OF JURISDICTION<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 04/08/2003 | SUBPOENA RETURNED AND ENDORSED ON ANDREW HARVEY BY SHERIFF ALTIERE<br>Amount Owed: $3.30<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $3.30 | |
| 04/09/2003 | SUBPOENA RETURNED AND ENDORSED ON JOSE SANCHEZ MAHONING COUNTY SHERIFF'S DEPARTMENT<br>Amount Owed: $1.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 123746 Date: 04/29/2008 | $1.00 | |
| 04/10/2003 | PRELIMINARY INSTRUCTIONS (DEFENDANT'S SUBMISSION) FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 04/10/2003 | DEFENDANT'S MOTION FOR SPECIFIC DISCLOSURE OF DUE PROCESS MATERIAL FILED BY THE DEFENDANT'S ATTONREY JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 04/14/2003 | STATE'S FIFTH SUPPLEMENTAL RESPONSE TO DEFENDANT'S REQUEST FOR DISCOVERY FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON MELVIN WILLIAMS MAHONING COUNTY SHERIFF<br>Amount Owed: $6.60<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $6.60 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON SHELIA FIELDS MAHONING COUNTY SHERIFF<br>Amount Owed: $3.80<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $3.80 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON JEFFREY DIAMANTES MAHONING COUNTY SHERIFF<br>Amount Owed: $27.40<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $27.40 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON JOSE FLORES RICHLAND COUNTY SHERIFF<br>Amount Owed: $2.50<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.50 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON JIM MCCOY CUYAHOGA COUNTY SHERIFF<br>Amount Owed: $16.27<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $16.27 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON CHRIS GEAR MAHONING COUNTY SHERIFF<br>Amount Owed: $3.80<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.80 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON RALPH ROBERTS MAHONING COUNTY SHERIFF<br>Amount Owed: $14.50<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $14.50 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON JAMES CULWELL FRANKLIN COUNTY SHERIFF<br>Amount Owed: $2.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.30 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JILL KENYON SHERIFF ALTIERE<br>Amount Owed: $4.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $4.30 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JENNIFER ROBINSON MAHONING COUNTY SHERIFF<br>Amount Owed: $5.40<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.40 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JEFFREY PASCARELLA MAHONING COUNTY SHERIFF<br>Amount Owed: $8.60<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $8.60 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON RITA MORRISON MAHNING COUNTY SJERIFF<br>Amount Owed: $5.40<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.40 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON RITA MOSSISON SHERIFF ALTIERE | $0.00 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JOHN GUZIK MAHONING COUNTY SHERIFF<br>Amount Owed: $5.40<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.40 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON MIGUEL DIAZ MAHONING SHERIFF ALTIERE<br>Amount Owed: $6.60<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $6.60 | |
| 04/25/2003 | TRIAL STIPULATION FILED BY THE DEDENDANT'S ATTORNEY ALONG WITH THE PROSECUTOR'S OFFICE | $0.00 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON FRANK REYNOLDS NOT SERVED MAHONING COUNTY SHERIFF<br>Amount Owed: $11.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $11.00 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JAMES DANIELS MAHONING COUNTY SHERIFF<br>Amount Owed: $3.80<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.80 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON BRIDGET PAUL SHERIFF ALTIERE<br>Amount Owed: $3.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.30 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON PAULA CARSON SHERIFF ALTIERE<br>Amount Owed: $3.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.30 | |
| 04/25/2003 | SUBPOENA RETURNED UNABLE TO SERVE IN TIME FOR HEARING (KRIS ELLINGTON) | $0.00 | |
| 04/29/2003 | SUBPOENA RETURNED - UNABLE TO SERVE IN TIME FOR HEARING - NEW ADDRESS 2747 RANDOLPH NW, WARREN, OH 44485 (SANTIAGO MASON) | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 05/12/2003 | 1001/295 1 - DEFTS MOTION TO PROHIBIT THE GOVERNMENT FROM USING PEREMPTORY CHALLENGES TO EXCLUDE VENIREMEN WHO EXPRESS CONCERN ABOUT IMPOSING CAPITAL PUNISHMENT IS OVERRULED. <br> 2 - DEFTS MOTION TO HAVE REASONS FOR OBJECTIONS AND REASONS FOR OVERRULING OBJECTIONS PLACED ON THE RECORD IS GRANTED IN PART. THE COURT WILL PROVIDE ITS REASONS FOR OVERRULING ANY OBJECTIONS ON THE RECORD IF REQUESTED BY EITHER PARTY. <br> 3 - DEFTS MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS BECAUSE METHOD OF EXECUTION IS UNCONSTITUTIONAL IS OVERRULED. <br> 4 - DEFTS MOTION TO DISMISS DEATH SPECIFICATIONS DUE TO INADEQUATE APPELLATE REVIEW IS OVERRULED. <br> 5 - DEFTS MOTION TO SUPPRESS REFERENCES TO THE JURY THAT A VERDICT OF DEATH IS ONLY A RECOMMENDATION IS OVERRULED. <br> 6 - DEFTS MOTION TO DISMISS INDICTMENT OR IN THE ALTERNATIVE TO DISMISS DEATH SPECIFICATIONS BECAUSE DEATH PENALTY IN OHIO IS UNCONSTITUTIONAL IS OVERRULED. <br> 7 - DEFTS MOTION FOR ALTERNATING VOIR DIRE EXAMINATION IS WITHDRAWN. <br> 8 - DEFTS MOTION FOR AN ORDER ENLARGING THE TIME FOR FILING PRETRIAL MOTIONS FILED 2/11/02 IS GRANTED. <br> 9 - DEFTS MOTION TO DETERMINE THE PROPER STANDARD TO EXCUSE JURORS FOR CAUSE IS OVERRULED TO THE EXTENT THAT THE COURT WILL DETERMINE BASED UPON THE APPLICABLE LAW THE STANDARD FOR EXCUSING JURORS. <br> 10 - DEFTS MOTION FOR COMPREHENSIVE VOIR DIRE EXAMINATION IS GRANTED AND THE COURT WILL PERMIT THE PARTIES 45 MINUTES PER SIDE TO INDIVIDUALLY VOIR DIRE THE PROSEPECTIVE JURORS. <br> 11 - DEFTS MOTION TO PROHIBIT DEATH QUALIFICATION OF JURORS UNLESS AND UNTIL THE GOVERNMENT HAS ESTABLISHED PROBABLE CAUSE THAT THE CASE WILL PROCEED TO A SECOND PHASE IS OVERRULED. <br> 12 - STATES MOTION TO HAVE THE DEFT SUBMIT TO HANDWRITING EXEMPLARS IS MOOT DUE TO THE STIPULATED ENTRY FILED ON 4/25/02. <br> 13 - DEFTS MOTION TO DISMISS DEATH SPECIFICATIONS AND TO DECLARE INVALID OHIO CONSTITUTION ART IV, 2 AND 3 AND ORC 2929.05 AND 2953.02 IS OVERRULED. <br> 14 - DEFTS MOTION TO CHANGE VENUE IS OVERRULED. <br> 5/12/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ <br> Amount Owed: $8.00 <br> Paid Before Conversion: $0.00 <br> Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $8.00 | |
| 05/12/2003 | DEFENDANT'S MOTION IN LIMINE HEARING REQUEST OR HEARING FILED BY THE DEFENDANT'S ATTORNEY JERRY INDRAM AND JOHN JUHASZ | $0.00 | |
| 05/12/2003 | DEFENDANT'S MOTION IN LIMINE CONCERING EXTRANEOUS STATEMENTS IN LETTERS AND TAPES FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM & JOHN JUHASZ | $0.00 | |
| 05/12/2003 | STENOGRAPHER FEE FILED BY KELLY J WILSON OFFICIAL COURT REPORTER <br> Amount Owed: $125.00 <br> Paid Before Conversion: $0.00 <br> Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $125.00 | |
| 05/13/2003 | WITNESS FEES FOR CHRIS MONYAK <br> Amount Owed: $24.00 <br> Paid Before Conversion: $0.00 <br> Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $24.00 | |
| 05/14/2003 | WITNESS FEES <br> JAMES DANIELS <br> Amount Owed: $8.00 <br> Paid Before Conversion: $0.00 <br> Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $8.00 | |
| 05/14/2003 | WITNESS FEES <br> $283.90 <br> Amount Owed: $283.90 <br> Paid Before Conversion: $0.00 <br> Receipt Number:  Receipt: 132123  Date: 08/25/2008 | $283.90 | |
| 05/15/2003 | WITNESS FEES  SANTIAGO MASON <br> Amount Owed: $24.00 <br> Paid Before Conversion: $0.00 <br> Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $24.00 | |
| 05/15/2003 | STIPULATION FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 05/16/2003 | DEFENDANT'S MTION IN LIMNE REQUEST FOR HEARING FILED BY THE DEFENDANT'S ATTORNEY JERRY AND ATTORNEY JOHN JUHASZ | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 05/22/2003 | 1002/478 JURORS MARGARET KAY AND TERRY GRAY ARE ORDERED BY THIS COURT NOT TO REPORT TO THEIR PLACES OF EMPLOYMENT DURING THE DURATION OF THEIR JURY SERVICE IN THE ABOVE STYLED CASE. THIS ORDER SHALL REMAIN IN EFFECT UNTIL A FINAL VERDICT IS REACHED IN THIS CASE IN THE GUILT PHASE AS WELL AS THE PENALTY PHASE IF SUCH PHASE IS NECESSARY. 5/22/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/22/2003 | POSTAGE<br>Amount Owed: $1.11<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.11 | |
| 05/22/2003 | 1004/867 ORDERED THAT JURORS MARGARET KAY & TERRY GRAY ARE NOT TO REPORT TO PLACES OF EMPLOYMENT DURING DURATION OF JURY SERVICE IN THIS CASE 06-30-03 COPIES TO J GERALD INGRAM, JOHN JUHASZ & PROS<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/27/2003 | DEFENDANT'S MOTION FOR JUDGEMENT OF ACQUITTAL FILED BY THE DEFENDANT'S ATTOENRY J. INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 05/27/2003 | DEFENDANT'S PROPSED INSTRUCTION TO TRIAL JURY FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 05/27/2003 | CHARGE IF THE COURT FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 05/29/2003 | 1002/761 VERDICT FOR PLAINTIFF - COUNT ONE - COMPLICITY TO AGGRAVATED MURDER (PRIOR CALCULATION AND DESIGN)<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/762 VERDICT FOR PLAINTIFF COUNT ONE - VERDICT ON SPECIFICATION ONE<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/763 VERDICT FOR PLAINTIFF  COUNT ONE - VERDICT ON SPECIFICATION TWO<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/764 VERDICT FOR PLAINTIFF COUNT TWO - COMPLICITY TO AGGRAVATED MURDER (FELONY MURDER)<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/765 VERDICT FOR PLAINTIFF COUNT TWO VERDICT ON SPECIFICATION ONE<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/766 VERDICT FOR PLAINTIFF COUNT TWO - VERDICT ON SPECIFICATION TWO<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/767 VERDICT FOR PLAINTIFF COUNT THREE COMPLICITY TO AGGRAVATED BURGLARY<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/768 VERDICT FOR PLAINTIFF COUNT THREE - VERDICT ON FIREARM SPECIFICATION<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/769 VERDICT FOR PLAINTIFF COUNT 4 COMPLICITY TO AGGRAVATED ROBBERY<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 05/29/2003 | 1002/770 VERDICT FOR PLAINTIFF COUNT FOUR - VERDICT ON FIREARM SPECIFICATION<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: 128021  Date: 06/30/2008 | $2.00 | |
| 06/03/2003 | MOTION TO MERGE DEATH SPECIFICATIONS FILED BY THE DEFENDANT'S ATTONREY | $0.00 | |
| 06/03/2003 | MOTION TO PROHIBIT READMISSION OF CERTAIN EXHIBITS FROM THE FIRST TRIAL PHASE FILED BY THE DEFENDANT'S ATTORNEY'S ATTORNEY JERRY INGRAM AND ATTORENY JOHN JUHASZ | $0.00 | |
| 06/03/2003 | MOTION TO PROHIBIT REFERENCE TO THE NATURE AND CIRCUMSTANCES OF THE OFFENSES AT CERTAIN TIMES FILED BY THE DEFENDANT'S ATTONREY | $0.00 | |
| 06/03/2003 | MOTION TO PROHIBIT REFERENCE TO THE NATURE AND CIRCUMSTANCES OF THE OFFENSES AT CERTIN TIMES FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/03/2003 | MOTION TO PROHIBIT IMPROPER COMMENT BY PROSECUTOR ON DEFENDANT'S UNSWORN STATEMENT FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/03/2003 | PROPOSED INSTRUCTION TO JURY FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/05/2003 | 1003/391 JURY FINDING AND RECOMMENDATION OF DEATH SENTENCE. COUNT ONE SPECIFICATION ONE: AGGRAVATED BURGLARY<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $4.00 | |
| 06/05/2003 | 1003/393 JURY FINDING AND RECOMMENDATION OF DEATH SENTENCE. COUNT ONE SPECIFICATION TWO: AGGRAVATED ROBBERY<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $4.00 | |
| 06/13/2003 | SENTENCING HEARING 06/20/2003  01:30 PM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 06/16/2003 | 1003/911 THE COURT FINDS THAT THERE IS NO AUTHORITY TO ORDER A PRE-SENTENCE INVESTIGATION AND REPORTS, AS WAS ORDERED BY THE COURT ON 6/4/03. AS SUCH A REPORT MAY BE PREPARED ONLY AT THE REQUEST OF THE DEFT AND AS THE DEFT HAS NOT MADE SUCH A REQUEST,THE DIRECTIVE THAT SUCH A REPORT BE PREPARED IS RESCINDED<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 06/20/2003 | 1004/263 JURORS EXCUSED WITHOUT OBJECTION BY COUNSEL. SEE J/E<br>Amount Owed: $16.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $16.00 | |
| 06/20/2003 | 1004/271 JURORS EXCUSED FOR CAUSE DURING THE TRIAL. SEE J/E<br>Amount Owed: $8.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $8.00 | |
| 06/20/2003 | 1004/275 OPINION OF THE COURT IMPOSING DEATH SENTENCE AND FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING IMPOSITION OF DEATH SENTENCE. SEE J/E<br>Amount Owed: $34.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $34.00 | |
| 06/23/2003 | POST SENTENCING RIGHTS FILED BY PROSECUTOR'S OFFICE | $0.00 | |
| 06/24/2003 | COMPLETE RECORD<br>Amount Owed: $20.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $20.00 | |
| 06/24/2003 | STENOGRAPHER FEE<br>Amount Owed: $25.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $25.00 | |
| 06/24/2003 | WARRANT TO CONVEY TO OHIO REFORMATORY FOR WOMEN ISSUED TO SHERIFF ON 6-24-03 | $0.00 | |

10/20/21, 11:18 AM

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 06/24/2003 | 1004/449 SENTENCING: 6/4/03 DEFT IS SENTENCED TO DEATH ON 1/11/04 ON COUNT ONE. DEFT SENTENCED TO THE OHIO REFORMATORY FOR WOMEN AT MARYSVILLE OHIO FOR 10 YEARS ON COUNT 3 PLUS A MANDATORY TERM OF 3 YEARS ON THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT 3; 10 YEARS ON COUNT 4 PLUS A MANDATORY TERM OF 3 YEARS ON THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT 4, SENTENCE IN COUNT 4 TO BE SERVED CONSECUTIVELY TO THE SENTENCE IMPOSED IN COUNT THREE. FIREARM SPECIFICATIONS IN COUNT THREE AND COUNT FOUR SHALL MERGE AS ONE SENTENCE IN COUNT THREE AS A MATTER OF LAW. DEFT TO PAY COSTS. 6/24/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ Amount Owed: $8.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $8.00 | |
| 06/24/2003 | POSTAGE Amount Owed: $1.11 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.11 | |
| 06/25/2003 | 1004/453 WRIT TO CONVEY PRISONER FOR EXECUTION OF PENALTY Amount Owed: $2.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 06/25/2003 | EXECUTION OF COSTS RETURNED ENDORSED BY SHERIFF Amount Owed: $5.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.00 | |
| 06/30/2003 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT DONNA ROBERTS SHERIFF ALTIERE Amount Owed: $82.30 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $82.30 | |
| 07/23/2003 | NOTICE OF COMMITTMENT AND CALCULATION OF SENTENCE FILED BY OHIO DEPT. OF REHABILITATION/CORRECTION | $0.00 | |
| 08/05/2003 | 1008/468 THE STATE OF OHIO PUBLIC DEFENDER'S OFFICE IS APPOINTED AS COUNSEL FOR THE DEFT IN HER APPEAL OF THIS MATTER. 8/6/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J YUHASZ Amount Owed: $2.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 08/06/2003 | POSTAGE Amount Owed: $1.11 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.11 | |
| 08/18/2003 | ORDER TO FILE RECORD WITH SUPREME COURT BY 10/14/03 Amount Owed: $2.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 12/05/2003 | PETITIONER DONNA ROBERT'S MOTION FOR APPOINTMENT OF COUNSEL FILED BY THE DEFENDANT ALSO MEMORANDUM IN SUPPORT OF PETITIONER DONNA ROBERT'S MOTION FOR APPOINTMENT OF COUNSEL FILED BY THE DEFENDANT DONNA MARIE ROBERTS. | $0.00 | |
| 01/20/2004 | APPELLANTS NOTICE OF APPEAL FOR DELAYED APPEAL IN THE SUPREME COURT OF OHIO FILED. | $0.00 | |
| 01/29/2004 | RECORD TRANSMITTED TO THE SUPREME COURT INCLUDING ORIGINAL PAPERS,TRANSCRIPTS (28 VOLUMES), AND EXHIBITS WITH INDEX BY PERSONAL DELIVERY FROM THE TRUMBULL COUNTY SHERIFFS DEPARTMENT.COPIES OF INDEX SENT TO COUNSEL OF RECORD. Amount Owed: $1.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.00 | |
| 02/02/2004 | COPY OF EXHIBIT OF RECORD OF DEATH PENALTY CASE FROM THE SUPREME COURT OF OHIO | $0.00 | |
| 02/13/2004 | HEARING 03/12/2004  01:00 PM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/27/2004 | MOTION FOR WARRANT FOR REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | |

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 10

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 02/27/2004 | ONE CERTIFIED COPY OF WARRANT FOR REMOVAL AND COPY OF MOTION FOR WARRANT OF REMOVAL AND WARRANT TO CONVEY TO TRUMBULL COUNTY JAIL ISSUED TO THE SHERIFF ON 2-27-04 | $0.00 | |
| 02/27/2004 | 1024/551 ORDER ON WARRANT TO CONVEY<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 03/15/2004 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT SHERIFF ALTIERE<br>Amount Owed: $240.50<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 132122 Date: 08/25/2008 | $240.50 | |
| 03/23/2004 | 1026/435 THE COURT FINDS THAT THERE IS A CONFLICT OF INTEREST WITH THE PUBLIC DEFENDERS OFFICE. ATTYS DAVID DOUGHTEN AND PATTY SMITH APPOINTED AS COUNSEL FOR DEFT IN HER APPEAL. THE ADDRESS FOR ATTYS IS 4403 ST CLAIR AVE, CLEVELAND OH 44103 (216)361-1112<br>3/23/04 COPIES SENT TO: K CULSHAW, R TROUTMAN, J WILHELM, D WATKINS, C BECKER, K BAILEY & L ANNOS. CC TO THE OHIO SUPREME COURT<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $4.00 | |
| 03/23/2004 | POSTAGE<br>Amount Owed: $2.96<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.96 | |
| 04/14/2004 | 1028/385 ORDER APPOINTING COUNSEL FOR POST CONVICTION PETITION AND SETTING FEES.<br>4/14/04 COPIES SENT TO: J INGRAM, J JUHASZ, D BODIKER, J WILHELM, S BOLTON, D MARGURGER, A MILLETTE, D WATKINS, C BECKER, K BAILEY & L ANNOS<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 04/14/2004 | POSTAGE<br>Amount Owed: $4.07<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $4.07 | |
| 07/22/2004 | MOTION FOR SUBSTITUTION OF COUNSEL FILED BY THE THE DEFENDANT'S ATTORNEY DAVID L DOUGHTEN AND ATTORNEY PATRICIA J SMITH | $0.00 | |
| 08/20/2004 | 1039/213 MOTION FOR SUBSTITUTION OF COUNSEL IS GRANTED<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 09/09/2004 | JOINT MOTION TO TOLL FILING DATE OF POST CONVICTION PETITION FILED BY ATTY LUWAYNE ANNOS | $0.00 | |
| 09/09/2004 | 1040/696 PURSUANT TO A JOINT MOTION FILED BY COUNSEL FOR DEFT DONNA ROBERTS AND COUNSEL FOR THE STATE OF OHIO, THIS COURT IN THE INTEREST OF JUSTICE WILL CONSTRUE DEFTS POSTCONVICTION PETITION TIMELY FILED IF IT IS TIME-STAMPED BY THE CLERK OF COURTS ON OR BEFORE 9/25/04.<br>9/9/04 COPIES SENT TO: PROSECUTOR, J INGRAM, J YUHASZ, D BODIKER, J WILHELM & D DOUGHTEN<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 09/09/2004 | POSTAGE<br>Amount Owed: $2.22<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.22 | |
| 09/24/2004 | PETITION TO VACATE OR SET ASIDE SENTENCE FILED BY ATTORNEY DAVID DOUGHTEN COUNSEL FOR PETITIONER ALSO EXHIBIT B FILED NATHANIEL JACKSON'S VIDEO STATEMENT FILED.SERVED A COPY OF PETITION TO THE TRUMBULL COUNTY PROSECUTORS OFFICE ON THIS DATE. | $0.00 | |
| 10/01/2004 | MOTION TO EXTEND TIME TO RESPONSE FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 10/07/2004 | 1042/898 PURSUANT TO A JOINT MOTION FILED BY COUNSEL FOR DEFT DONNA ROBERTS AND COUNSEL FOR THE STATE OF OHIO, THIS COURT, IN THE INTEREST OF JUSTICE, WILL CONSTRUE DEFTS POSTCONVICTION PETITION TIMELY FILED IF IT IS TIME-STAMPED BY THE CLERK OF COURTS ON OR BEFORE 9/25/04.<br>10/7/04 COPIES SENT TO: PROSECUTOR, J INGRAM, J YUHASZ, D BODIKER, J WILHELM & D DOUGHTEN<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 10/07/2004 | 1042/899 PURSUANT TO A MOTION BY THE PLAINTIFF-RESPONDENT, THE STATE OF OHIO, AND R.C. 2953.21 (D), THIS COURT FIXES THE DUE DATE FOR THE STATE'S RESPONSE BY ANSWER OR MOTION AT 11/3/04. THE STATE, PER MOTION, HAS SHOWN GOOD CAUSE TO EXTEND THE DUE DATE FROM 10/4/04 TO 11/3/04.<br>10/7/04 COPIES SENT TO: PROSECUTOR & D DOUGHTEN<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 10/25/2004 | FIRST AMENDED PETITION TO VACATE OR SET ASIDE SENTENCE WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 11/02/2004 | MOTION FOR SUMMARY JUDGMENT WITH SERVICE FILED BY ATTY LUWAYNE ANNOS | $0.00 | |
| 11/03/2004 | COPY OF MERIT BRIEF OF PLTF/APPLEE OF STATE OF OHIO FILED BY PROSECUTOR | $0.00 | |
| 12/01/2004 | PETITIONER'S MOTION TO TRANSFER THE RECORD OF NATHANIEL JACKSON TO THE CAUSE OF ACTION FILED BY THE DEFENDANT'S ATTORNEY DAVID L DOUGHTEN | $0.00 | |
| 12/01/2004 | PETITIONER'S MOTION IN OPPOSITION TO STATE'S MOTION FOR SUMMARY JUDGMENT FILED BY THE DEFENDANT'S ATTORNEY DAVID DOUGHTEN | $0.00 | |
| 12/01/2004 | MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY FILED BY THE DEFENDANT'S ATTORNEY DAVID DOUGHTEN | $0.00 | |
| 01/24/2005 | FILE SIGNED OUT TO JUDGE STUARD ON 1-25-05 | $0.00 | |
| 02/11/2005 | 1052/303 FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING PETITIONERS ORIGINAL AND FIRST AMENDED PETITION FOR POST CONVICTION RELIEF<br>Amount Owed: $28.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $28.00 | |
| 02/11/2005 | 1052/709 DEFENDANT-PETITIONER DONNA ROBERTS' MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY FILED DECEMBER 1, 2004 IS OVERRULED AS MOOT. MOTION TO TRANSFER THE RECORD OF NATHANIEL JACKSON TO THIS CASUE OF ACTION IS ALSO DENIED AS MOOT.<br>2/14/05 COPIES SENT TO: J INGRAM, J JUHASZ, D BOKER, J WILHELM, D DOUGHTEN, S BOLTEN, D MARBURGER, A MILLETTE, A WATKINS, C BECKER, D BODIKER, K BAILEY, L ANNOS<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 02/14/2005 | POSTAGE<br>Amount Owed: $4.81<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $4.81 | |
| 02/23/2005 | 1053/026 ORDER FOR CLERK OF COURTS TO IMMEDIATELY SERVE A COPY OF THIS COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW FILED FEBRUARY 11, 2005 UPON ATTY DAVID DOUGHTEN COUNSEL FOR DEFENDANT-PETITIONER DONNA ROBERTS AND UPON TRUMBULL COUNTY PROSECUTOR'S OFFICE COUNSEL FOR PLAINTIFF RESPONDENT. 2/24/05 COPIES SENT: ATTY D DOUGHTEN, PROSECUTOR<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 03/01/2005 | MOTION FOR APPOINTMENT OF APPELLATE COUNSEL WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 03/17/2005 | MOTION FOR LEAVE TO FILE DELAYED APPEAL AND NOTICE OF APPEAL TO THE 11TH APPELLATE COURT FILED BY ATTY D  DOUGHTEN | $0.00 | |
| 03/30/2005 | 1056/564 APPROVAL OF PAYMENT OF COUNSEL FEES CC: AUDITOR<br>Amount Owed: $12.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $12.00 | |
| 09/13/2006 | NOTICE FILE REQUESTED BY JUDGE STUARD FROM CLERK'S OFFICE | $0.00 | |

10/20/21, 11:18 AM                                  Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 10/10/2006 | ORDER FROM SUPREME COURT OF OHIO.  JUDGMENT OF THE COURT OF COMMON PLEAS IS AFFIRMED IN PART, VACATED IN PART AND THIS CAUSE IS REMANDED TO THE TRIAL COURT CONSISTENT WITH THE OPINION RENDERED HEREON.   SEE JE | $0.00 | |
| 10/10/2006 | ORDERED BY THE SUPREME COURT OF OHIO THAT THE MOTION FOR RECONSIDERATION IN THIS CASE IS DENIED | $0.00 | |
| 11/01/2006 | HEARING SET:<br>Event: STATUS HEARING<br>Date: 12/06/2006   Time: 9:00 am<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: TO BE RESET | | |
| 11/01/2006 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  11/01/2006  10:10:21 | | |
| 12/04/2006 | MOTION FOR APPOINTMENT OF CO-COUNSEL WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 12/04/2006 | MOTION FOR APPROPRIATION OF FUNDS FOR EXPERT ASSISTANCE WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 12/04/2006 | MOTION FOR RELEASE OF RECORDS WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 12/06/2006 | HEARING SET:<br><br>The following event: STATUS HEARING scheduled for 12/06/2006 at 9:00 am has been rescheduled as follows:<br><br>Event: STATUS HEARING<br>Date: 01/17/2007   Time: 3:00 pm<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: TO BE RESET | | |
| 12/06/2006 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  12/06/2006  12:31:39 | | |
| 12/08/2006 | MOTION FOR APPOINTMENT OF CO-COUNSEL IS GRANTED | $0.00 | |
| 01/17/2007 | ORDERED THAT ROBERT A DIXON BE APPOINTED AS CO COUNSEL  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 01/17/2007 | ORDER DIRECTIVING EVALUATION OF DEFENDANT'S COMPETENCE TO STAND TRIAL 1-23-97 COPIES TO  J. INGRAM, J. WILHELM, D DOUGHTON, R. DIXON, D. BODIKER, J JUHASZ AND PROS  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 01/17/2007 | ORDER FOR FORENSIC EXAM 1-23-07 COPIES TO J. INGRAM, J. WILHELM, D. DOUGTEN, R. DIXON, D BODIKER, J JUHASZ AND PROS  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 01/23/2007 | HEARING SET:<br><br>The following event: STATUS HEARING scheduled for 01/17/2007 at 3:00 pm has been rescheduled as follows:<br><br>Event: STATUS HEARING<br>Date: 02/14/2007   Time: 3:30 pm<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: TO BE RESET | | |
| 01/23/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  01/23/2007  14:22:06 | | |
| 01/25/2007 | MOTION FOR APPROPRIATION OF FUNDS FOR LEAD COUNSEL WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 01/29/2007 | POSTAGE  Receipt: 128021  Date: 06/30/2008 | $2.73 | |
| 01/29/2007 | POSTAGE  Receipt: 128021  Date: 06/30/2008 | $2.73 | |
| 02/01/2007 | REGULAR MAIL SENT TO:ROBERTA A DIXON<br>RETURNED BY POST OFFICE  FOR: ATTEMPTED NOT KNOWN<br>Receipt: 123746  Date: 04/29/2008 | $0.20 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 02/05/2007 | ORDER FOR DAVID DOUGHTEN TO BE APPOINTED LEAD COUNSEL.  2-8-07  COPIES SENT TO D DOUGHTEN, J INGRAM, J WILHELM, R DIXON, D BODIKER, J JUHASZ AND PROS  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 02/08/2007 | POSTAGE  Receipt: 128021  Date: 06/30/2008 | $2.73 | |
| 02/26/2007 | HEARING SET:  The following event: STATUS HEARING scheduled for 02/14/2007 at 3:30 pm has been rescheduled as follows:  Event: STATUS HEARING Date: 03/09/2007   Time: 2:00 pm Judge: STUARD, JOHN M   Location: COURTROOM 2  Result: SET STATUS CONFERENCE | | |
| 02/26/2007 | NOTICE SENT:  SPEEDY MAILER Sent on: 02/26/2007  11:04:16 | | |
| 03/09/2007 | HEARING SET:  The following event: STATUS HEARING scheduled for 03/09/2007 at 2:00 pm has been rescheduled as follows:  Event: STATUS HEARING Date: 05/11/2007   Time: 2:00 pm Judge: STUARD, JOHN M   Location: COURTROOM 2  Result: TO BE RESET | | |
| 03/09/2007 | NOTICE SENT:  SPEEDY MAILER Sent on:  03/09/2007  15:21:27 | | |
| 04/24/2007 | RECEIPT FROM THE SUPREME COURT OF OHIO.  ALL ORIGINAL PAPERS (3 BOXES) WERE RETURNED TO THE TRUMBULL COUNTY CLERK OF COURTS | $0.00 | |
| 05/01/2007 | MOTION TO ALLOW FULL PRESENTATION OF MITIGATION AT SENTENCING REHEARING WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 05/01/2007 | MOTION TO CONTINUE WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 05/25/2007 | HEARING SET:  The following event: STATUS HEARING scheduled for 05/11/2007 at 2:00 pm has been rescheduled as follows:  Event: STATUS HEARING Date: 06/29/2007   Time: 10:30 am Judge: STUARD, JOHN M   Location: COURTROOM 2  Result: SET SENTENCING | | |
| 05/25/2007 | NOTICE SENT:  SPEEDY MAILER Sent on: 05/25/2007  14:49:56 | | |
| 06/28/2007 | STATES MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO ALLOW FULL PRESENTATION OF MITIGATION AT SENTENCING  HEARING AND MEMORANDUM IN OPPOSITION WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 06/29/2007 | HEARING SET: Event: RE-SENTENCING HEARING Date: 08/15/2007   Time: 3:00 pm Judge: STUARD, JOHN M   Location: COURTROOM 2  Result: TO BE RESET | | |
| 06/29/2007 | NOTICE SENT:  SPEEDY MAILER Sent on:  06/29/2007  11:14:40 | | |
| 07/13/2007 | WARRANT FOR REMOVAL.  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 07/13/2007 | MOTION FOR WARRANT REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 07/13/2007 | WARRANT ISSUED TO SHERIFF ON 7-13-07 | $0.00 | |
| 08/02/2007 | MOTION TO CONTINUE SENTENCING HEARING WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 08/02/2007 | MOTION FOR VOLUNTARY RECUSAL OF TRIAL JUDGE, TO ASSIGN CASE TO VISITING JUDGE AND TO HOLD CASE IN ABEYANCE WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 08/07/2007 | XXX COSTS SENT TO CORRECTIONAL FACILITY FOR INMATE PAYMENT OF COSTS | $0.00 | |
| 08/15/2007 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 132122  Date: 08/25/2008 | $240.50 | |
| 08/17/2007 | HEARING SET:<br><br>The following event: RE-SENTENCING HEARING scheduled for 08/15/2007 at 3:00 pm has been rescheduled as follows:<br><br>Event: RE-SENTENCING HEARING<br>Date: 09/21/2007   Time: 2:30 pm<br>Judge: STUARD, JOHN M    Location: COURTROOM 2<br><br>Result: TO BE RESET | | |
| 08/17/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  08/17/2007  14:44:40 | | |
| 08/17/2007 | HEARING SET:<br>Event: HEARING<br>Date: 09/20/2007   Time: 2:30 pm<br>Judge: STUARD, JOHN M    Location: COURTROOM 2<br><br>Result: TO BE RESET | | |
| 08/17/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  08/17/2007  14:49:21 | | |
| 08/27/2007 | MOTION FOR WARRANT REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | |
| 08/27/2007 | WARRANT TO CONVEY TO TRUMBULL COUNTY JAIL  ISSUED TO SHERIFF ON 8-28-07 | $0.00 | |
| 08/27/2007 | WARRANT FOR REMOVAL.<br>8-28-07 ISSUED TO SHERIFF  Receipt: 123746  Date: 04/29/2008 | $2.00 | Image |
| 09/05/2007 | ORDER FOR CONTINUANCE OF TRIAL IS GRANTED TO ALLOW THE COMPETENCY EXAM TO BE CONDUCTED. SENTENCING DATE WILL BE SET AT COMPLETION OF COMPETENCY PROCEEDINGS.  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 09/11/2007 | MOTION FOR APPROPRIATION OF FUNDS FOR EXPERT ASSISTANCE WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 09/14/2007 | DEFENDANTS MOTION TO ALLOW FULL PRESENTATION OF MITIGATION AT SENTENCING HEARING IS DENIED.<br>9-14-07 COPIES TO: PROS, J. INGRAM, D. DOUGHTEN  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 09/14/2007 | POSTAGE  Receipt: 123746  Date: 04/29/2008 | $0.82 | |
| 09/18/2007 | MOTION TO PROFFER EVIDENCE FILED BY THE  DEFENDANT WITH PROOF OF SERVICE ALSO MEMORANDUM IN SUPPORT FILED BY THE DEFENDANT'S ATTORNEY WITH PROOF OF SERVICE DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 09/18/2007 | MOTION TO PROFFER EVIDENCE APPENDIX PRISON RECORDS ALONG WITH EXHIBITS FILED BY THE DEFENDANT'S ATTORNEY  FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 09/19/2007 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 128021  Date: 06/30/2008  Receipt: 132122  Date: 08/25/2008 | $230.50 | |
| 09/20/2007 | MOTION TO PROFFER EVIDENCE WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 09/20/2007 | MOTION FOR APPOINTMENT OF INDEPENDENT EXPERT AND FOR CONTINUANCE WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |

10/20/21, 11:18 AM                              Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 09/21/2007 | HEARING SET:<br><br>The following event: HEARING scheduled for 09/20/2007 at 2:30 pm has been rescheduled as follows:<br><br>Event: HEARING<br>Date: 10/22/2007   Time: 1:00 pm<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: COMPLETED | | |
| 09/21/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  09/21/2007  13:24:22 | | |
| 09/21/2007 | HEARING SET:<br><br>The following event: RE-SENTENCING HEARING scheduled for 09/21/2007 at 2:30 pm has been rescheduled as follows:<br><br>Event: RE-SENTENCING HEARING<br>Date: 10/29/2007   Time: 1:00 pm<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: SENTENCED | | |
| 09/21/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  09/21/2007  13:59:03 | | |
| 10/02/2007 | MOTION FOR WARRANT REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | |
| 10/02/2007 | JOURNAL ENTRY/ WARRANT FOR REMOVAL.  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 10/03/2007 | WARRANT TO CONVEY TO TRUMBULL COUNTY JAIL  ISSUED TO SHERIFF ON 10-3-07 | $0.00 | |
| 10/18/2007 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 132122  Date: 08/25/2008 | $240.50 | |
| 10/22/2007 | MANDATE FROM COURT OF APPEALS. INSTANT APPEAL IS DISMISSED FOR LACK OF JURISDICTION.  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 10/29/2007 | DEFT ROBERT'S SENTENCING MEMORANDUM WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 10/29/2007 | ORDERED THAT THE JURYS RECOMMENDATION IS ACCEPTED AND COURT DOES  FIND THAT THE SENTENCE OF DEATH IS THE APPROPRIATE PENALTY IN THIS CASE.<br>10-29-07 COPIES TO: PROS, D. DOUGTHEN  Receipt: 128021  Date: 06/30/2008 | $48.00 | Image |
| 10/29/2007 | POSTAGE Receipt: 123746  Date: 04/29/2008 | $0.41 | |
| 11/06/2007 | EXECUTION FOR COSTS IN FELONY  ISSUED TO SHERIFF ON 11-6-07 | $0.00 | |
| 11/06/2007 | WARRANT TO CONVEY TO OHIO REFORMATORY FOR WOMEN  ISSUED TO SHERIFF ON 11-6-07 | $0.00 | |
| 11/06/2007 | EXECUTION OF COSTS RETURNED ENDORSED BY SHERIFF  Receipt: 128021  Date: 06/30/2008 | $5.00 | |
| 11/06/2007 | WRIT TO CONVEY PRISONER FOR EXECUTION OF PENALTY ON OCT. 28, 2008.<br>11-6-07 ISSUED TO SHERIFF Receipt: 123746  Date: 06/30/2008 | $2.00 | Image |
| 11/06/2007 | SENTENCING: ON OCT. 29, 2007 DEFENDANT RE-SENTENCED TO DEATH ON OCT. 28, 2008 ON COUNT 1; AND IMPRISONED FOR 10 YEARS ON COUNT 3; PLUS MANDATORY TERM OF 3 YEARS OF FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO COUNT 3; 10 YEARS ON COUNT 4, PLUS MANDATORY 3 YEARS ON FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO SENTENCE IMPOSED IN COUNT 4, SENTENCE IN COUNT 4 TO BE SERVED CONSECUTIVELY TO SENTENCE IMPOSED ON COUNT 3. FIREARM SPECIFICATION IN COUNT 3 & 4 SHALL MERGE AS ONE SENTENCE IN COUNT 3.<br>11-6-07 COPIES TO: PROS, D. DOUGHTEN, BUREAU OF SENTENCE COMPUTATION  Receipt: 128021  Date: 06/30/2008 | $6.00 | Image |
| 11/06/2007 | POSTAGE Receipt: 123746  Date: 04/29/2008 | $0.82 | |
| 11/07/2007 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 132122  Date: 08/25/2008  Receipt: 132123  Date: 08/25/2008 | $240.50 | |
| 11/15/2007 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED  Receipt: 128021  Date: 06/30/2008 | $6.00 | Image |
| 12/03/2007 | MOTION TO APPOINT APPELLATE COUNSEL WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 12/14/2007 | ORDER TO CERTIFY RECORD IN DEATH PENALTY CASE BY 2-11-08 FILED BY THE SUPREME COURT OF OHIO | $0.00 | |
| 12/18/2007 | TRANSCRIPT OF PROCEEDINGS FILED BY MARY ANN MILLS COURT REPORTER | $0.00 | |
| 12/18/2007 | DEFTS EXHIBIT A, DEFTS EXHIBIT B AND STATES EXHIBIT 1 FILED BY MARY ANN MILLS COURT REPORTER | $0.00 | |
| 01/11/2008 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED Receipt: 128021 Date: 06/30/2008 | $8.00 | Image |
| 01/11/2008 | ORDERED THAT ATTY JEFFREY J HELMICK TO REPRESENT DEFENDANT FOR PURPOSES OF APPEAL. 1-11-08 COPIES TO: PROS, J. HELMICK Receipt: 128021 Date: 06/30/2008 | $2.00 | Image |
| 01/11/2008 | POSTAGE Receipt: 123746 Date: 04/29/2008 | $0.41 | |
| 02/07/2008 | INDEX PREPARED AND SENT TO ATTY'S. | $0.00 | |
| 02/12/2008 | RECEIPT FROM THE SUPREME COURT OF OHIO FOR FOUR BOXES WHICH INCLUDE THE CASE FILE, EXHIBITS AND TRANSCRIPTS OF THIS CASE | $0.00 | |
| 02/21/2008 | RECEIPT FROM SUPREME COURT OF OHIO FOR 6 BOXES OF EXHIBITS AND ONE POSTER | $0.00 | |
| 06/24/2008 | MOTION FOR APPOINTMENT OF COUNSEL FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 07/01/2008 | COUNTY FEES WITNESS FEES FOR CHRIS MONYAK, JAMES DANIEL AND SANTIAGO MASON Receipt: 128057 Date: 07/01/2008 | $56.00 | |
| 07/09/2008 | MOTION FOR APPOINTMENT OF COUNSEL IS GRANTED. Receipt: 132122 Date: 08/25/2008 | $4.00 | Image |
| 07/09/2008 | ATTY DAVID L DOUGHTEN IS REAPPOINTED AS COUNSEL FOR DEFENDANT. 7-10-08 COPIES TO: PROS, D. DOUGHTHEN Receipt: 132122 Date: 08/25/2008 | $2.00 | Image |
| 07/09/2008 | POSTAGE Receipt: 132122 Date: 08/25/2008 | $0.42 | |
| 08/20/2008 | APPENDIX TO DONNA ROBERTS FILED ALONG WITH EXHIBIT A FILED BY DAVID L DOUGHTEN | $0.00 | |
| 08/20/2008 | PETITION TO VACATE OR SET ASIDE SENTENCE FILED BY DAVID L DOUGHTEN | $0.00 | Image |
| 08/20/2008 | APPENDIX TO DONNA ROBERTS ALONG WITH EXCHIBIT K FILED BY DAVID L DOUGHTEN | $0.00 | Image |
| 08/22/2008 | MOTION TO EXTEND TIME TO RESPOND FILED WITH PROOF OF SERVICE LUWAYNE ANNOS (Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 08/26/2008 | COUNTY FEES *WITNESS FEES Receipt: 134296 Date: 09/25/2008 Receipt: 136816 Date: 11/03/2008 | $283.90 | |
| 09/02/2008 | ORDERED THAT DEFENDANTS PETITION TO A FIXED DATE OF SEPT 30, 2008 IS GRANTED. 9-2-08 COPIES TO: PROS, D. DOUGHTEN Receipt: 134296 Date: 09/25/2008 | $2.00 | Image |
| 09/02/2008 | POSTAGE Receipt: 134296 Date: 09/25/2008 | $0.42 | |
| 09/17/2008 | MOTION FOR APPROPRIATION OF FUNDS FOR EXPERT ASSISTANCE (INDEPENDENT PSYCHOLOGIST) WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 09/17/2008 | MOTION FOR APPROPRIATION OF FUNDS FOR EXPERT ASSISTANCE (NEUROPSYCHOLOGIST) WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 09/17/2008 | MOTION TO STAY WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 09/17/2008 | DONNA ROBERT'S MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 09/22/2008 | STATES RESPONSE TO PETITIONERS MOTION TO STAY POSTCONVICTION PROCEEDINGS WITH SERVICE FILED BY PROSECUTOR | $0.00 | Image |
| 09/22/2008 | STATES OPPOSITION FOR APPOINTMENT OF FUNDS FOR EXPERT ASSISTANCE (INDEPENDENT PSYCHOLOGIST) WITH SERVICE FILED BY PROSECUTOR | $0.00 | Image |
| 09/22/2008 | STATES RESPONSE TO PETITIONERS MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY WITH SERVICE FILED BY PROSECUTOR | $0.00 | Image |
| 09/22/2008 | STATES OPPOSITION FOR APPOINTMENT OF FUNDS FOR EXPERT ASSISTANCE (NEUROPSYCHOLOGIST) WITH SERVICE FILED BY PROSECUTOR | $0.00 | Image |
| 09/25/2008 | ORDERED THAT DEFENDANTS MOTION IS GRANTED. 9-26-08 COPIES TO: PROS, J. INGRAM Receipt: 136816 Date: 11/03/2008 | $2.00 | Image |
| 09/25/2008 | Receipt: 136816 Date: 11/03/2008 | $0.42 | |

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 10/02/2008 | LETTER FILED BY DEFT REGARDING COURT COSTS | $0.00 | |
| 10/29/2008 | COUNTY FEES WITNESS FEES Receipt: 136592 Date: 10/29/2008 Receipt: 136816 Date: 11/03/2008 | $339.90 | |
| 11/03/2008 | DEPOSIT FROM: OVERPAYMENT OF COURT COSTS Receipt: 136816 Date: 11/03/2008 | $281.41 | |
| 11/04/2008 | REFUND OF OVERPAYMETN OF LEBANON CORRECTIONAL. Voided on 11/19/2008. | $0.00 | |
| 11/19/2008 | REFUND OF DEPOSIT TO: OAKWOOD CORRECTIONAL INSTITUTION | $281.41 | |
| 03/11/2013 | MOTION TO APPOINT COUNSEL WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 04/08/2013 | APPOINTMENT OF COUNSEL:  ORDERED THAT ROBERT DIXON, OHIO REGISTRATION #0022466, 4403 ST. CLAIR AVENUE, CLEVELAND, OHIO 44103 BE APPOINTED AS SUBSTITUTE COUNSEL. 4/8/13--COPIES TO:  PROS, ATTY J. INGRAM, ATTY A. MILLETTE, ATTY J. WILHELM, ATTY J. HELMICK, ATTY S. BOLTON, ATTY D. DOUGHTEN, ATTY R. DIXON, ATTY J. JUHASZ  Receipt: 280467 Date: 08/18/2014 | $2.00 | Image |
| 04/08/2013 | POSTAGE  Receipt: 280467  Date: 08/18/2014 | $3.68 | |
| 04/24/2013 | REGULAR MAIL ISSUED TO: JOSEPH E WILHELM RETURNED BY POST OFFICE FOR: RETURN TO SENDER, NOT DELIVERABLE AS ADDRESSED, UNABLE TO FORWARD | $0.00 | |
| 11/18/2013 | APPEAL FROM THE COURT OF COMMON PLEAS:  THE DEATH SENTENCE IS VACATED AND THIS CAUSE IS REMANDED TO THE TRIAL COURT FOR RESENTENCING ON THE BASIS OF THE EXISTING RECORD, CONSISTENT WITH THE OPINION RENDERED HEREIN.  IT IS FURTHER ORDERED THAT MANDATES BE SENT TO AND FILED WITH THE CLERK OF THE COURT OF APPEALS FOR TRUMBULL COUNTY AND THE COURT OF COMMON PLEAS FOR TRUMBULL COUNTY.  Receipt: 280467  Date: 08/18/2014 | $9.00 | Image |
| 01/02/2014 | RETURN OF RECORD OF DEATH PENALTY CASE FROM THE SUPREME COURT OF OHIO. CONTENTS ARE 4 LARGE BOXES AND 4 REGULAR BOXES.   EXHIBITS SHARED WITH 01 CR 794 (STATE VS JACKSON) RETAINED BY THE SUPREME COURT FOR CONSIDERATION OF SUPREME COURT CASE NO.  2012-1644.   ATTACHED LIST OF PHYSICAL EXHIBITS ARE ALSO RETURNED. | $0.00 | Image |
| 03/25/2014 | HEARING SET: Event: RE-SENTENCING HEARING Date: 04/30/2014   Time: 2:00 pm Judge: RICE, RONALD J   Location: COURTROOM 2 Result: COMPLETED | | |
| 03/25/2014 | NOTICE SENT: SPEEDY MAILER Sent on:  03/25/2014  15:47:33.48 | | |
| 03/27/2014 | NOTICE SENT: SPEEDY MAILER Sent on:  03/27/2014  10:52:01.91 | | |
| 03/27/2014 | HEARING SET: Event: CONFERENCE CALL Date: 03/28/2014   Time: 10:00 am Judge: RICE, RONALD J   Location: COURTROOM 2 Result: COMPLETED | | |
| 03/28/2014 | HEARING SET: Event: HEARING ON PENDING MOTIONS Date: 04/30/2014   Time: 11:00 am Judge: RICE, RONALD J   Location: COURTROOM 2 Result: COMPLETED | | |
| 03/28/2014 | NOTICE SENT: SPEEDY MAILER Sent on:  03/28/2014  11:45:42.97 | | |
| 04/02/2014 | MOTION FOR WARRANT REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | Image |
| 04/02/2014 | WARRANT TO CONVEY TO OHIO REFORMATORY FOR WOMEN ISSUED TO SHERIFF ON: APRIL 2, 2014 | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 04/02/2014 | WARRANT FOR REMOVAL FOR A MOTIONS HEARING ON APRIL 30, 2014 @ 11:00 A.M. AND A RE-SENTENCING HEARING @ 2:00 P.M. <br> 4/3/14--COPIES TO:  PROS, J. INGRAM, A. MILLETTE, J. WHILHELM, L. ANNOS, S. BOLTON, D. DOUGHTEN, R. DIXON, D. BODIKER, J. JUHASZ  Receipt: 280467  Date: 08/18/2014 | $3.00 | Image |
| 04/03/2014 | MOTION TO APPOINT COUNSEL (DEATH PENALTY CASE) WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 04/03/2014 | POSTAGE  Receipt: 280467  Date: 08/18/2014 | $4.32 | |
| 04/10/2014 | JE:  ATTORNEY DAVID L. DAUGHTEN AND ATTORNEY ROBERT A. DIXON ARE HEREBY APPOINTED TO REPRESENT THE DEFENDANT, DONNA ROBERTS, IN THE ABOVE CAPTIONED CASE FOR THE SENTENCING HEARING SCHEDULED FOR APRIL 30, 2014.  Receipt: 280467 Date: 08/18/2014 | $3.00 | Image |
| 04/17/2014 | MOTION TO PRECLUDE A SENTENCE OF DEATH; OR IN THE ALTERNATIAVE, ORDER A FULL PENALTY PHASE HEARING WITH CERTIFICATE OF SERVICE FILED  BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 04/23/2014 | MOTION FOR CONTINUANCE OF SENTENCING HEARING WITH SERVICE FILED BY: DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 04/24/2014 | REGULAR MAIL ISSUED TO: DAVID H BODIKER <br> RETURNED BY POST OFFICE FOR: ATTEMPTED NOT KNOWN  Receipt: 280467  Date: 08/18/2014 | $0.48 | |
| 04/24/2014 | REGULAR MAIL ISSUED TO: JOSEPH E WILHELM <br> RETURNED BY POST OFFICE FOR: ATTEMPTED NOT KNOWN  Receipt: 280467  Date: 08/18/2014 | $0.48 | |
| 04/28/2014 | WARRANT TO CONVEY RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 282654  Date: 09/19/2014 | $471.00 | Image |
| 04/30/2014 | NOTICE OF POST RELEASE CONTROL FILED AND SIGNED BY DONNA M ROBERTS (DEFENDANT) AND DAVID L DOUDGHTEN (ATTORNEY FOR DEFENDANT) | $0.00 | Image |
| 04/30/2014 | OPINION OF THE COURT:  FINDS OF LAW AND CONCLUSIONS OF LAW REGARDING IMPOSITION OF DEATH PENALTY.  THE COURT HEREBY FINDS THE SENTENCE OF DEATH IS AN APPROPRIATE PENALTY FOR THE DEFENDANT DONNA MARIE ROBERTS IN THIS MATTER. Receipt: 280467  Date: 08/18/2014 | $69.00 | Image |
| 04/30/2014 | INDIGENT APPLICATION FEE ($25.00) NOTICE FILED  Receipt: 280467  Date: 08/18/2014 | $25.00 | |
| 04/30/2014 | JE:  THIS WRIT OF EXECUTION TO CONVEY DONNA MARIE ROBERTS TO THE OHIO REFORMATORY FOR WOMEN OR OTHER FACILITY AS INSTRUCTED BY THE DIRECTOR FOR THE OHIO DEPARTMENT OF REHABILITATION AND CORRECTION WHERE SHE SHALL BE HELD UNTIL THE EXECUTION OF THE DEATH SENTENCE AGAINST DONNA MARIE ROBERTS. Receipt: 280467  Date: 08/18/2014 | $3.00 | Image |
| 04/30/2014 | JE:  THE COURT FINDS ROBERT'S MOTION TO PRECLUDE A SENTENCE OF DEATH; OR IN THE ALTERNATIVE, ORDER A FULL PENALTY PHASE HEARING IS DENIED.  Receipt: 280467  Date: 08/18/2014 | $9.00 | Image |
| 04/30/2014 | DEATH PENALTY SENTENCING:  DEFENDANT SENTENCE ON APRIL 30, 2014 TO THE OHIO REFORMATORY FOR WOMEN.  DEFENDANT SENTENCED TO DEATH ON COUNT ONE, SHALL SERVE AN IMPRISONMENT TERM OF 10 YEARS ON COUNT 3; PLUS A MANDATORY TERM OF 3 YEARS ON THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO THE SENTENCE IMPOSED ON COUNT 3; SHALL SERVE AN IMPRISONMENT TERM OF 10 YEARS ON COUNT 4, PLUS A MANDATORY TERM OF 3 YEARS ON THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT 4, SENTENCE IN COUNT 4 TO BE SERVED CONSECUTIVELY TO THE SENTENCE IMPOSED ON COUNT 3 PLUS COSTS. <br> 4/30/14-COPIES TO:  PROS, J. INGRAM, A. MILLETTE, J. WILHELM, D. MARBURGER, S. BOLTON, D. DOUGHTEN, J. JUHASZ  Receipt: 280467  Date: 08/18/2014 | $15.00 | Image |
| 04/30/2014 | POSTAGE  Receipt: 280467  Date: 08/18/2014 | $3.36 | |
| 05/01/2014 | WARRANT TO CONVEY TO OHIO REFORMATORY FOR WOMEN ISSUED TO SHERIFF ON: MAY 1, 2014 | $0.00 | |
| 05/01/2014 | EXECUTION FOR COSTS IN FELONY  ISSUED TO SHERIFF ON: MAY 1, 2014 | $0.00 | |
| 05/01/2014 | EXECUTION OF COSTS RETURNED ENDORSED BY SHERIFF  Receipt: 280467  Date: 08/18/2014 | $5.00 | Image |
| 05/05/2014 | STATES MOTION FOR NUNC PRO TUNC ENTRIES WITH PROOF OF SERVICE FILED BY LUWAYNE ANNOS (Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 05/05/2014 | MOTION TO APPOINT APPELLATE COUNSEL DEATH PENALTY CASE WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 05/05/2014 | WARRANT TO CONVEY RETURNED SHOWING SERVICE ON DEFENDANT | $471.00 | Image |

10/20/21, 11:18 AM                                        Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 05/12/2014 | ORDER:  ATTORNEY DAVID L. DOUGHTEN IS APPOINTED LEAD COUNSEL AND ROBERT L. DIXON IS APPOINTED AS CO-COUNSEL.  Receipt: 280467  Date: 08/18/2014 | $3.00 | Image |
| 05/14/2014 | REGULAR MAIL ISSUED TO: JOSEPH E WILHELM<br>RETURNED BY POST OFFICE FOR: NO SUCH NUMBER  Receipt: 280467  Date: 08/18/2014 | $0.48 | |
| 06/02/2014 | MOTION TO CLARIFY COURTS SENTENCING OPINION FILED PURSUANT TO R.C. 2929.03(F) WITH CERTIFICATE OF SERVICE FILED BY<br>DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 06/03/2014 | $636.32  COSTS SENT TO CORRECTIONAL FACILITY FOR INMATE PAYMENT OF COSTS | $0.00 | Image |
| 06/10/2014 | OPINION OF THE COURT:  NUNC PRO TUNC FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING IMPOSITION OF DEATH PENALTY.  SEE JE  Receipt: 280467  Date: 08/18/2014  Receipt: 282654  Date: 09/19/2014 | $72.00 | Image |
| 06/16/2014 | ORDER TO CERTIFY RECORD WITH NOTICE OF APPEAL OF APPELLANT DONNA ROBERTS DEATH PENALTY APPEAL | $0.00 | |
| 07/07/2014 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED<br>7/8/2014: CC TO AUDITOR.  Receipt: 280467  Date: 08/18/2014 | $12.00 | Image |
| 07/17/2014 | APPROVAL OF PAYMENT OF COUNSEL FEES<br>CC AUDITOR 7/18/14  Receipt: 280467  Date: 08/18/2014 | $6.00 | Image |
| 07/22/2014 | APPROVAL OF PAYMENT OF COUNSEL FEES<br>CC AUDITOR 7/24/14  Receipt: 280467  Date: 08/18/2014 | $18.00 | Image |
| 09/15/2014 | RECORD TRANSPORTED TO THE SUPREME COURT INCLUDING ORIGINAL PAPERS (1 BOX), TRANSCRIPTS (28 VOLUMES IN 3 BOXES), NUMBERED INDEX AND LIST OF EXHIBITS BY PERSONAL DELIVERY FROM THE TRUMBULL COUNTY CLERK OF COURTS ON SEPTEMBER 15, 2014. COPIES OF INDEX ALSO SENT TO COUNSEL OF RECORD (L ANNOS, D DOUGHTEN, R DIXON)  Receipt: 282654  Date: 09/19/2014 | $1.00 | Image |
| 09/15/2014 | TRANSCRIPT OF PROCEEDINGS FILED BY: OFFICIAL COURT REPORTER:  RICHELLE J. GUERRIERI | $0.00 | |
| 09/18/2014 | RECEIPT OF RECORD DEATH PENALTY CASE (4 BOXES) TRANSMITTED TO THE CLERK OF COURT OF THE SUPREME COURT OF OHIO BY THE TRUMBULL COUNTY CLERK OF COURTS ON 09/15/14  Receipt: 282654  Date: 09/19/2014 | $1.00 | Image |
| 09/23/2014 | EXHIBITS (ONE EXPANDABLE FOLDER)  AND LIST OF EXHIBITS (SEE IMAGE) TRANSPORTED TO THE SUPREME OF COURT OF OHIO BY PERSONAL DELIVERY FROM THE TRUMBULL COUNTY CLERK OF COURTS ON SEPTEMBER 26, 2014 | $0.00 | Image |
| 12/15/2014 | MEMO ENTRY:  4 BOXES OF EVIDENCE, 1 BOX COPIES OF THE RECORD AND 3 BOXES OF TRANSCRIPTS TRANSPORTED TO THE EVIDENCE ROOM ON | $0.00 | |
| 02/17/2014 | MOTION TO AMEND POST-CONVICTION PETITION PURSUANT TO R.C.2929.03(F) FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 02/26/2015 | MOTION TO EXTEND TIME TO RESPOND WITH PROOF OF SERVICE FILED BY LUWAYNE ANNOS (Prosecuting Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 03/05/2015 | HEARING SET:<br>Event: MOTION<br>Date: 03/31/2015    Time: 1:30 pm<br>Judge: RICE, RONALD J    Location: COURTROOM 2<br><br>Result: COMPLETED | | |
| 03/05/2015 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  03/05/2015  14:40:00.79 | | |
| 03/05/2015 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  03/05/2015  14:42:09.60 | | |
| 07/20/2015 | AGREED JUDGMENT ENTRY SUBMITTED BY  ATTORNEY DAVID L. DOUGHTEN AND ATTORNEY LUWAYNE ANNOS | $0.00 | Image |
| 08/19/2015 | AGREED JUDGMENT ENTRY.  SEE JE. | $6.00 | Image |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 08/19/2015 | Issue Date: 08/19/2015<br>Service: FINAL APPEALABLE ORDER<br>Method: REGULAR MAIL - ENVELOPE<br>Cost Per: $<br><br>ROBERTS, DONNA MARIE<br>055 276<br>OAKWOOD CORRECTIONAL FACILITY<br>3200 N WEST STREET<br>LIMA, OH  45801<br>Tracking No: R000005205<br><br>STATE OF OHIO<br>c/o ATTY: ANNOS, LUWAYNE<br>TRUMBULL COUNTY ASSISTANT PROSECUTOR<br>160 HIGH STREET NW-4TH FLOOR<br>WARREN, OH  44481<br>Tracking No: R000005206 | | |
| 08/28/2015 | MOTION FOR SUMMARY JUDGMENT WITH PROOF OF SERVICE FILED BY LUWAYNE ANNOS (Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 09/04/2015 | HEARING SET:<br>Event: MOTION FOR SUMMARY JUDGMENT (MEMO)<br>Date: 10/30/2015   Time: 8:00 am<br>Judge: RICE, RONALD J   Location: COURTROOM 2<br><br>Result: TAKEN UNDER ADVISEMENT | | |
| 09/04/2015 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on: 09/04/2015  08:37:29.79 | | |
| 11/16/2015 | LETTER FILED BY: DONNA MARIE ROBERTS (DEFENDANT); PRO SE (REQUEST FOR COPIES OF TRANSCRIPTS) | $0.00 | Image |
| 07/28/2017 | ENTRY:  RECONSIDERATION IS DENIED FILED BY SUPREME COURT | $6.00 | Image |
| 04/12/2018 | NOTICE FROM THE SUPREME COURT OF OHIO. THE FOLLOWING RECORD IN THE ABOVE-NAMED CASE WAS RECEIVED BY THE UNDERSIGNED.<br>LIST OF CONTENTS:  4 BOXES | $0.00 | Image |
| 04/02/2019 | HEARING SET:<br>Event: MEMO ONLY<br>Date: 06/07/2019   Time: 8:00 am<br>Judge: RICE, RONALD J   Location: COURTROOM 2<br><br>Result: UNDER ADVISEMENT | | |
| 04/02/2019 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on: 04/02/2019  15:53:47.34 | | |
| 04/02/2019 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on: 04/02/2019  15:54:50.16 | | |
| 06/05/2019 | NOTICE OF MEMORANDUM IN SUPPORT WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 06/07/2019 | RENEWED MOTION FOR SUMMARY JUDGMENT WITH PROOF OF SERVICE FILED BY CHRISTOPHER D. BECKER (Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 06/13/2019 | OBJECTION TO SUMMARY JUDGMENT WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 11/20/2019 | Issue Date:  11/20/2019<br>Service:  FINAL APPEALABLE ORDER<br>Method:  REGULAR MAIL - ENVELOPE<br>Cost Per:  $<br><br>ROBERTS, DONNA MARIE<br>c/o ATTY: DIXON, ROBERT A<br>4403 ST CLAIR AVENUE<br>CLEVELAND, OH  44103<br>Tracking No: R000101953<br><br>STATE OF OHIO<br>c/o ATTY: MUSICK, ASHLEIGH<br>ASSISTANT PROSECUTING ATTORNEY<br>160 HIGH ST, N.W. 4TH FLOOR<br>WARREN, OH  44481<br>Tracking No: R000101954 | | |
| 11/20/2019 | POSTAGE | $0.50 | |
| 11/20/2019 | JE: THE PETITION FOR POST-CONVICTION RELIEF FILED BY DEFENDANT IS DENIED WITHOUT HEARING. SEE JE. FAP. | $18.00 | Image |
| 12/02/2019 | MOTION TO APPOINT APPELLATE COUNSEL (DEATH PENALTY CASE) WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT); ROBERT A DIXON (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 12/10/2019 | JE: ATTORNEY ROBERT A. DIXON AND ATTORNEY DAVID L. DOUGHTEN ARE APPOINTED AS APPELLATE COUNSEL. | $3.00 | Image |
| 12/18/2019 | NOTICE OF APPEAL TO 11TH DISTRICT COURT OF APPEALS WITH DOCKETING STATEMENT, AFFIDAVIT OF INDIGENCY AND COPY OF JE FILED BY: DAVID L DOUGHTEN (Attorney) on behalf of DONNA ROBERTS (DEFENDANT); ROBERT A DIXON (Attorney) on behalf of DONNA ROBERTS (DEFENDANT) | $0.00 | Image |
| 12/18/2019 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED; CC: TRUMBULL COUNTY AUDITOR'S OFFICE | $12.00 | Image |
| 08/25/2020 | MANDATE FROM COURT OF APPEALS; JUDGMENT OF THE TRUMBULL COUNTY COURT OF COMMON PLEAS IS AFFIRMED. COSTS TO APPELLANT. | $3.00 | |
| 10/06/2020 | IT IS SO ORDERED THAT THE MOTION FOR STAY OF EXECUTION IS GRANTED AND IT IS FURTHER ORDERED THAT THIS STAY SHALL REMAIN IN EFFECT UNTIL EXHAUSTION OF ALL STATE POSTCONVICTION PROCEEDINGS, INCLUDING ANY APPEALS, FILED BY THE SUPREME COURT OF OHIO | $0.00 | Image |

Mun./Co. 300-W

BARRETT BROTHERS, PUBLISHERS, SPRINGFIELD, OHIO

# WARRANT TO ARREST
## RULE 4

In the _Trumbull County Common Pleas_ Court, _Warren_ , Ohio

THE STATE OF OHIO,
vs.

_DONNA MARIE ROBERTS_

Name

254 Fonderlac SE

Address

Warren,  OH  44484

Case No. _01-CR-793_

**WARRANT ON COMPLAINT**
(RULE 4)

To _Detective Sgt. Paul Monroe of Howland Police Department and/or any other law_
Enforcement Officer _(Officer Authorized to Execute a Warrant)_

A complaint, a copy of which is attached hereto, has been filed in the _Trumbull County Common Pleas_ Court
charging _AGGRAVATED MURDER (ORC 2903.01(A)_

_AGGRAVATED BURGLARY (ORC 2911.11(A)(1)and/or (2) and (B)_

Describe the offense and state the numerical designation of the applicable statute.

You are ordered to arrest _DONNA MARIE ROBERTS_
and bring _her_ before said Court without unnecessary delay.
You _may not_ issue summons in lieu of arrest under Rule 4(A) (2) or issue summons after arrest under
(may – may not)
Rule 4(F) because

Special instructions to executing officer:

_____
Judge - Officer Designated by Judge(s) –
Clerk - Deputy Clerk

_Trumbull_ County, Ohio

## SUMMONS ENDORSEMENT
### Use only in appropriate case

This warrant was executed/by arrest and/by issuing the following summons.

To _____
(defendant)

You are hereby summoned and ordered to appear at _____ o'clock _____ M.

_____ , _____ , 19 ____ , at the above captioned Court.
(day)        (month)        (date)

If you fail to appear at the time and place stated above you may be arrested.

## RECEIPT OF WARRANT BY EXECUTING AUTHORITY

**First Receipt**
Received this warrant on _12-20_ , 19 _2001_ ,
at _5:40_ o'clock _P_ m.

By _Det Sgt Paul Monroe_
Title

**Subsequent Receipt**
Received this (alias)(warrant) on _____ , 19 __ ,
at _____ o'clock __ m.

Officer
By _____
Title

## RETURN OF EXECUTED WARRANT

**Fees**
Mileage $ _____
_____
_____
Total $ _____

**1. Execution By Arrest**
I received this warrant on _12-20_ , 19 _2001_ , at
_5:40_ o'clock _P_ m. On _12-20_
arrested _Donna Marie Roberts_ and gave _her_ a copy of this warrant
with complaint attached and brought to _Trumbull County Jail_
state the place

_Det Sgt Paul Monroe_
Arresting Officer, Title

**Fees**
Mileage $ _____
_____
_____
Total $ _____

**2. Execution By Issuance Of Summons Under Rule 4(A)(2) By Executing Officer**
I received this warrant on _____ , 19 __ , at
_____ __ m. On _____ , 19 __ , I
executed this warrant by issuing _____ a summons by _____
_____ service which ordered _____ to appear at _____
time
_____ at the captioned Court. The sum-
day                    date                    room
mons was endorsed upon the warrant and accompanied by a copy of the complaint.

_____
Issuing Officer, Title

**Fees**
Mileage $ _____
_____
_____
Total $ _____

**3. Execution By Arrest And Issuance Of Summons Under Rule 4(F) By Arresting Officer**
I received this warrant on _____ , 19 __ , at
_____ o'clock __ m. On _____ , 19 __ , I
arrested _____ and after arrest I issued _____ a summons by
personal service which ordered _____ to appear at caption Court at _____
time
_____ . The sum-
day                    date                    room
mons was endorsed upon the warrant and accompanied by a copy of the complaint.

_____
Issuing Officer, Title

**4. Execution By Arrest And Issuance Of Summons Under Rule 4(F) By Superior Of Arresting Officer**
On _____ , 19 __ , _____ was arrested by _____
name of arresting officer
and I issued _____ a summons by personal service which ordered _____ to appear at
time                    day                    date                    room

_____
Issuing Officer, Title

## RETURN OF UNEXECUTED WARRANT

**Fees**
Mileage $ _____
_____
_____
Total $ _____

I received this warrant on _____ , 19 __ , at
_____ o'clock __ m. On _____ , 19 __ , I
attempted to execute this warrant but was unable to do so because _____
_____
state specific reason or reasons and
_____
additional information regarding defendant's whereabouts
_____
Executing Officer, Title

*ORIG*

# COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO      )
                   )    SS.
COUNTY OF TRUMBULL   )

## AFFIDAVIT FOR ARREST WARRANT

Before me, the Honorable John M. Stuard, Judge of the Court of Common Pleas, Trumbull

County, Ohio, and for the above-named County, personally came Detective Paul Monroe of the

Howland Township Police Department, 169 Niles-Cortland Road, Warren, Ohio. Affiant has been

employed by the Howland Township Police Department as a police officer for fourteen (14) years.

On December 12, 2001 at approximately 12:00 a.m., Trumbull County 911 dispatch received

an emergency telephone call from the residence of Donna M. Roberts and Robert S. Fingerhut at 254

Fonderlac SE, Warren, Ohio 44484. The caller identified herself as the wife of Fingerhut, told the

dispatcher that there was a problem with her husband, and that he was on the kitchen floor. She was

screaming and complaining of a problem with her heart. Emergency vehicles were immediately sent

to the home.

The Fingerhut home is a large single story brick home with two bedrooms and six other

rooms. The home is located in Howland Township, Trumbull County, Ohio and surrounded by other

large residential houses in what is known as Avalon Estates. Ptlm. Albert Ray arrived at the home

and found Robert Fingerhut dead in a pool of blood near the open kitchen door which leads to an

attached two car garage.

Affiant arrived at the scene at 12:35 a.m. and found other officers and Howland's EMT Unit

along with the victim's wife, Donna M. Roberts. She appeared very excited, curious and asking a

1

lot of questions. Affiant said to her that it appeared that he had been shot. Ms. Roberts responded saying "Shot. Oh my God someone murdered my Robert." This conversation took place in the master bedroom. Affiant at this time did not know how the victim had died. In fact, it was initially believed that Fingerhut may have committed suicide since a revolver was found in close proximity to the body.

Affiant observed the body of Fingerhut as being face down and fully clothed wearing a lined Cincinnati Reds jacket. The weapon was less than two (2) feet from the body, and there was no evidence of forced entry. Officers at the scene also noticed drops of blood found separate from the pool of blood around the body. In fact, one large drop of blood was found in the hallway near the living room.

Shortly after Affiant arrived, Dr. Humphrey Germaniuk, Forensic Pathologist of the Trumbull County Coroner's Office, arrived at the scene. He photographed the scene as did Officer Anthony Leshnack of the Trumbull County Sheriff's Department and the Trumbull County's Homicide Investigation and Prosecution Unit. Dr. Germaniuk, upon inspecting the area of the body discovered that the 38 revolver next to the victim was fully loaded. Further, upon close inspection of the body, it was determined that the victim had been shot at least three times, including one shot to the back of the head.

Dr. Germaniuk determined that the victim died of multiple gunshot wounds, and the case was ruled a homicide. He also concluded that the victim was probably engaged in a struggle with the assailant since he had suffered other injuries including lacerations, abrasions and contusions. In addition, there appeared to be gunshot residue on the victim's red jacket where one of the gunshot wounds was observed.

2

After determining that the victim was in fact a homicide victim, your Affiant talked to Donna Roberts a second time. She was told that it was going to take a long time to process the scene, and asked if he could contact a family member to take her from the home and that he would talk to her later. She was emotional and crying at the time. Affiant also asked her for permission to search the whole home. Donna Roberts stated "I told you do whatever you have to do, search the whole place, just find the guy." A written consent was later obtained that morning. Also Roberts informed Affiant that her husband's vehicle, a silver 2001 Chrysler 300M was missing. At approximately 2:00 a.m., Ms. Roberts left with her brother Ralph Roberts to his home in Austintown, Ohio.

During the next few hours, Affiant and other officers searched the home and garage area of the house. In the garage was Donna Roberts' vehicle, a 2000 maroon Chrysler 300M. In the trunk of Ms. Roberts' car, in a brown paper bag with the name Nate Jackson and his prison number on it, officers found 145 handwritten letters from Donna Roberts addressed to Nathaniel E. Jackson, inmate at the Lorain Correctional Institution, Grafton, Ohio. The officers also found male clothing in the bag.

In the master bedroom another 143 handwritten letters were found which were addressed to Donna M. Roberts, PO Box 1483, Warren, Ohio. They were from Nathaniel E. Jackson whose address was Lorain Correctional Institution. Affiant read some of the letters found at both locations and concluded that Donna M. Roberts and Nathaniel E. Jackson were and had been lovers for over 2 years. These letters also established that they were plotting to murder Robert Fingerhut.

After determining that Ms. Roberts was likely involved in her husband's murder, she was requested to come to the Howland Township Police station for a further interview. At 1:00 p.m. December 12, 2001, she arrived with her brothers and was interviewed by Affiant and Captain Karl

3

Compton.  She proceeded to tell officers what she had done the day before finding her husband.  She said she saw Robert last alive at 8:30 a.m. on December 11th prior to her going to work at the Grey Hound Bus Terminal, Warren, Ohio. (Her husband owned and operated the Warren and Youngstown Grey Hound facilities).  She went to work and did not see him the whole day.  He had gone to work in Youngstown.  At 5:45 p.m. she returned home from work.  Then at 9:00 p.m. she spoke to Robert and he told her that he was going to be late and that "she should go shopping at the mall and buy herself something nice because she deserves it."

She stated in part that she went to Giant Eagle, Walmart and K-Mart and that she was gone for approximately three hours shopping.  She said she arrived home around mid-night and found her husband laying on the floor.  She said she never touched him.  She then told Affiant "You don't know something about Robert, that is, he goes both ways" (which Affiant interpreted as meaning that he was gay).  She told Affiant that though she had never met his friends, there was a man named "Bobby" who had been calling a couple times a week for several weeks until last week.  Furthermore, she claimed that since "Bobby" stopped calling her husband, he had been acting strange.  She claimed there had been no big problems between her and her husband.

Affiant asked Ms. Roberts whether she had any boyfriends.  She stated that a year or six months ago, she dated a man who was half-black and half-Hispanic named Carlos for two or three months.  She said that they (meaning she and her husband) were "just a real cool couple."  She did not mention any other names.  Affiant then confronted her with the name Nathaniel E. Jackson.  Upon hearing his name, she stated  that she knew him and that she had been seeing him for two years.  She had picked him up from prison on Sunday, December 9, 2001 and "had driven him home to Youngstown and dropped him off" at Oscar and Sheila's house in Youngstown, Ohio after picking

4

up some marijuana at her house. She next had contact with Jackson on Tuesday, December 11, 2001 when he had called her from a pay phone. Other than these two times she had not had contact with Nate. She further said that Robert knew about Nate and that they were friends.

She also mentioned that on Tuesday she had gone alone to Red Lobster and had dinner and one alcoholic beverage. After going over her story again-she remembered that she had also talked to Nate on the phone on Monday. She told Nate that she could not see him again to have sex and that she just wanted to be friends. In summary, the interview lasted one hour and Donna Roberts denied personally seeing Jackson except on Sunday morning and afternoon when she had picked him up from prison and brought him home. She was sure of that.

On Thursday, December 13, 2001, the victim's Chrysler automobile was found by Youngstown Police Department at Pershing and Victoria Streets in Youngstown, Ohio at 6:21 p.m. Affiant and Officer Frank Dillon and the Howland Police Department arrived at the above address at approximately 6:35 p.m. The car was unlocked with the keys in it. Blood drops appeared to be on the outside front passenger's door with what appeared to be blood smears on the door handle itself. Inside the car there appeared to be finger smears of blood on the front seat, and other blood stains on the headlight switch, keys, dashboard and stereo radio. This vehicle was towed to the Howland Township Police Department and then to Attorney General's B.C.I. & I. Laboratory, where Det. Sgt. Peter Pizzulo and B.C.I. Forensic Scientist Cindy Maylee processed the vehicle for fingerprints and blood-DNA evidence.

On Saturday, December 15, 2001 at 4:47 p.m., a tape recorded interview of Donna Roberts was conducted at the Howland Township Police Department by Affiant and Officer Dillion. Roberts was represented by Attorney Steve Chuparkoff. She was not in custody and voluntarily came to the

5

Howland Township Police station on her own accord.   Further, she received a verbal and written Miranda warning and knowingly waived her constitutional rights.  This interview lasted over one and one-half hours.

During this interview she contradicted her earlier statements and admitted that she had been with Nate Jackson on Sunday, Monday and Tuesday.  She stated that she had stayed with him or got him a room  at two different motels, the Wagon Wheel (Sunday night) on Market Street in Boardman, Ohio and the Days Inn (Tuesday night) which is also on Market Street in Boardman, Ohio. Further, she admitted that she had dinner with Jackson on the night of the shooting (December 11th) at the Red Lobster in Niles, Ohio at approximately 6:00 p.m.  After eating they then went back to her house to feed her dogs and then she took him back to Oscar and Sheila's house on Wirt Street, Youngstown, Ohio. At 9:30 p.m., Roberts was in her car when Jackson called on her car phone and said that he needed her to help him and put him up for a week.

She claimed that she picked up Jackson on Wirt Street in Youngstown.  When he got in her car, she stated that Jackson had a bandage over his left index finger which he said was injured with a hammer.  He asked her for money and she gave him $200.00.  They then drove to a crack house in Youngstown and purchased $100.00 worth of crack.  Then she drove to the Days Inn and charged the room on her Master Card at approximately 10:30 p.m.  He started to smoke crack and after a few minutes, she left him there.  This was the last time she saw Jackson.  Further, towards the end of the interview, she changed her story and told Affiant that Jackson, during a telephone call made after the discovery of Roberts' body, said he had been shot in the finger.  She also stated that Jackson may have taken her cell phone.  Further she said that "she could not believe that Jackson would ever do anything to Robert."

6

On Sunday, December 16, 2001, Affiant went to the Days Inn and verified that Donna Roberts had rented Room 129 for one week. A motel employee stated on Saturday, December 15, 2001, she had been cleaning the room and found used condoms, bloody dressings, wash cloths, and hydrogen peroxide. They were thrown in the trash dumpster and later retrieved by Affiant. One of the bloody medical wraps looked as if it could have been wrapped around an injured finger.

On Tuesday, December 18, 2001, B.C.I. Agent Ed Lulla went to Room 129 of the Days Inn and processed the room and found what appeared to be blood stains on the bed comforter, on wall near the door, on the floor in the bathroom, and on a wash cloth. Also fingerprints were found throughout the room.

Other evidence developed by Affiant and other police officers in this case which include officers from the Howland Township Police Department, Warren Police Department and the Trumbull County Sheriff's Department showed that lay witnesses also contradict the often self-contradicting story given by Donna Roberts. For example, Roberts told investigators that he was working late on Tuesday night and that she should go shopping. In fact, Dep. Jose Sanchez, who was working at the Youngstown Grey Hound Office with Robert Fingerhut, said that he remarked to Fingerhut that he (Fingerhut) was lucky and that he was going to get out of here on time. In fact, Fingerhut left at 9:00 p.m. It takes approximately 20-25 minutes to go from Youngstown to Howland.

Also Donna Roberts said that they were getting along well. However, an employee at the Youngstown Grey Hound business said to investigator that on Monday, December 10, 2001, Donna Roberts asked her husband for $3,000.00 and he said no and she gave him, according to witness, she gave him "the dirtiest look, like she was out to get him." Another employee in Youngstown said that

7

Fingerhut and his wife had an argument a week before his death over the phone and the argument "was the worst argument he ever heard Fingerhut and Donna Roberts ever have."

Furthermore, Affiant has attached to this Affidavit, copies of letters written by Nathaniel E. Jackson and Donna Marie Roberts to each other. (Jackson letters of November 27, 2001, October 29, 2001 and October 26, 2001; Roberts letter November 26, 2001). These letters establish a conspiracy between Nathaniel E. Jackson and Donna Marie Roberts to murder Robert Fingerhut upon Jackson's release from prison on December 9, 2001.

A check into the prison status of Nathaniel E. Jackson showed that on February 22, 2001, Nathaniel Edward Jackson (DOB 02/13/1972, SSN 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) formerly of 309 South Pearl Street, Youngstown, Ohio was sentenced for the third time to prison for two (2) counts of Receiving Stolen Property. Jackson was sentenced by the Mahoning County Common Pleas Court to a term of one (1) year at the Lorain Correctional Institution, Lorain, Ohio. On December 9, 2001 at 8:00 a.m., he was released from prison.

Examples of Roberts and Jackson 's murder plot are numerous. In the Friday, October 26, 2001 letter of Jackson, he writes to Roberts that upon his release they were to get a hotel room together to spend some romantic time before killing Robert Fingerhut. (As previously present in the foregoing Affidavit-Donna Roberts did in fact before his release get a room for Jackson at the Wagon Wheel Motel in Boardman, Ohio). Jackson goes on and writes..."then after that you don't ever have to worry about making known more excuses(sic) to him, because he will no longer be with us after 12-10-01." Jackson then drew a tombstone which read:

|   |    |   |
|---|----|---|
| R |    | P |
| E |    | I |
| S | IN | S |
| T |    | S |

8

(page 2) (Emphasis added). Later on page 8, he writes:

> "Hey Donna just think come 12-11-01 you'll be waking up to me or maybe we'll give it a couple of days to let things look cool an (sic) after the Funeral Baby when I come home I'm never leaving an (sic) we're only doing it like that just to make it look good...the way that I have it all planned out is so sweet an (sic) alls I need is for my Baby not to worry an (sic) leave everything else up to me..." (Emphasis added).

In his October 29, 2001letter Jackson writes another letter to Donna and says ...(p. 1) "An as far as that Robert Problem? Yes I'm taking care of that the next night. Because I told you I'm tired of living like this when I don't have to. An (sic) After that will you get me a 2002 Cadillac DeVille? Because I dream of it a lot." (Emphasis added). (It is noted that Affiant has learned from his investigation and talking to State Farm Insurance that the victim had $325,000 in life insurance with his wife as beneficiary.) (It is emphasized that the above letters were found in the bedroom of Donna Roberts-all letters written to her sent to a post office box in her name and not to the Fonderlac residence.

The most recent letter attached to this Affidavit is the Monday, November 26, 2001 letter written by Donna Roberts and sent to Nathaniel Jackson at the Lorain Correctional Institution. This letter was found in Donna Roberts automobile which was parked in the Fonderlac residence at the time of the homicide. Roberts addresses Jackson as "My dearest sweetheart." This letter is six (6) handwritten pages. There are many references to the murder plot in the letter. An example, Roberts state of mind on November 26th is well illustrated on page 4 which in part reads:

> "...And after it's over, I can get a place for you even here in Warren for a couple weeks because who is to tell me not to? Oh-I have been all over looking for a ski mask. I only see those knitted caps. Any suggestions on who might have them? And I'm still looking for gloves because I don't think the thick ones I'm seeing are good to work with as would be thinner leather ones. Know what I mean?

9

And yes, sneaking to see you for a couple hours doesn't do it.  It leaves
us both with no real life together and when you go your way, you have to fend
for yourself and eat alone and sleep alone and be out with the wolves.  And me -
I (live) exist in hell on earth.  Like last night - I got so sick of just looking at him.
And hearing the same shit over and over.  And smelling his breath.  And every
other little thing - it's all bad.  And seeing his skin.  And watching him walk - or
breathe.  I can't hold in my disgust and contempt for him well at all and he sees
it every time he looks at me now.  Which makes him feel worse about me in
return.  Which makes him talk to me and treat me like dirt."

Affiant further states that Trooper Gerald A. Funelli of the Ohio State Highway Patrol has

obtained copies of eighteen(18) separate telephone conversations which were recorded at the Lorain

Correctional Institution, an Ohio State Prison, located in Grafton Ohio.  These recordings were made

between October 25, 2001 and December 8, 2001 and were made from Lorain Correctional

Institution to telephone number 330-609-7812, which number is associated with a telephone

belonging to Donna Roberts.

Your Affiant reasonably believes that these recorded prison conversations were had between

Donna Roberts and Nathaniel Jackson.  During these conversations, Nathaniel Jackson, who

identifies himself during the collect calls from prison,  and Donna Roberts, discuss the planned

murder of Robert Fingerhut.  Donna Roberts made the following statements: "I can't take it anymore

here, " "I even gave you permission to do that to Robert to be with you forever,"

During these conversations Nathaniel Jackson states the following: "I can't wait to get out

to do what has to be done," "We in this 'til death do us part," "We going to wake-up for Christmas

together," (and to which Donna Roberts admits to daydreaming about the same thing); and  "You

would like to let him see you suck my dick before he goes away."

Finally, during the final prison conversation which was recorded on December 8, 2001, the

day before Nathaniel Jackson was released from prison, the following exchange took place:

10

Nathaniel Jackson: "I am going to need just one thing."

Donna Roberts: "What?"

Nathaniel Jackson: "I just need to be in the house when he come home."

WHEREFORE, for the above-given reasons, Affiant truly believes that probable cause his been established to charge both DONNA ROBERTS, 254 Fonderlac, SE, Warren, OH 44484; DOB 5/22/44 and SS #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 and NATHANIEL E. JACKSON, 309 South Pearl Street, Youngstown, Ohio; DOB 2/13/72; SS#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 with the crimes of AGGRAVATED MURDER §2903.01(A) and AGGRAVATED BURGLARY §2911.11(A)(1)(3) and after due consideration, Affiant further prays that this Honorable Court issue upon the Prosecutor's Complaint warrants for the arrest of said DONNA MARIE ROBERTS and NATHANIEL E. JACKSON.

FURTHER AFFIANT SAYETH NAUGHT.


DETECTIVE PAUL MONROE
AFFIANT

Sworn to and subscribed before me, a Common Pleas Judge, in and for Trumbull County, Ohio, this 20 th day of December, 2001


HONORABLE JOHN M. STUARD
JUDGE, COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

11

TRUMBULL COUNTY COMMON PLEAS COURT

GENERAL DIVISION

**ARRAIGNMENT FORM**

CASE NUMBER:   **2001 CR 00793**

JUDGE:   **HON. JOHN M. STUARD**

ATTORNEY OF RECORD AT TIME OF ARRAIGNMENT:

STATE OF OHIO

vs.

**DONNA MARIE ROBERTS**

Entered a plea of:  Not Guilty

Indicted for:  AGGRAVATED MURDER


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TO:     Thomas Altiere, Sheriff of Trumbull County

Whereas Defendant **DONNA MARIE ROBERTS** has this day appeared in court and was indicted for **AGGRAVATED MURDER.**

You are ordered to accept the said prisoner and retain him/her in your custody pending the posting of bond in the sum of:

_no bond_

Pre-trial Date:  _12/31/01_

Judge:  _John M. Stuard_          Date:  _12/21/01_

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 36

IN THE COURT OF COMMON PLEAS

TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 01 CR 793 |
| | ) | |
| Plaintiff | ) | JUDGE JOHN M. STUARD |
| | ) | |
| vs. | ) | **MOTION TO INTERVENE** |
| | ) | |
| DONNA ROBERTS | ) | |
| | ) | |
| Defendant | ) | |

Now comes WFMJ Television, Inc. and moves the Court granting it leave to intervene in this matter as a party for the purpose of being heard at the scheduled hearing of November 31, 2001 at 11:00 a.m., for the purpose of receiving Defendant's brief on the issue of whether the affidavit in this matter should be sealed from public view, and for the purpose of filing a Court brief herein.

WFMJ Television, Inc. says in support of its motion that it operates a television station in Youngstown, Ohio and that its rights under the First Amendment of the Constitution of the United States and Article I, Section 11 of the Ohio Constitution may be adversely affected by the ruling of the Court in this matter.

Respectfully submitted,

STEPHEN T. BOLTON (#0010994)
Attorney for Defendant

MANCHESTER, BENNETT, POWERS
& ULLMAN

A Legal Professional Association
Atrium Level Two
The Commerce Building
201 East Commerce Building
Youngstown, Ohio 44503-1641

{M01172841}

Telephone (330) 743-1171
Facsimile (330) 743-1190

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent by regular U.S. mail, postage prepaid, this _21_ day of _November_, 2001 to Dennis Watkins, Esq., Trumbull County Prosecutor and Attorney for Plaintiff, Trumbull County Courthouse 160 High Street, 3rd Floor, Warren, Ohio  44481 and J. Gerald Ingram, Esq.,  Attorney for Defendants, 7330 Market Street, Boardman, Ohio  44512.

STEPHEN T. BOLTON

{M0117284.1 }

01-CR-793
DIRECT PRESENTMENT
September Eighth Term, 2001
**COMMON PLEAS COURT**
TRUMBULL COUNTY, OHIO

**THE STATE OF OHIO**
*vs.*
DONNA MARIE ROBERTS
c/o Trumbull County Jail
Warren, OH   44481
SSN: 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; DOB: 05/22/44

*Indictment for:* CT 1: AGG MURDER (F) W/SPECS
OF AGG CIRCUMSTANCES (2903.01(A),
2941.14(C), and 2929.04(A)(7);
CT 2: AGG MURDER (F) W/SPECS OF AGG
CIRCUMSTANCES (2903.01(B), 2941.14(C), and
2929.04(A)(7);
CT 3: AGG BURGLARY (F1) W/FIREARM SPEC
(2911.11(A)(1)(2) and 2941.145;
CT 4: AGG ROBBERY (F1) W/FIREARM SPEC
(2911.01(A)(1)(3) and 2941.145

*Prosecuting Attorney*
**A TRUE BILL**

*Foreman of the Grand Jury*
This Bill of Indictment found upon testimony sworn and sent before
the Grand Jury at the request of the Prosecuting Attorney

*Foreman of the Grand Jury*

*Filed_____, 20_____*

_____ Clerk
*By*_____
*Deputy*

---

*On this _____day of_____20___*

*the within named* _____

*Defendant was arraigned, and pleads*

*_____guilty to this indictment*

_____ Clerk
*By*_____
Deputy

**The State of Ohio**
**Trumbull County**.

I, the undersigned, Clerk of the Court of
Common Pleas in and for said County, do hereby
certify that the foregoing is a full, true, and correct
copy of the original indictment, with endorsements
thereon, now on file in my office.

WITNESS my hand and seal of said Court at,
Warren,

Ohio, this_____ day of_____, 20_____

_____ Clerk
*By* _____
Deputy

Case No.        01-CR-793 - DIRECT PRESENTMENT
Defendant       ROBERTS, Donna Marie

Page 7 of  7

01-CR-793
**DIRECT PRESENTMENT**

**INDICTMENT**
Crim R. 6, 7

AGGRAVATED MURDER (F)
WITH SPECIFICATIONS OF
A G G R A V A T I N G
C I R C U M S T A N C E S
(2903.01(A), 2941.14(C), and
2929.04(A)(7)

THE STATE OF OHIO                    )
                                     )      **COURT OF COMMON PLEAS**
TRUMBULL . . . . . . . . . . . . . . . . COUNTY, ss.)

**Of the Term September, in the year two thousand one,**

*THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the County*

*aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or*

*about the* **11th day of December, 2001**, at Trumbull County, Ohio, **DONNA MARIE ROBERTS**, did purposely,

and with prior calculation and design, cause the death of Robert S. Fingerhut, age 56,

SPECIFICATION #1 TO COUNT ONE: Aggravating Circumstance of Aggravated Burglary (2929.04(A)(7)

THE GRAND JURORS further find and specify pursuant to Ohio Revised Code section 2929.04(A)(7)

that the offense was committed while **DONNA MARIE ROBERTS** was committing, attempting to commit, or

fleeing immediately after committing or attempting to commit Aggravated Burglary, and **DONNA MARIE**

**ROBERTS** was the principal offender in the commission of the Aggravated Murder or, if not the principal

offender, committed the Aggravated Murder with prior calculation and design.

You are hereby notified that you are under indictment
for a felony of violence and pursuant to Section 2923.13
of the Ohio Revised Code you are prohibited from acquir-
ing, having, carrying, or using any firearm or dangerous
ordnance while under indictment.

Case No.        01-CR-793 - DIRECT PRESENTMENT
Defendant       ROBERTS, Donna Marie                                    Page 1 of 7

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 40

SPECIFICATION #2 TO COUNT ONE: Aggravating Circumstance of Aggravated Robbery (2929.04(A)(7)

THE GRAND JURORS further find and specify pursuant to Ohio Revised Code section 2929.04(A)(7)

that the offense was committed while **DONNA MARIE ROBERTS** was committing, attempting to commit, or

fleeing immediately after committing or attempting to commit Aggravated Robbery, and **DONNA MARIE**

**ROBERTS** was the principal offender in the commission of the Aggravated Murder or, if not the principal

offender, committed the Aggravated Murder with prior calculation and design.

in violation of the Ohio Revised Code, Title 29, Section 2903.01(A), 2941.14(C), and 2929.04(A)(7), *and against*

*the peace and dignity of the State of Ohio.*

Case No.        01-CR-793 - DIRECT PRESENTMENT
Defendant      ROBERTS, Donna Marie                                          Page 2 of  7

**COUNT 2:**    **AGGRAVATED MURDER (F) WITH SPECIFICATIONS OF AGGRAVATING CIRCUMSTANCES  (2903.01(B), 2941.14(C), and 2929.04(A)(7)**

*THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the County aforesaid,* on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about the 11th **day of December, 2001,** at Trumbull County, Ohio, **DONNA MARIE ROBERTS,** did purposely cause the death of Robert S. Fingerhut, age 56,  while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, Aggravated Burglary and/or Aggravated Robbery,

SPECIFICATION #1 TO COUNT TWO: Aggravating Circumstance of Aggravated Burglary (2929.04(A)(7)

THE GRAND JURORS further find and specify pursuant to Ohio Revised Code section 2929.04(A)(7) that the offense was committed while **DONNA MARIE ROBERTS** was committing, attempting to commit, or fleeing immediately after committing or attempting to commit Aggravated Burglary, and **DONNA MARIE ROBERTS** was the principal offender in the commission of the Aggravated Murder or, if not the principal offender, committed the Aggravated Murder with prior calculation and design.

You are hereby notified that you are under indictment for a felony of violence and pursuant to Section 2923.13 of the Ohio Revised Code you are prohibited from acquiring, having, carrying, or using any firearm or dangerous ordnance while under indictment.

Case No.      01-CR-793 - DIRECT PRESENTMENT
Defendant     ROBERTS, Donna Marie                                              Page 3 of  7

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 42

SPECIFICATION #2 TO COUNT TWO: Aggravating Circumstance of Aggravated Robbery (2929.04(A)(7):

THE GRAND JURORS further find and specify pursuant to Ohio Revised Code section 2929.04(A)(7) that the offense was committed while **DONNA MARIE ROBERTS** was committing, attempting to commit, or fleeing immediately after committing or attempting to commit Aggravated Robbery, and **DONNA MARIE ROBERTS** was the principal offender in the commission of the Aggravated Murder or, if not the principal offender, committed the Aggravated Murder with prior calculation and design.

in violation of Section 2903.01(B), 2941.14(C), and 2929.04(A)(7) of the Ohio Revised Code, *and against the peace and dignity of the State of Ohio.*

Case No.        01-CR-793 - DIRECT PRESENTMENT
Defendant      ROBERTS, Donna Marie                                                    Page 4 of  7

**COUNT 3:**     **AGGRAVATED BURGLARY (F1) WITH FIREARM SPECIFICATION**

*THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the County aforesaid,* on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about the **11th day of December, 2001,** at Trumbull County, Ohio, **DONNA MARIE ROBERTS,** by force, stealth, or deception, did trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, to-wit: 254 Fonderlac, Howland Township, Ohio, when Robert S. Fingerhut, age 56, was present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, and **DONNA MARIE ROBERTS** did inflict, or attempted or threatened to inflict physical harm on Robert S. Fingerhut, and **DONNA MARIE ROBERTS** did have a deadly weapon or dangerous ordnance on or about her person or under her control,

SPECIFICATION #1 TO COUNT THREE: Firearm Specification (2941.145):

THE GRAND JURORS further find and specify pursuant to Ohio Revised Code 2941.145 that the said **DONNA MARIE ROBERTS** did at the time of her commission of the crime of Aggravated Burglary have a firearm on or about her person or under her control, and displayed the firearm, brandished the firearm, indicated that she possessed the firearm, or used it to facilitate the offense, said firearm being defined in Section 2923.11 of the Revised Code,

in violation of Section 2911.11(A)(1)(2) and 2941.145 of the Ohio Revised Code, *and against the peace and dignity of the State of Ohio.*

You are hereby notified that you are under indictment for a felony of violence and pursuant to Section 2923.13 of the Ohio Revised Code you are prohibited from acquiring, having, carrying, or using any firearm or dangerous ordnance while under indictment.

Case No.          01-CR-793 - DIRECT PRESENTMENT
Defendant          ROBERTS, Donna Marie                                    Page 5 of 7

**COUNT 4:**   **AGGRAVATED ROBBERY (F1) WITH FIREARM SPECIFICATION**

*THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the County*

*aforesaid,* on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about

the **11th day of December, 2001,** at Trumbull County, Ohio, **DONNA MARIE ROBERTS,** in attempting or

committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the

attempt or offense, did have a deadly weapon on or about her person or under her control, and either displayed

the weapon, brandished it, indicated that she possessed it, or used it, and **DONNA MARIE ROBERTS** did inflict,

or attempt to inflict, serious physical harm on Robert S. Fingerhut, age 56,

SPECIFICATION #1 TO COUNT FOUR: Firearm Specification (2941.145):

THE GRAND JURORS further find and specify pursuant to Ohio Revised Code 2941.145 that the said

**DONNA MARIE ROBERTS** did at the time of her commission of the crime of Aggravated Robbery have a

firearm on or about her person or under her control, and displayed the firearm, brandished the firearm, indicated

that she possessed the firearm, or used it to facilitate the offense, said firearm being defined in Section 2923.11

of the Revised Code,

in violation of Section 2911.01(A)(1)(3) and 2941.145 of the Ohio Revised Code, *and against the peace and*

*dignity of the State of Ohio.*

You are hereby notified that you are under indictment
for a felony of violence and pursuant to Section 2923.13
of the Ohio Revised Code you are prohibited from acquir-
ing, having, carrying, or using any firearm or dangerous
ordnance while under indictment.

Dennis Watkins, Prosecuting Attorney

Charles L. Morrow, Asst. Pros. Attorney

Case No.         01-CR-793 - DIRECT PRESENTMENT
Defendant       ROBERTS, Donna Marie                                          Page 6 of 7

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO                    )    CASE NO. 01-CR-793 - DIRECT
                                 )
        Plaintiff                )    Doc._____ Page _____
                                 )
    -vs-                         )
                                 )
DONNA MARIE ROBERTS,             )
c/o Trumbull County Jail         )
Warren, OH  44481                )    **PRECIPE FOR CAPIAS**
                                 )
        Defendant                )

**TO THE CLERK OF COURTS:**

        Issue Capias for Defendant.

_Dec. 28, 2001_                       _Dennis Watkins_
Dated                                 _____
                                      DENNIS WATKINS, #0009949
                                      Prosecuting Attorney
                                      Trumbull County, Ohio

SEPTEMBER EIGHTH TERM, 2001

CHARGE: CT 1: AGG MURDER (F) W/SPECS OF AGG CIRCUMSTANCES
(2903.01(A), 2941.14(C), AND 2929.04(A)(7); CT 2: AGG MURDER
(F) W/SPECS OF AGG CIRCUMSTANCES (2903.01(B), 2941.14(C), AND
2929.04(A)(7); CT 3: AGG BURGLARY (F1) W/FIREARM SPEC
(2911.11(A)(1)(2) AND 2941.145; CT 4: AGG ROBBERY (F1)
W/FIREARM SPEC (2911.01(A)(1)(3) AND 2941.145)

RADIUS: 1

Filed: _____, 2001

_____
Clerk

_____
By:

_12-28-01 Issued_                                    4

## TRUMBULL COUNTY, OHIO
## COURT OF COMMON PLEAS

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.: 01CR793 |
| | ) | |
| Plaintiff, | ) | JUDGE STUARD |
| | ) | |
| v. | ) | **Motion Of The Vindicator Printing** |
| | ) | **Company In Opposition To Defendant** |
| DONNA M. ROBERTS, | ) | **Donna M. Robert's Motion To Seal** |
| | ) | **Court Reeords** |
| Defendant. | ) | |

The Vindicator Printing Company, publisher of The Vindicator, hereby moves the

Court to vacate its order sealing the police affidavit and criminal complaint in the matter

of State of Ohio v. Donna M. Roberts, Case No. 01CR793.  The reason for this motion is

set forth in the attached memorandum which is incorporated herein.

Respectfully submitted,

David L. Marburger (0025747)
Ann Millette (0069447)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth Street
Cleveland, Ohio 44114
(216) 621-0200 (Telephone)
(216) 696-0740 (Facsimile)

Attorneys for the Vindicator Printing
Company

5

**TRUMBULL COUNTY, OHIO**
**COURT OF COMMON PLEAS**

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.:  01CR793 |
| | ) | |
| Plaintiff, | ) | JUDGE STUARD |
| | ) | |
| v. | ) | **Memorandum In Support Of Motion** |
| | ) | **Of The Vindicator Printing Company** |
| DONNA M. ROBERTS, | ) | **In Opposition To Defendant Donna M.** |
| | ) | **Roberts' Motion To Seal Court** |
| Defendant. | ) | **Records** |

**PRELIMINARY STATEMENT**

The Vindicator Printing Company, publisher of The Vindicator, respectfully moves the Court to vacate its order sealing the police affidavit and criminal complaint in the matter of State of Ohio v. Donna M. Roberts, Case No. 01CR793.  The Vindicator is circulated primarily in Mahoning and Trumbull County.  The Vindicator is not a party to the Roberts case, but seeks through its news reporters to inspect and/or copy the prosecutor's complaint and police affidavit.

**ARGUMENT**

I.  **An Order Barring Public Access To Court Records Violates The Ohio And United States Constitutions And The Common Law Right To Access Absent Judicial Determination That Barring Public Access To The Court Record Is Necessary To Protect A Compelling Interest, And That Sealing The Record Is Narrowly Tailored To Protect That Compelling Interest.**

    A.  **The Ohio And Federal Constitutions And The Common Law Restrict Judicial Discretion To Seal The Court Record Of Proceedings, Even Temporarily.**

The Ohio Constitution, the First Amendment and the common law afford the press and the public qualified rights to court records.  See State, ex rel. The Cincinnati Post v. Court of Appeals (1992), 65 Ohio St. 3d 378, 380-381, 604 N.E.2d 153, 155-156;

Brown & Williamson Tobacco Corp. v. F.T.C., 710 F.2d 1165, 1177-1179, cert. denied, 465 U.S. 1100 (1984); State ex rel. The Repository v. Unger (1986), 28 Ohio St. 3d 418, 421, 504 N.E.2d 37, 41 (explaining that the right to gather news about courtroom proceedings necessarily includes court records because they serve as repositories of information about judicial proceedings).

The Ohio Supreme Court has upheld the public's right to access even when statutory authority requires court papers and records to be kept confidential, if the confidentiality intended by the legislature can be achieved through other means. The Cincinnati Post, 65 Ohio St. 3d at 380, 604 N.E.2d at 155 (holding that the public is entitled to court records of cases falling under the "secrecy provision" of Ohio Rev. Code 2505.073). The Court stated:

> Only through public disclosure can it be known what factors the judge is using to come to a particular decision. Keeping the judicial reasoning secret prevents everyone, including appellants, their attorneys, and other judges, from knowing the common law as it develops.

The Cincinnati Post, 65 Ohio St. 3d at 380, 604 N.E.2d at 155

The presumption of openness that attaches to court records in a case is a right of "contemporaneous" access. Matter of Continental Illinois Securities Litigation, 732 F.2d 1302, 1308 (7th Cir. 1984) (emphasis in original). Even a temporary seal as brief as two days can be too long. The Ninth Circuit explained:

> It is irrelevant that some of these pretrial documents might only be under seal for, at a minimum, 48 hours. . . . The effect of the order is a total restraint on the public's first amendment right of access even though the restraint is limited in time.

Associated Press v. United States Dist. Ct., 705 F.2d 1143, 1147 (9th Cir. 1983).

II. **Potentially Prejudicial Pretrial Publicity Does Not, By Itself, Satisfy The Demanding Constitutional And Common Law Standards Governing Public Access To the Court Record In A Criminal Case.**

    A. **A Criminal Defendant Seeking To Deny Public Access To Court Records Has The Burden To Show A Substantial Probability That Public Access To A Judicial Record Or Proceeding Will Irreparably Damage The Defendant's Sixth Amendment Right To A Fair Trial.**

A court has no discretion to seal the record of a criminal proceeding unless a criminal defendant asserting her constitutional right to a fair trial persuades the court both that (1) there is a substantial probability that pretrial publicity will render her trial unfair, and (2) that reasonable alternatives to closure cannot protect her right to a fair trial. See Press Enterprise Co. v. Superior Court, 478 U.S. 1, 14 (1986) ("Press-Enterprise II") (right to transcript of closed preliminary hearing); State, ex rel. National Broadcasting Co. v. Court of Common Pleas (1990), 52 Ohio St. 3d 104, 108, 556 N.E.2d 1120, 1125.

The common law right of access also imposes a demanding burden upon those who seek to close judicial records to the public. The burden is similar to that imposed by the First Amendment. See e.g., In re Knoxville News-Sentinel Co., 723 F.2d 470, 476 (6th Cir. 1983) (applying common law: "[o]nly the most compelling reasons can justify non-disclosure of judicial records"); United States v. Criden, 648 F.2d 814, 826-829 (3d Cir. 1981) (analyzing common law right where criminal defendant sought to seal court records to protect fair trial right).

Thus, the criminal defendant seeking to deny the public access must show a substantial probability that her right to a fair trial "will be irreparably damaged" unless the court issues the order that he seeks. Unger, 28 Ohio St. 3d at 426, 504 N.E.2d at 44 (Celebrezze, C.J., concurring).

**B.      Potentially Prejudicial Publicity Does Not Inevitably Deprive A
Criminal Defendant Of Her Constitutional Right To A Fair Trial.**

Although a criminal defendant's right to a fair trial amply qualifies as a

"compelling governmental interest," a criminal defendant's conclusory assertion that

publicity would deprive him of a fair trial is not sufficient to overcome the public's

constitutional right of access.  Press-Enterprise II, 478 U.S. at 15.

The United States Supreme Court has emphasized that "pretrial publicity,

even if persuasive and concentrated, cannot be regarded as leading automatically in every

kind of criminal case to an unfair trial."  Nebraska Press Ass'n v. Stuart, 427 U.S. 539,

565 (1976); accord United State v. Presser, 828 F.2d 340, 346 (6th Cir. 1987) (the

assumption is "not tenable" that all publicity is prejudicial to a defendant's right to a fair

trial).

A defendant's constitutional right does not rest on whether potential jurors

were exposed to prejudicial publicity, or even whether they have preconceived notions of

guilt or innocence because of exposure to publicity.  The test is whether the court can

impanel a jury of individuals who can set aside whatever preconceived notions they have

and decide the case solely on the evidence presented in court.  E.g., Seattle Times Co. v.

United States Dist. Ct., 845 F.2d 1513, 1518 (9th Cir. 1988); United States v. Medina, 761

F.2d 12, 18 (1st Cir. 1985).

Even where potential jurors may be exposed to inadmissible evidence, that

exposure does not inevitably portend a violation of the defendant's fair trial rights.  Thus,

protection of the defendant's fair trial rights does not require closing a pretrial

suppression hearing to the public and the press, even though the purpose of a suppression

hearing "is to screen out unreliable or illegally obtained evidence and ensure that this

evidence does not become known to the jury." Gannet Co. v. DePasquale, 443 U.S. 368, 378 (1979); accord Waller v. Georgia, 467 U.S. 39, 45 (1984); State ex rel. Dayton Newspapers v. Phillips (1976), 46 Ohio St. 2d 457, 460, 351 N.E.2d 127, 130.

Publicizing information even as prejudicial as a confession does not *per se* violate a defendant's constitutional rights to a fair trial. Stroble v. California, 343 U.S. 181, 195 (1952) (pretrial newspaper accounts of defendant's confession did not prejudice defendant's trial); United States v. Chambers, 944 F.2d 1253, 1262 (6th Cir. 1991) (pretrial broadcast of videotape of defendant discussing the crime did not cause unfair trial).

Where pretrial publicity is largely factual in tone, as opposed to emotional assertions of the defendant's guilt, the publicity is less likely to interfere with the fairness of an upcoming trial. Phillips, 46 Ohio St. 2d at 473, 351 N.E.2d at 137 (Stern, J., concurring).

**C.** **The Ohio Supreme Court And Federal Courts Have Repeatedly Endorsed Alternative Means Of Ensuring A Fair Trial While Preserving The Public's Right Of Contemporaneous Access To Judicial Proceedings And Records.**

One reason that prejudicial and pervasive publicity does not lead inevitably to an unfair trial is that a variety of measures are available to protect a defendant's fair trial rights while allowing continued public access to judicial proceedings and records in the case.

Citing the heavily publicized Watergate and Abscam prosecutions, the Sixth Circuit has stated that "voir dire in some of the most widely covered criminal prosecutions has revealed the fact that many prospective jurors do not follow such news closely and that juries can be empanelled without inordinate difficulty." Presser, 828

F.2d at 346; accord In re Charlotte Observer, 882 F.2d 850, 855-856 (4th Cir. 1989)

("Increasingly the courts are expressing confidence that *voir dire* can serve in almost all

cases as a reliable protection against juror bias however induced.").

The Ohio Supreme Court has recognized change of venue as another

alternative mechanism to preserve the fairness of a defendant's trial in the wake of

prejudicial pretrial publicity.  Phillips, 46 Ohio St. 2d at 465, 351 N.E.2d at 133.

Continuance until publicity abates is another option.  See Seattle Times

Co., 845 F.2d at 1518.

### III.  Defendant Donna Roberts Has Failed To Demonstrate Any Entitlement To Sealing The Police Affidavit And The Criminal Complaint

Here, Defendant Roberts cannot demonstrate either a "substantial

probability that [her] right to a fair trial will be prejudiced by publicity," or that

"reasonable alternatives cannot adequately protect [her] fair trial rights."  See Press-

Enterprise II, 478 U.S. at 14.  The presumption of public access to judicial records

remains intact.

Roberts has objected to the Trumbull County Prosecutor's motion to

unseal court records, contending that if the Court releases the information it would be

difficult to impanel a jury in Trumbull County.  This conclusory assertion is insufficient

to support a court order sealing documents from public access.  Rather, only a "particular

factual demonstration of potential harm may justify barring public inspection of a judicial

record."  F.T.C. v. Standard Financial Management Corp., 830 F.2d 404, 412 (1st Cir.

1987).

The public's stake in open access to court records is heightened in this

case by the nature of the documents under seal.  The police affidavit and the prosecutor's

complaint are products of one of the government's most awesome exercises of power. The constitution is implicated from the moment the arrest warrant issues.  Public access to these documents is essential to the public evaluation of government officials, and may operate as a check upon government misconduct.  It is fundamental to public understanding of and confidence in the judicial process.

Moreover, the allegations against Roberts include aggravated murder, and the Trumbull County Prosecutor has stated that the case could become a capital murder case.  As such, the interest of the press and of the public to these records is at its peak.  If access to the court records is not immediately granted, The Vindicator's ability to cover this highly publicized case will be significantly hampered and the public's interest in observing the working of the criminal justice system will be correspondingly damaged.

## CONCLUSION

For the reasons stated herein, The Vindicator moves this Court to vacate its order sealing the court records containing the police affidavit and the criminal complaint in the case styled State v. Roberts, et al., Case No. 01CR793.

Respectfully submitted,

David L. Marburger (0025747)
Ann Millette (0069447)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth Street
Cleveland, Ohio 44114
(216) 621-0200 (Telephone)
(216) 696-0740 (Facsimile)

Attorneys for the Vindicator Printing Company

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion of The Vindicator Printing Company in Opposition to the Defendant Robert's Motion to Seal Court Records was served by regular U.S. mail, postage prepaid, on this _____ day of _____ 2001 upon:

Gerald J. Ingram, Esq.
7330 Market Street
Youngstown, OH 44512

Anthony Consoldane, Esq.
328 Mahoning Avenue, N.W.
Warren, Ohio  44481

Dennis Watkins, Esq.
Trumbull County Prosecutor
County Administration Building
160 High Street, N.W.
Warren, Ohio  44481

David L. Marburger (0025747)
Ann Millette (0069447)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth Street
Cleveland, Ohio  44114
(216) 621-0200 (Telephone)
(216) 696-0740 (Facsimile)

Attorneys for the Vindicator Printing Company

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | } | |
| | } | Case No. 01 CR 793 |
| Plaintiff | } | |
| | } | |
| *vs.* | } | Judge John M. Stuard |
| | } | |
| DONNA ROBERTS, | } | |
| | } | |
| Defendant | } | |

---

## NOTICE OF APPEARANCE

---

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., (#0009949)
160 High Street NW
Warren, Ohio  44481
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

A:\Roberts.1\Notice.appearance.wpd•Friday 28 Dec 2001 1:23:02PM (1323hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                      }
                                    }    Case No. 01 CR 793
    Plaintiff               }
                                    }
vs.                                 }    Judge John M. Stuard
                                    }
DONNA ROBERTS,                      }
                                    }
    Defendant               }

---

### NOTICE OF APPEARANCE AS CO-COUNSEL

---

    JOHN B. JUHASZ, notifies this Honorable Court that he has been engaged as co-counsel for the Defendant, DONNA ROBERTS.

                                Respectfully submitted,

                                JOHN B. JUHASZ  (#0023777)
                                7330 Market Street
                                Youngstown, Ohio  44512-5610
                                Telephone: 330.758-2308
                                Facsimile: 330.758.8290
                                COUNSEL FOR DEFENDANT

### CERTIFICATE OF SERVICE

    I hereby certify that a true copy of the foregoing was:

    ❑ sent by regular United States Mail, postage prepaid on
    ❑ hand delivered to counsel or counsel's office
    ❑ sent by telecopier

to Dennis Watkins, Esq., Counsel for Plaintiff, 160 High Street NW, Warren, Ohio  44481 (Facsimile: 330.675.2431) and to Stephen T. Bolton, Esq., 201 E. Commerce Street, Atrium Level Two, The Commerce Building, Youngstown, Ohio 44503-1641 (Facsimile: 330.743.1190) this ____ day of December, 2001.

                                  JOHN B. JUHASZ

LAW OFFICES · 7330 MARKET STREET · YOUNGSTOWN, OHIO  44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

    i

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 58

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | } | Case No. 01 CR 793 |
| Plaintiff | } | |
| | } | |
| *vs.* | } | Judge John M. Stuard |
| | } | |
| DONNA ROBERTS, | } | |
| | } | |
| Defendant | } | |

---

## DEFENDANT'S MOTION AND MEMORANDUM TO HOLD AFFIDAVIT AND EXHIBITS UNDER SEAL

---

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., (#0009949)
160 High Street NW
Warren, Ohio 44481
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

A:\Roberts.1\Seal. affidavit.exhibits.wpd•Friday 28 Dec 2001 0:23:41PM (1223hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | } | |
| | } | Case No. 01 CR 793 |
| Plaintiff | } | |
| | } | |
| *vs.* | } | Judge John M. Stuard |
| | } | |
| DONNA ROBERTS, | } | |
| | } | |
| Defendant | } | |

---

### DEFENDANT'S MOTION AND MEMORANDUM TO HOLD
### AFFIDAVIT AND EXHIBITS UNDER SEAL

---

COMES NOW THE DEFENDANT, DONNA ROBERTS, through the undersigned counsel, and moves this Honorable Court for an order continuing to hold under seal the affidavit and exhibits filed to cause the issuance of the arrest warrant in this case.

For cause, the Defendant says that, as demonstrated in the attached memorandum, release of those documents at this time would undermine the Defendant's ability to have a fair and impartial jury seated in Trumbull County, a liberty specifically guaranteed from encroachment by U.S. CONST. amend. VI and OHIO CONST. art. I, §10.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 60

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ  (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758-2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:

❑ sent by regular United States Mail, postage prepaid
❑ hand delivered to counsel or counsel's office
❑ sent by telecopier

to Dennis Watkins, Esq., Counsel for Plaintiff, 160 High Street NW, Warren,
Ohio  44481 (Facsimile: 330.675.2431) and to Stephen T. Bolton, Esq., 201 E.
Commerce Street, Atrium Level Two, The Commerce Building, Youngstown,
Ohio 44503-1641 (Facsimile: 330.743.1190) this 21ˢᵗ day of December, 2001.

JOHN B. JUHASZ

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 61

## MEMORANDUM IN SUPPORT OF MOTION

The Defendant, DONNA ROBERTS, was arrested on a warrant issued by this Court. Presented to the Court to support the issuance of the warrant was an affidavit detailing the investigation of law enforcement officers and exhibits consisting of letters allegedly written by this Defendant and a co-defendant, Nathaniel Jackson. Now that the Defendant has been arrested and made her initial appearance before this Court, the government proposes to unseal those documents, claiming that they are public records. As will be shown, unsealing these documents would be in contravention of Ohio's Public Records law and the Ohio and United States Constitutions.

Before embarking upon any detailed discussion of these legal principles, however, the Defendant submits that the Court and the parties should keep their bearings in this case. It's important to remember what the Defendant is seeking in this case and what she is not seeking. The Defendant is seeking a fair trial before an impartial jury in the county in which the offense is said to have been committed, a jury not tainted by pretrial publicity. *See*, U.S. CONST. amend VI and XIV; OHIO CONST., art. I, §10. The Defendant is not asking to eviscerate the news media's First Amendment liberties, nor does the Defendant seek an order barring the news media from reporting upon what takes place in public hearings as the case proceeds. The Defendant is not asking for secret,

Star Chamber proceedings, and indeed the Defendant wants and is entitled to a public trial.

If the documents which the government now claims are "public records" are indeed admissible as evidence in a court of law, then, this Court, at the proper time, will admit them into evidence.  When that happens any member of the public may be in attendance and any member of the news media may comment and report upon the evidence.[1]

The government, in claiming that the sealed items are now "public record" not only ignores the principles of Ohio Public Records law as developed by the Ohio Supreme Court, but also speaks from both sides of its mouth. Having filed the documents in secret and demanding that they remain sealed until the Defendant was arrested, the government, now having accomplished its objective, either affirmatively wants these items splayed across the airwaves or is indifferent to the Defendant's right to a fair trial.  In either event, the

---

[1] Any claim by the news media that control of the *timing* of disclosure directly impacts upon First Amendment liberties is a misplaced assertion.  The simplest example in the world demonstrates this point.  At least once a week, there is reported a horrible accident in which someone has been killed.  In cases where the victim's family has not yet been notified, the news commentator usually concludes the story with the solemn statement to the effect: "the identity of the victim has not been disclosed pending notification of the family."  In those situations, the news media does not run to court or intervene in some pending matter to complain that its First Amendment liberties are being trampled upon.  In those cases, it would be inelegant of the news media to publicly broadcast the name of a deceased victim where a family member, not yet having been notified by the government, might stare at the television or radio in shocked horror to learn of the death of a loved one.  That's why the government doesn't disclose the information to the news media until the family has been notified.  Here, at stake is more than a simple matter of civility.  Early disclosure of the documents here will adversely impact guaranteed constitutional liberties.

unsealing of the affidavit and exhibits would violate Ohio's public records law and constitute a denial of fundamental constitutional liberties.

The government's assertion that upon the Defendant's arrest the sealed records have been transformed into "public records" is astonishing, because the very same prosecutor was a party to a case which clearly sets forth the relief demanded here. In *State, ex rel. Vindicator Printing Co., v. Watkins* (1993), 66 Ohio St.3d 129, 609 N.E.2d 551, the Ohio Supreme Court, in a *per curiam* opinion, held in part:

> In *Sheppard* [*v. Maxwell* (1966), 384 U.S. 333, 86 S.Ct.1507, 16 L.Ed.2d 600,] the Supreme Court was greatly distressed by the disclosure to the news media of information which did not and could not constitute competent evidence at trial. The prejudicial effects of such disclosures and the dissemination thereof effectively foreclosed any possibility that the criminal defendant therein could receive a fair trial before any impartial jury.
>
> Many devices are available to a trial court to prevent the prejudicial effect of such pretrial publicity, including a change of venue and sequestration of a jury. However, if during the pendency of the criminal proceeding, such measures have not been undertaken or are ineffective in assuring an impartial determination of the issues and a danger of material prejudice to a criminal defendant is posed thereby, *the criminal defendant clearly possesses standing to challenge the release of such information in an action brought pursuant to R.C. 149.43. Inasmuch as such disclosure would prejudice the defendant's rights under the state and federal Constitutions, the information at issue would constitute "records the release of which is prohibited by state or federal law." Whereas subsequent in camera inspection reveals that release of the records would prejudice the right of a criminal defendant to a fair trial, such information would be exempt from disclosure pursuant to R.C. 149.43(A)(1) during the pendency of the defendant's criminal proceeding.*

66 Ohio St.3d at 138 (emphasis added).  The continued sealing of the described items, at least until they have been admitted into evidence,[2] is, the Defendant submits, a measure "during the pendency of the criminal proceeding" which will help assure "an impartial determination of the issues" and reduce the "danger of material prejudice to a criminal defendant".  Disclosure would prejudice the defendant's rights under the state and federal Constitutions, and accordingly the documents would constitute "[r]ecords the release of which is prohibited by state or federal law."  OHIO REV. CODE ANN. §149.43(A)(1)(q).

*Vindicator Printing Co.* further establishes that this Court should deny the news media's recent efforts at intervention because the media lacks standing to intervene in a pending criminal case.[3]

---

[2] The Defendant acknowledges that the Supreme Court's opinion speaks in terms of remedies "during the pendency of the defendant's criminal proceeding."  Further, the Supreme Court in *State, ex rel. Steckman, v. Jackson* (1994), 70 Ohio St. 3d 420, 639 N.E.2d 83 held at syl. 4.:

> Once a record becomes exempt from release as a "trial preparation record," that record does not lose its exempt status unless and until all "trials," "actions" and/or "proceedings" have been fully completed.

[3] In *State, ex rel., the Vindicator Printing Company, v. Watkins* (Dec. 31, 1991), Trumbull App. No. 91-T-4555, 1991 Ohio App. LEXIS 6414, unreported, reproduced in the Appendix, the Court of Appeals for Trumbull County upheld the trial court's ruling that the news media lacked standing to intervene in a pending criminal action.  That holding was not disturbed by the Supreme Court of Ohio.  The appellate court said in part:

> A perusal of the trial court record indicates that *The Vindicator* did, in fact, attempt to intervene in the trial court case involving *State v. Biros*, in an effort to secure records from Respondent, which *The Vindicator* deems to be public records. The issue here is a determination of the means available to the press for securing a forum in which to assert First and Fourteenth Amendment rights when certain records are not disclosed to the public. We hold that intervention in such a criminal trial proceeding by a press entity, such as the Relator here, who is not a party in that criminal case, is not a proper means of securing such a forum.
>
> No Ohio case law has come to this court's attention which demonstrates that a third party has the right to intervene in a highly publicized criminal

(continued...)

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 65

OHIO REV. CODE ANN. §149.43 provides in pertinent part that a "'Public record' means any record that is kept by any public office, including, but not limited to, state, county, city, village, township, and school district units, except that 'public record' does not mean .   .   . (q) Records the release of which is prohibited by state or federal law." OHIO REV. CODE ANN. §149.43(A)(1)(q).

As the Ohio Supreme Court noted in *Vindicator Printing Co.*, pretrial disclosure which threatens a defendant's fair trial rights is prohibited by the

---

[3](...continued)
proceeding such as *State v. Biros, supra,* or for that matter in any criminal case in which the intervenor is not an original, direct party.

However, we find persuasive the notably similar case of *State v. Bianchi* (1979), 92 Wash. 2d 91, 593 P.2d 1330, in which both the defense and prosecution appealed from an order of the superior court which permitted a newspaper (*The Herald*) to intervene for limited purposes in a highly publicized first-degree murder trial. The Washington Supreme Court held that "there is no rule, statute, or precedent in this state that would allow a third party to intervene in a criminal proceeding. .   .   . Intervention of right is provided for in civil cases only if the intervening party claims 'an interest relating to the property or transaction which is the subject of the action.' .   .   . The only purpose of a criminal trial is the legal determination of the defendant's guilt or innocence. The Herald has no direct interest in this determination to justify its intervention and the disruption of the pending criminal proceedings inherent in the intervention process. The *Herald's* remedy must therefore lie in a separate action for declaratory judgment, mandamus, or prohibition." *Id.* at 133 (emphasis added); *see, also, Central S.C. Chapter, Society of Professional Journalist v. United States District Court*, (C.A. 4, 1977), 551 F.2d 559. (Fourth Circuit considering a similar situation, treated an appeal by members of the press as a petition for mandamus and denied relief.); *State v. Simants* (1975), 194 Neb. 783, 236 N.W. 2d 794, *rev'd on other grounds sub nom., Nebraska Press Association v. Stuart* (1976), 427 U.S. 539, 96 S.Ct. 2791. (Trial court entered restrictive order relating to pretrial publicity in a mass murder [use] and members of the press attempted to intervene and other members of the press brought original action. In dismissing the appeal, the Supreme Court of Nebraska held that the press has no standing to intervene in the criminal case of a defendant accused of heinous crimes.)

In the case at bar, the Relator's attempt to intervene in the collateral criminal case was denied by the trial court on the basis that Relator has no standing. Relator did not appeal this trial court ruling. In the event that Relator had appealed such a ruling, the appeal would have ultimately been dismissed on the grounds that Relator's remedy for securing a forum in which to assert its First and Fourteenth Amendment rights as to the alleged public documents held by Respondent lay in a separate action for mandamus. *See, Bianchi, supra,* at 1331. *Id.* at *6-*8.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 66

state and federal constitutions. OHIO CONST. art. I, §10[4] and U.S. Const. amend. VI and XIV[5], secure for every citizen a fair trial. In *Sheppard v. Maxwell* (1966), 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600, the United States Supreme Court recognized that pervasive, unfair and prejudicial news coverage can effectively destroy this right to a fair trial. The court said:

> If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; *the cure lies in those remedial measures that will prevent the prejudice at its inception*. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming into the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation but is highly censurable and worthy of disciplinary measures.

(Emphasis added.) For the government to now claim that the detailed affidavit and the attached letters are public records is an "ingenuous" proposition. It is already evident that the news media in this case is "bent on getting sensational details." See, the news articles attached in the Appendix. As opposed to the

---

[4] OHIO CONST. art. I, §10 provides in pertinent part that "In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; . . . ."

[5] U.S. CONST. amend. VI provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

appellate palliatives in the cited cases, this Court has the opportunity, simply by ordering the described materials to remain sealed, to prevent the poisoning of the fountain of justice before it begins to flow.

In *Rideau v. Louisiana* (1963), 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663, the petitioner was arrested hours after someone had robbed a bank, kidnaped three of the bank's employees, and killed one of those employees. The morning after Rideau's arrest, a motion picture film and a soundtrack were made of a purported interview in the jail between Rideau and the local sheriff. The "interview" lasted about 20 minutes, during which Rideau admitted involvement in the bank robbery, kidnaping, and murder. Later that same day, and on two succeeding days, the interview was broadcast over local television stations. Rideau's trial counsel filed a motion for a change of venue, which was denied. Rideau of was convicted and sentenced to death.

The United States Supreme Court, in a majority opinion by Justice Potter Stewart, reversed Rideau's conviction. The Court held that although the record failed to demonstrate precisely whose idea it was to make the motion picture and whose idea it was to broadcast it over the airwaves, it was clear from what the Court labeled the "conceded circumstances" that the plan was carried out with the "active cooperation and participation of the local law

enforcement officers." 363 U.S. at 725.  The Court found a clear due process

violation.  The Court said:

> For anyone who has ever watched television the conclusion cannot be
> avoided that this spectacle, to the tens of thousands of people who saw
> and heard it, in a very real sense *was* Rideau's trial—at which he
> pleaded guilty to murder.  Any subsequent court proceedings in a
> community so pervasively exposed to such a spectacle could be but a
> hollow formality.

373.U.S. at 726.  (Emphasis in original).  Despite Rideau's admitted guilt, the

Supreme Court reversed the conviction and vacated the death sentence because

of the due process violation, precisely the violation the Defendant says will

occur here.  Again, the Defendant does not say that these documents are to

remain sealed indefinitely.  At the same time, for the Court to allow the

documents to be unsealed now and for the news media to seize upon the

opportunity and doubtless publish the documents would endanger Donna

Roberts' right to a fair trial.

The principles enunciated in *Rideau*, *ante*, have been adhered to in a

number of cases throughout other jurisdictions.  For example, in

*Commonwealth v. Pierce* (1973), 451 Pa. 190, 303 A.2d 209, the Supreme Court

of Pennsylvania reversed a murder conviction and ordered a new trial.  In so

doing, the court held that the defendant had been denied due process when a

change of venue had been refused and when the community had been informed

by authorities, including the police, that the defendant was the triggerman and

had a past record for violent crimes. Also in that case, pictures were shown of a staged re-enactment of the crime and there was other widespread publicity. The Pennsylvania Supreme Court observed that the nature of the accounts released by the police were so inherently prejudicial that the defendant was not required to show a nexus between the publicity and actual jury prejudice, and that the defendant had no burden of establishing identifiable prejudice.

The *Pierce* court relied upon a quote from Justice Oliver Wendell Holmes in *Patterson v. Colorado* (1907), 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879: "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." The Pennsylvania Supreme Court went on to hold that the news accounts were "inherently prejudicial" and that Pierce accordingly need not have shown a nexus between the publicity and actual jury prejudice. 451 Pa. at 194, 303 A.2d at 212. Here, the unsealing of these items will most certainly result in "inherently prejudicial" news accounts, accounts which would saturate the pool of potential jurors and thereby demand a change of venue without the Defendant having to show any identifiable prejudice.

Similarly, in *People v. Luedecke* (1965), 22 A.D. 636, 258 N.Y.S.2d 115, the defendant was shown re-enacting the alleged crime before a television

camera owned by one of the largest television stations in the area, and over 40,000 homes normally view the newscasts of that particular television station. The court held in part:

> The active participation by the District Attorney (as well as the police officers) far exceeded the responsibilities of that office, the duties of which require not only the prosecution of crime but also the obligation to safeguard and ensure the constitutional rights of defendants to a fair and impartial trial. The effect of what was done in the case at bar was "effectively to poison the fountain of justice before it begins to flow." [*Rex v. Parke* (1903) 2KB 432, 438].

22 A.D. at 638, 258 N.Y.S. at 117. Here, the actions of the prosecutor and the police officers in attaching the letters to the affidavit, and then proclaiming after the Defendant's arrest that those documents are "public records," has all the taint of the "active participation" which the courts found present in *Luedecke*. The effect of disclosure in this case would be to effectively poison the fountain of justice before it begins to flow. *Accord, People v. Sepos* (1964), 22 A.D. 1007, 254 N.Y.S.2d 759;[6] *People v. Martin* (1963), 19 A.D. 804, 243 N.Y.S.2d 343.

In *Martin*, juvenile defendants indicted for first degree murder, following the instructions of a police officer, were subjected to filmed questioning by press and television reporters. The New York Supreme Court said:

---

[6] In *Sepos*, the prisoner having was made to pose for sound motion picture cameras with a stolen moneybag allegedly taken in a holdup. The appellate court, in granting relief, said: While we make no comment on the right of freedom of the press or the permissible limits of the newsmen's endeavors, we think, if the allegations of the petition are true, that the active participation by law enforcement officers in the events alleged to have occurred was reprehensible, shocking and difficult to understand in a civilized, lawful community. 22 A.D.2d at 1007, 254 N.Y.S.2d at 760.

While the exact figures of the number of people who saw the telecast is in doubt, there can be no doubt that it was a very large number and that the potential for influence on possible talesmen is significant. The effect of the telecast cannot but be prejudicial. The deputy police commissioner defends his action on the ground that the police should keep the public informed through the various news media; and further that the police should not prevent defendants from giving any statement to the representatives of these media that they might care to give. As applied to this case, the explanation is ingenuous. Here two very young men, after first being conditioned by being photographed without their consent, are allowed to be subjected to insistent questioning of reporters bent on getting sensational details. Defendants far more experienced than these two would get the impression that their inquisitors were approved by those that had them in custody and that to rebuff them would not be advisable. To call this giving them an opportunity to state their version is an exercise in naivete.

19 A.D.2d at 804, 243 N.Y.S.2d at 343-344.

"The presumption of innocence of the accused in a criminal prosecution is a basic component of a fair trial in the criminal justice system." *State v. Lane* (1979), 60 Ohio St.2d 112, 115, 397 N.E.2d 1338, 14 Ohio Op.3d 342, citing *Coffin v. United States* (1895), 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481. The Ohio Supreme Court has clearly spelled out that:

It is the duty of our courts to guard against factors which may undermine the fairness of the fact-finding process and thereby dilute the right to the presumption of innocence. To implement the presumption courts must be alert to factors that may undermine the fairness of the fact-finding process. *Estelle v. Williams* (1976), 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126. These protections are extended to all criminal defendants even those who happen to be prison inmates. *See Wolff v. McDonnell* (1974), 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935.

It is well established that the mere probability of deleterious effects on fundamental rights calls for close judicial scrutiny. *See Estes v. Texas* (1965), 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543. The prison environment which is laden with a sense of punishment of the guilty within transmits too great an impression of guilt on the part of the inmate who is on trial.

Pretrial release of the subject items will not "allow[ ] a jury to maintain the delicate posture of impartiality which is a mainstay of our judicial system." *Id.*, 60 Ohio St.2d at 115.

Based on the foregoing authorities, the Defendant's right to the relief prayed for is clear. This Court should conduct an *in camera* review of the documents and thereafter, in order to ensure this Defendant's right to a fair trial by an impartial jury in this county, declare that the records are exempt from disclosure under the Public Records Act. The Defendant accordingly prays for an order of this Court declaring that the document should remain sealed "during the pendency of the Defendant's criminal proceeding" or at least until the subject items are admitted into evidence, if such be the case.

J. GERALD INGRAM

JOHN B. JUHASZ
COUNSEL FOR DEFENDANT

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 73

# APPENDIX

OHIO REV. CODE ANN. §149.43:

(A) As used in this section:

(1) "Public record" means any record that is kept by any public office, including, but not limited to, state, county, city, village, township, and school district units, except that "public record" does not mean any of the following:

(a) Medical records;

(b) Records pertaining to probation and parole proceedings;

(c) Records pertaining to actions under section 2151.85 and division (C) of section 2919.121 of the Revised Code and to appeals of actions arising under those sections;

(d) Records pertaining to adoption proceedings, including the contents of an adoption file maintained by the department of health under section 3705.12 of the Revised Code;

(e) Information in a record contained in the putative father registry established by section 3107.062 of the Revised Code, regardless of whether the information is held by the department of human services or, pursuant to section 5101.313 of the Revised Code, the division of child support in the department or a child support enforcement agency;

(f) Records listed in division (A) of section 3107.42 of the Revised Code or specified in division (A) of section 3107.52 of the Revised Code;

(g) Trial preparation records;

(h) Confidential law enforcement investigatory records;

(i) Records containing information that is confidential under section 2317.023 or 4112.05 of the Revised Code;

(j) DNA records stored in the DNA database pursuant to section 109.573 of the Revised Code;

(k) Inmate records released by the department of rehabilitation and correction to the department of youth services or a court of record pursuant to division (E) of section 5120.21 of the Revised Code;

(l) Records maintained by the department of youth services pertaining to children in its custody released by the department of youth services to the department of rehabilitation and correction pursuant to section 5139.05 of the Revised Code;

(m) Intellectual property records;

(n) Donor profile records;

(o) Records maintained by the department of human services pursuant to section 5101.312 of the Revised Code;

(p) In the case of a county hospital operated pursuant to Chapter 339. of the Revised Code, information that constitutes a trade secret, as defined in section 1333.61 of the Revised Code;

(q) Records the release of which is prohibited by state or federal law.

(2) "Confidential law enforcement investigatory record" means any record that pertains to a law enforcement matter of a criminal, quasi-criminal,

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 74

civil, or administrative nature, but only to the extent that the release of the record would create a high probability of disclosure of any of the following:

(a) The identity of a suspect who has not been charged with the offense to which the record pertains, or of an information source or witness to whom confidentiality has been reasonably promised;

(b) Information provided by an information source or witness to whom confidentiality has been reasonably promised, which information would reasonably tend to disclose the source's or witness's identity;

(c) Specific confidential investigatory techniques or procedures or specific investigatory work product;

(d) Information that would endanger the life or physical safety of law enforcement personnel, a crime victim, a witness, or a confidential information source.

(3) "Medical record" means any document or combination of documents, except births, deaths, and the fact of admission to or discharge from a hospital, that pertains to the medical history, diagnosis, prognosis, or medical condition of a patient and that is generated and maintained in the process of medical treatment.

(4) "Trial preparation record" means any record that contains information that is specifically compiled in reasonable anticipation of, or in defense of, a civil or criminal action or proceeding, including the independent thought processes and personal trial preparation of an attorney.

(5) "Intellectual property record" means a record, other than a financial or administrative record, that is produced or collected by or for faculty or staff of a state institution of higher learning in the conduct of or as a result of study or research on an educational, commercial, scientific, artistic, technical, or scholarly issue, regardless of whether the study or research was sponsored by the institution alone or in conjunction with a governmental body or private concern, and that has not been publicly released, published, or patented.

(6) "Donor profile record" means all records about donors or potential donors to a public institution of higher education except the names and reported addresses of the actual donors and the date, amount, and conditions of the actual donation.

(B) All public records shall be promptly prepared and made available for inspection to any person at all reasonable times during regular business hours. Upon request, a person responsible for public records shall make copies available at cost, within a reasonable period of time. In order to facilitate broader access to public records, governmental units shall maintain public records in a manner that they can be made available for inspection in accordance with this division.

(C) If a person allegedly is aggrieved by the failure of a governmental unit to promptly prepare a public record and to make it available to the person for inspection in accordance with division (B) of this section, or if a person who has requested a copy of a public record allegedly is aggrieved by the failure of a

person responsible for the public record to make a copy available to the person allegedly aggrieved in accordance with division (B) of this section, the person allegedly aggrieved may commence a mandamus action to obtain a judgment that orders the governmental unit or the person responsible for the public record to comply with division (B) of this section and that awards reasonable attorney's fees to the person that instituted the mandamus action. The mandamus action may be commenced in the court of common pleas of the county in which division (B) of this section allegedly was not complied with, in the supreme court pursuant to its original jurisdiction under Section 2 of Article IV, Ohio Constitution, or in the court of appeals for the appellate district in which division (B) of this section allegedly was not complied with pursuant to its original jurisdiction under Section 3 of Article IV, Ohio Constitution.

(D) Chapter 1347. of the Revised Code does not limit the provisions of this section.

(E)(1) The bureau of motor vehicles may adopt rules pursuant to Chapter 119. of the Revised Code to reasonably limit the number of bulk commercial special extraction requests made by a person for the same records or for updated records during a calendar year. The rules may include provisions for charges to be made for bulk commercial special extraction requests for the actual cost of the bureau, plus special extraction costs, plus ten per cent. The bureau may charge for expenses for redacting information, the release of which is prohibited by law.

(2) As used in division (E)(1) of this section:

(a) "Actual cost" means the cost of depleted supplies, records storage media costs, actual mailing and alternative delivery costs, or other transmitting costs, and any direct equipment operating and maintenance costs, including actual costs paid to private contractors for copying services.

(b) "Bulk commercial special extraction request" means a request for copies of a record for information in a format other than the format already available, or information that cannot be extracted without examination of all items in a records series, class of records, or data base by a person who intends to use or forward the copies for surveys, marketing, solicitation, or resale for commercial purposes. "Bulk commercial special extraction request" does not include a request by a person who gives assurance to the bureau that the person making the request does not intend to use or forward the requested copies for surveys, marketing, solicitation, or resale for commercial purposes.

(c) "Commercial" means profit-seeking production, buying, or selling of any good, service, or other product.

(d) "Special extraction costs" means the cost of the time spent by the lowest paid employee competent to perform the task, the actual amount paid to outside private contractors employed by the bureau, or the actual cost incurred to create computer programs to make the special extraction. "Special extraction costs" include any charges paid to a public agency for computer or records services.

(3) For purposes of divisions (E)(1) and (2) of this section, "commercial surveys, marketing, solicitation, or resale" shall be narrowly construed and does not include reporting or gathering news, reporting or gathering information to assist citizen oversight or understanding of the operation or activities of government, or nonprofit educational research.

CREDIT(S)

(1969 S 55, eff. 10-26-99; 1998 H 421, eff. 5-6-98; 1997 H 352, eff. 1-1- 98; 1996 S 277, § 6, eff. 7-1-97; 1996 S 277, § 1, eff. 3-31-97; 1996 H 438, eff. 7-1-97; 1996 S 269, eff. 7-1-96; 1996 H 353, eff. 9-17-96; 1996 H 419, eff. 9-18-96; 1995 H 5, eff. 8-30-95; 1993 H 152, eff. 7-1-93; 1987 S 275; 1985 H 319, H 238; 1984 H 84; 1979 S 62; 130 v H 187)

LEXSEE 1991 Ohio App. LEXIS 6414
**STATE OF OHIO, ex rel., THE VINDICATOR PRINTING COMPANY, et al., Relator, - vs - DENNIS WATKINS, IN HIS CAPACITY AS TRUMBULL COUNTY PROSECUTOR, Respondent, MARY JANE HEISS, et al., Intervenors.**
**CASE NO. 91-T-4555**
**COURT OF APPEALS OF OHIO, ELEVENTH APPELLATE DISTRICT, TRUMBULL COUNTY**
**1991 Ohio App. LEXIS 6414**
**December 31, 1991, Decided**

**PRIOR HISTORY:**
[*1]      CHARACTER    OF PROCEEDINGS: Petition for Writ of Mandamus.

**DISPOSITION:**
JUDGMENT: Writ granted in part; denied in part.

**COUNSEL:**
ATTY. STEPHEN T. BOLTON, Atrium Level Two, The Commerce Building, Youngstown, Ohio 44503-1641, (For Relators)

ATTY. MARTIN F. WHITE, 175 Franklin Street S.E., P.O. Box 1150, Warren, Ohio 44482, (For Respondent)

ATTY. LYNN SFARA BRUNO, 4271 Market Street, Youngstown, Ohio 44512, (For Intervenors)

**JUDGES:**
HON. DONALD R. FORD, P.J., HON. JUDITH A. CHRISTLEY, J., HON. JOSEPH E. MAHONEY, J.

**OPINIONBY:**
PER CURIAM

**OPINION:**

OPINION

PER CURIAM.

This matter comes before this court as a result of a Petition for a Writ of Mandamus which was filed in this court by Relator, The Vindicator Printing Company ("The Vindicator"), against Respondent, Dennis Watkins, in his capacity as the Trumbull County Prosecutor, in the specific collateral case of State of Ohio v. Kenneth Biros, Trumbull C.P. No. 91-CR-87.

Relator's petition is brought pursuant to R.C. 149.43(C) by reason of Respondent's alleged failure to properly comply with R.C. 149.43(B). Relator maintains that, through its employees, it has requested [*2] the following data and/or documents from Respondent, all to no avail:

"A. All statements of any kind, nature, and description, all police reports and documents, all charts, graphs, photographs, computer data, all expert's reports and all written or

pictorial material in the possession of the Respondent which relates to State of Ohio vs. Kenneth Biros, Trumbull County Common Pleas Court Case No. 91 C.R. 87.

"B. A statement given to the Sharon Police Department by Kenneth Biros, which statement was later produced to counsel for Kenneth Biros in the course of discovery proceedings in State of Ohio vs. Kenneth Biros.

"C. All other written or pictorial material produced by Respondent to Defendant's counsel in State of Ohio vs. Kenneth Biros.

"D. All other material relating to the case of State of Ohio vs. Kenneth Biros which is in the possession of Respondent and which are public documents within the meanings of R.C. 149.43 and the Judgment Entry handed down in State of Ohio, ex rel. vs. Hubbard Township Police Department, Eleventh District Court of Appeals Court Case No. 90-T-4491."

Relator contends that, pursuant to R.C. 149.43(B), the [*3] foregoing materials are public documents which they have a clear legal right to review and receive copies of, at cost, all within a reasonable time.

In order to maintain this action in mandamus, Relator asserts that it has no other adequate remedy at law which would provide it the remedy it seeks.

In addition, Relator contends that Respondent's refusal to provide the documents requested, violates its

First and Fourteenth Amendments; and that such actions of Respondent are capable of repetition, yet which would reoccur without the opportunity for timely and appropriate review.

Respondent admits that he has refused to provide Relator with certain requested documents and materials, but that he has provided Relator access and copies of items which are not exempted by law or statute. Respondent further asserts that: 1) he has not violated R.C. 149.43(B); 2) Relator has a plain and adequate remedy at law, by way of a direct appeal; 3) he is barred by the code of professional responsibility from providing Relator the requested information; 4) if the requested material were provided, it would deprive the defendant, Kenneth Biros, of his constitutional right to a fair trial guaranteed under [*4] the Sixth and Fourteenth Amendment; and that 5) the specific material requested is expressly exempted under R.C. 149.43(A)(1), (2), and (4).

In addition to the foregoing parties, Andrew Engstrom and Mary Jane Heiss, et al., filed an application to intervene (pursuant to Civ. R. 24[A]) in the instant action on the grounds that they, among others, are immediate family members of the deceased murder victim in the State v. Biros case, from which this mandamus emanates; and that they have a right and duty to protect their own privacy rights and the privacy rights of other members of the deceased family.

On September 20, 1991, this court

granted Engstrom and Heiss intervention status as additional Respondents on the basis that they had set forth a legally cognizable "privacy" interest in preventing the disclosure of certain nonpublic documents which contained personal information concerning the deceased murder victim.

Accordingly, this court will address separately the merits of the Intervenor's privacy rights claim as it relates to R.C. 149.43(B) and Crim. R. 16.

However, in order to provide conceptual clarity and avoid confusion, the initial discussion shall pertain to an analysis [*5] regarding the issue of whether Relator has presented a proper action sounding in mandamus.

I

As noted, Respondent argues that Relator has an adequate remedy at law by way of direct appeal. The basis of Respondent's argument is that Relator previously attempted and was denied the right to intervene in the criminal case of State v. Biros for the purpose of obtaining the purported public records which are the subject of the instant action. Thus, according to Respondent, since a denial of a motion to intervene has been recognized as a final appealable order, Relator possesses an adequate remedy at law via direct appeal in the collateral criminal case.

A perusal of the trial court record indicates that The Vindicator did, in fact, attempt to intervene in the trial court case involving State v. Biros, in

an effort to secure records from Respondent, which The Vindicator deems to be public records. The issue here is a determination of the means available to the press for securing a forum in which to assert First and Fourteenth Amendment rights when certain records are not disclosed to the public. We hold that intervention in such a criminal trial proceeding by a press entity, [*6] such as the Relator here, who is not a party in that criminal case, is not a proper means of securing such a forum.

No Ohio case law has come to this court's attention which demonstrates that a third party has the right to intervene in a highly publicized criminal proceeding such as State v. Biros, supra, or for that matter in any criminal case in which the intervenor is not an original, direct party.

However, we find persuasive the notably similar case of State v. Bianchi (1979), 92 Wash. 2d 91, 593 P. 2d 1330, in which both the defense and prosecution appealed from an order of the superior court which permitted a newspaper (The Herald) to intervene for limited purposes in a highly publicized first-degree murder trial. The Washington Supreme Court held that "there is no rule, statute, or precedent in this state that would allow a third party to intervene in a criminal proceeding. * * * Intervention of right is provided for in civil cases only if the intervening party claims 'an interest relating to the property or transaction which is the subject of the action.' *** The only purpose of a criminal trial is the legal determination of the [*7] defendant's guilt or innocence. The

Law Offices · 7330 Market Street · Youngstown, Ohio  44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290

Appendix 7

Herald has no direct interest in this determination to justify its intervention and the disruption of the pending criminal proceedings inherent in the intervention process. The Herald's remedy must therefore lie in a separate action for declaratory judgment, mandamus, or prohibition." Id. at 133 (emphasis added); see, also, Central S.C. Chapter, Society of Professional Journalist v. United States District Court, (C.A. 4, 1977), 551 F. 2d 559. (Fourth Circuit considering a similar situation, treated an appeal by members of the press as a petition for mandamus and denied relief.); State v. Simants (1975), 194 Neb. 783, 236 N.W. 2d 794, rev'd on other grounds sub nom., Nebraska Press Association v. Stuart (1976), 427 U.S. 539, 96 S.Ct. 2791. (Trial court entered restrictive order relating to pretrial publicity in a mass murder [use] and members of the press attempted to intervene and other members of the press brought original action. In dismissing the appeal, the Supreme Court of Nebraska held that the press has no standing [*8] to intervene in the criminal case of a defendant accused of heinous crimes.)

In the case at bar, the Relator's attempt to intervene in the collateral criminal case was denied by the trial court on the basis that Relator has no standing. Relator did not appeal this trial court ruling. In the event that Relator had appealed such a ruling, the appeal would have ultimately been dismissed on the grounds that Relator's remedy for securing a forum in which to assert its First and Fourteenth Amendment rights as to

the alleged public documents held by Respondent lay in a separate action for mandamus. See, Bianchi, supra, at 1331.

Accordingly, Relator has no adequate remedy at law via a direct appeal.

Further, R.C. 149.43 specifically provides that a mandamus action may be obtained to secure public records which are wrongfully withheld from the public. R.C. 149.43.

Therefore, the remaining questions are whether Relator has a clear legal right to the records and whether Respondent has a clear legal duty to provide such documents. Not surprisingly, Respondent maintains that Relator has no legal rights to the records because they are exempted under R.C. 149.43A(1), (2), and (4). Since this [*9] issue is the crux of the instant action, it shall be discussed infra. However, of greater inquietude is whether Respondent has a clear legal duty to provide the claimed documents in the context of a case which has yet to proceed to trial. In other words, should an R.C. 149.43 mandamus action apply to original criminal trial proceedings such as the case at bar?

Respondent legitimately raised the concern that to allow Relator to proceed in the instant action created an inherent conflict between R.C. 149.43 and Crim. R. 16.

Clearly, Crim. R. 16 prohibits discovery of various documents by defendants in a criminal trial. Crim. R. 16 specifically provides that:

"(2) *Information not subject to disclosure.* Except as provided in subsections (B)(1)(a), (b), (d), (f), and (g), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses to state agents.

Moreover, the Ohio Supreme Court in Shane ex rel. v. New Philadelphia Police Dept. (1990), 56 Ohio St. 3d 36, 37, [*10] limited the defendant's right to discover any records to the criminal discovery process. In Shane, supra, the court held that "a criminal defendant may not obtain a writ of mandamus under R.C. 149.43 to secure public records when he may litigate his right to obtain these records in his criminal case. *** Shane had an adequate legal remedy, criminal discovery, to test any right he had to obtain these documents as public records. Trial courts can decide R.C. 149.43 issues in the discovery process. * * *" Id. at 37. (Citations omitted.)

Based on the limitations provided a defendant under Crim. R. 16, and the holding in Shane, supra, Crim. R. 16 and R.C. 149.43 provide a basis for discord when a criminal defendant attempts to utilize both of the foregoing channels for information in a contemporaneous mandamus in his criminal case.

However, as to a nonparty, such as Relator here, Crim. R. 16 is not applicable. Therefore, inherent in Relator's request for the documents is the concern that the criminal rules may properly deny access to records to a criminal defendant, in an ongoing criminal case, which may under appropriate circumstances [*11] be released to third parties, i.e. the media, pursuant to R.C. 149.43. When the foregoing issue was presented to the Ohio Supreme Court, it specifically declined to address it. See, Clark v. Toledo (1990), 54 Ohio St. 3d 55, 57, infra. However, unlike the Supreme Court, we are constrained to confront this question since it is directly before us.

As previously indicated, the Ohio Supreme Court has denied a criminal defendant the right to utilize R.C. 149.43 in an original trial proceeding; Shane, supra. However, the court has also unequivocally stated that a criminal defendant who has exhausted the direct appeals of his conviction may avail himself of R.C. 149.43 to support his post-conviction relief. Clark, supra, at 57.

In making this determination, the court in Clark rejected the Respondent's argument that "'Crim. R. 16 implicitly creates an exception to R.C. 149.43 where the possibility of reprosecution of a criminal defendant remains.'" Id. at 56. The Clark court conceded that:

"because retrial is a possible outcome of Clark's petition for post conviction relief, respondent points [*12] out, and correctly so, that upon retrial Clark might possess more information, as result of disclosure pursuant to R.C. 149.43, than he

would possess if confined to discovery under Crim. R. 16.

"***

"Because the right to access (under R.C. 149.43) is substantive, it cannot be abridged by Crim. R. 16." Id. at 56-57.

The court also discussed the Respondent's argument that "giving criminal defendants access to police investigatory records would undermine the apparent purpose of R.C. 149.43," which was to ensure accountability of public officials and not to frustrate the proper administration of criminal justice. Id. at 57.

In response, the court stated:

"The flaw in this argument is that it cannot be squared with the clear mandate of R.C. 149.43(B), supra, unless Clark is relegated to 'non-person' status. It is clear that *any person* may obtain public records pursuant to R.C. 149.43 without the necessity of stating a reason for obtaining those records. Despite his present station in life, Clark remains a 'person' within the contemplation of R.C. 149.43(B).

"It may well be that the exceptions to disclosure found at R.C. 149.43(A)(2) [*13] and (4) evince a legislative intent that R.C. 149.43 not be utilized to frustrate the proper administration of criminal justice, but this cannot alter Clark's status as a person. If, indeed, the General Assembly intends to restrict those in

Clark's situation to such information as is discoverable under Crim. R. 16, it need only amend the exceptions to disclosure presently found at R.C. 149.43 to make them co-extensive with the limitations on discovery found in Crim. R. 16." Clark, supra, at 57.

In anticipation of the dissent argument in Clark, the majority of the court noted:

"The dissent contends that it is illogical to construe Crim. R. 16 and R.C. 149.43 as prohibiting disclosure of certain records in connection with a defendant's original trial, but as allowing disclosure of those same records in connection with a post-conviction proceeding.

"The narrow issue in this case is whether R.C. 149.43 is available to a criminal defendant in a post-conviction proceeding, and it has not been necessary to address the possible application of R.C. 149.43 to original trial proceedings." Id. at 57.

To the extent that the court in Clark limited [*14] its holding to post-conviction proceedings, it is not applicable to the instant action which involves an original trial proceeding. Moreover, since the post-conviction litigation in Clark is a civil proceeding, and the underlying case of State v. Biros is a criminal action to which different rules apply, it appears that Clark has even less application. See, State v. Milanovich (1975), 42 Ohio St. 2d 46, 49. However, there are other aspects of the opinion which are pertinent, and

hence, binding, and which directly affect the outcome of the case at bar.

Since the court in Clark conceded that one might obtain more information under R.C. 149.43 than under Crim. R. 16, it would appear that a nonparty would be able to obtain documents which the defendant himself could not. Moreover, since the court specifically rejected the concept that Crim. R. 16 creates an exception to R.C. 149.43, then one cannot presume that the documents which are not discoverable under Crim. R. 16 to a defendant are generally not discoverable to the public under R.C. 149.43.

The anomalous result would be that a criminal defendant could have any "person" request documents for [*15] him, utilizing R.C. 149.43, in order to circumvent the interdictions of Crim. R. 16, or as more aptly stated by Respondent here, the defendant could simply wait for the evening edition of the newspaper to learn of nondiscoverable evidence that the prosecution has against him.

This court concludes that the legislative intent of R.C. 149.43, as it relates to original criminal trial proceedings, was not designed to provide a nonparty or the public, prior to the commencement of trial, access to records which may not be disclosed to a criminal defendant until the actual trial. Accordingly, it is this court's position that in cases which have yet to proceed to trial, R.C. 149.43 should reasonably be read in concert with the applicable limitations provided by Crim. R.

16(B). Otherwise, R.C. 149.43 could serve to infringe upon a defendant's right to a fair trial, or frustrate the proper administration of criminal justice in the initial trial proceedings. See, generally, Clark, supra, at 58-59. (Holmes, J., dissenting.)

Notwithstanding the foregoing, this court acknowledges that when confronted with a request for public documents by a nonparty in the collateral criminal [*16] case, under R.C. 149.43, we are guided by the rule set forth in State. ex rel. National Broadcasting Co., v. Cleveland (1988), 38 Ohio St. 3d 79 ("NBC I"), which provides as follows, in paragraphs one, two, and four of the syllabus:

"Law enforcement investigatory records must be disclosed unless they are excepted from disclosure by R.C. 149.43. ***

"A governmental body refusing to release records has the burden of proving that the records are excepted from disclosure by R.C. 149.43.

"***

"When a governmental body asserts that public records are excepted from disclosure and such assertion is challenged, the court must make an individualized scrutiny of the records in question. If the court finds that these records contain excepted information, this information must be redacted and any remaining information must be released." (Citations omitted.)

Accordingly, pursuant to R.C.

149.43 and NBC I, supra, this court is under an affirmative duty to make an individualized scrutiny of the alleged public records and/or averred exempted matter in question.

Specifically, Respondent claims that the requested documents are exempt from disclosure under [*17] R.C. 149.43A(1), (2), and (4), which provide:

"(A) as used in this section:

"(1) 'Public record' means any record that is kept by any public office, including, but not limited to, state, county, city, village, township, and school district units, except medical records, records pertaining to adoption, probation, and parole proceedings, records pertaining to actions under section 2151.85 of the Revised Code and to appeals of actions arising under that section, records listed in division (A) of section 3107.42 of the Revised Code, trial preparation records, confidential law enforcement investigatory records, and records the release of which is prohibited by state or federal law.

"(2) 'Confidential law enforcement investigatory record' means any record that pertains to a law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature, but only to the extent that the release of the record would create a high probability of disclosure of any of the following:

"(a) The identity of a suspect who has not been charged with the offense to which the record pertains, or of an information source or witness to whom confidentiality has been reasonably promised;

"(b) [*18] Information provided by an information source or witness to whom confidentiality has been reasonably promised, which information would reasonably tend to disclose his identity;

"(c) Specific confidential investigatory techniques or procedures or specific investigatory work product;

"***

"(4) 'Trial preparation record' means any record that contains information that is specifically compiled in reasonable anticipation of, or in defense of, a civil or criminal action or proceeding, including the independent thought processes and personal trial preparation of an attorney."

In State, ex rel. National Broadcasting Co. v. Cleveland, (1991), 57 Ohio St. 3d 77, 79, ("NBC II"), the court stated:

"'To determine whether a record is exempt from public disclosure under R.C. 194.43, a two-step analysis is required. First, is the record a confidential law enforcement record? Second, would release of the record 'create a high probability of disclosure' of any one of the four kinds of information specified in R.C. 149.43(A)(2)?'" (Quoting, State, ex rel. Polovischak, v. Mayfield (1990), 50 Ohio St. 3d 51, 52.)

A perusal of the index and [*19]

LAW OFFICES · 7330 MARKET STREET · YOUNGSTOWN, OHIO  44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

Appendix 12

the actual documents provided to this court by Respondent under seal, reveals that some of the documents included in this Court's Exhibit BBB are records which were specifically compiled pursuant to criminal investigations that police routinely perform when they investigate crimes. Such records have been held to be confidential law enforcement investigatory records. NBC II, supra.

Moreover, the records at issue are confidential law enforcement investigatory records whose release would create a high probability of disclosure of specific investigatory work product. See, R.C. 149.43(A)(2).

In addition to the foregoing, other items enclosed in this Court's Exhibit BBB are more in the nature of trial preparation records, or records which were compiled in anticipation of trial, which are also exempt from disclosure under R.C. 149.43(A)(4).

The Ohio Supreme Court has rejected a broad interpretation of the trial preparation exception and has confined its application to include only records specifically compiled in reasonable anticipation of litigation. Investigations conducted for multiple purposes do not qualify. State, ex rel. Zuern, v. Leis (1990), 56 Ohio St. 3d 20, 21; [*20] State, ex rel. Coleman, v. Cincinnati, (1991), 57 Ohio St. 3d 83, 84.

In Coleman, supra, the court held that general criminal investigations, which involve successfully prosecuted brutal homicides, do not, as such, create investigative materials exempt from release as trial preparation records under R.C. 149.43(A)(4), if

they were not specifically compiled in anticipation of a criminal action or proceeding. The Coleman court further observed that the police investigated a homicide to find out what the facts were. Later, when a prosecutor reviewed the investigations, he decided what, if any, criminal charges should be brought and against whom. Id. at 57; see, also, NBC I, supra, where the city conducted internal investigations to monitor and discipline the conduct of its police officers. The investigations were not undertaken based upon a specific suspicion of criminal wrongdoing, but were routinely conducted in every incident where deadly force was used by a police officer. The court in NBC I, which was reaffirmed in NBC II, held that absent facts which demonstrate that records were prepared specifically for litigation [*21] purposes, the exception of trial preparation records is inapplicable. NBC I, supra, at 84; NBC II, supra, at 81.

On the contrary, in the case at bar, the facts do indicate that a great majority of the records were prepared specifically for trial or litigation. Moreover, it is apparent from the facts in the record that the documents include the independent thought processes and personal trial preparation of the prosecution.

In Coleman, supra, the court noted that:

"*** the language in R.C. 149.43(A)(4), 'including the independent thought processes and personal trial preparation of an

attorney' suggests that the General Assembly envisioned an attorney would normally direct or conduct the compilation of protected 'trial preparation' information based upon trial strategy and the exigencies of litigation." Id. at 84.

The record in the instant case demonstrates that once the Brookfield Chief of Police suspected foul play in the missing person's report regarding Tammy Engstrom, he contacted Respondent Dennis Watkins, Trumbull County Prosecutor, to request assistance in the investigation of a potential homicide. Immediately, Respondent Watkins [*22] dispatched members of the Trumbull County Homicide Investigation and Prosecution Unit, ("HIPU"), for investigative purposes to the alleged crime scene.

The record demonstrates that from that point on, all of the investigation was conducted under the advice, guidance, and supervision of the prosecutor.

The obvious purpose of the HIPU is to collect and preserve evidence for the purpose of prosecution. Evidence in the record here manifests that the assistance rendered by HIPU in the Biros case was primarily for the purpose of assisting the prosecutor in preparation for trial and aiding the State in its development of that strategy.

Due to the fact that the HIPU was called into the Biros investigation incipiently, and was acting under the supervision of Respondent, it should not be surprising that a majority of the documents properly qualify as

trial preparation records excepted from disclosure under R.C. 149.43(A)(4).

Accordingly, only the designated records contained in this Court's Exhibit AAA are hereby ordered to be released to Relator as they do not fall within the exceptions of R.C. 149.43, and are, therefore, public records.

The balance of exhibits in Exhibit BBB does consist [*23] of excepted information under R.C. 149.43(A)(1), (2), and/or (3) and shall remain undisclosed.

II

Respondents, Heiss and Engstrom ("Intervenors"), have been permitted to intervene in the instant action. While this court recognized that the Intervenors demonstrated a legally cognizable privacy interest to intervene, we were not called upon at that juncture to determine whether or not they could or would prevail on the merits. However, that issue is now before us.

This court recognizes the tragic loss the Intervenors have suffered, and the difficulty which must exist from the constant reminders which result from the dissemination of various documents. Therefore, with significant deference we find ourselves in the position of concluding that the merits of the Intervenors' claims must fail.

Essentially, what the Intervenors are requesting is that the various documents and photographs be withheld from public access. No case law or statute has come to our attention which gives any party the

right to interdict either the obligation or right of the prosecutor/respondent to provide or withhold data under Crim. R. 16 and/or R.C. 149.43.

Upon a perusal of the parties' briefs, case law, and the [*24] record, it appears that while this issue has evaded review in Ohio, other courts have recognized that family members of victims do have privacy interests in preventing the disclosure of certain documents containing personal information concerning deceased family members.

In McCambridge v. City of Little Rock (1989), 298 Ark. 219, 766 S.W. 2d 909, the Arkansas Supreme Court held that a mother of a man who committed a murder-suicide, had a constitutional privacy right to personal information with respect to the incident, but that in balancing the government's interest in disclosure of facts and circumstances of the crime, including motive and adequacy of police investigation, the public purpose outweighed this right.

Further, in Yeste v. Miami Herald Pub. Co. (Fla. App. 1984), 451 So. 2d 491, the court permitted the widow and sons of a deceased to intervene in a mandamus action brought by the Miami Herald which sought the inspection of the medical certification portion of the death certificate. The court held that the section of the certificate was confidential under Section 119.07(1)(a), Florida Statutes (1983). The court [*25] noted that a death certificate is a public record under Section 119.011(1), Florida Statutes (1983), and ordinarily would

be subject to the public inspection and copying provisions. However, an exception (Section 382.35[4]) ingrained in the statute prohibited the release of the portion of the certificate which contained the medical certification of the cause of death, unless the person applying for it had a direct and tangible interest in the cause of death. The court noted that "the cause of death as stated in a death certificate represents sensitive and generally private information. If made public, this information could cause public embarrassment to the deceased's family, * * *." Id. at 494.

In both of the foregoing cases, the applicable statutes specifically provided for exceptions which acknowledged the privacy interests of the family members. Significantly, in McCambridge v. City of Little, supra, the State of Arkansas adopted The Arkansas Freedom of Information Act which appears to be patterned after The Freedom of Information Act (FOIA) 5 U.S.C. Section 552.

The Federal Act provides for several exemptions from disclosure. [*26] In particular, Exemption 6 of the FOIA exempts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of privacy." 5 U.S.C. Section 552(b)(6).

Ohio has no such exception to its public record law, R.C. 149.43. Moreover, it appears that there is no case law in Ohio which indicates that the right of privacy can be applied in a manner in which it would emasculate the state's or government's ability to meet its

burden of proof and/or the defendant's right to defend and assert specific defenses within the rules of evidence in a criminal case.

Further, if in fact the State submits items in evidence in a collateral criminal proceeding which would have been subject to nondisclosure under Crim. R. 16 or R.C. 149.43 prior to that occasion, there appears to be little legal basis, if any, for the contention that the right to privacy should prevent such submissions later during the trial of such matter.

Logically, it follows that once such items are properly entered into evidence, they lose their exempted character, and, thus, unequivocably become public records.

Consequently, we overrule Intervenors' request for injunctive relief [*27] against Respondent, Dennis Watkins, and Relator, The Vindicator Printing Company. We note that indirectly Intervenors' requests are honored to the extent that we find that certain items are not subject to disclosure in this proceeding pursuant to our previous analysis between Relator and Respondent Watkins.

Therefore, consistent with our foregoing analysis, the Relator's request for a Writ of Mandamus against Respondent Watkins is granted with respect to the following items, marked as Court's Exhibit AAA Nos. 1-16, since Respondent has failed to demonstrate that these items are entitled to exempted status. However, the writ is denied as to the remaining items contained in Court's Exhibit BBB, since Respondent Watkins has met his burden here. Those items set forth in Court's Exhibit BBB shall remain undisclosed and under seal. Court's Exhibit AAA shall be placed under seal pending a possible appeal of this court's judgment, and/or further order of this court.

Accordingly, Relator's request for attorney fees is overruled and costs are to be assessed against Relator, The Vindicator Printing Company.

PRESIDING JUDGE DONALD R. FORD

JUDGE JUDITH A. CHRISTLEY

JUDGE JOSEPH [*28] E. MAHONEY

HOWLAND SLAYING

# Bond is delayed for jailed suspects

*Both suspects remained quiet during the hearing*

By PEGGY SINKOVICH
VINDICATOR TRUMBULL STAFF

WARREN — The county prosecutor says the two suspects accused of killing a 57-year-old Howland Township man could face the death penalty.

Prosecutor Dennis Watkins said Donna Roberts, 57, of Fonderlac Drive, Howland, and Nathaniel Jackson, 29, of Wirt Street, Youngstown, face aggravated murder and aggravated burglary charges. Court officials said the case will be presented to the grand jury, who will decide if there is sufficient evidence to indict the pair on capital charges.

They are accused of killing Robert S. Fingerhut.

Since the two could face the death penalty, Watkins asked Judge John Stuard of Trumbull County Common Pleas Court not to set bond.

The judge agreed and said he would discuss the bond issue at a later date. They are in Trumbull County jail.

No plea: Roberts and Jackson appeared Friday before the judge. Since it was an initial appearance, neither had to enter a plea, court officials said.

The complaint filed by the prosecutor's office accuses Roberts and Jackson of killing Fingerhut on Dec. 11.

Both Jackson and Roberts remained silent during the brief hearing.

Photograph: Atty. Anthony Consoldane of the Ohio Public Defender's Commission, who represents Jackson, told the judge that police



Jackson

Roberts

## Continued From A1

had on his finger. Consoldane said police did not have permission to do so.

Consoldane declined to say what type of injury his client has or how he was injured.

Police also declined to say why they photographed the injury.

Police said Jackson and Roberts were friends. Jackson recently had been released from prison. Officials would not say how the two knew each other.

Howland Police Chief Steve Lamantia and Sheriff Thomas Altiere declined to give specifics about the arrests.

**Affidavit:** Atty. J. Gerald Ingram, who represents Roberts, objected to the release of an affidavit filed by the prosecutor's office, saying information in it may make it difficult to seat an impartial jury in the county.

Watkins objected, saying the affidavit is public record.

The judge said he will have a hearing on the matter Dec. 31.

**What happened:** Roberts called 911 at 12:25 a.m. Dec. 12 to report that she found her husband's body when she returned home.

Police said that it did not appear that anyone broke into the home but that a car belonging to Fingerhut had been stolen. The car was found at 6:30 p.m. Dec. 12 on Pershing Street in Youngstown.

Police think Fingerhut was shot with a handgun. The weapon has not been recovered, officials said. Police spent several hours Friday searching for the weapon. They were looking in an area off state Route 82 in Howland.

Township police obtained a copy of a report filed Nov. 26 by Roberts with Warren police. The report says Roberts said her handgun was stolen while she was at a convenience store in Warren.

Lamantia said he was pleased that

arrests were able to be made so quickly.

"Our two detectives, Paul Monroe and Frank Dillon, and Gary Bacon and the other detectives from the sheriff's department, Jeff Hoolihan of Warren City and the Ohio State Highway Patrol did a terrific job," Lamantia said. "We also had members of the Violent Crimes Task Force assisting us. This was a great effort by everyone involved."

Fonderlac Drive runs behind the Howland branch of the Butler Institute of American Art in an upscale neighborhood. Neighbors say Fingerhut and Roberts lived there about 2 1/2 years and did not have any children.

Fingerhut managed the Greyhound bus stations in Warren and Youngstown, police said. Roberts also worked at the bus stations, officials said.

sinkovich@vindy.com

LAW OFFICES · 7530 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE: 330.758.5986 · FACSIMILE: 330.758.8290

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 90

Tribune Chronicle

**SATURDAY, DECEMBER 22, 2001**

# Suspects appear



Tribune Chronicle / R. Michael Semple

Nathaniel E. Jackson, center, and Donna M. Roberts, left, are escorted by deputies into Judge John M. Stuard's courtroom at the Trum- bull County Common Pleas Courthouse Friday for an initial appearance. **See Story and photos, Page 3A.**

LAW OFFICES · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

Appendix 18

# Judge seals an affidavit in death case

**By KELLI YOUNG**
Tribune Chronicle

WARREN — Two people are being held without bond in the Trumbull County Jail in the shooting death of a Howland man, but a common pleas judge sealed a police affidavit detailing information of the crime.



**ROBERTS**

Judge John M. Stuard agreed to seal the affidavit, which includes statements made by police under oath used to secure arrest and search warrants.

Defense attorney J. Gerald Ingram argued releasing the document's details would taint potential jurors.

Nathaniel E. Jackson, 29, 309 S. Pearl St., Youngstown, and Donna M. Roberts, 57, 254 Fonderlac Drive, Howland, face charges of aggravated murder and aggravated burglary in connection with the shooting death of Robert S. Fingerhut, 57, whose body was found Dec. 12 on his kitchen floor with multiple gunshot wounds.

The case potentially could become a capital murder case, according to Trumbull Prosecutor Dennis Watkins, who said Fingerhut's death was premeditated. A capital murder case means defendants could be eligible for the death penalty if convicted.

Watkins disagreed with the sealing but neither he nor police would release details of the murder.

The Tribune Chronicle has filed a public records request, arguing the document is a public record and should be open to the public.

Jackson, represented by public defender Anthony Consoldane, pleaded innocent to the charges, but Roberts, represented by Ingram, did not enter a plea during the initial appearance. Consoldane decided to seek the sealing of the affidavit after Ingram made the motion.

Roberts lived with Fingerhut at the Fonderlac address and worked at the Greyhound bus stations in Warren and Youngstown that Fingerhut owned.

Police and prosecutors refused to characterize Roberts' and Jackson's relationship, which apparently is outlined in detail in the sealed affidavit.

The 30-to 40-page document has letters attached to it, according to Ingram, who said he needed time to look over the lengthy filing, which he described as prejudicial.

Although Roberts has referred to Fingerhut as her husband, documents from the Trumbull County Recorder's Office dated April 2001 refer to Roberts as an "unmarried woman." Police officials also have said Fingerhut's family members have indicated the two were not legally married. But authorities said they have heard conflicting reports on whether Fingerhut and Roberts were married.

Jackson was released from prison Dec. 9 after serving six months for two counts of receiving stolen property. Though police are not releasing a motive, they did say that Jackson was not a stranger to the Howland couple.

Hours after the court appearance, investigators combed through leaves, muddy puddles and litter on the side of Ohio 82 near Howland-Wilson Road searching for the murder weapon.

Jackson appeared in court with his left index finger wrapped with a bulky white bandage. It was his writing hand.

Chief Deputy Ernest G. Cook III called the wound "suspicious" but declined to describe it or how Jackson received the wound.

Consoldane accused police officials of taking pictures of the wound without receiving consent or having a search warrant. But Cook said it is routine for someone to be medically checked when they are arrested. Jackson was arrested at a house on Wirt Street in Youngstown shortly after midnight Friday. Roberts was arrested around 7:30 p.m. at the Fonderlac address.

Jackson, also known as Nathaniel Johnson and Nathaniel Korneagay, has a history in Lorain Correction Institution.

Lidia Hishynsky, administrative assistant at the prison, said Jackson has been incarcerated four times. Hishynsky said Jackson was admitted in January 1992 for aggravated burglary and in February 1996 for having a weapon under disability.

In February 2001, Jackson was admitted for having a stolen 1987 Buick Electra and a stolen license plate in his possesion, according to court documents. He was transferred to Belmont Correctional Institution in March and given a judicial release in May.

After failing to show for work at Dinesol Plastics in Niles, Jackson was taken back to prison in October to serve the remainder of his sentence, being released Dec. 9 — three days before Fingerhut was murdered.

Roberts has been charged with driving under the influence and failure to control her vehicle, according to reports.



Tribune Chronicle / R. Michael Semple

Trumbull County Sheriff's deputies and Howland and Warren police officers search for evidence in the death of Robert S. Fingerhut Friday afternoon along Ohio 82 eastbound lane near Howland-Wilson Road.

TRUMBULL COUNTY COMMON PLEAS COURT

GENERAL DIVISION

**ARRAIGNMENT FORM**

CASE NUMBER:   2001 CR 00793

JUDGE:   **HON. JOHN M. STUARD**

ATTORNEY OF RECORD AT TIME OF ARRAIGNMENT:   J. GERALD INGRAM

STATE OF OHIO

vs.

**DONNA MARIE ROBERTS**

Entered a plea of:  Not Guilty

Indicted for:  AGGRAVATED MURDER

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TO:    Thomas Altiere, Sheriff of Trumbull County

Whereas Defendant **DONNA MARIE ROBERTS** has this day appeared in court and was indicted for **AGGRAVATED MURDER.**

You are ordered to accept the said prisoner and retain him/her in your custody pending the posting of bond in the sum of:

*No bail*

Pre-trial Date:  *Jan 30, 2002*

Judge:  *[signature] M. Stuard*          Date:  *12/31/01*

## S U M M O N S   O N   I N D I C T M E N T
### RULE 9 (B)

TRUMBULL COUNTY COMMON PLEAS COURT
WARREN, OHIO    44481

THE STATE OF OHIO
PLAINTIFF

CASE NO.  2001 CR 00793

VS.

**DONNA MARIE ROBERTS**
DEFENDANT

---

TO:    **THOMAS ALTIERE, SHERIFF**

An Indictment, a copy of which is attached hereto, has been filed in the Trumbull County Court of Common Pleas charging **DONNA MARIE ROBERTS with: CT 1: AGG MURDER (F) W/SPECS OF AGG CIRCUMSTANCES  CT 2: AGG MURDER (F) W/SPECS OF AGG CIRCUMSTANCES CT 3:** AGG BURGLARY (F1)W/FIREARM SPEC CT 4: AGG ROBBERY (F1) W/FIREARM SPEC

You are commanded to summon **DONNA MARIE ROBERTS**, said Defendant to appear before said court at Trumbull County Common Pleas Courthouse, before **Judge John M. Stuard on Monday, December 31, 2001 at 11:00 a.m.**

Said Defendant is hereby informed that SHE may be arrested if SHE fails to appear at the time and place stated herein.

Special instructions to the executing officer:

**Defendant must appear for arraignment.  No waivers accepted.**

Given under my hand and the seal of said Court this December 28, 2001.

**MARGARET R. O'BRIEN, Clerk of Courts**

Trumbull County, Ohio

Rochelle Ryan
Deputy Clerk

CASE NO. 2001 CR 00793   VS. DONNA MARIE ROBERTS

### RETURN

Received this writ on the _____ day of _____, 20___
at _____o'clock ____.m., and on the _____ day of _____, 20
I served the same on the within named by _____

_____

**RETURN OF SERVICE OF SUMMONS (PERSONAL)**
            Fees            I received this summons on _____ 20__
Service $_____ at _____ o'clock ___.m., and made personal service o
Mileage _____ upon _____
   Total $_____ by locating him-them and tendering a copy of summons
Date: _____ accompanying documents, on _____, 20__

_____
                              Sheriff, Bailiff, Process Ser

By _____
                                                    Dep

**RETURN OF SERVICE OF SUMMONS (RESIDENCE)**
            Fees            I received this summons on _____ 20___
Service $_____ at _____ o'clock ___.m., and made residence service
Mileage _____ it upon the defendant(s) _____
   Total $_____
Date: _____ by leaving, at this their usual place of residence wi

_____
a person of suitable age and discretion then residing
therein, a copy of the summons and accompanying docume
on _____, 20_____.

_____
                              Sheriff, Bailiff, Process Ser

By_____
                                                    Dep

**RETURN OF SERVICE OF SUMMONS (FAILURE OF SERVICE)**
            Fees            I received this summons on _____ 20_____
Service $_____ at _____ o'clock ___.m., with instructions to make
Mileage _____ personal-residence service upon the defendant(s) ____
   Total _____ _____
Date _____ and I was unable to serve a copy of the summons upon _
_____for the following reasons:_____
_____
_____

_____
                              Sheriff, Bailiff, Process Ser

By _____
                                                    Dep

CAPIAS

THE STATE OF OHIO.
TRUMBULL COUNTY

**STATE OF OHIO**                          **CASE: 2001 CR 00793**

         VS.

**DONNA MARIE ROBERTS**
         TRUMBULL COUNTY JAIL
         WARREN,OHIO   44481

**TO THE SHERIFF OF SAID COUNTY,GREETINGS:**

WE COMMAND YOU TO TAKE **DONNA MARIE ROBERTS**

AND SAFELY KEEP, SO THAT YOU HAVE HIM BEFORE THE JUDGE OF COMMON PLEAS

AT THE COURT HOUSE IN SAID COUNTY TO ANSWER UNTO THE STATE OF OHIO,

ON AN INDICTMENT EXHIBITED AGAINST HIM FOR

        CT  1:  AGG  MURDER  (F) W/SPEC OF AGG CIRUMSTANCES  CT 2: AGG MURDER  (F)
W/SPEC OF AGG CIRCUMSTANCES  CT3: AGG BURGLARY (F1)W/FIREARM
    SPEC   CT 4: AGG ROBBERY (F1) W/FIREARM SPEC RADIUS:1

AND HAVE YOU THEN AND THERE THIS WRIT.

                    WITNESS MY HAND AND THE SEAL
                    OF SAID COURT, THIS December 28, 2001

                    **MARGARET O'BRIEN  CLERK**

                    BY:  ROCHELLE RYAN            DEPUTY CLERK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE STATE OF OHIO          RECEIVED THIS WRIT___*Dec. 28*___A.D. 20 *01*

                         AT *1605* O'CLOCK *P* M., AND I HAVE

                         ARRESTED THE SAID

        **FEES**

    SERVICE.....$_____          _____

    MILEAGE..... _____

    CONVEYANCE.. _____          _____

    ASSISTANTS.. _____          *Dep. J Mace* _____ SHERIFF

    SUSTENANCE.. _____

    RETURN...... _____

       TOTAL    $_____                                        *10*

CASE NUMBER: 01-CR-793 - DIRECT PRESENTMENT

NAME:   DONNA MARIE ROBERTS

ADDRESS: C/O TRUMBULL COUNTY JAIL
         WARREN, OH   44481

         RADIUS:    1

<u>DESCRIPTIVE DATA OF PERSON WANTED ON THE ENCLOSED WARRANT</u>:
CHARGE: CT 1: AGG MURDER (F) W/SPECS OF AGG CIRCUMSTANCES
(2903.01(A), 2941.14(C), AND 2929.04(A)(7); CT 2: AGG MURDER
(F) W/SPECS OF AGG CIRCUMSTANCES (2903.01(B), 2941.14(C), AND
2929.04(A)(7); CT 3: AGG BURGLARY (F1) W/FIREARM SPEC
(2911.11(A)(1)(2) AND 2941.145; CT 4: AGG ROBBERY (F1)
W/FIREARM SPEC (2911.01(A)(1)(3) AND 2941.145)

DOB: 05/22/44     SOCIAL SECURITY NO.: 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

AGE:       HT.:           WT.:           SEX: FEMALE

COMPLEXION:

RACE: WHITE

EYES:                 HAIR:

SCARS, MARKS, TATTOOS, ETC.:

EMPLOYER:
         SHIFT:        DEPT.:

YEAR & MAKE OF AUTO:

COLOR:

REGISTRATION NO.:

STATE:

LIC. NO.:

NAME OF COMPLAINANT: DET MONROE - HOWLAND TWP POLICE DEPT
ADDRESS:
REMARKS:

In the Court of Common Please of Trumbull County

State of Ohio,
    Plaintiff,          :     Notice to Supreme Court of
                     :     Ohio of Filing of Indictment
    v.               :     Charging Aggravated Murder
                     :     with Specification(s) of
DONNA MARIE ROBERTS    :     Aggravating Circumstances
    Defendant.        :     [R.C. 2929.021(A)]

Name of defendant:    **DONNA MARIE ROBERTS**

The court in which the case will be heard:

        **JUDGE JOHN M STUARD**

Case number(s):      **2001CR793**

Date on which indictment was filed:

        **DECEMBER 28 2001**

_____
Clerk of Courts of Trumbull County

Date:  January 4, 2002

*1-4-02 Sent to Supreme Court*

11

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 98



*First Assistant*
**JAMES J. MISOCKY**

*Chief — Civil Division*
**JAMES T. SAKER**

*Chief — Criminal Division*
**CHARLES L. MORROW**

*Senior Trial Attorneys*
**KENNETH N. BAILEY**
**CHRISTOPHER D. BECKER**

*Administrator — Criminal Division*
**DIANE L. BARBER**

*Chief — Appellate Division*
**LuWAYNE ANNOS**

*Civil Division*
**JAMES M. BRUTZ**
**JASON C. EARNHART**
*Criminal Division*
**STANLEY A. ELKINS**
**JENNIFER CARROLL KIRR**
**DAVID M. TOEPFER**
*Child Assault Division*
**THOMAS C. WRENN, CHIEF**
**SARAH T. KOVOOR**
*Juvenile Division*
**SEAN J. O'BRIEN**
*Child Support Division*
**DAVID E. BOKER, CHIEF**
**DONALD W. HILL**
*Investigators*
**RALPH E. MARCHIO**
**SUEELLEN STINEDURF**
**JAMES L. TEEPLE**

# DENNIS WATKINS
## *Trumbull County Prosecuting Attorney*

4th FLOOR ADMINISTRATION BUILDING
160 HIGH STREET N.W.    WARREN, OHIO 44481-1092
PHONE: (330) 675-2426 • FAX: (330) 675-2431

## VICTIMS' RIGHTS NOTIFICATION
(Pursuant to Order of the Trumbull County Common Pleas Court)

**DEFENDANT** DONNA MARIE ROBERTS  **CHARGE** * SEE ATTACHMENT

**CASE NUMBER** ___01-CR-793___  **JUDGE** ___STUARD___

**DATE OF INDICTMENT** ___12/28/01___  **PROSECUTOR** ___WATKINS___

Dear Mr. Fingerhut:

The Trumbull County Grand Jury has returned and indictment against the defendant in the above case.  Resolution in this case may be by a guilty plea or trial.

The Trumbull County **Victim/Witness Division** is here to assist you in the criminal justice process.  As a victim in this case, you have the following rights:

1.    The right to notification of plea, trial and/or sentencing date and time.
2.    If you suffered physical harm or job wage loss because of this crime, you may be eligible for Crime Victims Compensation.  This fund can be tapped once other insurance benefits have been exhausted, when the crime is reported within 72 hours, and when you as the victim have cooperated with local law enforcement officers in solving the crime.
3.    The right to notification of shock parole, shock probation, parole or early release - if any - providing you notify such desire, in advance, to the Ohio Adult Parole Authority and our office.
4.    The right to submit a written Victim Impact Statement which, if given, will assist the Court in passing sentence.
5.    The right to make an oral statement at sentencing in open court which, if given, will be sent to the Ohio Adult Parole Authority at 1050 Freeway Drive, Columbus, OH 43229.

It is the duty of our office to assist you in exercising the above rights.  In order to receive our services it is **your responsibility** to return the enclosed **Response Form**.  Failure to return this form indicates that you do not desire the services of the Victim/Witness Division.  Please review our enclosed brochures.  If you have any questions, you may contact us at (330)675-2551.

**NOTE: YOU DO NOT HAVE TO RETURN A RESPONSE FORM.**

MARY JO HOSO
Administrator
Victim/Witness Division

12

A:\Roberts.Donna.2\Cover.wpd•Fri 04Jan2002•1504.28 (03:04:28PM)

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,     }  Case No. 01 CR 793

   Plaintiff     }  Judge John M. Stuard

-vs-         }

          }  **DEATH PENALTY CASE**

DONNA ROBERTS,    }

   Defendant    }

---

### DEFENDANT'S NOTICE OF REQUEST FOR DISCOVERY
[OHIO CRIM.R. 16(B)]

---

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq. (#0009949)
Trumbull County Prosecutor
CHARLES L. MORROW, Esq. (#0040575)
Assistant Prosecutor
160 High Street, NW
Warren, Ohio 44481
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

Roberts, Donna
1758

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

A:\Roberts.Donna.2\Disc.Request.wpd ✦ Fri 04·Jan02-03:03:59P

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    }        Case No. 01 CR 793

    Plaintiff                    }
                      }

*vs.*                            }        Judge John M. Stuard
                      }

DONNA ROBERTS,                    }

    Defendant                    }

---

## DEFENDANT'S NOTICE OF REQUEST FOR DISCOVERY

---

THE DEFENDANT, DONNA ROBERTS, through counsel, hereby gives notice to the Court that discovery pursuant to OHIO CRIM.R. 16 was requested of the government on the date indicated in the certificate of service.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Notice of Request for Discovery was sent by regular U.S. Mail to Dennis Watkins, Esq., and Charles L. Morrow, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren, Ohio 44481 this ___ day of January, 2002.

JOHN B. JUHASZ

A:\Roberts.Donna.2\Cover.wpd•Fri 04Jan2002•1504.28 (03:04:28PM)

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,                     }     Case No. 01 CR 793
                                   }
          Plaintiff                }     Judge John M. Stuard
                                   }
-vs-                               }
                                   }     **DEATH PENALTY CASE**
                                   }
DONNA ROBERTS,                     }
                                   }
          Defendant                }

---

### DEFENDANT'S MOTION FOR NOTICE OF INTENTION TO USE EVIDENCE
[OHIO CRIM.R. 12(D)(2)]

---

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ  (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq. (#0009949)
Trumbull County Prosecutor
CHARLES L. MORROW, Esq. (#0040575)
Assistant Prosecutor
160 High Street, NW
Warren, Ohio 44481
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

Roberts, Donna
1758

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

A:\Roberts.Donna.2\CRIMR12.D2.wpd•Fri 04Jan2002•1505.34 (03:05:34PM)

# In the Court of Common Pleas Trumbull County, Ohio

STATE OF OHIO,                    }    Case No. 01 CR 793
                                   }
      Plaintiff              }    Judge John M. Stuard
                                   }
-vs-                              }
                                   }
                                   }
DONNA ROBERTS,                    }
                                   }
      Defendant             }

---

### DEFENDANT'S MOTION FOR NOTICE OF INTENTION TO USE EVIDENCE
#### [OHIO CRIM.R. 12(D)(2)]

---

COMES NOW THE DEFENDANT, DONNA ROBERTS, through counsel, and pursuant to the provisions of OHIO CRIM.R. 12(D)(2), moves this Court for an order requiring the government to provide a detailed description of each and every item of evidence that is intended to be used or introduced against the Defendant by the government in its case against the Defendant.  This Motion includes, but is not limited to, any and all physical evidence, any identification testimony, and any evidence which the government intends to use and claims is admissible as "other act" evidence.  *See*, OHIO REV. CODE ANN. §2945.59 and OHIO EVID.R. 404(B).

For cause, the Defendant and counsel say that they cannot well and adequately prepare a defense, absent such information from the government.  Accordingly, denial of the requested information will result in a deprivation of

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 103

constitutional liberties specified in U.S. CONST. amend. V, VI, and XIV[1] and OHIO CONST. art. I, §§1, 2, 10, and 16.[2]

Further for cause, the Defendant says that OHIO CRIM.R. 12 provides in relevant part:

> **(A) Pleadings and Motions.**  Pleadings in criminal proceedings shall be the complaint, and the indictment or information, and the pleas of not guilty, not guilty by reason of insanity, guilty, and no contest.  All other pleas, demurrers, and motions to quash, are abolished.  Defenses and objections raised before trial which heretofore could have been raised by one or more of them shall be raised only by motion to dismiss or to grant appropriate relief, as provided in these rules.

---

[1] U.S. CONST. amend. V provides in pertinent part that "No person shall . . . be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."  Further, U.S. CONST. amend. VI provides in pertinent part that: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, . . . and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."  U.S. CONST. amend. XIV, through the Due Process Clause, makes these liberties applicable to state criminal prosecutions.  *See, e.g., Malloy v. Hogan* (1964), 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed.2d 653; *Pointer v. Texas* (1965), 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed.2d 923; *Parker v. Gladden* (1966), 385 U.S. 363, 87 S. Ct. 468, 17 L. Ed.2d 420; and, *Washington v. Texas* (1967), 388 U.S. 14, 87 S. Ct. 1920, 18 L.Ed.2d 1019.

[2] OHIO CONST. art. I, §1 provides: "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of *enjoying and defending life and liberty*, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."  Emphasis added.  OHIO CONST. art. I, §2 provides in pertinent part that: "All political power is inherent in the people. Government is instituted for their *equal protection and benefit* . . . ." (Emphasis added.)  OHIO CONST. art. I, §10 provides in pertinent part: "In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed . . . .  No person shall be compelled, in any criminal case, to be a witness against himself . . . .  No person shall be twice put in jeopardy for the same offense."  OHIO CONST. art. I, §16 provides in pertinent part: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy *by due course of law*, and shall have *justice administered without denial or delay*. . . ." (Emphasis added.)  Without the requested information, the defendant cannot effectively defend liberty, either by knowing the evidence to be used by the government, and also because the Defendant will be unable to effectively frame pretrial motions as envisioned by OHIO CRIM.R. 12.  Such a process undoubtedly favors the government, and deprives the Defendant of a remedy in the courts by due course of law.  Such a one-sided proceeding also works a denial of justice.  (All quotes are West Publishing Group Copyright © 2000; and Copyright © Lexis-Nexis, a Division of Reed Elsevier, Inc. 2001.)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUERSDOC@AOL.COM

2

**(B) Pretrial Motions.** Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion.  The following must be raised before trial:

(3) Motions to suppress evidence, including but not limited to statements and identification testimony, on the ground that it was illegally obtained.  Such motions shall be filed in the trial court only;

**(D) Notice by the Prosecuting Attorney of the Intention to Use Evidence.**

(2) At the Request of the Defendant.  At the arraignment or as soon thereafter as is practicable the defendant may, *in order to raise objections prior to trial under subsection (B)(3)*, request notice of the prosecuting attorney's intention to use evidence in chief at trial, which evidence the defendant is entitled to discover under Rule 16.[3]

WHEREFORE, the Defendant prays for a disclosure by the government as described herein and in OHIO CRIM.R. 12(D)(2).

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ  (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

---

[3] Emphasis (*italics*) added.  If the government is not required to list each item of evidence it intends to use, the purpose of OHIO CRIM.R. 12 is frustrated and a denial of justice results.  Similarly, the government must be required to explicitly state whether it intends to use any evidence as "other act" evidence.  Otherwise, the defendant cannot adequately prepare to defend his liberty.  *See*, OHIO CONST. art. I, §1.  The failure of the government to fully and timely respond results in a denial of justice and also a denial of a remedy in the courts by due course of law.  *See*, OHIO CONST. art. I, §16.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 105

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was

❑ hand delivered
☑ sent by regular U.S. mail
❑ sent by telecopier

on the 4th day of January, 2002 to DENNIS WATKINS, Esq., and CHARLES L. MORROW, Esq., 160 High Street, NW, Warren, Ohio 44481.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDO@AOL.COM

4



COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly) | B. Date of Delivery

C. Signature
X _____  ☐ Agent  ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

2001 CR 00793
THE SUPREME COURT
30 EAST BROAD STREET
COLUMBUS OH    43266

3. Service Type
☒ Certified Mail

4. Restricted Delivery? *(Extra Fee)*  ☐ Yes

2. Article Number *(Copy from service label)*

7104 2230 1690 0891 8018

PS Form 3811, July 1999          Domestic Return Receipt



UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

MARGARET R O'BRIEN
CLERK OF COMMON PLEAS COURT
160 HIGH ST NW
WARREN OH 44481-1005

## IN THE COURT OF COM.. .N PLEAS
## TRUMBULL COUNTY OHIO

| | |
|---|---|
| STATE OF OHIO, | ) CASE NO: 01-CR-793 |
| Plaintiff, | ) |
| | ) |
| -vs- | ) JUDGE JOHN M. STUARD |
| DONNA Roberts , | ) WAIVER OF SPEEDY TRIAL |
| | ) |
| Defendant | ) |

This matter came before this court this 30th day of Jan _____, 199_ 2002, before

the Honorable STUARD Judge of the Court of Common Pleas. The Defendant appeared

with Counsel, Attorney Juhasz _____, and the State was represented by Assistant

Prosecuting Attorney WATKINS _____.

The Court advised the Defendant that he/she had a right to a speedy trial pursuant to the

Sixth Amendment of the United States Constitution and Section 10, Article I of the Ohio

Constitution. Further, the Defendant was advised the pursuant to Ohio Supreme Court Rules of

Superintendence, Rule 8(B), he has the right to be brought to trial within six (6) months of

arraignment on indictment or information.

The Defendant, voluntarily, and in open court, agreed to waive his/her rights to speedy trial

and agreed to extend the time in which he/she has to be brought to trial by an additional 300

days beyond the statutorily imposed time period.

The Court, having fully advised the Defendant of his speedy trial rights, and being fully

satisfied that the Defendant understood, and voluntarily waived the same, and for good cause

shown, hereby accepts Defendant's speedy trial waiver, and extends the time in which the Defendant

must be brought to trial for an additional 300 days beyond the statutorily imposed

time period, and sets a trial date for Nov 18, 2002 ,said date being expressly

approved by both the Defendant and the State.

_Donna M Roberts_
Defendant

_Juhasz_
Attorney for Defendant

Approved:

_John M. Stuard_

JOHN M. STUARD
Judge Trumbull County
Common Pleas Court

1/30/02
Dated

0363 147

16

E:\JBJCD12\CAPITAL\CLIENT\ROBERTS.DONNA\Cover.Page.wpd*Wed 23Jan2002•0604.39 (06:04:39am)

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,

    Plaintiff

*vs.*

DONNA ROBERTS,

    Defendant

}
}
}
}
}
}
}
}
}
}
}

Case No.  01 CR 793

Judge John M. Stuard

**Death Penalty Case**

---

### DEFENDANT'S MOTION FOR AN ORDER ENLARGING THE TIME FOR FILING PRETRIAL MOTIONS
[OHIO CRIM.R. 12(C)]

---

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
CHARLES L. MORROW, Esq., Assistant
160 High Street NW
Warren, OH  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF



J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

17

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 110

E:\Jbjcd12\CAPITAL\Client\Roberts.Donna\Enlarge.time.PTMotions.wpd ✦ Wednesday 23 January 2002•06:03am (0603 hrs)

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    }        Case No. 01 CR 793
                                  }
    Plaintiff        }
                                  }
                                  }        Judge John M. Stuard
*vs.*                             }
                                  }
                                  }
DONNA M. ROBERTS,                 }
                                  }
    Defendant       }

---

### DEFENDANT'S MOTION FOR AN ORDER ENLARGING THE TIME FOR FILING PRETRIAL MOTIONS
### [OHIO CRIM.R. 12(C)]

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves for an order enlarging the time within which the Defendant may file pretrial motions.[1] The Defendant says that such an order is necessary to

---

[1] OHIO CRIM.R. 12 contemplates that certain motions be filed within 35 days after the Defendant is arraigned. The rule provides in pertinent part:
    **(B) Pretrial motions.** Prior to trial, any party may raise by motion any defense, objection, evidentiary issue, or request that is capable of determination without the trial of the general issue. The following must be raised before trial:
    (1) Defenses and objections based on defects in the institution of the prosecution;
    (2) Defenses and objections based on defects in the indictment, information, or complaint (other than failure to show jurisdiction in the court or to charge an offense, which objections shall be noticed by the court at any time during the pendency of the proceeding);
    (3) Motions to suppress evidence, including but not limited to statements and identification testimony, on the ground that it was illegally obtained. Such motions shall be filed in the trial court only.

(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

1

enforce the liberties of due process of law, specified in U.S. CONST. amend. XIV; and, liberties under the Ohio Constitution, including a remedy by due course of law, the administration of justice without denial, and the ability to defend life and liberty. *See*, OHIO CONST., art. I, §§1, 2, 10, and 16.

Further, the Defendant says that OHIO CRIM.R. 12(C) contemplates that the Court may extend the time for filing pretrial motions in the interest of justice. The rules of criminal procedure, however, contemplate that the government will timely and fully comply and provide the discovery and other information required by law to be provided to the defense. *See*, *State v. Bidinost* (1994), 71 Ohio St.3d 449, 644 N.E.2d 318. In that case, the Ohio Supreme Court held at 456, that "the 'spirit of the law' was not fulfilled by anything less than strict adherence" to the rules of criminal procedure. The Court also held that it "specifically drafted the rules to ensure the fairness of criminal proceedings."

In *State v. Wilson* (1993), 91 Ohio App.3d 611, 632 N.E.2d 1384, the court held that the failure of the government to timely disclose evidence gives it a tactical trial advantage, and puts the defendant at a corresponding disadvantage. Here, the government still has not provided complete discovery. *See*, the *Defendant's Motion for Discovery*, filed herein.

---

[1](...continued)
    (4) Requests for discovery under Crim. R. 16;
    (5) Requests for severance of charges or defendants under Crim. R. 14.
    **(C) Motion date.** All pretrial motions except as provided in Rule 7(E) and Rule 16(F) shall be made within thirty-five days after arraignment or seven days before trial, whichever is earlier. The court in the interest of justice may extend the time for making pretrial motions.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

2

Additionally, this is a capital case, where a substantial number of motions must be filed.  To be able to attempt to render effective counsel will take months, rather than days or weeks, of motion writing.

The process for determining whether the Defendant is guilty or not guilty must be a fair and reliable one.  U.S. CONST. amend. XIV; OHIO CONST. art. I, §§1, 2, 10, and 16; *In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368; *State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342;[2] *Estelle v. Williams* (1976), 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126; *Chambers v. Mississippi* (1973), 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297; *Medina v. California* (1992), 505 U.S. 437, 463, 112 S.Ct. 2572, 120 L.Ed.2d 353, 60 USLW 4684 (BLACKMUN, J., joined by STEVENS, J., dissenting.)[3]  OHIO CRIM. R. 12 gives the Court the power to enlarge the time for filing of pretrial motions; and, in this case, such an order would help to make the proceedings fair.  Indeed, such a situation would be:

> a cheap subterfuge of and shameless mockery upon justice for the state to put a man on trial in its courts, charged with an offense which involved his life, liberty, or character, and then place him in such a position that he could not prepare to make his defense.  It would be just as reasonable to place shackles upon a man's limbs, and then tell him that it is his right and duty to defend himself against an

---

[2]The Supreme Court of Ohio held in *Lane*:
The presumption of innocence of the accused in a criminal prosecution is a basic component of a fair trial in the criminal justice system.  *Coffin v. United States* (1895), 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481.  It is the duty of our courts to guard against factors which may undermine the fairness of the fact-finding process and thereby dilute the right to the presumption of innocence.  To implement the presumption courts must be alert to factors that may undermine the fairness of the fact-finding process.  *Estelle v. Williams* (1976), 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126. . . .

[3] There, Justice Blackmun said that "the *Due* Process Clause is not the *Some* Process Clause. . . ."

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290

3

> impending physical assault. If the right of defense exists, it includes
> and carries with it the right of such freedom of action as is essential
> and necessary to make such defense complete. In fact, there can be
> no such thing as a legal trial, unless both parties are allowed a
> reasonable opportunity to prepare to vindicate their rights.

*State ex rel. Tucker v. Davis* (1913), 9 Okl. Cr. 94, 130 P. 962, 44 L. R. A. (N. S.) 1083; *see, also, Thomas v. Mills* (1927), 117 Ohio St. 114, 157 N.E. 488, 54 A.L.R. 1220, 5 Ohio Law Abs. 401.

WHEREFORE, the Defendant respectfully prays for an order enlarging the time within which the Defendant may file pretrial motions under OHIO CRIM.R. 12(B) and (C).

Respectfully submitted,

J. GERALD INGRAM 0007887

JOHN B. JUHASZ 0023777
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330·758·2308
Facsimile: 330·758·8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Motion to Enlarge Time was:

☑ sent by regular United States Mail, postage prepaid,
☐ hand delivered to counsel or counsel's office
☐ sent by telecopier

this 24th day of January, 2002 to Dennis Watkins and Charles L. Morrow, Esq., Counsel for Plaintiff, 160 High Street, Warren, Ohio 44481.

JOHN B. JUHASZ

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 114

E:\JBJCD12\CAPITAL\CLIENT\ROBERTS.DONNA\Cover.Page.wpd*Wed  23Jan2002•0604.39  (06:04:39am)

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,

        Plaintiff

*vs.*

DONNA ROBERTS,

        Defendant

Case No.  01 CR 793

Judge John M. Stuard

**Death Penalty Case**

## DEFENDANT'S MOTION FOR DISCOVERY
### [OHIO CRIM.R. 16(B)]

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
CHARLES L. MORROW, Esq., Assistant
160 High Street NW
Warren, OH  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

J. GERALD INGRAM • JOHN B. JUHASZ • ATTORNEYS AT LAW • 7330 MARKET STREET • YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 • FACSIMILE: 330.758.8290

E:\JBJCD12\CAPITAL\CLIENT\ROBERTS.DONNA\Discovery.motion.wpd ✦ Wednesday 23 January 2002 • 06:18am
(0618 hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    }        Case No. 01 CR 793
                                  }
        Plaintiff                 }
                                  }        Judge John M. Stuard
vs.                               }
                                  }
                                  }
DONNA M. ROBERTS,                 }
                                  }
        Defendant                 }

---

### DEFENDANT'S MOTION FOR DISCOVERY
[OHIO CRIM.R. 12(C)]

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel,
and moves for an order directing the State of Ohio to provide discovery as set
forth in OHIO CRIM. R. 16(B), including, but not limited to, the following:

1. Statements as follows:
   (a)   Any written statement, recorded statement, and the
substance of any oral statement made by the Defendant.
   (b)   Any written statement, recorded statement, and the
substance of any oral statement made by any co-defendant.
   (c)   Any written statement, recorded statement, and the
substance of any oral statement of each and every alleged accomplice,
whether indicted or not indicted, which the Government intends to
introduce into evidence during its case-in-chief as an exception to the
hearsay rule or as the statement of a co-conspirator. This request
encompasses the original tape or videotape recording, if a tape or
videotape recording of any of the above described statements was
made; the original handwritten notes relative to any oral statements,
if handwritten notes were taken; the original longhand summary of
any oral statement described above; and any and all typed summary
of said statements.
2. Grand Jury Evidence, *etc.* as follows:

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

1

(a)    Any and all testimony of any co-defendants and accomplices, whether indicted or not indicted, given before the Grand Jury.

(b)    Please state whether or not any written statement, recorded statement, or the substance of any oral statement made by the defendant or any co-defendant was presented to the Grand Jury.

If so, (i) From whom was said statement taken; (ii) Who took said statement; and, (iii) Produce for inspection each such statement.

3.    The Defendant's prior criminal record, including arrests which did not result in convictions if the Government intends to use the same to impeach character witnesses.

4.    Any books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the Government, including any law enforcement officers, and which are intended for use by the Government as evidence at the trial or were obtained from or belonged to the Defendant.

5.    The results of any scientific examinations and tests or experiments made in connection with this case, available to, or within the possession, custody or control of, the Government, the existence of which is known or by the exercise of due diligence may become known to the Government.

6.    A written list of the names and addresses of all witnesses whom the Government intends to call at trial, together with any records of prior felony convictions of any witnesses. This request also includes convictions for misdemeanors which may be used *prima facie* for impeachment purposes.

7.    Any and all evidence which is favorable to the Defendant and/or co-defendants and material to either guilt or punishment. *See,* OHIO CRIM.R. 16(B)(1)(f), which provides:

*Disclosure of evidence favorable to defendant.*  Upon motion of the defendant before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment. The certification and the perpetuation provisions of subsection (B)(1)(e) apply to this subsection.

This request includes, but is not limited to:

(a) Any and all records and information revealing prior felony convictions or guilty verdicts or juvenile adjudications attributed to each prospective witness to be called by the Government, including, but not limited to, relevant F.B.I. "rap sheets," NADDIS, BCI and NCIC records, and the records of prior convictions referred to above.

(b) Any and all records and information revealing prior misconduct or bad acts attributed to the witness.

(c) Any and all consideration or promises of consideration given to or on behalf of the witness or expected or hoped for by the witness,

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 117

including but not limited to, payments, promises of immunity, leniency or preferential treatment.

(d) Any and all threats, express or implied, direct or indirect, or other coercion made or directed against the witness or persons of concern to the witness; any and all criminal prosecution or investigations, or potential investigations pending or which could be brought against them; any and all probation, parole, deferred prosecution, or custodial status of them; and any and all civil, tax, tax court, court of claims, administrative, or other pending or potential legal disputes or transactions of them which has real, apparent or perceived influence.

(e) Any and all records and information revealing any defect or deficiency of capacity in the witness or observe, remember or recount events, specifically including but not limited to all such records and information in any way related to or connected with the competency, mental capacity, disease, defect, disorder, symptoms, history, diagnosis, prescription, treatment, counseling and/or prognosis or any mentally impaired witness.

(f) Any and all other records and/or information which arguably could be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of the Government's evidence of which arguably could lead to such records or information, specifically including but not limited to any which tends to show a defect or deficiency of character for truthfulness and/or show partiality (prejudice, bias, motive, interest and/or corruption) on the part of the witness.

(g) The same records and information requested in items (a) through (f) above, with respect to each non-witness declarant, whose prior statements will be offered in evidence.

WHEREFORE, the Defendant respectfully prays for an order enlarging the time within which the Defendant may file pretrial motions under OHIO CRIM.R. 12(B) and (C).

Respectfully submitted,

J. GERALD INGRAM 0007887
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330·758·2308
Facsimile: 330·758·8290

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 118

JOHN B. JUHASZ 0023777
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330·758·2308
Facsimile: 330·758·8290
COUNSEL FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Motion for Discovery was:

☑ sent by regular United States Mail, postage prepaid,
☐ hand delivered to counsel or counsel's office
☐ sent by telecopier

this 24th day of January, 2002 to Dennis Watkins and Charles L. Morrow, Esq., Counsel for Plaintiff, 160 High Street, Warren, Ohio  44481.

JOHN B. JUHASZ

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

4

E:\BJCD15\CAPITAL\Client\Roberts.Donna\Cover.Page.wpd*Tue 12Feb2002•0535.51 (05:35:51am)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                            }

      Plaintiff                          }          Case No.  01 CR 793

*vs.*                                     }          Judge John M. Stuard

                                         }

DONNA M. ROBERTS,                         }

      Defendant                          }          **DEATH PENALTY CASE**

---

### MOTION TO DETERMINE PROPER STANDARD
### TO EXCUSE JURORS FOR CAUSE

### REQUEST FOR HEARING

---

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
CHARLES L. MORROW, Esq., Assistant
160 High Street NW
Warren, OH  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

E:\JBJCD15\CAPITAL\CLIENT\ROBERTS.DONNA\EXCUSAL.wpd•printed: Tue 12 February 2002 - 05:36am (05:36 hrs)

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,

    Plaintiff

v.

DONNA M. ROBERTS,

    Defendant

}
}
}
}
}
}
}
}
}
}
}

Case No. 01 CR 793

Judge John M. Stuard

---

### Motion to Determine Proper Standard
### to Excuse Jurors for Cause

### Request for Hearing

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Court for an order setting forth before the commencement of jury selection the proper standard for excusing jurors for cause in capital cases in the State of Ohio.  The Defendant asks for a hearing on this matter so that additional arguments may be presented as to why the proper standard should be that set forth in OHIO REV. CODE ANN. §2945.25(C).

For cause, the Defendant says that failure to employ the proper standard will result in a violation of the immunities of cruel and unusual punishment, and a fair and impartial jury drawn from a cross section of the community.  The appropriate standard is as set forth in the attached memorandum, which is made a part hereof and incorporated herein by this reference.

WHEREFORE, the Defendant prays for an order of this Court setting forth the proper standard for excusal of jurors with regard to death qualification; and,

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

-i-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 121

further, the Defendant prays that such an order be entered of record before the commencement of jury selection.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

*CERTIFICATE OF SERVICE*

I hereby certify that a true copy of the foregoing Motion to Determine Proper Standard to Excuse Jurors for Cause was:

☒ sent by regular United States Mail, postage prepaid on 2/12/02
☐ hand delivered to counsel or counsel's office
☐ sent by telecopier

to Dennis Watkins, Esq., and Charles L. Morrow, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren, Ohio 44481 this 12th day of February, 2002.

JOHN B. JUHASZ

# TABLE OF AUTHORITIES

**Constitutional Provisions**:

OHIO CONST. art. I, §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

OHIO CONST. art. I, §5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 5, 7, 13

OHIO CONST. art. I, §9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13

OHIO CONST. art. I, §10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 5, 12, 13

OHIO CONST. art. I, §11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

OHIO CONST. art. I, §16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13

OHIO CONST., art. I, §20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S. CONST. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S. CONST. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S. CONST. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

U. S. CONST. amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13

U.S. CONST. amend. IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U. S. CONST. amend. X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U. S. CONST. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

**Cases**:

*Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163 . . . . . . . . . . . 5, 6

*Boyd v. United States* (1886), 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 . . . . . . 12

*Cablevision of the Midwest, Inc. v. Gross* (1994), 70 Ohio St.3d 541, 639 N.E.2d 1154 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231, 53 USLW 4743 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ferner v. Toledo-Lucas Cty. Convention & Visitors Bur., Inc.* (1992), 80 Ohio App.3d 842, 610 N.E.2d 1158 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Grigsby v. Mabry* (8th Cir. 1985), 758 F.2d 226 . . . . . . . . . . . . . . . . . . . . . 1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 123

*Hoffman v. Pounds* (1930), 36 Ohio App. 492, 173 N.E. 622, 9 Ohio Law Abs. 29
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Keeten v. Garrison* (4th Cir. 1984), 742 F.2d 129 . . . . . . . . . . . . . . . . . . . . . . . 1

*Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137, 54
USLW 4449 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, 60
USLW 4541 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*People v. Jackson* (1991), 145 Ill. 2d 43, 582 N.E.2d 125, 163 Ill. Dec. 859 . . . . 3

*Preterm Cleveland v. Voinovich* (1993), 89 Ohio App.3d 684, 627 N.E.2d 570
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ross v. Oklahoma* (1988), 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80, 56 USLW
4676 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 14

*State ex rel. Mirlisena, v. Hamilton Cty. Bd. of Elections* (1993), 67 Ohio St.3d
597, 622 N.E.2d 329 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*State v. Beuke* (1988), 38 Ohio St.3d 29, 526 N.E.2d 274 . . . . . . . . . . . . . 4, 8, 9

*State v. Bidinost* (1994), 71 Ohio St.3d 449, 644 N.E.2d 318 . . . . . . . . . 10, 12

*State v. Buell* (1986), 22 Ohio St.3d 124, 489 N.E.2d 795 . . . . . . . . . . . . . . . . 9

*State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382 . . . . . . . . . . . . . 4, 10

*State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264 . . . . . . . . . . . . . . 9

*State v. Roe* (1989), 41 Ohio St.3d 18, 535 N.E.2d 1351 . . . . . . . . . . . . . . . . . 4

*State v. Rogers* (1985), 17 Ohio St.3d 174, 478 N.E.2d 984, 17 OBR 44 . . . . . . 9

*Underwood v. Isham* (1939), 61 Ohio App. 129, 22 N.E.2d 468, 15 Ohio Op. 110,
28 Ohio Law Abs 440 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Martinez-Salazar* (2000), 528 U.S. 304, 120 S.Ct. 774, 2000 U.S.
LEXIS 821, 145 L.Ed.2d 792, 68 USLW 4081 . . . . . . . . . . . . . . . . . . . . . . 14-17

*Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, 53 USLW
4108 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 7, 13

*Witherspoon v. Illinois* (1968), 391 U.S. 510,
88 S.Ct. 1770, 20 L.Ed.2d 776 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 10

*Wolfe v. Brigano* (2000), 232 F.3d 499, 2000 U.S. App. LEXIS 29337, 2000 FED
App. 0394P . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 124

**Statutes:**

OHIO REV. CODE ANN. §1.51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

OHIO REV. CODE ANN. §2929.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

OHIO REV. CODE ANN. §2945.25 . . . . . . . . . . . . . . . . . . . . . . 2, 4, 7, 9, 10, 12

**Other Authorities:**

FED R. CRIM. PROC. 24(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Gareau, David M., Note: *Opening the Courthouse Doors: Allowing a Cause of Action to Arise Directly from a Violation of the Ohio Constitution*, 43 CLEV.ST.L.REV. 459 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

OHIO CRIM. R. 24(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

OHIO CRIM.R. 24(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

-V-

## MEMORANDUM IN SUPPORT OF MOTION

### I.

The Defendant seeks an order of this Court in essence setting forth the "ground rules" for excusal of jurors in this case as that standard relates to the views of the potential jurors on the death penalty.  This standard should be set before trial so that both parties are aware of the standard as they prepare for and conduct voir dire.  Application of an improper standard for the excusal of jurors will violate the constitutional immunities specified in U.S. CONST. amend. V, VI, VIII and XIV [1] and OHIO CONST. art. I, §§5, 9, 10, and 16.

In *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, the United States Supreme Court announced a standard for excusing jurors in capital cases consistent with the federal constitution.  According to *Witherspoon,* jurors should be excused in capital cases if they would either automatically vote against the imposition against capital punishment without regard to any evidence which might be developed at the trial; or, their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.  *Id.*, 522 fn. 21.[2]

---

[1]  See the Appendix for these provisions.  All quotes herein and in the Appendix are Copyright © West Group 2000, no claim to original U.S. Gov't works; and, Copyright 2001 © Lexis-Nexis, a division of Reed Elsevier, Inc., all rights reserved.

[2]  William Witherspoon was convicted of murder in Cook County, Illinois in 1960 and sentenced to death.  ILL. REV. STAT. c 38, §743 (1959) provided that jurors in murder trials could be excluded for cause if the juror had "conscientious scruples against capital punishment" or that the juror was "opposed" to capital punishment.
    The Supreme Court, in an opinion by Justice Potter Stewart, held that the Illinois jury was not one which complied with the requirements of U.S. CONST. amend. VI and XIV because the defendant did not have a fair and impartial jury drawn from a true cross section of the community.
    Interestingly, the Court refused to concede in *Witherspoon* that death-qualified juries are more conviction-prone than juries which are not death qualified.  *Id.*, 517-518.  The Court in *Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137, 54 USLW 4449, concede the validity of studies which showed that death-qualified juries were more conviction-prone than non-death-qualified juries.  The Court, however, declined to adopt the *per se* rule sought by Petitioner McCree in that case.  *See,* 476 U.S. at 171.  *See, also, Grigsby v. Mabry* (8th Cir. 1985), 758 F.2d 226, but *cf. Keeten v. Garrison* (4th Cir. 1984), 742 F.2d 129, *cert. denied* (1986), 476 U.S 1145,

(continued...)

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 126

OHIO REV. CODE ANN. §2945.25(C)[3] sets forth the appropriate standard in Ohio. That statute has not been amended or repealed in the fifteen years since *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, 53 USLW 4108, discussed *post*, was decided. The statute in part holds that a prospective juror shall be excused for cause if: "[i]n the trial of a capital offense, . . . he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case. A prospective juror's *conscientious or religious opposition* to the death penalty *in and of itself is not grounds for a challenge for cause.* All parties shall be given wide latitude in voir dire questioning in this regard." (Emphasis added.)

Admittedly, the standard for excusals under the United States Constitution is somewhat different than under Ohio law. In *Wainwright v. Witt*, the United States Supreme Court set forth the *federal* constitutional standard, which held that a juror may not be "challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 469 U.S. at 420. Nothing in *Wainwright v. Witt,* removes from the trial judge the obligation to determine the question of actual bias. *See*, OHIO REV. CODE ANN. §2945.25(B). Further, the party seeking exclusion of the juror must demonstrate, through its questioning, that the potential juror lacks impartiality. *Id.*, 469 U.S. at 423.

In *Ross v. Oklahoma* (1988), 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80, 56 USLW 4676, the Supreme Court held that it was constitutional error not to

---

[2](...continued)
106 S.Ct. 2258, 90 L.Ed.2d 702, 54 USLW 3777.

[3] See the Appendix for wording of entire statute.

exclude for cause jurors who would automatically vote for the death penalty, thus recognizing the need to "life qualify" as well as "death qualify" prospective jurors. *Ross* found no error because offending jurors had been removed by peremptory challenges. *See,* Part II, *post.*

In *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, 60 USLW 4541, the Supreme Court held that, as a matter of federal constitutional law,[4] a juror who will automatically vote for a death sentence will in good faith fail to consider a proper weighing of aggravating factors and mitigating circumstances and deprive the defendant of a trial by an impartial jury.[5] The Supreme Court emphasized the need for probing voir dire; and, while it used *Wainwright* phraseology, the Court relied upon *Witherspoon*:

> *Witherspoon* and its succeeding cases would be in large measure superfluous were this Court convinced that such general inquiry could detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath.  But such jurors—whether they be unalterably in favor of or opposed to the death penalty in every case—by definition are ones who cannot perform their duties in accordance with law, their protestations to the contrary notwithstanding.
>
> As to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed. .  .  . Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of the law.

---

[4] U.S. CONST. amend. VI and XIV.

[5] In *Morgan*, the Illinois Supreme Court affirmed Morgan's conviction and death sentence, rejecting his claim that, pursuant to *Ross v. Oklahoma, ante,* voir dire must include the "life qualifying" or "reverse-*Witherspoon*" questioning upon request. (In Illinois, questioning is performed by the judge.)  The Illinois Supreme Court found no violation of *Ross,* claiming that, as the trial court tried to fashion here, a jury "selected from a fair cross-section of the community, [where] each juror swore to uphold the law regardless of his or her personal feelings, and no juror expressed any views that would call his or her impartiality into question." 142 Ill.2d at 470.  The Illinois Supreme Court later held that "the 'reverse-*Witherspoon*' question may not be the only means of ensuring defendant an impartial jury, but it is certainly the most direct.  The best way to ensure that a prospective juror would not automatically vote for the death penalty is to ask."  *See, People v. Jackson* (1991), 145 Ill. 2d 43, 110, 582 N.E.2d 125, 163 Ill. Dec. 859.  Here, the trial judge, utilizing the "follow the law" cliché employed by Ohio trial courts for so many years and specifically rejected in *Morgan,* refused to permit the lawyers to use the best way to identify pro-death bias: to ask.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

3

504 U.S. at 735. Thus, as recognized by the Ohio statute, the true test is whether a juror, because of his beliefs, could fairly consider all sentencing options. OHIO REV. CODE ANN. §2945.25(C) does not offend the state constitutional guarantee of an inviolate right to a trial by an impartial jury.[6] Nevertheless, the Ohio Supreme Court has on several occasions held that the proper standard for excusal in Ohio is the *Wainwright v. Witt* standard.[7] Those decisions claim that the proper standard in Ohio, after *Wainwright v. Witt* is OHIO REV. CODE ANN. §2945.25(O). In so holding, the cases fail to give effect to the specific subsection of the statute which *specifically* applies to capital murder prosecutions, OHIO REV. CODE ANN. §2945.25(C). Further, the cases ignore well-established legal principles. OHIO REV. CODE ANN. §1.51 provides:

> If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail.[8]

In *Cablevision of the Midwest, Inc. v. Gross* (1994), 70 Ohio St.3d 541, 544, 639 N.E.2d 1154, the Supreme Court of Ohio said:

> It is the responsibility of courts to enforce the literal language of a statute whenever possible. *Pike-Delta-York Local School Dist. Bd. of Edn.*

---

[6] OHIO CONST. art. I, §§5 and 10.

[7] *See, State v. Roe* (1989), 41 Ohio St.3d 18, 535 N.E.2d 1351, *cert. denied, Roe v. Ohio* (1990), 494 U.S. 1060, 110 S.Ct. 1535, 108 L.Ed.2d 774, 58 USLW 3614; *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382, *cert. denied, Greer v. Ohio* (1989), 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201, 57 USLW 3688(1989); and, *State v. Beuke* (1988), 38 Ohio St.3d 29, 526 N.E.2d 274, *cert. denied, Beuke v. Ohio* (1989), 489 U.S. 1071, 109 S.Ct. 1356, 103 L.Ed.2d 823, 57 USLW 3588.

[8] *See also, State ex rel. Mirlisena, v. Hamilton Cty. Bd. of Elections* (1993), 67 Ohio St.3d 597, 622 N.E.2d 329, which held that a court, when construing statute, is duty bound to give effect to all pronouncements of the statute and to render statute compatible, whenever and wherever possible. Here, it is possible to give effect to OHIO REV. CODE ANN. §2945.25(C) without violating any other provisions of the statute and also without violating the state constitution. *See, also, Hoffman v. Pounds* (1930), 36 Ohio App. 492, 173 N.E. 622, 9 Ohio Law Abs. 299, where the court said that sections of code effective on same date are presumed to have been intended to be harmoniously construed.

4

*v. Fulton Cty. Budget Comm.* (1975), 41 Ohio St.2d 147, 70 O.O.2d 300, 324 N.E.2d 566. A court's role is to interpret, not legislate. *Seeley v. Expert, Inc.* (1971), 26 Ohio St.2d 61, 55 O.O.2d 120, 269 N.E.2d 121. Absent ambiguity, the court must give effect to the plain meaning of a statute even when a court believes that the statute results in an unfavorable outcome. *Id.*; R.C. 1.49.[9]

While the federal standard may differ, it is clear from the plain language of the statute that *Witherspoon v. Illinois* is the Ohio standard. In other words, in Ohio, a juror must unequivocally state that under no circumstances could he follow the law as given by the court before he can be excused based upon his views concerning the death penalty. To do otherwise, of course, would deny the defendant his right to a jury composed of a fair cross section of the community and would deprive the Defendant of the right to trial by an impartial jury, guaranteed by OHIO CONST. art. I, §§5 and 10. Unless the Court finds OHIO REV. CODE ANN. §2945.25(C) unconstitutional, it is the standard that *must* be applied in Ohio. The Supreme Court of Ohio cannot *sub silentio* repeal OHIO REV. CODE ANN. §2945.25(C).

The State standard is the standard that governs unless it somehow is more restrictive of rights and liberties guaranteed under federal constitutional provisions which operate in a state criminal prosecution. In this regard, the United States Supreme Court has held that states may in the interpretation of state constitutional provisions grant more liberties and protections than the United States Supreme Court in its interpretation of federal safeguards. The Supreme Court of Ohio has recognized that principle. In *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 41-42, 616 N.E.2d 163, the Court said:

> The United States Supreme Court has repeatedly reminded state courts that they are free to construe their state constitutions as providing different or even broader individual liberties than those provided under the federal Constitution. See, *e.g., City of Mesquite v. Aladdin's Castle,*

---

[9] There is no ambiguity in the Ohio statute and this court is bound to apply the plain words of the statute even if the Supreme Court will not.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

5

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 130

*Inc.* (1982), 455 U.S. 283, 293, . . . ("... [A] state court is entirely free to read its own State's constitution more broadly than this Court reads the Federal Constitution, or to reject the mode of analysis used by this Court in favor of a different analysis of its corresponding constitutional guarantee."); and *California v. Greenwood* (1988), 486 U.S. 35, 43, . . . . ("Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution."). See, also, *Pruneyard Shopping Ctr. v. Robins* (1980), 447 U.S. 74, 81, . . . . Further, in *Michigan v. Long* (1983), 463 U.S. 1032, 1041, . . . . the Supreme Court reinforced its comments in this area by declaring that the state courts' interpretations of state constitutions are to be accepted as final, as long as the state court plainly states that its decision is based on independent and adequate state grounds.

A noticeable trend has recently emerged among state courts. [Footnote omitted.] It appears that more state courts are increasingly relying on their constitutions when examining personal rights and liberties. See *Davenport v. Garcia* (Tex.1992), 834 S.W.2d 4, 12, fn. 21. See, also, *State v. Johnson* (1975), 68 N.J. 349, 353, 346 A.2d 66, 67. A common thread found in the state court decisions which have relied exclusively on the state's constitution is that states may not deny individuals or groups the minimum level of protections mandated by the federal Constitution. However, there is no prohibition against granting individuals or groups greater or broader protections.

The recent movement by state courts to rely on their constitutions, rather than on the federal Constitution, has been labeled "state constitutionalism" or "new federalism." This movement has met with considerable approval. *Davenport, ante*, 834 S.W.2d at 12, fn. 22. See, also, Brennan, State Constitutions and the Protection of Individual Rights (1977), 90 HARV.L.REV. 489, and Comment, Interpretation and Authority in State Constitutionalism (1993), 106 HARV.L.REV. 1147. One court has pointedly stated that "[w]hen a state court interprets the constitution of its state merely as a restatement of the Federal Constitution, it both insults the dignity of the state charter and denies citizens the fullest protection of their rights." *Davenport, ante*, 834 S.W.2d at 12.

In joining the growing trend in other states, we believe that the Ohio Constitution is a document of independent force. In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall. As long as state courts provide at least as much protection as the United States Supreme Court has provided in its interpretation of the federal Bill of Rights, state courts are unrestricted in according greater civil liberties and protections to individuals and groups.

The courts of Ohio have indeed begun to pay attention to the state constitution. In many cases, the courts are declaring that state rights are more expansive than the federal counterparts. In *Ferner v. Toledo-Lucas Cty.*

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

6

*Convention & Visitors Bur., Inc.* (1992), 80 Ohio App.3d 842, 847-849, 610 N.E.2d 1158, the court interpreted OHIO CONST. art. I, §11 more expansively than U.S. CONST. amend. I.  The court noted that some courts have found a distinction between a prohibition against passing laws and an affirmative recitation of a right to be protected.  The court held:

> Some courts have concluded that the difference between a prohibition against passing laws and an affirmative grant of the right is significant. *Batchelder v. Allied Stores* (1983), 388 Mass. 83, 445 N.E.2d 590; *Commonwealth v. Tate* (1981), 495 Pa. 158, 432 A.2d 1382.  The prohibition against abridging the right is merely a prohibition against interfering with the right, while the positive grant of the right is a promise to affirmatively protect the right. *Id.*
>
> The California Supreme Court has determined that the Constitution of the state of California gives greater protection to the right of speech and referendum than does the United States Constitution.   .
> .   .
>
> We think that the better approach is that announced by the Supreme Court of California.  Free speech, especially political speech, is the foundation of our system of government.  Without robust political debate, each of our other rights so deeply cherished would be without substance.
>
> In subscribing to this more expansive view, we note that the right of free speech has often been treated differently from private property rights.   .   .
>
> We conclude that the affirmative grant of the right of free speech contained in Section 11, Article I of the Ohio Constitution allows for the limited assertion of that right on some forms of private property, so long as the infringement does not result in a "taking" of property.  To hold otherwise would render as mere surplusage the words of our state Constitution that say, "[e]very citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right .   .   .   ." There would be no purpose for this affirmative grant, as the Ohio constitutional language proscribing infringement of the right is similar to and would be coextensive with the language contained in the First Amendment to the United States Constitution.

Curiously, the Supreme Court of Ohio has not ruled that OHIO REV. CODE ANN. §2945.25(C) is unconstitutional under the federal guaranties enforced in *Wainwright v. Witt.*  It has not held that the subsection of the statute violates OHIO CONST., art. I, §5, which guarantees inviolate the ability to have a jury

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7550 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

7

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 132

trial,[10] nor any other provision of the State constitution.

In *State v. Beuke, ante,* the Supreme Court of Ohio acknowledged that OHIO REV. CODE ANN. §2945.25(C) embodies the *Witherspoon* standard. The Court said that the United States Supreme Court had "clarified" the *Witherspoon* standard in *Wainwright v. Witt.* The Court's opinion failed to take into consideration that Ohio's specific statute was not repealed and is still in effect; and the Court failed to take into consideration that states may constitutionally apply what the Court called the more "restrictive" *Witherspoon* standard.[11] The Court said:

> Beuke argues that the proper application of the test of *Witherspoon v. Illinois, ante* [(1968), 391 U.S. 510], shows the exclusion of prospective jurors Ritz, Gilbert, and Patterson to be constitutionally infirm. Under R.C. 2945.25(C), which reflects, in principle, the *Witherspoon* standard, a prospective juror may be removed for cause where ". . . he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case." See *State v. Jenkins, ante,* 15 Ohio St.3d at 180, . . . .
>
> *Wainwright v. Witt, ante* [(1985), 469 U.S. 412], 469 U.S. at 424, 105 S.Ct. at 852, subsequently clarified the *Witherspoon* standard to be ". . . whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath' [*Adams v. Texas* (1980), 448 U.S. 38, 45, . . . ]." The *Witt* standard was thereafter adopted and applied by this court in *State v. Rogers* (1985), 17 Ohio St.3d 174, 178-179, 478 N.E.2d 984, and is a basis for challenging prospective jurors for cause under R.C. 2945.25(O). . .
>
> As Beuke's trial was held in 1983, the trial court applied the more restrictive *Witherspoon* test found in R.C. 2945.25(C). Careful review of the voir dire record establishes no error under either the *Witherspoon* or *Witt* standards in the exclusion of the three prospective jurors for cause.

---

[10] OHIO CONST., art. I, §5 provides: "The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury."

[11] In terms of having as large a pool of jurors passed for cause from a cross section of the community as possible, it is of course the *Wainwright* standard which "restricts" the number of potential capital jurors. The *Witherspoon* standard seeks to include as many potential jurors as possible in the pool passed for cause.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290

8

*Id.* at 37-38. In *State v. Rogers* (1985), 17 Ohio St.3d 174, 177-178, 478 N.E.2d
984, 17 OBR 44, *cert. granted and judgment vacated, Rogers v. Ohio* (1985), 474
U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452, 54 USLW 3374,[12] the Supreme Court
of Ohio handled the application of the federal *Witherspoon-Witt* standard in a left-
handed fashion. Its analysis completely failed to take into consideration OHIO
REV. CODE ANN. §2945.25(C), and it failed to address why a more "restrictive"
standard was not permissible under Ohio law.

> In [*State v.*] *Jenkins, ante,* we analyzed [the issue] under the
> rationale of *Witherspoon v. Illinois* . . . . Since our decision in *Jenkins,*
> the United States Supreme Court has modified the *Witherspoon* standard
> in *Wainwright v. Witt* . . . . The Supreme Court dispensed with the
> reference to "automatic" decision-making and the "unmistakable clarity"
> standards. The *Witt* court held that the proper standard for determining
> when a prospective juror may be excluded for cause based on his views on
> capital punishment is whether the juror's views would prevent or
> substantially impair the performance of his duties as a juror in accordance
> with his instructions and oath. See *Adams v. Texas* (1980),448 U.S. 38,
> 45, . . . . Accordingly, we reaffirm our decision in *Jenkins* in light of
> *Witt,* and hold that a jury may be death-qualified with general questions
> concerning the prospective jurors' opinions on capital punishment.

In *State v. Buell* (1986), 22 Ohio St.3d 124, 138-139, 489 N.E.2d 795, *cert.
denied, Buell v. Ohio* (1986), 479 U.S. 871, the Supreme Court of Ohio relied
upon *State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, *cert. denied*
(1985), 472 U.S. 1032, *State v. Rogers,* and the federal cases to leap to the
conclusion that death qualification challenges for cause were to be governed by
OHIO REV. CODE ANN. §2945.25(O) and not the more specific OHIO REV. CODE
ANN. §2945.25(C). The federal cases obviously would fail to account for the
specific Ohio statute. The two Ohio cases just mentioned blindly rely upon the
federal standard but fail to account for the Ohio statute.[13]

---

[12] The Supreme Court granted cert. and vacated the judgment in light of *Caldwell v.
Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231, 53 USLW 4743.

[13] The following is the extent of the analysis in *Buell:*

(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

9

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 134

The Supreme Court of Ohio has continued without further analysis to hold that the proper standard for excusal is Оню REV. CODE ANN. §2945.25(O).[14] This Court, however, is not bound to apply the *Witt* standard.  While the decisions of the Supreme Court of Ohio apply the *Witt* standard, they do not hold that a trial court will be reversed for applying the *Witherspoon* standard.  This Court is bound to follow the Ohio statute specifically enacted for capital cases.  The General Assembly frequently meets.  It passes and amends statutes dealing with capital murder cases.[15]  The General Assembly presumably is aware of its own enactments and *Wainwright v. Witt*.  The statute has not been repealed.  It has not been declared unconstitutional.  Indeed, the Supreme Court of Ohio has interpreted state statutes according to their literal meaning in other cases, even when the result of doing so does not harmonize with federal decisions.  In *State*

---

[13](...continued)

[A]ppellant urges that R.C. 2945.25(C) denies an impartial jury by failing to provide an alternative challenge for cause for any juror irrevocably committed to the death penalty even where there is evidence that mitigation outweighs aggravation.

Relying upon *Witherspoon v. Illinois* (1968), 391 U.S. 510, . . . this court originally addressed the converse of appellant's claim in *Jenkins, ante*, . . . .  In *State v. Rogers*, (1985), 17 Ohio St.3d 174, at 177, . . . this court, again, addressed this issue by applying the modified standard of *Witherspoon* as set forth by the United States Supreme Court in *Wainwright v. Witt* . . . .

Although R.C. 2945.25(C) does not provide an alternative challenge for cause for such a juror, R.C. 2945.25(O) would allow, if found appropriate, a challenge for cause in such a case in light of *Wainwright*.  Accordingly, we find appellant's argument without merit.

[14] *See, e.g., State v. Greer, ante*, 39 Ohio St.3d at 247-248:

[A]ppellant asserts that juror Heinbaugh was erroneously excluded for cause even though she did not " .  .  . unequivocally [state] that under no circumstances * * * [would she] follow the instructions of the trial judge and consider fairly the imposition of the sentence of death.  R.C. 2945.25(C)."  See, also, *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

A review of the record indicates that the juror had considerable emotional difficulty with the requirement of recommending the death penalty.  Moreover, at every juncture of the voir dire, she was unable to state that she could follow the court's instructions on the law.  Clearly, therefore, she was excludable under R.C. 2945.25(C) as "unsuitable for any other cause to serve as a juror."  This issue has been previously presented and resolved by this court.  See, *e.g., State v. Buell, ante*, citing *Wainwright v. Witt* (1985), 469 U.S. 412, .  .  .  .

[15] *See, e.g.,* the statute amended after the Issue One constitutional amendments were passed, OHIO REV. CODE ANN. §2929.05.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

10

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 135

*v. Bidinost* (1994), 71 Ohio St.3d 449, 461-463, 644 N.E.2d 318, the Court was considering the interpretation of Ohio law regarding the interception of wireless communications.

Accordingly, we find that the purposeful interception of the Bidinosts' cordless telephone conversations was prohibited by the terms of R.C. 2933.52(A). Therefore, pursuant to R.C. 2933.63, the trial court was required to suppress the contents of the recorded communications. We hold that the provisions of R.C. 2933.52(A), prohibiting the purposeful interception of wire or oral communications through the use of an interception device, apply to cordless telephone communications that are intentionally intercepted and recorded.

We recognize, as did the court of appeals, that there exists a substantial body of case law from other jurisdictions holding that cordless and/or mobile telephone communications do not fit within the protections afforded by statutes prohibiting the interception of oral communications, since users of cordless or cellular telephones have no reasonable expectation of privacy in their telephone communications.  .   .   . However, the above-cited cases address the protections afforded radio telephone or cordless telephone communications in light of applicable federal and/or state statutory definitions of "oral communication," which differ from Ohio's statutory definition of that term.

For instance, the federal law prohibiting interception of oral communications defines an "oral communication" as one in which a person has a justifiable expectation that the communication is not subject to interception. Section 2510(2), Title 18, U.S. Code. Conversely, under Ohio's statutory scheme, the question whether users of cordless telephones have a reasonable expectation of privacy is not an issue that must be considered in determining whether a communication is an "oral communication" as defined in R.C. 2933.51(B). R.C. 2933.51(B) is clear and unambiguous. In Ohio, the terms of the statute defining "oral communication" clearly encompass cordless telephone conversations.  .   .   . In any event, we seriously question the proposition that people communicating on cordless telephones have no legitimate expectation of privacy. [Footnote omitted.] Fundamental rights should not be sacrificed on the altar of advancing technology.

Similarly, we recognize that our determination today that cordless telephone communications are protected "wire communications" is contra to a number of decisions from other jurisdictions which have held that cordless telephone communications are not wire communications. However, we are not persuaded to reach a similar conclusion under Ohio law. In our judgment, Ohio's definition of "wire communication" is free from ambiguity and clearly encompasses cordless telephone communications. Therefore, we are not at liberty to interpret Ohio's definition of "wire communication" as excluding cordless telephone communications. Where, as here, a legislative enactment is free from ambiguity, we must apply, not interpret, the enactment. See *Cleveland*

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 136

> *Elec. Illum. Co. v. Cleveland* (1988), 37 Ohio St.3d 50, . . ., paragraph three of the syllabus ("In matters of construction, it is the duty of this court to give effect to the words used, not to delete words used or to insert words not used."); *Ohio Dental Hygienists Assn. v. Ohio State Dental Bd.* (1986), 21 Ohio St.3d 21, 23, . . . ("Absent ambiguity, a statute is to be construed without resort to a process of statutory construction.").
>
> Accordingly, we believe that the very terms of Ohio's statutory scheme prohibiting the purposeful interception of wire or oral communications mandate the conclusions we have reached in this case. . . .

The Constitution of Ohio is a grant of limited powers from the people to the government. *See,* OHIO CONST., art. I, §2, reproduced in the Appendix; *see, also,* OHIO CONST., art. I, §20, U.S. CONST. amend. IX and X, also reproduced in the Appendix. *And see,* David M. Gareau, Note: *Opening the Courthouse Doors: Allowing a Cause of Action to Arise Directly from a Violation of the Ohio Constitution,* 43 CLEV.ST.L.REV. 459 (1995). Pursuant to that grant of power, the General Assembly of Ohio adopted OHIO REV. CODE ANN. §2945.25(C). OHIO CONST. art. I, §10 guarantees a trial by an impartial jury. The statute has not been repealed and it has not been held to be constitutionally invalid. A provision that is more "restrictive" in retaining the preservation of people's rights is the provision that must be followed. The words of the United States Supreme Court should guide every court in construing the constitutional liberties of its citizens. In *Boyd v. United States* (1886), 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746, the Court held:

> It [an encroachment upon a constitutional liberty] may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by *silent approaches* and *slight deviations* from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

The State cannot, based on the opinions of the Supreme Court of Ohio,

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290

12

explain its silent approaches and slight deviations from established procedures (*i.e.*, a specific statute). With all due respect to the courts, absent a finding that a statute is unconstitutional, they may not adopt a different standard than that set forth by the General Assembly. The court decisions are in effect judicial usurpation of the legislative process. No power to legislate for the state as a whole is conferred upon any arm of government other than the Ohio General Assembly. *Underwood v. Isham* (1939), 61 Ohio App. 129, 22 N.E.2d 468, 15 Ohio Op. 110, 28 Ohio Law Abs 440, *appeal dismissed,* (1939), 135 Ohio St. 320, 20 N.E.2d 719, 14 Ohio Op. 417. The decisions cited above ignore the fact that the General Assembly has expressly set forth the standard for death qualification in an Ohio capital case.

Every person has inalienable rights under natural law that cannot be restricted or denied by the government. *Preterm Cleveland v. Voinovich* (1993), 89 Ohio App.3d 684, 627 N.E.2d 570, *jurisdictional motion overruled,* 68 Ohio St.3d 1420, 624 N.E. 2d 194; *rehearing denied,* 68 Ohio St.3d 1452, 626 N.E.2d 693. Liberty resides in the tension between federal and state power. Because the state standard does nothing to deprive a citizen of immunities guaranteed by the federal constitution as interpreted by *Wainwright v. Witt,* OHIO REV. CODE ANN. §2945.25(C) is a proper exercise of state power.

The failure to follow the standard set forth in OHIO REV. CODE ANN. §2945.25(C) will violate the Defendant's constitutional immunities of a remedy by due course of law and the ability to have justice administered without denial or delay; to a fair and impartial jury, to the effective assistance of counsel, and to be free from cruel and unusual punishment. These immunities are specified in OHIO CONST., art. I, §§5, 10, and 16. This is a capital murder prosecution where the Defendant may be subject to death. Hence, U.S. CONST. amend. VIII and XIV and OHIO CONST., art. I, §9 are implicated, as are the immunities specified by

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 138

those provisions.

## II.

Assuming for discussion purposes that the Court and the Defendant do not agree upon whether a juror should be excused for cause, the Defendant need only make the challenge for cause to preserve the error.  Previously, the rule of *Ross v. Oklahoma* required that the Defendant, having been unsuccessful in his challenge for cause, peremptorily challenge such a juror to preserve the error.  The United States Supreme Court has modified the rule of *Ross v. Oklahoma* in *United States v. Martinez-Salazar* (2000), 528 U.S. 304, 120 S.Ct. 774, 2000 U.S. LEXIS 821, 145 L.Ed.2d 792, 68 USLW 4081.  There, the Court reversed the Ninth Circuit, which had held that Due Process requires automatic reversal of a conviction whenever a defendant goes on to exhaust his peremptory challenges during jury selection.  *See*, (9th Cir. 1998), 146 F.3d 653.  The Supreme Court rejected the government's claim that:

> a defendant is obliged to use a peremptory challenge to cure the judge's error [in denying a challenge for cause].  We hold, however, that if the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right.

528 U.S. at 307.  The Court, in an opinion by Justice Ruth Bader Ginsburg, held:

> The Court of Appeals erred in concluding that the District Court's for-cause mistake compelled Martinez-Salazar to challenge Gilbert peremptorily, thereby reducing his allotment of peremptory challenges by one.  146 F.3d at 659.  A hard choice is not the same as no choice.  .  .
>
> After objecting to the District Court's denial of his for-cause challenge, Martinez-Salazar had the option of letting [juror] Gilbert sit on the petit jury and, upon conviction, pursuing a Sixth Amendment challenge on appeal.  Instead, Martinez-Salazar elected to use a challenge to remove Gilbert because he did not want Gilbert to sit on his jury.  This was Martinez-Salazar's choice.  [Footnote omitted.]  The District Court did

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290

14

not demand—and Rule 24(b)[16] did not require—that Martinez-Salazar use a peremptory challenge curatively.

In choosing to remove Gilbert rather than taking his chances on appeal, Martinez-Salazar did not lose a peremptory challenge. Rather, he used the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury. *See, e.g.,[J. E. B. v. Alabama ex rel. T. B.* (1994), 511 U.S. 127, 128 L. Ed. 2d 89, 114 S. Ct. 1419], 511 U.S. at 137, n. 8 (purpose of peremptory challenges "'is to permit litigants to assist the government in the selection of an impartial trier of fact'") (quoting *Edmonson* v. *Leesville Concrete Co.*, 500 U.S. 614, 620, 114 L. Ed. 2d 660, 111 S. Ct. 2077 (1991)); *Georgia* v. *McCollum*, 505 U.S. 42, 57, 120 L. Ed. 2d 33, 112 S. Ct. 2348 (1992) (peremptory challenges are "one state-created means to the constitutional end of an impartial jury and a fair trial"); *Frazier* v. *United States*, 335 U.S. 497, 505, 93 L. Ed. 187, 69 S. Ct. 201 (1948) ("the right [to peremptory challenges] is given in aid of the party's interest to secure a fair and impartial jury"). Moreover, the immediate choice Martinez-Salazar confronted—to stand on his objection to the erroneous denial of

---

[16] FED R. CRIM. PROC. 24(b) provides:

(b) PEREMPTORY CHALLENGES. If the offense charged is punishable by death, each side is entitled to 20 peremptory challenges. If the offense charged is punishable by imprisonment for more than one year, the government is entitled to 6 peremptory challenges and the defendant or defendants jointly to 10 peremptory challenges. If the offense charged is punishable by imprisonment for not more than one year or by fine or both, each side is entitled to 3 peremptory challenges. If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly.

OHIO CRIM. R. 24(C) and (D) provide:

(C) *Peremptory challenges.* In addition to challenges provided in subdivision (B), if there is one defendant, each party peremptorily may challenge three jurors in misdemeanor cases, four jurors in felony cases other than capital cases, and six jurors in capital cases. If there is more than one defendant, each defendant peremptorily may challenge the same number of jurors as if he were the sole defendant.

In any case where there are multiple defendants, the prosecuting attorney peremptorily may challenge a number of jurors equal to the total peremptory challenges allowed all defendants. In case of the consolidation of any indictments, informations or complaints for trial, such consolidated cases shall be considered, for purposes of exercising peremptory challenges, as though the defendants or offenses had been joined in the same indictment, information or complaint.

(D) *Manner of exercising peremptory challenges.* Peremptory challenges may be exercised after the minimum number of jurors allowed by the rules has been passed for cause and seated on the panel. Peremptory challenges shall be exercised alternately, with the first challenge exercised by the state. The failure of a party to exercise a peremptory challenge constitutes a waiver of that challenge. If all parties, alternately and in sequence, fail to exercise a peremptory challenge, the joint failure constitutes a waiver of all peremptory challenges.

A prospective juror peremptorily challenged by either party shall be excused and another juror shall be called who shall take the place of the juror excused and be sworn and examined as other jurors. The other party, if he has peremptory challenges remaining, shall be entitled to challenge any juror then seated on the panel.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

15

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 140

the challenge for cause or to use a peremptory challenge to effect an instantaneous cure of the error—comports with the reality of the jury selection process. Challenges for cause and rulings upon them, as Judge Rymer observed, see *supra*, at 4, are fast paced, made on the spot and under pressure. Counsel as well as court, in that setting, must be prepared to decide, often between shades of gray, "by the minute." 146 F.3d at 661.

> In conclusion, we note what this case does not involve. It is not asserted that the trial court deliberately misapplied the law in order to force the defendants to use a peremptory challenge to correct the court's error. See *Ross*, 487 U.S. at 91, [Footnote omitted.]  Accordingly, no question is presented here whether such an error would warrant reversal. Nor did the District Court's ruling result in the seating of any juror who should have been dismissed for cause. As we have recognized, that circumstance would require reversal. See 487 U.S. at 85 ("Had [the biased juror] sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove [the juror] for cause, the sentence would have to be overturned."); see also *Parker v. Gladden*, 385 U.S. 363, 366, 17 L. Ed. 2d 420, 87 S. Ct. 468 (1966) (a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors"). [Footnote omitted.]

> We answer today the question left open in *Ross* and hold that a defendant's exercise of peremptory challenges pursuant to Rule 24(b) is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause.

528 U.S. at 315-317.  Though the decision interprets the federal rule, the Sixth Circuit has specifically applied the holding to Ohio courts. *See, Wolfe v. Brigano* (2000), 232 F.3d 499, 2000 U.S. App. LEXIS 29337, 2000 FED App. 0394P. There, the Sixth Circuit held:

> The Ohio Court of Appeals concluded that Wolfe did not properly preserve his right to challenge the presence of four biased jurors on his jury because he failed to remove the jurors with his peremptory challenges. That court, however, did not have the guidance of *U.S. v. Martinez-Salazar*, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), where the Supreme Court rejected the argument that federal law requires a defendant to use a peremptory challenge to cure a judge's erroneous refusal to dismiss a juror for cause. In *Martinez-Salazar*, the Supreme Court stated that when a defendant objects to a trial court's denial of his for-cause challenge, the defendant may choose to either remove the challenged juror peremptorily and forgo a later Sixth Amendment challenge, or allow the juror to sit, preserving the Sixth Amendment claim for appeal. *See id.* 120 S. Ct. at 781.

> Wolfe challenged six jurors for cause. The trial court granted one of his challenges. He removed a second juror with a peremptory challenge. The other four challenged jurors sat on his jury. After the jury

> was empaneled, he filed a motion to dismiss on the ground that the jury
> was biased, a motion he renewed at the conclusion of the trial. We are
> convinced that Wolfe properly preserved his Sixth Amendment claim, and
> we now address the merits of his argument that the four challenged jurors
> were biased and improperly allowed to sit on his jury.

232 F.3d at 501-502.  While the new rule is a step in the right direction, even the new rule enunciated in *Martinez-Salazar* demonstrates a basic misconception of constitutional immunities and the dynamics of a courtroom.  The new rule is that if a criminal defendant wants a fair trial rather than an appellate issue and the trial judge makes mistakes, the defendant still has fewer peremptories than the government or than he would otherwise have without the erroneous rulings. Thurgood Marshall was the last trial lawyer to sit on the Supreme Court, and it shows.  Nevertheless, all the Defendant need do in this case is make the challenge for cause to preserve the issue for appeal.

For the foregoing reasons, the Defendant prays for the relief set forth in the principal motion.

J. GERALD INGRAM

JOHN B. JUHASZ
COUNSEL FOR DEFENDANT

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 142

# APPENDIX

OHIO REV. CODE ANN. §2945.25

A person called as a juror in a criminal case may be challenged for the following causes:

(A) That he was a member of the grand jury that found the indictment in the case;

(B) That he is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial;

(C) In the trial of a capital offense, that he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case. A prospective juror's conscientious or religious opposition to the death penalty in and of itself is not grounds for a challenge for cause. All parties shall be given wide latitude in voir dire questioning in this regard.

(D) That he is related by consanguinity or affinity within the fifth degree to the person alleged to be injured or attempted to be injured by the offense charged, or to the person on whose complaint the prosecution was instituted, or to the defendant;

(E) That he served on a petit jury drawn in the same cause against the same defendant, and that jury was discharged after hearing the evidence or rendering a verdict on the evidence that was set aside;

(F) That he served as a juror in a civil case brought against the defendant for the same act;

(G) That he has been subpoenaed in good faith as a witness in the case;

(H) That he is a chronic alcoholic, or drug dependent person;

(I) That he has been convicted of a crime that by law disqualifies him from serving on a jury;

(J) That he has an action pending between him and the state or the defendant;

(K) That he or his spouse is a party to another action then pending in any court in which an attorney in the cause then on trial is an attorney, either for or against him;

(L) That he is the person alleged to be injured or attempted to be injured by the offense charged, or is the person on whose complaint the prosecution was instituted, or the defendant;

(M) That he is the employer or employee, or the spouse, parent, son, or daughter of the employer or employee, or the counselor, agent, or attorney of any person included in division (L) of this section;

(N) That English is not his native language, and his knowledge of English is insufficient to permit him to understand the facts and law in the case;

(O) That he otherwise is unsuitable for any other cause to serve as a juror.

The validity of each challenge listed in this section shall be determined by the court.

OHIO CONST., ART. I, §2

All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the General Assembly.

OHIO CONST., ART. I, §5

The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury.

OHIO CONST., ART. I, §9

All persons shall be bailable by sufficient sureties, except for capital offences where the proof is evident, or the presumption great. Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted.

OHIO CONST., ART. I, §10

Except in cases of impeachment, cases arising in the army and navy, or in the militia when in actual service in time of war or public danger, and cases involving offenses for which the penalty provided is less than imprisonment in the penitentiary, no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury; and the number of persons necessary to constitute such grand jury and the number thereof necessary to concur in finding such indictment shall be determined by law. In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court. No person shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be considered by the court and jury and may be the subject of comment by counsel. No person shall be twice put in jeopardy for the same offense.

OHIO CONST., ART. I, §16

All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law.

OHIO CONST., ART. I, §20

This enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers, not herein delegated, remain with the people.

U.S. CONST., AMEND. V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. CONST., AMEND. VI

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. CONST., AMEND. VIII

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

U.S. CONST., AMEND. IX

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

U.S. CONST., AMEND. X

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

U.S. CONST., AMEND. XIV

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290          Appendix, A-3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 145

JBJ

jbj\E:\JB\CAP1CD\CLIENTS\Roberts.Donna\Comprehensive.voir.dire.vers.1-2002.wpd•rev'd.—Thu 14Feb2002•0639.08 (06:39:08am)

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,                           }          Case No. 01 CR 793
                                         }
                  Plaintiff              }          Judge John M. Stuard
                                         }
-vs-                                     }
                                         }
                                         }          **Death Penalty Case**
                                         }
DONNA M. ROBERTS,                        }
                                         }
                  Defendant              }

---

### DEFENDANT'S MOTION FOR COMPREHENSIVE
### VOIR DIRE EXAMINATION

---

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
CHARLES L. MORROW, Esq., Assistant
160 High Street NW
Warren, Ohio  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 146

JBJ

E:\JB\CAP1CD\CLIENTS\Roberts.Donna\Comprehensive.voir.dire.vers.1-2002.wpd•Thursday 14 Feb 2002 6:59:08am (0659hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                                )        Case No. 01 CR 793
                                             )
     Plaintiff                          )        Judge John M. Stuard
                                             )
-vs-                                         )
                                             )
                                             )
DONNA M. ROBERTS,                            )
                                             )
     Defendant                          )

---

### DEFENDANT'S MOTION FOR COMPREHENSIVE
### VOIR DIRE EXAMINATION

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Honorable Court for an order permitting counsel to conduct a comprehensive voir dire examination of all prospective jurors.

For cause for this motion, the Defendant says that the requested relief is necessary to protect and secure the Defendant in his constitutional liberties, all as shown in the attached Memorandum, which is attached hereto and made a part hereof by this reference.

WHEREFORE, the Defendant prays for an order of this Court allowing counsel for both parties to conduct comprehensive voir dire examination of all jurors.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2306 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

-i-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 147

JBJ

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHÁSZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT


### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was sent by regular U.S. Mail, postage prepaid, this 22ᵗʰ day of February, 2002 to DENNIS WATKINS, Esq., County Prosecutor, and CHARLES L. MORROW, Esq., Assistant County Prosecutor, 160 High Street NW, Warren, OH  44483.

JOHN B. JUHÁSZ
COUNSEL FOR DEFENDANT

JOHN B. JUHÁSZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

-ii-

JBJ

# MEMORANDUM IN SUPPORT OF MOTION

The Defendant has been indicted for, *inter alia*, aggravated murder with death penalty specifications. Trial courts always have an obligation to insure that the proceedings are fair,[1] but that duty reaches a heightened level in death penalty cases because "death is different." *See*, *Woodson v. North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944.[2]

The purpose of voir dire examination is to determine whether any member of the venire harbors any bias against either party, or whether any member of the venire is unable to follow the law and put aside any preconceived notions concerning either the law or the case. *See, e.g.*, *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, 60 USLW 4541. The presence of juror bias, in any form, would result in a trial unfair to both parties, the government and the Defendant. Accordingly, a searching and comprehensive voir dire examination is crucial to uncover any concealed prejudices against either of the

---

[1] *See, generally*, *Chambers v. Mississippi* (1973), 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297; *State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342, and the authorities cited therein.

[2] Though there are those who criticize the "death is different" holding, *see, e.g., Morgan v. Illinois, post*, (SCALIA, J., joined by REHNQUIST, Ch.J. and THOMAS, J., dissenting), the precept is firmly entrenched in Eighth Amendment jurisprudence. The proposition was adopted by the Court from law professor Anthony Amsterdam. Arguing the second round of major capital cases which resulted in the holdings in *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 and *Woodson v. North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944, and in response to suggestions by the late Justice Potter Stewart that Amsterdam's argument "proved too much," Amsterdam replied:

> Now, why do we say death is different? Our legal system as a whole has always treated death differently. We allow more peremptory challenges; we allow automatic appeals; we have different rules of harmless error; we have indictment requirements; unanimous verdict requirements in some jurisdictions, because death is different.
>
> Death is factually different. Death is final. Death is irremediable. Death is unknowable; it goes beyond this world. It is a legislative decision to do something, and we know not what we do. Death is different because even if exactly the same discretionary procedures are used to decide issues of five years versus ten years, or life versus death, the result will be more arbitrary on the life or death choice.

Oral arguments held March 30-31, 1976. *See*, Peter Irons and Stephanie Guitton, ed., *May It Please the Court* (New York: The New Press, Copyright © 1993), 233.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 149

JBJ

parties.  Such an examination would reveal preconceived notions on the part of any juror that would preclude consideration of crucial mitigating or aggravating factors or which would cause automatic imposition of the death penalty, or which would prevent the imposition of the death penalty altogether.  Indeed, in *Morgan*, the Supreme Court, in an opinion by Justice Byron White, said that a failure to conduct such a searching voir dire in a capital case disentitles the government to execute any death sentence imposed as a result of such a patently unfair trial.  *Morgan, ante.*  Given the circumstances here, this Court's refusal to permit the parties to conduct a comprehensive voir dire examination would amount to an abuse of discretion, the effect of which would be to deny the parties due process of law and a fair and impartial jury.

OHIO REV. CODE ANN. §2945.27 provides that the judge of the trial judge shall "examine the prospective jurors under oath or upon affirmation as to their qualifications to serve as fair and impartial jurors, but he shall permit reasonable examination of such jurors by the prosecuting attorney and by the defendant or his counsel."  The Court's duty to permit the parties to examine each prospective juror is also addressed in OHIO CRIM.R. 24(A).  That rule provides that any person who is called as a juror for the trial of any case "shall be examined under oath or upon affirmation as to his qualifications.  The court may permit the attorney for the defendant, or the defendant if appearing pro se, and the attorney for the state to conduct the examination of the prospective jurors or may itself conduct the examination.  In the latter event, the court shall permit the state and defense to supplement the examination by further inquiry."

The language of both the rule and the statute clearly indicate that both parties must be afforded sufficient opportunity to question each member of the venire before a decision is made to either excuse or not excuse a particular juror.  The Ohio Supreme Court has stated that trial courts should permit "reasonable

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUERSDOC@AOL.COM

2

JBJ  examination of such jurors by . . . defendant or his counsel." *See, State v. Anderson* (1972), 30 Ohio St.2d 66, 72, 282 N.E.2d 568.[3] In *State v. Jones* (1982), 2 Ohio App.3d 345, 441 N.E.2d 1121, the court went further and said that the statute and the rule *require* the trial court to permit counsel for the parties to supplement the court's voir dire examination where a request to do so is made by counsel. Of course, it must be remembered that the statute and the rule derive from the basic constitutional premises of Due Process and trial by an impartial jury. The statute and the rule (and indeed the procedural orders of this Court) are but tools to implement those august constitutional guarantees.

In *State v. Anderson, ante*, the Supreme Court of Ohio vacated a death sentence because of limitations upon voir dire. The Court's discussion of voir dire and the constitutional implications of limiting voir dire demonstrates why the relief sought herein should be granted. The Supreme Court said:

> Compliance with the requirements of *Witherspoon* necessarily includes sufficient latitude in the voir dire examination of prospective jurors in a capital case to establish that those who are dismissed for cause upon the basis of their scruples regarding capital punishment would automatically vote against the imposition of a sentence of death no matter what the trial might reveal. We cannot so find from the record in the case at bar. See *State v. Watson, supra,* 28 Ohio St.2d 15, 275 N.E.2d 641.
>
> Additional grounds exist for our conclusions herein. The Ohio Constitution provides, insofar as here material:
>
> " . . . In any trial, in any court, the party accused shall be allowed . . . a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed. . . ." Article, I, Section 10, Constitution of Ohio.
>
> As we said in *Lingafelter v. Moore* (1917), 95 Ohio St. 384, 387, 117 N.E. 16:
>
> "It is beyond question that the right of trial by jury guaranteed by the Constitution carries with it by necessary implicating the right to a trial by a jury composed of unbiased and unprejudiced jurors. This right being guaranteed, all courts are charged with the imperative duty of affording every litigant the opportunity of having his cause tried by an impartial jury.' See, also, *Cooper v. State* (1865), 16 Ohio St. 328; *Petro v. Donner*

---

[3] *See also, State v. Proctor* (1977), 51 Ohio App.2d 151, 367 N.E.2d 908, where the court said that OHIO CRIM.R. 24(A) was not intended to allow a trial court to foreclose personal inquiry of the jurors by counsel.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURIS@AOL.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 151

JBJ

(1940), 137 Ohio St. 168, 28 N.E.2d 503; *Peart v. Jones* (1953), 159 Ohio St. 137, 111 N.E.2d 16; *State v. Duling* (1970), 21 Ohio St.2d 13, 254 N.E.2d 670.

To safeguard this constitutional right, the General Assembly has provided for peremptory challenges and challenges for cause.  R.C. §§2945.21, 2945.22 and 2945.25.

In *Dowd-Feder v. Truesdell* (1936), 130 Ohio St. 530, 533, 200 N.E. 762, we said:

"The right to examine prospective jurors on their voir dire is granted to litigants in order to enable them to select a jury composed of men and women qualified and competent to judge and determine, without bias, prejudice or partiality, facts in issue.  For the proper exercise of this right, the Legislature has deemed it wise to give to litigants the right of peremptory challenge and challenge for cause.  This former right is to be exercised at their discretion and free from any limitation or restriction.  Any rule of law which denies a litigant reasonable latitude in the examination of prospective jurors as to their qualifications, in order to enable him to exercise such peremptory challenges judiciously and intelligently, deprives him of a substantial right.

"Reasonable scope must be allowed and latitude given to counsel on the voir dire examination . . . ."

Later, in *Krupp v. Poor* (1970), 24 Ohio St.2d 123, 125, 265 N.E.2d 268, this court said:

"The purpose of the examination of a prospective juror upon his voir dire is to determine whether he has both the statutory qualification of a juror and is free from bias or prejudice for or against either litigant.' Paragraph one of the syllabus of *Pavilonis v. Valentine* (1929), 120 Ohio St. 154, 165 N.E. 730.  See, also, paragraph one of the syllabus of *Vega v. Evans* (1934), 128 Ohio St. 535, 191 N.E. 757, and paragraph one of the syllabus of *Dowd-Feder v. Truesdell* (1936), 130 Ohio St. 530, 200 N.E. 762.  Moreover, the voir dire examination serves as the foundation upon which an intelligent exercise of the litigants' right to peremptory challenge may be made.  *Pavilonis v. Valentine, supra*, and *DowdFeder v. Truesdell, supra*.

"To achieve that purpose reasonable latitude must be given to counsel on the voir dire examination.   .   .   ."  See, also, *Pearson v. Gardner Cargage Co.* (1947), 148 Ohio St. 425, 76 N.E.2d 67.

Whatever may be the practice in other jurisdictions, it is a rule of long standing in Ohio that counsel for the respective litigants be given a reasonable opportunity to personally examine prospective jurors.

The General Assembly has also addressed itself to this important area.  R.C. §2945.27 provides:

"The judge of the trial court shall examine the prospective jurors under oath or upon affirmation as to their qualifications to serve as fair and impartial jurors, but he shall permit reasonable examination of such jurors by the prosecuting attorney and by defendant or his counsel." .   .

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

4

JBJ

The judge of examination that is "reasonable" will vary from case to case depending upon many factors, including whether the trial to be held is criminal or civil, and, if criminal, for what crime.

In the instant case, the defendant was charged with first degree murder under R.C. s 2901.01.  The jury was entrusted with two distinct responsibilities: First, to determine defendant's guilt or innocence; and second, to determine whether defendant's sentence should be death or imprisonment for life.  The jurors were bound by their oath to base their verdict of "not guilty," "guilty of manslaughter," or "guilty," solely upon the law and the evidence, without regard to any personal feelings.  However, as in all first degree murder cases in this state, it was left entirely to the jury to determine the extent of punishment in the event of conviction.  See *McGautha v. California* (1971), 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711.  Under such circumstances, it was unreasonable within the meaning of R.C. §2945.27 for the trial court to prohibit the prosecuting attorney and the defendant or his counsel from asking the prospective jurors any questions concerning their scruples regarding capital punishment.

It has not been alleged, argued or shown that this jury was biased with respect to appellant's guilt.  We have examined the appellant's other contentions and find no error prejudicial to his interests.  Hence, the judgment of guilt will be affirmed.  However, as required by the doctrine of *Witherspoon v. Illinois, supra*, the penalty of death must be reversed and the cause remanded to the trial court, with instructions to vacate the journal entry sentencing this defendant death and then to sentence defendant to imprisonment for life as provided for in R.C. §2901.01.

*Id.*, 70-74.[4]  The purpose of voir dire examination is further to determine whether a juror has a bias in favor of or a prejudice against either party that would interfere with that juror's impartiality and his ability to give the case full consideration as to the guilt of a defendant.  *State v. Ellis* (1918), 98 Ohio St. 21, 120 N.E. 218.  The Ohio Supreme Court has in fact held that a "careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality".  *State v. Maurer* (1984), 15 Ohio St.3d 239, 251, 473 N.E.2d 768; *see, also, State v. Bayless* (1976), 48 Ohio St.2d 72, 98, 357 N.E.2d 1035.  The parties must be permitted to inquire into matters not only relating to challenges for cause, but also peremptory

---

[4] All quotes are copyright © West Publishing Co. 1995, no claim to original U.S. Govt. works; and copyright © LEXIS-NEXIS, 2001, a division of Reed Elsevier, Inc., all rights reserved..

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2508 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

5

JBJ challenges. *Aldridge v. United States* (1931), 283 U.S. 308, 310, 51 S.Ct. 470, 471-472, 75 L.Ed. 1054; *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382; *State v. Swanson* (1984), 16 Ohio App.3d 375, 476 N.E.2d 672.

The Ohio Supreme Court in *Pembaurer v. Leis* (1982), 1 Ohio St.3d 89, 437 N.E.2d 1199, reiterated its definition of "abuse of discretion." That term, the Court held, implies some arbitrary or unreasonable attitude on the part of the trial court. The Defendant respectfully submits that to limit voir dire examination in a case such as this would indeed amount to an abuse of discretion. *See, e.g., United States v. Dellinger* (5th Cir. 1972), 472 F.2d 340, 367, where the court held that:

> an answer which falls short of an admission of bias may nevertheless aid counsel in deciding to exercise a peremptory challenge . . . . Some questions may appear tangential to the trial but are actually so integral to the citizen juror's view of the case . . . that they must be explored . . . . What these essential inquires are, of course, varies with each case.

In this particular case, the Defendant seeks leave to conduct an examination in an effort to uncover biases on the part of any prospective jurors that would cause the juror to favor conviction or a death sentence for no reason other than that the defendant was brought to trial. The reasons for a careful voir dire are obvious, and in a capital case are grounded in the Due Process Clause. Speaking for the Court in *Morgan*, Justice Byron White said:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Id.*, 504 U.S. at 729. Justice White on behalf of the Court later said:

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

6

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 154

[B]

We deal here with [Morgan's] ability to exercise intelligently his complementary challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt. Were voir dire not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would always impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would never do so.[5]

509 U.S. at 733-734.  Indeed:

[i]t may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. [Footnote omitted.]  A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception.

509 U.S. at 735-736.

The Defendant requests permission to conduct voir dire examination geared toward uncovering any improper bias in favor of sentencing the defendant to death.

Failure to permit comprehensive voir dire examination would violate the Defendant's state and federal constitutional liberties, including due process of law, *see*, U.S. CONST. amend. XIV, to have justice administered without denial or delay, and to a remedy by due course of law, *see*, OHIO CONST. art. I, §16, to have a fair and impartial jury, *see*, U.S. CONST. amend.  VI and OHIO CONST. art. I, §10, to have the effective assistance of counsel, *see*, U.S. CONST. amend. VI and XIV and OHIO CONST. art. I, §10, and to be free from cruel and unusual punishment, *see*, U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §9.

---

[5] In footnote 7, the Court said:
As the Fifth Circuit has observed obiter dictum:  "All veniremen are potentially biased.   The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case. Clearly, the extremes must be eliminated—*i.e.*, those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence."  *Smith v. Balkcom*, 660 F.2d 573, 578 (1981) (emphasis in original), *modified*, 671 F.2d 858, *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982).

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

7

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 155

JBJ

For the foregoing reasons, the defendant prays for an order permitting counsel to conduct a comprehensive voir dire examination of all prospective jurors.

J. GERALD INGRAM

JOHN B. JUHASZ
COUNSEL FOR DEFENDANT

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJAJURISDOC@AOL.COM

8

In the Court of Common Please of Trumbull County

State of Ohio,                          :
      Plaintiff,                        :     Notice to Supreme Court of
                          :     Ohio of Filing of Indictment
      v.                                :     Charging Aggravated Murder
                          :     with Specification(s) of
DONNA MARIE ROBERTS                     :     Aggravating Circumstances
      Defendant.                        :     [R.C. 2929.021(A)]

Name of defendant:     **DONNA MARIE ROBERTS**

The court in which the case will be heard:

        **JUDGE JOHN M STUARD**

Case number(s):     **2001CR793**

Date on which indictment was filed:

        **DECEMBER 28 2001**

_____
Clerk of Courts of Trumbull County

Date:  January 4, 2002

FILED

JAN 09 2002

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | **CASE NO.    :01-CR-793** |
| | ) | |
| Plaintiff, | ) | **JUDGE:    :JOHN M. STUARD** |
| | ) | |
| -vs- | ) | **S T A T E ' S    R E Q U E S T    F O R** |
| | ) | **RECIPROCAL DISCOVERY** |
| DONNA M. ROBERTS, | ) | |
| | ) | |
| Defendant. | ) | |

Now comes the Prosecuting Attorney and hereby requests that the Defendant furnish the

State of Ohio with the following discoverable material pursuant to Rule 16(c) of the Ohio Rules

of Criminal Procedure:

1.    Books, papers, documents, photographs, tangible objects, or copies or portions thereof, available to or within the possession, custody, or control of the Defendant and which the Defendant intends to introduce in evidence at trial.

2.    Any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, available to or within the possession or control of the Defendant, and which the Defendant intends to introduce in evidence at the trial, or which were prepared by a witness whom the Defendant intends to call at the trial, when such results or reports relate to his testimony.

3.    A list of the names and addresses of the witnesses the defense intends to call at the trial.

Respectfully Submitted,
STATE OF OHIO, by

_____
DENNIS WATKINS (#0009949)
Trumbull County Prosecuting Attorney

Page -1-

22

and

CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecutor
Trumbull County Prosecutor's Office
160 High Street, NW
3rd Floor Administration Bldg.
Warren, Ohio  44481
(330)-675-2426

## CERTIFICATION

This is to certify that a copy of the foregoing *State's Request for Reciprocal Discovery*

was mailed to counsel for the Defendant,  this March 14, 2002.

CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecuting Attorney

Page -2-

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | **CASE NO.**    :01-CR-793 |
| | ) | |
| Plaintiff, | ) | **JUDGE:**    :JOHN M. STUARD** |
| | ) | |
| -vs- | ) | **S T A T E ' S   R E S P O N S E   T O** |
| | ) | **DEFENDANT'S   REQUEST   FOR** |
| DONNA M. ROBERTS, | ) | **DISCOVERY** |
| | ) | |
| Defendant. | ) | |

Now comes the Plaintiff, the State of Ohio, by and through the Prosecuting Attorney of Trumbull County, Ohio, and submits the following in answer to the *Defendant's Request For Discovery* pursuant to Rule 16 of the Ohio Rules of Criminal Procedure:

1.)    Pursuant to Crim. R. 16 (B)(1)(a), the State responds as follows:

      (i)    Written or recorded statements: The State has previously provided to counsel for the defendant copies of the following:

      1)    Video taped statement of Nathaniel Jackson

      2)    Video taped statement of Donna M. Roberts

      3)    Two (2) Cassettes containing taped statements of Donna Robert

      4)    One (1) Cassette containing telephone conversations between Donna Roberts and Tosha and Donna and Nate

      5)    One (1) compact disk containing 10 recorded conversations between Donna Roberts and Nathaniel Jackson recorded at Lorain Correctional Institute.

      6)    The State is providing to counsel for the Defendant in excess of 290 letters written between the Defendant and the Co-Defendant.   The State has not

Page -1-

numbered these pages, but would invite counsel for the Defendant to come to the Trumbull County Prosecutor's Office in the event counsel for the Defendant questions whether all letters have been accurately copied.

    (ii)     Written summaries of statements:

The State has provided counsel for the Defendant the reports of Officer Paul Monroe, detailing the conversation he had with the Defendant, numbered 194 - 207

The State has provided counsel for the Defendant the reports of Officer Frank Dillion, detailing the conversation he had with the Defendant, numbered 208 - 212.

The State has provided counsel for the Defendant the reports of Officer Al Ray, detailing the conversation he had with the Defendant, numbered 220-221.

    (iii)    Grand Jury Testimony of the Defendant or Co-Defendant: None

2.)    Pursuant to Crim. R. 16 (B)(1)(b), the State responds as follows:

The Defendant's prior record is attached hereto as page No. 222.

3.)    Pursuant to Crim. R. 16 (B)(1)(c), the State responds as follows:

All documents and tangible objects, which are available or in the custody of the State, and which are material to the Defendant, are located at either the Prosecuting Attorney's Office or at the Howland Township Police Department.  Counsel for the Defendant may make appropriate arrangements to view the same.

The State is providing to Counsel for the Defendant the following:

    1)    One (1) CD-ROM titled "Robert S. Fingerhut Autopsy 01-2000."

    2)    One (1) CD-ROM titled "Robert Fingerhut Homicide 552 Images."

    3)    Seven (7) Sheets of Color Photographs, numbered 1 - 7.

Page -2-

4)      One Copy of the Coroner's Verdict, numbered 8 - 44.

5)      Assorted ATF gun trace request, numbered 45 - 55.

6)      BCI &I submission sheets., numbered 56-59

7)      Crime Scene Log, numbered 60

8)      Days Inn Receipts, numbered 61 - 63.

9)      Evidence logs, numbered 64 - 94.

10)     Photographic arrays, numbered 95 - 96

11)     Guest register, numbered 97- 98

12)     Wal-Mart receipt, numbered 99

13)     EMS reports, numbered 100 - 102

14)     Assorted Rights Waivers, Consent to Search, numbered 103 - 108

15)     Red Lobster receipts, numbered 109 - 114

16)     Telephone Records, numbered 115 - 134; 147 - 148

17)     Assorted black and white photographs numbered 135 - 139

18)     Prison phone records, numbered 140-142

19)     Police Report, numbered 143 - 146, 213- 219

20)     Insurance Records, numbered 149 - 189

21)     Trumbull County 911 records, numbered 190 - 193.

4.)     Pursuant to Crim. R. 16 (B)(1)(d), the State responds as follows: Copies of any reports, examinations and/or tests or experiments performed are attached hereto.  The State has requested that various tests be performed on numerous evidential items.  As of this date, the reports are not complete.  Upon receipt of the same, the State will forward them to counsel for

Page -3-

the Defendant.

5.)     Pursuant to Crim. R. 16 (B)(1)(e), the State intends to call the following witnesses, whose criminal record, if any, is as follows:

The State's witness list has been provided to counsel for the Defendant, numbered 223-225.  The State is in the process of obtaining criminal histories on these individual, and will supply any such record to counsel for the Defendant upon receipt of the same.

6.)     Pursuant to Crim. R. 16 (B)(1)(f), the State responds as follows:

Jimmie L. McCoy was shown a photographic array and was not able to identify the Co-Defendant.

The Co-Defendant filed a stolen gun report, which has been provided to counsel for the Defendant

The State is aware of its continuing obligation to supplement discovery pursuant to Rule 16(D) and fully intends to do so if necessary.

Respectfully Submitted,
STATE OF OHIO, by

DENNIS WATKINS (#0009949)
Trumbull County Prosecuting Attorney

and

CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecutor
Trumbull County Prosecutor's Office
160 High Street, NW
3rd Floor Administration Bldg.
Warren, Ohio  44481
(330)-675-2426

Page -4-

## CERTIFICATION

This is to certify that a copy of the foregoing *State's Response to Defendant's Request for Discovery* was mailed to counsel for the Defendant,  this March 14, 2002.

CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
Trumbull County, Ohio

Page -5-

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| STATE OF OHIO, | ) | CASE NO.    :01-CR-793 |
| | ) | |
| Plaintiff, | ) | JUDGE:    :JOHN M. STUARD |
| | ) | |
| -vs- | ) | S T A T E ' S   R E S P O N S E   T O |
| | ) | DEFENDANT'S REQUEST BILL OF |
| DONNA M. ROBERTS, | ) | PARTICULARS |
| | ) | |
| Defendant. | ) | |

Now comes the Plaintiff, the State of Ohio, by and through the Prosecuting Attorney of Trumbull County, Ohio, and submits the following in answer to the *Defendant's Request For Bill of Particulars* pursuant to Rule 7 of the Ohio Rules of Criminal Procedure, the State responds as follows:

The Affidavit, Prosecutor's Complaint, and Indictment filed in this case are fully incorporated herein by reference, and the State further responds:

On or about December 12. 2001, the Co-Defendant, Nate Jackson, armed with an operable firearm, trespassed into 254 Fonderlac Drive, Howland Township, Trumbull County Ohio,  with purpose to murder Robert S. Fingerhut, whose murder had been planned by the Defendant and the Co-Defendant.  Robert S. Fingerhut, who was found in the kitchen of the Fonderlac residence, was shot by the Co-Defendant, three times, including one to the head, which resulted in Robert S. Fingerhut's death. The Co-Defendant then took Fingerhut's vehicle which had been parked in the attached, two car garage.

24

Respectfully Submitted,
STATE OF OHIO, by

_____
DENNIS WATKINS (#0009949)
Trumbull County Prosecuting Attorney

and

_____
CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecutor
Trumbull County Prosecutor's Office
160 High Street, NW
3rd Floor Administration Bldg.
Warren, Ohio  44481
(330)-675-2426

## CERTIFICATION

This is to certify that a copy of the foregoing *State's Response to Defendant's Request*

*for Bill of Particulars* was mailed to counsel for the Defendant,  this March 14, 2002.

_____
CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
Trumbull County, Ohio 44485

WWR# 02499575



IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| STATE OF OHIO | ) | CIVIL CASE NO. 01 CR 793 |
| | ) | |
| Plaintiff | ) | TRAFFIC CASE NO. 01-78868 |
| | ) | |
| vs. | ) | JUDGE JOHN M. STUARD |
| | ) | |
| DONNA M. ROBERTS | ) | *__MOTION OF INTERESTED PARTY__* |
| | ) | |
| Defendant | ) | |

Now comes Innocent Party, Fifth Third Bank, N.A., by and through counsel, Weltman, Weinberg & Reis Co., L.P.A., and respectfully moves this Court pursuant to Ohio Revised Code Section 4511.195(F) for an Order recognizing Fifth Third Bank, N.A. as an Interested Party and returning the vehicle to Fifth Third Bank, N.A. for the reason that Fifth Third Bank, N.A., the holder of the first lien of record, financed the lease of the vehicle by one Donna M. Roberts. Donna M. Roberts has defaulted under the terms of the Lease Agreement and thereby lost her right to possession of the vehicle by violating the law or otherwise allowing the leased vehicle to be impounded by the authorities.  The basis for this motion is more fully set forth in the Brief and Affidavit attached hereto.

Respectfully submitted.

WELTMAN, WEINBERG & REIS CO., L.P.A.

Rosemary Taft Milby (#0054183)
Attorney for Interested Party
Fifth Third Bank, N.A.
323 W. Lakeside Avenue, Suite 200
Cleveland, Ohio  44113
Email:  rtaftmilby@weltman.com
Telephone:  (216) 685-1103
Fax:  (216) 363-6913

2-5

<u>B R I E F</u>

The Affidavit of Laura Balside, attached hereto, and the Court's records establish the following facts:

Claimant, Fifth Third Bank, N.A., is the holder of a Lease Agreement executed by Donna M. Roberts on November 9, 2000.  As part of the Lease Agreement, Donna M. Roberts granted Claimant a security interest in a 2001 Chrysler 300M, bearing VIN#2C3AE66G81H526861 (hereinafter referred to as "vehicle").  A true and accurate copy of the Lease Agreement is attached hereto as Exhibit "A".  Claimant duly noted its lien on the Certificate of Title to the vehicle.  A true and accurate copy of the Certificate of Title to the vehicle is attached hereto as Exhibit "B".

Donna M. Roberts has defaulted under the terms of the Note by violating the law or otherwise allowing the leased vehicle to be impounded by the authorities.  As a result of Donna M. Roberts's default, Claimant, Fifth Third Bank, N.A. is entitled to possession of the vehicle. On or about December 20, 2001, the Howland Township Police Department impounded the vehicle.

Ohio Revised Code Section 4511.195(F) provides that an interested party may obtain a release of an impounded vehicle if the claimant demonstrates that it is entitled to possession of the vehicle and the vehicle's owner does not intend to or cannot pay the storage charges due upon the vehicle.  Claimant further states, as shown by the Certificate of Title attached hereto as Exhibit "B" and after a vehicle lien search, that it is the first and only lien holder noted on the title to the vehicle.

Further, Defendant's failure to maintain the monthly payments required under the terms of the Lease Agreement demonstrates Defendant's inability to pay the storage charges due upon the vehicle.  Therefore, this Court may properly order that title and possession of the vehicle be transferred to interested party, Fifth Third Bank, N.A.

For the above-stated reasons, Claimant, Fifth Third Bank, N.A., respectfully requests that this Court to order the vehicle to be turned over to Claimant.

Respectfully submitted,

WELTMAN, WEINBERG & REIS CO., L.P.A.

Rosemary Taft Milby  #0054264
Attorney for Interested Party
Fifth Third Bank, N.A.
323 W. Lakeside Avenue, Suite 200
Cleveland, Ohio  44113
Email:  rtaftmilby@weltman.com
Telephone:  (216) 685-1103
Fax:  (216) 363-6913

### CERTIFICATE OF SERVICE

A copy of the foregoing Motion for Interested Party was sent to Donna M. Roberts c/o Trumbull Correctional Institution, 5701 Burnett Road, Leavittsburg, OH 44430 on this ___ day of March 2002 by regular U.S. Mail.

Rosemary Taft Milby  #0054264
Attorney for Interested Party
Fifth Third Bank, N.A.

WWR# 02499575

STATE OF OHIO          )

                         )     S.S.  AFFIDAVIT

COUNTY OF _Hamilton_    )

Now comes _Laura Balsize_, who being first duly sworn deposes and states as follows:

1. Affiant states that he/she is an employee of Fifth Third Bank, N.A., to wit its _Associated Vice President_.

2. Affiant further states that he/she makes this Affidavit from personal knowledge or knowledge obtained from company records kept in the ordinary course of business over which Affiant is a custodian.

3. Affiant further states that Donna M. Roberts, the Defendant in the case of "State of Ohio vs. Donna M. Roberts", being Trumbull Common Pleas Case No. 01-CR793, executed a Lease Agreement to Fifth Third Bank, N.A. A copy of the Lease Agreement is attached hereto as Exhibit "A".

4. Affiant further states that in order to secure the indebtedness evidenced by the Lease Agreement attached hereto as "Exhibit A", Donna M. Roberts granted Fifth Third Bank, N.A. a security interest in a 2001 Chrysler 300M, bearing Manufacturer's Serial Number 2C3AE66G81H526861, and that Fifth Third Bank, N.A. duly noted its security interest upon the Certificate of Title to the above described vehicle. A true and accurate copy of the Certificate of Title to the 2001 Chrysler 300M naming Fifth Third Bank, N.A. as a holder of a security interest is attached hereto as "Exhibit B".

5. Affiant further states that at no time did he/she know or should have known that the vehicle in question would be used for an illegal purpose in violation of state and local ordinances concerning driving under suspension.

6.  Affiant further states that at no time did he/she authorize Defendant to act in a manner in violation of any state or local law relative to the driving under suspension or any other violation of the law.

7.  Affiant further states that Donna M. Roberts has defaulted under the terms of the Lease Agreement by violating the law or otherwise allowing the leased vehicle to be impounded by the authorities.

AFFIANT FURTHER SAYETH NAUGHT.

Fifth Third Bank, N.A.

By _____

SWORN TO BEFORE ME and subscribed in my presence this _11_ day of _March_, 2002.

_____

MARQUITA D. JESTER
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES NOV 20, 2005

_____
NOTARY PUBLIC

WWR# 02499575

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | CIVIL CASE NO. 01 CR 793 |
| | ) | |
| Plaintiff | ) | TRAFFIC CASE NO. 01-78868 |
| | ) | |
| vs. | ) | |
| | ) | |
| DONNA M. ROBERTS | ) | *JOURNAL ENTRY* |
| | ) | |
| Defendant | ) | |

This cause came on for hearing on the _____ day of _____, 2002, upon Interested Party, Fifth Third Bank, N.A.'s Motion of Interested Party. The Defendant, Donna M. Roberts, having failed to appear and for good cause shown, this Court hereby grants Interested Party's Motion.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that title to the 2001 Chrysler 300M, being Manufacturer's Serial No. 2C3AE66G81H526861, seized as a part of this action, be transferred to Interested Party, Fifth Third Bank, N.A., and the Court hereby releases the above described vehicle to Interested Party, Fifth Third Bank, N.A..

IT IS SO ORDERED.

_____
JUDGE

Submitted and Approved By:

Weltman, Weinberg & Reis Co., L.P.A.

_____
Rosemary Taft Milby (0055264)
Attorney for Interested Party
Ford Motor Credit Company
323 W. Lakeside Avenue, Suite 200
Cleveland, OH 44113
Email: rtaftmilby@weltman.com
Telephone: (216) 685-1103
Fax: (216) 363-6913

WWR# 02499575

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO | ) CIVIL CASE NO. 01 CR 793 |
| | ) |
| Plaintiff | ) TRAFFIC CASE NO. 01-78868 |
| | ) |
| vs. | ) |
| | ) |
| DONNA M. ROBERTS | ) *JOURNAL ENTRY* |
| | ) |
| Defendant | ) |

This cause came on for hearing on the _____ day of _____, 2002, upon Interested Party, Fifth Third Bank, N.A.'s Motion of Interested Party. The Defendant, Donna M. Roberts, having failed to appear and for good cause shown, this Court hereby grants Interested Party's Motion.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that title to the 2001 Chrysler 300M, being Manufacturer's Serial No. 2C3AE66G81H526861, seized as a part of this action, be transferred to Interested Party, Fifth Third Bank, N.A., and the Court hereby releases the above described vehicle to Interested Party, Fifth Third Bank, N.A..

IT IS SO ORDERED.

_____
JUDGE

Submitted and Approved By:

Weltman, Weinberg & Reis Co., L.P.A.

_____
Rosemary Taft Milby #0057264
Attorney for Interested Party
Ford Motor Credit Company
323 W. Lakeside Avenue, Suite 200
Cleveland, OH 44113
Email: rtaftmilby@weltman.com
Telephone: (216) 685-1103
Fax: (216) 363-6913

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.    :01-CR-793 |
| | ) | |
| Plaintiff, | ) | JUDGE:    :JOHN M. STUARD |
| | ) | |
| -vs- | ) | **STATE'S SECOND SUPPLEMENTAL** |
| | ) | **RESPONSE TO DEFENDANT'S** |
| DONNA ROBERTS, | ) | **REQUEST FOR DISCOVERY** |
| | ) | |
| Defendant. | ) | |

Now comes the Plaintiff, the State of Ohio, by and through the Prosecuting Attorney of

Trumbull County, Ohio, and submits the following in answer to the *Defendant's Request For*

*Discovery* pursuant to Rule 16 of the Ohio Rules of Criminal Procedure:

1.)    Pursuant to Crim. R. 16 (B)(1)(a), the State responds as follows:

(ii)    Written summaries of statements: The State is providing to Counsel for the

Defendant the following written summaries:

The reports of Detective Hoolihan's, regarding the arrest and subsequent interrogation

of the Defendant, bearing Nos. 226-228.

The Supplemental reports of Officer Paul Monroe bearing the Nos. 229-233 are also

being provided, as they contain summaries of statements taken from either the Defendant or the

Co-Defendant.

Respectfully Submitted,
STATE OF OHIO, by

*Dennis Watkins*

DENNIS WATKINS ( (#0009949)
Trumbull County Prosecuting Attorney

and

CHRISTOPHER BECKER (#0047252)
Assistant Prosecutor
Trumbull County Prosecutor's Office
160 High Street, NW
3rd Floor Administration Bldg.
Warren, Ohio  44481
(330)-675-2426

## CERTIFICATION

This is to certify that a copy of the foregoing *State's Supplemental Response to Defendant's Request for Discovery* was mailed to counsel for the Defendant, this April 15, 2002.

CHRISTOPHER BECKER (#0047252)
Assistant Prosecuting Attorney

Howland Police Department later on in the day. (Note: Refer. to search inventory and Det. Di? a report and Capt. Bacon photo_aphs for further details).

11:40, Hrs.

Along with other investigators cleared the Grey Hound Bus Terminal and went to the Trumbull County Pros. Office. and met with investigators.

14:00, Hrs.

Went to the Howland Police Department and met with Det. Karl Compton. Turned over to him several pieces of evidence that was taken from the Grey Hound Bus Terminal along with three rolls of 35, mm. film to be processed.

12-21-01

00:10, Hrs.

On Friday, December 21, 2001 the Mahoning Valley Crimes Task Force, Trumbull County Sheriffs Office and Warren Police Department arrested Nathaniel Jackson without incident at 791 Wirt Street, Youngstown, Ohio. Nathaniel Jackson was placed into the rear of a marked Youngstown Police vehicle that was parked in the intersection of the road blocking traffic. Det. Hoolihan sat in the rear of vehicle with Nathaniel Jackson. Capt. Gary Bacon from the Trumbull County Sheriff Office had called dispatch for a uniformed deputy to come to Wirt St. location to transport a prisoner to the Trumbull County Jail.



Det. Hoolihan from the Warren Police Department sat with Nathaniel Jackson until Deputy Hoso arrived for transport. Det. Hoolihan advised Nathaniel Jackson that he was under arrest for a warrant issued for Aggr. Murder. Nathaniel was advised of his Miranda rights by Det. Hoolihan and his right to an attorney. Nathaniel stated that man; I did not kill anybody, man and asked that he has the right to an attorney at any time. I advised him yes he has the right to an attorney. Nathaniel said man I was on the phone with Donna and looked out the window and sees all of the police cars and wondered what was going on. I advised Nathaniel that Donna Roberts had snitched him out and that is how we knew where to find him and she agreed to make the phone call to verify that you were in the house. Nathaniel said man I did not kill nobody. I advised Nathaniel that Donna was at the Trumbull County Jail and was cooperating with investigators and told them all about the murder of her husband Robert and that when we got to the Trumbull County Jail that he would have a chance to tell his side of the story and would be asked some questions. Nathaniel said man I cannot believe that she did that to me. I told Nathaniel once again that Donna told us everything and that he would have an opportunity to tell investigators his side of the story.


00:29, Hrs.

Deputy Jeff Hoso of the Trumbull County Sheriffs Office arrived and Nathaniel was placed into his vehicle along with Det. Hoolihan and transported to the Trumbull County Jail, for processing.


00:45, Hrs.

Officers arrived at the Trumbull County Jail. Jackson was placed into a holding area, until Capt Bacon from the Trumbull County Sheriffs Office, arrived to let investigators into an interview room, which the interior doors of offices located in the detective bureau were locked.


01:45, Hrs.



Jackson   as brought to Captain Bacon's   ice in the Detective Division at the Trumbull County Sheriff Office. Along with Det. Monroe from Howland Police Department, investigators began talking to Jackson. (Refer. to Det. Monroe report for further details).

02:13, Hrs.

Det. Monroe advised Jackson of his rights and read the rights from to Jackson who signed the rights waiver stating that he understood them and agreed to allow officers to video tape his statement. Along with Det. Monroe from the Howland Police Department interviewed Jackson and started video taping his statement. (See video taped statement of Nathaniel Jackson and typed transcript for further details). The interview was concluded at 03:13, Hrs.

12:30, Hrs.

Along with Members of the Trumbull County Sheriffs Office, The Warren and Howland Police Departments conducted an article search of the South side of State Route 82 from Howland Wilson Rd. SE, East to State Route 11. This area was described by Nathaniel Jackson as the area he discarded the handgun he claimed he used during the shooting of the victim, Robert Fingerhut. The search involved 22 Officers, however no weapons were found.

1-8-02

08:45, Hrs.

Met with Warren City Pros. Tracy Timko. After review of the case file of Santiago Mason this investigator was advised to dismiss the charges against Santiago Mason after it was learned through the murder investigation of Robert Fingerhut that Santiago Mason did not



# HOWLAND POLICE DEPARTMENT

169 N... s Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #:01-078868
Date: 12-21-01
Investigator:  Det. Sgt. Monroe
Page 1 of 2



On Friday, December 21, 2001 the Mahoning Valley Violent Crimes Task Force, Trumbull County Sheriff's Department and Warren Police Department arrested Nathaniel Jackson without incident at 791 Wirt Street, Youngstown, Ohio. At 00:29 hours Trumbull County Sheriff Deputy Jeff Hoso and Warren City Police Detective Jeff Hoolihan transported Jackson to the Trumbull County Jail. Officers arrived at the Trumbull County Jail at 00:45 hours. Before the transport Det. Hoolihan advised Jackson of his constitutional rights. Jackson was put in a holding area at the Trumbull County Jail prior to being interviewed.

Jackson was brought to Captain Bacon's office in the Detective Division at the Trumbull County Sheriff's Office 01:45 hours. R/O and Det. Hoolihan began talking with Jackson. Jackson told officers he spent the day of Robert Fingerhut's murder with Donna Roberts at the Warren Greyhound Bus Terminal. They had dinner and afterwards she took him to Oscar and Sheila's house on Wirt Street in Youngstown, Ohio. Jackson said he was downtown walking around after dark and saw Robert Fingerhut loading a bus at the Youngstown Greyhound Bus Terminal. Jackson said he engaged in conversation with Fingerhut in the parking lot. They talked about possible employment at the bus terminal. Jackson told officers Fingerhut wanted to purchase some marijuana from him. Jackson told him to meet him in the parking lot of C Staples when he got off work. C Staples Barbecue is a restaurant located at 320 Belmont Ave. in Youngstown between Lincoln and West Rayen.

Jackson walked to C Staples Barbecue and waited outside the restaurant in the parking lot for Fingerhut. When Fingerhut arrived at the restaurant he was driving a silver Chrysler. Jackson got into the car and sold marijuana to Fingerhut. For $100.00 Jackson sold Fingerhut a little less than an ounce of marijuana. Jackson asks Fingerhut if he could hang out with him for the evening and Fingerhut told him he could. Along the ride to Fingerhut's residence Jackson said they talked about possible employment opportunities. Fingerhut told Jackson he would give him a job at the bus terminal.

l

)

)



When they arrived at the Fingerhut residence, Robert parked h    ar in the garage. Robert and Jackson wen    .to the house through the garage man door and Robert closed the overhead garage door. Once inside the house both men continued their conversation. Nate Jackson told officers he was standing next to the kitchen table leaning on a chair with his back to the living room. Robert was still standing near the kitchen door they had come in through. Jackson said, Robert was taking down to him, telling him how black men don't step up and do what they have to do to get ahead. Robert continued to talk down to Nate. Nate said he just let everything go by because they were just words and didn't mean anything to him. Nate said, " hey I don't need this shit, you can just take me back to the hood. Robert told Nate to leave and Nate told Robert you brought me and your taking me back".

Nate said, "out of nowhere Robert pulled out a gun and started yelling at him. Then for no reason he shot me in the finger. Then Nate told officers he grabbed the gun and was fighting for his life. Nate said he took the gun away from Fingerhut and shot him twice. Jackson said he didn't kill Fingerhut. Jackson said, "when I left he was lying on the floor making breathing noises, like gurgling, but he was still alive". R/O asked Nate how he got back to Youngstown? Nate said, "I took his car and went to Sheila's". Nate told officers he got the keys for the car from the counter in the kitchen.

On Nates way back to Youngstown he said he threw the gun out of the passenger side of Fingerhut's car. Jackson thought he threw the gun out of the car when he got on the highway a short distance from Fingerhut's home. When Jackson was first questioned about what he did with the murder weapon he could not remember. The best location of the murder weapon Jackson could give officers was between State Route 82 at Howland Wilson Road and the highway to Youngstown.

Jackson agreed to allow officers to video tape his statement. At 02:13 hours R/O began video taping Jackson along with Det. Hoolihan of the Warren Police Department. See video taped statement of Nathaniel Jackson for further details of this interview. The interview was concluded at 03:13 hours.

2



# HOWLAND POLICE DEPARTMENT

169 Nile ortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #:01-078868
Date: 12-20-01
Investigator:  Det. Sgt. Monroe
Page  1 of  2



On Thursday, December 20, 2001 at 8:20pm, Donna Roberts made a voluntary video taped statement to Captain Bacon of the Trumbull County Sheriff's Office and R/O. The interview was conducted at the Trumbull County Sheriff's Department in Captain Bacon's office. Robert's was advised of her constitutional rights, she indicated she understood her rights. Donna Roberts was also shown a constitutional rights form that R/O read to her. Donna Roberts signed and initialed the form. Said interview took place shortly after her arrest

See typed transcript of video taped interview of Donna Robert's for details of the interview.

Robert's agreed to make a recorded telephone call to Sheila Field's residence where she believed Nate Jackson might be staying.  R/O, Det. Sgt. Dillon, Trumbull County female corrections officer Marlow Droney and Donna Roberts went to 254 Fonderlac SE where the telephone call was made from. R/O connected telephone-recording equipment to the telephone and recorded the call.  At 11:45pm Donna Roberts dialed Sheila Field's telephone number (330) 746-1682 a female answered the telephone and Donna ask to speak with Nate. A moment later Nate Jackson was speaking with Donna on the telephone. While Roberts was speaking to Jackson on the telephone, the Mahoning County Violent Crimes announced their presence from outside 791 Writ Street, Youngstown, Ohio. Jackson and other occupants of the residence were asked to exit the residence and they complied. Jackson was placed under arrested and transported to the Trumbull County Sheriff's Department.

After the recording officers and Roberts left the residence. While traveling west on East Market Street Roberts told R/O, "this is where I told you I pulled into the parking lot the night Robert was killed. I cut across the lot and parked up there in the handicapped space where I always park". Donna told officers and showed us the eastern most entrance to the Howland Plaza as her point of entry into the lot. Donna then directed R/O to the first full row of parking spaces west of the north/south entrance way. Donna indicated she parked in the first handicapped parking space in the row and pointed the parking space out to officers. Officers then left the parking lot and proceeded west on East Market Street. Donna pointed out the westbound

1



}

}

entrance to State Route 82 and told officers she entered the highway from said ramp and went to Wal-Mart.

Corrections Officer Droney escorted Roberts back to the Trumbull County Jail upon officer's return.

Det. Sgt. Paul Monroe

2

231

# HOWLAND POLICE DEPARTMENT

169 N. Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #: 01-078868
Date: 12-15-01
Investigator: Det. Sgt. Monroe
Page  1 of 2



On Saturday, December 15, 2001, Donna Roberts came to the Howland Police Department with her son Michael Raymond and Attorney Steve Chuparkloff. Michael Raymond waited in the lobby while Donna and Attorney Chuparkoff spoke with Det. Sgt. Dillon and R/O in the Detective Bureau Conference Room. R/O asked Donna if it would be ok with her to record our conversation and she said, "sure". At 1647 hours R/O began recording the interview.

R/O read a Constitutional Rights form to Donna and asked her if she understood her rights, she said, "yes". Attorney Chuparkoff also reviewed the form, further explaining it to Donna. Donna signed and initialed the constitutional rights form and indicated she understood her rights.

The interview was concluded at 1917hours. Donna and Attorney Chuparkoff agreed to make a recorded phone call to Nate Jackson and discuss the murder of Robert Fingerhut. All parties agreed it would be more prudent to make said call from Donna's home on Fonderlac due to possible caller identification capabilities of the numbers to be called. Det. Dillon, R/O, Attorney Chuparkoff and Donna also discussed questions we wanted Donna to ask Nate. Below is a list of some of the questions officers asked Donna to ask Nate:

What are you doing?
Did you eat something?
Are you still smoking that crack?
Are you going out tonight?
I can't believe Robert is gone, can you?
I'm real lonely?
How is your finger? Do you think you should go to the Hospital?
Do you think part of the bullet is still in your finger?
How did you get shot anyway?
Where are you staying?

1



Officers arrived at the Fingerhut residence, 254 Fonderlac SE at 7:45pm along with Donna Roberts, Michael Ra___ond, Attorney Steve Chuparkoff, De___gt. Dillon and Det. Sgt. Monroe. R/O set up the recording equipment in the master bedroom of the home. Donna first attempted to contact Nate Jackson at his sister Tosha's house. Donna dialed telephone number (330) 788-6266 several times and the number was busy.

Donna checked her caller identification, which revealed telephone number (330) 747-6260 and dialed the number. Donna said she did not know whose number it was. The person who answered the call said his name was James. R/O was unable to identify the subject.

Donna then dialed her cellular telephone number, (330) 506-0373. The subject that answered the cellular telephone told Dona she had the wrong number and hung up. Donna pressed redial which displayed the previous number called which was correct. On this attempt no one answered the cellular telephone.

Donna tried Tosha's telephone number again, (330) 788-6266 and reached her. They had a brief conversation Nate's well being. Tosha indicated Nate was not there. Tosha also asked Donna is it was all right to talk and Donna said, "anyone can hear", as if to tip off Tosha. Donna was told Nate needed money and she would have him contact her.

Donna again called her cellular telephone, (330) 506-0373, which was answered by an unknown subject. Donna ask to speak with Nate and was told he went to the store. The subject then hung up on Donna.

While at the residence officers spent some time just talking with Donna. In 1983 Donna married Robert Fingerhut. She told R/O her and Robert divorced in 1985. The divorce was Robert's idea. He felt by putting everything, the house, cars, banking accounts, etc., in Donna's name his assets would be protected in the case of a lawsuit. Donna told R/O her and Robert are a very devout Jewish family. In her and Roberts's eyes the only way they could be divorced was in the eyes of their religion. Donna said her and Robert would have to approach the church and ask a high ranking church official to grant them a "get" which is the Hebrew equivalent for a divorce. Donna told officers she still considers Robert her husband as she always has. Donna told officers her and Robert were a happy couple with no real problems. Donna also showed officers a parchment scroll in what we were told was Hebrew script. This scroll was what Donna told officers was a Jewish marriage certificate. R/O was unable to read said document. Donna told officers she reads and speaks some Hebrew.

Attorney Chuparkoff and Donna agreed to meet with officers on 12-16-01 at the Fingerhut residence and attempt to contact Nate Jackson via the telephone.

*Det. Sgt. Monroe*

2

233

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | **CASE NO.    :01-CR-793** |
| | ) | |
| Plaintiff, | ) | **JUDGE:     :JOHN M. STUARD** |
| | ) | |
| -vs- | ) | **STATE'S THIRD SUPPLEMENTAL** |
| | ) | |
| DONNA ROBERTS, | ) | **RESPONSE TO DEFENDANT'S** |
| | ) | |
| Defendant. | ) | **REQUEST FOR DISCOVERY** |

Now comes the Plaintiff, the State of Ohio, by and through the Prosecuting Attorney of Trumbull County, Ohio, and submits the following in answer to the *Defendant's Request For Discovery* pursuant to Rule 16 of the Ohio Rules of Criminal Procedure:

1.)    Pursuant to Crim. R. 16 (B)(1)(a), the State responds as follows:

(ii)    Written summaries of statements: The State is providing to Counsel for the Defendant the following written summaries:

The Supplemental reports of Officer Paul Monroe bearing the Nos. 234 to 235 are also being provided, as they contain summaries of statements taken from either the Defendant or the Co-Defendant.

2.)    Pursuant to Crim. R. 16 (B)(1)(d), the State responds as follows: Copies of any reports, examinations and/or tests or experiments performed are attached hereto as exhibit 236-246.

3.)    Pursuant to Crim. R. 16 (B)(1)(e), the State intends to call the following witnesses, whose criminal record, if any, is as follows:

In addition to the witness list previously provided the State has provided to counsel for the Defendant a supplemental witness list numbered 247.

27

Respectfully Submitted,
STATE OF OHIO, by

_____
DENNIS WATKINS ( (#0009949)
Trumbull County Prosecuting Attorney

and

_____
CHRISTOPHER BECKER (#0047252)
Assistant Prosecutor
Trumbull County Prosecutor's Office
160 High Street, NW
3rd Floor Administration Bldg.
Warren, Ohio 44481
(330)-675-2426

## CERTIFICATION

This is to certify that a copy of the foregoing *State's Supplemental Response to Defendant's Request for Discovery* was mailed to counsel for the Defendant, this April 18, 2002.

_____
CHRISTOPHER BECKER (#0047252)
Assistant Prosecuting Attorney

jbj\E:\JBJCRIM25\CAPITAL\CLIENT\ROBERTS.DONNA\Comprehensive.voir.dire.vers.1-2002.wpd•rev'd.
—Mon 10Jun2002•2257.15 (10:57:15pm)

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,                              )     Case No. 01 CR 793
                                            )
    Plaintiff                        )     Judge John M. Stuard
                                            )
-vs-                                        )
                                            )
                                            )     **Death Penalty Case**
                                            )
DONNA M. ROBERTS,                           )
                                            )
    Defendant                        )

---

### DEFENDANT'S MOTION FOR COMPREHENSIVE
### VOIR DIRE EXAMINATION

---

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
CHRISTOPHER D. BECKER, Esq., Assistant
160 High Street NW
Warren, Ohio 44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

28

JBJ

E:\JBJCRIM25\CAPITAL\CLIENT\ROBERTS.DONNA\Comprehensive.voir.dire.vers.1-2002.wpd•Monday 10 Jun 2002 10:57:15pm (2257hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                      )      Case No. 01 CR 793
                                    )
    Plaintiff                       )      Judge John M. Stuard
                                    )
-vs-                                )
                                    )
                                    )
DONNA M. ROBERTS,                   )
                                    )
    Defendant                       )

---

### DEFENDANT'S MOTION FOR COMPREHENSIVE
### VOIR DIRE EXAMINATION

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Honorable Court for an order permitting counsel to conduct a comprehensive voir dire examination of all prospective jurors.

For cause for this motion, the Defendant says that the requested relief is necessary to protect and secure the Defendant in his constitutional liberties, all as shown in the attached Memorandum, which is attached hereto and made a part hereof by this reference.

WHEREFORE, the Defendant prays for an order of this Court allowing counsel for both parties to conduct comprehensive voir dire examination of all jurors.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

-i-

JBJ

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was sent by regular U.S. Mail, postage prepaid, this ____ day of June, 2002 to DENNIS WATKINS, Esq., County Prosecutor, and CHRISTOPHER D. BECKER, Esq., Assistant County Prosecutor, 160 High Street NW, Warren, OH  44483.

JOHN B. JUHASZ
COUNSEL FOR DEFENDANT

JBJ

## MEMORANDUM IN SUPPORT OF MOTION

The Defendant has been indicted for, *inter alia*, aggravated murder with death penalty specifications. Trial courts always have an obligation to insure that the proceedings are fair,[1] but that duty reaches a heightened level in death penalty cases because "death is different." *See, Woodson v. North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944.[2] *Accord, Burger v. Kemp* (1987), 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638, 55 USLW 5131.

The purpose of voir dire examination is to determine whether any member of the venire harbors any bias against either party, or whether any member of the venire is unable to follow the law and put aside any preconceived notions concerning either the law or the case. *See, e.g., Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, 60 USLW 4541. The presence of juror bias, in any form, would result in a trial unfair to both parties, the government and the Defendant. Accordingly, a searching and comprehensive

---

[1] *See, generally, Chambers v. Mississippi* (1973), 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297; *State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342, and the authorities cited therein.

[2] Though there are those who criticize the "death is different holding, *see, e.g., Morgan v. Illinois, post,* (SCALIA, J., joined by REHNQUIST, Ch.J. and THOMAS, J., dissenting), the precept is firmly entrenched in Eighth Amendment jurisprudence. The proposition was adopted by the Court from law professor Anthony Amsterdam. Arguing the second round of major capital cases which resulted in the holdings in *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 and *Woodson v. North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944, in response to being pressed by Justice Potter Stewart that Amsterdam's argument "proved too much," Amsterdam replied:

> Now, why do we say death is different? Our legal system as a whole has always treated death differently. We allow more peremptory challenges; we allow automatic appeals; we have different rules of harmless error; we have indictment requirements; unanimous verdict requirements in some jurisdictions, because death is different.
> Death is factually different. Death is final. Death is irremediable. Death is unknowable; it goes beyond this world. It is a legislative decision to do something, and we know not what we do. Death is different because even if exactly the same discretionary procedures are used to decide issues of five years versus ten years, or life versus death, the result will be more arbitrary on the life or death choice.

Oral arguments held March 30-31, 1976. *See,* Peter Irons and Stephanie Guitton, ed., *May It Please the Court* (New York: The New Press, Copyright © 1993), 233.

-1-

voir dire examination is crucial to uncover any concealed prejudices against either of the parties.  Such an examination would reveal preconceived notions on the part of any juror that would preclude consideration of crucial mitigating or aggravating factors or which would cause automatic imposition of the death penalty, or which would prevent the imposition of the death penalty altogether. *Morgan, ante*.[3]  The Defendant respectfully submits that given the circumstances, this Court's refusal to permit the parties to conduct a comprehensive voir dire examination would amount to an abuse of discretion, the effect of which would be to deny the parties due process of law and a fair and impartial jury.

OHIO REV. CODE ANN. §2945.27 provides that the judge of the trial judge shall "examine the prospective jurors under oath or upon affirmation as to their qualifications to serve as fair and impartial jurors, but he shall permit reasonable examination of such jurors by the prosecuting attorney and by the defendant or his counsel."  The Court's duty to permit the parties to examine each prospective juror is also addressed in OHIO CRIM.R. 24(A).  That rule provides that any person who is called as a juror for the trial of any case "shall be examined under oath or upon affirmation as to his qualifications.  The court may permit the attorney for the defendant, or the defendant if appearing pro se, and the attorney for the state to conduct the examination of the prospective jurors or may itself conduct the examination.  In the latter event, the court shall permit the state and defense to supplement the examination by further inquiry."

The language of both the rule and the statute clearly indicate that both parties must be afforded sufficient opportunity to question each member of the

---

[3] Indeed, in *Morgan*, the United States Supreme Court, in an opinion by Justice Byron White, said that a failure to conduct such a searching voir dire in a capital case disentitles the government to execute any death sentence imposed as a result of such a patently unfair trial.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · Youngstown, Ohio 44512-5610
TELEPHONE (330) 758.2308 · FACSIMILE (330) 758.8290 · E-MAIL JBJJURISDOC@AOL.COM

-2-

JBJ

venire before a decision is made to either excuse or not excuse a particular juror. The Ohio Supreme Court has stated that trial courts should permit "reasonable examination of such jurors by . . . defendant or his counsel." *See, State v. Anderson* (1972), 30 Ohio St.2d 66, 72, 282 N.E.2d 568.[4]  In *State v. Jones* (1982), 2 Ohio App.3d 345, 441 N.E.2d 1121, the court went further and said that the statute and the rule *require* the trial court to permit counsel for the parties to supplement the court's voir dire examination where a request to do so is made by counsel.  We must of course remember that the statute and the rule derive from the basic constitutional premises of Due Process and trial by an impartial jury.  The statute and the rule (and indeed the procedural orders of this Court) are but tools to implement those grand constitutional guarantees.

In *State v. Anderson, ante*, the Supreme Court of Ohio vacated a death sentence because of limitations upon voir dire.  The Court's discussion of voir dire and the constitutional implications of limiting voir dire demonstrates why the relief sought herein should be granted.  The Supreme Court said:

> Compliance with the requirements of *Witherspoon* necessarily includes sufficient latitude in the voir dire examination of prospective jurors in a capital case to establish that those who are dismissed for cause upon the basis of their scruples regarding capital punishment would automatically vote against the imposition of a sentence of death no matter what the trial might reveal.  We cannot so find from the record in the case at bar.  See *State v. Watson, supra*, 28 Ohio St.2d 15, 275 N.E.2d 641.
>
> Additional grounds exist for our conclusions herein.  The Ohio Constitution provides, insofar as here material:
>
> " * * * In any trial, in any court, the party accused shall be allowed * * * a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed. * * * " Article, I, Section 10, Constitution of Ohio.
>
> As we said in *Lingafelter v. Moore* (1917), 95 Ohio St. 384, 387, 117 N.E. 16:

---

[4] *See also, State v. Proctor* (1977), 51 Ohio App.2d 151, 367 N.E.2d 908, where the court said that OHIO CRIM.R. 24(A) was not intended to allow a trial court to foreclose personal inquiry of the jurors by counsel.

JBJ

"It is beyond question that the right of trial by jury guaranteed by the Constitution carries with it by necessary implicating the right to a trial by a jury composed of unbiased and unprejudiced jurors.  This right being guaranteed, all courts are charged with the imperative duty of affording every litigant the opportunity of having his cause tried by an impartial jury.'  See, also, *Cooper v. State* (1865), 16 Ohio St. 328; *Petro v. Donner* (1940), 137 Ohio St. 168, 28 N.E.2d 503; *Peart v. Jones* (1953), 159 Ohio St. 137, 111 N.E.2d 16; *State v. Duling* (1970), 21 Ohio St.2d 13, 254 N.E.2d 670.

To safeguard this constitutional right, the General Assembly has provided for peremptory challenges and challenges for cause.  R.C. §§2945.21, 2945.22 and 2945.25.

In *Dowd-Feder v. Truesdell* (1936), 130 Ohio St. 530, 533, 200 N.E. 762, we said:

"The right to examine prospective jurors on their voir dire is granted to litigants in order to enable them to select a jury composed of men and women qualified and competent to judge and determine, without bias, prejudice or partiality, facts in issue.  For the proper exercise of this right, the Legislature has deemed it wise to give to litigants the right of peremptory challenge and challenge for cause.  This former right is to be exercised at their discretion and free from any limitation or restriction.  Any rule of law which denies a litigant reasonable latitude in the examination of prospective jurors as to their qualifications, in order to enable him to exercise such peremptory challenges judiciously and intelligently, deprives him of a substantial right.

"Reasonable scope must be allowed and latitude given to counsel on the voir dire examination * * * ."

Later, in *Krupp v. Poor* (1970), 24 Ohio St.2d 123, 125, 265 N.E.2d 268, this court said:

"The purpose of the examination of a prospective juror upon his voir dire is to determine whether he has both the statutory qualification of a juror and is free from bias or prejudice for or against either litigant.'  Paragraph one of the syllabus of *Pavilonis v. Valentine* (1929), 120 Ohio St. 154, 165 N.E. 730.  See, also, paragraph one of the syllabus of *Vega v. Evans* (1934), 128 Ohio St. 535, 191 N.E. 757, and paragraph one of the syllabus of *Dowd-Feder v. Truesdell* (1936), 130 Ohio St. 530, 200 N.E. 762.  Moreover, the voir dire examination serves as the foundation upon which an intelligent exercise of the litigants' right to peremptory challenge may be made.  *Pavilonis v. Valentine, supra*, and *DowdFeder v. Truesdell, supra*.

"To achieve that purpose reasonable latitude must be given to counsel on the voir dire examination.  * * *"  See, also, *Pearson v. Gardner Cargage Co.* (1947), 148 Ohio St. 425, 76 N.E.2d 67.

Whatever may be the practice in other jurisdictions, it is a rule of long standing in Ohio that counsel for the respective litigants be given a reasonable opportunity to personally examine prospective jurors.

[B]      The General Assembly has also addressed itself to this important area.  R.C. §2945.27 provides:

"The judge of the trial court shall examine the prospective jurors under oath or upon affirmation as to their qualifications to serve as fair and impartial jurors, but he shall permit reasonable examination of such jurors by the prosecuting attorney and by defendant or his counsel."  *  *  *

The judge of examination that is "reasonable" will vary from case to case depending upon many factors, including whether the trial to be held is criminal or civil, and, if criminal, for what crime.

In the instant case, the defendant was charged with first degree murder under R.C. s 2901.01.  The jury was entrusted with two distinct responsibilities:  First, to determine defendant's guilt or innocence; and second, to determine whether defendant's sentence should be death or imprisonment for life.  The jurors were bound by their oath to base their verdict of "not guilty," "guilty of manslaughter," or "guilty," solely upon the law and the evidence, without regard to any personal feelings.  However, as in all first degree murder cases in this state, it was left entirely to the jury to determine the extent of punishment in the event of conviction.  See *McGautha v. California* (1971), 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711.  Under such circumstances, it was unreasonable within the meaning of R.C. §2945.27 for the trial court to prohibit the prosecuting attorney and the defendant or his counsel from asking the prospective jurors any questions concerning their scruples regarding capital punishment.

It has not been alleged, argued or shown that this jury was biased with respect to appellant's guilt.  We have examined the appellant's other contentions and find no error prejudicial to his interests.  Hence, the judgment of guilt will be affirmed.  However, as required by the doctrine of *Witherspoon v. Illinois, supra,* the penalty of death must be reversed and the cause remanded to the trial court, with instructions to vacate the journal entry sentencing this defendant death and then to sentence defendant to imprisonment for life as provided for in R.C. §2901.01.

*Id.*, 30 Ohio St.2d, at 70-74.[5] The purpose of voir dire examination is further to determine whether a juror has a bias in favor of or a prejudice against either party that would interfere with that juror's impartiality and his ability to give the case full consideration as to the guilt of a defendant.  *State v. Ellis* (1918), 98 Ohio St. 21, 120 N.E. 218.  The Ohio Supreme Court has in fact held that a

---

[5] All quotes are copyright © West Publishing Co. 1995, no claim to original U.S. Govt. works; and copyright © LEXIS-NEXIS, 2001, a division of Reed Elsevier, Inc., all rights reserved..

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 194

[B]          "careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality". *State v. Maurer* (1984), 15 Ohio St.3d 239, 251, 473 N.E.2d 768; *see, also, State v. Bayless* (1976), 48 Ohio St.2d 72, 98, 357 N.E.2d 1035. The parties must be permitted to inquire into matters not only relating to challenges for cause, but also peremptory challenges. *Aldridge v. United States* (1931), 283 U.S. 308, 310, 51 S.Ct. 470, 471-472, 75 L.Ed. 1054; *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382; *State v. Swanson* (1984), 16 Ohio App.3d 375, 476 N.E.2d 672.

The Ohio Supreme Court in *Pembaurer v. Leis* (1982), 1 Ohio St.3d 89, 437 N.E.2d 1199, reiterated its definition of "abuse of discretion." That term, the court held, implies some arbitrary or unreasonable attitude on the part of the trial court. The Defendant respectfully submits that to limit voir dire examination in a case such as this would indeed amount to an abuse of discretion. *See, e.g., United States v. Dellinger* (5th Cir. 1972), 472 F.2d 340, 367, where the court held that:

> an answer which falls short of an admission of bias may nevertheless aid counsel in deciding to exercise a peremptory challenge .   .   .   . Some questions may appear tangential to the trial but are actually so integral to the citizen juror's view of the case .   .   . that they must be explored .   .   .   . What these essential inquires are, of course, varies with each case.

In this particular case, the Defendant seeks leave to conduct an examination in an effort to uncover biases on the part of any prospective jurors that would cause the juror to favor conviction or a death sentence for no reason other than that the defendant was brought to trial. The reasons for a careful voir dire are obvious, and in a capital case are grounded in the Due Process Clause. Speaking for the Court in *Morgan*, the late Justice Byron White said:

[JB]

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Id.*, 504 U.S. at 729. Justice White and the Court later said:

> We deal here with [Morgan's] ability to exercise intelligently his complementary challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt. Were voir dire not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would always impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would never do so.[6]

*Id.*, at 509 U.S. at 733-734. Indeed,

> [i]t may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. [Footnote omitted.] A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception.

*Id.*, 509 U.S. at 735-736.

The defendant requests permission to conduct voir dire examination geared toward uncovering any improper bias in favor of sentencing the defendant to death.

---

[6] In footnote 7, the Court said:
> As the Fifth Circuit has observed obiter dictum: "All veniremen are potentially biased. The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case. Clearly, the extremes must be eliminated—*i.e.*, those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence." *Smith v. Balkcom*, 660 F.2d 573, 578 (1981) (emphasis in original), *modified*, 671 F.2d 858, *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982).

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

-7-

JBJ   Failure to permit comprehensive voir dire examination would violate the Defendant's state and federal constitutional liberties, including due process of law, *see*, U.S. CONST. amend. XIV, to have justice administered without denial or delay, and to a remedy by due course of law, *see*, OHIO CONST. art. I, §16, to have a fair and impartial jury, *see*, U.S. CONST. amend. VI and OHIO CONST. art. I, §10, to the effective assistance of counsel, *see*, U.S. CONST. amend. VI and XIV and OHIO CONST. art. I, §10, and to be free from cruel and unusual punishment, *see*, U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §9.

J. GERALD INGRAM

JOHN B. JUHASZ

E:\JBJCRIM25\CAPITAL\Client\Roberts.Donna\Cover.Page.wpd*Tue 11Jun2002•0910.07 (09:10:07am)

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,                    }
                                  }          Case No.  01 CR 793
        Plaintiff                 }
                                  }          Judge John M. Stuard
*vs.*                             }
                                  }
                                  }
DONNA ROBERTS,                    }
                                  }          **Death Penalty Case**
        Defendant                 }

---

### DEFENDANT'S MOTION TO PROHIBIT DEATH QUALIFICATION OF JURORS UNLESS AND UNTIL THE GOVERNMENT HAS ESTABLISHED PROBABLE CAUSE THAT THE CASE WILL PROCEED TO A SECOND PHASE
### EVIDENTIARY HEARING REQUESTED

---

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
Christopher D. Becker, Esq., Assistant
160 High Street NW
Warren, Ohio  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

J. GERALD INGRAM • JOHN B. JUHASZ • ATTORNEYS AT LAW • 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 • TELEPHONE: 330.758.2308 • FACSIMILE: 330.758.8290

2-9

JBJ   E:\JBJCRIM25\CAPITAL\CLIENT\ROBERTS.DONNA\Death.qual.pc.2nd.phase.wpd*Tue 11 June 2002 - 08:54am (0854 hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )    Case No. 01 CR 793
                                  )
    Plaintiff             )
                                  )    Judge John M. Stuard
*vs.*                             )
                                  )
                                  )
DONNA M. ROBERTS,                 )
                                  )
    Defendant             )

---

## DEFENDANT'S MOTION TO PROHIBIT DEATH QUALIFICATION OF JURORS UNLESS AND UNTIL THE GOVERNMENT HAS ESTABLISHED PROBABLE CAUSE THAT THE CASE WILL PROCEED TO A SECOND PHASE
### EVIDENTIARY HEARING REQUESTED

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Honorable Court for an order prohibiting the government, the Court itself, and the Defendant herself, from death qualification of prospective jurors unless and until the government has established probable cause for this Court to believe that the case will proceed to a second phase; *i.e.,* that this case is truly a capital case, and not simply indicted as a capital case at the bidding of the prosecutor's office for the purpose of gaining for the government a strategic advantage.

For cause, the Defendant says that the process of death qualification results in a jury which is less than impartial, and accordingly denies the Defendant due process of law, trial by a fair and impartial jury, and other constitutional liberties protected by U. S. CONST. amend. VI and XIV and OHIO CONST. art. I, §§1, 2, 5, 10,

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

i

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 199

JBJ

and 16, more fully specified in the attached Memorandum, made a part hereof by this reference.

The process of death qualification, even the United States Supreme Court concedes, results in a conviction-prone jury. While that Court has appeared to suffer the existence of death qualification as a necessary evil in a capital case, the Defendant says that, given the conviction-prone nature of a death qualified jury, the government must first establish probable cause that this is truly a capital case before the Defendant may be tried by less than twelve "impartial and unprejudiced jurors". *See*, *Parker v. Gladden* (1966), 385 U.S. 363, 366, 87 S.Ct. 468, 17 L.Ed.2d 420.

The Defendant requests an evidentiary hearing, and submits that the government must adduce sufficient evidence to establish probable cause that this is truly a capital case. Mere representations of the prosecutor about the evidence are insufficient because, with due respect, such representations to the grand jury are what secured a capital indictment in the first instance.

WHEREFORE, the Defendant prays for an order of this Court directing that no death qualification of prospective jurors shall be conducted unless and until the government has first established probable cause that this is a truly capital case which will proceed to a second phase.

Respectfully submitted,

J. GERALD INGRAM 0007887

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8250

ii

JBJ

JOHN B. JUHASZ 0023777
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330·758·2308
Facsimile: 330·758·8290
COUNSEL FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:

- ☒ sent by regular United States Mail, postage prepaid,
- ☐ hand delivered to counsel or counsel's office
- ☐ sent by telecopier

this 17th day of June, 2002 to Dennis Watkins, Esq. and Christopher D. Becker, Esq., Counsel for Plaintiff, 160 High Street, Warren, Ohio  44481.

JOHN B. JUHASZ

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

iii

JBJ

# TABLE OF AUTHORITIES CITED

Cases:

*Burger v. Kemp* (1987), 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638, 55 USLW 5131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Callins v. Collins* (1994), 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (BLACKMUN, J., dissenting from the denial of certiorari) . . . . . . . . . . . . . . . . . . . 9

*Estelle v. Williams* (1976), 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 . . . . . . . 7

*Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 . . . . . . . 9

*Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 . . . . . . . . 9

*In re Murchison* (1955), 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 . . . . . . . . . . . 1

*In re Oliver* (1948), 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 . . . . . . . . . . . . . . 1

*Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137, 54 USLW 4449 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-7

*McCleskey v. Kemp* (1987), 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262, 55 USLW 4537 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*McGautha v. California* (1971), 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 . . . 9

*Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, 60 USLW 4541 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Parker v. Gladden* (1966), 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 . . . . . . 1, 2

*Reynolds v. United States* (1879), 98 U.S. 145, 25 L.Ed. 244 . . . . . . . . . . . . . . . 1

*Rodriguez v. State* (Tex. Crim. App. 1993), 848 S.W.2d 141, 1993 Tex. Crim. App. LEXIS 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Spinkellink v. Wainwright* (5th Cir. 1978), 578 F.2d 852 . . . . . . . . . . . . . . . . . . 3

*State v. Beuke* (1988), 38 Ohio St.3d 29, 526 N.E.2d 274 . . . . . . . . . . . . . . . . . . 3

*State v. Davis* (1978), 60 Ohio App.2d 355, 397 N.E.2d 1215, 14 Ohio Op.3d 315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

iv

JBJ

*State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342 . . 1, 4, 5, 7

*State v. Puente* (1982), 69 Ohio St.2d 136, 431 N.E.2d 987, 23 Ohio Op.3d 178 . . 7

*State v. Rogers* (1985), 17 Ohio St.3d 174, 478 N.E.2d 984 . . . . . . . . . . . . . . . . 3

*State v. Rudge* (1993), 89 Ohio App.3d 429, 624 N.E.2d 1069 . . . . . . . . . . . . . 7

*Tumey v. Ohio* (1927), 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 . . . . . . . . . . . . 1

*Turner v. Louisiana* (1965), 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 . . . . . 6, 7

*Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, 46 Ohio Op.2d 368 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 7

*Woodson v. North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Constitutions:

OHIO CONST. art. I, §1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8

OHIO CONST. art. I, §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

OHIO CONST. art. I, §5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

OHIO CONST. art. I, §10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

OHIO CONST. art. I, §16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U. S. CONST. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statutes:

OHIO REV. CODE ANN. §2945.25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Other Authorities:

Bright, Stephen B. and Patrick J. Keenan, *Judges and the Politics of Death: Deciding Between the Bill of Rights and the Next Election in Capital Cases*, 75 B.U. L. REV. 759 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

v

JBJ

Bright, Stephen B. *Political Attacks on the Judiciary: Can Justice Be Done Amid Efforts to Intimidate and Remove Judges From Office for Unpopular Decisions?* 72 N.Y.U. L. REV. 30 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Bright, Stephen B., *Elected Judges and the Death Penalty in Texas: Why Full Habeas Corpus Review by Independent Federal Judges Is Indispensable to Protecting Constitutional Rights*, 78 TEX. L. REV. 1806 (2000) . . . . . . . . . . . . 11

Jeffries, John C., Jr., *Justice Lewis F. Powell, Jr.* (New York: Charles Scribner's Sons, © 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Von Drehle, David, *Among the Lowest of the Dead* (New York: Times Books, Copyright © 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

vi

JBJ

# MEMORANDUM IN SUPPORT OF MOTION

## I.

The Defendant in this case, DONNA M. ROBERTS, has been indicted by the Trumbull County grand jury for aggravated murder with death specifications; and, accordingly, if convicted, the Defendant faces the death penalty.

U. S. CONST. amend. VI promises that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* of the State and district wherein the crime shall have been committed . . . ." (Emphasis added.) OHIO CONST. art. I, §5 promises that the "right of trial by jury shall be inviolate"; the Ohio Constitution also promises that every citizen shall have "a speedy public trial *by an impartial jury* of the county in which the offense is alleged to have been committed . . . ." (Emphasis added.)[1] In her trial, the Defendant is "entitled to be tried by twelve, not nine or even ten, impartial and unprejudiced jurors." *Parker v. Gladden* (1966), 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420. The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors, and the failure to accord an accused a fair hearing violates even the minimal standards of due process. *See, In re Oliver* (1948), 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682; *Tumey v. Ohio* (1927), 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749. "A fair trial in a fair tribunal is a basic requirement of due process." *See, In re Murchison* (1955), 349 U.S. 133, 136 , 75 S.Ct. 623, 99 L.Ed. 942. "The theory of the law is that a juror who has formed an opinion cannot be impartial." *See, Reynolds v. United States* (1879), 98 U.S. 145, 155, 25 L.Ed. 244.

---

[1] Additionally, OHIO CONST. art. I, §1 provides that "[a]ll men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty . . . ." OHIO CONST. art. I, §2 promises that all such rights shall be equally secured for all citizens; see, also, in this regard, *State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342. OHIO CONST. art. I, §16 secures for every citizen a "remedy by due course of law," and every citizen "shall have justice administered without denial or delay."

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

1

In capital cases, jurors must be both "death qualified" and "life qualified" before being seated.  *See, Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, 46 Ohio Op.2d 368; *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, 60 USLW 4541.  The Constitution prohibits entrusting "the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon, ante*, 391 U.S., at 520-523.  However, neither death qualification nor life qualification should be engaged in automatically simply because the government in its charging document has appended one or more death penalty specifications.  The very process of capital jury selection results in a jury of less than "impartial, disinterested" jurors.[2]

The standard for the selection of jurors in capital cases in Ohio is very clear. That standard is embodied in OHIO REV. CODE ANN. §2945.25, which provides in pertinent part that a prospective juror shall be excused for cause if:

> [i]n the trial of a capital offense, . . .  he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case.  A prospective juror's *conscientious or religious opposition* to the death penalty *in and of itself is not grounds for a challenge for cause.*  All parties shall be given wide latitude in voir dire questioning in this regard.

*See, also, Witherspoon, ante*, 391 U.S., at 520, fn. 16; and, OHIO REV. CODE ANN. §2945.25(C).[3]  Clearly, the law in Ohio does not require all potential jurors who

---

[2] In *Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137, 54 USLW 4449, the Court said:
> we will assume for purposes of this opinion that the studies are both methodologically valid and adequate to establish that "death qualification" in fact produces juries somewhat more "conviction-prone" than "non-death-qualified" juries.
> We hold, nonetheless, that the Constitution does not prohibit the States from "death qualifying" juries in capital cases.
476 U.S., at 173.  The Court offered no explanation nor any attempt to reconcile this holding with *Parker v. Gladden, ante.*

[3] The statute in relevant part provides that a prospective juror shall be excused for cause if: "[i]n the trial of a capital offense, . . .  he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case.  A prospective juror's *conscientious or religious opposition* to the death penalty

(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

2

JBJ

express feelings of conscience or religion against the death penalty, or those who oppose the death penalty in principle, to be automatically and summarily excused from the jury.[4]

The ostensible object of death qualification is to see whether jurors can follow their oaths as jurors and fairly consider all penalties under the law. *Morgan v. Illinois, ante*; *Witherspoon v. Illinois, ante*. However, death qualification of the venire results in a jury which is not impartial because it is not drawn from a fair cross-section of the community. Persons who are opposed to the death penalty constitute a distinct and cognizable group within American society. *Witherspoon v. Illinois, ante*. The process of death qualification will exclude from the jury "*Witherspoon* excludables" or death scrupled jurors, as they are sometimes called. *See, Spinkellink v. Wainright* (5th Cir. 1978), 578 F.2d 852.

## II.

The United States Supreme Court has conceded the practical reality that death-qualified juries are more conviction-prone than non-death-qualified juries. In *Lockhart* v. *McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137, 54 USLW 4449, the Court had as part of the record a number of studies, some of which went all the way back before 1968 and were part of the record in *Witherspoon*. The Court in *Witherspoon* dodged the issue of whether a death qualified jury results in one

---

[3](...continued)
*in and of itself is not grounds for a challenge for cause.* All parties shall be given wide latitude in voir dire questioning in this regard." (Emphasis added.)

[4]   With due respect, the Supreme Court of Ohio has only exacerbated the problem highlighted in this motion. *See, State v. Beuke* (1988), 38 Ohio St.3d 29, 526 N.E.2d 274; and, *State v. Rogers* (1985), 17 Ohio St.3d 174, 177-178, 478 N.E.2d 984, to be discussed elsewhere in some detail (in the Defendant's motion to determine the proper standard for excusal of jurors). In essence, the Ohio statute, although still suffering the existence of a death-qualified jury, minimizes the risk of a fair and impartial jury by increasing the likelihood of a fair cross-section. Without analysis and without any reference to the specific Ohio statute, which has not been repealed, the Ohio Supreme Court embraced a *federal* standard. This Court is not bound by that decision and indeed must follow the statute.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street
Youngstown, Ohio 44512-5610 · Telephone 330.758.2308 · Facsimile 330.758.8290

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 207

which is not fair and impartial and one which does not constitute a jury drawn from a fair cross-section of the community. The Court in *Lockhart v. McCree, ante*, did not sidestep the issue of whether such juries were conviction-prone: it simply circumvented the issue of how a defendant could receive a trial by a fair and impartial jury in a capital case when tried by a jury more likely to convict than a jury which was not death qualified. The Court in essence found death qualified juries to be a necessary evil to be able to permit the death penalty machinery to continue to operate. The Court refused to vacate McCree's conviction, even though it did recognize that death qualification results in conviction-prone juries.

In *State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342, the Supreme Court of Ohio reversed the convictions of three men who were charged with offenses alleged to have been committed inside the Southern Ohio Correctional Facility and who were tried inside the prison walls. That opinion, seldom if ever cited by the Ohio Supreme Court in its death penalty decisions, made it clear that it is the obligation of trial courts to be watchful for and guard against factors which impermissibly undermine the constitutional presumption of innocence.[5]

---

[5] The Court held at 114 *et seq.*:

The United States Supreme Court, in *In re Murchison* (1955), 349 U.S. 133, discussed, at page 136, 75 S.Ct. 623, at page 625, 99 L.Ed. 942, the constitutional requirements concerning the right to a fair trial:

"A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. . . . But to perform its high function in the best way '*Justice must satisfy the appearance of justice.*'  *Offutt* v. *United States*, 348 U.S. 11, 14, 75 S.Ct. 11 (99 L.Ed. 11)." (*Emphasis added.*)

The presumption of innocence of the accused in a criminal prosecution is a basic component of a fair trial in the criminal justice system. *Coffin* v. *United States* (1895), 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481. It is the duty of our courts to guard against factors which may undermine the fairness of the fact-finding process and thereby dilute the right to the presumption of innocence. To implement the presumption courts must be alert to factors that may undermine the fairness of the fact-finding process. *Estelle* v. *Williams* (1976), 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126. These protections are extended to all criminal defendants even those who happen to be prison inmates. See *Wolff* v. *McDonnell* (1974), 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935.

(continued...)

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street
Youngstown, Ohio 44512-5610 · Telephone 330.758.2308 · Facsimile 330.758.8290

4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 208

JBJ     That case cited federal cases, *see* fn. 5, *ante*, which the United States Supreme Court has not squared with *Lockhart v. McCree*. Nor has the Ohio Supreme Court squared with *State v. Lane* or provisions of the Ohio Constitution the idea that a defendant in a capital case begins the trial not with the jury committed to the constitutional presumption of innocence, but instead with the jury predisposed to disregard that constitutional presumption.[6]

---

[5] (...continued)
    It is well established that the mere probability of deleterious effects on fundamental rights calls for close judicial scrutiny. See Estes v. Texas (1965), 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543. The prison environment which is laden with a sense of punishment of the guilty within transmits too great an impression of guilt on the part of the inmate who is on trial.
    The Sixth Amendment to the United States Constitution and Section 10 of Article I of the Ohio Constitution guarantee every accused in a criminal proceeding the right to be tried by an impartial jury. This court does not believe that a trial within a maximum security penitentiary with 12-foot high double walls, armed guards, high guard towers and visible barred windows allows a jury to maintain the delicate posture of impartiality which is a mainstay of our judicial system.
    The United States Supreme Court, in *Frank* v. *Mangum* (1915), 237 U.S. 309, noted, at page 349, 35 S.Ct. 582, at page 596, 59 L.Ed. 969, that ". . . [a]ny judge who has sat with juries knows that in spite of forms they are extremely likely to be impregnated by the environing atmosphere." The exercise of calm, informed judgment by members of the jury is essential to the proper enforcement of the law. *Sinclair* v. *United States* (1929), 279 U.S. 749, 765, 49 S.Ct. 471, 73 L.Ed. 938. Unusual security measures carry obvious implications even to the most fair-minded jurors. *Woodards* v. *Maxwell* (S.D.Ohio E.D.1969), 303 F.Supp. 690.

[6]  It has been suggested by some—who perhaps would like to see the admittedly time-consuming process of capital voir dire accelerated or eliminated—that death qualification should not be engaged in at all. According to this hypothesis, the defendant has a chance of avoiding the death sentence by in essence allowing a "*Witherspoon* excludable" to "sneak" onto the jury because both parties have waived the process of death qualification. That thinking is not constitutionally acceptable. If even one juror is on the panel whose feelings about the death penalty are so rabid that he or she will be inclined to convict and impose death regardless of the circumstances, the Defendant has been denied fundamental constitutional liberties and the state is "disentitled" to execute the death sentence. *See, Morgan v. Illinois, ante.* The hypothesis also overlooks the fact that, although United States is the last civilized country in the world to still have the death penalty, about two thirds of the people favor capital punishment. Thus, as a matter raw numbers, assuming that the venire was a fair reflection of the community, the defendant begins a trial at a strategic disadvantage and the State has a corresponding strategic advantage.

JBJ

## III.

Common sense, logic, and experience lead to the inescapable conclusion that this indictment, with its capital specifications, is the product of the prosecutor's invitation to capitally indict. The grand jury, of course, returned the indictment, but it is "blinking reality"[7] to say that grand jurors are schooled in the nuances of Ohio's capital statutes when most lawyers are in fact not so schooled.[8] One may reasonably question whether any evidence was presented at all in support of the capital specifications. If evidence was presented in support of the capital specifications, then the government should have little difficulty indeed persuading this Court that there is probable cause to believe that the case will proceed to a second phase. Although the United States Supreme Court appears to have suffered the existence of conviction-prone juries as a necessary evil for a death penalty case, if the case is not truly a death penalty case, charging the case that way and then engaging in the process of death qualification provides the government with a strategic advantage: a jury more likely to return guilty verdicts than would otherwise be the case if the process of death qualification were not engaged in. The effect of *Lockhart v. McCree*, then, is to permit the oxymoronic situation to exist where the government has an advantage in a case where the stakes are highest and the penalty most severe.[9] In other cases where the death penalty is not involved, the Constitution, according to

---

[7] *See, Turner v. Louisiana* (1965), 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424.

[8] One has difficulty indeed imagining grand jury proceedings where, *e.g.*, after hearing the evidence alleged to be in support of an indictment for aggravated murder, grand jurors, *sua sponte*, vote to append a capital specification under OHIO REV. CODE ANN. §2929.04(A)(5), because the defendant has previously been convicted of a homicide offense said to satisfy the requirements of that statute.

[9] The United States Supreme Court has held that the death penalty is "qualitatively different from a sentence of imprisonment, however long" and that "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina* (1976), 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

6

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 210

both the United States Supreme Court and the Ohio Supreme Court, requires any impaneled jury to be a fair and impartial one. The principle of maintaining a fair and impartial jury throughout the trial has been highly touted by the courts, *see, e.g.*, *Estelle v. Williams* (1976), 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126; *Turner v. Louisiana* (1965), 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424; *State v. Lane, ante*; *State v. Rudge* (1993), 89 Ohio App.3d 429, 624 N.E.2d 1069—except in death penalty cases. Independent of federal guarantees, and *Lockhart v. McCree* notwithstanding, the Ohio Constitution not only preserves the fundamental liberty of trial by jury "inviolate;" the Constitution demands that the a criminal defendant in this state be tried by a fair and impartial jury.[10]

This tacit recognition by the courts that a conviction-prone jury is a necessary evil in cases which are truly capital cases in no way justifies such a conviction-prone jury in a non-capital case. A few examples should make the point. The true question, then, is whether a defendant whose case is not truly a capital case can have a trial by a fair and impartial jury, if the jury is unnecessarily skewed towards being conviction-prone. The Defendant admits that only a determination by a jury can fully determine whether the case is truly a capital case. On the other hand, requiring the government to adduce evidence that there is at least probable cause to believe that this is truly a capital case is mandated when the effect of a capital indictment is to select *prima facie* "a tribunal organized to return a verdict of death." *Witherspoon, ante*, 391 U.S., at 520-523.

---

[10] So important is the principle of trial by a fair and impartial jury that convictions have been overturned for a failure to follow the strict requirements of the Ohio Jury Code, designed to ensure trial by a fair and impartial jury drawn from a cross-section of the community. *See, e.g.*, *State v. Davis* (1978), 60 Ohio App.2d 355, 397 N.E.2d 1215, 14 Ohio Op.3d 315. *But see, State v. Puente* (1982), 69 Ohio St.2d 136, 431 N.E.2d 987, 23 Ohio Op.3d 178, *cert. denied, Puente v. Ohio* (1982), 457 U.S. 1109, 102 S.Ct. 2910, 73 L.Ed.2d 1318, 50 USLW 3964.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

7

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 211

JBJ

## IV.

As indicated above, the Defendant is not aware that any court has definitively addressed the difficulties raised herein in light of OHIO CONST. art. I, §§5 and 10. Nor is the Defendant aware that any court that has addressed the issue in terms of the language of OHIO CONST. art. I, §1, which guarantees a defendant the ability to defend life and liberty. That language is meaningless if the proceeding is a sham where the cards are stacked against the defendant before the jury has heard any evidence. The Defendant submits because neither the Ohio Supreme Court nor any appellate court has definitively spoken on this issue, this Court is free to place the construction upon those constitutional provisions herein urged by the Defendant and required by logic and the history of the enactment of both the State and Federal Constitutions.

## V.

## A.

Already it has been shown that the courts have admitted that the process of death qualification results in juries which are conviction-prone. Indeed, such a conviction-prone jury, in any case other than a death penalty case, would not be tolerated by the courts. Such a jury violates axiomatic constitutional liberties such as trial by an impartial jury and due process of law. The logical question, then, becomes: why do the courts tolerate the impaneling of less-than-impartial juries in capital cases, where the stakes are highest?[11] The answer is like the prestigious southern antebellum family with a retarded or insane child: everyone knows about it; everyone knows it is true; yet, everyone refuses to publicly recognize it. "It" is the yielding of judges to undeniable public sentiment in favor of the death penalty. The

---

[11] Paradoxically, the United States Supreme Court has said that the duty to review a case for constitutional error is never higher or more demanding than it is in a capital case. *Burger v. Kemp* (1987), 483 U.S. 776, 785, 107 S.Ct. 3114, 97 L.Ed.2d 638, 55 USLW 5131.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

8

JBJ

Defendant submits that justices of the United States Supreme Court and a number of state courts, including Ohio, have yielded to that type of pressure.

To see that this statement is true, one can begin with the United States Supreme Court. In 1971, just a year before the famous *Furman* decision, *Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, the Court approved the death penalty in *McGautha v. California* (1971), 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 and its companion case, *Crampton v. Ohio, id.* A year later, the Court in *Furman* struck down the death penalty in every state that then had the death penalty. Without quoting extensively from either opinion, it is sufficient for present purposes to say that *Furman* overruled *McGautha sub silentio*. Several justices of the Supreme Court, it is reported, privately predicted that there would never again be another execution in the United States of America. It seems reasonable to say that the justices were surprised at the alacrity with which the state legislatures acted in re-enacting new death penalty laws designed to meet the constitutional strictures of *Furman*. Realizing the political popularity of the death penalty, the United States Supreme Court has struggled since 1976, when *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, was decided, to make the death penalty work. In attempting to make work, courts have often employed the same type of logic that would tell one that it would be possible to fly to the moon inside a garbage can. Some justices have openly admitted that it is not possible to reconcile the death penalty with the Federal Constitution.[12]

---

[12] At least two justices, the late Thurgood Marshall and the late William Brennan, realized from the outset that it could not be done. Others tried to make it work but were unsuccessful. The late Justice Harry A. Blackmun tried for nearly twenty (20) years to make the death penalty work. He finally gave up. *See, Callins v. Collins* (1994), 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (BLACKMUN, J., dissenting from the denial of certiorari). The late Justice Louis F. Powell, Jr. admitted that one of the biggest mistakes of his judicial career was his vote in *McCleskey v. Kemp* (1987), 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262, 55 USLW 4537. *See,* John C. Jeffries, Jr., *Justice Lewis F. Powell, Jr.* (New York: Charles Scribner's Sons, © 1994), 451.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street
Youngstown, Ohio 44512-5610 · Telephone 330.758.2308 · Facsimile 330.758.8290

9

JBJ

No Ohio Supreme Court justice has, in the same light as Justices Brennan, Marshall, and ultimately Blackmun, outright held that the death penalty is unconstitutional. However, former Justice J. Craig Wright has acknowledged that justices of the Ohio Supreme Court are daunted by the political ramifications of reversing a death sentence because the statute did not permit imposition of the death penalty when the case was remanded simply for re-sentencing.

In other states, the blatant political nature of death penalty decisions is evident. The actions and motivations of Governor Bob Graham in Florida are detailed in an excellent book on the subject.[13] In California, judges have come under attack and have lost their seats because of their decisions in capital cases.

For example, California has the largest death row of any state in the nation. In 1986, then Governor George Deukmejian publicly dared two of the state's Supreme Court justices, Justices Grodin and Reynoso, that Deukmejian would find candidates to run against the justices in their retention elections unless they voted to uphold more death sentences. Prior to that time, Governor Deukmejian had announced his opposition to Chief Justice Rose Bird because of her votes in California death penalty cases. Deukmejian carried through with his threats and found candidates to oppose all three justices. All three justices lost their seats after campaigns dominated by the death penalty.[14]

The same political pressures have come to bear in Texas, which has the second highest number of death row inmates. After a decision by the state's highest criminal court, the Texas Court of Criminal Appeals, reversing the conviction in

---

[13] *See*, David Von Drehle, *Among the Lowest of the Dead* (New York: Times Books, Copyright © 1995).

[14] The removal of those three justices have affected every capital case in California subsequently reviewed. After the change in justices, the affirmance rate of death penalty cases in California climbed to nearly ninety-seven percent (97%), one of the highest rates in the nation. Law Professor Clark Kelso, who watches the California Supreme Court observed about the affirmance rate: "one thing it shows is that when the voters speak loudly enough, even the judiciary listens."

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8250

10

JBJ

*Rodriguez v. State* (Tex. Crim. App. 1993), 848 S.W.2d 141, 1993 Tex. Crim. App. LEXIS 46, a former chairman of the Texas Republican Party called for Republicans to take over the court in the 1994 election. The Texas voters obliged him, and Republicans won every position that they sought on the court. The Texas voters made it clear that the death penalty, and not the quality of the judicial candidates, was paramount in the election. One of the Republicans elected to the Texas Criminal Court of Appeals in the 1994 election was Stephen W. Mansfield. Mansfield's campaign platform was simple but direct: he promised the death penalty for murders, increased application of the harmless error rule, and penalties and sanctions against lawyers who file "frivolous appeals, especially in death penalty cases." The story sounds like a David Brinkley anecdote. It was discovered that Mansfield had lied about having been born in Texas. Mansfield had been fined for practicing law without a license in Florida, and had failed to report ten thousand dollars ($10,000.00) in child support arrearages he owed when he applied for his Texas law license. Incidentally, he applied for his Texas law license in 1992, just two years before he was elected to the state's highest criminal court. He was also unable to prove assertions about his experience in criminal cases and his representations that he had "written extensively" on both civil and criminal issues. He in fact retracted some of his campaign assertions *after* the campaign and after he was firmly ensconced on the Texas Criminal Court of Appeals.[15]

---

[15] The political *coups* of the Texas and California Supreme Courts are more fully detailed by Stephen B. Bright. *See,* Stephen B. Bright and Patrick J. Keenan, *Judges and the Politics of Death: Deciding Between the Bill of Rights and the Next Election in Capital Cases,* 75 B.U. L. REV. 759 (1995); Stephen B. Bright, *Political Attacks on the Judiciary: Can Justice Be Done Amid Efforts to Intimidate and Remove Judges From Office for Unpopular Decisions?* 72 N.Y.U. L. REV. 30 (1997), at 310, 313-315, 331-336; and, Stephen B. Bright, *Elected Judges and the Death Penalty in Texas: Why Full Habeas Corpus Review by Independent Federal Judges Is Indispensable to Protecting Constitutional Rights,* 78 TEX. L. REV. 1806 (2000).

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE: 330.758.8250

11

JBJ

### B.

All of this discussion about the political impact of the death penalty is not without a point. Here, despite the logical inconsistency and the variance with the presumption of innocence, the courts have held that death qualification of juries is acceptable in capital cases. The decisions of both the United States Supreme Court and the Supreme Court of Ohio in many death cases are suspect, relying more on legal cunning than application of constitutional principles.

There is no decision directly either permitting or prohibiting the relief sought by the Defendant in this case. This Court should thus resort to the fixed star in the Constitutional firmament that every person put on trial in this State shall have a fair trial by disinterested, impartial jurors. Accordingly, this Court should direct the government to provide evidence to establish that this is truly a capital case. Without such an assurance, it cannot be said that the Defendant will have a trial by a fair and impartial jury.

For the foregoing reasons, the Defendant prays for an order of this Court prohibiting death qualification of prospective jurors unless and until the government establishes, by legitimate evidence, probable cause that this is truly a capital case which will proceed to a penalty phase.

J. GERALD INGRAM

JOHN B. JUHASZ
COUNSEL FOR DEFENDANT

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2306 · FACSIMILE 330.758.8290

12

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,

    Plaintiff

*vs.*

DONNA ROBERTS,

    Defendant

)
)
)
)
)
)
)
)
)
)
)

Case No.  01 CR 793

Judge John M. Stuard

**Death Penalty Case**

---

### DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
### REQUEST FOR EVIDENTIARY HEARING

---

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
Christopher D. Becker, Esq., Assistant
160 High Street NW
Warren, Ohio  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

D:\Alex1\CAPITAL\Client\Roberts.Donna\Cover.Page.wpd•Sat 06Jul2002•1306.33 (01:06:33pm)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJUHASZ63@AOL.COM

30

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,

    Plaintiff

vs.

DONNA M. ROBERTS,

    Defendant

)
)
)
)
)
)
)
)
)
)

Case No. 01 CR 793

Judge John M. Stuard

---

### DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
### REQUEST FOR EVIDENTIARY HEARING

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through the undersigned counsel, and moves this Honorable Court for an order suppressing from evidence the statements given by the Defendant to officers of the Howland Police Department and the Trumbull County Sheriff's Department on December 20, 2001 at the Defendant's residence, and the Trumbull County Jail.

For cause, the Defendant says that, as demonstrated in the attached Memorandum and as will be more fully demonstrated at the evidentiary hearing hereon, the statements were taken in violation of the Defendant's Fifth Amendment privilege against self-incrimination, because the Defendant was impelled by the conduct of the government officers to surrender that privilege. Further, the statements were taken in violation of the Defendant's Fifth Amendment right to counsel, which the Defendant had timely asserted. The statements were also taken in violation of the liberties secured by OHIO

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JBJUHASZDOC@AOL.COM

i

CONST. art. I, §§1, 2, 10, and 16.  The statements are inadmissible because they were (1) taken in violation of the *Miranda* rule since there was an assertion of *Miranda* rights but the questioning continued; (2) taken in violation of the *Miranda* rule because there were no valid waivers; and (3) taken involuntarily.

The Defendant moves for an evidentiary hearing.

WHEREFORE, the Defendant prays for an order of this Court suppressing from evidence her statements given to officers of the Howland Police Department and the Trumbull County Sheriff's Office on December 20, 2001.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ  (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

*CERTIFICATE OF SERVICE*
I hereby certify that a true copy of the foregoing was:

❑ sent by regular United States Mail, postage prepaid
☑ hand delivered to counsel or counsel's office
❑ sent by telecopier

to Dennis Watkins, Esq., and Christopher Becker, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren, OH  44581  this _____ day of July, 2002.

JOHN B. JUHASZ

D:\Alex1\CRIMINAL\Subjects\Suppression\Confession\Roberts.D.draft.5.wpd•Saturday, 6 JUL 2002 1257 (12:57 pm)

J. GERALD INGRAM • JOHN B. JUHASZ • ATTORNEYS AT LAW • 7330 MARKET STREET • YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 • FACSIMILE 330.758.8290 • E-MAIL 670.JBJURIS@CCGAOL.COM

ii

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 219

# TABLE OF AUTHORITIES CITED

Cases:

*Abram v. State* (Miss. 1992), 606 So.2d 1015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Arizona v. Fulminante* (1991), 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ashcraft v. Tennessee* (1944), 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 . . . . . . . . . 6, 7

*Bram v. United States* (1897), 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 . . . . . . . . . . . 3

*Brown v. Mississippi* (1936), 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 . . . . . . . . . 3, 4, 6

*Carnley v. Cochran* (1962), 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 . . . . . . . . . . . . 13

*Chambers* v. *Florida* (1940), 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 . . . . . . . . . . . 6, 12

*Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Crooker v. California* (1958), 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 26

*Escobedo v. Illinois* (1964), 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, 4 Ohio Misc. 197, 32 Ohio Op.2d 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11

*Fare v. Michael C.* (1979), 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 . . . . . . . . . 4, 16

*Frazier v. Cupp* (1969), 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 . . . . . . . . . . . . 23

*In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 . . . . . . . . . . . . . 12

*Jackson v. Denno* (1964), 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 . . . . . . . . . . . 23

*Johnson v. Zerbst* (1938), 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 . . . . . . . . . 12, 22

*Jordan v. Israel* (E.D. Wis. 1983), 567 F.Supp. 1365 . . . . . . . . . . . . . . . . . . . . . . . 21

*Lyons v. Oklahoma* (1944), 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 . . . . . . . . . . . 6

*Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 . . . . . . . . . 3, 11, 22

*Michigan v. Tucker* (1974), 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Minnick v. Mississippi* (1990), 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489, 59 USLW 4037 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-18

*Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 Ohio Misc. 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10-14, 22, 26

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2998 · FACSIMILE: 330.758.8290 · E-MAIL: 676.JBJJURISDOC@AOL.COM

iii

*Mueller v. Virginia* (1993), 507 U.S. 1043, 113 S.Ct. 1880, 123 L.Ed.2d 498, 61 USLW 3813 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*North Carolina v. Butler* (1979), 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Shaw* (1989), 180 Ill.App.3d 1091, 129 Ill. Dec. 799, 536 N.E.2d 849 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Rogers v. Richmond* (1961), 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 . . . . . . . . . . . . . 8

*Smith v. Illinois* (1984), 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 . . . . . . . . . . . 18-21

*Spano v. New York* (1959), 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 . . . . . . . . . . . 8

*State v. Arrington* (1984), 14 Ohio App.3d 111, 470 N.E.2d 211 . . . . . . . . . . . . . . . . 24

*State v. Barker* (1978), 53 Ohio St.2d 135, 372 N.E.2d 1324 . . . . . . . . . . . . . . . . . . . 23

*State v. Cash* (Minn. App. 1986), 391 N.W.2d 875 . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*State v. Discoe* (N.D. 1983), 334 N.W.2d 466 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*State v. Edwards* (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051 . . . . . . . . . . . . . . . . . . 23

*State v. Garner* (Minn. 1980), 294 N.W.2d 725 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*State v. Griffin* (Utah App. 1988), 754 P.2d 965, 82 Utah Adv. Rep. 46 . . . . . . . . . . . . 3

*State v. Quintero* (Iowa 1992), 480 N.W.2d 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*State v. Sewell* (Sep. 14, 1990) Mahoning App. No. 89 C.A. 161, 1990 Ohio App. LEXIS 4071 unreported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*State v. Smith* (1979), 203 Neb. 64, 277 N.W.2d 441 . . . . . . . . . . . . . . . . . . . . . . . . . 3

*State v. Tague* (La. 1978), 372 So.2d 555 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Tague v. Louisiana* (1980), 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*The King v. Rudd* (K.B. 1775), 168 Eng. Rep. 160 . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Twining v. New Jersey* (1908), 211 U.S. 78, 29 S.Ct.14, 53 L.Ed. 97 . . . . . . . . . . . . . . 3

*United States v. Pinto* (D.C. Me. 1987), 671 F. Supp 41 . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Washington* (1977), 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 . . . . 23

Constitutions:

OHIO CONST. art. I, §10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 22

U.S. CONST. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 22

U.S. CONST. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: J70.JBJURISDOC@AOL.COM

iv

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 221

Rules:

Ohio Evid. R. 801(D)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: c/o jbjjurisdoc@aol.com

v

## MEMORANDUM IN SUPPORT OF MOTION

The Defendant, DONNA M. ROBERTS, has been indicted for the aggravated murder of Robert Fingerhut. Death specifications have been appended to the indictment.

The Defendant was arrested at her home on December 20, 2001. She was handcuffed, placed face down on the floor of her home, and questioned by the arresting officers. The Defendant asserted her right to counsel, but the police ignored this request and continued to question her. Subsequently, the Defendant was transported to the Trumbull County Sheriff's Department.

At the Sheriff's Department, Howland Police officers and Trumbull County Sheriff's Officers once again asked the Defendant to give a voluntary statement. The officers read the warnings as required by *Miranda v. Arizona, post*. Though the Defendant had done nothing to re-initiate questioning, the police made it clear that the Defendant was to talk to them and answer their questions. Howland Detective Paul Monroe said to the Defendant: "Like we talked before, I'm going to read you your rights *before we talk*." (Emphasis added.) He then went on to read the *Miranda* rights in the aggregate, with no pause in between to determine if the Defendant understood each warning. The detective went straight from the warnings to a rights waiver which included a representation that the Defendant would speak to police. After reading that paragraph, the detective attempted to minimize the effect of the waiver by maintaining that signing the waiver was merely an indication that the warnings had been given. He said, "Donna, could you look this over. All it says is that I have read this to you. Initial each of the lines and sign it

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJURISGO@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 223

down here."[1]  The police made no effort to determine, prior to questioning, if the Defendant wished to voluntarily relinquish her constitutional liberties and speak to the officers.

Pressing on with questioning, Detective Monroe asked the Defendant to bring the other officer who was in the interrogation room, identified as "Gary", up to speed.  Monroe directed the Defendant to begin with the morning of the death of the victim, Robert Fingerhut.  The Defendant replied that there was "nothing special planned—work—nothing."  The Defendant then began to slowly shake her head in obvious mental distress.  She told the officers that she woke up with Robert Fingerhut about 9:30 a.m.  The officers asked her about whether she had to pick up Nathaniel Jackson, who is also charged in the death of Mr. Fingerhut.  The Defendant unequivocally replied: "*I don't want to say any more.*  Jerry [Ingram, the Defendant's counsel] told me not talk any more *unless he is here.*"  (Emphasis added.)  Rather than stopping the interrogation, as the Constitution requires, the officers pressed on: "Well, Donna, the reason we are talking to you is because when we came to your house tonight you told us you wanted to talk and explain things to us . . . ."  The Defendant replied: "I did?"  The officers then went on to press for and obtain a statement, which was videotaped.  That statement must be suppressed for three reasons:  First, there was a clear invocation of the privilege against self-incrimination and a clear assertion of the right to counsel.  Second, though the Defendant executed a *Miranda* waiver, there was not even the most basic inquiry to determine whether the waiver was

---

[1] Concededly, the other officer asked the Defendant "did you understand everything that Paul [Monroe] said to you, Donna?" and asked if there was anything she did not understand. However, as will be shown post, this inquiry should not have occurred because of the invocation of silence and counsel; and, in any event, was insufficient to meet the requirements for a valid waiver.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: 770.jbjuhisdoc@aol.com

2

executed knowingly, intelligently, and voluntarily.  Third, the statements are not voluntary.

The rule requiring suppression of confessions obtained by threats and promises was established in England prior to 1775.  *See, e.g., The King v. Rudd* (K.B. 1775), 168 Eng. Rep. 160.[2]  The United States Supreme Court squarely endorsed the rule in the 1897 case of *Bram v. United States* (1897), 168 U.S. 532, 542, 18 S.Ct. 183, 42 L.Ed. 568.  There, the Court held that confessions are inadmissible if they are obtained by "any direct or implied promises, however slight."  State courts historically have taken the same view.[3]  After *Bram*, the Supreme Court focused on whether or not involuntary confessions were inherently unreliable and therefore inadmissible.  Initially, of course, the Supreme Court did not review state cases.  *See, e.g., Twining v. New Jersey* (1908), 211 U.S. 78, 29 S.Ct.14, 53 L.Ed. 97.[4]  Eventually, however, the Court began to review state cases under the Due Process Clause.  *See, e.g., Brown v. Mississippi* (1936), 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682.

*Brown* was the first case to be so analyzed, and its facts demonstrate why the Court later in *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct.

---

[2] There, the Court held: "The instance has frequently happened, of persons having made confessions under threat or promises: the consequence as frequently has been, that such examinations and confessions have not been made use of against them on their trial." 168 Eng. Rep. at 161.

[3] *State v. Discoe* (N.D. 1983), 334 N.W.2d 466; *State v. Caffrey* (S.D. 1983), 332 N.W.2d 269, habeas corpus proceeding, 400 N.W.2d 281; *State v. Smith* (1979), 203 Neb. 64, 277 N.W.2d 441; *State v. Garner* (Minn. 1980), 294 N.W.2d 725; *People v. Shaw* (1989), 180 Ill.App.3d 1091, 129 Ill. Dec. 799, 536 N.E.2d 849, *appeal denied*, 136 Ill. Dec. 602, 545 N.E.2d 126; *State v. Cash* (Minn. App. 1986), 391 N.W.2d 875; *State v. Griffin* (Utah App. 1988), 754 P.2d 965, 82 Utah Adv. Rep. 46; *State v. Quintero* (Iowa 1992), 480 N.W.2d 50; and, *Abram v. State* (Miss. 1992), 606 So.2d 1015. *See, also, United States v. Pinto* (D.C. Me. 1987), 671 F. Supp 41.

[4] *Twining's* holding that the Fifth Amendment privilege against was not incorporated into state criminal prosecutions under the Due Process Clause of the Fourteenth Amendment, was later reversed in *Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 225

1602, 16 L.Ed.2d 694, 10 Ohio Misc. 9, adopted the "rigid" prophylactic rule, *see*, *Fare v. Michael C.* (1979), 442 U.S. 707, 719, 99 S.Ct. 2560, 61 L.Ed.2d 197, to guard against government officers overcoming the volition of the suspect. *Brown* involved the murder of a farmer named Raymond Stewart in Mississippi in 1934. The local citizenry—some so enraged that their necks turned red—conducted an "investigation." The "investigators" concluded that three black men, including Ed Brown, a tenant on Stewart's farm, had murdered Stewart. Brown and another suspect, Shields, were arrested. The jailer and other "assistants" ordered the prisoners to strip, then bent them over chairs. The white men beat the prisoners with buckled leather straps until the prisoners' backs were cut to pieces. The deputy made the prisoners believe that the whipping would continue until they confessed. Their bodies shredded, the prisoners "confessed" and Stewart's murder was thus "solved." The grand jury indicted the men for murder, and a "trial" began the next day.

At the pretrial hearing (held just before the trial), the defense lawyers presented no evidence of the beatings the prisoners suffered. The trial judge ruled from a silent record that the confessions were admissible. These "free and voluntary" confessions, with little other corroborative evidence, were the government's evidence at the trial. In fact, the first time the prisoner beatings were mentioned was when the defendants testified at trial on their own behalf. The government's witnesses did not rebut the defendants' accounts of the beatings they had suffered. A deputy bragged during his testimony that one of the whippings was "not too much for a negro; not as much as I would have done if it were left to me." The trial concluded the following day, with the defendants, predictably, being convicted and sentenced to death.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail c/o jbjuhasdoc@aol.com

4

The Mississippi Supreme Court upheld the conviction on technical grounds having to do with the timing of objections to the evidence. The defendants appealed to the United States Supreme Court, which up to that point in time had never agreed to review a state court confession case. At the time that *Brown* came to the Supreme Court, the fundamental basis for excluding confessions was the common-law doctrine of trustworthiness.[5] The Supreme Court refused in *Brown* to apply the self-incrimination principles it would later apply in *Miranda*. The Court relied instead upon the Due Process Clause:

> And the trial equally is a mere pretense where the State authorities have contrived a conviction resting solely upon confessions obtained by violence. The due process clause requires that state action, whether through one agency or another, shall be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions. It would be difficult to conceive of methods more revolting to the sense of justice than those taken to procure the confessions of these petitioners, and the use of the confessions thus obtained as the basis for conviction and sentence was a clear denial of due process.

---

[5] The trustworthiness doctrine was established in an English case, *The King v. Warickshall* (K.B. 1783), 1 Leach 263, 168 Eng. Rep. 234. The trustworthiness doctrine was recognized at about the same time in the United States. *See, e.g., Commonwealth v. Dillon* (1791), 4 U.S. (Dallas) 116, 1 L.Ed. 765. There, a boy about 12 years old was indicted for arson. He was arrested and the next day was taken before the mayor but made no confession. On the 18th and 19th of December he was visited and interrogated by several "respectable citizens," who urged him to confess, suggesting that a confession would elicit public compassion and perhaps impel a pardon. Government officers similarly urged him to confess. They "carried him into the dungeon; they displayed it in all its gloom and horror; they said that he would be confined in it, dark, cold, and hungry, unless he made a full disclosure; but if he did make a disclosure, he should be well accommodated with room, fire, and victuals, and might expect pity and favour." *Id.,* at 116. The lad continued to deny his guilt for sometime, complaining of "the want of clothes, fire, and nourishment." *Id.* He finally relented and confessed. The Court's trustworthiness doctrine was put in these words:

> The hope of mercy actuates almost every criminal, who confesses his crime; and merely that he cherishes the hope, is no reason, in morality, nor in law, to disbelieve him. The true point for consideration, therefore, is, whether the prisoner has falsely declared himself guilty of a capital offence? If there is ground even to suspect, that he has done so, God forbid, that his life should be the sacrifice!

*Id.,* at 117.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: c/o Jbjuhsd@aol.com

5

297 U.S. at 286. *Brown* was the first in a series of cases where the Court reviewed confessions, many from below the Mason-Dixon Line. Though a complete survey of those cases is not necessary, it is important to sketch the highlights. In *Chambers* v. *Florida* (1940), 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, the Court held that a confession could be coerced *psychologically* as well as physically. In *Lyons v. Oklahoma* (1944), 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481, a conviction was reversed because of the unreliability of the confession. There, the defendant was forced to hold in his lap a pan of bones which the police claimed were the bones of the victim whom the defendant was accused of murdering.

Noting the abuses of power by law enforcement, the courts could no longer decide whether a confession was admissible simply because it was likely to be true. The touchstone for admissibility of confessions gradually shifted from *reliability* (*i.e.*, was the confession likely to be true) to *voluntariness*. The concept that the police could illegally obtain a confession without violating Due Process, so long as the confession was otherwise voluntary, did not sit well with some of the members of the Supreme Court. Accordingly, the Court broadened its analysis of confessions beyond those deemed merely "unreliable." For example, in *Ashcraft v. Tennessee* (1944), 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192, the Court held that the Constitution's Due Process Clause stands as an absolute barrier against the conviction of an individual by means of a coerced confession. In that case, the Court reversed the conviction of a man who had cracked after 36 hours of continuous questioning. Justice Hugo Black compared the station-house to the courtroom, and noted the dangers of *incommunicado* interrogation:

> It is inconceivable that any court of justice in the land, conducted as our courts are, open to the public, would permit prosecutors serving in relays to keep a defendant witness under continuous

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JBJUHSNDOC@AOL.COM

6

> cross examination for thirty-six hours without rest or sleep in an effort to extract a "voluntary" confession. Nor can we, consistently with Constitutional due process of law, hold voluntary a confession where prosecutors do the same thing away from the restraining influences of a public trial in an open court room.

322 U.S., at 154. The Supreme Court's analysis of confessions shifted from the issue of *reliability* of the confession to the issue of *voluntariness*. An involuntarily confession, even if completely true and in that respect, "reliable," violates Due Process and is not admissible. The focus shifted from the truth of a confession to whether it was constitutionally obtained.

As the Due Process debate continued, a minority of the Court, led by the late Justices William O. Douglas and Hugo L. Black, expressed dissatisfaction with the Due Process analysis. The justices seemed inclined to find that criminal interrogations were a "critical stage" of the prosecution, and that custodial suspects had a right to counsel to protect their rights against self-incrimination. The issue came to a head in *Crooker v. California* (1958), 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448.

Crooker worked as a house boy during his first year in law school, and had an amorous affair with his employer, which she wanted to terminate. Crooker apparently agreed to end the affair in a way that his lover would not have chosen: by stabbing and strangling her. He was arrested by the Los Angeles Police Department on the afternoon following the homicide. He refused a polygraph test, and asked to call an attorney. This request was refused. He continued to ask for counsel, even naming a specific lawyer whom he believed would represent him. Repeatedly, the police told him that he could not speak to a lawyer until after the interview was concluded. Finally, after twelve hours of interrogation, Crooker confessed.

Crooker argued that his confession was involuntary under U. S. CONST. amend. XIV. The Supreme Court rejected the argument, finding that because

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JBJUHISDO@AOL.COM

7

Crooker was "a college educated man with law school training who knew of his right to remain silent" the confession was not involuntary.  Crooker's right to counsel argument was also rejected, with the majority noting that Crooker's argument "would have a lesser but still devastating effect on the enforcement of criminal law, for it would effectively preclude police questioning—fair as well as unfair—until the accused was afforded opportunity to call his attorney." 357 U.S., at 441.  The four dissenters, led by Justice William O. Douglas, said that the "mischief and abuse of the third degree will continue as long as an accused can be denied the right to counsel at the most critical period of his ordeal.  For what takes place in the secret confines of the police station may be more critical than what takes place at trial." 357 U.S., at 444-45.

Two years later, in *Spano v. New York* (1959), 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265, the Court reversed a murder conviction of a man interrogated after he had been indicted.  Although the reversal was based on traditional Fourteenth Amendment principles, a new member of the Court, conservative Ohio Republican Potter Stewart, indicated in a concurring opinion that he shared the views of the *Crooker* minority.  Thus, with the four dissenters from *Crooker*, there now existed a theoretical five to four majority willing to recognize a right to counsel in the interrogation room.[6]

In *Escobedo v. Illinois* (1964), 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, 4 Ohio Misc. 197, 32 Ohio Op.2d 31, Danny Escobedo had been arrested in connection with the shooting of his brother-in-law.  He immediately asked for a lawyer, and in fact his mother had already sent his lawyer to the station

---

[6] Two years later, in *Rogers v. Richmond* (1961), 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760, the Court held admissibility turned not on whether the confession was true or false, but whether the behavior of the police officials was such as to overbear the defendant's will to resist and thereby bring about statements which were not freely self-determined.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 / Facsimile 330.758.8290 · E-mail: c/o Jbjjurindo@aol.com

8

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 230

house. The police denied the lawyer access to Escobedo and continued to ignore his requests for counsel. His accomplice was brought in to accuse him of the shooting. When Escobedo exclaimed: "I didn't shoot him, you did it" his complicity was established. Not long thereafter, he dictated a statement to a government attorney.

The United States Supreme Court expressly recognized a right to counsel in the interrogation room. Justice Arthur Goldberg said that no meaningful distinction could be drawn between interrogation before or after indictment. Similarly, giving a defendant the right to counsel at trial does him little good if he has already confessed. The trial would be "no more than an appeal from the interrogation." 378 U.S. at 487. Illinois had argued that pushing the Sixth Amendment into the interrogation room would effectively end confessions, since all competent attorneys would direct their clients not to talk. The Court was not impressed with the argument, noting:

> We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend upon the "confession" will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation.

378 U.S., at 488-89.

*Escobedo* made clear that upon assertion of a known right to remain silent or to counsel, interrogation must cease. The case left unanswered the crucial question of whether suspects had to be informed of their rights applicable to custodial interrogation.[7] To answer that question, the Supreme Court agreed to hear the appeals of Ernesto A. Miranda, Michael Vignera, Carl Calvin Westover, and the State of California's appeal of the case of Roy

---

[7] In retrospect, it seems there could have been but one answer. Under the *Johnson v. Zerbst* case from the 1930s, *post*, there can be no valid waiver unless there is a voluntary choice to abandon or relinquish a known right or privilege. How else could that determination be made absent warnings?

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL I7G.JBJUHSDOC@AOL.COM

9

Allen Stewart.[8] The Court answered the question in the affirmative, set out the now well known warnings,[9] and reversed the first three convictions and upheld the California decision which had reversed Stewart's conviction. In the opening paragraph of *Miranda v. Arizona*, *ante*, Chief Justice Earl Warren began: "The cases before us raise questions which go to the roots of our concepts of American criminal jurisprudence: the *restraints society must observe* consistent with the Federal Constitution in prosecuting individuals for crime." (Emphasis added.)

Speaking for the Court in *Miranda*, Warren began by reviewing the history of the "third degree". He demonstrated that the practice continued, particularly after arrest and before arraignment. Warren also stressed that while *physical* beatings may no longer be common, police were becoming increasingly proficient at obtaining confessions through *psychological* coercion. Quoting from various police interrogation manuals then in use, Warren concluded that *incommunicado* interrogation gave police an unfair advantage over the weak.

> From these representative examples of interrogation techniques, the setting prescribed by the manuals and observed in practice becomes clear. In essence, it is this: To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the interrogator must "patiently maneuver himself or his quarry into a position from which the desired objective may be obtained." When normal

---

[8] The Supreme Court of California reversed Stewart's convictions, 62 Cal.2d 571, 43 Cal.Rptr. 201, 400 P.2d 97, holding that under the decision in *Escobedo*, Stewart should have been advised of his right to remain silent and of his right to counsel and that it would not presume in the face of a silent record that the police advised Stewart of his rights.

[9] As demonstrated by the facts of this case, while the warnings themselves may be well-known, less well known is the procedure quite clearly laid out in *Miranda* for administration of the warnings and determining whether there is a valid waiver.

> procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advise.  It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings.  The police then persuade, trick, or cajole him out of exercising his constitutional rights.

384 U.S. at 455.  The constitutional source of the *Miranda* rule was not the Sixth Amendment right to counsel embraced in *Escobedo*, but instead the Fifth Amendment privilege against self-incrimination recognized in *Malloy v. Hogan, ante*.    Warren  traced  the  history  of  the  privilege  against self-incrimination from its roots in England and concluded that there could be "no doubt" as to the availability of the privilege outside the courtroom. Without  proper  safeguards,  custodial  interrogation  prevents  the  full opportunity to exercise Fifth Amendment rights.

After setting forth the now well-known warnings, the Court held that once the warnings are given, the interrogation must stop if the suspect invokes her rights.  While the police need not furnish the defendant a "station house attorney," if the suspect invokes her rights, the questioning must stop immediately.  The Court also held that the state has a "heavy burden" to show a waiver of those rights.   The privilege against self-incrimination is honored only when the citizen is guaranteed the immunity "to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Miranda*, 384 U.S., at 509, citing *Malloy v. Hogan, ante*.

U.S. CONST. amend. V provides in pertinent part: "No person shall . . . be compelled in any criminal case to be a witness against himself."  OHIO CONST. art. I, §10 provides in pertinent part that: "No person shall be compelled, in any criminal case, to be a witness against himself."  This immunity is the hallmark of our "accusatory system of criminal justice" which "demands that the government seeking to punish an individual produce the

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JBJJURISDOC@AOL.COM

11

evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." *Miranda v. Arizona, ante*, 384 U.S., at 460, citing *Chambers v. Florida, ante*, 309 U.S., at 235-238. The burden to prove that a defendant committed a crime is always the government's. *In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. This requirement is a natural corollary of, and logically compelled by, a citizen's privilege not to incriminate himself.

A criminal defendant may surrender the privilege in whole or in part. She may speak or refuse to speak. If she speaks, she may deny the offense or admit the offense. However, any statement of the Defendant to the government may be admitted into evidence[10] only if it is shown that she understood the liberties relinquished when making the statement. The government must demonstrate that the privilege against self-incrimination was, in the classic locution, knowingly, voluntarily, and intelligently waived. Waiver "is ordinarily an intentional relinquishment of a known right or privilege." *See, Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461.

*Miranda* made clear that if a suspect invokes the right to remain silent, questioning must cease immediately. If there is an invocation of the right to an attorney, questioning must cease until one is provided. 384 U.S., at 474. While a suspect may waive these fundamental rights, the government bears a "heavy burden" of showing a waiver. *Id.* at 475.

An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a

---

[10] As regards the law of evidence, a statement may be admitted against a criminal defendant *if* the statement satisfies the requirements of an admission. An admission is of course not hearsay, because the maker of the statement cannot complain about the lack of cross examination; and it is the lack of cross examination which gave rise to the rule against hearsay in the first instance. *See*, OHIO EVID. R. 801(D)(2).

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 234

> statement could constitute a waiver.  But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.

*Id.*  The waiver must be a "voluntary relinquishment," and cannot be the result of threats, tricks, or other compulsion that would make the waiver involuntary.  *Id.* at 476.  A failure to ask for a lawyer does not constitute a waiver.  Rather, the waiver of the right to counsel must be specifically made.  *Id.* at 470.

*Miranda* recognized that Fifth Amendment waiver issues were to be evaluated under the same standards as Sixth Amendment waiver issues.  *See, Johnson v. Zerbst, ante;*[11] *Carnley v. Cochran* (1962), 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70.  Waiver may not be inferred from a silent record.  Because courts are to indulge in "every reasonable presumption against waiver" and should "not presume acquiescence in the loss of fundamental rights" *Johnson v. Zerbst,* 304 U.S. at 464, the burden is upon the government to prove a valid waiver and the burden of going forward is likewise upon the government.

In this case, DONNA M. ROBERTS asserted her Fifth Amendment privilege to remain silent and her Fifth Amendment right to have counsel before electing whether to answer further questions.  She did so in a way that

---

[11] In *Zerbst*, the Court employed language which has become the well-known standard:  "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.  The determination of whether there has been an intelligent waiver of the right to Counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  304 U.S. at 464.

cannot be described as anything but unequivocal.[12]  In *Miranda*, the Court held:

> Once warnings have been given, the subsequent procedure is clear.  If the individual indicates *in any manner*, *at any time prior to or during questioning*, that he wishes to remain silent, the interrogation must cease. [Footnote omitted.]  At this point he has shown that he intends to exercise his Fifth Amendment privilege; *any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.*

384 U.S. at 473-474.  (Emphasis added.)

When a suspect invokes any of the rights of which they are informed in the *Miranda* warnings, questioning must cease immediately.  Only clear affirmative action by the prisoner permits any later interrogation.  In *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, the United States Supreme Court found that the Arizona state courts had applied incorrect standards in denying a motion to suppress.

---

[12]In *Mueller v. Virginia* (1993), 507 U.S. 1043, 113 S.Ct. 1880, 123 L.Ed.2d 498, 61 USLW 3813, the late Justice Byron White, joined by the late Justice Harry A. Blackmun and Justice David Souter, dissented from the denial of certiorari.  In his dissenting opinion, he noted that there are three approaches taken to *Edwards* problems, then he noted that the Sixth Circuit follows the rule that once counsel is requested, interrogation must cease.

It has been nearly a decade since the Court acknowledged the existence of three "conflicting standards" used by state and federal courts for determining the consequences of ambiguous or equivocal assertions of the right to counsel. *Smith v. Illinois*, 469 U.S. 91, 95-96, and n. 3 (1984) (*per curiam*).  Thus,

"[s]ome courts have held that all questioning must cease upon any request for or reference to counsel, however equivocal or ambiguous.  Others have attempted to define a threshold standard of clarity for such requests, and have held that requests falling below this threshold do not trigger the right to counsel....  Still others have adopted a third approach, holding that when an accused makes an equivocal statement that 'arguably' can be construed as a request for counsel, all interrogation must immediately cease except for narrow questions designed to 'clarify' at the earlier statement and the accused's desires respecting counsel." *Id.* at 96, n. 3 (citations omitted).

This disagreement has not abated.  Although a number of Circuits have since adopted what *Smith* described as the "third approach," see, *United States v. Porter*, 776 F.2d 370 (CA1 1985); *United States v. Gotay*, 844 F.2d 971, 975 (CA2 1988); *United States v. Fouche*, 776 F.2d 1398, 1405 (CA9 1985); *Towne v. Dugger*, 899 F.2d 1104 (CA11), cert. denied, 498 U.S. 991 [111 S.Ct. 536, 112 L.Ed.2d 546] (1990), the Sixth Circuit apparently adheres to the first approach.  See *Maglio v. Jago* 580 F.2d 202, 205 (1978) (ambiguous invocation requires cessation of all questioning). 507 U.S. at 1043.  Concerning the Sixth Circuit's position, *see, also, United States v. Whaley* (6th Cir. 1994), 13 F.3d 963, 1944 Fed. App. 0004P.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: (76.JBJURIND005.AOL.COM

14

Edwards was arrested at his home.  At the police station, he was informed of his *Miranda* rights, and stated that he understood his rights.  He said he was willing to submit to questioning.  After he was told that another suspect already in custody had implicated him in the crime, Edwards denied involvement and gave a taped statement that claimed alibi.  Edwards said that he wanted to "make a deal."  The police officer replied that the officer wanted a statement, but had no authority to negotiate a deal.  Edwards did not follow through on an offer to make a deal with a county attorney.  He then said: "I want an attorney before making a deal."  Unlike the case here, the questioning ceased at that point and Edwards was taken to the county jail.

The next morning, two colleagues of the officer who had questioned Edwards the previous night came to the jail and asked to see Edwards. Edwards said that he did not want to talk to anyone.  The jail guard instructed Edwards that he "had" to talk, and the guard took Edwards to meet with the detectives.  The officers identified themselves, stated that they wanted to talk to him, and informed him of his *Miranda* rights.  Edwards was willing to talk, but he first wanted to hear the taped statement of the person who had implicated him.  After listening to the tape for several minutes, Edwards agreed to make a statement so long as it was not tape-recorded.  The detectives informed him that the recording was irrelevant since they could testify in court concerning whatever he said.  Edwards insisted that: "I'll tell you anything you want to know, but I don't want it on tape."  Edwards then implicated himself in the crime.

Before trial, Edwards moved to suppress his confession on the ground that his *Miranda* rights had been violated when officers returned to question him after he had invoked his Fifth Amendment right to counsel the night

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 237

before.  The trial court initially granted the motion to suppress, then reversed itself.  It found the admission to have been "voluntary" without separately focusing on whether Edwards had knowingly and intelligently relinquished his right to counsel.

The Supreme Court reversed the conviction.  Writing for the Court, Justice White noted that *Miranda*'s requirements were clear: if an accused requests counsel, "the interrogation must cease until an attorney is present." 384 U.S. at 474.   The *Edwards* Court used this reasoning in reversing Edward's conviction:

> Second, although we have held that after immediately being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, see *North Carolina v. Butler, supra*, 441 U.S. at 372-376, the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, *a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.* [Footnote admitted.] We further hold that an accused, such as Edwards, *having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication,* exchanges, or conversations with the police.

451 U.S. at 484.   (Emphasis added.)   *Accord, Fare v. Michael C., ante.* *Edwards* emphasized that "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Id.*, 451 U.S. at 485.

In *Minnick v. Mississippi* (1990), 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489, 59 USLW 4037, the defendant was convicted of capital murder. The Supreme Court reversed the conviction, holding that where a defendant had counsel (at his request), re-initiation of any interrogation where the accused was compelled to attend without counsel was impermissible.  In

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 238

*Minnick*, the defendant, in the San Diego jail, talked briefly with FBI agents, then told them to come back when he had a lawyer. The FBI agents ended the interview. After counsel was assigned, a deputy sheriff from Mississippi, came to the San Diego jail to question Minnick. Minnick testified that his jailers again told him he would "have to talk" to the deputy and that he "could not refuse." The deputy advised Minnick of his rights. Minnick declined to sign a rights waiver form, but gave a statement to the deputy.

Writing for the Court, Justice Anthony Kennedy noted that *Edwards* is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990)." 498 U.S., at 150. Here, though the commands of *Miranda* and *Minnick* are clear, the police either did not appreciate them or consciously chose to ignore them. In *Minnick,* the Court stated:

> The merit of the *Edwards* decision lies in the clarity of its command and the certainty of its application. We have confirmed that the *Edwards* rule provides "'clear and unequivocal' guidelines to the law enforcement profession." *Arizona v. Roberson,* 486 U.S. 675, 682, 108 S.Ct. 2093, 2098, 100 L.Ed.2d 704 (1988). Cf. *Moran v. Burbine,* 475 U.S. 412, 425-426, 106 S.Ct. 1135, 1142-1144, 89 L.Ed.2d 410 (1986). Even before *Edwards,* we noted that *Miranda's* "relatively rigid requirement that interrogation must cease upon the accused's request for an attorney . . . has the virtue of informing the police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible. This gain in specificity, which benefits the accused and the State alike, has been thought to outweigh the burdens that the decision in *Miranda* imposes on law enforcement agencies and the courts by requiring the suppression of trustworthy and highly probative evidence even though the confession might be voluntary under the traditional Fifth Amendment analysis." *Fare v. Michael C.,* 442 U.S. 707, 718, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979). This pre-*Edwards* explanation applies as well to *Edwards* and its progeny. *Arizona v. Roberson, supra,* 486 U.S., at 681-682, 108 S.Ct., at 2098.

*Minnick, ante*, 498 U.S., at 151. Once the Defendant has requested counsel, interrogation must cease until counsel is present. In *Minnick*, the Supreme Court specifically noted:

> In our view, a fair reading of *Edwards* and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning. Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.

498 U.S., at 153. In this case, DONNA ROBERTS unequivocally invoked her right to counsel at her residence. The police failed to comply with the clear mandate of *Edwards* and *Minnick*. Accordingly, the resulting statements must be suppressed.

The facts of *Smith v. Illinois* (1984), 469 U.S. 91, 105 S.Ct. 490 83 L.Ed.2d 488, are analogous to the case at bar, except, if anything, the assertion of silence and the right to counsel here were more explicit than in *Smith*. The Court's *per curiam* opinion in *Smith* demonstrates how the rigid prophylactic rule of *Miranda* is to be employed.

> Shortly after his arrest, 18-year-old Steven Smith was taken to an interrogation room at the Logan County Safety Complex for questioning by two police detectives. The session began as follows:
> "Q. Steve, I want to talk with you in reference to the armed robbery that took place at McDonald's restaurant on the morning of the 19th. Are you familiar with this?
> "A. Yeah. My cousin Greg was.
> "Q. Okay. But before I do that I must advise you of your rights. Okay? You have a right to remain silent. You do not have to talk to me unless you want to do so. Do you understand that?
> "A. Uh. She told me to get my lawyer. She said you guys would railroad me.[13]
> "Q. Do you understand that as I gave it to you, Steve?

---

[13] In footnote 1 of the opinion, the Court said: "According to the Illinois Supreme Court, the 'she' that Smith referred to was an unidentified woman named Chico. 102 Ill.2d, at 368-369, 80 Ill.Dec., at 786, 466 N.E.2d, at 238."

> "A. Yeah.
> "Q. If you do want to talk to me I must advise you that whatever you say can and will be used against you in court.  Do you understand that?
> "A. Yeah.
> "Q. You have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned.  Do you understand that?
> "A. *Uh, yeah.   I'd like to do that.*
> "Q. Okay."

469 U.S. at 92-93, quoting 102 Ill.2d at 368-369, 80 Ill.Dec. at 786, 466 N.E.2d at 238 (emphasis in opinion).  Just as here, the officers in *Smith*, "[i]nstead of terminating the questioning at this point," pressed on.  They finished reading Smith his *Miranda* rights and then pressed him again to answer their questions:

> "Q. .  .  .  If you want a lawyer and you're unable to pay for one a lawyer will be appointed to represent you free of cost, do you understand that?
> "A. Okay.
> "Q. Do you wish to talk to me at this time without a lawyer being present?
> "A. *Yeah and no, uh, I don't know what's what, really.*
> "Q. *Well.   You either have [to agree] to talk to me this time without a lawyer being present* and if you do agree to talk with me without a lawyer being present you can stop at any time you want to.
> "Q. All right.  I'll talk to you then."

469 U.S., at 93, quoting 102 Ill.2d at 369, 80 Ill.Dec. at 786, 466 N.E.2d at 238 (emphasis in opinion).

The mere fact that DONNA ROBERTS gave a statement after she invoked her *Miranda* rights has nothing to do with the admissibility of the statement.  In *Smith* the Supreme Court noted that the courts below "were able to construe Smith's request for counsel as 'ambiguous' *only* by looking to Smith's *subsequent* responses to continued police questioning and by concluding that, 'considered in total,' Smith's '*statements*' were equivocal."  (Emphasis in original.)   The Court called this line of analysis "unprecedented and

untenable". The Court said that "[w]here nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." A subsequent statement is "relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together." 469 U.S., at 97-98.

The Illinois appellate court (and dissenting Justices Burger, Rehnquist and Powell in the Supreme Court) suggested that it was somehow significant that Smith's request came *during* the administration of *Miranda* warnings as opposed to during actual questioning.[14] The Court's *per curiam* opinion flatly rejected that claim as "plainly wrong", noting that *Miranda*'s clear holding was that a request for counsel coming "at *any* stage of the process" requires that questioning cease until counsel has been provided. *Miranda v. Arizona*, 384 U.S., at 444-445 (emphasis added).

In *Smith*, the Supreme Court explained that the *Edwards* "bright-line rule" was necessary because:

> In the absence of such a bright-line prohibition, the authorities through "badger[ing]" or "overreaching"—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983); *Fare v. Michael C.*, 442 U.S., at 719. With respect to the waiver inquiry, we accordingly have emphasized that a valid waiver "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation." *Edwards v. Arizona*, 451 U.S., at 484. Using an

---

[14] The Illinois appellate court had claimed that Smith "merely expressed an *interest* in obtaining counsel during the administration of the *Miranda* warnings and prior to the beginning of any interrogation . . . . Smith's statements were not a request for counsel during interrogation. Indeed, interrogation had not begun." 113 Ill.App.3d, at 309-310, 69 Ill.Dec. at 341-342 (emphasis in original). This farcical distinction is, with due respect, nothing but result-oriented justice. If there is an invocation, interrogation never should begin. Did the court (and the dissenters in the Supreme Court) mean to suggest that a valid invocation could only be made *after* a waiver (the condition precedent to interrogation)? One hopes not.

accused's subsequent responses to cast doubt on the adequacy of the initial request *itself* is even more intolerable. "No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." 102 Ill.2d, at 376, 80 Ill.Dec., at 789, 466 N.E.2d, at 241 (SIMON, J., dissenting). [Footnote omitted.]

*Smith, ante*, 469 U.S. at 98-99. In the case at bar, the police chose to ignore the *Edwards* bright line rule and accordingly the Defendant's statements are inadmissible.

*North Carolina v. Butler* (1979), 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286, discusses evaluation of waiver issues. The government must show that the suspect understood the rights delineated in the *Miranda* warnings. The suspect must possess the present capacity to understand the warning and the consequences thereof. It is not enough for the police to simply read the required warnings and assume that the warnings are understood. *See, Tague v. Louisiana* (1980), 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622, rejecting the holding of the state court that "[a]bsent a clear and readily apparent lack thereof, it can be presumed that a person has capacity to understand, and the burden is on the one claiming a lack of capacity to show that lack . . ." *See, State v. Tague* (La. 1978), 372 So.2d 555, 557.

The burden is, therefore, upon the government to establish not only that the Defendant knew or understood her constitutional rights or privileges, but also that relinquishment of the same was intentional; and that the Defendant acted knowingly, intelligently and voluntarily when doing so."[15]

---

[15] The Defendant does not assert that the "intelligent" requirement means that the decision was ultimately in her best interest, for if that were the case no confession could ever be admitted as having been intelligently made. The nature of a confession—an admission of guilt and invaluable assistance to the government trying to punish the confessor—is important to bear in mind when weighing the question of voluntariness; that is, whether the accused's will was overcome by actions of government officers. *See, e.g., Jordan v. Israel* (E.D. Wis. 1983), 567

(continued...)

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 243

The government cannot meet that burden in this case, and any statements made by the Defendant to law enforcement officers must be suppressed. *Miranda* established that the burden upon the government to show waiver is "great," *see, Miranda*, 384 U.S. at 475.  The evidence will show that there was virtually no effort to determine whether the Defendant had a true appreciation of her constitutional immunities; and thus no effort on the part of the government to ascertain whether the liberties were "known" to the Defendant.  *See, Johnson v. Zerbst, ante.*  The evidence will also show that there was no valid waiver because the signature was obtained under the pretense of being an avowal that the officers read the rights, but no that the Defendant understood, waived, and rejected them.

The government must show that the Defendant's statement was a choice "to speak in the unfettered exercise of [her] own will." *Malloy v. Hogan, ante*; U.S. CONST. amend. V and XIV; OHIO CONST. art. I, §10. *Miranda* recognized the atmosphere of compulsion bred by *incommunicado* custodial interrogation, coupled with modern police tactics which shy away from the rubber hose and bright light, and focus instead upon psychological compulsion.[16]

Though there is no claim here that the Defendant was beaten or physically mistreated, that is not to say that her confession was voluntarily

---

[15](...continued)
F.Supp. 1365, *aff'd without opinion*, (7th Cir. 1984), 746 F.2d 1483.

[16] Again, we stress that the modern practice of in-custody interrogation is psychologically rather than physically oriented.  As we have before, "Since *Chambers v. State of Florida*, 309 U.S. 227, 60 Ohio S.Ct. 472, 84 L.Ed. 716, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. State of Alabama*, 361 U.S. 199, 206, 80 Ohio S.Ct. 274, 279, 4 L.Ed.2d 242 (1960).  Interrogation still takes place in privacy.  Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms.  There is still a "privacy" aspect operative in the case, for the police turned on the recorder not when they began talking to the Defendant, but when they wanted to record her statement.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 244

obtained.  *Miranda* issues to one side, a confession cannot be admitted into evidence, or used at all, if it is involuntary.  *See, e.g., United States v. Washington* (1977), 431 U.S. 181, 186-87, 97 S.Ct. 1814, 52 L.Ed.2d 238; *Michigan v. Tucker* (1974), 417 U.S. 433, 440-41, 94 S.Ct. 2357, 41 L.Ed.2d 182; *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 520, 93 L.Ed.2d 473.  In determining whether a statement is voluntary, both federal and Ohio courts have held that a weighing of the totality of the circumstances is required.  *See, Jackson v. Denno* (1964), 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908; *Frazier v. Cupp* (1969), 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684; *State v. Barker* (1978), 53 Ohio St.2d 135, 372 N.E.2d 1324; *State v. Edwards* (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, *vacated on other grounds, Edwards v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1154.

In *Arizona v. Fulminante* (1991), 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302, Fulminante had driven his 11 year old step-daughter into the desert, where he choked her, sexually assaulted her, made her beg for her life, and then shot her twice in the head.  He was a suspect in the killing, but the government lacked sufficient evidence to convict him.  Later, in a New Jersey prison, he had several conversations with a paid government informer who was masquerading as an organized crime figure.  The FBI had encouraged the informant to question Fulminante.  The informant promised Fulminante protection from other inmates if he would confess to the crime.  Fulminante confessed to the informant.  The Supreme Court found that this confession was involuntary.  Here, though not as blatant trickery as in *Fulminante*, the Defendant was nevertheless coerced into talking to officers.  Such statements are involuntary, for once a suspect "has shown that [s]he intends to exercise [her] Fifth Amendment privilege; *any statement taken after the person invokes*

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 245

*his privilege cannot be other than the product of compulsion, subtle or otherwise.*" 384 U.S. at 473-474. (Emphasis added.) Here, the statements made by DONNA ROBERTS "cannot be other than the product of compulsion, subtle or otherwise."

In *State v. Arrington* (1984), 14 Ohio App.3d 111, 470 N.E.2d 211, the police officers procured incriminating statements through erroneous representations about the law and about whether or not the defendant would be charged with certain crimes. In affirming the trial court's suppression of the statements, the court relied on the totality of circumstances test set forth in *State v. Edwards.* The court held:

> Considering all the relevant factors, see *State v. Edwards* (1976), 49 Ohio St.2d 31, and *since the officers' statements and representations were the motivating cause of appellee's decision to speak, his incriminating statements, not being freely self-determined, were improperly induced, were involuntary and were inadmissible* as a matter of law.

14 Ohio App.3d, at 116. (Emphasis added.) Here, the motivating cause was the officers assertions, in violation of the United States and Ohio Constitutions, that the Defendant should speak because she had agreed to do so when arrested.[17]

The Court of Appeals for Mahoning County has reaffirmed the principle that the misleading statements of the police to a suspect in custody destroy that person's free will and exercise of self-determination. In *State v. Sewell* (Sep. 14, 1990) Mahoning App. No. 89 C.A. 161, 1990 Ohio App.

---

[17] Of course, there is a factual dispute about that matter as well. The Defendant was arrested in private. "Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on . . . ." *Miranda*, 384 U.S. at 448. When told by the officers that she agreed at her home to speak to them further, the Defendant replied, " I did?" The factual dispute is immaterial to the assertion of the self-incrimination privilege under *Miranda* and *Edwards.* It does circumstantially demonstrate, however, that the use of some "trickery" was involved in obtaining a statement which is obviously involuntary.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 246

LEXIS 4071 unreported,[18] the defendant was being questioned by the Youngstown Police Department concerning a charge of felonious assault. The officer told the defendant that "it's better to have your side known in case there is anything we missed" in the investigation. The Court of Appeals held that the subsequent statement had been taken in violation of the defendant's Fifth Amendment privilege against self-incrimination. The Court of Appeals held that the officer's statement "amounts to cajoled coercion." The Court of Appeals also agreed that the suggestion that there are always two sides to a case "engenders in the mind of the accused hope or fear in respect to the crime charged and unconsciously impels a defendant to make a statement." *Id.*, at *3. (Emphasis added.)[19] Here, setting to one side the clear *Miranda/Edwards* violations, the Defendant's statement amounts to no more than cajoled coercion. The line was clearly crossed when the officers told the Defendant—after she proclaimed that she should speak no more and should have counsel—was told by officers that she had said earlier that she wanted to speak.

In this case, the Defendant, despite a clear assertion of counsel and the right to remain silent was pressured by police to continue on; under a totality of the circumstances, this decision to speak was not voluntary. The police ignored the bright line rules of *Miranda*, *Edwards*, and *Minnick*. When the Defendant said "I don't want to say any more," the police pressed on: "Well, Donna, the reason we are talking to you is because when we came to your house tonight you told us you wanted to talk and explain things to us . . . ." The Defendant denies that she said at her home that she wanted to talk to

---

[18] Copy attached. *See*, Appendix.

[19] As an aside, the Defendant notes that the police used such tactics with Nathaniel Jackson, also charged in the death of Robert Fingerhut.

the police, but even if she did, the videotape makes clear her invocation of silence and counsel.  The police acted to overcome the expressed will of the Defendant to remain silent and to have counsel.  Under a totality of the circumstances, which here must include consideration of the officers' pressing on in violation of the clear, "bright line" prophylactic rule of *Miranda* and *Edwards*, the statements taken on December 20, 2001 were not given voluntarily.

The contents of the statement do not matter.  Once the Defendant asserted her right to remain silent and her right to counsel, further interrogation must cease.  The Defendant made clear her invocation of her rights.  Officers did not immediately cease talking to the Defendant.  Instead, without counsel, and without indicating a desire to reinitiate questioning, the Defendant was impelled to give a statement to the police.  There is no constitutional or common law exception to the bright line rule of *Miranda* for Defendants who said earlier that they wanted to explain things.

The statements obtained from the Defendant were taken in violation of her constitutional liberties as described herein.  There was a clear invocation of the right to remain silent and the right to counsel.  Further, there is no evidence that the purported waivers were done knowingly, voluntarily and intelligently.  Finally, the statements are the product of subtle coercion and are not voluntary. Accordingly, the statements must be suppressed from evidence, and the Defendant prays for an order accordingly.

J. GERALD INGRAM

JOHN B. JUHASZ
COUNSEL FOR DEFENDANT

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJURIS@GMAIL.COM

26

Appendix, A-1

# APPENDIX

**STATE OF OHIO, PLAINTIFF-APPELLEE, v. EMARY L. SEWELL, DEFENDANT-APPELLANT.**

**Case No. 89 C.A. 161**

**Court of Appeals of Ohio, Seventh Appellate District, Mahoning County**

**1990 Ohio App. LEXIS 4071**

**September 14, 1990**

## PRIOR HISTORY:

[*1]

Character of Proceedings: Criminal Appeal from Mahoning County Common Pleas Court Case, No. 89 CR 272.

## DISPOSITION:

JUDGMENT: Reversed and remanded.

## COUNSEL:

For Plaintiff-Appellee: James A. Philomena, Prosecuting Attorney, Kathi L. McNabb, Asst. Prosecuting Attorney, Youngstown, Ohio.

For Defendant-Appellant: Anthony Koury, Youngstown, Ohio.

## JUDGES:

Joseph E. O'Neill, Presiding Judge. Joseph Donofrio, J., Edward A. Cox, J., concurs.

## OPINIONBY:

O'NEILL

## OPINION:

OPINION

The appellant appeared in the trial court charged with felonious assault along with a firearm specification. Following trial, a jury returned a verdict of guilty and the appellant was sentenced. A timely notice of appeal was filed therefrom.

On March 23, 1989, the appellant and Daron Little were involved in an argument. Mr. Little struck the appellant in the face resulting in a broken nose and a chipped eye bone. As the result of this altercation, the appellant filed a complaint charging Mr. Little with assault. On the evening of March 24, 1989, Mr. Little returned to the appellant's house with appellant's cousin, Patrick Coleman, who was then living with appellant. [*2] The appellant testified that he did not approve of Patrick Coleman and Mr. Little using cocaine in his apartment and that he had told Patrick Coleman to take his clothes and move out. The appellant testified that on this occasion Mr. Little began threatening him. In fear of his life, the appellant had obtained a gun from his grandfather for protection. At about 11:30 p.m. on March 25, 1989, the appellant heard a knock on his door and, looking through a window, observed his cousin, Patrick Coleman. The appellant testified that he told his cousin to take his clothes from the porch where they had been left, however, Mr. Coleman insisted on entering appellant's house but appellant refused permission. During this time, Mr. Little was in his car parked in appellant's driveway. Appellant, after being threatened by Mr. Little, ordered Mr. Little to leave his driveway and Mr. Little moved his car across the

street.

Mr. Little testified that the appellant had run into his driveway pointing a gun at him. He went on to state that he had backed out of the driveway and parked across the street, approximately three houses down from the appellant's house. Mr. Little went on to testify that he was [*3] standing outside of his car, with the door open, and that he and the appellant were arguing back and forth across the street (Tr. 33). Mr. Little further testified that the appellant then stood on his front porch and the argument continued. He heard the girlfriend of the appellant state to the appellant that he should shoot Mr. Little. At this point, Mr. Little stated that his girlfriend, who was in his car, said to him "Come on, he ain't going to do nothing. I turned. Then I heard the gunshot" (Tr. 37). Mr. Little then observed that his girlfriend, LaShawn Little, had been shot.

The appellant testified that, when Mr. Little backed his car out of his driveway and parked in the street, he observed him reach down in his car and pull a gun out (Tr. 117). He went on to state that Mr. Little pointed the gun at him and he immediately ran into his bedroom and came out with his grandfather's gun (Tr. 117). The appellant went on to testify that he returned to his front porch with his gun and that, at that point, Mr. Little pointed his gun at him.

"*** I said basically I had wanted to scare them. But I had pointed the gun at him also because he had pointed his gun at me. If he would have [*4] fired first, I would have gotten hit" (Tr. 122).

Officer David McKnight testified that he investigated this incident and that he had interviewed some witnesses amongst whom was a person named Junior Davis.

"Q. Did any witnesses give you any information as to regard to Mr. Little having a gun?

"A. A Junior Davis gave me a statement as to him observing a man in the street with a pistol.

"Q. Did he describe what that pistol looked like?

"A. He said -- I believe he said it was silver. I'm not quite sure if he said it was silver or not. I'm -- he did say the gentleman in the street stated he had a gun." (Tr. 28).

The first assignment of error contends that the trial court erred in refusing to instruct the jury on a charge of aggravated assault.

"4. Aggravated assault, R.C. 2903.12, contains elements which are identical to the elements defining felonious assault, R.C. 2903.11, except for the additional mitigating element of serious provocation. Thus, in a trial for felonious assault, where the defendant presents sufficient evidence of serious provocation, an instruction on aggravated assault must be given to the jury. *** .

"5. Provocation, to be serious, must be reasonably [*5] sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time. * * *."

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 250

Appendix, A-3

State v. Deem (1988), 40 Ohio St. 3d 205, Syl. 4 and 5.

Considering the events which occurred prior to the day of the shooting incident, the ongoing threats by Mr. Little as to the appellant, the armed threat by Mr. Little as to the appellant and Mr. Little's injury which had occurred just a short time prior to the shooting, it would have been reasonable for the trial court to determine that the provocation involved was serious and reasonably sufficient to incite the defendant into using deadly force. In view of this finding, it is our conclusion that the trial court erred in refusing to instruct the jury on a charge of aggravated assault.

The second assignment of error complains that the appellant's statement to police officers was taken in violation of his Fifth Amendment [*6] right against self incrimination.

One police officer, David McKnight testified. Officer Mcknight presented, as state's exhibit six, a written statement given to him by the defendant-appellant. The following dialogue took place during trial:

"Q. Before you proceeded to talk to the Defendant, did you go over any preliminary matters?

"A. Absolutely. Prior to interviewing a witness or Defendant, we obviously read them their Constitutional rights, explain to them what their rights are, have them look them over prior to signing their rights.

"Q. Specifically, if you recall, would you tell the Court and jury what rights it is you explain (sic) to the Defendant?

"A. He basically has the right to remain silent, anything he says can and will be used against him in a court of law, he has the right to an attorney, to have an attorney present during the interrogation, and if he cannot afford an attorney, one can be provided for him. Of course, anything he signs will be used in a court of law.

"Q. I take it you read him those rights?

"A. I read him those rights, advised him I was a police officer, had him read them himself so he could understand the rights.

"Q. Did he appear to understand [*7] what his rights were?

"A. Yes, he did.

"Q. Did he likewise provide to you a written verification he understood what his rights were?

"A. He signed the statement with his name.

"Q. I will hand you what we have marked as State's Exhibit No. 6. Take a look at that and tell me if you can identify that.

"A. Yes. This is a copy of his statement. Seems to be all intact. His signature and my signature. And the time and date." (Tr. 25-26).

State's Exhibit No. 6 is a printed form containing what amounts to the Miranda warning. This exhibit also contains a waiver wherein the signator agrees that he had read or that there had been read to him the statement of rights as presented therein and that he fully understood those rights. The waiver goes on to

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: J70.JBIJURISDOC@AOL.COM

Appendix, A-4

state that any statement that he makes is a statement of his own free will.

Officer McKnight went on to testify that:

"**** A lot of times we advise them, like in this type of argument, there is always two sides, it's better to have your side known in case there is anything we missed, we can talk to those people. He agreed he wanted to give his side of the statement, his side of the story. That is exactly what he did." (Tr. 25).

The [*8] appellant argues that the advice by the police officer that "**** it's better to have your side known in case there is anything we missed * * *" (Tr. 25), it amounts to cajoled coercion. We agree with the appellant. Police officers are duty bound to inform a defendant of his rights pursuant to Miranda. Police officers are required to ascertain that if a defendant waives those rights, he waives them knowingly. Relative to the Miranda rights, there should be nothing further. We agree with the appellant that the suggestion that there is always two sides to a case certainly engenders in the mind of the accused hope or fear in respect to the crime charged and unconsciously impels a defendant to make a statement. Bram v. United States (1897), 168 U.S. 532.

Accordingly, we find this second assignment of error to be with merit.

The third assignment of error contends that the appellant's failure to make a pretrial objection to the Miranda violation should be relieved for good cause shown.

We agree with the appellant that there certainly was not any objection raised as to his statement given to the police and we notice and determine this error pursuant to Rule 52(B) Rules of Criminial [*9] Procedure.

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Cr. R. 52(B).

Accordingly, this third assignment of error is found to be with merit.

Assignment of error number four contends that failure by counsel for the appellant to object at trial to the Miranda violation deprive the appellant of his Sixth Amendment right to competent counsel.

In view of our disposition of previous assignments of error, we do not find it necessary to address this assignment of error.

The fifth assignment of error complains that the failure by appellant's counsel to call a critical witness deprived the appellant of his Sixth Amendment right to competent counsel.

This assignment of error addresses the testimony by Police Officer McKnight wherein he testified that he had secured evidence from a witness, Junior Davis, relative to the possession by Mr. Little of a silver pistol (Tr. 27-28). The jury, during their deliberation, sent a question to the judge "Why wasn't the witness who saw the gun brought to the hearing?" (Tr. 158). Darron Little and his wife had testified that, at the time of this incident, Mr. Little did [*10] not have a gun. The appellant basically argues, under this assignment of error, that the testimony of the missing witness was very essential to his affirmative defense of self defense.

Appendix, A-5

Under the evidence, as presented, we do not agree with this contention.

"'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. United States v. Morrison, 449 U.S. 361, 364-365 (1981)'". Strickland v. Washington (1984), 466 U.S. 668, 691 and State v. Bradley (1989), 42 Ohio St. 3d 136, 142.

Without objection, the trial judge instructed the jury, relative to the claim of self-defense:

"A defendant is not in a position to claim self-defense if he sought trouble and armed with a dangerous weapon he provoked a fight or renewed a fight that had broken off and did not attempt to avoid it or leave the scene of the trouble." (Tr. 150).

The appellant himself testified that, after he observed Mr. Little in the street with a gun, rather than closing the door to his apartment and breaking off the potential incident, he went to his bedroom, secured a gun and returned to [*11] his front door. It is our opinion, under this state of the evidence, the defendant-appellant failed to establish the affirmative defense of self-defense and, accordingly, the failure to call the witness named by Officer McKnight had no affect on the judgment or the verdict by the jury.

This fifth assignment of error is found to be without merit.

Pursuant to this opinion, the judgment and sentence of the trial court is reversed and this cause is remanded to the trial court for further proceedings according to law and according to this opinion.

E:\CAPITAL\CLIENT\ROBERTS.DONNA\Cover.Page.wpd*Wed 10Jul2002•0741.15 (07:41:15am)

# In the Court of Common Pleas
# Trumbull County, Ohio

| | | |
|---|---|---|
| STATE OF OHIO, | } | Case No.  01 CR 793 |
| Plaintiff | } | |
| | } | Judge John M. Stuard |
| vs. | } | |
| | } | |
| DONNA ROBERTS, | } | **Death Penalty Case** |
| Defendant | } | |

---

### DEFENDANT'S MOTION FOR ALTERNATING
### VOIR DIRE EXAMINATION

---

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
CHARLES L. MORROW, Esq., Assistant
160 High Street NW
Warren, OH  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 254

jbj\E:\CAPITAL\Client\Roberts.Donna\Alternating.voir.dire.wpd*July 10, 2002

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | } | Case No. 01 CR 793 |
| Plaintiff | } | |
| | } | Judge John M. Stuard |
| *vs.* | } | |
| | } | |
| DONNA M. ROBERTS, | } | |
| Defendant | } | |

### DEFENDANT'S MOTION FOR ALTERNATING
### VOIR DIRE EXAMINATION

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through the undersigned counsel, and moves this Honorable Court for an order allowing an examination of the venire in an alternating manner, as follows: the prosecution shall examine the first prospective juror before the Defendant, then the Defendant shall examine the second prospective juror before the prosecution, then the State would go first, then the Defendant would go first, *etc.*, so that the State would first examine the odd numbered prospective jurors, and the Defendant would first examine the even numbered prospective jurors.

For cause, the Defendant offers the attached memorandum, which is made part hereof as though fully rewritten herein.

WHEREFORE, the Defendant prays for an order of this Court directing that the parties shall alternate as to who shall examine each successive prospective juror.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

Respectfully submitted,

J. GERALD INGRAM 0007887

JOHN B. JUHASZ 0023777
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330·758·2308
Facsimile: 330·758·8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:

❑ sent by regular United States Mail, postage prepaid,
❑ hand delivered to counsel or counsel's office
❑ sent by telecopier

this _____ day of July, 2002 to Dennis Watkins and Christopher D. Becker, Esq., Counsel for Plaintiff, 160 High Street, Warren, Ohio  44481.

JOHN B. JUHASZ

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

## MEMORANDUM IN SUPPORT OF MOTION

There is no legal reason or authority for permitting the State to first examine each prospective juror. The procedure is in fact nothing more than tradition. The Defendant is not aware of any provision of the Ohio Revised Code or the Ohio Rules of Criminal Procedure which mandate that the prosecution be the first party to examine each prospective juror. The conduct of voir dire is a matter largely left to the discretion of the trial court. There is no reason, upon a request such as this, for the Court not to grant the motion; and, there being no authority to the contrary, the procedure should be adopted as it makes the proceedings appear fairer to all parties. The goal is to provide a fair trial, including trial by a fair an impartial jury committed to th presumption of innocence. U. S. CONST. amend. V, VI and XIV; OHIO CONST. art. I, §§1, 2, 10, and 16.

Neither the Ohio Rules of Criminal Procedure nor OHIO REV. CODE ANN. §2945.27 specify that the prosecution must first examine each prospective juror. In the absence of any such guidelines, this Court may establish any trial procedures that it sees fit. *See*, OHIO REV. CODE ANN. §§2945.03 and 2945.10. The Defendant respectfully submits the denial of such a request must be based upon some articulable and relevant reason. If the denial of this request has no such basis, it amounts to an abuse of discretion which implies an unreasonable or arbitrary attitude. *See, Powers v. Ohio* (1991), 499 U.S. 400, 111 S. Ct. 1364, 113 L.Ed.2d 411, 59 USLW 4268; *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69; *Rideau v. Louisiana* (1963), 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663; *State v. Maurer* (1984), 15 Ohio St.3d 239, 473 N.E.2d 592; *Steiner v. Custer* (1940), 137 Ohio St. 448, 31 N.E.2d 855, 19 Ohio Op. 148. Accordingly, this

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHSDOO@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 257

Court should order that the parties shall alternate with each successive prospective juror as to which party shall first examine said prospective juror.

J. GERALD INGRAM

JOHN B. JUHASZ

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

2



jbj\D:\Alex1\CAPITAL\Client\Roberts.Donna\Record.objections.wpd*rev.July 10, 2002 9:17 am

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,      }  Case No. 01 CR 793

   Plaintiff     }

           }  Judge John M. Stuard

-vs-          }

           }

DONNA M. ROBERTS,   }

   Defendant    }

---

### DEFENDANT'S MOTION TO HAVE REASONS FOR OBJECTIONS AND REASONS FOR OVERRULING OBJECTIONS PLACED ON THE RECORD

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Honorable Court for an order permitting defense counsel to state the reasons for defense objections on the record, and also requiring that the reasons for overruling any defense objections be placed on the record. For cause, the Defendant offers the attached Memorandum, which is incorporated herein.

WHEREFORE, the Defendant prays for an order of this Court permitting defense counsel to state the reasons for objections on the record, and requiring the Court to state the reasons on the record for overruling any defense objections that are overruled.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJEURISDOC@AOL.COM

32

Respectfully submitted,

J. Gerald Ingram (#0007887)

John B. Juhasz (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was sent by regular U.S. Mail, postage prepaid, this 16th day of July, 2002 to Dennis Watkins and Christopher D. Becker, Counsel  for Plaintiff, 160 High Street NW, Warren, OH  44481.

John B. Juhasz
Counsel for Defendant

## MEMORANDUM IN SUPPORT OF MOTION

The Defendant has been indicted for, *inter alia*, aggravated murder with death penalty specifications.  Trial courts always have an obligation to insure that the proceedings are fair, *see, Chambers* v. *Mississippi* (1973), 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297; *State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342, but that duty reaches a heightened level in death penalty cases because "death is different."  *See, Woodson* v. *North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944.[1]  If the Defendant is to truly be guaranteed the adequate and effective representation to which he is entitled under U.S. CONST., AMEND. VI and XIV and OHIO CONST., ART. I, §10, a complete record of every step of the proceedings must be compiled and preserved.  This is a death penalty case, and it is not the type of case where defense counsel should be thinking about appellate review after the trial is over.  To preserve any possible issues for appeal, defense

---

[1] In adopting this proposition, the Supreme Court accepted the argument of Professor Anthony Amsterdam, who, in response to a question at oral argument from Justice Potter Stewart, said:

> Now, why do we say death is different?  Our legal system as a whole has always treated death differently.  We allow more peremptory challenges; we allow automatic appeals; we have different rules of harmless error; we have indictment requirements; unanimous verdict requirements in some jurisdictions, because death is different.
>
> Death is factually different.  Death is final.  Death is irremediable. Death is unknowable; it goes beyond this world.  It is a legislative decision to do something, and we know not what we do.  Death is different because even if exactly the same discretionary procedures are used to decide issues of five years versus ten years, or life versus death, the result will be more arbitrary on the life or death choice.

Oral arguments held March 30-31, 1976.  *See,* Peter Irons and Stephanie Guitton, ed., *May It Please the Court* (New York: The New Press, Copyright © 1993), 233.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: 670 JBJURISDOC@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 261

counsel must make a complete record reflecting the entire proceedings in the trial court. If the issues are not preserved on the record, the appellate courts will only review issues constituting "plain error". *State v. Williams* (1977), 51 Ohio St.2d 112; *364 M/E/2d 1364. Pjop P[/3d 98, vacated on the grounds,* Williams v. Ohio *(1978), 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1154; see, also,* OHIO CRIM.R. 52. Failure to raise an issue other than "plain error" constitutes a waiver of that issue. *State v. Awan* (1986), 22 Ohio St.3d 120, 489 N.E.2d OBR 199. In addition, arcane rules relating to federal habeas jurisdiction under the Antiterrorism and Effective Death Penalty Act require exhaustion of all issues in state court. Coupled with state rules on *res judicata*, the need to have a *complete* record is essential.

A necessary part of building a complete record is to allow the defense counsel to state on the record reasons for objections, and for the Court to state on the record the reasons for overruling those objections. If that is not done, the record is not complete, and the Defendant has been denied his constitutional rights, including his Sixth and Fourteenth Amendment rights to the effective assistance of appellate counsel, and his rights under OHIO CONST. art. I, §16.

In *State, ex rel. Spirko, v. Court of Appeals* (1986), 27 Ohio St.3d 13, 18, 501 N.E.2d 625, the Supreme Court of Ohio held:

J. GERALD INGRAM · JOHN B. JUHANZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JBJJURISDOC@AOL.COM

2

Because of the foregoing considerations, we cannot countenance a situation where a person engaged in a contest with the state for his life should be placed in the untenable position of having to present his case before an appellate court without a comprehensive record to assist him.  Furthermore, we cannot allow the grave responsibility to review capital cases, placed by law upon the court of appeals and this court, to be crippled simply because a full record is unavailable.   We therefore hold that Section 16, Article I of the Ohio Constitution requires that a defendant in a capital case be afforded a complete, full, and unabridged transcript of all proceedings against him so that he may prosecute an effective appeal. [Footnote omitted.]

The reasons for objections, responses by the prosecutor, and the rulings on objections, together with the reason therefor, may of course be stated at sidebar.  However, the entire sidebar proceedings must be recorded.

J. GERALD INGRAM

JOHN B. JUHASZ

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JBJJURISDOC@AOL.COM

3

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.: 01-CR-793 |
| | ) | |
| Plaintiff, | ) | HONORABLE JUDGE: |
| | ) | JOHN M. STUARD |
| | ) | |
| -vs- | ) | |
| | ) | **MEMORANDUM IN** |
| DONNA ROBERTS, | ) | **OPPOSITION** |
| | ) | **TO DEFENDANT'S MOTION TO** |
| Defendant | ) | **PROHIBIT DEATH** |
| | ) | **QUALIFICATIONS UNTIL** |
| | ) | **PROSECUTION HAS SHOWN** |
| | ) | **PROBABLE CAUSE THAT THE** |
| | ) | **CASE WILL PROCEED TO A** |
| | ) | **SECOND PHASE** |

Now comes the State of Ohio by Assistant Prosecuting Attorney Christopher D. Becker response to Defendant's Motion to prohibit death qualification of the jury unless and until the prosecution has shown probable cause that the case will proceed to a second phase.

The main issue is whether a jury selected pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510 guidelines is "guilt prone" and therefore not impartial.  The Supreme Court has considered this very issue and rejected the contention the defendant has advanced saying:The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt.  We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." *Witherspoon*, at pp. 517-518.  (Emphasis added).  The Supreme Court reaffirmed that position in *Bumper v. North Carolina* (1968), 391 U.S. 543.

33

Since *Witherspoon*, numerous courts have considered the "guilty-bias" argument raised by defendant and rejected it.  The United States Court of Appeals, First Circuit, rejected the argument in *Spinkellink v. Wainwright* (1978), 578 F.2d 582, rehearing denied, 441 U.S. 937. The court was of the opinion that even after consideration of additional psychological studies conducted by Bronson, Goldberg, and Jurow, the very studies cited by the defendant, the proof was "far from conclusive." *Id*. at pp. 593-594.  Also, see footnote 15 at pp. 593-594.  *Hooks v. State of Delaware* (1980), Del. Supv., 416 A.2d 189.  Also see, *United States, ex rel. Clarke v. Fike* (7th Cir., 1976), 538 F.2d 750, *cert. denied*, 429 U.S. 1064, 97 S. Ct. 791 (1977); *Craig v. Wyse* (D. Colo. 1974), 373 F. Supp. 1008; *Pandilla v. People of the State of Colorado* (1970), 470 P.2d 846; *People v. Lewis* (Ill. 1981), 430 N.E.2d 1346; *Justus v. Commonwealth* (1981), 222 Va. 677, 283 S.E.2d 905.

Before the enactment of the current death penalty laws, the proposition that a *voir dire* procedure conducted pursuant to *Witherspoon* would result in a prosecution-prone jury was viewed by the Supreme Court of Ohio.  *State v. Carver*, 30 Ohio St. 2d 280, 59 Ohio Ops. 2d 343, *cert. denied,* 409 U.S. 1044 (1972).  The Ohio court held that such a procedure would not have embedded in the minds of prospective jurors that defendant is guilty and that they will merely be determining the penalty.  *Id*.

The Ohio Supreme Court re-examined the issue again and in *State v. Jenkins,* (1984), 15 Ohio St.3d 164, 168, certiorari denied (1985), 472 U.S. 1032, 87 L.Ed.2d 643 held that:

> "to death qualify a jury prior to the guilt phase of a
> bifurcated capital prosecution does not deny a capital defendant
> a trial by an impartial jury.

Moreover, the defendant could only cite one federal district court case to support his contention that death qualified juries are "conviction-pron." *Grigsby v. Maby* (E.D. Ark., 1983), 569 F. Supp. 1273. However, defendant admitted in his memorandum that the United States Supreme Court had overruled that case. *Lockhart v McCree* (1986), 106 S. Ct. 1758.

In accordance with the above, certainly the great weight of the authority follows the rule that the available "scientific" psychological sociological studies are not acceptable testing methods which are determinative of the issue, in Trumbull County, or any place else. Therefore, the contention that death qualified jurors result in a "prosecution-prone," or "guilt-bias" jury cannot be substantiated by psychological and sociological studies as defendant would have this Court believe.

Defendant also claims that persons who can be excluded from the panel under *Witherspoon* constitute a distinctive class in the community. This statement is remarkably bold, as it directly contradicts a United States Supreme Court case which the defendant himself cites. *Lockhart v. McCree, supra.* In that case, the court stated that

> "In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as the "*Witherspoon-excludables*" at issue here, are not 'distinctive groups' for fair cross-section purposes." *Lockhart*, at 1765.

Thus, it appears that questioning prospective jurors concerning their attitudes toward the death penalty does not violate the constitutional right to a jury that is drawn from a fair cross-section of the community.

Finally, the guarantee of equal protection means that no person shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances. *Roth v. Public Employees Retirement Board*, 44 Ohio App. 2d 155.

To show that death qualifying the jury violates the equal protection clause, the defendant here must show that death penalty juries are more likely to convict defendants than juries in non-death penalty cases. *Fay v. People of the State of New York* (1946), 332 U.S. 261, 67 S. Ct. 1613. Such a showing has not been made by any substantive facts, but rather, merely by inference and flawed logic. It is inconceivable how a jury automatically becomes conviction prone, thereby denying equal protection of the laws, simply by being death qualified during *voir dire*. The jury is presumed impartial unless a showing to the contrary can be advanced. Here, defendant has made no such showing. Therefore, no reasons exists for the Court to fashion any methods which will change the process of death qualifying the jury during *voir dire*.

For the foregoing reasons, the State respectfully requests the Court to overrule defendant's motion.

Respectfully submitted,

CHRISTOPHER D. BECKER (0047252)
Assistant Prosecuting Attorney
Trumbull County, Ohio
160 High Street NW
Warren, OH 44481
Telephone: (330) 675-2426
Fax: (330) 675-2431

ATTORNEY FOR STATE OF OHIO

## CERTIFICATION

This is to certify that a copy of the foregoing document was served upon the attorneys of record by hand delivering a copy of the same on this 18th day of July 2002.

_____
CHRISTOPHER D. BECKER (0047252)
Assistant Prosecuting Attorney
Trumbull County, Ohio

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,       )

                )    CASE NO.:  01-CR-793

    Plaintiff,      )

                )    JUDGE:    JOHN M. STUARD

   -vs-         )

                )    **STATE'S MEMORANDUM IN**

DONNA M. ROBERTS,    )    **RESPONSE TO DEFENDANT'S**

                )    **MOTION TO DETERMINE PROPER**

    Defendant.    )    **STANDARD TO EXCUSE JURORS**

                     **FOR CAUSE**

---

Now comes the State of Ohio by Assistant Prosecutor Christopher D. Becker in response to the Defendant's Motion to Determine the Proper Standard to Excuse Juror's for Cause.

The case at bar is being prosecuted by two assistant prosecutors who have tried numerous capital murder cases. Counsel for the Defendant are equally if not more experienced in trying capital murder cases. It is almost unimaginable that the four attorneys involved in this case need to be advised of the "proper standard" for excusing jurors for cause. With that said the law on this issue is well litigated.

The United States Supreme Court held in <u>Witherspoon v. Illinois</u> (1968) 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed2d 776, that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." <u>Id.</u> at 522-23, 88 S.Ct. 1770. <u>Witherspoon's</u> holding is grounded in the right to a fair and impartial jury guaranteed to state criminal defendants by the Sixth and Fourteenth Amendments, and thus veniremen can be excluded based on their views on capital punishment

only if they would be biased and lack impartiality in hearing the case.

In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " Id. at 424, 105 S.Ct. 844 (quoting Adams v. Texas 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). The Court explained that:

> this standard ... does not require that a juror's bias be proved with "unmistakable clarity" ... because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.
> Id. at 424-26, 105 S.Ct. 844 (footnote omitted).

As the Court emphasized in Witt, a trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." Id. at 429, 105 S.Ct. 844; see also Deputy v. Taylor, 19 F.3d 1485, 1499 (3d Cir.1994) ("The trial court is in the best position to observe the demeanor of the prospective jurors.").

When a prospective juror makes what appear to be contradictory statements on voir dire it is for the trial court to decide which statements to believe. The issue is not conclusively determined by whatever the prospective juror happens to say last. See, e.g., State v. Scott (1986),

2

26 Ohio St.3d 92, 97-98, 26 OBR 79, 83-84, 497 N.E.2d 55, 60-61; State v. White (1999), 85

Ohio St.3d 433, 439, 709 N.E.2d 140, 150 State v. Webb (1994), 70 Ohio St.3d 325, 339, 638

N.E.2d 1023, 1035-1036 and State v. Jones (2001), 91 Ohio St.3d 335, 339, 744 N.E.2d 1163,

1172.

     "Deference must be paid to the trial judge who sees and hears the juror." Wainwright v.

Witt (1985), at 426. As this honorable court is well aware the inflection, tone, eye movement,

posture and other physical factors are often very important when viewing a response to voir dire

questions.

     A prospective juror may be excused for cause if his or her "views would prevent or

substantially impair the performance of his duties as a juror in accordance with his instructions

and oath." Adams v. Texas (1980) 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589.

When a juror "voice[s] general objections to the death penalty or express[es] conscientious or

religious scruples against its infliction," this is not, in itself, a sufficient basis for excusal.

Witherspoon v. Illinois (1968) 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776, 784-85.

A prospective juror in a capital case must be able to state clearly, however, that he or she is

willing to temporarily set aside those concerns and beliefs and to fairly and impartially follow

the law. Lockhart v. McCree (1986), 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137,

149-50.

     Finally, Trumbull County has had a number of Capital Murder cases tried in the Common

Pleas Courts. The method and manner in conducting voir dire in those Capital Cases has

repeatedly been upheld by the Ohio Supreme Court. See State v. Getsy (1998), 84 Ohio St.3d

180, 702 N.E.2d 866; State v. Lorraine (1993), 66 Ohio St.3d 414, 613 N.E.2d 212 and State v.

3

Biros (1997),78 Ohio St.3d 426, 678 N.E.2d 891.

Quite simply this case will be tried by counsel with extensive capital murder trial experience and an experienced jurist on the bench. The "proper standard" for excusing jurors for cause is known to all, it is merely applying the law and those rules to the circumstances that may arise at the trial of this defendant that will present the difficult task for Counsel and the Court.

Respectfully Submitted,

CHRISTOPHER D. BECKER (0047252)
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO
Trumbull County Prosecutor's Office
160 High Street, NW
4th Floor Administration Bldg.
Warren, Ohio 44481
Telephone: (330) 675-2426
Fax: (330) 675-2431

## CERTIFICATION

This is to certify that a copy of the foregoing document was hand delivered to counsel of record this 18th day of July 2002.

CHRISTOPHER D. BECKER (0047252)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
Trumbull County, Ohio

4

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          )
                                        )    CASE NO.:    01-CR-793
          Plaintiff,                    )
                                        )    JUDGE:      JOHN M. STUARD
     -vs-                               )
                                        )    **MEMORANDUM IN OPPOSITION TO**
DONNA M. ROBERTS,                       )    **DEFENDANT'S   MOTION   FOR**
                                        )    **COMPREHENSIVE VOIR DIRE**
          Defendant.                    )

_____

Now comes the State of Ohio by Assistant Prosecutor Christopher D. Becker in response

to the Defendant's Motion for Comprehensive Voir Dire Examination.

The State of Ohio agrees that each side should be permitted to examine each juror and

should be granted wide latitude in the questioning.  No juror, however, should be subjected to

an ordeal of repetitious or ridiculous questions

In general, the purpose of *voir dire* of a prospective juror is to determine whether he has

both the statutory qualification of a juror and is free from bias or prejudice for or against either

litigant. Pavilonis v. Valentine (1929), 120 Ohio St. 154, 165 N.E. 730, paragraph one of the

syllabus. Crim.R. 24(A) permits the court discretion in determining the method of *voir dire* and

provides in pertinent part that "[t]he court may permit the attorney for the defendant, or the

defendant if appearing pro se, and the attorney for the state to conduct the examination of the

prospective jurors or may itself conduct the examination." Generally, "the scope of the

examination of prospective jurors is within the discretion of the trial court and the judgment will

only be reversed upon a showing that the trial court abused its discretion in restricting the scope

of *voir dire*." State v. Jenkins (1984), 15 Ohio St.3d 164, 186, 15 OBR 311, 330, 473 N.E.2d

35

264, 286. The court's discretion has been held to include the decision whether jurors should be questioned collectively or individually. United States v. Delval (C.A.5, 1979), 600 F.2d 1098, 1102.

Although the Ohio Supreme Court has held that "sufficient latitude must be afforded in the *voir dire* of prospective jurors in a capital case," Jenkins, supra, 15 Ohio St.3d at 186, 15 OBR at 330, 473 N.E.2d at 286, the court has still concluded that the scope of examination is within the discretion of the court. Id. See, also, State v. Coleman (1989), 45 Ohio St.3d 298, 302-303, 544 N.E.2d 622, 627-629, certiorari denied (1990), 493 U.S. 1051, 110 S.Ct. 855, 107 L.Ed.2d 849; State v. Mapes (1985), 19 Ohio St.3d 108, 115, 19 OBR 318, 324, 484 N.E.2d 140, 146-147, certiorari denied (1986), 476 U.S. 1178, 106 S.Ct. 2905, 90 L.Ed.2d 991.

To that end the State of Ohio requests that each side be permitted a reasonable time for voir dire of each juror, and would argue that it is not an abuse of discretion to limit questioning that has clearly become unreasonable and or repetitive. State v. Beuke, (1988), 38 Ohio St. 3d 29, 526 N.E.2d 274, certiorari denied (1989) 489 U.S. 1071.

Respectfully Submitted,

CHRISTOPHER D. BECKER (0047252)
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO
Trumbull County Prosecutor's Office
160 High Street, NW
4th Floor Administration Bldg.
Warren, Ohio 44481
Telephone: (330) 675-2426
Fax: (330) 675-2431

2

**CERTIFICATION**

This is to certify that a copy of the foregoing document was hand delivered to counsel of record this 18th day of July 2002.

CHRISTOPHER D. BECKER (0047252)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
Trumbull County, Ohio

Motion 4                                               3

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,

      Plaintiff

*vs.*

DONNA ROBERTS,

      Defendant

Case No.  01 CR 793

Judge John M. Stuard

**Death Penalty Case**

---

DEFENDANT'S MOTION TO DISMISS INDICTMENT; OR,
IN THE ALTERNATIVE, TO DISMISS DEATH SPECIFICATIONS
BECAUSE DEATH PENALTY IN OHIO IS UNCONSTITUTIONAL

REQUEST FOR ORAL HEARING

---

FILED

JAN 3 0 2004

MARCIA J MENGEL, CLERK
SUPREME COURT OF OHIO

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
Christopher D. Becker, Esq., Assistant
Kenneth N. Bailey, Esq., Assistant
160 High Street NW
Warren, Ohio  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

D:\Alex1\CAPITAL\Client\Roberts.Donna\Cover.Page.wpd*Wed 17Jul2002•1401.28 (02:01:28pm)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: C/O JBLJURIS DOC@AOL.COM

36

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 276

D:\Alex1\CAPITAL\Client\Roberts.Donna\Death\Const.MTD.vers.7.02.wpd✦Wednesday 17 July 2002•01:34pm
(1334 hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO, | Case No. 01 CR 793 |
|     Plaintiff | |
| *vs.* | |
| | Judge John M. Stuard |
| DONNA M. ROBERTS, | |
|     Defendant | |

---

### DEFENDANT'S MOTION TO DISMISS INDICTMENT; OR, IN THE ALTERNATIVE, TO DISMISS DEATH SPECIFICATIONS BECAUSE DEATH PENALTY IN OHIO IS UNCONSTITUTIONAL

### REQUEST FOR ORAL HEARING

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Honorable Court for an order dismissing the indictment in this case; or, in the alternative, dismissing the death penalty specifications appended to the indictment.  For cause, the Defendant says that, as shown in the attached Memorandum, made a part hereof by this reference, the Ohio death penalty law violates both the United States Constitution and the Ohio Constitution. Accordingly, the Court must dismiss the indictment, or at least dismiss the death penalty specifications appended to the indictment.

The Defendant requests an oral hearing on this Motion.

WHEREFORE, the Defendant prays for an order dismissing the indictment; or, in the alternative, dismissing all death penalty specifications appended to

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDIC@AOL.COM

i

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 277

any counts in the indictment.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHÁSZ  (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758-2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:

❑ sent by regular United States Mail, postage prepaid
☑ hand delivered to counsel or counsel's office
❑ sent by telecopier

to Dennis Watkins and Christopher D. Becker, Counsel for Plaintiff, 160 High Street, NW, Warren, Ohio 44481 this 18th day of July, 2002.

JOHN B. JUHÁSZ

J. GERALD INGRAM · JOHN B. JUHÁSZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

ii

## MEMORANDUM IN SUPPORT OF MOTION

Ohio's death penalty scheme, embodied principally in OHIO REV. CODE ANN. §§2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05, as read together and as applied in this case violate the liberties secured by U.S. CONST. amend. VI, VIII, and XIV; and the immunities specified in OHIO CONST., art. I, §§1, 2, 5, 9, 10, and 16.  Constitutional and statutory provisions, if not quoted in the body of this Memorandum, are reproduced in the Appendix, *post*. This motion is not an abolitionist essay decrying the moral depravity of the death penalty.  The Defendant concedes that the Framers of the United States Constitution contemplated the infliction of capital punishment when the Bill of Rights was adopted.  *See*, U. S. CONST. amend. V, which provides in part: "No person shall be held to answer for a capital, or otherwise infamous crime . . . ."

That the death penalty was contemplated by the Framers is not to say, however, that *any* death penalty statutory scheme comports with the Constitution.  *See, e.g., Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346; *Woodson* v. *North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; *Roberts* v. *Louisiana*  (1976), 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974; *cf. Callins v. Collins* (1994), 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435, 62 USLW 3546 (SCALIA, J. concurring in the denial of certiorari);[1] and *Atkins v. Virginia* (2002), __ U.S. __, 122 S.Ct. 2242, __ L.Ed.2d __, 70 USLW, 4585, 2002 U.S. LEXIS 4648, (SCALIA, J. joined by REHNQUIST, Ch.J., and THOMAS, J., dissenting).  Inscribed on one wall of the Jefferson Memorial

---

[1]Justice Scalia's position seems to be that because the Constitution's Fifth Amendment acknowledges the existence of capital punishment, any scheme imposing capital punishment is acceptable under the Eighth Amendment.  On balance, however, Justice Scalia was likely acting in response to Justice Blackmun's dissent, for even Justice Scalia on occasion finds death sentences to be prohibited.  *See, e.g.,* his opinion for the Court in *Hitchcock* v. *Dugger* (1987), 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347, 55 USLW 4567.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

1

in Washington, D.C. is a quote from Jefferson:

> I am not an advocate for frequent changes in laws and constitutions.  But laws and institutions must go hand in hand with the progress of the human mind.  As that becomes more developed, more enlightened, as new discoveries are made, new truths discovered and manners and opinions change, with the change of circumstances, institutions must advance also to keep pace with the times.  We might as well require a man to wear still the coat which fitted him when a boy as civilized society to remain ever under the regimen of their barbarous ancestors.

More recently, and as applied specifically to capital punishment, the Supreme Court has said in *Trop* v. *Dulles* (1958), 356 U.S. 86, 100-101, 78 S.Ct. 590, 2 L.Ed.2d 630: "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.  .  .  .   The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

The Framers clearly could not have foreseen the calamity and complexity that surrounds the modern death penalty.  The "rules" of when and how death may be inflicted as a punishment have become so arcane that one former Justice of the Supreme Court, who was personally opposed to capital punishment but who tried for years in vain to make it work, announced that he had given up the task of affirming a death sentence as a job impossible to square with the Constitution.  *See, Callins v. Collins* (1994), 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435, 62 USLW 3546 (BLACKMUN, J., dissenting). Dissenting from the denial of certiorari, the late Justice Blackmun wrote in part:

> From this day forward, I no longer shall tinker with the machinery of death. For more than 20 years I have endeavored—indeed, I have struggled—along with a majority of this Court, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor. [Footnote omitted.] Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated simply to concede that the death

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJ.JURISDOC@AOL.COM

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 280

penalty experiment has failed.  It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies. The basic question—does the system accurately and consistently determine which defendants "deserve" to die?—cannot be answered in the affirmative. It is not simply that this Court has allowed vague aggravating circumstances to be employed, see, *e. g.*, *Arave* v. *Creech*, ___ U.S. ___ (1993), relevant mitigating evidence to be disregarded, see, *e. g.*, *Johnson* v. *Texas*, ___ U.S. ___ (1993), and vital judicial review to be blocked, see, *e. g.*, *Coleman* v. *Thompson*, 501 U.S. ___ (1991). The problem is that the inevitability of factual, legal, and moral error gives us a system that we know must wrongly kill some defendants, a system that fails to deliver the fair, consistent, and reliable sentences of death required by the Constitution. [Footnote omitted.]

510 U.S. at 1145-1146.

The death penalty, at least as enacted and enforced in Ohio, violates both the state and federal constitutions.  The reasons will be set forth in this Memorandum.  However, before getting to the specific constitutional issues surrounding the death penalty in Ohio, it is essential to have in place the proper analytical framework.  It is impossible to properly solve a problem—here, a constitutional law problem of the greatest magnitude—without first establishing the correct mode for analyzing the problem.

## II. *Framework for Analyzing Constitutional Questions*

### A. *Government is a Creature of Limited, Delegated Powers*

The most basic precept of our democratic republic is that our government is not one of plenary powers limited only by specifications in the Constitution; rather, the government is one of limited, derived powers.  If the power to do an act is not enunciated in the Constitution, the power does not exist.  Though fundamental, this precept has been too long overlooked.  American government is different from any other government in the world—even the English government upon which the courts so often rely for legal guidance.  In his essay, "The Bill of Rights and the Doctrine of Incorporation," reproduced in

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8220 · E-MAIL: JBJJURINDOC@AOL.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 281

Eugene Hickok, ed., *The Bill of Rights*: *Original Meaning and Current Understanding* (Charlottesville, Va.: University Press of Virginia, Copyright ©1991), Charles Rice makes this point succinctly:

> The Constitution of the United States is the *first instance in all history* of the creation of a government *possessing only limited powers*. The Magna Charta, the Petition of Right, the English Bill of Rights, and all the other previous *efforts to restrain government* had merely imposed restrictions on the *otherwise unlimited power of government*. The framers of the Constitution, however, created a new government which would possess *only the powers delegated to it*.

*Id.*, at 11. (Emphasis added.)

Those who consider this principle as nothing more than viewing the water glass as either half full or half empty must consider the ramifications of the concept of limited government. One of the most flagrant examples of how the concept of derived powers has been misapplied is the doctrine of sovereign immunity. The late law Professor Irving Younger once quipped that lawyers reason by analogy—by false analogy.[2] Sovereign immunity demonstrates that intellectually ridiculous consequences can ensue from blind adherence to English legal judgments without taking into account the fundamental nature between our form of government and the English form of government. To be sure, most American courts today hold sovereign immunity to be constitutional. In Ohio, the leading decision is the Supreme Court of Ohio's holding in *Haas v. Hayslip* (1977), 51 Ohio St.2d 135, 364 N.E.2d 1376, 5 Ohio Op.3d 110. Yet, the case was no landslide, decided by a vote of 4-3. The three dissenters in *Haas* were led by Justice William B. Brown. The dissent said there that it "is something of an anomaly that the common-law doctrine of sovereign immunity which is based on the concept that 'the king can do no wrong' [footnote omitted]

---

[2] Professor Younger's joke was that legal reasoning goes something like this: "In my left hand I hold a candle. It is cylindrical and gives light. In my right hand I hold a broomstick. It, too, is cylindrical. Therefore, a broomstick also gives light."

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 282

was ever adopted by the American courts."  In a footnote, the dissenters noted that at the:

> earliest common law the doctrine of "sovereign immunity" did not produce the harsh results it does today.  It was a rule that allowed substantial relief.  It began as the personal prerogative of the king, gained impetus from sixteenth century metaphysical concepts, may have been based on the misreading of an ancient maxim, and only rarely had the effect of completely denying compensation.  How it became in the United States the basis for a rule that the federal and state governments did not have to answer for their torts has been called "one of the mysteries of legal evolution."

*Id.*, 51 Ohio St.2d at 140 (WILLIAM B. BROWN, J., joined by CELEBREEZE and SWEENEY, J.J., dissenting).  Fourth District Court of Appeals Judge Laurence Grey summed up the preposterousness of sovereign immunity in his dissent in *Justus v. Bd. of Edn. Chesapeake Exempted Village School Dist.* (Jul. 8, 1981), Lawrence Co. App. No. 1500, 1981 Ohio App. LEXIS 13392, unreported, where he said:

> The doctrine of sovereign immunity is often expressed in the maxim: "The King can do no wrong."  It seems to me to be unrealistic to follow this principle in a country which began its existence by declaring its independence and listing all the things the king had done wrong.

*Id.*, at \*3.  Any lawyer or judge who has the will to do so can easily discover in our jurisprudence many, many of "the mysteries of legal evolution."  Most of them, it is submitted here, derive from the failure to recognize and staunchly adhere to the principle that our government has limited powers derived from the people. Some of the most devastating mysteries of legal evolution include: the doctrine of "substantive due process," the degeneration evolution of the doctrine of harmless error, and the decimation of the once "Great Writ" of habeas corpus into a legal minefield peppered with phrases such as "cause and prejudice" and "procedural default."  In his dissent in *Callins v. Collins, ante,* the late Justice Blackmun summarized the shrinking nature of federal court habeas remedies.  He said:

J. GERALD INGHAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJLFRIEND@AOL.COM

5

In recent years, I have grown increasingly skeptical that "the death penalty really can be imposed fairly and in accordance with the requirements of the Eighth Amendment," given the now limited ability of the federal courts to remedy constitutional errors. *Sawyer*, ___ U.S., at ___ (BLACKMUN, J., concurring in the judgment) (slip op. 1).

Federal courts are required by statute to entertain petitions from state prisoners who allege that they are held "in violation of the Constitution or the treaties of the United States." 28 U.S.C. §2254(a). Serious review of these claims helps to ensure that government does not secure the penalty of death by depriving a defendant of his or her constitutional rights. At the time I voted with the majority to uphold the constitutionality of the death penalty in *Gregg* v. *Georgia*, 428 U.S. 153, 227 (1976), federal courts possessed much broader authority than they do today to address claims of constitutional error on habeas review. In 1976, there were few procedural barriers to the federal judiciary's review of a State's capital sentencing scheme, or the fairness and reliability of a State's decision to impose death in a particular case. Since then, however, the Court has "erected unprecedented and unwarranted barriers" to the federal judiciary's review of the constitutional claims of capital defendants. *Sawyer*, ___ U.S., at ___ (BLACKMUN, J., concurring in the judgment) (slip op. 2). See, *e. g.*, *Herrera* v. *Collins*, *supra*; *Coleman* v. *Thompson*, 501 U.S. ___ (1991); *McCleskey* v. *Zant*, 499 U.S. ___ (1991); *Keeney* v. *Tamayo-Reyes*, ___ U.S. ___ (1992) (overruling *Townsend* v. *Sain*, 372 U.S. 293 (1963), in part); *Teague* v. *Lane*, 489 U.S. 288 (1989); *Butler* v. *McKellar*, 494 U.S. 407 (1990).

The Court's refusal last term to afford Leonel Torres Herrera an evidentiary hearing, despite his colorable showing of actual innocence, demonstrates just how far afield the Court has strayed from its statutorily and constitutionally imposed obligations. See *Herrera* v. *Collins*, *supra*. . . . The Court is unmoved by this dilemma, however; it prefers "finality" in death sentences to reliable determinations of a capital defendant's guilt. Because I no longer can state with any confidence that this Court is able to reconcile the Eighth Amendment's competing constitutional commands, or that the federal judiciary will provide meaningful oversight to the state courts as they exercise their authority to inflict the penalty of death, I believe that the death penalty, as currently administered, is unconstitutional.

*Id.* 510 U.S. at 1157-1159.

Justice Blackmun's former law clerk, Edward Lazarus, summarized what is perhaps the consummation of the judicial branch of the government engaging in "bottom line" jurisprudence, and in the process discarding the very fabric of American constitutionalism. Lazarus says that he:

came of age with an essentially idealized image of the Supreme Court, an image defined by the events of July 24, 1974. On that day, the Court ordered President Richard Nixon to turn over to the Watergate special

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURIS@DOC@AOL.COM

6

prosecutor, Leon Jaworski, a series of highly incriminating tape recordings that the president previously had withheld on the ground of "executive privilege." Although three of the participating Justices had been appointed by Nixon, the Court's judgment against the president was unanimous. [Footnote omitted.] And although releasing the tapes would brand him both a liar and a probable felon, Nixon respected the authority of the Court and complied with its ruling. Seventeen days later, he resigned. . . . Today I carry with me a very different image of the Court. It is of an institution broken into unyielding factions that have largely given up on a meaningful exchange of their respective views or, for that matter, a meaningful explication or defense of their own views. It is of *Justices who in many important cases resort to transparently deceitful and hypocritical arguments and factual distortions as they discard judicial philosophy and consistent interpretation in favor of bottom-line results.* This is a Court so badly splintered, yet so intent on lawmaking, that shifting 5-4 majorities, or even mere pluralities, rewrite whole swaths of constitutional law on the authority of a single, often idiosyncratic vote.

*See*, Edward P. Lazarus, *Closed Chambers* (New York: Random House, Copyright © 1998), 6 (emphasis added). Lazarus laments what appears these days to be an immutable truth: the judiciary in general lacks judges of the type envisioned by Alexander Hamilton in *Federalist No. 78*: "There can be but few men in the society who will have sufficient skill in the laws to qualify them for the stations of judges. And making the proper deductions for the ordinary depravity of human nature, the number must be still smaller who unite the requisite integrity with the requisite knowledge." This Mahoning County Court of Common Pleas, with all due respect, engages on occasion in such practices when it sets trial dates at arraignment in violation of its own local rules. The Court has thus far not voiced either rational or "transparently deceitful and hypocritical arguments" for doing so. It has chosen to say nothing of record, discarding its own local rules in apparent "favor of bottom-line results" that no case shall be "lost" on the grounds of speedy trial; and, without contrary explanation, reflecting what Justice Scalia complained in dissent about the Supreme Court's decision in *Atkins v. Virginia*: "Seldom has an opinion of this

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS100@AOL.COM

7

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 285

Court rested so obviously upon nothing but the personal views of its members."
*See, Atkins v. Virginia, ante*, 2002 U.S. LEXIS 4648, at *52 (SCALIA, J., joined
by REHNQUIST, Ch.J. and THOMAS, J., dissenting).

When considering the nature of American constitutionalism, one must
never forget that the significant opposition to the adoption of the Constitution
largely had to do with just how much power was to be delegated—not with
whether the government was a sovereign. *See, e.g.*, "The Address and Reasons
of Dissent of the Minority the Convention of Pennsylvania to the
Constituents (December 18, 1787), reprinted in Ralph Ketcham, ed., *The Anti-
Federalist Papers and the Constitutional Convention Debates* (New York: New
American Library, Copyright ©1986), 237-256; *see, also, generally*, Bernard
Bailyn, *The Ideological Origins of the American Revolution* (Cambridge, MA:
Harvard University Press, Copyright © 1967, 1992).   Even those who
campaigned for ratification of the Constitution saw it as a document delegating
power from the people to the government, not the other way around.
Therefore, designation of judges as "conservative", "strict constructionists",
"liberal", or those who believe in honoring "original intent" are all ineffectual
and confounding attempts to rationalize decisions made largely since about the
time of President Franklin D. Roosevelt's "Court packing" plan in 1937.[3]  These
decisions are at best difficult, and at worst impossible, to square with the
natural law constitutional theory of the Framers.   The only accurate way to

---

[3] This statement is further developed *post*.  Those who adhere to the theory that a "right"
does not exist unless the Constitution says so, are farthest from the mark.   Instead of the
Constitution's Bill of Rights being a finite list of rights of the citizenry, it was designed to put the
imprimatur on the principle that the government consisted of delegated powers, but under no
circumstances were the things listed in the bill of rights to be encroached upon by the government.
Had the so-called Anti-Federalists, like Samuel Bryan, Melancton Smith, and the anonymous "John
DeWitt," not been so vocal in their opposition to the new constitutional government designed to
supplant the Articles of Confederation, the Bill of Rights would likely not have been adopted, and
the words of Madison and Hamilton, quoted herein, would have been quickly forgotten.

interpret the Constitution is as a charter that grants limited power to the government and prefers individual liberty over governmental power. This motion is not, however, intended to be an essay in history or political science. These particulars are mentioned not because they highlight the often thoughtless and shamelessly political way that judicial decisions are frequently made today—though indeed they do—but because they provide the correct analytical framework for considering the limitations which exist on the power of government to prosecute criminal cases.

Disciples of the "textualist" or "original intent" schools of thought should espouse the analysis set forth herein, because both the federal Constitution and the Ohio Constitution make plain that the government is one of delegated powers. In truth, most of those disciples are not espousing constitutional doctrine, but instead political philosophy. The problems created for judicial determination is that these judicial "philosophies" are in reality political philosophies. Applying the model of government chosen by the Framers does not always produce a decision which comports with counsel's personal philosophy.[4] Judicial philosophies are implemented by judges who have an agenda other than the blind administration of the Constitution.[5] On the one hand, unabashedly "liberal" decisions are implementation of a philosophy, not constitutional law as the Constitution intended. By the same token, the

_____

[4] A notable example is the sweeping use of the Commerce Clause to remedy social ills such as racial discrimination. To be opposed to such enactments as a matter of constitutional law is not at all to endorse the evil the laws were designed to eradicate.

[5] If the Court or anyone else believes that counsel is being to harsh on the judiciary in pointing out these flaws, counsel calls upon none other than the late Chief Justice Warren E. Berger for defense of the tack taken here. Nine months before being named Chief Justice, Burger, then a judge on the District of Columbia Court of Appeals, addressed the Ohio Judicial Conference. Burger said:
  A court which is final and unreviewable needs more careful scrutiny than any other. Unreviewable power is the most likely to self-indulge itself and the least likely to engage in dispassionate self-analysis. . . . In a country like ours, no public institution, or the people who operate it, can be above public debate.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHISDIG@AOL.COM

9

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 287

conservatives, too, have an agenda.  It was accurately expressed by Senator Trent Lott of Mississippi when he was a Mississippi congressman: "This is our country and it's time we conservative, God-fearing, hardworking Christian people take it back." *See, Washington Post* (November 24, 1987); *and see,* Herman Schwartz, *Packing the Courts: The Conservative Campaign to Rewrite the Constitution* (New York: Charles Scribner's Sons, Copyright © 1988), 10.

Incredibly, many hold the view that the government may do any act not prohibited by the Constitution.  Unfortunately, this from time to time includes the Supreme Court of Ohio.  *See, State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668, *cert. denied, Smith v. Ohio* (1998), 523 U.S. 1125, 140 L.Ed.2d 949, 118 S.Ct. 1811, 66 USLW 3748.  There, the Court, in rebuffing challenges to the Issue One Amendments to the Ohio Constitution, said:

> Defendant also argues that due process is denied  the capital defendant because the Supreme Court of Ohio cannot consider weight-of-the-evidence arguments during the guilt phase (although defendants often argue that the Supreme Court *does* have jurisdiction to do so). Despite some admittedly conflicting case law on this issue, there is *no provision* in the Ohio Constitution or statutes that prevents this court from reviewing weight-of-the-evidence in capital cases. See Article IV of the Ohio Constitution. [Footnote omitted..]

80 Ohio St.3d at 102.  (Emphasis in original.)  There, was, with due respect, no "admittedly conflicting case law on this issue".  Before *Smith,* the Court had nearly uniformly rejected claims that it had the constitutional grant of authority to review weight-of-the-evidence claims.  *See, e.g., State v. Shoemaker* (1996), 74 Ohio St.3d 664, 660 N.E.2d 1197; *State v. Eley* (1996), 77 Ohio St.3d 174, 672 N.E.2d 640; *State v. Waddy* (1992), 63 Ohio St.3d 424, 588 N.E.2d 819; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492; *State v. Powell* (1990), 49 Ohio St.3d 255, 552 N.E.2d 191; *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895.  In a sweeping, peremptory pronouncement, the Supreme Court dismissed its claimed lack of constitutional authority to review weight of the

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2368 · Facsimile 330.758.8290 · E-mail: JBJJURISDOC@AOL.COM

10

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 288

evidence claims by holding that "[t]hose issues are now mooted by the passage of the Issue I amendments to the Ohio Constitution." *Id.* The Court ignored the fact that the Constitution gave it no power to review the claims by a complete reversal of course, announcing that "there is no provision in the Ohio Constitution or statutes *that prevents this court from reviewing weight-of-the-evidence* in capital cases." (Emphasis added.) As shown *post*, such result-oriented holdings are now standard in Ohio capital appeals. For now, it is enough to say that such a holding sets the idea of limited government on its ear.

The government is not one of plenary powers, for the Constitution explicitly says in U. S. CONST. amend. X that the government's "powers" are "delegated to the United States by the Constitution." *See*, *also*, *e.g.*, U.S. CONST. art. I, §1, which provides in part that "all legislative powers *herein granted* . . . ." (emphasis added); and, *Ex parte Quirin* (1942), 317 U.S. 1, 25, 63 S.Ct. 1, 87 L.Ed. 3 ("Congress and the President, like the courts, *possess no power not derived* from the Constitution.") (Emphasis added.) Lest we forget, "We the People" created the government, a government whose existence is suffered by the consent of the governed; and, "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others *retained by the people.*" U. S. CONST., Preamble and amend. IX.

Those who claim that if they do not see, for example, the right to privacy in the text of the Constitution, then the right does not exist, make such claims without historical or textual justification. Both the text of the Constitution and the original intent of the Framers, as clearly reflected in the Constitution and in contemporary writings, unequivocally establish that our government is limited. U. S. CONST. amend. IX provides: "The enumeration in the Constitution, of certain rights, *shall not be construed to deny or disparage others*

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610  
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURIS@GOOGLE.COM

11

*retained by the people.*"  (Emphasis added.)  U. S. CONST. amend. X provides: "*The powers not delegated to the United States by the Constitution*, nor prohibited by it to the States, *are reserved* to the States respectively, or to the people." (Emphasis added.)    OHIO CONST. art. I, §20 provides: "This enumeration of rights *shall not be construed to impair or deny others retained* by the people; and *all powers, not herein delegated, remain with the people.*" (Emphasis added.)  If these judges and scholars have found a provision of the Constitution which says that the people have only the rights listed in the Constitution and that government may do anything it wants as long as the Constitution does not prohibit the exercise of such power, they have thus far failed to identify that provision.  Their conclusions, with due respect, can have their genesis only in feigned attempts to honor the intent of the Framers while in reality espousing a political, rather than a constitutional, philosophy.[6]

The Framers envisioned a federal government of limited powers even before the Bill of Rights was ratified.  The "Constitutional Convention" was not to be any such thing, but instead a meeting of state delegates to strengthen the admittedly too-loose Articles of Confederation.  *See*, Peter H. Irons, *A People's History of the Supreme Court* (New York: Penguin Putnam, Copyright © 1999), 19, *et seq*.  James Madison, referred to as the father of the Constitution, originally proposed, rather than a separate Bill of Rights, a preamble to the Constitution asserting that "all power is originally vested in, and consequently derived from, the people."  *See*, *Annals of Congress*, vol. 1 (Washington, D.C.:

---

[6] Justice John Paul Stevens, still at over 80 the most observant member of the present Supreme Court, is dismayed at the political nature of many of the Court's decisions.  Stevens often proclaimed: "I'm the most conservative justice up here," a reference to his view that a conservative judge decides the narrow issue presented by a case and relies on precedent to do so.  Stevens is dismayed by both "liberal" and "conservative" "judicial activists," those who would bend the law to enunciate their own political principles.  *See*, David G. Savage, *Turning Right: The Making of the Rehnquist Supreme Court* (New York: John Wiley & Sons, Inc., Copyright © 1992), 64-65.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 290

Gales & Seaton, 1834), 424-49.  *See, also*, James Madison, *Federalist No. 41*:

> The Constitution proposed by the convention may be considered under two general points of view.  The first relates to the sum or quantity of power which it vests in the government, including the restraints imposed on the States. The second, to the particular structure of the government, and the distribution of this power among its several branches.  Under the first view of the subject, two important questions arise: 1. Whether any part of the *powers transferred to the general government* be unnecessary or improper?  2. Whether the entire mass of them be dangerous to the portion of jurisdiction left in the several States? Is the aggregate power of the general government greater than ought to have been *vested in it?*"

(Emphasis added.)  When James Madison rose to address the House of Representatives on June 8, 1789, he admitted that he was pressing for the adoption of a Bill of Rights because of "a great number of our constituents who are dissatisfied" with the Constitution.  Madison said that the campaign for a Bill of Rights which was entrusted to him, "though mistaken in its object, is laudable in its motive." *See*, Daniel A. Farber and Suzanna Sherry, *A History of the American Constitution*, (St. Paul, MN: West Pub. Co., Copyright © 1990), 227-231; and, Peter H. Irons, *A People's History of the Supreme Court* (New York: Viking Press, Copyright © 1999), 73.  Madison's good friend and mentor, Thomas Jefferson, did not share Madison's views about the Bill of Rights. Repeatedly, Jefferson wrote to Madison from Paris, often pressing for a Bill of Rights.  For example, in a letter to Madison dated December 20, 1787, Jefferson recognized the danger that future government officers might not acknowledge the natural rights-limited government scheme set up earlier that year in Philadelphia—and how right he was.  Jefferson wrote:

> To say, as Mr. Wilson does, that a bill of rights was not necessary, because all is reserved in the case of the general government which is not given, while in the particular ones, all is given that is not reserved, might do for the audience to which it was addressed; but it is surely a *gratis dictum*, the reverse of which might just as well be said; and it is opposed by strong inferences from the body of the instrument, as well as from the omission of the cause from our present Confederation, which had made the reservations in express terms.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: jbjjurisdoc@aol.com

13

Letter reprinted in Lloyd S. Kramer, ed., *Paine and Jefferson on Liberty* (New York: Continuum Publ. Co. Copyright © 1988), 90. The Seventh District Court of Appeals cogently described the principle of the source of, and limited nature of, government power over seventy years ago:

> What is the source of all governmental power in our state? Are the people of our state controlled and limited by the Constitution and laws of any foreign power simply because at a time when the state was without a code the courts adopted the principles and usages of the common law? Is not the only source of sovereign power in the people themselves? When our federal government was organized was it not declared that all power was inherent in the people of this nation, and that they had the exclusive right to organize a government which derived its power from their consent alone? If this is not true, what place has the Declaration of Independence in our governmental structure? This great charter has very appropriately been carried along side by side with our Constitution in our codified statutes. Our opinion is that this declaration is a part of the law of this state, as much so as its Constitution and statutes. Without its adoption and maintenance there would have been no Federal or state Constitutions.
>
> We are therefore confronted with a question of constitutional law, and it is necessary for us to consider fundamentals. In doing so we are but carrying out the mandate of the sovereign power expressed in our old state Constitution, as found in section 18, article VIII, which reads as follows:
>
> "That a frequent recurrence to the fundamental principles of civil government, is absolutely necessary to preserve the blessings of liberty."
>
> So that we feel warranted to quote from some of these ancient documents. We shall begin with the Declaration of Independence, which says:
>
> "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain inalienable rights. . . . That to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed."
>
> Section 1 of article I of the Ohio Constitution is as follows:
>
> "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property," *etc.*
>
> Section 28 of article VIII of the Ohio Constitution of 1802 is as follows:
>
> "To guard against the transgressions of the high powers, which we have delegated, we declare, that all powers not hereby delegated, remain with the people."

*See, Fidelity & Casualty Co. of New York v. Union Savings Bank Co., et al.,*

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail: jbjuhasz@aol.com

14

(1928), 29 Ohio App. 154, 156-57, 163 N.E. 221.

Ohio's Constitution is even more explicit than the federal Constitution about the fact that government is a creature of delegated powers. *See*, OHIO CONST. art. I, §20, which provides: "This enumeration of rights shall not be construed to impair or deny others *retained by the people*; and all powers, *not herein delegated, remain* with the people." (Emphasis added.) The natural law principles[7] upon which American constitutionalism is founded are self-evident in the Ohio Constitution. For example, OHIO CONST. art. I, §1 provides: "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."[8] OHIO CONST. art. I, §2 provides: "All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the General Assembly." These pronouncements are far from recent, as in the Ohio Constitution of 1851 the language was the same.

B. *Courts Have Misconstrued the Nature of Government Power*

This fundamental pillar of our government has vanished from judicial

---

[7] Perhaps the most well known advocate of natural law was the English philosopher John Locke (1632-1704), who said in his 1690 work *Concerning Civil Government* that the "natural liberty of man is to be free from any superior power on earth, and not to be under the will or legislative authority of man. . . . . The liberty of man in society is to be under no other legislative power but that established by consent in the commonwealth; nor under dominion of any will or restraint of any law, but what that legislative shall enact according to the trust put in it . . . . ." *But cf.* David Wootton, ed., *Political Writings of John Locke* (New York, Mentor/New American Library, Copyright © 1993). *See, also*, the discussion of the thought of Thomas Hobbes in Raoul Berger, *Natural Law and Judicial Review: Reflections of an Earthbound Lawyer*, 61 U. CIN. L. REV. 5 (1992).

[8] *But cf. State v. Williams* (2000), 88 Ohio St.3d 513, 523, 728 N.E.2d 342, *cert. denied sub nom. Suffecool v. Ohio* (2000), 531 U.S. 902, 121 S.Ct. 241, 148 L.Ed.2d 173, 69 USLW 3232, *post.*

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

15

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 293

opinions.  Today, courts often look at the Bill of Rights as the *granting* of certain rights to the citizens by the government—as a checklist defining a finite list of personal liberties.  To show just how skewed constitutional analysis has become since the mid 1930s, consider the famous abortion case, *Roe v. Wade* (1973), 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147.  There, both the argument and analysis were largely whether a woman had a "right" to abortion, not whether the State had the power to proscribe one.  Ironically, the opinion's author, Harry Blackmun, lived the remainder of his judicial career under the cloud of the decision, which was extensively criticized as "giving" women the right to an abortion.  No one who has read the Constitution (let alone its history) could seriously make such a claim.  The Framers did not dole out rights to people, subject to "reasonable" modification by government functionaries. Our constitutional government obtained its authority from the people, not from the government or the sovereign.  James Otis, a lawyer who argued against King George's writs of assistance, which allowed British soldiers to search the colonists' belongings in an effort to see who might be evading import taxes by smuggling whiskey or tea, described the writs as "the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book".  Otis said that the writs conferred a "power that places the liberty of every man in the hands of every petty officer."  *See*, James Bovard, *Lost Rights: The Destruction of American Liberty* (New York: St. Martin's Press, Copyright © 1994), 227.  Otis would doubtless be shocked at modern Fourth Amendment jurisprudence.

Many "strict constructionists" read the Constitution so that if a right is

J. GERALD INGHAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBLJUERIS@GMAIL.COM

16

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 294

not specified in the Bill of Rights, then it simply does not exist.[9] Rather than the government being a creature of delegated powers established in the Constitution, those who are in power in the government have come to regard the Bill of Rights as a finite and exclusive listing of human liberties. Starting with such a faulty premise can only lead to the wrong constitutional result—or as Justice Felix Frankfurter once said, where you come out on a case depends upon where you go in. *See, United States v. Rabinowitz* (1950), 339 U.S. 56, 68-69, 70 S.Ct. 430, 94 L.Ed. 653 (FRANKFURTER, J., joined by JACKSON and BLACK, J.J., dissenting), quoted *post*. Thus there are so many exceptions engrafted upon the "rights" of the citizens "granted" by the Constitution because the judiciary, with due respect, has proved true Justice Frankfurter's assertion that in "journeys in the law . . . the place you reach depends on the direction you are taking." *Rabinowitz*, 339 U.S. at 68. In his essay "Limited Government and Individual Liberty: The Ninth Amendment's Forgotten Lessons," reproduced in Eugene Hickok, *op. cit.*, 419 *et seq*, Charles J. Cooper persuasively argues that the "obscurity" of the Constitution's Ninth Amendment is:

> undeserved, however, for it expresses two of the most basic propositions of our constitutional law: that the federal government is one of delegated powers, and that the enumeration of those powers is a guarantee that the American people enjoy *unenumerated, and therefore innumerable, rights against the federal government.*
> The relationship between the rights of the people and the powers of the federal government may be unfamiliar to readers of recent Supreme Court opinions, but it was central to the framers' concept of republican government.

*Id.*, 419. (Emphasis added.) Under the natural law theories of John Locke and

---

[9] This thinking is manifested in the doctrine of "substantive due process," discussed *post*, a doctrine that appears to ignore and supplant the Ninth Amendment. Instead of saying that liberties such as freedom to marry or freedom to procreate are part of the "traditional values" protected by Due Process, the courts could simply have decided the cases the way the Framers would have: by asking where in the Constitution is the government given power to restrain these liberties.

J. GERALD INGRAM · JOHN B. JUHANZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBIJURIS@AOL.COM

17

Thomas Hobbes upon which our government is based, rights are not allotted by the government, they exist in nature.  These natural rights, Locke said, are sacrificed only to the extent that it is necessary to do so to form a society.  *See,* John Locke, *The Second Treatise of Government: An Essay Concerning the True Original*, [sic] *Extent, and End of Civil Government*, reproduced in Wootton, *op. cit.*, at 326.  To realize the accuracy of Thomas Paine's contention that time makes more converts than reason, *post*, one need consider for a moment, *e.g.*, Locke's comment on the function of the legislative branch, then compare it with the modern United States Congress or the Ohio General Assembly.  Locke said: "But because those laws which are constantly to be executed, and whose force is always to continue, may be made in a little time, therefore there is no need that the legislative should be always in being, not having always business to do." *Second Treatise, op cit.*, 335.[10]

One cannot help but wonder what Locke, Hobbes, James Otis and the Founding Fathers (Federalists and Anti-Federalists alike) would have thought of cameras detecting cars running red lights, rental car agencies using satellite tracking to detect speed violators and then "fining" their own customers, or courthouses which search without probable cause every citizen who enters.  How ironic that judges, who are to stand as the guardians of liberty between citizens on the one hand, and the executive and legislative branches of government on the other, have enshrined policies which call for citizens to be

---

[10] Paine was also remarkably accurate in predicting the current Internal Revenue Code (though he was at the time describing other governments from which America was designed to differ):

> If, from the more wretched parts of the old world, we look at those which are in an advanced stage of improvement, we still find the greedy hand of government thrusting itself into every corner and crevice of industry, and grasping the spoil of the multitude.  Invention is continually exercised, to furnish new pretenses for revenue and taxation.  It watches prosperity as its prey, and permits none to escape without tribute.

Thomas Paine, *Rights of Man*, reproduced in Kramer, ed., *Paine and Jefferson on Liberty, op. cit.*, 107.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJJUHBS@AOL.COM

18

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 296

searched without probable cause before entering the halls of justice where basic civil liberties are to be enforced.  *See, e.g.*, OHIO SUP. R. 9.[11]

Alexander Hamilton and James Madison, primary collaborators on the *Federalist Papers*, opposed a Bill of Rights as unnecessary.  The Framers believed that a Bill of Rights was not needed to protect, for example, the right of citizens to engage in free speech.  In the Framers' view, because no power to regulate speech had been *delegated* to the new constitutional government, there was no need to add a provision that Congress had no power to regulate speech.

---

[11] Rules such as these evidence the *noblesse oblige* demeanor of modern government officers, the same attitude that resulted in the decision of the Supreme Court in *Buck v. Bell* (1927), 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000.  Challenged in that case was a Virginia statute by which Carrie Buck was to be sterilized.  As put by Justice Oliver Wendell Holmes for the Court: "Carrie Buck is a feeble minded white woman who was committed to the State Colony above mentioned in due form.  She is the daughter of a feeble minded mother in the same institution, and the mother of an illegitimate feeble minded child."  Holmes and the Court upheld the statute under this legal "survival of the fittest" theory:

> We have seen more than once that the public welfare may call upon the best citizens for their lives.  It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence.  It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind.  The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes.  *Jacobson* v. *Massachusetts*, 197 U.S. 11.  Three generations of imbeciles are enough.

*Id.*, 274 U.S. at 207.  When a citizen disputes what the government says or does, many modern judges appear to cast aside quickly the merits of the dispute as some shameless fabrication to avoid responsibility.  Such judges, who often self-righteously proclaim that they have seen and heard it all before, appear more interested in expediency and their next election than the constitutional charge that they are to stand as the "intermediate body between the people and the legislature".  The true facts in *Buck v. Bell* demonstrate the danger of judges who cavalierly make decisions which are "better for all the world" at the expense of "those who already sap the strength of the State".

> Five decades [after the case was decided], a journalist who tracked down Carrie Buck and dug into old records discovered that she had been committed to Virginia's "State Colony for Epileptics and Feeble Minded" only because she had been raped by the eminent doctor who employed her as a housekeeper.  Her daughter, Emma, was a perfectly normal child, and the "eugenic expert" who recommended her sterilization was later honored by the German Nazi regime for helping draft its "Race Hygiene" law, which laid the tracks that ended in the gas chambers of Auschwitz and other death camps.  Holmes knew nothing about the scientific fallacies of the "eugenic" movement; more important, he did not feel any duty to look behind the fabricated record in the *Buck* case.  His philosophy of "judicial restraint" allowed state officials to exercise their "police powers" without any effective oversight.

*See*, Irons, *A People's History of the Supreme Court*, 252.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

19

Hamilton asked: "For why declare that things shall not be done which there is no power to do?" *See,* Alexander Hamilton, James Madison, and John Jay, *The Federalist Papers,* ed. Clinton Rossiter (New York: New American Library, Copyright ©1961), No. 84, p. 513.

The conclusion is clear: when analyzing an exercise of government power, the question to be answered is whether the action of the government exceeds its delegated powers and by definition intrudes upon constitutional liberties. In *Weems v. United States* (1910), 217 U.S. 349, 373, 30 S.Ct. 544, 54 L.Ed. 793, the Supreme Court said that:

> our contemplation cannot be only of what has been, *but of what may be.* Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value, and be *converted by precedent into impotent and lifeless formulas.* Rights declared in words might be lost in reality. And this has been recognized. The meaning and vitality of the Constitution have developed against narrow and restrictive construction.

(Emphasis added.) *Accord, Boyd v. United States* (1886), 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746, where the Court said:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.[12]

---

[12] Curiously, despite its sweeping language, *Boyd* was the exception rather than the rule when it came to pronouncements on civil liberties by the Supreme Court in the late 19th century. *Boyd* was decided just three years after the Supreme Court said in the *Civil Rights Cases* (1883), 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, that freed black men ceased to be the special favorite of the law when they were freed; and just ten years before the Court decided in *Plessy v. Ferguson* (1896), 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, that if blacks wanted to look at separate but equal as being discriminatory, that was their perspective and only their perspective of the situation.

In point of fact, the opinion in *Boyd* is best understood as containing such a sweeping statement of liberty because businessmen were involved. There, the government customs officials had seized 35 cases of glass imported by the partnership of Boyd and Sons, and so the opinion in

(continued...)

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 298

C. *The Proper Office of the Judiciary Is To Insure that the Exercise of Power Does Not Exceed the Constitutionally Delegated Authority*

These matters are called to mind because it is the province of the judiciary to stand between the citizen and a government which might act beyond its limited, delegated powers. In *Federalist No. 78*, Hamilton made clear that the courts are the "intermediate body between the people and the legislature," a role which is of paramount importance in this situation. *See* Alexander Hamilton, James Madison, John Jay, *The Federalist Papers*, ed. Clinton Rossiter (New York: New American Library, copyright ©1961), No. 78, p. 467. In that same essay, Hamilton said that the:

> complete independence of the courts of justice is peculiarly essential in a limited Constitution. . . . Limitations . . . can be preserved in practice no other way than through the medium of courts of justice, *whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void.* Without this, all the reservations of the particular rights or privileges would amount to nothing.

(Emphasis added.) Thus, in our government of delegated powers, analyzing whether the government's actions are authorized is the essential—if oft-ignored—job of the judiciary. It is impossible to properly solve a problem—here, one of constitutional law of the greatest magnitude—without first establishing the correct method of analysis. Thomas Paine said that "a long habit of not thinking a thing *wrong*, gives it a superficial appearance of being right, and raise at first a formidable outcry in defence of custom. But the tumult soon subsides. Time makes more converts than reason." Thomas Paine, *Common*

---

[12](...continued)

*Boyd* was not a message sent to the government that it must abide by the Constitution even if the target of government officers is "a killer, a rapist or other criminal," *see, Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (WHITE, J., joined by HARLAN and STEWART, J.J., dissenting), but a message sent to the government that the Constitution applies with more force to "the best citizens" than it does to those who "already sap the strength of the State". *See, Buck v. Bell, ante.* The Supreme Court earned this toast from a New York banker in 1895, just 9 years after *Boyd*: "I give you, gentlemen, the Supreme Court of the United States—guardian of the dollar, defender of private property, enemy of spoliation, sheet anchor of the Republic." Howard Zinn, *A People's History of the United States* (New York: Harper & Row, Copyright © 1980), 292.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · EMAIL JBJURINDOC@AOL.COM

21

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 299

*Sense*, Author's Introduction (New York: Barnes & Noble, copyright ©1995). (Emphasis in original.)[13] The point here is that, the facts or charges of the case aside, the role of the Court is to guard the liberty not just of the accused, but of all citizens of this State by ensuring that the government does not exceed its constitutionally delegated authority when it acts.  In *State v. Williams* (1997), 79 Ohio St.3d 1, 21, 679 N.E.2d 646, Chief Justice Thomas Moyer, joined by Justice Paul Pfeifer said in dissent:

> Williams argues that the trial court impermissibly failed to protect his right to an impartial jury from the twin evils of juror misconduct and juror bias in favor of the death penalty.  I agree.  I do so acknowledging that the transcript in this case reveals a crime as heinous and calculated as any that come before us.  This case represents a test for the criminal justice system because, if the right to an impartial jury is not protected for the worst among us, it is guaranteed to none of us.

That sentiment, perhaps more eloquently stated, was enunciated years earlier by some of the greatest justices of the United States Supreme Court to sit in the twentieth century.  Though the case was a Fourth Amendment case, the method of analyzing the constitutional principles applies to any provision of the constitution being examined.  In *United States v. Rabinowitz* (1950), 339 U.S. 56, 68-69, 70 S.Ct. 430, 94 L.Ed. 653, Justices Felix Frankfurter, Robert H. Jackson, and Hugo L. Black wrote in dissent:[14]

> The old saw that hard cases make bad law has its basis in experience.  But petty cases are even more calculated to make bad law.  The impact of a sordid little case is apt to obscure the implications of the generalization to which the case gives rise. Only thus can I account for a disregard of the history embedded in the Fourth Amendment and the great place which belongs to that Amendment in the body of our liberties as recognized and applied by unanimous decisions over a long stretch of the Court's history.

---

[13] This quote is particularly salient in light of the discussion of "substantive due process," *post*; and, it seems that Paine predicted the development of appellate decisions in Ohio in the late twentieth and early twenty-first centuries.

[14] The case was reversed in part by *Chimel v. California* (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685.

It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people. And so, while we are concerned here with a shabby defrauder, we must deal with his case in the context of what are really the great themes expressed by the Fourth Amendment. A disregard of the historic materials underlying the Amendment does not answer them.

1. It is true also of journeys in the law that the place you reach depends on the direction you are taking. And so, where one comes out on a case depends on where one goes in. It makes all the difference in the world whether one approaches the Fourth Amendment as the Court approached it in *Boyd v. United States*, 116 U.S. 616, [6 S.Ct. 524, 29 L.Ed. 746,] in *Weeks v. United States*, 232 U.S. 383, [34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177,] in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, [40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426,] in *Gouled v. United States*, 255 U.S. 298, [41 S.Ct. 261, 65 L.Ed. 647,] or one approaches is as a provision dealing with a formality. It makes all the difference in the world whether one recognizes the central fact about the Fourth Amendment, namely, that it was a safeguard against recurrence of abuses so deeply felt by the Colonies as to be one of the potent causes of the Revolution, or one thinks of it as merely a requirement for a piece or paper.

Our history has shown that some of the most important cases decided in this country came from seemingly insignificant cases. Susan Epperson was a 24 year old science teacher who thought it academically dishonest to teach science without evolution, so she agreed to file suit to challenge the Arkansas law which prohibited teaching evolution. *See, Epperson v. Arkansas* (1968), 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228; Peter H. Irons, *The Courage of Their Convictions: Sixteen Americans Who Fought Their Way to the Supreme Court* (New York: Penguin, Copyright ©1988, 1990), 207-230. Mary Beth Tinker was 13 years old when she was suspended from a Des Moines school for wearing a black armband to protest the killing of civilians and military personnel on both sides in the Vietnam War. *See, Tinker v. Des Moines Independent Community School District* (1969), 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; Irons, *The Courage of Their Convictions*, 233-252. Both Clarence Earl Gideon and Ernesto Miranda petitioned the Supreme Court from their respective prison cells. Gideon, complaining at his trial that he was entitled to counsel even if he

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · EMAIL JBJUHISON@AOL.COM

23

couldn't afford a lawyer, was sent to a Florida prison for breaking and entering into a poolroom, a charge of which he was acquitted on retrial—with counsel. Miranda confessed to raping a woman and was sent to an Arizona prison, from which he was released for a new trial—without the use of his confession which the police had taken without telling Miranda he could speak to a lawyer.

One final comment on the role of the judicial branch in deciding constitutional questions. In one of the classic opinions of the twentieth century, the late Justice Robert H. Jackson, writing for the Court in *West Virginia v. Barnette* (1943), 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674, said:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

The Ohio Supreme Court has in the past adopted language which makes plain that the courts of this State stand in the same position—though the Court itself rarely cites the case, doubtless because it would pose an intellectual barrier to the result-oriented jurisprudence which often reigns. *See, State* v. *Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342.

The judiciary, though part of the government, occupies the unique position of standing as a guardian of liberty, between "the people and the legislature."[15] Yet, there appears no other workable explanation for many decisions but to say that the entrusted role has been abandoned for the sake of political expedience. And so when courts—in what may only rationally be

---

[15] Modern decisions concerning the Commerce Clause, procedural default in capital cases, and harmless error in all criminal cases are examples of the abandonment of the role entrusted to the judiciary.

called "ends justifies means" justice—announce that the provisions of the Ohio Constitution are "precatory,"[16] the judges of those courts, with due respect, not only demonstrate an abstruse ignorance of history but also "war against the Constitution".  *See, Cooper v. Aaron* (1958), 358 U.S. 1, 18, 78 S.Ct. 1401, 3 L.Ed.2d 5, 3 L.Ed.2d 19, 79 Ohio Law Abs. 452, 79 Ohio Law Abs. 462.[17]  The

---

[16] *See, State v. Williams* (2000), 88 Ohio St.3d 513, 523, 728 N.E.2d 342, *cert. denied sub nom. Suffecool v. Ohio* (2000), 531 U.S. 902, 121 S.Ct. 241, 148 L.Ed.2d 173, 69 USLW 3232:
    "Natural law" rights, in and of themselves, are of no legal force.  Rather, it is the laws enacted by legislatures that define the rights of the individual.  As noted by the United States Supreme Court, if "the Legislature of the Union, or the Legislature of any member of the Union, shall pass a law, within the general scope of their constitutional power, the Court cannot pronounce it to be void, merely because it is, in their judgment, contrary to the principles of natural justice.  The ideas of natural justice are regulated by no fixed standard." *Calder v. Bull* (1798), 3 U.S. (3 Dall.) 386, 399, 1 L.Ed. 648, 654 (Iredell, J., concurring).  In order for a court of law to enforce any right, there must be a fixed standard to ensure equal and uniform application. *Id.*
    The language in Section 1, Article I of the Ohio Constitution, in many ways, mirrors the precatory words of the Declaration of Independence ("We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness") and in the state constitutions previously mentioned.  Similar to the language in the Declaration of Independence and other state constitutions, the language in Section 1, Article I of the Ohio Constitution is not an independent source of self- executing protections.  Rather, it is a statement of fundamental ideals upon which a limited government is created.  But it requires other provisions of the Ohio Constitution or legislative definition to give it practical effect.  This is so because its language lacks the completeness required to offer meaningful guidance for judicial enforcement.

[17] "No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it." *Id.*  The Court's swift and decisive opinion in *Cooper* reflected Chief Justice Earl Warren's heated reply to Little Rock School Board lawyer Richard Butler.  Butler had argued that because "popular editorialists" in Little Rock were saying that the Court's decision in *Brown v. Board of Education* (1954), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 ALR2d 1180, "was not the law of the land, and that there were ways to get around it" the people of Arkansas were uncertain about what the law was.  Butler had the task of arguing to the United States Supreme Court that its decisions were not the law of the land.  His final appeal to delay school integration irked the normally amiable Warren:
    *Butler*: The point I'm making is this: that if the governor of any state says that a United States Supreme Court decision is *not* the law of the land, the people of that state, until it is finally resolved, have a doubt in their mind and a right to have a doubt.
    *Warren*: I have never heard such an argument made in a court of justice before, and I've tried many a case, over many a year.  I have never heard a lawyer say that the statement of a governor, as to what was legal or illegal, should control the action of any court.
*See*, Peter H. Irons and Stephanie Guitton, ed., *May It Please the Court* (New York: The New Press, Copyright © 1993), 252-253. (Emphasis in original.)  Warren's remarks were doubtless

(continued...)

J. Gerald Ingram · John H. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: Jrjurisdoc@aol.com

25

oath of judges and lawyers to support the Constitution is omnipresent. It is in the trial courtrooms of this state and every state where the liberty proclaimed by the Founders must live on.

When analyzing an exercise of government power, the focus should not be on the "interests" of the government, but upon whether the government possesses the power at all—that is, whether the power sought to be exercised was delegated in the first instance and, even if so, whether any provision in the Constitution limits the exercise of that power.  Using, *e.g.*, the Preamble of the Constitution and the Necessary and Proper Clause can result in finding nearly anything the government wants to do as being a compelling government interest.  It is as slippery a constitutional slope, the Defendant submits, as the Commerce Clause and substantive due process decisions have become.

The United States Supreme Court has held that the Eighth Amendment does not *per se* prohibit the government from imposing death as a sentence for certain offenses. *See, Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859.  At the same time, however, the government's authority to impose death as a punishment is not *carte blanche*.  It's ability to impose death may be limited by, *e.g.*, the Equal Protection or Due Process Clauses, *see, e.g., Lockett v. Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 54 L.Ed.2d 973; *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, 60 USLW 4541; *Zant v. Stephens* (1983), 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235; by the Sixth Amendment, *see, e.g., Ring v. Arizona* (2002), __ U.S. __, 122 S.Ct. 2428, 70 USLW 4666, 2002 U.S. LEXIS 4651; or by the Cruel and Unusual Punishments Clause itself, *see, e.g., Coker v. Georgia* (1977), 433 U.S. 584, 97 S.Ct. 2861, 53

---

[17](...continued)
addressed not only to Butler but Arkansas Governor Orval Faubus, who had ordered National Guard troops to prevent black children from entering Little Rock's Central High School.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile 330.758.8290 · e-mail JBJuhasz@aol.com

26

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 304

L.Ed.2d 982, *Robinson* v. *California* (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758; and, *Atkins v. Virginia*, *ante*.   In short, there can be no presumption that because the government acted under its "police" powers, that its actions are valid.   Indeed, such faulty reasoning led to the poorly written opinion by Justice Henry Brown in *Plessy*.

The exasperation is not as much with the "time-honored presumption" that enacted legislation is "constitutional exercise of legislative power" *see, Reno v. Condon* (2000), 528 U.S. 141, 120 S.Ct. 666; 145 L.Ed.2d 587, 68 USLW 4037, 28 Media L. Rep. 1281, citing and quoting *Close v. Glenwood Cemetery* (1883), 107 U.S. 466, 475, 2 S.Ct. 267, 27 L.Ed. 408, and, *INS v. Chadha* (1983), 462 U.S. 919, 944, 103 S.Ct. 2764, 77 L.Ed.2d 317, as it is the fact that, not for the sake of constitutional integrity but political correctness, the presumption has become well-nigh irrefutable.

### D.   *Substantive Due Process: The Triumph of Judicial Power Over Reasoned Constitutional Analysis*

#### 1.

Having discussed the nature of constitutional liberties and the requirements of the judiciary to guard those liberties, candor requires the admission that the decisions of the United States Supreme Court furnish at best an unsatisfactory hodgepodge of interpretation about the nature of both personal liberty and governmental authority.   As will be shown, the courts, often through the vehicle of "substantive due process," have abandoned both the concept of limited government and the principle that the judicial branch must declare actions of the other two branches to be beyond delegated powers when that is in fact the case.   Virtually written out of existence is the Ninth Amendment.   *See*, Charles Cooper, *op. cit.*, 419.  Despite the early profession that this is a government of laws and not of men, *see, Marbury v. Madison*

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHRISDOC@AOL.COM

27

(1803), 5 U.S. (1 Cranch) 137, 2 L.Ed.60,[18] the Supreme Court, whether dominated by liberals or conservatives, activists or strict constructionists, for some time now has interpreted the Constitution not as it was originally designed.  The courts have not considered the Constitution as creating a government with limited authority carved out of the body of nearly infinite personal liberty.  Instead, the Constitution has been used as a tool for social policy, economic policy and creating an ordered society.  The resulting decisions have at times been morally laudable, and at other times seemingly more hard-hearted.  The point is that both interpretations are clearly wrong.  Again, this argument is not an exposition of the defense's personal philosophy of morality, such as the memo written on the segregation cases, *Brown* v. *Board of Education* (1954), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 ALR2d 1180, by now Chief Justice William H. Rehnquist when he was a law clerk to the late Justice Robert H. Jackson.  In that memo, Rehnquist said: "To the arguments made by [then NAACP attorney, and later Solicitor General and Justice Thurgood Marshall] that a majority may not deprive a minority of its constitutional right, the answer must be made that while this is sound in theory, *in the long run it is the majority who will determine what the constitutional rights of the minority are.*"  *See*, David G. Savage, *Turning Right: The Making of the Rehnquist Supreme Court* (New York: John Wiley & Sons, Inc., 1992), 36. (Emphasis added.)[19]

---

[18] "The government of the United States has been emphatically termed a government of laws, and not of men.  It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."  5 U.S. at 163.

[19] Nearly fifty years later, Rehnquist is still at it.  Both the late William J. Brennan and Rehnquist are credited with saying of the United States Supreme Court that "five votes can do anything around here," the equivalent of a judicial body slam.  It is scarcely a reason to have confidence in the Supreme Court's pronouncements as sound constitutional doctrine. *See*, Edward P. Lazarus, *Closed Chambers*, *op cit.*, 447.  In the 1960s and 1970s, Brennan, a play-maker in the

(continued...)

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: jbjurisdoc@aol.com

28

What is most pervasive is that even when the Court arrives at the "correct" decision, it is often with reasoning that can only be regarded as faulty in light of the history and text of the Constitution. *See, e.g., Griswold v. Connecticut* (1965), 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510; *Roe v. Wade* (1973), 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147. Where, as in the *Griswold* case, does the government have the power to intrude into the bedroom of consenting adults? *See, also, Bowers v. Hardwick* (1986), 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140, 54 USLW 4919, where the Court found a Georgia sodomy statute to be constitutional, and allowed the state to prohibit sodomy between two consenting homosexuals. GEORGIA CODE ANN. §16-6-2 (1984) provided, in pertinent part that "A person commits the offense of sodomy when he performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another. . . . [and] . . . [a] person convicted of the offense of sodomy shall be punished by imprisonment for not less than one nor more than 20 years."

The Supreme Court dodged at least two issues in the case, though it does no appear that either was brought to the Court's attention by Hardwick's (and Vice President Al Gore's) lawyer, Professor Laurence Tribe. The first issue is the Ninth Amendment question of precisely what right the government has in the bedroom of two consenting adults. *See,* the quote of James Otis, *ante*, regarding the British writs of assistance.

The second issue was the equal protection issue. Also in the case with Hardwick were John and Mary Doe, who alleged that they wished to engage in sexual activity proscribed by §16-6-2 in the privacy of their home, and that

---

[19](...continued)
Warren and even Burger Courts, had the five votes, but now it is Rehnquist's turn. Sadly, neither is a correct model for judicial decision-making.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

29

they had been "chilled and deterred" from doing so by both the existence of the statute and by Hardwick's arrest. The courts up and down the line skirted the Equal Protection issue altogether. The District Court held that because the Does had neither sustained, nor were in immediate danger of sustaining, any direct injury from the enforcement of the statute, they did not have proper standing to maintain the action![20] The Supreme Court said that the "only claim properly before the Court, therefore, is Hardwick's challenge to the Georgia statute as applied to consensual homosexual sodomy. We express no opinion on the constitutionality of the Georgia statute as applied to other acts of sodomy." 478 U.S. at 188, fn. 2. Thus, because the statute was only being enforced against homosexuals, the Court found no merit to the Does' claim, a holding that is nearly as constitutionally indefensible as the Court's reasoning, 478 U.S. at 194, that it was not "inclined to take a more expansive view of our authority to discover new fundamental rights imbedded in the Due Process Clause." Chief Justice Burger concurred with a brief opinion that exposed the underbelly of his "strict constructionist" philosophy. Burger said that "I write separately to underscore my view that in constitutional terms there is no such thing as a fundamental right to commit homosexual sodomy." *Id.*, at 196. The dissent highlighted the problem with "substantive due process": how you define the question preordains the answer. Justice Blackmun and three other dissenters said that: "I cannot agree that either the length of time a majority has held its convictions or the passions with which it defends them can withdraw legislation from this Court's scrutiny." *Id.*, at 210. The dissent chided the "Court's cramped reading of the issue before it [which] makes for a short

---

[20] This holding deserves an exclamation point, it is submitted because of the tragicomical logic. In essence, the district court said that you straight couples need not worry about the Georgia sodomy law because the government is only going to enforce it against gays and lesbians.

J. Gerald Ingham · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: JBJJURISDOC@AOL.COM

30

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 308

opinion, but it does little to make for a persuasive one." *Id.*, at 202-203.[21]

If one simply bears in mind that the Framers believed in natural law and a government of limited and delegated powers, which could not act unless authorized by the Constitution, achieving the correct constitutional result becomes much less burdensome a task. The United States Supreme Court started in that direction of constitutional interpretation and application, but it frequently turned off the path. Its decisions taken collectively today describe a government nearly the exact opposite of what was intended.

2.

In *Marbury* v. *Madison* (1803), 5 U.S. (1 Cranch) 137, 2 L.Ed.60, Chief Justice John Marshall, speaking for the Court, set forth the role of the judiciary. Marshall said that it is emphatically the province of the judicial branch to say what the law is. This holding puts the branches in the proper perspective that the Framers intended: branches of government which provide checks and balances, each against the other. Many regard this holding as controversial. Some judges and historians say that there was no such power of judicial review written into the Constitution. Yet, the Framers made clear that this was precisely the role of the courts in constitutional questions. *See, Federalist No. 78*, quoted *ante*.

As originally designed, the Constitution envisioned that the legislature would make laws and the executive would enforce those laws. Twentieth

---

[21] The late Justice Lewis F. Powell, Jr. was the deciding vote. At the April 2 conference, Chief Justice Warren Burger and Justices Byron White, William H. Rehnquist and Sandra Day O'Connor voted to uphold Georgia's law. Justices William J. Brennan, Jr., Thurgood Marshall, Harry A. Blackmun and John Paul Stevens voted to strike the law. Powell voted to join Justice White's opinion upholding the law and assuring the resurgence of substantive due process. Ironically, Powell, in the annual James Madison Lecture at New York University Law School held on October 18, 1990, said that "I think I probably made a mistake in that one." When a reporter later called Powell to confirm what he had said at the law school, Powell said: "When I had the opportunity to reread the opinions a few months later, I thought the dissent had the better of the arguments." *See,* John C. Jeffries, Jr., *Justice Lewis F. Powell, Jr.* (New York: Charles Scribner's Sons, copyright © 1994), 530.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · email: jbjjurisdoc@aol.com

31

Century political reality has skewed much of this original intent. As Thomas Paine suggested, thinking about something the wrong way for a long enough time convinces you that you are thinking about it the right way. For example, no one even raises an eyebrow when there is a news story about the President's budget bill being presented late to the Congress, as if Congress could not appropriate funds without a proposal from the President.

Since Congress and the President have only those powers delegated them under the Constitution, *see*, *Ex parte Quirin*, *ante*, the necessary check and balance on their exercise of authority must be interpretation of the Constitution by the judicial branch to tell those other branches whether the authority exercised—legislative or executive—is within the bounds of delegated authority. In doing so, opinions about a wise course of economic, social, or criminal justice policies were not to be offered. The role of the courts was not to tell the political branches what to do or what they *should* do: only what they *could not do* because not authorized by the Constitution. The attempts of modern jurisprudence to be deferential to the acts of the government's political branches have resulted in a judiciary intractably guided by plebiscite, when the Framers intended the non-political branch to act as a check on the political branches.

So rigidly did the Supreme Court treat the Constitution as a document of personal liberty that it held the government had no power to regulate or abolish slavery, because of the freedom to contract and own property. *See, Dred Scott v. Sandford* (1856), 60 U.S. 393, 19 How. 393, 15 L.Ed. 691.[22] The

---

[22] The problem with *Dred Scott* was not the *laissez faire* attitude toward ownership of property and freedom of contract, but in failing to abide by the principles of the Declaration of Independence, later embodied in the Equal Protection Clause, that all men are created equal and hence no man can own another. *Dred Scott* was arguably the first "substantive due process" decision, for it (1) gave constitutional protection to the *tradition* of owning slaves; and (2) came out
(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE (330) 726-2308 · FACSIMILE (330) 726-8290 · E-MAIL: JBJURISDOC@AOL.COM

32

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 310

Constitution was still regarded as a document of personal liberty and restraint on the exercise of governmental power—at least when it came to convicted businessmen—in 1886 when the Supreme Court decided *Boyd v. United States, ante.* Whether bad social policy resulted or not, the Court generally held to that view. *See, e.g., Slaughter-House Cases* (1872), 83 U.S. 36, 16 Wall. 36, 21 L.Ed. 394; *Plessy v. Ferguson* (1896), 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; and *Lochner v. New York* (1905), 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, 3 Am. Ann. Cas. 1133.

The Court ran into difficulty when it began to use the Due Process Clause "substantively," to decide where the government could and could not intrude. Rather than decide issues on whether the government had been delegated the power to regulate, the Court decided whether something was within an ever-growing sphere or penumbra of personal liberty. Thus, said Justice McReynolds, due process:

> denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home ad bring up children, to worship God according to the dictates of his conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*See, Meyer v. Nebraska* (1923), 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042, 29 ALR 1446. While this statement sounds like a summary of the personal freedom for which America stands, the difficulty, with due respect to Justice McReynolds, was that, as Noah Webster had noted a hundred and fifty years earlier, the panoply of personal liberties cannot be defined. Webster demonstrated the impossibility of setting forth in a "Bill of Rights" the list of all unalienable (unalienable by government) rights. He sarcastically suggested a

---

[22](...continued)
the way the Court wanted it to, the principles of constitutional analysis notwithstanding.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: jbjuridico@aol.com

33

constitutional clause "that everybody shall, in good weather, hunt on his own land, and catch fish in rivers that are public property . . . And that Congress shall never restrain any inhabitant of America from eating and drinking, at seasonable times, or prevent his lying on his left side, in a long winter's night, or even on his back, when he is fatigued by lying on his right." *See*, Katherine Drinker Bowen, *Miracle at Philadelphia: The Story of the Constitutional Convention May to September 1787* (Boston: Little, Brown & Co., Copyright ©1966, 1986), 246. What *can* be defined is the limited powers delegated to the government under the Constitution. The Court, disappointingly, has gone in the other direction, holding that wide sweeping legislative enactments are entitled to a presumption of constitutionality, then failing to strike overreaching legislation or conduct by the government even when the presumption is clearly overcome. Justice John Harlan's notion of a "continuum" of liberty was all but dismantled, though quietly, in *Michael H. v. Gerald D.* (1989), 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91, 57 USLW 4691. There the Court, in an opinion by Justice Antonin Scalia, followed the *Bowers* approach, *see*, *Bowers v. Hardwick, ante,* and framed the issue not in terms of whether a natural father had parental rights, but whether an *adulterous* father had parental rights. When the issue, thus framed, is placed against the notion that the Due Process Clause gives substantive protection to rights "so rooted in the traditions and conscience of our people as to be ranked fundamental," the way the question is asked preordains the answer. Again, the dissent, led by Justice Brennan, chided the plurality for its substantive due process approach:

> It finds this limitation in "tradition." Apparently oblivious to the fact that this concept can be as malleable and as elusive as "liberty" itself, the plurality pretends that tradition places a discernible border around the Constitution. The pretense is seductive; it would be comforting to believe that a search for "tradition" involves nothing more idiosyncratic or complicated than poring through dusty volumes on American history.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: jbjjuris@aol.com

34

*Id.*, 491 U.S. at 137.

When Franklin Roosevelt's New Deal was attempting to the correct the economic and social problems caused by the Great Depression, the Supreme Court repeatedly struck down the legislation as an unconstitutional, over-broad exercise of power by the government.  The Court's answer in *West Coast Hotel Co. v. Parrish* (1937), 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 1 LRRM 754, 108 ALR 1330, 1 Lab. Cas. ¶17,021, was just as unsatisfactory as McReynold's pronouncement in *Meyer*.  In *Parrish*, the Court's progressives noted that the Constitution "does not speak of freedom of contract" and provides the Court with no authority to act as a superlegislature to override duly enacted laws merely because those laws go against the Justices' economic biases.

Roosevelt, frustrated with the Court, came up with his famous "court-packing" plan.  After all, Roosevelt mused, there were only nine men to handle the country's most important cases.[23]  Fifteen (15) seemed to Roosevelt a better number, though he seldom mentioned that he would appoint the six new justices.  As everyone knows, Justice Roberts suddenly had a constitutional revelation.  His change in voting pattern became the "switch in time which

---

[23] It was not until the passage of the Judiciary Act of 1925 that the Court achieved the discretion it had long sought to decide which cases it should hear and which it should not.  *See,* Peter H. Irons, *A People's History of the Supreme Court*, 226.
  Roosevelt made another point in the context of the New Deal which has become a modern concern.  In the year preceding the unveiling of the "court-packing" plan, Roosevelt noted that the Court had refused to hear 695 of the 803 cases where review was sought by non-government parties.  Though many of the refusals were "doubtless warranted", Roosevelt wondered aloud whether "full justice is achieved when a court is forced by the sheer necessity of keeping up with its business to decline, without even an explanation, to hear 87 percent of the cases presented to it by private litigants?"  *See,* Peter H. Irons, *The New Deal Lawyers* (Princeton, N.J.: Princeton University Press, Copyright © 1982), 275.  In an interview for the television program *America and the Courts*, broadcast on C-SPAN on December 19, 1999, Justice Anthony Kennedy said: "There is more at stake in a criminal trial than the guilt or innocence of the defendant."  At the same time, Kennedy discussed the Court's docket, a discussion that would have had Roosevelt looking for a Supreme Court large enough to fill Jacobs Field.  Each year, Kennedy said, the Court receives about 8,000 certiorari petitions.  Of the 8,000, only 500 are even discussed at conference.  Of that 500, Kennedy claimed that 100-110 cases are accepted for review.  His numbers may be inflated as far as the Court's workload.  Chief Justice Rehnquist's campaign to cut back the Court's docket has resulted in a decline of 175 cases argued in the 1986 term to 90 in the 1996 term.  *See,* Peter H. Irons, *A People's History of the Supreme Court*, 482.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail jbjjurisdoc@aol.com

35

saved nine."[24]  The Supreme Court suddenly held that the New Deal legislation *was* a valid exercise of constitutional power by the government and not an impermissible encroachment upon the freedom to contract implicit in the Due Process Clause.  The Court repudiated its freedom of contract approach of *Lochner v. New York* in *West Coast Hotel Co. v. Parrish* (1937), 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330, 8 Ohio Op. 89.  President Roosevelt suddenly decided that the Supreme Court was not as busy as he had originally thought.  Roosevelt's court packing plan suddenly began to collect dust on the shelf, and was never heard from again.

3.

As the Court was undergoing this miraculous transformation, vastly increasing the power and authority of government—and overlooking that there was neither a historical nor textual basis for doing so—it was not broadening its interpretation of the personal liberties which the Constitution held immune from government encroachment.  It certainly was not reading the Constitution as a delegation of power to the government and a charter of expansive personal liberty.  Thus, in cases such as *Betts* v. *Brady* (1942), 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595, the Court held that the assistance of counsel specified in the Sixth Amendment was not a basic component Fourteenth Amendment's Due Process Clause, and thus did not "incorporate" into state criminal

---

[24] Professor Irons makes a detailed analysis of the records and concludes that the "switch in time" is a myth.  Irons bases his claim on the fact that Roberts had voted in a conference in December of 1936 to uphold the Washington statute in issue, several months before President Roosevelt announced his court-packing plan on February 5, 1937.  The vote, and the opinion on the case was delayed by the illness of Justice Harlan Fiske Stone, the lone appointment to the Supreme Court bench of President Calvin Coolidge.  Thus, argues Professor Irons, the "switch in time" was no such thing because Roberts had voted before FDR unveiled his plan.  With all due respect to Professor Irons, FDR seems the type of shrewd politician who might have privately telegraphed his proposal before the public announcement.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBIJURISDOC@AOL.COM

36

prosecutions the assistance of counsel in criminal prosecutions.[25]  The Court said that Betts had a fair trial even though he had no lawyer, an approach that even the conservative John Harlan agreed with putting to rest in *Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 79, 29 L.Ed.2d 799.  The Constitution did not act as a limitation on government power in other areas as well, said the Court during this period.  Thus, the Court said that the government could require school children to salute the flag without violating the First Amendment, even if to do so violated the child's religion.  *See, Minersville School District v. Gobitis* (1940), 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375, 17 Ohio Op. 417, 127 ALR 1493.  *Gobitis* is one of the Court's dark moments, like *Dred Scott* and *Plessy*, for it unleashed a wave of attacks upon Jehovah's Witnesses across the country.  Within weeks of the decision, the Justice Department had received reports of hundreds of attacks on Witnesses, many assisted by government officers.  The most horrifying attack was when a Jehovah's Witness in Nebraska was kidnaped, beaten, and castrated by vigilantes.  *See*, Peter H. Irons, *A People's History of the Supreme Court*, 341; Peter H. Irons, *The Courage of Their Convictions,* 23.  This embarrassing chapter in the Court's history providentially was brief.  *See, West Virginia v. Barnette, ante.*

Roosevelt's Court Packing plan put an end—but only temporarily—to the reign of "substantive due process."  Although some thought that the New Deal

---

[25] As everyone knows, that rule was later reversed in *Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 79, 29 L.Ed.2d 799, and *Argersinger v. Hamlin* (1972), 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d. 530, but the Supreme Court never adopted Justice Hugo Black's "Total Incorporation" theory; *i.e.,* the idea that each constitutional liberty spelled out in the Federal Bill of Rights was a fundamental right implicit in due process and therefore applicable to the states. *See, e.g., Twining v. New Jersey* (1908), 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97, *Palko v. Connecticut* (1937), 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288, and *Adamson v. California* (1947), 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903. *See, also,* Bryan H. Wildenthal, *The Lost Compromise: Reassessing the Early Understanding in Court and Congress on Incorporation of the Bill of Rights in the Fourteenth Amendment*, 61 OHIO ST. L.J. 1051 (2000).

J. GERALD INGRAM · JOHN H. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JHJRUSH8@AOL.COM

37

and the resulting "switch in time" had killed substantive due process, a new strain of the virus has caught life, as seen in *Bowers* and *Michael H.*

The resulting hodgepodge has been inexplicable except to say that the cases come out the way the justices want them to, and they then work backwards and try to justify the result with constitutional text, precedent, or sometimes even less, such as "tradition." Pervasive until recently was an excessive deference to the legislative and executive branches of government as those branches used the government first to cure social evils. Thus, in *Heart of Atlanta Motel, Inc. v. United States* (1964), 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed. 258, 1 Empl. Prac. Dec. ¶9712, the Supreme Court upheld Congress' power to use the constitutional grant of authority to regulate interstate commerce as a tool to remedy racial discrimination in private accommodations. There is no question but that racial discrimination is morally wrong. Also beyond question is that the Constitution bans racial discrimination by the government. The constitutional question in *Heart of Atlanta Motel* was whether Congress could use its power to regulate interstate commerce to remedy discrimination by *private* establishments.[26] The result in *Heart of*

---

[26] The hotel's lawyer, Moreton Rolleston, asserted in oral argument before the Supreme Court: "The fundamental question, . . . I submit, is whether or not Congress has the power to take away the liberty of an individual to run his business as he sees fit . . . because if Congress can exercise these controls over the rights of individuals, *it is plausible that there is no limit to Congress' power to appropriate private property and liberty.*" Oral arguments before the Supreme Court, held October 5, 1964, reproduced in Peter H. Irons and Stephanie Guitton, ed., *May It Please the Court* (New York: The New Press, Copyright © 1993). (Emphasis added.)

Rolleston's argument was rejected, and his prediction of the Commerce Clause run amok became reality. The Supreme Court has recently begun to realize the Frankenstein's monster it created. *See, e.g., United States v. Lopez* (1995), 514 U.S. 549, 15 S.Ct. 1624, 131 L.Ed.2d 626 (holding the Gun-Free School Zone's Act, codified in 18 U.S.C. §922(q), was an enactment which exceeded Congress' power to regulate commerce); *Jones v. United States* (2000), 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902, 68 USLW 4422 (reversing an arson conviction under 18 U.S.C. §844(i) because the house that the defendant burned was not "property used in" an activity which affects interstate commerce); and *United States v. Morrison* (2000), 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658, 68 USLW 4351, 82 Fair Empl.Prac.Cas. (BNA) 1313, 144 Ed. Law Rep. 28, 2000 Daily Journal D.A.R. 5061 (holding that the Commerce Clause did not provide Congress with the authority to enact a civil remedy Violence Against Women Act, because the Act involved no

(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

38

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 316

*Atlanta Motel*, undeniably desirable as a matter of social policy, is questionable as a constitutional doctrine. Although the Court's opinion treats the issue as a no-brainer, in reality the Court scarcely considered the issues of constitutional power. The case was argued October 5, 1964 and decided just weeks later on December 14, 1964. While the opinion allows Congress to use it Commerce Clause power to prohibit racial discrimination, the Court failed to address in any meaningful way, *inter alia*, Due Process issues of "taking" under U.S. CONST. amend. V.

The *Heart of Atlanta Motel* case went beyond government action and reached private action. An equally socially and morally desirable result—though certainly more explainable in terms of constitutional theory—was *Loving v. Virginia* (1967), 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010, a case that declared unconstitutional Virginia's anti-miscegenation statutes under the Equal Protection Clause. The *Loving* result is more easily explained in terms of the constitutional theory asserted here because the anti-miscegenation statutes involved state action. If all persons are, under the Equal Protection Clause, to be treated equally, Virginia could not *as a matter of state action* prohibit Richard Loving, a white man, from marrying Mildred Jeter, a woman of mixed blood. The right to marry and procreate are natural rights,[27] and limitations on those rights by the government must be narrowly

---

[26](...continued)
regulation of an activity that substantially affected interstate commerce.)

[27] The analysis of *Bowers v. Hardwick, ante,* and *Michael H. v. Gerald D., ante,* however, would define the issue in terms of whether there was a fundamental right to *interracial* marriage. The framing of the question determines the result, a fundamental flaw with the "substantive due process" analysis. Edward Lazarus makes a compelling argument that all of this legal falderal is a concerted effort by the Court's conservatives to overrule *Roe v. Wade. See,* Edward P. Lazarus, *Closed Chambers,* op. cit., 373-424. *See, also generally,* Herman Schwartz, *Packing the Courts: The Conservative Campaign to Rewrite the Constitution;* and David G. Savage, *Turning Right: The Making of the Rehnquist Supreme Court.*

(continued...)

J. GERALD INGRAM · JOHN H. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE (330) 758-2308 · FACSIMILE (330) 758-8290 · E-MAIL: JHJURISDOC@AOL.COM

39

circumscribed, if permitted at all for the "common welfare." State action is circumscribed by the Equal Protection Clause: any law the government makes must apply to all citizens equally.

The Supreme Court refused to extend application of the Due Process Clause to negligence by government officials in *DeShaney v. Winnebago County Department of Human Services* (1989), 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249, 57 USLW 4218. *DeShaney* is a case whose facts invited a social policy decision, but the Court declined. Melody and Randy DeShaney were divorced and Randy received custody of their child, young Joshua DeShaney. Despite several visits, apparently based on complaints and reports, by Children Service/Family Protection caseworkers, nothing was ever done. Finally, young Joshua DeShaney was beaten so badly that he ended up in the hospital. He suffered permanent damage and will be institutionalized for the rest of his life. Randy DeShaney went to prison for the beatings. Melody DeShaney filed suit against the Winnebago County Department of Human Services. Her lawyer attempted to craft an "exquisitely narrow" right under the Due Process Clause

---

[27](...continued)

The Rehnquist Court's jurisprudence is often the epitome of a statement Rehnquist once made to another justice who was, in Rehnquist's view, struggling too long over an opinion: "Don't bother so much with the reasoning; it will only trip you up." Lazarus, *op. cit.*, 424. That notion is, with all due respect, evident in the Ohio Supreme Court's recent *per curiam* opinion in *State v. Carter* (2000), 89 Ohio St.3d 593, 734 N.E.2d 345. There the Court held that theft is not a lesser included offense of aggravated robbery. Without question, the facts in *Carter* were disturbing: Carter stabbed his grandmother eighteen times, then either anally raped her or masturbated on her, depending on the prosecution's or the defense's view of the evidence. The Supreme Court of Ohio turned the law of lesser included offenses on its ear, utilizing the following "reasoning:"

> The issue becomes whether aggravated robbery, as statutorily defined above, can ever be committed without theft, as statutorily defined above, also being committed. We answer that question in the affirmative because aggravated robbery can be committed in the course of an "attempted theft." R.C. 2913.02; 2923.02. Theft requires the accused to actually obtain or exert control over the property or services of another; attempted theft does not. Since theft is not a lesser-included offense of aggravated robbery, the trial court did not err by not providing a lesser-including-offense instruction.

With due respect, it appears that the Court did not want the reasoning to trip it up, and overlooked the language of the aggravated robbery statute, which the Court itself had earlier quoted: "No person, *in attempting or committing a theft offense*, as defined in section 2913.01 of the Revised Code . . . ." (Emphasis added.) *See*, OHIO REV. CODE ANN. §2911.01.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@CGAL.COM

40

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 318

to establish liability on the part of the government claiming that every citizen has a right to life guaranteed by the Constitution. During the oral argument, Chief Justice Rehnquist did not hide his skepticism. Melody DeShaney argued that the child protection workers and Randy DeShaney were "enmeshed," and, because of that, there was liability on the part of the government. Joshua, the argument ran, had been denied due process of law by the failure of the social workers to act. Rehnquist pointed out the language of the Fourteenth Amendment's Due Process Clause related only to government action.[28] Melody DeShaney lost the case, and the Court's opinion reflected Rehnquist's doubts. DeShaney probably achieved the right constitutional result, though it may sound hard-hearted to say so.[29]

---

[28] During oral argument, Rehnquist had asked Melody DeShaney's lawyer, Donald Sullivan, if he derived his "enmeshment" theory from the Due Process Clause, and pointed out that the Due Process Clause governs only state action.

    *Sullivan:* We do suggest that there is one, and only one, exquisitely narrow circumstance where there is an affirmative duty. I would suggest that there are two primary elements to the one and only one circumstance for which we argue.

    The first is the existence of a child-parent relationship. The other is what I term "enmeshment," intricate intimacy, enmeshment of the agents of the state in a particular circumstance which would have three characteristics: the first, an extreme danger to a particular individual child; the second, abundant actual knowledge on the part of he agents of the state; and the third, and actual undertaking by the state to protect the child.

    *Rehnquist:* You derive all this from the language of the Due Process Clause?

    *Sullivan:* . . . The Court has additionally recognized, I believe, that a child—indeed, any of us—has a constitutionally protected right to physical integrity, to bodily protection. What I'm suggesting . . .

    *Rehnquist:* A right against the state.

    *Sullivan:* And a right that arises out of the Constitution to remain alive, yes, sir.

    *Rehnquist:* Well, but it's protected only against the state. It's not protected against private individuals.

    *Sullivan:* Well, I think that's part of what the Court's going to have to address in this case.

    *Rehnquist:* Well, why don't we start with the language of the Fourteenth Amendment, which says that a state shall not—what does it say—deprive any person of life, liberty, or property without due process of law.

Transcript of oral arguments, portions of which are reproduced in Peter H. Irons and Stephanie Guitton, ed., *May It Please the Court* (New York: The New Press, Copyright © 1993), 41-42.

[29] It seems clear the Melody DeShaney should have the right to sue the government under

(continued...)

---

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURIS800@AOL.COM

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 319

At the same time that the Court was properly declaring that government is not the source of salvation for all tragedies or social problems, the Court paradoxically was retreating from the idea that the Constitution was a document whose premise was personal liberty. The Framers intended that citizens have broad personal liberties (natural rights) circumscribed only by the powers of government delegated by the citizenry to the government. The modern Supreme Court has chosen what its conservative majority considers the best of both worlds. In general, its decisions view government as one of limited social powers, broad police powers, and citizens have only such rights as are spelled out in the Constitution.[30] Thus, the Court has said that the government may prosecute a citizen for the same criminal acts in both the federal and state jurisdictions;[31] the government may carry out the death penalty even when it is demonstrated that the penalty is much more likely to be implied when the victim of the crime is white than black;[32] conviction-prone juries are a necessary evil to securing capital convictions and imposing the death sentence;[33] mentally

---

[29](...continued)
a negligence theory without invoking a Due Process right to remain alive—but for, of course, the doctrine of sovereign immunity. Whether the doctrine of sovereign immunity has valid constitutional underpinnings is questionable. The idea, derived from England and European experiences that one may sue the sovereign only when the sovereign consents to be sued, has little rational connection to the natural law theories which form the foundation of American government, and even less connection to the pronouncements of OHIO CONST. art. I, §§1 and 20.

[30] This interpretation, it is submitted, amounts to judicial repeal of the Ninth Amendment, which provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

[31] *Heath v. Alabama* (1985), 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387, 54 USLW 4016.

[32] *McCleskey v. Kemp* (1987), 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262, 55 USLW 4537.

[33] *Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137, 54 USLW 4449.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

42

retarded and incompetent defendants may be executed;[34] and, states may regulate the conduct of two consenting adults in the privacy of their bedroom.[35]

4.

The dangers of regarding the power of the legislative and executive branches as demarcated by some rational connection between a constitutional grant of authority and the action of the government is perhaps nowhere more evidence than in the infinite use the government has made of the Commerce Clause. Although the United States Supreme Court for some time gave Congress a free reign over its exercise of the Commerce Clause power, the Court has begun to recognize that Congress, in its effort to provide legislation that will ensure that all good things are done to all good people, has run amuck in terms of finding things that impact upon interstate commerce. The Court's reluctance was no doubt guided at least in part by the general predisposition of American judges to presume legislative enactments to be constitutional and the desire to avoid being perceived as a super-legislature.

U.S. CONST. Art. I, § 8, cl. 3 delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The Supreme Court's first effort to define the nature of that delegated power was in *Gibbons v. Ogden (1824)*, 9 Wheat. 1, 189-190, 6 L.Ed. 23 (1824), where the Court said that commerce was more than traffic: "it is intercourse." Gibbons said, however, that the power to regulate commerce is not the power to regulate matters which "does not extend to or affect other

---

[34] *Penry v. Lynaugh* (1989), 492 U. S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256, 57 USLW 4958, *but see, Atkins v. Virginia, ante.*

[35] *Bowers v. Hardwick* (1986), 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140, 54 USLW 4919. Substantive due process analysis is nothing more than a reflection of the personal beliefs of a majority of the justices as to whether a right is traditional and fundamental. The result is the hodgepodge of cases described herein.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

43

States.  Such a power would be inconvenient, and is certainly unnecessary." *Id.*, at 194.

Most Commerce Clause decisions for the next hundred years or so usually dealt with the Commerce Clause as a limit on state legislation that impaired interstate commerce.[36]  However, the Court did hold that the Commerce Clause permitted regulation of intrastate commerce where the interstate and intrastate aspects of commerce were so commingled as to be inseparable.  *See, Shreveport Rate Cases* (1914), 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341.

In *A.L.A. Schechter Poultry Corp. v. United States* (1935), 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, the Supreme Court struck down wage and hour regulations that applied to employees of an intrastate business because the activity being regulated related to interstate commerce only indirectly.  In doing so, the Court said that the Commerce Clause permits regulation of activities that affected interstate commerce directly, but that activities that affected interstate commerce indirectly were beyond Congress' reach.  *Id.* at 546.  Otherwise, said the Court, "there would be virtually no limit to the federal power and for all practical purposes we should have a completely centralized government." *Id.* at 548.  The conduct of the United States government over the past twenty years would have us believe that we do indeed have a centralized federal criminal prosecution authority.   The United States government has *e.g.,* used the RICO and Hobbs Acts, to make federal crimes out of events which are purely local matters.

---

[36] *See, e.g., Veazie v. Moor* (1853), 14 How. 568, 14 L.Ed. 545, which upheld a state-created steamboat monopoly because it involved regulation of only internal commerce; *Kidd v. Pearson* (1888), 128 U.S. 1, 9 S.Ct. 6, 32 L .Ed. 346, which upheld a state ban on the manufacture of intoxicating liquor (because the Commerce Clause "does not comprehend the purely internal domestic commerce of a State which is carried on between man and man within a State or between different parts of the same State.")

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: jbjuribsdoc@aol.com

44

In *NLRB v. Jones & Laughlin Steel Corp.* (1937), 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, the Supreme Court, in upholding the National Labor Relations Act against a Commerce Clause challenge, departed from the "direct" versus "indirect" effects on interstate commerce. The Court said that intrastate activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions" are within Congress' power to regulate. *Id.*, at 37.[37]

By the time the Court decided *Wickard v. Filburn* (1942), 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122, which upheld the application of amendments to the Agricultural Adjustment Act of 1938 to the production and consumption of homegrown wheat, gone were the earlier distinctions between direct and indirect effects on interstate commerce.

> [E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as "direct" or "indirect."

*Id.*, at 125. Congress, buoyed by the Supreme Court's nearly *carte blanche* endorsement of almost any use of the Commerce Clause power, enacted far-reaching legislation. Until recently, the most the Court did to determine whether Congress had gone too far with its Commerce Clause power—thereby

---

[37] Congress' spreading of its Commerce Clause wings, which has culminated (thus far) in the Gun-Free School Zones Act and Violence Against Women Act, both discussed *post*, was encouraged by the holding in *United States v. Darby* (1941), 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, where the Court upheld the Fair Labor Standards Act, stating: that the "power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." *Id.* at 118.

Then, in *United States v. Wrightwood Dairy Co.* (1942), 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726, the Court said that the Commerce Clause Power "extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power".

J. Gerald Ingram · John H. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile 330.758.8280 · Email: Jhjurisdoc@aol.com

45

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 323

threatening to obliterate our dual government in favor of one national government—was to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce. *See, e.g., Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.* (1981), 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1; *accord, Perez v. United States* (1971), 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686; *Katzenbach v. McClung* (1964), 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290; and, *Heart of Atlanta Motel, Inc. v. United States, ante.*

The test is now, as the Court held in *United States v. Lopez* (1995), 514 U.S. 549, 15 S.Ct. 1624, 131 L.Ed.2d 626, 63 ULSW 4343, whether the regulated activity "substantially affects" interstate commerce. In *Lopez*, the Supreme Court held the Gun-Free School Zone's Act, codified in 18 U.S.C. §922(q), was an enactment which exceeded Congress' power to regulate commerce. In doing so, the Court found that "neither the actors nor their conduct was a commercial character." 514 U.S. at 577-580. The *Lopez* Curt found that Congress may properly regulate, under the Commerce Clause power, in three general areas. First, the Court said that Congress has the power under the Commerce Clause to "regulate the channels of interstate commerce." 541 U.S., at 558, citing *United States v. Darby* (1941), 312 U.S. 100, 114, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430. Second, the Court said that Congress can "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may only come from intrastate activities." *Id.* Finally, Congress is permitted under the Commerce Clause to regulate activities which substantially affect interstate commerce. 514 U.S., at 559. The Court in *Lopez* said that "where economic activity substantially affects interstate commerce, legislation

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: jbjuhisn@cs.aol.com

46

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 324

regulating that activity will be sustained."  514 U.S., at 560.[38]

In deciding that the Gun-Free School Zone's Act exceeded the delegation of authority to Congress under the Commerce Clause, the Supreme Court in *Lopez* held that the statute had nothing to do with commerce and had nothing to do with any other type of economic activity.  The Court also found that the statute had "no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce."  514 U.S. at 561.

In *Jones v. United States* (2000), 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902, 68 USLW 4422, the Supreme Court reversed an arson conviction under 18 U.S.C. §844(i) because the house that the defendant burned was not "property used in" an activity which affects interstate commerce.  In that case, the government convicted the defendant much as the government has done in many federal convictions over the last number of years: by showing only the most tenuous connection to interstate commerce.[39]  In *Jones,* the government argued that the house burned by the defendant "affects" interstate commerce because the home was mortgaged and the mortgage company engaged in interstate commerce, and because the home received natural gas which moved through interstate commerce.  In the *Jones* case, the Supreme Court did not

---

[38]  The Court endorsed some of its earlier holdings—some of which are challenged by the premise urged here—that the Commerce Clause is properly used to regulate intrastate coal mining, *Hodel v. Virginia Surface Mining &Reclamation Association Assn., Inc.* (1981), 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1, 16 ERC 1027, 11 Envtl. L. Rep. ¶20,569; intrastate extortionate credit transactions, *Perez v. United States* (1971), 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686; restaurants utilizing substantial interstate supplies, *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290, 1 Empl. Prac. Dec. ¶9713 (1964); inns and hotels which cater to interstate guests, *Heart of Atlanta Motel, Inc. v. United States* (1964), 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed. 258, 1 Empl. Prac. Dec. ¶9712; and production and consumption of homegrown wheat, *Wickard v. Filburn* (1942), 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122.

[39]  Indeed, the government's theory in many of these cases, unfortunately often supported by the courts, is much like the popular game where any person in the world can be connected through no more than six steps to movie actor Kevin Bacon.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL  JBJURISDOC@AOL.COM

47

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 325

expand upon the rule of *Lopez*, choosing instead to reverse the conviction on narrow grounds.  The Court in *Jones* distinguished the fire in that case to the fire that burned a rental home in *Russell v. United States* (1985), 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829, 53 USLW 4652.  The Court's theory is that the rental home destroyed by fire in *Russell* did affect an activity involving interstate commerce, whereas the residential home in *Jones* did not affect interstate commerce.

In *United States v. Morrison* (2000), 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658, 68 USLW 4351, 82 Fair Empl.Prac.Cas. (BNA) 1313, 144 Ed. Law Rep. 28, 2000 Daily Journal D.A.R. 5061, a university student sued her alleged rapist under the Violence Against Women Act.  A constitutional challenge to the Act was before the Court.

In analyzing the matter, the Court began with the premise which has been urged here, and quoted Chief Justice Marshall in *Marbury v. Madison*, *ante.*

> Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution.  "The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written." *Marbury v. Madison*, 1 Cranch 137, 176, 2 L.Ed. 60 (1803).

The Court held that the Commerce Clause did not provide Congress with the authority to enact this civil remedy because it involved no regulation of an activity that substantially affected interstate commerce.  The *Morrison* opinion drew heavily upon *Lopez*.  The court in *Morrison* concluded that the gender-motivated crimes are in no way an economic activity.  The Court also noted that if it allows the Violence Against Women Act, which creates a civil remedy based solely on the violent crimes' attenuated affects on interstate commerce, then it would be allowing:

> Congress to regulate any crime whose nationwide, aggregated impact has

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHASZDOC@AOL.COM

48

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 326

> substantial effects on employment, production, transit, or consumption. Moreover, such reasoning would not limit Congress to regulating violence, but may be applied to family law and other areas of state regulation since the aggregate effect of marriage, divorce, and child rearing on the national economy is undoubtedly significant.
>
> Congress therefore may not regulate non-economic, violent criminal conduct based solely on the conduct's aggregate effect on interstate commerce.

529 U.S. at 615-616.

### E.  *"New Federalism"*

#### 1.

The power and authority of the judiciary come from respect, not from force of arms.  People in general obey judicial decisions because they respect the authority of a court, which intellectually and without passion decides the questions presented to it.  Much of a the judiciary's influence comes from the perceived reasoning power of the opinions issued.  But the foregoing discussion has shown that such reasoning is often abandoned, resulting in an inexplicable medley of decisions.  Unable to rely upon forceful and cogent reasoning from the federal courts, states have begun to turn to their own constitutions again. The states had long ignored their Constitutions when the United States Supreme Court was making what many called "activist" decisions.  In candor, it must be said that much of this was sheer intellectual lethargy.  Most states were unwilling to explore the meanings of their own constitutions when the federal courts had so much to say about the United States Constitution.  The "new federalism" was urged on the states by Justice Brennan, who late in his career found himself in the minority more often than not.  *See, e.g., Michigan v. Mosley* (1975), 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (BRENNAN, J., joined by MARSHALL, J., dissenting); *see, also*, generally, Savage, *Turning Right: The Making of the Rehnquist Supreme Court, op. cit.*  Many states courts, including to a very limited extent, Ohio, have dabbled in "new federalism." State courts,

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJUHASZ@GMAIL.COM

49

often with overt expression of dissatisfaction about the interpretation of the federal constitution, have chosen to interpret state constitutional provisions more in favor of personal liberty than the United States Supreme Court in analogous situations. *See, generally*, Robert Utter, *State Constitutional Law, the United States Supreme Court, and Democratic Accountability*, 64 WASH. L. REV. 19 (1989). As an example, more than a half dozen states have rejected the "good faith" exception to the Fourth Amendment exclusionary rule embodied in *United States v. Leon* (1984), 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677, 52 USLW5155. *See*, *State v. Novembrino* (N.J. 1987), 519 A.2d 820; *State v. Carter* (N.C. 1988), 370 S.E.2d 553; *Commonwealth v. Edmunds* (Pa. 1991), 586 A.2d 887. States have also rejected the rules laid down in *Michigan Dep't. Of State Police v. Sitz* (1990), 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412, 58 USLW 4781 and *Moran v. Burbine* (1986), 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410, 54 USLW 4265. *See, e.g., People v. Houston* (Cal. 1986), 724 P.2d 1166; *State v. Stoddard* (Conn. 1988), 537 A.2d 446; *Haliburton v. State* (Fla. 1987), 514 So.2d 1088.

2.

The United States Supreme Court has said that the federal Constitution establishes a minimum level of protection of personal liberty, *see*, Oregon v. Hass (1975), 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570, a statement that itself sullies the fundamental nature of our constitutional government in general and the Ninth Amendment in particular. At any rate, the thinking is that states, interpreting their own constitutions under the "new federalism," are free to interpret those constitutions to declare that their citizens enjoy greater liberties and hence the government enjoys less power than declared in cases interpreting the federal Constitution. *See, Cooper v. California* (1967), 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURIDIS@AOL.COM

50

Though the Ohio Supreme Court has dipped its toe in the pool of Ohio constitutional law, the Court steadfastly has refused to venture into "new federalism" in capital cases—its contrary claims notwithstanding.  While the Court has acknowledged that the Ohio Constitution is a document of independent force, *see*, *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163, the Court has persistently refused to treat the Ohio Constitution in capital cases as anything other than the red-headed stepchild of the United States Constitution.  One of the most recent attempts to ask the Court to square the death penalty with the Ohio Constitution was flatly if not rationally rejected.  *See*, *State v. Carter* (2000), 89 Ohio St.3d 593, 734 N.E.2d 345:

> Carter argues that this court has never analyzed the death penalty statute under the Ohio Constitution. However, in *State v. Jenkins* (1984), 15 Ohio St.3d 164, 179, 15 OBR 311, 324, 473 N.E.2d 264, 281, we specifically held that "Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution *or any provision of the Ohio Constitution*." (Emphasis added.)

89 Ohio St.3d at 607.  The *Jenkins* language is reproduced in the Appendix.  It is placed there so that this Court can see for itself what the Supreme Court said in *Jenkins* about the Ohio Constitution.  The Ohio Supreme Court seems to be saying that when it says the death penalty does not violate "any provision of the Ohio Constitution" it is the type of in-depth constitutional analysis demanded by a capital case.  *See*, *generally*, *Gardner* v. *Florida* (1979), 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393; *Burger* v. *Kemp* (1987), 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638, 55 USLW 5131.  This type of makeshift constitutional "analysis" calls to mind a quote of the late Justice Lewis F. Powell, Jr. upon seeing Chief Justice Warren Burger's first draft of an opinion in the Detroit school busing case, *Milliken v. Bradley* (1977), 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745: "If an associate in my firm had done this, I'd fire

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: jbjuhasz@aol.com

51

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 329

him." *See*, Bob Woodward and Scott Armstrong, *The Brethren* (New York: Simon & Schuster, Copyright © 1979), 335; and John C. Jeffries, Jr., *Justice Lewis F. Powell, Jr.* (New York: Charles Scribner's Sons, Copyright © 1994), 387.

The United States Supreme Court will not tamper with the result of a state court decision provided that decision is based on independent state grounds and not on an interpretation of the federal Constitution. *See, Michigan v. Long* (1983), 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201, 51 USLW 5231.

3.

The Ohio Supreme Court's use of the state constitutions has been limited. In *State v. Brown* (1992), 63 Ohio St.3d 349, 352, 588 N.E.2d 113, the Court held that a police officer may not "conduct a detailed search of an automobile solely because he has arrested one of its occupants, on any charge." The Court in *Brown* noted that state constitutions may impose greater restraints on police conduct than does the federal Constitution. *Id.* at 352. Indeed, many are of the opinion that *Brown* "overruled" for purposes of Ohio criminal prosecutions *New York v. Belton* (1981), 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768. *Belton* held that when a police officer makes an arrest he may search "as a contemporaneous incident of that arrest," the passenger compartment of the car.

*Brown* involved interpretation of OHIO CONST. art. I, 14. *State v. Storch* (1993), 66 Ohio St.3d 280, 612 N.E.2d 305, 61 USLW 2795, involved interpretation of OHIO CONST. art. I, §10, Ohio's "confrontation" provision. The Court, in holding that the Ohio Constitution does afford greater cross examination rights than the federal constitution, noted:

Our decision here does not represent the first time we have

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

52

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 330

compared the provisions of the Ohio Constitution to analogous Amendments to the United States Constitution. Indeed, last year in *State v. Brown* (1992), 63 Ohio St.3d 349, 588 N.E.2d 113, we compared the protection afforded by Section 14, Article I of the Ohio Constitution with the protection provided by the Fourth Amendment to the United States Constitution as construed by the United States Supreme Court in *New York v. Belton* (1981), 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768. We found the right to be free from unreasonable search and seizure guaranteed by the Ohio Constitution to be greater than that guaranteed by the Fourth Amendment, even though the words of the two provisions are very similar.

We note the requirement clearly set forth in Section 10, Article I, that an accused "meet the witnesses face to face."

*Id.*, at 292.

In *State ex Rel. Pizza, v. Rezcallah* (1998), 84 Ohio St.3d 116, 702 N.E.2d 81, the Court held "as a separate and independent basis for our decision that the mandatory closure-order provision of R.C. 3767.06(A) is unconstitutional" that the law as to innocent owners violated OHIO CONST. art. I, §19, which provides that "private property shall ever be held inviolate, but subservient to the public welfare."

The Ohio Supreme Court has not interpreted OHIO CONST. art. I, §1 in light of contemporary criminal prosecutions, but that lapse should not and does not preclude the Court from doing so here. Indeed the Court should do so, and breathe life into Ohio's Constitution so that it is no longer the afterthought that it has been all these years in Ohio appellate decisions. *See, generally*, Mary Cornelia Porter and G. Alan Tarr, *The New Judicial Federalism and the Ohio Supreme Court: Anatomy of a Failure*, 45 OHIO ST.L.J. 143 (1984).

### Constitutional Analysis Of Ohio's Death Penalty Law

II. *Due Process of Law, Equal Protection of the Law,
and Cruel and Unusual Punishment.*

The enjoyment of life is an "inalienable," natural one, secured from government encroachment by the Ohio Constitution. *See*, OHIO CONST., art. I,

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJUICED@GCAOL.COM

53

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 331

§1. The right is one which exists in natural law, and the Ohio Constitution is a document which specifies that every citizen is immune from government encroachment upon such natural rights. *See, e.g.*, Pollack, *Natural Rights: Conflict and Consequence*, 27 OHIO ST.L.J. 559 (Fall 1966); Kahn, *Interpretation and Authority in State Constitutionalism*, 106 HARV. L.REV. 1147 (1992); Brennan, *State Constitutions and the Protection of Individual Rights*, 90 HARV. L.REV. 489 (1977). Before the government can take a life by legislative mandate, the government must demonstrate that such a drastic action is the least restrictive means to further a legitimate objective of a limited government. *Gregg* v. *Georgia*, *ante*; *Commonwealth* v. *O'Neal* (1975), 367 Mass. 440, 327 N.E.2d 662, 668.[40]  *But see, Atkins* v. *Virginia*, *ante* (SCALIA, J., dissenting).[41]

---

[40] Under both the state and federal constitutions, the Defendant submits that there is no such thing as a compelling governmental end. Government exists not for its own purposes, and not to enjoy or exercise any rights or interests. Government exists rather for the limited purposes of serving the citizenry which formed it: "for their equal protection and benefit." OHIO CONST. art. I, §2.

[41] Justice Scalia apparently subscribes to the theory that because the original Constitution contemplated the imposition of the death penalty, there are no limits on the power of the government to impose and implement it. Dissenting in *Atkins*, he said:
> Today's opinion adds one more to the long list of substantive and procedural requirements impeding imposition of the death penalty imposed under this Court's assumed power to invent a death-is-different jurisprudence. None of those requirements existed when the Eighth Amendment was adopted, and some of them were not even supported by current moral consensus. They include prohibition of the death penalty for "ordinary" murder, *Godfrey*, 446 U.S., at 433, for rape of an adult woman, *Coker*, 433 U.S., at 592, and for felony murder absent a showing that the defendant possessed a sufficiently culpable state of mind, *Enmund*, 458 U.S., at 801; prohibition of the death penalty for any person under the age of 16 at the time of the crime, *Thompson*, 487 U.S., at 838 (plurality opinion); prohibition of the death penalty as the mandatory punishment for any crime, *Woodson* v. *North Carolina*, 428 U.S. 280, 305, 49 L.Ed. 2d 944, 96 S.Ct. 2978 (1976) (plurality opinion), *Sumner* v. *Shuman*, 483 U.S. 66, 77, 97 L.Ed. 2d 56, 107 S.Ct. 2716-78 (1987); a requirement that the sentencer not be given unguided discretion, *Furman* v. *Georgia*, 408 U.S. 238 (1972) (*per curiam*), a requirement that the sentencer be empowered to take into account all mitigating circumstances, *Lockett* v. *Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion), *Eddings* v. *Oklahoma*, *supra*, at 110; and a requirement that the accused receive a judicial evaluation of his claim of insanity before the sentence can be executed, *Ford*, 477 U.S., at 410-411 (plurality opinion). There is something to be said for popular abolition of the death penalty; there is nothing to be said for its incremental abolition by this Court.

(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURIS DOS@AOL.COM

54

The societal interests most commonly espoused as justifications for capital punishment are: (1) deterrence of capital crimes; (2) retribution;[42] and (3) incapacitation of and elimination of dangerous criminals, thereby preventing them from committing further crimes.[43]  However, in the recent case of *Atkins v. Virginia*, the Court's opinion recognized only the first two as valid reasons for capital punishment.

A. *Deterrence and Incapacitation.*

1. Deterrence

Despite considerable research, there is no substantial evidence that the death penalty is a deterrent superior in effect to any other form of lesser punishment.  Studies reveal that executions have no discernible negative effect on homicide rates.  *See*, Cochran, Chanmlin and Seth, *Deterrence or Brutalization? An Impact Assessment of Oklahoma's Return to Capital Punishment*, 32 CRIMINOLOGY 107 (1994); Verhovek, "With Practice, Texas is the Execution Leader," *New York Times*, Sunday, September 5, 1993, at 6E; Tabak and Lane, *The Execution of Injustice: A Cost and Lack-of-Benefit Analysis of the Death Penalty*, 23 LOYOLA L.A.L.REV. 59, 114-125 (1989); *see also*, Bailey and Peterson, *Murder, Capital Punishment and Deterrence: A Review of the Evidence and an Examination of Police Killings*, 50 JOURNAL OF SOCIAL ISSUES 53, 57 (1994).  In many cases, the "threat of death has little or no deterrent effect." *Gregg* v. *Georgia*, *ante*, 428 U.S. at 185.  *See, also*, OHIO

---

[41](...continued)
*Id.*, 2002 U.S. LEXIS 4648, at *77-*79.

[42] *Gregg v. Georgia, ante*, at 183.  In *Gregg*, the Court did not decide whether capital punishment is in fact the least restrictive means for achieving those purported societal interests. *Id.*, at 184.

[43] *See, e.g.*, *People v. Anderson* (1972), 6 Cal.3d 628, 493 P.2d 880, *cert den.* (1972), 406 U.S. 958.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE (330) 758-2308 · FACSIMILE (330) 758-8290 · E-MAIL: JBJURISDOC@AOL.COM

55

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 333

LEGISL. SERV. COMM'N., *Capital Punishment* (1961); and Bailey, *The Deterrent Effect of the Death Penalty for Murder in Ohio: A Time-series Analysis*, 28 CLEVE. ST.L.REV. 51 (1979). If the death penalty were a deterrent to capital crimes, Texas, Virginia, and Florida should not have any capital crimes being committed. *See,* Table 1, Number of Executions by State Since 1976, *post*. Indeed, at the rate executions were carried out in the 2000 election year under the administration of then Texas governor (and now President) George W. Bush, if the death penalty were truly a deterrent to capital crimes the streets of Texas would be cleaner than the air in Texas. Texas, which has executed 274 people since 1976, 40 in 2000 alone, still has the second largest death row in the United States—presently 457, up from 448 as of October of 2000. With a total of 731 death sentences in Texas alone since *Gregg/Jurek* in 1976, only the most myopic cannot see that the death penalty has no deterrent effect; or, if it does, the criminals in Texas are apparently too feeble-minded to get the message.

John Sorenson, Robert Wrinkle, Victoria Brewer, and James Marquart examined executions in Texas between the years 1984 and 1997. The authors speculated that if a deterrent effect were to exist, it would be found in Texas because of the high number of death sentences and executions there. Considering factors such as patterns in executions across the study period, and the relatively steady rate of murders in Texas, the authors found no evidence of a deterrent effect. They also found that the number of executions was unrelated to murder rates in general. *See,* 45 *Crime and Delinquency* 481-93 (1999).

In 1995, New York reinstated the death penalty, making it the 38th state to do so. *See,* James Dao, "Pataki and State Leaders Agree on Details of a Plan to Restore Death Penalty," *New York Times*, Feb. 16, 1995, at A1. Critics were

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

56

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 334

concerned that the financial cost to the state would be unbearable. Governor George Pataki refused to obtain a financial analysis, confidently predicting that "capital punishment would actually reduce state spending on prisons by deterring crime." *Id.* Pataki said: "I think we could amend the budget to reduce the number of cells we have because I think this will reduce crime." *Id.*

This type of argument, though common, has no factually supported. During the "Progressive Era", of the late 1800's and early 1900's, ten states,[44] abolished the death penalty. *See*, John E. Galliher, *et al.*, *Abolition and Reinstatement of Capital Punishment During the Progressive Era and Early 20th Century*, 83 J. CRIM. L. & CRIMINOLOGY 538, 541 (1992). Later efforts to reinstate capital punishment in Oregon, Washington, Missouri, Arizona and South Dakota revived at least partly because in each state a convicted murderer publicly acknowledged that he might not have committed the crime if the death penalty had been in existence. *Id.*, at 574; *see, also*, Thomas J. Walsh, *On the Abolition of Man: a Discussion of the Moral and Legal Issues Surrounding the Death Penalty*, 44 CLEV. ST. L. REV. 23 (1996).

There is no evidence to establish any correlation between the availability of the death penalty and a decrease in crime. *See*, Michael D. Hintze, *Attacking the Death Penalty: Toward a Renewed Strategy Twenty Years After* Furman, 24 COLUM. HUM. RTS. L. REV. 395, 406 (1992- 93). A comparison of the homicide rates in states which have the death penalty and states which do not demonstrates that capital punishment is not a deterrent. New York, which had no death penalty law until 1995, and California, which has had the death penalty, both had high homicide rates. In Maine there is no death penalty, and

---

[44] The states were: Colorado (1897), Kansas (1907), Minnesota (1911), Washington (1913), Oregon (1914), South Dakota (1915), North Dakota (1915), Tennessee (1915), Arizona (1916), and Missouri (1917).

J. GERALD INGHAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJUHASZ@GMAIL.COM

57

the State has a low homicide rate, but then so does New Hampshire, which has the death penalty. These statistics obviously suggest that factors other than the availability of the death penalty contribute to crime levels.

The late Justice Byron R. White found the death penalty unconstitutional in *Furman* because it was not used often enough—almost a direct contrast to the late Justice Potter Stewart's conclusion that the death penalty was cruel and unusual in the way that being struck by lightning is cruel and unusual because it was applied freakishly and without predictability. Justice White claimed that "common sense and experience tell us that seldom-enforced laws become ineffective measures for controlling human conduct and that the death penalty, unless imposed with sufficient frequency, will make little contribution to deterring those crimes for which it may be exacted." *Furman*, 408 U.S. at 312. Since Justice White's concurrence, many have argued that the infrequency and arbitrariness with which the death penalty is imposed denigrates the deterrent value because no criminal is ever able to rationally conclude that "if I commit this murder, then I get the death penalty."

With all due respect, the people who write these things have not represented persons accused of capital crimes. The "cold calculus that precedes the decision" of a capital murder, *see*, *Gregg v. Georgia* (1976), 428 U.S. 153, 186, 96 S.Ct. 2909, 49 L.Ed.2d 859, is seen more often in a TV movie than in a real live capital case. Many capital defendants lack the intelligence to think their way out of a game of checkers. Let alone determine in advance which murders are capital and which are not. Others have deep-seated and oft undiagnosed and untreated mental or emotional problems. These people are not Frank Morris and the Anglin brothers, planning and executing an escape from Alcatraz. Though these are exceptions, capital defendants generally do not contemplate the crime, then weigh against it the risk of apprehension or the

J. GERALD INGHAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 / FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@GMAIL.COM

58

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 336

death penalty, and to say otherwise is, as the Supreme Court once said in another context, "blinking reality." *See, Turner v. Louisiana* (1965), 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424. Many courts in reviewing these cases are understandably shocked at the conduct of the defendant. That reaction, while understandable, has no place in dispassionate constitutional analysis. To say that capital punishment acts as a deterrent because of its effect on "cold calculus that precedes the decision" is out of touch with reality.

Because the death penalty has no deterrent effect, it does not promote the general welfare or the public safety any more than does a term of imprisonment. The deterrence of crime is factually inadequate to overcome the presumption in favor of life and against death as a punishment.

Table 1 - NUMBER OF EXECUTIONS BY STATE SINCE 1976

(Updated as of the executions in Texas of Robert Coulson on June 25 and Jeffrey Williams on June 26, 2002)

| State | Total since *Gregg* | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| Texas | 274 | 18 | 17 | 40 | 35 |
| Virginia | 86 | 3 | 2 | 8 | 14 |
| Missouri | 57 | 4 | 7 | 5 | 9 |
| Florida | 51 | 0 | 1 | 6 | 1 |
| Oklahoma | 50 | 2 | 18 | 11 | 6 |
| Georgia | 29 | 2 | 4 | 0 | 0 |
| Louisiana | 27 | 1 | 0 | 1 | 1 |
| South Carolina | 26 | 1 | 0 | 1 | 4 |
| Arkansas | 24 | 0 | 1 | 2 | 4 |
| Alabama | 24 | 1 | 0 | 4 | 2 |
| Arizona | 22 | 0 | 0 | 3 | 7 |

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

59

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 337

| State | Total since *Gregg* | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| North Carolina | 21 | 0 | 5 | 1 | 4 |
| Delaware | 13 | 0 | 2 | 1 | 2 |
| Illinois | 12 | 0 | 0 | 0 | 1 |
| California | 10 | 1 | 1 | 1 | 2 |
| Nevada | 9 | 0 | 1 | 0 | 1 |
| Indiana | 9 | 0 | 2 | 0 | 1 |
| Utah | 6 | 0 | 0 | 0 | 1 |
| Mississippi | 4 | 0 | 0 | 0 | 0 |
| Ohio | 4 | 2 | 1 | 0 | 1 |
| Washington | 4 | 0 | 1 | 0 | 0 |
| Maryland | 3 | 0 | 0 | 0 | 0 |
| Nebraska | 3 | 0 | 0 | 0 | 0 |
| Pennsylvania | 3 | 0 | 0 | 0 | 1 |
| Kentucky | 2 | 0 | 0 | 0 | 1 |
| Montana | 2 | 0 | 0 | 0 | 0 |
| Oregon | 2 | 0 | 0 | 0 | 0 |
| Colorado | 1 | 0 | 0 | 0 | 0 |
| Idaho | 1 | 0 | 0 | 0 | 0 |
| New Mexico | 1 | 0 | 1 | 0 | 0 |
| Tennessee | 1 | 0 | 0 | 0 | 0 |
| Wyoming | 1 | 0 | 0 | 0 | 0 |

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: jbjuridisco@aol.com

60

Table 2- HOMICIDE RATES FOR STATES
Murder Rates per 100,000
Sources: FBI Uniform Crime Reports
Death Penalty Information Center, www.deathpenaltyinfo.org

| Death penalty (Y/N) | State | 1999 | 1998 | 1997 | 1996 | 1995 |
|---|---|---|---|---|---|---|
| Y | Louisiana | 10.7 | 12.8 | 15.7 | 17.5 | 17 |
| Y | New Mexico | 9.8 | 10.9 | 7.7 | 11.5 | 8.8 |
| Y | Nevada | 9.1 | 9.7 | 11.2 | 13.7 | 10.7 |
| Y | Maryland | 9 | 10 | 9.9 | 11.6 | 11.8 |
| N | Alaska | 8.6 | 6.7 | 8.9 | 7.4 | 9.1 |
| Y | Arizona | 8 | 8.1 | 8.2 | 8.5 | 10.4 |
| Y | Alabama | 7.9 | 8.1 | 9.9 | 10.4 | 11.2 |
| Y | Illinois | 7.7 | 8.4 | 9.2 | 10 | 10.3 |
| Y | Mississippi | 7.7 | 11.4 | 13.1 | 11.1 | 12.9 |
| Y | Georgia | 7.5 | 8.1 | 7..5 | 9.5 | 10 |
| Y | North Carolina | 7.2 | 8.1 | 8.3 | 8.5 | 9.4 |
| Y | Tennessee | 7.1 | 8.5 | 9.5 | 9.5 | 10.6 |
| N | Michigan | 7 | 7.3 | 7.8 | 7.5 | 8.5 |
| Y | Oklahoma | 6.9 | 6.1 | 6.9 | 6.8 | 12.2 |
| Y | Missouri | 6.6 | 7.3 | 7.9 | 8.1 | 8.8 |
| Y | Indiana | 6.6 | 7.7 | 7.3 | 7.2 | 8.0 |
| Y | South Carolina | 6.6 | 8 | 8.4 | 9 | 7.9 |
| Y | Texas | 6.1 | 6.8 | 6.8 | 7.7 | 9 |
| Y | Kansas | 6 | 5.9 | 6 | 6.6 | 6.2 |
| Y | California | 6 | 6.6 | 8 | 9.1 | 11.2 |

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHJ@AOL.COM

61

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 339

| Death penalty (Y/N) | State | 1999 | 1998 | 1997 | 1996 | 1995 |
|---|---|---|---|---|---|---|
| Y | Virginia | 5.7 | 6.2 | 7.2 | 7.5 | 7.6 |
| Y | Florida | 5.7 | 6.5 | 6.9 | 7.5 | 7.3 |
| Y | Arkansas | 5.6 | 8 | 9.9 | 8.7 | 10.4 |
| Y | Kentucky | 5.4 | 4.6 | 5.8 | 5.9 | 7.2 |
| Y | Pennsylvania | 4.9 | 5.3 | 5.9 | 5.7 | 6.3 |
| Y | Colorado | 4.6 | 4.6 | 4 | 4.7 | 5.8 |
| N | West Virginia | 4.4 | 4.3 | 4.1 | 3.8 | 4.9 |
| N | Hawaii | 3.7 | 2 | 4 | 3.4 | 4.7 |
| N | Rhode Island | 3.6 | 2.4 | 2.5 | 2.5 | 3.3 |
| Y | Nebraska | 3.6 | 3.1 | 3 | 2.9 | 2.9 |
| Y | Ohio | 3.5 | 4 | 4.7 | 4.8 | 5.4 |
| Y | New Jersey | 3.5 | 4 | 4.2 | 4.2 | 5.1 |
| N | Wisconsin | 3.4 | 3.6 | 4 | 4.2 | 5.1 |
| Y | Connecticut | 3.3 | 4.1 | 3.8 | 4.8 | 4.6 |
| Y | Delaware | 3.2 | 2.8 | 2.5 | 4.3 | 3.5 |
| Y | Washington | 3 | 3.9 | 4.3 | 4.6 | 5.1 |
| N | Vermont | 2.9 | 2.6 | 1.5 | 1.9 | 2.2 |
| N | Minnesota | 2.8 | 2.6 | 2.8 | 3.6 | 3.9 |
| Y | Oregon | 2.7 | 3.8 | 2.9 | 4 | 4.1 |
| Y | Montana | 2.6 | 4.1 | 4.8 | 3.9 | 3 |
| Y | South Dakota | 2.5 | 1.4 | 1.4 | 1.2 | 1.8 |
| Y | Wyoming | 2.3 | 4.8 | 3.5 | 3.3 | 2.1 |
| N | Maine | 2.2 | 2 | 2 | 2 | 2 |
| Y | Utah | 2.1 | 3.1 | 2.4 | 3.2 | 3.9 |

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail: JBJ4TRIN@AOL.COM

62

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 340

| Death penalty (Y/N) | State | 1999 | 1998 | 1997 | 1996 | 1995 |
|---|---|---|---|---|---|---|
| N | Massachusetts | 2 | 2 | 1.9 | 2.6 | 3.6 |
| Y | Idaho | 2 | 2.9 | 3.2 | 3.6 | 4.1 |
| N | North Dakota | 1.6 | 1.1 | 0.9 | 2.2 | 0.9 |
| Y | New Hampshire | 1.5 | 1.5 | 1.4 | 1.7 | 1.8 |

*Gregg* v. *Georgia, ante*, 428 U.S. at 153, identified "retribution and deterrence of capital crimes by prospective offenders" as the social purposes served by the death penalty.  Unless the imposition of the death penalty "measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment."  In *Atkins v. Virginia, ante*, Justice John Paul Stevens wrote for the Court: "Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." The Court in *Atkins* in essence said that the death penalty cannot be imposed

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: jbjurisdoc@aol.com

63

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 341



on mentally retarded capital defendants because the imposition of the death penalty on a mentally retarded person does not "measurably contribute[ ] to one or both of the[ ] goals, [of deterrence or retribution and] 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment."

Here, the tables show that states with high execution rates do not have the lowest homicide rates.  If the death penalty were a deterrent to capital crimes, Texas would have the lowest homicide rates.  Yet, its homicide rates per 100,000 residents ranged between 6.1 and 9 for the years shown.[45]  Conversely, some states without the death penalty have some of the lowest homicide rates.  Examples include North Dakota, Massachusetts, Maine, Vermont, and Minnesota.  Because there is no clear evidence that capital punishment deters capital crimes, the death penalty does not measurably contribute to deterrence. Its imposition, therefore, constitutes nothing more than the purposeless and needless imposition of pain and suffering, and violates U. S. CONST. amend. VIII

---

[45] In the Table above, the rates were converted to homcides per million for graphical presentation purposes.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · EMAIL: JBJUHASZ@AOL.COM

64

and XIV and OHIO CONST. art. I, §9.

### 2. Incapacitation of Offenders

The death penalty is not the least restrictive means for incapacitation and elimination of offenders.  Ohio has recognized as much by adopting, effective July 1, 1996, a provision for life imprisonment without parole.  *See*, OHIO REV. CODE ANN. §2929.03(D).  Incapacitation can be achieved by incarceration, which is certainly a less destructive, less restrictive, less final, and more humane method of punishment and the expression of societal outrage than is execution.  There is no need for the government to kill people, particularly when shocking and compelling evidence has demonstrated what those in government cannot believe but what those outside of government accept as a truism: the government does not always get it right.  The recent history of Illinois' death row is evidence enough that the death penalty should yield to life imprisonment.

### B. *Retribution.*

The Supreme Court's most recent comments on retribution—"the interest in seeing that the offender gets his 'just deserts'—the severity of the appropriate punishment necessarily depends on the culpability of the offender" are again in *Atkins v. Virginia, ante.*  The Court said:

> Since *Gregg,* our jurisprudence has consistently confined the imposition of the death penalty to a narrow category of the most serious crimes.  For example, in *Godfrey* v. *Georgia,* 446 U.S. 420 [100 S.Ct. 1759, 64 L.Ed. 2d 398] (1980), we set aside a death sentence because the petitioner's crimes did not reflect "a consciousness materially more 'depraved' than that of any person guilty of murder." *Id.,* at 433.  If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution. Thus, pursuant to our narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally retarded is appropriate.

*Id.,* at *27-*28.

J. GERALD INGRAM · JOHN H. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JHJURISDOC@AOL.COM

65

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 343

The language of *Gregg* notwithstanding, it is questionable whether retribution was ever a "compelling state interest" to justify capital punishment. Even those who have argued in favor of the death penalty acknowledge the words of Jefferson, quoted *ante*, that "laws and institutions must go hand in hand with the progress of the human mind. As that becomes more developed, more enlightened, as new discoveries are made, new truths discovered and manners and opinions change, with the change of circumstances, institutions must advance also to keep pace with the times." Arguing as *amici* and urging that the death penalty be upheld in *Gregg*, then United States Solicitor General Robert H. Bork, in response to a question from Justice Potter Stewart, acknowledged the evolving standards concept of *Trop* v. *Dulles*, *ante*:

> *Stewart*: What if a state said for the most heinous kind of first-degree murder we are going to inflict breaking a man on the wheel and then disemboweling him while he is still alive and then burning him up: What would you say to that?
> *Bork*: I would say that that practice is so out of step with modern morality and modern jurisprudence that the state cannot return to it. That kind of torture was precisely what the framers thought they were outlawing when they wrote the cruel and unusual punishments clause.

Partial transcript of oral arguments reprinted in Peter H. Irons and Stephanie Guitton, ed., *May It Please the Court*, 234.

Applying that evolving standards concept, acknowledged by Bork, and embodied in *Trop v. Dulles* and *Atkins v. Virginia*, it is obvious that life without parole ("LWOP") is being adopted by more and more legislatures, including Ohio. Table 4 shows the discernible trend in the six years from 1996 to 2002.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

66

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 344

Table 4—Comparison of States Which Have LWOP Option, 1996-2002

| 2002 | 1996 | |
|---|---|---|
| Alabama | Alabama | |
| Arizona | | x |
| Arkansas | Arkansas | |
| California | California | |
| Colorado | Colorado | |
| Connecticut | Connecticut | |
| Delaware | Delaware | |
| Florida | | x |
| Georgia | | x |
| Idaho | Idaho | |
| Illinois | Illinois | |
| Indiana | | x |
| Kentucky | | x |
| | Louisiana | |
| Maryland | Maryland | |
| Mississippi | | x |
| Missouri | Missouri | |
| Montana | Montana | |
| Nebraska | Nebraska | |
| Nevada | Nevada | |
| New Hampshire | New Hampshire | |
| New Jersey | | x |
| New York | | x |

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: jbjuhasz@aol.com

67

| 2002 | 1996 | |
|------|------|---|
| North Carolina | | x |
| Ohio | | x |
| Oklahoma | Oklahoma | |
| Oregon | Oregon | |
| Pennsylvania | Pennsylvania | |
| South Carolina | | x |
| South Dakota | South Dakota | |
| Tennessee | | x |
| Utah | Utah | |
| Virginia | | x |
| Washington | Washington | |
| Wyoming | Wyoming | 13 |

Employing the barometer used by the Supreme Court in *Coker* and *Atkins*, the death penalty is "unusual" because it is outmoded as a penalty. In just six (6) years, thirteen states have added the LWOP option. Moreover, in Ohio, Reginald Wilkinson, Director of the Ohio Department of Rehabilitation and Corrections, said in an interview published in the Cleveland *Plain Dealer* on August 21, 2001, that sentences in capital cases in Ohio are shifting from death to life without parole. Only 4% of defendants were sentenced to death in Ohio in 2000, the lowest percentage since records have been kept. The same year, 27% of those convicted of aggravated murder were sentenced to life without parole, the highest number ever. These numbers show a dramatic shift from 1998, when sentences for life and death were nearly even. Wilkinson said, "Usually we've been up in the double digits with 15, sometimes 17 [death sentences] a year. Now the numbers are way down." It will be demonstrated

in a separate filing that appellate review in Ohio is more form than substance. Included in that argument will be a demonstration that Ohio appellate courts have abandoned their statutorily assigned task of conducting a proportionality review. For present purposes, all that need be said is that: (1) the evolving standards, demonstrated by the trend of state legislatures, is to implement life imprisonment without parole, *see* Table 4; and (2) death is disproportionate because death is not generally being imposed for a certain type of offense, to-wit: aggravated murder with specifications, *see, e.g.*, *Coker v. Georgia* (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982.

The government has never produced compelling evidence that a penalty less severe than execution would not equally satisfy the public's desire for punishment.

Ross Byrd, son of James Byrd, the black man who was dragged to death in Texas in 1998, initially supported a death sentence for John W. "Bill" King, who was sentenced to death for Byrd's murder. However, the younger Byrd said that when he realized King had exhausted his appeals, he began thinking, "How can this [execution] help me solve my pain?" When Byrd realized it could not, he joined a vigil at Huntsville prison to oppose the execution, reported to *Houston Chronicle* on July 4, 2002. Indeed, the recent trend towards imposing LWOP rather than death shows that such compelling evidence, if it ever existed, has vanished. Until recently, in States like Florida and Arizona, where—unlike Ohio—a judge may override the jury's verdict for a life sentence and impose death, judges regularly do so. Thus, at least in Florida, it seems that the public's desire for punishment is often satisfied by a life sentence, but hanging judges would have none of it. *But see, Ring v. Arizona, ante.* There, in an opinion for the Court by Justice Ruth Bader Ginsburg, the Court held:

For the reasons stated, we hold that *Walton* [v. Arizona (1990),

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · Email: Jbjuhesq@aol.com

69

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 347

497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511, (1990)] and *Apprendi* [v. *New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435] are irreconcilable; our Sixth Amendment jurisprudence cannot be home to both. Accordingly, we overrule *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. See 497 U.S., at 647-649. Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," *Apprendi*, 530 U.S., at 494, n. 19, the Sixth Amendment requires that they be found by a jury.

.    .    . "The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. . . . If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it." *Duncan* v. *Louisiana,* 391 U.S. 145, 155, 20 L.Ed. 2d 491, 88 S.Ct. 1444, 45 Ohio Op.2d 198-156 (1968).

*Id.*, at \*44-\*45. The *Washington Post* reported on July 9, 2002 that Florida has stayed 2 executions to consider whether its scheme is unconstitutional under *Ring*. This mounting evidence shows that the government cannot meet its burden of demonstrating that it has chosen the least restrictive means to accomplish the "acceptable" goals of deterrence and retribution. The life without parole option makes clear that there are less restrictive, equally effective methods of satisfying the need for punishment. Because the death penalty is "more severe than is necessary to serve the legitimate interest of the State" it violates the Cruel and Unusual Punishment Clause. *See*, *Furman v. Georgia*, ante, 408 U.S., at 359-360, fn. 141 (MARSHALL, J., concurring); *see, also*, *Atkins v. Virginia, ante*; U.S. CONST. amend. VIII and XIV; OHIO CONST., art. I, §9.

## C. *Discrimination*

The death penalty is so fraught with discrimination its imposition violates the equal protection provisions of both the state and federal constitutions. *See*, U.S. CONST. amend. V and XIV; OHIO CONST. art. I, §2. The Ohio law is patterned after the laws of other jurisdictions which have been

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJFURIND@GXOL.COM

70

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 348

studied.  The studies prove that capital punishment has been applied in a racially discriminatory manner as to both the race of the victim and the defendant.  *See*, Bowers and Pierce, *Arbitrariness and Discrimination: Post-Furman Capital Statutes*, CRIME AND DELINQUENCY (October 1980), 563, 594-95; Greenberg, *Capital Punishment as a System* (1982), 91 YALE L.J. 908; and Baldus, Pulaski, & Woodworth, *Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience*, 74 J.CRIM.L. & C. 661 [the famous Baldus study examined but rejected in *McCleskey v. Kemp* (1987), 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262, 55 USLW 4537].  Such arbitrariness and discrimination persists under the Ohio framework which gives even greater discretion in sentencing to the trier of fact.  While blacks are less than twenty percent (20%) of Ohio's population, over half the present death row inmates in Ohio are black.  *Id*. As of 1998, only five white inmates were on death row for killing blacks, three of those also involving a white victim.  At the same time, 45 blacks were on death row for killing whites, one of those also for killing a black.  *See*, Table 5, *post*, the table demonstrating death penalty proportionality statistics in Ohio.  Ohio, like Georgia (as found in the Baldus study), has a clearly pronounced sentencing trend.  The trend is something Justice Powell and the other members of the majority refused to address in *McCleskey, ante*.  It is like the retarded child of the prosperous plantation owner in the Old South: everyone knows about it, but everyone refuses to acknowledge or discuss it.  In Ohio, like Georgia, the life of a white victim is worth much more than are the life of a black victim, for killers of whites, whatever their race, are far more likely to receive the death sentence than killers of blacks.  Ohio's statistical disparity in sentencing, when viewed by the factors of race of the defendant and race of the victim, is consistent with national trends.  In a 1990 General Accounting Office (GAO) Study, the GAO

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@GMAIL.COM

71



**Table 5 – Race of Ohio DR Inmates**

Native American - 2
Latino - 2
Other - 4
White - 95
Black - 101

found "a strong race of victim influence was found at all stages of the criminal process", and also found that the evidence was stronger at the earlier stages involving prosecutorial discretion in charging and trying cases. "Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities," U.S. General Accounting Office, Report to Senate and House Committees on the Judiciary (February 1990). People are more likely to get the death penalty for killing white people than for black people, in violation of both the state and federal constitutions. *See*, U.S. CONST. amend. VIII and XIV; OHIO CONST. art. I, §§2, 9, and 16.

### D. *Unbridled Charging Discretion*

No doubt part of the systemic discrimination begins with the charging function. In order for the death penalty to be constitutional, sentencing discretion "must be suitably directed and limited as to minimize the risk of wholly arbitrary and capricious action." *Gregg* v. *Georgia*, *ante*, at 189. Yet, in Ohio, there is no control of the prosecutor's unbridled discretion in charging.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHASZ@SBCGLOBAL.NET

72

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 350

Capital indictments are arbitrarily issued,[46] and Ohio law provides no independent review of the propriety of the charging decision to ensure that indictments are not arbitrarily issued. No judicial or reviewing body determines the appropriateness of a charge or oversees the unbridled discretion of the prosecutor in seeking a capital specification. Because death-qualified juries are more conviction-prone than juries which are not death-qualified, the prosecutor, simply by exercising his charging function, can undermine the constitutional liberties of a fair and an impartial jury.[47] While it is the grand jury which issues the indictment, as a practical matter, the grand jury, composed of laymen, will follow the prosecutor's recommendation as to whether to issue a death specification. One has difficulty imagining a situation where the grand jury appends a death specification to an indictment while the prosecutor begs, in the interest of evenhanded charging, that the grand jury not do so. By allowing the prosecutor to circumvent procedural safeguards mandated by decisions of the United States Supreme Court, the Ohio law allows arbitrary charging decisions.

In reality, the system of capital punishment in Ohio and nationwide is more like the one described by the late Justice Harry A. Blackmun than anything else. *See, Callins v. Collins* (1994), 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (BLACKMUN, J., dissenting). Blackmun concluded that the problem is more fundamental than the influences of racism[48] and politics:[49] efforts to

---

[46] Cuyahoga and Hamilton counties are prime examples.

[47] *See*, U.S. CONST. amend. VI and XIV; OHIO CONST., art. I, §§5 and 10.

[48] *See, e.g.*, William J. Bowers, *Legal Homicide: Death as Punishment in America, 1864-1982*, 205-17 (1984) for a review of empirical studies pre-dating *Furman*; Samuel R. Gross and Robert Mauro, *Death & Discrimination: Racial Disparities in Capital Sentencing* 17-20 (1989); *Michael Meltsner, Cruel and Unusual: The Supreme Court and Capital Punishment*, 73-77 (1973); Marvin Wolfgang & Marc Reidel, *Race, Judicial Discretion, and the Death Penalty*, 407 ANNALS

(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

73

accommodate the basic constitutional values of consistency, reliability, and fairness in the context of capital punishment have spawned constitutional rules that cannot be reconciled with one another, and cannot achieve their intended ends. In Blackmun's view, even if racism and politics could be wrenched from the system tomorrow, the system would still yield unacceptably arbitrary results. There seem only two solutions: refuse any longer to tinker with the machinery of death, as Blackmun concluded the Constitution demands; or abandon the "death is different" principle ingrained in our law long before 1976, as Justice Scalia says should be done. *See, Atkins v. Virginia, ante,* SCALIA, J. dissenting.

Those who have witnessed the day-to-day operation of the death penalty system, in candid moments, have admitted its constitutional infirmities. The process of selecting those offenders who will be put to death was described by one prosecutor as "random, chance, a throw of dice,"[50] while others call the system "a sham,"[51] "scandalous," "shameful," and "deplorable."[52] Cumbersome rules have been formulated ostensibly to ensure that only those defendants "most deserving of death" are singled out for the ultimate penalty, *see, e.g.,*

---

[48](...continued)
AM. ACAD. POL. & SOC. SCI. 119, 126-33 (1973).

[49] *See,* David R. Dow, *When Law Bows to Politics: Explaining* Payne v. Tennessee, 26 U.C. DAVIS L. REV. 157 (1992); Glenn L. Pierce and Michael L. Radelet, *The Role and Consequences of the Death Penalty in American Politics,* 18 N.Y.U. REV. L. & SOC. CHANGE 711 (1990-91); Paul Reidinger, *The Politics of Judging,* 73 A.B.A. J., April 1987, at 52.

[50] *See,* Jason DeParle, "Special Report: A Matter of Life or Death," *New Orleans Times-Picayune,* 2, 6 (1985).

[51] *See,* Esther F. Lardent & Douglas M. Cohen, *The Last Best Hope: Representing Death Row Inmates,* 23 LOY. L.A. L. REV. 213 (1989).

[52] *See,* American Bar Ass'n Task Force on Death Penalty Habeas Corpus (Ira P. Robbins, rep.), *Toward a More Just and Effective System of Review in State Death Penalty Cases,* 40 AM. U. L. REV. 1, 159 (1990).

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · EMAIL: JBJUHASZ@GMAIL.COM

74

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 352

Scott E. Sundby, *The* Lockett *Paradox: Reconciling Guided Discretion and Unguided Mitigation in Capital Sentencing*, 38 UCLA L. REV. 1147, 1176 (1991). In fact, those who have been sentenced to death are for the most part indiscernible from those murderers who have been spared. *See, e.g.*, David C. Baldus, *et al.*, *Equal Justice and the Death Penalty: A Legal and Empirical Analysis* 3 (1990);[53] Stephen B. Bright, *Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer*, 103 YALE L.J. 1835, 1840 (1994). The death penalty must be imposed rationally and predictably or not at all. That quite simply is not what is taking place, the death penalty quite clearly violates the Cruel and Unusual punishments provisions and the unconstitutional Due Process provisions of the United States Constitution. In his concurring opinion in *Furman, ante,* the late Justice Potter Stewart said that the death penalty was cruel and unusual in the same way that being struck by lightning was cruel and unusual. Despite the Court's struggle to provide safeguards to guarantee predictability and avoid the strike of lightning, the strike of lightning is in fact what is occurring when the death penalty is imposed in Ohio.

In Mahoning County, Willie "Flip" Williams originally was indicted for four (4) homicides without death specifications. Williams escaped from jail. After he was again apprehended, the grand jury was re-convened by the prosecutor and a superseding indictment with death specifications was returned. Nothing in the facts of the case changed; yet, death specifications

---

[53] Baldus and his colleagues established that "The problem is that a very large proportion of each year's death sentences are imposed against defendants whose cases are not among the most aggravated and therefore the most blameworthy cases." *Id.*

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHSDC@AOL.COM

75

were added simply to punish Williams for his escape.[54]

The same county prosecutor who directed the superseding indictment for Williams said that death specifications were not added to an indictment of another Mahoning County man because the jury would "like" him. The prosecutor therefore felt that his chances of securing a conviction on the death specification were small. Explaining why the indictment against Christopher Westerfield contained no death specification, former prosecutor James A. Philomena said: "In a death penalty case, a jury has to dislike the defendant. They [the jurors] have to have a reason to dislike him." Liking or disliking the defendant of course has nothing to do with the crime, nor does it reflect any pre-indictment prosecutorial weighing of the aggravating circumstances and the mitigating factors.[55]

The comments demonstrate exactly how much control a prosecutor has over the grand jury; and, they also demonstrate the racial discrimination of the death penalty as charged. Westerfield could have been charged with a death specification under a "principal offender" specification, OHIO REV. CODE ANN.

---

[54] If one reviews the record in the case, it's a reasonable conclusion indeed that, without, introduction of the incident where Williams attempted to break into the Juvenile Justice Center, he would not have been convicted of the murders. Williams' case, incidentally, is a poster child for the proposition that there is no effective appellate review of death sentences in Ohio. The dissent of Chief Justice Thomas Moyer, joined by Justice Paul Pfeifer, demonstrate the point adequately. *See, State* v. *Williams* (1997), 79 Ohio St.3d 1, 21, 679 N.E.2d 646 (MOYER, Ch.J., joined by PFEIFER, J., dissenting).

[55] The fact that Mr. Philomena is no longer the County Prosecutor in Mahoning County has not cured the problem. The present administration in Mahoning County added death specifications to counts not even eligible for death penalty consideration (*see, State of Ohio* v. *David E. Larew, Jr.*, Case No. 97 CR 160) and indicts people already serving life sentences with death penalty specifications (*see, State of Ohio* v. *Richard A. Johnson*). Though Johnson's case was ultimately resolved short of a capital trial, to even indict the case that way was a huge waste of public resources. If Johnson had been convicted and sentenced to death, he would have had to complete the life sentence which was imposed by a court of the District of Columbia, which he was already serving, before he could be executed. The huge waste of taxpayer dollars simply because the killing took place in a prison is not charging discretion, but political grandstanding. In terms of the constitutional arguments asserted herein, that case demonstrates the unbridled charging discretion that the prosecutor possesses.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS3@GMAIL.COM

76

§2929.04(A)(7)(aggravated burglary). He was not. The same county prosecutor's office, however, charged an indigent black youth who had a poor upbringing with a death specification under the "principal offender" specification, OHIO REV. CODE ANN. §2929.04(A)(7)(aggravated robbery). *See, State of Ohio* v. *Mark A. Brown*, Case No. 94 CR 120. Several years later, the prosecutor declined to capitally indict another man whom the government claimed had, with others, beaten and kidnaped a 17 year old boy, then drove the victim to a remote location and shot him, execution style, in the back of the head. *See, State of Ohio v. Kevin Green*, Mahoning C.P. Case No. 99 CR 893C. One of the undersigned was counsel on that case. The argument here is not that Mr. Green should have been capitally indicted. The argument is that there is no predictability to who will be charged, so there can be no predictability to who receives the death penalty. The "strike of lightning" is in selecting who shall run the gauntlet.

The decision of whether or not a case should be a capital case belongs almost exclusively to the county prosecutor. As noted above, the grand jurors rely upon the prosecutor. Most grand jurors, without being told by the prosecutor, do not know what a death specification is. In recognition of this feature of Ohio's death penalty law, Cuyahoga County has established a procedure for reviewing potential capital cases prior to indictment. The review was instituted if for nothing other than to allay the fears of citizens that there is racially discriminatory charging, which in turn causes political consternation for the elected prosecutor. The prosecutor has acquired "virtually unlimited control over charging, inconsistent with a system of criminal procedure fair to defendants and to the public." Vorenberg, *Decent Restraint of Prosecutorial Power* (1981), 42 HARV.L.REV. 1521, 1525. *See, also,* Sonner, *Asking for the Death Penalty*, ABA CRIMINAL JUSTICE 32 (Fall 1986).

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJUHASZ@GMAIL.COM

77

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 355

On July 1, 2002, the *Washington Post* reported that United States Attorney General John Ashcroft has been twice as likely as his predecessor, Janet Reno, to reverse the recommendations of federal prosecutors about whether or not to seek the death penalty in a given case. Since Ashcroft became Attorney General, the Justice Department has been three times more likely to seal a death sentence against blacks alleged to have killed whites than for blacks alleged to have killed non-whites.

The death penalty statutes, without any provision for review of the charging function, impinge on the natural rights of a defendant before the trial safeguards commence, and deny a defendant equal protection and benefit of the laws. U.S. CONST. amend. V and XIV; OHIO CONST., art. I, §2. The statutes further impose upon the defendant cruel and unusual punishment, especially if the product of the intentional acts on the part of the government result in arbitrary and unusual imposition of a death sentence. *See, e.g., McCleskey* v. *Kemp, ante*, and, *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585; U.S. CONST. amend. VIII and XIV; OHIO CONST. art. I, §9. As shown *post*, the assurance of effective appellate review has reduced any queasiness on the part of the United States Supreme Court in capital cases. *See, e.g., Gregg v. Georgia, ante; Zant v. Stephens, ante; Godfrey v. Georgia* (1980), 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed. 2d 398. The lack of any review by the Supreme Court of Ohio over the prosecutor's charging function renders the unbridled charging discretion an Eighth Amendment violation and a violation of OHIO CONST. art. I, §§2. 9, and 16.

### E. *Cruel and Unusual Punishment*

Ohio had two forms of execution: electrocution, the statutorily preferred method, and lethal injection. Death by either electrocution or lethal injection constitutes cruel and unusual punishment and denies due process under the

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJJFIRM@AOL.COM

78

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 356

state and federal constitutions.  Inflicting death as a punishment also violates internationally held principles of human rights.

U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §9 and 16 bar the imposition of penalties which are grossly disproportionate to the crime; or, are excessive because they do not make a measurable contribution to an acceptable punishment goal; or, are "nothing more than the purposeful and needless imposition of pain and suffering".  *Coker* v. *Georgia*, *ante*, 433 U.S., at 592;[56] *Solem* v. *Helm* (1983), 463 U.S. 277, 288, 103 S.Ct. 3001, 77 L.Ed.2d 637.

In *Louisiana ex rel. Francis* v. *Resweber* (1947), 329 U.S. 459, 463, 67 S.Ct. 374, 91 L.Ed. 422, four Justices interpreted the Cruel and Unusual Punishment Clause to prohibit the "infliction of unnecessary pain".  Botched executions have shown that unnecessary pain results from the use of the death penalty electrocution.  In barring executions by cyanide gas, the United States Court of Appeals for the Ninth Circuit looked to the severity of pain, the possibility of the execution process lasting several minutes, and the unnecessary cruelty presented by this method of punishment.  *See, Fierro* v. *Gomez* (9th Cir. 1996), 77 F.3d 301.

Punishment by electrocution was upheld over a hundred years ago in *In Re Kemmler* (1890), 136 U.S. 436, 105 S.Ct. 930, 34 L.Ed. 519.  Since that time, there has developed a substantial body of evidence that death by electrocution inflicts "unnecessary pain," "physical violence," and "mutilation," rather than the "mere extinguishment of life" referred to in *Kemmler*.

---

[56] At 592, the Court noted that it "firmly embraced" the holdings of earlier cases "to the effect that the Eighth Amendment bars not only those punishments that are 'barbaric' but also those that are 'excessive' in relation to the crime committed."  The Court went on to say that: "a punishment is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime.  A punishment might fail the test on either ground."

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

79

Aside from the applicability of U.S. CONST. amend. VIII to the states, Ohio has its own constitutional provision. OHIO CONST. art. I, §9 provides in pertinent part that "Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted." Even though *Kemmler* never decided whether electrocution was cruel and unusual punishment, and the Court subsequently held that the Eighth Amendment applies to the states, courts have continued to rely on *Kemmler* for the proposition that a wide range of capital punishments, most particularly electrocution, are permissible. Consequently, electrocution never has been scrutinized under modern Eighth Amendment standards. This circumstance persists despite substantial evidence that death by electrocution is more torture than the "mere extinguishment of life" referred to in *Kemmler*.

U.S. CONST. amend. VIII and XIV must respond to the "evolving standards of decency which mark the progress of a maturing society." *See*, *Trop v. Dulles* (1958), 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630. The constitutionality of electrocution has been questioned by a growing number of judges. Many states, including Ohio, have outlawed electrocution, and Georgia recently declared electrocution to be cruel and unusual punishment.

Public opinion, which plays a significant role in determination of whether a punishment is cruel and unusual, led the Ohio legislature to add lethal injection as an alternate means of punishment in 1994. While disclaiming that such action constituted a belief that punishment by electrocution is cruel and unusual, *see*, OHIO REV. CODE ANN. §2949.22(H), the Ohio legislature was responding to public opinion in this state which questioned electrocution as a penalty.

The modern trend to move away from electrocution demonstrates that, under evolving standards of decency and humanity, electrocution is cruel and

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

80

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 358



unusual punishment, whether states admit it or not.  Legislatures around the nation–and, indeed, around the world—are moving away from death by electrocution in favor a more "humane" and less painful means of execution. In 1979, twenty states mandated death by electrocution.  "State by State, The Death Penalty," *National Law Journal*, July 9, 1979.  Electrocution is inhumane and inconsistent with standards of human decency.  Under all of the foregoing principles, the State of Ohio should be barred from carrying out an execution by means of electrocution.

While intended to diminish pain, lethal injection nonetheless risks cruel and unusual punishment.  No other nations make use of this means of punishment.  Like electrocution, lethal injection should be barred.

Numerous international conventions and treaties envisage worldwide abolition of the death penalty.  Article 6 of the International Covenant on Civil and Political Rights [ICCPR], and Article 3 of the Universal Declaration of

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: jbjuhasz@gmail.com

81

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 359

Human Rights.  The Human Rights Committee charged with monitoring these documents is working toward such abolition, United Nations Document A/37/40 Annex V, General Comment 6 [16], ¶6.  The United Nations General Assembly has adopted a protocol calling for each state party to take all necessary measures to abolish the death penalty within its jurisdiction. Second Optional Protocol to the ICCPR Aiming at the Abolition of the Death Penalty, GA Res. 44/128, December 15 1989.  Similarly, the Organizations of American States adopted at its May 1990 Assembly the Protocol to the American Convention on Human Rights to Abolish The Death Penalty.  OAS Treaty Service, No. 73. The United States is the only "civilized" Western nation to carry out executions in non-treason crime settings. This Court should recognize that the death penalty is contrary to fundamental internationally guaranteed human rights, and should declare that the penalty is thus unconstitutional under the state constitution, OHIO CONST. art. I, §9 or alternatively, the federal constitution, U.S. CONST. amend. VIII.

### F.  *Ohio Constitutional Provisions*

Neither *State* v. *Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, 15 O.B.R. 311, *cert. denied, Jenkins v. Ohio* (1985), 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643, nor *State* v. *Maurer* (1984), 15 Ohio St.3d 239, 473 N.E.2d 768, 15 O.B.R. 379, *cert. denied, Maurer v. Ohio* (1985), 472 U.S. 1012, 105 S.Ct. 2714, 86 L.Ed.2d 728, contain any analysis of applicable Ohio constitutional provisions.  Later cases of the Ohio Supreme Court simply refer back to *Jenkins* and *Maurer*.  The Ohio Supreme Court has ignored the fact that it has never passed on the constitutionality of the Ohio death penalty law *vis-a-vis* the Ohio Constitution. *Jenkins*, at 167-179; *Maurer*, at 241-243.  The relevant portions of these opinions are reproduced in the Appendix.  A review of them will reveal no  analysis  of  the  Ohio  Constitution  whatsoever.    The  provisions  are

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.759.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

82

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 360

mentioned, but there is absolutely no analysis of them.  Only federal cases are cited and discussed, and those cases of course deal only with U.S. CONST. amend. VIII and XIV.  *See, also, State v. Carter, ante*.  This pattern is, unfortunately, typical of Ohio Supreme Court decisions in the area of capital punishment.  *See, e.g.*, the defendant's motion regarding the proper standard for excusal of jurors, where it is demonstrated that the courts of Ohio have, in the name of following the United States Supreme Court, ignored or forgotten that Ohio, unlike the Florida, the case where *Wainwright* v. *Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, originated, has a specific statute.  It is but another of the myriad of examples of judicial fiat and ineffective appellate review which render the death penalty unconstitutional.

If the Ohio Constitution means the same thing as the federal constitution, one wonders why someone went to so much trouble to write it and revise it.  The same thought occurs when one sees judicial opinions wherein the courts accept a failure of the government to follow the laws it enacted.  *See, e.g., State* v. *Puente* (1982), 69 Ohio St.2d 136, 431 N.E.2d 987, 23 Ohio Op.3d 178, cert. denied, Puente v. Ohio (182), 457 U.S. 1109, 102 S.Ct. 2910, 73 L.Ed.2d 1318, 50 USLW 3964.  There, the Ohio Supreme Court found "no prejudice to the appellee" in the failure of the jury commissioner to strictly follow the jury code.  *Id.*, at 139.  The prejudice was, of course, that the laws were not followed, for if the government is one of derived powers, a failure to act within the limits of those derived powers is, by definition, an illegal act.  The Framers would never contemplate a government that failed to follow its own laws, yet modern courts pass off such a failure as "harmless."  Incredible.  In less theoretical terms, why would such statutes be enacted, if not to be followed?

In any event, the provisions of OHIO CONST. art. I, §1 seem to negate any claim that the Ohio and United States Constitutions mean exactly the same

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · EMAIL: JBJURISDOC@AOL.COM

83

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 361

thing, particularly as the United States Constitution is often presently construed. The Ohio courts have not addressed these claims under the Ohio Constitution, and this Court should now do so.

Though the Ohio Supreme Court claims to have analyzed the death penalty under the Ohio Constitution, the Defendant says not. The Defendant can find no cases which discuss the flaws engendered by death qualification as those flaws relate to the ability to effectively defend life and liberty, OHIO CONST. art. I, §1. How can one say with a straight face that a citizen has had the ability to effectively defend his life and liberty when the jury is stacked against him in favor of conviction? There has been, as far as the Defendant can discover, no in-depth analysis of the *Ohio* requirements of an impartial jury and "equal protection and benefits" of the laws under OHIO CONST. art. I, §§10 and 2, respectively. How can it be said that a jury which is conviction-prone, and thus predisposed to convict, does not violate the liberties of having justice administered without denial or having a remedy in the court by due course of law, *see*, OHIO CONST. art. I, §16?

### III.

*Effective Assistance of Counsel; Trial Before an Impartial Jury.*

#### A. *Effective Assistance of Counsel*

Ohio's capital law provides for a sentencing recommendation by the very same jury which found the defendant guilty at the first phase and found the existence of one or more death specifications. This procedure violates the constitutional provisions which guarantee the effective assistance of counsel and a fair trial before an impartial jury. *See*, U.S. CONST. amend. VI and XIV; OHIO CONST. art. I, §§5, 10, and 16. These provisions are designed to guard against encroachment by the legislature.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHSLOC@AOL.COM

84

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 362

The two-phase capital trial in Ohio denies the Defendant the effective assistance of counsel, because if the Defendant is convicted, the conviction inherently destroys the credibility of his counsel and diminishes counsel's effectiveness at the second phase. *See*, U.S. CONST. amend. VI and XIV; OHIO CONST. art. I, §10; *see also*, *McMann* v. *Richardson* (1970), 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763, fn. 14; *Powell* v. *Alabama* (1932), 287 U.S. 45, 47, 53 S.Ct. 55, 177 L.Ed. 158; *State* v. *Hester* (1976), 45 Ohio St.2d 71, 341 N.E.2d 304, 74 Ohio Op.2d 156; and *State* v. *Frazier* (1991), 61 Ohio St.3d 247, 253, 574 N.E.2d 483, *cert denied, Frazier v. Ohio* (1992), 503 U.S. 941, 112 S.Ct. 1488, 117 L.Ed.2d 629, 60 USLW 3653. If defense counsel argues strenuously for his client's innocence at the first phase and the jury votes for conviction, counsel starts the second phase at a disadvantage. Counsel desperately needs credibility to successfully argue for a life sentence instead of the death penalty. A provision for two separate juries would easily eliminate this handicap; and, at least in this regard, restore the ability to have the effective assistance of counsel. The two-stage proceeding, with the same jury at both stages, is an action by the government which prevents defense counsel from effectively assisting a defendant during what has been held to be a "critical stage" of the proceeding, the sentencing phase. *See, e.g.*, *United States* v. *Cronic* (1984), 466 U.S. 468, 469, 104 S.Ct. 2039, 80 L.Ed.2d 657, fn. 25. Hence, this governmental action, effected through legislation, violates U.S. CONST. amend. VI and XIV and OHIO CONST. art. I, §10.

Any claim by the government that it has an interest in having a single jury for both phases of the trial; and, that this interest is paramount to the ability of a criminal defendant to have a fair and impartial trial phase jury is also belied by the Ohio Attorney General's efforts to have a statute enacted to require that a second jury be selected for purposes of resentencing trials when

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHASZ@AOL.COM

85

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 363

a capital defendant's death sentence is overturned on appeal.  This resentencing scheme, mandated by *State v. Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744, came under attack by Ohio Attorney General Betty Montgomery.  The Sixth Circuit's decision in *Glenn* v. *Tate* (6th Cir. 1995), 71 F.3d 1204, 1995 Fed. App. 0373P, *cert. denied*, *Tate* v. *Glenn* (1996), 519 U.S. 910, 117 S.Ct. 273, 136 L.Ed.2d 196, 65 USLW 3233, 65 USLW 3265, and the inability to re-sentence Glenn to death did not square with the Attorney General's emphasis on being tough on crime, and her support of the death penalty during her campaign. *Glenn v. Tate* was decided after she was elected.  When she was unsuccessful in overturning the Sixth Circuit's decision, she set out to overturn the statute, and its interpretation in *Penix*, that precluded the State from seeking death again. She persuaded the General Assembly to amend OHIO REV. CODE ANN. §2929.06, implemented through Senate Bill 258.

Senate Bill 258's revision allows the government prosecution to again seek death for resentencing proceedings "[where] the sentence of death that [was] imposed upon an offender is vacated upon appeal because of error that occurred in the sentencing phase of the trial" for crimes committed after the effective date, October 16, 1996.  The bill says that if "the offender was tried by a jury, the trial court shall impanel a new jury for the hearing." *See, generally*, Margery B. Koosed, *On Seeking Controlling Law and Re-Seeking Death under Section 2929.06 of the Ohio Revised Code*, 46 CLEV. ST. L. REV. 261 (1998).

The government is in the politically merchantable but constitutionally unacceptable position of having a second jury to re-impose death, but prohibiting a second jury even though death-qualified juries deny a fair trial at the first phase.  The government cannot have it both ways, and the capital criminal justice system must not force defendants into trial before a less than

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@AOL.COM

86

impartial jury.[57]

    The Ohio law also impairs the effective assistance of counsel because death qualification is necessary before the jurors have heard any evidence that a defendant may be guilty.  Requiring a defendant to question the prospective jurors about the death penalty places counsel in the undesirable position of appearing to have no confidence in the facts of the case or in the defendant's innocence.[58]  In *Grigsby* v. *Mabry* (E.D. Ark. 1983), 569 F.Supp. 1273, the court found that "death qualification" of prospective jurors creates juries which are conviction prone, thereby denying the defendant his right to a trial by a jury representative of a cross-section of the community.  *Grigsby* was affirmed by the Court of Appeals for the Eighth Circuit, (1985), 758 F.2d 226, but was reversed by the United States Supreme Court *sub nom. Lockhart* v. *McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137, 54 USLW 4449.  The Supreme Court did not deny that "death qualification" of jurors results in a jury more likely to convict.  The Court assumed that the studies done were correct and that "death qualification" does indeed produce juries more conviction prone than non-death qualified juries.[59]  Nonetheless, the Court held that the federal constitution does not prohibit the states from "death qualifying" juries in capital cases.  Ohio

---

[57] It appears at least to some that the Ohio Attorney General, like former governors Bob Graham in Florida and George W. Bush in Texas, wants executions for political capital—yet another infirmity of the death penalty in Ohio.

[58] Such a procedure destroys the constitutional presumption of innocence which is the foundation of Anglo-American criminal justice.  It therefore deprives a defendant of due process of law, the ability to defend life and liberty, a remedy by due course of law, and the administration of justice without denial.  U.S. CONST. amend. V and XIV; OHIO CONST., art. I, §§1, 10 and 16.  Appearances of guilt, though not evidence, can violate the constitutional guarantees, and it is incumbent upon this or any trial court to guard against any such factors.  *See, State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342; *Estelle* v. *Williams* (1976), 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126; *Estes* v. *Texas* (1965), 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543.

[59] The Court said, 476 U.S. at 173: "Having identified some of the more serious problems with McCree's studies, however, we will assume for purposes of this opinion that the studies are both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries."

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE (330) 758-2308 · FACSIMILE (330) 758-8290 · EMAIL: JBJJDURISIN@GMAIL.COM

87

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 365

courts have cited and have relied on *Lockhart* v. *McCree*, but have engaged in no analysis of the Ohio Constitution's assurances of trial by impartial jury, a remedy in the courts by due course of law, or the promise that justice shall be administered without denial. *See*, OHIO CONST. art. I, §§5, 10, and 16.

OHIO CONST. art. I, §10 secures against encroachment by the government a trial other than one before an impartial jury. *State* v. *Lane, ante; see also,* OHIO CONST. art. I, §5, which preserves inviolate the right to trial by jury. OHIO CONST. art. I, §16 prohibits the government from administering justice without denial, and OHIO CONST. art. I, §1 provides that the ability to defend "life and liberty" shall be "inalienable." These provisions mean that the government, whether acting through prosecutor, the court, or the legislature, may not act in any way as to deny trial by an impartial jury.  Given the constitutional presumption of innocence, justice is denied when the jury deciding the case is not impartial, but is instead inclined to convict.  Can the Framers of the Ohio Constitution have intended that a jury which begins the case inclined to convict is the administration of justice without denial?  Can the Framers have meant that such a conviction-prone jury satisfies the obligation that every citizen—even one charged with heinous offenses—be afforded a remedy in the courts by "due course of law"; or that trial by such a jury retains "inviolate" the right to jury trial; or that a citizen who tries his case before a conviction-prone jury can effectively defend his life and liberty?  Wasn't one of the reasons why trial by jury was implemented so that citizens would not be "railroaded" by government officers inclined to convict?  These provisions are found in OHIO CONST. art. I, §§1, 5, 10, and 16.  It appears that the courts have ignored them, but the Defendant asks this Court to once again breathe life into those provisions.

Ohio's law forces defense counsel to choose between engaging in

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJJURIS@GOOGLE.COM

88

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 366

sufficient—and, of necessity, extensive—voir dire on the death penalty issue or opting to forego voir dire on the death penalty issue altogether. The former presents the very real danger that it will appear to the jury panel that the defense is surrendering on the issue of guilt. The latter risks impaneling jurors who have undetected biases either for or against the death penalty. These hidden biases threaten the fairness of the entire proceeding. *See, State v. McClellan* (1967), 12 Ohio App.2d 204, 207, 232 N.E.2d 414, *cert. denied, McClellan v. Ohio* (1968), 393 U.S. 929, 89 S.Ct. 265, 21 L.Ed.2d 266. This legislatively-created Hobson's choice is obviously unacceptable *to any criminal* defendant, let alone a defendant who faces the death penalty. It does not suffice to say that if the Defendant is truly not guilty, then counsel can, without risk, try the case without first death-qualifying the jury, because the Defendant will be acquitted, and there is virtually no chance that the case will reach the second phase. It is no more satisfactory to say that if the Defendant is guilty, then the emphasis should be on death-qualification of the jury, with the entire focus of the trial on the second phase in order to save the Defendant's life. The first scenario forces the Defendant to assume the risk of having a non-death qualified jury, should things go desperately wrong and the case proceed to the second phase. The second scenario precludes the requirement that the government prove the elements of the charges against the defendant before a fair and impartial jury at the first phase.

The Ohio Constitution guarantees any capitally-indicted defendant an impartial jury during the first phase of the trial as well as one composed of a fair cross-section of the community. OHIO CONST., art. I, §§5, 10, and 16.[60]

---

[60] The Ohio Supreme Court has not addressed this issue on the independent state constitutional grounds asserted herein by the Defendant. The Defendant still asserts federal constitutional grounds as well.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJLURIS@AOL.COM

89

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 367

Where a jury does not fairly represent a cross-section of the community, it cannot be considered fair and impartial. *Lockhart* v. *McCree, ante*. Therefore, a death-qualified jury violates OHIO CONST. art. I, §§5, 10, and 16. Further, since a citizen charged with a noncapital offense ostensibly is tried by a jury which is not conviction prone (because it has not been death-qualified), those citizens receive rights not afforded a capital defendant. Surely, the simplest reading of OHIO CONST. art. I, §2 proves that death qualification is contrary to the Ohio Constitution.

In *State* v. *Jenkins, ante*, the Ohio Supreme Court relied on a federal case—*Keeten* v. *Garrison* (4th Cir. 1984), 742 F.2d 129—for the proposition that a criminal defendant wants, and believes he is entitled to, a jury more likely to acquit, as opposed to a truly impartial jury. *State* v. *Jenkins, ante*, at 188; *Keeten* v. *Garrison, ante*, at 134. That factually and legally incorrect proposition was discredited by the United States Supreme Court in *Lockhart* v. *McCree, ante*. The fact is, OHIO CONST., art. I, §§1, 2, 5, 10, and 16 entitle the Defendant to a fair and impartial jury, but legislative fiat and ineffective judicial review have deprived the Defendant of those immunities. In *State* v. *Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585, the Ohio Supreme Court, when confronted with the argument that the death penalty violates the effective assistance of counsel, simply relied on *Lockhart* v. *McCree*, and failed to address the state constitutional issues.

OHIO REV. CODE ANN. §2929.03(D)(1) is unconstitutional because it, too, denies a defendant the effective assistance of counsel. Under that statute, once a defendant requests a mental examination for mitigation purposes, the defendant and counsel have no control over the distribution of the results of that examination to the jury, whether the report appears to be mitigatory or aggravating. The law forces defense counsel to play a guessing game, running

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURIS@AOL.COM

90

the risk that something in the report may save a defendant's life, when in fact something in the report may cause the jury to vote for death. It is no answer to say that the jury instructions will prevent the jury from misusing the report. As shown elsewhere herein, the instructions do not clearly explain what the jury is to do and what the jury is to consider. Instructions of that kind are very close to "an instruction to unring a bell." *See, United States v. Murray* (6th Cir. 1986), 784 F.2d 188, 20 Fed.Evid.R.Serv. 186. The Ohio death penalty law must be declared unconstitutional because it deprives the Defendant of the effective assistance of counsel.

### B. *Denial of Impartial Jury.*

The Defendant cannot be deprived an impartial jury under the state and federal constitutions. *See*, U.S. CONST. amend. VI and XIV; OHIO CONST., art. I, §§5 and 10; *Sheppard v. Maxwell* (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; *State, ex rel. Vindicator Printing Co.*, v. *Watkins* (1993), 66 Ohio St.3d 129, 609 N.E.2d 551.

*First phase.* The effects of "death qualification" were discussed above. The requirement that an unbiased jury represent a fair cross-section of the community is mandated by the equal protection provisions of the Constitution. *See*, U. S. CONST. amend. XIV; *Taylor v. Louisiana* (1975), 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690. *See, also*, OHIO CONST. art. I, §2. *See, also, generally*, Jane Byrne, Lockhart v. McCree: *Conviction-Proneness and the Constitutionality of Death-Qualified Juries*, 36 CATH. U. L. REV. 287 (1986).

The Supreme Court has said that when certain cognizable groups are removed from the jury pool, the "qualities of human nature" and "perspective[s] on human events that may have unsuspected importance" are absent from the group's deliberations. *See*, *Peters v. Kiff* (1972), 407 U.S. 493, 503-04, 92 S.Ct. 2163, 33 L.Ed.2d 83.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · EMAIL: JBJUHASZ@AOL.COM

91

The requirement of a community cross-section in U. S. CONST. amend. XIV has also been extended to cases addressing the constitutionality of death-qualified juries. In *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, the government exercised unlimited peremptory challenges to exclude all venirepersons who expressed reservations about imposing capital punishment. The United States Supreme Court held that a death sentence is unconstitutional if it is recommended by a jury from which all venirepersons having doubts about capital punishment are removed.

In *Duren v. Missouri* (1979), 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579, women were excluded from the jury venire. The Court said that excluded groups must be deemed "distinctive" before a Sixth Amendment violation can be found. *Duren* also held that a *prima facie* violation of the cross-section requirement occurs when venire representation of a distinctive group "is not fair and reasonable in relation to the number of such persons in the community," and when "this underrepresentation is due to systematic exclusion of the group in the jury-selection process." 439 U.S. at 364. When an exclusion is made which is tailored to further a significant state interest, proper caution must be used to prevent the unnecessary exclusion of broad community groups. *Duren* found women sufficiently distinct so that their exclusion created a *prima facie* violation of the fair cross-section requirement.

In *Keeten v. Garrison* (W.D.N.C.), 578 F.Supp. 1164, the claim was that compliance with the *Witherspoon* death-qualification guidelines results in a *prima facie* violation of the Sixth Amendment representativeness requirement. The court was presented with numerous sociological studies which definitively established that persons who had *conscientious scruples* against the death penalty possess attitudes about the criminal justice system which are distinct from persons who favor the death penalty, and from persons broadly opposed to

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@GMAIL.COM

92

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 370

capital punishment.   The court, in summarizing the studies, found that individuals willing to impose the death penalty tend to favor testimony of the prosecution's witnesses while doubting defense witnesses, advocate stricter crime control measures, feel that the courts too often allow guilty defendants released because of "technical loopholes," and find proof beyond a reasonable doubt more readily than those individuals with conscientious scruples about capital punishment. *Keeten*, 578 F.Supp., at 1171-77, 1181-82.  The Court also found that the disproportionate exclusion of blacks and women was the by-product of death qualification since these groups tend to oppose the death penalty more than white men.  *Id.,* at 1182. The district court found that persons unwilling to impose the death penalty are a cognizable group in the community, representing eight to twenty-three percent of the population, and found that an exclusion of these jurors would prevent the guilt phase jury from reflecting the "collective conscience of the community."  The court rejected any argument that the state's interest in saving taxpayer money by preserving the use of single juries in the bifurcated jury procedure justified exclusion of these jurors.[61]

This constitutional scenario presents courts with either striking the death penalty as unconstitutional in this form or bending the Constitution by saying that *Witherspoon* and *Witt* excludables, and the resulting conviction-prone jury, are necessary evils if we as a society are going to put people to death.  We must, the reasoning goes, bend the Constitution to exclude a cognizable portion of the community so that we can still sentence people to death.  The danger for the first phase is that such juries are *not* fair and impartial, and are not wedded to the precept of the presumption of innocence.  "The decision of the *McCree*

---

[61] The Fourth Circuit reversed *Keeten*, finding that the state's interest in the use of a single jury outweighed the defendant's interest in a nondeath-qualified guilt phase jury.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7808 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS80@AOL.COM

93

majority not to extend cross section requirements to scrupled guilt phase jurors is inconsistent with the basic premise that has established *Witherspoon* as a universally accepted constitutional measure." Byrne, Lockhart v. McCree: *Conviction-Proneness and the Constitutionality of Death-Qualified Juries, ante*, at 313.

*Second phase.* A sentencing hearing is a part of the prosecution. *See, Mempa v. Rhay* (1967), 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336; *State v. Smith* (1972), 29 Ohio App.2d 241, 281 N.E2d 17. A sentencing hearing indeed is a "critical stage" of the prosecution. *United States v. Cronic, ante.* A defendant cannot be denied an impartial jury at his sentencing hearing, but the Ohio procedure, which uses the same jury for both the first and second phases, precludes an impartial jury at the sentencing hearing. If the jury finds a defendant guilty of aggravated murder at the first phase, there is a very high probability that jury bias, perhaps even animosity, toward the defendant will exist at the second phase, when a defendant most needs an impartial jury. That bias or animosity would in normal circumstances be a statutory challenge for cause during voir dire of any single-phase trial. *See*, OHIO REV. CODE ANN. §2945.25. The Ohio law therefore creates an unacceptable risk that the defendant's life will be put into the hands of a biased or hostile jury. There is no procedure to remove—or even question for that matter—jurors who, as a result of something that occurred at the first phase, become biased towards a defendant at the second phase.

The United States Supreme Court has recognized that capital punishment is in part an expression of society's outrage at particularly offensive conduct. *Gregg v. Georgia*, 428 U.S. at 183. The risk of an emotional response creates uncertainty in the reliability of the determination and undermines confidence in the outcome. Juror bias should never be tolerated in any case, but

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHINDOC@AOL.COM

94

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 372

it cannot be tolerated in a capital case.  *See*, *Beck* v. *Alabama* (1980), 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392.  The Ohio law must therefore be declared an unconstitutional violation of the Defendant's right to trial and sentencing by an impartial jury.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: jbjjuhosz@aol.com

95

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 373

IV. *Failure to Provide Adequate Guidelines for Deliberation.*

The Ohio law, which requires that aggravating factors "outweigh the mitigating factors" violates U.S. CONST. amend. VIII and XIV, and also violates OHIO CONST., art. I, §§9 and 16. The use of the term "outweigh" encourages a jury to use a preponderance of the evidence standard, while the state and federal constitutions demand proof beyond a reasonable doubt. The statute only requires that the sentencing body be convinced beyond a reasonable doubt that the aggravating factors are marginally greater than the mitigating circumstances. Any perceived marginal difference in weight between the aggravating circumstances and the mitigating factors would result in imposition of the death penalty. The sentencing scheme creates an unconstitutional and unacceptable risk of arbitrary or capricious sentencing. The Ohio statutes do not explicitly provide for merciful discretion on the part of the trier of fact even though such mercy was first introduced into Ohio capital law back in 1898. The death penalty is *mandatory* if the State proves that the aggravating circumstances outweigh the mitigating factors. The result is a sentencing scheme where the scales of justice are weighted more heavily toward the imposition of the death penalty. The Ohio law is not guided discretion, but instead coerced indiscretion. For example, a jealous husband who is charged with killing his wife and her lover may be indicted for aggravated murder with a capital "mass murder" specification, OHIO REV. CODE ANN. §2929.04(A)(5). If convicted, he may at the second phase offer only residual doubt, *i.e.,* that he did not commit the murders or that they were not committed with prior calculation and design. Although the jury, which obviously did not believe the defendant at the first phase, may find that the marital infidelity which led the defendant to commit the homicides does not warrant a death sentence, it will feel constrained to vote for a death sentence. It will surely find the taking of two

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHISHOP@AOL.COM

96

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 374

lives in a course of conduct outweighs the defendant's already-rejected claims of innocence.  Under the requirement of Ohio law, with no provisions for merciful discretion, the jury would be *required* to recommend the death sentence.  If the jury follows Ohio law, the death sentence would result, even though the jury did not believe that death was the "appropriate" sentence.  It is this type of mandatory sentencing that was struck down in *Lockett v. Ohio, ante.* Additionally, the mitigating circumstances set forth in the statutes are vague. For the scheme to be constitutionally valid, the jury is required to be given "specific and detailed guidance", and the jury must be provided with "clear and objective standards" in determining the appropriate sentence. *See, Godfrey v. Georgia, ante*; *Gregg v. Georgia, ante.*

Moreover, trial judges have not always been willing to give the "catchall" mitigation the weight to which it is entitled, thus encouraging a jury to recommend death. *See, e.g.,* the second phase instructions given in *State of Ohio vs. Thomas L. Rudge*, Portage Common Pleas Case No. 95 CR 15.  There, the defendant raised only evidence which fell under the "catchall" provision, OHIO REV. CODE ANN. §2929.04(B)(7).  The trial judge refused to instruct the jury on specific mitigating evidence presented by the defendant, instead telling the jury that it was to weigh against the aggravating circumstances of "any other factor" it found from the evidence to be mitigating.  The true danger is lack of guidance when specific aggravating circumstances are read by the trial judge, but no specific mitigating factors are mentioned.

The law fails to give the jury the appropriate guidance, and a pattern of arbitrary and capricious sentencing occurs.  Therefore, the unbridled sentencing discretion found unconstitutional in *Furman* v. *Georgia* persists.  The vague terminology of the mitigating circumstances stated in OHIO REV. CODE ANN. §2929.04(B) neither gives specific and detailed guidance to a jury nor provides

J. GERALD INGHAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHASZ@AOL.COM

97

a jury with clear and objective standards. Without such objective standards, there can be no confidence that the verdict at the second phase is not infected with caprice. *Cf. McGautha v. California, ante.* Moreover, it is impossible to explain to a jury composed of laymen that the aggravating circumstances, which it already found to exist beyond a reasonable doubt, must now be weighed against mitigating factors which it has not heard before the second phase. For the jury to do so, it might well think that it has to recant its first phase verdict as to the capital specification. There are lawyers who do not understand how the weighing process works in a capital case. To expect laymen to understand it is to engage in a legal and psychological fantasy in order to allow defendants to be executed. The guidelines do not guide: they misguide and they confuse. The Ohio law violates the state and federal constitutions because it provides no guided discretion to juries.

Caselaw from the Ohio Supreme Court continuously reaffirms that "the process of weighing factors, as well as the weight, if any, to assign a given factor, is a matter for the discretion of the individual decision maker". *See, State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124, *cert. denied, Fox v. Ohio* (1994), 513 U.S. 1060, 115 S.Ct. 671, 130 L.Ed.2d 604, 63 USLW 3460; *see, also State v. Loza* (1987), 71 Ohio St.3d 61, 82, 641 N.E.2d 1082, 37 ALR 5th 841, *cert. denied, Loza v. Ohio* (1995), 514 U.S. 1120, 115 S.Ct. 1983, 131 L.Ed.2d 871, 63 USLW 3818 ("the individual decision maker . . . must be allowed to freely decide whether to give any weight to the mitigating evidence".) To give that much discretion to sentencing juries concerning both aggravating circumstances and the mitigating factors inevitably leads to arbitrary and capricious judgments. Aggravating factors must not be applied arbitrarily or inconsistently, yet that application is unchecked in Ohio. Ohio's "open discretion" framework encourages a situation where factors which must be

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: jbjjurishconseagle.com

98

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 376

considered as mitigating will not be taken into consideration by the sentencer in making its decision. *See, e.g., Eddings v. Oklahoma* (1982), 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1, youth of the offender and history of childhood abuse; *Penry v. Lynaugh, ante*, mental disease or defect; *Enmund v. Florida* (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140; level of involvement in the crime; *Delo v. Lashley* (1993), 507 U.S. 272, 113 S.Ct. 1222, 122 L.Ed.2d 620, 61 USLW 3612, 61 USLW 3616, lack of criminal history. Ohio's capital framework fails to provide adequate guidelines to sentencing juries. The Ohio law simply fails to assure against arbitrary, capricious, and discriminatory results, and as such, it violates U.S. CONST. amend. V, VIII and XIV and OHIO CONST. art. I, §§1, 9, 10, and 16.

Further, empirical studies of commonly used penalty phase jury instructions show that juries do not understand their responsibilities and apply inaccurate standards for decision. *See* Cho, *Capital Confusion: The Effect of Jury Instructions on the Decision To Impose Death*, 85 J.CRIM.L. AND CRIMINOLOGY 532, 549-557 (1994). *See, also*, the findings of Zeisel discussed in *Free v. Peters* (7th Cir. 1993), 12 F.3d 700. There is a substantial risk that the law is presently being misapprehended in ways fundamentally prejudicial to defendants. This confusion violates the federal and state constitutions.

V. *Jury Trial and Privilege Against Self-incrimination*.

The Ohio death penalty law impermissibly encourages guilty pleas. The law therefore violates U.S. CONST. amend. XIV and OHIO CONST. art. I, §§1, 5 and 10. In *United States* v. *Jackson* (1968), 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138, the United States Supreme Court declared unconstitutional a statute which unnecessarily encouraged guilty pleas. The statute provided that a capitally-indicted defendant could be sentenced to death by a jury, but only to a mandatory life sentence by a judge if the defendant pleaded guilty to the

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · EMAIL: JBJURIDICO@AOL.COM

99

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 377

charge. The Court struck down the statute, holding that it encouraged the defendant to waive his right to a trial by jury and his privilege against self-incrimination by inducing him to plead guilty in order to escape the risk of death. The Ohio law is similar in many respects. A guilty plea greatly increases a defendant's chance to demonstrate mitigating facts, thereby avoiding the imposition of a death sentence. The Ohio Supreme Court did not fully or analytically address the distinction between the laws in *State v. Buell* (1986), 22 Ohio St.3d 124, 489 N.E.2d 795, 22 O.B.R. 203, *cert. denied, Buell v. Ohio* (1986), 479 U.S. 871, 107 S.Ct. 240, 93 L.E.d2d 165, when it overruled this argument on *federal* constitutional grounds.

Ohio's framework still encourages guilty pleas and thereby induces a capital defendant to waive his constitutional rights. OHIO CRIM.R. 11(C)(3) provides that, with respect to an aggravated murder committed on or after January 1, 1974, if the indictment contains one or more specifications, and if a plea is accepted, the court "may dismiss the specifications and impose sentence accordingly, in the interest of justice". The Ohio law does not adequately address the concerns expressed by Justice Blackmun in his concurring opinion in *Lockett* v. *Ohio,* 438 U.S. at 619. Ohio's law compels the sentencer to consider aggravating circumstances, and to balance them against mitigating factors. Therefore, if a defendant has doubtful mitigating circumstances or even no mitigating circumstances, he is strongly encouraged by the Ohio law to plead guilty and to waive all of his constitutional rights at trial with the hope of evading the death penalty. The issue of whether such a provision creates an impermissible burden on the defendant's exercise of his right to plead not guilty was not addressed by the majority of the United States Supreme Court in

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · EMAIL JBJJURISDOC@AOL.COM

100

*Lockett* v. *Ohio.*[62]  Justice Harry A. Blackmun, in a concurring opinion, said that he would have reversed the death sentence because the defendant could plead not guilty only by enduring a "semi-mandatory, rather than a purely discretionary, capital sentencing provision". 438 U.S. at 619.  The Ohio Supreme Court, on the other hand, had rejected the alleged constitutional violation. *State v. Weind* (1977), 50 Ohio St.2d 224, 364 N.E.2d 224, 4 Ohio Op.3d 413, *vacated, Weind v. Ohio* (1978), 438 U.S. 971, 98 S.Ct. 3137, 57 L.Ed.2d 1156; *State v. Jackson* (1977), 50 Ohio St.2d 253, 364 N.E.2d 236, 4 Ohio Op.3d 429, *vacated, Jackson v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3136, 57 L.Ed.2d 1156; *State v. Nabozny* (1978), 54 Ohio St.2d 195, 375 N.E.2d 784, 8 Ohio Op.3d. 181, *vacated, Nabozny v. Ohio* (1978), 439 U.S. 811, 99 S.Ct. 70,  58 L.Ed.2d 103.

VI.  *Lack of Meaningful Proportionality Review.*

The Ohio death penalty law also fails to provide a meaningful basis for distinguishing between life and death sentences.   OHIO REV. CODE ANN. §2929.03 does not explicitly require the jury, when recommending life imprisonment, to specify the mitigating factors found, or to otherwise identify its reasons for the sentence.  The Court of Appeals and the Supreme Court of Ohio are required to determine whether a particular death sentence is excessive or disproportionate to that imposed in similar cases.   The United States Supreme Court recognizes that a proportionality review serves as a check against arbitrary imposition of the death penalty.   *Gregg* v. *Georgia, ante.* Despite that holding, the Court has refused to require a proportionality review in all cases from every state as a matter of federal constitutional law.  *See, e.g., Pulley v. Harris* (1984), 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29, 52 USLW 4141.  However, when such a review is done, as is mandated by the Ohio

---

[62] The death sentence was reversed on other grounds.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · EMAIL JBJJUHISDOC@AOL.COM

101

statute, it must be a *true* proportionality review. *Pulley* describes what such a review is: the sentences imposed in similar cases. This means the sentences imposed (not just death) in factually and legally similar cases, not just cases where the death penalty has been imposed.

With all due respect to the Ohio Supreme Court, its proportionality review contains a logical *non-sequitur,* illustrated by this simple example. Ten boys are caught smoking in the school restroom on ten separate occasions under similar circumstances. All boys have no prior offense for smoking, or anything else for that matter. Although suspension is one of the possible penalties, nine boys are given detention; the tenth is suspended from school. The tenth should certainly be entitled to argue proportionality in the penalty imposed, as should the eleventh boy who is later caught (under similar circumstances) and suspended. Under the reasoning of the Ohio Supreme Court, the eleventh boy would not be able to mention the nine boys who received detention, and the school board would suspend him based on the precedent of suspending the tenth boy. That may be the type of proportionality review envisioned by the Supreme Court of Ohio, but it is not what is described in the statute. *See,* OHIO REV. CODE ANN. §2929.05(A). Neither is it the type of proportionality review envisioned by the United States Supreme Court.

Ohio's law requires that data be collected to assist in the proportionality review, but there is a fundamental flaw in the law: the law does not require the jury when recommending life imprisonment to identify the mitigating factors found to exist, and to state either why the aggravating circumstances do not outweigh mitigating factors beyond any reasonable doubt, why mitigating circumstances outweigh the aggravating factors or to otherwise state the reasons for a sentence less than death. The law also does not require the jury to state

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJJURIS@GMAIL.COM

102

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 380

which of the aggravating circumstances led it to impose death.[63]  There can be no proper proportionality review information is available, at a minimum, as to cases in which life imprisonment was imposed after a capital sentencing hearing.  Otherwise, it is impossible for a court to determine whether or not a death sentence is excessive or disproportionate.[64]

Under the Ohio law, the jury's recommendation of life is binding, yet no opinion or other documentation is required to be prepared by the jurors setting forth the mitigating circumstances found or the reasons why one factor or one set of factors outweighs the other.  Ohio has no means to accurately compare a case in which a binding recommendation of life was imposed by the jury to a case in which death was imposed.[65]

---

[63] The indictment difficulties in a case like *State v. Carter, ante*, highlight the need for jury specificity in this regard.

[64] *See*, Baldus, *et al.*, *Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach*, 33 STAN. L.REV. 1, 7, fn. 15 (1980).  Although the Ohio Supreme Court has found no constitutional problem with Ohio's law, there truly is no proportionality review.  The review of death sentences is something like "well, the defendant killed two people in this case and we have affirmed other death sentences where two people were killed."  What if the death sentence were imposed in three previous cases where two people were killed, but not imposed in twenty five such cases?  *See, Coker v. Georgia, ante.*  Such an analysis of course only takes into consideration the aggravating circumstances and not the mitigating factors.  It may well be that there are cases where the defendant killed two people but was given a life sentence because of certain mitigating factors.  See the argument on judicial fiat, *post*.

[65] Consider two local cases, *State v. John Steven Gerish*, Mahoning C.P. Case No. 91 CR 485 and State v. *Thomas L. Rudge*, Portage C.P. Case No. 95 CR 15, formerly Trumbull C.P. Case No. 92 CR 28.  Both were charged with shooting and killing two people in a motor vehicle.  Both were charged with and convicted of aggravated murder, OHIO REV. CODE ANN. §2903.01(A) and death specifications under OHIO REV. CODE ANN. §2929.04(A)(5).  Gerish received two death sentences, Rudge two life sentences.  There is no mechanism in Ohio law for anyone to take Rudge's life sentences into account when considering whether Gerish's death sentences are disproportionate.  Rudge's mitigation may have been different than Gerish's or it may not.  The appellate courts of Ohio will never know because they will not take Rudge's case into account when conducting a proportionality review in a case like Gerish's.  Gerish's case was dismissed because of his death, *see, State v. Gerish* (1999), 86 Ohio St.3d, 1430, 713 N.E.2d 431.  What the appellate courts of Ohio have prevented themselves from discovering is whether death is generally being imposed for the type of crime involved.  *See, Coker v. Georgia, ante*, :
It was also observed in *Gregg* that "[t]he jury . . . is a significant and reliable objective index of contemporary values because it is so directly involved." 428 U.S., at 181, and that it is thus important to look to the sentencing decisions that juries have made in the course of assessing whether capital punishment is an

(continued...)

J. GERALD INGRAM · JOHN H. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE (330) 758-2308 · FACSIMILE (330) 758-8290 · E-MAIL: JHJLAW@SBCGLOBAL.COM

103

In *Eddings* v. *Oklahoma*, *ante*, the United States Supreme Court held that the Constitution mandates measured and consistent application of the death penalty as well as fairness to the defendant.  The Court has said that capital punishment must be imposed fairly and with reasonable consistency or not at all.  It is impossible under the Ohio system to have such a consistent application.  Although a jury's binding recommendation of a life sentence favors the particular capital defendant receiving that sentence, that finding, masked by jury secrecy, deprives other capital defendants of the constitutional protections, spelled out in *Eddings*, that the government will not capriciously impose a death sentence.

VII.  *Lack of Adequate Appellate Analysis.*

OHIO REV. CODE ANN. §§2929.021, 2929.03, and 2929.05 require that minimal information be reported[65] to the Supreme Court of Ohio.  The statute

---

[65](...continued)
appropriate penalty for the crime being tried. Of course, the jury's judgment is meaningful only where the jury has an appropriate measure of choice as to whether the death penalty is to be imposed.  .  .  .
   According to the factual submissions in this Court, out of all rape convictions in Georgia since 1973 and that total number has not been tendered 63 cases had been reviewed by the Georgia Supreme Court as of the time of oral argument; and of these, 6 involved a death sentence, 1 of which was set aside, leaving 5 convicted rapists now under sentence of death in the State of Georgia. Georgia juries have thus sentenced rapists to death six times since 1973. This obviously is not a negligible number; and the State argues that as a practical matter juries simply reserve the extreme sanction for extreme cases of rape and that recent experience surely does not prove that jurors consider the death penalty to be a disproportionate punishment for every conceivable instance of rape, no atter how aggravated.  Nevertheless, it is true that in the vast majority of cases, at least 9 out of 10, juries have not imposed the death sentence.
433 U.S., at 596-97.  *See, also, Gregg v. Georgia:* "*If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedure assures that no defendant convicted under such circumstances will suffer a sentence of death.*"  Emphasis added.  428 U.S., at 205-206.

[66] OHIO REV. CODE ANN. §2929.021 requires the reporting of the name of the defendant, case number, court, and date that a capital indictment is filed.  OHIO REV. CODE ANN. §2929.03 requires the reporting of the trial court opinion as to why death is imposed; or if death is not imposed by a judge or a panel, why death is not imposed.  There is no requirement for reporting reasons why a jury recommends a life sentence.  OHIO REV. CODE ANN. §2929.05 requires that the court of appeals file its opinion with the Supreme court when a death sentence is affirmed.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJ1979@AOL.COM

104

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 382

is a toothless tiger, however, because additional data is necessary if there is to be a constitutionally adequate comparison in death penalty cases. The law does not require any compilation, collation, or analysis of the data for use in any comparison.[67] There is no statutory requirement that the reviewing courts identify the types of cases considered or the particular cases considered. There is no requirement that courts submit written findings comparing the cases.

While Ohio's capital sentencing provisions require collection of certain data relating to capital cases to facilitate this review, *i.e.*, the entire records of cases in which the death penalty is imposed, OHIO REV. CODE ANN. §2929.03(G); and information as to each capital indictment including name of defendant, court, date of capital indictment, disposition (by plea, dismissal, or trial) and sentence imposed, OHIO REV. CODE ANN. §2929.021, there is a fundamental omission in the collection scheme. This flaw arises from the failure to require, when recommending life imprisonment, identification of the mitigating factors found to exist, and why the aggravating circumstances do not outweigh the mitigating factors beyond any reasonable doubt.

Information as to cases in which life imprisonment was imposed after a capital sentencing hearing is essential for the reviewing courts to carry out their responsibility of assuring that excessive, disproportionate sentences of death are not imposed. *See,* Baldus, Pulaski, Woodworth and Kyle, *Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach*, 33 STAN.L.REV. 1, 7, fn. 15 (1980); *Woodson v. North Carolina* (1976), 428 U.S. 280, 316, 96 S.Ct. 2978, 49 L.Ed.2d 944 , *ante,* (REHNQUIST, J., dissenting); *McCaskill* v. *State* (Fla. 1977), 344 So.2d 1276, 1280. The majority of states follow the

---

[67] *See, State v. White* (Del. 1978), 395 A.2d 1082, 1094-1095.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

105

practice of comparing cases in which life sentences were imposed.[68]  *See*, Van Duizend, *Comparative Proportionality Review in Death Sentence Cases. What Why?*, STATE COURT JOURNAL (1984), Vol. 8, No. 3, at fn. 26 (pub. draft).

However, as the jury's recommendation of life is binding, and no opinion is required to be prepared by the jurors setting forth the mitigating factors found and the reasons why one outweighed the other, there is no means in Ohio to accurately compare a case in which a binding jury's life recommendation was made to that in which a death sentence was imposed.

While a finding of aggravation is necessarily made and specified by the jury in the guilt phase, this finding cannot substitute for the life recommendation of the jury as it cannot serve to distinguish among death-eligible defendants or explain why some of them are sentenced to death while others are not.

In *Eddings* v. *Oklahoma*, *ante*, the Court stated that the Constitution

---

[68] In *Gregg* v. *Georgia*, , the Court held:

It is apparent that the Supreme Court of Georgia has taken its review responsibilities seriously.  In *Coley* [*v. State* (1974), 231 Ga. 829, 204 S.E.2d 612], it held that "[t]he prior cases indicate that the past practice among juries faced with similar factual situations and like aggravating circumstances has been to impose only the sentence of life imprisonment for the offense of rape, rather than death." 231 Ga., at 835, 204 S.E.2d, at 617.  It thereupon reduced Coley's sentence from death to life imprisonment.  Similarly, although armed robbery is a capital offense under Georgia law, §26-1902 (1972), the Georgia court concluded that the death sentences imposed in this case for that crime were "unusual in that they are rarely imposed for [armed robbery].  Thus, under the test provided by statute, . . . they must be considered to be excessive or disproportionate to the penalties imposed in similar cases." 233 Ga., at 127, 210 S.E.2d, at 667.  The court therefore vacated Gregg's death sentences for armed robbery and has followed a similar course in every other armed robbery death penalty case to come before it. [Citations to Georgia cases omitted.]

The provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury.  *If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedure assure that no defendant convicted under such circumstances will suffer a sentence of death.*

*Id.*, at 205-206.  That type of proportionality review—which is the heart of a proportionality review itself—cannot take place in Ohio.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · Youngstown, Ohio 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@GMAIL.COM

106

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 384

mandated both "measured, consistent application (of the death penalty) and fairness to the Accused," and again that "capital punishment [must] be imposed fairly, and with reasonable consistency, or not at all." These aims of consistency and fairness cannot be achieved within the present Ohio capital sentencing scheme. Without requiring the jury to identify and specify its reasons, arbitrary and capricious decisions are masked by jury secrecy and the general verdict of a binding life recommendation.

For a death sentence to be constitutional, there must be adequate or meaningful appellate review, and death sentences must be reversed when there is a significant risk of arbitrary sentencing. *See, Gregg v. Georgia, ante; Godfrey v. Georgia, ante.* The standard for review is obviously one of careful scrutiny, and the review must be based on a comparison of similar cases. The review must ultimately focus on the character of the defendant and the circumstances of the crime or crimes and a consideration of the aggravating circumstances and mitigating factors. *Barclay* v. *Florida* (1983), 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134, 51 USLW 5206.

The Ohio statutes are unclear as to whether the sparse information gathered will indeed be used by the courts. A review of appellate death penalty decisions in Ohio seems to indicate that the information goes unnoticed. The statutes are equally unclear as to how the comparative evaluation is to be carried out and what documentation there is to be of the evaluation once it is performed.

A sentencing body that recommends a life sentence is not required to identify mitigating circumstances or factors, nor is the body required to indicate why mitigating circumstances outweigh aggravating factors. Without this type of information, no comparison of cases, except on the most superficial level, is possible. Effective and meaningful appellate review demands an in-depth

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail JBJURISDOC@AOL.COM

107

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 385

analysis, not a cursory review based upon sparse and incomplete information. Nor is a meaningful review possible without some standardized method of comparison. The Ohio law is the antithesis of a meaningful comparison and review. The procedure authorizes accelerated review, minimal information included in written findings at sentencing, and inadequate data. With no certainty of a meaningful appellate review, there can be no guarantee that death sentences are not arbitrary. *Zant* v. *Stephens, ante*.

The review of the Ohio Supreme Court likewise is not meaningful appellate review.[69] Limiting review to capital convictions tried in the same district in which the defendant is tried cannot and will not insure against arbitrary sentences. There is, in the words of Justice Byron White, "no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman* v. *Georgia, ante*, at 313 (WHITE, J., concurring). The Ohio Supreme Court's method of considering only other cases in which the death penalty was imposed abdicates the responsibility entrusted to it by the General Assembly in OHIO REV. CODE ANN. §2929.05.

Since its first death penalty decision, *State* v. *Jenkins, ante*, the Ohio Supreme Court has rejected arguments that Ohio's law violates U.S. CONST. amend. VIII and XIV. Yet, it is clear from *Jenkins* and subsequent decisions that the Court's method of review is itself suspect. The Court does not consider or compare death sentences with life sentences handed down in capital murder

---

[69] As noted in the argument concerning judicial fiat, all arguments made herein are made with all due respect to the courts. The arguments are valid. Any indelicacy in making the arguments is the fault of the writer and should not be held against the Defendant to diminish the reasoning contained therein.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

108

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 386

indictment cases.[70]  Nor does it consider life sentences imposed on co-defendants in separate jury trials.  Moreover, in *State v. Rogers* (1985), 17 Ohio St.3d 174, 478 N.E.2d 984, the Court held that appellate courts need only consider death verdicts within their own district or geographical boundaries.[71]  In *State v. Maurer, ante*, the Court undertook no comparison of cases at all and conducted no meaningful proportionality review.  In obvious violation of the principle that a criminal statute is to be strictly construed in favor of the defendant, it allowed the appellate court to provide the rationale for the death sentence, something the trial court was required to do so, but failed to do.  *See*, OHIO REV. CODE ANN. §2929.05.[72]  Many years ago the United States Supreme Court acknowledged that if the government does not follow the law, the citizenry will fail to afford the government the respect that is the cornerstone of its power.  In *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60, the Court said that the "government of the United States has been emphatically termed a government of laws, and not of men.  It will certainly cease to deserve this high appellation,

---

[70] *E.g., State v. Rogers* (1985), 17 Ohio St.3d 174, 478 N.E.2d 984; *State v. Mapes* (1985), 19 Ohio St.3d 108, 484 N.E.2d 140, 19 OBR 318.

[71] 17 Ohio St.3d, at 186.  Frankly, such a method is incongruous "end justifies means" jurisprudence.  If the same sentencing mistakes are made in a given appellate district, that somehow under the Court's reasoning satisfies the constitutional requirement that the law be applied equally throughout the state.  *See*, OHIO CONST. art. I, §2.  Judicial districts were created for administrative convenience, not to surpass constitutional provisions.  Indeed, if the imposition of the death penalty were not a penalty at least to some extent affected by local parochial attitudes, certain southern states would not be referred to as "death belt" states.

[72] In *State v. Martin* (1985), 19 Ohio St.3d 122, 483 N.E.2d 1157, the Court expedited the procedure for the proportionality review by holding that, in a case where there is no mitigation, the death sentence is *automatically* proportionate because death sentences have been affirmed in cases *with* mitigation.  That analysis quite simply fails to consider the significance of the aggravating circumstances or whether or not they are serious enough to warrant a death sentence.  The analysis also fails to take into consideration the mandate that death not be imposed when juries do not generally impose death for such offenses, regardless of the mitigation or lack thereof.  *See, Gregg v. Georgia*, quoted *ante*.  The Ohio Supreme Court decisions demonstrate that the Court's analysis and review of the death penalty is cursory at best and not the in-depth analysis demanded by the state and federal constitutions.  *See, e.g., State v. Zuern, ante; State v. Steffen* (1987), 31 Ohio St.3d 111, 509 N.E.2d 383; and *State v. Morales* (1987), 32 Ohio St. 3d 252, 513 N.E.2d 267.  See the argument *post* concerning judicial fiat.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS808@AOL.COM

109

if the laws furnish no remedy for the violation of a vested legal right." *See, also*, *Olmstead v. United States* (1928), 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944, 66 ALR 376: "In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." (BRANDEIS, J., dissenting.)

VIII. *Lack of Inquiry Regarding Arbitrariness, Passion, or Prejudice.*

U.S. CONST. amend. VIII mandates that, in appellate review of a death sentence, it must be determined whether the sentence is imposed under the influence of passion, prejudice, or any other arbitrary factor. This review is to serve as a check against the "random and arbitrary imposition of the death penalty". *Gregg* v. *Georgia, ante.* The Ohio law does not require inquiry or findings about the possible influence of passion, prejudice, or any other arbitrary factor, although the same is demanded by the state and federal constitutions. U.S. CONST. amend. VIII and XIV; OHIO CONST., art. I, §§9 and 16. If the review is not required explicitly by the statute, and if it is not deemed required by implication in every case through a construction of the statute, OHIO REV. CODE ANN. §1.47,[73] then Ohio's capital law is constitutionally deficient.

IX. *Requirement that Death Be Imposed in Certain Circumstances.*

The Ohio law violates the state and federal constitutions, *see*, U.S. CONST.

---

[73] OHIO REV. CODE ANN. §1.47, entitled "Intentions in the Enactment of Statutes," provides: "In enacting a statute, it is presumed that: . . . Compliance with the constitutions of the state and of the United States is intended; . . . The entire statute is intended to be effective; . . . A just and reasonable result is intended; . . . A result feasible of execution is intended." *See, also, Akron v. Rowland* (1993), 67 Ohio St.3d 374, 618 N.E.2d 138, 62 USLW 2220, where the Court held that construction of legislative enactment must bear some reasonable relation to the statute's language, and court may not insert provision not incorporated by legislature.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURIS1@AOL.COM

110

amend. V, VIII, and XIV and OHIO CONST., art. I, §§9 and 16, because it precludes a mercy option in two circumstances: (1) in the absence of mitigation; or (2) when aggravating circumstances outweigh mitigating factors. In those situations, the law *requires* the imposition of the death penalty.[74] The law emasculates the requirement of individualized sentencing and impermissibly limits the sentencer from returning a decision of life imprisonment. At least two federal circuits, the Fifth and Eleventh Circuits, have remanded cases, finding error in the jury instructions when the trial court failed to clearly instruct the jury that it, the jury, had the option to return a life sentence *even if* aggravating factors outweighed mitigating factors. *See, Chenaulte v. Stynchcombe* (5th Cir. 1978), 581 F.2d 444; *Westbrooke v. Zant* (11th Cir. 1983), 704 F.2d 1487.

If capital sentencing is to be truly individualized as required by the state and federal constitutions, a mercy option is required under all circumstances. Individualized sentencing requires that the sentencing body have the ability to choose mercy and to determine that death is not the appropriate penalty in the particular situation. In *Barclay* v. *Florida, ante*, the United States Supreme Court held that the jury must be and is free to "determine whether death is the *appropriate* punishment". 463 U.S. at 950, quoting *California* v. *Ramos*; (emphasis added). Ohio's law eliminates that option. Without the mercy option in all circumstances, the defendant faces a death verdict resulting from a type of statute as in *Lockett* v. *Ohio, ante*. That statute mandated a death verdict in the absence of one of three specific mitigating factors. Similarly, OHIO REV.

---

[74] It is now questionable whether a jury may ever be able to consider mercy, a ruling which clearly infects the proceedings with the outrage of the victims that any sentencing proceeding is to be free from. See Justice Resnick's majority opinion in *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212. This decision not only conflicts with earlier decisions of the Ohio Supreme Court, *e.g., State v. Zuern, ante*, but it conflicts with decisions of the United States Supreme Court, including *Eddings v. Oklahoma*, cited *ante*. The decision deprives the jury of the opportunity to determine that death is the "appropriate" penalty in any case, and it deprives the jury of the opportunity to recommend mercy which was first enacted in Ohio capital law in 1898.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8299 · EMAIL JBJJURIS@ICQAOL.COM

111

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 389

CODE ANN. §2929.03(D)(3) *requires* the imposition of the death penalty when aggravating circumstances outweigh mitigating factors.

In *California* v. *Brown* (1987), 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934, 55 USLW 4155, the United States Supreme Court reaffirmed the requirement of U.S. CONST. amend. VIII that there be reliability in the determination that death is the appropriate punishment in a specific case. Yet, the Ohio statute does not permit a determination as to whether the death penalty is appropriate in a particular case: a death sentence is mandated after it is determined that aggravating circumstances outweigh mitigating factors.

The Ohio Supreme Court in the past paid lip service to the mercy option by holding that an Ohio jury *is not precluded* from extending mercy to a defendant. *State* v. *Zuern, ante.* Yet, Ohio juries are not in fact told of the ability to opt for mercy regardless of whether the aggravating factors outweigh the mitigating circumstances beyond a reasonable doubt. The Court, in what appears to be a disregarding of federal decisions construing U.S. CONST. amend. VIII, has now demonstrated a further willingness to remove any impediment that might interfere with the execution of capitally charged defendants in this State. In *State* v. *Lorraine*, discussed *Post* in the section concerning judicial fiat, the Court held that a mercy instruction is not to be permitted because mercy is not one of the mitigating factors set forth in OHIO REV. CODE ANN. §2929.04(B). This decision conflicts with a number of federal decisions discussed elsewhere herein, including *California* v. *Brown, ante* (upon which the Court in *Lorraine* purports to base its decision); *Barclay* v. *Florida, ante*; *Gregg* v. *Georgia, ante*; *Furman* v. *Georgia, ante*; *Eddings* v. *Oklahoma, ante*; *Lockett* v. *Ohio, ante*; and *Skipper* v. *South Carolina* (1986), 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1, 54 USLW 4403. *Lorraine* also overlooks the Ohio statute, OHIO REV. CODE ANN. §2929.04(B)(7).

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJ/JGI@AOL.COM

112

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 390

The United States Supreme Court has repeatedly spoken on this subject, but nowhere did it speak more authoritatively than in *Hitchcock* v. *Dugger* (1987), 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347, 55 USLW 4567. In that case, the unanimous opinion of the Court was written by Justice Antonin Scalia, not among the "liberals" of the Supreme Court. The Court vacated the death sentence, holding that the jury and the trial judge may not refuse to consider nor be precluded from considering any relevant mitigating evidence. The Court held at 398-399:

> We think it could not be clearer that the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances, and that the proceedings therefore did not comport with the requirements of *Skipper* v. *South Carolina*, 476 U.S. 1 (1986), *Eddings* v. *Oklahoma*, 455 U.S. 104 (1982), and *Lockett* v. *Ohio*, 438 U.S. 586 (1978) (plurality opinion). Respondent has made no attempt to argue that this error was harmless, or that it had no effect on the jury or the sentencing judge. In the absence of such a showing our cases hold that the exclusion of mitigating evidence of the sort at issue here renders the death sentence invalid.

Hitchcock argued that certain evidence which was not specifically mentioned in the Florida statute was kept from the jury and not considered by the judge, and that still other evidence was not offered by his lawyer, on the reasonable belief that it was precluded by Florida law. It is interesting to note the similarity between the holding of *State* v. *Lorraine* and the decision of the Florida Supreme Court, now since rejected, which held that only statutory mitigation evidence could be considered. In *Cooper* v. *State* (Fla. 1976), 336 So.2d 1133, 1139, the court said that the "sole issue in a sentencing hearing under Section 921.252, Florida Statutes (1975), is to examine in each case the itemized aggravating and mitigating circumstances. Evidence concerning other matters have [*sic*] no place in that proceeding . . . ." In *Lorraine*, the Ohio Supreme Court said: "Permitting a jury to consider mercy, which is not a mitigating factor and thus irrelevant to sentencing, would violate the well-

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone (330) 758-2308 · Facsimile (330) 758-8290 · e-mail: JBJJURISDOC@AOL.COM

113

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 391

established principle that the death penalty must not be administered in an arbitrary, capricious, or unpredictable manner.  .  .  .  The arbitrary result which may occur from a jury's consideration of mercy is the exact reason the General Assembly established the procedure now used in Ohio." 66 Ohio St.3d at 417. The Court cited to *California* v. *Brown*, *Gregg*, and *Furman*. It did not mention *Hitchcock* v. *Dugger*, *Skipper*, *Eddings*, or *Lockett*. It also did not mention that the state and federal constitutions prohibit capricious infliction of the death penalty; they do not prohibit a penalty less than death. With all due respect, *Lorraine* is not sound constitutional reasoning based upon an expansive reading of personal liberty and limited government authority: it is instead crafting an opinion around a preordained result.

IX.  *Failure to Require Decision About Appropriateness.*

Under OHIO REV. CODE ANN. §2929.05, Ohio appellate courts, when reviewing a death sentence, must determine that death is the only "appropriate" penalty. Yet, the trial court is not required to make such a determination. The omission violates U.S. CONST. amend. VIII and XIV and OHIO CONST., art. I, §§9 and 16. A finding of appropriateness of the death penalty is constitutionally required. *See, Coker* v. *Georgia, ante.* The death penalty is unconstitutional if it is not the only penalty that will appropriately serve the government's punishment goals in a particular case. The death penalty is unconstitutional if the government cannot reliably establish that death is the appropriate punishment in a particular case. *See, e.g., Lockett* v. *Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed. 2d 973; *Woodson* v. *North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944.

It is not impossible, and it is certainly within the realm of reason that a jury could conclude that aggravating circumstances outweigh mitigating factors and still conclude that death is not the appropriate punishment in a specific

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

114

case. *See*, *Smith* v. *North Carolina* (1982), 459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622, 51 USLW 3418 (STEVENS, J., dissenting from denial of certiorari). The jury must have the opportunity to find the death penalty inappropriate even when statutory aggravating circumstances outweigh mitigating circumstances, yet the aggravating circumstances are not weighty enough to support the ultimate penalty of death. *Barclay* v. *Florida*, *ante*, 463 U.S., at 964.[75] However, if the original sentencing body does not make a finding that the penalty is appropriate in a particular case, then reviewing courts can do little more than speculate whether the sentencing body dealt with the issue. Arbitrary decisions are the natural by-product where such a finding is made for the first time on appeal due to forced speculation by the appellate court. *See*, *State* v. *Martin*, *ante*. The present Ohio law permits imposition of the death penalty in spite of factors in mitigation. The law is defective because it does not require the jury or the trial judge to decide the appropriateness of the death penalty.

## X. *Judicial Fiat*

### A.

Since judicial review of Ohio's post-*Lockett* death penalty statutes began in 1984, see, *State* v. *Jenkins*, *ante*; *State* v. *Maurer*, *ante*. it has become obvious that the Ohio death penalty law violates both the state and federal constitutions[76] because it has not been uniformly applied. The courts of Ohio have abandoned the role designed for them in the Constitution: to dispassionately construe statutes and to interpret and apply the Constitution. Instead, the courts of Ohio have in essence become a second legislature, rewriting statutes, ignoring bedrock principles of constitutional law, ignoring

---

[75] In *Barclay*, although the homicides were horrible, the jury recommended a life sentence.

[76] *See*, U.S. CONST. amend. VIII and XIV; OHIO CONST. art. I, §§1, 2, 9, and 16.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHSDOC@AOL.COM

115

*stare decisis*, and making every effort to affirm the convictions for those sentenced to death.[77] The actions of Ohio's courts have eroded a basic aspect of infliction of the death penalty: effective appellate review. Accordingly, the death penalty cannot be administered with certainly, reliability, and predictability. Absent those safeguards, it cannot therefore be inflicted at all, and the death specifications must be dismissed in this case.

## B.

To satisfy the state and federal constitutions, the procedure for invoking the death penalty must be reliable and evenhandedly applied. If the procedure lacks these essential qualities, the government is "disentitled" to execute any death sentence imposed.[78] In Ohio, the judicial review designed to comply with the federal Constitution has been the subject of short-cutting and short-circuiting. The result is a legal framework that on its face appears to comply with the federal Constitution, but in practice comes nowhere close.

Courts have struggled with the notion of trying to make the death penalty work. They have not been successful. They claim otherwise, of course, both those claims have little intellectual merit. The claims are rationalizations, as logically effective as whistling in the dark.[79] Even the United States Supreme Court, which has produced thousands of pages on the subject of the death penalty since 1972, has acknowledged that death, in its finality and its

---

[77] That popular opinion was most recently expressed in the vote to amend Ohio's constitutional provisions relating to the jurisdiction of appellate courts and the Supreme Court of Ohio only in cases in which the death penalty has been imposed. The issue was adopted as "Issue One" in the 1994 general election.

[78] This term is borrowed from Justice Byron White's opinion for the Court in *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, 60 USLW 4541.

[79] Former Justice Harry Blackmun finally gave up, concluding at about age 83 and after a long career that the death penalty cannot be applied in a fashion consistent with the federal constitution. He lamented that "the prospect of meaningful judicial oversight has diminished." See, *Callins* v. *Collins*, *ante*, (BLACKMUN, J., dissenting from denial of certiorari). The Defendant submits here that it has all but vanished.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJTURDOG@AOL.COM

116

irrevocable nature as a punishment, differs from all other kinds of punishment. The Court has not rationally dealt with the subtle interplay of the Cruel and Unusual Punishment Clause, the Equal Protection Clause, and the Due Process Clause. *See*, U.S. CONST. amend. VIII and XIV.

Often, in the claimed interest of separation of powers, judges are reluctant to intrude upon what is perceived as the will of the people, enacted by the legislature. Indeed, the political popularity of the death penalty cannot be denied. When *Furman, ante*, invalidated all death penalty laws, the reaction by state legislatures was swift and certain. They set about enacting new death penalty laws that would survive the perceived hurdles of *Furman*—admittedly no easy task, given the number of opinions and the differences between them.

Although the political popularity of the death penalty cannot be denied, judicial scrutiny is another matter entirely. It is the obligation of the judiciary to see to it that laws are fairly and evenhandedly administered. It is the Constitution that protects the minority against the majority, and it is the courts who see to it that all citizens, whether of the majority or minority, have their natural rights protected against encroachment by the government. *See, e.g.*, OHIO CONST. art. I, §1. We do well to recall the words of the Supreme Court in Justice Robert Jackson's classic opinion in *West Virginia v. Barnette, ante*: "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them *beyond the reach of majorities and officials* and to establish them as legal principles to be applied by the courts." (Emphasis added.)

The reluctance to hold something an unconstitutional exercise of power by the government was entrusted to the courts. The heart of this argument is that the judiciary of Ohio has abandoned the insulated role of arbiter of the law, and assumed the political position of enforcer and advocate.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.759.8280 · E-MAIL JBJURIS850@AOL.COM

117

In *Furman* v. *Georgia, ante,* the late Justice William O. Douglas set forth the mission of the Eighth Amendment:

> The high service rendered by the "cruel and unusual" punishment clause of the Eighth Amendment is to require legislatures to write penal laws that are evenhanded, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups.

408 U.S. 238, 256, Douglas, J. concurring.  Indeed, the lack of adequate appellate review in Ohio's death penalty, both as designed and as applied—but more particularly as applied—renders appropriate a passage inserted by Justice Douglas in his opinion in *Furman*, 408 U.S. at 253 *et seq.*:

> Irving Brant has given a detailed account of the Bloody Assizes, the reign of terror that occupied the closing years of the rule of Charles II and the opening years of the regime of James II (the Lord Chief Justice was George Jeffreys):
>
> "Nobody knows how many hundreds of men, innocent or of unproved guilt, Jeffreys sent to their deaths in the pseudo trials that followed Monmouth's feeble and stupid attempt to seize the throne. When the ordeal ended, scores had been executed and 1,260 were awaiting the hangman in three counties. To be absent from home during the uprising was evidence of guilt. Mere death was considered much too mild for the villagers and farmers rounded up in these raids. The directions to a high sheriff were to provide an ax, a cleaver, 'a furnace or cauldron to boil their heads and quarters, and soil to boil therewith, half a bushel to each traitor, and tar to tar them with, and a sufficient number of spears and poles to fix their heads and quarters' along the highways. One could have crossed a good part of northern England by their guidance."
>
> "The story of The Bloody Assizes, widely known to Americans, helped to place constitutional limitations on the crime of treason and to produce a bar against cruel and unusual punishments. But in the polemics that led to the various guarantees of freedom, it had no place compared with the tremendous thrust of the trial and execution of Sidney. The hundreds of judicial murders committed by Jeffreys and his fellow judges were totally inconceivable in a free American republic, but any American could imagine himself in Sidney's place–executed for putting on paper, in his closet, words that later on came to express the basic principles of republican government. Unless barred by fundamental law, the legal rulings that permitted this result could easily be employed against any person whose political opinions challenged the party in power." *The Bill of Rights* 154-155 (1965).
>
> Those who wrote the Eighth Amendment knew what price their forebears had paid for a system based, not on equal justice, but on

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail: JBJURIND@GMAIL.COM

118

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 396

discrimination. In those days the target was not the blacks or the poor, but the dissenters, those who opposed absolutism in government, who struggled for a parliamentary regime, and who opposed governments' recurring efforts to foist a particular religion on the people. *Id.*, at 155–163. But the tool of capital punishment was used with vengeance against the opposition and those unpopular with the regime. One cannot read this history without realizing that the desire for equality was reflected in the ban against "cruel and unusual punishments" contained in the Eighth Amendment.

Even if Ohio's death penalty law contains the required elements of guided discretion for juries, effective appellate review must work hand in hand with the jury in the sentencing function. Ohio now has over 200 inmates on its death row. Admittedly, not all are "innocent or of unproved guilt," but some are. Absent intervention by the federal courts, many will be sent to their deaths as a result of trials so filled with error as to be called "pseudo trials." Those who languish, awaiting the hangman, sit convicted and sentenced not as a result of a process narrowly tailored and cautiously applied, but as a result of their victimization by political opportunism.

### C.

#### 1.

It is beyond question that states must, in order for death penalty laws to satisfy the federal Constitution, tailor and apply their laws in a manner that avoids the arbitrary and capricious infliction of the death penalty. *Godfrey* v. *Georgia, ante.* Put another way, any action by the government in executing a death sentence, capriciously imposed, is beyond the constitutional powers delegated to the government.

#### 2.

Nowhere is discerning appellate review more necessary than in a death penalty case; and yet, in Ohio, nowhere is effective appellate judicial review more lacking. The United States Supreme Court has acknowledged that, even with efforts at guided discretion, juries may misapply sentencing procedures,

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: JBJuhasz@aol.com

119

and may impose the death sentence for someone outside the narrowly defined class of those who truly deserve consideration of the death sentence.  In *Gregg v. Georgia*, *ante*, 428 U.S. at 192, the Court said:

> But the provision of relevant information under fair procedural rules is not alone sufficient to guarantee that the information will be properly used in the imposition of punishment, especially if sentencing is performed by a jury.  Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given.

In *Gregg*, the Court upheld Georgia's post-*Furman* death penalty law.  In doing so, however, the Court noted that the automatic appellate review was a vital additional safeguard to avoid capricious infliction of the death penalty.  The Court said:

> These [statutory] procedures require the jury to consider the circumstances of the crime and the criminal before it recommends sentence.  No longer can a Georgia jury do as Furman's jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. . . . . As a result, while some jury discretion still exists, "the discretion to be exercised is controlled by clear and objective standards so as to produce non-discriminatory application." *Coley* v. *State*, 231 Ga. 829, 834, 204 S.E.2d 612, 615 (1974).
>
> As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State's Supreme Court.  That court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases. §27-2537(c) (Supp.1975).
>
> In short, Georgia's new sentencing procedures require as a prerequisite to the imposition of the death penalty, specific jury findings as to the circumstances of the crime or the character of the defendant.  Moreover, to guard further against a situation comparable to that presented in *Furman*, the Supreme Court of Georgia compares each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate.  On their face these procedures seem to satisfy the concerns of *Furman*.  No longer should there be "no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." 408 U.S., at 313, 92 S.Ct., at 2764 (White, J., concurring).

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJJURIS@AOL.COM

120

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 398

*Id.* 428 U.S. at 197-198.

When *Gregg* attacked the vagueness of one of the aggravating circumstances in the revised Georgia statute, the Court agreed that the language could be construed in an open-ended way, but then rebuffed Gregg's challenge by relying on the Georgia Supreme Court to construe the statute in a narrow way.  The Court said:

> The petitioner attacks the seventh statutory aggravating circumstance, which authorizes imposition of the death penalty if the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," contending that it is so broad that capital punishment could be imposed in any murder case.  It is, of course, arguable that any murder involves depravity of mind or an aggravated battery.  But this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction. . . .

428 U.S. at 201.  [Footnotes omitted.]

3.

Four years after rebuffing Gregg's challenge, the Supreme Court did exactly what Troy Gregg had sought on appeal and what this Defendant seeks now, before trial.  The Court voided the death sentence of a man because it found that judicial review in Georgia was ineffective.  The Court framed the issue as follows:

> Under Georgia law, a person convicted of murder [footnote omitted] may be sentenced to death if it is found beyond a reasonable doubt that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga. Code §27-2534.1(b)(7) (1978).  In *Gregg* v. *Georgia*, 428 U.S. 153, the Court held that this statutory aggravating circumstance (§(b)(7)) is not unconstitutional on its face.  Responding to the argument that the language of the provision is "so broad that capital punishment could be imposed in any murder case," the joint opinion said:
> "It is, of course, arguable that any murder involves depravity of mind or an aggravated battery.  But this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction." 428 U.S., at 201, (opinion of STEWART, POWELL, and STEVENS, JJ.).

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · EMAIL: JBJUHASZ@GMAIL.COM

121

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 399

> Nearly four years have passed since the *Gregg* decision, and during that time many death sentences based in whole or in part on §(b)(7) have been affirmed by the Supreme Court of Georgia. The issue now before us is whether, in affirming the imposition of the sentences of death in the present case, the Georgia Supreme Court has adopted such a broad and vague construction of the §(b)(7) aggravating circumstance as to violate the Eighth and Fourteenth Amendments to the United States Constitution. [Footnote omitted.]

*Id.*, at 422-23. The Supreme Court found that Godfrey had been sentenced to death solely on the basis that the offense was "outrageously or wantonly vile, horrible and inhuman." *Id.*, at 428; *see*, GA. CODE ANN. §27-2534.1(b)(7). The jury was given no guidance for its deliberations concerning the meaning of any of those statutory terms. The appellate review in Georgia of Godfrey's case, like appellate review in Ohio, was more form than substance. Although it had four years earlier tried to save the Georgia statute, the Supreme Court was forced to concede that myopic appellate review had rendered the death penalty—at least as to that aggravating circumstance—unconstitutional. The Court said:

> The standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury in this case was in no way cured by the affirmance of those sentences by the Georgia Supreme Court. Under state law that court may not affirm a judgment of death until it has independently assessed the evidence of record and determined that such evidence supports the trial judge's or jury's finding of an aggravating circumstance. Ga.Code §27-2537(c)(2) (1978).
>
> . . . [A]s was said in *Gardner* v. *Florida*, 430 U.S. 349, 358, it "is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."
>
> That cannot be said here. There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not. Accordingly, the judgment of the Georgia Supreme Court insofar as it leaves standing the petitioner's death sentences is reversed, and the case is remanded to that court for further proceedings.

*Id.*, at 429-433. Godfrey's death sentence was vacated because the Georgia courts had not done their job. They had not provided the effective appellate review of death sentences that the Eighth Amendment demands. The Supreme

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBHJURISDOC@AOL.COM

122

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 400

Court in *Gregg* had approved the Georgia death penalty on the explicit assumption that meaningful judicial review would remove caprice from infliction of the death penalty.  As will be shown herein, the Ohio courts have not done their job.  Not only have the Ohio courts failed to ferret out error, but their rulings have resulted in constitutional anomalies.  Juries are precluded from consideration of mitigation evidence; the proportionality review is designed to perpetuate past mistakes; and the independent weighing of aggravating circumstances and mitigating factors is inexplicable and at times almost nonsensical.  If the specification in this case is not dismissed, death may be imposed.  If death is imposed, there will be "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not."  The government is without the power to impose death under such circumstances, and this Court must dismiss the death specification to avoid the possibility.

### D.

The arbitrariness in appellate review in Ohio comes in a number of forms, each apparently more impassioned and unprincipled than the last.  The Ohio courts have abandoned the design that the death sentence should be imposed only after the sentencer has been given guided discretion.  The courts also appear to have abandoned the principle that the death penalty should be reserved for only the worst of Ohio's murderers.[80]  Several areas highlight the inadequacy of appellate review of death sentences in Ohio.  Discussed here will be but three such areas: (1) the improper limitation upon mitigation evidence

---

[80] *See, Zant* v. *Stephens, ante,* 462 U.S., at 876-877, where the United States Supreme Court said: "[To] protect . . . against the wanton and freakish imposition of the death penalty . . . ., an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others *found guilty of murder.*" (Emphasis added).  Note that the language is not "others sentenced to death" or "others sentenced to death in the same appellate district," the standards employed by the Supreme Court of Ohio.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: JBJ4CRISDOC@AOL.COM

123

and the denial of effective mitigation arguments; (2) the lack of a meaningful proportionality review; and (3) inadequate independent weighing of aggravating circumstances and mitigating factors, including use by the courts themselves of prohibited nonstatutory aggravating circumstances.

1.

The United States Supreme Court made clear in *Gregg* that the federal constitution does not act as a bar to a jury granting mercy in a given case, the statutorily defined aggravating factors and mitigating circumstances notwithstanding. The Court held:

> The petitioner next argues that the requirements of *Furman* are not met here because the jury has the power to decline to impose the death penalty even if it finds that one or more statutory aggravating circumstances are present in the case. This contention misinterprets *Furman*. See *ante*, at 198-199. Moreover, it ignores the role of the Supreme Court of Georgia which reviews each death sentence to determine whether it is proportional to other sentences imposed for similar crimes. Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.

The proportionality requirement, the Court made clear, is to prevent capricious *infliction* of the death penalty, not the converse, as the Ohio Supreme Court accomplished in *State v. Lorraine, ante*.

Hand in hand with that principle is a series of cases decided by the United States Supreme Court, the gist of which is that the Eighth Amendment does not permit limits to be placed on the mitigating evidence which a jury is permitted to consider. In *Eddings* v. *Oklahoma, ante*, the Court held it error to exclude consideration of evidence of Eddings' youth and troubled childhood from the sentencing determination. In *Lockett* v. *Ohio, ante*, the Court invalidated

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

124

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 402

Ohio's first post-*Furman* effort to resurrect the death penalty.[81] The Court found that the requirement that death be imposed unless one of three statutory conditions was met inappropriately limited consideration of mitigating evidence. In *Skipper* v. *South Carolina, ante,* the Court unanimously vacated a death sentence where the trial court had precluded the testimony of witnesses who would have commented on Skipper's adjustment to jail during pretrial incarceration.

*Hitchcock* v. *Dugger* is a notable case, for a number of reasons. First, it is just one example of inadequate state appellate review. The caption of the case is evidence enough. Hitchcock had his case decided by the last court of review, the United States Supreme Court. He had gone through the state system and was in the federal system, as evidenced by the fact that the Respondent was not the State of Florida, but Richard Dugger, the Secretary of Florida Department of Corrections.

Although there are complaints about the endless number of and length of capital appeals, it is worthy of note that it was not until review of federal *habeas corpus* proceedings by the United States Supreme Court—one of the last options before execution—that relief was granted in Hitchcock's case. Equally alarming is that the Court said that the right to relief could not be clearer—thus posing the question: how did all those other courts in all those endless appeals miss

---

[81] Although the appellate review process is essential to imposition of the death penalty, even with state court appellate review, death penalty litigation is still a slippery slope. As but two examples, the Ohio Supreme Court had affirmed Sandra Lockett's conviction, later reversed by the United States Supreme Court. *See*, (1976), 49 Ohio St.2d 48. The South Carolina Supreme Court affirmed the conviction and death sentence of Ronald Skipper, (1985), 285 S.C. 42, later reversed by the United States Supreme Court. See discussion *post*.

The point is that the state courts do not always get it right. The Supreme Court of the United States does not always get it right, either. *Cf. Atkins v. Virginia, ante,* and *Penry v. Lynaugh, ante.* Further, the United States Supreme Court only grants certiorari in a very small number of cases. When, as in Ohio, the state courts make only a perfunctory effort at appellate review—in an effort to avoid reversing death sentences, the ostensible safeguards of that review become meaningless. An unacceptable number of cases fall in the cracks between ineffective appellate review and the decision not to grant certiorari.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@GMAIL.COM

125

such a "clear" right to relief?  Another example, much closer to home, is the case of John Glenn, a Mahoning County man who was tried in Portage County, convicted of capital murder, and sentenced to death.  His conviction and death sentence were affirmed, *see* 28 Ohio St.3d 451.  His post-conviction relief claims were denied and he filed in federal court for a writ of habeas corpus.  The district court denied relief, but the United States Court of Appeals for the Sixth Circuit vacated the death sentence.  *See, Glenn* v. *Tate* (6th Cir. 1995), 71 F.3d 1204.  A reading of its opinion indicates that the case was not at all a close decision, thus raising the obvious question: what were all of these other courts doing?  The answer is the premise of this motion: overlooking obvious errors in an attempt to affirm the death penalty for a person who had committed a bad crime.  The United States Supreme Court declined review, *see, Tate* v. *Glenn* (1996), 519 U.S. 910, 117 S.Ct. 273, 136 L.Ed.2d 196, 65 USLW 3233, 65 USLW 3265. [82]

In *Hitchcock* v. *Dugger,* a unanimous Supreme Court vacated the death sentence.  The reason for doing so was that the Florida jury had not been instructed that it could consider nonstatutory *mitigating* factors.  Hitchcock's lawyer, Craig Barnard, successfully argued that, if the juries were not told to consider the mitigating evidence, they would not do so, thus in practical effect limiting the jury's consideration to statutory mitigating factors.  The argument was that, when Hitchcock was sentenced, the Florida statutes had been interpreted by the Florida Supreme Court to prohibit the sentencing jury and judge from considering mitigating circumstances not specifically enumerated in the statute.  *See, e.g., Cooper* v. *State*, 336 So.2d 1133, 1139 (Fla. 1976) where the court held that the sole issue in a sentencing hearing under F.S. §921.141

---

[82] Other examples of ineffective appellate review in Ohio have begun to surface, as the federal courts have granted relief to Ronald Combs, Charles Lorraine, Alfred Morales.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: jbjuris@sbcglobal.net

126

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 404

was to examine in each case the *itemized* aggravating and mitigating circumstances and that evidence concerning *other matters had no place* in such a proceeding. The United States Supreme Court denied review, *Cooper v. Florida* (1977), 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239. The Supreme Court in *Hitchcock* was convinced that the sentencing judge had assumed that only statutory mitigating factors could be considered, and he had instructed the jury accordingly.

In the sentencing phase, Hitchcock's counsel introduced evidence that as a child Hitchcock had the habit of inhaling gasoline from automobile gas tanks; that he had once passed out after doing so; that thereafter his mind tended to wander; that petitioner had been one of seven children in a poor family that earned its living by picking cotton; that his father had died of cancer; and that petitioner had been a fond and affectionate uncle to the children of one of his brothers. In argument to the jury, counsel argued that the jury to "look at the overall picture . . . consider everything together . . . consider the whole picture, the whole ball of wax." The prosecutor told the jury that it was "to consider the mitigating circumstances and consider those by number," and then he went down the statutory list item by item, arguing that only one (Hitchcock's youth) was applicable. The trial judge instructed the jury to consider only the statutory mitigating factors and himself considered the statutory mitigating factors. The Court agreed with Hitchcock that this was clearly wrong. See the language quoted *ante*.

The Ohio Supreme Court in the past paid lip service to the mercy option by holding that an Ohio jury *is not precluded* from extending mercy to a defendant. The Court said in *Zuern*: "Moreover, a jury is not precluded from extending mercy to a defendant." 32 Ohio St.3d at 64. The jury *is* precluded from extending mercy, of course, if it has no idea that it may extend mercy. A

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURIS@GMAIL.COM

127

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 405

three judge panel, presumed to know and follow the law, may not consider mercy—for under *Lorraine*, mercy "is not a mitigating factor" and is "thus irrelevant to sentencing." *Lorraine*, 66 Ohio St.3d at 417. Yet, Ohio juries are not in fact told by the Court of the ability to opt for mercy regardless of whether the aggravating factors outweigh the mitigating circumstances beyond a reasonable doubt. The Ohio Supreme Court has failed to account for federal decisions construing U.S. CONST. amend. VIII. In *State* v. *Lorraine*, *ante*, the Court held that a mercy instruction is not to be permitted because it is not one of the mitigating factors set forth in OHIO REV. CODE ANN. §2929.04(B). Lorraine had asked for a mercy instruction and was denied; he was also denied the ability to ask the jury to err on the side of mercy. It is interesting to note the similarity between the holding of *State* v. *Lorraine* and the decision of the Florida Supreme Court that only statutory mitigation evidence could be considered, a decision overruled *Hitchcock* v. *Dugger*. In *Cooper* v. *State* (Fla. 1976), 336 So.2d 1133, 1139, the Florida court said:

> The sole issue in a sentencing hearing under Section 921.252, Florida Statutes (1975), is to examine in each case the itemized aggravating and mitigating circumstances. Evidence concerning other matters have [*sic*] no place in that proceeding . . . .

In *Lorraine*, the Ohio Supreme Court said:

> Permitting a jury to consider mercy, which is not a mitigating factor and thus irrelevant to sentencing, would violate the well-established principle that the death penalty must not be administered in an arbitrary, capricious, or unpredictable manner. . . . . The arbitrary result which may occur from a jury's consideration of mercy is the exact reason the General Assembly established the procedure now used in Ohio.

*Id.*, 66 Ohio St. 3d, at 417. The Court did not mention *Hitchcock* v. *Dugger*, *Skipper* v. *South Carolina*, *Eddings* v. *Oklahoma*, or *Lockett* v. *Ohio*.

The Court in *Lorraine* held that:

> Permitting a jury to consider mercy, which is not a mitigating factor and thus irrelevant to sentencing, would violate the well

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5616
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURIS@AOL.COM

128

> established principle that the death penalty must not be administered in an arbitrary, capricious or unpredictable manner. . . . . The arbitrary result which may occur from a jury's consideration of mercy is the exact reason the General Assembly established the procedure now used in Ohio.

*Id.*, at 417. This decision conflicts with a number of federal decisions, including *California v. Brown* (1987), 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934, upon which the Court purported to base its decision in *Lorraine*; *Gregg* v. *Georgia*, *ante*; *Furman* v. *Georgia*, *ante*; *Eddings* v. *Oklahoma*, *ante*; *Lockett* v. *Ohio*, *ante*; and *Skipper* v. *South Carolina*, *ante*. *Lorraine* also overlooks the Ohio statute, OHIO REV. CODE ANN. §2929.04(B)(7). With due respect to the Court, it simply failed to recognize that the state and federal constitutions prohibit capricious *infliction* of the death penalty; not, for want of a better term, capricious decisions *not* to inflict the death penalty. The use of the term "administration" rather than "infliction" is a fine phrase; however, its use attempts to mask the Court's desire not to reverse the death sentence. In terms of the Eighth Amendment jurisprudence, the most notable example of which is *Hitchcock*, the decision is farcical. Like the Florida courts before *Hitchcock*, Ohio juries and trial judges are still precluded from considering a factor because it is not one of the statutorily listed factors.

Another interesting note is that former Justice Craig Wright, an occasional dissenter in death penalty cases, wrote a separate concurrence on the issue of the prosecutorial misconduct of Trumbull County Prosecutor Dennis Watkins. Wright noted that there are two ways to deal with prosecutorial misconduct. The first is to vacate the conviction and/or sentence. *See, State* v. *Keenan* (1993), 66 Ohio St.3d 402, 613 N.E.2d 203. The second is to refer the matter to the Disciplinary Counsel; *see, State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542. How having the prosecutor disciplined repairs constitutional error in a defendant's trial is unclear. The point is in any event

J. GERALD INGRAM · JOHN B. JUHANZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS@DOCAOL.COM

129

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 407

academic because the Supreme Court followed neither of the two options in *Lorraine*—although Justice Wright went so far as to say that he was "sorely tempted to propose such a referral in this case." *Id.*, at 431.

Ohio capital jurisprudence constantly saddles capital defendants with the errors of their trial counsel, finding in all but the rarest of cases that a failure to object was a waiver and that there was no plain error; and, that all but the most egregious errors are litigation strategy.  Apparently the Court has also adopted the posture that capital defendants are to be saddled with the errors of the prosecutor as well.[83]

OHIO CONST. art. I, §1 guarantees the right of every citizen, which exists in natural law, to effectively defend life and liberty.  OHIO CONST. art. I, §16 provides that all Ohio citizens will have a remedy in the courts "by due course of law" and that justice will be administered "without denial."  The United States Constitution provides that cruel and unusual punishments shall not be inflicted;[84] that all citizens shall enjoy equal protection of the laws, and shall be entitled to due process of law.

The Ohio Supreme Court's decision in *Lorraine* makes clear that, while a defendant may *argue* for mercy, the trial courts of this state are not to *instruct* the jury that they may extend mercy to a capital defendant.  Just as was the

---

[83] While a referral to the Disciplinary Counsel sounds like the Court will not tolerate prosecutorial misconduct in Ohio capital cases, one must look past the rhetoric.  Suppose that the Court finds egregious prosecutorial misconduct and makes a referral to the Disciplinary Counsel but does not reverse the conviction.  The system has now convicted and sentenced a man to death unfairly—so much so that the state's highest court felt compelled to have a government officer disciplined for professional misconduct which rendered the trial unfair.  Is that what Due Process means?  Is that the type of shining example we display to other countries as illustrative of American Due Process?  Was the Defendant's trial any less fair or his execution any more a shameless mockery upon justice because he had the opportunity to say among his final words: "At least that damn prosecutor got suspended from the practice of law for six months because of what he did to me at my trial"?

[84] U.S. CONST. amend. VIII is made applicable to state criminal prosecutions by U.S. CONST. amend. XIV. *See, Robinson* v. *California, ante.*

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURIS-DOC@AOL.COM

130

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 408

situation in *Hitchcock* v. *Dugger*, juries are or can be under the impression that they cannot extend mercy because the trial judge has not told them that they may do so. Thus, an extension of mercy by a jury is removed from their consideration as a mitigating factor. In the words of Justice Scalia, "it could not be clearer" that the an Ohio jury is—by omission—instructed not to consider evidence of a nonstatutory mitigating circumstance, an extension of mercy, regardless of the aggravating circumstances and other mitigating factors. Therefore, Ohio proceedings do not comport with the requirements of the Eighth Asmendment, as seen in *Skipper, Eddings, Lockett*, as well as OHIO CONST. art. I, §§1, 2, 9, and 16. Jurors rely not on what the lawyers tell them to weigh, but upon what the trial court instructs. The Ohio Supreme Court has flatly precluded consideration of mercy as a mitigating factor. Under no circumstances can such a procedure be termed "due process of law," the administration of justice without denial, or any of the other constitutional safeguards listed above.

2.

The weighing of aggravating circumstances against mitigating factors provides no assurance that the death penalty in Ohio is administered evenhandedly. Before looking at some specific cases, it is alarming to note that even the Ohio Supreme Court does not always set forth the proper standard, thus begging the question of the standard actually applied by the Court. In *State* v. *DePew* (1988), 38 Ohio St.3d 275, 292, 528 N.E. 2d 542, the Court *reversed* the standard and placed the burden on the defendant:

> In short, we find, beyond a reasonable doubt, that the unusual number of aggravating circumstances in this case *is not outweighed* by the relatively meager mitigating factors offered by appellant. Thus, the sentence of death imposed upon appellant must stand.

(Emphasis added.) The same thing happened during oral argument of *State v.*

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJFURISDOC@AOL.COM

131

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 409

*Spivey* (1998), 81 Ohio St.3d 405, 692 N.E.2d 151, *cert. denied, Spivey v. Ohio* (1998), 525 U.S 898, 119 S.Ct. 226, 142 L.Ed.2d 186, 67 USLW 3237.

In *State v. Green* (1993), 66 Ohio St.3d 141, 153-154, 609 N.E.2d 1253, the Court set out the mitigating factors, including Green's IQ of 66, youthful age of 24, remorse, poor upbringing, alcohol and drug addiction, the disparate treatment accorded to the co-defendant, and the fact that the victim "arguably 'induced or facilitated' the offense." Despite this plethora of mitigation the Supreme Court of Ohio rejected the mitigation, with only this simulated analysis:

> In weighing the aggravating circumstance against mitigating factors, we find that the aggravating circumstance does outweigh the mitigating factors beyond a reasonable doubt. Collectively, Green's lack of intelligence, family upbringing, and alcohol and drug addition are entitled to modest weight. In contrast, Green planned and carried out a calculated robbery and murder of a frail, elderly man in his own home. The number and manner of stab wounds convincingly demonstrate an intention to commit murder. The manner of death and the prior calculation and design tend to negate Green's later claims of remorse.

That the victim was frail and elderly is tragic indeed, but it is not an aggravating circumstance. That the murder was committed purposely, as evidenced by the number and type of wounds, is also not an aggravating circumstance. In fact, if the government had anything less than "convincingly demonstrate[d] an intention to commit murder," Green's conviction and death sentence would have to be vacated virtually without further analysis—for the government would not have met its burden of proof beyond a reasonable doubt. *Every* aggravated murder conviction in this State must have as its foundation a convincing demonstration that the defendant intended to commit murder. To use such proof as the basis for a death sentence is farcical. The language of the Court's opinion leaves one with the impression that 24 year old people with extremely low IQs who purposely kill someone cannot earnestly express

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-Mail: Jbjurisdoc@aol.com

132

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 410

remorse.[85]  It appears clear from the opinion that there was substantial mitigation in Green's case, but that the Court fumbled with how to vacate the death sentence.

In *State* v. *Evans* (1992), 63 Ohio St.3d 231, 586 N.E.2d 1042, the Supreme Court of Ohio affirmed the death sentence of a defendant with an IQ of less than 70.  In dissent, Justice Herbert wrote:

> I must respectfully dissent from the opinion of the majority.  I believe this record reflects errors that individually might be considered non-prejudicial but which, when considered cumulatively, taint the conviction for aggravated murder and appellant's sentence of death.
>
> What I find most disturbing is the trial court's failure to instruct the jury properly regarding the testimony of an accomplice. . .  . .  The majority, while conceding that the instruction is improper, concludes that the result would have been the same if the jury had been properly instructed.  This is speculation. . .  . .  I believe it is dangerously speculative to conclude that the jury would have reached the same conclusion if it had accorded this testimony the weight permitted by the proper instruction.
>
> In my opinion the trial court also erred in failing to instruct the jury on the lesser included offense of murder.  The majority finds that there is no error because the evidence does not reasonably support an acquittal on aggravated murder as well as a conviction upon the lesser included offense.  Again, I cannot agree.  Originally the appellant was convicted of aggravated burglary and aggravated robbery.  These convictions form the basis for his conviction of aggravated murder.  The appeals court, however, concluded that appellant could not be convicted of both aggravated burglary and aggravated robbery because they were allied crimes of similar import . . . [and the] appeals court vacated appellant's aggravated burglary conviction.  It also vacated the conviction on the gun specification . . . .  Then, however, the court of appeals held that the trial court did not err in denying appellant's motion pursuant to Crim.R. 29 for acquittal on the aggravated robbery charge, because "reasonable minds could reach different conclusions as to whether each material element of aggravated robbery had been proven beyond a reasonable doubt."  The trial court, however, instructed the jury that they could not find appellant guilty of aggravated murder unless they found him guilty of aggravated robbery and/or aggravated

---

[85] One is left with more questions than answers.  Can only those with intelligence and excellent upbringing earnestly express remorse?  Can only those who accidentally and not purposefully kill others earnestly express remorse?  Does that mean that remorse can never be a mitigating factor in a capital case, where the victim either dies purposefully and by prior calculation and design or purposefully and during another crime?  Does remorse have to be expressed before the crime to be fairly considered by the Supreme Court in sentencing?

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

133

> burglary—in other words, that either aggravated robbery or aggravated burglary was an element of aggravated murder. If reasonable minds could differ as to whether an aggravated robbery took place, they could differ as to whether each material element of aggravated murder had been proven beyond a reasonable doubt because a finding of aggravated murder (in this case) is predicated upon the finding of aggravated robbery. . . . .
>
> Appellant's low IQ also bothers me. Despite the line of cases beginning with *State* v. *Jenkins* (1984), 15 Ohio St.3d 164, . . . in which this court has held that lack of intelligence is not a sufficiently mitigating "mental disease or defect" pursuant to R.C. 2929.04(B)(3), I believe that a level of intelligence as low as the one here should be given considerable weight before a death penalty is imposed.
>
> Last, I find prosecutorial misconduct here. Though standing alone it is not enough to compel reversal, it adds to the concern about the fairness of the capital sentence when it is combined with the other errors. . . . . .

*Id.*, 63 Ohio St.3d, at 255-256. The Court's majority overlooked a series of errors toward one apparent end: affirming of the death penalty. The judges of this State, including the Justices of the Supreme Court, have forced square pegs into round holes, which is not effective and meaningful appellate review. It is the type of review that the United States Supreme Court found lacking in *Godfrey* v. *Georgia* when it vacated Robert Godfrey's death sentence. *See, also, State* v. *Rogers* (1985), 17 Ohio St.3d 174, 188, 478 N.E.2d 984 (WRIGHT, J., concurring in part and dissenting in part.):

> I concur with Justice William Brown's well-reasoned opinion except for that portion dealing with the imposition of the death penalty. The Ohio Revised Code places upon each member of this court the heavy burden of reviewing anew the record and independently weighing the aggravating circumstances against those factors mitigating against the death sentence. The appellant committed a heinous and outrageous crime, the nature of which cries out for the maximum sentence provided by law. The aggravating factors clearly outweigh the mitigating circumstances — save one. It is undisputed that the appellant has a mental and emotional age of a child between the ages of ten and twelve years.
>
> I recognize that my position will not be one that is popular; however, I cannot sanction the electric chair for a person with the mentality of a child in the fifth grade. Accordingly, I would vote for a life sentence with thirty years of actual incarceration.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURIS2@GMAIL.COM

134

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 412

In *State* v. *Lawrence* (1989), 44 Ohio St.3d 24, 541 N.E.2d 451, the Court held at 31-33:

> As required by R.C. 2929.05(A) we now turn to our independent determination of whether the aggravating circumstances outweighing the mitigating factors in this case.
>
> Each aggravated homicide of which appellant was convicted was proven beyond a reasonable doubt to have been part of a course of conduct involving the purposeful killing of two persons. As the penalty of death was imposed on both counts, we weigh the single aggravating circumstances of each offense against the mitigating factors we find to exist.
>
> R.C. 2929.04(B) sets forth seven factors to be considered in mitigation of the death penalty: [the seven statutory factors were then set forth.]
>
> There is nothing in the record relevant to mitigating factors (4) and (6). Accordingly, we examine the remaining factors.
>
> The circumstances surrounding the offenses suggest, at least to some extent, the existence of factors (1) and (2). . . . . .
>
>     . . . .
>
> Regarding the third factor, Dr. John P. Wilson, a clinical psychologist, testified that appellant was suffering from poor psychological disorders and that at the time of the offenses, appellant suffered from mental disease or defect which rendered him unable to distinguish right from wrong. Although the jury rejected appellant's insanity defense, the mitigating factor or appellant's mental state can still be considered. Drs. Grant and Resnick, psychiatrists called as state witnesses, disagreed with Wilson's opinion as to appellant's ability to distinguish right from wrong, but they concurred that he was suffering from post-traumatic stress disorder at the time of the offenses.
>
> Upon review of all expert testimony offered as to the mental state of appellant, we believe that he did lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. . . . . .
>
>     . . . . .
>
> Finally, we consider other factors that are relevant to the issue of whether the offender should be sentenced to death. We find his devotion to and care of his late mother during his high school years, his voluntary military service, and his deep love and caring for his children to be redeeming traits. We also find that appellant's mental health deteriorated following the loss of his son to sudden infant death syndrome. Appellant's severe depression caused by the loss of his son was untreated and eventually resulted in his quitting his job, the deterioration of his relationship with his neighbors, the disintegration of his marriage, and the tragic deaths of Cheryl and Jesse Mooney.
>
> Having reviewed and independently weighed all the facts and other evidence disclosed in the record and having considered each offense and the offender as required by R.C. 2929.05(A), we find the aggravating

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail JBJuhasz@gmail.com

135

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 413

circumstances the offender was found guilty of committing do not outweigh the mitigating factors beyond a reasonable doubt. . . .

The Defendant does not contend that Lawrence's death sentences should not have been vacated.  However, there are other cases where mitigation has been more substantial than in Lawrence's case but where the death sentence has nonetheless been affirmed.  Without attempting to understate the trauma of the loss of Lawrence's child, virtually every Ohio death row inmate has suffered some mental or emotional scar.  Does the loss of a child explain why Lawrence should live, but those with barely enough IQ to commit the murder should die, as in the case of Green and Rogers?

It is obvious that the true mitigation in *Lawrence* was not the mitigation evidence itself but the way that the murders occurred.  Indeed, the most frequent situations mentioned by jurors in capital voir dire is that they would want to hear evidence at the second phase that the murder of which they found the Defendant guilty at the first phase were committed in self defense or under some provocation.  These comments, as well as the decision in *Lawrence* indicate that: (1) jurors who have found someone guilty of a heinous offense enter the second phase with the death penalty having a preference; and (2) a true weighing of aggravating circumstances against mitigating factors is a fictional creation of the General Assembly and not realistic under the conditions of normal human psychology. In Ohio, juries and the courts have weighed not simply the aggravating circumstances but rather the actual facts of the murder or murders involved.  What has been weighed against the mitigating factors has not been the aggravating circumstance of *e.g.*, killing two or more people;[86] what

---

[86] *See*, OHIO REV. CODE ANN. §2929.04(A)(5), the aggravating circumstance at issue, sometimes referred to as the "mass murder" specification because it alleges that the defendant killed or attempted to kill two or more people in the same course of conduct.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL JBJUHASZDOC@AOL.COM

136

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 414

has been weighed is the manner in which the victims were killed.[87]

In *State* v. *Lawson* (1992), 64 Ohio St.3d 336, 351, 595 N. E.2d 902, the Court failed to provide guidance as to how the balancing should be conducted. In that case, the court again listed a number of mitigating factors, and then, without analysis or explanation, simply concluded that the aggravating circumstances outweighed the mitigating factors.  The court said:

> We therefore give appellant's personal weaknesses (suggestibility, low intelligence, impulsiveness) little weight in reducing his culpability. Also, we reject Dr. Lutz' diagnosis of appellant suffering from "brief reactive psychosis" as did most of the experts.
> Appellant murdered Martin to prevent his testimony against Tim Lawson and to prevent appellant's own apprehension, conviction, and punishment for the Titus burglary.  *These aggravating circumstances strike against the judicial system itself and deserves* [sic] *severe punishment*.  Moreover, appellant murdered Martin during the course of a kidnapping.  The lack of violence in the kidnapping arguably reduces the weight of the specification, but it does not eliminate it.
> Having conducted the statutory balancing, we conclude that the aggravating circumstances outweigh the factors presented in mitigation beyond a reasonable doubt.

(Emphasis added.)  The opinion demonstrates that the purpose of the Court is to affirm the death penalty because of a sense of outrage which strikes at the heart of the judicial system.

Employing whichever legal arguments are necessary and effective to defend a position is part of the craft of being a lawyer.  It is not,

---

[87] There is perhaps no better evidence of that than a recently Mahoning County case in which counsel were involved.  In *State of Ohio* v. *Mark A. Brown*, Case No. 94 CR 120, appeals case 96 C.A. 56, there were two deceased victims.  The death penalty specification on each was exactly the same: that he died as part of a course of conduct involving the purposeful killing of or attempt to kill tow or more persons on the same course of conduct, OHIO REV. CODE ANN. §2929.04(A)(5).  The mitigation evidence for both counts was exactly the same.  One victim was shot face on, allegedly while he was reaching for what the defendant thought was a weapon.  The other victim was shot in the back of the head as he crouched beneath the store counter, apparently executed while trying to hide and save his life.  The jury returned verdicts of—and the trial court of course imposed—sentences of life imprisonment with no parole until 30 full years were served on the count where the victim shot face on died, and death on the count involving the killing of the man shot in the back of the head.  A true weighing of aggravating circumstances against mitigating factors should have resulted in the same sentence for both counts.  It could only be otherwise if the way that the victims were killed was taken into consideration.  The case is on appeal, with the hope that the Supreme Court will do what the Seventh District Court of Appeals did not: engage in effective appellate review.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBLJURIS9@GMAIL.COM

137

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 415

> however, a legitimate part of judging.  Judge serve as the law's referee's. They cannot declare illegitimate a particular type of reasoning in one case, and then use it themselves in another.  To do so invites colleagues and the community to suspect their motives, especially when the subject matter is as sensitive as [the death penalty.]

*See*, Lazarus, *Closed Chambers*, 301.  Integrity, Lazarus continues, "is defined, in part, by the strength to adhere to one's principles even when they lead to results one finds personally objectionable." *See*, Lazarus, *Closed Chambers*, 303. The language from *Lawson* quoted above flies in the face of the unemotional, guided discretion demanded by the state and federal constitutions.

In *State* v. *Richey*, (1992), 64 Ohio St.3d 353, 595 N. E.2d 915, the opinion of the Supreme Court of Ohio leaves the reader with several conclusions.  The first of those conclusions is that the Ohio Supreme Court will not reverse a death sentence based upon the "independent review", regardless of what the mitigating evidence might be in a particular case.  The second conclusion is that a criminal defense lawyer is helpless to present enough mitigation evidence to warrant a sentence less than death.  The third conclusion is that the "independent review" has in fact become a rubber stamp to death sentences imposed by Ohio juries and routinely approved by trial judges and courts of appeal.  The court's independent review begins at page 371 of the opinion:

> Our independent assessment of the evidence reveals some mitigating features in Richey's history and background.  Richey's mother abused alcohol and taught him to resent authority.  Richey suffers from lifelong borderline and antisocial personalty disorders.  Richey also served more than a year in the United States Marine Corps and was honorably discharged.  All of these factors are entitled to some mitigating weight. Otherwise, little else in Richey's history, character, or background is mitigating.  Although Richey abused alcohol and drugs, nothing suggests a serious drug addiction.  On balance, his history, character and background do not offer substantial mitigating features.
>
> .  .  .
> Despite this mitigation evidence, the aggravating circumstance outweighs any mitigating factors.  In torching an apartment building at night, he jeopardized the lives of others in addition to killing an innocent two-year-old child. Applicable mitigating factors are of little weight when

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: jbjurisdoc@aol.com

138

compared to the aggravating circumstance proved against him.  His personality disorders did not rise to the level of substantial impairment of capacity under R.C. 2929.04(B)(3).  Many criminals have personality disorders.  Thus, his background did not contain any substantial mitigating features.

The death penalty is appropriate and proportionate when compared with similar felony murder cases.  See *State* v. *Bonnell* (1991), 61 Ohio St.3d 179, .   .   . (felony murder); *State* v. *Lott, ante* (felony murder, victim set on fire); *State* v. *Seiber* (1990), 56 Ohio St.3d 4, .   .   . (felony murder); *State* v. *Powell* (1990), 49 Ohio St.3d 255, .   .   . (including arson, three victims including a seven-year-old); *State* v. *Morales* (1987), 32 Ohio St.3d 252, .   .   . (felony murder, twelve-year-old victim); *State* v. *Buell* (1986), 22 Ohio St.3d 124, .   .   . (felony murder, eleven-year-old victim); *State* v. *Maurer, ante* (felony murder, seven-year-old victim).

In his dissent, Justice Brown, joined by Justices Sweeney and Wright, pointed out exactly how the majority had ignored the mitigating evidence, to the apparent end that the death sentence be affirmed.  64 Ohio St.3d 353, 373-378.  The dissent noted that the proportionality review by the majority was a sham, consisting of string citations without analysis.  The dissent said in part:

Besides reviewing the claims of error and weighing aggravating circumstances against mitigating factors, we must decide whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases.  It is this last part of the analysis which most clearly reveals how inappropriate the death penalty is in this case.

Several cases are cited by the majority to show the proportionality of the death penalty in this case.  However, if one reads those cases (*which are merely listed and not analyzed by the majority*), it is obvious that not one is remotely similar to this one." Emphasis added.  *Id.*, at 376.

Under the Eighth and Fourteenth Amendments to the United States Constitution, as well as R.C. 2929.05, we are obligated to perform a *meaningful* proportionality review of the death penalty in every case.  See *Gregg v. Georgia* (1976), 428 U.S. 153, 173, 187, 204-206, 223-224, 96 S.Ct. 2909, 2925, 2931-2932, 2939-2940, 2948-2949, 49 L.Ed.2d 859, 875, 882, 892-893, 902-903; see, also, *Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.  Such a review deserves more than lip service and a listing of cases which are in no sense comparable to this one.  There has been no meaningful proportionality review in this case.  The death penalty is not warranted, and I must dissent.

*Id.*, at 377-78 (emphasis in original).  A meaningful proportionality review should be just that, and, not a means to explain a preordained result.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: 2BJURIS@SBCGLOBAL.NET

139

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 417

The Ohio Supreme Court refused to vacate the death sentence of a 24 year old defendant who had an IQ of 66, a history of poor upbringing, and a history of drug and alcohol addiction.  The death penalty is designed to be reserved for only the worst of Ohio's murders and only certain aggravated murders are even eligible to be considered for the death penalty.  Of those who are eligible to be considered, not every defendant should receive the death sentence.  Otherwise, the death sentence becomes automatic if in the charging function the defendant is indicted with death specifications and is convicted.  *Woodson, ante*, clearly prohibits such automatic sentences.  *State* v. *Richey, ante*, highlights the automatic nature of the death sentence in Ohio which is not cured by appellate review.  There was substantial mitigation in Richey's case; yet, having read the opinion of the Supreme Court of Ohio, one concludes that Richey should have thrown in the proverbial towel before even beginning the penalty phase.  Along the same lines, *see, also, State* v. *Garner* (1995), 74 Ohio St.3d 49, 67, 656 N.E.2d 623 (WRIGHT, J., dissenting).

Another anomaly of the appellate review of death sentences in Ohio is the consideration by the courts of non-statutory aggravating circumstances.  *State* v. *Richey, ante*, also highlights that shortcoming.  The Ohio Supreme Court found that Richey deserved the death penalty because "[i]n torching an apartment building at night, he jeopardized the lives of others in addition to killing an innocent two-year-old child."  *Id.*, at 372.  One need not excuse Mr. Richey's atrocious conduct and yet may properly conclude that it is *not* a statutory aggravating circumstance.  The shocking actions of the defendant produce the type of emotional reaction that might well cause jurors to ignore a careful balancing of aggravating and mitigating evidence that the Eighth Amendment demands.  The Supreme Court, which sits to insure that those types of things do not occur, compounded the error—then admitted, even if

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJJURIS@AOL.COM

140

unwitingly, to the error in the Court's opinion.

3.

The Ohio Supreme Court has consistently held that its proportionality review is constitutionally sufficient. The proportionality review that is required of appellate courts in Ohio need only be confined to the appellate district. Moreover, and perhaps most incredibly, the proportionality review is limited to a review of decisions where the death penalty was actually imposed. *See, e.g., State* v. *Richey, ante.*

The proportionality review performed in Ohio is a far cry from the proportionality review approved by the United States Supreme Court in *Gregg* v. *Georgia, ante.* In discussing the Georgia appellate review procedure, the Supreme Court noted that the review procedure is a statewide one and noted that cases in which the death penalty is not imposed are included in the comparison and review. As to the statewide review of cases, the Supreme Court quoted the Georgia Supreme Court in *Moore* v. *State* (1975), 233 Ga. 861, 864, 213 S.E.2d 829, where the state court held: "we view it to be our duty under the similarity standard to assure that no death sentence is affirmed unless in similar cases throughout the state the death has been imposed generally . . . ." As to the obligation to include cases where the death penalty was *not* imposed, *see, Gregg, ante,* at 204, fn. 56: "The Georgia court has the authority to consider [nonappealed capital convictions where a life sentence is imposed and cases involving homicides or a capital conviction is not obtained], see *Ross* v. *State*, 233 Ga. 361, 365-366, 211 S.E.2d 356, 359 (1974), and it does consider appealed murder cases where a life sentence has been imposed. . . ."

Another reason that the Supreme Court approved the Georgia procedure in *Gregg* is that the state court was at least giving the appearance of actually performing a proportionality review. The Supreme Court said:

J. Gerald Ingham · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: jbjuhasz@aol.com

141

It is apparent that the Supreme Court of Georgia has taken its review responsibilities seriously. In *Coley* [*v. State* (1974), 231 Ga. 829, 204 S.E.2d 612], it held that "[t]he prior cases indicate that the past practice among juries faced with similar factual situations and like aggravating circumstances has been to impose only the sentence of life imprisonment for the offense of rape, rather than death." 231 Ga., at 835, 204 S.E.2d, at 617. It thereupon reduced Coley's sentence from death to life imprisonment. Similarly, although armed robbery is a capital offense under Georgia law, §26-1902 (1972), the Georgia court concluded that the death sentences imposed in this case for that crime were "unusual" in that they are rarely imposed for [armed robbery]. Thus, under the test provided by statute, . . . they must be considered to be excessive or disproportionate to the penalties imposed in similar cases. 233 Ga., at 127, 210 S.E.2d, at 667. The court therefore vacated Gregg's death sentences for armed robbery and has followed a similar course in every other armed robbery death penalty case to come before it. [Citations to Georgia cases omitted.]

The provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedure assure that no defendant convicted under such circumstances will suffer a sentence of death.

*Id.*, at 205-206.[88] The last sentence of the opinion quoted above clearly indicates that a proportionality review can only be a true proportionality review when it includes cases in which the death penalty was not imposed. As stated by the United States Supreme Court in *Gregg* v. *Georgia*, the purpose of the appellate review is in part to ensure that the death penalty is not randomly or arbitrarily imposed. Presumably, if juries begin by and large not to impose the death penalty for certain offenses, then the appellate review procedures would ensure that no defendant convicted under such circumstances would suffer the penalty

---

[88] Georgia at that time had offenses other than murder for which the death penalty could be imposed. Later, the United States Supreme Court held that the death penalty could be imposed only for certain homicide offenses. Troy Gregg was charged with committing armed robbery and murder. He was found guilty by the trial jury of two counts of armed robbery and two counts of murder. While the Georgia Supreme Court upheld his death sentences for murder, it vacated his death sentences imposed by the trial jury and trial judge for armed robbery. *Gregg v. Georgia, ante,* 161-162.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: jbjuhasz@gmail.com

142

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 420

of death.   Indeed, in *Furman*, one of the reasons that the death penalty was struck down is that the death sentences were:

> cruel and unusual in the same way that being struck by lightening is cruel and unusual.  For, of all the people convicted of [capital crimes], many just as reprehensible as these, the petitioners [in *Furman* were] among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. . . .   [T] he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

*Furman* v. *Georgia* (1972), 408 U.S. at 309-310 (STEWART, J., concurring.)  The truth is, under the Ohio Supreme Court's system for conducting a proportionality review, with no examination of cases in which the death penalty *could have been imposed but was not*, there is little, if any, chance that the Court will ever become aware that death for certain offenses is not generally being imposed.  Without a review of cases in which the death penalty could have been imposed but was not, the Ohio Supreme Court will only continue to affirm cases where juries have imposed the death penalty, with no real check to determine whether the imposition of the death penalty was "cruel and unusual in the same way that being struck by lightening is cruel and unusual."  The Ohio Supreme Court's stated method of proportionality review will never allow it to determine whether, of all the people convicted of certain offenses as reprehensible as those on review, the defendant in the case on review was among a "capriciously selected random handful upon whom the sentence of death has in fact been imposed." *Furman* v. *Georgia*, 408 U.S., at 309-10 (STEWART, J. concurring.) The method of review presently in use in Ohio only allows the Court to compound any mistake it is already making.  If the death sentence is only rarely imposed in a certain type of aggravated murder case, the Supreme Court cannot possibly know that unless it reviews *all* such cases.  The Court hears less than ten percent of discretionary appeals, so it cannot learn about the cases through the

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS-AT-LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

143

appeal process.  As an example, assume that the death sentence is imposed in only one of fifty "murder for hire" cases.  *See*, OHIO REV. CODE ANN. §2929.04(A)(2).  Upon the second of such cases to reach the Supreme Court where the death penalty has been imposed, it's "proportionality review" would find the death sentence constitutionally acceptable, even though imposed in only two out of fifty two such cases.  In that situation, though the time had come "when juries generally do not impose the death sentence in a certain kind of murder case," the appellate review procedure employed in Ohio  would fail to "assure that no defendant convicted under such circumstances will suffer a sentence of death."  *See*, *Gregg* v. *Georgia, ante.*

E.

1.

The Ohio Supreme Court has begun—or at least a few of its justices have begun—to realize that affirming capital convictions has run amok in this State. With all due respect, the Ohio court has not policed the death sentences in this State in the fashion that the United States Supreme Court held that the Georgia court had done in *Gregg*.  As but one example, the dissents of former Justice Wright and Justice Pfeifer, each joined by Chief Justice Moyer, in *State* v. *Simko* (1994), 71 Ohio St.3d 483, 644 N.E.2d 345, are illustrative.  Justice Wright said in part:

> In my view, the aggravating circumstance, kidnapping, clearly does not outweigh the mitigating factors beyond a reasonable doubt.  I say this for the following reasons: (1) The appellant was fifty-eight years old at the time of the crime.  Furthermore, he has no record of previous felonious conduct whatsoever.  Appellant's only criminal conviction was for a DWI some years ago.  (2) Appellant's history indicates a dysfunctional family background.  (3) Although appellant has a limited educational background, having completed only the tenth grade, he has had a record of productive employment during most of his adult life and notably spent eight years in the United States Air Force, receiving an honorable discharge after his service.  (4) There is a substantial amount of testimony in the record with respect to the appellant's reputation and

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURIS@AOL.COM

144

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 422

none of the testimony credited by the three-judge panel pointed toward violent activity in his past. The trial panel gave no credibility to the testimony of James Simko as to previous incidents of domestic violence. (5) Appellant poses no threat to society in the event of a twenty-or thirty-year actual incarceration. (6) Appellant has been a model prisoner. (7) While it is true that the murder itself was brutal in character, it has to be noted that appellant has a history of alcohol abuse and was intoxicated at the time of the offense, according to expert testimony that his blood-alcohol level at the time of the offense would have been about .14 percent. (8) Appellant was diagnosed as having avoidant personality disorder. While this does not rise to the level of a mental disease or defect such that it would be a mitigating factor under R.C. 2929.04(B)(3), it does apply to appellant's mental state and should be considered under R.C. 2929.04(B)(7). (9) Appellant has shown remorse for his actions.

Furthermore, it would appear that the trial panel may well have treated the nature and circumstances of the crime as a second aggravating circumstance insofar as they made detailed findings of fact concerning the circumstances of the crime and used the plural several times in alluding to aggravating circumstances. [Footnote omitted.] court has held that it is appropriate to consider the nature and circumstances of the offense as a mitigating factor, but not as an additional statutory aggravating circumstance.

In *State v. Johnson* (1986), 24 Ohio St.3d 87, . . . syllabus, this court held: "R.C. 2941.14(B) limits the aggravating circumstances which may be considered in imposing the death penalty to those specifically enumerated in R.C. 2929.04(A)." . . . . This principle was discussed in great detail in *State* v. *Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744, and *State* v. *Davis* (1988), 38 Ohio St.3d 361, 528 N.E.2d 925.

In *State* v. *Davis* [(1988), 38 Ohio St.3d 361] . . . [o]f the five "aggravating circumstances" listed in the [trial court's] opinion, only the aggravating circumstance described in R.C. 2929.04(A)(5) was a statutory aggravating circumstance. In response, this court stated "the balance of the five circumstances listed by the three-judge panel was outside the statute" and it was therefore improper to consider them. *Id.* at 369, 528 N.E.2d at 933.

The three-judge panel in this case apparently undertook the same type of flawed analysis. . . . . . It is permissible for a court to consider nonstatutory aggravating circumstances if there are no mitigating factors present, as there is no danger that nonstatutory circumstances will overcome the mitigating factors in the weighing process. . . . . . However, as specified above, there are numerous mitigating factors present in this case and therefore the nature and circumstances of the offense should not have been considered as an aggravating circumstance. *See, also, Zant* v. *Stephens* (1983), 462 U.S. 862, . . . and *Barclay* v. *Florida* (1982), 463 U.S. 939, . . . .

*Id.*, at 497-500. Justice Pfeifer, dissenting, noted the suspect nature of the Supreme Court's proportionality review:

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: jbjurisdoc@aol.com

145

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 423

I concur with Justice Wright that the aggravating circumstance in this case does not outweigh the mitigating factors. I write further because I would hold that the sentence of death is disproportionate, given the particular facts of this case.

The death penalty is special. That special nature is reflected in the types of crimes punishable by death and by this court's role in the death-penalty analysis.

By statute, not every murder is a death-penalty crime. . . . .

This court's role is also special in death-penalty cases. Unlike other criminal defendants, including nondeath-penalty murderers, defendants eligible for the death penalty receive an automatic right of appeal to this court. Part of that appeal is our mandated consideration of "whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A). Proportionality review is a key part of this court's death-penalty review and, as the state's highest court, we are in a unique position to determine what is proportionate in a statewide sense.

The focus in most death-penalty cases has been on issues other than proportionality. Typically, the court locates previous cases with similar statutory aggravating circumstances where the death penalty has been imposed, and thus finds proportionality to the case at issue. However, murders with the same statutorily defined aggravating circumstance are not necessarily crimes of the same character. In the present case, for example, the majority cites three cases in its proportionality review.

. . . . .

Thus, even though these cases share the same death-penalty-qualifying aggravating circumstance as does the case at issue, the characters of the crimes differ widely. To rely completely on the crimes of others in determining whether the death penalty is proportionate in a given case demeans our responsibility to review each case individually. In the present case, Simko technically did commit kidnapping and thus became eligible for the death penalty. But the death penalty is not for technicalities. The General Assembly recognized that when it mandated that this court employ a proportionality review. Our role is basically to determine whether the penalty of death is appropriate in a particular case, given the penalty's role in our overall system of justice. Our mandate was not prescribed with precision because the type of review involved is not truly capable of precise measurement. Yet we have been charged with making that call, and as the state's supreme court we ought not back down from making it.

The death penalty is to apply to the worst of cases. This is not one of those.

*Id.*, at 500-502. Justice Wright announced what many suspected: the Supreme Court of Ohio is daunted by the fact that a reversal of a death sentence, without mandating a new trial and simply remanding the case for resentencing, requires

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: jbjucrimdef@aol.com

146

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 424

the Defendant in that case to receive a life sentence. For example, in *State v. Combs* (1991), 62 Ohio St.3d 278, 294-295, 581 N.E.2d 1071, Justice Wright wrote in a dissent which was joined by Justice Herbert R. Brown:

> I must respectfully dissent from this court's affirmance of the imposition of the death penalty. The prosecutorial misconduct graphically outlined by the majority simply cannot be passed off as harmless error beyond a reasonable doubt. . . . .
>
> This court has been most reluctant to reverse imposition of the death penalty due in large measure to the effect of *State* v. *Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744. The General Assembly could easily deal with the effect of *Penix* by authorizing a second trial limited to the issue of whether the aggravating circumstance or circumstances outweigh the mitigating factors beyond a reasonable doubt. The cure for this legislative omission does not lie in repeatedly excoriating prosecutorial misconduct while allowing a tainted death penalty to stand. The right to a fair trial (including, most especially, the sentencing phase of a capital case) is of paramount consideration in our criminal justice system.
>
> "'[I]t is most important that the sentencing phase of the [capital] trial not be influenced by passion, prejudice, or any other arbitrary factor. . . . with a man's life at stake, a prosecutor should not play on the passions of the jury.'" *State v. DePew* (1988), 38 Ohio St.3d 275, at 299, . . . (Wright, J., concurring in part and dissenting in part), quoting *Hance v. Zant* (C.A. 11, 1983), 696 F.2d 940, 951, *certiorari denied* (1983) 463 U.S. 1210 . . . . I had hoped that my repetition of this lesson would eventually move this court to accept it, see *State v. Bedford* (1988), 39 Ohio St.3d 122, at 134-135, . . . (Wright, J., dissenting), but I see that it has not. Accordingly, I must dissent.

Combs eventually got relief, though not from the courts of Ohio. See, *Combs v. Coyle* (6th Cir. Ohio 2000), 205 F.3d 269, *cert. denied, Bagley v. Combs* (2000), 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533, 69 USLW 3380.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURIS@AOL.COM

147

2.

The death penalty is no less capriciously imposed if the caprice is in appellate review as opposed to the trial. The death penalty no more satisfies the constitutions if it is appellate judges who act with whim and caprice while pretending not to than if a jury does the same thing. Justice Wright's comments point out that the appellate review of death penalty decisions in Ohio is not an unemotional, carefully guided, objective weighing of legal factors. Hence, appellate review of death penalty cases in Ohio simply compounds the errors pervasive in the death penalty itself.

F.

Courts have an obligation to see that constitutional bounds are not overreached, but they may not act as judges as they might as legislators. *See Gregg, ante*, 428 U.S., at 174-175. Justice Felix Frankfurter wrote:

> Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits. Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures.

*See, Dennis* v. *United States* (1951), 341 U.S. 494, 525, 71 S.Ct. 857, 95 L.Ed. 1137 (FRANKFURTER, J., concurring in affirmance of the judgment.) Ohio courts have crossed the line once described by Justice Harry Blackmun, and the result has been an application of the death penalty that defies both the state and federal constitutions. Justice Blackmun said:

> We should not allow our personal preferences as to the wisdom of legislative and congressional action, or our distaste for such action, to guide our judicial decision in cases such as these. The temptations to cross that policy line are very great.

*Furman* v. *Georgia, ante*, 408 U.S., at 411 (BLACKMUN, J. dissenting).

Moreover, the lack of uniformity is not always attributed to the whim and

148

caprice of the prosecutor in the charging function or a jury whose discretion has not been suitably guided.  The appellate courts of this State have shown a predisposition against carefully following the law when the appellate review of a death sentence is involved.  Judicial review of death penalty decisions appears particularly indifferent when the result has been to affirm the death penalty.[89]

The imposition of the death penalty in Ohio is not predictable.  Judges of the courts of Ohio, including the Supreme Court of Ohio, have abandoned rational and unemotional patterns of thought when reviewing death penalty cases.  Appellate litigation of death penalty cases in Ohio is guided less by legal reasoning and more by what has every appearance of being kneejerk political reaction.  The government must be one of laws and not of men.  A review of Ohio appellate cases concerning the death penalty proves that the principle of a "government of laws and not of men" has been abandoned. It appears that when reviewing death penalty cases, the appellate courts of Ohio have abandoned the long-standing constitutional principle eloquently stated by Justice Bradley in *Boyd* v. *United States* (1886), 116 U.S. 616, 635:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.  This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed.  A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance.  It is the *duty of courts* to be *watchful for the constitutional rights of the citizen*, and *against any stealthy encroachments thereon.*

(Emphasis added.)  Appellate review of death sentences in Ohio has resulted in

---

[89] The argument asserted herein, as far as the Defendant is aware, has not been ruled upon in any other court in this State.  This Court must address this argument, and cannot overrule this constitutional challenge to the death penalty on the ground that the issues have been raised in and addressed by the Supreme Court of Ohio or the Supreme Court of the United States.  Because of the very nature of the argument, the entire argument is asserted with all due respect to the Supreme Court and appellate courts of this State.  However indelicately made, the argument is valid and must be considered.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail jbjuhasz@gmail.com

149

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 427

a "gradual depreciation of the rights" which every citizen of this State enjoys—even those accused of heinous offenses. When the case involves "a crime as heinous and calculated as any that come before [the courts], "the courts must provide effective appellate review, for if a constitutional liberty "is not protected for the worst among us, it is guaranteed to none of us." *See*, *State* v. *Williams* (1997), 79 Ohio St.3d 1, 21 679 N.E.2d 646 (MOYER, Ch.J., joined by PFEIFER, J., dissenting).

The only way to insure that this Defendant is not subjected to arbitrary and capricious infliction of the death penalty is to remove that possibility by dismissing the death specifications. The Defendant prays for such an order.

J. GERALD INGRAM

JOHN B. JUHASZ

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@AOL.COM

150

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 428

D:\Alex1\CAPITAL\Client\Roberts.Donna\Death\Const.MTD.appendix.wpd ✦ Tue 16 July 2002 - 10:12am
(1012 hrs)

# APPENDIX

United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 2
  Article I, §1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 2
  Amendment V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 2
  Amendment VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 2
  Amendment VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 2
  Amendment XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 2

Ohio Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 2
  Art. I, §1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 2
  Art. I, §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 3
  Art. I, §5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 3
  Art. I, §9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 3
  Art.I, §10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 3
  Art.I, §16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 4
  Art.I, §20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 4
  Article IV, §5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 4

Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 4
  Ohio Rev. Code Ann. §. §2903.01 . . . . . . . . . . . . . . . . . . . . . . A - 4
  Ohio Rev. Code Ann. §2929.021 . . . . . . . . . . . . . . . . . . . . . . . A - 5
  Ohio Rev. Code Ann. §2929.03 . . . . . . . . . . . . . . . . . . . . . . . . A - 6
  Ohio Rev. Code Ann. §2929.04 . . . . . . . . . . . . . . . . . . . . . . . . A - 6
  Ohio Rev. Code Ann. §2929.05 . . . . . . . . . . . . . . . . . . . . . . . . A - 8
  Ohio Rev. Code Ann. §2929.06 . . . . . . . . . . . . . . . . . . . . . . . . A - 10
  Ohio Rev. Code Ann. §2945.21 . . . . . . . . . . . . . . . . . . . . . . . . A - 11
  Ohio Rev. Code Ann. §2945.25 . . . . . . . . . . . . . . . . . . . . . . . . A - 11
  Ohio Rev. Code Ann. §2949.22 . . . . . . . . . . . . . . . . . . . . . . . . A - 12

RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 14
  Ohio Crim.R. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 14
  Ohio Crim. R. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 15
  Ohio Crim.R. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 17

Case Excerpts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 20
  Excerpt from *State v. Jenkins* . . . . . . . . . . . . . . . . . . . . . . . A - 20
  Excerpt from *State v. Maurer* . . . . . . . . . . . . . . . . . . . . . . . A - 30

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8280 · E-MAIL: JBLJURISDOC@AOL.COM

A - 1

### United States Constitution

Article I, §1:  Legislative Power Vested in Congress
All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

Amendment V
No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

Amendment VI
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

Amendment VIII
Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

Amendment XIV
Section 1
All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

# Ohio Constitution

ART. I, §1 INALIENABLE RIGHTS
All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety.

ART. I, §2  EQUAL PROTECTION AND BENEFIT
All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the General Assembly.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2398 · Facsimile: 330.758.8290 · E-mail: jbjuhisdoc@aol.com

A - 2

ART. I, §5  RIGHT OF TRIAL BY JURY

The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury.

ART. I, §9  BAIL; CRUEL AND UNUSUAL PUNISHMENTS

All persons shall be bailable by sufficient sureties, except for a person who is charged with a capital offense where the proof is evident or the presumption great, and except for a person who is charged with a felony where the proof is evident or the presumption great and where the person poses a substantial risk of serious physical harm to any person or to the community. Where a person is charged with any offense for which the person may be incarcerated, the court may determine at any time the type, amount, and conditions of bail. Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted.

The general assembly shall fix by law standards to determine whether a person who is charged with a felony where the proof is evident or the presumption great poses a substantial risk of serious physical harm to any person or to the community. Procedures for establishing the amount and conditions of bail shall be established pursuant to Article IV, Section 5(B) of the Constitution of the state of Ohio.

ART.I, §10 RIGHTS OF CRIMINAL DEFENDANTS

Except in cases of impeachment, cases arising in the army and navy, or in the militia when in actual service in time of war or public danger, and cases involving offenses for which the penalty provided is less than imprisonment in the penitentiary, no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury; and the number of persons necessary to constitute such grand jury and the number thereof necessary to concur in finding such indictment shall be determined by law. In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court. No person shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be considered by the court and jury and may be the subject of comment by counsel. No person shall be twice put in jeopardy for the same offense.

ART.I, §16 REDRESS FOR INJURY; DUE PROCESS

All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law.

ART. I, §20 POWERS NOT ENUMERATED RETAINED BY PEOPLE

This enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers, not herein delegated, remain with the people.

Article IV, §5

(A) (1) In addition to all other powers vested by this article in the supreme court, the supreme court shall have general superintendence over all courts in the state. Such general superintending power shall be exercised by the chief justice in accordance with rules promulgated by the supreme court.

(2) The supreme court shall appoint an administrative director who shall assist the chief justice and who shall serve at the pleasure of the court. The compensation and duties of the administrative director shall be determined by the court.

(3) The chief justice or acting chief justice, as necessity arises, shall assign any judge of a court of common pleas or a division thereof temporarily to sit or hold court on any other court of common pleas or division thereof or any court of appeals or shall assign any judge of a court of appeals temporarily to sit or hold court on any other court of appeals or any court of common pleas or division thereof and upon such assignment said judge shall serve in such assigned capacity until the termination of the assignment. Rules may be adopted to provide for the temporary assignment of judges to sit and hold court in any court established by law.

(B) The supreme court shall prescribe rules governing practice and procedure in all courts of the state, which rules shall not abridge, enlarge, or modify any substantive right. Proposed rules shall be filed by the court, not later than the fifteenth day of January, with the clerk of each house of the general assembly during a regular session thereof, and amendments to any such proposed rules may be so filed not later than the first day of May in that session. Such rules shall take effect on the following first day of July, unless prior to such day the general assembly adopts a concurrent resolution of disapproval. All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect.

Courts may adopt additional rules concerning local practice in their respective courts which are not inconsistent with the rules promulgated by the supreme court. The supreme court may make rules to require uniform record keeping for all courts of the state, and shall make rules governing the admission to the practice of law and discipline of persons so admitted.

(C) The chief justice of the supreme court or any judge of that court designated by him shall pass upon the disqualification of any judge of the courts of appeals or courts of common pleas or division thereof. Rules may be adopted to provide for the hearing of disqualification matters involving judges of courts established by law.

## Statutes

### OHIO REV. CODE ANN. §. §2903.01

(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

A - 4

to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.

(C) No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense.

(D) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.

(E) No person shall be convicted of aggravated murder unless the person is specifically found to have intended to cause the death of another or, if the case involves an alleged violation of division (A) or (B) of this section, the unlawful termination of another's pregnancy. In no case shall a jury in an aggravated murder case be instructed in such a manner that it may believe that a person who commits or attempts to commit any offense listed in division (B) of this section is to be conclusively inferred, because the person engaged in a common design with others to commit the offense by force and violence or because the offense and the manner of its commission would be likely to produce death or the unlawful termination of another's pregnancy, to have intended to cause the death of any person who is killed or the unlawful termination of another's pregnancy during the commission of, attempt to commit, or flight from the commission of or attempt to commit, the offense. If a jury in an aggravated murder case is instructed that a person who commits or attempts to commit any offense listed in division (B) of this section may be inferred, because the offender engaged in a common design with others to commit the offense by force or violence or because the offense and the manner of its commission would be likely to produce death or the unlawful termination of another's pregnancy, to have intended to cause the death of any person who is killed or the unlawful termination of another's pregnancy during the commission of, attempt to commit, or flight from the commission of or attempt to commit the offense, the jury also shall be instructed that the inference is nonconclusive, that the inference may be considered in determining intent, that it is to consider all evidence introduced by the prosecution to indicate the person's intent and by the person to indicate the person's lack of intent in determining whether the person specifically intended to cause the death of the person killed or the unlawful termination of another's pregnancy, and that the prosecution must prove the specific intent of the person to have caused the death or the unlawful termination of another's pregnancy by proof beyond a reasonable doubt.

**OHIO REV. CODE ANN. §2929.021**

(A) If an indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, the clerk of the court in which the indictment is filed, within fifteen days after the day on which it is filed, shall file a notice with the supreme court indicating that the indictment was filed. The notice shall be in the form prescribed by the clerk of the supreme court and shall contain, for

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

A - 5

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 433

each charge of aggravated murder with a specification, at least the following information pertaining to the charge:

(1) The name of the person charged in the indictment or count in the indictment with aggravated murder with a specification;

(2) The docket number or numbers of the case or cases arising out of the charge, if available;

(3) The court in which the case or cases will be heard;

(4) The date on which the indictment was filed.

(B) If an indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code and if the defendant pleads guilty or no contest to any offense in the case or if the indictment or any count in the indictment is dismissed, the clerk of the court in which the plea is entered or the indictment or count is dismissed shall file a notice with the supreme court indicating what action was taken in the case. The notice shall be filed within fifteen days after the plea is entered or the indictment or count is dismissed, shall be in the form prescribed by the clerk of the supreme court, and shall contain at least the following information:

(1) The name of the person who entered the guilty or no contest plea or who is named in the indictment or count that is dismissed;

(2) The docket numbers of the cases in which the guilty or no contest plea is entered or in which the indictment or count is dismissed;

(3) The sentence imposed on the offender in each case.

## OHIO REV. CODE ANN. §2929.03

(A) If the indictment or count in the indictment charging aggravated murder does not contain one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, then, following a verdict of guilty of the charge of aggravated murder, the trial court shall impose sentence on the offender as follows:

(1) Except as provided in division (A)(2) of this section, the trial court shall impose a sentence of life imprisonment with parole eligibility after serving twenty years of imprisonment on the offender.

## OHIO REV. CODE ANN. §2929.04

(A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:

(1) The offense was the assassination of the president of the United States or a person in line of succession to the presidency, the governor or lieutenant governor of this state, the president-elect or vice president-elect of the United States, the governor-elect or lieutenant governor-elect of this state, or a candidate for any of the offices described in this division. For purposes of this division, a person is a candidate if the person has been nominated for

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDO@AOL.COM

A - 6

election according to law, if the person has filed a petition or petitions according to law to have the person's name placed on the ballot in a primary or general election, or if the person campaigns as a write-in candidate in a primary or general election.

(2) The offense was committed for hire.

(3) The offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender.

(4) The offense was committed while the offender was under detention or while the offender was at large after having broken detention. As used in division (A)(4) of this section, "detention" has the same meaning as in section 2921.01 of the Revised Code, except that detention does not include hospitalization, institutionalization, or confinement in a mental health facility or mental retardation and developmentally disabled facility unless at the time of the commission of the offense either of the following circumstances apply:

(a) The offender was in the facility as a result of being charged with a violation of a section of the Revised Code.

(b) The offender was under detention as a result of being convicted of or pleading guilty to a violation of a section of the Revised Code.

(5) Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.

(6) The victim of the offense was a law enforcement officer, as defined in section 2911.01 of the Revised Code, whom the offender had reasonable cause to know or knew to be a law enforcement officer as so defined, and either the victim, at the time of the commission of the offense, was engaged in the victim's duties, or it was the offender's specific purpose to kill a law enforcement officer as so defined.

(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

(8) The victim of the aggravated murder was a witness to an offense who was purposely killed to prevent the victim's testimony in any criminal proceeding and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness, or the victim of the aggravated murder was a witness to an offense and was purposely killed in retaliation for the victim's testimony in any criminal proceeding.

(9) The offender, in the commission of the offense, purposefully caused the death of another who was under thirteen years of age at the time of the commission of the offense, and either the offender was the principal offender in the commission of the offense or, if not the principal offender, committed

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: Jbjuris0@aol.com

A - 7

the offense with prior calculation and design.

(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, and if the offender did not raise the matter of age pursuant to section 2929.023 of the Revised Code or if the offender, after raising the matter of age, was found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

(1) Whether the victim of the offense induced or facilitated it;

(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;

(4) The youth of the offender;

(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

(C) The defendant shall be given great latitude in the presentation of evidence of the factors listed in division (B) of this section and of any other factors in mitigation of the imposition of the sentence of death.

The existence of any of the mitigating factors listed in division (B) of this section does not preclude the imposition of a sentence of death on the offender but shall be weighed pursuant to divisions (D)(2) and (3) of section 2929.03 of the Revised Code by the trial court, trial jury, or the panel of three judges against the aggravating circumstances the offender was found guilty of committing.

## OHIO REV. CODE ANN. §2929.05

(A) Whenever sentence of death is imposed pursuant to sections 2929.03 and 2929.04 of the Revised Code, the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the supreme court shall upon appeal review the sentence of death at the same time that they review the other issues in the case. The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

A - 8

judges in the same manner that they review other criminal cases, except that they shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate. In determining whether the sentence of death is appropriate, the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. They shall also review all of the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors. The court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, or the supreme court shall affirm a sentence of death only if the particular court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case.

A court of appeals that reviews a case in which the sentence of death is imposed for an offense committed before January 1, 1995, shall file a separate opinion as to its findings in the case with the clerk of the supreme court. The opinion shall be filed within fifteen days after the court issues its opinion and shall contain whatever information is required by the clerk of the supreme court.

(B) The court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the supreme court shall give priority over all other cases to the review of judgments in which the sentence of death is imposed, and, except as otherwise provided in this section, shall conduct the review in accordance with the Appellate Rules.

(C) Whenever sentence of death is imposed pursuant to section 2929.022 or 2929.03 of the Revised Code, the court of common pleas that sentenced the offender shall, upon motion of the offender and after conducting a hearing on the motion, vacate the sentence if all of the following apply:

(1) The offender alleges in the motion and presents evidence at the hearing that the offender was not eighteen years of age or older at the time of the commission of the aggravated murder for which the offender was sentenced;

(2) The offender did not present evidence at trial pursuant to section 2929.023 of the Revised Code that the offender was not eighteen years of age or older at the time of the commission of the aggravated murder for which the offender was sentenced;

(3) The motion was filed at any time after the sentence was imposed in the case and prior to execution of the sentence;

(4) At the hearing conducted on the motion, the prosecution does not

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBLJUHSDO@AOL.COM

A - 9

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 437

prove beyond a reasonable doubt that the offender was eighteen years of age or older at the time of the commission of the aggravated murder for which the offender was sentenced.

**OHIO REV. CODE ANN. §2929.06**

(A) If the sentence of death that is imposed upon an offender is vacated upon appeal because the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, or the supreme court, in cases in which the supreme court reviews the sentence upon appeal, could not affirm the sentence of death under the standards imposed by section 2929.05 of the Revised Code, is vacated upon appeal for the sole reason that the statutory procedure for imposing the sentence of death that is set forth in sections 2929.03 and 2929.04 of the Revised Code is unconstitutional, or is vacated pursuant to division (C) of section 2929.05 of the Revised Code, the trial court that sentenced the offender shall conduct a hearing to resentence the offender. At the resentencing hearing, the court shall impose one of the following sentences upon the offender:

(1) Except as provided in division (A)(2) of this section, life imprisonment without parole, life imprisonment with parole eligibility after serving twenty- five full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment;

(2) If the sentence of death was imposed for an aggravated murder committed on or after January 1, 1997, and if the offender also was convicted of or pleaded guilty to a sexual motivation specification and a sexually violent predator specification that were included in the indictment, count in the indictment, or information that charged the aggravated murder, life imprisonment without parole that shall be served pursuant to section 2971.03 of the Revised Code.

(B) If the sentence of death that is imposed upon an offender is vacated upon appeal because of error that occurred in the sentencing phase of the trial and if division (A) of this section does not apply, the trial court that sentenced the offender shall conduct a new hearing to resentence the offender. If the offender was tried by a jury, the trial court shall impanel a new jury for the hearing. If the offender was tried by a panel of three judges, that panel or, if necessary, a new panel of three judges shall conduct the hearing. At the hearing, the court shall follow the procedure set forth in division (D) of section 2929.03 of the Revised Code in determining whether to impose upon the offender a sentence of death, life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment.

(C) If the sentence of life imprisonment without parole that is imposed upon an offender pursuant to section 2929.021 or 2929.03 of the Revised Code is vacated upon appeal for the sole reason that the statutory procedure for imposing the sentence of life imprisonment without parole that is set forth in sections 2929.03 and 2929.04 of the Revised Code is unconstitutional, the trial

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

A - 10

court that sentenced the offender shall conduct a hearing to resentence the offender to life imprisonment with parole eligibility after serving twenty- five full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

**OHIO REV. CODE ANN. §2945.21 PEREMPTORY CHALLENGES IN CAPITAL CASES**

(A)(1) In criminal cases in which there is only one defendant, each party, in addition to the challenges for cause authorized by law, may peremptorily challenge three of the jurors in misdemeanor cases and four of the jurors in felony cases other than capital cases. If there is more than one defendant, each defendant may peremptorily challenge the same number of jurors as if he were the sole defendant.

(2) Notwithstanding Criminal Rule 24, in capital cases in which there is only one defendant, each party, in addition to the challenges for cause authorized by law, may peremptorily challenge twelve of the jurors. If there is more than one defendant, each defendant may peremptorily challenge the same number of jurors as if he were the sole defendant.

(3) In any case in which there are multiple defendants, the prosecuting attorney may peremptorily challenge a number of jurors equal to the total number of peremptory challenges allowed to all of the defendants.

(B) If any indictments, informations, or complaints are consolidated for trial, the consolidated cases shall be considered, for purposes of exercising peremptory challenges, as though the defendants or offenses had been joined in the same indictment, information, or complaint.

(C) The exercise of peremptory challenges authorized by this section shall be in accordance with the procedures of Criminal Rule 24.

**OHIO REV. CODE ANN. §2945.25**

A person called as a juror in a criminal case may be challenged for the following causes:

(A) That he was a member of the grand jury that found the indictment in the case;

(B) That he is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial;

(C) In the trial of a capital offense, that he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case. A prospective juror's conscientious or religious opposition to the death penalty in and of itself is not grounds for a challenge for cause. All parties shall be given wide latitude in voir dire questioning in this regard.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

A - 11

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 439

(D) That he is related by consanguinity or affinity within the fifth degree to the person alleged to be injured or attempted to be injured by the offense charged, or to the person on whose complaint the prosecution was instituted, or to the defendant;

(E) That he served on a petit jury drawn in the same cause against the same defendant, and that jury was discharged after hearing the evidence or rendering a verdict on the evidence that was set aside;

(F) That he served as a juror in a civil case brought against the defendant for the same act;

(G) That he has been subpoenaed in good faith as a witness in the case;

(H) That he is a chronic alcoholic, or drug dependent person;

(I) That he has been convicted of a crime that by law disqualifies him from serving on a jury;

(J) That he has an action pending between him and the state or the defendant;

(K) That he or his spouse is a party to another action then pending in any court in which an attorney in the cause then on trial is an attorney, either for or against him;

(L) That he is the person alleged to be injured or attempted to be injured by the offense charged, or is the person on whose complaint the prosecution was instituted, or the defendant;

(M) That he is the employer or employee, or the spouse, parent, son, or daughter of the employer or employee, or the counselor, agent, or attorney of any person included in division (L) of this section;

(N) That English is not his native language, and his knowledge of English is insufficient to permit him to understand the facts and law in the case;

(O) That he otherwise is unsuitable for any other cause to serve as a juror.

The validity of each challenge listed in this section shall be determined by the court.

**OHIO REV. CODE ANN. §2949.22 EXECUTION OF DEATH SENTENCE**

(A) Except as provided in division (B)(1) of this section, a death sentence shall be executed by causing a current of electricity, of sufficient intensity to cause death, to pass through the body of the person upon whom the sentence was imposed. The application of the current shall be continued until the person upon whom the sentence was imposed is dead. The warden of the correctional institution in which the sentence is to be executed or another person selected by the director of rehabilitation and correction shall ensure that the death sentence is executed.

(B)(1) Any person sentenced to death may elect to be executed by lethal injection instead of by electrocution as described in division (A) of this section. The election shall be made no later than one week prior to the scheduled date of execution of the person by filing a written notice of the election with the department of rehabilitation and correction. If a person sentenced to death

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

A - 12

timely files with the department a written notice of an election to be executed by lethal injection, the person's death sentence shall be executed by causing the application to the person of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death instead of by electrocution as described in division (A) of this section. The application of the drug or combination of drugs shall be continued until the person is dead. The warden of the correctional institution in which the sentence is to be executed or another person selected by the director of rehabilitation and correction shall ensure that the death sentence is executed.

If a person sentenced to death does not timely file with the department a written notice of election to be executed by lethal injection, his death sentence shall be executed by electrocution in accordance with division (A) of this section.

(2) Neither a person's timely filing of a written notice of election under division (B)(1) of this section nor a person's failure to file or timely file a written notice of election under that division shall affect or waive any right of appeal or postconviction relief that may be available under the laws of this state or the United States relative to the conviction for which the sentence of death was imposed upon the person or relative to the imposition or execution of that sentence of death.

(C) A death sentence shall be executed within the walls of the state correctional institution designated by the director of rehabilitation and correction as the location for executions, within an enclosure to be prepared for that purpose, under the direction of the warden of the institution or, in his absence, a deputy warden, and on the day designated by the judge passing sentence or otherwise designated by a court in the course of any appellate or postconviction proceedings. The enclosure shall exclude public view.

(D) If a death sentence is required to be executed by lethal injection because the person sentenced to death elected to be executed by lethal injection pursuant to division (B)(1) of this section and if the execution of a death sentence by lethal injection is determined to be unconstitutional, the death sentence shall be executed by causing a current of electricity, of sufficient intensity to cause death, to pass through the body of the person upon whom the sentence was imposed. The application of the current shall be continued until the person is dead. The warden of the state correctional institution in which the sentence is to be executed or another person selected by the director of rehabilitation and correction shall ensure that the death sentence is executed.

(E) No change in the law made by this amendment constitutes a declaration by or belief of the general assembly that execution of a death sentence by electrocution is a cruel and unusual punishment proscribed by the Ohio Constitution or the United States Constitution.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

A - 13

# RULES

### OHIO CRIM.R. 11

(A) Pleas

A defendant may plead not guilty, not guilty by reason of insanity, guilty or, with the consent of the court, no contest. A plea of not guilty by reason of insanity shall be made in writing by either the defendant or his attorney. All other pleas may be made orally. The pleas of not guilty and not guilty by reason of insanity may be joined. If a defendant refuses to plead, the court shall enter a plea of not guilty on behalf of the defendant.

(B) Effect of guilty or no contest pleas

With reference to the offense or offenses to which the plea is entered:

(1) The plea of guilty is a complete admission of the defendant's guilt.

(2) The plea of no contest is not an admission of defendant's guilt, but is an admission of the truth of the facts alleged in the indictment, information, or complaint and such plea or admission shall not be used against the defendant in any subsequent civil or criminal proceeding.

(3) When a plea of guilty or no contest is accepted pursuant to this rule, the court shall, except as provided in subsections (C)(3) and (4), proceed with sentencing under Rule 32.

(C) Pleas of guilty and no contest in felony cases

(1) Where in a felony case the defendant is unrepresented by counsel the court shall not accept a plea of guilty or no contest unless the defendant, after being readvised that he has the right to be represented by retained counsel, or pursuant to Rule 44 by appointed counsel, waives this right.

(2) In felony cases the court may refuse to accept a plea of guilty or a plea of no contest, and shall not accept such plea without first addressing the defendant personally and:

(a) Determining that he is making the plea voluntarily, with understanding of the nature of the charge and of the maximum penalty involved, and, if applicable, that he is not eligible for probation.

(b) Informing him of and determining that he understands the effect of his plea of guilty or no contest, and that the court upon acceptance of the plea may proceed with judgment and sentence.

(c) Informing him and determining that he understands that by his plea he is waiving his rights to jury trial, to confront witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to require the state to prove his guilt beyond a reasonable doubt at a trial at which he cannot be compelled to testify against himself.

(3) With respect to aggravated murder committed on and after January 1, 1974, the defendant shall plead separately to the charge and to each specification, if any. A plea of guilty or no contest to the charge waives the defendant's right to a jury trial, and before accepting such plea the court shall so advise the defendant and determine that he understands the consequences of such plea.

If the indictment contains no specification, and a plea of guilty or no contest to the charge is accepted, the court shall impose the sentence provided by law.

If the indictment contains one or more specifications, and a plea of guilty or no contest to the charge is accepted, the court may dismiss the specifications and impose sentence accordingly, in the interests of justice.

If the indictment contains one or more specifications which are not dismissed

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJFIRMDOC@AOL.COM

A - 14

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 442

upon acceptance of a plea of guilty or no contest to the charge, or if pleas of guilty or no contest to both the charge and one or more specifications are accepted, a court composed of three judges shall: (a) determine whether the offense was aggravated murder or a lesser offense; and (b) if the offense is determined to have been a lesser offense, impose sentence accordingly; or (c) if the offense is determined to have been aggravated murder, proceed as provided by law to determine the presence or absence of the specified aggravating circumstances and of mitigating circumstances, and impose sentence accordingly.

(4) With respect to all other cases the court need not take testimony upon a plea of guilty or no contest.

(D) Misdemeanor cases involving serious offenses

In misdemeanor cases involving serious offenses the court may refuse to accept a plea of guilty or no contest, and shall not accept such plea without first addressing the defendant personally and informing him of the effect of the pleas of guilty, no contest, and not guilty and determining that he is making the plea voluntarily. Where the defendant is unrepresented by counsel the court shall not accept a plea of guilty or no contest unless the defendant, after being readvised that he has the right to be represented by retained counsel, or pursuant to Rule 44 by appointed counsel, waives this right.

(E) Misdemeanor cases involving petty offenses

In misdemeanor cases involving petty offenses the court may refuse to accept a plea of guilty or no contest, and shall not accept such pleas without first informing the defendant of the effect of the plea of guilty, no contest, and not guilty.

The counsel provisions of Rule 44(B) and (C) apply to this subdivision.

(F) Negotiated plea in felony cases

When, in felony cases, a negotiated plea of guilty or no contest to one or more offenses charged or to one or more other or lesser offenses is offered, the underlying agreement upon which the plea is based shall be stated on the record in open court.

(G) Refusal of court to accept plea

If the court refuses to accept a plea of guilty or no contest, the court shall enter a plea of not guilty on behalf of the defendant. In such cases neither plea shall be admissible in evidence nor be the subject of comment by the prosecuting attorney or court.

(H) Defense of insanity

The defense of not guilty by reason of insanity must be pleaded at the time of arraignment, except that the court for good cause shown shall permit such a plea to be entered at any time before trial.

OHIO CRIM. R. 12

(A) Pleadings and motions. Pleadings in criminal proceedings shall be the complaint, and the indictment or information, and the pleas of not guilty, not guilty by reason of insanity, guilty, and no contest. All other pleas, demurrers, and motions to quash, are abolished. Defenses and objections raised before trial which heretofore could have been raised by one or more of them shall be raised only by motion to dismiss or to grant appropriate relief, as provided in these rules.

(B) Pretrial motions. Prior to trial, any party may raise by motion any defense, objection, evidentiary issue, or request that is capable of determination without the trial of the general issue. The following must be raised before trial:

(1) Defenses and objections based on defects in the institution of the prosecution;

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

A - 15

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 443

(2) Defenses and objections based on defects in the indictment, information, or complaint (other than failure to show jurisdiction in the court or to charge an offense, which objections shall be noticed by the court at any time during the pendency of the proceeding);

(3) Motions to suppress evidence, including but not limited to statements and identification testimony, on the ground that it was illegally obtained. Such motions shall be filed in the trial court only.

(4) Requests for discovery under Crim. R. 16;

(5) Requests for severance of charges or defendants under Crim. R. 14.

(C) Motion date.   All pretrial motions except as provided in Rule 7(E) and Rule 16(F) shall be made within thirty-five days after arraignment or seven days before trial, whichever is earlier. The court in the interest of justice may extend the time for making pretrial motions.

(D) Notice by the prosecuting attorney of the intention to use evidence

(1) At the discretion of the prosecuting attorney. At the arraignment or as soon thereafter as is practicable, the prosecuting attorney may give notice to the defendant of the prosecuting attorney's intention to use specified evidence at trial, in order to afford the defendant an opportunity to raise objections to such evidence prior to trial under division (B)(3) of this rule.

(2) At the request of the defendant. At the arraignment or as soon thereafter as is practicable, the defendant, in order to raise objections prior to trial under division (B)(3) of this rule, may request notice of the prosecuting attorney's intention to use evidence in chief at trial, which evidence the defendant is entitled to discover under Crim. R. 16.

(E) Ruling on motion.  The court may adjudicate a motion based upon briefs, affidavits, the proffer of testimony and exhibits, a hearing, or other appropriate means.

A motion made pursuant to divisions (B)(1) to (B)(5) of this rule shall be determined before trial. Any other motion made pursuant to division (B) of this rule shall be determined before trial whenever possible. Where the court defers ruling on any motion made by the prosecuting attorney before trial and makes a ruling adverse to the prosecuting attorney after the commencement of trial, and the ruling is appealed pursuant to law with the certification required by division (J) of this rule, the court shall stay the proceedings without discharging the jury or dismissing the charges.

Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.

(F) Return of tangible evidence.  Where a motion to suppress tangible evidence is granted, the court upon request of the defendant shall order the property returned to the defendant if the defendant is entitled to possession of the property. The order shall be stayed pending appeal by the state pursuant to division (J) of this rule.

(G) Effect of failure to raise defenses or objections.  Failure by the defendant to raise defenses or objections or to make requests that must be made prior to trial, at the time set by the court pursuant to division (C) of this rule, or prior to any extension of time made by the court, shall constitute waiver of the defenses or objections, but the court for good cause shown may grant relief from the waiver.

(H) Effect of plea of no contest.  The plea of no contest does not preclude a defendant from asserting upon appeal that the trial court prejudicially erred in ruling on a pretrial motion, including a pretrial motion to suppress evidence.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: jbjurisdocs@aol.com

A - 16

(I) Effect of determination.  If the court grants a motion to dismiss based on a defect in the institution of the prosecution or in the indictment, information, or complaint, it may also order that the defendant be held in custody or that the defendant's bail be continued for a specified time not exceeding fourteen days, pending the filing of a new indictment, information, or complaint. Nothing in this rule shall affect any statute relating to periods of limitations. Nothing in this rule shall affect the state's right to appeal an adverse ruling on a motion under divisions (B)(1) or (2) of this rule, when the motion raises issues that were formerly raised pursuant to a motion to quash, a plea in abatement, a demurrer, or a motion in arrest of judgment.

(J) Appeal by state.  When the state takes an appeal as provided by law from an order suppressing or excluding evidence, the prosecuting attorney shall certify that: (1) the appeal is not taken for the purpose of delay; and (2) the ruling on the motion or motions has rendered the state's proof with respect to the pending charge so weak in its entirety that any reasonable possibility of effective prosecution has been destroyed.

The appeal from an order suppressing or excluding evidence shall not be allowed unless the notice of appeal and the certification by the prosecuting attorney are filed with the clerk of the trial court within seven days after the date of the entry of the judgment or order granting the motion. Any appeal taken under this rule shall be prosecuted diligently.

If the defendant previously has not been released, the defendant shall, except in capital cases, be released from custody on his or her own recognizance pending appeal when the prosecuting attorney files the notice of appeal and certification.

This appeal shall take precedence over all other appeals.

If an appeal pursuant to this division results in an affirmance of the trial court, the state shall be barred from prosecuting the defendant for the same offense or offenses except upon a showing of newly discovered evidence that the state could not, with reasonable diligence, have discovered before filing of the notice of appeal.

## OHIO CRIM.R. 24

(A) Examination of jurors

Any person called as a juror for the trial of any cause shall be examined under oath or upon affirmation as to his qualifications. The court may permit the attorney for the defendant, or the defendant if appearing pro se, and the attorney for the state to conduct the examination of the prospective jurors or may itself conduct the examination. In the latter event, the court shall permit the state and defense to supplement the examination by further inquiry.

(B) Challenge for cause

A person called as a juror may be challenged for the following causes:

(1) That he has been convicted of a crime which by law renders him disqualified to serve on a jury.

(2) That he is a chronic alcoholic, or drug dependent person.

(3) That he was a member of the grand jury which found the indictment in the case.

(4) That he served on a petit jury drawn in the same cause against the same defendant, and such jury was discharged after hearing the evidence or rendering a verdict thereon which was set aside.

(5) That he served as a juror in a civil case brought against the defendant for the same act.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJCHRISDOC@AOL.COM

A - 17

(6) That he has an action pending between him and the State of Ohio or the defendant.

(7) That he or his spouse is a party to another action then pending in any court in which an attorney in the cause then on trial is an attorney, either for or against him.

(8) That he has been subpoenaed in good faith as a witness in the case.

(9) That he is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.

(10) That he is related by consanguinity or affinity within the fifth degree to the person alleged to be injured or attempted to be injured by the offense charged, or to the person on whose complaint the prosecution was instituted; or to the defendant.

(11) That he is the person alleged to be injured or attempted to be injured by the offense charged, or the person on whose complaint the prosecution was instituted, or the defendant.

(12) That he is the employer or employee, or the spouse, parent, son, or daughter of the employer or employee, or the counsellor, agent, or attorney, of any person included in subsection (B)(11).

(13) That English is not his native language, and his knowledge of English is insufficient to permit him to understand the facts and the law in the case.

(14) That he is otherwise unsuitable for any other cause to serve as a juror.

The validity of each challenge listed in this subdivision shall be determined by the court.

(C) Peremptory challenges

In addition to challenges provided in subdivision (B), if there is one defendant, each party peremptorily may challenge three jurors in misdemeanor cases, four jurors in felony cases other than capital cases, and six jurors in capital cases. If there is more than one defendant, each defendant peremptorily may challenge the same number of jurors as if he were the sole defendant.

In any case where there are multiple defendants, the prosecuting attorney peremptorily may challenge a number of jurors equal to the total peremptory challenges allowed all defendants. In case of the consolidation of any indictments, informations or complaints for trial, such consolidated cases shall be considered, for purposes of exercising peremptory challenges, as though the defendants or offenses had been joined in the same indictment, information or complaint.

(D) Manner of exercising peremptory challenges

Peremptory challenges may be exercised after the minimum number of jurors allowed by the rules has been passed for cause and seated on the panel. Peremptory challenges shall be exercised alternately, with the first challenge exercised by the state. The failure of a party to exercise a peremptory challenge constitutes a waiver of that challenge. If all parties, alternately and in sequence, fail to exercise a peremptory challenge, the joint failure constitutes a waiver of all peremptory challenges.

A prospective juror peremptorily challenged by either party shall be excused and another juror shall be called who shall take the place of the juror excused and be sworn and examined as other jurors. The other party, if he has peremptory

John H. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: jhjuris100@aol.com

A - 18

challenges remaining, shall be entitled to challenge any juror then seated on the panel.

(E) Challenge to array

The prosecuting attorney or the attorney for the defendant may challenge the array of petit jurors on the ground that it was not selected, drawn or summoned in accordance with law. A challenge to the array shall be made before the examination of the jurors pursuant to subdivision (A) and shall be tried by the court.

No array of petit jurors shall be set aside, nor shall any verdict in any case be set aside because the jury commissioners have returned such jury or any juror in any informal or irregular manner, if in the opinion of the court the irregularity is unimportant and insufficient to vitiate the return.

(F) Alternate jurors

The court may direct that not more than six jurors in addition to the regular jury be called and empaneled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, have the same qualifications, be subject to the same examination and challenges, take the same oath, and have the same functions, powers, facilities, and privileges as the regular jurors. An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict. Each party is entitled to one peremptory challenge in addition to those otherwise allowed if one or two alternate jurors are to be empaneled, two peremptory challenges if three or four alternate jurors are to be empaneled, and three peremptory challenges if five or six alternate jurors are to be empaneled. The additional peremptory challenges may be used against an alternate juror only, and the other peremptory challenges allowed by this rule may not be used against an alternate juror.

(G) Control of juries

(1) Before submission of case to jury. Before submission of a case to the jury, the court, upon its own motion or the motion of a party, may restrict the separation of jurors or may sequester the jury.

(2) After submission of case to jury. (a) Misdemeanor cases. After submission of a misdemeanor case to the jury, the court, after giving cautionary instructions, may permit the separation of jurors.

(b) Non-capital felony cases. After submission of a non-capital felony case to the jury, the court, after giving cautionary instructions, may permit the separation of jurors during any period of court adjournment or may require the jury to remain under the supervision of an officer of the court.

(c) Capital cases. After submission of a capital case to the jury, the jury shall remain under the supervision of an officer of the court until a verdict is rendered or the jury is discharged by the court.

(3) Separation in emergency. Where the jury is sequestered or after a capital case is submitted to the jury, the court may, in an emergency and upon giving cautionary instructions, allow temporary separation of jurors.

(4) Duties of supervising officer. Where jurors are required to remain under the supervision of an officer of the court, the court shall make arrangements for their care, maintenance and comfort.

When the jury is in the care of an officer of the court and until the jury is discharged by the court, the officer may inquire whether the jury has reached a verdict, but shall not:

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@AOL.COM

A - 19

(a) Communicate any matter concerning jury conduct to anyone except the judge or;

(b) Communicate with the jurors or permit communications with jurors, except as allowed by court order.

## Case Excerpts

Excerpt from *State v. Jenkins*

Today we review for the first time a conviction and death sentence subsequent to the re-enactment of the death penalty in Ohio.  See R.C. 2929.03 et seq. For the reasons to follow, we hold the death penalty statutes to be constitutional and, in this case, to have been applied in a constitutional manner. We further affirm appellant's conviction and hold that the death sentence in the case at bar is proper.

I

At the outset, we direct our attention to appellant's arguments that in spite of the overhaul undertaken by the General Assembly subsequent to the decision of the United States Supreme Court in *Lockett v. Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 [9 O.O.3d 26], the Ohio death penalty scheme is both unconstitutional on its face and as applied to appellant in this case in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution.

Appellant first challenges the imposition of the death penalty on the basis that where a right as fundamental as life is at stake, a state must employ the least restrictive means possible to achieve a compelling interest.  Appellant contends that the societal interests at stake in the present case include deterrence and incapacitation which, according to appellant, can be adequately protected with a less restrictive approach than the imposition of death, *i.e.*, life imprisonment.

Appellant's "least restrictive" argument, however, was rejected over eight years ago when the United States Supreme Court released its decisions in *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida* (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Jurek v. Texas* (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; *Woodson v. North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 and *Roberts v. Louisiana* (1976), 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974.

In *Gregg, supra,* the court stated that " * * * the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death."[3]  The Supreme Court stated that the death penalty " * * * is an extreme sanction, suitable to the most extreme of crimes."[4] Appellant's argument is predicated upon societal protection, while the Supreme Court has recognized that the death penalty, as a sanction or punishment, is proper in extreme cases.

Alternatively, appellant argues that the death penalty violates the prohibition under the Eighth Amendment against cruel and unusual punishment

---

[3] Gregg v. Georgia, at 184, 96 S.Ct. at 2930.

[4] Id. at 187, 96 S.Ct. at 2932.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

A - 20

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 448

and is therefore per se unconstitutional. We disagree. Clearly, any vitality which this argument may have had at the time of *Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 was rejected in *Gregg* and its companion cases when the high court stated:

"We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it."[5]

Moreover, since the decision in *Gregg*, the recurring theme has been that states may constitutionally impose the sentence of death as long as the discretion of the sentencing authority is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action" in imposing the sentence. *Zant v. Stephens* (1983), 462 U.S. 862, at ---, 103 S.Ct. 2733, at 2741, 77 L.Ed.2d 235, at 248. The Supreme Court has stressed the necessity of "genuinely narrow[ing] the class of persons eligible for the death penalty," *id.* 462 U.S. at ---, 103 S.Ct. at 2741, 77 L.Ed.2d at 249, while requiring the capital sentencing procedure guide and focus "the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." *Jurek, supra*, 428 U.S. at 273-274, 96 S.Ct. at 2957. With these principles in mind, appellant's argument, which requests the erection of a *per se* rule against the death penalty, must be rejected.

Appellant maintains, however, that the death penalty is applied in an arbitrary and capricious fashion since in administering capital statutory schemes prosecutors will inevitably exercise a certain degree of discretion. A similar argument was considered and rejected by both the majority and concurring opinions in *Gregg*.

Justice Stewart, writing for the court, addressed the argument 428 U.S. at 199, 96 S.Ct. at 2937, as follows:

"First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.

"The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. * * *"

In his concurring opinion, Justice White, joined by Chief Justice Burger and Justice Rehnquist, discussed the allegation of the exercise of arbitrary and capricious prosecutorial discretion as follows:

---

[5] *Id.*

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.788.2308 · FACSIMILE: 330.788.8290 · E-MAIL: JBJUHASZ@SBCGLOBAL.COM

A - 21

"Petitioner's argument that prosecutors behave in a standardless fashion in deciding which cases to try as capital felonies is unsupported by any facts. Petitioner simply asserts that since prosecutors have the power not to charge capital felonies they will exercise that power in a standardless fashion. This is untenable. Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence. Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong. This does not cause the system to be standardless any more than the jury's decision to impose life imprisonment on a defendant whose crime is deemed insufficiently serious or its decision to acquit someone who is probably guilty but whose guilt is not established beyond a reasonable doubt. Thus the prosecutor's charging decisions are unlikely to have removed from the sample of cases considered by the Georgia Supreme Court any which are truly 'similar.' If the cases really were 'similar' in relevant respects, it is unlikely that prosecutors would fail to prosecute them as capital cases; and I am unwilling to assume the contrary." *Id.* at 225, 96 S.Ct. at 2949.

Moreover, as recognized by Justice White in his concurring opinion in *Gregg*, appellant's argument represents an indictment of our entire criminal justice system which must be constitutionally rejected. *Id.* at 226, 96 S.Ct. at 2949.

Next, appellant contends the Ohio death penalty scheme is unconstitutional for failing to require premeditation or deliberation as the culpable mental state for defendants in all capital cases.[6] Specifically, appellant relies upon the concurring opinion of Justice White in *Lockett v. Ohio, supra,* 438 U.S. at 621, 98 S.Ct. at 2973, wherein the view was expressed that the imposition of the death penalty upon one who did not possess at least a purpose "to cause the death of the victim" would likely violate the prohibition contained in the Eighth Amendment against cruel and unusual punishment.[7]

In *Edmund v. Florida* (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 Justice White, writing for the majority, concluded that imposition of the death sentence upon an individual who aids or abets a felony but who does not kill, attempt to kill or intend to kill, violates the Eighth Amendment. In that decision, the high court favorably cited a number of state statutes, including R.C. 2903.01(B),

---

[6] R.C. 2903.01 provides, in relevant part:
"(A) No person shall purposely, and with prior calculation and design, cause the death of another.
"(B) No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.
"(C) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.
"(D) No person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another. * * *"

[7] 438 U.S. 586, at 624, 98 S.Ct. 2954, at 2983.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJUHASZ@AOL.COM

A - 22

(C) and (D), as well as R.C. 2929.02(A) and 2929.04(A)(7), which preclude the imposition of a death sentence unless the defendant is specifically found to have intended to cause the death of another by proof beyond a reasonable doubt. *Id.* at 790, fn. 7, 102 S.Ct. at 3373, fn. 7.

Contrary to appellant's contention, the Eighth Amendment does not require that in order to be subject to a death sentence, the defendant must have committed the murder with prior calculation and design. *Cf. Edmund, supra.* Instead, the culpable mental state which must be proven in Ohio, consistent with Eighth Amendment protections, is that the defendant specifically intended to cause the death of another. Accordingly, we find appellant's contention to be without merit.

Without citation to legal authority, appellant further argues that the death penalty in Ohio is constitutionally defective since the state is not required to prove the absence of any of the mitigating factors. Simply stated, this argument represents an attempt by appellant to have this court impose upon the state a burden not required under either the Ohio or United States Constitutions. The concept of weighing aggravating circumstances proved beyond a reasonable doubt against any existing mitigating factors was approved in *Proffitt*, and its vitality continues today. *See Barclay v. Florida* (1983), 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134.

Appellant also contends his death sentence should be set aside for the reason that R.C. Chapter 2929 fails to explicitly identify whether the defendant bears the burden of proving the existence of mitigating factors, and what standard of proof must be utilized in determining their presence. We disagree. An examination of the pertinent statutory provisions which address the subject of mitigating factors demonstrates that the statute does indeed provide the direction that appellant claims is lacking.

For example, R.C. 2929.03(D)(1) provides, in pertinent part:

"The defendant shall have the burden of going forward with the evidence of any factors in mitigation of the imposition of the sentence of death. The prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death."

This statutory section unambiguously answers appellant's charge as to who bears the burden of proving the existence of mitigating circumstances, by specifically placing the burden on the defendant to go forward with evidence of mitigation. The question remains, however, as to what standard of proof applies to mitigating factors.

Although the standard is not readily apparent from a reading of R.C. 2929.03 or 2929.04, the Committee Comment to the former R.C. 2929.03[8] resolves any uncertainty. Therein, it is stated that " * * * [m]itigation must be established by a preponderance of the evidence, and the rules of evidence also apply in this phase of the trial [except that] (the requirement for a pre-sentence investigation and report, the requirement for a psychiatric examination and report, and the provision for an unsworn statement by the defendant, represent partial exceptions to the rules of evidence)."

In the present case, the trial court placed the burden of proving mitigating

---

[8]134 Ohio Laws, Part II, 1866, 1978-1981.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

A - 23

factors by a preponderance of the evidence upon appellant.  Thereafter, the state carried the burden of proving by proof beyond a reasonable doubt that the aggravating circumstances appellant was found guilty of committing outweighed the mitigating factors.  Since the trial court correctly interpreted the standards governing the burden of proving mitigating factors and by what degree, we are unable to find merit in this assignment of error.

Appellant next maintains that the imposition of the death penalty under Ohio's statutory structure is constitutionally infirm for failing to provide necessary and adequate guidance to the sentencing authority in relation to "weighing" aggravating circumstances and mitigating factors.

R.C. 2929.03(D)(2) provides in relevant part:

"Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case.  If the jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender.  Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment."[9]

Specifically, appellant focuses upon that portion of R.C. 2929.03(D)(2) which requires that the jury weigh aggravating circumstances against mitigating factors which are present in the case, arguing that the "weighing" process is an inarticulate and amorphous standard which deprived him of his Eighth Amendment protections due to the absence of a discernible legal standard. According to appellant, the constitutional defect arises because the sentencing authority receives no guidance in measuring such disparate factors as aggravating circumstances and mitigating factors beyond the term "weigh."

Appellant's argument is not novel.  In *Proffitt, supra*, 428 U.S. at 248, 96 S.Ct. at 2965, the Florida statute directed that the jury consider " * * * [w]hether sufficient mitigating circumstances exist * * * which outweigh the aggravating circumstances found to exist; and * * * [b]ased on these considerations, whether the defendant should be sentenced to life imprisonment or death.'  [Fla.Stat.Ann.

---

[9] The trial court at the sentencing phase charged the jury as follows:

"Outweigh.  To outweigh means to weigh more than, to be more important than.  The existence of mitigating factors does not preclude or prevent the death sentence if the aggravating circumstances outweigh the mitigating factors.

"It is the quality of the evidence that must be given primary consideration by you.  The quality of the evidence may or may not be commensurate with the quantity of the evidence, that is, the number of witnesses or exhibits presented in this case.

" * * * *

"If all twelve members of the jury find, by proof beyond a reasonable doubt, that the aggravating circumstances which Leonard Jenkins was found guilty of committing outweigh the mitigating factors, then you must return such finding to the Court."

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

A - 24

Sections 921.141(2)(b) and (c) ( 1976-1977 Supp.) ] * * *." In his argument before the Supreme Court the petitioner maintained that the weighing process was an inarticulate standard, making it impossible for the sentencing authority to rationally determine whether, in a given case, aggravating circumstances outweigh the mitigating factors.

In upholding the Florida standard, the court reasoned as follows:

"While these questions and decisions may be hard, they require no more line drawing than is commonly required of a factfinder in a lawsuit. For example, juries have traditionally evaluated the validity of defenses such as insanity or reduced capacity, both of which involve the same considerations as some of the above-mentioned mitigating circumstances. While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.

"The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed." *Id.* at 257-258, 96 S.Ct. at 2969.

In view of the foregoing, we are constrained to reject appellant's argument that by requiring sentencing authorities to "weigh" aggravating circumstances against mitigating factors, the General Assembly somehow failed to limit the sentencing authority's discretion and focus its attention upon the circumstances of the capital offense and the individual offender when considering whether to return a verdict imposing the death penalty.[10]

Appellant next maintains that by requiring proof of aggravating circumstances at the guilt phase of the trial, rather than at the sentencing phase, Ohio has effectively prohibited individualized sentencing required under post-*Furman* cases.[11] In support of this contention, appellant directs our attention to the Georgia and Florida statutes at issue in *Gregg* and *Proffitt*, where under each statute the determination of guilt is separated from the consideration of aggravating

---

[10] The concept of "weighing" aggravating circumstances and mitigating factors as contained under R.C. 2929.03(D)(2) was approved in *Gregg*, wherein the court cited with approval the suggestion in the Model Penal Code that aggravating circumstances and mitigating factors "should be weighed and weighed against each other." (Emphasis *sic.*) *Id.* 428 U.S. at 193, 96 S.Ct. at 2935.

[11] Appellant also submits that since the same jury which convicted him also sentenced him, he was denied a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, as well as Sections 10 and 16, Article I of the Ohio Constitution. Appellant illustrates this contention by arguing that if defense counsel pursues a defense at the guilt phase of a capital trial which affects defendant's credibility, then his credibility is diminished at the sentencing stage. Suffice it to say that although the Supreme Court has endorsed bifurcated proceedings in death penalty cases, *see Zant v. Stephens, supra*, 462 U.S. at ---, 103 S.Ct. at 2741, 77 L.Ed.2d at 248, the court has yet to even remotely suggest that the Constitution requires a new jury be selected for the sentencing phase. Accordingly, we are unable to accept appellant's contention.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURIST@GMAIL.COM

A - 25

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 453

circumstances.

In considering this contention, it is important to keep in mind the following principle stressed in *Gregg, supra*, 428 U.S. at 195, 96 S.Ct. at 2935:

"We do not intend to suggest that only the above-described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman*, for each distinct system must be examined on an individual basis."

Thus, although Ohio's capital scheme does differ from those under consideration in *Gregg* and *Proffitt* insofar as when aggravating circumstances are considered in a capital case, this difference does not, in and of itself, render the Ohio scheme unconstitutional. On the contrary, in *Jurek* the high court upheld the Texas death penalty statute which, like Ohio's, requires the jury to consider at the guilt phase whether the crime falls into a particular category justifying capital punishment.[12]

In comparing the Georgia and Florida statutes with the Texas statute the court observed that "[e]ach [statute] requires the sentencing authority to focus on the particularized nature of the crime." *Id.* 428 U.S. at 271, 96 S.Ct. at 2956. Equally important was the court's lack of concern for whether aggravating circumstances are proven at the guilt or sentencing phase, as long as at the sentencing phase the jury is allowed to consider factors in mitigation of the imposition of a death sentence. *Id.*

The system currently in place in Ohio does require the sentencing authority to focus on the particular nature of the crime as well as allow the accused to present a broad range of specified and nonspecified factors in mitigation of the imposition of a death sentence. Thus, we are unable to agree with appellant's contention that the consideration of aggravating circumstances at the guilt stage of his trial was constitutionally prohibited.

In his next contention appellant focuses upon the requirements of R.C. 2929.021,[13] 2929.03[14] and 2929.05,[15] arguing that the extent of proportionality review

---

[12] Although the statute under consideration in *Jurek* did not set forth a list of aggravating circumstances *per se*, it did narrow the categories of murder for which the death penalty could be imposed to such an extent that the Supreme Court concluded the categories served much the same purpose as do aggravating circumstances.

[13] R.C. 2929.021 provides:

"(A) If an indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, the clerk of the court in which the indictment is filed, within fifteen days after the day on which it is filed, shall file a notice with the supreme court indicating that the indictment was filed. The notice shall be in the form prescribed by the clerk of the supreme court and shall contain, for each charge of aggravated murder with a specification, at least the following information pertaining to the charge:

"(1) The name of the person charged in the indictment or count in the indictment with aggravated murder with a specification; "(2) The docket number or numbers of the case or cases arising out of the charge, if available;

"(3) The court in which the case or cases will be heard;

"(4) The date on which the indictment was filed.

"(B) If the indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code and

(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

A - 26

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 454

in Ohio is constitutionally infirm. In the main, appellant contends that proportionality review in Ohio is flawed since there is no requirement for a jury, when recommending a sentence of life imprisonment over the imposition of the death penalty, to identify the existence of mitigating factors and why those factors outweigh the aggravating circumstances.

We first observe that appellant's argument that proportionality review is constitutionally required is without merit.  In *Pulley v. Harris* (1984), 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29, the Supreme Court held that neither *Gregg, Proffitt* nor *Jurek* established proportionality review as a constitutional requirement.  *Id.* 465 U.S. at ----, 104 S.Ct. at 878, 79 L.Ed.2d at 39.  In reaching this conclusion, the court reasoned as follows:

"Needless to say, that some schemes providing proportionality

_____

[13] (...continued)
if the defendant pleads guilty or no contest to any offense in the case or if the indictment or any count in the indictment is dismissed, the clerk of the court in which the plea is entered or the indictment or count is dismissed shall file a notice with the supreme court indicating what action was taken in the case. The notice shall be filed within fifteen days after the plea is entered or the indictment or count is dismissed, shall be in the form prescribed by the clerk of the supreme court, and shall contain at least the following information:
"(1) The name of the person who entered the guilty or no contest plea or who is named in the indictment or count that is dismissed;
"(2) The docket numbers of the cases in which the guilty or no contest plea is entered or in which the indictment or count is dismissed;
(3) The sentence imposed on the offender in each case."

[14] R.C. 2929.03(D)(2) provides in relevant part:
"Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case.  If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender.  Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.
"If the trial jury recommends that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender.  If the trial jury recommends that the sentence of death be imposed upon the offender, the court shall proceed to impose sentence pursuant to division (D)(3) of this section."

[15] R.C. 2929.05 pertinently provides:
"* * * In determining whether the sentence of death is appropriate, the court of appeals and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases.  * * *"

A - 27

review are constitutional does not mean that such review is indispensable. We take statutes as we find them. To endorse the statute as a whole is not to say that anything different is unacceptable. As was said in *Gregg*, '[w]e do not intend to suggest that only the above-described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman*, for each distinct system must be examined on an individual basis.' 428 U.S. at 195 [96 S.Ct. at 2935] * * *. Examination of our 1976 cases makes clear that they do not establish proportionality review as a constitutional requirement."[16]

Thus, although viewed as commendable, the decision in *Pulley* demonstrates that proportionality review is not constitutionally required in every case. Other factors which minimize the risk of arbitrary and capricious sentencing include bifurcated proceedings, the limited number of chargeable capital crimes, the requirement that at least one aggravating circumstance be found to exist and the consideration of a broad range of mitigating circumstances. In conjunction with prior United States Supreme Court decisions, the General Assembly incorporated the aforementioned factors into Ohio's death penalty statutes, as well as providing proportionality review—a meaningful function which reduces the arbitrary and capricious imposition of death sentences.

The question remains whether the absence of a requirement that juries specify the mitigating factors which they found to exist, and why these factors outweigh aggravating circumstances, creates a fatal defect in the statutes. We hold that it does not.

The fundamental purpose behind proportionality review is to ensure that sentencing authorities do not retreat to the pre-*Furman* era when sentences were imposed arbitrarily, capriciously and indiscriminately. To achieve this result, state courts traditionally compare the overall course of conduct for which a capital crime has been charged with similar courses of conduct and the penalties inflicted in comparable cases. *See Gregg* 428 U.S. at 204-206, 96 S.Ct. at 2939-2940, and *Proffitt* 428 U.S. at 259-260, 96 S.Ct. at 2969-2970.

The system currently in place in Ohio enables this court to obtain a vast quantity of information with which to effectuate proportionality review, beginning with data pertinent to all capital indictments and concluding with the sentence imposed on the defendant, whether or not a plea is entered, the indictment dismissed or a verdict is imposed by the sentencing authority. *See* R.C. 2929.021, *supra*, at fn. 13. Although appellant would have this court require juries returning a life sentence to specify which mitigating factors were found to exist and why they outweigh aggravating circumstances, we conclude that such information is not an indispensable ingredient in assisting us to determine whether the imposition of a death sentence is disproportionate to sentences imposed for similarly proscribed courses of conduct.

Appellant further asserts that R.C. 2929.03 and 2929.04 are unconstitutional for treating felony murders in a different manner than premeditated murders. According to appellant, a principal in a felony murder is treated more harshly than a defendant charged with a premeditated murder, since a felony murder constitutes

---

[16] 465 U.S. 37, ---, 104 S.Ct. 871, 876, 79 L.Ed.2d 29, 37.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

A - 28

one of the eight aggravating circumstances under R.C. 2929.04, while premeditation is not set forth as an aggravating circumstance.  Stated otherwise, appellant argues that aggravating factors for felony murders simply duplicate an element of the offense while a murder by prior calculation and design requires proof of a separate aggravating circumstance in order to justify a death sentence.  As such, appellant argues that a single act should not both convict and aggravate.

Assuming, *arguendo*, that the elements set forth under R.C. 2929.04(A)(7) are identical to those set forth under R.C. 2903.01(B),[17] we need only review the Texas statute at issue in *Jurek* to determine whether such a practice is constitutionally proscribed.

The Texas statute under consideration in *Jurek* did not set forth a category of statutory aggravating circumstances which, if proven, would justify the imposition of the death penalty.  Instead, the Texas system set forth five classes of murders the existence of any one of which would justify the imposition of a death sentence.  The high court took notice of the fact that the five classes of murder set forth in the Texas statute encompassed the separate aggravating circumstances set forth in the Georgia and Florida statutes under consideration in *Gregg* and *Proffitt*.

In sustaining the Texas statute, wherein the conduct which convicts also aggravates, the court stated:

" * * * So far as consideration of aggravating circumstances is concerned, therefore, the principal difference between Texas and the other two States is that the death penalty is an available sentencing option—even potentially—for a smaller class of murderers in Texas.  Otherwise the statutes are similar.  Each requires the sentencing authority to focus on the particularized nature of the crime." *Jurek, supra*, 428 U.S. at 271, 96 S.Ct. at 2956.

Applying *Jurek* to the arguments raised by appellant in the present case demonstrates that even if we were to construe the aggravated conduct of felony murder set forth within R.C. 2903.01(B) as functionally equivalent to the aggravating circumstance under R.C. 2929.04(A)(7), no constitutional infirmities would arise.  On the contrary, any duplication is the result of the General Assembly having set forth in detail when a murder in the course of a felony rises to the level of a capital offense, thus, in effect, narrowing the class of homicides in Ohio for which the death penalty becomes available as a sentencing option.

Under his final contention, appellant maintains that the sentencing scheme in Ohio falls below constitutional standards by failing to afford the sentencing authority the option to impose a life sentence of imprisonment or to grant mercy, regardless of whether aggravating circumstances outweigh mitigating factors.  In support of this contention, appellant focuses upon both the Florida and Georgia statutes which, as discussed by Justice Stevens in his concurrence in *Barclay v. Florida, supra*, 463 U.S. at ----, 103 S.Ct. at 3428, 77 L.Ed.2d at 1149, authorize the sentencing authority to grant life imprisonment even where the defendant has

---

[17] It is noteworthy that R.C. 2903.01(B) and 2929.04(A)(7) are not identical.  First, crimes such as robbery, arson and burglary, contained under R.C. 2903.01(B), are noticeably absent from R.C. 2929.04(A)(7).  More importantly, while a conviction under R.C. 2903.01(B) cannot be sustained unless the defendant is found to have intended to cause the death of another, the state, in order to prevail upon an aggravating circumstance under R.C. 2929.04(A)(7), must additionally prove that the offender was the principal offender in the commission of the aggravated murder or, if the offender was not the principal offender, that the aggravated murder was committed with prior calculation and design.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: Jbjjurisdoc@aol.com

A - 29

crossed the statutory threshold and could be subjected to death.

Appellant seizes upon the following language of Justice Stevens' concurrence, arguing that the sentencing authority must be given an opportunity to find the death penalty inappropriate when "statutory aggravating circumstances exist, and arguably outweigh statutory mitigating circumstances, but they are insufficiently weighty to support the ultimate sentence * * *." *Id.* 463 U.S. at ----, 103 S.Ct. at 3431, 77 L.Ed.2d at 1153. As Justice Stevens noted, however, immediately following the above-described passage, is that a second category exists under the Florida scheme where "even though statutory mitigating circumstances do not outweigh statutory aggravating circumstances, the addition of non-statutory mitigating circumstances tips the scales in favor of life imprisonment." (Emphasis *sic.*) *Id.*

Under R.C. 2929.04(B)(7) and (C), defendants are given great latitude in the presentation of any relevant factors in mitigation of the imposition of a death sentence. Accordingly, even if states were constitutionally required to adopt one of the two methods described by Justice Stevens in his concurrence in *Barclay*, Ohio's system presently coincides with the second category by requiring the sentencing authority to consider and weigh against aggravating circumstances any relevant mitigating factors which the defendant presents.

In conclusion, we hold that Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution.

15 Ohio St.3d, at 167-179.

Excerpt from *State v. Maurer*

As in *State v. Jenkins, supra*, appellant contends that the Ohio death penalty statutes violate his rights under the Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution. Specifically, appellant contends that: imposition of the death penalty is cruel and unusual punishment; the death penalty is arbitrary and capricious since prosecutors inevitably exercise discretion in pursuing capital cases; Ohio has failed to employ the least restrictive means to achieve deterrence and societal protection; the death penalty can only be imposed when deliberation and premeditation are shown to exist; the state must prove the absence of any and all mitigating factors prior to imposing a death sentence; no standard is set forth for determining who bears the burden of going forward with evidence of mitigating factors and what standard of proof applies; the instruction to a jury to "weigh" aggravating circumstances against mitigating factors is standardless; the statute is constitutionally infirm for failing to instruct juries that life imprisonment is an available sentencing option even where aggravating circumstances outweigh mitigating factors; information essential to proportionality review is not required under the statute; felony murders are treated disproportionately to premeditated murders in that the same conduct which convicts under R.C. 2903.01(B) also aggravates under R.C. 2929.04(A)(7); and defendants charged with capital offenses must be afforded a new jury during the sentencing phase.

These contentions were addressed in *State v. Jenkins, supra*, at paragraph one of the syllabus, where we concluded that "Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJUHASZ@AOL.COM

A - 30

October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution." In view of this holding, the aforementioned constitutional arguments set forth by appellant, which were considered in *Jenkins*, must also be rejected. We therefore proceed to consider appellant's remaining challenge concerning the constitutionality of the Ohio death penalty statutes as applied in this case.

Appellant argues that the aggravating circumstance of which he was convicted is unconstitutionally overbroad. The aggravating circumstance applied to appellant was that he had committed an aggravated murder in the course of a kidnapping, as proscribed under R.C. 2929.04(A)(7). That section provides, in pertinent part, as follows:

"The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, * * * and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."

Under R.C. 2905.01[2] a kidnapping will occur if an offender by force, threat or deception restrains an individual from liberty for the purpose of terrorizing or inflicting serious physical harm on the victim. As appellant observes, in virtually every aggravated murder the victim will be restrained from liberty for the purpose of terrorizing or the infliction of serious physical harm. Appellant therefor maintains the aggravating circumstance applied in his conviction is unconstitutionally overbroad.

In support of this argument, appellant principally relies upon *Godfrey v. Georgia* (1980), 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398. In that case, the Supreme Court vacated a death sentence predicated upon the aggravating circumstance that the murder was outrageously or wantonly vile, horrible or inhuman. In finding this aggravating circumstance overbroad, the Supreme Court

---

[2]R.C. 2905.01 provides, in part:

"(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where he is found or restrain him of his liberty, for any of the following purposes:

"(1) To hold for ransom, or as a shield or hostage;

"(2) To facilitate the commission of any felony or flight thereafter;

"(3) To terrorize, or to inflict serious physical harm on the victim or another;

"(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against his will;

"(5) To hinder, impede, or obstruct a function of government, or to force any action or concession on the part of governmental authority. "(B) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall knowingly do any of the following, under circumstances which create a substantial risk of serious physical harm to the victim:

"(1) Remove another from the place where he is found;

"(2) Restrain another of his liberty;

"(3) Hold another in a condition of involuntary servitude."

reasoned that a person of ordinary sensibility could fairly conclude that virtually every murder is outrageously or wantonly vile, horrible or inhuman.   Thus, the aggravating circumstance did not sufficiently distinguish the *Godfrey* case, in which a death sentence was imposed, from those cases in which death sentences were not imposed.

Appellant's argument for the application of *Godfrey* would conceivably possess merit were it not for this court's prior decision in *State v. Logan* (1979), 60 Ohio St.2d 126, 397 N.E.2d 1345 [14 O.O.3d 373], and the application of the underlying rationale of that case to the aggravating circumstance of kidnapping under R.C. 2929.04(A)(7) in *Jenkins.*

In *Logan,* the court concluded that "[w]here the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions." *Id.* at paragraph (a) of the syllabus. *See, also, State v. Price* (1979), 60 Ohio St.2d 136, 143, 398 N.E.2d 772 [14 O.O.3d 379].[3] [FN3]  Cf. State v. Moss (1982), 69 Ohio St.2d 515, 433 N.E.2d 181 [23 O.O.3d 447], certiorari denied (1983), 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 430 (convictions sustained for aggravated murder as well as for the underlying felony of aggravated burglary), and State v. Bickerstaff (1984), 10 Ohio St.3d 62, 461 N.E.2d 892 (convictions sustained for aggravated murder as well as for the underlying felony of aggravated robbery).

In *State v. Jenkins* we required prolonged restraint, secretive confinement, or significant movement apart from that involved in the underlying crime in order to justify the application of the aggravating circumstance of kidnapping under R.C. 2929.04(A)(7).   We conclude that any problems of overbreadth in relation to the aggravating circumstance of kidnapping have been extinguished.

Application of the above-described standard demonstrates that the aggravating circumstance of kidnapping was properly applied to appellant, since the record overwhelmingly demonstrates that prolonged restraint, secretive confinement as well as substantial movement took place apart from the separate underlying crime of aggravated murder.

## II

Appellant next contends that it is a violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution to death-qualify a jury prior to the guilt phase of a bifurcated capital proceeding.   In *State v. Jenkins, supra,* we rejected this argument and stated:

"Although the right to a jury trial includes the right to a jury venire drawn from a representative cross-section of the community, it does not include the right to be tried by jurors who are unable or unwilling to follow the law and the instructions of the trial judge in a capital case.'" *Id.* 15 Ohio St.3d at 188, 473 N.E.2d 264, citing *Keeten v. Garrison* (C.A.4, 1984), 742 F.2d 129, 133.

---

[3] In *Logan, supra,* 60 Ohio St.2d at 135, 397 N.E.2d 1345, it was stated that "the restraint and movement of the victim had no significance apart from facilitating the rape.   The detention was brief, the movement was slight, and the victim was released immediately following the commission of the rape.   In such circumstances, we cannot say that appellant had a separate animus to commit kidnapping."

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL  JBJJURISDOC@AOL.COM

A - 32

Accordingly, we reiterate our holding in *State v. Jenkins, supra*, at paragraph two of the syllabus, that "[t]o death-qualify a jury prior to the guilt phase of a bifurcated capital prosecution does not deny a capital defendant a trial by an impartial jury."   As a result, we find no error in the jury selection process employed at the trial of appellant.[4]

15 Ohio St.3d, at 241-244.

---

[4] Significantly, appellant does not argue, as did the appellant in *State v. Jenkins, supra*, that any of the potential jurors excused on the authority of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 [46 O.O.2d 368], were less than unequivocal or unambiguous in their commitment to vote against the death penalty under all circumstances.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

A - 33

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 461

IN THE COURT OF COMMON PLEAS OF TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | * | ENTRY OF STIPULATION REGARDING |
| | | DEFENDANT'S JULY 9, 2002 MOTION |
| PLAINTIFF | * | TO SUPPRESS |
| | | |
| VS. | * | HONORABLE JUDGE: |
| | | JOHN M. STUARD |
| DONNA ROBERTS, | * | *01-CR-193* |
| | | |
| DEFENDANT | * | |
| | * | |
| | * | |

_____

On Thursday, July 18, 2002, the Defendant's Motion to Suppress Evidence filed on July 9, 2002 came on for hearing. The Defendant was present with retained counsel J. Gerald Ingram and John B. Juhasz and the State was present and represented by assistant prosecutors Kenneth N. Bailey and Christopher D. Becker.

Counsel for the State advised the Court that the State and Defendant would stipulate that the Defendant's video taped statement taken on December 20, 2001 at approximately 8:20 p.m. was taken in violation of the Defendant's Miranda Rights and would not be used in the State's case in chief. However, the parties further stipulated that the video taped statement was voluntarily given and that the statement may be used by the State should the Defendant take the witness stand for impeachment purposes only.

The State further advised the Court that there were no other inculpatory or exculpatory statements taken from the Defendant on December 20, 2001.

THEREFORE, the Defendant's motion is sustained in accordance with and pursuant to

0978   309

37

the agreement of this entry of stipulation.


_____

CHRISTOPHER D. BECKER (0047252)
ASSISTANT PROSECUTING ATTORNEY
JEFFERSON COUNTY, OHIO


_____

KENNETH N. BAILEY (0023228)
ASSISTANT PROSECUTING ATTORNEY
JEFFERSON COUNTY, OHIO


_____

J. GERALD INGRAM (0007887)
COUNSEL FOR DEFENDANT


_____

JOHN B. JUHASZ (0023777)
COUNSEL FOR DEFENDANT
SO ORDERED.

_____

JOHN M. STUARD, JUDGE

*7/19/02 - Copies*
*sent to :*
*J. Ingram*
*J. Juhasz*
*L. Bolton*
*D. Marburger*
*a. Millette*
*Pros.*

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS ... ... ... ... COUNSEL OF RECORD
OR UPON THE ... ... ... ... ... REPRESENTED FORTH-
WITH BY O... ...
JUDGE ...

0976  310

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 463

E:\JBJCap2\Client\Roberts.Donna\Cover.Page.wpd*Thu 22Aug2002•1106.46 (11:06:46am)

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,                        )

    Plaintiff                   )   Case No.  01 CR 793

                                  )

*vs.*                                 )   Judge John M. Stuard

                                  )

                                  )

DONNA ROBERTS,                        )

    Defendant                   )   **Death Penalty Case**

---

DEFENDANT'S MOTION TO SUPPRESS REFERENCES
TO THE JURY THAT A VERDICT OF DEATH
IS ONLY A RECOMMENDATION

REQUEST FOR HEARING

---

FILED

JAN 3 0 2004

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
CHRISTOPHER D. BECKER, Esq.
KENNETH N. BAILEY, Esq.
160 High Street NW
Warren, Ohio  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

38

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 464

E:\JBJCap2\Client\Roberts.Donna\Death\Suppress.recommendation.Caldwell.wpd⊗Thu 22 August 2002 - 10:54am (1054 hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO, | Case No. 01 CR 793 |
| Plaintiff | |
| | Judge John M. Stuard |
| vs. | |
| | **Death Penalty Case** |
| DONNA M. ROBERTS, | |
| Defendant | |

---

### DEFENDANT'S MOTION TO SUPPRESS REFERENCES TO THE JURY THAT A VERDICT OF DEATH IS ONLY A RECOMMENDATION

### REQUEST FOR HEARING

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Court for an order suppressing any references by the prosecutor, defense counsel, and the Court itself, to potential jurors or to the trial jurors that a jury verdict as to death is a non-binding "recommendation" upon the trial court. The Defendant further moves for an order suppressing any comment or suggestion that a death sentence is automatically reviewable by the Supreme Court of Ohio.

For cause, the Defendant says that such references would deprive him the ability to have a fair determination of the appropriateness of a death sentence, which is a denial of the liberties specified in U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §§1, 2, 5, 9, 10, and 16. Further in support of this

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 465

Motion, the Defendant offers the attached Memorandum, which is incorporated herein.

WHEREFORE, the Defendant prays for an order suppressing reference by anyone that a jury verdict of death is only a recommendation to the trial Court or that any death sentence is automatically reviewable by the Supreme Court of Ohio.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ  (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was

☒ hand delivered
☐ sent by regular U.S. mail
☐ sent by telecopier

on the 26th day of August, 2002 to CHRISTOPHER D. BECKER, Esq., and KENNETH N. BAILEY, Esq., 160 High Street, NW, Warren, Ohio 44481.

JOHN B. JUHASZ

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 466

# TABLE OF CONTENTS

I.

    Both the United States and Ohio Supreme Courts have held that references to the death sentence as a recommendation should not be made. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.

    *Caldwell v. Mississippi* held that the Eighth Amendment bars "recommendation" comments. . . . . . . . . . . . . . . . . . . . . . . . 2

III.

    The Ohio Supreme Court has not properly interpreted the Eighth Amendment requirements of *Caldwell v. Mississippi*.6 IV. Although trial courts should not analyze issues in terms of harmless error, in any event, telling a jury that its verdict is only a recommendation is *not* harmless error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.

    Because jury verdicts of death in Ohio are seldom, if ever, overridden, any suggestion of judicial review is factually misleading. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VI.

    There are no independent state grounds which serve as a basis not to follow *Caldwell*; in fact, the state Constitution demands the relief requested herein. . . . . . . . . . . . . . . . . . . . . 23

VII.

    Because fundamental constitutional liberties are involved, a motion to suppress, and not a motion *in limine*, is the proper vehicle for relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VIII.

    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7808 · FACSIMILE 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

-iii-

# TABLE OF AUTHORITIES

**Constitutional Provisions:**

OHIO CONST. art. I, §1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

OHIO CONST. art. I, §10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

OHIO CONST. art. I, §16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

OHIO CONST. art. I, §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

OHIO CONST. art. I, §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

OHIO CONST. art. I, §20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

OHIO CONST. art. I, §5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

U.S. CONST. amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

U.S. CONST. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 28

**Cases:**

*Beard v. State*, (1923), 19 Ala.App. 102, 95 So. 333 . . . . . . . . . . . . . . . . . . . 23

*Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231, 53 USLW 4743 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4-7, 14-16, 19

*Caldwell v. State* (1983), 443 So.2d 806 . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*California v. Ramos* (1983) 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171, 51 USLW 5220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705    16-18

*Combs v. Coyle* (6th Cir. Ohio 2000), 205 F.3d 269, 2000 FED App 0064P . . 12

*Estelle v. Williams* (1976), 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 . . . 21

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

-iv-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 468

*Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 . . 23

*Hawes v. State* (1977), 240 Ga. 327, 240 S.E.2d 833 . . . . . . . . . . . . . . . . . 23

*Pait v. State* (Fla.1959), 112 So.2d 380 . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*People v. Johnson* (1940), 284 N.Y. 182, 30 N.E.2d 465 . . . . . . . . . . . . . . . 23

*People v. Morse* (1964), 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33 . . . . . 23

*People v. Ramos* (1984), 37 Cal.3d 136, 207 Cal. Rptr. 800, 689 P.2d 430 . . . 2

*State v. Buell* (1986), 22 Ohio St.3d 124, 489 N.E.2d 795, 22 O.B.R. 203 . . . 8-10, 14

*State v. Clark* (1988), 38 Ohio St.3d 252, 527 N.E.2d 844 . . . . . . . . . . . . . 7, 8

*State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071 . . . . . . . . . . . 12

*State v. Davidson* (1985), 17 Ohio St.3d 132, 477 N.E.2d 1141, 17 O.B.R. 277 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*State v. Gilbert* (1979), 273 S.C. 690, 258 S.E.2d 890 . . . . . . . . . . . . . . . . 23

*State v. Hennessee* (1984), 13 Ohio App.3d 436, 469 N.E.2d 947, 13 O.B.R. 525 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264 . . . . . . . . . . . 2, 6

*State v. Jones* (1979), 296 N.C. 495, 251 S.E.2d 425 . . . . . . . . . . . . . . . . . 23

*State v. Keenan* (1998), 81 Ohio St.3d 133, 689 N.E.2d 929 . . . . . . . . . . . . . 2

*State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 26

*State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932 . . . . . . . . . . . . . 2

*State v. Maurer* (1984), 15 Ohio St.3d 239, 473 N.E.2d 768 . . . . . . . . . . . . . 2

*State v. Rogers* (1986), 28 Ohio St.3d 427, 504 N.E.2d 52 . . . . . . . . . . . . . . 6

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

-v-

*State v. Scott* (1986), 26 Ohio St.3d 92, 497 N. E.2d 55 . . . . . . . . . . . . . . . . . 2

*State v. Steffen* (1987), 31 Ohio St.3d 111, 509 N.E. 2d 383 . . . . . . . . . . . . . 2

*State v. Tyner* (1979), 273 S.C. 646 . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 29

*State v. Ulis* (1992), 65 Ohio St.3d 83, 600 N.E.2d 1040 . . . . . . . . . . . . . . 28

*State v. White* (1975), 286 N.C. 395, 211 S.E.2d 445 . . . . . . . . . . . . . . . . . 23

*State v. Williams* (1986), 23 Ohio St.3d 16, 490 N.E.2d 906 . . . . . . . . . . . 2, 6

*State v. Willie* (La. 1982), 410 So.2d 1019 . . . . . . . . . . . . . . . . . . . . . . . . 23

*Stein v. New York* (1953), 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 . . . . 21

**Statutes and Rules:**

OHIO EVID. R. 411 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

OHIO EVID.R. 103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

OHIO REV. CODE ANN. §2929.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Other Authorities and Sources:**

*Annals of Congress*, vol. 1 (Washington, D.C.: Gales & Seaton, 1834) . . . . . 24

Ball, Howard *Hugo L. Black: Cold Steel Warrior* (New York: Oxford University Press, Copyright © 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Bright, Stephen and Patrick Keenan, *Judges and the Politics of Death: Deciding Between The Bill of Rights and the Next Election in Capital Cases*, 73 BOSTON UNIV. L. REV. 759 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Jeffries, John C. Jr., *Justice Lewis F. Powell, Jr.* (New York: Charles Scribner's Sons, Copyright © 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Katherine Drinker Bowen, *Miracle at Philadelphia: The Story of the Constitutional Convention May to September 1787* (Boston: Little, Brown and Co., 1966, 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

-vi-

Lazarus, Edward, *Closed Chambers* (New York: Times Books, Random House, Copyright © 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Rice, Charles, "The Bill of Rights and the Doctrine of Incorporation," in Eugene Hickok, ed., *The Bill of Rights: Original Meaning and Current Understanding* (Charlottesville, Va.: University Press of Virginia, 1991) . . . . . . . . . . . . . . 24

Rowan, Carl T., *Dream Makers, Dream Breakers: The World of Justice Thurgood Marshall* (Boston: Little, Brown & Co., Copyright © 1993) . . . . . . . . . . . . . 3

Savage, David G., *Turning Right: The Making of the Rehnquist Supreme Court* (New York: John Wiley & Sons, Inc., 1992) . . . . . . . . . . . . . . . . . . . . . 21

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: Jbjjurisdoc@aol.com

-vii-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 471

## MEMORANDUM IN SUPPORT OF MOTION

### I.

Both the United States and Ohio Supreme Courts have held that references to the death sentence as a recommendation should not be made.

In most Ohio death penalty cases, prosecutors, judges, and sometimes even defense attorneys, have informed jurors during voir dire or argument that a jury verdict of death is a non-binding "recommendation" upon the trial judge and that it is the trial judge who makes the actual decision about whether the Defendant will be sentenced to death or will receive a life sentence. Judges sometimes have incorporated the suggestion into the mitigation charge to the jury. The United States Supreme Court has found that such references violate the Eighth Amendment guarantee that the appropriateness of a death sentence shall be fairly, impartially, and reliably determined. The Ohio Supreme Court has repeatedly held that these "recommendation" suggestions should not be made.

Suggestions that the jury verdict is a recommendation may mislead the jury about the importance of its sentencing verdict, thereby unconstitutionally diminishing the jury's own sense of responsibility for determining the appropriateness of the death sentence.[1] "Recommendation" comments, by

---

[1] Any claim by the government that such suggestions are proper because in fact the jury's verdict is a recommendation are misplaced. There are situations in our legal system where, truth or accuracy to one side, some information is so likely to be misused by a jury that the jurors must not be told of its existence. In most auto accident cases—where the stakes are certainly much less than a death sentence—jurors are not told that the lawyer representing the defendant is not the defendant's lawyer, but one representing his insurance company. The jurors are not told that any judgment against the defendant will likely be paid not by him, but by his insurance company. *See,* OHIO EVID. R. 411. The danger is that because an insurance company and not the defendant is paying the freight, as it were, the jury is less likely to treat the plaintiff's proof (of liability and damages) with the circumspection demanded even by the burden of proving the case by a mere preponderance.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 472

whomever made, are unconstitutional error. The proper method to prevent such error during the trial is through a pretrial motion such as this.

In *State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, the Ohio Supreme Court said that, though it would "prefer" that "recommendation" remarks not be made in future death penalty cases in Ohio,[2] the remarks were constitutionally acceptable pursuant to *California v. Ramos* (1983) 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171, 51 USLW 5220. There are two problems with the *Jenkins* holding as applied to this case. First, *Caldwell v. Mississippi*, discussed *post*, held that *Ramos* does not apply to "recommendation" comments. Second, the remarks in *Ramos* were later declared unconstitutional under the California Constitution. *See, People v. Ramos* (1984), 37 Cal.3d 136, 207 Cal. Rptr. 800, 689 P.2d 430, *cert. den.* (1985), 471 U.S. 1119, 105 S.Ct. 2367, 86 L.Ed.2d 266.[3]

## II.

*Caldwell v. Mississippi* held that the Eighth Amendment bars "recommendation" comments.

In *Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231, 53 USLW 4743, decided after *State v. Jenkins*, the Supreme Court

---

[2] The Ohio Supreme Court has consistently held since *Jenkins* that it would prefer that such remarks not be made. *See, e.g., State v. Maurer* (1984), 15 Ohio St.3d 239, 473 N.E.2d 768; *State v. Scott* (1986), 26 Ohio St.3d 92, 497 N.E.2d 55; *State v. Williams* (1986), 23 Ohio St.3d 16, 490 N.E.2d 906; *State v. Steffen* (1987), 31 Ohio St.3d 111, 509 N.E.2d 383; *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932; *State v. Keenan* (1998), 81 Ohio St.3d 133, 689 N.E.2d 929. The Court has never really done anything about it on appeal, always managing to find the error to be harmless. *See, e.g.,* Stephen Bright and Patrick Keenan, *Judges and the Politics of Death: Deciding Between The Bill of Rights and the Next Election in Capital Cases*, 73 BOSTON UNIV. L. REV. 759 (1995).

The goal of a trial court is to avoid error at trial, not to foresee which errors may be committed because they will likely be found harmless on appeal. At some point in the future, the Ohio Supreme Court may decide that enough harmless error is enough, and reverse a case based upon remarks that it has repeatedly said it would prefer not to have been made.

[3] *Appeal after remand, People v. Ramos* (1997), 15 Cal.4th 1133, 938 P.2d 950, 64 Cal.Rptr.2d 892, *cert. denied*, (1998), 523 U.S. 1027, 118 S.Ct. 1315, 140 L.Ed.2d 487, 66 USLW 3621.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

2

held it impermissible to rest a death sentence on a vote of a sentencing jury which had been led to believe that the state appellate courts had the ultimate responsibility to determine the appropriateness of the death sentence.  The prosecutor in that case said that the "decision you [the jurors] render is automatically reviewable by the Supreme Court." *Id.*, 472 U.S. at 326-26.  In an opinion by Justice Marshall, the Court set forth a list of dangers in allowing discussion of such "recommendation" language to be used in front of the jury.  Thurgood Marshall tried more capital cases—and has hands on appreciation for what happens in a courtroom—than all of the justices of the United States Supreme Court.  It is therefore appropriate to quote from his opinion for the Court at some length.[4]

> [W]e conclude that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.  This Court has repeatedly said that under the Eighth Amendment "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California v. Ramos*, 463 U.S., at 998-999.  Accordingly, many of the limits that this Court has placed on the imposition of capital punishment are rooted in a concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion.  See, *e.g., Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality opinion); *Gardner v. Florida*, 430 U.S. 349 (1977) (plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280 (1976). [Footnote omitted.]
>
> In evaluating the various procedures developed by States to determine the appropriateness of death, this Court's Eighth Amendment jurisprudence has taken as a given that capital sentencers would view their task as the serious one of determining whether a specific human being should die at the hands of the State. . . . Belief in the truth of the assumption that sentencers treat their

---

[4] *See, generally*, Carl T. Rowan, *Dream Makers, Dream Breakers: The World of Justice Thurgood Marshall* (Boston: Little, Brown & Co., Copyright © 1993); *see, also*, Edward Lazarus, *Closed Chambers* (New York: Times Books, Random House, Copyright © 1998), 107, 147; Howard Ball, *Hugo L. Black: Cold Steel Warrior* (New York: Oxford University Press, Copyright © 1996), 104; and, John C. Jeffries, Jr., *Justice Lewis F. Powell, Jr.* (New York: Charles Scribner's Sons, Copyright © 1994), 258-262.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: jbjjurisdoc@aol.com

3

power to determine the appropriateness of death as an "awesome responsibility" has allowed this Court to view sentencer discretion as consistent with—and indeed as indispensable to—the Eighth Amendment's "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina, supra,* 428 U.S., at 305 (plurality opinion). See also *Eddings v. Oklahoma, supra; Lockett v. Ohio, supra.*

### B

In the capital sentencing context there are specific reasons to fear substantial unreliability as well as bias in favor of death sentences when there are state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court.

### (1)

Bias against the defendant clearly stems from the institutional limits on what an appellate court can do—limits that jurors often might not understand.  The "delegation" of sentencing responsibility that the prosecutor here encouraged would thus not simply postpone the defendant's right to a fair determination of the appropriateness of his death; rather it would deprive him of that right, for an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance.  Whatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record.  This inability to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of what this Court has termed "[those] compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson, supra,* at 304.  When we held that a defendant has a constitutional right to the consideration of such factors, *Eddings, supra; Lockett, supra,* we clearly envisioned that that consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses.  As the dissenters below noted:

"The [mercy] plea is made directly to the jury as only they may impose the death sentence.  Under our standards of appellate review mercy is irrelevant.  There is no appellate mercy.  Therefore, the fact that review is mandated is irrelevant to the thought processes required to find that an accused should be denied mercy and sentenced to die." 443 So.2d, at 817 (Lee, J., joined by Patterson, C.J., and Prather and Robertson, JJ., dissenting).

Given these limits, most appellate courts review sentencing determinations with a presumption of correctness.  This is the case in Mississippi, where, as the dissenters below pointed out:  "Even a novice attorney knows that appellate courts do not impose a death penalty, they merely review the jury's decision and that review is with a presumption of correctness." *Id.,* at 816 (Lee, J., joined by Patterson, C.J., and Prather and Robertson, JJ., dissenting).  See also Miss.Code

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

4

Ann. Sec. 99-19-105 (Supp. 1984) (defining scope of appellate review of capital sentencing).

(2)

Writing on this kind of prosecutorial argument in a prior case, Justice STEVENS noted another reason why it presents an intolerable danger of bias toward a death jury:  Even when a sentencing jury is unconvinced that death is the appropriate punishment, it might nevertheless wish to "send a message" of extreme disapproval for the defendant's acts.  This desire might make the jury very receptive to the prosecutor's assurance that it can more freely "err because the error may be corrected on appeal."  *Maggio v. Williams,* 464 U.S. 46, 54-55 (1983) (concurring in judgment).  A defendant might thus be executed, although no sentencer had ever made a determination that death was the appropriate sentence.

(3)

Bias could similarly stem from the fact that some jurors may correctly assume that a sentence of life in prison could not be increased to a death sentence on appeal. See *Arizona v. Rumsey,* 467 U.S. 203, 211 (1984).  The chance that this will be the assumption of at least some jurors is increased by the fact that, in an argument like the one in this case, appellate review is only raised as an issue with respect to the reviewability of a death sentence.  If the jury understands that only a death sentence will be reviewed, it will also understand that any decision to "delegate" responsibility for sentencing can only be effectuated by returning that sentence. But for a sentencer to impose a death sentence out of a desire to avoid responsibility for its decision presents the spectre of the imposition of death based on a factor wholly irrelevant to legitimate sentencing concerns.   The death sentence that would emerge from such a sentencing proceeding would simply not represent a decision that the State had demonstrated the appropriateness of the defendant's death. [Footnote omitted.]  This would thus also create the danger of a defendant's being executed in the absence of any determination that death was the appropriate punishment.

(4)

In evaluating the prejudicial effect of the prosecutor's argument, we must also recognize that the argument offers jurors a view of their role which might frequently be highly attractive.  A capital sentencing jury is made up of individuals placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice.  They are confronted with evidence and argument on the issue of whether another should die, and they are asked to decide that issue on behalf of the community.  Moreover, they are given only partial guidance as to how their judgment should be exercised, leaving them with substantial discretion.  See, *e.g., Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Lockett v. Ohio,* 438 U.S. 586 (1978); *Woodson v. North Carolina,* 428 U.S. 280 (1976).  Given such a situation, the uncorrected suggestion that the responsibility for any ultimate determination of

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · Youngstown, Ohio 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

5

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 476

> death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role. Indeed, one can easily imagine that in a case in which the jury is divided on the proper sentence, the presence of appellate review could effectively be used as an argument for why those jurors who are reluctant to invoke the death sentence should nevertheless give in.
>
> This problem is especially serious when the jury is told that the alternative decision-makers are the justices of the state supreme court. It is certainly plausible to believe that many jurors will be tempted to view these respected legal authorities as having more of a "right" to make such an important decision than has the jury. Given that the sentence will be subject to appellate review only if the jury returns a sentence of death, the chance that an invitation to rely on that review will generate a bias toward returning a death sentence is simply too great.

*Id.*, 472 U.S. at 329-333. The dangers of "recommendation" suggestions are obvious, and this Court must prevent those comments from being made before the jury.

III.

The Ohio Supreme Court has not properly interpreted the Eighth Amendment requirements of *Caldwell v. Mississippi.*

*Caldwell* had not been decided when *Jenkins* was decided. The Ohio Supreme Court first considered *Caldwell* in *State v. Rogers* (1986), 28 Ohio St.3d 427, 504 N.E.2d 52 ("*Rogers, II*").[5] Though the Court found a way to distinguish *Rogers* from *Caldwell*, it nonetheless held that:

> this court has demonstrated an appreciation of the fact that some degree of *unreliability* in jury findings may be occasioned by arguments based on postsentencing procedures. We have repeatedly stated that because of the possible risk of diminishing jury responsibility, ". . . . we prefer that in the future no reference be made to the jury regarding the finality of their decision . . . . ."

28 Ohio St.3d at 433, quoting *State v. Williams* (1986), 23 Ohio St.3d 16, 490 N.E.2d 906, and *State v. Jenkins, ante.* (Emphasis added.)

---

[5] Rogers was also considered in *State v. Rogers* (1985), 17 Ohio St.3d 174, 478 N.E.2d 984 ("*Rogers I*"), and *State v. Rogers* (1987), 32 Ohio St.3d 70, 512 N.E.2d 581 ("*Rogers III*").

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHISDOC@AOL.COM

6

In other filings in this case, the Defendant has demonstrated the inadequacy of effective appellate review in Ohio. Decisions of the Ohio courts relating to *Caldwell* highlight this shortcoming. The Supreme Court has diluted constitutional holdings in an effort to affirm capital convictions. How does one categorize the ruling "we prefer"? The Court's deferential desire to avoid reversing capital sentences results in this type of language. Though the Court has not been clear, the answer is that it is error, for the Court in *State v. Clark, post*, said it that the comment was harmless. Something complained of on appeal is either error or it is not. If it is error, it is either harmless or not. If it is error, *Caldwell* requires reversal—not a "we prefer" ruling. As shown *post*, the Ohio Supreme Court employs reversal only when the Court believes that a defendant has not had a fair trial. The Court's incongruous capital jurisprudence seems to define a "fair trial" as one where the defendant is plainly guilty and deserves a death sentence, and where a reversal would be a waste of time and a political liability. That rule of law would soon make any legal error harmless so long as the trial is "fair." To avoid this "slippery slope" of uncertain appellate review, the possibility of error must be avoided here at the trial level by prohibiting "recommendation" comments. If this Court is prepared to ignore *Caldwell*, it should grant the requested relief nonetheless out of deference to the Supreme Court of Ohio's "preference" that such suggestions not be made.

As shown elsewhere,[6] the Ohio Supreme Court dilutes its earlier holdings when a lawyer argues that what the Court had held in an earlier case now requires reversal in the present case. The Court metamorphoses its earlier opinion so that the later conviction can likewise be affirmed—perhaps because

---

[6] *See, e.g., Defendant's Motion to Dismiss Indictment; or, in the Alternative, to Dismiss Death Specifications Because the Death Penalty in Ohio is Unconstitutional*, Memorandum, Part X.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · Youngstown, Ohio 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

7

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 478

the Court considers that the trial was "fair" and the death penalty justified. For example, in *State v. Clark* (1988), 38 Ohio St.3d 252, 527 N.E.2d 844, the Court, *per curiam*, said:

> In appellant's sixth proposition of law, he contends that the prosecutor cannot tell the jury that its verdict of death is a "mere recommendation" to the court. Appellant asserts that such a statement impermissibly reduces the jury's sense of responsibility for the death sentence. In support of his position, appellant relies on *Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed. 231.
>
> In our view, the judge and prosecutor in the instant cause were correct in referring to the jury's decision as a recommendation that the trial court need not accept. See R.C. 2929.03(D)(2). Hence, we reaffirm our prior refusal to extend *Caldwell* so as to forbid telling juries that they can only recommend the death sentence and not impose it. *See, e.g., State v. Buell* (1986), 22 Ohio St.3d 124, 142-144, 22 OBR 203, 219-220, 489 N.E.2d 795, 811-813. Even if appellant were correct on this point, it is noteworthy that he failed to object to the alleged prosecutorial misconduct. Since we do not believe that the prosecutor's statements deprived appellant of a fair trial, any alleged prosecutorial misconduct was harmless beyond a reasonable doubt. See *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O. [Ohio Op.]3d 362, 373 N.E.2d 1244.

38 Ohio St.3d at 259. This holding is, with due respect, so far off the constitutional beam as to defy analysis. The issue is *not* prosecutorial misconduct. There is a clear Eighth Amendment right to have a death sentence reliably determined. There is a clear obligation on the part of the trial court to insure that happens, whatever else takes place at a capital trial, and whatever anyone says or fails to say, or whatever anyone does or fails to do, a failure to reliably determine a death sentence can never be "harmless beyond a reasonable doubt."

*State v. Clark* relied upon *State v. Buell* (1986), 22 Ohio St.3d 124, 489 N.E.2d 795, 22 OBR 203, where the Court said:

> In the case at bar, the following instructions to the jury regarding their role in the sentencing process are relevant:
> "A jury recommendation to the Court that the death penalty be imposed is just that. A recommendation. And it is not binding upon

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

8

the Court. The final decision as to whether the defendant will be sentenced to death or to life imprisonment will be made by me, the Judge, after following the procedure and applying the criteria set forth in the statutes."

Initially we noted that while the jury has the power to impose the sentence of death under the Mississippi statute,[footnote 9 omitted]  R.C. 2929.03(D)(3) delegates the death sentencing responsibility to the trial court upon its separate and independent finding that the aggravating factors outweigh the mitigating factors in this case.[7]  The appellant herein has not alleged, nor does the record in any way reflect, that the trial court was unmindful of the awesome nature of its responsibility in imposing the death penalty.

Secondly, as noted in Part III, *supra*, Ohio's multi-leveled appellate review of the trial court's written findings justifying imposition of death serve as an additional safeguard against capriciousness or unjust bias.

Finally, unlike the comments to the jury in *Caldwell v. State, supra*, the instructions given to the jury in this case are an accurate statement of the law in Ohio. R.C. 2929.03(D)(2) provides:

" * * * If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. * * * " (*Emphasis added.*)

As we stated in *Jenkins, supra*, 150 Ohio St.3d at 202, 473 N.E.2d 264, and we now emphatically emphasize, the better procedure would be to have no comment by the prosecutor or by the trial judge on the question of who bears the ultimate responsibility for determining the penalty. Nevertheless, in the case at bar, the charge of the trial court was not inaccurate or misleading, nor was its effect upon the jury constitutionally infirm. Thus, we find that *Caldwell v. Mississippi, supra*, is clearly distinguishable from the matter now before us.

In conclusion, we find that the death sentence imposed in this case is appropriate in light of the existence of the aggravating circumstances and the absence of any factors in mitigation of this horrible crime. Additionally, we find the sentence of death to be appropriate as it is neither excessive nor disproportionate to the penalty imposed in similar cases. Finally, convinced as we are that the appellant has received objective, impartial and unbiased review on

---

[7] With all due respect, the Supreme Court of Ohio's opinion in *Buell* represents what at times borders on intellectual dishonesty of the Court employed to affirm capital convictions. In *Buell*, the Court said that "R.C. 2929.03(D)(3) delegates the death sentencing responsibility to the trial court upon its separate and independent finding that the aggravating factors outweigh the mitigating factors in this case." Yet, the United States Supreme Court's plurality opinion said at 472 U.S. 336: "That appellate review is available to a capital defendant sentenced to death is no valid basis for a jury to return such a sentence if otherwise it might not."

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: JBJJURISDOC@AOL.COM

9

appeal, we affirm both the conviction and the death sentence. Accordingly, the judgment of the court of appeals is affirmed.

*Id.*, at 143-44.  Again with due respect, this type of tortured legal reasoning is not of the caliber one has the right to expect from the State's highest court.

Footnote 9 of the Court's opinion referred to, but did not reproduce, MISS. CODE 1972 ANN. §99-19-101(1) and (2) (Supp.1985).  The Ohio Supreme suggested that only a Mississippi jury can impose death, which is not completely accurate.[8]  The Court also failed to take account of the fact that the burden of

---

[8] The statute provides in pertinent part:

(1) Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment.  The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable.  If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of the imposition of the penalty.  If the trial jury has been waived, or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose *or may be conducted before the trial judge sitting without a jury if both the State of Mississippi and the defendant agree thereto in writing.  . . . .*

(2) After hearing all the evidence, the jury shall deliberate on the following matters:

(a) Whether sufficient factors exist as enumerated in subsection (7) of this section;

(b) Whether sufficient aggravating circumstances exist as enumerated in subsection (5) of this section;

(c) *Whether sufficient mitigating circumstances exist* as enumerated in subsection (6) of this section, *which outweigh the aggravating circumstances found to exist;* and

(d) Based on these considerations, whether the defendant should be sentenced to life imprisonment, life imprisonment without eligibility for parole, or death.

(3) For the jury to impose a sentence of death, it must unanimously find in writing the following:

(a) That sufficient factors exist as enumerated in subsection (7) of this section;

(b) That sufficient aggravating circumstances exist as enumerated in subsection (5) of this section;  and

(c) That *there are insufficient mitigating circumstances*, as enumerated in subsection (6), *to outweigh the aggravating circumstances.*

In each case in which the jury imposes the death sentence, the determination of the jury shall be supported by specific written findings of fact based upon the circumstances in subsections (5) and (6) of this section and upon the records of the trial and the sentencing proceedings.  If, after the trial of the penalty phase, the jury does not make the findings requiring the death sentence or life imprisonment without eligibility for parole, or is unable to reach a decision, the

(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

10

proof in Mississippi is different from that in Ohio.  In Mississippi, mitigation must outweigh aggravation to entitle the Defendant to a life sentence.  In Ohio, the State's more difficult burden of proof is made all the easier if the jury's sense of responsibility is diminished by the assumption that any mistake it makes will be corrected by an appellate court.  Ohio *is* similar to Mississippi in the respect that in Ohio "[t]here is no appellate mercy." *Caldwell v. State* (1983), 443 So.2d 806, 817, (LEE, J., joined by PATTERSON, Ch.J., and BRATHER and ROBERTSON, JJ., dissenting).  *See, also, State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212.  There is no appellate mercy in Ohio, and precious little judicial mercy of any kind.[9]  The Supreme Court went so far in *Lorraine* as to say that mercy is inappropriate in a capital case.

Just how many times juries have spared a defendant's life, either by refusing to convict of death specifications or by a life verdict at the second phase, is unknown.  The statutes of Ohio require a notice of filing of all capital indictments with the Supreme Court, and of course require the filing of an appeal  if death is imposed.  However, the statutes do not require any subsequent notice if death specifications are dismissed, *e.g., State of Ohio v. Richard Johnson*, Mahoning C.P. No. 98 CR 285A, or when the jury fails to convict the defendant of any capital specifications, as in *State of Ohio v. John J.*

---

[8](...continued)
court shall impose a sentence of life imprisonment.
(Emphasis added.)

[9] Though there are over 200 inmates on Ohio's Death Row and though *juries* have spared lives, in only eight instances has a judge overruled the jury's death verdict.  *See, State v. Drewy Kaiser* (Jan. 10, 1983), Roth Cty. C.P. No. 82 CR 69, unreported; *State v. Alonzo Wright* (Apr. 24, 1987), Cuyahoga Cty. C.P. No. CR211,379, unreported; *State v. Eddie Robertson* (Apr. 20, 1989), Montgomery Cty. C.P. No. 88 CR 3179, *State v. John Parsons* (Oct. 19, 1990), Franklin Cty C.P. No. 88-CR-01-279, unreported; *State v. Gregory Crawford* (May 24, 1999), Wayne Cty. C.P. No. 98 CR 0185; *State v. Christopher Fuller* (Oct. 18, 2000), Butler C.P. No. CR00-03-0369; *State v. Timothy Hancock* (Dec. 26, 2001), Warren C.P. No. 00CR19073; and *State v. Brian Siler* (June 14, 2002), Ashland C.P. No. 01CR108110.

*Santine*, Ashtabula C.P. No. 96 CR 171, unreported, (1998), 1998 WL 552991, unreported, *jurisdictional motion overruled*, (1998), 83 Ohio St.3d 1473, 701 N.E.2d 380.

The Ohio Supreme Court has been criticized even by some of its own members for its less-than-scholarly approach to constitutional issues in death cases. *See*, e.g., *State v. Combs* (1991), 62 Ohio St.3d 278, 294-95, 581 N.E.2d 1071 (WRIGHT, J., joined by HERBERT R. BROWN, J., dissenting):

> I must respectfully dissent from this court's affirmance of the imposition of the death penalty. The prosecutorial misconduct graphically outlined by the majority simply cannot be passed off as harmless error beyond a reasonable doubt. Unlike several cases in which we have invoked the doctrine of harmless error or rejected plain-error analysis, substantial mitigating factors were extant in this case. [Footnote omitted.]
>
> This court has been most reluctant to reverse imposition of the death penalty due in large measure to the effect of *State v. Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744. The General Assembly could easily deal with the effect of *Penix* by authorizing a second trial limited to the issue of whether the aggravating circumstance or circumstances outweigh the mitigating factors beyond a reasonable doubt. The cure for this legislative omission does not lie in repeatedly excoriating prosecutorial misconduct while allowing a tainted death penalty to stand. The right to a fair trial (including, most especially, the sentencing phase of a capital case) is of paramount consideration in our criminal justice system.
>
> "'[I]t is most important that the sentencing phase of the [capital] trial not be influenced by passion, prejudice, or any other arbitrary factor. * * * With a man's life at stake, a prosecutor should not play on the passions of the jury.'" *State v. DePew* (1988), 38 Ohio St.3d 275, at 299, 528 N.E.2d 542, at 566 (WRIGHT, J., concurring in part and dissenting in part), quoting *Hance v. Zant* (C.A. 11, 1983), 696 F.2d 940, 951, certiorari denied (1983), 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393.

Combs has now been given a new trial, though not by the courts of this state. *See*, *Combs v. Coyle* (6th Cir. Ohio 2000), 205 F.3d 269, 2000 FED App 0064P, *cert. denied, Bagley v. Combs* (2000), 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533, 69 USLW 3380. Appellate review of Ohio death cases proves that attempts to skirt issues at the trial level because they will be "cured" by effective

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2508 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

12

appellate review are a triumph of faith over experience.  Errors are not "cured" when an appellate court looks at them and proclaims them harmless, often without regard for of the standard set out in *Chapman v. California*.  As the dissent in Caldwell's case before the Mississippi Supreme Court pointed out: "Even a novice attorney knows that appellate courts do not impose a death penalty, they merely review the jury's decision and that review is with a presumption of correctness." *Caldwell v. State* (1983), 443 So.2d 806, 816 (LEE, J., joined by PATTERSON, Ch.J., and BRATHER and ROBERTSON, JJ., dissenting.) As shown in other pleadings filed in this case, the presumption of correctness in Ohio is nearly irrefutable.

The Court said that Buell "has not alleged, nor does the record in any way reflect, that the trial court was unmindful of the awesome nature of its responsibility in imposing the death penalty." Indeed, Buell had not. Buell's complaint was with what the *jury* was told, not with what the trial judge's responsibility was.  The trial judge could not have faced that "awesome" responsibility unless the jury, untainted by the assurance that its decision would be reviewed, had not imposed death.[10]  Thus the palliative of referring to

----

[10] *See*, OHIO REV. CODE ANN. §2929.03(D)(2) provides in pertinent part:
  If the trial jury recommends that the offender be sentenced to life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender.  .  .  . If the trial jury recommends that the sentence of death be imposed upon the offender, the court shall proceed to impose sentence pursuant to division (D)(3) of this section.
Division (D)(3) provides in pertinent part:
  (3) Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted to the court pursuant to division (D)(1) of this section, if, after receiving pursuant to division (D)(2) of this section the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt, .  .  . that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, it shall impose sentence of death on the offender.  Absent such a finding by the court or panel, the court or the panel shall impose one of the following sentences on the offender:

(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUKISDOC@AOL.COM

13

the "awesome nature of [the trial court's] responsibility in imposing the death penalty," has absolutely nothing to do with the instructions to the *jury*! *Caldwell* clearly makes the point that the Ohio Supreme Court refused to discern and rule upon:

> Bias against the defendant clearly stems from the institutional limits on what an appellate court can do—limits that jurors often might not understand.  The "delegation" of sentencing responsibility that the prosecutor here encouraged would not thus simply *postpone* the defendant's right to a fair determination of the appropriateness of his death; rather it would *deprive* him of that right, for an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance.  Whatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record.

*Caldwell, ante*, 472 U.S. at 330. (Emphasis added.)  In light of this excerpt, how can the Ohio Supreme Court claim that it followed, but declined to extend, *Caldwell*?  The Court says that "Ohio's multi-leveled appellate review of the trial court's written findings justifying imposition of death serve as an additional safeguard against capriciousness or unjust bias;" while the United States Supreme Court is saying that "an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance," and that the failure of the jury to consider death, untainted by the prospect that any "mistake" will be corrected on appeal does not *delay* a defendant's Eighth Amendment rights—it *denies* those rights altogether.  The Ohio Supreme Court held in *Buell* that "the charge of the trial court was not inaccurate or misleading, nor was its effect upon the jury constitutionally

---

[10](...continued)

(a) Except as provided in division (D)(3)(b) [dealing with sexual motivation and sexually violent predator specifications] of this section, one of the following:
(i) Life imprisonment without parole;
(ii) Life imprisonment with parole eligibility after serving twenty-five full years of imprisonment;
(iii) Life imprisonment with parole eligibility after serving thirty full years of imprisonment.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: jbjjurisdoc@aol.com

14

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 485

infirm.  Thus, we find that *Caldwell v. Mississippi, supra,* is clearly distinguishable from the matter now before us." 22 Ohio St.3d at 144.  But *Caldwell* involved not just an instruction: it addressed the trial court's allowing the prosecutor to "cure" what he saw as a misleading argument by the defense. Here is what really happened in *Caldwell*:

> ASSISTANT DISTRICT ATTORNEY: Ladies and gentlemen, I intend to be brief.  I'm in complete disagreement with the approach the defense has taken.  I don't think it's fair.  I think it's unfair.  I think the lawyers know better.  Now, they would have you believe that you're going to kill this man and they know--they know that your decision is not the final decision.  My God, how unfair can you be? Your job is reviewable.  They know it.  Yet they …
>
> COUNSEL FOR DEFENDANT:  Your Honor, I'm going to object to this statement.  It's out of order.
>
> ASSISTANT DISTRICT ATTORNEY:  Your Honor, throughout their argument, they said this panel was going to kill this man.  I think that's terribly unfair.
>
> THE COURT: Alright, go on and make the full expression so the Jury will not be confused.  I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands.  I think that information is now needed by the Jury so they will not be confused.
>
> ASSISTANT DISTRICT ATTORNEY:  Throughout their remarks, they attempted to give you the opposite, sparing the truth.  They said 'Thou shalt not kill.'   If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair.  For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.

472 U.S. at 325-26.  This is what the Supreme Court in *Caldwell* found undermined the reliability of the Eighth Amendment determination.  Whatever the Ohio Supreme Court is saying in its less than scrupulous review of these cases, *Caldwell* requires this Court to insure reliability, *inter alia*, by prohibiting "recommendation" comments.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 486

IV.

Although trial courts should not analyze issues in terms of harmless error, in any event, telling a jury that its verdict is only a recommendation is *not* harmless error.

A.

The Ohio Supreme Court, while continuing to say that it would "prefer" that recommendation comments not be made, suggested in *Clark* that the error might be harmless. Unfortunately, the Court's harmless error analysis is as flawed as its analysis of *Caldwell*. More important for present purposes, this Court cannot allow suggestions that the verdict is a recommendation to be made, knowing that to do so is error, but relying upon the possibility that the Ohio Supreme Court will find the error harmless.

B.

Meaningful discussion of what constitutes harmless error begins with *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. In that case, the prosecutor referred to the defendant's failure to testify at trial. The Supreme Court set out the harmless error standard. In doing so, it declined to adopt a rule that any federal constitutional error must result in reversal, but it also rejected the tendency, prevalent at the time in the California courts, to find errors harmless because of overwhelming guilt—a standard that Ohio courts have adopted particularly in capital cases. The Supreme Court in *Chapman* said:

> We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. . . . We decline to adopt any such rule. All 50 States have harmless-error statutes or rules, and the United States long ago through its Congress established for its courts the rule that judgments shall not be reversed for "errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. §2111. [Footnote omitted.] None of these rules on its face distinguishes between federal constitutional errors and errors of state law or federal

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

16

statutes and rules.  All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial.  We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.

### III.

In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules *can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one.*  What harmless-error rules all aim at is a rule that will save the good in harmless-error practices while avoiding the bad, so far as possible.

The federal rule emphasizes "substantial rights" as do most others.  The California constitutional rule emphasizes 'a miscarriage of justice,' [footnote omitted] but the California courts have neutralized this to some extent by emphasis, and perhaps overemphasis, upon the court's view of "overwhelming evidence." [Footnote omitted.] We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy v. State of Connecticut*, 375 U.S. 85,   There we said: 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.*, at 86-87. Although our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error, [footnote omitted] this statement in *Fahy* itself belies any belief that all trial errors which violate the Constitution automatically call for reversal.   At the same time, however, like the federal harmless-error statute, *it emphasizes an intention not to treat as harmless those constitutional errors that "affect substantial rights" of a party.*  An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless.   Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless.   .    .    .

*Id.* at 20-24.  (Emphasis added.)  The late Justice Potter Stewart, no criminal law liberal by any stretch of the imagination, wondered what all the fuss was about.  His concurring opinion in *Chapman* makes clear that fundamental constitutional errors are not harmless, and further makes clear that such has long been the rule of law.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

17

In devising a harmless-error rule for violations of federal constitutional rights, both the Court and the dissent proceed as if the question were one of first impression.  But in a long line of cases, involving a variety of constitutional claims in both state and federal prosecutions, this Court has steadfastly rejected any notion that constitutional violations might be disregarded on the ground that they were "harmless."  Illustrations of the principle are legion.

When involuntary confessions have been introduced at trial, the Court has always reversed convictions regardless of other evidence of guilt.  As we stated in *Lynumn v. State of Illinois*, 372 U.S. 528, 537, the argument that the error in admitting such a confession "was a harmless one . . . is an impermissible doctrine." . . .  Even when the confession is completely "unnecessary" to the conviction, the defendant is entitled to "a new trial free of constitutional infirmity." *Haynes v. State of Washington, supra*, 373 U.S., at 518-519.[11]
. . .

To try a defendant in a community that has been exposed to publicity highly adverse to the defendant is per se ground for reversal of his conviction; no showing need be made that the jurors were in fact prejudiced against him.  *Sheppard v. Maxwell*, 384 U.S. 333, 351-352; *cf. Rideau v. State of Louisiana*, 373 U.S. 723, 727. . . .

*When a jury is instructed in an unconstitutional presumption, the conviction must be overturned, though there was ample evidence apart from the presumption to sustain the verdict.  Bollenbach v. United States*, 326 U.S. 607, 614-615.  Reversal is required when a conviction may have been rested on a constitutionally impermissible ground, despite the fact that there was a valid alternative ground on which the conviction could have been sustained. *Stromberg v. People of State of California*, 283 U.S. 359, 367-368; *Williams v. State of North Carolina*, 317 U.S. 287, 292.  In a long line of cases leading up to and including *Whitus v. Georgia*, 385 U.S. 545, it has never been suggested that reversal of convictions because of purposeful discrimination in the selection of grand and petit jurors turns on any showing of prejudice to the defendant.

*Id*. at 42-44.  (Emphasis added.)  Stewart went on to say that, while a harmless

error analysis might apply in Fourth Amendment cases, where the purpose of

the rule is to deter illegal police conduct, a less stringent harmless error analysis

---

[11] Stewart inserted a footnote which said: "None of these decisions suggests that the rejection of a harmless error rule turns on any unique evidentiary impact that confessions may have.  *Haynes v. State of Washington*, 373 U.S. 503, specifically contradicts that notion.  In addition to the confession found inadmissible by this Court, the defendant in Haynes had given two prior confessions, the admissibility of which was not disputed, and 'substantial independent evidence' of guilt existed.  The Court accepted the prosecution's contention that the inadmissible confession played little if any role in the conviction."

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 489



might be applicable.  Here, *Caldwell* makes clear that what is involved is a fundamental Eighth Amendment liberty to have a sentence of death reliably determined.  To instruct or argue to the jury that its death verdict is a recommendation, particularly when the appellate courts of Ohio reverse so few capital cases, is the same as instructing the jury "in an unconstitutional presumption" that its verdict will be effectively reviewed.  Table 1 show that Ohio appellate review is wholly inadequate, with a reversal rate far below the national average.

The "recommendation" error was not harmless in *Caldwell*, where no one questioned Caldwell's guilt, and it cannot be harmless here.

### C.

The campaign to dilute and/or eradicate the harmless error rule has been led by Chief Justice William H. Rehnquist.  Rehnquist has worked hard to try

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

19

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 490

to have his views concerning harmless error become law.  His views can be traced back 50 years.  In the spring of 1952, the United States Supreme Court accepted the case of three New York men who said that  confessions had been beaten out of them by the police.  Harry Stein and two of his friends, suspects in a robbery and murder of a delivery truck driver, were picked up by police for questioning.  Over the next two days, the three were held separately and incommunicado. When they were treated by a doctor afterward, one of the three had broken ribs.  All three men had bruises and abrasions, though the police denied using violence to obtain confessions.  The three men were found guilty and sentenced to death, and the state court upheld their convictions.

When the case made its way to the Supreme Court in 1952, the 27 year old Rehnquist was a law clerk for Justice Robert H. Jackson.    Though Rehnquist recommended to Jackson the Court deny certiorari, Justices William O. Douglas, Hugo L. Black, Felix Frankfurter, and Stanley Reed voted to hear the case. After oral argument in December of 1952, Rehnquist wrote a four page memorandum to Jackson, urging the Court to adopt the harmless error rule for coerced confessions. Rehnquist cited other evidence in the record to demonstrate that the men were guilty.  Rehnquist's memo to Jackson began by noting that the three defendants were seeking to have their convictions reversed "even though they are guilty as sin." His uncompromising tone has changed little over the years.  More alarmingly, there seems precious little appreciation of the presumption of innocence or the fact that due process means more than finding out if the system caught the right man. The *process* of reliably determining guilt is part and parcel of due process.  Rehnquist wrote to Jackson:

> The purpose of federal review of state courts is to guarantee defendants therein a fair trial, not to discipline state police officers.  If no evidence has been admitted at trial which had substantially prejudiced [the] defendant, he has had a fair trial, and this Court's

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

20

> inquiry is at an end.  The recent eagerness of this Court to seize upon coerced confessions as grounds for reversal is reflected in the trial below.  The defendants, instead of attempting to prove their innocence, devoted their time to proving [that] the confessions were coerced.  The ivory tower jurisprudence of the Murphy-Rutledge era [in the 1940s] has weakened local law enforcement, and if this case is an indication has saved few innocent men.  It has been a boon to smart criminal lawyers, and has supplied this court with a number of cases.  Let's hope it has come to and end.  WHR

Jackson did not accept Rehnquist's advice.  *See, Stein v. New York* (1953), 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522, where the Court upheld the conviction but declined to adopt the harmless error rule.[12]  Over the years, Rehnquist and like-minded judges and justices have watered down the harmless error rule.  The point for purposes of this motion is that harmless error, even the diluted version, has always been an *appellate* standard.  This Court cannot permit conduct which is clear error on the assumption that it will later be determined harmless.  To do so, even under the Rehnquist version of harmless error, assumes before trial that the Defendant is guilty as sin.  While, with due respect, the Chief Justice appears to have struggled with such a fundamental principle, the majority of judges in this country and this State have been more committed to the presumption of innocence.  *See, e.g., Estelle v. Williams* (1976), 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126; *State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342.  For present purposes, it should be enough to say that, regardless of one's view of whether the error is harmless or not, comments in violation of *Caldwell* are clearly error and cannot be permitted.[13]

---

[12] This account is taken from David G. Savage, *Turning Right: The Making of the Rehnquist Supreme Court* (New York: John Wiley & Sons, Inc., 1992), 380-381.

[13] This is neither the time nor place to discuss the matter, but the Defendant notes in passing that, unchecked, the harmless error doctrine could consume all constitutional liberties,

(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

21

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 492

## V.

Because jury verdicts of death in Ohio are seldom, if ever, overridden,
any suggestion of judicial review is factually misleading.

Telling a jury that its verdict is a "recommendation" is indeed factually misleading. In very few instances in Ohio has a trial judge overruled the finding of the jury and sentenced the Defendant to life.[14] Therefore, while the statute may speak in terms of a "recommendation," this recommendation has in effect been a verdict or sentence. Misleading the jury into believing that its verdict is a recommendation misinforms the jury and thereby creates an unacceptable risk that the death penalty will be meted out arbitrarily or capriciously. The misinformation encourages the jury to send a message of extreme disapproval of the Defendant's actions and therefore a vote of death, because the jury believes that the judge will make the ultimate decision as to sentence. The jury will be lead to believe that it can express its disapproval, and the judge can make the "correct" decision.[15] The trial judge seldom fails to adopt the jury's recommendation. Jurors will tend to approach sentencing decisions less cautiously if they believe that any error they might commit would be corrected

---

[13](...continued)
leaving a criminal trial to the vagaries of appellate judges, who were not in the courtroom, deciding that the conviction is to affirmed if it is clear to them that the defendant is guilty.

On balance, it should be said that not everyone subscribes to the Rehnquist theory. Justice Anthony Kennedy, in an interview broadcast the television production *America and the Courts*, broadcast on C-SPAN on December 19, 1999, said: "There is more at stake in a criminal trial than the guilt or innocence of the defendant."

[14] As demonstrated in other motions to be filed in this case, despite its repeated assertions of independently weighing the evidence, proportionality review, *etc.*, the Ohio Supreme Court seldom conducts an in depth review; and, it seldom reverses a death sentence.

[15] The likelihood that trial judges will "correct" a jury's mistake in meting out a death sentence appears as likely as correction by appellate review. Trial courts, appellate courts (before Issue One) and the Supreme Court have reversed or modified perhaps half a dozen cases each.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail Jbjjurisdoc@aol.com

22

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 493

by the trial judge. *Caldwell* holds that the risk of the jury's lack of caution is an unacceptable one.

Many state court decisions, some even predating *Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, have not allowed death sentences to stand under circumstances where the jury is told that its decision on death is reviewable.[16] In a South Carolina case, *State v. Tyner* (1979), 273 S.C. 646, the prosecutor told the jury that its verdict as to sentence was a recommendation. The prosecutor went on to say that the judge could correct the error if the jury made one, and went even further and discussed the appellate review process all the way through the South Carolina Supreme Court. The South Carolina Supreme Court vacated the death sentence, holding that the prosecutor's closing argument diverted the attention of the jury from its duty to decide the defendant's punishment on the basis of the evidence presented.

## VI.

There are no independent state grounds which serve as a basis not to follow *Caldwell*; in fact, the state Constitution demands the relief requested herein.

## A.

The repeated use of the word "recommendation" or the suggestion that the jury's decision is a "recommendation" will violate U.S. CONST. amend. VIII and XIV. Further, consideration of independent state grounds, not yet considered by the Ohio appellate courts, requires the relief sought here.

---

[16] *Hawes v. State* (1977), 240 Ga. 327, 240 S.E.2d 833; *Fleming v. State* (1977), 240 Ga. 142, 146, 240 S.E.2d 37, where the death sentence was vacated despite a curative instruction; *State v. Willie* (La. 1982), 410 So.2d 1019, 1034-1035, where the death sentence was vacated even absent other errors; *State v. Jones* (1979), 296 N.C. 495, 498-499, 251 S.E.2d 425; *State v. White* (1975), 286 N.C. 395, 404-405, 211 S.E.2d 445; *State v. Gilbert* (1979), 273 S.C. 690, 696-698, 258 S.E.2d 890, where the death sentence was vacated despite the defendant's failure to raise the issue on appeal; *People v. Morse* (1964), 60 Cal.2d 631, 649-653, 36 Cal.Rptr. 201, 388 P.2d 33; *Pait v. State* (Fla.1959), 112 So.2d 380, 383-384; *People v. Johnson* (1940), 284 N.Y. 182, 30 N.E.2d 465; *Beard v. State* (1923), 19 Ala.App. 102, 95 So. 333.

B.

The fundamental principle of our system of government is that the government is one of limited, derived powers.  Because it is a government of delegated powers, American government is different than any other government in the world.[17]

Ohio's Constitution is explicit that it is based upon the theory of natural law.  OHIO CONST. art. I, §1 provides: "All men are, *by nature*, free and independent, and have certain *inalienable rights*, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."[18]  (Emphasis added.)  The federal Constitution makes clear that the federal government, too, is one of delegated powers.  James Madison, referred to as the father of the Constitution, originally proposed, rather than a separate Bill of Rights, a preamble to the Constitution asserting that "all power is originally vested in, and consequently derived from, the people."[19]  Noah Webster demonstrated the impossibility of

---

[17] *See*, Charles Rice, "The Bill of Rights and the Doctrine of Incorporation," in Eugene Hickok, ed., *The Bill of Rights: Original Meaning and Current Understanding* (Charlottesville, Va.: University Press of Virginia, 1991), 11:
> The Constitution of the United States is the first instance in all history of the creation of a government possessing only limited powers.  The Magna Charta, the Petition of Right, the English Bill of Rights, and all the other previous efforts to restrain government had merely imposed restrictions on the otherwise unlimited power of government.  The framers of the Constitution, however, created a new government which would possess only the powers delegated to it.

This long forgotten principle of a government with only delegated powers is more fully developed in the Defendant's Constitutional Motion to Dismiss.

[18] OHIO CONST. art. I, §20 provides: "This enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers, not herein delegated, remain with the people."

[19] *See*, *Annals of Congress*, vol. 1 (Washington, D.C.: Gales & Seaton, 1834), pp. 424-49.  The Framers believed that a Bill of Rights was not needed to protect, for example, the right of citizens to engage in free speech.  In the view of the Framers, because no power to regulate speech had been *delegated* to the new constitutional government, there was no need to add a provision that Congress had no power to regulate speech.  Alexander Hamilton asked: "For why declare that

(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

24

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 495

setting forth in a "Bill of Rights" the list of unalienable "rights."  Webster sarcastically suggested a constitutional clause:

> that everybody shall, in good weather, hunt on his own land, and catch fish in rivers that are public property . . .  And that Congress shall never restrain any inhabitant of America from eating and drinking, at seasonable times, or prevent his lying on his left side, in a long winter's night, or even on his back, when he is fatigued by lying on his right.

*See*, Katherine Drinker Bowen, *Miracle at Philadelphia: The Story of the Constitutional Convention May to September 1787* (Boston: Little, Brown and Co., 1966, 1986), 246.  While it does not seem that the principle of a government consisting only of powers delegated to it by the people could be much clearer, the courts today tend to look at the Bill of Rights as the *granting* of certain rights to the citizens by the government, or as the enumeration of only those rights retained inviolate by the citizenry.  With that faulty premise as a foundation, it is easy to see why there are so many exceptions engrafted upon the "rights" of the citizens "granted" by the Constitution.  Hence, when analyzing the exercise of government power to impose a sentence of death, the preference must be in favor of the individual citizen and against the government.  That preference requires that the government may validly obtain a death sentence only if the process for doing so is reliable and not infected with the subtle assurance that the jury can make no mistake which cannot and will not be judicially corrected.

The limits placed on government action by OHIO CONST. art. I, §§1, 2, 5, 9, 10, and 16 demand that no reference be made to a death verdict as a

---

[19](...continued)
things shall not be done which there is no power to do?" Hickok, *op. cit.*, p. 2.  In some of the *Federalist* papers, proponents for the adoption of the Constitution without a Bill of Rights asserted that it was proper and consistent with the theory that the government is one of derived powers. The arguments noted that, *e.g.*, the Magna Carta was in essence a forceful *taking of power from the king*—an event wholly inconsistent with the principle of an American government with power derived from the people.

recommendation. OHIO CONST. art. I, §1 provides that every citizen has a natural right, which cannot be abridged by the government, to defend life and liberty.[20] The Defendant cannot effectively do so here if the procedure for determining whether the Defendant should live or die is infected by an undermining of the jury's sense of responsibility for the most awesome decision it can be called upon to make. OHIO CONST. art. I, §16 provides that every Ohio citizen shall have the right to the administration of justice without denial, and a remedy in the courts by due course of law.[21] Again, how can it be said that those guarantees have been honored when the process by which the jury determines life or death is undermined by a lessened sense of responsibility? A denial of these liberties is *ipso facto* a denial of equal protection, OHIO CONST. art. I, §2;[22] *State* v. *Lane, ante.* Nor can the Defendant be tried by an impartial jury or be said to have the right to trial by jury held inviolate, OHIO CONST. art. I, §§5 and 10, when the jury is infected with a diminished sense of responsibility in the only type of case where jurors impose the sentence.

---

[20] OHIO CONST. art. I, §1 provides: "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."

[21] OHIO CONST. art. I, §16 provides: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

[22] OHIO CONST. art. I, §2 provides: "All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the General Assembly."

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

26

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 497

## VII.

Because fundamental constitutional liberties are involved, a motion to suppress, and not a motion *in limine*, is the proper vehicle for relief.

A motion to suppress, and not a motion *in limine*, is the proper vehicle to assert the objections that the Defendant asserts to any use of the word "recommendation" when referring to the jury's sentencing verdict. First, though clearly constitutional grounds are involved here, a motion to suppress need not assert only constitutional grounds. A motion *in limine* is advisory in nature and subject to change depending upon the circumstances at trial. Where, as here, reference to the jury verdict as a recommendation is wholly improper, the motion to suppress, is the proper vehicle to ensure that the jury is not impermissibly tainted. In *State v. Hennessee* (1984), 13 Ohio App.3d 436, 469 N.E.2d 947, 13 OBR 525, the court discussed this issue at pages 437-438:

> This idea—a motion to suppress lies only where there is a constitutional violation—seems to be accepted in many jurisdictions in this state. See, for example, the opinion in *State v. Griggy* (1982), 1 Ohio Misc.2d 16, 440 N.E.2d 74, where it was held that a pretrial motion to suppress can only be made on constitutional grounds. . .
>
> We believe the Ohio Supreme Court's rulings in *State v. Unger* (1981), 67 Ohio St.2d 65, 423 N.E.2d 1078, and *Kettering v. Hollen* (1980), 64 Ohio St.2d 232, 416 N.E.2d 598, are being misapplied. In *Kettering* the court said, at page 235, 416 N.E.2d 598, after citing various cases:
> "It is clear from these cases that the exclusionary rule will not ordinarily be applied to evidence which is the product of police conduct violative of state law but not violative of constitutional rights."
> From this rule, some courts have taken the position that a constitutional violation is the only ground for a motion to suppress, *i.e.*, that unless a constitutional violation is alleged, a pretrial motion to suppress is not proper.
> This is not a proper application of *Kettering*. . . . A motion to suppress is a procedural form. It is the vehicle used to invoke the exclusionary rule. But is it to be used only to invoke the exclusionary rule? We think not.
> The whole thrust of the Criminal Rules is to have as many matters resolved at the pretrial stage as is possible. . . . Pretrial

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: Jbjjurisdoc@aol.com

27

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 498

determination of non-constitutional issues would also seem to be required.

> [A] motion to suppress on non-constitutional grounds filed before trial is exactly what is contemplated by the Ohio Criminal Rules and statutes. . . . After the court's ruling, the claim of error would be preserved for the defendant, while the state would, if the ruling was against them, have a pretrial right of appeal under R.C. 2945.67. . . .
>
> We therefore find that the exclusionary rule is a matter of substantive law designed to protect constitutional rights. A motion to suppress is a procedural form under Crim.R. 12(B) which may be used at the pretrial stage to raise both constitutional and non-constitutional claims capable of determination without a trial of the general issue.

The Supreme Court of Ohio made clear that the law in Ohio is that non-constitutional issues may be and should be properly raised in a motion to suppress. In *State v. Ulis* (1992), 65 Ohio St.3d 83, 600 N.E.2d 1040, the Court held:

> This court . . . noted that the intent of the Criminal Rules was to "determine matters before trial when possible." . . . Although the issues raised on motion to suppress here are constitutional in nature, the policy of early determination applies not only to constitutional issues but also to non-constitutional claims capable of determination without a trial on the general merits. *State v. Haines* (1984), 13 Ohio App.3d 436, 438, 13 OBR 525, 527, 469 N.E.2d 947, 950; *Kretz, supra*. This policy could be thwarted if the state and a defendant would be subjected to a trial where the case hinges upon an evidentiary issue capable of determination without additional evidence being elicited by either party.

*Id.* at 85. Moreover, even if this motion were to be titled as a motion *in limine*, it should be treated by the Court as a motion to suppress. *State v. Davidson* (1985), 17 Ohio St.3d 132, 477 N.E.2d 1141, 17 OBR 277. It is the policy of the law, to protect the fairness of all proceedings, civil and criminal, and to ensure application of U.S. CONST. amend. XIV and OHIO CONST., art. I, §16 in criminal cases, to decide matters in advance of trial where there is clearly an issue as to whether the jury should be permitted to consider evidence. OHIO EVID.R. 103(C) provides:

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

28

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 499

**(C) Hearing of jury**. In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury.

The Committee Comment to the foregoing subsection reads as follows:

**Rule 103(C) Hearing of Jury.**
Quite reasonably, Rule 103(C) provides that, where practicable, discussions involving the admissibility of evidence should be conducted in the absence of the jury. It would be quite pointless, for example, to permit the jury to overhear the offer of excluded evidence. The rule is not new to Ohio procedure; judges have always had discretion to conduct hearings regarding admissibility of evidence in the absence of the jury. See 52 OJur 2d Trial Sec. 89. The rule is similar to Rule 104(C).

Here, the suggestion that the death verdict is only a recommendation is so clearly prejudicial that a pretrial hearing—and not objections made before the jury or any prospective juror—is required to resolve the constitutional questions posed herein. Those questions should be resolved in favor of the Defendant.

VIII.

Conclusion

Use of the word "recommendation" will lessen the impact upon the jury of the task it must undertake. It will divert the attention of the jury from its task. *State v. Tyner, ante*. The "recommendation" of the jury has become the sentence of the court in all but eight (8) Ohio capital cases. It is too late after the fact to learn that the jury did not seriously undertake its responsibilities because it believed that if it made a mistake, the judge would correct it. The Mississippi statute, quoted in part *ante*, at fn. 8, requires a Mississippi jury which imposes death to state its reasons in writing. Ohio has never required this, either by statute or decision interpreting the Constitution. How a trial judge or appellate judges can know if the jury lost its way is beyond comprehension. There is no room for such errors in a capital case, and the relief

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 500

sought herein is therefore required.  No one should be permitted to suggest to the jury that its sentencing verdict is a recommendation.

J. GERALD INGRAM

JOHN B. JUHASZ
COUNSEL FOR DEFENDANT

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CASE NO. 01-CR-793

STATE OF OHIO,                )

    Plaintiff             )

vs.                           )          JUDGMENT ENTRY

DONNA ROBERTS,                )

    Defendant             )

This Court agrees with the statement contained in Defendant's brief that, "This Court should thus resort to the fixed star in the Constitutional firmament that every person put on trial in this State shall have a fair trial by disinterested, impartial jurors."

There is a fundamental problem, however, between the reasoning of the Defendant and the view of this Court regarding the view of what a "death qualified" jury means.  In the opinion of this Court a "death qualified" jury is not synonymous with a "death prone" jury.

Defendant argues in effect that the death penalty questions asked of prospective jurors preconditions the jury to the death penalty and thereby cause the jury to be death prone.

2

This Court thinks that view to be inaccurate after many years of observing ordinary jurors and their independent ability to recognize the precepts of law they are called upon to apply in reaching verdicts.

Defendant's counsel in argument admitted in colloquy with the Court that there is a certain portion of the general jury venire that when asked will state that they could under no circumstances find in favor of the death penalty.  To have such a person on the jury would deny the State a fair trial. There are prospective jurors that occasionally say something to the effect, "I think if the State has charged the Defendant with capital murder, he is probably guilty."  To allow such a person to sit would deny the Defendant a fair trial.

If in a civil case where a farmer's cow is on a highway and struck by a car, and a prospective juror on voir dire says, "If the farmer's cow was on the highway, the Plaintiff should recover damages no matter what the law says."  Does the Plaintiff legitimately argue he is denied a fair trial because the juror who refuses to follow the law is dismissed?

It is not the intent of this Court to diminish the seriousness of the matter before it by using the above comparison, but the <u>Witherspoon</u> case and others have required questions to be put to prospective jurors to determine if they

0081   503

are able and willing to consider the death penalty. Not that they will apply it. It is possible to have a juror seated who on voir dire states they are morally opposed to the death penalty but they are willing to follow the law and consider recommending such penalty if the law and facts so dictate.

It is the opinion of this Court that jurors almost without exception take their duties with the utmost seriousness and that processes now in place for conducting voir dire ensures a Defendant a fair and impartial jury.

This Court does not accept Defendant's argument that the Prosecutor should be required to show probable cause exists before the death qualification can proceed.

The history of our Grand Jury system illustrates that the finding of probable cause is a function of the Grand Jury and not the Court in returning an indictment. The Prosecution is required to prove its case beyond a reasonable doubt. To permit a jury to hear the case before being death qualified would, in the Court's opinion, be potentially a crap shoot for both the Defendant and the State as far as a fair and impartial trial goes.

_____9/6/02_____

DATE

JUDGE JOHN M. STUARD

4/11/02 - SENT COPIES TO:
PROS. D. WATKINS
ATTY J. INGRAM
" J. JUHASZ

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH WITH BY ORDINARY MAIL.

JUDGE

0981 509

E:\JBJCAP2\ROBERTS\Cover.Page.wpd*Sun 08Sep2002•1604.33 (04:04:33pm)

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,                           }

    Plaintiff                          }     Case No.  01 CR 793

                                       }     Judge John M. Stuard
*vs.*                                    }     Courtroom 2

                                       }

DONNA M. ROBERTS,                        }

    Defendant                          }     **Death Penalty Case**

---

### DEFENDANT'S MOTION TO DISMISS DEATH SPECIFICATIONS DUE TO INADEQUATE APPELLATE REVIEW REQUEST FOR HEARING

03-1441



J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

FILED

JAN 3 0 2004

MARCIA J MENGEL, CLERK
SUPREME COURT OF OHIO

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
CHRISTOPHER D. BECKER, Esq., Assistant
KENNETH N. BAILEY, Esq., Assistant
160 High Street NW
Warren, Ohio  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

40

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 505

E:\JBJCAP2\ROBERTS\DEATH.PEN\Ineff.app.review.wpd*Sun 8 September 2002 - 04:01pm (1601 hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | } | Case No. 01 CR 793 |
| Plaintiff | } | |
| | } | Courtroom No. 2 |
| *vs.* | } | Judge John M. Stuard |
| | } | |
| DONNA M. ROBERTS, | } | **Death Penalty Case** |
| Defendant | } | |

---

### DEFENDANT'S MOTION TO DISMISS DEATH SPECIFICATIONS DUE TO INADEQUATE APPELLATE REVIEW
### REQUEST FOR HEARING

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through the undersigned counsel, and moves this Honorable Court for an order dismissing all death specifications appended to the Indictment.

For cause, the Defendant says that capital punishment, as it is administered in Ohio, is virtually without effective appellate review. Because *effective,* and not simply *pro forma*, appellate review is a constitutionally indispensable part of the process of imposing a death sentence, imposition of *any* death sentence in this State violates U.S. CONST. amend. VIII and XIV, and also violates OHIO CONST. art. I, §§1, 2, 9, 10, and 16. This point is demonstrated in some detail in the attached Memorandum, made a part hereof by this reference.

The Defendant asks for an oral hearing on this matter.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

i

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 506

WHEREFORE, the Defendant prays for an order of this Court dismissing the death specifications.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ  (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was: ☐ sent by regular United States Mail, postage prepaid; ☐ hand delivered to counsel or counsel's office; or ☐ sent by telecopier to Christopher D. Becker and Kenneth N. Bailey, Counsel for Plaintiff, 160 High Street, Warren, Ohio 44481 this ____ day of September, 2002.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

ii

TABLE OF CONTENTS

I. Overview of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Underlying Premises of Constitutional Analysis . . . . . . . . . . . . . . . 2

III.  Historical Framework of the Bill of Rights . . . . . . . . . . . . . . . . . . 3

IV.  The Nature of Government Power is Limited, a Fact That Requires
Tightly Constructed Capital Schemes That Are Meticulously Operated
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.  The Requirement of Effective Appellate Review in Capital Cases . . . 12

V.  Implementation of Capital Punishment in Ohio . . . . . . . . . . . . . . . 17
    A.  The Role of the Judiciary  . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    B.  Appellate Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    C.  Post-*Lockett* Inadequate Review  . . . . . . . . . . . . . . . . . . . . . 20
    D.  Examples of Inadequate Ohio Appellate Review . . . . . . . . . . . 23
        1.  *Mercy and Limitations on Mitigation.* . . . . . . . . . . . . . . 23
        2.  *Independent Weighing.* . . . . . . . . . . . . . . . . . . . . . . . . 29
        3.  *Non-statutory aggravating circumstances* . . . . . . . . . . . 37
        4.  *Proportionality*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

V.  The Liebman Study  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

VI.  Ohio Statistics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

VII.  Virtually All Errors Are Held Harmless in Ohio . . . . . . . . . . . . . . 49

VIII.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

iii

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 508

# TABLE OF AUTHORITIES

**Cases:**

*Barclay* v. *Florida* (1983), 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134, 51 USLW 5206 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Beck v. Alabama*, (1980), 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Betts v. Brady* (1942), 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 . . . . . 62

*Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231, 53 USLW 4743 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 31

*Callins* v. *Collins* (1994), 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435, 62 USLW 3546 (BLACKMUN, J., dissenting) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Chimel v. California* (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Coker v. Georgia* (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 . . 39

*Combs v. Coyle* (6th Cir. Ohio 2000), 205 F.3d 269, 2000 FED App 0064P . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Cooper* v. *State* (Fla. 1976), 336 So.2d 1133 . . . . . . . . . . . . . . . . . . . . . . 28

*Dennis v. United States* (1951), 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (FRANKFURTER, J., concurring) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Dutton v. Evans* (1970), 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 . . . . 63

*Eddings* v. *Oklahoma* (1982), 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28, 29

*Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 . 1, 10, 12, 18, 21, 28, 29, 40

*Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

iv

*Glenn* v. *Tate* (6th Cir. 1995), 71 F.3d 1204, 1995 Fed. App. 0373P . . . . . 25

*Godfrey v. Georgia* (1980), 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 19, 20, 59

*Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859  . . 11-
15, 18, 20, 23, 29, 38, 39, 50, 59

*Hitchcock* v. *Dugger* (1987), 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347, 55
USLW 4567  . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-29

*Jones v. United States* (2000), 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902,
68 USLW 4422 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Lawson v. Warden* (S.D. Ohio 2002), 197 F. Supp.2d 1072 . . . . . . . . . . 34

*Lockett* v. *Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 54 L.Ed.2d 973 . . . . 20,
21, 24, 28, 29, 62

*Lorraine v. Coyle* (6th Cir. 2002), 291 F.3d 416, 2002 FED. App 0183P . . 51

*Lorraine v. Coyle* (N.D. Ohio Mar. 30, 2001), 2001 U.S. Dist. LEXIS 23248,
unreported  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 2 L.Ed.60 . . . . . . . . 3

*McGautha v. California* (1971), 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Moore* v. *State* (1975), 233 Ga. 861, 213 S.E.2d 829  . . . . . . . . . . . . . . 38

*Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, 60
USLW 4541  . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 50, 61

*New York Times v. United States* (1971), 403 U.S. 713, 91 S.Ct. 2140, 29
L.Ed.2d 822 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Skipper* v. *South Carolina* (1986), 476 U.S. 1, 106 S.Ct.1669, 90 L.Ed.2d 1
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28, 29

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

v

*State v. Carter* (2000), 89 Ohio St.3d 593, 2000 Ohio 172, 734 N.E.2d 345
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 53, 57-61

*State v. Cimpritz* (1953), 158 Ohio St. 490, 110 N.E.2d 416 . . . . . . . 54, 56

*State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071 . . . . . . . . . 42

*State v. Evans* (1992), 63 Ohio St.3d 231, 586 N.E.2d 1042 . . . . . . . . . . 30

*State v. Garner* (1995), 74 Ohio St.3d 49, 1995 Ohio 168, 656 N.E.2d 623
(WRIGHT, J. dissenting) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*State v. Glenn* (1986), 28 Ohio St.3d 451, 504 N.E.2d 701, 28 OBR 501
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Green* (1993), 66 Ohio St.3d 141, 609 N.E.2d 1253 . . . . . . . . . . 29

*State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, 15 OBR 311
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*State v. Lawrence* (1989), 44 Ohio St.3d 24, 541 N.E.2d 451 . . . . . . . 32, 33

*State v. Lawson* (1992), 64 Ohio St.3d 336, 1992 Ohio 47, 595 N.E.2d 902
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Lockett* (1976), 49 Ohio St.2d 48, 358 N.E.2d 1062 . . . . . . . 21, 24

*State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212 . . . .  27-29, 50

*State v. Maurer* (1984), 15 Ohio St.3d 239, 473 N.E.2d 768, 15 OBR 379
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*State v. Reynolds* (2001), 2001 Ohio 3156, 2001 Ohio App. LEXIS 139 . . 49

*State v. Richey*, (1992), 64 Ohio St.3d 353, 1992 Ohio 44, 595 N.E.2d 915
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-37

*State v. Rogers* (1985), 17 Ohio St.3d 174, 478 N.E.2d 984, 17 OBR 414
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHSDOC@AOL.COM

vi

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 511

*State v. Rudge* (1993) 89 Ohio App.3d 429, 624 N.E.2d 1067 . . . . . . . . . . 55

*State v. Simko* (1994), 71 Ohio St.3d 483, 1994 Ohio 350, 644 N.E.2d 345 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42-45

*State v. Williams (Andre)*(1996), 74 Ohio St.3d 569, 1996 Ohio 91, 660 N.E.2d 724 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 60

*State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585 . . . . . . . . . . . . 27

*United States v. Lopez* (1995), 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4313 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Morrison* (2000), 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658, 68 USLW 4351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Rabinowitz* (1950), 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (FRANKFURTER, J., joined by JACKSON and BLACK, J.J., dissenting) . . 53, 54

*West Virginia v. Barnette* (1943), 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Woodson v. North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21, 30, 36

*Zant v. Stephens* (1983), 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235, 51 USLW 4891 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**Constitutions:**

OHIO CONST art. I, §10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

OHIO CONST. art. I, §1 . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 21, 22

OHIO CONST. art. I, §16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

OHIO CONST. art. I, §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

OHIO CONST. art. I, §9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

vii

U.S. CONST. amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 27

U.S. CONST. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Statutes and Rules**:

GA. CODE ANN. §27-2534.1(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . 16

OHIO REV. CODE ANN. §2929.04(A)(5) . . . . . . . . . . . . . . . . . . . . . . 33

OHIO REV. CODE ANN. §2929.04(A)(7) . . . . . . . . . . . . . . 37, 52, 53

OHIO REV. CODE ANN. §2929.04(B)(7) . . . . . . . . . . . . . . . . . . . . . 28

OHIO REV. CODE ANN. §2929.06 . . . . . . . . . . . . . . . . . . . . . . . . . 42

OHIO REV.CODE ANN. §2929.04(B)(1)-(3) (Page 1975) . . . . . . . . . . . . 22

**Other Authorities:**

Bailyn, Bernard, *The Ideological Origins of the American Revolution* (Cambridge, MA: Harvard University Press, Copyright © 1967, 1992) . . 6

Bowen, Catherine Drinker, *Miracle at Philadelphia: The Story of the Constitutional Convention May to September 1787* (Boston: Little Brown & Co., Copyright © 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10

Bright, Stephen B. and Patrick J. Keenan, *Judges and the Politics of Death: Deciding Between The Bill of Rights and the Next Election in Capital Cases*, 73 BOSTON UNIV.L.REV. 759 (1995) . . . . . . . . . . . . . . . . . . . . . . . . 41

Bright, Stephen B., *The Politics of Crime and the Death Penalty: Not "Soft on Crime," but Hard on the Bill of Rights*, 39 ST. LOUIS UNIV. L.J. 479 (Winter, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Hamilton, Alexander, James Madison, and John Jay, *The Federalist Papers*, ed. C. Rossiter (New York: New American Library, Copyright ©1961), No. 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 817

Irons, Peter H., ed., *May It Please the Court: The First Amendment* (New York: New Press, Copyright © 1997) . . . . . . . . . . . . . . . . . . . . . . . 9

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

viii

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 513

Irons, Peter, *A People's History of the Supreme Court* (New York: Penguin Putnam, Copyright © 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 7

Irons, Peter, and Stephanie Guitton, ed., *May It Please the Court* (New York: The New Press, Copyright © 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Kramer, Lloyd S., ed., *Paine and Jefferson on Liberty* (New York: Continuum Publishing Co., Copyright © 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Lazarus, Edward, *Closed Chambers* (New York: Random House, © 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Liebman, James, Jeffrey Fagan, and Valerie West, *Broken System: Error Rates in Capital Cases, 1973-1995* (Copyright © 2000) . . . . . . 1, 25, 45-48

Locke, John, *The Second Treatise on Civil Government* (Amherst, New York: Prometheus Books, Copyright ©1986) . . . . . . . . . . . . . . . . . . . . . . . . . 5

Peterson, Merrill D., ed., *The Portable Thomas Jefferson* (New York: Penguin Books, Copyright © 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Phelps, Timothy M. and Helen Winternitz, *Capitol Games: The Inside Story of Clarence Thomas, Anita Hill, and a Supreme Court Nomination* (New York: Harper Collins, Copyright © 1992) . . . . . . . . . . . . . . . . . . . . . . . 6

Rice, Charles, "The Bill of Rights and the Doctrine of Incorporation," reproduced in Eugene Hickok, ed., *The Bill of Rights: Original Meaning and Current Understanding* (Charlottesville, Va.: University Press of Virginia, Copyright ©1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Savage, David G., *Turning Right: The Making of the Rehnquist Supreme Court* (New York: John Wiley & Sons, Inc., Copyright © 1992) . . . . . . . 3, 7

Schwartz, Herman, *Packing the Courts: The Conservative Campaign to Rewrite the Constitution* (New York: Charles Scribner's Sons, Copyright © 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Smith, James Morton, ed., *The Republic of Letters: The Correspondence Between Thomas Jefferson and James Madison 1776-1826* (New York: W.W. Norton & Co., Copyright © 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

ix

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 514

*Washington Post* (November 24, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 7

Wootton, David, ed., *Political Writings of John Locke* (New York: Penguin Putnam, Copyright © 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: jbjjurisdoc@aol.com

x

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 515

MEMORANDUM IN SUPPORT OF MOTION

I. Overview of Argument

As everyone knows, the culmination of the *de facto* moratorium on death sentences[1] came in 1972 when the Supreme Court of the United States struck down virtually every capital sentencing scheme then in existence. *See*, *Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. When four years later the Court found a number of state capital statutory schemes acceptable under the Eighth Amendment, the Court made clear that effective appellate review is an indispensable component of the legal machinery which imposes death as a punishment. Two years ago, a study commissioned by the United States Congress to review the death penalty nationwide was released. *See*, James Liebman, Jeffrey Fagan, and Valerie West, *Broken System: Error Rates in Capital Cases, 1973-1995* (Copyright © 2000). Liebman and his colleagues studied 5,760 capital sentences and 4,578 appeals. They found that:

> serious error—error substantially undermining the *reliability* of capital verdicts—has reached epidemic proportions throughout our death penalty system. More than two out of every three capital judgments reviewed by the courts during the 23-year study period were found to be seriously flawed.

*Id.*, 2. Of those flawed cases, some forty percent (40%) were ferreted out through state appellate review. Ohio was not part of the Liebman study. However, the Defendant has engaged in some review of Ohio capital cases—concededly a much less scientific and much less rigorous analysis than that done by Professor Liebman and his colleagues. A comparison

---

[1] The *de facto* moratorium is cogently described by former Blackmun law clerk Edward Lazarus in his book, *Closed Chambers* (New York: Random House, © 1998), 86-101.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 516

shows that while twenty eight other states[2] discovered constitutional error in some forty percent (40%) of their cases, Ohio appellate courts have found serious constitutional error in about ten percent (10%) of Ohio capital cases.[3] This necessarily means that one of two things is occurring in Ohio: either Ohio's system for imposing the death penalty is so flawless as to be well-nigh perfect; or, Ohio appellate review of capital cases is so deficient that it virtually does not exist.  This Memorandum will show that the latter is quite clearly the case.  Because effective appellate review is lacking in Ohio and because the process of imposing death as a punishment requires effective appellate review, the capital specifications in this case cannot stand.

## II.  Underlying Premises of Constitutional Analysis

The claim here is that Ohio's death penalty system as it is operated is unconstitutional.  Before embarking upon an analysis of the specific constitutional provisions pertinent to the questions now presented, it is essential to review the nature of constitutional liberties themselves.  In the general constitutional motion to dismiss, the Defendant engaged in a fairly exhaustive analysis of how constitutional questions should be approached.  That argument need not be reproduced in its entirety here, and the

---

[2] The states included in the Broken System study were: (1) Alabama, (2) Arizona, (3) Arkansas, (4) California, (5) Delaware, (6) Florida, (7) Georgia, (8) Idaho, (9) Illinois, (10) Indiana, (11) Kentucky, (12) Louisiana, (13) Maryland, (14) Mississippi, (15) Missouri, (16) Montana, (17) Nebraska, (18) Nevada, (19) North Carolina, (20) Oklahoma, (21) Pennsylvania, (22) South Carolina, (23) Tennessee, (24) Texas, (25) Utah, (26) Virginia, (27) Washington, and (28) Wyoming.

[3] Presently, there have been 214 cases reviewed by the Court (with some defendants' cases having been heard more than once).  Of those 214 reviews, there have been nine cases where the conviction and death sentence have been reversed by the Ohio Supreme Court, ten cases where the death sentence has been reversed, and three cases where the Supreme Court has affirmed the decision of the Court of Appeals (before Issue One) to reverse a death sentence.  It seems incredible, but the appellate reversal rate in Ohio is one third of the rate in Texas (31%), the state that imposes capital punishment more frequently than any other..

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 517

Defendant simply incorporates the argument by reference.  *See, Defendant's Motion to Dismiss Indictment; or, in the Alternative, to Dismiss Death Specifications Because Death Penalty in Ohio is Unconstitutional,* Memorandum, Part II.  While the entire argument will not be reproduced here, several key points do bear repeating.[4]

### III.  Historical Framework of the Bill of Rights

James Madison, the fourth President of the United States and protégée of Thomas Jefferson, is most often credited with being the Father of the Bill of Rights.  Civil rights lawyer and University of San Diego Political Science Professor Peter Irons makes a compelling argument that much of the praise which has been heaped upon Madison for being the

---

[4] This is done, counsel realizes, at the risk of crucifixion by counsel's colleagues, who sometimes jokingly wonder what the *Federalist Papers* have to say on a particular subject, or what relevance *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 2 L.Ed.60 has to some present controversy. Though the reply could be lengthy, counsel will confine it to two points.

The first point is that, when it comes to deciding what the Constitution means in the context of a present problem, it seems more prudent to consult the words of James Madison, Thomas Jefferson, or Alexander Hamilton than those of modern elected officials and Supreme Court Justices.. With the probable exception of Justices John Paul Stevens and David Souter, these modern officials each appear to have placed their own political agenda above constitutional adjudication. *See, e.g.,* David G. Savage, *Turning Right: The Making of the Rehnquist Supreme Court* (New York: John Wiley & Sons, Inc., Copyright © 1992); Edward P. Lazarus, *Closed Chambers, op. cit.*; and, Herman Schwartz, *Packing the Courts: The Conservative Campaign to Rewrite the Constitution* (New York: Charles Scribner's Sons, Copyright © 1988).

The second point is best made by an example. Suppose a man suddenly opens his eyes to find himself sitting in an office, but devoid of any knowledge of his past. He does not know where he is; who are the people who surround him; what job he is to perform, or even where he lives so that he can go home at the end of the day. Without knowing where one has been, one cannot make informed decisions about where to go, what to do, or how to go about it.

Thus, while some of the authorities cited admittedly are not quotes from episodes of *Friends* or *Seinfeld,* these authorities are cited in the hope that they will provide assistance in resolving the serious questions that this case poses. If the government in it submissions would prefer to rely upon Trent Lott, Joseph Biden, William Bradford Reynolds, Robert Bork, Clarence Thomas, or Antonin Scalia—rather than James Madison, Alexander Hamilton, John Locke, Noah Webster, Thomas Paine, James Otis, or Thomas Jefferson—to offer arguments about these thorny constitutional questions, it is certainly free to do so. One can get information about traveling to the moon from astronaut Neil Armstrong (the first man to walk on the moon) or from movie actor Tom Hanks (who played astronaut Jim Lovell in the movie *Apollo 13*). The former lived through the experience and therefore *knows* what he is talking about; the latter cannot know and is simply pretending.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 518

Father of the Bill of Rights is undeserved.  Professor Irons is correct.
Madison did in fact resist a Bill of Rights.  His reasons for doing so are of
prime importance in addressing any question of constitutional law, a point
that the United States Supreme Court has now come to realize—at least in
Commerce Clause cases since the mid-1990s.  *See, e.g., United States v.
Lopez* (1995), 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4313
[holding the Gun-Free School Zone's Act, codified in 18 U.S.C. §922(q), was
an enactment which exceeded Congress' power to regulate commerce]; *Jones
v. United States* (2000), 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902, 68
USLW 4422 [reversing an arson conviction under 18 U.S.C. §844(i) because
the house that the defendant burned was not "property used in" an activity
which affects interstate commerce]; and *United States v. Morrison* (2000), 529
U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658, 68 USLW 4351 [holding that the
Commerce Clause did not provide Congress with the authority to enact a civil
remedy Violence Against Women Act, because the Act involved no regulation
of an activity that substantially affected interstate commerce.]

Madison finally pushed for the adoption of the Bill of Rights as a result
of political promises he had made and a desire to satisfy the wishes of his
mentor, Jefferson.  *See, e.g.,* Peter Irons, *A People's History of the Supreme
Court* (New York: Penguin Putnam, Copyright © 1999), 71.  Madison thought
the Bill of Rights unnecessary because of the unique nature of the
government created in 1787, not because he opposed the fundamental human
liberties listed in the Bill of Rights.  The idea that a Bill of Rights was not
necessary highlights the most fundamental and the most often overlooked
precept of our government.  American government is different than any other

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: jbjjurisdoc@aol.com

4

government in the world—even the English government upon which we so often rely for legal guidance because American government is uniquely one of limited, derived powers.  Nowhere is the point more succinctly made than in an essay by Charles Rice, "The Bill of Rights and the Doctrine of Incorporation," reproduced in Eugene Hickok, ed., *The Bill of Rights: Original Meaning and Current Understanding* (Charlottesville, Va.: University Press of Virginia, Copyright ©1991), 11:

> The Constitution of the United States is the first instance in all history of the creation of a government possessing only limited powers.  The Magna Charta, the Petition of Right, the English Bill of Rights, and all the other previous efforts to restrain government had merely imposed restrictions on the otherwise unlimited power of government.  The framers of the Constitution, however, created a new government *which would possess only the powers delegated to it.*

(Emphasis added.)  Failure to discern and apply this basic point has resulted in some frankly inexplicable judicial decisions.

No person came to Philadelphia in 1787 more prepared to restructure American government than James Madison.  *See*, Irons, *op. cit.*, 20.  Madison had spent months before the summer convention studying the political and constitutional systems of other countries, with an emphasis on European countries.  Disgusted with the excesses of the power of the British monarchy, the leading thinkers in the Colonies were ready to embrace a revolutionary theory of natural law espoused by John Locke and other philosophers.  *See, generally*, John Locke, *The Second Treatise on Civil Government* (Amherst, New York: Prometheus Books, Copyright ©1986); David Wootton, ed., *Political Writings of John Locke* (New York: Penguin Putnam, Copyright © 1993).  The most revolutionary aspect of natural law was that it challenged the divine right of kings.  Thus, as the Defendant has noted elsewhere,

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

5

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 520

British symbols of individual liberty, such as the Magna Carta and the English Bill of Rights, were in reality concessions from the omnipotent and sovereign monarchy to citizens.  American government, on the other hand, is the first example in all of history that employs Locke's theory that political power resides in the citizenry and not in the government.[5]  This theory is expressed in Jefferson's eloquent words in the Declaration of Independence that all men are endowed by their creator with certain unalienable rights, a principle repeated in Ohio's Constitution.  *See*, OHIO CONST. art. I, §1. Jefferson had said earlier that the source of rights must be recognized as "the laws of nature, and not as the gift of their chief magistrate."  *See,* Bernard Bailyn, *The Ideological Origins of the American Revolution* (Cambridge, MA: Harvard University Press, Copyright © 1967, 1992), 188.  Bailyn also noted that no less a Federalist than Alexander Hamilton wrote in 1775 that "the sacred rights of mankind are not to be rummaged for among old parchments or musty records.  They are written, as with a sunbeam, in the whole *volume* of human nature, by the hand of divinity itself, and *can never be erased or obscured by mortal power.*"  *Id.*  (Emphasis added.)  The Declaration listed ways in which King George had inexcusably encroached upon those natural rights.[6]

---

[5] *But see*, the confirmation hearings of Justice Clarence Thomas, wherein he claimed "I don't see a role for natural law in constitutional adjudication" reported in Timothy M. Phelps and Helen Winternitz, *Capitol Games: The Inside Story of Clarence Thomas, Anita Hill, and a Supreme Court Nomination* (New York: Harper Collins, Copyright © 1992), 176.

[6] No one claims that these men were perfect nor that they were completely consistent. Jefferson, as we know, the author of the phrase that "all men are created equal" owned slaves. No one made the point more poignantly than the late Justice Thurgood Marshall.  During the bicentennial celebration of the Constitution, the Supreme Court had been asked to meet once in Philadelphia to commemorate the events of 1787.  Marshall had an inimitable way of bringing his
(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

6

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 521

The charge given to Madison and the others at the Philadelphia convention in 1787 was to strengthen the Articles of Confederation. *See,* Irons, *op. cit.*, 20; Catherine Drinker Bowen, *Miracle at Philadelphia: The Story of the Constitutional Convention May to September 1787* (Boston: Little Brown & Co., Copyright © 1966), 24.[7] The Articles were the product of the popular canon that the government should be given only limited power. Jefferson captured this spirit in a letter to Madison written from Paris on December 20, 1787: "I own I am not a friend to a very energetic government. It is always oppressive." *See,* Merrill D. Peterson, ed., *The Portable Thomas Jefferson* (New York: Penguin Books, Copyright © 1975), 431. Thus, when the new Constitution emerged from Philadelphia rather than revamped Articles of Confederation, many were suspicious and distrustful. The most vocal skeptics were known, as everyone knows, as the Anti-Federalists. The political concessions made to obtain ratification of the Constitution were largely a promise to adopt a Bill of Rights in the near future in exchange for a present ratification of the Constitution. *See, e.g.*, Irons, *op. cit.*, 68.

---

[6](...continued)
sometimes stuffed shirt colleagues back to reality. He announced that he would attend the Philadelphia session only if the commemoration were completely authentic. "I'll wear the knee breeches and serve the coffee," he told his colleagues. Apprehensive that the indomitable Marshall might do just that, the Justices promptly dropped the idea. *See,* Savage, *Turning Right: The Making of the Rehnquist Supreme Court,* pp. 399-400.

Because the Framers said that all men were created equal yet many owned slaves is no reason to disregard that the Constitution delegated limited, not plenary, powers to the government. Recognizing their shortcomings but embracing their genius seems preferable to relying for constitutional guidance upon Senator Trent Lott, who when he was a Mississippi congressman said: "This is our country, and it's time we conservative, God-fearing, hardworking Christian people take it back." *Washington Post* (November 24, 1987).

[7] The delegates' credentials from the various state legislatures were for a convention to be held "for the sole and express purpose of revising the Articles of Confederation." Bowen, *op. cit.*, 24.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

7

Many have lost sight of the fact that the American experiment in government was something completely new. Why this is so is a bit of a mystery, for the words are clearly spelled out in the Constitution, beginning with "We the people" and continuing on with indications that power is "delegated" to the government by the people. This is precisely the reason why Madison thought a Bill of Rights was unnecessary. Alexander Hamilton agreed. As noted by the Defendant in the constitutional motion to dismiss, both Hamilton and Madison argued in the *Federalist Papers* that there was no need to prohibit the government in a Bill of Rights from doing things which it had not been delegated the power to do in the first place. Thus, Hamilton and Madison saw no need for a First Amendment declaring that Congress shall make "no law" respecting freedom of speech or religion or impacting upon the free exercise of religion, or establishing a religion because Congress had been given no power to regulate speech or religion in the first place.[8] Madison and Hamilton apparently were not alone among the founding fathers and early congressmen who thought that all the talk about

---

[8] Though the closest of friends—the first floor guest bedroom at Jefferson's Monticello was known as "Mr. Madison's room" because of the many nights Madison and his wife spent there—Jefferson and Madison were not of the same mind on the necessity of a Bill of Rights. In the very same December 20, 1787 letter to Madison cited *ante*, Jefferson said:

> To say, as Mr. Wilson does that a bill of rights was not necessary because all is reserved in the case of the general government which is not given, while in the particular one all is given which is not reserved might do for the Audience to whom it was addressed, but is surely *gratis dictum*, opposed by strong inferences from the body of the instrument, as well as from the omission of the clause of our present confederation which had declared that in express terms.

*See*, James Morton Smith, ed., *The Republic of Letters: The Correspondence Between Thomas Jefferson and James Madison 1776-1826* (New York: W.W. Norton & Co., Copyright © 1995), 513; Peterson, *op. cit.*, 429-30; *see, also*, Lloyd S. Kramer, ed., *Paine and Jefferson on Liberty* (New York: Continuum Publishing Co., Copyright © 1988), 90.

It is interesting to note in passing that although the news media and indeed some judges often characterize the liberties in the First Amendment as being primary, in fact, had all of the amendments proposed as a bill of rights been adopted, the First Amendment would have been the *Third* Amendment.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

8

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 523

a bill of rights was foolish in light of the fact that the government possessed delegated, rather than plenary, powers. When Madison attempted to discuss the Bill of Rights in Congress, he was on a number of occasions chided, with many congressmen openly telling him that Congress had more important business to attend to. This fact further demonstrates that many who framed the new government and who began to see to its operation thought a Bill of Rights superfluous to a document which only delegated limited powers to the government.[9]

These points must be made because the popular interpretation by "strict constructionists" is that if the Bill of Rights does not specifically set forth a liberty, that liberty is undeserving of judicial protection. Thus, many argue that the "right of privacy" does not exist because it is not specified in the Constitution. Wherever such thinking came from, it clearly did not come from either the text of the Constitution or the from historical documents and events surrounding the Constitution's adoption. Noah Webster demonstrated why the modern "strict constructionists" are so far off the constitutional beam. Webster proved the impossibility of setting forth in a "Bill of Rights"

---

[9] They would have been shocked at the argument of then-Solicitor General Erwin Griswold in the Pentagon Papers case, *New York Times v. United States* (1971), 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822. There, Griswold addressed directly First Amendment "absolutist" Justice Hugo L. Black when he claimed that the United States was:

> of course, fully supporting the First Amendment. We do not claim, or suggest, any exception to the First Amendment. . . . The problem in this case is the construction of the First Amendment. Now, Mr. Justice Black, your construction of that is well known, and I certainly respect it. You say that "no law" means "no law" and that should be obvious.
>
> *Black*: I rather thought that.
>
> Griswold: And I can only say, Mr. Justice, that to me it is equally obvious that "no law" does *not* mean "no law." And I would seek to persuade the Court that that is true.

See, Peter H. Irons, ed., *May It Please the Court: The First Amendment* (New York: New Press, Copyright © 1997), 193-194. (Emphasis in original.)

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-Mail: jbjjurisdoc@aol.com

9

the panoply of personal liberties when he sarcastically suggested a constitutional clause:

> that everybody shall, in good weather, hunt on his own land, and catch fish in rivers that are public property . . . And that Congress shall never restrain any inhabitant of America from eating and drinking, at seasonable times, or prevent his lying on his left side, in a long winter's night, or even on his back, when he is fatigued by lying on his right.

*See*, Bowen, *Miracle at Philadelphia*, 246. In fact, Madison's fears that a Bill of Rights specifying certain sacrosanct rights might be deemed a finite list of individual liberty later became historical reality.[10]

### IV. The Nature of Government Power is Limited, a Fact That Requires Tightly Constructed Capital Schemes That Are Meticulously Operated

What importance does this discussion have to the issue at hand? The history of the adoption of the Constitution and the Bill of Rights shows quite clearly that the government is one of limited and not plenary powers. Thus, when the United States Supreme Court says that effective appellate review is an indispensable part of the proper administration of any sentence of death, that does not mean that the states may, in their exercise of discretion in "implementing" the Eighth and Fourteenth Amendments, employ any system of appellate review that pleases them.

*Furman* was a veritable medley of opinions. Most notable is that Justice Potter Stewart's concurring opinion found the death penalty cruel and unusual in the same way that being struck by lightning was cruel and unusual: because it was imposed without reason or predictability. Justice

---

[10] In light of the "energetic" government of today, one can wonder what government would be like had Madison and Hamilton had their way.

Byron White's concurring opinion, on the other hand, found the death penalty unconstitutional for almost the opposite reason: it was being too infrequently imposed to be an effective deterrent.[11]  The Court realized that juries, inexperienced in the ways of the law and likely to be shocked by the horrific facts in capital cases, could not be left to make unguided decisions about whether to impose the death sentence.

When *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, *Woodson* v. *North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944, and the other capital cases arrived at the Court in 1976, White was of course in favor of North Carolina's mandatory death penalty.  But the Court, led by the troika of Justices Stewart, Powell, and the newly-arrived Stevens, made clear that the Constitution guarded against capricious *infliction* of capital punishment.  That is precisely the reason why *Woodson* struck down death sentences which were mandatory upon conviction of a capital crime: mandatory death sentences fail to account for the individuality of the defendant.  Borrowing from a part of Professor Anthony Amsterdam's oral arguments, the Supreme Court adopted its "death is different" language in *Woodson*[12] and held it necessary to guard against the arbitrary and capricious *infliction* of death.  The Court was also astute enough to recognize was that judges, like juries, could succumb to the passion and arbitrariness that the facts in capital cases often engender.  Indeed, many trial judges have

---

[11] As if the medley of opinions in *Furman* were not confusing enough, *Furman sub silentio* overruled a case decided by the Court just a year earlier, *McGautha v. California* (1971), 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711, and a companion Ohio case, *Crampton v. Ohio.*

[12] Amsterdam's language is quoted *post.*

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

11

demonstrated a willingness to impose death, even when juries refused to do so.[13]

As will be shown below, the Supreme Court in *Gregg* rejected a challenge to the Georgia law enacted after *Furman*. In doing so, the Court said that effective appellate review would cure any potential problems with overbreadth in one of Georgia's capital specifications. When the Court found that the Georgia courts were not providing effective appellate review, the Court did precisely what the Defendant seeks here: declare that provision of the code to be unconstitutional.[14]

## V. The Requirement of Effective Appellate Review in Capital Cases

In the 1976 capital case arguments before the Supreme Court, Professor Anthony Amsterdam, when asked by the late Justice Potter Stewart if his argument did not "prove too much", responded:

> Our argument is essentially that death is different.  .   .   .
> Now, why do we say death is different?  Our legal system as a whole has always treated death differently.  We allow more peremptory challenges; we allow automatic appeals; we have different rules of harmless error; we have indictment requirements; unanimous verdict requirements in some jurisdictions, because death is different.
> Death is factually different.  Death is final.  Death is irremediable.  Death is unknowable; it goes beyond this world.  It is a legislative decision to do something, and we know not what we do.  Death is different because even if exactly the same discretionary procedures are used to decide issues of five years versus ten years, or

---

[13] Ohio does not permit judges to override the jury's recommendation to impose death if the jury refuses to recommend death. An Ohio judge may override a jury's recommendation of death, but Ohio judges have done so sparingly, only eight times as far as the Defendant is aware. Other states permit the reverse, that is, they permit judges to override a jury's life sentence recommendation and impose death. Florida is one such state, and judges in Florida have often exercised that option. *See, e.g., Barclay* v. *Florida* (1983), 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134, 51 USLW 5206.

[14] Here, the Defendant seeks to void all death specifications because none of them are being effectively reviewed.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 527

life versus death, the result will be more arbitrary on the life or death
choice.

Oral arguments held March 30-31, 1976. *See*, Peter Irons and Stephanie
Guitton, ed., *May It Please the Court* (New York: The New Press, Copyright
© 1993), 232-33. As noted above, the Court adopted this reasoning in
*Woodson, ante*. Because death is different, nowhere is scrupulous appellate
review more obligatory than in a death penalty case. Despite the efforts to
guide jury discretion, the United States Supreme Court has acknowledged
that juries may misapply sentencing procedures, *see, e.g., Caldwell v.
Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231, 53 USLW
4743, and may impose the death sentence for someone outside the narrowly
defined class of those who truly deserve consideration of the death sentence.
In *Gregg* v. *Georgia, ante*, 428 U.S. at 192, the Court noted the nature of the
unusual aspect of jury sentencing in a capital case:

> But the provision of relevant information under fair procedural
> rules is not alone sufficient to guarantee that the information will be
> properly used in the imposition of punishment, especially if sentencing
> is performed by a jury. Since the members of a jury will have had
> little, if any, previous experience in sentencing, they are unlikely to be
> skilled in dealing with the information they are given. See American
> Bar Association Project on Standards for Criminal Justice, Relating to
> Sentencing Alternatives and Procedures, s 1.1(b), Commentary, pp. 46-
> 47 (Approved Draft 1968); President's Commission on Law
> Enforcement and Administration of Justice: The Challenge of Crime
> in a Free Society, Task Force Report: The Courts 26 (1967). . . .

In *Gregg* the Court held that the automatic appellate review was a
vital additional safeguard, absolutely necessary in a capital punishment
scheme to avoid capricious infliction of the death penalty.

> We now turn to consideration of the constitutionality of
> Georgia's capital-sentencing procedures. In the wake of *Furman*,
> Georgia amended its capital punishment statute . . . .

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

13

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 528

Georgia did act, however, to narrow the class of murderers subject to capital punishment by specifying 10 statutory aggravating circumstances, one of which must be found by the jury to exist beyond a reasonable doubt before a death sentence can ever be imposed. . . .
    . . . In addition, the jury is authorized to consider any other appropriate aggravating or mitigating circumstances. §27-2534.1(b) (Supp.1975).  The jury is not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court, see §27-2302 (Supp.1975), but it must find a Statutory aggravating circumstance before recommending a sentence of death.

These procedures require the jury to consider the circumstances of the crime and the criminal before it recommends sentence.  No longer can a Georgia jury do as Furman's jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. . . . . As a result, while some jury discretion still exists, "the discretion to be exercised is controlled by clear and objective standards so as to produce non-discriminatory application." *Coley* v. *State*, 231 Ga. 829, 834, 204 S.E.2d 612, 615 (1974).

As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State's Supreme Court.  That court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases. §27-2537(c) (Supp.1975).

In short, Georgia's new sentencing procedures require as a prerequisite to the imposition of the death penalty, specific jury findings as to the circumstances of the crime or the character of the defendant.  Moreover, to guard further against a situation comparable to that presented in *Furman*, the Supreme Court of Georgia compares each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate.  On their face these procedures seem to satisfy the concerns of *Furman*.  No longer should there be "no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." 408 U.S., at 313 (WHITE, J., concurring).

*Id.* 428 U.S. at 196-198.  When Gregg attacked the vagueness of one of the aggravating circumstances in the revised Georgia statute, the Court agreed that the language might be construed in an open-ended way.  But the Court

JOHN B. JUHANZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

14

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 529

rebuffed Gregg's challenge by relying upon the Georgia Supreme Court to narrowly construe the statute.

> The petitioner attacks the seventh statutory aggravating circumstance, which authorizes imposition of the death penalty if the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," contending that it is so broad that capital punishment could be imposed in any murder case. It is, of course, arguable that any murder involves depravity of mind or an aggravated battery. But this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction. In only one case has it upheld a jury's decision to sentence a defendant to death when the only statutory aggravating circumstance found was that of the seventh, see *McCorquodale* v. *State*, 233 Ga. 369, 211 S.E.2d 577 (1974), and that homicide was a horrifying torture-murder.
>
> The petitioner also argues that two of the statutory aggravating circumstances are vague and therefore susceptible of widely differing interpretations, thus creating a substantial risk that the death penalty will be arbitrarily inflicted by Georgia juries. In light of the decisions of the Supreme Court of Georgia we must disagree. First, the petitioner attacks that part of §27-2534.1(b)(1) that authorizes a jury to consider whether a defendant has a "substantial history of serious assaultive criminal convictions." The Supreme Court of Georgia, however, has demonstrated a concern that the new sentencing procedures provide guidance to juries. It held this provision to be impermissibly vague in *Arnold* v. *State*, 236 Ga. 534, 540, 224 S.E.2d 386, 391 (1976), because it did not provide the jury with "sufficiently 'clear and objective standards.'" Second, the petitioner points to §27-2534.1(b)(3) which speaks of creating a "great risk of death to more than one person." While such a phrase might be susceptible of an overly broad interpretation, the Supreme Court of Georgia has not so construed it. The only case in which the court upheld a conviction in reliance on this aggravating circumstance involved a man who stood up in a church and fired a gun indiscriminately into the audience. See *Chenault* v. *State*, 234 Ga. 216, 215 S.E.2d 223 (1975). On the other hand, the court expressly reversed a finding of great risk when the victim was simply kidnaped in a parking lot. See *Jarrell* v. *State*, 234 Ga. 410, 424, 216 S.E.2d 258, 269 (1975).

428 U.S. at 201-203. [Footnotes omitted.]

Four years later, the United States Supreme Court did exactly what this Defendant seeks now, before trial. The Court voided the death sentence

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

15

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 530

of a man because it found that judicial review in Georgia was ineffective. The Court framed the issue as follows:

> Under Georgia law, a person convicted of murder [footnote omitted] may be sentenced to death if it is found beyond a reasonable doubt that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga. Code §27-2534.1(b)(7) (1978). In *Gregg* v. *Georgia*, 428 U.S. 153, the Court held that this statutory aggravating circumstance (§(b)(7)) is not unconstitutional on its face. Responding to the argument that the language of the provision is "so broad that capital punishment could be imposed in any murder case," the joint opinion said:
> "It is, of course, arguable that any murder involves depravity of mind or an aggravated battery. But this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction." 428 U.S., at 201, (opinion of STEWART, POWELL, and STEVENS, JJ.).
> Nearly four years have passed since the *Gregg* decision, and during that time many death sentences based in whole or in part on §(b)(7) have been affirmed by the Supreme Court of Georgia. The issue now before us is whether, in affirming the imposition of the sentences of death in the present case, the Georgia Supreme Court has adopted such a broad and vague construction of the §(b)(7) aggravating circumstance as to violate the Eighth and Fourteenth Amendments to the United States Constitution. [Footnote omitted.]

*Godfrey v. Georgia* (1980), 446 U.S. 420, 422-23, 100 S.Ct. 1759, 64 L.Ed.2d 398. The Supreme Court found that Godfrey had been sentenced to death solely on the basis that the offense was "outrageously or wantonly vile, horrible and inhuman." *Id.*, 446 U.S. at 428; *see*, GA. CODE ANN. §27-2534.1(b)(7). The jury was given no guidance for its deliberations concerning the meaning of any of those statutory terms. The appellate review in Georgia of Godfrey's case, like appellate review in Ohio, was more form than substance. Though the Court had four years earlier tried to save the Georgia statute, in 1980 the Court had to concede that the myopic appellate review

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8296 · E-MAIL: JBJURISDOC@AOL.COM

16

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 531

in Georgia had rendered the death penalty—at least with regard to that aggravating circumstance—unconstitutional. The Court said:

> The standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury in this case was in no way cured by the affirmance of those sentences by the Georgia Supreme Court. Under state law that court may not affirm a judgment of death until it has independently assessed the evidence of record and determined that such evidence supports the trial judge's or jury's finding of an aggravating circumstance. Ga.Code §27-2537(c)(2) (1978).
>
> . . . . [A]s was said in *Gardner* v. *Florida*, 430 U.S. 349, 358, it "is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."
>
> That cannot be said here. There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not. Accordingly, the judgment of the Georgia Supreme Court insofar as it leaves standing the petitioner's death sentences is reversed, and the case is remanded to that court for further proceedings.

*Id.*, at 429-433. Godfrey's death sentence was vacated because the Georgia courts had not done their job. *Gregg* had approved the Georgia death penalty only conditioned upon the promise of meaningful judicial review that would remove caprice from infliction of the death penalty.

## V. Implementation of Capital Punishment in Ohio

### A. The Role of the Judiciary

Alexander Hamilton said in *Federalist No. 78*: "There can be but few men in the society who will have sufficient skill in the laws to qualify them for the stations of judges. And making the proper deductions for the ordinary depravity of human nature, the number must be still smaller who unite the requisite integrity with the requisite knowledge." *See*, Alexander Hamilton, James Madison, and John Jay, *The Federalist Papers*, ed. C. Rossiter (New York: New American Library, Copyright ©1961), No. 78.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

17

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 532

Hamilton made clear that the courts were designed in the new government to act as the "intermediate body between the people and the legislature," a role which is of paramount importance in this situation.

Courts have an obligation to see that constitutional bounds are not overreached, but they may not act as judges as they might as legislators. *See, Gregg v. Georgia, ante,* 428 U.S. at 174-175.  Justice Felix Frankfurter wrote:

> Courts are not representative bodies.  They are not designed to be a good reflex of a democratic society.  Their judgment is best informed, and therefore most dependable, within narrow limits.  Their essential quality is detachment, founded on independence.  History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures.

*See, Dennis v. United States* (1951), 341 U.S. 494, 525, 71 S.Ct. 857, 95 L.Ed. 1137 (FRANKFURTER, J., concurring in affirmance of the judgment).

Ohio courts have crossed the line once described by Justice Harry Blackmun, and the result has been an application of the death penalty that defies both the state and federal constitutions.  Justice Blackmun said in his *Furman* dissent: "We should not allow our personal preferences as to the wisdom of legislative and congressional action, or our distaste for such action, to guide our judicial decision in cases such as these.  The temptations to cross that policy line are very great." 408 U.S. at 411 (BLACKMUN, J. dissenting).[15]

---

[15] It seems likely from the materials available that Justice Blackmun was always personally opposed to the death penalty.  However, when *Furman* was decided he believed it to be constitutional.  He later changed his view and announced that he could no longer find the death penalty to be constitutional.  *See, Callins* v. *Collins* (1994), 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435, 62 USLW 3546 (BLACKMUN, J., dissenting from denial of certiorari).

Twenty years have passed since this Court declared that the death penalty must be imposed fairly, and with reasonable consistency, or not at all, see *Furman* v.

(continued...)

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail jbjjurisdoc@aol.com

18

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 533

## B.  Appellate Default

Ohio courts, with due respect, have not followed the advice of these great Justices when reviewing death cases in Ohio.  Like the Georgia courts, the Ohio courts have not done their job.  So dismal has been Ohio appellate review of capital cases that rules have developed such as: juries are precluded from consideration of mitigation evidence; the proportionality review is designed to perpetuate past mistakes and fails to account for sentences less than death for similar crimes; and the independent weighing of aggravating circumstances and mitigating factors often ranges from the inexplicable to the nonsensical.  There is in Ohio "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey, ante.*

To make matters worse, the United States Supreme Court has not considered Ohio's post-*Lockett* statutes in light of the Eighth or Fourteenth Amendments, and has tacitly left the job of meaningful appellate review to the appellate courts of Ohio.  Worse still, when more appellate review was needed in Ohio, the Ohio Constitution has been amended to reduce the venue of appellate review to only one court, the Ohio Supreme Court.

---

[15](...continued)
*Georgia*, 408 U.S. 238 (1972), and, despite the effort of the States and courts to devise legal formulas and procedural rules to meet this daunting challenge, the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake.  This is not to say that the problems with the death penalty today are identical to those that were present 20 years ago.  Rather, the problems that were pursued down one hole with procedural rules and verbal formulas have come to the surface somewhere else, just as virulent and pernicious as they were in their original form.  Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death, see *Furman* v. *Georgia, supra,* can never be achieved without compromising an equally essential component of fundamental fairness—individualized sentencing.  See *Lockett* v. *Ohio,* 438 U.S. 586, (1978).

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-Mail: Jbjjurisdoc@aol.com

19

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 534

The appellate courts of Ohio have failed miserably in the sacred duty entrusted to them to review capital cases. To avoid beating a dead horse, not every way that meaningful appellate review is lacking will be described. It is enough to entitle the Defendant to the requested relief to catalogue just a few ways in which Ohio appellate review of capital cases is wholly lacking.[16]

Some may claim that the relief sought here must be granted, if at all, by an appellate court. However, this Court is entrusted with the vindication of constitutional liberties. The Court need do nothing more than look at the holdings of *Gregg* and *Godfrey*, and compare them to the catalogue of areas of ineffective appellate review in Ohio to see that quite clearly Ohio's appellate review fails to fulfill the guarantees of U.S. CONST. amend. VIII and XIV. This Court needs no pronouncement from on high to grant the relief requested here.

### C. Post-*Lockett* Inadequate Review

Virtually since the inception of judicial review of Ohio's post-*Lockett, see, Lockett* v. *Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 54 L.Ed.2d 973, death penalty statutes began in 1984, *see, State* v. *Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, 15 OBR 311, *cert. denied, Jenkins v. Ohio* (1985), 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643; and *State* v. *Maurer* (1984), 15 Ohio St.3d 239, 473 N.E.2d 768, 15 OBR 379, *cert. denied, Maurer v. Ohio* (1985), 472 U.S. 1012, 105 S.Ct. 2714, 86 L.Ed.2d 728, it has been clear that Ohio's death penalty violates both the state and federal constitutions because it has not been uniformly applied. *See,* U.S. CONST. amend. VIII and XIV;

---

[16] Another rule of law, wholly unjustified by the Ohio statute, is set forth in the Defendant's Motion to Determine the Proper Standard for Excusal of Jurors.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

20

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 535

OHIO CONST. art. I, §§1, 2, 9, 10, and 16.  The courts of Ohio have abandoned the traditional judicial role of dispassionately construing statutes and interpreting the Constitution, choosing instead to become a second legislature, rewriting statutes, ignoring principles of constitutional law and *stare decisis*, giving every appearance of carrying out the perceived will of the populace—the affirmance of convictions for those sentenced to death.

The political popularity of the death penalty cannot be denied.  When the United States Supreme Court in *Furman* v. *Georgia, ante*, struck as unconstitutional all death penalty laws of all states that had such laws, the reaction by state legislatures was swift and certain.  They set about enacting new death penalty laws that would survive the perceived hurdles in *Furman*.  This itself was no easy task, given the number of and differences between opinions in *Furman*.  Most notable are the concurring opinions suggesting that guided discretion is required, compared with Justice White's concurring opinion—which seems surely responsible for the mandatory law drafted by North Carolina and rejected by the Court in *Woodson*.  *Lockett, ante*, invalidated Ohio's first post-*Furman* effort to restore the death penalty.[17]

---

[17]The point is made not simply to cast criticism on the government for not getting it right. However, in an argument that asserts that Ohio appellate courts are not presently engaging in adequate review of death sentences must note that the Ohio Supreme Court, which now universally assumes that function, made a clear mistake in *Lockett. See, State v. Lockett* (1976), 49 Ohio St.2d 48, 358 N.E.2d 1062. Indeed, the United States Supreme Court's opinion in *Lockett*, stripped of dicta, boils down to just this: "The limited range of mitigating circumstances which may be considered by the sentencer under the Ohio statute is incompatible with the Eighth and Fourteenth Amendments.  To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors." 438 U.S., at 608.  The Ohio law, upheld by the Ohio Supreme Court, mandated death upon conviction of aggravated murder and at least one specification, unless the defendant established by a preponderance of the evidence that:

    (1) The victim of the offense induced or facilitated it.

    (2) It is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation.

    (3) The offense was primarily the product of the offender's psychosis or

                (continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8296 · E-MAIL: JBJJURISDOC@AOL.COM

21

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 536

The popular opinion was expressed in the vote to amend Ohio's constitutional provisions relating to the jurisdiction of appellate courts and the supreme court of Ohio only in cases in which the death penalty has been imposed. The issue was adopted as "Issue One" in the 1994 general election. As the Court knows, the effect of Issue One was to deprive the appellate courts of jurisdiction in cases where death is imposed so that review of those cases goes directly from the trial court to the Supreme Court of Ohio.

Although the *political* popularity of the death penalty cannot be denied, judicial scrutiny and constitutional enforcement are unequivocally distinct. It is the obligation of the judiciary to see to it that laws are fairly and evenhandedly administered. The Constitution that protects the minority against the majority, and it is the courts who see to it that all citizens, whether of the majority or minority, have their natural rights protected against encroachment by the government. *See, e.g.*, OHIO CONST. art. I, §1; and Justice Robert Jackson's classic opinion for the Court in *West Virginia v. Barnette* (1943), 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674. The gist of this argument is that Ohio's judiciary has abandoned the sequestered role of arbiter of the law, and assumed the political posture of enforcer and advocate.

---

[17](...continued)
mental deficiency, though such condition is insufficient to establish the defense of insanity.
OHIO REV.CODE ANN. §2929.04(B)(1)-(3) (Page 1975).

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJOHNSDOC@AOL.COM

22

Judicial review of death penalty decisions appears particularly indifferent when the result has been to affirm the death penalty.[18] Ohio courts have struggled with the notion of trying to make the death penalty work. They have not been successful, their repeated claims to the contrary often set forth with the same force and logic as an apprehensive whistle in the dark.

### D.  Examples of Inadequate Ohio Appellate Review

1. *Mercy and Limitations on Mitigation.* Whatever its motive, the Ohio Supreme Court has deprived capital defendants the ability to effectively argue their life should be spared by the trial jury. The United States Supreme Court made clear in *Gregg* that the federal Constitution does not act as a bar to a jury granting mercy in a given case, the statutorily defined aggravating and mitigating circumstances notwithstanding. The proportionality requirement, the Court made clear, is to prevent capricious *infliction* of the death penalty, not the converse. The Court held:

> The petitioner next argues that the requirements of *Furman* are not met here because the jury has the power to decline to impose the death penalty even if it finds that one or more statutory aggravating circumstances are present in the case. This contention misinterprets *Furman*. See *supra*, at 198-199. Moreover, it ignores the role of the Supreme Court of Georgia which reviews each death sentence to determine whether it is proportional to other sentences imposed for similar crimes. Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were

---

[18] The argument asserted herein has not, as far as the Defendant is aware, been asserted and ruled upon in any other court in this State. This Court must address this argument, and cannot overrule this constitutional challenge to the death penalty on the ground that the issues have been raised in and addressed by the Supreme Court of Ohio or the Supreme Court of the United States. Because of the very nature of the argument, the entire argument is asserted with all due respect to the Supreme Court and appellate courts of this State. However indelicately made, the argument is valid and must be considered.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.7308 · Facsimile: 330.758.8290 · E-mail: Jbjjurisdoc@aol.com

23

sentenced under a system that does not create a substantial risk of arbitrariness or caprice.

Hand in hand with that principle is a series of cases, the substance of which is that no limits can be placed on the mitigating evidence which a jury is permitted to consider. In *Lockett* v. *Ohio, ante*, the Court invalidated Ohio's first post-*Furman* effort to resurrect the death penalty.[19] The Court found that the requirement that death be imposed unless one of three statutory conditions was met unduly limited a jury's consideration of mitigating evidence. In *Eddings* v. *Oklahoma* (1982), 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1, the Court held it error to exclude consideration of evidence of Eddings' youth and troubled childhood from the sentencing determination. In *Skipper* v. *South Carolina* (1986), 476 U.S. 1, 106 S.Ct.1669, 90 L.Ed.2d 1, the Court unanimously vacated a death sentence where the trial court had precluded the testimony of witnesses who would have commented on Skipper's adjustment to jail during pretrial incarceration. In *Hitchcock* v. *Dugger* (1987), 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347, 55 USLW 4567,

---

[19] Although the appellate review process is essential to imposition of the death penalty, even with state court appellate review, death penalty litigation is still a slippery slope. As but two examples, the Ohio Supreme Court had affirmed Sandra Lockett's conviction, later reversed by the United States Supreme Court. *See, State v. Lockett* (1976), 49 Ohio St.2d 48, 358 N.E.2d 1062, 3 Ohio Op.3d 27. The South Carolina Supreme Court affirmed the conviction and death sentence of Ronald Skipper, (1985), 285 S.C. 42, later reversed by the United States Supreme Court. See discussion *post.*

The point is that the state courts do not always get it right. The thin veneer of Ohio appellate capital review is being worn away by federal decisions vacating death sentences and/or convictions of *e.g.*, John Glenn, Ron Combs, Alfred Morales, and Charles Lorraine.

The Supreme Court of the United States does not always get it right, either. Further, the United States Supreme Court only grants certiorari in a very small number of cases. When, as in Ohio, the state courts make only a perfunctory effort at appellate review the purported safeguards of that review become meaningless. An incredibly high and completely unacceptable number of cases fall between the cracks of ineffective state appellate review and the discretion not to grant certiorari.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

24

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 539

a unanimous Supreme Court vacated James Hitchcock's death sentence.[20]
The Court's reason for doing so was that the Florida jury had not been
instructed that it could consider nonstatutory mitigating factors.  Hitchcock's
lawyer, Craig Barnard, successfully argued that, if the juries were not told to
consider that evidence, they would not do so, thus in practical effect limiting
their consideration to statutory mitigating factors.  Barnard's argument is set
out in the opinion of the Supreme Court:

> Petitioner argues that, at the time he was sentenced, these
> provisions [of the Florida statutes] had been authoritatively
> interpreted by the Florida Supreme Court to prohibit the sentencing
> jury and judge from considering mitigating circumstances not
> specifically enumerated in the statute.  See, *e.g.*, *Cooper* v. *State*, 336
> So.2d 1133, 1139 (Fla.1976) ("The sole issue in a sentencing hearing
> under Section 921.141, Florida Statutes (1975), is to examine in each
> case the itemized aggravating and mitigating circumstances.  Evidence
> concerning other matters have [sic] no place in that proceeding . .
> . ."), cert. denied, 431 U.S. 925 (1977).  Respondent contends that
> petitioner has misconstrued *Cooper*, pointing to the Florida Supreme
> Court's subsequent decision in *Songer* v. *State*, 365 So.2d 696
> (1978)(*per curiam*), which expressed the view that *Cooper* had not

---

[20] *Hitchcock* v. *Dugger* highlights a point of concern manifested by the Liebman study.
Liebman and his colleagues found error in about 40% of the state cases.  But what of the state
cases reviewed where the courts find no error, yet error exists—clearly the case in Ohio?  The
caption of the case and the Court that decided the case are evidence enough.  Hitchcock had his
case decided by the last court of review, the United States Supreme Court.  He had gone through
the state system and was in the federal system, as evidenced by the fact that the Respondent was
not the State of Florida, but Richard Dugger, the Secretary of Florida Department of Corrections.
When Hitchcock's case arrived in the Supreme Court, a unanimous Court, led by Justice Scalia of
all people, said that Hitchcock's right to relief "could not be clearer".
  Another example, much closer to home, is the case of John Glenn, a Mahoning County man
who was tried in Portage County, convicted of capital murder, and sentenced to death.  His
conviction and death sentence were affirmed, *see State* v. *Glenn* (1986), 28 Ohio St.3d 451, 504
N.E.2d 701, 28 OBR 501, *cert. denied, Glenn* v. *Ohio* (1987), 482 U.S. 931, 96 L.Ed.2d 705, 107
S.Ct. 3219, 55 USLW 3837.  His postconviction relief claims wee denied and he filed in federal
court for a writ of habeas corpus.  The district court denied relief, but the United States Court of
Appeals for the Sixth Circuit vacated the death sentence.  *See, Glenn* v. *Tate* (6ᵗʰ Cir. 1995), 71
F.3d 1204, 1995 Fed. App. 0373P, *cert. denied, Tate* v. *Glenn* (1996), 519 U.S. 910, 117 S.Ct. 273,
136 L.Ed.2d 196, 65 USLW 3233, 65 USLW 3265 *Glenn* v. *Tate* (6ᵗʰ Cir. 1995), 71 F.3d 1204.  A
reading of its opinion indicates that the case was not at all a close decision, as it true of *Hitchcock*.
  The obvious question is: what were all of these other courts doing?  The answer is the
premise of this motion: overlooking obvious errors in an attempt to affirm the death penalty for a
person who had committed a bad crime—in Glenn's case, killing a deputy sheriff to permit Glenn's
brother to escape custody.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURIS@OEC.COM

25

prohibited sentencers from considering mitigating circumstances not enumerated in the statute. Because our examination of the sentencing proceedings actually conducted in this case convinces us that the sentencing judge assumed such a prohibition and instructed the jury accordingly, we need not reach the question whether that was in fact the requirement of Florida law. We do note, however, that other Florida judges conducting sentencing proceedings during roughly the same period believed that Florida law precluded consideration of nonstatutory mitigating circumstances. At least three death sentences have been overturned for this reason. See *Songer* v. *Wainwright*, 769 F.2d 1488 (CA11 1985)(*en banc*)(per curiam), cert. pending, No. 85-567; *Lucas* v. *State*, 490 So.2d 943, 946 (Fla.1986); *Harvard* v. *State*, 486 So.2d 537 (Fla.)(*per curiam*), cert. denied, 479 U.S. 863 (1986). We also note that the Florida Legislature has since removed the phrase "as enumerated [in the statutory list]" from the provisions requiring the advisory jury and the sentencing judge to consider mitigating circumstances. See Fla.Stat. §§921.141(2)(b), (3)(b)(1985).

In the sentencing phase of this case, petitioner's counsel introduced before the advisory jury evidence that as a child petitioner had the habit of inhaling gasoline from automobile gas tanks; that he had once passed out after doing so; that thereafter his mind tended to wander; that petitioner had been one of seven children in a poor family that earned its living by picking cotton; that his father had died of cancer; and that petitioner had been a fond and affectionate uncle to the children of one of his brothers. Tr. of Advisory Sentence 7-10. In argument to the advisory jury, petitioner's counsel referred to various considerations, some of which were the subject of factual dispute, making a sentence of death inappropriate: petitioner's youth (he was 20 at the time of the murder), his innocence of significant prior criminal activity or violent behavior, the difficult circumstances of his upbringing, his potential for rehabilitation, and his voluntary surrender to authorities. *Id.*, at 13-17, 21-26. Although petitioner's counsel stressed the first two considerations, which related to mitigating circumstances specifically enumerated in the statute, he told the jury that in reaching its sentencing decision it was to "look at the overall picture . . . consider everything together . . . consider the whole picture, the whole ball of wax." *Id.*, at 50-52. In contrast, the prosecutor told the jury that it was "to consider the mitigating circumstances and consider those by number," *id.*, at 28, and then went down the statutory list item by item, arguing that only one (petitioner's youth) was applicable. Before proceeding to their deliberations, the members of the jury were told by the trial judge that he would instruct them "on the factors in aggravation and mitigation that you may consider under our law." *Id.*, at 5. He then instructed them that "[t]he mitigating circumstances which you may consider shall be the following . . . ." (listing the statutory mitigating circumstances). Id., at 56.

After receiving the advisory jury's recommendation . . . of death, and despite the argument of petitioner's counsel that the court

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

26

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 541

should take into account the testimony concerning petitioner's family background and his capacity for rehabilitation, the sentencing judge found that "there [were] insufficient mitigating circumstances as enumerated in Florida Statute 921.141(6) to outweigh the aggravating circumstances." . . . He described the process by which he reached his sentencing judgment as follows: "In determining whether the defendant should be sentenced to death or life imprisonment, this Court is mandated to apply the facts to certain enumerated 'aggravating' and 'mitigating' circumstances." . . . The only mitigating circumstance he found was petitioner's youth. . . .

481 U.S. at 396-398.  The Court agreed, and held:

We think it could not be clearer that the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances, and that the proceedings therefore did not comport with the requirements of *Skipper* v. *South Carolina*, 476 U.S. 1 (1986), *Eddings* v. *Oklahoma*, 455 U.S. 104 (1982), and *Lockett* v. *Ohio*, 438 U.S. 586 (1978) (plurality opinion).  Respondent has made no attempt to argue that this error was harmless, or that it had no effect on the jury or the sentencing judge.  In the absence of such a showing our cases hold that the exclusion of mitigating evidence of the sort at issue here renders the death sentence invalid.  See *Skipper*, *supra* (evidence that defendant had adapted well to prison life); *Eddings*, *supra* (evidence of 16-year-old defendant's troubled family history and emotional disturbance). . . . .

*Id.*, at 398-399.

The Ohio Supreme Court in the past paid lip service to the mercy option by holding that an Ohio jury *is not precluded* from extending mercy to a defendant.  *See*, *State* v. *Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585.  Yet, Ohio juries are not in fact told of the ability to opt for mercy regardless of whether the aggravating factors outweigh the mitigating circumstances beyond a reasonable doubt.  The Court, in direct conflict with federal decisions construing U.S. CONST. amend. VIII, has now demonstrated a further willingness to remove any impediment that might interfere with the execution of capitally charged defendants in this State.  In *State* v. *Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212, *cert denied*, *Lorraine* v. *Ohio*

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

27

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 542

(1994), 510 U.S. 1054, 114 S.Ct. 715, 126 L.Ed.2d 679, 62 USLW 3452, the Court held that a mercy instruction is not to be permitted because it is not one of the mitigating factors set forth in OHIO REV. CODE ANN. §2929.04(B). *Lorraine* quite clearly conflicts with a number of federal decisions, including *Gregg* v. *Georgia, ante*; *Furman* v. *Georgia, ante*; *Eddings* v. *Oklahoma, ante*; *Lockett* v. *Ohio, ante*; *Skipper* v. *South Carolina, ante*, and of course *Hitchcock* v. *Dugger, ante*. The decision also overlooks the Ohio statute, OHIO REV. CODE ANN. §2929.04(B)(7).

It is astounding to compare the *Lorraine* language with that of the Florida Supreme Court, now since rejected. Both said that only statutory mitigating factors could be considered. In *Cooper* v. *State* (Fla. 1976), 336 So.2d 1133, 1139, the court said: "The sole issue in a sentencing hearing under Section 921.252, Florida Statutes (1975), is to examine in each case the itemized aggravating and mitigating circumstances. Evidence concerning other matters have [*sic*] no place in that proceeding . . . ." In *Lorraine*, the Court virtually mirrored the now-rejected language from *Cooper*:

> Permitting a jury to consider mercy, which is not a mitigating factor and thus irrelevant to sentencing, would violate the well-established principle that the death penalty must not be administered in an arbitrary, capricious, or unpredictable manner. . . . The arbitrary result which may occur from a jury's consideration of mercy is the exact reason the General Assembly established the procedure now used in Ohio.

66 Ohio St.3d at 417. These seemingly pious constitutional orthodoxies are, with due respect, nothing of the sort. The pious orthodoxies are legerdemain, attempting to obscure the fact that the state and federal constitutions prohibit capricious *infliction* of the death penalty—not capricious decisions

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7808 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

28

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 543

*not* to inflict the death penalty.  *Lorraine* curiously failed to mention the mitigation cases, *Hitchcock* v. *Dugger*, *Skipper*, *Eddings*, or *Lockett*.

2.  *Independent Weighing*.  The Supreme Court opinions are replete with cases where the Court has acted in apparent disregard of mitigation evidence and has conducted neither a meaningful weighing of factors nor a meaningful proportionality review.  The result is that there is "no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not."  *Gregg v. Georgia, ante*, 428 U.S. at 196-198, quoting *Furman v. Georgia, ante*, 408 U.S. at 313 (WHITE, J., concurring).

For example, in *State* v. *Green* (1993), 66 Ohio St.3d 141, 153-154, 609 N.E.2d 1253, *cert. denied, Green v. Ohio* (1993), 510 U.S. 891, 114 S.Ct. 250, 126 L.Ed.2d 203, 62 USLW 3251, the Court set out the mitigating factors, including Green's:

- IQ of 66;

- youthful age of 24;

- remorse for the offense;

- poor upbringing;

- alcohol and drug addiction; in addition to

- the disparate treatment accorded to the co-defendant; and

- the fact that the victim "arguably 'induced or facilitated' the offense".

Despite this surplus of mitigation, the Supreme Court "weighed" the evidence with only this postulated analysis:

> In weighing the aggravating circumstance against mitigating factors, we find that the aggravating circumstance does outweigh the mitigating factors beyond a reasonable doubt.  Collectively, Green's

lack of intelligence, family upbringing, and alcohol and drug addition are entitled to modest weight. In contrast, Green planned and carried out a calculated robbery and murder of a frail, elderly man in his own home. The number and manner of stab wounds convincingly demonstrate an intention to commit murder. The manner of death and the prior calculation and design tend to negate Green's later claims of remorse.

Again, the Court employs legerdemain. There must always be a convincing demonstration of an intention to commit murder in any murder case, let alone a capital case. Moreover, if the murder were not either planned or done in the commission of a robbery, there would be no eligibility for death. Thus, the Court has "dressed up" the aggravated murder and the specification to overcome substantial mitigation, in essence *sub silentio* employing a mandatory death penalty such as that struck in *Woodson, ante.*

In *State* v. *Evans* (1992), 63 Ohio St.3d 231, 586 N.E.2d 1042, *cert. denied, Evans v. Ohio* (1992), 506 U.S. 886, 113 S.Ct. 246, 121 L.Ed.2d 179, 61 USLW 3262, the Supreme Court affirmed the death sentence of a defendant with an IQ of less than 70. In dissent, Justice Herbert Brown said:

> I must respectfully dissent from the opinion of the majority. I believe this record reflects errors that individually might be considered non-prejudicial but which, when considered cumulatively, taint the conviction for aggravated murder and appellant's sentence of death.
> What I find most disturbing is the trial court's failure to instruct the jury properly regarding the testimony of an accomplice. . . . . The majority, while conceding that the instruction is improper, concludes that the result would have been the same if the jury had been properly instructed. This is speculation. . . . . I believe it is dangerously speculative to conclude that the jury would have reached the same conclusion if it had accorded this testimony the weight permitted by the proper instruction.
> In my opinion the trial court also erred in failing to instruct the jury on the lesser included offense of murder. The majority finds that there is no error because the evidence does not reasonably support an acquittal on aggravated murder as well as a conviction upon the lesser included offense. Again, I cannot agree. Originally the appellant was convicted of aggravated burglary and aggravated robbery. These convictions form the basis for his conviction of aggravated murder.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

30

The appeals court, however, concluded that appellant could not be convicted of both aggravated burglary and aggravated robbery because they were allied crimes of similar import .   .   .   [and the] appeals court vacated appellant's aggravated burglary conviction.  It also vacated the conviction on the gun specification .   .   .   .   Then, however, the court of appeals held that the trial court did not err in denying appellant's motion pursuant to Crim.R. 29 for acquittal on the aggravated robbery charge, because "reasonable minds could reach different conclusions as to whether each material element of aggravated robbery had been proven beyond a reasonable doubt." The trial court, however, instructed the jury that they could not find appellant guilty of aggravated murder unless they found him guilty of aggravated robbery and/or aggravated burglary—in other words, that either aggravated robbery or aggravated burglary was an element of aggravated murder.  If reasonable minds could differ as to whether an aggravated robbery took place, they could differ as to whether each material element of aggravated murder had been proven beyond a reasonable doubt because a finding of aggravated murder (in this case) is predicated upon the finding of aggravated robbery.  .   .   .   .

Appellant's low IQ also bothers me.  Despite the line of cases beginning with *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, in which this court has held that lack of intelligence is not a sufficiently mitigating "mental disease or defect" pursuant to R.C. 2929.04(B)(3), I believe that a level of intelligence as low as the one here should be given considerable weight before a death penalty is imposed.

Last, I find prosecutorial misconduct here.  Though standing alone it is not enough to compel reversal, it adds to the concern about the fairness of the capital sentence when it is combined with the other errors.  .   .   .   .

63 Ohio St.3d at 255-256.  *Accord*, *State v. Rogers* (1985), 17 Ohio St.3d 174, 188, 478 N.E.2d 984, 17 OBR 414, *cert. granted and judgment vacated,* *Rogers v. Ohio* (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452, 54 USLW 3374 (WRIGHT, J., concurring in part and dissenting in part):[21]

I concur with Justice William Brown's well-reasoned opinion except for that portion dealing with the imposition of the death penalty.  The Ohio Revised Code places upon each member of this court the heavy burden of reviewing anew the record and independently weighing the aggravating circumstances against those

---

[21] The Supreme Court did not decide Billy Rogers' case; the Court simply vacated the judgment based upon its decision in *Caldwell v. Mississippi, ante.*  Thus, *Rogers* notwithstanding, the United States Supreme Court still has not passed on Ohio's post-*Lockett* law, and it certainly has not passed upon the *Godfrey*-like argument asserted herein.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.7808 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

31

factors mitigating against the death sentence. The appellant committed a heinous and outrageous crime, the nature of which cries out for the maximum sentence provided by law. The aggravating factors clearly outweigh the mitigating circumstances—save one. It is undisputed that the appellant has a mental and emotional age of a child between the ages of ten and twelve years.

I recognize that my position will not be one that is popular; however, I cannot sanction the electric chair for a person with the mentality of a child in the fifth grade. Accordingly, I would vote for a life sentence with thirty years of actual incarceration.

The "analysis" of aggravating and mitigating factors in *State* v. *Lawrence* (1989), 44 Ohio St.3d 24, 31-33, 541 N.E.2d 451, follows:

As required by R.C. 2929.05(A) we now turn to our independent determination of whether the aggravating circumstances outweighing the mitigating factors in this case.

Each aggravated homicide of which appellant was convicted was proven beyond a reasonable doubt to have been part of a course of conduct involving the purposeful killing of two persons. As the penalty of death was imposed on both counts, we weigh the single aggravating circumstances of each offense against the mitigating factors we find to exist.

R.C. 2929.04(B) sets forth seven factors to be considered in mitigation of the death penalty: [the seven statutory factors were then set forth.]

There is nothing in the record relevant to mitigating factors (4) and (6). Accordingly, we examine the remaining factors.

The circumstances surrounding the offenses suggest, at least to some extent, the existence of factors (1) and (2). . . . .

Regarding the third factor, Dr. John P. Wilson, a clinical psychologist, testified that appellant was suffering from poor psychological disorders and that at the time of the offenses, appellant suffered from mental disease or defect which rendered him unable to distinguish right from wrong. Although the jury rejected appellant's insanity defense, the mitigating factor or appellant's mental state can still be considered. Drs. Grant and Resnick, psychiatrists called as state witnesses, disagreed with Wilson's opinion as to appellant's ability to distinguish right from wrong, but they concurred that he was suffering from post-traumatic stress disorder at the time of the offenses.

Upon review of all expert testimony offered as to the mental state of appellant, we believe that he did lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. . . . .

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

32

Finally, we consider other factors that are relevant to the issue of whether the offender should be sentenced to death. We find his devotion to and care of his late mother during his high school years, his voluntary military service, and his deep love and caring for his children to be redeeming traits. We also find that appellant's mental health deteriorated following the lost of his son to sudden infant death syndrome. Appellant's severe depression caused by the loss of his son was untreated and eventually resulted in his quitting his job, the deterioration of his relationship with his neighbors, the disintegration of his marriage, and the tragic deaths of Cheryl and Jesse Mooney.

Having reviewed and independently weighed all the facts and other evidence disclosed in the record and having considered each offense and the offender as required by R.C. 2929.05(A), we find the aggravating circumstances the offender was found guilty of committing do not outweigh the mitigating factors beyond a reasonable doubt. .

The defendant does not contend that Lawrence's death sentences should not have been vacated. However, there are other cases where mitigation has been far more substantial than in Lawrence's case but where the death sentence has nonetheless been affirmed. It is obvious that the true mitigation in *Lawrence* was not the mitigation evidence itself but the way that the murders occurred.[22] In Ohio, juries and the courts have weighed not simply the aggravating circumstances but rather the actual facts of the murder or murders involved. What has been weighed against the mitigating factors has not been the aggravating circumstance of *e.g.*, killing two or more people;[23] what has been weighed is the manner in which the victims were

---

[22] Indeed, the most frequent situations mentioned by jurors in capital voir dire is that they would want to hear evidence at the second phase that the murder of which they found the Defendant guilty at the first phase were committed in self defense or under some provocation. These comments, as well as the decision in *Lawrence* indicate that: (1) jurors who have found someone guilty of a heinous offense enter the second phase with the death penalty having a preference, *see, Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, 60 USLW 4541; and (2) a true weighing of aggravating circumstances against mitigating factors is a fictional creation of the General Assembly and not capable under the conditions of normal human psychology.

[23] *See*, OHIO REV. CODE ANN. §2929.04(A)(5), the aggravating circumstance at issue, (continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

33

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 548

killed. This is unquestionably weighing non-statutory aggravating circumstances. See, discussion, *post*.

In *State* v. *Lawson* (1992), 64 Ohio St.3d 336, 351, 1992 Ohio 47, 595 N.E.2d 902, *cert. denied, Lawson v. Ohio* (1993), 507 U.S. 1007, 113 S.Ct. 1653, 123 L.Ed.2d 273, 61 USLW 3668,[24] the Court failed to demonstrate any meaningful weighing. provide guidance as to how the balancing should be conducted. In that case, the Court again listed a number of mitigating factors, and then, without analysis or explanation, simply concluded that the aggravating circumstances outweighed the mitigating factors. The Court said:

> We therefore give appellant's personal weaknesses (suggestibility, low intelligence, impulsiveness) little weight in reducing his culpability. Also, we reject Dr. Lutz' diagnosis of appellant suffering from "brief reactive psychosis" as did most of the experts.
>
> Appellant murdered Martin to prevent his testimony against Tim Lawson and to prevent appellant's own apprehension, conviction, and punishment for the Titus burglary. *These aggravating circumstances strike against the judicial system itself and deserves [sic] severe punishment.* Moreover, appellant murdered Martin during the course of a kidnapping. The lack of violence in the kidnapping arguably reduces the weight of the specification, but it does not eliminate it.
>
> Having conducted the statutory balancing, we conclude that the aggravating circumstances outweigh the factors presented in mitigation beyond a reasonable doubt.

(Emphasis added.) The opinion demonstrates that the purpose of the Court is affirmance of the death penalty because of a sense of outrage which strikes

---

[23](...continued)
sometimes referred to as the "mass murder" specification because it alleges that the defendant killed or attempted to kill two or more people in the same course of conduct.

[24] Lawson's death sentence was vacated earlier this year by a *federal* court. *See, Lawson v. Warden* (S.D. Ohio 2002), 197 F. Supp.2d 1072.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

34

at the heart of the judicial system.  The highlighted language from the above quotation flies in the face of the unemotional, guided discretion demanded by the state and federal constitutions.  Again, the death penalty in Ohio is all but *de facto* mandatory.

In *State* v. *Richey*, (1992), 64 Ohio St.3d 353, 1992 Ohio 44, 595 N.E.2d 915, *cert. denied*, *Richey v. Ohio* (1993), 507 U.S. 989, 113 S.Ct. 1592, 123 L.Ed.2d 157, 61 USLW 3651, the opinion of the Supreme Court of Ohio leaves the reader with several conclusions.  The first conclusion is that the Ohio Supreme Court will not reverse a death sentence based upon the "independent review", regardless of what the mitigating evidence might be in a particular case.  The second conclusion is that a capital defendant is virtually impotent to present enough mitigation evidence to warrant a sentence less than death—a fact proved by comparing the findings of the Liebman study, *post*, to Ohio's reversal rate.  The third conclusion is that the "independent review" has in fact become a rubber stamp placed on death sentences imposed by Ohio juries and routinely approved by trial judges.  The Supreme Court's independent review of Richey's case begins at page 371 of the opinion:

> Our independent assessment of the evidence reveals some mitigating features in Richey's history and background.  Richey's mother abused alcohol and taught him to resent authority.  Richey suffers from lifelong borderline and antisocial personalty disorders.  Richey also served more than a year in the United States Marine Corps and was honorably discharged.  All of these factors are entitled to some mitigating weight.  Otherwise, little else in Richey's history, character, or background is mitigating.  Although Richey abused alcohol and drugs, nothing suggests a serious drug addiction.  On balance, his history, character and background do not offer substantial mitigating features.

Despite this mitigation evidence, the aggravating circumstance outweighs any mitigating factors. In torching an apartment building at night, he jeopardized the lives of others in addition to killing an innocent two-year-old child. Applicable mitigating factors are of little weight when compared to the aggravating circumstance proved against him. His personality disorders did not rise to the level of substantial impairment of capacity under R.C. 2929.04(B)(3). Many criminals have personality disorders. Thus, his background did not contain any substantial mitigating features.

The death penalty is appropriate and proportionate when compared with similar felony murder cases. See *State v. Bonnell* (1991), 61 Ohio St.3d 179, . . . (felony murder); *State v. Lott, supra* (felony murder, victim set on fire); *State v. Seiber* (1990), 56 Ohio St.3d 4, . . . (felony murder); *State v. Powell* (1990), 49 Ohio St.3d 255, . . . (including arson, three victims including a seven-year-old); *State v. Morales* (1987), 32 Ohio St.3d 252, . . . (felony murder, twelve-year-old victim); *State v. Buell* (1986), 22 Ohio St.3d 124, . . . (felony murder, eleven-year-old victim); *State v. Maurer, supra* (felony murder, seven-year-old victim).

Three justices dissented in Richey's case, Justices, Sweeney, Wright, and Herbert R. Brown. They pointed out exactly how the majority ignored the mitigating evidence, to the apparent end that the death sentence be affirmed. *See*, 64 Ohio St.3d at 373-378. The dissent noted that the proportionality review by the majority is a sham, consisting of string citations without analysis. *Id.*, at 376. The Ohio Supreme Court refused to vacate the death sentence of a 24 year old defendant who had an IQ of 66, a history of poor upbringing, and a history of drug and alcohol addiction.

On the surface, the death penalty is to be reserved for only the worst of Ohio's murders and even then only certain aggravated murders are eligible to be considered for the death penalty. Ostensibly, of those who are eligible to be considered, not every defendant should receive the death sentence. Otherwise, the death sentence becomes automatic if in the charging function the defendant is indicted with death specifications—something clearly prohibited at least since *Woodson* in 1976. *State v. Richey, ante*, highlights

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8250 · E-MAIL JBJURISDOC@AOL.COM

36

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 551

the automatic nature of the death sentence in Ohio which is *not* cured by effective appellate review. There was substantial mitigation in Richey's case; yet, having read the opinion of the Supreme Court of Ohio, one concludes that Richey should have thrown in the proverbial towel before even beginning the penalty phase.[25]

3. *Non-statutory aggravating circumstances.* Another anomaly of the appellate review of death sentences in Ohio is the consideration of non-statutory aggravating circumstances. *State* v. *Richey, ante*, also highlights that shortcoming. The Supreme Court of Ohio found that Richey deserved the death penalty in part because "[i]n torching an apartment building at night, he jeopardized the lives of others in addition to killing an innocent two-year-old child. Applicable mitigating factors are of little weight when compared to the aggravating circumstance proved against him." No matter how fine one chops it, the aggravating circumstance in Richey's case was not the statutory felony murder circumstance, OHIO REV. CODE ANN. §2929.04(A)(7). That is not what the Court weighed against the mitigation evidence. Instead, what the Court weighed as the aggravator was that "[i]n torching an apartment building at night, [Richey] jeopardized the lives of others in addition to killing an innocent two-year-old child." This was the aggravating circumstance "proved against [Richey]."

4. *Proportionality.* The Ohio Supreme Court has consistently held that its proportionality review is constitutionally sufficient. The proportionality

---

[25] *See, also,* the dissent of WRIGHT, J. in *State* v. *Garner* (1995), 74 Ohio St.3d 49, 67, 1995 Ohio 168, 656 N.E.2d 623, *cert. denied, Garner v. Ohio* (1996), 517 U.S. 1147, 116 S.Ct. 1444, 134 L.Ed.2d 564, 64 USLW 3691.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

37

review that is required of appellate courts in Ohio need only be confined to the appellate district. Moreover, and perhaps most incredibly, the proportionality review is limited to a review of decisions where the death penalty was imposed, with no consideration even given to capital cases where a sentence less than death was recommended by the trial jury.

The proportionality review performed in Ohio is a far cry from that approved by the Supreme Court in *Gregg* v. *Georgia, ante.* In discussing the Georgia appellate review procedure, the Supreme Court noted that the review procedure is a statewide one and noted that cases where death is not imposed must be included in the review. *See, Moore* v. *State* (1975), 233 Ga. 861, 864, 213 S.E.2d 829, where the court held:

> we view it to be our duty under the similarity standard to assure that no death sentence is affirmed *unless in similar cases throughout the state the death has been imposed generally* . . . .

(Emphasis added.) The Supreme Court in *Gregg, ante,* at 204, fn.56, discussed the obligation to include cases where the death penalty was *not* imposed:

> The Georgia court has the authority to consider [nonappealed capital convictions where a life sentence is imposed and cases involving homicides or a capital conviction is not obtained], see *Ross v. State,* 233 Ga. 361, 365-366, 211 S.E.2d 356, 359 (1974), and it does consider appealed murder cases where a life sentence has been imposed. . .
> . .

Another reason that the United States Supreme Court found the procedure in *Gregg* to be constitutionally acceptable is that the court was at least giving the appearance of actually performing a proportionality review. The Supreme Court held:

> It is apparent that the Supreme Court of Georgia has taken its review responsibilities seriously. In *Coley* [v. *State* (1974), 231 Ga.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

38

829, 204 S.E.2d 612], it held that "[t] he prior cases indicate that the past practice among juries faced with similar factual situations and like aggravating circumstances has been to impose only the sentence of life imprisonment for the offense of rape, rather than death." 231 Ga., at 835, 204 S.E.2d, at 617. It thereupon reduced Coley's sentence from death to life imprisonment. Similarly, although armed robbery is a capital offense under Georgia law, §26-1902 (1972), the Georgia court concluded that the death sentences imposed in this case for that crime were "unusual in that they are rarely imposed for [armed robbery]. Thus, under the test provided by statute, . . . they must be considered to be excessive or disproportionate to the penalties imposed in similar cases. 233 Ga., at 127, 210 S.E.2d, at 667. The court therefore vacated Gregg's death sentences for armed robbery and has followed a similar course in every other armed robbery death penalty case to come before it. [Citations to Georgia cases omitted.]

The provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. *If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedure assure that no defendant convicted under such circumstances will suffer a sentence of death.*

*Gregg v. Georgia, ante,* at 205-206 (emphasis added).[26] A proportionality review can only be a true proportionality review when it includes cases in which the death penalty was *not* imposed—unless the reviewing court purports to claim by clairvoyance that it knows "when juries generally do not impose the death sentence in a certain kind of murder case". As stated in *Gregg v. Georgia,* the purpose of the appellate review is in part to ensure that the death penalty is not randomly or arbitrarily imposed. Presumably, if juries begin by and large not to impose the death penalty for certain offenses,

---

[26] Georgia at that time had offenses other than murder for which the death penalty could be imposed. Later, the United States Supreme Court held that the death penalty could be imposed only for certain homicide offenses. *See, Coker v. Georgia* (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982. Troy Gregg was charged with committing armed robbery and murder. He was found guilty by the trial jury of two counts of armed robbery and two counts of murder. While the Georgia Supreme Court upheld his death sentences for murder, it vacated his death sentences imposed by the trial jury and trial judge for armed robbery. *Gregg v. Georgia, ante,* 161-162.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

39

then the appellate review procedures would ensure that no defendant convicted under such circumstances would suffer the penalty of death. Indeed, in *Furman v. Georgia*, one of the reasons that the death penalty was struck down is that the death sentences were:

> cruel and unusual in the same way that being struck by lightening is cruel and unusual. For, of all the people convicted of [capital crimes], many just as reprehensible as these, the petitioners [in *Furman* were] among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. . . . [T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

*Furman* v. *Georgia*, 408 U.S. at 309-310 (STEWART, J., concurring.)  The truth is, under the Ohio Supreme Court's system for conducting a proportionality review, with no examination of cases in which the death penalty could have been imposed but was not, there is little, if any, chance that the Court will even become aware that death for certain offenses is not generally being imposed.  Without a review of cases in which the death penalty could have been imposed but was not, the Ohio Supreme Court will only continue to affirm cases where juries *have* imposed the death penalty, with no real check to determine whether the imposition of the death penalty was "cruel and unusual in the same way that being struck by lightening is cruel and unusual."  The Ohio Supreme Court's stated method of proportionality review will never allow it to determine whether, of all the people convicted of certain offenses as reprehensible as those on review, the defendant in the case on review was among a "capriciously selected random handful upon whom the sentence of death has in fact been imposed." *Furman* v. *Georgia, ante* (STEWART, J. concurring.)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

40

The imposition of the death penalty in Ohio is not predictable. Judges of the courts of Ohio have abandoned rational and unemotional patterns of thought when reviewing death penalty cases. Appellate litigation of death penalty cases in Ohio is guided less by legal reasoning and more by what has every appearance of being kneejerk political reaction.[27] *See, generally*, Stephen B. Bright and Patrick J. Keenan, *Judges and the Politics of Death: Deciding Between The Bill of Rights and the Next Election in Capital Cases*, 73 BOSTON UNIV.L.REV. 759 (1995); and Stephen B. Bright, *The Politics of Crime and the Death Penalty: Not "Soft on Crime," but Hard on the Bill of Rights*, 39 ST. LOUIS UNIV. L.J. 479 (Winter, 1995).

Some of the justices of the Supreme Court of Ohio have on occasion spoken out, no longer able to overlook the many errors in Ohio death penalty cases simply so that the sentence of death can be affirmed. Principal along those justices is retired Justice J. Craig Wright. He on occasion has been joined by former Justice Herbert R. Brown. These justices obviously have a first-hand view of the inner workings of the Supreme Court of Ohio. Justice Wright disclosed what many had suspected: the Supreme Court of Ohio was daunted by the fact that a reversal of a death sentence, without mandating a new trial and simply remanding the case for re-sentencing, requires the

---

[27] In *Stanford v. Kentucky* (1989), 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306, 57 USLW 4973, the Court held that Constitution is designed to limit the Supreme Court itself, which of course interprets the Constitution. To state that "it is for us" who are on the court to say what the constitution means, in the sense that the justices may base their decisions upon what they *personally* think instead of upon what the Constitution originally meant is to abandon a court of judges of the law and to replace it with a "committee of philosopher-kings". In short, the government must be one of laws and not of men. A review of Ohio appellate cases concerning the death penalty proves that the principle of a "government of laws and not of men" has been abandoned.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

41

Defendant in that case to receive a life sentence.[28]  For example, the dissents of former Justice Wright and Justice Paul Pfeifer in *State* v. *Simko* (1994), 71 Ohio St.3d 483, 1994 Ohio 350, 644 N.E.2d 345, are illustrative.[29]  Justice Wright said in part:

> In my view, the aggravating circumstance, kidnapping, clearly does not outweigh the mitigating factors beyond a reasonable doubt. I say this for the following reasons: (1) The appellant was fifty-eight years old at the time of the crime.  Furthermore, he has no record of previous felonious conduct whatsoever.  Appellant's only criminal conviction was for a DWI some years ago.  (2) Appellant's history indicates a dysfunctional family background.  (3) Although appellant has a limited educational background, having completed only the tenth grade, he has had a record of productive employment during most of his adult life and notably spent eight years in the United States Air Force, receiving an honorable discharge after his service. (4) There is a substantial amount of testimony in the record with

---

[28] For example, in *State v. Combs* (1991), 62 Ohio St.3d 278, 294-295, 581 N.E.2d 1071, *cert. denied, Combs v. Ohio* (1992), 504 U.S. 977, 112 S.Ct. 2950, 119 L.Ed.2d 573, 60 USLW 3828, Justice Wright wrote in a dissent which was joined by Justice Herbert R. Brown:
I must respectfully dissent from this court's affirmance of the imposition of the death penalty.  The prosecutorial misconduct graphically outlined by the majority simply cannot be passed off as harmless error beyond a reasonable doubt.
. . . .
This court has been most reluctant to reverse imposition of the death penalty due in large measure to the effect of *State v. Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744.  The General Assembly could easily deal with the effect of *Penix* by authorizing a second trial limited to the issue of whether the aggravating circumstance or circumstances outweigh the mitigating factors beyond a reasonable doubt.  The cure for this legislative omission does not lie in repeatedly excoriating prosecutorial misconduct while allowing a tainted death penalty to stand.  The right to a fair trial (including, most especially, the sentencing phase of a capital case) is of paramount consideration in our criminal justice system.
"[I]t is most important that the sentencing phase of the [capital] trial not be influenced by passion, prejudice, or any other arbitrary factor. . . . with a man's life at stake, a prosecutor should not play on the passions of the jury.'" *State v. DePew* (1988), 38 Ohio St.3d 275, at 299, . . . (Wright, J., concurring in part and dissenting in part), quoting *Hance v. Zant* (C.A. 11, 1983), 696 F.2d 940, 951, *certiorari denied* (1983) 463 U.S. 1210 . . . .  I had hoped that my repetition of this lesson would eventually move this court to accept it, see *State v. Bedford* (1988), 39 Ohio St.3d 122, at 134-135, . . . (Wright, J., dissenting), but I see that it has not.  Accordingly, I must dissent.
Combs is another death row inmate who received relief from the federal courts, not the Ohio courts. *See, Combs v. Coyle* (6th Cir. Ohio 2000), 205 F.3d 269, 2000 FED App 0064P, *cert. denied, Bagley v. Combs* (2000), __ U.S. __, 121 S.Ct. 623, 148 L.Ed.2d 533, 69 USLW 3380.  Of course, the statute has now been amended. *See*, OHIO REV. CODE ANN. §2929.06.

[29] Chief Justice Moyer joined in the dissents.

42

respect to the appellant's reputation and none of the testimony credited by the three-judge panel pointed toward violent activity in his past. The trial panel gave no credibility to the testimony of James Simko as to previous incidents of domestic violence. (5) Appellant poses no threat to society in the event of a twenty- or thirty-year actual incarceration. (6) Appellant has been a model prisoner. (7) While it is true that the murder itself was brutal in character, it has to be noted that appellant has a history of alcohol abuse and was intoxicated at the time of the offense, according to expert testimony that his blood-alcohol level at the time of the offense would have been about .14 percent. (8) Appellant was diagnosed as having avoidant personality disorder. While this does not rise to the level of a mental disease or defect such that it would be a mitigating factor under R.C. 2929.04(B)(3), it does apply to appellant's mental state and should be considered under R.C. 2929.04(B)(7). (9) Appellant has shown remorse for his actions.

Furthermore, it would appear that the trial panel may well have treated the nature and circumstances of the crime as a second aggravating circumstance insofar as they made detailed findings of fact concerning the circumstances of the crime and used the plural several times in alluding to aggravating circumstances. [Footnote omitted.] court has held that it is appropriate to consider the nature and circumstances of the offense as a mitigating factor, but not as an additional statutory aggravating circumstance.

In *State v. Johnson* (1986), 24 Ohio St.3d 87, . . . syllabus, this court held: "R.C. 2941.14(B) limits the aggravating circumstances which may be considered in imposing the death penalty to those specifically enumerated in R.C. 2929.04(A)." . . . . This principle was discussed in great detail in *State v. Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744, and State v. Davis (1988), 38 Ohio St.3d 361, 528 N.E.2d 925.

In *State v. Davis* [(1988), 38 Ohio St.3d 361] . . . [o]f the five "aggravating circumstances" listed in the [trial court's] opinion, only the aggravating circumstance described in R.C. 2929.04(A)(5) was a statutory aggravating circumstance. In response, this court stated "the balance of the five circumstances listed by the three-judge panel was outside the statute" and it was therefore improper to consider them. *Id.* at 369, 528 N.E.2d at 933.

The three-judge panel in this case apparently undertook the same type of flawed analysis. . . . . It is permissible for a court to consider nonstatutory aggravating circumstances if there are no mitigating factors present, as there is no danger that nonstatutory circumstances will overcome the mitigating factors in the weighing process. . . . . However, as specified above, there are numerous mitigating factors present in this case and therefore the nature and circumstances of the offense should not have been considered as an aggravating circumstance. *See, also, Zant v. Stephens* (1983), 462 U.S. 862, . . . and *Barclay v. Florida* (1982), 463 U.S. 939, . . . .

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: jbjuridoc@aol.com

43

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 558

*Id.*, at 497-500.  In his dissent, Justice Pfeifer pointed out the suspect nature of the Supreme Court's proportionality review:

> I concur with Justice Wright that the aggravating circumstance in this case does not outweigh the mitigating factors.  I write further because I would hold that the sentence of death is disproportionate, given the particular facts of this case.
>
> The death penalty is special.  That special nature is reflected in the types of crimes punishable by death and by this court's role in the death-penalty analysis.
>
> By statute, not every murder is a death-penalty crime.  .  .  .
>
> This court's role is also special in death-penalty cases.  Unlike other criminal defendants, including nondeath-penalty murderers, defendants eligible for the death penalty receive an automatic right of appeal to this court.  Part of that appeal is our mandated consideration of "whether the sentence is excessive or disproportionate to the penalty imposed in similar cases."  R.C. 2929.05(A).  Proportionality review is a key part of this court's death-penalty review and, as the state's highest court, we are in a unique position to determine what is proportionate in a statewide sense.
>
> The focus in most death-penalty cases has been on issues other than proportionality.  Typically, the court locates previous cases with similar statutory aggravating circumstances where the death penalty has been imposed, and thus finds proportionality to the case at issue.  However, murders with the same statutorily defined aggravating circumstance are not necessarily crimes of the same character.  In the present case, for example, the majority cites three cases in its proportionality review.
>
> Thus, even though these cases share the same death-penalty-qualifying aggravating circumstance as does the case at issue, the characters of the crimes differ widely.  To rely completely on the crimes of others in determining whether the death penalty is proportionate in a given case demeans our responsibility to review each case individually.  In the present case, Simko technically did commit kidnapping and thus became eligible for the death penalty.  But the death penalty is not for technicalities.  The General Assembly recognized that when it mandated that this court employ a proportionality review.  Our role is basically to determine whether the penalty of death is appropriate in a particular case, given the penalty's role in our overall system of justice.  Our mandate was not prescribed with precision because the type of review involved is not truly capable of precise measurement.  Yet we have been charged with making that call, and as the state's supreme court we ought not back down from making it.
>
> The death penalty is to apply to the worst of cases.  This is not one of those.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

44

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 559

*Id.*, at 500-502.

The death penalty is no less capriciously imposed if the caprice is in appellate review as opposed to the trial. Capital punishment no more fulfills the constitutional command if appellate judges act with whim and caprice, while pretending not to, than if a jury does the same thing. Justice Wright's comments point out that the appellate review of death penalty decisions in Ohio is not an unemotional, carefully guided, objective weighing of legal factors. Hence, appellate review of death penalty cases in Ohio simply compounds the errors pervasive in the death penalty itself. *See,* the Defendant's Constitutional Motion to Dismiss. The Supreme Court has abandoned the principle that the death penalty should be reserved for only the worst of Ohio's murderers.[30] With all due respect, the Ohio court has not policed the death sentences in this State in the fashion that the United States Supreme Court held that the Georgia court had done in *Gregg.*

## V.  The Liebman Study

In his study, Liebman and his colleagues found that there are:

> two beliefs about the death penalty. One is that death sentences move too slowly from imposition to execution, undermining deterrence and retribution, subjecting our criminal laws and courts to ridicule, and increasing the agony of victims.[Footnote omitted.] The other is that death sentences are fraught with error, causing justice too often to miscarry, and subjecting innocent and other undeserving defendants—mainly, the poor and racial minorities— to execution. [Footnote omitted.] Some observers attribute these seemingly conflicting events and opinions to "America's schizophrenia—we

---

[30] *See, Zant* v. *Stephens* (1983), 462 U.S. 862, 876-877, 103 S.Ct. 2733, 77 L.Ed.2d 235, 51 USLW 4891, where the United States Supreme Court said that tp: "protect . . . against the wanton and freakish imposition of the death penalty . . . , an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

45

believe in the death penalty, but shrink from it as applied." [Footnote omitted.]

Liebman and his colleagues were led to the conclusion:

> that capital sentences spend too much time under review *and* that they are fraught with disturbing amounts of error. Indeed, it may be that capital sentences spend so much time under and awaiting judicial review precisely *because* they are so persistently and systematically fraught with alarming amounts of error. That is the conclusion to which we are led by a study of all 4,578 capital sentences that were finally reviewed by state direct appeal courts, 248 state post-conviction reversals of capital judgments, and all 599 capital sentences that were finally reviewed by federal habeas corpus courts between 1973 and 1995. [Footnote omitted.]

(Emphasis added.)  The study's central findings, characterized below, are startling when compared with the Ohio experience.  The study found that, in the states which were reviewed:

• Between 1973 and 1995, approximately 5,760 death sentences were imposed in the United States;

• Only 313 (5.4%; one in 19) of those resulted in an execution during the period.

• Of the 5,760 death sentences imposed in the study period, 4,578 (79%) were finally reviewed on "direct appeal" by a state high court.

• Of those, 1,885 (41%, or more than two out of five) were thrown out because of "serious error," *i.e.*, error that the reviewing court concludes has seriously undermined the reliability of the outcome or otherwise "harmed" the defendant.

• Nearly all of the remaining death sentences were then inspected by state post-conviction courts.  State post-conviction review is an important source of review in states such as Florida, Georgia, Indiana, Maryland, Mississippi, North Carolina, and Tennessee.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.7308 · FACSIMILE: 330.758.8290 · E-MAIL: JB.JURISDOC@AOL.COM

46

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 561

• In Maryland, at least 52% of capital judgments reviewed on state post-conviction during the study period were overturned due to serious error;

• The same was true of at least 25% of the capital judgments that were similarly reviewed in Indiana, and at least 20% of those reviewed in Mississippi.

• Of the death sentences that survived state direct and post-conviction review, 599 were finally reviewed in a first habeas corpus petition during the 23-year study period.

• Of those 599, 237 (40%, or two out of five) were overturned due to serious error.

• The "overall *error* rate" (the portion of fully reviewed capital judgments that were overturned at one of the three stages due to serious error) over the entire 1973-1995 period, was 68%.

• The most common errors are (1) egregiously incompetent defense lawyering (accounting for 37% of the state post-conviction reversals), and (2) prosecutorial suppression of evidence that the defendant is innocent or does not deserve the death penalty (accounting for another 16%-19%, when all forms of law enforcement misconduct are considered).

• In the state post-conviction study, an astonishing 82% (247 out of 301) of the capital judgments that were reversed were replaced on retrial with a sentence *less* than death, or *no* sentence at all.

• The state post-conviction study revealed that 7% (22/301) of the reversals for serious error resulted in a determination on retrial that the defendant was *not guilty* of the capital offense.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail: Jbjjurisdoc@aol.com

47

- Overall, for every 100 death sentences imposed and reviewed during the study period:

    - 41 were turned back at the state direct appeal phase because of serious error.

    - of the 59 that got through that phase to the second, state post-conviction stage, at least 10%—meaning 6 more of the original 100—were turned back due to serious flaws; and,

    - of the 53 that got through that stage to the third, federal habeas checkpoint, 40%—an additional 21 of the original 100—were turned back because of serious error.

    - Overall, at least 68 of the original 100 were thrown out because of serious flaws, compared to only 32 (or less) that were found to have passed muster—after an average of 9-10 years had passed.

    - Equally startling, among the individuals whose death sentences were overturned for serious error, 82% (56 of the 68) were found on retrial not to have deserved the death penalty, including 7% (5) who were found innocent of the offense.

## VI. Ohio Statistics

Ohio has reviewed on direct appeal 214 cases. The results are less than compelling for anyone trying to make a case that there is effective appellate review in Ohio. Of the 214 cases:

- in only 9 cases (4.21%) has the conviction and death sentence been reversed.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

48

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 563

    • in 3 cases (1.40%) the Ohio Supreme Court affirmed an intermediate appellate Court[31] which had reversed a death sentence.

    • in only 10 cases (4.67%) has the Supreme Court reversed the death sentence while allowing the conviction to stand.

    • Thus, the overall reversal rate in Ohio (22 cases) is 10.28%.

Given what has been shown in this Memorandum, it is easy to see why the reversal rate is so low. As far as the Defendant is aware, few trial courts have granted hearings on post-conviction petitions. When they have the petitions have not been granted, and there has been little appellate relief. As far as the Defendant can discover, the Ohio Supreme Court has declined jurisdiction on every capital post-conviction case it has been asked to hear. Again, given the myopic nature of appellate review of capital cases in Ohio, this too should come as no surprise.

VII.  Virtually All Errors Are Held Harmless in Ohio

    Ohio has an abysmally low rate of reversal in capital cases. In order to affirm capital convictions, Ohio appellate judges have found nearly every error presented to them to be harmless. They have also, with all due respect, engaged in conduct which ranges from the logically absurd to the intellectually specious. That's a strong statement, and a few examples are in order to back up that statement.

    In *State v. Reynolds* (2001), 2001 Ohio 3156, 2001 Ohio App. LEXIS 139, *appeal dismissed* (due to death of Defendant), (2002), 94 Ohio St.3d

---

[31] As this Court knows, Ohio had direct appellate review by both a court of appeals and the Ohio Supreme Court prior to "Issue One" amendments to the Ohio Constitution effective January 1, 1995.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7250 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

49

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 564

1479, 763 N.E.2d 609. Reynolds was convicted of the aggravated murder of Lynn Hanna and sentenced to death. Reynolds argued extensively in his appellate brief that several of the jurors who sat on the jury which sentenced him to death should have been excluded under the holding of *Morgan v. Illinois, ante*. Not only did the Seventh District Court of Appeals affirm Reynolds' conviction and death sentence, but it failed in its nearly 100 page opinion to even *mention* the *Morgan* case. Anyone who has tried capital cases and undergone capital voir dire knows that *Morgan v. Illinois* is the most important capital decision since *Gregg v. Georgia*.

In *State* v. *Lorraine, ante*, the Supreme Court affirmed the convictions and death sentence of Charles Lorraine of Trumbull County. In doing so, at least one justice, former Justice J. Craig Wright, noted the tendency of prosecutors to "overtry" capital cases. Wright found that the remarks of Trumbull County Prosecutor Dennis Watkins were well over the line. In an astounding constitutional non-sequitur, Wright noted prosecutors who step outside the ethical rules in order to obtain a conviction in capital cases should be referred to the Disciplinary Counsel. Wright said that he was "sorely tempted" to make such a referral in the *Lorraine* case. While such a referral might be proper, Wright proposed that the referral supplant a reversal of the conviction. The lack of logic is plainly evident. Referring prosecutors to the disciplinary counsel *after* an unfair capital conviction no more cures the denial of a fair trial than does sending pregnant teenage girls to the convent

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 565

in an effort to curb teenage pregnancy.  In both situations, it might *appear* that something meaningful is being done, but it is not.[32]

One of the Supreme Court's more recent capital cases, *State v. Carter* (2000), 89 Ohio St.3d 593, 2000 Ohio 172, 734 N.E.2d 345, represents the extent to which courts are willing to go simply to affirm a capital conviction. In *Carter*, the facts were shocking.  Sean Carter, 19 at the time of the commission of the offenses, and mentally slow, had been thrown out of the home of his "adoptive" grandmother, Veader Prince.[33]  Mrs. Prince had told Carter that he must leave her home, that he could not stay there.  In the middle of the night, Carter came in through a window.  He called out to Mrs. Prince, and when she awoke, the two of them got into an argument once again.  Carter grabbed a knife and repeatedly stabbed Mrs. Prince.  Though he said in his confession that he doesn't remember raping Mrs. Prince, semen was found in her rectum.  Carter also says that after he hid Mrs. Prince's body under some clothes in the basement, he realized he would need to run and he then took money from her purse.

---

[32]  Lorraine's death sentence was vacated by United States District Judge David Dowd, in part because of prosecutorial misconduct.  *See, Lorraine v. Coyle* (N.D. Ohio Mar. 30, 2001), 2001 U.S. Dist. LEXIS 23248, unreported.  That decision has now been reversed.  *See. Lorraine v. Coyle* (6th Cir. 2002), 291 F.3d 416, 2002 FED. App 0183P.  That reversal leaves Lorraine in the position of being executed when the government violated the Constitution and the disciplinary rules in order to convict him.

Judges have accepted the idea that the death penalty has a deterrent effect.  If that were true, there wouldn't be any more capital crimes being committed in Florida, Texas, and Virginia.  Even if one believes in the deterrent effect, by the nature of the word, it only deters.  Under the deterrent effect theory, the death penalty reduces capital crimes, but it does not eliminate them.  Using a referral to the Disciplinary Counsel has about as much chance of eliminating prosecutorial misconduct as invoking the death penalty has of eliminating aggravated murder.

[33]  Mrs. Prince was actually the natural mother of the woman who adopted Sean Carter, Evely Carter.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

51

Carter was indicted for aggravated murder with three death specifications, all under OHIO REV. CODE ANN. §2929.04(A)(7). One specification alleged that Carter committed aggravated murder while committing rape; the next that he committed aggravated murder while committing aggravated burglary; and the third alleged that he committed aggravated murder while committing aggravated robbery. Carter was also charged with those three principal offenses, rape, aggravated burglary, and aggravated robbery. In drafting the indictment, the prosecutor and/or the grand jury left out of the rape count the essential element of engaging in sexual conduct with anther. In addition, at the close of all of the evidence, the defense requested charges on lesser included offenses, to wit: criminal trespass for aggravated burglary, theft for aggravated robbery, and gross sexual imposition for rape.[34]

There wasn't much question that Carter was guilty of killing Mrs. Prince. When Carter was arrested in Pennsylvania, Trumbull County authorities went to Pennsylvania and obtained two confessions from him. The trial judge granted Carter's request for a lesser included instruction on criminal trespass, but refused lesser included instructions on gross sexual imposition and theft. The jury must be said from the record to have been one which scrupulously considered the evidence. The jury found Carter guilty of aggravated murder, rape, and aggravated robbery. It found Carter not guilty

---

[34] The defense's theory appeared to be that the jury should consider criminal trespass because Carter had gone into an open window and his confession did not indicate that he had any purpose to commit a crime when he entered the house. As to the rape count, the defense's theory appeared to be that Carter may have masturbated on Mrs. Prince and the semen may have leaked into her rectum. As to the aggravated robbery count, the argument was that the only evidence as to how Carter got the money (it was undisputed that he had taken the money) was by taking it from Mrs. Prince's purse after she was dead.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

of aggravated burglary, but guilty of criminal trespass.  Consistent with that verdict, it failed to convict Carter of the death specification relating to aggravated burglary, but it did convict him of the other two capital specifications.  The jury recommended death and the trial judge imposed death.

On direct appeal, the Supreme Court of Ohio was faced with a daunting task.  Carter was clearly guilty of murdering Mrs. Prince.  Carter had been sentenced to death under two capital specifications, each under OHIO REV. CODE ANN. §2929.04(A)(7), one relating to rape and one relating to aggravated robbery.  But there were two monumental problems for the Supreme Court to overcome in order to be able to affirm the conviction and death sentence of a man who admittedly stabbed his grandmother nearly twenty (20) times and who probably raped her anally, either while she was alive or not long after she died at his hand.

Over the years, Supreme Court Justices have sprinkled poignant phrases throughout their opinions.  There is of course the "old saw" that "hard cases make bad law."  Relying on that premise, over a half century ago, the late Justice Felix Frankfurter noted that the cases which test the application of the constitution to all of us often involve cases about people who are not nice people.[35]  Faced with such a test in *State v. Carter*, it must

---

[35] In *United States v. Rabinowitz* (1950), 339 U.S. 56, 68-69, 70 S.Ct. 430, 94 L.Ed. 653, Justice Frankfurter, joined by Justices Robert H. Jackson and Hugo L. Black wrote in dissent:
> The old saw that hard cases make bad law has its basis in experience.  But petty cases are even more calculated to make bad law.  The impact of a sordid little case is apt to obscure the implications of the generalization to which the case gives rise.  Only thus can I account for a disregard of the history embedded in the Fourth Amendment and the great place which belongs to that Amendment in the body of our liberties as recognized and applied by unanimous decisions over a long stretch

(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

53

be said with all due respect that the Supreme Court of Ohio miserably failed its constitutional test.

As suggested above, there were at least two difficulties in Carter's case. First, how could Carter be convicted of rape when the indictment failed to mention the essential element of sexual conduct?  The Ohio Supreme Court itself had said in *State v. Cimpritz* (1953), 158 Ohio St. 490, 110 N.E.2d 416, that failure to insert an essential element into the indictment rendered a court without *jurisdiction* to try that indictment.  Not only was the rape count an issue by virtue of the *Cimpritz* decision, but so was the specification based on rape.  After all, if the court lacked jurisdiction to try the rape count, how could it possibly impose a sentence of death under a specification, the foundation of which was a count about which the court had no jurisdiction?

The second problem in Carter was that the trial judge had not given a lesser included instruction on theft.  Carter claimed he had taken money

---

[35](...continued)
of the Court's history.

It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people. And so, while we are concerned here with a shabby defrauder, we must deal with his case in the context of what are really the great themes expressed by the Fourth Amendment. A disregard of the historic materials underlying the Amendment does not answer them.

1. It is true also of journeys in the law that the place you reach depends on the direction you are taking.  And so, where one comes out on a case depends on where one goes in.  It makes all the difference in the world whether one approaches the Fourth Amendment as the Court approached it in *Boyd v. United States*, 116 U.S. 616, [6 S.Ct. 524, 29 L.Ed. 746,] in *Weeks v. United States*, 232 U.S. 383, [34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177,] in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, [40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426,] in *Gouled v. United States*, 255 U.S. 298, [41 S.Ct. 261, 65 L.Ed. 647,] or one approaches is as a provision dealing with a formality.  It makes all the difference in the world whether one recognizes the central fact about the Fourth Amendment, namely, that it was a safeguard against recurrence of abuses so deeply felt by the Colonies as to be one of the potent causes of the Revolution, or one thinks of it as merely a requirement for a piece or paper.

The holding of the Court against which these Justices dissented was later reversed in part by *Chimel v. California* (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

54

from Mrs. Prince's purse after the killing.  While prevailing case law permits a capital specification under those circumstances, *see State v. (Andre) Williams* (1996), 74 Ohio St.3d 569, 1996 Ohio 91, 660 N.E.2d 724, *cert. denied, Williams v. Ohio* (1996), 519 U.S. 835, 117 S.Ct. 109, 136 L.Ed.2d 62, 65 USLW 3258, that fact in no way cures the failure to charge on a lesser included instruction where the evidence warranted it.  In *Carter*, the facts clearly warranted it.  The claim on appeal was not that the judge lacked the authority to charge on the aggravated robbery and the attendant capital specification.  The claim was that the judge had deprived the jury—obviously a discerning jury[36] as evidenced by its finding of not guilty on aggravated burglary but guilty on criminal trespass—of the opportunity to choose between whether the state had proved aggravated robbery beyond a reasonable doubt or only theft beyond a reasonable doubt.  Though the questions at oral argument were often poignant, the opinion is a disappointment in terms of both constitutional law and legal reasoning.  The opinion in fact represents the epitome of what one appellate court called "artful dodging" of the true legal issues.  *See, State v. Rudge* (1993) 89 Ohio App.3d 429, 624 N.E.2d 1067, *leave to appeal denied*, (1993), 67 Ohio St.3d 1502, 622 N.E.2d 651.

The Court's opinion shamelessly mischaracterized Carter's argument about the lack of the essential element of sexual conduct in the rape count.

---

[36] At oral argument, at least thirty seconds was spent in a debate between counsel and Justice Andrew Douglas about whether the word "discriminating" as applied to the jury was an appropriate word.  Sean Carter is black.  Counsel finally acceded to substitute the word "discerning" instead of "discriminating" in order to be able to move on.  This point is made only because counsel suggests that the Court should be less *politically* correct and more *constitutionally* correct in its review of Ohio capital cases.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

55

The Court said that Carter claimed that he was not on notice of the charges, then proceeded to dispose of the argument by saying that the rape charge was vigorously defended. While the appellate briefs are public records, they are not published, as are the Court's opinions. Thus, when the casual reader who lacks the energy, resources, or incentive to go to Columbus and look at the appellate briefs, sees that the court says that Carter argues he was not on notice of the charge against him, the hapless reader is left to conclude that is precisely what Carter argued. While Carter did make a notice and due process argument, that argument was simply a minor premise of Carter's complaint about the rape count in the Indictment. The major premise of Carter's argument was that the trial court lacked jurisdiction to try Carter on the rape count under the holding of *State v. Cimpritz, ante*. In an effort to brush aside Carter's challenge, the Supreme Court mischaracterized his argument. Carter argued in his brief:

> The State did not allege the essential elements of rape in Count 4 of the indictment, and it did not allege the essential elements of rape in the specification (specification 3 to Count 1). The indictment fails to comply with OHIO CRIM.R. 7 or the statutes set forth above. It does not comply with OHIO CONST. art. I, §10. The indictment was never amended. This Court held in the syllabus of *State v. Cimpritz* (1953), 158 Ohio St. 490, 110 N.E.2d 416:
>
> > 1. In Ohio, all crimes are statutory.
> >
> > 2. The elements necessary to constitute a crime must be gathered wholly from the statute.
> >
> > 3. If any material element or ingredient of an offense, as defined by statute, is omitted from an indictment, such omission is fatal to the validity of the indictment.
>
> Here, there obviously was—and is—missing the material element of "engag[ing] in sexual conduct with another." The trial court could not correct the indictment even if someone had asked it to, for a trial court "may not amend an indictment to supply an essential element of the crime." *State v. Ahedo* (1984), 14 Ohio App.3d 254, 470 N.E.2d 904, citing *State v. Headley* (1983), 6 Ohio St.3d 475, 478-479, 453 N.E.2d 716; *State v. Radebaugh* (1982), 5 Ohio App.3d 152, 155-156, 450 N.E.2d 291. This Court in its opinion in *Cimpritz, supra*, held:

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.7808 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURIS.DOC@AOL.COM

56

A majority of this court entertains the view that the indictment in issue is fatally defective in that it does not set forth the necessary and essential elements to charge an offense and hence is not subject to the curative provisions of Sections 13437-28 and 13437-29, General Code. Those sections authorize correction in the form or substance of an indictment which as drawn is sufficient to charge an offense but do not contemplate the making of a good indictment out of one which states no offense. There must be something effectual on which Sections 13437-28 and 13437-29, General Code, can operate to render them available.

*Id.*, at 493. In this case, the indictment as drawn was not sufficient to state an offense. The Court in *Cimpritz* found the indictment in that case "deficient, ineffective and invalid." *Id.*, at 494. The Court also found that a "conviction based on an indictment which does not charge an offense is void for lack of jurisdiction of the subject matter and may be successfully attacked either on direct appeal to a reviewing court or by a collateral proceeding." *Id.*, citing *People v. Edge*, 406 Ill. 490, 94 N.E.2d 359.

There can be nothing more basic than the indictment in a criminal case, particularly one where the State argued vociferously for the death of one of its citizens, Appellant herein. OHIO CONST. art. I, §1 says that an "inalienable" right is that to defend life. Appellant could not do so here when the basis—or one of the bases—for his death sentence was an offense that did not exist. If the offense did not and could not exist, the trial court had no jurisdiction to try Appellant on the crime or the death specification arising therefrom.

*See, State v. Carter, ante*, Appellant's brief at 8-10. The Court dealt with the issue in pertinent part as follows:

A comparison of the indictment and the statute reveals that the words "engage in sexual conduct" are missing from the indictment. The state concedes that the indictment on the rape count is missing the "engaging in sexual conduct" language, but argues that even if this court were to find this to be reversible error, only the fourth count of the indictment would be affected.

In the bill of particulars, the state specified as follows: "The defendant repeatedly beat the victim with his fists, stabbed her multiple times with a knife and he forcibly engaged in sexual conduct with the victim (specifically the defendant had anal intercourse with Mrs. Prince)." Carter never objected to the indictment and there is no indication that Carter was unaware of the charges against him.

Carter argues now that he did not have notice of the charges against him and was unable to defend himself. However, Carter never challenged the sufficiency of the indictment at any time before or during his trial. An appellate court need not consider an error that was not called to the attention of the trial court at a time when such

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2908 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

57

error could have been avoided or corrected by the trial court. *State v. Williams* (1977), 51 Ohio St.2d 112, 117, 5 O.O.3d 98, 101, 364 N.E.2d 1364, 1367. As a result, such error is waived absent plain error. *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899. Plain error does not exist unless, but for the error, the outcome at trial would have been different. *Id.*

The record reveals that of all the charges against him, Carter vigorously defended against the charge of rape. Carter challenged the state's forensic experts on evidence that supported the charge of rape and even sought appointment of his own expert to testify concerning the evidence of rape. His claim now that he did not have notice of the charges is without merit.

Carter alleges that the error in the indictment is fatal error. Were this true, it would be fatal only as it relates to count four, the rape count. While Carter argues that this defect also affects the aggravated murder charge and the capital specification attached thereto, this argument lacks merit. If the state seeks the death penalty for a defendant who commits aggravated murder, the indictment charging the offense must contain at least one of the specifications enumerated in R.C. 2929.04(A)(1) through (9). R.C. 2929.04(A) provides: "Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt." That section then sets out nine different aggravating circumstances. See *State v. Joseph* (1995), 73 Ohio St.3d 450, 456, 653 N.E.2d 285, 291-292.

The form of the specification is governed by R.C. 2941.14(C), which requires that the aggravating circumstance " 'may be stated in the words of the subdivision in which it appears, or in words sufficient to give the accused notice of the same.' " Thus, the language of the statute clearly provides that the specification is sufficient if the accused knows which subsection or which aggravating circumstance of the nine listed in R.C. 2929.04(A) has been alleged.

Here, the aggravated murder count specifies that the victim was purposefully killed during the course of a rape, and specification three charges Carter under R.C. 2929.04(A)(7) with committing the offense during the course of a rape. Further, the trial court correctly instructed the jury as to all the elements constituting rape. The capital offense remains unaffected by this defect in the indictment.

Furthermore, even as it relates to the rape count, appellant has not shown that he was prejudiced in the defense of his case by this error or that he would have proceeded differently had this error been corrected. Indeed, had the error been discovered, it was properly subject to amendment. Crim.R. 7(D); *State v. O'Brien* (1987), 30 Ohio St.3d 122, 30 OBR 436, 508 N.E.2d 144, paragraph two of the syllabus.

Carter had sufficient notice that he was charged with raping Prince and he was not prejudiced by the error in the indictment. Carter's first proposition of law is overruled.

58

89 Ohio St.3d at 598-599. With all due respect, blatant ignorance of the most elemental precepts of jurisdiction is *not* effective appellate review. There are many adjectives that could be applied to this type of review, all of them pejorative if applied by anyone who took an oath to uphold the Constitution without passion or prejudice. Whatever this type of review may be called it may *not* be called the type of effective appellate review envisioned by the United States Supreme Court in *Gregg* and *Godfrey, ante.*

The second issue that the Supreme Court had to sidestep in *State v. Carter* was the refusal of the trial judge to instruct on the lesser included offense of theft. In doing so, the Court contrived tortured legal reasoning. Though it came as a surprise virtually every prosecutor, judge, and defense lawyer in the State, to get the desired result in *Carter* the Court proclaimed that theft is not a lesser included offense of aggravated robbery. The Court had no explanation, other than this contrived one, for why the lesser included offense was not given to the jury. The Court's opinion reflects a judicial arrogance and a deprivation of the Sixth Amendment right to trial by jury. Under the Sixth Amendment, *juries* are to decide whether a defendant is guilty or not guilty. The Framers of both the State and Federal Constitutions wisely chose to take these decisions out of the hand of government functionaries and place them in the hands of ordinary citizens who are immune from the political pressures that seem to perennially plague government officers. The decision about what crime a defendant may be guilty of is to be decided by a jury. It is not to be decided by the grand jury or the prosecutor responsible for indicting the defendant—and perhaps over-indicting the defendant. A judge's job is to determine whether a jury should

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

59

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 574

consider lesser included offenses, and the well-known standard for doing so is whether any reasonable jury could find the defendant guilty of the lesser offense. In *Carter*, how could anyone with a straight face say that a discerning jury might not find Carter guilty of theft rather than aggravated robbery, when the only evidence as to how Carter obtained Mrs. Prince's money was Carter's own confession? The confession, played for the jury, said that Carter took the money as an afterthought, realizing that he would need some money to get away. The point is not that a jury could not reasonably, under the *Williams* decision, have found Carter guilty of aggravated robbery. The point is that the judiciary, by substituting its own judgment for that of a jury, deprived Carter of his constitutional right to trial by jury. Carter, to be sure, had a trial before a jury. However, the United States Supreme Court has recognized that when the legitimate choices given to a jury are improperly limited, a constitutional deprivation results. Thus, in *Beck v. Alabama*, (1980), 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392,[37] the United States Supreme Court said that a failure to instruct on lesser included offense, in effect giving the jury a choice only between capital murder and acquittal—what local practitioner Don Hanni calls the "free him or fry him" syndrome—is a constitutional violation.

Justice Paul Pfeiffer had concerns during oral argument about sentencing someone to death for a $50.00 petty theft concerns he echoed in his brief concurring opinion. He said:

---

[37] A word search of the Supreme Court's opinion in *Carter* reveals that *Beck v. Alabama* is not mentioned.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2508 · Facsimile: 330.758.8290 · E-mail: Jbjjurisdoc@aol.com

60

> We are charged to independently weigh each sentence of death. Among the factors we consider are whether the death sentence is appropriate and proportionate. When petty theft (for that is what taking $150 is) elevates a murder to a felony-murder capital offense, I believe a death sentence is not appropriate. See Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death* (1990), 31 B.C.L.Rev. 1103; Ledewitz, *The New Role of Statutory Aggravating Circumstances in American Death Penalty Law* (1984), 22 Duq.L.Rev. 317. I could not with a good conscience have affirmed a death sentence based solely on the aggravated-robbery specification.
>
> Here, however, there is a second felony-murder specification, which was proved beyond a reasonable doubt. Based on that specification, the death sentence imposed is both appropriate and proportionate. Accordingly, I concur with the majority opinion, with respect to the convictions and the death sentence.

*Id.*, 89 Ohio St.3d at 611. Justice Pfeifer said he had no problem affirming Carter's death sentence because of the specification relating to the rape count. There can't *be* a valid rape conviction unless the Ohio Supreme Court overruled its *Cimpritz* decision. Clearly, it did not. Thus, Justice Pfeifer's opinion amounts to an admission that he would be timid about affirming a death sentence for a theft rather than an aggravated robbery, but that he had no such qualms about affirming a death sentenced based on a count over which the trial court had absolutely no jurisdiction! Again, whatever one calls this, it is *not* effective appellate review.

## VIII. Conclusion

To satisfy the state and federal constitutions, the procedure for invoking the death penalty must be reliable and evenhandedly applied. If the procedure lacks these essential qualities, the government is "disentitled" to execute any death sentence imposed.[38] In Ohio, judicial review has been subject to short-cutting and short-circuiting. The result is a legal framework

---

[38] This term is borrowed from Justice White's opinion for the Court in *Morgan v. Illinois, ante.*

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: jbjjurisdoc@aol.com

61

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 576

that on its face appears to comply with the federal Constitution, but in practice comes nowhere close.

To make matters worse, the United States Supreme Court has not reviewed an Ohio capital case since *Lockett*. The Ohio Supreme Court has thus *de facto* become unreviewable when it comes to capital cases. Speaking before the Ohio Judicial Conference on September 4, 1968—just nine months before being named Chief Justice of the United States, Circuit Court of Appeals Judge Warren E. Burger said:

> A court which is final and unreviewable needs more careful scrutiny than any other. Unreviewable power is the most likely to self-indulge itself and the least likely to engage in dispassionate self-analysis.  .   .   . In a country like ours, no public institution, or the people who operate it, can be above public debate.

Again with due respect, the Defendant submits that the Ohio Supreme Court has demonstrated that it "most likely to self-indulge itself and the least likely to engage in dispassionate self-analysis." In some ways, what the Defendant asks the Court to do here is to change the course of Ohio law. In a sense, the Defendant is faced with the same daunting task that faced the late Justice Abe Fortas when he was assigned as counsel for Clarence Earl Gideon: convince the United States Supreme Court that its decision in *Betts v. Brady* (1942), 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595, should be overruled because *Betts* was in essence an unconstitutional rule of law. *See, Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799. Here, the Defendant says that the rule of law in Ohio is unconstitutional because effective appellate review is wholly lacking. Perhaps the words chosen by the Defendant here are not as carefully chosen, not as eloquent as those used by Fortas. That such may be the case does not in any way lessen

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

62

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 577

the wholesale constitutional violation which has been and which is occurring. The force of judicial power is not a force of arms, but the strength of the reasoning in its opinions. That is where the public respect for the rule fo law resides. In Ohio, the judiciary is attempting to convince the public that something is being done to deter violent crime in this state. The fiction is that violent crime is being justly and effectively punished because every capital case is given a thorough and searching review to determine if the results were reliably obtained and the trial was fair. Saying that the Defendant had a fair trial, however, poses the same type of dangers raised by the United States Supreme Court in its opinion in *Dutton v. Evans* (1970), 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213. There, the Court suggested that hearsay was admissible against Alex Evans because he had a fair trial; *i.e.,* a guilty man was found guilty. Like many of Ohio's death cases, the facts spawned the result.

Clearly, Ohio has suffered long enough under this system of unreviewed—and hence unreviewable—power of the appellate courts to affirm capital sentences without the meaningful appellate review that the Eighth Amendment requires. Without that review the government is "disentitled" to impose a death sentence or even permit the prosecution of a capital specification. The Defendant accordingly prays for an order dismissing every capital specification appended to the indictment.

J. GERALD INGRAM

JOHN B. JUHASZ
COUNSEL FOR DEFENDANT

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

63

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,                     }

     Plaintiff                     }

*vs.*                              }

                               }

DONNA M. ROBERTS,                  }

     Defendant                     }

Case No.  01 CR 793

Judge John M. Stuard
Courtroom 2

**Death Penalty Case**

## DEFENDANT'S MOTION TO PROHIBIT THE GOVERNMENT FROM USING PEREMPTORY CHALLENGES TO EXCLUDE VENIREMEN WHO EXPRESS CONCERN ABOUT IMPOSING CAPITAL PUNISHMENT REQUEST FOR ORAL HEARING

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
CHRISTOPHER D. BECKER, Esq., Assistant
KENNETH N. BAILEY, Esq., Assistant
160 High Street NW
Warren, Ohio  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

E:\JBJCAP2\ROBERTS\Cover.Page.wpd*Fri 13Sep2002•0627.10 (06:27:10am)

41

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | } | |
| Plaintiff | } | Case No. 01 CR 793 |
| | } | |
| vs. | } | Judge John M. Stuard |
| | } | |
| DONNA M. ROBERTS, | } | |
| Defendant | } | |

---

### DEFENDANT'S MOTION TO PROHIBIT THE GOVERNMENT FROM USING PEREMPTORY CHALLENGES TO EXCLUDE VENIREMEN WHO EXPRESS CONCERN ABOUT IMPOSING CAPITAL PUNISHMENT REQUEST FOR ORAL HEARING

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through the undersigned counsel, and moves this Honorable Court for an order prohibiting the government from excluding, through the use of the peremptory challenges available to the government, any prospective jurors who express during voir dire concerns over imposition of the death penalty.

For cause, the Defendant says that the requested order is necessary to ensure a trial by a fair and impartial jury. Trial by a fair and impartial jury is secured against any encroachment by the government by U.S. CONST. amend. VI and XIV and by OHIO CONST. art. I, §§1, 2, and 5. The requested relief is also required to avoid the risk of arbitrary imposition of capital punishment where a sentence of death is not reliably determined. U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §9 guarantee that any death

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7230 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL c/o JBJURISDOC@AOL.COM

i

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 580

sentence imposed is reliably determined.  The relief is also required by the Due Process and Equal Protection Clauses of U.S. CONST. amend. XIV; the guarantee in OHIO CONST. art. I, §1 that all citizens of this State enjoy an unalienable right to defend life and liberty; the promise that all citizens of this State will be treated equally unless there is a compelling reason not to do so, set forth in OHIO CONST. art. I, §2; and, the guarantee that justice in this State shall be administered without denial set forth in OHIO CONST. art. I, §16.

Further in Support of this Motion, the Defendant offers the attached Memorandum, made a part hereof by this reference.  The Defendant requests an oral hearing on this matter.

WHEREFORE, the Defendant prays for an order of this Court prohibiting the government from peremptorily challenging prospective jurors who express concern over the imposition of the death penalty.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ  (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:

❑ sent by regular United States Mail, postage prepaid
☑ hand delivered to counsel or counsel's office
❑ sent by telecopier

to Christopher D. Becker, Esq. and Kenneth N. Bailey, Counsel for Plaintiff, 160 High Street, NW, Warren, OH  44581  this 13th day of September, 2002.

JOHN B. JUHASZ

E:\JBJCAP2\ROBERTS\DEATH.PEN\perempt.challenge.wpd•Friday, 13 SEP 2002 0624 (06:24 am)

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail c/o Jbjjurisdoc@aol.com

iii

## MEMORANDUM IN SUPPORT OF MOTION

### I.

In its opinion in *Woodson v. North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944, the United States Supreme Court adopted the argument made by the petitioner's counsel in that case, Professor Anthony Amsterdam.  Amsterdam argued that "death is different" from any other penalty imposed by the criminal justice system.  In Ohio, death *is* different, not only for the reasons set forth by Amsterdam and the Court in *Woodson*, but also because the death penalty is the only penalty in Ohio decided by the jury.[1] Whenever a jury decides an issue, the Constitution demands that the jury be fair and impartial.  *See, generally,* U.S. CONST. amend. VI and XIV; OHIO CONST. art. I, §§5 and 10; *Duren v. Missouri* (1979), 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579.

### II.

The requirement that a jury be fair and impartial applies of course to both phases of a capital murder case.  This requirement of impartiality has a number of aspects.  A jury must be open-minded, both concerning guilt and punishment *see, e.g., Estelle v. Williams* (1976), 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126; *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, 46 Ohio Op.2d 368;  *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, 60 USLW 4541; *State* v. *Williams* (1997), 79 Ohio St.3d 1, 21, 1997 Ohio 407, 679 N.E.2d 646 (MOYER, Ch.J., joined by PFEIFER, J., dissenting), *cert. denied, Williams v. Ohio* (1998), 522 U.S. 1053, 118 S.Ct. 703, 139 L.Ed.2d 646, 66 USLW 3456; *State* v. *Lane* (1979), 60 Ohio St.2d 112,

---

[1]  In her motion to suppress any reference to the jury that its death verdict is merely a "recommendation," the defendant demonstrated that when an Ohio jury recommends a sentence of death, a sentence of death is virtually always imposed.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL C/O JBJJURISDOC@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 583

397 N.E.2d 1338, 14 Ohio Op.3d 342.  A jury also must be composed of a fair cross-section of the community.  *See, e.g., Duren v. Missouri* (1979), 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579; *Taylor v. Louisiana* (1975), 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690.  A jury steeped in pretrial publicity is not one which can be fair and impartial.  *See, e.g., Sheppard v. Maxwell* (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, 6 Ohio Misc. 231, 35 Ohio Op.2d 431; *Rideau v. Louisiana* (1963), 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663; and *Irvin v. Dowd* (1961), 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.d 751.

### III.

Because an impartial jury is one of the hallmarks of American criminal justice, the system goes to great ends to enforce the constitutional command.  *See, e.g.*, OHIO REV. CODE ANN. §2313.01 *et seq.*; OHIO REV. CODE ANN. §2945.25; OHIO CRIM. R. 24.[2]  Aside from procedural mechanisms before trial, the law has historically employed two mechanisms at trial to enforce the constitutional command of impartiality.  The first is a challenge for cause.  *See,*

---

[2] The rule provides:
  *(E) Challenge to array.* The prosecuting attorney or the attorney for the defendant may challenge the array of petit jurors on the ground that it was not selected, drawn or summoned in accordance with law. A challenge to the array shall be made before the examination of the jurors pursuant to subdivision (A) and shall be tried by the court.
  No array of petit jurors shall be set aside, nor shall any verdict in any case be set aside because the jury commissioners have returned such jury or any juror in any informal or irregular manner, if in the opinion of the court the irregularity is unimportant and insufficient to vitiate the return.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: CJO.JBJJURISDOC@AOL.COM

2

OHIO REV. CODE ANN. §2945.25.[3]  The second is the peremptory challenge.
*See*, OHIO CRIM.R. 24.[4].

---

[3] OHIO REV. CODE ANN. §2945.25 provides:
A person called as a juror in a criminal case may be challenged for the following causes:
(A) That he was a member of the grand jury that found the indictment in the case;
(B) That he is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial;
(C) In the trial of a capital offense, that he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case. A prospective juror's conscientious or religious opposition to the death penalty in and of itself is not grounds for a challenge for cause. All parties shall be given wide latitude in voir dire questioning in this regard.
(D) That he is related by consanguinity or affinity within the fifth degree to the person alleged to be injured or attempted to be injured by the offense charged, or to the person on whose complaint the prosecution was instituted, or to the defendant;
(E) That he served on a petit jury drawn in the same cause against the same defendant, and that [petit] [n1] jury was discharged after hearing the evidence or rendering a verdict on the evidence that was set aside;
(F) That he served as a juror in a civil case brought against the defendant for the same act;
(G) That he has been subpoenaed in good faith as a witness in the case;
(H) That he is a chronic alcoholic or drug dependent person;
(I) That he has been convicted of a crime that by law disqualifies him from serving on a jury;
(J) That he has an action pending between him and the state or the defendant;
(K) That he or his spouse is a party to another action then pending in any court in which an attorney in the cause then on trial is an attorney, either for or against him;
(L) That he is the person alleged to be injured or attempted to be injured by the offense charged, or is the person on whose complaint the prosecution was instituted, or the defendant;
(M) That he is the employer or employee, or the spouse, parent, son, or daughter of the employer or employee, or the counselor, agent, or attorney of any person included in division (L) of this section;
(N) That English is not his native language, and his knowledge of English is insufficient to permit him to understand the facts and law in the case;
(O) That he otherwise is unsuitable for any other cause to serve as a juror.
The validity of each challenge listed in this section shall be determined by the court.

[4] OHIO CRIM. R. 24 provides in pertinent part:
*(C) Peremptory challenges.* In addition to challenges provided in subdivision (B), if there is one defendant, each party peremptorily may challenge three jurors in misdemeanor cases, four jurors in felony cases other than capital cases, and six jurors

(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: 670.JBJJURISDOC@AOL.COM

3

The peremptory challenge plays an incontrovertibly important, though intangible, part in the selection of a fair and impartial jury.  *See, e.g., Swain v. Alabama* (1965), 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.  At least since the Supreme Court decision in *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, 46 Ohio Op.2d 368, there have been concerns about the way that a capital jury is selected. Certainly, the Constitution is a limitation upon the power of the government to do anything it wants, including anything it wants with the employment of peremptory challenges. *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, 54 USLW 4425, held that the government may not use peremptory challenges to exclude potential jurors because of race.  *Powers v. Ohio* (1991), 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411, 59 USLW 4268, made clear that the defendant need not be of the same race as the excluded jurors in order to present a successful *Batson* challenge.[5]  In *Powers*, the Court rejected the

---

[4](...continued)

in capital cases. If there is more than one defendant, each defendant peremptorily may challenge the same number of jurors as if he were the sole defendant.

In any case where there are multiple defendants, the prosecuting attorney peremptorily may challenge a number of jurors equal to the total peremptory challenges allowed all defendants. In case of the consolidation of any indictments, informations or complaints for trial, such consolidated cases shall be considered, for purposes of exercising peremptory challenges, as though the defendants or offenses had been joined in the same indictment, information or complaint.

*(D) Manner of exercising peremptory challenges.* Peremptory challenges may be exercised after the minimum number of jurors allowed by the rules has been passed for cause and seated on the panel. Peremptory challenges shall be exercised alternately, with the first challenge exercised by the state. The failure of a party to exercise a peremptory challenge constitutes a waiver of that challenge. If all parties, alternately and in sequence, fail to exercise a peremptory challenge, the joint failure constitutes a waiver of all peremptory challenges.

A prospective juror peremptorily challenged by either party shall be excused and another juror shall be called who shall take the place of the juror excused and be sworn and examined as other jurors. The other party, if he has peremptory challenges remaining, shall be entitled to challenge any juror then seated on the panel.

[5]  In counsel's experience, there is the occasional judge who believes that *Batson* was wrongly decided because peremptory challenges lose their character as peremptory challenges if the courts

(continued...)

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: j?o.juhasz-io@aol.com

4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 586

government's argument that only a black could challenge the exclusion of blacks:

> The State contends that our holding in the case now before us must be limited to the circumstances prevailing in *Batson* and that in equal protection analysis the race of the objecting defendant constitutes a relevant precondition for a *Batson* challenge. Because Powers is white, the State argues, he cannot object to the exclusion of black prospective jurors. This limitation on a defendant's right to object conforms neither with our accepted rules of standing to raise a constitutional claim nor with the substantive guarantees of the Equal Protection Clause and the policies underlying federal statutory law.
>
> In *Batson*, we spoke of the harm caused when a defendant is tried by a tribunal from which members of his own race have been excluded. But we did not limit our discussion in *Batson* to that one aspect of the harm caused by the violation. *Batson* "was designed 'to serve multiple ends,'" only one of which was to protect individual defendants from discrimination in the selection of jurors. *Allen* v. *Hardy*, 478 U.S. 255, 259 (1986) (*per curiam*) (quoting *Brown* v. *Louisiana*, 447 U.S. 323, 329 (1980)). *Batson* recognized that a prosecutor's discriminatory use of peremptory challenges harms the excluded jurors and the community at large. 476 U.S., at 87.
>
> The opportunity for ordinary citizens to participate in the administration of justice has long been recognized as one of the principal justifications for retaining the jury system. See *Duncan* v. *Louisiana*, 391 U.S. 145, 147-158 (1968). In *Balzac* v. *Porto Rico*, 258 U.S. 298 (1922), Chief Justice Taft wrote for the Court:
>
> "The jury system postulates a conscious duty of participation in the machinery of justice. ... One of its greatest benefits is in the security it gives the people that they, as jurors actual or possible, being part of the judicial system of the country can prevent its arbitrary use or abuse." *Id.*, at 310.
>
> And, over 150 years ago, Alexis de Tocqueville remarked:

---

[5](...continued)
are in any fashion able to limit the exercise of a peremptory challenge. With due respect to those judges, such a position can only be the product of a myopic review of the nature of constitutional power. The Sixth Amendment and the applicable provisions of the Ohio Constitution do not guarantee the government a fair trial by an impartial jury: those provisions guarantee a *defendant* a trial by a fair and impartial jury. For present purposes, it is enough to say that the government has plenty of advantages in a criminal trial. Through the grand jury it decides who shall be indicted and for what offenses. Many jurors, though they do not always say so, do not really believe in the presumption of innocence, and the government enjoys a *de facto* presumption of guilt because of the fact that the defendant was indicted. The government is permitted to argue first and last during final arguments. With these and other advantages, limiting peremptory challenges as set forth in *Batson* and as urged here does not result in a trial which is unfair or unbalanced in favor of the defendant.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: 170.jejjurisdoc@aol.com

5

> "The institution of the jury raises the people itself, or at least a class of citizens, to the bench of judicial authority [and] invests the people, or that class of citizens, with the direction of society.
>
> .... "... The jury ... invests each citizen with a kind of magistracy; it makes them all feel the duties which they are bound to discharge towards society; and the part which they take in the Government.  By obliging men to turn their attention to affairs which are not exclusively their own, it rubs off that individual egotism which is the rust of society.
>
> .... "I do not know whether the jury is useful to those who are in litigation; but I am certain it is highly beneficial to those who decide the litigation; and I look upon it as one of the most efficacious means for the education of the people which society can employ." 1 Democracy  in America 334-337 (Schocken 1st ed. 1961).

499 U.S., at 406-407.

Experience demonstrated that popular opinion about the death penalty, superimposed upon a capital venire, results in a slightly lopsided bell-shaped curve.  At one end, a fairly small number, are people who are opposed to the death penalty unequivocally and who could in no circumstances consider its imposition.  These are the so-called "*Witherspoon* excludables."  At the other end of the spectrum or bell-shaped curve is another group, also relatively small in number, but larger than the number of "*Witherspoon* excludables," are jurors who favor the death penalty and would automatically impose it upon conviction for a capital offense—or sometimes, upon conviction for any homicide offense.  These individuals are often referred to as "*Morgan* excludables."  In the middle are two groups, one smaller than the other.  The first group consists of individuals who are generally opposed to the death penalty but who could fairly consider its imposition in a specific case where the evidence and the law warranted the imposition of a death sentence.  The second group consists of individual who are generally in favor of the death penalty.  They would, however, only impose it where the facts and the law warranted it; and, they could impose a life sentence where the state failed to prove beyond a reasonable doubt that the aggravating circumstances

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 588

outweigh the mitigating factors.   The number of individuals who favor imposition of the death penalty exceeds the number who are opposed. Further, during the voir dire process, if the challenges for cause are to work the way they were supposed to work, the trial court would exclude for cause those jurors who are *Witherspoon* excludables and those jurors who are *Morgan* excludables.  If statistics and experience are of any value whatsoever, the majority of the remaining jurors will be those who generally favor imposition of the death penalty.  This leaves the government in a position of being able to exclude "death scrupled" jurors through the use of peremptory challenges.   Indeed, prosecutors often employ the peremptory challenge to select a jury composed entirely of individuals who do not oppose capital punishment.  In *Gray v. Mississippi* (1987), 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622, 55 USLW 4638, held that "prosecutors often use peremptory challenges" to "remove all venire members who expressed any degree of hesitation against the death penalty.  Part III-B-2 of the opinion joined by Justices Blackmun, Brennan, Marshall, and Stevens, concluded that, since prosecutors often use peremptory challenges to remove venire members who have expressed *any* degree of hesitation against imposing the death penalty, and because the courts generally do not review the prosecution's reasons for exercising peremptory challenges, an erroneous exclusion of a scrupled, yet eligible, venire member is more than an isolated incident having no prejudicial effect in any particular case.  The constitutional right to an impartial jury is so basic to a fair trial that its infraction can *never* be treated as harmless error.

Though the death scrupled jurors are a minority of the population, they are nonetheless a cognizable group.  Their exclusion violates the constitutional guarantees of trial by a fair and impartial jury.

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: c/o Jbjjurisdoc@aol.com

7

As noted *ante*, some judges view with disapproval cases like *Batson* and *Powers*, which place limits upon the use of the peremptory challenge by one party (the government) but not the other. Such a position, with due respect, overlooks the fundamental nature of constitutional liberties. It is the *citizen's* right, not the government's, to have a fair trial by an impartial jury selected from a cross-section of the community.[6] Because there are fewer death-scrupled jurors than jurors who generally favor the death penalty, the government, if not restrained, can effectively use its peremptory challenges to remove all death scrupled jurors who are not "*Witherspoon* excludables."

That said, it is evident that *Batson* and *Powers* were rightly decided. It is equally evident that the government's exercise of a peremptory challenge may indeed be limited by the Constitution. The Defendant has argued extensively elsewhere that *everything* that the government does is limited by the Constitution. Justice O'Connor made this point apparent in her concurring opinion in *J. E. B. v. Alabama ex rel. T. B.* (1994), 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89, 62 USLW 4219:

> The principal value of the peremptory is that it helps produce fair and impartial juries. *Swain* v. *Alabama*, 380 U.S. 202, 218-219 (1965); Babcock, *Voir Dire: Preserving "Its Wonderful Power,"* 27 STAN. L. REV. 545, 549-558 (1975). . . . . The peremptory's importance is confirmed by its persistence: It was well established at the time of Blackstone and continues to endure in all the States. *Id.*, at 481.
> . . . . Because I believe the peremptory remains an important litigator's tool and a fundamental part of the process of selecting impartial juries, our increasing limitation of it gives me pause.
> Today's decision severely limits a litigant's ability to act on this intuition, for the import of our holding is that any correlation between a juror's gender and attitudes is irrelevant as a matter of constitutional law. But to say that gender makes no difference as a matter of law is not to say that gender makes no difference as a matter of fact. I

---

[6] Indeed, the English at one time provided for 35 peremptories for the defendant and none for the government. *See*, Ordinance for Inquests, 33 Edw. 1, Stat. 4 (1305), provided that if "they that sue for the King will challenge any ... Jurors, they shall assign ... a Cause certain." *See*, *Swain v. Alabama*, *ante*, 380 U.S. at 213.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JBJUHISDOC@AOL.COM

8

previously have said with regard to *Batson:* "That the Court will not tolerate prosecutors' racially discriminatory use of the peremptory challenge, in effect, is a special rule of relevance, a statement about what this Nation stands for, rather than a statement of fact." *Brown* v. *North Carolina,* 479 U.S. 940, 941-942 (1986) (opinion concurring in denial of certiorari). Today's decision is a statement that, in an effort to eliminate the potential discriminatory use of the peremptory, see *Batson,* 476 U.S. at 102 (MARSHALL, J., concurring), gender is now governed by the special rule of relevance formerly reserved for race. Though we gain much from this statement, we cannot ignore what we lose. In extending *Batson* to gender we have added an additional burden to the state and federal trial process, taken a step closer to eliminating the peremptory challenge, and diminished the ability of litigants to act on sometimes accurate gender-based assumptions about juror attitudes.

These concerns reinforce my conviction that today's decision should be limited to a prohibition on the government's use of gender-based peremptory challenges. *The Equal Protection Clause prohibits only discrimination by state actors.* In *Edmonson,* [v. *Leesville Concrete Co.* (1991), 500 U.S. 614, 111 S.Ct. 2077 114 L. Ed. 2d 660], we made the mistake of concluding that private civil litigants were state actors when they exercised peremptory challenges; in *Georgia* v. *McCollum,* 505 U.S. 42, 50-55 [120 L.Ed.2d 33, 112 S.Ct. 2348] (1992), we compounded the mistake by holding that criminal defendants were also state actors. Our commitment to eliminating discrimination from the legal process should not allow us to forget that not all that occurs in the courtroom is state action. Private civil litigants are just that—*private* litigants. "The government erects the platform; it does not thereby become responsible for all that occurs upon it." *Edmonson,* 500 U.S. at 632 (O'CONNOR, J., dissenting).

Clearly, criminal defendants are not state actors. "From arrest, to trial, to possible sentencing and punishment, the antagonistic relationship between government and the accused is clear for all to see. . . . The unique relationship between criminal defendants and the State precludes attributing defendants' actions to the State . . . . " *McCollum, supra,* at 67 (O'CONNOR, J., dissenting). The peremptory challenge is "'one of the most important of the rights secured to the accused.'" *Swain,* 380 U.S. at 219 (emphasis added); Goldwasser, *Limiting a Criminal Defendant's Use of Peremptory Challenges: On Symmetry and the Jury in a Criminal Trial,* 102 HARV. L. REV. 808, 826-833 (1989). Limiting the accused's use of the peremptory is "a serious misordering of our priorities," for it means "we have exalted the right of citizens to sit on juries over the rights of the criminal defendant, even though it is the defendant, not the jurors, who faces imprisonment or even death." *McCollum, supra,* at 61-62 (THOMAS, J., concurring in judgment).

Accordingly, I adhere to my position that the Equal Protection Clause does not limit the exercise of peremptory challenges *by private civil litigants and criminal defendants.* This case itself presents no

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL c/o.JBJURISDOC@AOL.COM

9

> state action dilemma, for here the State of Alabama itself filed the paternity suit on behalf of petitioner.  But what of the next case?  Will we, in the name of fighting gender discrimination, hold that the battered wife—on trial for wounding her abusive husband—is a state actor?  Will we preclude her from using her peremptory challenges to ensure that the jury of her peers contains as many women members as possible?  I assume we will, but I hope we will not.

511 U.S., at 149-150.  (Emphasis added.)

Plainly, the Constitution limits the *government's* authority to exercise peremptory challenges to remove death scrupled jurors.  The Constitution acts as a barrier in this case, through the Equal Protection, Due Process, and Impartial Jury Clauses, to limit the government's unfettered use of the peremptory challenge.  The sentence of death, if it is imposed, must be reliably determined; and, if not, the sentence may not be imposed.  See, generally, *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Zant v. Stephens* (1983), 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235, 51 USLW 4891.

Without a fair and impartial jury, one not made partial by the government's unfettered use of the peremptory challenge to remove death-scrupled jurors, that cannot be said in this case.  The Defendant accordingly moves for an order prohibiting the government from excluding, through the use of the peremptory challenges available to the government, any prospective jurors who express during voir dire concerns over imposition of the death penalty.

J. GERALD INGRAM

JOHN B. JUHASZ
COUNSEL FOR DEFENDANT

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,  }
　　　　　　　　　 }  Case No.  01 CR 793
　　　Plaintiff  }
　　　　　　　　　 }  Judge John M. Stuard
_vs._  }  Courtroom 2
　　　　　　　　　 }
　　　　　　　　　 }
DONNA M. ROBERTS,  }
　　　　　　　　　 }  **Death Penalty Case**
　　　Defendant  }

## DEFENDANT'S MOTION TO HAVE REASONS FOR OBJECTIONS AND REASONS FOR OVERRULING OBJECTIONS PLACED ON THE RECORD

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
CHRISTOPHER D. BECKER, Esq., Assistant
KENNETH N. BAILEY, Esq., Assistant
160 High Street NW
Warren, Ohio  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

C:\Program Files\Corel\WordPerfect Office 2000\Backup\wp{wp}.bk3*Mon 16Sep2002•1401.34 (02:01:34pm)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

42

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 593

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,           }    Case No. 01 CR 793

      Plaintiff      }    Judge John M. Stuard
                   }    Courtroom 2
-vs-               }

                   }
DONNA MARIE ROBERTS,  }

      Defendant    }

---

### DEFENDANT'S MOTION TO HAVE REASONS FOR OBJECTIONS AND REASONS FOR OVERRULING OBJECTIONS PLACED ON THE RECORD

---

COMES NOW THE DEFENDANT, DONNA MARIE ROBERTS, through counsel, and moves this Honorable Court for an order permitting defense counsel to state the reasons for defense objections on the record, and also requiring that the reasons for overruling any defense objections be placed on the record.  For cause, the Defendant offers the attached Memorandum, which is incorporated herein.

WHEREFORE, the Defendant prays for an order of this Court permitting defense counsel to state the reasons for objections on the record, and requiring the Court to state the reasons on the record for overruling any defense objections that are overruled.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

42

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
E-mail: Jbjjurisdoc@aol.com
COUNSEL FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Defendant's Motion to Dismiss Death Penalty Specifications Because Method of Execution is Unconstitutional was:

❑ sent by regular United States Mail, postage prepaid
❑ sent by telecopier pursuant to OHIO CRIM.R. 57(B) and OHIO CIV.R. 5(B)
☑ hand delivered to counsel or counsel's office

this _____ day of September, 2002 to CHRISTOPHER D. BECKER, Esq., and KENNETH N. BAILEY, Esq., 160 High Street NW, Warren, Ohio 44483.

JOHN B. JUHASZ

E:\JBJCAP2\ROBERTS\DEATH.PEN\Objections.record.wpd ✦ Mon 16Sep02-02:01:50P

MEMORANDUM IN SUPPORT OF MOTION

The Defendant has been indicted for, *inter alia*, aggravated murder with death penalty specifications. Trial courts always have an obligation to insure that the proceedings are fair,[1] but that duty reaches a heightened level in death penalty cases because "death is different." If the Defendant is to truly be guaranteed the adequate and effective representation to which he is entitled under U.S. CONST., amend. VI and XIV and OHIO CONST., art. I, §10, a complete record of every step of the proceedings must be compiled and preserved. This is a death penalty case, and it is not the type of case where defense counsel should be thinking about appellate review after the trial is over. To preserve any possible issues for appeal, defense counsel must make a complete record reflecting the entire proceedings in the trial court. If the issues are not preserved on the record, the appellate courts will only review issues constituting "plain error". *State v. Williams* (1977), 51 Ohio St.2d 112; *see, also*, OHIO CRIM.R. 52. Failure to raise an issue other than "plain error" constitutes a waiver of that issue. *State v. Awan* (1986), 22 Ohio St.3d 120.

A necessary part of building a complete record is to allow the defense counsel to state on the record reasons for objections, and for the Court to state on the record the reasons for overruling those objections. If that is not done, the record is not complete, and the Defendant has been denied his constitutional rights, including his Sixth and Fourteenth Amendment rights to the effective assistance of appellate counsel.

The principle that an Ohio capital defendant is entitled to an unabridged record for appeal was nowhere more clearly stated than in *State,*

---

[1] *See, generally, Chambers* v. *Mississippi* (1973), 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297; *State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342, and the authorities cited therein.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

1

*ex rel. Spirko, v. Judges of the Court of Appeals, Third Appellate District, et al.* (1986), 27 Ohio St.3d 13, 501 N.E.2d 625, 27 OBR 432.  There the Court said:

> Section 16, Article I of the Ohio Constitution provides:
> "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."
> In *Thomas v. Mills* (1927), 117 Ohio St. 114, 157 N.E. 488, this court had occasion to interpret and apply the foregoing constitutional provision.   In that dispute, the warden of the Ohio Penitentiary had refused to allow an attorney to enter the prison for the purpose of conferring with his client. The prisoner was appealing a conviction of first-degree murder.   The court found from the record that the attorney had applied for entry only at reasonable times.
> Judge Florence E. Allen, author of this court's opinion, framed the issue at 120 with these observations:
> "Was Article I, Section 16 of the Constitution of Ohio, violated by the warden's refusal? That section provides that every person shall have justice administered without denial or delay.  Surely the right to be represented by counsel in every stage of a criminal proceeding is a right inherent in justice itself, and any person who is denied the right is denied justice."
> We think these basic principles also apply in the present case. Just as the right to confer with an attorney "is a right inherent in justice itself," so too is the right to an unabridged transcript.   If consultation with one's lawyer is essential to prepare a case for the appellate courts, we believe the availability of a trial record is indispensable for that very same purpose.  Without a transcript, a capital defendant is precluded from obtaining a complete and meaningful appellate review of his case as provided by statute and by Section 16, Article I of the Ohio Constitution.  In brief, with respect to the right to a comprehensive transcript, "any person who is denied the right is denied justice."
> Judge Allen, in *Mills, supra*, at 125, 157 N.E. 488, approvingly quoted language from an Oklahoma case, *State ex rel. Tucker v. Davis* (1913), 9 Okla.Crim. 94, 97, 130 P. 962, 963, which we find appropriate here:
> " 'It would be a cheap subterfuge of and shameless mockery upon justice for the state to put a man on trial in its courts, charged with an offense which involved his life, liberty, or character, and then place him in such a position that he could not prepare to make his defense.  It would be just as reasonable to place shackles upon a man's limbs, and then tell him that it is his right and duty to defend himself against an impending physical assault.  If the right of defense exists, it includes and carries with it the right of such freedom of action as is

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

2

essential and necessary to make such defense complete.  In fact, there can be no such thing as a legal trial, unless both parties are allowed a reasonable opportunity to prepare to vindicate their rights. * * * ' "

Because of the foregoing considerations, we cannot countenance a situation where a person engaged in a contest with the state for his life should be placed in the untenable position of having to present his case before an appellate court without a comprehensive record to assist him.  Furthermore, we cannot allow the grave responsibility to review capital cases, placed by law upon the court of appeals and this court, to be crippled simply because a full record is unavailable.  We therefore hold that Section 16, Article I of the Ohio Constitution requires that a defendant in a capital case be afforded a complete, full, and unabridged transcript of all proceedings against him so that he may prosecute an effective appeal.[2]

27 Ohio St.3d, at 17-18.

In addition, it must in candor be said that the Ohio courts afford little relief to capital defendants.   Ohio Courts finds far fewer errors than do courts of other states.   However, the federal courts have provided relief to some Ohio capital defendants.   But the jurisdiction of the federal courts has

---

[2] In footnote 5 of its opinion, the Court said:

Because we find the statutes and Constitution of Ohio require the result reached herein, we expressly do not decide whether the federal Constitution would demand the same conclusion.  We note in passing, however, that the United States Supreme Court has repeatedly emphasized, in the context of federal constitutional provisions, the right to effective appellate review.  *Griffin v. Illinois* (1956), 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891; *Eskridge v. Washington State Bd. of Prison Terms & Paroles* (1958), 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269; and *Gardner v. California* (1969), 393 U.S. 367, 89 S.Ct. 580, 21 L.Ed.2d 601 (guaranteeing indigents a free transcript for appeal purposes); *Burns v. Ohio* (1959), 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 404 [10 Ohio Op.2d 404] (compelling the clerk of this court to accept appeal petitions from indigents without the payment of filing fees); *Anders v. California* (1967), 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (invalidating an appellate judgment where the attorney failed to prepare a brief on the ground that there was no merit to the appeal); *Douglas v. California* (1963), 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (guaranteeing the assistance of counsel on the first appeal as of right); *Evitts v. Lucey* (1985), 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (establishing the right to effective assistance of appellate counsel); *Draper v. Washington* (1963), 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (finding that a trial court's judgment that an appeal is frivolous does not satisfy the constitutional right to effective appellate review); *Proctor v. Warden* (1978), 435 U.S. 559, 98 S.Ct. 1596, 56 L.Ed.2d 547 (vacating an appellate judgment because its summary review was based on an inapposite case and statute); *Bounds v. Smith* (1977), 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (guaranteeing adequate libraries and other supplies for prisoners who desire to prepare and file appeals and postconviction actions); *Entsminger v. Iowa* (1967), 386 U.S. 748, 87 S.Ct. 1402, 18 L.Ed.2d 501 (nullifying an appellate judgment where defense counsel had filed only a partial record with the court).

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330. 758.2308 · Facsimile 330. 758.8290 · e-mail: jbjurisdoc@aol.com

3

been limited by a number of decisions and by the Antiterrorism and Effective Death Penalty Act of 1996.  The details of the Act, and habeas concepts of "procedural default" and "cause and prejudice" need not be explored here in depth.  It is enough for present purposes to say that any error which was not preserved and for which state review is not sought, is barred from federal habeas relief, no matter how grievous the error.

The reasons for objections, responses by the prosecutor, and the rulings on objections, together with the reason therefor, may of course be stated at sidebar.  However, the entire sidebar proceedings must be recorded.

For the foregoing reasons, the Defendant prays that all proceedings be recorded.

J. GERALD INGRAM

JOHN B. JUHASZ

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: JbJuris.doc@aol.com

4

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,

    Plaintiff

*vs.*

DONNA M. ROBERTS,

    Defendant

Case No.  01 CR 793

Judge John M. Stuard
Courtroom 2

**Death Penalty Case**

---

### DEFENDANT'S MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS BECAUSE METHOD OF EXECUTION IS UNCONSTITUTIONAL

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
CHRISTOPHER D. BECKER, Esq., Assistant
KENNETH N. BAILEY, Esq., Assistant
160 High Street NW
Warren, Ohio  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

E:\JBJCap2\Roberts\Cover.Page.wpd*Mon 16Sep2002•1309.14 (01:09:14pm)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

43

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 600

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,

    Plaintiff

-vs-

DONNA MARIE ROBERTS,

    Defendant

}
}
}
}
}
}
}
}
}
}
}

Case No. 02 CR 236

Judge Stuard
Courtroom 2

---

### DEFENDANT'S MOTION TO DISMISS DEATH PENALTY
### SPECIFICATIONS BECAUSE METHOD OF EXECUTION
### IS UNCONSTITUTIONAL

---

COMES NOW THE DEFENDANT, DONNA MARIE ROBERTS, through counsel, and moves for an order dismissing the death penalty specifications in this case.  For cause, the Defendant says that, as shown in the attached memorandum, made a part hereof by this reference, the death penalty violates U.S. CONST. amend. VII and XIV and OHIO CONST. art. I, §§1, 2, 9 and 16.

WHEREFORE, the Defendant prays for an order dismissing all death penalty specifications herein.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.7700 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHASZ@DOCS@AOL.COM

-i-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 601

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
E-mail: Jbjjurisdoc@aol.com
COUNSEL FOR DEFENDANT

*CERTIFICATE OF SERVICE*

I hereby certify that a true copy of the foregoing Defendant's Motion to Dismiss Death Penalty Specifications Because Method of Execution is Unconstitutional was:
❑ sent by regular United States Mail, postage prepaid
❑ sent by telecopier pursuant to OHIO CRIM.R. 57(B) and OHIO CIV.R. 5(B)
☒ hand delivered to counsel or counsel's office
this 16 day of September, 2002 to CHRISTOPHER D. BECKER, Esq., and KENNETH N. BAILEY, Esq., 160 High Street NW, Warren, Ohio 44483.

JOHN B. JUHASZ

E:\JBJCAP2\ROBERTS\DEATH.PEN\Methods.unconst.wpd ✦ Mon 16Sep02-01:06:33P

## MEMORANDUM

### I.

The Defendant has been indicted for, *inter alia*, two counts of aggravated murder and death specifications.   Many of the arguments asserted herein have been asserted in the Defendant's omnibus constitutional motion to dismiss, and for any repetition, the Defendant apologizes. However, as any Eighth Amendment[1] Cruel and Unusual Punishment standard is necessarily one which employs evolving standards of decency, dignity, and due process,[2] the Defendant asks the Court to consider the forms of capital punishment in that light.   *See, e.g.,* Leonard W. Levy, *Origins of the Bill of Rights* (New Haven, Conn., Yale University Press, Copyright © 1999), 231-240.   Punishment, to avoid the constitutional ban, must not be "barbarous or unduly severe" and "in no circumstances involve a lingering death or any form of torture." *Id.,* at 231, 240.[3]

### II.

Over time, the methods of execution have shifted in this country, from hanging and the firing squad, to the electric chair and the gas chamber, to

---

[1] U.S. CONST. amend. VIII provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Of course, the same arguments apply with equal force to OHIO CONST. art. I, §9, which provides in pertinent part: "Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted."

[2] The Cruel and Unusual Punishments Clause is an integral part of due process of law; hence, the guarantees of U.S. CONST. amend. VIII apply to state criminal prosecutions under U.S. CONST. amend. XIV. See, *Robinson v. California* (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758.

[3] The Amendment is also designed to bar the "once-frequent judicial practice" of fixing "bail at impossibly high rates, far in excess of the prisoner's capacity to raise." *Id.,* at 231. If this standard were applied by appellate courts in habeas proceedings today, a substantial number of cases—including virtually every high-profile case—would entitle the prisoner to relief.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 603

the most preferred method these days, lethal injection.    *See*, Table 1, Appendix.  Yet, even death by lethal injection constitutes cruel and unusual punishment and denies due process under the state and federal constitutions. That form of inflicting death is so out of step with modern jurisprudence that the government may not return to it.[4]  The United States is the only major industrialized, "civilized," country in the world to still kill people as a form of punishment.  Death as a form of punishment, *ipso facto,* violates evolving standards of Due Process and human dignity.   There is quite simply no humane way to kill another person which is not is some form or fashion "barbarous or unduly severe" or which does not involve "a lingering death or any form of torture."  Levy, *op. cit.*  Indeed, killing another human is regarded today as so uncivilized that it is precisely why the legislatures have reserved the most severe forms of punishment for aggravated murder.[5]

### III.

To argue that death as a form of punishment may be imposed because it existed when the Eighth Amendment was written ignores the obvious. When the Constitution was written, slavery existed.  Although U.S. CONST. amend. XIII abolished slavery, the real reason that slavery cannot be tolerated is the equal protection provisions of U.S. CONST. amend. V, specifically made applicable to the states in U.S. CONST. amend. XIV; and,

---

[4]See the quote *post* of Solicitor General Robert Bork from the oral arguments in *Jurek v. Texas* (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed. 2d 929 and *Roberts v. Louisiana* (1976), 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974.

[5] Nothing asserted herein is intended to suggest that life imprisonment without parole, or life imprisonment with parole eligibility after a term of years violates the constitutional provisions set forth herein.

evolving standards of human dignity.  During the first Congress, when the Bill of Rights was being debated, Congressman Samuel Livermore of New Hampshire argued that death by hanging was sometimes necessary, and he also argued that some offenders deserved to be whipped and have their ears cut off.  *See*, Levy, *op. cit.*, 239.

### A.

Prior to the adoption of U.S. CONST. amend. XIV, the federal Bill of Rights acted to restrict only federal action and not state action.  *Barron v. Baltimore* (1833), 32 U.S. (7 Peters) 243, 8 L.Ed. 672.  Other early cases, decided between the adoption of U.S. CONST. amend. XIV in 1868 and the first "incorporation" case, held that the Bill of Rights did not apply to state action.[6]  In 1897, the "just compensation" clause was held to apply to state action through U.S. CONST. amend. XIV.  This was the first breakthrough in the application of the federal Bill of Rights to state action.  *See*, *B & Q.R.R. v. Chicago* (1897), 166 U.S. 226, 241, 17 S.Ct. 581, 41 L.Ed. 979.

### B.

Over time, the United States Supreme Court began to find that certain liberties expressed in the original "Bill of Rights" were so fundamental as to be a part of the American concept of due process of law.[7]  Those rights were

---

[6] *See*, *O'Neil v. Vermont* (1892), 144 U.S. 323, 332, 12 S.Ct. 693, 36 L.Ed. 450; *McElvaine v. Brush* (1891), 142 U.S. 155, 158-159, 12 S.Ct. 156, 35 L.Ed. 971; *In Re Kemmler* (1890), 136 U.S. 436, 446, 10 S.Ct. 930, 34 L.Ed 517; and, *United States v. Cruikshank* (1875), 92 U.S. 542, 552-556, 2 Otto 542, 23 L.Ed. 588.

[7] Interestingly, James Madison, the rather reluctant father of the Bill of Rights, originally proposed an amendment to the Constitution that would have prohibited states from denying the constitutional liberties of trial by jury, and the rights of conscience, speech and a free press.  Had the amendment been adopted, "the rights of the people against oppression by the states would have been secured well before the Supreme Court finally began applying the Bill of Rights to the

(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.7700 · FACSIMILE: 330.758.8290 · E-MAIL: JB.JURISDOC@AOL.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 605

"incorporated" into state criminal prosecutions by virtue of the Due Process Clause of U.S. CONST. amend. XIV. Though intended as an illustrative and not exhaustive tracing of the doctrine of incorporation, the Court, for example, in 1949 held that the prohibition against unreasonable searches and seizures of U.S. CONST. amend. IV was extended to the states. *See, Wolf v. Colorado* (1949), 338 U.S. 25, 27-28, 69 S.Ct. 1359, 93 L.Ed. 1782. However, the states were left free to decide for themselves whether any effective means of enforcing the guarantee was to be made available. *Id.* In 1961, the exclusionary rule was applied to state proceedings. *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 16 Ohio Op.2d 384, 86 Ohio Law Abs. 513. The provisions of U.S. CONST. amend. VIII, which prohibits cruel and unusual punishments, were made applicable to state action in *Robinson v. California*, ante. *Robinson* was not a death penalty case. The provisions of U.S. CONST. amend. VI that the defendant enjoys the assistance of counsel was applied in felony cases in *Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799. It was made applicable to jailable misdemeanor offenses in *Argersinger* v. *Hamlin* (1972), 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530.

The privilege against compulsory self-incrimination found in U.S. CONST. amend. V was extended to state action in *Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653. The next logical extension was of course that police officers must advise a suspect of the privilege against self-

---

[7](...continued)
states." *See,* Peter Irons, *A People's History of the Supreme Court* (New York: Penguin Putnam, Inc., Copyright ©1999), 79.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.7898 · FACSIMILE 330.758.8290 · E-MAIL JB.JURISDOCS@AOL.COM

4

incrimination before interrogating the suspect.  *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 Ohio Misc. 9, 36 Ohio Op.2d 237.  And, the Confrontation Clause was applied in a series of cases, the first of which was *Pointer v. Texas* (1965), 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923.

The right to a speedy and public trial found in U.S. CONST. amend. VI was extended to the states in *Klopfer v. North Carolina* (1967), 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1.  The right to a trial by impartial jury under U.S. CONST. amend. VI was extended to the states in *Parker v. Gladden* (1966), 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420.  The right to have compulsory process for obtaining witnesses under U.S. CONST. amend. VI was extended to the states in *Washington v. Texas* (1967), 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019.  The Double Jeopardy clause of the Fifth Amendment was applied to state action in *Benton v. Maryland* (1969), 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707.

It is significant to note that, prior to these decisions, which most of us who were licensed to practice law after 1960 now take for granted, these liberties were *not* held by the highest Court in the land to be part of American Due Process.  *See, e.g., Adamson v. California* (1947), 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903; *Betts v. Brady* (1942), 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595; *Palko v. Connecticut* (1937), 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288; and, *Twining v. New Jersey* (1908), 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97.  The point for present purposes, of course, is that the Constitution must be read in light of evolving standards of decency, human dignity, and

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.7808 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOM@AOL.COM

5

due process.  *See, Trop* v. *Dulles* (1958), 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630.

## IV.

### A.

The Constitution is written in broad, sweeping phrases like due process of law," "equal protection of the laws," "necessary and proper", and "regulate interstate commerce".  For some reason, late twentieth century American courts have chosen, in many circumstances, to read the Constitution in exactly the opposite way from the reading intended by its framers.  Phrases restricting the power of government in favor of the citizen (*e.g.*, due process of law, equal protection, cruel and unusual punishment) have been interpreted in a way to give the government broad powers and to place the burden upon the individual citizen to demonstrate that the government has exceeded those broad powers.  Conversely, the courts have apparently confused a desire on the part of the Framers not to micro-manage with grants of broad, sweeping power.  While it is true that the Constitution gives Congress the power to regulate interstate commerce, without more specificity, nothing about that general phrase was intended to conflict with the notion that the government is one of limited, derived powers.  *See, e.g.,* U.S. CONST. art. I, §1; *Ex parte Quirin* (1942), 317 U.S. 1, 25, 63 S.Ct. 1, 87 L.Ed. 3.  Indeed, the very preamble of the Constitution supports this idea.  The Constitution begins "We, the People."  It is evident that the Constitution is a charter wherein the people grant certain rights to the government—not a charter wherein the government grants certain rights to the people, such

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

6

as the Magna Charta and the English Bill of Rights.  In *Federalist* No. 84, Alexander Hamilton argued against a Bill of Rights which would particularize certain rights.  Hamilton said that it would be "not only unnecessary .   .   .   But would even be dangerous.  They would contain various exceptions to powers which are not granted; and, in this very account, would afford a colorable pretext to claim more than were granted."

The differences might seem esoteric, the kind of distinction without difference that one might see law professors argue about.  The Defendant submits, however, that not only is the distinction not esoteric, but also that an appreciation of the distinction is essential to any proper analysis of and ruling upon any constitutional question, including, obviously, those presented here.  Even if one denies that the federal government is one of limited, derived powers—an incredible argument in light of the clear wording of the Constitution—it is beyond dispute that the government of the State of Ohio is a creature of limited, derived powers.  *See*, OHIO CONST. art. I §1:  "All men are, *by nature*, free and independent, and *have certain inalienable rights*, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."  (Emphasis added.)  OHIO CONST. art. I, §2 provides: "All *political power is inherent in the people.* Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the General Assembly."  (Emphasis added.)

JOHN B. JURASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5616
TELEPHONE 330.758.2298 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

7

These well-established, if sometime ignored, principles require the courts, rather than to approach with a jaundiced eye a claim by a citizen charged with a crime that the government has violated the Constitution by exceeding its derived powers, should instead approach any exercise of governmental power with a jaundiced eye directed toward the government, placing the burden on the government to demonstrate that the proposed exercise of power is one conferred by the Constitution.

B.

The broad, oracle-like phrases of the Constitution have been refined in light of the evolving concepts of justice and human dignity.  The Eighth Amendment's Cruel and Unusual Punishment Clause must satisfy that standard, and even the most adamant defenders of capital punishment must concede the point.  There was no more staunch defender of capital punishment that then- Solicitor General Robert Bork in 1976 when he argued for the United States as *amicus* in favor of the death penalty.  Yet, Bork, when questioned by the late Justice Potter Stewart, acknoeldged the evolving standards prnciple:

> *Stewart:* What if a state said for the most heinous kind of first-degree murders we are going to inflict breaking a man on the wheel and then disemboweling him while he is still alive and then burning him up:  What would you say to that?

> *Bork:* I would say that that practice is so out of step with modern morality and modern jurisprudence that the state cannot return to it.  That kind of torture was precisely what the framers thought they were outlawing when they wrote the cruel and unusual punishments clause.

*See,* Peter H. Irons and Stephanie Guitton, ed., *May It Please the Court* (New York: The New Press, Copyright © 1993), 234.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

8

Perhaps no saying more precisely and eloquently captures the essence of the refinement of judicial constitutional thinking over time than a saying by Thomas Jefferson.  Jefferson asserted that it was not necessary to frequently rewrite laws or constitutions.  Rather, within existing public institutions, it was not only possible but appropriate to act in a more enlightened way as man becomes more enlightened.  Jefferson wrote: "I am not an advocate for frequent changes in laws and constitutions.  But laws and institutions must go hand in hand with the progress of the human mind.  As that becomes more developed, more enlightened, as new discoveries are made, new truths discovered and manners and opinions change, with the change of circumstances, institutions must advance also to keep pace with the times.  We might as well require a man to wear still the coat which fitted him when a boy as civilized society to remain ever under the regimen of their barbarous ancestors."  As man's knowledge of executions has grown to realize the pain and suffering that any execution causes, even lethal injection, the Constitution requires us to abandon execution as a manifestation of "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles, ante.*

### C.

The meaning of Due Process as a principle of American justice has also evolved over time.  The guiding principle of constitutional law always should be that expressed by Justice Bradley when writing for the court in *Boyd v. United States* (1886), 116 U.S. 616, 636, 6 S.Ct. 524, 29 L.Ed. 746: "[C]onstitutional provisions for the security of person and property should be

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

9

liberally construed . . . . It is *the duty of courts* to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." (Emphasis added.)

There was a time, not so long ago, when a majority of the United States Supreme Court held that the Sixth Amendment's explicit right to the assistance of counsel in criminal cases was not part of the fundamental due process to which every citizen was entitled. In *Betts v. Brady* (1942), 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595, the Court held that the guarantee of counsel in U.S. CONST. amend. VI did not apply to the state criminal trial in Maryland of petitioner Smith Betts. The Court has held in a collection of cases that, whatever else Due Process means, it means a fair trial in a fair tribunal with a fair opportunity to present a defense.[8] Yet, only sixty years ago, the Court held that the assistance of counsel was *not* a component of a fair trial such as to incorporate the provisions of U.S. CONST. amend. VI through the Due Process Clause of U.S. Const. amend. XIV and apply that provision of the Bill of Rights to state criminal prosecutions.

---

[8] *See, Chambers* v. *Mississippi* (1973), 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297:
    The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process. Mr. Justice Black, writing for the Court in *In re Oliver*, 333 U.S. 257, 273 (1948), identified these rights as among the minimum essentials of a fair trial:
    "A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel."
*See, also, In re Murchison* (1955), 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942: "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. . . . But to perform its high function in the best way 'justice must satisfy the appearance of justice.' *Offutt v. United States*, 348 U.S. 11, 14."

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

10

Beyond dispute today, it was fortunate that the Court reversed that course of action in the famous 1963 case *Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799. Clarence Earl Gideon was tried and convicted in Florida for breaking into a poolroom. Gideon was tried without counsel when he specifically asked for counsel. The Supreme Court granted certiorari based upon Gideon's *pro se* petition. The Court specifically asked the parties to brief whether *Betts v. Brady, ante*, should be overruled.[9] As we know, the Court in *Gideon v. Wainwright* did reverse the holding of *Betts v. Brady*, and held that a trial could not be fair—could not be held in accordance with the Due Process Clause—unless the defendant had a lawyer.[10]

The Court adopted over a number of years the rather inexplicable selective incorporation theory. The general parameters of the theory were recounted above. This logically indefensible position was eschewed by some of the justices, notably the late Justices Hugo L. Black and William O. Douglas. The selective incorporation theory is logically indefensible because

---

[9] There are several interesting twists to *Gideon v. Wainwright*. Clarence Earl Gideon wrote his own certiorari petition from his Florida prison cell. When the Supreme Court granted certiorari, it appointed Gideon a lawyer. As an aside, it appointed no ordinary lawyer. The Court appointed Abe Fortas, who himself would be appointed to the Supreme Court within a couple of years. Call it irony, oxymoron, or paradox: the Court appointed a lawyer to represent a *pro se* defendant in a case where the issue would be to decide whether as a matter of due process, the appointment of counsel would be required in all serious cases. Had the Court not overruled *Betts v. Brady*, its own conduct would send the message that cases before the Court were important enough to require counsel, but a case where a man could go to jail for 20 years was not important enough to require the appointment of counsel.

Another interesting note, is that, according to Assistant Attorney General Bruce Jacob, who argued for Florida, judges in Florida who did not appoint counsel in felony cases always did so in capital cases. Thus, death has always been different from any other form of punishment, something that certainly needs to be considered in light of the arguments asserted in this Motion.

[10] As we also know, the Court later held that the appointment of counsel was required not only for felony cases, but for misdemeanor cases where the defendant faced the possibility of jail. See *Argersinger v. Hamlin, ante*.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@AOL.COM

11

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 613

it required the Court to individually examine rights set forth in the Bill of Rights, admittedly applicable to the federal government, and determine whether those rights were so fundamental as to be part and parcel of due process of law.[11]

There can be no question that both the due process and equal protection clauses have been read as Thomas Jefferson suggested: as an implementation of the more enlightened mind of mankind as it becomes more enlightened.  If that were not the case, then the *Dred Scott* decision, holding that black slaves are not people, would still be the law.  *Dred Scott v. Sandford* (1856), 60 U. S. 393, 19 How. 393, 15 L.Ed. 691.  So, too, *Plessy v. Ferguson* (1896), 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, holding that separate but equal facilities would not have been overruled by *Brown v. Board of Education of Topeka, Kansas* (1954), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 ALR2d 1180.

V.

---

[11]  The Defendant submits that the selective incorporation theory, like many twentieth century court decisions, with all due respect, simply ignore the history of the formation of this Republic and the history of the formation of the government.  It is well to remember that some advocates of the new government, notably Alexander Hamilton and James Madison, did not believe that a bill of rights was even required, because there was no need to specify that the government could not interfere with certain liberties when the government had not been delegated the power to do so.  It was the anti-federalists who had enough influence to insist upon the compromise: the Constitution would be ratified provided that a Bill of Rights would be appended.

For purposes of the present discussion, it seems elementary to note that the rights enumerated in the Bill of Rights were deemed so basic and fundamental that, no matter what else the new government might do, no matter what power the new government might exercise, it could never encroach upon these basic and fundamental rights.  How curious it is, then, that the United States Supreme Court in the mid-Twentieth Century would have any question that these basic and fundamental rights were part and parcel of the concept of due process.

The selective incorporation theory was usually defended on the grounds of federalism.  Federalism is important, to be sure.  But can encroachment on a fundamental right by a state government be defended on the theory of federalism?  The Defendant submits not.

Under Ohio law, the death sentence was by means of electrocution; or, if requested in a timely manner by the prisoner, lethal injection. OHIO REV. CODE ANN. §2949.22.[12] U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §9 and 16 bar the imposition of penalties which are grossly disproportionate to the crime; or, are excessive because they do not make a measurable contribution to an acceptable punishment goal; or, are "nothing more than the purposeful and needless imposition of pain and suffering". *Coker* v. *Georgia* (1977), 433 U.S. 584, 592 *Coker v. Georgia* (1977), 433 U.S.

---

[12]OHIO REV. CODE ANN. §2949.22 as amended on November 21, 2001, acknowledges the evolving standards argument *sub silentio*. It provides:

(A) Except as provided in division (C) of this section, a death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death. The application of the drug or combination of drugs shall be continued until the person is dead. The warden of the correctional institution in which the sentence is to be executed or another person selected by the director of rehabilitation and correction shall ensure that the death sentence is executed.

(B) A death sentence shall be executed within the walls of the state correctional institution designated by the director of rehabilitation and correction as the location for executions, within an enclosure to be prepared for that purpose, under the direction of the warden of the institution or, in the warden's absence, a deputy warden, and on the day designated by the judge passing sentence or otherwise designated by a court in the course of any appellate or postconviction proceedings. The enclosure shall exclude public view.

(C) If a person is sentenced to death, and if the execution of a death sentence by lethal injection has been determined to be unconstitutional, the death sentence shall be executed by using any different manner of execution prescribed by law subsequent to the effective date of this amendment instead of by causing the application to the person of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death, provided that the subsequently prescribed different manner of execution has not been determined to be unconstitutional. The use of the subsequently prescribed different manner of execution shall be continued until the person is dead. The warden of the state correctional institution in which the sentence is to be executed or another person selected by the director of rehabilitation and correction shall ensure that the sentence of death is executed.

(D) No change in the law made by the amendment to this section that took effect on October 1, 1993, or by this amendment constitutes a declaration by or belief of the general assembly that execution of a death sentence by electrocution is a cruel and unusual punishment proscribed by the Ohio Constitution or the United States Constitution.

HISTORY: GC §13456-2; 113 v 123(208), ch 35, §2; Bureau of Code Revision, 10-1-53; 144 v S 359 (Eff 12-22-92); 145 v H 11 (Eff 10-1-93); 145 v H 571 (Eff 10-6-94); 149 v H 362. Eff 11-21-2001.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

13

584, 97 S.Ct. 2861, 53 L.Ed.2d 982;[13] *Solem* v. *Helm* (1983), 463 U.S. 277, 288.

In *Louisiana ex rel. Francis* v. *Resweber* (1947), 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422, four Justices interpreted the Cruel and Unusual Punishment Clause to prohibit the "infliction of unnecessary pain," 329 U.S., at 463.  Botched executions have shown that unnecessary pain results from the use of electrocution.  In barring executions by cyanide gas, the United States Court of Appeals for the Ninth Circuit looked to the severity of pain, the possibility of the execution process lasting several minutes, and the unnecessary cruelty presented by this method of punishment. *See, Fierro* v. *Gomez* (9th Cir. 1996), 77 F.3d 301.

## VI.

### A.

Punishment by electrocution was upheld over a hundred years ago in *In Re Kemmler, ante.* Kemmler's execution, the first electric chair execution in the United States, was botched.  However, the United States Supreme Court refused to decide Kemmler's claim that the use of electrocution to inflict death was cruel and unusual punishment under the Eighth Amendment.  *Kemmler* held that U.S. CONST. amend. VIII did not apply to the states.  The Court therefore refused to review the premise of the state legislature of New York that electrocution produced "instantaneous, and,

---

[13] At 592, the Court noted that it "firmly embraced" the holdings of earlier cases "to the effect that the Eighth Amendment bars not only those punishments that are 'barbaric' but also those that are 'excessive' in relation to the crime committed."  The Court went on to say that "a punishment is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime.  A punishment might fail the test on either ground."

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.7508 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

14

therefore, painless death." The Court later held that U.S. CONST. amend. VIII applies to the states. *Robinson* v. *California, ante.* Although *Kemmler* was decided before *Robinson,* courts have continued to rely on *Kemmler* to justify electrocution as a permissible form of capital punishment under U.S. CONST. amend. VIII. Therefore, electrocution has never been scrutinized under modern Eighth Amendment standards, and this Court must now do so.[14] Moreover, there is a substantial body of evidence that death by electrocution and lethal injection inflicts "unnecessary pain," "physical violence," and "mutilation," rather than the "mere extinguishment of life" referred to in *Kemmler.*[15]

B.

Aside from the applicability of U.S. CONST. amend. VIII to the states, Ohio has its own constitutional provision. OHIO CONST. art. I, §9 provides:

> All persons shall be bailable by sufficient sureties, except for capital offences where the proof is evident, or the presumption great. Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted.

*Kemmler* failed to decide whether electrocution was cruel and unusual punishment. The Court subsequently held that U.S. CONST. amend. VIII applies to the states. Yet, courts have continued to rely on *Kemmler* for the

---

[14] With all due respect, this Court cannot leap over or around the issue under a claim, oft made by both trial courts and lawyers for the government, that this Court is not empowered to decide such a constitutional question—that a "higher court" must decide such issues. This Court stands to enforce the Defendant's constitutional liberties, whether related to the death penalty or not. *See, e.g., State* v. *Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342, where the Ohio Supreme Court spoke clearly and eloquently of the duty of trial courts to enforce the constitutional liberties of a criminal defendant.

[15] Most of the botched executions since 1979 are detailed in the Appendix. *See, also,* Deborah Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death Over the Century,* 35 WM. & MARY L.REV. 551, 664 (1994).

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

15

proposition that a wide range of capital punishments, including electrocution and lethal injection, are permissible.  Electrocution never has been analyzed under modern Eighth Amendment standards, and no court has analyzed whether the infliction of "unnecessary pain," in lethal injection cases, rather than the "mere extinguishment of life" referred to in *Kemmler*, violates OHIO CONST. art. I, §9.

U.S. CONST. amend. VIII and OHIO CONST. art. I, §9 respond to the "evolving standards of decency which mark the progress of a maturing society."  *See, Trop* v. *Dulles* (1958), 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630.  The constitutionality of electrocution has been questioned by a number of recent and sitting justices of the United States Supreme Court, at least to the extent that they have said that the constitutional questions raised by electrocution should be addressed.[16]  Most states, including Ohio, have switched to lethal injection to avoid the unwanted ruling that electrocution violates the Constitution.  *See, generally*, Denno, *ante*, at 664; Gardner, *Executions and Indignities—An Eighth Amendment Assessment of Methods of Inflicting Capital Punishment*, 39 OHIO ST. L.J. 96, 125-127 (1978), and Weisberg, "This is Your Death", *The New Republic*, July 1, 1991.

---

[16] *Clisby* v. *Alabama* (1995), 514 U.S. 1093, 115 S.Ct. 1818, 131 L.Ed.2d 741, 63 USLW 3786.  An application for a stay, presented to KENNEDY, J. and referred by him to the Court was denied, as was a petition for certiorari. STEVENS, GINSBURG, and BREYER, J.J., would have granted the stay.  *See, also, Poyner* v. *Murray* (1993), 508 U.S. 931, 113 S.Ct. 2397, 124 L.Ed.2d 299, 61 USLW 3770 (SOUTER, BLACKMUN, and STEVENS, respecting denial of certiorari).  At 933, the opinion said:

> The Court has not spoken squarely on the underlying issue since *In re Kemmler*, 136 U.S. 436 (1890), and the holding of that case does not constitute a dispositive response to litigation of the issue [Virginia's use of electrocution as a method of executing people sentenced to death] in light of modern knowledge about the method of execution in question.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2508 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

16

Lethal injection is cruel and offends human dignity because it may inflict pain, causes undue psychological suffering, and is violent. Compared with electrocution, where a prisoner may be alive for several minutes after the current has passed through his body, lethal injection is the same without the electricity.

Past incidents of botched executions, *see* Appendix, demonstrate the level of pain and cruelty can be heightened by a practice of death by installments as has occurred with electrocution and lethal injections. *See,* Glass and Fernandez, "Execution Foul-ups Common", *San Francisco Examiner*, April 22, 1992. Malfunctioning equipment caused flames and smoke to come out of the head of Jesse Tafero on May 4, 1990. Ritchie, "Flames, Smoke Mar Execution of Murderer," *Florida Times-Union*, May 5, 1990, at 1; Denno, at 664-670; Weisberg; and Fernandez. The execution of Jesse Tafero in Florida is described as follows:

> On May 4, 1990 Jesse Tafero was strapped into Old Sparky fourteen years after he had murdered two police officers. In all previous procedures, the prison staff had packed a sea sponge into the headpiece, but over time the sponge had rotted. The electrician had gone to the supermarket and bought a new, synthetic sponge. When the switch was thrown, the sponge caught fire. Flames leapt from Tafero's head. At the end of the first jolt, he was still breathing; his head nodded after the second dose; only after the third cycle of current was the killer pronounced dead.[17]

Looking at some of the botched lethal injections, things have not gotten much better, only different.

Public opinion, which plays a significant role in determinations of whether a punishment is cruel and unusual, led the Ohio legislature to add

---

[17] *See,* David Von Drehle, *Among the Lowest of the Dead* (New York: Fawcett Crest, 1995), 380.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZDOC@AOL.COM

17

lethal injection as an alternate means of punishment in 1994.  While disclaiming that such action constituted a belief that punishment by electrocution is cruel and unusual, the Ohio legislature was responding to public opinion in this state questioning this penalty.  Now, electrocution has been jettisoned altogether.  It is not enough that the General Assembly says that electrocution or any other form of execution is not cruel and unusual, and this Court may not overrule this motion on that basis.  U.S. CONST. amend. VIII stands as a bar between the citizenry and such overreaching on the part of the legislature.[18]

The General Assembly, just seven years after adding lethal injection as an alternative method of execution, has established lethal injection as the method of execution, and has scrapped electrocution.  *See,* OHIO REV. CODE ANN. §2949.22, *ante.*  This statute is a legislative whistle in the dark, combined with an exasperated cry of "just find a way to kill them that will satisfy the courts."  The disclaimer in division (D) has no constitutional effect, and any claim to the contrary ignores the fundamental principle of separation of powers.

The modern trend to move away from electrocution demonstrates that, under evolving standards of decency and humanity, electrocution is cruel and unusual punishment.  State legislatures around the nation—and, indeed,

---

[18] *See, Glass* v. *Louisiana* (1985), 472 U.S. 1080, 1083,105 S.Ct. 3516, 87 L.Ed..2d 645, 53 USLW 3895 (BRENNAN, J. dissenting):
> To be sure, legislative decisions concerning appropriate forms of punishment are entitled to considerable deference.  But in common with all constitutional guarantees, "it is evident that legislative judgments alone cannot be determinative of Eighth Amendment standards since that Amendment was intended to safeguard individuals from the abuse of legislative power." *Gregg* v. *Georgia, supra,* 428 U.S., at 174, n. 19 (opinion of STEWART, POWELL, and STEVENS, JJ.) * * * .

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

18

around the world—are moving away from death by electrocution in favor of a more "humane" and purportedly less painful means of execution.  In 1979, twenty states mandated death by electrocution.[19]  Today, only Nebraska requires execution by electrocution.  Statutory disclaimers notwithstanding, electrocution is inhumane and inconsistent with standards of human decency.

Under all of the foregoing principles, the State of Ohio should be barred from carrying out an execution by means of electrocution, even if lethal injection is later held invalid and the State attempts to return to electrocution.

## VII.

As noted above, Ohio law now requires death by lethal injection. While originally thought to be preferable to electrocution, lethal injection also results in the imposition of cruel and unusual punishment.  *See, Appendix, Botched Executions.*  The claims of Florida State Senator Ginny Brown-Waite after the July 8, 1999 botched execution of Allen Lee Davis notwithstanding, there is no compelling evidence that God supports executions.[20]

---

[19] "State by State, The Death Penalty", *National Law Journal*, July 9, 1979.

[20] *See, Appendix*, Botched Executions, *post*, at No. 31.  The Senator said at first that she "shocked" to see the blood forming on Davis' chest during the execution.  Then she realized that the blood was forming the shape of a cross, in her opinion a message from God saying He supported Davis' execution. Later, Florida Supreme Court Justice Leander Shaw said that Davis was "brutally tortured to death by the citizens of Florida." Justice Shaw also described the botched executions of Davis, Jesse Tafero, and Pedro Medina, *see Appendix, post*, as "acts more befitting a violent murderer than a civilized state."

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · e-mail: Jbjurispoc@aol.com

19

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 621

Ohio law requires that the injection "quickly and painlessly cause death."[21] But there is no assurance that physical pain will be avoided. While it is intended that the only physical pain is the pain of the initial prick of a needle, that assumes the killing is done correctly. "Since doctors are precluded by medical ethics from participating in executions except to pronounce death, the injections are often performed by incompetent or inexperienced technicians". Weisberg, *ante*. If the drugs are—inadvertently or malevolently—injected into muscle instead of a vein, or if the needle becomes clogged, extreme pain can result.[22] Pain is pain and suffering is suffering, regardless of how administered or by whom. Pain and suffering do not lose their character as such because inflicted by the government as punishment for a crime that almost certainly caused pain and suffering.

Lethal injections have not been the panacea to cruel and unusual claims that governments had hoped. In 1984, James Autry was executed in Texas by means of such an injection. Autry "took at least ten minutes to die and throughout much of that time was conscious, moving about, and complaining of pain." Weisberg, *ante*, quoting a *Newsweek* account from witnesses. If a prisoner's veins are damaged due to drug use or other reasons or are simply hard to find, such as in the case of Stephen Morin in Texas, the inmate may be prodded repeatedly (41 minutes in that case) until the drugs can be administered. As suggested by Weisberg:

---

[21] *See,* OHIO REV. CODE ANN. §2949.22(B)(1).

[22] *Id.; see, also,* Royal Commission on Capital Punishment, 1949-1953 Report, CMD. No. 8932, at 258-260.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURIS.DOC@AOL.COM

20

> Being strapped to a table for a lengthy period while waiting to die is a form of psychological torture arguably worse than most physical kinds. This is demonstrated by the fact that mock executions, which cause no physical pain, are a common method of torture around the world. The agony comes not from the prospect of pain, but from the expectation of death.

*See, Appendix*, Botched Executions.

The inhumanity and pain brought out by such problems have prompted officials to draw the curtains to prevent witness observation in one case; in another, a witness fainted due to the violent physical reaction of the inmate to the drugs. *Fernandez, ante.* While perhaps intended to diminish pain, lethal injection also inflicts cruel and unusual punishment. As electrocution has been barred in Ohio, so too lethal injection must be barred.[23]

## VIII.

Numerous international conventions and treaties envisage worldwide abolition of the death penalty. Article 6 of the International Covenant on Civil and Political Rights [ICCPR], and Article 3 of the Universal Declaration of Human Rights. Clearly, the evolving standards of human dignity and Due

---

[23] If the government insists upon the death of one of its citizens, humanitarian considerations and the Constitution suggest a less cruel alternative of permitting the condemned the option of taking his own life by means of oral sedative. If the inmate failed to exercise the suicide option, then lethal injection may be administered. Such a suicide option is not unknown historically nor without its more contemporary advocates. Gardner, at 146-147, n. 110-111 [referencing Socrates' own action, as well as Plato and Camus]. As Gardner suggests, once an execution date were deemed final, for a brief specified period after that date the inmate would be provided with the means to take his life if he chose. He would be told the lethal dosage of an oral sedative, and it would be placed at his disposal. Death by self-induced drug overdose would be virtually painless, without many of the other human and economic costs, and would be more humane.

It seems incredible to think of the discussions, as we approach the twenty first century, of the most humane way to kill our fellow man. We punish people for committing aggravated murder, purposely and with prior calculation and design causing the death of another. *See,* OHIO REV. CODE ANN. §2903.01(A). Yet, scheduling and carrying out an execution, the government is, by prior calculation and design, causing the death of another. Does the fact that the government–as opposed to one of its citizens–is killing another person change the character of the killing? The Defendant says no, and asserts that U.S. CONST. amend. VII and XIV and OHIO CONST. art. I, §9, taken in context of modern thought and morality, supports that assertion.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHASZ@AOL.COM

21

Process of Law require a holding that the death penalty is unconstitutional. The United States is the only major industrialized, "civilized" country which still executes its citizens as punishment for a crime.

IX.

The evolving standards of decency which mark a maturing society have led us away from whipping, the pillory, ear cutting and nose notching. We have "progressed" through hanging, the firing squad, and the gas chamber. States have now almost universally jettisoned the electric chair in favor of lethal injection. Still, because lethal injection cannot guarantee that it will hurdle the "pain and suffering" barriers erected by the Eighth Amendment (and by the Ohio Constitution), lethal injection, too, violates those provisions. Aside from those provisions, we pride ourselves in this country for the principle of Due Process of Law. Due Process sets American justice apart from every other justice system in the world. One cannot say that the process of imposing punishment is "due" when it is so outmoded that only the most uncivilized of countries in the world employ it. For these reasons, as well as the myriad of reasons set forth in the Defendant's constitutional motion to dismiss, the death specifications must be dismissed.

J. GERALD INGRAM

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

22

# APPENDIX

## Table 1 - Methods of Execution

| Method | States | Notes |
|---|---|---|
| Lethal Injection | Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, Wyoming, U.S. Military, U.S. Government | |
| Electro-cution | Alabama, Arkansas, Florida, [Illinois],[†] Kentucky, Nebraska, [Oklahoma], South Carolina, Tennessee, Virginia | (Nebraska is the only state that requires electrocution) |
| Gas Chamber | Arizona, California, Maryland, Missouri, [Wyoming] | (all have lethal injection as an alternative |
| Hanging | Delaware, New Hampshire, Washington | (all have lethal injection as an alternative  method) |
| Firing Squad | Idaho, [Oklahoma], Utah | (all have lethal injection as an alternative |

**Application Notes for Table 1**: Alabama: Effective 7/1/02, lethal injection will be administered unless the inmate requests electrocution. Arizona: Authorizes lethal injection for persons sentenced after 11/15/92; those sentenced before that date may select lethal injection or lethal gas. Arkansas: Authorizes lethal injection for persons committing a capital offense after 7/4/83; those who committed the offense before that date may select lethal injection or electrocution. California: Provides that lethal injection be administered unless the inmate requests lethal gas. Colorado: Lethal injection is the sole method.  Connecticut: Lethal injection is the sole method. Delaware: Authorizes lethal injection for those whose capital offense occurred after 6/13/86; those who committed the offense before that date may select lethal injection or hanging. Florida: Allows prisoners to choose between lethal injection and electrocution. Georgia: Lethal injection is the sole method. (On October 5, 2001, the Georgia Supreme Court held that the electric chair was cruel and unusual punishment and struck down the state's use of the method). Idaho: Authorizes firing squad only if lethal injection is "impractical". Illinois: Lethal injection is the state's method.  However, it authorizes electrocution if lethal injection is ever held to be unconstitutional. Indiana: Lethal injection is

---

[†] States in [brackets] authorize the method only if a current method is found unconstitutional.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

a

the sole method.  Kansas: Lethal injection is the sole method.  Kentucky: Authorizes lethal injection for those convicted after March 31, 1998; those who committed the offense before that date may select lethal injection or electrocution. Louisiana: Lethal injection is the sole method. Maryland: Authorizes lethal injection for those whose capital offenses occurred on or after 3/25/94; those who committed the offense before that date may select lethal injection or lethal gas. Mississippi: Lethal injection is the sole method. Missouri: Authorizes lethal injection or lethal gas; the statute leaves unclear who decides what method to use, the inmate or the Director of the Missouri Department of Corrections. Montana: Lethal injection is the sole method.  Nebraska: Electrocution is the sole method. Nevada: Lethal injection is the sole method. New Hampshire: Authorizes hanging only if lethal injection cannot be given.  New Jersey: Lethal injection is the sole method.  New Mexico: Lethal injection is the sole method. New York: Lethal injection is the sole method.  North Carolina: Lethal injection is the sole method.  Ohio: Lethal injection is the sole method.  Oklahoma:  Authorizes electrocution if lethal injection is ever held to be unconstitutional and firing squad if both lethal injection and electrocution are held unconstitutional.  Oregon:  Lethal injection is the sole method. Pennsylvania: Lethal injection is the sole method.  South Carolina: Allows prisoners to choose between lethal injection and electrocution.  South Dakota: Lethal injection is the sole method. Tennessee: Authorizes lethal injection for those sentenced after Jan. 1, 1999; others choose between the electric chair and lethal injection.  Texas: Lethal injection is the sole method. Utah: Allows prisoners to choose between lethal injection and firing squad. Virginia: Allows prisoners to choose between lethal injection and electrocution.  Washington: Provides that lethal injection be administered unless the inmate requests hanging.  Wyoming: Authorizes lethal gas if lethal injection is ever held to be unconstitutional.  U.S. Military: Lethal injection is the sole method. U.S. Government: The method of execution of Federal prisoners for offenses under the Violent Crime Control and Law Enforcement Act of 1994 is that of the state in which the conviction took place, pursuant to 18 USC 3596. If the state has no death penalty, the judge may chose the method of another state.  For offenses under the 1988 Drug Kingpin Law, the method of executions is lethal injection, pursuant to 28 CFR, Part 26.

(Source: Bureau of Justice Statistics, Capital Punishment 1996 Bulletin, Table 2 (Dec. 1997); updated by Death Penalty Information Center.

---

Botched Executions
Botched Post-*Furman* Executions
complied by Michael L. Radelet, University of Florida
<www.deathpenaltyinfo.org/botched.html>

*1. August 10, 1982. Virginia. Frank J. Coppola. Electrocution.* Although no media representatives witnessed the execution and no details were ever released by the Virginia Department of Corrections, an attorney who was present later stated that it took two 55-second jolts of electricity to kill Coppola. The second jolt produced the odor and sizzling sound of burning flesh, and Coppola's head and leg caught on fire.  Smoke filled the death chamber from floor to ceiling with a smoky haze.

*2. April 22, 1983. Alabama. John Evans. Electrocution.* After the first jolt of electricity, sparks and flames erupted from the electrode attached to Evans's leg.  The electrode burst from the strap holding it in place and caught on fire.  Smoke and sparks also came out from under the hood in the vicinity of Evans's left temple.  Two physicians entered the chamber and found a heartbeat.  The electrode was reattached to his leg, and another jolt

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

b

of electricity was applied.  This resulted in more smoke and burning flesh. Again the doctors found a heartbeat.  Ignoring the pleas of Evans's lawyer, a third jolt of electricity was applied.  The execution took 14 minutes and left Evans's body charred and smoldering.

3. *Sept. 2, 1983.  Mississippi.  Jimmy Lee Gray.  Asphyxiation.* Officials had to clear the room eight minutes after the gas was released when Gray's desperate gasps for air repulsed witnesses.  His attorney, Dennis Balske of Montgomery, Alabama, criticized state officials for clearing the room when the inmate was still alive.  Said noted death penalty defense attorney David Bruck, "Jimmy Lee Gray died banging his head against a steel pole in the gas chamber while the reporters counted his moans (eleven, according to the Associated Press)."  Later it was revealed that the executioner, Barry Bruce, was drunk.

4. *December 12, 1984.  Georgia. Alpha Otis Stephens.  Electrocution.* "The first charge of electricity ... failed to kill him, and he struggled to breathe for eight minutes before a second charge carried out his death sentence ..."  After the first two minute power surge, there was a six minute pause so his body could cool before physicians could examine him (and declare that another jolt was needed).  During that six-minute interval, Stephens took 23 breaths.  A Georgia prison official said, "Stephens was just not a conductor" of electricity.

5. *March 13, 1985.  Texas.  Stephen Peter Morin.  Lethal Injection.* Because of Morin's history of drug abuse, the execution technicians were forced to probe both of Morin's arms and one of his legs with needles for nearly 45 minutes before they found a suitable vein.

6. *October 16, 1985.  Indiana.  William E. Vandiver.  Electrocution.* After the first administration of 2,300 volts, Vandiver was still breathing.  The execution eventually took 17 minutes and five jolts of electricity. Vandiver's attorney, Herbert Shaps, witnessed the execution and observed smoke and the smell of burning.  He called the execution "outrageous."  The Department of Corrections admitted the execution "did not go according to plan."

7. *August 20, 1986.  Texas.  Randy Woolls.  Lethal Injection.*  A drug addict, Woolls helped the execution technicians find a useable vein for the execution.

8. *June 24, 1987.  Texas.  Elliot Rod Johnson.  Lethal Injection.* Because of collapsed veins, it took nearly an hour to complete the execution.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JB.JURISDOC@AOL.COM

c

9. *December 13, 1988.  Texas.  Raymond Landry.  Lethal Injection.* Pronounced  dead 40 minutes after being strapped to the execution gurney and 24 minutes  after the drugs first started flowing into his arms.  Two minutes after the  drugs were administered, the syringe came out of Landry's vein, spraying the  deadly chemicals across the room toward witnesses.  The curtain separating the  witnesses from the inmate was then pulled, and not reopened for fourteen minutes  while the execution team reinserted the catheter into the vein.  Witnesses  reported "at least one groan."  A spokesman for the Texas Department of  Correction, Charles Brown (sic), said, "There was something of a delay in the  execution because of what officials called a 'blowout.'  The syringe came out of  the vein, and the warden ordered the (execution) team to reinsert the catheter  into the vein."

10. *May 24, 1989.  Texas.  Stephen McCoy.  Lethal Injection.*  He had such  a  violent physical reaction to the drugs (heaving chest, gasping, choking, back  arching off the gurney, etc.) that one of the witnesses (male) fainted, crashing  into and knocking over another witness.  Houston attorney Karen Zellars, who  represented McCoy and witnessed the execution, thought the fainting would  catalyze a chain reaction.  The Texas Attorney General admitted the inmate  "seemed to have a somewhat stronger reaction," adding "The drugs might have been  administered in a heavier dose or more rapidly."

11. *July 14, 1989.  Alabama.  Horace Franklin Dunkins, Jr. Electrocution.*  It took two jolts of electricity, nine minutes apart, to complete the execution.  After the first jolt failed to kill the prisoner (who was mildly retarded), the  captain of the prison guard opened the door to the witness room and stated "I  believe we've got the jacks on wrong."  Because the cables had been connected  improperly, it was impossible to dispense sufficient current to cause death.  The  cables were reconnected before a second jolt was administered.  Death was  pronounced 19 minutes after the first electric charge.  At a post-execution news  conference, Alabama Prison Commissioner Morris Thigpen said, "I regret very very  much what happened.  [The cause] was human error."

12. *May 4, 1990.  Florida.  Jesse Joseph Tafero.  Electrocution.*  During the  execution, six-inch flames erupted from Tafero's head, and three jolts of power  were required to stop his breathing.  State officials claimed that the botched  execution was caused by "inadvertent human error" -- the inappropriate  substitution of a synthetic sponge for a natural sponge that had been used in  previous executions.  They attempted to support this theory by sticking a part  of a synthetic sponge into a "common household toaster" and observing that it  smoldered and caught fire.18

13. *September 12, 1990.  Illinois.  Charles Walker.  Lethal Injection.* Because of equipment failure and human error, Walker suffered excruciating

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

d

pain during his execution. According to Gary Sutterfield, an engineer from the Missouri State Prison who was retained by the State of Illinois to assist with Walker's execution, a kink in the plastic tubing going into Walker's arm stopped the deadly chemicals from reaching Walker. In addition, the intravenous needle was inserted pointing at Walker's fingers instead of his heart, prolonging the execution.

14. *October 17, 1990. Virginia. Wilbert Lee Evans. Electrocution.* When Evans was hit with the first burst of electricity, blood spewed from the right side of the mask on Evans's face, drenching Evans's shirt with blood and causing a sizzling sound as blood dripped from his lips. Evans continued to moan before a second jolt of electricity was applied. The autopsy concluded that Evans suffered a bloody nose after the voltage surge elevated his high blood pressure.

15. *August 22, 1991. Virginia. Derick Lynn Peterson. Electrocution.* After the first cycle of electricity was applied, and again four minutes later, prison physician David Barnes inspected Peterson's neck and checked him with a stethoscope, announcing each time "He has not expired." Seven and one-half minutes after the first attempt to kill the inmate, a second cycle of electricity was applied. Prison officials later announced that in the future they would routinely administer two cycles before checking for a heartbeat.

16. *January 24, 1992. Arkansas. Rickey Ray Rector. Lethal Injection.* It took medical staff more than 50 minutes to find a suitable vein in Rector's arm. Witnesses were kept behind a drawn curtain and not permitted to view this scene, but reported hearing Rector's eight loud moans throughout the process. During the ordeal Rector (who suffered from serious brain damage) helped the medical personnel find a vein. The administrator of State's Department of Corrections medical programs said (paraphrased by a newspaper reporter) "the moans did come as a team of two medical people that had grown to five worked on both sides of his body to find a vein." The administrator said "That may have contributed to his occasional outbursts." The difficulty in finding a suitable vein was later attributed to Rector's bulk and his regular use of antipsychotic medication.2

17. *April 6, 1992. Arizona. Donald Eugene Harding. Asphyxiation.* Death was not pronounced until 10 1/2 minutes after the cyanide tablets were dropped. During the execution, Harding thrashed and struggled violently against the restraining straps. A television journalist who witnessed the execution, Cameron Harper, said that Harding's spasms and jerks lasted 6 minutes and 37 seconds. "Obviously, this man was suffering. This was a violent death .. . an ugly event. We put animals to death more humanely." Another witness, newspaper reporter Carla McClain, said, "Harding's death was extremely violent. He was in great pain. I heard him

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHASZ@AOL.COM

e

gasp and moan. I saw his body turn from red to purple." One reporter who witnessed the execution suffered from insomnia and assorted illnesses for several weeks; two others were "walking vegetables" for several days.

18. *March 10, 1992. Oklahoma. Robyn Lee Parks. Lethal Injection.* Parks had a violent reaction to the drugs used in the lethal injection. Two minutes after the drugs were dispensed, the muscles in his jaw, neck, and abdomen began to react spasmodically for approximately 45 seconds. Parks continued to gasp and violently gag until death came, some eleven minutes after the drugs were first administered. Tulsa World reporter Wayne Greene wrote that the execution looked "painful and ugly," and "scary." "It was overwhelming, stunning, disturbing -- an intrusion into a moment so personal that reporters, taught for years that intrusion is their business, had trouble looking each other in the eyes after it was over."

19. *April 23, 1992. Texas. Billy Wayne White. Lethal Injection.* White was pronounced dead some 47 minutes after being strapped to the execution gurney. The delay was caused by difficulty finding a vein; White had a long history of heroin abuse. During the execution, White attempted to assist the authorities in finding a suitable vein.

20. *May 7, 1992. Texas. Justin Lee May. Lethal Injection.* May had an unusually violent reaction to the lethal drugs. According to one reporter who witnessed the execution, May "gasped, coughed and reared against his heavy leather restraints, coughing once again before his body froze ..." Associated Press reporter Michael Graczyk wrote, "Compared to other recent executions in Texas, May's reaction was more violent. He went into a coughing spasm, groaned and gasped, lifted his head from the death chamber gurney and would have arched his back if he had not been belted down. After he stopped breathing, his eyes and mouth remained open."

21. *May 10, 1994. Illinois. John Wayne Gacy. Lethal Injection.* After the execution began, the lethal chemicals unexpectedly solidified, clogging the IV tube that lead into Gacy's arm, and prohibiting any further passage. Blinds covering the window through which witnesses observed the execution were drawn, and the execution team replaced the clogged tube with a new one. Ten minutes later, the blinds were then reopened and the execution process resumed. It took 18 minutes to complete. Anesthesiologists blamed the problem on the inexperience of prison officials who were conducting the execution, saying that proper procedures taught in "IV 101" would have prevented the error.

22. *May 3, 1995. Missouri. Emmitt Foster. Lethal Injection.* Seven minutes after the lethal chemicals began to flow into Foster's arm, the execution was halted when the chemicals stopped circulating. With Foster

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

f

gasping and convulsing, the blinds were drawn so the witnesses could not view the scene.  Death was pronounced thirty minutes after the execution began, and three minutes later the blinds were reopened so the witnesses could view the corpse.  According to William "Mal" Gum, the Washington County Coroner who pronounced death, the problem was caused by the tightness of the leather straps that bound Foster to the execution gurney; it was so tight that the flow of chemicals into the veins was restricted.  Foster did not die until several minutes after a prison worker finally loosened the straps.  The coroner entered the death chamber twenty minutes after the execution began, diagnosed the problem, and told the officials to loosen the strap so the execution could proceed.34  In an editorial, the St. Louis Post-Dispatch called the execution "a particularly sordid chapter in Missouri's capital punishment experience."

23. *January 23, 1996.  Virginia.  Richard Townes, Jr.  Lethal Injection.*  This execution was delayed for 22 minutes while medical personnel struggled to find a vein large enough for the needle.  After unsuccessful attempts to insert the needle through the arms, the needle was finally inserted through the top of Mr. Townes's right foot.

24. *July 18, 1996.  Indiana.  Tommie J. Smith.  Lethal Injection.*  Because of unusually small veins, it took one hour and nine minutes for Smith to be pronounced dead after the execution team began sticking needles into his body.  For sixteen minutes, the execution team failed to find adequate veins, and then a physician was called. Smith was given a local anesthetic and the physician twice attempted to insert the tube in Smith's neck. When that failed, an angio-catheter was inserted in Smith's foot.  Only then were witnesses permitted to view the process.  The lethal drugs were finally injected into Smith 49 minutes after the first attempts, and it took another 20 minutes before death was pronounced.

25. *March 25, 1997.  Florida.  Pedro Medina.  Electrocution.*  A crown of foot-high flames shot from the headpiece during the execution, filling the execution chamber with a stench of thick smoke and gagging the two dozen official witnesses.  An official then threw a switch to manually cut off the power and prematurely end the two-minute cycle of 2,000 volts.  Medina's chest continued to heave until the flames stopped and death came.  After the execution, prison officials blamed the fire on a corroded copper screen in the headpiece of the electric chair, but two experts hired by the governor later concluded that the fire was caused by the improper application of a sponge (designed to conduct electricity) to Medina's head.

26. *May 8, 1997.  Oklahoma.  Scott Dawn Carpenter.*  Carpenter was pronounced dead some 11 minutes after the lethal injection was administered.  As the drugs took effect, Carpenter began to gasp and shake.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

g

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 631

"This was followed by a guttural sound, multiple spasms and gasping for air" until his body stopped moving, three minutes later.

27. *June 13, 1997. South Carolina. Michael Eugene Elkins. Lethal Injection.* Because Elkins's body had become swollen from liver and spleen problems, it took nearly an hour to find a suitable vein for the insertion of the catheter. Elkins tried to assist the executioners, asking "Should I lean my head down a little bit?" as they probed for a vein. After numerous failures, a usable vein was finally found in Elkins's neck.

28. *April 23, 1998. Texas. Joseph Cannon. Lethal Injection.* It took two attempts to complete the execution. After making his final statement, the execution process began. A vein in Cannon's arm collapsed and the needle popped out. Seeing this, Cannon lay back, closed his eyes, and exclaimed to the witnesses, "It's come undone." Officials then pulled a curtain to block the view of the witnesses, reopening it fifteen minutes later when a weeping Cannon made a second final statement and the execution process resumed.

29. *August 26, 1998. Texas. Genaro Ruiz Camacho. Lethal Injection.* The execution was delayed approximately two hours due, in part, to problems finding suitable veins in Camacho's arms.

30. *October 5, 1998. Nevada. Roderick Abeyta.* It took 25 minutes for the execution team to find a vein suitable for the lethal injection.

31. *July 8, 1999. Florida. Allen Lee Davis.* "Before he was pronounced dead ... the blood from his mouth had poured onto the collar of his white shirt, and the blood on his chest had spread to about the size of a dinner plate, even oozing through the buckle holes on the leather chest strap holding him to the chair." His execution was the first in Florida's new electric chair, built especially so it could accommodate a man Davis's size (approximately 350 pounds). Later, when another Florida death row inmate challenged the constitutionality of the electric chair, Florida Supreme Court Justice Leander Shaw commented that "the color photos of Davis depict a man who -- for all appearances -- was brutally tortured to death by the citizens of Florida." Justice Shaw also described the botched executions of Jesse Tafero and Pedro Medina (q.v.), calling the three executions "barbaric spectacles" and "acts more befitting a violent murderer than a civilized state." Justice Shaw included pictures of Davis's dead body in his opinion. The execution was witnessed by a Florida State Senator, Ginny Brown-Waite, who at first was "shocked" to see the blood, until she realized that the blood was forming the shape of a cross and that it was a message from God saying he supported the execution.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2908 · FACSIMILE: 330.758.8250 · E-MAIL: JBJURISDOC@AOL.COM

h

32.  *June 8, 2000.  Florida.  Bennie Demps*.  It took execution technicians 33 minutes to find suitable veins for the execution.  "They butchered me back there," said Demps in his final statement.  "I was in a lot of pain.  They cut me in the groin; they cut me in the leg.  I was bleeding profusely.  This is not an execution, it is murder."  The executioners had no unusual problems finding one vein, but because Florida protocol requires a second alternate intravenous drip, they continued to work to insert another needle, finally abandoning the effort after their prolonged failures.

33.  *June 28, 2000.  Missouri.  Bert Leroy Hunter*.  Hunter had an unusual reaction to the lethal drugs, repeatedly coughing and gasping for air before he lapsed into unconsciousness.  An attorney who witnessed the execution reported that Hunter had "violent convulsions.  His head and chest jerked rapidly upward as far as the gurney restraints would allow, and then he fell quickly down upon the gurney.  His body convulsed back and forth like this repeatedly. ... He suffered a violent and agonizing death."

34.  *November 7, 2001.  Georgia.  Jose High*.  High was pronounced dead some one hour and nine minutes after the execution began.  After attempting to find a useable vein for "15 to 20 minutes," the emergency medical technicians under contract to do the execution abandoned their efforts.  Eventually, one needle was stuck in High's hand, and a physician was called in to insert a second needle between his shoulder and neck.

35. *John Spenkelink. Florida. May 25, 1979*.  Spenkelink was the second person to be executed, but the first to be electrocuted, after the Supreme Court lifted its capital punishment ban in 1976.  Spenkelink received three separate jolts of electricity and five minutes lapsed before his death.  After the first jolt, "[t]he flesh on Spenkelink's right leg seared, by one account, and smoke rose into the death chamber. A few inches below the electrode cuff on his calf, there was a three inch wound. It looked as if his skin had split, but there was no blood." "Witnesses said that, in seconds, puffs of smoke came from his legs and his hands began to blacken."

Because the doctor stated that Spenkelink was not yet dead, the executioner applied two additional surges. According to State Representative Andy Johnson, one of the witnesses, "[w]e saw a man sizzled and sizzled again."

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHASZ02@AOL.COM

i